# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY
LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

_______________________________/

VIDEO-RECORDED DEPOSITION OF UNION QUIMICO
FARMACEUTICA SAU (UQUIFA)
pursuant to Fed. R. Civ. P. Rule 30(b)(6)

Taken on behalf of the Zantac PSC
(via videoconference)

DEPONENT: MARIA LLORIS VLUDEZ, Ph.D.

DATE TAKEN: Tuesday, January 11, 2022

TIME: 4:00 a.m. - 7:36 a.m. EST

PLACE: US Legal Support - Remotely

Stenographically reported by:
Laura J. Landerman, RDR, CRR, FPR
Notary Public, State of Florida at Large.

A P P E A R A N C E S:

MIKAL C. WATTS, ESQ.
RICK HOLSTEIN, ESQ.
DAVID V. McLENDON, ESQ.
Watts Guerra, LLP
4 Dominion Drive
Building 3 - Suite 100
San Antonio, Texas 78257
mcwatts@wattsguerra.com
rick@wattsguerra.com
dmclendon@wattsguerra.com

Appearing on behalf of the Zantac PSC,

JENNIFER J. MOORE, ESQ.
Law Office of Jennifer J. Moore
10620 Treena Street -- Suite 230
San Diego, California 92131
lawofficeofjennifermmoore@gmail.com

Appearing on behalf of the Plaintiffs,

ROBERT B. FRIEDMAN, ESQ.
King & Spalding, LLP
1180 Peachtree Street NE -- Suite 1600
Atlanta, Georgia 30309
rfriedman@kslaw.com
and
REBECCA L. PARADIS, ESQ.
King & Spalding, LLP
1700 Pennsylvania Avenue NW - Suite 200
Washington, DC 20006
rparadis@kslaw.com

Appearing on behalf of the Defendant, Boehringer Ingelheim,

M. ELAINE HORN, ESQ.
EMMA J. NINO, ESQ.
Williams & Connolly, LLP
725 Twelfth Street N.W.
Washington, DC 20005
ehorn@wc.com
enino@wc.com

Appearing on behalf of Pfizer, Inc.,



A P P E A R A N C E S: (cont'd)

WILL SACHSE, ESQ.
Dechert, LLP
2929 Arch Street
Philadelphia, Pennsylvania 19104
will.sachse@dechert.com
and
PEIYUAN GUO, PH.D., ESQ.
Shook, Hardy & Bacon, LLP
1325 Avenue of the Americas -- 28th Floor
New York, New York 10019
pguo@SHB.com

Appearing on behalf of the Defendants, GlaxoSmithKline, LLC, GlaxoSmithKline, PLC,

CHRISTOPHER M. STRONGOSKY, ESQ.
DLA Piper, LLP
1251 Avenue of the Americas - 27th Floor
New York, New York 10020
Christopher.Strongosky@dlapiper.com
and
KATIE INSOGNA, ESQ.
DLA Piper
33 Arch Road -- 26th Floor
Boston, Massachusetts 02110
katie.insogna@us.dlapiper.com
and
RYAN SULLIVAN, ESQ.
DLA Piper
303 Colorado Street -- Suite 3000
Austin, Texas 78701
ryan.sullivan@dlapiper.com

Appearing on behalf of the Defendant, Chattem, Inc., Sanofi U.S. Services, Inc., Sanofi-Avertis U.S. LLC,



A P P E A R A N C E S: (cont'd)

GEORGE S. McCALL, ESQ.
Faegre Drinker Biddle & Reath, LLP
1717 Main Street -- Suite 5400
Dallas, Texas 75201
george.mccall@faegredrinker.com
and
TRACI T. McKEE, ESQ.
Faegre Drinker Biddle & Reath, LLP
1500 K Street NW -- Suite 1100
Washington, DC 20005
traci.mckee@faegredrinker.com
and
LEXI FUSON, ESQ.
Faegre Drinker Biddle & Reath, LLP
300 North Meridian Street --- Suite 2500
Indianapolis, Indiana 46204
lexi.fuson@faegredrinker.com

Appearing on behalf of The Witness and Union Quimica Farmaceutica SAU (Uquifa).

THE VIDEOGRAPHER: John Schmitzer

THE DEPO TECH: Erik Thornes

ALSO PRESENT: Regina Carmony, Watts Guerra
Tim Sperling, Boehringer Ingelheim
Nina Dillon, Boehringer Ingelheim



I N D E X


| | |
|---|---|
| TESTIMONY OF MARIA LLORIS VLUDEZ | |
| Direct Examination by Mr. Watts | 9 |
| Direct Examination by Ms. Moore | 73 |
| Cross-Examination by Mr. Strongosky | 92 |
| Cross-Examination by Mr. Friedman | 97 |
| Cross-Examination by Mr. Sachse | 106 |
| Cross-Examination by Ms. Horn | 113 |
| CERTIFICATE OF REPORTER | 115 |
| CERTIFICATE OF OATH | 116 |
| ACKNOWLEDGMENT | 117 |
| ERRATA SHEET | 118 |

E X H I B I T S

| | | |
|---|---|---|
| Exhibit No. 2601 (previously marked) | 22 |
| Exhibit No. 2606 (previously marked) | 24 |
| Exhibit No. 2609 (previously marked) | 58 |
| Exhibit No. 5189 | 12 |
| Exhibit No. 5190 | 14 |
| Exhibit No. 5191 | 14 |
| Exhibit No. 5208 | 18 |
| Exhibit No. 5230 | 29 |
| Exhibit No. 5239 | 19 |
| Exhibit No. 5244 | 20 |
| Exhibit No. 5245 | 20 |
| Exhibit No. 5246 | 20 |
| Exhibit No. 5253 | 31 |
| Exhibit No. 5255 | 35 |
| Exhibit No. 5256 | 33 |
| Exhibit No. 5258 | 36 |
| Exhibit No. 5261 | 51 |
| Exhibit No. 5262 | 42 |
| Exhibit No. 5263 | 44 |
| Exhibit No. 5266 | 15 |
| Exhibit No. 5268 | 52 |
| Exhibit No. 5269 | 53 |
| Exhibit No. 5272 | 55 |
| Exhibit No. 5273 | 56 |



E X H I B I T S (cont'd)

| | |
|---|---|
| Exhibit No. 5274 | 46 |
| Exhibit No. 5276 | 60 |
| Exhibit No. 5278 | 25 |
| Exhibit No. 5279 | 61 |
| Exhibit No. 5280 | 66 |
| Exhibit No. 5281 | 26 |
| Exhibit No. 5284 | 10 |
| Exhibit No. 5285 | 12 |
| Exhibit No. 5671 | 68 |
| Lloris Exhibit No. 1 | 105 |
| Lloris Exhibit No. 2 | 107 |
| Lloris Exhibit No. 3 | 109 |



THE VIDEOGRAPHER: We are on the record at 9:13 UTC on January 11, 2022. Audio and recording -- excuse me. Audio and video recording will continue to take place until all parties agree to go off the record. Please note that the microphones are sensitive and may pick up whispering and private conversations. Private conversations and/or attorney-client interactions should be held outside of the presence of the remote interface.

For the purpose of creating a witness-only video recording, the witness is being spotlighted or locked on all video screens while in speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness. For anyone who does not want the witness's video to take up the large part of your screen, you may click the gallery view button in the upper right corner of the RemoteDepo interface.

This is the remote video-recorded deposition of Maria Vludez taken by counsel for the plaintiff in the matter of In re: Zantac (ranitidine) Products Liability Litigation.



My name is John Schmitzer. I am the videographer on behalf of US Legal Support. I am not related to any party in this action nor am I financially interested in the outcome. The court reporter is Laura Landerman on behalf of US Legal Support, and she will now swear in the witness.

THE REPORTER: Ms. Lloris, do you consent to my swearing you in remotely?

THE WITNESS: (No response.)

THE REPORTER: Is it okay if I swear you in remotely?

THE WITNESS: Yes.

THE REPORTER: Please raise your right hand. Do you swear the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, I do.

DIRECT EXAMINATION

BY MR. WATTS:

Q Good morning, Ms. Lloris. My name is Mikal Watts. I'll be asking you questions first today. How are you?

A Fine. Good morning. Thank you.

Q Can you state your full name for the record?

A Name? Maria Lloris Vludez.

(Exhibit No. 5284 was marked.)

Q Ms. Lloris, I'm going to show you a document and see if you can see it on the screen. It's Exhibit 5284, which is the amended notice for this deposition. Can you see that on your screen?

A Yes.

Q And this is the notice of Union Quimica Farmaceutica SAU. That's what's known as Uquifa. Is that where you work?

A Yes, at Uquifa.

Q And if we go to pages 15 and 16 of the notice, there are topics that we asked Uquifa to have a witness testify to. And the first topic is the root cause analysis requested by Boehringer Ingelheim Promeco in 2019 and performed by Uquifa in 2019 and '20 regarding how NDMA revealed by third party and government testing to be present in the active pharmaceutical ingredient of Zantac came to exist there.

Are you the witness that Uquifa has designated to testify on its behalf on the root cause analysis?

A Yes, I am.

Q And topic number two is with respect to the risk assessment requested by Boehringer Ingelheim Promeco and performed by Uquifa in 2019 and '20 regarding the presence and level of NDMA revealed by



third party and government testing to be in the active pharmaceutical ingredient Zantac and how to avoid the same.

Are you the person that Uquifa has designated to testify on its behalf on that subject?

A Yes, I am.

Q Third topic is the testing work and analyses performed by or on behalf of Uquifa to determine how to keep the level of NDMA in the active pharmaceutical ingredient of Zantac at a level below the regulatory limit of 0.16 parts per million level throughout the shelf life of Zantac.

Are you the individual who Uquifa has designated to testify on its behalf on that subject?

A Yes, I am.

Q And lastly, number four, analyses, work, testing, communications and documents relating to Uquifa's January 29, 2020, statement that in order to keep the level of NDMA in the active pharmaceutical ingredient of Zantac at a level below the regulatory limit of 0.16 parts per million level throughout the shelf life of Zantac, the API must be stored and transported at a temperature of 2 to 8 degrees Celsius.

Are you the individual who's been designated by Uquifa to testify on its behalf on that subject?



A Yes, I am.

(Exhibit No. 5285 was marked.)

Q All right. Thank you, ma'am. Now, before we talk about those topics, I want to get some background information on you personally, and to do that I'm going to go to Exhibit 5285, which is your LinkedIn profile. And it says that you have worked at Uquifa for more than 29 years now; is that right?

A 28 years.

Q And you were a senior research scientist between January of 1993 and March of 2018; is that right?

A It's January 1994.

Q And you are now the research and development manager for Uquifa since March of 2018; is that right?

A Yes. Yes, it is.

Q And prior to coming to work for Uquifa, you got a Ph.D. in organic chemistry; is that right?

A Yes, that is correct.

Q All right. And it would be appropriate that I call you Dr. Lloris, as a result; is that right?

A Yeah, it's okay.

(Exhibit No. 5189 was marked.)

Q Okay. Now, let me get some background information on Uquifa itself, your employer. And if we



could, I'll go to Exhibit 5189. And this is a document that is an overview with respect to Uquifa dated December of 2019; is that correct?

A Yes.

Q And on the lower corner, you can see a Bates page number, and I'll take you to the page ending in 108. And this document says that Uquifa was founded in Spain in 1936, 86 years ago; is that right?

A Yes.

Q And in 2011, it merged with Vivimed Labs, Limited; is that right?

A Yes.

Q And it says in 2012, there was major growth in the CMO business. Does CMO mean contract manufacturing organization?

A Yes.

Q And if we go to Bates page 110, we can see that Uquifa --

MR. McCALL: You're cutting out. We can't -- can you repeat the question?

Q Sure. As we look at Bates page 110, we see that Uquifa is based outside of Barcelona, Spain; is that right?

A Yes. The headquarters are in Barcelona, and we do have two factories outside the city.

Q And the two factories are Sant Celoni and Llica de Vall; is that right?
A Yes, right. That's right.
Q And if we go to Bates page 116, we can see that at the Llica de Vall site, one of the products that is made is ranitidine hydrochloride; is that right?
A This is right.
Q And on the next page, at the Sant Celoni site, one of the products made is ranitidine hydrochloride; is that right?
A Yes, that's right.
(Exhibit No. 5190 was marked.)
Q And so the jury can get an idea of where these sites are, the Sant Celoni site, if we can go to Exhibit 5190, this is a photograph of the manufacturing plant just outside of Barcelona; is that right?
A Yes, it is.
Q If we go to the second page, we can see an overhead view of the Sant Celoni plant just outside of Barcelona; is that right?
A Yes, this is right.
(Exhibit No. 5191 was marked.)
Q And to see the Llica de Vall plant, we go to 5191, and this is the photograph of the Llica de Vall site also just outside of Barcelona; is that right?


A This is right.
Q And the second page we see a Google overhead image of the Llica de Vall plant outside of Barcelona; is that right?
A It is right.
(Exhibit No. 5266 was marked.)
Q Now, in terms of those two plants, I want to take you to Exhibit 5266, Bates page 343, which is a Uquifa internal audit. And if we go to Bates page 343, under Manufacturing Process, if we could blow that up, now, it says, "There are two different synthesis routes, (I and II.) Route II is used for the BI product, is more stable than route I." And it says the synthesis of the process is done at the Llica de Vall plant and compacting step is performed at the Sant Celoni site; is that correct?
A That's correct.
Q Now, do those two plants have different -- let me try again.
Do those two plants have different refrigeration capabilities?
A The refrigeration of the reactors or the facilities, the general one, yes, they will have similar refrigeration facilities.
Q Does one of the plants have the ability to


store ranitidine hydrochloride between 2 degrees and 8 degrees Celsius?
A Both facilities have the possibility to store API at this temperature, between 2 and 5 -- 8 degrees.
Q Prior to September of 2019, did both plants store the API between 2 and 8 degrees Celsius?
A No. It was not stored in the same conditions.
Q Prior to September of 2019, did the Llica de Vall plant store ranitidine hydrochloride between 2 and 8 degrees Celsius?
A Some batches, yes. The code number 1200.
Q So form 1200 was stored at the Llica de Vall plant at approximately 5 degrees Celsius; is that right?
A Yes, it is.
Q There is also a form 1207; is that correct?
A It is. The compacted one has internal code 1200 -- 1208.
Q And the compacted one, where was it stored?
A The compacted one was stored at Sant Celoni site or in the third-party warehouse maintained in temperatures below 30 degrees in the Sant Celoni site in an alarmed facility and moving the product with the protocol if the temperature was up to 30. And when it was stored in the third-party -- third-party warehouse, it was stored at less than 25 degrees.


Q Okay. So as I understand it --
MR. HOLIAN: Mikal, you're having an echo.
Q Okay. As I understand it, form 1200 was stored at 5 degrees Celsius at the Llica de Vall plant whereas the form 1208, the compounded, was stored at Sant Celoni or a third-party site between 25 and 30 degrees Celsius; is that right?
A Less than 30 degrees at Sant Celoni site and less than 25 degrees if we use the typical we did at third-party warehouse.
Q Why was ranitidine form 1200 stored at 5 degrees Celsius whereas compacted ranitidine was stored at approximately 25 to 30 degrees Celsius?
A Because of the stability studies of the different products. So the stability studies of the code 1207 indicate that there was no -- no special control, no special conditions for the storage of the compacted ranitidine.
Q And who made the decision that compacted 1207 did not require refrigeration as form 1200 did?
MR. HOLIAN: Mikal, you had that echo again in that question.
Q Who made the decision that compacted 1207 did not require the same refrigeration at 5 degrees Celsius that form 1200 did?

Page 18

A Quality department at Uquifa.
Q How long did form 1200 get stored at 5 degrees Celsius as opposed to 1207 being stored at 25 to 30 degrees?
A I don't know.
(Exhibit No. 5208 was marked.)
Q Okay. Now, I want to show you Exhibit 5208. This a document with respect to DSM, which is a company in North Carolina, and it's a manufacturing work order for Zantac 150 mg core tablets. And my question is on the second page, 058, it has cautions with respect to handling ranitidine hydrochloride.
And my question to you is in Uquifa in Spain, were these precautions, hand protections, respiratory protection, protective clothing with a positive pressure suit, as well as additional requirements of local exhaust and hazard warnings, were these additional protections used by Uquifa in Barcelona when handling ranitidine hydrochloride?
A I do not know if they're exactly the same, but we do have an internal and an external as well material safety data sheet.
Q Okay. And did the material safety data sheet for ranitidine hydrochloride require special precautions when handling ranitidine hydrochloride?

Page 19

A I do not recall now, but if there are, it has to be stated there.
Q And those precautions would be stated in the material safety data sheet for ranitidine hydrochloride; is that right?
A Yes.
(Exhibit No. 5239 was marked.)
Q Okay. Now, I want to take you to December of 2019 and Exhibit 5239. Did there come a time in December of 2019 where there was an audit of the Uquifa facility in December of 2019?
A If I knew -- I mean --
Q Do you recall an audit of the Uquifa facilities in December of 2019?
A Yes, I recall there was an audit.
Q And if we go to the second page of this document, we see that there was an audit planned for the Llica de Vall site on December 17th and the Sant Celoni site on December the 18th; is that correct?
A It is.
Q And the audit topic was the loss of GMP certification because of nitrosamine contamination in APIs; is that right?
A Yes.
Q Did you participate in the audit of Uquifa's

Page 20

facilities by Boehringer Ingelheim?
A No.
Q Prior to this audit, was there testing done of the active pharmaceutical ingredient ranitidine hydrochloride that was produced by Uquifa in order to see whether NDMA was present?
A Okay.
Q Is that true?
A I don't know. I was not there.
(Exhibit No. 5244 was marked.)
Q Okay. Let me show you Exhibit 5244. You see how this is a document from Agrama that shows the client is Uquifa?
A Agrama is a third-party lab that we used to perform the NDMA content of ranitidine samples.
Q And this particular sample showed an NDMA level of 12.419 parts per million; is that right?
A Yes.
(Exhibit No. 5245 was marked.)
Q And if we go to Exhibit 5245, we have another sample that tested for 8.177 parts per million of NDMA; is that correct?
A Yes.
(Exhibit No. 5246 was marked.)
Q If we go to 5246, we have a third sample of

Page 21

ranitidine hydrochloride that has a content of 8.086 parts per million of --
MR. HOLIAN: You're getting that echo again, sir.
MR. WATTS: Yeah, Rick, I can hear it, bud.
A Yes, it's true.
Q All right. Let me reask the question because I got interrupted.
As we look at Exhibit 5246, this is the third sample tested by Agrama that shows an NDMA level of 8.086 parts per million of NDMA; is that right?
A It is.
Q What was the permissible daily limit with respect to NDMA?
A As far as I know, there is no official NDMA level. We calculate the limit according to the maximum daily dose of ranitidine in the applications and then we applied an internal limit of 0.160 ppms after the storage conditions in (inaudible) state, and that at that time was not established.
Q But this limit of 0.16 parts per million, if we go back to Exhibit 5244, we see a test result of 12.149, and if we divided that by 0.16, that would be about 77 times the allowable limit of NDMA; is that right?

Page 22

A Yes, that is the conclusion.
Q And if we go to 5245, and we take 8.177 and divide it by .16, this would be an NDMA test result that is 51 times the permissible limit; is that right?
A Internally we established, yes, later. This was not the specification at the time.
Q And Exhibit 5246, 8.096 -- strike that.
Exhibit 5246, 8.086, that is 50.5 times the limit of 0.16 parts per million; is that right?
A Yes.
Q Now, as a result of these results showing NDMA levels 50 to 77 times 0.16 parts per million that were detected in the active pharmaceutical ingredient ranitidine hydrochloride, was Uquifa asked to perform a root cause investigation to determine how the NDMA ended up in the active pharmaceutical ingredient?
A Not after specifically these results, but after knowing that some of the samples that were sent to have these NDMA content outside contain some NDMA.
Q And let's go to Exhibit 2601.
THE REPORTER: What number?
THE DEPO TECH: I'm sorry, Mikal. That cut out.
THE REPORTER: Yeah, I couldn't hear what number.

Page 23

BY MR. WATTS:
Q Let's go to Exhibit 2601, and this is a document entitled, "Information on Nitrosamine for Marketing Authorization Holders, MAH," and this is a Uquifa document from January of 2020. Can you see that, ma'am?
A Yes.
Q And part of what it says is, "According to directive 2001/83/EC, marketing authorization holders are responsible for the quality, safety and efficiency of their products, including the quality of the active pharmaceutical ingredients, excipients and raw materials used in the manufacture of finished products." Can you see that?
A Yes.
Q Now, if we go to the next page, it says, "Uquifa, being aware of the risk evaluation of all products, should be concluded at the latest within six months of the publication of CMDh/404/2019, commits to provide the required information to market authorization holders as soon as possible and in any case by the end of January of 2020." Did I read that correctly?
A Yes.
Q And as we see at the bottom of the page, it's written by yourself and it's dated January the 8th of

Page 24

2020.
A Yes.
Q And it's reviewed and approved by Imma Pladeveya. Is that the quality director for Uquifa?
A Yes, it is.
Q Now, I want to show you Exhibit 2606, and this is a Sanofi document that is signed by a Daniel Ramos Bernal of Boehringer Ingelheim in February of 2020. And down at the bottom, if we blow up the bottom, we see there is a preliminary risk identification that confirms the risk of NDMA in the active pharmaceutical ingredient supplied by Uquifa. Can you see that, ma'am?
A Yes.
Q My question is did Boehringer Ingelheim communicate to Uquifa that its risk assessment had confirmed the risk of NDMA being present in the active pharmaceutical ingredient ranitidine hydrochloride produced by Uquifa?
MR. FRIEDMAN: Objection to form.
THE WITNESS: Do I answer?
Q You can answer.
THE WITNESS: Do I answer? Sorry.
MR. McCALL: You can answer if you're able to answer.
A I do not know if Boehringer Ingelheim

Page 25

expressed this to Uquifa. As far as I know -- I don't know.
(Exhibit No. 5278 was marked.)
Q All right. Now, let me take you to Exhibit 5278. This is a Uquifa document.
A Yes.
Q And it's entitled, "Updated Action Plan to Control NDMA Levels in Ranitidine Hydrochloride API"; is that correct?
A Yes.
Q And if we go to Bates page ending 763, part of what's written at the top of the page is, "During the risk assessment, the potential root causes for NDMA formation have been systematically considered with a deep look at raw materials, the manufacturing process, solvent recovery and the storage of the product. The exhaustive root cause analysis performed by Uquifa has eliminated many potential causes and centered the root cause hypothesis on thermal stability. The defined root cause has been confirmed by degradation studies, spiked experiments with several contaminants and thermal stability studies carried out by Uquifa." Did I read that correctly?
A Yes, it's correct.
Q And if I go to the third page of the document,

Page 26

this is a document that was written by yourself; is that correct?
A Yes, it is.
Q You signed it on February the 28th of 2020; is that right?
A Yes.
(Exhibit No. 5281 was marked.)
Q And if we go to Exhibit 5281, you see a document written in March of 2020 entitled, "Executive Summary." And in --
A Yes.
Q -- the context for the report, it says, "NDMA is classified as a possible human carcinogen based on animal studies"; is that right?
A Yes.
Q On the second page --
A We don't have this information.
Q On the second page, there's a scientific discussion of the root cause. It says, "After risk assessment, the established root cause" -- let me try again. I'm not sure why we're getting this.
On the second page, it says, "Scientific discussion on root cause. After risk assessment, the established root cause was confirmed by performing degradation studies, spiking experiments with several

Page 27

contaminants and thermal stability studies"; is that right?
A Yes.
Q And at the bottom of the page, it says, "During the risk assessment, the root cause analysis has been systematically looked at with reference to different relative parameters such as," and there's A through K listed; is that right?
A Yes, it is.
Q And K says the impact of temperature and humidity on the stability of the API; is that right?
A Yes.
Q And if we go to page 3, it says, "How do we confirm root cause?" And it says, "Once thermal sensitivity identified as a root cause, actions have been put into place to demonstrate it, assessing the parameters which impact the most through an extensive evaluation based on the scientific evidence. The defined root cause was then further confirmed by degradation studies, spiked experiments with several contaminants and thermal stability studies carried out by Uquifa." Is that what's written here?
A Yes.
Q And it says, "We postulate that the thermal sensitivity is related with the presence of a nitro

Page 28

(inaudible) moiety in ranitidine's molecule's chemical structure --
MR. McCALL: You're cutting out there. We can't hear you.
MR. WATTS: Let me -- let me try again. I don't know what happened.
BY MR. WATTS:
Q It continues, "We postulate that thermal sensitivity is related to the presence of a nitroethylene moiety in ranitidine molecule's chemical structure which could undergo a rearrangement to generate a nitrite group. This nitrite ranitidine would act as a nitrosating agent forming NDMA only under certain experimental conditions depending upon temperature, pH and solvent content." Did I read that right?
A Yes.
Q And at the bottom, the report says, "As detailed later in the report, we have clearly established a control strategy focused on parameters which we believe control NDMA formation," and it lists temperature conditions during the manufacturing process and storage, pH of the final API, and residual solvent profile of the final API. Did I read that correctly?
A Yes.

Page 29

Q And this report was generated by yourself; is that right?
A Yes, it is.
Q If we go to Bates page 472, we can see that it was written by yourself and approved by Imma Pladeveya; is that right?
A Yes.
Q Now, Dr. Lloris, you've worked at Uquifa since 1984.
A Yes.
Q Were there earlier occasions where --
MR. McCALL: Sorry. You cut out. We can't hear.
MR. WATTS: Yeah, thanks.
BY MR. WATTS:
Q Were there earlier occasions where the API, ranitidine hydrochloride, was observed to be discolored?
A I don't know.
(Exhibit No. 5230 was marked.)
Q Let me show you Exhibit 5230. And this is a Uquifa ranitidine hydrochloride complaint response, and it's from back in 2007. And it says, "Since September 17th, DSM has made three complaints for ranitidine hydrochloride manufactured by Uquifa," and it references a foreign matter that ranitidine hydrochloride had

melted and discolored into a faint burnt odor, not strong. Can you see that, ma'am?

A Yes.

Q Were you involved in preparing the response to this complaint with respect to this foreign matter?

A No, I was not.

Q Okay. On Bates page 208, it says, "Our first theory as to the cause of the problems related to melted ranitidine hydrochloride was that the bad flowability of the product in the feeding system and the high speed of the feeding screws were leading to elevated temperatures in the compactor. With the compactor operating at its highest speed, if insufficient product is fed to the machine, higher temperatures generated could lead to the brown/gray layer and the brown/gray particles in the final product." Do you see that, ma'am?

A Yes, I can read it.

Q And down at the bottom it says, "The analysis performed on the" -- down at the bottom, it says, "The" -- I'm trying to get the -- let me try again.

At the bottom it says, "The analysis performed on the samples of dark granulates of ranitidine hydrochloride of batch number 0710078 and the melted ranitidine lumps of batch number 0710084 confirm that the ranitidine has been subjected to elevated



temperatures giving the higher values of impurities in both samples." Do you see that, ma'am?

A Yes, I can see it.

Q Now, when you did the root cause analysis 12 years ago, did you learn that if ranitidine was subjected to higher temperatures, it would begin to break down or degrade?

A I did not have this -- I was not familiar with this particular document, but we did have some info from this that definitely it does, so I knew the stability of the ranitidine was limited to the retest date.

(Exhibit No. 5253 was marked.)

Q And I'd like to move forward to 2019, and let me show you Exhibit 5253. Is this one of those degradation studies that Uquifa did to analyze the stability of ranitidine hydrochloride and ranitidine base?

A Yes.

Q And was this work done at your direction as part of the root cause analysis?

A Yes.

Q And as we look at this report, if we go to Bates page 252, the objective is, "To determine the possible formation of NDMA during the degradation of ranitidine hydrochloride and ranitidine base by



subjecting it to conditions of forced degradation and determining by HPLC-MS the final content of this carcinogenic impurity." Did I read that right?

A Yes.

Q And Bates page 260, in these degradation studies, did you learn that ranitidine form 2 was showing a value of 13 parts per million of NDMA after five days at 70 degrees Celsius?

A Yes.

Q And if we go to Bates page 261, it says at the top, 6.2, with respect to moisture degradation, "Ranitidine hydrochloride has an important NDMA content with respect to the initial content during its degradation by moisture, 75 percent relative humidity at temperature equals to 70 degrees Celsius, in any of the solid forms studied. Values between approximately 85 and 145 parts per million of NDMA demonstrate that moisture, together with temperature, favors the formation of this impurity." Did I read that correctly?

A Yes.

Q And on Bates page 262, the conclusion (inaudible) --

MR. McCALL: You cut out. We didn't hear that.

Q At Bates page -- let me try again.



At Bates page 262, the conclusion says, "After completion of the degradation study of ranitidine hydrochloride, it was found that during the degradation from humidity with temperature and hydrolysis in acidic medium is where a greater formation of NDMA has been observed." Is that what it says?

A Yes.

Q This information was made available to you during your root cause investigation; is that correct?

A Yes.

(Exhibit No. 5256 was marked.)

Q Now, if we could go to Exhibit 5256, this is a document entitled, "Evaluation of NDMA levels in ranitidine hydrochloride API and update of our studies"; is that right?

A Yes.

Q And if we go to Bates page 571, this evaluation and update is written by yourself and dated October the 31st of 2019; is that right?

A Yes.

Q And if we look at your report and we go to Bates page 570, the second bullet point says, "We are also noticing that our form 2 compacted when stored at 25 degrees Celsius is generating NDMA levels of higher than 0.16 parts per million after three months, correct?

A Yes, some of the form 2 compacted did.
Q It says, "At Uquifa" -- it says, "At Uquifa, we have" -- trying to not get the background noise. sorry.
The second bullet point says, "At Uquifa, we have also carried out degradation studies of the API, and we understand that the variables of temperature, acidic conditions or pH and solvent profile are potentially causing NDMA to be generated in the API." Is that what you wrote?
A Yes.
Q The fourth bullet point says, "In conclusion, from our test data, we can state that our ranitidine form 2 gives a very low, if not nondetected NDMA content on release and continues to comply with the 0.16 parts per million limit after a period of 12 or 36 months dependent upon storage conditions. For our current ranitidine form 1, there is no NDMA on release and remains within the 0.16 parts per million limit for a minimum of 12 months at storage conditions of 5 degrees Celsius"; is that correct?
A It is.
Q And you write, "Next, we are noticing that storage at 5 degrees Celsius would ensure a product with NDMA content within the 0.16 parts per million limit for



a period of up to 36 months for form 2 and a minimum of 12 months for form 1"; is that correct?
A It is.
Q And you also write, "We are also confident that we can extend the retest date of the form 1 and form 2 to 24 to 36 months at 25 degrees Celsius and over 36 months at 5 degrees Celsius based upon our initial experimental data." Did I read that correctly?
A Yes.
Q And on the next page, under the target and next step, did you write, "We are focused on" -- under target and next steps -- a third time.
Under target and next steps, did you write, "We are focused on generating more experimental data to validate our above hypothesis and then intend to make the required changes in our regulatory files to ensure the objective of having a form 1 and form 2, powder and compacted versions product with levels of NDMA within the 0.16 parts per million spec during the shelf life of the product with potentially modified storage conditions"? Is that what you wrote?
A Yes.
(Exhibit No. 5255 was marked.)
Q Now, if we go to Exhibit 5255, this is a Uquifa laboratory report dated October of 2019. And the



title is, "Finding the root cause of NDMA impurity formation in ranitidine hydrochloride," and it is prepared by José Diaz; is that right?
A Yes.
Q On Bates page 452, the conclusion of this laboratory report says, "According to the laboratory trials done, it seems that NDMA impurity appears in ranitidine hydrochloride due to the presence of hydrochloride ETOH in the product favored by temperature/moisture"; is that correct?
A Yes.
Q Was this information made available to you during your root cause analysis?
A Yes.
Q Did you communicate this to Sanofi?
A I can't recall if this document was sent to them.
(Exhibit No. 5258 was marked.)
Q Now, I want to show you a Sanofi document dated 5 -- I want to show a Sanofi document marked as Exhibit 5258 and want to ask you a question about it. And let's start on Bates page 442 and 443.
Did you meet with a woman by the name of Gerda Glanzmann from Sanofi?
A I'm sorry?



Q Did you ever meet a woman named Gerda Glanzmann?
A I -- face to face I don't know, I recall but I see, yes, I think.
Q This e-mail dated November the 1st of 2019 is sent to a number of people including an Alain Dlubala on the third line.
A Yes.
Q Are you familiar with Alain Dlubala?
A Yes.
Q Now, Ms. Glanzmann tells these folks, including Mr. Dlubala, "We have received an update from Uquifa about their risk assessment and root cause analysis on NDMA and ranitidine, see attached summary statement and report in PDF format." It says, "The report will be discussed in a meeting between Uquifa and EDQM next week. We plan to have a follow-up call with Uquifa the week after. The data demonstrate that the compacted ranitidine hydrochloride form 2, which is issued for Zantac is generated through" -- let me try again.
It says, "The data demonstrated that the compacted ranitidine hydrochloride form 2, which is issued for Zantac is generating NDMA through storage supported by temperature and humidity. Results from

samples during the retesting period reported for this form are similar to the results we have achieved at Chilly-Mazarin." Can you see that?
A Yes.
Q Now, on the next page, part of what it says is, "It is assumed that the lower pH and higher ETOH content of the compacted form versus the other forms is the root cause for this behavior, though all forms show an increase of NDMA during storage, especially at higher temperature and humidity." Did I read that correct?
A Yes.
Q Is that consistent with what you communicated to Sanofi?
A What was discussed with Sanofi is the result that we have at that moment, and the results showed that temperature, low pH and a high solvent content, ethanol and water specifically, particularly, were important parameters during the NDMA formation.
Q Now, I want to take you to pages 439 and 440. At the bottom of 439, Alain Dlubala writes an e-mail that continues to the top. And as we look at this e-mail, it says, "Thanks, Gerda, for these information," and then it goes to the top. And one of the bullet points that Mr. Dlubala says is, "The evolution of the quantity of NDMA during the storage could be a


consequence of an evolution of" -- let me try again.
One of the things that Mr. Dlubala says is, "The evolution of the quantity of NDMA during the storage could be a consequence of an evolution of a precursor NDMA by oxidation and/or cleavage. The mechanism given below gives the implication of oxygen, storage in contact with air and acidification, H plus in step three." Do you see that?
A Yes, I can see it.
Q Did you and Mr. Dlubala have a discussion as to what was creating this precursor NDMA via oxidation and/or cleavage?
A Yes. I don't know if at that point of time, but later we were discussing potential or hypothetical ways of this -- for this NDMA generation, including oxidation as well.
Q Was there subsequent work done by Uquifa to analyze what was creating this precursor NDMA via oxidation and/or cleavage?
A So there was some hypothesis pointed out that some -- a potential impurity in one of the stability study material was present and this was the idea that came from Sanofi. And we -- at Uquifa we tried to detect this precursor. We didn't have -- it was not success experiment, but we had some indication that


potentially it can be there -- could be there, but we didn't have any clear idea or clear result of its presence.
Q So this was a hypothesis -- I'm sorry. Let me reask the question.
This was a hypothesis -- once again. This was a hypothesis by Alain Dlubala that perhaps precursor NDMA was being created by the oxidation and/or cleavage from iron; is that correct?
A Not at that point in time. The idea here was that the presence of a precursor in one of the study materials could lead at the end to the NDMA formation, so we were just considering and discussing a lot of hypothesis. At this point of time -- and it was -- we can check, but it was in November 2019, the iron hypothesis was not discussed. It was later, much later.
Q When was the iron hypothesis first discussed?
A I think it was in 2021.
Q And when the iron hypothesis was discussed in 2021, did Uquifa do testing or analyses as to whether that hypothesis was borne out by the data?
A Yes.
Q And as a result of the work that Uquifa did, what did the testing and analyses show concerning iron being a precursor to NDMA formation?


A No. Our result showed that there was no clear correlation between the iron content in samples of ranitidine and the NDMA formation.
Q So this was --
A It was true that -- sorry.
Q Go ahead. I didn't mean to interrupt you. Please answer.
A I will finish. So it is true that if you spike ranitidine with certain amount of iron species, then you can have response in the -- an increased response in the NDMA content. But we could not see any direct and clear correlation between the N -- between the iron content in the ranitidine samples and the behavior against the generation of NDMA.
Q So with respect to the testing that was done on ranitidine produced by Uquifa, the iron hypothesis was not borne out in the data generated by Uquifa's testing; is that fair?
A Sorry. Borne out is discard -- ah, yes. No, it was -- the idea was coming from Sanofi.
Q Right. But this idea that came from Sanofi that iron could through oxidation and cleavage create NDMA, that was not confirmed by Uquifa's own testing of the hydrochloride manufactured at Uquifa; is that correct?

Page 42

A Exactly. It was not confirmed.
(Exhibit No. 5262 was marked.)
Q Now, let me go back to 2019 and show you Exhibit 52 (inaudible.)
Let me try it again. As we look at 5262, this again is communications inside of Sanofi, but I want to ask you about something on Bates page 746. You see down at the bottom it asks, "How is 1207 compacted form packed/shipped?" And it says, "During the site visit, we saw the finished products warehouse without temperature control, and according to Uquifa, temperature can rise up to 40 degrees Celsius during the summer." Can you see that?
A I can see it.
Q Now, where was the finished product warehouse with respect to ranitidine hydrochloride manufactured in Barcelona by Uquifa?
A The compacted -- the compacted product that was stored sometimes at a location site in Sant Celoni and mostly outside in a third-party warehouse was controlled at room temperature, meaning ambient temperature, at Sant Celoni site and in a monitored warehouse. Temperature was not controlled, but the temperature was alarmed. And if the temperature rised 30 degrees, our protocol for ranitidine includes to move

Page 43

the product to a cooler place. This is in the Sant Celoni site.
And outside, in the third-party warehouse, the conditions for the storage of this product, compacted form 2 ranitidine, was not more than 25 degrees.
Q Okay. When Sanofi writes here that during the site visit we saw finished product warehoused without temperature control, what warehouse are they referring to?
MR. STROGOSKY: Objection to form.
A I don't know how our warehouse is monitored, but temperature is monitored. It's not controlled but it's alarmed, as I said, at 30 degrees Celsius. The temperature -- if the temperature is higher than 30 Celsius, then there is a protocol that includes to move ranitidine to a cooler place that we don't have in place.
Q Now, with respect to the transport, the last bullet point says, "In addition, transport is done in trucks without temperature control unless the customer requires it." Do you see that?
A Yes, I can see.
Q Is that true?
A You mean the temperature of the -- during the transport from the site to the port or the airport?

Page 44

Q Yes.
A As far as I know, this truck is not controlled.
Q Okay. And the ranitidine hydrochloride is then flown to the United States or shipped; is that correct?
A Yeah, mostly shipped.
Q When ranitidine hydrochloride -- sorry. I'm going to try again.
MR. McCALL: You cut out.
Q When ranitidine hydrochloride was shipped to Mexico, to the Promeco plant, it was put on ships and not flown, right?
A It was put on ship, by sea, yes.
Q Who at Uquifa was responsible for the temperature control of ranitidine hydrochloride while it was being shipped across the Atlantic ocean?
A To study the temperature, quality department.
Q And who was the head of the quality department?
A Imma Pladeveya.
(Exhibit No. 5263 was marked.)
Q Okay. Now, I want to ask you about another issue, and if we could, let's look at Exhibit 5263. This is a research and development report from the

Page 45

laboratory prepared by José Diaz entitled, "Study of pH crystallization in ranitidine hydrochloride NDMA impurity formation," dated November of 2019.
MR. McCALL: You're cutting out again. We can't hear you.
Q Let me try again. Exhibit 5263 is written by José Diaz of the research and development function of Uquifa, and this laboratory report --
MR. McCALL: We didn't hear the first part of that question.
MR. WATTS: I'm not sure why it's cutting out. Let me keep trying.
BY MR. WATTS:
Q Exhibit 5263 is a laboratory report entitled, "Study of pH crystallization in ranitidine hydrochloride NDMA impurity formation," written by José Diaz dated November 2019; is that correct?
A It is.
Q And under the Introduction and Objective on Bates page 227, it says, "NDMA impurity is classified as a probable human carcinogenic impurity. EMA, the European Medicines Agency, has ordered the withdrawal as a preventative measure of the medicines containing oral ranitidine." Can you see that?
A Yes.

Page 46

Q On Bates page 230, the laboratory report says, "So NDMA content in ranitidine hydrochloride was affected by low pH values of the isolated product and high temperatures with drying. In the picture below, dependence of NDMA formation on pH is showed. Higher percentage NDMA formation is observed at lower pH, specifically pH equals 2.5 to 4.5"; is that right?
A Yes.
Q Now, when the pH is lower, the acidic content is higher; is that right?
A Yes.
Q And this correlation between higher acidic content in the form of lower pH and the formation of NDMA is a laboratory result that you verified; is that correct?
A No. It was taken from the literature.
Q Let me show you Bates page 235. This report written by José Diaz was verified by you on November the 29th of 2019; is that correct?
A Yes.
Q And did José Diaz work in the research and development department?
A Yes.
(Exhibit No. 5274 was marked.)
Q If we could go to 5274, this is a Sanofi

Page 47

e-mail dated February 18, 2020, and it's written by Gerda Glanzmann but copied to Alain Dlubala. And I'm asking you about it because it says, "Dear All, just to share with you some additional information received from Uquifa during a call this morning between Maria, Alain and myself." Can you see that?
A Yes.
Q So these would be the notes of a call between Gerda Glanzmann, Alain Dlubala, and yourself, Maria Lloris, right?
A Yes.
Q Now, part of what it says in the fourth bullet point is, "Uquifa management does not want to indicate the thermodynamic instability of the molecule as a root cause."
Is that what you told Mr. Dlubala and Ms. Glanzmann on February the 18th of 2020?
A I do not recall to say that.
Q Now, the next bullet point says, "Maria will check" -- let me try again.
The next bullet point says -- in the next bullet point, does it say, "Maria will check which data are available to assess increase of NDMA/nitrite related to temperature and time. We need to understand whether the NDMA is only generated from the ranitidine molecule

Page 48

or other external contaminants."
Is that what you discussed with them that day?
A I do not recall if we were discussing this specifically.
Q Okay. Now, let's go to the second page, 258. This is an e-mail dated February the 12th from Alain Dlubala to Gerda Glanzmann concerning a call with Uquifa on February the 12th. And it says, "After the requirement of Uquifa, Maria Lloris, I try to propose this argue draft for intern validation of my vision of the key points for the executive summary. Root causes evaluation: The well-known chemical reactivities and thermal instabilities of ranitidine hydrochloride and its precursor, NTM/NMSM, should drive the elaboration of the hypothesis in the root causes."
Do you see that, sir? I mean, ma'am.
A Yes, I can see.
Q Okay. These well-known chemical reactivities and thermal instabilities of ranitidine were familiar to you; is that right?
A I do know about the chemical reactivities, and I do have the stability data from our stability data protocols. So I know that the impurity of ranitidine can be compromised because of the temperature, according to the stability results that we do have.

Page 49

Q And because you knew that the -- because you knew of the -- I'm getting the background again.
Let's go to 257. Because you knew that the stability of ranitidine could be affected by temperature, on the call on the 18th, did you mention that -- just the first page.
As a result of the fact that you knew that the stability of ranitidine could be affected by temperature, on this call on February the 18th, the bullet point says, "We highlighted the need to cover the storage, transportation of the API as well. Maria confirmed that they did not plan any changes to the current packaging except the change in storage conditions." Did I read that correctly?
A You have read it correctly.
Q And the reason there was going to be a change in the storage conditions is you had one form of ranitidine that was stored at 25 to 30 degrees and another form that was being stored at 5 degrees, which showed remarkably lower NDMA levels; is that correct?
A No, it is not correct. I mean, the temperature was not the only parameter to consider. So the root cause analysis showed us that it was a combination of different things. The impact and the importance of each parameter was different and

temperature was real important, but other parameters were playing a role in the NDMA generation. I cannot say that the product maintained at five was okay and the product that was at 25 it was not.

Q What you're telling me is it's multifactorial?

A Sorry?

Q What you're telling me is that -- I don't know why it's doing this.

What you're telling me is there's more than one factor involved?

A Yes.

Q All right. But with respect to temperature, if we go to Exhibit 5189 and this overview on Bates 128, we see the climactic chambers that were available are different at Sant Celoni than at Llica de Vall; is that right?

A Yes.

Q And some ranitidine had been stored at 5 degrees Celsius; is that correct?

A It is.

Q And that ranitidine had a lower NDMA content than the ranitidine stored at 25 or 30 degrees Celsius; is that correct?

A No. You cannot compare it because the same -- the same product was not maintained at the two



temperatures always. So we did have some data at 5 degrees. We did have some data at 25. But it was not the same material.

Q And if we look at Exhibit --

A So that -- sorry. Meaning that other parameters were playing a role as well.

Q Let me show you Exhibit 52 --

THE DEPO TECH: Mikal, I couldn't hear that number clearly.

(Exhibit No. 5261 was marked.)

Q Let me show you Exhibit 5 -- turn to Exhibit 5261. And this is a background note for Sanofi and Uquifa on ranitidine NDMA scheduled for November 14, 2019; is that correct?

A It is.

Q And on Bates 146, at the top, the question, "Why are retained samples of 1207 form stored at room temperature whereas retained samples from form 1200 are stored at 5 degrees plus or minus 3 degrees Celsius?" And Uquifa's response is, "The reason for this is simply because the 1200 product is finished and released from the Llica de Vall site, which has the possibility for these storage conditions."

Then later it says, "The 1207 is compacted and this compaction is done at the Sant Celoni which does



not have available these storage conditions to the extent that Llica has. There is no other reason for us using different storage conditions for the two products." Did I read that right?

A You read it right.

Q Prior to September of 2019, the Sant Celoni site did not have the ability to store the product at 5 degrees Celsius; is that right?

A To store retained samples. So is there a problem? Yes, because we don't have an area that is between 2 and 8 degrees in the warehouse. So we are talking about the retained samples, not the product itself.

(Exhibit No. 5268 was marked.)

Q As we go to 5268 --

A Sorry?

Q If we go to Exhibit 52 -- Exhibit 5268 is a laboratory report entitled, "Results of new ranitidine hydrochloride form 2 batches manufactured using modified process conditions to avoid NDMA presence." It's dated January of 2020; is that correct?

A Yes. I can't read it.

MR. McCALL: What was the number again?

MR. WATTS: 5268.

BY MR. WATTS:



Q And as we go to the second page of the report, it says, "In a previous R&D report, 1207-LAB19.04, it was found that ranitidine hydrochloride form 2 presented lower NDMA contents when having a low RRSS content and high pH, both features associated with form 2 low-density grade. Moreover, form 2 low density has consistently better stability, and it is relevant to note that NDMA content can be maintained under the limit 0.16 parts per million for up to 36 months when form 2 is stored at 5 degrees plus or minus 3 degrees Celsius." Did I read that correctly?

A Yes.

Q And if we go to the last page of the document, Bates page 243, to the report down at the bottom prepared by José Diaz but verified by you.

A Yes.

Q You verified that on January the 7th of 2020; is that right?

A Yes.

(Exhibit No. 5269 was marked.)

Q Now, Dr. Lloris, if we could go to 5269, is this a joint meeting of Sanofi and Uquifa with respect to NDMA content in ranitidine active pharmaceutical ingredient that was held at Uquifa on January the 9th of 2020?

A Yes.
Q And on Bates page 572, there were a number of Sanofi participants that are listed on the left side, including Scott Coapman, and a number of Uquifa participants listed on the right side, including yourself; is that right?
A Yes.
Q As we go to Bates page 576, it says, "Based on our findings and scientific logic, we are now considering updating our existing CEP/DMFs with the following: For form 2 powder, retest date of 36 months at storage conditions of 2 to 8 degrees Celsius. For form 2 compacted, a retest date of 12 months at storage degrees of 2 to 8 degrees Celsius"; is that right?
A That's right.
Q What is a CEP/DMF?
A A CEP is the document -- is the file that is presented to the European authorities, and it's the same -- has the same content as the DMF in the US.
Q And on Bates page 581 under NDMA Degradation Kinetics, it says, "From our extensive investigations, we can conclude that the degradation kinetics of the NDMA are driven by in the following order of criticality, pH of the final API, residual solvent content in the final API and temperature of storage in



the API"; is that right?
A Yes.
Q But it says, "For the new process" -- but it says, "For the new process" -- now I'm trying. Sorry.
It says, "For the new process, powder and compacted, we believe the degradation kinetics will be better than the existing registration due to our tightening of parameters." Did I read that correctly?
A Yes.
Q Is that what you told Sanofi?
A Sorry?
Q Is that what you told Sanofi during this meeting?
A Yes.
(Exhibit No. 5272 was marked.)
Q In terms of these tightening of parameters, let me show you Exhibit 5272. This is a statement concerning storage and transport conditions of ranitidine hydrochloride form 2. And it says, "We, Uquifa, hereby declare that storage and transport conditions for the active substance 1200 ranitidine hydrochloride form 2, retest date 36 months, are the following: Storage conditions between 2 degrees and 8 degrees Celsius, transport conditions between 2 degrees and 8 degrees Celsius.



"These conditions are based on the outcome of the stability data to ensure that the product complies with an NDMA content of NMT 0.16 parts per million until retest date. If these storage and transport conditions are not followed as indicated, Uquifa does not guarantee that the product complies with the above-mentioned NDMA specifications until the retest date." Did I read that correctly?
A Yes.
Q And Jessica Sanchez with quality assurance -- she is the manager at the Llica de Vall site; is that right?
A Yes. Currently she is manager at the Llica yes.
Q And the Llica de Vall site is where the form 1200 ranitidine had been stored at 5 degrees Celsius; is that right?
A Yes.
(Exhibit No. 5273 was marked.)
Q If we can go to Exhibit 5273, at the bottom of Bates page 719 and the top of 720, Vojtech Komarek -- let me try again.
At the bottom of 519 -- once more.
Vojtech Komarek writes an e-mail to four individuals at Uquifa, including yourself, on the 24th



of January of 2020; is that correct?
A Yes.
Q And asks, "Could you please send the following sample of ranitidine new process lots?" And it says, "Please pack with maximum humidity protection, clearly labeled before and after compacting and ship under controlled conditions of 2 to 8 degrees Celsius ASAP to Sanofi"; is that right?
A Yes.
Q And if we go to 718, Mr. -- or Ms. Frieden from Uquifa -- that's one of your colleagues, right?
A Yes.
Q -- sends an e-mail back to Mr. Komarek copying you, "Dear Vojtech, we acknowledge that you want us to ship the samples under cold conditions. This has a cost 1,500 to 2,000 Euros. We are willing to fulfill this requirement in order to move forward with the process in the quickest and smoothest way"; is that right?
A Yes.
Q Uquifa had the capability to ship product under cold chain conditions; is that true?
A Yes.
Q Prior to September of 2019 -- let me try again.
Prior to September of 2019, did Uquifa ever

receive a request from Sanofi or Boehringer Ingelheim that ranitidine hydrochloride should be shipped to it under cold chain conditions?
A At which temperature?
Q Did Boehringer Ingelheim ever request Uquifa to ship ranitidine hydrochloride to it at 5 degrees Celsius?
A I do not know.
Q Did Sanofi ever request Uquifa to ship ranitidine hydrochloride to it at 5 degrees Celsius?
A Before September 2019, as far as I know, no.
Q Okay. Let me show you Exhibit 2609. This is a risk assessment summary entitled, "Risk assessment summary for the occurrence of N-nitrosamines as potential impurities in ranitidine hydrochloride drug substance manufactured by Uquifa," and it's written by Dr. Thilo Berkenbusch.
Did you know Dr. Berkenbusch at Boehringer Ingelheim?
A Sorry?
Q Did you know Dr. Berkenbusch at Boehringer Ingelheim?
A No, no.
Q Did you ever see this risk assessment?
A No.



Q Let me show you Bates page 761. At the top, it says, "Uquifa stated that form 2 gives very low if not nondetected NDMA content on release and complies with NMT .016 parts per million after a period of 12 or 36 months depending on the storage condition. However, when stored at 5 degrees Celsius for 36 months, the NDMA limit remained within specification 0.16 parts per million." Did I read that correctly?
A Yes.
Q That's something that Uquifa communicated to Boehringer Ingelheim, correct?
A I do not know.
Q It says, "Supportive degradation studies of ranitidine hydrochloride were carried out by Uquifa and clearly show that temperature, acidic conditions, pH, and solvent profile are potentially causing NDMA to be generated in the drug substance. Based on these experimental data, Uquifa concluded that ranitidine hydrochloride form 2 gives a very low if not nondetected NDMA content on release and continues to comply with the 0.16 parts per million limit after a period of 12 or 36 months dependent upon storage conditions and concluded that a storage at 5 degrees Celsius would ensure a product with NDMA content within the 0.16 parts per million." Do you see that?



A Yes, I can see.
Q And then it says, "On January 29th, 2019, a declaration from Uquifa was received stating that if ranitidine hydrochloride form 2 is transported and stored between 2 degrees and 8 degrees Celsius, the content of NDMA remains below NMT 0.16 parts per million over 36 months."
What Dr. Berkenbusch just wrote is what's in the statement that Uquifa put out on January the 29th; is that right?
A January 2020. It was not January 2019.
Q I agree. He's off by a year, but with that one change, what's in that statement is consistent with what Uquifa said on January the 29th of 2020, correct?
A Yeah. If the date is January 2020, it's okay.
(Exhibit No. 5276 was marked.)
Q Now, let's go to February of 2020 -- hold on just a second.
If we go to February of 2020 and look at 5276, on Bates page 344, Mr. Dlubala writes to Gerda Glanzmann, and I want to ask you about one statement. It says, "The potential of hidden NDMA in Uquifa process is well demonstrated by the high quantity of NDMA observed in humidity degradation with 145 parts per million in Uquifa." Do you see that now?



A I can see it.
Q One of the humidity degradations that Uquifa achieved in its laboratory testing was 145 parts per million; is that right?
A I do not recall the numbers, but we can check, if necessary, but it can be.
Q And if that result was achieved, 145 parts per million is 906 times greater than the 0.16 parts per million limit, right?
A Yes.
(Exhibit No. 5279 was marked.)
Q All right. Let's go to 5279. This is a report entitled, "Evaluation of impurity NDMA presence in ranitidine hydrochloride"; is that right?
A Yes.
Q And you were one of the authors of this report; is that right?
A Yes, yes.
Q And as we look through it, on Bates page 027, the objective of your report says, "The purpose of this report is to perform an assessment to evaluate if the NDMA impurity, or any other nitrosamine, could be present in the final API ranitidine hydrochloride manufactured at Uquifa and define all the possible root causes that could generate the impurity"; is that right?

Page 62

A It is.
Q And Bates page 031, under nitrosating agents, you write, "In general, the formation of nitrosamines is only possible in the presence of a secondary or tertiary amine and nitrite usually under acidic reaction conditions." Is that what you wrote?
A Yes.
Q And if we look at Bates page 065, you compared NDMA tests, and you said, "It is clear from the results that the same product before compaction and depending on storage temperatures can lead to a not detected NDMA content at 5 degrees Celsius but can result after three months at 25 degrees Celsius with some excursion to 30 degrees Celsius in a very high NDMA content, 1.2 to 0.7 parts per million. After compaction, the samples were stored at room temperature, temperature of not greater were 25 degrees Celsius having even less NDMA content;" is that right?
A That's right that if you compare compaction versus the effect of temperature, the temperature effect is much higher than compaction.
Q Okay. And if we go to Bates page 076, part of what you wrote at the bottom is, "Form 2 powder quality is the most stable product compared with form 1, both stored at the same temperature. Form 2 can be

Page 63

maintained in some cases near the current retest date at 5 degrees Celsius, and it remains with a NDMA content under the specification 0.16 parts per million for a daily dosage of 600 mgs for more than a year. On the other hand, form 2 compacted is the less stable, reaching high values of NDMA at room temperature." Did I read that right?
A Yes, that's read right.
Q And on the next page, 078, with respect to stability studies and NDMA content, you report that, "Clearly, temperature and probably relative humidity as well is affecting the NDMA content in the product. The retained samples maintained at 5 degrees plus or minus 3 degrees Celsius have a very low NDMA content, even after two years from their manufacturing. Whereas the same batches at 25 degrees plus or minus 2 degrees Celsius, 65 percent plus or minus 5 percent relative humidity have increased a lot in NDMA content resulting in the higher NDMA content the longer the batch has been manufactured." Is that what you wrote?
A Yes. We are talking form 2 compacted.
Q And on the next page, 079, you write again, "Clearly, temperature (and probably relative humidity as well) is affecting the NDMA content in the product. The retained samples maintained at 5 degrees plus or minus 3

Page 64

degrees Celsius have a very low NDMA content even after two years from their manufacturing whereas the same batches at 25 degrees plus or minus 2 degrees Celsius, 65 percent plus or minus 5 percent relative humidity have increased a lot in NDMA content resulting in the higher the NDMA content the longer the batch has been manufactured.
You know what? I apologize. I read that twice. Let me try again. I read from the wrong area of my outline. My apologies.
On Bates page 079, you write, "Clearly, the temperature and probably relative humidity as well is affecting the NDMA content in the product." You say, "The retained samples maintained at 5 degrees plus or minus 3 degrees Celsius have a not detected NDMA content and after two years from their manufacturing, the NDMA content still is the same. Whereas the same batches at 25 degrees plus or minus 2 degrees Celsius, 65 percent plus or minus 5 percent relative humidity have increased NDMA content, although clearly code 1200 is less affected by time and temperature than code 1208.
"Even sample after one year under long-term conditions has an NDMA content under the specification, 0.080 parts per million versus 0.16 parts per million for 600 mg daily dose. Again, the higher NDMA content

Page 65

the longer the batch has been manufactured." Is that what you wrote?
A Yes.
Q And then on Bates page 086, part of what you wrote is, "According to degradation studies, NDMA content is increasing with time, humidity and temperature for the current manufactured material. If temperature maintained low, for instance, 5 degrees Celsius, then NDMA content increase is significantly lower." Is that written in your report?
A Yes.
Q And on page 087, you write, "Based on our data showing that storage of ranitidine hydrochloride between 2 degrees and 8 degrees Celsius would ensure a product with NDMA content clearly under the 0.16 parts per million limit for a period of up to 36 months for form 2, the validation batches will be stored at 5 degrees Celsius. Although as we generally" -- "Although as we generate stability data, storage temperature will be reviewed according to the stability results." Is that something you wrote?
A Yes.
Q And your signature is down at the bottom of that page dated January the 17th of 2020; is that right?
A Yes.

Page 66

(Exhibit No. 5280 was marked.)
Q And if we could go to Bates -- I mean, to Exhibit 5280, there is an e-mail at the bottom of Bates page 126 and the top of 127 from a Saurabh SG. What is that individual's name?
A He's the executive CO of Uquifa. Saurabh.
Q Saurabh's position at Uquifa is what again?
A Executive CO.
Q Okay. Executive CO. And he writes --
A Yes.
Q -- to Vojtech Komarek copying you and others, "NDMA Report Executive Summary"; is that right?
A Yes.
Q On the next page, it says, "Please find enclosed the version of the executive summary on the NDMA topic. Look forward to Sanofi comments if possible. Our idea is to send this update to the FDA and the EDQM along with the detailed report in the coming week. You will also notice that we have one-month stability results of the compacted trials also inserted in the reports. They are ND in 2 to 8 degrees storage but displaying thermal reflexivity in higher temperature storage conditions as per the root cause." Did I read that right?
A Yes.

Page 67

Q When the executive CO writes, "They are ND in 2 to 8 degrees storage," he is saying that the NDMA is non-detectable at 2 to 8 degrees storage; is that right?
A Yeah, it was not detected.
MR. WATTS: Okay. Dr. Lloris, let's take our first break. Take a five or ten-minute break.
THE VIDEOGRAPHER: We are going off the record. The time is 10:46 UTC.
(A 15-minute recess was had.)
THE VIDEOGRAPHER: We are back on the record. The time is 11:01 UTC. Please proceed.
BY MR. WATTS:
Q Dr. Lloris, I'd like to before we get started --
MR. McCALL: Before we get started --
MR. WATTS: Go ahead.
MR. McCALL: Before we get started, this is George McCall representing Uquifa, and I just wanted to point out that we have an interpreter in here, as Maria is a native Spanish-speaking person, and the interpreter is here only as needed. Maria speaks good English. If she doesn't understand a question or doesn't understand a phrase, she may look over to the interpreter and ask a question.
MR. WATTS: Yeah, and for the record, George,

Page 68

you and I had that agreement before. I understand there's an interpreter in the room. She's only occasionally used her. Her English is much better than my Spanish, so she's doing great, and we have no objection to the procedure you described.
MR. McCALL: Okay. Thank you.
(Exhibit No. 5671 was marked.)
BY MR. WATTS:
Q Okay. If we could go to Exhibit 5671, Dr. Lloris, is this a Uquifa laboratory report entitled, "Presence of iron in ranitidine hydrochloride: effect on NDMA formation," prepared by José Diaz dated July of 2021?
A It is.
Q And when you and I were discussing the impact of iron on NDMA formation, you said that the testing at Uquifa did not perform that hypothesis, correct?
A Yes. What we realized was that there was no correlation between the iron content in ranitidine samples and the NDMA content or NDMA generation.
Q Okay. And let me show you the report. You're familiar with this report. That's why you were able to answer that question, right?
A Yes.
Q If we go to Bates page 996, under the

Page 69

Introduction and Objective, in the middle, it says, "The aim of this report is verifying if iron presence in ranitidine hydrochloride could favor NDMA formation with temperature and time"; is that right?
A Yes.
Q And if we go to the next page, 997, below the big table, there are five observations. And the report says, "From these initial laboratory trials, it can be concluded, one, more time at the same temperature increases NDMA content; two, in the presence of nitrogen atmosphere, the formation of NDMA is minimized; three, the effect of having ranitidine hydrochloride solubilized in ethanol affords the highest NDMA content at temperatures of 70 degrees Celsius. We know that apart from temperature effect in NDMA formation, ethanol has also an important role in the mechanism of its formation, and for this reason, final ethanol content in ranitidine hydrochloride API was reduced below 600 parts per million.
"Four, in solid state, the formation of NDMA is favored in the presence of iron species; five, it seems that the effect of having iron in ethanol solution during the forced degradation affords less NDMA than when degradation takes place only in ethanol." Did I read that correctly?

A Yes.
Q And as we go to Bates page 999, after the experiments were conducted, the laboratory report writes at the very top, "From the above set of experiments, we observed the same as previous behavior. One, NDMA content increases over time, although at the end, contents around 4- to 5,000 parts per million are obtained except when iron salts and ethanol are used together.
"Two, the content of NDMA" -- here we go again. Hold on.
"Number two, the content of NDMA in ethanol is always the highest. When product is a in solution in the presence of iron salts, the NDMA content is lower.
"Three, in the presence of iron salts, the different quantity of NDMA generated is higher at the beginning (10 days) than the sample without iron species but over time the contents become similar."
Did I read that correctly?
A Yes.
Q Now, on the next page, 000, it says, "With the aim of introducing different amounts of iron into the ranitidine hydrochloride and check their impact in NDMA formation, the same ranitidine hydrochloride batch 120020012004.02 was treated with different quantities of



Tulsion T-63 resin in the same above conditions."
And it says, "The idea was to prepare different samples of ranitidine hydrochloride with different estimated iron content after resin treatment considering the iron value obtained in the first treated sample of around 6,000 parts per billion." But down at the bottom, it says, "It was not possible to rework samples of hydrochloride having different amounts of iron."
Try again. Down at the bottom, it says -- we'll get there, Dr. Lloris. I'm sorry for the sound.
At the bottom it says, "It was not possible to rework samples of ranitidine hydrochloride having different amounts of iron so the different experiments conduct different quantity of iron was purged during crystallization of the mother liquors." Did I read that right?
A Yes.
Q On the next page, 0001, under the table, it says, "Although there is no correlation between initial iron content in the sample and NDMA formed at 40 degrees Celsius, lower iron content in the sample without resin treatment afforded lower NDMA content. Iron presence in ranitidine hydrochloride could be a possible root cause for NDMA formation." Did I read that right?



A Yes.
Q So that was the hypothesis that was being tested; is that right?
A Yes.
Q But on the next page, 0002, the conclusions, the conclusion was that, at the bottom, that there was not a clear correlation found between iron content and NDMA formation over time; is that right?
A Yes.
Q Now -- I'm done with that document. Dr. Lloris, have you continued to work on NDMA formation in ranitidine hydrochloride since July of 2021?
A I couldn't hear properly --
MR. McCALL: Mikal, you cut out again.
Q Let me try again. Since July of 2021, have you done any subsequent work --
MR. McCALL: I'm afraid that was worse.
MR. WATTS: Okay. It usually works on the third time, so let me try a third time.
Q Since July of 2021, Dr. Lloris, have you conducted any subsequent work on NDMA formation in ranitidine hydrochloride?
A No. I think all experimental work was done -- was over.
MR. WATTS: Dr. Lloris, those are all my



questions. I thank you for appearing here today.
THE WITNESS: I'm sorry?
MR. WATTS: Doctor, those are all my questions. I'm going to let the other lawyer ask the questions.
THE WITNESS: Okay.
MR. McCALL: You're not through. The other --
- - - - -
DIRECT EXAMINATION
BY MS. MOORE:
Q Good morning, Dr. Lloris. My name is Jennifer Moore. I'm an attorney handling the litigation in California state court, and I just have a few questions for you and then we'll get you out of here. Okay?
If you could, just introduce yourself to the jury by stating your name and your position with Uquifa.
A Yes. It's Maria Lloris Vludez, and I am the R&D -- the research and development manager at Uquifa.
Q And have you been at Uquifa for close to 30 years?
A Yeah, close.
Q And Uquifa is a Spanish company located in Barcelona, Spain?
A Yeah, headquarters in Barcelona and two factories outside.

Q And what are those factories' names again?
A Yeah, one is located in Llica de Vall, and the other one is located in Sant Celoni.
Q And you refer to those by their names where they're located?
A Yes.
Q Okay. Barcelona's right on the Mediterranean Sea, right?
A Barcelona is what? Sorry.
Q Is on the Mediterranean?
A Yeah, yeah, it's right on the Mediterranean.
Q Now, Uquifa was first hired by the company Pfizer to manufacture the API in ranitidine more than 30 years ago; is that correct?
A I do not have information on that, so I do not have the dates.
Q Did you prepare an executive summary that we've marked as Exhibit 5281 in this case? If we could pull that up on the screen, please, Exhibit 5281.
Dr. Lloris, is that your executive summary of your root cause analysis?
A Yes, the executive summary.
Q And do you see -- can you call out the first paragraph, please? And if I could direct your attention to the second sentence, it says, "We," which would be



Uquifa, "have been manufacturing the ranitidine hydrochloride API at our Llica de Vall site in Spain for more than 30 years with major markets of our product being in the USA and EU." Do you see that?
A Yes.
Q Does that refresh your recollection that Uquifa's been manufacturing ranitidine in Spain for more than 30 years?
A Yes.
MS. MOORE: We can take the exhibit down. Thank you.
Q And isn't it true that Uquifa then manufactured ranitidine for Boehringer Ingelheim?
A Yes, I am aware of that. I do not have the dates, but I know.
Q And then Uquifa also continued to manufacture ranitidine for Sanofi?
A Yeah. Well, after then, yes.
Q Yes. And during the time that Uquifa manufactured the API in ranitidine for Pfizer, Boehringer Ingelheim and Sanofi, Uquifa was hauling this product by truck to the port to then ship it and there was no temperature control in the truck; is that correct?
MS. HORN: Objection, form.



A In the truck there was no temperature control. Either in the container, during the shipment, it was.
Q So let's focus just on the transport for the truck. Is it true then for --
A The transfer --
Q Go ahead.
A Sorry. The transfer from the factory or the warehouse to the port in Barcelona.
Q Okay. And the transport via the truck from the warehouse to the port in Barcelona, it's true that there was no temperature control, correct?
A It was no control.
Q And is that true for the entire 30-plus years that Uquifa manufactured ranitidine?
A I do not know.
Q Are you aware of any time prior to 2020 that there was any temperature control for the truck that transported the product from the warehouse to the port?
A I do not know.
Q Okay. It's your understanding that there was no temperature control during the transport from the warehouse to the port; is that right?
MS. HORN: Objection, form.
A Can you repeat that question, please?
Q No problem. Is it your understanding that



there was no temperature control in the truck during the transport?
A Yeah.
Q Now, during the time that the product was shipped by ocean freight to the US, do you agree that there was no temperature control in the shipping containers?
MR. FRIEDMAN: Objection to form.
A In the shipping containers, there was temperature control and that temperature was at --
Q At what?
A -- not more than 25 degrees.
Q Do you agree that it costs more to use cold chain conditions to transport a product?
MR. FRIEDMAN: Objection to form.
A Can you repeat the question, please?
Q Do you agree that it costs more to use cold chain conditions to transport a product?
MR. FRIEDMAN: Objection to form.
A The stability data provided by our studies are clear that for form 2 compacted, there is no requirement for the transport or the storage.
Q Okay. I think there must have been something lost in translation. I was asking do you agree that the costs are increased when -- when cold chain conditions

Page 78

are required in transport?

MR. FRIEDMAN: Objection to form.

MR. McCALL: Give us a second here.

A Ah, the cost. Sorry. Yes, I do agree.

Q At any point in the 30-plus years that the product was being shipped by ocean freight, was the product controlled at temperatures between 2 and 8 degrees Celsius?

MS. HORN: Objection, form.

A Not before 2020, I think.

Q Did Uquifa have the capacity to ship ranitidine in temperature-controlled conditions at 2 to 8 degrees Celsius prior to 2020?

MR. FRIEDMAN: Objection to form.

A Yeah, it was possible.

Q Did Uquifa have the capacity to transport the product by truck in temperature-controlled conditions prior to 2020?

A Yes.

Q Dr. Lloris, do you agree that NDMA is a known human carcinogen?

A I do have some information from literature. I'm not an expert on that, so I have read.

Q You have read that in the literature when you were conducting your root cause analysis?

Page 79

A Yes.

Q Based on your evaluation of ranitidine, do you agree that NDMA is present in the API for ranitidine?

A In some of the samples that we measured, it is present.

Q Based on your evaluation, do you agree that NDMA was created during the manufacturing process at the Uquifa plants?

A According to the results that we do have, it seems that at release there was no NDMA present, but we do not have tested all the batches for NDMA.

Q In your determination of your root cause, isn't it true that you determined that NDMA was created during the manufacturing process?

A You can detect NDMA during the manufacturing process, although at the end, once the product is isolated and dried, typically, the NDMA content is not detected and released.

Q You did detect NDMA during -- for several samples that you tested of the ranitidine product, correct?

A Yeah, of the reaction mixture. Not isolated samples, but from the reaction mixture, you can see -- you can detect NDMA. But isolation procedure and drier procedure it's eliminated or just to have at the end, at

Page 80

release, not detected content.

Q Well, you determined that NDMA was being created due to thermal sensitivity of the API, correct?

A It was a combination of different parameters and factors, and the importance of each one is not the same. But we do know as a result of all the trials and degradation studies and stability studies, that temperature is having a big impact, pH as well, in the content of particularly ethanol, and water is playing an important role in the generation of this NDMA.

Q In fact, if we could pull up Exhibit 5281 again, please. And if we could turn to Bates stamp at the end of 468, page 3 of the exhibit, and if we call out the very bottom, "As detailed later in the report."

And Dr. Lloris, if we could, this is the report that you authored, correct?

A Yes.

Q And you wrote here, "As detailed later in the report, we have clearly established a control strategy focused on parameters which we believe control NDMA formation." And you list here temperature conditions during manufacturing process and storage, pH of the final API, and residual solvent profile of the final API. Do you see that?

A Yes.

Page 81

Q And that was your conclusion that NDMA formation would be created by both -- by the combination of temperatures -- temperature conditions during manufacturing, storage, pH and the solvent level; is that correct?

A It is.

Q Okay. We can take down the exhibit.

Do you agree that storing ranitidine at higher temperatures accelerates the creation of NDMA in ranitidine?

A Depending on temperature.

Q Well, do you agree that NDMA content in ranitidine increases with time, humidity and temperature?

A Yes, those are factors affecting the NDMA generated and also --

Q And you've -- I'm sorry. I didn't mean to interrupt you. Go ahead.

A I mean, water, temperature, pH and ethanol content as well.

Q And you agree that if you maintain the temperature at a low degree between 2 and 8 degrees Celsius, then the NDMA content would be significantly lower, correct?

A With -- yes, in combination, yes. It

depends -- again, it will be modulated, the NDMA content by the other parameters, and those are the principal ones apart from temperature. But as I said, you can modulate not only with temperature but other parameters that are affecting the NDMA.

Q In other words -- in other words, even if you control just for temperature, you still have to address the pH and solvent level, correct?

A Yes.

Q If you want to prevent the NDMA creation in the ranitidine; is that right?

A To have even lower results, yes.

Q At any point prior to 2019, did Sanofi ask you to investigate why NDMA was present in the ranitidine?

A No.

Q If Sanofi had asked you to investigate why NDMA was present in ranitidine prior to 2019, would your company have done so?

A Yes.

Q There's no reason why this root cause analysis that you performed in 2019 and 2020 could not have been done before that time period, right?

A Well, because we had no reason to believe that the NDMA was present in our product, so we didn't have any request or any requirement from any of the



authorities or any client --

Q If San --

A -- and so that --

Q If Sanofi had requested you to do the root cause analysis prior to 2019, you would have done so?

A Yes, we would have studied.

Q And the same is true for Boehringer Ingelheim. If Boehringer Ingelheim had requested you do a root cause analysis as to why NDMA was present in the ranitidine, you would have done so, correct?

A Yes.

Q And at no time prior to 2019 did Boehringer Ingelheim request a root cause analysis be conducted as to why NDMA was in ranitidine, correct?

MR. FRIEDMAN: Object to form.

A No as far as I know.

Q And at any point prior to 2019 did Pfizer request Uquifa to perform a root cause analysis as to why NDMA was present in ranitidine?

A No as far as I know.

Q And if Pfizer had requested a root cause analysis to be performed as to why NDMA was contained within ranitidine, would Uquifa have done so?

MS. HORN: Objection, form.

A Yes.



Q Dr. Lloris, do you agree that during the time Uquifa manufactured ranitidine, Sanofi never instructed Uquifa to store the ranitidine at a certain temperature?

A No as far as I know. Our storage temperature and transport temperature was in conformance with the stability data that we had which was generated according to the guidelines.

Q If Sanofi had told you to store the ranitidine at a certain temperature prior to 2019, would your company have done so?

A Probably -- this is my guess. I will discuss for the reason why, and because in accordance with all the stability data that we were generating since the file was presented, it was not necessary to reduce temperature during the storage and the transportation.

Q But you agree that based on your findings that ranitidine should be stored at a temperature of 2 to 8 degrees Celsius?

A Which we did.

Q Do you agree based on your own findings documented in these exhibits that we've seen today that ranitidine should be stored at a temperature 2 to 8 degrees Celsius?

A I recommended to maintain these storage conditions in 2020, yes, according to all the



information that we had at that time.

Q At any time prior to 2020, did Sanofi instruct Uquifa to store ranitidine at a temperature between 2 and 8 degrees Celsius?

A No as far as I know.

Q And if Sanofi had told Uquifa to store ranitidine at a temperature of 2 to 8 degrees Celsius prior to 2020, did Uquifa have the capacity to do so?

A Yes, we do have --

Q At any point --

A -- in both factories.

Q At any point prior to 2020, did Boehringer Ingelheim instruct Uquifa to store the ranitidine at a temperature between 2 and 8 degrees Celsius?

A No as far as I know.

Q Okay. If Boehringer Ingelheim had instructed Uquifa to store the ranitidine between 2 and 8 degrees Celsius prior to 2020, would Uquifa have had the capacity to do so?

A Yes.

Q At any time prior to 2020, did Pfizer instruct Uquifa to store the ranitidine at a temperature between 2 and 8 degrees Celsius?

A No as far as I know.

Q If Pfizer had instructed Uquifa to store the

Page 86

ranitidine prior to 2020 at a temperature between 2 and 8 degrees Celsius, would Uquifa have had the capacity to do so?
A Yes, we do have the capacity.
Q Is it fair to say, Dr. Lloris, that in the 30-plus years that Uquifa manufactured ranitidine, that it had the capacity to store the product at a temperature between 2 and 8 degrees Celsius for that entire time frame?
A Yes, we did have the capacity.
Q And prior to 2020, is it correct that Uquifa did not store ranitidine at a temperature of 2 to 8 degrees Celsius?
A Not for form 2 compacted.
Q Do you agree that the compacted ranitidine has higher -- you found it to have higher levels of NDMA levels than the uncompacted?
MR. FRIEDMAN: Objection to form.
A At that time when we were discovering the info from the manufacturing samples, yes, the compacted has a -- the NDMA content was higher.
Q And Uquifa stored the compacted ranitidine at room temperature; is that correct?
A Some did, yes. In a warehouse with monitored temperature -- in a monitored temperature area with an

Page 87

alarm at 30 degrees and with a protocol for ranitidine that it clears to move the ranitidine in the case that 30 degrees was reached.
Q And there were times during the storage of the ranitidine product prior to 2020 that the alarm -- the alarm sounded that the temperature in the warehouse was exceeding 30 degrees Celsius; is that correct?
MR. FRIEDMAN: Objection to form.
A I don't know.
Q At any time prior to 2020, did Sanofi instruct Uquifa to store the compacted ranitidine at levels of 2 to 8 degrees Celsius?
A No, as far as I know.
Q At any point prior to 2020, did Sanofi give any instructions at all to Uquifa as to what temperature to store compacted ranitidine?
A No instructions. We have an agreement with our clients that include the storage conditions, and if it was to stay there and then another in our DMF.
Q So Sanofi would have been aware prior to 2020 what the storage temperature conditions were for ranitidine at Uquifa's plants; is that correct?
A They knew, yes.
Q Okay. And prior to 2020, when Uquifa was manufacturing the ranitidine product for Boehringer

Page 88

Ingelheim, is it true that Boehringer Ingelheim would have also known what the storage conditions at the Uquifa plants were?
MR. FRIEDMAN: Objection to form.
A Yes.
Q And is it your understanding that prior to 2020 when Uquifa would have manufactured ranitidine for Pfizer, that Uquifa would have instructed -- would have informed Pfizer as to what the temperature conditions were for storage of the ranitidine at its plants?
MS. HORN: Objection, form.
A Yes. The conditions, test conditions, those conditions were in the file from the beginning.
Q And from the beginning, which was 30-plus years of Uquifa manufacturing ranitidine, the compacted ranitidine would have been stored at room temperature; is that correct?
MS. HORN: Objection, form.
A Yes.
Q And during the 30-plus years of manufacturing the compacted ranitidine, did Uquifa have the capacity to store the compacted ranitidine at a temperature -- at whatever temperature the client would have instructed?
A Yes. I mean, yes. If not, we can just work on having this possibility.

Page 89

Q And do you agree that controlling temperature during the storage of the ranitidine product costs more money?
A Would you agree on what? Sorry.
Q Sure. That controlling the temperature --
A Ah, again, costs more, yes.
Q Yes, okay. And Dr. Lloris, Uquifa could have implemented temperature controls in the manufacturing process more than 30 years ago when you first started manufacturing the API for ranitidine?
MR. FRIEDMAN: Objection to form.
A If it is needed, we can do it.
Q And it's your understanding that -- let me try again.
It's your understanding that there was no point in time when Pfizer instructed Uquifa to control the temperature in the manufacturing process of the API in ranitidine, correct?
MS. HORN: Objection, form.
A In the manufacturing process, in the manufacturing -- in the storage or what?
Q In the manufacturing process.
A The manufacturing process was stated at the beginning as well and it's in the file and it's not changed. So we are using the same production, almost

Page 90

the same resistor conditions since the beginning. As far as I know, Pfizer was not telling us anything as per the manufacturing process.
Q And did Boehringer Ingelheim provide Uquifa any instructions as to temperature controls in the manufacturing process?
MR. FRIEDMAN: Object to form.
A Not Sanofi, no.
Q And did Sanofi provide Uquifa with any instructions prior to 2020 for the temperature controls in the manufacturing process of ranitidine?
A (Shakes head.) No, as far as I know.
Q Dr. Lloris, do you agree that Uquifa could have implemented temperature controls in the storage of ranitidine more than 30 years ago when Uquifa first started manufacturing ranitidine?
A In the storage, yes.
Q And do you agree that Uquifa could have implemented temperature controls in the transport of ranitidine more than 30 years ago when Uquifa first started manufacturing the product?
A Yeah. It was not necessary, but yes.
Q At any point in the 30-plus years that Uquifa has manufactured ranitidine, did Pfizer ever instruct Uquifa as to temperature controls in the transport of

Page 91

the product?
MS. HORN: Objection, form.
A Not as far as I know.
Q In the 30-plus years that Uquifa has manufactured ranitidine, did Boehringer Ingelheim ever instruct Uquifa as to temperature controls to implement in the transport of the product?
MR. FRIEDMAN: Objection to form.
A No, as far as I know.
Q And in the 30-plus years that Uquifa has manufactured ranitidine, did Sanofi ever instruct Uquifa as to temperature controls to implement during the transport of the ranitidine product?
A No, as far as I know.
MS. MOORE: Dr. Lloris, those are all the questions I have today. Thank you.
MR. SACHSE: I think -- Dr. Lloris, thank you for your time. I think we'd would like just a few moments to talk and see if we have any questions for you.
THE VIDEOGRAPHER: Going off the record. The time is 11:38 UTC.
(A 25-minute recess was had.)
MR. STRONGOSKY: I believe I will have some questions here.

Page 92

THE VIDEOGRAPHER: We are back on the record. The time is 12:02 UTC. Please proceed.

- - - - -

CROSS-EXAMINATION

BY MR. STRONGOSKY:
Q Hi, Dr. Lloris. My name is Chris Strongosky. I am counsel to Sanofi. Good to meet you.
A Hello.
Q I have a -- just a few questions I'd like to ask to clarify a few points you made in your testimony earlier today.
You had testified in response to Ms. Moore's questions that Uquifa had provided ranitidine API to Boehringer Ingelheim. Do you recall that testimony?
A Yes.
Q Okay. And that ranitidine API was provided specifically to BI Promeco. Are you familiar with the BI Promeco manufacturing site?
A No.
Q No? Do you know exactly to where such ranitidine API was shipped?
A No.
Q Dr. Lloris, do you understand that the ranitidine API that was provided to BI Promeco was provided for purposes of manufacturing the Zantac that

Page 93

was sold in the United States?
A I was aware.
Q Dr. Lloris, do you know when Uquifa first began providing ranitidine API to BI Promeco?
A No, I don't know.
Q Do you know whether Uquifa was providing ranitidine API in the year 2010 to BI Promeco?
A I do not have details of where, but I know I was aware that we were sending product to Boehringer. I don't know where was located the factory or if it was a third party.
Q Do you know when -- when Uquifa stopped providing ranitidine API to Boehringer?
A No.
Q Do you know what year?
A Not that I know. No, no, I do not know the year.
Q Was Uquifa providing ranitidine API to Boehringer Ingelheim in the year 2018?
A I do not know.
Q You don't know?
A No.
Q Well, did you testify that Uquifa was providing ranitidine API to BI? When --
A Yes, because --

Page 94

Q When do you believe Uquifa was doing that?
A I do not have any belief. I do not know. I do not have data.
Q Okay. You testified similarly that Uquifa was providing ranitidine to Sanofi. Do you recall that testimony?
A Yes.
Q Okay. But Sanofi wasn't a customer of Uquifa of ranitidine API for purposes of the manufacturing of Zantac sold in the United States, was it?
A I do not know what was the final product.
Q Sanofi wasn't buying ranitidine API for manufacturing because Sanofi wasn't manufacturing Zantac; isn't that correct?
A I do not know if Sanofi was manufacturing Zantac.
Q How do you know Sanofi -- how do you know Uquifa was providing ranitidine to Sanofi? On what basis did you make that testimony?
A Yeah, because I was aware because during our meetings with Sanofi, I learned that Boehringer was our client and Sanofi as well, but I do not know when or under which conditions.
Q Patheon is a manufacturer of Zantac. Do you understand that?

Page 95

A Yes. That is a third party, I understand, another company that is the manufacturer of Zantac.
Q Okay. And Patheon is also a customer of Uquifa for the purchase of ranitidine API; isn't that true?
A I do not have details of the different customers.
Q Okay. Dr. Lloris, who within Uquifa would know the details of the relationships with the actual customers, the party that was buying the API?
A Quality department, commercial department.
Q Okay. But not you?
A I am the -- I am the R&D manager, so I'm not having all these details.
Q Is it fair to say that your understanding of Sanofi's purchase of ranitidine is in the context of R&D research?
A Sorry. Can you repeat the question?
Q Is it fair to say that your understanding of Sanofi's purchase of ranitidine from Uquifa, that purchase was done for R&D purposes?
A As far as I know, no. He was a customer of our ranitidine manufactured in the plant. He was not for R&D purposes, as far as I know.
Q Okay. Again, as a scientist in the R&D

Page 96

department, you don't have expertise on the commercial relations between Uquifa and its actual customers?
A No, I do not have.
Q Okay. For instance, you don't know who pays Uquifa for the purchase of the ranitidine API, correct?
THE WITNESS: Can you help me?
A Who pay? No, I do not know.
Q You don't know who -- to whom Uquifa issues the invoices for the purchase of API; isn't that true?
A No, I do not know.
Q You don't understand the contracts between Uquifa and the actual customer for the purchase of the API. That's not within your department, correct?
A No. I am not in charge of -- my responsibility is not taking care of this contract.
Q Have you personally ever received an order for the purchase of API from Sanofi?
A No.
Q Do you have any understanding of Sanofi's involvement in the manufacturing of the Zantac that was sold in the United States?
A I do not have any understanding. I don't know. I do not know.
MR. STRONGOSKY: Dr. Lloris, thank you for your time. I'm going to conclude. I don't have

Page 97

further questions. I do reserve the right to come back based on your answers to any other questions. Thank you again for your time.
THE WITNESS: Thank you very much.

- - - - -

CROSS-EXAMINATION

BY MR. FRIEDMAN:
Q My name is Robert Friedman. I'm one of the attorneys for Boehringer Ingelheim, and I have a few questions for you. I apologize for not having my camera on. I've been a little sick the last week and I'm not -- not ready for camera time.
Is it okay if I ask you a few questions?
A Yeah, it's okay.
Q Thank you. I appreciate based on the questions that Mr. Strongosky just asked you that you're not very familiar with the commercial history for ranitidine in the United States. Would that -- is that fair?
A I am not familiar.
Q Okay. But are you generally aware that the marketers of Zantac in the United States have been GlaxoSmithKline, Pfizer, Boehringer Ingelheim and Sanofi?
A Yes, I have learned this.

Q Now, regardless of -- well, strike that.
During the time that Uquifa was manufacturing for the US market up until the fall of 2019, there were no major changes to the way that Uquifa manufactured ranitidine, correct?
A No major changes.
Q For lack of a better term, the recipe for ranitidine stayed the same the entire time that Uquifa manufactured it for the US market, correct?
A Yes. The main process was the same.
Q Right. Now, I want to just ask you a few questions about a term you used today, and that term is "stability studies." Can you tell us what a stability study is?
A It's a study performed on the drug substance at different temperatures. With the results of the stability studies, you can establish your storage conditions, your transport conditions, and then your retest date as well. All these studies are stated in the guidelines, and to be official, you have to follow the guideline.
Q Does Uquifa use stability studies to determine how long and under what temperature its products can be stored while remaining within their specifications?
A Yes, we are use stability studies.



Q Okay. And did Uquifa use stability studies specifically for ranitidine to determine how long and under what conditions its ranitidine products can be -- could safely store?
A Yes.
Q Okay. And you mentioned that there are published guidelines for how to do stability studies, correct?
A Yes.
Q And did Uquifa always follow the available guidelines and regulations for how to conduct stability studies?
A Yes. ICH Q1.
Q Thank you. Now --
A As far as I know, we are always doing that.
Q And I'll come back to stability studies in a second, but you mentioned that there were different storage conditions for the form 1200 and form 1207 ranitidine products. Do you recall that?
A Yes.
Q Now, first can you tell us the difference between 1200 and 1207, just generally?
A 1200 was a powdered compound, and the 1207 was a compacted one.
Q Okay. And I think you mentioned also a 1208.



What is 1208?
A 1208 is form 1.
Q Form 1. Okay. Thank you.
A Form 1 is a different polymer.
Q Now --
A Code 1200 and code 1207 corresponds to the same polymer, which is form 2. So it's the same polymer, the same crystallin form but with different density.
Q And is it correct that the product that Uquifa supplied to Boehringer Ingelheim for the US market was the 1207 product?
A Yes. As far as I know, was compacted.
Q And you told us that the 1200 and the 1207 had different specified storage conditions, correct?
A Yes.
Q Were those storage conditions based on stability studies that Uquifa conducted?
A Yes. We conducted a stability study for the code 1200 and another stability study for the 1207.
Q And are those storage conditions specified in something called the drug master file for ranitidine?
A Yes. All this information, all the stability studies are included in the drug master file.
Q And can you tell us what is a drug master



file?
A A drug master file is a file containing all the information required by the authorities concerning the manufacturing, the quality, methods, stabilities, as per the, let's say, produced during the -- during the file of the holder in the DMF case, in the US case.
Q And you said the authorities. Is one of those authorities the US Food and Drug Administration, the FDA?
A Yes, FDA.
Q Does the drug master file get submitted to the FDA?
A Yes, it was submitted.
Q And those storage conditions that are determined in the stability studies are in the drug master file that gets submitted to the FDA, correct?
A Yes.
Q Okay. Now, you were asked questions about whether Boehringer Ingelheim ever instructed Uquifa to change the storage conditions. Do you recall that?
A Yes.
Q Okay. And I think you were asked some questions about whether -- also whether Sanofi or Pfizer instructed Uquifa to change storage conditions as well. Do you recall that?

A Yes.
Q Okay. Now, as we just established, the storage conditions are within the drug master file, correct?
A As far as I know, yes.
Q And Uquifa has to follow the drug master file in its manufacture and handling of ranitidine, correct?
A Yes, stability parameters has to be controlled in that way.
Q Part of what Uquifa is required to do under its contract with its customers is to make sure that it follows the drug master file when it manufactures its products, right?
A I do not know the details of the contract.
Q But you generally understand that Uquifa is responsible for following the drug master files that it has submitted to authorities?
A I think so.
Q And so if any of Uquifa's customers came to Uquifa and asked Uquifa to do something different than what is in the drug master file, Uquifa would take that request very seriously, correct?
A Yes.
Q Uquifa would need to understand the reason why the customer is asking for the change, correct?



A Yes, usually.
Q Uquifa would want to make sure that there was a scientific justification for making any change to any of the specifications in the drug master file, correct?
A We do not need -- I mean, if a customer is telling us to require certain density, for instance, we do not know why they required this quality to be different from the general one, but if we can do it, we do.
Q Understood. But Uquifa wouldn't make a change to the drug master file that it thought would have a negative impact on the quality of its products, correct?
A We will never -- we will never do that. I mean, we need data -- to present any change, either minor or major, we need data -- to prepare data and gather data just demonstrating that this is the situation. It's true that if you are restraining and reducing a range, it's easy to do the change in your drug master file, especially -- specifically if you're having these numbers in your manufacturing. But, yes, we are presenting data every time we want to do a minor or a major change in our -- in our DMF.
Q And the entire time that Uquifa sold the ranitidine API to Boehringer Ingelheim, Uquifa did not have any reason to change any of the storage or



temperature specifications for ranitidine, correct?
A No.
Q Now, the last thing I want to ask you about is shipping and just a few questions. You indicated that the API was shipped to the US primarily via ocean; is that right?
A That's my understanding, yes.
Q Or shipped to North America via ocean, correct?
A I don't know to where. I think it was to Mexico, but I really don't know if it is -- I know it was by boat shipping, but I do not know the final port.
Q And when it was shipped via ocean, it was shipped in what's called a reefer container, correct?
A It was a container with a controlled temperature, and as far as I know, temperature was no more than 25 degrees.
Q Actually, do you know if the temperature was actually specified to be 15 degrees Celsius in the containers?
A I do not know.
MR. FRIEDMAN: Okay. If we could pull up -- there's a document in the Lloris file in the King and Spalding folder that ends in Bates 679.
THE DEPO TECH: Sorry. Give me a moment,



please.
MR. FRIEDMAN: Sure, sure. I'm not sure what's an open number, so maybe we call it D-1.
MR. McCALL: Call it Lloris 1.
MR. FRIEDMAN: Lloris 1. Okay.
(Lloris Exhibit No. 1 was marked.)
THE DEPO TECH: I'm sorry, Rob. It's Erik. What are you looking for?
MR. FRIEDMAN: It ends in 679 called "Bill of Lading."
BY MR. FRIEDMAN:
Q So Dr. Lloris, just to orient you, do you see at the top of this document it says "Sea Way Bill of Lading for port to port or combined transport"?
A Yes, I can see it.
Q And then you see that the shipper is Uquifa and the entity to be notified is Boehringer Ingelheim?
A Yes.
Q Okay. So do you see that this is, then, a bill of lading for 32 packages of ranitidine hydrochloride compactada?
A Yes.
Q Okay. And you see in the center there, underneath the stamp that says "Not Negotiable," it says, "Stowed in reefer container at temperature of plus

15 Celsius till plus --
A I can see it.
Q -- 150 vent closed, humidity zero percent." Do you see that?
A Yes.
Q And so does that indicate to you that the shipping conditions for at least this shipment of ranitidine going by boat was 15 degrees Celsius?
A I can see it.
MR. FRIEDMAN: Okay. Dr. Lloris, I think those are all the questions I have right now. I may have some follow-up after some other questions, but I appreciate your time and your patience today.
THE WITNESS: Thank you.
- - - - -
CROSS-EXAMINATION
BY MR. SACHSE:
Q Dr. Lloris, buenas tardes. My name is Will Sachse. I am a lawyer representing GKS, and I have just a few questions for you today. First of all, thank you very much for taking the time to talk to all of us. We really appreciate it.
So let me start here. Did Uquifa supply ranitidine base to GSK?
A I do not know.



Q Okay. Well, let me see if I could jog your memory a little bit.
MR. SACHSE: Erik, if we could pull up 6439, and actually if we go to page 441. I think it's page 3 of this document, if we could blow that up. Great.
(Lloris Exhibit No. 2 was marked.)
BY MR. SACHSE:
Q Now, Doctor, you see here what we'll mark as Lloris 2. This is an application from GSK to the FDA, and you see that it's dated October 6, 2003?
A Yes.
Q Okay. And if we scroll down a little bit on this page, you can see at the bottom "manufacture ranitidine based at Union Quimica Farmaceutica S.A." That's Uquifa?
A Yes.
Q And as part of this application to the FDA to have Uquifa manufacture ranitidine base, Uquifa would have provided that drug master file that you were just talking about a few minutes ago?
A So we're not talking about the base because here it says hydrochloride -- chemical/biochemical/blood product name, it states hydrochloride at the top.
Q So maybe we should start there. What's the



difference between ranitidine base and ranitidine API?
A The API, it's the hydrochloride, meaning that it's a completed salt. It's a hydrochloride salt. This hydrochloride salt is prepared from the base, and this hydrochloride is introduced in base solution and then the hydrochloride is precipitated. So it's a different -- it's a different chemical entity. One thing is the base and the other -- the freebase and the other one is the hydrochloride.
Q So in other words --
A They have different properties. I mean, the physical and the characteristics of the two products are different.
Q And I apologize. I did not mean to interrupt you. So, in other words, you start with the base and then you turn it into the API?
A Yes.
Q Okay.
A During the process, you are to prepare first by reaction of two components. You have to prepare the base. And then once you have the base, you have to prepare the hydrochloride either in the form 1, the polymorphic form 1, or in the polymorphic form 2.
Q And so looking back at this FDA application, what we see on the bottom right hand, it says,



"Manufacture ranitidine base at Uquifa"; is that right?
A Yes.
Q And then on the left-hand side, it says, "Manufacture test and release ranitidine hydrochloride at Glaxo Wellcome Manufacturing," right?
A Yeah.
Q So --
A That's what it says.
Q So, in other words, Uquifa is making the ranitidine base for GSK, and then GSK is turning that ranitidine base into ranitidine API and finished product?
A I do not know.
Q Fair enough.
A This is what is put in here, but I do not know if this was the situation.
Q Okay. Fair enough.
A I do not have details because the date of that document was in 2003, so I do not know if at that time, you know, Uquifa was doing this.
(Lloris Exhibit No. 3 was marked.)
Q Okay. Well, let's take a look at another document just to close the loop on this. If we could pull up 9270, please, and we'll call this Lloris 3. And if we could actually put both pages up side by side,

Page 110

that would be great.

And so, Doctor, first of all, on page 1, you see towards the bottom, right below that black box, it says, "We acknowledge receipt of your submission dated October 6, 2003." Do you see that?

A Yes.

Q So the October 6, 2003, submission, that was Lloris 2, the document we were just looking at; is that right?

A I think it was. I can't recall now, but I think it was in 2003. I do not know if it was October, but --

Q Okay. And we see here that the supplemental applications provide for qualification of an alternate manufacturing site for ranitidine base used in the manufacture of ranitidine hydrochloride. That would be -- the alternate manufacturing site would be Uquifa; is that right?

A Yes, this is what is stated here.

Q Okay. And then if we go to the next page of this document, please -- we can take down that call out. And if you look at the first full paragraph on the second page, the first sentence says, "We completed our review of these supplemental applications and they are approved." Do you see that?

Page 111

A Yes, I can see it.

Q So based on that, is it your understanding that the FDA approved Uquifa to manufacture ranitidine base for GSK in -- after October of 2003?

A Yes.

Q Okay. To your knowledge, did Uquifa ever supply ranitidine API to GSK?

A Ranitidinie API you mean hydrochloride?

Q Correct.

A Yes, because I know -- I know that we were supplying the freebase as well. I do not know who was the customer, but we did have a DMA for the freebase as well. That's why I'm asking.

I do not have details of this situation. I do not know if Uquifa was supplying the freebase or the hydrochloride to GSK.

MR. SACHSE: And we can actually pull down Lloris 3 at this point.

Q Doctor, to your knowledge, did Uquifa supply ranitidine in any form to any manufacturer prior to October of 2003?

A Yes, I guess so because I -- I do have learned that we were manufacturing before 2003.

Q Sitting here right now, do you know who you were manufacturing ranitidine for prior to 2003?

Page 112

A No. Who you mean? Who was manufacturing?

MR. McCALL: Who?

Q Which customers you were manufacturing ranitidine for?

A No, I don't know. I don't know, but I was talking with some of the regulatory people, and, yes, I was just checking dates for the different DMFs that we do have, and then I have learned that we did have customers before this 2003, but I do not know who -- what our customer at that time.

Q Okay. Was your customer prior to 2003 Pfizer?

A I do not know.

Q Okay. Now, your testimony earlier today, this morning, was about ranitidine hydrochloride or the API; is that right?

A Yeah, we were talking about different codes, but basically we're talking about hydrochloride form 2.

Q So your testimony earlier today was not about the base or ranitidine finished product; is that right?

A Not finished product for sure because I do not have any information. I do have information of the freebase, but I do not recall any question as per the -- as per the freebase.

Q When making ranitidine API, did Uquifa use glass-lined equipment?

Page 113

A Glass lined, yes.

Q And why did Uquifa use glass-lined equipment?

A Because it -- because the final product is a hydrochloride, meaning that the using of this HCL in the system could, let's say, produce corrosion in stainless steel, so all the equipment that we are using is glass lined or Teflon protect.

MR. SACHSE: Thank you very much, Doctor. Those are all of my questions, and I appreciate your time.

THE WITNESS: Thank you.

MS. HORN: Hi. This is Elaine Horn. I just had a couple of questions for Pfizer.

- - - - -

CROSS-EXAMINATION

BY MS. HORN:

Q Doctor, prior -- do you have any personal knowledge of Uquifa manufacturing API for Pfizer prior to 2004?

A No, I do not have any information.

Q Okay. And do you know that when Uquifa first started manufacturing ranitidine for Pfizer, that it was shipped by air?

A I do not have the details of the transportation.

MS. HORN: No further questions. Thank you.
MR. SACHSE: Last call. Anyone else?
MR. WATTS: All right. Thank you, Doctor. We're all done.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: We are going off the record. The time is 12:36 UTC. We are now off the record.
(The proceedings were concluded at 7:36 a.m.)



CERTIFICATE OF REPORTER

STATE OF FLORIDA:
COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, RDR, CRR, FPR-C, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of MARIA LLORIS VLUDEZ; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 114 is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the outcome of the action.

Signed this 25th day of January, 2022.

________________________________________
LAURA J. LANDERMAN, RDR, CRR, FPR-C



CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, RDR, CRR, FPR-C, Notary Public, State of Florida at Large, do hereby certify that MARIA LLORIS VLUDEZ remotely appeared before me this 11th day of January 2022 and was duly sworn/affirmed.

WITNESS my hand and official seal this 25th day of January, 2022.

________________________________________
LAURA J. LANDERMAN, RDR, CRR, FPR-C



A C K N O W L E D G E M E N T

I, MARIA LLORIS VLUDEZ, hereby certify that I have read the foregoing transcript of my deposition given under oath on January 11, 2022; and that the transcript is a true, complete and correct record, to the best of my knowledge, recollection and belief, except for the corrections noted hereon and/or list of corrections, if any attached on a separate sheet herewith.

______________________________
MARIA LLORIS VLUDEZ

Sworn and subscribed before me,

this _____ day of _____________, 2022.

_________________________________

Notary Public, State of ______________

ERRATA SHEET - USL Job No. 6050179

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

I, MARIA LLORIS VLUDEZ, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record with the exception of the corrections listed below:

PAGE # LINE # CORRECTION

---------------------------------------------------------

________ ____________________

DATE SIGNATURE OF WITNESS

## Exhibits

**EX Lloris 0002 Maria Lloris 011122**
7:12 107:7
**EX Lloris 0003 Maria Lloris 011122**
7:13 109:21
**EX 5189 Maria Lloris 011122**
6:5 12:23 13:1 50:13
**EX 5190 Maria Lloris 011122**
6:6 14:12,15
**EX 5191 Maria Lloris 011122**
6:7 14:22
**EX 5208 Maria Lloris 011122**
6:8 18:6,7
**EX 5230 Maria Lloris 011122**
6:9 29:19,20
**EX 5239 Maria Lloris 011122**
6:10 19:7,9
**EX 5244 Maria Lloris 011122**
6:11 20:10,11 21:22
**EX 5245 Maria Lloris 011122**
6:12 20:19,20
**EX 5246 Maria Lloris 011122**
6:13 20:24 21:9 22:7,8
**EX 5253 Maria Lloris 011122**
6:14 31:12,14
**EX 5255 Maria Lloris 011122**
6:15 35:23,24
**EX 5256 Maria Lloris 011122**
6:16 33:11,12
**EX 5258 Maria Lloris 011122**
6:17 36:18,21
**EX 5261 Maria Lloris 011122**
6:18 51:10,12
**EX 5262 Maria Lloris 011122**
6:19 42:2
**EX 5263 Maria Lloris 011122**
6:20 44:22,24 45:6,14
**EX 5266 Maria Lloris 011122**
6:21 15:6,8
**EX 5268 Maria Lloris 011122**
6:22 52:14,17
**EX 5269 Maria Lloris 011122**
6:23 53:20
**EX 5272 Maria Lloris 011122**
6:24 55:15,17
**EX 5273 Maria Lloris 011122**
6:25 56:19,20
**EX 5274 Maria Lloris 011122**
7:2 46:24
**EX 5276 Maria Lloris 011122**
7:3 60:16
**EX 5278 Maria Lloris 011122**
7:4 25:3,5
**EX 5279 Maria Lloris 011122**
7:5 61:11
**EX 5280 Maria Lloris 011122**
7:6 66:1,3
**EX 5281 Maria Lloris 011122**
7:7 26:7,8 74:18,19 80:11
**EX 5284 Maria Lloris 011122**
7:8 10:1,4
**EX 5285 Maria Lloris 011122**
7:9 12:2,6
**EX 5671 Maria Lloris 011122**
7:10 68:7,9
**EX Lloris 0001 Maria Lloris 011122**
7:11 105:6

## 0

**0.080**
64:24
**0.16**
11:11,21 21:21,23 22:9,12 33:25 34:15,19,25 35:19 53:9 56:3 59:7,21,24 60:6 61:8 63:3 64:24 65:15
**0.160**
21:18
**0.7**
62:14
**000**
70:21
**0001**
71:19
**0002**
72:5
**016**
59:4
**027**
61:19
**031**
62:2
**058**
18:11
**065**
62:8
**0710078**
30:23

**0710084**
30:24
**076**
62:22
**078**
63:9
**079**
63:22 64:11
**086**
65:4
**087**
65:12

**1**

**1**
7:11 34:18 35:2,5,17 62:24 100:2, 3,4 105:4,5, 6 108:22,23 110:2
**1,500**
57:16
**1.2**
62:14
**10**
7:8 70:17
**105**
7:11
**106**
5:5
**107**
7:12
**108**
13:7
**109**
7:13
**10:46**
67:8
**11**
8:2
**110**
13:17,21
**1100**
4:6
**113**
5:5
**115**
5:7
**116**
5:8 14:4
**117**
5:9
**118**
5:10
**11:01**
67:11
**11:38**
91:22
**12**
6:5 7:9 31:4 34:16,20 35:2 54:13 59:4,21
**12.149**
21:23
**12.419**
20:17
**1200**
16:11,12,17 17:3,11,20, 25 18:2 51:18,21 55:21 56:16 64:20 99:18, 22,23 100:6, 14,20
**120020012004. 02**
70:25
**1207**
16:15 17:16, 19,23 18:3 42:8 51:17, 24 99:18,22, 23 100:6,12, 14,20
**1207-LAB19.04**
53:2
**1208**
16:17 17:5 64:21 99:25 100:1,2
**126**
66:4
**127**
66:4
**128**
50:13
**12:02**
92:2
**12:36**
114:7
**12th**
48:6,8
**13**
32:7
**14**
6:6,7 51:13
**145**
32:17 60:24 61:3,7
**146**
51:16
**15**
6:21 10:11 104:19 106:1,8
**15-minute**
67:9
**150**
18:10 106:3
**1500**
4:6
**16**
10:11 22:3
**1717**
4:3
**17th**
19:18 29:23 65:24
**18**
6:8 47:1
**18th**
19:19 47:17 49:5,9
**19**
6:10
**1936**
13:8
**1984**
29:9
**1993**
12:11
**1994**
12:13
**1st**
37:5

**2**

**2**
7:12 11:23 16:1,4,6,9 32:6 33:23 34:1,14 35:1,6,17 37:19,23 43:5 52:11, 19 53:3,5,6, 9 54:11,12, 13,14 55:19, 22,23,24 57:7 59:2,19 60:4,5 62:23,25 63:5,16,21 64:3,18 65:14,17 66:21 67:2,3 77:21 78:7, 12 81:22 84:17,22 85:3,7,14, 17,23 86:1, 8,12,14 87:11 100:7 107:7,10 108:23 110:8 112:17
**2,000**
57:16
**2.5**
46:7
**20**

6:11,12,13 10:15,24
**20005** 4:6
**2001/83/EC** 23:9
**2003** 107:11 109:19 110:5,7,11 111:4,21,23, 25 112:9,11
**2004** 113:19
**2007** 29:22
**2010** 93:7
**2011** 13:10
**2012** 13:13
**2018** 12:11,15 93:19
**2019** 10:15,24 13:3 16:5,8 19:9,10,11, 14 31:13 33:19 35:25 37:5 40:15 42:3 45:3,17 46:19 51:14 52:6 57:23, 25 58:11 60:2,11 82:13,17,21 83:5,12,17 84:9 98:3
**2020** 11:18 23:5, 22 24:1,8 26:4,9 47:1, 17 52:21 53:17,25 57:1 60:11, 14,15,17,19 65:24 76:16 78:10,13,18 82:21 84:25 85:2,8,12, 18,21 86:1, 11 87:5,10, 14,20,24 88:7 90:10
**2021** 40:18,20 68:13 72:12, 15,20
**2022** 8:2
**208** 30:7
**22** 6:2
**227** 45:20
**230** 46:1
**235** 46:17
**24** 6:3 35:6
**243** 53:14
**24th** 56:25
**25** 7:4 16:25 17:6,9,13 18:3 33:24 35:6 43:5 49:18 50:4, 22 51:2 62:13,17 63:16 64:3, 18 77:12 104:17
**25-minute** 91:23
**2500** 4:9
**252** 31:23
**257** 49:3
**258** 48:5
**26** 7:7
**260** 32:5
**2601** 6:2 22:20 23:2
**2606** 6:3 24:6
**2609** 6:4 58:12
**261** 32:10
**262** 32:21 33:1
**28** 12:9
**28th** 26:4
**29** 6:9 11:18 12:8
**29th** 46:19 60:2, 9,14

**3**

**3** 7:13 27:13 51:19 53:10 63:13,25 64:15 80:13 107:5 109:21,24 111:18
**30** 16:21,23 17:6,8,13 18:3 42:25 43:13,14 49:18 50:22 62:13 73:19 74:13 75:3,8 87:1,3,7 89:9 90:15, 20
**30-plus** 76:13 78:5 86:6 88:14, 20 90:23 91:4,10
**300** 4:9
**31** 6:14
**31st** 33:19
**32** 105:20
**33** 6:16
**343** 15:8,9
**344** 60:20
**35** 6:15
**36** 6:17 34:16 35:1,6,7 53:9 54:11 55:22 59:5, 6,21 60:7 65:16

**4**

**4-** 70:7
**4.5** 46:7
**40** 42:12 71:21
**42** 6:19
**439** 38:19,20

**44**
6:20
**440**
38:19
**441**
107:4
**442**
36:22
**443**
36:22
**452**
36:5
**46**
7:2
**46204**
4:9
**468**
80:13
**472**
29:4

**5**

**5**
16:4,13 17:4,11,24 18:2 34:20, 24 35:7 36:20 49:19 50:18 51:1, 11,19 52:7 53:10 56:16 58:6,10 59:6,23 62:12 63:2, 13,17,25 64:4,14,19 65:8,17
**5,000**
70:7
**50**
22:12
**50.5**
22:8
**51**
6:18 22:4
**5189**
6:5 12:23 13:1 50:13
**519**
56:23
**5190**
6:6 14:12,15
**5191**
6:7 14:22,24
**52**
6:22 42:4 51:7 52:17
**5208**
6:8 18:6,7
**5230**
6:9 29:19,20
**5239**
6:10 19:7,9
**5244**
6:11 20:10, 11 21:22
**5245**
6:12 20:19, 20 22:2
**5246**
6:13 20:24, 25 21:9 22:7,8
**5253**
6:14 31:12, 14
**5255**
6:15 35:23, 24
**5256**
6:16 33:11, 12
**5258**
6:17 36:18, 21
**5261**
6:18 51:10, 12
**5262**
6:19 42:2,5
**5263**
6:20 44:22, 24 45:6,14
**5266**
6:21 15:6,8
**5268**
6:22 52:14, 15,17,24
**5269**
6:23 53:20, 21
**5272**
6:24 55:15, 17
**5273**
6:25 56:19, 20
**5274**
7:2 46:24,25
**5276**
7:3 60:16,19
**5278**
7:4 25:3,5
**5279**
7:5 61:11,12
**5280**
7:6 66:1,3
**5281**
7:7 26:7,8 74:18,19 80:11
**5284**
7:8 10:1,4
**5285**
7:9 12:2,6
**53**
6:23
**5400**
4:3
**55**
6:24
**56**
6:25
**5671**
7:10 68:7,9
**570**
33:22
**571**
33:17
**572**
54:2
**576**
54:8
**58**
6:4
**581**
54:20

**6**

**6**
107:11 110:5,7
**6,000**
71:6
**6.2**
32:11
**60**
7:3
**600**
63:4 64:25 69:18
**61**
7:5
**6439**
107:3
**65**
63:17 64:4, 18
**66**
7:6
**679**
104:24 105:9
**68**
7:10

**7**

**70**
32:8,15 69:14
**718**
57:10
**719**
56:21

**720** 56:21
**73** 5:3
**746** 42:7
**75** 32:14
**75201** 4:3
**761** 59:1
**763** 25:11
**77** 21:24 22:12
**7:36** 114:9
**7th** 53:17

**8**

**8** 11:23 16:1, 4,6,10 52:11 54:12,14 55:23,25 57:7 60:5 65:14 66:21 67:2,3 78:7, 13 81:22 84:17,22 85:4,7,14, 17,23 86:2, 8,12 87:12
**8.086** 21:1,11 22:8
**8.096** 22:7
**8.177** 20:21 22:2
**85** 32:16
**86** 13:8
**8th** 23:25

**9**

**9** 5:3
**906** 61:8
**92** 5:4
**9270** 109:24
**97** 5:4
**996** 68:25
**997** 69:6
**999** 70:2
**9:13** 8:2
**9th** 53:24

**A**

**a.m.** 114:9
**ability** 15:25 52:7
**able** 24:23 68:22
**above** 35:15 70:4 71:1
**above-mentioned** 56:6
**accelerates** 81:9
**accordance** 84:12
**achieved** 38:2 61:3,7
**acidic** 33:4 34:8 46:9,12 59:15 62:5
**acidification** 39:7
**acknowledge** 57:14 110:4
**ACKNOWLEDGMENT** 5:9
**across** 44:17
**act** 28:13
**action** 9:3 25:7
**actions** 27:15
**active** 10:17 11:1, 9,19 20:4 22:13,16 23:11 24:11, 16 53:23 55:21
**actual** 95:9 96:2,12
**addition** 43:19
**additional** 18:16,17 47:4
**address** 82:7
**Administration** 101:8
**affected** 46:3 49:4,8 64:21
**affecting** 63:12,24 64:13 81:15 82:5
**afforded** 71:23
**affords** 69:13,23
**afraid** 72:17
**Agency** 45:22
**agent** 28:13
**agents** 62:2
**ago** 13:8 31:5 74:14 89:9 90:15,20 107:21
**Agrama** 20:12,14 21:10
**agree** 8:4 60:12 77:5,13,17, 24 78:4,20 79:3,6 81:8, 12,21 84:1, 16,20 86:15 89:1,4 90:13,18
**agreement** 68:1 87:17
**ahead** 41:6 67:16 76:6 81:18
**aim** 69:2 70:22
**air** 39:7 113:23
**airport** 43:25
**Alain** 37:6,9 38:20 40:7 47:2,5, 9 48:6
**alarm** 87:1,5,6
**alarmed** 16:22 42:24 43:13

**allowable** 21:24
**alternate** 110:14,17
**ambient** 42:21
**amended** 10:4
**America** 104:8
**amine** 62:5
**amount** 41:9
**amounts** 70:22 71:8, 14
**analyses** 11:7,16 40:20,24
**analysis** 10:14,20 25:17 27:5 30:18,21 31:4,20 36:13 37:14 49:23 74:21 78:25 82:20 83:5,9,13, 18,22
**analyze** 31:15 39:18
**and/or** 8:8 39:5,12, 19 40:8
**animal** 26:14
**answer** 24:20,21,22, 23,24 41:7 68:23
**answers** 97:2
**anyone** 8:17 114:2
**apart** 69:15 82:3
**API** 11:22 16:4,6 25:8 27:11 28:23,24 29:16 33:14 34:6,9 49:11 54:24,25 55:1 61:23 69:18 74:13 75:2,20 79:3 80:3,23,24 89:10,17 92:13,16,21, 24 93:4,7, 13,18,24 94:9,12 95:4,10 96:5,9,13,17 103:24 104:5 108:1,2,16 109:11 111:7,8 112:14,24 113:18
**APIS** 19:23
**apologies** 64:10
**apologize** 64:8 97:10 108:14
**appearing** 4:11 73:1
**appears** 36:7
**application** 107:10,18 108:24
**applications** 21:17 110:14,24
**applied** 21:18
**appreciate** 97:15 106:13,22 113:9
**appropriate** 12:20
**approved** 24:3 29:5 110:25 111:3
**approximately** 16:13 17:13 32:16
**area** 52:10 64:9 86:25
**argue** 48:10
**around** 70:7 71:6
**ASAP** 57:7
**asked** 10:12 22:14 82:16 97:16 101:18,22 102:20
**asking** 9:21 47:3 77:24 102:25 111:13
**asks** 42:8 57:3
**assess** 47:23
**assessing** 27:16
**assessment** 10:23 24:15 25:13 26:20, 23 27:5 37:13 58:13, 24 61:21
**associated** 53:5
**assumed** 38:6
**assurance** 56:10
**Atlantic** 44:17
**atmosphere** 69:11
**attached** 37:14
**attention** 74:24
**attorney** 73:12
**attorney-client** 8:8
**attorneys** 97:9
**Audio** 8:2,3
**audit** 15:9 19:10, 13,15,17,21, 25 20:3
**authored** 80:16
**authorities** 54:18 83:1 101:3,7,8 102:17
**authorization** 23:4,9,20
**authors** 61:16
**available** 33:8 36:12 47:23 50:14 52:1 99:10
**avoid** 11:2 52:20
**aware** 23:17 75:14 76:16 87:20 93:2,9 94:20 97:21

**B**

**back** 21:22 29:22 42:3 57:13 67:10 92:1

97:2 99:16 108:24
**background** 12:4,24 34:3 49:2 51:12
**bad** 30:9
**Barcelona** 13:22,24 14:16,20,25 15:3 18:18 42:17 73:23, 24 74:9 76:8,10
**Barcelona's** 74:7
**base** 31:17,25 106:24 107:19,22 108:1,4,5,8, 15,21 109:1, 10,11 110:15 111:4 112:19
**based** 13:22 26:13 27:18 35:7 54:8 56:1 59:17 65:12 79:2,6 84:16,20 97:2,15 100:17 107:15 111:2
**basically** 112:17
**basis** 94:19
**batch** 30:23,24 63:19 64:6 65:1 70:24
**batches** 16:11 52:19 63:16 64:3, 17 65:17 79:11
**Bates** 13:5,17,21 14:4 15:8,9 25:11 29:4 30:7 31:23 32:5,10,21, 25 33:1,17, 22 36:5,22 42:7 45:20 46:1,17 50:13 51:16 53:14 54:2, 8,20 56:21 59:1 60:20 61:19 62:2, 8,22 64:11 65:4 66:2,3 68:25 70:2 80:12 104:24
**began** 93:4
**begin** 31:6
**beginning** 70:17 88:13, 14 89:24 90:1
**behalf** 4:11 9:2,5 10:20 11:5, 8,14,25
**behavior** 38:8 41:14 70:5
**belief** 94:2
**believe** 28:21 55:6 80:20 82:23 91:24 94:1
**below** 11:10,20 16:21 39:6 46:4 60:6 69:6,18 110:3
**Berkenbusch** 58:17,18,21 60:8
**Bernal** 24:8
**better** 53:7 55:7 68:3 98:7
**BI** 15:12 92:17, 18,24 93:4, 7,24
**Biddle** 4:2,5,8
**big** 69:7 80:8
**bill** 105:9,13,20
**billion** 71:6
**bit** 107:2,13
**black** 110:3
**blow** 15:10 24:9 107:5
**boat** 104:12 106:8
**Boehringer** 4:15 10:14, 23 20:1 24:8,14,25 58:1,5,18,21 59:11 75:13, 21 83:7,8,12 85:12,16 87:25 88:1 90:4 91:5 92:14 93:9, 13,19 94:21 97:9,23 100:11 101:19 103:24 105:17
**borne** 40:21 41:17, 19
**bottom** 23:24 24:9 27:4 28:18 30:18,19,21 38:20 42:8 53:14 56:20, 23 62:23 65:23 66:3 71:7,10,12 72:6 80:14 107:14 108:25 110:3
**box** 110:3
**break** 31:7 67:6
**brown/gray** 30:15
**bud** 21:5
**buenas** 106:18
**bullet** 33:22 34:5, 12 38:23 43:19 47:12, 19,21,22 49:10
**burnt** 30:1
**business** 13:14
**button** 8:20
**buying** 94:12 95:10

## C

**calculate** 21:16
**California** 73:13
**call** 12:21 37:17 47:5,8 48:7 49:5,9 74:23

80:13 105:3, 4 109:24 110:21 114:2
**called** 100:22 104:14 105:9
**camera** 97:10,12
**capabilities** 15:21
**capability** 57:20
**capacity** 78:11,16 85:8,19 86:2,4,7,10 88:21
**carcinogen** 26:13 78:21
**carcinogenic** 32:3 45:21
**care** 96:15
**Carmony** 4:14
**Carolina** 18:9
**carried** 25:22 27:21 34:6 59:14
**case** 23:21 74:18 87:2 101:6
**cases** 63:1
**causing** 34:9 59:16
**cautions** 18:11
**Celoni** 14:1,8,14,19 15:15 16:19, 21 17:6,8 19:18 42:19, 22 43:2 50:15 51:25 52:6 74:3
**Celsius** 11:23 16:2, 6,10,13 17:4,7,12, 13,24 18:3 32:8,15 33:24 34:21, 24 35:6,7 42:12 43:13, 15 50:19,22 51:19 52:8 53:10 54:12, 14 55:24,25 56:16 57:7 58:7,10 59:6,23 60:5 62:12,13,14, 17 63:2,14, 16 64:1,3, 15,18 65:9, 14,18 69:14 71:22 78:8, 13 81:23 84:18,23 85:4,7,14, 18,23 86:2, 8,13 87:7,12 104:19 106:1,8
**center** 105:23
**centered** 25:18
**CEP** 54:17
**CEP/DMF** 54:16
**CEP/DMFS** 54:10
**certain** 28:14 41:9 84:3,9 103:6
**CERTIFICATE** 5:7,8
**certification** 19:22
**chain** 57:21 58:3
77:14,18,25
**chambers** 50:14
**change** 49:13,16 60:13 101:20,24 102:25 103:3,10,14, 18,22,25
**changed** 89:25
**changes** 35:16 49:12 98:4,6
**characteristics** 108:12
**charge** 96:14
**check** 40:15 47:20, 22 61:5 70:23
**checking** 112:7
**chemical** 28:1,10 48:12,18,21 108:7
**chemical/ biochemical/ blood** 107:23
**chemistry** 12:18
**Chilly-mazarin** 38:3
**Chris** 92:6
**city** 13:25
**clarify** 92:10
**classified** 26:13 45:20
**clear** 40:2 41:1,12 62:9 72:7 77:21
**clearly** 28:19 51:9 57:5 59:15 63:11,23 64:11,20 65:15 80:19
**clears** 87:2
**cleavage** 39:5,12,19 40:8 41:22
**click** 8:19
**client** 20:12 83:1 88:23 94:22
**clients** 87:18
**climactic** 50:14
**close** 73:19,21 109:23
**closed** 106:3
**clothing** 18:15
**CMDH/404/2019** 23:19
**CMO** 13:14
**Coapman** 54:4
**code** 16:11,16 17:16 64:20, 21 100:6,20
**codes** 112:16
**cold** 57:15,21 58:3 77:13, 17,25

**colleagues** 57:11
**combination** 49:24 80:4 81:2,25
**combined** 105:14
**come** 19:9 97:1 99:16
**comments** 66:16
**commercial** 95:11 96:1 97:17
**commits** 23:19
**communicate** 24:15 36:15
**communicated** 38:12 59:10
**communications** 11:17 42:6
**compactada** 105:21
**compacted** 16:16,18,19 17:12,18,19, 23 33:23 34:1 35:18 37:19,23 38:7 42:8,18 43:4 51:24 54:13 55:6 63:5,21 66:20 77:21 86:14,15,20, 22 87:11,16 88:15,21,22 99:24 100:13
**compacting** 15:15 57:6
**compaction** 51:25 62:10, 15,19,21
**compactor** 30:12
**company** 18:8 73:22 74:12 82:18 84:10 95:2
**compare** 50:24 62:19
**compared** 62:8,24
**complaint** 29:21 30:5
**complaints** 29:23
**completed** 108:3 110:23
**completion** 33:2
**complies** 56:2,6 59:3
**comply** 34:15 59:20
**components** 108:20
**compound** 99:23
**compounded** 17:5
**compromised** 48:24
**conclude** 54:22 96:25
**concluded** 23:18 59:18, 22 69:9 114:9
**conclusion** 22:1 32:22 33:1 34:12 36:5 72:6 81:1
**conclusions** 72:5
**condition** 59:5
**conditions** 16:7 17:17 21:19 28:14, 22 32:1 34:8,17,20 35:21 43:4 49:14,17 51:23 52:1, 3,20 54:12 55:18,21,23, 24 56:1,4 57:7,15,21 58:3 59:15, 22 62:6 64:23 66:23 71:1 77:14, 18,25 78:12, 17 80:21 81:3 84:25 87:18,21 88:2,9,12,13 90:1 94:23 98:18 99:3, 18 100:15, 17,21 101:14,20,24 102:3 106:7
**conduct** 71:15 99:11
**conducted** 70:3 72:21 83:13 100:18,19
**conducting** 78:25
**confident** 35:4
**confirm** 27:14 30:24
**confirmed** 24:16 25:20 26:24 27:19 41:23 42:1 49:12
**confirms** 24:10
**conformance** 84:5
**consent** 9:7
**consequence** 39:1,4
**consider** 49:22
**considered** 25:14
**considering** 40:13 54:10 71:5
**consistent** 38:12 60:13
**consistently** 53:7
**cont'd** 4:1 7:1
**contact** 39:7
**contained** 83:22
**container** 76:2 104:14, 15 105:25
**containers** 77:7,9 104:20
**contaminants** 25:21 27:1, 21 48:1
**contamination** 19:22
**content** 20:15 21:1 22:19 28:15 32:2,12,13 34:14,25 38:7,16 41:2,11,13 46:2,9,13 50:21 53:4, 8,23 54:19, 25 56:3 59:3,20,24 60:6 62:12, 14,17 63:2, 10,12,14,18, 19,24 64:1, 5,6,13,15,

17,20,23,25 65:6,9,15 68:19,20 69:10,13,17 70:6,10,12, 14 71:4,21, 22,23 72:7 79:17 80:1,9 81:12,20,23 82:1 86:21
**contents** 53:4 70:7,18
**context** 26:12 95:16
**continue** 8:4
**continued** 72:11 75:16
**continues** 28:8 34:15 38:21 59:20
**contract** 13:14 96:15 102:11,14
**contracts** 96:11
**control** 17:17 25:8 28:20,21 42:11 43:8, 20 44:16 75:23 76:1, 11,12,17,21 77:1,6,10 80:19,20 82:7 89:16
**controlled** 42:21,23 43:12 44:3 57:7 78:7 102:8 104:15
**controlling** 89:1,5
**controls** 89:8 90:5, 10,14,19,25 91:6,12
**conversations** 8:7,8
**cooler** 43:1,16
**copied** 47:2
**copying** 57:13 66:11
**core** 18:10
**corner** 8:20 13:5
**correct** 12:19 13:3 15:16,17 16:15 19:19 20:22 25:9, 24 26:2 33:9,25 34:21 35:2 36:10 38:10 40:9 41:25 44:6 45:17 46:15,19 49:20,21 50:19,23 51:14 52:21 57:1 59:11 60:14 68:17 74:14 75:24 76:11 79:21 80:3,16 81:5,24 82:8 83:10,14 86:11,23 87:7,22 88:17 89:18 94:14 96:5, 13 98:5,9 99:8 100:10, 15 101:16 102:4,7,22, 25 103:4,12 104:1,9,14 111:9
**correctly** 23:22 25:23 28:24 32:19 35:8 49:14, 15 53:11 55:8 56:8 59:8 69:25 70:19
**correlation** 41:2,12 46:12 68:19 71:20 72:7
**corresponds** 100:6
**corrosion** 113:5
**cost** 57:15 78:4
**costs** 77:13,17,25 89:2,6
**counsel** 8:23 92:7
**couple** 113:13
**court** 9:4 73:13
**cover** 49:10
**create** 41:22
**created** 40:8 79:7,13 80:3 81:2
**creating** 8:11 39:11, 18
**creation** 81:9 82:10
**criticality** 54:24
**Cross-examination** 5:4,5 92:4 97:6 106:16 113:15
**crystallin** 100:8
**crystallization** 45:2,15 71:16
**current** 34:17 49:13 63:1 65:7
**customer** 43:20 94:8 95:3,22 96:12 102:25 103:5 111:12 112:10,11
**customers** 95:7,10 96:2 102:11,19 112:3,9
**cut** 22:22 29:12 32:23 44:10 72:14
**cutting** 13:19 28:3 45:4,11

**D**

**D-1** 105:3
**daily** 21:13,17 63:4 64:25
**Dallas** 4:3
**Daniel** 24:7
**dark** 30:22
**data** 18:22,23 19:4 34:13 35:8,14 37:18,22 40:21 41:17 47:22 48:22 51:1,2 56:2 59:18 65:12,

19 77:20 84:6,13 94:3 103:14,15, 16,21
**date**
31:11 35:5 54:11,13 55:22 56:4,7 60:15 63:1 98:19 109:18
**dated**
13:2 23:25 33:18 35:25 36:20 37:5 45:3,16 47:1 48:6 52:20 65:24 68:12 107:11 110:4
**dates**
74:16 75:15 112:7
**day**
48:2
**days**
32:8 70:17
**DC**
4:6
**de**
14:2,5,23,24 15:3,14 16:8,12 17:4 19:18 50:15 51:22 56:11, 15 74:2 75:2
**Dear**
47:3 57:14
**December**
13:3 19:8, 10,11,14,18, 19
**decision**
17:19,23
**declaration**
60:3
**declare**
55:20
**deep**
25:15
**define**
61:24
**defined**
25:19 27:19
**definitely**
31:10
**degradation**
25:20 26:25 27:20 31:15, 24 32:1,5, 11,14 33:2,3 34:6 54:20, 22 55:6 59:13 60:24 65:5 69:23, 24 80:7
**degradations**
61:2
**degrade**
31:7
**degree**
81:22
**degrees**
11:23 16:1, 2,4,6,10,13, 21,25 17:4, 7,8,9,12,13, 24 18:2,4 32:8,15 33:24 34:20, 24 35:6,7 42:12,25 43:5,13 49:18,19 50:19,22 51:2,19 52:8,11 53:10 54:12, 14 55:23,24, 25 56:16 57:7 58:6,10 59:6,23 60:5 62:12,13,14, 17 63:2,13, 14,16,25 64:1,3,14,
15,18 65:8, 14,17 66:21 67:2,3 69:14 71:21 77:12 78:8,13 81:22 84:18, 23 85:4,7, 14,17,23 86:2,8,13 87:1,3,7,12 104:17,19 106:8
**demonstrate**
27:16 32:17 37:18
**demonstrated**
37:22 60:23
**demonstrating**
103:16
**density**
53:6 100:9 103:6
**department**
18:1 44:18, 20 46:22 95:11 96:1, 13
**dependence**
46:5
**dependent**
34:17 59:22
**depending**
28:14 59:5 62:10 81:11
**depends**
82:1
**DEPO**
4:13 22:22 51:8 104:25 105:7
**deposition**
8:15,22 10:5
**described**
68:5
**designated**
10:19 11:4, 14,24
**detailed**
28:19 66:18 80:14,18
**details**
93:8 95:6,9, 14 102:14 109:18 111:14 113:24
**detect**
39:24 79:15, 19,24
**detected**
22:13 62:11 64:15 67:4 79:18 80:1
**determination**
79:12
**determine**
11:8 22:15 31:23 98:22 99:2
**determined**
79:13 80:2 101:15
**determining**
32:2
**development**
12:14 44:25 45:7 46:22 73:18
**Diaz**
36:3 45:1,7, 16 46:18,21 53:15 68:12
**difference**
99:21 108:1
**different**
15:11,18,20 17:15 27:7 49:24,25 50:15 52:3 70:16,22,25 71:3,4,8,14, 15 80:4 95:6 98:16 99:17 100:4,8,15

102:20 103:8 108:7,11,13 112:7,16
**Dillon** 4:15
**direct** 5:3 9:18 41:12 73:9 74:24
**direction** 31:19
**directive** 23:9
**director** 24:4
**discard** 41:19
**discolored** 29:17 30:1
**discovering** 86:19
**discuss** 84:11
**discussed** 37:16 38:14 40:16,17,19 48:2
**discussing** 39:14 40:13 48:3 68:15
**discussion** 26:19,23 39:10
**displaying** 66:22
**divide** 22:3
**divided** 21:23
**Dlubala** 37:6,9,12 38:20,24 39:2,10 40:7 47:2,9,16 48:7 60:20
**DMA** 111:12
**DMF** 54:19 87:19 101:6 103:22
**DMFS** 112:7
**Doctor** 73:3 107:9 110:2 111:19 113:8,17 114:3
**document** 10:2 13:1,7 18:8 19:17 20:12 23:3,5 24:7 25:5,25 26:1,9 31:9 33:13 36:16, 19,20 53:13 54:17 72:10 104:23 105:13 107:5 109:19,23 110:8,21
**documented** 84:21
**documents** 11:17
**doing** 50:8 68:4 94:1 99:15 109:20
**dosage** 63:4
**dose** 21:17 64:25
**draft** 48:10
**dried** 79:17
**drier** 79:24
**Drinker** 4:2,5,8
**drive** 48:14
**driven** 54:23
**drug** 58:15 59:17 98:15 100:22,24,25 101:2,8,11, 15 102:3,6, 12,16,21 103:4,11,19 107:20
**drying** 46:4
**DSM** 18:8 29:23
**due** 36:8 55:7 80:3

**E**

**e-mail** 37:5 38:20, 22 47:1 48:6 56:24 57:13 66:3
**earlier** 29:11,16 92:11 112:13,18
**easy** 103:18
**echo** 17:2,21 21:3
**EDQM** 37:17 66:18
**effect** 62:20 68:11 69:12,15,22
**efficiency** 23:10
**either** 76:2 103:14 108:22
**elaboration** 48:14
**Elaine** 113:12
**elevated** 30:11,25
**eliminated** 25:18 79:25
**EMA** 45:21
**employer** 12:25
**enclosed** 66:15
**end** 23:21 40:12 70:6 79:16, 25 80:13
**ended** 22:15
**ending** 13:6 25:11
**ends** 104:24 105:9
**English** 67:22 68:3
**ensure** 34:24 35:16 56:2 59:23 65:14
**entire** 76:13 86:9 98:8 103:23
**entitled** 23:3 25:7 26:9 33:13 45:1,14 52:18 58:13 61:13 68:10
**entity** 105:17 108:7
**equals** 32:15 46:7
**equipment** 112:25 113:2,6
**Erik** 4:13 105:7 107:3
**ERRATA** 5:10

**ESQ**
4:2,5,8
**establish**
98:17
**established**
21:20 22:5 26:20,24 28:20 80:19 102:2
**estimated**
71:4
**ethanol**
38:16 69:13, 15,17,22,24 70:8,12 80:9 81:19
**ETOH**
36:9 38:6
**EU**
75:4
**European**
45:22 54:18
**Euros**
57:16
**evaluate**
61:21
**evaluation**
23:17 27:18 33:13,18 48:12 61:13 79:2,6
**evidence**
27:18
**evolution**
38:24 39:1, 3,4
**exactly**
18:20 42:1 92:20
**Examination**
5:3 9:18 73:9
**exceeding**
87:7
**excipients**
23:12
**excursion**
62:13
**excuse**
8:3
**executive**
26:9 48:11 66:6,8,9,12, 15 67:1 74:17,20,22
**exhaust**
18:17
**exhaustive**
25:17
**exhibit**
6:2,3,4,5,6, 7,8,9,10,11, 12,13,14,15, 16,17,18,19, 20,21,22,23, 24,25 7:2,3, 4,5,6,7,8,9, 10,11,12,13 10:1,4 12:2, 6,23 13:1 14:12,15,22 15:6,8 18:6, 7 19:7,9 20:10,11,19, 20,24 21:9, 22 22:7,8,20 23:2 24:6 25:3,5 26:7, 8 29:19,20 31:12,14 33:11,12 35:23,24 36:18,21 42:2,4 44:22,24 45:6,14 46:24 50:13 51:4,7,10, 11,12 52:14, 17 53:20 55:15,17 56:19,20 58:12 60:16 61:11 66:1,3 68:7,9 74:18,19 75:10 80:11, 13 81:7 105:6 107:7 109:21
**exhibits**
84:21
**exist**
10:18
**existing**
54:10 55:7
**experiment**
39:25
**experimental**
28:14 35:8, 14 59:18 72:23
**experiments**
25:21 26:25 27:20 70:3,4 71:14
**expert**
78:23
**expertise**
96:1
**expressed**
25:1
**extend**
35:5
**extensive**
27:17 54:21
**extent**
52:2
**external**
18:21 48:1

**F**

**face**
37:3
**facilities**
15:23,24 16:3 19:14 20:1
**facility**
16:22 19:11
**fact**
49:7 80:11
**factor**
50:10
**factories**
13:25 14:1 73:25 85:11
**factories'**
74:1
**factors**
80:5 81:15
**factory**
76:7 93:10
**Faegre**
4:2,5,8
**faint**
30:1
**fair**
41:18 86:5 95:15,19 97:19 109:14,17
**fall**
98:3
**familiar**
31:8 37:9 48:19 68:22 92:17 97:17, 20
**far**
21:15 25:1 44:2 58:11 83:16,20 84:4 85:5, 15,24 87:13 90:2,12 91:3,9,14 95:22,24 99:15 100:13 102:5 104:16
**Farmaceutica**
4:11 10:8 107:15
**favor**
69:3
**favored**
36:9 69:21

**favors**
32:18
**FDA**
66:17 101:9, 10,12,16 107:10,18 108:24 111:3
**features**
53:5
**February**
24:8 26:4 47:1,17 48:6,8 49:9 60:17,19
**fed**
30:13
**feeding**
30:10,11
**file**
54:17 84:14 88:13 89:24 100:22,24 101:1,2,6, 11,16 102:3, 6,12,21 103:4,11,19 104:23 107:20
**files**
35:16 102:16
**final**
8:16 28:23, 24 30:16 32:2 54:24, 25 61:23 69:17 80:23 94:11 104:12 113:3
**financially**
9:4
**find**
66:14
**Finding**
36:1
**findings**
54:9 84:16, 20
**Fine**
9:23
**finish**
41:8
**finished**
23:13 42:10, 15 43:7 51:21 109:11 112:19,20
**first**
9:21 10:13 30:7 40:17 45:9 49:6 67:6 71:5 74:12,23 89:9 90:15, 20 93:3 99:21 106:20 108:19 110:2,22,23 113:21
**five**
32:8 50:3 67:6 69:7,21
**flowability**
30:9
**flown**
44:5,13
**focus**
76:3
**focused**
28:20 35:11, 14 80:20
**folder**
104:24
**folks**
37:11
**follow**
98:20 99:10 102:6
**follow-up**
37:17 106:12
**followed**
56:5
**following**
54:11,23 55:23 57:3 102:16
**follows**
102:12
**Food**
101:8
**forced**
32:1 69:23
**foreign**
29:25 30:5
**form**
16:12,15 17:3,5,11, 20,25 18:2 24:19 32:6 33:23 34:1, 14,18 35:1, 2,5,6,17 37:19,23 38:2,7 42:8 43:5,10 46:13 49:17, 19 51:17,18 52:19 53:3, 5,6,9 54:11, 13 55:19,22 56:15 59:2, 19 60:4 62:23,24,25 63:5,21 65:16 75:25 76:23 77:8, 15,19,21 78:2,9,14 83:15,24 86:14,18 87:8 88:4, 11,18 89:11, 19 90:7 91:2,8 99:18 100:2,3,4,7, 8 108:22,23 111:20 112:17
**format**
37:15
**formation**
25:14 28:21 31:24 32:19 33:5 36:2 38:18 40:12, 25 41:3 45:3,16 46:5,6,13 62:3 68:12, 16 69:3,11, 15,17,20 70:24 71:25 72:8,11,21 80:21 81:2
**formed**
71:21
**forming**
28:13
**forms**
32:16 38:7,8
**forward**
31:13 57:17 66:16
**found**
33:3 53:3 72:7 86:16
**founded**
13:7
**four**
11:16 56:24 69:20
**fourth**
34:12 47:12
**frame**
86:9
**freebase**
108:8 111:11,12,15 112:22,23
**freight**
77:5 78:6
**Frieden**
57:10
**Friedman**
5:4 24:19 77:8,15,19 78:2,14 83:15 86:18 87:8 88:4 89:11 90:7

91:8 97:7,8 104:22 105:2,5,9,11 106:10
**fulfill** 57:16
**full** 9:24 110:22
**function** 45:7
**FUSON** 4:8

G

**gallery** 8:20
**gather** 103:16
**general** 15:23 62:3 103:8
**generally** 65:18 97:21 99:22 102:15
**generate** 28:12 61:25 65:19
**generated** 29:1 30:14 34:9 37:20 41:17 47:25 59:17 70:16 81:16 84:6
**generating** 33:24 35:14 37:24 84:13
**generation** 39:15 41:14 50:2 68:20 80:10
**George** 4:2 67:18,25
**george.mccall@faegredrinker.com** 4:4
**Gerda** 36:23 37:1 38:22 47:2,9 48:7 60:20
**getting** 21:3 26:21 49:2
**give** 9:14 78:3 87:14 104:25
**given** 39:6
**giving** 31:1
**GKS** 106:19
**Glanzmann** 36:24 37:2,11 47:2,9,17 48:7 60:21
**glass** 113:1,6
**glass-lined** 112:25 113:2
**Glaxo** 109:5
**Glaxosmithkline** 97:23
**GMP** 19:21
**God** 9:16
**goes** 38:23
**going** 10:2 12:5 44:9 49:16 67:7 73:4 91:21 96:25 106:8 114:6
**good** 9:20,23 67:22 73:11 92:7
**Google** 15:2
**government** 10:16 11:1
**grade** 53:6
**granulates** 30:22
**great** 68:4 107:6 110:1
**greater** 33:5 61:8 62:16
**group** 28:12
**growth** 13:13
**GSK** 106:24 107:10 109:10 111:4,7,16
**guarantee** 56:5
**Guerra** 4:14
**guess** 84:11 111:22
**guideline** 98:21
**guidelines** 84:7 98:20 99:7,11

H

**hand** 9:13 18:14 63:5 108:25
**handling** 18:12,18,25 73:12 102:7
**happened** 28:6
**hauling** 75:21
**hazard** 18:17
**HCL** 113:4
**head** 44:19 90:12
**headquarters** 13:24 73:24
**hear** 21:5 22:24 28:4 29:13 32:23 45:5,9 51:8 72:13
**held** 8:9 53:24
**Hello** 92:8
**help** 9:16 96:6
**hidden** 60:22
**high** 30:10 38:16 46:4 53:5 60:23 62:14 63:6
**higher** 30:14 31:1,6 33:24 38:6,9 43:14 46:5,10,12 62:21 63:19 64:6,25 66:22 70:16 81:8 86:16,21
**highest** 30:13 69:13 70:13
**highlighted** 49:10
**hired** 74:12

**history** 97:17
**hold** 60:17 70:11
**holder** 101:6
**holders** 23:4,9,21
**HOLIAN** 17:2,21 21:3
**Horn** 5:5 75:25 76:23 78:9 83:24 88:11, 18 89:19 91:2 113:12, 16 114:1
**HPLC-MS** 32:2
**human** 26:13 45:21 78:21
**humidity** 27:11 32:14 33:4 37:25 38:10 57:5 60:24 61:2 63:11,17,23 64:4,12,19 65:6 81:13 106:3
**hydrochloride** 14:6,9 16:1, 9 18:12,19, 24,25 19:4 20:5 21:1 22:14 24:17 25:8 29:17, 21,24,25 30:9,23 31:16,25 32:12 33:3, 14 36:2,8,9 37:19,23 41:24 42:16 44:4,8,11,16 45:2,15 46:2 48:13 52:19 53:3 55:19, 22 58:2,6, 10,15 59:14, 19 60:4 61:14,23 65:13 68:11 69:3,12,18 70:23,24 71:3,8,13,24 72:12,22 75:2 105:21 107:23,24 108:2,3,4,5, 6,9,22 109:4 110:16 111:8,16 112:14,17 113:4
**hydrolysis** 33:4
**hypothesis** 25:19 35:15 39:20 40:4, 6,7,14,16, 17,19,21 41:16 48:15 68:17 72:2
**hypothetical** 39:14

**I**

**ICH** 99:13
**idea** 14:13 39:22 40:2,10 41:20,21 66:17 71:2
**identification** 24:10
**identified** 27:15
**II** 15:12
**image** 15:3
**Imma** 24:3 29:5 44:21
**impact** 27:10,17 49:24 68:15 70:23 80:8 103:12
**implement** 91:6,12
**implemented** 89:8 90:14, 19
**implication** 39:6
**importance** 49:25 80:5
**important** 32:12 38:17 50:1 69:16 80:10
**impurities** 31:1 58:15
**impurity** 32:3,19 36:1,7 39:21 45:3,16,20, 21 48:23 61:13,22,25
**inaudible** 21:19 28:1 32:22 42:4
**include** 87:18
**included** 100:24
**includes** 42:25 43:15
**including** 23:11 37:6, 12 39:15 54:4,5 56:25
**increase** 38:9 47:23 65:9
**increased** 41:10 63:18 64:5,19 77:25
**increases** 69:10 70:6 81:13
**increasing** 65:6
**Indiana** 4:9
**Indianapolis** 4:9
**indicate** 17:16 47:13 106:6
**indicated** 56:5 104:4
**indication** 39:25
**individual** 11:13,24
**individual's** 66:5
**individuals** 56:25
**info** 31:9 86:19
**information** 12:5,25 23:3,20 26:17 33:8 36:12 38:22 47:4 74:15 78:22 85:1 100:23 101:3 112:21 113:20
**informed** 88:9
**Ingelheim** 4:15 10:14, 23 20:1 24:8,14,25 58:1,5,19,22 59:11 75:13, 21 83:7,8,13

85:13,16 88:1 90:4 91:5 92:14 93:19 97:9, 23 100:11 101:19 103:24 105:17
**ingredient** 10:17 11:2, 10,20 20:4 22:13,16 24:11,17 53:24
**ingredients** 23:12
**initial** 32:13 35:7 69:8 71:20
**inserted** 66:21
**inside** 42:6
**instabilities** 48:13,19
**instability** 47:14
**instance** 65:8 96:4 103:6
**instruct** 85:2,13,21 87:10 90:24 91:6,11
**instructed** 84:2 85:16, 25 88:8,23 89:16 101:19,24
**instructions** 87:15,17 90:5,10
**insufficient** 30:13
**intend** 35:15
**interactions** 8:8
**interested** 9:4
**interface** 8:10,21
**intern** 48:10
**internal** 15:9 16:16 18:21 21:18
**Internally** 22:5
**interpreter** 67:19,21,24 68:2
**interrupt** 41:6 81:18 108:14
**interrupted** 21:8
**introduce** 73:15
**introduced** 108:5
**introducing** 70:22
**Introduction** 45:19 69:1
**investigate** 82:14,16
**investigation** 22:15 33:9
**investigations** 54:21
**invoices** 96:9
**involved** 30:4 50:10
**involvement** 96:20
**iron** 40:9,15,17, 19,24 41:2, 9,13,16,22 68:11,16,19 69:2,21,22 70:8,14,15, 17,22 71:4, 5,9,14,15, 21,22,23 72:7
**isolated** 46:3 79:17, 22
**isolation** 79:24
**issue** 44:24
**issued** 37:20,24
**issues** 96:8

**J**

**January** 8:2 11:18 12:11,13 23:5,22,25 52:21 53:17, 24 57:1 60:2,9,11, 14,15 65:24
**Jennifer** 73:11
**Jessica** 56:10
**jog** 107:1
**John** 4:12 9:1
**joint** 53:22
**José** 36:3 45:1,7, 16 46:18,21 53:15 68:12
**July** 68:12 72:12, 15,20
**jury** 14:13 73:16
**justification** 103:3

**K**

**keep** 11:9,19 45:12
**key** 48:11
**kinetics** 54:21,22 55:6
**King** 104:23
**knew** 19:12 31:10 49:1,2,3,7 87:23
**know** 18:5,20 20:9 21:15 24:25 25:1,2 28:6 29:18 37:3 39:13 43:11 44:2 48:21, 23 50:7 58:8,11,18, 21 59:12 64:8 69:14 75:15 76:15, 19 80:6 83:16,20 84:4 85:5, 15,24 87:9, 13 90:2,12 91:3,9,14 92:20 93:3, 5,6,8,10,12, 15,16,20,21 94:2,11,15, 17,22 95:9, 22,24 96:4, 7,8,10,23 99:15 100:13 102:5,14 103:7 104:10,11,

12,16,18,21 106:25 109:13,15, 19,20 110:11 111:10,11, 15,24 112:5, 9,12 113:21
**knowing** 22:18
**knowledge** 111:6,19 113:18
**known** 10:8 78:20 88:2
**Komarek** 56:21,24 57:13 66:11

**L**

**lab** 20:14
**labeled** 57:6
**laboratory** 35:25 36:6 45:1,8,14 46:1,14 52:18 61:3 68:10 69:8 70:3
**Labs** 13:10
**lack** 98:7
**lading** 105:10,14,20
**Landerman** 9:5
**large** 8:19
**lastly** 11:16
**latest** 23:18
**Laura** 9:5
**lawyer** 73:4 106:19
**layer** 30:15
**lead** 30:14 40:12 62:11
**leading** 30:11
**learn** 31:5 32:6
**learned** 94:21 97:25 111:22 112:8
**left** 54:3
**left-hand** 109:3
**Legal** 9:2,5
**level** 10:25 11:9, 10,11,19,20, 21 20:17 21:10,16 81:4 82:8
**levels** 22:12 25:8 33:13,24 35:18 49:20 86:16,17 87:11
**LEXI** 4:8
**lexi.fuson@ faegredrinker .com** 4:10
**Liability** 8:25
**life** 11:12,22 35:19
**limit** 11:11,21 21:13,16,18, 21,24 22:4,9 34:16,19,25 53:8 59:7,21 61:9 65:16
**limited** 13:11 31:11
**line** 37:7
**lined** 113:1,7
**Linkedin** 12:6
**liquors** 71:16
**list** 80:21
**listed** 27:8 54:3,5
**lists** 28:21
**literature** 46:16 78:22, 24
**litigation** 8:25 73:12
**little** 97:11 107:2, 13
**Llica** 14:2,5,23,24 15:3,14 16:8,12 17:4 19:18 50:15 51:22 52:2 56:11,13,15 74:2 75:2
**lloris** 5:2 7:11,12, 13 9:7,20,25 10:2 12:21 29:8 47:10 48:9 53:21 67:5,13 68:10 71:11 72:11,20,25 73:11,17 74:20 78:20 80:15 84:1 86:5 89:7 90:13 91:15, 17 92:6,23 93:3 95:8 96:24 104:23 105:4,5,6,12 106:10,18 107:7,10 109:21,24 110:8 111:18
**LLP** 4:2,5,8
**local** 18:16
**located** 73:22 74:2, 3,5 93:10
**location** 42:19
**locked** 8:13
**logic** 54:9
**long** 18:2 98:23 99:2
**long-term** 64:22
**longer** 63:19 64:6 65:1
**look** 13:21 21:9 25:15 31:22 33:21 38:21 42:5 44:24 51:4 60:19 61:19 62:8 66:16 67:24 109:22 110:22
**looked** 27:6
**looking** 105:8 108:24

110:8
**loop**
109:23
**loss**
19:21
**lost**
77:24
**lot**
40:13 63:18 64:5
**lots**
57:4
**low**
34:14 38:16 46:3 53:4,6 59:2,19 63:14 64:1 65:8 81:22
**low-density**
53:6
**lower**
13:5 38:6 46:6,9,13 49:20 50:21 53:4 65:10 70:14 71:22, 23 81:24 82:12
**lumps**
30:24

**M**

**machine**
30:14
**made**
14:6,9 17:19,23 29:23 33:8 36:12 92:10
**MAH**
23:4
**main**
4:3 98:10
**maintain**
81:21 84:24
**maintained**
16:20 50:3, 25 53:8 63:1,13,25 64:14 65:8
**major**
13:13 75:3 98:4,6 103:15,22
**make**
35:15 94:19 102:11 103:2,10
**making**
103:3 109:9 112:24
**management**
47:13
**manager**
12:15 56:11, 13 73:18 95:13
**manufacture**
23:13 74:13 75:16 102:7 107:14,19 109:1,4 110:16 111:3
**manufactured**
29:24 41:24 42:16 52:19 58:16 61:24 63:20 64:7 65:1,7 75:13,20 76:14 84:2 86:6 88:7 90:24 91:5, 11 95:23 98:4,9
**manufacturer**
94:24 95:2 111:20
**manufactures**
102:12
**manufacturing**
13:14 14:15 15:10 18:9 25:15 28:22 63:15 64:2, 16 75:1,7 79:7,14,15 80:22 81:4 86:20 87:25 88:15,20 89:8,10,17, 20,21,22,23 90:3,6,11, 16,21 92:18, 25 94:9,13, 15 96:20 98:2 101:4 103:20 109:5 110:15,17 111:23,25 112:1,3 113:18,22
**March**
12:11,15 26:9
**Maria**
5:2 8:23 9:25 47:5,9, 19,22 48:9 49:11 67:20, 21 73:17
**mark**
107:9
**marked**
6:2,3,4 10:1 12:2,23 14:12,22 15:6 18:6 19:7 20:10, 19,24 25:3 26:7 29:19 31:12 33:11 35:23 36:18, 20 42:2 44:22 46:24 51:10 52:14 53:20 55:15 56:19 60:16 61:11 66:1 68:7 74:18 105:6 107:7
109:21
**market**
23:20 98:3,9 100:11
**marketers**
97:22
**marketing**
23:4,9
**markets**
75:3
**master**
100:22,24,25 101:2,11,16 102:3,6,12, 16,21 103:4, 11,19 107:20
**material**
18:21,23 19:4 39:22 51:3 65:7
**materials**
23:12 25:15 40:12
**matter**
8:24 29:25 30:5
**maximum**
21:16 57:5
**Mccall**
4:2 13:19 24:23 28:3 29:12 32:23 44:10 45:4,9 52:23 67:15, 17,18 68:6 72:14,17 73:7 78:3 105:4 112:2
**Mckee**
4:5
**mean**
13:14 19:12 41:6 43:24 48:16 49:21 66:2 81:17, 19 88:24 103:5,14

108:11,14 111:8 112:1
**meaning** 42:21 51:5 108:2 113:4
**measure** 45:23
**measured** 79:4
**mechanism** 39:6 69:16
**medicines** 45:22,23
**Mediterranean** 74:7,10,11
**medium** 33:5
**meet** 36:23 37:1 92:7
**meeting** 37:16 53:22 55:13
**meetings** 94:21
**melted** 30:1,8,23
**memory** 107:2
**mention** 49:5
**mentioned** 99:6,17,25
**merged** 13:10
**Meridian** 4:9
**methods** 101:4
**Mexico** 44:12 104:11
**mg** 18:10 64:25
**mgs** 63:4
**microphones** 8:6
**middle** 69:1
**Mikal** 9:20 17:2,21 22:22 51:8 72:14
**million** 11:11,21 20:17,21 21:2,11,21 22:9,12 32:7,17 33:25 34:16, 19,25 35:19 53:9 56:3 59:4,8,21,25 60:6,25 61:4,8,9 62:15 63:3 64:24 65:16 69:19 70:7
**minimized** 69:11
**minimum** 34:20 35:1
**minor** 103:15,21
**minus** 51:19 53:10 63:13,16,17, 25 64:3,4, 15,18,19
**minutes** 107:21
**mixture** 79:22,23
**modified** 35:20 52:19
**modulate** 82:4
**modulated** 82:1
**moiety** 28:1,10
**moisture** 32:11,14,18
**molecule** 47:14,25
**molecule's** 28:1,10
**moment** 38:15 104:25
**moments** 91:19
**money** 89:3
**monitored** 42:22 43:11, 12 86:24,25
**months** 23:19 33:25 34:16,20 35:1,2,6,7 53:9 54:11, 13 55:22 59:5,6,22 60:7 62:13 65:16
**Moore** 5:3 73:10,12 75:10 91:15
**Moore's** 92:12
**morning** 9:20,23 47:5 73:11 112:14
**mother** 71:16
**move** 31:13 42:25 43:15 57:17 87:2
**moving** 16:22
**multifactorial** 50:5

**N**

**N-NITROSAMINES** 58:14
**name** 9:1,20,24,25 36:23 66:5 73:11,16 92:6 97:8 106:18 107:24
**named** 37:1
**names** 74:1,4
**native** 67:20
**NDMA** 10:16,25 11:9,19 20:6,15,16, 21 21:10,11, 14,15,24 22:3,11,15, 19 24:11,16 25:8,13 26:12 28:13, 21 31:24 32:7,12,17 33:5,13,24 34:9,14,18, 25 35:18 36:1,7 37:14,24 38:9,18,25 39:3,5,11, 15,18 40:8, 12,25 41:3, 11,14,23 45:2,16,20 46:2,5,6,14 47:25 49:20 50:2,21 51:13 52:20 53:4,8,23 54:20,23 56:3,6 59:3, 6,16,20,24 60:6,22,23 61:13,22 62:9,11,14, 17 63:2,6,

10,12,14,18, 19,24 64:1, 5,6,13,15, 16,20,23,25 65:5,9,15 66:12,16 67:2 68:12, 16,20 69:3, 10,11,13,15, 20,23 70:5, 10,12,14,16, 23 71:21,23, 25 72:8,11, 21 78:20 79:3,7,10, 11,13,15,17, 19,24 80:2, 10,20 81:1, 9,12,15,23 82:1,5,10, 14,17,24 83:9,14,19, 22 86:16,21
**NDMA/NITRITE** 47:23
**necessary** 61:6 84:14 90:22
**need** 47:24 49:10 102:24 103:5,14,15
**needed** 67:21 89:12
**negative** 103:12
**Negotiable** 105:24
**never** 84:2 103:13
**Nina** 4:15
**nitrite** 28:12 62:5
**nitro** 27:25
**nitroethylene** 28:10
**nitrogen** 69:10
**nitrosamine** 19:22 23:3 61:22
**nitrosamines** 62:3
**nitrosating** 28:13 62:2
**NMT** 56:3 59:4 60:6
**noise** 34:3
**non-detectable** 67:3
**nondetected** 34:14 59:3, 19
**North** 4:9 18:9 104:8
**note** 8:5 51:12 53:8
**notes** 47:8
**notice** 10:4,7,11 66:19
**noticing** 33:23 34:23
**notified** 105:17
**November** 37:5 40:15 45:3,17 46:18 51:13
**NTM/NMSM** 48:14
**number** 10:22 11:16 13:6 16:11 22:21,25 30:23,24 37:6 51:9 52:23 54:2,4 70:12 105:3
**numbers** 61:5 103:20
**NW** 4:6

**O**

**OATH** 5:8
**Object** 83:15 90:7
**objection** 24:19 43:10 68:5 75:25 76:23 77:8, 15,19 78:2, 9,14 83:24 86:18 87:8 88:4,11,18 89:11,19 91:2,8
**objective** 31:23 35:17 45:19 61:20 69:1
**observations** 69:7
**observed** 29:17 33:6 46:6 60:24 70:5
**obtained** 70:8 71:5
**occasionally** 68:3
**occasions** 29:11,16
**occurrence** 58:14
**ocean** 44:17 77:5 78:6 104:5, 8,13
**October** 33:19 35:25 107:11 110:5,7,11 111:4,21
**odor** 30:1
**official** 21:15 98:20
**okay** 9:10 12:22, 24 17:1,3 18:7,23 19:8 20:7,11 30:7 43:6 44:4,23 48:5,18 50:3 58:12 60:15 62:22 66:9 67:5 68:6,9, 21 72:18 73:6,14 74:7 76:9,20 77:23 81:7 85:16 87:24 89:7 92:16 94:4,8 95:3, 8,12,25 96:4 97:13,14,21 99:1,6,25 100:3 101:18,22 102:2 104:22 105:5,19,23 106:10 107:1,13 108:18 109:17,22 110:13,20 111:6 112:11,13 113:21
**once** 27:14 40:6 56:23 79:16 108:21
**one** 14:5,9 15:23,25

16:16,18,19 31:14 38:23 39:2,21 40:11 49:17 50:10 57:11 60:13,21 61:2,16 64:22 69:9 70:5 74:2,3 80:5 97:8 99:24 101:7 103:8 108:7, 9

**one-month** 66:20

**ones** 82:3

**open** 105:3

**operating** 30:12

**opposed** 18:3

**oral** 45:23

**order** 11:18 18:9 20:5 54:23 57:17 96:16

**ordered** 45:22

**organic** 12:18

**organization** 13:15

**orient** 105:12

**outcome** 9:4 56:1

**outline** 64:10

**outside** 8:9 13:22,25 14:16,19,25 15:3 22:19 42:20 43:3 73:25

**overhead** 14:19 15:2

**overview** 13:2 50:13

**oxidation** 39:5,11,16, 19 40:8 41:22

**oxygen** 39:6

**P**

**pack** 57:5

**packages** 105:20

**packaging** 49:13

**packed/ shipped** 42:9

**page** 13:6,17,21 14:4,8,18 15:2,8,9 18:11 19:16 23:16,24 25:11,12,25 26:16,18,22 27:4,13 29:4 30:7 31:23 32:5,10,21, 25 33:1,17, 22 35:10 36:5,22 38:5 42:7 45:20 46:1,17 48:5 49:6 53:1, 13,14 54:2, 8,20 56:21 59:1 60:20 61:19 62:2, 8,22 63:9,22 64:11 65:4, 12,24 66:4, 14 68:25 69:6 70:2,21 71:19 72:5 80:13 107:4, 5,14 110:2, 20,23

**pages** 10:11 38:19 109:25

**paragraph** 74:24 110:22

**parameter** 49:22,25

**parameters** 27:7,17 28:20 38:18 50:1 51:6 55:8,16 80:4,20 82:2,4 102:8

**part** 8:19 23:8 25:11 31:20 38:5 45:9 47:12 62:22 65:4 102:10 107:18

**participants** 8:16 54:3,5

**participate** 19:25

**particles** 30:15

**particular** 20:16 31:9

**parties** 8:4

**parts** 11:11,21 20:17,21 21:2,11,21 22:9,12 32:7,17 33:25 34:15, 19,25 35:19 53:9 56:3 59:4,7,21,24 60:6,24 61:3,7,8 62:15 63:3 64:24 65:15 69:18 70:7 71:6

**party** 9:3 10:16 11:1 93:11 95:1,10

**Patheon** 94:24 95:3

**patience** 106:13

**pay** 96:7

**pays** 96:4

**PDF** 37:15

**people** 37:6 112:6

**percent** 32:14 63:17 64:4,18,19 106:3

**percentage** 46:6

**perform** 20:15 22:14 61:21 68:17 83:18

**performed** 10:15,24 11:8 15:15 25:17 30:19, 21 82:21 83:22 98:15

**performing** 26:24

**period** 34:16 35:1 38:1 59:4,21 65:16 82:22

**permissible** 21:13 22:4

**person** 11:4 67:20

**personal** 113:17
**personally** 12:5 96:16
**Pfizer** 74:13 75:20 83:17,21 85:21,25 88:8,9 89:16 90:2,24 97:23 101:23 112:11 113:13,18,22
**ph** 28:15,23 34:8 38:6,16 45:1,15 46:3,5,6,7,9,13 53:5 54:24 59:15 80:8,22 81:4,19 82:8
**Ph.d.** 12:18
**pharmaceutical** 10:17 11:2,9,19 20:4 22:13,16 23:12 24:11,17 53:23
**photograph** 14:15,24
**phrase** 67:23
**physical** 108:12
**pick** 8:6
**picture** 46:4
**place** 8:4 27:16 43:1,16,17 69:24
**Pladeveya** 24:4 29:5
44:21
**plaintiff** 8:23
**plan** 25:7 37:17 49:12
**planned** 19:17
**plant** 14:16,19,23 15:3,14 16:9,13 17:4 44:12 95:23
**plants** 15:7,18,20,25 16:5 79:8 87:22 88:3,10
**playing** 50:2 51:6 80:9
**please** 8:5 9:13 41:7 57:3,5 66:14 67:11 74:19,24 76:24 77:16 80:12 92:2 105:1 109:24 110:21
**point** 33:22 34:5,12 39:13 40:10,14 43:19 47:13,19,21,22 49:10 67:19 78:5 82:13 83:17 85:10,12 87:14 89:16 90:23 111:18
**pointed** 39:20
**points** 38:24 48:11 92:10
**polymer** 100:4,7,8
**polymorphic** 108:23
**port** 43:25 75:22 76:8,10,18,22 104:12 105:14
**position** 66:7 73:16
**positive** 18:15
**possibility** 16:3 51:22 88:25
**possible** 23:21 26:13 31:24 61:24 62:4 66:17 71:7,12,24 78:15
**postulate** 27:24 28:8
**potential** 25:13,18 39:14,21 58:15 60:22
**potentially** 34:9 35:20 40:1 59:16
**powder** 35:17 54:11 55:5 62:23
**powdered** 99:23
**ppms** 21:18
**precautions** 18:14,24 19:3
**precipitated** 108:6
**precursor** 39:5,11,18,24 40:7,11,25 48:14
**preliminary** 24:10
**prepare** 71:2 74:17 103:15 108:19,20,22
**prepared** 36:3 45:1 53:15 68:12 108:4
**preparing** 30:4
**presence** 8:9 10:25 27:25 28:9 36:8 40:3,11 52:20 61:13 62:4 68:11 69:2,10,21 70:14,15 71:23
**present** 4:14 10:17 20:6 24:16 39:22 61:23 79:3,5,10 82:14,17,24 83:9,19 103:14
**presented** 53:3 54:18 84:14
**presenting** 103:21
**pressure** 18:15
**prevent** 82:10
**preventative** 45:23
**previous** 53:2 70:5
**previously** 6:2,3,4
**primarily** 104:5

**principal** 82:2
**prior** 12:17 16:5,8 20:3 52:6 57:23,25 76:16 78:13, 18 82:13,17 83:5,12,17 84:9 85:2,8, 12,18,21 86:1,11 87:5,10,14, 20,24 88:6 90:10 111:20,25 112:11 113:17,18
**private** 8:7
**probable** 45:21
**probably** 63:11,23 64:12 84:11
**problem** 52:10 76:25
**problems** 30:8
**procedure** 68:5 79:24, 25
**proceed** 67:11 92:2
**proceedings** 114:9
**process** 15:10,14 25:15 28:22 52:20 55:3, 4,5 57:4,17 60:22 79:7, 14,16 80:22 89:9,17,20, 22,23 90:3, 6,11 98:10 108:19
**produce** 113:5
**produced** 20:5 24:18 41:16 101:5
**product** 15:12 16:22 25:16 30:10, 13,16 34:24 35:18,20 36:9 42:15, 18 43:1,4,7 46:3 50:3,4, 25 51:21 52:7,12 56:2,6 57:20 59:24 62:10, 24 63:12,24 64:13 65:14 70:13 75:3, 22 76:18 77:4,14,18 78:6,7,17 79:16,20 82:24 86:7 87:5,25 89:2 90:21 91:1, 7,13 93:9 94:11 100:10,12 107:24 109:12 112:19,20 113:3
**production** 89:25
**products** 8:25 14:5,9 17:15 23:11, 13,18 42:10 52:4 98:23 99:3,19 102:13 103:12 108:12
**profile** 12:6 28:24 34:8 59:16 80:23
**Promeco** 10:14,24 44:12 92:17, 18,24 93:4,7
**properly** 72:13
**properties** 108:11
**propose** 48:9
**protect** 113:7
**protection** 18:15 57:5
**protections** 18:14,18
**protective** 18:15
**protocol** 16:23 42:25 43:15 87:1
**protocols** 48:23
**provide** 23:20 90:4,9 110:14
**provided** 77:20 92:13, 16,24,25 107:20
**providing** 93:4,6,13, 18,24 94:5, 18
**publication** 23:19
**published** 99:7
**pull** 74:19 80:11 104:22 107:3 109:24 111:17
**purchase** 95:4,16,20, 21 96:5,9, 12,17
**purged** 71:15
**purpose** 8:11 61:20
**purposes** 92:25 94:9 95:21,24
**put** 27:16 44:12, 14 60:9 109:15,25

Q

**Q1** 99:13
**qualification** 110:14
**quality** 18:1 23:10, 11 24:4 44:18,19 56:10 62:23 95:11 101:4 103:7,12
**quantities** 70:25
**quantity** 38:25 39:3 60:23 70:16 71:15
**question** 13:20 17:22 18:10,13 21:7 24:14 36:21 40:5 45:10 51:16 67:23,24 68:23 76:24 77:16 95:18 112:22
**questions** 9:21 73:1,4, 5,13 91:16, 19,25 92:9, 13 97:1,2,

10,13,16 98:12 101:18,23 104:4 106:11,12,20 113:9,13 114:1

**quickest** 57:18

**Quimica** 4:11 10:7 107:15

**R**

**R&d** 53:2 73:18 95:13,16,21,24,25

**raise** 9:13

**Ramos** 24:7

**range** 103:18

**ranitidine** 8:24 14:6,9 16:1,9 17:11,12,18 18:12,19,24,25 19:4 20:4,15 21:1,17 22:14 24:17 25:8 28:10,12 29:17,21,23,25 30:9,22,24,25 31:5,11,16,25 32:6,12 33:2,14 34:13,18 36:2,8 37:14,19,23 41:3,9,13,16 42:16,25 43:5,16 44:4,8,11,16 45:2,15,24 46:2 47:25 48:13,19,23 49:4,8,18 50:18,21,22 51:13 52:18 53:3,23 55:19,21 56:16 57:4 58:2,6,10,15 59:14,18 60:4 61:14,23 65:13 68:11,19 69:3,12,18 70:23,24 71:3,13,24 72:12,22 74:13 75:1,7,13,17,20 76:14 78:12 79:2,3,20 81:8,10,13 82:11,14,17 83:10,14,19,23 84:2,3,8,17,22 85:3,7,13,17,22 86:1,6,12,15,22 87:1,2,5,11,16,22,25 88:7,10,15,16,21,22 89:2,10,18 90:11,15,16,20,24 91:5,11,13 92:13,16,21,24 93:4,7,13,18,24 94:5,9,12,18 95:4,16,20,23 96:5 97:18 98:5,8 99:2,3,19 100:22 102:7 103:24 104:1 105:20 106:8,24 107:15,19 108:1 109:1,4,10,11 110:15,16 111:3,7,20,25 112:4,14,19,24 113:22

**ranitidine's** 28:1

**Ranitidinie** 111:8

**raw** 23:12 25:15

**reached** 87:3

**reaching** 63:6

**reaction** 62:5 79:22,23 108:20

**reactivities** 48:12,18,21

**reactors** 15:22

**read** 23:22 25:22 28:15,24 30:17 32:3,19 35:8 38:10 49:14,15 52:4,5,22 53:11 55:8 56:7 59:8 63:7,8 64:8,9 66:24 69:25 70:19 71:16,25 78:23,24

**ready** 97:12

**real** 50:1

**realized** 68:18

**rearrangement** 28:11

**reask** 21:7 40:5

**reason** 49:16 51:20 52:2 69:17 82:20,23 84:12 102:24 103:25

**Reath** 4:2,5,8

**recall** 19:1,13,15 36:16 37:3 47:18 48:3 61:5 92:14 94:5 99:19 101:20,25 110:10 112:22

**receipt** 110:4

**receive** 58:1

**received** 37:12 47:4 60:3 96:16

**recess** 67:9 91:23

**recipe** 98:7

**recollection** 75:6

**recommended** 84:24

**record** 8:1,5 9:24 67:8,10,25 91:21 92:1 114:7,8

**recording** 8:3,12

**recovery** 25:16

**reduce** 84:14

**reduced** 69:18

**reducing** 103:18
**reefer** 104:14 105:25
**refer** 74:4
**reference** 27:6
**references** 29:24
**referring** 43:8
**reflexivity** 66:22
**refresh** 75:6
**refrigeration** 15:21,22,24 17:20,24
**regarding** 10:15,25
**Regina** 4:14
**registration** 55:7
**regulations** 99:11
**regulatory** 11:10,20 35:16 112:6
**related** 9:3 27:25 28:9 30:8 47:23
**relating** 11:17
**relations** 96:2
**relationships** 95:9
**relative** 27:7 32:14 63:11,17,23 64:4,12,19
**release** 34:15,18 59:3,20 79:10 80:1 109:4
**released** 51:21 79:18
**relevant** 53:7
**remained** 59:7
**remaining** 98:24
**remains** 34:19 60:6 63:2
**remarkably** 49:20
**remote** 8:10,22
**Remotedepo** 8:21
**remotely** 9:8,11
**remove** 8:14
**repeat** 13:20 76:24 77:16 95:18
**report** 26:12 28:18, 19 29:1 31:22 33:21 35:25 36:6 37:15,16 44:25 45:8, 14 46:1,17 52:18 53:1, 2,14 61:13, 17,20,21 63:10 65:10 66:12,18 68:10,21,22 69:2,7 70:3 80:14,16,19
**reported** 38:1
**reporter** 5:7 9:5,7, 10,13 22:21, 24
**reports** 66:21
**representing** 67:18 106:19
**request** 58:1,5,9 82:25 83:13, 18 102:22
**requested** 10:14,23 83:4,8,21
**require** 17:20,24 18:24 103:6
**required** 23:20 35:16 78:1 101:3 102:10 103:7
**requirement** 48:9 57:17 77:21 82:25
**requirements** 18:16
**requires** 43:21
**research** 12:10,14 44:25 45:7 46:21 73:18 95:17
**reserve** 97:1
**residual** 28:23 54:24 80:23
**resin** 71:1,4,22
**resistor** 90:1
**respect** 10:22 13:2 18:8,11 21:14 30:5 32:11,13 41:15 42:16 43:18 50:12 53:22 63:9
**respiratory** 18:14
**response** 9:9 29:21 30:4 41:10, 11 51:20 92:12
**responsibility** 96:15
**responsible** 23:10 44:15 102:16
**restraining** 103:17
**result** 12:21 21:22 22:3,11 38:14 40:2, 23 41:1 46:14 49:7 61:7 62:12 80:6
**resulting** 63:18 64:5
**results** 22:11,17 37:25 38:2, 15 48:25 52:18 62:9 65:20 66:20 79:9 82:12 98:16
**retained** 51:17,18 52:9,12 63:13,25 64:14
**retest** 31:11 35:5 54:11,13 55:22 56:4,7 63:1 98:19
**retesting** 38:1

**revealed** 10:16,25
**review** 110:24
**reviewed** 24:3 65:20
**rework** 71:7,13
**Rick** 21:5
**right** 8:20 9:13 12:3,8,12, 15,18,20,21 13:8,11,23 14:2,3,6,7, 10,11,16,20, 21,25 15:1, 4,5 16:13 17:7 19:5,23 20:17 21:7, 11,25 22:4,9 25:4 26:5,14 27:2,8,11 28:16 29:2,6 32:3 33:15, 19 36:3 41:21 44:13 46:7,10 47:10 48:20 50:12,16 52:4,5,8 53:18 54:5, 6,14,15 55:1 56:12,17 57:8,11,18 60:10 61:4, 9,12,14,17, 25 62:18,19 63:7,8 65:24 66:12,24 67:3 68:23 69:4 71:17, 25 72:3,8 74:7,8,11 76:22 82:11, 22 97:1 98:11 102:13 104:6 106:11 108:25 109:1,5 110:3,9,18 111:24 112:15,19 114:3
**rise** 42:12
**rised** 42:24
**risk** 10:23 23:17 24:10,11,15, 16 25:13 26:19,23 27:5 37:13 58:13,24
**Rob** 105:7
**Robert** 97:8
**role** 50:2 51:6 69:16 80:10
**room** 42:21 51:17 62:16 63:6 68:2 86:23 88:16
**root** 10:13,20 22:15 25:13, 17,18,19 26:19,20,23, 24 27:5,14, 15,19 31:4, 20 33:9 36:1,13 37:13 38:8 47:14 48:11, 15 49:23 61:24 66:23 71:24 74:21 78:25 79:12 82:20 83:4, 8,13,18,21
**route** 15:12,13
**routes** 15:11
**RRSS** 53:4

**S**

**S.A.** 107:15
**Sachse** 5:5 91:17 106:17,19 107:3,8 111:17 113:8 114:2
**safely** 99:4
**safety** 18:22,23 19:4 23:10
**salt** 108:3,4
**salts** 70:8,14,15
**sample** 20:16,21,25 21:10 57:4 64:22 70:17 71:6,21,22
**samples** 20:15 22:18 30:22 31:2 38:1 41:2,13 51:17,18 52:9,12 57:15 62:15 63:13,25 64:14 68:20 71:3,8,13 79:4,20,23 86:20
**San** 83:2
**Sanchez** 56:10
**Sanofi** 24:7 36:15, 19,20,24 38:13,14 39:23 41:20, 21 42:6 43:6 46:25 51:12 53:22 54:3 55:10,12 57:8 58:1,9 66:16 75:17, 21 82:13,16 83:4 84:2,8 85:2,6 87:10,14,20 90:8,9 91:11 92:7 94:5,8, 12,13,15,17, 18,21,22 96:17 97:24 101:23
**Sanofi's** 95:16,20 96:19
**Sant** 14:1,8,14,19 15:15 16:19, 21 17:6,8 19:18 42:19, 22 43:1 50:15 51:25 52:6 74:3
**SAU** 4:11 10:8
**Saurabh** 66:4,6
**Saurabh's** 66:7
**saying** 67:2
**says** 12:7 13:7,13 15:11,13 23:8,16 26:12,19,22 27:4,10,13, 14,24 28:18 29:22 30:7,

18,19,21 32:10 33:1, 6,22 34:2,5, 12 36:6 37:15,22 38:5,22,24 39:2 42:9 43:19 45:20 46:1 47:3, 12,19,21 48:8 49:10 51:24 53:2 54:8,21 55:3,4,5,19 57:4 59:2,13 60:2,22 61:20 66:14 69:1,8 70:21 71:2,7,10, 12,20 74:25 105:13,24,25 107:23 108:25 109:3,8 110:4,23

**scheduled** 51:13

**Schmitzer** 4:12 9:1

**scientific** 26:18,22 27:18 54:9 103:3

**scientist** 12:10 95:25

**Scott** 54:4

**screen** 8:19 10:3,5 74:19

**screens** 8:13

**screws** 30:11

**scroll** 107:13

**sea** 44:14 74:8

105:13

**second** 14:18 15:2 18:11 19:16 26:16,18,22 33:22 34:5 48:5 53:1 60:18 74:25 78:3 99:17 110:23

**secondary** 62:4

**see** 10:3,5 13:5, 17,21 14:4, 18,23 15:2 19:17 20:6, 11 21:22 23:5,14,24 24:9,12 26:8 29:4 30:2,16 31:2,3 37:4, 14 38:3 39:8,9 41:11 42:7,13,14 43:21,22 45:24 47:6 48:16,17 50:14 58:24 59:25 60:1, 25 61:1 74:23 75:4 79:23 80:24 91:19 105:12,15, 16,19,23 106:2,4,9 107:1,9,11, 14 108:25 110:3,5,13, 25 111:1

**send** 57:3 66:17

**sending** 93:9

**sends** 57:13

**senior** 12:10

**sensitive** 8:6

**sensitivity** 27:15,25 28:9 80:3

**sentence** 74:25 110:23

**September** 16:5,8 29:22 52:6 57:23, 25 58:11

**seriously** 102:22

**set** 70:4

**setting** 8:15

**several** 25:21 26:25 27:20 79:19

**SG** 66:4

**shakes** 90:12

**share** 47:4

**sheet** 5:10 18:22, 23 19:4

**shelf** 11:12,22 35:19

**ship** 44:14 57:6, 15,20 58:6,9 75:22 78:11

**shipment** 76:2 106:7

**shipped** 44:5,7,11,17 58:2 77:5 78:6 92:21 104:5,8,13, 14 113:23

**shipper** 105:16

**shipping** 77:6,9 104:4,12 106:7

**ships** 44:12

**show** 10:2 18:7 20:11 24:6 29:20 31:14 36:19,20 38:8 40:24 42:3 46:17 51:7,11 55:17 58:12 59:1,15 68:21

**showed** 20:16 38:15 41:1 46:5 49:20,23

**showing** 22:11 32:7 65:13

**shows** 20:12 21:10

**sick** 97:11

**side** 54:3,5 109:3,25

**signature** 65:23

**signed** 24:7 26:4

**significantly** 65:9 81:23

**similar** 15:23 38:2 70:18

**similarly** 94:4

**simply** 51:20

**sir**
21:4 48:16
**site**
14:5,8,14,25 15:15 16:20, 21 17:6,8 19:18,19 42:9,19,22 43:2,7,25 51:22 52:7 56:11,15 75:2 92:18 110:15,17
**sites**
14:14
**Sitting**
111:24
**situation**
103:17 109:16 111:14
**smoothest**
57:18
**sold**
93:1 94:10 96:21 103:23
**solid**
32:16 69:20
**solubilized**
69:13
**solution**
69:22 70:13 108:5
**solvent**
25:16 28:15, 23 34:8 38:16 54:24 59:16 80:23 81:4 82:8
**sound**
71:11
**sounded**
87:6
**Spain**
13:8,22 18:13 73:23 75:2,7
**Spalding**
104:24
**Spanish**
68:4 73:22
**Spanish-speaking**
67:20
**speaker**
8:13
**speaks**
67:22
**spec**
35:19
**special**
17:16,17 18:24
**species**
41:9 69:21 70:17
**specifically**
22:17 38:17 46:7 48:4 92:17 99:2 103:19
**specification**
22:6 59:7 63:3 64:23
**specifications**
56:7 98:24 103:4 104:1
**specified**
100:15,21 104:19
**speed**
30:10,13
**Sperling**
4:15
**spike**
41:9
**spiked**
25:20 27:20
**spiking**
26:25
**spotlight**
8:15
**spotlighted**
8:12
**stabilities**
101:4
**stability**
17:14,15 25:19,22 27:1,11,21 31:10,16 39:21 48:22, 25 49:4,8 53:7 56:2 63:10 65:19, 20 66:20 77:20 80:7 84:6,13 98:13,17,22, 25 99:1,7, 11,16 100:18,19, 20,23 101:15 102:8
**stable**
15:13 62:24 63:5
**stainless**
113:5
**stamp**
80:12 105:24
**start**
36:22 106:23 107:25 108:15
**started**
67:14,15,17 89:9 90:16, 21 113:22
**state**
9:24 21:19 34:13 69:20 73:13
**stated**
19:2,3 59:2 89:23 98:19 110:19
**statement**
11:18 37:15 55:17 60:9, 13,21
**states**
44:5 93:1 94:10 96:21 97:18,22 107:24
**stating**
60:3 73:16
**stay**
87:19
**stayed**
98:8
**steel**
113:6
**step**
15:15 35:11 39:8
**steps**
35:12,13
**stopped**
93:12
**storage**
17:17 21:19 25:16 28:23 34:17,20,24 35:20 37:24 38:9,25 39:4,7 43:4 49:11,13,17 51:23 52:1,3 54:12,13,25 55:18,20,23 56:4 59:5, 22,23 62:11 65:13,19 66:22,23 67:2,3 77:22 80:22 81:4 84:4,15,24 87:4,18,21 88:2,10 89:2,21 90:14,17 98:17 99:18 100:15,17,21 101:14,20,24 102:3 103:25

**store**
16:1,3,6,9 52:7,9 84:3, 8 85:3,6,13, 17,22,25 86:7,12 87:11,16 88:22 99:4
**stored**
11:22 16:7, 12,18,19,24, 25 17:4,5, 11,12 18:2,3 33:23 42:19 49:18,19 50:18,22 51:17,19 53:10 56:16 59:6 60:5 62:16,25 65:17 84:17, 22 86:22 88:16 98:24
**storing**
81:8
**Stowed**
105:25
**strategy**
28:20 80:19
**Street**
4:3,6,9
**strike**
22:7 98:1
**STROGOSKY**
43:10
**strong**
30:2
**Strongosky**
5:4 91:24 92:5,6 96:24 97:16
**structure**
28:2,11
**studied**
32:16 83:6
**studies**
17:14,15 25:20,22 26:14,25 27:1,20,21 31:15 32:6 33:14 34:6 59:13 63:10 65:5 77:20 80:7 98:13, 17,19,22,25 99:1,7,12,16 100:18,24 101:15
**study**
33:2 39:22 40:11 44:18 45:1,15 98:14,15 100:19,20
**subject**
11:5,14,25
**subjected**
30:25 31:6
**subjecting**
32:1
**submission**
110:4,7
**submitted**
101:11,13,16 102:17
**subsequent**
39:17 72:16, 21
**substance**
55:21 58:16 59:17 98:15
**success**
39:25
**suit**
18:16
**Suite**
4:3,6,9
**summary**
26:10 37:14 48:11 58:13, 14 66:12,15 74:17,20,22 75:10 81:7 102:21 109:22 110:21
**summer**
42:13
**supplemental**
110:13,24
**supplied**
24:12 100:11
**supply**
106:23 111:7,19
**supplying**
111:11,15
**Support**
9:2,6
**supported**
37:25
**Supportive**
59:13
**sure**
13:21 26:21 45:11 89:5 102:11 103:2 105:2 112:20
**swear**
9:6,10,14
**swearing**
9:8
**synthesis**
15:11,13
**system**
30:10 113:5
**systematically**
25:14 27:6

**T**

**T-63**
71:1
**table**
69:7 71:19
**tablets**
18:10
**take**
8:4,18 13:6 15:8 19:8 22:2 25:4 38:19 67:5,6
**taken**
8:23 46:16
**takes**
69:24
**taking**
96:15 106:21
**talk**
12:4 91:19 106:21
**talking**
52:12 63:21 107:21,22 112:6,16,17
**tardes**
106:18
**target**
35:10,12,13
**TECH**
4:13 22:22 51:8 104:25 105:7
**Teflon**
113:7
**tell**
98:13 99:21 100:25
**telling**
50:5,7,9 90:2 103:6
**tells**
37:11
**temperature**
11:23 16:4, 23 27:10 28:15,22 32:15,18 33:4 34:7 37:25 38:10, 16 42:11,12, 21,22,23,24 43:8,12,14, 20,24 44:16, 18 47:24

48:24 49:5, 9,22 50:1,12 51:18 54:25 58:4 59:15 62:16,20,25 63:6,11,23 64:12,21 65:7,8,19 66:23 69:4, 9,15 75:23 76:1,11,17, 21 77:1,6,10 80:8,21 81:3,11,14, 19,22 82:3, 4,7 84:3,4, 5,9,15,17,22 85:3,7,14,22 86:1,8,12, 23,25 87:6, 15,21 88:9, 16,22,23 89:1,5,8,17 90:5,10,14, 19,25 91:6, 12 98:23 104:1,16,18 105:25

**temperature-controlled** 78:12,17

**temperature/ moisture** 36:10

**temperatures** 16:21 30:11, 14 31:1,6 46:4 51:1 62:11 69:14 78:7 81:3,9 98:16

**ten-minute** 67:6

**term** 98:7,12

**terms** 15:7 55:16

**tertiary** 62:4

**test** 21:22 22:3 34:13 88:12 109:4

**tested** 20:21 21:10 72:3 79:11, 20

**testified** 92:12 94:4

**testify** 10:13,20 11:5,14,25 93:23

**testimony** 5:2 9:14 92:10,14 94:6,19 112:13,18

**testing** 10:16 11:1, 7,17 20:3 40:20,24 41:15,18,23 61:3 68:16

**tests** 62:9

**Texas** 4:3

**thank** 9:23 12:3 68:6 73:1 75:11 91:16, 17 96:24 97:3,4,15 99:14 100:3 106:14,20 113:8,11 114:1,3,5

**thanks** 29:14 38:22

**theory** 30:8

**thermal** 25:19,21

27:1,14,21, 24 28:8 48:13,19 66:22 80:3

**thermodynamic** 47:14

**Thilo** 58:17

**thing** 104:3 108:8

**things** 39:2 49:24

**think** 37:4 40:18 72:23 77:23 78:10 91:17, 18 99:25 101:22 102:18 104:10 106:10 107:4 110:10,11

**third** 10:16 11:1,7 20:25 21:9 25:25 35:12 37:7 72:19 93:11 95:1

**third-party** 16:20,24 17:6,10 20:14 42:20 43:3

**Thornes** 4:13

**thought** 103:11

**three** 29:23 33:25 39:8 62:12 69:11 70:15

**tightening** 55:8,16

**till** 106:1

**Tim** 4:15

**time** 19:9 21:20 22:6 35:12 39:13 40:10, 14 47:24 64:21 65:6 67:8,11 69:4,9 70:6, 18 72:8,19 75:19 76:16 77:4 81:13 82:22 83:12 84:1 85:1,2, 21 86:9,19 87:10 89:16 91:18,22 92:2 96:25 97:3,12 98:2,8 103:21,23 106:13,21 109:19 112:10 113:10 114:7

**times** 21:24 22:4, 8,12 61:8 87:4

**title** 36:1

**today** 9:21 73:1 84:21 91:16 92:11 98:12 106:13,20 112:13,18

**told** 47:16 55:10, 12 84:8 85:6 100:14

**top** 25:12 32:11 38:21,23 51:16 56:21 59:1 66:4 70:4 105:13 107:24

**topic**
10:13,22 11:7 19:21 66:16
**topics**
10:12 12:4
**TRACI**
4:5
**traci.mckee@faegredrinker.com**
4:7
**transfer**
76:5,7
**translation**
77:24
**transport**
43:18,19,25 55:18,20,24 56:4 76:3,9,21 77:2,14,18,22 78:1,16 84:5 90:19,25 91:7,13 98:18 105:14
**transportation**
49:11 84:15 113:25
**transported**
11:23 60:4 76:18
**treated**
70:25 71:5
**treatment**
71:4,23
**trials**
36:7 66:20 69:8 80:6
**truck**
44:2 75:22,23 76:1,4,9,17 77:1 78:17
**trucks**
43:20
**true**
20:8 21:6 41:5,8 43:23 57:21 75:12 76:4,10,13 79:13 83:7 88:1 95:5 96:9 103:17
**truth**
9:15,16
**try**
15:19 26:20 28:5 30:20 32:25 37:20 39:1 42:5 44:9 45:6 47:20 48:9 56:22 57:23 64:9 71:10 72:15,19 89:13
**trying**
30:20 34:3 45:12 55:4
**Tulsion**
71:1
**turn**
51:11 80:12 108:16
**turning**
109:10
**twice**
64:9
**two**
10:22 13:25 14:1 15:7,11,18,20 50:25 52:3 63:15 64:2,16 69:10 70:10,12 73:24 108:12,20
**typical**
17:9
**typically**
79:17

**U**

**uncompacted**
86:17
**undergo**
28:11
**underneath**
105:24
**understand**
17:1,3 34:7 47:24 67:22,23 68:1 92:23 94:25 95:1 96:11 102:15,24
**understanding**
76:20,25 88:6 89:13,15 95:15,19 96:19,22 104:7 111:2
**Understood**
103:10
**Union**
4:11 10:7 107:15
**United**
44:5 93:1 94:10 96:21 97:18,22
**update**
33:14,18 37:12 66:17
**Updated**
25:7
**updating**
54:10
**upper**
8:20
**Uquifa**
4:11 10:8,10,12,15,19,24 11:4,8,13,25 12:7,15,17,25 13:2,7,18,22 15:9 18:1,13,18 19:10,13 20:5,13 22:14 23:5,17 24:4,12,15,18 25:1,5,17,22 27:22 29:8,21,24 31:15 34:2,5 35:25 37:13,16,18 39:17,23 40:20,23 41:16,24 42:11,17 44:15 45:8 47:5,13 48:7,9 51:13 53:22,24 54:4 55:20 56:5,25 57:11,20,25 58:5,9,16 59:2,10,14,18 60:3,9,14,22,25 61:2,24 66:6,7 67:18 68:10,17 73:16,18,19,22 74:12 75:1,12,16,19,21 76:14 78:11,16 79:8 83:18,23 84:2,3 85:3,6,8,13,17,18,22,25 86:2,6,11,22 87:11,15,24 88:3,7,8,15,21 89:7,16 90:4,9,13,15,18,20,23,25 91:4,6,10,11 92:13 93:3,6,12,18,23 94:1,4,8,18 95:4,

8,20 96:2,5, 8,12 98:2,4, 8,22 99:1,10 100:10,18 101:19,24 102:6,10,15, 20,21,24 103:2,10,23, 24 105:16 106:23 107:16,19 109:1,9,20 110:17 111:3,6,15, 19 112:24 113:2,18,21

**Uquifa's** 11:18 19:25 41:17,23 51:20 75:7 87:22 102:19

**USA** 75:4

**UTC** 8:2 67:8,11 91:22 92:2 114:7

**V**

**validate** 35:15

**validation** 48:10 65:17

**Vall** 14:2,5,23,24 15:3,14 16:9,12 17:4 19:18 50:15 51:22 56:11, 15 74:2 75:2

**value** 32:7 71:5

**values** 31:1 32:16 46:3 63:6

**variables** 34:7

**vent** 106:3

**verified** 46:14,18 53:15,17

**verifying** 69:2

**version** 66:15

**versions** 35:18

**versus** 38:7 62:20 64:24

**video** 8:3,12,13, 17,18

**video-recorded** 8:22

**videographer** 4:12 8:1 9:2 67:7,10 91:21 92:1 114:6

**view** 8:14,20 14:19

**vision** 48:10

**visit** 42:9 43:7

**Vivimed** 13:10

**Vludez** 5:2 8:23 9:25 73:17

**Vojtech** 56:21,24 57:14 66:11

**W**

**want** 8:18 12:4 15:7 18:7 19:8 24:6 36:19,20,21 38:19 42:6 44:23 47:13 57:14 60:21 82:10 98:11 103:2,21 104:3

**wanted** 67:19

**warehouse** 16:20,24 17:10 42:10, 15,20,23 43:3,8,11 52:11 76:8, 10,18,22 86:24 87:6

**warehoused** 43:7

**warnings** 18:17

**Washington** 4:6

**water** 38:17 80:9 81:19

**Watts** 4:14 5:3 9:19,21 21:5 23:1 28:5,7 29:14,15 45:11,13 52:24,25 67:5,12,16, 25 68:8 72:18,25 73:3 114:3

**way** 57:18 98:4 102:9 105:13

**ways** 39:15

**week** 37:17,18 66:19 97:11

**well-known** 48:12,18

**Wellcome** 109:5

**whispering** 8:7

**withdrawal** 45:22

**witness** 4:11 8:12, 14,17 9:6,9, 12,17 10:12, 19 24:20,22 73:2,6 96:6 97:4 106:14 113:11 114:5

**witness's** 8:18

**witness-only** 8:11

**woman** 36:23 37:1

**words** 82:6 108:10, 15 109:9

**work** 10:9 11:7,16 12:17 18:9 31:19 39:17 40:23 46:21 72:11,16,21, 23 88:24

**worked** 12:7 29:8

**works** 72:18

**worse** 72:17

**write** 34:23 35:4, 11,13 62:3 63:22 64:11 65:12

**writes** 38:20 43:6 56:24 60:20 66:9 67:1

70:3
**written**
23:25 25:12 26:1,9 27:22 29:5 33:18 45:6,16 46:18 47:1 58:16 65:10
**wrong**
64:9
**wrote**
34:10 35:21 60:8 62:6,23 63:20 65:2, 5,21 80:18

**Y**

**yeah**
12:22 21:5 22:24 29:14 44:7 60:15 67:4,25 73:21,24 74:2,11 75:18 77:3 78:15 79:22 90:22 94:20 97:14 109:6 112:16
**year**
60:12 63:4 64:22 93:7, 15,17,19
**years**
12:8,9 13:8 31:5 63:15 64:2,16 73:20 74:14 75:3,8 76:13 78:5 86:6 88:15,20 89:9 90:15, 20,23 91:4, 10

**Z**

**Zantac**
8:24 10:18 11:2,10,12, 20,22 18:10 37:20,24 92:25 94:10, 14,16,24 95:2 96:20 97:22
**zero**
106:3

# EXHIBIT 22

**Deposition of Matt Lochstampfor (03/31/2021)**

**Subject to Renewed Motion to Seal Per DE 6124**

# EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

________________________________/

VIDEO-RECORDED DEPOSITION OF ANTHONY M. LYNCH, Ph.D.
(via videoconference)

Taken on behalf of the Zantac PSC

DATE TAKEN: Monday, December 6, 2021

TIME: 6:00 a.m. - 2:20 p.m. EST

PLACE: US Legal Support - Remotely

Stenographically reported by:
Laura J. Landerman, RDR, CRR, FPR
Notary Public, State of Florida at Large.

A P P E A R A N C E S:

MIKAL C. WATTS, ESQ.
JERRY WHITE, ESQ.
Watts Guerra, LLP
4 Dominion Drive
Building 3 - Suite 100
San Antonio, Texas 78257
mcwatts@wattsguerra.com
jwhite@wattsguerra.com

Appearing on behalf of the Zantac PSC,

ROOPAL LUHANA, ESQ.
KENDRA GOLDHIRSCH, ESQ.
COURTNEY GRIFFIN, ESQ.
Chaffin Luhana, LLP
600 Third Avenue -- 12th Floor
New York, New York 10016
luhana@chaffinluhana.com
goldhirsch@chaffinluhana.com
cgriffin@chaffinluhana.com

Appearing on behalf of the Zantac PSC,

TRACY A. FINKEN MAGNOTTA, ESQ.
Anapol Weiss
One Logan Squire
130 N. 18th Street -- Suite 1600
Philadelphia, Pennsylvania 19103
tfinken@anapolweiss.com

Appearing on behalf of the Zantac PSC,

A P P E A R A N C E S: (cont'd)

WILL SACHSE, ESQ.
CAROLINE POWER, ESQ.
Dechert, LLP
2929 Arch Street
Philadelphia, Pennsylvania 19104
caroline.power@dechert.com
will.sachse@dechert.com
and
THOMAS J. SHEEHAN, ESQ.
PEIYUAN GUO, ESQ.
Shook, Hardy & Bacon, LLP
1325 Avenue of the Americas -- 28th Floor
New York, New York 10019
tsheehan@SHB.com
pguo@SHB.com

Appearing on behalf of the Defendants, GlaxoSmithKline, LLC, GlaxoSmithKline, PLC.

MATTHEW SCARVIE, ESQ.
Arnold Porter Kay Scholer, LLP
601 Massachusetts Avenue NW
Washington, D.C. 20001
matthew.scarvie@arnoldporter.com

Appearing on behalf of the Defendant, Chattem, Inc., Sanofi U.S. Services, Inc., Sanofi-Avertis U.S. LLC,

LUKE BOSSO, ESQ.
King & Spalding, LLP
1180 Peachtree Street NE, Suite 1600
Atlanta, Georgia 30309
lbosso@kslaw.com

Appearing on behalf of the Defendant, Boehringer Ingelheim,

THE DEPO TECHNICIAN: Erik Thorsnes

THE VIDEOGRAPHER: Shaun Dewis

ALSO PRESENT: Regina Carmony
John O'Tuel

I N D E X

TESTIMONY OF ANTHONY M. LYNCH, Ph.D.

| | |
|---|---|
| Direct Examination by Mr. Watts | 8 |
| Cross-Examination by Mr. Sachse | 163 |
| Redirect Examination by Mr. Watts | 199 |
| CERTIFICATE OF REPORTER | 220 |
| CERTIFICATE OF OATH | 221 |
| ACKNOWLEDGMENT | 222 |
| ERRATA SHEET | 223 |

E X H I B I T S

| | |
|---|---|
| Exhibit No. 4928 Previously Marked | 188 |
| Exhibit No. 5339 | 121 |
| Exhibit No. 5340 | 127 |
| Exhibit No. 5341 | 9 |
| Exhibit No. 5343 | 8 |
| Exhibit No. 5345 | 14 |
| Exhibit No. 5346 | 44 |
| Exhibit No. 5354 | 52 |
| Exhibit No. 5356 | 54 |
| Exhibit No. 5357 | 155 |
| Exhibit No. 5358 | 98 |
| Exhibit No. 5361 | 70 |
| Exhibit No. 5364 | 18 |
| Exhibit No. 5367 | 24 |
| Exhibit No. 5368 | 83 |
| Exhibit No. 5369 | |

E X H I B I T S (cont'd)


| | |
|---|---|
| Exhibit No. 5371 | 94 |
| Exhibit No. 5372 | 102 |
| Exhibit No. 5374 | 62 |
| Exhibit No. 5375 | 95 |
| Exhibit No. 5376 | 69 |
| Exhibit No. 5377 | 160 |
| Exhibit No. 5379 | 107 |
| Exhibit No. 5380 | 99 |
| Exhibit No. 5381 | 101 |
| Exhibit No. 5382 | 74 |
| Exhibit No. 5383 | 38 |
| Exhibit No. 5384 | 136 |
| Exhibit No. 5385 | 142 |
| Exhibit No. 5387 | 41 |

THE VIDEOGRAPHER: This is the beginning of media one, volume one. We're on the record at 11:02 a.m. UTC on December the 6th, 2021. Audio and video recording will continue to take place until all parties agree to go off the record. Please know that microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of Anthony Lynch taken on counsel for plaintiff in the matter of Zantac (ranitidine) products liability litigation filed in the United States District Court, Southern District of Florida. This proceeding is being held at Dechert LLP located at 160 Queen Victoria Street London, London EC4V 4QQ.

My name is Shaun Dewis. I'm the videographer on behalf of US Legal Support located at 1818 Market Street, Suite 1400, Philadelphia, Pennsylvania 19103. I'm not related to any party in this action nor am I financially interested in the outcome.

The court reporter is Laura Landerman on behalf of US Legal Support. Counsel will state their appearances for the record after which the court reporter will enter the statement for remote proceedings into the record and swear in the

witness.

MR. WATTS: I'm Mikal Watts together with Roopal Luhana, and we represent the plaintiffs.

MR. SACHSE: And Will Sachse for GSK and the witness.

THE REPORTER: I just have a brief statement and we'll be ready. The attorneys participating in this deposition acknowledge I am not physically present in the deposition room and that I will be reporting the deposition remotely as well as administering the oath remotely. They further acknowledge in lieu of me appearing in person, I will be appearing remotely. The parties and their counsel consent to this arrangement and waive any objections. Hearing no objections, I'll go ahead and swear in the witness.

Dr. Lynch, do you consent to my swearing you in remotely?

THE WITNESS: I do.

THE REPORTER: Please raise your right hand. Do you swear the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

- - - - -

DIRECT EXAMINATION

BY MR. WATTS:

Q What is your name?

A My name is Anthony Mark Lynch.

(Exhibit No. 5342 was marked.)

Q I'm Mikal Watts. I'm the lawyer who will be asking you questions today. I'd like to put up Exhibit 5342, which is the notice for your deposition.

Dr. Lynch, can you see Exhibit 5342 on the screen?

A I can.

(Exhibit No. 5343 was marked.)

Q Wonderful. I'd like to get some background information on you, and I'm going to put up your LinkedIn profile as Exhibit 5343. Do you maintain your LinkedIn profile?

A I do.

Q Okay. On the first page, it says your experience includes eleven years and seven months at GlaxoSmithKline; is that right?

A It's longer than that now.

Q Okay. How long have you been at GlaxoSmithKline?

A 21 years.

Q Okay. If we could, when did you first join

Glaxo?
A I joined Glaxo -- well, I joined SmithKline Beecham in May of 1999 and then Glaxo when SmithKline merged in 2001, something like that. 2001. Sorry.
Q You've worked for SmithKline Beecham ever since 2001; is that right?
A Since 1999.
Q Okay. And it says here you've been the global director of genetic toxicology since May of 2010. Is that still your position?
A Yes.
(Exhibit No. 5341 was marked.)
Q And let me put up what Mr. Sachse just sent to me. This is Exhibit 5341. Is this a present copy of your curriculum vitae?
A That's correct.
Q All right. If we could go to the next page, and here, with respect to your career history on the upper half of the page, we can see your history at SmithKline Beecham and GlaxoSmithKline; is that right?
A Yeah, unfortunately, the document is skewed so I can't see the left-hand side. That's better.
MR. WATTS: Do whatever you need to do, Erik, to keep that from --
THE DEPO TECH: You cut out there for just a

moment.

MR. WATTS: I said when he said the document was skewed on the left side, is there something they need to do with his screen to keep that from happening?

THE DEPO TECH: I don't know exactly what he's seeing. Shaun, can you go over and make sure his screen is maximized and that the view panel of Mr. Watts is all the way to the side and as small as possible so it doesn't skew?

BY MR. WATTS:

Q As we look at your page 2 of your curriculum vitae at the top -- (Zoom connection interrupted).

MR. SACHSE: Mikal, you kind of cut out there a little bit.

MR. WATTS: Yeah, okay. Let me try again.

BY MR. WATTS:

Q Does the second page of your curriculum vitae give us an accurate summary of your work history at SmithKline Beecham and GlaxoSmithKline since 1998?

A Yes.

MR. WATTS: You know what? We can go off the record. Let me try to get back on with a bubble card. Sorry about that, guys. This is the first time I've had this problem. I'll be right back on.

Just a second.
THE VIDEOGRAPHER: This is end of media one, volume one. Going off the record at 11:10 a.m.
(A 3-minute recess was had.)
THE VIDEOGRAPHER: This is the beginning of media two, volume one. We are now back on the record at 11:13 a.m.
BY MR. WATTS:
Q Dr. Lynch, my question is what were the new screening technologies that you were working on between 1998-2010?
A There were various technologies. We were looking at assays for micronucleus in assessment using flow cytometry. We were looking at image-based methods. We were looking at different data modeling methods. There were various things.
Q And who was your predecessor as the global director of genetic toxicology for GlaxoSmithKline?
A Dr. Robert Reese.
Q Okay. And did he retire in May 2010?
A He did.
Q Okay. And is your position still global director for genetic toxicology for GlaxoSmithKline?
A It is.
Q And what is the function of the genetic

toxicology department within GlaxoSmithKline?
A So genetic toxicology department provides an assessment of the potential for a new drug candidate to damage DNA using a range of regulatory prescribed assays to look at the different types of genetic damage, that there are various types of DNA damage. Not one assay can detect all of the types of damage.
Q What is a clastogenic substance?
A A clastogenic substance is a substance that can cause chromosome damage.
Q And so in your department of genetic toxicology, are you looking at the propensity of drug substances to become clastogenic?
A Amongst other things, yes.
Q And what are the other things you're looking for?
A To see whether the compounds can induce gene mutations and/or aneuploidy, which is a term we use to describe chromosome loss.
Q Okay. And what is the phrase used to describe gene mutation?
A Mutagenesis.
Q And the last -- chromosome loss, what's the phrase you referenced again?
A Aneuploidy.

Q Aneuploidy?
A That's correct.
Q What is NDMA?
A It's nitrosodimethylamine.
Q And is NDMA a mutagenic substance?
A NDMA causes mutation in bacterial and mammalian cell assays, and also it's been reported to induce mutation in in vivo rodent studies, yes.
Q Is it a clastogenic substance?
A Again, there are data from mammalian cell assays to demonstrate that NDMA induces clastogenicity.
Q Is it an aneuploidy?
A I'm not aware of that NDMA causes aneuploidy.
Q Is it a probable human carcinogen?
A According to the WHO, it's classified as a probable human carcinogen. The World Health Organization.
Q Dr. Lynch, since the time that you joined SmithKline Beecham, have you known that NDMA is a probable human carcinogen?
A I know that NDMA has been reviewed by the World Health Organization and by the International Agency for Cancer Research, IARC, and they have defined NDMA for a number of years as a probable human carcinogen, which means that there's no definitive human

data, but there are animal study data that suggests that it has the potential to be a human carcinogen.

Q Under medical ethics, are we allowed to test human beings with NDMA?

A It would be inappropriate to test humans with NDMA, but also I wouldn't understand the reason to do so.

Q Okay. And when you say you wouldn't understand the reason to do so, why do you not want to put NDMA inside the human body?

A NDMA at high doses causes -- induces tumors in rodents, including mice and rats, and therefore, there would be a risk that NDMA exposure in humans could contribute to cancer risk in humans. NDMA's a widely prevalent environmental genotoxic carcinogen, and those reviews by the World Health Organization and IARC describe a number of studies that have led them to the conclusion that NDMA is a probable carcinogen.

Q Are you familiar with the PMDA, the Pharmaceutical and Medicines Device Agency?

A I am familiar with the agency. I've never worked or had any direct involvement with them.

(Exhibit No. 5345 was marked.)

Q Let me show you Exhibit 5345. And this document on the top of the first page has your name as

the author of an e-mail to Liangfu Chen; is that right?
A That's correct.
Q So what I want to do is I want to start at the back and work our way up the e-mail chain. Let's go to the Bates page in the lower right-hand corner ending in 599 and 560.
Do you see that there's an e-mail from Noriko Takahashi to Marta Kierzkowska?
A I can see that.
Q And this e-mail is dated July the 9th of 2019; is that right?
A That's correct. I mean --
Q And Noriko --
A -- I don't have a -- sorry, if I could finish, please. I don't have a direct recollection of this particular e-mail. Would it be possible if I could read through it, please?
Q Sure.
MR. SACHSE: I think he wants to start at the top of the thread, like the first page of that e-mail.
THE DEPO TECH: Okay.
THE WITNESS: If you could go down, please. And further down, please. And further down, please. Okay. (Reviewing document.) You can move

on, please. And further down. And again. Hello. Again, please. And next page, please. And the next page, please. And the next page, please. And these last two pages, the full text is not clearly visible.

MR. SACHSE: Is there anything we can do to fix the skew here?

THE DEPO TECH: No. Will, if you look, you can see the GSK at the bottom is within the margin. This is just the way the image was produced.

MR. SACHSE: Okay. It's the best we can do, then.

THE WITNESS: Next page, then, please. Okay. Thanks. Next page, please. Next page. And the next page, please. Okay. Thank you.

THE DEPO TECH: That was the last page, guys.

BY MR. WATTS:

Q Okay. Doctor, at the bottom of Bates page 599, we can see Noriko Takahashi, who's the safety evaluation and risk management with GSK Japan, sending an e-mail to another GSK colleague referencing a PMDA inquiry on ranitidine. Can you see that, sir?

A Yes.

Q And on Bates page 600, she says, "We received a query from the Japan authority (PMDA)," and then there

are two queries, including one, "Do you have any knowledge about the risk of NDMA produced from Zantac?" Can you see that, sir?

A I can see that.

Q Further up on Bates page 596, Ms. Yasuto Nakata writes to Steve Parker at GSK, and the inquiry is from PMDA on NDMA. Can you see that?

A I can see that.

Q Who is Steve Parker?

A Steve Parker was a member of the project team group within GSK as part of IV/IVT, which is the in vitro/in vivo transition headed up but by Patrick Wier.

Q And if we go all the way to the first page of this string, this e-mail chain is eventually sent to you by a Liangfu Chen. What was Liangfu Chen's role?

A Liangfu Chen is a director in drug metabolism and pharmacokinetics group within IV/IVT.

Q And part of what Liangfu Chen says is, "With this, the potential release of DMA together with the similar to human nitrosation conditions in rat, as Anthony illustrated, would substantiate the relevance of carcinogenicity safety assessment in rat on NDMA"; is that right?

A That's what the e-mail says, yes.

Q And the Anthony being referred to is you,

right?

A That's correct.

Q And in terms of human nitrosation conditions between humans and rats, what was your conclusion in that regard?

A So this is -- I think what I was referring to was the nitrosation conditions in the rodent two-year bioassays conducted with ranitidine where the conditions for nitrosation were evaluated as part of those studies. And this included assessment for bacterial species that can reduce nitrate and also for the presence of nitrates in their diet and also drinking water.

Q Okay. And you respond to Mr. Chen at the top of the page that you think this would be useful, right?

A So it's useful because the conditions for nitrosation were evaluated as part of the two-year bioassays in mouse and rat that were conducted with ranitidine and therefore relevant to -- to the question posed by Liangfu Chen.

Q Doctor, what is an AOP?

A An AOP is adverse outcome pathway.

(Exhibit No. 5364 was marked.)

Q Let me show you Exhibit 5364, and this is an e-mail chain between you and a Jeff Birmingham in October of 2019. Who was Mr. Birmingham?

A Jeff Birmingham is a scientist working in the target safety group in nonclinical safety in IV/IVT.
Q At the bottom of the first page, Mr. Birmingham writes an e-mail to several people, including yourself, and he says, "We need an AOP to describe the mechanism for PB/PK of nitrosamine formation in the stomach," and then it goes on, "through both dietary and ranitidine exposure routes leading to NDMA-induced carcinogenesis." Do you see that, sir?
A I can see that.
Q Okay. And again, AOP stands for what?
A An adverse outcome pathway.
Q And we need an adverse outcome pathway to describe the mechanism for PB/PK. What does that stand for?
A It's about pharmacokinetics, physiological-based pharmacokinetic testing.
Q So physiological base/pharmacokinetics; is that right?
A That's the term, yeah. It's a type of modeling used to describe exposure -- potential exposure situations.
Q Yes, sir. So if we put up the acronyms and just call it out, Mr. Birmingham on October the 22nd, 2019, writes an e-mail to you and says, "We need an

adverse outcome pathway to describe the mechanism for physiological-based pharmacokinetics of nitrosamine formation in the stomach through dietary and ranitidine exposure routes leading to NDMA-induced carcinogens;" is that right?

A He's asking for the development, I think, of an adverse outcome pathway describing a potential mechanistic basis to evaluate exposures to NDMA.

Q He says, "The mechanism appears to involve nitrosation and the acidic environment of the stomach, the action of nitroreductase bacteria. Ranitidine changes stomach pH giving rise to bacterial growth." Is that right? So --

Q Is that what he said?

A That's what he said, yes.

Q Now, the next one I need your help on. "Nitrosamines are indirect mutagens via a P450 2E1-driven mechanism." What is a P450 2E1 mechanism?

A So nitrosamines require metabolic activation by cytochrome P450 2E1, which is a specific enzyme, in order to convert it to something that's DNA reactive, and therefore, approximate mutagen, therefore, is something that has the potential to bind to DNA and cause mutation.

Q And the P450 2E1 enzyme, where is that found?

A It's found in the liver.
Q And, again, apologize for my ignorance, but the P450 2E1 enzyme that is found in the liver, is that an enzyme that is known to be present in the human liver?
A It's present in human liver and in the liver of rats and mice too.
Q And as I understand it, when we ingest a pharmaceutical into our mouth, it goes down a pathway including the stomach and eventually gets to the liver; is that right?
A If it's absorbed through the GI tract and typically compounds have first pass metabolism via the liver.
Q And is ranitidine absorbed through the GI tract such that you would expect it to end up in the human liver?
A Ranitidine, did you say, or NDMA?
Q Ranitidine.
A Ranit -- well, I'm not an expert on ranitidine pharmacokinetics, so I'm not sure I can actually answer your question. I don't know what the fate of ranitidine is in terms of its biotransformation.
Q Well, when Mr. Birmingham said that nitrosamine for indirect mutagens via P450 2E1

driven-mechanism leading to the formation of a proximate mutagen, combining with a nucleophile, giving rise to mutation and genotox in vitro and clastogenicity and mutation in vitro, that's something that you were told on October the 22nd of 2019, right?

MR. SACHSE: Objection. You misread the last little bit of that.

Q Sure. Let me try again. When Mr. Birmingham writes you and says nitrosamines are indirect mutagens via a P450 2E1-driven mechanism leading to a formation of a proximal mutagen, combining with a nucleophile, giving rise to mutation and genotox in vitro and clastogenicity and mutation in vitro, you received that on July the 22nd, 2019?

MR. SACHSE: Objection. It says "in vivo" for that last little bit.

Q Mr. Birmingham wrote you, "Nitrosamines are indirect mutagens via a P450 2E1-driven mechanism leading to formation of a proximate mutagen, combining with a nucleophile, giving rise to mutation and genotox in vitro and clastogenicity and mutation in vivo," you received that on October the 22nd of 2019, correct?

A That's correct. It's a statement specific to nitrosamines, which would be well documented in reviews by the World Health Organization and by the

International Agency on Cancer Research. It's not a statement about ranitidine.

Q And you responded to that, "Thanks for the summary, Jeff. You have a great plan and a great framework. Look forward to seeing the first." Is that right?

A So this is about translating the information on nitrosamine from the literature into an adverse outcome pathway format and how it's linked to carcinogenesis. It's not specific to ranitidine.

Q Is that what you said, sir?

A Words are -- yeah, I said thanks for the summary, Jeff.

Q And this summary was provided approximately five weeks after the Food and Drug Administration put out a notification that it had detected NDMA in ranitidine; is that right?

A The e-mail happened on the 22nd of October. I'm not sure exactly what the timeline was with regard to regulatory communication.

Q Sure. But you're not suggesting to the jury that this work had nothing to do with ranitidine. This was the whole reason you were doing it, right?

A So it would have been appropriate to understand the -- how NDMA is linked to carcinogenesis,

and this is a piece of work that was started to clarify that using adverse outcome pathways, which is a mostly novel way of matching out the relationship between an exposure -- a molecular initiating event such as mutation and a potential adverse outcome such as rodent carcinogenesis.
Q Doctor, I think my question was you're not suggesting to this jury that Mr. Birmingham's work was not related to ranitidine. It was, wasn't it?
A Well, it was related to NDMA and a better understanding of NDMA and, therefore, clearly, you know, the -- the communication around NDMA in ranitidine was salient.
(Exhibit No. 5367 was marked.)
Q Okay. And let's go to Exhibit 5367. And 5367 is an e-mail you received from the same Jeff Birmingham on November the 15th of 2019, entitled "AOP NDMA, 15 November 19, 1216 one slide, PowerPoint, right?
A That's correct.
Q It says, "Julia, Hazel and myself met on three occasions to map out our understanding of the NDMA adverse outcome pathway based on notes from our initial discussion with yourselves and from preliminary literature assessments. We have come up with the attached pathway which we would appreciate your thoughts

and comments on"; is that right?
A Yeah, that's correct.
Q And that's sent to you and Jim Harvey. What was Mr. Harvey's role in relation to you in looking at this issue?
A Jim Harvey is the head of the target safety group, and both Jeff and Hazel report to Jim and --
Q And the attached pathway, if we go to the second page, we can see it's a hypothetical adverse outcome pathway: Covalent binding to DNA (DNA methylation) leading to carcinogenicity and cell death." Do you see that, sir?
A Yeah, I can see that.
Q And this was sent to you by Jeff Birmingham, the same individual that was on the last document; is that right?
A It would have been sent to me by Jeff Birmingham, yes.
Q Now, he references Julia and Hazel. Who is Julia Kenny?
A Julia Kenny was a colleague reporting to me in genetic toxicology.
Q And Hazel Lawson Harrison, what role did Ms. Lawson Harrison have?
A So Hazel is a colleague who works aside Jeff

Birmingham in the target safety sciences group reporting to Jim Harvey.

Q So the three of them got together and mapped out their understanding of the NDMA adverse outcome pathway and sent it to you on the 15th of November of 2019; is that right?

A That's right.

Q And if we go to that pathway that they mapped out, we see in the upper left-hand corner on the second page that it's referencing ranitidine, right?

A It does reference degradation of ranitidine.

Q Sure. And let's box out those three on the left side as well as the second one. There you go. Right there.

Now, as we look at the left side of this page, it says, "Stressor: Degradation of ranitidine to NDMA in low pH, excess nitrite conditions in the stomach," and then there's an arrow that goes to the right and down; is that right?

A Yeah.

Q There's a second stressor that says, "Ranitidine increases stomach pH to promote bacterial growth," and there's arrows going up and down, right?

A Yep.

Q And then the third stressor says, "Nitrosation

of ranitidine by nitroreductase bacteria in stomach to form nitrosamine or NDMA," and then there's arrows going up and to the side, right?

A That's correct.

Q And so these three stressors all end up with stressors going to the second box, which says NDMA is transported to the liver from the GI tract via portal vein; is that right?

A That's correct.

MR. WATTS: Let's box up from the second to the third so we can blow that up, so we're on the -- no, no, no, second column. There we go. Box the second and third column, please. Try again. Try again. No, that's the third one. There's -- Erik, the second one is NDMA transported to liver from GI tract. See how it's second? That would be column number two. Now it's second and third. Perfect.

BY MR. WATTS:

Q Okay. So boxing the second and third column, the stressor is NDMA has been transported to liver from the GI tract via the portal vein, and then there is an arrow to the right that says, "Electrophilic metabolite, (methyldiazonlum) formation by P450 2E1 in liver and GI tract," right?

A Correct.
Q So that's that that same P450 2E1 enzyme that is necessary in order to nitrosate the substance into a mutagen, right?
A That's -- the key event here is describing the metabolic activation step.
Q And the previous document said, "Nitrosamines are indirect mutagens via the P450 2E1-driven mechanism leading to the formation of a proximate mutagen," right?
A Yeah, so that's the -- yeah, that's the understood mechanism of NDMA activation.
Q Sure. And as you pointed out, we know that there's P450 2E1 enzyme in the liver, so when NDMA is transported to the liver, it's activated by this P450 2E1 enzyme that's present in the liver, right?
A That's assuming NDMA is present.
Q Okay. If it's transported to the liver, it's then present in the same location, i.e., the liver has the P450 2E1 enzyme that's necessary to activate it, right?
A If it's present in the liver, it can be subject to a metabolism by P450 2E1 amongst other enzymes.
Q Excellent. Okay. Now, let's go from the activation of a P450 2E1, which in column three, and

start with column three and blow up the upper row all the way to right.
According to the adverse outcome pathway sent to you by Jeff Birmingham of GSK on November the 15th, if you activate through P450 2E1 enzyme, NDMA that's transported to the liver, you get a covalent binding to the DNA and then it says DNA methylation in parentheses; is that right?
A That's correct.
Q What is DNA methylation?
A It's the addition of the methyl group to the DNA molecule.
Q Okay. And do you need the methyl group to be added to the DNA molecule in order to have carcinogenicity?
A Well, I think you're conflating carcinogenesis with mutagenesis there. You need, essentially, activation in the transfer of the methyl group to alcolate (ph) DNA which causes DNA adducts in O6 methyl-guanine or other types of DNA adducts, which are not mutagenic in and of themselves. They potentially can lead to mutation if they're not repaired.
Q Now, Doctor, when you said I was conflating carcinogenesis, if we go to the right side, the adverse outcome listed is carcinogenesis in the stomach and

tumor formation, right?

A I agree. That's right. But remember, an adverse outcome pathway is a way to characterize putative steps along the way linking a molecular initiating event with an apical event of regulatory concern such as carcinogenesis, like cancer formation. Whether those events translate along with the pathway depend on a large number of factors. And so, you know, this is -- all this is showing is a hypothetical relationship rather than a definitive relationship.

And same could be said about the stressors. Those were identified as potential mechanisms from the literature, which had described the potential formation of NDMA from ranitidine for various reasons, and so they were collected as reflection of the literature to describe potential stressors. But, you know, as I said, this is a hypothetical AOP, and it doesn't mean that one event leads conclusively to the next event in the pathway. There are a number of factors that influence that.

Q Okay. But the adverse outcome pathway that was sent to you on November the 15th has arrows between the activation of NDMA through the P450 2E1 enzyme that we know's in the liver, that leads to a covalent binding to DNA or DNA methylation, and then it's got a KE 1, 2

and 3 in gray boxes. Can you see that, sir?
A Yes.
Q What does KE mean?
A Key event.
Q So you have key event one is incorrect or insufficient DNA repair; key event two is mutation in critical genes; key event three is increased clonal expansion, correct?
A Yeah.
Q And then there's an arrow that says, "Adverse outcome: Carcinogenesis in stomach/tumor formation"; is that correct?
A That's correct.
Q If we could go to the second row, after we get the activation of NDMA by the P450 2E1 enzyme located in the liver, there's an arrow down, if we could blow up that entire row. It says, "Key event: Electron transport on coupling"; is that right?
A Yes.
Q And then there's an arrow to a key event, ROS production. What is ROS?
A Reactive oxygen species.
Q And then there's an arrow to -- what is reactive oxygen species?
A So it's essentially the formation of reactive

oxygen or -- gosh, what's the word I'm looking for? Essentially atoms of oxygen that can be reactive and therefore bind to macromolecules like DNA.

Q Okay. Does reactive -- or does ROS production lead to the mutation in critical genes?

MR. SACHSE: Objection. Sorry.

A Not necessarily because it depends on the levels of reactive oxygen species that are generated.

Q Okay.

A And the bulavian body (ph) has a number of antioxidant defense mechanisms that prevent the translation of these key events to form mutation, but it is accepted that reactive oxygen species can be a mechanism by which mutation can arise.

Q Okay. That's why there's an arrow between key event, reactive oxygen species production, to mutation of critical genes; is that right?

A That's why there's a link between the key event for ROS production and potential mutation.

Q Then the other arrow from ROS production that's caused by electron transport uncoupling after NDMA is activated by the P450 2E1 enzyme in the liver says, "Key event: Cytotoxicity." What is that?

A So that means toxicity in the cells can lead to cell death.

Q And what is cell death in relation to cancer?
A Well, cell death is not related to cancer in and of itself.
Q Is cell death a good thing?
A Well, cell death causes -- can cause the death of cells within a tissue and therefore lead to a toxicity in the tissue.
MR. WATTS: Take this out, Erik, so we can see it all.
Q So when this was sent to you in November of 2019, did you have subsequent meetings with Mr. Birmingham and Julia and Hazel with respect to this adverse outcome pathway that they provided you?
A I don't recall specifically.
Q Okay. In addition to the adverse outcome pathway that Mr. Birmingham sent to you after his meetings and review of the literature with Julia and Hazel, did you get involved in reviewing literature with respect to NDMA formation from ranitidine?
A I have been involved in the review of NDMA-induced mutagenesis and carcinogenesis. I've also been involved in the review of ranitidine and the studies conducted on ranitidine to evaluate mutagenesis and carcinogenesis.
(Exhibit No. 5368 was marked.)

Q Doctor, I want to show you Exhibit 5368, which is 12 days after you received this adverse outcome pathway. Down at the bottom, Jim Harvey writes an e-mail to you and others on November the 27th of 2019. It says, "See below. Please Skype with any comments. Thank you." Can you see that, sir?

A Yes, I can see that. Can I read the e-mail, please?

Q Yeah, go ahead.

A (Reviewing document.) Okay.

Q And as we go to the second page of this e-mail from Mr. Harvey to you on the 27th, he references an additional report WBP 82:001 describing a study conducted in 1982 titled, "The determination of N-nitrosodimethylamine formed by the reaction of ranitidine hydrochloride with sodium nitrite has been identified from the archive." Did I read that right?

A Correct.

Q And this next summary of the study basically says they carried out experiments to determine whether nitrite reacted with ranitidine hydrochloride to form NDMA, right?

A That's what's written.

Q It says "NDMA was formed in a 3.1 percent yield"; is that right?

A Based on specific conditions in the test.
Q Yeah, and so this is going to be my next question. Are you familiar with the World Health Organization NAP test conditions?
A So I'm familiar with WHO NAP test. It's a test that was done -- some time done decades ago. It hasn't been a test that's been routinely used in my professional career but also that it's used to understand nitrosation but using conditions that are nonphysiological, such as 40 millimolar nitrite, and is more akin to a chemistry test rather than a biological test, so --
Q Well --
A So it's something that we're aware of, but, you know, has low priority in terms of our overall consideration.
Q Doctor, have you ever performed a WHO NAP test?
A No.
Q Okay. Are you familiar with the conditions under which the World Health Organization's NAP test calls for when testing for the presence of NDMA?
A I can't say I am.
Q Okay. Have you been provided with a copy of Dr. Tanner's deposition that I took?

A No, I haven't.
Q Okay. Are you familiar that this work is performed by Dr. Tanner in 1982 at GSK?
A No, I wasn't.
Q Okay. Can you tell the jury here today whether or not Dr. Tanner in fact utilized the conditions called for by the World Health Organization's NAP test protocol?
A I have no knowledge of that.
Q All right. So after you received this summary of this study from back in 1982, that said NDMA was formed in 3.1 percent yield, did you look for the data that was produced during that work by Dr. Tanner back in 1982?
A No, I didn't. But I did look at other studies conducted on nitrosation where similar levels of nitrite has been used in the presence of ranitidine, for instance, in Ames test. In there, the evidence was that no genotoxic substances were produced, so the Ames tests were negative, and therefore, the concerns for the formation of NDMA were disregarded based on the outcomes of those studies.
MR. WATTS: Objection, nonresponsive.
Q Doctor, my question was specific to Dr. Tanner's work. Did you locate the source data for

study WBP 82:011 in order to --

A No, I didn't.

Q And if we go down to the bottom of this e-mail, there's a short and long paragraph. The short begins, "To date, GSK has been unable to find the source data for study WBP 82:011 and, therefore, we cannot confirm the quantitative aspects of the NDMA formation following the reaction of ranitidine hydrochloride with sodium nitrite reported by the study authors." That's what it says, right?

A That's what it says, but it wasn't my role to look for source data.

Q Okay. And then the long version has the same first sentence that says the same thing, right?

A That's what it says.

Q You said it wasn't your role to look for the source data. Have you spoken with anybody at GSK who obtained the source data from the Tanner study back in 1982?

A No, I haven't.

Q Are you familiar with whether or not GSK provided the Food and Drug Administration with the Tanner study prior to the introduction of ranitidine in the US market in 1983?

A I don't know whether that happened or not.

Q Now, Doctor, in fairness to you, that was a little before your time, right?
A Yeah, I was still in school when that marketing application was made for ranitidine.
Q Yep. Doctor, how old a man are you?
A Pardon?
Q How old a man are you?
A Oh, I'm 57.
Q Okay. Now, in 1982, you were just finishing pre-university work, correct?
A In 1982, I would have still been in a six foreman [sic] in school.
(Exhibit No. 5383 was marked.)
Q Right. Now, I'd like to take you to Exhibit 5383, and the subject of this e-mail chain is risk assessment for handling neat nitrosamines.
Can you tell the jury what a neat nitrosamine is?
A It is a pill form of the chemical.
MR. WATTS: Okay. And if we could, Erik, go to the e-mail below that one, please.
Q You get an e-mail from Dean Hatt. Who is Dean Hatt?
A Dean Hatt is the head of the dispensary in IV/IVT.

Q In where?
A In the in vitro/in vivo translation division of GSK.
Q Okay. And he's asking a bunch of questions about storing, handling, access, et cetera, with respect to neat nitrosamines, right?
A Can I read the rest of the e-mail just to be sure? I mean, that's the title of the subject.
Q Go ahead. Just put them both up. It's two pages. Let's start at the bottom of the first page and top of the second. Dean Thomas is writing an e-mail to you on July the 23rd of 2020; is that right?
A That's correct.
Q Who's Dean Thomas?
A He's a colleague that works in genetic toxicology.
Q And he writes on the top of the second page, "A few weeks back I was contacted regarding the handling of nitrosamines." NDMA is a nitrosamine, right?
A NDMA is one amongst many nitrosamines.
Q And in the second paragraph, he says, "I described our process in genotox with respect to handling neat genotoxic carcinogens; i.e., the use of class 3, et cetera. Since the guys in building five do not have a class 3 cabinet, they asked if it would be

okay to send or store any nitrosamine-related structures to me to store in dispensary and weight in our class 3 cabinets." Do you see that, sir?

A I do.

Q Now, let's see if we can break this down. When handling a neat genotoxic carcinogen, why do they need to be stored in a class 3 cabinet?

A So pure nitrosamines, and same with any genotoxic carcinogen, have safety labels as part of their material safety information that helps scientists who are working with pure compounds to handle those substances in a safe way. These hazard characterizations are a regulatory requirement to describe both the potential safety concerns and also the handling precautions that need to be taken when using high -- when using and storing and weighing out these pill materials. And so they -- they include using a class 3 cabinet, which minimizes exposure to the scientists when they're doing their work.

Q Is a class 3 cabinet considered safety equipment to protect the workers handling genotoxic carcinogens like nitrosamines such as NDMA?

A So, yeah, class 3 cabinets is one of the pieces of safety equipment used to protect exposure -- potential exposure to our scientists when handling pure

compounds, you know, typically at levels much higher than those they would be exposed to, say, from environmental exposure.

Q So a class 3 cabinet is a worker protection safety equipment, right?

A Right.

(Exhibit No. 5387 was marked.)

Q Okay. Now let's go look at a picture of one. Exhibit 5387. This is a class 3 cabinet like what Mr. Thomas was referring to, right?

A It's -- it's an example of a class 3 cabinet.

Q Okay. And those two cylindrical objects, are those where one would put their arms in and be protected when handling it on the other side, or what are those about?

A Yeah, they're sort of gloves so that you can handle the materials safely within the confines of the cabinet.

Q And the purpose of putting NDMA inside a class 3 cabinet is to keep it completely separated from a worker who could be exposed to this genotoxic carcinogen, right?

A So the purpose of the cabinet is applied to all potential genotoxic carcinogens, not just NDMA. And when we're working in the laboratory, obviously we're

using quite high levels of material in our tests, and, therefore, yeah, we want to minimize the exposure of the scientists to those potential genotoxic carcinogens, whether it's NDMA or other nitrosamines or other compounds that are labeled hazardous and with potential genotoxicity and/or carcinogenicity labels.

Q And are class 3 cabinets expensive?

A I couldn't tell you how much a class 3 cabinet costs.

Q Let's go back to Exhibit 5383. Keep this one on the right side and put 5383 on the left. So Thomas writes the e-mail about the class 3 cabinet that's shown on the right, and then Dean Hatt responds, "All sounds easy, but I think we need to understand a few things. How many compounds are we talking about that they would want us to store? What sort of containers and quantities? How often are these weighed out? We currently have restricted access for the TM store. I would not want to extend this, particularly. How many people would potentially need to weigh out? When would we allow this to happen? Lots of questions probably needing answering first to assess the scale of the ask."

That's what Mr. Thomas wrote back to Dean Thomas [sic] and to you; is that right?

MR. SACHSE: Objection.

A No. It was from Dean Hatt wrote back that to Dean Thomas.

Q Thank you. I'm sorry. That's what Dean Hatt wrote to you and Mr. Thomas; is that right?

A Correct.

Q Okay. And then you responded up at the top on the 24th of July of 2023 [sic], "I will ask Dean Thomas to set up a meeting to discuss, but I'd like to nip in the bud in the sense of look for reasons why we can't do it attitude I'm getting when reading Dean Hatt's response. As you know, the nitrosamine issue is a significant one for GSK with potentially major cost implications. We have to be able to support this work, and I don't think the request from our CMC colleagues is unreasonable and can be measured in a measured and safe way"; is that right?

A Yeah, this is because we expected to be -- needed to assess a number of nitrosamine compounds other than NDMA or NDMA in terms of understanding the potential for genotoxicity. And therefore, we would need access to using equipment where we could do that in a safe way because nitrosamines as a class are considered hazardous and therefore appropriate precautions to limit the scientists' exposure when handling large amounts of these materials need to be in

place.

(Exhibit No. 5346 was marked.)

Q Yes, sir. Now, if we could go to Exhibit 5346, you write an e-mail in July of 2019 forwarding a paper, and you say it's an interesting paper. Do you see that up at the top?

A I see that.

Q And as we go further back in the e-mail to page 2, we see a Mr. Steve Hobbinger writing an e-mail before that and it says, "Dear Patrick, could I have your initial impressions on this data? Given our historical and current portfolio, this is clearly a significant question for both pharma and CH with ranitidine over-the-counter"; is that right?

A Yeah, that's right. Can I see the rest of the e-mail chain cuz, again, I don't recall the full e-mail.

Q I'm going to give you the full e-mail in a second, but before we do that, go up real quick. I want to give it just a little bit more context.

After Hobbiger asks that question, Patrick Wier sends it to you and to Jim Harvey and to Jo Oliver saying, "Can you help prepare a reply to Steve?" Do you see that, sir?

A I do.

Q Now look at the full e-mail.

A (Reviewing document.) Okay. Okay. Is there any more?

Q Here is the paper, "A short commentary on NDMA contamination of valsartan products." Do you see that, sir?

A I do.

Q Okay. So by way of a little context, on the first page, at the bottom before you say "An interesting paper," Jo Oliver writes you and some others and says, "Below is the e-mail. For awareness, Jackie and Steve copied as their regular meeting with Japanese colleagues where this same query was received from last week."

Now, you recall our discussion of a PMDA in Japan, right?

A I do.

Q Well, there was an inquiry from the PMDA in January received in early July, and then now we have an additional question. And this is coming from the EMA, which is the European Medicines Agency in Europe; is that right?

A Yes. So in the e-mail chain, they've written to our regulatory affairs group asking for information, and then that's been cascaded through various groups via Steve Hobbiger, which is pharmacovigilance, and then to Patrick Wier, who's head of the in vitro/in vivo

translation, the IV/IVT group that I'm a member of. And then from there Patrick has reached out to Joe, who's head of the project which Steve Parker refers to, and then Jim and myself.

Q So if we go to Bates page 711, we see correspondence from Guimaraes Margarida Viana de Ferraz of the European Medicines Agency, and it's a request for information on the risk of NDMA formation in vivo and the importance is high; is that right?

A That's right.

Q And the request for information is sent on July the 16th, 2019, right?

A Correct.

Q That's about a week after you received your request for information from the Japanese regulatory authorities, right?

A It's a week before GSK. I didn't receive the request personally.

Q This European Medicines Agency sent a request for information to GSK on July 16th, 2019, about a week after the PMDA, the Japanese regulatory authority asks for information with respect to this issue, right?

A To GSK Japan, yes.

Q Yes. And as we go to 711 and we look at the request for information, it says, "A private analytical

pharmacy in the US have recently conducted tests whilst others are ongoing, and preliminary reports seem to indicate that in certain conditions, e.g., high temperature and low temperature in the presence of NaNO2, ranitidine decomposes to form high quantities of NDMA." Do you see that, sir?

A Yeah, I see that written.

Q And then there are three questions down at the bottom. "We'd like your responses to the list of the following questions, or LoQs. Please provide a critical appraisal of the most recent data on the carcinogenic potential of ranitidine use." And then number two, "Please submit all relevant data on the carcinogenic potential of ranitidine use." They ask for further discussion of the possible reasons for these findings including a description of the plausible pathways involved and the endogenous formation of NDMA from ranitidine within the human body would also be helpful.

And number three, "Based on the results of this overall review, a discussion on the need and your plans for immediate action should be provided as applicable"; is that right?

A Yes.

Q And so is this the e-mail chain where you're pulled in for the first time to doing work necessary to

respond to the request for information sent by the European Medicines Agency with respect to this issue of the carcinogenic potential of ranitidine use?

A Yeah, I believe so.

Q And then if we go to the paper that's attached to this and I believe you say is an interesting paper -- this would be on Bates page 713. And this is the Snodin and Elder paper entitled, "Short commentary on NDMA contamination of valsartan products;" is that right?

A Correct.

Q And the valsartan issue had come up back in 2018, and you were aware of that, right?

A That's right.

Q And the Snodin paper begins with an introduction that says, "Many observers across industry and within various worldwide regulatory agencies had assumed that the control of mutagenic impurities in pharmaceuticals was a done deal and reduced to practice." And it references guidance in the ICH M7 which was introduced during 2014 and updated at the beginning of 2017.

You know what ICH M7 is, right?

A I do.

Q It says, "Robust risk-based processes to assess the potential for mutagenic impurity formation

(real and potential) and control were in place across industry. It was surprising to many, therefore, that in the middle of 2018, European Medicines Agency announced it was reviewing medicines containing valsartan drug substance supplied by Zhejiang Huahai following the deduction of an impurity."

Were you involved in GSK's work with respect to NDMA found in valsartan products in 2018?

A No.

Q On the second column, it says, "NDMA is described by the International Agency for Research on Cancer as genotoxic, carcinogenic in multiple rodent and nonrodent animal species and so should be regarded for practical purposes as if it were carcinogenic to humans. To the best of our knowledge, this was the first instance of a product recall being initiated on the basis of an N-nitroso impurity, which according to ICH M7, [Assessment and control and DNA reactive (mutagenic) impurities in pharmaceuticals to limit potential carcinogenic risk], is a member of the, quote, cohort of concern, closed quote, class of high-potency mutagenic carcinogens."

What is a cohort of concern?

A So the cohort of concern are a series of potential genotoxic carcinogens that are being

identified because of their higher potency. And therefore, under ICH M7 additional level of -- yeah, exposures are restricted to lower levels because of being a part of that cohort of concern.

Q So again on Bates page 711, the European Medicines Agency writes this request for information with respect to the potential carcinogenic potential for ranitidine use, and that happens on July 16. And Mr. Hobbiger forwards it on the 17th to Patrick Wier, as we go to Bates page 710. And again, who is Patrick Wier?

A He's the head of the in vitro/in vivo translation division.

Q And Mr. Hobbiger is the head of safety and medical governance for research and development global medical at GSK, right?

A He was. I think he's retired now.

Q And what Mr. Hobbiger, the head of safety and medical governance globally for GSK says, "Given our historical and current portfolio, this is clearly a significant question for both pharma and CH with ranitidine OTC." What is CH?

A Consumer healthcare.

Q And when it says for both pharma and consumer healthcare with ranitidine over-the-counter, does

consumer healthcare sell ranitidine over-the-counter?

A I don't have knowledge of what over-the-counter medicines are in the consumer healthcare portfolio.

Q Okay. Does the pharma division within GSK sell prescription medicines?

A Yes.

Q And to your knowledge, does consumer healthcare sell medicines such as over-the-counter?

A Yes.

Q Okay. And so in 2019, GSK's pharmaceutical division is still selling Zantac prescription medicines, right?

MR. SACHSE: Objection.

A I don't know the answer to that. I mean, it's not my role, and I'm not a member of the pharma group and sales operations for ranitidine. I'm not the right person to ask that question.

Q Are you familiar with whether in 2019, GSK's consumer healthcare division was selling ranitidine over-the-counter in various areas across the world?

MR. SACHSE: Objection.

Q Do you know, sir?

A I don't know. It wasn't part of my role, like I explained. I don't belong to the sales group or

consumer health, so it would have been outside of my role.

MR. WATTS: Dr. Lynch, I apologize to you. I'm supposed to call a break about once an hour and I just frankly forgot since I was having such an interesting conversation with you. Why don't we take our first break. We've been going for a while. And my apologies, sir.

THE WITNESS: Okay. Thank you.

MR. SACHSE: Let's go off the record.

MR. WATTS: Ten minutes?

MR. SACHSE: Let's go off the record.

THE VIDEOGRAPHER: That's the end of media two, volume one. Going off the record at 12:36 p.m.

(A 15-minute recess was had.)

THE VIDEOGRAPHER: This is the beginning of media three, volume one. We're now back on the record at 12:53 p.m.

(Exhibit No. 5354 was marked.)

BY MR. WATTS:

Q Doctor, let me show you Exhibit 5354. And this is an e-mail from Ethnie Conner to a large number of people including yourself. Ethnie Conner was the vice president of global, classic and established

products, right?

MR. SACHSE: Objection.

MR. WATTS: What'd I get wrong, Will?

MR. SACHSE: In the global regulatory function.

MR. WATTS: Oh, okay.

BY MR. WATTS:

Q Ethnie Conner was the vice president of global, classic and established products in the global regulatory quality function, right?

A Yeah, that's her title on the -- on the e-mail communication.

Q Okay. And this e-mail to you is dated August 19, 2019; is that right?

A That's the date on the heading, yes.

Q And the first sentence, "I'd like to suggest the following edit to the response to question three," and then there's a strike-through and the language that's structured is "The registered specification for both ranitidine hydrochloride and Zantac tablets do not include a test for NDMA." Do you see that, sir?

A I see this strike-through of those words, yes.

Q Are you aware of whether prior to August of 2019, whether GSK ever tested Zantac tablets that it produced for the presence of NDMA?

A Was I aware -- can I -- could you please repeat the question?
Q Are you aware of whether prior to August of 2019 GSK ever tested the Zantac that it produced for the presence of NDMA?
A I'm not aware specifically that that happened.
Q Have you ever seen such a test prior to August of 2019 where GSK tested Zantac that it manufactured for the presence of NDMA?
A Again, no, I haven't. It wouldn't have been my role as a genetic toxicologist.
(Exhibit No. 5356 was marked.)
Q Okay. Let me take you to Exhibit 5356. I'm at Bates page 186, and on 186, there's some e-mail traffic between Maria Mehlin and a number of people, including Jim Harvey.
Explain for the jury how you and Mr. Harvey work together again.
A So Jim Harvey is head of the target safety scientist group in nonclinical safety, and I head up genetic toxicology.
Q Okay. What about Tracey Spriggs?
A Tracey Spriggs is head of toxicology in the consumer healthcare company. This e-mail isn't -- I'm not on this specific e-mail itself.

Q Yeah, if we go back up to 183, we'll see that you're added to the e-mail chain about two weeks later on September the 4th.

A May I have the opportunity to read the whole chain, please? I don't recollect the full chain itself.

Q Sure. But before you read the full chain, can you see on September the 4th, Mr. Harvey sends it to you?

A Yes, I can see it.

Q Okay. Have at it. Go ahead and read the full chain.

A (Reviewing document.) All right.

Q Doctor, what I want to refer you to is Bates page 186.

A Sorry.

THE DEPO TECH: I don't think he's done.

A I meant all right. Can I see the next page? I apologize for that.

Q I'm just optimistic. I'm teasing you. Keep going. I'm sorry.

MR. SACHSE: If you want to put the two pages side by side, it might make it quicker to review.

A Okay. Could I see the next page, please? (Reviewing document.) Okay. Can I see the other page, please? Thanks. Okay. Thanks.

Q All ready?
A Are there any more?
THE DEPO TECH: That's all the pages.
Q Okay. Let's go to Bates page 186. Maria Mehlin in the bottom writes a e-mail to a number of people including Jim Harvey and forwarding is the NPSB paper for N-nitrosamines.
What is NPSB, as you understand it?
A I don't know the answer to that question in this context.
Q It says, "As discussed within CH (PO team,) the opinion from Vicky is that the latest nitrosamine alert is product specific related to sartan drugs. The carcinogenic status of nitrosamine itself is historically known. Therefore, I'd expect if any of our products have known nitrosamine risk from a chemistry standpoint, it would have been properly evaluated and mitigated prior to marketing." Do you see that, sir?
A I can see that sentence, yes.
Q Now, when Maria Mehlin writes the carcinogenic status of nitrosamine itself is historically known, she was the director of global regulatory affairs for CMC oral and skin care; is that right?
A I don't know what her role was.
MR. WATTS: Go to the next page, Erik, so we

can see the bottom of her e-mail.
Q You see it says director, global regulatory affairs, CMC, oral and skin care.
A Yes, I can see that.
Q And when she says the carcinogenic status of nitrosamine itself is historically known, that was known to you as well, right?
A I mean, not necessarily in the context of this e-mail chain because I think you will find that the question I was asked at the end of this e-mail chain was regarding the Ames test and its suitability to assess nitrosamines, and therefore I have no role in this -- the prep prior e-mail correspondence with regards to, you know, presence of nitrosamines or not within products within consumer healthcare, et cetera.
If you're asking me whether I knew that nitrosamines were carcinogenic when this e-mail was written but outside the context of this e-mail chain, then, yes, I would have known that nitrosamines have been described as rodent carcinogens and genotoxic compounds in the literature.
Q Doctor, how long did you know that nitrosamines were carcinogenic?
A There's a long existing literature about the rodent carcinogenicity of nitrosamine-type compounds.

Not all are carcinogenic. Some, you know, according to some work by colleagues at NASA, 20 percent reports to be not carcinogenic in rodents. Other nitrosamines have never been tested for carcinogenicity. But of those that have been tested, a large proportion have given positive results in rodent carcinogenicity studies. Whether they're human carcinogens or not has not been determined.

Q The nitrosamine NDMA is historically known to be carcinogenic, right?

MR. SACHSE: Objection.

A NDMA has been purported to be a rodent carcinogen in various long-term studies that were reported in the literature.

Q And within GSK's consumer health division, the potential risk of nitrosamines have been historically evaluated by toxicology, right?

A I'm afraid you'll have to ask consumer healthcare. I'm not a member of that department and so I really couldn't comment on what status they have in terms as they've evaluated nitrosamines in the past.

Q Let's go to the top of the page. Tracey Spriggs -- and what's Tracey's role again?

A She's head of toxicology.

Q So the head of toxicology at GSK says "Within

GSK" --
A Consumer Healthcare, yeah.
Q I'm sorry. Say again.
A She's not head of toxicology in GSK. I think you need to be more specific. She's head of toxicology in GSK Consumer Healthcare.
Q Let me try again. Tracey Spriggs, the head of toxicology within GSK's consumer healthcare division, says, "Within GSK Consumer Healthcare, the potential risk of nitrosamines has historically been evaluated by toxicology when formulations are submitted for an assessment, i.e., TAR." Do you see that?
A I see that.
Q First of all, what is TAR?
A I don't know. I don't work in consumer healthcare, so it would be outside of my role.
Q Now, Tracey Spriggs, the head of toxicology for consumer healthcare of GSK, says, "As stated by Maria, the carc or carcinogenic risk of nitrosamine is well established." Do you see that, sir?
A I see that, yes.
Q And then later she says, "There are few raw materials that are known to contain nitrosamines, and as such, the levels are typically controlled by the raw material manufacturer." Do you see that, sir?

A I do.
Q Do you know who the raw material manufacturer is for Zantac's active pharmaceutical ingredient ranitidine hydrochloride?
A I'm not aware of that information, no.
Q Okay. And then as you mentioned, if we go back up to Bates page 183, Mr. Harvey writes you an e-mail at the top of the page. "Hi, Jon" -- and that's Jonathan Howe, and Ant, that's you, Anthony Lynch, "We need to get a position piece together on why we can use an Ames test to derisk a nitrosamine. The impression we are getting from the EFPIA and maybe EMA is that the Ames test isn't good enough to detect their DNA reactivity." Did I read that correctly?
A Yes, you've read that correctly.
Q What's EFPIA?
A It's the European Federation for Pharmaceutical Industrial Association.
Q And EMA, that's the European Medicines Agencies?
A That's correct.
Q Mr. Harvey writes to you that the impression we are getting from EFPIA and maybe the European Medicines is that the Ames test isn't good enough to detect their DNA reactivity; is that right?

A That's the impression that Jim was getting from the FPS so he was asking me as a subject matter expert about the suitability of the Ames test for evaluating the potential genotoxicity of nitrosamines as a class.

Q And then as we go up to the first page, you write in response, "We should check the Kirkland database. I think Jules has a copy. There was work on the nitroso reduction Ames strains in the past. Did you want that included? I seem to recall Gatehouse and Tweats were big in this area"; is that right?

A So I'm referring to a database that was compiled by Professor David Kirkland and basically lists Ames test outcomes for a wide range of chemicals, including certain nitrosamine exemplars and --

Q What's --

MR. SACHSE: Hold on. Let him finish.

Q I'm sorry.

A Yeah, I was speculating on where some of those studies, including various test strains sometimes used in the Ames test, and I was asking whether Jim would be interested to see if that data was indeed there.

Q Yeah. Dr. Lynch, I want to apologize you to. In doing it by Zoom instead of being in the same room, sometimes I'll look down at my notes and you'll pause

for ever so slight a deal and I'll go to my next question. I'm not trying to run over you, and my colleague was right to inform me that I'd interrupted you, but it wasn't intentional. I apologize.

A That's fine.

Q Tell me who Gatehouse and Tweats are.

A David Gatehouse and David Tweats were scientists. They formally worked with Glaxo prior to -- Dr. Gatehouse I think left during the merger or just after the merger between SmithKline Beecham and Glaxo. David Tweats retired a few years later after that merger.

Q Okay. Now, this is in September of 2019. Did there come a point when you received a rapporteur's preliminary joint assessment report with respect to ranitidine?

A I'm not exactly sure what you mean by a rapporteur's joint report.

(Exhibit No. 5374 was marked.)

Q Let me show you Exhibit 5374, which is an e-mail from Jim Harvey to you dated February 19, 2020, forwarding a EudraLink ranitidine EMA-H-A31-1491 rapporteur's preliminary joint report on responses to LoOI. Do you see that, sir?

A I do.

Q Now, if we go to Bates page 929, we can see the attachment, which is the CHMP rapporteur's updated assessment report referral under article 31 of directive 2001/83/EC, and this is circulated on February the 11th of 2020. So you now recall that you received a rapporteur's report, fair?

A Yeah, I remember this document now, yes.

Q Okay. Fair enough. And I just want to ask you about some of the things that the rapporteur's report says. If we go to Bates page 956, on Bates page ending 956, the rapporteur's report says, "NDMA is a potent mutagenic carcinogen in a number of different animal species. On the basis of animal data, rat being the most sensitive species, NDMA is classified by IARC as probably carcinogenic to humans, (class 2A carcinogen.) This classification is used by IARC where there is limited evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in experimental animals. Other long-term effects such as severe hepatotoxicity have been observed in rhesus monkeys with this class of nitrosamines." Did I read that correctly?

A You've read that correctly, yes.

Q If we go to Bates page 960, in the section on safety, there's some demonstrated risks, and it says,

"Clinical data clearly show that patients treated with H2-receptor antagonists are a higher risk for gastric and pancreatic cancer. This is also observed in patients who treated with PPI." Did I read that right?

A You read that correct. I'm not sure that you can conflate that to NDMA and/or the other pharmacological effects of H2-receptor antagonists and the observation of both gastric and pancreatic tumors in patients with gastric ulcers or other diseases being treated with ranitidine or any other H2-receptor antagonists.

Q So Zantac or ranitidine is an H2 receptor antagonist, right?

A Correct.

Q And the rapporteur says, "Clinical data clearly shows that patients treated with H2-receptor antagonists are at higher risk for gastric and pancreatic cancers." That's what it says, right?

A That's what it says --

MR. SACHSE: Objection.

A -- but it doesn't relate that to any causal relationship with NDMA or other possible causes.

Q Right now I'm just asking if that's what it says. Is that what it says?

MR. SACHSE: Objection. Just so you know, the

basis of my objection is that you've admitted the parenthetical at the end of this sentence this time.

BY MR. WATTS:

Q Okay. Fair enough. I mean, the jury can see the words on the screen. I read it right, right?

A Those are the words on the screen. I'm not a physician. I'm a genetic toxicologist. So, you know, those are the words on the screen. I wouldn't necessarily conflate it with NDMA, that statement.

Q As a genetic toxicologist, do you agree with the last sentence that NDMA should be considered carcinogenic in humans?

A As a genetic toxicologist, I understand that the IARC have defined NDMA as a possible human carcinogen and also states that the evidence to show that it's a human carcinogen is not available.

Q Well, they said it was a probable human carcinogen, right?

A That's a categorization that the IARC use when they're looking at evidence for potential carcinogenicity. And there are a number of distinct classes that they ascribe to, including class one, which are known human carcinogens and class two and class three. It's an IARC definition, and I've explained to

you that, you know, that's what the definition they use is.

Q Doctor, have you ever been to Nuremberg, Germany?

MR. SACHSE: Objection.

Q Have you ever been there?

A I've not been to Nuremberg.

Q I have, and there's this great museum where they held something called the Nuremberg trials. Are you familiar with the Nuremberg trials?

A Yes, I am familiar with the Nuremberg trials.

Q Are you familiar that Nazi doctors were convicted of war crimes by virtue of testing human beings with known mutagenic carcinogens?

MR. SACHSE: Objection.

A I have no knowledge of the proceedings of the Nuremberg trials.

Q Since the late 1940s, has it been considered unethical to cause human test subjects to take substances which are known human carcinogens?

A The control of potential genotoxic carcinogens is highly regulated both in the pharmaceutical industry and other industries like consumer healthcare and other products, and therefore, all steps are taken to minimize the exposure of human beings to potential genotoxic

carcinogens when the presence of those compounds are known.

Q Okay. Fair enough. That's why we have a class 3 cabinet, right, among other things?

A Well, a class 3 cabinet is there to protect scientists who are using large amounts of materials in the conduct of their experiments from potential hazards that those compounds may pose. And that can include mutagenicity, carcinogenicity, toxicity, repro-toxicology and other elements, and it's a regulated title that's used in terms of hazard identification and worker safety protection.

Q And the reason for that worker safety protection, as we look at, for example, Bates page 962, the rapporteur says, "Additional exposure to NDMA due to treatment with ranitidine containing NDMA as an impurity were leading to additional endogenous formation of NDMA should be seen as an additional risk factor adding to the total tumor risk associated with nitrosamine exposure." That's what the rapporteur concluded, right?

A So that's -- that's a statement they've made, but that's assuming that, you know, that the ranitidine tablets that people -- patients were taking had levels of impurity that constituted a risk.

Q And in terms of the rapporteur's conclusion,

at the bottom of the page, does the rapporteur write based on the review of all available data on safety and efficacy, the rapporteur considers that the benefit-risk balance of medicinal products containing ranitidine is negative?

A That's the conclusion that the rapporteur came to, but my understanding is that as soon as GSK learned about potential impurity in ranitidine, that ranitidine was withdrawn from the market and the rapporteurs come to this conclusion once ranitidine has been withdrawn.

Q In your mind, did GSK do the right thing in withdrawing ranitidine from the market based on all available data on safety and efficacy?

MR. SACHSE: Objection.

A My view is that it wasn't my decision, but GSK will always take a proactive approach to ensure the safety of patients and would have withdrawn ranitidine. Whilst there were a lot of unknowns about the potential for an impurity in ranitidine, the source of that impurity and also the potential of low levels of NDMA to result in a safety concern, be that mutagenesis and/or carcinogenesis, and, therefore, I believe that GSK acted in the correct way.

Q Now, after the product was withdrawn from the market, did you continue to do testing on NDMA?

A In order to fully understand the relationship between dose and potential concerns for mutagenicity. And we've carried on to do work to better understand and follow the science to characterize the relationship between NDMA and carcinogenesis. I've not worked on ranitidine itself per se.

(Exhibit No. 5376 was marked.)

Q Okay. Let's look at Exhibit 5376. This is dated March the 31st of 2021, and it's written to you with respect to a purchase order created for your cost object. Do you see that, sir?

A I see that.

Q And it says, "The following purchase order was created by Mark Burman." Who is Mark Burman?

A Mark Burman is a colleague that works in genetic toxicology.

Q It says, "The purchase order contains items allocated to one or more cost objects that you were responsible for or you were the line manager of the shopper." And the purchase item is NDMA, right?

A That's right.

Q And how much NDMA was being purchased that you are responsible for in terms of the cost?

A I can't see the -- it's 1,000-something, but I'm not sure what those initials mean.

Q Okay. Do you remember how much NDMA you ordered for analysis?

A Well, we -- the order wasn't for the analysis of NDMA. I think we were interested in a number of questions related to the potential genotoxicity of NDMA. And one avenue of research that we were interested in was understanding the response of the Ames test to NDMA because of those concerns raised in that e-mail that Jim sent me. And also we had plans to do further investigations both within GSK and external to GSK with other collaborators to further understand the relationship between dose -- NDMA dose and mutagenicity, to follow the science and characterize the potential for mutation, potentially in the low-dose region, which would be consistent with exposures to levels identified as impurities because this hadn't been characterized in previous literature in the scientific journals.

Q What was my question?

A You asked me how much was there.

Q And what's your answer to that specific question?

A 1,000 something. I don't know what those two initials are saying. It's something G, but it's a bit blurry.

Q All right. So in late March of 2020, this

document is created referencing the acquisition of 1,000 something that you ordered for analysis of NDMA, right?

A No, that's not right. That wasn't for the analysis of NDMA. It was to use NDMA as the test agent in some studies that we were going to conduct to understand the response and the studies particularly to follow some scientific questions we had to further the science around NDMA and mutagenesis.

Q Do you remember who you got the NDMA from?

A No, I don't recall.

Q Do you know who in the world manufactures NDMA?

A I handed the request to Mark and Mark basically followed up and sourced the NDMA. I didn't know where the source was.

Q Does NDMA have any intended purpose other than to induce tumor formation?

A Well, NDMA is a nitrosamine, which is present in the environment and also, as you've said, been identified as impurities in potential -- in a number of drug substances, and, therefore, it's legitimate to purchase NDMA in order to characterize the science of NDMA dose exposure and its association with mutagenesis. So that's how I would characterize it as obtaining samples of the material in order to further investigate

the science.

Q So other than causing cancer, is there any purpose for which NDMA is created?

A For scientific research.

Q Okay. But is there any industrial purpose other than causing cancer for scientific research?

A Well, I wouldn't say it's causing cancer for scientific research. I think the fact that NDMA is present in our environment and scientists require access to NDMA to explore the biological basis and dose and metabolism, et cetera, that, you know, it's appropriate for scientists to obtain material like NDMA and other potential genotoxic carcinogens. Otherwise, we could never progress the science around these compounds that require attention.

Q I guess what I'm asking is are you aware of NDMA having any other industrial or commercial purpose whatsoever other than because we know it's a carcinogen for scientists to study it?

MR. SACHSE: Objection.

A Well, NDMA is genotoxic. It has other toxicological characteristics. And as scientists, we need to access those materials in order to study those biological effects. NDMA's formed naturally within our environment. It's formed -- it's present in food stuff

that we eat. It's present in beverages. It's present in the water we drink. And there was a control, for example, in the US by the Environmental Protection Agency, and therefore, there are legitimate reasons to purchase NDMA for scientific research.

MR. WATTS: Objection, nonresponsive.

Q Let me just give you a little speech. I'm not suggesting you did anything wrong by getting this or that, you know, this is some sort of war crimes research. I'm not saying that at all. Okay?

What I'm asking is other than scientific research, does NDMA get created on purpose for any other reason?

MR. SACHSE: Object to the colloquy. You can answer.

A I'm not aware there is any commercial use of NDMA, but there is a genuine need for scientists to understand this material --

Q Okay.

A -- as well as other genotoxic carcinogens which might include other nitrosamines or other chemical structures.

Q But in terms of any other purpose for it other than scientific research to evaluate the carcinogenicity of it, you're not aware of any other legitimate

commercial purpose for NDMA to be produced, correct?

A You keep referring to investigate the carcinogenicity, but there are other issues and mechanisms that can be investigated including mutagenesis. As I've tried to explain on several accounts, there is a legitimate reason why NDMA should -- scientists should have access to NDMA to conduct research to understand the biology of NDMA interactions and also to follow the science and understand, you know, its effect in the low-dose region compared to the high doses used in the standard two-year rodent bioassays, for example.

Q Let me refine my question and see if can -- we're getting close. I feel it.

Other than scientific research as to the mutagenicity or carcinogenicity of NDMA, is there any other legitimate commercial purpose for producing and supplying a third-party NDMA?

A I'm not aware of any commercial uses of NDMA.

(Exhibit No. 5382 was marked.)

Q Okay. Let's go to Exhibit 5382. And you'll recall a Mr. Dean Thomas talking about his class 3 cabinet, and this is a different e-mail chain that encompasses that, so let's start at the bottom with Alec Simpson writing an e-mail to Dean Thomas and others.

Do you know who Alec Simpson is?
A I'm not sure who Alec Simpson is.
Q Okay. Fair enough. On the second page, Alec Simpson writes to Dean Thomas and others, "We need to start the process of working up a risk assessment to cover the handling of neat nitrosamine compounds for analytical testing. Dean, I'd like to start by visiting the isolator containment facility that you have in IV/IVT. We discussed the possibility of using it for nitrosamines in a meeting with Fiona King a while back." Do you see that, sir?
A I do.
Q I asked you this before, but tell the jury again what IV/IVT is.
A It's in vitro/in vivo translation. It's the larger department that I'm a member of.
Q And then as we go to the response e-mail to this, Dean Thomas writes back, and that's where on July 23rd, Mr. Thomas is talking about the class 3 cabinet that we put up a picture; is that right?
A Let me just read it, please. (Reviewing document.) Dean is asking if people in building five can have access to and see the class 3 loading occupation, I think.
Q Okay. And in this chain, you respond at the

top that "Dean Hatt has accountability for the UK IV/IVT dispensary and for the training in his lab. I can add that I support this request on as work on nitrosamines is critical to the current and future GSK portfolio. We have robust processes in place to safely handle genotoxic carcinogens, and I think it would be appropriate to share these with colleagues at CMC." Is that what you wrote on July the 23rd?

A Yes.

Q And so you were advocating for the use of this class 3 cabinet to handle nitrosamines during this research that's going to be conducted, right?

A So, yes, I -- nitrosamine's a class, a part of that cohort of concern that you mentioned earlier, and therefore given their potential hazards, they need to be handled in a safe way typical of handling all types of genotoxic carcinogens -- and obviously, it would have -- it would have been appropriate for colleagues in another department who are looking to handle those materials trained to do so in the right way.

Q And as we leave that up on the left side and put 5387 back up on the right side, the right way to handle nitrosamines such as NDMA is through this class 3 cabinet that's referenced in the document and now shown on the right side of the screen, right?

A So when we're weighing out quite large amounts of genotoxic carcinogens like nitrosamines, we will be weighing out grams of the material to make up a solution then to use in experiments like the Ames test or other experiments. Then, you know, we typically weigh out the raw powder in these class 3 cabinets to minimize exposure to the scientists.

Q Yes, sir. Now, this class 3 cabinet that is referenced in this e-mail dated July the 23rd, this is work that is being commissioned approximately a year after the first request from the Japanese and European regulatory agencies with respect to the carcinogenicity of ranitidine; is that right?

A I think you're conflating two aspects here. One is around the potential for impurities in ranitidine and the second is around nitrosamines as a chemical class. And there was an outcome where, you know, control of all nitrosamines needed to be considered in all potential drug products. And as part of GSK's way of addressing that need to address potential impurities of a nitrosamine class, we needed to work out processes.

MR. WATTS: Mr. Sachse, I know I promised that after about an hour, we'd break for lunch after about an hour. Would now be a good time for that lunch break?

MR. SACHSE: Yeah, I think so.
MR. WATTS: How long would you guys like?
MR. SACHSE: Let's go off the record.
THE VIDEOGRAPHER: That's end of media three, volume one. Going off the record at 1:39 p.m.
(A 43-minute recess was had.)
THE VIDEOGRAPHER: Back on the record at 2:22 p.m.
BY MR. WATTS:
Q In addition to the PDMA from Japan, the EMA from Europe requesting information about ranitidine and its potential carcinogenicity, did GSK also receive a request for information from the Food and Drug Administration of the United States?
A I believe so, yes.
Q And did GSK undertake to test ranitidine to ascertain the level of NDMA that was contained therein?
A I believe GSK undertook a commitment to do analysis on ranitidine in relation to investigate for the presence of NDMA as an impurity.
Q Was there a limit of the amount of NDMA that was permissible according to the regulators?
A So regulators like the EMA have identified an allowable intake of NDMA which they set at 96 nanograms.
Q Okay. And what does 96 nanograms convert to

from the standpoint of micrograms?
A .092 micrograms.
Q And does NDMA in an amount less than .092 micrograms meet the regulatory requirement with respect to the permissible level of NDMA in a pharmaceutical product?
MR. SACHSE: I'm sorry. Just to make sure the record's clear, did you mean to say .092 or .096?
Q Well, I thought he said .092, but did you mean to say .096?
A There is an allowable intake that's been defined by the EMA. My recollection is I think it's 96 nanograms.
Q Fair enough. And by the way, I think Mr. Sachse's coaching is correct, so we don't mind it if we step off the rails just a tad. You said 92 and I just kind of went with it and I'm glad he interrupted us.
Okay. From the standpoint of the permissible 96 nanograms, that converts to .096 micrograms, right?
A That's what the amount would be in micrograms, correct.
(Exhibit No. 5361 was marked.)
Q And I want to show you a document that's dated October the 18th of 2019. It's Exhibit 5361. And this

appears to be a transcript of a phone communication between yourself and Jim Harvey. Did you-all use WhatsApp?

A No. I think we used Microsoft Teams.

Q Okay. And is this the record of a conversation that you and Steve Parker and Jim Harvey were having on October the 18th of 2019?

A That's what it looks to be, yes.

Q And if we could go to the third page, I want to ask you about something on Bates page 146. It says, "Standard dosing and duration of use." It says, "The upper end of the range of NDMA levels, 2.9 parts per million reported in ranitidine tablets is equivalent to 0.87 micrograms of NDMA assume that is a 300 mg dose of ranitidine. This level of NDMA of 0.87 micrograms is 0.03-fold the less than lifetime intake for NDMA of 29.17 micrograms per person per day defined in table 1." Do you see that, sir?

A I see that, yes.

Q And Jim Harvey says, "How about if we phrase it like this?" You say, "Looks good. 0.03-fold looks small." And then Steve Parker says, "I think we need duration in there too." You say, "33.5-fold less." Parker says, "I assume this is assuming 12 weeks," and you say, "Yes, standard." Is that right?

A Yes.
Q Did you have any information as to how long the typical ranitidine user utilized the drug?
A I think Jim was using 12 weeks as a -- some data from a prescribing leaflet. That's probably about what we had at the time.
Q Okay. And when Parker says, "We need duration in there too," how does duration of use relate to lifetime intake of NDMA?
A Well, duration is a -- one component of the assessment criteria that could be considered.
Q Okay. In terms of what the permissible intake of NDMA would be, would it be a function of both dose and duration?
A So the allowable intake level of 96 nanograms is per day for lifetime.
Q So why does -- why does Parker need duration in there as well?
A I think it's just to contextualize some of the math that Jim was working on.
Q So this is referencing a test result of 2.9 parts per million, which is slightly below the allowable limit. Would that be fair?
A 2.9 parts per million is the same as 2 nanograms per milligram or 2.9 nanograms per milligram

of drug.

Q Okay. But if you had a result of, say, 7.6 parts per million, that would be two and a half times that amount, and that would be over the allowable limit, right?

A Well, the allowable -- I'm not sure whether the allowable limit of 96 nanograms had been set by the regulatory agencies at that time. I'm trying to think back.

Q You certainly reference a lifetime intake limit in this document, right?

A So could you please go to table 1 that's referenced? I need to orientate myself to what those numbers are referring to, please.

Q Yeah, I don't think the document I was given has a table 1, just the transcript. I guess my point is, as a matter of math, if 2.9 parts per million is just below the limit, 7.6 parts per million would be substantially above it, right?

MR. SACHSE: Objection.

A Well, I think your use of the word "substantial," the limit -- the allowable intake limit is clearly defined from a calculation based on the TD50 for NDMA in rodents and then extrapolation down to one in a hundred thousand or one in a million incidents,

cancer incidents. And that limit in terms of assessing of that -- of that risk paradigm based on that calculation clearly, you know, six or seven point something is higher than 2.9 is what you're saying, yes.

(Exhibit No. 5369 was marked.)

Q Okay. Let me show you Exhibit 5369. This is dated December 4th, and it's being sent to a number of individuals, including yourself, by James Harvey. It says, "An update. Previous NDMA levels in tablets were 2.9 parts per million. We now have data that indicates level may be around 7.6 parts per million in certain batches. Based on the previous document, 7.6 parts per million would be substantially above the allowable limit." Can we agree?

A It would be just above the allowable limit. However, that allowable limit is based on -- it's -- it defines a limit for a theoretical concern for an increase in cancer risk. It's not an absolute number in that regards to what the risk is. So when you're near or around the limits, you know, the risk might change from one in a million to one in 999,000 on paper, but where that translates into a real -- real world risk is highly debatable given the number of assumptions made in the calculation, so I wouldn't view it in that way -- in the terms that you're saying it.

MR. WATTS: Objection, nonresponsive.
Q My question is the limit itself, not your judgment of it.
A If you're saying 7.6 is higher than 2.9, I agree with that statement.
Q And 7.6 is above the limit. 2.9 is just below the limit. Can we agree?
A It's above the allowable intake specified by the agency. I think at the time that, you know, the absolute levels of NDMA present in ranitidine was only being characterized, so clearly Jim is conveying that this information is what it is.
Q Sure. And let's go back to 5374, which is the information from the rapporteur. And if we go to his report on Bates page 937, we can see some testing results by the rapporteur. And we can see on the bottom row of 937, that he's got it expressed in micrograms, right?
A Are you referring to column three or six or seven?
Q Well, I'm looking at the fourth, fifth and sixth column, and then the one that's column for the corresponding API. You can see it yellowed there, right?
A Yes, so there's an average level of 2.040

micrograms per tablet is written down in the sixth box, and then there's a level in parts per million in corresponding API with a range reference of .197 to 13.677.

Q And so if we wanted to see from the standpoint of this sample, this test of Zantac, whether it was above or below the allowable limit, the minimum, the maximum and the average are all above the allowable limit of .096 micrograms, right?

MR. SACHSE: Objection.

A I mean, I -- I don't know what this particular analysis is and also, you know, the levels on how they're assessed, again, it's outside my role as a genetic toxicologist and it would normally fall to the CMC department that are involved in product development and quality control. So all I can see is numbers there, but I don't know exactly what they're referring to.

MR. WATTS: Doctor, can you hear me?

THE WITNESS: Yes.

MR. WATTS: I had to switch over to my phone again and I apologize.

BY MR. WATTS:

Q I guess -- and if you just answered this, I apologize. You kind of cut out on me. Is .399 micrograms more than four times the allowable limit of

.096?

A Again, I'm not sure what that .399 -- level of NDMA in what, though?

Q Well, this is testing --

A What level --

Q This is testing of ranitidine samples by the rapporteur's representatives.

A Well, again, it's -- the analytical chemistry analysis side is not my level of expertise or it's not part of my role in genetic toxicology. If you're asking me whether .399 micrograms is higher than .096, then, yes, I would agree with that statement.

Q It's four times as high, isn't it?

A I'd have to do the math, but 96 times four times -- it's about four times, yep.

Q And with respect to the maximum sample, that's 13.285 micrograms. That's 138 times higher than the allowable limit of 0.096 micrograms, isn't it?

MR. SACHSE: Objection.

A It is, but I'm not sure what these numbers refer to and how consistent they are across sampling of what actual particular sample of ranitidine this is taken from, what the, you know, methodology was, what the -- so, you know, again, as I've stated, I'm not an expert in this particular area, and if you're just

asking me whether numbers are bigger than other numbers, I would agree with you.

Q Well, you are the recipient of this document. You've already told me that, that it was provided to you at the time, right?

A So this rapporteur document that I reviewed, you know, was sent to a number of different experts within -- within the company, and each would have had their own subject matter expertise component to review. The levels in the tablets wouldn't have been part of mine. I would have been concerned with the, you know, assessment of genetic toxicity and potential for rodent carcinogenicity.

Q Well, let's just see if we can simplify it. Would you -- and I'm on Microsoft Excel doing division here. If you took the maximum allowable limit of 0.96 -- strike that.

If you took the maximum allowable limit of 0.096 and divided it into 13.285 micrograms of NDMA found in this ranitidine tablet, math tells you that the level of NDMA is 138 times higher than the maximum allowable limit, right?

MR. SACHSE: Objection.

A Well, that's in one tablet. Obviously, you know, I think that's for one tablet. I mean, the max --

allowable intake is 96 nanograms per day. This is clearly a wide variation in the levels reported in this particular tablet batch. How relevant that is to other batches it's not clear to me. And again, I reiterate this is not my area of expertise.

Q Sure. But you make a good point, and that is, if you took two tablets with that level of NDMA -- it's a twice daily drug, right?

A Again, I'm not a physician, so I'm not familiar with the prescribing information for ranitidine. That's not my area.

Q But you can multiply 13 times two and that will give you 26, right?

A 13 times two equals 26, I agree.

Q Okay. And so on average, this sample had 2.04 micrograms per tablet. That's 21 times the maximum allowable daily limit, right?

MR. SACHSE: Objection.

A This particular batch was analyzed and produced these results. Whether they're representative of all batches, you know, of ranitidine, and which manufacturer, I have no idea, so I guess I wouldn't like to comment.

Q Okay. The API that was tested had an average of 3.997, that's 41.6 times greater than the allowable

limit. That's what the math shows us, right?

MR. SACHSE: Objection.

A So the level in that particular batch was reported to be .399, but I don't know what the source of that particular batch, what that tablet represents and whether it's consistent across other batches. So it's a number that's being presented to me, and as I said, I'm not an analytical chemist, and, you know, I can't comment about the veracity of the methods used or the variability. So if you just ask me is that a multiplication number, then I can -- I can see that that's the case, but there's a board of context to this analysis, I would suggest.

Q So Dr. Lunch, just so that we have a clear record, when you said .3997, you meant 3.997 is what the document shows, right?

A There's 0.399 micrograms per tablet.

Q I'm over on the API side on the fourth --

A I'm sorry. API --

Q We were talking about the API --

A The API is .399 --

MR. SACHSE: Hold on, Doctor. Let him finish.

Q So on the left, we've got the finished product, and the average is 2.04 micrograms per tablet average. And on the right, we've got the active

pharmaceutical ingredient, and the average there is 3.997. Can you see that, sir?
A Yes.
Q Okay. Fair enough. And all of those numbers are above the permissible limit, agreed? I won't make you do math on every one of them again.
A The levels that were determined in that particular analysis indicate they were above an allowable intake that's been used by regulators like BMA.
Q Let's go to Bates page 938, and we'll look at another one, and we'll short-circuit this and not do the math on every one of them. But again we can see a minimum and maximum for the finished product both of which are above the maximum allowable limit, agreed?
A Those are the data reported in the table, but, again, I'm not an expert analytical chemist, and, you know, I don't know what batches of material these refer to or how representative they are of ranitidine in general, so --
Q The API of 3.383 micrograms is well above the 0.96 micrograms permissible limit, agreed?
A This is parts per million, so I'm not sure it's a microgram in the 3.383.
Q Okay. Let's go to 938 -- I mean 941. Do you

see the average of 5.34 parts per million?
A Average -- that's a number in that row, yes, column six.
Q That's above the acceptable limit, isn't it?
A That's a part per million unit again, so it depends what -- what the million of what? Is it a kilogram or a gram or what is it?
Q It's the level of NDMA in this testing.
A This expresses parts per million, so the context of what the -- how much of what you're measuring, you know, is important. You're not -- I'm not getting all the information here to make a judgment, I'm afraid.
Q Okay. On the API --
A I don't --
Q On the API we can see an average of 8.6 parts per million, then 9.9 parts per million. Can you give the jury any indication as to whether that's above the allowable limit?
A The limit, as I said, is expressed as 96 nanograms per day. The parts per million calculation depends on, you know, the amount of tablet or formulation that's been analyzed, and I don't know what the context of that is in this regard.
Q 943, fourth row, average, 17.26 parts per

million. Above or below the allowable limit?
A As I said, it's hard to say because the numbers are expressed as parts per million and not nanograms.
Q Okay. 944, rows four and six. We have 5.06 parts per million in row six -- I mean, in row four, and on the API, an average of 4.7 parts per million. Above or below the permissible limit?
A Again, without stating the units as nanograms, it's difficult for me to determine whether that's the case or not.
Q Let's go to 947. You can see a maximum level here of 14.88 parts per million on the API. Is that above or below the permissible limit?
MR. SACHSE: Objection.
A Again, I don't know what the ppm refers to in this context, whether it's nanograms or what. So, again, I couldn't actually say. And I'd like to reiterate the fact that I'm not an analytical chemist and this is outside my area of expertise.
Q Okay. 948. I could go through all these and you'd give me the same answer. You don't know whether it's above or below parts per million, right?
A Yeah, because that's an important, you know, context for understanding what those levels are.

Q Okay. And as we go to 949, for those of us that want more context, we can see the statement from the rapporteur, "As can be seen from the table above, almost all drug products tested so far have NDMA contents above the current limit of 0.16 parts per million." Do you see that, sir?
A I see that, yes.
Q When you read the rapporteur's report, did you read the narrative where they said almost all the drug product of ranitidine was tested and has NDMA contents above the current limit?
A I would have read that narrative. I just didn't recall what the context was. I mean, we talked about an allowable intake of 96 nanograms at the beginning of this discussion and now it's turned into .16 parts per million, so --
Q Well, let me just ask you, when you received the rapporteur's report, did you become aware that substantial testing of ranitidine had revealed that almost all the drug product tested was substantially above the allowable limit?
A I became aware that there was data to suggest that there were levels of impurity -- NDMA impurity in ranitidine drug products from different manufacturers. That was the level of my awareness because, as I said,

in that analytical side and quality component side, it's not part of my specific role as a genetic toxicologist, and that role is covered by other subject matter expertise in GSK, so it would have been for them to consider those numbers.

(Exhibit No. 5371 was marked.)

Q Dr. Lynch, let me show you something that came out of your custodial file. It's Exhibit 5371.

A Uh-huh.

Q And, again, this is related to the rapporteur's assessment, right, the PAR, preliminary assessment reports?

A Yeah.

Q Okay. And as we go to Bates page 652, based on the testing that we just talked about -- I'm sorry.

Let's go to 652. The recommendation and next steps, you see how at the bottom of the second bullet point, the rapporteur says, "Therefore, it is proposed to suspend all marketing authorizations with conditions to lift the suspension"?

A Yeah, I see that sentence, but my understanding is that this document came out after GSK voluntarily withdrew ranitidine from the market. And I would also like to point out in that e-mail distribution list, which has a large number of recipients and some of

which will be directly related to the individual roles of some of those people with regard to levels and others, there's a wider distribution list because of, for example, knowledge that NDMA has a genotoxic profile, and therefore, it would be appropriate for a genetic toxicologist to be cc'd into the distribution.

Q Dr. Lynch, did the rapporteur propose a suspension of all marketing authorizations of ranitidine?

A That was the conclusion -- one of the conclusions that the rapporteur proposed. I think it was after GSK voluntarily withdrew ranitidine from the market prior to this overall assessment that concluded.

(Exhibit No. 5375 was marked.)

Q Now, let me show you Exhibit 5375 with respect to this 96 nanograms per day limitation. This is a conversation between you and James Harvey. And if we could go to Bates page bottom of 872, start of 873, do you see at 1429 Jim Harvey tells you, "Basically, the EMA are saying total NDMA formation from ranitidine as an impurity and as an in vivo degradant in total has to be less than 96 nanograms per day," and Harvey says, "So setting a new precedent, pretty much impossible." Do you see that?

A I see that, yeah.

Q And on the next page, Mr. Harvey says at 1433, "I think any future work we will do will be to support the legal case." Do you see that, sir, at 1433?
A It's not coming up on my screen. Yes, yes, I see that, yep.
Q And you say, "Yes, I thought that too."
A Well, I think --
Q Then Mr. Harvey says, "As the EMA are effectively removing ranitidine from the market as that spec is not possible." That's what he told you, right?
A That's what Jim told me. I think in terms of the future work that we were going to do. And, you know, I'd like to make a couple of comments. I mean, the levels set by the regulatory agencies of 96 nanograms, you know, is something that would be viewed as immutable in the sense that GSK would always adhere to that level.
And I think Jim is thinking about, you know, longer term with other nitrosamines and what the potential impact of that regulatory decision could be and therefore thinking about what work in this conversation we could be doing in the future to fully understand that because there was a concern, I think as Jim indicates, that the levels would be very hard to maintain in terms of quality, although we'd already

pulled ranitidine from the market.
I think the statement about support the legal case is basically, you know, we were aware of the concern that the regulators had about NDMA and levels in ranitidine would warrant both attention from a -- both a scientific perspective and also a legal perspective. But the two, you know, are not necessarily connected. So where Jim and I are just talking in this dialogue, we're just planning about what science we can do for the future.
Q So Mr. Harvey says, "The EMA are effectively removing ranitidine from the market," and that's something he said on February the 24th.
On April the 1st, did the Food and Drug Administration prohibit the sale of all ranitidine-containing products in the United States?
A I don't know the exact date, but like I said, GSK already removed ranitidine from the market voluntarily prior to these regulatory decisions, so we were proactive.
Q Now, were you a member of the GSK nitrosamine response team?
A Not -- not as such. I think that was Jim Harvey. But I was called in to review ranitidine and the supporting documentation that was used to support

the filing indirectly, and I supported work to look at that information.

Q And did you receive direction that members of the legal department and the communications department also support those responses?

MR. SACHSE: Objection.

A I mean, my understanding -- these responses back to the regulators, you know, involve a number of different parties throughout the GSK organization, which would include regulatory affairs, pharmacovigilance, expert reviews or commentary from nonclinical safety, as well as have some legal overview. And what individual roles were in that committee, you know, I had my own comments to make regarding the genetic toxicity and reviewing the bioassay data that were conducted with ranitidine in the two-year mouse and rat studies. So every response around an issue like this would be a team response permeating throughout the organization.

(Exhibit No. 5358 was marked.)

Q And for example, as we look at 5358, this is an e-mail from Jim Harvey dated September the 20th of 2019, and you're copied on it. You see how Mr. Harvey instructs everybody, "Please mark any e-mails with comments as privileged and confidential and cc in Soovanker"?

A Yeah, I see this e-mail, and I see this as proof that Jim received it and he was taking reasonable steps to inform correspond -- future correspondence between individuals.
Q And Soovanker is Soovanker Goswami, a lawyer at GSK, right?
A I don't know for sure.
Q You mentioned there was scientific work that was begun to address the issue of nitrosamines in a variety of different products, not just ranitidine, right?
MR. SACHSE: Objection.
A So my understanding is on the -- as a result of the regulatory focus of potential nitrosamine contamination in drug products, there was a requirement for pharmaceutical companies to look at the rest of their portfolio with regard to nitrosamine. So in that context, there was an ask to -- for GSK, among other companies, to look at their portfolio with regard to nitrosamines as a class.
(Exhibit No. 5380 was marked.)
Q And let me visit with you about that by looking at Exhibit 5380. And on Bates page 295, we can see there is a PowerPoint being forwarded by Mr. Harvey to several, including you, on May 29, 2020, right?

A Yeah, that's right.
Q And it says, "Brian Callan and I discussed the STP with Paul Daly yesterday." Who's Paul Daly?
A I'm not absolutely sure. I think he's senior manager in the product line part of the company, but I have no direct interactions with Mr. Daly.
Q Do you know what the STP is?
A It's an acronym we use for situation target proposal. And I think the document was going to outline some lines of research that Jim and I had discussed with regard to understanding nitrosamine biology in the low dose.
Q It says, "After a brief conversation on who would fund this" -- can you hear me?
A Yeah.
Q -- "research, question mark? He recognized that given this is a GSK-wide issue, it was reasonable to express that all the funding come out of the existing N-nitrosamine budget within the PSC." What is the PSC?
A Product supply chain.
Q Do you know what the N-nitrosamine budget was after all this began?
A No, I don't know exactly what the N-nitrosamine budget was in total. I don't belong to the product supply chain line. All I do know, and I

think one of the reasons I was cc'd on to this e-mail by Jim, was that I'd had discussions with Jim Harvey about possible lines of research to investigate nitrosamine and low-dose responses for mutation. And we were hoping to have that work funded by GSK, and it looks like Jim is talking to Patrick about how that research could be funded and which part of the GSK organization that would come from.

(Exhibit No. 5381 was marked.)

Q Let's keep that on the left and let's go to 5381 on the right so we can pin down this budget amount. And 5381 is an e-mail to you and Nick McMahan by Jim Harvey on May the 29th of 1920 -- I mean of 2020. And you see how it says that Regis holds the nitrosamine budget, which was around 12 million pounds?

A Okay. I had -- I'd forgotten about this e-mail.

Q Okay. So who other than your department was spending the budget of 12 million pounds on the nitrosamine issue?

A I mean, I don't want you to conflate the nitrosamine issue with NDMA because the nitrosamine issue is talking about nitrosamines as a class. And as a result of the regulatory concerns that have been raised, there was a question about pharmaceutical

companies examining their portfolio for potential contamination with impurities linked to nitrosamines.

And I don't know exactly how that budget was going to be carved up or what activities, but clearly qualification of potential impurities would constitute a significant budget, and it's been a work stream that I understand has been ongoing for the duration and continues to occur now because of the regulatory issues raised around nitrosamines as a class and having to control those levels to the rigorous limits set by the regulatory agencies of 96 nanograms. So the company's doing all the best it can to work on that problem.

MR. WATTS: Give me one minute, Doctor.

(Exhibit No. 5372 was marked.)

Q Let me show you Exhibit 5372. As we look at --

MR. WATTS: Can you hear me, Doctor?

THE WITNESS: Yeah.

MR. WATTS: I'm sorry. I'm having some sort of a, I don't know, Internet issue that's bizarre. It's on my computer but not on my phone, so I apologize for the hiccups.

BY MR. WATTS:

Q Okay. As we look at 5372, this is an e-mail, I believe, from Jim Harvey to yourself dated January the

8th of 2020. And it says, "Ant" -- that's short for Anthony, right?

A Yeah.

Q "So this is how ranitidine costs work. So in theory, we could commission work externally and get the money back." What does he mean by that?

A I think he's thinking about which particular line in GSK would be essentially footing the final bill, so that would be my guess as to what he means by that. It's just about ultimate accountance within GSK, although overall GSK would be commissioning the work. It would just depend on which department foots the bill.

Q So if you did the work internally, which department would foot the bill?

A Well, it depends on the nature of the work. So, you know, in -- if some of the work was to do with understanding mutation and it was done internally, ultimately, it would be, in the first instance, my department, genetic toxicology, but that would roll up into a nonclinical safety department, that would roll up into an IV/IVT department team budget, which would roll up into an overall R&D budget. So it's just different ways that the cake can be sliced, you know, for accountancy purposes.

Q And if it is work that is commissioned

externally, where is the accountancy placed for that work?

A Well, again, it can fall on different departments. I think -- ultimately, I think Jim was concerned with understanding how we could progress following the science and commission some work and who within GSK would have their final accountancy responsibility for how that work was supported financially. And I think -- I wasn't party to these discussions and they involved Jim and at times Patrick and at times other people, so I don't know the ins and outs of those discussions.

Q Okay. So let me just -- you're familiar with the work of Dr. George Johnson because you're a co-author with respect to the publication that resulted from it, right?

A Yeah, I'm familiar with some -- I've published a number of papers with Dr. Johnson over the years, and so you might need to be a bit more specific to which paper you're referring to.

Q And as to the paper with respect to NDMA modeling that you published in 2021, GSK paid for that work?

MR. SACHSE: Objection.

A That's not correct. I think you're confusing

some wording in this -- in this e-mail with other work that we did with Dr. Johnson.

Q Okay. All right.

A I think the NDMA modeling work actually is referring to some analytical work. As you can see, it's variation in endogenous and exogenous NDMA formation, so likely to be referring to work linked to DMPK and it's nothing to do with benchmark dose modeling on a collaboration I had with George, which actually preceded the 8th of January date described here. We've never commissioned that work from George Johnson. That work was done independently of financial support from GSK. It was done under the auspices of the Health and Environmental Science Institute, H-E-S-I, and the GTTC, which is the Genotoxic Testing Committee, and included a number of authors who are a member of that committee including Dr. Johnson himself.

Q Okay. So before we get to that, and we will, this is an e-mail from James Harvey saying if we commission work externally, we get the money back.

Did you commission work externally from George Johnson?

A We have established a collaboration with George Johnson to investigate mutation induction in the low-dose region in sarlines in vitro and to further

investigate the role of DNA repair in mutation induction. And that is a contract that's been signed with Academic Alliance and the University of Swansea, and the money is -- pays the salary of a postdoctoral scientist to run the studies in Dr. Johnson's laboratory because Dr. Johnson's lab has previous expertise in running mutation assays and looking at low-dose response relationships with genotoxic carcinogens and has published a number of papers in that particular context.

It has nothing to do with modeling, and wasn't related to the benchmark dose modeling paper I co-authored with Dr. Johnson.

Q So let's stay with the contract for the work that Dr. Johnson is doing.

A Uh-huh.

Q Who provided the funding for that work pursuant to the contract?

A GSK is providing the work to support that collaboration and to pay for the salary of the postdoctoral scientist.

Q When you said GSK is providing the work, you meant to say they're providing the money, right?

A We provide -- yeah, we provide money to support that collaboration because it has the employment of the senior postdoctoral scientist to conduct the

studies.

Q And who signed the contract on behalf of GSK?

A It would have been -- for the work to do with the sarline work, I would have authorized it from a genetic toxicology and photo safety departmental perspective. And then the work was also signed off by GSK legal because it was -- there was a contractual element to the collaboration, and therefore, there was a legal agreement to the work.

(Exhibit No. 5379 was marked.)

Q Okay. Let me show you Exhibit 5379 for a second, and then we'll keep going on this in a minute. And 5379 is dated April the 22nd of 2020. It's sent to you. The subject is nitrosamine work streams. The attachment says, "Nitrosamine work streams version two," right?

A That's what the title says, yes.

Q And it says, "Attached are the slides that we presented to the ranitidine corporate group regarding proposed external engagement in support in the application of the ICH M7 framework for N-nitrosamines."

Were you part of the presentation that was made to the corporate group with respect to this proposed external engagement?

A No.

Q Who made the presentation to the corporate group with respect to the proposed external engagement in support of this nitrosamine issue?
A I don't know.
Q Okay. Who was on -- who's at the corporate group that makes the decision whether to authorize a contract for the external engagement of this work on this nitrosamine issue?
A I don't know. I wasn't there.
Q Okay. If we can go to the third page of the document, let's start with the second row, which is Dr. Johnson at Swansea University. It says, "Mechanistic studies and modeling of preexisting and new data. The deliverable determination and mechanism of NDMA mutation threshold in vitro, establish NDMA point of departure related to DNA repair and metabolism." Did I read that correctly?
A Yes, you did.
Q Is that the work that was being done pursuant to the contract that you signed off on together with a member of GSK legal?
A Yeah, that's the work that we commissioned in order to understand the relationship between NDMA-induced mutation and low doses of NDMA in cultured mammalian cells.

Q And Doctor, when it says 137,000 pounds, that's 137,000 units of British money, not weight, correct?
A It's 137 pounds sterling and would cover the cost of one postdoctoral scientist, also consumable requirements to conduct the studies, and the university adds basically an overhead as part of its contractual arrangements with third-party collaborators like GSK.
Q Sure. And so when you said 137 pounds, you meant 137,000 pounds sterling, correct?
A Correct.
Q All right. And Google's telling me that's 185,531 dollars and 85 cents of US dollars. And you described what that's for, and it's supposed to last 12 months; is that right?
A Yeah, that work is ongoing presently and will report out sometime next year.
Q Now, Doctor, above that there's some work with respect to Lhasa, and you just mentioned Lhasa before. Is this work that is being externally done pursuant to a contract with GSK?
A So I'm only -- I'm less familiar with exact details of that work, which has been commissioned with Dr. David Ponting through GSK. It's linked to SAR, structural activity relationships, and predicting

potential genotoxicity and looking at the relationship between genotoxicity and rodent carcinogenicity from nitrosamines as a task, and Lhasa are experts in developing platforms that can interrogate chemical structure and predict outcomes for genotoxicity and/or rodent carcinogenicity.

Q And I thought you mentioned the Lhasa work in one of your previous answers as something that you were referred in?

A Yes, you did. I referred to a paper that Lhasa had recently published indicating that 20 percent of N-nitrosamines do not induce carcinogenesis in the two-year rodent bioassay. So not all nitrosamines are carcinogenic.

Q Ah, I got it.

A And they've been looking at different passes of nitrosamines to understand the relationship between chemical structure, potential for genotoxicity and potential for rodent carcinogenicity, which they've published on -- there are a number of papers they've recently published in that -- in that regard.

Q Excellent. Doctor, I didn't mean to suggest something that wasn't true, so if I was confused, I apologize to you. Thank you for that clarification.

How many different nitrosamines did they study

to see which ones were carcinogenic and which ones were not?

A You're asking me fine details about the study and reports, and as I told you, I wasn't -- I didn't have firsthand involvement in this particular collaboration. I've recently been the co-author on the paper where we looked at the Lhasa database, and there are several hundred nitrosamines within their database. And I've seen publications from that group looking at the relationship between chemical structure and putative genotoxic liability and the relationship with rodent carcinogenicity.

Q And so your point is of the several hundred nitrosamines in the database, 20 percent of them are not carcinogenic, according to Lhasa, correct?

A That's a statement that occurs in a number of papers and published by authors from Lhasa, yes.

Q But to be clear, the 20 percent of nitrosamines that are not carcinogenic does not include NDMA, which is carcinogenic, right?

A NDMA is well documented as a rodent carcinogen in both rats and in mice.

Q Sure. And in the Lhasa work, the Lhasa work confirmed that again, that with respect to that particular carcinogen, NDMA, it's carcinoid?

A So the Lhasa work looks at carcinogenicity publications in the literature and essentially uses those categorizations. So although I don't have the paper on hand in front of me, there would be no reason for me to suspect that Lhasa has not concluded NDMA to be a rodent carcinogen.

Q Fair enough. Third row there's a Dr. Paul White at Ottawa University in Canada. The external cost is 180- to 200,000 pounds sterling. It's going to take 24 months.

Were you involved in the commissioning of this work?

A I was involved with negotiations with Dr. Paul White to contribute with GSK to collaborate with him and his group at University of Ottawa to undertake work to look at the induction of NDMA in mutations, particularly in the low-dose in vivo using transgenic animal models used to measure mutation induction and to consider the relationship with dose. However, that collaboration subsequently fell through later on in 2020.

Q Why'd it fall through?

A Why did it fall through?

Q Yes, sir.

A So Dr. White has an academic position at the University of Ottawa, but he also has a position with

Health Canada, and he was going to work with a colleague at Health Canada called Dr. Francesco Marchetti, who has or manages their own transgenic mouse colony for mutation analysis. And in one of our calls to discuss the project, Dr. White informed me that the MutaMouse colony would no longer be made available to him to progress the work with NDMA that we had planned.

As I had --

Q Only. Well --

A -- said, we have commissioned the same study from a CRO provider called Covance, and that study is currently concluding and we'll bring it out sometime next year. Again, it's all around following the science and trying to understand the role of low doses with regard to mutation because mutation clearly is a key event, as my AOP describes, in the potential for carcinogenesis. But mutation is influenced by a number of factors, including metabolism, DNA repair of adducts, whether the mutations occur in neutral genes or critical genes, et cetera. And this work is to understand that relationship taking the low-dose region, which is relevant for the levels of impurity of nitrosamines.

Q So Doctor, did you commission the work from Covance as a replacement to the work that was going to be done by Dr. Paul White?

A Yes.
Q Okay. And is the cost of the Covance work approximately the same as what's shown here, somewhere between 180- and 200,000 British pounds sterling?
A It's a little bit more, but it's around that ballpark.
Q And who is the individual primary investigator at Covance that's doing that work?
A I'm sorry. The name's alluding me. It's one of their study directors. My colleague, John Howe, is the study monitor in my group, and he has the sort of day-to-day interactions with the study director at Covance. It's not part of my specific role.
Q So when you say he's the study monitor, what is the role of the study monitor in interfacing with the study director that's referenced here?
A So the study that we're running is a good laboratory practice compliance study investigating the full dose range going down into really low doses. And the study design, prior to commissioning the study, was reviewed by a number of external experts as part of that HESI DTTC I mentioned earlier and included a number of scientific experts in genetic toxicology who work for various regulatory agencies throughout the world.
And the role that John has is to keep in touch

with the study director, monitor how the study is progressing, provide the overall review of the protocol and any deviations to the protocol that the study director has invoked and then will also contribute to data review and the final report publication. So it's just, essentially, how GSK manages the conduct of contracted research with the CRO partner.

Q Okay. I hate to keep jumping around on you, but go back up to the top. Dr. Ponting's work at Lhasa, who was the study monitor for GSK?

A I don't think there would have necessarily been a study monitor for that kind of work, which is around structural activity relationships and is not following a detailed GLP protocol like a MutaMouse study that we commissioned with Covance.

And as I've already mentioned to you, I didn't have direct responsibility for that collaborative work stream. I was more having an awareness, but I wasn't involved in its day-to-day management.

Q Do you know who is?

A I would think that's Jim Harvey.

Q Okay.

A Or -- yeah, Jim Harvey would ultimately have accountability for that piece of work.

Q The second row, the work by Dr. George

Johnson, who was the study monitor for GSK for that work?

A So initially it was Julia Kenny, but she recently left my department, and therefore, I've taken over that role.

Q Okay. And then Dr. Lynch, the Covance work, who's the study monitor again? You told me and I didn't write it down. I apologize to you.

A John Howe.

Q Yes, okay. Sorry about that. Let's go to the fourth one. We've got Dr. Johnson again, benchmark dose modeling training for GSK, and there's a 9,000 dollar pound sterling cost for a month.

When did that training take place by Dr. George Johnson of GSK employees with respect to how to do benchmark dose modeling?

A It hasn't taken place. In fact, we've recently recruited an individual who is an expert in benchmark dose modeling, so I don't think that training will be required any further.

Q Who did -- who did you bring on that's an expert in benchmark dose modeling?

A Dr. John Wills from Cambridge University. He's been a key author on benchmark dose modeling. He has previous positions with the University of Ottawa and

working with Dr. Paul White and also he's worked with Dr. Johnson.

In the past, he did his Ph.D. at Swansea, but for the last four years, he's been working at Cambridge University and developing imaging platforms and not really been working -- well, he hasn't been working on nitrosamines, as far as I'm aware.

Q Okay. The next row is Dr. Aarti Patel, PB/PK modeling of NDMA and NDEA exposure nonclinical and clinical extrapolation. We don't know about the cost. It's six months long. In-house expertise disposition modeling to support clinical risk assessment.

Who contracted for that work to be done by Dr. Patel?

A Dr. Patel works for GSK. She's a member of DMPK department in IV/IVT and -- I don't know whether that work has been commissioned or not. Again, it's one of those work streams that are outside genetic toxicology.

Q Okay. And the reason it's kind of nonapplicable under external cost is she's internal to the company, right?

A That would be my assumption.

Q All right. The next row is a risk assessment related to biological consequences of low-level NDMA

exposure in humans. The deliverable is ICH M7 aligned acceptable intake for NDMA assuming no threshold, (TD50 and BMD) and threshold (PDE approach.)" And it's external, and lists Professor David Tweats, Professor Alan Boobis and Dr. Jim McGregor, has an external cost of 10,000 pounds sterling, duration of three months.

And the comment is, "For expertise associated with ranitidine and genotoxicity (DT), BMD and mutagenicity/carcinogenicity risk assessment (AB - GSK advisor to GSK attrition council, and BMD/POD mutation data, Jim McGregor."

Who commissioned that work for GSK?

A Those engagements were pursued I think at the time this table was pulling together some ideas and potential costings but not all of the projects were followed up with. And to my knowledge, we did not engage with Professors Tweats, Boobis or Dr. McGregor.

Q Okay. And then we've got you and Jim Harvey, duration of three months, it's in-house expertise mutagenicity/carcinogenicity. Did that work go forth?

A Well, I mean, clearly, as heads of target safety sciences and genetic toxicology, and, you know, I think it's already been demonstrated by the e-mail distributions we've been involved with understanding the role of NDMA mutation and potential rodent car -- and

rodent carcinogenesis. And we were involved in managing some of these collaborations that we wanted to initiate to follow the science and better understand the underlying relationship between dose and mutagenicity and its connection with potential rodent carcinogenicity and therefore how that informs human risk assessment.

Q Doctor, I think my question was did that work go forth. I think was your answer yes?

A Well, there was no program of work linked to that particular title. I think it's all about how Jim and I were involved in the management of some of these other work streams --

Q Gotcha. And --

A -- as far as what it would take.

Q Yeah, the reason I ask that question is right below this on the top of the next page but in the same column, there's a Richard Haworth.

A Yeah, he's head of pathology, so he's an expert in rodent carcinogenesis. He's also chair of the carcinogenicity panel, which is our expert panel for carcinogenesis within GSK.

Q And so this is a preliminary listing of external work on NDMA. Were there other projects not listed here that ultimately went forward?

A I mean, this is the work that a link to IV/IVT

directed work streams and so I'm not -- I don't know if there are other work streams that have been undertaken by GSK in other lines. You know, the focus we have here is around those particular work streams related to, you know, the function of genetic toxicology.

Q Yes, sir.

A And therefore, you know, that -- I just don't know the answer to your question.

Q Are you involved with any other work relating to the NDMA issue other than what's been described in this document?

A So I wouldn't characterize it as the NDMA issue. I've been involved in work looking at nitrosamines as a class and the robustness of the Ames test. I'm a co-author on a paper that's about to be published that's been submitted to a journal following referee's comments, and those have now been addressed and so we're hoping that that paper will be published soon. And it's looked at -- it's questioned around concern for the robustness of the Ames test with regard to nitrosamines and concluded that the Ames test is a robust study.

It also looked at various components of the testing design and also provide some case studies with exemplar nitrosamines which have been tested in a number

of the authors' laboratories. So, yes, I've been involved in that work.

I've also been involved in writing a paper with Jim Harvey and Angela White looking at less than lifetime risk assessments for NDMA similar to a paper that was recently published by Joel Bercu and colleagues on NDEA and reviewing the various studies on rodent carcinogenicity described in the literature and looking at the impact of dose and duration to understand how that might inform a less-than-lifetime exposure risk assessment. That work is not completed yet. It's still in preparation, but in due course, we would submit that for publication and review by external referees, scientific referees for publication.

Q Okay. Now, while we've got this on the screen, I want to go back and just talk about a few of these including the one you just referenced. But let's start with the Covance work that is kind of in the place we highlighted, that third row where Dr. Paul White was. This work is presently ongoing with Covance, right?

A Yeah, we've run a one-month study using a range of doses of NDMA to look at mutation induction across the dose response and --

Q And this is using what was the MutaMouse colony?

A So we're using Covance's MutaMouse colony to investigate in vivo mutation induction, that's correct.

(Exhibit No. 5339 was marked.)

Q Let me show you a document marked as Exhibit 5339. And this is a publication that you authored back in 2008 entitled, "Is the MutaMouse insensitive to clastogens?" Were you first author on this?

A I was, yes, sir.

Q And without going through it in too much detail, if we look at the last sentence of the abstract, it says, "These studies support the view that MutaMouse is insensitive to compounds where the genotoxic mechanism of action is predominantly clastogenisis but demonstrate that the peripheral blood micronucleus test is a useful adjunct to the transgenic gene mutation assay."

A Yeah, that's a correct summary of the work we presented there looking at various compounds known to induce clastogenicity via well-defined mechanisms.

Q Yep.

A What I would say about the work we're doing with NDMA is that NDMA induces mutagenesis and so -- and in addition to clastogenicity. The reports of clastogenicity are usually observed at doses higher than

those that result in mutagenesis.
And also, in the current MutaMouse study that we've designed, we are investigating the potential for clastogenicity in those animals using a peripheral blood micronucleus test and also looking at the Comet assay endpoint. So I appreciate your diligence in picking up some limitations regarding MutaMouse, but from the scientific perspective, we've covered those bases in the NDMA study that we've commissioned with Covance.
Q And not suggesting you did anything wrong. I just want to pin it down so that we're all living with the same thing, and here's my question: Do you view NDMA as predominantly clastogenesis?
A No.
Q Okay. And so can I take it from that statement that you view the MutaMouse as being sensitive to compounds such as NDMA where they are primarily mutagenist?
A So I would agree that MutaMouse is appropriate in the in vivo study designed to investigate in vivo mutagenesis. I would also add that regulatory agencies, when concerned about the validity of a negative Ames test for nitrosamines as a class, have been asking companies for follow-up studies using MutaMouse to evaluate the potential for mutation.

So it's not only my view, but I think it's an accepted view of both regulatory agencies and other subject matter expertise in genetic toxicology that MutaMouse is an appropriate model to investigate mutagenesis.

Q Okay. So --

A If I may add, if you add on a micronucleus test like a peripheral blood micronucleus test, you also cover the base --

Q Yes.

A -- for clastogenicity.

Q That's where I was about to go. So I think I'm hearing two things. Number one, with respect to a mutagen like NDMA, your view is that MutaMouse is an appropriate tool to utilize to study that compound. That's first, right?

A Yeah, it provides the appropriate endpoint via mutation to investigate the role of dose in the low-dose region, which is the aim of our current study that we've commissioned with Covance.

Q And then over and above that, what you're saying is that in addition to the MutaMouse tool, you're also doing the peripheral blood micronucleus test as kind of a backup or a secondary approach; is that right?

A So we're adding that endpoint on to the

current MutaMouse study, which allows us to evaluate potential for clastogenicity in the peripheral blood compartment in those treated animals so we cover that clastogenesis piece, yes.

Q Okay. Fair enough. Now, back to our --

MR. SACHSE: Mikal, I'm sorry. We've been going about an hour and a half. Are you coming close to a conclusion on this one?

MR. WATTS: Yeah, I'm close. Let me finish this up, and then we'll stop, but thanks for the heads-up.

BY MR. WATTS:

Q So with respect to the Covance study, how far along is it? How much longer do we have till it'll be completed?

A For the Covance study?

Q Yes.

A I'm hoping that we would get the full report Q2 next year.

Q Okay. When do we expect a full report from Dr. Ponting on the Lhasa work?

A Again, as I said, I haven't been close to that study or what that involves, so I'm not sure an outcome is a report per se. It could be that, you know, some of the publications that Lhasa have produced represent some

of that work was being conducted, but you would have to ask Dr. Harvey for those details. I'm not the right person.

Q And let's go back to Exhibit 5379 and then we'll finish this and take break. On Bates page 459, with respect to Dr. Johnson's work in the second column on mechanistic studies of modeling and preexisting and new data, when do you expect that work to be complete?

A There's been a delay because of the COVID pandemic and access to the laboratory, so we've just extended the timeline to Q2, so hopefully, again, we should get a report around the end of Q2 next year. That would be my -- my best estimate at the moment.

Q Okay. And your department is the department that signed off on the contracts for this work together with the member of legal; is that right?

MR. SACHSE: Objection.

A It wouldn't have been -- yeah, I think the way you've worded that, I mean, all contracts that we have with university -- between universities and GSK have a legal basis and therefore have a legal review as to the nature of the contract and then the fate of the data, et cetera. Such a contract was signed between GSK and Swansea University.

Outside of the contractual elements, I've been

basically involved with Julia Kenny. We have frequent meetings with Dr. Johnson to understand progress with the project, and, you know, that's typical in terms of management, monitoring and oversight with contracted research with university institutions. And as I said, we hope that the work will conclude around Q2, 2022.

Q Sure. But Dr. Lynch, who has possession of the contracts? Are they stored in the legal department or do you have a copy?

A I don't know the answer to that right at this moment.

MR. WATTS: Okay. Let's take that break. Ten minutes?

MR. SACHSE: Sure.

THE VIDEOGRAPHER: That's the end of media four, volume one. Going off the record at 3:52 p.m.

(A 35-minute recess was had.)

THE VIDEOGRAPHER: This is the beginning of media five, volume one. We're now back on the record at 4:16 p.m.

(Exhibit No. 5340 was marked.)

BY MR. WATTS:

Q Dr. Lynch, I want to show you Exhibit 5340. This is an article entitled, "Permitted daily exposure

limits for noteworthy N-nitrosamines," authored by George Johnson and a number of other individuals, including yourself, right?

A Yeah, that's correct.

Q It's first published on June the 5th of 2021; is that right?

A That's correct.

Q It says, "Funding information: Baxter International." What does that mean?

A I believe that Ryan Wheeldon was funded by Baxter as part of his Ph.D., and I think he did a remote Ph.D. with Dr. Johnson, so I think that's what that's alluding to.

Q And if we could put this page on the left and put -- let's see. Let's go to page 17 on the right.

Okay. Now, with respect to the authors on the left, George Johnson is the man with the initials GEJ, right?

A Yes.

Q And under the Conflict of Interest, it says, "GEJ is a consultant who evaluates the risks posed by the pharmaceutical impurities." Do you see that?

A I see that.

Q It says, "His clients did not influence the content of this manuscript." Do you see that, sir?

A I do.
Q GSK is one of George Johnson's clients.
A Well, I would dispute that because as far as I'm aware, George Johnson has not been involved in any consultation regarding pharmaceutical impurities leading to nitrosamines.
Q So is GSK a client of George Johnson?
A Currently, not that I'm aware of.
Q How about when he wrote the paper?
A No. We weren't using George Johnson as a consultant with regard to ranitidine.
Q And so when George Johnson, in a conflict of interest disclosure, says his clients did not influence his manuscript, we should not take that sentence to include GSK because GSK is not his client, right?
A Yeah, exactly. GSK wasn't a client of George Johnson with regard to the content of that manuscript.
Q GSK did influence the content of this manuscript, didn't it?
A GSK wasn't a client, but as a co-author who works for GSK, I have a contribution -- I made a contribution to the manuscript.
Q And Julia Kenny works for GSK, is that right, as we look over on the left side and highlight her name?
A Yeah.

Q And Jim Harvey worked for GSK, right?
A Yes.
Q The three of you employed by GSK influenced the content of the manuscript. We agree?
A I agree that we contributed to writing the manuscript because we have a legitimate interest in benchmark dose modeling and --
Q So --
A -- and that these -- the work that was described in this article is relevant to furthering the science around nitrosamines and risk assessment.
Q Now, in addition to Jim Harvey, Julia Kenny and Anthony Lynch, you're aware that Zantac was co-promoted in the United States by a company called Hoffmann La Roche pursuant to a contract with GSK, right?
A I wasn't aware of the details of how Zantac was marketed.
Q Well, your co-author, Andreas Zeller, is employed by Hoffman La Roche, right?
A Andreas does work for Roche, yes.
Q And other parties in this litigation other than GSK, are you aware that the over-the-counter molecule for ranitidine was bought by Pfizer through Warner-Lambert from GSK?

A No, I wasn't aware of that.
Q You're not aware that Pfizer is a defendant in this litigation just like GSK?
A Not specifically aware of that.
Q Your co-author, Krista Dobo, is an employee of Pfizer; is that?
A That's correct.
Q And in addition to Krista Dobo, another co-author is Michele Kenyon, who is also employed by Pfizer, a defendant in this lawsuit, right?
A Both Krista Dobo and Michele Kenyon work for Pfizer.
Q And Ryan Wheeldon works for a company called Johnson & Johnson, right?
A Yeah, I mean, the affiliations of all the authors are documented clearly in the manuscript.
Q And you know that Johnson & Johnson signed an indemnification agreement to indemnify Pfizer for its liability in this case?
A I wasn't --
Q Did you know that?
MR. SACHSE: Objection.
A No, I wasn't aware of that.
Q And another defendant in this case is Sanofi. Are you aware of that?

A No.

Q Do you know who Veronique Thybaud works for?

A Again, the affiliations are noted in the manuscript. She works for Sanofi. She's a senior person in their genetic toxicology group.

Q Sure. Are you familiar with a company out in California that provides litigation consulting to pharmaceutical companies known as Exponent?

A I am aware of the name Exponent. I didn't know what their function was.

Q And Exponent employs your co-author Bhaskar Gollapudi; is that right?

A Yeah, that's correct.

Q And then there's another pharmaceutical company known as Amgen that employs Sheroy Minocherhomji, right?

A Right.

Q And another pharmaceutical company known as AbbVie employs your co-author John Nicolette, right?

A I would add, though, while you're outlining the names of the co-authors on this paper that I'm also co-author with Dr. Johnson. But in addition, all of these people are members GTTC, the Genetic Toxicology Testing Committee, which is one of the committees of the Health and Environment Sciences Institute in Washington,

D.C. And that committee's existed for over two decades now and for the last decade or so has had an interest in quantitative genetic toxicology testing modeling, including benchmark dose modeling, and a number of these authors have published or been co-authors on papers specifically around developing mathematical models for benchmark dose modeling, which is a method that's also used by regulatory agencies such as the European Food Standards Agency to evaluate data for -- from carcinogenicity assays conducted in rodents.

And so all of these authors have had prior interest in evolving modeling approaches for risk assessment used in benchmark dose modeling and quantitative genetic toxicology assessments of data outside of whether their company's had associations with ranitidine or not.

Q Who funds the Health Environmental Sciences Institute in Washington, D.C.?

A They have funding from different sources, including a number of different industrial sectors. But it's also a body that invites participation from regulatory scientists and academic scientists, and that funding is used to help sponsor attendance of those experts to meetings and workshops.

Q Is GSK a funder of the Health and

Environmental Sciences Institute?
A We pay a contribution to be a part of the genetic toxicology testing group, yes.
Q Pfizer does as well?
A Pfizer -- the members of Pfizer that are listed are members of that same committee.
Q Sanofi contributes to the Environmental -- Health Environmental Sciences Institute, right?
A I mean, I don't have a definitive list of which representative companies are members of the HESI GTTC. That information is disclosed publicly on their web pages. I'm sure that that information can be provided to you. But what I'm saying is that all of these co-authors have been working on the topic of quantitative genetic toxicology testing and benchmark dose modeling for a number of years as part of their scientific research which is facilitated by HESI.
Q And HESI is funded by the companies employing all of these co-authors, GSK, Pfizer, Sanofi, Johnson & Johnson, La Roche, AbbVie, Amgen, every one of them is a member of the contributing group to fund HESI, isn't it?
A But it also has representatives in the GTC from academia and from various regulatory authorities from around the world and therefore provides a platform to advance the science, which is part of the mission of

HESI. And everything is done in a very open and transparent way. All the -- there are a number of papers that are published by HESI, including this paper which was reviewed by HESI management prior to publication.

MR. WATTS: Objection, nonresponsive.

Q My question was very specific. The employers of the 12 authors of this paper, with the exception of George Johnson, GSK, Pfizer, Amgen, AbbVie, Sanofi, Johnson & Johnson and La Roche are all contributors of HESI?

A Yes, amongst other companies they haven't listed.

Q Now, with respect to -- going back to the paper, the conflict of interest disclosure, Exhibit 5340, when George Johnson says his client did not influence the content of this manuscript, he gave GSK the ability to edit the manuscript before it was published, didn't he?

MR. SACHSE: Objection.

A No, I wouldn't put it in those terms. You know, as a co-author, we all individually contributed to the development of the manuscript and the review of the data that George had analyzed using the benchmark dose approach. And in fact, if you go back to the early

versions of the paper, there were other people involved in the development, including regulators like Paul White.

Q Sir, my question was more specific. Was GSK given the opportunity to make, quote, "institutional improvements," with respect to the content of this paper?

MR. SACHSE: Objection.

A My answer to your question is that as a co-author, I contributed to the development of the manuscript from the very early draft right through to addressing reviewers' comments and was a full contributor to this manuscript as required in terms of, you know, how scientists contribute to papers of this nature.

Q As was Julia Kenny and Jim Harvey, all co-employees of GSK, right?

A Jim Harvey and Julia Kenny are employees of GSK.

(Exhibit No. 5384 was marked.)

Q And let me show you Exhibit 5384. This is written by George Johnson to you copying Julia Kenny and Jim Harvey. "Hi Ant, I've chatted with Andreas and since Paul White is no longer on the paper, we are happy to soften the future work bits around the adjustment

factors in line with your major comments. I have accepted the wordsmithing bits as well, as I don't think these will affect the institutional improvements that have already gone through." Did I read that correctly?

A Yeah, you read that correctly, but I can --

Q What does this mean?

MR. SACHSE: He wasn't done.

Q Go ahead.

A But I'm happy to provide you some context because Paul White's interest was around potential adjustment factors that can be used when determining a permissible daily exposure using a benchmark dose defined as no effect level and how the appropriate adjustment factors are determined, and his research interests are around how you better define this to genetic toxicology.

Of course, without Paul being a contributor to the paper, it was not appropriate that we further describe those adjustment factors, which are a work in progress. In fact, some of the work that in our original potential collaboration with Paul we were openly exploring with him. So I think, you know, it was only appropriate with Paul withdrawing himself as a co-author that we -- we didn't focus on discussion about future work around adjustment factors, which you will

see from the earlier drafts of this paper.

And then the wordsmith and bits is basically how one looks at -- for instance, George wanted some input on the abstract because it was going over the 250 words and he knows I'm good at placing scientific text. So it's just about making the paper more readable. It wasn't changing any of the scientific content or the conclusions. It was around contributing to readability at this sort of final -- these final versions of the paper.

Q Sir, one of the reasons that every major pharmaceutical company that's a defendant in this litigation has an author on this paper is so that they could provide approval to the content of the paper before it was published; isn't that true?

A No, that --

MR. SACHSE: Objection.

A That isn't true. Essentially, all companies like GSK, and I can only speak for GSK --

MR. BOSSA: Excuse me.

A -- for authorizing all publications that go to peer-reviewed journals, and that's the process that's being referred to here. It's -- it's around, you know, signoff from management -- of the managers of those -- paper authors. And there's also a review from the legal

department around potential IPE conflicts, and there's just a formal process in place for all external publications.

And as lead author, George would have had to get all those ducks in order for that paper then to be submitted to -- to the journal editors for consideration for publication.

Q What is the GSK process for approval --

MR. BOSSA: Hey, Mikal. This is Luke Bossa for BI. Can I just lodge an objection to that most recent question?

MR. WATTS: You just did.

BY MR. WATTS:

Q What is the GSK approval process before Anthony Lynch can appear as a co-author on a paper? Who has to approve it?

MR. SACHSE: Objection.

A So there's an internal process called publication review, and you submit a copy of the manuscript and departmental managers have to provide an approval that the manuscript can be submitted for publication. One of those elements as well includes a review by the legal department as to looking at potential for sort of IP concerns because often papers that are published by GSK might include information

that's commercially sensitive on development projects. In this case, there were no potential restrictions and approval was gained for publication and that information was communicated to Dr. Johnson before the paper was submitted.

Q Dr. Lynch, who was the departmental manager that approved this transcript before your name could go on it in a publication?

A I -- I can't remember.

Q How did you know who to submit it to?

A Well, it normally has to be either a line manager or a senior director position.

Q Who's the senior director to whom you report?

A My line manager is Nick McMahan.

Q Did you communicate with Nick McMahan about this transcript, this manuscript?

A I don't recall.

Q Who's the senior director above him?

A Nick McMahan reports to Patrick Wier.

Q Did you communicate with Patrick Wier concerning this work?

A I don't have any recollection of talking to Patrick about this work.

Q But if the publication review procedure was followed, one of them had to sign off on this before

your name could go on a publication according to GSK procedure, right?

A Right, or -- or another senior director.

Q Did you communicate with any other senior directors about this work?

A I don't recall.

Q Do you recall communicating with anybody other than Julia Kenny and Jim Harvey about this work during the co-authoring this article?

A No, I don't recall.

Q Who was the member of the GSK legal department that approved this manuscript before it could be published with your name on it?

A I don't know. I'd have to go back to the records for the publication tracker that we have.

Q And where is the publication tracker maintained? Where would you go to look?

A There's an internal -- there's an internal website where essentially all publication approvals are kept.

Q What's that named?

A I mean, you -- we just can access it by putting "publication tracker" into our internal web browser.

Q What's the internal web --

A I don't know what the exact URL is for that publication tracker.

Q What's the URL for the web browser that you would type "publication tracker" into?

A Well, the GSK web browser, the internal GSK web browser.

(Exhibit No. 5385 was marked.)

Q Okay. Let me show you Exhibit 5385. This is a May 6, 2021, e-mail from George Johnson, and this is sent to all the co-authors, is it not?

A Yeah.

Q In addition, this is sent to Alyssa Flores at HESI. Do you see that?

A I see that.

Q She's not a co-author?

A No, but she's a manager linked to the TTC committee in HESI, which is the group that I referred to earlier that has an interest in benchmark dose modeling.

Q Okay. Is she entitled to make changes to an article she's not a co-author to?

A Well, I don't know whether it's implicit that she has that ability to make changes. I don't know whether she did or did not.

Q She's certainly on the list of people being e-mailed as changes are made, right?

A Because, as I intimated to you previously, that the paper was submitted to the HESI management for review.

Q Now, what Dr. Johnson says is that the EMM editor -- EMM stands for environmental and molecular mutagenesis?

A That's the name of the journal, yes.

Q "The journal editor would like further amendments. I've completed these to a level that I'm happy with and Andreas has also okayed it. These are now back with you. Some will need final approval from your institutions again. Apologies for this. Can I add in a deadline of close of play tomorrow, May 7, 2021, please?" Is that right?

A Yes.

Q Was your institution one of the institutions that would need to give final approval before these changes could be implemented into the publication?

A I mean, it depends on the nature of the changes.

Q And up at the top, Mr. Johnson writes another e-mail later in the same day, "P.S., I hope that you are all watching. Joel Bercu is at GTA right now, and he's excellent and his presentation links with our stuff a lot." Did I read that right?

A Yeah, but I wasn't watching that.
Q And GTA stands for?
A The Genetic Toxicology Association. It's a scientific society in the US.
Q And you mentioned Joel Bercu as one of the individuals with whom GSK was working on these issues, right?
A So I'm a co-author with Joel on a separate paper, which was interested in the robustness of the Ames test that I talked about earlier.
Q And you-all are getting ready to publish an article together with respect to how robust the Ames test is, right?
A We've done a considerable amount of work looking at the literature and looking at doing some statistical analysis about how the Ames test predicts mutagenicity and how that's linked to potential rodent carcinogenicity, as I explained. And also we've conducted some case studies with known nitrosamines to look at different variations of the Ames test procedure to see how these impact how well the Ames test performs with regard to predicting the potential mutagenicity of nitrosamines, and that paper has recently been submitted for publication.
Q Okay. First of all, who is Joel Bercu

employed by?
A Gliead.
Q And are there 12 authors or is it just you and Mr. Bercu?
A There are additional authors on that Ames test paper.
Q Okay. By whom are those additional authors employed?
A I'd have to go back to look at that paper again to -- there are a number of authors -- to just check exactly who was included.
Q What's the journal that it was submitted to?
A It was either Environmental and Molecular Metagenesis or Top Scientists, as I recall.
Q When is it going to be published?
A It has to go through peer review, so I can't answer that question.
Q Now, Doctor, you remember how we went through all of the rapporteur testing results that showed almost every ranitidine sample that was tested was over the allowable limit of 96 nanograms a day of NDMA?
MR. SACHSE: Objection.
A You showed me a table with a whole bunch of numbers, and it wasn't clear to me exactly what was -- what batches or what manufacturer reagents were being

tested. But you showed me a table with a whole bunch of numbers in parts per million, and you told me that they were higher than another parts per million limit that the rapporteur identified as being the limit for NDMA.

Q I tell ya what. Go to Exhibit 5374, Bates page 949, and you remember in the discussion it says, "As can be seen from the table above, almost all drug products tested so far have NDMA contents above the current limit of 0.16 parts per million"?

A Yeah, I remember reading that summary, but as I told you when we were discussing those tables, you know, I'm not an analytical chemist. It wasn't my role to be part of that analysis, and therefore, I'm not sure I'm the right person to be commenting on those datasets.

Q Let's test that in a minute.

MR. WATTS: Leave that on the right and put the first page up of 929 so we can see of which drug products are being addressed by the rapporteur.

BY MR. WATTS:

Q Now, this is the rapporteur's updated assessment report concerning to ranitidine-containing medicinal products, right?

A Yes.

Q And in the rapporteur report concerning

ranitidine-containing medicinal products, on 949, it says, "As can be seen from the table above, almost all drug products tested so far have NDMA contents above the current limit of 0.16 parts per million," right?

A Yeah, I read the summary of the first sentence.

Q Now, that's --

A I understand that statement, and all I would say --

Q And that's -- sorry.

A What I was trying to explain to you is that it wasn't clear to me exactly what -- what companies ranitidine was being described in that content or what the batches -- and like I said, I'm not an expert in analytical chemistry, and it's therefore difficult for me to comment on what those levels are and have been reported. So I recognize that that's a table present in this document and those levels have been described, and I recognize that this is the summary as the first sentence in the discussion part of this document.

Q So in February of 2019, the rapporteur says, "With respect to ranitidine-containing products, almost all drug products tested thus far have NDMA contents above the current limit of 0.16 parts per million." You understand that that is the equivalent of 96 nanograms

for NDMA, right?
A Right.
Q Okay. Now, let's go back to your study or your article, 5340, and let's look at the first page and see what you and your 12 authors came up with. And if we go down to the bottom of the abstract, we can see you say PDEs for NDMA were 6.2 micrograms a day for cancer. Do you see that?
A Yeah, that's based on -- this is reporting --
Q Hold on.
A -- those calculation, so that's the figures that were determined as a result of the work that we explain in more detail in the body of the paper.
Q All right.
MR. WATTS: Erik, take the second line highlighting off and just put "NDMA were 6.2" and then pick it up at "micrograms per person per day for cancer." "For cancer" --
A I would like to --
MR. SACHSE: Hold on. Wait for a question.
MR. WATTS: And then "PDEs for" on the previous line.
BY MR. WATTS:
Q Now, PDE, if we go up four lines, means permissible daily exposures, right?

A Right.
Q And it says on the next line both PDEs are higher than the acceptable daily intake values, and then we've got 96 nanograms for NDMA, right?
A Yeah, we're not disputing that fact.
Q Calculated by regulatory authorities, right?
A Right, using a new extrapolation method.
Q Now, the acceptable regulatory limit that the testing on ranitidine-containing products did not meet was 96 nanograms for NDMA, right?
MR. SACHSE: Objection.
A I can't comment on the levels that were reported in drug. Again, it's not my area of expertise.
Q Okay. Now, would --
A All I --
MR. SACHSE: Hold on. Let him finish.
A What this paper is describing --
Q I don't have a question about it yet. I don't need a big long speech. I need an answer to my question.
The question was specific to the intake limits for NDMA was 96 nanograms. That's a yes or no question. The answer is yes, right?
MR. SACHSE: Objection.
A No, it's 96 -- okay. The acceptable intake

limits that have been defined by regulators on which GSK always applied to have been defined as 96 nanograms for NDMA. That figure is derived using a linear extrapolation from the TD50 number in the rodent bioassay and extrapolating that to a presumed human risk, theoretical risk of one in a hundred thousand or one in a million in humans.

What this paper is investigating whether --

MR. WATTS: Objection, nonresponsive.

A -- alternative approaches --

Q This is ridiculous.

A -- which are prescribed by ICH M7 and whether if we follow those processes what numbers do we calculate as alternative PDEs. We're not saying that becomes the regulatory number, but this is essentially an exercise looking at those alternative approaches to find levels based on those benchmark dose modeling approaches and putting that data out there for scientific discussion and debate in a very transparent and open way.

MR. WATTS: Objection, nonresponsive.

Q Now, my question is a precise one, and I'd like an answer to my question, not a speech. Here's the question: The acceptable daily intake values calculated by regulatory authorities you say is 96 nanograms for

NDMA. Yes?

MR. SACHSE: Object to colloquy.

A But that's the level currently regulators are using to control NDMA in potential drug products, and GSK will always abide to the regulatory letters mandated by those agencies. I'm not, you know, have any conflict with that number, and I would expect GSK, you know, to work to those numbers prescribed by the regulators.

Nevertheless, I think there's a scientific interest to look at alternative approaches to calculating those numbers given the levels of uncertainty and given that there are other processes prescribed by ICH M7, which provides guidelines to scientists to determine those levels, and this paper is an exercise in understanding those approaches and figuring out what those numbers could look like.

MR. WATTS: Objection, nonresponsive to everything beginning with "and GSK will abide by."

MR. SACHSE: Objection.

BY MR. WATTS:

Q Now, my next question is your paper suggests a permissible daily exposure for NDMA of 6.2 micrograms per person per day for cancer, right?

A As I said --

MR. SACHSE: Objection.

A -- GSK will abide to the regulatory limits of 96 nanograms for NDMA. Our paper explores alternative ways to reach a PDE assessment based on benchmark dose modeling, which is an approach that has been recognized by regulatory agencies and defined in ICH M7.
MR. WATTS: Objection, nonresponsive.
Q The words on your paper say --
MR. SACHSE: Objection to your nonresponsive.
Q -- PDEs for NDMA were 6.2 micrograms per day for cancer. That's what it says, right?
A It is a calculation based on benchmark dose modeling approaches --
Q And --
A -- which are leading to those values that you're stating.
Q And 6 --
A And we're exploring that possibility because that's part of the guidelines in the ICH M7. We're not saying that this now becomes the regulatory level. This is following the science and having a scientific discussion about using benchmark dose modeling.
MR. WATTS: Objection, nonresponsive.
Q Does your paper say PDEs for NDMA were 6.2 micrograms per person per day for cancer?
A This is an abstract, and an abstract is a sort

of a high-level summary of the content of the paper. And it's very clear in the context of the paper how those PDEs were arrived using benchmark dose modeling, and, yes, using that approach the levels are higher than those stipulated by regulators, which are currently 96 nanograms for NDMA.

But as I've said, GSK will always abide to that regulatory prescribed number for the control of NDMA impurities in drug substances and, therefore, there is no conflict with regard to that regulatory level that's being described as 96 nanograms for NDMA.

MR. WATTS: Objection, nonresponsive.

Q Doctor, do the words on the page say PDEs for NDMA were 6.2, dot, dot, dot, micrograms per person per day for cancer?

A No. They say PDEs for NDMA were 6.2 and 0.6 micrograms per day per person for cancer and mutation.

Q Now, let's split it up and talk about cancer. The PDEs for cancer for NDMA were 6.2 micrograms per person per day for cancer, right?

A Based on a benchmark dose modeling approach that's described in the paper.

Q 6.2 micrograms is the same thing as 6,200 nanograms, right?

A Yeah.

Q And if we use the calculator and divide 6,200, divide it by 96, that is a PDE that is 64.583 times higher than the PDEs currently calculated by regulatory authorities, agreed?
A Agreed. And we will always abide to the value calculated and stipulated by regulatory authorities when it comes to levels --
Q Now, since you --
A -- of impurities in a drug substance, so we --
Q Now, since you published --
MR. SACHSE: Let him finish.
Q I'm sorry.
A There is no contention around that value.
Q Okay. Dr. Lynch, the number that you put in this paper, 6,200 nanograms, is 64.583 times higher than the PDE for NDMA calculated by regulatory authorities. Can we just agree on that?
MR. SACHSE: Objection, asked and answered. He already agreed.
Q Go ahead, Doctor.
A I agree with your math, yeah.
Q Okay. Now, with respect to the publication date of this article --
MR. WATTS: If we could take that down.
Q -- we see that the publication date is June

5th of 2021; is that right?
A Yes.
Q That is six months and a day ago because I'm taking your deposition on December the 6th of 2021, correct?
A Yes.
Q In the six months and a day since this publication came out, has GSK submitted this publication to regulatory authorities?
A I don't know the answer to that question.
Q All right.
MR. WATTS: Let's take a short break. I need about ten minutes, guys.
THE VIDEOGRAPHER: That's the end of media five, volume one. We're now going off the record at 5:02 p.m.
(A 15-minute recess was had.)
THE VIDEOGRAPHER: This begins media six, volume one. We're now back on the record at 5:17 p.m.
(Exhibit No. 5357 was marked.)
BY MR. WATTS:
Q Dr. Lynch, I want to show you Exhibit 5357. Did you participate in the creation of a safety position on NDMA for GSK?

A I contributed to initial parts of a document that was later used by GSK to respond to questions to the European regulators, and I think then used also to respond to other regulators around the world.
Q And if we look at the bottom of the first page, Jim Harvey writes an e-mail to you and Jo Oliver and Steve Parker. What was Jo Oliver's role?
A Jo Oliver is the head of the safety projects group within IV/IVT.
Q And Steve Parker's role again?
A He's a -- he was a project manager and part of Joe's department. He's now retired.
Q And Mr. Harvey says, "Following comments from legal and clinical, I would propose we go with the following," and it's got changes in track changes, right?
A That's what it says in that part of the e-mail. I would need to see the rest of the e-mail chain to understand what this is pertaining to.
Q Sure. Right now it's pertaining to the fact that legal edited GSK's safety position document before you sent it to regulatory authorities around the world, right?
MR. SACHSE: Objection.
A No, I don't believe that's the case.

Q Well, does Mr. Harvey say "following changes from legal"?
A No, it says "following comments."
Q From legal? Who at legal commented on the safety position paper that GSK was going to send to regulatory authorities around the world?
MR. SACHSE: Objection.
A Like I say, I contributed to early drafts of a response document. I have no knowledge of who commented upon that final version of the document, and I don't believe legal would comment on the scientific content of that document.
Q And so if it wasn't legal, it had to have been clinical because that's what Mr. Harvey's e-mail says, right?
A So as you can appreciate, the response to the regulators had a number of components, which included a review of the clinical data as well as the nonclinical data. I contributed to early drafts surrounding the nonclinical aspects of the questions that were addressed. Other subject matter experts contributed to the clinical responses.
Q And if we could, let's go to Bates page 394 and just look at your earlier draft that was being changed by legal and/or clinical. We can see on the

right side it says "Deleted," and what's deleted is the statement, "The reported levels of NDMA in the various Zantac ranitidine formulations are associated with a negligible risk to patients"; is that right?

MR. SACHSE: Objection to the colloquy.

Q Do you see that, sir?

A I see that statement and I see that they're made.

Q How many times are there deletes of the statement concerning negligible risk to patients? Is there two times on this page?

A That's what I can see in this draft report.

Q Go -- go to the next page. Is it eliminated three different times on Bates page 395?

MR. SACHSE: Objection.

Q Do you see that?

A I can see there are deletions to the text. Again, these kind of reports are composite authored by a number of individuals, including people that are much more senior than I am in the company, and I contributed to elements regarding the assessment of genetic toxicity and to review of the rodent bioassay data.

MR. WATTS: Objection, nonresponsive.

Q On Bates page 395, are there three deletions of the phrase "a negligible risk to patients"?

A Yes.

Q On Bates page 396, in the middle of the page, "a negligible risk to patients" is one of the deletions, right?

A Yes.

Q And then there are three further deletions of the word "negligible" in the box, right? Do you see that?

A Yes.

Q And then the next page, 397, the word "negligible" comes out of the last row of the box. There's a further deletion of the words "to the patient is negligible," right?

A Yeah, I think -- I think the whole purpose of these edits was to keep the number as a factual number rather than have a context of, you know, an amount in terms of negligible or small or, et cetera. So I think they're perfectly reasonable editorial changes, but they weren't made by myself, and I don't know what the context of why those changes were made by whoever conducted those changes.

Q The point is there's ten deletions of the phrase "negligible risk to patients" that was in the text that you originally wrote; isn't that right?

MR. SACHSE: Objection.

A Well, I didn't write these texts around the numbers, but the numbers are still, you know, there are as an absolute value, and I think that is a more -- it avoids a -- a descriptive wording around that number. It just gives the number of less than one in a hundred thousand.

Q Doctor, who wrote "negligible risk to patients" ten times such that it had to be taken out ten times?

A Again, it's moving from a qualitative description --

Q Who --

A -- to one of quantitative.

Q Who wrote it?

A I -- it's not clear to me from the document you're showing me who wrote -- who made those editorial changes.

Q Who took "negligible risk to patients" out of the safety position paper that was submitted to regulatory authorities around the world?

MR. SACHSE: Objection, asked and answered.

A I -- I don't know.

(Exhibit No. 5377 was marked.)

Q Let's go to Exhibit 5377. Now, in the middle of the page, Steve Hobbiger writes an e-mail on April 16

that's then sent by Jim Harvey to you at the top of the page. And Hobbiger writes, "Hi, everyone. Please find attached correspondence received today from EMA. The changes are highlighted, and I will leave you to read these and the further hardening of the EU position." Do you see that, sir?

A I do.

Q Now, part of what the EMA wrote is on Bates page 763. And down at the bottom, it references a less than lifetime, LTL, approach. Can you see that, sir?

A I can.

Q And the less than lifetime approach is explained in ICH M7, right?

A Right.

Q And it says, "The use of the LTL approach has been considered by the CHMP. However, the LTL approach is only accepted for N-nitrosamines in exceptional circumstances, e.g., to prevent drug shortages for drug products while there is a clinical need for those products. For ranitidine, these exceptional circumstances are not recognized at the European level since alternative treatments are available within the European Union." Did I read that right?

A You read that correctly.

Q Now, the reason I asked you about this

documents -- and I'm done with the document -- is to ask you you're presently writing an article about the less than lifetime, LTL, approach; is that right?
A Yes.
Q And your co-author is?
A Jim Harvey and Angela Wright.
Q And has that been submitted for publication?
A No, it's still in draft form. It needs additional work.
Q And when do you anticipate that the work on the GSK less than lifetime approach will be finished?
A We don't have a definitive timeline for that work. It's a work in progress.
Q Dr. Lynch, is ranitidine sold anywhere in the world presently?
A I don't know the answer to that question. I do know that GSK withdraw -- voluntarily withdrew ranitidine from the market.
Q Has it sought to introduce as a reentry into the market ranitidine in any jurisdiction in the world since 2019?
A I don't know the answer to that question. It's not part of my role in genetic toxicology.
MR. WATTS: Dr. Lynch, those are all my questions. I appreciate your time today. Thank

you, sir.
MR. SACHSE: Can we go off the record for a minute?
THE VIDEOGRAPHER: This is the end of media six, recording one going off at 5:19 p.m.
(A 27-minute recess was had.)
THE VIDEOGRAPHER: And we're back on the record at 5:46 p.m.

- - - - -

CROSS-EXAMINATION

BY MR. SACHSE:
Q I want to thank you for taking the time to talk to us today. Could we pull up Exhibit 5341, please? Exhibit 5341, that's your curriculum vitae, right?
A Correct.
Q And we didn't really have a chance to learn too much about your educational background, so could you please tell us about your education?
A Yeah, of course. So I studied genetics and zoology at the University of Swansea and then graduated and then continued to do a Ph.D. degree, again at the University of Swansea, mainly focused on genetic toxicology.
And after obtaining my Ph.D., I took a

postdoctoral position at the Royal Postgraduate Medical School where I come to do investigations on potential dietary genotoxic carcinogens called heterocyclic amines. I was a post-op for seven years at Royal Postgraduate Medical School, which is Imperial College, and obtained fellowships during that day. And then took a position with SmithKline Beecham because there were -- they were looking for somebody with expertise in transgenic gene mutation assays, and I'd been involved and published work using that model as part of my position at Imperial.

I then was a member of the department of the genetic toxicology gaining more senior positions over a period of a decade. And then I became head of department upon retirement of my former manager, Robert Reese, in 2010.

I then led the group in genetic toxicology and expanded it to include photo safety in the intervening years. I've also been recognized as a fellow of the Royal College of Pathology in that time based on my published works. And I've also been appointed as an honorary professor at the University of Swansea and then after that became a senior fellow within GlaxoSmithKline.

Over that period, I've contributed to various

public and private partnership collaborations on all aspects of science, mainly focused on genetic toxicology and/or carcinogenesis and also photo safety. I've also published a number of papers again focused mainly on those disciplines, and I've led a very talented team of scientists. And on a daily basis we contribute to the assessment or the potential genotoxicity of new drug candidates and potential qualifications of impurities and synthesis intermediates for the potential genotoxicity in the course of the development of compounds that go directly into the market in some cases. In other cases, development is terminated for various reasons.

I have experienced working at GLP with general toxicity and management. I also have represented -- being a member of scientific societies, for example, I was president of the United Kingdom Environmental Mutagen Society. I was treasurer of the European Environmental Mutagen Society. I've been an expert member of the committee on mutagenicity, which is an agency that advises Her Majesty here in the UK on topics related to mutagenicity.

And I've also been an expert member on the OECG committee on eye and skin safety because of my expertise in photo safety.

So I have considerable experience both of regulatory genetic toxicology and photo safety, engagement with regulators in academics and other industry partners to advance the signs of genetic toxicology and photo safety over the years.

Q Thank you for that summary. Could we just go to page 2 of this CV, please, and blow up the education and qualification section?

So Dr. Lynch, the education and qualifications in your CV, this shows your course of study at University of Swansea.

A That's where I got my bachelor's degree and Ph.D. degree.

Q What was your Ph.D. degree in?

A So my thesis was called the "Development of the cytochalasin-B micronucleus/kinetochore assay in vitro," and essentially it's the development of an assay to assess chromosome damage and also using aneuploidy using a mammalian system. And at the time, we were trying to define a new assay for that endpoint back in the -- well, I guess it was the late '80s.

Q So broadly speaking, your Ph.D. was in the field of toxicology?

A Yes, specifically genetic toxicology.

Q And so that's why we call you Dr. Lynch

because of your Ph.D. in genetic toxicology?

A That's correct.

Q And I see right below the university experience there's a reference to work as an appointed honorary professor and you just told us about that.

Can you just give us a little more detail about that position?

A Yes. So I was appointed by the college of medicine at Swansea University back in February 2011. That was based on being invited for that role. And then I'm supported by referee's comments from -- to basically highly reputable scientists in the field, and subsequently then I received an academic position in the university. And as part of that role, I've contributed to the delivery of lectures and supporting Ph.D. students at Swansea and also looking at supporting master students and running courses.

Q So I want to talk about some of the other extra-curricular activities that you mention. Let's start with that Royal College of Pathology fellowship. What is that?

A So the Royal College of Pathology is a professional body for pathologists. And entrance to the -- to the school of pathology or the Royal College, I should say, can occur by two avenues. One is through

examination.

Typically, all physicians have to obtain Royal College of Pathology part one examination in order to practice medicine or veterinary medicine, but in addition, one could be admitted to the college based on published works. Again, it requires the assessors -- there are a number of assessors appointed whenever an application is made, and that application is made based on a referral from a current member and then supported by additional referees from scientists of distinction.

And then the assessors review your published works to see whether you reached the standard that merits appointment as a fellow. So it typically has to be 30 or 40 papers plus, with outstanding contributions in the disciplines of choice, which for me was genetic toxicology, which the Royal College of Pathology sees as a subdiscipline of pathology and also for my contributions to photo safety. And on the basis of those reviews, I was admitted to the college and have remained a member at the college since that time.

Q Why don't we take down this call out and go to the next page of the CV. So if we look down at the fellow of the Royal College of Pathologists, it says here you were appointed in 2013; is that correct?

A That's correct.

Q And that appointment was through that second pathway you were just talking about where the Royal College assessed your body of work and your area of expertise?
A Yes, so it's an appointment based on written publications and the credit -- well, it's based on impact and just the expertise demonstrated as part of that publication record.
Q And let's talk about publications. I see -- we can pull that down.
Let's talk about your publications. I see that there's a whole section here of your CV titled "Publications," and the first category is manuscripts. Do you see that?
A That's correct.
Q What's a manuscript?
A It's the term we use for a journal paper that's submitted to a scientific journal and requires peer review before being accepted for publication.
Q And you mentioned peer review earlier. What is peer review?
A So peer review is -- a manuscript is submitted to a journal and then the editorial committee assigns external referees to review that manuscript in-camera to the authors, and those referees then provide commentary

and essentially a quality assessment of the -- of the scientific content and the purpose of the manuscript.

And then they provide feedback both to the authors and to the journal editors commissioning the work. And they then decide whether the journal is suitable for publication or whether it requires amendment or whether a journal is not sufficiently robust to merit publication. So it's a quality control process that science is measured against in society.

Q And when you say that the manuscripts are reviewed in-camera, what do you mean by that?

A I mean that typically the authors don't know who the reviewers are, so there's -- you avoid any possibility of a bias in terms of that review, so they can provide open and honest feedback to the papers without concern about undue pressure about career, et cetera, particularly if you're reviewing the work of various scientists, for example. So it's a very sort of evil -- not evil, level playing field for a review process for manuscripts.

Q Why don't we take down this call out. And how many manuscripts have you authored over the course of your career?

A So in terms of journal papers, I've been a contributing author for 40 or 50 manuscripts, and then

the way I've structured my CV, I also talk about review papers and book chapters because typically a manuscript also assigns original science data or novel; whereas a review paper or a book chapter provides a kind of overview and synthesis of the current state of the work, and I've published chapters on genetic toxicity testing and also on photo safety testing in more recent years.

Q On the bottom of page three it starts with manuscripts and if we could just page through. Another page, another page, one more page. We see here it looks like you have 51 published manuscripts; is that correct?

A Yes.

Q And we're talking about book chapters and reviews and that's the next chapter of your CV?

A That's correct.

Q How many book chapters or reviews have you authored over the course of your career?

A You would have to remind me. Maybe 20.

Q Why don't we go to the next page.

A 14.

Q And then the last category of publications you have here is published abstracts and letters. Tell us what that's about.

A So scientists often publish abstracts when attending scientific conferences or workshops, and

often these might be pieces of work in progress that don't merit a full manuscript at the time. But the idea is that you share the latest data or findings at a scientific conference and that's a way we disseminate information around the science. And in my case, it would be genetic toxicity testing or photo safety.

And these abstracts appear often in journals as basically a summary of the events for a conference and it's a way that scientists can look at what's the latest science in their field in any given year.

Q And I'm not going -- I'm going to ask you how many abstracts and letters you've published but I'm not going to make you guess, if we could just go to the last page of this CV.

Does this jive with your recollection that you've had 66 published abstracts and letters over the course of your career?

A It's probably a little more than that. I think this list in particular is not current. It's quite a lot of work to hunt down all the names and stuff, so it's a minimum of 66, probably a few more than that.

Q One other thing about your background. I noticed -- and maybe if we could go back to page 3 of the CV. I'm sorry. That's bench -- if we could just

call out editorial board of Mutagenesis.

A Yes.

Q So what is the editorial board of Mutagenesis?

A So Mutagenesis is one of the journals which has a focus on, well, as the title suggests, the induction of mutation. And it's a journal and is pardoned by the UK Environmental Mutagenic Society, and it has the remitted publishing of current and cutting-edge science linked to the understanding of mutagenesis and genetic toxicology. So I was appointed to the editorial board, say, from 2011.

You're allowed to do a number of terms and then you roll off the editorial board, which I did so in 2020. And as an editor, one of the editorial team, you have -- you can be pulled in as a senior reviewer on -- particularly when there's sort of a difference of opinion between referees and so you can be brought in to provide your overview and with the commission editor understand how to navigate whether a piece is suitable for publication or whether adjustments or additional work needs to be done.

Q You just mentioned the organization, the UK Environmental -- is it Mutagenesis Society?

A Yes.

Q Is that also known as UKEMS?

A That's correct.
Q And if we see just above the entry about being on the editorial board of Mutagenesis, it says vice president UKEMS 2010 to 2012 and president UKEMS 2012 to 2014; is that right?
A That's correct.
Q And I think you were telling us about this earlier, that you were actually appointed the president or elected the president of this organization; is that correct?
A Yeah, I was elected as the vice president. And then from being vice president, you transition into the role of president, which I was over the period of 2012 to 2014. And it's essentially a professional scientific society and the registered charity in the UK with an evidence of proceeding science of genetic toxicology and environmental mutagenesis.
Q Thank you. Why don't we take down the CV, and I'd like to just touch on a few areas of your work at GSK with respect to ranitidine or NDMA.
Okay. I want to start with the ranitidine investigation that began with the company in 2019. Did you have a role in the ranitidine investigation the company undertook beginning in 2019?
A Yes, I did.

Q And what was your role?
A So some of the questions were around what was known about the potential genotoxicity and carcinogenicity of ranitidine, and therefore, my role was to review documentation pertaining to those studies, which were part of the new drug application that supported the marketing of ranitidine, and so I reviewed those documents and then summarized my findings which they contributed to the -- there's an echo here. That contributed to the response that GSK eventually made to the regulatory agencies.
Q So just to make sure that I understand what you're talking about, you reviewed historic animal carcinogenicity studies that Glaxo did prior to approval of ranitidine?
A That's correct.
Q As a toxicologist, are you familiar with animal carcinogenicity studies?
A Yes, I am.
Q Are you familiar with how to design rigorous animal carcinogenicity studies?
A Yes.
Q In your role as a toxicologist, have you interpreted carcinogenicity studies?
A Yes, I have.

Q Overall, what conclusion did you draw from your review of the animal carcinogenicity studies Glaxo did for ranitidine?
A I considered them very robust studies in mice and rats and that all due consideration was given according to the dose, the duration of the studies. They were both lifetime studies and also there was consideration given to potential nitrosation.
They considered, for example, the presence of nitro bacteria in the gut and also the levels of nitrate in the diet given to the animals and also present in the water supply that the animals had. And overall the conclusions of the studies were that ranitidine did not induce cancer in either mice or rats when tested to the limit dose in either species over the lifetime of the animals.
Q So when you were reviewing the ranitidine carcinogenicity studies, did you rely on your training and experience as a scientist with a Ph.D. in toxicology?
A Yes, I did.
Q When you reviewed the ranitidine animal carcinogenicity studies, did you see anything that caused you concern as a trained Ph.D. toxicologist?
A No, I didn't.

Q As a trained Ph.D. toxicologist, what is your opinion of the design of the carcinogenicity studies Glaxo did for ranitidine?

A That they were very robust studies and that the conclusions were valid in terms of thorough assessment of the potential or the lack of potential of ranitidine to induce tumors in rodents.

Q What do you mean when you say that the studies were robust?

A They were well designed and that they were conducted to high standards and the data was properly recorded and reported and that the conclusions that were made around the studies reflected the data that was generated in the study with regard to tumor incidents.

Q As a trained Ph.D. toxicologist, what is your opinion of the rigor of the carcinogenicity studies that Glaxo did for ranitidine?

A The studies preceded ICH guidance when they started, but even though that was the case, the standards would have been commensurate with those expected of an ICH conducted study and therefore, as I said, they come across as highly robust studies and the conclusions completely reflected the data that was generated in the studies and overall ranitidine did not result in an increased level of tumors compared to

untreated control group in those studies.

Q Okay. I'd like to now switch gears a little bit and let's pull up Exhibit 5374, please. And Dr. Lynch, showing you what was previously used and marked as Exhibit 5374, do you remember answering questions about this document?

A I do.

Q And Exhibit 5374 just so the jury's clear, this is an e-mail attaching a rapporteur's preliminary joint assessment report; is that correct?

A That's correct.

Q And why don't we go to the first page of that report and just refresh us on what is the CHMP?

A It's the -- I can't remember what the acronym stands for there. It's the -- essentially it's the committee within the EMA that reviews the data around nonclinical and clinical safety.

Q So this is a committee that was looking at data related to ranitidine and NDMA; is that correct?

A That's correct.

Q And if we could go, please, to page 960, and if could blow up the bottom generated risks, please? First question for you, Dr. Lynch, do you recall Mr. Watts showing you this section of the joint assessment report?

A I was shown the first paragraph.
Q Well, let's start with the first paragraph. Can you explain to us what the first paragraph is saying?
A It says that the clinical data shows that in patients receiving H2 A receptor antagonists, which is a class of drug, that they're at high risk for both cancers of the pancreas and for cancers of the stomach.
Q So just to be sure that I am clear here and I understand, what the EMA joint assessment report is saying here is that patients who are treating with either H2 receptors or PPIs --
A Yes.
Q -- are naturally at a higher risk for gastric and pancreatic cancer; is that right?
MR. WATTS: Objection, form.
A There's data reported in the literature to show that patients who are treated with H2-receptor antagonists and also with protein pump inhibitors, PPIs, because of their medical condition that can be associated with an increased risk for cancers of the stomach and of the pancreas.
Q And to address Mr. Watts' objection, let me just ask this again.
Is it the conclusion of the joint assessment

report that H2-receptor antagonists or PPIs are causing patients to be at a higher risk for a gastric and pancreatic cancers?

MR. WATTS: Same objection.

A No, this -- the statement does not address a causal relationship between H2-receptor antagonist and/or PPI with regard to gastric or pancreatic cancer.

Q Is it your understanding that patients treating with H2-receptor antagonists or PPIs have preexisting risks for gastric and pancreatic cancers?

A Yes.

MR. WATTS: Objection, form.

Q Mr. Watts also read you the last sentence of this section. Do you see that?

A I do.

Q NDMA should be considered carcinogenic in humans?

A That's correct.

Q And we won't go back into -- I think he spent quite a bit of time with you on that sentence -- but Mr. Watts did not read the second paragraph, so could you please read to the members of the jury what the second paragraph says?

A Yes. It says, "Based on a comprehensive review of clinical safety data currently available, it

can be concluded that there is no evidence of a causal association between ranitidine therapy and the development of cancer in patients."

Q And what does that mean?

A So a causal association is a scientific term used to indicate a mechanistic basis for the relationship between exposure to a test agent and an outcome like cancer.

Q If we could go to -- we can pull down the call out and just go to the previous page, 959. And if we could look at the second paragraph of 3.4.2 and pull that out. And looking at this second paragraph, of the joint assessment report, what is the conclusion of the rapporteurs here?

A Based on a comprehensive review of clinical safety data currently available, it can be concluded that there is no evidence of a causal association between ranitidine therapy and the development of cancer in patients. However, any potential cancer risk due to NDMA exposure associated with ranitidine use is of a low level and will probably not be detected with conventional animal studies or epidemiological studies.

Q Okay. We can take down that call out. Could we go to page 937 of this joint assessment report? Again, I'm not going to get too deep into this chart

that Mr. Watts showed you because I think you told us that you were not involved in any of the testing of ranitidine to assess how much NDMA might be in a particular tablet; is that correct?
A That's correct.
Q So understanding this was not your area, are you able to determine from looking at this chart whether any of these samples that were tested or results that are reported here relate to a product manufactured by GSK?
A No, that's not quite possible from this data table.
Q And why is that?
A Because the nature of the medicinal product is described as confidential information.
Q Okay. We can pull that down. I'd like to move on and just, again, briefly you and Mr. Watts were discussing the Tanner study earlier. Do you recall that?
A Yes.
Q And I think Mr. Watts asked you whether you looked for data related to the Tanner study, and you said you didn't but you looked at some other studies. Do you recall that?
A I did, yes.

Q What other studies did you look at that related to nitrosation and ranitidine?

A So there were a number of reports specific to genotoxicity assays that investigated a potential role for nitrosation with regard to ranitidine both in bacterial assays like the Ames test and also in the mammalian assay cell cultures and also looking at things like stomach aspirate from patients taking ranitidine.

And in all of those cases, the overall assessment was that there was no evidence for NDMA formations in those studies and that they were typically negative in terms of genotoxicity except for a few examples of Ames test where the positive results were ascribed to N-nitrosonitrolic acid derivative that had been characterized in a paper by Britt & Natal, so on the basis of that review and the number of studies that were conducted both external to GSK and subsequent reviews by other scientists like Parker and Brumvilla, which, again, concluded that ranitidine was negative for genotoxicity, and there was no particular role for nitrosation that would -- were relevant to human exposure situations, came to the conclusion that, you know, there had been a lot of work done in the '80s around that subject, and so therefore I think the concerns had been adequately addressed by GSK and others

at the time, and therefore, you know, the risk assessments around the use of ranitidine up until the recent disclosure about NDMA impurities, that GSK -- had used that data in good faith along the way and they just didn't realize there was an issue.

Q I'd like to move to a discussion about acceptable daily intake and benchmark dosing. I know that you testified at great length about this topic, but let's just start with the basics.

What is the current framework that regulators use to determine the limits of genotoxic impurities in medicine?

A So the default framework is an acceptable intake, which is derived from a linear extrapolation of values that put in a TD50 in the rodent bioassay, which I mean a dose that leads to an incidence of tumors in half of the animals treated. And then you extrapolate that dose down to a dose that would result in an incidence of either one in a hundred thousand or one in a million depending on the context that was being used for the agent being considered.

Q And in the context of NDMA specifically is the dose extrapolated to one in a hundred thousand hypothetical increase or one in a million hypothetical increased risk?

A It's possible for cohort of concern it would be extrapolated to one in a million.
Q And just explain what you mean by that.
A So the cohort of concern is a list of compounds that have genotoxic rodent carcinogens which have been identified having high potency and therefore members of that cohort concern are regulated at higher levels compared to other potential genotoxic carcinogens.
Q Okay. So we heard a lot of numbers today, but I just want to make sure the record is very clear.
Is it your understanding that the acceptable daily intake set by FDA and EMA for -- and BMA -- is 96 nanograms per day?
A That's correct.
MR. WATTS: Object to form.
Q Let me fix it. What is the acceptable daily intake for NDMA set by the regulators?
A 96 nanograms.
Q Is 96 nanograms also -- let me back up. Let me start again.
Is 96 nanograms equivalent to .32 parts per million if we're talking about 150 mg dose of ranitidine?
A That's correct.

Q And so if we were talking about a 300 mg dose of ranitidine, the acceptable daily intake is .16 parts per million; is that right?

A That's right.

Q And does GSK work to adhere to the limits set by regulators?

A Yes, it does.

Q Does GSK disregard or dispute the 96 nanogram acceptable daily intake set by regulators here?

A No, it doesn't.

Q So if that's the case, then why study alternative approaches to calculating acceptable daily intake?

A Yeah, that's an important question. And there are a number of reasons why a study of that nature would be relevant. One is that it's acknowledged that the linear extrapolation from the TD50 is quite a simple way of leading to a PDE because it ignores, essentially, the statistics involved in generating the data, the TD50, which is based on, typically, a group of 50 animals in a rodent bioassay.

It ignores the potential for confidence limits around those numbers because it's an absolute number. And it also ignores any adjustment factors that you may take into account for species translation, et cetera,

and ignores the full dose response of the data. And so there are other approaches that can be used to set acceptable intake values for potential genotoxic carcinogens.

And these are outlined by ICH guidances in M7. They can include things like using the TTC or threshold of toxicological concern. And they I think can also include taking approaches such as the benchmark dose modeling approach, which takes into account the full dataset to understand where a potential point of departure can be defined for one of the endpoints of interest in the case of the paper we published -- I published with Dr. Johnson, we were looking at mutagenesis and also rodent carcinogenicity as two distinct endpoints.

And there are scientific reasons why taking that point of departure approach is relevant, and these are around the potential for mutation and how they can be impacted by other factors like DNA repair, level of metabolism, the actual level of exposure to the nitrosamine, and also the fact that not all mutations lead to effects in cancer specific genes.

Also, when you look at cancer data, they also recognize that cancer is a multifactorial process and there are other aspects that contribute to

carcinogenesis other than mutation, and that could be around immuno-surveillance. It could be around how often cells turn over, and these have -- these attributes can be influenced by both dose and duration and other affects associated with an exposure.

So from that basis, you know, there's a scientific reason to explore alternate methods that have been outlined by ICH M7 and that was the intention of that paper.

Q Thank you for that. So you mentioned the Johnson paper, and it's a paper you testified about earlier with Mr. Watts. Could we put up Exhibit 5340?

Just to orient us, Dr. Lynch, Exhibit 5340 is the version of this paper that Mr. Watts showed you earlier today; is that correct?

A That's correct.

Q Could we also put up now Exhibit 4928, which is in our folder and kind of do it side by side. So Dr. Lynch, Exhibit 5340 and Exhibit 4928, is that the same paper?

A It's the same paper, but Exhibit 4928 is a facsimile copy of the published article, the front page.

Q And what do you mean by the published article?

A That's the paper that's published in the

Journal of Molecular Mutagenesis, so if you open the journal and read the paper, that's the page you will see.

Q And you see that Exhibit 4928 has a sticker on it that says James Harvey, Exhibit 4928. Do you see that?

A I see that.

Q And I'll represent to you that Mr. Watts used Exhibit 4928 with Mr. Harvey during his deposition. For some reason, he chose to use Exhibit 5340 with you today. Is that fair?

A I would agree with that statement.

Q Let's look at Exhibit 4928, and if we could just blow up the authors and then the affiliation underneath the authors. So first question: You're a co-author of this study?

A Yes.

Q So is Dr. Harvey?

A Yes.

Q So is Dr. Kenny?

A It's Ms. Kenny, yes.

Q Apologies. And all three of you are employees of GSK; that is correct?

A That's correct.

Q And if we look at your name and Dr. Harvey's

name and Ms. Kenny's name, there's a number four. Do you see that?

A I see that.

Q And what -- if we look further down on the page, what does the number four mean?

A It's referring to our affiliation, that being GlaxoSmithKline genetic toxicology and we're in the UK.

Q And you look at the other authors listed in this study, each author has a number after her or his name corresponding to the author's affiliation; is that fair?

A That's correct.

Q So when Mr. Watts was asking you questions using Exhibit 4359, he did not show you that, in fact, every author disclosed his or her affiliation in the official publication; isn't that right?

A That's correct.

Q Now, just to be clear, when we look at Exhibit 4928, you and the other authors aren't trying to hide the fact that you work at these companies; isn't that right?

A That's correct.

Q And so you disclosed your relationship with GSK on page 1, right at the beginning of Exhibit 4928, right?

A I did.
Q And the paper also discloses funding from a company called Baxter International?
A It does.
Q And if we could just take down this call out and on Exhibit 4928 just blow up the funding information. And I think you testified earlier, but just want to make sure. Do you know whether Baxter is a defendant in this litigation?
A During the questioning, that's what I learned, that Baxter is a defendant in this litigation.
Q Is or is not?
A Is.
Q You think that that was the result of the questioning earlier?
A Yes.
Q I will represent to you that Baxter International is not a defendant in this litigation.
A I was not aware of that.
Q Do you know whether Baxter manufactured ranitidine or Zantac?
A I don't know that.
Q Does GSK provide funding for scientific research?
A Yes, it does.

Q Is there anything wrong with GSK providing funding for scientific research?
A No, there isn't.
Q Is there anything wrong with GSK working together with other pharmaceutical manufacturers?
A No.
Q Is there anything wrong with GSK working with government scientists to investigate scientific or medical questions of interest?
A No, there isn't. It's a common occurrence.
Q And what about government regulators? Is there anything wrong with GSK working with government regulators to work with scientific or medical issues of interest?
A No, there isn't.
Q Let's take down the call out. And let's just stick with the official publication, the 4928.
So did you work with Dr. Johnson on this paper to advance scientific knowledge or for purposes of this litigation?
A To advance scientific knowledge. And as I testified earlier, this group of people have been interested in using benchmark dose modeling for a number of years now and have published extensively on that topic. And throughout the paper, we explain what the

advantages of using a benchmark dose approach provides, and we're being transparent that it's linked to ICH M7 guidance and we provide information around standing of mutation and its language and also around carcinogenesis.

Q And when working on this paper with George Johnson and the other authors, were you working on Exhibit 4928 to criticize the FDA in any way?

A No.

Q Were you working with Dr. Johnson and the other authors in Exhibit 4928 to criticize the EMA in any way?

A No, we weren't.

Q We can take this exhibit down now, and I'd like to put up Exhibit 5379, please, and go to the next page, please, next page. There we go.

So Dr. Lynch, do you recall this chart that Mr. Watts questioned you about for some period of time today?

A I did.

Q Now, I want to go back through some of these studies and just understand what you're doing here, what the company's doing here. So let's start with the first one, dose response modeling on preexisting data. This is the one with Dr. Ponting. Do you see that?

A Yes.
Q Was GSK working with Dr. Ponting on the dose response modeling on preexisting data to advance scientific knowledge or for purposes of this litigation?
A To advance scientific knowledge.
Q And same question for the next -- the next entry, mechanistic studies and modeling of preexisting and new data. This is the study with Dr. Johnson; is that right?
A That's right.
Q When I say "the study," I should be clear. Different study than Exhibit 4928; is that correct?
A That's correct.
Q And this new study that you are doing with Dr. Johnson, is the purpose of that study to advance scientific knowledge or is it for purposes of this litigation?
A It's to advance scientific knowledge.
Q And then the next study -- and this is the one, the Determination and Confirmation of N -- that should be NDMA mutation threshold in vivo internal dose and comparison of mutagenic potency versus carcinogenic potency to support risk assessment. Do you see that one?
A I do.

Q And is this the one that you said is now a study that you're cooperating with Covance on?

A Yeah, we've commissioned Covance to conduct a study on behalf of GSK.

Q So this Covance study, is this a study that you are doing to advance scientific knowledge or purposes of this litigation?

A No, to advance scientific knowledge and explore the low-dose region in these animals exposed to NDMA.

Q And the rest of the work that we see here, the benchmark dose modeling training for GSK, the PBTK modeling of NDMA and MDEA exposure and the ICH M7 aligned acceptable intake for NDMA assuming no threshold, all of that work, is that being done to advance scientific knowledge or for purposes of this litigation?

A So the purpose of those potential work streams was to advance scientific knowledge, although a number of those work streams -- well, the work stream with the quality bench dose modeling training and the one around discussions with Professors Tweats, Boobis and Dr. McGregor, they were never progressed.

Q Okay. So last question about these studies or this ongoing research. You mentioned, I think, in the

course of your testimony with Mr. Watts that studies, publications that GSK is involved in get reviewed by legal. Do you recall that?

A Yes.

Q And you mentioned they're reviewed by legal for IPE reasons. Did you say that?

A I think I said IP and it was --

Q It's been along day. Is that intellectual properties?

A That's right, that's right. Intellectual property, which is an important component of research in GSK because we're developing new drugs with a commercial interest and we don't want to disclose information to the market that could prejudice that.

Q Understood. So this is information that could be related to, for example, a patent or patent application?

A Exactly, yeah, so a new drug chemical structure, for example, could be of IP interest and shouldn't be disclosed, naturally. But the work we were doing with NDMA didn't fall into those categories. They still have to go through the approval process.

Q So overall do you consider your work with Dr. Johnson to be lobbying work or scientific work?

A Completely focused on the science.

Q And do you consider your overall work at GSK to be lobbying work or scientific work?
A We're following the science and then understanding the nature of the biology.
Q Okay. Thank you. And I'm almost done, I promise, but I do have to go back and talk about the acceptable daily intake asset by the regulators because I think I misspoke and probably caused some more confusion about all these numbers that have been popping around. So let me try this again.
96 -- is what is the acceptable daily intake set by regulations?
A Yeah, 96 nanograms.
Q And when we're talking about API -- excuse me. It's been a long day for me too.
When we're talking about ranitidine specifically and NDMA, we talked about converting the 96 nanogram acceptable daily intake into a ppm measure, parts per million?
A That's correct.
Q And just to make sure we're clear, a .32 parts per million is for a 300 mg dose; is that right? I think earlier we said 150 and that was my fault.
A Yeah, okay, that rings a bell. That's correct.

Q So let me try this again. So .32 parts per million corresponds to a 300 mg dose of Zantac or ranitidine?
A It does.
Q And .64 parts per million would be, then, 150 mg dose?
A Yes, it would.
Q And .16 parts per million is for a 600 mg dose of ranitidine; is that right?
A That's correct.
Q Sorry. That was my fault for confusing the issue more.
Dose daily limits, you accept all of those daily limits set by the regulators; is that right?
A Absolutely.
Q Last few questions here, Doctor. As a toxicologist and employee of GSK, do you prioritize the safety of patients?
A Yes, I do.
Q How do you do that?
A I mean, the safety of patients is paramount in all that we do, you know, in GSK. I do that through the role I have in leading genetic toxicology and assessing potential new drugs for genotoxic potential and also through contributing to science-driven research.

Q Are you proud of the work that you do at GSK?
A Yeah, very much so.
Q And do you stand by that work?
A I do indeed.
MR. SACHSE: I have nothing further at this time. Thank you.

- - - - -

REDIRECT EXAMINATION

BY MR. WATTS:

Q Dr. Lynch, let me just follow-up in the order that Mr. Sachse went. He asked you for your review of the animal carcinogenicity studies that GSK did on ranitidine. Do you recall that?
A Yes, I do.
Q And you said it was very robust?
A Yes.
Q With a good design?
A Yes.
Q Made it properly recorded?
A That's right.
Q With rigor?
A Yes.
Q Where was the active pharmaceutical ingredient for the ranitidine given these rats manufactured?
A I'd have to go back to the original reports to

check that information.

Q What was the temperature the ranitidine was stored at before it was given to the rats in these animal carcinogenicity studies?

A Again, I'd have to go back to the full detailed reports to check that information.

Q What was the humidity that the ranitidine given to these rats was subjected to prior to ingestion by the rats?

A I'd have to go back to the original reports to confirm that information.

Q Where were these rat studies conducted?

A Again, I'd have to go back to the reports to confirm that information.

Q Do you know whether the active pharmaceutical ingredient was shipped or flown to the location where the rats were?

A I don't have those details in hand, and I'd have to go back to the original reports to see if that was documented.

Q Do you know whether the active pharmaceutical ingredient that was eventually given to the rats was stored in a non-temperature-controlled warehouse?

A Again, that's a detail I'd have to refer back to the initial reports.

Q Do you know whether it was trucked from the site of manufacture to the place where it was transported in non-temperature-controlled trucks?
A I don't have those details on hand.
Q Okay. Do you know whether it was put on a ship for weeks at a time with no temperature control whatsoever?
A I don't have those details. I'd have to go back to the original reports about how the materials were transported.
Q Do you know how long the finished product that was given to the rats had been in transport in nontemperature-controlled, nonhumidity-controlled conditions?
A I don't have those details at my fingertips. I'd have to go back to the original reports to look for those numbers.
Q Before you did these very robust animal carcinogenicity studies, did GSK test the NDMA level of the ranitidine prior to causing the rats to ingest it?
A The studies were looking at the potential for ranitidine to cause tumors in rodents, in mice and in rats. There was no reason to test those drug samples that were going to be used on the bioassay study for NDMA at that time given that there was no concurrent

information around a potential contamination with NDMA.
Q When did the studies get conducted that you reviewed?
A The studies were conducted in the '80s, early '80s.
Q And they were conducted in the early '80s after SmithKline Beecham, your old employer, alerted regulators about the nitrosation potential of ranitidine, were they not?
MR. SACHSE: Objection.
A I wasn't aware of any correspondence between my former company, SmithKline Beecham, and regulators.
Q Were these animal studies conducted after 1982?
A I believe they were.
Q Did any of the animal studies conducted after 1982 reference the research by Dr. Tanner in 1982 showing a 3.1 percent yield of NDMA from ranitidine?
MR. SACHSE: Objection, misstates the evidence.
A Those data using high levels of nitrate would not have been near as relevant to the conduct of a two-year bioassays in rodents.
Q Hmm. Did any of the rodents get tested for more than ten years?

A The rodents were tested for their full lifespan of two years. Rodents don't live for ten years.

Q Humans live for more than ten years, though, don't we?

MR. SACHSE: Objection.

A Yes, humans live for more than ten years. But the purpose of a lifetime rodent bioassay is to cover the lifespan of the animal, and the data that's generated then is used as an assessment for potential of carcinogenicity and used for risk assessment purposes in humans. Those were than exclusively negative in rats and mice following lifetime exposure and that information was supplied to the regulatory agencies as part of the documentation to support registration of ranitidine.

Q What was the level of the vitamin E in the rodent diet given the carcinogenicity studies?

A I'd have to go back individual the reports to consider that information.

Q What polymorphic form of ranitidine was given to the rodents in the carcinogenicity studies?

A I would have to go back to the original reports to give an answer to that question.

Q What type of histopathological staining was

done to evaluate tumors in the rodents?
A I would have to go back to the specific study reports to give an answer to that question.
Q Was silver staining used to evaluate the histiopath in the carcinogenicity studies?
A I would have to go back to the original reports to give an answer to that question.
Q If silver staining wasn't used, do you know why silver staining wasn't used to evaluate histiopath in the carcinogenicity studies?
MR. SACHSE: Objection.
A I can't answer that question, and, I mean, typ -- typically, hematoxylin staining is used, but like I said to you in the answer to your previous question, I'd have to go back to the details of the study protocols to answer your question with any authority.
Q Are there pulmonary tumors in the treated group versus the controls in these animal carcinogenicity studies?
A There were more tumors in the control groups compared to the -- the untreated control groups and the rats and mice compared to the ranitidine treatment groups, that's correct.
Q Objection, form, I mean, responsiveness. Listen to my question. I think you're trying to answer.

Were there increased pulmonary tumors in the treated groups versus the control groups in these animal carcinogenistic studies?

A I'd have to go back to the individual tumor incidence data tables for those studies, and I haven't looked at those reports for a number of -- well, a long time, literally a year and a half. And I do recall that the overall tumor incidence in the control treatment groups, the untreated animals was higher than in the treatment groups versus both the low, intermediate and high doses.

Q How about pulmonary tumors is the question that I asked? Were there increased pulmonary tumors in the treated groups versus the controls?

MR. SACHSE: Objection, asked and answered.

A I've answered that question. I'd have to go back to the individual reports to look at the individual sites of tumor incidences in those reports. It's been a long time since I looked at those reports.

Q How many animal carcinogenicity study reports did you look at?

A There were three studies.

Q Did you see any reports for animal carcinogenicity studies in animals other than rodents performed by GSK?

A No.

Q Okay. Let's go to 5374. If we look at 5374, this is the rapporteur's study, if we go to the third page. Fourth page. There we go. You see that, right?

A Yes.

Q Now, Mr. Sachse read you a sentence here, sentence there, was the bottom line that the rapporteur recommended the suspension of market authorization of ranitidine?

A Could you -- I mean, that's my recollection of what you showed me, but as I stated in my response to you earlier in the day, my understanding was that GSK voluntarily withdrew ranitidine from the market prior to the rapporteur's conclusion.

Q Now, at the time of this rapporteur's conclusion, England was still in the European Union, right?

A Back in 2019, yep.

Q And when the CHMP rapporteur for the European Union recommends the suspension of market authorization, companies like GSK are no longer free to sell ranitidine in any of the European Union nations, right?

A Right.

Q And by the way, since Brexit, can you buy ranitidine in the United Kingdom?

A I don't know the answer to that question.
Q Now, Mr. Sachse asked you about studies that you looked at that GSK did other than Tanner and you called them the framework that regulators use to determine the limits of genotoxic mutagenicity, right?
A You need to be a bit more specific about your question, please.
Q Well, we'll just leave the transcript the way it was, but the regulators that determine the limits of genotoxic carcinogenicity, the regulators in the United States don't allow the sale of ranitidine anymore, right?
A That's my understanding.
Q The regulators in the United Kingdom don't allow the sale of ranitidine anymore, right?
A That's my understanding.
Q The regulators in the European Union, including the home countries of Sanofi and Boehringer Ingelheim, France and Germany, they don't allow the sale of ranitidine in those jurisdictions anymore, right?
A That's my understanding based on the conclusion of what us and HP talked about withdrawal of marketing authorization.
Q Sure. And we talked about the e-mail you were on where the regulators in Japan were asking for

information. The Japanese regulators do not allow the sale of ranitidine in Japan anymore. Agreed?

A That's my understanding.

Q Same in Singapore. It's not allowed by the regulators there?

A I don't have knowledge of all the regulation jurisdictions. Again, it's outside of my specific role.

Q Well, you know, I went and took a deposition down in Mexico of some of the Promeco Mexico people who manufactured ranitidine for a while. Can you buy ranitidine in the nation of Mexico?

MR. SACHSE: Objection.

A I don't know.

Q Okay. Let's move on to the Johnson paper, 5340 and 4928. You can put them side to side at -- let me assure you I'm not as clever as Mr. Sachse believed. I think I had different people prepping me for different depositions but uses yours. It's prettier, Exhibit 4928.

This is the published version; is that correct?

A That's correct.

Q Just a couple of questions about this nice pretty published version that's 4928 that I should have used. You see each of the authors have a footnote

behind their name?

A They have a number after their name, yes.

Q Yeah, and for example, Bhaskar Gollapudi that we're looking at now, footnote three says he's from the Center for Toxicology and Mechanistic Biology, Exponent Consulting, right?

A Yes, that's right.

Q Now, I noticed something that while we're fully disclosing things, in the upper right-hand corner, I see how it says Wiley?

A Yeah.

Q Now, the publication where this paper is published is EMM, Environmental and Molecular Mutagenesis, right?

A Yes.

Q Who's the editor-in-chief of Environmental and Molecular Mutagenesis?

A I believe it's Bhaskar Gollapudi.

Q So let me get this straight. Footnote three?

MR. WATTS: And let's just use the one on the right, Erik.

Q Footnote three is co-authored by Bhaskar Gollapudi, right?

MR. SACHSE: Objection.

A Is that a question --

Q Yeah. Right?
A -- or a statement?
MR. WATTS: Mikal, you might want to fix that question. Sure.
Q This article is co-authored by Bhaskar Gollapudi of Exponent, right?
A Correct.
Q And it's submitted to a journal where Bhaskar Gollapudi is the editor-in-chief, right?
A Correct.
Q Take a look through 4928. Is the fact that the co-author is also the editor-in-chief disclosed on Exhibit 4928?
A No, it's not disclosed, as far as I'm aware. But I also know that the editor who was responsible for managing this manuscript was not Bhaskar Gollapudi. There's correspondence between the editor and at the Environmental Mutagenesis -- Molecular Metagenesis Journal -- the person is -- what's the name? I'm trying to remember her name, but what I do know is that she is a -- has been a member of Health Canada, so she has a regulatory position as well as academic position at Ottawa University and she would have been dealing with this publication in this instance.
Q Well, maybe the reason you can't remember her

name is she's not the editor-in-chief, right?

A Well, I was an editor on the editorial board with Metagenesis and typically, you know, the editor reviewing the paper has the accountability for reviewing that paper and commissioning referee's reviews. Even if the editor was senior editor-in-chief were also scientists, can be -- can be authors on that paper.

Q Doesn't it make a little sense that if you're going to be an author, you ought to submit it to a journal that you're not the boss of?

MR. SACHSE: Objection.

A I say that the editorial control was by another editor on that committee of the journal. That's the information I know.

Q And so another editor is going to clean up the conflict that exists by approving a paper submitted by her boss the editor-in-chief. That's what you're telling this jury?

MR. SACHSE: Objection.

A Well, in all honesty, I think you need to ask the editorial board of the journal rather than myself about how they manage editorial process. It's not my role.

Q By the way, you have another paper that you're working on right now that you told me you're about to

submit to the Environmental and Molecular Mutagenesis journal, right?
A Yes.
Q What's that paper about again? I just want to tie this down.
A It's about the use of the Ames test with nitrosamines.
Q And your co-author includes Mr. Bercu?
A Yes.
Q Don't mean to be a jerk, but is Dr. Gollapudi a co-author on that one?
A There are a number of co-authors. I'd have to go back to the current -- the draft that was submitted to give you a full list.
Q Well, did you work with Bhaskar Gollapudi on the Ames paper that you've already submitted for publication to his journal?
A At this time I can't remember who the full or the list on the paper that was recently submitted.
Q That wasn't my question. My question is did Bhaskar Gollapudi work on the Ames research that is the basis for the paper that you submitted to his journal, Environmental and Molecular Mutagenesis?
MR. SACHSE: Objection, asked and answered.
A As I say, at the moment -- at this moment in

time, I can't remember who were the co-authors on that paper around the Ames test. I can provide you with that information and, you know, but I don't have that information on hand.

Q Dr. Lynch, that's the most recent publication you've submitted, isn't it?

A Yes.

Q When was it submitted?

A I think it was submitted last week.

Q When we subpoenaed the documents related to this Ames paper, is it your belief that it's going to have Bhaskar Gollapudi's name on it?

MR. SACHSE: Objection.

A I don't know. At this moment in time, I don't recall the full list on that paper.

Q Okay. Now, let's put up 5379 and the chart, and let's put that on the left side and let's put your CV on the right. That's 5341. Go to the second page of the CV.

On the right I see that you have worked for SmithKline Beecham and GlaxoSmithKline since 1998. That's 23 years, right?

A That's right.

Q And in the 23 years that you worked for SmithKline Beecham and GlaxoSmithKline, did you

commission any articles as we look at the chart on 5739 dealing with NDA mutagenicity in those 23 years?

A Did I commission any articles?

Q Yep.

A I don't understand the question. Could you please clarify it?

Q Yeah, let me try again. Between 1998 and 2019, when the NDMA announcement came out and the product was pulled from the market worldwide, did you in your position with GSK cause any third-party investigators to do a research with respect to NDMA?

A So over the course of my career, I've worked on a lot of different subjects.

Q Do you recall any on NDMA before 2019?

A Well, I recall working on looking at Ames tests and thinking about compounds that were positive in the Ames test or negative in the Ames test that was published with Dr. Kirkland, and that would have been considered studies on NDMA.

Q Anything else?

A Right at this moment I don't recall any other specific studies with NDMA specific.

Q And you realize this ranitidine litigation began in the fall of 2019, right?

A I'm not sure -- I don't have details of when

the litigation itself started or not. I was aware --
Q Well --
A I was aware of questions from the European regulators that I have already explained how I contributed to those reviews.
Q Well, in the 21 years before the litigation began in 2019, did you advance the scientific knowledge by asking Dr. David Ponting to research NDMA?
A No, but I've worked with Lhasa in the years before the issue with NDMA arose to --
Q But you didn't work with them on NDMA?
MR. SACHSE: Objection. Let him finish.
A But I worked on studies to advance SAR in standing with anilines and other substance of interest, so, you know, there is a history of work with Lhasa that I've been a contributor to.
Q Well, any acceptable intakes for NDMA based on most robust carcinogenicity data and modeling methods, anything with Dr. Ponting on that before the litigation began in 2019?
MR. SACHSE: Objection.
A I hadn't worked directly with Dr. Ponting.
Q Okay. Before the litigation began in 2019, in the 21 years where you had been at GSK, did you do any work to advance the scientific knowledge with Dr. George

Johnson on NDMA mutation threshold in vitro to establish an NDMA point of departure related to DNA repair and metabolism?
A No, not specifically on NDMA. I've worked with Dr. Johnson in another -- a number of other projects including work at promoting and developing quantitive genotoxicity assessments and threshold dose response type relationships.
Q Doctor, in the 21 years where you were at GSK before the ranitidine litigation began in 2019, did you do any work with Dr. Paul White or Covance on the determination and confirmation of NDMA mutation threshold in vivo?
A No.
Q Now, Mr. Sachse asked whether you were proud of your work at GSK and whether you stand by it. Do you recall that question?
A I do.
Q Are you proud of GSK for pulling ranitidine off the market worldwide in 2019?
A I think the decision by GSK as a company to withdraw ranitidine from the market once we considered the nature of the potential impurity issue with ranitidine and also further explored our understanding of NDMA potential for mutagenicity and for rodent

carcinogenicity and how that relates to human risk and also in terms of overall assessments of ranitidine itself in terms of its clinical use, I think that was an important and appropriate response, and I think GSK should be -- took -- made the right decision in that regard knowing that, you know, the complete story wasn't understood and there was more work to be done.

Q So you're proud of your company?

A I am, indeed.

Q And you stand by your company's decision to see to it that ranitidine is not sold to another consumer in the entire world, right?

MR. SACHSE: Objection.

A I have nothing to do with those kind of decisions. That's outside my role agreement.

Q But you stand by that decision with them. You're not here to second guess it or complain about it, right?

A It was a decision made by GSK in good faith, and I, you know, think it was an appropriate decision while also understanding that there's a lot more to be understood about NDMA and the potential levels of NDMA as an impurity and what that means in terms of an overall risk assessment, and I fully believe in following the science and much the work that you've

described in this table on the left talks to the point that GSK is a science led organization that really wants to understand the science of NDMA.

You asked about previous work around NDMA. NDMA wasn't an issue prior to 2019, and there wasn't any reason for -- GSK or myself to conduct work specifically on GSK prior to that time.

Q Doctor, I forgot one question. I'm sorry to jump around on you. Go back to 4928, George Johnson's paper where you and eleven others are a co-author. The disclosure of funding information on the left side, do you see where it says funding information, Baxter International, Incorporated?

A Yeah.

Q And Mr. Sachse told you that Baxter International is not a defendant in this case. You understand that?

A I understand that.

Q Do you know who it is that holds the patent for injectable ranitidine?

A No, I don't.

Q Would you put a hundred pound of sterling on the proposition that it's held by Baxter International, Incorporated?

A I'm not a gambler, sir, so I wouldn't want to

do that.
Q Since you're not a gambler, do you think it's a good thing that ranitidine is no longer available for sale anywhere in the world?
A A decision by regulators to withdraw ranitidine from the market is something GSK would abide by and therefore we would follow the regulatory decision in that regard.
MR. WATTS: Those are all my questions, sir. Thank you.
MR. SACHSE: Dr. Lynch, thank you very much for your time and your patience. I have no further questions either.
MR. WATTS: Could I have the breakout room for a minute? Thank you, Dr. Lynch.
THE VIDEOGRAPHER: That's the end of media seven, volume one. We're now going off the record at 7:19 p.m.
(The proceedings were concluded at 2:20 p.m.)

CERTIFICATE OF REPORTER

STATE OF FLORIDA:
COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, RDR, CRR, FPR-C, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of ANTHONY M. LYNCH, Ph.D.; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 219 is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the outcome of the action.

Signed this 8th day of December, 2021.

__________________________________________
LAURA J. LANDERMAN, RDR, CRR, FPR-C

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE:

I, LAURA J. LANDERMAN, RDR, CRR, FPR-C, Notary Public, State of Florida at Large, do hereby certify that ANTHONY M. LYNCH, PH.D. remotely appeared before me this 6th day of December 2021 and was duly sworn/affirmed.

WITNESS my hand and official seal this 8th day of December, 2021.

________________________________________

LAURA J. LANDERMAN, RDR, CRR, FPR-C

A C K N O W L E D G E M E N T

I, ANTHONY M. LYNCH, Ph.D., certify that I have read the foregoing transcript of my deposition given under oath on December 6, 2021; and that the transcript is a true, complete and correct record, to the best of my knowledge, recollection and belief, except for the corrections noted hereon and/or list of corrections, if any attached on a separate sheet herewith.



______________________________

ANTHONY LYNCH, Ph.D.

Sworn and subscribed before me,

this _____ day of _____________, 2021.

________________________________

Notary Public, State of ______________

ERRATA SHEET - USL Job No. 601265

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

I, ANTHONY M. LYNCH, Ph.D., do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record with the exception of the corrections listed below:

PAGE # LINE # CORRECTION

---------------------------------------------------------

_________ _________________________

DATE SIGNATURE OF WITNESS

## Exhibits

**EX 5339 Anthony M. Lynch, Ph.D. 120621** 4:11 122:3,5
**EX 5340 Anthony M. Lynch, Ph.D. 120621** 4:12 127:22, 24 135:16 188:12,13,20 189:10
**EX 5341 Anthony M. Lynch, Ph.D. 120621** 4:13 9:12,14 163:13,14
**EX 5343 Anthony M. Lynch, Ph.D. 120621** 4:14 8:12,15
**EX 5345 Anthony M. Lynch, Ph.D. 120621** 4:15 14:23, 24
**EX 5346 Anthony M. Lynch, Ph.D. 120621** 4:16 44:2,4
**EX 5354 Anthony M. Lynch, Ph.D. 120621** 4:17 52:20, 22
**EX 5356 Anthony M. Lynch, Ph.D. 120621** 4:18 54:12, 13
**EX 5357 Anthony M. Lynch, Ph.D. 120621** 4:19 155:21, 23
**EX 5358 Anthony M. Lynch, Ph.D. 120621** 4:20 98:19
**EX 5361 Anthony M. Lynch, Ph.D. 120621** 4:21 79:23, 25
**EX 5364 Anthony M. Lynch, Ph.D. 120621** 4:22 18:22, 23
**EX 5367 Anthony M. Lynch, Ph.D. 120621** 4:23 24:14, 15
**EX 5368 Anthony M. Lynch, Ph.D. 120621** 4:24 33:25 34:1
**EX 5369 Anthony M. Lynch, Ph.D. 120621** 4:25 83:5,6
**EX 5371 Anthony M. Lynch, Ph.D. 120621** 5:2 94:6,8
**EX 5372 Anthony M. Lynch, Ph.D. 120621** 5:3 102:14, 15
**EX 5374 Anthony M. Lynch, Ph.D. 120621** 5:4 62:19,20 146:5 178:3, 5,8
**EX 5375 Anthony M. Lynch, Ph.D. 120621** 5:5 95:14,15
**EX 5376 Anthony M. Lynch, Ph.D. 120621** 5:6 69:7,8
**EX 5377 Anthony M. Lynch, Ph.D. 120621** 5:7 160:23, 24
**EX 5379 Anthony M. Lynch, Ph.D. 120621** 5:8 107:10, 11 126:4 193:15
**EX 5380 Anthony M. Lynch, Ph.D. 120621** 5:9 99:21,23
**EX 5381 Anthony M. Lynch, Ph.D. 120621** 5:10 101:9
**EX 5382 Anthony M. Lynch, Ph.D. 120621** 5:11 74:20, 21
**EX 5383 Anthony M. Lynch, Ph.D. 120621** 5:12 38:13, 15 42:10
**EX 5384 Anthony M. Lynch, Ph.D. 120621** 5:13 136:20, 21
**EX 5385 Anthony M. Lynch, Ph.D. 120621** 5:14 142:7,8
**EX 5387 Anthony M. Lynch, Ph.D. 120621** 5:15 41:7,9

## 0

**0.03-fold** 80:16,21
**0.096** 86:18 87:19
**0.16** 93:5 146:9 147:4,24
**0.399** 89:17
**0.6** 153:16
**0.87** 80:14,15
**0.96** 87:17 90:22
**092** 79:2,3,8,9
**096** 79:8,10,20 85:9 86:1,11

## 1

**1** 30:25 80:17 82:12,16 190:24
**1,000** 70:22 71:1
**1,000-something** 69:24
**10,000** 118:6
**10019** 3:8
**101** 5:10
**102** 5:3
**107** 5:8

**1180**
3:18
**11:02**
6:3
**11:10**
11:3
**11:13**
11:7
**11th**
63:4
**12**
34:2 80:24 81:4 101:15, 19 109:14 135:8 145:3 148:5
**121**
4:11
**1216**
24:18
**127**
4:12
**12:36**
52:14
**12:53**
52:19
**13**
88:12,14
**13.285**
86:17 87:19
**13.677**
85:4
**136**
5:13
**137**
109:4,9
**137,000**
109:1,2,10
**138**
86:17 87:21
**14**
4:15 171:20
**14.88**
92:13
**1400**
6:17
**142**
5:14
**1429**
95:19
**1433**
96:1,3
**146**
80:10
**15**
24:17
**15-minute**
52:16 155:17
**150**
185:23 197:23 198:5
**155**
4:19
**15th**
24:17 26:5 29:4 30:22
**16**
50:8 93:16 160:25 186:2 198:8
**160**
5:7 6:14
**1600**
3:18
**163**
4:3
**16th**
46:12,20
**17**
128:15
**17.26**
91:25
**17th**
50:9
**18**
4:22
**180-**
112:9 114:4
**1818**
6:16
**183**
55:1 60:7
**185,531**
109:13
**186**
54:14 55:14 56:4
**188**
4:10
**18th**
79:25 80:7
**19**
24:18 53:14 62:21
**19103**
6:18
**19104**
3:4
**1920**
101:13
**1940s**
66:18
**197**
85:3
**1982**
34:14 36:3, 11,14 37:19 38:9,11 202:14,17
**1983**
37:24
**199**
4:4
**1998**
10:20 213:21 214:7
**1998-2010**
11:11
**1999**
9:3,7
**1:39**
78:5
**1st**
97:14

## 2

**2**
10:12 30:25 44:9 81:24 166:7
**2.04**
88:15 89:24
**2.040**
84:25
**2.9**
80:12 81:21, 24,25 82:17 83:4,10 84:4,6
**20**
58:2 110:11 111:14,18 171:18
**200,000**
112:9 114:4
**20001**
3:13
**2001**
9:4,6
**2001/83/EC**
63:4
**2008**
122:6
**2010**
9:9 11:20 164:16 174:4
**2011**
167:9 173:11
**2012**
174:4,14
**2013**
168:24
**2014**
48:20 174:5, 14
**2017**
48:21
**2018**
48:12 49:3,8
**2019**
15:10 18:25 19:25 22:5, 14,22 24:17 26:6 33:11

34:4 44:4 46:12,20 51:11,19 53:14,24 54:4,8 62:13 79:25 80:7 98:22 147:21 162:21 174:22,24 206:18 214:8,14,24 215:7,20,23 216:10,20 218:5

**2020**
39:12 62:21 63:5 70:25 99:25 101:13 103:1 107:13 112:20 173:14

**2021**
6:3 69:9 104:22 128:5 142:9 143:13 155:1,4

**2022**
127:6

**2023**
43:7

**20th**
98:21

**21**
8:24 88:16 215:6,24 216:9

**220**
4:5

**221**
4:6

**222**
4:7

**223**
4:8

**22nd**
19:24 22:5,14,22 23:18
107:13

**23**
213:22,24 214:2

**23rd**
39:12 75:19 76:8 77:9

**24**
4:23 112:10

**24th**
43:7 97:13

**250**
138:4

**26**
88:13,14

**27-minute**
163:6

**27th**
34:4,12

**28th**
3:7

**29**
99:25

**29.17**
80:17

**295**
99:23

**29th**
101:13

**2:20**
219:19

**2:22**
78:7

**2A**
63:15

**2E1**
20:18,20,25 21:3,25 27:24 28:2,13,15,19,22,25 29:5 30:23 31:15 32:22

**2e1-driven**
20:18 22:10,18 28:8

## 3

**3**
31:1 39:24,25 40:2,7,18,20,23 41:4,9,11,20 42:7,8,12 67:4,5 74:22 75:19,23 76:11,23 77:6,8 172:24

**3-minute**
11:4

**3.1**
34:24 36:12 202:18

**3.383**
90:21,24

**3.4.2**
181:11

**3.997**
88:25 89:15 90:2

**30**
168:14

**300**
80:14 186:1 197:22 198:2

**30309**
3:18

**31**
63:3

**31st**
69:9

**32**
185:22 197:21 198:1

**33.5-fold**
80:23

**35-minute**
127:18

**38**
5:12

**394**
157:23

**395**
158:14,24

**396**
159:2

**397**
159:10

**399**
85:24 86:2,11 89:4,21

**3997**
89:15

**3:52**
127:16

## 4

**4.7**
92:7

**40**
35:10 168:14 170:25

**41**
5:15

**41.6**
88:25

**43-minute**
78:6

**4359**
190:14

**44**
4:16

**459**
126:5

**4928**
4:10 188:18,20,22 189:4,5,9,13 190:19,24 191:6 192:17 193:8,11 194:12 208:15,19,24 210:11,13 218:9

**4:16**
127:21
**4QQ**
6:14
**4th**
55:3,7 83:7

**5**

**5.06**
92:5
**5.34**
91:1
**50**
170:25 186:20
**51**
171:11
**52**
4:17
**5339**
4:11 122:3,5
**5340**
4:12 127:22,24 135:16 148:4 188:12,13,20 189:10 208:15
**5341**
4:13 9:12,14 163:13,14 213:18
**5342**
8:5,8,9
**5343**
4:14 8:12,15
**5345**
4:15 14:23,24
**5346**
4:16 44:2,4
**5354**
4:17 52:20,22
**5356**
4:18 54:12,13
**5357**
4:19 155:21,23
**5358**
4:20 98:19,20
**5361**
4:21 79:23,25
**5364**
4:22 18:22,23
**5367**
4:23 24:14,15
**5368**
4:24 33:25 34:1
**5369**
4:25 83:5,6
**5371**
5:2 94:6,8
**5372**
5:3 102:14,15,24
**5374**
5:4 62:19,20 84:13 146:5 178:3,5,8 206:2
**5375**
5:5 95:14,15
**5376**
5:6 69:7,8
**5377**
5:7 160:23,24
**5379**
5:8 107:10,11,13 126:4 193:15 213:16
**5380**
5:9 99:21,23
**5381**
5:10 101:9,11,12
**5382**
5:11 74:20,21
**5383**
5:12 38:13,15 42:10,11
**5384**
5:13 136:20,21
**5385**
5:14 142:7,8
**5387**
5:15 41:7,9 76:22
**54**
4:18
**560**
15:6
**57**
38:8
**5739**
214:1
**596**
17:5
**599**
15:6 16:19
**5:02**
155:16
**5:17**
155:19
**5:19**
163:5
**5:46**
163:8
**5th**
128:5 155:1

**6**

**6**
142:9 152:16
**6,200**
153:23 154:1,15
**6.2**
148:7,16 151:22 152:9,23 153:14,16,19,23
**600**
16:24 198:8
**601**
3:13
**62**
5:4
**64**
198:5
**64.583**
154:2,15
**652**
94:14,16
**66**
172:16,21
**69**
5:6
**6th**
6:3 155:4

**7**

**7**
143:13
**7.6**
82:2,18 83:11,12 84:4,6
**70**
4:21
**710**
50:10
**711**
46:5,24 50:5
**713**
48:7
**74**
5:11
**763**
161:9
**7:19**

219:18

8

**8** 4:3,14
**8.6** 91:16
**80s** 166:21 183:23 202:4,5,6
**82:001** 34:13
**82:011** 37:1,6
**83** 4:24
**85** 109:13
**872** 95:18
**873** 95:18
**8th** 103:1 105:10

9

**9** 4:13
**9,000** 116:12
**9.9** 91:17
**92** 79:16
**929** 63:1 146:17
**937** 84:15,17 181:24
**938** 90:11,25
**94** 5:2
**941** 90:25
**943** 91:25
**944** 92:5
**947** 92:12
**948** 92:21
**949** 93:1 146:6 147:1
**95** 5:5
**956** 63:10,11
**959** 181:10
**96** 78:24,25 79:12,20 81:15 82:7 86:14 88:1 91:20 93:14 95:16,22 96:14 102:11 145:21 147:25 149:4,10,22, 25 150:2,25 152:2 153:5, 11 154:2 185:13,19, 20,22 186:8 197:11,13,17
**960** 63:24 178:21
**962** 67:14
**98** 4:20
**99** 5:9
**999,000** 83:21
**9th** 15:10

A

**a.m.** 6:3 11:3,7
**Aarti** 117:8
**AB** 118:9
**Abbvie** 132:19 134:20 135:9
**abide** 151:5,18 152:1 153:7 154:5 219:6
**ability** 135:18 142:22
**able** 43:13 182:7
**above** 82:19 83:13, 15 84:6,8 85:7,8 90:5, 8,15,21 91:4,18 92:1,7,14,23 93:3,5,11,21 109:18 124:21 140:18 146:7,8 147:2,3,24 174:2
**absolute** 83:18 84:10 160:3 186:23
**absolutely** 100:4 198:15
**absorbed** 21:12,15
**abstract** 122:11 138:4 148:6 152:25
**abstracts** 171:22,24 172:7,12,16
**academia** 134:23
**academic** 106:3 112:24 133:22 167:13 210:22
**academics** 166:3
**accept** 198:13
**acceptable** 91:4 118:2 149:3,8,25 150:24 184:7,13 185:12,17 186:2,9,12 187:3 195:14 197:7,11,18 215:17
**accepted** 32:13 124:2 137:2 161:17 169:19
**access** 39:5 42:18 43:21 72:9, 23 74:7 75:23 126:10 141:22
**account** 186:25 187:9
**accountability** 76:1 115:24 211:4
**accountance** 103:10
**accountancy** 103:24 104:1,7
**accounts** 74:6

**accurate**
10:19
**acid**
183:14
**acidic**
20:10
**acknowledge**
7:8,12
**acknowledged**
186:16
**ACKNOWLEDGMENT**
4:7
**acquisition**
71:1
**acronym**
100:8 178:14
**acronyms**
19:23
**across**
48:15 49:1 51:21 86:21 89:6 121:23 177:22
**acted**
68:22
**action**
6:19 20:11 47:21 122:14
**activate**
28:19 29:5
**activated**
28:14 32:22
**activation**
20:19 28:6, 11,25 29:18 30:23 31:15
**active**
60:3 89:25 199:23 200:15,21
**activities**
102:4 167:19
**activity**
109:25 115:13
**actual**
86:22 187:20
**add**
76:2 123:21 124:7 132:20 143:12
**added**
29:14 55:2
**adding**
67:18 124:25
**addition**
29:11 33:15 78:10 122:24 124:22 130:12 131:8 132:22 142:12 168:5
**additional**
34:13 45:18 50:2 67:15, 17,18 145:5, 7 162:9 168:10 173:20
**address**
77:20 99:9 179:23 180:5
**addressed**
120:17 146:18 157:21 183:25
**addressing**
77:20 136:12
**adds**
109:7
**adducts**
29:19,20 113:18
**adequately**
183:25
**adhere**
96:16 186:5
**adjunct**
122:16
**adjustment**
136:25
137:11,14, 19,25 186:24
**adjustments**
173:20
**administering**
7:11
**Administration**
23:15 37:22 78:14 97:15
**admitted**
65:1 168:5, 19
**advance**
134:25 166:4 192:19,21 194:3,5,15, 18 195:6,8, 16,19 215:7, 13,25
**advantages**
193:1
**adverse**
18:21 19:12, 13 20:1,7 23:8 24:2,5, 22 25:9 26:4 29:3,24 30:3,21 31:10 33:13, 15 34:2
**advises**
165:21
**advisor**
118:10
**advocating**
76:10
**affairs**
45:22 56:22 57:3 98:10
**affect**
137:3
**affects**
188:5
**affiliation**
189:14 190:6,10,15
**affiliations**
131:15 132:3
**afraid**
58:18 91:13
**agencies**
48:16 60:20 77:12 82:8 96:14 102:11 114:24 123:21 124:2 133:8 151:6 152:5 175:11 203:14
**agency**
13:23 14:20, 21 23:1 45:19 46:7, 19 48:2 49:3,11 50:6 73:4 84:9 133:9 165:21
**agent**
71:4 181:7 184:21
**ago**
35:6 155:3
**agree**
6:5 30:2 65:11 83:14 84:5,7 86:12 87:2 88:14 123:19 130:4,5 154:17,21 189:12
**agreed**
90:5,15,22 154:4,5,19 208:2
**agreement**
107:9 131:18 217:15
**ahead**
7:15 34:9 39:9 55:10 137:8 154:20
**aim**
124:19

**akin**
35:11
**Alan**
118:5
**alcolate**
29:19
**Alec**
74:24 75:1, 2,3
**alert**
56:13
**alerted**
202:7
**aligned**
118:1 195:14
**Alliance**
106:3
**allocated**
69:18
**allow**
42:21 207:11,15,19 208:1
**allowable**
78:24 79:11 81:15,22 82:4,6,7,22 83:13,15,16 84:8 85:7,8, 25 86:18 87:16,18,22 88:1,17,25 90:9,15 91:19 92:1 93:14,21 145:21
**allowed**
14:3 173:12 208:4
**allows**
125:1
**alluding**
114:9 128:13
**alternate**
188:7
**alternative**
150:10,14,16 151:10 152:2 161:22 186:12
**Alyssa**
142:12
**amendment**
170:7
**amendments**
143:9
**Americas**
3:7
**Ames**
36:18,19 57:11 60:11, 13,24 61:3, 9,14,21 70:7 77:4 120:14, 20,21 123:22 144:10,12, 16,20,21 145:5 183:6, 13 212:6,16, 21 213:2,11 214:15,17
**Amgen**
132:15 134:20 135:9
**amines**
164:4
**amount**
78:21 79:3, 21 82:4 91:22 101:11 144:14 159:16
**amounts**
43:25 67:6 77:1
**analysis**
70:2,3 71:2, 4 78:19 85:12 86:9 89:13 90:8 113:4 144:16 146:13
**analytical**
46:25 75:7 86:8 89:8 90:17 92:19 94:1 105:5 146:12 147:15
**analyzed**
88:19 91:23 135:24
**and/or**
12:18 42:6 64:6 68:21 110:5 157:25 165:3 180:7
**Andreas**
130:19,21 136:23 143:10
**aneuploidy**
12:18,25 13:1,12,13 166:18
**Angela**
121:4 162:6
**anilines**
215:14
**animal**
14:1 49:13 63:13 112:17 175:13,18,21 176:2,22 181:22 199:12 200:4 201:18 202:13,16 203:9 204:18 205:2,20,23
**animals**
63:19 123:4 125:3 176:11,12,16 184:17 186:20 195:9 205:9,24
**announced**
49:3
**announcement**
214:8
**answer**
21:21 51:15 56:9 70:20 73:15 92:22 119:8 120:8 127:10 136:9 145:17 149:19,23 150:23 155:10 162:16,22 203:24 204:3,7,12, 14,16,25 207:1
**answered**
85:23 154:18 160:21 205:15,16 212:24
**answering**
42:22 178:5
**answers**
110:8
**Ant**
60:9 103:1 136:23
**antagonist**
64:13 180:6
**antagonists**
64:2,7,11,17 179:6,19 180:1,9
**Anthony**
4:2 6:9 8:4 17:21,25 60:9 103:2 130:13 139:15
**anticipate**
162:10
**antioxidant**
32:11
**anybody**
37:17 141:7
**anymore**
207:11,15,20

208:2
**AOP**
18:20,21 19:5,11 24:17 30:17 113:16
**API**
84:23 85:3 88:24 89:18, 19,20,21 90:21 91:14, 16 92:7,13 197:14
**apical**
30:5
**apologies**
52:8 143:12 189:22
**apologize**
21:2 52:3 55:18 61:23 62:4 85:21, 24 102:22 110:24 116:8
**appearances**
6:23
**appearing**
3:10,15,20 7:12,13
**appears**
20:9 80:1
**applicable**
47:22
**application**
38:4 107:21 168:8 175:6 196:17
**applied**
41:23 150:2
**appointed**
164:21 167:4,8 168:7,24 173:10 174:8
**appointment**
168:13 169:1,5
**appraisal**
47:11
**appreciate**
24:25 123:6 157:16 162:25
**approach**
68:16 118:3 124:24 135:25 152:4 153:4,21 161:10,12, 15,16 162:3, 11 187:9,17 193:1
**approaches**
133:12 150:10,16,18 151:10,15 152:12 186:12 187:2,8
**appropriate**
23:24 43:23 72:11 76:7, 18 95:5 123:19 124:4,15,17 137:13,18,23 217:4,20
**approval**
138:14 139:8,14,21 140:3 143:11,17 175:14 196:22
**approvals**
141:19
**approve**
139:16
**approved**
140:7 141:12
**approving**
211:16
**approximate**
20:22
**approximately**
23:14 77:10 114:3
**April**
97:14 107:13 160:25
**Arch**
3:3
**archive**
34:17
**area**
61:11 86:25 88:5,11 92:20 149:13 169:3 182:6
**areas**
51:21 174:19
**arise**
32:14
**arms**
41:13
**Arnold**
3:12
**arose**
215:10
**around**
24:12 71:8 72:14 77:15, 16 83:11,20 98:17 101:15 102:9 113:13 114:5 115:8, 13 120:4,19 126:12 127:6 130:11 133:6 134:24 136:25 137:10,15,25 138:8,23 139:1 154:13 156:4,22 157:6 160:1, 4,20 172:5 175:2 177:13 178:16 183:24 184:2 186:23 187:18 188:2
193:3,4 195:21 197:10 202:1 213:2 218:4, 9
**arrangement**
7:14
**arrangements**
109:8
**arrived**
153:3
**arrow**
26:18 27:23 31:10,16,20, 23 32:15,20
**arrows**
26:23 27:2 30:22
**article**
63:3 127:25 130:10 141:9 142:20 144:12 148:4 154:23 162:2 188:23,24 210:5
**articles**
214:1,3
**ascertain**
78:17
**ascribe**
65:23
**ascribed**
183:14
**asked**
39:25 57:10 70:19 75:13 154:18 160:21 161:25 182:21 199:11 205:13,15 207:2 212:24 216:15 218:4
**asking**
8:7 20:6

39:4 45:22 57:16 61:2, 21 64:23 72:16 73:11 75:22 86:10 87:1 111:3 123:23 190:13 207:25 215:8

**asks**
44:20 46:21

**aspects**
37:7 77:14 157:20 165:2 187:25

**aspirate**
183:8

**assay**
12:6 122:17 123:5 166:16,17,20 183:7

**assays**
11:13 12:4 13:7,11 106:7 133:10 164:9 183:4, 6

**assess**
42:22 43:18 48:25 57:11 166:18 182:3

**assessed**
85:13 169:3

**assessing**
83:1 198:23

**assessment**
11:13 12:3 17:22 18:10 38:16 49:18 59:12 62:15 63:3 75:5 81:11 87:12 94:11,12 95:13 117:12,24 118:9 119:6 121:11 130:11 133:13 146:22 152:3 158:21 165:7 170:1 177:6 178:10,24 179:10,25 181:13,24 183:10 194:23 203:10,11 217:24

**assessments**
24:24 121:5 133:14 184:2 216:7 217:2

**assessors**
168:6,7,11

**asset**
197:7

**assigns**
169:23 171:3

**associated**
67:19 118:7 158:3 179:21 181:20 188:5

**association**
60:18 71:23 144:3 181:2, 5,17

**associations**
133:15

**assume**
80:14,24

**assumed**
48:17

**assuming**
28:16 67:22 80:24 118:2 195:14

**assumption**
117:23

**assumptions**
83:23

**assure**
208:16

**Atlanta**
3:18

**atoms**
32:2

**attached**
24:25 25:8 48:5 107:18 161:3

**attaching**
178:9

**attachment**
63:2 107:15

**attendance**
133:23

**attending**
171:25

**attention**
72:15 97:5

**attitude**
43:10

**attorneys**
7:7

**attributes**
188:4

**attrition**
118:10

**Audio**
6:3

**August**
53:13,23 54:3,7

**auspices**
105:13

**author**
15:1 116:24 122:7 138:13 139:4 170:25 190:9,15 211:9

**author's**
190:10

**authored**
122:6 128:1 158:18 170:22 171:17

**authorities**
46:16 134:23 149:6 150:25 154:4,6,16 155:9 156:22 157:6 160:20

**authority**
16:25 46:21 204:16

**authorization**
206:8,20 207:23

**authorizations**
94:19 95:8

**authorize**
108:6

**authorized**
107:4

**authorizing**
138:21

**authors**
37:9 105:16 111:17 128:16 131:16 133:5,11 135:8 138:25 145:3,5,7,10 148:5 169:25 170:4,12 189:14,15 190:8,19 193:7,11 208:25 211:7

**authors'**
121:1

**available**
65:17 68:2, 13 113:6 161:22 180:25 181:16 219:3

**avenue**
3:7,13 70:6

**avenues**
167:25

**average**
84:25 85:8 88:15,24 89:24,25 90:1 91:1,2, 16,25 92:7
**avoid**
170:13
**avoids**
160:4
**aware**
13:13 35:14 48:12 53:23 54:1,3,6 60:5 72:16 73:16,25 74:19 93:18, 22 97:3 117:7 129:4, 8 130:13,17, 23 131:1,2, 4,23,25 132:9 191:19 202:11 210:14 215:1,3
**awareness**
45:10 93:25 115:18

**B**

**bachelor's**
166:12
**back**
10:23,25 11:6 15:4 36:11,13 37:18 39:18 42:10,23 43:1 44:8 48:11 52:18 55:1 60:7 75:10,18 76:22 78:7 82:9 84:13 98:8 103:6 105:20 115:9 121:16 122:6 125:5 126:4 127:20 135:14,25 141:14 143:11 145:9 148:3 155:19 163:7 166:20 167:9 172:24 180:19 185:20 193:21 197:6 199:25 200:5,10,13, 19,24 201:9, 16 203:19,23 204:2,6,15 205:4,17 206:18 212:13 218:9
**background**
8:13 163:18 172:23
**backup**
124:24
**Bacon**
3:7
**bacteria**
20:11 27:1 176:10
**bacterial**
13:6 18:10 20:12 26:22 183:6
**balance**
68:4
**ballpark**
114:6
**base**
124:9
**base/ pharmacokinetics**
19:18
**based**
24:22 35:1 36:21 47:19 68:2,12 82:23 83:2, 12,16 94:14 148:9 150:17 152:3,11 153:21 164:20 167:10 168:5,8 169:5,6 180:24 181:15 186:20 207:21 215:17
**bases**
123:8
**basically**
34:19 61:13 71:14 95:19 97:3 109:7 127:1 138:2 167:11 172:8
**basics**
184:9
**basis**
20:8 49:17 63:13 65:1 72:10 126:21 165:6 168:18 181:6 183:16 188:6 212:22
**batch**
88:3,19 89:3,5
**batches**
83:12 88:4, 21 89:6 90:18 145:25 147:14
**Bates**
15:5 16:18, 24 17:5 46:5 48:7 50:5,10 54:14 55:13 56:4 60:7 63:1,10,24 67:14 80:10 84:15 90:11 94:14 95:18 99:23 126:5 146:5 157:23 158:14,24 159:2 161:8
**Baxter**
128:8,11 191:3,8,11, 17,20 218:12,15,23
**Beecham**
9:3,5,20 10:20 13:19 62:10 164:7 202:7,12 213:21,25
**began**
100:22 174:22 214:24 215:7,20,23 216:10
**beginning**
6:1 11:5 48:21 52:17 93:15 127:19 151:18 174:24 190:24
**begins**
37:5 48:14 155:18
**begun**
99:9
**behalf**
3:10,15,20 6:16,22 107:2 195:4
**behind**
209:1
**beings**
14:4 66:14, 25
**belief**
213:11
**believe**
48:4,6 68:22

78:15,18 102:25 128:10 156:25 157:11 202:15 209:18 217:24
**believed** 208:16
**bell** 197:24
**belong** 51:25 100:24
**below** 34:5 38:21 45:10 81:22 82:18 84:6 85:7 92:1,8, 14,23 119:16 167:3
**bench** 172:25 195:21
**benchmark** 105:8 106:11 116:11,16, 19,22,24 130:7 133:4, 7,13 134:15 135:24 137:12 142:18 150:17 152:3,11,21 153:3,21 184:7 187:8 192:23 193:1 195:12
**benefit-risk** 68:3
**Bercu** 121:6 143:23 144:5,25 145:4 212:8
**best** 16:11 49:15 102:12 126:13
**better** 9:22 24:10 69:3 119:3 137:15
**beverages** 73:1
**Bhaskar** 132:11 209:3,18,22 210:5,8,16 212:15,21 213:12
**BI** 139:10
**bias** 170:14
**big** 61:11 149:19
**bigger** 87:1
**bill** 103:8,12,14
**bind** 20:23 32:3
**binding** 25:10 29:6 30:24
**bioassay** 98:15 110:13 150:5 158:22 184:15 186:21 201:24 203:8
**bioassays** 18:8,17 74:12 202:23
**biological** 35:11 72:10, 24 117:25
**biology** 74:8 100:11 197:4 209:5
**biotransformation** 21:23
**Birmingham** 18:24,25 19:1,4,24 21:24 22:8, 17 24:16 25:14,18 26:1 29:4 33:12,16
**Birmingham's** 24:8
**bit** 10:15 22:7, 16 44:19 70:23 104:19 114:5 178:3 180:20 207:6
**bits** 136:25 137:2 138:2
**bizarre** 102:20
**blood** 122:15 123:4 124:8,23 125:2
**blow** 27:11 29:1 31:16 166:7 178:22 189:14 191:6
**blurry** 70:24
**BMA** 90:10 185:13
**BMD** 118:3,8
**BMD/POD** 118:10
**board** 89:12 173:1, 3,11,13 174:3 211:2, 21
**body** 14:10 32:10 47:18 133:21 148:13 167:23 169:3
**Boehringer** 3:20 207:18
**Boobis** 118:5,17 195:22
**book** 171:2,4,13, 16
**boss** 211:10,17
**Bossa** 138:20 139:9
**BOSSO** 3:17
**bottom** 16:9,18 19:3 34:3 37:3 39:10 45:8 47:9 56:5 57:1 68:1 74:24 84:16 94:17 95:18 148:6 156:5 161:9 171:8 178:22 206:7
**bought** 130:24
**box** 26:12 27:6, 10,13 85:1 159:7,11
**boxes** 31:1
**boxing** 27:20
**break** 40:5 52:4,7 77:23,25 126:5 127:12 155:12
**breakout** 219:14
**Brexit** 206:24
**Brian** 100:2

**brief**
7:6 100:13
**briefly**
182:17
**bring**
113:12
116:21
**British**
109:2 114:4
**Britt**
183:15
**broadly**
166:22
**brought**
173:17
**browser**
141:24
142:3,5,6
**Brumvilla**
183:18
**bubble**
10:23
**bud**
43:9
**budget**
100:19,21,24
101:11,15,19
102:3,6
103:21,22
**building**
39:24 75:22
**bulavian**
32:10
**bullet**
94:17
**bunch**
39:4 145:23
146:1
**Burman**
69:14,15
**buy**
206:24
208:10

**C**

**cabinet**
39:25 40:7,
18,20 41:4,
9,11,18,20,
23 42:8,12
67:4,5 74:23
75:19 76:11,
24 77:8
**cabinets**
40:3,23 42:7
77:6
**cake**
103:23
**calculate**
150:14
**calculated**
149:6 150:24
154:3,6,16
**calculating**
151:11
186:12
**calculation**
82:23 83:3,
24 91:21
148:11
152:11
**calculator**
154:1
**California**
132:7
**call**
19:24 52:4
166:25
168:21
170:21 173:1
181:9,23
191:5 192:16
**Callan**
100:2
**called**
36:7 66:9
97:24 113:2,
11 130:14
131:13
139:18 164:3
166:15 191:3
207:4
**calls**
35:22 113:4
**Cambridge**
116:23 117:4
**Canada**
112:8 113:1,
2 210:21
**cancer**
13:23 14:14
23:1 30:6
33:1,2 49:12
64:3 72:2,6,
7 83:1,18
148:7,18
151:23
152:10,24
153:15,17,
18,19,20
176:14
179:15 180:7
181:3,8,18,
19 187:22,
23,24
**cancers**
64:18 179:8,
21 180:3,10
**candidate**
12:3
**candidates**
165:8
**car**
118:25
**carc**
59:19
**carcinogen**
13:14,16,20,
25 14:2,15,
18 40:6,9
41:22 58:13
63:12,16
65:16,17,19
72:18
111:21,25
112:6
**carcinogenesis**
19:9 23:10,
25 24:6
29:16,24,25
30:6 31:11
33:21,24
68:22 69:5
110:12
113:17
119:1,19,21
165:3 188:1
193:5
**carcinogenic**
47:11,13
48:3 49:12,
14,20 50:7
56:14,20
57:5,17,23
58:1,3,10
59:19 63:15
65:13 110:14
111:1,15,19,
20 180:16
194:22
**carcinogenicity**
17:22 25:11
29:15 42:6
57:25 58:4,6
63:17,18
65:22 67:9
73:24 74:3,
16 77:12
78:12 87:13
110:2,6,19
111:12 112:1
119:5,20
121:8 133:10
144:18
175:4,14,18,
21,24 176:2,
18,23 177:2,
16 187:14
199:12 200:4
201:19
203:11,18,22
204:5,10,19

205:20,24 207:10 215:18 217:1
**carcinogenistic**
205:3
**carcinogens**
20:4 39:23 40:22 41:24 42:3 49:22, 25 57:20 58:7 65:24 66:14,20,21 67:1 72:13 73:20 76:6, 17 77:2 106:8 164:3 185:5,9 187:4
**carcinoid**
111:25
**card**
10:24
**care**
56:23 57:3
**career**
9:18 35:8 170:16,23 171:17 172:17 214:12
**Carmony**
3:24
**CAROLINE**
3:2
**caroline.power@dechert.com**
3:4
**carried**
34:20 69:3
**carved**
102:4
**cascaded**
45:23
**case**
89:12 92:11 96:3 97:3 120:24 131:19,24 140:2 144:19 156:25 172:5 177:19 186:11 187:12 218:16
**cases**
165:12 183:9
**categories**
196:21
**categorization**
65:20
**categorizations**
112:3
**category**
169:13 171:21
**causal**
64:21 180:6 181:1,5,17
**caused**
32:21 176:24 197:8
**causing**
72:2,6,7 180:1 201:20
**cc**
98:24
**cc'd**
95:6 101:1
**cell**
13:7,10 25:11 32:25 33:1,2,4,5 183:7
**cells**
32:24 33:6 108:25 188:3
**Center**
209:5
**cents**
109:13
**certain**
47:3 61:15 83:11
**certainly**
82:10 142:24
**CERTIFICATE**
4:5,6
**cetera**
39:5,24 57:15 72:11 113:20 126:23 159:17 170:17 186:25
**CH**
44:13 50:21, 22 56:11
**chain**
15:4 17:14 18:24 38:15 44:16 45:21 47:24 55:2, 5,6,11 57:9, 10,18 74:23 75:25 100:20,25 156:19
**chair**
119:19
**chance**
163:17
**change**
83:20
**changed**
157:25
**changes**
20:12 142:19,22,25 143:18,20 156:15 157:1 159:18,20,21 160:17 161:4
**changing**
138:7
**chapter**
171:4,14
**chapters**
171:2,6,13, 16
**characteristics**
72:22
**characterizations**
40:13
**characterize**
30:3 69:4 70:13 71:22, 24 120:12
**characterized**
70:16 84:11 183:15
**charity**
174:15
**chart**
181:25 182:7 193:17 213:16 214:1
**chatted**
136:23
**Chattem**
3:15
**check**
61:7 145:11 200:1,6
**chemical**
38:19 73:21 77:16 110:4, 18 111:10 196:18
**chemicals**
61:14
**chemist**
89:8 90:17 92:19 146:12
**chemistry**
35:11 56:16 86:8 147:15
**Chen**
15:1 17:15, 16,18 18:13, 19

**Chen's**
17:15
**CHMP**
63:2 161:16 178:13 206:19
**choice**
168:15
**chose**
189:10
**chromosome**
12:10,19,23 166:18
**circulated**
63:4
**circumstances**
161:18,21
**clarification**
110:24
**clarify**
24:1 214:6
**class**
39:24,25 40:2,7,18, 20,23 41:4, 9,11,19 42:7,8,12 43:22 49:21 61:5 63:15, 21 65:23,24 67:4,5 74:22 75:19,23 76:11,13,23 77:6,8,17,21 99:20 101:23 102:9 120:14 123:23 179:7
**classes**
65:23
**classic**
52:25 53:9
**classification**
63:16
**classified**
13:15 63:14
**clastogenesis**
123:13 125:4
**clastogenic**
12:8,9,13 13:9
**clastogenicity**
13:11 22:3, 13,21 122:20,24,25 123:4 124:11 125:2
**clastogenisis**
122:14
**clastogens**
122:7
**clean**
211:15
**clear**
79:8 88:4 89:14 111:18 145:24 147:12 153:2 160:15 178:8 179:9 185:11 190:18 194:11 197:21
**clearly**
16:4 24:11 44:12 50:20 64:1,16 82:23 83:3 84:11 88:2 102:4 113:15 118:21 131:16
**clever**
208:16
**client**
129:7,15,16, 20 135:16
**clients**
128:24 129:2,13
**clinical**
64:1,15 117:10,12 156:14 157:14,18, 22,25 161:19 178:17 179:5 180:25 181:15 217:3
**clonal**
31:7
**close**
74:14 125:8, 9,22 143:13
**closed**
49:21
**CMC**
43:14 56:22 57:3 76:7 85:15
**co-author**
104:15 111:6 120:15 129:20 130:19 131:5,9 132:11,19,22 135:22 136:10 137:24 139:15 142:15,20 144:8 162:5 189:16 210:12 212:8,11 218:10
**co-authored**
106:12 209:22 210:5
**co-authoring**
141:9
**co-authors**
132:21 133:5 134:14,19 142:10 212:12 213:1
**co-employees**
136:17
**co-promoted**
130:14
**coaching**
79:15
**cohort**
49:20,23,24 50:4 76:14 185:1,4,7
**collaborate**
112:14
**collaboration**
105:9,23 106:19,24 107:8 111:6 112:19 137:21
**collaborations**
119:2 165:1
**collaborative**
115:17
**collaborators**
70:11 109:8
**colleague**
16:21 25:21, 25 39:15 62:3 69:15 113:1 114:10
**colleagues**
43:14 45:11 58:2 76:7,18 121:6
**collected**
30:15
**college**
164:5,20 167:8,20,22, 24 168:3,5, 16,19,20,23 169:3
**colloquy**
73:14 151:2 158:5
**colony**
113:3,6 121:25 122:1

**column** 27:12,13,17, 20 28:25 29:1 49:10 84:19,22 91:3 119:17 126:6
**combining** 22:2,11,19
**come** 24:24 48:11 62:14 68:9 100:18 101:8 164:2 177:22
**comes** 154:7 159:11
**Comet** 123:5
**commensurate** 177:20
**comment** 58:20 88:23 89:9 118:7 147:16 149:12 157:11
**commentary** 45:3 48:8 98:11 169:25
**commented** 157:4,9
**commenting** 146:14
**comments** 25:1 34:5 96:13 98:14, 24 120:17 136:12 137:1 156:13 157:3 167:11
**commercial** 72:17 73:16 74:1,17,19 196:12
**commercially** 140:1
**commission** 103:5 104:6 105:20,21 113:23 173:18 214:1,3
**commissioned** 77:10 103:25 105:11 108:22 109:23 113:10 115:15 117:17 118:12 123:9 124:20 195:3
**commissioning** 103:11 112:11 114:20 170:4 211:5
**commitment** 78:18
**committee** 98:13 105:15,16 132:24 134:6 142:17 165:20,24 169:23 178:16,18 211:13
**committee's** 133:1
**committees** 132:24
**common** 192:10
**communicate** 140:15,20 141:4
**communicated** 140:4
**communicating** 141:7
**communication** 23:20 24:12 53:12 80:1
**communications** 98:4
**companies** 99:16,19 102:1 123:24 132:8 134:10,18 135:12 138:18 147:12 190:20 206:21
**company** 54:24 87:8 100:5 117:22 130:14 131:13 132:6,15,18 138:12 158:20 174:22,24 191:3 202:12 216:21 217:8
**company's** 102:11 133:15 193:23 217:10
**compared** 74:11 177:25 185:8 204:21,22
**comparison** 194:22
**compartment** 125:3
**compiled** 61:13
**complain** 217:17
**complete** 126:8 217:6
**completed** 121:11 125:15 143:9
**completely** 41:20 177:23 196:25
**compliance** 114:18
**component** 81:10 87:9 94:1 196:11
**components** 120:23 157:17
**composite** 158:18
**compound** 124:15
**compounds** 12:17 21:13 40:11 41:1 42:5,15 43:18 57:21, 25 67:1,8 72:14 75:6 122:13,19 123:17 165:11 185:5 214:16
**comprehensive** 180:24 181:15
**computer** 102:21
**concern** 30:6 49:21, 23,24 50:4 68:21 76:14 83:17 96:23 97:4 120:20 170:16 176:24 185:1,4,7 187:7
**concerned** 87:11 104:5 123:22
**concerns** 36:20 40:14 69:2 70:8

101:24 139:24 183:25
**conclude** 127:6
**concluded** 67:20 95:13 112:5 120:21 181:1,16 183:19 219:19
**concluding** 113:12
**conclusion** 14:18 18:4 67:25 68:6, 10 95:10 125:8 176:1 179:25 181:13 183:22 206:14,16 207:22
**conclusions** 95:11 138:8 176:13 177:5,12,23
**conclusively** 30:18
**concurrent** 201:25
**condition** 179:20
**conditions** 17:20 18:3, 7,8,15 26:17 35:1,4,9,20 36:7 47:3 94:19 201:14
**conduct** 67:7 71:5 74:8 106:25 109:6 115:6 195:3 202:22 218:6
**conducted** 18:8,17

33:23 34:14 36:16 47:1 76:12 98:15 126:1 133:10 144:19 159:21 177:11,21 183:17 200:12 202:2,4,6, 13,16
**conference** 172:4,8
**conferences** 171:25
**confidence** 186:22
**confidential** 98:24 182:15
**confines** 41:17
**confirm** 37:7 200:11, 14
**confirmation** 194:20 216:12
**confirmed** 111:24
**conflate** 64:6 65:10 101:21
**conflating** 29:16,23 77:14
**conflict** 128:20 129:12 135:15 151:6 153:10 211:16
**conflicts** 139:1
**confused** 110:23
**confusing** 104:25

198:11
**confusion** 197:9
**connected** 97:7
**connection** 10:13 119:5
**Conner** 52:23,24 53:8
**consent** 7:14,17
**consequences** 117:25
**consider** 94:5 112:18 196:23 197:1 203:20
**considerable** 144:14 166:1
**consideration** 35:16 139:6 176:5,8
**considered** 40:20 43:23 65:12 66:18 77:18 81:11 161:16 176:4,9 180:16 184:21 214:19 216:22
**considers** 68:3
**consistent** 70:15 86:21 89:6
**constitute** 102:5
**constituted** 67:24
**consultant** 128:21 129:11
**consultation** 129:5

**consulting** 132:7 209:6
**consumable** 109:5
**consumer** 50:23,24 51:1,3,8,20 52:1 54:24 57:15 58:15, 18 59:2,6,8, 9,15,18 66:23 217:12
**cont'd** 3:1 5:1
**contacted** 39:18
**contained** 78:17
**containers** 42:16
**containment** 75:8
**contains** 69:17
**contamination** 45:4 48:9 99:15 102:2 202:1
**content** 128:25 129:17,18 130:4 135:17 136:6 138:7, 14 147:13 153:1 157:11 170:2
**contention** 154:13
**contents** 93:5,10 146:8 147:3, 23
**context** 44:19 45:7 56:10 57:8, 18 89:12 91:10,24

92:17,25 93:2,13 99:18 106:9 137:9 153:2 159:16,20 184:20,22
**contextualize** 81:19
**continue** 6:4 68:25
**continued** 163:22
**continues** 102:8
**contract** 106:2,13,17 107:2 108:7, 20 109:21 126:22,23 130:15
**contracted** 115:7 117:13 127:4
**contracts** 126:15,19 127:8
**contractual** 107:7 109:7 126:25
**contribute** 14:14 112:14 115:4 136:14 165:6 187:25
**contributed** 130:5 135:22 136:10 156:1 157:8,19,21 158:20 164:25 167:14 175:9,10 215:5
**contributes** 134:7
**contributing** 134:21 138:8 170:25
198:25
**contribution** 129:21,22 134:2
**contributions** 168:14,18
**contributor** 136:13 137:17 215:16
**contributors** 135:10
**control** 48:17 49:1, 18 66:21 73:2 77:18 85:16 102:10 151:4 153:8 170:8 178:1 201:6 204:20,21 205:2,8 211:12
**controlled** 59:24
**controls** 204:18 205:14
**conventional** 181:22
**conversation** 52:6 80:6 95:17 96:22 100:13
**conversations** 6:7
**convert** 20:21 78:25
**converting** 197:17
**converts** 79:20
**conveying** 84:11
**convicted** 66:13
**cooperating** 195:2
**copied** 45:11 98:22
**copy** 9:14 35:24 61:8 127:9 139:19 188:23
**copying** 136:22
**corner** 15:5 26:9 209:9
**corporate** 107:19,23 108:1,5
**correct** 9:16 13:2 15:2,12 18:2 22:22,23 24:19 25:2 27:4,9 28:1 29:9 31:8, 12,13 34:18 38:10 39:13 43:5 46:13 48:10 60:21 64:5,14 68:23 74:1 79:15,22 104:25 109:3,10,11 111:15 122:2,18 128:4,7 131:7 132:13 155:5 163:16 167:2 168:24,25 169:15 171:11,15 174:1,6,10 175:16 178:10,11, 19,20 180:18 182:4,5 185:15,25
188:15,16 189:23,24 190:12,17,22 194:12,13 197:20,25 198:10 204:23 208:21,22 210:7,10
**correctly** 60:14,15 63:22,23 108:17 137:4,5 161:24
**correspond** 99:3
**correspondence** 46:6 57:13 99:3 161:3 202:11 210:17
**corresponding** 84:23 85:3 190:10
**corresponds** 198:2
**cost** 43:12 69:10, 18,23 109:5 112:8 114:2 116:13 117:10,21 118:5
**costings** 118:15
**costs** 42:9 103:4
**council** 118:10
**counsel** 6:9,22 7:14
**countries** 207:18
**couple** 96:13 208:23

**coupling**
31:18
**course**
121:12 137:17 163:20 165:10 166:10 170:22 171:17 172:17 196:1 214:12
**courses**
167:17
**court**
6:12,21,24
**covalent**
25:10 29:6 30:24
**Covance**
113:11,24 114:2,8,13 115:15 116:6 121:18,20 123:9 124:20 125:13,16 195:2,3,5 216:11
**Covance's**
122:1
**cover**
75:6 109:4 124:9 125:3 203:8
**covered**
94:3 123:8
**COVID**
126:9
**created**
69:10,14 71:1 72:3 73:12
**creation**
155:24
**credit**
169:6
**crimes**
66:13 73:9
**criteria**
81:11
**critical**
31:7 32:5,17 47:10 76:4 113:19
**criticize**
193:8,11
**CRO**
113:11 115:7
**Cross-examination**
4:3 163:10
**cultured**
108:24
**cultures**
183:7
**current**
44:12 50:20 76:4 93:5,11 123:2 124:19 125:1 146:9 147:4,24 168:9 171:5 172:19 173:8 184:10 212:13
**curriculum**
9:15 10:12, 18 163:14
**custodial**
94:8
**cut**
9:25 10:14 85:24
**cutting-edge**
173:9
**cuz**
44:16
**CV**
166:7,10 168:22 169:12 171:1,14 172:14,25
174:18 213:18,19
**cylindrical**
41:12
**cytochalasin-b**
166:16
**cytochrome**
20:20
**cytometry**
11:14
**Cytotoxicity**
32:23

**D**

**D.C.**
3:13 133:1, 18
**daily**
88:8,17 127:25 137:12 148:25 149:3 150:24 151:22 165:6 184:7 185:13,17 186:2,9,12 197:7,11,18 198:13,14
**Daly**
100:3,6
**damage**
12:4,5,6,7, 10 166:18
**data**
11:15 13:10 14:1 36:12, 25 37:6,12, 17,18 44:11 47:11,13 61:22 63:13 64:1,15 68:2,13 81:5 83:10 90:16 93:22 98:15 108:14 115:5 118:11 126:8,22 133:9,14 135:24 150:18 157:18,19 158:22 171:3 172:3 177:11,13,23 178:16,19 179:5,17 180:25 181:16 182:11,22 184:4 186:19 187:1,23 193:24 194:3,8 202:21 203:9 205:5 215:18
**database**
61:8,12 111:7,8,14
**dataset**
187:10
**datasets**
146:14
**date**
37:5 53:15 97:17 105:10 154:23,25
**dated**
15:10 53:13 62:21 69:9 77:9 79:24 83:7 98:21 102:25 107:13
**David**
61:13 62:7, 11 109:24 118:4 215:8
**day**
80:17 81:16 88:1 91:21 95:16,22 143:22

145:21 148:7,17 151:23 152:9,24 153:15,17,20 155:3,7 164:6 185:14 196:8 197:15 206:12
**day-to-day** 114:12 115:19
**days** 34:2
**de** 46:6
**deadline** 143:13
**deal** 48:18 62:1
**dealing** 210:23 214:2
**Dean** 38:22,24 39:11,14 42:13,23 43:1,2,3,7,10 74:22,25 75:4,7,18,22 76:1
**Dear** 44:10
**death** 25:11 32:25 33:1,2,4,5
**debatable** 83:23
**debate** 150:19
**decade** 133:2 164:14
**decades** 35:6 133:1
**December** 6:3 83:7 155:4
**Dechert** 3:3 6:13
**decide** 170:5
**decision** 68:15 96:20 108:6 216:21 217:5,10,16,19,20 219:5,7
**decisions** 97:19 217:15
**decomposes** 47:5
**deduction** 49:6
**deep** 181:25
**default** 184:13
**defendant** 3:15,20 131:2,10,24 138:12 191:9,11,18 218:16
**Defendants** 3:10
**defense** 32:11
**define** 137:15 166:20
**defined** 13:23 65:15 79:12 80:17 82:23 137:13 150:1,2 152:5 187:11
**defines** 83:17
**definition** 65:25 66:1
**definitive** 13:25 30:10 134:9 162:12
**degradant** 95:21
**degradation** 26:11,16
**degree** 163:22 166:12,13,14
**delay** 126:9
**deleted** 158:1
**deletes** 158:9
**deletion** 159:12
**deletions** 158:17,24 159:3,6,22
**deliverable** 108:14 118:1
**delivery** 167:15
**demonstrate** 13:11 122:15
**demonstrated** 63:25 118:23 169:7
**department** 12:1,2,11 58:19 75:16 76:19 85:15 98:4 101:18 103:12,14,19,20,21 116:4 117:16 126:14 127:8 139:1,23 141:11 156:12 164:12,15
**departmental** 107:5 139:20 140:6
**departments** 104:4
**departure** 108:16
187:11,17 216:2
**depend** 30:8 103:12
**depending** 184:20
**depends** 32:7 91:6,22 103:15 143:19
**DEPO** 3:22 9:25 10:6 15:22 16:8,16 55:16 56:3
**deposition** 7:8,9,10 8:8 35:25 155:4 189:9 208:8
**depositions** 208:18
**derisk** 60:11
**derivative** 183:14
**derived** 150:3 184:14
**describe** 12:19,20 14:17 19:6,14,21 20:1 30:16 40:14 137:19
**described** 30:13 39:22 49:11 57:20 105:10 109:14 120:10 121:8 130:10 147:13,18 153:11,22 182:15 218:1
**describes** 113:16
**describing** 20:7 28:5

34:13 149:17
**description** 47:16 160:11
**descriptive** 160:4
**design** 114:20 120:24 175:20 177:2 199:17
**designed** 123:3,20 177:10
**detail** 122:11 148:13 167:6 200:24
**detailed** 115:14 200:6
**details** 109:23 111:3 126:2 130:17 200:18 201:4,8,15 204:15 214:25
**detect** 12:7 60:13, 25
**detected** 23:16 181:21
**determination** 34:14 108:14 194:20 216:12
**determine** 34:20 92:10 151:14 182:7 184:11 207:5,9
**determined** 58:8 90:7 137:14 148:12
**determining** 137:11
**developing** 110:4 117:5 133:6 196:12 216:6
**development** 20:6 50:15 85:15 135:23 136:2,10 140:1 165:10,12 166:15,17 181:3,18
**deviations** 115:3
**Device** 14:20
**Dewis** 3:23 6:15
**dialogue** 97:8
**diet** 18:12 176:11 203:18
**dietary** 19:8 20:3 164:3
**difference** 173:16
**different** 11:15 12:5 63:12 74:23 87:7 93:24 98:9 99:10 103:22 104:3 110:16,25 133:19,20 144:20 158:14 194:12 208:17 214:13
**difficult** 92:10 147:15
**diligence** 123:6
**direct** 4:3 8:1
14:22 15:15 100:6 115:17
**directed** 120:1
**direction** 98:3
**directive** 63:3
**directly** 95:1 165:11 215:22
**director** 9:9 11:18,23 17:16 56:22 57:2 114:12, 16 115:1,4 140:12,13,18 141:3
**directors** 114:10 141:5
**disciplines** 165:5 168:15
**disclose** 196:13
**disclosed** 134:11 190:15,23 196:20 210:12,14
**discloses** 191:2
**disclosing** 209:9
**disclosure** 129:13 135:15 184:3 218:11
**discuss** 43:8 113:4
**discussed** 56:11 75:9 100:2,10
**discussing** 146:11 182:18
**discussion** 24:23 45:13
47:15,20 93:15 137:24 146:6 147:20 150:19 152:21 184:6
**discussions** 101:2 104:10,12 195:22
**diseases** 64:9
**dispensary** 38:24 40:2 76:2
**disposition** 117:11
**dispute** 129:3 186:8
**disputing** 149:5
**disregard** 186:8
**disregarded** 36:21
**disseminate** 172:4
**distinct** 65:22 187:15
**distinction** 168:10
**distribution** 94:24 95:3,6
**distributions** 118:24
**District** 6:11,12
**divide** 154:1,2
**divided** 87:19
**division** 39:2 50:13 51:5,12,20 58:15 59:8 87:15
**DMA** 17:19

**DMPK**
105:7 117:16
**DNA**
12:4,6 20:21,23 25:10 29:7, 10,12,14,19, 20 30:25 31:6 32:3 49:18 60:13, 25 106:1 108:16 113:18 187:19 216:2
**Dobo**
131:5,8,11
**Doctor**
16:18 18:20 24:7 29:23 34:1 35:17 36:24 38:1,5 52:22 55:13 57:22 66:3 85:18 89:22 102:13,17 109:1,18 110:22 113:23 119:7 145:18 153:13 154:20 160:7 198:16 216:9 218:8
**doctors**
66:12
**document**
9:21 10:2 14:25 15:25 25:15 28:7 34:10 45:1 55:12,24 63:7 71:1 75:22 76:24 79:24 82:11, 15 83:12 87:3,6 89:16 94:22 100:9 108:11 120:11 122:4 147:18,20 156:1,21 157:9,10,12 160:15 162:1 178:6
**documentation**
97:25 175:5 203:15
**documented**
22:24 111:21 131:16 200:20
**documents**
162:1 175:8 213:10
**doing**
23:23 40:19 47:25 61:24 87:15 96:22 102:12 106:14 114:8 122:22 124:23 144:15 193:22,23 194:14 195:6 196:21
**dollar**
116:12
**dollars**
109:13
**dose**
69:2 70:12 71:23 72:10 80:14 81:13 100:12 105:8 106:11 112:19 114:19 116:11,16, 19,22,24 119:4 121:9, 23 124:18 130:7 133:4, 7,13 134:16 135:24 137:12 142:18 150:17 152:3,11,21 153:3,21 176:6,15 184:16,18,23 185:23 186:1 187:1,8 188:4 192:23 193:1,24 194:2,21 195:12,21 197:22 198:2,6,8,13 216:7
**doses**
14:11 74:11 108:24 113:14 114:19 121:22 122:25 205:11
**dosing**
80:11 184:7
**dot**
153:14
**draft**
136:11 157:24 158:12 162:8 212:13
**drafts**
138:1 157:8, 19
**draw**
176:1
**drink**
73:2
**drinking**
18:12
**driven-mechanism**
22:1
**drug**
12:3,12 17:16 23:15 37:22 49:4 71:21 77:19 78:13 81:3 82:1 88:8 93:4,9,20,24 97:14 99:15 146:7,18 147:3,23 149:13 151:4 153:9 154:9 161:18 165:7 175:6 179:7 196:18 201:23
**drugs**
56:13 196:12 198:24
**DT**
118:8
**DTTC**
114:22
**ducks**
139:5
**due**
67:15 121:12 176:5 181:19
**duration**
80:11,23 81:7,8,10, 14,17 102:7 118:6,19 121:9 176:6 188:4

## E

**e-mail**
15:1,4,7,10, 16,21 16:21 17:14,24 18:24 19:4, 25 23:18 24:16 34:4, 7,11 37:4 38:15,21,22 39:7,11 42:12 44:4, 8,9,16,17,25 45:10,21

47:24 52:23 53:11,13 54:14,24,25 55:2 56:5 57:1,9,10, 13,17,18 60:8 62:21 70:8 74:23, 25 75:17 77:9 94:24 98:21 99:1 101:1,12,17 102:24 105:1,19 118:23 142:9 143:22 156:6,18 157:14 160:25 178:9 207:24
**e-mailed** 142:25
**e-mails** 98:23
**e.g.** 47:3 161:18
**earlier** 76:14 114:22 138:1 142:18 144:10 157:24 169:20 174:8 182:18 188:12,15 191:7,15 192:22 197:23 206:12
**early** 45:17 135:25 136:11 157:8,19 202:4,6
**easy** 42:14
**eat** 73:1
**EC4V** 6:14
**echo** 175:9
**edit** 53:17 135:18
**edited** 156:21
**editor** 143:5,8 173:14,18 210:15,17 211:2,3,6, 13,15
**editor-in-chief** 209:16 210:9,12 211:1,6,17
**editorial** 159:18 160:16 169:23 173:1,3,11, 13,14 174:3 211:2,12,21, 22
**editors** 139:6 170:4
**edits** 159:15
**education** 163:19 166:7,9
**educational** 163:18
**effect** 74:10 137:13
**effectively** 96:9 97:11
**effects** 63:19 64:7 72:24 187:22
**efficacy** 68:3,13
**EFPIA** 60:12,16,23
**either** 140:11 145:13 176:14,15 179:12 184:19 219:13
**Elder** 48:8
**elected** 174:9,11
**electron** 31:17 32:21
**Electrophilic** 27:23
**element** 107:8
**elements** 67:10 126:25 139:22 158:21
**eleven** 8:19 218:10
**eliminated** 158:13
**EMA** 45:18 60:12, 19 78:10,23 79:12 95:20 96:8 97:11 161:3,8 178:16 179:10 185:13 193:11
**EMA-H-A31-1491** 62:22
**EMM** 143:4,5 209:13
**employed** 130:3,20 131:9 145:1, 8
**employee** 131:5 198:17
**employees** 116:15 136:18 189:22
**employer** 202:7
**employers** 135:7
**employing** 134:18
**employment** 106:24
**employs** 132:11,15,19
**encompasses** 74:24
**end** 11:2 21:16 27:5 52:13 57:10 65:2 78:4 80:12 126:12 127:15 155:14 163:4 219:16
**ending** 15:5 63:11
**endogenous** 47:17 67:17 105:6
**endpoint** 123:6 124:17,25 166:20
**endpoints** 187:11,15
**engage** 118:17
**engagement** 107:20,24 108:2,7 166:3
**engagements** 118:13
**England** 206:16

**ensure**
68:16
**enter**
6:24
**entire**
31:17 217:12
**entitled**
24:17 48:8 122:6 127:25 142:19
**entrance**
167:23
**entry**
174:2 194:7
**environment**
20:10 71:19 72:9,25 132:25
**environmental**
14:15 41:3 73:3 105:14 133:17 134:1,7,8 143:5 145:13 165:17,19 173:7,23 174:17 209:13,16 210:18 212:1,23
**enzyme**
20:20,25 21:3,4 28:2, 13,15,19 29:5 30:23 31:15 32:22
**enzymes**
28:23
**epidemiological**
181:22
**equals**
88:14
**equipment**
40:21,24 41:5 43:21
**equivalent**
80:13 147:25 185:22
**Erik**
3:22 9:23 27:15 33:8 38:20 56:25 148:15 209:21
**ERRATA**
4:8
**ESQ**
3:2,6,12,17
**essentially**
29:17 31:25 32:2 103:8 112:2 115:6 138:18 141:19 150:15 166:17 170:1 174:14 178:15 186:18
**establish**
108:15 216:1
**established**
52:25 53:9 59:20 105:23
**estimate**
126:13
**et**
39:5,24 57:15 72:11 113:20 126:22 159:17 170:16 186:25
**ethics**
14:3
**Ethnie**
52:23,24 53:8
**EU**
161:5
**Eudralink**
62:22
**Europe**
45:19 78:11
**European**
45:19 46:7, 19 48:2 49:3 50:5 60:17, 19,23 77:11 133:8 156:3 161:21,23 165:18 206:16,19,22 207:17 215:3
**evaluate**
20:8 33:23 73:24 123:25 125:1 133:9 204:1,4,9
**evaluated**
18:9,16 56:17 58:17, 21 59:10
**evaluates**
128:21
**evaluating**
61:4
**evaluation**
16:20
**event**
24:4 28:5 30:5,18 31:4,5,6,7, 17,20 32:16, 19,23 113:16
**events**
30:7 32:12 172:8
**eventually**
17:14 21:10 175:10 200:22
**everybody**
98:23
**everyone**
161:2
**evidence**
36:18 63:17, 18 65:16,21 174:16 181:1,17 183:10 202:20
**evil**
170:19
**evolving**
133:12
**exact**
97:17 109:22 142:1
**exactly**
10:6 23:19 62:17 85:17 100:23 102:3 129:16 145:11,24 147:12 196:18
**examination**
4:3,4 8:1 168:1,3 199:8
**examining**
102:1
**examples**
183:13
**Excel**
87:15
**excellent**
28:24 110:22 143:24
**exception**
135:8
**exceptional**
161:17,20
**excess**
26:17
**exclusively**
203:12
**excuse**
138:20 197:14

**exemplar**
120:25
**exemplars**
61:15
**exercise**
150:16
151:15
**exhibit**
4:10,11,12, 13,14,15,16, 17,18,19,20, 21,22,23,24, 25 5:2,3,4, 5,6,7,8,9, 10,11,12,13, 14,15 8:5,8, 9,12,15 9:12,14 14:23,24 18:22,23 24:14,15 33:25 34:1 38:13,15 41:7,9 42:10 44:2,4 52:20,22 54:12,13 62:19,20 69:7,8 74:20,21 79:23,25 83:5,6 94:6, 8 95:14,15 98:19 99:21, 23 101:9 102:14,15 107:10,11 122:3,5 126:4 127:22,24 135:16 136:20,21 142:7,8 146:5 155:21,23 160:23,24 163:13,14 178:3,5,8 188:12,13, 18,20,22 189:4,5,9, 10,13 190:14,19,24 191:6 193:8, 11,14,15 194:12 208:18 210:13
**existed**
133:1
**existing**
57:24 100:18
**exists**
211:16
**exogenous**
105:6
**expanded**
164:18
**expansion**
31:8
**expect**
21:16 56:15 125:20 126:8 151:7
**expected**
43:17 177:21
**expensive**
42:7
**experience**
8:19 166:1 167:4 176:19
**experienced**
165:14
**experimental**
63:19
**experiments**
34:20 67:7 77:4,5
**expert**
21:20 61:3 86:25 90:17 98:11 116:18,22 119:19,20 147:14 165:19,23
**expertise**
86:9 87:9 88:5 92:20 94:4 106:6 117:11 118:7,19 124:3 149:13 164:8 165:25 169:4,7
**experts**
87:7 110:3 114:21,23 133:24 157:21
**explain**
54:17 74:5 147:11 148:13 179:3 185:3 192:25
**explained**
51:25 65:25 144:18 161:13 215:4
**explore**
72:10 188:7 195:9
**explored**
216:24
**explores**
152:2
**exploring**
137:22 152:17
**Exponent**
132:8,9,11 209:5 210:6
**exposed**
41:2,21 195:9
**exposure**
14:13 19:8, 21 20:4 24:4 40:18,24,25 41:3 42:2 43:24 66:25 67:15,20 71:23 77:7 117:9 118:1 121:10 127:25 137:12 151:22 181:7,20 183:22 187:20 188:5 195:13 203:13
**exposures**
20:8 50:3 70:15 148:25
**express**
100:18
**expressed**
84:17 91:20 92:3
**expresses**
91:9
**extend**
42:19
**extended**
126:11
**extensively**
192:24
**external**
70:10 107:20,24 108:2,7 112:8 114:21 117:21 118:4,5 119:23 121:13 139:2 169:24 183:17
**externally**
103:5 104:1 105:20,21 109:20
**extra-curricular**
167:19
**extrapolate**
184:17

**extrapolated**
184:23 185:2
**extrapolating**
150:5
**extrapolation**
82:24 117:10 149:7 150:4 184:14 186:17
**eye**
165:24

**F**

**facilitated**
134:17
**facility**
75:8
**facsimile**
188:23
**fact**
36:6 72:8 92:19 116:17 135:25 137:20 149:5 156:20 187:21 190:14,20 210:11
**factor**
67:18
**factors**
30:8,19 113:18 137:1,11,14, 19,25 186:24 187:19
**factual**
159:15
**fair**
63:6,8 65:5 67:3 75:3 79:14 81:23 90:4 112:7 125:5 189:11 190:11
**fairness**
38:1
**faith**
184:4 217:19
**fall**
85:14 104:3 112:21,22 196:21 214:24
**familiar**
14:19,21 35:3,5,20 36:2 37:21 51:19 66:10, 11,12 88:10 104:13,17 109:22 132:6 175:17,20
**far**
93:4 117:7 119:14 125:13 129:3 146:8 147:3, 23 210:14
**fate**
21:22 126:22
**fault**
197:23 198:11
**FDA**
185:13 193:8
**February**
62:21 63:4 97:13 147:21 167:9
**Federation**
60:17
**feedback**
170:3,15
**feel**
74:14
**fell**
112:20
**fellow**
164:19,23 168:13,23
**fellowship**
167:20
**fellowships**
164:6
**Ferraz**
46:6
**field**
166:23 167:12 170:19 172:10
**fifth**
84:21
**figure**
150:3
**figures**
148:11
**figuring**
151:16
**file**
94:8
**filed**
6:11
**filing**
98:1
**final**
103:8 104:7 115:5 138:9 143:11,17 157:10
**financial**
105:12
**financially**
6:19 104:9
**find**
37:5 57:9 150:17 161:2
**findings**
47:15 172:3 175:8
**fine**
62:5 111:3
**fingertips**
201:15
**finish**
15:14 61:17 89:22 125:9 126:5 149:16 154:11 215:12
**finished**
89:23 90:14 162:11 201:11
**finishing**
38:9
**Fiona**
75:10
**first**
8:18,25 10:24 14:25 15:20 17:13 19:3 21:13 23:5 37:14 39:10 42:22 45:8 47:25 49:15 52:7 53:16 59:14 61:6 77:11 103:18 122:7 124:16 128:5 144:25 146:17 147:5,19 148:4 156:5 169:13 178:12,23 179:1,2,3 189:15 193:23
**firsthand**
111:5
**five**
23:15 39:24 75:22 127:20 155:15
**fix**
16:7 185:17 210:3
**Floor**
3:7
**Flores**
142:12
**Florida**
6:12

**flow**
11:14
**flown**
200:16
**focus**
99:14 120:3 137:24 173:5
**focused**
163:23 165:2,4 196:25
**folder**
188:19
**follow**
69:4 70:13 71:7 74:9 119:3 150:13 219:7
**follow-up**
123:24 199:10
**followed**
71:14 118:16 140:25
**following**
37:8 47:10 49:5 53:17 69:13 104:6 113:13 115:14 120:16 152:20 156:13,15 157:1,3 197:3 203:13 217:25
**food**
23:15 37:22 72:25 78:13 97:14 133:8
**foot**
103:14
**footing**
103:8
**footnote**
208:25 209:4,19,22
**foots**
103:12
**foreman**
38:12
**forgot**
52:5 218:8
**forgotten**
101:16
**form**
27:2 32:12 34:21 38:19 47:5 162:8 179:16 180:12 185:16 203:21 204:24
**formal**
139:2
**formally**
62:8
**format**
23:9
**formation**
19:7 20:3 22:1,10,19 27:24 28:9 30:1,6,13 31:11,25 33:19 36:21 37:7 46:8 47:17 48:25 67:17 71:17 95:20 105:6
**formations**
183:11
**formed**
34:15,24 36:12 72:24, 25
**formulation**
91:23
**formulations**
59:11 158:3
**forth**
118:20 119:8
**forward**
23:5 119:24
**forwarded**
99:24
**forwarding**
44:5 56:6 62:22
**forwards**
50:9
**found**
20:25 21:1,3 49:8 87:20
**four**
85:25 86:13, 14,15 92:5,6 117:4 127:16 148:24 190:1,5
**fourth**
84:21 89:18 91:25 116:11 206:4
**FPS**
61:2
**framework**
23:5 107:21 184:10,13 207:4
**France**
207:19
**Francesco**
113:2
**frankly**
52:5
**free**
206:21
**frequent**
127:1
**front**
112:4 188:23
**full**
16:4 44:16, 17,25 55:5, 6,10 114:19 125:18,20 136:12 172:2 187:1,9
200:5 203:1 212:14,18 213:15
**fully**
69:1 96:22 209:9 217:24
**function**
11:25 53:5, 10 81:13 120:5 132:10
**fund**
100:14 134:21
**funded**
101:5,7 128:10 134:18
**funder**
133:25
**funding**
100:18 106:16 128:8 133:19,23 191:2,6,23 192:2 218:11,12
**funds**
133:17
**furthering**
130:10
**future**
76:4 96:2, 12,22 97:10 99:3 136:25 137:25

G

**gained**
140:3
**gaining**
164:13
**gambler**
218:25 219:2
**gastric**
64:2,8,9,17 179:14

180:2,7,10
**Gatehouse** 61:10 62:6, 7,9
**gave** 135:17
**gears** 178:2
**GEJ** 128:17,21
**gene** 12:17,21 122:16 164:9
**general** 90:20 165:14
**generated** 32:8 177:14, 24 178:22 203:10
**generating** 186:19
**genes** 31:7 32:5,17 113:19,20 187:22
**genetic** 9:9 11:18, 23,25 12:2, 5,11 25:22 39:15 54:11, 21 65:8,11, 14 69:16 85:14 86:10 87:12 94:2 95:6 98:14 103:19 107:5 114:23 117:18 118:22 120:5 124:3 132:5, 23 133:3,14 134:3,15 137:16 144:3 158:21 162:23 163:23 164:13,17 165:2 166:2, 4,24 167:1 168:15 171:6 172:6 173:10 174:16 190:7 198:23
**genetics** 163:20
**genotox** 22:3,12,20 39:22
**genotoxic** 14:15 36:19 39:23 40:6, 9,21 41:21, 24 42:3 49:12,25 57:20 66:21, 25 72:13,21 73:20 76:6, 17 77:2 95:4 105:15 106:8 111:11 122:13 164:3 184:11 185:5,8 187:3 198:24 207:5,10
**genotoxicity** 42:6 43:20 61:4 70:5 110:1,2,5,18 118:8 165:7, 10 175:3 183:4,12,20 216:7
**genuine** 73:17
**George** 104:14 105:9,11,21, 24 115:25 116:15 128:2,17 129:2,4,7, 10,12,16 135:9,16,24 136:22 138:3 139:4 142:9 193:6 215:25 218:9
**Georgia** 3:18
**Germany** 66:4 207:19
**get all** 139:5
**getting** 43:10 60:12, 23 61:1 73:8 74:14 91:12 144:11
**GI** 21:12,15 27:7,16,22, 24
**give** 7:21 10:19 44:17,19 73:7 88:13 91:17 92:22 102:13 143:17 167:6 203:24 204:3,7 212:14
**given** 44:11 50:19 58:5 76:15 82:15 83:23 100:17 136:5 151:11,12 172:10 176:5,8,11 199:24 200:3,8,22 201:12,25 203:18,21
**giving** 20:12 22:2, 12,20
**glad** 79:17
**Glaxo** 9:1,2,3 62:8,10 175:14 176:2 177:3,17
**Glaxosmithkline** 3:10 8:20,23 9:20 10:20 11:18,23 12:1 164:24 190:7 213:21,25
**Gliead** 145:2
**global** 9:8 11:17,22 50:15 52:25 53:4,9 56:22 57:2
**globally** 50:19
**gloves** 41:16
**GLP** 115:14 165:14
**God** 7:23
**goes** 19:7 21:9 26:18
**going** 8:14 11:3 26:23 27:2,6 35:2 44:17 52:7,14 55:20 71:5 76:12 78:5 96:12 100:9 102:4 107:12 112:9 113:1, 24 114:19 122:10 125:7 127:16 135:14 138:4 145:15 155:15 157:5 163:5 172:11,13 181:25 201:24

211:9,15 213:11 219:17
**Gollapudi** 132:12 209:3,18,23 210:6,9,16 212:10,15,21
**Gollapudi's** 213:12
**good** 33:4 60:13, 24 77:24 80:21 88:6 114:17 138:5 184:4 199:17 217:19 219:3
**Google's** 109:12
**gosh** 32:1
**Goswami** 99:5
**Gotcha** 119:13
**governance** 50:15,19
**government** 192:8,11,12
**graduated** 163:21
**gram** 91:7
**grams** 77:3
**gray** 31:1
**great** 23:4 66:8 184:8
**greater** 88:25
**group** 17:11,17 19:2 25:7 26:1 29:11, 13,18 45:22 46:1 51:16, 25 54:20 107:19,23 108:2,6 111:9 112:15 114:11 132:5 134:3,21 142:17 156:9 164:17 178:1 186:20 192:22 204:18
**groups** 45:23 204:20,21,23 205:2,9,10, 14
**growth** 20:12 26:23
**GSK** 7:4 16:9,20, 21 17:6,11 29:4 36:3 37:5,17,21 39:3 43:12 46:17,20,23 50:16,19 51:5 53:24 54:4,8 58:25 59:1,4,6,9, 18 68:7,11, 15,22 70:10 76:4 78:12, 16,18 94:4, 22 95:12 96:16 97:18, 21 98:9 99:6,18 101:5,7 103:8,10,11 104:7,22 105:12 106:18,21 107:2,7 108:21 109:8,21,24 112:14 115:6,10 116:1,12,15 117:15 118:9,10,12 119:21 120:3 126:20,23 129:2,7,15, 16,18,20,21, 23 130:1,3, 15,23,25 131:3 133:25 134:19 135:9,18 136:4,17,19 138:19 139:8,14,25 141:1,11 142:5 144:6 150:1 151:5, 7,18 152:1 153:7 155:8, 25 156:2 157:5 162:11,17 174:20 175:10 182:10 183:17,25 184:3 186:5, 8 189:23 190:24 191:23 192:1,4,7,12 194:2 195:4, 12 196:2,12 197:1 198:17,22 199:1,12 201:19 205:25 206:12,21 207:3 214:10 215:24 216:9,16,19, 21 217:4,19 218:2,6,7 219:6
**GSK's** 49:7 51:11, 19 58:15 59:8 77:19 156:21
**GSK-WIDE** 100:17
**GTA** 143:23 144:2
**GTC** 134:22
**GTTC** 105:14 132:23 134:11
**guess** 72:16 82:16 85:23 88:22 103:9 166:21 172:13 217:17
**guidance** 48:19 177:18 193:3
**guidances** 187:5
**guidelines** 151:13 152:18
**Guimaraes** 46:6
**GUO** 3:6
**gut** 176:10
**guys** 10:24 16:16 39:24 78:2 155:13

**H**

**H-E-S-I** 105:14
**H2** 64:12 179:6, 12
**H2-receptor** 64:2,7,10,16 179:18

180:1,6,9
**half**
9:19 82:3 125:7 184:17 205:7
**hand**
7:20 112:4 200:18 201:4 213:4
**handed**
71:13
**handle**
40:11 41:17 76:5,11,19, 23
**handled**
76:16
**handling**
38:16 39:5, 18,23 40:6, 15,21,25 41:14 43:25 75:6 76:16
**happen**
42:21
**happened**
23:18 37:25 54:6
**happening**
10:5
**happy**
136:24 137:9 143:10
**hard**
92:2 96:24
**hardening**
161:5
**Hardy**
3:7
**Harrison**
25:23,24
**Harvey**
25:3,6 26:2 34:3,12 44:21 54:16, 17,19 55:7 56:6 60:7,22 62:21 80:2, 6,20 83:8 95:17,19,22 96:1,8 97:11,24 98:21,22 99:24 101:2, 13 102:25 105:19 115:21,23 118:18 121:4 126:2 130:1, 12 136:16, 18,23 141:8 156:6,13 157:1 161:1 162:6 189:5, 9,18
**Harvey's**
25:4 157:14 189:25
**hate**
115:8
**Hatt**
38:22,23,24 42:13 43:1,3 76:1
**Hatt's**
43:10
**Haworth**
119:17
**hazard**
40:12 67:11
**hazardous**
42:5 43:23
**hazards**
67:7 76:15
**Hazel**
24:20 25:7, 19,23,25 33:12,18
**head**
25:6 38:24 45:25 46:3 50:12,14,18 54:19,20,23 58:24,25 59:4,5,7,17 119:18 156:8 164:14
**headed**
17:12
**heading**
53:15
**heads**
118:21
**heads-up**
125:11
**health**
13:16,22 14:16 22:25 35:3,21 36:7 52:1 58:15 105:13 113:1,2 132:25 133:17,25 134:8 210:21
**healthcare**
50:23,25 51:1,4,9,20 54:24 57:15 58:19 59:2, 6,8,9,16,18 66:23
**hear**
85:18 100:14 102:17
**heard**
185:10
**hearing**
7:15 124:13
**held**
6:13 66:9 218:23
**Hello**
16:1
**help**
7:23 20:16 44:22 133:23
**helpful**
47:18
**helps**
40:10
**hematoxylin**
204:13
**hepatotoxicit y**
63:20
**HESI**
114:22 134:10,17, 18,21 135:1, 3,4,11 142:13,17 143:2
**heterocyclic**
164:3
**Hey**
139:9
**hiccups**
102:22
**hide**
190:20
**high**
14:11 40:16 42:1 46:9 47:3,5 74:11 86:13 177:11 179:7 185:6 202:21 205:11
**high-level**
153:1
**high-potency**
49:21
**higher**
41:1 50:1 64:2,17 83:4 84:4 86:11, 17 87:21 122:25 146:3 149:3 153:4 154:3,15 179:14 180:2 185:7 205:9
**highlight**
129:24
**highlighted**
121:19 161:4

**highlighting** 148:16
**highly** 66:22 83:23 167:12 177:22
**histiopath** 204:5,9
**histopathological** 203:25
**historic** 175:13
**historical** 44:12 50:20
**historically** 56:15,21 57:6 58:9,16 59:10
**history** 9:18,19 10:19 215:15
**Hmm** 202:24
**Hobbiger** 44:20 45:24 50:9,14,18 160:25 161:2
**Hobbinger** 44:9
**Hoffman** 130:20
**Hoffmann** 130:15
**Hold** 61:17 89:22 148:10,20 149:16
**holds** 101:14 218:19
**home** 207:18
**honest** 170:15
**honesty** 211:20
**honorary** 164:22 167:5
**hope** 127:6 143:22
**hoping** 101:4 120:18 125:18
**hour** 52:4 77:23, 24 125:7
**Howe** 60:9 114:10 116:9
**HP** 207:22
**Huahai** 49:5
**human** 13:14,16,20, 24,25 14:2, 4,10 17:20 18:3 21:4,6, 17 47:18 58:7 65:15, 17,18,24 66:13,19,20, 25 119:6 150:5 183:21 217:1
**humans** 14:5,13,14 18:4 49:14 63:15,17 65:13 118:1 150:7 180:17 203:4,7,12
**humidity** 200:7
**hundred** 82:25 111:8, 13 150:6 160:5 184:19,23 218:22
**hunt** 172:20
**hydrochloride** 34:16,21 37:8 53:20 60:4
**hypothetical** 25:9 30:9,17 184:24

**I**

**i.e.** 28:18 39:23 59:12
**IARC** 13:23 14:16 63:14,16 65:15,20,25
**ICH** 48:19,22 49:17 50:2 107:21 118:1 150:12 151:13 152:5,18 161:13 177:18,21 187:5 188:8 193:2 195:13
**idea** 88:22 172:2
**ideas** 118:14
**identification** 67:12
**identified** 30:12 34:17 50:1 70:15 71:20 78:23 146:4 185:6
**ignorance** 21:2
**ignores** 186:18,22,24 187:1
**illustrated** 17:21
**image** 16:10
**image-based** 11:14
**imaging** 117:5
**immediate** 47:21
**immuno-surveillance** 188:2
**immutable** 96:16
**impact** 96:20 121:9 144:21 169:7
**impacted** 187:19
**Imperial** 164:5,11
**implemented** 143:18
**implications** 43:13
**implicit** 142:21
**importance** 46:9
**important** 91:11 92:24 186:14 196:11 217:4
**impossible** 95:23
**impression** 60:11,22 61:1
**impressions** 44:11
**improvements** 136:6 137:3
**impurities** 48:17 49:19 70:16 71:20 77:15,20 102:2,5 128:22 129:5

153:9 154:9 165:8 184:3, 11
**impurity** 48:25 49:6, 17 67:16,24 68:8,19,20 78:20 93:23 95:21 113:22 216:23 217:23
**in-camera** 169:24 170:11
**in-house** 117:11 118:19
**inappropriate** 14:5
**incidence** 184:16,19 205:5,8
**incidences** 205:18
**incidents** 82:25 83:1 177:14
**include** 40:17 53:21 67:8 73:21 98:10 111:19 129:15 139:25 164:18 187:6,8
**included** 18:10 61:10 105:15 114:22 145:11 157:17
**includes** 8:19 139:22 212:8
**including** 14:12 17:1 19:5 21:10 47:16 52:24 54:16 56:6 61:15,20 65:23 74:4 83:8 99:25 105:17 113:18 121:17 128:3 133:4,20 135:3 136:2 158:19 207:18 216:6
**Incorporated** 218:13,24
**incorrect** 31:5
**increase** 83:18 184:24
**increased** 31:7 177:25 179:21 184:25 205:1,13
**increases** 26:22
**indeed** 61:22 199:4 217:9
**indemnification** 131:18
**indemnify** 131:18
**independently** 105:12
**indicate** 47:3 90:8 181:6
**indicates** 83:10 96:24
**indicating** 110:11
**indication** 91:18
**indirect** 20:17 21:25 22:9,18 28:8
**indirectly** 98:1
**individual** 25:15 95:1 98:12 114:7 116:18 203:19 205:4,17
**individually** 135:22
**individuals** 83:8 99:4 128:2 144:6 158:19
**induce** 12:17 13:8 71:17 110:12 122:20 176:14 177:7
**induces** 13:11 14:11 122:23
**induction** 105:24 106:2 112:16,18 121:22 122:2 173:6
**industrial** 60:18 72:5, 17 133:20
**industries** 66:23
**industry** 48:15 49:2 66:22 166:4
**influence** 30:19 128:24 129:13,18 135:17
**influenced** 113:17 130:3 188:4
**inform** 62:3 99:3 121:10
**information** 8:14 23:7 40:10 45:22 46:8,11,15, 20,22,25 48:1 50:6 60:5 78:11, 13 81:2 84:12,14 88:10 91:12 98:2 128:8 134:11,12 139:25 140:3 172:5 182:15 191:7 193:3 196:13,15 200:1,6,11, 14 202:1 203:14,20 208:1 211:14 213:3,4 218:11,12
**informed** 113:5
**informs** 119:6
**Ingelheim** 3:20 207:19
**ingest** 21:8 201:20
**ingestion** 200:8
**ingredient** 60:3 90:1 199:23 200:16,22
**inhibitors** 179:19
**initial** 24:22 44:11 156:1 200:25
**initially** 116:3
**initials** 69:25 70:23 128:17
**initiate** 119:2

**initiated**
49:16
**initiating**
24:4 30:5
**injectable**
218:20
**input**
138:4
**inquiry**
16:22 17:6 45:16
**ins**
104:11
**insensitive**
122:7,13
**inside**
14:10 41:19
**instance**
36:18 49:16 103:18 138:3 210:24
**Institute**
105:14 132:25 133:18 134:1,8
**institution**
143:16
**institutional**
136:5 137:3
**institutions**
127:5 143:12,16
**instructs**
98:23
**insufficient**
31:6
**intake**
78:24 79:11 80:16 81:9, 12,15 82:10, 22 84:8 88:1 90:9 93:14 118:2 149:3, 21,25 150:24 184:7,14 185:13,18 186:2,9,13 187:3 195:14 197:7,11,18
**intakes**
215:17
**intellectual**
196:8,10
**intended**
71:16
**intention**
188:8
**intentional**
62:4
**interactions**
74:9 100:6 114:12
**interest**
128:20 129:13 130:6 133:2,12 135:15 137:10 142:18 151:10 187:12 192:9,14 196:13,19 215:14
**interested**
6:19 61:22 70:4,6 144:9 192:23
**interesting**
44:5 45:8 48:6 52:6
**interests**
137:15
**interfacing**
114:15
**intermediate**
205:10
**intermediates**
165:9
**internal**
117:21 139:18 141:18,23,25 142:5 194:21
**internally**
103:13,17
**International**
13:22 23:1 49:11 128:9 191:3,18 218:13,16,23
**Internet**
102:20
**interpreted**
175:24
**interrogate**
110:4
**interrupted**
10:13 62:3 79:17
**intervening**
164:18
**intimated**
143:1
**introduce**
162:19
**introduced**
48:20
**introduction**
37:23 48:15
**investigate**
71:25 74:2 78:19 101:3 105:24 106:1 122:2 123:20 124:4,18 192:8
**investigated**
74:4 183:4
**investigating**
114:18 123:3 150:8
**investigation**
174:22,23
**investigations**
70:10 164:2
**investigator**
114:7
**investigators**
214:11
**invited**
167:10
**invites**
133:21
**invoked**
115:4
**involve**
20:9 98:8
**involved**
33:18,20,22 47:17 49:7 85:15 104:10 112:11,13 115:19 118:24 119:1,11 120:9,13 121:2,3 127:1 129:4 136:1 164:9 182:2 186:19 196:2
**involvement**
14:22 111:5
**involves**
125:23
**IP**
139:24 196:7,19
**IPE**
139:1 196:6
**isolator**
75:8
**issue**
25:5 43:11 46:22 48:2, 11 98:17 99:9 100:17 101:20,22,23 102:20 108:3,8 120:10,13 184:5 198:12 215:10 216:23 218:5

**issues**
74:3 102:8 144:6 192:13
**item**
69:20
**items**
69:17
**IV/IVT**
17:11,17 19:2 38:25 46:1 75:9,14 76:1 103:21 117:16 119:25 156:9

**J**

**Jackie**
45:10
**James**
83:8 95:17 105:19 189:5
**January**
45:17 102:25 105:10
**Japan**
16:20,25 45:14 46:23 78:10 207:25 208:2
**Japanese**
45:11 46:15, 21 77:11 208:1
**Jeff**
18:24 19:1 23:4,13 24:16 25:7, 14,17,25 29:4
**jerk**
212:10
**Jim**
25:3,6,7 26:2 34:3 44:21 46:4 54:16,19 56:6 61:1,21 62:21 70:8 80:2,6,20 81:4,20 84:11 95:19 96:11,18,24 97:8,23 98:21 99:2 100:10 101:2,5,12 102:25 104:4,10 115:21,23 118:5,11,18 119:10 121:4 130:1,12 136:16,18,23 141:8 156:6 161:1 162:6
**jive**
172:15
**Jo**
44:21 45:9 156:6,7,8
**Joe**
46:2
**Joe's**
156:12
**Joel**
121:6 143:23 144:5,8,25
**John**
3:24 114:10, 25 116:9,23 132:19
**Johnson**
104:14,18 105:2,11,17, 22,24 106:12,14 108:12 116:1,11,15 117:2 127:2 128:2,12,17 129:4,7,10, 12,17 131:14,17 132:22 134:19,20 135:9,10,16 136:22 140:4 142:9 143:4, 21 187:13 188:11 192:18 193:7,10 194:8,15 196:24 208:14 216:1,5
**Johnson's**
106:5,6 126:6 129:2 218:9
**join**
8:25
**joined**
9:2 13:18
**joint**
62:15,18,23 178:10,24 179:10,25 181:13,24
**Jon**
60:8
**Jonathan**
60:9
**journal**
120:16 139:6 143:7,8 145:12 169:17,18,23 170:4,5,7,24 173:6 189:1, 2 210:8,19 211:10,13,21 212:2,17,22
**journals**
70:17 138:22 172:7 173:4
**judgment**
84:3 91:12
**Jules**
61:8
**Julia**
24:20 25:19, 20,21 33:12, 17 116:3 127:1 129:23 130:12 136:16,18,22 141:8
**July**
15:10 22:14 39:12 43:7 44:4 45:17 46:12,20 50:8 75:18 76:8 77:9
**jump**
218:9
**jumping**
115:8
**June**
128:5 154:25
**jurisdiction**
162:20
**jurisdictions**
207:20 208:7
**jury**
23:21 24:8 36:5 38:17 54:17 65:5 75:13 91:18 180:22 211:18
**jury's**
178:8

**K**

**Kay**
3:12
**KE**
30:25 31:3
**keep**
9:24 10:4 41:20 42:10 55:19 74:2 101:10 107:12 114:25 115:8

159:15
**Kenny**
25:20,21 116:3 127:1 129:23 130:12 136:16,18,22 141:8 189:20,21
**Kenny's**
190:1
**Kenyon**
131:9,11
**kept**
141:20
**key**
28:5 31:4,5, 6,7,17,20 32:12,15,18, 23 113:15 116:24
**Kierzkowska**
15:8
**kilogram**
91:7
**kind**
10:14 79:17 85:24 115:12 117:20 121:18 124:24 158:18 171:4 188:19 217:14
**King**
3:17 75:10
**Kingdom**
165:17 206:25 207:14
**Kirkland**
61:7,13 214:18
**knew**
57:16
**know**
6:6 10:6,22 13:21 21:22 24:11 28:12 30:8,16 35:15 37:25 41:1 43:11 48:22 51:15, 23,24 56:9, 24 57:14,22 58:1 59:15 60:2 64:25 65:8 66:1 67:22 70:22 71:11,15 72:11,18 73:9 74:10 75:1 77:5, 17,22 83:3, 20 84:9 85:11,12,17 86:23,24 87:7,11,25 88:21 89:4,8 90:18 91:11, 22,23 92:16, 22,24 96:13, 15,18 97:3, 7,17 98:8,13 99:7 100:7, 21,23,25 102:3,20 103:16,23 104:11 108:4,9 115:20 117:10,16 118:22 120:1,3,5,7, 8 125:24 127:3,10 131:17,21 132:2,10 135:22 136:14 137:22 138:23 140:10 141:14 142:1,21,22 146:12 151:6,7 155:10 159:16,19 160:2,22 162:16,17,22 170:12 183:23 184:1,7 188:6 191:8, 20,22 198:22 200:15,21 201:1,5,11 204:8 207:1 208:8,13 210:15,20 211:3,14 213:3,14 215:15 217:6,20 218:19
**know's**
30:24
**knowing**
217:6
**knowledge**
17:2 36:9 49:15 51:2,8 66:16 95:4 118:16 157:9 192:19,21 194:4,5,16, 18 195:6,8, 16,19 208:6 215:7,25
**known**
13:19 21:4 56:15,16,21 57:6,19 58:9 59:23 65:24 66:14,20 67:2 122:19 132:8,15,18 144:19 173:25 175:3
**Krista**
131:5,8,11

**L**

**La**
130:15,20 134:20 135:10
**lab**
76:2 106:6
**labeled**
42:5
**labels**
40:9 42:6
**laboratories**
121:1
**laboratory**
41:25 106:5 114:18 126:10
**lack**
177:6
**Landerman**
6:21
**language**
53:18 193:4
**large**
30:8 43:25 52:23 58:5 67:6 77:1 94:25
**larger**
75:16
**late**
66:18 70:25 166:21
**latest**
56:12 172:3, 10
**Laura**
6:21
**Lawson**
25:23,24
**lawsuit**
131:10
**lawyer**
8:6 99:5

**lbosso@kslaw.com**
3:19
**lead**
29:22 32:5, 24 33:6 139:4 187:22
**leading**
19:8 20:4 22:1,10,19 25:11 28:9 67:17 129:5 152:14 186:18 198:23
**leads**
30:18,24 184:16
**leaflet**
81:5
**learn**
163:17
**learned**
68:7 191:10
**leave**
76:21 146:16 161:4 207:8
**lectures**
167:15
**led**
14:17 164:17 165:5 218:2
**left**
10:3 26:13, 15 42:11 62:9 76:21 89:23 101:10 116:4 128:14,17 129:24 213:17 218:1,11
**left-hand**
9:22 26:9
**legal**
6:16,22 96:3 97:2,6 98:4, 12 107:7,9 108:21 126:16,21 127:8 138:25 139:23 141:11 156:14,21 157:2,4,11, 13,25 196:3, 5
**legitimate**
71:21 73:4, 25 74:6,17 130:6
**length**
184:8
**less-than-lifetime**
121:10
**letters**
151:5 171:22 172:12,16
**level**
50:2 78:17 79:5 80:15 81:15 83:11 84:25 85:2 86:2,5,9 87:21 88:7 89:3 91:8 92:12 93:25 96:17 137:13 143:9 151:3 152:19 153:10 161:21 170:19 177:25 181:21 187:19,20 201:19 203:17
**levels**
32:8 36:16 41:1 42:1 50:3 59:24 67:23 68:20 70:15 80:12 83:9 84:10 85:12 87:10 88:2 90:7 92:25 93:23 95:2 96:14, 24 97:4 102:10 113:22 147:16,18 149:12 150:17 151:11,14 153:4 154:7 158:2 176:10 185:8 202:21 217:22
**Lhasa**
109:19 110:3,7,11 111:7,15,17, 23 112:1,5 115:9 125:21,25 215:9,15
**liability**
6:10 111:11 131:19
**Liangfu**
15:1 17:15, 16,18 18:19
**lieu**
7:12
**lifespan**
203:2,9
**lifetime**
80:16 81:9, 16 82:10 121:5 161:10,12 162:3,11 176:7,15 203:8,13
**lift**
94:20
**limit**
43:24 49:19 78:21 81:23 82:4,7,11, 18,22 83:1, 14,15,16,17 84:2,6,7 85:7,9,25 86:18 87:16, 18,22 88:17 89:1 90:5, 15,22 91:4, 19,20 92:1, 8,14 93:5, 11,21 145:21 146:3,4,9 147:4,24 149:8 176:15
**limitation**
95:16
**limitations**
123:7
**limited**
63:17
**limits**
83:20 102:10 128:1 149:21 150:1 152:1 184:11 186:5,22 198:13,14 207:5,9
**line**
69:19 100:5, 25 103:8 137:1 140:11,14 148:15,22 149:2 206:7
**linear**
150:3 184:14 186:17
**lines**
100:10 101:3 120:3 148:24
**link**
32:18 119:25
**linked**
23:9,25 102:2 105:7 109:24 119:9 142:16

144:17 173:9 193:2
**Linkedin** 8:15,16
**linking** 30:4
**links** 143:24
**list** 47:9 94:25 95:3 134:9 142:24 172:19 185:4 212:14,19 213:15
**listed** 29:25 119:24 134:6 135:13 190:8
**Listen** 204:25
**listing** 119:22
**lists** 61:13 118:4
**literally** 205:7
**literature** 23:8 24:24 30:13,15 33:17,18 57:21,24 58:14 70:17 112:2 121:8 144:15 179:17
**litigation** 6:11 130:22 131:3 132:7 138:13 191:9,11,18 192:20 194:4,17 195:7,17 214:23 215:1,6,19, 23 216:10
**little** 10:15 22:7, 16 38:2 44:19 45:7 73:7 114:5 167:6 172:18 178:2 211:8
**live** 203:2,4,7
**liver** 21:1,3,5,6, 10,14,17 27:7,16,21, 24 28:13,14, 15,17,18,21 29:6 30:24 31:16 32:22
**living** 123:11
**LLC** 3:10,16
**LLP** 3:3,7,12,17 6:13
**loading** 75:23
**lobbying** 196:24 197:2
**locate** 36:25
**located** 6:13,16 31:15
**location** 28:18 200:16
**lodge** 139:10
**London** 6:14
**long** 8:22 37:4,13 57:22,24 78:2 81:2 117:11 149:19 197:15 201:11
205:6,19
**long-term** 58:13 63:19
**longer** 8:21 96:19 113:6 125:14 136:24 206:21 219:3
**Looi** 62:24
**look** 10:12 12:5 16:8 23:5 26:15 36:12, 15 37:12,16 41:8 43:9 44:25 46:24 61:25 67:14 69:8 90:11 98:1,20 99:16,19 102:15,24 112:16 121:22 122:11 129:24 141:17 144:20 145:9 148:4 151:10,16 156:5 157:24 168:22 172:9 181:11 183:1 187:23 189:13,25 190:4,8,18 201:16 205:17,21 206:2 210:11 214:1
**looked** 111:7 120:19,23 182:22,23 205:6,19 207:3
**looking** 11:13,14,15 12:12,15 25:4 32:1 65:21 76:19 84:21 99:23 106:7 110:1, 16 111:9 120:13 121:4,8 122:19 123:5 139:23 144:15 150:16 164:8 167:16 178:18 181:12 182:7 183:7 187:13 201:21 209:4 214:15
**looks** 80:8,21 101:5 112:1 138:3 171:10
**Loqs** 47:10
**loss** 12:19,23
**lot** 68:18 143:25 172:20 183:23 185:10 214:13 217:21
**Lots** 42:21
**low** 26:17 35:15 47:4 68:20 100:11 108:24 113:14 114:19 181:20 205:10
**low-dose** 70:14 74:10 101:4 105:25 106:7 112:17

113:21 124:18 195:9
**low-level** 117:25
**lower** 15:5 50:3
**LTL** 161:10,15,16 162:3
**Luhana** 7:3
**Luke** 3:17 139:9
**lunch** 77:23,25 89:14
**Lynch** 4:2 6:9 7:17 8:4,9 11:9 13:18 52:3 60:9 61:23 94:7 95:7 116:6 127:7, 24 130:13 139:15 140:6 154:14 155:23 162:14,24 166:9,25 178:4,23 188:13,20 193:17 199:10 213:5 219:11,15

**M**

**M7** 48:19,22 49:18 50:2 107:21 118:1 150:12 151:13 152:5,18 161:13 187:5 188:8 193:2 195:13
**macromolecules** 32:3
**made** 38:4 67:21 83:23 107:23 108:1 113:6 129:21 142:25 158:8 159:19,20 160:16 168:8 175:10 177:13 199:19 217:5,19
**maintain** 8:15 96:25
**maintained** 141:17
**Majesty** 165:21
**major** 43:12 137:1 138:11
**make** 10:7 55:22 77:3 79:7 88:6 90:5 91:12 96:13 98:14 136:5 142:19,22 172:13 175:12 185:11 191:8 197:21 211:8
**makes** 108:6
**making** 138:6
**mammalian** 13:7,10 108:25 166:19 183:7
**man** 38:5,7 128:17
**manage** 211:22
**management** 16:20 115:19 119:11 127:4 135:4 138:24 143:2 165:15
**manager** 69:19 100:5 140:6,12,14 142:16 156:11 164:15
**managers** 138:24 139:20
**manages** 113:3 115:6
**managing** 119:1 210:16
**mandated** 151:5
**manufacture** 201:2
**manufactured** 54:8 182:9 191:20 199:24 208:10
**manufacturer** 59:25 60:2 88:22 145:25
**manufacturers** 93:24 192:5
**manufactures** 71:11
**manuscript** 128:25 129:14,17, 19,22 130:4, 6 131:16 132:4 135:17,18,23 136:11,13 139:20,21 140:16 141:12 169:16,22,24 170:2 171:2 172:2 210:16
**manuscripts** 169:13 170:10,20, 22,25 171:9, 11
**map** 24:21
**mapped** 26:3,8
**March** 69:9 70:25
**Marchetti** 113:2
**Margarida** 46:6
**margin** 16:9
**Maria** 54:15 56:4, 20 59:19
**mark** 8:4 69:14,15 71:13 98:23 100:16
**marked** 4:10 8:5,12 9:12 14:23 18:22 24:14 33:25 38:13 41:7 44:2 52:20 54:12 62:19 69:7 74:20 79:23 83:5 94:6 95:14 98:19 99:21 101:9 102:14 107:10 122:3,4 127:22 136:20 142:7 155:21 160:23 178:4
**market** 6:17 37:24

68:9,12,25 94:23 95:13 96:9 97:1, 12,18 162:18,20 165:11 196:14 206:8,13,20 214:9 216:20,22 219:6
**marketed** 130:18
**marketing** 38:4 56:18 94:19 95:8 175:7 207:23
**Marta** 15:8
**Massachusetts** 3:13
**master** 167:17
**matching** 24:3
**material** 40:10 42:1 59:25 60:2 71:25 72:12 73:18 77:3 90:18
**materials** 40:17 41:17 43:25 59:23 67:6 72:23 76:19 201:9
**math** 81:20 82:17 86:14 87:20 89:1 90:6,13 154:21
**mathematical** 133:6
**matter** 6:10 61:2 82:17 87:9 94:3 124:3 157:21
**MATTHEW** 3:12
**matthew. scarvie@ arnoldporter. com** 3:14
**max** 87:25
**maximized** 10:8
**maximum** 85:8 86:16 87:16,18,21 88:16 90:14, 15 92:12
**Mcgregor** 118:5,11,17 195:23
**Mcmahan** 101:12 140:14,15,19
**MDEA** 195:13
**mean** 15:12 30:17 31:3 39:8 51:15 57:8 62:17 65:5 69:25 79:8,9 85:11 87:25 90:25 92:6 93:13 96:13 98:7 101:13, 21 103:6 110:22 118:21 119:25 126:19 128:9 131:15 134:9 137:6 141:22 143:19 170:11,12 177:8 181:4 184:16 185:3 188:24 190:5 198:21 204:12,24 206:10 212:10
**means** 13:25 32:24 103:9 148:24 217:23
**meant** 55:17 89:15 106:22 109:10
**measure** 112:18 197:18
**measured** 43:15 170:9
**measuring** 91:11
**mechanism** 19:6,14 20:1,9,18 22:10,18 28:8,11 32:14 108:14 122:14
**mechanisms** 30:12 32:11 74:4 122:20
**mechanistic** 20:8 108:13 126:7 181:6 194:7 209:5
**media** 6:2 11:2,6 52:13,18 78:4 127:15, 20 155:14,18 163:4 219:16
**medical** 14:3 50:15, 16,19 164:1, 5 179:20 192:9,13
**medicinal** 68:4 146:23 147:1 182:14
**medicine** 167:9 168:4 184:12
**medicines** 14:20 45:19 46:7,19 48:2 49:3,4 50:6 51:3,6,9,12 60:19,24
**meet** 79:4 149:9
**meeting** 43:8 45:11 75:10
**meetings** 33:11,17 127:2 133:24
**Mehlin** 54:15 56:5, 20
**member** 17:10 46:1 49:20 51:16 58:19 75:16 97:21 105:16 108:21 117:15 126:16 134:21 141:11 164:12 165:16,20,23 168:9,20 210:21
**members** 98:3 132:23 134:5,6,10 180:22 185:7
**mention** 167:19
**mentioned** 60:6 76:14 99:8 109:19 110:7 114:22 115:16 144:5 169:20 173:22 188:10

195:25 196:5
**merged**
9:4
**merger**
62:9,10,12
**merit**
170:8 172:2
**merits**
168:13
**met**
24:20
**metabolic**
20:19 28:6
**metabolism**
17:16 21:13 28:22 72:11 108:16 113:18 187:20 216:3
**metabolite**
27:23
**Metagenesis**
145:14 210:18 211:3
**method**
133:7 149:7
**methodology**
86:23
**methods**
11:14,15 89:9 188:7 215:18
**methyl**
29:11,13,18
**methyl-guanine**
29:20
**methylation**
25:11 29:7, 10 30:25
**methyldiazonlum**
27:24
**Mexico**
208:9,11
**mg**
80:14 185:23
186:1 197:22 198:2,6,8
**mice**
14:12 21:7 111:22 176:4,14 201:22 203:13 204:22
**Michele**
131:9,11
**microgram**
90:24
**micrograms**
79:1,2,4,20, 21 80:14,15, 17 84:17 85:1,9,25 86:11,17,18 87:19 88:16 89:17,24 90:21,22 148:7,17 151:22 152:9,24 153:14,17, 19,23
**micronucleus**
11:13 122:15 123:5 124:7, 8,23
**micronucleus/kinetochore**
166:16
**microphones**
6:6
**Microsoft**
80:4 87:15
**middle**
49:3 159:2 160:24
**Mikal**
7:2 8:6 10:14 125:6 139:9 210:3
**milligram**
81:25
**millimolar**
35:10
**million**
80:13 81:22, 24 82:3,17, 18,25 83:10, 11,13,21 85:2 90:23 91:1,5,6,9, 17,21 92:1, 3,6,7,13,23 93:6,16 101:15,19 146:2,3,9 147:4,24 150:7 184:20,24 185:2,23 186:3 197:19,22 198:2,5,8
**mind**
68:11 79:15
**mine**
87:11
**minimize**
42:2 66:24 77:6
**minimizes**
40:18
**minimum**
85:7 90:14 172:21
**Minocherhomji**
132:16
**minute**
102:13 107:12 146:15 163:3 219:15
**minutes**
52:11 127:13 155:13
**misread**
22:6
**mission**
134:25
**misspoke**
197:8
**misstates**
202:19
**mitigated**
56:18
**model**
124:4 164:10
**modeling**
11:15 19:21 104:22 105:4,8 106:10,11 108:13 116:12,16, 19,22,24 117:9,12 126:7 130:7 133:3,4,7, 12,13 134:16 142:18 150:17 152:4,12,21 153:3,21 187:9 192:23 193:24 194:3,7 195:12,13,21 215:18
**models**
112:17 133:6
**molecular**
24:4 30:4 143:5 145:13 189:1 209:13,17 210:18 212:1,23
**molecule**
29:12,14 130:24
**moment**
10:1 126:13 127:11 212:25 213:14 214:21

**money**
103:6 105:20 106:4,22,23 109:2
**monitor**
114:11,14,15 115:1,10,12 116:1,7
**monitoring**
127:4
**monkeys**
63:21
**month**
116:13
**months**
8:19 109:15 112:10 117:11 118:6,19 155:3,7
**mouse**
18:17 98:16 113:3
**mouth**
21:9
**move**
15:25 182:17 184:6 208:14
**moving**
160:10
**multifactorial**
187:24
**multiple**
49:12
**multiplication**
89:11
**multiply**
88:12
**museum**
66:8
**mutagen**
20:22 22:2,11,19 28:4,9 124:14 165:18,19
**mutagenesis**
12:22 29:17 33:21,23 68:21 71:8,23 74:5 122:23 123:1,21 124:5 143:6 173:1,3,4,10,23 174:3,17 187:14 189:1 209:14,17 210:18 212:1,23
**mutagenic**
13:5 29:21 48:17,25 49:18,21 63:12 66:14 173:7 194:22
**mutagenicity**
67:9 69:2 70:12 74:16 119:4 144:17,22 165:20,22 207:5 214:2 216:25
**mutagenicity/carcinogenicity**
118:9,20
**mutagenist**
123:18
**mutagens**
20:17 21:25 22:9,18 28:8
**Mutamouse**
113:5 115:14 121:24 122:1,6,12 123:2,7,16,19,24 124:4,14,22 125:1
**mutation**
12:21 13:6,8 20:24 22:3,4,12,13,20,21 24:5 29:22 31:6 32:5,12,14,16,19 70:14 101:4 103:17 105:24 106:1,7 108:15,24 112:18 113:4,15,17 118:10,25 121:22 122:2,16 123:25 124:18 153:17 164:9 173:6 187:18 188:1 193:4 194:21 216:1,12
**mutations**
12:18 112:16 113:19 187:21

**N**

**N-NITROSAMINE**
100:19,21,24
**N-NITROSAMINES**
56:7 107:21 110:12 128:1 161:17
**N-NITROSO**
49:17
**N-NITROSODIMETHYLAMINE**
34:15
**N-NITROSONITROLIC**
183:14
**Nakata**
17:6
**name**
6:15 8:3,4 14:25 129:24 132:9 140:7 141:1,13 143:7 189:25 190:1,10 209:1,2 210:19,20 211:1 213:12
**name's**
114:9
**named**
141:21
**names**
132:21 172:20
**Nano2**
47:5
**nanogram**
186:8 197:18
**nanograms**
78:24,25 79:13,20 81:15,25 82:7 88:1 91:21 92:4,9,17 93:14 95:16,22 96:15 102:11 145:21 147:25 149:4,10,22 150:2,25 152:2 153:6,11,24 154:15 185:14,19,20,22 197:13
**NAP**
35:4,5,17,21 36:8
**narrative**
93:9,12
**NASA**
58:2
**Natal**
183:15

**nation**
208:11
**nations**
206:22
**naturally**
72:24 179:14 196:20
**nature**
103:15 126:22 136:15 143:19 182:14 186:15 197:4 216:23
**navigate**
173:19
**Nazi**
66:12
**NDA**
214:2
**NDEA**
117:9 121:7
**NDMA**
13:3,5,6,11, 13,19,21,24 14:4,6,10, 11,13,18 17:2,7,22 20:8 21:18 23:16,25 24:10,11,12, 17,21 26:4, 16 27:2,6, 15,21 28:11, 13,16 29:5 30:14,23 31:15 32:22 33:19 34:22, 24 35:22 36:11,21 37:7 39:19, 20 40:22 41:19,24 42:4 43:19 45:3 46:8 47:6,17 48:8 49:8,10 53:21,25 54:5,9 58:9, 12 63:11,14 64:6,22 65:10,12,15 67:15,16,17 68:20,25 69:5,20,22 70:1,4,5,7, 12 71:2,4,8, 9,12,14,16, 18,22,23 72:3,8,10, 12,17,21 73:5,12,17 74:1,6,7,8, 16,18,19 76:23 78:17, 20,21,24 79:3,5 80:12,14,15, 16 81:9,13 82:24 83:9 84:10 86:3 87:19,21 88:7 91:8 93:4,10,23 95:4,20 97:4 101:22 104:21 105:4,6 108:15,24 111:20,21,25 112:5,16 113:7 117:9, 25 118:2,25 119:23 120:10,12 121:5,22 122:23 123:9,13,17 124:14 145:21 146:4,8 147:3,23 148:1,7,16 149:4,10,22 150:3 151:1, 4,22 152:2, 9,23 153:6, 9,11,14,16, 19 154:16 155:25 158:2 174:20 178:19 180:16 181:20 182:3 183:10 184:3,22 185:18 194:21 195:10,13,14 196:21 197:17 201:19,25 202:1,18 214:8,11,14, 19,22 215:8, 10,11,17 216:1,2,4, 12,25 217:22 218:3,4,5
**NDMA's**
14:14 72:24
**NDMA-INDUCED**
19:9 20:4 33:21 108:24
**NE**
3:18
**neat**
38:16,17 39:6,23 40:6 75:6
**necessarily**
32:7 57:8 65:10 97:7 115:11
**necessary**
28:3,19 47:25
**need**
9:23 10:4 19:5,13,25 20:16 29:13, 17 40:7,15 42:14,20 43:21,25 47:20 59:5 60:10 72:23 73:17 75:4 76:15 77:20 80:22 81:7, 17 82:13 104:19 143:11,17 149:19 155:12 156:18 161:19 207:6 211:20
**needed**
43:18 77:18, 21
**needing**
42:22
**needs**
162:8 173:21
**negative**
36:20 68:5 123:22 183:12,19 203:12 214:17
**negligible**
158:4,10,25 159:3,7,11, 13,17,23 160:7,18
**negotiations**
112:13
**neutral**
113:19
**never**
14:21 58:4 72:14 105:10 195:23
**nice**
208:23
**Nick**
101:12 140:14,15,19
**Nicolette**
132:19

**nip**
43:8
**nitrate**
18:11 176:10 202:21
**nitrates**
18:11
**nitrite**
26:17 34:16, 21 35:10 36:16 37:9
**nitro**
176:10
**nitroreductase**
20:11 27:1
**nitrosamine**
19:6 20:2 21:25 23:8 27:2 38:17 39:19 43:11, 18 56:12,14, 16,21 57:6 58:9 59:19 60:11 61:15 67:19 71:18 75:6 77:21 97:21 99:14, 17 100:11 101:3,14,20, 22 107:14,15 108:3,8 187:21
**nitrosamine's**
76:13
**nitrosamine-related**
40:1
**nitrosamine-type**
57:25
**nitrosamines**
20:17,19 22:9,17,24 28:7 38:16 39:6,19,20 40:8,22 42:4 43:22 57:12, 14,17,19,23 58:3,16,21 59:10,23 61:4 63:21 73:21 75:10 76:3,11,23 77:2,16,18 96:19 99:9, 20 101:23 102:2,9 110:3,13,17, 25 111:8,14, 19 113:22 117:7 120:14,21,25 123:23 129:6 130:11 144:19,23 212:7
**nitrosate**
28:3
**nitrosation**
17:20 18:3, 7,9,16 20:10 26:25 35:9 36:16 176:8 183:2,5,21 202:8
**nitroso**
61:9
**nitrosodimethylamine**
13:4
**non-temperature-controlled**
200:23 201:3
**nonapplicable**
117:21
**nonclinical**
19:2 54:20 98:11 103:20 117:9 157:18,20 178:17
**nonhumidity-controlled**
201:13
**nonphysiological**
35:10
**nonresponsive**
36:23 73:6 84:1 135:6 150:9,21 151:17 152:6,8,22 153:12 158:23
**nonrodent**
49:13
**nontemperature-controlled**
201:13
**Noriko**
15:7,13 16:19
**noted**
132:3
**notes**
24:22 61:25
**noteworthy**
128:1
**notice**
8:8
**noticed**
172:24 209:8
**notification**
23:16
**novel**
24:3 171:3
**November**
24:17,18 26:5 29:4 30:22 33:10 34:4
**NPSB**
56:6,8
**nucleophile**
22:2,11,20
**number**
13:24 14:17 27:17 30:8, 19 32:10 43:18 47:12, 19 52:23 54:15 56:5 63:12 65:22 70:4 71:20 83:7,18,23 87:7 89:7,11 91:2 94:25 98:8 104:18 105:16 106:9 110:20 111:16 113:17 114:21,22 120:25 124:13 128:2 133:4,20 134:16 135:2 145:10 150:4,15 151:7 153:8 154:14 157:17 158:19 159:15 160:4,5 165:4 168:7 173:12 183:3,16 186:15,23 190:1,5,9 192:23 195:19 205:6 209:2 212:12 216:5
**numbers**
82:14 85:16 86:20 87:1 90:4 92:3 94:5 145:24 146:2 150:13 151:8,11,16 160:2 185:10 186:23 197:9 201:17
**Nuremberg**
66:3,7,9,10, 11,17

**NW**
3:13

**O**

**O'TUEL**
3:24
**O6**
29:19
**oath**
4:6 7:11
**object**
69:11 73:14 151:2 185:16
**objection**
22:6,15 32:6 36:23 42:25 51:14,22 53:2 58:11 64:20,25 65:1 66:5,15 68:14 72:20 73:6 82:20 84:1 85:10 86:19 87:23 88:18 89:2 92:15 98:6 99:12 104:24 126:17 131:22 135:6,20 136:8 138:17 139:10,17 145:22 149:11,24 150:9,21 151:17,19,25 152:6,8,22 153:12 154:18 156:24 157:7 158:5,15,23 159:25 160:21 179:16,23 180:4,12 202:10,19 203:6 204:11,24 205:15 208:12 209:24 211:11,19 212:24 213:13 215:12,21 217:13
**objections**
7:15
**objects**
41:12 69:18
**observation**
64:8
**observed**
63:20 64:3 122:25
**observers**
48:15
**obtain**
72:12 168:2
**obtained**
37:18 164:6
**obtaining**
71:24 163:25
**obviously**
41:25 76:17 87:24
**occasions**
24:21
**occupation**
75:24
**occur**
102:8 113:19 167:25
**occurrence**
192:10
**occurs**
111:16
**October**
18:25 19:24 22:5,22 23:18 79:25 80:7
**OECG**
165:24
**official**
190:16 192:17
**okay**
8:18,22,25 9:8 10:16 11:20,22 12:20 14:8 15:22,25 16:11,13,15, 18 18:13 19:11 24:15 27:20 28:17, 24 29:13 30:21 32:4, 9,15 33:15 34:10 35:20, 24 36:2,5 37:13 38:9, 20 39:4 40:1 41:8,12 43:6 45:1,7 51:5, 11 52:9 53:6,13 54:13,22 55:10,23,24, 25 56:4 60:6 62:13 63:8 65:5 67:3 69:8 70:1 72:5 73:10, 19 74:21 75:3,25 78:25 79:19 80:5 81:7,12 82:2 83:6 88:15,24 90:4,25 91:14 92:5, 21 93:1 94:14 101:16,18 102:24 104:13 105:3,18 107:11 108:5,10 114:2 115:8, 22 116:6,10 117:8,20 118:18 121:15 123:15 124:6 125:5,20 126:14 127:12 128:16 142:8,19 144:25 145:7 148:3 149:14,25 154:14,22 174:21 178:2 181:23 182:16 185:10 195:24 197:5,24 201:5 206:2 208:14 213:16 215:23
**okayed**
143:10
**Oliver**
44:21 45:9 156:6,8
**Oliver's**
156:7
**once**
52:4 68:10 216:22
**one**
6:2 11:2,3,6 12:6 17:1 20:16 24:18 26:13 27:14, 15 30:17 31:5 38:21 39:20 40:23 41:8,13 42:10 43:12 52:14,18 65:23 69:18 70:6 77:15 78:5 81:10 82:24,25

83:21 84:22 87:24,25 90:6,12,13 95:10 101:1 102:13 109:5 110:8 113:4 114:9 116:11 117:17 121:17 124:13 125:8 127:16,20 129:2 132:24 134:20 138:3,11 139:22 140:25 143:16 144:5 150:6,7,22 155:15,19 159:3 160:5, 13 163:5 167:25 168:3,5 171:10 172:23 173:4,14 184:19,23,24 185:2 186:16 187:11 193:24,25 194:20,24 195:1,21 209:20 212:11 218:8 219:17

**one-month** 121:21

**ones** 111:1

**ongoing** 47:2 102:7 109:16 121:20 195:25

**open** 135:1 150:20 170:15 189:1

**openly** 137:22

**operations** 51:17

**opinion** 56:12 173:17 177:2,16

**opportunity** 55:4 136:5

**optimistic** 55:19

**oral** 56:23 57:3

**order** 20:21 28:3 29:14 37:1 69:1,10,13, 17 70:3 71:22,25 72:23 108:23 139:5 168:3 199:10

**ordered** 70:2 71:2

**organization** 13:17,22 14:16 22:25 35:4 98:9,18 101:7 173:22 174:9 218:2

**Organization's** 35:21 36:7

**orient** 188:13

**orientate** 82:13

**original** 137:21 171:3 199:25 200:10,19 201:9,16 203:23 204:6

**originally** 159:24

**OTC** 50:22

**Ottawa** 112:8,15,25 116:25 210:23

**outcome** 6:20 18:21 19:12,13 20:1,7 23:9 24:2,5,22 25:10 26:4 29:3,25 30:3,21 31:11 33:13, 15 34:2 77:17 125:23 181:8

**outcomes** 36:21 61:14 110:5

**outline** 100:9

**outlined** 187:5 188:8

**outlining** 132:20

**outs** 104:12

**outside** 52:1 57:18 59:16 85:13 92:20 117:18 126:25 133:15 208:7 217:15

**outstanding** 168:14

**over-the-counter** 44:14 50:25 51:1,3,9,21 130:23

**overhead** 109:7

**oversight** 127:4

**overview** 98:12 171:5

173:18

**oxygen** 31:22,24 32:1,2,8,13, 16

## P

**p.m.** 52:15,19 78:5,8 127:17,21 155:16,20 163:5,8 219:18,19

**P.S.** 143:22

**P450** 20:17,18,20, 25 21:3,25 22:10,18 27:24 28:2, 8,13,14,19, 22,25 29:5 30:23 31:15 32:22

**page** 8:18 9:17,19 10:12,18 14:25 15:5, 20 16:2,3, 13,14,15,16, 18,24 17:5, 13 18:14 19:3 25:9 26:10,15 34:11 39:10, 17 44:9 45:8 46:5 48:7 50:5,10 54:14 55:14, 17,23,24 56:4,25 58:22 60:7,8 61:6 63:1, 10,24 67:14 68:1 75:3 80:9,10

84:15 90:11 94:14 95:18 96:1 99:23 108:10 119:16 126:5 128:14,15 146:6,17 148:4 153:13 156:6 157:23 158:11,13, 14,24 159:2, 10 160:25 161:2,9 166:7 168:22 171:8,9,10, 19 172:14,24 178:12,21 181:10,24 188:23 189:2 190:5,24 193:16 206:4 213:18

**pages**
16:4 39:10 55:21 56:3 134:12

**paid**
104:22

**pancreas**
179:8,22

**pancreatic**
64:3,8,18 179:15 180:3,7,10

**pandemic**
126:10

**panel**
10:8 119:20

**paper**
44:5,6 45:3, 9 48:5,6,8, 14 56:7 83:21 104:20,21 106:11 110:10 111:7 112:4 120:15,18 121:3,5 129:9 132:21 135:3,8,15 136:1,7,24 137:18 138:1,6,10, 13,14,25 139:5,15 140:4 143:2 144:9,23 145:6,9 148:13 149:17 150:8 151:14,21 152:2,7,23 153:1,2,22 154:15 157:5 160:19 169:17 171:4 183:15 187:12 188:9,11,14, 21,22,25 189:2 191:2 192:18,25 193:6 208:14 209:12 211:4,5,7, 16,24 212:4, 16,19,22 213:2,11,15 218:10

**papers**
104:18 106:9 110:20 111:17 133:5 135:3 136:14 139:24 165:4 168:14 170:15,24 171:2

**PAR**
94:11

**paradigm**
83:2

**paragraph**
37:4 39:21 179:1,2,3 180:21,23 181:11,12

**paramount**
198:21

**Pardon**
38:6

**pardoned**
173:7

**parentheses**
29:7

**parenthetical**
65:2

**Parker**
17:6,9,10 46:3 80:6, 22,24 81:7, 17 156:7 183:18

**Parker's**
156:10

**part**
17:11,18 18:9,16 40:9 50:4 51:24 76:13 77:19 86:10 87:10 91:5 94:2 100:5 101:7 107:22 109:7 114:13,21 128:11 134:2,16,25 146:13 147:20 152:18 156:11,17 161:8 162:23 164:10 167:14 168:3 169:7 175:6 203:15

**participate**
155:24

**participating**
7:7

**participation**
133:21

**particular**
15:16 85:11 86:22,25 88:3,19 89:3,5 90:8 103:7 106:9 111:5,25 119:10 120:4 172:19 182:4 183:20

**parties**
6:5 7:13 98:9 130:22

**partner**
115:7

**partners**
166:4

**partnership**
165:1

**parts**
80:12 81:22, 24 82:3,17, 18 83:10,11, 12 85:2 90:23 91:1, 9,16,17,21, 25 92:3,6,7, 13,23 93:5, 16 146:2,3,9 147:4,24 156:1 185:22 186:2 197:19,21 198:1,5,8

**party**
6:18 104:9

**pass**
21:13

**passes**
110:16

**past**
58:21 61:9 117:3

**Patel**
117:8,14,15

**patent**
196:16

218:19
**pathologists** 167:23 168:23
**pathology** 119:18 164:20 167:20,22,24 168:3,16,17
**pathway** 18:21 19:12, 13 20:1,7 21:9 23:9 24:22,25 25:8,10 26:5,8 29:3 30:3,7,19,21 33:13,16 34:3 169:2
**pathways** 24:2 47:16
**patience** 219:12
**patient** 159:12
**patients** 64:1,4,9,16 67:23 68:17 158:4,10,25 159:3,23 160:8,18 179:6,11,18 180:2,8 181:3,19 183:8 198:18,21
**Patrick** 17:12 44:10, 20 45:25 46:2 50:9,10 101:6 104:10 140:19,20,23
**Paul** 100:3 112:7, 13 113:25 117:1 121:19 136:2,24 137:10,17, 21,23 216:11
**pause** 61:25
**pay** 106:19 134:2
**pays** 106:4
**PB/PK** 19:6,14 117:8
**PBTK** 195:12
**PDE** 118:3 148:24 152:3 154:2, 16 186:18
**PDES** 148:7,21 149:2 150:14 152:9,23 153:3,13,16, 19 154:3
**PDMA** 78:10
**Peachtree** 3:18
**peer** 145:16 169:19,20, 21,22
**peer-reviewed** 138:22
**PEIYUAN** 3:6
**Pennsylvania** 3:4 6:18
**people** 19:4 42:20 52:24 54:15 56:6 67:23 75:22 95:2 104:11 132:23 136:1 142:24 158:19 192:22 208:9,17
**percent** 34:24 36:12 58:2 110:11 111:14,18 202:18
**Perfect** 27:18
**perfectly** 159:18
**performed** 35:17 36:3 205:25
**performs** 144:21
**period** 164:14,25 174:13 193:18
**peripheral** 122:15 123:4 124:8,23 125:2
**permeating** 98:18
**permissible** 78:22 79:5, 19 81:12 90:5,22 92:8,14 137:12 148:25 151:22
**Permitted** 127:25
**person** 7:12 51:18 80:17 126:3 132:5 146:14 148:17 151:23 152:24 153:14,17,20 210:19
**personally** 46:18
**perspective** 97:6 107:6 123:8
**pertaining** 156:19,20 175:5
**Pfizer** 130:24 131:2,6,10, 12,18 134:4, 5,19 135:9
**pguo@shb.com** 3:9
**ph** 20:12 26:17, 22 29:19 32:10
**Ph.d.** 4:2 117:3 128:11,12 163:22,25 166:13,14,22 167:1,15 176:19,24 177:1,15
**pharma** 44:13 50:21, 24 51:5,16
**pharmaceutical** 14:20 21:9 51:11 60:3, 18 66:22 79:5 90:1 99:16 101:25 128:22 129:5 132:8,14,18 138:12 192:5 199:23 200:15,21
**pharmaceuticals** 48:18 49:19
**pharmacokinetic** 19:17
**pharmacokinetics** 17:17 19:16 20:2 21:21

**pharmacological**
64:7
**pharmacovigilance**
45:24 98:10
**pharmacy**
47:1
**Philadelphia**
3:4 6:17
**phone**
80:1 85:20 102:21
**photo**
107:5 164:18 165:3,25 166:2,5 168:18 171:7 172:6
**phrase**
12:20,24 80:20 158:25 159:23
**physically**
7:8
**physician**
65:8 88:9
**physicians**
168:2
**physiological**
19:18
**physiological-based**
19:17 20:2
**pick**
6:7 148:17
**picking**
123:6
**picture**
41:8 75:20
**piece**
24:1 60:10 115:24 125:4 173:19
**pieces**
40:24 172:1
**pill**
38:19 40:17
**pin**
101:11 123:11
**place**
6:4 44:1 49:1 76:5 116:14,17 121:18 139:2 201:2
**placing**
138:5
**plaintiff**
6:9
**plaintiffs**
7:3
**plan**
23:4
**planned**
113:7
**planning**
97:9
**plans**
47:21 70:9
**platform**
134:24
**platforms**
110:4 117:5
**plausible**
47:16
**play**
143:13
**playing**
170:19
**PLC**
3:11
**please**
6:6 7:20 15:15,17,23, 24,25 16:1, 2,3,13,14,15 27:13 34:5,8 38:21 47:10, 13 54:1 55:5,23,25 75:21 82:12, 14 98:23 143:14 161:2 163:14,19 166:7 178:3, 21,22 180:22 193:15,16 207:7 214:6
**PMDA**
14:19 16:21, 25 17:7 45:13,16 46:21
**PO**
56:11
**point**
62:14 82:16 83:3 88:6 94:18,24 108:15 111:13 159:22 187:10,17 216:2 218:1
**pointed**
28:12
**polymorphic**
203:21
**Ponting**
109:24 125:21 193:25 194:2 215:8,19,22
**Ponting's**
115:9
**popping**
197:9
**portal**
27:7,22
**Porter**
3:12
**portfolio**
44:12 50:20 51:4 76:4 99:17,19 102:1
**pose**
67:8
**posed**
18:19 128:21
**position**
9:10 11:22 60:10 112:24,25 140:12 155:24 156:21 157:5 160:19 161:5 164:1,7,11 167:7,13 210:22 214:10
**positions**
116:25 164:13
**positive**
58:6 183:13 214:16
**possession**
127:7
**possibility**
75:9 152:17 170:14
**possible**
10:10 15:16 47:15 64:22 65:15 96:10 101:3 182:11 185:1
**post-op**
164:4
**postdoctoral**
106:4,20,25 109:5 164:1
**Postgraduate**
164:1,5
**potency**
50:1 185:6 194:22,23
**potent**
63:12
**potential**
12:3 14:2 17:19 19:21 20:7,23 24:5

30:12,13,16 32:19 40:14, 25 41:24 42:3,5 43:20 47:12,14 48:3,25 49:1,19,25 50:7 58:16 59:9 61:4 65:21 66:21, 25 67:7 68:8,18,20 69:2 70:5,13 71:20 72:13 76:15 77:15, 19,20 78:12 87:12 96:20 99:14 102:1, 5 110:1,18, 19 113:16 118:15,25 119:5 123:3, 25 125:2 137:10,21 139:1,24 140:2 144:17,22 151:4 164:2 165:7,8,9 175:3 176:8 177:6 181:19 183:4 185:8 186:22 187:3,10,18 195:18 198:24 201:21 202:1,8 203:10 216:23,25 217:22

**potentially** 29:21 42:20 43:12 70:14

**pound** 116:13 218:22

**pounds** 101:15,19 109:1,4,9,10 112:9 114:4 118:6

**powder** 77:6

**POWER** 3:2

**Powerpoint** 24:18 99:24

**PPI** 64:4 180:7

**PPIS** 179:12,19 180:1,9

**ppm** 92:16 197:18

**practical** 49:14

**practice** 48:19 114:18 168:4

**pre-university** 38:10

**precautions** 40:15 43:24

**preceded** 105:9 177:18

**precedent** 95:23

**precise** 150:22

**predecessor** 11:17

**predict** 110:5

**predicting** 109:25 144:22

**predicts** 144:16

**predominantly** 122:14 123:13

**preexisting** 108:13 126:7 180:10 193:24 194:3,7

**prejudice** 196:14

**preliminary** 24:23 47:2 62:15,23 94:11 119:22 178:9

**prep** 57:13

**preparation** 121:12

**prepare** 44:22

**prepping** 208:17

**prescribed** 12:4 150:12 151:8,13 153:8

**prescribing** 81:5 88:10

**prescription** 51:6,12

**presence** 18:11 35:22 36:17 47:4 53:25 54:5,9 57:14 67:1 78:20 176:9

**present** 3:24 7:9 9:14 21:4,6 28:15,16,18, 21 71:18 72:9,25 73:1 84:10 147:17 176:11

**presentation** 107:22 108:1 143:24

**presented** 89:7 107:19

122:19

**presently** 109:16 121:20 162:2,15

**president** 52:25 53:8 165:17 174:4,8,9, 11,12,13

**pressure** 170:16

**presumed** 150:5

**prettier** 208:18

**pretty** 95:23 208:24

**prevalent** 14:15

**prevent** 32:11 161:18

**previous** 28:7 70:17 83:9,12 106:6 110:8 116:25 148:22 181:10 204:14 218:4

**previously** 4:10 143:1 178:4

**primarily** 123:17

**primary** 114:7

**prior** 37:23 53:23 54:3,7 56:18 57:13 62:8 95:13 97:19 114:20 133:11 135:4 175:14 200:8 201:20 206:13

218:5,7
**prioritize** 198:17
**priority** 35:15
**private** 6:7 46:25 165:1
**privileged** 98:24
**proactive** 68:16 97:20
**probable** 13:14,16,20, 24 14:18 65:18
**probably** 42:21 63:15 81:5 172:18, 21 181:21 197:8
**problem** 10:25 102:12
**procedure** 140:24 141:2 144:20
**proceeding** 6:8,13 174:16
**proceedings** 6:25 66:16 219:19
**process** 39:22 75:5 138:22 139:2,8,14, 18 170:9,20 187:24 196:22 211:22
**processes** 48:24 76:5 77:21 150:13 151:12
**produced** 16:10 17:2 36:13,19 53:25 54:4 74:1 88:20 125:25
**producing** 74:17
**product** 49:16 56:13 68:24 79:6 85:15 89:24 90:14 93:10, 20 100:5,20, 25 182:9,14 201:11 214:9
**production** 31:21 32:4, 16,19,20
**products** 6:10 45:4 48:9 49:8 53:1,9 56:16 57:15 66:24 68:4 77:19 93:4,24 97:16 99:10, 15 146:8,18, 23 147:1,3, 22,23 149:9 151:4 161:19,20
**professional** 35:8 167:23 174:14
**professor** 61:13 118:4 164:22 167:5
**Professors** 118:17 195:22
**profile** 8:15,16 95:5
**program** 119:9
**progress** 72:14 104:5 113:7 127:2 137:20 162:13 172:1
**progressed** 195:23
**progressing** 115:2
**prohibit** 97:15
**project** 17:10 46:3 113:5 127:3 156:11
**projects** 118:15 119:23 140:1 156:8 216:6
**Promeco** 208:9
**promise** 197:6
**promised** 77:22
**promote** 26:22
**promoting** 216:6
**proof** 99:2
**propensity** 12:12
**properly** 56:17 177:11 199:19
**properties** 196:9
**property** 196:11
**proportion** 58:5
**proposal** 100:9
**propose** 95:7 156:14
**proposed** 94:18 95:11 107:20,24 108:2
**proposition** 218:23
**protect** 40:21,24 67:5
**protected** 41:13
**protection** 41:4 67:12, 14 73:3
**protein** 179:19
**protocol** 36:8 115:2, 3,14
**protocols** 204:16
**proud** 199:1 216:15,19 217:8
**provide** 47:10 106:23 115:2 120:24 137:9 138:14 139:20 169:25 170:3,15 173:18 191:23 193:3 213:2
**provided** 23:14 33:13 35:24 37:22 47:21 87:4 106:16 134:13
**provider** 113:11
**provides** 12:2 124:17 132:7 134:24 151:13 171:4 193:1
**providing** 106:18,21,22 192:1
**proximal** 22:11

**proximate**
22:1,19 28:9
**PSC**
100:19
**public**
165:1
**publication**
104:15 115:5 121:13,14 122:5 135:5 139:7,19,22 140:3,8,24 141:1,15,16, 19,23 142:2, 4 143:18 144:24 154:22,25 155:8 162:7 169:8,19 170:6,8 173:20 190:16 192:17 209:12 210:24 212:17 213:5
**publications**
111:9 112:2 125:25 138:21 139:3 169:6,9,11, 13 171:21 196:2
**publicly**
134:11
**publish**
144:11 171:24
**published**
104:17,22 106:9 110:11,20,21 111:17 120:16,18 121:6 128:5 133:5 135:3, 19 138:15 139:25 141:13 145:15 154:10 164:10,21 165:4 168:6, 11 171:6,11, 22 172:12,16 187:12,13 188:23,24,25 192:24 208:20,24 209:13 214:18
**publishing**
173:8
**pull**
163:13 169:10 178:3 181:9,11 182:16
**pulled**
47:25 97:1 173:15 214:9
**pulling**
118:14 216:19
**pulmonary**
204:17 205:1,12,13
**pump**
179:19
**purchase**
69:10,13,17, 20 71:22 73:5
**purchased**
69:22
**pure**
40:8,11,25
**purported**
58:12
**purpose**
41:19,23 71:16 72:3, 5,17 73:12, 23 74:1,17 159:14 170:2 194:15 195:18 203:8
**purposes**
49:14 103:24 192:19 194:4,16 195:7,16 203:11
**pursuant**
106:17 108:19 109:20 130:15
**pursued**
118:13
**put**
8:7,14 9:13 14:10 19:23 23:15 39:9 41:13 42:11 55:21 75:20 76:22 128:14,15 135:21 146:16 148:16 154:14 184:15 188:12,18 193:15 201:5 208:15 213:16,17 218:22
**putative**
30:4 111:10
**putting**
41:19 141:23 150:18

**Q**

**Q2**
125:19 126:11,12 127:6
**qualification**
102:5 166:8
**qualifications**
165:8 166:9
**qualitative**
160:10
**quality**
53:10 85:16 94:1 96:25 170:1,8 195:21
**quantitative**
37:7 133:3, 14 134:15 160:13
**quantities**
42:17 47:5
**quantitive**
216:7
**Queen**
6:14
**queries**
17:1
**query**
16:25 45:12
**question**
11:9 18:18 21:22 24:7 35:3 36:24 44:13,20 45:18 50:21 51:18 53:17 54:2 56:9 57:10 62:2 70:18,21 74:13 84:2 100:16 101:25 119:7,15 120:8 123:12 135:7 136:4, 9 139:11 145:17 148:20 149:18,20, 21,22 150:22,23,24 151:21 155:10

162:16,22 178:23 186:14 189:15 194:6 195:24 203:24 204:3,7,12, 14,16,25 205:12,16 207:1,7 209:25 210:4 212:20 214:5 216:17 218:8

**questioned**
120:19 193:18

**questioning**
191:10,15

**questions**
8:7 39:4 42:21 47:8, 10 70:5 71:7 156:2 157:20 162:25 175:2 178:5 190:13 192:9 198:16 208:23 215:3 219:9,13

**quick**
44:18

**quicker**
55:22

**quite**
42:1 77:1 172:20 180:20 182:11 186:17

**quote**
49:20,21 136:5

**R**

**R&d**
103:22

**rails**
79:16

**raise**
7:20

**raised**
70:8 101:25 102:9

**range**
12:4 61:14 80:12 85:3 114:19 121:22

**Ranit**
21:20

**ranitidine**
6:10 16:22 18:8,18 19:8 20:3,11 21:15,18,19, 20,22 23:2, 10,17,22 24:9,12 26:10,11,16, 22 27:1 30:14 33:19, 22,23 34:16, 21 36:17 37:8,23 38:4 44:14 47:5, 12,14,18 48:3 50:8, 22,25 51:1, 17,20 53:20 60:4 62:16, 22 64:10,12 67:16,22 68:4,8,10, 12,17,19 69:6 77:13, 15 78:11,16, 19 80:13,15 81:3 84:10 86:6,22 87:20 88:11, 21 90:19 93:10,19,24 94:23 95:9, 12,20 96:9 97:1,5,12, 18,24 98:16 99:10 103:4 107:19 118:8 129:11 130:24 133:16 145:20 147:13 158:3 161:20 162:14,18,20 174:20,21,23 175:4,7,15 176:3,13,17, 22 177:3,7, 17,24 178:19 181:2,18,20 182:3 183:2, 5,8,19 184:2 185:24 186:2 191:21 197:16 198:3,9 199:13,24 200:2,7 201:20,22 202:9,18 203:16,21 204:22 206:9,13,21, 25 207:11, 15,20 208:2, 10,11 214:23 216:10,19, 22,24 217:2, 11 218:20 219:3,6

**ranitidine-containing**
97:16 146:22 147:1,22 149:9

**rapporteur**
64:15 67:15, 20 68:1,3,6 84:14,16 87:6 93:3 94:18 95:7, 11 145:19 146:4,19,25 147:21 206:7,19

**rapporteur's**
62:14,18,23 63:2,6,9,11 67:25 86:7 93:8,18 94:11 146:21 178:9 206:3, 14,15

**rapporteurs**
68:9 181:14

**rat**
17:20,22 18:17 63:13 98:16 200:12

**rats**
14:12 18:4 21:7 111:22 176:5,14 199:24 200:3,8,9, 17,22 201:12,20,23 203:12 204:22

**raw**
59:22,24 60:2 77:6

**reach**
152:3

**reached**
46:2 168:12

**reacted**
34:21

**reaction**
34:15 37:8

**reactive**
20:21 31:22, 24,25 32:2, 4,8,13,16 49:18

**reactivity**
60:14,25

**read**
15:16 34:7, 17 39:7 55:4,6,10 60:14,15 63:21,23 64:4,5 65:6 75:21 93:8, 9,12 108:17 137:4,5 143:25 147:5 161:4,23,24 180:13,21,22 189:2 206:6
**readability**
138:8
**readable**
138:6
**reading**
43:10 146:10
**ready**
7:7 56:1 144:11
**reagents**
145:25
**real**
44:18 49:1 83:22
**realize**
184:5 214:23
**reason**
14:6,9 23:23 67:13 73:13 74:6 112:4 117:20 119:15 161:25 188:7 189:10 201:23 210:25 218:6
**reasonable**
99:2 100:17 159:18
**reasons**
30:14 43:9 47:15 73:4 101:1 138:11 165:13
186:15 187:16 196:6
**recall**
33:14 44:16 45:13 49:16 61:10 63:5 71:10 74:22 93:13 140:17 141:6,7,10 145:14 178:23 182:18,24 193:17 196:3 199:13 205:7 213:15 214:14,15,21 216:17
**receive**
46:17 78:12 98:3
**received**
16:24 22:13, 22 24:16 34:2 36:10 45:12,17 46:14 62:14 63:5 93:17 99:2 161:3 167:13
**receiving**
179:6
**recent**
47:11 139:11 171:7 184:3 213:5
**recently**
47:1 110:11, 21 111:6 116:4,18 121:6 144:23 212:19
**receptor**
64:12 179:6
**receptors**
179:12
**recess**
11:4 52:16 78:6 127:18
155:17 163:6
**recipient**
87:3
**recipients**
94:25
**recognize**
147:17,19 187:24
**recognized**
100:16 152:4 161:21 164:19
**recollect**
55:5
**recollection**
15:15 79:12 140:22 172:15 206:10
**recommendatio n**
94:16
**recommended**
206:8
**recommends**
206:20
**record**
6:2,5,23,25 10:23 11:3,7 52:10,12,14, 19 78:3,5,7 80:5 89:15 127:16,21 155:15,19 163:2,8 169:8 185:11 219:17
**record's**
79:8
**recorded**
177:12 199:19
**recording**
6:4 163:5
**records**
141:15
**recruited**
116:18
**Redirect**
4:4 199:8
**reduce**
18:11
**reduced**
48:18
**reduction**
61:9
**reentry**
162:19
**Reese**
11:19 164:16
**refer**
55:13 86:21 90:18 200:24
**referee's**
120:17 167:11 211:5
**referees**
121:13,14 168:10 169:24,25 173:17
**reference**
26:11 82:10 85:3 167:4 202:17
**referenced**
12:24 76:24 77:9 82:13 114:16 121:17
**references**
25:19 34:12 48:19 161:9
**referencing**
16:21 26:10 71:1 81:21
**referral**
63:3 168:9
**referred**
17:25 110:9, 10 138:23 142:17

**referring**
18:6 41:10 61:12 74:2 82:14 84:19 85:17 104:20 105:5,7 190:6
**refers**
46:3 92:16
**refine**
74:13
**reflected**
177:13,23
**reflection**
30:15
**refresh**
178:13
**regard**
18:5 23:19 91:24 95:2 99:17,19 100:11 110:21 113:15 120:20 129:11,17 144:22 153:10 177:14 180:7 183:5 217:6 219:8
**regarded**
49:13
**regarding**
39:18 57:11 98:14 107:19 123:7 129:5 158:21
**Regina**
3:24
**region**
70:14 74:10 105:25 113:21 124:19 195:9
**Regis**
101:14
**registered**
53:19 174:15
**registration**
203:15
**regular**
45:11
**regulated**
66:22 67:11 185:7
**regulation**
208:6
**regulations**
197:12
**regulators**
78:22,23 90:9 97:4 98:8 136:2 150:1 151:3, 8 153:5 156:3,4 157:17 166:3 184:10 185:18 186:6,9 192:11,13 197:7 198:14 202:8,12 207:4,9,10, 14,17,25 208:1,5 215:4 219:5
**regulatory**
12:4 23:20 30:5 40:13 45:22 46:15, 21 48:16 53:4,10 56:22 57:2 77:12 79:4 82:8 96:14, 20 97:19 98:10 99:14 101:24 102:8,11 114:24 123:21 124:2 133:8,22 134:23
149:6,8 150:15,25 151:5 152:1, 5,19 153:8, 10 154:3,6, 16 155:9 156:22 157:6 160:20 166:2 175:11 203:14 210:22 219:7
**reiterate**
88:4 92:19
**relate**
64:21 81:8 182:9
**related**
6:18 24:9,10 33:2 56:13 70:5 94:10 95:1 106:11 108:16 117:25 120:4 165:22 178:19 182:22 183:2 196:16 213:10 216:2
**relates**
217:1
**relating**
120:9
**relation**
25:4 33:1 78:19
**relationship**
24:3 30:10 64:22 69:1,4 70:12 108:23 110:1,17 111:10,11 112:19 113:21 119:4 180:6 181:7 190:23
**relationships**
106:8 109:25 115:13 216:8
**release**
17:19
**relevance**
17:21
**relevant**
18:18 47:13 88:3 113:22 130:10 183:21 186:16 187:17 202:22
**rely**
176:18
**remained**
168:20
**remember**
30:2 63:7 70:1 71:9 140:9 145:18 146:6,10 178:5,14 210:20,25 212:18 213:1
**remind**
171:18
**remitted**
173:8
**remote**
6:24 128:11
**remotely**
7:10,11,13, 18
**removed**
97:18
**removing**
96:9 97:12
**repair**
31:6 106:1 108:16 113:18 187:19 216:2
**repaired**
29:22
**repeat**
54:2

**replacement** 113:24
**reply** 44:22
**report** 25:7 34:13 62:15,18,23 63:3,6,10,11 84:15 93:8, 18 109:17 115:5 125:18,20,24 126:12 140:13 146:22,25 158:12 178:10,13,25 179:10 180:1 181:13,24
**reported** 13:7 37:9 58:14 80:13 88:2 89:4 90:16 147:17 149:13 158:2 177:12 179:17 182:9
**reporter** 4:5 6:21,24 7:6,20
**reporting** 7:10 25:21 26:1 148:9
**reports** 47:2 58:2 94:12 111:4 122:24 140:19 158:18 183:3 199:25 200:6,10,13, 19,25 201:9, 16 203:19,24 204:3,7 205:6,17,18, 19,20,23
**represent** 7:3 125:25 189:8 191:17
**representative** 88:20 90:19 134:10
**representatives** 86:7 134:22
**represented** 165:15
**represents** 89:5
**repro-toxicology** 67:10
**reputable** 167:12
**request** 43:14 46:7, 11,15,18,19, 25 48:1 50:6 71:13 76:3 77:11 78:13
**requesting** 78:11
**require** 20:19 72:9, 15
**required** 116:20 136:13
**requirement** 40:13 79:4 99:15
**requirements** 109:6
**requires** 168:6 169:18 170:6
**research** 13:23 23:1 49:11 50:15 70:6 72:4,6, 8 73:5,10, 12,24 74:8, 15 76:12 100:10,16 101:3,6 115:7 127:5 134:17 137:14 191:24 192:2 195:25 196:11 198:25 202:17 212:21 214:11 215:8
**respect** 9:18 33:12, 19 39:5,22 46:22 48:2 49:7 50:7 62:15 69:10 77:12 79:4 86:16 95:15 104:15,21 107:23 108:2 109:19 111:24 116:15 124:13 125:13 126:6 128:16 135:14 136:6 144:12 147:22 154:22 174:20 214:11
**respond** 18:13 48:1 75:25 156:2, 4
**responded** 23:3 43:6
**responds** 42:13
**response** 43:11 53:17 61:7 70:7 71:6 75:17 97:22 98:17, 18 106:7 121:23 157:9,16 175:10 187:1 193:24 194:3 206:11 216:8 217:4
**responses** 47:9 62:23 98:5,7 101:4 157:22
**responsibility** 104:8 115:17
**responsible** 69:19,23 210:15
**responsiveness** 204:24
**rest** 39:7 44:15 99:16 156:18 195:11
**restricted** 42:18 50:3
**restrictions** 140:2
**result** 68:21 81:21 82:2 99:13 101:24 123:1 148:12 177:25 184:18 191:14
**resulted** 104:15
**results** 47:19 58:6 84:16 88:20 145:19 182:8 183:13
**retire** 11:20
**retired** 50:17 62:11 156:12

**retirement** 164:15
**revealed** 93:19
**review** 33:17,20,22 47:20 55:22 68:2 87:9 97:24 115:2, 5 121:13 126:21 135:23 138:25 139:19,23 140:24 143:3 145:16 157:18 158:22 168:11 169:19,20, 21,22,24 170:14,19 171:1,4 175:5 176:2 180:25 181:15 183:16 199:11
**reviewed** 13:21 87:6 114:21 135:4 170:11 175:7,13 176:22 196:2,5 202:3
**reviewer** 173:15
**reviewers** 170:13
**reviewers'** 136:12
**reviewing** 15:25 33:18 34:10 45:1 49:4 55:12, 24 75:21 98:15 121:7 170:17 176:17 211:4
**reviews** 14:16 22:24 98:11 168:19 171:14,16 178:16 183:18 211:5 215:5
**rhesus** 63:20
**Richard** 119:17
**ridiculous** 150:11
**right** 7:20 8:20 9:6,17,20 10:25 15:1, 11 17:23 18:1,14 19:19 20:5, 13 21:11 22:5 23:6, 17,23 24:18 25:1,16 26:6,7,10, 14,18,19,23 27:3,8,23,25 28:4,9,15,20 29:2,8,24 30:1,2 31:18 32:17 34:17, 22,25 36:10 37:10,14 38:2,14 39:6,12,19 41:5,6,10,22 42:11,13,24 43:4,16 44:14,15 45:14,20 46:9,10,12, 16,22 47:22 48:9,12,13, 22 50:16 51:13,17 53:1,10,14 55:12,17 56:23 57:7 58:10,17 60:25 61:11 62:3 64:4, 13,18,23 65:6,19 67:4,20 68:11 69:20, 21 70:25 71:2,3 75:20 76:12,20,22, 25 77:13 79:20 80:25 82:5,11,19 84:18,24 85:9 87:5,22 88:8,13,17 89:1,16,25 92:23 94:11 96:10 99:6, 11,25 100:1 101:11 103:2 104:16 105:3 106:22 107:16 109:12,15 111:20 117:22,24 119:15 121:20 124:16,24 126:2,16 127:10 128:3,6,15, 18 129:15,23 130:1,16,20 131:10,14 132:12,16, 17,19 134:8 136:11,17 141:2,3 142:25 143:14,23,25 144:7,13 146:14,16,23 147:4 148:1, 2,14,25 149:1,4,6,7, 10,23 151:23 152:10 153:20,24 155:1,11 156:16,20,23 157:15 158:1,4 159:4,7,13, 24 161:13, 14,23 162:3 163:15 167:3 174:5 179:15 186:3,4 190:16,21, 24,25 194:9, 10 196:10 197:22 198:9,14 199:20 206:4,17,22, 23 207:5,12, 15,20 209:6, 7,14,21,23 210:1,6,9 211:1,25 212:2 213:18,20, 22,23 214:21,24 217:5,12,18
**right-hand** 15:5 209:9
**rigor** 177:16 199:21
**rigorous** 102:10 175:20
**rings** 197:24
**rise** 20:12 22:2, 12,20
**risk** 14:13,14 16:20 17:2 38:16 46:8 49:20 56:16

58:16 59:10, 19 64:2,17 67:18,19,24 75:5 83:2, 18,19,20,22 117:12,24 118:9 119:6 121:5,10 130:11 133:12 150:6 158:4,10,25 159:3,23 160:7,18 179:7,14,21 180:2 181:19 184:1,25 194:23 203:11 217:1,24

**risk-based**
48:24

**risks**
63:25 128:21 178:22 180:10

**Robert**
11:19 164:15

**robust**
48:24 76:5 120:22 144:12 170:8 176:4 177:4, 9,22 199:15 201:18 215:18

**robustness**
120:14,20 144:9

**Roche**
130:15,20,21 134:20 135:10

**rodent**
13:8 18:7 24:5 49:12 57:20,25 58:6,12 74:12 87:12 110:2,6,13, 19 111:11,21 112:6 118:25 119:1,5,19 121:7 144:17 150:4 158:22 184:15 185:5 186:21 187:14 203:8,18 216:25

**rodents**
14:12 58:3 82:24 133:10 177:7 201:22 202:23,24 203:1,2,22 204:1 205:24

**role**
17:15 25:4, 23 37:11,16 51:16,24 52:2 54:11 56:24 57:12 58:23 59:16 85:13 86:10 94:2,3 106:1 113:14 114:13,15,25 116:5 118:25 124:18 146:12 156:7,10 162:23 167:10,14 174:13,23 175:1,4,23 183:4,20 198:23 208:7 211:23 217:15

**roles**
95:1 98:13

**roll**
103:19,20,21 173:13

**room**
7:9 61:24 219:14

**Roopal**
7:3

**ROS**
31:20,21 32:4,19,20

**routes**
19:8 20:4

**routinely**
35:7

**row**
29:1 31:14, 17 84:17 91:2,25 92:6 108:11 112:7 115:25 117:8,24 121:19 159:11

**rows**
92:5

**Royal**
164:1,4,20 167:20,22,24 168:2,16,23 169:2

**run**
62:2 106:5 121:21

**running**
106:7 114:17 167:17

**Ryan**
128:10 131:13

**S**

**Sachse**
3:2 4:3 7:4 9:13 10:14 15:19 16:6, 11 22:6,15 32:6 42:25 51:14,22 52:10,12 53:2,4 55:21 58:11 61:17 64:20,25 66:5,15 68:14 72:20 73:14 77:22 78:1,3 79:7 82:20 85:10 86:19 87:23 88:18 89:2, 22 92:15 98:6 99:12 104:24 125:6 126:17 127:14 131:22 135:20 136:8 137:7 138:17 139:17 145:22 148:20 149:11,16,24 151:2,19,25 152:8 154:11,18 156:24 157:7 158:5,15 159:25 160:21 163:2,11 199:5,11 202:10,19 203:6 204:11 205:15 206:6 207:2 208:12,16 209:24 211:11,19 212:24 213:13 215:12,21 216:15 217:13 218:15 219:11

**Sachse's**
79:15

**safe**
40:12 43:15,

22 76:16
**safely**
41:17 76:5
**safety**
16:19 17:22 19:2 25:6 26:1 40:9, 10,14,20,24 41:5 50:14, 18 54:19,20 63:25 67:12, 13 68:2,13, 17,21 98:11 103:20 107:5 118:22 155:24 156:8,21 157:5 160:19 164:18 165:3,24,25 166:2,5 168:18 171:7 172:6 178:17 180:25 181:16 198:18,21
**salary**
106:4,19
**sale**
97:15 207:11,15,19 208:2 219:4
**sales**
51:17,25
**salient**
24:13
**sample**
85:6 86:16, 22 88:15 145:20
**samples**
71:25 86:6 182:8 201:23
**sampling**
86:21
**Sanofi**
3:15 131:24 132:4 134:7, 19 135:9 207:18
**Sanofi-avertis**
3:16
**SAR**
109:24 215:13
**sarline**
107:4
**sarlines**
105:25
**sartan**
56:13
**saying**
44:22 70:23 73:10 83:4, 25 84:4 95:20 105:19 124:22 134:13 150:14 152:19 179:4,11
**says**
8:18 9:8 16:24 17:18, 24 19:5,25 20:9 22:9,15 24:20 26:16, 21,25 27:6, 23 29:7 31:10,17 32:23 34:5, 20,24 37:10, 11,14,15 39:21 44:10 45:9 46:25 48:15,24 49:10 50:19, 24 56:11 57:2,5 58:25 59:9,18,22 63:10,11,25 64:15,18,19, 24 67:15 69:13,17 80:10,11,20, 22,24 81:7 83:9 94:18 95:22 96:1,8 97:11 100:2, 13 101:14 103:1 107:15,17,18 108:12 109:1 122:12 128:8,20,24 129:13 135:16 143:4 146:6 147:2, 21 149:2 152:10 156:13,17 157:3,14 158:1 161:15 168:23 174:3 179:5 180:23,24 189:5 209:4, 10 218:12
**scale**
42:22
**SCARVIE**
3:12
**Scholer**
3:12
**school**
38:3,12 164:2,5 167:24
**science**
69:4 70:13 71:8,22 72:1,14 74:9 97:9 104:6 105:14 113:13 119:3 130:11 134:25 152:20 165:2 170:9 171:3 172:5,10 173:9 174:16 196:25 197:3 217:25 218:2,3
**science-driven**
198:25
**sciences**
26:1 118:22 132:25 133:17 134:1,8
**scientific**
70:17 71:7 72:4,6,8 73:5,11,24 74:15 97:6 99:8 114:23 121:14 123:8 134:17 138:5,7 144:4 150:19 151:9 152:20 157:11 165:16 169:18 170:2 171:25 172:4 174:15 181:5 187:16 188:7 191:23 192:2,8,13, 19,21 194:4, 5,16,18 195:6,8,16, 19 196:24 197:2 215:7, 25
**scientist**
19:1 54:20 106:5,20,25 109:5 176:19
**scientists**
40:10,19,25 42:3 62:8 67:6 72:9, 12,19,22 73:17 74:7 77:7 133:22 136:14 145:14 151:14 165:6

167:12 168:10 170:18 171:24 172:9 183:18 192:8 211:7
**scientists'**
43:24
**screen**
8:10 10:4,8 65:6,7,9 76:25 96:4 121:16
**screening**
11:10
**second**
10:18 11:1 25:9 26:9, 13,21 27:6, 10,12,13,15, 16,17,20 31:14 34:11 39:11,17,21 44:18 49:10 75:3 77:16 94:17 107:12 108:11 115:25 126:6 148:15 169:1 180:21,22 181:11,12 213:18 217:17
**secondary**
124:24
**section**
63:24 166:8 169:12 178:24 180:14
**sectors**
133:20
**see**
8:9 9:19,22 12:17 15:7,9 16:9,19,22 17:3,4,7,8 19:9,10 25:9,12,13 26:9 27:16 31:1 33:8 34:5,6,7 40:3,5 44:6, 7,9,15,23 45:4 46:5 47:6,7 53:21,22 55:1,7,9,17, 23,24 56:18, 19 57:1,2,4 59:12,13,20, 21,25 61:22 62:24 63:1 65:5 69:11, 12,24 74:13 75:11,23 80:18,19 84:15,16,23 85:5,16 87:14 89:11 90:2,13 91:1,16 92:12 93:2, 6,7 94:17,21 95:19,24,25 96:3,5 98:22 99:1,24 101:14 105:5 111:1 128:15,22, 23,25 138:1 142:13,14 144:21 146:17 148:5,6,8 154:25 156:18 157:25 158:6,7,12, 16,17 159:7 161:6,10 167:3 168:12 169:9,11,14 171:10 174:2 176:23 180:14 189:3,4,5,7 190:2,3 193:25 194:23 195:11 200:19 205:23 206:4 208:25 209:10 213:20 217:11 218:12
**seeing**
10:7 23:5
**sees**
168:16
**sell**
51:1,6,9 206:21
**selling**
51:12,20
**send**
40:1 157:5
**sending**
16:20
**sends**
44:21 55:7
**senior**
100:4 106:25 132:4 140:12,13,18 141:3,4 158:20 164:13,23 173:15 211:6
**sense**
43:9 96:16 211:8
**sensitive**
6:6 63:14 123:16 140:1
**sentence**
37:14 53:16 56:19 65:2, 12 94:21 122:11 129:14 147:6,20 180:13,20 206:6,7
**separate**
144:8
**separated**
41:20
**September**
55:3,7 62:13 98:21
**series**
49:24
**Services**
3:15
**set**
43:8 78:24 82:7 96:14 102:10 185:13,18 186:5,9 187:2 197:12 198:14
**setting**
95:23
**seven**
8:19 83:3 84:20 164:4 219:17
**several**
19:4 74:5 99:25 111:8, 13
**severe**
63:20
**share**
76:7 172:3
**Shaun**
3:23 6:15 10:7
**SHEEHAN**
3:6
**SHEET**
4:8
**Sheroy**
132:15
**ship**
201:6

**shipped**
200:16
**Shook**
3:7
**shopper**
69:20
**short**
37:4 45:3 48:8 103:1 155:12
**short-circuit**
90:12
**shortages**
161:18
**show**
14:24 18:23 34:1 52:22 62:20 64:1 65:16 79:24 83:6 94:7 95:15 102:15 107:11 122:4 127:24 136:21 142:8 155:23 179:18 190:14
**showed**
145:19,23 146:1 182:1 188:14 206:11
**showing**
30:9 160:16 178:4,24 202:18
**shown**
42:12 76:24 114:3 179:1
**shows**
64:16 89:1, 16 166:10 179:5
**sic**
38:12 42:24 43:7
**side**
9:22 10:3,9 26:13,15 27:3 29:24 41:14 42:11 55:22 76:21, 22,25 86:9 89:18 94:1 129:24 158:1 188:19 208:15 213:17 218:11
**sign**
140:25
**signed**
106:2 107:2, 6 108:20 126:15,23 131:17
**significant**
43:12 44:13 50:21 102:6
**signoff**
138:24
**signs**
166:4
**silver**
204:4,8,9
**similar**
17:20 36:16 121:5
**simple**
186:17
**simplify**
87:14
**Simpson**
74:25 75:1, 2,4
**Singapore**
208:4
**sir**
16:22 17:3 19:9,23 23:11 25:12 31:1 34:6 40:3 44:3,23 45:5 47:6 51:23 52:8 53:21 56:18 59:20,25 62:24 69:11 75:11 77:8 80:18 90:2 93:6 96:3 112:23 120:6 122:9 128:25 136:4 138:11 158:6 161:6, 10 163:1 218:25 219:9
**site**
201:2
**sites**
205:18
**situation**
100:8
**situations**
19:22 183:22
**sixth**
84:22 85:1
**skew**
10:10 16:7
**skewed**
9:21 10:3
**skin**
56:23 57:3 165:24
**Skype**
34:5
**sliced**
103:23
**slide**
24:18
**slides**
107:18
**slight**
62:1
**slightly**
81:22
**small**
10:9 80:22 159:17
**Smithkline**
9:2,3,5,20 10:20 13:19 62:10 164:7 202:7,12 213:21,25
**Snodin**
48:7,14
**societies**
165:16
**society**
144:4 165:18,19 170:9 173:7, 23 174:15
**sodium**
34:16 37:9
**soften**
136:25
**sold**
162:14 217:11
**solution**
77:3
**Soovanker**
98:25 99:5
**sort**
41:16 42:16 73:9 102:19 114:11 138:9 139:24 152:25 170:18 173:16
**sought**
162:19
**sounds**
42:13
**source**
36:25 37:5, 12,17,18 68:19 71:15 89:4
**sourced**
71:14
**sources**
133:19

**Southern** 6:12
**Spalding** 3:17
**speak** 138:19
**speaking** 166:22
**spec** 96:10
**species** 18:10 31:22,24 32:8,13,16 49:13 63:13,14 176:15 186:25
**specific** 20:20 22:23 23:10 35:1 36:24 54:25 56:13 59:5 70:20 94:2 104:19 114:13 135:7 136:4 149:21 183:3 187:22 204:2 207:6 208:7 214:22
**specifically** 33:14 54:6 131:4 133:6 166:24 184:22 197:17 216:4 218:6
**specification** 53:19
**specified** 84:8
**speculating** 61:19
**speech** 73:7 149:19 150:23
**spending** 101:19
**spent** 180:19
**split** 153:18
**spoken** 37:17
**sponsor** 133:23
**Spriggs** 54:22,23 58:23 59:7,17
**staining** 203:25 204:4,8,9,13
**stand** 19:14 199:3 216:16 217:10,16
**standard** 74:11 80:11,25 168:12
**standards** 133:9 177:11,20
**standing** 193:3 215:14
**standpoint** 56:17 79:1,19 85:5
**stands** 19:11 143:5 144:2 178:15
**start** 15:3,19 29:1 39:10 74:24 75:5,7 95:18 108:11 121:18 167:20 174:21 179:2 184:9 185:21 193:23
**started** 24:1 177:19 215:1
**starts** 171:8
**state** 6:22 171:5
**stated** 59:18 86:24 206:11
**statement** 6:24 7:6 22:23 23:2 65:10 67:21 84:5 86:12 93:2 97:2 111:16 123:16 147:8 158:2,7,10 180:5 189:12 210:2
**states** 6:11 65:16 78:14 97:16 130:14 207:11
**stating** 92:9 152:15
**statistical** 144:16
**statistics** 186:19
**status** 56:14,21 57:5 58:20
**stay** 106:13
**step** 28:6 79:16
**steps** 30:4 66:24 94:17 99:3
**sterling** 109:4,10 112:9 114:4 116:13 118:6 218:22
**Steve** 17:6,9,10 44:9,22 45:10,24 46:3 80:6,22 156:7,10 160:25
**stick** 192:17
**sticker** 189:4
**stipulated** 153:5 154:6
**stomach** 19:7 20:3,10,12 21:10 26:17,22 27:1 29:25 179:8,22 183:8
**stomach/tumor** 31:11
**stop** 125:10
**store** 40:1,2 42:16,18
**stored** 40:7 127:8 200:3,23
**storing** 39:5 40:16
**story** 217:6
**STP** 100:3,7
**straight** 209:19
**strains** 61:9,20
**stream** 102:6 115:18 195:20
**streams** 107:14,15 117:18 119:12 120:1,2,4 195:18,20

**Street**
3:3,18 6:14, 17
**stressor**
26:16,21,25 27:21
**stressors**
27:5,6 30:11,16
**strike**
87:17
**strike-through**
53:18,22
**string**
17:14
**structural**
109:25 115:13
**structure**
110:5,18 111:10 196:19
**structured**
53:19 171:1
**structures**
40:1 73:22
**students**
167:16,17
**studied**
163:20
**studies**
13:8 14:17 18:9 33:23 36:15,22 58:6,13 61:20 71:5,6 98:16 106:5 107:1 108:13 109:6 120:24 121:7 122:12 123:24 126:7 144:19 175:5,14,18, 21,24 176:2, 4,6,7,13,18, 23 177:2,4, 8,13,16,18, 22,24 178:1 181:22 182:23 183:1,11,16 193:22 194:7 195:24 196:1 199:12 200:4,12 201:19,21 202:2,4,13, 16 203:18,22 204:5,10,19 205:3,5,22, 24 207:2 214:19,22 215:13
**study**
14:1 34:13, 19 36:11 37:1,6,9,18, 23 72:19,23 110:25 111:3 113:10,11 114:10,11, 12,14,15,16, 17,18,20 115:1,3,10, 12,14 116:1, 7 120:22 121:21 123:2,9,20 124:15,19 125:1,13,16, 23 148:3 166:10 177:14,21 182:18,22 186:11,15 189:16 190:9 194:8,11,12, 14,15,19 195:2,4,5 201:24 204:2,15 205:20 206:3
**stuff**
72:25 143:24 172:21
**subdiscipline**
168:17
**subject**
28:22 38:15 39:8 61:2 87:9 94:3 107:14 124:3 157:21 183:24
**subjected**
200:8
**subjects**
66:19 214:13
**submit**
47:13 121:12 139:19 140:10 211:9 212:1
**submitted**
59:11 120:16 139:6,21 140:5 143:2 144:23 145:12 155:8 160:19 162:7 169:18,22 210:8 211:16 212:13,16, 19,22 213:6, 8,9
**subpoenaed**
213:10
**subsequent**
33:11 183:17
**subsequently**
112:20 167:13
**substance**
12:8,9 13:5, 9 28:3 49:5 154:9 215:14
**substances**
12:13 36:19 40:12 66:20 71:21 153:9
**substantial**
82:22 93:19
**substantially**
82:19 83:13 93:20
**substantiate**
17:21
**sufficient**
63:18
**sufficiently**
170:7
**suggest**
53:16 89:13 93:22 110:22
**suggesting**
23:21 24:8 73:8 123:10
**suggests**
14:1 151:21 173:5
**suitability**
57:11 61:3
**suitable**
170:6 173:19
**Suite**
3:18 6:17
**summarized**
175:8
**summary**
10:19 23:4, 13,14 34:19 36:10 122:18 146:10 147:5,19 153:1 166:6 172:8
**supplied**
49:5 203:14
**supply**
100:20,25 176:12
**supplying**
74:18
**support**
6:16,22 43:13 76:3 96:2 97:2,25

98:5 105:12 106:18,24 107:20 108:3 117:12 122:12 194:23 203:15
**supported** 98:1 104:8 167:11 168:9 175:7
**supporting** 97:25 167:15,16
**supposed** 52:4 109:14
**sure** 10:7 15:18 21:21 22:8 23:19,21 26:12 28:12 39:8 55:6 62:17 64:5 69:25 75:2 79:7 82:6 84:13 86:2, 20 88:6 90:23 99:7 100:4 109:9 111:23 125:23 127:7,14 132:6 134:12 146:13 156:20 175:12 179:9 185:11 191:8 197:21 207:24 210:4 214:25
**surprising** 49:2
**surrounding** 157:19
**suspect** 112:5
**suspend** 94:19
**suspension** 94:20 95:8 206:8,20
**Swansea** 106:3 108:12 117:3 126:24 163:21,23 164:22 166:11 167:9,16
**swear** 6:25 7:16,21
**swearing** 7:17
**switch** 85:20 178:2
**synthesis** 165:9 171:5
**system** 166:19

**T**

**table** 80:17 82:12, 16 90:16 93:3 118:14 145:23 146:1,7 147:2,17 182:12 218:1
**tables** 146:11 205:5
**tablet** 85:1 87:20, 24,25 88:3, 16 89:5,17, 24 91:22 182:4
**tablets** 53:20,24 67:23 80:13 83:9 87:10 88:7
**tad** 79:16
**Takahashi** 15:8 16:19
**take** 6:4 33:8 38:14 52:7 54:13 66:19 68:16 112:9 116:14 119:14 123:15 126:5 127:12 129:14 148:15 154:24 155:12 168:21 170:21 174:18 181:23 186:25 191:5 192:16 193:14 210:11
**taken** 6:9 40:15 66:24 86:23 116:4,17 160:8
**takes** 187:9
**taking** 67:23 99:2 113:21 155:4 163:12 183:8 187:8,16
**talented** 165:5
**talk** 121:16 153:18 163:13 167:18 169:9,11 171:1 197:6
**talked** 93:13 94:15 144:10 197:17
207:22,24
**talking** 42:15 74:22 75:19 89:20 97:8 101:6, 23 140:22 169:2 171:13 175:13 185:23 186:1 197:14,16
**talks** 218:1
**Tanner** 36:3,6,13 37:18,23 182:18,22 202:17 207:3
**Tanner's** 35:25 36:25
**TAR** 59:12,14
**target** 19:2 25:6 26:1 54:19 100:8 118:21
**task** 110:3
**TD50** 82:23 118:2 150:4 184:15 186:17,19
**team** 17:10 56:11 97:22 98:17 103:21 165:5 173:14
**Teams** 80:4
**teasing** 55:19
**TECH** 9:25 10:6 15:22 16:8, 16 55:16 56:3
**TECHNICIAN** 3:22

**technologies**
11:10,12
**tell**
36:5 38:17 42:8 62:6 75:13 146:5 163:19 171:22
**telling**
109:12 174:7 211:18
**tells**
87:20 95:19
**temperature**
47:4 200:2 201:6
**ten**
52:11 127:12 155:13 159:22 160:8 202:25 203:2,4,7
**term**
12:18 19:20 96:19 169:17 181:5
**terminated**
165:12
**terms**
18:3 21:23 35:15 43:19 58:21 67:11, 25 69:23 73:23 81:12 83:1,25 96:11,25 127:3 135:21 136:13 159:17 170:14,24 173:12 177:5 183:12 217:2,3,23
**test**
14:3,5 35:1, 4,5,6,7,11, 12,18,21 36:8,18 53:21 54:7 57:11 60:11, 13,24 61:3, 14,20,21 66:19 70:7 71:4 77:4 78:16 81:21 85:6 120:15, 20,21 122:15 123:5,23 124:8,23 144:10,13, 16,20,21 145:5 146:15 181:7 183:6, 13 201:19,23 212:6 213:2 214:17
**tested**
53:24 54:4,8 58:4,5 88:24 93:4,10,20 120:25 145:20 146:1,8 147:3,23 176:14 182:8 202:24 203:1
**testified**
184:8 188:11 191:7 192:22
**testimony**
4:2 7:21 196:1
**testing**
19:17 35:22 66:13 68:25 75:7 84:15 86:4,6 91:8 93:19 94:15 105:15 120:24 132:24 133:3 134:3,15 145:19 149:9 171:6,7 172:6 182:2
**tests**
36:19 42:1 47:1 214:16
**text**
16:4 138:5 158:17 159:24
**texts**
160:1
**thank**
16:15 34:6 43:3 52:9 110:24 162:25 163:12 166:6 174:18 188:10 197:5 199:6 219:10,11,15
**thanks**
16:14 23:3, 12 55:25 125:10
**theoretical**
83:17 150:6
**theory**
103:5
**therapy**
181:2,18
**thesis**
166:15
**thing**
33:4 37:14 68:11 123:12 153:23 172:23 219:3
**things**
11:16 12:14, 15 42:14 63:9 67:4 124:13 183:7 187:6 209:9
**think**
15:19 18:6, 14 20:6 24:7 29:16 42:14 43:14 50:17 55:16 57:9 59:4 61:8 62:9 70:4 72:8 75:24 76:6 77:14 78:1 79:12, 14 80:4,22 81:4,19 82:8,15,21 84:9 87:25 95:11 96:2, 7,11,18,23 97:2,23 100:4,9 101:1 103:7 104:4,9,25 105:4 115:11,21 116:19 118:13,23 119:7,8,10 124:1,12 126:18 128:11,12 137:2,22 151:9 156:3 159:14,17 160:3 172:19 174:7 180:19 182:1,21 183:24 187:7 191:7,14 195:25 196:7 197:8,23 204:25 208:17 211:20 213:9 216:21 217:3,4,20 219:2
**thinking**
96:18,21 103:7 214:16
**third**
26:25 27:11, 13,14,18,20 80:9 108:10 112:7 121:19

206:3
**third-party**
74:18 109:8 214:10
**Thomas**
3:6 39:11,14 41:10 42:11, 23,24 43:2, 4,7 74:22,25 75:4,18,19
**thorough**
177:5
**Thorsnes**
3:22
**thought**
79:9 96:6 110:7
**thoughts**
24:25
**thousand**
82:25 150:6 160:6 184:19,23
**thread**
15:20
**three**
24:20 26:3, 12 27:5 28:25 29:1 31:7 47:8,19 52:18 53:17 65:25 78:4 84:19 118:6, 19 130:3 158:14,24 159:6 171:8 189:22 205:22 209:4,19,22
**threshold**
108:15 118:2,3 187:6 194:21 195:15 216:1,7,13
**Thybaud**
132:2
**tie**
212:5
**till**
125:14
**time**
10:25 13:18 35:6 38:2 47:25 65:3 77:24 81:6 82:8 84:9 87:5 118:14 162:25 163:12 164:20 166:19 168:20 172:2 180:20 184:1 193:18 199:6 201:6,25 205:7,19 206:15 212:18 213:1,14 218:7 219:12
**timeline**
23:19 126:11 162:12
**times**
82:3 85:25 86:13,14,15, 17 87:21 88:12,14,16, 25 104:10,11 154:2,15 158:9,11,14 160:8,9
**tissue**
33:6,7
**title**
39:8 53:11 67:11 107:17 119:10 173:5
**titled**
34:14 169:12
**TM**
42:18
**today**
8:7 36:5
161:3 162:25 163:13 185:10 188:15 189:11 193:19
**told**
22:4 87:4 96:10,11 111:4 116:7 146:2,11 167:5 182:1 211:25 218:15
**tomorrow**
143:13
**tool**
124:15,22
**top**
10:13 14:25 15:20 18:13 39:11,17 43:6 44:6 58:22 60:8 76:1 115:9 119:16 143:21 145:14 161:1
**topic**
134:14 184:8 192:25
**topics**
165:21
**total**
67:19 95:20, 21 100:24
**touch**
114:25 174:19
**toxicity**
32:24 33:7 67:9 87:12 98:14 158:21 165:15 171:6 172:6
**toxicological**
72:22 187:7
**toxicologist**
54:11 65:8, 11,14 85:14 94:2 95:6 175:17,23 176:24 177:1,15 198:17
**toxicology**
9:9 11:18,23 12:1,2,12 25:22 39:16 54:21,23 58:17,24,25 59:4,5,8,11, 17 69:16 86:10 103:19 107:5 114:23 117:19 118:22 120:5 124:3 132:5, 23 133:3,14 134:3,15 137:16 144:3 162:23 163:24 164:13,17 165:2 166:2, 5,23,24 167:1 168:16 173:10 174:17 176:20 190:7 198:23 209:5
**Tracey**
54:22,23 58:22 59:7, 17
**Tracey's**
58:23
**track**
156:15
**tracker**
141:15,16,23 142:2,4
**tract**
21:12,16 27:7,16,22,

25
**traffic** 54:15
**trained** 76:20 176:24 177:1,15
**training** 76:2 116:12, 14,19 176:18 195:12,21
**transcript** 80:1 82:16 140:7,16 207:8
**transfer** 29:18
**transgenic** 112:17 113:3 122:16 164:9
**transition** 17:12 174:12
**translate** 30:7
**translates** 83:22
**translating** 23:7
**translation** 32:12 39:2 46:1 50:13 75:15 186:25
**transparent** 135:2 150:19 193:2
**transport** 31:18 32:21 201:12
**transported** 27:7,15,21 28:14,17 29:6 201:3, 10
**treasurer** 165:18
**treated** 64:1,4,10,16 125:3 179:18 184:17 204:17 205:1,14
**treating** 179:11 180:9
**treatment** 67:16 204:22 205:8,10
**treatments** 161:22
**trials** 66:9,10,11, 17
**trucked** 201:1
**trucks** 201:3
**true** 110:23 138:15,18
**truth** 7:22,23
**try** 10:16,23 22:8 27:13, 14 59:7 197:10 198:1 214:7
**trying** 62:2 82:8 113:14 147:11 166:20 190:19 204:25 210:19
**tsheehan@shb. com** 3:8
**TTC** 142:16 187:6
**tumor** 30:1 67:19 71:17 177:14 205:4,8,18
**tumors** 14:11 64:8 177:7,25 184:16 201:22 204:1,17,20 205:1,12,13
**turn** 188:3
**turned** 93:15
**Tweats** 61:11 62:6, 7,11 118:4, 17 195:22
**twice** 88:8
**two** 11:6 16:4 17:1 27:17 31:6 39:9 41:12 47:12 52:14 55:2, 21 65:24 70:22 77:14 82:3 88:7, 12,14 97:7 107:15 124:13 133:1 158:11 167:25 187:14 203:2
**two-year** 18:7,16 74:11 98:16 110:13 202:23
**typ** 204:13
**type** 19:20 142:4 203:25 216:8
**types** 12:5,6,7 29:20 76:16
**typical** 76:16 81:3 127:3
**typically** 21:13 41:1 59:24 77:5 168:2,13 170:12 171:2 183:11 186:20 204:13 211:3

**U**

**U.S.** 3:15,16
**Uh-huh** 94:9 106:15
**UK** 76:1 165:21 173:7,22 174:15 190:7
**UKEMS** 173:25 174:4
**ulcers** 64:9
**ultimate** 103:10
**ultimately** 103:18 104:4 115:23 119:24
**unable** 37:5
**uncertainty** 151:12
**uncoupling** 32:21
**underlying** 119:4
**underneath** 189:15
**understand** 14:6,9 21:8 23:25 35:9 42:14 56:8 65:14 69:1,3 70:11 71:6 73:18 74:8, 10 96:23 102:7 108:23

110:17 113:14,20 119:3 121:9 127:2 147:8, 25 156:19 173:19 175:12 179:10 187:10 193:22 214:5 218:3,17,18
**understanding** 24:11,21 26:4 43:19 68:7 70:7 92:25 94:22 98:7 99:13 100:11 103:17 104:5 118:24 151:15 173:9 180:8 182:6 185:12 197:4 206:12 207:13,16,21 208:3 216:24 217:21
**understood** 28:11 196:15 217:7,22
**undertake** 78:16 112:15
**undertaken** 120:2
**undertook** 78:18 174:24
**undue** 170:16
**unethical** 66:19
**Union** 161:23 206:16,20,22 207:17
**unit** 91:5
**United** 6:11 78:14
97:16 130:14 165:17 206:25 207:10,14
**units** 92:9 109:2
**universities** 126:20
**university** 106:3 108:12 109:6 112:8, 15,25 116:23,25 117:5 126:20,24 127:5 163:21,23 164:22 166:11 167:3,9,14 210:23
**unknowns** 68:18
**unreasonable** 43:15
**untreated** 178:1 204:21 205:9
**update** 83:9
**updated** 48:20 63:2 146:21
**upper** 9:19 26:9 29:1 80:12 209:9
**URL** 142:1,3
**user** 81:3
**UTC** 6:3
**utilize** 124:15
**utilized** 36:6 81:3

**V**

**valid** 177:5
**validity** 123:22
**valsartan** 45:4 48:9,11 49:4,8
**value** 154:5,13 160:3
**values** 149:3 150:24 152:14 184:15 187:3
**variability** 89:10
**variation** 88:2 105:6
**variations** 144:20
**variety** 99:10
**various** 11:12,16 12:6 30:14 45:23 48:16 51:21 58:13 61:20 114:24 120:23 121:7 122:19 134:23 158:2 164:25 165:13 170:18
**vein** 27:8,22
**veracity** 89:9
**Veronique** 132:2
**version** 37:13 107:15 157:10 188:14
208:20,24
**versions** 136:1 138:9
**versus** 194:22 204:18 205:2,10,14
**veterinary** 168:4
**Viana** 46:6
**vice** 52:25 53:8 174:3,11,12
**Vicky** 56:12
**Victoria** 6:14
**video** 6:4
**video-recorded** 6:8
**videographer** 3:23 6:1,15 11:2,5 52:13,17 78:4,7 127:15,19 155:14,18 163:4,7 219:16
**view** 10:8 68:15 83:24 122:12 123:12,16 124:1,2,14
**viewed** 96:15
**virtue** 66:13
**visible** 16:5
**visit** 99:22
**visiting** 75:7

**vitae**
9:15 10:13, 18 163:14
**vitamin**
203:17
**vitro**
22:3,4,12, 13,21 105:25 108:15 166:17 216:1
**vitro/in**
17:12 39:2 45:25 50:12 75:15
**vivo**
13:8 17:12 22:15,21 39:2 45:25 46:8 50:12 75:15 95:21 112:17 122:2 123:20 194:21 216:13
**volume**
6:2 11:3,6 52:14,18 78:5 127:16, 20 155:15,19 219:17
**voluntarily**
94:23 95:12 97:19 162:17 206:13

**W**

**Wait**
148:20
**waive**
7:14
**want**
14:9 15:3 34:1 42:2, 16,19 44:18 55:13,21 61:10,23 63:8 79:24 80:9 93:2 101:21 121:16 123:11 127:24 155:23 163:12 167:18 174:21 185:11 191:8 193:21 196:13 210:3 212:4 218:25
**wanted**
85:5 119:2 138:3
**war**
66:13 73:9
**warehouse**
200:23
**Warner-lambert**
130:25
**warrant**
97:5
**Washington**
3:13 132:25 133:18
**watching**
143:23 144:1
**water**
18:12 73:2 176:12
**Watts**
4:3,4 7:2 8:2,6 9:23 10:2,9,11, 16,17,22 11:8 16:17 27:10,19 33:8 36:23 38:20 52:3, 11,21 53:3, 6,7 56:25 65:4 73:6 77:22 78:2,9 84:1 85:18, 20,22 102:13,17, 19,23 125:9, 12 127:12,23 135:6 139:12,13 146:16,20 148:15,21,23 150:9,21 151:17,20 152:6,22 153:12 154:24 155:12,22 158:23 162:24 178:24 179:16 180:4,12,13, 21 182:1,17, 21 185:16 188:12,14 189:8 190:13 193:18 196:1 199:9 209:20 210:3 219:9, 14
**Watts'**
179:23
**way**
10:9 15:4 16:10 17:13 24:3 29:2 30:3,4 40:12 43:16,22 45:7 68:23 76:16,20,22 77:19 79:14 83:24 126:18 135:2 150:20 171:1 172:4, 9 184:4 186:17 193:8,12 206:24 207:8 211:24
**ways**
103:23 152:3
**WBP**
34:13 37:1,6
**web**
134:12 141:23,25 142:3,5,6
**website**
141:19
**week**
45:12 46:14, 17,20 213:9
**weeks**
23:15 39:18 55:2 80:24 81:4 201:6
**weigh**
42:20 77:5
**weighed**
42:17
**weighing**
40:16 77:1,3
**weight**
40:2 109:2
**well-defined**
122:20
**went**
79:17 119:24 145:18 199:11 208:8
**What'd**
53:3
**Whatsapp**
80:3
**whatsoever**
72:18 201:7
**Wheeldon**
128:10 131:13
**whilst**
47:1 68:18
**whispering**
6:7
**White**
112:8,14,24 113:5,25 117:1 121:4, 19 136:3,24

216:11
**White's** 137:10
**Why'd** 112:21
**wide** 61:14 88:2
**widely** 14:14
**wider** 95:3
**Wier** 17:12 44:21 45:25 50:9, 11 140:19,20
**Wiley** 209:10
**will.sachse@dechert.com** 3:5
**Wills** 116:23
**withdraw** 162:17 216:22 219:5
**withdrawal** 207:22
**withdrawing** 68:12 137:23
**withdrawn** 68:9,10,17, 24
**withdrew** 94:23 95:12 162:17 206:13
**witness** 7:1,5,16,19, 24 15:23 16:13 52:9 85:19 102:18
**Wonderful** 8:13
**word** 32:1 82:21 159:7,10
**worded** 126:19
**wording** 105:1 160:4
**words** 23:12 53:22 65:6,7,9 138:5 152:7 153:13 159:12
**wordsmith** 138:2
**wordsmithing** 137:2
**work** 10:19 15:4 23:22 24:1,8 36:2,13,25 38:10 40:19 43:13 47:25 49:7 54:18 58:2 59:15 61:8 69:3 76:3 77:10, 21 96:2,12, 21 98:1 99:8 101:5 102:6, 12 103:4,5, 11,13,15,16, 25 104:2,6, 8,14,23 105:1,4,5,7, 11,20,21 106:13,16, 18,21 107:3, 4,6,9,14,15 108:7,19,22 109:16,18, 20,23 110:7 111:23 112:1,12,15 113:1,7,20, 23,24 114:2, 8,23 115:9, 12,17,24,25 116:2,6 117:13,17,18 118:12,20 119:7,9,12, 23,25 120:1, 2,4,9,13 121:2,11,18, 20 122:18,22 125:21 126:1,6,8,15 127:6 130:9, 21 131:11 136:25 137:19,20,25 140:21,23 141:5,8 144:14 148:12 151:8 162:9,10,13 164:10 167:4 169:3 170:5, 17 171:5 172:1,20 173:21 174:19 183:23 186:5 190:20 192:13,18 195:11,15, 18,20 196:20,23,24 197:1,2 199:1,3 212:15,21 215:11,15,25 216:6,11,16 217:7,25 218:4,6
**worked** 9:5 14:22 62:8 69:5 117:1 130:1 213:20,24 214:12 215:9,13,22 216:4
**worker** 41:4,21 67:12,13
**workers** 40:21
**working** 11:10 19:1 40:11 41:25 75:5 81:20 117:1,4,6 134:14 144:6 165:14 192:4,7,12 193:6,7,10 194:2 211:25 214:15
**works** 25:25 39:15 69:15 117:15 129:21,23 131:13 132:2,4 164:21 168:6,12
**workshops** 133:24 171:25
**world** 13:16,22 14:16 22:25 35:3,21 36:7 51:21 71:11 83:22 114:24 134:24 156:4,22 157:6 160:20 162:15,20 217:12 219:4
**worldwide** 48:16 214:9 216:20
**Wright** 162:6
**write** 44:4 61:7 68:1 116:8 160:1
**writes** 17:6 19:4,25 22:9 34:3 39:17 42:12 45:9 50:6 56:5,20

60:7,22 75:4,18 143:21 156:6 160:25 161:2
**writing** 39:11 44:9 74:25 121:3 130:5 162:2
**written** 34:23 45:21 47:7 57:18 69:9 85:1 136:22 169:5
**wrong** 53:3 73:8 123:10 192:1,4,7,12
**wrote** 22:17 42:23 43:1,4 76:8 129:9 159:24 160:7,14,16 161:8

**Y**

**ya** 146:5
**Yasuto** 17:5
**yeah** 9:21 10:16 19:20 23:12 25:2,13 26:20 28:10 31:9 34:9 35:2 38:3 40:23 41:16 42:2 43:17 44:15 47:7 48:4 50:2 53:11 55:1 59:2 61:19, 23 63:7 78:1 82:15 92:24 94:13,21 95:25 99:1 100:1,15 102:18 103:3 104:17 106:23 108:22 109:16 115:23 119:15,18 121:21 122:18 124:17 125:9 126:18 128:4 129:16,25 131:15 132:13 137:5 142:11 144:1 146:10 147:5 148:9 149:5 153:25 154:21 159:14 163:20 174:11 186:14 195:3 196:18 197:13,24 199:2 209:3, 11 210:1 214:7 218:14
**year** 77:10 109:17 113:13 125:19 126:12 172:10 205:7
**years** 8:19,24 13:24 62:11 104:18 117:4 134:16 164:4,19 166:5 171:7 192:24 202:25 203:2,3,4,7 213:22,24 214:2 215:6, 9,24 216:9
**yellowed** 84:23
**yesterday** 100:3
**yield** 34:25 36:12 202:18
**York** 3:8
**you-all** 80:2 144:11

**Z**

**Zantac** 6:10 17:2 51:12 53:20, 24 54:4,8 64:12 85:6 130:13,17 158:3 191:21 198:2
**Zantac's** 60:3
**Zeller** 130:19
**Zhejiang** 49:5
**zoology** 163:21
**zoom** 10:13 61:24

# EXHIBIT 24

## Deposition of Alan Main (01/20/2022)

## Subject to Renewed Motion to Seal Per DE 6124

# EXHIBIT
# 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MDL NO. 2924
20-MD-2924
-----------------------------------x
IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY
LITIGATION
THIS DOCUMENT RELATES TO:
ALL CASES
-----------------------------------x
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF ALAMEDA
CCP NO. 5150
-----------------------------------x
COORDINATION PROCEEDING SPECIAL TITLE
(Rule 3.550)

RANITIDINE PRODUCTS CASES

THIS DOCUMENT RELATES TO:
ALL ACTIONS
-----------------------------------x

November 9, 2021
9:56 a.m.

Videotaped Deposition of WILLIAM A. MITCH, Ph.D., taken by Defendants, pursuant to Notice, held via Zoom videoconference, before Todd DeSimone, a Registered Professional Reporter and Notary Public of the State of New York.

A P P E A R A N C E S :

BAUM, HEDLUND, ARISTEI & GOLDMAN, PC
10940 Wilshire Boulevard
Suite 1600
Los Angeles, California 90024
Attorneys for Plaintiffs
BY: R. BRENT WISNER, ESQ.
bwisner@baumhedlundlaw.com
ADAM FOSTER, ESQ.
afoster@baumhedlundlaw.com

ANAPOL WEISS LLP
One Logan Square
130 North 18th Street
Suite 1600
Philadelphia, Pennsylvania 19103
Attorneys for Plaintiffs
BY: CATELYN McDONOUGH, ESQ.
cmcdonough@anapolweiss.com

HILLIARD MARTINEZ GONZALES LLP
719 South Shoreline Boulevard
Corpus Christi, Texas 78401
Attorneys for Plaintiffs
BY: MICHAEL WATSON, ESQ.
mwatson@hmglawfirm.com
SOPANHA ANDERSON, ESQ.
sanderson@hmglawfirm.com

MATTHEWS & ASSOCIATES
16518 East Kingscoate Drive
Crosby, Texas 77532
Attorneys for Plaintiffs
BY: CANDICE McNABB, ESQ.
cmcnabb@matthewslawfirm.com

A P P E A R A N C E S: (Continued)

MOORE LAW GROUP PLLC
1473 South 4th Street
Louisville, Kentucky 40208
Attorneys for Plaintiffs
BY: JENNIFER MOORE, ESQ.
jennifer@moorelawgroup.com

BRADY LAW GROUP
One Embarcadero Center
Suite 500
San Francisco, California 94111
Attorneys for Plaintiffs
BY: STEVEN J. BRADY, ESQ.
steve@bradylawgroup.com

MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington D.C. 20032
Attorneys for Plaintiffs
BY: JE YON JUNG, ESQ.
jjung@maylightfootlaw.com

MARTIN, HARDING & MAZZOTTI LLP
111 Washington Avenue
Suite 750
Albany, New York 12210
Attorneys for Plaintiffs
BY: ROSEMARIE BOGDAN, ESQ.
rosemarie.bogdan@1800LAW1010.com
NICOLE HADDADNIA, ESQ.
nicole.haddadnia@1800LAW1010.com

A P P E A R A N C E S: (Continued)

DOWNEY BRAND, LLP
455 Market Street
Suite 1500
San Francisco, California 94105
Attorneys for Defendant Grocery Outlet
BY: SOPHIA CASTILLO, ESQ.
scastillo@downeybrand.com

KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, New York 10036-2601
Attorneys for Defendants Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, Boehringer Ingelheim USA Corporation, Boehringer Ingelheim International GmbH, Boehringer Ingelheim Promeco, S.A. de C.V.
BY: EVA CANAAN, ESQ.
ecanaan@kslaw.com

- and -

KING & SPALDING LLP
1180 Peachtree Street, NE
Suite 1600
Atlanta, Georgia 30309
BY: CARMEN R. TOLEDO, ESQ.
ctoledo@kslaw.com

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Attorneys for Defendant Pfizer Inc.
BY: JESSICA RYDSTROM, ESQ.
jrydstrom@wc.com

A P P E A R A N C E S: (Continued)

BARNES & THORNBURG LLP
One Marina Park Drive
Suite 1530
Boston, Massachusetts 02210
Attorneys for Retailer Defendants
BY: ALISON CASEY, ESQ.
alison.casey@btlaw.com

GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street
20th Floor
Baltimore, Maryland 21202
Attorneys for Defendants Perrigo Company PLC and Perrigo Research & Development Company
BY: RICHARD M. BARNES, ESQ.
rmb@gdldlaw.com
MATTHEW TRANTER, ESQ.
mtranter@gdldlaw.com

DLA PIPER LLP (US)
33 Arch Street
26th Floor
Boston, Massachusetts 02110-1447
Attorneys for Defendants Chattem, Inc., Sanofi-Aventis U.S. LLC, Sanofi US Services Inc. and Sanofi S.A.
BY: KATIE INSOGNA, ESQ.
katie.insogna@dlapiper.com

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Attorneys for Defendants Chattem, Inc., Sanofi-Aventis U.S. LLC, Sanofi US Services Inc. and Sanofi S.A.
BY: AARON H. LEVINE, ESQ.
aaron.levine@arnoldporter.com
MATTHEW SCARVIE, ESQ.
matthew.scarvie@arnoldporter.com

A P P E A R A N C E S: (Continued)

BOWMAN AND BROOKE, LLP
2901 Via Fortuna Drive
Suite 500
Austin, Texas 78746
Attorneys for Defendant Pantheon Manufacturing Services LLC
BY: DAVID DUKE, ESQ.
david.duke@bowmanandbrooke.com

SHOOK, HARDY & BACON L.L.P
1325 Avenue of the Americas
28th Floor
New York, New York 10019
Attorneys for Defendant GlaxoSmithKline
BY: THOMAS J. SHEEHAN, ESQ.
tjsheehan@shb.com
KIMBERLY S. PENNER, ESQ.
kpenner@shb.com
PEIYUANN GUO, ESQ.
pguo@shb.com

NATHAN A. SCHACHTMAN, ESQ., P.C.
325 East 79th Street
Suite 16-D
New York, New York 10075
Attorneys for Defendant Dr. Reddy's Laboratories
BY: NATHAN A. SCHACHTMAN, ESQ.
nathan@schachtmanlaw.com

A P P E A R A N C E S: (Continued)

JONES DAY
1755 Embarcadero Road
Palo Alto, California 94303
Attorneys for The Witness
BY: BRIAN SELDEN, ESQ.
bgselden@jonesday.com

- and -

JONES DAY
555 South Flower Street
Los Angeles, California 90071
BY: GLENN KRINSKY, ESQ.
glkrinsky@jonesday.com

ALSO PRESENT:

NICOLE COSTELLO, King & Spalding
JAMES ROBERTS, Videographer
ALI KRAL, Concierge Tech

THE VIDEOGRAPHER: Good morning. We are going on the record at approximately 9:56 a.m. Pacific standard time on November 9th, 2021. Please silence any cell phones, computer tones or other electronic devices. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the remote video-recorded deposition of William A. Mitch, Ph.D., taken by counsel for defendants in the matter of Zantac Products Liability Litigation, filed in the U.S. District Court, Southern District of Florida, case number MDL-2924.

My name is Jim Roberts here in association with Veritext New York. I'm the videographer. The court reporter is Todd DeSimone also with Veritext. All counsel consent to this remote video arrangement and waive objections to this manner of reporting and to the remote swearing in of the witness.

The court reporter has noted counsel's appearances and will now please

swear in the witness.

* * *

W I L L I A M A. M I T C H, Ph.D., called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. SHEEHAN:

Q. Dr. Mitch, good morning, good afternoon actually in my time, I'm over on the east coast here. My name is Tom Sheehan and I represent GlaxoSmithKline in this matter.

Have you given a deposition before?

A. No.

Q. Okay. So just a couple of ground rules here before we start. This deposition is being taken remotely, as you know. Where are you right now?

A. I'm in the offices of Jones Day in Palo Alto.

Q. And are you alone in the room? Do you have counsel with you? I understand you are being represented by Brian Selden. Is he in the room with you?

A. Yes.
Q. Okay. So there is a lot of people in a lot of different locations here, so it is important that we don't talk over one another. I will do my very best to allow you to answer my questions before I start another question, and if you could do your very best to allow me to finish my questions before you start to answer, that will make things go a little bit smoother. Fair enough?
A. Yes.
Q. If I ask a question that you don't understand, just let me know and I will try and rephrase it. I suspect that will happen at some point today, given the topics that we'll discuss, but just let me know and I will try and rephrase it in a way that you understand. Okay?
A. Yes.
Q. Also, if you need to take a break for any reason just let me know and we can do that. We will take breaks from time to time, every hour, hour and a half or so. The only thing that I would add is

if there is a question pending, please answer the question before you take a break. Okay?
A. Okay.
Q. Now, I'm probably going to be looking around, I have got you on a screen here, I have got you on a different laptop because we had technical issues, I've got documents with me. If I don't happen to be looking directly at you when you are speaking, it is not because I'm not paying attention or I'm being rude, it is just because there is a number of moving parts on my end. Okay?
A. Sure.
Q. What did you do, if anything, to prepare for your deposition today?
A. I met with Brian Selden and Glenn Krinsky from Jones Day.
Q. And how many times did you meet with them?
A. I'm not totally sure, but probably about three or four times.
Q. And about how long each time, if you could estimate?

A. A couple of hours each time, three or four.
Q. Did you discuss with anybody else, have any other communication, e-mail, text, with anybody other than your counsel in connection with your deposition today?
A. Well, my wife knows I'm at a deposition, nothing in terms of details, but yes, I mean, people know that I'm at a deposition.
Q. When you say people, is it just your wife or is it -- I guess what I'm getting at is did you, for example, did you talk with David Light about your deposition today?
A. No.
Q. Have you talked with any of the folks that you have worked with in connection with issues relating to ranitidine about your deposition today?
A. Not about the deposition, no.
Q. When is the last time you spoke with David Light?
A. Many, many months ago, I e-mailed him, probably back about the time

we were retracting the article.
Q. I would like to just mark as Exhibit D-1 to your deposition the notice of your deposition.
MR. SHEEHAN: Ali, could we just put that up there.
(Defendants' Exhibit 1 marked for identification.)
Q. Dr. Mitch, can you see that okay on your end?
A. Yes, I can.
Q. Have you seen this document before?
A. I have not.
Q. You have not, okay. Did you at some point undertake to identify documents, whether it is e-mails or other documents that you may have had, in connection with your work relating to ranitidine and NDMA?
A. Identify documents? I was asked by our -- Stanford's general counsel occasionally to provide specific documents or look over e-mails, that sort of thing, but for the most part Stanford went via sort of an e-mail screening program type

thing to look up documents.
Q. Okay. So Stanford -- Stanford essentially responded to any requests for documents, they coordinated with you, and Stanford counsel was the one who gathered relevant responsive documents; is that fair?
A. Yes.
Q. Okay, you can put that down, Ali.
Just some -- just some general terms here before we get started. Okay that we use ranitidine and Zantac interchangeably?
A. Yes.
Q. And when I say NDMA, I will be referring to N-nitrosodimethylamine. Fair enough?
A. Yes.
Q. And I will probably be asking you some questions about simulated gastric fluid today. Can we agree that if I use the abbreviation SGF, that stands for simulated gastric fluid?
A. Yes.

Q. Similarly, I will be asking you some questions about gas chromatography/mass spectrometry, okay we use GC/MS to refer to gas chromatography/mass spectrometry?
A. Yes.
Q. And same question for LC/MS, okay if we use LC/MS to refer to liquid chromatography/mass spectrometry?
A. Yes.
Q. Now, Dr. Mitch, you currently are a professor of civil and environmental engineering at Stanford; is that correct?
A. Yes.
Q. Not going into, you know, tremendous detail, but can you tell us in general terms what's the focus of your research?
A. I am in the environmental engineering side of civil and environmental engineering and my focus is on drinking water and wastewater treatment, specifically on contaminants in those waters.
Q. Okay. I would like to just --

thank you for that -- I would like to just get a sense of how you came to meet some of the folks that you worked with in connection with your work on ranitidine specifically.

So who is David Light?

A. David Light is an employee of Valisure, which is a company in the Connecticut area.

Q. Do you know what Valisure does?

A. My understanding from talking with David Light is that they run an online pharmacy and they also have a physical laboratory that conducts testing on the pharmaceuticals that they may or may not sell.

Q. Do you recall when you first came into contact with Mr. Light?

A. I don't recall the exact time, but it was about two years ago.

Q. Two years ago, meaning sometime in 2019?

A. I believe so, yes.

MR. SHEEHAN: Can we throw up Exhibit D-2, Ali.

(Defendants' Exhibit 2 marked for identification.)

Q. So this is an e-mail from David Light to you and others dated March 27th, 2019, correct?

A. Yes.

Q. And the e-mail is sent to you and to Dr. Zeng; is that correct?

A. Yes, that's correct.

Q. And Dr. Zeng is a colleague of yours that you had worked on in connection with some studies involving ranitidine; is that correct?

A. Yes. Dr. Zeng was my postdoctoral associate at the time of the study.

Q. So in March of 2019, Mr. Light wanted to talk to you because Valisure had detected NDMA using, in ranitidine, using gas chromatography/mass spectrometry, correct?

A. Correct.

Q. Now, we are going to get into this in some detail today, but just to cut to the chase, you came to understand that

GC/MS is not a reliable scientific technique to measure NDMA in ranitidine, correct?

A. Eventually, yes.

Q. And why is that?

A. Due to --

MR. SELDEN: Objection, vague. It is not clear whether the question was to his understanding.

Q. Dr. Mitch, did you understand my question?

A. Repeat the question, please.

Q. I will ask it again.

Why is it that gas chromatography/mass spectrometry, GC/MS, is an unreliable scientific technique to measure NDMA in ranitidine?

A. My understanding is that ranitidine is a thermally unstable molecule. Gas chromatography involves the injection of a sample into a typically heated injection port before chromatographic separation and analysis, so that if there were ranitidine in the sample being injected under hot temperatures, it

can rearrange to form NDMA before it is chromatographically separated and therefore it could appear that there is NDMA in the sample.

Q. And what temperatures does gas chromatography/mass spectrometry typically use in the injection port?

A. They temperatures used vary. I would say many techniques employ high temperatures such as 200 degrees centigrade. Ours at the time of the study used a temperature ramping technique which is referred to as large volume injection, where the injection port started at about 37 degrees centigrade and then rapidly increased to higher temperatures, I don't remember the final temperature, but somewhere in the 100 to 200 range probably.

Q. 100 to 200 would be Celsius, correct?

A. Yes.

Q. So just so I can sort of understand what you are saying, is it fair to say that due to the high temperatures utilized by the GC/MS technique, the

measurements of NDMA are created in the gas chromatography/mass spectrometry test itself and do not represent levels of NDMA that are in ranitidine products; is that correct?

A. I would rephrase it to say that it is conceivable that if there were ranitidine in the sample, it could be converted in the injection port to NDMA and appear as NDMA, so it would be not possible to distinguish NDMA that may have been originally in the sample from any that could have formed from ranitidine also in the sample.

Q. And for that reason the FDA concluded that utilizing GC/MS is not a reliable technique to actually measure or quantify NDMA in ranitidine, fair enough?

A. Well, I can't speak for the FDA. What I can say is that they developed an LC/MS-based method in about 2019, and my assumption is that they were addressing this potential artifact issue.

Q. Okay. Now, in this e-mail Mr. Light indicates that Valisure had found

your paper from 2016 that you published with Dr. Zeng, correct?

A. Yes.

Q. And he indicates in this e-mail that your paper reported increased NDMA levels in the urine of folks who had ingested Zantac, correct?

A. Correct.

Q. And, again, we are going to talk about this in a little bit of detail, but just to cut to the chase, you later retracted this paper, your 2016 paper, because the NDMA measurements after Zantac use were not reliable, fair enough?

A. Fair enough.

Q. Now, after you got this e-mail from Mr. Light, you subsequently started working with David Light and others at Valisure on issues relating to ranitidine and NDMA; is that correct?

A. I would say Dr. -- or David Light contacted me originally to discuss his analytical results and get feedback on that and thereafter we had several conversations about that and other research

he was undertaking.
Q. Okay. You entered into a consulting agreement with David Light and Valisure, if I recall correctly; is that right?
A. Yes, I signed a nondisclosure agreement and a, I forgot what they called it, but consulting agreement, or something of that nature.
Q. Okay. And we will take a look at that just to see the scope of it. But just to finish up on this exhibit, the e-mail was sent to you and to Dr. Zeng. To your knowledge, did Dr. Zeng ever work with David Light or Valisure on issues relating to ranitidine or NDMA?
A. I don't have any knowledge of him working with David Light or Valisure.
Q. Okay.
MR. SHEEHAN: You can take this down, Ali, and if we can bring up Exhibit D-3.
(Defendants' Exhibit 3 marked for identification.)
Q. Okay, here we go. So this is

an e-mail dated April 12, 2019, and in essence David Light, if you could go down there, he is asking you to work with -- work with him as a consultant, correct?

MR. SELDEN: Review the whole e-mail if you need to before answering.

THE WITNESS: Sure.

MR. SHEEHAN: I'm sorry, did somebody --

MR. SELDEN: Yes, I advised the witness that he can review as much of the e-mail as he would like before answering.

MR. SHEEHAN: Brian, I'm sorry, I don't know if others are having difficulty, but I really, really can't hear what you're saying.

THE CONCIERGE: It is true, we can't hear what you are saying.

MR. SELDEN: I will try to speak louder. Can you hear me now?

THE CONCIERGE: Can you put your phone closer to you? Because it seems like it's in the middle of the room.

MR. SELDEN: It is. I am trying to use the microphone, I apologize,

maybe this is easier. All I did was ask the witness, or, sorry, advise the witness that he can look at the entire exhibit before answering a question about it.

MR. SHEEHAN: Fair enough, yeah, yeah, yeah. I should have said that myself.

Q. Dr. Mitch, to the extent that you want to look at an exhibit, we will be going through your studies, and that sort of thing, please let me know, I will typically try to direct you what I want to ask you about, but if you need to look at something else, just let me know.

A. Okay. I have read it, but remind me what your question was.

Q. Well, David Light in April of 2019, April 12, 2019, he is asking you to enter into a consulting agreement with Valisure, correct?

A. Yes.

Q. And he indicates that he has brought in a number of prestigious institutions and partners. Do you know who he is referring to?

A. No, I don't.
Q. And he sent you the consulting agreement, and as you said, they are standard nondisclosure agreements. If we just go up, Ali, to the top part of this exhibit.
He sent you that stuff on April 18th, 2019, correct?
A. It looks to be the case, yes.
MR. SHEEHAN: Okay. So we can take that down, Ali, and let's just go to Exhibit D-4, and if you would go to PDF page 4 of this exhibit.
(Defendants' Exhibit 4 marked for identification.)
Q. I will represent to you, Dr. Mitch, that this is the consulting agreement and you signed this on April 18th, 2019, correct?
A. Yes.
Q. Okay. And if we go to the next page, PDF page 5, Ali. Okay.
And this describes the services that you are performing as a consultant to Valisure, correct?

A. Yes.
Q. Now, did David Light ever inform you of relationships that he has with counsel for plaintiffs in Zantac litigation?
A. Not that I recall.
Q. Did he ever indicate to you that he has relationships with counsel for plaintiffs in valsartan litigation involving NDMA?
A. I was aware of his research at least related to valsartan, but as I recall we didn't discuss any kind of legal, you know, cases or so relating to that work.
Q. Would you have wanted to know if David Light was -- had entered into any agreement with counsel for plaintiffs in Zantac litigation?
MR. WISNER: Objection, speculation.
Q. You can answer.
A. Okay. Well, I guess if you could be more specific. At this time when he contacted me, as I recall, my assumption was that he wanted to discuss technical

details of his work, and that was before he could even -- or before he wanted to reveal what any of his lab experiments or what he was doing was about, he wanted me to sign this nondisclosure agreement.

He also had this document you're looking at here, this consulting agreement, and my impression of that was that if this were going to be something that would drag on for a long period of time about technical feedback regarding reaction conditions or analytical techniques or what have you, then perhaps I might actually submit an invoice. But that was my impression of this. As it turned out, we never, as far as I know, submitted any invoice.

Q. Thank you. I was going to ask you that question.

So you entered into an agreement to provide consulting services for the two years from April 19th, 2019 to April 18th, 2021, correct?

A. Yes.

Q. And the agreement, contemplated

anyway, is a payment of $175 per hour, but what I'm hearing you say is you never actually invoiced Valisure for any amount in connection with this consulting agreement; is that right?

A. Yes, I don't recall ever submitting an invoice to him.

Q. Is it your understanding, then, that you never performed work for Valisure pursuant to the consulting agreement that you entered into?

A. Well, I guess it depends on what you mean by "work." He at points over the years sent me things, basically documents he was preparing where he wanted to summarize the results of our research, and I helped him edit that to ensure that his summary was accurate, but that was pretty much the extent of our work together. You know, so I guess you can call that work, if you want.

Q. Sure. I guess what I'm getting at was do you intend to send him an invoice for work that you did pursuant to the consulting agreement or are you doing it

gratis?
A. I did it gratis.
Q. Okay. But it's your understanding that the work you performed was pursuant to the consulting agreement that you had entered into with David Light and Valisure; is that fair?
A. As I recall, I didn't actually think much about this consulting agreement, so it is mostly on the gratis side. My intention at the time of signing this consulting agreement was he lumped it together with the NDA agreement, and at the time of this initial contact, I wasn't clear what he wanted in the sense of, you know, as I mentioned before, was this going to be hours, days, of looking over documents and looking over the intricate details of analytical methods, in which case I may have gone ahead and issued an invoice. But it didn't turn out to be that.
Q. Okay. Now, I take it from your work on ranitidine, you feel it is important to present data fairly,

accurately and objectively, correct?
A. Correct.
Q. And if you don't present data objectively and accurately, it can be misleading, correct?
A. Correct.
Q. And as a scientist, you don't want to present misleading data, fair enough?
A. Fair enough.
Q. And if information becomes available that casts doubt on the accuracy or validity of data, you want to correct the record, right?
A. Correct.
Q. And it is important to correct the record to prevent people from being misled, fair enough?
A. Fair enough.
Q. And you would agree that it is important to present all the data that you have whether it supports or does not support your hypothesis, correct?
MR. WISNER: Objection, incomplete hypothetical, speculation.

MS. BOGDAN: I concur with that objection.

Q. You can answer, Dr. Mitch.

A. You were asking is it important to show all of the data. In general, yes.

Q. Okay. And just to follow up on that, it is important to present data that you generate that may be inconsistent with the hypothesis that you are testing, fair enough?

MR. WISNER: Same objection, incomplete hypothetical, speculation.

A. Yes.

Q. Now, is it fair to say that David Light introduced you to some other folks in connection with the work that you did on ranitidine and NDMA?

A. Yes.

Q. And do you recall who he introduced you to?

A. One person was Ron Najafi from Emery Pharma.

Q. I'm just curious, in connection with any of your conversations with David Light, did he ever discuss with you his

criminal history?
A. No.
Q. He never mentioned illegal possession of armor-piercing bullets or bomb-making materials, anything like that?
MR. WISNER: Objection, speculation, facts not in evidence, incomplete hypothetical, misstates the record, and I think probably racist.
MS. BOGDAN: Objection as well, facts not in evidence.
Q. Did he mention any of those things to you?
A. No.
MR. SHEEHAN: Ali, you can bring that down, and you could just bring up D-5.
(Defendants' Exhibit 5 marked for identification.)
Q. So this is an invitation for a meeting for April 19th, 2019, correct?
A. Yes, it looks to be.
Q. Okay. And it is sent by David Light to you and to some others here, and the subject is "WebEx meeting scheduled:

Bill Mitch - Valisure meeting," correct?
A. Correct.
Q. And the participants are David Light, Wolfgang Hinz, Lior Braunstein, Michael Bretholz and Kaury Kucera, if I am pronouncing that correctly; is that correct?
A. Correct.
Q. Who is Lior Braunstein?
A. Lior Braunstein is a person at Sloan Kettering Hospital or Cancer Center who studies epidemiology.
Q. And do you have any understanding of the relationship between David Light and Lior Braunstein?
A. I don't know the details of their relationship.
Q. Do you have any understanding or is it just the details that you're not aware of?
A. Right, I know that they communicated with each other, yes, but I don't know the, you know, I mean, the formalities of their relationship.
Q. Okay. You don't know how long

they have known each other, for example?
A. No.
Q. Do you have any understanding of the relationship between David Light and Michael Bretholz?
A. I don't believe I know who Michael Bretholz is.
Q. I guess that answers that question.
Now, as you mentioned, David Light later introduced you to some folks at Emery Pharma, including Ron Najafi, correct?
A. Correct.
Q. And do you have an understanding of the relationship between David Light and Emery Pharma?
MR. WISNER: Objection, speculation.
MS. BOGDAN: Objection, calls for speculation.
A. So you are asking about the relationship between Emery Pharma and Valisure or I guess David Light. I don't know the details of their relationship

other than that they know each other.
Q. Okay. Did Ron Najafi indicate to you at any time that he had been retained by counsel for plaintiffs in ranitidine litigation?
A. Not that I recall.
Q. I will ask you a little bit more about that later. All right, so let's switch topics here a little bit, and let's just go to your studies. You can take that down, Ali.
I'm going to go in kind of chronological order here, Dr. Mitch. I want to talk about your 2015 study first and then your 2016 study. So if we can bring up D-8, Ali, that would be great.
(Defendants' Exhibit 8 marked for identification.)
Q. And just go to PDF page 2, if you would. Okay. So this is a study that you published in 2015 entitled Contribution of N-nitrosamines -- PDF page 2, Ali. Yeah, there we go, perfect.
This is a study that you published in 2015 entitled Contribution of

N-nitrosamines and their Precursors to Domestic Sewage by Greywaters and Blackwaters, correct?

A. Correct.

Q. What are greywaters, Dr. Mitch?

A. Greywaters is a term used to refer to sources of water that end up as sewage that do not involve toilet water, so, in other words, kitchen sink water, shower water, laundry water.

Q. Okay. And what are -- I take it from that answer that blackwaters would be toilet water?

A. Yes.

Q. Okay. And is it fair to say that the purpose of this article was to compare the loadings of N-nitrosamines and their precursors from different greywater and blackwater streams to domestic sewage?

A. Yes.

Q. And as part of this study, you measured NDMA in two volunteers who took one Zantac 150-milligram tablet; is that correct?

A. I believe so, yes.

Q. And if we could just go to PDF page 8, Ali, I think we will get into some of the details about what you found here. So I want to be on 13164 at the bottom, Ali, I think it is PDF page 8. There we go, perfect.

So if we blow this up, we see that you reported no NDMA in the raw urine samples prior to ingestion of ranitidine, correct?

A. Yes.

Q. And then the NDMA -- the mean NDMA concentration in raw urine following ranitidine ingestion was 40 plus or minus 15 nanograms per liter, correct?

A. Yes.

Q. Okay. So if we convert that to a concentration in milliliters, you simply divide by 1,000, right, and it is 0.04 nanograms per milliliter, correct?

A. Yes.

Q. Okay. And the raw urine samples, though, had, if you recall, an 18-fold dilution in tap water; is that correct?

A. I don't recall the details, but yes, there was some dilution to try to mimic a toilet flush or dilution in the toilet.

Q. I think we can get to the bottom of it. If you just take down the insert there, Ali, and go to the one at the top of the page. There we go.

So the raw urine sample had an 18-fold dilution in tap water, right?

A. Yes.

Q. So if you want to find out the concentration in milliliters, the final concentration, you would simply multiply the 0.04 nanograms per milliliter times 18, and I will represent to you that that comes out to 0.72 nanograms per milliliter. Does that sound about right?

A. It sounds about right.

Q. Okay. Ali, if you could just take this down and go back to the bottom.

Now, you say that the NDMA in the urine after Zantac intake represents endogenous nitrosation, correct?

A. Correct.

Q. And endogenous nitrosation refers to NDMA forming from ranitidine in the human body after ingestion, correct?
A. Correct.
Q. All right. So the analytical method that you used to detect NDMA in urine in this study was gas chromatography/mass spectrometry, right?
A. Correct.
Q. And and as we previewed earlier, you learned that GC/MS leads to falsely inflated levels of NDMA when the sample also contains ranitidine, fair enough?
A. Correct.
Q. And ultimately you issued a correction in 2021 for the analysis in this study that involved ranitidine, correct?
A. Correct.
Q. Ali, if we could just go to the first page of this exhibit. And this is the correction that you issued, correct, Dr. Mitch?
A. Yes.
Q. Okay. And in the correction --

if you could just blow up the highlighted language there, Ali -- you note that "Research has identified the potential for an analytical artifact that could have contributed to the levels of NDMA measured in urine samples containing ranitidine in our study," right?
A. Correct.
Q. And then you go on to say that given the analytical artifact, the measurements that you reported are not reliable, correct?
A. Correct.
Q. So, in other words, the NDMA measured in urine samples after ranitidine ingestion reported in this study does not represent endogenous formation of NDMA from ranitidine, fair enough?
A. Well, I guess I would rephrase to say it is impossible to tell because we cannot rule out the fact that there could have been an analytical artifact, so hence, you know, as indicated in this text, the numbers are not reliable.
Q. Fair enough, and I understand

the distinction you're drawing.
So is it fair to say that you would not rely on the data in this study to draw a conclusion that there is in fact endogenous formation of NDMA after ranitidine ingestion?
A. Correct.
Q. It would not be reliable to draw that conclusion from the data presented in this paper because of the unreliable nature of the technique used to measure NDMA, fair enough?
A. Correct.
Q. Okay. You go on to say in the correction here that "Although the detection of NDMA in these specific urine samples was not reliable, this does not affect the conclusions of the study, since we did not conclude that ranitidine consumption was associated with an important contribution of NDMA or its chloramine- or ozone-reactive precursors to sewage."
Did I read that correctly?
A. You did.

Q. Okay. And what did you mean by that?
A. What I meant by that was that the main conclusions of the article were that the primary contributors of NDMA and its disinfectant reactant precursors appeared to come from laundry, not from urine, and I don't recall the specific details, but we had some calculation in there, in this original manuscript about the number, assuming that the NDMA concentrations were reliable, the number of Americans that would -- or percentage of Americans that would have to be consuming Zantac on a daily basis for it to meaningfully contribute to NDMA in water, wastewater, etc.
Q. I understand.
Based on what you have just said, is it fair to say that according to your study the primary contributor to NDMA in sewage was laundry water, correct?
A. In domestic sewage, yes.
Q. Okay. And the contribution of laundry water to NDMA in domestic sewage

has nothing to do with ranitidine, fair enough?
A. Assuming that the fraction of Americans consuming ranitidine on a daily basis, which we didn't necessarily know at that time, was low, and that the numbers in this article were reliable, which the second aspect that's indicated by this correction we don't believe.
Q. Let me just follow up on that real quick.
So I think you've told me that the numbers as they relate to NDMA in urine after Zantac ingestion are not reliable, correct?
A. Correct.
Q. And the primary conclusion of this study was a contribution of laundry water to NDMA in domestic sewage, correct?
A. Correct.
Q. Given the correction that you issued, would you agree that scientists should not rely on your 2015 paper to support an opinion that there is endogenous formation of NDMA after ranitidine

ingestion?
MR. WISNER: Objection, asked and answered.
MS. BOGDAN: Same objection.
Q. You can answer, Dr. Mitch.
A. Okay. You were asking should people rely on the results of this study to validate or demonstrate that there is endogenous transformation of ranitidine to NDMA that ends up in the urine, so correct, I would not rely on the study.
Q. Okay. We can take that down, Ali, and let's go to Exhibit D-9, which is your 2016 study, Dr. Mitch.
(Defendants' Exhibit 9 marked for identification.)
Q. And we can go to the next page. There we go.
So you published a paper in the journal Carcinogenesis in 2016 entitled Oral Intake of Ranitidine Increases Urinary Excretion of N-Nitrosodimethylamine, correct?
A. Correct.
Q. And you used the same

analytical method of GC/MS to identify NDMA in human urine in your 2016 study as you did in the 2015 paper, correct?
A. Yes, we used GC/MS.
Q. And ultimately this article was retracted in 2021, correct?
A. Correct.
Q. And both you and your co-author, Dr. Zeng, made the decision to retract the article, right?
A. Correct.
Q. And what does it mean to retract an article?
A. What does it mean? Can you be more specific? It means you no longer believe the results are reliable.
Q. Okay. Was one of the reasons that you retracted this paper to ensure that other scientists and the public had accurate information about the formation of NDMA after ingestion of ranitidine?
A. Yes, that was one of the reasons.
Q. And it was important for you that the record for your study be

scientifically accurate, correct?
A. Correct.
Q. And the record does not support that NDMA forms from ranitidine after ingestion, correct?
MR. WISNER: Objection, misstates his testimony, as well as asked and answered.
MS. BOGDAN: Objection.
Q. You can answer, Dr. Mitch.
A. We -- I'm trying to remember the question -- we -- why did we retract the study? What was the question again?
Q. The record from this study is not reliable evidence that ingestion of ranitidine results in endogenous formation of NDMA, fair enough?
MR. WISNER: Objection, asked and answered.
A. Correct.
Q. Now, if we go to the first page, Ali, and just blow up -- just blow up the language so we can see it. Thank you.
Regarding the recent research that you refer to here identifying the

potential for an analytical artifact, you cite to an FDA document, correct?

A. Correct.

Q. So is it fair to say that you are relying on the FDA for information regarding the reliable testing methodology that should be employed for assessing potential NDMA formation from ranitidine?

MR. WISNER: Objection, overbroad, misstates his testimony.

A. I don't recall the details of that specific reference. I believe it was -- yeah, I don't remember if this specific reference is the one that details analytical methods or is the market withdrawal notice.

Q. Fair enough, okay. So I've got a few more questions about this 2016 article.

If you recall, this actually involved two experiments, right? There was the human urine experiment but there was also an in vitro nitrosation assay, correct?

A. Correct.

Q. If we can go to PDF page 3. What is a nitrosation assay?
A. A nitrosation assay was essentially -- there has been kind of decades of research on nitrosation. Nitrosation is a reaction involving acidic nitrite to form nitrous acid and then that reacts with amines to form nitrosamines, and that is referred to as nitrosation. So the nitrosation assay was essentially conducting that type of reaction with a model compound, in this case ranitidine.
Q. And you used different concentrations of nitrite in conducting that experiment, correct?
A. I don't recall the details, but likely we did.
Q. Okay. Now, just stepping back, in vitro means that the experiment was not done in a living animal, right?
A. Correct.
Q. It sometimes will be referred to as test tube studies; is that fair enough?
A. Yes.

Q. Now, we are going to be talking about several in vitro experiments involving or evaluating the potential for NDMA formation from ranitidine, but I just want to get a sense of how you are viewing those studies.

As a general proposition, is it fair to say that you would not conclude from an in vitro experiment that NDMA will actually form in a human being after ingestion of ranitidine?

MR. WISNER: Objection. Sorry, Rosemarie.

MS. BOGDAN: Go ahead, Brent.

MR. WISNER: Speculation, incomplete hypothetical, overbroad.

MS. BOGDAN: Speculation, mischaracterizes his testimony and the article.

A. So yes, the conditions are ones that I believe we consulted literature such as the article referenced right above the yellow line, Maura, et al (22), about what people who conduct such assays in the past consider conditions that might mimic a

stomach, but it is very difficult to truly mimic a stomach, that there are several things that happened that are difficult to mimic in a test tube such as the specific salt concentrations, particularly nitrite, and the length of time that a stomach juice, if you will, gastric juice, stays in the stomach.

Q. Okay. So is it fair to say that you conduct an in vitro study and whatever those results are with respect to the potential for NDMA from ranitidine, you have to then test that in humans to know whether it is actually happening in humans, correct?

MS. BOGDAN: Objection, calls for speculation, mischaracterizes.

A. So to truly know whether it is happening in humans, yes, you would ideally want to grab a sample from a human.

Q. Okay. So if we take that down, Ali, and let's go to the right-hand column and just blow up the highlighted language there. Okay. So I think actually go down -- actually, go back to the original

one, down there in the bottom on the left. I need to ask a question about that. Okay.
So this gives us the conditions, right? 5 millimolar sodium nitrite was dissolved in 5 milliliters of water and was added to 2.5 millimolar ranitidine dissolved in 15 milliliters hydrochloric acid, correct?
A. Correct.
Q. Okay. So I just want to -- I just want to get a sense of some figures here because it will be useful to compare apples to apples later on.
So, in total, 5 millimolar sodium nitrite was incubated with 2.5 millimolar ranitidine in 20 milliliters of solution, correct?
A. 20 milliliters of solution, where are you seeing that?
Q. Because you have got 5 millimolars of sodium nitrite in 5 milliliters of water, and then you add that to the 2.5 millimolars ranitidine in 15 milliliters of hydrochloric acid?
A. Yes.

Q. So we have got 20 milliliters of solution total, correct?
A. Correct.
Q. And 1 millimole per liter is a 1 millimolar concentration, correct?
A. Correct.
Q. So the nitrite concentration in solution, if we wanted to figure that out here, is simply 5 millimolars divided by 0.02 liters, and I will represent to you that that equals 250 millimolar concentration of nitrite. Does that sound about right?
A. That sounds about right.
Q. And the ranitidine concentration is 125 millimolar, correct?
A. Yes.
Q. So the molar ratio of sodium nitrite to ranitidine is 2 to 1, correct?
A. Correct.
Q. All right. So let's bring that down, Ali. Let's go over to the right-hand side. And if you would pump up -- yeah, right there.
Right up at the top, that tells

us that you used LC/MS to identify the nitrosation products in the mixture, correct?
A. Yes.
Q. And if we go to -- let's go to PDF page 4, the top right of PDF page 4 -- no, PDF page 4, you've got to go back one. There we go. Top right-hand side. Blow that up. Perfect.
You indicate here that previous research has not demonstrated NDMA formation from ranitidine under these conditions, correct?
A. Correct.
Q. And you go on to explain that high-resolution mass spectrometry was used to identify products formed from reactions of ranitidine and nitrite at stomach-relevant pH in vitro, correct?
A. Correct.
Q. And you are referring to the LC/MS testing and you talk about Table 1 to identify the nitrosation products, right?
A. Correct.
Q. All right. So let's take a

look at Table 1 which is on the next page there, Ali. All right, if we could just blow up Table 1.

So looking at Table 1 on page 628, this is a table entitled High Resolution Accurate Mass Measurements of Identified Ranitidine Nitrosation Products, correct?

A. Correct.

Q. And NDMA is not identified as a ranitidine nitrosation product using LC/MS in this table, correct?

A. Correct.

Q. So let's go back to page 626, PDF page 3, Ali. One more back, all right, and just blow up the right-hand side again.

Now, you indicate that there are additional in vitro nitrosation experiments using a range of nitrite to ranitidine molar ratios with a constant final reaction volume of 10 milliliters, e.g., 5 millimolar ranitidine, correct?

A. Correct.

Q. All right. So we've got to do a little bit more math here, but I think

given how easily you did this before, you will be able to easily do it again.
So since the ranitidine concentration of 5 millimolar doesn't change, you simply multiply the ratio by 5 to get the nitrite concentration, right?
A. Correct.
Q. So, for example, for a molar ratio of 0.1, the concentration of nitrite used in that experiment is 0.5 millimolar, correct?
A. Correct.
Q. And if there is a molar ratio of 10, that would be 50 millimolar concentration of nitrite, right?
A. Correct.
Q. All right. And it says that LC/MS was used to track the disappearance and growth of chromatographic peaks as detailed below, and you refer to Supplementary Table 3, correct?
A. Correct.
Q. So let's go to Supplementary Table 3, that is PDF page 19, Ali. It would be page 19 of the PDF itself.

THE CONCIERGE: Can you give me a number at the top?

MR. SHEEHAN: The document page I think might be -- I'm not sure, Peiyuann, do you know that? It is S-8, because it is part of the supplementary table.

THE CONCIERGE: That is going to be difficult for me to find because it doesn't define that here.

MR. SHEEHAN: Is there not a way to just go to the PDF? There we go, S-8, there we go.

Q. That is Table -- Supplementary Table 3, correct, Dr. Mitch?

A. I'm seeing S-7 now.

Q. You've got to go back to -- there we go, right there, Supplementary Table 3.

A. Yes.

Q. Okay. And my question about Table S3 is that there is no indication of any data supporting a chromatographic peak that would relate to NDMA, correct?

A. Correct.

Q. So let's go back to PDF page 3,

page 626, Ali, of this document. Okay. And if we look at the bottom of the -- not the bottom of the right column, but just the same stuff that we had highlighted before, Ali. There we go.

I'm just going to focus your attention on the bottom here. So GC/MS was used to measure NDMA in the reaction solution, correct?

A. Correct.

Q. Is it fair to say that in order to detect NDMA in a sample containing ranitidine using LC/MS, the LC/MS procedure has to be customized for that purpose?

A. Correct.

MR. WISNER: Objection, incomplete hypothetical.

Q. I'm sorry, Dr. Mitch, did you answer?

A. Yes, that would be fair to say.

Q. Okay. And that's the technique that the FDA issued guidance about in 2019, correct?

MR. WISNER: Objection, misstates his testimony.

A. The FDA issued an LC/MS-based method in 2019.
Q. Okay. And they issued that LC/MS method specific to measuring NDMA reliably in ranitidine, correct?
A. Yes.
Q. Okay. Now, I want to ask you some questions specifically about Figure 1.
We can take that down, Ali, and if we go to PDF page 6, which is page 629, the figure in the bottom right corner is what I want to ask you about. Now, this figure in your 2015, or 2016 article, rather, relates to the formation of NDMA at different molar ratios of sodium nitrite to ranitidine, correct?
A. Correct.
Q. Okay. And if we look at this, it shows that even with the potential analytical artifact from GC/MS, the NDMA concentration did not start to increase until the nitrite to ranitidine ratio was above 1.0, correct?
MR. WISNER: Objection, misstates the document.

A. Correct.
Q. And a nitrite to ranitidine ratio of 1.0 corresponds to a nitrite concentration of 5 millimolar, correct?
A. Correct.
MR. WISNER: Again, objection, misstates the document.
MS. BOGDAN: Objection.
Q. Now, the plot here that you have got along the bottom, we can see the NDMA levels in the little circles with X's in them along the bottom of the figure, that plot of NDMA levels versus nitrite to ranitidine molar ratios starts at zero millimolar nitrite, correct?
MR. WISNER: Same objection.
A. It is hard to see because there is a giant T in the middle, but it appears to --
Q. You know what, let's go to -- let's go to -- let's take this down, Ali. Let's go to D-10.
(Defendants' Exhibit 10 marked for identification.)
Q. I understand exactly what you

are saying, Dr. Mitch. It has got that big retracted thing on there. But I think I've got a clean copy here, that's all I wanted to bring your attention to. So if we go to page 626.

THE CONCIERGE: I think it is a different PDF page on this one.

MR. SHEEHAN: All right, go ahead, go forward. We'll find it. There we go. Just blow up the bottom right there.

Q. So as we can see on this document along the bottom there we have got the circles with X's which represent NDMA at various sodium nitrite to ranitidine molar ratios, correct?

A. Yes.

Q. Okay. And the plot, the question I was asking that was blocked out by the T in the retracted version is that it starts with zero concentration of sodium nitrite, correct?

A. Correct.

Q. And you included zero millimolar nitrite, because it is important

for readers to know whether there was any NDMA with no nitrite added, correct?

MR. WISNER: Objection, misstates his testimony and the document, and I will just keep this running objection, Tom, so I don't have to interrupt you regarding levels of detection and everything.

MS. BOGDAN: I concur with the objection.

A. Remind me what your question was.

Q. Well, my question is getting at this: I mean, you include zero millimolar concentration of nitrite on your plot here, and you do that because it is important to understand whether there is any evidence of NDMA without any added nitrite, correct?

A. Correct.

Q. Okay. So is it fair -- is it fair enough to say to understand whether ranitidine can react with nitrite to form NDMA you need to know the starting level of NDMA at zero millimolar nitrite, right?

A. Yes.

Q. And why is that?
A. Well, what we were looking for was whether there was an increase in NDMA associated with the occurrence of nitrite.
Q. And so otherwise -- let me see if I can ask this.
You wouldn't know whether any NDMA detected may have been in the ranitidine used in the experiment or whether it was formed from the reaction between ranitidine and nitrite unless you know what happens at zero millimolar nitrite, correct?
A. Well, that is certainly one way. The other way is if you increase the nitrite concentration, do you get an increase in NDMA.
Q. Fair enough, fair enough, until you see that increase, but you need to know the levels prior to the increase to understand sort of where your starting point was, correct?
A. Yes. It can be helpful, but it's not always necessary, because you can show, even if there is a background level,

you can also show an increase associated with increasing nitrite concentrations.
Q. Fair enough, fair enough. But you would want to know what the background level is ideally, correct?
MS. BOGDAN: Objection, mischaracterizes his testimony.
A. It is interesting to know, yes.
Q. And in fact what you did here was to look at incrementally higher concentrations of nitrite to see whether there was any threshold at which the concentration of sodium nitrite forces the production of NDMA, fair enough?
A. Yes.
Q. And as we discussed, that threshold nitrite concentration for the production of NDMA was greater than 5 millimolar nitrite, correct?
MR. WISNER: Objection, misstates the document.
A. It is hard to say from the figure. Certainly it looks a lot higher. This is from six years ago, so I don't remember the details, but certainly it is a

lot higher at 2 to 10 than at 1 or lower, but whether it would be 1, for example, represents a level of zero or a level above zero, I can't tell from this plot. But it would appear that it is above zero because you can see the dashed line is above -- next to the 1, the 1 molar ratio appears to be slightly above zero.

Q. Slightly above zero, okay. And that's the molar ratio where we agreed there is a 5 millimolar concentration of sodium nitrite, correct?

A. Correct.

Q. All right. So I want to just -- we can take that down, Ali -- I want to ask you a little bit about the differences in the NDMA levels that you reported in your 2015 article versus your 2016 article, okay?

A. Okay.

Q. All right. Now, if you recall when we discussed the results of your 2015 article, we agreed that the concentration of NDMA that you reported in urine after 150 milligram ranitidine ingestion was 0.72

nanograms per milliliter, do you recall that?

A. Yes.

Q. And in your 2016 article you reported a maximum NDMA urinary level after 150 milligrams ranitidine increased, it increased some 400-fold, to 95.6 nanograms per milliliter, correct?

A. Yes.

Q. So I will represent to you that 95.6 nanograms per milliliter is just over 130 times greater concentration of NDMA than 0.72 nanograms per milliliter. Does that sound about right to you?

A. Yes.

Q. Did it strike you as inconsistent or odd that there was this disparity in what you observed in 2015 in connection with measuring NDMA after ranitidine ingestion compared to what you observed in 2016?

A. Not necessarily, because one was a snapshot in time, whereas the 2016 study was an attempt to capture an excretion profile which varies over time.

Q. Understood, understood. Now, you eventually reviewed a paper, I believe, by some FDA investigators that evaluated endogenous formation of NDMA after ranitidine ingestion, correct?

A. If you are referring to early 2021, yes.

Q. Yes. The lead author's name if I recall correctly is Florian. Does that ring a bell?

A. I don't recall the lead author's name, but it was an FDA study.

Q. Okay. I'm going to ask you a little bit about your review of that study later, but right now I really just want to focus on their description of your 2016 paper, okay?

If we could bring up Defense 11, Ali.

(Defendants' Exhibit 11 marked for identification.)

Q. Okay. What we are showing you is a paper entitled Effect of Oral Ranitidine on Urinary Excretion of N-Nitrosodimethylamine a Randomized

Clinical Trial, with the lead author's name of Jeffrey Florian. Do you see that, Dr. Mitch?

A. Yes.

Q. And as you said, this was published in 2021, correct?

A. Correct.

Q. And you peer reviewed this paper prior to publication, correct?

A. Correct.

Q. Now, if we just go to the Discussion section on PDF page 7, Ali. Okay.

Now, in this highlighted language they are describing a prior clinical study reporting a 400-fold increase in 24-hour urinary excretion of NDMA and a 2.5-fold increase in DMA, which stands for dimethylamine, after ranitidine ingestion, right?

A. Yes.

Q. And they are referring to your study, correct, your 2016 study?

A. Yes.

Q. And if you go just a couple of

sentences below here, we see that they say "The analytical artifact was likely the primary factor; however, other factors could have contributed to falsely high NDMA levels in the prior study," correct?

A. Correct.

Q. So basically they are just pointing out that your 2016 study used GC/MS, it is now understood that GC/MS can lead to falsely high NDMA levels with ranitidine, and they are saying there are other reasons that may have contributed to elevated NDMA levels, fair enough?

A. Yes.

Q. All right. So if we can just go to eTable 10, which is PDF page 17 of this document, Ali. And there is a comparison here of the current study and your study from 2016, correct?

A. Correct.

Q. If we go to the section on the study findings, which I think is on the next page, Ali. If we can just blow that up.

It says that in your 2016

study, 24-hour urinary excretion of DMA increased from 9.7 milligrams prior to ranitidine ingestion to 24.9 milligrams after ranitidine ingestion, correct?
A. Correct.
Q. And they note that this difference would account for 93.4 milligrams of the ranitidine product on a per mole basis, right?
A. That's what they have, yes.
Q. Okay. And in the third bullet, or in the third bullet there, they say the detected amount of ranitidine and DMA in urine accounted for 143.4 milligrams of the 150 milligram ranitidine dose, correct?
A. Correct.
Q. They go on to say that "Ranitidine metabolites (ranitidine N-oxide, ranitidine S-oxide, and desmethyl ranitidine) accounted for approximately 9.4 percent (14.1 milligrams) of the 150 milligram ranitidine dose in urine," correct?
A. Correct.
Q. And they say "These totals

exceed the total amount of ranitidine administered. In addition, oral ranitidine only has 50 percent bioavailability," right?

A. Yes.

Q. Okay. So the point they are making here, Dr. Mitch, seems to me that the numbers just don't seem to add up given the dose of ranitidine that was administered, fair enough?

MS. BOGDAN: Objection, mischaracterizes the document.

A. That is the point they are making, yes.

Q. Did you -- did you read this while you were peer reviewing the study?

A. No.

Q. You did not. Is this the first time that you are seeing this?

A. Yes.

Q. Okay. Do you disagree with the characterization that -- of your study that is presented in this table from the FDA study?

A. Well, I would say that the

point they are making here about 143 plus 14 being greater than 150 is not necessarily a valid point in the sense that there is uncertainty in all measurements, so having 157 milligrams compared to 150 milligrams is not at all surprising.

Q. Okay.

A. Typical analytical methods have plus, you know, ideally somewhere between 70 and 130 percent recovery.

Q. Understood, understood. Did you, prior to doing your 2016 study, did you evaluate how much ranitidine is excreted unchanged in urine?

A. Prior to this 2016 study, we weren't really in the business of human subject studies.

Q. I appreciate that, and I'm just wondering if you evaluated at all whether ranitidine is excreted unchanged in urine, and, if so, how much prior to conducting the testing that was done in your 2016 study?

A. We conducted no independent studies of ranitidine excretion in urine.

Q. Okay. Did you -- did you -- what did you do in 2016 to ensure that the GC/MS method was a valid method to detect NDMA in samples that contained ranitidine?

A. We used a standard or slightly modified EPA, U.S. Environmental Protection Agency method 521 that has been used in prior studies in my field to evaluate NDMA formation from ranitidine, yeah, from ranitidine.

Q. Okay. Did you -- did it come as a surprise to you that when FDA evaluated NDMA in ranitidine in 2019 they determined that GC/MS was not a reliable technique to accurately measure NDMA?

A. Yes.

Q. Would you agree that a reasonable scientist could read your 2016 paper and conclude that the levels of -- the reported levels of NDMA may not be plausibly generated by ranitidine ingestion?

MS. BOGDAN: Objection, calls for speculation.

A. I would say no, I would

disagree, it was peer reviewed, and we had no such comments.

Q. Fair enough. Do you agree -- well, I'm going to withdraw that and I will move on. You can take that down, Ali.

Now, I'm going to switch gears just a little bit here, Dr. Mitch. I don't know if you want to take a quick break, if you want to keep going. We have been going, I forget -- we have been going a little bit over an hour I think.

MR. SELDEN: Why don't we take a break. In addition to going for more than an hour in the deposition, the witness has been in the chair for quite a bit of discussion among counsel.

MR. SHEEHAN: How long do we want to break for?

MR. WISNER: Let's go off the record.

THE VIDEOGRAPHER: We are going off the record 11:17 a.m. This is the end of media unit one.

(Recess taken.)

THE VIDEOGRAPHER: We are going

back on the record 11:34 a.m. This is the beginning of media unit two. Okay, you may proceed.

BY MR. SHEEHAN:

Q. Dr. Mitch, you recognized that the GC/MS methods that you used to measure NDMA in your 2016 study were not reliable and you, for lack of a better word, you essentially tried to redo the 2016 study, correct?

A. Using LC/MS, correct.

Q. And you worked with a company called Emery Pharma to conduct the new study, correct?

A. Correct.

Q. All right. I just want to walk through that process with you a little bit here.

Ali, if we could bring up Exhibit D-12 and go to PDF page 3.

(Defendants' Exhibit 12 marked for identification.)

Q. Okay. So down at the bottom of this, if we could just go down to the bottom and highlight that language at the

bottom of this page, Ali, you are writing to David Light, correct, and you are telling him, hey, I have applied for IRB permission to collect some samples, and you are basically saying hey, do you think this is going to be useful at all; is that correct?

MR. SELDEN: Counsel, can we see the header and the date of this e-mail again?

MR. SHEEHAN: Absolutely. I believe it is December 4th, 2019.

A. Okay. Your question was?

Q. You are telling David Light that you are conducting a new study to analyze NDMA using LC/MS-based methods, correct?

A. Correct.

Q. And you are asking him do you think this is going to be useful or not to undertake this new study, correct?

A. Correct.

Q. And you questioned the significance, quote, "after this epi study," correct?

A. Correct.
Q. Were you referring to Dr. Braunstein's epidemiology study?
A. As I recall, yes.
Q. Okay. So if we could just go up, we can take that insert out, Ali, and go to the next one in the chain there, also on December 4th, 2019.
Dr. Braunstein replies to you, correct?
A. It looks to be that way, yes.
Q. And he says -- he indicates that "Your study is going to be critical since many will say that your original findings are a GC-based artifact and the FDA will surely make that claim," that's what he wrote, correct?
A. That's what he wrote.
Q. And he also says your follow-up study will have significant implications because his epidemiology study will have severe limitations, right?
A. That is what it says, yes.
Q. Okay. Do you have an understanding that Dr. Braunstein's

epidemiology study was submitted to numerous scientific journals and it was always rejected for publication?

MR. WISNER: Objection, misstates the record, vague and ambiguous as to which epidemiological study.

MS. BOGDAN: Objection.

A. I'm not aware of all the different places he may have submitted it. To my knowledge, it hasn't been published.

Q. To your knowledge, it has not been published, is that what you said?

A. Yes.

Q. Do you know that Dr. Braunstein was recently deposed in this litigation?

A. I was not aware.

Q. Okay. Would you defer to Dr. Braunstein regarding the severe limitations of his study?

A. Yes.

Q. Okay. You can take this down, Ali.

So at some point David Light introduced you to Ron Najafi, correct?

A. Correct.

Q. I just want to get a sense of the timing here. If we could bring up Exhibit D-13, Ali.

(Defendants' Exhibit 13 marked for identification.)

Q. And go to PDF page 2. Okay. I don't think that's quite right. Let me just look at my -- aha, yeah, we just need to go to the next page as well. Actually, let me do this, go to the previous page, Ali.

So this is -- this is an e-mail from David Light dated January 2, 2020 to you, correct, Dr. Mitch?

A. It appears to be that, yes.

Q. And if we just go to the next page. He says "I also wanted to introduce you to Dr. Ron Najafi, copied here. Ron is CEO of a contract research laboratory in the Bay Area and just released some of his data on ranitidine through an FDA citizen petition," correct?

A. Yes, that's what it says.

Q. Okay. Now, did David Light ever indicate to you that he had previously

contracted with Emery to test ranitidine samples for NDMA?
A. Not that I recall.
Q. And you end up having dinner with David Light and Ron Najafi, correct?
A. Correct.
Q. And if we could just go to -- if we can take this down, Ali, and we can go to D-14.
(Defendants' Exhibit 14 marked for identification.)
Q. And go to PDF page 4 of D-14, and here we see an e-mail from you dated January 17, 2020 to Ron Najafi, Neelanjan Bose, who is also from Emery Pharma, and David Light, correct?
A. Yes, to Ron and Neelan, yes.
Q. And David Light, correct?
A. Yes.
Q. You say "It was great to meet you all. I was able to get a package of 150 milligram tablets that should reach me this weekend. I was hoping to start the urine study soon and was wondering if" -- and it is blacked out -- "is still

interested in applying LC/MS to some of these samples," correct?
A. Correct.
Q. And if we take that down and just look at the response, if we go back a page, if we go to PDF page 3. There we go. It is Ron Najafi responding to you the same day, January 17th, 2020, correct?
A. Correct.
Q. And he says he is looking forward to collaborating with you on the NDMA project as we discussed, correct?
A. That is what it says.
Q. So the bottom line here is that you and Emery decide to be co-investigators with respect to a new study evaluating NDMA formation after ranitidine ingestion, correct?
A. Correct.
Q. And just for purposes of referring to this study, can we call it the Mitch/Emery study?
A. Yes.
Q. Now --
MS. BOGDAN: Assumes facts not

in evidence.

Q. Now, did Dr. Najafi mention to you that just four days earlier, on January 13th, 2020, he was retained by lawyers for plaintiffs in Zantac litigation?

A. I don't recall him mentioning that.

Q. Okay. Are you surprised to learn that?

MR. WISNER: Objection, assumes facts not in evidence.

MS. BOGDAN: Objection as well.

MR. WATSON: Same objection.

A. I don't really have an opinion one way or the other on it.

Q. Is that something that you would have wanted to understand before deciding to work with Emery Pharma?

MR. WISNER: Objection, speculation.

MS. BOGDAN: Objection, speculation.

A. Not necessarily.

Q. Well, would you agree that retention by a party in litigation

represents a potential conflict of interest, correct?

MS. BOGDAN: Objection, calls for speculation.

MR. WISNER: Incomplete hypothetical.

A. At least in my understanding, you can testify whichever way you want when you're in front of -- when you are actually giving the testimony. It depends on -- you can say whatever it is that you perceive to be the truth, whether or not somebody is paying you or not.

Q. Understood. And maybe my question is unclear. Let me ask it this way:

If you had been retained by the defense or by the plaintiffs in Zantac litigation prior to publication of your 2016 study, you would have noted that in connection with publishing that study, right, as a potential conflict of interest?

MS. BOGDAN: Objection, calls for speculation.

A. (Inaudible)

Q. Say it again, Dr. Mitch, I'm sorry, I didn't hear you.
A. It is hard to say. But likely I would have. I was not --
THE CONCIERGE: I'm sorry, excuse me, we cannot understand you. I'm going to have to stop sharing my screen. It sounds as though you have another audio on. I apologize, but I could not understand him.
THE WITNESS: Let me try it again. Is that better?
THE CONCIERGE: That does sound better, yes, thank you, sorry.
A. The question was about would I have acknowledged being retained by, you know, pharmaceutical companies or somebody of that nature or plaintiffs, I guess, prior to this 2016 study? Likely I would have. I was not.
Q. And I understand that you weren't. Why would you have likely disclosed that in connection with your publication if you had been retained by one of those parties?

A. Under the supposition that it perhaps could be perceived in a certain way.
Q. Okay. So it is information that you would want to be up front about, correct?
A. Correct.
Q. So if we -- let's go to the study protocol. If we could take that down, Ali, and just go to Defense 15.
(Defendants' Exhibit 15 marked for identification.)
Q. And this is an e-mail from you to, dated Tuesday, April 28th, 2020, to Neel Bose, Ron Najafi, Eshani Nandita and Neeku Mahdavian, if I'm pronouncing that correctly, and you distribute the IRB protocol and some other materials in connection with the study that you are performing with Emery, correct?
A. Correct.
Q. All right. So if we could just go to PDF page 10 of this document, Ali. Okay, so this is the approved IRB -- oh, and, by the way, just so the record is

clear, IRB stands for Institutional Review Board; is that right?

A. I believe so, yes.

Q. And that's a body that you need approval from prior to doing human clinical research, correct?

A. Correct.

Q. So this is the approved IRB protocol and we can see that the approval period is February 15th, 2020 to November 30th, 2020, correct?

A. Correct.

Q. And if we can go to the bottom of PDF page 11, there is three study locations, correct, Stanford University, USDA, and Emery?

A. Correct.

Q. All right. Ali, let's go to PDF page 16. All right, if you could just blow that up. That's great. All right, so section sub (b), section (b) of the bottom of this is actually what I want to talk to you about, Dr. Mitch. It says, section (b), under the purpose of the study, indicates "State what the investigators

hope to learn from the study. Include an assessment of the importance of" -- and if we go to the next page, Ali -- "the importance of this new knowledge."

Did I read that correctly, Dr. Mitch?

A. You read it correctly.

Q. So you filled this out, correct?

A. Yes, I did.

Q. And you state here under the purpose of the study that "Zantac (ranitidine) is a widely used pharmaceutical. Our findings from the previous study, and recent findings from others, suggest that its use is associated with exposure to the carcinogen NDMA. However, questions have arisen as to whether the NDMA we observed was attributable to an analytical artifact. The purpose of this application is to collect additional samples to determine whether NDMA occurs in blood or urine associated with Zantac consumption. This will aid the determination as to whether

use of this pharmaceutical is safe."

Did I read that correctly?

A. You did.

Q. With respect to aiding the determination as to whether the use of this pharmaceutical is safe, what did you mean?

A. I'm trying to recall, but likely it had to do with knowing that there were high levels of NDMA in the urine or blood would suggest, after consumption of Zantac versus prior to consumption of Zantac, would suggest that it is something the FDA should consider as to whether they should maintain use of ranitidine.

Q. Understood. So if the evidence from the new study did not support that Zantac consumption results in endogenous formation from NDMA, that would be information supporting the safety of the product, correct?

MS. BOGDAN: Calls for speculation.

MR. WISNER: Incomplete hypothetical.

MR. WATSON: Objection to form.

A. Okay, so the absence of evidence of NDMA in urine and blood samples would indeed indicate that there was no demonstrable association between consumption of Zantac and endogenous formation of NDMA.

Q. Okay. Now, blood samples were planned to be collected from some of the subjects, correct?

A. Correct.

Q. And why was it important to collect and analyze blood samples in connection with developing this protocol?

A. We perceived it to be additional information as to the levels of NDMA to which a consumer might actually be exposed. Because urine samples represent what is finally excreted from the body, it is not a direct measure of what is passing through the bloodstream.

Q. Okay. And that's something that you wanted to understand to inform your scientific understanding of whether or not there is endogenous formation of NDMA after ranitidine ingestion, correct?

MR. SELDEN: Objection, vague. What is the antecedent for "that"?
MR. SHEEHAN: NDMA in blood. I will just rephrase it.
Q. You wanted to understand NDMA levels in blood post ranitidine ingestion to further inform your understanding of whether or not NDMA formed endogenously in people who ingested ranitidine, correct?
MS. BOGDAN: Objection, compound, vague, confusing.
A. Correct.
Q. If we could go to PDF page 30. All right, this is the collection protocol for the study. It states "You may follow your usual dietary routine and maintain your normal intake of liquids during the collection period," correct?
A. Correct.
Q. So there was, in the design of your study, there was no restriction regarding what the subjects could eat or drink during the study, correct?
A. Correct.
Q. Was that done to mimic

real-world dietary habits?
A. Correct.
Q. And you and Emery Pharma agreed regarding the design of the study to assess potential endogenous formation of NDMA from ranitidine, correct?
MS. BOGDAN: Mischaracterizes the evidence.
A. I would say that I was the predominant developer of this protocol. So Emery Pharma and I did not have a lot of back and forth as to these sorts of aspects.
Q. Okay. But you sent this protocol to Emery, correct?
A. Correct.
Q. And did Ron Najafi or anyone at Emery write to you afterwards to say hey, we don't think this study is designed to reliably assess endogenous formation of NDMA after ranitidine ingestion?
A. Not that I recall.
MS. BOGDAN: Objection to form.
Q. Okay. The nitrate and nitrite intakes of the subjects during the study

were not controlled or recorded; is that correct?
A. That is correct.
Q. And there was no measurement of nitrite concentration in the subjects; is that correct?
A. That is correct.
Q. There was no measurement, for example, of nitrite concentrations in saliva, correct?
A. That is correct.
Q. Or in the gastric compartment, right?
A. Correct.
Q. And there was no measurement of nitrite levels in the food ingested by the study participants, correct?
A. Correct.
Q. And there was no measurement of ranitidine concentrations in the stomach, correct?
A. Correct.
Q. So the study starts, and as I understand it you begin to receive information from Emery that they are not

finding any NDMA in the initial participants in the study; is that fair?

A. I'm trying to remember the details, but I believe there was one participant that we got some initial feedback on, but you are correct that we, from a response from Emery Pharma, indicated that they had not, you know, detected NDMA in those samples, and then there was a several-month gap before we were able to get samples from other volunteers.

Q. Okay. And you can take this down, Ali. Let's bring up D-17.

I just want to go through the timeline that you just mentioned real quick, Dr. Mitch.

(Defendants' Exhibit 17 marked for identification.)

Q. Okay. So on the bottom portion of this Exhibit D-17 we have an e-mail from Neel Bose to you dated June 29th, 2020, correct?

A. Correct.

Q. And he says "Hello Professor

Mitch, good morning. We finished the 1 volunteer study - so far we did not see any NDMA peak in any of the samples (we are still going through the data, specifically the internal standard and QC runs, to ensure that everything technically went well)."

Did I read that correctly?

A. You did.

Q. And you respond then to Neel Bose. And if we can just pull up the top of the exhibit, Ali. You respond on June 29, 2020 and you say "Hi Neelan, Yikes! Could it all be artifact? When you say protocol, you mean how did we extract and concentrate our samples into methylene chloride?"

Did I read that correctly?

A. You did.

Q. And by "artifact" in this e-mail, are you referring to an understanding that the high levels of NDMA detected in the urine of people that took ranitidine in your 2016 study may not have been valid; is that fair?

A. Yes, I am referring to the 2016 study and whether the results were associated with the fact that we used GC.

Q. Okay. And so is it fair to say that at this point you are starting to doubt whether the results of your 2016 study are accurate?

A. I would alter that a little bit to say that this was one volunteer and the first runs by Emery Pharma. So it was, as the text indicates, my answer up there, indicates raised some concerns, but N equals 1 does not provide sufficient data.

Q. Fair enough. And we can take down the insert there, Ali, and we will just keep going along here. If you could bring up D-18.

(Defendants' Exhibit 18 marked for identification.)

Q. And go to PDF page 4 of D-18. So about a month later, actually a little bit more than a month later, around August 3rd, 2020, you asked Emery if they, you know, what had happened with that first urine analysis, correct?

A. Yes.
Q. And you are asking should we, you know, get more samples, what's the status of the study, you are raising that issue with Emery Pharma, correct?
A. Correct.
Q. So if we can pull out this insert and let's just see Emery's response, Ali, and I think it's on the previous page. All right.
So on August 6th, 2020, Neel Bose responds and he says "We now have a good method to simultaneously detect NDMA and ranitidine, and optimized the extraction condition to offer around 90 percent recovery and sub nanogram per milliliter detection for NDMA," correct?
A. That's what it says, yes.
Q. And he says "We so far ran a few of the samples from the first batch, specifically after ranitidine injection, we see an expected huge ranitidine peak, but so far no NDMA," correct?
A. That is what it says, yes.
Q. So, in essence, Emery went back

and they optimized their testing for NDMA, right?
A. Correct.
Q. And they improved the recovery of NDMA and the detection limit for NDMA, correct?
A. Correct.
Q. And you had coordinated with them with respect to how to improve the testing methodologies to better detect and quantify NDMA, correct?
A. I don't recall a lot of back and forth in that department. They were primarily responsible for the development of the method.
Q. Okay. Well, the purpose here is, by optimizing the testing, is to be able to detect any NDMA if it is present, correct?
A. That is correct.
Q. And the detection limit, as they say here, is sub nanogram per milliliter, correct?
A. That is what it says.
Q. And that, would you agree that

that is a very sensitive detection limit?
A. That is, although I would caution that I believe they later modified that to a higher number.
Q. Okay. You may be thinking of the quantification limit, but we will get there. Let me just ask you this: As a scientist, you agree that this testing method was suitable for your study, correct?
A. I believe it was.
Q. So even after optimizing the testing, Emery didn't find any NDMA in the urine samples of the first subject; is that right?
A. That is right.
Q. Let's take this off.
You respond the next day, right? Friday, August 7th, you are telling Emery, hey, it is going to be useful to complete this study irrespective of the results in the first subject, correct?
A. Correct.
Q. And you are saying "Even if nothing shows, we can correct the record."

What did you mean by "correct the record"?

A. I'm trying to recall exactly what we were thinking back at that time, but something in the nature of either issuing a correction in the literature or a retraction or something of that nature.

Q. And that's ultimately a step that you take to retract the results of your 2016 study, correct?

A. Correct.

Q. Now, you had received e-mails from Zantac users asking you about your 2016 paper; is that right?

A. Correct.

Q. So you understood that there was a certain amount of angst among Zantac users who were concerned about potential exposure to NDMA based on the results of the study as presented in your 2016 paper, right?

A. Correct.

Q. Is it fair to say that you thought the findings from the Mitch/Emery study in 2020 would help relieve anxiety

among Zantac users and should be published to set the record straight?

A. Correct.

Q. I'm sorry, what did you say, Dr. Mitch?

A. Correct.

Q. Okay. All right, let's go to -- let's go to Exhibit D-19, Ali.

(Defendants' Exhibit 19 marked for identification.)

Q. And if we go to PDF page 12.

So on October 10th, 2020, you actually write an e-mail to Emery about what we just discussed, right? You are saying it doesn't seem like there is any evidence of NDMA here, unless there's some major change in the additional data that we generate, I'm planning to retract my 2016 article, correct?

MS. BOGDAN: Objection, misstates the document, mischaracterizes.

A. Correct.

Q. And you wanted to, as part of relieving the angst among Zantac patients, you wanted to get the results of this study

out there into the public record, correct?
A. Correct.
Q. And if we go to PDF page 11, just the previous page there, I think we can find Emery's response. All right, so just blow that up. Actually, if you want to see the beginning of the e-mail, we can go just to the previous page, Ali.
So this is Monday, October 12 of 2020, Ryan Cheu from Emery Pharma writes to you, correct?
A. Correct.
Q. And if we go to the next page, Ali.
He tells you that they have completed the LC/MS analysis in four of eight subjects, there is no detectable levels of NDMA in three out of the four, and one has detectable but below the limit of quantification, right? Quantitation, rather, correct?
A. Correct.
Q. He then goes on to say "We will discuss internally about the best way to share this information with the public as

well as our thoughts on journals," right?
A. Yes, that's what it says.
Q. So did you discuss with Emery how best to share the information that you were generating in your study with the public?
A. Yes.
Q. And has the information from this study regarding the lack of any NDMA formation after ranitidine ingestion been shared with the public to your knowledge?
A. Not to my knowledge.
Q. Do you currently have a plan to share the information from this study with the public?
A. No.
Q. Do you still feel that it is important scientific information that should be shared with the public to relieve angst that was generated in connection with your 2016 study?
MR. SELDEN: Objection to the characterization of prior testimony.
A. Sorry, I didn't hear what that last bit was.

Q. So I will withdraw the question.
I'm just inquiring, do you still believe that this Mitch/Emery study that you conducted in 2020 contains important scientific information that should be shared with the public to set the record straight?
MS. BOGDAN: Objection.
A. I think it would be useful, but not necessary, because the FDA has conducted essentially a very similar although larger study that we had discussed an hour ago and showed essentially the same results.
Q. Okay. So is it -- is it fair to say that you considered the FDA study results to be confirmatory of the results that you generated in the Mitch/Emery study?
A. Yes.
MS. BOGDAN: Objection to form.
Q. Okay. Let me just do this real quick. If we could go to PDF page 9 of this document. Okay. And just blow that

up.

Again, we have an e-mail from Ryan Cheu at Emery Pharma to you dated August -- or October 26th, 2020. He says "Hello Dr. Mitch, we have completed the LC-MS/MS analysis for all of the subjects. With the exception of 1 subject who had detectable, but not quantifiable levels of NDMA, all others were negative for NDMA in urine."

Did I read that correctly?

A. You did.

Q. So there was no detectable NDMA in seven of the eight subjects, and in one subject the NDMA level was so low that it couldn't even be quantified, correct?

A. Correct.

Q. And if we just go up to PDF page 5, there we go, just blow this up, this is an e-mail, again, from Ryan Cheu at Emery Pharma to you dated November 4, 2020. It states "The limit of detection for our method is 1 nanogram per milliliter and our lowest level of quantitation of 5 nanogram per milliliter. For all the samples run,

the calibration standards ranged from 5 to 1,000 nanograms per milliliter and were all within 80 to 120 percent accuracy. Similarly, we ran quality control samples during each of these analyses at 6, 30, and 750 nanograms per milliliter all of which were within 85 to 120 percent accuracy. Taken together, considering our LOD/LOQ, sample extraction method, and accuracy of calibration standards and QCs, we are confident in our method sensitivity, accuracy, and results."

Did I read that correctly?

A. You did.

Q. So basically Emery is telling you we performed thorough sensitive testing and the results that we came up with are accurate, right?

A. That is what they are saying.

Q. And do you agree with that?

A. I agree with, yes, I agree in general with their statements.

Q. So I just want to wrap up some questions about your study here. The evidence from the Mitch/Emery study

demonstrated that the results regarding endogenous formation of NDMA after ranitidine ingestion reported in your 2015 and 2016 studies are not reliable, correct?
A. Yes, they demonstrated that the excretion of NDMA in the urine post consumption of Zantac was, at best, far lower than what we had reported in the 2016 study.
Q. And the results of this Mitch/Emery study prompted you to retract the data regarding endogenous formation of NDMA after ranitidine ingestion that you had previously published, correct?
A. Correct.
Q. Now, there is no evidence, no scientific evidence from the Mitch/Emery study that ranitidine use increases endogenous formation of NDMA, fair enough?
MS. BOGDAN: Objection, mischaracterizes, calls for speculation.
A. Correct.
Q. And is it fair to say that the Mitch/Emery study is evidence that NDMA is not forming at any quantifiable level after

ranitidine ingestion?

MS. BOGDAN: Objection, calls for speculation, incomplete hypothetical.

A. It is evidence that there was no NDMA measurable above the 5 nanogram per milliliter quantitation limit used in our study.

Q. And there is, in seven of the eight subjects that you studied, there was no detectable NDMA at all, correct?

A. Not above the 1 nanogram per milliliter detection limit.

Q. So, in other words, you cannot rely on the Mitch/Emery study to support that there is NDMA formation endogenously after ranitidine ingestion, correct?

A. Correct.

MS. BOGDAN: Objection.

MR. SHEEHAN: All right. I want to -- I want to switch gears here a little bit. If you want to take another short break right now, we could do that, but if you want to press on, I'm happy to do that too. We can take this down, Ali. Brian? Dr. Mitch?

MR. SELDEN: Why don't we take five minutes.

MR. SHEEHAN: Five minutes is great. Let's go off the record.

THE VIDEOGRAPHER: We are going off the record 12:16 p.m. This is the end of media unit two.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record 12:28 p.m. This is the beginning of media unit three. Okay, you may proceed.

BY MR. SHEEHAN:

Q. Okay, Dr. Mitch, after a short break, are you ready to proceed?

A. Yes.

Q. Okay. I'm going to switch gears a little bit here and I would like to talk with you about some of the e-mails you received from patients with respect to potential cancer risk from ranitidine. If we could bring up D-33, Ali, and go to PDF page 4 of that document.

(Defendants' Exhibit 33 marked for identification.)

Q. Okay, D-33, there we go. Okay, right there. If you could blow up the bottom, please.
Dr. Mitch, this is an e-mail that you received from a consumer. Obviously their name has been blacked out here. This e-mail is dated September 29th, 2019, correct?
A. Correct.
Q. Or, rather, I'm sorry, it is dated -- the e-mail to you is dated September 28th, 2019 at the bottom of this page, correct?
A. Correct.
Q. And somebody had wrote to you saying they had taken Zantac for seven years and had come across your article, correct?
A. Correct.
Q. And this is obviously before your article had been retracted, right?
A. Correct.
Q. And they say that they were very alarmed by the content of your 2016 study, especially the part about the

400-fold increase in NDMA after ingesting one 150-milligram pill of ranitidine, right?

A. That's what it says, yes.

Q. And they go on to say that they have been using Zantac twice daily for seven years and that given the NDMA reported in your 2016 study they must be at death's door, correct?

A. That is what she says.

Q. Okay. And to be clear, they have not been diagnosed with any cancer, correct?

MR. SELDEN: Objection.

MR. WISNER: Objection, speculation.

A. I'm not aware of their diagnosis.

MR. WATSON: Objection, form.

A. I'm not aware of their diagnosis or lack thereof.

Q. Well, if you want to just go to the next page, actually, I think we can clarify this real quick. Do you want to just blow up the top there.

Do you see in the third paragraph there where it says "I have been diagnosed with no cancer"?
A. Yes.
Q. Okay. Let's go back to the previous page and we can just blow up Dr. Mitch's response. I just have to fix something on my screen here. All right.
Now, you respond the next day on September 29th, 2019, right?
A. Correct.
Q. And you say that "Our results suggest that there is a potential cancer risk, but likely much less than activities such as smoking," right?
A. Correct.
Q. And you reassure this individual not to worry overly about this, correct?
A. Correct.
Q. Now, at the time of your response in September 2019, you believed that the results you reported in your 2016 article were accurate, correct?
A. I don't recall the specific

timeline, but I believe that's the case.

Q. So, in other words, you thought that ingesting Zantac could result in a 400-fold increase in NDMA in the body, correct?

A. That was my understanding.

Q. Okay. So even with that understanding, with a presumed 400-fold increase in NDMA exposure for seven years daily, you didn't tell this person hey, Zantac in fact increased their risk of cancer, but you characterized it as a, quote/unquote, "potential cancer risk," correct?

A. That is what I wrote.

Q. Okay. Now, as I told you before, Dr. Braunstein was deposed in this litigation and he was asked whether Zantac causes cancer, and I just want to see if his testimony is consistent with what you were communicating with this patient.

So, Ali, could we just bring up Exhibit D-7 and go to PDF page 5 of that. Actually, we'll take a look at the first page. This is a deposition transcript

dated October 25, 2021, videotaped deposition of Lior Braunstein. Do you see that, Dr. Mitch?

A. I see it.

Q. All right. If you could go to PDF page 5 of this document, which is page 70, and I think if we highlight the question that begins on line 11. Actually, if you could just blow that up all the way down to the bottom. Thank you.

"Question: You go on to state -- 'the last sentence of our paper state as much. At best, there is uncertainty out there and ongoing study is needed. While I would not take this drug, I cannot say definitively that a single person got cancer from it.'

"That's what you wrote, correct?

"Answer: That's what this e-mail says.

"Question: And I assume that's still your opinion today, correct?

"Answer: I think there remains significant uncertainty about the link" --

If we go to the next page.

-- "between ranitidine and cancer, and much more study will be needed before a causal link can be established."

Did I read that correctly?

A. Yes, you read it correctly.

MR. WISNER: Objection. This is an incomplete rendition of Dr. Braunstein's testimony. If you want to show the redirect examination that surely follows this, he testified unequivocally that he is making no causal assertions, and if you do not show that to the witness, my objection remains.

MR. SHEEHAN: Okay.

Q. Dr. Mitch, you don't disagree with Dr. Braunstein's testimony, as we saw here, that there remains significant uncertainty about any link between ranitidine and cancer, correct?

MR. WISNER: Objection. He did not testify as much. There was an e-mail which you showed an incomplete portion of. All of this is inadmissible.

MS. BOGDAN: Objection,

mischaracterizes the previous testimony of another witness.

Q. Dr. Braunstein (sic), do you agree that there remains significant uncertainty about any link between ranitidine and cancer?

MR. WISNER: Same objection. Misstates Dr. Braunstein's testimony.

MR. SHEEHAN: I'm just asking Dr. Mitch.

Q. Dr. Mitch, do you agree that there remains significant uncertainty about the link between ranitidine and cancer?

MR. WISNER: I'm sorry, Tom, are you saying not agree with Dr. Braunstein, but just agree with the proposition?

MR. SHEEHAN: Just agree with the proposition.

MR. WISNER: Okay.

MS. CANAAN: No speaking objections, please.

A. Okay, do I answer now?

I think, in general, I'm not a toxicologist, but my understanding in

general was demonstrating a cause between any exposure and cancer is extremely difficult and ranitidine would certainly remain in that camp.

Q. Okay. And you never indicated to anybody that contacted you that their cancer was caused by exposure to ranitidine, correct?

A. Correct, not that I can recall, I did not respond to anyone that I know of indicating that their cancer was caused by ranitidine.

Q. Okay. And we can take this down, Ali. Let's go back to Defense 33. Okay. And if we go to -- I want to go to PDF page 4. Okay, and let's just blow up the top.

So this individual responds to you, and I will represent to you that this is September 29th, 2019, and they ask for clarification, correct?

A. Let's see.

Q. I can direct you, Dr. Mitch. They say "If you wouldn't mind, can you please further explain this finding?"

Do you see that in the second paragraph there?
A. Yes.
Q. And then they go on to say "I would think the extreme amount of NDMA would be much higher than that of smoking; being 400-fold higher in the urine than before ingestion of ranitidine."
Do you see that language?
A. I do see that language.
Q. And they go on to say that "Valisure is suggesting 300,000 times higher than acceptable limits," and that the "molecule of ranitidine itself is mixing with the body acids and releasing NDMA in the body," right?
A. That's what it says.
Q. And then they go on to say that the FDA is only testing for NDMA in the lab outside the body, correct?
A. That's what it says, yes.
Q. Now, in retrospect, we know that Valisure's testing of NDMA in Zantac tablets using GC/MS suggesting 300,000 times higher than acceptable limits is not

valid, correct?

A. If they were using GC/MS, likely their results could have been impacted by an analytical artifact.

Q. And that would render the results just as it rendered your GC/MS results unreliable as you indicated in your retraction of your 2016 article, correct?

A. Correct.

Q. And based on your Mitch/Emery study and the FDA study that you reviewed we know that there is no evidence that ranitidine is mixing with body acids to release NDMA in the body, fair enough?

MS. BOGDAN: Objection, calls for speculation, mischaracterizes evidence.

A. We know that consumption of ranitidine does not form a concentration of NDMA in the urine exceeding 5 nanograms per ml, or we're not exactly sure what the FDA's analytical method of detection limit is, but in our case it was 5 nanograms per ml.

Q. And in that study, as we discussed, there was no subject that had

quantifiable levels of NDMA in urine, correct?

A. Are you referring to our study?

Q. In the study that you conducted with Emery Pharma.

A. Yes, we did not have quantifiable levels of NDMA in the urine samples.

Q. And in seven out of the eight people, there was no detectable NDMA in the urine, correct?

MR. WISNER: Objection, asked and answered multiple times.

A. We did not detect NDMA above the quantitation limit in any volunteers. In one volunteer, Emery Pharma indicated that they did detect NDMA at levels below the quantification limit.

Q. Okay. And when you write back to this individual, though -- we can take this down and go to PDF page 3 -- when you write back to this individual, you didn't have the information that you now have about the lack of the reliability of GC/MS testing with respect to NDMA and ranitidine

or the lack of endogenous formation of NDMA after ranitidine injection, correct?

A. The date is 2019, I believe; is that correct?

Q. Correct, September 2019.

A. Yes, so at that time we had not yet done the LC/MS-based study, and back in 2019, I'm not sure of the exact timeline, but I would have been under the assumption that our 2016 results were still valid.

Q. Okay. So you write back to this individual and you use the EPA's cancer potency values for NDMA to estimate risk above background, correct?

A. That is correct.

Q. And the risk that you are estimating here based on the EPA cancer potency values is a theoretical lifetime excess cancer risk, correct?

A. Correct.

Q. So the EPA risk assessment, I just want to understand what your understanding of it is, it is a regulatory framework that helps define acceptable daily exposures to chemicals, right?

A. Correct.
Q. And the EPA framework is based on data in animals, correct?
A. Correct.
Q. And it is primarily based on data in rats, fair enough?
A. Rats and mice, yes.
Q. And rats and mice are not humans, I think you would agree with that, right?
A. That is correct.
Q. And the EPA framework assumes a linear relationship between exposure and risk down to even a picogram of exposure to NDMA, correct?
A. Correct.
Q. Now, there is no evidence that a 1 nanogram level exposure actually causes cancer in even mice or rats, correct?
MR. WISNER: Objection, speculation, incomplete hypothetical, lacks foundation.
A. Not that I'm aware of.
Q. Okay. And certainly there is no evidence that there is a linear

relationship between exposure to low levels of NDMA and development of cancer in humans, correct?

MS. BOGDAN: Objection to form, lacks foundation, speculative, mischaracterizes the scientific evidence.

MR. WISNER: Same objections.

A. Not that I'm aware of.

Q. So is it fair to say that the EPA risk estimates based on the cancer potency values are theoretical and based on assumptions that have not been proven in humans?

MR. WISNER: Objection.

MS. BOGDAN: Objection.

MR. WISNER: Objection, misstates his testimony. He said he is not aware of it.

MR. WATSON: Objection, form.

A. Yes, I am not aware of comparable studies in humans to validate that particular relationship for NDMA.

Q. And you would agree that any risk calculation that you arrived at using the EPA's cancer potency values represents

a theoretical risk and not an actual cancer risk established in humans, true?

MR. WISNER: Objection, improper opinion, speculation, lacks foundation.

A. I would agree that it is a theoretical risk.

Q. Okay. Now, the background risk you are referring to here is just the background risk of what the general public has with respect to lifetime risk of cancer, irrespective of any particular exposure, correct?

A. Correct.

Q. And do you know what the general background risk is of cancer?

A. Off the top of my head, I do not know the exact number.

Q. Okay. If we can just take this down, Ali. Let's bring up Exhibit D-34. I just want to see if I can get your agreement with the American Cancer Society here, Dr. Mitch.

(Defendants' Exhibit 34 marked for identification.)

Q. This is a document that is published by the American Cancer Society with respect to lifetime risk of developing or dying of cancer, correct?

A. It looks like it is specific to pancreatic cancer.

Q. Well, we will get there. I think they are using an example, but it is a good example. We can actually talk about that.

But in simple terms, lifetime risk is the chance that an individual in the U.S. would develop cancer over their lifetime, right?

A. Yes.

Q. And as you state -- you can pull up that example, Ali -- they give an example of pancreatic cancer, right? And the American Cancer Society states that the risk that a man will develop cancer of the pancreas during his lifetime is 1.66 percent, right?

MR. WISNER: Objection. This witness is not qualified or appropriate to testify about a document that he didn't

write --
MR. SHEEHAN: Just make your objection, Brent, seriously.
Q. Did I read that correctly, Dr. Mitch?
MR. WISNER: That's a different question. I don't object to whether or not he reads it correctly.
A. I believe you read it correctly.
Q. Okay. And the American Cancer goes on to say -- the American Cancer Society goes on to state that this means that he has about a 1 chance in 60 of developing pancreatic cancer, correct?
A. That is what it says.
Q. Okay. So if we go to the next page, we actually have to go to the bottom of the previous page to see that it relates to men. Can we do that real quick.
All right, down at the bottom of this page, Dr. Mitch, do you see that there is a section on males risk of developing and risk of dying from? Do you see that?

A. I see that.
Q. Okay. And if we go to the next page, at the top, we can see that the risk of developing cancer of all invasive sites is 40.14 percent, correct?
A. That is, yes, 40.14 percent.
Q. Okay. And that would represent the lifetime risk of developing an invasive cancer in men, correct?
A. Yes.
Q. So if we go down to the bottom, we see they have a chart for females as well. We can go to the next page. We can see that the risk of developing an invasive cancer for females is 38.7 percent, correct?
A. Correct.
Q. And some of these cancers vary by sex, correct? So if you look at breast cancer, for example, in women, the risk of developing breast cancer is about 1 in 8, correct?
A. Sorry, what was that?
Q. I can just have Ali highlight it for you, the breast cancer finding,

there we go, we see that 1 in 8 women develop invasive breast cancer over their lifetime, correct?

A. Correct.

Q. All right. So but it's fair to say that in the United States, you have, if you combine the men and the women, you have about a 40 percent risk of developing invasive cancer over your lifetime, correct?

MR. WISNER: Objection, lacks foundation, speculation.

A. Yes.

Q. All right. So I want to go back to your e-mail in response. Let's go back to D-33. If we go to PDF page 3 actually. The previous page, I think it has got to be 1704 there. There we go, all right.

So down at the bottom, you are quantifying a 3 percent theoretical excess lifetime cancer risk assuming 45 micrograms per day exposure to NDMA over somebody's 70-year lifetime, correct?

A. Correct.

Q. Now, when you say smoking is more like 25 to 30 percent, again, that would be above the background risk of 40 percent, correct?
A. That was my intention, yes.
Q. Okay. You go on to state "You are correct that the actual exposure from Zantac might be higher if NDMA was partially metabolized in the body before it reached urine. But we have not measured NDMA in blood and so can't really speculate on this level."
So without measurements in blood, assuming that NDMA is partially metabolized, degraded in the body before it reaches urine, is simply speculation, correct?
A. Well, I would phrase it this way: Our study would have no direct results to indicate what levels were in the blood. I am aware of previous research that suggests that NDMA is metabolized from the blood by the liver.
Q. Okay. And we know that when FDA did their study and published it, they

measured NDMA in blood, correct?
A. I don't recall the exact results, but perhaps they did.
Q. Do you recall that they measured NDMA in blood?
A. What I recall are the urine results. I don't recall the blood results.
Q. Okay. Well, we'll get there.
And you go on to say that "The EPA risk calculation above assumes daily exposure over a 70-year lifetime," correct?
A. Yes.
Q. And you say "your indicated exposure was 1/10 that."
So, in other words, your calculation of a theoretical 3 percent excess risk was based on an underlying assumption of 70 years of lifetime exposure, correct?
A. I believe that's the case.
Q. So is it fair to say that 1/10 of a theoretical 3 percent lifetime excess cancer risk is 0.3 percent excess risk?
A. That is the way those theoretical calculations work.

Q. Okay. Now, I'm going to show you a graphic that we came up with that tries to capture the various lifetime risks that you are describing in this e-mail, okay? If we go to D-35, Ali.

(Defendants' Exhibit 35 marked for identification.)

THE CONCIERGE: Just one moment. It's not seeming to work. One second. I would like to apologize, just one moment.

Q. So this is a graph that I put together, and I just want to walk through it with you, okay, Dr. Mitch?

A. Sure.

Q. So on the left -- what happened to it -- there we go, we're back at it, D-35. Do you see what I'm seeing, Dr. Mitch, sort of a bar graph?

A. Yes.

Q. Okay. So on the left, the far left, we've got the 40 percent background cancer risk in the general population, correct?

A. Yes.

Q. And that 40 percent, as we saw from the American Cancer Society, that is an established risk of cancer over somebody's lifetime, correct?
A. An established risk over someone's lifetime, I believe that's the case.
Q. So next to that we have the 30 percent excess risk above background for smoking, correct?
A. That is what you plotted.
Q. Okay. And that represents the excess risk of cancer from smoking that you described in your e-mail, correct?
A. Yes. However, I would indicate that my understanding of the American Cancer Society's numbers are that they incorporate the entire U.S. population, which includes smokers, so --
Q. Fair enough, fair enough. But you are talking about, in your e-mail to the patient, you are talking about excess risk above background, correct?
A. Yes, but my point is that your background level incorporates smokers.

Q. Okay. Now, smoking, I think we would both agree, also is an established cause of cancer, correct?
A. I believe at this point it is.
Q. And now next to that we have a 3 percent theoretical excess risk that you calculated assuming exposure to 45,000 nanograms of NDMA for 70 years, correct?
A. Yes.
Q. Now, do you know when ranitidine was approved for use in the United States?
A. I believe that it was around about 1980.
Q. Okay. So is it fair to say that nobody has used Zantac every day for 70 years?
A. I believe that's the case.
Q. And we know that your estimate of NDMA exposure from Zantac is not accurate, correct, with respect to the 45,000 nanograms of NDMA per day?
A. Based on our LC/MS results, that would be the case.
Q. So if we continue with this

exhibit, we can see that the theoretical lifetime excess risk of exposure to 4,500 nanograms of NDMA a day for 70 years is 0.3 percent, right?

A. Yes.

MS. BOGDAN: Just note my ongoing objection to this whole exhibit. It has a lack of foundation. The witness has already explained how it misrepresents the additional risk with regard to smoking and we don't have foundation for the rest of the numbers that are being shown here.

MR. SHEEHAN: That is a speaking objection, Rosemary.

Q. Do you need me to repeat my question, Dr. Mitch?

A. Yes. You were somewhere around 0.3 percent.

Q. Yeah. I'm just saying all right, you had estimated 3 percent with 45,000 nanograms of NDMA a day, and given the linear calculation derived from the EPA cancer potency values, if you assume 4,500 nanograms of NDMA per day over 70 years, that would give you an excess cancer risk

above background of 0.3 percent, correct?
A. Correct.
MR. WISNER: Objection, speculation, lacks foundation.
Q. And if we continue with this, assuming -- well, let me just ask you this: We know based on your retraction and based on the work that you did with Emery Pharma that 4,500 nanograms per day NDMA exposure from Zantac is not accurate either, correct?
MS. BOGDAN: Objection.
A. Well, I believe, just to clarify what you are doing here, the 45,000 nanograms was what was provided in the 2016 article, not 4,500. What we were doing was saying that the consumer had indicated she had only consumed the tablets over seven years rather than 70 years.
So what we found in the Emery Pharma study was that the concentrations in urine based on LC/MS were not equivalent to excretion of 54, or whatever, I forgot the exact number, 45 micrograms NDMA per day, but somewhere, depending on the urinary

volume excretion, 1,000 nanograms or less based on detection limits.

Q. I see what you're saying. So you did -- but you did not have affirmative evidence that NDMA was forming endogenously after ingestion of ranitidine, correct?

A. Correct.

MR. WISNER: Objection.

Q. Is it fair to say that without affirmative evidence of endogenous formation of NDMA after ingestion of ranitidine, your calculation that you provided to this consumer would now have to be zero percent excess risk, correct?

MR. WISNER: Objection.

A. It would certainly be lower, and it depends on our ability to detect a mass excretion in the urine.

Q. Correct. But if you cannot detect the excretion in the urine, you don't have a basis to assume that there is NDMA formation endogenously after ingestion of ranitidine, and therefore you would have to use zero NDMA with respect to responding to somebody that is inquiring about the

results of your 2016 study, correct?

MR. WISNER: Objection, speculation, incomplete hypothetical, misstates his testimony, and compound and ambiguous.

MS. BOGDAN: I repeat the objections.

MR. WATSON: Objection, form.

Q. You can go ahead, Dr. Mitch.

A. There are several ways of approaching it. One is the method that you suggested. An alternative would be to say that the risk is less than whatever the urine volume times detection limit is in terms of mass, processed through the theoretical risk calculation, and say the risk is less than some value.

Q. Understood, understood. All right, let's -- we can take that down, Ali. So let's go to D-12. If we can just go to -- all right, the e-mail at the bottom, could you just blow that up. This is an e-mail from David Light to you dated October 28th, 2020, correct?

A. Yes.

Q. Okay. He says "Good to hear from you and thanks for the update. Sorry to hear about the drastic shift in the data and I'm sure Lior will be making the appropriate modifications to our chemistry and epidemiology paper regarding references and authorship."
Did I read that correctly?
A. You did.
Q. So fair to say that David Light is acknowledging that the data regarding NDMA formation after use of ranitidine have shifted drastically?
A. That is what it says.
Q. And he understands that based on the new data, the old data are not reliable and are being retracted, correct?
A. I don't know where -- does it say that in here? Let me read.
Q. Well, if we go to the next e-mail, I think you updated him that you would be retracting the -- not that one, the one before -- no, is there another page to this? Is there a next page?
THE CONCIERGE: You want the

following --

MR. SHEEHAN: The following page, right, of the exhibit.

THE CONCIERGE: There.

MR. SHEEHAN: All right, if you just highlight that.

Q. On October 26th, 2020, Dr. Mitch, you wrote to Dr. Light and you say "I wanted to update you about our recent study," right?

A. Yes.

Q. And in the middle paragraph you say "I am planning to meet with Emery Pharma this week to plan a route forward, but suffice it to say, we will need to retract the 2016 results, ideally getting the negative results out in some fashion to assuage concerns among Zantac users," correct?

A. Yes, that's what I said.

Q. And you ask Dr. Light to remove reference to that article from their publication, correct?

A. Yes.

Q. Okay. So Dr. Light, or David

Light, I don't think he is a doctor actually, David Light was aware that your study was going to be retracted, correct?

A. Yes, according to this, yes.

Q. So fair to say that it wouldn't be scientifically appropriate for David Light to rely on your 2016 data to represent that use of ranitidine results in formation of NDMA in the body, correct?

MR. WISNER: Objection, misstates the record, speculation.

A. After this e-mail, yes, it would be fair to say he should not rely on the 2016 results.

Q. You wouldn't want Stanford's name linked to those types of misrepresentations, would you?

MR. WISNER: Objection, misstates, hypothetical, misrepresentations.

MS. BOGDAN: Speculative.

MR. WATSON: Objection, form.

A. I would say basically what I said right here, I'm trying to find the exact line here, "It is preferable to

remove reference to that article from your publication."

Q. Well, you wouldn't want him relying on your article to represent that there is endogenous formation of NDMA whether it is in a published article or not, would you?

A. Well, that was the -- yes, that was the point of the retraction.

Q. Okay. Could we just bring up Exhibit D-16, Ali.

(Defendants' Exhibit 16 marked for identification.)

Q. I will represent to you that this is a slide that is on the Valisure website to this day, or at least it was yesterday, I should clarify that, the last time I looked at it was yesterday.

Do you see that in -- do you see that he has got Stanford University's logo on this slide, on the Valisure website?

A. I see it.

Q. Okay. Do you see that there is a heading for Body, where the subheading is

"Ranitidine likely generates millions of ng of NDMA in humans"?

A. Point to me where you are looking right now.

Q. The second -- the second column is Body. Do you see that?

A. Yes.

Q. And then underneath that it says "Ranitidine likely generates millions of nanograms of NDMA in humans."

Do you see that?

A. I see that.

Q. And then within that column there is reference to a Stanford study from 2016. Do you see that?

A. Yes.

Q. And it says "Stanford study suspects millions of nanograms of NDMA formed by ranitidine separately from the stomach, but mechanism unknown."

Did I read that correctly?

A. You did.

Q. With the retraction of your article, that is simply not true, correct?

A. Well, it is true that the study

detected what it detected, but I would rephrase it to say that after the retraction, putting those results on the website is probably inappropriate.

Q. Okay. Do you see that there is a heading for Waste?

A. Yes.

Q. And it says -- and in that subheading, there is also an entry for year 2016?

A. Yes.

Q. And it says "Stanford University conducts clinical study with 10 healthy volunteers taking 150 milligrams of ranitidine once per day. Greater than 40,000 nanograms of NDMA detected in urine. Suspected link to bladder cancer."

Did I read that correctly?

A. You did.

Q. And that should be corrected as well, fair enough?

A. Correct.

Q. You wouldn't want David Light misrepresenting your study on his website to suggest that it stands for the

proposition that there is 40,000 nanograms of NDMA generated after somebody takes ranitidine, correct?

MR. WISNER: Objection, speculation.

A. Correct.

Q. Do you see down in the corner there it says "Valisure, the pharmacy that checks"?

A. Yes.

Q. They apparently haven't checked very closely the accuracy of the data that are on their website, correct?

MR. WISNER: Objection, lacks foundation as to when this document was prepared and posted.

MS. BOGDAN: I second the objection.

A. Correct.

MR. SHEEHAN: You can take that down, Ali. I'm going to pause here. I can keep going, Dr. Mitch. I know it is lunchtime where you are. You tell me.

THE WITNESS: Why don't we just get it over with and be back in a half hour

or so.

MR. SHEEHAN: Do you want to stop for half an hour, is that what you are saying?

MR. SELDEN: Yes, please.

MR. SHEEHAN: Okay, let's go off the record.

THE VIDEOGRAPHER: Off the record 1:13 p.m. This is the end of media unit three.

(Luncheon recess: 1:13 p.m.)

A F T E R N O O N S E S S I O N
1:49 p.m.
W I L L I A M A. M I T C H, Ph.D., resumed.
THE VIDEOGRAPHER: We are going back on the record 1:49 p.m. This is the beginning of media unit four. Okay, you may proceed.
CONTINUED EXAMINATION
BY MR. SHEEHAN:
Q. Dr. Mitch, are you ready to continue?
A. Yes.
Q. Ali, could you bring up D-20.
(Defendants' Exhibit 20 marked for identification.)
Q. And you can just blow up the top there so Dr. Mitch can see.
This is an e-mail to you and others from Lior Braunstein dated July 25, 2019, correct?
A. Yes.
Q. And he attaches a draft letter to be submitted to the New England Journal of Medicine as a correspondence, right?

A. Yes, he appears to be.
Q. And he says if you are receiving this e-mail, I want you to be a co-author, right?
A. That's what it says, yes.
Q. Now, I think I asked you about Michael Bretholz earlier. I want to ask you about Adam Bretholz here. Do you know who Adam Bretholz is who received an invitation to be a co-author on this correspondence?
A. I don't recall meeting him, no.
Q. Do you know him at all other than meeting him? Did you speak with him at all?
A. Not that I recollect.
Q. Okay. Do you know that both Adam and Michael are investigators in Valisure?
A. I was not aware of that.
Q. Okay. Are you an investor in Valisure?
A. Not that I know of.
Q. Now, in addition to the epidemiology study that we touched on

earlier, the Memorial Sloan Kettering draft reported testing of ranitidine tablets for NDMA using GC-MS. Do you recall that?

A. I have very little recollection of the manuscript itself, but it sounds like it happened, yes.

Q. All right. Can we just go to the next page, Ali, and just blow that all up. So they say -- and again, this always gets screwed up on my computer. There we go.

They say "To quantify NDMA levels in commercially-available ranitidine, we employed FDA recommended gas chromatography/mass spectrometry (GC/MS) methods for NDMA measurement among 10 independent drug samples, including certified reference material."

Did I read that correctly?

A. You did.

Q. Now, to be clear and to be accurate, FDA has never recommended GC/MS to test ranitidine for NDMA, correct?

MR. WISNER: Objection, misstates the record.

A. I don't have a -- to my knowledge, I don't know if they have recommended it or not specifically for ranitidine.

Q. Okay. So you don't -- you don't -- as you are sitting here today, you don't have any evidence in mind of FDA recommending GC/MS to test ranitidine for NDMA; is that fair?

A. Correct.

Q. Now, this draft correspondence also reported testing of ranitidine tablets under physiologic gastric conditions and temperature, 37 degrees Celsius, correct?

A. They indicate, yes, they reevaluated ranitidine tablets under gastric conditions.

Q. Okay. So if we just go to two pages later, Table 2, Ali, and we take a look at this, the data reported in Table 2 involved testing ranitidine under seven different conditions, right?

A. That's what it looks like, yes.

Q. And the conditions included just testing the tablet without any

solvent, testing the tablet presumably with solvent, testing simulated gastric fluid, testing simulated intestinal fluid, and then testing simulated gastric fluid with various concentrations of sodium nitrite, correct?

A. That's what it says, yes.

Q. And the reason that they wanted to test under these conditions was to use a lower temperature method for measuring NDMA, correct?

A. I don't know what their rationale was.

Q. Actually, if you take this down, I think we can do this real quick, Ali, and just go back to the previous page. One more. There we go.

Just in the middle there, it says "Hypothesizing that the supraphysiologic assay temperature (130 degrees Celsius) mandated by the FDA protocol contributed to NDMA formation, we reevaluated ranitidine tablets under physiologic gastric conditions and temperature (37 degrees Celsius)."

Did I read that correctly?
A. You did. The question is, or my question is, presumably that is in relation to the incubation temperatures of the experiment, or are you referring to the GC injection port conditions?
Q. I believe they developed a lower temperature GC injection port method, but if you don't know, that's fine.
A. I don't know.
Q. Okay. Let's go back to Table 2, and if we can just blow that up.
When just the tablet without solvent was tested, was any NDMA detected?
A. It says not detected.
Q. And the tablet with solvent, was any NDMA detected?
A. Again, it says not detected.
Q. And Zantac in simulated gastric fluid, was any NDMA detected?
A. It says not detected.
Q. Same question for Zantac in simulated intestinal fluid, was any NDMA detected?
A. It says not detected.

Q. When ranitidine was incubated in simulated gastric fluid with a 10 millimolar concentration of sodium nitrite, was any NDMA detected?

A. It says not detected.

Q. Okay. So it was only when ranitidine was put into simulated gastric fluid with concentrations of 25 millimolar and 50 millimolar sodium nitrite that there was any NDMA detected, right?

A. Yes, according to this chart.

Q. The conditions under which the results were obtained are characterized as physiologic gastric conditions, correct?

A. Where it says --

Q. We can go back -- if we go back just actually to the previous pull-out, Ali. There we go. Just blow that up again.

They say in the middle there "We reevaluated ranitidine tablets under physiologic gastric conditions," correct?

A. That's what it says.

Q. Okay. So what does physiologic mean to you in this context?

A. Physiologic to me means that it attempts to mimic conditions that might be in a human stomach.

Q. Okay. So do the conditions tested, if they are physiologic, that refers to conditions that would actually be present in somebody that may take Zantac, correct?

A. Well, the intention is to make it mimic a human stomach. I'm not a gastroenterologist so I don't know the extent to which that is accurate in terms of what human stomachs contain.

Q. Okay. But you questioned the relevance of the nitrite concentrations. Do you recall that?

A. I don't recall that.

Q. Okay. If we could go to D-21, Ali. You can take this down.

(Defendants' Exhibit 21 marked for identification.)

Q. You would agree that it is important to understand the relevance of the conditions used in the in vitro experiment in order to understand the

relevance of the results to actual human use of Zantac, correct?

A. Sounds reasonable.

Q. And in this, if we could just blow that up, this is an e-mail from you to Dr. Braunstein on July 26th, 2019, correct?

A. Yes.

Q. And under number 2, you say "You might also want to clarify the relevance of the nitrite concentrations to those encountered in the stomach," correct?

A. Correct.

Q. Why were you suggesting that Dr. Braunstein should clarify the relevance of the nitrite concentrations in the stomach?

A. In order to justify whether the concentrations are physiologically relevant, a reviewer of a manuscript might want a reference to indicate whether, I forgot which concentrations he used, but whatever it was that he used, were they encountered in human stomachs.

Q. And do you recall, did anybody respond to you regarding the relevance of

the levels of sodium nitrite used in the in vitro experiment?

A. I don't recall.

Q. We can pull that down, Ali. And if we could bring up D-22.

(Defendants' Exhibit 22 marked for identification.)

Q. Okay. This is an e-mail from Elizabeth Kantor. We can just blow that up, Ali, so Dr. Mitch can see.

Actually, it is an e-mail from Lior Braunstein to Elizabeth Kantor on August 20, 2020, correct?

A. Yes.

Q. Do you know Dr. Kantor?

A. I don't believe I do.

Q. In this e-mail Dr. Braunstein is asking Dr. Kantor for her thoughts on the draft of the MSK data, correct?

MR. WISNER: Objection as to the speculation of the mental processes of Dr. Kantor.

A. That's what it says.

Q. Exactly. Now, if we go to the next page of the exhibit there, Ali,

Dr. Braunstein is attaching a draft of the article to his e-mail with the title Ranitidine Use, N-Nitrosodimethylamine (NDMA) Production and Variations in Cancer Diagnoses, correct?

A. Correct.

Q. And your name is on this draft, correct?

A. Correct.

Q. So let's take a look, if we go to PDF page 3 of this exhibit, let's take a look at the Methods section. PDF page 3, you've got to go back. There we go, Methods.

Now, in this draft of the article, it is saying "To identify the conditions under which ranitidine may yield NDMA we employed liquid chromatography-high resolution mass spectrometry on simulated gastric fluid while varying pH, incubation time, and concentrations of ranitidine and nitrite," correct?

A. Correct.

Q. And if we go to the bottom there where it says "To assess potential."

I want to go under Results actually. There you go. No, you had it correct. You had it correct.

It says "Using LC-HRMS, we detected NDMA formation from ranitidine in simulated gastric fluid across a range of physiologic conditions (Figure 1). Whereas the U.S. FDA has advised that NDMA intake below 96 nanograms may be considered reasonably safe, we detected levels several thousand-fold beyond this threshold. Under optimal reactive physiologic conditions, NDMA yield from a 300 milligram tablet rose to 0.612 milligrams (612,000 nanograms.)"

And we can go to the next page to show him that language.

THE CONCIERGE: Sorry, that was D-22?

MR. SHEEHAN: Yeah, just the next page of this exhibit.

Q. There we go. Do you see the reference to 612,000 nanograms there, Dr. Braunstein (sic)?

A. Yes.

Q. Holy cow, Dr. Mitch, my

apologies.
A. Yes.
Q. So let's take a look at Table 1. If we can go to PDF page 7 of this exhibit, Ali, please. There we go. We are going to have to blow that up. It has got a lot of numbers there in that.
So this table presents the measurement of NDMA in nanograms under various conditions, correct?
A. Yes.
Q. And in Section A, do you see how this is Table 1, but there is a Section A that is immediately under the dark black line and there is a Section B that is below that. Do you see that?
A. Yes.
Q. And in Section A we have the results for ranitidine in simulated gastric fluid with 50 millimolar sodium nitrite, correct?
A. Correct.
Q. And we can see the 612,000 nanograms NDMA for ranitidine at 300 milligrams at a pH of 2.5, right?

A. Correct.
Q. And so the pH 2.5 with 50 millimolar nitrite is the optimal condition for generation of NDMA that was referenced earlier, correct?
A. Correct.
Q. And one more question about Section A here. The amounts of NDMA go up as time increases, correct? Do you see how there is time one hour and time two hour there?
A. Yes.
Q. And is it fair to say that as the time increases in this experiment the NDMA measurement increases as well?
A. In general, yes.
Q. So it's fair to say that NDMA is not somehow disappearing the longer the experiment is extended, correct?
A. Correct.
Q. And that shows the stability of NDMA over time, correct?
MS. BOGDAN: Objection to form.
A. The results show no indication that NDMA is degrading.

Q. No indication that NDMA --
A. Is degrading.
Q. Thank you. And then in Section B, so let's go to Section B, it showed that when 150 milligrams ranitidine was placed in simulated gastric fluid with no sodium nitrite at a pH of 2.5, 921 nanograms of NDMA was detected, correct?
A. That's what they are showing.
Q. And that must be NDMA that is already present in ranitidine or it is just some kind of background noise, correct?
A. That could be multiple -- those are two possibilities, yes.
Q. Okay. Are there other possibilities that I should be thinking about?
A. There could be many. Another possible option would be is ranitidine unstable at pH 2.5.
Q. Okay. But it would not reflect an influence of nitrite concentration on the development of NDMA, fair enough?
A. Fair enough.
Q. Okay. Now, when 150 milligrams

ranitidine was incubated with 0.005 millimolar nitrite in simulated gastric fluid at a pH of 2.5, 824 nanograms of NDMA was detected, right?

A. Yes.

Q. And that's, for all intents and purposes, that's the same as when there was no nitrite added, right?

A. Correct.

Q. And in fact the NDMA yields are all similar when the nitrite concentrations are between zero and 2.5 millimolar, fair enough?

MR. SELDEN: Objection, vague.

MR. WISNER: Objection, misstates the document.

A. They appear to be similar.

Q. Okay. Now, to be fair, the NDMA levels do start to increase at 5 millimolar nitrite concentration, correct?

A. Correct.

Q. Okay. So the scientific evidence as it is presented here in Table 1 shows that NDMA was not formed from a reaction between ranitidine and sodium

nitrite when the nitrite concentration was less than 5 millimolar?

MR. WISNER: Objection, misstates the document and his testimony.

A. I would rephrase to say that the evidence provides no positive evidence for NDMA formation that nitrite concentration is less than 5 millimolar.

Q. Fair enough. Thank you for that clarification, Dr. Mitch.

And so if you recall we talked about your 2016 paper earlier and you provided the data at zero concentration of nitrite as a way to understand what nitrite concentration was necessary to influence the production of NDMA with Zantac in vitro. Do you recall that?

A. I recall we did an experiment looking at varying nitrite to ranitidine molar ratios.

Q. And within that experiment, you recall that you presented data including data with zero millimolar nitrite, correct?

A. I believe so.

Q. Okay. So if we go back to the

Results discussion, it would be PDF page 3 here, Ali, and they are talking about a range of physiologic conditions, correct? Down at the bottom. It is at the bottom, in the Results section.

A. Yes.

Q. And they are talking about detection of NDMA formation across a range of physiologic conditions, true?

A. That's what it says.

Q. Okay. Do you see any statement or any citation that provides any evidence that a nitrite concentration of 5 millimolar is physiologic?

A. I do not.

Q. And the physiologic relevance of the nitrite concentrations where NDMA was detected is the -- is the question that you raised with Dr. Braunstein and Dr. Light in your correspondence with them, correct?

MR. WISNER: Objection, misstates the document. The correspondence that you are referring to was a year prior to this regarding a different paper.

A. The e-mail, I do not recall what that e-mail -- which manuscript that e-mail referred to, but it did refer to the justification of nitrite concentrations in terms of relevance to human stomachs.

Q. Fair enough. I just want to show you another draft of this study with some redline comments and edits. So if we can pull that down, Ali. If we could go to Exhibit D-23.

(Defendants' Exhibit 23 marked for identification.)

Q. Okay, so if we go to PDF page 9 of this. All right, you can just blow that up.

So this table, it includes data, if we look at subsection (b), it includes data obtained at nitrite concentrations ranging from zero to 50 millimolar, correct?

A. Correct.

Q. And it looks the same as the table that, in the previous draft, that we looked at, right?

A. It appears to be similar.

Q. And if we scroll down, if we go to PDF page 12, there we go, and we just blow that up. Blow up the highlighted language, please. There we go.

We scroll down, this is the description of the experiments. We see in the second to last sentence they say "To demonstrate that NDMA formation could occur at variable nitrite concentrations, 100 milliliters simulated gastric fluid containing 50, 25," and they go all the way down to "1 millimolar nitrite were prepared at pH 2.5," correct? Do you see that?

A. I see that.

Q. So all of the concentrations below 1 millimolar nitrite have been crossed out, correct?

A. They have been crossed out.

Q. So it appears, based on the edits to this document, that somebody does not want to include those data, correct?

MR. WISNER: Objection, speculation as to the mental decision process of whoever edited this.

Q. Dr. Mitch?

A. I don't know if that can be determined from this sentence alone. One could also say that from the phrasing, that NDMA formation could occur, so based on the table there was no significant formation at concentrations less than 1, so therefore you could not determine that it had occurred at lower concentrations.

Q. Okay, I will accept that.

Just to be very clear, it was not you -- you are not the one that is crossing through or redlining this document; is that correct?

MR. WISNER: Objection, speculation.

A. I'm not sure. I don't recall this, if I did or not.

Q. Okay. I want to go to, if we go to PDF -- if we go to -- actually, let's go to PDF page 8 of this document, and if we could turn that around, Ali.

THE CONCIERGE: Just one second. Which exhibit is this?

MR. SHEEHAN: This is D-23.

THE CONCIERGE: 23, okay. Let

me just go to page 8 and flip it for you.
MR. SHEEHAN: There we go. Thank you, Ali.
Q. So we have got Figure 1 here, correct, Dr. Mitch?
A. Yes.
Q. Okay. So we can just put that below. And, Ali, actually, can you just blow up Figure A there.
Now, this only includes data points ranging from 1 to 50 millimolar concentrations of nitrite, correct?
A. Correct.
Q. So there is no data that is presented in this figure below a concentration of 1 millimolar of sodium nitrite, correct?
A. Correct.
Q. And that's consistent with the deletion of the statement describing the simulated gastric fluid testing conducted at nitrite concentrations from zero to 0.5 millimolar sodium nitrite, correct?
A. Correct.
Q. So let's go to D-24. Just let

me ask, do you have any sense of who edited this document?

A. I do not.

Q. Okay. So let's go to Exhibit D-24, Ali. You can take this one down.

(Defendants' Exhibit 24 marked for identification.)

Q. And I will represent to you that Valisure produced this document to us in both PDF and Word format. So basically what I did here, Dr. Mitch -- and if you could blow this up, the redlining below, Ali, I don't know whether that's possible, including the box of the editor -- basically what I did was I went to the Word version and I put my mouse over the redlining to see if there was any information there, and this is what popped up. I will represent to you that this is what popped up. Do you understand what I'm describing?

A. I believe so, yes.

Q. And so this would indicate that the information with respect to concentrations of sodium nitrite below 1

millimolar was deleted by David@Valisure on August 19th, 2020, correct?

MR. WISNER: Objection, speculation, lacks foundation.

A. It would seem to suggest that, yes.

Q. And that e-mail address belongs to David Light, correct?

A. I don't know, but it seems like a good assumption.

Q. Okay. Were you aware prior to today that David Light deleted data relating to concentrations of nitrite lower than 1 millimolar?

MR. WISNER: Objection, lacks foundation.

MS. BOGDAN: Objection to form.

MR. WISNER: Speculation, assumes facts not in evidence.

MS. BOGDAN: Lack of foundation.

Q. You can answer, Dr. Mitch.

A. I don't actually recall much about this manuscript, to be honest, so no, I do not recall this particular deletion.

Q. Would you agree that if you are interested in determining whether there is a nonlinear threshold by which concentrations of sodium nitrite produce NDMA in an incubation with ranitidine, it is important to include data with zero percent nitrite or zero concentration nitrite and then incremental increases to be able to observe the threshold concentration?

MR. WISNER: Objection, completely incomplete hypothetical.

MR. SHEEHAN: Completely incomplete this time?

A. If you have the data, it would be useful to present it, even if it did not show any interesting effect.

Q. Okay. And so you would not have -- you did not approve of the deletion of the data below 1 millimolar nitrite concentrations, correct?

A. I don't recall much about this paper, but I don't recall specifically looking into this effect of nitrite concentration issue.

Q. Okay. And knowing what you now know, I believe you testified it would be useful to present the data below 1 millimolar nitrite in assessing whether there is a threshold at which concentrations of sodium nitrite produce NDMA in an incubation with ranitidine; is that fair?

MR. WISNER: Objection, misstates his testimony, incomplete hypothetical.

MS. BOGDAN: Objection to form.

Q. Go ahead, Dr. Mitch.

A. If you have already obtained the results and believe that they are accurate, it would be useful to include them.

Q. Now, you can take that down.

And why would it be useful to include them, Dr. Mitch?

A. Well, even if it -- I don't want to speak to the specific situation -- but even if it appears that the results are not germane to the particular point you're making, somebody in the future might find

them useful.

Q. You can take this exhibit down, Ali. I want to go to D-25.

(Defendants' Exhibit 25 marked for identification.)

Q. Okay. So let's just blow up the title. This, I will represent to you, that this is the final paper published in JAMA Open Network. This is a paper entitled Analysis of Ranitidine-Associated N-Nitrosodimethylamine Production Under Simulated Physiologic Conditions, lead author, Lior Braunstein, and you can see that David Light's name is on there along with some other co-authors, correct?

A. Correct.

Q. And you are not a co-author of this paper, right?

A. Correct.

Q. And this is the paper where you had asked that your name be taken off because you couldn't offer any data showing that ranitidine leads to the formation of NDMA in the body, correct?

A. I believe that's the case, yes.

Q. Now, if we -- we can take off the title there, Ali. If we can go to Methods and just blow that up. The authors state "To characterize conditions under which ranitidine may yield NDMA, we used liquid chromatography-high resolution mass spectrometry for NDMA detection on simulated gastric fluid while varying pH and concentrations of ranitidine and nitrite."

Do you see that?

A. I do.

Q. And they go on to state they evaluated NDMA at variable nitrite concentrations using 50, 25, 10, 5, 2.5 and 1 millimolar concentrations, correct?

A. Correct.

Q. Now, the authors here do not provide any citation that would support that any of those levels of nitrite are physiologic, true?

A. I do not see any.

Q. Are you aware of any scientific literature to support these authors' claim that 1 millimolar concentration of nitrite

is physiologically possible in the gastric compartment?

A. I am not aware of that type of literature.

Q. If we go to the Results section, it is on PDF page 2 of this document. It states "Using LC-HRMS, we detected NDMA formation from ranitidine in SGF across a range of physiologic conditions," correct?

A. Correct.

Q. And here, again, there is no citation to support the contention that the nitrite concentrations used in this experiment are in fact physiologic, correct?

A. I'm reading it, but I do not see such a citation.

Q. Now, it is important if you are going to call something physiologic that you have data demonstrating that the conditions of your experiment indeed are physiologic, right?

MR. SELDEN: Objection, vague.

A. Well, different -- I would

agree that it is a somewhat vague question in the sense that researchers sometimes use that terminology to indicate the general conditions, such as pH, rather than each specific condition, such as nitrite concentration. So it is a poorly-defined term, physiologic.

Q. So are you suggesting that the authors did not believe that the sodium nitrite concentrations used in this experiment were physiologic?

MR. WISNER: Objection, speculation.

A. Yeah, I don't know what their intentions were. You would have to ask them. But what I'm indicating is that sometimes there are unknowns in a particular condition, in this case it may, although you would have to ask them, it may have been nitrite concentrations. You can refer to physiologic conditions as being the other aspects of the media, the environment, surrounding that experiment.

Q. Is it fair to say that if there are other aspects other than the nitrite

concentration that indeed represent physiologic conditions, but the nitrite concentration does not represent a physiologic condition, then the results of the experiment do not represent physiologic conditions?

MR. WISNER: Objection, ambiguous and vague.

MS. BOGDAN: Speculative and not supported.

Q. You can answer, Dr. Mitch.

A. Again, it would come down to a proper definition of what the writer means by "physiologic."

Q. Let's go to PDF page 1 of this document. All right, if we can just blow up Figure A. And again, we see in this figure, in the published version of the document, that there are no data for nitrite concentrations below 1 millimolar, correct?

A. Correct.

Q. So in the publication that Dr. Braunstein and David Light present to the scientific community, all of the data

relating to concentrations of nitrite below 1 millimolar are absent, correct?

A. Correct.

Q. And somebody reading this article in the scientific community wouldn't even know that lower nitrite concentrations were actually tested by Dr. Braunstein and Dr. Light in this publication, correct?

A. Correct.

MR. WISNER: Objection, speculation.

Q. Let's go to D-26, Exhibit 26.

(Defendants' Exhibit 26 marked for identification.)

Q. Dr. Mitch, I'm going to represent to you that we plotted on the right here all of the data points that were in the original version of Dr. Braunstein and Dr. Light's simulated gastric fluid experiment, and on the left is the data that was actually presented to the scientific community.

Now, can I get your agreement that these two graphs look very different

in terms of when the formation of NDMA from the reaction between ranitidine and nitrite actually begins to occur?

A. Correct.

Q. The right graph shows that the formation of NDMA from the reaction between ranitidine and nitrite doesn't occur until the nitrite concentration really was increased to 5 millimolar, correct?

A. Correct.

Q. Now, is it fair to say that the graph on the left that was actually presented to the scientific community is misleading precisely because of all of the data that David Light decided to delete from the final publication?

MR. WISNER: Objection, assumes facts not in evidence, lacks foundation, speculation, and improper opinion.

MS. BOGDAN: Objection, lack of foundation.

A. It appears from the line and the plot on the left to suggest that it can be extrapolated according to that line, and accordingly would indicate that a

relationship continues in that linear fashion at lower concentrations.

Q. And as we know from the data that was not presented, that's not accurate, correct?

MR. WISNER: I renew my objection. In addition, I'm going to object that the graph on the right is not a trend --

MR. SHEEHAN: You know, I don't even know who is talking, but goodness gracious, the speaking objections are really getting out of bounds here. Let's keep it to a minimum.

MR. WISNER: Tom, with all due respect, you keep showing inappropriate things and asking for speculative testimony and wasting everyone's time. So if you could please move this along and actually get some --

Q. Dr. Mitch, you can answer. I can rephrase the question if you would like if you don't have it in mind.

A. Just to remind me, you said that the significant formation doesn't

appear to occur until 5 millimolar, is that basically what you said?

Q. No, I'm asking about the representation that was presented to the scientific community.

Is it fair to say that in the final publication presented to the scientific community by David Light and Dr. Braunstein, the removal of the data below 1 millimolar concentration of nitrite presents a misleading representation of the relationship between concentrations of sodium nitrite and the generation of NDMA in an incubation with ranitidine?

MR. WISNER: Same objections, and asked and answered.

A. As I indicated before, the graph on the left seems to suggest that the relationship between nitrite and NDMA concentrations is linear and can be extrapolated at lower nitrite concentrations.

Q. And that's not actually borne out by the data that was generated by Valisure and Dr. Braunstein, correct?

MS. BOGDAN: Objection, assumes facts not in evidence.

A. I would say that it's not possible to determine with the plot on the right that that is the case because of the background levels that appear to be present in the -- even at zero nitrite.

Q. Okay, fair enough. If you had generated this data, you would have presented all of the data points to the scientific community, correct?

MR. WISNER: Objection, speculation, assumes facts not in evidence.

MS. BOGDAN: I second that objection with regard to speculative.

Q. You can answer, Dr. Mitch.

A. I would think it would be useful to include, yes.

Q. Okay, thank you. You can take that down. I would like to switch a little bit -- you can take the exhibit down, Ali. Thank you so much. If we could bring up D-27.

(Defendants' Exhibit 27 marked for identification.)

Q. This is a recent in vitro study performed by the FDA, Dr. Mitch. The title of this study reads In Vitro Analysis of N-Nitrosodimethylamine (NDMA) Formation From Ranitidine Under Simulated Gastrointestinal Conditions, correct?

A. Correct.

Q. And if we go to just the introduction section on page 2, if we go to page 2 of this, and blow that up, it states "Ranitidine was proposed to convert to NDMA in vivo, as described in an article by Braunstein et al titled 'Analysis of Ranitidine-Associated N-Nitrosodimethylamine Production Under Simulated Physiologic Conditions,'" correct?

A. Correct.

Q. That's the Braunstein/Valisure paper that we just discussed, right?

A. I believe so.

Q. Now, the FDA goes on to say "However, that article did not provide any justification for the physiologic relevance of the nitrite (NO2) concentrations studied

(1,000 to 50,000 micromolar)," correct?
A. Correct.
Q. And you agree that they didn't provide any justification or citation that there was physiologic relevance of the nitrite concentrations that they studied, right?
A. Correct.
Q. And just for clarity, just so the record is clear, 1,000 micromole is the same as 1 millimole, right?
A. Correct.
Q. And so 50,000 micromole is the same as 50 millimole, correct?
A. Correct.
Q. If we go to just below, beginning with "Review," the FDA states that "Review of the literature revealed that 25 micromole per liter of nitrite (i.e., 40-fold lower than the lowest concentration studied by Braunstein et al) had been considered the upper range of normal in the acidic fasting stomach based on published clinical studies. However, that assessment was performed in 1985, and

an updated evaluation of physiologic nitrite concentrations was warranted, with additional consideration of the potential effect of food; of medications, such as H2 blockers and proton pump inhibitors; and among specific patient groups."

Did I read that correctly?

A. You read it correctly.

Q. So one of the goals of this FDA study was to determine the physiologic nitrite concentrations in the gastric juice that would be expected in humans under a variety of conditions, correct?

MR. SELDEN: Objection, foundation.

A. Let's see. I don't specifically see that in here, but --

Q. Well, let's go to the Methods section. If we go to PDF page 14 of this document, I think I can help you out, Dr. Mitch. All right, if we can just blow that up.

The FDA includes a section on "The boundary conditions for physiologic nitrite concentrations in gastric juice,"

correct?
A. Yes.
Q. And they state "To investigate the physiologic nitrite concentrations in gastric juice. Two independent reviewers extracted data on nitrite concentrations and pH in gastric juice, as well as on the context and characteristics of proton pump inhibitors (PPIs) and histamine-2 (H2) blocker intervention and assessed risk of bias. Twenty-six studies were included in the review." And they cite to eFigure 1.
Did I read that correctly?
A. Yes.
Q. Okay. So the FDA identified and reviewed 26 clinical studies precisely to determine the physiologic nitrite concentrations in the gastric juice under various conditions, correct?
A. Correct.
Q. Okay. So if we go back up to PDF page 3. There we go. The FDA scientists include a section on fasting gastric nitrite and pH across diverse patient populations, correct?

A. Yes.

Q. All right. And if we go below that -- you can take down that insert there, Ali -- the FDA has a section on association of meals with gastric nitrite and pH, correct?

A. Yes.

Q. All right. And you can take that down, Ali. And if we just go to the next page, the end of that section, blow that up, the FDA concludes that "Overall, these studies provide a conservative upper bound for gastric fluid nitrite amounts at a pH level of less than 6 of approximately 100 micromole per liter."

Did I read that correctly?

A. You did.

Q. Okay. And the upper range of 100 micromole would include nitrite concentrations in gastric juice in healthy subjects and patients in the fasted and the fed stomach and in patients taking medications, correct?

A. I don't know the context of this. Presumably, yes.

Q. Okay. I mean, we looked at the headings of the various -- you can take that down -- we looked at the headings of the various sections that FDA is describing, right?

A. We did. But to the extent that it includes all the groups that you mentioned, I didn't read that that carefully.

Q. Okay, fair enough.

Is it fair to say that basically FDA scoured the scientific literature and they came to a determination that the upper bound of nitrite concentration in the gastric compartment is 100 micromole per liter?

MR. WISNER: Objection, speculation as to what the FDA did or did not do.

MS. BOGDAN: I concur with that objection.

Q. You can go ahead, Dr. Mitch.

A. It appears that the FDA did a literature review and based on that literature review determined that that 0.1

millimolar concentration was a conservative upper estimate.

Q. That was going to be my next question actually. 100 micromole per liter equates to 0.1 millimole per liter, right?

A. Yes.

Q. And that's a 0.1 millimolar concentration, correct?

A. Yes.

Q. So after FDA's literature review, they determined that nitrite concentrations above 0.1 millimolar are nonphysiologic, correct?

MR. WISNER: Objection, misstates the document.

MS. BOGDAN: Objection.

Q. Go ahead, Dr. Mitch.

A. To rephrase that, that levels above 0.1 millimolar are abnormally high.

Q. Okay. Meaning that nitrite concentrations above 0.1 millimolar would not be expected clinically in humans, correct?

A. Or it would be expected to occur rarely.

Q. Okay. And as you testified earlier, this was FDA's conservative upper bound, correct?
A. That's correct.
MR. SELDEN: Objection to the characterization of the testimony.
Q. If we go to -- let's just go to the first page, Ali. Let's just see what the FDA found here. I want to blow up the key points on the right-hand side there.
So these key points are where the FDA poses a question, presents its findings, and gives the meaning of the study, correct?
A. It appears to be that.
Q. The question posed is "Does ranitidine convert to N-nitrosodimethylamine (NDMA), a probable human carcinogen, in simulated gastric fluid at physiologic pH levels and nitrite concentrations?"
Did I read that correctly?
A. Yes.
Q. And the findings are that "In this in vitro study of 150 milligram

ranitidine tablets added to simulated gastric fluid, NDMA did not form when gastric nitrite concentrations were at the upper range of physiologic or at nitrite concentrations as much as 50-fold greater than the upper range."

Did I read that correctly?

A. You read it correctly.

Q. And you don't have any reason to dispute the FDA's findings, correct?

A. I would dispute their phrasing in that they cannot demonstrate that NDMA did not form. What they can demonstrate is that NDMA after the reaction was not present at above whatever their detection limit happened to be.

Q. Okay. Do you know what their detection limit happened to be?

A. I have not read this manuscript.

Q. Okay. And the meaning of the study according to the FDA is that "In this study 150 milligram ranitidine tablets did not convert to NDMA in simulated gastric fluid with physiologic nitrite

concentrations."
Did I read that correctly?
A. Yes.
MR. WISNER: Objection, misstates the ownership of the study.
MS. BOGDAN: With regard to the meaning of the FDA.
Q. Did you answer the question, Dr. Mitch?
A. You appeared to read it correctly.
Q. So if we go to page 2, third sentence of the second paragraph under the Introduction, if you can just blow that up there. No, no, second paragraph under Introduction. There we go.
I'm going to direct your attention to the sentence beginning "The proposed mechanism." Do you see that in the middle there?
A. Yes.
Q. Okay. It states "The proposed mechanism for ranitidine to form NDMA involves 2 separate nitrite-dependent steps, and the reaction rate for the second

step is proportional to the concentration of the NDMA precursor dimethylamine and the square of the concentration of protonated nitrite."

Did I read that correctly?

A. You did.

Q. So what FDA is saying here is that the nitrosation of ranitidine actually depends on the amount of protonated nitrite rather than nitrite itself, fair enough?

MS. BOGDAN: Objection, to what the FDA is saying.

Q. Go ahead, Dr. Mitch.

A. The sentence appears to say that.

Q. Okay. So if we go to the next page, page -- I want to go to Figure 1B on page 3, and blow up Figure 1B.

Figure 1B includes data on protonated nitrite, correct?

A. Yes, it appears to show that.

Q. The HNO2, the little green circles related to HNO2 are the protonated nitrite, right?

A. Yes.

Q. And it shows that as pH increases, the amount of protonated nitrite decreases and falls rapidly when the pH is above 5, correct?

A. Correct.

Q. Fair to say that the nitrosation of ranitidine to form NDMA is unlikely to occur in mildly acidic or neutral conditions?

MR. WISNER: Objection, incomplete hypothetical.

MS. BOGDAN: Objection, lacks foundation, speculative.

A. I would say that it is not possible to indicate that based upon this.

Q. And why is that?

A. Well, two factors. Number one, this is based on the nitrous acid mechanism which, yes, has a strong pH dependence, but it is not absolute in the sense reactions do not suddenly flip a switch and occur or don't occur, it depends on the amount that forms if the two reagents are present. So if you have lower concentrations, the kinetics of that reaction in turn slow

down, but it doesn't mean that they don't happen at all.

Number two, there are other pathways that I understand for nitrosation that do not necessarily involve N2O3, which is the intermediate that forms from nitrous acid.

Q. And have you tested any of those mechanisms with respect to ranitidine and formation of NDMA?

A. I have not.

Q. If we go to page 6 of this document. You can take that down, Ali. Okay. And it states "As shown in Figure 4 and consistent with the results of this study, Zeng and Mitch also reported NDMA formation from ranitidine only at 5,000 micromole per liter nitrite and greater."

Do you see that language?

A. I do.

Q. As we discussed earlier, this is a correct description of the in vitro experiment of your 2016 paper, correct?

A. I believe so.

Q. So, in other words, the FDA in

vitro results and your in vitro results are consistent with respect to the formation of NDMA at nitrite concentrations of 5,000 micromole per liter, right?

A. I might be getting confused here. Did we actually see the results for this particular study? We were looking at the nitrite concentrations, but did we look at the NDMA results from the study?

Q. I believe we did. If you want to go back to -- if you want to go back to the first page, we can get that out. That is a good point. We can do that real quick, Ali, just go to the Conclusions.

A. Okay, yeah.

Q. The conclusions of this study, it states "In this in vitro study of ranitidine tablets added to simulated gastric fluid with different nitrite concentrations, ranitidine conversion to NDMA was not detected until nitrite was 5,000 micromole per liter, which is 50-fold greater than the upper range of physiologic gastric nitrite concentrations at acidic pH. These findings suggest that ranitidine

is not converted to NDMA in gastric fluid at physiologic conditions."

Did I read that correctly?

A. You read that correctly.

Q. Okay. Fair to say that the results of this study are consistent with the in vitro experiment that you performed in 2016?

A. Yes.

Q. Okay. Let's go to Figure 4 on page 6. All right, I'm going to have to take a look at this and I want to see if I can get some agreement from you here, Dr. Mitch.

So Figure 4, this is a plot of gastric nitrite concentration in micromole per liter against pH, correct?

A. Yes.

Q. All right. And the gray, orange and blue lines that are sort of on the bottom half of the figure show the upper range of nitrite concentration as a function of pH reported in the literature review that was discussed by the FDA, correct?

A. I don't know for sure, but I assume they do.
Q. Okay.
MR. WISNER: Objection, speculation.
Q. You can see in the legend on the right that they are discussing the clinical studies, correct?
MR. WISNER: I objected, I move to strike the witness' previous answer as speculative, by his own admission.
A. I will say, yes, you are reading correctly that the clinical studies on the right are the three colors that you mentioned appear to be representing those three clinical studies.
Q. Okay. And the green triangles show the nitrite concentration and pH combinations tested in the Braunstein study, correct?
A. Green arrows, yes.
Q. You call them green arrows, I call them green triangles, but it is the green part, right, that relates to the Braunstein study?

A. Yes.

Q. Okay. And the pink diamonds, I will call them pink diamonds, show the nitrite concentration and pH combinations that were tested in your 2016 study, right?

A. Correct.

Q. And then the purple dots show the nitrite concentration and pH combinations that were tested in the current study, right?

A. Correct.

Q. And then I think we need to see actually the legend underneath this. Can we get that as well, Ali. We need the whole sort of shebang, if you will. There you go.

So the light green shaded area, and maybe you can highlight this, Ali, it is the second sentence below the graph, the light green shaded area represents the region where formation of NDMA was observed in simulated gastric fluid with supplemental nitrite across different pH values, right?

A. Correct.

Q. And as Figure 4 shows, all of the nitrite concentrations required for the formation of NDMA from ranitidine in vitro are orders of magnitude higher than the physiologic nitrite concentrations at various pH levels, fair enough?

MR. WISNER: Objection, misstates the record and his testimony.

A. I would rephrase that to say in order for NDMA to be detectable according to the methods used in the various studies, you had to have those levels of reagents.

Q. Okay, all right, I will take that.

So, in other words, there is no affirmative evidence that NDMA forms in a reaction with nitrite at levels that are close to the physiologic levels of nitrite that are reported by FDA in this study, fair enough?

A. That would be fair.

Q. Okay. Now, let's go -- you can take this down, Ali -- and let's go back to page 6, and actually you have to go to the next page I think. There we go. Whoops,

actually, starting on -- can you blow up that highlighted language again there. There we go. Blow that up. Okay.

I want to talk about the second sentence here. FDA goes on to say "In contrast" -- actually, let me do it this way. In the first sentence they are talking about your study from 2016, correct?

A. It appears to be correct, yes.

Q. All right. And then they go on to say "In contrast, Braunstein et al (Figure 4) detected the same amount of NDMA at 1,000 micromole per liter nitrite and 2,500 micromole per liter nitrite" --

And then if we can go to the next page, Ali.

-- "while at 5,000 micromole per liter nitrite the NDMA amount increased. Notably, Braunstein et al did not report the background amounts of NDMA present in the ranitidine product they used in the study. Thus, the constant amount of NDMA they detected at the lower nitrite concentrations (i.e., 1,000 micromole per

liter and 2,500 micromole per liter) may be the result of background NDMA being present in the ranitidine tablets before being placed in simulated gastric fluid and not the result of ranitidine-to-NDMA conversion in simulated gastric fluid."

Did I read that correctly?

A. You did.

Q. So is it fair to say that if the data from the Braunstein and Light in vitro publication were provided at nitrite concentrations lower than 1 millimolar, FDA could have confirmed that the NDMA reported at 1 millimolar and 2.5 millimolar concentrations in the Braunstein publication did not in fact represent ranitidine-to-NDMA conversion?

MR. WISNER: Objection. This document does not reflect the opinions of the FDA.

A. I would think that would be fair.

Q. Okay. Now, if we go down to the bottom of this, beginning with the sentence "Regardless." No, you have to

keep it up there, Ali. Keep it up. The bottom of this paragraph, it is actually kind of the middle of it.

Do you see the sentence that begins "Regardless, the lowest nitrite concentration"?

A. Okay, yeah, "Regardless," yeah.

Q. It states "Regardless, the lowest nitrite concentration they studied (1,000 micromole per liter) was more than 1,800-fold greater than the 95th percentile of fasting nitrite concentrations (Figure 1) and approximately 70-fold greater than the maximum range of 95th percentile of combined fed and fasting samples at pH levels between 2 and less than 3 (eFigure 2 in the Supplement). At other pH values, Braunstein et al used 50,000 micromole per liter nitrite, which is approximately 88,000-fold greater than the 95th percentile of fasting nitrite at pH levels between 2 and less than 3 and approximately 3,500-fold greater than combined fed and fasting (Figure 1 and eFigure 2 in the supplement). None of the experiments in

the study by Braunstein et al included physiologic conditions."

Did I read that correctly?

A. You did.

Q. Fair to say that you don't disagree with the characterization that none of the experiments in the study by Braunstein included physiological conditions?

A. So none of the conditions -- none of the experiments included the low nitrite concentrations that reflect those values measured in the reviewed nitrite studies.

Q. Okay. And you're not aware of data as you are sitting here today that nitrite concentrations in the human gastric compartment exceed the conservative upper bound as reviewed by FDA in this publication; is that fair?

A. I am not aware.

MS. BOGDAN: Objection to form.

Q. Now, all of the in vitro experiments that we have looked at and discussed to this point do not provide

evidence that ranitidine is converted to NDMA in gastric fluid at physiologic conditions, correct?

A. All of the studies we have just looked at do not provide positive evidence of NDMA formation under, yes, under that range of nitrite concentrations mentioned in the FDA article.

Q. And neither in yours as well, I'm talking about all of the -- all of the studies that we have reviewed, whether it's your study from 2016, the Braunstein study published in JAMA Open Network, or the FDA study just published a few months ago, none of them show affirmative evidence that ranitidine is converted to NDMA in gastric fluid at physiologic conditions, fair enough?

MR. WISNER: Objection. This is not the FDA study.

MS. BOGDAN: I object to form. It is like an ongoing objection.

MR. WATSON: Objection, form.

Q. You can answer, Doctor.

A. None of the three studies

mentioned demonstrated a positive NDMA formation under those low nitrite conditions indicated in the study we're looking at right now.

Q. Okay. And it is fair to say that they are not low nitrite conditions, but they are the conservative upper bound of nitrite conditions in the human gastric compartment as indicated in the review in the Gao publication, correct?

A. According to the FDA, that's a conservative number.

MR. WISNER: Objection, move to strike the answer as incorrect, again, not an FDA study.

MR. SHEEHAN: I'm about to go to a different document and I actually have to take just a short break if you don't mind. Could we go off the record?

MR. SELDEN: Could we have ten minutes?

MR. SHEEHAN: Ten minutes is fine with me, if that is okay with you, Dr. Mitch.

THE WITNESS: Yes.

THE VIDEOGRAPHER: We are going off the record at 3:05 p.m. This is the end of media unit four.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record 3:21 p.m. This is the beginning of media unit five. Okay, you may proceed.

BY MR. SHEEHAN:

Q. Dr. Mitch, hello again after a short break. Just to give you a little bit of a roadmap here, I want to discuss with you one more in vitro experiment very briefly and then discuss with you your review of the Florian FDA clinical trial that we have touched on a couple of times today.

So, Ali, if you could bring up D-28.

(Defendants' Exhibit 28 marked for identification.)

Q. And just highlight that e-mail at the top there.

So, Dr. Mitch, this is an e-mail from Ryan Cheu at Emery Pharma to

you. The subject is NDMA manuscript update 1-18-21, and it is dated Friday, January 29th, 2021, correct?

A. Correct.

Q. And Ryan Cheu says "Hello Dr. Mitch, apologies for the delay in this manuscript. We have been very busy with the start of the new year. Please find the attached draft manuscript. Please let me know if you have any questions," correct?

A. Correct.

Q. And this was a draft manuscript that incorporated the work that you had done with Emery that we earlier referred to as the Mitch/Emery study, correct?

A. Correct.

Q. And you reviewed this draft that they sent you; is that right?

A. Correct.

Q. And if we can go to I guess the next page, we can just get the title of this in here. You know what, let's go -- let's go -- if we can find the beginning, I think it is important to find, they send you an attachment, I just want to identify

the attachment. I don't know what page it is on actually, Ali. You would think I would know. There we go. Here we go. Just blow that up.

This is a draft manuscript entitled Quantitation of a Probable Human Carcinogen, N-Nitrosodimethylamine, in Pharmaceuticals, correct?

A. That's what it says, yes.

Q. And you are a co-author on this draft article, correct?

A. Correct.

Q. I think we may have covered this earlier, but this, to your knowledge, this draft article has not been published; is that right?

A. Not to my knowledge.

Q. Okay. To your knowledge, has this draft article been submitted for publication anywhere?

A. Not to my knowledge.

Q. Have you had any conversations with anyone at Emery about publishing the -- about publishing this draft article?

A. Yes.

Q. And what were the result of those conversations?
A. I had contacted personnel at Emery Pharma to indicate that we could not publish the results of the urine study.
Q. And I think I saw something in e-mails, did this have something to do with the IRB?
A. Yes.
Q. Can you just describe for me the context why you cannot publish the results of the urine study?
A. The IRB indicated that we were not able to publish it due to what they considered violations of the protocol.
Q. And have you pushed back on the IRB at all and said hey, you know, I think this is important data that should be available to the public? What was your reaction, I guess, to the IRB telling you this?
A. Yes, I appealed several times.
Q. And what did you tell the IRB in connection with your appeals?
A. In connection with the appeals,

they had provided several rationales for the violation of the protocol, for example, they had indicated that our original approved protocol, approved by Stanford IRB, indicated that we would enroll participants via an initial pre-study interview in my office.

By the time we initiated sample collection, COVID had happened in the interim, so our office was closed, so when we enrolled participants we did not do it in my office, we, for example, did it at either Emery Pharma's office as an example of a place where we did it, so that was one such objection indicating a violation of a protocol.

One of the others had to do with whether or not NDMA was marketable at the time that we had, you know, initiated sample collection, because at the same general period of time, i.e., in between when we obtained the IRB approval, which was I believe in early 2020, and sample collection, in the interim was when the FDA's market withdrawal notice came out.

Q. Okay. So is it your understanding, then, that at least with respect to the urine study that you performed with Emery, those data cannot be published for the scientific community to read and review?

A. My understanding is that the Stanford IRB indicated we could not submit them for publication.

Q. Okay. And you said you appealed several times. I just want to get a sense of how many times you appealed.

A. I don't know the number off my head, but I have had e-mails back and forth with the IRB, it must be at least five or more times.

Q. Okay. So is it fair to say that your numerous appeals to the IRB represent your position that the data are relevant, the data are valid, and the data can be submitted for publication so that the scientific community is aware of the findings that you produced in connection with your study with Emery?

MR. SELDEN: I'm sorry, I

didn't hear the whole question. Could you repeat it?

MR. SHEEHAN: Brian, again, it is an echo, I'm sorry, I didn't quite catch that.

MR. SELDEN: I just asked if you could repeat the question.

MR. SHEEHAN: Sure. Can the court reporter read that back. I'm not sure I can repeat the question, to be honest.

(The record was read.)

MR. SELDEN: I'm going to object as compound.

A. Yes.

THE CONCIERGE: I'm sorry, your microphone is not working very well. Can you kindly repeat that?

MR. SELDEN: Objection, compound.

Q. Dr. Mitch, I believe your answer was yes, correct?

A. Correct.

Q. All right. So if we go to PDF page 25 of this document. Ali, if we can

get there. All right, and just blow up the yellow highlighted stuff there in the middle. No, in the middle, just the middle part I think I need. Thanks.

So within this draft publication Emery describes an in vitro experiment in which ranitidine was incubated with nitrite in simulated gastric fluid, correct?

A. Correct.

Q. Okay. And if we go to Figure 2, which I believe should be on the next page. The next page after that, I'm sorry, it was two pages later. There we go. We can just blow up Figure 2.

Here we see the results of ranitidine incubation and concentration of NDMA with 150 -- well, actually, let me get this correct here, this figure represents the levels of NDMA formed when incubated under simulated gastric fluids with and without sodium nitrite, correct?

A. Correct.

Q. All right. And so when ranitidine was incubated in simulated

gastric fluid, the level, the concentration of NDMA, was no different than water, correct?

A. There appeared to be no significant difference.

Q. Okay. And there was an increase in NDMA when ranitidine was incubated in simulated gastric fluid with 50 millimolar sodium nitrite, correct?

A. Correct.

Q. And that's consistent with the other in vitro studies that we have discussed where supraphysiologic levels of sodium nitrite can't produce NDMA when incubated with ranitidine, correct?

A. They are consistent.

Q. This study could not be used to affirmatively conclude that any level of nitrite below 50 millimolar had any effect on the production of NDMA from ranitidine, true?

A. Correct.

Q. So let's move to -- we can take this down. You can take this exhibit down, Ali.

I want to talk about the Florian paper that you reviewed, Dr. Mitch, so why don't we just start by bringing up your review. I think it is D-31, Ali.

(Defendants' Exhibit 31 marked for identification.)

Q. Okay. So you can just pop the top part. Now, this is an e-mail from Josie Sheehy at JAMA Network to you dated Thursday, May 13th, 2021, correct?

A. Correct.

Q. And she says "Dear Dr. Mitch" -- actually, this is probably from Wolfgang Winkelmayer I guess but it is sent through Josie Sheehy. But in any event, the e-mail says "Dear Dr. Mitch, thank you for your review of 'Effect of Oral Ranitidine on Urinary Excretion of N-Nitrosodimethylamine (NDMA),' which we have received. A copy of this review is attached for your reference."

Did I read that correctly?

A. Yes.

Q. So you were one of the peer reviewers of this study prior to

publication, correct?
A. Correct.
Q. And you gave an honest assessment of the study when you peer reviewed it?
A. Yes.
Q. So if we go to just the bottom of this e-mail, here we go, you provide a recommendation, correct?
A. Yes.
Q. And you thought the publication should be fast tracked, correct?
A. Correct.
Q. Why is that?
A. Because fast track normally is applied to articles that have, or manuscripts, that have interest beyond just the academic community, and clearly in this case there is interest in ranitidine.
Q. Fair to say that you thought it was important for public health?
A. Important for public health, and, yes, general citizen knowledge.
Q. And you believed it was a good-quality study, correct?

A. Yes.
Q. And it was your opinion that the data were valid, correct?
A. Yes.
Q. And you thought the information contained in the study was important, correct?
A. Yes.
Q. And you believed that the conclusions that the authors arrived at were reasonable, correct?
A. Yes.
Q. Meaning that the authors interpreted their data to arrive at valid conclusions in your opinion, correct?
A. Correct.
Q. And the conclusion of this study was that there was no evidence that ranitidine contributes to endogenous formation of NDMA, correct?
A. I don't recall the exact conclusions from how they phrased it, but I would say that there was no evidence for an increase in NDMA in urine associated with consumption of ranitidine.

Q. Okay. And the -- I think we may have asked this before, but the conclusions of this study are consistent with the results that you generated from the Mitch/Emery study, correct?
A. Correct.
Q. And the conclusions, to be fair, are also consistent with all of the in vitro data that we have discussed today, fair enough?
A. As I recall for this study, they weren't looking at gastric fluid that I recall.
Q. No, I guess what I'm getting at is the lack of NDMA formation after clinical use of ranitidine is consistent with the lack of NDMA formation at physiologic nitrite conditions that we've seen in the in vitro data, fair enough?
A. I don't think there's a direct link between the two. They are looking at different aspects.
Q. Okay. Now, okay, I want to go to the next page here, the PDF page 2. I don't think I need that right now, Ali.

You can put that down. Let me just pull it up real quick myself here. My apologies, Dr. Mitch. Okay, I want to go to the "Remarks to the author" down below. There we go, that's perfect.

So you wrote that, in your remarks to the author "In a well-conceived and conducted study, the authors present convincing evidence that consumption of ranitidine (300 milligrams) does not result in a measurable increase in urinary excretion of NDMA nor measurable increases in NDMA concentrations in plasma."

Did I read that correctly?

A. You did.

Q. Okay. So you agree that this study was well conceived and conducted, correct?

A. Yes.

Q. And you agree that the authors present convincing evidence that consumption of ranitidine, 300 milligrams, does not result in measurable increases in urinary excretion of NDMA, correct?

A. Correct.

Q. And you agree that the authors also present convincing evidence that consumption of ranitidine, 300 milligrams, does not result in a measurable increase in NDMA concentrations in plasma, correct?
A. Correct.
Q. Does this refresh your recollection that this study measured NDMA after ranitidine ingestion in both urinary excretion and in plasma?
A. It does.
Q. Okay. You go on to say down below "Given the current concerns regarding NDMA and ranitidine, the results of this study are important and merit publication," correct?
A. Correct.
Q. Is it fair to say that you thought these FDA results, when published, would help assuage concerns about the risk of cancer from Zantac?
A. Yes.
Q. And that's because the data as presented, again, did not support any measurable increase in either urinary

excretion of NDMA or increases in NDMA concentrations in plasma after ingestion of 300 milligrams of ranitidine, correct?

A. Correct.

Q. If we go to the next page, Ali, in Introduction and Discussion, can we just pop that.

Now, you suggested here that the sections in the paper need more discussion on why using GC/MS, gas chromatography/mass spectrometry, to detect NDMA in ranitidine is faulty because it leads to NDMA in injection ports, correct?

A. Correct.

Q. And you state "The current phrasing" -- in the draft -- "appears to suggest that the thermal instability of ranitidine was well-known (e.g., line 83). The intramolecular rearrangement involved was not obvious: Conversion of the NO2 group to NO and intramolecular migration for reaction with the dimethylamine functional group on the other side of the molecule."

Did I read that correctly?

A. You did.
Q. Why is the molecular rearrangement involved in the formation of NDMA from ranitidine not obvious?
A. It is an unusual reaction and was not obvious to me, has not been obvious to other users of the EPA method in my field, is not obvious as far as I know to the FDA given that they didn't come up with an LC/MS-based method for this scenario until around about 2019.
Q. Now, because it is not obvious, you wouldn't predict the formation of NDMA from ranitidine, for example, simply by looking at the molecular structure of ranitidine, correct?
A. Correct.
Repeat the question. Are you saying in the context of GC injection ports?
Q. No. What I'm saying is the molecular rearrangement involved in the production of NDMA is not obvious, correct?
A. The molecular rearrangement, to me, it is not obvious.

Q. Okay. And because it is not obvious, it is fair to say that the molecular rearrangement involved in the formation of NDMA from ranitidine would not be reasonably predicted, correct?

MS. BOGDAN: Objection to the form.

A. Yes, I'm sorry, yes, it would not -- I would not have foreseen or predicted that such a rearrangement would occur.

Q. Fair enough, okay. Let's go back to what the FDA reported in their published paper. If we go to just page 1. Actually, we have to go back to D-11, Exhibit D-11.

So under Interventions, let's just blow that up there. In this study, "Participants were randomized to 1 of 4 treatment sequences and over 4 periods received ranitidine (300 milligrams) and placebo (randomized order) with a noncured-meats diet and then a cured-meats diet. The cured-meats diet was designed to have higher nitrites, nitrates, and NDMA,"

correct?
A. That's what it says.
Q. Now, 300 milligrams ranitidine is twice the dose that you used in the Mitch/Emery study, correct?
A. Correct.
Q. If we go to PDF page 2, under Interventions. No, I don't want that one there, Ali. Down at the bottom, correct.
The authors write "After consuming the same diet on the pretreatment day as the treatment day, participants received ranitidine or placebo at zero hours (after overnight fast) on treatment days (days 1, 3, 5 and 7) and then began eating breakfast 1 minute afterward." It goes on to say that "Participants were required to finish meals within 25 minutes," correct?
A. Where are you seeing the 25 minutes?
Q. It actually goes on to the next page there. If you want to go on to that, Ali.
A. Correct.

Q. So the schedule was arranged, in essence, to maximize the potential for NDMA formation from ranitidine in the subject studies, correct?
A. That appears to be the intention.
Q. If we go to page 4, PDF page 4, Ali, under Outcomes. It states that "The primary outcome was 24-hour urinary excretion of NDMA," right?
A. Correct.
Q. And "Exploratory outcomes included the 24-hour urinary excretion of DMA," dimethylamine, right?
A. Correct.
Q. "Plasma tests for NDMA, DMA, and ranitidine," correct?
A. Correct.
Q. And there was also a comparison of the cured-meats diet and the noncured-meats diet, correct?
A. Correct.
Q. All right. Let's take that insert down. Same page, Ali, let's go on to Results. Just blow that up.

Now, under Results we can see that the lower limit of quantitation, the LLOQ, in the study is 0.0156 nanograms per milliliter for both urine and plasma, correct?
A. Correct.
Q. And that lower limit of quantitation of 0.0156 nanograms per milliliter is more than 100 times more sensitive than the 5 nanograms per milliliter quantification threshold that was used in the Mitch/Emery study, correct?
A. Yes.
Q. So, in essence, this is a very, very, very low level of quantification, correct?
A. It would be. I'm not aware of the extent to it. One of my comments in my review was that they should make these determinations in the matrix itself. In the version of the draft that I reviewed, as I recall, what they had done was spike deionized water to determine the limit of quantitation, and I'm not clear if they revised that, but based on the fact that the limit of quantitation is the same in

urine and plasma suggests to me that they didn't.

Q. Okay. Is it fair to say that if NDMA is present in urine or in plasma, this study is capable of detecting it and quantifying it?

A. I would rephrase that to say assuming that they had detection limits that were appropriate, as in validated within urine and plasma, they would presumably be able to detect NDMA at levels in excess of that limit of quantitation.

Q. Okay. Now, if we go to page 5. You can take that down, Ali. Just go to the primary outcome and blow that up. All right.

The authors found that "There was no statistically significant difference between ranitidine and placebo in 24-hour urinary excretion of NDMA with a noncured-meats diet or a cured-meats diet," correct?

A. That's what it says.

Q. Okay. And you would agree that that is -- that does not provide evidence

that ingestion of ranitidine under either a noncured-meats diet or a cured-meats diet results in increases of NDMA in urinary excretion, correct?

A. Correct. The results do not provide evidence of an increase in NDMA.

Q. If we can go to -- you can bring that down, Ali. Go under Plasma NDMA, Exploratory Outcomes. If you can blow that section up there.

The authors reported that "There were no statistically significant differences between ranitidine and placebo with the noncured-meats diet or the cured-meats diet with respect to plasma NDMA," correct? And we can go to the next page if you need to see that.

A. That's what it says.

Q. So as with urinary excretion, this study does not provide evidence that ranitidine ingestion results in increased NDMA in plasma whether or not somebody is eating a cured-meats diet or a noncured-meats diet, correct?

A. Yes.

Q. Now, if we go to page 6, under DMA, I think we are there actually, there we go, we can blow that up. Yeah, perfect.
They state, under DMA -- this is dimethylamine, right -- "All participants had quantifiable DMA in plasma and urine across all treatment groups," correct?
A. Correct.
Q. "Across the 4 treatment groups, the geometric mean maximum plasma concentration range was 1.36 to 1.51 micrograms per milliliter," correct?
A. Correct.
Q. Okay. So -- oh, they go on to state that "All comparisons between ranitidine and placebo had geometric mean ratio 90 percent confidence intervals crossing 1," correct?
A. Correct.
Q. So the study authors reported that ranitidine ingestion did not affect urinary excretion of DMA, dimethylamine, or plasma levels of DMA under either diet, correct?

A. Correct.
Q. All right. So Florian, which is the first named author -- is it okay if we call this the Florian study?
A. Yes.
Q. All right. The Florian study provides no evidence that the dimethylamino group on the ranitidine molecule is somehow coming off and contributing to NDMA formation after ingestion of ranitidine, fair enough?
A. It provides no positive evidence for that, yes.
MS. BOGDAN: Objection to the form of that last question.
Q. Let's go to page 7. Yeah, right there, Ali, if you can blow that up, the comparison between diets.
All right, the authors state that "The cured-meats diet compared with the noncured-meats diet was associated with significantly higher 24-hour urinary excretion of NDMA with placebo and ranitidine," correct?
A. Correct.

Q. Okay. So a high nitrite diet, a high nitrite and nitrate meal actually increased urinary excretion of NDMA, correct?

A. That is what it says.

Q. And the increase in urinary excretion of NDMA that was due to diet had nothing to do with exposure to ranitidine, according to the authors, correct?

A. According to the authors, it did not.

Q. So if we go to page 8, there we go, first full paragraph. Just blow that up there.

In the last sentence there, the authors state that "There was a consistent level of DMA," again, that is dimethylamine, "in plasma throughout the day, with approximately 40 milligrams excreted in urine daily across all treatment groups. This demonstrated that the human body is constantly exposed to large amounts of DMA."

Did I read that correctly?

A. You did.

Q. So it's fair to say that the human body contains a large amount of DMA that potentially is available to form NDMA, correct?
A. Correct.
Q. And there are a million nanograms in a milligram, right?
A. Correct.
Q. And so what the authors are telling us is that in excretion of urine alone, there is 40 million nanograms of DMA that gets excreted daily, correct?
A. Correct.
Q. And all of that potentially could be nitrosated to form NDMA under the right conditions, correct?
A. Correct.
Q. And exposure to millions and millions of nanograms of DMA on a constant daily basis has nothing to do with exposure to ranitidine, correct?
MR. WISNER: Objection, speculation, incomplete hypothetical.
Q. That's what the authors are telling us, correct?

MS. BOGDAN: Lack of foundation.

A. That's what the authors appear to be saying.

Q. So if we go to page 8. Are we on page 8? Maybe we are already on page 8. Down at the bottom, if you could just -- I want to get the whole thing going there, if we can do a side by side or something if that's at all -- or up and down is fine too.

So these authors write that "When considering all cancer types, while each study had limitations (e.g., confounding by indication, residual confounding, multiple comparisons), no consistent signals emerged across studies, and studies with comparison to active controls found no association between ranitidine and overall or specific cancer risk."

Did I read that correctly?

A. You read it correctly.

Q. Do you have any reason to disagree with the authors' assessment that

there is no consistent signal of an association between ranitidine and either overall or specific cancer risk?

MR. WISNER: Objection, speculation, improper opinion.

MS. BOGDAN: Lack of foundation.

A. I don't -- I have not read these studies to my knowledge, so I don't have any opinion as to what the FDA's opinion of these studies.

Q. Okay. Well, is it fair, let me ask you this, is it fair to say that the lack of any association with overall or any specific cancer risk is consistent with the lack of any NDMA formation from ranitidine after ingestion?

MS. BOGDAN: Objection.

MR. WISNER: I object to form.

MS. BOGDAN: Lack of foundation, speculative.

Q. You can answer, Dr. Mitch.

A. I would say that if these studies found a reliable lack of correlation between cancer and ranitidine

consumption, it could be consistent with a lack of significant increase in NDMA concentrations in urine after consumption.

Q. Okay. And as we discussed, there was a -- there was no evidence supporting an increased risk of NDMA in plasma in this FDA study either, correct?

A. Correct.

Q. Okay. So we have discussed a number of in vitro studies. We have discussed this clinical trial. We have discussed your clinical trials. Is it fair to say, Dr. Mitch, that there is no reliable affirmative evidence demonstrating endogenous formation of NDMA after ranitidine ingestion?

MR. WISNER: Objection, assumes facts not in evidence. You are asking the witness to speculate about science he doesn't know about.

Q. You can answer, Dr. Mitch.

MS. BOGDAN: Just note my objection as well. Sorry to interrupt.

A. Based on these studies that I am familiar with, namely the FDA study and

our own LC/MS-based study with Emery Pharma, we don't have any reliable indication that there is a significant increase in NDMA concentrations in urine associated with ranitidine consumption.

Q. And is it fair to say that you're not aware of any reliable evidence to support an increase in endogenous formation of NDMA from ranitidine anywhere in the body, including in urinary excretion?

MR. WISNER: Same objections.

MS. BOGDAN: Objection, calls for speculation, lack of foundation.

A. I am not aware of other studies that address that.

Q. Okay. And when you say you're not aware, I just want to be very clear that you are aware that in the FDA study they measured plasma NDMA as well as urinary excretion NDMA, correct?

A. Correct.

MS. BOGDAN: Objection. You are referring to it again as the FDA study.

MR. WISNER: Objection, form.

Q. Now I want to talk a little bit here about chloramination. You can take this down, Ali. Thanks so much.
What is chloramination?
A. Chloramination is a disinfection process used in drinking water and wastewater treatment in which chlorine, which consumers know of as bleach, is mixed with ammonia and form inorganic chlorines.
Q. Okay. And for one reason or another, I don't know why this is, but I cannot see anybody, I'm assuming you can see me?
A. I can see myself. I can't necessarily see you. But let me --
Q. You should be able to see me.
A. There you are. I see you.
Q. You do see me, okay. I can no longer see anybody, but that doesn't matter to me. I will just keep going, as long as you all can see me.
MR. WISNER: I think Ali needs to stop sharing her screen, that's the problem.
MR. SHEEHAN: Aha. It is good

to see you, Dr. Mitch.

Q. You agree that formation of NDMA from chloramination is not a process that would occur physiologically in humans, correct?

A. It would be -- I wouldn't necessarily go that far. It would probably be a relatively unimportant process.

Q. And what do you mean by that?

A. Well, white blood cells as part of the immune system are known to generate chlorine, a/k/a bleach, and if there were ammonia in the bloodstream, you could form chlorines.

Q. If there were ammonia in the bloodstream. Now, that -- okay, well, fair enough. I think I'm -- I think I'm tracking with you there.

MR. SHEEHAN: Let's see here. Let's take a short break. I'm going to see whether I have got some further questions for you and I also just want to check on the time. I suspect we might be around five hours now, but let's just take a short break.

THE VIDEOGRAPHER: We are going off the record, 4:06 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record 4:18 p.m. This is the beginning of media unit six. Okay, you may proceed.

BY MR. SHEEHAN:

Q. Dr. Mitch, I think fortunately I have only got 15 or so more minutes of questions for you and we will finish in advance of the five and a half hours that we discussed earlier.

Ali, can you bring up Exhibit D-49, please.

(Defendants' Exhibit 49 marked for identification.)

Q. There we go. Do you see that exhibit, Dr. Mitch?

A. Yes.

Q. Okay. So this is an e-mail from David Light to you CCing Alexandra Jirstrand dated May 2, 2019, correct?

A. Yes.

Q. And he attaches a Valisure

ranitidine press story, correct?
A. Yes.
Q. And he says "Please see attached the latest revision of the press-facing story we are putting together regarding ranitidine," right?
A. That's what it says, yes.
Q. And David Light further told you "Attached is both the story itself and the scientific report. Please keep confidential, we have not yet received all the lab verification results, though the initial report from the FDA certified lab is already consistent with our findings."
Did I read that correctly?
A. You did.
Q. So Mr. Light is telling you on May 2, 2019 that what Valisure found regarding NDMA and ranitidine is consistent with what an FDA certified lab found, correct?
A. That's what it appears to say, yes.
Q. And did you trust David Light regarding his representations about the

consistency of these findings?

A. I don't recall this e-mail, but likely I did.

Q. Okay. If we go to the next page of the report, this is the draft press release, and it states "Tests conducted at Valisure's labs on ranitidine, a common over-the-counter prescription antacid, resulted in the detection of N-nitrosodimethylamine (NDMA), a probable human carcinogen. Using the FDA-standard protocol established for valsartan, Valisure detected levels of NDMA at over 2.5 million nanograms, or roughly 25,000 times the allowable daily limit established by the FDA of 96 nanograms."

Did I read that correctly?

A. You did.

Q. The press release goes on to say that Valisure's laboratory results, both FDA standard and simulated gastric conditions, were reproduced and verified by Emery Pharma, correct?

A. I don't see that in here.

Q. Actually, I think we have got

to get rid of the -- so I think that is the next page. Yeah, it is the next page. If we could just go to the next page. Do you see the language?

A. Yes.

Q. And it indicates that "Valisure's laboratory results (both FDA standard and simulated stomach conditions) were reproduced and verified by Emery Pharma," correct?

A. That's what it says.

Q. Okay. So it appears that Emery Pharma is the FDA certified lab that Mr. Light referred to in his e-mail to you, correct?

MR. WISNER: Objection, speculation.

MS. BOGDAN: Objection, speculation, lack of foundation.

A. I can say that David Light was the person who introduced me to Emery Pharma. I don't remember the specific e-mail.

Q. Well, let's just go back to the e-mail. We can just go back to the first

page of this. Do you see where he says "Please keep confidential, we have not yet received all the lab verification results, though the initial report from the FDA certified lab is already consistent with our findings"?

A. Yes.

Q. So putting two and two together, I'm not trying to trick you here or anything, it appears based on the press release and based on this e-mail that Emery Pharma is the FDA certified lab where David Light is representing that the results are consistent, right?

MR. WISNER: Objection, speculation.

MS. BOGDAN: Calls for speculation, lack of foundation.

MR. WATSON: Objection, form.

Q. Dr. Mitch?

A. Correct.

Q. We can pull this down, Ali, and go to D-50.

(Defendants' Exhibit 50 marked for identification.)

Q. And if we just go to, it is PDF page 28 of this exhibit. There we go. Now, this, we can pull that up, that's great, this is an e-mail from David Light to Ron Najafi and others dated Friday, March 29th, 2019, correct?

A. Correct.

Q. So this is prior to David Light's e-mail to you that we just looked at in Exhibit D-49 that was dated May 2, 2019, correct?

A. Correct.

Q. And this is right around the same time that Mr. Light contacted you for the first time, correct?

A. I don't recall the exact date, but about that time.

Q. Now, David Light mentions the Valisure testing and he says "It's apparently well studied that the ranitidine molecule itself easily degrades to NDMA," and then he discusses your study, right?

A. Correct.

Q. And we now know that your 2016 article findings with respect to urinary

excretion of NDMA after ranitidine ingestion are not reliable and have been retracted, correct?
A. Correct.
Q. And Mr. Light mentions that he has got strong press connections and he expects very wide traction, correct?
A. That's what it says.
Q. And he goes on to say that he is "hoping Emery are comfortable with Valisure saying Emery has validated the results; assuming the data are consistent," right?
A. He would like them to validate the results, yes.
Q. Well, he is asking them if they are comfortable mentioning in the press release that Emery Pharma has validated the Valisure results; assuming the data comes back consistent, correct?
A. Yes.
Q. All right. So if we can go to PDF page 21 of this document. This is an e-mail dated April 9, 2019 from Ron Najafi to David Light, correct?

A. It appears to be, yes.
Q. And Dr. Najafi states "We feel that the thermal degradation of ranitidine under headspace GC conditions is a significant confounding factor that we need to first resolve as the results may entail legal connotations down the road."
Did I read that correctly?
A. You did.
Q. Okay. So Emery is telling Valisure and David Light that headspace GC is not a reliable way to measure NDMA for ranitidine, right?
MR. WISNER: Objection, misstates the document. That's not what it says.
MS. BOGDAN: The document speaks for itself.
Q. Dr. Mitch?
A. That appears to be what he is saying.
Q. And it doesn't appear that it took very long for Emery to figure that out, right?
A. It does not appear to be the

case.

Q. So if we go to PDF page 18 of the document. So Light says -- well, let me just set this here. This is an e-mail from David Light dated Tuesday, April 16, 2019 to Ron Najafi and others, correct?

A. Correct.

Q. And David Light says "Just to clarify on the samples and tests; we've sent you tablets from the same bottles as we've been running. The GC/MS method we're using is the FDA system with the 130 degrees Celsius oven temp, which we understand can cause the ranitidine to degrade though still want to reproduce these initial results."

Did I read that correctly?

A. You did.

Q. So David Light is telling Emery that although he understands that FDA's GC/MS protocol established for valsartan leads to thermal degradation of ranitidine, he still wants Emery to validate and replicate those results, correct?

A. That appears to be the case.

Q. So is it fair to say that Light is persisting in using gas chromatography even though he knows from Emery that NDMA is forming in the GC injection port?

MR. WISNER: Objection, misstates the document.

A. I cannot speak to his intentions here. He appears to want Emery Pharma to apply GC/MS to the specific samples.

Q. Okay. And that's with the knowledge that NDMA may form in the GC injection port due to high temperatures that are causing thermal degradation of ranitidine, correct?

MS. BOGDAN: Objection, calls for speculation.

MR. WISNER: Again, misstates the document.

MR. WATSON: Objection, form.

Q. You can answer.

A. It says as much in the sentence, "we understand can cause ranitidine to degrade."

Q. So is it fair to say that the

measurement of NDMA in testing using high temperature gas chromatography/mass spectrometry doesn't represent the actual NDMA content in a ranitidine tablet, correct?

A. I would say that the results of such an analysis are unreliable.

Q. Okay. Now, Emery sent, if we can go to PDF page 4 of this document, Emery sent like the initial draft report. No, that's not what I'm looking for. PDF page 4, is that what we're at here?

THE CONCIERGE: Yes.

MR. SHEEHAN: No, it is correct. Up at the top, if you can just highlight that.

Q. So Emery sends to Light the initial draft report and it has got this moniker for it, it is RVSR-NV-190429, and they send that on May 13th, 2019, correct?

A. Correct.

Q. And if we go to PDF page 2, if you bring that down, go back two more pages to PDF page 2, they say in the middle paragraph there "During the analysis, which

entails heating the sample in a sealed vial at 125 degrees Celsius for 15 minutes in DMSO, the resultant slurry of Zantac was significantly discolored (darkened) in both cases. No NDEA was observed in the sample. Very high levels of NDMA were observed."

Did I read that correctly?

A. You did.

Q. So Emery reported discoloration of ranitidine and high levels of NDMA when ranitidine was heated to 125 degrees Celsius, correct?

A. Correct.

Q. And that's, and I did the calculations, I will represent to you that is 257 degrees Fahrenheit. Does that sound about right to you?

A. It sounds about right.

Q. And they say down below, "Due to the discoloration observed in the chemical structure of the Zantac drug substance (ranitidine), the levels obtained are suspected to be caused by the heating produced in this method."

Did I read that correctly?

A. You read that correctly.
Q. So Emery is reporting to Valisure that the high levels of NDMA are caused by the method of testing itself, right?
A. They appear to be suggesting that.
Q. And that is a critical piece of information, fair enough?
A. It seems like an important piece of information, yes.
(Defendants' Exhibit 51 marked for identification.)
Q. Okay. If we go back to Exhibit D-51, and if we go to PDF page 2 of Exhibit D-51. This is an e-mail from David Light dated Thursday, May 23, to Neelanjan Bose at Emery Pharma and others, including Ron Najafi at Emery Pharma, correct?
A. Yes.
Q. And Light directs Emery "Regarding the report, although the commentary on the samples is nice for discussion, for the final report, can you include only the FDA method designation

that was used and the results? The clarification that the results are outside of the calibration range and thus could be underestimates is fine to include."

Do you see that?

A. I see it.

Q. So regarding the GC/MS method, Light is telling Emery, hey, I don't want you to discuss the issue of ranitidine samples forming NDMA artificially during heating in the gas chromatography injection ports, correct?

MR. WISNER: Objection, plainly misstates the e-mail.

A. That appears to be what is being suggested.

MR. SHEEHAN: Okay. I'm going to take another short break here, just a couple of minutes, I'm going to consult with my co-counsel and I think we might be done for the day. So, Dr. Mitch and Bill -- or, Brian, rather, can we take five?

MR. SELDEN: That's fine.

THE VIDEOGRAPHER: We are going

off the record 4:36 p.m.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record 4:47 p.m. Okay, you may proceed.

MR. SHEEHAN: Dr. Mitch, thanks so much for your time and attention today. I really, really, appreciate it. I don't have any further questions at this time.

As we discussed at the beginning of the deposition, I may have some questions to follow up whatever it is the plaintiffs may want to ask you about, but at this point I'm ready to pass the witness. And I think we've got some time today. I don't know if, Dr. Mitch, it is up to you, but I suspect we could utilize the time and continue, but that's up to you all.

MR. WISNER: Let's go off the record.

MR. SHEEHAN: Sure.

(Continued on the next page.)

THE VIDEOGRAPHER: Off the record, 4:48 p.m.

[TIME NOTED: 4:48 p.m.]

_____________________________
WILLIAM A. MITCH, Ph.D.

_________________________
Subscribed and sworn to
before me this _________
day of ________________, 2021.

________________________
Notary Public

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| MITCH | SHEEHAN | 9 |

E X H I B I T S

| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Third Amended Notice of Deposition | 13 |
| Exhibit 2 | MITCH001081-001082 | 17 |
| Exhibit 3 | MITCH001107-001114 | 22 |
| Exhibit 4 | MITCH000004-000009 | 25 |
| Exhibit 5 | MITCH000131-000133 | 32 |
| Exhibit 8 | Article from Environmental Science & Technology | 35 |
| Exhibit 9 | Article from Carcinogenesis | 44 |
| Exhibit 10 | Article from Carcinogenesis | 59 |
| Exhibit 11 | Article from JAMA | 66 |
| Exhibit 12 | MITCH0001237-0001242 | 74 |
| Exhibit 13 | MITCH000202-000205 | 78 |
| Exhibit 14 | MITCH000454-000458 | 79 |
| Exhibit 15 | EMERY 0968-1003 | 84 |
| Exhibit 16 | Ranitidine Investigation Summary | 139 |
| Exhibit 17 | EMERY 1241-1242 | 92 |
| Exhibit 18 | MITCH000539-000543 | 94 |
| Exhibit 19 | MITCH000323-000337 | 99 |
| Exhibit 20 | MITCH001100-001104 | 144 |
| Exhibit 21 | MITCH001280-001282 | 151 |
| Exhibit 22 | MSK00007347-00007359 | 153 |
| Exhibit 23 | VAL-BI 00025-00039 | 162 |
| Exhibit 24 | Microsoft Word document | 166 |
| Exhibit 25 | Article from JAMA Open Network | 170 |
| Exhibit 26 | Graphs | 175 |
| Exhibit 27 | Article from JAMA Open Network | 179 |
| Exhibit 28 | MITCH000417-000447 | 204 |
| Exhibit 31 | MITCH001612-001616 | 213 |
| Exhibit 33 | MITCH001702-001707 | 107 |
| Exhibit 34 | Document from American Cancer Society | 122 |

E X H I B I T S

| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 35 | Bar chart | 129 |
| Exhibit 49 | MITCH000055-000066 | 237 |
| Exhibit 50 | Confidential Report prepared by Emery Pharma | 241 |
| Exhibit 51 | VAL 01167-01177 | 249 |

DIRECTIONS NOT TO ANSWER

Page Line

(NONE)

REQUESTS

Page Line

(NONE)

CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of November, 2021.

_______________________

TODD DESIMONE

* * *

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: IN RE ZANTAC
DATE OF DEPOSITION: 11/9/21
WITNESS' NAME: WILLIAM A. MITCH, Ph.D.

PAGE/LINE(S)/ CHANGE REASON
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________

________________________
WILLIAM A. MITCH, Ph.D.
SUBSCRIBED AND SWORN TO
BEFORE ME THIS______DAY
OF_______________, 2021.

_______________________
NOTARY PUBLIC
MY COMMISSION EXPIRES__________________

**&**

**&** 2:2,21 3:17 4:8 4:18,22 5:2,7,10 5:20 6:8 7:12 253:10

**0**

**0.005** 159:1
**0.0156** 224:3,8
**0.02** 52:10
**0.04** 37:19 38:15
**0.1** 55:9 185:25 186:5,7,12,19,21
**0.3** 128:23 132:3 132:18 133:1
**0.5** 55:10 165:22
**0.612** 155:14
**0.72** 38:17 64:25 65:13
**00025-00039** 253:20
**01167-01177** 254:4
**02110-1447** 5:16
**02210** 5:3
**0968-1003** 253:15

**1**

**1** 13:3,7 52:4,5,19 53:22 54:1,3,4 58:8 64:1,2,7,7 93:1 94:13 103:7 103:23 106:11 120:18 124:14 125:21 126:1 155:7 156:4,13 159:23 163:12,16 164:6 165:4,11,16 166:25 167:14 168:20 169:3 171:16,25 174:15 174:20 175:2 178:10 181:11 183:12 199:12,14 200:13,24 221:14 221:19 222:15,16 227:19 253:7
**1,000** 37:19 104:2 134:1 181:1,10 198:14,25 200:10
**1,800** 200:11
**1-18-21** 205:2
**1.0** 58:23 59:3
**1.36** 227:12
**1.51** 227:12
**1.66** 123:21
**1/10** 128:14,21
**10** 54:21 55:14 59:22,23 64:1 68:16 84:23 141:13 146:16 150:2 171:15 253:12
**100** 19:18,19 163:9 184:15,19 185:16 186:4 224:9
**10019** 6:10
**10019-9710** 5:21
**10036-2601** 4:9
**10075** 6:18
**107** 253:24
**10940** 2:2
**10th** 99:12
**11** 66:19,20 85:14 100:3 112:8 221:15,16 253:13
**11/9/21** 256:3
**111** 3:18
**1180** 4:18
**1185** 4:8
**11:17** 73:22
**11:34** 74:1
**12** 23:1 24:18 74:20,21 99:11 100:9 135:20 163:2 253:14
**120** 104:3,7
**122** 253:25
**12210** 3:19
**1241-1242** 253:17
**125** 52:16 248:2,11
**129** 254:2
**12:16** 107:6
**12:28** 107:10
**13** 78:3,4 253:7,14
**130** 2:9 65:12 71:10 148:20 245:12
**13164** 37:4
**1325** 6:9
**139** 253:16
**13th** 81:4 213:10 247:20
**14** 71:2 79:9,10,12 182:19 253:15
**14.1** 69:21
**143** 71:1
**143.4** 69:14
**144** 253:18
**1473** 3:2
**15** 37:15 51:7,23 84:10,11 237:10 248:2 253:15
**150** 36:23 64:25 65:6 69:15,21 71:2,5 79:22 109:2 141:14 158:5,25 187:25 188:23 211:18
**1500** 4:3
**151** 253:19
**153** 253:19
**1530** 5:3
**157** 71:5
**15th** 85:10
**16** 6:18 85:19 139:11,12 245:5 253:16
**1600** 2:3,10 4:19
**162** 253:20
**16518** 2:21
**166** 253:20
**17** 68:16 79:14 92:14,18,21 253:8 253:17
**170** 253:21
**1704** 126:18
**175** 28:1 253:22
**1755** 7:2
**179** 253:22
**17th** 80:8
**18** 37:24 38:10,15 94:17,18,20 245:2 253:17
**1800law1010.com** 3:20,21
**18th** 2:9 25:8,19 27:23
**19** 55:24,25 99:8,9 253:18
**190429** 247:19
**19103** 2:10
**1980** 131:14
**1985** 181:25
**19th** 27:22 32:21 167:2 255:15
**1:13** 143:9,11
**1:49** 144:2,6
**1b** 190:17,18,19

**2**

**2** 16:25 17:1 35:19 35:22 52:19 64:1 78:6,13 147:19,20

149:12 152:8 172:6 180:9,10 183:9 189:12,24 200:16,16,22,24 211:12,15 216:24 222:7 237:23 238:18 242:10 247:22,24 249:15 253:8
**2,500** 198:15 199:1
**2.5** 51:6,15,23 67:18 156:25 157:2 158:7 159:3 159:12 163:13 171:15 199:14 239:14
**2.5.** 158:20
**20** 1:2 51:16,18 52:1 144:14,15 153:13 253:18
**200** 19:10,18,19
**20005** 4:23
**20032** 3:13
**2015** 35:14,21,25 43:23 45:3 58:13 64:18,22 65:18 105:3
**2016** 21:1,12 35:15 44:14,20 45:2 47:18 58:13 64:19 65:4,21,23 66:16 67:23 68:8,19,25 71:12,15,22 72:2 72:18 74:7,9 82:20 83:19 93:24 94:1,6 98:10,14,20 99:18 101:21 105:4,8 108:24 109:8 110:23 117:8 119:10 133:15 135:1 137:16 138:7,14 140:15 141:10 160:12 192:23 194:8 196:5 198:8 202:12 242:24
**2019** 16:22 17:5,17 20:21 23:1 24:18 24:18 25:8,19 27:22 32:21 57:22 58:2 72:13 75:12 76:8 108:8,12 110:10,22 115:20 119:3,5,8 144:21 152:6 220:11 237:23 238:18 242:6,11 243:24 245:6 247:20
**2020** 78:13 79:14 80:8 81:4 84:14 85:10,11 92:22 93:13 94:23 95:11 98:25 99:12 100:10 102:5 103:4,21 135:24 137:7 153:13 167:2 208:23
**2021** 1:16 8:4 27:23 39:17 45:6 66:7 67:6 112:1 205:3 213:10 252:9 255:15 256:22
**204** 253:23
**20th** 5:8
**21** 151:18,20 243:23 253:19
**21202** 5:8
**213** 253:24
**22** 49:23 153:5,6 155:18 253:8,19
**23** 162:10,11 164:24,25 249:17 253:20
**237** 254:3
**24** 67:17 69:1 165:25 166:5,6 223:9,13 225:19 228:22 253:20
**24.9** 69:3
**241** 254:3
**249** 254:4
**25** 112:1 127:2 144:20 150:8 163:11 170:3,4 171:15 181:19 210:25 222:18,20 253:9,21
**25,000** 239:14
**250** 5:21 52:11
**257** 248:16
**26** 175:13,13,14 183:16 253:22
**26th** 5:15 103:4 137:7 152:6
**27** 179:23,24 253:22
**27th** 17:4
**28** 204:19,20 242:2 253:23
**28th** 6:9 84:14 108:12 135:24
**29** 93:13
**2901** 6:2
**2924** 1:2,2 8:15
**29th** 92:22 108:7 110:10 115:20 205:3 242:6

**3**

**3** 22:22,23 48:1 54:15 55:21,24 56:14,18,25 74:20 80:6 118:21 126:16,21 128:16 128:22 131:6 132:20 154:11,12 161:1 183:22 190:18 200:16,22 222:15 253:8
**3,500** 200:23
**3.550** 1:11
**30** 89:13 104:5 127:2 130:8
**300** 155:13 156:24 217:10,22 218:3 219:3 221:21 222:3
**300,000** 116:12,24
**30309** 4:19
**30th** 85:11
**31** 213:4,5 253:24
**32** 253:9
**3200** 3:12
**325** 6:17
**33** 5:15 107:22,24 108:1 115:14 126:16 253:24
**34** 122:20,24 253:25
**34th** 4:9
**35** 129:5,6,18 253:10 254:2
**37** 19:15 147:14 148:25
**38.7** 125:15
**3879** 255:17
**3:05** 204:2
**3:21** 204:6
**3rd** 94:23

**4**

**4** 25:12,13,14 53:6 53:6,7 79:12 94:20 103:21

107:23 115:16 192:14 194:10,15 197:1 198:13 221:19,20 223:7,7 227:10 247:9,12 253:9
**4,500** 132:2,23 133:9,16
**40** 37:14 126:8 127:3 129:22 130:1 181:20 229:19 230:11
**40,000** 141:16 142:1
**40.14** 125:5,6
**400** 65:7 67:16 109:1 111:4,8 116:7
**40208** 3:3
**44** 253:11
**45** 126:22 133:24
**45,000** 131:7,22 132:21 133:14
**455** 4:2
**49** 237:15,16 242:10 254:3
**4:06** 237:2
**4:18** 237:5
**4:36** 251:1
**4:47** 251:4
**4:48** 252:2,4
**4th** 3:2 75:12 76:8

**5**

**5** 25:22 32:17,18 51:4,5,14,20,21 52:9 54:22 55:4,5 59:4 63:18 64:11 103:19,24 104:1 106:5 111:23 112:6 117:19,22 159:19 160:2,8 161:13 171:15 176:9 178:1 191:4 222:15 224:10 225:13 253:9
**5,000** 192:17 193:3 193:22 198:18
**50** 55:14 70:3 150:9 156:20 157:2 162:19 163:11 165:11 171:15 181:14 188:5 193:22 212:9,19 241:23 241:24 254:3
**50,000** 181:1,13 200:18
**500** 3:7 6:3
**51** 249:12,15,16 254:4
**5150** 1:10
**521** 72:7
**54** 133:23
**555** 7:7
**55th** 5:21
**59** 253:12

**6**

**6** 58:10 104:5 184:14 192:12 194:11 197:24 227:1
**60** 124:14
**612,000** 155:14,22 156:23
**626** 54:14 57:1 60:5
**628** 54:5
**629** 58:10
**66** 253:13
**6th** 95:11

**7**

**7** 56:15 67:12 111:23 156:4 222:15 228:16
**70** 71:10 112:7 126:24 128:11,18 131:8,17 132:3,24 133:19 200:13
**719** 2:15
**725** 4:23
**74** 253:14
**750** 3:18 104:6
**77532** 2:22
**78** 253:14
**78401** 2:16
**78746** 6:3
**79** 253:15
**79th** 6:17
**7th** 97:19

**8**

**8** 35:16,17 37:2,5 56:5,12 125:21 126:1 164:20 165:1 229:12 231:5,6,6 253:10
**80** 104:3
**824** 159:3
**83** 219:18
**84** 253:15
**85** 104:7
**88,000** 200:20

**9**

**9** 1:16 44:13,15 102:24 162:13 243:24 253:3,11
**9.4** 69:20
**9.7** 69:2
**90** 95:15 227:18
**90024** 2:3
**90071** 7:7
**92** 253:17
**921** 158:7
**93.4** 69:7
**94** 253:17
**94105** 4:3
**94111** 3:8
**94303** 7:3
**95.6** 65:7,11
**95th** 200:11,14,20
**96** 155:9 239:16
**99** 253:18
**9:56** 1:16 8:3
**9th** 8:4

**a**

**a.m.** 1:16 8:3 73:22 74:1
**aaron** 5:23
**aaron.levine** 5:24
**abbreviation** 14:23
**ability** 134:17
**able** 55:2 79:21 92:11 96:18 168:9 207:14 225:11 235:16
**abnormally** 186:19
**absence** 88:1
**absent** 175:2
**absolute** 191:20
**absolutely** 75:11
**academic** 214:18
**accept** 164:9
**acceptable** 116:13 116:25 119:24
**account** 69:7
**accounted** 69:14 69:20
**accuracy** 30:12 104:3,7,9,12

142:12
**accurate** 28:18 45:20 46:1 54:6 94:7 104:18 110:24 131:21 133:10 146:22 151:12 169:16 177:5
**accurately** 30:1,4 72:15
**acid** 48:7 51:8,24 191:18 192:7
**acidic** 48:6 181:23 191:8 193:24
**acids** 116:15 117:13
**acknowledged** 83:16
**acknowledging** 136:11
**action** 255:11
**actions** 1:15
**active** 231:18
**activities** 110:14
**actual** 122:1 127:7 152:1 247:3
**adam** 2:5 145:8,9 145:18
**add** 10:25 51:22 70:8
**added** 51:6 61:2 61:18 159:8 188:1 193:18
**addition** 70:2 73:13 145:24 177:7
**additional** 54:18 86:22 88:15 99:17 132:10 182:3
**address** 167:7 234:16
**addressing** 20:22
**administered** 70:2 70:10
**admission** 195:11
**advance** 237:12
**advise** 24:2
**advised** 23:10 155:8
**affect** 41:18 227:22
**affirmative** 134:4 134:10 197:16 202:15 233:14
**affirmatively** 212:18
**afoster** 2:6
**afternoon** 9:9
**afterward** 222:16
**agency** 72:7
**ago** 12:24 16:20,21 63:24 102:14 202:14
**agree** 8:7 14:22 30:20 43:22 72:17 73:3 81:24 96:25 97:8 104:20,21,21 114:4,11,15,16,18 120:9 121:23 122:6 131:2 151:22 168:1 173:1 181:3 217:16,20 218:1 225:24 236:2
**agreed** 64:10,23 90:3
**agreement** 22:3,7 22:8 24:19 25:3 25:18 26:17 27:5 27:8,21,25 28:5,10 28:25 29:5,9,12,13 122:22 175:24 194:13
**agreements** 25:4
**aha** 78:8 235:25
**ahead** 29:20 49:14 60:9 135:9 169:13 185:22 186:17 190:13
**aid** 86:25
**aiding** 87:4
**al** 49:23 180:13 181:21 198:12,20 200:18 201:1
**alameda** 1:9
**alarmed** 108:24
**albany** 3:19
**alexandra** 237:22
**ali** 7:14 13:5 14:10 16:25 22:21 25:5 25:11,22 32:15 35:11,16,22 37:2,5 38:7,20 39:20 40:2 44:13 46:22 50:22 52:22 54:2 54:15 55:24 57:1 57:5 58:9 59:21 64:15 66:19 67:12 68:17,23 73:5 74:19 75:1 76:6 77:22 78:3,11 79:8 84:10,23 85:18 86:3 92:14 93:12 94:15 95:9 99:8 100:8,14 106:24 107:22 111:22 115:14 122:20 123:17 125:24 129:5 135:19 139:11 142:21 144:14 146:8 147:19 148:16 150:18 151:19 153:4,10 153:25 156:5 161:2 162:9 164:21 165:3,8 166:5,13 170:3 171:2 179:21 184:4,9 187:8 192:13 193:14 196:14,18 197:23 198:17 200:1 204:18 206:2 210:25 212:25 213:4 216:25 219:5 222:9,24 223:8,24 225:14 226:8 228:17 235:3,22 237:14 241:22
**alison** 5:4
**alison.casey** 5:5
**allow** 10:6,8
**allowable** 239:15
**alter** 94:8
**alternative** 135:12
**alto** 7:3 9:21
**ambiguous** 77:5 135:5 174:8
**amended** 253:7
**american** 122:22 123:2,19 124:11 124:12 130:2,16 253:25
**americans** 42:13 42:14 43:4
**americas** 4:8 6:9
**amines** 48:8
**ammonia** 235:9 236:13,15
**amount** 28:3 69:13 70:1 98:17 116:5 190:9 191:2

191:22 198:13,19 198:23 230:2
**amounts** 157:8 184:13 198:21 229:23
**analyses** 104:5
**analysis** 18:23 39:17 94:25 100:16 103:6 170:10 180:3,13 247:7,25
**analytical** 21:23 27:12 29:19 39:5 40:4,10,22 45:1 47:1,15 58:20 68:2 71:8 86:20 117:4,21
**analyze** 75:16 88:12
**anapol** 2:8
**anapolweiss.com** 2:12
**anderson** 2:18
**angeles** 2:3 7:7
**angst** 98:17 99:24 101:20
**animal** 48:20
**animals** 120:3
**answer** 10:6,9 11:2 26:21 31:3 36:12 44:5 46:10 57:19 94:11 112:20,24 114:23 167:22 174:11 177:21 179:16 189:8 195:10 202:24 203:14 210:22 232:22 233:21 246:21 254:6
**answered** 44:3 46:8,19 118:13 178:16
**answering** 23:6,12 24:4
**answers** 34:8
**antacid** 239:8
**antecedent** 89:2
**anxiety** 98:25
**anybody** 12:3,5 115:6 152:24 235:12,19
**anyway** 28:1
**apologies** 156:1 205:6 217:2
**apologize** 23:25 83:9 129:10
**apparently** 142:11 242:20
**appealed** 207:22 209:11,12
**appeals** 207:24,25 209:18
**appear** 19:3 20:10 64:5 159:17 178:1 179:6 195:15 231:3 244:22,25 249:6
**appearances** 8:25
**appeared** 42:7 189:10 212:4
**appears** 59:18 64:7 78:15 145:1 162:25 163:19 169:23 176:22 185:23 187:15 190:14,21 198:10 219:16 223:5 238:22 240:12 241:10 244:1,20 245:25 246:8
250:15
**apples** 51:13,13
**application** 86:21
**applied** 75:3 214:16
**apply** 246:9
**applying** 80:1
**appreciate** 71:18 251:7
**approaching** 135:11
**appropriate** 123:24 136:5 138:6 225:9
**approval** 85:5,9 208:22
**approve** 168:19
**approved** 84:24 85:8 131:11 208:4 208:4
**approximately** 8:2 69:20 184:14 200:13,19,22 229:19
**april** 23:1 24:17 24:18 25:7,18 27:22,23 32:21 84:14 243:24 245:5
**arch** 5:15
**area** 16:9 78:20 196:17,20
**arisen** 86:18
**aristei** 2:2
**armor** 32:4
**arnold** 5:20
**arnoldporter.com** 5:24,25
**arranged** 223:1
**arrangement** 8:21
**arrive** 215:14
**arrived** 121:24 215:10
**arrows** 195:21,22
**article** 13:1 36:16 42:4 43:7 45:5,10 45:13 47:19 49:19 49:22 58:13 64:18 64:19,23 65:4 99:19 108:17,21 110:24 117:8 133:16 137:22 139:1,4,6 140:24 154:2,16 175:5 180:12,23 202:8 206:11,15,19,24 242:25 253:10,11 253:12,13,21,22
**articles** 214:16
**artifact** 20:23 40:4 40:10,22 47:1 58:20 68:2 76:15 86:20 93:14,20 117:4
**artificially** 250:10
**asked** 13:21 44:2 46:7,18 94:23 111:18 118:12 145:6 170:21 178:16 210:6 216:2
**asking** 14:20 15:1 23:3 24:18 31:4 34:22 44:6 60:19 75:19 95:2 98:13 114:9 153:18 177:17 178:3 233:18 243:16
**aspect** 43:8
**aspects** 90:13 173:22,25 216:22

**assay** 47:23 48:2,3 48:10 148:20
**assays** 49:24
**assertions** 113:12
**assess** 90:4,20 154:25
**assessed** 183:10
**assessing** 47:7 169:4
**assessment** 86:2 119:21 181:25 214:4 231:25
**associate** 17:15
**associated** 41:20 62:4 63:1 86:16 86:24 94:3 170:10 180:14 215:24 228:21 234:5
**associates** 2:21
**association** 8:17 88:4 184:5 231:19 232:2,14
**assuage** 137:18 218:20
**assume** 112:22 132:23 134:21 195:2
**assumes** 80:25 81:10 120:12 128:10 167:19 176:17 179:1,13 233:17
**assuming** 42:11 43:3 126:22 127:14 131:7 133:6 225:8 235:12 243:12,19
**assumption** 20:22 26:24 119:9 128:18 167:10
**assumptions** 121:12
**atlanta** 4:19
**attached** 205:9 213:21 238:4,9
**attaches** 144:23 237:25
**attaching** 154:1
**attachment** 205:25 206:1
**attempt** 65:24
**attempts** 151:2
**attention** 11:12 57:7 60:4 189:18 251:6
**attorneys** 2:4,11 2:16,22 3:3,8,14 3:19 4:4,10,24 5:4 5:9,16,22 6:4,10 6:19 7:3
**attributable** 86:20
**audio** 8:6 83:8
**august** 94:22 95:11 97:19 103:4 153:13 167:2
**austin** 6:3
**author** 45:9 145:4 145:10 170:13,17 206:10 217:4,7 228:3
**author's** 66:8,12 67:1
**authors** 170:15 171:3,18,24 173:9 215:10,13 217:8 217:20 218:1 222:10 225:17 226:11 227:21 228:19 229:9,10 229:16 230:9,24 231:3,12,25
**authorship** 136:7
**available** 30:12 146:13 207:19 230:3
**aventis** 5:17,22
**avenue** 3:12,18 4:8 6:9
**aware** 26:11 33:20 77:8,16 109:17,20 120:23 121:8,18 121:20 127:21 138:2 145:20 167:11 171:23 172:3 201:15,21 209:22 224:16 234:7,15,18,19

**b**

**b** 85:21,21,24 156:15 158:4,4 162:17 253:5 254:1
**back** 12:25 38:21 48:18 50:25 53:7 54:14,15 56:16,25 74:1 80:5 90:12 95:25 96:12 98:4 107:10 110:5 115:14 118:19,22 119:7,11 126:15 126:16 129:17 142:25 144:6 148:16 149:11 150:16,16 154:13 160:25 183:21 193:11,11 197:23 204:6 207:16 209:14 210:9 221:13,15 237:5 240:24,25 243:20 247:23 249:14 251:3
**background** 62:25 63:4 119:14 122:8 122:10,16 127:3 129:22 130:9,23 130:25 133:1 158:12 179:6 198:21 199:2
**bacon** 6:8
**baltimore** 5:8
**bar** 129:19 254:2
**barnes** 5:2,11
**based** 20:21 42:19 58:1 75:16 76:15 98:19 117:10 119:7,17 120:2,5 121:10,11 128:17 131:23 133:7,7,22 134:2 136:15 163:19 164:4 181:23 185:24 191:15,18 220:10 224:24 233:24 234:1 241:10,11
**basically** 28:14 68:7 75:5 104:15 138:23 166:10,15 178:2 185:12
**basis** 42:15 43:5 69:9 134:21 230:20
**batch** 95:20
**baum** 2:2
**baumhedlundla...** 2:5,6
**bay** 78:20
**began** 222:15
**beginning** 74:2 100:7 107:11 144:7 181:17 189:18 199:24 204:7 205:23

237:6 251:10
**begins** 112:8 176:3 200:5
**believe** 16:23 34:6 36:25 43:9 45:16 47:12 49:21 66:2 75:12 85:3 92:4 97:3,11 102:4 111:1 119:3 124:9 128:20 130:6 131:4,13,18 133:13 149:7 153:16 160:24 166:22 169:2,15 170:25 173:9 180:21 192:24 193:10 208:23 210:21 211:12
**believed** 110:22 214:24 215:9
**bell** 66:10
**belongs** 167:7
**best** 10:5,8 100:24 101:4 105:7 112:13
**better** 74:8 83:12 83:14 96:10
**beyond** 155:11 214:17
**bgselden** 7:4
**bi** 253:20
**bias** 183:11
**big** 60:1
**bill** 33:1 250:22
**bioavailability** 70:3
**bit** 10:10 21:10 35:7,9 54:25 64:16 66:14 73:7 73:11,15 74:17 94:8,22 101:25 106:21 107:18 179:21 204:11 235:1
**black** 156:14
**blacked** 79:25 108:6
**blackwater** 36:19
**blackwaters** 36:3 36:12
**bladder** 141:17
**bleach** 235:8 236:12
**blocked** 60:19
**blocker** 183:10
**blockers** 182:5
**blood** 86:23 87:10 88:2,7,12 89:3,6 127:11,14,21,23 128:1,5,7 236:10 255:12
**bloodstream** 88:20 236:13,16
**blow** 37:7 40:1 46:22,22 50:23 53:8 54:3,16 60:10 68:23 85:20 100:6 102:25 103:19 108:2 109:25 110:6 112:9 115:16 135:22 144:17 146:8 149:12 150:18 152:5 153:9 156:6 162:14 163:3,3 165:9 166:12 170:6 171:3 174:16 180:10 182:21 184:10 187:9 189:14 190:18 198:1,3 206:4 211:1,15 221:18 223:25 225:15 226:10 227:3 228:17 229:13
**blue** 194:20
**board** 85:2
**body** 39:3 85:4 88:18 111:4 116:15,16,20 117:13,14 127:9 127:15 138:9 139:25 140:6 170:24 229:22 230:2 234:10
**boehringer** 4:10 4:11,11,12,13
**bogdan** 3:20 31:1 32:10 34:20 44:4 46:9 49:14,17 50:16 59:8 61:9 63:6 70:11 72:23 77:7 80:25 81:12 81:21 82:3,23 87:21 89:10 90:7 90:23 99:20 102:9 102:22 105:20 106:2,18 113:25 117:15 121:4,15 132:6 133:12 135:6 138:21 142:17 157:23 167:17,20 169:12 174:9 176:20 179:1,14 185:20 186:16 189:6 190:11 191:12 201:22 202:21 221:6 228:14 231:1 232:6,18,20 233:22 234:13,23 240:18 241:17 244:17 246:16
**bomb** 32:5
**borne** 178:23
**bose** 79:15 84:15 92:22 93:11 95:12 249:17
**boston** 5:3,16
**bottles** 245:10
**bottom** 37:4 38:6 38:21 51:1 57:2,3 57:7 58:11 59:10 59:12 60:10,13 74:23,25 75:1 80:14 85:13,21 92:20 108:3,12 112:10 124:18,21 125:11 126:20 135:21 154:24 161:4,4 194:21 199:24 200:2 214:7 222:9 231:7
**boulevard** 2:2,15
**bound** 184:13 185:14 187:3 201:19 203:7
**boundary** 182:24
**bounds** 177:13
**bowman** 6:2
**bowmanandbro...** 6:5
**box** 166:14
**brady** 3:6,9
**bradylawgroup....** 3:9
**brand** 4:2
**braunstein** 33:4,9 33:10,15 76:9 77:14,18 111:17 112:2 114:3,16 144:20 152:6,14

153:12,17 154:1 155:23 161:19 170:13 174:24 175:8,19 178:9,25 180:13,19 181:21 195:19,25 198:12 198:20 199:10,15 200:18 201:1,8 202:12
**braunstein's** 76:3 76:25 113:9,17 114:8
**break** 10:22 11:3 73:8,13,18 106:22 107:15 203:18 204:11 236:20,25 250:18
**breakfast** 222:16
**breaks** 10:23
**breast** 125:19,21 125:25 126:2
**brent** 2:4 49:14 124:3
**bretholz** 33:5 34:5 34:7 145:7,8,9
**brian** 7:4 9:24 11:18 23:13 106:25 210:3 250:22
**briefly** 204:14
**bring** 22:21 32:16 32:16 35:16 52:21 60:4 66:18 74:19 78:2 92:14 94:17 107:22 111:22 122:20 139:10 144:14 153:5 179:22 204:18 226:8 237:14 247:23
**bringing** 213:3
**brooke** 6:2
**brought** 24:23
**btlaw.com** 5:5
**bullet** 69:11,12
**bullets** 32:4
**business** 71:16
**busy** 205:7
**bwisner** 2:5

**c**

**c** 2:1 3:1 4:1 5:1 6:1 7:1 9:3 144:3
**c.v.** 4:14
**calculated** 131:7
**calculation** 42:9 121:24 128:10,16 132:22 134:12 135:16
**calculations** 128:25 248:15
**calibration** 104:1 104:10 250:3
**california** 1:9 2:3 3:8 4:3 7:3,7
**call** 28:21 80:21 172:20 195:22,23 196:3 228:4
**called** 9:4 22:7 74:13
**calls** 34:20 50:16 72:23 82:3,23 87:21 105:21 106:2 117:15 234:13 241:17 246:16
**camp** 115:4
**canaan** 4:14 114:21
**cancer** 33:11 107:21 109:12 110:3,13 111:12 111:13,19 112:17 113:3,20 114:6,13 115:2,7,11 119:13 119:17,19 120:19 121:2,10,25 122:1 122:12,16,22 123:2,4,6,13,18,19 123:20 124:11,12 124:15 125:4,9,15 125:20,21,25 126:2,9,22 128:23 129:23 130:2,3,13 130:17 131:3 132:23,25 141:17 154:4 218:21 231:13,20 232:3 232:15,25 253:25
**cancers** 125:18
**candice** 2:23
**capable** 225:5
**capture** 65:24 129:3
**carcinogen** 86:17 187:19 206:7 239:11
**carcinogenesis** 44:20 253:12,13
**carefully** 185:9
**carmen** 4:20
**case** 8:15 25:9 29:20 48:12 111:1 117:22 128:20 130:7 131:18,24 170:25 173:18 179:5 214:19 245:1,25 256:2
**cases** 1:7,12 26:14 248:5
**casey** 5:4
**castillo** 4:5
**casts** 30:12
**catch** 210:4
**catelyn** 2:11
**causal** 113:4,12
**cause** 115:1 131:3 245:14 246:23
**caused** 115:7,11 248:23 249:4
**causes** 111:19 120:18
**causing** 246:14
**caution** 97:3
**ccing** 237:22
**ccp** 1:10
**cell** 8:4
**cells** 236:10
**celsius** 19:19 147:14 148:21,25 245:13 248:2,12
**center** 3:7 33:11
**centigrade** 19:11 19:15
**ceo** 78:19
**certain** 84:2 98:17
**certainly** 62:14 63:23,25 115:3 120:24 134:16
**certification** 255:1
**certified** 146:18 238:13,20 240:13 241:5,12
**certify** 255:5,10
**chain** 76:7
**chair** 73:15
**chance** 123:12 124:14
**change** 55:5 99:17 256:4
**characteristics** 183:8

**characterization** 70:22 101:23 187:6 201:6
**characterize** 171:4
**characterized** 111:12 150:13
**chart** 125:12 150:11 254:2
**chase** 17:25 21:11
**chattem** 5:16,22
**check** 236:22
**checked** 142:11
**checks** 142:9
**chemical** 248:21
**chemicals** 119:25
**chemistry** 136:5
**cheu** 100:10 103:3 103:20 204:25 205:5
**chloramination** 235:2,4,5 236:3
**chloramine** 41:22
**chloride** 93:17
**chlorine** 235:7 236:12
**chlorines** 235:9 236:14
**christi** 2:16
**chromatographic** 18:23 55:19 56:22
**chromatographi...** 19:2
**chromatography** 15:3,5,9 17:20 18:15,20 19:6 20:2 39:8 146:15 154:18 171:6 219:11 246:2 247:2 250:11
**chronological** 35:13
**circles** 59:11 60:14 190:23
**citation** 161:12 171:19 172:13,18 181:4
**cite** 47:2 183:12
**citizen** 78:21 214:23
**civil** 15:12,20
**claim** 76:16 171:24
**clarification** 115:21 160:10 250:2
**clarify** 109:24 133:14 139:17 152:9,14 245:9
**clarity** 181:9
**clean** 60:3
**clear** 18:8 29:15 85:1 109:11 146:21 164:10 181:10 224:23 234:18
**clearly** 214:18
**clinical** 67:1,16 85:5 141:13 181:24 183:16 195:8,13,16 204:15 216:16 233:11,12
**clinically** 186:22
**close** 197:18
**closed** 208:10
**closely** 142:12
**closer** 23:22
**cmcdonough** 2:12
**cmcnabb** 2:23
**coast** 9:10
**collaborating** 80:11
**colleague** 17:10
**collect** 75:4 86:22 88:12
**collected** 88:8
**collection** 89:14 89:18 208:9,20,24
**colors** 195:14
**column** 50:22 57:3 140:5,13
**combinations** 195:19 196:4,9
**combine** 126:7
**combined** 200:15 200:23
**come** 42:7 72:11 108:17 174:12 220:9
**comes** 38:16 243:19
**comfortable** 243:10,17
**coming** 228:9
**commentary** 249:23
**comments** 73:2 162:8 224:17
**commercially** 146:13
**commission** 256:24
**common** 239:7
**communicated** 33:22
**communicating** 111:21
**communication** 12:4
**community** 174:25 175:5,23 176:13 178:5,8 179:11 209:5,22 214:18
**companies** 83:17
**company** 5:9,10 16:8 74:12
**comparable** 121:21
**compare** 36:17 51:12
**compared** 65:20 71:5 228:20
**comparison** 68:18 223:19 228:18 231:18
**comparisons** 227:16 231:16
**compartment** 91:12 172:2 185:15 201:18 203:9
**complete** 97:21
**completed** 100:16 103:5
**completely** 168:12 168:13
**compound** 48:12 89:11 135:4 210:14,20
**computer** 8:5 146:10
**conceivable** 20:7
**conceived** 217:7 217:17
**concentrate** 93:16
**concentration** 37:13,18 38:13,14 52:5,7,12,16 55:4 55:6,9,15 58:21 59:4 60:21 61:15 62:16 63:13,17 64:11,23 65:12 91:5 117:18 150:3

158:22 159:20 160:1,8,13,15 161:13 165:16 168:7,10,25 171:25 173:6 174:1,3 176:8 178:10 181:21 185:15 186:1,8 190:1,3 194:16,22 195:18 196:4,8 200:6,9 211:17 212:1 227:12

**concentrations** 42:12 48:14 50:5 63:2,11 91:9,20 133:21 148:5 150:8 151:15 152:10,15,18,21 154:21 159:11 161:17 162:4,19 163:9,15 164:6,8 165:12,22 166:25 167:13 168:4,21 169:6 171:9,15,16 172:14 173:10,20 174:20 175:1,7 177:2 178:12,20 178:22 180:25 181:6 182:2,11,25 183:4,6,18 184:20 186:12,21 187:21 188:3,5 189:1 191:24 193:3,8,20 193:24 197:2,5 198:25 199:12,15 200:12 201:12,17 202:7 217:13 218:5 219:2 233:3 234:4

**concerned** 98:18

**concerns** 94:12 137:18 218:13,20

**concierge** 7:14 23:17,21 56:1,7 60:6 83:5,13 129:8 136:25 137:4 155:17 164:22,25 210:16 247:13

**conclude** 41:19 49:8 72:19 212:18

**concluded** 20:16

**concludes** 184:11

**conclusion** 41:4,9 43:17 215:17

**conclusions** 41:18 42:4 193:14,16 215:10,15,22 216:3,7

**concur** 31:1 61:9 185:20

**condition** 95:15 157:3 173:5,18 174:4

**conditions** 27:12 49:20,25 51:4 53:13 147:13,17 147:22,24 148:9 148:24 149:6 150:12,14,22 151:2,4,6,24 154:17 155:7,12 156:10 161:3,9 170:12 171:4 172:10,22 173:4 173:21 174:2,6 180:6,16 182:13 182:24 183:19 191:9 194:2 201:2 201:9,10 202:3,17 203:3,6,8 216:18 230:16 239:22 240:8 244:4

**conduct** 49:24 50:10 74:13

**conducted** 71:24 102:5,12 118:4 165:21 217:8,17 239:6

**conducting** 48:11 48:14 71:21 75:15

**conducts** 16:14 141:13

**confidence** 227:18

**confident** 104:11

**confidential** 238:11 241:2 254:3

**confirmatory** 102:18

**confirmed** 199:13

**conflict** 82:1,22

**confounding** 231:15,16 244:5

**confused** 193:5

**confusing** 89:11

**connecticut** 16:9

**connection** 12:6 12:19 13:18 16:4 17:11 28:4 31:16 31:23 65:19 82:21 83:23 84:19 88:13 101:20 207:24,25 209:23

**connections** 243:6

**connolly** 4:22

**connotations** 244:7

**consent** 8:20

**conservative** 184:12 186:1 187:2 201:18 203:7,12

**consider** 49:25 87:13

**consideration** 182:3

**considered** 102:17 155:9 181:22 207:15

**considering** 104:8 231:13

**consistency** 239:1

**consistent** 111:20 165:19 192:15 193:2 194:6 212:11,16 216:3,8 216:16 229:16 231:17 232:1,15 233:1 238:14,19 241:5,14 243:12 243:20

**constant** 54:20 198:23 230:19

**constantly** 229:22

**consult** 250:19

**consultant** 23:4 25:24

**consulted** 49:21

**consulting** 22:3,8 24:19 25:2,17 27:7,21 28:4,10,25 29:5,9,12

**consumed** 133:18

**consumer** 88:16 108:5 133:17 134:13

**consumers** 235:8

**consuming** 42:14 43:4 222:11

**consumption** 41:20 86:24 87:10 87:11,17 88:5

105:7 117:17 215:25 217:9,22 218:3 233:1,3 234:5
**contact** 16:18 29:14
**contacted** 21:22 26:24 115:6 207:3 242:14
**contain** 151:13
**contained** 72:4 215:6
**containing** 40:6 57:12 163:11
**contains** 39:13 102:5 230:2
**contaminants** 15:23
**contemplated** 27:25
**content** 108:24 247:4
**contention** 172:13
**context** 150:25 183:8 184:24 207:11 220:19
**continue** 8:6 131:25 133:5 144:12 251:17
**continued** 3:1 4:1 5:1 6:1 7:1 144:9 251:22
**continues** 177:1
**contract** 78:19
**contracted** 79:1
**contrast** 198:6,12
**contribute** 42:16
**contributed** 40:5 68:4,12 148:22
**contributes** 215:19
**contributing** 228:9
**contribution** 35:21,25 41:21 42:24 43:18
**contributor** 42:21
**contributors** 42:5
**control** 104:4
**controlled** 91:1
**controls** 231:19
**conversations** 21:25 31:24 206:22 207:2
**conversion** 193:20 199:5,17 219:20
**convert** 37:17 180:11 187:17 188:24
**converted** 20:9 194:1 202:1,16
**convincing** 217:9 217:21 218:2
**coordinated** 14:4 96:8
**coordination** 1:11
**copied** 78:18
**copy** 60:3 213:20
**corner** 58:11 142:7
**corporation** 4:11 4:12
**corpus** 2:16
**correct** 15:13 17:5 17:8,9,13,21,22 18:3 19:20 20:5 21:2,7,8,20 23:4 24:20 25:8,19,25 27:23 30:1,2,5,6 30:13,15,16,23 32:21 33:1,2,7,8 34:13,14 36:3,4,24 37:10,15,20,25 38:24,25 39:3,4,9 39:15,18,19,22 40:8,12,13 41:7,13 42:22 43:15,16,19 43:20 44:10,23,24 45:3,6,7,11 46:1,2 46:5,20 47:2,3,24 47:25 48:15,21 50:15 51:8,9,17 52:2,3,5,6,16,19 52:20 53:3,13,14 53:19,20,24 54:8,9 54:12,13,22,23 55:7,11,12,16,21 55:22 56:14,23,24 57:9,10,15,23 58:5 58:16,17,23 59:1,4 59:5,15 60:16,22 60:23 61:2,18,19 62:13,22 63:5,19 64:12,13 65:8 66:5 67:6,7,9,10 67:23 68:5,6,19,20 69:4,5,15,16,23,24 74:10,11,14,15 75:2,7,17,18,21,22 75:25 76:1,10,17 77:24,25 78:14,22 79:5,6,16,18 80:2 80:3,8,9,12,18,19 82:2 84:6,7,20,21 85:6,7,11,12,15,17 86:9 87:20 88:9 88:10,25 89:9,12 89:18,19,23,24 90:2,6,15,16 91:2 91:3,6,7,10,11,14 91:17,18,21,22 92:6,23,24 94:25 95:5,6,17,23 96:3 96:6,7,11,19,20,23 97:10,22,23,25 98:1,10,11,15,22 99:3,6,19,22 100:1 100:2,11,12,21,22 103:16,17 105:4 105:14,15,22 106:10,16,17 108:8,9,13,14,18 108:19,22 109:9 109:13 110:11,16 110:19,20,24 111:5,14 112:19 112:23 113:20 115:8,9,21 116:20 117:1,8,9 118:2,11 119:2,4,5,14,15,19 119:20 120:1,3,4 120:11,15,16,19 121:3 122:13,14 123:4 124:15 125:5,9,16,17,19 125:22 126:3,4,10 126:24,25 127:4,7 127:17 128:1,11 128:19 129:24 130:4,10,14,23 131:3,8,21 133:1,2 133:11 134:6,7,14 134:19 135:1,24 136:17 137:19,23 138:3,9 140:24 141:22 142:3,6,13 142:19 144:21 146:23 147:10,14 148:6,11 150:14 150:22 151:8 152:2,6,11,12 153:13,19 154:5,6 154:8,9,22,23 155:2,3 156:10,21

156:22 157:1,5,6,9 157:19,20,22 158:8,12 159:9,20 159:21 160:23 161:3,21 162:20 162:21 163:13,17 163:21 164:13 165:5,12,13,17,18 165:23,24 167:2,8 168:21 170:15,16 170:19,24 171:16 171:17 172:10,11 172:16 174:21,22 175:2,3,9,10 176:4 176:9,10 177:5 178:25 179:11 180:6,7,17,18 181:1,2,8,12,14,15 182:13 183:1,19 183:20,25 184:6 184:23 186:8,13 186:23 187:3,4,14 188:10 190:20 191:4,5 192:22,23 194:17,25 195:8 195:20 196:6,11 196:25 198:9,10 202:3 203:10 205:3,4,10,11,15 205:16,19 206:8 206:11,12 210:22 210:23 211:9,10 211:19,22,23 212:3,9,10,15,22 213:10,11 214:1,2 214:9,12,13,25 215:3,7,11,15,16 215:20 216:5,6 217:18,24,25 218:5,6,16,17 219:3,4,13,14 220:16,17,23 221:5 222:1,5,6,9 222:19,25 223:4 223:11,15,17,18 223:21,22 224:5,6 224:12,15 225:22 226:4,5,16,24 227:8,9,13,14,19 227:20,25 228:1 228:24,25 229:4,9 230:4,5,8,12,13,16 230:17,21,25 233:7,8 234:21,22 236:5 237:23 238:1,21 239:23 240:10,15 241:21 242:6,7,11,12,15 242:23 243:3,4,7 243:20,25 245:6,7 245:24 246:15 247:5,15,20,21 248:12,13 249:19 250:12

**corrected** 141:20

**correction** 39:17 39:22,25 41:15 43:9,21 98:6

**correctly** 22:4 33:6 41:24 66:9 84:17 86:5,7 87:2 93:8,18 103:11 104:13 113:5,6 124:4,8,10 136:8 140:21 141:18 146:19 149:1 182:7,8 183:13 184:16 187:22 188:7,8 189:2,11 190:5 194:3,4 195:13 199:7 201:3 213:22 217:14 219:25 229:24 231:22,23 238:15 239:17 244:8 245:17 248:7,25 249:1

**correlation** 232:25

**correspondence** 144:25 145:11 147:11 161:20,23

**corresponds** 59:3

**costello** 7:12

**counsel** 8:11,20 9:23 12:5 13:21 14:5 26:4,8,17 35:4 73:16 75:8 250:20

**counsel's** 8:25

**counter** 239:8

**county** 1:9

**couple** 9:16 12:1 67:25 204:16 250:19

**court** 1:1,9 8:14 8:18,24 210:9

**covered** 206:13

**covid** 208:9

**cow** 155:25

**created** 20:1

**criminal** 32:1

**critical** 76:13 249:8

**crosby** 2:22

**crossed** 163:17,18

**crossing** 164:12 227:19

**ctoledo** 4:20

**cured** 221:23,24 223:20 225:21 226:2,15,23 228:20

**curious** 31:23

**current** 68:18 196:10 218:13 219:15

**currently** 15:11 101:13

**customized** 57:14

**cut** 17:24 21:11

**d**

**d** 6:18 13:3 16:25 22:22 25:12 32:17 35:16 44:13 59:22 74:20 78:3 79:9 79:12 92:14,21 94:17,20 99:8 107:22 108:1 111:23 122:20 126:16 129:5,18 135:20 139:11 144:14 151:18 153:5 155:18 162:10 164:24 165:25 166:5 170:3 175:13 179:23 204:19 213:4 221:15,16 237:15 241:23 242:10 249:15,16 253:1

**d.c.** 3:13 4:23

**daily** 42:15 43:4 109:6 111:10 119:25 128:10 229:20 230:12,20 239:15

**dann** 5:7

**dark** 156:14

**darkened** 248:4

**dashed** 64:6

**data** 29:25 30:3,8 30:13,21 31:5,7

41:3,9 56:22 78:21 93:4 94:13 99:17 105:12 120:3,6 136:3,11 136:16,16 138:7 142:12 147:20 153:19 160:13,22 160:23 162:17,18 163:21 165:10,14 167:12 168:6,15 168:20 169:3 170:22 172:21 174:19,25 175:18 175:21 176:15 177:3 178:9,24 179:9,10 183:6 190:19 199:10 201:16 207:18 209:4,19,20,20 215:3,14 216:9,19 218:23 243:12,19
**date** 75:9 119:3 242:16 256:3
**dated** 17:4 23:1 78:13 79:13 84:14 92:22 103:3,21 108:7,11,11 112:1 135:23 144:20 205:2 213:9 237:23 242:5,10 243:24 245:5 249:17
**david** 6:5 12:14,23 16:6,7,12 17:3 21:18,21 22:3,15 22:18 23:2 24:17 26:2,16 29:6 31:15,24 32:23 33:3,15 34:4,10,17 34:24 75:2,14 77:23 78:13,24 79:5,16,18 135:23 136:10 137:25 138:2,6 141:23 167:1,8,12 170:14 174:24 176:15 178:8 237:22 238:8,24 240:20 241:12 242:4,8,18 243:25 244:11 245:5,8,19 249:16
**david.duke** 6:5
**day** 7:2,6 9:20 11:19 80:8 97:18 110:9 126:23 131:16,22 132:3 132:21,24 133:9 133:24 139:16 141:15 222:12,12 229:19 250:21 252:9 255:15 256:21
**days** 29:17 81:3 222:15,15
**de** 4:14
**dear** 213:12,16
**death's** 109:9
**decades** 48:5
**december** 75:12 76:8
**decide** 80:15
**decided** 176:15
**deciding** 81:18
**decision** 45:9 163:23
**decreases** 191:3
**defendant** 4:4,24 6:4,10,19
**defendants** 1:20 4:10 5:4,9,16,22 8:12 13:7 17:1 22:23 25:14 32:18 35:17 44:15 59:23 66:20 74:21 78:4 79:10 84:11 92:18 94:18 99:9 107:24 122:24 129:6 139:12 144:15 151:20 153:6 162:11 166:6 170:4 175:14 179:24 204:20 213:5 237:16 241:24 249:12 253:6 254:2
**defense** 66:18 82:18 84:10 115:14
**defer** 77:17
**define** 56:9 119:24
**defined** 173:6
**definition** 174:13
**definitively** 112:16
**degradation** 244:3 245:22 246:14
**degrade** 245:15 246:24
**degraded** 127:15
**degrades** 242:21
**degrading** 157:25 158:2
**degrees** 19:10,15 147:14 148:21,25 245:13 248:2,11 248:16
**deionized** 224:22
**delay** 205:6
**delete** 176:15
**deleted** 167:1,12
**deletion** 165:20 167:25 168:19
**demonstrable** 88:4
**demonstrate** 44:8 163:8 188:12,13
**demonstrated** 53:11 105:1,5 203:1 229:21
**demonstrating** 115:1 172:21 233:14
**department** 96:13
**dependence** 191:19
**dependent** 189:24
**depending** 133:25
**depends** 28:12 82:10 134:17 190:9 191:22
**deposed** 77:15 111:17
**deposition** 1:19 8:10 9:13,18 11:17 12:6,8,10,14 12:20,21 13:3,4 73:14 111:25 112:2 251:10 253:7 256:3
**derived** 132:22
**describe** 207:10
**described** 130:14 180:12
**describes** 25:23 211:6
**describing** 67:15 129:4 165:20 166:21 185:5
**description** 66:16 163:6 192:22 253:6 254:2
**design** 89:20 90:4

**designation** 249:25
**designed** 90:19 221:24
**desimone** 1:22 8:19 255:3,18
**desmethyl** 69:19
**detail** 15:16 17:24 21:10
**detailed** 55:20
**details** 12:8 27:1 29:19 33:16,19 34:25 37:3 38:1 42:9 47:11,14 48:16 63:25 92:4
**detect** 39:6 57:12 72:3 95:13 96:10 96:18 118:14,17 134:17,20 219:11 225:11
**detectable** 100:17 100:19 103:8,13 106:10 118:10 197:10
**detected** 17:19 62:8 69:13 92:9 93:23 141:1,1,16 149:14,15,17,18 149:20,21,24,25 150:4,5,10 155:5 155:10 158:8 159:4 161:18 172:8 193:21 198:13,24 239:13
**detecting** 225:5
**detection** 41:16 61:7 95:17 96:5 96:21 97:1 103:22 106:12 117:21 134:2 135:14 161:8 171:7 188:15,18 225:8 239:9
**determination** 86:25 87:5 185:13
**determinations** 224:19
**determine** 86:22 164:7 179:4 182:10 183:17 224:22
**determined** 72:14 164:2 185:25 186:11
**determining** 168:2
**develop** 123:13,20 126:2
**developed** 20:20 149:7
**developer** 90:10
**developing** 88:13 123:3 124:15,24 125:4,8,14,21 126:8
**development** 5:10 96:14 121:2 158:23
**devices** 8:5
**devries** 5:7
**diagnosed** 109:12 110:3
**diagnoses** 154:5
**diagnosis** 109:18 109:21
**diamonds** 196:2,3
**diet** 221:23,24,24 222:11 223:20,21 225:21,21 226:2,2 226:14,15,23,24 227:24 228:20,21 229:1,7
**dietary** 89:16 90:1
**diets** 228:18
**difference** 69:7 212:5 225:18
**differences** 64:17 226:13
**different** 10:3 11:7 36:18 48:13 58:15 60:7 77:9 124:6 147:22 161:25 172:25 175:25 193:19 196:23 203:17 212:2 216:22
**difficult** 50:1,3 56:8 115:3
**difficulty** 23:15
**dilution** 37:24 38:2,3,10
**dimethylamine** 67:19 190:2 219:22 223:14 227:5,23 229:18
**dimethylamino** 228:7
**dinner** 79:4
**direct** 24:12 88:19 115:23 127:19 189:17 216:20
**directions** 254:6
**directly** 11:10
**directs** 249:21
**disagree** 70:21 73:1 113:16 201:6 231:25
**disappearance** 55:18
**disappearing** 157:18
**disclosed** 83:23
**discoloration** 248:9,20
**discolored** 248:4
**discuss** 10:17 12:3 21:22 26:13,25 31:25 100:24 101:3 204:12,14 250:9
**discussed** 63:16 64:22 80:12 99:14 102:13 117:25 180:20 192:21 194:24 201:25 212:13 216:9 233:4,9,11,12 237:13 251:9
**discusses** 242:22
**discussing** 195:7
**discussion** 67:12 73:16 161:1 219:6 219:10 249:24
**disinfectant** 42:6
**disinfection** 235:6
**disparity** 65:18
**dispute** 188:10,11
**dissolved** 51:5,7
**distinction** 41:1
**distinguish** 20:11
**distribute** 84:17
**district** 1:1,1 8:14 8:14
**diverse** 183:24
**divide** 37:19
**divided** 52:9
**dla** 5:14
**dlapiper.com** 5:18
**dma** 67:18 69:1,13 223:14,16 227:2,4 227:6,23,24 229:17,23 230:2 230:11,19

**dmso** 248:3
**doctor** 138:1 202:24
**document** 1:6,14 13:12 27:6 47:2 56:3 57:1 58:25 59:7 60:13 61:4 63:21 68:17 70:12 84:23 99:21 102:25 107:23 112:6 123:1,25 142:15 159:16 160:4 161:23 163:20 164:13,20 166:2,9 172:7 174:16,19 182:20 186:15 192:13 199:19 203:17 210:25 243:23 244:15,17 245:3 246:6,19 247:9 253:20,25
**documents** 11:9 13:16,17,20,22 14:1,4,6 28:15 29:18
**doing** 27:4 28:25 71:12 85:5 133:14 133:16
**domestic** 36:2,19 42:23,25 43:19
**door** 109:9
**dose** 69:15,22 70:9 222:4
**dots** 196:7
**doubt** 30:12 94:6
**downey** 4:2
**downeybrand.com** 4:5
**dr** 6:19 9:8 13:9 15:11 17:8,10,14 18:10 21:2,21 22:13,14 24:8 25:17 31:3 35:13 36:5 39:23 44:5 44:14 45:9 46:10 56:14 57:18 60:1 67:3 70:7 73:7 74:5 76:3,9,25 77:14,18 78:14,18 81:2 83:1 85:23 86:6 92:17 99:5 103:5 106:25 107:14 108:4 110:7 111:17 112:3 113:9,16,17 114:3,8,10,11,16 115:23 122:23 124:5,22 129:14 129:19 132:16 135:9 137:8,8,21 137:25 142:22 144:11,18 152:6 152:14 153:10,15 153:17,18,22 154:1 155:23,25 160:10 161:19,20 163:25 165:5 166:11 167:22 169:13,20 174:11 174:24 175:8,8,16 175:19,20 177:21 178:9,25 179:16 180:2 182:21 185:22 186:17 189:9 190:13 194:14 203:24 204:10,24 205:6 210:21 213:2,13 213:16 217:3 232:22 233:13,21 236:1 237:9,19 241:20 244:2,19 250:21 251:5,15
**draft** 144:23 146:1 147:11 153:19 154:1,7,15 162:7 162:23 205:9,12 205:17 206:5,11 206:15,19,24 211:5 219:16 224:20 239:5 247:10,18
**drag** 27:10
**drastic** 136:3
**drastically** 136:13
**draw** 41:4,9
**drawing** 41:1
**drink** 89:23
**drinking** 15:21 235:6
**drive** 2:21 5:2 6:2
**drug** 112:15 146:17 248:21
**due** 18:6 19:24 177:15 207:14 229:7 246:13 248:19
**duke** 6:5
**duly** 9:4 255:7
**dying** 123:4 124:24

**e**

**e** 2:1,1 3:1,1 4:1,1 5:1,1 6:1,1 7:1,1 12:4,25 13:17,23 13:25 17:3,7 20:24 21:4,16 22:13 23:1,6,12 75:9 78:12 79:13 84:13 92:21 93:21 98:12 99:13 100:7 103:2,20 107:19 108:4,7,11 112:21 113:22 126:15 129:4 130:14,21 135:21,23 136:21 138:12 144:1,1,19 145:3 152:5 153:8 153:11,17 154:2 162:1,2,3 167:7 204:22,25 207:7 209:14 213:8,16 214:8 237:21 239:2 240:14,23 240:25 241:11 242:4,9 243:24 245:4 249:16 250:14 253:1,5 254:1
**e.g.** 54:22 219:18 231:14
**earlier** 39:11 81:3 145:7 146:1 157:5 160:12 187:2 192:21 205:14 206:14 237:13
**early** 66:6 208:23
**easier** 24:1
**easily** 55:1,2 242:21
**east** 2:21 6:17 9:10
**eat** 89:22
**eating** 222:16 226:23
**ecanaan** 4:15
**echo** 210:4
**edit** 28:17
**edited** 163:24 166:1
**editor** 166:14
**edits** 162:8 163:20
**effect** 66:23 168:17,24 182:4

212:19 213:17
**efigure** 183:12 200:16,24
**eight** 100:17 103:14 106:9 118:9
**either** 98:5 133:10 208:13 218:25 226:1 227:24 232:2 233:7
**electronic** 8:5
**elevated** 68:13
**elizabeth** 153:9,12
**embarcadero** 3:7 7:2
**emerged** 231:17
**emery** 31:22 34:12 34:17,23 74:13 79:1,15 80:15,22 81:18 84:20 85:16 90:3,11,15,18 91:25 92:7 94:10 94:23 95:5,25 97:13,20 98:24 99:13 100:10 101:3 102:4,19 103:3,21 104:15 104:25 105:11,17 105:24 106:14 117:10 118:5,16 133:8,20 137:13 204:25 205:14,15 206:23 207:4 208:13 209:4,24 211:6 216:5 222:5 224:12 234:1 239:23 240:9,12 240:21 241:11 243:10,11,18 244:10,23 245:19 245:23 246:3,8 247:8,10,17 248:9 249:2,18,19,21 250:8 253:15,17 254:4
**emery's** 95:8 100:5
**employ** 19:9
**employed** 47:7 146:14 154:18
**employee** 16:7
**encountered** 152:11,23
**endogenous** 38:24 39:1 40:17 41:5 43:24 44:9 46:16 66:4 87:17 88:5 88:24 90:5,20 105:2,12,19 119:1 134:10 139:5 215:19 233:15 234:8
**endogenously** 89:8 106:15 134:5 134:22
**ends** 44:10
**engineering** 15:13 15:20,21
**england** 144:24
**enroll** 208:5
**enrolled** 208:11
**ensure** 28:17 45:18 72:2 93:6
**entail** 244:6
**entails** 248:1
**enter** 24:19
**entered** 22:2 26:16 27:20 28:11 29:6
**entire** 24:3 130:18
**entitled** 35:21,25 44:20 54:5 66:23 170:10 206:6
**entry** 141:9
**environment** 173:23
**environmental** 15:12,19,20 72:6 253:10
**epa** 72:6 119:17,21 120:2,12 121:10 128:10 132:22 220:7
**epa's** 119:12 121:25
**epi** 75:24
**epidemiological** 77:6
**epidemiology** 33:12 76:3,21 77:1 136:6 145:25
**equals** 52:11 94:13
**equates** 186:5
**equivalent** 133:22
**errata** 256:1
**eshani** 84:15
**especially** 108:25
**esq** 2:4,5,11,17,18 2:23 3:4,9,14,20 3:21 4:5,14,20,24 5:4,11,12,18,23,24 6:5,11,12,13,17,20 7:4,8
**essence** 23:2 95:25 223:2 224:14
**essentially** 14:3 48:4,10 74:9 102:12,14
**established** 113:4 122:2 130:3,5 131:2 239:12,15 245:21
**estimate** 11:25 119:13 131:19 186:2
**estimated** 132:20
**estimates** 121:10
**estimating** 119:17
**et** 49:23 180:13 181:21 198:12,20 200:18 201:1
**etable** 68:16
**eva** 4:14
**evaluate** 71:13 72:8
**evaluated** 66:3 71:19 72:13 171:14
**evaluating** 49:3 80:16
**evaluation** 182:1
**event** 213:16
**eventually** 18:4 66:2
**everyone's** 177:18
**evidence** 32:7,11 46:15 61:17 81:1 81:11 87:15 88:2 90:8 99:16 104:25 105:16,17,24 106:4 117:12,16 120:17,25 121:6 134:5,10 147:7 159:23 160:6,6 161:12 167:19 176:18 179:2,13 197:16 202:1,5,15 215:18,23 217:9 217:21 218:2 225:25 226:6,20 228:7,13 233:5,14 233:18 234:7
**exact** 16:19 119:8 122:18 128:2 133:24 138:25

215:21 242:16
**exactly** 59:25 98:3 117:20 153:24
**examination** 9:7 113:10 144:9 253:2
**examined** 9:5
**example** 12:13 34:1 55:8 64:2 91:9 123:8,9,17,18 125:20 208:2,12 208:13 220:14
**exceed** 70:1 201:18
**exceeding** 117:19
**exception** 103:7
**excess** 119:19 126:21 128:17,22 128:23 130:9,13 130:22 131:6 132:2,25 134:14 225:12
**excreted** 71:14,20 88:18 229:20 230:12
**excretion** 44:22 65:25 66:24 67:17 69:1 71:25 105:6 133:23 134:1,18 134:20 213:18 217:12,24 218:10 219:1 223:10,13 225:20 226:4,19 227:23 228:23 229:3,7 230:10 234:11,21 243:1
**excuse** 83:6
**exhibit** 13:3,7 16:25 17:1 22:12 22:21,23 24:3,9 25:6,12,13,14 32:18 35:17 39:21 44:13,15 59:23 66:20 74:20,21 78:3,4 79:10 84:11 92:18,21 93:12 94:18 99:8 99:9 107:24 111:23 122:20,24 129:6 132:1,7 137:3 139:11,12 144:15 151:20 153:6,25 154:11 155:20 156:5 162:10,11 164:23 166:4,6 170:2,4 175:13,14 179:21 179:24 204:20 212:24 213:5 221:16 237:14,16 237:19 241:24 242:2,10 249:12 249:14,15 253:7,8 253:8,9,9,10,11,12 253:13,14,14,15 253:15,16,17,17 253:18,18,19,19 253:20,20,21,22 253:22,23,24,24 253:25 254:2,3,3,4
**expected** 95:22 182:12 186:22,24
**expects** 243:7
**experiment** 47:22 48:15,19 49:9 55:10 62:9 149:5 151:25 153:2 157:14,19 160:18 160:21 172:15,22 173:11,23 174:5 175:21 192:23 194:7 204:13 211:7
**experiments** 27:3 47:21 49:2 54:19 163:6 200:25 201:7,11,24
**expires** 256:24
**explain** 53:15 115:25
**explained** 132:9
**exploratory** 223:12 226:9
**exposed** 88:17 229:22
**exposure** 86:17 98:19 111:9 115:2 115:7 120:13,14 120:18 121:1 122:13 126:23 127:7 128:11,14 128:19 131:7,20 132:2 133:9 229:8 230:18,20
**exposures** 119:25
**extended** 157:19
**extent** 24:8 28:19 151:12 185:6 224:17
**extract** 93:15
**extracted** 183:6
**extraction** 95:15 104:9
**extrapolated** 176:24 178:21
**extreme** 116:5
**extremely** 115:2

**f**

**f** 144:1
**facing** 238:5
**fact** 40:21 41:4 63:9 94:3 111:11 159:10 172:15 199:16 224:24
**factor** 68:3 244:5
**factors** 68:3 191:17
**facts** 32:7,11 80:25 81:11 167:19 176:18 179:2,13 233:18
**fahrenheit** 248:16
**fair** 10:11 14:7,17 19:23 20:18 21:14 21:15 24:5 29:7 30:8,10,18,19 31:9 31:14 36:15 39:13 40:18,25 41:2,12 42:20 43:1 46:17 47:4,17 48:23 49:8 50:9 57:11 57:20 61:20,21 62:18,18 63:3,3,14 68:13 70:10 73:3 92:2 93:25 94:4 94:14 98:23 102:16 105:19,23 117:14 120:6 121:9 126:5 128:21 130:20,20 131:15 134:9 136:10 138:5,13 141:21 147:9 157:13,17 158:23 158:24 159:12,18 160:9 162:6 169:8 173:24 176:11 178:6 179:8 185:10,11 190:10 191:6 194:5 197:6 197:20,21 199:9 199:22 201:5,20 202:17 203:5 209:17 214:20

216:8,10,19 218:18 221:2,12 225:3 228:11 230:1 232:12,13 233:12 234:6 236:16 246:1,25 249:9
**fairly** 29:25
**falls** 191:3
**falsely** 39:12 68:4 68:10
**familiar** 233:25
**far** 27:16 93:2 95:19,23 105:7 129:21 220:8 236:7
**fashion** 137:17 177:2
**fast** 214:12,15 222:14
**fasted** 184:21
**fasting** 181:23 183:23 200:12,15 200:21,24
**faulty** 219:12
**fda** 20:15,20 47:2 47:5 57:22 58:1 66:3,12 70:23 72:12 76:16 78:21 87:13 102:11,17 116:19 117:11 127:25 146:14,22 147:7 148:21 155:8 180:2,22 181:17 182:9,23 183:15,22 184:4 184:11 185:4,12 185:18,23 187:9 187:12 188:22 189:7 190:7,12 192:25 194:24 197:19 198:5 199:12,20 201:19 202:8,13,20 203:11,15 204:15 218:19 220:9 221:13 233:7,25 234:19,24 238:13 238:20 239:11,16 239:21 240:7,13 241:4,12 245:12 249:25
**fda's** 117:21 186:10 187:2 188:10 208:25 232:10 245:20
**february** 85:10
**fed** 184:22 200:15 200:23
**feedback** 21:23 27:11 92:6
**feel** 29:24 101:17 244:2
**females** 125:12,15
**field** 72:8 220:8
**figure** 52:8 58:8 58:11,13 59:12 63:23 155:7 165:4 165:9,15 174:17 174:18 190:17,18 190:19 192:14 194:10,15,21 197:1 198:13 200:12,24 211:11 211:15,19 244:23
**figures** 51:11
**filed** 8:13
**filled** 86:8
**final** 19:17 38:13 54:21 170:8 176:16 178:7 249:24
**finally** 88:18
**find** 38:12 56:8 60:9 97:13 100:5 138:24 169:25 205:8,23,24
**finding** 92:1 115:25 125:25
**findings** 68:22 76:15 86:14,15 98:24 187:13,24 188:10 193:25 209:23 238:14 239:1 241:6 242:25
**fine** 149:9 203:23 231:10 250:4,24
**finish** 10:8 22:12 222:18 237:11
**finished** 93:1
**first** 9:4 16:17 35:14 39:21 46:21 70:18 94:10,24 95:20 97:14,22 111:24 187:8 193:12 198:7 228:3 229:13 240:25 242:15 244:6
**five** 107:2,3 204:7 209:15 236:24 237:12 250:23
**fix** 110:7
**flip** 165:1 191:21
**floor** 3:13 4:9 5:8 5:15 6:9
**florian** 66:9 67:2 204:15 213:2 228:2,4,6
**florida** 1:1 8:15
**flower** 7:7
**fluid** 14:22,24 148:2,3,4 149:20 149:23 150:2,8 154:20 155:6 156:20 158:6 159:3 163:10 165:21 171:8 175:20 184:13 187:20 188:2,25 193:19 194:1 196:22 199:4,6 202:2,17 211:9 212:1,8 216:12
**fluids** 211:21
**flush** 38:3
**focus** 15:17,21 57:6 66:16
**fold** 37:24 38:10 65:7 67:16,18 109:1 111:4,8 116:7 155:11 181:20 188:5 193:22 200:11,13 200:20,23
**folks** 12:18 16:3 21:6 31:16 34:11
**follow** 31:6 43:10 76:19 89:15 251:11
**following** 37:13 137:1,2
**follows** 9:6 113:11
**food** 91:16 182:4
**forces** 63:13
**foreseen** 221:9
**forget** 73:10
**forgot** 22:7 133:23 152:21
**form** 19:1 48:7,8 49:10 61:22 87:25 90:23 102:22

109:19 117:18 121:4,19 135:8 138:22 157:23 167:17 169:12 188:2,13 189:23 191:7 201:22 202:21,23 221:7 228:15 230:3,15 232:19 234:25 235:9 236:13 241:19 246:12,20
**formalities** 33:24
**format** 166:10
**formation** 40:17 41:5 43:25 45:20 46:16 47:8 49:4 53:12 58:14 66:4 72:9 80:17 87:18 88:6,24 90:5,20 101:10 105:2,12 105:19 106:15 119:1 134:11,22 136:12 138:9 139:5 148:22 155:5 160:7 161:8 163:8 164:4,5 170:23 172:8 176:1,6 177:25 180:4 192:10,17 193:2 196:21 197:3 202:6 203:2 215:20 216:15,17 220:3,13 221:4 223:3 228:10 232:16 233:15 234:9 236:2
**formed** 20:13 53:17 62:10 89:8 140:19 159:24 211:20
**forming** 39:2 105:25 134:5 246:4 250:10
**forms** 46:4 191:23 192:6 197:16
**forth** 90:12 96:13 209:14 255:7
**fortuna** 6:2
**fortunately** 237:9
**forward** 60:9 80:11 137:14
**foster** 2:5
**found** 20:25 37:3 133:20 187:9 225:17 231:19 232:24 238:18,20
**foundation** 120:22 121:5 122:5 126:12 132:8,11 133:4 142:15 167:4,16,21 176:18,21 182:15 191:13 231:2 232:7,21 234:14 240:19 241:18
**four** 11:23 12:2 81:3 100:16,18 144:7 204:3
**fraction** 43:3
**framework** 119:24 120:2,12
**francisco** 3:8 4:3
**friday** 97:19 205:2 242:5
**front** 82:9 84:5
**full** 229:13
**function** 194:23
**functional** 219:23
**further** 89:7 115:25 236:21 238:8 251:8
255:10
**future** 169:25

**g**

**gao** 203:10
**gap** 92:10
**gas** 15:2,4 17:20 18:14,20 19:5 20:1 39:7 146:14 219:10 246:2 247:2 250:11
**gastric** 14:21,24 50:7 91:12 147:13 147:17 148:2,4,24 149:19 150:2,7,14 150:22 154:20 155:6 156:19 158:6 159:2 163:10 165:21 171:8 172:1 175:20 182:11,25 183:5,7,18,24 184:5,13,20 185:15 187:19 188:2,3,24 193:19 193:24 194:1,16 196:22 199:4,6 201:17 202:2,16 203:8 211:8,21 212:1,8 216:12 239:21
**gastroenterologist** 151:11
**gastrointestinal** 180:6
**gathered** 14:5
**gc** 15:4 18:1,15 19:25 20:16 39:11 45:1,4 57:7 58:20 68:9,9 72:3,14 74:6 76:15 94:3 116:24 117:2,6 118:24 146:3,15 146:22 147:8 149:6,8 219:10 220:19 244:4,11 245:11,21 246:4,9 246:12 250:7
**gdldlaw.com** 5:11 5:12
**gears** 73:6 106:20 107:18
**general** 13:21 14:11 15:17 31:5 49:7 104:22 114:24 115:1 122:10,16 129:23 157:16 173:3 208:21 214:23
**generate** 31:8 99:18 236:11
**generated** 72:21 101:20 102:19 142:2 178:24 179:9 216:4
**generates** 140:1,9
**generating** 101:5
**generation** 157:4 178:13
**geometric** 227:11 227:17
**georgia** 4:19
**germane** 169:24
**getting** 12:13 28:22 61:13 137:16 177:13 193:5 216:14
**giant** 59:18
**give** 56:1 123:17 132:25 204:11
**given** 9:13 10:16 40:10 43:21 55:1 70:8 109:7 132:21

218:13 220:9 255:9
**gives** 51:3 187:13
**giving** 82:10
**glaxosmithkline** 6:11 9:11
**glenn** 7:8 11:19
**glkrinsky** 7:8
**gmbh** 4:13
**go** 8:7 10:10 22:25 23:2 25:5,11,12,21 35:10,12,19,23 37:1,6 38:7,8,21 39:20 40:9 41:14 44:13,17,18 46:21 48:1 49:14 50:22 50:24,25 52:22 53:5,5,7,8,15 54:14 55:23 56:11 56:11,12,16,17,25 57:5 58:10 59:20 59:21,22 60:4,8,9 60:10 67:11,25 68:16,21 69:17 73:19 74:20,24 76:5,7 78:6,9,10 78:16 79:7,9,12 80:5,6,6 84:8,10 84:23 85:13,18 86:3 89:13 92:15 94:20 99:7,8,11 100:3,8,13 102:24 103:18,19 107:4 107:22 108:1 109:5,22 110:5 111:23 112:5,11 113:1 115:14,15 115:15 116:4,11 116:18 118:21 124:17,18 125:2 125:11,13 126:1 126:14,15,16,18 127:6 128:9 129:5 129:17 135:9,20 135:20 136:20 143:6 146:7,11 147:18 148:16,17 149:11 150:16,16 150:18 151:18 153:24 154:10,13 154:13,24 155:1,2 155:15,21 156:4,5 157:8 158:4 160:25 162:9,13 163:1,2,4,11 164:18,19,19,20 165:1,2,25 166:4 169:13 170:3 171:2,13 172:5 174:15 175:13 180:8,9 181:16 182:18,19 183:21 183:22 184:2,9 185:22 186:17 187:7,7 189:12,16 190:13,16,17 192:12 193:11,11 193:14 194:10 196:16 197:22,23 197:24,25 198:3 198:11,16 199:23 203:16,19 205:20 205:22,23 206:3,3 210:24 211:11,14 214:7,8 216:23 217:3,5 218:12 219:5 221:12,14 221:15 222:7,23 223:7,24 225:13 225:14 226:7,8,16 227:1,3,15 228:16 229:12,13 231:5 236:7 237:18 239:4 240:3,24,25 241:23 242:1,2 243:22 245:2 247:9,22,23 249:14,15 251:19
**goals** 182:9
**goes** 100:23 124:12,13 180:22 198:5 222:17,22 239:19 243:9
**going** 8:2 11:5 15:15 17:23 21:9 24:10 27:9,18 29:16 35:12 49:1 56:7 57:6 66:13 73:4,6,9,10,10,13 73:21,25 75:6,20 76:13 83:7 93:4 94:16 97:20 107:5 107:9,17 129:1 138:3 142:21,22 144:5 156:6 172:20 175:16 177:7 186:3 189:17 194:11 204:1,5 210:13 231:8 235:20 236:20 237:1,4 250:17,19,25
**goldman** 2:2
**gonzales** 2:15
**good** 8:1 9:8,8 93:1 95:13 123:9 136:1 167:10 193:13 214:25 235:25
**goodell** 5:7
**goodness** 177:11
**grab** 50:20
**gracious** 177:12
**graph** 129:12,19 176:5,12 177:8 178:18 196:19
**graphic** 129:2
**graphs** 175:25 253:22
**gratis** 29:1,2,10
**gray** 194:19
**great** 35:16 79:20 85:20 107:4 242:4
**greater** 63:18 65:12 71:2 141:15 188:5 192:18 193:23 200:11,13 200:20,23
**green** 190:22 195:17,21,22,23 195:24 196:17,20
**greywater** 36:18
**greywaters** 36:2,5 36:6
**grocery** 4:4
**ground** 9:17
**group** 3:2,6 219:21,23 228:8
**groups** 182:6 185:7 227:7,11 229:21
**growth** 55:19
**guess** 12:12 26:22 28:12,20,22 34:8 34:24 40:19 83:18 205:20 207:20 213:14 216:14
**guidance** 57:22
**guo** 6:13

**h**

**h** 5:23 9:3 144:3 253:5 254:1

**h2** 182:4 183:9
**habits** 90:1
**haddadnia** 3:21
**half** 10:24 142:25 143:3 194:21 237:12
**hand** 50:22 52:22 53:8 54:16 187:10 255:15
**happen** 10:16 11:9 192:2
**happened** 50:3 94:24 129:16 146:6 188:16,18 208:9
**happening** 50:14 50:19
**happens** 62:12
**happy** 106:23
**hard** 59:17 63:22 83:3
**harding** 3:17
**hardy** 6:8
**head** 122:17 209:14
**header** 75:9
**heading** 139:25 141:6
**headings** 185:2,3
**headspace** 244:4 244:11
**health** 214:21,22
**healthy** 141:14 184:20
**hear** 23:15,18,20 83:2 101:24 136:1 136:3 210:1
**hearing** 28:2
**heated** 18:22 248:11
**heating** 248:1,23 250:11
**hedlund** 2:2
**held** 1:21
**hello** 92:25 103:5 204:10 205:5
**help** 98:25 182:20 218:20
**helped** 28:17
**helpful** 62:23
**helps** 119:24
**hereunto** 255:14
**hey** 75:3,5 90:18 97:20 111:10 207:17 250:8
**hi** 93:13
**high** 19:9,24 53:16 54:5 68:4,10 87:9 93:22 154:18 171:6 186:19 229:1,2 246:13 247:1 248:6,10 249:3
**higher** 19:16 63:10,23 64:1 97:4 116:6,7,13,25 127:8 197:4 221:25 228:22
**highlight** 74:25 112:7 125:24 137:6 196:18 204:22 247:16
**highlighted** 40:1 50:23 57:4 67:14 163:3 198:2 211:2
**hilliard** 2:15
**hinz** 33:4
**histamine** 183:9
**history** 32:1
**hmglawfirm.com** 2:17,18
**hno2** 190:22,23
**holy** 155:25
**honest** 167:24 210:11 214:3
**hope** 86:1
**hoping** 79:23 243:10
**hospital** 33:11
**hot** 18:25
**hour** 10:24,24 28:1 67:17 69:1 73:11,14 102:14 142:25 143:3 157:10,10 223:9 223:13 225:19 228:22
**hours** 12:1 29:17 222:14 236:24 237:12
**hrms** 155:4 172:7
**huge** 95:22
**human** 39:3 45:2 47:22 49:10 50:20 71:16 85:5 151:3 151:10,13 152:1 152:23 162:5 187:19 201:17 203:8 206:6 229:22 230:2 239:11
**humans** 50:13,14 50:19 120:9 121:3 121:13,21 122:2 140:2,10 182:12 186:22 236:4
**hydrochloric** 51:8 51:24
**hypothesis** 30:23 31:9
**hypothesizing** 148:19
**hypothetical** 30:25 31:12 32:8 49:16 57:17 82:6 87:24 106:3 120:21 135:3 138:19 168:12 169:11 191:11 230:23

**i**

**i.e.** 181:20 198:25 208:21
**ideally** 50:19 63:5 71:9 137:16
**identification** 13:8 17:2 22:24 25:15 32:19 35:18 44:16 59:24 66:21 74:22 78:5 79:11 84:12 92:19 94:19 99:10 107:25 122:25 129:7 139:13 144:16 151:21 153:7 162:12 166:7 170:5 175:15 179:25 204:21 213:6 237:17 241:25 249:13
**identified** 40:3 54:7,10 183:15
**identify** 13:16,20 45:1 53:1,17,23 154:16 205:25
**identifying** 46:25
**illegal** 32:3
**immediately** 156:14
**immune** 236:11
**impacted** 117:4
**implications** 76:20

**importance** 86:2,4
**important** 10:4 29:25 30:16,21 31:4,7 41:21 45:24 60:25 61:16 88:11 101:18 102:6 151:23 168:6 172:19 205:24 207:18 214:21,22 215:6 218:15 249:10
**impossible** 40:20
**impression** 27:8 27:15
**improper** 122:4 176:19 232:5
**improve** 96:9
**improved** 96:4
**inadmissible** 113:24
**inappropriate** 141:4 177:16
**inaudible** 82:25
**include** 61:14 86:1 163:21 168:6 169:16,20 179:18 183:23 184:19 249:25 250:4
**included** 60:24 147:24 183:11 201:1,8,11 223:13
**includes** 130:19 162:16,18 165:10 182:23 185:7 190:19
**including** 34:12 146:17 160:22 166:14 234:10 249:18
**incomplete** 30:25 31:12 32:8 49:16 57:17 82:5 87:23 106:3 113:8,23 120:21 135:3 168:12,14 169:10 191:11 230:23
**inconsistent** 31:8 65:17
**incorporate** 130:18
**incorporated** 205:13
**incorporates** 130:25
**incorrect** 203:14
**increase** 58:21 62:3,15,17,19,20 63:1 67:17,18 109:1 111:4,9 159:19 212:7 215:24 217:11 218:4,25 226:6 229:6 233:2 234:4 234:8
**increased** 19:16 21:5 65:6,7 69:2 111:11 176:9 198:20 226:21 229:3 233:6
**increases** 44:21 105:18 157:9,14 157:15 168:8 191:2 217:12,23 219:1 226:3
**increasing** 63:2
**incremental** 168:8
**incrementally** 63:10
**incubated** 51:15 150:1 159:1 211:8 211:20,25 212:8 212:15
**incubation** 149:4 154:20 168:5 169:7 178:14 211:17
**independent** 71:24 146:17 183:5
**indicate** 26:7 35:2 53:10 54:17 78:25 88:3 127:20 130:15 147:15 152:20 166:23 173:3 176:25 191:15 207:4
**indicated** 40:23 43:8 92:8 115:5 117:7 118:16 128:13 133:17 178:17 203:3,9 207:13 208:3,5 209:8
**indicates** 20:25 21:4 24:22 76:12 85:25 94:11,12 240:6
**indicating** 115:11 173:16 208:15
**indication** 56:21 157:24 158:1 231:15 234:3
**individual** 110:18 115:18 118:20,22 119:12 123:12
**inflated** 39:12
**influence** 158:22 160:15
**inform** 26:3 88:22 89:7
**information** 30:11 45:20 47:5 84:4 87:19 88:15 91:25 100:25 101:4,8,14 101:18 102:6 118:23 166:18,24 215:5 249:9,11
**ingelheim** 4:10,11 4:12,12,13
**ingested** 21:7 89:9 91:16
**ingesting** 109:1 111:3
**ingestion** 37:9,14 39:3 40:16 41:6 43:14 44:1 45:21 46:5,15 49:11 64:25 65:20 66:5 67:20 69:3,4 72:22 80:17 88:25 89:6 90:21 101:10 105:3,13 106:1,16 116:8 134:6,11,22 218:9 219:2 226:1 226:21 227:22 228:10 232:17 233:16 243:2
**inhibitors** 182:5 183:9
**initial** 29:14 92:1,5 208:6 238:13 241:4 245:16 247:10,18
**initiated** 208:8,19
**injected** 18:25
**injection** 18:21,22 19:7,13,14 20:9 95:21 119:2 149:6 149:8 219:13 220:19 246:4,13 250:11
**inorganic** 235:9
**inquiring** 102:3 134:25

**insert** 38:7 76:6 94:15 95:8 184:3 223:24
**insogna** 5:18
**instability** 219:17
**institutional** 85:1
**institutions** 24:24
**intake** 38:23 44:21 89:17 155:8
**intakes** 90:25
**intend** 28:23
**intention** 29:11 127:5 151:9 223:6
**intentions** 173:15 246:8
**intents** 159:6
**interchangeably** 14:14
**interest** 82:2,22 214:17,19
**interested** 80:1 168:2 255:13
**interesting** 63:8 168:17
**interim** 208:10,24
**intermediate** 192:6
**internal** 93:5
**internally** 100:24
**international** 4:13
**interpreted** 215:14
**interrupt** 61:7 233:23
**intervals** 227:18
**intervention** 183:10
**interventions** 221:17 222:8
**interview** 208:7
**intestinal** 148:3 149:23
**intramolecular** 219:19,21
**intricate** 29:18
**introduce** 78:17
**introduced** 31:15 31:20 34:11 77:24 240:21
**introduction** 180:9 189:14,16 219:6
**invasive** 125:4,8 125:14 126:2,9
**investigate** 183:3
**investigation** 253:16
**investigators** 66:3 80:15 85:25 145:18
**investor** 145:21
**invitation** 32:20 145:10
**invoice** 27:14,17 28:7,23 29:21
**invoiced** 28:3
**involve** 36:8 192:5
**involved** 39:18 47:21 147:21 219:19 220:3,22 221:3
**involves** 18:20 189:24
**involving** 17:12 26:10 48:6 49:3
**irb** 75:3 84:17,24 85:1,8 207:8,13,17 207:20,23 208:5 208:22 209:8,15 209:18
**irrespective** 97:21 122:12
**issue** 20:23 95:5 168:25 250:9
**issued** 29:20 39:16 39:22 43:22 57:22 58:1,3
**issues** 11:8 12:19 21:19 22:15
**issuing** 98:6

**j**

**j** 3:9 6:11
**jama** 170:9 202:13 213:9 253:13,21 253:22
**james** 7:13
**january** 78:13 79:14 80:8 81:3 205:2
**je** 3:14
**jeffrey** 67:2
**jennifer** 3:4,4
**jessica** 4:24
**jim** 8:16
**jirstrand** 237:23
**jjung** 3:15
**jones** 7:2,6 9:20 11:19
**jonesday.com** 7:4 7:8
**josie** 213:9,15
**journal** 44:20 144:24
**journals** 77:2 101:1
**jr** 3:12
**jrydstrom** 4:25
**juice** 50:7,7 182:11,25 183:5,7 183:18 184:20
**july** 144:20 152:6
**june** 92:22 93:12
**jung** 3:14
**justification** 162:4 180:24 181:4
**justify** 152:17

**k**

**k** 236:12
**kantor** 153:9,12 153:15,18,22
**katie** 5:18
**katie.insogna** 5:18
**kaury** 33:5
**kaye** 5:20
**keep** 61:5 73:9 94:16 142:22 177:14,16 200:1,1 235:20 238:10 241:2
**kentucky** 3:3
**kettering** 33:11 146:1
**key** 187:10,11
**kimberly** 6:12
**kind** 26:13 35:12 48:4 158:12 200:3
**kindly** 210:18
**kinetics** 191:25
**king** 3:12 4:8,18 7:12
**kingscoate** 2:21
**kitchen** 36:9
**know** 9:19 10:14 10:18,22 12:9 15:15 16:10 23:14 24:11,14,24 26:14 26:15 27:16 28:20 29:16 33:16,21,23 33:23,25 34:6,25 35:1 40:23 43:5 50:13,18 56:5

59:20 61:1,23 62:7,12,19 63:4,8 71:9 73:8 77:14 83:17 92:8 94:24 95:3 115:10 116:22 117:12,17 122:15,18 127:24 131:10,19 133:7 136:18 142:22 145:8,13,17,23 147:2 148:12 149:9,10 151:11 153:15 164:1 166:13 167:9 169:2 173:14 175:6 177:3,10,11 184:24 188:17 195:1 205:10,22 206:1,3 207:17 208:19 209:13 220:8 233:20 235:8,11 242:24 251:15
**knowing** 87:8 169:1
**knowledge** 22:14 22:17 77:10,11 86:4 101:11,12 147:2 206:14,17 206:18,21 214:23 232:9 246:12
**known** 34:1 219:18 236:11
**knows** 12:7 246:3
**kpenner** 6:13
**kral** 7:14
**krinsky** 7:8 11:19
**kslaw.com** 4:15,20
**kucera** 33:5

**l**

**l** 9:3,3 144:3,3
**l.l.p** 6:8
**lab** 27:3 116:19 238:12,13,20 240:13 241:3,5,12
**laboratories** 6:19
**laboratory** 16:14 78:19 239:20 240:7
**labs** 239:7
**lack** 74:8 101:9 109:21 118:24 119:1 132:8 167:20 176:20 216:15,17 231:1 232:6,14,16,20,24 233:2 234:14 240:19 241:18
**lacks** 120:21 121:5 122:4 126:11 133:4 142:14 167:4,15 176:18 191:12
**language** 40:2 46:23 50:23 67:15 74:25 116:9,10 155:16 163:4 192:19 198:2 240:4
**laptop** 11:7
**large** 19:13 229:23 230:2
**larger** 102:13
**latest** 238:4
**laundry** 36:10 42:7,22,25 43:18
**law** 3:2,6
**lawyers** 81:4
**lc** 15:7,8 20:21 53:1,22 54:11 55:18 57:13,13 58:1,4 74:11 75:16 80:1 100:16 103:6 119:7 131:23 133:22 155:4 172:7 220:10 234:1
**lead** 66:8,11 67:1 68:10 170:12
**leads** 39:11 170:23 219:13 245:22
**learn** 81:9 86:1
**learned** 39:11
**leech** 5:7
**left** 51:1 129:16,21 129:22 175:21 176:12,23 178:18
**legal** 26:13 244:7
**legend** 195:6 196:13
**length** 50:6
**letter** 144:23
**level** 61:23 62:25 63:5 64:3,3 65:5 103:15,24 105:25 120:18 127:12 130:25 184:14 212:1,18 224:15 229:17
**levels** 20:3 21:6 39:12 40:5 59:11 59:13 61:7 62:20 64:17 68:5,10,13 72:19,20 87:9 88:15 89:6 91:16 93:22 100:18 103:8 118:1,7,17 121:1 127:20 146:13 153:1 155:10 159:19 171:20 179:6 186:18 187:20 197:6,12,17,18 200:16,21 211:20 212:13 225:11 227:24 239:13 248:6,10,22 249:3
**levine** 5:23
**liability** 1:4 8:13
**lifetime** 119:18 122:11 123:3,11 123:14,21 125:8 126:3,9,22,24 128:11,18,22 129:3 130:4,6 132:2
**light** 12:14,23 16:6 16:7,12,18 17:4,17 20:25 21:17,18,22 22:3,15,18 23:2 24:17 26:2,16 29:6 31:15,25 32:24 33:4,15 34:4,11,17,24 75:2 75:14 77:23 78:13 78:24 79:5,16,18 135:23 136:10 137:8,21,25 138:1 138:2,7 141:23 161:20 167:8,12 174:24 175:8 176:15 178:8 196:17,20 199:10 237:22 238:8,17 238:24 240:14,20 241:13 242:4,14 242:18 243:5,25 244:11 245:3,5,8 245:19 246:1 247:17 249:16,21 250:8

**light's** 170:14 175:20 242:9
**lightfoot** 3:12
**limit** 96:5,21 97:1 97:6 100:19 103:22 106:6,12 117:21 118:15,18 135:14 188:16,18 224:2,7,22,25 225:12 239:15
**limitations** 76:22 77:19 231:14
**limits** 116:13,25 134:2 225:8
**line** 49:23 64:6 80:14 112:8 138:25 156:15 176:22,24 219:18 254:7,11 256:4
**linear** 120:13,25 132:22 177:1 178:20
**lines** 194:20
**link** 112:25 113:4 113:19 114:5,13 141:17 216:21
**linked** 138:16
**lior** 33:4,9,10,15 112:2 136:4 144:20 153:12 170:13
**liquid** 15:8 154:18 171:6
**liquids** 89:17
**liter** 37:15 52:4 181:19 184:15 185:16 186:4,5 192:18 193:4,22 194:17 198:14,15 198:19 199:1,1 200:10,19
**literature** 49:21 98:6 171:24 172:4 181:18 185:13,24 185:25 186:10 194:23
**liters** 52:10
**litigation** 1:5 8:13 26:5,9,18 35:5 77:15 81:5,25 82:19 111:18
**little** 10:10 21:10 35:7,9 54:25 59:11 64:16 66:14 73:7,11 74:17 94:8,21 106:21 107:18 146:4 179:20 190:22 204:11 235:1
**liver** 127:23
**living** 48:20
**llc** 5:17,22 6:4 256:1
**lloq** 224:3
**llp** 2:8,15 3:17 4:2 4:8,18,22 5:2,7,14 5:20 6:2
**loadings** 36:17
**locations** 10:3 85:15
**lod** 104:8
**logan** 2:9
**logo** 139:21
**long** 11:24 27:10 33:25 73:17 235:20 244:23
**longer** 45:15 157:18 235:19
**look** 13:23 14:1 22:10 24:3,9,13 54:1 57:2 58:18 63:10 78:8 80:5 111:24 125:19 147:20 154:10,12 156:3 162:17 175:25 193:8 194:12
**looked** 139:18 162:24 185:1,3 201:24 202:5 242:9
**looking** 11:6,10 27:7 29:17,18 54:4 62:2 80:10 140:4 160:19 168:24 193:7 203:4 216:12,21 220:15 247:11
**looks** 25:9 32:22 63:23 76:11 123:5 147:23 162:22
**loq** 104:8
**los** 2:3 7:7
**lot** 10:2,3 63:23 64:1 90:11 96:12 156:7
**louder** 23:20
**louisville** 3:3
**low** 43:6 103:15 121:1 201:11 203:2,6 224:15
**lower** 64:1 105:8 134:16 148:10 149:8 164:8 167:13 175:6 177:2 178:21 181:20 191:24 198:24 199:12 224:2,7
**lowest** 103:24 181:20 200:5,9
**lumped** 29:12
**luncheon** 143:11
**lunchtime** 142:23
**luther** 3:12

**m**

**m** 5:11 9:3,3 144:3 144:3
**magnitude** 197:4
**mahdavian** 84:16
**mail** 12:4 13:25 17:3,7 20:24 21:4 21:16 22:13 23:1 23:6,12 75:9 78:12 79:13 84:13 92:21 93:21 99:13 100:7 103:2,20 108:4,7,11 112:21 113:22 126:15 129:4 130:14,21 135:21,23 136:21 138:12 144:19 145:3 152:5 153:8 153:11,17 154:2 162:1,2,3 167:7 204:22,25 213:8 213:16 214:8 237:21 239:2 240:14,23,25 241:11 242:4,9 243:24 245:4 249:16 250:14
**mailed** 12:25
**mails** 13:17,23 98:12 107:19 207:7 209:14
**main** 42:4
**maintain** 87:14 89:16
**major** 99:17
**making** 32:5 70:7 70:14 71:1 113:12 136:4 169:25

**males** 124:23
**man** 123:20
**mandated** 148:21
**manner** 8:22
**manufacturing** 6:4
**manuscript** 42:10 146:5 152:19 162:2 167:24 188:20 205:1,7,9 205:12 206:5
**manuscripts** 214:17
**march** 17:4,17 242:6
**marina** 5:2
**mark** 13:2
**marked** 13:7 17:1 22:23 25:14 32:18 35:17 44:15 59:23 66:20 74:21 78:4 79:10 84:11 92:18 94:18 99:9 107:24 122:24 129:6 139:12 144:15 151:20 153:6 162:11 166:6 170:4 175:14 179:24 204:20 213:5 237:16 241:24 249:12
**market** 4:2 47:15 208:25
**marketable** 208:18
**marriage** 255:12
**martin** 3:12,17
**martinez** 2:15
**maryland** 5:8
**mass** 15:3,5,9 17:20 18:15 19:6 20:2 39:8 53:16 54:6 134:18 135:15 146:15 154:19 171:6 219:11 247:2
**massachusetts** 5:3 5:16
**material** 146:18
**materials** 32:5 84:18
**math** 54:25
**matrix** 224:19
**matter** 8:12 9:12 235:19 255:13
**matthew** 5:12,24
**matthew.scarvie** 5:25
**matthews** 2:21
**matthewslawfir...** 2:23
**maura** 49:23
**maximize** 223:2
**maximum** 65:5 200:14 227:11
**maylightfootlaw...** 3:15
**mazzotti** 3:17
**mcdonough** 2:11
**mcnabb** 2:23
**md** 1:2
**mdl** 1:2 8:15
**meal** 229:2
**meals** 184:5 222:18
**mean** 12:9 28:13 33:23 37:12 42:1 45:12,14 61:14 87:6 93:15 98:1 150:25 185:1 192:1 227:11,17 236:9
**meaning** 16:21 186:20 187:13 188:21 189:7 215:13
**meaningfully** 42:16
**means** 45:15 48:19 124:13 151:1 174:13
**meant** 42:3
**measurable** 106:5 217:11,12,23 218:4,25
**measure** 18:2,17 20:17 41:12 57:8 72:15 74:6 88:19 244:12
**measured** 36:22 40:5,15 127:10 128:1,5 201:13 218:8 234:20
**measurement** 91:4 91:8,15,19 146:16 156:9 157:15 247:1
**measurements** 20:1 21:13 40:11 54:6 71:4 127:13
**measuring** 58:4 65:19 148:10
**meats** 221:23,23 221:24 223:20,21 225:21,21 226:2,2 226:14,15,23,24 228:20,21
**mechanism** 140:20 189:19,23 191:18
**mechanisms** 192:9
**media** 8:9 73:23 74:2 107:7,11 143:9 144:7 173:22 204:3,7 237:6
**medications** 182:4 184:23
**medicine** 144:25
**meet** 11:20 16:2 79:20 137:13
**meeting** 32:21,25 33:1 145:12,14
**memorial** 146:1
**men** 124:20 125:9 126:7
**mental** 153:21 163:23
**mention** 32:12 81:2
**mentioned** 29:16 32:3 34:10 92:16 185:8 195:15 202:7 203:1
**mentioning** 81:6 243:17
**mentions** 242:18 243:5
**merit** 218:15
**met** 11:18
**metabolites** 69:18
**metabolized** 127:9 127:15,22
**method** 20:21 39:6 45:1 58:2,4 72:3,3 72:7 95:13 96:15 97:9 103:23 104:9 104:11 117:21 135:11 148:10 149:8 220:7,10 245:11 248:24 249:4,25 250:7
**methodologies** 96:10

**methodology** 47:6
**methods** 29:19 47:15 71:8 74:6 75:16 146:16 154:12,14 171:3 182:18 197:11
**methylene** 93:16
**mice** 120:7,8,19
**michael** 2:17 33:5 34:5,7 145:7,18
**micrograms** 126:22 133:24 227:13
**micromolar** 181:1
**micromole** 181:10 181:13,19 184:15 184:19 185:16 186:4 192:18 193:4,22 194:16 198:14,15,18,25 199:1 200:10,18
**microphone** 23:25 210:17
**microsoft** 253:20
**middle** 23:23 59:18 137:12 148:18 150:20 189:20 200:3 211:3,3,3 247:24
**migration** 219:21
**mildly** 191:8
**milligram** 36:23 64:25 69:15,22 79:22 109:2 155:13 187:25 188:23 230:7
**milligrams** 65:6 69:2,3,8,14,21 71:5,6 141:14 155:14 156:25 158:5,25 217:10 217:22 218:3 219:3 221:21 222:3 229:19
**milliliter** 37:20 38:15,17 65:1,8,11 65:13 95:17 96:23 103:23,25 104:2,6 106:6,12 224:4,9 224:11 227:13
**milliliters** 37:18 38:13 51:5,7,16,18 51:22,24 52:1 54:21 163:10
**millimolar** 51:4,6 51:14,16 52:5,11 52:16 54:22 55:4 55:10,14 59:4,15 60:25 61:14,24 62:12 63:19 64:11 150:3,8,9 156:20 157:3 159:2,12,20 160:2,8,23 161:14 162:20 163:12,16 165:11,16,23 167:1,14 168:20 169:4 171:16,25 174:20 175:2 176:9 178:1,10 186:1,7,12,19,21 199:12,14,14 212:9,19
**millimolars** 51:21 51:23 52:9
**millimole** 52:4 181:11,14 186:5
**million** 230:6,11 239:14
**millions** 140:1,9 140:18 230:18,19
**mimic** 38:3 49:25 50:2,4 89:25 151:2,10
**mind** 115:24 147:7 177:23 203:19
**minimum** 177:14
**minus** 37:14
**minute** 222:16
**minutes** 107:2,3 203:21,22 222:19 222:21 237:10 248:2 250:19
**mischaracterizes** 49:18 50:17 63:7 70:12 90:7 99:21 105:21 114:1 117:16 121:6
**misleading** 30:5,8 176:14 178:11
**misled** 30:18
**misrepresentatio...** 138:17,20
**misrepresenting** 141:24
**misrepresents** 132:9
**misstates** 32:8 46:7 47:10 57:25 58:25 59:7 61:4 63:21 77:5 99:21 114:8 121:17 135:4 138:11,19 146:25 159:16 160:4 161:23 169:10 186:15 189:5 197:8 244:15 246:6,18 250:14
**mitch** 1:20 8:11 9:8 13:9 15:11 18:10 24:8 25:17 31:3 33:1 35:13 36:5 39:23 44:5 44:14 46:10 56:14 57:18 60:1 67:3 70:7 73:7 74:5 78:14 80:22 83:1 85:23 86:6 92:17 93:1 98:24 99:5 102:4,19 103:5 104:25 105:11,17 105:24 106:14,25 107:14 108:4 112:3 113:16 114:10,11 115:23 117:10 122:23 124:5,22 129:14 129:19 132:16 135:9 137:8 142:22 144:11,18 153:10 155:25 160:10 163:25 165:5 166:11 167:22 169:13,20 174:11 175:16 177:21 179:16 180:2 182:21 185:22 186:17 189:9 190:13 192:16 194:14 203:24 204:10,24 205:6,15 210:21 213:2,13,16 216:5 217:3 222:5 224:12 232:22 233:13,21 236:1 237:9,19 241:20 244:19 250:21 251:5,15 252:6 253:3 256:3,20
**mitch's** 110:7
**mitch000004-00...** 253:9

**mitch000055-00...** 254:3
**mitch0001237-0...** 253:14
**mitch000131-00...** 253:9
**mitch000202-00...** 253:14
**mitch000323-00...** 253:18
**mitch000417-00...** 253:23
**mitch000454-00...** 253:15
**mitch000539-00...** 253:17
**mitch001081-00...** 253:8
**mitch001100-00...** 253:18
**mitch001107-00...** 253:8
**mitch001280-00...** 253:19
**mitch001612-00...** 253:24
**mitch001702-00...** 253:24
**mixed** 235:8
**mixing** 116:15 117:13
**mixture** 53:2
**ml** 117:20,23
**model** 48:12
**modifications** 136:5
**modified** 72:6 97:3
**molar** 52:18 54:20 55:8,13 58:15 59:14 60:16 64:7 64:10 160:20
**mole** 69:9
**molecular** 220:2 220:15,22,24 221:3
**molecule** 18:20 116:14 219:24 228:8 242:21
**moment** 129:9,11
**monday** 100:9
**moniker** 247:19
**month** 92:10 94:21,22
**months** 12:24 202:14
**moore** 3:2,4
**moorelawgroup....** 3:4
**morning** 8:1 9:8 93:1
**mouse** 166:16
**move** 73:5 177:19 195:9 203:13 212:23
**moving** 11:13
**msk** 153:19
**msk00007347-0...** 253:19
**mtranter** 5:12
**multiple** 118:13 158:13 231:16
**multiply** 38:14 55:5
**mwatson** 2:17

**n**

**n** 2:1 3:1 4:1 5:1 6:1 7:1 14:17 35:22 36:1,17 44:22 66:25 69:19 94:12 144:1,1,1 154:3 170:11 180:4,15 187:18 206:7 213:19 239:10 253:1
**n.w.** 4:23
**n2o3** 192:5
**najafi** 31:21 34:12 35:2 77:24 78:18 79:5,14 80:7 81:2 84:15 90:17 242:5 243:24 244:2 245:6 249:19
**name** 8:16 9:10 66:8,12 67:1 108:6 138:16 154:7 170:14,21 256:2,3
**named** 228:3
**nandita** 84:15
**nanogram** 95:16 96:22 103:23,24 106:5,11 120:18
**nanograms** 37:15 37:20 38:15,17 65:1,7,11,13 104:2 104:6 117:19,22 131:8,22 132:3,21 132:24 133:9,15 134:1 140:10,18 141:16 142:1 155:9,14,22 156:9 156:24 158:7 159:3 224:3,8,10 230:7,11,19 239:14,16
**nathan** 6:17,20,20
**nature** 22:9 41:11 83:18 98:5,7
**nda** 29:13
**ndea** 248:5
**ndma** 13:19 14:16 17:19 18:2,17 19:1,3 20:1,3,9,10 20:11,18 21:5,13 21:20 22:16 26:10 31:17 36:22 37:8 37:12,13 38:22 39:2,6,12 40:5,14 40:17 41:5,12,16 41:21 42:5,11,16 42:21,25 43:13,19 43:25 44:10 45:1 45:21 46:4,17 47:8 49:4,9 50:12 53:11 54:10 56:23 57:8,12 58:4,14,20 59:11,13 60:14 61:2,18,23,24 62:3 62:8,17 63:14,18 64:17,24 65:5,12 65:19 66:4 67:18 68:4,10,13 72:4,8 72:13,15,20 74:7 75:16 79:2 80:12 80:16 86:17,19,23 87:9,18 88:2,6,16 88:24 89:3,5,8 90:5,21 92:1,9 93:3,22 95:13,17 95:23 96:1,5,5,11 96:18 97:13 98:19 99:16 100:18 101:9 103:9,9,13 103:15 105:2,6,13 105:19,24 106:5 106:10,15 109:1,7 111:4,9 116:5,16 116:19,23 117:14 117:19 118:1,7,10 118:14,17,25 119:1,13 120:15 121:2,22 126:23 127:8,11,14,22

128:1,5 131:8,20 131:22 132:3,21 132:24 133:9,24 134:5,11,22,24 136:12 138:9 139:5 140:2,10,18 141:16 142:2 146:3,12,16,23 147:9 148:11,22 149:14,17,20,23 150:4,10 154:4,18 155:5,8,13 156:9 156:24 157:4,8,15 157:17,22,25 158:1,8,10,23 159:3,10,19,24 160:7,16 161:8,17 163:8 164:4 168:5 169:7 170:24 171:5,7,14 172:8 176:1,6 178:13,19 180:4,11 187:18 188:2,12,14,24 189:23 190:2 191:7 192:10,16 193:3,9,21 194:1 196:21 197:3,10 197:16 198:13,19 198:21,24 199:2,5 199:13,17 202:2,6 202:16 203:1 205:1 208:18 211:18,20 212:2,7 212:14,20 213:19 215:20,24 216:15 216:17 217:12,13 217:24 218:5,8,14 219:1,1,12,13 220:4,13,23 221:4 221:25 223:3,10 223:16 225:4,11 225:20 226:3,6,9 226:16,22 228:9 228:23 229:3,7 230:3,15 232:16 233:2,6,15 234:4,9 234:20,21 236:3 238:19 239:10,13 242:21 243:1 244:12 246:3,12 247:1,4 248:6,10 249:3 250:10

**ne** 4:18

**necessarily** 43:5 65:22 71:3 81:23 192:5 235:15 236:7

**necessary** 62:24 102:11 160:15

**need** 10:21 23:6 24:13 51:2 61:23 62:19 78:8 85:4 132:15 137:15 196:12,14 211:4 216:25 219:9 226:17 244:5

**needed** 112:15 113:3

**needs** 235:22

**neeku** 84:16

**neel** 84:15 92:22 93:10 95:11

**neelan** 79:17 93:13

**neelanjan** 79:14 249:17

**negative** 103:9 137:17

**neither** 202:9

**network** 170:9 202:13 213:9 253:21,23

**neutral** 191:9

**never** 27:16 28:2,9 32:3 115:5 146:22

**new** 1:24 3:19 4:9 4:9 5:21,21 6:10 6:10,18,18 8:17 74:13 75:15,21 80:16 86:4 87:16 136:16 144:24 205:8 255:4 256:1

**ng** 140:1

**nice** 249:23

**nicole** 3:21 7:12

**nicole.haddadnia** 3:21

**nitrate** 90:24 229:2

**nitrates** 221:25

**nitrite** 48:7,14 50:5 51:5,15,21 52:7,12,19 53:18 54:19 55:6,9,15 58:15,22 59:2,3,13 59:15 60:15,22,25 61:2,15,18,22,24 62:4,11,13,16 63:2 63:11,13,17,19 64:12 90:24 91:5 91:9,16 148:5 150:3,9 151:15 152:10,15 153:1 154:22 156:20 157:3 158:7,22 159:2,8,11,20 160:1,1,7,14,14,19 160:23 161:13,17 162:4,18 163:9,12 163:16 165:12,17 165:22,23 166:25 167:13 168:4,7,8 168:20,24 169:4,6 171:10,14,20,25 172:14 173:5,10 173:20,25 174:2 174:20 175:1,6 176:2,7,8 178:10 178:13,19,21 179:7 180:25 181:6,19 182:2,11 182:25 183:4,6,17 183:24 184:5,13 184:19 185:14 186:11,20 187:20 188:3,4,25 189:24 190:4,9,10,20,24 191:2 192:18 193:3,8,19,21,24 194:16,22 195:18 196:4,8,23 197:2,5 197:17,18 198:14 198:15,19,24 199:11 200:5,9,12 200:19,21 201:12 201:13,17 202:7 203:2,6,8 211:8,22 212:9,14,19 216:18 229:1,2

**nitrites** 221:25

**nitrosamines** 35:22 36:1,17 48:8

**nitrosated** 230:15

**nitrosation** 38:24 39:1 47:23 48:2,3 48:5,6,9,10 53:2 53:23 54:7,11,18 190:8 191:7 192:4

**nitrosodimethyl...** 14:17 44:22 66:25 154:3 170:11 180:4,15 187:18 206:7 213:19

239:10
**nitrous** 48:7 191:18 192:6
**no2** 180:25 219:20
**noise** 158:12
**noncured** 221:23 223:21 225:21 226:2,14,24 228:21
**nondisclosure** 22:6 25:4 27:5
**nonlinear** 168:3
**nonphysiologic** 186:13
**normal** 89:17 181:23
**normally** 214:15
**north** 2:9
**notably** 198:20
**notary** 1:23 252:10 255:3 256:23
**note** 40:2 69:6 132:6 233:22
**noted** 8:24 82:20 252:4
**notice** 1:21 13:3 47:16 208:25 253:7
**november** 1:16 8:3 85:10 103:21 255:15
**number** 8:15 11:13 24:23 42:11 42:12 56:2 97:4 122:18 133:24 152:8 191:17 192:3 203:12 209:13 233:10
**numbers** 40:24 43:6,13 70:8
130:17 132:12 156:7
**numerous** 77:2 209:18
**nv** 247:19

**o**

**o** 144:1,1,1
**object** 124:7 177:8 202:21 210:14 232:19
**objected** 195:9
**objection** 18:7 26:19 30:24 31:2 31:11 32:6,10 34:18,20 44:2,4 46:6,9,18 47:9 49:12 50:16 57:16 57:24 58:24 59:6 59:8,16 61:3,6,10 63:6,20 70:11 72:23 77:4,7 81:10,12,13,19,21 82:3,23 87:25 89:1,10 90:23 99:20 101:22 102:9,22 105:20 106:2,18 109:14 109:15,19 113:7 113:14,21,25 114:7 117:15 118:12 120:20 121:4,14,15,16,19 122:3 123:23 124:3 126:11 132:7,14 133:3,12 134:8,15 135:2,8 138:10,18,22 142:4,14,18 146:24 153:20 157:23 159:14,15 160:3 161:22 163:22 164:14 167:3,15,17 168:11 169:9,12 172:24 173:12 174:7 175:11 176:17,20 177:7 179:1,12,15 182:14 185:17,21 186:14,16 187:5 189:4 190:11 191:10,12 195:4 197:7 199:18 201:22 202:19,22 202:23 203:13 208:15 210:19 221:6 228:14 230:22 232:4,18 233:17,23 234:13 234:23,25 240:16 240:18 241:15,19 244:14 246:5,16 246:20 250:13
**objections** 8:21 114:22 121:7 135:7 177:12 178:15 234:12
**objectively** 30:1,4
**observe** 168:9
**observed** 65:18,21 86:19 196:21 248:5,6,20
**obtained** 150:13 162:18 169:14 208:22 248:22
**obvious** 219:20 220:4,6,6,8,12,23 220:25 221:2
**obviously** 108:6 108:20
**occasionally** 13:22
**occur** 163:8 164:4 176:3,7 178:1 186:25 191:8,21 191:22 221:11 236:4
**occurred** 164:8
**occurrence** 62:4
**occurs** 86:23
**october** 99:12 100:9 103:4 112:1 135:24 137:7
**odd** 65:17
**offer** 95:15 170:22
**office** 208:7,10,12 208:13
**offices** 9:20
**oh** 84:24 227:15
**okay** 9:16 10:2,19 11:3,4,14 13:10,15 14:2,9,12 15:3,8 15:25 20:24 22:2 22:10,19,25 24:15 25:10,21,22 26:22 29:3,23 31:6 32:23 33:25 35:2 35:20 36:11,15 37:17,22 38:20 39:25 41:14 42:1 42:24 44:6,12 45:17 47:17 48:18 50:9,21,24 51:2,10 56:20 57:1,21 58:3,7,18 60:18 61:20 64:9,19,20 66:13,17,22 67:13 69:11 70:6,21 71:7 72:1,11 74:2 74:23 75:13 76:5 76:24 77:17,21 78:6,24 81:8 84:4 84:24 88:1,7,21

90:14,24 92:13,20 94:4 96:16 97:5 99:7 102:16,23,25 107:11,14,17 108:1,1 109:11 110:5 111:7,16 113:15 114:20,23 115:5,13,15,16 118:19 119:11 120:24 122:8,19 124:11,17 125:2,7 127:6,24 128:8 129:1,5,14,21 130:12 131:1,15 136:1 137:25 139:10,24 141:5 143:6 144:7 145:17,21 147:5 147:18 149:11 150:6,24 151:4,14 151:18 153:8 158:15,21,25 159:18,22 160:25 161:11 162:13 164:9,18,25 165:7 166:4 167:11 168:18 169:1 170:6 179:8,19 183:15,21 184:18 185:1,10 186:20 187:1 188:17,21 189:22 190:16 192:14 193:15 194:5,10 195:3,17 196:2 197:13,22 198:3 199:23 200:7 201:15 203:5,23 204:7 206:18 209:1,10 209:17 211:11 212:6 213:7 216:1 216:23,23 217:3 217:16 218:12 221:1,12 225:3,13 225:24 227:15 228:3 229:1 232:12 233:4,9 234:17 235:10,18 236:16 237:6,21 239:4 240:12 244:10 246:11 247:8 249:14 250:17 251:4

**old** 136:16
**once** 141:15
**ones** 49:20
**ongoing** 112:14 132:7 202:22
**online** 16:12
**open** 170:9 202:13 253:21,23
**opinion** 43:24 81:14 112:23 122:4 176:19 215:2,15 232:5,10 232:11
**opinions** 199:19
**optimal** 155:12 157:3
**optimized** 95:14 96:1
**optimizing** 96:17 97:12
**option** 158:19
**oral** 44:21 66:23 70:2 213:18
**orange** 194:20
**order** 35:13 57:11 151:25 152:17 197:10 221:22
**orders** 197:4
**original** 42:10 50:25 76:14 175:19 208:3
**originally** 20:12 21:22
**outcome** 223:9 225:15 255:13
**outcomes** 223:8,12 226:9
**outlet** 4:4
**outside** 116:20 250:2
**oven** 245:13
**overall** 184:11 231:20 232:3,14
**overbroad** 47:10 49:16
**overly** 110:18
**overnight** 222:14
**ownership** 189:5
**oxide** 69:19,19
**ozone** 41:22

**p**

**p** 2:1,1 3:1,1 4:1,1 5:1,1 6:1,1 7:1,1
**p.c.** 6:17
**p.m.** 107:6,10 143:9,11 144:2,6 204:2,6 237:2,5 251:1,4 252:2,4
**pacific** 8:3
**package** 79:21
**page** 25:13,22,22 35:19,22 37:2,5 38:8 39:21 44:17 46:22 48:1 53:6,6 53:7 54:1,4,14,15 55:24,25 56:3,25 57:1 58:10,10 60:5,7 67:12 68:16,23 74:20 75:1 78:6,9,10,17 79:12 80:6,6 84:23 85:14,19 86:3 89:13 94:20 95:9 99:11 100:3 100:4,8,13 102:24 103:19 107:23 108:13 109:23 110:6 111:23,25 112:6,6 113:1 115:16 118:21 124:18,19,22 125:3,13 126:16 126:17 136:23,24 137:3 146:8 148:16 153:25 154:11,12 155:15 155:20 156:4 161:1 162:13 163:2 164:20 165:1 172:6 174:15 180:9,10 182:19 183:22 184:10 187:8 189:12 190:17,17 190:18 192:12 193:12 194:11 197:24,25 198:17 205:21 206:1 210:25 211:13,13 216:24,24 219:5 221:14 222:7,23 223:7,7,24 225:13 226:17 227:1 228:16 229:12 231:5,6,6 239:5 240:2,2,3 241:1 242:2 243:23 245:2 247:9,12,22 247:24 249:15 251:22 253:2,6

254:2,7,11 256:4
**pages** 147:19 211:14 247:23
**palo** 7:3 9:21
**pancreas** 123:21
**pancreatic** 123:6 123:18 124:15
**pantheon** 6:4
**paper** 21:1,5,12,12 41:10 43:23 44:19 45:3,18 66:2,17,23 67:9 72:19 98:14 98:20 112:12 136:6 160:12 161:25 168:23 170:8,9,18,20 180:20 192:23 213:2 219:9 221:14
**paragraph** 110:2 116:2 137:12 189:13,15 200:2 229:13 247:25
**park** 5:2
**part** 13:24 25:5 36:21 56:6 99:23 108:25 195:24 211:4 213:8 236:10
**partially** 127:9,14
**participant** 92:5
**participants** 33:3 91:17 92:2 208:6 208:11 221:19 222:12,17 227:6
**particular** 121:22 122:12 167:25 169:24 173:18 193:7
**particularly** 50:5
**parties** 8:7 83:25 255:11
**partners** 24:24
**parts** 11:13
**party** 81:25
**pass** 251:13
**passing** 88:19
**pathways** 192:4
**patient** 111:21 130:22 182:6 183:25
**patients** 99:24 107:20 184:21,22
**pause** 142:21
**paying** 11:11 82:13
**payment** 28:1
**pc** 2:2
**pdf** 25:12,22 35:19 35:22 37:1,5 48:1 53:6,6,7 54:15 55:24,25 56:11,25 58:10 60:7 67:12 68:16 74:20 78:6 79:12 80:6 84:23 85:14,19 89:13 94:20 99:11 100:3 102:24 103:18 107:22 111:23 112:6 115:16 118:21 126:16 154:11,12 156:4 161:1 162:13 163:2 164:19,20 166:10 172:6 174:15 182:19 183:22 210:24 216:24 222:7 223:7 242:1 243:23 245:2 247:9,11,22,24
249:15
**peachtree** 4:18
**peak** 56:22 93:3 95:22
**peaks** 55:19
**peer** 67:8 70:16 73:1 213:24 214:4
**peiyuann** 6:13 56:4
**pending** 11:1
**penner** 6:12
**pennsylvania** 2:10
**people** 10:3 12:9 12:11 30:17 44:7 49:24 89:9 93:23 118:10
**perceive** 82:11
**perceived** 84:2 88:14
**percent** 69:21 70:3 71:10 95:16 104:3 104:7 123:22 125:5,6,15 126:8 126:21 127:2,4 128:16,22,23 129:22 130:1,9 131:6 132:4,18,20 133:1 134:14 168:7 227:18
**percentage** 42:13
**percentile** 200:11 200:14,21
**perfect** 35:23 37:6 53:9 217:5 227:3
**performed** 28:9 29:4 104:16 180:2 181:25 194:7 209:4
**performing** 25:24 84:20
**period** 27:10 85:10 89:18 208:21
**periods** 221:20
**permission** 75:4
**perrigo** 5:9,9
**persisting** 246:2
**person** 31:21 33:10 111:10 112:17 240:21
**personnel** 207:3
**petition** 78:22
**pfizer** 4:24
**pguo** 6:14
**ph** 53:19 154:20 156:25 157:2 158:7,20 159:3 163:13 171:8 173:4 183:7,24 184:6,14 187:20 191:1,3,19 193:25 194:17,23 195:18 196:4,8,23 197:6 200:15,17,21
**ph.d.** 1:20 8:11 9:3 144:3 252:6 256:3 256:20
**pharma** 31:22 34:12,17,23 74:13 79:15 81:18 90:3 90:11 92:7 94:10 95:5 100:10 103:3 103:21 118:5,16 133:8,21 137:14 204:25 207:4 234:2 239:23 240:10,13,22 241:12 243:18 246:9 249:18,19 254:4

**pharma's** 208:13
**pharmaceutical** 83:17 86:14 87:1 87:6
**pharmaceuticals** 4:10 16:15 206:8
**pharmacy** 16:13 142:8
**philadelphia** 2:10
**phone** 23:22
**phones** 8:4
**phrase** 127:18
**phrased** 215:22
**phrasing** 164:3 188:11 219:16
**physical** 16:13
**physiologic** 147:13 148:24 150:14,22,24 151:1,5 155:7,12 161:3,9,14,16 170:12 171:21 172:9,15,20,23 173:7,11,21 174:2 174:4,5,14 180:16 180:24 181:5 182:1,10,24 183:4 183:17 187:20 188:4,25 193:23 194:2 197:5,18 201:2 202:2,17 216:18
**physiological** 201:8
**physiologically** 152:18 172:1 236:4
**picogram** 120:14
**piece** 249:8,11
**piercing** 32:4
**pill** 109:2
**pink** 196:2,3
**piper** 5:14
**place** 8:7 208:14
**placebo** 221:22 222:13 225:19 226:13 227:17 228:23
**placed** 158:5 199:4
**places** 77:9
**plainly** 250:13
**plaintiffs** 2:4,11 2:16,22 3:3,8,14 3:19 26:4,9,17 35:4 81:5 82:18 83:18 251:12
**plan** 101:13 137:14
**planned** 88:8
**planning** 99:18 137:13
**plasma** 217:13 218:5,10 219:2 223:16 224:4 225:1,4,10 226:8 226:15,22 227:6 227:11,24 229:18 233:7 234:20
**plausibly** 72:21
**plc** 5:9
**please** 8:4,25 11:1 18:12 24:11 108:3 114:22 115:25 143:5 156:5 163:4 177:19 205:8,9 237:15 238:3,10 241:2
**pllc** 3:2,12
**plot** 59:9,13 60:18 61:15 64:4 176:23 179:4 194:15
**plotted** 130:11 175:17
**plus** 37:14 71:1,9
**point** 10:16 13:16 62:22 70:6,13 71:1,3 77:23 94:5 130:24 131:4 139:9 140:3 169:24 193:13 201:25 251:13
**pointing** 68:8
**points** 28:13 165:11 175:18 179:10 187:10,11
**poorly** 173:6
**pop** 213:7 219:7
**popped** 166:18,20
**population** 129:23 130:18
**populations** 183:25
**port** 18:22 19:7,14 20:9 149:6,8 246:4,13
**porter** 5:20
**portion** 92:20 113:23
**ports** 219:13 220:20 250:12
**posed** 187:16
**poses** 187:12
**position** 209:19
**positive** 160:6 202:5 203:1 228:12
**possession** 32:4
**possibilities** 158:14,16
**possible** 20:10 158:19 166:13 172:1 179:4 191:15
**post** 89:6 105:6
**postdoctoral** 17:15
**posted** 142:16
**potency** 119:13,18 121:11,25 132:23
**potential** 20:23 40:3 47:1,8 49:3 50:12 58:19 82:1 82:22 90:5 98:18 107:21 110:13 111:13 154:25 182:3 223:2
**potentially** 230:3 230:14
**ppis** 183:9
**pre** 208:6
**precisely** 176:14 183:16
**precursor** 190:2
**precursors** 36:1 36:18 41:22 42:6
**predict** 220:13
**predicted** 221:5 221:10
**predominant** 90:10
**preferable** 138:25
**prepare** 11:17
**prepared** 142:16 163:12 254:4
**preparing** 28:15
**prescription** 239:8
**present** 7:10 29:25 30:3,8,21 31:7 96:18 151:7 158:11 168:16 169:3 174:24 179:6 188:15

191:23 198:22 199:2 217:8,21 218:2 225:4
**presented** 41:10 70:23 98:20 159:23 160:22 165:15 175:22 176:13 177:4 178:4,7 179:10 218:24
**presents** 156:8 178:11 187:12
**press** 106:23 238:1 238:5 239:5,19 241:10 243:6,17
**prestigious** 24:23
**presumably** 148:1 149:3 184:25 225:11
**presumed** 111:8
**pretreatment** 222:11
**pretty** 28:19
**prevent** 30:17
**previewed** 39:10
**previous** 53:10 78:10 86:15 95:9 100:4,8 110:6 114:1 124:19 126:17 127:21 148:16 150:17 162:23 195:10
**previously** 78:25 105:14
**primarily** 96:14 120:5
**primary** 42:5,21 43:17 68:3 223:9 225:15
**prior** 37:9 62:20 67:9,15 68:5 69:2 71:12,15,21 72:8 82:19 83:19 85:5 87:11 101:23 161:24 167:11 213:25 242:8
**probable** 187:18 206:6 239:10
**probably** 11:5,23 12:25 14:20 19:18 32:9 141:4 213:13 236:7
**problem** 235:24
**procedure** 57:13
**proceed** 74:3 107:12,15 144:8 204:8 237:7 251:4
**proceeding** 1:11
**process** 74:17 163:24 235:6 236:3,8
**processed** 135:15
**processes** 153:21
**produce** 168:4 169:6 212:14
**produced** 166:9 209:23 248:24
**product** 54:11 69:8 87:20 198:22
**production** 63:14 63:18 154:4 160:16 170:11 180:15 212:20 220:23
**products** 1:4,12 8:12 20:4 53:2,17 53:23 54:7
**professional** 1:23
**professor** 15:12 92:25
**profile** 65:25
**program** 13:25
**project** 80:12
**promeco** 4:13
**prompted** 105:11
**pronouncing** 33:6 84:16
**proper** 174:13
**proportional** 190:1
**proposed** 180:11 189:19,22
**proposition** 49:7 114:17,19 142:1
**protection** 72:6
**protocol** 84:9,18 85:9 88:13 89:14 90:10,15 93:15 148:22 207:15 208:2,4,16 239:12 245:21
**proton** 182:5 183:8
**protonated** 190:3 190:9,20,23 191:2
**proven** 121:12
**provide** 13:22 27:21 94:13 171:19 180:23 181:4 184:12 201:25 202:5 214:8 225:25 226:6,20
**provided** 133:15 134:13 160:13 199:11 208:1
**provides** 160:6 161:12 228:7,12
**public** 1:23 45:19 100:1,25 101:6,11 101:15,19 102:7 122:10 207:19 214:21,22 252:10 255:3 256:23
**publication** 67:9 77:3 82:19 83:24 137:23 139:2 174:23 175:9 176:16 178:7 199:11,16 201:20 203:10 206:20 209:9,21 211:6 214:1,11 218:15
**publish** 207:5,11 207:14
**published** 21:1 35:21,25 44:19 67:6 77:10,12 99:1 105:14 123:2 127:25 139:6 170:8 174:18 181:24 202:13,14 206:15 209:5 218:19 221:14
**publishing** 82:21 206:23,24
**pull** 93:11 95:7 123:17 150:17 153:4 162:9 217:1 241:22 242:3
**pump** 52:23 182:5 183:8
**purple** 196:7
**purpose** 36:16 57:14 85:24 86:12 86:21 96:16
**purposes** 80:20 159:7
**pursuant** 1:20 28:10,24 29:5
**pushed** 207:16
**put** 13:6 14:9 23:21 129:12

150:7 165:7 166:16 217:1
**putting** 141:3 238:5 241:8

**q**

**qc** 93:5
**qcs** 104:10
**qualified** 123:24
**quality** 104:4 214:25
**quantifiable** 103:8 105:25 118:1,7 227:6
**quantification** 97:6 100:20 118:18 224:11,15
**quantified** 103:16
**quantify** 20:18 96:11 146:12
**quantifying** 126:21 225:6
**quantitation** 100:20 103:24 106:6 118:15 206:6 224:2,8,23 224:25 225:12
**question** 10:7,13 11:1,2 15:7 18:8 18:11,12 24:4,16 27:19 34:9 46:12 46:13 51:2 56:20 60:19 61:11,13 75:13 82:15 83:15 102:2 112:8,11,22 124:7 132:16 149:2,3,22 157:7 161:18 173:1 177:22 186:4 187:12,16 189:8 210:1,7,10 220:18 228:15
**questioned** 75:23 151:14
**questions** 10:6,9 14:21 15:2 47:18 58:8 86:18 104:24 205:10 236:21 237:11 251:8,11
**quick** 43:11 73:8 92:17 102:24 109:24 124:20 148:15 193:14 217:2
**quite** 73:15 78:7 210:4
**quote** 75:24 111:13

**r**

**r** 2:1,4 3:1 4:1,20 5:1 6:1 7:1 144:1
**racist** 32:9
**raised** 94:12 161:19
**raising** 95:4
**ramping** 19:12
**ran** 95:19 104:4
**randomized** 66:25 221:19,22
**range** 19:18 54:19 155:6 161:3,8 172:9 181:22 184:18 188:4,6 193:23 194:22 200:14 202:7 227:12 250:3
**ranged** 104:1
**ranging** 162:19 165:11
**ranitidine** 1:4,12 12:20 13:19 14:13 16:4 17:12,19 18:2,17,19,24 20:4 20:8,13,18 21:19 22:16 29:24 31:17 35:5 37:9,14 39:2 39:13,18 40:6,15 40:18 41:6,19 43:1,4,25 44:9,21 45:21 46:4,16 47:8 48:12 49:4 49:11 50:12 51:7 51:16,23 52:15,19 53:12,18 54:7,11 54:20,22 55:3 57:13 58:5,16,22 59:2,14 60:15 61:22 62:9,11 64:25 65:6,20 66:5,24 67:19 68:11 69:3,4,8,13 69:15,18,18,19,20 69:22 70:1,2,9 71:13,20,25 72:4,9 72:10,13,21 78:21 79:1 80:17 86:13 87:14 88:25 89:6 89:9 90:6,21 91:20 93:24 95:14 95:21,22 101:10 105:3,13,18 106:1 106:16 107:21 109:2 113:2,20 114:6,13 115:3,8 115:12 116:8,14 117:13,18 118:25 119:2 131:11 134:6,12,23 136:12 138:8 140:1,9,19 141:15 142:3 146:2,14,23 147:4,8,12,16,21 148:23 150:1,7,21 154:3,17,21 155:5 156:19,24 158:5 158:11,19 159:1 159:25 160:19 168:5 169:7 170:10,23 171:5,9 172:8 176:2,7 178:14 180:5,11 180:14 187:17 188:1,23 189:23 190:8 191:7 192:9 192:17 193:18,20 193:25 197:3 198:22 199:3,5,17 202:1,16 211:7,17 211:25 212:7,15 212:20 213:18 214:19 215:19,25 216:16 217:10,22 218:3,9,14 219:3 219:12,18 220:4 220:14,16 221:4 221:21 222:3,13 223:3,17 225:19 226:1,13,21 227:17,22 228:8 228:10,24 229:8 230:21 231:20 232:2,16,25 233:16 234:5,9 238:1,6,19 239:7 242:20 243:1 244:3,13 245:14 245:22 246:15,24 247:4 248:10,11 248:22 250:9 253:16
**rapidly** 19:15 191:3
**rarely** 186:25
**rate** 189:25

**ratio** 52:18 55:5,9 55:13 58:22 59:3 64:7,10 227:18
**rationale** 148:13
**rationales** 208:1
**ratios** 54:20 58:15 59:14 60:16 160:20
**rats** 120:6,7,8,19
**raw** 37:8,13,22 38:9
**reach** 79:22
**reached** 127:10
**reaches** 127:16
**react** 61:22
**reactant** 42:6
**reaction** 27:12 48:6,11 54:21 57:8 62:10 159:25 176:2,6 188:14 189:25 191:25 197:17 207:20 219:22 220:5
**reactions** 53:17 191:20
**reactive** 41:22 155:12
**reacts** 48:8
**read** 24:15 41:24 70:15 72:18 86:5 86:7 87:2 93:8,18 103:11 104:13 113:5,6 124:4,9 136:8,19 140:21 141:18 146:19 149:1 182:7,8 183:13 184:16 185:8 187:22 188:7,8,19 189:2 189:10 190:5 194:3,4 199:7 201:3 209:6 210:9 210:12 213:22 217:14 219:25 229:24 231:22,23 232:8 238:15 239:17 244:8 245:17 248:7,25 249:1
**readers** 61:1
**reading** 172:17 175:4 195:13
**reads** 124:8 180:3
**ready** 107:15 144:11 251:13
**reagents** 191:23 197:12
**real** 43:11 90:1 92:16 102:23 109:24 124:20 148:15 193:13 217:2
**really** 23:15,15 66:15 71:16 81:14 127:11 176:8 177:13 251:7,7
**rearrange** 19:1
**rearrangement** 219:19 220:3,22 220:24 221:3,10
**reason** 10:22 20:15 148:8 188:9 231:24 235:10 256:4
**reasonable** 72:18 152:3 215:11
**reasonably** 155:10 221:5
**reasons** 45:17,23 68:12
**reassure** 110:17
**recall** 16:17,19 22:4 26:6,12,24 28:6 29:8 31:19 35:6 37:23 38:1 42:8 47:11,20 48:16 64:21 65:1 66:9,11 76:4 79:3 81:6 87:7 90:22 96:12 98:3 110:25 115:9 128:2,4,6,7 145:12 146:3 151:16,17 152:24 153:3 160:11,17 160:18,22 162:1 164:16 167:23,25 168:22,23 215:21 216:11,13 224:21 239:2 242:16
**receive** 91:24
**received** 98:12 107:20 108:5 145:9 213:20 221:21 222:13 238:11 241:3
**receiving** 145:3
**recess** 73:24 107:8 143:11 204:4 237:3 251:2
**recognized** 74:5
**recollect** 145:16
**recollection** 146:4 218:8
**recommendation** 214:9
**recommended** 146:14,22 147:3
**recommending** 147:8
**record** 8:2,8 30:14 30:17 32:9 45:25 46:3,14 73:20,22 74:1 77:5 84:25 97:25 98:2 99:2 100:1 102:8 107:4 107:6,10 138:11 143:7,9 144:6 146:25 181:10 197:8 203:19 204:2,6 210:12 237:2,5 251:1,4,20 252:2 255:8
**recorded** 8:10 91:1
**recording** 8:6
**recovery** 71:10 95:16 96:4
**reddy's** 6:19
**redirect** 113:10
**redline** 162:8
**redlining** 164:12 166:12,17
**redo** 74:9
**reevaluated** 147:16 148:23 150:21
**refer** 15:4,8 36:7 46:25 55:20 162:3 173:21
**reference** 47:12,14 137:22 139:1 140:14 146:18 152:20 155:22 213:21
**referenced** 49:22 157:4
**references** 136:6
**referred** 19:13 48:9,22 162:3 205:14 240:14
**referring** 14:17 24:25 53:21 66:6 67:22 76:2 80:21

93:21 94:1 118:3 122:9 149:5 161:24 234:24
**refers** 39:2 151:6
**reflect** 158:21 199:19 201:12
**refresh** 218:7
**regard** 132:10 179:15 189:6
**regarding** 27:11 46:24 47:6 61:7 77:18 89:22 90:4 101:9 105:1,12 136:6,11 152:25 161:25 218:13 238:6,19,25 249:22 250:7
**regardless** 199:25 200:5,7,8
**region** 196:21
**registered** 1:22
**regulatory** 119:23
**rejected** 77:3
**relate** 43:13 56:23
**related** 26:12 190:23 255:10
**relates** 1:6,14 58:14 124:19 195:24
**relating** 12:19 13:19 21:19 22:15 26:14 167:13 175:1
**relation** 149:4
**relationship** 33:14 33:17,24 34:4,16 34:23,25 120:13 121:1,22 177:1 178:12,19
**relationships** 26:3 26:8
**relatively** 236:8
**release** 117:14 239:6,19 241:11 243:18
**released** 78:20
**releasing** 116:15
**relevance** 151:15 151:23 152:1,10 152:14,25 161:16 162:5 180:24 181:5
**relevant** 14:6 53:19 152:19 209:20
**reliability** 118:24
**reliable** 18:1 20:17 21:14 40:12,24 41:8,17 42:12 43:7,14 45:16 46:15 47:6 72:14 74:7 105:4 136:17 232:24 233:14 234:2,7 243:2 244:12
**reliably** 58:5 90:20
**relieve** 98:25 101:19
**relieving** 99:24
**rely** 41:3 43:23 44:7,11 106:14 138:7,13
**relying** 47:5 139:4
**remain** 115:4
**remains** 112:24 113:14,18 114:4 114:12
**remarks** 217:4,7
**remember** 19:17 46:11 47:13 63:25 92:3 240:22
**remind** 24:16 61:11 177:24
**remote** 8:10,20,22
**remotely** 9:18
**removal** 178:9
**remove** 137:21 139:1
**render** 117:5
**rendered** 117:6
**rendition** 113:8
**renew** 177:6
**repeat** 18:12 132:15 135:6 210:2,7,10,18 220:18
**rephrase** 10:15,18 20:6 40:19 89:4 141:2 160:5 177:22 186:18 197:9 225:7
**replicate** 245:24
**replies** 76:9
**report** 198:21 238:10,13 239:5 241:4 247:10,18 249:22,24 254:3
**reported** 21:5 37:8 40:11,16 64:18,24 65:5 72:20 105:3 105:8 109:8 110:23 146:2 147:12,20 192:16 194:23 197:19 199:13 221:13 226:11 227:21 248:9
**reporter** 1:23 8:18 8:24 210:9
**reporting** 8:22 67:16 249:2 256:1
**represent** 9:11 20:3 25:16 38:16 40:17 52:10 60:14 65:10 88:17 115:19 125:7 138:8 139:4,14 166:8,19 170:7 174:1,3,5 175:17 199:16 209:19 247:3 248:15
**representation** 178:4,11
**representations** 238:25
**represented** 9:24
**representing** 195:15 241:13
**represents** 38:23 64:3 82:1 121:25 130:12 196:20 211:19
**reproduce** 245:15
**reproduced** 239:22 240:9
**requests** 14:3 254:10
**required** 197:2 222:18
**research** 5:10 15:18 21:25 26:11 28:16 40:3 46:24 48:5 53:11 78:19 85:6 127:21
**researchers** 173:2
**residual** 231:15
**resolution** 53:16 54:6 154:19 171:6
**resolve** 244:6
**respect** 50:11 80:16 87:4 96:9 107:20 118:25

122:11 123:3 131:21 134:24 166:24 177:16 192:9 193:2 209:3 226:15 242:25
**respond** 93:10,12 97:18 110:9 115:10 152:25
**responded** 14:3
**responding** 80:7 134:24
**responds** 95:12 115:18
**response** 80:5 92:7 95:8 100:5 110:7 110:22 126:15
**responsible** 96:14
**responsive** 14:6
**rest** 132:11
**restriction** 89:21
**result** 111:3 199:2 199:5 207:1 217:10,23 218:4
**resultant** 248:3
**resulted** 239:9
**results** 21:23 28:16 44:7 45:16 46:16 50:11 64:22 87:17 94:2,6 97:22 98:9,19 99:25 102:15,18 102:18 104:12,17 105:1,10 110:12 110:23 117:3,6,7 119:10 127:20 128:3,7,7 131:23 135:1 137:16,17 138:8,14 141:3 150:13 152:1 155:1 156:19 157:24 161:1,5 169:15,23 172:5 174:4 192:15 193:1,1,6,9 194:6 207:5,12 211:16 216:4 218:14,19 223:25 224:1 226:3,5,21 238:12 239:20 240:7 241:3,13 243:12 243:15,19 244:6 245:16,24 247:6 250:1,2
**resumed** 144:4
**retailer** 5:4
**retained** 35:4 81:4 82:17 83:16,24
**retention** 81:25
**retract** 45:10,13 46:12 98:9 99:18 105:11 137:16
**retracted** 21:12 45:6,18 60:2,20 108:21 136:17 138:3 243:3
**retracting** 13:1 136:22
**retraction** 98:7 117:8 133:7 139:9 140:23 141:3
**retrospect** 116:22
**reveal** 27:2
**revealed** 181:18
**review** 23:5,11 66:14 85:1 181:17 181:18 183:12 185:24,25 186:11 194:24 203:9 204:15 209:6 213:4,17,20 224:18
**reviewed** 66:2 67:8 73:1 117:11 183:16 201:13,19 202:11 205:17 213:2 214:5 224:20
**reviewer** 152:19
**reviewers** 183:5 213:25
**reviewing** 70:16
**revised** 224:24
**revision** 238:4
**richard** 5:11
**rid** 240:1
**right** 9:19 22:5 28:5 30:14 33:21 35:8 37:19 38:10 38:18,19 39:5,8 40:7 45:10 47:21 48:20 49:22 50:22 51:4 52:13,14,21 52:22,24,25 53:6,8 53:23,25 54:2,15 54:16,24 55:6,15 55:17 56:17 57:3 58:11 60:8,10 61:24 64:14,21 65:14 66:15 67:20 68:15 69:9 70:4 74:16 76:22 78:7 82:22 84:22 85:2 85:18,19,20 89:14 91:13 95:10 96:2 97:15,16,19 98:14 98:21 99:7,14 100:5,20 101:1 104:18 106:19,22 108:2,21 109:3 110:8,10,15 112:5 116:16 119:25 120:10 123:14,18 123:22 124:21 126:5,14,19 132:4 132:20 135:19,21 137:3,5,10 138:24 140:4 144:25 145:4 146:7 147:22 150:10 156:25 159:4,8 162:14,24 170:18 172:23 174:16 175:18 176:5 177:8 179:5 180:20 181:7,11 182:21 184:2,8 185:5 186:5 187:10 190:24 193:4 194:11,19 195:7,14,24 196:5 196:10,24 197:13 198:11 203:4 205:18 206:16 210:24 211:1,24 216:25 223:10,14 223:23 225:16 227:5 228:2,6,17 228:19 230:7,16 238:6 241:14 242:13,22 243:13 243:22 244:13,24 248:17,18 249:5
**ring** 66:10
**risk** 107:21 110:14 111:11,13 119:14 119:16,19,21 120:14 121:10,24 122:1,2,7,8,10,11 122:16 123:3,12 123:20 124:23,24 125:3,8,14,20 126:8,22 127:3 128:10,17,23,23

129:23 130:3,5,9 130:13,23 131:6 132:2,10,25 134:14 135:13,16 135:17 183:10 218:20 231:21 232:3,15 233:6
**risks** 129:3
**rmb** 5:11
**road** 7:2 244:7
**roadmap** 204:12
**roberts** 7:13 8:16
**ron** 31:21 34:12 35:2 77:24 78:18 78:18 79:5,14,17 80:7 84:15 90:17 242:5 243:24 245:6 249:18
**room** 9:22,25 23:23
**rose** 155:13
**rosemarie** 3:20 49:13
**rosemarie.bogdan** 3:20
**rosemary** 132:14
**roughly** 239:14
**route** 137:14
**routine** 89:16
**rude** 11:12
**rule** 1:11 40:21
**rules** 9:17
**run** 16:12 103:25
**running** 61:5 245:11
**runs** 93:5 94:10
**rvsr** 247:19
**ryan** 100:10 103:3 103:20 204:25 205:5
**rydstrom** 4:24

**s**

**s** 2:1 3:1 4:1 5:1 6:1,12 7:1 56:5,12 56:15 69:19 144:1 144:1,1 253:5 254:1 256:4
**s.a.** 4:14 5:17,23
**s3** 56:21
**safe** 87:1,6 155:10
**safety** 87:19
**saliva** 91:10
**salt** 50:5
**sample** 18:21,24 19:4 20:8,12,14 38:9 39:13 50:20 57:12 104:9 208:8 208:20,23 248:1,5
**samples** 37:9,23 40:6,15 41:17 72:4 75:4 79:2 80:2 86:22 88:2,7 88:12,17 92:9,11 93:3,16 95:3,20 97:14 103:25 104:4 118:8 146:17 200:15 245:9 246:10 249:23 250:10
**san** 3:8 4:3
**sanderson** 2:18
**sanofi** 5:17,17,17 5:22,22,23
**saw** 113:17 130:1 207:6
**saying** 19:23 23:16 23:18 60:1 68:11 75:5 97:24 99:15 104:19 108:16 114:15 132:19 133:17 134:3 143:4 154:16 190:7,12 220:19 220:21 231:4 243:11 244:21
**says** 55:17 68:25 76:12,19,23 78:17 78:23 80:10,13 85:23 92:25 95:12 95:18,19,24 96:24 101:2 103:4 109:4 109:10 110:2 112:21 116:17,21 124:16 136:1,14 140:9,17 141:8,12 142:8 145:2,5 148:7,19 149:15 149:18,21,25 150:5,15,23 153:23 154:25 155:4 161:10 205:5 206:9 213:12,16 222:2 225:23 226:18 229:5 238:3,7 240:11 241:1 242:19 243:8 244:16 245:3,8 246:22
**scarvie** 5:24
**scastillo** 4:5
**scenario** 220:10
**schachtman** 6:17 6:20
**schachtmanlaw....** 6:20
**schedule** 223:1
**scheduled** 32:25
**scholer** 5:20
**science** 233:19 253:10
**scientific** 18:1,16 77:2 88:23 101:18 102:6 105:17 121:6 159:22 171:23 174:25 175:5,23 176:13 178:5,8 179:11 185:12 209:5,22 238:10
**scientifically** 46:1 138:6
**scientist** 30:7 72:18 97:8
**scientists** 43:22 45:19 183:23
**scope** 22:11
**scoured** 185:12
**screen** 11:6 83:7 110:8 235:23
**screening** 13:25
**screwed** 146:10
**scroll** 163:1,5
**se** 3:12
**sealed** 248:1
**second** 43:8 116:1 129:10 140:5,5 142:17 163:7 164:23 179:14 189:13,15,25 196:19 198:4
**section** 67:12 68:21 85:21,21,23 124:23 154:12 156:12,13,15,18 157:8 158:3,4 161:5 172:6 180:9 182:19,23 183:23 184:4,10 226:10
**sections** 185:4 219:9

**see** 13:9 22:11 37:7 46:23 59:10 59:17 60:12 62:5 62:19 63:11 64:6 67:2 68:1 75:9 79:13 85:9 93:2 95:8,22 100:7 110:1 111:19 112:2,4 115:22 116:1,9,10 122:21 124:19,22,25 125:1,3,12,14 126:1 129:18 132:1 134:3 139:19,20,23,24 140:6,11,12,15 141:5 142:7 144:18 153:10 155:21 156:12,16 156:23 157:9 161:11 163:6,13 163:14 166:17 170:13 171:11,22 172:18 174:17 182:16,17 187:8 189:19 192:19 193:6 194:12 195:6 196:12 200:4 211:16 224:1 226:17 235:12,13,14,15 235:16,17,18,19 235:21 236:1,19 236:20 237:18 238:3 239:24 240:4 241:1 250:5 250:6
**seeing** 51:19 56:15 70:19 129:18 222:20
**seen** 13:12 216:19
**selden** 7:4 9:24 11:18 18:7 23:5 23:10,19,24 73:12 75:8 89:1 101:22 107:1 109:14 143:5 159:14 172:24 182:14 187:5 203:20 209:25 210:6,13 210:19 250:24
**sell** 16:16
**send** 28:23 205:24 247:20
**sends** 247:17
**sense** 16:2 29:15 49:5 51:11 71:3 78:1 166:1 173:2 191:20 209:12
**sensitive** 97:1 104:16 224:10
**sensitivity** 104:11
**sent** 17:7 22:13 25:2,7 28:14 32:23 90:14 205:18 213:15 245:10 247:8,10
**sentence** 112:12 163:7 164:2 189:13,18 190:14 196:19 198:5,7 199:25 200:4 229:15 246:23
**sentences** 68:1
**separate** 189:24
**separated** 19:2
**separately** 140:19
**separation** 18:23
**september** 108:7 108:12 110:10,22 115:20 119:5
**sequences** 221:20
**seriously** 124:3
**services** 5:17,23 6:4 25:23 27:21
**set** 99:2 102:7 245:4 255:7,14
**seven** 103:14 106:8 108:16 109:7 111:9 118:9 133:18 147:21
**severe** 76:22 77:18
**sewage** 36:2,8,19 41:23 42:22,23,25 43:19
**sex** 125:19
**sgf** 14:23 172:9
**shaded** 196:17,20
**share** 100:25 101:4,14
**shared** 101:11,19 102:7
**sharing** 83:7 235:23
**shb.com** 6:12,13 6:14
**shebang** 196:15
**sheehan** 6:11 9:7 9:11 13:5 16:24 22:20 23:8,13 24:5 25:10 32:15 56:3,10 60:8 73:17 74:4 75:11 89:3 106:19 107:3 107:13 113:15 114:9,18 124:2 132:13 137:2,5 142:20 143:2,6 144:10 155:19 164:24 165:2 168:13 177:10 203:16,22 204:9 210:3,8 235:25 236:19 237:8 247:14 250:17 251:5,21 253:3
**sheehy** 213:9,15
**sheet** 256:1
**shift** 136:3
**shifted** 136:13
**shook** 6:8
**shoreline** 2:15
**short** 106:22 107:14 203:18 204:11 236:20,24 250:18
**show** 31:5 62:25 63:1 113:10,13 129:1 155:16 157:24 162:7 168:17 190:21 194:21 195:18 196:3,7 202:15
**showed** 102:14 113:23 158:4
**shower** 36:10
**showing** 66:22 158:9 170:22 177:16
**shown** 132:12 192:14
**shows** 58:19 97:25 157:21 159:24 176:5 191:1 197:1
**sic** 114:3 155:23
**side** 15:20 29:10 52:23 53:8 54:16 187:10 219:23 231:9,9
**sign** 27:4
**signal** 232:1
**signals** 231:17

**signature** 255:17
**signed** 22:6 25:18
**significance** 75:24
**significant** 76:20 112:25 113:18 114:4,12 164:5 177:25 212:5 225:18 226:12 233:2 234:3 244:5
**significantly** 228:22 248:4
**signing** 29:11
**silence** 8:4
**similar** 102:12 159:11,17 162:25
**similarly** 15:1 104:4
**simple** 123:11
**simply** 37:18 38:14 52:9 55:5 127:16 140:24 220:14
**simulated** 14:21 14:24 148:2,3,4 149:19,23 150:2,7 154:19 155:6 156:19 158:6 159:2 163:10 165:21 170:12 171:8 175:20 180:5,16 187:19 188:1,24 193:18 196:22 199:4,6 211:8,21,25 212:8 239:21 240:8
**simultaneously** 95:13
**single** 112:16
**sink** 36:9
**sites** 125:4
**sitting** 147:6 201:16
**situation** 169:22
**six** 63:24 183:11 237:6
**slide** 139:15,21
**slightly** 64:8,9 72:5
**sloan** 33:11 146:1
**slow** 191:25
**slurry** 248:3
**smokers** 130:19 130:25
**smoking** 110:15 116:6 127:1 130:10,13 131:1 132:10
**smoother** 10:10
**snapshot** 65:23
**society** 122:22 123:2,19 124:13 130:2 253:25
**society's** 130:17
**sodium** 51:4,15,21 52:18 58:15 60:15 60:21 63:13 64:12 148:5 150:3,9 153:1 156:20 158:6 159:25 165:16,23 166:25 168:4 169:6 173:9 178:13 211:22 212:9,14
**solution** 51:17,18 52:2,8 57:9
**solvent** 148:1,2 149:14,16
**somebody** 23:9 82:12 83:17 108:15 134:25 142:2 151:7 163:20 169:25 175:4 226:22
**somebody's** 126:23 130:4
**someone's** 130:6
**somewhat** 173:1
**soon** 79:24
**sopanha** 2:18
**sophia** 4:5
**sorry** 23:8,13 24:2 49:12 57:18 83:2 83:5,14 99:4 101:24 108:10 114:14 125:23 136:2 155:17 209:25 210:4,16 211:13 221:8 233:23
**sort** 13:23,25 19:22 24:10 62:21 129:19 194:20 196:15
**sorts** 90:12
**sound** 38:18 52:12 65:14 83:13 248:16
**sounds** 38:19 52:14 83:8 146:5 152:3 248:18
**sources** 36:7
**south** 2:15 3:2 5:7 7:7
**southern** 1:1 8:14
**spalding** 4:8,18 7:12
**speak** 20:19 23:20 145:14 169:22 246:7
**speaking** 11:11 114:21 132:14 177:12
**speaks** 244:18
**special** 1:11
**specific** 13:22 26:23 41:16 42:8 45:15 47:12,14 50:4 58:4 110:25 123:5 169:22 173:5 182:6 231:20 232:3,15 240:22 246:9
**specifically** 15:23 16:5 58:8 93:4 95:21 147:3 168:23 182:17
**spectrometry** 15:3 15:5,9 17:20 18:15 19:6 20:2 39:8 53:16 146:15 154:19 171:7 219:11 247:3
**speculate** 127:11 233:19
**speculation** 26:20 30:25 31:12 32:7 34:19,21 49:15,17 50:17 72:24 81:20 81:22 82:4,24 87:22 105:21 106:3 109:16 117:16 120:21 122:4 126:12 127:16 133:4 135:3 138:11 142:5 153:21 163:23 164:15 167:4,18 173:13 175:12 176:19 179:13 185:18 195:5 230:23 232:5 234:14 240:17,19 241:16

241:18 246:17
**speculative** 121:5 138:21 174:9 177:17 179:15 191:13 195:11 232:21
**spike** 224:21
**spoke** 12:22
**square** 2:9 190:3
**stability** 157:21
**standard** 8:3 25:4 72:5 93:5 239:11 239:21 240:8
**standards** 104:1 104:10
**stands** 14:23 67:19 85:1 141:25
**stanford** 13:24 14:2,2,5 15:13 85:15 139:20 140:14,17 141:12 208:4 209:8
**stanford's** 13:21 138:15
**start** 9:17 10:7,9 58:21 79:23 159:19 205:8 213:3
**started** 14:12 19:14 21:17
**starting** 61:23 62:21 94:5 198:1
**starts** 59:14 60:21 91:23
**state** 1:9,24 85:25 86:11 112:12,13 123:16 124:13 127:6 171:4,13 183:3 219:15 227:4,16 228:19 229:16 255:4
**statement** 161:11 165:20
**statements** 104:22
**states** 1:1 89:15 103:22 123:19 126:6 131:12 172:7 180:10 181:17 189:22 192:14 193:17 200:8 223:8 239:6 244:2
**statistically** 225:18 226:12
**status** 95:4
**stays** 50:7
**step** 98:8 190:1
**stepping** 48:18
**steps** 189:25
**steve** 3:9
**steven** 3:9
**stomach** 50:1,2,6 50:8 53:19 91:20 140:20 151:3,10 152:11,16 181:23 184:22 240:8
**stomachs** 151:13 152:23 162:5
**stop** 83:7 143:3 235:23
**story** 238:1,5,9
**straight** 99:2 102:8
**streams** 36:19
**street** 2:9 3:2 4:2 4:18,23 5:7,15,21 6:17 7:7
**strike** 65:16 195:10 203:14
**strong** 191:19 243:6
**structure** 220:15 248:21
**studied** 106:9 180:25 181:6,21 200:9 242:20
**studies** 17:12 24:10 33:12 35:10 48:23 49:6 71:17 71:25 72:8 105:4 121:21 181:24 183:11,16 184:12 195:8,13,16 197:11 201:14 202:4,11,25 212:12 223:4 231:17,18 232:9 232:11,24 233:10 233:24 234:15
**study** 17:16 19:11 35:14,15,20,24 36:21 39:7,18 40:7,16 41:3,18 42:21 43:18 44:7 44:11,14 45:2,25 46:13,14 50:10 65:24 66:12,14 67:16,23,23 68:5,8 68:18,19,22 69:1 70:16,22,24 71:12 71:15,23 74:7,9,14 75:15,21,25 76:3 76:13,20,21 77:1,6 77:19 79:24 80:16 80:21,22 82:20,21 83:19 84:9,19 85:14,24 86:1,12 86:15 87:16 89:15 89:21,23 90:4,19 90:25 91:17,23 92:2 93:2,24 94:2 94:7 95:4 97:9,21 98:10,20,25 99:25 101:5,9,14,21 102:4,13,17,20 104:24,25 105:9 105:11,18,24 106:7,14 108:25 109:8 112:14 113:3 117:11,11 117:24 118:3,4 119:7 127:19,25 133:21 135:1 137:10 138:3 140:14,17,25 141:13,24 145:25 162:7 180:1,3 182:10 187:14,25 188:22,23 189:5 192:16 193:7,9,16 193:17 194:6 195:20,25 196:5 196:10 197:19 198:8,23 201:1,7 202:12,12,14,20 203:3,15 205:15 207:5,12 208:6 209:3,24 212:17 213:25 214:4,25 215:6,18 216:3,5 216:11 217:8,17 218:8,15 221:18 222:5 224:3,12 225:5 226:20 227:21 228:4,6 231:14 233:7,25 234:1,19,24 242:22
**stuff** 25:7 57:4 211:2
**sub** 85:21 95:16 96:22

**subheading** 139:25 141:9
**subject** 32:25 71:17 97:14,22 103:7,15 117:25 205:1 223:4
**subjects** 88:9 89:22 90:25 91:5 100:17 103:6,14 106:9 184:21
**submit** 27:14 209:8
**submitted** 27:16 77:1,9 144:24 206:19 209:21
**submitting** 28:7
**subscribed** 252:8 256:21
**subsection** 162:17
**subsequently** 21:17
**substance** 248:22
**suddenly** 191:21
**suffice** 137:15
**sufficient** 94:13
**suggest** 86:16 87:10,12 110:13 141:25 167:5 176:23 178:18 193:25 219:17
**suggested** 135:12 219:8 250:16
**suggesting** 116:12 116:24 152:13 173:8 249:6
**suggests** 127:22 225:1
**suitable** 97:9
**suite** 2:3,10 3:7,18 4:3,19 5:3 6:3,18
**summarize** 28:16
**summary** 28:18 253:16
**superior** 1:9
**supplement** 200:17,25
**supplemental** 196:23
**supplementary** 55:21,23 56:6,13 56:17
**support** 30:23 43:24 46:3 87:16 106:14 171:19,24 172:13 218:24 234:8
**supported** 174:10
**supporting** 56:22 87:19 233:6
**supports** 30:22
**supposition** 84:1
**supraphysiologic** 148:20 212:13
**sure** 11:15,22 23:7 28:22 56:4 117:20 119:8 129:15 136:4 164:16 195:1 210:8,10 251:21
**surely** 76:16 113:10
**surprise** 72:12
**surprised** 81:8
**surprising** 71:6
**surrounding** 173:23
**suspect** 10:15 236:23 251:16
**suspected** 141:17 248:23
**suspects** 140:18
**swear** 9:1
**swearing** 8:23
**switch** 35:9 73:6 106:20 107:17 179:20 191:21
**sworn** 9:5 252:8 255:7 256:21
**system** 236:11 245:12

**t**

**t** 9:3 59:18 60:20 144:1,3 253:5 254:1
**table** 53:22 54:1,3 54:4,5,12 55:21,24 56:6,13,14,18,21 70:23 147:19,20 149:11 156:3,8,13 159:23 162:16,23 164:5
**tablet** 36:23 147:25 148:1 149:13,16 155:13 247:4
**tablets** 79:22 116:24 133:18 146:2 147:12,16 148:23 150:21 188:1,23 193:18 199:3 245:10
**take** 8:7 10:21,23 11:2 22:10,20 25:11 29:23 35:10 36:11 38:6,21 44:12 50:21 53:25 58:9 59:21 64:15 73:5,8,12 76:6 77:21 79:8 80:4 84:9 92:13 94:14 97:17 98:9 106:21 106:24 107:1 111:24 112:15 115:13 118:20 122:19 135:19 142:20 147:19 148:14 151:7,19 154:10,11 156:3 166:5 169:18 170:2 171:1 179:19,21 184:3,8 185:2 192:13 194:12 197:13,23 203:18 212:23,24 223:23 225:14 235:2 236:20,24 250:18,22
**taken** 1:20 8:11 9:18 73:24 104:8 107:8 108:16 170:21 204:4 237:3 251:2
**takes** 142:2
**talk** 10:4 12:14 17:18 21:10 35:14 53:22 85:22 107:19 123:9 198:4 213:1 235:1
**talked** 12:17 160:11
**talking** 16:11 49:1 130:21,22 161:2,7 177:11 198:8 202:10
**tap** 37:24 38:10
**tech** 7:14
**technical** 11:8 26:25 27:11
**technically** 93:6
**technique** 18:2,16 19:12,25 20:17 41:11 57:21 72:15

**techniques** 19:9 27:13
**technology** 253:11
**tell** 15:16 40:20 64:4 111:10 142:23 207:23
**telling** 75:3,14 97:19 104:15 207:20 230:10,25 238:17 244:10 245:19 250:8
**tells** 52:25 100:15
**temp** 245:13
**temperature** 19:12,17 147:14 148:10,20,25 149:8 247:2
**temperatures** 18:25 19:5,8,10,16 19:24 149:4 246:13
**ten** 203:20,22
**term** 36:6 173:7
**terminology** 173:3
**terms** 12:8 14:12 15:17 123:11 135:15 151:12 162:5 176:1
**test** 20:2 48:23 50:4,13 79:1 146:23 147:8 148:9
**tested** 149:14 151:5 175:7 192:8 195:19 196:5,9
**testified** 9:5 113:11 169:2 187:1
**testify** 82:8 113:22 123:25
**testimony** 46:7 47:10 49:18 57:25 61:4 63:7 82:10 101:23 111:20 113:9,17 114:1,8 121:17 135:4 160:4 169:10 177:17 187:6 197:8 255:6,9
**testing** 16:14 31:9 47:6 53:22 71:22 96:1,10,17 97:8,13 104:16 116:19,23 118:25 146:2 147:12,21,25 148:1,2,3,4 165:21 242:19 247:1 249:4
**tests** 223:16 239:6 245:9
**texas** 2:16,22 6:3
**text** 12:5 40:23 94:11
**thank** 16:1 27:18 46:23 83:14 112:10 158:3 160:9 165:3 179:19,22 213:17
**thanks** 136:2 211:4 235:3 251:5
**theoretical** 119:18 121:11 122:1,7 126:21 128:16,22 128:25 131:6 132:1 135:16
**thereof** 109:21
**thermal** 219:17 244:3 245:22 246:14
**thermally** 18:19
**thing** 10:25 13:23 14:1 24:11 60:2 231:8
**things** 10:10 28:14 32:13 50:3 177:17
**think** 29:9 32:9 37:2,5 38:5 43:12 50:24 54:25 56:4 60:2,6 68:22 73:11 75:5,20 78:7 90:19 95:9 100:4 102:10 109:23 112:7,24 114:24 116:5 120:9 123:8 126:17 131:1 136:21 138:1 145:6 148:15 179:17 182:20 196:12 197:25 199:21 205:24 206:2,13 207:6,17 211:4 213:4 216:1 216:20,25 227:2 235:22 236:17,17 237:9 239:25 240:1 250:20 251:14
**thinking** 97:5 98:4 158:16
**third** 3:13 69:11 69:12 110:1 189:12 253:7
**thomas** 6:11
**thornburg** 5:2
**thorough** 104:16
**thought** 98:24 111:2 214:11,20 215:5 218:19
**thoughts** 101:1 153:18
**thousand** 155:11
**three** 11:23 12:2 85:14 100:18 107:11 143:10 195:14,16 202:25
**threshold** 63:12 63:17 155:11 168:3,9 169:5 224:11
**throw** 16:24
**thursday** 213:10 249:17
**time** 8:3 9:9 10:24 10:24 11:24 12:1 12:22,25 16:19 17:15 19:11 26:23 27:11 29:11,14 35:3 43:6 50:6 65:23,25 70:19 98:4 110:21 119:6 139:18 154:21 157:9,10,10,14,22 168:14 177:18 208:8,19,21 236:23 242:14,15 242:17 251:6,8,14 251:17 252:4
**timeline** 92:16 111:1 119:8
**times** 11:20,23 38:15 65:12 116:12,25 118:13 135:14 204:16 207:22 209:11,12 209:16 224:9 239:15
**timing** 78:2
**title** 1:11 154:2 170:7 171:2 180:2 205:21

**titled** 180:13
**tjsheehan** 6:12
**today** 10:16 11:17 12:6,15,20 14:22 17:24 112:23 147:6 167:12 201:16 204:17 216:9 251:6,15
**todd** 1:22 8:19 255:3,18
**toilet** 36:8,13 38:3 38:4
**told** 43:12 111:16 238:8
**toledo** 4:20
**tom** 9:10 61:6 114:14 177:15
**tones** 8:5
**top** 25:5 38:8 52:25 53:6,8 56:2 93:11 109:25 115:17 122:17 125:3 144:18 204:23 213:8 247:15
**topics** 10:17 35:9
**total** 51:14 52:2 70:1
**totally** 11:22
**totals** 69:25
**touched** 145:25 204:16
**toxicologist** 114:25
**track** 55:18 214:15
**tracked** 214:12
**tracking** 236:18
**traction** 243:7
**transcript** 111:25 255:8
**transformation** 44:9
**tranter** 5:12
**treatment** 15:22 221:20 222:12,14 227:7,10 229:21 235:7
**tremendous** 15:16
**trend** 177:9
**trial** 67:1 204:15 233:11
**trials** 233:12
**triangles** 195:17 195:23
**trick** 241:9
**tried** 74:9
**tries** 129:3
**true** 23:17 122:2 140:24,25 161:9 171:21 212:21 255:8
**truly** 50:1,18
**trust** 238:24
**truth** 82:12
**try** 10:15,18 23:19 24:12 38:2 83:11
**trying** 23:25 46:11 87:7 92:3 98:3 138:24 241:9
**tube** 48:23 50:4
**tuesday** 84:14 245:5
**turn** 29:21 164:21 191:25
**turned** 27:15
**twelfth** 4:23
**twenty** 183:11
**twice** 109:6 222:4
**two** 16:20,21 27:22 36:22 47:21 74:2 107:7 147:18 157:10 158:14 175:25 183:5 191:17,23 192:3 211:14 216:21 241:8,8 247:23
**type** 13:25 48:11 172:3
**types** 138:16 231:13
**typical** 71:8
**typically** 18:21 19:6 24:12

**u**

**u.s.** 5:17,22 8:13 72:6 123:13 130:18 155:8
**ultimately** 39:16 45:5 98:8
**uncertainty** 71:4 112:14,25 113:19 114:5,12
**unchanged** 71:14 71:20
**unclear** 82:15
**underestimates** 250:4
**underlying** 128:17
**underneath** 140:8 196:13
**understand** 9:23 10:14,19 17:25 18:10 19:23 40:25 42:18 59:25 61:17 61:21 62:21 81:17 83:6,10,21 88:22 89:5 91:24 119:22 151:23,25 160:14 166:20 192:4 245:14 246:23
**understanding** 16:11 18:9,18 28:8 29:4 33:14 33:18 34:3,16 76:25 82:7 88:23 89:7 93:22 111:6 111:8 114:25 119:23 130:16 209:2,7
**understands** 136:15 245:20
**understood** 66:1,1 68:9 71:11,11 82:14 87:15 98:16 135:18,18
**undertake** 13:16 75:21
**undertaking** 22:1
**unequivocally** 113:11
**unimportant** 236:8
**unit** 8:9 73:23 74:2 107:7,11 143:10 144:7 204:3,7 237:6
**united** 1:1 126:6 131:12
**university** 85:15 141:13
**university's** 139:20
**unknown** 140:20
**unknowns** 173:17
**unquote** 111:13
**unreliable** 18:16 41:11 117:7 247:7
**unstable** 18:19 158:20
**unusual** 220:5
**update** 136:2 137:9 205:1

**updated** 136:21 182:1
**upper** 181:22 184:12,18 185:14 186:2 187:2 188:4 188:6 193:23 194:22 201:18 203:7
**urinary** 44:21 65:5 66:24 67:17 69:1 133:25 213:18 217:11,24 218:9,25 223:9,13 225:20 226:3,19 227:23 228:22 229:3,6 234:10,21 242:25
**urine** 21:6 37:8,13 37:22 38:9,23 39:7 40:6,15 41:16 42:8 43:13 44:10 45:2 47:22 64:24 69:14,22 71:14,20,25 79:24 86:23 87:9 88:2 88:17 93:23 94:25 97:14 103:10 105:6 116:7 117:19 118:1,7,11 127:10,16 128:6 133:22 134:18,20 135:14 141:16 207:5,12 209:3 215:24 224:4 225:1,4,10 227:7 229:20 230:10 233:3 234:4
**usa** 4:12
**usda** 85:16
**use** 14:13,22 15:4 15:8 19:7 21:14 23:25 86:16 87:1 87:5,14 105:18 119:12 131:11 134:24 136:12 138:8 148:9 152:2 154:3 173:2 216:16
**useful** 51:12 75:6 75:20 97:20 102:10 168:16 169:3,16,19 170:1 179:18
**users** 98:13,18 99:1 137:18 220:7
**usual** 89:16
**utilize** 251:16
**utilized** 19:25
**utilizing** 20:16

**v**

**vague** 18:7 77:5 89:1,11 159:14 172:24 173:1 174:8
**val** 253:20 254:4
**valid** 71:3 72:3 93:25 117:1 119:10 209:20 215:3,14
**validate** 44:8 121:21 243:14 245:23
**validated** 225:9 243:11,18
**validity** 30:13
**valisure** 16:8,10 17:18 20:25 21:19 22:4,15,18 24:20 25:25 28:3,9 29:7 33:1 34:24 116:12 139:15,21 142:8 145:19,22 166:9 167:1 178:25 180:19 237:25 238:18 239:13 242:19 243:11,19 244:11 249:3
**valisure's** 116:23 239:7,20 240:7
**valsartan** 26:9,12 239:12 245:21
**value** 135:17
**values** 119:13,18 121:11,25 132:23 196:24 200:17 201:13
**variable** 163:9 171:14
**variations** 154:4
**varies** 65:25
**variety** 182:13
**various** 60:15 129:3 148:5 156:10 183:19 185:2,4 197:6,11
**vary** 19:8 125:18
**varying** 154:20 160:19 171:8
**verification** 238:12 241:3
**verified** 239:22 240:9
**veritext** 8:17,19 256:1
**version** 60:20 166:16 174:18 175:19 224:20
**versus** 59:13 64:18 87:11
**vial** 248:1
**video** 8:6,10,20
**videoconference** 1:21
**videographer** 7:13 8:1,18 73:21,25 107:5,9 143:8 144:5 204:1,5 237:1,4 250:25 251:3 252:1
**videotaped** 1:19 112:1
**viewing** 49:5
**violation** 208:2,15
**violations** 207:15
**vitro** 47:23 48:19 49:2,9 50:10 53:19 54:18 151:24 153:2 160:17 180:1,3 187:25 192:22 193:1,1,17 194:7 197:3 199:11 201:23 204:13 211:6 212:12 216:9,19 233:10
**vivo** 180:12
**volume** 19:13 54:21 134:1 135:14
**volunteer** 93:2 94:9 118:16
**volunteers** 36:22 92:12 118:15 141:14

**w**

**w** 9:3 144:3
**waive** 8:21
**walk** 74:16 129:13
**want** 24:9,12 28:21 30:8,13 35:14 37:4 38:12 49:5 50:20 51:10 51:11 58:7,12 63:4 64:14,16

66:15 73:8,9,18 74:16 78:1 82:8 84:5 85:22 92:15 100:6 104:23 106:20,20,21,23 109:22,24 111:19 113:9 115:15 119:22 122:21 126:14 129:13 136:25 138:15 139:3 141:23 143:2 145:3,7 152:9,20 155:1 162:6 163:21 164:18 169:22 170:3 187:9 190:17 193:10,11 194:12 198:4 204:12 205:25 209:11 213:1 216:23 217:3 222:8,23 231:8 234:18 235:1 236:22 245:15 246:8 250:8 251:12

**wanted** 17:18 26:15,25 27:2,4 28:15 29:15 52:8 60:3 78:17 81:17 88:22 89:5 99:23 99:25 137:9 148:8

**wants** 245:23

**warranted** 182:2

**washington** 3:13 3:18 4:23

**waste** 141:6

**wastewater** 15:22 42:17 235:7

**wasting** 177:18

**water** 15:22 36:7,8 36:9,10,10,13 37:24 38:10 42:16 42:22,25 43:19 51:6,22 212:2 224:22 235:6

**waters** 15:24

**watson** 2:17 81:13 87:25 109:19 121:19 135:8 138:22 202:23 241:19 246:20

**way** 10:19 56:11 62:15,15 76:11 81:15 82:8,16 84:3,25 100:24 112:9 127:19 128:24 160:14 163:11 198:7 244:12 255:12

**ways** 135:10

**wc.com** 4:25

**we've** 54:24 129:22 216:18 245:9,11 251:14

**webex** 32:25

**website** 139:16,22 141:4,24 142:13

**week** 137:14

**weekend** 79:23

**weiss** 2:8

**went** 13:24 93:6 95:25 166:15

**west** 5:21

**whereof** 255:14

**whichever** 82:8

**white** 236:10

**whoops** 197:25

**wide** 243:7

**widely** 86:13

**wife** 12:7,12

**william** 1:19 8:10 252:6 256:3,20

**williams** 4:22

**wilshire** 2:2

**winkelmayer** 213:14

**wisner** 2:4 26:19 30:24 31:11 32:6 34:18 44:2 46:6 46:18 47:9 49:12 49:15 57:16,24 58:24 59:6,16 61:3 63:20 73:19 77:4 81:10,19 82:5 87:23 109:15 113:7,21 114:7,14 114:20 118:12 120:20 121:7,14 121:16 122:3 123:23 124:6 126:11 133:3 134:8,15 135:2 138:10,18 142:4 142:14 146:24 153:20 159:15 160:3 161:22 163:22 164:14 167:3,15,18 168:11 169:9 173:12 174:7 175:11 176:17 177:6,15 178:15 179:12 185:17 186:14 189:4 191:10 195:4,9 197:7 199:18 202:19 203:13 230:22 232:4,19 233:17 234:12,25 235:22 240:16 241:15 244:14 246:5,18 250:13 251:19

**withdraw** 73:4 102:1

**withdrawal** 47:16 208:25

**witness** 7:3 8:23 9:1,4 23:7,11 24:2 24:2 73:14 83:11 113:13 114:2 123:24 132:8 142:24 195:10 203:25 233:19 251:14 253:2 255:6,9,14 256:3

**wolfgang** 33:4 213:14

**women** 125:20 126:1,7

**wondering** 71:19 79:24

**word** 74:8 166:10 166:15 253:20

**words** 36:9 40:14 106:13 111:2 128:15 192:25 197:15

**work** 13:19 16:4 22:14 23:3,4 26:14 27:1 28:9 28:13,19,21,24 29:4,24 31:16 81:18 128:25 129:9 133:8 205:13

**worked** 12:18 16:3 17:11 74:12

**working** 21:18 22:18 210:17

**world** 90:1
**worry** 110:18
**wrap** 104:23
**write** 90:18 99:13 118:19,22 119:11 124:1 222:10 231:12
**writer** 174:13
**writes** 100:10
**writing** 75:1
**wrote** 76:17,18 108:15 111:15 112:18 137:8 217:6

**x**

**x** 1:3,8,10,15 253:1,5 254:1
**x's** 59:11 60:14

**y**

**yeah** 24:6,6,6 35:23 47:13 52:23 72:9 78:8 132:19 155:19 173:14 193:15 200:7,7 227:3 228:16 240:2
**year** 126:24 128:11 141:9 161:24 205:8
**years** 16:20,21 27:22 28:14 63:24 108:17 109:7 111:9 128:18 131:8,17 132:3,24 133:19,19
**yellow** 49:23 211:2
**yesterday** 139:17 139:18
**yield** 154:17 155:13 171:5
**yields** 159:10
**yikes** 93:13
**yon** 3:14
**york** 1:24 3:19 4:9 4:9 5:21,21 6:10 6:10,18,18 8:17 255:4 256:1

**z**

**zantac** 1:4 8:12 14:13 21:7,13 26:4,18 36:23 38:23 42:15 43:14 81:5 82:18 86:12 86:24 87:11,12,17 88:5 98:13,17 99:1,24 105:7 108:16 109:6 111:3,11,18 116:23 127:8 131:16,20 133:10 137:18 149:19,22 151:7 152:2 160:16 218:21 248:3,21 256:2
**zeng** 17:8,10,14 21:2 22:13,14 45:9 192:16
**zero** 59:14 60:21 60:24 61:14,24 62:12 64:3,4,5,8,9 134:14,24 159:12 160:13,23 162:19 165:22 168:6,7 179:7 222:13
**zoom** 1:21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MDL NO. 2924
20-MD-2924
-----------------------------------x
IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY
LITIGATION
THIS DOCUMENT RELATES TO:
ALL CASES
-----------------------------------x
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF ALAMEDA
CCP NO. 5150
-----------------------------------x
COORDINATION PROCEEDING SPECIAL TITLE
(Rule 3.550)

RANITIDINE PRODUCTS CASES

THIS DOCUMENT RELATES TO:
ALL ACTIONS
-----------------------------------x

November 10, 2021
9:03 a.m.

VOLUME II

Videotaped Deposition of WILLIAM A. MITCH, Ph.D., taken by Plaintiffs, pursuant to Notice, held via Zoom videoconference, before Todd DeSimone, a Registered Professional Reporter and Notary Public of the State of New York.

A P P E A R A N C E S :

BAUM, HEDLUND, ARISTEI & GOLDMAN, PC
10940 Wilshire Boulevard
Suite 1600
Los Angeles, California 90024
Attorneys for Plaintiffs
BY: R. BRENT WISNER, ESQ.
bwisner@baumhedlundlaw.com
ADAM FOSTER, ESQ.
afoster@baumhedlundlaw.com

ANAPOL WEISS LLP
One Logan Square
130 North 18th Street
Suite 1600
Philadelphia, Pennsylvania 19103
Attorneys for Plaintiffs
BY: CATELYN McDONOUGH, ESQ.
cmcdonough@anapolweiss.com
TRACY FINKEN MAGNOTTA, ESQ.
tfinken@anapolweiss.com

HILLIARD MARTINEZ GONZALES LLP
719 South Shoreline Boulevard
Corpus Christi, Texas 78401
Attorneys for Plaintiffs
BY: MICHAEL WATSON, ESQ.
mwatson@hmglawfirm.com

MATTHEWS & ASSOCIATES
16518 East Kingscoate Drive
Crosby, Texas 77532
Attorneys for Plaintiffs
BY: CANDICE McNABB, ESQ.
cmcnabb@matthewslawfirm.com

A P P E A R A N C E S: (Continued)

MOORE LAW GROUP PLLC
1473 South 4th Street
Louisville, Kentucky 40208
Attorneys for Plaintiffs
BY: JENNIFER MOORE, ESQ.
jennifer@moorelawgroup.com

BRADY LAW GROUP
One Embarcadero Center
Suite 500
San Francisco, California 94111
Attorneys for Plaintiffs
BY: STEVEN J. BRADY, ESQ.
steve@bradylawgroup.com

MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington D.C. 20032
Attorneys for Plaintiffs
BY: JE YON JUNG, ESQ.
jjung@maylightfootlaw.com

MARTIN, HARDING & MAZZOTTI LLP
111 Washington Avenue
Suite 750
Albany, New York 12210
Attorneys for Plaintiffs
BY: ROSEMARIE BOGDAN, ESQ.
rosemarie.bogdan@1800LAW1010.com
NICOLE HADDADNIA, ESQ.
nicole.haddadnia@1800LAW1010.com

A P P E A R A N C E S: (Continued)

CHAFFIN LUHANA LLP
600 Third Avenue
12th Floor
New York, New York 10016
Attorneys for Plaintiffs
BY: ROOPAL P. LUHANA, ESQ.
luhana@chaffinluhana.com

DOWNEY BRAND, LLP
455 Market Street
Suite 1500
San Francisco, California 94105
Attorneys for Defendant Grocery Outlet
BY: SOPHIA CASTILLO, ESQ.
scastillo@downeybrand.com

KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, New York 10036-2601
Attorneys for Defendants Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, Boehringer Ingelheim USA Corporation, Boehringer Ingelheim International GmbH, Boehringer Ingelheim Promeco, S.A. de C.V.
BY: EVA CANAAN, ESQ.
ecanaan@kslaw.com

- and -

KING & SPALDING LLP
1180 Peachtree Street, NE
Suite 1600
Atlanta, Georgia 30309
BY: CARMEN R. TOLEDO, ESQ.
ctoledo@kslaw.com

A P P E A R A N C E S: (Continued)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Attorneys for Defendant Pfizer Inc.
BY: JESSICA RYDSTROM, ESQ.
jrydstrom@wc.com

BARNES & THORNBURG LLP
One Marina Park Drive
Suite 1530
Boston, Massachusetts 02210
Attorneys for Retailer Defendants
BY: ALISON CASEY, ESQ.
alison.casey@btlaw.com

GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street
20th Floor
Baltimore, Maryland 21202
Attorneys for Defendants Perrigo Company PLC and Perrigo Research & Development Company
BY: MATTHEW TRANTER, ESQ.
mtranter@gdldlaw.com

DLA PIPER LLP (US)
33 Arch Street
26th Floor
Boston, Massachusetts 02110-1447
Attorneys for Defendants Chattem, Inc., Sanofi-Aventis U.S. LLC, Sanofi US Services Inc. and Sanofi S.A.
BY: KATIE INSOGNA, ESQ.
katie.insogna@dlapiper.com

A P P E A R A N C E S: (Continued)

ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Attorneys for Defendants Chattem, Inc., Sanofi-Aventis U.S. LLC, Sanofi US Services Inc. and Sanofi S.A.
BY: AARON H. LEVINE, ESQ.
aaron.levine@arnoldporter.com
MATTHEW SCARVIE, ESQ.
matthew.scarvie@arnoldporter.com

BOWMAN AND BROOKE, LLP
2901 Via Fortuna Drive
Suite 500
Austin, Texas 78746
Attorneys for Defendant Pantheon Manufacturing Services LLC
BY: DAVID DUKE, ESQ.
david.duke@bowmanandbrooke.com

SHOOK, HARDY & BACON L.L.P
1325 Avenue of the Americas
28th Floor
New York, New York 10019
Attorneys for Defendant GlaxoSmithKline
BY: THOMAS J. SHEEHAN, ESQ.
tjsheehan@shb.com
PEIYUANN GUO, ESQ.
pguo@shb.com

NATHAN A. SCHACHTMAN, ESQ., P.C.
325 East 79th Street
Suite 16-D
New York, New York 10075
Attorneys for Defendant Dr. Reddy's Laboratories
BY: NATHAN A. SCHACHTMAN, ESQ.
nathan@schachtmanlaw.com

A P P E A R A N C E S: (Continued)

JONES DAY
1755 Embarcadero Road
Palo Alto, California 94303
Attorneys for The Witness
BY: BRIAN SELDEN, ESQ.
bgselden@jonesday.com

- and -

JONES DAY
555 South Flower Street
Los Angeles, California 90071
BY: GLENN KRINSKY, ESQ.
glkrinsky@jonesday.com

ALSO PRESENT:

NICOLE COSTELLO, King & Spalding
JAMES ROBERTS, Videographer
ALI KRAL, Concierge Tech

THE VIDEOGRAPHER: Good morning. We are going on the record at approximately 9:03 a.m. Pacific standard time on November 10th, 2021. Please silence any cell phones, computer tones and other electronic devices. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the remote video-recorded deposition of William A. Mitch, Ph.D., taken by counsel for the plaintiff in the matter of Zantac Products Liability Litigation, filed in the U.S. District Court, Southern District of Florida, MDL number 2924.

My name is Jim Roberts here in association with Veritext New York. I'm the videographer. The court reporter is Todd DeSimone also with Veritext.

All counsel consent to this remote video arrangement and waive objections to this manner of reporting and to the remote swearing in of the witness. The court reporter has noted counsel's appearances and will now please reswear the

witness.

* * *

W I L L I A M A. M I T C H, Ph.D., called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY MS. BOGDAN:

Q. Good morning, Dr. Mitch. My name is Rosemary Bogdan and I represent the plaintiffs in the multidistrict litigation that has been commenced with regard to ranitidine. I'm going to be continuing to ask you questions today and I would just ask that if for any reason you don't understand the question that I pose, that you let me know that so I have the opportunity to rephrase it. Okay?

A. Yes.

Q. And if you don't indicate that you don't understand my question, I'm going to assume that you understood it, fair?

A. Fair.

Q. Also, we are taking this obviously by Zoom and there is a little bit dealing with the remote nature of it.

There is a little bit of a delay on my end between when I see someone moving their mouth and when I actually hear, so I'm going to try to make a real effort not to start questioning another question before you finish, but if that becomes a problem, just let me know and I'll make sure I correct it, all right?

A. That's fine.

MR. SELDEN: Rosemary, can I make just a couple of preliminary statements before you get going?

MS. BOGDAN: Sure.

MR. SELDEN: Just really quickly, because we didn't introduce the JCCP case, I wanted to make it clear that this deposition is Dr. Mitch's testimony in two cases by agreement of the parties.

Second, the parties and the witness have agreed that today's testimony will be six hours.

And, third, I wanted to just identify on the record that a number of the exhibits that were shared at yesterday's version -- or yesterday's portion of the

deposition and will likely be used today have been designated as confidential by Stanford, by Dr. Mitch, and we expect that both the exhibits and any testimony about them would be treated as confidential under the respective protective orders. Thanks.

MS. BOGDAN: You're welcome.

THE VIDEOGRAPHER: This is the videographer. Are you able to move the microphone a little closer to yourself? You sound a little soft. The volume is down.

THE WITNESS: Yes, how's that?

MS. BOGDAN: Does that work for everybody?

MR. WISNER: It is definitely much worse than yesterday.

THE VIDEOGRAPHER: Yeah, it is not as good as yesterday for whatever reason. I'm not sure why.

MR. WISNER: Let's go off the record.

THE VIDEOGRAPHER: Off the record, 9:07 a.m.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record 9:21 a.m. Okay, you may proceed.

BY MS. BOGDAN:

Q. Okay, Dr. Mitch, can you hear me? Are we all set with this IT issue?

A. Hopefully.

Q. Okay. What department do you work for at Stanford?

A. Civil and Environmental Engineering.

Q. And what generally do you study as a civil and environmental engineer?

A. I study water and wastewater treatment, and in particular chemical contaminants in the water.

Q. Now, have you studied NDMA in the course of your work as a professor and doing research?

A. Yes.

Q. All right. And do you have a long history of studying NDMA?

A. I have studied NDMA since 2000.

Q. What led you to study NDMA in the first place?

A. It was my dissertation at the University of California Berkeley, and the project had to do with the detection of NDMA in Orange County water districts potable reuse system. Potable reuse is recycling municipal wastewater as a drinking water supply.

Q. And why was that issue of NDMA in the drinking water system brought to your attention?

A. Well, it was brought to my advisor's attention. He obtained a project. I believe at the time it was called the Water Research Foundation, or perhaps it was the Water Reuse Association, had a project to try to determine where the NDMA was coming from.

Q. And why was there a concern as to NDMA in the water supply?

A. The background to why -- where Orange County noticed it is that in the late 1990s there was an incident where various rocket fuel producers had been generating plumes, groundwater plumes, associated with unsymmetrical

dimethylhydrazine, which is rocket fuel essentially, and that oxidizes in groundwater to NDMA, and so it was detected in several drinking water wells.

And then, further, California decided to do a survey of drinking water wells around the state, because there is a lot of defense industry sites around the state, but it began to be noticed in places where there was no necessary association with rocket fuel, and upon further research they determined that it was forming during the wastewater disinfection step. So that was the initiation of our project to try to understand why, what were the nature of the reactions that would generate NDMA during disinfection.

Q. And why is there an interest in knowing the amount of NDMA in the water supply?

A. NDMA is a potential carcinogen and so there are concerns about it showing up in potable water.

Q. What are the characteristics of NDMA?

A. NDMA is low molecular weight, it weighs about 70 grams per mole. It is a very polar molecule. It tends to be neutral at environmental pH.

Q. Is NDMA known to be a carcinogen?

MR. SHEEHAN: Objection, vague.

A. It is believed to be a carcinogen. It is hard to ever definitively prove that it is a carcinogen.

(Technical discussion)

MR. WISNER: Can we go off the record?

THE VIDEOGRAPHER: Off the record, 9:26 a.m.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record 9:30 a.m. Okay, you may proceed.

BY MS. BOGDAN:

Q. Is NDMA a carcinogen?

MR. SHEEHAN: Objection, vague.

A. I am not a toxicologist. My understanding is that the World Health Organization considers it a probable human

carcinogen.

Q. What are the characteristics of NDMA that make it a probable human carcinogen?

MR. SHEEHAN: Objection, vague.

A. Again, I am not a toxicologist, but my understanding of the toxicology studies indicate that it is metabolized in the liver to form methyl radical, which can add to DNA and therefore alter DNA.

Q. Is NDMA a known mutagen?

MR. SHEEHAN: Objection, vague.

A. Again, not being a toxicologist, but the alkylation, which is the reaction I was just referring to, the addition of methyl radical to DNA could conceivably alter and therefore change or mutate DNA.

Q. And why is that a concern?

MR. SHEEHAN: Objection, vague.

A. Again, I'm not a toxicologist. My understanding, the complete sequence that leads to cancer is still poorly understood, but one possible pathway is that altering DNA and altering the genetic

code could lead to cancer.
Q. Are you familiar with IARC?
A. IARC did you say?
Q. Yes, IARC.
A. Yes.
Q. And have you read the IARC publication from 1978 with regard to NDMA?
A. I believe there are several IARC publications that deal with nitrosamines. I have read some many, many years ago. I don't necessarily recall a specific one from 1978.
Q. Do you agree that NDMA should be regarded for practical purposes as if it is carcinogenic to humans?
MR. SHEEHAN: Objection.
A. I believe, again, my field is the drinking water field, and we tend to take the precautionary approach, and when you have something that is a potential or probable carcinogen you attempt to limit exposure to the extent possible.
Q. Are there any benefits to exposure to NDMA?
MR. SHEEHAN: Objection, vague.

A. I am not aware of any benefits to exposure to NDMA.

Q. What is NDMA currently used for in the United States?

MR. SHEEHAN: Objection, calls for speculation.

A. I am not aware that NDMA has any commercial uses in the United States. In the 1950s or '60s I believe it was used in France as a precursor to produce rocket fuel, unsymmetrical dimethylhydrazine.

Q. Was the use of NDMA for commercial purposes banned in the United States?

MR. SHEEHAN: Objection, calls for speculation.

A. I am unaware of whether there are specific bans on the commercial use of NDMA.

Q. Is the amount of NDMA in water regulated?

A. I will say it in the following way: The State of California has a notification limit of 10 nanograms per liter for detections of NDMA in drinking

water. Notification limit essentially means that if detected, you need to notify your consumers. It does not necessarily mean that the well or the water supply is taken out of service, but it is often treated by utilities as a de facto regulatory level because when you send consumers a notice that there is NDMA in the water, that tends to generate concerns, so utilities feel the need to address it.

Q. And why when there is more than 10 nanograms per liter in water of NDMA is it a concern?

MR. SHEEHAN: Objection, vague.

A. Well, I guess I need further clarification. Are you essentially asking how was that particular number arrived at?

Q. Not with regard to the 10 nanograms per liter number, but why, if -- you said the State of California has a notification requirement, correct?

A. Correct.

Q. Okay. Why does the State of California have a notification requirement if NDMA exceeds 10 nanograms per liter?

MR. SHEEHAN: Objection, vague.
MR. SELDEN: I will object, calls for speculation. But answer if you can.
A. I'm not privy to the specific decision-making by the regulatory authorities that led to that number, but in general, as I mentioned before, there is an attempt to limit exposure to potential or probable carcinogens in water supplies, and when regulatory levels are set, they do risk calculations of the nature that we discussed previously where you look at theoretical excess lifetime cancer risks and attempt to balance that against other aspects such as feasibility of doing the regulations, cost of the regulations, etc., and 10 nanograms per liter was the level arrived at.
MS. BOGDAN: Could we please pull up Exhibit 27.
(Plaintiffs' Exhibit 27 marked for identification.)
MR. SHEEHAN: Are you doing -- is this 27 that was used yesterday or is

this something -- oh, so it is P-27, I get it.

MS. BOGDAN: Yes.

Q. And, Dr. Mitch, let me know when you can see that exhibit, please.

A. I can see it.

Q. Okay. Do you recognize this article?

A. Yes.

Q. And are you the first named author of the article?

A. Yes, I am.

Q. And what is the title of this article?

A. It is, I'm trying to get your faces out of the way here for a second, N-nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review.

Q. And is NDMA in the drinking water considered a contaminant in water?

A. Yes, it is.

Q. And what is a contaminant?

MR. SHEEHAN: Objection, vague.

Q. As you used it in the title of this review.

A. A contaminant is considered an undesirable constituent of a water.
Q. And when did you write this article?
A. It was published in 2003.
Q. And at that time you were associated with Yale University?
A. At the time I was -- by the time it was published, I was an assistant professor at Yale University. We probably initiated writing it while I was still a graduate student at the University of California Berkeley.
Q. I would like to direct your attention to the abstract which is on the first page of the exhibit, and in particular the first sentence, please. Could you read the first sentence that begins "N-nitrosodimethylamine."
A. Yes. "N-nitrosodimethylamine (NDMA) is a member of a family of extremely potent carcinogens, the N-nitrosamines."
Q. Do you agree with that statement that you wrote in this abstract of the article?

A. Yes. If we want to be more specific, it is considered I believe a probable human carcinogen, but we often just refer to it as a potent carcinogen for conciseness.

Q. And, in fact, in this article that you published in 2003, you referred to NDMA as a member of a family of extremely potent carcinogens; isn't that true?

A. That is how I referred to it.

Q. What is your definition of the word "potent"?

A. Potent refers to the concentrations or the -- essentially indicates that lower concentrations are needed to achieve a particular effect relative to other chemicals in a particular category, so, for example, potential carcinogens.

Q. So that means that for an extremely potent carcinogen, you would need less exposure to it to cause cancer than to a carcinogen that was less potent; is that correct?

MR. SHEEHAN: Objection.

A. I would say you would need exposure to lower concentrations.
Q. And when you say lower concentrations, do you mean less of it?
A. Yes.
MR. SHEEHAN: Objection.
Q. And then to direct your attention to the third sentence in that abstract, would you please read that.
A. "However, current concern focuses on NDMA as" -- sorry? "However, current concern" --
Q. It is the third sentence in the abstract which begins with the word "However."
A. Yes, okay. "However, current concern focuses on NDMA as a drinking water contaminant resulting from reactions occurring during chlorination or via direct industrial contamination."
Q. And is that why you had an interest in this subject matter as an environmental engineer?
A. Yes.
Q. Now, directing your attention

to the same page down to the Introduction, the first sentence in the Introduction, could you please read that.

A. "N-nitrosodimethylamine (NDMA) is a member of a family of extremely potent carcinogens, the N-nitrosamines (U.S. EPA, 2002)."

Q. Do you agree with that sentence?

A. Yes, I do, and, again, indicating that when we write these articles, we tend to be concise in the sense that the health authorities might refer to it still as a probable human carcinogen.

Q. But you referred to it as a member of a family of extremely potent carcinogens, correct?

A. I did.

Q. And you cited to the EPA for this, correct?

A. I did.

Q. Okay. And then the next sentence, could you please read that.

A. "Their cancer potencies are

much higher than those of the trihalomethanes."

Q. And in that sentence are you comparing the potency of NDMA to the trihalomethanes?

A. I am.

Q. And is NDMA more potent than the trihalomethanes?

A. According to potency slope factors provided by the U.S. EPA integrated risk information system, they are.

Q. Now, if we can go to the second page of this exhibit, please. And in the first paragraph, about halfway down, it starts "The U.S. EPA established a cleanup level." Do you see that sentence?

A. I do.

Q. What cleanup level did you cite in that sentence?

A. We cited a cleanup level of 0.7 nanograms per liter for NDMA in groundwater.

Q. And are you familiar with different cleanup levels that are established by the EPA for various

chemicals?
MR. SHEEHAN: Objection, vague.
A. I would not necessarily know them off the top of my head, but I am familiar with this particular one for NDMA.
Q. And is that cleanup level -- how would you describe it relative to the other cleanup levels for other chemicals?
MR. SHEEHAN: Objection, vague.
A. Again, I don't necessarily know off the top of my head levels for other specific contaminants, but this is on the low side.
Q. And when you say low side, does that mean there is less of it that is permitted in the groundwater than other chemicals?
A. Yes.
Q. And is that because it is regarded as being a potent carcinogen?
MR. SHEEHAN: Objection, vague.
A. It is regarded as being a potent probable human carcinogen.
Q. Directing your attention to page 391 of your 2003 study, which would be

the next page, please. There we go, perfect. Do you see the section that reads Sources and Occurrence?

A. Yes.

Q. And do you see the sentence that reads "Available data suggests that there are two major pathways for NDMA formation (1) nitrosation, and (2) formation by oxidation of UDMH"?

A. I do see that sentence.

Q. Can you describe the pathway for NDMA formation that is what you noted as number 1, nitrosation?

A. I believe we had it in the article, but the pathway typically involves nitrite under acidic conditions, which essentially means you are dealing with nitrous acid, and two nitrous acid molecules interact, dehydrate, leading to the formation of M2O3, which is a nitrosating agent, which means it transfers NO to amines, such as dimethylamine, to form NDMA.

Q. Is nitrite present in the human stomach?

MR. SHEEHAN: Objection, vague.
A. My understanding, again, not being a gastroenterologist, is that nitrite can occur in food and end up in the human stomach.
Q. And nitrite can be in human saliva?
MR. SHEEHAN: Objection.
A. My understanding is that nitrite can be in human saliva and that there can be enzymes or other pathways in human saliva that can lead to the reduction of nitrate to nitrite in the mouth.
Q. Do you know of any other sources of nitrite in the human body other than in the stomach, which we have already mentioned, and human saliva?
A. My understanding is that within the human body itself, nitric oxide within, say, the bloodstream, can be oxidized to NO2, nitrogen dioxide, and NO, nitric oxide, and NO2 can interact to form N2O3, which is a potential nitrosating agent, and that subsequent decay of the N2O3 can also release nitrite.

Q. Do you know of any other sources of nitrite in the human body?
A. I'm not aware of other ones.
Q. If we could move ahead to page 395, please. I'm directing your attention to the last paragraph on that page. If you could please read that. It begins "Other industrial products."
A. "Other industrial products containing dimethylamine functional groups that could serve as precursors include fungicides such as thiram (tetramethylthiuram disulfide) (IARC, 1978) (Graham et al., 1995), pesticides and herbicides such as 2,4-D, which are formulated as a dimethylamine salt (Fine, 1978; Child et al., 1996), drugs such as ranitidine (IARC, 1978), and amine-containing accelerators for vulcanization of tires (Figure 2)."
Q. Thank you. So in your 2003 article you are citing as a reference IARC 1978 which was the publication I asked you about just a little bit ago, correct?
A. That appears to be correct.

Q. And you were citing to that publication as authoritative in this article, correct?

MR. SHEEHAN: Objection, vague.

A. I am citing it as reference for this statement, yes.

Q. And in particular you are citing it for the statement "Drugs such as ranitidine," correct?

A. That appears to be the reference, yes.

Q. So why is a drug such as ranitidine a precursor to NDMA formation?

MR. SHEEHAN: Objection, assumes facts, vague.

A. What we have found with chloramination, which, again, chloramine is a common disinfectant for drinking water and wastewater supplies, is that chloramines can react with dimethylamine to form NDMA, but they can also react with what we call tertiary amines that have dimethylamine as a functional group and form NDMA, and the structure of ranitidine has such a dimethylamine functional group

so that it could, like other comparable compounds, such as, for example, trimethylamine, react with chloramines to form NDMA.

Q. So chemicals with dimethylamine functional groups are precursors to NDMA formation, correct?

MR. SHEEHAN: Objection, misstates testimony.

A. We certainly see that with chloramination.

Q. And ranitidine has a tertiary amine, correct?

A. I believe it does.

Q. Now, ranitidine has a dimethyl functional group, correct?

There was noise in the background here. So ranitidine has a dimethylamine functional group, correct?

MR. SHEEHAN: Objection, vague.

A. I believe it does, and I would suspect based on that sentence that it is pictured in Figure 2.

Q. Now, in this sentence that is highlighted, is ranitidine the only drug

that is noted?

A. That appears to be the only pharmaceutical that is cited in this sentence.

Q. Is there something about ranitidine as a drug that makes it apparent that it could serve as a precursor to NDMA formation?

MR. SHEEHAN: Objection, vague.

A. Well, as we were just discussing, chemicals that have tertiary amines with dimethylamine as part of the functional group can react with chloramines to form NDMA, and ranitidine appears to have such a functional group.

Q. And if we could turn, please, now to page 396, which is the following page, and if we could look at Figure 2, which Dr. Mitch mentioned in his testimony. Does Figure 2 include ranitidine, Zantac?

A. It does.

Q. And what is that schematic depicting?

A. The structure of ranitidine.

Q. And does that structure that's

depicted in Figure 2 show the diethylamine functional group?

MR. SHEEHAN: Objection.

A. It depicts the dimethylamine functional group.

Q. And where does it show the dimethylamine functional group?

A. It depicts it at the far left of the molecule.

Q. So that would be over where you see the N and the two lines?

A. Exactly.

Q. If we could just highlight that, please, the N and the two lines on the far left of the ranitidine molecule. No, the one below, please, the ranitidine molecule. There we go. And what I would like you to do is just highlight in that molecule that you just highlighted, the N with the two lines on the far left side of the molecule.

Dr. Mitch, if we were together in the room, I would just have you circle it, but we can't, so it makes it a little more difficult. I just need you to

unhighlight it, if you could, and then don't highlight it. Now, with the yellow, you see the N on the far left. You are on the far right. I need you on the far left. The N and those two lines, if you could just draw a yellow box around those two lines there. Perfect.

So now let me ask you the question. Is the yellow box on the ranitidine (Zantac) molecule that is depicted in your study now on the dimethylamine functional group?

A. The yellow box is, yes, highlighting the dimethylamine functional group.

Q. And this is the functional group that allows ranitidine, otherwise known as Zantac, to be a precursor to NDMA, correct?

MR. SHEEHAN: Objection, vague.

A. That is what we believe, yes.

Q. Now, back in 2003 when you published this study, were you contacted by GlaxoSmithKline inquiring about this study and why ranitidine is noted as a precursor

to NDMA formation?

A. Not to my knowledge.

Q. Back in 2003, when you published this study, did you get any inquiry from Pfizer regarding this study and ranitidine being identified as a precursor to NDMA formation?

A. I don't recall any such contact.

Q. If we could please bring up Exhibit 49. Actually -- yes, 49 I believe.

(Plaintiffs' Exhibit 49 marked for identification.)

Q. Are you familiar with this study?

A. I am familiar with it, yes.

Q. And in what context?

A. I likely read it many years ago.

Q. And this study is from 2001; is that correct?

A. I think it is 2011.

Q. Okay, I'm sorry, 2011. And is that noted on the top of this exhibit?

A. Yes.

Q. Okay. And why would you have read this particular study?

A. Much of our research, which, again, is focused on the formation of what we call disinfection byproducts, which includes NDMA, is trying to determine how they form during disinfection so that ideally you can modify the disinfection process to minimize their formation while still getting the benefits of disinfection, perhaps of not getting sick from pathogens.

Part of that process is figuring out what the precursors are that could lead to the formation of these products to see if it is possible to avoid having them in waters or at least remove them before the disinfection step, for example.

Q. So directing your attention to the abstract for this article, and in the center of the abstract, there is a sentence that starts "Molar yields." Could you please read that sentence.

A. "Molar yields higher than 1 percent are observed for eight

pharmaceuticals, with ranitidine showing the strongest potential to form N-nitrosodimethylamine (NDMA)."

Q. And is that sentence representing that with regard to the eight pharmaceuticals, ranitidine forms more NDMA than the others?

MR. SHEEHAN: Objection, vague.

A. That appears to be what the authors are intending.

Q. If we could please go to the next page of the article, which is page 945, and if we could go down to the second paragraph in the left-hand column, and about halfway down that paragraph, there is a sentence that starts with "Ranitidine, one of the most prescribed drugs in the world." Do you see that sentence? It is right -- almost right in the middle.

A. Okay, yes, I see it.

Q. Could you please read that sentence.

A. "Ranitidine, one of the most prescribed drugs in the world, has been demonstrated to render a high conversion

rate to NDMA upon chloramination (Sacher et al., 2008; Schmidt et al., 2006).

Q. And to your understanding, is that sentence correct?

MR. SHEEHAN: Objection, calls for speculation.

A. I have read I believe the Schmidt et al. study, obviously it has been many, many years, but I can't specifically recall what they did with respect to ranitidine, but I'm not necessarily aware of what Schmidt et al. found, or I can't recall at this point.

Q. Do you disagree with the statement that ranitidine has been demonstrated to render a high conversion rate to NDMA upon chloramination?

MR. SHEEHAN: Objection.

A. Well, again, I don't remember the references in question, but I would say that the study we're currently looking at has provided experimental results indicating that ranitidine converts to NDMA during chloramination at relatively high yield compared to other tertiary amines,

such as trimethylamine.

Q. If we could go to page 947, please, and directing your attention to Figure 2, please, at the bottom of the page. What is this figure demonstrating?

A. Let me read it. "Nitrosamine-FPs for selected PPCPs under MFP conditions," a lot of acronyms.

PPCPs are pharmaceuticals and personal care products. FPs is a test used where you apply an abnormally high concentration of chloramines. The intent is to not run out of chloramines essentially but to achieve complete conversion of the precursor to whatever products it is going to form. I don't know what MFP stands for in this particular context.

It is apparently showing concentrations of NDMA or NDEA, that is nitrosodiethylamine. You have the molar concentrations on the left. What else are they showing? Molar conversion on the right axis. And so we're looking at that for various PPCPs.

Q. And what is it showing with regard to the findings for ranitidine relative to the other chemicals listed?

A. It is showing molar conversions of ranitidine to almost 100 percent, it is hard to say because it is a log scale, but probably on the order of 90 percent, whether in essentially deionized water, also known as Milli-Q water, or in tap water.

Q. So is this illustrating that ranitidine has the highest conversions?

A. For the PPCs shown, yes.

Q. Again, PPCs are the personal care and pharmaceutical products, correct?

A. Correct.

Q. Now, if we could stay on the same page, and the last paragraph on that page, the second sentence begins "Ranitidine and nizatidine." Do you see that?

A. The second sentence, yes.

Q. Can you please read that sentence?

A. Sure. "Ranitidine and

nizatidine, two H2 antihistamines, both have the DMA group bound to the C2 site of a five element heterocyclic ring, but ranitidine has a much higher molar conversion than nizatidine."

Q. Now can you go on and read the second sentence, or the third sentence in the paragraph.

A. Sure. "This is because C2 on the furan ring of ranitidine is a strong electrophilic site due to the electron donating effect of the oxygen heteroatom, while C2 on the thiazole ring of nizatidine is a slight nucleophilic site because of the combined effects from the nitrogen and the sulfur atoms."

Q. Do you agree with those two statements?

A. I would agree that those particular types of functional groups tend to be associated with higher molar conversion. I do not necessarily agree that it has been demonstrated what has been stated in I guess it is the third sentence, that seems more -- the rationale for why

this is the case may be more speculation at this point from these authors.
Q. But you are talking now about -- when you say the third sentence, you mean the "This is because"?
A. "This is because," exactly, that sentence.
Q. The first sentence you read, do you agree with that sentence?
A. I believe that that is the common denominator for chemical structures that feature dimethylamine as a component of a tertiary amine functional group. These subset that tend to show higher molar conversions during chloramination fall into that group that is described in that second sentence beginning "Ranitidine."
Q. If we could please move to Exhibit 37.
(Plaintiffs' Exhibit 37 marked for identification.)
Q. Now, this is an article that you authored, correct?
A. Correct.
Q. And we spoke about it a little,

and you spoke a little bit about it yesterday, correct?

A. Correct.

Q. Now, when did you publish this article, or when was this published, excuse me, you didn't publish it, but when was the article published?

A. It should say on the article. It looks like it was 2015.

Q. And in this article you analyzed some Zantac tablets, correct?

MR. SHEEHAN: Objection, vague.

A. In this article we took various types, categories of water, that would contribute to municipal sewage, blackwaters, greywaters using various consumer products, and compared the formation of NDMA and other nitrosamines during chloramination and ozonation, which are two common disinfectants applied to disinfect waters and wastewaters, and that included, in I believe it was the urine -- for the blackwater studies, we collected samples from volunteers both without, and in two cases had two volunteers consume I

believe it was a 150-milligram ranitidine tablet.
Q. And what did you find with regard to those two volunteers that consumed the 150-milligram Zantac tablet?
A. Well, perhaps we could go to the figure that shows the urine results.
Q. If you could just please allow the witness to orient us to the figure by moving through the pages.
A. How do I do that?
Q. The tech will do it.
A. Keep going. Keep going. One more. At the top.
Q. And that would be Figure 5?
A. That would be Figure 5. So --
Q. Go ahead.
A. So the top of the bars you will see various U's, U1 through 5. Those are the five samples collected from -- associated with five volunteers. So in this case urine samples were collected but then they were I believe diluted into a volume of additional water to mimic what would happen in the toilet, there is water

already in the toilet, so obviously there is some dilution, you don't just flush straight urine down the toilet. So we mimicked that dilution, and then we took the samples and analyzed those diluted urine samples straight. So that would be the bars labeled "raw."

We also took separate aliquots of the same diluted urine samples and treated them with chloramines or with ozone, again, two common disinfectants applied to drinking waters, wastewaters. And so on the left-hand portion of the figure you see the levels of nitrosamines. We looked at specific nitrosamines, including NDMA. You will also see nitrosopyrrolidine, NPYR, and we looked at other ones that are not in the legend but we did not detect, so we didn't include them in the legend.

The analysis we used was EPA Method 521, which captures seven specific nitrosamines. We also applied a total nitrosamine assay that we partially developed in our laboratory based on

analyses that were prevalent in the medical arena, that is referred to as TONO in the yellow bars.

So you will see the results on the left-hand side of the figure pertain to consumers who are participants who were not taking ranitidine, and then there is a bar that provides the mean of the five volunteers. And then we have two of the volunteers shown at the right consume the I believe it was 150-milligram Zantac tablet, or I don't know if it was Zantac, but it could have been ranitidine nonetheless, it might have been Zantac, and conducted the same analysis, and what the striped bars are, which represent NDMA, indicates, so if you see the U2 Zantac, that was the volunteer number 2 we will call him, compared to U2, the difference we see is that, according to this figure, NDMA was higher in the samples post Zantac consumption, and this was true in all three types of treatments, including essentially the raw or no treatment.

Q. So the -- I'm sorry.

A. Go ahead.
Q. So the participants in the study that took Zantac you are seeing generation of NDMA which is noted in blue?
A. Well, we are seeing the occurrence of NDMA, we appear to be seeing the occurrence of NDMA in the samples.
Q. And that is for the participants that took Zantac, and you don't see that for the participants who did not take Zantac, correct?
A. That's correct
MR. SHEEHAN: Objection, mischaracterizes the current state of this scientific study.
Q. My question for you, Dr. Mitch, is when you published this study in 2015 and noted that there was NDMA formation for user 2 and user 5 that had taken Zantac, did GlaxoSmithKline contact you to ask about the results of the study?
MR. SHEEHAN: Objection.
A. Not to my knowledge.
Q. When you published the result, when this study was published in 2015, did

any representative of Pfizer contact you about the results of the study and that user 2 and user 5 showed NDMA as published in the study?

MR. SHEEHAN: Objection.

A. Not to my knowledge.

Q. When you published the study, excuse me, when the study was published in 2015, did Boehringer Ingelheim contact you to discuss the results of the study?

MR. SHEEHAN: Objection.

A. Not to my knowledge.

Q. When this study was published in 2015, did Sanofi contact you about the results of the study?

MR. SHEEHAN: Objection.

A. Not to my knowledge.

Q. Now, you mentioned before -- we can take this down -- the EPA Method 521, correct?

A. Correct.

Q. Was that the gold standard that was being used for determination of nitrosamines in drinking water as of 2015?

MR. SHEEHAN: Objection, vague.

A. It remains the standard method for NDMA detection in water and wastewater samples.
Q. Did the manufacturers of ranitidine contact you to tell you that a different methodology should be used or a different method should be used to detect NDMA when Zantac is involved?
MR. SHEEHAN: Objection, vague.
A. No, I don't recall any such contact.
Q. At any time did the manufacturers of Zantac contact you to advise you that a method other than EPA Method 521 should be used for testing NDMA levels when ranitidine is involved?
MR. SHEEHAN: Objection, vague.
A. Again, I don't recall any such contact.
Q. Now, you mentioned earlier in one of your studies the concept of oxidation?
A. Yes.
Q. Can oxidation occur in the body?

MR. SHEEHAN: Objection, vague.
A. Oxidation can occur in the body. One of the aspects people look at in the body are the generation of what are called reactive oxygen species that can damage molecules and hence is the origin of the interest in what people hear about in the media as antioxidants.
Q. Can ranitidine be oxidized in the body?
MR. SHEEHAN: Objection, vague.
A. It likely can be oxidized in the body.
Q. And can the result of that oxidation be the formation of NDMA?
MR. SHEEHAN: Objection.
A. We do not have any strong evidence for what happens within the body personally from any of our results to know what happens to ranitidine within the body, but any organic molecule that I can think of can theoretically be oxidized.
Q. If we could now please pull up Exhibit 40.
(Plaintiffs' Exhibit 40 marked

for identification.)

Q. And this is the 2016 publication that you authored, correct, entitled Oral Intake of Ranitidine Increases Urinary Excretion of N-nitrosodiethylamine?

A. N-nitrosodimethylamine, yes.

Q. N-nitrosodiethylamine?

A. Dimethylamine.

Q. Dimethylamine, yes.

And this is a study that you testified yesterday that was retracted because of an issue with the testing method that was used to quantify the amounts of NDMA; is that a fair statement?

A. Correct.

Q. Where was this article published, in what journal?

A. It was published in the journal Carcinogenesis.

Q. And is that a known journal?

MR. SHEEHAN: Objection, vague.

A. I'm in a different field, not the medical field, so I'm not a good source of information as to which journals in the

medical field are renowned or less so.
Q. But this article was published in Carcinogenesis in 2016, correct?
A. Correct.
Q. Upon the publication of this article, did GlaxoSmithKline contact you to discuss the findings in the article?
MR. SHEEHAN: Objection.
A. I'm not aware of any such contacts.
Q. Did Sanofi contact you after this article was published to discuss the findings in the article?
MR. SHEEHAN: Objection.
A. I don't recall any such contact.
Q. Did Boehringer Ingelheim contact you after the publication of this article in 2016 to discuss its findings?
MR. SHEEHAN: Objection.
A. I'm not aware of any such contacts.
Q. Did Pfizer contact you about this article and its findings as it pertained to ranitidine?

MR. SHEEHAN: Objection.
A. I'm not aware of any such contact.
Q. Did any generic manufacturer of ranitidine contact you after the publication of this article and inquire about --
MR. SHEEHAN: Objection.
Q. -- and inquire regarding the connection between ranitidine and N-nitrosodimethylamine?
A. I'm not aware of any such contact.
Q. Were you contacted by any manufacturer of Zantac or ranitidine when this publication came out in 2016 to inquire about the connection between ranitidine and the increase of urinary excretion of N-nitrosodimethylamine?
MR. SHEEHAN: Objection.
A. I don't recall any such contact.
Q. Now, this manuscript was retracted because the issue was brought to light that when a heat is applied to

ranitidine, NDMA can form, correct?

MR. SHEEHAN: Objection, vague.

A. It was retracted due to the belief that there was an artifact associated with the thermal degradation of ranitidine potentially forming NDMA in gas chromatography related analyses, rendering the results of the study unreliable.

Q. And you used the term "thermal degradation." Could you please describe what you mean by that?

A. Degradation refers to the chemical transformation that occurs to the molecule modifying the structure of the molecule, and thermal indicates high temperature conditions.

Q. So thermal degradation as it pertains to NDMA means that when heat is applied to -- sorry, thermal degradation -- strike that.

So thermal degradation when it is applied to the chemical ranitidine refers to a chemical transformation of ranitidine when heat is applied into NDMA, correct?

MR. SHEEHAN: Objection, vague, and misstates prior testimony.

A. Correct, that is the context for our retraction, is that under the heated conditions of the gas chromatography analysis, ranitidine, if in the sample could have transformed into NDMA, rendering the results of the analysis inaccurate.

Q. Do you believe that's what occurred in this case?

A. I believe that that is likely to have affected our results and that is why I retracted it based on our more recent LC/MS-based results together with essentially a very similar study recently published by FDA.

Q. So the retraction of your study is based upon that when heat is applied to ranitidine, NDMA can form, correct?

MR. SHEEHAN: Objection.

A. Correct.

MR. SHEEHAN: Misstates testimony.

A. It is related to that phenomenon, yes.

Q. Now, in the study, did you do other types of analyses that did not involve GC/MS?
A. In this study we analyzed several chemicals, I believe including ranitidine, using LC/MS.
Q. And you used LC/MS when doing the evaluation of the in vitro ranitidine nitrosation assays?
A. Sorry, we used LC/MS during?
Q. I'm sorry, for the in vitro ranitidine nitrosation assays?
A. Yes.
Q. If we could go to the second page of the article, please, and under Materials and Methods, do you see where it begins "In vitro ranitidine nitrosation assays"?
A. Yes.
Q. And for that part of the analysis, LC/MS was used, correct?
A. I don't recall the details of this particular assay. Certainly ranitidine would have been analyzed I believe by LC/MS.

Q. And directing your attention, and if you could please look at the -- do you recall the results from the in vitro ranitidine nitrosation assay?

MR. SHEEHAN: Objection, vague.

A. I believe they are portrayed in one of the figures.

Q. Did the results of the in vitro ranitidine nitrosation assays show that ranitidine with nitrite reacts to form NDMA?

MR. SHEEHAN: Objection, vague.

A. The results of those analyses suggested that NDMA increased when nitrite was mixed with ranitidine under acidic conditions.

Q. Did you also measure amounts of dimethylamines in the study?

A. Dimethylamine, I believe we did, yes.

Q. And would that have -- how was that measured, the dimethylamines?

A. Dimethylamine, I'm trying to remember the details, typically we do what is called a derivitization reaction because

it is such a small molecule, which means you react it with another chemical and form a larger molecule and analyze that larger molecule. I suspect, but I don't recall, that that larger molecule was measured by LC/MS, but it could also have been measured by GC/MS.

Q. But measuring DMA by LC/MS or GC/MS would be valid testing methods for DMA, correct?

MR. SHEEHAN: Objection, vague.

A. There is, to my knowledge, no standard method for those analytes in terms of an EPA style method, but in my mind there is no evidence to suggest that there are artifacts associated with those analyses.

Q. Directing your attention to page 627, please, which is the next page, and right about where you have the cursor now actually, where it says "The concentration profiles of DMA," do you see that?

A. Yes.

Q. And you can read "The

concentration profiles of DMA suggest that it likely formed as a byproduct of ranitidine nitrosation."

A. Yes, you want me to read it?

Q. No. Do you believe that to be correct?

A. Oh, "concentration profiles of DMA suggest that it likely formed as a byproduct of ranitidine nitrosation."

I believe that the results we presented in the article would suggest that, yes.

Q. And just bringing you back to the abstract, which is the first page of this article, and in the abstract you mention patients with a particular disease, and I'm going to try to pronounce this, which is schistosomiasis?

A. Yes, schistosomiasis.

Q. Schistosomiasis, okay. Why are you mentioning schistosomiasis as a disease in this paper?

A. As I recall, schistosomiasis is a parasitic or pathogenic disease that is particularly prevalent in Egypt and

it leads the hypothesized -- there is a hypothesized link between schistosomiasis and prevalence of bladder cancer associated with N-nitrosamine generation as an outcome of that disease.

Q. So the statement where you have the name of the disease, the schistosomiasis, a disease where N-nitrosamines are implicated as the etiological agents for bladder cancer, do you see that?

A. Yes.

Q. Is that statement correct?

MR. SHEEHAN: Objection.

A. Let me see. "NDMA excretion rates after ranitidine" --

Q. I'm not asking about the entire sentence, I'm just asking about the fact that that disease is implicated as the etiological agents for bladder cancer implicating N-nitrosamines.

MR. SHEEHAN: Objection.

MR. SELDEN: Objection, vague.

A. That is what we understood from various articles. I'm not an expert on

schistosomiasis.
Q. But those articles that you read demonstrated and you put in your published article that that was a disease wherein N-nitrosamines are implicated as the etiological agents for bladder cancer, correct?
MR. SHEEHAN: Objection.
A. That was my understanding of those articles.
Q. Would you like me to press on now or would you like a morning break?
A. I'm fine to go on some more.
Q. Okay.
MR. SELDEN: Maybe go another 20 minutes or half hour. We are about an hour and a half in.
MS. BOGDAN: Did you say another 20 minutes or so?
MR. SELDEN: Yes, something like that, we can break in a half hour.
MS. BOGDAN: Perfect.
THE VIDEOGRAPHER: Counsel, this is the videographer. We will need to switch out the video media in about 15

minutes though.

MS. BOGDAN: Okay, then why don't we do 15 minutes, and if we are going to have to do a break to switch out the media, that seems like that would be a good time.

Q. If we could please bring up Exhibit D-12 from yesterday. Can you see that exhibit, Dr. Mitch?

A. I see it.

Q. I would like to direct your attention actually to the top of this exhibit, and first to actually I guess it is not quite halfway down, the Wednesday, November 4th e-mail.

A. Okay.

Q. And you are writing to David Light?

A. Yes, it appears I am.

Q. And you write "Do you remember the reference for the renal clearance of NDMA being approximately 1 percent," correct?

A. Correct.

Q. Why are you inquiring as to the

identity of the reference for the renal clearance of NDMA being approximately 1 percent?

A. I don't exactly recall, it was a long time ago, but based on the last sentence I would suggest that it had to do with the concept of urine is not a direct measure necessarily of what could be in the bloodstream, so there was this article that was referred to here that suggested that only a small fraction of what circulates in the body of NDMA might make it to the urine because it is metabolized or otherwise converted to something else in the body.

So what I believe I was asking here was trying to track down this, what at that time presumably was a vague recollection in my head of this article to see what it was about and see if that were the case, maybe it would be work collecting a blood sample.

Q. And in your response you mention that NDMA can be converted in the body, correct?

MR. SHEEHAN: Objection.

Q. You said converted or metabolized?

MR. SELDEN: Objection, misstates. You can go ahead and answer.

A. I'm not sure where it says that, but that would be the context of the 1 percent.

Q. And if NDMA is metabolized by the body, does it change into something else?

MR. SHEEHAN: Objection, vague.

A. Metabolism typically means that there is a conversion of a molecule to something else.

Q. So it would hence to be NDMA any longer, correct?

MR. SHEEHAN: Objection, vague.

A. That would be the outcome of a conversion, would be conversion would mean that the molecule would cease to be NDMA and would be something else.

Q. And at that point it would not be detectable in the urine, correct, it wouldn't make it to the bladder?

MR. SHEEHAN: Objection.

A. Well, it would -- once a chemical is converted to another chemical, it would be unlikely that you would be able to measure in the urine as the original parent chemical.

Q. Correct. So the NDMA would not make it to the bladder, correct, to be measured?

MR. SHEEHAN: Objection, vague.

A. Correct. Essentially the NDMA, if it were metabolized prior to reaching the kidney, would -- therefore that portion of NDMA that was metabolized would not be available to be excreted via the urine.

Q. And then David Light responds to you, correct?

A. I can't see it, but I --

Q. The highlight is just blocking the view of the e-mail above.

A. Yes, it appears he did.

Q. Okay. And then what information did David Light provide to you in response to your e-mail request for the reference?

A. He provided the reference that

presumably relates to the 1 percent number that was shown in the e-mail below, and it looks like in the highlighted section you have there he is suggesting that it would in fact be interesting to measure NDMA concentrations in blood.

Q. And did you in fact read the Spiegelhalder study that is referenced in the e-mail?

A. I believe I did. I don't recall the details now.

Q. Let's pull up Exhibit 48, please.

(Plaintiffs' Exhibit 48 marked for identification.)

Q. And if we could go, this is a face sheet, if we could go to the second page of this exhibit, please. And the title of this article is Urinary Excretion of N-Nitrosamines in Rats and Humans, by Spiegelhalder, correct?

A. That is the title.

Q. And that is the citation that was given to you by David Light, correct?

A. I believe it is.

Q. And this is the article that you became familiar with?
A. Again, I don't remember it from that period of time, but yes, it was the article, presumably the article that is relevant to the 1 percent comment.
Q. So just to orient you to the article again, under the Introduction, it reads "It is well accepted that exposure to nitrosamines must be considered to be a cancer risk."
Did I read that correctly?
A. Yes.
Q. And "To calculate this risk, it is necessary to estimate total exposure."
Do you see that?
A. I do.
Q. And then it reads "The individual contributions from various sources, however, are difficult to estimate; in particular, exposure to drugs, cosmetics and the possible endogenous formation of nitrosamines would require biological monitoring."
Did I read that correctly?

A. You did.
Q. And then it talks about what they are doing, which is to "study the kinetics of urinary excretion of administered nitrosamines, animal experiments have been performed with single exposures to different doses of nitrosodimethylamine (NDMA), nitrosomorpholine (NMOR), and nitrosodiethanolamine (NDELA)."
Does that reorient you to the study?
A. Yes.
Q. And then the last sentence in the Introduction reads "For comparison, nitrosodimethylamine excretion in humans has been studied with the help of three volunteers."
Does that familiarize you?
A. Yes.
Q. Is this the only study you have seen where NDMA was actually administered to humans?
A. There were others. I don't recall them.

Q. You saw other studies where actually not NDMA was an incidental exposure, like from diet or occupational, but you have seen other studies where NDMA was actually administered to humans as part of the study protocol?
A. Well, as I vaguely recall, there was a study reaching back I think it was even in the 1800s where someone had poisoned someone with NDMA.
Q. But that wasn't a study design, right, that was looking at the effects of the poisoning, the crime that had been committed, correct?
A. It was reporting, yes, the nature of the harm done.
Q. The question I'm asking as far as a study that is designed where they have volunteers where they are actually administering NDMA to the study participants, is this the only study you're aware of?
A. This is the only one I can recall, yes.
Q. If you could please go to page

446 in the upper right-hand corner which I believe is three pages in. Okay. Can you read the first sentence please on this page.

A. Sure. "Exposure to NDMA and NMOR, however, seems to be much more difficult to monitor in urine, due to the extremely low excretion rates. Accordingly, it was not possible to detect NDMA or NMOR in urine from workers of a tire and tube factory."

Q. Is that your understanding that it is difficult to monitor NDMA in urine due to the extremely low excretion rates based upon the findings in the study?

A. Again, it has been a while since I have read this, and I don't recall all of the results, but I don't necessarily find these results to be surprising.

Q. And why don't you find the results to be surprising?

A. Well, this study was written back in 1980s sometime when they had typically fairly primitive analytical equipment, and our study was able to use,

here referring to the 2016 study, was able to use GC/MS, and in the participants who did not consume ranitidine we did not tend to detect NDMA, and that was with, you know, 40 years difference in terms of advancements in analytical techniques.

Q. And you said you did not detect NDMA, correct?

A. In the participants that did not consume ranitidine, I don't believe we detected.

Q. Right, correct, okay.

So in this study they actually administered NDMA to the human participants? Actually, let me go back and ask you, I think, the next sentence that is not highlighted, do you see "their exposure was in the range of"?

A. Yes.

Q. And what is that in the range of? What does that say? Can you read that?

A. "Their exposure was in the range of 4 to 12 micrograms per hour. Higher exposures (up to 100 micrograms

NDMA, Spiegelhalder et al, 1979) are possible by drinking contaminated beer."

Q. Are you familiar with that study of the workers in the tire and the tube factory where they were not able to detect the NDMA or NMOR in the urine and those workers were exposed to the range of 4 to 12 micrograms per hour?

A. I don't recall it at this moment. It is possible that I could have read it.

Q. Would that be consistent with the proposition that it is difficult to calculate exposure to NDMA by measuring urine due to the extremely low excretion rates?

MR. SHEEHAN: Objection, vague.

A. The difficulty associated with measuring NDMA in urine is a function of both how much NDMA could be in urine and the sensitivity of the analytical technique. So the difficulty could occur due to either factor.

Q. All right. If you could read the next two sentences, please.

A. "In repeated experiments, we studied NDMA excretion in humans after oral administration of NDMA in beer, orange juice and orange juice with 6 percent ethanol. As can be seen from Table 4, even single doses in the 12 to 30 microgram range can be detected in urine."
Q. And then the next sentence, please.
A. "The observed excretion was between 0.5 and 2.4 percent of the ingested dose."
Q. And so what is that telling -- what are the authors telling us about the amount of NDMA that's being seen in the urine when single doses in the 12 to 30 microgram range are being administered?
MR. SHEEHAN: Objection, vague.
A. They appear to be suggesting that only a small fraction, on the order of 1 percent, reaches the or ends up being excreted in the urine.
Q. So this study stands for the proposition that only a small, small percent, you said 1 percent?

A. Yes.
Q. And it is actually 0.5 and 2.4 of the ingested doses was referenced in the study, right, as a range?
A. That is what the study says.
Q. And then what does the next sentence say?
A. "The interesting fact is that these rather high values (compared with the animal experiments) were observed only when NDMA was administered with ethanol."
Q. So the authors are qualifying that observed excretion percentage, correct?
A. They are.
Q. And they are noting that they are only seeing that when NDMA was administered with ethanol, correct?
A. They are.
Q. In the Florian study that you were questioned about yesterday, was ethanol administered?
A. You are referring to the one that I reviewed?
Q. Yes.

A. I'm trying to remember the details. I remember they controlled their diet. I don't remember if they allowed them to drink alcohol.

Q. Do you remember anything in the study about administering alcohol in order to have an observed excretion of NDMA?

MR. SHEEHAN: Objection.

A. I don't recall any purposeful administration of alcohol. Again, I don't recall if the diet controlled by the study permitted alcohol consumption.

Q. If the diet in the Florian study did not permit alcohol consumption, wouldn't it be consistent with the findings of the Spiegelhalder study that NDMA would not be excreted in the urine?

MR. SHEEHAN: Objection, vague.

A. Again, I think the distinction that needs to be made is whether NDMA is detectable in the urine. So they would -- the outcome would be that it would be more difficult to detect NDMA in the urine without alcohol because presumably there would be less excretion of NDMA in the

urine without alcohol.
Q. Or as this study is indicating, there could be no excretion, correct?
MR. SHEEHAN: Objection.
A. I don't think the study specifically says that. It says "Without alcohol, no significant amount of NDMA could be detected in urine."
Q. Okay. And you are referring to the next sentence, correct?
A. That is correct.
Q. Okay. And we can highlight that. So "Without alcohol, no significant amount of NDMA could be detected in the urine," right? But in this study they actually administered between 12 and 30 micrograms of NDMA to these participants, correct?
A. That is what the text says.
Q. And that amount of NDMA that they administered in the Spiegelhalder study is far above the amount of NDMA that was in the ranitidine tablets that were given to the participants in the Florian study, correct?

A. I don't recall the ranitidine levels in the Florian study, but I would think that is a fair assumption that that was the case.
Q. Did the participants in the Florian study, were they given Zantac that had under 96 nanograms of NDMA in it?
A. Again, I don't recall the details of the study, but I would be surprised if they were administering tablets that had levels in excess of 96 nanograms.
Q. And why would you be surprised if they were administering tablets in excess of 96 nanograms?
A. Well, my understanding is it is an FDA limit, and they are the FDA.
Q. And so when you say the FDA limit, is there a limit set by the FDA as to the amount of nanograms of NDMA that can be in a drug product?
A. Again, I'm not in this field, so I'm not completely familiar with the regulatory framework, but it has been my understanding that there is a de facto

limit, I don't know how they enforce it or not, if it is voluntary or what have you, but those in the field appear to speak about a 96 nanogram limit.

THE VIDEOGRAPHER: Counsel, I'm sorry, this is the videographer. We do need to switch out the video media as soon as we can.

MS. BOGDAN: Okay. Well, I guess if we are going to get shut down here because of video, let's go off. Why don't we go off the record and take that break and allow you to switch your media.

THE VIDEOGRAPHER: Thank you. We are going off the record 11:04 a.m. This is the end of media unit one.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record 11:23 a.m. This is the beginning of media unit two. Okay, you may proceed.

BY MS. BOGDAN:

Q. Going back to the Spiegelhalder study, Dr. Mitch, the last sentence in the paragraph that is in front of you reads "To

detect NDMA exposure by urine monitoring, single doses would have to be of the order of hundreds of micrograms, unless excretion rates are increased by the administration of ethanol."

Do you see that sentence?

A. I do.

Q. And when it says on the order of hundreds of micrograms, 100 micrograms would be how many nanograms?

A. 100 micrograms would be 100,000 nanograms.

Q. And 100,000 nanograms is far in excess of the number of nanograms in the ranitidine that they use in the Florian study, correct?

A. It is, again, I don't recall the numbers in the Florian study, but it is far higher than the 96 nanogram NDMA, shall we call it, limit.

Q. Let me represent to you that the nanograms of NDMA that were used in the ranitidine for the Florian study were between 6.3 and 10.5 nanograms.

A. Okay.

Q. Which is on the order of how much -- let me strike that.
In the Florian study, the number of nanograms that were used -- excuse me, let me take that back.
So the Spiegelhalder study is basically telling us that doses of NDMA would have to be in the hundreds of micrograms in order to be able to detect them in the urine, correct?
MR. SHEEHAN: Objection.
A. The study is indicating that the dose would have to be on the order of hundreds of micrograms for them to have been able to detect NDMA in urine using the analytical methods that they were using.
(Technical interruption)
THE VIDEOGRAPHER: Off the record 11:26 a.m.
(Recess taken.)
THE VIDEOGRAPHER: We are going back on the record 11:27 a.m. Okay, you may proceed.
BY MS. BOGDAN:
Q. If we could move to Table 4,

please, of this exhibit, which is on page 448, and let's review the data from the Spiegelhalder study which came from, do you see Urinary excretion of NDMA in humans following the ingestion of NDMA-containing beverages as the title of the table, correct?
A. Correct.
Q. Okay. Do you see that with orange juice, which is in the center of the table?
A. I see it.
Q. That they administered 13 to 26 micrograms of NDMA?
A. I see that.
Q. Do you see at the -- and then they had number of experiments, six, correct?
A. They have six.
Q. And then the excreted NDMA percentage of ingested NDMA with orange juice was zero. Do you see that?
A. I see that.
Q. So in the Spiegelhalder study, when they administered 13,000 to 26,000

nanograms of NDMA, they found zero in the urine, correct?

A. That is correct.

Q. So in this study, when pure NDMA was given to the participants in the order of 13,000 to 26,000 nanograms, they found zero in the urine; isn't that correct?

A. They found none above the detection limit.

Q. None above the detection limit, but they administered a significant amount of NDMA to these participants in the tune of 13,000 to 26,000 nanograms, correct?

A. They did dose administer, yes, 13,000 to 26,000 nanograms.

Q. And in the Florian study, which you reviewed, the participants were given ranitidine with only 6.3 to 10.5 nanograms of NDMA?

MR. SELDEN: Counsel, you are representing that's what the study says?

MS. BOGDAN: I'm representing that's what the study says.

MR. SELDEN: Okay, thank you.

Q. And so that is on a magnitude of over 2,000 times less NDMA than was administered in the Spiegelhalder study, correct?

A. That would be about right, yes.

Q. And in the Spiegelhalder study, when 20,000 times more NDMA was administered to these participants, they didn't detect any in the urine, correct?

A. They appear not to have detected any in the urine, correct.

Q. Don't you think the FDA should have considered the Spiegelhalder study when designing their study considering the fact that when 2,000 times more NDMA was administered to the participants, that none was detected in the urine?

MR. SHEEHAN: Objection, calls for speculation.

A. I don't know the intentions of the FDA, but it depends on what they were hoping to achieve in the sense that one possible goal would be to say are the levels of NDMA that are excreted in urine after consumption of a ranitidine tablet

significant relative to some health-based metric.

Q. However, the Spiegelhalder study is evidence that 13,000 to 26,000 nanograms of NDMA was ingested by these participants and then none came out in the urine, correct?

MR. SHEEHAN: Objection, asked and answered a few times now.

A. I believe to be more explicit, they did not detect NDMA in urine in excess of their detection limit.

Q. So wouldn't you agree that when 13,000 to 26,000 nanograms is given to participants of NDMA and none is excreted in the urine, that in the Florian study, when only 6.3 to 10.5 nanograms of NDMA was given to the participants, none would be found in the urine, correct?

MR. SHEEHAN: Objection, misstates the Florian paper.

A. I would agree that it may be that the levels detected in urine would be potentially lower than the amounts that were in the pill. Again, it depends on the

detection limit and the intention of the study. I believe that my understanding of the intention of the FDA study was to focus on whether there was a significant enhancement in NDMA levels associated with consumption potentially including endogenous nitrosation.

Q. But based upon the results of the Spiegelhalder study, one would not expect to find NDMA in the urine, correct?

MR. SHEEHAN: Objection, vague, misstates evidence.

A. Again, the key factor in my mind is, keeping in mind that there is a detection limit concern here, so the detection limit of the study we're looking at here, Spiegelhalder, may be different from the FDA limit, but the results of the Spiegelhalder study would appear to suggest that at least with respect to NDMA that is directly consumed, i.e., in, for example, the ranitidine tablet, that not all of it would necessarily appear in the urine sample, because some of it may have been metabolized, for example, in the body.

Q. When you say not all of it, wouldn't the Spiegelhalder study support that none of it was excreted in the urine?

MR. SHEEHAN: Objection, misstates evidence, mischaracterizes the publication.

A. It doesn't indicate that none came out, it indicated that it was not measurable above their specific detection limit.

Q. So of the 13,000 to 26,000 nanograms of NDMA that the participants ingested, none was detected in the urine at the detection limit used in the study, correct?

MR. SHEEHAN: Objection.

A. That appears to be what the results are providing, yes.

Q. However, there is also data here for when alcohol is administered, correct?

A. Correct, it appears that they are looking at both beer and orange juice plus 6 percent ethanol.

Q. And when beer is administered,

they actually did detect a small amount of NDMA in urine, correct?

A. That is correct.

Q. And they detected 0.5 to 1.3 percent of the 12,000 to 30,000 nanograms that was administered to the participants, correct?

A. Looking at this table, I am a little bit confused about the units. It appears to indicate that the percent of, you know, 0.5 to 1.3 is a percent of ingested NDMA, but what is confusing is there is a second column that shows zero with a superscript "a." So I'm not sure what that second column refers to. It may refer to the parentheses under the excreted NDMA.

So I'm not sure if the 0.5 to 1.3 are micrograms of NDMA excreted or that is the percent. But, regardless, you are correct that it appears in either case to be a small percentage of what was dosed.

Q. So even when beer was administered with the 12,000 to 30,000 nanograms of NDMA, only 0.5 to 1.3 percent

was found in the urine, correct?
A. That appears to be correct.
Q. So this is evidence that a large part, as a matter of fact, almost all of the NDMA, the 12,000 to 30,000 nanograms that was ingested was metabolized by the body, correct?
MR. SHEEHAN: Objection.
A. That appears to be what the table is saying.
Q. Then with regard to the orange juice plus 6 percent ethanol, do you see that part of the chart?
A. I do.
Q. So in this case, between 13,000 and 23,000 nanograms were administered to the volunteers, correct?
A. Correct.
Q. And even with 6 percent alcohol being on board, the excretion of NDMA was only 1.8 to 2.4 percent, correct?
A. That appears to be what the table is saying, yes.
Q. So would you agree with me that the Spiegelhalder study stands for the

proposition that the body metabolizes NDMA at a very high rate and very little NDMA would be expected to be excreted in the urine?

MR. SHEEHAN: Objection, calls for speculation.

A. That is what the results suggest.

Q. Does the study that you repeated with the IRB, that was given or granted to basically repeat the 2016 study, correct?

A. Correct.

Q. You hired or collaborated with Emery Pharma to do the testing for that study?

A. Correct.

Q. And in that study, which I know wasn't published, the results showed that most of the participants in the study had no detectable NDMA in the urine, correct?

A. That is correct.

Q. And there was one study participant that had detectable NDMA in the urine or below the limit of quantification,

correct?
A. Correct.
Q. Now, what we know from the Spiegelhalder study is that even when high amounts of NDMA are administered to people, right, either no percent is detected in the urine or very small percent is detected if alcohol is on board, correct?
MR. SHEEHAN: Objection, misstates testimony.
A. The results of the Spiegelhalder study appear to suggest that only a small fraction of the NDMA that is consumed is excreted in urine.
Q. And this would provide an explanation for when you repeated the -- got the IRB and repeated the 2016 study, that there would be no NDMA detected in the urine of the study participants, correct?
MR. SHEEHAN: Objection, calls for speculation.
A. There could be several potential explanations, one of which, as you indicated, could be that NDMA had been present in the bloodstream but did not make

it to the urine, but we have no evidence for that. That was one of the motivations for attempting to collect plasma samples.

Q. If we could please pull up Mitch 23.

(Plaintiffs' Exhibit 23 marked for identification.)

Q. And this is manuscript of the repeat study that was being done with Emery Pharma, correct?

A. I believe it is, yes.

Q. And this study wasn't published because of the IRB board; is that correct?

A. That is correct.

Q. And you associated with Emery Pharma to do this study, correct?

A. Correct.

Q. And Emery Pharma's primary role in this study was to do the analytical chemistry?

A. Correct.

Q. As far as the design of repeating the 2016 study, were you primarily responsible for that?

MR. SHEEHAN: Objection, vague.

A. I was responsible for organizing the volunteers, the protocol, the collection of the samples essentially, while Emery Pharma was in charge of analyzing the samples.

Q. And they developed the analytical testing method, correct?

A. Correct.

Q. And they validated that method, correct?

A. Correct.

Q. And did you find the testing that they did in the study to be accurate?

A. You would have to ask them for details, but in my consideration I believe and have no reason to doubt their results.

Q. And you were satisfied with the work they were doing as far as the analytical chemistry in cooperation with you on this project?

A. I have been satisfied, yes.

Q. And why did you choose Emery Pharma?

A. I was referenced to Emery Pharma or put in touch with them by

Valisure, introduced to them by Valisure, but they were -- had several potential advantages for the purposes of this study.

Number one, they were in the sort of business of analyzing pharmaceuticals. They were in the process of developing an LC/MS-based method for NDMA, which is not necessarily a simple task. I, nor they, had funding for this study, so it would have been much more difficult for me to develop the study. They had an analytical technique. And, lastly, I thought it would be useful to have, given the concerns raised about analytical artifacts associated with the 2016 study, to have an external group do the actual analysis.

Q. Were you satisfied that Emery Pharma had an expertise in this area and would be able to develop an LC/MS analytical method that would be satisfactory for your study?

A. I believe that they would have more experience analyzing pharmaceuticals than myself.

Q. And it was in fact Emery Pharma's testing results of the urine that caused you to retract your 2016 study; isn't that right?

MR. SHEEHAN: Objection.

A. That was one factor, combined with also receiving the results of the FDA study.

Q. Now, as part of Exhibit 23, there was also some testing that was being done with regard to the stability of ranitidine; isn't that correct?

A. That is correct.

Q. Were you aware of that testing that was being done?

A. I was aware of it but I was not involved with that portion of the study.

Q. When you say -- were the results of that shared with you?

A. They were shared through this manuscript.

Q. Can we turn to page 14 of this PDF, please. And at the bottom of this page it reads that "Ranitidine stability was examined at three temperatures and the

given humidity levels including 30 degrees Celsius (at 100 percent humidity), 40 degrees Celsius (at ambient humidity), and 70 degrees Celsius (at ambient humidity)."

Do you see that?

A. I do.

Q. And 30 degrees Celsius would be 86 degrees Fahrenheit, does that sound right?

A. Likely it is, yes.

Q. And 40 degrees Celsius is about 104 degrees Fahrenheit, correct?

A. Correct, it seems right.

Q. And 70 degrees Celsius is 158 degrees Fahrenheit?

A. It seems reasonable, yes.

Q. Now, if we could go to the next page, please. If we could highlight the top two side-by-side graphs. Thank you.

And on these graphs, which is on -- in the table below, below the tables, which you can see peeking out from below the exhibit, so if we could maybe move those graphs up a little bit, the green lines are the 30 degrees/100 percent

relative humidity condition. Do you see that?

A. I do.

Q. Okay. And what is the nanograms of NDMA that is represented in the first graph for the green, which is the 30 percent -- 30 degrees Celsius and 100 degrees humidity at about day 45?

A. It appears to be, it is a little bit fuzzy, but it appears to be about 55,000 nanograms.

Q. And the chart to the right, what does the concentration nanograms of NDMA in the tablet reach for the 30 degree/100 percent humidity condition at day approximate 35?

A. Day approximately 35, it appears to be on the order of about 1,400 nanograms.

Q. Are both of those values far in excess of the FDA allowed limit of 96 nanograms?

MR. SHEEHAN: Objection, vague.

A. They appear to be above 96 nanograms, yes.

Q. And significantly above, correct?

MR. SHEEHAN: Objection, vague.

A. Correct.

Q. One is hundreds of times above and the other is thousands of times above, correct?

A. Correct.

Q. If we could go, please, to the next page of the PDF, second paragraph. It reads "At 40 degrees under ambient humidity" -- do you see that?

A. I do.

Q. -- "a gradual increase in NDMA levels was observed from Zantac where an initial 93 nanograms of NDMA per pill increased to 672 nanograms by day 22 through the process of ranitidine degradation."

A. I see that.

Q. Did you read these results when you were provided the draft of this manuscript?

A. I did.

Q. Did these results of finding

either hundreds or tens of thousands of nanograms in these tablets under the different stability tests, was that surprising to you?

MR. SHEEHAN: Objection, vague.

A. I don't have any particular experience myself with doing such experiments. These were Emery Pharma's results. I believe I commented to them on their figures in the sense that it would be useful to redo the experiments due to some of the kinetic curves shown. By that I mean -- maybe we could go back to them.

Q. I'm sorry, what? You faded out.

A. Maybe we could go back to the figure.

Q. Okay.

A. I believe I commented to them that it could be useful to go back, redo the experiment, revalidate the numbers, because some of the curves, so, for example, the red one looks like a type of experiment you would typically see, or the blue one on the right, but that the green

one was a little bit surprising in the sense that, looking at the one on the right, for example, it appears to be lower than the other two colors for several days and then something happens and it jumps up to a higher level at around day 35.

So under such -- with such types of results, we typically, at least for me, I would think it would be useful to go back, redo the experiment, and see if that was a real number.

Q. I'm asking about what was your reaction to the total number of nanograms, knowing that the FDA's limit is 96 nanograms in a tablet.

MR. SHEEHAN: Objection, asked and answered.

A. The total number of nanograms, what they are showing, for example, in the red curve by the end of 45 days appears to be very high relative to 96 nanograms.

Q. Does this data support that ranitidine is an unstable molecule when subjected to heat and will transform into NDMA?

MR. SHEEHAN: Objection, vague.
A. It appears to suggest that, yes.
Q. Does this data support that ranitidine is an unstable molecule and that it turns into NDMA when subjected to humidity?
MR. SHEEHAN: Objection.
MR. SELDEN: Objection, compound.
A. I don't recall what the different humidity conditions were here, but I don't recall them specifically isolating the effect of humidity from temperature, and I believe that was one of my comments to them on the manuscript was that it would be useful to do an experiment where you used the same temperature with and without different levels of humidity to isolate that factor.
Q. Condition that is green and shown on the chart is at 86 degrees Fahrenheit, 30 degrees Celsius, and 100 percent relative humidity.
A. Okay.

Q. Okay? And so -- and with the values that are reflected by the green lines on the chart, does that not in fact show increasing levels of NDMA with time under those conditions?

MR. SHEEHAN: Objection, vague.

A. Well, again, my point was that you have three curves, each curve represents a different temperature, and simultaneously there are variations in humidity, some showing ambient, some showing 100 percent.

So your question had been does the humidity affect NDMA formation, and I would say it cannot be determined from the information given in this figure because there was not two scenarios evaluated side by side at the same temperature with different levels of humidity.

Q. Does this data support that with increasing temperature Zantac is unstable and transforms into NDMA?

MR. SHEEHAN: Objection, vague.

A. Again, we're missing the legend, but it suggests an increase in NDMA

over time during storage, and with comparing, now that you have the legend, comparing the red versus the blue curve, it suggests that the accumulation of NDMA is higher in the 70 degrees centigrade case, higher temperature.

Q. You can take that down, please.

I would like now to turn to the Florian study. If you could please bring that up at Exhibit 52.

(Plaintiffs' Exhibit 52 marked for identification.)

Q. Now, you were a reviewer of this study, correct?

A. Correct.

Q. And as part of your review of the study, you made remarks to the editors, correct?

A. Correct.

Q. As part of your review, did you read and analyze the supplement which was 39 pages?

A. I believe I did, but caution that I reviewed the original manuscript, the comments of myself and the reviewers

were presumably sent to the authors, and then modifications were made to the manuscript on that basis. I did not see the revised version of the manuscript before publication.

Q. Did you look at the manuscript after publication to see if they addressed all of the remarks that you made to the editor as part of your review?

A. I did not.

Q. Do you know if the editors addressed the concerns that you made in your remarks?

MR. SHEEHAN: Objection.

A. I do not know if they addressed all of my comments.

Q. Do you know if they addressed any of them?

A. I do not know how they addressed all of them. Typically when you submit a series of reviews, it goes out to the authors, the authors revise the manuscript and provide something called a response to comments document. At that point the editor reads it, decides if it is

worth sending back out to the reviewers or to a subset of reviewers to see if the reviewers feel that the comments have been adequately addressed, for a second review.

I did not receive such a second look via this responses to comments document where the authors can choose to modify the manuscript or not and explain the way in which they have modified the manuscript if they do.

Q. So in this case you didn't receive that second communication from the editors acknowledging your comments and explaining their justification for either not addressing them or any adjustments they were going to be making to the publication; is that correct?

A. That is correct.

Q. Okay. If you could please take down Exhibit 52 and bring up Exhibit 46.

(Plaintiffs' Exhibit 46 marked for identification.)

Q. And if you could just maybe zoom in on the top of this. Do you recognize this e-mail, Dr. Mitch?

A. Yes, I do recognize this e-mail.
Q. And is this the e-mail you got back from JAMA?
A. It appears to be so, yes.
Q. With your comments as well as the other reviewers' comments on the Florian manuscript?
A. Yes.
Q. Did you read the comments that were made by the other reviewers?
A. I probably skimmed them, but I don't recall their specific comments.
Q. If we could please go down to Reviewer 1. And in Reviewer 1's comments, it mentions in the fourth paragraph down the fact that the Florian study, and it says they "had 18 people take ranitidine or placebo before they ate their first meal of the day and then measured NDMA concentrations in urine for 24 hours thereafter."
Do you see that?
A. I do.
Q. And is that your understanding

of what the Florian protocol was?
A. As best I can recall, it was along those lines, yes.
Q. And so in the Florian study, the 18 participants were taking their ranitidine after sleeping overnight and before their first meal of the day, correct?
MR. SHEEHAN: Objection.
A. I don't recall those details of whether they took it right before their meal or the night before. I don't recall.
Q. Does the amount of nitrites and nitrates in the human digestive system vary over 24 hours?
MR. SHEEHAN: Objection, vague.
A. I'm not a gastroenterologist, so I don't have any direct evidence of what the cycle of nitrite concentrations in the stomach are.
Q. If we can go down further in this exhibit to the section that says "Is this a slam dunk?" Can you read the first paragraph?
A. Sure. "While this was their

intent, I am not sure of the methods utilized give the physiologic state for which to assess the maximum creative potential of NDMA in humans. They gave the ranitidine (or placebo) after a 12-hour fast to the patients and then gave them food. So even though they consumed a high nitrate/nitrite meal the day before the administration of ranitidine, I am not sure the salivary contribution to gastric nitrate availability at breakfast-time (12 hours later) would still be present like it would if the ranitidine was given with lunch or dinner."

Q. Did you consider that fact when reviewing the study?

A. I did not.

Q. This reviewer is indicating that that factor could change the results, correct?

MR. SHEEHAN: Objection, calls for speculation.

A. They are apparently suggesting that that factor is important.

Q. Do you feel the factor is

important as to when the participants are eating versus when they are taking their ranitidine?

MR. SHEEHAN: Objection.

A. I agree that it could be a potential factor in the sense that the confluence or co-occurrence of nitrite and ranitidine in the stomach may potentially affect NDMA formation within the stomach, but, again, I don't have expertise on nitrite concentrations in the stomach and their cycles over time.

Q. Jumping down to the third paragraph where it reads "However, the crux of the whole study is, was it fast enough to ensure enough intermingling with dissolved ranitidine for the reaction to occur?"

Do you see that?

A. Yes, the second sentence there.

Q. Yes. Do you agree that it would be important that there would have to be intermingling of the high nitrite diet with the dissolved ranitidine to get accurate results in the Florian study?

MR. SHEEHAN: Objection, vague.
A. Again, it depends on the intention of the study. My understanding, that one of the goals of the study was to essentially repeat our 2016 study, so rather than isolating the effect of gastric conditions just to evaluate what the final levels of NDMA could be in urine.
So in a sense the Reviewer No. 1 is raising the point that there could be a scenario wherein consumption of ranitidine at the same time as -- exact same time as a high nitrite/nitrate meal may lead to potentially greater formation in the stomach itself, which may translate into higher concentrations in the urine.
Q. Now, you keep saying the intention of the study. So the intention of the Florian study was not to actually determine what would be the maximum amount of NDMA that a patient would be exposed to when taking ranitidine under a variety of different conditions?
MR. SHEEHAN: Objection, vague, incomplete hypothetical.

A. I'm not totally clear what their intentions were. You would have to ask them. But my understanding of the manuscript was that one of the intentions was to see -- reevaluate or reconduct our 2016 study essentially to see whether the very high levels of NDMA we were reporting in urine after consumption of a ranitidine tablet were repeatable.

Q. But given the study protocol and the fact that the ranitidine was taken in the morning before breakfast, then the study does not address the situation where ranitidine would be taken at the same time or after a high nitrite meal, do you agree?

MR. SHEEHAN: Objection, incomplete hypothetical.

A. I don't recall what was provided during breakfast, whether there was nitrite or nitrate during breakfast, but the tablets were taken in the neighborhood of time at which breakfast was provided.

Q. Going down to the next part of that same paragraph, it explains that

"Foods with nitrates have to release the nitrate and then have it be converted to nitrite to facilitate the interaction."

And you have testified to that already today, correct?

MR. SHEEHAN: Objection, misstates.

A. I had indicated that nitrate, or I can indicate now, my understanding is that nitrate is not itself reactive as a nitrosating agent, but that its reduction to nitrite, for example, in saliva, could render it a potential precursor as a nitrosating agent.

Q. And then it goes on to say "The in vitro stomach model studies directly administered nitrite, not the whole foods higher in nitrate. This means the interaction between ranitidine and nitrite in the models could occur instantaneously and possibly for a longer period of time. Using Florian methods, the big question is, did they miss the interaction?"

Do you understand what the author of this commentary is getting to?

MR. SHEEHAN: Objection, vague.
A. Let me just read that last sentence there.
(Witness perusing document.)
A. I'm not sure that their writing is completely clear, but what I would understand from this is that it is in the vein of their comments above that they are questioning whether the conditions used in the study would have provided the maximum co-occurrence of ranitidine and nitrite, and so I guess that what they are referring to here is how long would it take nitrate in food to be converted to nitrite, where in the time frame relative to ranitidine occurrence in the stomach would that conversion from nitrate to nitrite occur, and was it maximum.
Q. And if it wasn't maximum and the interaction was missed, then the results on Florian would not be accurate, correct?
MR. SHEEHAN: Objection, vague.
A. I wouldn't say it is inaccurate. The results would indicate the

levels of NDMA in urine relative to their detection limit based on the conditions specifically analyzed. Whether it was the maximum conceivable that could ever form, that could be a different question.

Q. Let me -- let me reask the question.

With the protocol that was followed in Florian and given the issues that this commentator is making, there could be a possibility that depending on the real-life scenario of when somebody takes their ranitidine relative to a meal, that those values would not have been captured by the Florian study because they weren't studied, right?

MR. SHEEHAN: Objection, vague, incomplete hypothetical.

A. This appears to be what this particular reviewer is suggesting.

Q. If you go down to the sentence that begins "Florian et al did not measure ranitidine levels in the stomach at the time the food was there and being digested."

A. Yes.
Q. And that statement is true, correct?
A. Again, I don't recall that detail, but I don't remember them specifically analyzing gastric fluid.
Q. And the next sentence reads "They don't know how much ranitidine was there in the stomach at the time the nitrite was in ample supply in the stomach," correct?
A. That's what it says, correct.
Q. And if the ranitidine was not in the stomach at the time that the nitrite was in the stomach, wouldn't that affect the results potentially, or wouldn't the results not -- let me ask it another way.
If the ranitidine was not in the stomach at the time the nitrite was in the stomach, then the findings in Florian would not be valid for situations that occur when ranitidine is in the stomach at the same time there is nitrite, correct?
MR. SHEEHAN: Objection, vague.
A. Conceivably the results could

be different under different feeding conditions. It appears the reviewer is raising the question about the lack of clarity or direct analyses of the nitrite and ranitidine concentrations in the stomach.

MR. SHEEHAN: Can we take a break? My apologies, there is a fire alarm going off, and apparently I'm being told I need to leave the building.

MS. BOGDAN: All right, let's go off the record, please.

THE VIDEOGRAPHER: We are going off the record, 12:22 p.m. This is the end of media unit two.

(Luncheon recess: 12:22 p.m.)

A F T E R N O O N S E S S I O N
1:04 p.m.
W I L L I A M A. M I T C H, Ph.D.,
resumed.
THE VIDEOGRAPHER: We are going back on the record, 1:04 p.m. This is the beginning of media unit three. Okay, you may proceed.
CONTINUED EXAMINATION
BY MS. BOGDAN:
Q. We were talking before we went on the break about the Florian study, and so I have just, you know, a general question about the study in that isn't it true that it only represents results for the conditions that were tested?
A. I think that's usually a fair characterization of any article.
Q. Of any, did you say "article"? The audio is a little muffled.
A. Yes, of any article.
Q. That it only represents the conditions that it studied, correct?
MR. SHEEHAN: Objection.
A. Correct.

Q. So, for example, if a patient was taking their Zantac after they had an upset stomach from eating a full meal and they took it 25 minutes after they ate, then that Florian study did not give us any results for those types of conditions, correct?

MR. SHEEHAN: Objection, calls for speculation.

A. The conditions of the study did not appear to match that condition.

Q. Now, did you -- or did your, excuse me, comments end up on Exhibit 46, the ones that you wrote when you reviewed?

A. They should. I believe they were -- I was, as I recall, Reviewer No. 2.

Q. Okay. So you are Reviewer 2? Which is on the next page.

A. If we could see them, I would be able to confirm. Yes, as I recall, those are my comments.

Q. Did you in your comments note limitation of the study, is that something you would do as a reviewer?

A. I don't think it is necessarily

my role to do limitation or specify limitations. We provide criticisms but it is usually the authors that would have a section in the manuscript that might provide limitations.

Q. And so you said you would provide criticisms of the study?

A. Yes, that is generally the purpose of the review.

Q. And what was your main criticism of the study?

A. I believe, my recollection, my main criticism or suggestion was that they do a more exact job of determining what's referred to as the LLOQ, or the lower limit of quantitation I believe is the terminology that they were using, within the specific matrices of urine and plasma.

Q. And why was that a criticism of yours?

A. Well, I felt that it would be important to determine a matrix specific quantification limit. The LC/MS, the sensitivity to analytes, can be affected by the matrix in which the samples are

occurring, so particularly for a polar molecule like NDMA that tends to elute from the column early, there can be interference, for example, from salts that might be in urine. Urine tends to be a salty solution relative to drinking water or something of that nature.

So part of the -- there are two kind of benefits, you could say, to this study. One was that it provides a publication by the FDA of a new analytical method or at least an example, application of such a new analytical method for these types of matrices that presumably future researchers could point to and say we used the same analysis that Florian, et al., used, for example.

So going forward, they are introducing this, or at least initially applying this method that they had earlier developed I think it was back in 2019 they published on their website, at least applying this to these matrices that people might use in future studies, it would be helpful while doing this to actually report

what the matrix specific quantification limit would be. That was one aspect.

The other aspect is particularly when you have a result that suggests a nondetect, as was the case with this study, it would be useful to report what that actually means in terms of your ability to detect. So, in other words, it is one thing to say we didn't find NDMA in urine, it is a different thing to say the concentration that was in urine was less than X, whatever the limit of quantification is.

Q. So your criticism, to put it in more like layman's terms, was about actually quantifying the way that they were measuring it so that you would know what ability they actually had to detect levels in the urine?

MR. SHEEHAN: Objection, vague, and misstates testimony.

A. I would rephrase to say providing the limit of quantification provides a boundary around their ability to detect NDMA in these samples.

Q. And when you say provides a boundary, it explains what actually their ability to detect would be and puts a number on it, correct?

MR. SHEEHAN: Objection, vague.

A. Correct.

Q. And that number would be very useful especially if you are trying to detect something in the urine that we know from the Spiegelhalder study is going to be metabolized by the body and very little of it, if any, would show up in the urine, correct?

MR. SHEEHAN: Objection, misstates testimony.

A. I don't believe that there is necessarily a connection between those two. I would just say that it helps place a boundary so that, to take the ridiculous example, it would be one thing to say we couldn't detect any NDMA in urine with a 1 gram detection limit versus a nanogram detection limit. The two might -- the first example wouldn't necessarily be very meaningful.

Q. Of course. And so as a scientist, you would want a detection limit and an ability to detect to be as precise as possible down to the smallest unit as possible, correct?

A. Ideally, you could detect anything, but obviously you would want -- why don't I put it this way: You would want your quantification limit to be at a level where you could detect what you considered to be a meaningful amount of NDMA, and meaningful would be in the context of, it would depend on the scenario that you are looking at, but whatever the, for example, the FDA considers to be a relevant concentration of NDMA.

Q. And when you reviewed the study, you did not think that the study adequately addressed that, correct?

MR. SHEEHAN: Objection, vague.

A. I believe they reported a lower limit of quantification in I believe it was deionized water. My point was the level determined in deionized water doesn't necessarily reflect a similar limit of

quantification in a matrix such as urine and plasma that is more complex.

In other words, in those other matrices, it is conceivable that you would have a higher limit of quantification, because there could be interference from a matrix, and a higher limit of quantification essentially means that the method is less sensitive than would be suggested by a deionized water sample. That's not necessarily the case. It could be that there is no interference. My suggestion was that they actually go and try it out.

Q. And less sensitivity means less of an ability to detect NDMA, correct?

A. Correct.

Q. And when you use the term "interference," you are referring to a phenomenon that would make the testing results not accurate, correct?

MR. SHEEHAN: Objection, vague.

A. It is not that it is not accurate, it is that it is potentially less sensitive.

Q. So when you say "interference," it could potentially make the testing less sensitive, which means that it would be less likely to pick up levels of NDMA, correct?

MR. SHEEHAN: Objection, vague.

A. Correct.

Q. In your comments you write "While Valisure's initial efforts were also based on faulty GC/MS analyses, their finding of high NDMA concentrations in ranitidine tablets remains unchallenged even by FDA using LC/MS. GC/MS analysis was routine for these scenarios until the analytical artifact was identified in 2019 and the identification of the artifact is what led to FDA developing the new LC/MS method used here." And then you write "One could be similarly critical of FDA for not handling this issue until 40 years after ranitidine manufacture."

That's what you wrote, correct?

A. Yes, that is what I wrote.

Q. When you wrote "One could be similarly critical of FDA for not handling

this issue until 40 years after ranitidine manufacture," what did you mean by that?
A. Well, again, this is my understanding of the sequence of events, but that my impression, and, again, I'm not in the pharmaceutical field, but it has been my impression that until the publication of the, or I don't know if you would call it a publication, but the loading online of the LC/MS-based method by FDA in 2019, there was not such an LC/MS-based method in use routinely for the analysis of ranitidine, and ranitidine had been on the market for about 40 years.
Q. In your research, were you able to find any guidance given by the manufacturers of ranitidine as to what method to use to test for NDMA when ranitidine was involved?
MR. SHEEHAN: Objection, vague.
A. I was not aware of such methods.
Q. Other than your criticism with regard to the interference and the detection limits, did you have another

criticism of the study?
A. I don't recall all of these comments, but presumably all of these are suggestions for improvement or potential criticisms.
Q. Could we actually pull up Exhibit 45.
(Plaintiffs' Exhibit 45 marked for identification.)
Q. Dr. Mitch, this is the e-mail that I believe only has your review on it, which is a lot easier to read.
A. Okay.
Q. Okay? And you saw this yesterday, correct?
A. I believe so.
Q. If we could go to the third page of this exhibit, please. Actually, it starts on the second page, right at the bottom, under Introduction and Discussion, you write "The current manuscript is overly critical of the Valisure petition and almost appears to suggest that the petition was conducted with nefarious intentions."
Do you see that on the bottom

of the page?
A. Yes, I do.
Q. Under Introduction and Discussion?
A. I do.
Q. What did you mean when you wrote that?
A. I don't recall the exact text of the original manuscript, but the way that it was phrased in terms of covering in this case the citizen's petition appeared to me to hint that this was some, basically what I said, that Valisure had knowingly, you know, used a GC/MS-based method knowing about artifacts and didn't care about it, or something of that nature, and I didn't have any evidence to believe that that was the case.
Q. And then you write "It is important to note that the citizen petition brought to light the high concentrations of NDMA (greater than 96 nanograms per tablet) associated with certain batches of ranitidine. These greater than 96 nanograms per tablet have been confirmed by

FDA and others and are not in dispute by the current authors. After 40 years of ranitidine on the market, it was the citizen petition that brought this issue to light."

Why did you write that?

A. Well, because my reading of the FDA market withdrawal notice by the FDA in 2020 was that they indicated that a partial rationale for the withdrawal of ranitidine from the market was that they concurred with the idea that certain batches of ranitidine on the market had levels of NDMA in excess of 96 nanograms per tablet and that my understanding was that this whole issue initiated essentially by Valisure is what led to the evaluation of this issue by the FDA.

Q. And for that reason the Valisure petition that brought this issue to light had value in your mind, correct?

MR. SHEEHAN: Objection.

A. I would say in my opinion the GC/MS-based results by Valisure are unreliable because they could have been

subject to this temperature-based artifact, but that regardless of whether those results are accurate or not they did lead, in my opinion, or my understanding, led to the evaluation of this issue by the FDA, which, according to their market withdrawal notice, they appeared to agree with the concept that even using LC/MS there are cases where certain batches of ranitidine tablets had levels of NDMA in excess of 96 nanograms.

Q. Didn't the Valisure petition also bring to light, as well as the retraction of your 2016 study, that when ranitidine is subjected to heat, it can transform into NDMA?

MR. SHEEHAN: Objection, vague.

A. As I recall, the market withdrawal notice also indicated that there were concerns about storage conditions of ranitidine tablets and at the time the inability of the FDA to validate or know for certain what levels of NDMA were in different batches of ranitidine that had been for sale over the counter across the

country or how they were stored by consumers after they obtained the tablets.

Q. And you are referencing the FDA's concern about storage conditions relative to the idea that ranitidine transforms into NDMA under certain temperatures, correct?

MR. SHEEHAN: Objection, vague.

A. That is my understanding of what they mean in the market withdrawal notice. I do not know whether the motivator for that, their language in the withdrawal notice was solely on the basis of the citizen's petition or by other research that they may have conducted themselves or other parties.

Q. Do you know the rate of metabolism of NDMA?

A. I do not.

Q. Wouldn't the rate of metabolism of NDMA be important to know when trying to evaluate levels in plasma?

MR. SHEEHAN: Objection, vague.

A. Sorry, you said why is the rate of metabolism important to know in the body

when --

Q. I'm sorry, the audio is bad. I didn't mean to speak over you.

My question was, isn't it important to know the rate of metabolism of NDMA when determining measurements in plasma?

MR. SHEEHAN: Objection, vague.

A. It is not necessarily central to measuring a concentration of NDMA in plasma, but it is part of a pharmacokinetic model of the formation or degradation and clearance of NDMA from the body.

Q. And when you say -- let me ask the question another way. Fair enough.

When looking at the results of NDMA measured in plasma, isn't it important to know the rate of metabolism of NDMA?

MR. SHEEHAN: Objection, vague.

A. In my understanding, it would be a useful parameter to characterize the potential exposure, overall exposure, to NDMA.

Q. Because one would need to know the rate of metabolism in order to

calculate the potential exposure if you were looking at measurements taken in the plasma at certain time periods over 24 hours, correct?

MR. SHEEHAN: Objection, vague, and incomplete hypothetical.

A. Again, it could be a useful parameter to characterize the overall level of NDMA to which someone could be exposed, could have been exposed, and my understanding is using a pharmacokinetic model it would be one of the components of such a model.

Q. Florian did not test for the amount of NDMA that would be seen in human plasma if participants took tablets that had hundreds of nanograms of NDMA in them, correct?

MR. SHEEHAN: Objection, vague.

A. Based upon what you had indicated as the levels of NDMA in the tablets that they used, that would be correct.

Q. So that would be another condition that Florian did not test for,

correct?
MR. SHEEHAN: Objection.
A. Apparently so.
Q. If a patient took their Zantac at night after dinner, the Florian study did not test that condition either, correct?
A. Again, I don't recall the exact time at which they took the tablets. I believe it was at breakfast, so in that case you are correct.
Q. The participants in the Florian study were 18 healthy participants; isn't that correct?
A. Again, I don't recall the exact characteristics of the participants. I believe they were all adults. I don't remember the extent to which they restricted it to healthy patients.
Q. If we could please pull up Exhibit 52. And I would direct your attention to Conclusions and Relevance.
A. Okay.
Q. And the first sentence reads "In this trial that included 18 healthy

participants."

Do you see that?

A. I do.

Q. So the Florian study had 18 healthy participants, correct?

A. It appears that that's the case, yes.

Q. So it excluded a portion of what would be the patient population that would not fall in the definition of 18 healthy participants, correct?

MR. SHEEHAN: Objection.

A. That appears to be the case.

Q. So the Florian study did not test participants that had a chronic gastrointestinal issue, correct?

A. I don't recall what they define as healthy participants, but presumably that would be part of someone being considered healthy.

Q. And patients with chronic gastric conditions can have different pHs than healthy patients, correct, in their stomach?

MR. SHEEHAN: Objection, calls

for speculation.

A. I'm not a gastroenterologist, but I believe that that can be the case, at least in certain conditions.

Q. Isn't it true that NDMA is capable of distribution in a wide variety of tissues?

MR. SHEEHAN: Objection, vague.

MR. SELDEN: Objection.

A. I am not an expert in that field, so I don't know the extent to which it partitions into different tissues.

Q. That's outside your area of expertise?

A. Yes.

Q. Isn't it true that vitamin C has been shown to be an effective inhibitor of nitroso compound formation?

MR. SHEEHAN: Objection.

A. My understanding from some of the medical literature is that yes, vitamin C can prevent or minimize nitrosation by reacting with the $N_2O_3$ intermediate.

Q. And isn't it also true that vitamin E has been shown to be an effective

inhibitor of nitroso compound formation?
MR. SHEEHAN: Objection, vague.
A. Similar comments, I'm not in the medical field, but my understanding from reading some of that literature is that tocopherol has been shown in certain studies to help limit nitrosation reactions.
Q. The diet given to the participants in Florian, did you review that when you looked at the manuscript?
A. I recall that I looked at it. I don't recall any of the details. But I'm not, you know, an expert in diets and the different constituents within the diets, so at the time I probably would have more out of curiosity looked at what they were using, for example, cured-meats, noncured-meats, such as shown here in the Conclusion section. Because I am aware that previous research on NDMA has focused on things like bacon, hot dogs, that sort of thing, cured-meats, because they contain nitrite essentially being associated with higher levels of nitrosation.

Q. So when you reviewed the diets, you were focused on looking at foods that were high in nitrite?

A. As I mentioned before, I'm not a dietary expert, so to be honest, I didn't spend a lot of time focusing on the different constituents of the diets, more out of just general interest, what were they feeding them for a cured-meats diet. I don't remember the details of what that included.

Q. Would it surprise you to learn that kiwi has vitamin C in it?

MR. SHEEHAN: Objection.

A. It wouldn't surprise me, but many vegetables and fruits can have vitamin C in them.

Q. And that in the Florian study, they gave kiwi, strawberries and orange juice as part of the diet; isn't that true?

MR. SHEEHAN: Objection.

A. Again, I don't remember the details of the diet.

Q. Well, why don't we go to the eMethods 1, Table 2, which I think is

probably Exhibit P-53, if the supplement was marked separately.

(Plaintiffs' Exhibit 53 marked for identification.)

Q. And we are going to want to go to eMethods 1, Table 2. It is the full menu listing, it is page 23 of the supplement, if that helps you.

Do you see the full menu listing, Dr. Mitch?

A. I do.

Q. And do you see that, under noncured-meats diet, do you see kiwi, strawberries and orange juice?

A. I see, yes.

Q. Would it surprise you to learn that they all have vitamin C?

A. It would not surprise me.

Q. And then you see under, they have it both under pre-dose day and dosing day, kiwi, strawberries and orange juice?

A. Yes, under the noncured-meats diet.

Q. Correct. And then you see the eggs?

A. I see the eggs.
Q. Would it surprise you to learn that eggs have vitamin E in them?
A. I wouldn't be surprised I guess. I wasn't aware.
Q. And then looking under the noncured-meats diet, do you see where it has apple juice?
A. Where are you seeing that?
Q. Tomato soup, it is under lunch, the apple juice and tomato soup.
A. Yes, I see that.
Q. And those also have vitamin C?
A. I wouldn't be surprised if they did. I don't know the amount or much about that.
Q. And, likewise, we have carrots and apple juice listed. Do you see that?
A. On the right, yes.
Q. So then and if we move over to the cured-meats diet, you see pre-dose day, pre-dose day there?
A. I do.
Q. You see eggs and vegetable oil there?

A. I do.
Q. And sausage links?
A. Yes, I do.
Q. Would you be surprised to learn that they all have vitamin E?
MR. SHEEHAN: Objection.
A. Again, as I mentioned previously with eggs, I wouldn't be surprised, but I don't know much about eggs, to be honest.
Q. Okay, all right. And then if we go down to lunch, we have food such as tomatoes and spinach and strawberries and pomegranate juice. Do you see those?
A. I see, yes, I do.
Q. And with regard to foods that have vitamin C or vitamin E in them, both of those have been shown to be effective inhibitors of nitroso compound formation, correct?
MR. SHEEHAN: Objection, vague.
A. It is my understanding that there is literature showing that both can inhibit nitrosation.
Q. And if nitrosation was

inhibited by vitamin C and vitamin E in the foods that were given as a part of the Florian study, then that would affect the measurements of NDMA in the plasma and/or potentially the urine, correct?

MR. SHEEHAN: Objection.

MR. SELDEN: Speculation.

MR. SHEEHAN: Calls for speculation, incomplete hypothetical.

A. The levels of such nitrosation, anti-nitrosation agents, could conceivably affect the levels of NDMA in the samples.

Q. Could we please pull up Exhibit 47.

(Plaintiffs' Exhibit 47 marked for identification.)

Q. Exhibit 47 is a study entitled Exposure to Ranitidine and Risk of Bladder Cancer: A Nested Case-Control Study.

Have you seen this study before, Dr. Mitch?

A. I have not.

Q. This was published online May 21st of 2021. Do you see that at the bottom?

A. I see 2021, yes.
Q. Okay. And the results of this study, which involved 3,260 cases and 14,037 controls were as follows, and I'm going to read from the study. "There was evidence of an increased risk of bladder cancer in ranitidine users, compared with nonusers (fully adjusted OR equals 1.22 with a 95 percent confidence interval of 1.06 to 1.40), which was more marked with use of over 3 years of ranitidine (fully adjusted OR of 1.43 with a 95 percent confidence interval of 1.05 to 1.94)."
Do you see that?
A. I do.
Q. Was this study brought to your attention by the authors of the Florian study?
A. It was not, at least not that I'm aware of. Was it referenced in their study? I don't recall.
Q. It was not referenced in their study, I will represent that, which was published on June 28th of 2001.
A. I don't recall when I reviewed

the manuscript.

Q. Okay. I'm sorry. Well, you reviewed the manuscript in advance of May 21st of 2001. What I'm asking is after the study came out, did the authors of Florian then bring this study to your attention?

A. I have never, to my knowledge, had any direct contact with Florian and friends.

Q. Did JAMA contact you after the study came out and ask you to consider this study in the context of your review of the Florian?

A. They did not.

MR. WISNER: Hey, this is Brent Wisner for the California JCP, Rosemary. Can we take a break, because I think you are eating into my time now?

MS. BOGDAN: Yeah, we can go off the record.

THE VIDEOGRAPHER: We are off the record 1:46 p.m. This is the end of media unit three.

(Recess taken.)

THE VIDEOGRAPHER: We are going

back on the record 1:55 p.m. This is the beginning of media unit four. Okay, you may proceed.

BY MS. BOGDAN:

Q. Okay, Dr. Mitch, now directing your attention to the Conclusions section of the Cardwell study that's on the first page, could you read that for me, please.

A. The Conclusions reads "Ranitidine was associated with a 22 percent increase in bladder cancer risk, after controlling for confounders. Future studies are required to replicate this finding."

Q. And that's the conclusion in this study that was not cited in Florian?

MR. SELDEN: Objection. The witness hasn't seen the whole study. He can only look at what has been shown to him on the screen.

MS. BOGDAN: Of course.

Q. Is that what is written in the conclusion of this study?

A. That appears to be written in the conclusion box in this picture, yes.

MS. BOGDAN: Okay, thank you. I'm going to pass the witness to attorney Brent Wisner.

EXAMINATION BY MR. WISNER:

Q. Good afternoon, Dr. Mitch. My name is Brent Wisner. I'm an attorney here in California, just down the street from you in Marin County, and I represent plaintiffs who are alleging that they developed cancer as a result of ingesting ranitidine that contained NDMA.

Are you familiar with the sort of nature of these lawsuits or have you sort of kept your nose out of it?

A. I have tried to keep out of them, but, you know, I'm aware that they are going on, yes.

Q. Now, how long have you been a scientist for, Doctor?

A. I would say that, if we define that as initiation of a Ph.D., that would have been since 2000.

Q. And during the last 21, 22 years, how much of your work has focused on or looked at NDMA?

A. Greater than half, I would say.
Q. One of the reasons why you have studied NDMA is because you would agree with me that NDMA is not good for humans to be exposed to, right?
MR. SHEEHAN: Objection, vague.
A. I would agree that it is an undesirable contaminant.
Q. In fact, it is something that we don't want in our drinking water, which has really been the major focus of your work with NDMA; is that right?
A. That is correct.
Q. And the reason for that, and you said this earlier, and that's because NDMA is a probable human carcinogen, right?
A. Correct.
Q. And you based that statement, probable human carcinogen, because that's what the World Health Organization has classified it under its classifications, right?
A. I believe that to be the case, yes.
Q. Now, when you say a probable

human carcinogen, what the World Health Organization is really saying is that it is highly likely to cause cancer in humans, right?

MR. SHEEHAN: Objection.

A. I'm not a toxicologist, but my understanding is that some of the distinctions between the categories happen to do with whether or not there is evidence in humans for cancer versus in, you know, rat studies and such like.

(Plaintiffs' Exhibit 100 marked for identification.)

Q. Well, I'm going to show you a document that will be marked as an exhibit in your deposition, ongoing it will be dropped into the Dropbox for everybody, but do you see that this is a document entitled Concise International Chemical Assessment Document 38, Nitrosodimethylamine?

A. I see that.

Q. And then down here you see it is World Health Organization, 2002?

A. I see that.

Q. Okay. Now, if we go to page 4

in this document, you see we're in the section entitled Executive Summary?
A. I see that.
Q. If we come down here, it says "Based upon laboratory studies in which tumors have been studied" -- sorry -- "in which tumors have been induced in all species examined at relatively low doses, NDMA is clearly carcinogenic. There is overwhelming evidence that NDMA is mutagenic and clastogenic."
Do you see that?
A. I see that.
Q. When you say something is mutagenic, that means it can cause things to mutate, right?
A. It causes alterations to DNA.
Q. And that's what causes cancer, right?
MR. SHEEHAN: Objection, calls for speculation.
A. My understanding is that there are many potential theories as to the cause of cancer, of which includes mutations of DNA.

Q. Well, when we look at the cells of cancer, they are mutated cells of otherwise healthy human cells, right?

MR. SHEEHAN: Objection, calls for speculation.

A. Again, I'm not a biological cancer expert, but I believe there are other theories such as epigentics which don't entail permanent modifications to DNA but are probably, to get at the essence of your question, mutagen -- mutation of DNA is definitely typically considered to be a component of a process leading to cancer.

Q. Now, if we read it, it says "While the mechanism by which NDMA induces tumors is not fully elucidated, DNA adducts (in particular 06-methylguanine) formed by methyldiazonium ion generated during metabolism likely play a critical role."

Do you see that?

A. I do.

Q. Now, I don't want to get into all the fancy scientific jargon, but essentially what this is saying is NDMA, they theorized, metabolized into this

substance and that substance is what is causing the genetic damage; is that right?
MR. SHEEHAN: Objection, vague.
A. That's my understanding of that sentence.
Q. Okay. Now, that substance, that methyldiazonium ion, can that be tested in blood plasma?
A. That, to my knowledge, cannot be tested, because it is an unstable intermediate.
Q. So that's the problem, right, when you want to study whether or not someone has NDMA that is metabolizing in their system, you can't actually find the metabolite through any assay, right?
MR. SHEEHAN: Objection.
A. Well, this specific metabolite, the methyl cation is what that essentially is, is difficult to detect. The other products I believe are nitrogen gas, so that conceivably could be detected but it would be very difficult to do so because there is clearly lots of nitrogen around.
Q. Exactly. And, you know, when

we talk about NDMA metabolism, you testified earlier that you are not familiar with how long it takes NDMA to metabolize in the body, you don't know that number; is that right?

A. Exactly. I'm not in the metabolism field.

Q. Do you know if it is generally short or long?

MR. SHEEHAN: Objection, calls for speculation.

A. I do not have knowledge in that area.

Q. Now, if you were to learn that NDMA can metabolize in as short as five to ten minutes and it converts into this methyldiazonium ion, it would be very difficult to detect NDMA in blood plasma or even in the body, correct?

MR. SHEEHAN: Objection, calls for speculation.

A. That would certainly render it more difficult to detect.

Q. Now, if you were to do a study measuring NDMA in a test tube in a

controlled environment, you don't have to worry about NDMA metabolizing, right?

A. In a test tube with just water, there are presumably no enzymes that would accomplish such a metabolism, so yes.

Q. And so in some sense, due to the fact that the human body is so complex and has all these enzymes that could interact with NDMA, it is almost easier to identify NDMA formation in an in vitro or test tube experiment, right?

MR. SHEEHAN: Objection.

MR. SELDEN: Objection, foundation.

A. In my mind, again, I don't take blood plasma samples or anything of that nature on a routine basis, but in my estimation it would always be easier to measure something in a test tube than trying to extract samples from humans and measure them.

Q. Now, the World Health Organization, it goes on to state, "Qualitatively, the metabolism of NDMA appears to be similar in humans and

animals; as a result it is considered highly likely that NDMA is carcinogenic to humans, potentially at relatively low levels of exposure."

Do you see that?

A. I do.

Q. So when we say, and when you said earlier, that NDMA is a probable human carcinogen based on what the World Health Organization has said, they have gone on to explain that it is actually highly likely that it is carcinogenic in humans at very low levels of exposure, correct?

MR. SHEEHAN: Objection.

A. Yes. Again, I'm not a toxicologist, but that's my understanding of their categorization. When they say "probable human carcinogen," they think it likely that it is a human carcinogen, but they do not have evidence necessarily in humans, they are extrapolating from other animals.

Q. I'm sorry, sir, you said it is probably likely. I think they said it is highly likely, right?

A. That's what it said, yes.
Q. Right. And it is important to keep that in perspective because you, for example, wouldn't knowingly expose another human to NDMA, right?
MR. SHEEHAN: Objection.
A. I certainly would not make someone drink NDMA for fun.
Q. You wouldn't secretly poison someone with NDMA, right?
A. I would hope not.
Q. And, in fact, if you found out that a substance people were taking daily had tens of thousands of nanograms of NDMA in it, you would agree that that substance should be taken off the market, right?
MR. SHEEHAN: Objection, calls for speculation.
A. I'm not in the sort of position of the FDA, but certainly in my mind a product, if I were to consume it that would have tens of micrograms of NDMA would cause me at least concern.
Q. And so you would agree, then, that today, with Zantac having been removed

from the market, that is probably a good thing, right?

MR. SHEEHAN: Objection, vague.

MR. SELDEN: Objection, foundation.

A. Well, let me bring back the idea that we retracted our results because we believed that the excretion of somewhere in the neighborhood of 50 micrograms of NDMA post consumption of Zantac is no longer a reliable number.

Q. Sir, I didn't -- I didn't ask you about your study. I didn't ask you about your retraction. I asked you a very straightforward question, and I would like the jury to hear your answer.

Good thing that Zantac is off the market, right?

MR. SHEEHAN: Objection, vague.

MR. SELDEN: Objection, foundation.

A. My answer to that is that we need to understand potential risks associated with ranitidine compared to its benefits. The retraction -- the removal of

NDMA from the market was based on, according to the FDA's statement, not necessarily our Carcinogenesis study but their estimation that there were levels of NDMA in tablets in excess of 96 nanograms from either the factory or forming upon storage in shelves.

Q. Doctor, do you remember my question?

A. I do.

Q. What was my question?

A. Your question was am I positive or in favor of withdrawal of ranitidine from the market.

Q. That's right. What's your answer?

MR. SHEEHAN: Objection, vague.

MR. SELDEN: Objection, asked and answered.

A. My answer is that I would hope that ranitidine, for it to be on the market, that it would be approved by the FDA and maintain compliance with all FDA guidelines, which includes, to my understanding, that the levels of NDMA in

the tablets should be less than 96 nanograms.

Q. All right, Doctor, I will ask you one more time. Hopefully I can get an answer.

In your opinion, as someone who has been studying NDMA for no less than a decade, do you think it is a good thing that ranitidine is no longer sold in the U.S. marketplace?

MR. SHEEHAN: Objection, asked and answered, and argumentative at this point.

MR. SELDEN: Agreed, Brent. Can we please move on to something else? The witness has answered three times.

A. What do I do? Am I answering?

I would say that I am in favor of the initial, me as a private citizen, not necessarily as a regulatory expert, I am in favor of the concept that FDA was looking into this issue and took the precautionary principle of withdrawing ranitidine from the market at the time that it did so under, according to them,

evidence that they believed in that the levels of NDMA may have been in certain cases in excess of 96 nanograms.
Q. Now, you have actually studied ranitidine and its stability and its propensity to turn into NDMA in storage, right?
MR. SHEEHAN: Objection.
A. I wouldn't say I have looked at it under the storage association.
Q. Okay. Well, you remember that -- well, okay. We will get to that later. Well, actually let's do it right now.
So you previously were drafting a manuscript with Emery Pharma, correct?
A. Correct.
Q. I'm going to show what has been labeled as Exhibit D-28. Do you see this e-mail, sir?
A. I see a Google --
MR. SHEEHAN: You have been Googling V-8?
MR. WISNER: Yeah, I was trying to find out how much vitamin E it has in

it.

Q. Do you see this e-mail, sir?

A. I do.

Q. And this is an e-mail from Ryan Cheu to you?

A. Yes, it is.

Q. Dated January 29th, 2021, right?

A. Correct.

Q. About nine months ago?

A. Yes.

Q. All right. And then attached to it is a draft of this article that we were talking about titled Quantitation of a Probable Human Carcinogen, N-nitrosodimethylamine (NDMA) in Pharmaceuticals. Do you see that?

A. I do.

Q. Now, if we go into this document, on page 25, I'm sorry, let's go up earlier actually, in the Methods section you talk about, okay, well, one of the reasons, sorry, I'm having a hard time finding it, one of the reasons, Doctor, that you wanted to study the stability of

ranitidine was to mirror storage and transport conditions, correct?

MR. SHEEHAN: Objection, misstates prior testimony.

A. Let me clarify that this manuscript is an amalgamation of separate studies. The storage, temperature, humidity results, etc., was conducted by Emery Pharma. We decided to include the subset of the study that is associated with urine, which is the extent of the study that I conducted together with Emery Pharma.

Q. Okay. So do you dispute Emery Pharma's findings regarding the stability testing that they conducted?

A. I was not directly involved with the study. My suggestions to them with respect to this manuscript -- oops, it disappeared -- was what I mentioned an hour or so ago, that some of the points on that plot could use some replication because they did not appear to follow a smooth trend.

Q. Now, Doctor, you have

previously worked with Emery Pharma, correct?

A. This is the only experience I have had with Emery Pharma.

Q. Well, for example, you -- fair enough. And Emery Pharma's results, for example, of the urine testing you found to be reliable, correct?

A. Yes.

Q. Do you have any reason to believe that their analysis of the stability testing was not reliable?

MR. SHEEHAN: Objection, asked and answered.

A. I don't have a specific complaint about how a particular analysis is done, but oftentimes when you do many analyses, the chances are there is some chance for error whenever you do an analysis, and so my -- that's why I was suggesting to them that that final point, maybe it was the green point, I forgot the color, seemed odd to me. It doesn't necessarily mean that it was wrong, but it could be useful or wise to try to repeat

that experimental point and make sure you still get the same answer.

Q. Okay. But I'm showing you the chart. You agree that -- here we are looking at the green, that's the 100 percent humidity analysis at 80 degrees, right?

A. I believe so.

Q. And then the red is at a higher temperature but ambient humidity, right?

A. I can't see the legend, but that seems reasonable.

Q. Okay. Now, what these results are showing are, at least for the red line, it gets up to around 30,000 nanograms at 45 days, and at a similar time frame you are well over 50,000 nanograms for the high humidity metric. Do you see that?

A. I see that.

Q. Now, assuming that this trend was replicated, and you have no reason to believe that this is wrong -- well, do you have any reason to think this is absolutely wrong, sir?

MR. SHEEHAN: Objection.

A. Well, like I said, I don't -- say, for example, with the red line, I don't see any point that in particular would cause me pause, because it is a consistent trend that seems internally consistent for the data.

What I was mentioning about the green line, and similar comments to the red line would apply to the blue line, but with respect to the green line the final point is confusing, and so one would -- that's what I mentioned to them, that it would be prudent to repeat that point and to ensure themselves that that is not just a chance, you know, something weird happened that day to that particular beaker or something of that nature, but that that is a replicable data point.

Q. Well, they did studies on different lots of Zantac, right? Here is one on TopCare brand, right?

A. They appear to have done so.

Q. They did one on the USP ranitidine. Do you see that?

A. I do see that.

Q. And they also show the same trends, don't they?

MR. SHEEHAN: Objection.

A. So with the, again, let's take the middle plot, you see a similar trend like you said. My question to them, again, and I don't know the details, was that -- were those two beakers put together, was this the same day, the same day that they analyzed these samples for the two batches of ranitidine? Did something weird then happen, happen that day to the instrument, or anything else associated with the experiment?

That is why I suggested, and I don't have any specific reason to say I know for sure that there was something wrong with that point, but I think any reasonable reviewer of a paper would say this is an unexpected trend that the concentration shown in the green is routinely low for 35 days and suddenly in the last ten days it jumps up remarkably.

Q. Okay. Let's assume for a minute that there is nothing wrong in these

multiple tests done on these multiple lots, okay? Let's just make that assumption for a second, Doctor. And it turns out that at 80 degrees after 45 days of high humidity, you are seeing these levels of NDMA, that's very concerning, right?

MR. SHEEHAN: Objection, vague and incomplete hypothetical.

A. Again, I'm not a regulator, but to me as a private citizen, that would be concerning to me.

Q. Doctor, I'm asking you not as a private citizen, I'm asking you as a man who has been studying NDMA for over ten years, 50,000 nanograms of NDMA in one pill after 45 days, that's a concerning number, right?

MR. SHEEHAN: Objection, vague.

MR. SELDEN: And argumentative.

A. As I indicated, it was a concern to me in my professional capacity, that is in relation to what we consider to be relevant for drinking water exposure, so in that sense you are correct that that is far higher than what we consider to be a

safe, if you will, exposure via drinking water.

Q. And if somebody goes and buys a 100 pack of Zantac at Costco and stores a bottle in their glove compartment or in their boat or something like that, there is a real probability that they can be ingesting pills that have been exposed to heat and humidity for periods of time significantly longer than 45 days, right?

MR. SHEEHAN: Objection, speculation.

A. That's a conceivable scenario.

Q. And you would agree with me this data, whether or not there is something funky going on with that one green analysis in every single lot tested, it does show that over time, with heat, you are getting more and more NDMA, right?

MR. SELDEN: Objection.

MR. SHEEHAN: Objection, vague.

A. Those plots would appear to suggest that, yes.

Q. And so if some poor person tomorrow pulls out some Zantac that they

had in their glovebox for the last two and a half years, you have no idea how much NDMA is in there today, right?

MR. SHEEHAN: Objection, speculation.

A. In my mind, you are correct, and I believe that that is what the FDA market withdrawal notice also suggested.

Q. And in fact, for example, if these products were manufactured in Mexico during the summer, put into a shipping container for three or four weeks, by the time it finally gets into the mouth of the consumer, it could be well past 45 days, right?

MR. SHEEHAN: Objection, calls for speculation.

MR. SELDEN: Foundation.

A. That appears to me to be a conceivable scenario.

Q. Why hasn't this stuff been published, sir?

A. Why hasn't the study we were just looking at been published?

Q. Yeah.

A. All I can speak to is the urine results that we were involved in. To my knowledge, Emery Pharma could very well be attempting to publish the results that we were just looking at. There is no prohibition associated with -- from the urine results that does not apply to anything else in the manuscript.

Q. Okay. So this, you think this should be published?

A. As I indicated, I had comments to them that they should repeat, for example, the green point in question, but if it is repeatable, it seems like something that would be interesting to publish in my mind.

Q. When you saw these results, did you find them shocking?

MR. SHEEHAN: Objection, vague.

A. I don't know what I was expecting to see in the first place in terms of what level. I don't know if I was shocked. But based on the knowledge of -- or the issues around artifact and thermal instability, the idea that NDMA at the

lower temperatures evaluated in that particular study would increase over perhaps much longer times than are observed in a GC injection port isn't necessarily shocking to me.

Q. Now, Doctor, you testified earlier that the Valisure petition was sort of what brought to light the issue regarding ranitidine and NDMA, right?

A. That is my understanding. Again, I don't have a lot of interactions with or really any interactions with the FDA, but that's my understanding of why they began to focus on this issue.

Q. And you were first brought in as a consultant at Valisure back in May of 2019, right?

A. I believe that that's the case, around that time frame.

Q. And as part of your consulting work, you were asked to review the Valisure petition, correct?

A. I was asked to review certain portions of it, particularly the parts that attempted to summarize our studies.

Q. And you also, Doctor --

MR. SHEEHAN: Brent, I'm sorry, I keep on getting this note that my internet connection is screwed up, and everybody is fading in and out, so I'm wondering whether we can just take a short break and I will reconnect.

MR. WISNER: Sure. Let's get off the record.

THE VIDEOGRAPHER: We are off the record 2:25 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record 2:29 p.m. This is the beginning of media unit five. Okay, you may proceed.

BY MR. WISNER:

Q. Now, during the examination by defense counsel earlier, I think that was yesterday, do you remember being shown some e-mails from David Light with Emery Pharma about the results of heating and it potentially creating an artifact in the results?

A. I recall some e-mails, yes.

Q. Okay. I'm going to show you an exhibit that was shown to you. This is Exhibit 51. And this is the e-mail chain. And what you were shown was the sentence here from David Light "Regarding the report, although the commentary on the samples is nice for discussion, for the final report, can you include only the FDA method designation that was used and the results? The clarification that the results are outside of the calibration range and thus could be underestimates is fine to include."

Do you see that?

A. I see that.

Q. And he said it looks like Mr. Light is trying to remove any discussions of the samples from the final report. Do you remember those questions?

MR. SHEEHAN: Objection, mischaracterizes prior testimony.

A. I recall the discussion, yes.

Q. Well, this is Exhibit 50. This is the report that you were shown yesterday with that language that we're discussing.

Do you see that?
A. Yes, I do.
Q. Would you be surprised to learn that this is actually the final report and that the very language that Mr. Light is accused of trying to remove is plainly right there?
MR. SHEEHAN: Objection.
A. Show me where you are talking about.
Q. Right down here. It says "Due to the discoloration observed and the chemical structure of the Zantac substance (ranitidine), the levels obtained are suspected to be caused by the heating produced in this method."
Do you see that?
A. I see that.
Q. So would you be surprised to learn that this is actually the language that's in the final report?
MR. SHEEHAN: Objection.
A. I don't have an opinion one way or the other. I'm not really a part of this whole interaction between Emery Pharma

and Valisure.

Q. I know. But yesterday defense counsel showed you this and then showed you this e-mail and had you make an opinion about David Light trying to remove something from the final report. Do you remember that sequence of questioning?

MR. SHEEHAN: Objection.

A. I do.

Q. It would be an incredibly misleading thing if in fact the very language that he refers to here actually is the final language after this commentary, right?

MR. SHEEHAN: Objection.

A. Again, I don't know enough about this particular interaction to understand the details of what they are referring to here, but as I recall, from a discussion yesterday, a lot of the discussion was about, as I vaguely recall, whether we were looking at certain ratios or concentrations of nitrite less than I think it was 1 millimolar or something of that nature.

Q. Okay.
A. And that sort of thing.
Q. Oh, sorry.
Now, if you look down here, earlier in this e-mail exchange, there is actually an e-mail from David Light that specifically gets into the heating issue. Right down here, an e-mail from David Light dated April 1st at 5:19 p.m. Do you see that?
A. I see that.
Q. And what he says right here is "The FDA proposal we've been using is attached with a few additional details below. This is a great, high-sensitivity assay for NDMA though it incubates the sample at 130 Celsius and heat is a contributing factor to the degradation of ranitidine."
Do you see that?
A. I see that.
Q. So it looks like in this e-mail David Light is actually telling Emery hey, there is a problem with this assay because it leads to the degradation of ranitidine

in heat, right?
A. That's what it appears to suggest, yes.
Q. And in fact in the ultimate Valisure petition that was filed, they openly acknowledged the heat issue, don't they?
A. I don't recall those details in the citizen's petition.
(Plaintiffs' Exhibit 102 marked for identification.)
Q. Well, let's take a look at it. This is the citizen's petition. I will put it up. And if we go down to page 3, "The FDA protocol uses conditions that are benign for nearly all other molecules discussed in this petition, however, it is suspected that the modest heating in the GC/MS of 130 degrees Celsius oven incubation for 15 minutes results in this highly efficient conversion of ranitidine to NDMA."
Do you see that?
A. I see that.
Q. So in the petition, David Light

and Valisure are openly talking about this issue of heating, aren't they?

MR. SHEEHAN: Objection, vague.

A. It appears that they are bringing up this issue in the petition.

Q. And, in fact, they go on to explain that they then developed a gas chromatography approach that uses human body temperatures, right?

A. I don't recall those sections. Where do you see that?

Q. We can go -- we can go down here. It says, if we go to page 6, it says right here "The extreme nature of the results prompted petitioner to undergo further scientific research to determine the origin of the NDMA. Suspecting that the modest oven heating parameter of 130 degrees Celsius in the FDA recommended GC/MS protocol contributed to the high results, Valisure developed a low temperature GC/MS method that could still detect NDMA but would only subject samples to 37 degrees centigrade."

Do you see that?

A. I see that.

Q. So in fact, Valisure not only identified the heat issue, they went and developed a gas chromatography testing method that didn't use heat, right?

A. That's what they are claiming in this text, it appears. I don't know the details of that analytical method.

Q. Fair enough. They said "This method was validated to a lower limit of detection of 100 nanograms."

Do you see that?

A. I see that.

Q. So it would be a really unfair characterization of the Valisure petition to suggest that it was concealing the heat artifact from the FDA, correct?

MR. SHEEHAN: Objection.

A. The section of the manuscript that you had just shown, not manuscript, but petition I guess, appears to indicate that they are aware of the temperature issue.

Q. And when this manuscript was, I'm sorry, when this petition was filed

with the FDA, at that time the FDA had not said hey, this is the way you are supposed to study ranitidine for NDMA, right?

A. To my knowledge, we were certainly unaware of a notice by the FDA as to which, certainly something like an LC/MS-based method.

Q. And, in fact, that's why you used GC/MS in your 2016 study, right?

A. We used GC/MS in our 2016 study because we had routinely been using the U.S. EPA-based method and we knew of no reason why that should be a cause of concern at the time.

Q. Now, you recall that the defendants, they showed you that chart that they claimed to have pulled off of Valisure's website that referenced your Stanford study. Do you remember that?

A. You mean the one that had the Stanford logo on it?

Q. That's correct. Do you remember that?

A. I recall it.

Q. Okay. And you said well, he

probably should take that off of his website because it is no longer accurate, correct?

A. Based on what I was looking at yesterday, I would indicate that that's the case.

Q. All right. Now, Doctor, I'm going to share with you my screen here. This is Google. I'm going to type in Dr. Mitch, Stanford. We get a result here, it looks like a couple of different things, one of them is The Mitch Laboratory. That's you, right?

A. I believe so.

Q. So if I click on it, we have got a picture, it looks like you and some of your students and Ph.D. candidates; is that right?

A. That is the case.

Q. And if I click on Publications, I will just control F for ranitidine, we have your 2016 study here listed, right?

A. We do.

Q. It doesn't say it is retracted though, does it?

A. It does not appear to say that.
Q. That's because you haven't got around to updating this website, right?
MR. SHEEHAN: Objection.
A. That appears to be the case.
Q. So would it be unfair to accuse you of being misleading to the world because you haven't updated your website?
MR. SHEEHAN: Objection, vague.
A. You are correct that I did not update the website. My suspicion is that if you click the full text, it would link in to a retraction notice.
Q. Absolutely. It takes you right to the same link of your old, which has now had "retracted" added to it. Do you see that?
A. Yes.
Q. So after Valisure files its petition, there was a whole bunch of media and interest regarding Zantac, right?
A. I believe so.
Q. Your study that you did back in 2016 gained a lot of interest, right?
A. It appears so.

Q. You got e-mails from people who were using Zantac who were worried about their health, right?
A. Correct.
Q. And as you said earlier, you are not a medical doctor, right?
A. Correct.
Q. You are not an epidemiologist?
A. I am not an epidemiologist.
Q. You are not a toxicologist?
A. I'm not a toxicologist.
Q. So when you responded to these concerns, you did your best as an environmental engineer would, right?
A. I would hope so.
Q. Now, the petition, the Valisure petition, was filed in September of 2019, right?
A. I don't recall the date, but that seems about right.
Q. Do you recall when the FDA pulled ranitidine off the market?
A. I believe it was in early 2020.
Q. Do you know the exact dates or no?

A. I don't.
Q. So let's go to, I will share my screen again, this is the FDA's website. Do you see that?
A. I see that.
Q. And I assume, you know, you have been to this website before, right?
A. I believe so.
Q. And if we look right here, there is actually a timeline of events that happened with the FDA, the first one starting in September 13th, 2019 and the last one here being dated April 16th, 2020. Do you see that?
A. I see that.
Q. And if you look right here, on April 1st, April Fool's Day, 2020, FDA requests removal of all ranitidine products (Zantac) from the market. Do you see that?
A. I do.
Q. Now, prior to that, it looks like there was a statement alerting patients and healthcare professionals of NDMA found in samples of ranitidine. Do you see that?

A. I see that.
Q. This was in response to the Valisure petition, correct?
MR. SHEEHAN: Objection.
A. I am not aware of that, but it could be.
Q. Now, we earlier discussed that you were brought in as a consultant in May of 2019, right?
A. That seems about right.
Q. Are you aware that Valisure actually shared the results of their analysis with the FDA in the summer of 2019 before it filed its petition?
A. I was not aware of that.
Q. And are you aware that after they shared the results with the FDA, the FDA took no action?
MR. SHEEHAN: Objection, calls for speculation, misstates facts.
A. I have no knowledge of the Valisure/FDA interactions.
Q. So after that, as you can see the next one, Sandoz, one of the manufacturers of ranitidine, it recalls it

voluntarily within two weeks of the Valisure petition, doesn't it?

MR. SHEEHAN: Objection.

A. That's what it appears from what I'm seeing.

Q. And then if we click here on November 1st, 2019, the FDA releases laboratory testing results for NDMA, doesn't it?

A. That's what it appears from the title, yes.

Q. So approximately two months after the Valisure petition, the FDA announced its results, right?

A. I haven't looked into the details of this, but that's what the titles seem to indicate, yes.

Q. And, in fact, you have looked at these results before, right?

A. I don't recall looking at all the specific results. I do recall looking at the aspects about certainly the market withdrawal notice and also some of the announcements of different analytical techniques such as LC/MS, but I don't

believe I looked through all of these different media updates.

Q. Fair enough. But did you look at the laboratory results of NDMA they found in the pills in November of 2019?

A. I don't believe I did.

Q. Okay. Earlier you testified that the FDA released results that showed that pills had NDMA in excess of 96 nanograms. Isn't that what that reflects?

A. No. It reflects my reading of their market withdrawal notice.

(Plaintiffs' Exhibit 101 marked for identification.)

Q. Okay. Well, let me show you the next exhibit. These are those FDA results, and as you can see here -- do you see those FDA results, sir?

A. Not yet.

Q. My share screen acts a little funky sometimes. Do you see them now?

A. Yes, I'm starting to see them.

Q. And if we go down here, it lists the results of various levels of NDMA in pills, and just to give you some

context, the NDMA level in micrograms per tablet or oral dose, do you see these results here?

A. Yes.

MR. SELDEN: The witness has testified he has never seen this before. If you are going to ask him about it, give him a chance to see it rather than flipping through section by section asking him.

MR. WISNER: I think I heard you right, Brian.

Q. But, Doctor, have you seen these results before?

A. I have not.

Q. In any event, this is literally two pages, it is not particularly, sorry, three pages, it is not a particularly complicated document, but you can see here that the testing results are showing levels in excess of the FDA's 96 nanogram limit, right?

MR. SHEEHAN: Objection, mischaracterizes the document.

A. So my reading of the last column is that that is showing

micrograms-mcg, I guess that is their abbreviation for micrograms per tablet. So in the first case of Sanofi Pharmaceutical, it appears to show 10 to 360 nanograms per tablet.

Q. And that 360 would be in excess of the 96 limit, right?

A. It appears to be so.

Q. And you can see up here, this is dated, of course the FDA never dates anything, it drives me crazy, well, we saw from the website, do you remember what date this was?

A. 2019 November, maybe, somewhere around there.

Q. I will show you right here. November 1st, 2019. Do you see that?

A. I see that.

Q. Okay. So they have their own results showing that ranitidine products being sold have more than 96 nanograms of ranitidine -- of NDMA in them.

MR. SHEEHAN: Objection, mischaracterizes the document.

MR. WISNER: Let me get to my

question and you can do your objection, Tom.

MR. SHEEHAN: I'm sorry about that, Brent.

MR. WISNER: No problem.

Q. So on November 1st we have results of laboratory tests showing that ranitidine has NDMA in excess of FDA regulatory limits. We go through December 1st, January 1st, February 1st, March 1st, and finally on April 1st, five months later, the FDA finally requests the withdrawal of ranitidine from the market. Do you see that?

MR. SHEEHAN: Objection, mischaracterizes the testimony.

A. I see, yes, the withdrawal notice occurred April 1st, 2020.

Q. You would agree with me that's a long time to finally get a product off the market, right?

MR. SHEEHAN: Objection, vague.

A. I don't have a lot of experience in the medical field, but sometimes it does take a long time to, at

least in the environmental field, for things to happen.

Q. And during that time, many, many, many manufacturers are voluntarily recalling it, right?

MR. SHEEHAN: Objection.

A. I'm not aware of that time sequence. It looked like at least one did from what you showed me. I forgot the name of the company, but Sandoz, something like that.

Q. We have Aurobindo, we have Glenmark's voluntarily recall, Mylan's voluntary recall, the American Health Packaging voluntary recall. Do you see all these voluntary recalls here?

A. I'm looking at a list of concentrations measured in tablets.

Q. Good grief, I'm really getting bad at this sharing my screen thing, I apologize, sure.

All right, so after November 1st, or even before November 1st, we have Sandoz recall, we have multiple voluntary recalls listed here which includes

Dr. Reddy's Laboratories, Sanofi, Wal-Mart, Walgreens, CVS, Target, Kroger, we have later recalls by Aurobindo, we have Golden State Medical Supply recalls, Precision Dose Inc. recalls.

There are numerous recalls here following the Valisure petition that all predate the FDA's withdrawal of Zantac from the marketplace, right?

MR. SELDEN: Objection. Are you making representations that those recalls existed and then asking the witness to confirm your representation?

MR. WISNER: I can't hear what your objection is, I'm sorry. Are you asking me a question?

MR. SELDEN: You made representations about there being recalls and now it sounds like you are asking the witness to confirm the representations you just made.

MR. WISNER: I think my question was pretty clear.

Q. Based on what we are seeing here in this website, Dr. Mitch, there

appears to be numerous recalls long before the FDA gets around to voluntarily withdrawing Zantac from the market, correct?

MR. SELDEN: Again, objection. The witness testified that he has not seen the website or the recall notices. If you want him to spend the time to review them and then ask him about that, that's fine. But what you are asking him to do, as I'm hearing it, is to validate the representations that you are making.

Q. Okay. Can you please answer my question, Dr. Mitch?

A. I have not read the details of any of these recalls, but from the titles of the different statements or updates that you have on your screen, it appears to suggest that there were voluntary recalls by various entities.

Q. So it took the FDA months to finally get around to voluntarily withdrawing Zantac from the market even after they knew that they had pills testing in excess of the regulatory limit for NDMA,

correct?

MR. SHEEHAN: Objection.

A. It appears that there were several months, yes, between the publication of those results you were showing us and the market withdrawal notice of April 2020.

(Plaintiffs' Exhibit 104 marked for identification.)

Q. Now, Doctor, you and a couple of other scientists, including Dr. Braunstein, authored a publication that was set to be published in January of 2020, correct?

A. Yes, I believe so.

Q. And that was a study that I'm going to call, moving forward, as Braunstein -- I will call it JAMA article 1, okay?

A. Okay.

Q. For our purposes here. Did you have a chance to see the peer reviews for that publication?

A. Not to my knowledge. So maybe you could refresh my memory at least as to

what was in that publication because there were, as I recall, a few that he was attempting to publish.

Q. Sure. I don't want to spend too much time reconstructing it, but I will just show it to you so you will see what I'm talking about. This is the copy of the article, you see Ranitidine Use, do you see this article, sir?

A. Yes, I do.

Q. And it says "Confidential Embargoed until 11:00 a.m. eastern January 10, 2020. Do not distribute."

Do you see that?

A. I see that.

Q. And you are an author on this article, right?

A. It appears to be so, yes.

Q. Okay. And this article goes on to discuss some of the studies that had been done using the data of cancer patients at Memorial Sloan Kettering, right?

A. As best as I can recall, it does, yes.

Q. Now, did you get a chance to

see the peer reviews that were done for this publication?

A. If I did, I don't recall reading them.

Q. Do you recall if there was any peer reviewer that suggested it should not be published?

A. Again, I don't recall seeing the reviews, so it is hard for me to say.

Q. All right. Let's take a look at -- let's take a look at at least one of them. I'm showing you another exhibit that will be marked by the court reporter at some point.

(Plaintiffs' Exhibit 103 marked for identification.)

Q. Do you see this e-mail exchange, sir?

A. I see, yes, I see an e-mail.

Q. It is to Dr. Braunstein from JAMA Network Open. Do you see that?

A. I see that.

Q. And if we go down here, we have Reviewer Comments. Do you see that?

A. I do.

Q. And it looks like there is Reviewer 1 and there is Reviewer 2. Do you see that?
A. I do.
Q. And it looks like Reviewer 1 goes by the name of William Douglas Figg. Do you see that?
A. That is interesting that they identified themselves. Yes, I do see that.
Q. And what Reviewer 1 says, "The current manuscript by David Light, et al.," and he gives the title, "is a clinically significant original research letter and should be published urgently given its potential impact on clinical practice."
Do you see that?
A. I do.
Q. "We recognize one grammatical change that is required," and he goes on to say that, "otherwise this manuscript is appropriate for immediate publication."
Do you see that?
A. I do.
Q. That's a pretty good review for a manuscript, right?

MR. SHEEHAN: Objection, vague.
A. It appears to be very positive, yes.
Q. And at this time, if we go look at the date here, this is in September of 2019, right, issues relating to ranitidine and its potential NDMA formation and potential carcinogenicity are really an important issue of public interest, right?
MR. SHEEHAN: Objection.
A. I would believe that that is a fair characterization.
Q. And so you would agree, then, that this publication, which provided some data that Memorial Sloan Kettering had, would be helpful information for the scientific community to see and think with and incorporate into their understanding of the science?
MR. SHEEHAN: Objection, calls for speculation.
A. I would agree that the results appear to be interesting.
Let me clarify my role in the study. So the study, as I recall, had two

aspects, one was an epidemiological study by -- run by Lior Braunstein, and the other aspects were some NDMA formation during heating or such like experiments, in vitro type studies, as I recall, by Valisure. My role, or the reason why they asked me to be in it, was they wanted me to accurately summarize our 2015 and mostly the 2016 study results that we had conducted. So I don't really have a lot of intimate knowledge of either the epidemiological results, because I'm certainly not an epidemiologist, or much about the Valisure results.

Q. Okay. If you look at the disclosure on the actual -- I shared the wrong one, sorry.

If you look at the disclosure in the study here, it has a whole section about authors' contributions, right?

A. It appears to be so, yeah.

Q. And it says "Acquisition, analysis, or interpretation of data: all authors," right?

A. Correct.

Q. "Critical revision of the manuscript for important intellectual content: all authors," right?
A. That's correct.
Q. And you're an author, right?
A. Yes, that's correct.
Q. So when you just said you only had a role in, I don't know, reviewing the analytical results of some in vitro tests, is this disclosure of your contribution incorrect?
A. I would say it is incomplete in that yes, I helped interpret the text because I certainly helped edit and modify the sections that summarized my previous texts.
I would agree with you that perhaps this is an overblown interpretation of my contributions if it is saying that I spent significant time looking over, say, the results of the epidemiological study. As an epidemiologist, I would have little to no technical insights into how that study was done.
Q. Okay. Well, I guess my

question then is, Doctor, why did you put your name on this if you are distancing yourself so much from it now?

MR. SHEEHAN: Objection.

A. Well, at the time, again, this paper, to my knowledge, has never been published, but at the time it was my impression that the results of our 2016 study were reliable results and had a bearing as part of a complete story with these other results.

Again, it is not my expertise to be an epidemiologist, but assuming that the results of the epidemiology study were valid, that it would be useful to have a complete story. As I recall vaguely, I don't remember all the details, but in terms of what the original drafts were, but the sections that they were writing to summarize our studies were needing improvement.

Q. Sorry, I don't know why it keeps jumping around. Okay, thanks.

If you look down here, interesting results, there are quite a few

odds ratios, greater odds of presenting with given cancer for ranitidine users, there is quite a few statistically significant results in this study. Do you see that?

A. I see that.

Q. Okay. Now, this, as we saw a second ago, was embargoed, you understand that, right?

A. I saw that it was embargoed.

Q. So it had gone through the peer review, it was slated for publication, it hadn't even been formatted, but it had been sent to a select few reporters so that they could do stories on it before it was actually officially published, right?

A. I don't know the details, but that sounds likely.

Q. Now, is it your understanding that embargoed papers are given to the manufacturers of the products that are being studied?

A. I don't know. Again, the field that I'm in, we typically don't have manufacturers.

Q. Okay. But in this publication, when it was, that you have your name on, when it was being embargoed, did you expect it would get into the hands of, for example, Sanofi?

MR. SHEEHAN: Objection.

A. I had no expectations one way or the other. My assumption was embargoed meant that we were, as people listed on the publication, were not supposed to go talk about it openly, and that was the extent of my understanding.

(Plaintiffs' Exhibit 105 marked for identification.)

Q. So I'm sharing you another e-mail. This was produced to us by Dr. Braunstein. You can see it is dated January 9th, 2020. Do you see that?

A. I see that.

Q. It is the day before the publication of the article, right?

A. I see that, yes.

Q. And it looks like a reporter from USA Today -- you see right there it says USA Today?

A. Yes.
Q. It says "I have reached out to Sanofi, given the company makes the branded project in question. Below is their response. I want to give you an opportunity to add anything else. I know we have already discussed some of the limitations and plans for future research."
Do you see that?
A. I see that.
Q. And then Sanofi has a statement, "We reviewed the Research Letter published in JAMA Network Open."
Do you see that?
A. I see that.
Q. So it looks like Sanofi got a sneak peek at it the day before it was published?
MR. SHEEHAN: Objection, mischaracterizes the document.
A. I have not seen this e-mail before. It appears to be what it is saying.
Q. This is at 2:22 p.m., right?
A. Yes.

Q. Let's see what happens a few hours later. I'm going to show you another document. This is an e-mail dated 2:44 p.m., 22 minutes later. Do you see that?
A. Yes, I see that.
Q. And then it says "Dear Dr. Braunstein, as Editor in Chief of JAMA and The JAMA Network I oversee all of our publications."
Do you see that?
A. I see that.
Q. Now, you understand that Dr. Bauchner, he wasn't the editor in chief who had been working on this article before that, right?
A. I did not interact with the editor, so I don't know who it was.
Q. Okay. I'm going to represent to you that Howard Bauchner is the boss of the editor who had been working with Dr. Braunstein, okay?
A. Okay.
Q. Now, Dr. Bauchner goes on to say "A number of concerns have been raised about the validity of the results in your

article 'Ranitidine Use, N-Nitrosodimethylamine (NDMA) Production, and Variations in Cancer Diagnoses.'"

Do you see that?

A. I see that.

Q. "Because of the importance of the issue and the public health implication of the reported findings, these concerns will need to be satisfactorily addressed prior to any publication."

Do you see that?

A. I see that.

Q. So 22 minutes later, JAMA pulls the publication the day before it is meant to go, doesn't he?

MR. SHEEHAN: Objection.

A. It appears to be that's what this e-mail is saying, yes.

Q. Dr. Mitch, in the last 20 years of your research and the various publications you have been involved in, have you ever seen a publication go through peer review, be slated for publication, be given to one of the stakeholders of the product at issue, they review it, complain

about it, and suddenly it doesn't get published?

MR. SHEEHAN: Objection, mischaracterizes the facts and evidence, lack of foundation.

A. Well, as I mentioned before, in my field, we don't tend to deal with companies, so it is a little bit -- I probably would not have run into any such situation, but, you know, it doesn't -- it's not something I'm used to.

Q. You do understand, though, that pharmaceutical companies have a considerable amount of influence, right?

MR. SHEEHAN: Objection, calls for speculation, lack of foundation, vague.

A. In general, my understanding is they can be influential in certain areas, but I had no knowledge that they had particular associations with academic journals.

Q. Okay. This is the journal of the American Medical Association, right?

A. Correct.

Q. They make a lot of money

selling reprints to pharmaceutical companies, don't they?

MR. SHEEHAN: Objection, calls for speculation, lack of foundation.

A. I don't know their business model.

Q. You would agree it is a bit odd that this publication, which had gone through peer review, had been sent as an embargoed paper to reporters, was pulled the evening before it was set for publication, right?

MR. SHEEHAN: Objection, vague.

A. Again, I don't know the details, but presumably there was some indication, some more definition to Lior Braunstein as to the nature of the issues. I don't recall getting that information.

Q. Let's look at the next exhibit. This is an e-mail exchange dated February 5th, so it is a little less than a month later. Do you see that?

A. I see that.

Q. And it is from Dr. Braunstein. Do you see that?

A. I see that.
Q. It says "Talked to JAMA editorial group (main office in Chicago, not network open sub-team) and it turns out a few rather unprecedented things happened: (1) as anticipated, there were objections to the lab method from a few vocal/influential sources."
Do you see that?
A. I see that.
Q. He goes on to say "It was the only protocol around when our work was done, and by the time we reached publication, a new method became the standard. The editor was very sympathetic about the whole thing, but in the meantime we've employed that new methods and results are robust, so we're adding that now."
Do you see that?
A. I see that.
Q. Did Dr. Braunstein ever talk to you about who this few vocal/influential sources that lodged the complaints were?
A. As I recall, again, this is many years ago, but as I recall, I do not

necessarily have direct conversations with Dr. Braunstein, but more so heard it secondhand through David Light.

Q. What is your understanding -- sorry. Sorry, I didn't mean to interrupt you.

A. So, you know, I heard his feelings that there was -- his suspicions that there were these influential sources potentially including pharmaceutical companies involved, but, again, the nature of the concerns raised by the influential sources were not clear to me.

Q. Fair enough. So fair to say, Dr. Mitch, you don't know who these vocal/influential sources were that raised objections that led to the manuscript not being published the day before it was sent to; is that right?

A. That's true.

MR. SHEEHAN: Objection.

Q. Now, after that, Dr. Braunstein prepared a second manuscript for publication. Do you recall that?

A. I recall there being one or two

publications. Again, I don't totally recall the details on them.

Q. Yesterday, defense counsel showed you Exhibit 22, and this is an e-mail exchange between Dr. Braunstein and Dr. Kantor, and attached to it is this draft of Ranitidine Use N-Nitrosodimethylamine (NDMA) Production and Variations in Cancer Diagnoses. Do you see that?

A. I see that.

Q. It looks like your name is listed here as a potential author. Do you see that?

A. I see that.

Q. Now, during the defense's examination of you, they showed you this table right here, Figure 1. Do you remember that?

A. I recall that from yesterday, yes.

Q. And they made a huge stink about the fact that the results between zero and 0.5 micromolars of sodium nitrite were not ultimately disclosed in the final

publication. Do you remember that?
A. I remember that contention, yes.
Q. And I believe, if I recall correctly, they asked you if you thought -- if you had published this, if you had the opportunity, and you said you would, because you think it could be useful, right?
A. I believe so, yes.
Q. Now, when you made that testimony, did you know if there was any constraints on the word limits or references that were permissible in the publication?
A. I was not aware of specific word limits.
(Plaintiffs' Exhibit 106 marked for identification.)
Q. Let me show you an exhibit. You see this is an e-mail to Dr. Braunstein from JAMA Network Open?
MR. SHEEHAN: How are you identifying these exhibits? We are getting sort of lost in the shuffle here I think.

There have been a lot of exhibits that have never been marked.

THE CONCIERGE: They are marked. They are in the marked exhibits folder as P100 through 105. This will be P106. Thank you.

MR. WISNER: Sorry, Tom, I didn't have a chance to get them premarked, so I'm just flowing through it, but the reporter is marking them for us.

MR. SHEEHAN: I understand.

Q. Okay, Dr. Mitch, do you see this is an e-mail to Dr. Braunstein from JAMA Network Open?

A. I see that.

Q. It is dated October 21st, 2020. Do you see that?

A. I see that.

Q. And it says "Dear Dr. Braunstein, we have completed our review of your Research Letter - Cross-Sectional Study, Ranitidine Use, N-Nitrosodimethylamine (NDMA) Production and Variations in Cancer Diagnoses."

Do you see that?

A. I see that.
Q. It says "While the current manuscript is not suitable for publication in JAMA Network Open, we would be interested in evaluating a revised version that addresses the items below."
Do you see that?
A. I see that.
Q. If we go down here, you see that there is a word limit of 600 words. Do you see that?
A. I see that.
Q. And it looks like the citation limit, no more than six references. Do you see that?
A. I see that.
Q. So when you have a manuscript limited to 600 words and only six citations, that is very limiting in what you are going to put in the manuscript, right?
A. It certainly can constrain the manuscript, particularly if there is not a supporting information section.
Q. And in fact, Dr. Mitch, putting

in otherwise not directly relevant information, while it might be useful, that is probably going to be the first thing on the chopping block, right?

MR. SHEEHAN: Objection, calls for speculation.

A. Putting in information that is clearly not relevant to the topic at hand would, yes, probably be part of the chopping block as you say.

Q. Now, the analysis that was done in that study wasn't focusing on the existing levels of NDMA in ranitidine, right, it was looking at whether or not it formed with increasing levels of nitrite, right?

A. I'm trying to remember the specific study, but based on that table you were showing, that specific experiment seemed to be the effect of nitrite on NDMA formation.

Q. And if we go back to this chart that the defendants used with you, this is Exhibit 26, remember this chart, Dr. Mitch?

A. That was, yes, I recall that

chart.

Q. Now, they got frustrated or -- let me say that again.

There was criticism lodged about not reporting these data whereas this is what was reported in the final publication, right?

A. That was the discussion yesterday, yes.

Q. Now, if you are trying to show or demonstrate sodium nitrite's effect on the formation on NDMA in an in vitro experiment, are these data points under 1 particularly relevant to that question?

A. Well, as we discussed yesterday, my understanding is that they could be potentially relevant in the sense that the contention was, I'm looking at the plot on the left, is that a line that you can extrapolate to lower values or does it level out.

Q. But this is a trend, right? I'm sorry. This is a trend -- I'm sorry, Doctor, I keep -- I'm sorry.

A. I have not read the details of

this manuscript, so I'm not sure if how it was phrased, the point -- let's take the point at 1 millimolar nitrite, whether it indicated in the manuscript that that was the same as the background level in these tablets, for example.

Q. Now, this line here, that's a trend line, right?

MR. SHEEHAN: Objection.

A. That appears to be a trend line.

Q. This line over here on the right, that's not a trend line, right?

A. It is -- it depends on what you mean by a trend line. It is not showing a relationship between nitrite and NDMA. Again, I haven't read this manuscript in detail, but my understanding from what was discussed yesterday was that it's indicating that there is a background level of NDMA in the tablets.

Q. I understand. But my question to you was a very simple one, both the diagram on the left, that line is a trend line, right, it is not connecting the dots,

right?
A. It appears to be an attempt at a trend line.
Q. And the diagram on the right is just connecting the dots of the results, right?
A. That seems to be the case.
Q. There is no regression to the mean of the results, correct?
MR. SHEEHAN: Objection, vague.
A. I don't see any regression equation.
MR. WISNER: Okay. Let's take a break.
THE VIDEOGRAPHER: Off the record 3:18 p.m. This is the end of media unit five.
(Recess taken.)
THE VIDEOGRAPHER: We are going back on the record at 3:27 p.m. This is the beginning of media unit six. Okay, you may proceed.
BY MR. WISNER:
Q. Now, Doctor, going back to Exhibit 22, this was the Figure 1 that

showed the results of NDMA at various concentrations of sodium nitrite. Do you see that?
A. I see that.
Q. And, you know, there is a lot of questioning about whether or not, you know, the results below 1 should have been included, but I want to take a look actually at what those results are saying.
So we have here at zero, at 2.5 pH, with no sodium nitrite, we are seeing 921 nanograms of NDMA. Do you see that?
A. I see that.
Q. And that is nine times the FDA's limit approximately, right?
A. About that.
Q. So, again, even before we see any in vitro effects of nitrosation with the nitrite, we already have ranitidine at baseline that is violating the FDA regs?
MR. SHEEHAN: Objection.
A. The levels provided in that table with zeros seem to suggest a concentration above 96, yes.
Q. And if we look here, those

concentrations from 1 and below, they range from 900 -- I'm sorry, 824 nanograms up to 1,440. Do you see that?

A. I see that.

Q. And that variation is probably reflecting, you know, the variation you have in these various assays, right?

A. Rightfully so.

Q. That said, if the range of potential NDMA at baseline is between 824 and 1,440 NDMA, that's a considerable amount of NDMA exposure on a daily basis, if someone is ingesting those pills, right?

MR. SHEEHAN: Objection, vague.

A. I'm not in the medical field, but in the drinking water context, that would be in excess of what we typically target, in the nature of 20 nanograms.

Q. And these elevated levels of NDMA in the pill themselves, that's pretty consistent with some of those results in the Emery analysis that you had seen as part of that draft manuscript, right?

MR. SHEEHAN: Objection, vague.

A. I'm trying to remember the

levels. I don't recall the specific levels in the Emery manuscript.
Q. You remember they were above 96, right?
A. Again, the section of the study that I dealt with was the urine study, and in that portion of the study we were careful to achieve pills that had in the nature of 20 nanograms.
Q. I understand. I'm talking about the stability portion of the analysis, which I understand Emery was the primary, you know, driver and doer of that study. I'm not suggesting you were.
But in those results that you saw, they showed also that ranitidine at, you know, at a stability testing point over time had varyingly high levels of NDMA in excess of the FDA regulations, right?
MR. SHEEHAN: Objection, vague.
A. I recall that chart, yes.
Q. Okay. So, that said, one of the criticisms that was also levied against Dr. Braunstein was that he claimed that nitrite levels of 1 micromolar or higher

was potentially at physiological range. Do you remember those questions?
A. I don't recall the -- you are saying in the reviews of this manuscript?
Q. Yesterday, when defense counsel was asking you questions about the physiological range of nitrite in the human gut, there was questions about whether or not 1 or 2 were actually physiologically realistic. Do you remember those questions?
A. I believe I do, yes.
Q. Dr. Braunstein was actually, his deposition was taken. Have you spoken with Dr. Braunstein?
A. Not to my knowledge. I may have had a phone conversation with him, but I don't remember.
Q. Okay. Did you talk to him at all about his deposition?
A. I have not.
(Plaintiffs' Exhibit 107 marked for identification.)
Q. All right. So during his deposition, I had the privilege of getting

to ask him some questions, and defense counsel asked him some questions here about this exact issue. It starts up here. The question is "Did you find a paper that suggests that sodium concentration -- sodium nitrite levels of 1 to 50 millimolar are physiologic?"

And he responded "I don't recall papers testing all of those conditions in the full range, but the lower end of the range, to the best of my recollection, was mentioned in at least one paper.

"Okay. Can you name the paper?

"I cannot at this time.

"So as you sit here today, you cannot name a single paper that finds any sodium nitrite concentration mentioned in your published study is physiologically relevant?"

And then there was an objection. Then she says "Never mind, bad question." And then she asked this next question:

"As you sit here today, you

cannot name for me even one paper that suggests that any sodium nitrite concentrations used in your published study were physiologically relevant?"

And then he goes on to say "While I can't name the paper, I do recall at least one publication that demonstrated a concentration of I believe 2.5 millimolar sodium nitrite in saliva, which would then presumably be swallowed into the stomach."

And she says "But you can't name it for me today, right?"

And he says "I do not recall the authors of that paper at this moment."

Do you see that?

A. I see that.

Q. Do you know what paper he is referring to here?

A. I do not. I have little to no knowledge of nitrite concentrations within the body, including the saliva.

(Plaintiffs' Exhibit 108 marked for identification.)

Q. All right. Well, I'm going to show you another document. This is an

older paper. It is called Nitrite Sources and Nitrosamine Formation in Vitro and in Vivo. Do you see that?
A. I see that.
Q. So based on its title, Nitrite Sources and the Formation of Nitrosamines in Vitro and in Vivo, that is pretty relevant to sort of the issue we are talking about here, right?
MR. SHEEHAN: Objection.
MR. SELDEN: Objection, vague.
A. I have not read the paper. From the title, it appears to be related.
Q. In other words, if you were doing a lit review, literature search, or let's say you were one of the authors on the Gao study, you would probably want to take a look at this document, right?
MR. SHEEHAN: Objection, vague, and calls for speculation.
Q. You know what, it is a bad question. I will just move on. I withdraw it.
Now, if we go down here, Doctor, in the Discussion section, it reads

"The great individual variation in salivary nitrite concentrations reported by several workers was borne out by these studies. Okabe (1973) found nitrite levels ranging from 0.0014 to 2.9," do you see that, "MM" there?

A. I see it.

Q. That's a micromolar, right?

A. I believe it might be millimolar, but it could be a typo.

Q. Okay. "In the saliva of 200 Japanese subjects. "

Have you ever seen this study before, this Okabe?

A. I have not.

Q. Based on how it is reported here, though, it does suggest they were able to find almost 3 m-molars in the saliva of Japanese subjects. Do you see that?

MR. SHEEHAN: Objection.

A. Again, I have not read Okabe or this manuscript, but based on what I am reading with that line, it would suggest that they found at least one person who had

2.9 millimolar.

Q. And if you are trying to find if something is the outer range of physiologic possibility, finding a human with that physiology would be an example of that, right?

MR. SHEEHAN: Objection, calls for speculation.

A. If that -- again, I know nothing about this particular study, what the context was for that person who had 2.9 millimolar. Were they oddball? If you want to take somebody who has a particularly odd scenario and call them part of typical scenario, that is conceivable.

Q. Sir, I wasn't saying they are typical. We are talking about the outer limit of physiological possibility, right? And by definition, if you find a human who has that physiology, that is clearly the outer limit, right?

MR. SHEEHAN: Objection, calls for speculation, asked and answered.

A. Again, not being familiar with

the studies, what you said could be considered reasonable.

Q. Okay. And so earlier when you were asked questions about Dr. Braunstein's assessment that in fact they tested in vitro the formation of NDMA at various nitrite levels that in their opinion were physiologically possible, you, as someone who is not an expert in this area of gastroenterology, you can't dispute that, can you?

MR. SHEEHAN: Objection.

A. You are correct that I am not a gastroenterologist and I have really no knowledge of typical nitrite levels in humans, so I could not dispute any particular finding.

Q. And, in fact, you couldn't offer an opinion about what is physiological or what isn't, because that's really not your area of expertise, right?

A. That would be correct.

(Plaintiffs' Exhibit 109 marked for identification.)

Q. All right. I want to go back

to the Florian paper briefly for a minute. This is Exhibit 52. And you recall talking about the Florian paper at various times with defense counsel as well as with my colleague, Ms. Bogdan?

A. I do.

Q. Now, in the Florian study, the main primary outcome is they wanted to test and see if after ingesting ranitidine they could measure any NDMA in urine, right?

A. That was my understanding of the manuscript.

Q. It is sort of the same approach you took back in 2016, right?

A. Yes.

Q. Now, you would agree with me, though, even back in 2016, the likelihood of seeing NDMA in urine was probably pretty small, right?

MR. SHEEHAN: Objection, vague.

A. I mean, what was our expectation of finding NDMA in urine at the time?

Q. Let me ask you a better question. Let me take it back.

Back in 2016, you actually commented in your publication that you were surprised by the results because less than 5 percent of NDMA would be expected to be excreted in the urine. Do you recall that?

A. I don't recall the details of the text, but perhaps that specific comment is in there.

Q. And so you would agree with me, then, that just as a basic sort of methodological approach, using urine to test NDMA exposure or formation is probably not the most sensitive test, right?

MR. SHEEHAN: Objection, vague.

A. So, again, not being a doctor, but we did the urine analysis because it was accessible to us, easy to collect samples. You know, we are not hematologists, we could not draw blood.

But my understanding of, again, not being a physiologist, and the reason why we attempted or were going to attempt to collect plasma samples in the second study was that we considered that plasma might be a more direct measure of exposure

than urine samples.

Q. Wouldn't it also be pretty effective to just pull gastric juices out out of people after they have consumed ranitidine?

A. Again, I'm not a physiologist, but my two comments, or at least one comment there, would be that is also an indirect potential measure of exposure because that doesn't necessarily directly measure what partitions into the circulating system, and, number two, certainly for us that would be very difficult. I don't know how you get a gastric sample.

Q. Now, you would agree, then -- you would agree, then, whether it is urine, blood plasma, or taking direct gastric juices, or whatever approach you can come up with, trying to measure the amount of actual NDMA formation in the body following ingestion of ranitidine, you would agree that is a very difficult thing to accurately do?

MR. SHEEHAN: Objection, vague.

A. My understanding is that it would be very difficult to measure all of the molecules of NDMA that conceivably could have formed if we do not know the levels of any degradation processes.
Q. Okay. Now, in the Florian study, I just want to go through a couple of basic facts, right? So you would agree with me that in the Florian study what they measured was you take ranitidine and then you eat breakfast and various meals throughout the day and then you are measuring NDMA formation after that, right?
A. That is my recollection.
Q. Now, you would agree with me that doesn't follow the typical pattern of most ranitidine users?
MR. SHEEHAN: Objection, calls for speculation.
A. I have no real knowledge of how ranitidine is typically taken.
Q. I mean, Doctor, we can apply a little bit of common sense here, right? Do you know anybody who wakes up in the morning, pops ranitidine, and then starts

their day?

MR. SELDEN: Objection, argumentative.

A. Again, I have no knowledge of typical ranitidine patients. I don't take it as a routine myself. I wouldn't be surprised if people do do that.

Q. So it's your testimony that you wouldn't be surprised if regular ranitidine users wake up in the morning, take ranitidine before eating anything, every day?

MR. SHEEHAN: Objection, argumentative.

A. As I mentioned to you, I don't have any knowledge of how ranitidine is typically consumed, but I could conceive, as a general member of the public, that some people would take it in a prophylactic manner.

Q. Do you get heartburn, Doctor?

A. I do not.

Q. Okay. Have you ever gotten heartburn in your entire life?

A. I assume I have, yes.

Q. Have you ever taken ranitidine?
A. I have taken it.
Q. To treat heartburn?
A. I have not.
Q. Okay. When you have -- have you ever taken any medication to treat heartburn that you were experiencing?
A. I have not.
Q. Okay. Well, good for you. You have a very good gastrointestinal system.
But you would agree that it is pretty reasonable to assume that a person who is experiencing heartburn, when they experience the heartburn, takes the antacid, right?
MR. SHEEHAN: Objection, calls for speculation.
A. Again, I don't know how people typically consume ranitidine. I could conceive some wait until after they get heartburn, some might take it before.
Q. Okay. Well, at least we know that if people take an antacid after they have, you know, heartburn, for those people that circumstance wasn't specifically

studied in the Florian study, right?
MR. SHEEHAN: Objection.
A. To my knowledge, the Florian study involved a scenario where ranitidine was taken before breakfast.
Q. Okay. Now, we also know that regular ranitidine users, right, are not what we would consider the healthy people that were studied in the Florian study, right?
MR. SHEEHAN: Objection, calls for speculation.
A. As we looked at before, my recollection is the text indicated that they were healthy volunteers, and I don't recall the details, but one would like to think that healthy volunteers included, in the context of this study, people who were not routine heartburn patients.
Q. Have you actually taken a look at the Florian protocol, study protocol?
A. I have, but it has been more than a year or about a year since that review took place, so I don't recall.
Q. Are you familiar with something

called screening criteria?
A. You would have to be more specific.
Q. In a study protocol, screening criteria for the participants, do you know what that refers to?
A. I do not.
Q. Okay. Well, do you know what inclusion criteria refers to?
A. Again, I can guess on things, but I'm sure it has a specific context in this -- in this study. So it looks like we're looking at it right here.
Q. Okay. So looking at Section 4.2.1 of the Florian study protocol, and it says "Subjects who meet all of the following inclusion criteria will be eligible to participate in the study."
Do you see that?
A. I see that.
Q. It looks like there is several items here, right?
A. It does.
Q. They have to have signed informed consent. Do you see that?

A. I see that.
Q. They have to be healthy, nonsmoking, right?
A. I see that.
Q. They have to have a specific body mass index, right?
A. I see that.
Q. They have to have normal medical history findings, including clinical laboratory results, vital sign measurements, ECG results, and physical examination findings at screening. Do you see that?
A. I see that.
Q. They have to have a negative test for alcohol and drugs of abuse at screening, right?
A. I see that.
Q. Women of child-bearing age were not permitted to participate unless they agreed to at least one month prior of abstinence and abstinence during the program and/or use of a contraceptive?
A. I see that.
Q. And then he goes on to say

people who will not be allowed in would be "subject has used antacids or proton pump inhibitors within 14 days." Do you see that?

A. I see that.

Q. "Any prescription or nonprescription drugs within 14 days or five half-lives."

Do you see that?

A. I see that.

Q. Obviously no cigarettes, cigars, chewing tobacco. Do you see that?

A. I see that.

Q. No alcohol or tea, coffee, cola, caffeine, grapefruit or grapefruit juice within 24 hours of check-in. Do you see that?

A. I see that.

Q. And there is a bunch of other potential history of clinically significant disorders that they have listed here?

A. I see that.

Q. So you would agree with me, considering all these inclusion and exclusion criteria for the protocol, the

people studied in the Florian study were not users of ranitidine, right?
MR. SHEEHAN: Objection, calls for speculation.
A. Well, the section that you had just shown us in the exclusion criteria I believe specifically stated has not used such drugs in the past 14 days.
Q. So a person who was --
A. Someone could have used it 15 days before.
Q. Fair enough. I guess it is possible that somebody had been a regular ranitidine user and then two weeks before they enrolled in the study hadn't used it, that's a possibility, right?
A. Correct.
Q. But, generally speaking, the people studied in this protocol were very healthy, right?
A. It appears to be so.
Q. And so if you have a person who smokes or drinks lots of coffee or all these other sorts of issues that are exclusion or included in these criteria,

they wouldn't really be captured by the study protocol, right?

A. As you indicated, as we read in the exclusion criteria, for example, that they are to explicitly eliminate people who are smokers, so in that sense you are correct.

Q. And also excluded drinkers, alcohol consumers, right?

MR. SHEEHAN: Objection.

A. It wasn't clear to me in the same context as with the Zantac question before, it is not saying people who never drank alcohol, it just appeared to me that it indicated you could not be drinking alcohol during the study.

Q. That's right. Within -- before the study, just before the study, and during the study, no alcohol consumption, right?

A. That appears to be the case.

Q. And we know that alcohol consumption increases the amount of NDMA in urine excretion, right?

MR. SHEEHAN: Objection.

A. What we saw earlier this morning, there were some literature that appeared to suggest that was the case.

Q. And you haven't analyzed whether or not the diets for the people who participated in this protocol contained high levels of vitamin E, right?

A. You are correct, I have no knowledge about levels of vitamins in the different diets.

Q. But if there was high levels of vitamin E in that diet, then you would expect to see very little NDMA, right?

MR. SHEEHAN: Objection, calls for speculation.

A. My knowledge from the previous literature is that ascorbic acid, vitamin C, and vitamin E, can inhibit nitrosation, but being able to predict the extent to which that is inhibited is not something that I've studied.

Q. But you would agree with me if you are designing a protocol that is trying to see if ranitidine is forming into NDMA in the gastric system or in the human body,

you sure would want to limit those vitamin exposures to really see an effect, right?

MR. SHEEHAN: Objection, calls for speculation.

A. I guess I have a different read of the intention of the manuscript. My reading at the time that I reviewed it was that they were trying to determine that under typical dietary conditions, putting typical into two camps, those who eat cured foods versus those who do not eat cured foods, would consumption of ranitidine lead to a significant increase in NDMA levels relative to a background.

Q. Doctor, there is nothing typical about the participants in the study, right?

MR. SHEEHAN: Objection, vague.

A. All right, let's rephrase it and say for typical healthy adult volunteers consuming either a noncured foods or a cured foods diet would consumption of ranitidine lead to a significant increase in NDMA concentrations relative to background levels.

Q. Including nonsmokers, nondrinkers, noncaffeine users, and people who decide to take ranitidine first thing in the morning before they eat anything, right?

MR. SHEEHAN: Objection, compound, vague.

A. What we have seen from the inclusion and exclusion criteria would suggest that those were the types of people in the study, yes.

Q. Now, you believe and agree that when you are reporting on the results of your peer-reviewed literature, you shouldn't omit studies that contradict yourself, right?

A. In general, that's -- I would agree with that statement.

Q. And, in fact, during your examination, I'm showing you the Florian study, this is Exhibit 52, the defendants went out of their way to show you this sentence, "When considering all cancer types, 26 through 32, while each study had limitations (example, confounding by

indication, residual confounding, multiple comparisons) no consistent signals emerged across studies, and studies with comparison to active controls found no association between ranitidine and overall or specific cancer risk."

Do you see that?

A. I see that.

Q. And it says, for that controls, it literally cites 27 to 29, 31. Do you see that?

A. I see that.

Q. If we go to the actual footnotes, we see that 27 refers to this Yoon. Do you see that?

A. I see that.

Q. 28, 29 is Kantor. Do you see that?

A. I see that.

Q. And 31 is Kumar. Do you see that?

A. I see that.

Q. So the citation skipped 30 and it skipped 29, didn't it?

MR. SHEEHAN: Objection,

mischaracterizes the document.
A. It appears to not include those two references, yes.
Q. Have you ever looked at Habel?
A. I have not.
(Plaintiffs' Exhibit 110 marked for identification.)
Q. Why don't we take a quick look at it. So this is Habel. You see it is Habel, it is published 2000, do you see that, Doctor?
A. I see that.
Q. It is Cimetidine Use and Risk of Breast, Prostate and Other Cancers. Do you see that?
A. I see that.
Q. And if we go down here and actually take a look at what they did, there is this chart of relative risks of cancer associated with cimetidine and ranitidine use. Do you see that?
A. I see that.
Q. And over here we have cimetidine users and over here we have ranitidine users. Do you see that?

A. I see that.

Q. This is what you call an active control, right?

MR. SHEEHAN: Objection, mischaracterizes the document.

A. Well, I haven't seen the study, I'm not an epidemiologist, so I can't provide you a detailed assessment of these results.

Q. Okay. Well, you would agree based on what it says right here, non-users of cimetidine and ranitidine were the referent group for all comparisons. Do you see that?

A. I agree that's what it says, yes.

Q. And right here, on all sites, all cancer risks for ranitidine, there is a statistically significant 1.26. Do you see that?

A. RR, what does RR stand for?

Q. Risk ratio.

A. Risk ratio? It appears to give a 95 percent confidence interval that is just slightly greater than 1.

Q. So that's statistically significant, right, Doctor?

A. That would indicate -- suggest statistical significance at the 5 percent level.

Q. Okay. It doesn't suggest it, it actually is that, that's the definition of statistical significance, right?

MR. SELDEN: Objection, argumentative.

A. Again, I'm not an epidemiologist. My exposure in my own field through drinking water cancer results is there are studies similar to this that show, as you indicated, a statistically significant risk, but usually you need to then go on to do a meta-analysis of multiple studies because it is so close to a level of the risk ratio of 1.

Q. Okay. So going back to the Florian study, I'm sorry, Exhibit 52, the Habel study, which had that statistically significant result for all cancers for ranitidine, if you go back up to that sentence, number 30 was specifically

excluded in that citation. Do you see that?

MR. SHEEHAN: Objection, mischaracterizes the document.

A. I'm looking at that line, and 30 is not in the reference list.

Q. In fact, it is specifically skipped, it goes 27, 28, 29, 30 is gone, and then 31, right?

MR. SHEEHAN: Objection, mischaracterizes the document.

A. It is not in the reference list. I have no knowledge of reference 30, so it is hard for me to say whether it is specifically skipped intentionally or not. You would have to ask the authors.

Q. Do you have any understanding of why the FDA went out of its way to talk about epidemiology and then omit a study that's directly contrary to its conclusion?

MR. SHEEHAN: Objection, mischaracterizes the document, calls for speculation, and is just plain wrong.

A. I have no inside insights into FDA's thinking, no.

Q. All right, Doctor, are you familiar with something -- well, let's just go over some basics to make sure we are on the same page, okay? We talked about this earlier and you said this multiple times, you are not an epidemiologist, right?
A. Correct.
Q. You do not make assessments of causation for carcinogens, correct?
A. Correct.
Q. You are not qualified to do so and you are not offering any opinions about whether or not ranitidine or NDMA is a carcinogen, correct?
A. Correct.
Q. Now, earlier there was questions asked of you regarding whether or not ranitidine within the body can form into NDMA. Do you recall those questions?
A. I recall some questions to that nature, yes.
Q. Have you done an exhaustive literature search of every single study that has examined this issue in any way, shape or form?

A. Certainly not.
MR. SHEEHAN: Objection.
Q. So it would be fair to say, then, you are not qualified or it wouldn't be appropriate for you to offer any opinions about whether or not there is such a thing as endogenous formation of NDMA from ingestion of ranitidine?
MR. SHEEHAN: Objection.
A. I am not an expert in endogenous nitrosation, no.
Q. Again, you would agree with me that on whether or not ranitidine forms into NDMA and whether or not that causes cancer, again, that's not something you are qualified or prepared to offer any opinions about, right?
A. That's correct.
Q. And to be clear, the primary opinion you have offered so far, and this is one I think you're qualified to render, is that in fact the study you published in 2016 is not reliable due to an artifact of gas chromatography testing, correct?
A. That's correct.

Q. Any opinions that you have offered when you were examined by the defendants or by myself regarding the motives of David Light, the FDA, or anyone else, are you qualified to give those opinions?

A. I have no inside insights into their motivations, so no.

Q. So in any study that you were shown and asked to interpret the meaning of it based upon the author's intent, you would agree with me you were just speculating?

MR. SHEEHAN: Objection, vague.

A. Yes, I would agree with that.

MR. WISNER: Okay, great. Let's take a break.

THE VIDEOGRAPHER: We are going off the record. The time is 4:02 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are going back on the record 4:08 p.m. This is the beginning of medium unit seven. Okay, you may proceed.

BY MR. WISNER:

Q. Doctor, a couple of last questions I want to ask you to wrap things up. I appreciate your patience and willingness to sit for two days, I really do, so thank you for that.
The first is you remember yesterday defense counsel was asking you questions about the cancer slope factor for NDMA as published by the EPA and/or FDA?
A. Correct.
Q. Have you investigated how that cancer slope factor was created?
A. I have in the past, I have looked at the EPA's integrated risk information system database, which is the source for where we got the slope factor. I don't recall the details, but it involved rat and mice -- mouse type studies.
Q. And do you understand how the math is done to extrapolate the carcinogenicity of a substance based upon those various animal studies?
A. In a broad sense, yes, but I'm not in that toxicology subfield, but I understand some of the general principles.

Q. But you would agree with me, you're not an expert in the area of cancer slope factors, right?
A. Correct.
Q. You haven't done a literature review or an analysis on how they were done as it relates to NDMA, correct?
A. You are right. We simply took the number from the database.
Q. Okay. So any opinions you may offer trying to interpret the cancer slope factor, whether it was in the previous examination or any e-mails you may have sent to consumers who were concerned, those weren't opinions that would qualify as an expert opinion in your field, correct?
A. You are correct.
Q. Now, earlier do you remember there was the Gao study that was shown to you? Do you recall that?
A. I recall a Gao study, I don't recall the details, but one of the more recent ones I believe.
Q. That's right. If I recall correctly, when defense counsel showed it

to you, yesterday was the first time you had ever seen it; is that right?
A. Correct.
Q. And then he showed you little portions of it and asked you questions about those portions. Do you recall that?
A. I recall going through the article, I don't recall the details.
Q. Would it be fair to say you have not read the article from beginning to end, correct?
A. Correct.
Q. Would it be fair to say you have not critically evaluated the methods, procedures or results of the Gao article, correct?
A. Correct, I haven't read the study.
Q. You haven't studied the supplemental materials of the Gao study, right?
A. I have not seen it.
Q. So would it be fair to say that any opinions that you may or may not have given regarding the Gao study yesterday or

today are not based on any sound scientific principles, correct?

A. They would be poorly informed, correct.

Q. One other thing. You recall yesterday every time you or defense counsel called the Gao study the FDA study, well not every time, but most times I tried to object. Do you recall that?

A. I recall objections.

MR. SHEEHAN: Objection to form.

A. I don't recall the details.

Q. Okay, fair enough. It is a good practice, just ignore the objections as much as you can. They are not for you anyway.

If you go down here, this is the Gao study. Do you see that, sir?

A. I see Gao, yes.

Q. And this is the Exhibit D-27, for the record. And if you go -- if you look at the front, it has all these various authors. Do you see that?

A. I see that.

Q. And it's your understanding that these authors were employed by the FDA, correct?

A. That was the -- what I gathered from the testimony yesterday, I believe the only name on there that is familiar is Florian, so I assume he is still at the FDA, but I have no knowledge.

Q. Fair enough. Now, Doctor, do you know if this study represents the views and opinions of the FDA?

A. I do not.

MR. SHEEHAN: Objection.

Q. In fact, if we go down to the disclaimer, it says right here "Disclaimer: This manuscript reflects the views of the authors and should not be construed to represent the FDA's views or policies."

Do you see that?

A. I see that.

Q. So at least the document based on this disclaimer says this is not the view of the FDA, do not interpret it or construe it that way, right?

MR. SHEEHAN: Objection.

A. That's what the document appears to say, yes.

Q. So it would be inappropriate then to call this the FDA study when the FDA specifically disclaims it being construed that way?

MR. SHEEHAN: Objection.

A. That seems like a reasonable statement.

Q. All right. Now, I understand at some point in this litigation you were served with a subpoena; is that right?

A. That's correct.

Q. And you were served by a subpoena by one of the defendants in this case; is that right?

A. I believe so, yes.

Q. And at that point you took the subpoena to your counsel at Stanford; is that right?

A. Correct.

Q. Now, I want to be very clear, I'm going to ask you some questions, but I don't want you to tell me any conversations that you specifically had with any of your

attorneys, all right?
A. Correct.
Q. Now, I do want to ask some questions surrounding those conversations, which I do believe are admissible, but, again, if your attorney objects and tells you not to answer, obviously follow his instruction, okay?
Now, I understand early on you were represented by a counsel that was employed directly by Stanford; is that right?
A. That's correct.
Q. At some point you were then represented by counsel from the law firm of Jones Day; is that right?
A. That's correct.
Q. Is there any way you can tell me why that happened that wouldn't disclose privileged information?
MR. SELDEN: I'm going to object on the basis of privilege. I can have an off the record conversation with the witness about this, but I don't believe there is a nonprivileged answer.

MR. WISNER: That's fine. We can go off the record.

THE VIDEOGRAPHER: Off the record 4:15 p.m.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record, 4:17 p.m. Okay, you may proceed.

MR. SELDEN: We have confirmed in an off the record conversation that the witness' only knowledge of any facts that would be responsive to the question did come from counsel in privileged communications, and so I'm going to instruct the witness not to answer.

MR. WISNER: Okay.

BY MR. WISNER:

Q. So just to clarify, Dr. Mitch, I think this is what your attorney just said, so I just need to confirm it from you, that the only basis of your knowledge as to why Jones Day as opposed to in-house counsel at Stanford is representing you is based on privileged communications; is that right?

A. Correct.

Q. And you are electing not to waive that privilege and disclose that information; is that correct?
A. Correct.
Q. Now, are you aware if Jones Day represents any of the defendants in this litigation?
A. I don't know the complete list of defendants or the complete list of their clients.
Q. Who is paying for Jones Day's time in representing you?
A. I believe it is Stanford, for me.
Q. Okay. What do you mean, "for me"? What does that mean?
A. Well, I mean, yes, for my representation by Jones Day, the money I believe is coming from Stanford.
Q. Okay. Did you personally make the decision to switch attorneys or did someone else make that decision?
A. Someone else made that decision.
Q. Did you have any say in the

decision of who would represent you today?

A. I don't have a lot of knowledge about law firms. This was the one that was suggested. I had no reason to not agree to that.

Q. Have you had any communications with any attorney representing any party in this litigation?

A. Have I had any communications? I don't recall the details, but there have been, over the past couple of years, e-mails I have received from various law firms, I believe mostly on the plaintiffs' side, requesting information, and yeah, so I have received e-mails, but I don't necessarily recall their names or details.

Q. Full disclosure, Dr. Mitch, I sent you an e-mail at one point, so I'm one of those people.

Putting aside those types of e-mails, did you ever receive any e-mails from someone representing the defendants in this case?

A. Again, I don't recall. I don't necessarily -- I could have, but I may not

have even recognized if they were a defendant or not. But I don't specifically recall anybody announcing themselves as a representative for, say, Boehringer Ingelheim, or something of that nature.

Q. Have you spoken with anybody who represents any of those defendants?

A. If I have, I was not aware that they are representing those people, those parties.

Q. Have you spoken with anybody in any way about the substance or about this litigation -- let me give you more -- that is too broad. Let me ask you this. Strike that question.

Have you spoken with anybody in anticipation of your deposition today other than your direct representing counsel?

A. Not about any of the details of this, no.

Q. Okay. Have you spoken with anybody, I guess this covers them too, have you spoken with any employees of any of the defendants about ranitidine?

A. Any employees? To my

knowledge, I have had no interactions with employees of these -- of the defendants.

Q. Has anybody relayed communications to you that were coming from the defendants or their attorneys?

A. Not that I recall.

Q. Now, I understand you made the decision to retract the 2016 paper. Did you receive any pressure from anybody to do so?

A. In my mind, no.

Q. In someone else's mind was there pressure exerted on you?

A. No.

MR. SHEEHAN: Objection.

Q. I'm just trying to understand why you made that qualification, Dr. Mitch. Well, if you say I think bla-de-bla was pressuring me but I didn't feel it, I would like to know about that person. You know what I'm saying?

A. I received no external pressure to retract the article.

Q. Have you received any pressure from Stanford University regarding your

work in ranitidine in any way?
A. None.
Q. Did you receive any encouragement to retract the paper from anybody?
A. None.
Q. Did anyone suggest that you retract the paper?
A. No.
MR. WISNER: All right, we will take another short break. I think I'm done.
THE VIDEOGRAPHER: Off the record 4:23 p.m.
(Recess taken.)
THE VIDEOGRAPHER: We are going back on the record 4:39 p.m. Okay, you may proceed.
MR. WISNER: Dr. Mitch, thank you for your time. I really appreciate your patience. I have no further questions at this time. I pass the witness and reserve time for requestioning as needed.
EXAMINATION BY MR. SHEEHAN:
Q. Okay, are you ready to go,

Dr. Mitch?
A. Yes.
Q. All right, I will try to be short and sweet. I don't have too much here. Ali, can you bring up D-73.
Dr. Mitch, you were asked some questions about the IARC categorization of probable human carcinogen by counsel for plaintiffs. Do you recall that?
A. I recall that.
Q. Okay. And you understand that IARC has a category of known human carcinogens or established human carcinogens, correct?
A. Again, not being a toxicologist, I don't know all of the specific definitions, but yes, I'm aware they have different categories such as probable human carcinogen and such like.
MR. SHEEHAN: Okay. My apologies, I am again getting the notice that my internet connection is bad. I'm going to switch seats and keep this going.
(Technical discussion)
THE VIDEOGRAPHER: Off the

record, 4:41 p.m.
(Recess taken.)
THE VIDEOGRAPHER: Back on the record, 4:41 p.m.
BY MR. SHEEHAN:
Q. Dr. Mitch, I was just asking you, do you have an understanding that IARC also classifies carcinogens as known human carcinogens or established human carcinogens?
A. I'm getting some feedback, but I would say --
(Technical interruption).
THE VIDEOGRAPHER: Off the record, 4:42 p.m.
(Recess taken.)
THE VIDEOGRAPHER: Back on the record 4:43 p.m. Okay, you may proceed.
BY MR. SHEEHAN:
Q. My apologies, Dr. Mitch. I don't want this to take any longer than it needs to be.
Just so the record is clear, I'm just asking you whether you have an understanding of whether IARC also

classifies known or established human carcinogens?

A. Let me clarify my knowledge of this WHO and IARC knowledge. As a water chemist, we use information from these types of studies as justification for why we would study particular chemicals, but we don't have an in-depth knowledge as to the validity of the classification of different levels of cancer hazards, so I don't know the details as to the different rankings.

I'm aware, for example, that NDMA has something, I forget the exact category, but I believe it is referred to by one of these agencies as a probable human carcinogen and sometimes we refer to that in introductions to articles as justifications for why we might be interested in NDMA in drinking water.

Q. Okay, and I appreciate that answer.

Can we go to page 31 of this document. We have to go to page 31 I believe. I think we are on page 28. This is not -- this is not -- we don't need to

bring this out. The paragraph that begins at line 15, if you can just bring that out.

Dr. Mitch, can you just read that into the record, please.

A. The text starting with line 15 indicates "The categories of the classification refer to the strength of the evidence that an exposure is carcinogenic and not to the risk of cancer from particular exposures. The terms probably carcinogenic and possibly carcinogenic have no quantitative significance and are used as descriptors of different strengths of evidence of carcinogenicity in humans; probably carcinogenic signifies a greater strength of evidence than possibly carcinogenic."

Q. Okay. So what IARC is telling us that the term "probably carcinogenic" and the term "possibly carcinogenic" are not quantifiable in terms of the likelihood that they represent a real risk of cancer in humans, correct?

MR. WISNER: Objection, misstates the document.

A. My understanding of this particular section indicates that they are categorizing chemicals based upon the likelihood that the chemical of concern could be carcinogenic in humans without a specific reference dose or something of that nature involved. Could any concentration be conceivably carcinogenic, it would be my, again, not being a toxicologist, but my limited understanding of what this paragraph is suggesting.

Q. Okay. But they use -- they specifically articulate that the category does not have any quantitative significance, correct?

A. That is what the text says.

Q. Okay. We can pull that down.

Now, you testified earlier, I believe, that you did not recall whether your Zeng 2016 paper was sensitive enough to detect NDMA in the participants in that study prior to Zantac ingestion. Do you recall that testimony?

A. I don't recall specifically what I said, but I recall making a

distinction between the levels that we did not see or observe NDMA in subjects prior to Zantac consumption and in comparison we did after Zantac consumption with the GC/MS-based analytical method.

Q. Understood. And you can pull this down, Ali, I don't need this up here anymore. If you could bring up D-10. Okay.

And this is a copy of your published 2016 study that was later retracted, correct?

A. Yes, that is correct.

Q. Okay. Ali, if we could just go to page 629, and if we go to, yeah, 629, next page, perfect, the left-hand column. I've just got to find it in my hard copy because I'm looking at a really small copy here.

Left-hand column, about midway down we see, just after the sentence where there is the citation to Carcinogenesis Online, do you see that about five -- can you blow this up a little bit. There you go, just pull that out, okay. Just after

where it says Supplementary Figure 3, available at Carcinogenicity Online. I want to pull out the 24-hour total excreted masses, just highlight it, just keep highlighting. Perfect.

It states that "The 24-hour total excreted masses of N-nitrosamines before ranitidine intake concurred with previous research," correct?

A. That's what it says.

Q. Okay. And the 24-hour excreted mass of NDMA ranged from 37 to 230 nanograms with a mean standard deviation of 110 plus or minus 63 nanograms, comparable to levels reported by Garland, et al., Van Maanen, et al., Vermeen, et al., in healthy adults. Did I read that correctly?

A. You did.

Q. Okay. So your testing in 2016 was sensitive enough to detect a 24-hour mean of 110 nanograms in non-ranitidine users and this was comparable to background levels reported by other investigators, correct?

A. That's what the text says, yes.

Q. There was some testimony earlier, some questions, rather, about the ability to detect urinary excretion of NDMA. Is it fair to say that in 2016 the testing you employed was sensitive enough to detect NDMA in the urine of non-ranitidine users?
A. It appears from this that we could detect those levels, yes.
Q. Okay. And I believe you testified to this yesterday, but let's just get it straight, you are not aware of any affirmative evidence that ranitidine ingestion contributes to endogenous NDMA formation, correct?
A. Correct.
Q. And you were asked some criticisms about Florian and its methodology, you were asked some questions about the ability to detect urinary excretion of NDMA, do you recall those questions?
A. I do.
Q. Is it fair to say that any potential criticisms of the existing

studies looking at endogenous formation of NDMA in humans cannot substitute for affirmative evidence demonstrating an increase in NDMA due to ranitidine ingestion?

MR. WISNER: Objection, calls for an expert opinion he has testified he is not qualified to render.

MS. BOGDAN: I object as well.

Q. You can answer.

A. Repeat the question. I got a little bit lost there. You are saying you need to have positive evidence of NDMA -- can you --

Q. Sure. I guess what I'm getting at is that is how science works, right? Before you can draw conclusions about whether Zantac actually increases endogenous formation of NDMA, you need positive evidence in humans demonstrating the effect, correct?

MR. WISNER: Same objection.

MS. BOGDAN: Objection.

A. I'm a water chemist, but our intention was to provide positive or to see

whether there was positive evidence of NDMA in terms of an increase relative to background levels. We did not see that in the most recent LC/MS-based study, and the Florian, et al., similarly did not, and that was one of the reasons why we retracted the paper, the 2016 paper.

Q. Okay. But it's fair to say that you would not conclude based on the Mitch/Emery study that you performed and based on the Florian study that ranitidine ingestion actually does increase endogenous formation of NDMA anywhere in the body, correct?

MR. WISNER: Objection, improper opinion. This witness testified that he is not qualified to offer testimony, expert opinions, about endogenous formation.

MS. BOGDAN: I will join that objection.

A. Neither the Emery Pharma study that we conducted nor my reading of the Florian study provided positive evidence for increases in NDMA relative to

background associated with ranitidine consumption.

Q. Thank you. Now, you were asked some questions -- you can pull that down, Ali, you can pull the whole exhibit down -- you were asked some questions about an exhibit from Valisure with respect to the testing that Emery did for them, correct?

A. Yes, I believe so.

Q. Okay. If we can just pull up Exhibit D-50. So Exhibit D-50, this is the exhibit that I showed you yesterday, right?

A. I believe so, yes.

Q. And do you see that there is a watermark draft that is over the top of it?

A. I see draft, yes.

Q. And if we can just go to the next page, and do you see the highlighted language down at the bottom that says "Due to the discoloration observed and the chemical structure of the Zantac drug substance, the levels obtained are suspected to be caused by the heating produced in this method"?

A. I see that.

Q. Okay. You can take that down, Ali.

Now, this, the counsel for plaintiffs represented that the final report from Emery actually included the same language, correct?

A. That was my understanding.

Q. Okay. Did he show you the final report?

A. I believe that was the intention at the time that I was answering the question.

Q. He wasn't showing you the exact same draft?

A. If he was, I do not recall it with the draft in the background, but I may have missed it.

(Defendants' Exhibit 74 marked for identification.)

Q. Okay. Let's take a look at Exhibit D-74. I will represent to you that this is a document that was produced by Valisure and it appears to have a report with respect to Emery Pharma's testing for NDMA, correct?

MR. WISNER: Can I have a standing objection? I don't believe this document has been produced to us in this litigation, so I have never seen it before.

A. I haven't seen the specific document as well, but I see it now. What was the specific question?

Q. Do you see any watermark draft on this document?

A. I do not.

Q. Okay. If we could just go to the next page. Next page. Actually, the first page. Sorry about that, just stay on the first page there. Okay.

Now, do you see any language above the table stating that "Due to the discoloration observed in the chemical structure of the Zantac drug substance (ranitidine) the levels obtained are suspected to be caused by the heating produced in this method"?

A. I haven't seen this document before, so let me briefly read it.

(Witness perusing document.)

A. I do not see that language

here.

Q. Okay. You can pull that down, Ali.

Can I get your agreement that the Florian study -- well, actually, let me back up. I believe that you testified that there have been advances in the detection of NDMA and the sensitivity of tests that have developed over the last few decades, correct?

A. The context of that statement I believe was to do with the Spiegelhalder 1980 or so study, and I don't know the specific details of the Spiegelhalder study, but in general there have been advances in analytical equipment over the past four decades, yes.

Q. Let's go to Spiegelhalder, actually. You can go to D-52, and if we go to the PDF page 4. If we take a look at the second to last sentence in that paragraph, beginning with "With a 0.05 microgram per liter detection limit."

Do you see that?

A. I see that.

Q. So that was the detection limit in Spiegelhalder, correct?
A. That's what they are indicating, yes.
Q. And is it fair to say that the detection limit in the Florian study that you reviewed was orders of magnitude more sensitive than the 0.05 microgram per liter detection limit for NDMA in Spiegelhalder?
A. As I recall the detection limit reported, I believe you are correct.
Q. Okay. And I will represent to you that the Florian 2021 detection limit was 0.0078 micrograms per liter. Does that sound about correct?
A. Again, I don't recall the specific number, but that could be correct.
Q. Now, do you recall that the Florian study detected NDMA in ranitidine users and placebo users?
A. Sorry, detected NDMA in ranitidine and placebo users?
Q. Correct.
A. I don't recall the details. My overall recollection was that the end

result was that there was no significant difference between the two, but I don't recall the specific numbers.

Q. Okay. We will pull that up in just a second. I have just a couple of other questions about Spiegelhalder here. Now, if you could pull down the box there, yeah, exactly. So if we go to -- if we go to the next page of Spiegelhalder. Go to the next page. Right here, perfect.

So you were asked some questions about Table 4, correct?

A. Yes.

Q. Again, we see at the bottom of Table 4 here the detection limit of 0.05, right?

A. Correct.

Q. Now, the excreted NDMA, what they are providing to you in this table is the excreted NDMA as a percentage of the total ingested NDMA, correct?

A. That appears to be correct, yes.

Q. Okay. And that is not the definition of renal clearance, correct?

MS. BOGDAN: Objection. He testified that he is not an expert on anything in the body.

A. I would agree with that, I'm not an expert in definition of clearance rates.

Q. Okay. So you can't affirmatively testify, then, that this represents a renal clearance rate of around 1 percent, correct?

A. That's correct, unless I knew what the definition of clearance rate was.

Q. Well, let me try this out on you. Do you agree that renal clearance is the rate at which a drug is removed from plasma divided by the concentration of that drug in the plasma?

MS. BOGDAN: Same objection.

A. Again, I'm not -- should not be quoted as to the proper definition of clearance rate. If what you are asking is the intention of this plot, of this chart to indicate what fraction of ingested NDMA ends up in the urine, and not having read this manuscript, but that is what this

appears to indicate.
Q. Okay. And so is it fair to say that not knowing what the renal clearance rate is, you can't testify that the Spiegelhalder study contains any data whatsoever that is relevant to the renal clearance rate of NDMA?
A. I would say having not read this article, I would not put too much stock in my testimony regarding this article.
Q. Okay. Fair to say that you're not an expert in the topic of NDMA metabolism?
A. Correct.
Q. And you cannot testify as to whether Spiegelhalder represents that NDMA is metabolized extensively and what the fate of that metabolism is in the human body, correct?
A. I'm certainly not an expert in that area, correct.
Q. Okay. So you don't know, for example, if NDMA is not absorbed in the small intestine, it may be excreted in

feces, correct?
A. If it's not absorbed in the small intestine, could it be excreted in feces? I'm not an expert in that area. It seems a reasonable conclusion to me.
Q. Okay. Did they measure NDMA concentrations in feces at all in the Spiegelhalder study?
A. Again, I don't know the details of the Spiegelhalder study, so I cannot answer.
Q. Okay. Do you know whether they measured NDMA concentrations in plasma in the Spiegelhalder study?
A. I cannot tell you at this point. I would have to read the manuscript.
Q. Okay. I want to go back to Florian. You can pull this down and bring up Florian, which I think is, what is that, D-11. And if we just go to Table 2 on page 6. No, Table 2, Table 2 on page 6 of the study. There we go.
So is it fair to say that with respect to NDMA, urinary excretion, the

methodology employed was sufficiently sensitive to detect NDMA in the urinary excretion of patients getting placebo?

MR. WISNER: Objection. This witness just testified he is not qualified to render that exact opinion.

Q. You can answer.

A. Let me look at the table here. The placebo section, what are they plotting here?

Q. You know what, just highlight the middle, all the placebo findings, if you can, Ali.

A. I see the column. What I'm looking for here is what are those numbers. Nanograms, okay. So based on what is presented in this table, it appears that they were able to detect NDMA on a median basis in the placebo cases, which would suggest that they were able to -- that their analytical method was able to detect it.

Q. Okay. And the same was true of the plasma concentrations of NDMA in the placebo patients?

A. I'm looking for plasma. Exploratory outcomes, plasma. Similarly, on a median basis it appears that they were able to detect NDMA based on what's presented in this table.

Q. And that means that their methodology was sufficiently sensitive to detect the levels of NDMA that they reported in their paper, correct?

MR. WISNER: Same objection, improper opinion, speculation.

MS. BOGDAN: Objection.

A. It appears to suggest that, yes.

Q. And you were sent this article as a peer reviewer prior to publication, correct?

A. I was.

Q. Now, do you have any basis to disagree that if there was any true difference in NDMA formation between ranitidine and placebo users, the Florian study was sufficiently sensitive to detect that difference?

MR. WISNER: Same objection.

MS. BOGDAN: Objection.

A. I don't have any basis based on what's provided in this manuscript to suspect that there was anything untoward or unreliable in the results and for that reason that was my recommendation that it was publishable.

Keep in mind that I'm not an expert in all the areas of this manuscript. It is usual that you collect reviewers from a variety of backgrounds, and as a reviewer you are not meant to be an expert in all the areas, so there could be areas of this manuscript that I'm not an expert in.

Q. Okay. Can you go to page 2, Ali. We are going to go under Interventions. Are we on page 2 there? Under Interventions, just down, the highlighted language, if you could just blow that up for us, please.

Could you just read the highlight, the first highlighted language into the record, please, Dr. Mitch.

A. Okay. The text indicates --

MR. WISNER: Asked and

answered.
A. The text indicates "After consuming the same diet on the pretreatment day as the treatment day, participants received ranitidine or placebo at zero hours (after overnight fast) on treatment days (days 1, 3, 5, and 7) and then began eating breakfast 1 minute afterward."
Q. Keep going.
A. "This was done because the formation of NDMA is dependent on having nitrite and acidic conditions. Because gastric acidity is highest in the fasting state and then decreases after eating, this sequence was selected to maximize the 2 factors."
Q. Thank you. So it appears that this schedule was arranged to maximize the potential of NDMA formation from ranitidine in the subject's stomach, correct?
A. This would be a good example of an area that is not my area of expertise, but that is what the text is suggesting.
Q. Okay. You can pull that down, Ali, and if we could just go to page 8, and

if you could just put the highlighted language at the bottom of the page next to the highlighted language at the top of the page, that would be useful. Can you put those two things together on top of each other.

A. Okay.

Q. Do you recall that counsel for plaintiffs in the JCCP suggested that the authors of this paper intentionally omitted discussion of reference number 30? Do you recall that testimony?

A. I recall.

Q. Okay. Now, can you just read the references, read the full sentence with the references into the record, please.

A. Okay. "When considering all cancer types, references 26 to 32, while each study had limitations (eg, confounding by indication, residual confounding, multiple comparisons), no consistent signals emerged across studies, and studies with comparison to active controls found no association between ranitidine and overall or specific cancer risk, references 27 to

29, 31."

Q. Okay. Is it fair to say that within the sentence that counsel for plaintiffs directed you to, there is inclusion of reference 30?

A. In the first clause of the sentence, there is a section of references that includes reference 30.

Q. Okay. And in fact we know that reference 30 is described in the reference section of the paper, correct?

A. Reference 30 is listed in the references section.

Q. Okay. So there is absolutely no evidence that the authors of this paper intentionally omitted reference to any of the studies that they reviewed, correct?

MR. WISNER: Objection, speculation as to the mental state of the FDA authors, employee authors.

MS. BOGDAN: I concur.

A. Well, going back to my previous point, this regards epidemiological studies, which is beyond my area of expertise, but my reading of this, I have

no knowledge of the particular intentions of the authors of this paper as to the nature of these articles and why they would include or not include any study in the references.

Q. Okay, fair enough. You can pull that down, Ali.

MR. SELDEN: Counsel, we are over six hours and over five and half hours of time for defendants. How much longer?

MR. SHEEHAN: I've got just three or four more questions.

MR. SELDEN: Okay, three or four more questions.

Q. You are not an expert in chemistry, manufacturing and controls of pharmaceuticals, correct?

A. Correct.

Q. You are not an expert in how stability tests should be properly conducted to identify and qualify actual and potential impurities in drugs, correct?

A. Correct.

Q. You are not an expert in degradation studies of drugs, correct?

A. Correct.
Q. Now, is it fair to say that -- if you could pull up Defense 26 -- is it fair to say that by deleting the data below 1 millimolar of nitrite that the figure on the left in Defense Exhibit 26 represents a misleading linear relationship between nitrite concentration and the development of NDMA with ranitidine?
MR. WISNER: All my typical objections.
MS. BOGDAN: I object as well.
A. I haven't read the specific reference in detail, but what I would be interested in knowing is the context in which the point on the left was discussed, the one at 1 millimolar, was it discussed as there is a background level of NDMA --
Q. I will represent to you that it was not discussed that there was any background level of NDMA, Dr. Mitch.
A. Okay. Again, I haven't read the details of this manuscript, so just speaking off the cuff, the regression line, if you will, to me would suggest that there

is a linear relationship and that the data would continue to follow approximately that line.

Q. And if you assumed that was true in reading that article as you are sitting here today, Dr. Mitch, that would in fact be misleading because all of the data does not in fact demonstrate that linear relationship, correct?

MR. WISNER: Objection, misstates the document.

A. Again, I would need to know what was actually said in the text and in the context of the discussion around that figure. It is hard to pass a judgment on the intentions of this figure without knowing how it was discussed.

MR. SHEEHAN: Okay, Dr. Mitch, I thank you for your time. That's all the questions that I have.

MR. WISNER: Rosemary?

MR. SELDEN: Counsel for the witness has no questions. We will review the transcript.

MS. BOGDAN: I couldn't hear.

I think Brian was speaking.

MR. SELDEN: Yes, we have no questions and we do not waive signature, we will review the transcript.

MR. WISNER: Okay, there might be some more follow-ups but not much. Rosemary, do you want to go?

MS. BOGDAN: Yeah. You can just bring back up Mitch 52, Exhibit 52.

MR. SELDEN: Hold on. We are over six hours. Everyone has had their shot. Can you explain what you intend to bring up and how long you think you want to go here?

MR. WISNER: Brian, we have less than five minutes. Let's just get that done.

MR. SELDEN: I appreciate you telling me that now. Rosemary, you have less than five minutes?

MS. BOGDAN: Absolutely, I have less than five minutes.

MR. SELDEN: Brent?

MR. WISNER: Definitely.

MR. SELDEN: Okay, go ahead.

EXAMINATION BY MS. BOGDAN:
Q. Exhibit 52, if you could please go to page E-8, since you were discussing the Florian case again, and right where you almost have the cursor, under Limitations, where it starts, the sentence starts "Fourth," there we go, and that sentence reads "Fourth, this study only included healthy participants and did not exclude formation of NDMA in the gastrointestinal tract that was not absorbed and detected in plasma or urine."
Is that what that says?
A. That's what it appears to say.
Q. So the authors are acknowledging that this study does not address the formation of NDMA in the gastrointestinal tract that was not absorbed and detected in plasma or urine, correct?
A. That is what it says.
MS. BOGDAN: Brent, I would pass to you.
EXAMINATION BY MR. WISNER:
Q. Hi, Dr. Mitch, a few quick

follow-ups just on something the defendants just covered.

Do you recall looking at the Florian study and he showed you the results of the placebo group for the NDMA in the urine?

A. I recall that, yes.

Q. Okay. And here, I'll just show you quickly, so you don't have to guess, it showed here that the NDMA urinary excretion for the noncured-meats was 10.5 nanograms. Do you see that?

A. I see that.

Q. And then the cured-meats was 23.4 nanograms. Do you see that?

A. I see that.

Q. Now, when you did your urinary experiment and published in the 2016 article, when you measured the NDMA excretion of your healthy volunteers, you found hundreds of nanograms, didn't you?

A. In the healthy volunteers, I forgot the exact numbers, but they should be in the supporting information of the manuscript.

Q. We were looking at it just a second ago. Do you want me to pull it up or do you recall that there were over 100 nanograms?

A. I will take your word for it.

Q. Okay. Do you find it odd that when the NDMA in the urine of the placebo users in the Florian study, when they measured it there, they found ten times less nanograms?

MR. SHEEHAN: Objection, vague.

A. I don't have an opinion one way or the other. They appear to be within about the same order of magnitude.

Q. Could it be -- would that significantly lower amount of nanograms than you observed in your study for the non -- for the healthy non-ranitidine exposed patients or participants, would that be consistent with some other factor stopping or prohibiting the endogenous formation of NDMA like ascorbic acid or vitamin E?

MR. SHEEHAN: Objection, calls for speculation.

A. That's one conceivable explanation.

MR. WISNER: Thank you. I have no further questions.

MR. SHEEHAN: No questions.

MR. WISNER: I think we're done. We can go off the record.

THE VIDEOGRAPHER: We are going off the record 5:25 p.m. This concludes today's testimony given by Dr. Mitch. There are seven media units. They will be retained by Veritext.

[TIME NOTED: 5:25 p.m.]

____________________________

WILLIAM A. MITCH, Ph.D.

_________________________

Subscribed and sworn to
before me this _________
day of ________________, 2021.

________________________

Notary Public

# I N D E X



| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| MITCH | BOGDAN | 265, 549 |
| | WISNER | 402, 549 |
| | SHEEHAN | 519 |



# E X H I B I T S



| PLAINTIFFS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 23 | MITCH000424-000447 | 348 |
| Exhibit 27 | N-nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: a Review | 276 |
| Exhibit 37 | Article from Environmental Science & Technology | 299 |
| Exhibit 40 | Article from Carcinogenesis | 307 |
| Exhibit 45 | MITCH001612-001616 | 383 |
| Exhibit 46 | MITCH001609-001611 | 361 |
| Exhibit 47 | Article from The American Journal of Gastroenterology | 398 |
| Exhibit 48 | Urinary Excretion of N-Nitrosamines in Rats and Humans | 323 |
| Exhibit 49 | Article from Water Research | 292 |
| Exhibit 52 | Article from JAMA Network | 359 |
| Exhibit 53 | Document entitled Supplementary Online Content 2 | 395 |
| Exhibit 100 | Report from World Health Organization | 404 |
| Exhibit 101 | Laboratory analysis of ranitidine and nizatidine products | 442 |
| Exhibit 102 | Citizen Petition | 432 |
| Exhibit 103 | MSK00000243-00000252 | 451 |
| Exhibit 104 | Embargoed article from JAMA Network Open | 449 |

E X H I B I T S

| PLAINTIFFS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 105 | MSK00002336-0002338 | 458 |
| Exhibit 106 | MSK00001015-00001023 | 467 |
| Exhibit 107 | Transcript of Lior Braunstein deposition | 477 |
| Exhibit 108 | Nitrite Sources and Nitrosamine Formation In Vitro and In Vivo | 479 |
| Exhibit 109 | Supplementary Online Content 1 | 483 |
| Exhibit 110 | Article from Pharmacoepidemiology and Drug Safety | 500 |

| DEFENDANTS' | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 74 | Ranitidine Headspace GC-MS Analysis for NDMA and NDEA | 531 |

DIRECTIONS NOT TO ANSWER

| Page | Line |
|---|---|
| 514 | 8 |

REQUESTS

Page Line

(NONE)

CERTIFICATION

I, TODD DeSIMONE, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of November, 2021.



_______________________

TODD DESIMONE

* * *

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: IN RE ZANTAC
DATE OF DEPOSITION: 11/10/21
WITNESS' NAME: WILLIAM A. MITCH, Ph.D.

PAGE/LINE(S)/ CHANGE REASON
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________
____/________/___________________/___________

________________________
WILLIAM A. MITCH, Ph.D.

SUBSCRIBED AND SWORN TO
BEFORE ME THIS______DAY
OF________________, 2021.

________________________
NOTARY PUBLIC
MY COMMISSION EXPIRES___________________

**&**

**&** 258:2,20 259:17 260:12,22 261:2,6 261:11,14 262:2 262:15 263:12 553:11

**0**

**0.0014** 481:5
**0.0078** 534:14
**0.05** 533:22 534:8 535:15
**0.5** 330:11 331:2 344:4,11,18,25 466:24
**0.7** 282:20
**02110-1447** 261:19
**02210** 261:8
**06** 406:17

**1**

**1** 284:8,13 293:24 319:22 320:2 321:7 323:1 324:6 330:21,25 362:15 366:10 378:21 394:25 395:6 430:24 449:19 452:2,5,10 464:6 466:18 471:13 472:3 473:25 474:7 475:1 476:25 477:9 478:6 501:25 502:19 536:10 542:7,8 546:5,17 554:6
**1's** 362:15
**1,400** 353:18
**1,440** 475:3,11
**1.05** 399:13
**1.06** 399:10
**1.22** 399:8
**1.26.** 501:19
**1.3** 344:4,11,19,25
**1.40** 399:10
**1.43** 399:12
**1.8** 345:21
**1.94** 399:13
**10** 257:16 274:24 275:12,18,25 276:18 444:4 450:13 525:8
**10.5** 336:24 339:19 341:17 550:11
**100** 297:5 328:25 336:9,11 352:2,25 353:7,15 357:23 358:12 404:12 419:5 423:4 434:11 551:3 553:20
**100,000** 336:11,13
**10016** 260:3
**10019** 262:16
**10019-9710** 262:3
**10036-2601** 260:14
**10075** 262:23
**101** 442:13 553:21
**102** 432:10 553:23
**103** 451:15 553:23
**104** 352:12 449:8 553:24
**105** 458:13 468:5 554:2
**106** 467:18 554:3
**107** 477:22 554:3
**108** 479:22 554:4
**109** 483:23 554:6
**10940** 258:2
**10th** 264:4
**11** 538:21
**11/10/21** 556:3
**110** 500:6 526:14 526:21 554:7
**111** 259:18
**1180** 260:23
**1185** 260:13
**11:00** 450:12
**11:04** 335:15
**11:23** 335:19
**11:26** 337:19
**11:27** 337:22
**12** 319:8 328:24 329:8 330:6,16 333:16 364:5,11
**12,000** 344:5,24 345:5
**12210** 259:19
**12:22** 372:14,16
**12th** 260:3
**13** 338:13
**13,000** 338:25 339:6,14,16 341:4 341:14 343:11 345:15
**130** 258:9 431:17 432:19 433:18
**1325** 262:15
**13th** 439:12
**14** 351:22 493:3,7 494:8
**14,037** 399:4
**1473** 259:2
**15** 318:25 319:3 432:20 494:10 523:2,5
**150** 301:1,5 303:11
**1500** 260:8
**1530** 261:7
**158** 352:14
**16** 262:22
**1600** 258:3,10 260:23
**16518** 258:20
**16th** 439:13
**1755** 263:2
**18** 362:18 363:5 390:13,25 391:4 391:10
**1800law1010.com** 259:20,21
**1800s** 326:9
**18th** 258:9
**19103** 258:10
**1950s** 274:9
**1973** 481:4
**1978** 273:7,12 286:13,17,18,23
**1979** 329:1
**1980** 533:13
**1980s** 327:23
**1990s** 269:22
**1995** 286:14
**1996** 286:17
**19th** 555:15
**1:04** 373:2,6
**1:46** 400:22
**1:55** 401:1
**1st** 431:9 439:17 441:7 444:17 445:6,10,10,10,10 445:11,18 446:23 446:23

**2**

**2** 284:8 286:20 288:23 289:18,20 290:1 296:4 303:18 304:19 305:3 374:16,17

394:25 395:6 452:2 477:9 538:21,22,22 541:15,17 542:15 553:19
**2,000** 340:2,15
**2,4** 286:15
**2.4** 330:11 331:2 345:21
**2.5** 474:10 479:8
**2.9** 481:5 482:1,11
**20** 257:2 318:16,19 461:19 475:18 476:9
**20,000** 340:7
**200** 481:11
**2000** 268:23 402:22 500:10
**20005** 261:3
**2001** 292:20 399:24 400:4
**2002** 281:7 404:23
**2003** 278:5 279:7 283:25 286:21 291:22 292:3
**20032** 259:13
**2006** 295:2
**2008** 295:2
**2011** 292:22,23
**2015** 300:9 304:17 304:25 305:9,14 305:24 454:8
**2016** 308:2 309:3 309:19 310:16 328:1 346:11 347:17 348:23 350:16 351:3 366:5 367:6 386:14 435:9,10 436:22 437:24 454:8 456:8
484:14,17 485:1 505:23 518:8 524:20 525:11 526:19 527:4 529:7 550:18
**2019** 376:21 381:15 382:11 426:17 438:17 439:12 440:9,13 441:7 442:5 444:14,17 453:6
**2020** 385:9 438:23 439:13,17 445:18 449:7,13 450:13 458:18 468:16
**2021** 257:16 264:4 398:24 399:1 416:7 534:13 552:19 555:15 556:22
**20th** 261:12
**21** 402:23
**21202** 261:13
**21st** 398:24 400:4 468:16
**22** 354:17 401:10 402:23 460:4 461:13 466:4 473:25
**23** 348:5,6 351:9 395:7 553:7
**23,000** 345:16
**23.4** 550:15
**230** 526:12
**24** 362:21 363:15 389:3 493:16 526:3,6,11,20
**25** 374:4 416:20
**250** 262:2
**26** 338:13 470:24 498:24 543:18
546:3,6
**26,000** 338:25 339:6,14,16 341:4 341:14 343:11
**265** 553:3
**26th** 261:19
**27** 276:21,22,25 277:1 499:10,14 503:8 510:21 543:25 553:8
**276** 553:8
**28** 415:19 499:17 503:8 522:24
**28th** 262:16 399:24
**29** 499:10,17,24 503:8 544:1
**2901** 262:9
**292** 553:16
**2924** 257:2,2 264:15
**299** 553:10
**29th** 416:7
**2:22** 459:24
**2:25** 427:11
**2:29** 427:14

**3**

**3** 399:11 432:14 481:18 526:1 542:7
**3,260** 399:3
**3.550** 257:11
**30** 330:6,16 333:16 352:1,7,25 353:7,7 353:14 357:23 499:23 502:25 503:6,8,13 543:11 544:5,8,10,12
**30,000** 344:5,24 345:5 419:15
**30309** 260:24
**307** 553:11
**31** 499:10,20 503:9 522:22,23 544:1
**32** 498:24 543:18
**3200** 259:12
**323** 553:15
**325** 262:22
**33** 261:18
**348** 553:7
**34th** 260:13
**35** 353:16,17 356:6 421:22
**359** 553:17
**360** 444:4,6
**361** 553:13
**37** 299:19,20 433:24 526:12 553:10
**38** 404:20
**383** 553:12
**3879** 555:17
**39** 359:22
**391** 283:25
**395** 286:5 553:18
**396** 289:17
**398** 553:13
**3:18** 473:16
**3:27** 473:20

**4**

**4** 328:24 329:8 330:5 337:25 404:25 533:20 535:12,15
**4.2.1** 491:15
**40** 307:24,25 328:5 352:2,11 354:11 381:20 382:1,14 385:2 553:11
**402** 553:4

**40208** 259:3
**404** 553:20
**432** 553:23
**442** 553:22
**446** 327:1
**448** 338:2
**449** 553:24
**45** 353:8 356:20 383:7,8 419:15 422:4,16 423:10 424:14 553:12
**451** 553:23
**455** 260:7
**458** 554:2
**46** 361:20,21 374:13 553:13
**467** 554:3
**47** 398:14,15,17 553:13
**477** 554:3
**479** 554:4
**48** 323:12,14 553:15
**483** 554:6
**49** 292:11,11,12 553:16
**4:02** 506:19
**4:08** 506:22
**4:15** 514:4
**4:17** 514:7
**4:23** 519:14
**4:39** 519:17
**4:41** 521:1,4
**4:42** 521:15
**4:43** 521:18
**4th** 259:2 319:15

**5**

**5** 301:15,16,19 304:19 305:3 485:4 502:4 542:7
**50** 412:9 428:23 478:6 530:11,11
**50,000** 419:17 422:15
**500** 259:7 262:9 554:7
**51** 428:3
**514** 554:16
**5150** 257:10
**519** 553:4
**52** 359:10,11 361:20 390:21 484:2 498:21 502:21 533:19 548:9,9 549:2 553:17
**521** 302:22 305:19 306:15
**53** 395:1,3 553:18
**531** 554:10
**549** 553:3,4
**55,000** 353:11
**555** 263:7
**55th** 262:2
**5:19** 431:9
**5:25** 552:9,14
**5th** 463:21

**6**

**6** 330:4 343:24 345:12,19 433:13 538:22,22
**6.3** 336:24 339:19 341:17
**600** 260:2 469:10 469:18
**60s** 274:9
**627** 315:19
**629** 525:15,15
**63** 526:14
**672** 354:17

**7**

**7** 542:7
**70** 271:2 352:4,14 359:5
**719** 258:16
**725** 261:2
**73** 520:5
**74** 531:18,21 554:10
**750** 259:18
**77532** 258:21
**78401** 258:16
**78746** 262:10
**79th** 262:22

**8**

**8** 415:23 542:25 549:3 554:16
**80** 419:6 422:4
**824** 475:2,10
**86** 352:8 357:22

**9**

**90** 297:7
**900** 475:2
**90024** 258:3
**90071** 263:7
**921** 474:12
**93** 354:16
**94105** 260:8
**94111** 259:8
**94303** 263:3
**945** 294:13
**947** 296:2
**95** 399:9,12 501:24
**96** 334:7,11,15 335:4 336:19 353:21,24 356:14 356:21 384:22,24 385:14 386:10 413:5 414:1 415:3 442:9 443:20 444:7,21 474:24 476:4
**9:03** 257:16 264:3
**9:07** 267:24
**9:21** 268:2
**9:26** 271:15
**9:30** 271:18
**9th** 458:18

**a**

**a.m.** 257:16 264:3 267:24 268:2 271:15,18 335:15 335:19 337:19,22 450:12
**aaron** 262:5
**aaron.levine** 262:5
**abbreviation** 444:2
**ability** 377:8,18,24 378:3 379:3 380:16 527:3,20
**able** 267:9 322:3 327:25 328:1 329:5 337:9,15 350:20 374:20 382:15 481:18 496:19 539:18,20 539:21 540:4
**abnormally** 296:11
**absolutely** 419:23 437:14 544:14 548:21
**absorbed** 537:24 538:2 549:11,19
**abstinence** 492:22 492:22
**abstract** 278:15,24 280:9,14 293:20 293:21 316:14,15

**abuse** 492:16
**academic** 462:20
**accelerators** 286:19
**accepted** 324:9
**accessible** 485:17
**accomplish** 409:5
**accumulation** 359:4
**accurate** 349:13 365:25 369:21 380:21,24 386:3 436:2
**accurately** 454:7 486:24
**accuse** 437:6
**accused** 429:6
**achieve** 279:16 296:14 340:22 476:8
**acid** 284:18,18 496:17 551:22
**acidic** 284:16 314:15 542:12
**acidity** 542:13
**acknowledged** 432:6
**acknowledging** 361:13 549:16
**acquisition** 454:22
**acronyms** 296:8
**action** 440:18 555:11
**actions** 257:15
**active** 499:4 501:2 543:23
**acts** 442:20
**actual** 350:17 454:16 486:21 499:13 545:21
**adam** 258:5
**add** 272:10 459:6
**added** 437:16
**adding** 464:18
**addition** 272:16
**additional** 301:24 431:14
**address** 275:10 367:13 549:17
**addressed** 360:7 360:12,15,17,20 361:4 379:19 461:9
**addresses** 469:6
**addressing** 361:15
**adducts** 406:16
**adequately** 361:4 379:19
**adjusted** 399:8,12
**adjustments** 361:15
**administer** 339:15
**administered** 325:5,22 326:5 328:14 330:17 331:11,18,22 333:16,21 338:13 338:25 339:12 340:3,8,16 343:20 343:25 344:6,24 345:16 347:5 368:17
**administering** 326:20 332:6 334:10,14
**administration** 330:3 332:10 336:4 364:9
**admissible** 513:5
**adult** 497:20
**adults** 390:17 526:17
**advance** 400:3
**advancements** 328:6
**advances** 533:7,16
**advantages** 350:3
**advise** 306:14
**advisor's** 269:12
**affect** 358:14 365:9 371:15 398:3,12
**affirmative** 527:13 528:3
**affirmatively** 536:8
**afoster** 258:6
**afternoon** 402:5
**afterward** 542:8
**age** 492:19
**agencies** 522:15
**agent** 284:21 285:23 368:11,14
**agents** 317:10,20 318:6 398:11
**ago** 273:11 286:24 292:19 320:5 416:10 417:21 457:8 464:25 551:2
**agree** 264:8 273:13 278:23 281:8 298:17,19 298:22 299:9 341:13,22 345:24 365:5,21 367:15 386:7 403:3,7 411:15,24 419:4 423:14 445:19 453:13,22 455:17 463:7 484:16 485:9 486:16,17 486:22 487:8,15 489:11 493:23 496:22 498:12,18 501:10,15 505:12 506:12,15 508:1 516:4 536:4,14
**agreed** 266:20 414:14 492:21
**agreement** 266:18 533:4
**ahead** 286:4 301:17 304:1 321:4 548:25
**al** 286:14,17 295:2 295:2,8,12 329:1 370:22 376:16 452:11 526:15,16 526:16 529:5
**alameda** 257:9
**alarm** 372:8
**albany** 259:19
**alcohol** 332:4,6,10 332:12,14,24 333:1,7,13 343:20 345:19 347:8 492:16 493:14 495:9,14,16,19,22
**alerting** 439:22
**ali** 263:14 520:5 525:7,14 530:5 531:2 533:3 539:13 541:16 542:25 545:7
**aliquots** 302:8
**alison** 261:9
**alison.casey** 261:9
**alkylation** 272:14
**alleging** 402:9
**allow** 301:8 335:13

**allowed** 332:3 353:21 493:1
**allows** 291:17
**alter** 272:10,17
**alterations** 405:17
**altering** 272:25,25
**alto** 263:3
**amalgamation** 417:6
**ambient** 352:3,4 354:11 358:11 419:10
**american** 446:14 462:23 553:14
**americas** 260:13 262:15
**amine** 286:19 288:13 299:13
**amines** 284:22 287:22 289:12 295:25
**amount** 270:19 274:20 330:15 333:7,14,20,22 334:20 339:12 344:1 363:13 366:20 379:11 389:15 396:15 462:14 475:12 486:20 495:23 551:16
**amounts** 308:14 314:17 341:24 347:5
**ample** 371:10
**analyses** 303:1 311:7 313:2 314:13 315:17 372:4 381:10 418:18
**analysis** 302:21 303:15 312:6,8 313:21 350:17 376:16 381:13 382:13 418:11,16 418:20 419:6 423:17 440:13 454:23 470:11 475:22 476:12 485:16 502:17 508:6 553:21 554:11
**analytes** 315:13 375:24
**analytical** 327:24 328:6 329:21 337:16 348:19 349:7,19 350:12 350:15,21 376:11 376:13 381:15 434:8 441:24 455:9 525:5 533:16 539:21
**analyze** 315:3 359:21
**analyzed** 300:11 302:5 313:4,24 370:3 421:10 496:4
**analyzing** 349:5 350:5,24 371:6
**anapol** 258:8
**anapolweiss.com** 258:12,13
**angeles** 258:3 263:7
**animal** 325:5 331:10 507:22
**animals** 410:1,22
**announced** 441:14
**announcements** 441:24
**announcing** 517:3
**answer** 276:3 321:4 412:16,22 413:16,20 414:5 419:2 448:13 513:7,25 514:14 522:21 528:10 538:11 539:7 554:14
**answered** 341:9 356:17 413:19 414:12,16 418:14 482:24 542:1
**answering** 414:17 531:11
**antacid** 489:15,23
**antacids** 493:2
**anti** 398:11
**anticipated** 464:6
**anticipation** 517:17
**antihistamines** 298:1
**antioxidants** 307:8
**anybody** 487:24 517:3,6,11,16,22 518:3,9 519:5
**anymore** 525:8
**anyway** 510:17
**apologies** 372:8 520:21 521:20
**apologize** 446:21
**apparent** 289:6
**apparently** 296:19 364:23 372:9 390:3
**appear** 304:6 330:19 335:3 340:10 342:19,23 347:12 353:24 374:11 417:23 420:22 423:22 437:1 453:23 551:13
**appearances** 264:25
**appeared** 384:11 386:7 495:14 496:3
**appears** 286:25 287:10 289:2,14 294:9 319:19 322:20 343:17,22 344:10,21 345:2,9 345:22 353:9,10 353:18 356:3,20 357:2 362:5 370:19 372:2 383:23 391:6,13 401:24 409:25 424:19 432:2 433:4 434:7,21 437:5,25 441:4,10 444:4,8 448:1,18 449:3 450:18 453:2 454:21 459:22 461:17 472:10 473:2 480:13 494:21 495:21 500:2 501:23 512:2 527:8 531:23 535:22 537:1 539:17 540:3,13 542:17 549:14
**apple** 396:8,11,18
**application** 376:12
**applied** 300:20 302:12,23 310:25

311:19,22,24 312:18
**apply** 296:11 420:9 425:7 487:22
**applying** 376:20 376:23
**appreciate** 507:3 519:20 522:20 548:18
**approach** 273:19 433:8 484:13 485:11 486:19
**appropriate** 452:21 505:5
**approved** 413:22
**approximate** 353:16
**approximately** 264:2 319:22 320:2 353:17 441:12 474:15 547:2
**april** 431:9 439:13 439:17,17 445:11 445:18 449:7
**arch** 261:18
**area** 350:19 392:13 408:13 483:9,21 508:2 537:22 538:4 542:22,22 544:24
**areas** 462:18 541:9,13,13
**arena** 303:2
**argumentative** 414:12 422:19 488:3,14 502:10
**aristei** 258:2
**arnold** 262:2
**arnoldporter.com** 262:5,6
**arranged** 542:18
**arrangement** 264:21
**arrived** 275:17 276:19
**article** 277:8,11,14 278:4,25 279:6 284:15 286:22 287:3 293:20 294:12 299:22 300:5,7,8,10,13 308:17 309:2,6,7 309:12,13,19,24 310:6 313:15 316:11,15 318:4 320:9,18 323:19 324:1,5,5,8 373:18 373:19,21 416:13 449:18 450:8,9,17 450:19 458:21 460:14 461:1 509:8,10,15 518:23 537:9,11 540:15 547:5 550:19 553:10,11 553:13,16,17,24 554:7
**articles** 281:12 317:25 318:2,10 522:17 545:3
**articulate** 524:13
**artifact** 311:4 381:15,16 386:1 425:24 427:23 434:17 505:23
**artifacts** 315:16 350:15 384:15
**ascorbic** 496:17 551:22
**aside** 516:20
**asked** 286:23 341:8 356:16 412:14 413:18 414:11 418:13 426:21,23 454:6 467:5 478:2,23 482:24 483:4 504:17 506:10 509:5 520:6 527:17,19 530:3,6 535:11 541:25
**asking** 275:16 317:17,18 320:15 326:17 356:12 400:4 422:12,13 443:9 447:12,16 447:19 448:10 477:6 507:7 521:6 521:24 536:21
**aspect** 377:2,3
**aspects** 276:16 307:3 441:22 454:1,3
**assay** 302:24 313:23 314:4 407:16 431:16,24
**assays** 313:9,12,18 314:9 475:7
**assess** 364:3
**assessment** 404:19 483:5 501:8
**assessments** 504:8
**assistant** 278:9
**associated** 269:25 278:7 298:21 301:21 311:5 315:16 317:3 329:18 342:5 348:15 350:15 384:23 393:24
401:10 412:24 417:10 421:13 425:6 500:20 530:1
**associates** 258:20
**association** 264:17 269:15 270:10 415:10 462:23 499:4 543:24
**associations** 462:20
**assume** 265:21 421:24 439:6 488:25 489:12 511:7
**assumed** 547:4
**assumes** 287:15
**assuming** 419:20 456:13
**assumption** 334:3 422:2 458:8
**ate** 362:19 374:4
**atlanta** 260:24
**atoms** 298:16
**attached** 416:12 431:14 466:6
**attempt** 273:21 276:9,15 473:2 485:22
**attempted** 426:25 485:22
**attempting** 348:3 425:4 450:3
**attention** 269:10 269:12 278:15 280:8,25 283:24 286:5 293:19 296:3 314:1 315:18 319:12 390:22 399:17 400:6 401:6

**attorney** 402:2,6 513:6 514:18 516:7
**attorneys** 258:4,11 258:17,21 259:3,8 259:14,19 260:4,9 260:14 261:3,8,13 261:20 262:3,10 262:17,23 263:3 513:1 515:21 518:5
**audio** 264:6 373:20 388:2
**aurobindo** 446:12 447:3
**austin** 262:10
**author** 277:11 368:25 450:16 455:5 466:13
**author's** 506:11
**authored** 299:23 308:3 449:12
**authoritative** 287:2
**authorities** 276:7 281:13
**authors** 294:10 299:2 330:14 331:12 360:1,22 360:22 361:7 375:3 385:2 399:17 400:5 454:20,24 455:3 479:14 480:16 503:16 510:24 511:2,17 543:10 544:15,20,20 545:2 549:15
**availability** 364:11
**available** 284:6 322:14 526:2
**aventis** 261:20 262:4
**avenue** 259:12,18 260:2,13 262:15
**avoid** 293:15
**aware** 274:1,7 286:3 295:11 309:9,21 310:2,12 326:22 351:14,16 382:21 393:20 396:5 399:20 402:16 434:22 440:5,11,15,16 446:7 467:16 515:5 517:8 520:17 522:12 527:12
**axis** 296:24

**b**

**b** 553:6 554:1
**back** 268:2 271:18 291:22 292:3 316:13 326:8 327:23 328:15 335:19,23 337:5 337:22 355:13,16 355:20 356:10 361:1 362:4 373:6 376:21 401:1 412:6 426:16 427:14 437:23 470:22 473:20,24 483:25 484:14,17 484:25 485:1 502:20,24 506:22 514:6 519:17 521:3,17 533:6 538:18 544:22 548:9
**background** 269:20 288:18 472:5,20 497:14 497:25 526:22 529:3 530:1 531:16 546:18,21
**backgrounds** 541:11
**bacon** 262:15 393:22
**bad** 388:2 446:20 478:22 480:21 520:22
**balance** 276:15
**baltimore** 261:13
**banned** 274:13
**bans** 274:18
**bar** 303:7
**barnes** 261:6
**bars** 301:18 302:7 303:3,15
**based** 288:22 302:25 312:13,14 312:18 320:5 327:15 341:1 342:8 350:7 370:2 381:10 382:10,12 384:14 385:24 386:1 389:20 403:18 405:5 410:9 413:1 425:23 435:7,12 436:4 447:24 470:18 480:5 481:16,23 501:11 506:11 507:21 510:1 511:21 514:23 524:3 525:5 529:4,9,11 539:16 540:4 541:2
**baseline** 474:20 475:10
**basic** 485:10 487:8
**basically** 337:7 346:11 384:12
**basics** 504:3
**basis** 360:3 387:13 409:17 475:12 513:22 514:20 539:19 540:3,19 541:2
**batches** 384:23 385:12 386:9,24 421:10
**bauchner** 460:13 460:19,23
**baum** 258:2
**baumhedlundla...** 258:5,6
**beaker** 420:16
**beakers** 421:8
**bearing** 456:10 492:19
**beer** 329:2 330:3 343:23,25 344:23
**began** 270:9 426:14 542:7
**beginning** 299:17 335:20 373:7 401:2 427:15 473:21 506:23 509:10 533:22
**begins** 278:19 280:14 286:7 297:19 313:17 370:22 523:1
**belief** 311:4
**believe** 269:13 273:8,17 274:9 279:2 284:14 288:14,21 291:21

292:11 295:7 299:10 300:22 301:1,23 303:11 312:9,11 313:5,25 314:6,19 316:5,10 320:15 323:10,25 327:2 328:10 341:10 342:2 348:11 349:15 350:23 355:9,19 357:15 359:23 374:15 375:12,16 378:16 379:21,22 383:11,16 384:17 390:10,17 392:3 403:23 406:7 407:21 418:11 419:8,22 424:7 426:18 436:14 437:22 438:23 439:8 442:1,6 449:15 453:11 467:4,10 477:12 479:8 481:9 494:7 498:12 508:23 511:5 512:17 513:5,24 515:13 515:19 516:13 522:14,24 524:19 527:10 530:9,13 531:10 532:2 533:6,12 534:11
**believed** 271:8 412:8 415:1
**benefits** 273:23 274:1 293:10 376:9 412:25
**benign** 432:16
**berkeley** 269:2 278:13
**best** 363:2 438:13 450:23 478:11
**better** 484:24
**beverages** 338:6
**beyond** 544:24
**bgselden** 263:4
**big** 368:22
**biological** 324:24 406:6
**bit** 265:24 266:1 286:24 300:1 344:9 352:24 353:10 356:1 462:8 463:7 487:23 525:24 528:12
**bla** 518:18,18
**blackwater** 300:23
**blackwaters** 300:16
**bladder** 317:3,10 317:20 318:6 321:24 322:7 398:18 399:6 401:11
**block** 470:4,10
**blocking** 322:18
**blood** 320:21 323:6 407:8 408:18 409:16 485:19 486:18 555:12
**bloodstream** 285:20 320:9 347:25
**blow** 525:24 541:20
**blue** 304:4 355:25 359:3 420:9
**board** 345:20 347:8 348:13
**boat** 423:6
**body** 285:15,19 286:2 306:25 307:3,4,10,13,18 307:20 320:12,14 320:24 321:9 342:25 345:7 346:1 378:11 387:25 388:13 408:4,19 409:7 433:9 479:21 486:21 492:6 496:25 504:18 529:13 536:3 537:20
**boehringer** 260:14 260:15,16,17,18 305:9 309:17 517:4
**bogdan** 259:20 265:7,9 266:13 267:7,14 268:4 271:20 276:20 277:3 318:18,22 319:2 335:9,22 337:24 339:23 372:11 373:10 400:19 401:4,21 402:1 484:5 528:9 528:23 529:20 536:1,18 540:12 541:1 544:21 546:12 547:25 548:8,21 549:1,22 553:3
**borne** 481:3
**boss** 460:19
**boston** 261:8,19
**bottle** 423:5
**bottom** 296:4 351:23 383:20,25 398:25 530:19 535:14 543:2
**boulevard** 258:2 258:16
**bound** 298:2
**boundary** 377:24 378:2,19
**bowman** 262:8
**bowmanandbro...** 262:12
**box** 291:6,9,13 401:25 535:7
**brady** 259:6,9
**bradylawgroup....** 259:9
**brand** 260:7 420:21
**branded** 459:3
**braunstein** 449:12 449:18 451:20 454:2 458:17 460:7,21 463:17 463:24 464:21 465:2,22 466:5 467:21 468:13,20 476:24 477:13,15 554:4
**braunstein's** 483:4
**break** 318:12,21 319:4 335:12 372:8 373:12 400:17 427:7 473:14 506:17 519:11
**breakfast** 364:11 367:12,19,20,22 390:10 487:11 490:5 542:8

**breast** 500:14
**brent** 258:4 400:15 402:3,6 414:14 427:2 445:4 548:23 549:22
**brian** 263:4 443:11 548:1,15
**briefly** 484:1 532:23
**bring** 292:10 319:7 359:9 361:20 386:13 400:6 412:6 520:5 523:1,2 525:8 538:19 548:9,13
**bringing** 316:13 433:5
**broad** 507:23 517:14
**brooke** 262:8
**brought** 269:9,11 310:24 384:21 385:4,20 399:16 426:8,15 440:8
**btlaw.com** 261:9
**building** 372:10
**bunch** 437:20 493:19
**business** 350:5 463:5
**buys** 423:3
**bwisner** 258:5
**byproduct** 316:2,9
**byproducts** 293:5

**c**

**c** 258:1 259:1 260:1 261:1 262:1 263:1 265:3 373:3 392:16,22 394:13 394:17 395:17 396:13 397:17 398:1 496:18
**c.v.** 260:18
**c2** 298:2,9,13
**caffeine** 493:15
**calculate** 324:14 329:14 389:1
**calculations** 276:12
**calibration** 428:11
**california** 257:9 258:3 259:8 260:8 263:3,7 269:2 270:5 274:23 275:20,24 278:13 400:16 402:7
**call** 287:22 293:5 303:18 336:20 382:9 449:17,18 482:14 501:2 512:4
**called** 265:4 269:14 307:5 314:25 360:23 480:1 491:1 510:7
**calls** 274:5,15 276:3 295:5 340:18 346:5 347:20 364:21 374:8 391:25 398:8 405:20 406:4 408:10,20 411:17 424:16 440:19 453:20 462:15 463:3 470:5 480:20 482:7,23 487:18 489:16 490:11 494:3 496:14 497:3 503:22 528:6 551:24
**camps** 497:10
**canaan** 260:19
**cancer** 272:23 273:1 276:14 279:22 281:25 317:3,10,20 318:6 324:11 398:19 399:7 401:11 402:10 404:3,10 405:18,24 406:2,7 406:13 450:21 457:2 461:3 466:9 468:24 498:23 499:6 500:20 501:18 502:13 505:15 507:8,12 508:2,11 522:10 523:9,22 543:18 543:25
**cancers** 500:14 502:23
**candice** 258:22
**candidates** 436:17
**capable** 392:6
**capacity** 422:21
**captured** 370:15 495:1
**captures** 302:22
**carcinogen** 270:21 271:6,9,10,21 272:1,4 273:21 279:3,4,21,23 281:15 283:20,23 403:16,19 404:1 410:9,18,19 416:15 504:14 520:8,19 522:16
**carcinogenesis** 308:20 309:3 413:3 525:22 553:12
**carcinogenic** 273:15 405:9 410:2,12 523:8,11 523:11,15,17,19 523:20 524:5,8
**carcinogenicity** 453:8 507:21 523:14 526:2
**carcinogens** 276:10 278:22 279:9,19 281:6,18 504:9 520:13,14 521:8,9,10 522:2
**cardwell** 401:7
**care** 296:10 297:15 384:15
**careful** 476:8
**carmen** 260:24
**carrots** 396:17
**case** 266:16 299:1 301:22 312:10 320:20 334:4 344:21 345:15 359:5 361:11 377:5 380:11 384:11,18 390:11 391:7,13 392:3 398:19 403:23 426:18 436:6,19 437:5 444:3 473:7 495:21 496:3 512:16 516:23 549:4 556:2
**cases** 257:7,12 266:18 300:25 386:9 399:3 415:3 539:19
**casey** 261:9
**castillo** 260:10
**categories** 300:14 404:8 520:18

523:6
**categorization** 410:17 520:7
**categorizing** 524:3
**category** 279:18 520:12 522:14 524:13
**catelyn** 258:11
**cation** 407:19
**causation** 504:9
**cause** 279:22 404:3 405:15,23 411:22 420:4 435:13
**caused** 351:3 429:15 530:23 532:20
**causes** 405:17,18 505:14
**causing** 407:2
**caution** 359:23
**ccp** 257:10
**cease** 321:20
**cell** 264:4
**cells** 406:1,2,3
**celsius** 352:2,3,4,7 352:11,14 353:7 357:23 431:17 432:19 433:19
**center** 259:7 293:21 338:10
**centigrade** 359:5 433:24
**central** 388:9
**certain** 384:23 385:12 386:9,23 387:6 389:3 392:4 393:6 415:2 426:23 430:22 462:18
**certainly** 288:10 313:23 408:22 411:7,20 435:5,6 441:22 454:12 455:14 469:22 486:13 505:1 537:21
**certification** 555:1
**certify** 555:5,10
**chaffin** 260:2
**chaffinluhana.c...** 260:5
**chain** 428:3
**chance** 418:19 420:14 443:8 449:22 450:25 468:8
**chances** 418:18
**change** 272:17 321:9 364:19 452:19 556:4
**characteristics** 270:24 272:2 390:16
**characterization** 373:18 434:15 453:12
**characterize** 388:21 389:8
**charge** 349:4
**chart** 345:13 353:12 357:22 358:3 419:4 435:16 470:22,24 471:1 476:21 500:19 536:22
**chattem** 261:20 262:3
**check** 493:16
**chemical** 268:15 299:11 311:13,22 311:23 315:2 322:2,2,5 404:19 429:13 524:4 530:21 532:17
**chemicals** 279:17 283:1,8,17 288:5 289:11 297:3 313:5 522:7 524:3
**chemist** 522:5 528:24
**chemistry** 348:20 349:19 545:16
**cheu** 416:5
**chewing** 493:12
**chicago** 464:3
**chief** 460:7,13
**child** 286:17 492:19
**chloramination** 287:17 288:11 295:1,17,24 299:15 300:19
**chloramine** 287:17
**chloramines** 287:20 288:3 289:13 296:12,13 302:10
**chlorination** 280:19
**choose** 349:22 361:7
**chopping** 470:4,10
**christi** 258:16
**chromatography** 311:7 312:5 433:8 434:4 505:24
**chronic** 391:15,21
**cigarettes** 493:11
**cigars** 493:12
**cimetidine** 500:13 500:20,24 501:12
**circle** 290:23
**circulates** 320:11
**circulating** 486:12
**circumstance** 489:25
**citation** 323:23 469:13 499:23 503:1 525:22
**citations** 469:19
**cite** 282:18
**cited** 281:20 282:20 289:3 401:16
**cites** 499:10
**citing** 286:22 287:1,5,8
**citizen** 384:20 385:4 414:19 422:10,13 553:23
**citizen's** 384:11 387:14 432:9,13
**civil** 268:10,13
**claimed** 435:17 476:24
**claiming** 434:6
**clarification** 275:16 428:10
**clarify** 417:5 453:24 514:17 522:3
**clarity** 372:4
**classification** 522:9 523:7
**classifications** 403:21
**classified** 403:21
**classifies** 521:8 522:1

**clastogenic** 405:11
**clause** 544:6
**cleanup** 282:15,18 282:20,24 283:6,8
**clear** 266:16 367:1 369:6 447:23 465:13 495:11 505:19 512:22 521:23
**clearance** 319:21 320:2 388:13 535:25 536:5,9,12 536:14,21 537:3,7
**clearly** 405:9 407:24 470:8 482:21
**click** 436:15,20 437:12 441:6
**clients** 515:10
**clinical** 452:15 492:10
**clinically** 452:12 493:20
**close** 502:18
**closer** 267:10
**cmcdonough** 258:12
**cmcnabb** 258:22
**code** 273:1
**coffee** 493:14 494:23
**cola** 493:15
**collaborated** 346:14
**colleague** 484:5
**collect** 348:3 485:17,23 541:10
**collected** 300:23 301:20,22
**collecting** 320:20
**collection** 349:3
**color** 418:23
**colors** 356:4
**column** 294:14 344:13,15 376:3 443:25 525:16,20 539:14
**combined** 298:15 351:6
**come** 405:4 486:19 514:12
**coming** 269:17 515:19 518:4
**commenced** 265:11
**comment** 324:6 485:7 486:8
**commentary** 368:25 428:6 430:13
**commentator** 370:10
**commented** 355:9 355:19 485:2
**comments** 357:16 359:25 360:16,24 361:3,6,13 362:6,7 362:10,13,15 369:8 374:13,21 374:22 381:8 383:3 393:3 420:8 425:11 451:24 486:7
**commercial** 274:8 274:13,18
**commission** 556:24
**committed** 326:14
**common** 287:18 299:11 300:20 302:11 487:23
**communication** 361:12
**communications** 514:13,23 516:6,9 518:4
**community** 453:17
**companies** 462:8 462:13 463:2 465:11
**company** 261:14 261:15 446:10 459:3
**comparable** 288:1 526:14,22
**compared** 295:25 300:17 303:19 331:9 399:7 412:24
**comparing** 282:4 359:2,3
**comparison** 325:15 499:3 525:3 543:23
**comparisons** 499:2 501:13 543:21
**compartment** 423:5
**complain** 461:25
**complaint** 418:16
**complaints** 464:23
**complete** 272:22 296:14 456:10,16 515:8,9
**completed** 468:20
**completely** 334:23 369:6
**complex** 380:2 409:7
**compliance** 413:23
**complicated** 443:18
**component** 299:12 406:13
**components** 389:12
**compound** 357:10 392:18 393:1 397:19 498:7
**compounds** 288:2
**computer** 264:5
**concealing** 434:16
**conceivable** 370:4 380:4 423:13 424:20 482:16 552:1
**conceivably** 272:17 371:25 398:11 407:22 487:3 524:8
**conceive** 488:17 489:20
**concentration** 296:12 315:22 316:1,7 353:13 377:11 379:16 388:10 421:21 474:24 478:5,18 479:8 524:8 536:16 546:8
**concentrations** 279:14,15 280:2,4 296:20,22 323:6 362:21 363:19 365:11 366:16 372:5 381:11 384:21 430:23 446:18 474:2 475:1 479:3,20

481:2 497:24 538:7,13 539:24
**concept** 306:21 320:7 386:8 414:21
**concern** 269:18 272:19 275:13 280:10,12,17 342:15 387:4 411:23 422:21 435:14 524:4
**concerned** 508:14
**concerning** 422:6 422:11,16
**concerns** 270:22 275:9 350:14 360:12 386:20 438:13 460:24 461:8 465:12
**concierge** 263:14 468:3
**concise** 281:12 404:19
**conciseness** 279:5
**conclude** 529:9
**concludes** 552:9
**conclusion** 393:20 401:15,23,25 503:20 538:5
**conclusions** 390:22 401:6,9 528:17
**concur** 544:21
**concurred** 385:11 526:8
**condition** 353:1,15 357:21 374:11 389:25 390:6
**conditions** 284:16 296:8 311:16 312:5 314:16 357:12 358:5 366:7,23 369:9 370:2 372:2 373:16,23 374:6 374:10 386:20 387:4 391:22 392:4 417:2 432:15 478:10 497:9 542:12
**conducted** 303:14 383:24 387:15 417:8,12,16 454:9 529:23 545:21
**confidence** 399:9 399:13 501:24
**confidential** 267:2 267:5 450:11
**confirm** 374:20 447:13,20 514:19
**confirmed** 384:25 514:8
**confluence** 365:7
**confounders** 401:12
**confounding** 498:25 499:1 543:19,20
**confused** 344:9
**confusing** 344:12 420:11
**connecting** 472:25 473:5
**connection** 310:10 310:17 378:17 427:4 520:22
**connolly** 261:2
**consent** 264:20 491:25
**consider** 364:15 400:11 422:22,25 490:8
**considerable** 462:14 475:11
**consideration** 349:15
**considered** 277:20 278:1 279:2 324:10 340:13 379:11 391:20 406:12 410:1 483:2 485:24
**considering** 340:14 493:24 498:23 543:17
**considers** 271:25 379:15
**consistent** 329:12 332:15 420:5,6 475:21 499:2 543:21 551:20
**constituent** 278:2
**constituents** 393:15 394:7
**constrain** 469:22
**constraints** 467:13
**construe** 511:24
**construed** 511:17 512:6
**consultant** 426:16 440:8
**consulting** 426:20
**consume** 300:25 303:10 328:3,10 411:21 489:19
**consumed** 301:5 342:21 347:14 364:7 486:4 488:17
**consumer** 300:17 424:14
**consumers** 275:3 275:8 303:6 387:2 495:9 508:14
**consuming** 497:21 542:3
**consumption** 303:22 332:12,14 340:25 342:6 366:11 367:8 412:10 495:19,23 497:12,23 525:3,4 530:2
**contact** 292:9 304:20 305:1,9,14 306:5,11,13,19 309:6,11,16,18,23 310:3,5,13,22 400:8,10
**contacted** 291:23 310:14
**contacts** 309:10,22
**contain** 393:23
**contained** 402:11 496:6
**container** 424:12
**containing** 286:10 286:19 338:5
**contains** 537:5
**contaminant** 277:18,20,22 278:1 280:18 403:8 553:9
**contaminants** 268:16 283:12
**contaminated** 329:2
**contamination** 280:20
**content** 455:3 553:19 554:6
**contention** 467:2 471:18

**context** 292:17 296:18 312:3 321:6 379:13 400:12 443:1 475:16 482:11 490:18 491:11 495:12 533:11 546:15 547:14
**continue** 264:7 547:2
**continued** 259:1 260:1 261:1 262:1 263:1 373:9
**continuing** 265:12
**contraceptive** 492:23
**contradict** 498:15
**contrary** 503:20
**contribute** 300:15
**contributed** 433:20
**contributes** 527:14
**contributing** 431:18
**contribution** 364:10 455:10
**contributions** 324:19 454:20 455:19
**control** 398:19 436:21 501:3
**controlled** 332:2 332:11 409:1
**controlling** 401:12
**controls** 399:4 499:4,9 543:23 545:16
**conversation** 477:17 513:23 514:9
**conversations** 465:1 512:24 513:4
**conversion** 294:25 295:16 296:15,23 298:5,22 321:13 321:19,19 369:17 432:21
**conversions** 297:4 297:12 299:15
**converted** 320:14 320:23 321:1 322:2 368:2 369:14
**converts** 295:23 408:16
**cooperation** 349:19
**coordination** 257:11
**copy** 450:7 525:10 525:17,18
**corner** 327:1
**corporation** 260:16,16
**corpus** 258:16
**correct** 266:8 275:21,22 279:24 281:18,21 286:24 286:25 287:3,9 288:7,13,16,19 291:19 292:21 295:4 297:15,16 299:23,24 300:2,3 300:11 304:11,12 305:20,21 308:3 308:16 309:3,4 311:1,25 312:3,19 312:21 313:21 315:10 316:6 317:13 318:7 319:23,24 320:24 321:16,23 322:6,7 322:10,16 323:21 323:24 326:14 328:8,12 331:14 331:18 333:3,10 333:11,18,25 336:16 337:10 338:7,8,18 339:2,3 339:8,14 340:4,9 340:11 341:7,19 342:10 343:15,21 343:22 344:2,3,7 344:21 345:1,2,7 345:17,18,21 346:12,13,17,21 346:22 347:1,2,8 347:19 348:10,13 348:14,16,17,21 349:7,8,10,11 351:12,13 352:12 352:13 354:2,4,7,8 359:14,15,18,19 361:17,18 363:8 364:20 368:5 369:22 371:3,11 371:12,23 373:23 373:25 374:7 378:4,6,13 379:5 379:19 380:16,17 380:21 381:5,7,22 383:15 385:21 387:7 389:4,18,23 390:1,7,11,14 391:5,11,16,23 395:24 397:20 398:5 403:13,17 408:19 410:13 415:16,17 416:9 417:2 418:2,8 422:24 424:6 426:22 434:17 435:22 436:3 437:10 438:4,7 440:3 448:4 449:1 449:14 454:25 455:4,6 462:24 473:9 483:13,22 494:17 495:7 496:8 504:7,9,10 504:14,15 505:18 505:24,25 507:10 508:4,7,16,17 509:3,11,12,16,17 510:2,4 511:3 512:13,21 513:2 513:13,17 514:25 515:3,4 520:14 523:23 524:15 525:12,13 526:9 526:24 527:15,16 528:21 529:14 530:8 531:6,25 533:10 534:2,11 534:15,17,23 535:12,17,21,22 535:25 536:10,11 537:15,20,22 538:1 540:9,17 542:20 544:11,17 545:17,18,22,23 545:25 546:1 547:9 549:20
**correctly** 324:12 324:25 467:5 508:25 526:17
**cosmetics** 324:22
**cost** 276:17
**costco** 423:4
**costello** 263:12
**counsel** 264:11,20 318:23 335:5

339:21 427:19 430:3 466:3 477:5 478:2 484:4 507:7 508:25 510:6 512:19 513:10,15 514:12,22 517:18 520:8 531:3 543:8 544:3 545:8 547:22
**counsel's** 264:24
**counter** 386:25
**country** 387:1
**county** 257:9 269:4,21 402:8
**couple** 266:11 436:11 449:10 487:7 507:1 516:11 535:5
**course** 268:18 379:1 401:21 444:10
**court** 257:1,9 264:14,18,24 451:13
**covered** 550:2
**covering** 384:10
**covers** 517:22
**crazy** 444:11
**created** 507:12
**creating** 427:23
**creative** 364:3
**crime** 326:13
**criteria** 491:1,5,9 491:17 493:25 494:6,25 495:4 498:9
**critical** 381:19,25 383:22 406:19 455:1
**critically** 509:14
**criticism** 375:11 375:13,19 377:14 382:23 383:1 471:4
**criticisms** 375:2,7 383:5 476:23 527:18,25
**crosby** 258:21
**cross** 468:22
**crux** 365:14
**ctoledo** 260:25
**cuff** 546:24
**cured** 393:18,23 394:9 396:21 497:10,11,22 550:14
**curiosity** 393:17
**current** 280:10,12 280:16 304:14 383:21 385:2 452:11 469:2
**currently** 274:3 295:21
**cursor** 315:20 549:5
**curve** 356:20 358:8 359:3
**curves** 355:12,22 358:8
**cvs** 447:2
**cycle** 363:19
**cycles** 365:12

**d**

**d** 262:22 286:15 319:8 415:19 510:21 520:5 525:8 530:11,11 531:21 533:19 538:21 553:1
**d.c.** 259:13 261:3
**daily** 411:13 475:12
**damage** 307:6 407:2
**dann** 261:11
**data** 284:6 338:2 343:19 356:22 357:4 358:20 420:6,18 423:15 450:21 453:15 454:23 471:5,13 537:5 546:4 547:1 547:8
**database** 507:15 508:9
**date** 438:19 444:12 453:5 556:3
**dated** 416:7 431:9 439:13 444:10 458:17 460:3 463:20 468:16
**dates** 438:24 444:10
**david** 262:11 319:17 322:15,22 323:24 427:21 428:5 430:5 431:6 431:8,23 432:25 452:11 465:3 506:4
**david.duke** 262:12
**day** 263:2,6 353:8 353:16,17 354:17 356:6 362:20 363:7 364:8 395:20,21 396:21 396:22 420:15 421:9,9,12 439:17 458:20 459:17 461:14 465:18 487:12 488:1,12 513:16 514:21 515:5,18 542:4,4 552:19 555:15 556:21
**day's** 515:11
**days** 356:4,20 419:16 421:22,23 422:4,16 423:10 424:14 493:3,7 494:8,11 507:4 542:7,7
**de** 260:18 275:6 334:25 518:18
**deal** 273:9 462:7
**dealing** 265:25 284:17
**dealt** 476:6
**dear** 460:6 468:19
**decade** 414:8
**decades** 533:9,17
**decay** 285:24
**december** 445:9
**decide** 498:3
**decided** 270:6 417:9
**decides** 360:25
**decision** 276:6 515:21,22,24 516:1 518:8
**decreases** 542:14
**defendant** 260:9 261:3 262:10,17 262:23 517:2
**defendants** 260:14 261:8,13,20 262:3 435:16 470:23 498:21 506:3 512:15 515:6,9 516:22 517:7,24 518:2,5 531:18

545:10 550:1 554:10
**defense** 270:8 427:19 430:2 466:3 477:5 478:1 484:4 507:7 508:25 510:6 546:3,6
**defense's** 466:16
**define** 391:17 402:20
**definitely** 267:16 406:12 548:24
**definition** 279:11 391:10 463:16 482:20 502:7 535:25 536:5,12 536:20
**definitions** 520:17
**definitively** 271:10
**degradation** 311:5 311:10,12,17,19 311:21 354:19 388:12 431:18,25 487:5 545:25
**degree** 353:15
**degrees** 352:1,3,4 352:7,8,11,12,14 352:15,25 353:7,8 354:11 357:22,23 359:5 419:6 422:4 432:19 433:19,24
**dehydrate** 284:19
**deionized** 297:8 379:23,24 380:10
**delay** 266:1
**deleting** 546:4
**demonstrate** 471:11 547:8
**demonstrated** 294:25 295:16 298:23 318:3 479:7
**demonstrating** 296:5 528:3,20
**denominator** 299:11
**department** 268:8
**depend** 379:13
**dependent** 542:11
**depending** 370:11
**depends** 340:21 341:25 366:2 472:14
**depicted** 290:1 291:11
**depicting** 289:23
**depicts** 290:4,8
**deposition** 257:20 264:10 266:17 267:1 404:16 477:14,20,25 517:17 554:4 556:3
**depth** 522:8
**derivitization** 314:25
**describe** 283:7 284:11 311:10
**described** 299:16 544:10
**description** 553:7 554:2,10
**descriptors** 523:13
**design** 326:11 348:22
**designated** 267:2
**designation** 428:9
**designed** 326:18
**designing** 340:14 496:23
**desimone** 257:23 264:19 555:3,18
**detail** 371:5 472:18 546:14
**detailed** 501:8
**details** 313:22 314:24 323:11 332:2 334:9 349:15 363:10 393:13 394:10,23 421:7 430:18 431:14 432:8 434:8 441:16 448:15 456:17 457:17 463:15 466:2 471:25 485:6 490:16 507:17 508:22 509:8 510:13 516:10,16 517:19 522:11 533:14 534:24 538:9 546:23
**detect** 302:19 306:7 327:9 328:4 328:7 329:6 332:23 336:1 337:9,15 340:9 341:11 344:1 377:8,18,25 378:3 378:9,21 379:3,6 379:10 380:16 407:20 408:18,23 433:23 524:21 526:20 527:3,6,9 527:20 539:2,18 539:21 540:4,8,23
**detectable** 321:23 332:21 346:21,24
**detected** 270:3 275:2 328:11 330:7 333:8,14 340:11,17 341:23 343:13 344:4 347:6,7,18 407:22 534:19,21 549:11 549:19
**detection** 269:3 306:2 339:10,11 341:12 342:1,15 342:16 343:9,14 370:2 378:22,23 379:2 382:25 434:11 533:7,23 534:1,6,9,10,13 535:15
**detections** 274:25
**determination** 305:23
**determine** 269:16 293:6 366:20 375:22 433:16 497:8
**determined** 270:12 358:15 379:24
**determining** 375:14 388:6
**develop** 350:11,20
**developed** 302:25 349:6 376:21 402:10 433:7,21 434:4 533:9
**developing** 350:7 381:17
**development** 261:14 546:8
**deviation** 526:13
**devices** 264:6

**devries** 261:11
**diagnoses** 461:3 466:9 468:24
**diagram** 472:24 473:4
**diet** 326:3 332:3 332:11,13 365:23 393:9 394:9,20,23 395:13,23 396:7 396:21 496:12 497:22 542:3
**dietary** 394:5 497:9
**diethylamine** 290:1
**diets** 393:14,15 394:1,7 496:5,10
**difference** 303:19 328:5 535:2 540:21,24
**different** 282:24 306:6,7 308:23 325:7 342:17 355:3 357:12,19 358:9,19 366:23 370:5 372:1,1 377:10 386:24 391:22 392:12 393:15 394:7 420:20 436:11 441:24 442:2 448:17 496:10 497:5 520:18 522:9,11 523:13
**difficult** 290:25 324:20 327:7,13 329:13 332:23 350:11 407:20,23 408:18,23 486:14 486:23 487:2
**difficulty** 329:18 329:22
**digested** 370:25
**digestive** 363:14
**diluted** 301:23 302:5,9
**dilution** 302:2,4
**dimethyl** 288:15
**dimethylamine** 284:22 286:10,16 287:20,23,25 288:5,19 289:12 290:4,7 291:12,14 299:12 308:9,10 314:19,23
**dimethylamines** 314:18,22
**dimethylhydrazine** 270:1 274:11
**dinner** 364:14 390:5
**dioxide** 285:21
**direct** 278:14 280:7,19 319:11 320:7 363:18 372:4 390:21 400:8 465:1 485:25 486:18 517:18
**directed** 544:4
**directing** 280:25 283:24 286:5 293:19 296:3 314:1 315:18 401:5
**directions** 554:14
**directly** 342:21 368:16 417:17 470:1 486:10 503:20 513:11
**disagree** 295:14 540:20
**disappeared** 417:20
**disclaimer** 511:15 511:15,22
**disclaims** 512:5
**disclose** 513:19 515:2
**disclosed** 466:25
**disclosure** 454:16 454:18 455:10 516:17
**discoloration** 429:12 530:20 532:17
**discuss** 305:10 309:7,12,19 450:20
**discussed** 276:13 432:17 440:7 459:7 471:15 472:19 546:16,17 546:20 547:17
**discussing** 289:11 428:25 549:3
**discussion** 271:11 383:20 384:4 428:7,22 430:20 430:21 471:8 480:25 520:24 543:11 547:14
**discussions** 428:18
**disease** 316:16,21 316:24 317:5,7,8 317:19 318:4
**disinfect** 300:21
**disinfectant** 287:18
**disinfectants** 300:20 302:11
**disinfection** 270:13,17 293:5,7 293:8,10,17
**disorders** 493:21
**dispute** 385:1 417:14 483:10,16
**dissertation** 269:1
**dissolved** 365:17 365:24
**distancing** 456:2
**distinction** 332:19 525:1
**distinctions** 404:8
**distribute** 450:13
**distribution** 392:6
**district** 257:1,1 264:14,14
**districts** 269:4
**disulfide** 286:13
**divided** 536:16
**dla** 261:18
**dlapiper.com** 261:22
**dma** 298:2 315:8 315:10,22 316:1,8
**dna** 272:10,10,16 272:18,25 405:17 405:25 406:9,11 406:16
**doctor** 402:19 413:8 414:3 416:24 417:25 422:3,12 426:6 427:1 436:7 438:6 443:12 449:10 456:1 471:24 473:24 480:25 485:15 487:22 488:21 497:15 500:11 502:2 504:1 507:1 511:9

**document** 257:6 257:14 360:24 361:7 369:4 404:15,18,20 405:1 416:20 443:18,23 444:24 459:20 460:3 479:25 480:18 500:1 501:5 503:4 503:11,22 511:21 512:1 522:23 523:25 531:22 532:3,6,9,22,24 547:11 553:18
**doer** 476:13
**dogs** 393:22
**doing** 268:19 276:16,24 313:7 325:3 349:18 355:7 376:25 480:15
**donating** 298:12
**dose** 330:12 337:13 339:15 395:20 396:21,22 443:2 447:5 524:6
**dosed** 344:22
**doses** 325:7 330:6 330:16 331:3 336:2 337:7 405:8
**dosing** 395:20
**dots** 472:25 473:5
**doubt** 349:16
**douglas** 452:6
**downey** 260:7
**downeybrand.com** 260:10
**dr** 262:24 265:8 266:17 267:3 268:5 277:4 289:19 290:22 304:16 319:9 335:24 361:25 383:10 395:10 398:21 401:5 402:5 436:10 447:1,25 448:14 449:12 451:20 458:17 460:7,13 460:21,23 461:19 463:24 464:21 465:2,15,22 466:5 466:6 467:21 468:12,13,20 469:25 470:24 476:24 477:13,15 483:4 514:17 516:17 518:17 519:19 520:1,6 521:6,20 523:3 541:23 546:21 547:6,18 549:25 552:10
**draft** 354:22 416:13 466:7 475:23 530:15,16 531:14,16 532:8
**drafting** 415:15
**drafts** 456:18
**drank** 495:14
**draw** 291:6 485:19 528:17
**drink** 332:4 411:8
**drinkers** 495:8
**drinking** 269:7,9 270:4,6 273:18 274:25 277:17,19 280:17 287:18 302:12 305:24 329:2 376:6 403:10 422:23 423:1 475:16 495:15 502:13 522:19 553:8
**drinks** 494:23
**drive** 258:20 261:7 262:9
**driver** 476:13
**drives** 444:11
**dropbox** 404:17
**dropped** 404:17
**drug** 287:12 288:25 289:6 334:21 530:21 532:18 536:15,17 554:8
**drugs** 286:17 287:8 294:17,24 324:21 492:16 493:7 494:8 545:22,25
**due** 298:11 311:3 327:7,14 329:15 329:23 355:11 409:6 429:11 505:23 528:4 530:19 532:16
**duke** 262:11
**duly** 265:4 555:7
**dunk** 363:23

**e**

**e** 258:1,1 259:1,1 260:1,1 261:1,1 262:1,1 263:1,1 319:15 322:19,23 323:2,9 361:25 362:2,3 373:1,1 383:10 392:25 396:3 397:5,17 398:1 415:20,25 416:2,4 427:21,25 428:3 430:4 431:5 431:6,8,22 438:1 451:17,19 458:16 459:21 460:3 461:18 463:20 466:5 467:21 468:13 496:7,12 496:18 508:13 516:12,15,18,21 516:21 549:3 551:23 553:1,6 554:1
**earlier** 306:20 376:20 403:15 408:2 410:8 416:21 426:7 427:19 431:5 438:5 440:7 442:7 483:3 496:1 504:5 504:16 508:18 524:18 527:2
**early** 376:3 438:23 513:9
**easier** 383:12 409:9,18
**east** 258:20 262:22
**eastern** 450:12
**easy** 485:17
**eat** 487:11 497:10 497:11 498:4
**eating** 365:2 374:3 400:18 488:11 542:8,14
**ecanaan** 260:19
**ecg** 492:11
**edit** 455:14
**editor** 360:9,25 460:7,13,17,20 464:15
**editorial** 464:3
**editors** 359:17 360:11 361:13

**effect** 279:16 298:12 357:14 366:6 470:20 471:11 497:2 528:21
**effective** 392:17 392:25 397:18 486:3
**effects** 298:15 326:12 474:18
**efficient** 432:21
**effort** 266:4
**efforts** 381:9
**eggs** 395:25 396:1 396:3,24 397:8,10
**egypt** 316:25
**eight** 293:25 294:5
**either** 329:23 344:21 347:6 355:1 361:14 390:6 413:6 454:11 497:21
**electing** 515:1
**electron** 298:11
**electronic** 264:5
**electrophilic** 298:11
**element** 298:3
**elevated** 475:19
**eligible** 491:18
**eliminate** 495:5
**else's** 518:12
**elucidated** 406:16
**elute** 376:2
**embarcadero** 259:7 263:2
**embargoed** 450:12 457:8,10,20 458:3 458:8 463:10 553:24
**emerged** 499:2 543:22
**emery** 346:15 348:9,15,18 349:4 349:22,24 350:18 351:1 355:8 415:16 417:9,12 417:14 418:1,4,6 425:3 427:21 429:25 431:23 475:22 476:2,12 529:10,22 530:8 531:5,24
**emethods** 394:25 395:6
**employed** 464:17 511:2 513:11 527:5 539:1
**employee** 544:20
**employees** 517:23 517:25 518:2
**encouragement** 519:4
**endogenous** 324:22 342:7 505:7,11 527:14 528:1,19 529:12 529:19 551:21
**ends** 330:21 536:24
**enforce** 335:1
**engineer** 268:13 280:23 438:14
**engineering** 268:11
**enhancement** 342:5
**enrolled** 494:15
**ensure** 365:16 420:13
**entail** 406:9
**entire** 317:17 488:24
**entities** 448:20
**entitled** 308:4 398:17 404:18 405:2 553:18
**environment** 409:1
**environmental** 268:10,13 271:4 280:23 438:14 446:1 553:10
**enzymes** 285:11 409:4,8
**epa** 281:6,20 282:10,15,25 302:21 305:19 306:14 315:14 435:12 507:9
**epa's** 507:14
**epidemiological** 454:1,11 455:21 544:23
**epidemiologist** 438:8,9 454:13 455:22 456:13 501:7 502:12 504:6
**epidemiology** 456:14 503:19
**epigentics** 406:8
**equals** 399:8
**equation** 473:12
**equipment** 327:25 533:16
**errata** 556:1
**error** 418:19
**especially** 378:8
**esq** 258:4,5,11,12 258:17,22 259:4,9 259:14,20,21 260:4,10,19,24 261:4,9,15,21 262:5,6,11,18,19 262:21,24 263:4,8
**essence** 406:10
**essentially** 270:2 275:1,16 279:14 284:17 296:14 297:8 303:23 312:15 322:10 349:3 366:5 367:6 380:8 385:16 393:24 406:24 407:19
**established** 282:15 282:25 520:13 521:9 522:1
**estimate** 324:15 324:21
**estimation** 409:18 413:4
**et** 286:14,17 295:1 295:2,8,12 329:1 370:22 376:16 452:11 526:15,16 526:16 529:5
**ethanol** 330:5 331:11,18,22 336:5 343:24 345:12
**etiological** 317:10 317:20 318:6
**eva** 260:19
**evaluate** 366:7 387:22
**evaluated** 358:17 426:1 509:14
**evaluating** 469:5
**evaluation** 313:8 385:17 386:5

**evening** 463:11
**event** 443:15
**events** 382:4 439:10
**everybody** 267:15 404:17 427:5
**evidence** 307:18 315:15 341:4 342:12 343:5 345:3 348:1 363:18 384:17 399:6 404:9 405:10 410:20 415:1 462:4 523:8 523:14,16 527:13 528:3,13,20 529:1 529:24 544:15
**exact** 366:12 375:14 384:8 390:8,15 438:24 478:3 522:13 531:13 539:6 550:23
**exactly** 290:12 299:6 320:4 407:25 408:6 535:8
**examination** 265:7 373:9 402:4 427:18 466:17 492:12 498:20 508:13 519:24 549:1,24 553:2
**examined** 265:5 351:25 405:8 504:24 506:2
**example** 279:18 288:2 293:18 342:21,25 355:23 356:3,19 368:12 374:1 376:4,12,17 378:20,24 379:15 393:18 411:4 418:5,7 420:2 424:9 425:13 458:5 472:6 482:5 495:4 498:25 522:12 537:24 542:21
**exceeds** 275:25
**excess** 276:14 334:11,15 336:14 341:11 353:21 385:14 386:10 413:5 415:3 442:9 443:20 444:6 445:8 448:25 475:17 476:19
**exchange** 431:5 451:18 463:20 466:5
**exclude** 549:9
**excluded** 391:8 495:8 503:1
**exclusion** 493:25 494:6,25 495:4 498:9
**excreted** 322:14 330:22 332:17 338:20 340:24 341:15 343:3 344:16,19 346:3 347:14 485:5 526:3,7,11 535:18 535:20 537:25 538:3
**excretion** 308:5 310:19 317:15 323:19 325:4,16 327:8,14 329:15 330:2,10 331:13 332:7,25 333:3 336:3 338:4 345:20 412:8 495:24 527:3,21 538:25 539:3 550:10,20 553:15
**excuse** 300:5 305:8 337:5 374:13
**executive** 405:2
**exerted** 518:13
**exhaustive** 504:22
**exhibit** 276:21,22 277:5 278:16 282:13 292:11,12 292:24 299:19,20 307:24,25 319:8,9 319:13 323:12,14 323:18 338:1 348:6 351:9 352:23 359:10,11 361:20,20,21 363:22 374:13 383:7,8,18 390:21 395:1,3 398:13,15 398:17 404:12,15 415:19 428:2,3,23 432:10 442:13,16 449:8 451:12,15 458:13 463:19 466:4 467:18,20 470:24 473:25 477:22 479:22 483:23 484:2 498:21 500:6 502:21 510:21 530:5,7,11,11,12 531:18,21 546:6 548:9 549:2 553:7 553:8,10,11,12,13 553:13,15,16,17 553:18,20,21,23 553:23,24 554:2,3 554:3,4,6,7,10
**exhibits** 266:24 267:4 467:24 468:1,4
**existed** 447:12
**existing** 470:13 527:25
**expect** 267:3 342:10 458:3 496:13
**expectation** 484:22
**expectations** 458:7
**expected** 346:3 485:4
**expecting** 425:21
**experience** 350:24 355:7 418:3 445:24 489:14
**experiencing** 489:7,13
**experiment** 355:21,24 356:10 357:17 409:11 421:14 470:19 471:13 550:18
**experimental** 295:22 419:1
**experiments** 325:6 330:1 331:10 338:17 355:8,11 454:4
**expert** 317:25 392:10 393:14 394:5 406:7 414:20 483:9 505:10 508:2,16 528:7 529:18 536:2,5 537:13,21

538:4 541:9,12,14 545:15,19,24
**expertise** 350:19 365:10 392:14 456:12 483:21 542:22 544:25
**expires** 556:24
**explain** 361:8 410:11 433:7 548:12
**explaining** 361:14
**explains** 367:25 378:2
**explanation** 347:16 552:2
**explanations** 347:23
**explicit** 341:10
**explicitly** 495:5
**exploratory** 540:2
**expose** 411:4
**exposed** 329:7 366:21 389:9,10 403:5 423:8 551:19
**exposure** 273:22 273:24 274:2 276:9 279:22 280:2 324:9,15,21 326:3 327:5 328:17,23 329:14 336:1 388:22,22 389:1 398:18 410:4,13 422:23 423:1 475:12 485:12,25 486:9 502:12 523:8
**exposures** 325:7 328:25 497:2 523:10
**extensively** 537:18
**extent** 273:22 390:18 392:11 417:11 458:11 496:19
**external** 350:16 518:22
**extract** 409:20
**extrapolate** 471:20 507:20
**extrapolating** 410:21
**extreme** 433:14
**extremely** 278:21 279:8,21 281:5,17 327:8,14 329:15

**f**

**f** 373:1 436:21
**face** 323:17
**faces** 277:16
**facilitate** 368:3
**fact** 279:6 317:18 323:5,7 331:8 340:15 345:4 351:1 358:3 362:17 364:15 367:11 403:9 409:7 411:12 424:9 430:11 432:4 433:6 434:2 435:8 441:18 466:23 469:25 483:5,18 498:19 503:7 505:22 511:14 544:9 547:7,8
**facto** 275:6 334:25
**factor** 329:23 342:13 351:6 357:20 364:19,24 364:25 365:6
431:18 507:8,12 507:16 508:12 551:20
**factors** 282:10 508:3 542:16
**factory** 327:11 329:5 413:6
**facts** 287:15 440:20 462:4 487:8 514:10
**faded** 355:14
**fading** 427:5
**fahrenheit** 352:8 352:12,15 357:23
**fair** 265:21,22 308:15 334:3 373:17 388:15 418:5 434:9 442:3 453:12 465:14,14 494:12 505:3 509:9,13,23 510:14 511:9 527:4,24 529:8 534:5 537:2,12 538:24 544:2 545:6 546:2,4
**fairly** 327:24
**fall** 299:15 391:10
**familiar** 273:2 282:23 283:5 292:14,16 324:2 329:3 334:23 402:12 408:2 482:25 490:25 504:2 511:6
**familiarize** 325:19
**family** 278:21 279:8 281:5,17
**fancy** 406:23
**far** 290:8,15,20 291:3,4,4 326:17
333:22 336:13,19 348:22 349:18 353:20 422:25 505:20
**fast** 364:6 365:15 542:6
**fasting** 542:13
**fate** 537:19
**faulty** 381:10
**favor** 413:13 414:18,21
**fda** 312:16 334:17 334:17,18,19 340:12,21 342:3 342:18 351:7 353:21 376:11 379:15 381:13,17 381:19,25 382:11 385:1,8,8,18 386:5 386:22 411:20 413:23,23 414:21 424:7 426:13 428:8 431:13 432:15 433:19 434:17 435:1,1,5 438:21 439:11,17 440:13,17,18,22 441:7,13 442:8,16 442:18 444:10 445:8,12 448:2,21 474:20 476:19 503:18 506:4 507:9 510:7 511:3 511:8,11,23 512:4 512:5 544:20
**fda's** 356:14 387:4 413:2 439:3 443:20 447:8 474:15 503:25 511:18

**feasibility** 276:16
**feature** 299:12
**february** 445:10 463:20
**feces** 538:1,4,7
**feedback** 521:11
**feeding** 372:1 394:9
**feel** 275:10 361:3 364:25 518:19
**feelings** 465:8
**felt** 375:21
**field** 273:17,18 308:23,24 309:1 334:22 335:3 382:6 392:11 393:4 408:7 445:24 446:1 457:23 462:7 475:15 502:13 508:16
**figg** 452:6
**figure** 286:20 288:23 289:18,20 290:1 296:4,5 301:7,9,15,16 302:14 303:5,20 355:17 358:16 466:18 473:25 526:1 546:5 547:15,16
**figures** 314:7 355:10
**figuring** 293:13
**filed** 264:13 432:5 434:25 438:17 440:14
**files** 437:19
**final** 366:7 418:21 420:10 428:8,18 429:4,21 430:6,13 466:25 471:6 531:4,9
**finally** 424:13 445:11,12,20 448:22
**find** 301:3 327:19 327:20 342:10 349:12 377:9 382:16 407:15 415:25 425:18 478:4 481:18 482:2,20 525:17 551:6
**finding** 354:25 381:11 401:14 416:24 482:4 483:17 484:22
**findings** 297:2 309:7,13,19,24 327:15 332:15 371:20 417:15 461:8 492:9,12 539:12
**finds** 478:17
**fine** 266:9 286:16 318:13 428:13 448:9 514:1
**finish** 266:6
**finken** 258:12
**fire** 372:8
**firm** 513:15
**firms** 516:3,13
**first** 265:4 268:25 277:10 278:16,17 278:18 281:2 282:14 299:8 316:14 319:13 327:3 353:6 362:19 363:7,23 378:24 390:24 401:7 425:21 426:15 439:11 444:3 470:3 498:3 507:6 509:1 532:13,14 541:22 544:6
**five** 298:3 301:20 301:21 303:8 408:15 427:15 445:11 473:17 493:8 525:23 545:9 548:16,20 548:22
**flipping** 443:8
**floor** 259:13 260:3 260:13 261:12,19 262:16
**florian** 331:20 332:13 333:24 334:2,6 336:15,18 336:23 337:3 339:17 341:16,21 359:9 362:8,17 363:1,4 365:25 366:19 368:22 369:21 370:9,15 370:22 371:20 373:12 374:5 376:16 389:14,25 390:5,12 391:4,14 393:10 394:18 398:3 399:17 400:5,8,13 401:16 484:1,3,7 487:6,9 490:1,3,9,21 491:15 494:1 498:20 502:21 511:7 527:18 529:5,11,24 533:5 534:6,13,19 538:19,20 540:22 549:4 550:4 551:8
**florida** 257:1 264:15
**flower** 263:7
**flowing** 468:9
**fluid** 371:6
**flush** 302:2
**focus** 342:3 403:11 426:14
**focused** 293:4 393:21 394:2 402:24
**focuses** 280:11,17
**focusing** 394:6 470:12
**folder** 468:5
**follow** 417:23 487:16 513:7 547:2 548:6 550:1
**followed** 370:9
**following** 274:22 289:17 338:5 447:7 486:21 491:17
**follows** 265:6 399:4
**food** 285:4 364:7 369:14 370:24 397:12
**foods** 368:1,17 394:2 397:16 398:2 497:11,12 497:22,22
**fool's** 439:17
**footnotes** 499:14
**forget** 522:13
**forgot** 418:22 446:9 550:23
**form** 272:9 284:23 285:22 287:21,24 288:4 289:14 293:7 294:2

296:16 311:1 312:19 314:10 315:2 370:4 504:18,25 510:12
**formation** 284:8,9 284:12,20 287:13 288:7 289:8 292:1 292:7 293:4,9,14 300:18 304:18 307:15 324:23 358:14 365:9 366:14 388:12 392:18 393:1 397:19 409:10 453:7 454:3 470:21 471:12 480:2,6 483:6 485:12 486:21 487:13 505:7 527:15 528:1,19 529:13,19 540:21 542:11,19 549:10 549:17 551:22 554:5
**formatted** 457:13
**formed** 316:2,8 406:17 470:15 487:4
**forming** 270:12 311:6 413:6 496:24
**forms** 294:6 505:13
**formulated** 286:16
**forth** 555:7
**fortuna** 262:9
**forward** 376:18 449:17
**foster** 258:5
**found** 287:16 295:12 339:1,7,9 341:19 345:1 411:12 418:7 439:24 442:5 481:4,25 499:4 543:23 550:21 551:9
**foundation** 269:14 409:14 412:5,21 424:18 462:5,16 463:4
**four** 401:2 424:12 533:17 545:12,14
**fourth** 362:16 549:7,8
**fps** 296:7,10
**fraction** 320:11 330:20 347:13 536:23
**frame** 369:15 419:16 426:19
**framework** 334:24
**france** 274:10
**francisco** 259:8 260:8
**friends** 400:9
**front** 335:25 510:23
**fruits** 394:16
**frustrated** 471:2
**fuel** 269:23 270:1 270:11 274:11
**full** 374:3 395:6,9 437:12 478:10 516:17 543:15
**fully** 399:8,11 406:16
**fun** 411:8
**function** 329:19
**functional** 286:10 287:23,25 288:6 288:16,19 289:13 289:15 290:2,5,7 291:12,14,16 298:20 299:13
**funding** 350:9
**fungicides** 286:12
**funky** 423:16 442:21
**furan** 298:10
**further** 270:5,11 275:15 363:21 433:16 519:21 552:4 555:10
**future** 376:14,24 401:12 459:8
**fuzzy** 353:10

**g**

**gained** 437:24
**gao** 480:17 508:19 508:21 509:15,20 509:25 510:7,19 510:20
**garland** 526:15
**gas** 311:6 312:5 407:21 433:7 434:4 505:24
**gastric** 364:10 366:6 371:6 391:22 486:3,15 486:18 496:25 542:13
**gastroenterologist** 285:3 363:17 392:2 483:14
**gastroenterology** 483:10 553:14
**gastrointestinal** 391:16 489:10 549:10,18
**gathered** 511:4
**gc** 313:3 315:7,9 328:2 381:10,13 384:14 385:24 426:4 432:19 433:20,22 435:9 435:10 525:5 554:11
**gdldlaw.com** 261:16
**general** 276:8 373:13 394:8 462:17 488:18 498:17 507:25 533:15
**generally** 268:12 375:8 408:8 494:18
**generate** 270:16 275:9
**generated** 406:18
**generating** 269:24
**generation** 304:4 307:4 317:4
**generic** 310:4
**genetic** 272:25 407:2
**georgia** 260:24
**getting** 293:10,11 368:25 423:19 427:3 446:19 463:18 467:24 477:25 520:21 521:11 528:15 539:3
**give** 364:2 374:5 442:25 443:7 459:5 501:23 506:5 517:13
**given** 323:24 333:24 334:6 339:5,18 341:14

341:18 346:10 350:14 352:1 358:16 364:13 367:10 370:9 382:16 393:9 398:2 452:14 457:2,20 459:3 461:24 509:25 552:10 555:9
**gives** 452:12
**glaxosmithkline** 262:17 291:24 304:20 309:6
**glenmark's** 446:13
**glenn** 263:8
**glkrinsky** 263:8
**glove** 423:5
**glovebox** 424:1
**gmbh** 260:17
**go** 264:8 267:21 271:12 282:12 284:1 290:17 294:11,13 296:2 298:6 301:6,17 304:1 313:14 318:13,15 321:4 323:16,17 326:25 328:15 335:11,12 352:17 354:9 355:13,16,20 356:10 362:14 363:21 370:21 372:12 380:13 383:17 394:24 395:5 397:12 400:19 404:25 416:19,20 432:14 433:6,12,12,13 439:2 442:23 445:9 451:23 453:4 458:10 461:15,22 469:9 470:22 480:24 483:25 487:7 499:13 500:17 502:17,24 504:3 510:18,22 511:14 514:2 519:25 522:22,23 525:14 525:15,25 530:17 532:11 533:18,19 533:19 535:8,8,9 538:18,21,23 541:15,16 542:25 548:7,14,25 549:3 549:7 552:7
**goal** 340:23
**goals** 366:4
**goes** 360:21 368:15 409:23 423:3 450:19 452:6,19 460:23 464:11 479:5 492:25 503:8
**going** 264:2 265:12,20 266:4 266:12 268:1 271:17 296:16 301:13,13 316:17 319:3 335:10,15 335:18,23 337:21 361:16 367:24 372:9,13 373:5 376:18 378:10 395:5 399:5 400:25 402:2,17 404:14 415:18 423:16 427:13 428:1 436:8,9 443:7 449:17 460:2,18 469:20 470:3 473:19,24 479:24 485:22 502:20 506:18,21 509:7 512:23 513:21 514:13 519:16 520:23,23 541:16 542:9 544:22 552:8
**gold** 305:22
**golden** 447:3
**goldman** 258:2
**gonzales** 258:15
**good** 264:1 265:8 267:19 308:24 319:5 402:5 403:4 412:1,17 414:8 446:19 452:24 489:9,10 510:15 542:21
**goodell** 261:11
**google** 415:21 436:9
**googling** 415:23
**gotten** 488:23
**gradual** 354:14
**graduate** 278:12
**graham** 286:14
**gram** 378:22
**grammatical** 452:18
**grams** 271:2
**granted** 346:11
**grapefruit** 493:15 493:15
**graph** 353:6
**graphs** 352:19,20 352:24
**great** 431:15 481:1 506:16
**greater** 366:14 384:22,24 403:1 457:1 501:25 523:15
**green** 352:24 353:6 355:25 357:21 358:2 418:22 419:5 420:8,10 421:21 423:17 425:13
**greywaters** 300:16
**grief** 446:19
**grocery** 260:9
**groundwater** 269:24 270:3 282:22 283:16
**group** 259:2,6 287:23,25 288:16 288:19 289:13,15 290:2,5,7 291:12 291:15,17 298:2 299:13,16 350:16 464:3 501:13 550:5
**groups** 286:10 288:6 298:20
**guess** 275:15 298:24 319:13 335:10 369:12 396:5 434:21 444:1 455:25 491:10 494:12 497:5 517:22 528:15 550:9
**guidance** 382:16
**guidelines** 413:24
**guo** 262:19
**gut** 477:8

**h**

**h** 262:5 265:3 373:3 553:6 554:1
**h2** 298:1
**habel** 500:4,9,10 502:22

**haddadnia** 259:21
**half** 318:16,17,21 403:1 424:2 493:8 545:9
**halfway** 282:14 294:15 319:14
**hand** 294:14 302:13 303:5 327:1 470:8 525:16,20 555:15
**handling** 381:20 381:25
**hands** 458:4
**happen** 301:25 404:8 421:12,12 446:2
**happened** 420:15 439:11 464:5 513:19
**happens** 307:18 307:20 356:5 460:1
**hard** 271:9 297:6 416:23 451:9 503:14 525:17 547:15
**harding** 259:17
**hardy** 262:15
**harm** 326:16
**hazards** 522:10
**head** 283:4,11 320:18
**headspace** 554:10
**health** 271:24 281:13 341:1 403:20 404:1,23 409:22 410:9 438:3 446:14 461:7 553:21
**healthcare** 439:23
**healthy** 390:13,19 390:25 391:5,11 391:18,20,23 406:3 490:8,15,17 492:2 494:20 497:20 526:16 549:9 550:20,22 551:18
**hear** 266:3 268:5 307:7 412:16 447:14 547:25
**heard** 443:10 465:2,7
**hearing** 448:11
**heartburn** 488:21 488:24 489:3,7,13 489:14,21,24 490:19
**heat** 310:25 311:18,24 312:18 356:24 386:15 423:9,18 431:17 432:1,6 434:3,5,16
**heated** 312:5
**heating** 427:22 429:15 431:7 432:18 433:2,18 454:4 530:23 532:20
**hedlund** 258:2
**held** 257:22
**help** 325:17 393:7
**helped** 455:13,14
**helpful** 376:25 453:16
**helps** 378:18 395:8
**hematologists** 485:19
**herbicides** 286:15
**hereunto** 555:14
**heteroatom** 298:12
**heterocyclic** 298:3
**hey** 400:15 431:23 435:2
**hi** 549:25
**high** 294:25 295:16,24 296:11 311:15 331:9 346:2 347:4 356:21 364:7 365:23 366:13 367:7,15 381:11 384:21 394:3 419:17 422:4 431:15 433:20 476:18 496:7,11
**higher** 282:1 293:24 298:4,21 299:14 303:21 328:25 336:19 356:6 359:5,6 366:16 368:18 380:5,7 393:25 419:9 422:25 476:25
**highest** 297:12 542:13
**highlight** 290:13 290:18 291:2 322:18 333:12 352:18 526:4 539:11 541:22
**highlighted** 288:25 290:19 323:3 328:17 530:18 541:19,22 543:1,3
**highlighting** 291:14 526:5
**highly** 404:3 410:2 410:11,25 432:21
**hilliard** 258:15
**hint** 384:12
**hired** 346:14
**history** 268:22 492:9 493:20
**hmglawfirm.com** 258:18
**hold** 548:10
**honest** 394:5 397:10
**hope** 411:11 413:20 438:15
**hopefully** 268:7 414:4
**hoping** 340:22
**hot** 393:22
**hour** 318:16,17,21 328:24 329:8 364:5 417:20 526:3,6,11,20
**hours** 266:21 362:21 363:15 364:12 389:4 460:2 493:16 542:6 545:9,9 548:11
**house** 514:21
**how's** 267:13
**howard** 460:19
**huge** 466:22
**human** 271:25 272:3 279:3 281:14 283:23 284:24 285:4,6,10 285:12,15,17,19 286:2 328:14 363:14 389:15 403:16,19 404:1 406:3 409:7 410:8

410:18,19 411:5 416:15 433:8 477:7 482:4,20 496:25 520:8,12 520:13,19 521:8,9 522:1,16 537:19
**humans** 273:15 323:20 325:16,23 326:5 330:2 338:4 364:4 403:4 404:3 404:10 409:20,25 410:3,12,21 483:16 523:14,23 524:5 528:2,20 553:16
**humidity** 352:1,2 352:3,4 353:1,8,15 354:12 357:7,12 357:14,19,24 358:11,14,19 417:8 419:6,10,18 422:4 423:9
**hundreds** 336:3,9 337:8,14 354:5 355:1 389:17 550:21
**hypothesized** 317:1,2
**hypothetical** 366:25 367:17 370:18 389:6 398:9 422:8

**i**

**i.e.** 342:21
**iarc** 273:2,3,4,6,9 286:13,18,22 520:7,12 521:7,25 522:4 523:18
**idea** 385:12 387:5 412:7 424:2 425:25
**ideally** 293:8 379:6
**identification** 276:23 292:13 299:21 308:1 323:15 348:7 359:12 361:22 381:16 383:9 395:4 398:16 404:13 432:11 442:14 449:9 451:16 458:14 467:19 477:23 479:23 483:24 500:7 531:19
**identified** 292:6 381:15 434:3 452:9
**identify** 266:23 409:10 545:21
**identifying** 467:24
**identity** 320:1
**ignore** 510:15
**ii** 257:18
**illustrating** 297:11
**immediate** 452:21
**impact** 452:15
**implicated** 317:9 317:19 318:5
**implicating** 317:21
**implication** 461:7
**importance** 461:6
**important** 364:24 365:1,22 375:22 384:20 387:21,25 388:5,17 411:2 453:9 455:2
**impression** 382:5 382:7 456:8
**improper** 529:16 540:11
**improvement** 383:4 456:21
**impurities** 545:22
**inability** 386:22
**inaccurate** 312:8 369:25
**inappropriate** 512:3
**incident** 269:22
**incidental** 326:2
**include** 286:11 289:20 302:19 417:9 428:8,13 500:2 545:4,4
**included** 300:22 390:25 394:11 474:8 490:17 494:25 531:5 549:8
**includes** 293:6 405:24 413:24 446:25 544:8
**including** 302:16 303:23 313:5 342:6 352:1 449:11 465:10 479:21 492:9 498:1
**inclusion** 491:9,17 493:24 498:9 544:5
**incomplete** 366:25 367:17 370:18 389:6 398:9 422:8 455:12
**incorporate** 453:18
**incorrect** 455:11
**increase** 310:18 354:14 358:25 401:11 426:2 497:13,24 528:4 529:2,12
**increased** 314:14 336:4 354:17 399:6
**increases** 308:5 495:23 528:18 529:25
**increasing** 358:4 358:21 470:15
**incredibly** 430:10
**incubates** 431:16
**incubation** 432:20
**index** 492:6
**indicate** 265:19 272:8 343:7 344:10 368:9 369:25 434:21 436:5 441:17 502:3 536:23 537:1
**indicated** 343:8 347:24 368:8 385:9 386:19 389:21 422:20 425:11 472:4 490:14 495:3,15 502:15
**indicates** 279:15 303:16 311:15 523:6 524:2 541:24 542:2
**indicating** 281:11 295:23 333:2 337:12 364:18 472:20 534:4
**indication** 463:16 499:1 543:20

**indirect** 486:9
**individual** 324:19 481:1
**induced** 405:7
**induces** 406:15
**industrial** 280:20 286:8,9
**industry** 270:8
**influence** 462:14
**influential** 462:18 464:8,22 465:9,12 465:16
**information** 282:11 308:25 322:22 358:16 453:16 463:18 469:24 470:2,7 507:15 513:20 515:3 516:14 522:5 550:24
**informed** 491:25 510:3
**ingelheim** 260:15 260:15,16,17,18 305:9 309:17 517:5
**ingested** 330:11 331:3 338:21 341:5 343:13 344:12 345:6 535:21 536:23
**ingesting** 402:10 423:8 475:13 484:9
**ingestion** 338:5 486:22 505:8 524:22 527:14 528:5 529:12
**inhibit** 397:24 496:18
**inhibited** 398:1 496:20
**inhibitor** 392:17 393:1
**inhibitors** 397:19 493:3
**initial** 354:16 381:9 414:19
**initially** 376:19
**initiated** 278:11 385:16
**initiation** 270:14 402:21
**injection** 426:4
**inquire** 310:6,9,17
**inquiring** 291:24 319:25
**inquiry** 292:5
**inside** 503:24 506:7
**insights** 455:23 503:24 506:7
**insogna** 261:21
**instability** 425:25
**instantaneously** 368:20
**instruct** 514:14
**instruction** 513:8
**instrument** 421:12
**intake** 308:4 526:8
**integrated** 282:10 507:14
**intellectual** 455:2
**intend** 548:12
**intending** 294:10
**intent** 296:12 364:1 506:11
**intention** 342:1,3 366:3,18,18 497:6 528:25 531:11 536:22
**intentionally** 503:15 543:10 544:16
**intentions** 340:20 367:2,4 383:24 545:1 547:16
**interact** 284:19 285:22 409:9 460:16
**interaction** 368:3 368:19,23 369:20 429:25 430:17
**interactions** 426:11,12 440:22 518:1
**interest** 270:18 280:22 307:7 394:8 437:21,24 453:9
**interested** 469:5 522:19 546:15 555:13
**interesting** 323:5 331:8 425:15 452:8 453:23 456:25
**interference** 376:4 380:6,12,19 381:1 382:24
**intermediate** 392:23 407:11
**intermingling** 365:16,23
**internally** 420:5
**international** 260:17 404:19
**internet** 427:4 520:22
**interpret** 455:13 506:10 508:11 511:23
**interpretation** 454:23 455:18
**interrupt** 465:5
**interruption** 337:17 521:13
**interval** 399:9,13 501:24
**interventions** 541:17,18
**intestine** 537:25 538:3
**intimate** 454:10
**introduce** 266:15
**introduced** 350:1
**introducing** 376:19
**introduction** 281:1,2 324:8 325:15 383:20 384:3
**introductions** 522:17
**investigated** 507:11
**investigators** 526:23
**involve** 313:3
**involved** 306:8,16 351:17 382:19 399:3 417:17 425:2 461:21 465:11 490:4 507:17 524:7
**involves** 284:15
**ion** 406:18 407:7 408:17
**irb** 346:10 347:17 348:13
**isolate** 357:20
**isolating** 357:14 366:6

**issue** 268:6 269:8 308:13 310:24 381:20 382:1 385:4,16,17,20 386:5 391:16 414:22 426:8,14 431:7 432:6 433:2 433:5 434:3,23 453:9 461:7,25 478:3 480:8 504:24
**issues** 370:9 425:24 453:6 463:17 494:24
**items** 469:6 491:22

**j**

**j** 259:9 262:18
**jama** 362:4 400:10 449:18 451:21 459:13 460:7,8 461:13 464:2 467:22 468:14 469:4 553:17,24
**james** 263:13
**january** 416:7 445:10 449:13 450:12 458:18
**japanese** 481:12 481:19
**jargon** 406:23
**jccp** 266:16 543:9
**jcp** 400:16
**je** 259:14
**jennifer** 259:4,4
**jessica** 261:4
**jim** 264:16
**jjung** 259:15
**job** 375:14
**join** 529:20
**jones** 263:2,6 513:16 514:21 515:5,11,18
**jonesday.com** 263:4,8
**journal** 308:18,19 308:21 462:22 553:14
**journals** 308:25 462:21
**jr** 259:12
**jrydstrom** 261:4
**judgment** 547:15
**juice** 330:4,4 338:10,22 343:23 345:12 394:20 395:14,21 396:8 396:11,18 397:14 493:16
**juices** 486:3,19
**jumping** 365:13 456:23
**jumps** 356:5 421:23
**june** 399:24
**jung** 259:14
**jury** 412:16
**justification** 361:14 522:6
**justifications** 522:18

**k**

**kantor** 466:6 499:17
**katie** 261:21
**katie.insogna** 261:22
**kaye** 262:2
**keep** 301:13,13 366:17 402:15 411:3 427:3 471:24 520:23 526:4 541:8 542:9
**keeping** 342:14
**keeps** 456:23
**kentucky** 259:3
**kept** 402:14
**kettering** 450:22 453:15
**key** 342:13
**kidney** 322:12
**kind** 376:9
**kinetic** 355:12
**kinetics** 325:4
**king** 259:12 260:12,22 263:12
**kingscoate** 258:20
**kiwi** 394:13,19 395:13,21
**knew** 435:12 448:24 536:11
**know** 265:16 266:7 277:4 283:3 283:10 285:14 286:1 296:16 303:12 307:19 328:5 335:1 340:20 344:11 346:18 347:3 360:11,15,17,19 371:8 373:13 377:17 378:9 382:8 384:14 386:22 387:11,17 387:21,25 388:5 388:18,24 392:11 393:14 396:15 397:9 402:16 404:10 407:25 408:4,8 420:15 421:7,17 425:20 425:22 430:2,16 434:7 438:24 439:6 455:8 456:22 457:17,23 459:6 460:17 462:10 463:5,14 465:7,15 467:12 474:5,7 475:6 476:13,17 479:17 480:21 482:9 485:18 486:14 487:4,24 489:18 489:22,24 490:6 491:5,8 495:22 511:10 515:8 518:20,20 520:16 522:10 533:13 537:23 538:9,12 539:11 544:9 547:12
**knowing** 270:19 356:14 384:14 537:3 546:15 547:17
**knowingly** 384:13 411:4
**knowledge** 292:2 304:23 305:6,12 305:17 315:12 400:7 407:9 408:12 425:3,23 435:4 440:21 449:24 454:11 456:6 462:19 477:16 479:20 483:15 487:20 488:4,16 490:3 496:9,16 503:13 511:8 514:10,20 516:2 518:1 522:3 522:4,8 545:1

**known** 271:5 272:11 291:18 297:9 308:21 520:12 521:8 522:1
**kral** 263:14
**krinsky** 263:8
**kroger** 447:2
**kslaw.com** 260:19 260:25
**kumar** 499:20

**l**

**l** 265:3,3 373:3,3
**l.l.p** 262:15
**lab** 464:7
**labeled** 302:7 415:19
**laboratories** 262:24 447:1
**laboratory** 302:25 405:5 436:12 441:8 442:4 445:7 492:10 553:21
**lack** 372:3 462:5 462:16 463:4
**language** 387:12 428:25 429:5,20 430:12,13 530:19 531:6 532:15,25 541:19,22 543:2,3
**large** 345:4
**larger** 315:3,3,5
**lastly** 350:13
**late** 269:22
**law** 259:2,6 513:15 516:3,12
**lawsuits** 402:13
**layman's** 377:15
**lc** 312:14 313:6,7 313:10,21,25 315:6,8 350:7,20 375:23 381:13,17 382:10,12 386:8 435:7 441:25 529:4
**lead** 273:1 285:12 293:14 366:14 386:3 497:12,23
**leading** 284:19 406:13
**leads** 272:23 317:1 431:25
**learn** 394:12 395:16 396:2 397:4 408:14 429:3,20
**leave** 372:10
**led** 268:24 276:7 381:17 385:17 386:4 465:17
**leech** 261:11
**left** 290:8,15,20 291:3,4 294:14 296:22 302:13 303:5 471:19 472:24 525:16,20 546:6,16
**legend** 302:18,20 358:25 359:2 419:11
**letter** 452:13 459:12 468:21
**level** 275:7 276:18 282:16,18,20 283:6 356:6 379:10,23 389:8 425:22 443:1 471:21 472:5,20 502:5,19 546:18 546:21
**levels** 276:11 282:24 283:8,11 302:14 306:16 334:2,11 340:24 341:23 342:5 352:1 354:15 357:19 358:4,19 366:8 367:7 370:1 370:23 377:18 381:4 385:13 386:10,23 387:22 389:21 393:25 398:10,12 410:4 410:13 413:4,25 415:2 422:5 429:14 442:24 443:19 470:13,15 474:22 475:19 476:1,1,18,25 478:6 481:4 483:7 483:15 487:5 496:7,9,11 497:13 497:25 522:10 525:1 526:15,23 527:9 529:3 530:22 532:19 540:8
**levied** 476:23
**levine** 262:5
**liability** 257:4 264:13
**life** 370:12 488:24
**lifetime** 276:14
**light** 310:25 319:18 322:15,22 323:24 384:21 385:5,21 386:13 426:8 427:21 428:5,17 429:5 430:5 431:6,8,23 432:25 452:11 465:3 506:4
**lightfoot** 259:12
**likelihood** 484:17 523:21 524:4
**likewise** 396:17
**limit** 273:21 274:24 275:1 276:9 334:17,19 334:19 335:1,4 336:20 339:10,11 341:12 342:1,15 342:16,18 343:10 343:14 346:25 353:21 356:14 370:2 375:15,23 377:2,12,23 378:22,23 379:2,9 379:22,25 380:5,7 393:7 434:10 443:20 444:7 448:25 469:10,14 474:15 482:19,22 497:1 533:23 534:1,6,9,10,13 535:15
**limitation** 374:23 375:1
**limitations** 375:2 375:5 459:8 498:25 543:19 549:5
**limited** 469:18 524:10
**limiting** 469:19
**limits** 382:25 445:9 467:13,17
**line** 419:14 420:2 420:8,9,9,10 471:19 472:7,8,11 472:12,13,15,24 472:25 473:3 481:24 503:5

523:2,5 546:24 547:3 554:15,19 556:4
**linear** 546:7 547:1 547:9
**lines** 290:11,14,20 291:5,7 352:25 358:3 363:3
**link** 317:2 437:12 437:15
**links** 397:2
**lior** 454:2 463:16 554:3
**list** 446:17 503:6 503:13 515:8,9
**listed** 297:3 396:18 436:22 446:25 458:9 466:13 493:21 544:12
**listing** 395:7,10
**lists** 442:24
**lit** 480:15
**liter** 274:25 275:12,19,25 276:18 282:21 533:23 534:8,14
**literally** 443:15 499:10
**literature** 392:21 393:5 397:23 480:15 496:2,17 498:14 504:23 508:5
**litigation** 257:5 264:13 265:10 512:11 515:7 516:8 517:13 532:4
**little** 265:24 266:1 267:10,11 286:24 290:24 299:25 300:1 344:9 346:2 352:24 353:10 356:1 373:20 378:11 442:20 455:22 462:8 463:21 479:19 487:23 496:13 509:4 525:24 528:12
**liver** 272:9
**lives** 493:8
**llc** 261:20 262:4,11 556:1
**lloq** 375:15
**llp** 258:8,15 259:17 260:2,7,12 260:22 261:2,6,11 261:18 262:2,8
**loading** 382:10
**lodged** 464:23 471:4
**log** 297:6
**logan** 258:9
**logo** 435:21
**long** 268:22 320:5 369:13 402:18 408:3,9 445:20,25 448:1 548:13
**longer** 321:16 368:21 412:11 414:9 423:10 426:3 436:2 521:21 545:10
**look** 276:13 289:18 307:3 314:2 360:6 361:6 401:19 406:1 431:4 432:12 439:9,16 442:3 451:10,11 453:4 454:15,18 456:24 463:19 474:8,25 480:18 490:20 500:8,18 510:23 531:20 533:20 539:8
**looked** 302:15,17 393:11,12,17 402:25 415:9 441:15,18 442:1 446:8 490:13 500:4 507:14
**looking** 295:21 296:24 326:12 342:16 343:23 344:8 356:2 379:14 388:16 389:2 394:2 396:6 414:22 419:5 424:24 425:5 430:22 436:4 441:20,21 446:17 455:20 470:14 471:18 491:13,14 503:5 525:18 528:1 539:15 540:1 550:3 551:1
**looks** 300:9 323:3 355:23 428:16 431:22 436:11,16 439:21 452:1,5 458:23 459:16 466:12 469:13 491:12,21
**los** 258:3 263:7
**lost** 467:25 528:12
**lot** 270:8 296:8 383:12 394:6 423:17 426:11 430:20 437:24 445:23 454:10 462:25 468:1 474:5 516:2
**lots** 407:24 420:20 422:1 494:23
**louisville** 259:3
**low** 271:1 283:13 283:14 327:8,14 329:15 405:8 410:3,13 421:22 433:21
**lower** 279:15 280:2,3 341:24 356:3 375:15 379:21 426:1 434:10 471:20 478:10 551:16
**luhana** 260:2,4,5
**lunch** 364:14 396:10 397:12
**luncheon** 372:16
**luther** 259:12

**m**

**m** 265:3,3 373:3,3 481:18
**m2o3** 284:20
**maanen** 526:16
**magnitude** 340:1 534:7 551:14
**magnotta** 258:12
**mail** 319:15 322:19,23 323:2,9 361:25 362:2,3 383:10 415:20 416:2,4 428:3 430:4 431:5,6,8,22 451:17,19 458:16 459:21 460:3 461:18 463:20 466:5 467:21 468:13 516:18

**mails** 427:21,25 438:1 508:13 516:12,15,21,21
**main** 375:10,13 464:3 484:8
**maintain** 413:23
**major** 284:7 403:11
**making** 276:6 361:16 370:10 447:11 448:12 524:25
**man** 422:13
**manner** 264:22 488:20
**manufacture** 381:21 382:2
**manufactured** 424:10
**manufacturer** 310:4,15
**manufacturers** 306:4,13 382:17 440:25 446:4 457:21,25
**manufacturing** 262:11 545:16
**manuscript** 310:23 348:8 351:21 354:23 357:16 359:24 360:3,4,6,23 361:8 361:10 362:8 367:4 375:4 383:21 384:9 393:11 400:1,3 415:16 417:6,19 425:8 434:19,20 434:24 452:11,20 452:25 455:2 465:17,23 469:3 469:17,20,23 472:1,4,17 475:23 476:2 477:4 481:23 484:12 497:6 511:16 536:25 538:17 541:3,9,14 546:23 550:25
**march** 445:10
**marin** 402:8
**marina** 261:7
**marked** 276:22 292:12 299:20 307:25 323:14 348:6 359:11 361:21 383:8 395:2,3 398:15 399:10 404:12,15 432:10 442:13 449:8 451:13,15 458:13 467:18 468:2,4,4 477:22 479:22 483:23 500:6 531:18
**market** 260:7 382:14 385:3,8,11 385:13 386:6,18 387:10 411:16 412:1,18 413:1,14 413:22 414:24 424:8 438:22 439:19 441:22 442:12 445:13,21 448:3,23 449:6
**marketplace** 414:10 447:9
**marking** 468:10
**marriage** 555:12
**mart** 447:1
**martin** 259:12,17
**martinez** 258:15
**maryland** 261:13
**mass** 492:6 526:12
**massachusetts** 261:8,19
**masses** 526:4,7
**match** 374:11
**materials** 313:16 509:20
**math** 507:20
**matrices** 375:18 376:14,23 380:4
**matrix** 375:22,25 377:1 380:1,7
**matter** 264:12 280:22 345:4 555:13
**matthew** 261:15 262:6
**matthew.scarvie** 262:6
**matthews** 258:20
**matthewslawfir...** 258:22
**maximize** 542:15 542:18
**maximum** 364:3 366:20 369:10,18 369:19 370:4
**maylightfootlaw...** 259:15
**mazzotti** 259:17
**mcdonough** 258:11
**mcg** 444:1
**mcnabb** 258:22
**md** 257:2
**mdl** 257:2 264:15
**meal** 362:19 363:7 363:12 364:8 366:13 367:15 370:13 374:3
**meals** 487:11
**mean** 275:4 280:4 283:15 299:5 303:8 311:11 321:19 355:13 382:2 384:6 387:10 388:3 418:24 435:20 465:5 472:15 473:9 484:21 487:22 515:15,16 515:17 526:13,21
**meaning** 506:10
**meaningful** 378:25 379:11,12
**means** 275:2 279:20 284:17,21 311:18 315:1 321:12 368:18 377:7 380:8,15 381:3 405:15 540:6
**meant** 458:9 461:14 541:12
**measurable** 343:9
**measure** 314:17 320:8 322:4 323:5 370:22 409:19,21 484:10 485:25 486:9,11,20 487:2 538:6
**measured** 314:22 315:5,6 322:8 362:20 388:17 446:18 487:10 538:13 550:19 551:9
**measurements** 388:6 389:2 398:4 492:11

**measuring** 315:8 329:14,19 377:17 388:10 408:25 487:13
**meats** 393:18,19 393:23 394:9 395:13,22 396:7 396:21 550:11,14
**mechanism** 406:15
**media** 264:9 307:8 318:25 319:5 335:7,13,16,20 372:15 373:7 400:23 401:2 427:15 437:20 442:2 473:16,21 552:11
**median** 539:18 540:3
**medical** 303:1 308:24 309:1 392:21 393:4 438:6 445:24 447:4 462:23 475:15 492:9
**medication** 489:6
**medium** 506:23
**meet** 491:16
**member** 278:21 279:8 281:5,17 488:18
**memorial** 450:22 453:15
**memory** 449:25
**mental** 544:19
**mention** 316:16 320:23
**mentioned** 276:8 285:17 289:19 305:18 306:20 394:4 397:7 417:20 420:12 462:6 478:12,18 488:15
**mentioning** 316:21 420:7
**mentions** 362:16
**menu** 395:7,9
**meta** 502:17
**metabolism** 321:12 387:18,20 387:25 388:5,18 388:25 406:19 408:1,7 409:5,24 537:14,19
**metabolite** 407:16 407:18
**metabolize** 408:3 408:15
**metabolized** 272:8 320:13 321:2,8 322:11,13 342:25 345:6 378:11 406:25 537:18
**metabolizes** 346:1
**metabolizing** 407:14 409:2
**method** 302:22 305:19 306:1,7,14 306:15 308:13 315:13,14 349:7,9 350:7,21 376:12 376:13,20 380:9 381:18 382:10,12 382:18 384:14 428:9 429:16 433:22 434:5,8,10 435:7,12 464:7,14 525:5 530:24 532:21 539:21
**methodological** 485:11
**methodology** 306:6 527:19 539:1 540:7
**methods** 313:16 315:9 337:16 364:1 368:22 382:22 416:21 464:17 509:14
**methyl** 272:9,16 407:19
**methyldiazonium** 406:18 407:7 408:17
**methylguanine** 406:17
**metric** 341:2 419:18
**mexico** 424:10
**mfp** 296:8,17
**mice** 507:18
**michael** 258:17
**microgram** 330:6 330:17 533:23 534:8
**micrograms** 328:24,25 329:8 333:17 336:3,9,9 336:11 337:9,14 338:14 344:19 411:22 412:9 443:1 444:1,2 534:14
**micromolar** 476:25 481:8
**micromolars** 466:24
**microphone** 267:10
**middle** 294:19 421:5 539:12
**midway** 525:20
**milli** 297:9
**milligram** 301:1,5 303:11
**millimolar** 430:24 472:3 478:6 479:8 481:10 482:1,12 546:5,17
**mimic** 301:24
**mimicked** 302:4
**mind** 315:14 342:14,14 385:21 409:15 411:20 424:6 425:16 478:22 518:11,12 541:8
**minimize** 293:9 392:22
**minus** 526:14
**minute** 421:25 484:1 542:8
**minutes** 318:16,19 319:1,3 374:4 408:16 432:20 460:4 461:13 548:16,20,22
**mirror** 417:1
**mischaracterizes** 304:14 343:5 428:21 443:23 444:24 445:16 459:20 462:4 500:1 501:5 503:4 503:11,22
**misleading** 430:11 437:7 546:7 547:7
**missed** 369:20 531:17

**missing** 358:24
**misstates** 288:9 312:2,22 321:4 341:21 342:12 343:5 347:10 368:7 377:21 378:15 417:4 440:20 523:25 547:11
**mitch** 257:21 264:11 265:8 267:3 268:5 277:4 289:19 290:22 304:16 319:9 335:24 348:5 361:25 383:10 395:10 398:21 401:5 402:5 436:10,12 447:25 448:14 461:19 465:15 468:12 469:25 470:24 514:17 516:17 518:17 519:19 520:1,6 521:6,20 523:3 529:10 541:23 546:21 547:6,18 548:9 549:25 552:10,16 553:3 556:3,20
**mitch's** 266:17
**mitch000424-00...** 553:7
**mitch001609-00...** 553:13
**mitch001612-00...** 553:12
**mixed** 314:15
**mm** 481:5
**model** 368:16 388:12 389:12,13 463:6
**models** 368:20
**modest** 432:18 433:18
**modifications** 360:2 406:9
**modified** 361:9
**modify** 293:8 361:8 455:14
**modifying** 311:14
**molar** 293:22,24 296:21,23 297:4 298:4,21 299:14
**molars** 481:18
**mole** 271:2
**molecular** 271:1
**molecule** 271:3 290:9,15,17,19,21 291:10 307:21 311:14,15 315:1,3 315:4,5 321:13,20 356:23 357:5 376:2
**molecules** 284:19 307:6 432:16 487:3
**moment** 329:10 479:14
**money** 462:25 515:18
**monitor** 327:7,13
**monitoring** 324:24 336:1
**month** 463:21 492:21
**months** 416:10 441:12 445:11 448:21 449:4
**moore** 259:2,4
**moorelawgroup....** 259:4
**morning** 264:1 265:8 318:12 367:12 487:25 488:10 496:2 498:4
**motivations** 348:2 506:8
**motivator** 387:12
**motives** 506:4
**mouse** 507:18
**mouth** 266:3 285:13 424:13
**move** 267:9 286:4 299:18 337:25 352:23 396:20 414:15 480:22
**moving** 266:2 301:10 449:17
**msk00000243-0...** 553:23
**msk00001015-0...** 554:3
**msk00002336-0...** 554:2
**mtranter** 261:16
**muffled** 373:20
**multidistrict** 265:10
**multiple** 422:1,1 446:24 499:1 502:18 504:5 543:21
**municipal** 269:6 300:15
**mutagen** 272:11 406:11
**mutagenic** 405:11 405:15
**mutate** 272:18 405:16
**mutated** 406:2
**mutation** 406:11
**mutations** 405:24
**mwatson** 258:18
**mylan's** 446:13

**n**

**n** 258:1 259:1 260:1 261:1 262:1 263:1 277:17 278:19,20,22 281:4,6 290:11,14 290:19 291:3,5 294:3 308:6,7,8 310:11,19 317:4,9 317:21 318:5 323:20 373:1,1,1 416:16 461:2 466:8 468:23 526:7 553:1,8,15
**n.w.** 261:2
**n2o3** 285:22,24 392:23
**name** 264:16 265:9 317:7 402:6 446:9 452:6 456:2 458:2 466:12 478:14,17 479:1,6 479:12 511:6 556:2,3
**named** 277:10
**names** 516:16
**nanogram** 335:4 336:19 378:22 443:20
**nanograms** 274:24 275:12,19,25 276:18 282:21 334:7,12,15,20 336:10,12,13,14 336:22,24 337:4 339:1,6,14,16,19

Case 9:20-md-02924-RLR Document 6169-3 Entered on FLSD Docket 12/30/2022 Page 1001 of 2157



341:5,14,17 343:12 344:5,25 345:5,16 353:5,11 353:13,19,22,25 354:16,17 355:2 356:13,15,18,21 384:22,25 385:14 386:11 389:17 411:14 413:5 414:2 415:3 419:15,17 422:15 434:11 442:10 444:4,21 474:12 475:2,18 476:9 526:13,14,21 539:16 550:11,15 550:21 551:4,10 551:16
**nathan** 262:21,24 262:25
**nature** 265:25 270:15 276:12 326:16 376:7 384:16 402:13 409:17 420:17 430:25 433:14 463:17 465:11 475:18 476:9 504:21 517:5 524:7 545:3
**ndea** 296:20 554:11
**ndela** 325:10
**ndma** 268:17,22 268:23,24 269:4,8 269:17,19 270:3 270:16,19,21,25 271:1,5,21 272:3 272:11 273:7,13 273:24 274:2,3,7 274:12,19,20,25 275:8,12,25 277:17,19 278:21 279:8 280:11,17 281:4 282:4,7,21 283:5 284:7,12,23 287:13,21,24 288:4,6 289:7,14 291:18 292:1,7 293:6 294:3,6 295:1,17,23 296:20 300:18 302:16 303:16,20 304:4,6,7,18 305:3 306:2,8,15 307:15 308:15 311:1,6,18 311:24 312:7,19 314:11,14 317:15 319:22 320:2,12 320:23 321:8,15 321:20 322:6,10 322:13 323:5 325:8,22 326:2,4 326:10,20 327:5 327:10,13 328:4,8 328:14 329:1,6,14 329:19,20 330:2,3 330:15 331:11,17 332:7,16,20,23,25 333:7,14,17,20,22 334:7,20 336:1,19 336:22 337:7,15 338:4,5,14,20,21 339:1,5,13,20 340:2,7,15,24 341:5,11,15,17 342:5,10,20 343:12 344:2,12 344:17,19,25 345:5,20 346:1,2 346:21,24 347:5 347:13,18,24 350:8 353:5,14 354:14,16 356:25 357:6 358:4,14,22 358:25 359:4 362:20 364:4 365:9 366:8,21 367:7 370:1 376:2 377:9,25 378:21 379:12,16 380:16 381:4,11 382:18 384:22 385:13 386:10,16,23 387:6,18,21 388:6 388:10,13,17,18 388:23 389:9,15 389:17,21 392:5 393:21 398:4,12 402:11,25 403:3,4 403:12,16 405:9 405:10 406:15,24 407:14 408:1,3,15 408:18,25 409:2,9 409:10,24 410:2,8 411:5,8,10,14,22 412:10 413:1,5,25 414:7 415:2,6 416:16 422:5,14 422:15 423:19 424:3 425:25 426:9 431:16 432:22 433:17,23 435:3 439:24 441:8 442:4,9,24 443:1 444:22 445:8 448:25 453:7 454:3 461:2 466:8 468:23 470:13,20 471:12 472:16,21 474:1 474:12 475:10,11 475:12,20 476:18 483:6 484:10,18 484:22 485:4,12 486:21 487:3,13 495:23 496:13,24 497:13,24 504:13 504:19 505:7,14 507:9 508:7 522:13,19 524:21 525:2 526:12 527:4,6,14,21 528:2,4,13,19 529:1,13,25 531:25 533:8 534:9,19,21 535:18,20,21 536:23 537:7,13 537:17,24 538:6 538:13,25 539:2 539:18,24 540:4,8 540:21 542:11,19 546:9,18,21 549:10,17 550:5 550:10,19 551:7 551:22 553:8 554:11
**ne** 260:23
**nearly** 432:16
**necessarily** 273:11 275:3 283:3,10 295:11 298:22 320:8 327:18 342:23 350:8 374:25 378:17,24 379:25 380:11 388:9 410:20 413:3 414:20 418:24 426:4 465:1 486:10 516:16,25
**necessary** 270:10 324:15

**need** 275:2,10,15 279:21 280:1 290:25 291:4 318:24 335:7 372:10 388:24 412:23 461:9 502:16 514:19 522:25 525:7 528:13,19 547:12
**needed** 279:16 519:23
**needing** 456:20
**needs** 332:20 521:22
**nefarious** 383:24
**negative** 492:15
**neighborhood** 367:22 412:9
**neither** 529:22
**nested** 398:19
**network** 451:21 459:13 460:8 464:4 467:22 468:14 469:4 553:18,24
**neutral** 271:4
**never** 400:7 443:6 444:10 456:6 468:2 478:22 495:13 532:4
**new** 257:25 259:19 260:3,3,14,14 262:3,3,16,16,23 262:23 264:17 376:11,13 381:17 464:14,17 555:4 556:1
**nice** 428:7
**nicole** 259:21 263:12
**nicole.haddadnia** 259:21
**night** 363:12 390:5
**nine** 416:10 474:14
**nitrate** 285:13 364:8,11 366:13 367:20 368:2,8,10 368:18 369:13,17
**nitrates** 363:14 368:1
**nitric** 285:19,21
**nitrite** 284:16,24 285:3,6,10,13,15 285:25 286:2 314:10,14 363:19 364:8 365:7,11,23 366:13 367:15,20 368:3,12,17,19 369:11,14,17 371:10,14,19,23 372:4 393:24 394:3 430:23 466:24 470:15,20 472:3,16 474:2,11 474:19 476:25 477:7 478:6,18 479:2,9,20 480:1,5 481:2,4 483:7,15 542:12 546:5,8 554:4
**nitrite's** 471:11
**nitrites** 363:13
**nitrogen** 285:21 298:15 407:21,24
**nitrosamine** 296:7 302:24 317:4 480:2 554:5
**nitrosamines** 273:10 278:22 281:6 300:18 302:14,15,23 305:24 317:9,21 318:5 323:20 324:10,23 325:5 480:6 526:7 553:15
**nitrosating** 284:21 285:23 368:11,14
**nitrosation** 284:8 284:13 313:9,12 313:17 314:4,9 316:3,9 342:7 392:22 393:7,25 397:24,25 398:10 398:11 474:18 496:18 505:11
**nitroso** 392:18 393:1 397:19
**nitrosodiethanol...** 325:10
**nitrosodiethyla...** 296:21 308:6,8
**nitrosodimethyl...** 277:17 278:19,20 281:4 294:3 308:7 310:11,19 325:8 325:16 404:20 416:16 461:2 466:8 468:23 553:8
**nitrosomorpholine** 325:9
**nitrosopyrrolidine** 302:17
**nitrous** 284:18,18
**nizatidine** 297:20 298:1,5,13 553:22
**nmor** 325:9 327:6 327:10 329:6
**no2** 285:21,22
**noise** 288:17
**non** 501:11 526:21 527:7 551:18,18
**noncaffeine** 498:2
**noncured** 393:19 395:13,22 396:7 497:21 550:11
**nondetect** 377:5
**nondrinkers** 498:2
**nonprescription** 493:7
**nonprivileged** 513:25
**nonsmokers** 498:1
**nonsmoking** 492:3
**nonusers** 399:8
**normal** 492:8
**north** 258:9
**nose** 402:14
**notary** 257:24 552:20 555:3 556:23
**note** 374:22 384:20 427:3
**noted** 264:24 284:12 289:1 291:25 292:24 304:4,18 552:14
**notice** 257:22 275:8 385:8 386:7 386:19 387:11,13 424:8 435:5 437:13 441:23 442:12 445:18 449:6 520:21
**noticed** 269:21 270:9
**notices** 448:7
**notification** 274:24 275:1,21 275:24

**notify** 275:2
**noting** 331:16
**november** 257:16 264:3 319:15 441:7 442:5 444:14,17 445:6 446:22,23 555:15
**npyr** 302:17
**nucleophilic** 298:14
**number** 264:15 266:23 275:17,19 276:7 284:13 303:18 323:1 336:14 337:4 338:17 350:4 356:11,13,18 378:4,7 408:4 412:11 422:16 460:24 486:12 502:25 508:9 534:17 543:11
**numbers** 336:18 355:21 535:3 539:15 550:23
**numerous** 447:6 448:1

**o**

**o** 373:1,1,1
**object** 276:2 510:9 513:22 528:9 546:12
**objection** 271:7,22 272:5,12,20 273:16,25 274:5 274:15 275:14 276:1 277:23 279:25 280:6 283:2,9,21 285:1,8 287:4,14 288:8,20 289:9 290:3 291:20 294:8 295:5,18 300:12 304:13,22 305:5 305:11,16,25 306:9,17 307:1,11 307:16 308:22 309:8,14,20 310:1 310:8,20 311:2 312:1,20 314:5,12 315:11 317:14,22 317:23 318:8 320:25 321:3,11 321:17,25 322:9 329:17 330:18 332:8,18 333:4 337:11 340:18 341:8,20 342:11 343:4,16 345:8 346:5 347:9,20 348:25 351:5 353:23 354:3 355:5 356:16 357:1,8,9 358:6,23 360:14 363:9,16 364:21 365:4 366:1,24 367:16 368:6 369:1,23 370:17 371:24 373:24 374:8 377:20 378:5,14 379:20 380:22 381:6 382:20 385:22 386:17 387:8,23 388:8,19 389:5,19 390:2 391:12,25 392:8,9 392:19 393:2 394:14,21 397:6 397:21 398:6 401:17 403:6 404:5 405:20 406:4 407:3,17 408:10,20 409:12 409:13 410:14 411:6,17 412:3,4 412:19,20 413:17 413:18 414:11 415:8 417:3 418:13 419:25 421:3 422:7,18 423:11,20,21 424:4,16 425:19 428:20 429:8,22 430:8,15 433:3 434:18 437:4,9 440:4,19 441:3 443:22 444:23 445:1,15,22 446:6 447:10,15 448:5 449:2 453:1,10,20 456:4 458:6 459:19 461:16 462:3,15 463:3,13 465:21 470:5 472:9 473:10 474:21 475:14,24 476:20 478:22 480:10,11,19 481:21 482:7,23 483:12 484:20 485:14 486:25 487:18 488:2,13 489:16 490:2,11 494:3 495:10,25 496:14 497:3,18 498:6 499:25 501:4 502:9 503:3 503:10,21 505:2,9 506:14 510:11 511:13,25 512:7 518:15 523:24 528:6,22,23 529:15,21 532:2 536:1,18 539:4 540:10,12,25 541:1 544:18 547:10 551:11,24
**objections** 264:22 464:6 465:17 510:10,15 546:11
**objects** 513:6
**observe** 525:2
**observed** 293:25 330:10 331:10,13 332:7 354:15 426:3 429:12 530:20 532:17 551:17
**obtained** 269:12 387:2 429:14 530:22 532:19
**obviously** 265:24 295:8 302:1 379:7 493:11 513:7
**occupational** 326:3
**occur** 285:4 306:24 307:2 329:22 365:18 368:20 369:17 371:22
**occurred** 312:10 445:18
**occurrence** 284:3 304:6,7 365:7 369:11,16
**occurring** 280:19 376:1
**occurs** 311:13
**october** 468:16
**odd** 418:23 463:7 482:14 551:6

**oddball** 482:12
**odds** 457:1,1
**offer** 483:19 505:5 505:16 508:11 529:17
**offered** 505:20 506:2
**offering** 504:12
**office** 464:3
**officially** 457:16
**oftentimes** 418:17
**oh** 277:1 316:7 431:3
**oil** 396:24
**okabe** 481:4,14,22
**okay** 265:17 268:2 268:5,8 271:18 275:23 277:7 280:16 281:23 292:23 293:1 294:20 316:20 318:14 319:2,16 322:21 327:2 328:12 333:9,12 335:9,20 336:25 337:22 338:9 339:25 353:4 355:18 357:25 358:1 361:19 373:7 374:17 383:13,14 390:23 397:11 399:2 400:2 401:2,5 402:1 404:25 407:6 415:11,12 416:22 417:14 419:3,13 421:24 422:2 425:9 427:15 428:1 431:1 435:25 442:7,15 444:19 448:13 449:19,20 450:19 454:15 455:25 456:23 457:7 458:1 460:18,21,22 462:22 468:12 473:13,21 476:22 477:19 478:14 481:11 483:3 487:6 488:23 489:5,9,22 490:6 491:8,14 501:10 502:6,20 504:4 506:16,23 508:10 510:14 513:8 514:7,15 515:15 515:20 517:21 519:17,25 520:11 520:20 521:18 522:20 523:18 524:12,17 525:9 525:14,25 526:11 526:19 527:10 529:8 530:10 531:1,8,20 532:11 532:14 533:2 534:12 535:4,24 536:7 537:2,12,23 538:6,12,18 539:16,23 541:15 541:24 542:24 543:7,14,17 544:2 544:9,14 545:6,13 546:22 547:18 548:5,25 550:8 551:6
**old** 437:15
**older** 480:1
**omit** 498:15 503:19
**omitted** 543:10 544:16
**once** 322:1
**ones** 286:3 302:18 374:14 508:23
**ongoing** 404:16
**online** 382:10 398:23 525:23 526:2 553:19 554:6
**oops** 417:19
**open** 451:21 459:13 464:4 467:22 468:14 469:4 553:24
**openly** 432:6 433:1 458:11
**opinion** 385:23 386:4 414:6 429:23 430:4 483:7,19 505:20 508:16 528:7 529:16 539:6 540:11 551:12
**opinions** 504:12 505:6,16 506:1,6 508:10,15 509:24 511:11 529:18
**opportunity** 265:17 459:6 467:7
**opposed** 514:21
**oral** 308:4 330:2 443:2
**orange** 269:4,21 330:3,4 338:10,21 343:23 345:11 394:19 395:14,21
**order** 297:7 330:20 332:6 336:2,8 337:1,9,13 339:6 353:18 388:25 551:14
**orders** 267:6 534:7
**organic** 307:21
**organization** 271:25 403:20 404:2,23 409:23 410:10 553:21
**organizing** 349:2
**orient** 301:9 324:7
**origin** 307:6 433:17
**original** 322:4 359:24 384:9 452:13 456:18
**outcome** 317:4 321:18 332:22 484:8 555:13
**outcomes** 540:2
**outer** 482:3,18,22
**outlet** 260:9
**outside** 392:13 428:11
**oven** 432:19 433:18
**overall** 388:22 389:8 499:5 534:25 543:24
**overblown** 455:18
**overly** 383:21
**overnight** 363:6 542:6
**oversee** 460:8
**overwhelming** 405:10
**oxidation** 284:9 306:22,24 307:2 307:15
**oxide** 285:19,22

**oxidized** 285:20 307:9,12,22
**oxidizes** 270:2
**oxygen** 298:12 307:5
**ozonation** 300:19
**ozone** 302:11

**p**

**p** 258:1,1 259:1,1 260:1,1,4 261:1,1 262:1,1 263:1,1 277:1 395:1
**p.c.** 262:21
**p.m.** 372:14,16 373:2,6 400:22 401:1 427:11,14 431:9 459:24 460:4 473:16,20 506:19,22 514:4,7 519:14,17 521:1,4 521:15,18 552:9 552:14
**p100** 468:5
**p106** 468:6
**pacific** 264:3
**pack** 423:4
**packaging** 446:15
**page** 278:16 281:1 282:13 283:25 284:1 286:4,6 289:17,18 294:12 294:12 296:2,5 297:18,19 313:15 315:19,19 316:14 323:18 326:25 327:4 338:1 351:22,24 352:18 354:10 374:18 383:18,19 384:1 395:7 401:8 404:25 416:20 432:14 433:13 504:4 522:22,23 522:24 525:15,16 530:18 532:12,12 532:13,14 533:20 535:9,10 538:21 538:22 541:15,17 542:25 543:2,4 549:3 553:2,7 554:2,10,15,19 556:4
**pages** 301:10 327:2 359:22 443:16,17
**palo** 263:3
**pantheon** 262:10
**paper** 316:22 341:21 421:19 456:6 463:10 478:4,13,14,17 479:1,6,14,17 480:1,12 484:1,3 518:8 519:4,8 524:20 529:7,7 540:9 543:10 544:11,15 545:2
**papers** 457:20 478:9
**paragraph** 282:14 286:6 294:14,15 297:18 298:8 335:25 354:10 362:16 363:24 365:14 367:25 523:1 524:11 533:22
**parameter** 388:21 389:8 433:18
**parasitic** 316:24
**parent** 322:5
**parentheses** 344:16
**park** 261:7
**part** 289:12 293:12 313:20 326:5 345:4,13 351:9 359:16,20 360:9 367:24 376:8 388:11 391:19 394:20 398:2 426:20 429:24 456:10 470:9 475:23 482:15
**partial** 385:9
**partially** 302:24
**participant** 346:24
**participants** 303:6 304:2,9,10 326:21 328:2,9,15 333:17 333:24 334:5 339:5,13,18 340:8 340:16 341:6,15 341:18 343:12 344:6 346:20 347:19 363:5 365:1 389:16 390:12,13,16 391:1,5,11,15,18 393:10 491:5 497:16 524:21 542:4 549:9 551:19
**participate** 491:18 492:20
**participated** 496:6
**particular** 268:15 275:17 278:17 279:16,17 283:5 287:7 293:2 296:17 298:20 313:23 316:16 324:21 355:6 370:20 406:17 418:16 420:3,16 426:2 430:17 462:20 482:10 483:17 522:7 523:10 524:2 545:1
**particularly** 316:25 376:1 377:4 426:24 443:16,17 469:23 471:14 482:14
**parties** 264:7 266:18,19 387:16 517:10 555:11
**partitions** 392:12 486:11
**parts** 426:24
**party** 516:7
**pass** 402:2 519:22 547:15 549:23
**pathogenic** 316:24
**pathogens** 293:11
**pathway** 272:24 284:11,15
**pathways** 284:7 285:11
**patience** 507:3 519:21
**patient** 366:21 374:1 390:4 391:9
**patients** 316:16 364:6 390:19 391:21,23 439:23 450:21 488:5 490:19 539:3,25 551:19
**pattern** 487:16

**pause** 420:4
**paying** 515:11
**pc** 258:2
**pdf** 351:23 354:10 533:20
**peachtree** 260:23
**peek** 459:17
**peeking** 352:22
**peer** 449:22 451:1 451:6 457:11 461:23 463:9 498:14 540:16
**peiyuann** 262:19
**pennsylvania** 258:10
**people** 307:3,7 347:5 362:18 376:23 411:13 438:1 458:9 486:4 488:7,19 489:18 489:23,24 490:8 490:18 493:1 494:1,19 495:5,13 496:5 498:2,10 516:19 517:9
**percent** 293:25 297:5,7 319:22 320:3 321:7 323:1 324:6 330:4,11,21 330:25,25 343:24 344:5,10,11,20,25 345:12,19,21 347:6,7 352:2,25 353:7,15 357:24 358:12 399:9,12 401:11 419:6 485:4 501:24 502:4 536:10
**percentage** 331:13 338:21 344:22 535:20
**perfect** 284:2 291:7 318:22 525:16 526:5 535:10
**performed** 325:6 529:10
**period** 324:4 368:21
**periods** 389:3 423:9
**permanent** 406:9
**permissible** 467:14
**permit** 332:14
**permitted** 283:16 332:12 492:20
**perrigo** 261:13,14
**person** 423:24 481:25 482:11 489:12 494:9,22 518:20
**personal** 296:10 297:14
**personally** 307:19 515:20
**perspective** 411:3
**pertain** 303:5
**pertained** 309:25
**pertains** 311:18
**perusing** 369:4 532:24
**pesticides** 286:14
**petition** 383:22,23 384:11,20 385:4 385:20 386:12 387:14 426:7,22 432:5,9,13,17,25 433:5 434:15,21 434:25 437:20 438:16,17 440:3 440:14 441:2,13 447:7 553:23
**petitioner** 433:15
**pfizer** 261:3 292:5 305:1 309:23
**pguo** 262:19
**ph** 271:4 474:11
**ph.d.** 257:21 264:11 265:3 373:3 402:21 436:17 552:16 556:3,20
**pharma** 346:15 348:10,16 349:4 349:23,25 350:19 415:16 417:9,13 418:1,4 425:3 427:21 429:25 529:22
**pharma's** 348:18 351:2 355:8 417:15 418:6 531:24
**pharmaceutical** 289:3 297:15 382:6 444:3 462:13 463:1 465:10
**pharmaceuticals** 260:15 294:1,6 296:9 350:6,24 416:17 545:17
**pharmacoepide...** 554:7
**pharmacokinetic** 388:11 389:11
**phenomenon** 312:25 380:20
**philadelphia** 258:10
**phone** 477:17
**phones** 264:5
**phrased** 384:10 472:2
**phs** 391:22
**physical** 492:11
**physiologic** 364:2 478:7 482:4
**physiological** 477:1,7 482:19 483:20
**physiologically** 477:9 478:19 479:4 483:8
**physiologist** 485:21 486:6
**physiology** 482:5 482:21
**pick** 381:4
**picture** 401:25 436:16
**pictured** 288:23
**pill** 341:25 354:16 422:15 475:20
**pills** 423:8 442:5,9 442:25 448:24 475:13 476:8
**piper** 261:18
**place** 264:7 268:25 378:18 425:21 490:24
**placebo** 362:19 364:5 534:20,22 539:3,9,12,19,25 540:22 542:5 550:5 551:7
**places** 270:9
**plain** 503:23
**plainly** 429:6
**plaintiff** 264:12
**plaintiffs** 257:21 258:4,11,17,21

259:3,8,14,19 260:4 265:10 276:22 292:12 299:20 307:25 323:14 348:6 359:11 361:21 383:8 395:3 398:15 402:9 404:12 432:10 442:13 449:8 451:15 458:13 467:18 477:22 479:22 483:23 500:6 516:13 520:9 531:4 543:9 544:4 553:7 554:2
**plans** 459:8
**plasma** 348:3 375:18 380:2 387:22 388:7,11 388:17 389:3,16 398:4 407:8 408:18 409:16 485:23,24 486:18 536:16,17 538:13 539:24 540:1,2 549:12,19
**play** 406:19
**plc** 261:14
**please** 264:4,25 276:20 277:5 278:17 280:9 281:3,24 282:13 284:1 286:5,7 289:16 290:14,16 292:10 293:23 294:11,21 296:3,4 297:23 299:18 301:8 307:23 311:10 313:15 314:2 315:19 319:7 323:13,18 326:25 327:3 329:25 330:9 338:1 348:4 351:23 352:18 354:9 359:7,9 361:19 362:14 372:12 383:18 390:20 398:13 401:8 414:15 448:13 523:4 541:20,23 543:16 549:2
**pllc** 259:2,12
**plot** 417:22 421:5 471:19 536:22
**plots** 423:22
**plotting** 539:9
**plumes** 269:24,24
**plus** 343:24 345:12 526:14
**point** 295:13 299:2 321:22 358:7 360:25 366:10 376:15 379:23 414:13 418:21,22 419:1 420:3,10,13 420:18 421:18 425:13 451:14 472:2,3 476:17 512:11,18 513:14 516:18 538:16 544:23 546:16
**points** 417:21 471:13
**poison** 411:9
**poisoned** 326:10
**poisoning** 326:13
**polar** 271:3 376:1
**policies** 511:18
**pomegranate** 397:14
**poor** 423:24
**poorly** 272:23 510:3
**pops** 487:25
**population** 391:9
**port** 426:4
**porter** 262:2
**portion** 266:25 302:13 322:12 351:17 391:8 476:7,11
**portions** 426:24 509:5,6
**portrayed** 314:6
**pose** 265:15
**position** 411:19
**positive** 413:12 453:2 528:13,20 528:25 529:1,24
**possibility** 370:11 482:4,19 494:16
**possible** 272:24 273:22 293:15 324:22 327:9 329:2,10 340:23 379:4,5 483:8 494:13
**possibly** 368:21 523:11,16,20
**post** 303:21 412:10
**potable** 269:5,5 270:23
**potencies** 281:25
**potency** 282:4,9
**potent** 278:22 279:4,9,12,13,21 279:23 281:5,17 282:7 283:20,23
**potential** 270:21 273:20 276:9 279:18 285:23 294:2 347:23 350:2 364:4 365:6 368:13 383:4 388:22 389:1 405:23 412:23 452:15 453:7,8 466:13 475:10 486:9 493:20 527:25 542:19 545:22
**potentially** 311:6 341:24 342:6 365:8 366:14 371:16 380:24 381:2 398:5 410:3 427:23 465:10 471:17 477:1
**ppcps** 296:7,9,25
**ppcs** 297:13,14
**practical** 273:14
**practice** 452:15 510:15
**pre** 395:20 396:21 396:22
**precautionary** 273:19 414:23
**precise** 379:3
**precision** 447:4
**precursor** 274:10 287:13 289:7 291:18,25 292:7 296:15 368:13
**precursors** 286:11 288:6 293:13
**predate** 447:8
**predict** 496:19
**preliminary** 266:11

**premarked** 468:8
**prepared** 465:23 505:16
**prescribed** 294:17 294:24
**prescription** 493:6
**present** 263:10 284:24 347:25 364:12
**presented** 316:11 539:17 540:5
**presenting** 457:1
**press** 318:11
**pressure** 518:9,13 518:22,24
**pressuring** 518:19
**presumably** 320:17 323:1 324:5 332:24 360:1 376:14 383:3 391:18 409:4 463:15 479:10
**pretreatment** 542:3
**pretty** 447:23 452:24 475:20 480:7 484:18 486:2 489:12
**prevalence** 317:3
**prevalent** 303:1 316:25
**prevent** 392:22
**previous** 393:21 455:15 496:16 508:12 526:9 544:22
**previously** 276:13 397:8 415:15 418:1
**primarily** 348:24
**primary** 348:18 476:13 484:8 505:19
**primitive** 327:24
**principle** 414:23
**principles** 507:25 510:2
**prior** 312:2 322:11 417:4 428:21 439:21 461:10 492:21 524:22 525:2 540:16
**private** 414:19 422:10,13
**privilege** 477:25 513:22 515:2
**privileged** 513:20 514:12,23
**privy** 276:5
**probability** 423:7
**probable** 271:25 272:3 273:21 276:10 279:3 281:14 283:23 403:16,19,25 410:8,18 416:15 520:8,19 522:15
**probably** 278:10 297:7 362:12 393:16 395:1 406:10 410:24 412:1 436:1 462:9 470:3,9 475:5 480:17 484:18 485:12 523:10,15 523:19
**problem** 266:6 407:12 431:24 445:5
**procedures** 509:15
**proceed** 268:3 271:19 335:21 337:23 373:8 401:3 427:16 473:22 506:24 514:7 519:18 521:18
**proceeding** 257:11
**process** 293:9,12 350:6 354:18 406:13
**processes** 487:5
**produce** 274:10
**produced** 429:16 458:16 530:24 531:22 532:3,21
**producers** 269:23
**product** 334:21 411:21 445:20 461:25
**production** 461:2 466:8 468:23
**products** 257:4,12 264:12 286:8,9 293:15 296:10,16 297:15 300:17 407:21 424:10 439:18 444:20 457:21 553:22
**professional** 257:24 422:21
**professionals** 439:23
**professor** 268:18 278:10
**profiles** 315:22 316:1,7
**program** 492:23
**prohibiting** 551:21
**prohibition** 425:6
**project** 269:3,13 269:16 270:14 349:20 459:4
**promeco** 260:18
**prompted** 433:15
**pronounce** 316:17
**propensity** 415:6
**proper** 536:20
**properly** 545:20
**prophylactic** 488:19
**proposal** 431:13
**proposition** 329:13 330:24 346:1
**prostate** 500:14
**protective** 267:6
**protocol** 326:6 349:2 363:1 367:10 370:8 432:15 433:20 464:12 490:21,21 491:4,15 493:25 494:19 495:2 496:6,23
**proton** 493:2
**prove** 271:10
**provide** 322:22 347:15 360:23 375:2,5,7 501:8 528:25
**provided** 282:10 295:22 322:25 354:22 367:19,23 369:10 453:14 474:22 529:24 541:3
**provides** 303:8 376:10 377:24 378:1

**providing** 343:18 377:23 535:19
**prudent** 420:13
**public** 257:24 453:9 461:7 488:18 552:20 555:3 556:23
**publication** 273:7 286:23 287:2 308:3 309:5,18 310:6,16 343:6 360:5,7 361:16 376:11 382:8,9 449:5,12,23 450:1 451:2 452:21 453:14 457:12 458:1,10,21 461:10,14,22,23 463:8,12 464:14 465:24 467:1,15 469:3 471:7 479:7 485:2 540:16
**publications** 273:9 436:20 460:9 461:21 466:1
**publish** 300:4,6 425:4,16 450:3
**publishable** 541:7
**published** 278:5,9 279:7 291:23 292:4 300:5,7 304:17,24,25 305:3,7,8,13 308:18,19 309:2 309:12 312:16 318:4 346:19 348:12 376:22 398:23 399:24 424:22,24 425:10 449:13 451:7 452:14 456:7 457:16 459:13,18 462:2 465:18 467:6 478:19 479:3 500:10 505:22 507:9 525:11 550:18
**pull** 276:21 307:23 323:12 348:4 383:6 390:20 398:13 486:3 524:17 525:6,25 526:3 530:4,5,10 533:2 535:4,7 538:19 542:24 545:7 546:3 551:2
**pulled** 435:17 438:22 463:10
**pulls** 423:25 461:13
**pump** 493:2
**pure** 339:4
**purpose** 375:9
**purposeful** 332:9
**purposes** 273:14 274:13 350:3 449:21
**pursuant** 257:21
**put** 318:3 349:25 377:14 379:8 421:8 424:11 432:13 456:1 469:20 537:9 543:1,4
**puts** 378:3
**putting** 469:25 470:7 497:9 516:20

**q**

**qualification** 518:17
**qualified** 504:11 505:4,16,21 506:5 528:8 529:17 539:5
**qualify** 508:15 545:21
**qualifying** 331:12
**qualitatively** 409:24
**quantifiable** 523:21
**quantification** 346:25 375:23 377:1,13,23 379:9 379:22 380:1,5,8
**quantify** 308:14
**quantifying** 377:16
**quantitation** 375:16 416:14
**quantitative** 523:12 524:14
**question** 265:15 265:20 266:5 291:9 295:20 304:16 326:17 358:13 368:22 370:5,7 372:3 373:14 388:4,15 406:11 412:15 413:9,11,12 421:6 425:13 445:1 447:16,23 448:14 456:1 459:4 471:14 472:22 478:4,23,24 480:22 484:25 495:12 514:11 517:15 528:11 531:12 532:7
**questioned** 331:21
**questioning** 266:5 369:9 430:7 474:6
**questions** 265:13 428:19 477:2,6,8 477:11 478:1,2 483:4 504:17,19 504:20 507:2,8 509:5 512:23 513:4 519:21 520:7 527:2,19,22 530:4,6 535:6,12 545:12,14 547:20 547:23 548:3 552:4,5
**quick** 500:8 549:25
**quickly** 266:15 550:9
**quite** 319:14 456:25 457:3
**quoted** 536:20

**r**

**r** 258:1,4 259:1 260:1,24 261:1 262:1 263:1 373:1
**radical** 272:9,16
**raised** 350:14 460:24 465:12,16
**raising** 366:10 372:3
**range** 328:18,20 328:24 329:7 330:7,17 331:4 428:12 475:1,9 477:1,7 478:10,11 482:3
**ranged** 526:12
**ranging** 481:4
**ranitidine** 257:4 257:12 265:12

286:18 287:9,13 287:24 288:12,15 288:18,25 289:6 289:14,20,24 290:15,16 291:10 291:17,25 292:6 294:1,6,16,23 295:11,15,23 297:2,5,12,20,25 298:4,10 299:17 301:1 303:7,13 306:5,16 307:9,20 308:4 309:25 310:5,10,15,18 311:1,6,22,24 312:6,19 313:6,8 313:12,17,24 314:4,9,10,15 316:3,9 317:16 328:3,10 333:23 334:1 336:15,23 339:19 340:25 342:22 351:12,24 354:18 356:23 357:5 362:18 363:6 364:5,9,13 365:3,8,17,24 366:12,22 367:8 367:11,14 368:19 369:11,15 370:13 370:23 371:8,13 371:18,22 372:5 381:12,21 382:1 382:13,13,17,19 384:24 385:3,10 385:13 386:9,15 386:21,24 387:5 398:18 399:7,11 401:10 402:11 412:24 413:13,21 414:9,24 415:5 417:1 420:24 421:11 426:9 429:14 431:19,25 432:21 435:3 436:21 438:22 439:18,24 440:25 444:20,22 445:8 445:13 450:8 453:6 457:2 461:1 466:7 468:22 470:13 474:19 476:16 484:9 486:5,22 487:10 487:17,21,25 488:5,9,11,16 489:1,19 490:4,7 494:2,14 496:24 497:12,23 498:3 499:5 500:21,25 501:12,18 502:24 504:13,18 505:8 505:13 517:24 519:1 526:8,21 527:7,13 528:4 529:11 530:1 532:19 534:19,22 540:22 542:5,19 543:24 546:9 551:18 553:22 554:10

**rankings** 522:11

**rat** 404:11 507:18

**rate** 295:1,17 346:2 387:17,20 387:24 388:5,18 388:25 536:9,12 536:15,21 537:4,7

**rates** 317:16 327:8 327:14 329:16 336:4 536:6

**ratio** 501:22,23 502:19

**rationale** 298:25 385:10

**ratios** 430:22 457:1

**rats** 323:20 553:16

**raw** 302:7 303:24

**reach** 353:14

**reached** 459:2 464:13

**reaches** 330:21

**reaching** 322:11 326:8

**react** 287:20,21 288:3 289:13 315:2

**reacting** 392:23

**reaction** 272:15 314:25 356:13 365:17

**reactions** 270:16 280:18 393:8

**reactive** 307:5 368:10

**reacts** 314:10

**read** 273:6,10 278:18 280:9 281:3,24 286:7 292:18 293:2,23 294:21 295:7 296:6 297:23 298:6 299:8 315:25 316:4 318:3 323:7 324:12,25 327:3 327:17 328:21 329:11,24 354:21 359:21 362:10 363:23 369:2 383:12 399:5 401:8 406:14 448:15 471:25 472:17 480:12 481:22 495:3 497:5 509:10,17 523:3 526:17 532:23 536:24 537:8 538:16 541:21 543:14,15 546:13,22

**reading** 385:7 393:5 442:11 443:24 451:4 481:24 497:7 529:23 544:25 547:5

**reads** 284:2,6 324:9,18 325:15 335:25 351:24 354:11 360:25 365:14 371:7 390:24 401:9 480:25 549:8

**ready** 519:25

**real** 266:4 356:11 370:12 423:7 487:20 523:22

**realistic** 477:10

**really** 266:14 403:11 404:2 426:12 429:24 434:14 446:19 453:8 454:10 483:14,21 495:1 497:2 507:4 519:20 525:18

**reask** 370:6

**reason** 265:14 267:20 349:16 385:19 403:14 418:10 419:21,23

421:16 435:13 454:6 485:21 516:4 541:6 556:4
**reasonable** 352:16 419:12 421:19 483:2 489:12 512:8 538:5
**reasons** 403:2 416:23,24 529:6
**recall** 273:11 292:8 295:10,13 306:10,18 309:15 310:21 313:22 314:3 315:4 316:23 320:4 323:11 325:25 326:7,24 327:17 329:9 332:9,11 334:1,8 336:17 357:11,13 362:13 363:2,10,12 367:18 371:4 374:16,20 383:2 384:8 386:18 390:8,15 391:17 393:12,13 399:21 399:25 427:25 428:22 430:19,21 432:8 433:10 435:15,24 438:19 438:21 441:20,21 446:13,14,15,24 448:7 450:2,23 451:3,5,8 453:25 454:5 456:16 463:18 464:24,25 465:24,25 466:2 466:20 467:4 470:25 476:1,21 477:3 478:9 479:6 479:13 484:2 485:5,6 490:16,24 504:19,20 507:17 508:20,21,22,24 509:6,7,8 510:5,9 510:10,13 516:10 516:16,24 517:3 518:6 520:9,10 524:19,23,24,25 527:21 531:15 534:10,16,18,24 535:3 543:8,12,13 550:3,7 551:3
**recalling** 446:5
**recalls** 440:25 446:16,25 447:3,4 447:5,6,12,18 448:1,16,19
**receive** 361:5,12 516:21 518:9 519:3
**received** 516:12 516:15 518:22,24 542:5
**receiving** 351:7
**recess** 267:25 271:16 335:17 337:20 372:16 400:24 427:12 473:18 506:20 514:5 519:15 521:2,16
**recognize** 277:7 361:25 362:1 452:18
**recognized** 517:1
**recollection** 320:18 375:12 478:12 487:14 490:14 534:25
**recommendation** 541:6
**recommended** 433:19
**reconduct** 367:5
**reconnect** 427:7
**reconstructing** 450:5
**record** 264:2,8 266:23 267:22,24 268:2 271:13,15 271:18 335:12,15 335:19 337:19,22 372:12,14 373:6 400:20,22 401:1 427:9,11,14 473:16,20 506:19 506:22 510:22 513:23 514:2,4,7,9 519:14,17 521:1,4 521:15,18,23 523:4 541:23 543:16 552:7,9 555:8
**recorded** 264:10
**recording** 264:6
**recycling** 269:6
**red** 355:23 356:20 359:3 419:9,14 420:2,8
**reddy's** 262:24 447:1
**redo** 355:11,20 356:10
**reduction** 285:12 368:11
**reevaluate** 367:5
**refer** 279:4 281:14 344:16 522:16 523:7
**reference** 286:22 287:5,11 319:21 320:1 322:24,25 503:6,12,13 524:6 543:11 544:5,8,10 544:10,12,16 546:14
**referenced** 323:8 331:3 349:24 399:20,22 435:18
**references** 295:20 467:14 469:14 500:3 543:15,16 543:18,25 544:7 544:13 545:5
**referencing** 387:3
**referent** 501:13
**referred** 279:7,10 281:16 303:2 320:10 375:15 522:14
**referring** 272:15 328:1 331:23 333:9 369:12 380:19 430:19 479:18
**refers** 279:13 311:12,23 344:15 430:12 491:6,9 499:14
**reflect** 379:25
**reflected** 358:2
**reflecting** 475:6
**reflects** 442:10,11 511:16
**refresh** 449:25
**regard** 265:11 273:7 275:18 294:5 297:2 301:4 345:11 351:11 382:24 397:16
**regarded** 273:14 283:20,22

**regarding** 292:5 310:9 417:15 426:9 428:5 437:21 504:17 506:3 509:25 518:25 537:10
**regardless** 344:20 386:2
**regards** 544:23
**registered** 257:23
**regression** 473:8 473:11 546:24
**regs** 474:20
**regular** 488:9 490:7 494:13
**regulated** 274:21
**regulations** 276:17 276:17 476:19
**regulator** 422:9
**regulatory** 275:7 276:6,11 334:24 414:20 445:9 448:25
**related** 311:7 312:24 480:13 555:10
**relates** 257:6,14 323:1 508:7
**relating** 453:6
**relation** 422:22
**relationship** 472:16 546:7 547:1,9
**relative** 279:17 283:7 297:3 341:1 353:1 356:21 357:24 369:15 370:1,13 376:6 387:5 497:14,25 500:19 529:2,25
**relatively** 295:24 405:8 410:3
**relayed** 518:3
**release** 285:25 368:1
**released** 442:8
**releases** 441:7
**relevance** 390:22
**relevant** 324:6 379:16 422:23 470:1,8 471:14,17 478:20 479:4 480:8 537:6
**reliable** 412:11 418:8,12 456:9 505:23
**remains** 306:1 381:12
**remarkably** 421:23
**remarks** 359:17 360:8,13
**remember** 295:19 314:24 319:20 324:3 332:1,2,3,5 371:5 390:18 394:10,22 413:8 415:11 427:20 428:19 430:7 435:19,23 444:12 456:17 466:19 467:1,2 470:17,24 475:25 476:3 477:2,10,18 507:6 508:18
**remote** 264:10,21 264:23 265:25
**removal** 412:25 439:18
**remove** 293:16 428:17 429:6 430:5
**removed** 411:25 536:15
**renal** 319:21 320:1 535:25 536:9,14 537:3,6
**render** 294:25 295:16 368:13 408:22 505:21 528:8 539:6
**rendering** 311:7 312:7
**renowned** 309:1
**reorient** 325:11
**repeat** 346:11 348:9 366:5 418:25 420:13 425:12 528:11
**repeatable** 367:9 425:14
**repeated** 330:1 346:10 347:16,17
**repeating** 348:23
**rephrase** 265:17 377:22 497:19
**replicable** 420:17
**replicate** 401:13
**replicated** 419:21
**replication** 417:22
**report** 376:25 377:6 428:6,8,19 428:24 429:4,21 430:6 531:5,9,23 553:20
**reported** 379:21 461:8 471:6 481:2 481:16 526:15,23 534:11 540:9
**reporter** 257:24 264:18,24 451:13 458:23 468:10
**reporters** 457:14 463:10
**reporting** 264:22 326:15 367:7 471:5 498:13 556:1
**represent** 265:9 303:16 336:21 399:23 402:8 460:18 511:18 516:1 523:22 531:21 534:12 546:19
**representation** 447:13 515:18
**representations** 447:11,18,20 448:12
**representative** 305:1 517:4
**represented** 353:5 513:10,15 531:4
**representing** 294:5 339:22,23 514:22 515:12 516:7,22 517:9,18
**represents** 358:9 373:15,22 511:10 515:6 517:7 536:9 537:17 546:6
**reprints** 463:1
**request** 322:23
**requesting** 516:14
**requestioning** 519:23
**requests** 439:18 445:12 554:18
**require** 324:23
**required** 401:13 452:19

**requirement** 275:21,24
**research** 261:14 268:19 269:14 270:11 293:3 382:15 387:15 393:21 433:16 452:13 459:8,12 461:20 468:21 526:9 553:17
**researchers** 376:15
**reserve** 519:23
**residual** 499:1 543:20
**respect** 295:10 342:20 417:19 420:10 530:7 531:24 538:25
**respective** 267:6
**responded** 438:12 478:8
**responds** 322:15
**response** 320:22 322:23 360:24 440:2 459:5
**responses** 361:6
**responsible** 348:24 349:1
**responsive** 514:11
**restricted** 390:19
**result** 304:24 307:14 377:4 402:10 410:1 436:10 502:23 535:1
**resulting** 280:18
**results** 295:22 301:7 303:4 304:21 305:2,10 305:15 307:19 311:8 312:8,12,14 314:3,8,13 316:10 327:18,19,21 342:8,18 343:18 346:7,19 347:11 349:16 351:2,7,19 354:21,25 355:9 356:8 364:19 365:25 369:21,25 371:16,17,25 373:15 374:6 380:21 385:24 386:3 388:16 399:2 412:7 417:8 418:6 419:13 425:2,4,7,17 427:22,24 428:10 428:11 432:20 433:15,21 440:12 440:17 441:8,14 441:19,21 442:4,8 442:17,18,24 443:3,13,19 444:20 445:7 449:5 453:22 454:9,12,14 455:9 455:21 456:8,9,11 456:14,25 457:4 460:25 464:17 466:23 473:5,9 474:1,7,9 475:21 476:15 485:3 492:10,11 498:13 501:9 502:13 509:15 541:5 550:4
**resumed** 373:4
**reswear** 264:25
**retailer** 261:8
**retained** 552:12
**retract** 351:3 518:8,23 519:4,8
**retracted** 308:12 310:24 311:3 312:13 412:7 436:24 437:16 525:12 529:7
**retraction** 312:4 312:17 386:14 412:14,25 437:13
**reuse** 269:5,5,15
**revalidate** 355:21
**review** 277:18,25 338:2 359:16,20 360:9 361:4 375:9 383:11 393:10 400:12 426:21,23 448:8 452:24 457:12 461:23,25 463:9 468:21 480:15 490:24 508:6 547:23 548:4 553:9
**reviewed** 331:24 339:18 359:24 374:14 379:17 394:1 399:25 400:3 459:12 497:7 498:14 534:7 544:17
**reviewer** 359:13 362:15,15 364:18 366:9 370:20 372:2 374:16,17 374:24 421:19 451:6,24 452:2,2,5 452:10 540:16 541:11
**reviewers** 359:25 361:1,2,3 362:7,11 541:10
**reviewing** 364:16 455:8
**reviews** 360:21 449:22 451:1,9 477:4
**revise** 360:22
**revised** 360:4 469:5
**revision** 455:1
**ridiculous** 378:19
**right** 266:8 268:21 291:4 294:19,19 296:24 303:10 315:20 326:12 327:1 328:12 329:24 331:4 333:15 340:5 347:6 351:4 352:9 352:13 353:12 355:25 356:3 363:11 370:16 372:11 383:19 396:19 397:11 403:5,12,16,22 404:4 405:16,19 406:3 407:2,12,16 408:5 409:2,11 410:25 411:2,5,10 411:16 412:2,18 413:15 414:3 415:7,13 416:8,12 419:7,10 420:20 420:21 422:6,17 423:10,19 424:3 424:15 426:9,17 429:7,11 430:14 431:8,12 432:1 433:9,14 434:5 435:3,9 436:7,13 436:18,22 437:3 437:14,21,24

438:3,6,14,18,20 439:7,9,16 440:9 440:10 441:14,19 443:11,21 444:7 444:16 445:21 446:5,22 447:9 450:17,22 451:10 452:25 453:6,9 454:20,24 455:3,5 457:9,16 458:21 458:24 459:24 460:15 462:14,23 463:12 465:19 466:18 467:9 469:21 470:4,14 470:16 471:7,22 472:8,13,13,25 473:1,4,6 474:15 475:7,13,23 476:4 476:19 477:24 479:12,24 480:9 480:18 481:8 482:6,19,22 483:21,25 484:10 484:14,19 485:13 487:8,13,23 489:15 490:1,7,10 491:13,22 492:3,6 492:17 494:2,16 494:20 495:2,9,17 495:20,24 496:7 496:13 497:2,17 497:19 498:5,16 501:3,11,17 502:2 502:8 503:9 504:1 504:6 505:17 508:3,8,24 509:2 509:21 511:15,24 512:10,12,16,20 513:1,12,16 514:24 519:10 520:3 528:16 530:12 535:10,16 549:4

**rightfully** 475:8
**ring** 298:3,10,13
**risk** 276:12 282:11 324:11,14 398:18 399:6 401:11 499:6 500:13 501:22,23 502:16 502:19 507:14 523:9,22 543:25
**risks** 276:14 412:23 500:19 501:18
**road** 263:2
**roberts** 263:13 264:16
**robust** 464:18
**rocket** 269:23 270:1,11 274:10
**role** 348:18 375:1 406:19 453:24 454:6 455:8
**room** 290:23
**roopal** 260:4
**rosemarie** 259:20
**rosemarie.bogdan** 259:20
**rosemary** 265:9 266:10 400:16 547:21 548:7,19
**routine** 381:14 409:17 488:6 490:19
**routinely** 382:12 421:22 435:11
**rr** 501:21,21
**rule** 257:11
**run** 296:13 454:2 462:9
**ryan** 416:4
**rydstrom** 261:4

**s**

**s** 258:1 259:1 260:1 261:1 262:1 263:1 373:1,1,1 553:6 554:1 556:4
**s.a.** 260:18 261:21 262:4
**sacher** 295:1
**safe** 423:1
**safety** 554:8
**sale** 386:25
**saliva** 285:7,10,12 285:17 368:12 479:9,21 481:11 481:19
**salivary** 364:10 481:1
**salt** 286:16
**salts** 376:4
**salty** 376:6
**sample** 312:6 320:21 342:24 380:10 431:17 486:15
**samples** 300:24 301:20,22 302:5,6 302:9 303:21 304:7 306:3 348:3 349:3,5 375:25 377:25 398:12 409:16,20 421:10 428:7,18 433:23 439:24 485:18,23 486:1
**san** 259:8 260:8
**sandoz** 440:24 446:10,24
**sanofi** 261:20,20 261:21 262:4,4,4 305:14 309:11 444:3 447:1 458:5 459:3,11,16
**satisfactorily** 461:9
**satisfactory** 350:22
**satisfied** 349:17,21 350:18
**sausage** 397:2
**saw** 326:1 383:14 425:17 444:11 457:7,10 476:16 496:1
**saying** 345:10,23 366:17 404:2 406:24 455:19 459:23 461:18 474:9 477:4 482:17 495:13 518:21 528:12
**says** 315:21 321:5 331:5 333:6,6,19 336:8 339:22,24 362:18 363:22 371:12 405:4 406:14 429:11 431:12 433:13,13 450:11 452:10 454:22 458:25 459:2 460:6 464:2 468:19 469:2 478:22 479:11,13 491:16 499:9 501:11,15 511:15 511:22 524:16 526:1,10,25 530:19 549:13,21
**scale** 297:6
**scarvie** 262:6

**scastillo** 260:10
**scenario** 366:11 370:12 379:13 423:13 424:20 482:14,15 490:4
**scenarios** 358:17 381:14
**schachtman** 262:21,24
**schachtmanlaw....** 262:25
**schedule** 542:18
**schematic** 289:22
**schistosomiasis** 316:18,19,20,21 316:23 317:2,8 318:1
**schmidt** 295:2,8 295:12
**scholer** 262:2
**science** 453:19 528:16 553:10
**scientific** 304:15 406:23 433:16 453:17 510:1
**scientist** 379:2 402:19
**scientists** 449:11
**screen** 401:20 436:8 439:3 442:20 446:20 448:18
**screening** 491:1,4 492:12,17
**screwed** 427:4
**se** 259:12
**search** 480:15 504:23
**seats** 520:23
**second** 266:19 277:16 282:12 294:13 297:19,22 298:7 299:16 313:14 323:17 344:13,15 354:10 361:4,5,12 365:20 383:19 422:3 457:8 465:23 485:23 533:21 535:5 551:2
**secondhand** 465:3
**secretly** 411:9
**section** 284:2 323:3 363:22 375:4 393:20 401:6 405:2 416:21 434:19 443:9,9 454:19 469:24 476:5 480:25 491:14 494:5 524:2 539:9 544:7,11,13
**sectional** 468:22
**sections** 433:10 455:15 456:19
**see** 266:2 277:5,6 282:16 284:2,5,10 288:10 290:11 291:3 293:15 294:18,20 297:20 301:19 302:14,16 303:4,17,19 304:10 313:16 315:22 317:11,15 319:8,10 320:19 320:19 322:17 324:16 328:17 336:6 338:4,9,12 338:15,16,22,23 345:12 352:5,22 353:1 354:12,20 355:24 356:10 360:3,7 361:2 362:23 365:19 367:5,6 374:19 383:25 391:2 395:9,12,13,15,19 395:24 396:1,7,12 396:18,21,24 397:14,15 398:24 399:1,14 404:18 404:21,22,24 405:1,3,12,13 406:20 410:5 415:19,21 416:2 416:17 419:11,18 419:19 420:3,24 420:25 421:5 425:21 428:14,15 429:1,17,18 431:9 431:11,20,21 432:23,24 433:11 433:25 434:1,12 434:13 437:16 439:4,5,14,15,19 439:25 440:1,23 442:17,18,21,22 443:2,8,18 444:9 444:17,18 445:14 445:17 446:15 449:22 450:6,8,8 450:14,15 451:1 451:17,19,19,21 451:22,24 452:3,7 452:9,16,22 453:17 457:5,6 458:17,18,19,22 458:24 459:9,10 459:14,15 460:1,4 460:5,10,11 461:4 461:5,11,12 463:22,23,25 464:1,9,10,19,20 466:10,11,14,15 467:21 468:12,15 468:17,18,25 469:1,7,8,9,11,12 469:15,16 473:11 474:3,4,12,13,17 475:3,4 479:15,16 480:3,4 481:5,7,19 484:9 491:19,20 491:25 492:1,4,7 492:13,14,18,24 493:3,5,9,10,12,13 493:17,18,22 496:13,24 497:2 499:7,8,11,12,14 499:15,16,17,19 499:20,22 500:9 500:10,12,15,16 500:21,22,25 501:1,14,19 503:1 510:19,20,24,25 511:19,20 525:2 525:21,23 528:25 529:3 530:14,16 530:18,25 532:6,8 532:15,25 533:24 533:25 535:14 539:14 550:12,13 550:15,16
**seeing** 304:3,5,6 331:17 396:9 422:5 441:5 447:24 451:8 474:11 484:18
**seen** 325:22 326:4 330:5,15 389:15 398:20 401:18 443:6,12 448:6 459:21 461:22 475:22 481:13 498:8 501:6 509:2

509:22 532:4,5,22
**selden** 263:4 266:10,14 276:2 317:23 318:15,20 321:3 339:21,25 357:9 392:9 398:7 401:17 409:13 412:4,20 413:18 414:14 422:19 423:20 424:18 443:5 447:10,17 448:5 480:11 488:2 502:9 513:21 514:8 545:8,13 547:22 548:2,10,18,23,25
**select** 457:14
**selected** 296:7 542:15
**selling** 463:1
**send** 275:7
**sending** 361:1
**sense** 281:13 340:22 355:10 356:2 365:6 366:9 409:6 422:24 471:17 487:23 495:6 507:23
**sensitive** 380:9,25 381:3 485:13 524:20 526:20 527:5 534:8 539:2 540:7,23
**sensitivity** 329:21 375:24 380:15 431:15 533:8
**sent** 360:1 457:14 463:9 465:18 508:14 516:18 540:15
**sentence** 278:17 278:18 280:8,13 281:2,9,24 282:3 282:16,19 284:5 284:10 288:22,24 289:4 293:21,23 294:4,16,18,22 295:4 297:19,22 297:24 298:7,7,24 299:4,7,8,9,17 317:18 320:6 325:14 327:3 328:16 330:8 331:7 333:10 335:24 336:6 365:20 369:3 370:21 371:7 390:24 407:5 428:4 498:23 502:25 525:21 533:21 543:15 544:3,7 549:6,7
**sentences** 329:25
**separate** 302:8 417:6
**separately** 395:2
**september** 438:17 439:12 453:5
**sequence** 272:22 382:4 430:7 446:8 542:15
**series** 360:21
**serve** 286:11 289:7
**served** 512:12,14
**service** 275:5
**services** 261:21 262:4,11
**set** 268:6 276:11 334:19 449:13 463:11 555:7,14
**seven** 302:22 506:23 552:11
**sewage** 300:15
**shape** 504:25
**share** 436:8 439:2 442:20
**shared** 266:24 351:19,20 440:12 440:17 454:16
**sharing** 446:20 458:15
**shb.com** 262:18,19
**sheehan** 262:18 271:7,22 272:5,12 272:20 273:16,25 274:5,15 275:14 276:1,24 277:23 279:25 280:6 283:2,9,21 285:1,8 287:4,14 288:8,20 289:9 290:3 291:20 294:8 295:5,18 300:12 304:13,22 305:5 305:11,16,25 306:9,17 307:1,11 307:16 308:22 309:8,14,20 310:1 310:8,20 311:2 312:1,20,22 314:5 314:12 315:11 317:14,22 318:8 320:25 321:11,17 321:25 322:9 329:17 330:18 332:8,18 333:4 337:11 340:18 341:8,20 342:11 343:4,16 345:8 346:5 347:9,20 348:25 351:5 353:23 354:3 355:5 356:16 357:1,8 358:6,23 360:14 363:9,16 364:21 365:4 366:1,24 367:16 368:6 369:1,23 370:17 371:24 372:7 373:24 374:8 377:20 378:5,14 379:20 380:22 381:6 382:20 385:22 386:17 387:8,23 388:8,19 389:5,19 390:2 391:12,25 392:8,19 393:2 394:14,21 397:6 397:21 398:6,8 403:6 404:5 405:20 406:4 407:3,17 408:10 408:20 409:12 410:14 411:6,17 412:3,19 413:17 414:11 415:8,22 417:3 418:13 419:25 421:3 422:7,18 423:11 423:21 424:4,16 425:19 427:2 428:20 429:8,22 430:8,15 433:3 434:18 437:4,9 440:4,19 441:3 443:22 444:23 445:3,15,22 446:6 449:2 453:1,10,20 456:4 458:6 459:19 461:16 462:3,15 463:3,13

465:21 467:23 468:11 470:5 472:9 473:10 474:21 475:14,24 476:20 480:10,19 481:21 482:7,23 483:12 484:20 485:14 486:25 487:18 488:13 489:16 490:2,11 494:3 495:10,25 496:14 497:3,18 498:6 499:25 501:4 503:3,10,21 505:2,9 506:14 510:11 511:13,25 512:7 518:15 519:24 520:20 521:5,19 545:11 547:18 551:11,24 552:5 553:4
**sheet** 323:17 556:1
**shelves** 413:7
**shipping** 424:11
**shocked** 425:23
**shocking** 425:18 426:5
**shook** 262:15
**shoreline** 258:16
**short** 408:9,15 427:6 519:11 520:4
**shot** 548:12
**show** 290:1,6 299:14 314:9 358:4 378:12 404:14 415:18 421:1 423:18 428:1 429:9 442:15 444:4,16 450:6 460:2 467:20 471:10 479:25 498:22 502:15 531:8 550:8
**showed** 305:3 346:19 430:3,3 435:16 442:8 446:9 466:4,17 474:1 476:16 508:25 509:4 530:12 550:4,10
**showing** 270:22 294:1 296:19,23 297:1,4 356:19 358:11,12 397:23 419:3,14 443:19 443:25 444:20 445:7 449:6 451:12 470:19 472:15 498:20 531:13
**shown** 297:13 303:10 323:2 355:12 357:22 392:17,25 393:6 393:19 397:18 401:19 421:21 427:20 428:2,4,24 434:20 494:6 506:10 508:19
**shows** 301:7 344:13
**shuffle** 467:25
**shut** 335:10
**sick** 293:11
**side** 283:13,14 290:20 303:5 352:19,19 358:17 358:18 516:14
**sign** 492:10
**signals** 499:2 543:22
**signature** 548:3 555:17
**signed** 491:24
**significance** 502:4 502:8 523:12 524:15
**significant** 333:7 333:13 339:12 341:1 342:4 452:13 455:20 457:4 493:20 497:13,24 501:19 502:2,16,23 535:1
**significantly** 354:1 423:10 551:16
**signifies** 523:15
**silence** 264:4
**similar** 312:15 379:25 393:3 409:25 419:16 420:8 421:5 502:14
**similarly** 381:19 381:25 529:5 540:2
**simple** 350:8 472:23
**simply** 508:8
**simultaneously** 358:10
**single** 325:6 330:6 330:16 336:2 423:17 478:17 504:23
**sir** 410:23 412:12 415:20 416:2 419:24 424:22 442:18 450:9 451:18 482:17 510:19
**sit** 478:16,25 507:4
**site** 298:2,11,14
**sites** 270:8 501:17
**sitting** 547:6
**situation** 367:13 462:10
**situations** 371:21
**six** 266:21 338:17 338:19 469:14,18 473:21 545:9 548:11
**skimmed** 362:12
**skipped** 499:23,24 503:8,15
**slam** 363:23
**slated** 457:12 461:23
**sleeping** 363:6
**slight** 298:14
**slightly** 501:25
**sloan** 450:22 453:15
**slope** 282:9 507:8 507:12,16 508:3 508:11
**small** 315:1 320:11 330:20,24 330:24 344:1,22 347:7,13 484:19 525:18 537:25 538:3
**smallest** 379:4
**smokers** 495:6
**smokes** 494:23
**smooth** 417:23
**sneak** 459:17
**sodium** 466:24 471:11 474:2,11 478:5,6,18 479:2,9

**soft** 267:11
**sold** 414:9 444:21
**solely** 387:13
**solution** 376:6
**somebody** 370:12 423:3 482:13 494:13
**soon** 335:7
**sophia** 260:10
**sorry** 280:11 292:23 303:25 311:19 313:10,11 335:6 355:14 387:24 388:2 400:2 405:6 410:23 416:20,23 427:2 431:3 434:25 443:16 445:3 447:15 454:17 456:22 465:5,5 468:7 471:23,23,24 475:2 502:21 532:13 534:21
**sort** 350:5 393:22 402:12,14 411:19 426:7 431:2 467:25 480:8 484:13 485:10
**sorts** 494:24
**sound** 267:11 352:8 510:1 534:15
**sounds** 447:19 457:18
**soup** 396:10,11
**source** 308:24 507:16
**sources** 284:3 285:15 286:2 324:20 464:8,23 465:9,13,16 480:1 480:6 554:4
**south** 258:16 259:2 261:12 263:7
**southern** 257:1 264:14
**spalding** 260:12 260:22 263:12
**speak** 335:3 388:3 425:1
**speaking** 494:18 546:24 548:1
**special** 257:11
**species** 307:5 405:8
**specific** 273:12 274:18 276:5 279:2 283:12 302:15,22 343:9 362:13 375:18,22 377:1 407:18 418:15 421:16 441:21 467:16 470:18,19 476:1 485:7 491:3,11 492:5 499:5 520:17 524:6 532:5,7 533:14 534:17 535:3 543:25 546:13
**specifically** 295:9 333:6 357:13 370:3 371:6 431:7 489:25 494:7 502:25 503:7,15 512:5,25 517:2 524:13,24
**specify** 375:1
**speculating** 506:13
**speculation** 274:6 274:16 276:3 295:6 299:1 340:19 346:6 347:21 364:22 374:9 392:1 398:7 398:9 405:21 406:5 408:11,21 411:18 423:12 424:5,17 440:20 453:21 462:16 463:4 470:6 480:20 482:8,24 487:19 489:17 490:12 494:4 496:15 497:4 503:23 540:11 544:19 551:25
**spend** 394:6 448:8 450:4
**spent** 455:20
**spiegelhalder** 323:8,21 329:1 332:16 333:21 335:23 337:6 338:3,24 340:3,6 340:13 341:3 342:9,17,19 343:2 345:25 347:4,12 378:10 533:12,14 533:18 534:2,9 535:6,9 537:5,17 538:8,10,14
**spinach** 397:13
**spoke** 299:25 300:1
**spoken** 477:14 517:6,11,16,21,23
**square** 258:9
**stability** 351:11,24 355:3 415:5 416:25 417:15 418:12 476:11,17 545:20
**stakeholders** 461:24
**stand** 501:21
**standard** 264:3 305:22 306:1 315:13 464:15 526:13
**standing** 532:2
**stands** 296:17 330:23 345:25
**stanford** 267:3 268:9 435:19,21 436:10 512:19 513:11 514:22 515:13,19 518:25
**start** 266:5
**starting** 439:12 442:22 523:5
**starts** 282:15 293:22 294:16 383:19 478:3 487:25 549:6,6
**state** 257:9,25 270:7,9 274:23 275:20,23 304:14 364:2 409:23 447:4 542:14 544:19 555:4
**stated** 298:24 494:7
**statement** 278:24 287:6,8 295:15 308:15 317:6,13 371:2 403:18 413:2 439:22 459:12 498:18 512:9 533:11

**statements** 266:12 298:18 448:17
**states** 257:1 274:4 274:8,14 526:6
**stating** 532:16
**statistical** 502:4,8
**statistically** 457:3 501:19 502:1,15 502:22
**stay** 297:17 532:13
**step** 270:13 293:17
**steve** 259:9
**steven** 259:9
**stink** 466:22
**stock** 537:10
**stomach** 284:25 285:5,16 363:20 365:8,9,11 366:15 368:16 369:16 370:23 371:9,11 371:14,15,19,20 371:22 372:6 374:3 391:24 479:10 542:20
**stopping** 551:21
**storage** 359:1 386:20 387:4 413:7 415:6,10 417:1,7
**stored** 387:1
**stores** 423:4
**stories** 457:15
**story** 456:10,16
**straight** 302:3,6 527:12
**straightforward** 412:15
**strawberries** 394:19 395:14,21 397:13
**street** 258:9 259:2 260:7,23 261:2,12 261:18 262:2,22 263:7 402:7
**strength** 523:7,16
**strengths** 523:13
**strike** 311:20 337:2 517:14
**striped** 303:15
**strong** 298:10 307:17
**strongest** 294:2
**structure** 287:24 289:24,25 311:14 429:13 530:21 532:18
**structures** 299:11
**student** 278:12
**students** 436:17
**studied** 268:17,23 325:17 330:2 370:16 373:23 403:3 405:6 415:4 457:22 490:1,9 494:1,19 496:21 509:19
**studies** 272:8 300:23 306:21 326:1,4 368:16 376:24 393:7 401:13 404:11 405:5 417:7 420:19 426:25 450:20 454:5 456:20 481:3 483:1 498:15 499:3,3 502:14,18 507:18,22 522:6 528:1 543:22,22 544:17,24 545:25
**study** 268:12,14 268:24 283:25 291:11,23,24 292:4,5,15,20 293:2 295:8,21 304:3,15,17,21,25 305:2,4,7,8,10,13 305:15 308:11 311:8 312:15,17 313:1,4 314:18 323:8 325:3,12,21 326:6,8,11,18,20 326:21 327:15,22 327:25 328:1,13 329:4 330:23 331:4,5,20 332:6 332:11,14,16 333:2,5,15,22,25 334:2,6,9 335:24 336:16,18,23 337:3,6,12 338:3 338:24 339:4,17 339:22,24 340:3,6 340:13,14 341:4 341:16 342:2,3,9 342:16,19 343:2 343:14 345:25 346:9,11,16,18,20 346:23 347:4,12 347:17,19 348:9 348:12,16,19,23 349:13 350:3,10 350:11,16,22 351:3,8,17 359:9 359:14,17 362:17 363:4 364:16 365:15,25 366:3,4 366:5,18,19 367:6 367:10,13 369:10 370:15 373:12,14 374:5,10,23 375:7 375:11 376:10 377:6 378:10 379:18,18 383:1 386:14 390:5,13 391:4,14 394:18 398:3,17,19,20 399:3,5,16,18,21 399:23 400:5,6,11 400:12 401:7,16 401:18,23 407:13 408:24 412:13 413:3 416:25 417:10,11,18 424:23 426:2 435:3,9,10,19 436:22 437:23 449:16 453:25,25 454:1,9,19 455:21 455:24 456:9,14 457:4 468:22 470:12,18 476:5,6 476:7,14 478:19 479:3 480:17 481:13 482:10 484:7 485:24 487:7,9 490:1,4,9 490:18,21 491:4 491:12,15,18 494:1,15 495:2,16 495:18,18,19 497:17 498:11,21 498:24 501:6 502:21,22 503:19 504:23 505:22 506:9 508:19,21 509:18,20,25 510:7,7,19 511:10 512:4 522:7 524:22 525:11 529:4,10,11,22,24 533:5,13,15 534:6

534:19 537:5 538:8,10,14,23 540:23 543:19 545:4 549:8,16 550:4 551:8,17
**studying** 268:22 414:7 422:14
**stuff** 424:21
**style** 315:14
**sub** 464:4
**subfield** 507:24
**subject** 280:22 386:1 433:23 493:2
**subject's** 542:20
**subjected** 356:24 357:6 386:15
**subjects** 481:12,19 491:16 525:2
**submit** 360:21
**subpoena** 512:12 512:15,19
**subscribed** 552:18 556:21
**subsequent** 285:24
**subset** 299:14 361:2 417:10
**substance** 407:1,1 407:6 411:13,15 429:13 507:21 517:12 530:22 532:18
**substitute** 528:2
**suddenly** 421:22 462:1
**sufficiently** 539:1 540:7,23
**suggest** 315:15 316:1,8,11 320:6 342:19 346:8 347:12 357:2 383:23 423:23 432:3 434:16 448:19 474:23 481:17,24 496:3 498:10 502:3,6 519:7 539:20 540:13 546:25
**suggested** 314:14 320:10 380:10 421:15 424:8 451:6 516:4 543:9
**suggesting** 323:4 330:19 364:23 370:20 418:21 476:14 524:11 542:23
**suggestion** 375:13 380:13
**suggestions** 383:4 417:18
**suggests** 284:6 358:25 359:4 377:5 478:5 479:2
**suitable** 469:3
**suite** 258:3,10 259:7,18 260:8,23 261:7 262:9,22
**sulfur** 298:16
**summarize** 426:25 454:8 456:20
**summarized** 455:15
**summary** 405:2
**summer** 424:11 440:13
**superior** 257:9
**superscript** 344:14
**supplement** 359:21 395:1,8
**supplemental** 509:20
**supplementary** 526:1 553:19 554:6
**supplies** 276:10 287:19
**supply** 269:7,19 270:20 275:4 371:10 447:4
**support** 343:2 356:22 357:4 358:20
**supporting** 469:24 550:24
**supposed** 435:2 458:10
**sure** 266:7,13 267:20 297:25 298:9 321:5 327:5 344:14,18 363:25 364:1,9 369:5 419:1 421:17 427:8 446:21 450:4 472:1 491:11 497:1 504:3 528:15
**surprise** 394:12,15 395:16,18 396:2
**surprised** 334:10 334:13 396:4,14 397:4,9 429:3,19 485:3 488:7,9
**surprising** 327:19 327:21 355:4 356:1
**surrounding** 513:4
**survey** 270:6
**suspect** 288:22 315:4 541:4
**suspected** 429:15 432:18 530:23 532:20
**suspecting** 433:17
**suspicion** 437:11
**suspicions** 465:8
**swallowed** 479:10
**swearing** 264:23
**sweet** 520:4
**switch** 318:25 319:4 335:7,13 515:21 520:23
**sworn** 265:5 552:18 555:7 556:21
**sympathetic** 464:15
**system** 269:5,9 282:11 363:14 407:15 486:12 489:10 496:25 507:15

**t**

**t** 265:3 373:1,3 553:6 554:1
**table** 330:5 337:25 338:6,11 344:8 345:10,23 352:21 394:25 395:6 466:18 470:18 474:23 532:16 535:12,15,19 538:21,22,22 539:8,17 540:5
**tables** 352:21
**tablet** 301:2,5 303:11 340:25 342:22 353:14 356:15 367:9 384:22,25 385:14 443:2 444:2,5

**tablets** 300:11 333:23 334:11,14 355:2 367:21 381:12 386:10,21 387:2 389:16,22 390:9 413:5 414:1 446:18 472:6,21
**take** 264:7 273:19 304:11 305:19 335:12 337:5 359:7 361:19 362:18 369:13 372:7 378:19 400:17 409:15 421:4 427:6 432:12 436:1 445:25 451:10,11 472:2 473:13 474:8 480:18 482:13 484:25 487:10 488:5,10 488:19 489:21,23 498:3 500:8,18 506:17 519:11 521:21 531:1,20 533:20 551:5
**taken** 257:21 264:11 267:25 271:16 275:5 304:19 335:17 337:20 367:11,14 367:21 389:2 400:24 411:16 427:12 473:18 477:14 487:21 489:1,2,6 490:5,20 506:20 514:5 519:15 521:2,16
**takes** 370:13 408:3 437:14 489:14
**talk** 408:1 416:22 458:10 464:21 477:19 503:18
**talked** 464:2 504:4
**talking** 299:3 373:11 416:14 429:9 433:1 450:7 476:10 480:9 482:18 484:2
**talks** 325:2
**tap** 297:9
**target** 447:2 475:18
**task** 350:9
**tea** 493:14
**team** 464:4
**tech** 263:14 301:12
**technical** 271:11 337:17 455:23 520:24 521:13
**technique** 329:22 350:12
**techniques** 328:6 441:25
**technology** 553:11
**tell** 306:5 512:24 513:18 538:15
**telling** 330:13,14 337:7 431:23 523:18 548:19
**tells** 513:6
**temperature** 311:16 357:15,18 358:9,18,21 359:6 386:1 417:7 419:10 433:22 434:22
**temperatures** 351:25 387:7 426:1 433:9
**ten** 408:16 421:23 422:14 551:9
**tend** 273:18 281:12 298:20 299:14 328:3 462:7
**tends** 271:3 275:9 376:2,5
**tens** 355:1 411:14 411:22
**term** 311:9 380:18 523:19,20
**terminology** 375:17
**terms** 315:13 328:5 377:7,15 384:10 425:22 456:18 523:10,21 529:2
**tertiary** 287:22 288:12 289:11 295:25 299:13
**test** 296:10 382:18 389:14,25 390:6 391:15 408:25 409:3,11,19 484:8 485:12,13 492:16
**tested** 373:16 407:8,10 423:17 483:5
**testified** 265:5 308:12 368:4 408:2 426:6 442:7 443:6 448:6 524:18 527:11 528:7 529:16 533:6 536:2 539:5
**testify** 536:8 537:4 537:16
**testimony** 266:17 266:20 267:4 288:9 289:19 312:2,23 347:10 377:21 378:15 417:4 428:21 445:16 467:12 488:8 511:5 524:23 527:1 529:18 537:10 543:12 552:10 555:6,9
**testing** 306:15 308:13 315:9 346:15 349:7,12 351:2,10,14 380:20 381:2 417:16 418:7,12 434:4 441:8 443:19 448:24 476:17 478:9 505:24 526:19 527:5 530:8 531:24
**tests** 355:3 422:1 445:7 455:9 533:8 545:20
**tetramethylthiur...** 286:13
**texas** 258:16,21 262:10
**text** 333:19 384:8 434:7 437:12 455:13 485:7 490:14 523:5 524:16 526:25 541:24 542:2,23 547:13
**texts** 455:16
**tfinken** 258:13
**thank** 286:21 335:14 339:25 352:19 402:1

468:6 507:5 519:19 530:3 542:17 547:19 552:3
**thanks** 267:6 456:23
**theoretical** 276:14
**theoretically** 307:22
**theories** 405:23 406:8
**theorized** 406:25
**thermal** 311:5,9 311:15,17,19,21 425:24
**thiazole** 298:13
**thing** 377:9,10 378:20 393:23 412:2,17 414:8 430:11 431:2 446:20 464:16 470:3 486:23 498:3 505:7 510:5
**things** 393:22 405:15 436:11 446:2 464:5 491:10 507:2 543:5
**think** 292:22 307:21 326:8 328:16 332:19 333:5 334:3 340:12 356:9 373:17 374:25 376:21 379:18 394:25 400:17 410:18,24 414:8 419:23 421:18 425:9 427:19 430:24 443:10 447:22 453:17 467:8,25 490:17 505:21 514:18 518:18 519:11 522:24 538:20 548:1,13 552:6
**thinking** 503:25
**thiram** 286:12
**third** 259:13 260:2 266:22 280:8,13 298:7,24 299:4 365:13 383:17
**thomas** 262:18
**thornburg** 261:6
**thought** 350:13 467:5
**thousands** 354:6 355:1 411:14
**three** 303:22 325:17 327:2 351:25 358:8 373:7 400:23 414:16 424:12 443:17 545:12,13
**time** 264:3 269:13 278:6,8,9 306:12 319:6 320:5,17 324:4 358:4 359:1 364:11 365:12 366:12,13 367:14 367:22 368:21 369:15 370:24 371:9,14,19,23 386:21 389:3 390:9 393:16 394:6 400:18 414:4,24 416:23 419:16 423:9,18 424:13 426:19 435:1,14 445:20 445:25 446:3,7 448:8 450:5 453:4 455:20 456:5,7 464:13 476:18 478:15 484:23 497:7 506:19 509:1 510:6,8 515:12 519:20,22 519:23 531:11 545:10 547:19 552:14
**timeline** 439:10
**times** 340:2,7,15 341:9 354:5,6 414:16 426:3 474:14 484:3 504:5 510:8 551:9
**tire** 327:11 329:4
**tires** 286:20
**tissues** 392:7,12
**title** 257:11 277:13 277:24 323:19,22 338:6 441:11 452:12 480:5,13
**titled** 416:14
**titles** 441:16 448:16
**tjsheehan** 262:18
**tobacco** 493:12
**tocopherol** 393:6
**today** 265:13 267:1 368:5 411:25 424:3 458:24,25 478:16 478:25 479:12 510:1 516:1 517:17 547:6
**today's** 266:20 552:10
**todd** 257:23 264:19 555:3,18
**toilet** 301:25 302:1 302:3
**told** 372:9
**toledo** 260:24
**tom** 445:2 468:7
**tomato** 396:10,11
**tomatoes** 397:13
**tomorrow** 423:25
**tones** 264:5
**tono** 303:2
**top** 283:4,11 292:24 301:14,18 319:12 352:19 361:24 530:15 543:3,5
**topcare** 420:21
**topic** 470:8 537:13
**total** 302:23 324:15 356:13,18 526:3,7 535:21
**totally** 367:1 466:1
**touch** 349:25
**toxicologist** 271:23 272:6,14 272:21 404:6 410:16 438:10,11 520:16 524:10
**toxicology** 272:7 507:24
**track** 320:16
**tract** 549:11,18
**tracy** 258:12
**transcript** 547:24 548:4 554:3 555:8
**transfers** 284:21
**transform** 356:24 386:16
**transformation** 311:13,23
**transformed** 312:7
**transforms** 358:22 387:6

**translate** 366:15
**transport** 417:2
**tranter** 261:15
**treat** 489:3,6
**treated** 267:5 275:6 302:10
**treatment** 268:15 303:24 542:4,6
**treatments** 303:23
**trend** 417:24 419:20 420:5 421:5,20 471:22 471:23 472:8,10 472:13,15,24 473:3
**trends** 421:2
**trial** 390:25
**tried** 402:15 510:8
**trihalomethanes** 282:2,5,8
**trimethylamine** 288:3 296:1
**true** 279:9 303:22 371:2 373:15 392:5,16,24 394:20 465:20 539:23 540:20 547:5 555:8
**try** 266:4 269:16 270:14 316:17 380:14 418:25 520:3 536:13
**trying** 277:15 293:6 314:23 320:16 332:1 378:8 387:21 409:20 415:24 428:17 429:6 430:5 470:17 471:10 475:25 482:2 486:20 496:23 497:8 508:11 518:16
**tube** 327:11 329:5 408:25 409:3,11 409:19
**tumors** 405:6,7 406:16
**tune** 339:13
**turn** 289:16 351:22 359:8 415:6
**turns** 357:6 422:3 464:4
**twelfth** 261:2
**two** 266:18 284:7 284:18 290:11,14 290:20 291:5,6 298:1,17 300:20 300:25,25 301:4 302:11 303:9 329:25 335:20 352:19 356:4 358:17 372:15 376:8 378:17,23 421:8,10 424:1 441:1,12 443:16 453:25 465:25 486:7,12 494:14 497:10 500:3 507:4 535:2 543:5
**type** 355:23 436:9 454:5 507:18
**types** 298:20 300:14 303:23 313:2 356:8 374:6 376:14 498:10,24 516:20 522:6 543:18
**typical** 482:15,18 483:15 487:16 488:5 497:9,10,16 497:20 546:10
**typically** 284:15 314:24 321:12 327:24 355:24 356:8 360:20 406:12 457:24 475:17 487:21 488:17 489:19
**typo** 481:10

**u**

**u.s.** 261:20 262:4 264:13 281:6 282:10,15 414:10 435:12
**u1** 301:19
**u2** 303:17,19
**udmh** 284:9
**ultimate** 432:4
**ultimately** 466:25
**unaware** 274:17 435:5
**unchallenged** 381:12
**underestimates** 428:12
**undergo** 433:15
**understand** 265:15,20 270:15 368:24 369:7 412:23 430:18 457:8 460:12 462:12 468:11 472:22 476:10,12 507:19,25 512:10 513:9 518:7,16 520:11
**understanding** 271:24 272:7,22 285:2,9,18 295:3 318:9 327:12 334:16,25 342:2 362:25 366:3 367:3 368:9 382:4 385:15 386:4 387:9 388:20 389:11 392:20 393:4 397:22 404:7 405:22 407:4 410:16 413:25 426:10,13 453:18 457:19 458:12 462:17 465:4 471:16 472:18 484:11 485:20 487:1 503:17 511:1 521:7,25 524:1,10 531:7
**understood** 265:21 272:24 317:24 525:6
**undesirable** 278:2 403:8
**unexpected** 421:20
**unfair** 434:14 437:6
**unhighlight** 291:1
**unit** 264:9 335:16 335:20 372:15 373:7 379:4 400:23 401:2 427:15 473:17,21 506:23
**united** 257:1 274:4 274:8,13
**units** 344:9 552:11
**university** 269:2 278:7,10,12 518:25
**unprecedented** 464:5

**unreliable** 311:8 385:25 541:5
**unstable** 356:23 357:5 358:22 407:10
**unsymmetrical** 269:25 274:11
**untoward** 541:4
**update** 437:11
**updated** 437:8
**updates** 442:2 448:17
**updating** 437:3
**upper** 327:1
**ups** 548:6 550:1
**upset** 374:3
**urgently** 452:14
**urinary** 308:5 310:18 323:19 325:4 338:4 527:3 527:20 538:25 539:2 550:10,17 553:15
**urine** 300:22 301:7,22 302:3,6,9 320:7,12 321:23 322:4,14 327:7,10 327:13 329:6,15 329:19,20 330:7 330:16,22 332:17 332:21,23 333:1,8 333:15 336:1 337:10,15 339:2,7 340:9,11,17,24 341:7,11,16,19,23 342:10,23 343:3 343:13 344:2 345:1 346:4,21,25 347:7,14,19 348:1 351:2 362:21 366:8,16 367:8 370:1 375:18 376:5,5 377:10,11 377:19 378:9,12 378:21 380:1 398:5 417:11 418:7 425:1,7 476:6 484:10,18 484:22 485:5,11 485:16 486:1,17 495:24 527:6 536:24 549:12,19 550:6 551:7
**usa** 260:16 458:24 458:25
**use** 274:12,18 327:25 328:2 336:15 376:24 380:18 382:12,18 399:11 417:22 434:5 450:8 461:1 466:7 468:22 492:23 500:13,21 522:5 524:12
**useful** 350:13 355:11,20 356:9 357:17 377:6 378:8 388:21 389:7 418:25 456:15 467:8 470:2 543:4
**user** 304:19,19 305:3,3 494:14
**users** 399:7 457:2 487:17 488:10 490:7 494:2 498:2 500:24,25 501:11 526:22 527:7 534:20,20,22 540:22 551:8
**uses** 274:8 432:15 433:8
**usp** 420:23
**usual** 541:10
**usually** 373:17 375:3 502:16
**utilities** 275:6,10
**utilized** 364:2

**v**

**v** 415:23
**vague** 271:7,22 272:5,12,20 273:25 275:14 276:1 277:23 283:2,9,21 285:1 287:4,15 288:20 289:9 291:20 294:8 300:12 305:25 306:9,17 307:1,11 308:22 311:2 312:1 314:5 314:12 315:11 317:23 320:17 321:11,17 322:9 329:17 330:18 332:18 342:11 348:25 353:23 354:3 355:5 357:1 358:6,23 363:16 366:1,24 369:1,23 370:17 371:24 377:20 378:5 379:20 380:22 381:6 382:20 386:17 387:8,23 388:8,19 389:5,19 392:8 393:2 397:21 403:6 407:3 412:3,19 413:17 422:7,18 423:21 425:19 433:3 437:9 445:22 453:1 462:16 463:13 473:10 475:14,24 476:20 480:11,19 484:20 485:14 486:25 497:18 498:7 506:14 551:11
**vaguely** 326:7 430:21 456:16
**valid** 315:9 371:21 456:15
**validate** 386:22 448:11
**validated** 349:9 434:10
**validity** 460:25 522:9
**valisure** 350:1,1 383:22 384:13 385:16,20,24 386:12 426:7,16 426:21 430:1 432:5 433:1,21 434:2,15 437:19 438:16 440:3,11 440:22 441:2,13 447:7 454:5,13 530:7 531:23
**valisure's** 381:9 435:18
**value** 385:21
**values** 331:9 353:20 358:2 370:14 471:20
**van** 526:15
**variation** 475:5,6 481:1
**variations** 358:10 461:3 466:9 468:24

**variety** 366:22 392:6 541:11
**various** 269:23 282:25 296:25 300:13,16 301:19 317:25 324:19 442:24 448:20 461:20 474:1 475:7 483:6 484:3 487:11 507:22 510:23 516:12
**vary** 363:14
**varyingly** 476:18
**vegetable** 396:24
**vegetables** 394:16
**vein** 369:8
**veritext** 264:17,19 552:12 556:1
**vermeen** 526:16
**version** 266:25 360:4 469:5
**versus** 359:3 365:2 378:22 404:10 497:11
**video** 264:6,10,21 318:25 335:7,11
**videoconference** 257:22
**videographer** 263:13 264:1,18 267:8,9,18,23 268:1 271:14,17 318:23,24 335:5,6 335:14,18 337:18 337:21 372:13 373:5 400:21,25 427:10,13 473:15 473:19 506:18,21 514:3,6 519:13,16 520:25 521:3,14 521:17 552:8
**videotaped** 257:20
**view** 322:19 511:23
**views** 511:10,16 511:18
**violating** 474:20
**vital** 492:10
**vitamin** 392:16,21 392:25 394:13,16 395:17 396:3,13 397:5,17,17 398:1 398:1 415:25 496:7,12,17,18 497:1 551:23
**vitamins** 496:9
**vitro** 313:8,11,17 314:3,8 368:16 409:10 454:4 455:9 471:12 474:18 480:2,7 483:6 554:5
**vivo** 480:3,7 554:5
**vocal** 464:8,22 465:16
**volume** 257:18 267:11 301:24
**voluntarily** 441:1 446:4,13 448:2,22
**voluntary** 335:2 446:14,15,16,24 448:19
**volunteer** 303:18
**volunteers** 300:24 300:25 301:4,21 303:9,10 325:18 326:19 345:17 349:2 490:15,17 497:21 550:20,22
**vulcanization** 286:20

**w**

**w** 265:3 373:3
**wait** 489:20
**waive** 264:21 515:2 548:3
**wake** 488:10
**wakes** 487:24
**wal** 447:1
**walgreens** 447:2
**want** 279:1 316:4 379:2,7,9 395:5 403:10 406:22 407:13 448:8 450:4 459:5 474:8 480:17 482:13 483:25 487:7 497:1 507:2 512:22,24 513:3 521:21 526:3 538:18 548:7,13 551:2
**wanted** 266:16,22 416:25 454:7 484:8
**washington** 259:13,18 261:3
**wastewater** 268:14 269:6 270:13 287:19 306:2
**wastewaters** 300:21 302:12
**water** 268:14,16 269:4,7,9,14,15,19 270:4,6,19,23 273:18 274:20 275:1,4,9,12 276:10 277:18,20 277:20 278:2 280:17 287:18 297:8,9,10 300:14 301:24,25 305:24 306:2 376:6 379:23,24 380:10 403:10 409:3 422:23 423:2 475:16 502:13 522:4,19 528:24 553:9,16
**watermark** 530:15 532:8
**waters** 293:16 300:21 302:12
**watson** 258:17
**way** 274:23 277:16 361:9 371:17 377:16 379:8 384:9 388:15 429:23 435:2 458:7 498:22 503:18 504:24 511:24 512:6 513:18 517:12 519:1 551:12 555:12
**wc.com** 261:4
**we've** 431:13 464:17
**website** 376:22 435:18 436:2 437:3,8,11 439:3,7 444:12 447:25 448:7
**wednesday** 319:14
**weeks** 424:12 441:1 494:14
**weighs** 271:2
**weight** 271:1
**weird** 420:15 421:11
**weiss** 258:8

**welcome** 267:7
**wells** 270:4,7
**went** 373:11 434:3 498:22 503:18
**west** 262:2
**whatsoever** 537:6
**whereof** 555:14
**wide** 392:6
**william** 257:20 264:10 452:6 552:16 556:3,20
**williams** 261:2
**willingness** 507:4
**wilshire** 258:2
**wise** 418:25
**wisner** 258:4 267:16,21 271:12 400:15,16 402:3,4 402:6 415:24 427:8,17 443:10 444:25 445:5 447:14,22 468:7 473:13,23 506:16 506:25 514:1,15 514:16 519:10,19 523:24 528:6,22 529:15 532:1 539:4 540:10,25 541:25 544:18 546:10 547:10,21 548:5,15,24 549:24 552:3,6 553:4
**withdraw** 480:22
**withdrawal** 385:8 385:10 386:6,19 387:10,13 413:13 424:8 441:23 442:12 445:13,17 447:8 449:6
**withdrawing** 414:23 448:3,23
**witness** 263:3 264:23 265:1,4 266:20 267:13 301:9 369:4 401:18 402:2 414:16 443:5 447:12,20 448:6 513:24 514:10,14 519:22 529:16 532:24 539:5 547:23 553:2 555:6,9,14 556:3
**women** 492:19
**wondering** 427:6
**word** 279:12 280:14 467:13,17 469:10 551:5
**words** 377:8 380:3 469:10,18 480:14
**work** 267:14 268:9 268:18 320:20 349:18 402:24 403:12 426:21 464:12 519:1
**worked** 418:1
**workers** 327:10 329:4,7 481:3
**working** 460:14 460:20
**works** 528:16
**world** 271:24 294:18,24 403:20 404:1,23 409:22 410:9 437:7 553:20
**worried** 438:2
**worry** 409:2
**worse** 267:17
**worth** 361:1
**wrap** 507:2
**write** 278:3 281:11 319:20 381:8,18 383:21 384:19 385:6
**writing** 278:11 319:17 369:5 456:19
**written** 327:22 401:22,24
**wrong** 418:24 419:22,24 421:18 421:25 454:17 503:23
**wrote** 278:24 374:14 381:22,23 381:24 384:7

**x**

**x** 257:3,8,10,15 377:12 553:1,6 554:1

**y**

**yale** 278:7,10
**yeah** 267:18 400:19 415:24 424:25 454:21 516:14 525:15 535:8 548:8
**year** 490:23,23
**years** 273:11 292:18 295:9 328:5 381:20 382:1,14 385:2 399:11 402:24 422:15 424:2 461:19 464:25 516:11
**yellow** 291:2,6,9 291:13 303:3
**yesterday** 267:17 267:19 276:25 300:2 308:12 319:8 331:21 383:15 427:20 428:24 430:2,20 436:5 466:3,20 471:9,16 472:19 477:5 507:7 509:1 509:25 510:6 511:5 527:11 530:12
**yesterday's** 266:24,25
**yield** 295:25
**yields** 293:22,24
**yon** 259:14
**yoon** 499:15
**york** 257:25 259:19 260:3,3,14 260:14 262:3,3,16 262:16,23,23 264:17 555:4 556:1

**z**

**zantac** 257:4 264:12 289:20 291:10,18 300:11 301:5 303:11,12 303:14,17,21 304:3,9,11,19 306:8,13 310:15 334:6 354:15 358:21 374:2 390:4 411:25 412:10,17 420:20 423:4,25 429:13 437:21 438:2 439:19 447:8 448:3,23 495:12 524:22 525:3,4

528:18 530:21
532:18 556:2
**zeng** 524:20
**zero** 338:22 339:1
339:7 344:13
466:24 474:10
542:5
**zeros** 474:23
**zoom** 257:22
265:24 361:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT 26

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

________________________________/

VIDEO RECORDED DEPOSITION OF

BERNARD OLSEN, Ph.D.

Taken on behalf of the Plaintiffs

(Via videoconference)

DATE TAKEN: Monday, May 23, 2022

TIME: 9:06 a.m. - 5:34 p.m. EDT

PLACE: US Legal Support - Remotely

Reported by:
CANDIDA BORRIELLO
JOB NO. 6133467-001

A P P E A R A N C E S:

Appearing on behalf of the Zantac PSC:

MARTIN, HARDING & MAZZOTTI LLP
One Wall Street
Albany, New York 12205
BY: ROSEMARIE RIDDELL BOGDAN, ESQ.
DOLORES DeSALVO, ESQ.
E-MAIL: rosemarie.bogdan@1800law1010.com
dolores.desalvo@1800law1010.com

Appearing on behalf of the Zantac PSC:
ANAPOL WEISS
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
BY: TRACY A. FINKEN, ESQ.
E-MAIL: tfinken@anapolweiss.com

Appearing on behalf of the Zantac PSC:
MAY LIGHTFOOT, PLLC
3200 Martin Luther King Jr. Avenue S.E.
Third Floor
Washington, D.C. 20032
BY: JE YON JUNG, ESQ.
E-MAIL: jjung@maylightfootlaw.com

Appearing on behalf of the Zantac PSC:

LEAR WERTS, LLP
103 Ripley Street
Columbia, Missouri 65201
BY: BRADFORD B. LEAR, ESQ.
E-MAIL: lear@learwerts.com



Appearing on behalf of the Defendant,
Boehringer Ingelheim:

KING & SPALDING
1180 Peachtree Street NE, Suite 1600
Atlanta, Georgia 30309
BY: CARMEN R. TOLEDO, ESQ.
LUKE BOSSO, ESQ.
EVA CANAAN, ESQ.
ROBERT B. FRIEDMAN, ESQ.
E-MAIL: ctoledo@kslaw.com
lbosso@kslaw.com
ecanaan@kslaw.com
rfriedman@kslaw.com

Appearing on behalf of the Defendants,
Walmart, Inc. and GlaxoSmithKline, LLC
GlaxoSmithKline, PLC
SHOOK, HARDY & BACON LLP
1325 Avenue of the Americas
28th Floor
New York, NY 10019
BY: PEIYUAN GUO, ESQ.
E-MAIL: pguo@shb.com

Appearing on behalf of the Defendant,
Chattem Inc., Sanofi U.S. Services, Inc.
Sanofi-Avertis U.S. LLC:
DLA PIPER
303 Colorado Street
Suite 3000
Austin, Texas 78701
BY: ASHLEY ALLEN CARR, ESQ.
E-MAIL: ashley.carr@dlapiper.com

Appearing on behalf of the Defendant,
Perrigo:

GOODELL, DeVRIES, LEECH & DANN, LLP
One South Street
20th Floor
Baltimore, Maryland 21202
BY: MATTHEW H. TRANTER, ESQ.
E-MAIL: mtranter@gdldlaw.com



Appearing on behalf of the Defendant,
Pantheon Manufacturing Services, LLC:

BOWMAN and BROOKE, LLP
2901 Via Fortuna
Suite 500
Austin, Texas 78746
BY: JOHN D. GARRETT, ESQ.
E-MAIL: john.garrett@bowmanandbrooke.com

Appearing on behalf of the Defendant,
Teva Pharmaceuticals:

GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, New York 10017
BY: NILDA M. ISIDRO, ESQ.
E-MAIL: isidron@gtlaw.com

Appearing on behalf of the Defendant,
Mylan Pharmaceuticals, Inc.:
PIETRAGALLO, GORDON, ALFANO,
BOSICK & RASPANTI, LLP
301 Grant Street
38th Floor
Pittsburgh, Pennsylvania 15219
BY: FRANK H. STOY, ESQ.
E-MAIL: FHS@pietragallo.com

ALSO PRESENT:
VIDEOGRAPHER: CARLOS COELLO
TRIAL PRESENTATION SPECIALIST:
GREG CASSIN



-------------------I N D E X-------------------

WITNESS: BERNARD OLSEN


| EXAMINATION BY | PAGE |
|---|---|
| MS. BOGDAN | 8 |
| MS. TOLEDO | 212 |


----------------E X H I B I T S--------------


| NUMBER | PAGE |
|---|---|
| Exhibit 1 | 14 |
| Exhibit 2 | 16 |
| Exhibit 3 | 17 |
| Exhibit 4 | 18 |
| Exhibit 5 | 22 |
| Exhibit 6 | 24 |
| Exhibit 7 | 34 |
| Exhibit 8 | 69 |
| Exhibit 9 | 74 |
| Exhibit 10 | 97 |
| Exhibit 11 | 110 |
| Exhibit 12 | 111 |
| Exhibit 13 | 137 |
| Exhibit 14 | 145 |
| Exhibit 15 | 149 |
| Exhibit 16 | 151 |
| Exhibit 17 | 152 |
| Exhibit 18 | 197 |
| Exhibit 19 | 199 |
| Exhibit 20 | 201 |

Page 6

THE VIDEOGRAPHER: Good morning. We are now on the record. Participants should be aware that this proceeding is being recorded and, as such, all conversations held will be recorded unless there is a request and agreement to go off the record. Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness-only video recording, the witness is being spotlighted on all video screens while in speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness.

For anyone who doesn't want the witness's video to take up the large part of your screen, you may click the gallery view button in the upper right corner of the RemoteDepo interface.

Page 7

This is the remote video-recorded deposition of Bernard Olsen, Ph.D., being taken by counsel for the plaintiff. Today is Monday, May 23, 2022. The time is now 13:06 UTC, 9:06 a.m. EDT. We are here in the matter of In Re Zantac Ranitidine Products Liability Litigation.

My name is a Carlos Coello, remote video technician on behalf of US Legal Support. I am not related to any party in this action nor am I financially interested in the outcome.

At this time will the reporter, Candida Borriello, on behalf of US Legal Support, please enter the statement for remote proceedings into the record.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in

Page 8

B. Olsen

lieu of an oath administered in person, the witness will verbally declare his or her testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objection to this manner of reporting. If there are no objections, I will now swear in the witness.

B E R N A R D O L S E N,
called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MS. BOGDAN:

Q. Good morning, Dr. Olsen. My name is Rosemary Bogdan, and I'm going to be questioning you on behalf of the plaintiffs in this litigation.

A. I'm sorry. You're a little faint.

Q. I'm faint?

A. Your voice.

Q. Okay. Let's see if we can correct

Page 9

B. Olsen

that. Okay. It might be on your end with the volume, so can you hear me clearly now?

A. Yes. Yes, ma'am.

Q. Okay, good. So I'll repeat what I had said before.

Good morning, Dr. Olsen. My name is Rosemary Bogdan, and I'm going to be questioning you this morning into the afternoon on behalf of the plaintiffs in this litigation.

Is this your first experience doing a deposition remotely by Zoom?

A. Yes, it is.

Q. Okay. So, there's a couple things with regard to doing depositions like this, which will be helpful to have this proceeding go a little bit more smoothly.

We have to make sure we are not speaking over each other because it is very difficult for the court reporter to get down the questions and the answers. So, if you could just wait until I'm done asking my question before you begin answering, that would be very helpful. There's sometimes a little bit of a delay on the audio as well,

so that will help with that.
Do you have any devices with you as you're sitting there today, any iPads, iPhones, any other type of communication device?
A. No.
Q. Okay. The computer that you're using to do this Zoom deposition, does that have any applications open, messaging, e-mail or anything like that?
A. No.
Q. Okay. You're simply using it on this Zoom platform for this deposition?
A. That's correct.
Q. Okay. And where are you sitting today?
A. I'm sitting in the offices of King & Spalding in Atlanta.
Q. Okay. And who is with you in the room today, if anyone?
A. Carmen Toledo and Luke Bosso.
Q. And I see that they're both on the Zoom as well. Is anyone else with you?
A. No.
Q. Okay. Now, if you don't understand



any of the questions that I ask you today, will you please let me know that so I have the opportunity to rephrase them?
A. Yes.
Q. Now, did you bring anything with you today for this deposition?
A. I have -- I have copies of reports and other documents, hard copies.
Q. Okay. When you say "reports," what reports are you referring to?
A. My expert report, Dr. Najafi's expert report and rebuttals, my supplement report, Dr. Davis's report, and I may have some -- some other reports as well. I haven't looked through all of them yet.
MS. BOGDAN: Okay. I just want to put a statement on the record.
You mentioned a supplemental report of yours. We received that shortly before midnight on May 21st, which was about 34 hours or less ago, and I'm just making a statement on the record that we're not waiving our rights with regard to that disclosure and when it was served by taking this



deposition here today.
Q. Now, those documents that you mention that you have in front of you, do you have any notes on them?
A. No.
Q. So, they are just as they were served?
A. Yes.
Q. And you said other documents. Did you give me a quick -- or excuse me, a complete list of the other documents that you were referring to?
A. Yes. I have the USP General Chapter 1010 on Analytical Data, Interpretation and Treatment. I have the Aizawa article on Thermal environment and moisture production in the bathroom.
Q. I can't see what you have. I don't know how big of a pile this is of what you have there. Okay. I don't need you to go through each of them. Let me ask you a more encompassing question.
Are the documents that you have in front of you today all documents that were references or cited in the various reports



that you have?
A. Yes.
Q. Okay. And none of them have notes or comments on them or -- or anything that you've -- that you noted on the documents itself, correct?
A. That's right.
MS. BOGDAN: If we could please pull up the plaintiffs' notice for this deposition and mark it as an exhibit.
For this deposition today, if I call for an exhibit and have it shown to the witness, are we going to be marking them just for purposes or can we please mark them for purposes of the dep?
THE VIDEOGRAPHER: Yes, Counselor. Absolutely. What exhibit number would you like to start at?
MS. BOGDAN: Were numbers reserved for this particular deposition or are we just going to start with 1? If you don't know the answer, let's just start with 1.

Page 14
B. Olsen

THE VIDEOGRAPHER: Yeah. I apologize. I don't know the answer to that, Counselor.
MS. BOGDAN: All right.
THE VIDEOGRAPHER: So this will be marked as Exhibit 1.
(Plaintiffs' Exhibit 1 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, do you see Plaintiffs' Exhibit 1, the notice for this deposition today?
A. I see the first page of it.
Q. Okay. Have you seen that document before?
A. Yes.
Q. Okay. Did you go about making an effort assembling documents that would be responsive to the demands that were in that document?
A. Through the attorneys, yes.
Q. Okay. And one of the demands asked for identification of any research grants that you received involving the study of ranitidine-containing products, NDMA or

Page 15
B. Olsen

cancer.
Have you received any research grants regarding those three?
A. No, I have not.
MS. TOLEDO: Counsel, I will reference the objections and responses that were served; they -- they give answers to the demands as well.
MS. BOGDAN: Yes. I will be happy to mark that. I'm just questioning the witness with regard to the demands.
BY MS. BOGDAN:
Q. Have you prepared any articles or papers or done any presentations on Zantac or ranitidine?
A. No, I have not.
Q. Have you written any articles or papers on NDMA?
A. I believe NDMA is mentioned in a book chapter that I was a co-author of.
Q. And in addition to that book chapter, have you authored any other writings on NDMA?
A. I -- I don't believe so.

Page 16
B. Olsen

Q. Have you presented at any seminars or webinars or any presentations with regard to NDMA?
A. No, I have not.
MS. BOGDAN: If we can please pull up the defendant's responses and objections to the plaintiffs' notice.
(Plaintiffs' Exhibit 2 was marked for identification.)
BY MS. BOGDAN:
Q. Do you see that exhibit, Dr. Olsen?
A. Yes.
Q. All right. Have you seen that response document before?
A. I don't think I've seen this.
MS. BOGDAN: We can take that down.
Q. Is there any reason, Dr. Olsen, that you cannot testify truthfully or accurately today?
A. No.
Q. Did you prepare a report in this case?
A. Yes.
MS. BOGDAN: Okay. If we could

Page 17
B. Olsen

please pull up Dr. Olsen's report that's dated March 7, 2002 [sic].
MS. TOLEDO: 2022?
MS. BOGDAN: 2022, yep.
(Plaintiffs' Exhibit 3 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, can you see that document? I'm not sure how quickly these are loading. Are they loading pretty quickly?
A. Yes. I can see it.
Q. All right. And is that a copy of the report that you drafted and was served in this litigation?
A. It's the first page of it.
Q. Okay. Do you have a hard copy of the report?
A. Yes.
Q. And if we could just go to the last written page of the report. The report in total is 93 pages long?
A. Yes.
Q. And did you serve a supplemental report in this matter?
A. Yes.

Q. Okay.
MS. BOGDAN: If we could please pull up and mark Dr. Olsen's supplemental report, which is dated May 21, 2022.
THE COURT REPORTER: Counsel, the last exhibit you had up is being marked, correct?
MS. BOGDAN: Yes. If I pull up the exhibit and I had asked of our tech, are we going -- do you need me to call to mark it or are you marking them?
THE VIDEOGRAPHER: Counsel, I'm having a little trouble with Box, but I'm following along. So Exhibit Number 1 is the Notice, Exhibit Number 2 is the Responses, Exhibit Number 3 is the Expert Report, and this next one is going to be Exhibit Number 4.
MS. BOGDAN: Excellent. Thank you.
(Plaintiffs' Exhibit 4 was marked for identification.)


BY MS. BOGDAN:
Q. Dr. Olsen, this supplemental report is dated May 21, 2022?
A. Yes.
Q. Okay. So that's less than two days ago, correct?
A. Yes.
Q. And this report is five pages in length?
A. Yes.
Q. What did you do to prepare for your testimony here today?
A. I reviewed a lot of documents related to my report and other reports. I had conversations with the attorneys I've been working with.
Q. Did you review any transcripts in preparation for your testimony here today?
A. Yes. Some of them I think were preliminary transcripts.
Q. Meaning rough transcripts?
A. I don't know. Is that the same as a preliminary transcript?
Q. Whose transcripts were they?
A. I think not Dr. Ron Najafi but his


daughter, her transcript, and -- and Dr. Davis's transcript. Also looked at Dr. Gibbons' transcript.
Q. Okay. Any others?
A. I -- I don't recall if I looked at others.
Q. So you have Dr. Najafi's, Dr. Davis, and Dr. Gibbons. And when I'm referring to Dr. Najafi I'm referring to Dr. Anita Najafi.
A. Right. Those are the ones I recall at the moment.
Q. Did you review any transcripts of witnesses that you understood to be chemists?
A. One that I remember now is I reviewed Dr. Searle's transcript.
Q. Doctor who?
A. Andrew Searle from GSK.
Q. Okay.
A. And I understand that he is a chemist.
Q. Okay. Any other chemists' transcripts?
A. Yeah, not that I remember at the moment.


MS. BOGDAN: We can take down the supplemental report.
Q. Now, with regard to your two reports that have been served, do they contain all the opinions you intend to offer in this litigation?
A. I reserve the right to add to those opinions in future reports.
Q. Do you have an understanding that you'd be able to continue to write future reports?
A. That's my understanding.
Q. Did you write the two expert reports?
A. Yes, I did.
Q. Did you use a research assistant, resident, or fellow, or anyone else?
A. No.
Q. Now, for your reports, you have a Materials Considered list as well?
A. Yes.
Q. Okay.
MS. BOGDAN: If we could please pull that up and mark it as an exhibit.

THE VIDEOGRAPHER: This will be marked as Exhibit Number 5.

(Plaintiffs' Exhibit 5 was marked for identification.)

Q. And Doctor, can you see what's been pulled up as Exhibit B?

A. Yeah. The -- just the Exhibit B page.

MS. BOGDAN: Let's go to the first page, please.

Q. Do you recognize that to be your Materials Considered list?

A. One page of it, yes.

Q. Okay. And it is -- if we could go to the last page please -- seven pages long?

A. I don't recall how many pages it was.

Q. Did you read all of the documents that are noted on your Materials Considered list?

A. Not all of them completely.

Q. And when you say "not all of them completely," can you please expand on what you mean by that?

A. Well, some of those I may have



scanned for pertinent sections and others I would have read completely.

Q. Did you keep a list of the materials that you read completely as opposed to just scanning?

A. No, I didn't note that.

Q. Between the references that are actually noted in your report and your supplemental report and the documents that are listed on the Materials Considered list, does that encompass all of the references and authorities that you are relying on in this case?

A. To the best of my knowledge, it does. In addition to, of course, my own background and experience.

Q. My question was asking about whether the list encompasses all of the references and authorities that you are relying on; the studies, the regulations, the documents, does it include all of those?

MS. TOLEDO: Object to form.

A. Yeah. I mean I thought I answered that.

Q. So that's a yes?



MS. TOLEDO: Object to form.

A. To the best of my knowledge, these -- these are the documents that I relied on that, but my experience is part of my basis for my opinions.

Q. Understood.

MS. BOGDAN: If we could please pull up Dr. Olsen's invoices and mark those as an exhibit, please.

THE VIDEOGRAPHER: This will be marked as Exhibit Number 6.

(Plaintiffs' Exhibit 6 was marked for identification.)

DOCUMENT TECHNICIAN: Stand by. I'm looking for that one in my list here.

BY MS. BOGDAN:

Q. Dr. Olsen, can you see what's been marked as Plaintiffs' Exhibit 6?

A. Yes.

Q. Which is a series of invoices. The first one is an invoice date of August 2, 2021 for a period of services July 12th through July 31st?

A. Yes.



Q. How many invoices have you served in this matter?

A. I think you have them all, and I think they have been monthly since starting with this one.

Q. Okay. We were provided with ten invoices. Does that sound to be about right?

A. Yes.

Q. And so you began work on this matter back in July of 2021?

A. Yes.

Q. So a little less than a year ago, correct?

A. Yes.

Q. Okay. And these invoices that we were provided reflect that you've done 338 and a half hours of work on this matter up through the date of the last invoice.

Does that sound correct?

A. I haven't totalled up the -- all the hours but the totals for each month are listed.

Q. What are you charging per hour for your work?

A. As indicated on my invoice, I

charge $450 per hour and I charge $550 per hour for deposition and trial testimony.
     Q.   And from reviewing your invoices, I see that you billed a total of $152,212.50 for your work on this litigation?
     A.   That sounds correct.
     Q.   Are you self-employed?
     A.   Yes.
     Q.   And what type of work do you do as a self-employed person?
     A.   I do pharmaceutical consulting, so I work with pharmaceutical companies, small, medium and -- mostly small and medium.  And several of the small ones don't have full-time expertise, so they hire consultants and they also usually don't have their own manufacturing and testing capabilities, so they rely on contract organizations.  And I help them with those activities.
          I also have done some training-type work giving short courses.  And I have done other work for law firms.
     Q.   What percentage of your work is done for the pharmaceutical industry?
     A.   As opposed to -- can you clarify a


little bit?
     Q.   As opposed to any other business sector, what percentage of your work is done for pharmaceutical companies?
     A.   Well, for example, the work I've done in training, I don't know if you classify that as for pharmaceutical companies.  I suppose my students that attend my training sessions are usually from pharmaceutical companies, so the predominance of my work is for pharmaceutical companies.
     Q.   And you mention that you've done other work for law firms.  Are those law firms that are representing pharmaceutical companies?
     A.   Yes.  I think they have all been related to pharmaceutical questions.
     Q.   They're all related to pharmaceutical questions but is the client that you're working on behalf of or have been hired by a pharmaceutical company?
     A.   Yes.  I remember that one other consulting position I had was at Purdue University where I was working with a professor there.


     Q.   And when was that?
     A.   Well, that was a few years ago now, about I'd say eight years ago for -- for a few months.
     Q.   You worked for Purdue University for a few months about eight years ago?
     A.   I worked for her -- she had a company.  She was a Purdue professor and she also had a company.  I was working in her lab but for her company.
     Q.   And did that company also do work for pharmaceutical companies?
     A.   They were trying to develop a product that could be -- could be used by pharmaceutical companies, could be used by academic laboratories.  It was more -- analytical chemistry device.
     Q.   Now, on your invoices I know that from reading them you have an activity description of document review.
     A.   Yes.
     Q.   What does the description "document review" encompass?
     A.   Well, just as it says.  That's when I'm reviewing various documents that are


furnished and related to -- to this case.
     Q.   And with regard to the documents that are on your Materials Considered list, where did you get those from?
     A.   Those would be furnished through -- through the attorneys, although some of them I found myself actually in doing some of my own literature searching.
     Q.   What percentage of the documents on the Materials Considered list were furnished by the lawyers as opposed to you finding them during your literature search?
     A.   I really don't know, of course, all the reports and so forth that were furnished through the lawyers and -- but literature articles, I -- I don't know what percentage that would've been.
     Q.   How many articles did you find on your own doing your literature search that you used for purposes of writing your reports in this matter?
     A.   I didn't know which ones I found on my own.  Some of -- and some of these I requested, you know, saw references and requested and they were furnished that way.

Q. There are over 220 documents listed on your Materials Considered list. How many of those are studies that you found on your own?
MS. TOLEDO: Objection. Asked and answered.
A. I'd have to go through. If you like, I can try and -- well, I just don't know what percentage of those would have been things that I -- I found and requested or I already had or was aware of.
Q. Were the majority of those items provided to you by counsel?
A. Can I take a look at that list?
Q. Sure. Do you have it there in front of you?
A. I don't know if it's -- (inaudible).
THE COURT REPORTER: I'm sorry?
A. I don't know if it's in my hard copies here.
Q. Well, let's just -- we'll move on. Let's go back to your invoices.
With regard to your invoices, I also see an activity description listed


that's entitled Literature Search. And, for example, the first one of those is on the third page of this exhibit, and it's on September 8th and September 9th. Do you see that?
A. Yes.
Q. When you noted literature search as your activity description, were you doing the work that you have previously testified about as far as doing your own searching?
A. That -- that would've been time stamped doing my own literature searching, although some of that additional time doing literature search I may have captured under Report Preparation as well.
Q. And then you also have a Report Preparation?
A. Yeah.
Q. Okay. So, for example, on this invoice we're looking at right now, the Literature Search category has 4.75 hours noted, correct?
A. For this invoice, yes.
Q. Okay. And then Report Preparation is listed as a separate activity, correct?


A. It's listed as a separate activity, but, as I mentioned, I may have lumped that together in some cases with literature searching during the report preparation.
Q. So if you were doing literature searches but not preparing the report, you would note that as a separate activity but if you were doing literature searches and doing report preparation together, you would note it as a report preparation activity?
MS. TOLEDO: Object to form.
A. Well, I wasn't -- I guess as -- what's the right word -- distinct in keeping literature searching and report preparation as distinct activities. I have some literature searching where that's -- that's what I was only doing at that time. Of course, that did play into report preparation and so I think I started, well, not delineating the time stamps separately.
Q. Literature Search and Review is noted on this invoice on September 8th and 9th, and if we go to the next invoice, it's noted for 2.25 hours on October 12th.
Do you see that?


A. Yes.
Q. And if we skip ahead the rest of the invoices, I don't see that noted at all, is that correct?
A. I believe that's probably correct. As I mentioned, during report preparation, I would also be checking literature references and some of that could've involved literature searching that I didn't carve out as a specific activity description.
Q. What literature searches did you conduct in this matter?
A. I don't remember all of them, but I looked for things on methodology for nitrosamine was one definite one --
(Court reporter clarification.)
A. Literature methodology for nitrosamine determination.
Q. Do you recall any other literature searches that you did?
A. I did others. I don't recall the exact subjects on them.
Q. Did you keep a record of the literature searches you did?
A. No. I didn't record those.

Q. Did you keep a record of the articles that you found based upon the literature searches you did do?
A. Articles that I requested and reviewed and used in my report, those are in my Materials Considered list. But just any -- you know, the overall hits on a particular search, I didn't keep a record of that.
MS. BOGDAN: If we could please pull up Dr. Olsen's CV and mark it as an exhibit.
THE VIDEOGRAPHER: Yes, Counsel. This will be marked as Exhibit Number 7.
(Plaintiffs' Exhibit 7 was marked for identification.)
BY MS. BOGDAN:
Q. And you see your curriculum vitae, Doctor?
A. Yes.
Q. Okay. And is this an up-to-date CV that you provided to counsel for this litigation?
A. Yes.



Q. Not for this litigation, but it's an up-to-date CV? It's your most current?
A. Yes.
Q. Okay. Now, I see that you -- your business name is Olsen Pharmaceutical Consulting, LLC?
A. That's correct.
Q. And are a part of the consulting services that you offer impurity investigations, including related substances, degradation products and catalyst?
A. I don't know about catalysts but impurities, yes.
Q. Okay. And what does that service entail?
A. Well, impurity investigations are an important part of pharmaceutical development, and firms need help in deciding how -- how to do those, you know, what to do at what time, regulatory framework for those kinds of activities.
Q. Why are impurity investigations an important part of pharmaceutical development?
A. Well, for doing drug development, control of impurities, which are present in



every pharmaceutical product, is an expectation of regulators and companies themselves to have adequate quality of the materials they are using in clinical trials. And then, eventually, if the drug makes it to market, you know, in their approved product.
Q. And why is it important to control impurities?
MS. TOLEDO: Object to form.
A. Impurities need to be controlled to an acceptable level to -- for both efficacy and safety.
Q. And is another service that you offer genotoxic impurity strategies?
A. Yes.
Q. What is encompassed in the work you do regarding genotoxic impurity strategies?
A. Well, since -- especially since ICH and seven guidelines have been published, companies are expected to deal with any compounds that are identified as impurities that they need to be assessed for their genotoxic potential. And the guidelines outline, you know, what those expectations are, and there are several options for



addressing those that -- I work with companies on, you know, making those kinds of recommendations.
Q. So you advise companies as to how to identify impurities and assess them for their genotoxic potential and also make recommendations as to how to control them?
MS. TOLEDO: Object to form.
A. Can we take one question at a time there so...
Q. In your work for Olsen Pharmaceutical Consulting, you advise companies as to how to identify genotoxic impurities, correct?
A. I wouldn't say how to identify genotoxic impurities. I work with them on impurity identification in general. And -- and then a question would be, does this have this impurity after it's identified? Does it have genotoxic potential, or mutagenic potential is the, I think, term that's used now.
Q. And so when you work with pharmaceutical companies on impurity identification in general, if an impurity is

identified, then the next step would be to evaluate it for its genotoxic or mutagenic potential, correct?
MS. TOLEDO: Object to form.
A. So if I understand what you're asking, if the structure of an impurity is identified, then the -- yeah, the question is asked, does this have an alerting structure for mutagenicity or is it -- does it give a positive response in a structure activity relationship in silico assessment. And, you know, then, depending on the outcome of those kinds of assessments, then, you know, advising what next steps might be.
Q. Now, is NDMA a compound that has an alerting structure for mutagenicity?
MS. TOLEDO: Object to form.
A. NDMA as a nitrosamine would be an alert.
Q. And why would NDMA as a nitrosamine have an alerting structure?
A. It does -- well, nitrosamines are grouped in ICH M7 as a cohort of concern, it's how it's termed, because of known mutagenic properties.


Q. And how long has NDMA been known to have mutagenic properties?
MS. TOLEDO: Object to form.
A. I don't know how long that's been studied.
Q. When did -- well, you've been in the pharmaceutical business since, it looks like, the 1970s, is that true?
A. 19 -- October 1979.
Q. And so when did you first become familiar with NDMA?
A. I don't -- I don't know if NDMA -- I really don't recall then -- when that would've been.
Q. Did you do any work with NDMA before being hired as a consultant for this case?
A. No, I did not.
Q. Did you review the IARC monograph that was done in 1978 on NDMA as part of your research into this case?
A. Yes. I looked at that.
Q. And that IARC monograph in 1978, under its evaluation, stated that there is sufficient evidence of a carcinogenic effect


of N-nitrosodimethylamine in many experimental animal species.
Are you aware of that?
MS. TOLEDO: Object to form.
A. Can you -- can you pull that up to look at?
Q. I'm asking you if you are aware that the IARC monograph in 1978 stated that there is a sufficient evidence of a carcinogenic effect of N-nitrosodimethylamine in many experimental species.
MS. TOLEDO: Object to form.
If you want him to comment on a document, he should be able to look at it.
A. I know that the IARC classification for NDMA is as a probable human carcinogen but that's based on animal studies.
Q. Are you aware back in 1978 IARC stated that N-nitrosodimethylamine should be regarded for practical purposes as if it were carcinogenic to humans?
MS. TOLEDO: Object to form.
A. Again, if I could see that document, I could say whether that's what it


said. But yeah, I -- my review of that document was to confirm the classification as a probable human carcinogen based on the animal data.
Q. Now, I see on your curriculum vitae that you worked for a company called Aptuit Consulting?
A. Yes.
Q. For a short period of time in 2009?
A. Yes.
Q. Did I pronounce that correctly?
A. Yes.
Q. Okay. What was your role there as the managing director?
A. I had a dual role as it turned out. Aptuit is, well, the site I was at in West Lafayette was a contract laboratory and they did primarily solid state development for pharmaceutical firms. And I was spending about half my time directing some of their laboratory personnel who were also -- or doing -- branching out into other activities, such as HPLC analysis. And the other part of my time was spent directing the work of a support litigation support group, and this

was primarily related to support a patent litigation matters.
Q. Why did you leave Aptuit Consulting after working there about seven months?
A. Well, if you note the time, that is right when the recession hit and business slowed down, and we came to a mutual agreement that I would leave as a full-time employee but remain as a contractor to Aptuit for consulting work where I might be a good fit.
Q. You continued to do consulting work for Aptuit?
A. As a contractor, yes. That's when I started my own independent company and -- but I continued some projects going through Aptuit for other clients.
Q. And how long did you continue your association with Aptuit Consulting?
A. It was a few years. In fact, that's when my other legal-related work initiated. That was actually right after I left as a full-time person.
Q. And you were the managing director at Aptuit. Wasn't one of the scientists



found guilty for altering preclinical data designed to support applications to perform clinical trials?
MS. TOLEDO: Object to form.
A. I have no knowledge of that at all.
Q. Do you know a scientist named Eaton when you worked for Aptuit Consulting as the managing director?
A. Pardon me? What was the name?
Q. Eaton, E-A-T-O-N.
A. I do not. I do not.
Q. And as the managing director for Aptuit Consulting, you aren't aware that one of the scientists was sentenced to a three-month prison term for altering preclinical data that was designed to support applications to perform clinical trials?
MS. TOLEDO: Object to form.
A. I don't know when this occurred, and I was not involved in -- in that at all. There was -- I was going to say there were other parts of Aptuit in other sites doing -- supporting other types of work that what you're referring to may -- may have come from, but I -- I was not involved or aware of



any of that.
Q. So as the managing director, it's your testimony that you were not aware of this criminal fraud investigation or sentencing of one of the Aptuit consulting scientists that took place during the time you worked there?
MS. TOLEDO: Object to form. Asked and answered.
A. I have -- I was not involved and have no knowledge of -- of that.
Q. Why don't you have Aptuit Consulting listed on your LinkedIn profile?
MS. TOLEDO: Object to form.
A. I don't think it's necessary.
Q. I see that you also worked for many years at Eli Lilly?
A. Yes.
Q. Did you work with pharmaceutical impurities while you worked for Eli Lilly?
A. Yes.
Q. Was that your major area of concentration?
A. That was one of the main activities I was involved in as what we talked about



earlier, impurity investigations and control. That was not the only activity however.
Q. And so you worked with Eli Lilly from 1979 until 2008?
A. Correct.
Q. As far as analytical methods to do impurity investigations while you worked for Eli Lilly, what was the primary method that was used for that type of analysis during that time period?
MS. TOLEDO: Object to form.
A. There were lots of different methods depending on the nature of the impurity, the question being answered -- or asked, what kind of information we needed, so chromatography is a -- in general a major tool for looking at impurities.
Q. Was HPLC one of the methods that was often employed to do impurity investigations during the time that you worked for Eli Lilly?
MS. TOLEDO: Object to form.
A. HPLC was becoming -- when I started, was becoming more widespread as -- and more common for impurity investigations.

And as instrumentation technology improved, it became a primary tool certainly by the time I retired.
Q. You mentioned that HPLC was becoming more wide spread. What was the method that predated HPLC?
A. Well, other methods -- there wasn't a single other precursor to HPLC, and HPLC wasn't -- isn't even today not the only thing that can be used for impurity investigations. So, you know, during the time HPLC was becoming more widespread, techniques such as NMR, gas chromatography, MIR chromatography, color metric analysis.
(Court Reporter clarification.)
Q. Ion chromatography?
A. Yeah, ion, I-O-N. It was actually introduced early in my career.
Q. Was gas chromatography in use for impurity identification back when you worked for Eli Lilly?
A. I wouldn't say that was its sole or even predominant use, but gas chromatography was used.
Q. Was gas chromatography used to



measure residual solvents in API back when you worked for Eli Lilly?
MS. TOLEDO: Object to form.
A. Yes. Gas chromatography is used for residual solvents determination.
Q. And back when you worked at Eli Lilly was GC coupled with mass spectometry in order to identify compounds?
A. Not on a routine basis. If there was a question about a compound's identity that might have been looked at by GC-MS.
Q. But the technology of gas chromatography, mass spectrometry was available at the time you worked at Eli Lilly, correct?
A. Yes, that's correct.
Q. What kind of detectors did you work with when using liquid chromatography at Eli Lilly?
MS. TOLEDO: Object to form.
A. I worked with a lot of different detectors. UV detection is probably the most common HPLC detector, but I also worked with conductivity detection which is used for ion chromatography, which is a form of liquid



chromatography. I've used refractive index detection. I've used charge aerosol detection, evaporative light scattering detection, and mass spec detection. There may be some others in there, but...
Q. Roughly how many years have you worked with mass spectrometry as a detector?
A. As a detector for what kind of instrument?
Q. Any instrument.
A. I'd say starting in 1984 for a GC and starting in early '90s for LC.
Q. That would be both during your time when you were working at Eli Lilly, correct?
A. Yes.
Q. And what kind of mass spectrometry assays have you performed?
MS. TOLEDO: Object to form.
A. Well, initially I've used it as more of an identification tool initially but, later on, I also used it as a -- for quantitative analysis.
Q. And when you say you used it for a quantitative analysis, what compounds were you using MS to quantitate?



A. I really can only comment on one that is published or I can mention things that are published. One was a mesylate ester as a potential impurity and mesylate salt and another was for a -- I believe it was a hydrazine derivative.
Q. Have you personally ever performed a mass spectrometry assay to identify a nitrosamine?
MS. TOLEDO: Object to form.
A. I'm not sure I understand your question. You say assay to identify. I don't know exactly what that means.
Q. All right. Have you ever personally used a mass spectrometry assay for a nitrosamine?
MS. TOLEDO: Object to form.
A. By "personally used," are you asking if I pushed the buttons on the instrument?
Q. Yes.
A. I have not done that.
Q. Have you --
A. I've directed work with mass spectrometry though.

Q. You directed work with mass spectrometry to measure NDMA?
A. No, not to measure NDMA.
Q. What is your familiarity with MRM mass spectrometry?
MS. TOLEDO: Object to form.
A. I'm -- I know how the basis of the technique and how -- how it works.
Q. What does MRM stand for?
A. Multiple reaction monitoring.
Q. And can you explain to me the basis of how it works?
A. The first part of any mass spec analysis is itemizing the analytes in the source of the mass spectrometer. And if you have a target analyte that you're looking for, you know what its mass molecular ion is and that, then, is selected to go pass through to a collision chamber where it fragments into its characteristic fragment ions, and those fragments then can be passed on to third analyze -- mass analyzer for detection.
Q. Okay. You used the word "analyte." What is an analyte?



A. That is the compound you're looking for, what you're trying to determine.
MS. TOLEDO: Counsel, we've been going over an hour. Would it be a good time for a break?
MS. BOGDAN: Let me just finish up with this line of questioning, and then absolutely.
MS. TOLEDO: Thank you.
BY MS. BOGDAN:
Q. So, as you gave that description, you were talking about different I guess you said you called one part of MRM a collision chamber, correct?
A. Yes.
Q. Okay. Does the analyte go through a filter before it reaches the collision chamber?
A. Well, the ion that is characteristic of the analyte or if there is another substance there that gives the same ion that is selected, yes, to go through to the next stage, in the collision chamber.
Q. So that filter that takes place before the ion would reach the collision



chamber is set to only let certain ions through, correct?
MS. TOLEDO: Object to form.
A. That -- that you select -- sort of a range of ions that go through usually a narrow range to select the ions you want.
Q. And those are based on a particular mass-to-charge ratio?
MS. TOLEDO: Object to form.
A. Yes. If you know what you're looking for and it gives an ion of a particular mass-to-charge ratio, you can select for that ion.
Q. And then those ions that are allowed through the mass filter end up in the collision chamber, correct?
A. Yes.
Q. And then after the ions end up in the collision chamber, they go through yet another mass filter, correct?
MS. TOLEDO: Object to form.
A. Well, the fragmentation takes place and then going through the filter selects for those -- the fragment ions.
Q. And again, that filter, which would



be the second filter, is set up to only essentially let through particular fragments based on mass-to-charge ratio, correct?
MS. TOLEDO: Object to form.
A. That's the basis for it, but you have to show that analysis, nothing else, is giving rise to -- to those signals.
Q. And then those particular fragments that have been allowed to pass through quadrupole mass filter are the ones that actually go to the detector, correct?
MS. TOLEDO: Object to form.
A. That's the idea of monitoring those fragments or sometimes called daughter ions.
Q. Just for the stenographer, your response said daughter, right, like D-A-U-G-H-T-E-R?
A. Yes.
Q. And what does daughter ion mean?
A. Well, that's one of the -- another name for one of the fragments from the parent ion.
Q. So the ion that's created in the beginning of the MRM analysis is called a parent ion, correct?

A. Yes.
Q. And then during the analysis, that parent ion is fragmented into daughter ions, correct?
A. Yes.
MS. BOGDAN: All right, Carmen. You had asked to take a break and I'm done with that line of questioning, so.
MS. TOLEDO: Thank you.
MS. BOGDAN: Do you want to take five or ten minutes?
MS. TOLEDO: Ten minutes would be great. Thank you.
MS. BOGDAN: Okay. You're welcome.
THE VIDEOGRAPHER: We are now off the record. The time is 1428 UTC, 10:28 a.m. EDT.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are now back on the record. The time is 1444 UTC, 10:44 a.m. EDT.
BY MS. BOGDAN:



Q. Dr. Olsen, do you have any direct experience working with NDMA in the lab?
A. Not with NDMA. I've looked for other potentially mutagenic impurities in various compounds.
Q. You had mentioned earlier in your testimony that you could only speak to -- I believe you were talking about certain esters that you were quantitating that you could only speak to those because they were published.
Do you remember testifying to that?
A. Yes. I can't give details of confidential things that I did while at Eli Lilly.
Q. Okay. And things that are of confidential nature that you did at Eli Lilly, you can't speak about at this deposition nor would you be able to publish about them?
A. I have published some things; as I said, mesylate esters. Another example would be formaldehyde and, as I mentioned, hydrazine was another example.
Q. But those weren't of a confidential



nature, correct?
A. No. Those were -- had to be approved through Lilly's publication approval system.
Q. And if something was a confidential matter that wasn't approved through Lilly's public indication approval system, then you couldn't publish about it, correct?
MS. TOLEDO: Object to form.
A. I would have to go through Lilly's public disclosure approval process to publish about something, anything else that I wanted to publish related to my work at Lilly.
Q. And if you weren't granted that approval, then you would not be able to publish it, correct?
MS. TOLEDO: Object to form.
A. Lilly's publication approval process is necessary to, you know, publish something about work anybody has done at Lilly.
Q. And that's because the work that's done at Lilly was confidential, correct?
A. Every scientist's work at Lilly is treated as confidential, proprietary



information until it goes through an approval process for -- for disclosure.
Q. Do you have any direct experience developing or validating any analytical assays for NDMA?
MS. TOLEDO: Object to form.
A. In any analytical assays for NDMA, no. But, as I mentioned, I have used or done development and validation for other trace level of potentially mutagenic impurities.
Q. Have you personally used Agilent laboratory equipment?
MS. TOLEDO: Object to form.
A. Any particular kind of equipment or just Agilent overall?
Q. Agilent instruments.
A. Yes. I've used Agilent equipment.
Q. What types of Agilent instruments have you used?
A. I can't recall all the different types that I've used. They used to be branded as Hewlett-Packard and then became Agilent. And then I've used Agilent HPLC systems and chromatography software. I have also used Agilent gas chromatography systems.

Q. Your -- your audio cut out a little bit for me so I heard that you've used Agilent gas chromatography systems, and then there was another type of system you mentioned before that.
A. I mentioned HPLC.
Q. Have you used an Agilent UHPLC instrument?
A. I have used Agilent UHPLC instruments.
Q. And where have you used those?
A. I was at Lilly and I have directed further work that utilizes that technology.
Q. What was the model of UHPLC instrument that you used at Eli Lilly?
MS. TOLEDO: Object to form.
A. I -- I don't recall the model number.
Q. But that would be a model that was available as of 2008, correct?
A. Yes.
Q. Have you used an Agilent UHPLC instrument personally since 2008?
A. I haven't -- well, by personally, I have, again, directed work that uses Agilent



as well as other instrument vendors, UPLC systems such as Waters and Thermo Fisher.
Q. When you say "directed work," that doesn't mean that you actually did the work yourself, correct?
A. I had not been pushing the buttons and running the instrument.
Q. And you haven't been preparing the samples and actually running the analysis using the instruments, correct?
A. I have not been doing hands-on laboratory work in -- in those instances but am involved with and aware of what the people who are, are doing.
Q. When is the last time you did hands-on laboratory work?
MS. TOLEDO: Object to form.
A. I don't recall the exact last time, you know, doing -- doing hands on.
Q. Is the last time you did hands-on laboratory work when you worked for Eli Lilly?
A. I was doing a little bit when I was at Purdue.
Q. And when you were at Purdue, that



was for how many months?
A. I don't recall how many months that was exactly.
Q. It was a few months right?
A. Yes.
Q. And what type of equipment were you using hands on when you did that work at Purdue?
A. Well, by hands on, I'm in the laboratory working with other people. This was a Thermo Fisher instrument. And we also did an instrument evaluation where we did look at both Waters and Agilent systems.
Q. And what type of systems are you speaking of, HPLC?
A. UPLC systems.
Q. Were you using any type of mass spectrometer for your work at Purdue?
A. Not -- not at that time.
Q. And you said that you were working in the lab with others. Were you actually running the instruments?
A. I was there with the graduate student I was working with, and that person was doing the hand -- entering commands on



the -- on the instrument, but I was present.
Q. So the answer is no, you were not actually running the instruments?
MS. TOLEDO: Object to form.
A. Depends. If you mean by "running" pressing the buttons, no I was not doing that. But that, you know, that is not -- that's more of a technician kind of role for just doing the running of the instrument.
Q. Have you personally used a triple quadrupole mass spectrometer?
A. Again, can you clarify what you mean by "personally used"?
Q. Meaning actually run the instrument.
Have you personally run a triple quadrupole mass spectrometry?
A. I have not hands-on run a triple quadrupole mass spectrometer. I have worked with others in many types of mass spec systems --
THE COURT REPORTER: The audio cut out.
MS. BOGDAN: His audio is very choppy.

THE WITNESS: Well, I'll move it a little closer. Is that better?
THE COURT REPORTER: I guess for now. We'll have to see as we go.
BY MS. BOGDAN:
Q. Let me ask the question again because your response -- your audio was kicking in and out.
Have you personally run a triple quadrupole mass spectrometer instrument?
A. I have directed work on a triple quad mass spectrometer, as well as other mass spec systems, but I did not push the buttons on the instrument or operate it myself.
Q. Have you used a UHPLC together with a triple quadrupole mass spectrometer?
MS. TOLEDO: Objection. Asked and answered.
A. I directed work that has used that combination of technology.
Q. But have you ever personally run samples on those instruments being used together?
MS. TOLEDO: Objection. Asked and answered.



A. I have not operated the instrument myself.
Q. Have you personally used MassHunter Quantitative Analysis software for data processing?
A. I have seen output from MassHunter software, but I have not worked hands on with it myself other than reviewing results from it.
Q. Have you personally used MRM mass spectrometry to measure nitrosamines?
A. I have not used MRM for nitrosamines specifically but have done mass spec detection of other potentially genotoxic or mutagenic impurities at low levels.
Q. Have you testified in past litigations?
A. Yes, I have.
Q. And in those past litigations, were you an expert for the pharmaceutical company?
A. The client was a pharmaceutical company, so was the defendant.
Q. Okay. And what were -- do you recall the name of those litigations?
A. The first one was in Canada and it



was related to lovastatin.
Q. What type of a drug is lovastatin?
A. That is a statin drug for cholesterol.
(Court Reporter clarification.)
A. Lowering.
Q. Was there another litigation where you testified?
A. Yes. I testified a few times in Delaware.
Q. Okay. And what were those litigations?
A. Those involved Fentora.
Q. And what type of drug is Fentora?
A. Fentora is a fentanyl filtrate which is a pain medication.
Q. And what was the other litigation?
A. They were both for that -- that product.
Q. And that was a fentanyl medication?
A. Yes. It was related for -- to especially -- I think they called it breakthrough cancer pain.
Q. What is NDMA currently used for, if anything?



MS. TOLEDO: Object to form.
A. I don't know of any particular uses for NDMA.
Q. Do you know if NDMA is used for research purposes?
MS. TOLEDO: Object to form.
A. What type of research purposes would that be?
Q. If NDMA is used in animal studies as the chemical that will initiate cancer in animals so the cancer can be studied?
MS. TOLEDO: Object to form.
A. I don't know what -- what's involved in those studies. I'm not aware of use of NDMA for that.
Q. Do you agree that NDMA is carcinogenic?
MS. TOLEDO: Object to form.
A. I'm not a cancer biologist. I -- that's why I would refer to the IARC classification as a probable human carcinogen as shown in animal laboratory testing.
Q. As part of your investigation into this case, did you research the properties of NDMA?

MS. TOLEDO: Object to form.
A. Properties encompassing what, for example?
Q. The chemical properties of NDMA, since your expertise is in chemistry?
MS. TOLEDO: Object to form.
A. I looked at things like its characterization data, some of its physical properties. I don't recall them all at the moment, but I looked at some of those things.
Q. Why did you look at those things?
A. To understand how NDMA would behave during analysis.
Q. Do you agree that NDMA is mutagenic?
MS. TOLEDO: Object to form.
A. My understanding is that NDMA has been mutagenic in laboratory testing, but has not been shown to be carcinogenic in humans.
Q. And what are you basing that statement on?
A. The IARC classification as a probable human carcinogen based on the animal and laboratory studies.
Q. And that classification was made in



1987, correct?
MS. TOLEDO: Object to form.
A. Can you show me that classification or that document that has the date? I don't recall the date.
Q. So when looking at that IARC classification during your investigation into this matter, you didn't notice the date that it was classified as a probable human carcinogen?
MS. TOLEDO: Object to form.
A. I don't -- I may have noticed it at the time. I didn't -- I don't remember it exactly right now.
Q. Was it a recent classification, meaning in the last ten years? Do you remember that?
MS. TOLEDO: Object to form.
A. Can we -- can we look at it and see, 'cause I don't remember the dates.
Q. Do you agree that NDMA is genotoxic?
MS. TOLEDO: Object to form.
A. I can only really classify it or agree with the IARC classification as a



probable human carcinogen based on laboratory studies. Genotoxic is a broad term now that is ill-defined I would say.
Q. What does probable human carcinogen mean to you?
MS. TOLEDO: Object to form.
A. I would have to look up what it means to IARC to comment on that. Again, I'm not a cancer biologist so I have not been focused on that.
Q. Do you agree that the IARC monographs are authoritative with regard to the classification of NDMA?
MS. TOLEDO: Object to form.
A. This is not an area that I have a lot of familiarity with, so as far as IARC's authoritativeness, that's -- I guess others can debate whether that is or is not.
Q. But you're relying on IARC's classification as a probable human carcinogen, correct?
A. That's the classification that I'm aware of that has been accepted, I think IARC is part of WHO, if I'm not mistaken.
Q. Do you agree with that



classification?
MS. TOLEDO: Object to form.
A. I have not studied NDMA so or -- again, I'm not a toxicologist or a cancer biologist, so I -- I have no opinion on that.
MS. BOGDAN: If we can please pull up the 1978 IARC monograph.
THE VIDEOGRAPHER: And this will -- this will be marked as Exhibit Number 8.
(Plaintiffs' Exhibit 8 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, do you see the IARC monograph?
A. Yes, the first page.
Q. Yes.
MS. BOGDAN: And if we could go to page 125 where it has N-nitrosodimethylamine.
Q. Do you see that?
A. Yes.
Q. And N-nitrosodimethylamine is also known as NDMA, correct?
A. Yes.

Page 70
B. Olsen

Q. And then bringing you to page 127, you see the section that says, Use?
A. Yes.
Q. And do you see where it says:
Prior to the 1st of April 1976 NDMA was used in the US as an intermediate in the production of 1,1-dimethylhydrazine, a storable liquid rocket fuel which is believed to have contained up to 0.1 percent as an NDMA impurity?
Do you see that?
A. Yes.
Q. Were you aware that NDMA was used in the production of rocket fuel?
MS. TOLEDO: Object to form.
A. I remember reading that previously.
Q. Do you know if it's currently used in any commercial capacity in the United States today --
MS. TOLEDO: Object to form.
Q. For research purposes?
A. By "commercial capacity" meaning what?
Q. Is it used in manufacturing or in any capacity in the United States today

Page 71
B. Olsen

except for research?
MS. TOLEDO: Object to form.
A. I don't know whether it's used or not.
Q. The next sentence reads:
No evidence was found that NDMA is used at present, except for research purposes?
Do you see that?
A. Yes.
Q. Do you know why NDMA is no longer used except for research purposes?
MS. TOLEDO: Object to form.
A. Well, this -- this statement just says no evidence was found, so...
Q. Do you have any evidence that you know of that NDMA is used other than for research?
MS. TOLEDO: Object to form.
A. I -- I don't have that evidence of use of NDMA.
MS. BOGDAN: If we can go to page 151, please.
Q. See under 4.1 Experimental Data?
A. Yes.

Page 72
B. Olsen

Q. Is this part of what you read when you read the IARC monograph on NDMA?
A. I don't recall whether I looked at this section or not.
Q. The first sentence begins:
N-nitrosodimethylamine is carcinogenic in all animal species tested.
Do you see that?
A. Yes.
Q. And it lists a bunch of different species, correct?
MS. TOLEDO: Object to form.
A. Lists several animals, yes.
Q. Do you know of any animal species that was tested with NDMA where NDMA was not carcinogenic?
MS. TOLEDO: Object to form. This is outside his area of expertise.
A. That was going to be my response was I've not studied the toxicity of NDMA.
MS. BOGDAN: If we can go to page 152, please.
Q. Directing your attention to the Evaluation section, and the last sentence which reads:

Page 73
B. Olsen

Although no epidemiological data were available (and efforts should be directed toward this end), N-nitrosodimethylamine should be regarded for practical purposes as if it were carcinogenic to humans.
Do you see that?
A. Yes, I see that.
Q. Do you disagree with that statement by IARC?
MS. TOLEDO: Object to form. This is outside his area of expertise, outside the scope of his opinions.
A. Yeah. I have no basis to comment one way or another because I have not studied the -- the data on this topic, and it is outside my expertise.
Q. So when you were retained as an expert in this litigation, you did not conduct any type of investigation to determine a carcinogenic, mutagenic or genotoxic nature of NDMA?
MS. TOLEDO: Object to form.
A. I was not asked to give an opinion about the carcinogenicity or -- or lack

thereof of NDMA because it's not in my area of expertise.
MS. BOGDAN: And what was this IARC monograph marked as far as the exhibit number?
THE VIDEOGRAPHER: Exhibit Number 8.
MS. BOGDAN: If we could please pull up the GSK Hazard Assessment Report and mark it as Exhibit 9.
THE COURT REPORTER: I'm sorry, Charles. Could you just double-check the number of the exhibits? I may have written it down in error, but I already had 8.
THE VIDEOGRAPHER: That's correct. Exhibit Number 8 was a 1978 IARC monograph, and now the GSK will be Exhibit Number 9.
THE COURT REPORTER: Okay. Thank you. I'm sorry.
(Plaintiffs' Exhibit 9 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, is Exhibit 9 loaded for


your review? Do you see it?
A. I see it on the screen. It's not coming up in our Box access. The IARC monograph is. I don't think this GSK one is.
Q. You might have to refresh it. We could use the one -- I mean can you read the one that's on the screen?
A. There it is. I had to do it twice. Okay. I have it now.
Q. Did the defendants provide this document to you as part of your review for this case?
A. I don't recall if I looked at this or not. Is it in my list of things considered?
Q. I didn't see it, but I'm asking if you have seen this document before.
A. That's why I don't recall.
Q. All right. So if we look at this document, it gives the molecular formula for NDMA, correct?
A. Yes.
Q. And is that correct to the best of your knowledge?
A. Yes.


Q. And it also gives the molecular weight?
A. Yes.
Q. And what is the molecular weight of NDMA that is on this exhibit?
A. 74 grams per mol.
Q. Is that correct?
A. I think so to -- are -- the significant figures that are listed there.
Q. Do you know the molecular weight of NDMA to be something different?
A. No, I don't think so.
Q. But you're not sure?
A. Well, I haven't calculated it specifically myself, but I don't know why it would be incorrect here.
Q. And it gives a structural formula. You see that?
A. Yes.
Q. Okay. And is that a chemical structural formula?
A. Yes.
Q. And is that structural formula correct for NDMA?
A. Yes.


Q. And can you describe the structure of NDMA from a chemical perspective?
A. Describe the structure. Well, the -- there are two methyl groups, hence the dimethyl, connected to a nitrogen, so you have a dimethylamine part. And then the N-nitroso is the rest of the molecule.
Q. In this diagram, what part is the N-nitroso?
A. The right part.
Q. And that's the structure that you testified earlier as being an alerting structure?
MS. TOLEDO: Object to form.
A. That is -- the nitroso part of it is, yeah, N-nitroso part, as a nitrosamine, is a -- in the ICH M7 guideline part of that cohort of concern because it's in this category.
Q. What about that nitroso structural group makes it an alerting structure for purposes of being in the cohort of concern?
MS. TOLEDO: Object to form.
A. I don't understand what you mean by what about it. It's a -- it's a nitrosamine

and that would -- that would be what puts it in that category.

Q. And why are nitrosamines put into the category of the cohort of concern?

MS. TOLEDO: Object to form.

A. They have potential mutagenicity as indicated in some laboratory studies.

Q. As a chemist, do you understand the mechanism of action of nitrosamines that gives rise to them having the potential for mutagenicity?

MS. TOLEDO: Object to form.

A. I have not studied -- that's outside my -- scope of my report, and I've not studied any mechanism of action of toxicity of nitrosamines.

Q. Well, in your role as a pharmaceutical consultant, you advise regarding genotoxic impurity strategies, correct?

MS. TOLEDO: Object to form.

A. Strategies don't -- I advise on chemistry, manufacturing and control-related strategies, regulatory strategies for potentially mutagenic impurities and not what



any mechanism of action of toxicity for any impurity might be.

Q. Why is it important to control the amount of mutagenic impurities in a pharmaceutical?

MS. TOLEDO: Object to form.

A. It's important to control any impurity that's known in a pharmaceutical to acceptable levels.

Q. And are mutagenic impurities controlled at lower levels in other impurities?

MS. TOLEDO: Object to form.

A. It depends on several things. You know, what the -- I guess what's known about the impurity's toxicity, what the dose indication, course of treatment of, you know, the use of the pharmaceutical; all that would figure into what kind of level would be a concern.

Q. And with regard to NDMA, is that control at a low level of impurity pursuant to ICH M7?

MS. TOLEDO: Object to form.

A. Again, it would depend on, you



know, what impurity is in, what -- what it's going to be used for, what would be the dose of the drug; so just saying NDMA in general is not specific enough.

Q. Has the FDA established an acceptable daily intake limit for NDMA in pharmaceuticals?

A. FDA established, based on what they acknowledged as a highly conservative ICH M7 approach for NDMA, where they extrapolated animal data and also considered 70 years dosing and one in 100,000 risk of cancer all to come up with a very conservative limit of 96 nanograms per day.

Q. So the FDA's acceptable daily intake limit for NDMA in pharmaceuticals is 96 nanograms per day, correct?

A. That's what they published in their guideline that could be discussed with FDA, again, depending on use of the drug, dose, course of treatment, all those kinds of things. And even then they haven't said that higher doses constitute an increased risk.

Q. Doctor, the question that I asked you was, is the FDA's acceptable daily intake



limit for NDMA in pharmaceuticals 96 nanograms a day; is that true?

A. That's what they have indicated in their guideline.

Q. So the answer is yes?

MS. TOLEDO: Object to form.

A. That would be the starting point. They may have situations where a higher limit or a lower limit would be something they'd look at.

Q. Have you seen the FDA publish any limit that allows more than 96 nanograms per day in a pharmaceutical regarding NDMA?

MS. TOLEDO: Object to form.

A. Well, can we pull up their guideline and --

Q. I'm asking if you -- I'm asking if you are aware of the FDA allowing more than 96 nanograms a day of NDMA in any pharmaceutical.

MS. TOLEDO: Object to form.

A. I would not have awareness of individual companies' discussions with FDA to know whether that daily limit was changed from their guideline limit of 96 nanograms

per day.
Q. So you don't have, as you sit here, any authority to suggest that the FDA has allowed more than 96 nanograms per day of NDMA in any pharmaceutical, correct?
MS. TOLEDO: Object to form. Asked and answered.
A. I can only comment on what they have put in their guideline as years -- here's a limit that they are comfortable with if you're under that. If you're over that, then, yeah, individual companies would have their own discussions, but I would not be privy to those.
MS. BOGDAN: You can go to page 2 of this document, please.
Q. And up in the chart at the top of the document, do you see where GSK is noting that NDMA is a positive genotoxicant?
A. I see that.
Q. Do you agree with GSK?
MS. TOLEDO: Object to form.
A. Yeah. I have not studied the toxicological properties of NDMA. Here they also have it in the comments that they put it



as a positive genotoxicant because it's -- it is a mutagen or a clastogen.
Q. Do you see where they have in this chart potential carcinogen, and they have checked the box "yes"?
A. I see that. And that is modified -- or the reason it is checked is because it is classified as a probable human carcinogen as they noted.
Q. Right. Over in the comment box on the right, correct?
A. Yes.
Q. Okay. If we could go on this page to number 1 where it says:
NDMA is a semivolatile organic chemical that forms both -- in both industrial and natural processes?
Do you see that?
A. Yes.
Q. Is NDMA a semivolatile organic chemical?
A. Well, if we look back at the physical properties -- oh. They don't have it here, but I think on the IARC monograph they had some other properties, so I don't



know exactly what the range of boiling points is for semivolatile, but I think NDMA falls into that category.
Q. And is NDMA an organic chemical?
A. Yes.
Q. Any volatile organic chemical can NDMA be detected with gas chromatography-mass spectrometry?
A. Yes, it can.
Q. Now the next sentence reads:
It is a member of N-nitrosamines, a family of point carcinogen?
Do you see that sentence?
A. Yes.
Q. Are you aware that N-nitrosamines are a family of potent carcinogens?
MS. TOLEDO: Object to form.
Q. From a chemical perspective?
MS. TOLEDO: Object to form. Again, outside the scope of his opinions.
A. Yeah. I have not given an opinion on this and whether -- my understanding is this is all based on animal data and laboratory data.



Q. Well, when it's talking about NDMA being a member of N-nitrosamines, it's talking about its chemical -- chemical composition, correct, when it's talking about it being in the family of N-nitrosamines?
MS. TOLEDO: Object to form.
A. NDMA, that is an N-nitrosamine.
Q. And N-nitrosamine describes certain chemical attributes of those compounds, correct?
MS. TOLEDO: Object to form.
A. There are other N-nitrosamines.
Q. It's a family of chemical compounds, correct?
A. There can be other groups on the amine besides methyl groups.
Q. But N-nitrosamines are known as a family of chemical compounds, correct?
A. I don't know if "family" is the right word. It's a -- contains the functional groups, nitroso and amine.
Q. And is there something about having those functional groups, the nitroso groups and the amines, that makes those chemicals potent carcinogens?

MS. TOLEDO: Object to form.
A. I don't -- I'm not a toxicologist or a pharmacologist, so I have not studied the mechanism of any toxicity in animals or -- or other laboratory organisms for -- for nitrosamines.
Q. Do you know how NDMA is metabolized?
MS. TOLEDO: Object to form. Outside the scope of his opinions.
A. Not in detail I don't. I just heard about enzymatic processes but not -- I have not studied that.
Q. And what do you know about the enzymatic processes, even if it's just in general?
A. Yeah. I -- I don't want to comment on that because I'd have to go look again at what I read about it.
Q. Have you studied the stability of NDMA as a compound?
A. Do you mean if I have a sample of NDMA is it stable?
Q. Yes. Have you studied the stability of NDMA?


A. I have not looked at the stability of NDMA as a neat compound.
MS. BOGDAN: You can take that down.
Q. For your work on this case, did you start with a research question?
MS. TOLEDO: Object to form.
A. I was asked to review the testing data and conclusions offered by Dr. Najafi, and so this is not a research project.
Q. So your work on this case was limited to commenting on the reports of others?
MS. TOLEDO: Object to form.
A. Well, by -- by work -- yeah, work of others related to testing of NDMA in ranitidine.
Q. Well, you indicate that you were going to comment on the report of Charles Davis, and he did not do any testing of NDMA in ranitidine, did he?
A. He did not do testing himself, but he did statistical analyses of data on NDMA in ranitidine that was furnished to him.
Q. So, what was the scope of what you


were asked to do as an expert in this litigation?
MS. TOLEDO: Object to form.
A. I looked at the validity of testing of NDMA in ranitidine and the various studies done to investigate or to try and -- try and retrospectively assign levels of NDMA that consumers years ago might have been exposed to, and give opinions as to the validity of those types of experiments.
Q. And in order to do this work of commenting on the reports and work of others, did you come up with any type of research question or hypothesis?
MS. TOLEDO: Object to form.
A. Again, I was not conducting research into -- into this question -- these questions.
Q. Now, I see on page 4 of your report that you also have listed to review the report of Dr. Jennifer Le.
A. Yes.
Q. Did you, in fact, do that?
A. Yes. Not her complete report; but another area of my scope was on exogenous


NDMA formation and levels.
Q. And how did the review of Dr. Le's report relate to exogenous NDMA and levels?
A. I would need to go back to her report to look at specifics of what she said. It's been a while since I looked at her report.
Q. Are you offering any opinions as you sit here today with regard to Dr. Le's report?
A. I have to, again, look at what -- what I said in my report would be the opinion for Doctor -- Dr. Le. I think I only commented on one aspect of what she said.
Q. As you sit here, do you know what that was?
A. She commented without support -- literature support or evidence that NDMA could go on to form the species that is purported to be part of a mechanism for mutagenicity. I believe that's how it was described.
Q. You previously told me here today that you didn't do any research or analysis and are offering no opinions with regard to

the mutagenic properties of NDMA, isn't that correct?
MS. TOLEDO: Object to form.
A. I didn't give an opinion about that. What you asked was what comment did I make on Dr. Le's report, and it was the comment that she mentioned that NDMA could decompose not -- this was exogenously to form this other -- other species but there were no data for that.
Q. But I asked you, but you did not study the stability of NDMA, correct?
A. You asked about it and I said, Are you talking about NDMA as a neat compound? No. I did not study the stability of that.
Q. And you did not study NDMA and what makes it a mutagen, correct?
MS. TOLEDO: Object to form.
A. That -- that's outside the scope of my expertise and so I had not looked at or given opinions about why NDMA may give mutagenic response in petri dishes and animals.
Q. So you are not giving any opinion with regard to Dr. Le's comments about NDMA



going on to form species that are part of the mechanism of mutagenicity of NDMA, correct?
MS. TOLEDO: Object to form.
A. Well, can -- can we look at her report to see exactly what she said that I commented on?
Q. Doctor, I'm asking if you're giving any opinions with regard to the mutagenic properties of NDMA.
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. I'm getting two different questions here, so I'm not following. My -- my recollection of Dr. Le's report was trying to come up with an explanation for why some levels of NDMA reported by Dr. Najafi appeared to decrease rather than a continual increase.
And her comment was that it must be degrading and -- but gave no evidence of what it's degrading to. And I think the question or the concern was that she extrapolated into -- degrading into the whatever might be responsible for mutagenic properties. So, I don't comment on NDMA's mechanism of



mutagenicity.
Q. You remember my question?
My question was, I'm asking if you're giving any opinions with regard to the mutagenic properties of NDMA, independent of Dr. Le.
MS. TOLEDO: Object to form. Asked and answered.
A. The only thing that I have -- I am not giving an opinion on it. I'm just citing --
Q. Thank you.
A. -- information.
MS. TOLEDO: Please don't interrupt the witness when he's still answering.
A. I -- my comment was that if NDMA has been -- determined to be a mutagen in the Ames test or other laboratory tests, you know, that's -- that's -- I don't have an opinion as to whether that's correct or not. It's just it is what it is.
Q. Are you offering any opinions in this matter that are not in response to the opinions offered by one of the plaintiffs'



experts?
MS. TOLEDO: Object to form. Mischaracterizes his testimony.
A. Yeah. I didn't understand your question, please.
Q. Are you offering any opinions in this case that are not in response to the opinions offered by one of the plaintiffs' experts?
MS. TOLEDO: Object to form. Mischaracterizes his testimony and his report.
A. My opinions are in my report.
Q. And in your report on page 4, you write --
MS. BOGDAN: And if we can pull up the expert report, please.
Q. And this is in the fourth full paragraph down, and I'm just going to read the first sentence:
I have been retained to provide opinions on behalf of the defendants to analyze and comment on the scientific reliability of the opinions expressed in the reports of Plaintiffs' experts, Ramin Najafi

Ph.D., Charles Davis Ph.D., Andrew Salmon, M.A., Doctor of Philosophy, C.Chem, M.R.S.C., Jennifer Le PharmD and Dipak Panigrahy, M.D.
That is what you wrote, correct?
A. Yes.
Q. And the scope of your work on that case, was that defined by what you were asked to do by the defendants?
MS. TOLEDO: Object to form.
A. That's what I did in my report, is analyze and comment on the reliability of these opinions.
Q. And is that -- that is all you did, correct?
MS. TOLEDO: Object to form. Mischaracterizes his testimony and his report.
A. Well, if we look at the summary at the end of my report, I think it's got the conclusion.
Q. But what I have read and highlighted here is the question that you were asked to answer, correct?
MS. TOLEDO: Object to form.
A. This may not have been the total of



the scope of what I was asked to do, but I guess I'm not understanding what's -- what's outside or what's different than what is in my report.
Q. Well, what else were you asked to do other than provide opinions and analyze and comment regarding these five Plaintiff experts?
MS. TOLEDO: Object to form.
A. This was the primary aspect of it. I guess how other things enter into this, I'm not sure I -- I'm following how to answer this.
Q. Let's go to page 7 of your report and under Principles of Drug Stability at the very end of that section you write: As such once a drug is made, the next questions are under what conditions and at what rate does the drug degrade?
Do you see that sentence in your report?
A. Yes.
Q. Did you answer that question in this case?
MS. TOLEDO: Objection to form.



A. This is a background discussion of drug stability investigation in general. It was not my job in this case to determine what -- well, to investigate what's happening with ranitidine.
Q. So the answer to that question would be no, you did not answer those next questions under what conditions and at what rate does ranitidine degrade?
MS. TOLEDO: Object to form. Asked and answered.
A. Again, these are -- this was background information on drug stability in general, and I did not for ranitidine specifically.
Q. So you did not answer those questions, correct?
MS. TOLEDO: Object to form. Asked and answered.
A. I didn't set out to answer those questions.
Q. Because you didn't set out to answer those questions you didn't answer them, correct?
MS. TOLEDO: Object to form.



Asked and answered.
A. I reviewed data that attempted to -- to look at this, so in that sense, you know, I was investigating ranitidine's stability.
MS. BOGDAN: If we could please pull up the King publication from 2020.
A. Are we about ready for a lunch break?
THE VIDEOGRAPHER: This exhibit will be marked as Exhibit Number 10.
(Plaintiffs' Exhibit 10 was marked for identification.)
MS. BOGDAN: Carmen, the witness has just asked me about lunch break, so -- you're muted so I --
MS. TOLEDO: Well, I just -- we're just using the one speaking.
MS. BOGDAN: Sorry. I thought you might be speaking and I wasn't hearing.
MS. TOLEDO: No. I mean, do you have -- if he'd rather wait to ask about King after lunch break or if you

don't have a lot to go.

MS. BOGDAN: I'd rather go ahead and ask the questions on the King study. I'm thinking it's maybe 15 minutes, 20 minutes, and that would be a good time for a break. Is that --

MS. TOLEDO: It's up to you, Dr. Olsen.

THE WITNESS: I'm okay for that.

MS. TOLEDO: If it's -- if it's all right -- we actually got lunch delivered. So if it's all right and we can take the break now.

MS. BOGDAN: That's fine.

MS. TOLEDO: Okay. How much time, 20 minutes, 30 minutes?

MS. BOGDAN: Say 20 and hope to get started by 30.

MS. TOLEDO: Sounds fair.

THE VIDEOGRAPHER: We're now off the record. The time is 1607 UTC, 12:07 p.m. EDT.

(Whereupon, a lunch recess was taken.)



THE VIDEOGRAPHER: We are now back on the record. The time is 1644 UTC, 12:44 p.m. EDT.

THE WITNESS: Can I go back and provide some clarification to the discussion of the Le report?

I had a chance to look at my expert report and what I did was quoted what she said about NDMA transforming to other entities, and she said that it -- that could be potentially it's toxic metabolite.

So she was offering that opinion, and I said she didn't give any evidence that that was occurring, and she didn't account for other potential reasons that the NDMA levels may have been observed to decrease, such as variation among the tablets or, you know, loss of the physical integrity of the -- the tablet.

So, that's -- I think we were getting what she said and what I said maybe conflated there.

MS. BOGDAN: My questions were not



asking about what Dr. Le said. It was asking about what opinions you're offering with regard to the metabolic activation or the mutagenic capacity of NDMA, but we'll let the record speak for itself. But I do appreciate you providing that additional information.

If we could start -- I believe it was marked Exhibit 10 before we had the break for lunch.

BY MS. BOGDAN:

Q. Dr. Olsen, are you familiar with this study by first author King, which is a GSK, GlaxoSmithKline, study?

A. Yes, in general.

Q. Did you review this as part of your work on this case?

A. Yes. I reviewed this paper.

Q. Did you understand that the defendants have admitted that ranitidine degrades into NDMA with heat?

MS. TOLEDO: Object to form.

A. Yeah. In that sentence, I -- I don't know that the word "admitted" is



appropriate. I would say they found that ranitidine, under certain conditions, different samples, certain temperatures, humidity and time, can at highly variable rates form NDMA.

Q. Do you have an understanding that Defendants have found that ranitidine degrades into NDMA with humidity?

MS. TOLEDO: Object to form.

A. Again, ranitidine, humidity can be a contributing factor among others, such as the particular sample, container closure, heat, time, and humidity all can impact NDMA formation.

Q. If I could direct your attention to the abstract of this GlaxoSmithKline publication. This publication is essentially GSK's undertook a root cause analysis to investigate NDMA found in ranitidine drug products, correct?

A. Yes. They were looking at trying to find out what was going on.

Q. Okay. And in the abstract written by GSK it states:

The root cause analysis suggested

that the presence of NDMA results from a slow degradation of the ranitidine molecule?
Had you read that sentence as part of your investigation into this matter?
A. Yes.
Q. What does degradation -- the presence of NDMA results from a slow degradation of the ranitidine molecule mean to you as a chemist?
MS. TOLEDO: Object to form.
A. Well, that ranitidine can be reacting. This doesn't imply that it's reacting with itself. It could be or it could be reacting with something else present in a slow degradation process.
Q. Directing your attention to the next sentence which reads:
Analysis using suitably isotopically labeled ranitidine hydrochloride confirmed the formation of NDMA solely from an intermolecular reaction of ranitidine hydrochloride without involvement of impurities?
Did I read that correctly?
A. Yes.



Q. And as a chemist what does that sentence mean to you?
MS. TOLEDO: Object to form.
A. Well, they're -- they do provide evidence that the NDMA formation is from ranitidine molecules rather than interaction with other species that could be present; although, they don't give a -- really a specific mechanism for how that occurs.
Q. But they are confirming in this study that the NDMA is forming from the ranitidine molecules interacting with each other, correct?
MS. TOLEDO: Object to form.
A. Can you repeat that again? You kind of cut out at the first.
Q. Sure.
But they are confirming in this study that the NDMA is forming from the ranitidine molecules interacting with each other, correct?
MS. TOLEDO: Object to form.
A. Well, they didn't confirm that. They -- they were trying to find out what was -- was happening, whether it was presence



of impurities that was influencing this or not.
Q. And in the abstract, they confirmed that this NDMA was forming without involvement of impurities, correct?
A. They stated that in the abstract as one of their findings.
Q. Then GSK authors go on to say:
Factors that influence the rate of degradation include heat, humidity, and the crystal morphology of ranitidine hydrochloride with a material exhibiting a columnar habit showing a slower rate of degradation?
Correct?
A. That's what that says.
Q. And so that is acknowledging that their studies and investigation found that heat and humidity are factors that affect the rate of NDMA formation from ranitidine?
MS. TOLEDO: Object to form.
Q. Correct?
A. Well, this particular finding was related to API and they were looking at what -- what can influence the rate of



formation of NDMA and found that it can be influenced by heat, humidity, and crystal morphology.
Q. And this analysis that's being done by GSK is a post hoc analysis, correct?
MS. TOLEDO: Object to form.
A. Can -- can you define that a little -- little more for me?
Q. Well, you use post hoc analysis in your report. Can you tell me what you meant by the words "post hoc analysis"?
A. Well, I think you're asking the question, so I want to answer your questions so I would appreciate that clarification.
Q. Page 5 of your report you write:
Chemists, -- chemists do not, however, typically conduct post hoc analyses.
What did you mean by the term "post hoc analyses" when you wrote it in your report?
MS. TOLEDO: Object to form.
A. I need to look at where -- where I said that to know the context.
DOCUMENT TECHNICIAN: Counsel, do you want that put up on the screen?

Q. It's on page 5 of your report, and it's under the Introduction section in the first full paragraph.
And I'm simply asking, Dr. Olsen, what you meant by your definition of post hoc.
A. Well, in -- this case, the whole sentence is post hoc analyses for estimating what levels of impurities might have existed many years ago, so trying to do a retrospective estimate of that.
Q. So what you mean by "post hoc" is basically doing something after the event has occurred, correct?
MS. TOLEDO: Object to form.
A. Here is retrospectively, yeah, trying to go back and know what happened at an earlier time.
Q. And isn't the study here being done by GSK to find out why there is NDMA in ranitidine a post hoc analysis?
MS. TOLEDO: Object to form.
A. I don't know what -- I guess they're trying to answer the question if NDMA is in ranitidine, where is it coming from.



Q. And they concluded that the NDMA is coming from the ranitidine molecule itself, correct?
MS. TOLEDO: Object to form.
A. That it's coming -- if there are any material -- slow degradation via an intermolecular reaction.
Q. For those who are not chemists, an intermolecular reaction would be a reaction between ranitidine molecules, correct?
A. Yes. That would be as opposed to, as it says, other components such as other impurities.
Q. Directing your attention to page 2919 of this study.
And in the last sentence on this page it reads:
The key observations made from accelerated stability studies reported in Table 6 were as follows.
And then it says:
Both an elevation in temperature and relative humidity increased the rate of formation of NDMA?
And then the next sentence on the



next page reads:
A similar finding has recently been reported for ranitidine drug substances and tablets?
Do you see that?
A. Yes.
Q. So this published study by GSK does not only comment on API, correct?
MS. TOLEDO: Object to form.
A. They -- they give a reference. I don't know what, but that's -- yeah, that's the Abe paper, so they reference that.
Q. And they're acknowledging that that has been found with drug product as well, correct? The authors are mentioning that in their study?
MS. TOLEDO: Object to form.
A. They don't -- let's see. If we go back to the bottom of that, that temperature and relative humidity. And I would emphasize that the -- they called it accelerated stability but this was really stress conditions at 60 degrees.
Q. My question simply is if the authors of the study are acknowledging that



the elevation and temperature in RH, which is relative humidity, was found to increase the rate of formation of NDMA in drug substances and tablets?
MS. TOLEDO: Object to form.
Asked and answered.
A. They say similar and reference another paper, so.
Q. Well, they -- and that's what the study says, correct?
MS. TOLEDO: Object to form.
Which study?
Q. The King study. It references the finding has been reported for ranitidine drug substances and tablets, and then cites to the Abe paper, correct?
A. It references the Abe paper, which also shows that ranitidine under certain conditions of heat, humidity, exposure, packaging. And although I don't know in the Abe paper if -- how many different samples they looked at, but -- so that they -- they also saw in some cases NDMA was increased.
Q. Did you look at the internal RSK root cause analysis that was done as part of

your investigation into this case?
A. The GSK root cause analysis?
Q. Yes. Not the -- not the published version, which was the article that I've just shown you marked as Exhibit 10, but the internal root cause analysis document.
A. I looked at the -- I don't know if you'd call it summary report of that, which I think also references many individual reports that are discussed there.
MS. BOGDAN: Would you please pull up and mark as Exhibit 11 the GlaxoSmithKline investigations into the root cause, which is dated June 15, 2020?
DOCUMENT TECHNICIAN: We're working on pulling it up for you.
MS. BOGDAN: Okay.
(Plaintiffs' Exhibit 11 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, I see it on my screen now so let me know once it arrives.
A. Okay.
MS. TOLEDO: We're still waiting



for it to load.
A. Okay. We -- I have that.
Q. Okay. Did you review this document as part of your investigations into this case?
A. Yes.
Q. And along with this root cause for the presence of NDMA in ranitidine hydrochloric drug substance and associated drug products, did you also review the Excel sheet with all of the testing data that was done with this RCA?
A. I don't remember if I looked at that or not.
Q. It's on your Materials Considered list.
MS. BOGDAN: Can we please pull up the GSK master data sheet?
A. Yes. I remember looking at some of this.
(Plaintiffs' Exhibit 12 was marked for identification.)
Q. Did you go through the GSK root cause for the presence of NDMA in ranitidine that was marked as Exhibit 11 and the data



from that study, which is on this master spreadsheet marked as Exhibit 12, and look to see how much NDMA GlaxoSmithKline found when they were testing the ranitidine drug substance and drug product?
A. Okay. Can you state that again?
Q. Did you go through GSK's root cause analysis that was marked as Exhibit 11 and the material data spreadsheet, which has been marked Exhibit 12, and look to see how much NDMA GlaxoSmithKline found when they tested the ranitidine drug substance and drug product?
MS. TOLEDO: Object to form.
A. I really don't recall how much of the spreadsheet data I -- I looked at and -- and how it related to the root cause analysis.
Q. Did you read the root cause analysis and take note of the amount of NDMA that GSK was reporting to have found in the drug substance and the drug product in the root cause analysis marked as Exhibit 11?
MS. TOLEDO: Object to form.
A. Well, I looked at the experiments



they did. Do you have a specific set of data that I can comment on? I have a lot of data here.
Q. Yes, they do have a lot of data.
And I'm asking if you looked at the results with regard to the amount of NDMA they found in the drug substance, meaning the API, and the drug product.
MS. TOLEDO: Object to form.
A. No. I'd have to go back. If you like, I can look through and see what data I recall looking at. If you're talking just about the -- well, you know, I'd have to look really -- go through and look to see what data you're talking about.
Q. I'm talking about any of the test results that they list in their root cause analysis as far as how much NDMA they found in ranitidine drug substance or drug product.
MS. TOLEDO: Object to form.
A. Well, for example, I looked at Table 1 or the figure showing NDMA levels in drug substance.
Q. Do you record in your report any of the NDMA levels that were detected by GSK in

Page 114
B. Olsen

its root cause analysis, either of the drug substance, the drug tablets?
A. Well, I need to look at my report to make sure I -- I'm accurate on what I cited there.
Q. Is there any table or figure in your report where you discuss the findings of GSK and the levels of NDMA that it found in the drug product and drug substance it tested?
MS. TOLEDO: Object to form. Let him have a look at his report.
A. In one instance in my report I actually gave the range for GSK film-coated tablets that Dr. Najafi listed in his report of 36 to 1140-nanograms per 150-milligram tablet.
Q. My question is, did you note anywhere in your report the amounts of NDMA that GSK found when measuring the levels in drug substance and drug product?
MS. TOLEDO: Object to form. Asked and answered.
A. Those were the GSK results.
Q. Listing them from Dr. Najafi's

Page 115
B. Olsen

report, correct?
A. He quoted them or cited them in his report.
Q. Did you look at GSK's report?
MS. TOLEDO: Objection.
Q. And look at all of the values for NDMA that they found when they tested the drug substance and drug product?
MS. TOLEDO: Objection. Asked and answered.
A. I took the values from my report that Dr. Najafi decided -- cited as the tablet analysis by GSK, so.
Q. You didn't look at GSK's results yourself?
MS. TOLEDO: Objection. Misstates his testimony.
A. Did I audit Dr. Najafi's citing the results? No. I took them from his reports since that's what he was saying.
Q. Did you look at the results that are on Exhibit 12, which is put up in front of you, for GSK's testing of API and finished-dose products and compare them to the results that Emery Pharma got when

Page 116
B. Olsen

testing ranitidine drug substance and drug products?
MS. TOLEDO: Object to form.
A. The only -- I think the only GSK results that I mentioned in my report were those that Dr. Najafi mentioned in his report which were consistent with testing from parties such as FDA and TGA as discussed on -- in my report, but I didn't include -- even include those in the graph showing the disparity between Emery's results and the rest of the world.
Q. Did you do a review of GSK's results to determine the upper level of NDMA that they found in a 150-milligram tablet?
MS. TOLEDO: Object to form.
A. I took the result range given by Dr. Najafi.
Q. Did you independently look at the GSK results to determine from their results what the values were in the tablets that they tested?
MS. TOLEDO: Objection. Asked and answered.
A. I quoted the results that

Page 117
B. Olsen

Dr. Najafi was citing in his report.
Q. In order to form an opinion with regard to the testing levels found by Emery Pharma in ranitidine drug substance and drug product, you didn't feel it important to compare those values to the values found by GSK when they tested ranitidine drug substance and drug product?
MS. TOLEDO: Object to form.
A. That's why I took the values directly from Dr. Najafi's report as comparison. And in my report, I am not relying on GSK or Sanofi other than to say that their results are consistent with the others that have looked at ranitidine levels -- or NDMA levels in ranitidine.
Q. Were you aware that GSK found over 1,000-nanograms in 150-milligram tablet of ranitidine when they did their testing?
MS. TOLEDO: Object to form.
A. The range was 36 to 1140-nanograms.
Q. Do you know how many tablets GSK found that had more than 1,000-nanograms?
MS. TOLEDO: Object to form.
A. No. I -- I believe Dr. Najafi only

cited the range in his report.
Q. But you didn't look at the results of GSK yourself to see all of the values that are in between that range?
MS. TOLEDO: Object to form. Misstates his testimony.
A. The range that he quoted that I cite from his report is consistent -- more consistent with the other analyses reported by independent parties than it is with Emery's results.
Q. But the question was, did you look at the GSK results yourself to perform an independent analysis on the levels that they found in the drug substance and drug product?
MS. TOLEDO: Objection. Asked and answered several times now.
A. I looked at -- I guess if Dr. Najafi didn't do that, then I don't know why he would report this range.
Q. Did you ask the defendants to provide you as an expert in this litigation with all the information they had regarding the testing that they did of ranitidine drug substance and drug product?



MS. TOLEDO: I'm going to object on the basis of privilege. Communications with counsel are outside the scope of discovery.
Q. Do you have an understanding as to whether or not you had been provided with all the information regarding the testing for NDMA that has been done by the defendants of ranitidine drug substance and drug product?
MS. TOLEDO: Object to form.
A. I have not asked for additional information.
Q. As an expert giving an opinion with regard to validity of test results, wouldn't you want to have all the information available regarding others' test results of ranitidine drug substance and drug product in order to be able to compare the results?
MS. TOLEDO: Object to form. Argumentative.
A. In my report, I state that I am not relying on GSK data for my opinions. But again, I make the observation that they're -- the range quoted by Dr. Najafi was consistent with those results from independent parties.



Q. Do you know how GSK came about selecting the various drug product and drug substance it tested?
MS. TOLEDO: Object to form.
A. I'd have to look through the root cause analysis to see what they said about that.
Q. You said that you read Andy Searle's transcript as part of your investigation into this case, correct?
A. I read it some time ago.
Q. Did you make any note as to his testimony regarding how they determined what product they would test in their root cause analysis?
A. I don't recall what he had to say about that.
MS. BOGDAN: Okay. We can take this exhibit down.
Q. Did you test any of the defendants' ranitidine API for the presence of NDMA?
A. I was retained just last summer and, so testing of ranitidine at -- at that time, I wouldn't -- I don't know what the purpose of that would be.



Q. Now, when you say that, that would be in the summer of 2021?
A. Yes.
Q. Did you test any of the defendants' ranitidine finished drug product for the presence of NDMA?
A. Well, that would be the same answer as I wasn't retained until then and the recall had occurred many months ago, so no -- no real reason to do that.
Q. Well, wouldn't one reason to do it be to see how much NDMA is actually in the drug substance and the drug product?
MS. TOLEDO: Object to form.
A. Well, it depends on, you know, why look at samples that are old and not relevant any longer.
Q. Did you make inquiry as to whether there were samples available that were still within their expiration date?
MS. TOLEDO: Object to form.
A. No. I didn't ask about that because by that point, again, they were -- would not represent what would -- if the question was, you know, what was available on

the market at the time consumers had access to ranitidine, then those samples wouldn't -- wouldn't be as relevant.
Q. Did you ask if the defendants had preserved samples of ranitidine API and ranitidine drug product for testing?
MS. TOLEDO: Object to form.
A. The information I got was that samples either had been or were being furnished to Plaintiffs to -- as part of this litigation.
Q. Do you have an understanding that any samples that were furnished to the plaintiffs for testing in this litigation there was part of that batch or lot that was retained by the defendants? That Plaintiffs were not provided the only sample available from any particular batch or lot?
MS. TOLEDO: Object to form.
A. I'm not aware of how -- how many samples and whether, you know, they were retained at -- at separate places.
Q. Have you ever tested ranitidine for the presence of NDMA?
A. Have I conducted a test or directed



a test for ranitidine?
Is that the question?
Q. Yeah.
A. I had no -- no reason to do that.
Q. Did you make any suggestion that you should test ranitidine API and drug product to determine the levels of NDMA?
MS. TOLEDO: Objection. Privilege.
Q. As an expert, do you think it's important to have tested the ranitidine drug product and drug substance in order to give an opinion with regard to the levels of NDMA in the drug substance and drug product?
MS. TOLEDO: Objection. Asked and answered.
A. I guess the question is also what -- for what purpose? What are you going to try and use that information for?
And testing had already been conducted on tablets and API.
BY MS. TOLEDO:
Q. Other than the GSK root cause analysis and the master spreadsheet that I've already marked as an exhibit, are you aware



of any other testing done by the defendants on ranitidine drug substance or API? This is a drug substance or drug product.
MS. TOLEDO: Object to form.
A. I don't -- I don't recall seeing other testing that -- that was done.
Q. As you sit here today, can you offer an opinion with a reasonable degree of scientific certainty as to the levels of NDMA in any of the tablets that were provided to the plaintiffs for testing?
MS. TOLEDO: Object to form.
A. I think you're asking do I have a comparison dataset to compare to the Emery results and, to my knowledge, that doesn't exist, but that doesn't soothe my concerns about the Emery dataset itself being invalid.
Q. You, as you sit here today, can't offer testimony as to what levels are in the tablets or the API that was provided to the plaintiffs for testing because you, yourself, have not tested the samples and you have no dataset to compare it to, correct?
MS. TOLEDO: Object to form.
A. I don't have a dataset to compare



to Emery's results. I can only look at the gaps and validations and concerns about the data that Emery had generated.
Q. But as you sit here today, you can't say that the amount of NDMA that Emery Pharma measured in the API or the tablets is incorrect.
MS. TOLEDO: Object to form.
A. I have reason to doubt that it is correct as I have expressed in my report and supplemental report; and, not to mention, the inconsistency with Emery's previous data for the citizens' petition and all the other independent parties that have generated data on ranitidine.
Q. When you say you have reason to doubt, that doesn't mean that you can prove that their reporting of NDMA in the drug substance and drug tablets that they tested is wrong, correct?
MS. TOLEDO: Object to form. Misstates his testimony and his reports.
A. And if you -- in fact, I address that in my supplemental report where it seems

that Emery wants to claim validity of the -- their data until it's proven not reliable. And that's not the way it works.

They need to show that it's reliable and that it -- interferences have not occurred even if there's no other dataset to compare it to. And especially when we see the inconsistencies with all the other data that's been generated.

Q. But you, Dr. Olsen, have no testing data for these samples to show that the amounts that Emery Pharma has measured in the drug substance or the drug product are incorrect?

MS. TOLEDO: Object to form. Misstates his testimony.

A. I don't have data for those samples but have the concern about the Emery data as it is by itself.

Q. You live within about 20 miles of the GSK Zebulon facility located in Zebulon, North Carolina?

A. I'm not far from Zebulon.

Q. At the Zebulon facility, does GSK have LC-MS/MS capacity?



A. I don't know what capacity they have in that facility.

Q. Are you familiar with what is known as the Research Triangle Regional Partnership in North Carolina, sort of from your part of the country there?

MS. TOLEDO: Object to form.

A. I'm not -- I'm not familiar with what research partnership refers to. I'm familiar with the Research Triangle area.

Q. Okay. And what is the Research Triangle area?

A. That is a large area kind of between Raleigh, West Raleigh and Durham, North Carolina, which has a lot of different technology-related companies, including some pharma companies.

Q. And are there analytical laboratory service providers in that Research Triangle?

MS. TOLEDO: Object to form.

A. Are there contract analytical laboratories, is that --

Q. Yes.

A. Yes. I know -- I know of at least one.



Q. And are there Tier 1 research universities also located in the Research Triangle?

MS. TOLEDO: Object to form.

A. By "Tier 1," do you mean well-known universities?

Q. Like Duke, UNC at Chapel Hill, North Carolina State?

A. Those would be the -- the ones, yes.

Q. Did you make any inquiry as to whether any of those laboratory service providers, GSK Zebulon facility, or any of the research universities would be willing to test ranitidine drug substance and drug product?

MS. TOLEDO: Object to form.

A. I had no -- no reason to -- to inquire about external testing. It had already been done by FDA, Health Canada, TGA, all the other data sources I cite in my report.

Q. Had those agencies tested the samples of ranitidine drug product and drug substance that were sent to the plaintiffs?



MS. TOLEDO: Object to form.

A. They tested samples as described in their results, FDA's samples coming from both the marketplace and some furnished by suppliers, and same situation with other -- some of the other independent laboratories.

Q. My question was, did they test the batches or lots that were provided to the plaintiffs?

MS. TOLEDO: Object to form.

A. I don't know if any of the lot numbers that they tested corresponded to any of the samples tested by Emery a couple years later.

MS. BOGDAN: Mind if we take just a quick five-minute break here?

MS. TOLEDO: Sure.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We are now off the record. The time is 1742 UTC, 1:42 p.m. EDT.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are now back on the record. The time is 1754 UTC,

1:54 p.m. EDT.
BY MS. BOGDAN:
Q. Dr. Olsen, in other cases you've been retained to actually do testing, correct?
A. Testing or experiments related to a question at hand.
Q. And one of those cases was the Cephalon and C-I-M-A Labs versus Watson Pharmaceuticals?
A. Cephalon, CIMA LABS, yes.
Q. And you were retained to design and execute testing to detect carbon dioxide gas that evolve from Watson tablets upon contact with aqueous media?
A. It was experiments to monitor the evolution of CO2.
Q. And did you design an experiment in order to do that?
A. Did I design an experiment? I designed the testing that we did for it.
Q. So you designed a test method that was used in that case?
A. The procedure that we used.
Q. And what test method did you come


up with in that case?
MS. TOLEDO: Object to form.
A. Well, this was -- this was a much different situation than doing a -- like a quality control-type measurement or an impurity measurement, for example. In -- in this case the question we were trying to answer is how much carbon dioxide is released when a tablet is introduced into various aqueous media. I don't remember how many different ones we looked at, but.
Q. And to do this testing you used a device equipped with an infrared sensor which was an accepted scientific methodology for detecting carbon dioxide gas, correct?
MS. TOLEDO: Object to form.
A. Carbon dioxide has a very distinctive infrared band that is well known and, in fact, the device we use to monitor the CO2 could be used as a field device; in other words, portable. Wouldn't even have to remain in the laboratory for use.
Q. That was actually an EA80 indoor air quality meter data logger?
A. I believe that's the -- the model


that had -- had capability for outputting data to a computer.
Q. And so you designed this testing method in that case to fit the issues that were presented in the litigation, correct?
MS. TOLEDO: Object to form.
A. It was designed to, as I said, monitor CO2 when a tablet was exposed, introduced to aqueous media.
Q. Okay. And so when you designed that test method, you attached an experimental vessel containing the tablet to the meter's gas inlet port via tubing and then you use nitrogen gas to carry the gas to the meter's infrared sensor to measure the amount of CO2?
MS. TOLEDO: Object to form.
A. It's been -- been a long time since I did those experiments, but in general, that is the idea of how that went.
Q. So you developed the experimental design and test method based upon your scientific experience and knowledge, correct?
MS. TOLEDO: Object to form.
A. Yes. And the -- this was a -- not


a standard test method. It was something designed for this particular purpose.
Q. Right. So it was a fit-for-purpose design based upon your scientific experience and knowledge in that case, right?
A. And using a well-accepted principle for looking at CO2 and -- and equipment.
Q. And the manufacturer of that meter device that was being used to measure the CO2, how is that device calibrated to work in 5 to 50 degree Celsius and between 10 and 90 percent relative humidity, correct?
MS. TOLEDO: Object to form.
A. I don't remember the exact specifications on -- on the meter.
Q. Do you remember using the meter in less than the relative humidity condition that the meter was calibrated for?
MS. TOLEDO: Object to form.
A. No. I don't recall what -- what the humidity was.
Q. Do you have a memory of using the meter in conditions that were outside of what the manufacturer calibrated the meter to work in?

MS. TOLEDO: Object to form.
A. Can you ask that again?
Q. Did you use the meter in that case in conditions that were outside of the conditions that the manufacturer calibrated the device to work within?
MS. TOLEDO: Object to form.
A. That's what I don't recall; what specific conditions were outside, if they were.
Q. But you can't say if you did or you didn't as you sit here today. You just don't remember?
A. It was, what, 12 years ago.
Q. In that case, did the testing you conducted take more than one day?
A. I don't remember if it did or not.
Q. Did you use more than one sample when you were doing your testing in that case?
A. By one sample, you have to define sample for me.
Q. Did you run the test on more than one tablet?
A. Yes. We did replicates for each



condition. It was a destructive test.
Q. Do you know how many tablets you tested?
A. Not all together.
Q. Was it more than ten?
A. I believe so. I don't -- I don't recall for each condition exactly how many tablets were -- were used.
Q. Was it more than 50?
A. I don't think we needed that many tablets for what we did.
Q. And the testing protocol that you detected in that case was based upon your scientific judgment of over 29 years as an analytical chemistry or analytical chemist?
MS. TOLEDO: Object to form.
A. That plus the well-accepted common use of infrared as a $CO_2$ measurement tool. And this was such a robust technology that it, you know, could be used as an air quality monitor in the field.
Q. Did you follow CGMP or GLP to conduct your testing in that case?
MS. TOLEDO: Object to form.
A. We followed all of the standard



operating procedures in place. This was at the Aptuit laboratory, which included CGMP notebook documentation. And also, since the samples were controlled substances, we had to maintain careful accountability and a chain of custody of those -- excuse me -- even while testing.
Q. That's because you were working with fentanyl, correct, which is a controlled substance?
A. Yes.
Q. Fentanyl has never been available over the counter, has it?
A. Just -- no, just illegally.
Q. And when you say you maintained a lab notebook, are you telling me that this was done with CGMP and QA oversight and all the documentation that comes with CGMP work?
MS. TOLEDO: Objection --
(Cross-talk.)
Q. -- talking about maintaining a lab notebook?
A. I said we followed the laboratory documentation procedures, which are consistent with CGMP requirements, unlike



what I saw in Emery's notebook documentation. Much, much more complete in Aptuit lab.
Q. And you created protocols for your testing methodology in that case, didn't you?
A. Yes. We had a protocol that described how the test was to be conducted.
MS. BOGDAN: If we could please mark Dr. Olsen's Cephalon protocol as an exhibit. What exhibit number are we on, please?
THE VIDEOGRAPHER: This will be marked as Exhibit Number 13, Counsel.
(Plaintiffs' Exhibit 13 was marked for identification.)
BY MS. BOGDAN:
Q. Doctor, do you see Exhibit Number 13?
A. Yes.
Q. And this is your Cephalon protocol?
A. This was what was furnished as an appendix to my report.
Q. There's no date on this protocol, is there? And I'm not talking about the timestamp from the cord at the top.
A. Right. The date that this would've

been applied to would've been in the notebook. So this was taken -- procedure from the notebook where the date was. And in this case, we didn't have the date for the exhibit.

Q. But there's no date on the protocol, correct?

MS. TOLEDO: Object to form.

A. Not on this example that was furnished in my report. But in the notebook, the date -- dates are clear.

Q. And there's no revision history on this protocol, correct?

MS. TOLEDO: Object to form.

A. We did not use a different -- different protocol for it.

Q. And there's no author written on this protocol, correct?

MS. TOLEDO: Object to form.

A. Not as furnished in the expert report; although, it's mentioned that I developed the protocol and it's in the laboratory notebook of the person who executed it.

Q. Does the protocol list the brand



and type of syringe needles that were used?

A. That's not the type of thing that's necessary for something like this. This is a -- all the information here given is sufficient to reproduce this test.

Q. Does it mention the type of tubing that was used, the brand?

A. It doesn't give the brand because that's not a critical factor.

Q. I'm sorry?

A. I was just gonna say, I think we're getting a bit of a false comparison. In the Emery testing methods, some of the --

Q. Doctor, I'm not asking you for a comparison right now with the Emery testing methods. I'm asking you with regard to what's on this particular protocol.

MS. TOLEDO: Please don't interrupt the witness. He was finishing his answer.

Q. My question was, does it mention the type of tubing that was used, the brand. That was the question; that there is no question pending that that was an answer to, so I will continue to ask my question.



MS. TOLEDO: He's entitled to provide an explanation to his answer and he can finish.

You can finish your answer, Dr. Olsen.

MS. BOGDAN: That wasn't an answer to the question that was posed. He had stopped and he answered the question that was posed, and then was just providing a narrative if you look at the transcript.

So, there isn't a question pending right now. I certainly will ask another question, and then the doctor can -- I've not interrupted the doctor. I've let him answer the questions that are pending, but what he was just doing there was not in response to any question that was asked.

A. Yes, it was in response to the tubing question.

I mentioned that the pipe or the brand of tubing was not a critical factor in reproducing this -- this testing. However,



in the -- as opposed to the Emery method where Dr. Najafi has noted such a concern with ranitidine being a highly unstable molecule that there is no information about avoiding heat during sample preparation and things like that that could -- as already known artifactually formed NDMA.

Q. Back to the protocol. You mention an electronic gas flow meter in the protocol. Does it tell us the type of electronic gas flow meter?

MS. TOLEDO: Object.

Q. In number 6?

MS. TOLEDO: Object to form.

A. It doesn't list the brand there and the -- that's because it's not specific to a brand that's necessary to conduct the test.

Q. And your protocol here mentioned tablet but does not provide any information about the identification of the tablet, correct?

MS. TOLEDO: Object to form.

A. This was for a fen- -- in this case, the defendants' tablets. So this could be used -- that would've been in the notebook

statement of purpose of which tablets you're going to use this method for.
Q. Protocol fails to prespecify the number and identity of samples that you're gonna use in the testing, correct?
MS. TOLEDO: Object to form. It misstates his testimony. He's already explained that this information is included in notebooks.
BY MS. BOGDAN:
Q. I'm asking if it's written in -- on the protocol. The protocol does not prespecify the number and identity of samples to use in the testing, does it?
MS. TOLEDO: Object to form.
A. This protocol is how to conduct the test. The information in the notebook is what to conduct the tests on.
Q. The protocol doesn't include anything about visual inspection of the tablets, does it?
MS. TOLEDO: Object to form.
A. Was not at all necessary or related to -- to this -- this work. This -- this was not involving degradation. This was just



determining the CO2 evolution properties of these tablets.
Q. And the protocol doesn't include anything about how you would choose a tablet to use for the testing, correct?
MS. TOLEDO: Object to form.
A. There was no concern about differentiation of tablets that had been treated in some accelerated or stressed way, and then there were replicas done as part of the individual protocols for -- for this testing.
Q. And you mention notebooks. Were the notebooks provided to the parties in this case?
A. I don't recall what all was provided for this matter.
Q. And were those your own personal notebooks?
A. No. These were maintained at -- on experiments conducted by a bachelor's degree person at the laboratory under my direction and in my presence.
Q. And this is when you were doing consulting work but using Aptuit's laboratory



after you no longer worked there?
A. That's right.
Q. And who would maintain those lab notebooks?
A. Aptuit would maintain those. And they have CGMP SOP procedures for recording all experimental data in the notebook. They don't do anything, even things that would be considered development work, they follow their notebook documentation procedures because it gets to be really tricky, difficult to try and keep kinda two sets of rules for documentation.
Q. So you've mentioned development work. Is it also known as R&D work, research and development work?
A. That's a very loosely defined term. I think what Emery has tried to portray it as anything that doesn't involve, you know, manufacturing or releasing drugs to market.
Q. Are you familiar with a term, that is research and development work, as it's used in the chemistry field?
MS. TOLEDO: Object to form.
A. Again, that covers a wide range of



activities but, nevertheless, for anything under that umbrella, appropriate documentation minimum standards should be metaphor any laboratory work. And my opinion was that Emery's notebook documentation in this matter fell far short of that.
MS. BOGDAN: Okay. If we could please pull up the next exhibit, which would be CFR 58.1.
THE VIDEOGRAPHER: And this will be marked as Exhibit 14.
(Plaintiffs' Exhibit 14 was marked for identification.)
BY MS. BOGDAN:
Q. Are you familiar with the Code of Federal Regulations that pertains to GLP?
A. Yes.
Q. And if we look here in the scope for GLP, it states that:
This part prescribes good laboratory practices for conducting nonclinical laboratory studies that support or are intended to support applications for research or marketing permits for products regulated by the Food and Drug

Administration, including food and color additives, animal food additives, human and animal drugs, medical devices for human use, biological products, and electronic products?
Do you see that?
A. Yes.
Q. So the Code of Federal Regulations describes the scope of GLP as pertaining to studies that support or are intended to support applications for research or marketing permits for products like human drugs, correct?
MS. TOLEDO: Object to form.
A. Well, the same thing applies as what I said about GMPs. Just saying that something is not a GLP study doesn't absolve one of the need for careful and complete laboratory notebook documentation of -- so that results can be checked, retrieved, examined and reproduced if -- if desired.
Q. But you agree that GLP is required only in instances where the research is being done for drug application seeking drug approval for human use?
MS. TOLEDO: Objection.



Q. Definition of the statute itself?
MS. TOLEDO: Object to form.
Asked and answered.
A. In the, you know, good laboratory practices covers a lot more than documentation. It covers a lot of the other aspects of preclinical studies that get demitted for -- to FDA. But again, it doesn't -- calling something non-GLP does not give leeway from a scientific standards standpoint to use substandard documentation practices.
Q. But you agree that the work that Emery Pharma did as an expert in this litigation was not for the purpose of investigating new drug applications or seeking approval of a drug for sale for human use, correct?
MS. TOLEDO: Object to form.
A. That's not the purpose of the litigation, but Emery was also not doing what I would call R&D. They were not developing anything. They were trying to design tests and take measurements in support of the litigation.



Q. Which is not developing a drug for regulatory approval to be used in humans, correct?
MS. TOLEDO: Object to form.
A. Not going to be used for that purpose but still needs to meet minimum scientific standards for documentation.
Q. The work that they did was not a GLP project, correct?
MS. TOLEDO: Object to form.
Asked and answered.
A. It's -- I don't know what aspect of that it would pertain to, you know, not following good documentation practices.
Q. You're using the term "good documentation practices," and I'm asking about the regulatory requirements of -- of GLP.
I'm asking if the work that Emery did in this litigation was to do research in furtherance of getting a drug approved regulatorily for use in humans?
MS. TOLEDO: Objection. Asked and answered.
A. They were not conducting testing



for that purpose but still need to follow minimum scientific standards for documentation to defend the integrity and quality of their -- their data which was in my examination not present.
Q. Did you undertake an investigation as to whether the defendants engaged in non-GLP research regarding ranitidine?
MS. TOLEDO: Object to form.
A. To my knowledge, the defendants followed their own internal SOPs related to their documentation in support of the data they're generating, and my understanding is that that still followed what would be considered at least at CGMP documentation practices as well as other things like instrument qualification, training, et cetera.
MS. BOGDAN: If you could please pull up Exhibit GSKZAN3395640, which is called Bioanalysis.
THE VIDEOGRAPHER: This will be marked as Exhibit 15, Counselor.
(Plaintiffs' Exhibit 15 was marked for identification.)

BY MS. BOGDAN:
Q. Doctor, do you see this exhibit that's been loaded? Is it up on your screen?
A. Yes.
Q. Okay. Have you seen this method sheet before?
MS. TOLEDO: We need to see the document on Box, please. Give us a second for it to load.
Do you see it?
THE WITNESS: Not yet. Okay.
BY MS. BOGDAN:
Q. Have you seen this document before, Dr. Olsen?
A. I don't recall having seen this.
Q. Okay. It's a GlaxoSmithKline document. Do you see that at the top?
A. Yes.
Q. Okay. And you see that it pertains to ranitidine? That's in the top right.
A. Yes.
Q. Okay. And then you see in the center of the document it says:
Non-GLP Method Sheet?
A. Yes.



Q. But you hadn't seen this document before today and me showing it to you, correct?
MS. TOLEDO: Objection. This clearly shows that it is not an exogenous text document. It is outside the scope of his opinions.
Q. I'm just asking if you've seen it before me showing it to you today. That was my question.
A. I don't recall having seen this.
MS. BOGDAN: We can take that down. And if we could pull up Protocol Amendment 4, GSKZAN3692463.
THE VIDEOGRAPHER: This one will be marked as Exhibit 16.
(Plaintiffs' Exhibit 16 was marked for identification.)
THE WITNESS: Okay.
BY MS. BOGDAN:
Q. And do you see this document, it says, Sponsor GlaxoSmithKline in the center?
A. Yes.
Q. And the Study Title is N-nitrosodimethylamine Transgenic Gene



Mutation Assay in MutaMice?
A. Yes.
Q. And Compliance Status, do you see it says, Non-GLP?
MS. TOLEDO: Again, objection. This is outside the scope of his opinions.
Q. Have you seen this document before I showed it to you today at this deposition?
A. No. It would not pertain to -- to my opinions. And it's well known that not all studies are GLP.
MS. BOGDAN: We can take this exhibit down.
If we can please bring up the exhibit, Current Good Manufacturing Practice Regulations.
THE VIDEOGRAPHER: This one will be marked as Exhibit 17.
(Plaintiffs' Exhibit 17 was marked for identification.)
BY MS. BOGDAN:
Q. Has that loaded for you, Dr. Olsen, on the computer?
A. Not quite. Not -- not come through



yet.
Q. It's only a two-page document.
A. Here it is. Loading now.
Q. Okay.
A. Okay.
Q. Okay. And this is from the FDA website with regard to Current Good Manufacturing Practice Regulations. And I would direct you to the first paragraph where the FDA is stating that the FDA ensures the quality of drug products by carefully monitoring drug manufactures' compliance with its good manufacturing practice (CGMP) regulations.
And then they go on to say:
The CGMP regulations for drugs contain minimum requirements for the methods, facilities, and controls used in the manufacturing, processing, and packaging of a drug product?
Do you see that?
A. Yes.
Q. Okay. And in this case, was Emery Pharma manufacturing a drug product?
MS. TOLEDO: Object to form.

A. Well, what's puzzling is that in I think all of Dr. Najafi's or Emery's communications they lead with a claim that Emery is GMP, GLP certified. Then they go on to describe results that apparently are not following their -- any GMP, GLP practices that they might have.

So I would find that misleading from the start. But no, they're not, to my knowledge, manufacturing any -- any products.

Q. So, my question, Doctor, and if you could please listen to the question, but -- that I'm asking, and my question to that in this case was Emery manufacturing a drug product?

MS. TOLEDO: Object to form. Asked and answered.

Q. And so -- go ahead.

My next question is, was Emery manufacturing, processing, or packing a drug product?

MS. TOLEDO: Object to form. Asked and answered.

A. Be the same response, is while they are not doing that, they highlight their



come -- certification as CGMP, GLP, so.

Q. Which means that they can do that kind of work, correct?

MS. TOLEDO: Object to form.

A. Presumably that's what that means. But when it's followed immediately by discussion of results they did for NDMA and ranitidine, it strongly implies, in my opinion, that that's what they're doing. I don't ever state that for this study we're -- we're not following our standard SOPs.

Q. To your knowledge, did Emery -- has Emery Pharma manufactured, processed and packaged Zantac or ranitidine for sale to humans?

MS. TOLEDO: Object to form. Asked and answered.

A. No. That -- I don't know that they have done that.

MS. BOGDAN: Take this exhibit down.

MS. TOLEDO: Before we start over with new line of questions, Rosemary, could we take a five-minute break?

MS. BOGDAN: Sure.



MS. TOLEDO: Thank you.

THE VIDEOGRAPHER: We are now off the record. The time is 1840 UTC, 2:40 p.m. EDT.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are now back on the record. The time is 1851 UTC, 2:51 p.m. EDT.

BY MS. BOGDAN:

Q. Welcome back, Doctor.

Would you agree that analytical chemistry is the science of obtaining, processing and communicating information about the composition and structure of matter?

MS. TOLEDO: Object to form.

A. There's a lot -- a lot of descriptors in there. You want to go through that again?

Q. Well, what -- how would you describe analytical chemistry?

A. Well, did I talk about that in my report?

Q. Just asking you for what you



believe the field of analytical chemistry is.

A. I'm just trying to find where -- 'cause I thought I mentioned some of that. Okay.

The way I described it in my report was, analytical chemistry is a discipline concerned with developing methods to qualitatively and quantitatively evaluate chemical substances.

Q. And within the field of analytical chemistry, there are various techniques used to qualitatively and quantitatively detect, identify, characterize, and quantify chemical substances, correct?

MS. TOLEDO: Object to form.

A. I would say various methods to qualitatively and quantitatively evaluate chemical substances.

Q. And gas chromatography would be one of those, correct?

A. Gas chromatography is a technique used in analytical chemistry.

Q. And gas chromatography works for separating and analyzing compounds that can be vaporized without decomposition, correct?

MS. TOLEDO: Object to form.
A. It -- it works by separating and detecting compounds that have been vaporized.
Q. And it works for separating and analyzing those compounds that can be vaporized without decomposition, correct?
MS. TOLEDO: Object to form.
A. Well, if we start talking about the whole technique, then there's a number of aspects that we'll have to get into which start with the introduction of the sample. You know, is it coming from a head space file, is it coming from direct injection, how hot is the injection port.
You know, all of those things lead to what's -- what's present in the vapor stage -- phase. And if you are concerned about decomposition, then that can happen, you know, in several ways.
That could happen at the -- even when a sample solution is made up before injection there could be decomposition of some sort. If you have as were shown in the artifactual NDMA formation in Valisure's analysis, repeated by Emery, but where NDMA



was formed in the solution for analysis from heating, and another -- and that was before introduction into the gas chromatograph. And then in the injection port you could also have decomposition from a component of a sample itself in the injection port. So, there are a lot of possibilities there.
Q. Now, GC/MS doesn't work for qualifying NDMA in ranitidine. Do you agree?
A. Well, you haven't talked about how a sample is introduced there. One author showed a -- at least one author showed a technique to avoid decomposition -- or to avoid interference from ranitidine in a GC analysis.
Q. And there's a difference between interference and decomposition, correct?
A. Inter- -- decomposition could lead to interference or interference could be caused by some other mechanism that's not related to decomposition.
Q. And when you were referring to interference, were you referring to that heating the ranitidine in a head space GC environment would result in the creation of



NDMA?
A. I don't think -- I don't know if you've got it quite right there. The -- it's the environment in the head space vial that's getting heated external. It's part of the sampling mechanism or injection mechanism for a head space GC, but it's the heating in the solution, such as shown in FDA's Grand Rounds seminar when they showed the black vials of ranitidine solution that had degraded.
Q. Which was the reason the FDA advises against using GC/MS to measure the amount of NDMA in ranitidine, correct?
A. They advised against using head space GC, the previous method that had been used for the sartans that would not be appropriate for -- for ranitidine.
Q. And doesn't the fact that NDMA forms from ranitidine when using the GC/MS head space method confirm that NDMA forms from ranitidine with heat?
MS. TOLEDO: Object to form.
A. That's a very apples and oranges comparison. You have ranitidine in solution experiencing high heat, so very stressed



conditions as opposed to in a product.
Q. But it is the heat that is applied during the GC head space analysis that causes the artifactual formation of NDMA, correct?
MS. TOLEDO: Object to form.
A. Valisure, in fact, showed data that NDMA was not detected when they used lower temperatures in the head space file.
Q. Do you recommend using GC/MS to detect the amount of NDMA in ranitidine as long as a lower temperature was used?
MS. TOLEDO: Object to form.
A. That was not what I -- what I said. I said that's what Valisure showed or reported in their citizens' petition.
Q. Did you take any steps to ascertain the validity of that statement?
A. Did I take any steps? That's -- that's what they reported.
Q. I understand that's what they reported.
But did you do your own independent analysis to determine if that statement of Valisure was correct?
A. I was retained well after

Valisure's citizens' petition so none of that would have been relevant to -- to what I've been trying to do.
Q. Did you do an independent evaluation of the method that GSK used to test the ranitidine drug substance in drug products?
MS. TOLEDO: Object to form.
A. The GSK method, the FDA method, everybody's method except Emery's has employed reverse phase HPLC coupled to LC-MS or LC-MS/MS. And so if validation data were obtained using that technique, it would not be necessary for me to go further to validate that.
Q. Did you independently look at the validation data from the FDA or from GSK with regard to the methodologies used to measure NDMA in ranitidine drug substance and drug product?
MS. TOLEDO: Object to form.
A. I looked at the validation data that FDA supplied with their method where they -- they gave validation results as well as other -- oh, the EDQM Laboratory in



Europe. I looked at their validation summaries.
I don't recall how much of GSK's validation I reviewed. I don't -- I can look in the King paper to see if it's summarized there, but it would have been available to a reviewer if they wanted.
Q. I'm asking if you personally, independently validated or -- excuse me. Strike that.
I'm asking if you independently looked at the validation done, if any, by GSK of the method that it used to test ranitidine drug substance and drug product.
A. Well, I can go back through what I've seen. I've looked at so many of these I don't recall exactly which ones I looked at and the details around that. Might be in the -- it's probably not in the root -- I don't know if it's in the root cause analysis or other documents, but I'm happy to spend time looking there and take a look at the King paper.
Q. I'm asking if you did that as part of your investigation into this case and



that -- and not do it now but did you already do that?
A. That's what I'm saying is I don't recall the exact, specific information that I reviewed because I have reviewed so much of it that I don't want to say something that I -- I didn't do.
Q. Is there anywhere in your report where you go through the actual procedures that were done by GSK to validate their testing method?
A. I was concerned more with the data supplied by independent laboratories like FDA and PGA and EDQM and other independent groups where, in some cases, they give validation data. In other cases, it's in peer-reviewed publications where the validation data, if not explicit, would've been available to -- to people. So that, you know, given their independence and not being biased in this matter, as well as their reputations as leading regulatory authorities, I was satisfied with what -- what they had done.
Q. And when you say the validation data if not explicit would be available to



people, did you go about requesting any of the validation data for the methods used in any of the peer-reviewed publications on this issue?
MS. TOLEDO: Object to form.
A. What I -- what I believe I said was that would be available to reviewers on request, as I have requested in my review of journal articles in the past, if not for inclusion in the paper, for support of the -- the data and conclusions made in -- in the paper.
Q. But in this case, you didn't ask for any of the underlying validation data for the methods that were used in the peer-reviewed publications, correct?
MS. TOLEDO: Object to form.
A. That would've been available to reviewers. Whether authors would want to furnish that to a, you know, an independent requestor, I don't know. But I'm confident in the standards of the journals that these articles appeared in to -- to not need to request an independent review.
Q. And how many of these peer-reviewed

publications were you actually able to review the validation data for? Did you note that in your report?

MS. TOLEDO: Object to form. Misstates his testimony.

A. What -- what I -- what I said was I did not request validation data from peer-reviewed articles because it had already gone through a peer review, so I didn't find that necessary. And unlike Emery's incomplete validation summary and further concern generated by seeing some of the chromatograms of samples, I have large concerns about the validation status or reliability of their results.

Q. You didn't look at GSK's validation data when evaluating their root cause analysis, correct?

MS. TOLEDO: Objection. Asked and answered.

A. I don't recall exactly what validation information I looked at from GSK. I'd have to go back and look through those documents and separate reports, which I can do that, and refresh my memory as to what I



reviewed and, you know, if I didn't, then that would be accurate.

Q. Did you review any validation data from Sanofi regarding their testing of Zantac finished-dosed product?

MS. TOLEDO: Objection. Asked and answered.

A. I don't recall if I saw validation data from Sanofi or -- or not, and I didn't -- I don't think I cited other than Dr. Najafi's citation of GSK's results in my report.

Q. Now, liquid chromatography is another technique to separate a sample into its individual components, correct?

A. Yes. Liquid chromatography is a separation technique.

(Cross-talk.)

A. Sorry. It may or may not separate all the components depending on the conditions under which the analysis is conducted.

Q. And for liquid chromatography, the mobile phase is a liquid instead of a gas, like as used for gas chromatography, correct?



A. Yes, that's correct.

Q. And liquid chromatography separates samples based on the interaction of the sample with the mobile and stationary phases in a column, correct?

A. A column contains the stationary phase and the mobile phase flows through it. Things that tend to interact more strongly with the stationary phase take longer to go through the column, and that's the basis for separating so that they come out of the column at different times.

Q. So the column is filled with a solid phase which interacts differently with each component causing different flow rates through the column leading to the separation, correct?

A. May or may not act differently. Some things act very similarly and are not completely separated.

Q. But that's the idea of liquid chromatography, right?

A. That's the goal, is to affect the separation of the desired components.

Q. And the old style flash



chromatography relied on gravity to move the liquid solvent containing the sample through the column, correct?

A. One form of flash chromatography, column chromatography, relied on gravity. I think there was also some low pressure devices that could make that happen more quickly, and that is primarily used for purification purposes.

Q. But high performance liquid chromatography, which is known as HPLC, does this by passing a pressurized liquid solvent through the column, correct?

A. In order to put, you know, directly mobile -- liquid mobile phase through the column a pump is used and that creates some degree of pressure.

Q. And for most HPLC systems, there is a column oven that allows for controlling the temperature at which the separation is performed?

A. I don't know if that's the case for most HPLC systems. For -- certainly for some that the column temperature can be controlled.

Page 170
B. Olsen

Q. And HPLC typically uses UV detection to identify the components of a sample?
A. UV is used whether it's typical or not kind of depends on the types of compounds that one is looking -- looking to detect.
Q. Would you agree that HPLC UV alone cannot accurately measure the amount of NDMA in ranitidine?
MS. TOLEDO: Object to form.
A. Depends on -- that would depend on how much NDMA is present or the levels of interest but for trace type levels, UV detection would be difficult.
Q. And what about for quantification, not just identification but quantification? Would you agree that HPLC UV alone cannot accurately quantify the amount of NDMA in ranitidine?
A. What was your previous question about identifying NDMA or quantifying it?
Q. I -- I used the word "measure" in my previous statement, my previous question, and what I was asking for was quantification and that's why I asked the question using the

Page 171
B. Olsen

other word because I didn't know, from your perspective, using the word "measure" if you might have thought I was asking about identification, so --
A. Okay.
Q. -- I rephrased the question.
A. So, quantification ability by UV depends on, you know, properties of the anilide and how low detection you need to have. And for NDMA, it would be difficult to go to very trace levels by UV detection.
Q. And so there is another analytical method for HPLC, which is LC-MS. Are you familiar with that?
A. I'm familiar with LC-MS, yes.
Q. Okay. And that's liquid chromatography coupled with mass spectrometry, correct?
A. That's what that stands for.
Q. And can LC-MS be used to detect, identify, characterize, and quantify NDMA in a sample?
A. You listed a lot of things there. Can we -- can you specify which one you're interested in?

Page 172
B. Olsen

Q. Sure. I can break the question up.
Can LC-MS be used to detect NDMA in a sample?
A. It depends on what levels. Do you -- are you -- do you know you're looking for NDMA? And, you know, what -- what sample do you have? What else is present?
So a number of factors there that kind of relate to that general question.
Q. Can you design a testing method using LC-MS to detect NDMA in a sample?
A. If you know you're looking for NDMA in a sample, it's possible to develop an LC-MS method to detect certain levels; then the -- things like sample concentration and other instrumental parameters govern what levels one is able to see.
Q. Can you design a testing method using LC-MS/MS to detect NDMA in a sample?
A. Same kinds of factors enter in. Do -- you know, what sample concentration? What levels are you looking for? What -- whether components are present that could impact the validity, reliability of your results, which is why the concern is there

Page 173
B. Olsen

about Emery's, so far, unique use of the HILIC mode as opposed to the rest of the world using reverse phase; in fact, Emery using reverse phase for some of its methods.
So this use of HILIC is still, to this day, unjustified in my opinion because we don't know what's -- what's happening to the rest of the sample.
Q. My question was, can you design a testing method using LC-MS/MS to detect NDMA in a sample? Is it possible to do that?
A. Well, FDA has done that, for one.
Q. So the answer is yes?
A. FDA and others have all designed methods that have shown -- been shown to be valid for determination of NDMA and ranitidine, unlike Emery's method.
Q. And what does mass spectrometry rely on to detect, identify and quantify a compound?
A. Again, do you want to break that up into what...
Q. How does mass spectrometry identify and quantify a compound?
A. Okay. By identify, if you're

talking about -- identification, that can mean a couple of different things. One is you see a response that you don't know what the particular compound is.

In -- in mass spec, you can get qualitative information about that through fragmentation of -- well, the molecular ion and then the fragments that are produced. Things break apart according to various patterns depending on, you know, structure of the molecule and so forth.

So if you -- if that's your goal, you don't -- you're trying to identify an unknown, then that's -- that's one aspect of MS. The other one is if you know what you're looking for and you see a response at that -- if you know the retention time, how that compound is retained on the HPLC part of it and when it comes into the detector, that can give an indication that that's when that -- that that's the molecule you're -- you're looking at, and so you've identified it by retention time.

Dr. Najafi argues that the two stages of MS/MS offers further selectivity in



identification such that only NDMA will respond to the detector -- in the detector. But what -- what the problem is, is his own data shows something else is responding as in early in the chromatogram in the -- especially the HILIC mode chromatograms that I focused on.

And if it's -- if only NDMA can come through the mass filters we talked about earlier, then that would be an indication that NDMA is being formed in the detector itself and represents an interference and inaccuracy and, therefore, non-reliability of -- of the data.

Q. And with regard to when you say something else is responding, do you know what that is?

A. Well, this is -- the question has been a concern to other workers doing -- developing methods for NDMA in ranitidine and they explicitly talk about the need to demonstrate the separation of ranitidine itself from NDMA. And, in particular, they usually then actually divert the flow of the HPLC away from the detector so ranitidine



doesn't enter it. The -- it may not --

Q. I'm sorry.

A. I'm not quite done.

It may not -- you could say, well, that's not a problem if it's separated and that -- that may be the case but that's when the potential for large -- relatively large quantities of ranitidine building up in the source could cause interference and unreliability later on.

But anyway, that's why FDA saw fit to include a chromatogram -- example chromatogram in their method showing the separation of NDMA and ranitidine. And at least three other sources that I've cited have done that, including the -- the EMA EDQM Lab in Europe that actually states it's important to -- critical to separate ranitidine from NDMA because ranitidine, in the mass spec, can form NDMA.

And that's where -- and now I want to talk about the difference between reverse phase and HILIC mode chromatography.

Q. I'd like to just stop you there because the question was -- do you remember



what the question was at this point?

A. You asked if an HPLC MS/MS method could be developed.

Q. That was a long, long, long time ago that question was asked. I'd like to ask you, you mentioned studies when you gave your narrative answer.

What studies are you referring to? You specifically mentioned the EMA EDQM, but you also mentioned authors and studies.

What study are you referring to, or studies?

A. Well, I said methods. If I -- If I said studies, that would encompass method developments that others, independent labs have done, including the EDQM, FDA, the Waters Corporation. And I think Yamamoto in that paper also talks about the concern of ranitidine getting into the mass spec detector.

Q. So Yamamoto, the EMA EDQM, and the FDA?

A. And the Waters application note also mentions this explicitly.

Q. When you say the Waters application

note, is that a document or a peer-reviewed study or what is that?
A. I reference that in my report. See what it's -- how it's termed there. I have to find it.
Q. Is this in your supplemental report?
A. It's in my initial report. Sorry. It's in my supplement as well. It's Reference 3.
(Cross-talk.)
A. I'm not sure that -- somehow that doesn't sound like the right title, but it was a latter application. So Waters pub- --
Q. I'm sorry?
A. -- Waters published a -- on their website an application describing determination of NDMA and ranitidine.
Q. You mentioned the FDA, the EMA and what you cited as Reference Number 3 in your supplemental report?
A. And if I can take a moment to look at my report, I can try and give you a more complete list.
Q. That's fine. I'm -- I'm going to



move on.
On your Materials Considered list, do you list any documentation that is the FDA's validation of the LC-MS/MS method that it published?
A. Sorry. Can you repeat that?
Q. On your Materials Considered list for your references in your report, is there any reference listed that includes the FDA's validation of the LC-MS/MS method?
A. Their validation is described in the LC-MS/MS method, which, if you hold on for a minute, I will find that.
Q. That's fine. If it's in the LC-MS/MS method that the FDA has published, then you've told me where it is.
So with mass spectrometry, does mass spectrometry ionize the molecules using an energy source?
MS. TOLEDO: Object to form.
A. I don't know what you mean by an energy source.
Q. Well, does -- does MS ionize the molecules?
A. They -- molecules entering the mass



spec source need to be vaporized and ionized.
Q. How do they vaporize and ionize?
A. Pardon me?
Q. How are the molecules vaporized and ionized?
A. There are different techniques for doing that. Emery has used an electro spray interface. This is the -- the interface or the source; it's the part Dr. Najafi left out of his supplemental -- rebuttal diagram.
It's probably the more critical aspect of things. And in that case, there's a high field, 2500 volts, that ionizes -- or ionizes particles that then are evaporated and break up into ions or component ions from the sample.
Another type of source is called atmospheric pressure chemical ionization. It works on a somewhat different mode, but -- and that's -- that's a mode that other workers have used for NDMA and ranitidine, but it eventually achieves ionization as well.
And all of these are in as the flow of the liquid from the HPLC goes into the



source, it gets sprayed in many cases in the presence of a heated gas that also contributes to volatilization.
Q. Doesn't that ionization take place in a matter of milliseconds?
A. I don't know how long it takes place. It is a relatively rapid event. But to the issue is if we have ranitidine, for example, coming into the mass spec over a period of -- some period of time, because it will be a relatively wide peak because there's such a large -- a relatively large amount coming in, then it has an opportunity during that time to, under those conditions, be degraded into NDMA, especially if one believes that ranitidine is such an unstable molecule.
Q. Let's get back to how mass spectrometry works.
So these ionized molecules then pass through a set of electromagnetic fields, which will further separate the molecules based on their mass-to-charge ratio?
A. Different mass analyzers that -- that are being used for MS/MS I believe in

most of the cases are quadrupole analyzers that provide the selection of a mass to go on to the next stage or to be detected.
Q. And the detection is performed based on charged particles striking a detector and creating a current, correct?
A. Yes. After they've been through the last stage.
Q. And this detector only detects charges and cannot differentiate based on mass, correct?
A. Well, the mass to charge particular particles get -- or ions get directed on to the detector, so then the detector is just responding to the ions that are -- that are getting it.
Q. It's the magnetic separation that provides the selectivity of the methodology, correct?
MS. TOLEDO: Object to form.
A. Well, the methodology includes the separation part of it, and then the goal of MS/MS is to only be looking at one particular component. And as long as there are no other components that have those same precursor and



product ions, then it should be the idea is that that will be selective for that compound but that doesn't -- that is not going to differentiate things that are like NDMA that is present from the sample going into the detector from NDMA that's formed in the detector as an artifact.
Q. So two molecules that are ionized at the same time but have different masses can be detected independently using mass spectrometry detection, correct?
MS. TOLEDO: Object to form.
A. So just in general talking about things that are ionized?
Q. Yes.
A. To give -- okay. We're not -- we're not separating or not doing a filtering, just looking at other, I guess, scanning across mass-to-charge ratios?
Q. Yes.
A. Yeah. Different mass to charge can be detected in a -- in a mass spec.
Q. And two molecules that are ionized at the same time and have different masses but have different charges tend to be



detected independently using a mass detection, correct?
MS. TOLEDO: Object to form.
A. Yeah. We've got multiple differences in there; different masses and different charges, same mass-to-charge ratio. The issue is whether the same molecule, NDMA, is being formed and subsequently detected in Emery's system.
Q. And with MS, further specificity can be obtained when fragments of the ions are performed within a collision cell of the mass spec, correct?
MS. TOLEDO: Object to form.
A. As we talked about before, this is the basis for the MRM mode, but it, as I said before, does not differentiate NDMA that's formed in the detector from compounds entering the detector and degrading, doesn't differentiate that from NDMA that was -- may have been present to start with.
Q. But you don't have any proof, as you sit here today, that NDMA is formed in the detector, correct?
MS. TOLEDO: Object to form.



A. The concern I have is based on a couple of things. One is the much higher levels distribution of NDMA in over, you know, multiple ranitidine samples using the HILIC method compared to all the data obtained using reverse phase methods. And then finally getting to see some chromatograms from Emery's HILIC method, seen responses for NDMA coming out throughout the initial part of the chromatogram and overlapping with what should be the -- an NDMA peak.
That's an indication that something is going on there that is creating a response that should be specific to NDMA, according to Dr. Najafi.
Q. But the question that I asked you is if you, as you're sitting here today, have any proof that NDMA is being formed in the detector. You say you have a concern.
I'm asking if you have proof that NDMA is being formed in the detector.
MS. TOLEDO: Object to form.
Asked and answered.
A. This would go back to the burden of

proof is on the validation of the method to show that that is not happening rather than being able to prove exactly what is happening. Something is happening. There's no doubt about that.
Q. We spoke about this a little earlier and I think you -- did you call it a collision cell or a collision -- what did you call that part of the MRM?
A. I --
Q. Chamber maybe?
A. I don't remember.
Q. Okay. And that would be a quadrupole 2 of an MRM system, correct, the collision chamber?
A. Yes. That's usually how -- it's called q2 often.
Q. Q2? Okay. And that is introduced into LC-MS/MS to fragment the molecules into pieces that each have their own mass-to-charge ratio, correct?
A. That takes the parent or precursor ion from the first quadrupole into the second one where the fragmentation occurs to produce the daughter ions.



Q. And that follows to my next question that these pieces are called daughter ions that can be detected instead or along with the precursor in parent ion, correct?
A. Well, if the precursor ion, if that last filter is scanned to let it through, it would be detected too. But, yeah, the -- the product or daughter ions are the ones that go through to the detector.
Q. And since each parent molecule fragments into a predictable fashion, thus, even if two parent molecules have the same mass-to-charge ratio, if they break into different daughter ions, then these can be differentiated from each other, correct?
MS. TOLEDO: Object to form.
A. It depends -- now it depends on the resolution of the filter and how -- how unique these daughter ions are.
Q. But if the daughter ions are unique, then they can be differentiated from each other, correct?
MS. TOLEDO: Object to form. Misstates his testimony.



A. Depends on the resolution. You know, what's the window of mass that is being allowed into the -- the last stage and would that allow slightly different mass to charge ratios through.
Q. If the resolution is sufficient, then it can differentiate them, correct?
MS. TOLEDO: Object to the form. Misstates his testimony.
A. Yeah. You'd have to know what, you know, the possibilities are to determine or to know whether there would be a potential interference there.
Q. And generally, the MS/MS technology is only used when a single source ionization is not adequate to achieve the desired sensitivity or specificity, correct?
MS. TOLEDO: Object to form.
A. I don't -- can you -- you're saying -- can you ask that again just to make sure I know what you mean?
Q. I'm asking the reason that you would have the double MS instead of just LC-MS, you have LC-MS/MS, that's when you use that when a single source ionization isn't



adequate to achieve the desired specificity.
MS. TOLEDO: Object to form.
A. If you -- that could be a reason for using the LC-MS/MS mode as opposed to a single stage technique. And again, this is why the data, the chromatograms are concerning from Emery with supposedly high selectivity of MRM.
If that is only responding to NDMA, then there's some source of NDMA coming through there early in the chromatogram that's interfering with that -- that looks like an NDMA peak, that it's on the shoulder of this hump or poorly resolved. And that's what's -- makes -- that would only lead to a bias, high bias in results, and it's not been demonstrated that that is not a factor.
Q. When you say that there's some source of NDMA coming through early in the chromatogram, what are you basing that on, that that's NDMA?
A. Dr. Najafi claims and we've been talking about MRM supposedly being a very selective way of only looking at one particular component, even at -- he will

almost implies that no separation is even necessary because of the high selectivity of MRM mode.
          But when you look at the chromatograms for the signal that's supposed to be just NDMA in the samples, you see this other misshapen response that comes through. It's not a -- I wouldn't call it a peak. It's just a big slug of response that shows up for NDMA. And you can contrast that with the response that is quite clean for the internal standard.
          There's no corresponding signal like that for the deuterated internal standard, which is another -- is more data that's consistent with NDMA being formed in the detector because you would not form a deuterated NDMA. And we see nothing related to that.
     Q. And you're basing this opinion on what you perceive to be a slug response, correct?
          MS. TOLEDO: Object to form misstates his testimony.
     A. I hesitated to call that a response


that I'm seeing a peak. It's a response above what would be considered a flat baseline in front of a clean NDMA peak. And, again, if that mode or detection is only responding to NDMA, then nothing else could be giving rise to that response.
          And as pointed out, concern from other workers, that's a distinct possibility and -- if a big relatively large concentration of ranitidine goes into a mass spec.
     Q. What is the ionized mass-to-charge ratio for NDMA?
     A. Let me look at Dr. Najafi's method, and I'll tell you which ions he's monitoring.
     Q. Do you know, as you sit here, what the mass-to-charge ratio is for NDMA?
          MS. TOLEDO: Objection. He needs to look through the report and he can give you the answer.
     Q. You're looking through Dr. Najafi's report?
     A. Yes.
     Q. Not your own report to answer this question?


          MS. TOLEDO: Object to form.
     A. He lists the precursor on as 75.1.
     Q. What is the ionized mass-to-charge ratio for ranitidine?
     A. That's not the point. It's whether ranitidine forms NDMA, which then would have a mass-to-charge ratio of 75.1.
     Q. My question was, what is the ionized mass-to-charge ratio for ranitidine? Do you know that value?
     A. No, not off the top of my head.
     Q. Would you expect to see ranitidine and NDMA ions in the same MRM transition?
          MS. TOLEDO: Object to form.
     A. I would not -- I would expect to see -- well, what I've said is if NDMA is formed from ranitidine, it will give a signal just like NDMA are coming in from the sample that was there initially.
     Q. But my question, Doctor, is would you expect to see ranitidine and NDMA ions in the same MRM transition?
          MS. TOLEDO: Object to form.
     A. By transition, you're referring to how NDMA is being monitored for.


     Q. Same transition. Would you expect to see them in the same MRM transition?
     A. Just -- just to be clear, does that mean the 75 to 43 transition?
     Q. Yes. Would you expect to see ranitidine and NDMA in the same MRM transition?
          MS. TOLEDO: Object to form.
     A. I wouldn't expect ranitidine to appear as an impact molecule when monitoring that transition, which is what the concern is, that if it's not -- if ranitidine itself can't do that, then NDMA must be -- be informed which does give rise to that signal.
     Q. Do you expect to see NDMA and any of the ranitidine impurities that all have different molecular weights in the same MRM transitions?
          MS. TOLEDO: Object to form.
     A. The same thing would apply. In fact, the impurities in Yokoo's paper, he showed that impurities were even more likely to form NDMA; so impurities, in addition to ranitidine, could be degrading in the mass specs or to form NDMA and giving an

unreliable response or --
Q. The question -- I'm sorry. Were you finished? There was a little gap on the --
A. Yeah. Just I was saying that that would lead to an unreliable response if those impurities were present and that they -- if they could also give rise to -- degrade to form NDMA in -- in the detector and cause a high bias.
Q. What I'm asking, and the question that I asked if you could please listen to the question, would you expect to see NDMA and any of the ranitidine impurities that all have different molecular weights in the same MRM transition?
MS. TOLEDO: Object to form. Asked and answered.
A. It's not the ionized intact impurity or ranitidine itself that would be the concern. It's the -- any NDMA degradation product that would not be differentiated.
Can we take a -- a little break?
Q. Sure. If you'd like to take a


five-minute break?
A. Yeah.
MS. TOLEDO: That would be great. Thank you.
THE WITNESS: Thanks.
THE VIDEOGRAPHER: We are now off the record. The time is 2004 UTC, 4:04 p.m. EDT.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are now back on the record. The time is 2024 UTC, 4:24 p.m. EDT.
BY MS. BOGDAN:
Q. Dr. Olsen, in your supplemental report you state that the high voltage, 2500 volts, used to ionize sample components could also contribute to artifactual NDMA formation?
Can you -- can you name one study that states that 2500 volts used to ionize sample components contributes to artifactual NDMA formation? A study that actually proves that that phenomenon occurs?
MS. TOLEDO: Object to form.


A. I don't know of a study that has shown that. But it is incumbent on Dr. Najafi to show that that is not causing NDMA to form as has been a concern from other workers that explicitly highlight the need to separate ranitidine from NDMA.
Q. Can you point to one part of the Yokoo 2021 study where it affirmatively states that high heat in LC-MS source is a contributing to NDMA formation from ranitidine?
MS. TOLEDO: Object to form.
A. My report actually says high heat is applied right before samples are analyzed by a mass spectrometer detector. This can present an issue and confound the results because when high heat is used -- and Yokoo's paper does not talk about high heat in a mass spec necessarily, he's talking about just high heat in general -- ranitidine or its impurities may artifactually degrade into NDMA.
So, that's -- that's the concern about the impurities, could be even more subject to this degradation than even


ranitidine.
Q. But the Yokoo paper does not state that heat from the ionization source causes NDMA formation, isn't that correct?
MS. TOLEDO: Object to form.
A. I didn't say that it did, that his paper did state that. It's just an acknowledgment that it's not just ranitidine; that it's the impurities that could be a concern as well and, you know, further exercises the need to demonstrate separation and non-introduction into the mass spec of ranitidine and related compounds.
And as yet, I haven't seen anything that demonstrates that from Dr. Najafi.
MS. BOGDAN: If we could please pull up 2003 Olsen Strategies For Investigation and Control of Processed and Degradation Related Impurities.
THE VIDEOGRAPHER: This will be marked as Exhibit 18.
(Plaintiffs' Exhibit 18 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, do you recognize this

book chapter that you authored?
A. I'm waiting to pull it up on our screen here. Okay. Yes.
Q. This was a book chapter that you authored with Dr. Steven Baertschi?
A. Yes.
Q. Okay. And this was an entire chapter that you wrote with Dr. Baertschi regarding strategies for investigation and control of process and degradation-related impurities, correct?
A. Yes, that's the topic.
Q. And NDMA from ranitidine is a degradation impurity, correct?
MS. TOLEDO: Object to form.
A. It is a degradation impurity, but it wouldn't have normally been identified as such in the description we have of investigation of degradation-related impurities.
Q. Despite you writing an entire book chapter on strategies for investigation and control of process and degradation-related impurities, you were not hired by the defendants in this case to investigate those


issues, correct?
MS. TOLEDO: Object to form.
A. Investigate those issues, that's a really broad category, so do you have specific thing in mind there?
Q. Well, are you offering any opinions in this case regarding the manufacturing and processing of ranitidine and controlling the amount of NDMA in the drug?
A. I, at present, haven't given impure cal- -- opinions on that, but I may do so in the future.
MS. BOGDAN: Please pull up Chapter 12, Mutagenic impurities, please.
THE VIDEOGRAPHER: This will be marked as Exhibit 19.
(Plaintiffs' Exhibit 19 was marked for identification.)
BY MS. BOGDAN:
Q. Dr. Olsen, do you see Chapter 12?
A. Again, we're lagging a bit getting ours loaded. Here we are. Okay.
Q. And this is a chapter that you wrote with Dr. Baertschi and it was published


in 2020, correct?
A. Yes.
Q. And this chapter is entitled Mutagenic impurities, correct?
A. Yes.
Q. But in this litigation, you are not offering any opinion with regard to the mutagenic nature of NDMA.
Is that my understanding from your earlier testimony?
MS. TOLEDO: Object to form.
A. Only -- only what I've referenced previously about its classification as a probable human carcinogen.
Q. And despite writing an entire chapter of a book regarding mutagenic impurities, when I asked you about the mutagenic characteristics of NDMA, you told me that was outside the scope of your opinion in this case, correct?
MS. TOLEDO: Object to form.
A. I have not studied the mutagenic properties of NDMA and -- and, again, stating that the IARC classification is it is a probable human carcinogen.


MS. BOGDAN: Will you please pull up the FDA news release from April 1st of 2020?
THE VIDEOGRAPHER: This will be marked as exhibit 20.
(Plaintiffs' Exhibit 20 was marked for identification.)
BY MS. BOGDAN:
Q. Has Exhibit 20 been loaded for you, Dr. Olsen?
A. Not yet. Okay.
Q. Are you familiar with the FDA news release requesting removal of all ranitidine products from the market?
MS. TOLEDO: Object to form.
A. I have seen this.
Q. Did you consider this when you were forming your opinions in this case?
A. Just taking a minute to look it over.
(Document review.)
Is it on my Materials Considered list?
Q. I'm asking if you, as you sit here today, you don't know if you considered this

when forming your opinions in the case?
A. I looked at a lot of things from FDA so trying to make sure that this was one.
Q. Well, this was an FDA release requesting removal of ranitidine from the market.
A. Yes. Yes. This was in my Materials Considered list.
Q. And drawing your attention to the first paragraph where it reads after they announced the withdrawal they say:
The agency has determined that the impurity in some ranitidine products increases over time and when stored at higher than room temperatures which may result in consumer exposure to unacceptable levels of this impurity.
Did you consider that statement of the FDA when writing your report and offering your opinions in this case?
A. I considered that statement, as well as where the rest of this release. For example, lower than that, next paragraph, it says:
The FDA conducted thorough


laboratory tests and found NDMA in ranitidine at low levels.
They didn't have enough information so they continued to look at that.
Q. And then the next sentence in this first paragraph states that:
As a result of this immediate market withdrawal request, ranitidine products will not be available for new or existing prescriptions or OTC use in the U.S?
You see that?
A. Yes.
Q. Would that mean after April 1st of 2020 ranitidine or Zantac would not be available for sale?
MS. TOLEDO: Object to form.
A. I don't know how the timing of an immediate market withdrawal request would work, whether it goes into effect right then. I will say that what the agency said in that previous sentence was consistent with what everyone has found, that NDMA can increase in some products over time and some higher temperatures can increase the levels.
Q. Bring you down to the last sentence


on this first page, or actually it might be on the top of the next page. Right. That reads:
New FDA testing and evaluation prompted by information from third-party laboratories confirmed that NDMA levels increase in ranitidine even under normal storage conditions.
Do you see that statement from the FDA?
A. Yes.
Q. Did you consider that statement when formulating your opinions in this case?
A. I considered this in its entire context, along with the other data from FDA and -- and others.
Q. And the FDA goes on to say:
And NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures that the product may be exposed to during distribution and handling by consumers.
Did you consider that statement in formulating your opinions in this case?
A. This, again, is a finding that may


increase, depending on the -- how high a temperature, how long a time, how it -- material is stored and at different rates, depending on all those factors, plus the samples themselves.
Q. Do you disagree with the FDA's statement that NDMA levels increase in ranitidine even under normal storage conditions?
MS. TOLEDO: Object to form.
A. They can increase under normal storage conditions. In fact, in Emery's non-disclosed 37 degrees Celsius data for over a month, NDMA levels didn't increase, so that is even an elevated temperature condition.
Q. So do you disagree with the FDA statement that NDMA levels increase in ranitidine even under normal storage conditions?
MS. TOLEDO: Object to form. Asked and answered.
A. I agree with what they've put in context previously, that it can increase depending on many factors and temperatures is

one of them.
Q. And do you agree with the FDA statement that NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by consumers?
A. This, again, is consistent with other findings that NDMA raise a formation can vary significantly and, you know, what's -- it doesn't -- it's not explicit here about what "increase significantly" means or "stored at higher temperatures" means and what -- what conditions "during distribution and handling" are referring to.
But, you know, all -- that whole realm of possibilities and variation is -- is possible, but it still would not be possible to go back and retrospectively know what levels of NDMA might have been in an individual consumer's Zantac.
Q. So do you agree or disagree with the FDA's statement?
MS. TOLEDO: Objection to form. Asked and answered.



A. I agree -- I agree with the context -- overall context and the other information FDA has -- has provided and others have shown; that rate of NDMA formation is highly variable, it's dependent on sample, container closure, temperature, humidity, time and varies significantly.
Q. Do you agree with the FDA's decision to recall ranitidine from the market?
MS. TOLEDO: Object to form.
A. That kind of policy decision is not, you know, something I am involved with.
Q. Well, as someone that advises pharmaceutical companies on genotoxic impurity strategies and impurity investigations related to degradation, do you have an opinion as to whether the FDA should've recalled ranitidine knowing that it can transform into NDMA?
MS. TOLEDO: Object to form. This goes beyond the scope of this phase of the litigation.
A. So, yeah. That was kind of a run-on question. Can you shorten that?



Q. My question was, do you agree with the FDA's decision to recall ranitidine from the market?
MS. TOLEDO: Object to form.
A. I'll answer that's not something -- that's a FDA policy question that I don't get involved with. If manufacturers disagreed with that, they would need to make the case for it.
My understanding is that that decision was based on an abundance of caution based on very highly conservative evaluation of what an acceptable daily intake would be.
Q. Does that mean you disagree with the FDA's decision to recall the product?
MS. TOLEDO: Object to form. This goes beyond the scope of this phase of the litigation.
A. That's not what I said.
MS. BOGDAN: Why don't we take a five-minute break?
THE VIDEOGRAPHER: We are now off the record. The time is 2050 UTC, 4:50 p.m. EDT.
(Whereupon, a brief recess was



taken.)
THE VIDEOGRAPHER: We are now back on the record. The time is 2104 UTC, 5:04 p.m. EDT.
BY MS. BOGDAN:
Q. And one of the studies that you relied on and referenced in your report is the Abe study, correct, Dr. Olsen?
A. I looked at the Abe study.
Q. Okay. And in the Abe study, there were tablets stored at 40 degrees Celsius and 75 percent relative humidity for up to eight weeks and then were analyzed for NDMA content by liquid chromatography-mass spectrometry. And they found that the NDA -- NDMA levels increased from 28.5-nanograms to 17,400-nanograms, and another set of pills increased from 433.5-nanograms to 2700-nanograms.
Did you consider those test results when forming your opinions in this case?
A. Can I look at that paper to refresh my memory of the context they were doing the study?
Q. Well, they did accelerated testing

study under conditions. And I'm asking if you considered the values that they found of NDMA in those tablets in formulating your opinions in this case since you cited that study in your references in Materials Considered.

MS. TOLEDO: Objection. He asked to have a look at the document, so I think he should be given the opportunity to do that.

A. Also, I don't know if I referenced that in my report. I read the -- I read the paper.

Q. So you did read this paper as part of your investigation into the case?

A. I read the paper in looking at other studies on ranitidine.

Q. Since you -- since I received the supplemental report less than -- well, at this point, it might be 40 hours ago, are you, as you sit here today, drafting any more supplemental reports or anticipating serving another supplemental report?

A. At this point, I think I need to reserve the right to do that, but I don't



know that I have any unless additional information comes to light.

MS. TOLEDO: And I -- I will just add that we are in the general causation phase of the litigation. If the case proceeds, there may be also need for another separate report, so I -- I want to make sure that is clear.

Q. And when I was asking the question I meant a supplemental report in this phase of the litigation, if the doctor is drafting one or if he is in process of doing another report currently.

A. I am not currently working on one.

MS. BOGDAN: At this point, I will pass the witness and reserve the remaining time.

MS. TOLEDO: All right. We'll take a quick break, ten minutes, and we may have a couple of questions on our end.

MS. BOGDAN: Okay.

MS. TOLEDO: Thank you.

MS. BOGDAN: Thank you.



THE VIDEOGRAPHER: We are now off the record. The time is 2109 UTC, 5:09 p.m. EDT.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are now back on the record. The time is 2120 UTC, 5:20 p.m. EDT.

EXAMINATION BY
MS. TOLEDO:

Q. Dr. Olsen, I'm going to ask you just a few questions to clarify a couple of things from -- mostly from questioning earlier.

And the first question I have for you is, earlier do you recall that counsel asked you about whether you literally pushed the buttons of the equipment related to various tests that you have conducted in the past?

A. Right. And one of the points there is that often there will be an instrument or equipment operator who is at a lower degree level than a Ph.D. scientist but has adequate and thorough training on operation of the



instrument, but then would perform analyses at the direction of the Ph.D. scientist. And so I filled more of the -- the latter role, not only in, you know, looking at the conditions and so forth to make sure they were appropriate but evaluating the data coming from the experiment.

Q. And do you also recall when counsel asked you about a protocol that you had produced in prior litigation?

A. Yes.

Q. And we looked at that document, right?

A. Right.

Q. Was the testing in that prior litigation similar to the testing that Emery has done for purposes of this litigation?

A. It was totally different, apples and oranges situation. It was a patent litigation. So the question was what does the -- what did the generic product do in terms of what might infringe on the patent. And much different than trying to go back in a retrospective manner to determine what consumers might have been exposed to.

So the nature of the testing was totally different. And even then, we recorded under GMP practices in lab notebooks to provide total traceability of the data, the experimental plan that was outlayed -- outlined in the notebook, as well as sufficient information for anybody to replicate the study.

MS. BOGDAN: Please just note I think my audio might have cut out. I wanted to object to the form but once the doctor started answering his question, I didn't want to interrupt his response.

MS. TOLEDO: Okay.

BY MS. TOLEDO:

Q. And I believe earlier you were looking through your supplemental report and were looking for a reference, and there might have been a wrong reference cited, is that right?

A. Right. I'd like to correct that. It's Reference 3 in my supplemental report. It's -- it's got the incorrect title there. I don't know if the link reference is correct



or not.

But the correct reference is given in my Materials Considered. It's same first author, Lame, MT, et al. And the title is High Sensitivity Quantitation of Nitrosamine Genotoxic Impurities: LC-MS Analysis of Ranitidine Drug Product using the Waters ACUITY UPLC I-Class/Xevo TQ-XS Tandem Quadrupole Mass Spectrometer.

And the date is 2020.

Q. Thank you.

Then you were also asked earlier this question: Do you disagree with the FDA's statement that NDMA levels increase in ranitidine even under normal storage conditions?

Do you remember that question?

A. Yes.

Q. Okay. And I believe you said that they can increase under normal storage conditions. And then you added:

In fact, in Emery's non-disclosed 37 degrees Celsius data for over a month, NDMA levels didn't increase, so that is even an elevated temperature condition.



So, can you please clarify for me your answer?

A. Yes.

MS. BOGDAN: Objection -- objection to the form of the question. It mischaracterizes the previous testimony.

MS. TOLEDO: I read it from the transcript.

A. Well, what the difficulty was is when I said it -- it can increase, I added that inflection, which doesn't come across in -- in the written transcript. And given the generality of the statement and that I was asked about, what I would clarify is to say it may or may not increase. And again, that depends on materials involved, the -- what the normal storage conditions would be in their range and time, not to mention the FDA was not clear on what levels of increase they were observing.

So, that was a -- something that maybe didn't come across as intended and -- but I still would use the 37 degree Centigrade, 90- -- 98-degree Fahrenheit data



as support that sometimes it doesn't increase, and why Emery never disclosed that is still unclear.

MS. TOLEDO: All right. Well, those are all my questions. Thank you.

MS. BOGDAN: Okay. Let's take just five minutes.

THE VIDEOGRAPHER: We are now off the record. The time is 2128 UTC, 5:28 p.m. EDT.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are now back on the record. Time is 2133 UTC, 5:33 p.m. EDT.

MS. BOGDAN: Dr. Olsen, I have no further questions, so I'd like to thank you for your time today and wish you safe travels home.

THE WITNESS: Thank you.

MS. TOLEDO: Thank you.

MS. BOGDAN: And to everyone else, take care.

THE VIDEOGRAPHER: We are now off

the record. The time is 2134 UTC, 5:34 p.m. EDT.

(Time noted: 5:34 p.m. Eastern Time)



J U R A T

I, BERNARD OLSEN, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on MAY 23, 2022; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

________________________

BERNARD OLSEN, Ph.D.

Subscribed and sworn to before me

This _______ day of __________, 20__.

____________________________________

NOTARY PUBLIC



C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF RICHMOND )

I, CANDIDA BORRIELLO, a Notary Public for and within the State of New York, do hereby certify:

That the witness, BERNARD OLSEN, whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of June, 2022.

Candida Borriello
__________________________
CANDIDA BORRIELLO



ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: ZANTAC LITIGATION
Dep. Date: MAY 23, 2022
Deponent: BERNARD OLSEN

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |

________________________

BERNARD OLSEN, Ph.D.

SUBSCRIBED AND SWORN BEFORE ME,

This___ day of____________, 20__.

__________________________________

Notary Public

My Commission Expires:__________

**Exhibits**

**EX 0001 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:11 14:6,7,11 18:16,17
**EX 0002 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:12 16:8 18:17,18
**EX 0003 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:12 17:5 18:18,19
**EX 0004 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:13 18:20,21,24
**EX 0005 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:13 22:2,3
**EX 0006 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:14 24:11,12,19
**EX 0007 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:14 34:14,15,16
**EX 0008 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:15 69:9,10,11 74:6,7,17
**EX 0009 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:15 74:10,19,22,25
**EX 0010 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:16 97:12,13 100:10 110:5
**EX 0011 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:16 110:12,19 111:25 112:8,23
**EX 0012 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:17 111:21 112:2,10 115:22
**EX 0013 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:17 137:12,13,16,17
**EX 0014 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:18 145:11,12
**EX 0015 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:18 149:23,24
**EX 0016 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:19 151:16,17
**EX 0017 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:19 152:19,20
**EX 0018 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:20 197:21,22
**EX 0019 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:20 199:17,18
**EX 0020 Bernard Olsen, Ph.D.**
**PLTF 052322**
5:21 201:5,6,9

**$**

**$152,212.50**
26:4
**$450**
26:1
**$550**
26:1

**-**

**------------------I**
5:2
**----------------E**
5:8

**0**

**0.1**
70:9

**1**

**1**
5:11 13:23,25 14:6,7,11 18:17 83:14 113:22 128:1,5
**1,000-nanograms**
117:18,23
**1,1-dimethylhydrazine**
70:7
**10**
5:16 97:12,13 100:10 110:5 133:11
**100,000**
80:12
**10017**
4:9
**1010**
12:14
**10:28**
54:19
**10:44**
54:24
**11**
5:16 110:12,

19 111:25 112:8,23
**110** 5:16
**111** 5:17
**1140-nanograms** 114:16 117:21
**12** 5:17 111:21 112:2,10 115:22 134:14 199:14,21
**125** 69:19
**127** 70:1
**12:07** 98:23
**12:44** 99:3
**12th** 24:23 32:24
**13** 5:17 137:12,13,17
**137** 5:17
**13:06** 7:5
**14** 5:11,18 145:11,12
**1428** 54:18
**1444** 54:23
**145** 5:18
**149** 5:18
**15** 5:18 98:5 110:15 149:23,24
**150-milligram** 114:16 116:15 117:18
**151** 5:19 71:23
**152** 5:19 72:22
**15219** 4:16
**16** 5:12,19 151:16,17
**1607** 98:22
**1644** 99:2
**17** 5:12,19 152:19,20
**17,400-nanograms** 209:17
**1742** 129:20
**1754** 129:25
**18** 5:13,20 197:21,22
**1840** 156:3
**1851** 156:8
**19** 5:20 39:9 199:17,18
**197** 5:20
**1970s** 39:8
**1976** 70:5
**1978** 39:20,23 40:8,19 69:7 74:17
**1979** 39:9 45:4
**1984** 48:11
**1987** 67:1
**199** 5:20
**1:42** 129:21
**1:54** 130:1
**1st** 70:5 201:2 203:13

**2**

**2** 5:12 16:8 18:18 24:22 82:15 186:14
**2.25** 32:24
**20** 5:21 98:5,17,18 126:20 201:5,6,9
**2002** 17:2
**2003** 197:17
**2004** 195:7
**2008** 45:4 58:20,23
**2009** 41:9
**201** 5:21
**2020** 97:8 110:15 200:1 201:3 203:14 215:10
**2021** 24:23 25:10 121:2 196:8
**2022** 7:5 17:3,4 18:5 19:3
**2024** 195:12
**2050** 208:23
**21** 18:5 19:3
**2104** 209:3
**2109** 212:2
**212** 5:6
**2120** 212:7
**2128** 217:10
**2133** 217:15
**21st** 11:20
**22** 5:13
**220** 30:1
**23** 7:4
**24** 5:14
**2500** 180:13 195:17,21
**2700-nanograms** 209:19
**28.5-nanograms** 209:16
**29** 135:14
**2901** 4:3

**2919** 107:15
**2:40** 156:4
**2:51** 156:9

### 3

**3** 5:12 17:5 18:19 178:10,20 214:23
**30** 98:17,19
**301** 4:15
**31st** 24:24
**338** 25:16
**34** 5:14 11:21
**36** 114:16 117:21
**37** 205:13 215:23 216:24

### 4

**4** 5:13 18:21, 24 88:19 93:14 151:14
**4.1** 71:24
**4.75** 31:21
**40** 209:11 210:20
**43** 193:4
**433.5-nanograms** 209:18
**4:04** 195:8
**4:24** 195:13
**4:50** 208:24

### 5

**5** 5:13 22:2,3 105:15 106:1 133:11
**50** 133:11 135:9
**500** 4:3
**58.1** 145:9
**5:04** 209:4
**5:09** 212:3
**5:20** 212:8
**5:28** 217:11
**5:33** 217:16

### 6

**6** 5:14 24:11, 12,19 107:20 141:13
**60** 108:23
**69** 5:15

### 7

**7** 5:14 17:2 34:15,16 95:14
**70** 80:11
**74** 5:15 76:6
**75** 193:4 209:12
**75.1** 192:2,7
**78746** 4:4

### 8

**8** 5:5,15 69:10,11 74:7,15,17
**8th** 31:4 32:22

### 9

**9** 5:15 74:10, 19,22,25
**90** 133:12
**90-** 216:25
**90s** 48:12
**93** 17:21
**96** 80:14,17 81:2,12,19, 25 82:4
**97** 5:16
**98-degree** 216:25
**9:06** 7:6
**9th** 31:4 32:23

### A

**a.m.** 7:6 54:19,24
**Abe** 108:12 109:16,17,21 209:8,9,10
**ability** 171:7
**able** 21:10 40:14 55:19 56:15 119:18 166:1 172:17 186:3
**above** 191:2
**absolutely** 13:19 51:8
**absolve** 146:16
**abstract** 101:16,23 104:3,6
**abundance** 208:11
**academic** 28:16
**accelerated** 107:19 108:21 143:9 209:25
**acceptable** 36:11 79:9 80:6,15,25 208:13
**accepted** 68:23 131:14
**access** 75:3 122:1

**account**
99:16
**accountability**
136:5
**accurate**
114:4 167:2
**accurately**
16:20 170:8, 18
**achieve**
188:16 189:1
**achieves**
180:22
**acknowledge**
7:21,25
**acknowledged**
80:9
**acknowledging**
104:17 108:13,25
**acknowledgment**
197:8
**across**
183:19 216:12,23
**act**
168:18,19
**action**
7:12 78:9,15 79:1
**activation**
100:4
**activities**
26:19 32:15 35:21 41:22 44:24 145:1
**activity**
28:19 30:25 31:8,25 32:1,7,10 33:10 38:10 45:2
**actual**
164:9
**ACUITY**
215:8
**add**
21:7 211:4
**added**
215:21 216:11
**addition**
15:22 23:15 193:23
**additional**
31:13 100:7 119:11 211:1
**additives**
146:2
**address**
125:24
**addressing**
37:1
**adequate**
36:3 188:16 189:1 212:24
**administered**
8:1
**Administration**
146:1
**admitted**
100:21,25
**advise**
37:4,12 78:18,22
**advised**
160:14
**advises**
160:12 207:14
**advising**
38:14
**aerosol**
48:2
**affect**
104:19 168:23
**affirmatively**
196:8
**afternoon**
9:9
**agencies**
128:23
**agency**
202:12 203:20
**Agilent**
57:11,15,16, 17,18,23,25 58:3,7,9,22, 25 60:13
**ago**
11:21 19:6 25:12 28:2, 3,6 88:8 106:10 120:11 121:9 134:14 177:5 210:20
**agree**
65:16 66:14 67:21,25 68:11,25 82:21 146:21 147:13 156:12 159:9 170:7,17 205:23 206:2,22 207:1,8 208:1
**agreement**
6:7 42:8
**ahead**
33:2 98:2 154:18
**air**
131:24 135:20
**Aizawa**
12:16
**alert**
38:19
**alerting**
38:8,16,21 77:12,21
**ALFANO**
4:14
**allow**
188:4
**allowed**
52:15 53:9 82:4 188:3
**allowing**
81:18
**allows**
81:12 169:19
**altering**
43:1,15
**Amendment**
151:14
**Ames**
92:19
**amine**
85:16,21
**amines**
85:24
**amount**
79:4 112:20 113:6 125:5 132:16 160:13 161:10 170:8,18 181:13 199:9
**amounts**
114:19 126:12
**analyses**
87:23 105:17,19 106:8 118:9 213:1
**analysis**
41:23 45:9 46:14 48:22, 24 50:14 53:6,24 54:2 59:9 63:4 66:13 89:24 101:18,25 102:18 105:4,5,9,11

106:21 109:25 110:2,6 112:8,18,20, 23 113:18 114:1 115:13 118:14 120:6,15 123:24 158:25 159:1,15 161:3,23 163:20 166:18 167:21 215:6
**analyte** 50:16,24,25 51:16,20
**analytes** 50:14
**analytical** 12:14 28:17 45:6 57:4,7 127:18,21 135:15 156:12,22 157:1,6,10, 22 171:12
**analyze** 50:22 93:23 94:11 95:6
**analyzed** 196:14 209:13
**analyzer** 50:22
**analyzers** 181:24 182:1
**analyzing** 157:24 158:5
**and/or** 6:8
**Andrew** 20:18 94:1
**Andy** 120:8
**anilide** 171:9
**animal** 40:2,18 41:4 65:9,22 66:23 72:7, 14 80:11 84:24 146:2, 3
**animals** 65:11 72:13 86:4 90:23
**Anita** 20:10
**announced** 202:11
**answer** 13:24 14:2 61:2 81:5 94:23 95:12, 23 96:6,7, 16,20,23 105:13 106:24 121:7 131:8 139:20,24 140:2,4,6,16 173:13 177:7 191:20,24 208:5 216:2
**answered** 23:23 30:6 44:9 45:14 62:18,25 82:7 92:8 96:11,19 97:1 109:6 114:23 115:10 116:24 118:17 123:16 140:8 147:3 148:11,24 154:17,23 155:17 166:20 167:7 185:24
194:18 205:22 206:25
**answering** 9:23 92:16 214:12
**answers** 9:21 15:8
**anticipating** 210:22
**anybody** 56:20 214:7
**anyone** 6:21 10:20, 23 21:17
**apart** 174:9
**API** 47:1 104:24 108:8 113:8 115:23 120:21 122:5 123:6,21 124:2,20 125:6
**apologize** 14:2
**apparently** 154:5
**appeared** 91:17 165:23
**Appearing** 4:1,7,12
**appendix** 137:21
**apples** 160:23 213:18
**application** 146:23 177:23,25 178:14,17
**applications** 10:9 43:2,17 145:23 146:10 147:16
**applied** 138:1 161:2 196:14
**applies** 146:14
**apply** 193:20
**appreciate** 100:6 105:14
**approach** 80:10
**appropriate** 101:1 145:2 160:17 213:6
**approval** 56:3,7,11, 15,18 57:1 146:24 147:17 148:2
**approved** 36:6 56:3,6 148:21
**April** 70:5 201:2 203:13
**Aptuit** 41:6,16 42:3,9,13, 17,19,25 43:7,13,22 44:5,12 136:2 137:2 144:5
**Aptuit's** 143:25
**aqueous** 130:15 131:10 132:9
**area** 44:22 68:15 72:18 73:12 74:1 88:25 127:10,12,13
**argues** 174:24
**Argumentative** 119:20

**around**
163:18
**arrangement**
8:6
**arrives**
110:23
**article**
12:16 110:4
**articles**
15:14,18
29:16,18
34:2,4
165:9,23
166:8
**artifact**
183:7
**artifactual**
158:24 161:4
195:18,22
**artifactually**
141:7 196:21
**ascertain**
161:16
**asked**
14:22 18:10
30:5 38:8
44:9 45:15
54:7 62:17,
24 73:24
80:24 82:7
87:8 88:1
90:5,11,13
92:8 94:7,23
95:1,5
96:11,19
97:1,16
109:6 114:23
115:9 116:23
118:16
119:11
123:15
140:20 147:3
148:11,23
154:17,23
155:17
166:19 167:6
170:25
177:2,5
185:17,24
194:12,18
200:17
205:22
206:25 210:7
212:17 213:9
215:12
216:15
**asking**
9:22 23:17
38:6 40:7
49:19 75:16
81:17 91:7
92:3 100:1,2
105:12 106:4
113:5 124:13
139:14,16
142:11
148:16,19
151:8 154:13
156:25
163:8,11,24
170:24 171:3
185:21
188:22
194:11
201:24 210:1
211:10
**aspect**
89:14 95:10
148:12
174:14
180:12
**aspects**
147:7 158:10
**assay**
49:8,12,15
152:1
**assays**
48:17 57:5,7
**assembling**
14:18
**assess**
37:5
**assessed**
36:22
**assessment**
38:11 74:9
**assessments**
38:13
**assign**
88:7
**assistant**
21:16
**associated**
111:9
**association**
42:19
**Atlanta**
10:18
**atmospheric**
180:18
**attached**
132:11
**attempted**
97:2
**attend**
27:8
**attention**
72:23 101:15
102:16
107:14 202:9
**attorney-client**
6:9
**attorneys**
7:19 14:21
19:15 29:6
**attributes**
85:9
**audio**
9:25 58:1
61:22,24
62:7 214:10
**audit**
115:18
**August**
24:22
**Austin**
4:4
**author**
100:14
138:17
159:11,12
215:4
**authored**
15:23 198:1,
5
**authoritative**
68:12
**authoritativeness**
68:17
**authorities**
23:12,19
164:22
**authority**
82:3
**authors**
104:8
108:15,25
165:19
177:10
**available**
47:14 58:20
73:2 119:16
121:19,25
122:17
136:12 163:6
164:18,25
165:7,18
203:9,15
**Avenue**
4:9
**avoid**
159:13,14
**avoiding**
141:5
**aware**
6:3 30:11
40:3,7,19
43:13,25
44:3 59:13
65:14 68:23
70:13 81:18
84:15 117:17
122:20
123:25
**awareness**
81:22

## B

**bachelor's** 143:21
**back** 25:10 30:23 40:19 46:20 47:1,6 54:22 83:22 89:4 99:1,4 106:17 108:19 113:10 129:24 141:8 156:7,11 163:15 166:23 181:18 185:25 195:11 206:19 209:2 212:6 213:23 217:14
**background** 23:16 96:1, 13
**Baertschi** 198:5,8 199:25
**band** 131:18
**based** 34:2 40:18 41:3 52:7 53:3 66:23 68:1 80:8 84:24 132:22 133:4 135:13 168:3 181:23 182:5,10 185:1 208:11,12
**baseline** 191:3
**basically** 106:13
**basing** 66:20 189:20 190:20
**basis** 24:5 47:9 50:7,11 53:5 73:14 119:2 168:10 184:16
**batch** 122:15,18
**batches** 129:8
**bathroom** 12:17
**began** 25:9
**begin** 9:23
**beginning** 53:24
**begins** 72:5
**behalf** 4:1,7,12 7:10,15 8:20 9:9 27:20 93:22
**behave** 66:12
**believe** 15:20,25 33:5 49:5 55:8 89:21 100:9 117:25 131:25 135:6 157:1 165:6 181:25 214:17 215:19
**believed** 70:8
**believes** 181:16
**Bernard** 5:3 7:2
**besides** 85:16
**best** 23:14 24:2 75:23
**better** 62:2
**bias** 189:16 194:10
**biased** 164:20
**big** 12:19 190:9 191:9
**billed** 26:4
**Bioanalysis** 149:21
**biological** 146:4
**biologist** 65:19 68:9 69:5
**bit** 9:17,25 27:1 58:2 59:23 139:12 199:22
**black** 160:9
**Bogdan** 5:5 8:17,19 9:7 11:16 13:8,21 14:4,9 15:9, 13 16:5,10, 16,25 17:4,7 18:2,9,22 19:1 21:1,23 22:9 24:7,17 34:10,18 51:6,10 54:6,11,15, 25 61:24 62:5 69:6, 13,18 71:22 72:21 74:3, 8,24 82:15 87:3 93:16 97:6,15,20 98:2,15,18 99:25 100:12 110:11,18,21 111:17 120:18 129:15 130:2 137:7,15 140:6 142:10 145:7,14 149:19 150:1,12 151:12,20 152:13,22 155:20,25 156:10 195:14 197:16,24 199:13,20 201:1,8 208:20 209:5 211:16,23,25 214:9 216:4 217:7,17,23
**boiling** 84:1
**book** 15:21,22 198:1,4,21 200:16
**Borriello** 7:15
**BOSICK** 4:14
**Bosso** 10:21
**bottom** 108:19
**BOWMAN** 4:2
**box** 18:15 75:3 83:5,10 150:8

**branching**
41:22
**brand**
138:25
139:7,8,22
140:24
141:15,17
**branded**
57:22
**break**
51:5 54:7
97:10,16,25
98:6,14
100:11
129:16
155:24 172:1
173:21 174:9
180:15
187:14
194:24 195:1
208:21
211:20
**breakthrough**
64:23
**brief**
54:20 129:22
156:5 195:9
208:25 212:4
217:12
**bring**
11:5 152:15
203:25
**bringing**
70:1
**broad**
68:2 199:4
**BROOKE**
4:2
**building**
176:8
**bunch**
72:10
**burden**
185:25
**business**
27:2 35:5
39:7 42:6
**button**
6:24
**buttons**
49:19 59:6
61:6 62:13
212:18

**C**

**C-I-M-A**
130:9
**C.chem**
94:2
**cal-**
199:11
**calculated**
76:14
**calibrated**
133:10,18,24
134:5
**call**
13:13 18:12
110:8 147:22
186:7,9
190:8,25
**called**
8:12 41:6
51:13 53:14,
24 64:22
108:21
149:21
180:17
186:17 187:2
**calling**
147:9
**Canada**
63:25 128:20
**cancer**
15:1 64:23
65:10,11,19
68:9 69:4
80:12
**Candida**
7:15
**capabilities**
26:17
**capability**
132:1
**capacity**
70:18,22,25
100:4 126:25
127:1
**captured**
31:14
**carbon**
130:13
131:8,15,17
**carcinogen**
40:17 41:3
65:21 66:23
67:10 68:1,
4,21 83:4,9
84:12
200:14,25
**carcinogenic**
39:25 40:10,
22 65:17
66:19 72:7,
16 73:5,21
**carcinogenicity**
73:25
**carcinogens**
84:16 85:25
**care**
217:24
**career**
46:18
**careful**
136:5 146:17
**carefully**
153:11
**Carlos**
4:20 7:9
**Carmen**
10:21 54:6
97:15
**Carolina**
126:22
127:5,15
128:8
**carry**
132:14
**carve**
33:9
**case**
16:23 23:13
29:1 39:17,
21 65:24
75:12 87:5,
11 93:7 94:7
95:24 96:3
100:18 106:7
110:1 111:5
120:10
130:23
131:1,7
132:4 133:5
134:3,15,20
135:13,23
137:4 138:4
141:24
143:15
153:23
154:14
163:25
165:13
169:22 176:6
180:12
198:25 199:7
200:20
201:18
202:1,20
204:13,24
208:8 209:21
210:4,15
211:6
**cases**
32:3 109:23
130:3,8
164:15,16
181:1 182:1
**CASSIN**
4:21
**catalyst**
35:11
**catalysts**
35:12
**category**
31:21 77:19
78:2,4 84:3

199:4
**causation**
211:5
**caused**
159:20
**causing**
168:15 196:3
**caution**
208:11
**cell**
184:12 186:8
**Celsius**
133:11 205:13 209:11 215:23
**center**
150:23 151:22
**Centigrade**
216:25
**Cephalon**
130:9,11 137:8,19
**certain**
52:1 55:8 85:8 101:2,3 109:18 172:14
**certainly**
46:2 140:13 169:23
**certainty**
124:9
**certification**
155:1
**certified**
154:4
**cetera**
149:18
**CFR**
145:9
**CGMP**
135:22 136:2,17,18, 25 144:6 149:15

153:13,16 155:1
**chain**
136:5
**chamber**
50:19 51:14, 18,23 52:1, 16,19 186:11,15
**chance**
99:7
**changed**
81:24
**Chapel**
128:7
**chapter**
12:14 15:21, 23 198:1,4, 8,22 199:14, 21,24 200:3, 16
**characteristic**
50:20 51:20
**characteristics**
200:18
**characterization**
66:8
**characterize**
157:13 171:21
**charge**
26:1 48:2 182:12 183:21 188:4
**charged**
182:5
**charges**
182:10 183:25 184:6
**charging**
25:23
**Charles**
74:12 87:19 94:1

**chart**
82:17 83:4
**checked**
83:5,7 146:19
**checking**
33:7
**chemical**
65:10 66:4 76:20 77:2 83:16,21 84:4,6,18 85:3,9,13,18 157:9,13,18 180:18
**chemicals**
85:24
**chemist**
20:21 78:8 102:9 103:1 135:15
**chemistry**
28:17 66:5 78:23 135:15 144:23 156:13,22 157:1,6,11, 22
**chemists**
20:14 105:16 107:8
**chemists'**
20:22
**cholesterol**
64:4
**choose**
143:4
**choppy**
61:25
**chromatogram**
175:5 176:12,13 185:10 189:11,20
**chromatograms**
166:13 175:6 185:8 189:6

190:5
**chromatograph**
159:3
**chromatography**
45:16 46:13, 16,19,23,25 47:4,13,18, 25 48:1 57:24,25 58:3 157:19, 21,23 167:13,16, 23,25 168:2, 22 169:1,4, 5,11 171:17 176:23
**chromatography-mass**
84:7 209:14
**CIMA**
130:11
**citation**
167:11
**cite**
118:8 128:21
**cited**
12:25 114:5 115:2,12 118:1 167:10 176:15 178:20 210:4 214:20
**cites**
109:15
**citing**
92:11 115:18 117:1
**citizens'**
125:13 161:15 162:1
**claim**
126:1 154:3
**claims**
189:22
**clarification**
33:16 46:15

64:5 99:5 105:14
**clarify** 26:25 61:12 212:12 216:1,15
**classification** 40:16 41:2 65:21 66:22, 25 67:3,7, 15,25 68:13, 20,22 69:1 200:13,24
**classified** 67:9 83:8
**classify** 27:7 67:24
**clastogen** 83:2
**clean** 190:11 191:3
**clear** 138:11 193:3 211:9 216:20
**clearly** 9:2 151:5
**click** 6:23
**client** 27:19 63:21
**clients** 42:17
**clinical** 36:4 43:3,17
**closer** 62:2
**closure** 101:12 207:6
**co-author** 15:21
**CO2** 130:17 131:20 132:8,16 133:7,10 135:18 143:1
**Code** 145:15 146:7
**Coello** 4:20 7:9
**cohort** 38:23 77:18, 22 78:4
**collision** 50:19 51:13, 17,23,25 52:16,19 184:12 186:8,15
**color** 46:14 146:1
**column** 168:5,6,10, 12,13,16 169:3,5,13, 16,19,24
**columnar** 104:13
**combination** 62:20
**come** 43:24 80:13 88:13 91:15 130:25 152:25 155:1 168:11 175:9 216:12,23
**comes** 136:18 174:19 190:7 211:2
**comfortable** 82:10
**commands** 60:25
**comment** 40:13 49:1 68:8 73:14 82:8 83:10 86:17 87:19 90:5,7 91:19,25 92:17 93:23
94:11 95:7 108:8 113:2
**commented** 89:14,17 91:6
**commenting** 87:12 88:12
**comments** 13:4 82:25 90:25
**commercial** 70:18,22
**common** 45:25 47:23 135:17
**communicating** 156:14
**communication** 10:4
**communications** 119:3 154:3
**companies** 26:12 27:4, 8,10,11,15 28:12,15 36:2,20 37:2,4,13,24 82:12 127:16,17 207:15
**companies'** 81:23
**company** 27:21 28:8, 9,10,11 41:6 42:15 63:20, 22
**compare** 115:24 117:6 119:18 124:14,23,25 126:7
**compared** 185:5
**comparison** 117:12
124:14 139:12,15 160:24
**complete** 12:11 88:24 137:2 146:17 178:24
**completely** 22:21,23 23:2,4 168:20
**compliance** 152:3 153:12
**component** 159:5 168:15 180:15 182:24 189:25
**components** 107:12 167:15,20 168:24 170:2 172:23 182:25 195:17,22
**composition** 85:4 156:15
**compound** 38:15 51:1 86:21 87:2 90:14 173:20,24 174:4,18 183:2
**compound's** 47:10
**compounds** 36:21 47:8 48:24 55:5 85:9,14,18 157:24 158:3,5 170:5 184:18 197:13
**computer** 10:7 132:2 152:24

**concentration** 44:23 172:15,21 191:10
**concern** 38:23 77:18, 22 78:4 79:20 91:22 126:18 141:2 143:7 166:12 172:25 175:19 177:18 185:1,20 191:7 193:11 194:21 196:4,23 197:10
**concerned** 157:7 158:17 164:12
**concerns** 124:16 125:2 166:14
**concluded** 107:1
**conclusion** 94:20
**conclusions** 87:9 165:11
**condition** 133:17 135:1,7 205:16 215:25
**conditions** 95:18 96:8 101:2 108:23 109:19 133:23 134:4,5,9 161:1 167:21 181:14 204:8 205:9,12,20 206:14 210:1 213:5 215:16,21 216:18
**conduct** 33:12 73:20 105:17 135:23 141:17 142:16,18
**conducted** 122:25 123:21 134:16 137:6 143:21 167:22 202:25 212:19
**conducting** 88:16 145:21 148:25
**conductivity** 47:24
**confident** 165:21
**confidential** 55:14,17,25 56:5,23,25
**confirm** 41:2 103:23 160:20
**confirmed** 102:20 104:3 204:6
**confirming** 103:10,18
**conflated** 99:24
**confound** 196:16
**connected** 77:5
**consent** 8:6
**conservative** 80:9,13 208:12
**consider** 201:17 202:18 204:12,23 209:20
**considered** 21:20 22:12, 19 23:10 29:3,10 30:2 34:6 75:15 80:11 111:15 144:9 149:15 179:2,7 191:2 201:22,25 202:8,21 204:14 210:2,6 215:3
**consistent** 116:7 117:14 118:8,9 119:24 136:25 190:16 203:21 206:8
**constitute** 80:23
**consultant** 39:16 78:18
**consultants** 26:15
**consulting** 26:11 27:23 35:6,8 37:12 41:7 42:3, 10,12,19 43:7,13 44:5,13 143:25
**consumer** 202:16
**consumer's** 206:21
**consumers** 88:8 122:1 204:22 206:7 213:25
**contact** 130:14
**contained** 70:9
**container** 101:12 207:6
**contains** 85:20 168:6
**content** 209:13
**context** 105:23 204:15 205:24 207:2 209:23
**continual** 91:17
**continue** 21:10 42:18 139:25
**continued** 42:12,16 203:4
**contract** 26:18 41:17 127:21
**contractor** 42:9,14
**contrast** 190:10
**contribute** 195:18
**contributes** 181:3 195:22
**contributing** 101:11 196:10
**control** 35:25 36:7 37:7 45:1 79:3,7,22 197:18 198:10,23
**control-related** 78:23
**control-type** 131:5
**controlled** 36:10 79:11

136:4,9 169:25
**controlling** 169:19 199:8
**controls** 153:18
**conversations** 6:5,8 19:15
**copies** 11:7,8 30:21
**copy** 17:12,16
**cord** 137:24
**corner** 6:25
**Corporation** 177:17
**correct** 8:25 10:14 13:6 18:8 19:6 25:13, 19 26:6 31:22,25 33:4,5 35:7 37:14 38:3 45:5 47:15, 16 48:14 51:14 52:2, 16,20 53:3, 11,25 54:4 56:1,8,16,23 58:20 59:5, 10 67:1 68:21 69:24 72:11 74:16 75:21,23 76:7,24 78:20 80:17 82:5 83:11 85:4,10,14, 18 90:2,12, 17 91:2 92:21 94:4, 14,23 96:17, 24 101:20 103:13,21 104:5,15,22 105:5 106:14 107:3,10 108:8,15 109:10,16 115:1 120:10 124:23 125:10,20 130:5 131:15 132:5,23 133:12 136:9 138:7,13,18 141:21 142:5 143:5 146:12 147:18 148:3,9 151:3 155:3 157:14,20,25 158:6 159:17 160:13 161:4,24 165:16 166:18 167:15,25 168:1,5,17 169:3,13 171:18 182:6,11,19 183:11 184:2,13,24 186:14,21 187:5,16,23 188:7,17 190:22 197:4 198:11,14 199:1 200:1, 4,20 209:8 214:22,25 215:2
**correctly** 41:11 102:24
**corresponded** 129:12
**corresponding** 190:13
**could've** 33:8
**counsel** 7:3 8:5 15:5 18:6,14 30:13 34:13, 23 51:3 105:24 119:3 137:12 212:16 213:8
**Counselor** 13:18 14:3 149:23
**counter** 136:13
**country** 127:6
**couple** 9:14 129:13 174:2 185:2 211:21 212:12
**coupled** 47:7 162:11 171:17
**course** 23:15 29:13 32:18 79:17 80:21
**courses** 26:21
**court** 7:19 9:20 18:6 30:19 33:16 46:15 61:22 62:3 64:5 74:11, 20
**covers** 144:25 147:5,6
**created** 53:23 137:3
**creates** 169:16
**creating** 6:12 182:6 185:14
**creation** 159:25
**criminal** 44:4
**critical** 139:9 140:24 176:18 180:11
**Cross-talk** 136:20 167:18 178:11
**crystal** 104:11 105:2
**current** 35:2 152:16 153:7 182:6
**curriculum** 34:19 41:5
**custody** 136:6
**cut** 58:1 61:22 103:16 214:10
**CV** 34:11,22 35:2

## D

**D-A-U-G-H-T-E-R** 53:17
**daily** 80:6,15,25 81:24 208:13
**data** 12:14 41:4 43:1,16 63:4 66:8 71:24 73:1,16 80:11 84:24, 25 87:9,23 90:10 97:2 111:11,18,25 112:9,16 113:1,2,4, 11,15 119:22

125:3,12,14 126:2,8,11, 17,18 128:21 131:24 132:2 144:7 149:4, 12 161:6 162:12,17,22 164:12,16, 17,25 165:2, 11,14 166:2, 7,17 167:3,9 175:4,14 185:5 189:6 190:15 204:15 205:13 213:6 214:4 215:23 216:25
**dataset** 124:14,17, 23,25 126:6
**date** 24:22 25:18 67:4,5,8 121:20 137:22,25 138:3,4,6,11 215:10
**dated** 17:2 18:4 19:3 110:14
**dates** 67:20 138:11
**daughter** 20:1 53:14, 16,19 54:3 186:25 187:3,9,15, 20,21
**Davis** 20:8 87:20 94:1
**Davis's** 11:13 20:2
**day** 80:14,17 81:2,13,19 82:1,4
134:16 173:6
**days** 19:5
**deal** 36:20
**debate** 68:18
**decided** 115:12
**deciding** 35:18
**decision** 207:9,12 208:2,11,15
**declare** 8:3
**decompose** 90:8
**decomposition** 157:25 158:6,18,22 159:5,13,17, 18,21
**decrease** 91:17 99:18
**defend** 149:3
**defendant** 4:1,7,12 63:22
**defendant's** 16:6
**defendants** 75:10 93:22 94:8 100:21 101:7 118:21 119:8 122:4, 16 124:1 149:7,10 198:25
**defendants'** 120:20 121:4 141:24
**define** 105:7 134:21
**defined** 94:7 144:17
**definite** 33:15
**definition** 106:5 147:1
**degradation** 35:11 102:2, 6,8,15 104:10,14 107:6 142:25 194:22 196:25 197:19 198:14,16 207:17
**degradation-related** 198:10,19,23
**degrade** 95:19 96:9 194:8 196:21
**degraded** 160:10 181:15
**degrades** 100:22 101:8
**degrading** 91:20,21,23 184:19 193:24
**degree** 124:8 133:11 143:21 169:17 212:23 216:24
**degrees** 108:23 205:13 209:11 215:23
**Delaware** 64:10
**delay** 9:25
**delineating** 32:20
**delivered** 98:13
**demands** 14:19,22 15:8,12
**demitted** 147:8
**demonstrate** 175:22 197:11
**demonstrated** 189:17
**demonstrates** 197:15
**dep** 13:17
**depend** 79:25 170:11
**dependent** 207:5
**depending** 38:12 45:13 80:20 167:20 174:10 205:1,4,25
**depends** 61:5 79:14 121:15 170:5,11 171:8 172:4 187:18 188:1 216:17
**deposition** 6:18 7:2,20, 22,24 9:12 10:8,13 11:6 12:1 13:10, 12,22 14:11 26:2 55:19 152:9
**depositions** 9:15
**derivative** 49:6
**describe** 77:1,3 154:5 156:22

**described**
89:22 129:2 137:6 157:5 179:11
**describes**
85:8 146:8
**describing**
178:17
**description**
28:20,22 30:25 31:8 33:10 51:11 198:18
**descriptors**
156:19
**design**
130:12,18,20 132:22 133:4 147:23 172:10,18 173:9
**designed**
43:2,16 130:21,22 132:3,7,10 133:2 173:14
**desired**
146:20 168:24 188:16 189:1
**destructive**
135:1
**detail**
86:11
**details**
55:13 163:18
**detect**
130:13 157:12 161:10 170:6 171:20 172:2,11,14, 19 173:10,19
**detected**
84:7 113:25 135:13 161:7 182:3
183:10,22 184:1,8 187:3,8
**detecting**
131:15 158:3
**detection**
47:22,24 48:2,3,4 50:23 63:14 170:2,14 171:9,11 182:4 183:11 184:2 191:4
**detector**
47:23 48:7,8 53:11 174:19 175:2,11,25 177:20 182:6,9,14 183:6,7 184:18,19,24 185:20,22 187:10 190:17 194:9 196:15
**detectors**
47:17,22
**detects**
182:9
**determination**
33:18 47:5 173:16 178:18
**determine**
51:2 73:21 96:3 116:14, 20 123:7 161:23 188:11 213:24
**determined**
92:18 120:13 202:12
**determining**
143:1
**deuterated**
190:14,18
**develop**
28:13 172:13
**developed**
132:21 138:22 177:3
**developing**
57:4 147:22 148:1 157:7 175:20
**development**
35:18,23,24 41:18 57:9 144:9,14,16, 22
**developments**
177:15
**device**
10:5 28:17 131:13,19,20 133:9,10 134:6
**devices**
10:2 146:3 169:7
**diagram**
77:8 180:10
**difference**
159:16 176:22
**differences**
184:5
**different**
45:12 47:21 51:12 57:20 72:10 76:11 91:12 95:3 101:3 109:21 127:15 131:4,11 138:15,16 168:12,15 174:2 180:6, 19 181:24 183:9,21,24, 25 184:5,6 187:15 188:4 193:17 194:15 205:3
213:18,23 214:2
**differentiate**
182:10 183:4 184:17,20 188:7
**differentiate d**
187:16,22 194:23
**differentiati on**
143:8
**differently**
168:14,18
**difficult**
9:20 144:12 170:14 171:10
**difficulty**
216:10
**dimethyl**
77:5
**dimethylamine**
77:6
**dioxide**
130:13 131:8,15,17
**Dipak**
94:3
**direct**
55:1 57:3 101:15 153:9 158:13
**directed**
49:24 50:1 58:12,25 59:3 62:11, 19 73:3 122:25 182:13
**directing**
41:20,24 72:23 102:16 107:14
**direction**
143:22 213:2

**directly**
117:11 169:14
**director**
41:14 42:24 43:8,12 44:2
**disagree**
73:9 205:6, 17 206:22 208:14 215:13
**disagreed**
208:7
**discipline**
157:6
**disclosed**
217:2
**disclosure**
11:24 56:11 57:2
**discovery**
119:4
**discuss**
114:7
**discussed**
80:19 110:10 116:8
**discussion**
96:1 99:6 155:7
**discussions**
81:23 82:13
**dishes**
90:22
**disparity**
116:11
**distinct**
32:13,15 191:8
**distinctive**
131:18
**distribution**
185:3 204:21 206:7,15
**divert**
175:24
**doctor**
20:17 22:5 34:20 80:24 89:13 91:7 94:2 137:16 139:14 140:14,16 150:2 154:11 156:11 192:20 211:12 214:12
**document**
14:14,20 16:14 17:9 24:14 28:20, 22 40:14,25 41:2 67:4 75:11,17,20 82:16,18 105:24 110:6,16 111:3 150:8, 13,17,23 151:1,6,21 152:8 153:2 178:1 201:21 210:8 213:12
**documentation**
136:3,18,24 137:1 144:10,13 145:3,5 146:18 147:6,11 148:7,14,16 149:3,12,15 179:3
**documents**
11:8 12:2,9, 11,23,24 13:5 14:18 19:13 22:18 23:9,21 24:3 28:25 29:2,9 30:1 163:21 166:24
**doing**
9:11,15 29:7,19 31:8,10,12, 13 32:5,8,17 35:24 41:22 43:22 59:11, 14,19,23 60:25 61:6,9 106:13 131:4 134:19 140:18 143:24 147:21 154:25 155:9 175:19 180:7 183:17 209:23 211:13
**dose**
79:16 80:2, 20
**doses**
80:23
**dosing**
80:12
**double**
188:23
**double-check**
74:12
**doubt**
125:9,17 186:5
**drafted**
17:13
**drafting**
210:21 211:12
**drawing**
202:9
**drug**
35:24 36:5 64:2,3,14 80:3,20 95:15,17,19 96:2,13 101:19 108:3,14 109:3,14 111:9,10 112:4,5,12, 22 113:7,8, 19,23 114:1, 2,9,21 115:8 116:1 117:4, 7,8 118:15, 24,25 119:9, 17 120:2 121:5,13 122:6 123:6, 11,12,14 124:2,3 125:18,19 126:13 128:15,24 145:25 146:23 147:16,17 148:1,21 153:11,12, 20,24 154:14,20 162:6,19 163:14 199:9 215:7
**drugs**
144:20 146:3,12 153:16
**dual**
41:15
**Duke**
128:7
**duly**
8:13
**Durham**
127:14

**E**

**E-A-T-O-N**
43:10
**e-mail**
4:5,10,17 10:9

**EA80**
131:23
**earlier**
45:1 55:6
77:12 106:18
175:10 186:7
200:10
212:14,16
214:17
215:12
**early**
46:18 48:12
175:5
189:11,19
**Eaton**
43:6,10
**EDQM**
162:25
164:14
176:16
177:9,16,21
**EDT**
7:6 54:19,24
98:23 99:3
129:21 130:1
156:4,9
195:8,13
208:24 209:4
212:3,8
217:11,16
**effect**
39:25 40:10
203:19
**efficacy**
36:11
**effort**
14:18
**efforts**
73:2
**eight**
28:3,6
209:12
**either**
114:1 122:9
**electro**
180:7
**electromagnetic**
181:21
**electronic**
141:9,10
146:4
**elevated**
205:15
215:25
**elevation**
107:22 109:1
**Eli**
44:17,20
45:3,8,21
46:21 47:2,
6,14,18
48:14 55:14,
17 58:15
59:21
**EMA**
176:16
177:9,21
178:19
**Emery**
115:25 117:3
124:14,17
125:3,5
126:1,12,18
129:13
139:13,15
141:1 144:18
147:14,21
148:19
153:23
154:4,14,19
155:12,13
158:25 173:3
180:7 189:7
213:16 217:2
**Emery's**
116:11
118:11
125:1,12
137:1 145:5
154:2 162:10
166:10
173:1,17
184:9 185:8
205:12
215:22
**emphasize**
108:20
**employed**
45:19 162:11
**employee**
42:9
**encompass**
23:11 28:23
177:14
**encompassed**
36:16
**encompasses**
23:18
**encompassing**
12:22 66:2
**end**
9:1 52:15,18
73:3 94:19
95:16 211:22
**energy**
179:19,22
**engaged**
149:7
**ensures**
153:10
**entail**
35:15
**enter**
7:16 95:11
172:20 176:1
**entering**
60:25 179:25
184:19
**entire**
198:7,21
200:15
204:14
**entities**
99:10
**entitled**
31:1 140:1
200:3
**environment**
12:16 159:25
160:4
**enzymatic**
86:12,15
**epidemiological**
73:1
**equipment**
57:12,14,17
60:6 133:7
212:18,23
**equipped**
131:13
**error**
74:14
**ESQ**
4:4,10,16
**essentially**
53:2 101:17
**established**
80:5,8
**ester**
49:3
**esters**
55:8,22
**estimate**
106:11
**estimating**
106:8
**et**
149:18
**et al**
215:4
**Europe**
163:1 176:17
**evaluate**
38:2 157:8,
17
**evaluating**
166:17 213:6
**evaluation**
39:24 60:12
72:24 162:5
204:4 208:12
**evaporated**
180:14
**evaporative**
48:3

**event**
106:13 181:7
**eventually**
36:5 180:22
**everybody's**
162:10
**everyone**
203:22
217:23
**evidence**
39:25 40:9
71:6,15,16,
20 89:18
91:20 99:15
103:5
**evolution**
130:17 143:1
**evolve**
130:14
**exact**
33:22 59:18
133:14 164:4
**exactly**
49:13 60:3
67:14 84:1
91:5 135:7
163:17
166:21 186:3
**examination**
5:4 8:16
149:5 212:9
**examined**
8:14 146:20
**Excel**
111:10
**Excellent**
18:22
**excuse**
12:10 136:6
163:9
**execute**
130:13
**executed**
138:24
**exercises**
197:11
**exhibit**
5:11,12,13,
14,15,16,17,
18,19,20,21
13:11,13,19
14:6,7,11
16:8,11 17:5
18:7,10,16,
17,18,20,24
21:25 22:2,
3,6,7 24:9,
11,12,19
31:3 34:12,
14,16 69:9,
11 74:5,6,
10,17,19,22,
25 76:5
97:11,12,13
100:10
110:5,12,19
111:21,25
112:2,8,10,
23 115:22
120:19
123:25
137:9,12,13,
16 138:5
145:8,11,12
149:20,23,24
150:2
151:16,17
152:14,16,
19,20 155:20
197:21,22
199:17,18
201:5,6,9
**exhibiting**
104:12
**exhibits**
74:13
**exist**
124:16
**existed**
106:9
**existing**
203:10
**exogenous**
88:25 89:3
151:6
**exogenously**
90:8
**expand**
22:23
**expect**
192:12,15,21
193:1,5,9,15
194:13
**expectation**
36:2
**expectations**
36:24
**expected**
36:20
**experience**
9:11 23:16
24:4 55:2
57:3 132:23
133:4
**experiencing**
160:25
**experiment**
130:18,20
213:7
**experimental**
40:2,11
71:24
132:12,21
144:7 214:5
**experiments**
88:10 112:25
130:6,16
132:19
143:21
**expert**
11:11,12
18:19 21:13
63:20 73:19
88:1 93:17
99:8 118:22
119:13
123:10
138:20
147:14
**expertise**
26:15 66:5
72:18 73:12,
17 74:2
90:20
**experts**
93:1,9,25
95:8
**expiration**
121:20
**explain**
50:11
**explained**
142:8
**explanation**
91:15 140:2
**explicit**
164:18,25
206:11
**explicitly**
175:21
177:24 196:5
**exposed**
88:8 132:8
204:21 206:6
213:25
**exposure**
109:19
202:16
**expressed**
93:24 125:10
**external**
128:19 160:5
**extrapolated**
80:10 91:22

**F**

**facilities**
153:18
**facility**
126:21,24
127:2 128:13
**fact**
42:20 88:23
125:24
131:19
160:18 161:6
173:3 193:21

205:12 215:22
**factor**
101:11 139:9 140:24 189:17
**factors**
104:9,19 172:8,20 205:4,25
**Fahrenheit**
216:25
**fails**
142:3
**faint**
8:22,23
**fair**
98:20
**falls**
84:2
**false**
139:12
**familiar**
39:11 100:13 127:3,8,10 144:21 145:15 171:14,15 201:12
**familiarity**
50:4 68:16
**family**
84:12,16 85:5,13,18, 19
**far**
31:10 45:6 68:16 74:4 113:18 126:23 145:6 173:1
**fashion**
187:12
**FDA**
80:5,8,19 81:11,18,23 82:3 116:8 128:20 147:8 153:6,10 160:11 162:9,17,23 164:13 173:12,14 176:11 177:16,22 178:19 179:15 201:2,12 202:3,4,19, 25 204:4,10, 15,17 205:17 206:2 207:3, 18 208:6 216:20
**FDA's**
80:15,25 129:3 160:8 179:4,9 205:6 206:23 207:8 208:2, 15 215:14
**Federal**
145:16 146:7
**feel**
117:5
**fell**
145:6
**fellow**
21:17
**fen-**
141:23
**fentanyl**
64:15,20 136:9,12
**Fentora**
64:13,14,15
**FHS@ PIETRAGALLO. COM**
4:17
**field**
131:20 135:21 144:23 157:1,10 180:13
**fields**
181:21
**figure**
79:19 113:22 114:6
**figures**
76:9
**file**
158:13 161:8
**filled**
168:13 213:3
**film-coated**
114:14
**filter**
51:17,24 52:15,20,23, 25 53:1,10 187:7,19
**filtering**
183:18
**filters**
175:9
**filtrate**
64:15
**final**
6:19
**finally**
185:7
**financially**
7:13
**find**
29:18 101:22 103:24 106:20 154:8 157:2 166:9 178:5 179:13
**finding**
29:11 104:23 108:2 109:14 204:25
**findings**
104:7 114:7 206:9
**fine**
98:15 178:25 179:14
**finish**
51:6 140:3,4
**finished**
121:5 194:3
**finished-dose**
115:24
**finished- dosed**
167:5
**finishing**
139:20
**firms**
26:22 27:13, 14 35:18 41:19
**first**
9:11 14:13 17:15 22:9 24:22 31:2 39:10 50:13 63:25 69:16 72:5 93:20 100:14 103:16 106:3 153:9 186:23 202:10 203:6 204:1 212:15 215:3
**Fisher**
59:2 60:11
**fit**
42:11 132:4 176:11
**fit-for- purpose**
133:3
**five**
19:8 54:12 95:7 217:8
**five-minute**
129:16 155:24 195:1 208:21
**flash**
168:25 169:4
**flat**
191:2

**Floor**
4:15
**flow**
141:9,11 168:15 175:24 180:24
**flows**
168:7
**focused**
68:10 175:7
**follow**
135:22 144:9 149:1
**followed**
135:25 136:23 149:11,14 155:6
**following**
18:16 91:13 95:12 148:14 154:6 155:11
**follows**
8:15 107:20 187:1
**food**
145:25 146:1,2
**form**
23:22 24:1 32:11 36:9 37:8 38:4,17 39:3 40:4, 12,23 43:4, 18 44:8,14 45:11,22 47:3,20,25 48:18 49:10, 17 50:6 52:3,9,21 53:4,12 56:9,17 57:6,13 58:16 59:17 61:4 65:1,6, 12,18 66:1, 6,16 67:2, 11,18,23 68:6,14 69:2 70:15,20 71:2,13,19 72:12,17 73:11,23 77:14,23 78:5,12,21 79:6,13,24 81:6,14,21 82:6,22 84:17,19 85:6,11 86:1,9 87:7, 14 88:3,15 89:19 90:3, 8,18 91:1,3, 10 92:7 93:2,10 94:9,15,24 95:9,25 96:10,18,25 100:23 101:5,9 102:10 103:3,14,22 104:21 105:6,21 106:15,22 107:4 108:9, 17 109:5,11 112:14,24 113:9,20 114:11,22 116:3,16 117:2,9,20, 24 118:5 119:10,19 120:4 121:14,21 122:7,19 124:4,12,24 125:8,21 126:15 127:7,20 128:4,17 129:1,10 131:2,16 132:6,17,24 133:13,19 134:1,7 135:16,24 138:8,14,19 141:14,22 142:6,15,22 143:6 144:24 146:13 147:2,19 148:4,10 149:9 153:25 154:16,22 155:4,16 156:17 157:15 158:1,7 160:22 161:5,12 162:8,21 165:5,17 166:4 169:4 170:10 176:20 179:20 182:20 183:12 184:3,14,25 185:23 187:17,24 188:8,18 189:2 190:17,23 192:1,14,23 193:8,19,23, 25 194:9,17 195:25 196:4,12 197:5 198:15 199:2 200:11,21 201:15 203:16 205:10,21 206:24 207:11,21 208:4,16 214:11 216:5
**formaldehyde**
55:23
**formation**
89:1 101:14 102:20 103:5 104:20 105:1 107:24 109:3 158:24 161:4 195:19,23 196:10 197:4 206:9 207:5
**formed**
141:7 159:1 175:11 183:6 184:8,18,23 185:19,22 190:16 192:17
**forming**
103:11,19 104:4 201:18 202:1 209:21
**forms**
83:16 160:19,20 192:6
**formula**
75:20 76:17, 21,23
**formulating**
204:13,24 210:3
**forth**
29:14 174:11 213:5
**Fortuna**
4:3
**found**
29:7,22 30:3,10 34:2 43:1 71:6,15 101:1,7,19 104:18 105:1 108:14 109:2 112:3,11,21 113:7,18 114:8,20 115:7 116:15 117:3,6,17, 23 118:15

203:1,22 204:18 206:3 209:15 210:2
**fourth** 93:18
**fragment** 50:20 52:24 186:19
**fragmentation** 52:22 174:7 186:24
**fragmented** 54:3
**fragments** 50:20,21 53:2,8,14,21 174:8 184:11 187:12
**framework** 35:20
**FRANK** 4:16
**fraud** 44:4
**front** 12:3,24 30:16 115:22 191:3
**fuel** 70:8,14
**full** 93:18 106:3
**full-time** 26:15 42:8, 23
**functional** 85:21,23
**furnish** 165:20
**furnished** 29:1,5,10, 14,25 87:24 122:10,13 129:4 137:20 138:10,20
**furtherance** 148:21
**future** 21:8,10 199:12

**G**

**gallery** 6:24
**gap** 194:3
**gaps** 125:2
**GARRETT** 4:4
**gas** 46:13,19,23, 25 47:4,12 57:25 58:3 84:7 130:13 131:15 132:13,14 141:9,10 157:19,21,23 159:3 167:24,25 181:2
**gave** 51:11 91:20 114:14 162:24 177:6
**GC** 47:7 48:11 159:14,24 160:7,15 161:3
**GC-MS** 47:11
**GC/MS** 159:8 160:12,19 161:9
**Gene** 151:25
**general** 12:13 37:17, 25 45:16 80:3 86:16 96:2,14 100:16 132:19 172:9 183:13 196:20 211:4
**generality** 216:14
**generally** 188:14
**generated** 125:3,14 126:9 166:12
**generating** 149:13
**generic** 213:21
**genotoxic** 36:14,17,23 37:6,13,16, 20 38:2 63:14 67:22 68:2 73:22 78:19 207:15 215:6
**genotoxicant** 82:19 83:1
**getting** 91:12 99:23 139:12 148:21 160:5 177:19 182:16 185:7 199:22
**Gibbons** 20:8
**Gibbons'** 20:3
**give** 12:10 15:7 38:9 55:13 73:24 88:9 90:4,21 99:14 103:8 108:10 123:12 139:8 147:10 150:8 164:15 174:20 178:23 183:16 191:20 192:17 193:14 194:8
**given** 84:22 90:21 116:17 139:4 164:19 199:10 210:9 215:2 216:13
**giving** 26:21 53:7 90:24 91:7 92:4,10 119:13 191:6 193:25
**Glaxosmithkline** 100:15 101:16 110:13 112:3,11 150:16 151:22
**GLP** 135:22 145:16,19 146:8,16,21 148:9,18 152:12 154:4,6 155:1
**GMP** 154:4,6 214:3
**GMPS** 146:15
**goal** 168:23 174:12 182:22
**goes** 57:1 180:25 191:10 203:19 204:17

207:22 208:17
**going** 8:19 9:7 13:14,23 18:11,20 42:16 43:21 51:4 52:23 72:19 80:2 87:19 91:1 93:19 101:22 119:1 123:18 142:2 148:5 178:25 183:3,5 185:14 212:11
**good** 6:1 8:18 9:4,6 42:10 51:5 98:6 145:20 147:4 148:14,15 152:16 153:7,13
**GORDON** 4:14
**govern** 172:16
**graduate** 60:23
**grams** 76:6
**Grand** 160:8
**Grant** 4:15
**granted** 56:14
**grants** 14:23 15:3
**graph** 116:10
**gravity** 169:1,5
**great** 54:14 195:3
**GREENBERG** 4:8
**GREG** 4:21
**group** 41:25 77:21
**grouped** 38:23
**groups** 77:4 85:15, 16,21,23 164:14
**GSK** 20:18 74:9, 18 75:4 82:18,21 100:15 101:24 104:8 105:5 106:20 108:7 110:2 111:18,23 112:21 113:25 114:8,14,20, 24 115:13 116:4,20 117:7,13,17, 22 118:3,13 119:22 120:1 123:23 126:21,24 128:13 162:5,9,17 163:12 164:10 166:22
**GSK's** 101:18 112:7 115:4,14,23 116:13 163:3 166:16 167:11
**GSKZAN3395640** 149:20
**GSKZAN3692463** 151:14
**guess** 32:12 51:12 62:3 68:17 79:15 95:2, 11 106:23 118:18 123:17 183:18
**guideline** 77:17 80:19 81:4,16,25 82:9
**guidelines** 36:19,23
**guilty** 43:1

**H**

**habit** 104:13
**half** 25:17 41:20
**hand** 60:25 130:7
**handling** 204:22 206:7,15
**hands** 59:19 60:7,9 63:7
**hands-on** 59:11,16,20 61:18
**happen** 158:18,20 169:7
**happened** 106:17
**happening** 96:4 103:25 173:7 186:2, 4
**happy** 15:9 163:21
**hard** 11:8 17:16 30:20
**Hazard** 74:9
**head** 158:12 159:24 160:4,7,14, 20 161:3,8 192:11
**Health** 128:20
**hear** 9:2
**heard** 58:2 86:12
**hearing** 97:22
**heat** 100:22 101:13 104:10,19 105:2 109:19 141:5 160:21,25 161:2 196:9, 13,17,18,20 197:3
**heated** 160:5 181:2
**heating** 159:2,24 160:7
**held** 6:5,10
**help** 10:1 26:19 35:18
**helpful** 9:16,24
**hence** 77:4
**hesitated** 190:25
**Hewlett-packard** 57:22
**high** 160:25

169:10 180:13 189:7,16 190:2 194:10 195:16 196:9,13,17, 18,20 205:1 215:5
**higher** 80:23 81:8 185:2 202:14 203:23 204:19 206:5,13
**highlight** 154:25 196:5
**highlighted** 94:22
**highly** 80:9 101:4 141:3 207:5 208:12
**HILIC** 173:2,5 175:6 176:23 185:5,8
**Hill** 128:7
**hire** 26:15
**hired** 27:21 39:16 198:24
**history** 138:12
**hit** 42:6
**hits** 34:7
**hoc** 105:5,9,11, 17,19 106:6, 8,12,21
**hold** 179:12
**home** 217:20
**hope** 98:18
**hot** 158:14
**hour** 25:23 26:1,2 51:4
**hours** 11:21 25:17, 21 31:21 32:24 210:20
**HPLC** 41:23 45:18, 23 46:4,6,8, 11 47:23 57:23 58:6 60:15 162:11 169:11,18,23 170:1,7,17 171:13 174:18 175:25 177:2 180:25
**human** 40:17 41:3 65:21 66:23 67:9 68:1,4, 20 83:8 146:2,3,11, 24 147:17 200:14,25
**humans** 40:22 66:19 73:6 148:2, 22 155:15
**humidity** 101:4,8,10, 13 104:10,19 105:2 107:23 108:20 109:2,19 133:12,17,21 207:7 209:12
**hump** 189:14
**hydrazine** 49:6 55:24
**hydrochloric** 111:9
**hydrochloride** 102:19,22 104:12
**hypothesis** 88:14

**I**

**I-CLASS/XEVO** 215:8
**I-O-N** 46:17
**IARC** 39:19,23 40:8,16,19 65:20 66:22 67:6,25 68:8,11,23 69:7,14 72:2 73:10 74:4, 17 75:3 83:24 200:24
**IARC's** 68:16,19
**ICH** 36:18 38:23 77:17 79:23 80:9
**idea** 53:13 132:20 168:21 183:1
**identification** 14:8,23 16:9 17:6 18:25 22:4 24:13 34:17 37:17, 25 46:20 48:20 69:12 74:23 97:14 110:20 111:22 137:14 141:20 145:13
149:25 151:18 152:21 170:16 171:4 174:1 175:1 197:23 199:19 201:7
**identified** 36:21 37:19 38:1,7 174:22 198:17
**identify** 37:5,13,15 47:8 49:8,12 157:13 170:2 171:21 173:19,23,25 174:13
**identifying** 170:21
**identity** 47:10 142:4, 13
**ill-defined** 68:3
**illegally** 136:14
**immediate** 203:7,18
**immediately** 155:6
**impact** 101:13 172:24 193:10
**implies** 155:8 190:1
**imply** 102:12
**important** 35:17,23 36:7 79:3,7 117:5 123:11 176:18
**improved** 46:1

**impure**
199:10
**impurities**
35:13,25
36:8,10,21
37:5,14,16
44:20 45:17
55:4 57:10
63:15 78:25
79:4,10,12
102:23
104:1,5
106:9 107:13
193:16,21,
22,23 194:7,
14 196:21,24
197:9,19
198:11,20,24
199:14
200:4,17
215:6
**impurity**
35:9,16,22
36:14,17
37:17,19,24,
25 38:6
45:1,7,14,
19,25 46:10,
20 49:4
70:10 78:19
79:2,8,22
80:1 131:6
194:20
198:14,16
202:13,17
207:16
**impurity's**
79:16
**inaccuracy**
175:13
**inaudible**
30:18
**include**
23:21 104:10
116:9,10
142:19 143:3
176:12
**included**
136:2 142:9
**includes**
179:9 182:21
**including**
35:10 127:16
146:1 176:16
177:16
204:20 206:5
**inclusion**
165:10
**incomplete**
166:11
**inconsistenci es**
126:8
**inconsistency**
125:12
**incorrect**
76:16 125:7
126:14
214:24
**increase**
91:18 109:2
203:22,24
204:7,18
205:1,7,11,
14,18,24
206:4,12
215:14,20,24
216:11,16,20
217:2
**increased**
80:23 107:23
109:23
209:16,18
**increases**
202:14
**incumbent**
196:2
**independence**
164:20
**independent**
42:15 92:5
118:10,14
119:25
125:14 129:6
161:22 162:4
164:13,14
165:20,24
177:15
**independently**
116:19
162:16
163:9,11
183:10 184:1
**index**
48:1
**indicate**
87:18
**indicated**
25:25 78:7
81:3
**indication**
56:7 79:17
174:20
175:10
185:13
**individual**
81:23 82:12
110:9 143:11
167:15
206:21
**indoor**
131:23
**industrial**
83:17
**industry**
26:24
**inflection**
216:12
**influence**
104:9,25
**influenced**
105:2
**influencing**
104:1
**information**
45:15 57:1
92:13 96:13
100:8 118:23
119:7,12,15
122:8 123:19
139:4 141:4,
19 142:8,17
156:14 164:4
166:22 174:6
203:3 204:5
207:3 211:2
214:7
**informed**
193:14
**infrared**
131:13,18
132:15
135:18
**infringe**
213:22
**initial**
178:8 185:10
**initially**
48:19,20
192:19
**initiate**
65:10
**initiated**
42:22
**injection**
158:13,14,22
159:4,6
160:6
**inlet**
132:13
**inquire**
128:19
**inquiry**
121:18
128:11
**inspection**
142:20
**instance**
114:13
**instances**
59:12 146:22
**instrument**
48:9,10
49:20 58:8,
15,23 59:1,7
60:11,12
61:1,9,15
62:10,14

63:1 149:17 212:22 213:1
**instrumental** 172:16
**instrumentation** 46:1
**instruments** 57:16,18 58:10 59:10 60:22 61:3 62:22
**intact** 194:19
**intake** 80:6,16,25 208:13
**integrity** 99:20 149:3
**intend** 21:5
**intended** 145:23 146:9 216:23
**Inter-** 159:18
**interact** 168:8
**interacting** 103:12,20
**interaction** 103:6 168:3
**interactions** 6:9
**interacts** 168:14
**interest** 170:13
**interested** 7:13 171:25
**interface** 6:11,25 180:8
**interference** 159:14,17, 19,23 175:12 176:9 188:13
**interferences** 126:5
**interfering** 189:12
**intermediate** 70:6
**intermolecular** 102:21 107:7,9
**internal** 109:24 110:6 149:11 190:12,14
**Interpretation** 12:15
**interrupt** 92:15 139:19 214:13
**interrupted** 140:15
**introduced** 46:18 131:9 132:9 159:11 186:18
**introduction** 106:2 158:11 159:3
**invalid** 124:17
**investigate** 88:6 96:4 101:19 198:25 199:3
**investigating** 97:4 147:16
**investigation** 44:4 65:23 67:7 73:20 96:2 102:4 104:18 110:1 120:10 149:6 163:25 197:18 198:9,19,22 210:15
**investigations** 35:10,16,22 45:1,7,20,25 46:10 110:13 111:4 207:17
**invoice** 24:22 25:18, 25 31:20,23 32:22,23
**invoices** 24:8,21 25:1,7,15 26:3 28:18 30:23,24 33:3
**involve** 144:19
**involved** 33:8 43:20, 25 44:10,25 59:13 64:13 65:14 207:13 208:7 216:17
**involvement** 102:22 104:5
**involving** 14:24 142:25
**ion** 46:16,17 47:24 50:17 51:19,22,25 52:11,13 53:19,22,23, 25 54:3 174:7 186:23 187:4,6
**ionization** 180:18,22 181:4 188:15,25 197:3
**ionize** 179:18,23 180:2 195:17,21
**ionized** 180:1,5 181:20 183:8,14,23 191:12 192:3,9 194:19
**ionizes** 180:13,14
**ions** 50:21 52:1, 5,6,14,18,24 53:14 54:3 180:15 182:13,15 183:1 184:11 186:25 187:3,9,15, 20,21 191:15 192:13,21
**ipads** 10:3
**iphones** 10:4
**ISIDRO** 4:10
**isidron@gtlaw.com** 4:10
**isotopically** 102:19
**issue** 165:4 181:8 184:7 196:16
**issues** 132:4 199:1, 3
**itemizing** 50:14
**items** 30:12

**J**

**Jennifer** 88:21 94:3
**job** 96:3

**JOHN**
4:4
**john.garrett@bowmanandbrooke.com**
4:5
**journal**
165:9
**journals**
165:22
**judgment**
135:14
**July**
24:23,24 25:10
**June**
110:15

**K**

**keep**
23:3 33:23 34:1,8 144:12
**keeping**
32:13
**key**
107:18
**kicking**
62:8
**kind**
45:15 47:17 48:8,16 57:14 61:8 79:19 103:16 127:13 155:3 170:5 172:9 207:12,24
**kinda**
144:12
**kinds**
35:21 37:2 38:13 80:21 172:20
**King**
10:18 97:7, 25 98:3
100:14 109:13 163:5,23
**know**
11:2 12:19 13:24 14:2 19:22 27:6 28:18 29:13, 16,22,24 30:9,17,20 34:7 35:12, 19 36:6,24 37:2 38:12, 13 39:4,12 40:16 43:6, 19 46:11 49:13 50:7, 17 52:10 56:19 59:19 61:7 65:2,4, 13 70:17 71:3,11,17 72:14 76:10, 15 79:15,17 80:1 81:24 84:1 85:19 86:7,14 89:15 92:20 97:4 99:20 100:25 105:23 106:17,23 108:11 109:20 110:7,23 113:13 117:22 118:19 120:1,24 121:15,25 122:21 127:1,24 129:11 135:2,20 144:19 147:4 148:12,13 155:18 158:12,15,19 160:2 163:20 164:19 165:20,21 167:1 169:14,22 171:1,8 172:5,6,12, 21 173:7 174:3,10,15, 17 175:16 179:21 181:6 185:4 188:2, 10,11,12,21 191:16 192:10 196:1 197:10 201:25 203:17 206:10,16,19 207:13 210:11 211:1 213:4 214:25
**knowing**
207:19
**knowledge**
23:14 24:2 43:5 44:11 75:24 124:15 132:23 133:5 149:10 154:10 155:12
**known**
38:24 39:1 69:24 79:8, 15 85:17 127:3 131:18 141:7 144:15 152:11 169:11

**L**

**lab**
28:9 55:2 60:21 136:16,21 137:2 144:3 176:17 214:3
**labeled**
102:19
**laboratories**
28:16 127:22 129:6 164:13 204:6
**laboratory**
41:17,21 57:12 59:12, 16,21 60:10 65:22 66:18, 24 68:1 78:7 84:25 86:5 92:19 127:18 128:12 131:22 136:2,23 138:23 143:22,25 145:4,21,22 146:18 147:4 162:25 203:1
**labs**
130:9,11 177:15
**lack**
73:25
**Lafayette**
41:17
**lagging**
199:22
**Lame**
215:4
**large**
6:22 127:13 166:13 176:7 181:12 191:9
**law**
26:22 27:13
**lawyers**
29:11,15
**LC**
48:12
**LC-MS**
162:11 171:13,15,20 172:2,11,14

188:24 196:9 215:6
**LC-MS/MS**
126:25 162:12 172:19 173:10 179:4,10,12, 15 186:19 188:24 189:4
**Le**
88:21 89:13 92:6 94:3 99:6 100:1
**Le's**
89:2,9 90:6, 25 91:14
**lead**
154:3 158:15 159:18 189:15 194:6
**leading**
164:22 168:16
**leave**
42:3,8
**leeway**
147:10
**left**
42:23 180:9
**Legal**
7:10,16
**legal-related**
42:21
**length**
19:9
**level**
36:11 57:10 79:19,22 116:14 212:24
**levels**
63:15 79:9, 11 88:7 89:1,3 91:16 99:17 106:9 113:22,25

114:8,20 117:3,16 118:14 123:7,13 124:9,19 170:12,13 171:11 172:4,14,17, 22 185:3 202:16 203:2,24 204:6 205:7, 14,18 206:20 209:15 215:14,24 216:20
**Liability**
7:8
**lieu**
8:1
**light**
48:3 211:2
**Lilly**
44:17,20 45:3,8,21 46:21 47:2, 7,15,19 48:14 55:15, 18 56:13,21, 23,24 58:12, 15 59:22
**Lilly's**
56:3,6,10,18
**limit**
80:6,13,16 81:1,8,9,12, 24,25 82:10
**limited**
87:12
**line**
51:7 54:8 155:23
**link**
214:25
**Linkedin**
44:13
**liquid**

47:18,25 70:8 167:13, 16,23,24 168:2,21 169:2,10,12, 15 171:16 180:25 209:14
**list**
12:11 21:20 22:12,20 23:3,10,18 24:15 29:3, 10 30:2,14 34:6 75:14 111:16 113:17 138:25 141:15 178:24 179:2,3,7 201:23 202:8
**listed**
23:10 25:22 30:1,25 31:25 32:1 44:13 76:9 88:20 114:15 171:23 179:9
**listen**
154:12 194:12
**Listing**
114:25
**lists**
72:10,13 192:2
**literally**
212:17
**literature**
29:8,12,15, 19 31:1,7, 12,14,21 32:3,5,8,14, 16,21 33:7, 8,11,17,19, 24 34:3 89:18

**litigation**
7:8 8:21 9:10 17:14 21:6 26:5 34:24 35:1 41:25 42:2 64:7,17 73:19 88:2 118:22 122:11,14 132:5 147:15,21,25 148:20 200:6 207:23 208:18 211:5,12 213:10,16, 17,20
**litigations**
63:17,19,24 64:12
**little**
8:22 9:17,25 18:15 25:12 27:1 58:1 59:23 62:2 105:8 186:6 194:3,24
**live**
126:20
**LLC**
4:1 35:6
**LLP**
4:2,8,14
**load**
111:1 150:9
**loaded**
74:25 150:3 152:23 199:23 201:9
**loading**
17:10 153:3
**located**
126:21 128:2
**logger**
131:24
**long**

17:21 22:15 39:1,4 42:18 132:18 161:11 177:4 181:6 182:24 205:2
**longer**
71:11 121:17 144:1 168:9
**look**
30:14 40:6, 14 60:13 66:11 67:19 68:7 75:19 81:10 83:22 86:18 89:5, 11 91:4 94:18 97:3 99:7 105:22 109:24 112:2,10 113:11,13,14 114:3,12 115:4,6,14, 21 116:19 118:2,12 120:5 121:16 125:1 140:10 145:18 162:16 163:4,22 166:16,23 178:22 190:4 191:14,19 201:19 203:4 209:22 210:8
**looked**
11:15 20:2,5 33:14 39:22 47:11 55:3 66:7,10 72:3 75:13 87:1 88:4 89:6 90:20 109:22 110:7 111:13 112:16,25 113:5,21 117:15 118:18 131:11 162:22 163:1,12,16, 17 166:22 202:2 209:9 213:12
**looking**
24:15 31:20 45:17 50:16 51:1 52:11 67:6 101:21 104:24 111:19 113:12 133:7 163:22 170:6 172:5,12,22 174:16,22 182:23 183:18 189:24 191:21 210:16 213:4 214:18,19
**looks**
39:7 189:12
**loosely**
144:17
**loss**
99:20
**lot**
19:13 47:21 68:16 98:1 113:2,4 122:15,18 127:15 129:11 147:5,6 156:18 159:7 171:23 202:2
**lots**
45:12 129:8
**lovastatin**
64:1,2
**low**
63:15 79:22 169:6 171:9 203:2
**lower**
79:11 81:9 161:7,11 202:23 212:23
**Lowering**
64:6
**Luke**
10:21
**lumped**
32:2
**lunch**
97:9,16,25 98:12,24 100:11

**M**

**M.A.**
94:2
**M.D.**
94:3
**M.R.S.C.**
94:2
**M7**
38:23 77:17 79:23 80:9
**made**
66:25 95:17 107:18 158:21 165:11
**magnetic**
182:17
**main**
44:24
**maintain**
136:5 144:3, 5
**maintained**
136:15 143:20
**maintaining**
136:21
**major**
44:22 45:16
**majority**
30:12
**make**
9:18 37:6 90:6 114:4 119:23 120:12 121:18 123:5 128:11 169:7 188:20 202:3 208:8 211:8 213:5
**makes**
36:5 77:21 85:24 90:17 189:15
**making**
11:22 14:17 37:2
**managing**
41:14 42:24 43:8,12 44:2
**manner**
8:7 213:24
**manufactured**
155:13
**manufacturer**
133:8,24 134:5
**manufacturers**
208:7
**manufactures'**
153:12
**manufacturing**
4:1 26:17 70:24 78:23 144:20 152:16 153:8,13,19, 24 154:10, 14,20 199:7
**March**
17:2
**mark**
13:10,16 15:10 18:3, 12 21:24

24:8 34:11 74:10 110:12 137:8
**marked** 14:6,7 16:8 17:5 18:8,24 22:2,3 24:11,12,19 34:14,16 69:9,11 74:4,22 97:12,13 100:10 110:5,19 111:21,25 112:2,8,10, 23 123:25 137:12,13 145:11,12 149:23,24 151:16,17 152:19,20 197:21,22 199:17,18 201:5,6
**market** 36:6 122:1 144:20 201:14 202:6 203:8,18 207:10 208:3
**marketing** 145:24 146:11
**marketplace** 129:4
**marking** 13:15 18:12
**mass** 47:7,13 48:4,7,16 49:8,15,24 50:1,5,13, 15,17,22 52:15,20 53:10 60:17 61:11,17,19, 20 62:10,12, 16 63:10,13 171:17 173:18,23 174:5 175:9 176:20 177:19 179:17,18,25 181:9,18,24 182:2,11,12 183:10,21,22 184:1,13 188:2,4 191:10 193:24 196:15,18 197:12 215:9
**mass-to-charge** 52:8,12 53:3 181:23 183:19 184:6 186:21 187:14 191:12,17 192:3,7,9
**masses** 183:9,24 184:5
**Masshunter** 63:3,6
**master** 111:18 112:1 123:24
**material** 104:12 107:6 112:9 205:3
**materials** 21:20 22:12, 19 23:4,10 29:3,10 30:2 34:6 36:4 111:15 179:2,7 201:22 202:8 210:5 215:3 216:17
**matter** 7:7 8:4 17:24 25:2, 10,17 29:21 33:12 56:6 67:8 92:24 102:4 143:17 145:6 156:16 164:21 181:5
**matters** 42:2
**mean** 22:24 23:23 53:19 59:4 61:5,13 68:5 75:6 77:24 86:22 97:23 102:8 103:2 105:18 106:12 125:17 128:5 174:2 179:21 188:21 193:4 203:13 208:14
**meaning** 19:21 61:14 67:16 70:22 113:7
**means** 49:13 68:8 155:2,5 206:13,14
**meant** 105:10 106:5 211:11
**measure** 47:1 50:2,3 63:11 132:15 133:9 160:12 162:18 170:8,22 171:2
**measured** 125:6 126:12
**measurement** 131:5,6 135:18
**measurements** 147:24
**measuring** 114:20
**mechanism** 78:9,15 79:1 86:4 89:20 91:2,25 103:9 159:20 160:6
**media** 130:15 131:10 132:9
**medical** 146:3
**medication** 64:16,20
**medium** 26:13
**meet** 148:6
**member** 84:11 85:2
**memory** 133:22 166:25 209:23
**mention** 12:3 27:12 49:2 125:11 139:6,21 141:8 143:13 216:19
**mentioned** 11:18 15:20 32:2 33:6 46:4 55:6,23 57:8 58:5,6 90:7 116:5,6 138:21 140:23 141:18 144:14 157:3 177:6,9,10 178:19
**mentioning** 108:15
**mentions** 177:24

**messaging** 10:9
**mesylate** 49:3,4 55:22
**metabolic** 100:3
**metabolite** 99:12
**metabolized** 86:8
**metaphor** 145:4
**meter** 131:24 133:8,15,16, 18,23,24 134:3 141:9, 11
**meter's** 132:13,15
**method** 45:8 46:6 130:22,25 132:4,11,22 133:1 141:1 142:2 150:5, 24 160:15,20 162:5,9,10, 23 163:13 164:11 171:13 172:10,14,18 173:10,17 176:13 177:2,14 179:4,10,12, 15 185:5,8 186:1 191:14
**methodologies** 162:18
**methodology** 33:14,17 131:14 137:4 182:18,21
**methods** 45:6,13,18 46:7 139:13, 16 153:17 157:7,16 165:2,15 173:4,15 175:20 177:13 185:6
**methyl** 77:4 85:16
**metric** 46:14
**midnight** 11:20
**miles** 126:20
**milliseconds** 181:5
**mind** 129:15 199:5
**minimum** 145:3 148:6 149:2 153:17
**minute** 179:13 201:19
**minutes** 54:12,13 98:5,17 211:20 217:8
**MIR** 46:13
**mischaracterizes** 91:11 93:3, 11 94:16 216:6
**misleading** 154:8
**misshapen** 190:7
**misstates** 115:16 118:6 125:22 126:16 142:7 166:5 187:25 188:9 190:24
**mistaken** 68:24
**mobile** 167:24 168:4,7 169:15
**mode** 173:2 175:6 176:23 180:19,20 184:16 189:4 190:3 191:4
**model** 58:14,17,19 131:25
**modified** 83:7
**moisture** 12:17
**mol** 76:6
**molecular** 50:17 75:20 76:1,4,10 174:7 193:17 194:15
**molecule** 77:7 102:2,8 107:2 141:4 174:11,21 181:17 184:7 187:11 193:10
**molecules** 103:6,12,20 107:10 179:18,24,25 180:4 181:20,22 183:8,23 186:19 187:13
**moment** 20:12,25 66:10 178:22
**Monday** 7:4
**monitor** 130:16 131:19 132:8 135:21
**monitored** 192:25
**monitoring** 50:10 53:13 153:12 191:15 193:10
**monograph** 39:19,23 40:8 69:7,15 72:2 74:4,18 75:4 83:24
**monographs** 68:12
**month** 25:21 205:14 215:23
**monthly** 25:4
**months** 28:4,6 42:4 60:1,2,4 121:9
**morning** 6:1 8:18 9:6,8
**morphology** 104:11 105:3
**move** 30:22 62:1 169:1 179:1
**MRM** 50:4,9 51:13 53:24 63:10, 12 184:16 186:9,14 189:8,23 190:3 192:13,22 193:2,6,17 194:16
**MS/MS** 174:25 177:2 181:25 182:23

188:14
**MT**
215:4
**multiple**
50:10 184:4 185:4
**mutagen**
83:2 90:17 92:18
**mutagenic**
37:20 38:2, 25 39:2 55:4 57:10 63:15 66:15,18 73:21 78:25 79:4,10 90:1,22 91:8,24 92:5 100:4 199:14 200:4,8,16, 18,22
**mutagenicity**
38:9,16 78:6,11 89:21 91:2 92:1
**Mutamice**
152:1
**Mutation**
152:1
**muted**
97:17
**mutual**
42:7
**Mylan**
4:13

**N**

**N-NITROSAMINE**
85:7,8
**N-NITROSAMINES**
84:11,15 85:2,5,12,17
**N-NITROSO**
77:7,9,16
**N-NITROSODIMETHYLAMINE**
40:1,10,20 69:20,23 72:6 73:4 151:25
**Najafi**
19:25 20:9, 10 87:9 91:16 93:25 114:15 115:12 116:6,18 117:1,25 118:19 119:24 141:2 174:24 180:9 185:16 189:22 196:3 197:15
**Najafi's**
11:11 20:7 114:25 115:18 117:11 154:2 167:11 191:14,21
**name**
7:9 8:18 9:6 35:5 43:9 53:21 63:24 195:20
**named**
43:6
**nanograms**
80:14,17 81:2,12,19, 25 82:4
**narrative**
140:10 177:7
**narrow**
52:6
**natural**
83:17
**nature**
45:13 55:17 56:1 73:22
200:8 214:1
**NDA**
209:15
**NDMA**
14:25 15:19, 20,24 16:3 38:15,18,20 39:1,11,12, 15,20 40:17 50:2,3 55:2, 3 57:5,7 64:24 65:3, 4,9,15,16,25 66:4,12,14, 17 67:21 68:13 69:3, 24 70:5,10, 13 71:6,11, 17,21 72:2, 15,20 73:22 74:1 75:21 76:5,11,24 77:2 79:21 80:3,6,10,16 81:1,13,19 82:5,19,24 83:15,20 84:2,4,7 85:1,7 86:7, 21,23,25 87:2,16,20, 23 88:5,7 89:1,3,18 90:1,7,12, 14,16,21,25 91:2,9,16 92:5,17 99:9,17 100:5,22 101:5,8,13, 19 102:1,7, 20 103:5,11, 19 104:4,20 105:1 106:20,24 107:1,24 109:3,23 111:8,24 112:3,11,20 113:6,18,22, 25 114:8,19 115:7 116:14 117:16 119:8 120:21 121:6,12 122:24 123:7,13 124:9 125:5, 18 141:7 155:7 158:24,25 159:9 160:1, 13,18,20 161:4,7,10 162:19 170:8,12,18, 21 171:10,21 172:2,6,11, 12,19 173:10,16 175:1,8,11, 20,23 176:14,19,20 178:18 180:21 181:15 183:4,6 184:7,17,20, 23 185:3,9, 12,15,19,22 189:9,10,13, 19,21 190:6, 10,16,18 191:3,5,13, 17 192:6,13, 16,18,21,25 193:6,13,15, 23,25 194:9, 13,21 195:18,23 196:4,6,10, 22 197:4 198:13 199:9 200:8,18,23 203:1,22 204:6,18 205:7,14,18

206:3,9,20 207:4,20 209:13,15 210:3 215:14,24
**NDMA's** 91:25
**neat** 87:2 90:14
**necessarily** 196:19
**necessary** 44:15 56:19 139:3 141:17 142:23 162:14 166:10 190:2
**need** 12:20 18:11 35:18 36:10, 22 89:4 105:22 114:3 126:4 146:17 149:1 150:7 165:23 171:9 175:21 180:1 196:5 197:11 208:8 210:24 211:7
**needed** 45:15 135:10
**needles** 139:1
**needs** 148:6 191:18
**never** 136:12 217:2
**news** 201:2,12
**NILDA** 4:10
**nitrogen** 77:5 132:14
**nitrosamine** 33:15,18 38:18,20 49:9,16 77:16,25 215:5
**nitrosamines** 38:22 63:11, 13 78:3,9,16 86:6
**nitroso** 77:15,20 85:21,23
**NMR** 46:13
**non-disclosed** 205:13 215:22
**non-glp** 147:9 149:8 150:24 152:4
**non-introduction** 197:12
**non-reliability** 175:13
**nonclinical** 145:22
**normal** 204:7 205:8, 11,19 215:15,20 216:18
**North** 126:22 127:5,15 128:8
**Notary** 8:13
**note** 23:6 32:7,9 42:5 112:20 114:18 120:12 166:2 177:23 178:1 214:9
**notebook** 136:3,16,22 137:1 138:2, 3,10,23 141:25 142:17 144:7,10 145:5 146:18 214:6
**notebooks** 142:9 143:13,14,19 144:4 214:3
**noted** 13:5 22:19 23:8 31:7,22 32:22,24 33:3 83:9 141:2
**notes** 12:4 13:3
**notice** 13:9 14:11 16:7 18:17 67:8
**noticed** 67:12
**noting** 82:18
**number** 5:10 13:19 18:17,18,19, 21 22:2 24:11 34:15 58:18 69:10 74:5,7,13, 17,19 83:14 97:12 137:9, 12,17 141:13 142:4,13 158:9 172:8 178:20
**numbers** 13:21 129:12

**O**

**oath** 8:1
**object** 23:22 24:1 32:11 36:9 37:8 38:4,17 39:3 40:4, 12,23 43:4, 18 44:8,14 45:11,22 47:3,20 48:18 49:10, 17 50:6 52:3,9,21 53:4,12 56:9,17 57:6,13 58:16 59:17 61:4 65:1,6, 12,18 66:1, 6,16 67:2, 11,18,23 68:6,14 69:2 70:15,20 71:2,13,19 72:12,17 73:11,23 77:14,23 78:5,12,21 79:6,13,24 81:6,14,21 82:6,22 84:17,19 85:6,11 86:1,9 87:7, 14 88:3,15 90:3,18 91:3,10 92:7 93:2,10 94:9,15,24 95:9 96:10, 18,25 100:23 101:9 102:10 103:3,14,22 104:21 105:6,21 106:15,22 107:4 108:9, 17 109:5,11 112:14,24 113:9,20 114:11,22 116:3,16

117:9,20,24 118:5 119:1, 10,19 120:4 121:14,21 122:7,19 124:4,12,24 125:8,21 126:15 127:7,20 128:4,17 129:1,10 131:2,16 132:6,17,24 133:13,19 134:1,7 135:16,24 138:8,14,19 141:12,14,22 142:6,15,22 143:6 144:24 146:13 147:2,19 148:4,10 149:9 153:25 154:16,22 155:4,16 156:17 157:15 158:1,7 160:22 161:5,12 162:8,21 165:5,17 166:4 170:10 179:20 182:20 183:12 184:3,14,25 185:23 187:17,24 188:8,18 189:2 190:23 192:1,14,23 193:8,19 194:17 195:25 196:12 197:5 198:15 199:2 200:11,21 201:15 203:16 205:10,21 207:11,21 208:4,16 214:11

**objection**
8:7 30:5 62:17,24 95:25 115:5, 9,16 116:23 118:16 123:8,15 136:19 146:25 148:23 151:4 152:5 166:19 167:6 191:18 206:24 210:7 216:4,5

**objections**
8:9 15:6 16:7

**observation**
119:23

**observations**
107:18

**observed**
99:18

**observing**
216:21

**obtained**
162:13 184:11 185:6

**obtaining**
156:13

**occurred**
43:19 106:14 121:9 126:6

**occurring**
99:15

**occurs**
103:9 186:24 195:24

**October**
32:24 39:9

**offer**
21:5 35:9 36:14 124:8, 19

**offered**
87:9 92:25 93:8

**offering**
89:8,25 92:23 93:6 99:13 100:3 199:6 200:7 202:19

**offers**
174:25

**offices**
10:17

**okay**
8:25 9:1,4, 14 10:7,12, 15,19,25 11:9,16 12:20 13:3 14:14,17,22 16:25 17:16 18:1 19:5 20:4,19,22 21:22 22:14 25:6,15 31:19,24 34:22 35:4, 14 41:13 50:24 51:16 54:15 55:16 63:23 64:11 74:20 75:9 76:20 83:13 98:10,16 101:23 110:18,24 111:2,3 112:6 120:18 127:11 129:18 132:10 145:7 150:5,11,16, 19,22 151:19 153:4,5,6,23 157:4 171:5, 16 173:25 183:16 186:13,18 198:3,7 199:23 201:11 209:10 211:23 214:15 215:19 217:7

**Olsen**
5:3 7:2 8:18 9:6 14:10 16:11,18 17:8 19:2 24:18 35:5 37:11 55:1 69:14 74:25 98:9 100:13 106:4 110:22 126:10 130:3 140:5 150:14 152:23 195:15 197:17,25 199:21 201:10 209:8 212:11 217:17

**Olsen's**
17:1 18:3 24:8 34:11 137:8

**once**
95:17 110:23 214:11

**one**
4:9 14:22 18:20 20:15 22:13 24:15, 22 25:5 27:22 31:2 33:15 37:9 42:25 43:13 44:5,24 45:18 49:1,3 51:13 53:20,

21 63:25 73:15 75:4, 6,7 80:12 89:14 92:25 93:8 97:19 104:7 114:13 121:11 127:25 130:8 134:16,18, 21,24 146:17 151:15 152:18 157:19 159:11,12 169:4 170:6 171:24 172:17 173:12 174:2,14,15 181:15 182:23 185:2 186:24 189:24 195:20 196:7 202:3 206:1 209:6 211:13,15 212:21

**ones**
20:11 26:14 29:22 53:10 128:9 131:11 163:17 187:9

**open**
10:9

**operate**
62:14

**operated**
63:1

**operating**
136:1

**operation**
212:25

**operator**
212:23

**opinion**
69:5 73:24 84:22 89:12 90:4,24 92:10,21 99:13 117:2 119:13 123:13 124:8 145:4 155:9 173:6 190:20 200:7,19 207:18

**opinions**
21:5,8 24:5 73:13 84:21 86:10 88:9 89:8,25 90:21 91:8 92:4,23,25 93:6,8,13, 22,24 94:12 95:6 100:2 119:22 151:7 152:7,11 199:6,11 201:18 202:1,20 204:13,24 209:21 210:4

**opportunity**
11:3 181:13 210:10

**opposed**
23:4 26:25 27:2 29:11 107:11 141:1 161:1 173:2 189:4

**options**
36:25

**oranges**
160:23 213:19

**order**
47:8 88:11 117:2 119:18 123:12 130:19 169:14

**organic**
83:15,20 84:4,6

**organisms**
86:5

**organizations**
26:18

**OTC**
203:10

**others'**
119:16

**outcome**
7:13 38:12

**outlayed**
214:5

**outline**
36:24

**outlined**
214:6

**output**
63:6

**outputting**
132:1

**outside**
6:10 72:18 73:12,13,17 78:14 84:20 86:10 90:19 95:3 119:4 133:23 134:4,9 151:7 152:6 200:19

**oven**
169:19

**overlapping**
185:11

**oversight**
136:17

**P**

**p.m.**
98:23 99:3 129:21 130:1 156:4,9 195:8,13 208:24 209:4 212:3,8 217:11,16

**packaged**
155:14

**packaging**
109:20 153:19

**packing**
154:20

**page**
5:4,10 14:13 17:15,20 22:8,10,13, 15 31:3 69:16,19 70:1 71:23 72:22 82:15 83:13 88:19 93:14 95:14 105:15 106:1 107:15,17 108:1 204:1, 2

**pages**
17:21 19:8 22:15,16

**pain**
64:16,23

**Panigrahy**
94:3

**Pantheon**
4:1

**paper**
100:19 108:12 109:8,16,17, 21 163:5,23 165:10,12 177:18 193:21 196:18 197:2,7 209:22 210:13,14,16

**papers**
15:15,19

**paragraph**
93:19 106:3

153:9 202:10,23 203:6
**parameters** 172:16
**Pardon** 43:9 180:3
**parent** 53:21,25 54:3 186:22 187:4,11,13
**part** 6:23 24:4 35:8,17,23 39:20 41:23 50:13 51:13 65:23 68:24 72:1 75:11 77:6,8,10, 15,16,17 89:20 91:1 100:17 102:3 109:25 111:4 120:9 122:10,15 127:5 143:10 145:20 160:5 163:24 174:18 180:9 182:22 185:10 186:9 196:7 210:14
**participants** 6:3,19
**participating** 7:20
**particles** 180:14 182:5,13
**particular** 13:22 34:8 52:7,12 53:2,8 57:14 65:2 101:12 104:23 122:18 133:2 139:17 174:4 175:23

182:12,23 189:25
**parties** 8:5 116:8 118:10 119:25 125:14 143:14
**partnership** 127:4,9
**parts** 43:22
**party** 7:12
**pass** 50:18 53:9 181:21 211:17
**passed** 50:21
**passing** 169:12
**past** 63:16,19 165:9 212:20
**patent** 42:1 213:19, 22
**patterns** 174:10
**peak** 181:11 185:12 189:13 190:8 191:1,3
**peer** 166:9
**peer-reviewed** 164:16 165:3,16,25 166:8 178:1
**penalty** 8:4
**pending** 139:24 140:12,17

**Pennsylvania** 4:16
**people** 59:13 60:10 164:19 165:1
**perceive** 190:21
**percent** 70:9 133:12 209:12
**percentage** 26:23 27:3 29:9,16 30:9
**perform** 43:2,17 118:13 213:1
**performance** 169:10
**performed** 48:17 49:7 169:21 182:4 184:12
**period** 24:23 41:9 45:10 181:10
**perjury** 8:4
**permits** 145:24 146:11
**person** 8:2 26:10 42:23 60:24 138:23 143:22
**personal** 143:18
**personally** 49:7,15,18 57:11 58:23, 24 61:10,13, 16 62:9,21 63:3,10 163:8
**personnel** 41:21

**perspective** 77:2 84:18 171:2
**pertain** 148:13 152:10
**pertaining** 146:8
**pertains** 145:16 150:19
**pertinent** 23:1
**petition** 125:13 161:15 162:1
**petri** 90:22
**PGA** 164:14
**Ph.d.** 7:2 94:1 212:24 213:2
**pharma** 115:25 117:4 125:6 126:12 127:17 147:14 153:24 155:13
**pharmaceutical** 26:11,12,24 27:4,7,10, 11,14,17,19, 21 28:12,15 35:5,17,23 36:1 37:12, 24 39:7 41:19 44:19 63:20,21 78:18 79:5, 8,18 81:13, 20 82:5 207:15
**pharmaceuticals**

4:7,13 80:7, 16 81:1 130:10
**pharmacologist** 86:3
**Pharmd** 94:3
**phase** 158:17 162:11 167:24 168:7,9,14 169:15 173:3,4 176:23 185:6 207:22 208:17 211:5,11
**phases** 168:4
**phenomenon** 195:24
**Philosophy** 94:2
**physical** 66:8 83:23 99:20
**physically** 7:21
**pieces** 186:20 187:2
**PIETRAGALLO** 4:14
**pile** 12:19
**pills** 209:17
**pipe** 140:23
**Pittsburgh** 4:16
**place** 44:6 51:24 52:22 136:1 181:4,7
**places** 122:22
**plaintiff** 7:4 95:7
**plaintiffs** 8:20 9:9 122:10,14,16 124:11,21 128:25 129:9
**plaintiffs'** 13:9 14:7,10 16:7,8 17:5 18:24 22:3 24:12,19 34:16 69:11 74:22 92:25 93:8,25 97:13 110:19 111:21 137:13 145:12 149:24 151:17 152:20 197:22 199:18 201:6
**plan** 214:5
**platform** 10:13
**play** 32:18
**please** 7:16 11:2 13:8,16 16:5 17:1 18:2 21:23 22:10, 15,23 24:7,9 34:10 69:6 71:23 72:22 74:8 82:16 92:14 93:5, 17 97:6 110:11 111:17 137:7,10 139:18 145:8 149:19 150:8 152:15 154:12 194:12 197:16 199:13,15 201:1 214:9 216:1
**point** 81:7 84:12 121:23 177:1 192:5 196:7 210:20,24 211:16
**pointed** 191:7
**points** 84:1 212:21
**policy** 207:12 208:6
**poorly** 189:14
**port** 132:13 158:14 159:4,6
**portable** 131:21
**portray** 144:18
**posed** 140:7,9
**position** 27:23
**positive** 38:10 82:19 83:1
**possibilities** 159:7 188:11 206:17
**possibility** 191:8
**possible** 172:13 173:11 206:18
**post** 105:5,9,11, 17,18 106:6, 8,12,21
**potent** 84:16 85:25
**potential** 36:23 37:6, 20,21 38:3 49:4 78:6,10 83:4 99:16 176:7 188:12
**potentially** 55:4 57:10 63:14 78:25 99:12
**practical** 40:21 73:5
**practice** 152:17 153:8,13
**practices** 145:21 147:5,12 148:14,16 149:16 154:6 214:3
**preclinical** 43:1,16 147:7
**precursor** 46:8 182:25 186:22 187:4,6 192:2
**predated** 46:6
**predictable** 187:12
**predominance** 27:10
**predominant** 46:23
**preliminary** 19:20,23
**preparation** 19:18 31:15, 17,24 32:4, 9,10,14,18

33:6 141:5
**prepare**
16:22 19:11
**prepared**
15:14
**preparing**
32:6 59:8
**prescribes**
145:20
**prescriptions**
203:10
**presence**
6:10 102:1,7
103:25
111:8,24
120:21 121:6
122:24
143:23 181:2
**present**
4:19 7:22
35:25 61:1
71:7 102:14
103:7 149:5
158:16
170:12
172:7,23
183:5 184:21
194:7 196:16
199:10
**PRESENTATION**
4:21
**presentations**
15:15 16:2
**presented**
16:1 132:5
**preserved**
122:5
**prespecify**
142:3,13
**pressing**
61:6
**pressure**
169:6,17
180:18
**pressurized**
169:12
**Presumably**
155:5
**pretty**
17:10
**previous**
125:12
160:15
170:20,23
203:21 216:6
**previously**
31:9 70:16
89:23 200:13
205:24
**primarily**
41:18 42:1
169:8
**primary**
45:8 46:2
95:10
**principle**
133:6
**Principles**
95:15
**prior**
70:5 213:10,
15
**prison**
43:15
**Private**
6:8
**privilege**
119:2 123:9
**privy**
82:14
**probable**
40:17 41:3
65:21 66:23
67:9 68:1,4,
20 83:8
200:14,25
**probably**
33:5 47:22
163:19
180:11
**problem**
175:3 176:5
**procedure**
130:24 138:2
**procedures**
136:1,24
144:6,10
164:9
**proceeding**
6:4 9:16
**proceedings**
7:17
**proceeds**
211:6
**process**
56:11,19
57:2 102:15
198:10,23
211:13
**processed**
155:13
197:18
**processes**
83:17 86:12,
15
**processing**
63:5 153:19
154:20
156:14 199:8
**produce**
186:24
**produced**
174:8 213:10
**product**
28:14 36:1,6
64:19 108:14
112:5,13,22
113:8,19
114:9,21
115:8 117:5,
8 118:15,25
119:9,17
120:2,14
121:5,13
122:6 123:7,
12,14 124:3
126:13
128:16,24
153:20,24
154:15,21
161:1 162:20
163:14 167:5
183:1 187:9
194:22
204:21 206:6
208:15
213:21 215:7
**production**
12:17 70:7,
14
**products**
7:8 14:25
35:11 101:20
111:10
115:24 116:2
145:24
146:4,11
153:11
154:10 162:7
201:14
202:13
203:9,23
**professor**
27:25 28:8
**profile**
44:13
**project**
87:10 148:9
**projects**
42:16
**prompted**
204:5
**pronounce**
41:11
**proof**
184:22
185:19,21
186:1
**properties**
38:25 39:2
65:24 66:2,
4,9 82:24
83:23,25
90:1 91:9,24
92:5 143:1
171:8 200:23

**proprietary** 56:25
**protocol** 135:12 137:5,8,19, 22 138:7,13, 16,18,22,25 139:17 141:8,9,18 142:3,12,16, 19 143:3 151:14 213:9
**protocols** 137:3 143:11
**prove** 125:17 186:3
**proven** 126:2
**proves** 195:23
**provide** 75:10 93:21 95:6 99:5 103:4 118:22 140:2 141:19 182:2 214:4
**provided** 25:6,16 30:13 34:23 119:6 122:17 124:10,20 129:8 143:14,17 207:3
**providers** 127:19 128:13
**provides** 182:18
**providing** 100:7 140:10
**pub-** 178:14
**public** 8:13 56:7,11
**publication** 56:3,18 97:7 101:17
**publications** 164:17 165:3,16 166:1
**publish** 55:19 56:8, 11,13,16,19 81:11
**published** 36:19 49:2,3 55:11,21 80:18 108:7 110:3 178:16 179:5,15 199:25
**pull** 13:9 16:5 17:1 18:3,9 21:24 24:8 34:11 40:5 69:6 74:9 81:15 93:16 97:7 110:11 111:17 145:8 149:20 151:13 197:17 198:2 199:13 201:1
**pulled** 22:6
**pulling** 110:17
**pump** 169:16
**Purdue** 27:23 28:5,8 59:24,25 60:8,18
**purification** 169:9
**purported** 89:20
**purpose** 6:12 120:25 123:18 133:2 142:1 147:15,20 148:6 149:1
**purposes** 13:15,16 29:20 40:21 65:5,7 70:21 71:8,12 73:5 77:22 169:9 213:17
**pursuant** 79:22
**push** 62:13
**pushed** 49:19 212:17
**pushing** 59:6
**put** 11:17 78:3 82:9,25 105:25 115:22 169:14 205:23
**puts** 78:1
**puzzling** 154:1

**Q**

**q2** 186:17,18
**QA** 136:17
**quad** 62:12
**quadrupole** 53:10 61:11, 17,19 62:10, 16 182:1 186:14,23 215:9
**qualification** 149:17
**qualifying** 159:9
**qualitative** 174:6
**qualitatively** 157:8,12,17
**quality** 36:3 131:5, 24 135:20 149:4 153:11
**quantification** 170:15,16,24 171:7
**quantify** 157:13 170:18 171:21 173:19,24
**quantifying** 170:21
**quantitate** 48:25
**quantitating** 55:9
**Quantitation** 215:5
**quantitative** 48:22,24 63:4
**quantitatively** 157:8,12,17
**quantities** 176:8
**question** 9:23 12:22 23:17 37:9, 18 38:7 45:14 47:10 49:12 62:6 80:24 87:6 88:14,17 91:21 92:2,3 93:5 94:22 95:23 96:6 105:13 106:24 108:24

114:18 118:12 121:25 123:2,17 129:7 130:7 131:7 139:21,23, 24,25 140:7, 9,12,14,19, 22 151:10 154:11,12, 13,19 170:20,23,25 171:6 172:1, 9 173:9 175:18 176:25 177:1,5 185:17 187:2 191:25 192:8,20 194:2,11,13 207:25 208:1,6 211:10 212:15 213:20 214:13 215:13,17 216:5

**questioning** 8:20 9:8 15:10 51:7 54:8 212:13

**questions** 9:21 11:1 27:17,19 88:18 91:12 95:17 96:8, 17,21,23 98:3 99:25 105:13 140:17 155:23 211:21 212:12 217:5,18

**quick** 12:10 129:16 211:20

**quickly** 17:9,10 169:8

**quite** 152:25 160:3 176:3 190:11

**quoted** 99:9 115:2 116:25 118:7 119:24

**R**

**R&d** 144:15 147:22

**raise** 206:9

**Raleigh** 127:14

**Ramin** 93:25

**range** 52:5,6 84:1 114:14 116:17 117:21 118:1,4,7,20 119:24 144:25 216:19

**ranitidine** 7:7 15:16 87:17,21,24 88:5 96:5,9, 14 100:21 101:2,7,10, 19 102:2,8, 11,19,21 103:6,12,20 104:11,20 106:21,25 107:2,10 108:3 109:14,18 111:8,24 112:4,12 113:19 116:1 117:4,7,15, 16,19 118:24 119:9,17 120:21,23 121:5 122:2, 5,6,23 123:1,6,11 124:2 125:15 128:15,24 141:3 149:8 150:20 155:8,14 159:9,14,24 160:10,13, 17,19,21,24 161:10 162:6,19 163:13 170:9,19 173:17 175:20,22,25 176:8,14,19 177:19 178:18 180:21 181:8,16 185:4 191:10 192:4,6,9, 12,17,21 193:6,9,12, 16,24 194:14,20 196:6,11,20 197:1,8,13 198:13 199:8 201:13 202:5,13 203:1,8,14 204:7 205:8, 19 207:9,19 208:2 210:17 215:7,15

**ranitidine's** 97:4

**ranitidine-containing** 14:25

**rapid** 181:7

**RASPANTI** 4:14

**rate** 95:18 96:9 104:9,13,20, 25 107:23 109:3 207:4

**rates** 101:5 168:15 205:3

**ratio** 52:8,12 53:3 181:23 184:6 186:21 187:14 191:13,17 192:4,7,9

**ratios** 183:19 188:5

**RCA** 111:12

**reach** 51:25

**reaches** 51:17

**reacting** 102:12,13,14

**reaction** 50:10 102:21 107:7,9

**read** 22:18 23:2,4 72:1,2 75:6 86:19 93:19 94:21 102:3, 24 112:19 120:8,11 210:12,14,16 216:8

**reading** 28:19 70:16

**reads**
71:5 72:25 84:10 102:17 107:17 108:1 202:10 204:3
**ready**
97:9
**real**
121:10
**realm**
206:17
**reason**
16:18 83:7 121:10,11 123:4 125:9, 16 128:18 160:11 188:22 189:3
**reasonable**
124:8
**reasons**
99:17
**rebuttal**
180:10
**rebuttals**
11:12
**recall**
20:5,11 22:16 33:19, 21 39:13 57:20 58:17 59:18 60:2 63:24 66:9 67:5 72:3 75:13,18 112:15 113:12 120:16 121:9 124:5 133:20 134:8 135:7 143:16 150:15 151:11 163:3,17 164:4 166:21 167:8 207:9 208:2,15 212:16 213:8
**recalled**
207:19
**received**
11:19 14:24 15:2 210:18
**recent**
67:15
**recently**
108:2
**recess**
54:20 98:24 129:22 156:5 195:9 208:25 212:4 217:12
**recession**
42:6
**recognize**
22:11 197:25
**recollection**
91:14
**recommend**
161:9
**recommendations**
37:3,7
**record**
6:2,7 7:18 11:17,23 33:23,25 34:1,8 54:18,23 98:22 99:2 100:5 113:24 129:20,25 156:3,8 195:7,12 208:23 209:3 212:2,7 217:10,15
**recorded**
6:4,6 214:3
**recording**
6:13 144:6
**refer**
65:20
**reference**
15:6 108:10, 12 109:7 178:3,10,20 179:9 214:19,20, 23,25 215:2
**referenced**
200:12 209:7 210:11
**references**
12:25 23:7, 11,19 29:24 33:7 109:13, 17 110:9 179:8 210:5
**referring**
11:10 12:12 20:9 43:24 159:22,23 177:8,11 192:24 206:15
**refers**
127:9
**reflect**
25:16
**refractive**
48:1
**refresh**
75:5 166:25 209:22
**regard**
9:15 11:24 15:11 16:2 21:3 29:2 30:24 68:12 79:21 89:9, 25 90:25 91:8 92:4 100:3 113:6 117:3 119:14 123:13 139:16 153:7 162:18 175:15 200:7
**regarded**
40:21 73:4
**regarding**
15:3 36:17 78:19 81:13 95:7 118:23 119:7,16 120:13 149:8 167:4 198:9 199:7 200:16
**Regional**
127:4
**regulated**
145:25
**regulations**
23:20 145:16 146:7 152:17 153:8,14,16
**regulatorily**
148:22
**regulators**
36:2
**regulatory**
35:20 78:24 148:2,17 164:22
**relate**
89:3 172:9
**related**
7:11 19:14 27:17,18 29:1 35:10 42:1 56:13 64:1,21 87:16 104:24 112:17 130:6 142:23 149:11 159:21 190:18 197:13,19 207:17 212:18
**relationship**
38:11
**relative**
107:23 108:20 109:2 133:12,17 209:12
**release**

201:2,13 202:4,22
**released** 131:8
**releasing** 144:20
**relevant** 121:16 122:3 162:2
**reliability** 93:24 94:11 166:15 172:24
**reliable** 126:2,5
**relied** 24:4 169:1,5 209:7
**rely** 26:18 173:19
**relying** 23:12,20 68:19 117:13 119:22
**remain** 42:9 131:22
**remaining** 211:18
**remember** 20:15,24 27:22 33:13 55:12 67:13, 17,20 70:16 92:2 111:13, 19 131:10 133:14,16 134:13,17 176:25 186:12 215:17
**remote** 6:11 7:1,9, 17
**Remotedepo** 6:25
**remotely** 7:24 9:12
**removal** 201:13 202:5
**remove** 6:16
**repeat** 9:4 103:15 179:6
**repeated** 158:25
**rephrase** 11:3
**rephrased** 171:6
**replicas** 143:10
**replicate** 214:8
**replicates** 134:25
**report** 11:11,12,13, 19 16:22 17:1,13,17, 20,24 18:4, 19 19:2,8,14 21:2 23:8,9 31:15,16,24 32:4,6,9,10, 14,18 33:6 34:5 74:10 78:14 87:19 88:19,21,24 89:3,5,7,10, 12 90:6 91:5,14 93:12,13,14, 17 94:10,17, 19 95:4,14, 21 99:6,8 105:10,15,20 106:1 110:8 113:24 114:3,7,12, 13,15,19 115:1,3,4,11 116:5,6,9 117:1,11,12 118:1,8,20 119:21 125:10,11,25 128:22 137:21 138:10,21 156:24 157:5 164:8 166:3 167:12 178:3,7,8, 21,23 179:8 191:19,22,24 195:16 196:13 202:19 209:7 210:12,19,23 211:7,11,14 214:18,23
**reported** 91:16 107:19 108:3 109:14 118:9 161:15,19,21
**reporter** 7:14,19 9:20 18:6 30:19 33:16 46:15 61:22 62:3 64:5 74:11, 20
**reporting** 7:23 8:8 112:21 125:18
**reports** 11:7,9,10,14 12:25 19:14 21:4,8,11, 14,19 29:14, 20 87:12 88:12 93:25 110:9 115:19 125:23 166:24 210:22
**represent** 121:24
**representing** 27:14
**represents** 175:12
**reproduce** 139:5
**reproduced** 146:20
**reproducing** 140:25
**reputations** 164:21
**request** 6:6 165:8,24 166:7 203:8, 18
**requested** 29:24,25 30:10 34:4 165:8
**requesting** 165:1 201:13 202:5
**requestor** 165:21
**required** 146:21
**requirements** 136:25 148:17 153:17
**research** 14:23 15:2 21:16 39:21 65:5,7,24 70:21 71:1, 7,12,18 87:6,10 88:13,17 89:24 127:4, 9,10,11,19 128:1,2,14 144:15,22 145:24 146:10,22 148:20 149:8
**reserve** 21:7 210:25 211:17

**reserved** 13:21
**resident** 21:17
**residual** 47:1,5
**resolution** 187:19 188:1,6
**resolved** 189:14
**respond** 175:2
**responding** 175:4,16 182:15 189:9 191:5
**response** 16:14 38:10 53:16 62:7 72:19 90:22 92:24 93:7 140:19,21 154:24 174:3,16 185:14 190:7,9,11, 21,25 191:1, 6 194:1,6 214:14
**responses** 15:6 16:6 18:18 185:9
**responsible** 91:24
**responsive** 14:19
**rest** 33:2 77:7 116:12 173:2,8 202:22
**result** 116:17 159:25 202:15 203:7
**results** 63:8 102:1,7 113:6,17 114:24 115:14,19, 21,25 116:5, 11,14,20,25 117:14 118:2,11,13 119:14,16, 18,25 124:15 125:1 129:3 146:19 154:5 155:7 162:24 166:15 167:11 172:25 189:16 196:16 209:20
**retained** 73:18 93:21 120:22 121:8 122:16,22 130:4,12 161:25 174:18
**retention** 174:17,23
**retired** 46:3
**retrieved** 146:19
**retrospective** 106:11 213:24
**retrospectively** 88:7 106:16 206:19
**reverse** 162:11 173:3,4 176:22 185:6
**review** 19:17 20:13 28:20,23 32:21 39:19 41:1 75:1,11 87:8 88:20 89:2 100:17 111:3,10 116:13 165:8,24 166:1,9 167:3 201:21
**reviewed** 19:13 20:16 34:5 97:2 100:19 163:4 164:5 167:1
**reviewer** 163:7
**reviewers** 165:7,19
**reviewing** 26:3 28:25 63:8
**revision** 138:12
**RH** 109:1
**right** 6:24 13:7 14:4 16:13 17:12 20:11 21:7 25:7 31:20 32:13 42:6,22 49:14 53:16 54:6 60:4 67:14 75:19 77:10 83:10, 11 85:20 98:12,13 133:3,5 137:25 139:15 140:13 144:2 150:20 160:3 168:22 178:13 196:14 203:19 204:2 210:25 211:19 212:21 213:13,14 214:21,22 217:4
**rights** 11:24
**rise** 53:7 78:10 191:6 193:14 194:8
**risk** 80:12,23
**robust** 135:19
**rocket** 70:8,14
**role** 41:13,15 61:8 78:17 213:3
**Ron** 19:25
**room** 7:22 10:20 202:15
**root** 101:18,25 109:25 110:2,6,14 111:7,23 112:7,17,19, 23 113:17 114:1 120:5, 14 123:23 163:19,20 166:17
**Rosemary** 8:19 9:7 155:23
**rough** 19:21
**Roughly** 48:6
**Rounds** 160:8
**routine** 47:9

**RSK**
109:24
**rules**
144:13
**run**
61:14,16,18
62:9,21
134:23
**run-on**
207:25
**running**
59:7,9 60:22
61:3,5,9

## S

**S------------ --**
5:8
**safe**
217:20
**safety**
36:12
**sale**
147:17
155:14
203:15
**Salmon**
94:1
**salt**
49:4
**sample**
86:22 101:12
122:17
134:18,21,22
141:5
158:11,21
159:6,11
167:14 168:4
169:2 170:3
171:22
172:3,6,11,
13,15,19,21
173:8,11
180:16 183:5
192:18
195:17,22
207:6
**samples**
59:9 62:22
101:3 109:21
121:16,19
122:2,5,9,
13,21 124:22
126:11,17
128:24
129:2,3,13
136:4 142:4,
13 166:13
168:3 185:4
190:6 196:14
204:19 205:5
206:4
**sampling**
160:6
**Sanofi**
117:13
167:4,9
**sartans**
160:16
**satisfied**
164:23
**saying**
80:3 115:20
146:15 164:3
188:20 194:5
**says**
28:24 70:2,4
71:15 83:14
104:16
107:12,21
109:10
150:23
151:22 152:4
196:13
202:24
**scanned**
23:1 187:7
**scanning**
23:5 183:19
**scattering**
48:3
**science**
156:13
**scientific**
93:23 124:9
131:14
132:23 133:4
135:14
147:10 148:7
149:2
**scientist**
43:6 212:24
213:2
**scientist's**
56:24
**scientists**
42:25 43:14
44:6
**scope**
73:13 78:14
84:20 86:10
87:25 88:25
90:19 94:6
95:1 119:4
145:18 146:8
151:7 152:6
200:19
207:22
208:17
**screen**
6:23 75:2,7
105:25
110:22 150:3
198:3
**screens**
6:15
**search**
29:12,19
31:1,7,14,21
32:21 34:8
**searches**
32:6,8
33:11,20,24
34:3
**searching**
29:8 31:10,
12 32:4,14,
16 33:9
**Searle**
20:18
**Searle's**
20:16 120:9
**second**
53:1 150:9
186:23
**section**
70:2 72:4,24
95:16 106:2
**sections**
23:1
**sector**
27:3
**see**
8:25 10:22
12:18 14:10,
13 16:11
17:8,11 22:5
24:18 26:4
30:25 31:4
32:25 33:3
34:19 35:4
40:24 41:5
44:16 62:4
67:20 69:14,
21 70:2,4,11
71:9,24 72:8
73:7,8 75:1,
2,16 76:18
82:18,20
83:3,6,18
84:13 88:19
91:5 95:20
108:5,18
110:22
112:3,10
113:11,14
118:3 120:6
121:12 126:7
137:16 146:5
150:2,7,10,
17,19,22
151:21 152:3
153:21 163:5
172:17
174:3,16
178:3 185:7
190:6,18
192:12,16,21

193:2,5,15 194:13 199:21 203:11 204:9
**seeing** 124:5 166:12 191:1
**seeking** 146:23 147:17
**select** 52:4,6,13
**selected** 50:18 51:22
**selecting** 120:2
**selection** 182:2
**selective** 183:2 189:24
**selectivity** 174:25 182:18 189:8 190:2
**selects** 52:23
**self-employed** 26:7,10
**seminar** 160:9
**seminars** 16:1
**semivolatile** 83:15,20 84:2
**sense** 97:3
**sensitivity** 188:17 215:5
**sensor** 131:13 132:15
**sentence** 71:5 72:5,24 84:10,13 93:20 95:20 100:24 102:3,17 103:2 106:8 107:16,25 203:5,21,25
**sentenced** 43:14
**sentencing** 44:5
**separate** 31:25 32:1,7 122:22 166:24 167:14,19 176:18 181:22 196:6 211:7
**separated** 168:20 176:5
**separately** 32:20
**separates** 168:2
**separating** 157:24 158:2,4 168:11 183:17
**separation** 167:17 168:16,24 169:20 175:22 176:14 182:17,22 190:1 197:11
**September** 31:4 32:22
**series** 24:21
**serve** 17:23
**served** 11:25 12:7 15:7 17:13 21:4 25:1
**service** 35:14 36:13 127:19 128:12
**services** 4:1 24:23 35:9
**serving** 210:22
**sessions** 27:9
**set** 52:1 53:1 96:20,22 113:1 181:21 209:17
**sets** 144:12
**setting** 6:17
**seven** 22:15 36:19 42:4
**several** 26:14 36:25 72:13 79:14 118:17 158:19
**sheet** 111:11,18 150:6,24
**short** 26:21 41:9 145:6
**shorten** 207:25
**shortly** 11:20
**should've** 207:19
**shoulder** 189:13
**show** 53:6 67:3 126:4,11 186:2 196:3
**showed** 152:9 159:12 160:9 161:6, 14 193:22
**showing** 104:13 113:22 116:10 151:2,9 176:13
**shown** 13:13 65:22 66:19 110:5 158:23 160:8 173:15 196:2 207:4
**shows** 109:18 151:5 175:4 190:9
**sic** 17:2
**signal** 190:5,13 192:17 193:14
**signals** 53:7
**significant** 76:9
**significantly** 204:19 206:4,10,12 207:7
**silico** 38:11
**similar** 108:2 109:7 213:16
**similarly** 168:19
**simply** 10:12 106:4 108:24
**single** 46:8 188:15, 25 189:5
**sit** 82:2 89:9,15 124:7,18 125:4 134:12

184:23 191:16 201:24 210:21
**site** 41:16
**sites** 43:22
**sitting** 10:3,15,17 185:18
**situation** 129:5 131:4 213:19
**situations** 81:8
**skip** 33:2
**slightly** 188:4
**slow** 102:1,7,15 107:6
**slowed** 42:7
**slower** 104:13
**slug** 190:9,21
**small** 26:12,13,14
**smoothly** 9:17
**software** 57:24 63:4,7
**sole** 46:22
**solely** 102:20
**solid** 41:18 168:14
**solution** 158:21 159:1 160:8,10,24
**solvent** 169:2,12
**solvents** 47:1,5
**soothe** 124:16
**SOP** 144:6
**SOPS** 149:11 155:11
**sort** 52:4 127:5 158:23
**sound** 25:7,19 178:13
**sounds** 26:6 98:20
**source** 50:15 176:9 179:19,22 180:1,9,17 181:1 188:15,25 189:10,19 196:9 197:3
**sources** 128:21 176:15
**space** 158:12 159:24 160:4,7,15,20 161:3,8
**Spalding** 10:18
**speak** 55:7,10,18 100:6
**speaker** 6:15
**speaking** 9:19 60:15 97:19,21
**spec** 48:4 50:13 61:20 62:13 63:14 174:5 176:20 177:19 180:1 181:9 183:22 184:13 191:11 196:19 197:12
**SPECIALIST** 4:21
**species** 40:2,11 72:7,11,14 89:19 90:9 91:1 103:7
**specific** 33:10 80:4 103:9 113:1 134:9 141:16 164:4 185:15 199:5
**specifically** 63:13 76:15 96:15 177:9
**specifications** 133:15
**specificity** 184:10 188:17 189:1
**specifics** 89:5
**specify** 171:24
**specs** 193:25
**spectometry** 47:7 49:15
**spectrometer** 50:15 60:18 61:11,19 62:10,12,16 196:15 215:9
**spectrometry** 47:13 48:7,16 49:8,25 50:2,5 61:17 63:11 84:8 171:18 173:18,23 179:17,18 181:19 183:11 209:14
**spend** 163:21
**spending** 41:19
**spent** 41:24
**spoke** 186:6
**Sponsor** 151:22
**spotlight** 6:17
**spotlighted** 6:14
**spray** 180:7
**sprayed** 181:1
**spread** 46:5
**spreadsheet** 112:2,9,16 123:24
**stability** 86:20,25 87:1 90:12,15 95:15 96:2,13 97:5 107:19 108:22
**stable** 86:23
**stage** 51:23 158:17 182:3,8 188:3 189:5
**stages** 174:25
**stamped** 31:12

**stamps** 32:20
**stand** 24:14 50:9
**standard** 133:1 135:25 155:11 190:12,15
**standards** 145:3 147:10 148:7 149:2 165:22
**standpoint** 147:11
**stands** 171:19
**start** 13:20,23,25 87:6 100:9 154:9 155:22 158:8,11 184:21
**started** 32:19 42:15 45:24 98:19 214:12
**starting** 25:4 48:11, 12 81:7
**state** 41:18 112:6 119:21 128:8 155:10 195:16 197:2,7
**stated** 39:24 40:8, 20 104:6
**statement** 7:17 11:17, 22 66:21 71:14 73:9 142:1 161:17,23 170:23 202:18,21 204:9,12,23 205:7,18 206:3,23 215:14 216:14
**states** 70:19,25 101:24 145:19 176:17 195:21 196:9 203:6
**statin** 64:3
**stating** 153:10 200:23
**stationary** 168:4,6,9
**statistical** 87:23
**status** 152:3 166:14
**statute** 147:1
**stenographer** 53:15
**step** 38:1
**steps** 38:14 161:16,18
**Steven** 198:5
**stop** 176:24
**stopped** 140:8
**storable** 70:8
**storage** 204:8 205:8, 12,19 215:15,20 216:18
**stored** 202:14 204:19 205:3 206:4,13 209:11
**STOY** 4:16
**strategies** 36:14,17 78:19,22,24 197:17 198:9,22 207:16
**Street** 4:15
**stress** 108:22
**stressed** 143:9 160:25
**Strike** 163:10
**striking** 182:5
**strongly** 155:8 168:8
**structural** 76:17,21,23 77:20
**structure** 38:6,8,10, 16,21 77:1, 3,11,13,21 156:15 174:10
**student** 60:24
**students** 27:8
**studied** 39:5 65:11 69:3 72:20 73:15 78:13, 15 82:23 86:3,13,20, 24 200:22
**studies** 23:20 30:3 40:18 65:9, 14 66:24 68:2 78:7 88:5 104:18 107:19 145:22 146:9 147:7 152:12 177:6,8,10, 12,14 209:6 210:17
**study** 14:24 90:12, 15,16 98:4 100:14,15 103:11,19 106:19 107:15 108:7,16,25 109:10,12,13 112:1 146:16 151:24 155:10 177:11 178:2 195:20,23 196:1,8 209:8,9,10, 24 210:1,5 214:8
**style** 168:25
**subject** 196:25
**subjects** 33:22
**subsequently** 184:8
**substance** 51:21 111:9 112:5,12,22 113:7,19,23 114:2,9,21 115:8 116:1 117:4,8 118:15,25 119:9,17 120:3 121:13 123:12,14 124:2,3 125:19 126:13 128:15,25

136:10 162:6,19 163:14
**substances** 35:10 108:3 109:3,15 136:4 157:9, 14,18
**substandard** 147:11
**sufficient** 39:25 40:9 139:5 188:6 214:7
**suggest** 82:3
**suggested** 101:25
**suggestion** 123:5
**suitably** 102:18
**Suite** 4:3
**summaries** 163:2
**summarized** 163:5
**summary** 94:18 110:8 166:11
**summer** 120:22 121:2
**supplement** 11:12 178:9
**supplemental** 11:18 17:23 18:4 19:2 21:2 23:9 125:11,25 178:6,21 180:10 195:15 210:19,22,23 211:11 214:18,23
**supplied** 162:23 164:13
**suppliers** 129:5
**support** 7:11,16 41:25 42:1 43:2,16 89:17,18 145:22,23 146:9,10 147:24 149:12 165:10 217:1
**supporting** 43:23
**suppose** 27:8
**supposed** 190:5
**supposedly** 189:7,23
**sure** 9:18 17:9 30:15 49:11 76:13 95:12 103:17 114:4 129:17 155:25 172:1 178:12 188:21 194:25 202:3 211:8 213:5
**swear** 8:9
**sworn** 8:13
**syringe** 139:1
**system** 56:4,7 58:4 184:9 186:14
**systems** 57:24,25 58:3 59:2 60:13,14,16 61:21 62:13 169:18,23

**T**

**table** 107:20 113:22 114:6
**tablet** 99:21 114:17 115:13 116:15 117:18 131:9 132:8,12 134:24 141:19,20 143:4
**tablets** 99:19 108:4 109:4,15 114:2,15 116:21 117:22 123:21 124:10,20 125:6,19 130:14 135:2,8,11 141:24 142:1,21 143:2,8 209:11 210:3
**take** 6:22 16:16 21:1 30:14 37:9 54:7,11 87:3 98:14 112:20 120:18 129:15 134:16 147:24 151:12 152:13 155:20,24 161:16,18 163:22 168:9 178:22 181:4 194:24,25 208:20 211:20 217:7,24
**taken** 7:3 54:21 98:25 129:23 138:2 156:6 195:10 209:1 212:5 217:13
**takes** 51:24 52:22 181:6 186:22
**taking** 11:25 201:19
**talk** 156:23 175:21 176:22 196:18
**talked** 44:25 159:10 175:9 184:15
**talking** 51:12 55:8 85:1,3,4 90:14 113:12,15,16 136:21 137:23 158:8 174:1 183:13 189:23 196:19
**talks** 177:18
**Tandem** 215:8
**target** 50:16
**tech** 18:11
**technician** 7:10 24:14 61:8 105:24 110:16
**technique** 50:8 157:21

158:9 159:13 162:13 167:14,17 189:5
**techniques** 46:12 157:11 180:6
**technology** 46:1 47:12 58:13 62:20 135:19 188:14
**technology-related** 127:16
**tell** 105:10 141:10 191:15
**telling** 136:16
**temperature** 107:22 108:19 109:1 161:11 169:20,24 205:2,15 207:6 215:25
**temperatures** 101:3 161:8 202:15 203:24 204:20 205:25 206:5,13
**ten** 25:6 54:12,13 67:16 135:5 211:20
**tend** 168:8 183:25
**term** 37:21 43:15 68:2 105:18 144:17,21 148:15
**termed** 38:24 178:4
**terms** 213:22
**test** 92:19 113:16 119:14,16 120:14,20 121:4 122:25 123:1,6 128:15 129:7 130:22,25 132:11,22 133:1 134:23 135:1 137:6 139:5 141:17 142:17 162:6 163:13 209:20
**tested** 72:7,15 112:11 114:10 115:7 116:22 117:7 120:3 122:23 123:11 124:22 125:19 128:23 129:2,12,13 135:3
**testified** 8:14 31:9 63:16 64:8,9 77:12
**testify** 16:19
**testifying** 55:12
**testimony** 8:3 19:12,18 26:2 44:3 55:7 91:11 93:3,11 94:16 115:17 118:6 120:13 124:19 125:22 126:16 142:7 166:5 187:25 188:9 190:24 200:10 216:7
**testing** 26:17 65:22 66:18 87:8,16,20,22 88:4 111:11 112:4 115:23 116:1,7 117:3,19 118:24 119:7 120:23 122:6,14 123:20 124:1,6,11,21 126:10 128:19 130:4,6,13,21 131:12 132:3 134:15,19 135:12,23 136:7 137:4 139:13,15 140:25 142:5,14 143:5,12 148:25 164:11 167:4 172:10,18 173:10 204:4 209:25 213:15,16 214:1
**tests** 92:19 142:18 147:23 203:1 212:19
**Teva** 4:7
**Texas** 4:4
**text** 151:6
**TGA** 116:8 128:20
**thank** 18:22 51:9 54:10,14 74:20 92:12 156:1 195:4 211:24,25 215:11 217:5,19,21,22
**Thanks** 195:5
**thereof** 74:1
**Thermal** 12:16
**Thermo** 59:2 60:11
**thing** 46:9 92:9 139:2 146:14 193:20 199:5
**things** 9:14 30:10 33:14 49:2 55:14,16,21 66:7,10,11 75:14 79:14 80:22 95:11 141:6 144:8 149:16 158:15 168:8,19 171:23 172:15 174:2,9 180:12 183:4,14 185:2 202:2 212:13
**think** 16:15 19:19,25 25:3,4 27:16 32:19 37:21 44:15 64:22 68:23 75:4 76:8,12 83:24 84:2 89:13 91:21

94:19 99:22 105:12 110:9 116:4 123:10 124:13 135:10 139:11 144:18 154:2 160:2 167:10 169:6 177:17 186:7 210:9, 24 214:10

**thinking**
98:4

**third**
31:3 50:22

**third-party**
204:5

**thorough**
202:25 212:25

**thought**
23:23 97:20 157:3 171:3

**three**
15:3 176:15

**three-month**
43:15

**Tier**
128:1,5

**time**
7:5,14 31:11,13 32:17,20 35:20 37:9 41:9,20,24 42:5 44:6 45:10,20 46:3,11 47:14 48:13 51:5 54:18, 23 59:15,18, 20 60:19 67:13 98:6, 16,22 99:2 101:4,13 106:18 120:11,24 122:1 129:20,25 132:18 156:3,8 163:22 174:17,23 177:4 181:10,14 183:9,24 195:7,12 202:14 203:23 205:2 207:7 208:23 209:3 211:18 212:2,7 216:19 217:10,15,19

**times**
64:9 118:17 168:12

**timestamp**
137:24

**timing**
203:17

**title**
151:24 178:13 214:24 215:4

**today**
7:4 10:3,16, 20 11:1,6 12:1,24 13:12 14:12 16:20 19:12, 18 46:9 70:19,25 89:9,23 124:7,18 125:4 134:12 151:2,9 152:9 184:23 185:18 201:25 210:21 217:19

**told**
89:23 179:16 200:18

**Toledo**
5:6 10:21 15:5 17:3 23:22 24:1 30:5 32:11 36:9 37:8 38:4,17 39:3 40:4,12,23 43:4,18 44:8,14 45:11,22 47:3,20 48:18 49:10, 17 50:6 51:3,9 52:3, 9,21 53:4,12 54:10,13 56:9,17 57:6,13 58:16 59:17 61:4 62:17, 24 65:1,6, 12,18 66:1, 6,16 67:2, 11,18,23 68:6,14 69:2 70:15,20 71:2,13,19 72:12,17 73:11,23 77:14,23 78:5,12,21 79:6,13,24 81:6,14,21 82:6,22 84:17,19 85:6,11 86:1,9 87:7, 14 88:3,15 90:3,18 91:3,10 92:7,14 93:2,10 94:9,15,24 95:9,25 96:10,18,25 97:18,23 98:8,11,16, 20 100:23 101:9 102:10 103:3,14,22 104:21 105:6,21 106:15,22 107:4 108:9, 17 109:5,11 110:25 112:14,24 113:9,20 114:11,22 115:5,9,16 116:3,16,23 117:9,20,24 118:5,16 119:1,10,19 120:4 121:14,21 122:7,19 123:8,15,22 124:4,12,24 125:8,21 126:15 127:7,20 128:4,17 129:1,10,17 131:2,16 132:6,17,24 133:13,19 134:1,7 135:16,24 136:19 138:8,14,19 139:18 140:1 141:12,14,22 142:6,15,22 143:6 144:24 146:13,25 147:2,19 148:4,10,23 149:9 150:7 151:4 152:5 153:25 154:16,22 155:4,16,22 156:1,17 157:15 158:1,7 160:22

161:5,12 162:8,21 165:5,17 166:4,19 167:6 170:10 179:20 182:20 183:12 184:3,14,25 185:23 187:17,24 188:8,18 189:2 190:23 191:18 192:1,14,23 193:8,19 194:17 195:3,25 196:12 197:5 198:15 199:2 200:11,21 201:15 203:16 205:10,21 206:24 207:11,21 208:4,16 210:7 211:3, 19,24 212:10 214:15,16 216:8 217:4, 22
**tool** 45:17 46:2 48:20 135:18
**top** 82:17 137:24 150:17,20 192:11 204:2
**topic** 73:16 198:12
**total** 17:21 26:4 94:25 214:4
**totalled** 25:20
**totally** 213:18 214:2
**totals** 25:21
**toxic** 99:12
**toxicity** 72:20 78:16 79:1,16 86:4
**toxicological** 82:24
**toxicologist** 69:4 86:2
**TQ-XS** 215:8
**trace** 57:9 170:13 171:11
**traceability** 214:4
**training** 27:6,9 149:17 212:25
**training-type** 26:20
**transcript** 19:23 20:1, 2,3,16 120:9 140:11 216:9,13
**transcripts** 19:17,20,21, 24 20:13,23
**transform** 207:20
**transforming** 99:10
**Transgenic** 151:25
**transition** 192:13,22,24 193:1,2,4,7, 11 194:16
**transitions** 193:18
**TRAURIG** 4:8
**travels** 217:20
**treated** 56:25 143:9
**treatment** 12:15 79:17 80:21
**trial** 4:21 26:2
**trials** 36:4 43:3,17
**Triangle** 127:4,10,12, 19 128:3
**tricky** 144:11
**triple** 61:10,16,18 62:9,11,16
**trouble** 18:15
**true** 39:8 81:2
**truthfully** 16:19
**try** 30:8 88:6 123:19 144:12 178:23
**trying** 28:13 51:2 91:14 101:21 103:24 106:10,17,24 131:7 147:23 157:2 162:3 174:13 202:3 213:23
**tubing** 132:13 139:6,22 140:22,24
**turned** 41:15
**twice** 75:8
**two** 19:5 21:3,13 77:4 91:12 144:12 174:24 183:8,23 187:13
**two-page** 153:2
**type** 10:4 26:9 45:9 58:4 60:6,14,17 64:2,14 65:7 73:20 88:13 139:1,2,6,22 141:10 170:13 180:17
**types** 43:23 57:18, 21 61:20 88:10 170:5
**typical** 170:4
**typically** 105:17 170:1

## U

**U.s** 203:10
**UHPLC** 58:7,9,14,22 62:15
**umbrella** 145:2
**unacceptable** 202:16
**UNC** 128:7
**unclear** 217:3
**underlying** 165:14
**understand** 10:25 20:20

38:5 49:11 66:12 77:24 78:8 93:4 100:20 161:20
**understanding** 21:9,12 66:17 84:23 95:2 101:6 119:5 122:12 149:13 200:9 208:10
**understood** 20:14 24:6
**undertake** 149:6
**undertook** 101:18
**unique** 173:1 187:20,22
**United** 70:18,25
**universities** 128:2,6,14
**University** 27:24 28:5
**unjustified** 173:6
**unknown** 174:14
**unlike** 136:25 166:10 173:17
**unreliability** 176:10
**unreliable** 194:1,6
**unstable** 141:3 181:16
**up-to-date** 34:22 35:2
**UPLC** 59:1 60:16 215:8
**upper** 6:24 116:14
**USP** 12:13
**UTC** 7:5 54:18,23 98:22 99:2 129:20,25 156:3,8 195:7,12 208:23 209:3 212:2,7 217:10,15
**utilizes** 58:13
**UV** 47:22 170:1,4,7,13,17 171:7,11

**V**

**valid** 173:16
**validate** 162:14 164:10
**validated** 163:9
**validating** 57:4
**validation** 57:9 162:12,17,22,24 163:1,4,12 164:15,17,24 165:2,14 166:2,7,11,14,16,22 167:3,8 179:4,10,11 186:1
**validations** 125:2
**validity** 88:4,9 119:14 126:1
161:17 172:24
**Valisure** 161:6,14,24
**Valisure's** 158:24 162:1
**value** 192:10
**values** 115:6,11 116:21 117:6,10 118:3 210:2
**Vanderbilt** 4:9
**vapor** 158:16
**vaporize** 180:2
**vaporized** 157:25 158:3,6 180:1,4
**variable** 101:4 207:5
**variation** 99:19 206:17
**varies** 207:7
**various** 12:25 28:25 55:5 88:5 120:2 131:9 157:11,16 174:9 212:19
**vary** 206:10
**vendors** 59:1
**verbally** 8:2
**version** 110:4
**versus** 130:9
**vessel** 132:12
**vial** 160:4
**vials** 160:9
**video** 6:13,15,20,22 7:10
**video-recorded** 7:1
**VIDEOGRAPHER** 4:20 6:1 13:18 14:1,5 18:14 22:1 24:10 34:13 54:17,22 69:8 74:6,16 97:11 98:21 99:1 129:19,24 137:11 145:10 149:22 151:15 152:18 156:2,7 195:6,11 197:20 199:16 201:4 208:22 209:2 212:1,6 217:9,14,25
**view** 6:15,24
**visual** 142:20
**vitae** 34:19 41:5
**voice** 8:24
**volatile** 84:6
**volatilization** 181:3
**voltage** 195:16

**volts**
180:13
195:17,21
**volume**
9:2

**W**

**wait**
9:22 97:24
**waiting**
110:25 198:2
**waive**
8:6
**waiving**
11:23
**want**
6:21 11:16
40:13 52:6
54:11 86:17
105:13,25
119:15
156:19 164:6
165:19
173:21
176:21 211:8
214:13
**wanted**
56:12 163:7
214:11
**Waters**
59:2 60:13
177:17,23,25
178:14,16
215:7
**Watson**
130:9,14
**way**
29:25 73:15
126:3 143:9
157:5 189:24
**ways**
158:19
**webinars**
16:2
**website**
153:7 178:17
**weeks**
209:13
**weight**
76:2,4,10
**weights**
193:17
194:15
**well-accepted**
133:6 135:17
**well-known**
128:5
**went**
132:20
**West**
41:16 127:14
**wide**
46:5 144:25
181:11
**widespread**
45:24 46:12
**window**
188:2
**withdrawal**
202:11
203:8,18
**witness**
5:3 6:14,16,
20 8:2,10,12
13:14 15:11
62:1 92:15
97:15 98:10
99:4 129:18
139:19
150:11
151:19 195:5
211:17
217:21
**witness's**
6:22
**witness-only**
6:13
**witnesses**
20:14
**word**
32:13 50:24
85:20 100:25
170:22
171:1,2
**words**
105:11
131:21
**work**
25:9,17,24
26:5,9,12,
21,22,23
27:3,5,11,13
28:11 31:9
36:16 37:1,
11,16,23
39:15 41:24
42:10,12,21
43:23 44:19
47:17 49:24
50:1 56:13,
20,22,24
58:13,25
59:3,4,12,
16,21 60:7,
18 62:11,19
87:5,11,15
88:11,12
94:6 100:18
133:10,24
134:6 136:18
142:24
143:25
144:9,15,16,
22 145:4
147:13
148:8,19
155:3 159:8
203:19
**worked**
28:5,7 41:6
43:7 44:7,
16,20 45:3,
7,21 46:20
47:2,6,14,
21,23 48:7
59:21 61:19
63:7 144:1
**workers**
175:19
180:21 191:8
196:5
**working**
19:16 27:20,
24 28:9 42:4
48:14 55:2
60:10,20,24
110:17 136:8
211:15
**works**
50:8,12
126:3 157:23
158:2,4
180:19
181:19
**world**
116:12 173:3
**would've**
29:17 31:11
39:14 137:25
138:1 141:25
164:18
165:18
**write**
21:10,13
93:15 95:16
105:15
**writing**
29:20 198:21
200:15
202:19
**writings**
15:23
**written**
15:18 17:20
74:14 101:23
138:17
142:11
216:13
**wrong**
125:20
214:20
**wrote**
94:4 105:19
198:8 199:25

**X**

**X------------------**
5:2

**Y**

**Yamamoto**
177:17,21
**yeah**
14:1 20:24 22:7 23:23 31:18 38:7 41:1 46:17 73:14 77:16 82:12,23 84:22 86:17 87:15 93:4 100:24 106:16 108:11 123:3 183:21 184:4 187:8 188:10 194:5 195:2 207:24
**year**
25:12
**years**
28:2,3,6 42:20 44:17 48:6 67:16 80:11 82:9 88:8 106:10 129:13 134:14 135:14
**Yokoo**
196:8 197:2
**Yokoo's**
193:21 196:17
**York**
4:9

**Z**

**Zantac**
7:7 15:15 155:14 167:4 203:14 206:21
**Zebulon**
126:21,23,24 128:13
**Zoom**
9:12 10:8, 13,23

# EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT.
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IN RE: ZANTAC (RANITIDINE), PRODUCTS LIABILITY LITIGATION | Docket NO. MDL NO. 2924<br>20-MD-2924 |

DEPOSITION UNDER ORAL EXAMINATION OF:

ANDREW SEARLE

Friday, June 18, 2021

Reported by:

Melissa Ann Mormile, CCR, CRR, RDR

Job No. 360826

TRANSCRIPT of the remote videotaped testimony as taken of the above-named witness, called for Oral Examination in the above-entitled matter, said deposition being taken pursuant to the Federal Rules of Civil Procedure, by and before MELISSA A. MORMILE, a Certified Realtime Shorthand Reporter and Notary Public of the States of New Jersey and New York, License No. 30X100223800, commencing at 934 UTC.

A P P E A R A N C E S:

ANAPOL WEISS
BY: TRACY A. FINKEN MAGNOTTA, ESQ.
One Logan Squire
130 N. 18th Street - Suite 1600
Philadelphia, Pennsylvania 19103
215-929-8822
For Zantac PSC
tfinken@anapolweiss.com

CHAFFIN LUHANA, LLP
BY: ERIC T. CHAFFIN, ESQ.
ROOPAL P. LUHANA, ESQ.
KENDRA GOLDHIRSCH, ESQ.
COURTNEY GRIFFIN, ESQ.
GEOFFREY SPAULDING, ESQ.
MICHAEL SWEET, ESQ.
600 Third Avenue - 12th Floor
New York, New York 10016
888-480-1123
For Zantac PSC
chaffin@chaffinluhana.com
luhana@chaffinluhana.com
goldhirsch@chaffinluhana.com
griffin@chaffinluhana.com
spaulding@chaffinluhana.com
sweet@chaffinluhana.com

HAUSFELD
BY: STEVE ROTMAN, ESQ.
One Marina Park Drive - Suite 1410
Boston, Massachusetts 02210
617-207-0600
For Zantac PSC
srotman@hausfeld.com

And

HAUSFELD
BY: COLLEEN RYF, ESQ.
888 16th Street NW - Suite 300
Washington, DC 20006
202-540-7200
For Zantac PSC
cryf@hausfeld.com

Continued...

A P P E A R A N C E S:

ARNOLD & PORTER KAY SCHOLER, LLP
BY: MOHAMED AL-HENDY, ESQ.
700 Louisiana Street - Suite 4000
Houston, Texas 77002
713-576-2400
For Defendant Chatthem, Inc.,
Sanofi US Services, Inc., Sanofi-Avertis, US, LLC
mohamed.al-hendy@arnoldporter.com

MAY LIGHTFOOT, PLLC
BY: JE YON JUNG, ESQ.
3200 Martin Luther King Jr. Avenue SE - Third Floor
Washington, DC 20032
202-506-3591
For Zantac PSC
jjung@maylightfootlaw.com

KING & SPALDING, LLP
BY: LUKE BOSSO, ESQ.
1180 Peachtree Street NE
Atlanta, Georgia 30309
404-572-4600
For Defendant Boehringer Ingelheim
lbosso@kslaw.com

JOHN O'TUEL, ESQ (GSK in-house counsel)

DECHERT, LLP
BY: CAROLINE POWER, ESQ.
WILL SACHSE, ESQ.
Circa Centre
2929 Arch Street
Philadelphia, Pennsylvania 19104
215-994-4000
For GlaxoSmithKline, LLC, GlaxoSmithKline, PLC
caroline.power@dechert.com
will.sachse@dechert.com

And

Continued...

A P P E A R A N C E S:

DECHERT, LLP
BY: JULIE WITHAM, ESQ.
160 Queen Victoria Street
London, UK ECV4 4QQ
44-20-7184-7394
For GlaxosmithKline, LLC, GlaxoSmithKline, PLC
julie.witham@dechert.com

GOODELL DEVRIES LEECH & DANN
BY: RICHARD M. BARNES, ESQ.
1 South Street - Suite 2000
Baltimore, Maryland 21202
410-783-4004
For Defendant Perrigo
rbarnes@gdldlaw.com

REED SMITH
BY: JULIA A. LOPEZ, ESQ.
506 Carnegie Center - Suite 300
Princeton, New Jersey 08540
609-987-0050
For Defendant Par Pharmaceuticals
jalopez@reedsmith.com

SHOOK, HARDY & BACON, LLP
BY: THOMAS J. SHEEHAN, ESQ.
KIMBERLY PENNER, ESQ.
1325 Avenue of the Americas - 28th Floor
New York, New York 10019
212-759-4888
For Defendants Walmart
tjsheehan@shb.com
kpenner@shb.com

ULMER & BERNE, LLP
BY: NATHAN A. SCHACHTMAN, ESQ.
600 Vine Street - Suite 2800
Cincinnati, Ohio 45202
513-698-5000
For the Defendant Dr. Reddy's Laboratories, Inc.
nschachtman@ulmer.com

Continued...

A P P E A R A N C E S:

BLANK ROME, LLP
BY: SERENA GOPAL, ESQ.
One Logan Square
130 North 18th Street
Philadelphia, Pennsylvania 19103
215-569-5415
For Defendant Apotex Corp.

BARNES & THORNBURG, LLP
BY: SARAH JIN, ESQ.
One North Wacker Drive - Suite 4400
Chicago, Illinois 60606
312-357-1313
For Defendants Albertsons Companies, Inc., Amazon.com, Inc., BJ's Wholesale Club Holdings, Inc, Costco Wholesale Corporation; CVS Pharmacy, Inc., Duane Reade, Inc., Giant Eagle, Inc., Publix Super Markets, Inc., Rite Aid Hdqtrs. Corp., Safeway, Inc., ShopRite Supermarkets, Inc., Southeastern Grocers, Inc., Walgreen Co.; Walgreens Boot Alliance, Inc., Wakefern Food Corporation H-E-B Grocery Company, LP, and Winn-Dixie Stores, Inc.
sarah.jin@btlaw.com

CONROY SIMBERG
BY: DREW M. LEVIN, ESQ.
3440 Hollywood Boulevard - Second Floor
Hollywood, Florida 33021
954-961-1400
For Defendant Nostrum Laboratories, Inc.
dlevin@conroysimberg.com

ALSO PRESENT:

Jessica Szumla, Paralegal (Chaffin Luhana)
Katelyn Nardi, Paralegal (Chaffin Luhana)
John Schmitzer - U.S. Legal Support Videographer
Eric Berglund - U.S. Legal Support Technician

# I N D E X


| | PAGE |
|---|---|
| WITNESS NAME: ANDREW SEARLE | |
| EXAMINATION BY MS. LUHANA | 11 |
| EXAMINATION BY MR. CHAFFIN | 331, 379 |
| EXAMINATION BY MR. SHEEHAN | 371 |


# E X H I B I T S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 3120 | Deposition Notice | 19 |
| 3121 | LinkedIn CV | 24 |
| 3122 | CV | 24 |
| 3123 | Publication List | 24 |
| 3124 | GSKZAN0000443403 | 93 |
| 3125 | GSKZAN0000582941 | 99 |
| 3126 | GSKZAN0000257640 | 99 |
| 3127 | GSKZAN0000384483 | 129 |
| 254 | Valisure Petition | 137 |
| 3128 | GSKZAN0003001693 | 156 |
| 3129 | GSKZAN0003001694 | 156 |
| 3130 | GSKZAN0003001700 | 156 |
| 3131 | GSKZAN0000465673 | 172 |
| 3132 | GSKZAN0000892669 | 178 |
| 288 | GSKZAN0000369313 | 188 |
| 3133 | SANOFI_ZAN_MDL_0000267964 | 198 |

Continued...

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 3134 | GSKZAN0000229569 | 204 |
| 3135 | GSKZAN0000229575 | 204 |
| 3136 | GSKZAN0000149970 | 218 |
| 264 | Tanner Study | 223 |
| 3137 | Braunstein Article, "Analysis of Ranitidine-Associated N-nitrosodimethylamine Production Under Simulated Physiological Conditions" | 233 |
| 3138 | GSKZAN0000051927 to 52017 | 238 |
| 3139 | GSKZAN0000859960 | 269 |
| 3140 | GSKZAN0000859961 | 270 |
| 3141 | GSKZAN000088350 | 276 |
| 3142 | GSKZAN0000883508 | 276 |
| 3143 | GSKZAN0000883288 | 288 |
| 3144 | GSKZAN0000893147 | 292 |
| 3145 | GSKZAN0000893977 | 311 |
| 3146 | GSKZAN0000893978 | 312 |
| 3147 | (skipped) | |
| 3148 | (skipped) | |
| 3149 | GSKZAN00002943899 | 320 |
| 3150 | ICH Stability Testing | 320 |

Continued...

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 407 | Zantac GSK Discoloration | 340 |
| 422 | GSKZAN0000251138 | 344 |
| 439 | 2015 Toxicology Risk Assessment | 348 |
| 3158 | GSKZAN00002943899 | 357 |
| 3159 | GSKZAN00002943899 | 366 |

C E R T I F I E D Q U E S T I O N S

PAGE LINE

(No questions certified.)

THE VIDEOGRAPHER: We are now on the record.

Participants should be aware that this proceeding is being recorded; and as such, all conversations held will be recorded unless there is a request and agreement to go off the record.

Private conversations and/or attorney-client interactions should be held outside of the presence of the remote interface. The purpose of creating a witness-only video recording, the witness is being spotlighted or locked on all video screens while on speaker view. We ask that the witness not remove the spotlight setting during the deposition, as it may cause other people to appear on the final video rather than just the witness.

For anyone who does not want the witness's video to take up the large part of the screen, please click gallery view on the corner of the remote depo interface.

This is the remote video recorded deposition of Andrew Searle being taken by counsel for the plaintiff.

Today is Friday, June 18, 2021. The time is now 934 UTC.

We are here in the matter of in Re: Zantac Ranitidine Products Liability Litigation.

My name is John Schmitzer, remote video

technician, on behalf of U.S. Legal Support. I am not related to any party in this action, nor am I financially interested in the outcome.

At this time, will the reporter, on behalf of U.S. Legal Support, please enter the statement for remote proceedings into the record.

THE STENOGRAPHER: The -- excuse me -- the attorneys participating in this deposition acknowledge that I am not physically present in the room and that I will be reporting this deposition remotely.
They further acknowledge that, I, in lieu of an oath administered in -- in person, the witness
will verbally declare his testimony in this matter under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record.

MS. LUHANA: Hi. This is Roopal Luhana, and I consent.

MS. PENNER: Kimberly Penner on behalf of GSK, I consent.

ANDREW SEARLE, SWORN:

EXAMINATION BY MS. LUHANA:

Q. Good morning, Mr. Searle. I'm Roopal

Luhana, and I will be taking your deposition today on behalf of the plaintiffs, along with my colleague, Eric Chaffin.

Can you please state your full name for the record?

A. Yeah, full name, Andrew David Searle.

Q. Mr. Searle, have you ever been deposed before?

A. No.

Q. Okay. So, I will be asking the questions today; and if you don't understand a question or need me to repeat it, please just ask me to do so. Okay?

A. Yes.

Q. And please make sure in terms of your responses, make them verbal. No head nods, so the court reporter can take them down. Okay?

A. Yes.

Q. Please make sure that you wait until I finish with my question until you answer, and let's best -- do our best not to talk over one another, so we have a clear record. Understood?

A. Yes.

Q. During the deposition, you understand you are not permitted to have any devices open to try to

communicate with attorneys who are representing you. Okay?

A. I understand, yes.

Q. Do you have any other electronic devices in the room with you?

A. I have a phone in the room, but it's not on my person. It's over the other side of the room.

Q. Okay. Anything else?

A. Nothing else, no.

Q. You understand that unless on breaks, you can't use that device to communicate with any of your attorneys, correct?

A. I understand, yes.

Q. And you are on one computer.

Are there any other computers you have open in the room?

A. I don't, no.

Q. Okay. And please make sure, as you said, you have your phone in the other room, correct, your mobile phone?

A. It's in this room, but it's over with -- over in the corner. It is nowhere near my person.

Q. Okay.

Do you have any prepared notes that you

made that you have in the room with you today?
A. No.
Q. Okay.
Mr. Searle, where are you located today?
A. In the Dechert office in London.
Q. Okay.
And is there anybody there with you?
A. Yes.
Q. And who are -- who is with you?
A. Kimberly Penner, Tom Sheehan, and Julie Witham.
Q. Okay.
And those are all your attorneys, correct?
A. Yes.
Q. Did you personally retain the attorneys who are with you today?
A. No.
Q. Are you paying for the attorneys who are there with you today?
A. No.
Q. They are paid for by GSK?
A. I assume so, yes.
Q. Have you met with the attorneys for GSK to -- prior to today?

A. Yes.
Q. When did you meet with them?
A. I've met with them remotely a number of occasions since I have noticed my deposition. I met with them in person two days ago.
Q. Okay.
So, the remote meetings, when was the first meeting you had with the attorneys?
A. They were just -- I had overall probably about five sessions with the attorneys just to discuss the -- the case and go through some of the documents --
MS. PENNER: Okay. Stop. You don't need to discuss what we did.
THE WITNESS: Okay.
MS. PENNER: Just other questions about it are okay.
BY MS. LUHANA:
Q. I don't intend to go into the substance --
A. Yes.
Q. -- of those discussions.
I just want to know the details of the meetings in terms of, for example, when was the first time you met with them? You said you met with them on

five occasions.

A. I -- I don't know the exact date, but they -- they were between -- the first meetings were in February and March of this year ahead of my initial deposition date, which was the 31st of March, and then I've met two more occasions in the last month once this date was agreed.

Q. Okay.

And so how many hours collectively did you meet with them?

A. About 15 hours, I'd say.

Q. Okay.

And separate from meeting with them, how did you prepare for this deposition?

A. By reviewing some of the key documents that are associated with my involvement in Zantac over the years, work -- the work that I've done investigating Zantac on a number of occasions in the last ten years, principally just familiar myself with those -- those documents.

Q. And how did you locate those key documents?

A. They are documents I have hard copies of and stored electronically.

Q. So, you searched for those documents

yourself and located them?

A. Yes, initially, I think, yes.

Q. When you say "initially," were there other documents provided to you --

A. Well --

Q. -- to prepare for the deposition?

A. I was provided with my custodial file at a later date.

Q. And did you go through your custodial file as well?

A. Yes, at high levels. I mean, there -- there were about 8,000 documents in the file in total, but I did go -- go through the document titles.

Q. And how did you search for those document titles? What were you searching for?

A. Well, the titles were presented in -- in the custodial files, document names. So, I just scrolled down the list.

Q. You scrolled down a list of the subjects of the custodial files? You mean the emails?

A. No, the document name -- the documents were all named with the document titles in the custodial files. So, you know, I was able to, you know, assess the content from the document titles.

Q. Okay. So, was that a list of

documents provided to you by counsel?

A. Yes.

Q. And how many hours did you spend reviewing those documents?

A. Probably about two days going through the custodial file documents.

Q. Okay.

Did the attorneys have you review documents to prepare for your deposition?

MS. PENNER: Objection. Direct the witness not to answer.

BY MS. LUHANA:

Q. Are you relying on those -- any of those documents that the attorneys reviewed with you to prepare for your deposition?

A. No.

Q. Did you bring any documents with you today?

A. No.

Q. Do you understand that you are here because of a lawsuit involving Zantac ranitidine breaking down and forming NDMA?

A. Yes.

MS. LUHANA: John, can we mark plaintiff's second amended notice to take videotaped

deposition of Andy Searle as Plaintiff's Exhibit 3120.

(Exhibit 3120, Deposition Notice, marked for identification.)

MS. LUHANA: John, can you please bring it up.

THE VIDEOGRAPHER: I apologize. I don't see it in your private folder.

MS. LUHANA: Okay.

MS. NARDI: It is the deposition notice.

MS. PENNER: Roopal, I have a copy of it here. I can show the witness.

MS. LUHANA: Okay.

And I think John will be able to bring it up too as well.

BY MS. LUHANA:

Q. But, Mr. Searle, have you seen this notice before?

A. Yes.

Q. You understand that you are here pursuant to this notice, correct?

A. Yes.

Q. So, if you can please turn to page 8 and 9, let's run through those documents that have been requested.

MS. PENNER: Just like to note for the

record that we served an objection that all documents responsive to this request have already been provided.

BY MS. LUHANA:

Q. Mr. Searle, have you produced or caused your complete custodial file to be produced?

MS. PENNER: Objection.

THE WITNESS: I mean, all I can answer is the custodial file was -- was produced on my behalf by GSK, not me personally.

BY MS. LUHANA:

Q. Okay. Understood.

Mr. Searle, if you take a look at page 9, No. 2, it says, "All documents reviewed, received or prepared by deponent in anticipation of and preparation for the deposition."

MS. PENNER: Objection.

BY MS. LUHANA:

Q. Mr. Searle, have those been produced?

A. I -- it's not a question I -- I feel I can answer.

Q. You --

A. I -- I know the custodial file was -- was provided and that includes -- so, all documents that I'm aware that -- that I have written over the past ten years with respect to ranitidine from -- from my

review of the list.

MS. LUHANA: In terms of the key documents that you reviewed for this deposition, Counsel, we request that they be produced. In addition to that, Counsel, we request that the list of titles from all the custodial files be produced as well.

MS. PENNER: Objection. We will take that under advisement, but that's --

MR. SHEEHAN: I think we have --

MS. PENNER: -- work product, so we do object to that.

MS. LUHANA: If he considered it for his deposition, it has to be produced.

MS. PENNER: As I said before and as we said in our objections and responses to your notice, all relevant documents that are responsive to this request have already been produced that are not privileged.

BY MS. LUHANA:

Q. Mr. Searle, if you look at No. 3, it says, "All documents, including all communications relating to your performance at GSK."

Do you have a personnel file that GSK maintains?

MS. PENNER: Same objection. Totally irrelevant to this litigation.

BY MS. LUHANA:
Q. Mr. Searle?
A. Well, there is a file on me maintained in our HR system, yes.
Q. Understood.
MS. LUHANA: Counsel, we request that you produce that.
MS. PENNER: As I said before, we will take that under advisement, but all relevant documents that are responsive to this request and are not privileged have already been produced.
BY MS. LUHANA:
Q. And, Mr. Searle, No. 4 says, "Your current CV," and that's been produced by counsel and I'll plan to review that with you.
A. Yes.
Q. You can set the notice aside.
You understand that you are giving testimony under oath just as you would be if you are giving testimony in a courtroom?
A. Yes.
Q. And you understand that your testimony today is being videotaped and that it may be shown to a judge and a jury at trial to determine if GSK acted appropriately with respect to its ranitidine

products?

MS. PENNER: Objection.

THE WITNESS: Well, I'm aware it's being videoed. That's already been stated.

BY MS. LUHANA:

Q. And it may be presented before a jury and a judge as well.

A. Oh. That -- that's -- I'm here as a scientific witness. I'm -- I do not understand the legal side of this -- this case. So, all I know is that you stated that my testimony is being videotaped. I'm -- I understand that.

Q. Well, Mr. Searle, you understand that it's being videotaped and may be played before a judge and jury at trial as well, correct?

MS. PENNER: Objection.

THE WITNESS: I -- I rely on my legal colleagues to -- to advise on that, not -- it's not something I have any -- any knowledge of. I just say I know that you are recording this testimony.

BY MS. LUHANA:

Q. Mr. Searle, I'm just making the representation to you, and I'm letting you know that it will be played before a judge and jury at some point. That's it.

A. Okay.

MS. LUHANA: Can we please mark the LinkedIn CV, Mr. Searle's LinkedIn CV as Exhibit 3121 and also his CV that's been produced by counsel as 3122 and additionally, his list of publications that have been produced by counsel as 3123.

(Exhibit 3121, LinkedIn CV, marked for identification.)

(Exhibit 3122, CV, marked for identification.)

(Exhibit 3123, Publication List, marked for identification.)

MS. LUHANA: John, let us know if you have difficulty findings those. Katelyn is on and can direct you.

THE VIDEOGRAPHER: Those have been marked.

MS. LUHANA: John, can you put it up.

BY MS. LUHANA:

Q. Mr. Searle, you've seen this LinkedIn CV, correct?

A. I -- I have, yes. It's not something I actively maintain. I don't use LinkedIn on a regular basis, and I haven't updated this since it was written in 2014.

Q. So, the last time you've accessed LinkedIn and updated this was 2014?
A. Yes, I think -- I think -- I believe so. Yes.
Q. Understood. Okay.
I just want -- can you please read for the ladies and gentlemen of the jury your description here as to what you've been doing for GSK?
A. I manage a chemistry team who support API manufacturer across the GSK primary network and the wider GMS network providing expertise in troubleshooting and development process improvements. I also provide support in the area of chemical process safety and genotoxic risk assessments to the GMS manufacturing network.
Q. Great.
So, it says you provide support in the area of chemical process safety and genotoxic risk assessments to the GMS manufacturing network, correct?
A. Yes.
Q. What is GMS?
A. It's global manufacture and supply. It doesn't exist anymore.
Q. Okay.
A. It's changed names.

Q. When did it cease to exist?

A. Approximately two years ago it became the PSC, pharmaceutical supply chain.

Q. Okay.

And this -- this LinkedIn profile was done, as you said, before litigation, correct?

A. Yes.

Q. Okay.

You can set that aside. You can take that down.

A. Yeah.

Q. And that LinkedIn profile you have put together yourself; correct?

A. I did write that, but I don't actively maintain it.

MS. LUHANA: John, can you please put up 3122, and that should be Mr. Searle's CV.

BY MS. LUHANA:

Q. Mr. Searle, did you draft this CV?

A. Yes.

Q. When did you draft it?

A. I drafted this version last week.

Q. And who helped you draft it?

A. No one.

Q. You drafted it yourself?

A. Yes.
Q. Was it reviewed and edited by someone before you submitted it to us?
A. No.
Q. When was the version prior to this of the CV that you had?
A. I -- I can't recall. It got deleted in -- in the file consolidation on my computer.
Q. When did it get deleted?
A. I -- I deleted it. On the -- to be on the record, I am preparing to retire and -- and I was clearing out files on my computer and this was one that got deleted because I didn't feel I needed it moving forward to retirement in the form it was.
Q. Mr. Searle, when did you delete that file?
A. I don't know. I don't know.
Q. Well, what --
A. I don't recall.
Q. When have you been planning to retire?
A. I -- I will be retiring sometime in the next 12 months.
It would -- I think it would have been January or February this year.

Q. When did you begin preparing for retirement?

A. When I was given a notice of redundancy in January this year.

Q. Mr. Searle, do you understand there's a litigation hold in place, and you are not allowed --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- to delete emails or files of any nature?

MS. PENNER: Objection.

THE WITNESS: It -- it wasn't a file that had -- you know, is related to the litigation.

BY MS. LUHANA:

Q. Your CV is certainly related to the litigation, and it was after the litigation hold notice. As you said, it was of January of 2021.

You understand you weren't allowed to delete any files, correct?

MS. PENNER: Objection.

How this is related to the litigation, you know, you would have to explain.

MS. LUHANA: Kimberly, there are no speaking objections allowed. You can object to scope. You can object to form, but that's it.

BY MS. LUHANA:

Q. Mr. Searle, you said you drafted the -- the CV that we currently have, correct?

A. Yes.

Q. Are the terms "subject matter expert" something you utilize?

A. Yes, it's a term used frequently within GSK, people with particular expertise.

Q. Was the term "subject matter expert" in your prior version of your CV?

A. Yes, it was.

Q. But we won't know that because you deleted that file, correct?

MS. PENNER: Objection. Argumentative.

BY MS. LUHANA:

Q. Mr. Searle, I just find it interesting that the LinkedIn profile that you have says you provide support in the area of chemical process safety and genotoxic risk assessment, and then in your CV that was just prepared this past week or last week, you've become a subject matter expert in the arena.

MS. PENNER: Objection.

Is there a question there, Roopal?

MS. LUHANA: I'm just surprised.

BY MS. LUHANA:

Q. Are you surprised, Mr. Searle?
MS. PENNER: Objection.
THE WITNESS: I'm not surprised. Bear in mind that, you know, I -- that was written seven years ago, and, you know, my -- my role has somewhat evolved in that period to -- to be more of a subject matter expert in these areas.
MS. LUHANA: Counsel, we request you retrieve the prior version or make an attempt to retrieve the prior version of Mr. Searle's CV that was deleted.
MS. PENNER: We will take that under advisement, but note that we believe it's not relevant. It's neither relevant nor responsive to any appropriate request.
MS. LUHANA: Well, we will have -- raise this issue before the judge and see the relevancy of our request, but we request that you produce his prior CV. It is relevant to this litigation.
John, can you please pull up the list of Mr. Searle's publications. It's Exhibit 3123.
BY MS. LUHANA:
Q. Mr. Searle, did you put this together or had this pulled for you?
A. This was produced from a search on SciFinder, which is the online repository of published

chemistry information. So, I did an author search for myself to produce this list.

Q. Okay.

And it lists 11 publications, correct?

A. Yes.

Q. Are there any other publications that -- that you've worked on or drafted?

A. No.

Q. Do any of these publications relate to ranitidine aside from the King publication?

A. No, that's the only publication which is relevant to ranitidine.

Q. Okay.

You can set that aside.

MS. LUHANA: John, can you please put back 3122.

BY MS. LUHANA:

Q. Mr. Searle, I would like you to walk me through your time at GSK from the beginning and your history at the company and your responsibilities. So, let's start from the beginning, from 1982 to 1989 and your responsibilities at the time.

A. Okay.

So, I joined what was Glaxo in 1982 as a graduate research chemist and for that first period of

seven years I worked in medicinal chemistry. So, I was working on designing and preparing new drug candidates for screening for whether they were viable drug targets or not, so just worked on different projects in that period, preparing materials and getting more and more involved in the design of the structures, but essentially it was making molecules for screening for new drug candidates, which is the first stage of drug development.

Q. And so were you working at all on Zantac ranitidine at that time?

A. No, absolutely nothing to do with Zantac.

Q. And what type of screening is done for target molecules?

A. In those days, it was usually, if I recall, in vitro enzyme screens. So, they have a model with an enzyme. They are looking to see whether particular molecules will interact with that enzyme and inhibit that enzyme to -- that -- that was probably most of the type of screening that was done back then.

Q. Okay. And then from 1989 to 2004, what were you doing then?

A. I -- I transferred to chemical development, which is the next stage up in -- in drug

development and manufacture where molecules have sort of passed that first screening exercise are then, we have to design a process to manufacture larger quantities, and then that material is manufactured and it goes into toxicology tests and early clinical trials all the way through to developing manufacturing processes. And in that period, I worked on one drug right from coming into development all the way through to regulatory approval and transfer to manufacturing facility.

Q. And what drug was that?

A. It was a drug called fosamprenavir.

Q. Okay.

And so the focus there was more about, you would say, scalability?

A. It was designing a safe and efficient manufacturing root that was, you know, scalable, so, it could be in the case of some of these run-on, you know, up to, sort of one-ton scale manufacture.

Q. And so what production sites were you looking at that time?

A. The -- the ones mainly were GSK Ulverston, GSK Montrose, and GSK Dartford, which no longer exists.

Q. And so at that time, did you have any involvement with Zantac?

A. No, none whatsoever.
Q. Okay.
Now moving forward to 2004 to 2009, if you could describe that time period and what you did.
A. So, I took a bit of a career change for this period. At this stage in development, GSK had a large number of potential drug candidates and the development group wasn't able to -- to work on all of them at the same time. So, we started to outsource the development and scale up to external companies, and so I managed the development activities and the scale-up campaigns. Many of them were done in India at that point, and I also worked closely with our pharmaceutical development group, and we had what were physical property development teams. So, we were looking to work to develop the initial formulations of the drug using the material we manufactured.
Q. And at that point, what CROs were you working with or looking into if you recall?
A. Dr. Reddy's in India was the principal one --
Q. Any others? Sorry.
A. Shasun in India and a company called Carbogen in Switzerland were the main ones.
Q. And at that time, were you working on

Zantac at all?
A. No.
Q. Okay. Moving forward to the 2009 to 2016 time frame, if you could describe what you did then.
A. So, again, I took a job change in 2009, and I moved to a new role in -- in the technical group in the manufacturing company to take a leadership of a small chemistry team. And we really support any activities related to the manufacture of established products. So, this could be troubleshooting issues, developing new processes to reduce cost of goods for second-generation roots. And at this point, I -- I took on the responsibility for genotoxic risk assessments within the manufacturing organization because this was something I had experience of in -- in R & D and became an expert in chemical process safety in order to advise manufacturing sites in case of any process safety-related issues.
Q. So, in terms of -- you mentioned genotoxic risk assessments and you had prior experience with R & D with those assessments.
When was that?
A. Well, every new chemical entity requires a genotoxic risk assessment now to be put

together. So, I would author those risk assessments, and they were reviewed with a panel in R & D. So, I --

Q. Well --

A. -- gained a lot of knowledge.

Q. Well, you mentioned now. But you said in terms of you were equipped to become an expert in this arena based on prior work that you had done in genotoxic risk assessments in R & D. So, I am looking for the time frame you were working on those assessments.

A. Well --

MS. PENNER: Objection.

THE WITNESS: But it's the period between 2004 and 2009.

BY MS. LUHANA:

Q. So, what did you learn in 2004 to 2009 regarding genotoxic risk assessments?

A. It -- how to assess new chemical processes for the presence of impurities.

Q. You said "impurities."

Wouldn't it be how to assess for genotoxic impurities specifically?

MS. PENNER: Objection.

THE WITNESS: Well, you have to understand how this works. We -- we identify impurities,

and then it's someone else's role to determine if they are genotoxic or not. That's a toxicology expertise.

BY MS. LUHANA:

Q. Mr. Searle, you appreciate that there are different thresholds for genotoxic impurities versus all other impurities, correct?

MS. PENNER: Objection.

THE WITNESS: Absolutely. Yes.

BY MS. LUHANA:

Q. So, if you are looking for just impurities, you may miss those genotoxic impurities, correct?

MS. PENNER: Objection.

THE WITNESS: No. Because the -- the process that we go through identifies all known impurities, and we also look to identify what we call reasonably predicted impurities that could form which could include low-level impurities. So, it's a -- it's a well-established process, which is now covered by an ICH-M7 guideline, and, you know, what we do is follow the -- the principles that -- and the previously regulatory guidance that was in existence before that.

BY MS. LUHANA:

Q. Mr. Searle, you mentioned all known impurities.

If you are trying to assess for genotoxic impurities, presumably they are not known at that time, correct?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. That's the whole point of the risk assessment, wouldn't you agree?

MS. PENNER: Objection.

THE WITNESS: Known and potential impurities, we -- which are reasonably predicted.

BY MS. LUHANA:

Q. Reasonably predicted, are those your words, Mr. Searle?

MS. PENNER: Objection.

THE WITNESS: They are -- they are words that are well established in -- in this area. They --

BY MS. LUHANA:

Q. So, I want to -- sorry. Go ahead.

A. No. They are not just my words. It's a well-established principle.

Q. Was that a well-established principle in 2004 to 2009, when you were doing genotoxic risk assessments, to only look at what was reasonably predicted?

MS. PENNER: Objection.

THE WITNESS: That's always been the principle of these risk assessments, yes, to look for reasonably predicted impurities.

BY MS. LUHANA:

Q. So, Mr. Searle, in 2004 to 2009, when you were doing these genotoxic risk assessments, what were you doing? Tell me how you would assess a genotoxic impurity.

A. As I said before, I -- what we would do is to assess a synthetic root. We would provide a list of actual and reasonably predicted potential impurities. They would then be provided to our computation and toxicology group. And they would advise on any structures and impurities that could be known or potential genotoxic impurities. And in that case, if there were known or potentially -- if potential impurities were shown to be there, then -- then we would put in place a control strategy.

Q. So, how would you go about identifying potential impurities?

A. By using knowledge of chemistry identifying, you know, potential reaction pathways that are precedented in chemistry knowledge. So, something is reasonably predicted if there is a sort of known chemical mechanism that would lead to the formation of

that impurity. So, it's -- there has to be some precedence for this reaction occurring before we say it's reasonably predicted.

Q. I understand that, but can't you just take a molecule and do a mass spec and identify the impurities that way?

MS. PENNER: Objection.

THE WITNESS: No. Because the -- the methodology has to be specific for these types of impurities because of the level.

BY MS. LUHANA:

Q. I don't understand that.

If it's a genotoxic impurity, don't you want to be able to identify it and quantify it?

A. So --

MS. PENNER: Objection.

THE WITNESS: -- if it's a reasonably predicted impurity we suspect could be there, then we would develop a specific method for that impurity to look for it.

BY MS. LUHANA:

Q. I -- I still don't understand the genotoxic risk assessment.

Isn't the whole goal of a genotoxic risk assessment to assess what genotoxins are in the product, correct?

A. That's --

MS. PENNER: Objection.

THE WITNESS: -- exactly what I described.

We -- we -- we look at all the impurities, the potential impurities. And then we establish are those structures likely to be genotoxic or not. And if there is anything that is identified as potential genotoxic genotoxic impurity, then we have to come up with what we call a control strategy, which in the case more back then than now, would be to develop a specific analytical method for that impurity and -- and identify if it's there.

BY MS. LUHANA:

Q. Mr. Searle, let's go back to your -- your CV and go through the 2009 to 2016 time frame.

When did you start working on Zantac then?

A. My first involvement with Zantac was 2010.

Q. So, never before that time frame?

A. Never before that, no.

Q. And what did you do for Zantac in 2010? What kind of work did you do?

A. So, in 2010, I was informed that in our partner site, where they manufacture the IV solution

formulation of Zantac, that they had some vials that -- it wasn't every vial, but occasionally they had a vial of solution that was more colored than normal. And I was asked to assist with a chemistry investigation into why these vials were slightly yellow colored in appearance.

Q. What root materials did you review to do that assessment?

A. To do this assessment, what we did was we -- we employed some specific analysis of those solutions. So, we obtained some of these vials that had noted this yellow coloration and got some assistance from analytical colleagues in -- in GSK Stevenage. And they made a very good suggestion that when -- when you are dealing with yellow coloration, one of the first things to do is to analyze that material but using a detector that detects specifically colored impurities. And we were able to set up that detector to specifically look for any impurities that would be yellow in color. And -- and we did that with the solutions, and we found that there were a number, half dozen or more, of very, very, very low -level peaks that only -- that were -- that we could see this wavelength that meant that these impurities were yellow in color. And when we compared the levels of these with all of the other known

impurities with, you know -- we couldn't see them then, which means that they must be a level that is way below the standard limit of detection of the analytical method, but because we employed a specific wavelength for yellow impurities, we were able to pick these up.

And the next stage then was to try and get some information about the structures of these yellow peaks. And what we found was using LC-MS, that the molecular weights could be -- we could see the molecular weights were Zantac or ranitidine-related, but they appeared to be dimeric or had some additional parts added to them, so although we weren't able to formally characterize the structures, we know that they were structurally related to -- to ranitidine.

Q. So, Mr. Searle, you just focused on the colored impurities, correct, at that time and you assessed them via the wavelength. Is that what you said?

MS. PENNER: Objection.

THE WITNESS: Well, as I said before, you know, we were investigating the cause of the yellow coloration in the solution. So, we performed an analysis that would specifically find colored impurities, and that's what we did. So, we were able to see that the yellow color in this solution was caused by -- by these very low-level

impurities.

BY MS. LUHANA:

Q. Understood, but you focused on only the colored impurities at that time, correct? That's all I'm looking for.

A. Yes.

Q. You focused on identifying the color impurities by the wavelength, correct?

MS. PENNER: Objection.

THE WITNESS: As I said, that was the purpose of the investigation, yes.

BY MS. LUHANA:

Q. And so what's the wavelength for color impurities; do you know?

MS. PENNER: Objection.

THE WITNESS: But it's 4 -- it was about between 400 and 450 nanometers.

BY MS. LUHANA:

Q. Okay.

And what's the wavelength for NDMA?

A. NDMA would not show up at that wavelength.

Q. I know.

What's the wavelength for NDMA; do you know?

A. I don't know the exact off the top of my head, but it will be between 200 and 350.

Q. Understood.

So, at that time, you didn't go and identify all of the genotoxic impurities. You just focused on the color impurity, correct, Mr. Searle?

MS. PENNER: Objection.

THE WITNESS: That was the purpose of the investigation, was to understand what was causing the color. And that's what we achieved in that investigation. We -- we showed that the color was due to -- to these impurities.

BY MS. LUHANA:

Q. Mr. Searle, you didn't identify all the impurities at that time, correct, as you would typically do in a genotoxic risk assessment?

A. This --

MS. PENNER: Objection.

THE WITNESS: This was not a genotoxic risk assessment.

BY MS. LUHANA:

Q. Okay.

In -- when I was asking the question as to what you did for this investigation in 2010, my focus is more so about what homework did you do to get to know

Zantac at that time. You had said you had never worked on Zantac previously.

What work did you know to understand the molecule, understand the history of the drug? Did you do anything when you began that investigation to understand that?

MS. PENNER: Objection.

THE WITNESS: Well, what I can recall is, you know, understanding what the known degradation pathways were for -- for ranitidine because these were established back in, you know, the time of the -- the development of the product and those pathways are well established and -- and documented.

BY MS. LUHANA:

Q. And so anything else you did aside -- where did you look at the known pathways? What documents were you looking at that time?

A. They are actually published in -- in a paper.

Q. What paper?

A. There's -- there's -- there's an external publication that -- that has published at least one thing, yeah.

Q. Can you please identify the paper?

A. Not -- not off the top of my head.

It could be -- it could be provided, but it's -- it's a -- it's actually referenced in -- in my RCA report.

Q. In your root cause analysis report?

A. Yeah. In the root cause analysis report written in 2020, there is a section on the known degradation pathways of ranitidine, and there is a reference to the paper where these were described.

Q. So, this reference was in 2020 when you signed off on the root cause analysis.

A. No. The reference is to a paper that I believe was published in the late 1970s.

Q. Understood.

But I'm saying this is the same paper that you recall relying on in 2010 when you did your homework for this investigation?

A. Yeah. So, basically it is the definitive study on the degradation pathways of ranitidine.

Q. But you don't recall the name of it, but you know you used --

A. Well --

(Simultaneous crosstalk.)

Q. -- you relied on it in 2010?

A. I don't --

MS. PENNER: Objection.

THE WITNESS: I don't memorize references to publications, but if you look in the RCA report in the list of references -- we could quickly pull it up, but I don't remember all the names of the authors and the, -- you know, the page number in the paper, but as I say, it is a well-established paper.

BY MS. LUHANA:

Q. So, it's from the '70s, you said?

A. I believe it's the late '70s, yes.

Q. Okay.

So, did you rely on anything after that time period when you did your homework to work on the 2010 assessment, when prior to that time you had never worked on Zantac?

MS. PENNER: Objection.

THE WITNESS: I can't recall anything significant.

BY MS. LUHANA:

Q. Okay. And then in terms of the 2009 to 2016 time frame, you said you worked on Zantac in 2010.

Did that -- did that work continue after that time frame?

A. That was a specific piece of work that was done around 2010. My -- you know, I did

another significant project in 2015 on Zantac.

Q. Okay. But between 2010 to 2015, did you generally work on Zantac?

A. Not -- not significantly. I -- I mean, the role I was in, we would work on products when there was a specific requirement, but, you know, we had 30 or 40 different products. So, you know, we -- I wouldn't be working on one all of the time. You know, we -- very much, we were running issue-driven support.

Q. Okay.

So, you weren't supporting Zantac from 2010 to 2015, but you were brought in for specific projects, like you said, in 2010 and then again in 2015?

A. Yes.

MS. PENNER: Objection.

BY MS. LUHANA:

Q. Correct?

A. Yes, that's -- my role is -- it was -- as I say, it was troubleshooting mainly in that period. So, you know, if I was made aware of an issue, I would provide support for it.

Q. Okay. And so when next did you work on Zantac?

A. So, there was a bit of work I did advising a third-party manufacturing group, who were

overseeing the manufacture of Zantac at a company called Dr. Reddy's. That was, you know, very limited where they were looking to provide better process control, but that was sort of not a significant thing.

The -- the next thing which was really significant for me was in 2015, when I was made aware of an issue with discolored, degraded Zantac tablets in China, and we were asked to, you know, investigate this principally to come up with a statement on the toxicological risk of administration of one degraded Zantac tablet. My role was -- was on the characterization of the degradation, not any statement about toxicology. That was done by some -- someone else.

Q. So, in terms of the 2015 assessment, was there any homework you did on Zantac at that time, asides from the assessment itself?

A. In terms of homework, there was no real need to do homework on it. We -- we were -- you know, again, we were faced with an issue that we had to study and understand. And, again, you know, that knowledge of existing degradation pathways was important, but, you know, we were actually looking to, you know, learn more about degradation than had ever been done before. And that's what we actually did in

that investigation.

Q. Did you look at prior stability data during that -- before 2015 to see if there was a history of degradation with Zantac pills?

MS. PENNER: Objection.

THE WITNESS: Not specifically, but this issue was -- was due to inappropriate storage of -- of the tablets. That's what caused the issues. So, it was things that would not have been picked up in the -- in the formal stability studies with packaged material. These issues occurred with material that was, you know, removed from the packaging and -- and then stored inappropriately.

BY MS. LUHANA:

Q. So, Mr. Searle, are you familiar with the accelerated stability testing that has to be done for Zantac?

A. Absolutely.

MS. PENNER: Objection.

BY MS. LUHANA:

Q. So, are you familiar with the degradation history that the drug has had prior to 2015 as a result of that accelerated stability testing that was done?

MS. PENNER: Objection.

THE WITNESS: Well, as I said before,

I'm familiar with the -- the known degradation pathways of ranitidine.

BY MS. LUHANA:

Q. But that was an article from the late 1970s, correct?

MS. PENNER: Objection.

THE WITNESS: But no -- there is no additional information from accelerated stability studies that would have changed the conclusions. That identified degradation pathways, and those degradation pathways are the pathways that would be observed in any accelerated stability studies.

BY MS. LUHANA:

Q. Mr. Searle, when you are coming in as the lead chemist on an investigation like you were in 2015, don't you agree it makes sense to do your homework to assess the history of this drug to see if there was degradation in the past?

MS. PENNER: Objection.

THE WITNESS: I believe I've already answered the question. You know, I was well aware of the degradation pathways that ranitidine undergoes.

BY MS. LUHANA:

Q. Mr. Searle, that's the pathways. I'm talking about after the drug was placed on the market,

an actual stability test that were done on the drug that showed significant degradation when it's put at 40 degrees Celsius and 75 percent relative humidity.

Are you aware of those?

MS. PENNER: Objection.

THE WITNESS: Well, I'm aware of the studies that we did on those tablets, but they -- they were more extreme conditions because we exposed the tablets directly to the atmosphere, but what I do know is storage conditions have been designed to -- to ensure that whatever you see in the accelerated stability studies there are accepted storage conditions and -- and duration for the drug. That means that, you know, it would meet the specification at the end of its shelf life and that --

BY MS. LUHANA:

Q. So, you're saying -- go ahead. Sorry.

A. Well, that's -- that's, you know, an established principle of -- of -- of, you know, developing and marketing a drug and stability studies would have been shared with the regulators, and they would have agreed with the conclusions in terms of what are appropriate storage conditions for -- for this drug. I mean, this goes for any drug, not just Zantac. The -- the storage conditions and shelf life will be set based

on what is found in the accelerated and real time stability studies and what would have been established for Zantac was considered to be completely appropriate by the regulators.

Q. Mr. Searle, I'm not talking about the regulators. I'm setting that aside. I am focused on you doing your homework coming in as a lead chemist on a 2015 investigation, and it's quite surprising that you didn't look at that stability data.

A. Because --

MS. PENNER: Objection, Roopal.

Is there a question there or are you just making speeches to a jury?

MS. LUHANA: I'm -- I'm just surprised Mr. Searle didn't do his homework, but --

MS. PENNER: Again --

MS. LUHANA: -- let's move forward.

MS. PENNER: -- you are making speeches to the jury and not asking a question.

BY MS. LUHANA:

Q. Mr. Searle, did you do anything asides from look at that article from the 1970s about the degradation pathways when you did the 2015 investigation?

A. I think you have to understand the

purpose of what we were doing in this investigation. The purpose of the investigation that we were doing was to characterize the degradation of the tablets that we were presented with. And that was the purpose of the investigation and that degradation actually goes beyond anything that would have been seen in any, you know, accelerated stability study. So, we had a specific need to do that. And what we did was an incredibly complex piece of work, we -- we identified around 20 impurities that had formed in these degraded tablets. These included all of the known degradants we would expect, but we actually identified a significant number of new ones. So, we actually took the study of the degradation of Zantac further than anyone had done before. So, you know, we -- you know, we went way beyond what was previously known. I mean, that was the purpose of this exercise, to -- to -- we were given these degraded tablets, which we had to simulate in the lab to generate tablets that, you know, looked the same, and then understand exactly what had happened in those tablets in terms of formation of impurities. And that's -- that's what we did, and we did it very successfully.

Q. So, Mr. Searle, you took a siloed approach to look at the situation at hand and not consider the totality of the circumstances.

Is that correct?

MS. PENNER: Objection. Misconstrues his testimony.

THE WITNESS: We took an approach that was entirely the right thing to do in that situation. As I said before, we have -- we were presented with these degraded tablets. The question I was asked, understand the degradation profile of those tablets. That's not a siloed approach. That is doing the work that is required to answer the question, and that's exactly what we did. It's not a siloed approach.

BY MS. LUHANA:

Q. So, the right thing for whom, GSK or patient safety?

MS. PENNER: Objection.

THE WITNESS: It was what we were tasked to do, to investigate this issue on -- on behalf of the LOC in China.

MS. LUHANA: Okay.

Can you please put up 3122 again.

BY MS. LUHANA:

Q. Let's go through 2016 to 2021 and what you did at that time.

A. It's essentially the same as what I was doing before but with added responsibilities in

terms of probably something that went wider than just what we call API manufacturing, which is, you know, chemistry, you know, making the active ingredient, but more and more I've also been asked to provide chemistry expertise for, you know, drug product issues as well, so issues with impurities of drug products and things like that. So where -- where they need chemistry expertise across all of our networks, I -- I provide advice and support.

Q. And so during this time frame, when did you work on Zantac?

A. Well, principally, when the -- in 2019, when we were first made aware of the -- the breaking news about the potential presence of NDMA in Zantac samples.

Q. And prior to that, had you done any work on Zantac during that time frame?

A. I -- I believe I signed off on a -- on a genotoxic risk assessment for a source change for -- for ranitidine.

Q. When was that?

A. 2017.

Q. And what did that concern? You said a source change for ranitidine?

A. Yeah. This was when we moved our --

our source of ranitidine from Dr. Reddy's to a company called Saraca to support that change of source, we needed to do ICH-M7 compliance risk assessment.

Q. And that was the first time you started using Saraca was in 2017 as an API manufacturer?

A. Yes.

Q. Okay.

And you had previously mentioned that there was this third-party manufacturing group that you worked on that dealt with Dr. Reddy's, which concerned -- to provide better process control.

A. Yeah.

Q. What does that mean?

MS. PENNER: Objection.

THE WITNESS: Well, this followed on from the color investigation and when -- when Dr. Reddy's was introduced, they saw slightly elevated color in their material. So -- and that color was due to, you know, similar findings we had seen with the polymer investigation with these low-level related impurities that are, you know, highly colored yellow and Dr. Reddy's were able to alleviate this by improving their -- some of their manufacturing stages.

BY MS. LUHANA:

Q. Do you know what they did?

A. Principally, they added a second distillation process to one of the intermediates.

Q. Okay.

And when was that?

A. Well, it's between 2000 -- about 2012, I would say, 2012, 2013.

Q. Okay.

And who is the third party you hired?

A. Excuse me. Repeat your question.

Q. Who was the third party you worked with on facilitating this?

A. No, no. What I've said, we have a group within technical who -- who work -- who are the technical people that work with third parties, such as Dr. Reddy's and any other outsource-manufactured product. So, it is a GSK group.

Q. What is the name of that group?

A. Third -- third-party API experts, I think they call themselves now.

Q. Okay.

And then in terms of your education, it says that you went to St. John's College in Cambridge --

A. Yes.

Q. -- from '78 to '82.

And what did you graduate with?

A. A BA in natural sciences.
Q. Any further studies or degrees?
A. No.
Q. Okay.
You can set that aside.
MS. PENNER: You have been going for about an hour.
Are you at a good breaking point?
MS. LUHANA: Yeah, that's fine. Let's take a break, ten minutes.
MS. PENNER: That works fine.
THE VIDEOGRAPHER: We are going off the record. The time is 1042 UTC.
(Off the record.)
THE VIDEOGRAPHER: Please standby.
We are back on the record. The time is 1100UTC.
Please proceed.
BY MS. LUHANA:
Q. Mr. Searle, did you have any substantive conversations with your attorneys during the break?
MS. PENNER: Objection. It's privileged. Direct the witness not to answer.
MS. LUHANA: Kimberly, if he is

discussing his testimony, it's improper. That's why I am asking him.

BY MS. LUHANA:

Q. Mr. Searle, did you --

MS. PENNER: PGO -- PGO54 specifically says that we may have private conversations on regularly occurring breaks.

MS. LUHANA: Okay.

BY MS. LUHANA:

Q. Mr. Searle, as a subject matter expert on genotoxic risk assessments, have you taught any courses?

A. Internally, I have provided training to a number of our manufacturing sites over the years, not externally, but for some of our manufacturing sites, I have. I have done some training courses, yes.

Q. What type of training courses?

A. When -- when our internal -- we have an internal guideline that sites have to follow. When that -- when that was first released and it's subsequently been updated, I have either remotely or in person, you know, done a -- an update on -- on the policy to -- to the relevant people at the sites.

Q. So, would that concern chemical process safety or are you talking about genotoxic risk

assessment?

A. I've -- I've actually done both. I've done chemical process safety updates as well, not -- not so often, but many times on -- on the genotoxic risk assessment process.

Q. So, in terms of the genotoxic risk assessment process, when was the first time you did internal training on that?

A. I -- probably 20 -- 2013, 2014, when we first issued a divisional SOP on the subject that I was the author of.

Q. And what was that SOP?

A. It's an -- it's an SOP that describes the application of genotoxic risk assessments to a change control in API manufacturing.

Q. Is there a separate one for finished dose product as well?

A. There isn't at the moment, no.

Q. Okay.

Any other courses you've taught internally?

A. No, I can't recall any.

Q. Have you published in the arena of genotoxic risk assessments, setting aside the root cause analysis?

A. No.

Q. Have you published in the area of chemical process safety?

A. No.

Q. Okay.

Mr. Searle, I just want to run through basic chemistry concepts and testing if you can do that with me.

Can we first start with HPLC and explain what that is and what's done.

A. HPLC is high pressure liquid chromatography. So, in that case, there is a column, which is usually packed with -- called a stationary phase. It's usually based on silica or derivatized silica, and it's designed to retain, you know, molecules to a different extent so you can separate them. It is a -- it is a more sophisticated version of thin layer chromatography where molecules move at different rates on a -- on a stationary phase depending on their properties.

So, in this --

Q. Sorry. Go ahead.

A. So, in -- so, in HPLC there is a column and then there is a -- downstream of the column, there is a detector, which is usually a UV detector,

which is set to a wavelength, which can be varied depending on the analytes. So, by looking at the UV spectrum of what you are trying to analyze for, you would select a -- you know, the most appropriate wavelength to use for -- for that and the related impurities. And then there is a mobile phase, which is a -- a solvent mixture, which is pumped through this system. And then your analyte is a sample of your substance you are analyzing introduced actually to the top of the column, and then it is eluted down the column by pumping the mobile phase through there, and then the components will separate out on that column and then pass through the detector. And they will be, you know, detected as peaks and, you know, the size of the peak that comes off, you know, reflects the amount of the material. So, you know, if you test doing impurities testing, you know, by farther the largest peak will by your -- you know, whatever you are trying to analyze and then you may see, you know, smaller peaks for other impurities, but in the case of, you know, manufactured products, the -- the method will be developed specifically for that substance. The column will be selected. The wavelength will be selected. The mobile phase will be selected, you know, to separate out components that are there.

Q. So, it is a way to take the molecule, test it and segregate parts of the molecule and identify it with its peaks, correct?

MS. PENNER: Objection.

THE WITNESS: Well, it -- it separates out the -- you know, the molecule from the impurities in there and allows you to quantify the -- the impurity peaks.

BY MS. LUHANA:

Q. When you -- how does it allow you to quantify it? How -- how are the peaks quantified?

A. The -- the simplistic way is called percent area. So, when it goes through the detector, you will get a peak and then you are able to -- to measure the area of that peak and then compare the areas between the impurities in the main thing.

When methods are further developed, because percent area can sometimes be misleading because of what we'll call response factor, some impurities may respond to a greater extent or a lesser extent than the -- than the analyte itself. So what you are able to do then as things move on, if you actually have an identified sample of the impurities, you can convert your response from what we call percent area to percent weight. So, it is actually comparing the actual amount of the impurity, not -- not just the area. So, that's

ultimately for -- you know, for your marketed products we want to move to a percent weight -- weight method, but, you know, that's something that's developed over time.

Q. So, based on your processes in terms of having a peak area, do certain impurities -- or do impurities generally have a signature peak area?

MS. PENNER: Objection.

THE WITNESS: It depends entirely on the structure of the impurity.

BY MS. LUHANA:

Q. No. I understand that --

(Simultaneous crosstalk.)

BY MS. LUHANA:

Q. Sorry.

MS. PENNER: Objection.

Please let him answer.

THE WITNESS: Yeah.

The most -- most impurities that form are usually, you know, closely structurally related to your API. So, the -- so, the methodology that works for the -- your API tends to work for the related impurities because they -- they are structurally similar, and they will have similar UV profiles so they are detected in the same way.

BY MS. LUHANA:

Q. Right.
And then the weight you were talking about, it is the molecular weight, correct?
A. That's the, yeah, molecular weight, yes.
Q. So, how is the molecular weight quantified? What process is used?
A. In the case of a -- of a known impurity -- if you know the structure of the impurity, then you can work out the molecular weight just from the structure. You know, if we know the molecular form of how many carbons, hydrogens, oxygens, et cetera, then the molecular weight is just the function of the number of those atoms in the molecule. So, it's not -- it's not -- it's characterized because you know the structure. Therefore, you know, you automatically know the molecular weight.
Q. What about for unidentified impurities?
A. Unidentified impurities will -- the first -- the first way of characterizing will be from LC mass spec.
Q. Okay.
How long has HPLC been around?
MS. PENNER: Objection.

THE WITNESS: I have no idea. I'm not an analytical expert, so I couldn't really answer that question.

BY MS. LUHANA:

Q. You are the subject matter expert in genotoxic risk assessments and chemical process safety and have been -- are the author, lead author, on the root cause analysis, and you can't tell me how long HPLC has been around?

MS. PENNER: Objection.

THE WITNESS: It has no -- it's not a relevant question. That's an -- that's an analytical technique that we use, but I'm not subject matter expert in HPLC.

BY MS. LUHANA:

Q. Understood.

A. It's not chemistry. It's analysis.

Q. Understood.

So, you have been working at GSK since 1982.

Since you have been there, have you used HPLC?

A. We -- we didn't -- we weren't using it in -- for -- for my role in the first probably three or four years. I think we started to use it in -- in --

in our -- in one of our labs probably in about 1986, but it would have been -- it would have been used in a chemical analysis product of that. But, you know, when it was first introduced, I -- I couldn't give you a date on that, but it was a long time ago.

Q. Are you aware that the initial Zantac NDA18203 they used HPLC in the early 1980s, the first one, to identify the ranitidine content?

MS. PENNER: Objection.

THE WITNESS: I'm -- I'm not, you know, familiar with the exact content of the original ranitidine file because, as I said, I was not working on ranitidine back in that time. So, you know, the content of the ranitidine file is not something that I would have been aware of back then.

BY MS. LUHANA:

Q. Understood.

What about LC-MS, can you tell me about LC-MS?

A. Well, LC-MS --

MS. PENNER: Objection.

Go on.

THE WITNESS: -- it's an extension of -- of HPLC where you couple a mass spec detector on the back of the HPLC.

So -- as well as going through a -- maybe a UV detector, you then, you know, pass the -- that solution through a mass spec, which can give you molecular weights for -- for structures.

BY MS. LUHANA:

Q. Okay. So, to your knowledge, how long has LC-MS been around?

MS. PENNER: Objection.

THE WITNESS: It's been around since, certainly, the early '80s in some form, but probably not to the level of sophistication that -- that we have now.

BY MS. LUHANA:

Q. Mr. Searle, in terms of the advances that are -- have been made in mass spec, isn't it largely larger molecules that it's helped analyze?

MS. PENNER: Objection.

THE WITNESS: I -- I -- I don't know the answer to that. I'm not an expert in -- in LC-MS technology.

BY MS. LUHANA:

Q. But you've -- you use it on a regular basis as a chemist, correct?

MS. PENNER: Objection.

THE WITNESS: I -- I don't personally use it. We -- we work with experts in that field in --

in -- in our, you know, structural characterization group. They are the experts who -- who provide that support.

BY MS. LUHANA:

Q. So, when -- when is the earliest you remember using LC-MS?

MS. PENNER: Objection.

THE WITNESS: Me -- do you -- can you clarify that? Do you mean me personally or --

BY MS. LUHANA:

Q. When is the earliest you know of LC-MS being used, you personally or have directing experts to utilize it?

A. I -- I couldn't give you a -- a precise date on that. We -- we would have used it on the -- I mentioned the fosamprenavir project. Certainly, it would have been used on that project to help elucidate impurities.

Q. So, that was in the early '80s, correct?

A. No, that was in the -- the late 1990s.

Q. So, you don't recall if it was used in the early '80s?

MS. PENNER: Objection.

THE WITNESS: As -- as I say, I wasn't

using it in the early '80s. So, it's not my area of expertise.

BY MS. LUHANA:

Q. I am -- I am not asking whether you were using it. I am asking if you know of it being used in the early '80s.

MS. PENNER: Objection.

THE WITNESS: I'd rather not speculate. You know, from my -- my experience at GSK, which is all I can speak of, I would not have used LC -- LC mass speck, you know, in the -- in the early '80s.

BY MS. LUHANA:

Q. Mr. Searle, I am -- I am asking about your knowledge as to if you know that LC-MS was used in the early '80s.

Can you just answer my question?

MS. PENNER: Objection. No need to be disrespectful to the witness.

MS. LUHANA: I am not trying to be disrespectful. I am just trying to have him answer my question.

THE WITNESS: Well, at the time, I couldn't say whether it was used or not. It was not in the realm of my role and experience to know whether it was being used.

BY MS. LUHANA:
Q. Mr. Searle, I'm not asking whether it was known to have been used.
I am asking: Do you have knowledge of whether LC-MS was used in the early '80s?
MS. PENNER: Objection. Asked and answered multiple times.
THE WITNESS: Not -- not -- it's not something I've got specific knowledge of from that time, no.
BY MS. LUHANA:
Q. Mr. Searle, you understand you are still under oath, correct?
MS. PENNER: Objection.
BY MS. LUHANA:
Q. I am not asking for your specific knowledge. I'm just asking for general knowledge.
Do you have knowledge as to whether LC-MS was used in the early '80s?
MS. PENNER: Objection.
THE WITNESS: Used by -- can I ask used by whom?
BY MS. LUHANA:
Q. Experts in the area, others that you know of, people that -- chemists that you worked with.

Just generally, do you know if it was used in the arena -- it's not a difficult question.

A. I -- I --

Q. I am not trying to trick you.

Was LC-MS used in the early '80s, to your knowledge?

MS. PENNER: Objection. Vague.

THE WITNESS: Well, I would anticipate that it has been used, but, you know, it's not that -- it's coming from my experience at the time.

BY MS. LUHANA:

Q. I am not only asking about your experience, Mr. Searle, your personal experience. I am asking about your general knowledge as to if LC-MS was used in the early '80s.

MS. PENNER: By anyone? By GSK? You know, you've asked a number of different questions.

MS. LUHANA: Please, Kimberly, let me conduct my examination. I've asked the question. It's a simple question. There are no speaking objections. You can make your objections to form and scope, and that's it.

THE WITNESS: I would anticipate that it would have been used somewhere in the early '80s, but, you know, that's, you know, not from my personal experience.

BY MS. LUHANA:

Q. Okay. In terms of TLC, can you explain what thin layer chromatography is?

A. TLC is simply a silica coating on a glass plate, and it's the unsophisticated version of HPLC. You just dissolve your analyte in a solvent, place it as a dot on the bottom of this silica plate, and then elute this plate. So, you put the plate in some solvent, which would slowly sort of go up to the plate from the bottom to the top, and as it does that, different components in your spot may move at different speeds up silica plate. And then once it's reached -- your solvent has reached the top of the plate, you could then analyze your sample by either looking at it under a UV lamp or there are various sort of spray reagents you can spray onto the thing, which will highlight spots.

Q. And as you've testified, it's not a very sophisticated way or method to -- to analyze impurities, right?

MS. PENNER: Objection.

THE WITNESS: It -- it's a very quick qualitative assessment of impurity. So, you know, it certainly had a lot of value, and I used it extensively in the first, you know, few years of my employment because when -- particularly in the R and -- research arena, we may make a new drug, molecule, a new target molecule. We then

have to purify it. We're not worried about, you know, nature of impurities. We just want to get a pure sample of this material, so it can be screened. And we would typically use a technique known as column chromatography, which is a scaled-up version of -- of TLC in a way where -- where the -- where your silica is put in a glass column and you apply your mixture to the top and then elute it down and collect samples and then analyze those samples by TLC to work out, you know, which -- which samples you -- you eluted contain your -- the product you are interested in. So -- so, it's very useful for things like that.

BY MS. LUHANA:

Q. Understood.

Mr. Searle, all I am asking is and it's a cheap way to assess impurities. I'm not talking about new molecules when you are doing tons of testing there. However, it is a cheap, quick way, as you said, to assess impurities, correct?

MS. PENNER: Objection. Misstates.

THE WITNESS: I -- you know, I object to the use of the word "cheap." It's a -- I mean, at one point, it was a state-of-the-art method to do it. You know, technologies move on, but -- you know, which is why, you know, you don't -- you don't see it used very much now, but, you know, back -- back in the, you know, '70s, it

would have been, you know, for most people, the sort of -- the best method that could be employed to -- to do this.

BY MS. LUHANA:

Q. Mr. Searle, I'm just trying to understand your testimony because you used the words "cheap" and "unsophisticated" to describe TLC.

So, I was just wondering, do you think it's a cheap, unsophisticated way to identify impurities --

MS. PENNER: Objection.

THE WITNESS: The -- the word "cheap" doesn't -- it is simply that you don't require sophisticated instrumentation to do something. So, you know, it has -- it has a place in -- in analysis. It's not -- I didn't use the word "cheap" you know, in the sense of cutting corners. Just that, you know, you just need a coated silica plate, some solvent and a UV lamp to find stuff out.

BY MS. LUHANA:

Q. Understood.

So, Mr. Searle, in the '80s, if you were doing an -- an impurity analysis, what would you utilize? What type of testing would you utilize to do that analysis?

MS. PENNER: Objection.

THE WITNESS: I -- you know, in the 1980s, I -- I've explained what my role was, and I know I -- I used, you know, what was relevant to my role. I was not involved in manufacture and scale-up and official testing of drugs at that time. So, it's -- you know, it's not really a question that's my area of expertise at the time to answer.

BY MS. LUHANA:

Q. Okay.

In terms of gas chromatography mass spec, can you please explain that?

MS. PENNER: Objection.

THE WITNESS: I -- I couldn't provide -- I could provide very poor description of the technology because I'm certainly not an expert in that. But gas chromatography is typically used to analyze volatile molecules. So -- which are then eluted down a column at different rates depending on their -- their boiling points. And then as for LC -- LC-MS, you -- you could couple that to a detector to detect molecular weights.

BY MS. LUHANA:

Q. Okay.

Have you ever utilized gas chromatography?

MS. PENNER: Objection.

THE WITNESS: Me personally --

BY MS. LUHANA:

Q. Yes.

A. -- not hands on, no, but people in laboratories working with me will -- will use gas -- gas chromatography extensively for volatile analysis.

Residual solvents is the -- is the main use in -- in the pharmaceutical industry.

Q. Have you ever conducted any residual solvent testing of the ranitidine API?

MS. PENNER: Objection.

THE WITNESS: Me personally, no. Obviously, it's done as a -- you know, it's a routine test to do, residual solvent testing of the ranitidine molecule.

BY MS. LUHANA:

Q. Are you aware of what conditions were used to test ranitidine molecule at that time -- ranitidine API at that time with --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- gas chromatography?

MS. PENNER: Objection.

THE WITNESS: No, not -- it will be whatever -- if there was a method, it will be a method that was registered by -- by GSK. So, it would be publicly

available, but I don't know the details of that method myself.

BY MS. LUHANA:

Q. To your knowledge, how long has gas chromatography been around?

MS. PENNER: Objection.

THE WITNESS: I don't know exactly, but it was certainly around, by me, late '70s, early '80s.

BY MS. LUHANA:

Q. Okay. And what about NMR?

Are you familiar with NMR?

A. Not -- not -- certainly not as an expert, but I've used NMR throughout my career.

Q. Can you describe the purpose of NMR?

A. NMR, nucellar magnetic resonance, I mean, I can't -- I can't explain the theory of it, but, essentially, if you take a molecule, which an organic molecule is largely made up of carbons and hydrogen, so proton NMR will allow you to identify the location of every hydrogen in that molecule by -- by looking at how the positions of those hydrogens -- and so complexity of the peaks you get, it allows you to characterize the structure, you know, often, you know, completely. And an added level of sophistication is to do carbon NMR, which locates every carbon in the molecule. And,

certainly, by looking at the proton and the carbon NMR, you can get a very, very, you know, good structural characterization of the molecule.

Q. Okay.

And how long has NMR been around?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- to your knowledge?

A. Well, since I was at university, because we -- we studied NMR at university, so at least since 19 -- late 1970s.

Q. Okay.

Are you familiar with isotope radio labeling?

MS. PENNER: Objection.

THE WITNESS: I am familiar with that, yes.

BY MS. LUHANA:

Q. And -- and can you please describe that?

A. Well, one of the -- one of the key things, in my experience, is that when you have a molecule, if you want to study its metabolism, then -- then you can label a specific part of that -- that molecule. So, for instance, instead of a hydrogen you

got deuterium there or different oxygen or nitrogen isotope there, and then you can locate, you know, labeled material, you know, following administration. It's a, you know, very, very common technique used in metabolism studies, I would imagine.

Q. And how long has radio labeling been around?

A. I have no idea, but, I mean, obviously, the knowledge of isotopes is something that is hundreds of years -- you know, very old.

Q. Would it be older than the '80s?

A. Oh, yes, definitely. Absolutely.

Q. So, isn't that similar -- didn't you do radio labeling in the root cause analysis?

MS. PENNER: Objection.

THE WITNESS: Technically, we -- we did a labeling -- an isotopic labeling study but not radio labeling because we did not use radioactive isotopes, but, yes, we -- we -- we did employ labeled atoms to -- to study NDMA formation.

BY MS. LUHANA:

Q. And what did you label on the molecule?

A. We -- we labeled the -- instead of -- on the left-hand side of the molecules we described, we

have the dimethylamino group, which has six hydrogens it. We labeled that with six deuteriums. So, they were DUL then H. And then the nitro group on the alkene, we labeled the -- the nitrogen with an N15 rather than the standard N14.

Q. What did you find? Did you -- did it result in finding NDMA?

MS. PENNER: Objection.

THE WITNESS: It -- what -- what it allowed us to do was to -- to confirm that the -- the generation of NDMA occurs from, you know, within the ranitidine molecule. So, the -- all of the atoms that, you know, end up in the NDMA come from within the ranitidine molecule. And also that it's what we would call an intermolecular process. So, it requires, you know, more than one ranitidine molecule. It's not a reaction that occurs within one molecule. It's probably two separate reactions occurring.

BY MS. LUHANA:

Q. So, that study confirmed that NDMA was being generated from the ranitidine molecule itself; correct?

MS. PENNER: Objection.

THE WITNESS: Yes, that was -- that was the conclusion of that study, yes.

BY MS. LUHANA:

Q. Okay.

Mr. Searle, you agree that a drug manufacturer has a duty to understand the ingredients in a drug it manufactures?

MS. PENNER: Objection.

THE WITNESS: I would -- I would generally agree with that statement.

BY MS. LUHANA:

Q. And -- and as a chemist how the ingredients interact with one another, right, it's important to know that as well?

MS. PENNER: Objection.

THE WITNESS: Well, these -- these are aspects that are studied during development.

BY MS. LUHANA:

Q. Understood.

So, you would agree that -- that a drug manufacturer has a duty to understand how the ingredients and -- I mean, parts of the molecule interact with one another, correct?

MS. PENNER: Objection.

THE WITNESS: Yes. But, you know, it must be done within the confines of, you know, established organic chemistry.

BY MS. LUHANA:

Q. What does that mean?

A. It means we -- we -- when we -- when we look at molecules and understand what can happen to it, as -- as I mentioned before, you know, key -- the key statement is, you know, we look at what we -- what is considered to be reasonably predicted in terms of, you know, interaction and degradation and things like that. And that -- you know, that's the critical wording is it's, you know, we -- we work out what is reasonably predicted to be there, and, you know, the focus of control is on that.

Q. So, you would agree with me that a manufacturer has to know how the parts of a molecule interact with each other as long as it's reasonably predictable based on looking at the molecule, correct?

MS. PENNER: Objection.

THE WITNESS: Not based -- it's not based on just looking at the molecule. It's based on understanding, you know, organic chemistry pathways, how it works, not just to say, you know, look at the molecule. It looks like that should happen. You know, reasonably predicted means that any chemistry that happens, you know, there is a precedent within, you know, established knowledge of organic chemistry.

BY MS. LUHANA:

Q. So, you would only test what's reasonably predicted.

Even though a molecule is in front of you and you know certain interactions can cause potentially a genotoxic carcinogen, you won't -- you won't look at that because it's not reasonably predicted?

MS. PENNER: Objection.

THE WITNESS: We look at things that are reasonably predicted, and -- and -- and that's -- that's the basis of -- of assessments. It's a very -- as I was explaining the concept, it is a very simple concept. It's, you know -- it's not a question of looking at the molecule. It's looking at the molecule in conjunction with, you know, knowledge of organic chemistry, and that's what we would base it on.

BY MS. LUHANA:

Q. Because looking at a molecule would be way too simple to analyze it?

MS. PENNER: Objection.

THE WITNESS: It's an incredibly simplistic view, which, you know, does not -- you know, that's the sort of thing someone would do if they are not an organic chemist, you know. We have to -- we have to

look at the structures and -- and -- and, you know, understand what can and cannot happen with that structure.

BY MS. LUHANA:

Q. Understood.

Can you tell me your definition of a carcinogen?

MS. PENNER: Objection.

THE WITNESS: You understand, you know, a carcinogen is a substance that -- that causes cancer, but, you know, I am not an expert in the subject by any means.

BY MS. LUHANA:

Q. So, prior to joining GSK or working on Zantac, because you started working on Zantac in 2010, were you familiar with NDMA?

MS. PENNER: Objection.

THE WITNESS: It wasn't -- it wasn't a molecule that come to my attention at any point, from my recollection.

BY MS. LUHANA:

Q. So, when you taught those courses on genotoxic risk assessment, NDMA never came to your attention then?

MS. PENNER: Objection.

THE WITNESS: So -- so, what I can tell

you is that, you know, NDMA is a nitrosamine and the one -- the one thing I would have said is that -- and this is not me saying, this is just the ICH-M7 guideline. The ICH-M7 guideline does list nitrosamines as potential carcinogens and, you know, molecules of concern.

BY MS. LUHANA:

Q. Mr. Searle, I am asking about your knowledge of NDMA.

When did you first become familiar with NDMA?

MS. PENNER: Objection.

THE WITNESS: The first time that, you know, NDMA as a, you know, subject matter really, you know, came into anything to do with my job was when the, you know, issues with nitrosamines and APIs first broke. I mean, prior to that, NDMA was just the molecule amongst, you know, thousands of molecules that -- you know, there are literally thousands, millions of organic molecules, and we don't consider every one of them every day, you know. Particularly at my job, you know, you -- you have to consider the things that are relevant to the issues that we're investigating. And I never had an issue that required me to -- to really consider NDMA prior to that.

BY MS. LUHANA:

Q. Mr. Searle, I'm just asking about

when you first became familiar with NDMA.

Setting your work aside even before you joined GSK, when did you first become familiar with NDMA?

MS. PENNER: Objection.

THE WITNESS: NDMA specifically, I'll say 2018.

BY MS. LUHANA:

Q. That's the first time, as the subject matter expert on genotoxic risk assessments, you became familiar with NDMA, 2018?

MS. PENNER: Objection.

THE WITNESS: I -- I've already said in my answer that nitrosamines as a category were -- were called out in ICH-M7, but that's a general category, not specifically NDMA. That could be any nitrosamine. So, as I say, I'm aware of nitrosamines as -- as a, you know, class of concern in ICH-M7, but NDMA specifically, you know, yes, when -- when information about, you know, NDMA presence in -- in pharmaceuticals was first described.

BY MS. LUHANA:

Q. So, it was in 2018, your first --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- you became familiar with NDMA?

MS. PENNER: Objection.

THE WITNESS: As I said, that was when issues related to the presence of NDMA were first raised in APIs.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: I think now is a good time to take a break, so let's go off the record for 10 minutes.

MS. PENNER: Okay. It's 12:30 here. So, what's your kind of plan for a break, a quick break now and then like 1:30 our time take a break for lunch; or what do you want to do?

THE VIDEOGRAPHER: Standby.

We are going off the record. The time is 1139 UTC.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 1153 UTC.

Please proceed.

BY MS. LUHANA:

Q. Mr. Searle, before break, you testified that it was 2018 when you specifically learned about NDMA, correct?

MS. PENNER: Objection.

THE WITNESS: Yes, that's what I said.

Yeah.

BY MS. LUHANA:

Q. However, you had known about nitrosamines prior to 2018?

MS. PENNER: Objection.

THE WITNESS: As I said before, as a class of compounds, yes.

BY MS. LUHANA:

Q. And when did you learn about nitrosamines as a class of compounds?

A. It was probably during the development of -- of divisional SOP on genotoxic risk assessments and, you know, linking that to the text of the ICH-M7 guideline.

Q. And so what year was that?

A. Well, in the period of 2012 to 2014.

Q. So, in terms of 2004 to 2009, you previously testified that you had knowledge of genotoxic risk assessments.

You're saying that nitrosamines weren't covered during that time frame?

MS. PENNER: Objection.

THE WITNESS: They were -- yeah. They were covered, but, you know, to my knowledge, we never had an example in any of -- any genotoxic risk assessments in

that period where -- where nitrosamines were flagged as a risk. So, you know, there was no requirement to do anything more than that.

BY MS. LUHANA:

Q. Understood.

But you were familiar with nitrosamines, correct?

A. Familiar --

MS. PENNER: Objection.

THE WITNESS: -- yeah, as a class of compound, but that -- they -- they never actually, you know -- never got any involvement with having to deal with nitrosamines.

BY MS. LUHANA:

Q. So, what was your knowledge about nitrosamines, if I can take you back to that time period?

MS. PENNER: Objection.

THE WITNESS: They are a class of compounds that are suspected carcinogens and, therefore, would require specific controls if shown to be present.

BY MS. LUHANA:

Q. Okay. Do you know that NDMA is a genotoxic carcinogen, correct?

MS. PENNER: Objection.

THE WITNESS: All I can say is NDMA is a suspected human carcinogen or probable human carcinogen. No more than that.

BY MS. LUHANA:

Q. You know it's a -- NDMA is a genotoxic carcinogen, correct?

MS. PENNER: Objection.

THE WITNESS: I've just given my answer. I said it's a suspected or potential human carcinogen.

MS. LUHANA: Okay.

Can we mark as Plaintiff's Exhibit 3124, GSKZAN0000443403.

John, when you find it, can you please put it on the screen.

(Exhibit 3124, GSKZAN0000443403, marked for identification.)

BY MS. LUHANA:

Q. So, Exhibit 3124 is GSK's response to SwissMedic concerning detection of NDMA and Zantac solution for injection in analytical tests. It's dated September 2019.

MS. LUHANA: Why don't you go to the first page, please, John?

BY MS. LUHANA:

Q. Mr. Searle, can you please read the

first sentence of the introduction?

A. GlaxoSmithKline received notification from SwissMedic on 29th of August 2019, informing that their official medicine control laboratory, OMCL, has detected the genotoxic carcinogen NDMA in Zantac, injection solution in analytical tests.

Q. I think --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- you misread that.

It says genotoxic nitrosamine NDMA --

A. I'm sorry.

Q. -- in Zantac, correct?

A. So, genotoxic nitrosamine, yeah. Apologies.

Q. So, would you agree with me that NDMA is a genotoxic nitrosamine?

MS. PENNER: Objection.

THE WITNESS: That's -- that's what is written there, but genotoxic, you mentioned, you know, carcinogen before, and, you know, those two don't necessarily go together.

BY MS. LUHANA:

Q. Okay.

Why don't you differentiate for me the

difference between a genotoxic nitrosamine versus a genotoxic carcinogen?

MS. PENNER: Objection.

THE WITNESS: Well, genotoxic, you know, is having some, you know, effect. You know, carcinogen is causing cancer.

BY MS. LUHANA:

Q. Does not -- doesn't NDMA cause cancer?

A. In --

MS. PENNER: Objection.

THE WITNESS: -- certain animals.

BY MS. LUHANA:

Q. Isn't NDMA reasonably anticipated to be a human carcinogen?

MS. PENNER: Objection.

THE WITNESS: That's what I -- I stated before it's described as a probable human carcinogen, but no more than that.

BY MS. LUHANA:

Q. Reasonably anticipated to be a human carcinogen, correct?

MS. PENNER: Objection.

THE WITNESS: I've stated on the record probable human carcinogen, and that's -- that's the wording

that I -- I will wish to be recorded.

BY MS. LUHANA:

Q. Understood.

So, Mr. Searle, you disagree with me that NDMA is reasonably anticipated to be a human carcinogen?

MS. PENNER: Objection.

THE WITNESS: I -- I'm just going to give my previous answer again.

It's a probable human carcinogen, and that -- that is my response.

BY MS. LUHANA:

Q. Correct.

So, I am asking you, do you disagree with me in saying that it is a reasonably anticipated human carcinogen?

MS. PENNER: Objection.

THE WITNESS: I'm just going to say probable human carcinogen.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: John, can you turn to -- I don't know what page it is. It's -- ends in 443407 of this document.

Right -- no, scroll up. Thank you.

Scroll up further.
BY MS. LUHANA:
Q. Can you read question 3, Mr. Searle, please?
A. N-nitrosodimethylamine NDMA is reasonably anticipated to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in experimental animals.
Q. So, Mr. Searle, you agree with GSK's response to SwissMedic here?
MS. PENNER: Objection.
THE WITNESS: That -- that is GSK's response. I -- you know, as I've said before, I am not an expert in genotoxicity and carcinogenicity. So, you know, this -- this response was written by an expert in this area, not by me. So, you know, I really am not the person to be questioned on -- on the validity of this wording.
BY MS. LUHANA:
Q. Understood.
You are not the expert.
So, what is your basis with disagreeing with this response?
MS. PENNER: Objection.
THE WITNESS: It -- look, it's wording. It's semantics. You know, you can say reasonably

anticipated, suspected, probable. You know, they are just words that, you know -- but it's making a statement that it's not a definitive human carcinogen. You know, no one is stating that it's definitely proven to be a human carcinogen.

BY MS. LUHANA:

Q. But it's reasonably anticipated to be a human carcinogen, correct?

MS. PENNER: Objection.

THE WITNESS: The words are there, but, you know, I am not the person to be questioned on the validity of those words.

BY MS. LUHANA:

Q. Okay. You can set that -- set that aside.

Mr. Searle, you know that IARC, in the first monogram -- graph on the evaluation of carcinogenic risk of chemicals demand concluded that NDMA was carcinogenic in all seven animal species tested?

MS. PENNER: Objection.

THE WITNESS: Not my area of expertise.

BY MS. LUHANA:

Q. But you would have no reason to dispute it if I'm representing that it's accurate,

correct?

MS. PENNER: Objection.

THE WITNESS: Well, I stated earlier that it's a known animal carcinogen. That -- that's -- you know, I said that, but that -- that's the only fact that I can attest to.

BY MS. LUHANA:

Q. Do you agree it's a potential -- that the potential carcinogenic effects of NDMA has been studied for over 40 years?

A. I --

MS. PENNER: Objection.

THE WITNESS: I can't disagree or -- agree or disagree with that statement. I have no knowledge on that.

MS. LUHANA: Okay.

Let's mark two exhibits, Plaintiff's Exhibit 3125, GSKZAN0000582941.

(Exhibit 3125, GSKZAN0000582941, marked for identification.)

MS. LUHANA: And Plaintiff's Exhibit 3126 as GSKZAN0000257640.

(Exhibit 3126, GSKZAN0000257640, marked for identification.)

THE VIDEOGRAPHER: Can you state that

again, I apologize.

MS. LUHANA: Sure, sorry.

It ends in 257640.

And can you please pull up Exhibit 3125 once you find it.

THE VIDEOGRAPHER: So, I do not see 582941.

MS. LUHANA: 582941, you don't -- you don't have that?

Katelyn or Jessica, can you please -- I'm sorry --

THE VIDEOGRAPHER: I just found it.

MS. LUHANA: Okay. Great.

BY MS. LUHANA:

Q. So, Exhibit 3125 looks to be an email from, I believe, Jim Harvey to you, Mr. Searle, and a few others.

Can you tell me who Jim Harvey is?

A. He's a director in toxicology.

Q. Okay.

And can you identify some of the other individuals this email was sent to?

A. Yes, I can. Mike Urquhart, he's -- he's the chair of the genotoxic review panel in R&D. Fiona King is the head of the trace and analytical group

in chemical analysis in Stevenage. Stephen Hermitage is the -- was my -- took my spot. He is the director in chemistry in chemical development at Stevenage.

Q. Okay.

And the email is dated August 27, 2019, correct?

A. 2019 -- yeah, 2019, yes.

Q. And it looks to attach the guidance on nitrosamine formation, and Jim Harvey says here, "Sending you the email, consumer health process, some useful information here, Jim."

Correct?

MS. PENNER: Mr. Searle, if you need to review any other pages of this document to understand it --

THE WITNESS: Yeah.

MS. PENNER: -- I'm sure Ms. Luhana will give you an opportunity to do so.

THE WITNESS: Well, there is no attachment there.

BY MS. LUHANA:

Q. Well, I am going to provide the attachment.

A. Yeah.

Q. That's why I've marked that as 3126, but if you need time to review the email --

A. Could you scroll down the entire emails.

You can scroll a bit more, please. Keep going.

Q. Mr. Searle, does this give you enough context to understand my questions? I'm going to ask about the other attachment --

A. Yes.

Q. -- and not about the email.

So, I prefer we spend time with you reviewing the attachment once John pulls it up.

A. Yeah. Okay. Yeah.

MS. LUHANA: It's Exhibit 3126, John.

BY MS. LUHANA:

Q. Mr. Searle, do you recall receiving that email and reviewing this attachment?

THE WITNESS: Yes, I do recall it. Yes.

BY MS. LUHANA:

Q. Okay.

This is -- looks to be a guidance on nitrosamines or potential formation and testing strategy for consumer health products, and when is that dated?

A. 2013.

Q. Okay.

And can you please read the last

sentence of the first paragraph for the ladies and gentlemen of the jury?

A. So, while this document is not exhaustive of all information related to --

Q. No, no, no, no. The first -- I'm sorry. The first paragraph, the last sentence of the first paragraph.

A. Okay. Nitrosamines are not considered new contaminants. Their potential carcinogenic effects have been studied for over 40 years.

Q. Do you have any disagree -- reason to disagree with that statement?

A. No.

MS. PENNER: Objection.

MS. LUHANA: And can you -- John, can you turn to the page ending 257650.

BY MS. LUHANA:

Q. And one of the conclusions, correct, is -- that's listed here is testing would only be conducted if there was a potential for nitrosamine production, correct?

A. Yes.

Q. Do you recall seeing this email, this guidance earlier while at GSK?

MS. PENNER: Objection.

THE WITNESS: No.

BY MS. LUHANA:

Q. So, you have never seen this 2013 guidance on consumer products?

MS. PENNER: Objection.

THE WITNESS: I'm not aware I've seen it, no.

BY MS. LUHANA:

Q. I mean, prior to receiving this email, you've never seen it?

A. No.

Q. Okay.

If you go to the back, the last page, there's a flow chart that's provided, which says, "Flow chart outlining the toxicological evaluation of nitrosamines in cosmetic products."

Do you see this flow chart here where it says, "It is a probable" -- "if it is probable" -- "it is probable a nitrosamine could be formed in the product."

Do you see that bubble there?

A. Yes.

Q. And then the next bubble says, "Does the product contain nitrite or compound known to

interfere with the ANTC method?"
Do you see that there?
A. Yes.
Q. Do you know what the ANTC method is?
A. No.
Q. Okay. And do you see that if -- it says if there is a probable nitrosamine being formed, that you do that and the next step is to proceed to known nitrosamine method or screened using HPLC GC-MS?
A. Yes, I can see that. Yeah.
Q. So, you see it identifies all the screening methods, including GC-MS and LC-MS, to identify nitrosamines, correct?
MS. PENNER: Objection.
THE WITNESS: I mean, that's the flow chart on the screen.
BY MS. LUHANA:
Q. Okay.
MS. LUHANA: And can we go back to the first -- second page, John. It's ending 257641.
BY MS. LUHANA:
Q. Doesn't it say two nitrosamines, nitrosodimethylamine and nitrosodimethylamine -- wait. N-nitrosodimethylamine NDMA and N-nitrosodiphenylamine NDEA are classified by IARC and the EU as category 1B

carcinogens.

Correct?

A. That's what it says, yes.

Q. Do you have any reason to disagree with that statement?

A. It's not my area of expertise to -- to agree or disagree with that statement really. As I said before, I'm not a toxicological expert.

Q. But you would have no basis to disagree with GSK's guidance here, correct?

MS. PENNER: Objection.

THE WITNESS: Well, as I've said before, you know, I haven't disputed NDMA is a carcinogen. I think we've agreed that, you know, there are animal studies that -- that show it is, but, you know, the translation of that into human carcinogenicity has not been, as far as I'm aware, confirmed, which is why it's only suspected or probable, but that statement itself is -- you know, doesn't qualify the -- the -- you know, the species. So -- so, from that point of it, it would be correct.

BY MS. LUHANA:

Q. Okay.

Mr. Searle, can you read the paragraph starting N-nitrosamine formation, the first three sentences there.

MS. PENNER: I'm sorry.
Where are you, Roopal?
MS. LUHANA: The N-nitrosamine formation.
BY MS. LUHANA:
Q. Mr. Searle --
MS. PENNER: Okay.
BY MS. LUHANA:
Q. -- can you please read that right there and the --
A. N- --
Q. -- following two sentences?
Go ahead.
A. N-nitrosamine compounds are typically formed by the interaction of the nitrosating agent, NOX, with an amino substitution (R2NH.) The nitrosating agent can be formed from nitrites, nitrates, or nitro compounds.
Q. And the -- the next two sentences there.
A. I can't see those.
MS. LUHANA: Scroll down, John, please. Right there.
THE WITNESS: The amino substance can be one of several types of compound such as primary, secondary

and tertiary amines, secondary and tertiary amides, peptides, substituted ureas, guanidines and urethanes. The mechanism and extent of formation of the N-nitroso derivative is dependent on both the structure of the amino substance and the source of the nitrosating agent as well as the reaction conditions; for example, acidic pH, high temperature. Generally, secondary amines are more susceptible to nitrosation than primary or tertiary amines or quaternary ammonium compounds. While a nitrosating agent is also required, nitride ions have been found to be quite prevalent in cosmetic materials and so should not be automatically assumed to be absent. The stability and interaction resultant nitrosamine with other molecules is also a key consideration.

BY MS. LUHANA:

Q. Mr. Searle, so, you agree that if there is a concern for nitrosation, for example, when you have a tertiary amine and nitroso source, correct?

MS. PENNER: Objection.

THE WITNESS: It's a potential reaction that can occur, yes. It's not definite --

BY MS. LUHANA:

Q. Correct.

A. -- but it's --

Q. Understood.

So, if you have a tertiary amine and you have a nitroso compound, there is concern for nitrosation to occur, correct?

MS. PENNER: Objection.

THE WITNESS: That's from the metal chemistry and nitrosation source, yes. It's -- but it doesn't mean it will happen because nitrosation sources can react with other parts of the molecule as well.

BY MS. LUHANA:

Q. Of course. Understood.

But it can happen, correct?

MS. PENNER: Objection.

THE WITNESS: It can happen, yes.

BY MS. LUHANA:

Q. And you agree that once you identify a potential risk, you have to test for it per this guidance, correct?

MS. PENNER: Objection.

THE WITNESS: You -- I mean, the statement you made once you identified the risk, and that's exactly -- we certainly agree with that statement where the key thing is identifying the risk and is it a plausible risk that you identified, and, you know, there was a statement in the -- I wonder if you go back to the -- the flow chart at the end --

BY MS. LUHANA:

Q. Sure.

A. -- the one you mentioned one of the --

Q. The last page.

A. The last page.

Q. Yes.

A. That is the key one.

Is it probable that nitrosamine could be formed in a product? And, you know, that's the key. Is it probable, and this, you know, I'll come back to -- you know, that means if it is probable, it's -- it's what we call reasonably predicted and, you know, that -- to me, that's the key statement.

Q. Correct.

So, once you identify this risk of potentially nitrosation occurring, you conduct testing, right, to confirm it?

MS. PENNER: Objection.

THE WITNESS: I mean, this is a consumer health document. I don't work in consumer health, and I never have worked in consumer health, but, as I said, I called this out just to say the keyword there is, you know, we don't randomly test for nitrosamines. You know, there has to be a credible risk identified before anything is

done.

BY MS. LUHANA:

Q. I understand it's a cosmetic document.

Do you believe that the standards for cosmetic products are greater than pharmaceutical products?

MS. PENNER: Objection.

THE WITNESS: I mean, else -- elsewhere I think it says in this -- in this document that there are specific ingredients that are used in cosmetic -- that have a specific nitrosamine risk associated with them.

BY MS. LUHANA:

Q. I understand, Mr. Searle.

Nitrosamines are nitrosamines, right? The same standard would apply. If you identify a risk for formation of a nitrosamine, whether it be in a cosmetic product or a pharmaceutical product, then you test for it. Once there's, you know, probability, then you test.

Correct?

MS. PENNER: Objection.

THE WITNESS: Yeah, but I come back to that there has to be a credible risk identified before you do anything further.

BY MS. LUHANA:

Q. What is your definition of credible? What is the difference between "credible" and "probable" you're using here? Are you distinguishing?

MS. PENNER: Objection.

THE WITNESS: What I mean is I come back to -- I have said these -- you know, there has to be a -- a risk that is reasonably predicted. And, you know, bear in mind, this is for cosmetic products. The word "product" is there and my experience is, obviously, with active ingredients, not products, but -- so, for me in manufacturing active ingredients, it would be the, you know, chemistry, you know, predicts there's a credible or probable risk that a nitrosamine could form. And that has to be reasonably predicted based on, you know, as I say, knowledge of organic chemistries and mechanistic pathways and things like that. So --

(Simultaneous crosstalk.)

BY MS. LUHANA:

Q. Sorry. Go ahead.

MS. PENNER: Objection.

THE WITNESS: There are aspects, you know, we're talking about products where there are different risk factors, which, you know, this document talks about excipients. That's a separate issue to the one

that, you know, I'm involved in, which is, you know, what happens in active ingredients.

BY MS. LUHANA:

Q. So, Mr. Searle, is it your testimony that there's a higher standard for finding nitrosamines in active ingredients than in cosmetics?

MS. PENNER: Objection.

THE WITNESS: As I say, and I will refer back to what I said about, you know, performing genotoxic risk assessments on new chemical entities.

If a credible risk of a nitrosamine was identified, then -- then, you know, a control strategy in the investigation would have been done.

MS. LUHANA: Move to strike as unresponsive.

BY MS. LUHANA:

Q. Mr. Searle, I'm asking you: Do you believe there's a higher threshold of identifying nitrosamines for active ingredients versus cosmetics?

MS. PENNER: Objection.

THE WITNESS: I'm not -- I'm not sure I can answer that question. It is a very vague question.

I know what -- my area of expertise is in active ingredients, and I know, you know, what -- what's important for that.

I'm not going to judge -- I don't think you can compare standards in the way you're suggesting. I'm -- you know, I can testify about active ingredients and -- and what's important for that.

BY MS. LUHANA:

Q. So, can you redefine that language for me? How would that read for an active ingredient?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. In terms of --

MS. PENNER: Which one?

BY MS. LUHANA:

Q. Is it -- is it probable nitrosamine could be formed in the product? Can -- can you re-write that language for what the standard is for active ingredients?

MS. PENNER: Objection.

THE WITNESS: Well, I'd say -- okay.

Is -- is there a reason to be predicted possibility that a nitrosamine could be present in the active ingredient?

BY MS. LUHANA:

Q. Okay.

And so if that's the standard, then immediately once you find that, you test, correct?

MS. PENNER: Objection.
BY MS. LUHANA:
Q. Once you identify that risk as you defined it, you test; correct?
MS. PENNER: Objection.
THE WITNESS: That's what happens now, yes. That's -- once --
BY MS. LUHANA:
Q. What about the past --
(Simultaneous crosstalk.)
MS. PENNER: Objection.
BY MS. LUHANA:
Q. Was it a different standard in the past?
A. All I can say about the past is that for established manufactured products have been, you know, registered and -- and filed, you know, according to, you know, validated procedures. And until recently, no -- there was no requirements to retrospective assessments unless there was a, you know, known cause of concern.
Q. So, it was a different standard in the past? And -- and what's this timeline that you're defining?
So, when was it this standard versus the

standard that you're articulating where --
MS. PENNER: Objection.
BY MS. LUHANA:
Q. -- apparently for established products, there is a higher threshold to asses nitrosamines than, you know -- than there was at this time?
MS. PENNER: Objection. Compound.
THE WITNESS: Well, you know, you may be -- there is a requirement to perform these risk assessments across the whole of the pharmaceutical industry now as of 2019.
BY MS. LUHANA:
Q. Mr. Searle, as a lead chemist for GSK, would you say safety of Zantac and other medicines you work on is your highest priority?
MS. PENNER: Objection.
THE WITNESS: Of course, safety is -- is important, yes. Efficacy is important.
BY MS. LUHANA:
Q. That wasn't my question, Mr. Searle.
Is safety your highest priority at GSK?
MS. PENNER: Objection.
THE WITNESS: That's a -- that's a GSK question to ask, not -- not a question to ask me.

BY MS. LUHANA:
Q. Mr. Searle, how long have you worked at GSK, for almost 40 years?
MS. PENNER: Objection.
THE WITNESS: Safety is important. Of course, it is.
BY MS. LUHANA:
Q. Do you have different standards in GSK?
A. No.
MS. PENNER: Objection.
BY MS. LUHANA:
Q. So, are they the same standard? Are they -- are you aligned with GSK?
MS. PENNER: Objection.
BY MS. LUHANA:
Q. In terms of assessing safety --
(Simultaneous crosstalk.)
BY MS. LUHANA:
Q. -- is safety your highest priority?
MS. PENNER: Objection.
THE WITNESS: Safety is important. Of course, it is.
BY MS. LUHANA:
Q. I didn't ask if it's important.

A. I'm not denying that.
Q. I'm saying -- oh. So, where is the threshold then? Is it profits, then safety? Where does safety fall?
MS. PENNER: Objection.
THE WITNESS: That is not -- you know, I'm -- I'm not someone who makes those decisions, but, you know, GSK does -- does not knowingly, you know, sell unsafe drugs.
BY MS. LUHANA:
Q. Isn't it GSK's duty to know if it's selling unsafe drugs, and investigate that, and research, and do the due diligence on the front end to make sure -- to ensure that our clients are getting safe products?
A. And -- and --
MS. PENNER: Objection.
Please let me get my objection in.
You know, this -- he is here as a fact witness, not to speak for the company.
So, you can answer to the extent you have a personal answer. You are not speaking for the company.
MS. LUHANA: Kim, please, let me do my examination of Mr. Searle.
THE WITNESS: Yeah.

MS. LUHANA: No speaking objections. Objections on scope. Objections on form.

Okay?

MS. PENNER: That was an objection on scope.

MS. LUHANA: One word, that's it.

THE WITNESS: Can you repeat the question.

MS. LUHANA: Melissa, can you repeat it.

THE WITNESS: Yeah.

(Record Read.)

MS. PENNER: Objection.

THE WITNESS: Well, I -- I -- I -- I will agree with that statement.

BY MS. LUHANA:

Q. So, you would agree that safety is your highest priority?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. In your role at GSK, I'm asking you for your -- as lead chemist doing the root cause analysis working at GSK for 40 plus -- almost 40 years, is safety your highest priority?

MS. PENNER: Objection.

THE WITNESS: In terms of my -- my -- my

role, then no. Safety is not my highest priority in the job that I do, but if I have to investigate issues related to safety, then -- then I do that.

BY MS. LUHANA:

Q. So, safety isn't -- isn't the point of you doing your investigations as a chemist to assure that you are putting safe products out there, Mr. Searle?

MS. PENNER: Objection.

THE WITNESS: There is an established way of developing drugs, studying drugs that is followed by GSK, and I've supported this on many projects in terms of performing, you know, the required toxicological evaluations and risk assessments and, you know, all of those are designed to ensure that the -- you know, the medicine that is -- is safe, and -- and, yeah, of course, I support those activities. I've done that always in my job.

BY MS. LUHANA:

Q. So, you are aligned with GSK in finding that safety is your greatest priority, correct?

MS. PENNER: Objection.

THE WITNESS: I've explained to you -- I -- I support the evaluations to determine the safety of the drug.

BY MS. LUHANA:

Q. And that's your highest priority, correct?

MS. PENNER: Objection.

THE WITNESS: I have many priorities. I can't, you know -- you know, it's very difficult to rank them all sometimes.

BY MS. LUHANA:

Q. So, what's greater than safety to you? Your allegiance to GSK, is that greater than safety?

MS. PENNER: Objection.

THE WITNESS: No. No.

BY MS. LUHANA:

Q. Then what's greater than safety for you?

A. As I say, we would not knowingly be marketing and selling unsafe drugs. So, safety is a very high priority.

Q. Why isn't it the highest priority, Mr. Searle?

A. You can understand, you know, my job is -- when I was particularly working as a development chemist, if -- you know, the ability to make something is also a priority of my job. If we could -- it wouldn't matter how safe or unsafe something is if you

can't make it in the first place. So, you know, we have to come up with a root to manufacture something and then, you know, material from that root is -- is investigated for, you know, safety. And, you know, if there are any signals in toxicological studies and clinical trials that -- that show that, you know, there's a safety issue, then GSK would not progress with the product.

Q. So, you are relying on others to ensure that safety is their highest priority?

A. Well, I'm not -- as I say, safety is not -- my job is not in -- in safety and toxicology. My job, lot of my career was to provide the drug to do that. I mean, we say we do some risk assessments associated with the root synthesis, but, ultimately, you know, side effects and things like that would -- in judging the acceptability of those, it was not my call to make.

Q. Mr. Searle, I'm not talking about side effects. I'm talking about the genotoxic carcinogen. If you -- if you are working on a product and it contains a genotoxic carcinogen, it's a failure, correct?

MS. PENNER: Objection.

THE WITNESS: Look, if it -- I explained

the process we go through with new drugs, that we evaluate things to -- to come up with, you know, the presence of carcinogens and mutagens and -- and that's what the -- the risk assessment process is in place, to -- to -- to allow the study and make those informed decisions about the safety of the drug, but, you know, it's done, you know, always through this lens of, you know, what do we expect to be there based on chemistry.

BY MS. LUHANA:

Q. Why is it -- why would it be important for safety to be a priority?

MS. PENNER: Objection.

THE WITNESS: Because, you know, we are making medicines. You know, we don't want -- we want them to be safe for the patients to take them.

BY MS. LUHANA:

Q. Any other reasons?

A. That's the -- that's the key one.

Q. What can happen if you have a genotoxic carcinogen in the medicine you are -- you are marketing and manufacturing and selling to millions of consumers?

MS. PENNER: Objection.

THE WITNESS: Yeah. I'm not sure how to answer that, what could happen.

BY MS. LUHANA:

Q. Well, what could potentially happen when you have a genotoxic carcinogen in the medicine that's being sold to millions of consumers, and --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- they are ingesting it for years?

What can happen? What's the end --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- result of that, Mr. Searle?

MS. PENNER: Objection. Scope.

THE WITNESS: I'm not qualified to talk about safety in terms of the impact -- I mean...

BY MS. LUHANA:

Q. So, you can't tell the ladies and gentlemen of the jury, being a subject matter expert on nitrosamine -- genotoxic nitrosamine risk assessments, as to what can happen if a genotoxic carcinogen is in a product that's sold to millions of consumers and taken on a daily basis?

MS. PENNER: Objection, scope. Objection, compound. Objection, argumentative.

THE WITNESS: I am an expert on the chemistry aspect of it, not the impact of that substance,

you know, following administration. So, I'm not -- I'm not qualified to answer questions in that area. I'm -- I'm -- I'll talk about, you know, I'm there to understand potential for the formation of these things in the drug, but I can't comment on -- on what happens postadministration. It's not -- not my area of expertise.

BY MS. LUHANA:

Q. Okay.

Why wouldn't you want a genotoxic carcinogen in a drug, as a chemist?

MS. PENNER: Objection.

THE WITNESS: I've explained that we assess these things.

BY MS. LUHANA:

Q. No.

I am asking why wouldn't you want a genotoxic carcinogen in the drug? What would result if it's in the drug that's being consumed by millions on a daily basis? What would happen, Mr. Searle?

MS. PENNER: Objection.

THE WITNESS: I'm -- I'm not qualified to answer that question.

BY MS. LUHANA:

Q. You are not qualified or you don't want to answer that question?

MS. PENNER: Objection.

You can answer.

THE WITNESS: What -- what can happen? Well, there is a potential, but how much, how long, I couldn't tell you the answer to that. You know, carcinogens can cause cancer, but there are so many factors in that, you know, the amount, the time, all of these things, and, you know, I can say no more than that.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: I think now is a good time to take a lunch break.

So, should we go for a half hour? Does that work?

MS. PENNER: How about 45?

MR. SHEEHAN: 45.

MS. PENNER: 45.

MS. LUHANA: Okay.

THE VIDEOGRAPHER: Going off the record, the time is -- is 1237 UTC.

(Luncheon recess is taken.)

THE VIDEOGRAPHER: Please standby.

We are back on the record. The time is 1323 UTC.

Please proceed.

BY MS. LUHANA:

Q. Mr. Searle, GSK was the original innovator for brand-name Zantac, correct?

A. Yes.

Q. Please explain what that means to the jury.

A. It means that the -- the drug was discovered within the research group, what was Glaxo back in the 1970s.

Q. Okay.

GSK submitted the original ANDA18703 for Zantac, correct?

MS. PENNER: Objection.

THE WITNESS: I -- I don't know the answer to that.

BY MS. LUHANA:

Q. Sir, are you familiar with any of those submission details and dates --

A. ANDA is all new drug application, but the dates and numbers, I wouldn't know, no.

Q. Okay.

Do you know what time period GSK sold Zantac for the U.S. market?

MS. PENNER: Objection.

THE WITNESS: Well, I don't -- I

wouldn't know exactly the starting date around 1982. I believe it stopped in around 2014.

BY MS. LUHANA:

Q. And do you know if ANDA18703 changed ownership after it was approved?

MS. PENNER: Objection.

THE WITNESS: I don't know.

BY MS. LUHANA:

Q. Mr. Searle, do you have details about, you know, talking about the ranitidine base, API, finished dose history for Zantac in the U.S. market? Would you have that knowledge?

MS. PENNER: Objection.

THE WITNESS: No.

BY MS. LUHANA:

Q. Okay.

GSK received approval for and began selling Zantac in 1983, correct?

MS. PENNER: Objection.

THE WITNESS: I don't know.

BY MS. LUHANA:

Q. By 1986, did you know Zantac became the top selling drug in the United States?

MS. PENNER: Objection.

THE WITNESS: I -- I don't know.

BY MS. LUHANA:

Q. Are you familiar with the term "blockbuster drug" used to describe drugs that sell over $1 billion in sales annually?

A. Yeah, I've heard the term used.

Q. Is it fair to say that Zantac became a blockbuster drug for Zantac -- I mean for GSK?

MS. PENNER: Objection.

THE WITNESS: I -- I -- I don't know. It's not a choice of term I would have heard used in connection with Zantac in particular.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: Can we please mark Plaintiff's Exhibit 3127. It's GSKZAN0000384483.

(Exhibit 3127, GSKZAN0000384483, marked for identification.)

MS. PENNER: Before you ask a question, Roopal, you are really tiny on our screen, and we have a very large and lovely view of Melissa.

So, John, is there something you can do for us?

THE VIDEOGRAPHER: I believe on your Polycom remote, if you hit pound 1, it should change your view.

MR. SHEEHAN: What is it called, a Polycom remote?

THE VIDEOGRAPHER: Would you like to go off the record?

MS. PENNER: Yes, why don't we do that first.

THE VIDEOGRAPHER: We are going off the record. The time is 1326 UTC.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 1328 UTC.

BY MS. LUHANA:

Q. Mr. Searle, would you agree that you've been at GSK long enough to see firsthand the impact ranitidine had in the '80s and '90s on the fortunes of the company? Fair to say that a lot of jobs now would not have existed if it wasn't for Zantac?

MS. PENNER: Objection.

THE WITNESS: I'm -- I mean, I'm aware it was a very successful drug in terms of sales. You know, whether that -- what that means for jobs, you know, that's -- that's another point, but, you know, I'm aware it was a successful drug.

BY MS. LUHANA:

Q. So, Exhibit 3127 is a Glaxo

presentation from January 28, 1992. If you can please turn to -- it ends in Bates 384500.

Right there, Zantac became the highest selling drug on the U.S. market in the early '90s.

Would you agree with that, Mr. Searle?

MS. PENNER: Objection.

THE WITNESS: If those figures are correct, then yeah. It's top of the list.

BY MS. LUHANA:

Q. And you have -- okay.

MS. LUHANA: Can you please turn to 384515. 515. Sorry.

BY MS. LUHANA:

Q. Mr. Searle, did you know that Zantac -- the Zantac market consisted of and was targeted at 32 million heavy antacid users in 1991?

MS. PENNER: Objection.

THE WITNESS: No.

BY MS. LUHANA:

Q. You have no reason to dispute this, correct?

MS. PENNER: Objection.

THE WITNESS: No reason to dispute or -- or confirm it. I have no knowledge of that slide and those figures. Never seen it before.

BY MS. LUHANA:
Q. But there would be no basis for you to dispute it, correct?
MS. PENNER: Objection.
THE WITNESS: It's -- it's the slide you're showing to me. I -- I can't, you know, confirm or deny the content of it.
MR. SHEEHAN: I just -- I just want to put on the record that you are asking this chemistry witness about marketing documents, and you're -- you've also represented that you need more time with this witness to ask him about the root cause assessment, for whatever it's worth, Roopal.
MS. LUHANA: Understood.
Let's go to 84384496 on this document. Right there.
BY MS. LUHANA:
Q. Mr. Searle, do you see this pie chart here in the right --
(Simultaneous crosstalk.)
BY MS. LUHANA:
Q. Yeah. Look at the one for June 1991.
Do you see that pie chart there?
A. Yes.
Q. Where would -- the chemistry

department fall that you were in at this time?

MS. PENNER: Objection.

THE WITNESS: It would be nowhere on that pie chart.

BY MS. LUHANA:

Q. Would it be part of research and development?

A. Well, I -- I don't know whether is -- whether that refers to the total staff of -- of Glaxo or people who were associated with -- with Zantac at the time because in 1991, no one in -- in GSK in research and development, as I was working, would have been responsible for Zantac because it was a marketed product managed by the manufacturing company.

Q. This isn't a Zantac-specific PowerPoint, Mr. Searle. It's -- it's -- it's just, you know, a Glaxo PowerPoint from 1992.

In terms of -- does it surprise you that field sales made up 42 percent of all personnel at GSK in 1991? At least more than double personnel for research and department -- development.

MS. PENNER: Objection.

THE WITNESS: I -- I have no view one way or the other on that.

BY MS. LUHANA:

Q. I'm sorry?

A. I don't have -- I don't really have an opinion on that. I mean, clearly, you know, marketing is -- is one important aspect of any company.

Q. Understood.

MS. LUHANA: You can take this down.

BY MS. LUHANA:

Q. Are you aware, Mr. Searle, that by 1993 Zantac was the most prescribed in the -- most prescribed drug in the marketplace and the most prescribed medication for five out of six indications for initial acute gastric ulcer, duodenal ulcers, GERD, recurrent gastric ulcers, recurrent duodenal ulcers?

A. No.

Q. Any reason to dispute that?

MS. PENNER: Objection.

THE WITNESS: I have no reason to, you know, say -- confirm or dispute those figures. As I said before, I was aware that it was a highly successful drug, but specific details about percentage sales and prescriptions is not detail that I have ever been presented with before. And I've had no reason to -- to see that sort of data before.

BY MS. LUHANA:

Q. Okay.

Are you aware that after GSK subsequently sought approval from the FDA for short-term maintenance, it -- it sought approval for long-term maintenance for duodenal ulcers in 1996?

MS. PENNER: Objection.

THE WITNESS: No.

BY MS. LUHANA:

Q. Any reason to dispute that?

MS. PENNER: Objection.

THE WITNESS: Refer to my previous answer, I have no reason to, you know, deny or -- or -- or agree with that. I have no knowledge in this area whatsoever.

BY MS. LUHANA:

Q. Are you aware that GSK sought approval from the FDA and received it to market Zantac to the pediatric population in 1999 with Zantac syrup?

MS. PENNER: Objection.

THE WITNESS: I refer to my previous answer, no.

BY MS. LUHANA:

Q. Any reason to dispute it?

MS. PENNER: Objection.

THE WITNESS: Previous answer. I -- I -- I have no reason to agree or disagree with it. I have

no knowledge in that area.

BY MS. LUHANA:

Q. If I represented it's accurate, do you have any reason to dispute it?

MS. PENNER: Objection.

THE WITNESS: I -- as I say, I can't agree or disagree. It's not -- not -- I have never been involved in sales and marketing and these aspects of it, you know.

BY MS. LUHANA:

Q. Are you -- are you aware that Zantac syrup was prescribed to children?

MS. PENNER: Objection.

THE WITNESS: No.

BY MS. LUHANA:

Q. Are you aware GSK sought approval from the FDA and received to market Zantac to the pediatric population in 2004 for patients age 1 months old to 16 years with EFFERdose for the -- for pediatric GERD?

A. Refer to my --

MS. PENNER: Objection.

THE WITNESS: -- previous answer, I have no knowledge to agree or disagree with that statement.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: John, can you please pull up Exhibit 254. It is the Valisure petition.

(Exhibit 254, Valisure Petition, marked for identification.)

BY MS. LUHANA:

Q. Exhibit 254 is the Valisure petition dated September 9, 2019. It's Valisure Citizens petition to the FDA.

Mr. Searle, you've previously seen and reviewed this, correct?

A. Yes.

MS. PENNER: Objection.

THE WITNESS: Some -- some aspects in more detail, the aspects related mainly to chemistry and analysis, I -- I'm familiar with.

BY MS. LUHANA:

Q. So, what areas have you focused on of the petition then?

A. The -- the --

MS. PENNER: Objection.

THE WITNESS: The front page in particular.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: Can you please go to page 6.

BY MS. LUHANA:

Q. Are you aware that Valisure tested Zantac pills and detected close to 3 million nanograms of NMDA with GC-MS?

MS. PENNER: Objection.

THE WITNESS: I am aware, and I'm also aware that they have -- they've subsequently withdrew this data, in effect, because they realize that these -- these results are completely erroneous due to the technique used in the conditions. So, these are completely irrelevant numbers as far as Zantac is concerned.

BY MS. LUHANA:

Q. So, you're saying Valisure withdrew this petition?

MS. PENNER: Objection.

THE WITNESS: Not -- I didn't say withdraw the petition, but if you read on in this document, they subsequently state that these results are due to basically degrading ranitidine in the GC at 130 degrees for prolonged period. And it says there, you know, so they were using an analytical method that was not appropriate for testing Zantac. So, you know, these results are -- are meaningless --

(Simultaneous crosstalk.)

BY MS. LUHANA:

Q. Where in the petition does it say that?

A. It says, "The extreme nature of the results prompted the petitioner to undergo further scientific investigation to determine the origin of the NDMA suspecting that the modest oven heating parameter of 130 degrees in the FDA recommended GC-MS protocol contributed to the high results, Valisure developed a low temperature GC-MS method that could still detect NDMA, but would only subject samples to 37 degrees," and those results, I think, are presented in a subsequent table.

Q. Great.

MS. LUHANA: So, let's go to page 7 then.

BY MS. LUHANA:

Q. So, Valisure, as you can see, used different amounts of sodium nitrite with ranitidine and simulated gastric fluid, and they saw up to 300,000 nanograms of NDMA, correct?

MS. PENNER: Objection.

THE WITNESS: Those are completely physiologically irrelevant conditions.

BY MS. LUHANA:
Q. Okay.
So, what do you think are physiologically relevant conditions?
A. Well -- well, I don't know the exact figure, but the concentration of nitrite at 25 and 50 mM is -- I believe, is higher than the concentration of the --
THE STENOGRAPHER: Hold on. Hold on one second. I just want to stop you one second.
I don't know the exact figure, but the concentration of nitrate at 25 and -- continue, please.
THE WITNESS: And 50 mM, 50 mM sodium nitrite, these are what we call super physiological concentrations of nitrite.
BY MS. LUHANA:
Q. But wasn't this concerning to you when you saw the Valisure petition, and saw this much NDMA potentially being generated for ranitidine?
MS. PENNER: Objection.
THE WITNESS: No. No. It wasn't because this is not work that is relevant to the -- what we -- what we were investigating, which was the presence of NDMA in ranitidine. What we are seeing here is the interaction of the ranitidine molecule with an external

reactive molecule, nitrite, which is an extremely reactive molecule, which, you know, reacts in a number of ways with -- with ranitidine, but it's not relevant to the manufacture of the active ingredient and the storage of the active ingredient because this is an external agent causing this reaction, which is not what happens with the ranitidine molecule itself.

Q. Mr. Searle, to your knowledge, does -- do Zantac pills contain nitrite?

MS. PENNER: Objection.

THE WITNESS: I do not -- no, I do not believe they contain nitrite. We -- we tested -- we tested the active ingredient, and -- and we didn't detect nitrite in that.

BY MS. LUHANA:

Q. You tested it in the root cause analysis, and you absolutely found nitrite in the pill, Mr. Searle.

MS. PENNER: Objection.

BY MS. LUHANA:

Q. There is also the WHO article which confirmed that there were close to 96 milligrams of nitrite in the pill.

MS. PENNER: Objection.

THE WITNESS: No. You are confusing

nitrite with NDMA. Nitrite and NDMA are not the same thing.

BY MS. LUHANA:

Q. No, I -- I am -- I am not confusing nitrite with NDMA, but we will get to that.

Okay.

MS. LUHANA: Can you go to the first page of the petition.

BY MS. LUHANA:

Q. Can you walk us through this molecule?

As you can see, Valisure is stating in this petition that the ranitidine molecule contains both the nitrite and the dimethylamine group, which are well known to combine to form NDMA. So, walk me through the molecule there.

A. I will walk you through that and say that that was not written by anyone that has got any chemistry knowledge. It is completely factually incorrect. It does contain a dimethylamine or dimethylamino group circled in blue, but the statement it makes there that it says it contains a nitrite group is completely incorrect. That is a nitro group, not a nitrite group, and those are, you know, completely different functional groups in organic chemistry. So,

you know, to put that sort of information in a summary of a document really is -- is not scientifically sound. That is not a nitrite group. That is a nitro group, and the chemistry of a nitro group is very different from the chemistry of a nitrite group. So, ranitidine does not contain a nitrite group, and that's a fact.

Q. Okay.

So, the nitroso group and the dimethylamine come together to form NDMA and that was, in fact, confirmed by the root cause analysis, correct?

MS. PENNER: Objection. Misstates.

THE WITNESS: What we've -- what we've said in the root cause analysis is that the atoms that make up the NDMA, as -- as I've explained before in the -- in the isotopic label study, are derived from the dimethylamino group and that nitrogen. As we also state in the NDMA, the mechanism of how that happens is not known even after studying it for an extensive period is not a favored mechanism. It's not a predicted mechanism and even after studying it extensively for months, we were still unable to come up with a, you know, reasonable path way by which that could happen.

BY MS. LUHANA:

Q. Mr. Searle, the root cause analysis you did isotope labeling actually on the nitroso group

and the dimethylene group and guess what, you found NDMA.

MS. PENNER: Objection. Misstates.

(Simultaneous crosstalk.)

THE WITNESS: I want to correct the chemistry. That is not a nitroso group. It is not a nitrite group. It is a nitro group. That's the group that we labeled, but, you know, we cannot call that a nitroso group because it's not.

BY MS. LUHANA:

Q. Okay.

Then we are getting into semantics here.

Did this form NDMA? Was Valisure correct in that he took the nitro and the dimethylamine, and it formed NDMA, something GSK could have done in the early '80s? It was that simple, correct?

A. No.

MS. PENNER: Objection.

THE WITNESS: It is not that simple, and I'm going -- I'm going to explain. I come back to my statement about reasonably predicted.

These people think they can just look at a molecule, draw some rings around it and say, you know, those things can just fly off and combine to form NDMA. The -- the chemistry to do that is not reasonably

predicted.

To convert that nitro group into a nitrosating agent is not a pathway that would be predicted by what we call precedented organic chemistry. We -- we -- it's not -- it looks simple on paper, but for that to happen there needs to be, you know, a pathway that is precedented, and it's been previously documented and then we can understand, yes, that would happen. But the reality is, you know, no one was saying this prior to 2019. All of this has happened, you know, subsequent to NDMA being discovered, and I think that's a very important point. If it were that obvious, then people would have been saying this way back, but no one ever wrote this until after 2019. And the reason for that is it's not chemistry -- chemically obvious.

And -- and then as I said before, you know, we -- having established that NDMA was forming, you know, we undertook the RCA and that included, you know, postulating a number of mechanisms by which this could form and there are several documented in there.

Several months later, we are still unable to say there is an obvious mechanism for -- for it forming because the reason is it's so -- you know, it's not predicted. It's really difficult.

And I think another point I want to make,

I think it's a very important point, is about levels. When you actually look at the levels that are forming in the drug substance -- and I will -- I will use as an example, you know, material that GSK manufactured up to 2014. You know, we have taken that -- samples of that. We tested them and even after five years, we're only detecting about .2 parts per million NDMA, which if you, you know, work that out as an annual rate of formation, is .04 parts per million or 40 parts per billion. That's giving an indication of how slow this reaction actually is, and it's -- you know, it's such a slow reaction. It's just telling us how, you know, unfavored and disfavored this reaction actually is.

So, you know, it's easy for people to say after the event that's obvious, but when you take a step back, think about the chemistry, you know, there is no obvious pathway and the actual rate of formation we're seeing is incredibly slow.

And, I mean, just a -- just a couple more things just to finish with --

BY MS. LUHANA:

Q. Mr. Searle, I appreciate what you're saying, but please answer the question at hand.

MS. PENNER: Objection. He is giving his answer. Please let him finish.

MS. LUHANA: He is adding many more things that aren't -- that's fine.

Go ahead. Continue.

THE WITNESS: Yeah. I'm just explaining to you, you know, why this is not obvious and -- and, you know, why you can't just take a structure and write some rings on it and say "NDMA were formed."

You know, when you take a step back and consider chemistry, it -- it's not a lightly thing and, you know, we didn't come into this with no knowledge of the degradation pathways of ranitidine.

As I stated before, we understand the degradation that ranitidine does undergo from, you know, the initial work and the additional work that we did in 2015. When we look across all of that work, all of the structures that have been identified and there are a large number of them, none of those structures can be linked to the degradation pathway that -- that would ultimately result in NDMA forming. You know, there is not -- so, the degradation that NDMA -- ranitidine undergoes, you know, predominantly goes down very different pathways than the ones that would need to happen in order to form NDMA.

BY MS. LUHANA:

Q. It's interesting, Mr. Searle, the -- this simple chemistry resulted in finding the truth that

there was NDMA in Zantac, something that evaded GSK for 30, 40 years.

MS. PENNER: Again --

BY MS. LUHANA:

Q. -- correct?

MS. PENNER: -- Roopal, do you have a question?

Or are you --

MS. LUHANA: I said correct, correct. That was my question --

MS. PENNER: Objection.

THE WITNESS: No -- you used the words, and I'm going to -- that says "simple chemistry," and, you know, what I was saying before was it's not simple. You know, people make out its really simple just by drawing rings around a structure. Chemistry, you don't do chemistry by drawing rings around structures and then just putting bits together. You know, chemistry works on a series of rules and mechanisms, pathways that are known and understood exemplified, precedented. You know, the pathway that you need to undergo to -- to do this is not -- doesn't -- you know, doesn't follow those known rules. You know, so it's not simple. It's far from simple and, you know, a reaction that takes 5 million years to go to completion, which is our estimate for some of the material,

is -- is barely a reaction at all. So, you know, it's not simple. It's highly unlikely and unprecedented.

BY MS. LUHANA:

Q. Mr. Searle, we will get to the root cause, but with Jurong, let's just talk about Jurong, how many samples did you test and how long did you use Jurong for? How long did GSK use --

MS. PENNER: Objection --

BY MS. LUHANA:

Q. -- Jurong as an API manufacturer?

MS. PENNER: Objection, compound.

THE WITNESS: I don't know exactly how long we used Jurong material but a substantial period, probably --

BY MS. LUHANA:

Q. Would you say mid '80s to, you know, 2014, '15?

MS. PENNER: Objection.

THE WITNESS: We manufactured other sites initially, but certainly in the latter, certainly --

BY MS. LUHANA:

Q. And --

A. -- throughout the 2000s.

Q. And so you are talking about 1984 to 2014, almost, like, a 30-year period, right?

A. Yes.
Q. How many API batches did GSK manufacture during that time, ballpark?
MS. PENNER: Objection. Objection.
THE WITNESS: I have absolutely no idea. Absolutely no idea at all.
BY MS. LUHANA:
Q. And how many samples did you rely on for your root cause analysis for Jurong?
MS. PENNER: Objection.
BY MS. LUHANA:
Q. How many batches, Mr. Searle?
A. And -- and -- well -- well, first thing I'll say is we didn't rely on any batches from Jurong in terms of the RCA. We tested between -- about five to seven samples of material that we obtained from -- retained samples there, but, you know, we didn't -- we weren't relying on those for the RCA. They provided some evidence for the RCA but, you know, just one tiny piece in a much bigger jigsaw.
Q. Evidence for a lawsuit, correct?
MS. PENNER: Objection.
THE WITNESS: Evidence for a scientific investigation into the root cause, nothing more than that.
BY MS. LUHANA:

Q. How were the samples retained, do you recall? What kind of conditions were they kept in at Jurong?

MS. PENNER: Objection.

THE WITNESS: They -- they were stored, I think, in Jurong under 30 -- under 30 degrees C, so similar to the -- you know, the established storage conditions for the API.

BY MS. LUHANA:

Q. I would say it was I believe in a retention room at 22 degrees Celsius.

Do you recall if there was any humidity in that room --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- or if it was controlled?

A. I don't know. I'm not in -- in Jurong.

As I say, we -- we received some samples and, you know, we tested them to inform our RCA at the time and given the very low levels of NDMA we saw, I would suggest that it was very, very well controlled storage.

Q. How many batches would you say Jurong has manufactured? More than five or seven, right?

MS. PENNER: Objection --
BY MS. LUHANA:
Q. During the time -- the 30-year time frame if you had to estimate?
MS. PENNER: Objection.
THE WITNESS: I have no idea. I have absolutely no idea, and I wouldn't want to --
BY MS. LUHANA:
Q. A 1,000, 5,000? How is that a representative sample when you have five to seven batches? I'm just curious.
How many batches were manufactured by GSK at the --
MS. PENNER: Objection.
BY MS. LUHANA:
Q. -- Jurong facility?
A. As I say, it has no -- the number of samples we -- we tested have no -- you know, was purely done to -- to inform some information in terms of the RCA. You know, we weren't setting out to test the representative sample of Jurong batches. And it's worth noting that the -- the active ingredient has a -- has an assigned shelf life of five years. When we tested those batches, they were almost bang on that five-year shelf life. Testing any samples that were substantially older

than that, we could argue would not -- you know, would not be relevant anyway because they are expired -- they are effectively expired samples anyway. So --

Q. I recall you did the testing for the RCA. It was like October, November 2019, 2000, correct, that that was the time frame?

A. 2019.

Q. October -- right.

And the Jurong samples were -- I believe they were manufactured December 2014.

So, you would still have until December 2019, correct? And so all the testing was done prior to the expiration date?

A. Yes, yes.

MS. PENNER: Objection.

THE WITNESS: Yes.

BY MS. LUHANA:

Q. Yes, but it still hadn't expired.

But in terms of my question, in terms of batches, was it thousands of batches of API that were manufactured on an annual basis --

A. I --

Q. -- for that -- those 30 years?

MS. PENNER: Objection. Asked and answered.

THE WITNESS: I -- I don't know, and -- and I'm not going to speculate in terms of manufacturing volumes.

BY MS. LUHANA:

Q. Do you have any idea about the quantity?

A. I --

MS. PENNER: Objection.

THE WITNESS: I -- I don't, and it's -- it was not a factor at all relevant to -- to the RCA we did.

BY MS. LUHANA:

Q. Okay. Mr. Searle, do you agree that it's been well known that NDMA can form if a tertiary amine such as dimethylamine and ranitidine is exposed to a nitrite?

MS. PENNER: Objection.

THE WITNESS: It's -- it's a known chemical reaction, yes.

BY MS. LUHANA:

Q. Would you agree that --

A. I testified to that before.

Q. Would you agree that it's been known since the late 1970s?

MS. PENNER: Objection.

THE WITNESS: Yes, it's -- it's standard. You know, it's a standard organic chemistry reaction.

BY MS. LUHANA:

Q. As a subject expert in the arena of nitrosamines, are you familiar with Dr. Mirvish?

MS. PENNER: Objection.

THE WITNESS: No.

BY MS. LUHANA:

Q. He is internationally recognized leader in the study of nitrosamines and carcinogenicity. He's had over 150 publications on the topic.

Are you familiar with his article from 1975 regarding nitrosation concerns with tertiary amines and nitrates?

MS. PENNER: Objection.

THE WITNESS: No, I'm not familiar with that.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: Can we go off the record for a minute.

THE VIDEOGRAPHER: We are going off the record. The time is 1357 UTC.

(Off the record.)

THE VIDEOGRAPHER: Please standby.
We are back on the record. The time is 1359 UTC.
Please proceed.
MS. LUHANA: John, can we please have Plaintiff's Exhibit 3128 marked? It's GSKZAN0003001693. And there are two others that accompany it as well. It's 3129 would be GSKZAN0003001694 and 3130, which is GSKZAN0003001700. And I can repeat those for you if you need.
(Exhibit 3128, GSKZAN0003001693, marked for identification.)
(Exhibit 3129, GSKZAN0003001694, marked for identification.)
(Exhibit 3130, GSKZAN0003001700, marked for identification.)
THE VIDEOGRAPHER: Do you want 3128 first?
MS. LUHANA: Yes, 3001693? Great.
BY MS. LUHANA:
Q. Exhibit 3128 is an email from Robert Whitten -- I'm sorry. It's from -- I can't tell. The low -- the lower email is from Robert Whitten to Mike Urquhart and cc'ing Richard Henson dated November 3, 2020, and the email from above is from Mike to Robert

Whitten. And can you please read the text there, Mr. Searle?

A. Which -- which one, the bottom one?

Q. Start with the bottom.

A. Do you have a method for prepping nitrosamines that have been demonstrated? John says they are easy enough to make.

Q. And then Mike responds and says that he has some papers that have been around for sometime and it's very easy, indeed, and he attaches what is a Gillatt article, which is 3129, and a Mirvish article from 1975, which is 3130.

MS. PENNER: Objection.

MS. LUHANA: So, can we please pull up 3130.

BY MS. LUHANA:

Q. So, Mr. Searle, are you familiar with this Mirvish article on the formation of N-nitroso compounds, chemistry, kinetics and in vivo occurrence?

A. Not -- not specifically, no.

Q. Can you read the first sentence of the introduction?

A. Carcinogenics, N-nitros are -- compounds are produced by the acid catalyzed reaction of nitrite with certain nitrogen compounds.

Q. Mr. Searle, do you have any reason to disagree with that?

MS. PENNER: Objection.

THE WITNESS: The -- I will agree with the second part of the statement, the acid catalyzed reaction of nitrite with certain organic nitrogen compounds does produce nitrosamines.

BY MS. LUHANA:

Q. So, which part of the sentence are you disagreeing with?

A. Carcinogenic N-nitros are compounds, that's a very general statement about nitrosamines, which there isn't -- not specific to every single nitrosamine. Not all nitrosamines are -- are carcinogens and certainly not human carcinogens.

Q. You would agree that NDMA is a carcinogen, correct?

MS. PENNER: Objection.

THE WITNESS: It -- it's a suspected human carcinogen, as -- you know.

MS. LUHANA: Okay.

Let's go to page 3001703. Right there.

BY MS. LUHANA:

Q. And can you read that first paragraph under kinetics of N-nitrosation. It is the last

sentence of the first paragraph.

A. The -- the HNO2 is --

Q. No, for -- I'm sorry. It starts at for nitrosation to occur.

A. For nitrosation to occur, nitrite is usually first converted to nitrous acid, which explains why nitrosation is catalyzed by acid. The HNO2 is then converted to an active nitrosating species, e.g., nitrous anhydride, nitrosyl thiocyanate, nitrosyl halide, or nitrous acidium ion.

Q. And what does that mean to you?

MS. PENNER: Objection.

THE WITNESS: It -- it means that under various conditions a nitrosation species can be generated from nitrous acid.

BY MS. LUHANA:

Q. Correct.

And in terms of --

MS. LUHANA: Can we take a look at table 1 on 3001705.

BY MS. LUHANA:

Q. And here, Mirvish has listed numerous nitrogen compounds including seven tertiary amine drugs that yield NDMA by nitrosation -- NDMA by nitrosation, correct? And you see dimethylamine there?

MS. PENNER: Objection.

THE WITNESS: I can see it there, but this has no -- no relevance to -- to the ranitidine whatsoever because it's not any of those drugs, any of those compounds.

BY MS. LUHANA:

Q. Of course, but Mirvish is saying that, you know, combining a tertiary amine like dimethylamine with a nitrite results in NDMA formation, correct?

MS. PENNER: Objection.

THE WITNESS: Not always correct, no.

BY MS. LUHANA:

Q. When -- when is it incorrect?

A. Well, I can quote -- I'll quote a real example and that is that if you take a ranitidine molecule itself and you react that with -- with nitrite, it does not first react on the tertiary amine. It reacts at another point in the molecule to give a completely different structure.

Q. So, you're saying the dimethylamine doesn't react with nitrite in the ranitidine molecule to create NDMA?

A. That's not what I said.

MS. PENNER: Objection.

THE WITNESS: I said the ranitidine -- when nitrite reacts with the ranitidine molecule, and, you know, you have to bear in mind that ranitidine does not contain dimethylamine. It contains a dimethylamino group, which is not the same thing. Dimethylamine is a free amine. It is not attached to anything, but nitrite reacts first in a different position on the ranitidine molecule. It does not attack on the dimethylamino group.

BY MS. LUHANA:

Q. So, the dimethyl group, what is it connected to in the ranitidine molecule?

A. It's connected to a carbon.

Q. And what else?

A. And then it's connected to a furan ring.

Q. Okay.

A. -- through the carbon.

MS. LUHANA: All right.

You can take this down.

Can you please put up 3129.

BY MS. LUHANA:

Q. It's an article by Gillatt saying "Susceptibilities of Drugs to Nitrosation under Standardized Chemical Conditions," and it's from 1983.

Mr. Searle, have you seen this before?

A. No.

Q. Can you read the first sentence there of the introduction?

A. Many drugs contain a secondary amino or amido group potentially capable of reacting with nitrous acid to form a relatively complex N-nitroso derivative.

Q. And then the next sentence as well.

A. Some other drugs are tertiary amines with either a dialkylamino substituent or an alkyl or other group attached to a ring tertiary nitrogen atom.

Q. And the last sentence, please.

A. The former type is often subject to nitrosative cleavage with the formation of a simple volatile N-nitrosidialkylamine and in addition more complex N-nitrosamines probably result from the loss of alKyl or other group.

Q. So, would you agree that it's well-recognized principle that nitrosamines can form if you have a tertiary amine in the nitrite?

A. I -- I --

MS. PENNER: Objection.

THE WITNESS: I have said that before. It's -- you know, it is a -- it's a known chemical pathway, but, as I also said, it doesn't mean that with certain

molecules it is the pathway that -- that happens first because nitrite is a very reactive reagent and if there's a more reactive site it can interact with, it will do that first. So, you know, it's a very -- most of the examples you showed in the previous paper were with very simple amines where there were no other site where -- where reaction could occur. But when you get to more complex molecules, then, you know, the -- those -- nitrite has a choice and it will -- it will react to the most reactive center first, and that's what we see with ranitidine.

BY MS. LUHANA:

Q. All right.

So, we know the facts here, the dimethylamine -- the dimethylamine -- the tertiary amine in ranitidine, the dimethylamine, and nitrite -- the nitrate from the molecule formed to form NDMA, correct?

MS. PENNER: Objection --

THE WITNESS: It's incorrect. There is no nitrite in the molecule. I keep saying that.

BY MS. LUHANA:

Q. It turned into a nitrite, though, correct? It converted to a nitrite to form NDMA, correct?

MS. PENNER: Objection.

THE WITNESS: Not -- not proven. We --

as I say, we haven't elucidated the mechanism completely. It's -- that -- that is -- you know, we're -- we're still speculating on exactly what that pathway is.

Q. The end result is the same, NDMA formation, correct?

A. The end --

MS. PENNER: Objection.

THE WITNESS: -- result is the same, but, you see, all of these papers you are quoting are really irrelevant to the RCA because they all involve reaction with an external source of nitrite, and that is a completely different situation to -- to the ranitidine molecule when there is no external source of nitrite.

So -- and that's why it's not predict -- because you have to, you know, work out how that nitro group can get converted to a nitrosating agent. And as I stated many times, that is not obvious and, you know, there is no one who can, you know, provide a rational explanation even now for how that is happening. And because -- and because of the slow rate it occurs at, it's clearly a highly disfavored reaction. It is not predicted.

BY MS. LUHANA:

Q. Mr. Searle, I assume, as a chemist, you are curious, right? You could have -- looking at, you know, what is well recognized, that a tertiary amine

and a nitrite can come together to form NDMA, you could have at any point, you know, while you have been at GSK since 1982, out of curiosity or just for the safety of, you know, the consumers you are pedaling this drug to, tested how much nitrite was in the pill, how much DMA was in the pill, correct?

MS. PENNER: Objection. Misstates.

THE WITNESS: You make -- you know, that's a very simplistic view, I'm afraid. No. That's -- as I say, no one in GSK until 2019, you know, up -- up until that point, we just said it's not a reason to be predicted impurity because there is no source of nitrite in that molecule, so no one had any reason to do what you're saying.

BY MS. LUHANA:

Q. Did you ever measure it? Did you ever bother testing the pill?

MS. PENNER: Objection.

THE WITNESS: Absolutely nothing to do with me. I can't talk to that.

My first involvement with NDMA and ranitidine was in 2019.

BY MS. LUHANA:

Q. I understand, but once you saw it -- no, it wasn't in 2019. It was in 2010, when you did the

assessment of impurities.

Did you ever at that point test the amount of DMA in the pill, the amount of nitrite or even NDMA looking at this simple chemistry?

MS. PENNER: Objection. Objection.

THE WITNESS: I object to that. I object to -- as I said before, it is not simple chemistry and it's mischaracterizing that chemistry to call it simple. As I said many times, it's highly complex. It's not obvious. It's not simple. There is no obvious grounds to -- to do the testing you suggest because, you know, it's not a reasonably predicted impurity. That's -- that's the position.

BY MS. LUHANA:

Q. So, looking at the ranitidine compound this way, it isn't just chemistry 101 in taking building blocks from the molecule itself to show how NDMA can form?

MS. PENNER: Objection. Asked and answered multiple times.

THE WITNESS: Absolutely not. Absolutely not. That's -- as I say, that's taking this very simplistic view of drawing rings around functional groups, pulling them off and sticking them together. You know, that is not chemistry. That's -- chemistry requires

known exemplified pathways and the reaction that takes five million years to go to completion is not going by -- by an obvious reaction pathway. It is not simple. It's not obvious.

BY MS. LUHANA:

Q. What is this five billion years you are saying from? Is that the Jurong sample that was --

A. That's the --

Q. -- the representative sample and you're concluding from that?

Did you put that equation together in the RCA, by the way?

MS. PENNER: Objection. Multiple questions.

THE WITNESS: Can you restate the question, you know, one by one, please.

BY MS. LUHANA:

Q. Sure.

Does five million year figure that you're putting out there right now, what is that based on?

A. That is based on an extrapolation of the testing we did on the Jurong material, that if it went to .2 parts per million in five years, what does that represent in terms of a molar conversion and,

therefore, just -- and it extrapolated to a hundred percent conversion. It was purely an illustrative number. It was only an estimate just to show the, you know, this reaction is not a viable chemical reaction.

Q. Really? Did you do that equation for the root cause analysis?

MS. PENNER: Objection.

THE WITNESS: I -- I -- I --

BY MS. LUHANA:

Q. Was that your formula, Mr. Searle?

MS. PENNER: Objection.

THE WITNESS: Yes. Yes, it was. Yes.

BY MS. LUHANA:

Q. So, you -- did you calculate in terms of the Dr. Reddy's batches that were examined and how much NDMA was in -- in those batches?

A. Yeah. There was a second calculation based on the highest level we ever detected in a sample.

Q. And -- and you -- you limited that as well, correct? Which Dr. Reddy's batches did you include for the RCA? You created a cut-off, right, timeline? It was someplace -- sometime before April 2017. You looked --

MS. PENNER: Object --

BY MS. LUHANA:
Q. -- you looked at the Dr. Reddy's batches?
MS. PENNER: Objection.
THE WITNESS: We tested the samples that were still available to us through -- through sourcing them from sites around the world. You know, we -- we were limited in our samples of what was still available, simple as that.
BY MS. LUHANA:
Q. So, that -- that cut-off time period for Dr. Reddy's in Saraca was strictly based on availability?
MS. PENNER: Objection.
THE WITNESS: Well -- well, yeah, because once -- once you go past the five-year period of storage, then there is no -- I think there is probably no requirement for sites to continue to store samples because, you know, they are expired samples. So, by and large, that -- you know, that was set at the cut-off because the site wouldn't need to store those samples for longer than that because they are expired.
BY MS. LUHANA:
Q. That wasn't my question.
So, was it based on availability of

samples or the reasoning that you're provide right now?

MS. PENNER: Objection.

THE WITNESS: Well, it was both because the sample -- there wouldn't be many samples that would be other than that because the sites would not retain them any longer, so they wouldn't be available.

BY MS. LUHANA:

Q. That's strange that you say that because Montrose had a sample available that you tested and did not include in the root cause analysis, correct?

MS. PENNER: Objection.

THE WITNESS: They did, but that sample was -- was so old that we have -- and we have no idea about how that sample was stored because it wasn't a retained sample. That was a sample that had been put into a compound storage facility. It actually came from America. We -- so because we -- because it's so old and we had no idea of the storage conditions, no, it was really hard to draw any conclusions from a sample of that age because, you know, we would never be dealing with a sample -- I think it was 22 years old. You know, what's the point? It's -- it's of no -- it's of no scientific relevance because it's so -- so long past its -- its expiring date.

BY MS. LUHANA:

Q. So of scientific relevance to test

and confirm it had 240 parts per million of NDMA but not of scientific relevance to include in the RCA, correct?

MS. PENNER: Objection.

THE WITNESS: We -- as I said, the reason was because there were other samples that also contained those sorts of levels, but we -- we understood, you know, how those samples had been made, how they had been stored and things like that. So, we could rationalize the data, but that was a complete outlier in terms of the -- the RCA.

BY MS. LUHANA:

Q. Mr. Searle, why were you trying to rationalize the data? Didn't the EMA ask you test what you had available and then produce those results?

A. Yeah.

Q. Were you cherry picking data --

A. No.

Q. -- to include in the RCA?

MS. PENNER: Objection.

THE WITNESS: There's absolutely -- they would not have wanted us to include data on -- on batches that were 22 years old because it's irrelevant.

BY MS. LUHANA:

Q. So, if it's irrelevant, why did you test it? It's irrelevant. It was 20 years old. Why

did you test it? But once you found out it had 240 parts per million and it didn't support GSK's narrative, you decided to exclude it, correct?

MS. PENNER: Objection.

THE WITNESS: Well, we -- we excluded it. You are aware of the data. I'm aware of the data. There was no -- we couldn't make any scientific conclusions about that sample because we were not aware of -- it could have been stored who knows where, cold, damp. We -- you know, we weren't able to trace the history of that sample because it was so old.

BY MS. LUHANA:

Q. But it wasn't five million years old, correct?

MS. PENNER: Objection.

MS. LUHANA: Can we please mark as Plaintiff's Exhibit 3131, GSKZAN0000465673.

(Exhibit 3131, GSKZAN0000465673, marked for identification.)

MS. LUHANA: Scroll down, please, John.

BY MS. LUHANA:

Q. So, the email I would like you to look at is the one from Susanne Wings to Anna Ferrari as well as yourself and many others on September 6, 2019.

Mr. Searle. Do you recall this email?

A. Not specifically this long ago.

Q. Do you know, who is Susanne Wings?

A. I -- I don't know who Susanne Wings is, no.

Q. Okay. So, apparently the lower portion of the email is from Susanne Wings to you and many others, and it concerns a SwissMedic investigation.

So, if we can scroll down further to the second page, she has translated the original text from SwissMedic, and then can you read the sentence starting from the following must also be submitted.

MS. LUHANA: John, can you could please scroll down.

BY MS. LUHANA:

Q. I'm sorry. It's the statement two I would like you to start reading right there.

A. Your -- your statement does not address the possibility of NDMA formation using building blocks from the ranitidine molecule itself, including its precursors. On the left-hand side of the molecule, there is secondary amine, which can be activated by the neighboring furan ring and is detachable. And on the right side, nitrogen and formal oxidation study 3 by simple hydrolysis, according to the following sketch, nitrite could be released for nitro sation.

Q. So, this is chemistry 101, correct?
(Simultaneous crosstalk.)
MS. PENNER: Objection.
BY MS. LUHANA:
Q. This is taking building blocks from the molecule itself to show how NDMA can form and here SwissMedic is puzzled at why GSK didn't think of this simple mechanism, correct?
A. We --
MS. PENNER: Objection.
THE WITNESS: We disputed this mechanism with them as being overly simplistic and, again, it was purely a hypothesis that someone had come up with after the discovery was made. That's very important point that no one was doing this prior to that data being generated, and they were speculating. You know, GSK did our own speculating as to potential mechanisms, but the important thing is that no -- no one was doing this until August 2019.
BY MS. LUHANA:
Q. Mr. Searle, is it the regulators and consumers' job to ensure that the product that GSK is manufacturing and selling is safe?
MS. PENNER: Objection.
THE WITNESS: I don't think it's a

regulators' job themselves. They -- they -- they make decisions on safety based on data that's presented to them.

BY MS. LUHANA:

Q. And it's problematic if data is held back, correct?

MS. PENNER: Objection.

THE WITNESS: I'm not aware of data being held back.

BY MS. LUHANA:

Q. Understood. Okay.

Mr. Searle --

MS. LUHANA: You can take this down.

BY MS. LUHANA:

Q. Are you familiar with a 1985 Manchee study called "Radioisotopes Study to Investigate the Metabolic Disposition of Ranitidine to Man"?

A. No.

Q. By the way, there is no reason that you couldn't access older documents, correct, like historic documents at GSK?

MS. PENNER: Objection.

THE WITNESS: Absolutely no reason, but, you know, bear in mind that ranitidine is one of dozens of compounds that GSK manufactures over the years and there would literally be probably millions of documents

associated with them. You know, no one person would be aware of all of those documents.

BY MS. LUHANA:

Q. No. I'm just curious.

If you wanted to access historical documents, you could, correct?

MS. PENNER: Objection.

THE WITNESS: There -- there are archive systems, but the archive is used when there is a reason to do so.

BY MS. LUHANA:

Q. Okay.

But there was no reason to do so when you did your initial investigation of Zantac in 2010, correct?

MS. PENNER: Objection.

THE WITNESS: I've explained before the -- the reason for that explanation and what we did, which was about the identification of colored impurities in solution and, you know, the excellent job that was done to show that this color was due to, you know, trace level ranitidine-related impurities.

BY MS. LUHANA:

Q. So, no reason to do it in 2010.

What about in 2015, was there any reason

to do it then?

A. No. No. Exactly the same difference. As I say, the -- the link between ranitidine in NDMA was not provided, and we weren't made aware of until 2019. And --

Q. I'm sorry.

Who is supposed to provide it to you? Isn't it GSK's responsibility to manage the safety of its drugs that it's putting out on the market --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- where it's billions of dollars, because it's a blockbuster drug that has been on the market for 40 years?

It's someone else's responsibility to manage the safety of the drug and not GSK's? Is that what you're saying?

MS. PENNER: Objection.

THE WITNESS: All I'm going to say is that, you know, the safety was managed during the registration. There was no scientific reason to suspect that NDMA could form as a degradant by -- from the ranitidine molecule. I've stated on the record many times it's not a reasonably predicted pathway. So, you know, there was no reason to go looking for NDMA in those studies

--

(Simultaneous crosstalk.)

BY MS. LUHANA:

Q. Sorry. Go ahead.

A. It was not the -- it was not the -- there was a specific objective for both of those investigations, which -- which we followed.

Q. So, in 2010, you didn't feel a need to look at historical documents when you first got involved with GSK.

In 2015, you didn't feel the need to look at those historic documents.

In 2019, '18 -- '18, '19, when you started the RCA analysis or when the NDMA issue came up in 2018 and, subsequently, in 2019 with your RCA analysis, you didn't feel a need to look at historic documents.

However, in January 2020 you did.

MS. LUHANA: Let's take a look at GSKZAN0000892669.

Can you please mark it as Plaintiff's Exhibit 3132.

(Exhibit 3132, GSKZAN0000892669, marked for identification.)

BY MS. LUHANA:

Q. This is an email from Sebastien DeBarge to you in January 30, 2020, letting you know that he was able to get access to technical docs from back in 1989, correct?

MS. PENNER: Objection.

THE WITNESS: These -- these were technical documents, you know, related to manufacturing -- I think from the manufacturing site in Singapore, I believe, but, you know, it's all a question of, you know, historical documents, you know, are only relevant if they provide some information that informs the RCA.

BY MS. LUHANA:

Q. So, Mr. Searle, you've never gone back and looked at historical documents?

MS. PENNER: Objection.

THE WITNESS: When it -- it became apparent that what we were seeing was a -- a novel phenomenon that -- that, you know, was not -- would never have been reported in historical documents, so there are -- there are -- as I mentioned, we've looked at historical documents on degradation pathways, which are absolutely relevant to this. Historical documents on the nitrosation of chemistry of ranitidine.

MS. LUHANA: Let's go off the record.

THE VIDEOGRAPHER: Going off the record,

the time is 1430 UTC.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 1439 UTC.

Please proceed.

BY MS. LUHANA:

Q. Mr. Searle, before we broke, you were giving testimony about historical documents that you may have accessed and that none of the historical documents provided information on NDMA?

A. I didn't --

MS. PENNER: Objection.

THE WITNESS: I didn't say that. I said there were historical documents that provided information on nitrosation chemistry of ranitidine.

BY MS. LUHANA:

Q. Mr. Searle, can you break that down further?

MS. PENNER: Objection.

THE WITNESS: Well, the -- the principle study I'm referring to was -- was a study that was done where nitrites was reacted with -- with ranitidine to -- to identify the products that were formed. And -- and as I said before, the first site of nitrosation and the second site of nitrosation are at the other end of the molecule

from the dimethylamino group. So, the -- the principal products that formed would not be -- could not lead -- going to lead to NDMA.

BY MS. LUHANA:

Q. What nitrosation study are you taking about?

A. We are talking about --

MS. PENNER: Objection.

THE WITNESS: It's referenced in the RCA. I think it's what we call a Britain publication.

BY MS. LUHANA:

Q. And are you saying it shows NDMA being generated by ranitidine in sodium nitrite?

MS. PENNER: Objection. Completely --

THE WITNESS: That's not --

MS. PENNER: -- misstates his testimony.

THE WITNESS: -- what I said.

It -- it looked at things sort of stoichiometry and -- and there are two -- if you look at the ranitidine molecule, there are three sites where nitrite can react and the site that would lead to the generation of NDMA is -- is the No. 3. So, it's the least likely site of reaction. So, unless you've got what I'll call an excess of nitrite, you wouldn't expect NDMA to form because when you've got these lower amounts of nitrite,

which are more relevant, you get an alternative reaction pathway because of the -- you know, there is a more reactive site in the molecule.

BY MS. LUHANA:

Q. Mr. Searle, did -- is there a -- are there nitrites found in the stomach?

MS. PENNER: Objection.

THE WITNESS: Nitrites can be found in the stomach, but in terms of the RCA, which -- which I'm, you know, talking about, what happens in the stomach is not -- is not relevant because that's -- as I've said before, that's what happens with a -- an external source of nitrite and there is no external source of nitrite in ranitidine.

BY MS. LUHANA:

Q. There is. You just chose not to see it, correct?

MS. PENNER: Objection. Argumentative.

THE WITNESS: The -- the external source means there is nitrite added to ranitidine. That's what I mean by "external source." So, it's you have a reaction -- I mean, break it down very simple terms, if ranitidine is A, nitrite is B, A plus B can give C, but in the case of ranitidine, that cannot be NDMA unless you have a lot of nitrite, but if you take away the nitrite, ranitidine, you

know, will not undergo that reaction --

BY MS. LUHANA:

Q. So, you're -- you're --

A. -- by --

Q. -- focused on it outside the body, not inside the body.

So, you're saying let's ignore the stomach. The fact that, you know -- you know, Zantac is ingested by so many people in the stomach environment and taken and being exposed to nitrite, let's ignore that completely in terms of NDMA forming potentially there. Let's focus on outside the body.

Is that what you're focused on right now?

MS. PENNER: Objection.

THE WITNESS: That was -- that was -- that was the purpose. Our RCA we had identified, you know, detected the presence of NDMA in product before it goes anywhere near the stomach. So, I was asked to do the RCA to understand the presence of that, the NDMA in those ranitidine products. They haven't been anywhere near the stomach.

The relevance of some of those nitration studies to the RCA was that one of the potential root causes that was identified in our brainstorm, amongst many

potential root causes, was that somehow there was nitrite present as an impurity getting into the process, and it was that nitrite reacting with ranitidine that caused the presence of the NDMA, but we studied that and demonstrated quite, you know, conclusively that that could not be the root cause, an external source of nitrite, because when you take ranitidine and you add nitrite to it, you get an instantaneous reaction. It reacts and nitrite is consumed.

And as you will be aware, that profile is completely inconsistent with what we actually observed in the product, which is a very slow formation over time of NDMA. So, you know, the addition of nitrite could not explain that because it would react instantaneously and then be gone because nitrite is a very, very reactive molecule. It will either react or it will be destroyed.

So, that's why --

BY MS. LUHANA:

Q. Mr. Searle, root cause -- sorry. Go ahead.

A. No. That -- so, that was why we considered, you know, the chemistry of nitrite reacting with ranitidine to see if we could learn anything to inform the RCA, but, you know, ultimately, you know, that was not the root cause.

Q. You could have just measured the

amount of NDMA in the pill like you did with, say, Dr. Reddy's batches, which generated 40,000 nanograms of NDMA without adding any nitrite, correct?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. Correct? That's the data, right?

(Simultaneous crosstalk.)

BY MS. LUHANA:

Q. I am focused on the data.

(Simultaneous crosstalk.)

BY MS. LUHANA:

Q. Tell me, honestly.

A. We measured that.

(Simultaneous crosstalk.)

THE STENOGRAPHER: Excuse me. Hold on. Hold on. We have to go one at a time. I'm sorry.

MS. LUHANA: I'm sorry.

BY MS. LUHANA:

Q. Go ahead, Mr. Searle.

MS. PENNER: There is no reason to --

MS. LUHANA: Understood, Kimberly.

MS. PENNER: -- keep asking the same question.

MS. LUHANA: I apologize. We are talking about Dr. Reddy's batch, RCA. I want to focus in

on and I want an answer to this.

BY MS. LUHANA:

Q. Mr. Searle, for the root cause analysis, you tested Dr. Reddy's batches and you found some which had 40,000 nanograms of NDMA on their own without adding nitrite, correct?

MS. PENNER: Objection.

THE WITNESS: That is incorrect. We -- we found batches at 40,000 parts per billion, which is nanograms per gram. It's the units, not nanograms -- it's nanograms per gram in a sample that was a retained sample that was very old and would not have reflected whether that would have gone into the, you know, patient from a drug made from that batch, but that just illustrated sort of the other end of the spectrum in terms of formation of NDMA in batches. So, we knew that was there, but what we had to then, you know, figure out was, you know, why was it, you know, forming over time rather than an instantaneous reaction. So, that was just a data point amongst, you know, hundreds of data points we got in the testing.

BY MS. LUHANA:

Q. Understood.

Those batches were not expired, correct, those Dr. Reddy's batches that I'm citing? Because API lasts for five years. So, those were unexpired batches

that tested for 40,000 nanograms of NDMA. By just simply running a test, you could have, you know, tested the simple chemistry there and just tested the pills and found NDMA.

(Simultaneous crosstalk.)

BY MS. LUHANA:

Q. GSK never did that until the root cause analysis, correct?

MS. PENNER: Objection. Misstates.

THE WITNESS: I will point out that -- you know, that was one sample that was tested as part of our testing. There was lots of samples done in 2019, you know, several years after that batch was manufactured. We would, obviously, not have been testing anything earlier on because, as I've said many times, it was only in 2019 that the -- the link to NDMA was -- was something that -- that we had to -- to study. It was just a data point in the RCA.

BY MS. LUHANA:

Q. Brought to your attention by regulators, correct?

MS. PENNER: Objection.

THE WITNESS: Well, you -- you've shown the SwissMed communication. So, we received communications, yes.

MS. LUHANA: Let's mark Exhibit 3133, GSKZAN0000369313.

THE VIDEOGRAPHER: I believe this was previously marked as Exhibit 288.

MS. LUHANA: Okay.

So, let's use that number.

(Exhibit 288, GSKZAN0000369313, marked for identification.)

BY MS. LUHANA:

Q. Mr. Searle, this is the Broom/Manchee study. It's called a "Radioisotope Study to Investigate the Metabolic Disposition of Ranitidine in Man." The report number is WMH/85/013, and the date of issue is March 1986.

Have you ever seen this study previously?

A. No.

Q. Can you please turn to page -- it's ending -- it's page 13.

MS. PENNER: Roopal, is there someone in the room with you?

MS. LUHANA: Yes.

MS. PENNER: Someone who is on camera?

MS. LUHANA: He doesn't have to be. It's -- it's Mr. Chaffin.

MS. PENNER: I was under the assumption that all attorneys in the room needed to be on --

MS. LUHANA: With the witness. You can take a look at the order.

MS. PENNER: I have taken a look at the order.

MS. LUHANA: It's only the --

MS. PENNER: I think it would be only fair if Mr. Chaffin were on camera.

MS. LUHANA: He doesn't have a camera, but he will be examining the witness later, so he will have an opportunity to be on the camera then.

BY MS. LUHANA:

Q. Mr. Searle, is it fair to say that you didn't consider this when you did the root cause analysis?

MS. PENNER: Objection, vague.

THE WITNESS: I didn't consider it because, you know, certainly from what's on the screen, I can't see the relevance to the RCA.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: Let's go to page 13. It's 369328, down to the Conclusion, Mr. Searle.

Can you read the last sentence of the

conclusion, Mr. Searle.

A. This study has also identified the furoic acid analogue of ranitidine as a minor metabolite in man and has excluded the presence of any further major metabolites in urine.

Q. Great.

MS. LUHANA: And if you go to page 18.

BY MS. LUHANA:

Q. So, Mr. Searle, you take that to mean that the furoic acid analogue of ranitidine was detected as a metabolite in the urine, right, of those who took ranitidine?

MS. PENNER: Objection.

THE WITNESS: I think it's gone -- it's gone from my screen now.

BY MS. LUHANA:

Q. But that's what you read, correct?

A. Yes.

MS. LUHANA: You can put it back on the screen, John.

THE WITNESS: Yeah.

BY MS. LUHANA:

Q. And this was a radioisotope study, correct?

A. Yes.

MS. PENNER: Objection.

MS. LUHANA: And can you go back to -- can you go to page 18? Can you turn that around.

John, can you please turn that table around? I don't know if you can.

THE VIDEOGRAPHER: I'm working on it. Sorry.

MS. LUHANA: Okay. That's okay.

MS. PENNER: Is this a document we can pull a hard copy for?

MS. LUHANA: I don't know if it's -- right there. There you go.

BY MS. LUHANA:

Q. Mr. Searle, as you can see, these are the four participants in the study and the furoic acid analogue is measured as a percentage below, and they found up to 2.2 percent of it in the oral dose -- I mean, in the urine, the furoic acid for 1504, for example. 1.8 percent for participant 1502; .8 for participant 1406; and 1.1 for participant 1505.

So, this is in 1985, Glaxo found the furoic acid metabolite in ranitidine by HPLC in human urine from a study of healthy male volunteers who received 150 milligrams of radio-labeled ranitidine.

Mr. Searle, finding the furoic acid

analogue of ranitidine in urine in humans confirms that ranitidine underwent oxidative decontamination releasing the dimethylamine group, correct?

MS. PENNER: Objection. Lack of foundation and please feel free to review the document if it might help answer.

THE WITNESS: Well, I doubt this document would have the specific detail, but it doesn't -- you're speculating on the mechanism there. We don't know the mechanism and -- and, anyway, it's a metabolism. So, it's not -- a metabolism of the drug in vivo is -- is not relevant to the drug outside the body being stored because there are, obviously, enzymes and all sorts of things involved. So, this is just not a relevant piece of data to the RCA.

BY MS. LUHANA:

Q. Really? So, let me get this straight.

So, the furoic acid, the furan ring is attached to the dimethylamine, and it's breaking off. It's disassociating and the dimethylamine is free to meet with a nitrite to form NDMA.

However, you find that to be relevant?

A. No. That's --

MS. PENNER: Objection.

THE WITNESS: That's complete speculation on chemistry. You -- you -- you've just said -- the only thing we know about that chemistry is the formation of the furoic acid analogue. We don't know the form in which the -- the dimethylamino group comes off, but, you know, one thing I can note from -- from this table is they also mention there is methyl ranitidine. So, that's a -- that's a compound where one -- one of the methyl comes off first. Now, if -- which is probably suggesting that the pathway undergoes is actually not what you're talking about. That is a stabilized pathway that demethylates first. And then if it goes again, it will release methylamine, not dimethylamine, and -- and that would not form a nitrosamine.

So, you know, it's pure speculation what you're saying. There is absolutely no basis to say that because the furoic acid is there, there is dimethylamine formed. And, you know, further to that, even if there was dimethylamine formed, you know, the point that I keep coming back to is where is the source of nitrite?

Okay. There is -- there is no source of nitrite in -- in -- in ranitidine.

BY MS. LUHANA:

Q. It's in the stomach. It's in saliva. Correct? But that's -- that's --

A. But it's --
Q. -- strike that.
Withdraw that.
A. It's in the -- it's in the urine.
MS. PENNER: What's the question?
BY MS. LUHANA:
Q. So, do you agree with me the study shows that the furoic acid analogue is showing up in the urine and disassociating from the dimethylamine group?
MS. PENNER: Objection.
THE WITNESS: We have -- we have cleaved off that term "nitrogen," but, you know, to say being cleaved off to form dimethylamine is pure speculation and the data, the evidence on the screen there, is that the pathway is probably not that because, you know, why else would you get the dimethylamine ranitidine, because you've cleaved off one methyl there. So, you know, that is pure speculation and -- and, you know, it's not relevant to what happens in the -- the API because, you know, this is done by enzymes. This is in vivo. This is metabolism. And, you know, what happens to drugs through metabolism, you know, it can be completely different to -- to chemistry.
BY MS. LUHANA:
Q. Oh. That sounds like that siloed approach yet now again. You're talking about API.

This is finished postranitidine that was given to volunteers. They tested their urine. They found furoic acid. They knew that the dimethylamine disassociates from the furoic acid. However, you're saying that's not accurate?

A. That's not --

Q. Is that your testimony?

A. My --

MS. PENNER: Objection.

THE WITNESS: What I'm saying, it's my testimony is you're saying it proves dimethylamino comes off. There is nothing in this report that states -- state that. The mechanism by which you get to the furoic acid analogue could be completely different. So, you know, there is a leap being made there in that data.

BY MS. LUHANA:

Q. Did you test it? Did GSK test it in 1985? Did they test for DMA?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. In the pills, did they test for it?

A. I don't know.

MS. PENNER: Objection.

THE WITNESS: I don't know.

BY MS. LUHANA:

Q. And did you do your homework previously in 2010 when you became lead chemist, on these investigations with discolored pills and impurities by reviewing the study beforehand?

A. This --

MS. PENNER: Objection.

THE WITNESS: This study has no relevance to that work. This is -- what -- what is the relevance of -- of metabolism occurring in the urine compared to a solution of ranitidine in water? You know, it's -- they are completely different situations.

BY MS. LUHANA:

Q. It wasn't just the IV. It was oral doses given as well. So, that's a separate point.

It just shows you that the dimethylamine is free to form and meet with a nitrite to form NDMA. However, you choose not to see that, and that's your decision, Mr. Searle.

A. Well, I --

MS. PENNER: Roopal, that was another speech that completely misrepresents his testimony --

MS. LUHANA: I withdraw it.

MS. PENNER: -- and you are totally --

MS. LUHANA: Kimberly, I withdraw it, please.

MS. PENNER: -- misrepresenting what he said.

MS. LUHANA: Let me -- let me withdraw it.

BY MS. LUHANA:

Q. Mr. Searle, did you know that Manchee was never produced to the FDA until 2019?

MS. PENNER: Objection.

THE WITNESS: I have no knowledge of that whatsoever.

BY MS. LUHANA:

Q. Would you agree that this confirms that the DMA is cleaved off to encounter a nitrate to form NDMA?

A. Absolutely not.

MS. PENNER: Objection.

THE WITNESS: Absolutely not. There's not one piece of evidence in this report that will say that. It doesn't mention nitrites and it doesn't mention dimethylamine. So, sorry, that -- you know, that's -- that's my testimony about this report, and -- and, please, that's how I want it recorded.

MS. LUHANA: You can take this down.

John, what exhibit number was that, the Manchee study just now?

THE VIDEOGRAPHER: That was previously marked Exhibit 288.

MS. LUHANA: Okay.

So, we are at 3133, correct, John?

THE VIDEOGRAPHER: Correct.

MS. LUHANA: Okay.

Can we please mark 3133. It's SANOFI_ZAN_MDL_0000267964.

This is a Sanofi presentation: Potential presence of NDMA in Ranitidine products, Product Alert Decision committee, dated October 15, 2019.

John, can you please turn to page 9 -- actually, page 8 first.

(Exhibit 3133, SANOFI_ZAN_MDL_0000267964, marked for identification.)

BY MS. LUHANA:

Q. Mr. Searle, can you please review this slide? Can you read the second bullet point?

A. In theory, if NDMA is produced, it would result from N-nitrosation of DMA, which could be released during RNTD biotransformation through dealkylation oxidative deamination process.

Q. And then the next bullet point.

A. This specific metabolic pathway leading to furoic acid metabolite --

Q. Above that.
A. In this case, the counterpart should -- furoic acid should be released as well.
Q. So, you disagree with this mechanism, Mr. Searle?
MS. PENNER: Objection.
THE WITNESS: I will point out the first words, "in theory." It's a -- it's a theoretical pathway, but, again, it's endogenous. It's endogenous, which is not -- this is not what would happen in -- in the API.
BY MS. LUHANA:
Q. We're not focused on the API. We are focused on Zantac, which means the API, which means the finished dose and if this was truly a theory, this was a theory that was known to GSK in 1985, kept from the FDA. However, GSK didn't investigate that there in 1958, correct?
MS. PENNER: Objection.
THE WITNESS: I can't comment on what GSK or Glaxo did in 1985. I was not involved in it.
BY MS. LUHANA:
Q. Did anyone ever tell you about the Manchee study and this potential mechanism?
MS. PENNER: Objection.
THE WITNESS: No.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: Can you go to slide 9?

BY MS. LUHANA:

Q. Can you read the bullet point -- its, I guess, bullet point 5? It starts with human ADME.

A. A human ADME study with radiolabeled 3H RNTD seems to have been performed (Manchee GR, et. al, Abstracts of the European Drug Metabolism Workshop 1986) were the formation of furoic acid has been observed (article not retrieved so far, study in the initial IND or IB probably but not retrieved as well.)

Q. And what's the next bullet point? Can you please read that?

A. In the light of this information, the formation of DMA from RNTD by metabolism cannot be ruled out.

Q. And so my question to you is: Did you or GSK ever test and rule this out in 1985 or thereafter?

MS. PENNER: Objection.

THE WITNESS: I can't -- I can't answer that question. As you know, I was not involved in ranitidine in 1985.

BY MS. LUHANA:

Q. And if they had, what would they have found?

MS. PENNER: Objection.

THE WITNESS: I -- I don't want to speculate.

MS. LUHANA: Okay. You can set this aside.

BY MS. LUHANA:

Q. In fact, Mr. Searle, it seems like as a lead chemist, you saw these building blocks with the molecule and chose to ignore them.

Is that correct?

MS. PENNER: Objection.

THE WITNESS: Completely incorrect, as I've said before. There is no building block for the nitrosating agent in that molecule. There has to be some chemistry that is unprecedented and unknown to -- to get to that point.

BY MS. LUHANA:

Q. Who is the holder of all of that information for all of these years?

MS. PENNER: Objection.

THE WITNESS: I -- I don't even understand the question.

BY MS. LUHANA:

Q. Well, who had access to all of this information to test it, to test it --
A. Well --
Q. -- to investigate it, to test if there are genotoxic carcinogens in this product and ensure that there aren't any before they manufactured and sold it to consumers?
Who -- who has access to that information?
MS. PENNER: Objection.
THE WITNESS: I don't know -- I don't understand your question. I don't know the answer.
BY MS. LUHANA:
Q. Well, who has a duty to investigate the safety of the products itself?
MS. PENNER: Objection.
THE WITNESS: As I stated before, you know, studies were done when -- when the drug was registered, to assess the safety of -- of the drug and they were filed with the regulators and the drug was approved.
In -- in terms of safety, ultimately, safety is the responsibility of toxicology, pharmacovigilance. You know -- it's not -- you know, I'm not a safety expert.
BY MS. LUHANA:

Q. So, toxicologist and pharmacovigilance in -- at GSK?

A. Well -- well, they would be --

Q. Correct?

A. -- they would be assessing, you know, if there is any data coming in that suggested any issues with toxicity of the drug.

That's -- that's their job.

Q. It wasn't your job?

MS. PENNER: Objection.

THE WITNESS: In those days, no, of course not. I was a chemist.

BY MS. LUHANA:

Q. When did it become your job?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. Isn't it your job to assess nitrosamine carcinogens in products and create a limit --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- limit or remove the genotoxic carcinogens?

Isn't it a part of your responsibility?

MS. PENNER: Objection.

Which question would you like him to answer?

THE WITNESS: My -- my job, as I've stated specifically on -- on, you know, ranitidine was -- was to, you know, investigate the presence of -- of NDMA in -- in ranitidine.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: Let's mark 3134, GSKZAN0000229569.

(Exhibit 3134, GSKZAN0000229569, marked for identification.)

MS. LUHANA: As well as the attachment as 3135, it's GSKZAN0000229575.

(Exhibit 3135, GSKZAN0000229575, marked for identification.)

THE VIDEOGRAPHER: Can you say the last three again?

MS. LUHANA: Of the second one or the first one?

THE VIDEOGRAPHER: Second.

MS. LUHANA: It is 575.

BY MS. LUHANA:

Q. Mr. Searle, Exhibit 3134 is an email from you to Brian Neill and cc'ing --

A. Yes.
Q. -- Giuseppe Whelan on July 24, 2019, correct?
And you're attaching the Zeng/Mitch paper, correct?
A. Yes.
I mean, can I say on the record now that --
Q. You can review the document.
A. -- the -- the Zeng and Mitch paper has been -- has been withdrawn.
Q. Yeah, I understand that.
A. So --
Q. But at this time it wasn't withdrawn, correct?
A. It wasn't withdrawn.
Q. And in 2016, when it came out, it wasn't withdrawn then, correct?
A. I wasn't aware of it being published in 20 -- 2016. This was, you know, the first time I would have been aware of it.
Q. So, Zeng and Mitch was just brought to your attention in 2019 and not 2016, when it was published?
A. Yes.

MS. PENNER: Objection.
THE WITNESS: Yeah.
Why -- why -- there is no reason for me to be made aware of it in 2016. It's -- again, it's a paper that describes a finding that's happening, you know, in vivo and would not have been relevant to -- to my job at the time.
BY MS. LUHANA:
Q. So, Mr. Searle, your only concern about NDMA developing in the API and not necessarily NDMA developing in the finished dose product? Is that what you're saying?
MS. PENNER: Objection.
THE WITNESS: Concern is the wrong word, but, you know, there would be -- there would have been absolutely no reason for someone like me in the job that I did to be made aware of publications in the area of, you know, drug metabolism. It's -- it's simply not -- would not have been my job to be involved in it. This, again, is a -- you know, a finding for safety and toxicology.
BY MS. LUHANA:
Q. Mr. Searle, do you know why Zeng/Mitch was retracted?
A. I believe because the -- again, they -- they -- they used an inappropriate analytical

method that effectively caused the NDMA to form rather than it being there in the first place. So, it's very similar to the Valisure issue.

Q. Do you understand that was the FDA-approved method at the time, to use GC-MS?

MS. PENNER: Objection. Misrepresents the state of the ARC.

MS. LUHANA: Objection -- Kim, please. Let me continue my examination. You can object to scope.

MS. PENNER: I'm not stopping you. Go ahead.

THE WITNESS: It may have been the FDA method at the time, but, you know, you have to understand that, you know, these specific trace methods for analyzing molecules like this, you know, are -- are very -- not easy to develop and, you know, there was a clear learning there that something like GC, if not done properly, you know, because of the extreme temperatures involved, can -- can effectively lead to a false positive result, which is what happened in -- in this case.

BY MS. LUHANA:

Q. It's because ranitidine is heat labile, correct, so it reacts to the extreme temperatures in creating NDMA. However, it still gives notice to GSK that NDMA is being generated from

ranitidine; correct?

MS. PENNER: Objection.

THE WITNESS: Chemistry that occurs under those conditions is -- is really extreme and something that no one has ever done, and I'd be really interested to see this done, is they measured NDMA in those samples. What else was actually left behind? Because I suspect that that temperature has caused just gross degradation of this molecule completely because, you know, you're effectively almost burning the molecule at those temperatures. So, you know, it's not a relevant analytical technique and a relevant finding, and, you know, that's why these -- this paper is withdrawn. That's why, you know, even the Valisure paper, they -- they redesigned their method.

BY MS. LUHANA:

Q. Mr. Searle, the Zeng paper was published in 2016, found NDMA. Your root cause analysis in 2020, four years later, as the maker of Zantac, ultimately, concluded there were tens of thousands of micrograms of NDMA -- I mean, nanograms of NDMA in ranitidine, yet you're choosing to criticize Zeng and Mitch for finding it at that point?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. Is that what you're doing?

MS. PENNER: Objection.

THE WITNESS: I'm not criticizing them, but this, again, you know, is a study of what happened after the drug was administered, not what -- this is not talking about what was present in the drug substance before it was administered. And, you know, even before, this -- you know, it was refuted, you have to ask questions about dimethylamine.

Was it actually coming from the ranitidine or could it be dimethylamine, which was endogenous itself. You know, so there is a lot of questions about -- about that because, you know, dimethylamine might be present as an endogenous substance itself and have nothing to do with ranitidine.

BY MS. LUHANA:

Q. Right.

It would cause a responsible drug company to test its product, right, to confirm that --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- NDMA is not being generated, correct?

MS. PENNER: Objection.

THE WITNESS: But it's a different --

it's a different scenario. The -- you know, the in vivo finding is -- is -- is different to, you know, testing your -- your product before you administer it. They are separate things.

BY MS. LUHANA:

Q. Mr. Searle, the end result is the same. You're creating a genotoxic carcinogen. Whether it's outside the body or in the body, it's still, at the end of the day, a genotoxic carcinogen that's being generated, correct?

MS. PENNER: Objection. Misstates.

THE WITNESS: I -- I -- yeah. I -- it's not a -- it's only a suspected carcinogen, so I -- I -- you know, I can't -- I can't agree with your statement at all.

BY MS. LUHANA:

Q. We went through this previously. GSK, in all of these documents, has admitted its a genotoxic -- genotoxin nitrosamine.

Are you okay with that term?

MS. PENNER: Objection.

THE WITNESS: I mean, the -- the most important thing is that it's not a hundred percent conclusively proven that it's a carcinogen in -- in humans. That's the most important fact there.

BY MS. LUHANA:

Q. So, this was the first time you were seeing the Zeng article, in July 2019?

A. Yes.

Q. Okay.

And were you troubled at that time reading this article, as being the lead chemist, in finding that a genotoxic carcinogen was being generated; or did you think to yourself, oh, I only deal with the API and this is in vivo?

MS. PENNER: Objection. Misstates.

THE WITNESS: Well, as I said before, this -- yeah, this was not, you know, my responsibility to -- to assess the findings of that paper and -- and, you know, determine whether it's actually a relevant publication or not. So, it wasn't my responsibility because this is a toxicological DMPK issue. It's not a chemistry issue.

BY MS. LUHANA:

Q. You are the subject matter expert, as you've written on your résumé, on genotoxic risk assessment, and you're saying this isn't my problem. This is someone else's problem. Correct?

MS. PENNER: Objection.

THE WITNESS: Genotoxic risk assessments

as they are, you know, linked to -- to the API and the product we make, not, you know -- something that happens in vivo is a completely separate area. You know, my -- you know, my expertise is in, you know, can there be genotoxic impurities in the active ingredient, not what happens in vivo, you know, with, you know, generation of metabolites and things like that is a completely separate area of expertise. I'm not a subject matter expert in that at all.

BY MS. LUHANA:

Q. So, when you saw this, did you take action and test the Zantac API for NDMA at that point, because that is your area?

MS. PENNER: Objection.

THE WITNESS: Well, we -- we did fairly soon after that, yes. I mean, do you -- that was July, August, 2019. By September 2019, we were testing API --

(Simultaneous crosstalk.)

BY MS. LUHANA:

Q. Three years after Zeng -- three years after came out, correct?

A. No. After --

MS. PENNER: Objection.

THE WITNESS: After I was aware of it. As I say, 2016, that paper, you can't ask me about because I was never aware of it.

BY MS. LUHANA:

Q. But once you became aware of it, you took it upon yourself to test the API for NDMA?

MS. PENNER: Objection.

THE WITNESS: Things escalated fairly quickly in this area, and this -- this finding and the SwissMedic finding were -- you know, occurred at almost the same time. And we did take it upon ourselves, not me personally, but, you know, I was intimately involved with arranging for the testing to -- to -- to start up, yeah. By September, we were -- we were testing samples.

BY MS. LUHANA:

Q. Is there anything that prevented GSK from testing samples when Zeng came out?

MS. PENNER: Objection.

THE WITNESS: I -- I can't answer that question.

BY MS. LUHANA:

Q. Is --

A. I would say it's -- it -- I don't know who reviewed that paper when it came out and -- and what. So, you would have to ask experts in that field that question.

Q. Whose responsibility would it be at GSK --

MS. PENNER: Objection --
BY MS. LUHANA:
Q. -- to take action once they find NDMA coming out of the product?
Who is responsible to test?
MS. PENNER: Objection. Objection.
THE WITNESS: Well, I object to the phrase you've used "coming out of the product," because that was clearly not what was happening in that, you know, Zeng and Mitch study. It was not NDMA coming out of the product.
All we -- all that was saying was dimethylamine was coming out of the product.
What was the source of nitrite in that study then? I don't know, but it -- I know it wasn't coming out of the product, but whose responsibility is it? It would have been either someone in toxicology, I would think --
(Simultaneous crosstalk.)
BY MS. LUHANA:
Q. We're coming full circle here. Now you're seeing -- now someone tested DMA actually, the dimethylamine, and you see that coming out, and that was used -- they used LC-MS then, right, with the -- the Zeng/Mitch study, correct?

MS. PENNER: Objection.

THE WITNESS: I'd have to check, but DMA -- DMA is -- but the thing about the DMA, as I said before, we -- we don't even know it was coming out of the molecule. It could have been endogenous DMA. I mean, I believe substances like DMA may -- like to be present in urine anyway, nothing to do with ranitidine. So, you know, the detection of DMA, you know, could -- could be, you know, nothing to do with Zantac at all.

BY MS. LUHANA:

Q. Well, you can say that. However, if you reviewed the article, you know there was a control group that didn't have it in the urine versus the group that did receive ranitidine and did have DMA in its urine. So, in fact, it does disassociate and show up in the urine, Mr. Searle.

Did that surprise you when you read that article?

MS. PENNER: Objection.

THE WITNESS: As I say, I'm not the person to be questioned on the detail of that study because, again, it's an in vivo study. It really didn't -- it didn't significantly inform the RCA. We did because we, obviously, considered, you know, the formation of DMA as -- as one of the things in the RCA anyway.

BY MS. LUHANA:

Q. Three years later, correct?

MS. PENNER: Objection.

THE WITNESS: I object to that. I would say the RCA kicked off, you know, within a month of that -- me being made aware of that paper.

BY MS. LUHANA:

Q. Mr. Searle, for the RCA, you did test finished dose product, correct?

A. We -- I mean, the original reason for testing it was because we were asked to provide data to the regulators as part of the Article 31 process. That -- so -- so, that was the thing that initially kicked off that -- that testing.

We also, you know, looked at that data in the context of the RCA, but the RCA, I think, is very clear that the actual root cause sits not with the finished product, but it's something that starts with the -- the active ingredient.

Q. But I'm just curious because you've continued to say the API is, you know, only in your purview, not the finished dose, but you are the author of the -- the lead author on the root cause analysis, and you tested finished dose product and made it your business for the RCA, correct?

MS. PENNER: Objection.

THE WITNESS: We included the data on the -- the finished product in the RCA, but there -- there is a section in the RCA that -- that states, you know, based on our initial assessment, of what was going on. You know, there was overwhelming evidence that the root cause sat with the active ingredient. The levels that are present in the finished dose are essentially a consequence of what would have been in the active ingredient at the time that the finished dose product was manufactured, but there were no additional sort of processes going on in the finished dose product. Everything was just an extension of what was happening with the active ingredient.

BY MS. LUHANA:

Q. However, you didn't test the finished dose product far out enough. You didn't have it for weeks, months on end to see how much NDMA was being generated, right?

MS. PENNER: Objection.

THE WITNESS: We -- we did do an accelerated stability study on finished dose product --

BY MS. LUHANA:

Q. According to --

A. -- and -- and we -- yeah -- and we saw findings that were totally consistent with the --

with the active ingredient.

We saw very similar profile and trends.

Q. And you selectively chose the ones to do accelerated testing on, according to your own parameters, and not what was required by the EMA, which specifically said, "Test at stress stability conditions of," you know, "40 degrees Celsius, 75 percent relative humidity, but you didn't test under those conditions at all, correct, for the RCA?

MS. PENNER: Objection. If you're going to talk about a document, please put it up for the witness.

THE WITNESS: I -- I -- we -- we actually tested at more extreme conditions than that in that accelerated stability study.

BY MS. LUHANA:

Q. Not real world conditions, correct?

A. And -- and the reason for that was because by that point, you know, we had sufficient evidence that said the root cause was something happening in the drug substance.

Q. We will get to that.

MS. LUHANA: Let's mark Exhibit 3136, GSKZAN0000149970.

(Exhibit 3136, GSKZAN0000149970, marked for identification.)

MS. LUHANA: This is an addendum to a prior submission by GSK to the FDA on December 11, 2019, and the last Bates number is 149986.
BY MS. LUHANA:
Q. Mr. Searle, are you aware that GSK represented to the FDA in its November 2019 submission that it didn't test for NDMA specifically by combining sodium nitrate with ranitidine and simulated gastric fluid?
A. I'm not --
MS. PENNER: Objection.
THE WITNESS: I'm not aware of communications made between GSK and the FDA.
BY MS. LUHANA:
Q. Okay.
MS. LUHANA: Let's take a look at page 2 -- or actually, it ends in 149980. So, you have to scroll down some.
Okay. Right there.
BY MS. LUHANA:
Q. I believe it starts on August 6, 2019.
Can you read that, that paragraph?
A. So -- say that again. Which one?
Q. The third paragraph.

A. Okay.

On August 6, 2019, in an email, the FDA had requested for information on N-nitrosodimethylamine, for an assessment of the available data in relation to NDA018703, Zantac tablets. In this request, FDA had asked the question "Have you tested Zantac tablets in simulated human body conditions (including gastric conditions)? If you have, have you detected NDMA? If you did, what were the levels observed?"

Q. Okay.

MS. LUHANA: And if you scroll down further.

BY MS. LUHANA:

Q. GSK provides its response, it's the fourth paragraph, the last sentence there, however.

A. The information recently, that one?

Q. Yeah. It is GSK and its response, that paragraph. It's that last sentence I would like you to read.

A. Okay.

However, GSK mentioned that there was no analysis for NDMA in these studies as NDMA would not have been predicted to form given the structures of the observed nitrosation products.

Q. So, do you see that GSK didn't

provide a very relevant study to the FDA?

MS. PENNER: Objection.

And I remind you if you need to read more of the document, feel free.

THE WITNESS: As -- as I said before, I'm not aware of, you know, the communications that took place between GSK and the -- the FDA.

BY MS. LUHANA:

Q. But based on a review of this document, you see that GSK didn't provide something in its root cause analysis and had to amend its response, correct?

MS. PENNER: Objection.

THE WITNESS: Yeah. This is --

BY MS. LUHANA:

Q. You can take your time and review the document.

A. Yeah. But this is not relevant to my root cause analysis. Again, in terms of nitrous acid and -- and human gastric juice is -- you know, that's -- again, that's something that happens, you know, postdosing of the drug.

Q. Have you looked at the Tanner study, Mr. Searle?

A. Yes, I have.

Q. When did you review it?
A. I couldn't give you a date, but I -- it would have been sometime in the sort of probably fourth quarter 2019.
Q. And was that your first time reviewing it?
A. Yes.
Q. What were your first thoughts when you reviewed the Tanner study?
A. My -- my thoughts on the Tanner study are that -- again, it's similar to something I said before. When you -- when you look at some of the conditions that were used, they -- they were utilizing excess amounts of nitrite in that study, which forced reactions to occur that -- that would not have occurred had they -- you know, when you operate at the physiological conditions. So, NDMA was detected under super physiological conditions because the amount of it -- nitrite was added was 3, 4 molar equivalents. And when you add that much nitrite, then that allows the third of the three reactions I mentioned before when nitrite interacts with ranitidine to start to occur. But, you know, if you add the physiological concentration of nitrite, which was one of the experiments, NDMA was not detected.

MS. LUHANA: Can you please take this document down.

BY MS. LUHANA:

Q. So, you reviewed Tanner in 2019. And you had no concern that there was a genotoxic nitrosamine, NDMA, specifically in a drug, Zantac, taken by infants, pregnant women and millions of others?

MS. PENNER: Objection.

THE WITNESS: You -- there is no evidence that -- from the Tanner study that -- as I said before, the Tanner study is actually a good study because it shows that on the physiological conditions, NDMA was not forming. It was only when the reaction was loaded up with an excess of nitrite that it was observed. So -- and that's entirely consistent with the other study I've discussed in terms of the site of reaction of -- of nitrite with ranitidine. So, to me, there's a very clear, consistent picture between those two studies, and, actually, it's -- it's saying that the NDMA risk is not there in physiological conditions.

MS. LUHANA: Can we please bring up Exhibit 264, which is the Tanner study.

(Exhibit 264, Tanner Study, marked for identification.)

Can you please go to page 2.

BY MS. LUHANA:
Q. Mr. Searle, I would like you to read the introduction. You have to scroll down. Sorry. It's 84997, that first paragraph there.
THE WITNESS: The dimethylamino groups of aminopyrine and oxytetra-cyclin react with nitrite under conditions to yield N-nitrosodimethylamine.
The mechanization of nitrosation of tertiary amines has been discussed, (Singer 1980.)
BY MS. LUHANA:
Q. So, agree then it's well recognized as far back --
A. Yeah.
Q. -- as 1982 that nitrosation --
A. Yes.
Q. -- can occur when you have a tertiary amine and nitrate, correct?
MS. PENNER: Objection.
THE WITNESS: Yeah.
THE STENOGRAPHER: Can I just have one second?
Mr. Searle, just do me a favor and wait until the question is asked and the question is put on the record before you start.
Thank you.

THE WITNESS: Can you repeat the question again?

BY MS. LUHANA:

Q. Do you agree that it's well recognized even as far back as 1982 that nitrosation can occur when you have a tertiary amine and nitrite?

A. This is something we've covered already. Yes, it's a theoretical reaction that is possible.

Q. Okay. And the theoretical reaction that it's possible, the next thing, once you identify that risk, is to test, correct?

MS. PENNER: Objection.

THE WITNESS: What -- this -- this reaction was -- well, this study was done to -- to -- to assess this risk and as -- as -- as it states later on in the physiological conditions, which is the -- in that second half of that paragraph, further incubation experiments simulated the drug and nitrite concentrations anticipated in the human stomach after a nitrite-rich meal, and they were the relevant studies because there we have 1 mM of ranitidine and only .3 mMs of nitrite. So, there's only, you know, 30 percent whereas the experiment where -- where NDMA was seen, there is, I think, a four-fold excess of nitrite there.

BY MS. LUHANA:
Q. Did you look at the underlying study that Tanner is citing for that .3 mM and how many participants were in that study?
MS. PENNER: Objection.
THE WITNESS: No.
BY MS. LUHANA:
Q. Okay.
And do you see here it says, "The NDMA content was determined by gas chromatography-mass spectrometry"?
A. Yes.
Q. So, we know it was available in 1982, correct?
A. I believe I stated that earlier, yes.
Q. Okay.
MS. LUHANA: Let's go to page 6.
BY MS. LUHANA:
Q. Can you review that second paragraph and -- and read it out loud for the jury?
A. When ranitidine (10 ml, 10 mM) was incubated with sodium nitrate (40 mM) under the conditions of the WHO NAP test. 232ug NDMA were formed (corrected for 62 percent recovery) equivalent to a 3.1 percent yield based on ranitidine.

Q. You can stop there.

So, Tanner mixed in ranitidine with 40 mM of sodium nitrite and found 232 micrograms of NDMA, correct?

A. Yes.

Q. So, how many nanograms is that, Mr. Searle?

MS. PENNER: Objection.

THE WITNESS: Multiply by a thousand.

BY MS. LUHANA:

Q. So, 232,000 nanograms of NDMA were generated, correct?

A. Correct.

Q. Isn't it surprising that, you know, GSK, back then in the '80s knew about Tanner, yet you being the lead of the genotoxic risk assessment team didn't know about NDMA until, what, 2018?

MS. PENNER: Objection.

THE WITNESS: You're -- you're -- you're picking out a piece of data from this report to -- to suit what you want -- the point you want to make here. And the point is there are 10 mM ranitidine, 40 mMs of nitrite and the other conditions. There's a lot of nitrite there. The relevant part of this study is the final paragraph, which -- which is physiological conditions. There --

BY MS. LUHANA:

Q. Based on -- based on a report, the underlying report you haven't reviewed.

So, okay, the physiological conditions --

A. Well, I'm --

Q. -- allegedly is .3 mM, correct?

MS. PENNER: Objection.

THE WITNESS: I'm --

BY MS. LUHANA:

Q. So --

A. -- not an expert in that area, so I -- but I know this has been reviewed by people who are, and they -- and they would support that those conditions are -- are right.

MS. LUHANA: Can you -- can you take this down?

BY MS. LUHANA:

Q. So, GSK used .3 mM and then 40 mM and 40 mM generated 232,000 nanograms of NDMA.

However, as a chemist, wouldn't you agree that there's a dose response range.

So, why didn't GSK test that .5 mM, 1 mM, 1.5 mM, 2 mM? Do you know if that test was ever done?

A. I don't --

MS. PENNER: Objection.

THE WITNESS: I don't know.

BY MS. LUHANA:

Q. Why wouldn't you do that? It's a potential genotoxic carcinogen that's being generated in Zantac, and that test was --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- never done, correct?

MS. PENNER: Objection.

THE WITNESS: I -- I cannot answer questions on a study that was done in 1982 on people I don't know, and I know nothing about the study. I -- I don't know the answer. But, as I say, I made the point, you know, physiological conditions did not generate NDMA, and that is entirely consistent with the known nitrosation chemistry of -- of ranitidine with nitrites. The reason we see it with a large amount of nitrites is because, you know, you've reacted it in the other places first and then -- and then it will react to form NDMA, but, you know, the reaction pathway that generated NDMA from ranitidine with external nitrite in solution, the No. 1 site of reaction is the other side of the molecule.

BY MS. LUHANA:

Q. So, you're so ready to accept .3 mM as physiologically possible and the right, you know, level to use for sodium nitrite without having any expertise, correct?

MS. PENNER: Objection.

THE WITNESS: I can't comment on the design of a study that was done nearly 40 years ago. You understand that. I'm just seeing it now, you know, in 2019. It's -- you know, but for me, the reason I was interested in it was, again, because it provided information on, you know, how sodium nitrite as an external agent interacts with the ranitidine molecule, and that was my real interest in these studies, could it be a potential root cause for the presence of the NDMA in the API. And as I said before, that reaction that occurs instantaneously. It is not at all consistent with the -- with the findings of the RCA that this is a very, very slow process that takes place over a period.

BY MS. LUHANA:

Q. Mr. Searle, I understand that this peaks your interest. However, the overarching issue here is the pill is generating NDMA. And, to your knowledge, do you know if GSK tested anywhere between the .3 mM and 40 mM used in the study ever, to your knowledge?

MS. PENNER: Objection.

THE WITNESS: I've --

MS. PENNER: Objection.

THE WITNESS: I've answered that question already. To my knowledge, I know nothing more about that report other than what is written there.

BY MS. LUHANA:

Q. Something GSK or you could have easily done if you wanted to, correct, test different test points, as you've done for the RCA now in 2019, '20?

MS. PENNER: Objection.

THE WITNESS: But as far as the RCA is concerned that I did, we were dealing with, you know, purely a chemistry phenomena and we -- we had the information on, you know, the reactivity of nitrite with ranitidine, and -- and that was almost as important to the RCA to try and understand could nitrite as an impurity be the root cause for -- for what we were seeing.

BY MS. LUHANA:

Q. Mr. Searle, wouldn't it have been easy to test between the .3 mM and 40 mM amount of sodium nitrate to see how many NDMA is generated, especially if safety is your greatest priority?

MS. PENNER: Objection.

THE WITNESS: I -- I've already answered the question. I can't comment on -- on that, you know, follow-up to that study. I wasn't involved in it. It was the year I joined the company. I had nothing to do with ranitidine for about 30 years after that. So, you know, it's not a question I can answer.

BY MS. LUHANA:

Q. But wouldn't it be appropriate to test between .3 mM and 40 mM? I just don't understand.

If it's a genotoxic carcinogen, wouldn't you want to test those different points to see, hey, let me see if NDMA is generated at this point? Because I'm selling this drug to millions of people. There are pregnant women taking it. There are babies consuming this product. Isn't that something a manufacturer that's concerned about safety would want to know?

MS. PENNER: Objection.

THE WITNESS: I refer to my previous answer. I can't comment on -- any more on that study.

BY MS. LUHANA:

Q. You can't or you don't want to?

A. I can't.

MS. PENNER: Objection.

THE WITNESS: I cannot because I was not involved in that in 1982. It's -- it's not my area of

expertise. It's an in vivo finding. You know, I was first made aware of that study as part of the RCA in 2019. So, what happened nearly 40 years ago is not in my area to -- to comment on.

MS. LUHANA: Let's mark as 3137, it's the Braunstein Article, "Analysis of Ranitidine-Associated N-nitrosodimethylamine Production under Simulated Physiological Conditions."

(Exhibit 3137, Braunstein Article, "Analysis of Ranitidine-Associated N-nitrosodimethylamine Production under Simulated Physiological Conditions," marked for identification.)

BY MS. LUHANA:

Q. Mr. Searle, have you seen this article before?

A. No.

Q. Here is another example where GSK is looking for someone else to do its job.

If you see --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- Braunstein --

MS. PENNER: If you have a question --

MS. LUHANA: I'm not done with my question.

MS. PENNER: If you have a question, ask it.

MS. LUHANA: I'm not -- I am asking a question.

MS. PENNER: It doesn't need to have a preface.

MS. LUHANA: You -- you don't get to dictate my examination.

BY MS. LUHANA:

Q. Mr. Searle, this is a group of scientists who decided to set out and do an analysis of ranitidine under simulated physiologic conditions and actually test different millimolars of sodium nitrite. They, in fact, tested at 1 mM, 2.5 mM, 5 mM, 10 mM, 25 mM and 50 mM, something GSK could have done in 1982 but didn't, correct?

MS. PENNER: Objection.

THE WITNESS: As I say, I don't want to comment again on 1982. I've answered the questions on that. I was barely working for the company, if I was then. You know, so I can't really answer any questions on decisions that were taken about that study and selection of concentrations and things like that.

BY MS. LUHANA:

Q. Okay. So, take responsibility for

when you actually did step in and work on Zantac in 2010 and 2015 and 2018 and 2019.

Can you comment? At any of those times, you could have done this test, correct?

MS. PENNER: Objection.

THE WITNESS: I think I explained the reason we did the study in 2010 and 2015. They were studies aimed to understanding impurity formation degradation. They have no relevance whatsoever to studies about the addition of nitrite to ranitidine, absolutely no relevance whatsoever. Because we were studying product in solution.

Why would we be adding nitrite to that solution? It made no sense at all. We were studying tablet degradation.

Why would we be adding nitrite into that study? It has no relevance to the study whatsoever.

BY MS. LUHANA:

Q. Mr. Searle, you understand that Zantac is being consumed and is in a gastric environment, correct?

MS. PENNER: Objection.

THE WITNESS: That is a completely separate issue to the investigations I was doing in 2010 and 2015, which were to evaluate findings in the drug

product prior to dosing.

MS. LUHANA: If you turn to page 2, can you turn to page 2. Right there.

BY MS. LUHANA:

Q. Can you see the results section and read the second sentence there -- or third sentence, sorry, is 150 mg of cool mint-branded?

A. From -- I'm sorry -- at a constant pH of 2.5 and under increasing nitrate concentrations, 150 mg of cool mint-branded ranitidine yielded increasing amounts of NDMA after two hours: A minimum of 947 ng of NDMA was detected at 1mM of sodium nitrate and a maximum of 320,000 ng at 50 mM of sodium nitrite.

Q. Mr. Searle, do you know how -- 947 nanograms is ten times the daily allowable limit set for NDMA, correct, by the FDA?

MS. PENNER: Objection.

THE WITNESS: Well, I know that 96 nanograms per day is the -- is the regulatory limit for NDMA.

MR. CHAFFIN: So, guys, pause for a second.

Roopal's computer just went out, actually, it sounds like. So, it's frozen. So, we just need to go off the record for a minute.

THE VIDEOGRAPHER: Going off the record. The time is 1550 UTC.

(Off the record.)

THE VIDEOGRAPHER: Standby.

We are back on the record. The time is 1600 UTC.

Please proceed.

MS. LUHANA: Melissa, can you please read the last question.

THE STENOGRAPHER: And answer?

MS. LUHANA: And -- and answer. I don't know.

Mr. Searle, did you complete your response?

THE WITNESS: There was a document on the screen, which isn't there now, so that was referring to that.

MS. LUHANA: Okay. So, you had completed your -- just, Melissa, why don't you -- you read the question and see if he's -- he's completed the answer because we cut off in between, I think.

THE STENOGRAPHER: One second.

(Record Read.)

THE WITNESS: Yeah.

BY MS. LUHANA:

Q. Okay.

So, let's move on to the root cause analysis.

MS. LUHANA: Let's mark it as Exhibit 3138.

(Exhibit 3138, GSKZAN0000051927 to 52017, marked for identification.)

MS. LUHANA: And it is GSKZAN0 -- 0000051927 to 52017.

BY MS. LUHANA:

Q. And, I believe, Mr. Searle, you should have a hard copy of this.

MS. PENNER: Okay. Let me see what we've got here.

(Discussion off the record.)

BY MS. LUHANA:

Q. So, this is the root cause analysis, Investigations into the Root Cause for the presence of N-Nitrosodimethylamine, NDMA, in Ranitidine Hydrochloride Drug Substance and associated Drug Products. The author is you, Mr. Searle, and it's dated June 15, 2020. It's Exhibit 3138.

Mr. Searle, the root cause analysis was done by GSK in response to requests by regulatory agency's about NDMA and Zantac and ranitidine, correct?

A. Yes.
Q. So, the root cause analysis wasn't unilaterally initiated by GSK to assess Zantac and ranitidine's safety, but done in response to safety concern raised by regulators finding NDMA in ranitidine, correct?
MS. PENNER: Objection.
THE WITNESS: It was done in -- in -- in response to findings that we're made aware of. The PIRC was set up, and it was sort of action from that to just conduct the root cause analysis. There were some aspects which were addressing specific questions that we received from -- from regulators.
BY MS. LUHANA:
Q. Fair.
But my -- my question just is that GSK didn't unilaterally decide to do this root cause analysis. It was in response to the regulators' concerns, correct?
MS. PENNER: Objection.
THE WITNESS: It -- well, we -- we undertook certain aspects in response to the -- the regulators specific areas, but when -- when -- when we were -- findings were aware, we did decide that we should conduct our own testing to -- to verify whether findings

had been reported were correct.

BY MS. LUHANA:

Q. Sure.

A. By the time we had done that, we had received the, you know, official request to -- from the EMA -- EMEA (sic) to -- to respond to this Article 31 process.

Q. I was just focused on the language of -- on -- on page 7. That's 51933. It's the introduction section.

MS. LUHANA: Right there.

BY MS. LUHANA:

Q. And it says -- it's, "In response to requests that GSK received from regulatory agencies indicating that NDMA had been detected in commercial batches of drug substance and drug product, notably from SwissMedic in August 2019, GSK undertook an extensive batch testing exercise.

Did I read that correctly?

A. Yes. But that's -- I mean, what that says is batch testing exercises. It doesn't use the word "RCA." So, that -- that was -- the RCA, you know, followed -- you know, was running in parallel and following on from when we generated that data.

Q. Okay.

This analysis was done by you and others between September 2019 and April 2020, correct?

A. Yes.

Q. So, about seven, eight months of work, correct?

A. Yes.

Q. And you signed off on the root cause analysis?

A. Yes.

Q. You also submitted your findings for publication, correct?

A. Yes.

Q. Since you submitted your analysis in June 2020, have you reviewed and found anything you would like to correct?

A. No.

Q. Okay. For GSK batches, how many different batches of API did GSK manufacture through the years?

MS. PENNER: Objection.

THE WITNESS: As stated before, I don't know the answer to that question.

BY MS. LUHANA:

Q. Do you know generally how many API suppliers GSK has had?

A. API suppliers for ranitidine or do you mean --
Q. Yes. I'm just trying to get an idea. I -- I understand --
A. It's a -- it's a four --
Q. Let me just finish.
THE STENOGRAPHER: Hold -- hold on.
BY MS. LUHANA:
Q. Let me guide --
THE STENOGRAPHER: Let her finish her question, please.
I'm sorry.
BY MS. LUHANA:
Q. I just -- I just want to guide you in terms of what I'm asking here.
I'm just trying to ascertain, you know, there -- there is a ranitidine base. There is, obviously, ranitidine API and then there is finished dose product. And I understand there are different suppliers to each.
So, do -- if you have an idea, because, you know, this is your arena of API, if you could provide that information for who was supplying the ranitidine base versus the API supplier, that would be helpful to know?

A. So, I mean, initially it was manufactured entirely in-house by GSK laterally in -- in Jurong, the base was manufactured by a company called Shasun and then Jurong did the final sort formation. And then there was a switch to externally sourced API, you know, in around 2013/2014 to Dr. Reddy's and then Saraca. There were some evaluations of other suppliers taking place towards the end, a company called SMS and another one called ORCHEV, O-R-C-H-E-V.

Q. And so what time frames was -- and -- and so just to be clear, further ranitidine base, it was manufactured in-house initially, and where was that by GSK?

MS. PENNER: Objection.

THE WITNESS: In numerous locations, Montrose, Jurong, I believe there was another site at some point in the UK.

BY MS. LUHANA:

Q. And so when you say "in-house," that means the base was made there, the API and the finished dose?

A. All -- yeah, all of the -- all of the registered stages and the -- the drug product would have been manufactured at GSK facilities.

Q. And so when -- when -- what year did

that switch off to someone else -- when was the first year that someone else was supplying and making the ranitidine base?

A. I don't know the answer to that question on ranitidine base.

Q. Generally speaking, if you know it.

A. I don't know.

Q. Okay. Well, do you know when Shasun was used?

A. No, neither, I don't know. It -- it was -- it would have supply chained into GSK Singapore and Jurong. No -- I would have -- wouldn't -- wouldn't have known when that switch over took place.

Q. But you're involved in the API process, correct, in terms of -- you -- you've worked on scaling up production facilities for API, and so you weren't involved in any of this at that time?

A. Not -- not in --

MS. PENNER: Objection.

THE WITNESS: I -- I was involved in the scale-up of certain APIs, but never ranitidine. In terms of manufacture of ranitidine itself, I've never been involved.

BY MS. LUHANA:

Q. So, in terms of doing the root cause

analysis in making sure you had a representative sample, I'm just curious, which other manufacturers of ranitidine base are there? There's Shasun, you had said, but you are -- you don't know generally what time period they were used?

A. No. But --

MS. PENNER: Objection.

THE WITNESS: -- it's -- but all of the -- all of the samples that we tested from Singapore would have -- because they were late, would have been made with Shasun base.

BY MS. LUHANA:

Q. How -- how are you so certain about that?

A. Because -- because I know the switch -- the switch -- we tested samples made in 2014. Jurong exited manufacture in 2014. The switch to Shasun as a supplier, you know, did not take place, you know, halfway through 2014. It was considerably before that. I just don't know exactly when.

Q. So, Shasun could have been manufacturing from 2012 to 2014, and that -- that's the -- that's -- those were the -- the batches that you had at that time, correct?

MS. PENNER: Objection.

THE WITNESS: I -- I don't know the precise pedigree of those samples. In -- in terms of the RCA, we know the process that was followed by Shasun stroke, GSK Jurong, because Shasun just operated the GSK process. So, when we -- when we were assessing differences in -- in chemistry processes as a potential root cause, you know, we had the information on how that material was made. So, in terms of the root cause, it wouldn't have mattered whether it was made at Shasun or GSK Singapore because the process they were following was the same.

BY MS. LUHANA:

Q. I'm -- I'm not talking even -- I mean, I know we are talking about the root cause, but I'm just generally trying to figure out the timeline of these things.

So who else manufactured and made the ranitidine base for GSK?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. To your knowledge?

A. I'm not aware anyone else made the ranitidine base that was then subsequently sent to GSK. The other suppliers I've mentioned do -- did the whole manufacture, so they manufactured ranitidine base and converted it to ranitidine hydrochloride salt.

Q. So, Saraca did that; SMS did that --
A. Correct.
Q. -- ORCHEV did that?
A. Yes.
Q. Okay.
And when was Saraca used?
A. From 2017, it was used.
Q. 2017 was the start of using Saraca?
A. What was the -- yes. That was -- I mean, that was where I think I previously mentioned we were looking at the assessment of the change, so we had 20 -- 2017, I think.
Q. And what about SMS?
A. I'm not sure SMS necessarily made it to -- to marketed products. I'm not -- that -- that was a change that was being assessed by the manufacturing site in -- in GSK India, but I think it was still undergoing assessment rather than it got to the stage of commercial product. So, we had some samples to test, but I don't believe there were many, if any, drug product samples manufactured.
Q. What about ORCHEV?
A. Similar, all -- this -- this was a supplier being considered by -- I think it was a GSK site in Pakistan and Egypt. And, again, it was an

essential change of source. So, again, we never had any drug product from ORCHEV.

Q. Okay.

And then you said Dr. Reddy's. I recall seeing Dr. Reddy's supplying for Jurong previously.

Did that ever take place?

MS. PENNER: Objection.

THE WITNESS: I -- I -- I don't know whether they have supplied the -- the base or not.

BY MS. LUHANA:

Q. Or the API, something. I mean --

A. API, they supplied the API to GSK, yes, definitely.

Q. So, any -- any time before 2013, was Dr. Reddy's involved?

MS. PENNER: Objection.

THE WITNESS: I think, you know, 2012, 2013 was the -- about the time I think that that change was being considered.

BY MS. LUHANA:

Q. Okay.

Who -- who -- who, to your knowledge, would have knowledge about these details? Or where would I go to find these answers?

A. Probably someone at the -- the GSK

Singapore site may -- may know.

Q. No. I'm saying generally in terms of which -- which -- what is used for ranitidine base versus API supplier versus, you know, finished dose, years that they were doing so and the markets they were doing so for.

MS. PENNER: Objection.

THE WITNESS: I -- I don't know exactly. I mean, it would be someone in supply chain, but it is a very, very complicated supply chain.

BY MS. LUHANA:

Q. Okay. When -- when you're referencing DS in -- in the root cause analysis, you're referring to API, correct?

A. DS or API, yeah, they are interchangeable.

Q. And then for DP, it's the finished -- finished product?

A. Drug product -- well, I would say there are four different -- four types of drug product, but yes, different formulations.

Q. Right.

So it's the pills, the capsules, the syrup and IV?

A. No. I don't believe there were

capsules. There were tablets. There were the effervescent tablets, which a slightly different formulation. Then there was the syrup and the IV, so they were the four.

Q. Effervescents are the ones that are -- children can use, right? They are prescribed for their use?

MS. PENNER: Objection.

THE WITNESS: I wouldn't know the market of them, but...

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: Let's take a look at page 16. It's 51942.

BY MS. LUHANA:

Q. So if you look at section 3.2, where it says --

MS. PENNER: Do you want to put it up on the screen, please?

THE WITNESS: It's coming up, I think.

MS. PENNER: Okay.

THE WITNESS: I see it, yeah.

BY MS. LUHANA:

Q. And you have a hard copy as well, right, Mr. Searle?

A. I've got a hard -- I've got a hard copy.

MS. PENNER: He has got a hard copy.

THE WITNESS: Yeah.

MS. LUHANA: No. I just want to make sure. It's easier to get through.

MS. PENNER: Yeah.

BY MS. LUHANA:

Q. In terms of the batches that were gathered, it looks like they were from five different sources, correct?

A. Yes.

Q. And so you're saying "Jurong," and do you recall the dates that Jurong was used?

MS. PENNER: Objection.

THE WITNESS: Well, for this particular -- actually, these were the batches made in 2014.

BY MS. LUHANA:

Q. And only 2014, and Jurong made batches since probably 1984, correct?

A. Yes.

MS. PENNER: Objection.

BY MS. LUHANA:

Q. And this was -- also, you had said Shasun had made the ranitidine base, but you're unsure

of who made the ranitidine base prior to?
A. Prior to that, it was GSK. So GSK, as I said, we were responsible for the entire supply chain but at some point, they switched supply of the base to Shasun but maintained responsibility for the API stage.
Q. But you don't know what year that was, correct?
A. I don't know exactly what year that was.
Q. Okay.
And then Dr. Reddy's, you had batches from Dr. Reddy's and --
A. Yeah.
Q. -- Saraca as well, correct?
A. Yeah.
Q. And then ORCHEV and SMS, you said those were batches that were never commercialized, correct?
A. I can't be a hundred percent certain about SMS, but -- but it was very early on, if any, were commercialized. They were looking at a switch, you know, in -- very late on in this.
Q. Okay.
MS. LUHANA: Can you turn to -- it's the

Bates ending in 51929. It's actually page 3.

MS. PENNER: Do you know off the top of your head what the document --

MS. LUHANA: Acknowledgments.

MS. PENNER: Okay.

Do you want to do that in your hard copy or your --

THE WITNESS: Yeah.

MS. LUHANA: It's 51929 if you are looking for the Bates, so four more pages up.

THE WITNESS: Yeah.

MS. LUHANA: There it goes.

BY MS. LUHANA:

Q. So, apparently, in terms of the RCA, there were teams of people that worked on the RCA, correct?

A. At different times, yes, there were different people with different expertise.

Q. And were these created for the RCA specifically or these are teams already in place?

A. No. The -- the -- the only team that was specifically put together for the RCA was the -- where it says chemical development Stevenage and isotope chemistry Stevenage so we -- when we -- when we decided that we needed some -- some hands-on chemistry resource,

so that resource was allocated within the chemical development group in Stevenage. And -- and those three people worked from the projects. And then when we decided to make the label material, we brought in Geoff Badman to do that as well. But the other groups were -- were, you know, material science and analytical, you know, particular people were -- were involved at particular times to perform, you know, a different type of analysis when we needed it.

Q. So, can -- can we just quickly run through and can you tell me what the material sciences group does typically?

A. They -- they perform analysis of the -- of the physical product. So, once you've made the API, they will do different measurements on -- on the solid products, such as microscopy, DSC and TGA, XRPD. So there's a whole -- a whole raft of testing that was done by that group. They run in the RCA.

Q. And then the API third-party team?

A. So, they just provided the link to Shasun.

Q. Okay.

So, they would house that information in terms of how long Shasun -- Shasun has been used, correct?

A. Sorry. Apologies. Saraca, not Shasun.

Q. Okay.

Who provided the link to Shasun? Or Shasun?

A. There was no link to Shasun at this point because it was six years after we -- we stopped sourcing material from there.

Q. Okay.

So, that means the last time you used Shasun -- Shasun was 2008.

A. No. 2014. Shasun supplied material to GSK Jurong. GSK Jurong ceased any manufacture of ranitidine --

Q. No. I understand.

Okay.

A. Yeah.

Q. Understood. Okay.

The statistics pharma supply chain?

A. Yeah. That's just, you know, when you -- when you generate, you know, large amounts of data. Neill, you know, provides some analysis of the data looking for any, you know, trends and significance in the data.

Q. So he's a one-man team.

In terms of the external supply --
A. He's actually -- yeah.
Q. -- external supply, pharma supply chain, what's that responsible for?
A. No. That was just the group in which Andy Whitehead works. You know, he's -- he is one of the sort of the realms of experts, and so mechanistic chemistry. So -- so he -- you know, he wasn't part of the team all the time, but, you know, when we got questions particularly about potential reaction mechanisms, he was someone that we -- we would involve as that's one of his specialities.
Q. The global pharma analytical science and technology pharma supply chain at Ware?
A. So, they were responsible for setting up and managing the analysis that was done. Most of the analysis that was done on the historical samples was actually done at two external contract labs, LGC and Intertech, and that relationship and the management of data in the samples was managed by that group.
Q. Okay. The Thermofisher Cork (ex TSS Chemistry Group)?
A. Yes.
So -- so -- so this is -- this was actually -- I don't know whether you remember in my

résumé, I said I was responsible at one point for a group of chemists. In -- in 20 -- I think in 2019 the site where they worked, GSK Cork was actually sold to Thermofisher, but we maintained a resource there to work on GSK chemistry products. So, we used some of that resource for some of the early experiments in the RCA.

Q. So, there are no employed by GSK; they are employed by Thermofisher?

A. They are now, yes.

Q. Okay.

A. I'm not -- I'm trying to -- I -- potentially, at the time we kicked off the work, I think that was about the time they were transitioning.

Q. What does TSS stand for?

A. Technical shared services.

Q. Okay.

The chemical development -- oh. That was a new group that was developed for the RCA.

And what was their -- their purpose?

A. They performed the laboratory investigations that were done in Stevenage. So, we had legwork being done at two sites, one at Cork and Stevenage. And -- and then Daren and Geoff Badman took on the synthesis of the isotopic label material when -- when we -- when we initiated that work at the end of

2019.

Q. Okay.

So, that's the -- the isotope chemistry team?

A. Yeah.

Q. Okay.

And that -- that was the isotope labeling that was done in the RCA, that's what they assisted with?

A. They -- they -- they made the -- they made the labeled material.

Q. Okay. That's right.

You made it in-house, correct?

A. Yes, we made it in-house, yes. And -- and Geoff has -- has worked for about 30 or 40 years doing that. So, he's -- he's the company expert.

Q. How long did it take you to make the labels?

A. Somewhere between two and three months it took to -- to make it.

Q. Okay.

Analytical chemistry?

A. Yeah. I mean, we have people there that did trace analysis. So, any NDMA testing that was done in Stevenage for the RCA was done. Some of the

work we did to try and identify specific impurities was done there and impurities testing, solvent testing, metals testing. So, various peoples assisted with that at various points.

Q. Crystallography modeling?

A. Yeah. There is a section in the RCA where we -- once -- once we had established that it was this interim molecular reaction that was occurring, you know, it wasn't anything in the -- the way that the -- because it -- the other thing, we think it's a solid state process. Is anything in the crystal structure that might provide any clues as to what was happening?

Q. Okay.

And then the MST, the PDS, TMCA --

A. Yeah.

Q. -- DS & PA.

A. Yeah. Don't ask me what all of that stands for, but they did the stability studies, the accelerated stability studies.

Q. I think it's the Medicinal Science and Technology for MST, but I don't know the others.

A. And PDS, Pharmaceutical Development Sciences.

Q. Okay.

But they did all the stability studies?

A. They did all the stability work, yes.

Q. Okay.

And there -- I have seen a mass spec team.

How long has that been in existence at GSK?

MS. PENNER: Objection.

THE WITNESS: Well, I couldn't tell you exactly how long, you know, but there's been a trace analysis team for probably 15 years.

BY MS. LUHANA:

Q. Okay.

Is trace analysis different than the mass spec -- it's -- it's labeled mass spectrometry team, so...

A. Yeah. Yeah. But -- yes. But one of the -- one of the specialities they do is because we need LC-MS, MS for -- for this low-level testing. It's -- it's an expertise that they have in developing the methods to do that.

Q. Okay.

MS. LUHANA: Can you turn to page 7, 51933?

BY MS. LUHANA:

Q. The second sentence here says, "Retained samples of drug substance and drug products resourced from manufacturing sites across the network and analyzed to determine their NDMA content," correct?
A. Yes.
Q. Anything preventing you from simply calculating NDMA amount and drug substance and drug products sooner?
MS. PENNER: Objection.
THE WITNESS: Calculating, absolutely not. It is an analytical test. You don't calculate it. You have to test.
BY MS. LUHANA:
Q. The test for NDMA and the amount of NDMA in drug substance and drug product, my question is, Mr. Searle, was there anything that prevented you from testing, analyzing, quantifying the amount of NDMA in the drug substance and drug product sooner?
MS. PENNER: Objection.
THE WITNESS: Availability of samples. We had to request the samples to do the testing, and these came from, you know, right across the world. And also setting up the -- the analytical method to do the testing because that is by no means straightforward, and it requires specialist equipment and, you know, a certain

amount of time just to develop and ensure the method is appropriately validated before we -- we actually generate test data.

BY MS. LUHANA:

Q. Of course, I understand that. That goes with any kind of testing you're doing.

However, there's a process to collect the samples and to analyze them and calculate them, but I'm focused right now just on the batch testing that was done here where you collected batches of Zantac ranitidine from numerous suppliers and tested the content of NDMA.

Is there anything that prevented you from doing that sooner?

MS. PENNER: Objection.

THE WITNESS: Why -- why -- we -- we could not do the testing until we requested the samples and the request from the samples was made as a result of the -- the PIRC that was set up in August 2019 and the request to get the samples provided, you know, was -- was made then and in parallel, we -- we started immediately working on setting up the -- the site, the two labs to do the testing. So, by the time the samples started to come in from around the world, we had a method set up to -- to do the testing.

BY MS. LUHANA:

Q. Is there anything else that prevented you, aside from requesting the samples from these different sources?

MS. PENNER: Objection.

THE WITNESS: No. It's a very significant undertaking to do this. It required, you know, seeing the stakeholders to endorse this -- this testing exercise.

BY MS. LUHANA:

Q. Mr. Searle, who are -- who do you consider the senior stakeholders?

A. In this case, it would have been recommendation from the PIRC, but that would have gone to, I imagine, the -- the -- you know, the head of pharma supply chain would have -- would have had to have endorsed doing it.

Q. Would the CEO have to sign off on this decision?

MS. PENNER: Objection.

Don't speculate.

THE WITNESS: I have no idea. I...

BY MS. LUHANA:

Q. You reference senior stakeholders. I'm just trying to -- you used the terminology. I'm just trying to identify who you are referring to.

A. Well, as I say, it would have been the -- maybe the -- you know, the head of pharma supply chain, certainly the head of technical within pharma supply chain.

Q. Right.

You would presume that if safety was GSK's priority, considering there was a potential of a genotoxic carcinogen being in the pills, they would investigate, analyze --

A. Yeah.

Q. -- and quantify the amount of NDMA, correct?

A. And that's exactly --

MS. PENNER: Objection.

THE WITNESS: -- what we did.

BY MS. LUHANA:

Q. Correct.

In 2020, correct?

A. No. 2019.

Q. The -- the final root cause analysis was published 2020, correct?

A. The -- the root cause analysis, but the testing was done in the -- in the sort of September, October, November period in 2019.

Q. That's fantastic.

It only took you two, three months to do this -- all this testing, correct?

MS. PENNER: Objection.

THE WITNESS: You've seen the large number of samples taken, and they didn't all turn up on the same day. You know, these were being shipped from sites all around the world. It was, you know, a significant undertaking to generate this amount of data in such a short period.

BY MS. LUHANA:

Q. Mr. Searle, how many batches of drug substance and drug product did you collect?

MS. PENNER: Objection.

THE WITNESS: Somewhere -- I want to say somewhere in here there's a table in one of our regulator responses, but it was, you know, in excess of, you know, 200 batches of API, and I imagine a similar number of drug product batches at different formulations, but, you know, we -- we had to source, you know, from each site and each product formulation and where available, the -- the API batch associated with -- with that batch of drug product, but, you know, ran into the hundreds in terms of batches we tested.

BY MS. LUHANA:

Q. Where is all that data? Where can I

find the 200 batches of API and 200 batches of drug product tested? Where -- where would that -- where would I be able to locate that information?

MS. PENNER: Objection.

THE WITNESS: Well, there is this -- there's a spreadsheet that exists that contains the master paper that is held by the analytical group that was -- I mentioned the -- the reference, Hlak Mohammed's team.

BY MS. LUHANA:

Q. So, that is the master data sheet that's referenced as footnote 3 on 51933?

MS. LUHANA: I think if you scroll down, it's referenced there.

THE VIDEOGRAPHER: Okay.

THE WITNESS: There is a reference -- there is a reference there. That's -- that's it, yes.

BY MS. LUHANA:

Q. So, what methods did you use to pick the samples to include and plot?

A. As I said, we --

Q. Because there aren't 200 samples noted on that graph.

MS. PENNER: Objection.

THE WITNESS: That -- that -- that graph, I think, covers all of the Saraca and Dr. Reddy's

and GSK batches that were tested. I'm not -- I don't think in this one we included the ORCHEV and the Saraca batches, but -- because they -- they were much newer and typically -- and -- and bear -- bear in mind the purpose of that graph and this report is not to provide a comprehensive set of data. That was done elsewhere. The purpose of this was to try and provide some insight into the -- the root cause.

BY MS. LUHANA:

Q. Where is the methodology set out anywhere in terms of what you decided to include, exclude, which batches were tested and not included? Where -- where would I find that information?

MS. PENNER: Objection.

THE WITNESS: No methodology at all. In -- in here, we've -- those graphs encompass all of the samples from Dr. Reddy's and -- and Saraca and -- and GSK Jurong.

BY MS. LUHANA:

Q. So, you just decided to exclude ORCHEV or SMS on that -- on that graph?

MS. PENNER: Objection.

THE WITNESS: As I said before, you know, the purpose of this is not the RCA and -- and generating, you know, data that would inform what was going

on in terms of the formation of NDMA. It's not intended to be a comprehensive repository of all the data that was generated on samples.

BY MS. LUHANA:

Q. Where -- where would I find all of that information on all the testing that was done on 200 batches? Is -- would it be in this master data spreadsheet?

A. That master -- that master data sheet, yeah.

Q. Okay. We will take a look at that.

MS. LUHANA: Let's mark -- actually, let's do a time check.

How many hours have we been on the record?

THE VIDEOGRAPHER: Approximately five hours and 32 minutes.

MS. LUHANA: Kimberly, this is going to go longer than seven hours. There is a lot to go through in the -- the root cause. It is very detailed. It references so many other documents.

MS. PENNER: This is not going longer than seven hours. There is a PTO that covers this. It says you get seven hours with a witness. We have never made any indication that we would take this fact witness and -- and provide him for longer than the agreed upon

time, and that's ordered in PTO54.

MS. LUHANA: I mean, I think we should try to work it out before we go to the Court.

MS. PENNER: I don't know that there is anything to work out, Roopal. You know, it was your decision to -- how you wanted to spend the first three hours of this deposition on something other than the RCA, and that's clearly what this witness's knowledge is relevant to. So, we're not going beyond seven hours.

MS. LUHANA: Okay.

We are going to have to go to the Court on this issue.

All right. Let's take a five-minute break and decide next steps, okay?

THE VIDEOGRAPHER: Going off the record. The time is 1639 UTC.

(Off the record.)

THE VIDEOGRAPHER: Please standby.

We are back on the record. The time is 1703 UTC.

Please proceed.

MS. LUHANA: Can we please mark Exhibit 3139. It's GSKZAN0000859960.

(Exhibit 3139, GSKZAN0000859960, marked for identification.)

MS. LUHANA: And then also Exhibit 3140, which is GSKZAN0000859961.

(Exhibit 3140, GSKZAN0000859961, marked for identification.)

BY MS. LUHANA:

Q. And, Mr. Searle, for this questioning it makes sense for you to have the root cause analysis handy, and, you know, you -- I want you to review these emails in conjunction with that, but, you know, John will put the email up.

Mr. Searle, this is an email from you dated December 5, 2019, to John Hayler and a few other folks.

And it says, "I've been through the list of samples from Ware and highlighted five to pick out for LC-MS testing. Actual batches I chose are highlighted also in the spreadsheet."

And the spreadsheet is the attachment, which is 3140 to this email, and if you --

MS. LUHANA: If John brings that up.

THE VIDEOGRAPHER: I am still looking for it. I apologize.

MS. LUHANA: Sorry. It's 859961.

BY MS. LUHANA:

Q. So, this is the attachment to the

email, Mr. Searle, and you've highlighted certain batches to do LC-MS testing on.

Was -- was there a method here on how you chose these to test?

MS. PENNER: Objection.

THE WITNESS: So, let me explain. This LC-MS testing was not testing for NDMA. This was testing that we wanted to do at a later stage. We identified a whole list of structures, potential structures that could be linked to different mechanisms. So, if we lose the dimethylamino fragment or some reaction occurs at the other side of the molecule that could ultimately generate a nitrosating source, there were a whole bunch of structures that different people postulated linked to different potential mechanisms. So, what we wanted to do there was to take a sort of selection of the different batches we had from different suppliers with different amounts of NDMA generated and then analyze the subset of samples for these specific molecular weights associated with the structures.

So, this is very, very complicated work, and we had to be highly selective in the number of samples we could test because we -- we -- we couldn't have tested every sample for these particular impurities. So, we were doing this in order to try and get some clues as to potential mechanisms, so we could then, you know,

correlate, if -- if any of the structures were found, you know, with -- with the generation of NDMA.

BY MS. LUHANA:

Q. Okay. I understand that.

I was just asking was there a method for how you chose what to test and what not to test?

A. I've just explained. We -- it was just -- it was a subset that covered different suppliers and different levels of NDMA. So, you have some samples that had high levels of NDMA, you know, some that had low levels. We had in there some of our recrystallized purified batches in there as well. So, you know, we just picked a list of about 12 or so batches that covered the range.

Q. But there -- there was no basis other than that. You just chose high, low range of samples to test, correct?

MS. PENNER: Objection.

THE WITNESS: That is the basis and -- and, you know, that's a scientific view of -- you know, when you've got 200 batches and you can only test about 12, you know, we picked, as I say, different suppliers, different NDMA content because it -- the purpose of this work was to determine whether there were any trace impurities related to ranitidine that could be correlated

with the elevated levels of NDMA. So, you know, it was a very good selection of samples we made.

BY MS. LUHANA:

Q. Was -- was the methodology set out anywhere in terms of the samples you chose in the RCA?

A. The -- the methodology, I think was -- I don't think it needed -- needed to be. I don't know the exact wording we -- we -- we used, but, as I say, we chose a selection of samples to -- to cover that.

Q. Okay.

Can you turn to page 751933 of the RCA, which is 3138, the second paragraph there.

MS. PENNER: Can you wait just a second?

THE WITNESS: I --

MS. PENNER: He is not there.

THE WITNESS: I'm -- the reference you gave, what was the number?

BY MS. LUHANA:

Q. It's page 7 of the RCA. It's 51 -- 51933.

A. Oh, here.

Q. The second paragraph says, "Batches manufactured by Dr. Reddy's labs, Dr. Reddy's prior to April 2017 by Saraca Laboratories, Saraca, after April

2017 are shone along with a small number of batches that were manufactured at the GSK Jurong factory in 2014 just prior to ceasing supply from this facility."

Why did you focus on Dr. Reddy's older samples manufactured from 2017 -- pre 2017?

MS. PENNER: Objection.

THE WITNESS: It's very simple explanation. As I said, we -- we -- we underwent a supplier switch from Dr. Reddy's to Saraca in 2017. So, there was a cut off in terms of where the supply came from. So, after 2017, we weren't getting supply, I think, from Dr. Reddy's. So, the batches would not have been available. So, simply that. It was a supplier change that took place. And, again, that leads to Jurong as well. There was a switch from Jurong to Dr. Reddy's.

BY MS. LUHANA:

Q. So --

A. -- that took place earlier.

Q. So, Dr. Reddy's, you don't have any Dr. Reddy's batches that were manufactured post April 2017?

A. I don't -- unfortunately, your -- your transcript is not colored in there. If it did, I -- I could tell you when the color -- the changes, but looking -- looking at this here, the square is starting

2017 and there are no circles after that. So, yeah, there is a -- there is a clear cut off that took place around April to August 2017 --
Q. So if --
A. -- and that's just based on, yes, supply.
Q. So, April to August, so you're saying post April 2017 you had batches that were manufactured by Dr. Reddy's until August 2017?
MS. PENNER: Objection.
THE WITNESS: I don't know the detail of the sample switch, but you can see that in that period as I -- unfortunately, it's not been printed in color so I can't see, but, you know, there's a -- there's a slight overlap in the -- around April -- between April and August 2017, when that switch was being made.
BY MS. LUHANA:
Q. So, in terms of the reasoning for why certain batches were included or excluded, where would I find that reasoning in the root cause analysis?
A. This --
MS. PENNER: Objection.
THE WITNESS: This -- there is no reasoning behind it. These were the batches that we had supplied from the sites that we tested.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: You can set that aside.

Can we mark as 31 -- Exhibit 3141 GSKZAN000088350, and there is also a spreadsheet, which is GSKZAN0000883508.

(Exhibit 3141, GSKZAN000088350, marked for identification.)

(Exhibit 3142, GSKZAN0000883508, marked for identification.)

BY MS. LUHANA:

Q. So, 3141 is an email from Tim Cartwright to you and Giuseppe Whelan dated January 31, 2020.

Can you --

A. Yeah.

Q. -- read the body of that email, the text?

A. The text is the master sheet, which has been put together, essentially formatted comparable to the Article 31 response. I have crossed through the "obvious" columns I would like to omit before the wider review. I appreciate there is likely to be discussions around the naming of sites, et cetera, but can you have a top-level review to see if you're happy with me

omitting those columns and if there are others we should not include.

Q. Mr. Searle, exactly why would you be omitting data and obvious columns before a wider review?

MS. PENNER: Objection.

THE WITNESS: I would need to see the spreadsheet in which the obvious columns are, but it's one of -- one of them clearly is around whether it's appropriate in some of our external communications to actually name specific suppliers because we were certainly advised in some external communications not to -- not to name suppliers that we had. So, that would have been a key reason behind that.

BY MS. LUHANA:

Q. If you rename the API suppliers, there is no way to marry the data that's in those spreadsheets to what's found in the RCA, correct?

MS. PENNER: Objection.

THE WITNESS: Once they are renamed, we -- we would of -- we had a -- we would have had a code agreed that Dr. Reddy's would be supplier 1, Saraca would be supplier 2, et cetera.

BY MS. LUHANA:

Q. Is that information provided somewhere in the root cause analysis?

A. But the --

MS. PENNER: Objection.

THE WITNESS: -- the root -- the root cause analysis names the suppliers, so it's not -- it's not relevant to be named -- we named them in this document because it -- it was an internal document.

BY MS. LUHANA:

Q. My -- my question is: In terms of the -- the analysis and the data that you've analyzed in the root cause analysis, if you try to match it up to an underlying spreadsheet which collects all the data and you're renaming the API suppliers, there is no way to match up the information, correct?

MS. PENNER: Objection.

THE WITNESS: As I said, this was for the purpose of potentially some external communications where we did not want to name specific suppliers. Internally, it's for -- for visibility on which batches come from which supplier, as you can see from the RCA. It's clearly all there. There's not -- there's no hiding of that whatsoever.

BY MS. LUHANA:

Q. But that wasn't produced to the regulators that way in that form?

MS. PENNER: Objection.

THE WITNESS: I can't recall exactly what was -- was provided to the regulators, but, you know, we -- we were advised, I think, say, this is not a decision that I would have taken. You know, there was some advice that externally we should not be naming specific suppliers.

BY MS. LUHANA:

Q. Okay.

A. It's not a decision I took.

Q. To your knowledge, in terms of potentially renaming API suppliers, do you recall omitting any other information from the regulators?

MS. PENNER: Objection.

THE WITNESS: I -- I don't recall anything.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: Why -- why don't you put up 3142, which is the spreadsheet.

And, John, is there any way for me to maneuver it once you put it up?

THE VIDEOGRAPHER: Do you want the Excel document or the --

MS. LUHANA: Yeah, the Excel document.

THE VIDEOGRAPHER: Yes.

MS. LUHANA: Would you be able to turn

over control to me to use it?

Great.

BY MS. LUHANA:

Q. Mr. Searle, this is Exhibit 3142, and this is your master spreadsheet that I believe you were referring to. And I see a number of things crossed off, the batch number API was crossed off, as well as the date of testing of the finished product was crossed out. The testing laboratory, as well as the limit of detection for the testing and the limit of quantification.

Do you know if any of these were ultimately omitted to what was provided to the regulators?

A. I don't --

MS. PENNER: Objection.

THE WITNESS: -- know.

I don't know, but some of those are, you know, in terms of drawing any conclusions, are not relevant, such as the -- as you can see, the batch number API is not always available. And what we go by is the actual manufactured batch number, which is the suppliers' batch number. The batch number API is a number that GSK would have assigned, I think, to -- to that. So, you know, we have full traceability based on the manufacturers' batch

number. So, that's why that wasn't included.
Certainly, the testing laboratory is not really a relevant piece of information. That was generated by a validated method at both test labs. So, you know, externally it's not that critical to say which lab it was done in.
BY MS. LUHANA:
Q. Why -- why would you remove the limit of detection and the limit of quantification for all of these tests?
A. It might well be because it's the same -- I -- I believe that when we reported this in the summary form, we just would have reported that as a standard figure rather than record it for every batch. As you can see for a particular test, it seems to be saying every time --
Q. Well, I think it varies depending on...
A. Yeah. Some of these testing different dosage forms, for instance, so...
Q. Okay.
So, let's look at the Jurong API. I'm going to filter it, so we can focus on it.
So, here it looks like only -- how many batches of Jurong were there? It looks like there was

seven approximately.
Is that accurate?
A. That's -- yes.
Q. There is an overlap, I think, with one batch, 381229 --
A. Yeah.
Q. -- and over here.
A. Yeah.
Q. And so this is the amount of the NDMA content in the API. And then the product content is greater than the API, correct, NDMA amount?
A. It -- it -- it's slightly higher, yes.
Q. Okay.
And we previously discussed this, but you're -- you're unsure of how many batches Jurong produced during the time it was the API manufacturer, correct?
MS. PENNER: Objection.
THE WITNESS: I have previously said I don't know.
BY MS. LUHANA:
Q. Okay.
In the -- in the root cause analysis, that same page, page 7, 51933 --

MS. LUHANA: Is there any way to keep that up and for him to look at that hard copy document, so we can go back and forth?

John, you can leave it up, that spreadsheet up. Thank you.

BY MS. LUHANA:

Q. Mr. Searle, do you see, it's the third paragraph? It's the last sentence and it says that the NDMA content of these batches were less than or equal to .2 micrograms per gram?

A. Yes.

Q. There were a couple batches that were above, including Brazil at .52, correct, and then 381229 at .22, correct?

A. Yeah. So, this -- this data, there was other data generated on some Jurong samples. These -- these were -- these were generated on batches that were associated with batches of drug product that were sourced. We had previously sourced samples from the site and -- and had those tested. But because they -- they didn't link to any batches of drug product, they weren't reported in -- in this particular spreadsheet.

Q. Why not? There are many other -- you're talking about the Brazil batch right here? Or --

because Brazil doesn't have the -- the drug product either, and you included it? See? You don't have the product.

A. I -- we had a vast number of samples supplied, and, you know, the purpose of this data from my point of view in the RCA is -- is trends. That's why we are -- that's what we were assessing, is -- is trends in different supplier batches related to age and various things.

Q. It wasn't to have a complete picture of the data that you have and the testing that you've done, but just to cherry pick what you want to predict a certain trend?

A. No.

MS. PENNER: Objection.

THE WITNESS: I -- I object to that statement as well. Look, I say this is an RCA. It is a scientific investigation into -- into why NDMA was forming and to do that we assessed different suppliers and their batches. You know, you can argue between .2 and .3 percent, but given the age of those samples, if you compare that with, you know, material from Dr. Reddy's, there is a huge difference, and -- and I'm trying to understand the difference between those samples, what was the important thing here, you know. Why was it that Dr. Reddy's material

was higher than -- than the Jurong material? And the RCA goes on to link that to -- to, you know, the physical properties of the API.

BY MS. LUHANA:

Q. I understand that, Mr. Searle, but that's an incorrect statement here in the RCA where you're saying the content of these batches was less than or equal to.2 micrograms per gram. That's just an incorrect statement, correct, based on the data --

A. That --

Q. -- you have here?

A. It's correct --

MS. PENNER: Objection.

THE WITNESS: It's a correct statement made on the data that it's presented in the RCA.

BY MS. LUHANA:

Q. So, you decided not to include the Brazil batches in your consideration of the RCA?

A. I think when that -- I don't believe we had that data at the time when this graph was put together.

Q. So, you're saying the final graph will have that data reflected?

MS. PENNER: Objection.

THE WITNESS: As I say, this graph is

not intended to be a comprehensive dataset. It's -- it's there to inform, you know, what could potentially be going on with the RCA. There -- there appear to be this trend with age and the NDMA content, which strongly suggested there was a slow degradation pathway occurring. But when we tested the Jurong samples, and whether it's .2 percent or .3 percent, that sticks out as being way off the trend. So --

BY MS. LUHANA:

Q. Mr. Searle, this is .5 percent I'm looking at, and I'm just asking what -- this data wasn't included and considered in the RCA, correct, with your statement here?

MS. PENNER: Objection.

Let me get my objection in before you start.

Objection.

THE WITNESS: As I say, it's all about trends. It's all about trends, and one of the things we noticed with material from Brazil was we intended to see higher levels, which we think is related to the storage and the material, and we clearly make a statement about that in the RCA.

Having those --

BY MS. LUHANA:

Q. So, does that mean -- sorry. Go ahead.

A. Having those batches, you know, those additional batches in there would not have changed our conclusions and trends in any way.

Q. So, how many suppliers were there for Jurong? You previously had mentioned Shasun. There is Japan and Brazil I see here.

What sites are they?

A. Now --

MS. PENNER: Objection.

THE WITNESS: -- you are misunderstanding that.

They are the secondary sites of manufacture where the drug product is manufactured.

BY MS. LUHANA:

Q. Understood.

A. So, there is a whole -- the sites where the drug product is made are completely separate to the sites where the API are made.

Q. Okay.

Were there any other Jurong batches that you tested that you didn't consider?

MS. PENNER: Objection.

THE WITNESS: No.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: Let's mark as Exhibit 3143 GSKZAN0000883288.

(Exhibit 3143, GSKZAN0000883288, marked for identification.)

BY MS. LUHANA:

Q. So, 3143 is an email from Tsin Chun Sow at -- to you and Guiseppe Whelan dated October 4, 2019.

Can you please review the email.

MS. LUHANA: You can -- you can scroll down and start from the bottom, John. I think that would be best.

BY MS. LUHANA:

Q. And as you can see, Jurong ranitidine samples are being discussed in this email.

A. Yeah.

THE WITNESS: Okay. You can scroll up.

Okay. Keep going. Okay. Okay. Okay. Keep going.

BY MS. LUHANA:

Q. So, Mr. Searle, this email tells you that these batches were from 2014 and kept in pristine conditions in the retention sample room at 22 degrees

Celsius, correct?

A. Yes.

MS. PENNER: Objection.

BY MS. LUHANA:

Q. And they would have expired, since API expires in five years, December 2019, correct?

A. Yes.

Q. And in terms of the NMDA content, you found that it was --

MS. LUHANA: If you scroll down further, John, to the second page.

BY MS. LUHANA:

Q. -- it was .3, .4, and .3, correct?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. Mr. Searle?

A. I can see it on the screen, yes.

Q. Why weren't these included in the spreadsheet or in the root cause analysis?

A. I'm -- well, I thought these batch -- these batch numbers were -- as I say before, the trend is clear. When we had -- when we had these batches tested, we were expecting results of, you know, seven, eight, ten VPM, and we saw these low levels.

Q. So, Mr. Searle, why not put the

accurate amount in the RCA where you are saying you are not seeing batches that were greater than .5 micrograms? Why did you say .2 in the root cause analysis?

MS. PENNER: Objection.

THE WITNESS: Because the figures in this particular graph do represent those levels.

BY MS. LUHANA:

Q. They -- these weren't included in your master spreadsheet, Mr. Searle.

A. Yeah. But some of -- as I said before, the master spreadsheet reflected the -- the testing that was done of -- of drug product and associated API batches. There were samples done to support the RCA that were tested outside of that process.

Q. So, what was your methodology in terms of what to include and what to exclude? Is it somewhere that I can find in the RCA?

MS. PENNER: Objection.

THE WITNESS: It's about representative samples from different suppliers, and, you know, we could have had five batches or ten batches from -- from Singapore. The trend -- the trend would have been exactly the same with all of these data points. They -- they are completely different, you know, subset of data to

everything else.

BY MS. LUHANA:

Q. What's that based on, the seven samples that you have?

A. That's all --

MS. PENNER: Objection.

THE WITNESS: That's all we had. As I say, you know, we -- we -- we didn't have access to many samples still within shelf life.

BY MS. LUHANA:

Q. Were -- were -- were you pulling these batches and reporting these numbers for litigation purposes?

MS. PENNER: Objection.

THE WITNESS: Absolutely not. We were doing it -- I can tell you the exact reason we were interested in Jurong. I think I explained it. We had identified the -- the trend we see in Saraca and Dr. Reddy's material linked to age of sample. And we were thinking, you know, could we have access to older samples because at the time we hadn't had -- received samples that go back to 2014. And then we asked the question to Jurong, have you got any samples remaining of ranitidine from when you were manufacturing it? And they provided some samples.

As I said, at the time, we would have

expected to see a very different result of this, but we were surprised to see that these -- these were low levels. But it was purely at the time to get older samples to test to see whether our theory about age versus NDMA held up. And, you know, based on this analysis, it was clearly something else going on as well as the age of the sample. So, that -- that was the purpose of it, is --

(Simultaneous crosstalk.)

BY MS. LUHANA:

Q. So the --

A. -- for science.

Q. So the purpose --

A. Simple as that.

Q. So, for science and not for litigation purposes?

A. Absolutely not.

Q. Okay.

MS. LUHANA: Can we mark 3144, GSKZAN0000893147.

(Exhibit 3144, GSKZAN0000893147, marked for identification.)

BY MS. LUHANA:

Q. Mr. Searle, this is an email from you to Tsin Chen Sow and Giuseppe Whelan dated November 17, 2021.

Why don't you read the body of the email, the top part of the email.

A. Last year, you provided these samples of Jurong derived ranitidine API. Due to the ongoing litigation with ranitidine, I have been asked to identify any remaining samples of batches of Jurong API. Are you able to confirm whether there are still any of these batches kept in Jurong, and are there other batches other than these still remaining? We still have some samples of these batches in Stevenage remaining after the testing we did last year.

Q. So, this was done for science purposes and not litigation purposes, Mr. Searle?

MS. PENNER: Objection.

THE WITNESS: I object. You just have to look at the dates. We moved on from the 4th of October 2019 forward by over a year to -- this was done because I was asked to -- to support the litigation. There was a potential request for retesting of samples to be done, which came through the litigation. So, that was why this question was being asked. But, you know, this was after the RCA had been concluded. So, this is a completely separate issue.

Yes, it is related to litigation, but, you know, in October 2019 it was -- it was for the purpose of

the RCA solely.

MS. LUHANA: Okay.

Why don't we go off the record at this point, and I will try to premark these exhibits so we can move a lot quicker.

THE VIDEOGRAPHER: We are going off the record. The time is 1737 UTC.

(Off the record.)

THE VIDEOGRAPHER: Please standby.

We are back on the record. The time is 1752 UTC. Please proceed.

BY MS. LUHANA:

Q. Mr. Searle, can you please take a look at page 9 of the RCA, Exhibit 3138? It's Bates 51935 is the page, page 9?

A. Yeah, I have that.

Q. Okay. Great.

In the drug product data section there is a statement there that says, "When both drug product and the input drug substance batch has been tested within the period of a few weeks, in almost all cases the NDMA content of the drug substance is higher, which indicates that the rate of NDMA formation decreases or ceases once the product is formulated and the level measured most likely reflects the content at the point

of formulation."

Did I read that correctly?

A. Yes.

Q. What is your basis for saying that the NDMA content of drug substance is higher than drug product?

A. The -- the basis is simply that in cases where we tested a batch of drug product and we also tested the input API that went into that batch, if you compare those two levels, then in, as I say, the majority of cases, the API returns a higher level than the -- the drug product, yet all the testing was done, you know, within a period of a few weeks. So, you know, given the rate of change, it would -- you know, the difference in testing dates would not be significant. So, you know, that -- that has led us to -- to believe that the rate of increase takes place prior to formulation is -- is greater than -- than after formulation.

Q. This is based on the limited data that you decide to in that plot graph, correct?

A. It's quite significant --

MS. PENNER: Andy, let me get my objection in.

Objection.

THE WITNESS: I wouldn't describe it as limited data. I mean, table 3 has a significant number of entries in it.

BY MS. LUHANA:

Q. It's about 130 samples that you decided to include, but I believe you had said you tested 300 samples, correct?

MS. PENNER: Objection.

THE WITNESS: No, no, no, no. That -- you see, we double count these because those points have a point for both drug substance and drug product.

BY MS. LUHANA:

Q. So -- go ahead.

A. So -- so, you double count them.

Q. And in terms of going out only a few weeks, what's your basis to conclude that the -- the amount of NDMA content ceases to form?

MS. PENNER: Objection.

THE WITNESS: We -- we don't say it definitely ceases to form. We say the rate decreases or ceases.

BY MS. LUHANA:

Q. Right. So, it's an either or.

So, what is that based on that it ceases once the product is formulated?

MS. PENNER: Objection.

THE WITNESS: I did not say it ceases. It's -- it's a -- it may cease. It's hard for us to say because we -- we are not testing the drug substance on the day it is formulated. We don't have that -- that data point. If we had that data point, that statement could be more definitive, but, obviously, we are doing all of this retrospectively, but, you know, it's a very valid observation based on that data. That's -- that's all we're saying.

Q. So, in terms of the batches, these batches weren't exposed to the elements, correct?

THE WITNESS: Yeah. These are -- these are batches of drug products which are in their -- in their packs.

BY MS. LUHANA:

Q. So, there are -- they are retained at -- in controlled temperatures and controlled humidity, correct?

MS. PENNER: Objection.

THE WITNESS: I think as -- as we state in the RCA, it's not -- we -- we weren't able to ascertain the precise storage conditions from every site we sourced material from, but again, this is about trends, you know. We were doing this to determine trends and one of the key

reasons we wanted to -- to look at this data was to ask a very important question, which I think you will agree, is this RCA, you know, the root cause, is it more likely to be an API phenomenon or a drug product phenomenon?

Based on this data here, it allowed us to -- to put our focus in the RCA to concentrate on the API and as it was proven at the end of the RCA, that was the correct thing to do because, you know, we showed that this is a phenomenon that is taking place in the API. It may continue in the drug product to some extent, but, for instance, we believe that the in vivo formulation potentially stops completely when you formulate it because whatever the mechanism is, it doesn't occur in solution, in water.

BY MS. LUHANA:

Q. Have you tested that in vivo?

MS. PENNER: Objection.

THE WITNESS: No. I said the in vivo -- sorry. That's all right. It's a long day.

IV formulation. I correct that. Yeah. Sorry.

BY MS. LUHANA:

Q. Understood.

So, in terms of the -- the retention of these batches, do you know the relative humidity that

was maintained in these retention rooms?

MS. PENNER: Objection.

THE WITNESS: I've already said we -- we don't know that in most cases.

BY MS. LUHANA:

Q. But in the cases you do know, do you know what the humidity was?

A. No.

MS. PENNER: Objection.

THE WITNESS: As I say, they -- they are probably in retention rooms where it -- you know, it's not exposed to the elements, put it that way. And, and also, these are samples in sealed containers. So, you know, however they are stored, they have -- they are not directly exposed to -- to the atmosphere anyway because they are in containers. They are in packaging.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: Can you turn to page 11, which is 51937. It's the section that says "Estimated rates of reaction to form NDMA."

BY MS. LUHANA:

Q. Mr. Searle, what is the purpose here of this equation?

A. It was to -- and I've said this

before, -- to give some sort of context to the -- the actual rate of reaction that was occurring. I said before, you know, for the -- for the lowest NDMA we're talking about millions of years and for the worst case, we're talking tens of thousands of years. So, it -- it just puts into context the -- the very slow rate that this reaction occurs at, which links to my previous testimony about, you know, this not being an obvious reaction. If this reaction was precedented and obvious, you actually expect to see a lot more forming and the fact that we see such a little -- small amount forming at such a slow rate means this is a highly disfavored reaction that's taking place. That's -- that's the only reason for it. It's just to put some context in the rate of reaction. It's just an estimate.

Q. As a chemist, do you typically do these types of calculations?

A. Well, this is a very unusual case. I mean, what -- as a chemist, one of the most important things about a chemical reaction that is pract ically, you know, something you would operate is -- what the -- the percent theory conversion of that reaction is. So, you know, pretty much, all the reactions we do, we would calculate that, but for most chemical reactions that are of any practical value, the time to go to completion is

measured in hours, not thousands of years. So, again, that's a sort of reaction rate you get for viable chemical reactions. Reactions that take tens to thousands to millions of years are not very efficient reactions, and they are not obvious. So, that's the only reason this was put in this, put some context on that.

Q. And in terms of -- we already established in terms of the drawn number that's being used here, .2 micrograms, in fact, the sample from Brazil was .5 micrograms, correct?

MS. PENNER: Objection.

THE WITNESS: That's correct, but this is a trend and if you substituted that figure, you would still get, you know, 3 million years maybe. So, you know, it's a trend. You see the contrast, and it doesn't change the conclusions in the contrast in -- in any way. These are not absolute numbers. They are just there to illustrate a point.

BY MS. LUHANA:

Q. And this was just based on the limited samples you had analyzed, correct?

MS. PENNER: Objection.

THE WITNESS: As I say, this was just identifying something that was different between these two

things. You know, we weren't going to calculate this figure for every -- every batch. It's not a practical number of any value. It was just simply to illustrate how slow this reaction is.

BY MS. LUHANA:

Q. In terms of the worst case scenario here, you mean pristine pills stored in retention centers -- retention rooms where the temperature is maintained at 22 degrees Celsius and not exposed to the elements, correct?

MS. PENNER: Objection.

THE WITNESS: Well, store -- you know, storage conditions for products are -- are defined. So, these are retention samples, but, you know, you've got to understand that the actual batches that are manufactured are -- you know, this controlled storage for those batches is defined. It's registered for the API and for the drug product. So, you know, that's -- that's the important storage conditions here because these are just, say, samples that had been pulled out of a batch and kept, and, you know, normally, you wouldn't expect to have to do any testing on those samples, but they proved really useful to this investigation that we -- we had access to them.

BY MS. LUHANA:

Q. But these -- these samples didn't go

through the chain of transport with exposure to different temperatures and humidity, correct?

MS. PENNER: Objection.

THE WITNESS: That -- that -- they didn't. It's not relevant. These are retention samples stored at sites for a period, because, you know, they have to keep these samples. That's all. They have no relevance to transport or anything like that.

BY MS. LUHANA:

Q. Well, you are representing the worst case scenario here. It is truly not the worst case scenario if you are not taking those things into consideration, right?

Did you also take into consideration people storing pills in other places like human bathrooms and otherwise?

A. I would --

MS. PENNER: Objection.

THE WITNESS: I would point out that this data is not generated on pills. This data is generated on API. API is not something that patients ever get access to. So, this -- this data is not relevant to storage of pills itself.

BY MS. LUHANA:

Q. Okay.

Jurong almost had a 30-year manufacturing history, correct?

MS. PENNER: Objection.

THE WITNESS: As I said before, I don't know at what point they started manufacturing. I know when they finished, but they had a significant period of manufacture.

BY MS. LUHANA:

Q. And you state that those handful of samples are representative of Jurong, correct?

MS. PENNER: Objection.

THE WITNESS: I -- I believe they are because the other thing to take into account in terms of representative samples is these are -- these are samples that represent the quality produced by a given process, and that process has -- you know, has remained unchanged for a long period. So, you know, for a registered validated process, we -- we would expect to do a material of -- of the same quality, you know, every time. And that is confirmed by the -- you know, the registered testing to the specification that, you know, all of these batches conform to that specification. They are all manufactured using the same process.

BY MS. LUHANA:

Q. However, you notice that the supplier

of the base made a huge difference in terms of the amount of NDMA in the pill, correct, in the API?

MS. PENNER: Objection.

THE WITNESS: I didn't say that. You said the base.

We've seen -- we've observed differences with the -- the different suppliers of the API. But those batches also conformed completely to the registered specifications. So, you know, if you analyze those batches, you know, the quality, according to our specification, is totally acceptable.

BY MS. LUHANA:

Q. Okay.

MS. LUHANA: Can you turn to page 18, section 42? It's Bates 51944.

BY MS. LUHANA:

Q. You carry out recrystallization to remove NDMA here, correct?

MS. PENNER: Objection.

THE WITNESS: Well, we did an experiment to determine whether it was possible to purge NDMA from drug substance. That's -- that's what it states in the report.

BY MS. LUHANA:

Q. Did you get a different crystal upon

-- form upon recrystallization?

A. What we got, and this is covered later in the RCA, the crystal form as determined by XRPD was identical. So, you know, it is fundamentally the same polymorph, technical term.

What we got, and we didn't notice at the time, it was subsequently discovered, was a -- you know, there was a difference in the morphology of the crystal, which is different thing. The appearance of the crystals under microscopy was different when we performed this recrystallization.

Q. So, is this something in the final prep you're doing?

MS. PENNER: Objection.

THE WITNESS: I mean, if you refer to a later section in the report, you will see that there is a -- there is a comparison of different isolation processes, you know, using, you know, different solvent mixtures, temperatures, concentrations. And we learned as part of RCA that that does have an effect on the crystal. But I -- I, you know, come back to it does not affect any of the, you know, registered parameters and the specification and material, you know, by all of the standard tests, you know, would look very similar.

BY MS. LUHANA:

Q. This is the first time GSK has done this with this particular formula with isopropanol and water and alleged strong conditions, correct?

MS. PENNER: Objection.

THE WITNESS: No. It's a standard. All APIs would have a recrystal -- most of them have a recrystallized process that is registered in -- in cases of manufacturing issues and you need to reprocess material. So, this was an existing process that Jurong we have used from time to time anyway.

BY MS. LUHANA:

Q. But this isn't something that was routinely done and consumers didn't receive the product as a result of this recrystallization that was done, correct?

A. Not --

MS. PENNER: Objection.

THE WITNESS: Not typically, but it would have happened on some occasions because, you know, there are -- from all APIs, you know, have occasions when, you know, there is a manufacturing issue and recrystallization is required. It's -- it's allowed under GMP.

BY MS. LUHANA:

Q. But -- but this isn't -- this

isn't -- not something ever sold or taken by anyone. This was more so the exception than the rule, correct?

MS. PENNER: Objection.

THE WITNESS: As I said, it would have been given -- it would have been passed on and formulated because it's a -- it's part of the registered detail for the process.

BY MS. LUHANA:

Q. Correct, Mr. Searle, but this recrystallization that you are doing to the drug substance is not -- this is an exception to the rule. This is if something arises, you recrystallize. It is not formally and routinely part the process of drugs that are sold to consumers, correct?

MS. PENNER: Objection.

THE WITNESS: As I said, most APIs will have a facility to do this in -- in certain circumstances. This is not at all unusual. It's fairly typical in the industry to -- to be able to do this.

BY MS. LUHANA:

Q. What circumstances would require them to recrystallize drug substance -- or what -- specifically, let's talk about GSK here.

In what circumstances are you recrystallizing the drug substance like this?

MS. PENNER: Objection.

THE WITNESS: I can give a simple answer, and one -- one is what we call physical contamination. So, you know, manufacturing plants, you can get, you know, extraneous matter in a batch. You know, this is not typical. You know, it's something that's just for ranitidine. Again, it's an industry-wide thing. So, you perform a, dissolution, filtration, and then recrystallization step to remove something. You know, this -- to say this is perfectly acceptable under GMP to do this.

BY MS. LUHANA:

Q. I'm not asking whether it's perfectly acceptable. I'm asking was this routinely done?

Were 50 percent of the batches recrystallized like this that were ultimately sold to consumers?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. Or is this like one percent of the batches where this recrystallization process was used?

THE WITNESS: I don't -- I don't know the answer to that, how many times it would have been employed, but, as I say, it's -- there's nothing, you know, we're not hiding anything by having this process

registered. It's just that because it was available, we were able to use it in -- on a lab scale to recrystallization the batch we had. We just took a process that Jurong gave us to -- and we followed it to -- to manufacture in the lab these recrystallized samples.

BY MS. LUHANA:

Q. So, when was the first time this process was established?

MS. PENNER: Objection.

THE WITNESS: It was probably established in 1982. It would have been established -- often -- often, this is established at the time as the registration of the product.

BY MS. LUHANA:

Q. So, Mr. Searle, you found a way to supposedly purge NDMA from Zantac ranitidine, and you didn't utilize this process for all the drugs that GSK manufactured?

MS. PENNER: Objection.

THE WITNESS: And what I'm going to say now is if you -- if you understand the root cause here, what this recrystallization will do is if you effectively take the batch back to T zero, it would not -- but then it doesn't stop the degradation process from -- from continuing. It will just continue from, you know, you've

removed some and then it continues again. But what this did provide us with some really useful information on is that the fact that we could do this was further evidence that this was a degradation pathway rather than as, you know, was mentioned as a potential root cause, that it's a synthetic impurity because what this showed is if NDMA was present as a synthetic impurity, by tracking through from the earlier stages of the synthesis, it would be removed in the final stage when you isolate your API. And then it would start to form this degradant. So, this is not a means of purging NDMA, you know, on a manufacturing scale. It was just -- you know, again, it gave us a really powerful bit of information about the root cause.

BY MS. LUHANA:

Q. Understood.

MS. LUHANA: Can you turn to page 2021? It's section 44. It's the accelerated stability monitoring, the ASM study.

Can you pull up Exhibit 3145, which is GSKZAN0000893977. It's an email from you, Mr. Searle, to Jim Harvey dated March 23, 2020.

(Exhibit 3145, GSKZAN0000893977, marked for identification.)

BY MS. LUHANA:

Q. So, this email provides that you are

giving him the master spreadsheet of testing results and then he could filter the batches supplied from Japan accordingly from March 2020?

MS. LUHANA: And can you please pull up Exhibit 3146, which is the attachment, which is GSKZAN0000893978.

(Exhibit 3146, GSKZAN0000893978, marked for identification.)

BY MS. LUHANA:

Q. And I want to review this with you, Mr. Searle, along with the -- the accelerated stability monitoring section.

MS. LUHANA: And do I have control now? Great.

BY MS. LUHANA:

Q. So, let's focus on Saraca right now.

Okay. Mr. Searle, if you look at the accelerated monitoring study that you've done here, the batch that you used was a Saraca batch that had .33 micrograms and was actually manufactured in September 2019, correct?

A. Yes.

Q. Okay. How was that chosen to be the representative batch?

A. Well, we wanted a newer batch as

possible for the study because, you know, we want -- we knew it wasn't possible because we didn't have it available to start from, you know, zero NDMA, but the intention was that we would start with a batch with as low a level as -- as we had available at the time, and that's why that batch was selected.

Q. Why would you want the lowest level? Is the lowest level the most representative batch?

MS. PENNER: Objection.

THE WITNESS: This is -- this is a scientific study looking at degradation. With such a study, it makes perfect sense actually to start -- if you're looking for pure degradation to start with zero because then the findings of the study can then totally be attributed to degradation.

BY MS. LUHANA:

Q. To -- to predict the worst case scenario with the lowest sample with the lowest amount of NDMA is --

MS. PENNER: Objection.

BY MS. LUHANA:

Q. -- is the science based?

A. This -- this study was not done to predict levels. This study was done to understand the relationship between temperature and humidity under

exposed conditions. So, this does not have any -- it's deliberately done under extreme conditions because it allows you to generate data very quickly. That's why it's called accelerated stability monitoring. It's a -- it's a new protocol that I wasn't aware of until this RCA that is now used to study stuff. Because we're generating a lot of data within three weeks, which -- which is very fast for a stability study. So -- and it's also not done under what I call, say, this direct exposure to the temperature and the humidity. So, there was no packaging involved. So, it's to understand trends. It should not be related back to -- to actual levels in -- in batches.

Q. In fact, if you look at the -- your spreadsheet, there were approximately, I believe, 129 Saraca batches, all -- which none of them had expired. However, if you look at the NDMA content here, I think the highest value would be -- well, out of the 129 batches tested, the highest batches, nearly half of them had results above 1 microgram per gram with the highest being 24.1 micrograms.

However, you think the .33 sample is the most representative?

MS. PENNER: Objection.

THE WITNESS: I've already explained the

study we were doing. If you're doing a study on degradation, pure degradation, you want your starting point to be zero, not -- not something that's already undergone some change. It's a simple point as that. I can't say any more.

BY MS. LUHANA:

Q. You've -- you've -- you've sealed the vials here -- here with the study and you've removed the nitrogen.

What was the purpose of that?

A. That, I think you're confusing the study, aren't you there?

Q. I'm looking at --

A. You are looking at a different study there, I believe.

Q. I guess that was the earlier sample. Sorry.

A. Yeah, that was the --

Q. So, it's table 10.

A. Yeah. Table 10 is -- yeah, table 10, those -- those are exposed. They are not sealed with -- with nitrogen. They are in these samples put in containers in -- in stability chambers at different conditions.

Q. Okay.

MS. LUHANA: You can take this down.
Let's turn to page 27 of the root cause analysis. And you can put it up. It's Exhibit 3138.
BY MS. LUHANA:
Q. This last sentence here, you say, "The process operated by GSK Jurong has been used since the product was first introduced to the site so the results obtained from the retained samples are likely indicative of historical production batches."
THE WITNESS: Yeah. That is correct. That's the point I made earlier, because they generated from a validated process that -- that has -- it's not changed.
BY MS. LUHANA:
Q. What did you do to confirm that the processes have stayed the same -- the same throughout this long time frame for Jurong?
A. Nothing specific. And I do say likely definitive. It's not a definitive -- it's not a definitive statement, but I -- I know that it's not changed significantly and...
Q. What's that based on?
A. Well, we don't --
MS. PENNER: Objection.
THE WITNESS: We don't change -- we

don't change processes. If something works, you don't change it.

Why -- why change something that is delivering material that's acceptable?

BY MS. LUHANA:

Q. Mr. Searle, this isn't a hypothetical question. I am asking you what you did to confirm that statement.

A. I -- I -- I --

MS. PENNER: Objection.

THE WITNESS: As I said --

BY MS. LUHANA:

Q. Let me retract my question.

What did you do to confirm the statement here?

MS. PENNER: Objection.

THE WITNESS: Nothing, because I've said likely indicative, so I don't need to. It's just a -- you know, it's not a definitive statement.

BY MS. LUHANA:

Q. So, you did nothing to confirm that the processes have stayed the same throughout this time frame?

A. It's --

MS. PENNER: Objection.

THE WITNESS: It's not relevant. I don't see how the relevance to the -- this aspect of the RCA. This was a comparison across a set of different processes of which the Jurong process, which was used to produce the batches we were testing.

And that's the important thing. We were -- we were relating to batches we generated data on to -- to this process. So, that's -- you know, that's the most important thing here, that we know how batches made by different suppliers and different processes, we can relate that to the observations about the rate of NDMA formation.

BY MS. LUHANA:

Q. However, you did nothing to confirm that the processes --

A. It --

Q. -- remained the same?

A. It has --

MS. PENNER: Objection.

THE WITNESS: It has no relevance to the RCA. I've explained that the data we generated in the RCA relates to the process that is listed here. That's the important thing.

BY MS. LUHANA:

Q. Mr. Searle, you are coming to a conclusion here, but you haven't confirmed that

conclusion. So, I'm just looking to see exactly what you did. If it's nothing, that's fine, but it seems you didn't do anything to confirm that statement, correct?

MS. PENNER: Objection.

THE WITNESS: It -- it's not relevant. The conclusion we are making here was that that manufacturing processes, that is the purpose of this section, was not to make definitive statements about the process in -- in Jurong, but it was looking at across five different processes that we -- we know have been used to make ranitidine. There are different process conditions, and we were trying to say are there any features about that processes that are correlated to the difference in rate. That's what this work was about. Simple as that.

MS. LUHANA: John, can you access the screen?

THE VIDEOGRAPHER: Do you want access?

MS. LUHANA: No, no, no, I don't.

Can you turn to page 49? Actually, can you take this down.

I just want to mark -- I am going to have to change the exhibit numbers -- or, actually, we can skip. That's fine.

Can you just mark 3149, GSKZAN0002943899. It's marked as 3149 right now.

(Exhibit 3149, GSKZAN00002943899, marked for identification.)

MS. LUHANA: And then 3150 is an ICH stability testing of new drug substances and products.

(Exhibit 3150, ICH Stability Testing, marked for identification.)

MS. LUHANA: So if you can pull up 3149 right now.

Scroll down to page 2.

BY MS. LUHANA:

Q. Mr. Searle, can you please those questions out loud?

A. Number 1 and 2: Each MAH should assess the potential for NDMA formation from representative API and finished product batches following stress test under conditions described in ICH Q1A and Q1B guidelines. This may include testing acidic basic oxidative solutions including high temperature and in solid phase at high temperature and humidity among other conditions.

BY MS. LUHANA:

Q. And then No. 2 as well.

A. Each MAH is requested --

MS. PENNER: Slow down for a second for the court reporter. So, just read a little more slowly.

THE WITNESS: Each MAH is requested to test for NDMA content in its batches of their finished products containing ranitidine as well as the batches of API used in their finished products released in the EU/EEA market using published, validated analytical methods of ranitidine, e.g., the method published by FDA. Details and validation status of the analytical method should be provided. The test results in PPM calculated on API should be provided and annexed Excel -- Excel template or batches tested excluding -- including negative results with information on API and corresponding finished product if available --

BY MS. LUHANA:

Q. You can stop. You can stop there.

A. Okay.

Q. So, did you -- did you provide all of this testing to the regulators?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. Of all the batches tested?

MS. PENNER: Objection.

THE WITNESS: You've -- you've seen the master spreadsheet. So, this is -- this is saying testing finished product batches, and -- and the API goes into that. And -- and, you know, we -- we did -- we did this

across different dosage forms and different sites. So, we -- we were able to cover all of the potential sort of variants of the product.

BY MS. LUHANA:

Q. But did you -- it specifically states it provides for all batches tested with information on API and the corresponding finished product if available.

So, did you provide all the test results to the regulators?

MS. PENNER: Objection.

THE WITNESS: We -- we provided a spreadsheet of the -- the results that I think you've seen the -- you know, the early version of that.

BY MS. LUHANA:

Q. I produced the final -- I showed you the final spreadsheet that you had submitted in March 2020, and there were clearly batches that were excluded.

So, I'm curious as to where all the batch testing data is available.

MS. PENNER: Objection.

THE WITNESS: I think you're talking about batches of API that were excluded and may not be linked to drug product. This specifically says you start with a drug product. You test that and if the API is also available for that, you test that. And that's what --

that's what we -- we provided.

BY MS. LUHANA:

Q. Mr. Searle, where are you reading that? It says that the test results should be provided using the annexed Excel spread template for all batches tested with information on API, and then it says "and corresponding finished if available."

So, you provide everything for the API and everything for the finished dose if it's available.

You didn't do that, with you?

MS. PENNER: Objection.

THE WITNESS: As I said, there were some cases where, you know, drug product batches were -- were -- were available, but the site did not have at that point the -- still the samples of the -- the API. So, we couldn't always provide those two data points, but we provided, you know, a very significant list of testing results to the regulators.

BY MS. LUHANA:

Q. But not the complete results, correct?

MS. PENNER: Objection.

THE WITNESS: We -- we provided enough results that satisfied the regulators and showed clearly the -- the trends involved in this product.

BY MS. LUHANA:

Q. Mr. Searle, the EMA asked you to assess NDMA formation for representative API in finished product under specific stress testing per ICH Q1A, and that's provided in Exhibit 3150. And as you may know, stress testing means accelerated conditions of anywhere from 25 degrees Celsius with 60 percent relative humidity, 30 degrees Celsius and 65 percent relative humidity and then 40 degrees Celsius and 75 percent relative humidity.

You didn't test all representative drug product or API under those conditions, correct?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. You didn't test any?

A. We --

MS. PENNER: Objection.

THE WITNESS: We didn't because the purpose of this -- this was really to help the regulators understand the root cause and our understanding evolved and what we did do allowed us to elucidate what the root cause was. We provided that in the final response to the regulators. And, you know, I think GSK provided by far the most comprehensive result -- response to these questions to the extent that when the EMA published their final findings

on -- on the ranitidine, you know, they quoted large parts of our own response, you know, and they published that in their -- in their conclusions. So, you know, the understanding evolved over time in terms of what was causing this.

BY MS. LUHANA:

Q. I'm not focused on that. I'm just saying the EMA asked you to do something specific.

You didn't do -- you didn't test under those conditions, correct?

MS. PENNER: Objection.

THE WITNESS: As I said, as our -- as our understanding about this evolved -- I mean, the EMA, when they were asking these questions, didn't really have a clue about, you know, what was causing NDMA and they wanted someone to get to the bottom of it. And -- and we -- we decided at some point that actually a lot of these things being requested here, you know, would have added no value at all to the -- the investigation because of our findings.

BY MS. LUHANA:

Q. So, you didn't test any of the drug substance or product between greater than 20 degrees Celsius and less than 50 degrees Celsius, correct?

MS. PENNER: Objection.

THE WITNESS: As I've said before, we

did the accelerated stability monitoring, which highlighted the trends under, you know, more forcing conditions.

So --

BY MS. LUHANA:

Q. Mr. Searle, that's not my question.

My question is: You did not test greater than 20 degrees Celsius between -- you know, greater than 20 degrees Celsius and less than 50 degrees Celsius, correct?

MS. PENNER: Objection, misrepresents.

THE WITNESS: We did investigations that were intended to provide the -- you know, the answer to the regulators on this. And, as I say, we shared our findings. They didn't come back to us and say you didn't do that, you didn't do that, you didn't do that. They, you know, were very grateful that we had taken this seriously and provided responses that, you know, as I said, they ultimately shared more widely because of what we found.

BY MS. LUHANA:

Q. We would have been very grateful as well if you had done this testing in the early '80s, when this product was put on the market.

MS. PENNER: Is there a question there, Roopal? Please stop making speeches.

BY MS. LUHANA:

Q. Mr. Searle, are you familiar with the Abe article?
A. Just, can you repeat that?
Q. The Abe article?
A. I -- I'm not sure.
Q. It -- it was an article from 2020 where this group had tested ranitidine at 40 degrees Celsius and 75 percent relative humidity for an eight-week time period, something that GSK routinely did during stability testing. And when they looked for NDMA, they found 116 parts per million of NDMA in the drug and that was routine stability testing that, presumably, GSK was doing all along. So, I was curious.
You are not familiar with that article?
MS. PENNER: Objection to your characterization of the article.
THE WITNESS: I'm not familiar with that article.
BY MS. LUHANA:
Q. Have you considered that article in framing your opinions for the root cause analysis?
MS. PENNER: Objection.
THE WITNESS: We have generated our own stability data that we used to inform the RCA, which is absolutely clear.

BY MS. LUHANA:

Q. But you didn't mimic real-world conditions to assess actually what was happening in the RCA?

A. The purpose of the RCA was to determine the science behind what was going on. That was the purpose of it. Simple as that. So, we used -- in most cases, you know, accelerated conditions because we get to -- we get to an answer faster. And, I mean, that was important that we understood what was happening. And we did that. And it was capped off by the labeling study, which really, you know, showed what was happening in terms of generating NDMA.

BY MS. LUHANA:

Q. Mr. Searle, I saw in the root cause analysis the majority of the tests that you had run were actually on Saraca grade 3.

Saraca grade 3 was never commercialized by GSK, correct?

MS. PENNER: Objection.

THE WITNESS: When you say majority of the testing, what we did was a considerable amount of comparative testing between Saraca grade 1 and grade 3.

BY MS. LUHANA:

Q. The Saraca grade 1 that we talked --

spoke of with .33 micrograms per gram of NDMA and Saraca grade 3 that was never commercialized or used by any consumers, correct?

MS. PENNER: Objection.

THE WITNESS: I can't say whether it's ever been used by consumers in the local market, but GSK had never used that material.

BY MS. LUHANA:

Q. Okay. And you also recrystallized the API and then tested it and ran several tests in the RCA. And, once again, we said the recrystallized API was the exception and not the rule of what consumers were using, correct?

MS. PENNER: Objection. Misstates testimony.

THE WITNESS: The recrystallization was a tool we used in the RCA to understand -- and it proved to be very useful because it allowed us to understand those subtle process differences that were at play.

BY MS. LUHANA:

Q. And you never used Dr. Reddy's for any accelerated testing, correct?

MS. PENNER: Objection. If you need to refer to the RCA, please go ahead.

THE WITNESS: We didn't because we

weren't able to do, you know, as many as we wanted to. And Saraca was considered to be more relevant because Dr. Reddy's material was no longer in our supply chain by that point.

BY MS. LUHANA:

Q. There was still unexpired material, correct?

MS. PENNER: Objection.

BY MS. LUHANA:

Q. Dr. Searle, is the purpose of the RCA to --

MS. PENNER: Would you let him provide the answer to the question --

(Simultaneous crosstalk.)

Q. -- go ahead.

A. There may have been drug product left over, you know, but we didn't have any API remaining from Dr. Reddy's material because -- in bulk form, so we never used any Dr. Reddy's material to manufacture more product in 2019. So, we felt that the Saraca batch was more relevant for the stability study because that was the existing supplier at the time. It's a very simple explanation.

Q. Thank you, Dr. Searle.

MS. LUHANA: Let's take a two-minute

break.

THE VIDEOGRAPHER: Going off the record. The time is 1837 UTC.

(Off the record.)

THE VIDEOGRAPHER: Standby, we are back on the record. The time is 1840 UTC.

Please proceed.

MS. LUHANA: Mr. Searle, thank you so much for your time, my colleague, Mr. Chaffin, is now going to question you.

Let's go off the record a minute.

THE VIDEOGRAPHER: Off the record at 1841 UTC.

(Off the record.)

THE VIDEOGRAPHER: Please stand by for recording. We are back on the record. The time is 1844 UTC. Please proceed.

EXAMINATION BY MR. CHAFFIN:

Q. Mr. Searle, I'm Eric Chaffin. I am one of the attorneys representing the plaintiffs in this litigation. I have had an opportunity, obviously, to listen in today. I wanted to cover some points with you really away from the root cause analysis, which I know my colleague was focused on with you.

First, I just want to understand -- and

I think I can cut through some things based upon your testimony, but I want to make sure.

First, I understand that you did some work in 2011 on the ranitidine product. Is that correct?

MS. PENNER: Objection.

BY MR. CHAFFIN:

Q. Is that correct?

A. 2010, I think the work -- first work I did on the ranitidine product.

Q. Okay. And that was -- ultimately, came about there was a report in October of 2011 regarding the investigation into yellow impurities in ranitidine HCI sterile injection formulation.

Is that one of the --

MS. PENNER: Objection. Eric, this has been covered by your partner.

BY MR. CHAFFIN:

Q. That's the question, sir.

A. Yes, that's -- that's the report that we wrote on that investigation.

Q. Understood. Okay. And I'm really trying to avoid going into the documents of the report. I know that it was touched on generally and perhaps I can do that.

My general question was, as I understand it, the defined question that was given to you to investigate was: What were the impurities addressed -- the impurities you are looking at is what was causing it to be a yellow impurity or a yellow product. Is that correct?

A. That's correct --

MS. PENNER: Objection.

Let me get my objection in before you answer.

THE WITNESS: That's correct.

BY MR. CHAFFIN:

Q. Okay. And so really the scope of what you were told to look for is as a chemist, someone looking at the impurities was look at what impurities can make this product yellow, is what you were focused on. Is that right?

MS. PENNER: Objection.

THE WITNESS: The question was in these particular samples that were -- had slightly yellow color, you know, could we attribute that to impurities that were forming in there. And, you know, the analysis that we did that's reported showed the presence of a number of very, very low-level impurities based on their UV and visible spectrum would have been yellow. So, you know, we were

able to conclude that these impurities were giving rise to at yellow color.

BY MR. CHAFFIN:

Q. So, again, the scope of the question is actually what defined -- what -- that defined the end point you were looking for.

A. Yes.

Q. And you felt you answered that question. There was other questions raised at that time; is that correct?

MS. PENNER: Objection. Eric, are you going to move off of this very soon because this is not --

This is not permitted by PTO54 --

(Simultaneous crosstalk.)

MR. CHAFFIN: Listen Kimberly, I have a half on hour. I have a half an hour.

MS. PENNER: This is not permitted by PTO54.

MS. LUHANA: It absolutely is and there's absolutely --

MS. PENNER: It absolutely not.

MS. LUHANA: There is absolutely documents pertaining to this. None of the documents have been covered. I actually -- my portion is going to focusing on the historical information that he had done

leading to up the RCA. That is really what I am focused on. If you are directing him not to answer, direct him not to answer. I think it's wrong. I think that we can move through this quickly. But I have 29 minutes, and I would like to use it efficiently and be done with this witness.

MS. PENNER: You can go on, but I adjust want an objection to this entire line of questioning as being not permitted by PTO54.

MR. CHAFFIN: Well, look, I asked for a half an hour. We have just taken up two minutes arguing over something that's a nonissue, but that's fine. Okay. So, I am going to ask for additional time at the end of this if we're not done.

BY MR. CHAFFIN:

Q. Sir, I just want to understand in terms of the work that was done. In 2011, we can talk about the work. In 2015, which has not been covered yet, the scope of the inquiry is defined by the question that's being presented. Is that correct?

MS. PENNER: Objection.

THE WITNESS: The scope was defined by, you know, the problem statement, we would call it. The problem statement was the yellow coloration in these vials.

BY MR. CHAFFIN:

Q. Understood. So, you were told these

were turning yellow. We want to figure out why they were turned yellow. So, you looked at color impurities. So, you looked at anything at 450 parts per million and over is what you focused on. Is that correct?

MS. PENNER: Objection.

THE WITNESS: We designed our UV detection to specifically monitor for impurities that would be yellow.

BY MR. CHAFFIN:

Q. Understood. And you didn't look at anything else at that time; is that correct?

MS. PENNER: Objection.

THE WITNESS: No. That was the purpose of the investigation was to look at those.

BY MR. CHAFFIN:

Q. Understood -- this is really simple. I agree.

So, you didn't look at nitrosamines, correct?

MS. PENNER: Objection.

THE WITNESS: We didn't look for nitrosamines, no.

BY MR. CHAFFIN:

Q. You didn't look for NDMA?

MS. PENNER: Objection.

THE WITNESS: We didn't look for NDMA, no.

BY MR. CHAFFIN:

Q. And, certainly, sitting here today having you done the root cause analysis, if you had been asked to go look for nitrosamines, go look for NDMA, you had the analytical majors to go and do that. Is that correct?

MS. PENNER: Objection.

BY MR. CHAFFIN:

Q. They may not have been perfect, I get it, but you had the ability to go and identify those if the toxicology or PV department said to you, look for these. Is that fair?

MS. PENNER: Objection.

THE WITNESS: The technology would have existed to look for them, but as I stated many times today, there was no, you know, rational reason at the time to go looking for those types of impurities.

BY MR. CHAFFIN:

Q. I understand it. I understand your testimony to be as, look I'm not the safety guy, right? You are not the safety expert. Correct?

A. I am not the safety expert, no, by no means.

Q. Understood. And so really it would have been incumbent upon the toxicologist and the PV people to come and say, look for NDMA, look for nitrosamine. Unless you saw something there and you didn't because you relied on them. Is that a fair statement?

MS. PENNER: Objection.

THE WITNESS: In that investigation, you know, toxicologists were not involved in that investigation. It was a quality investigation due to coloration that we undertook.

BY MR. CHAFFIN:

Q. So, it never rose to the level of a PIRC then?

MS. PENNER: Objection.

THE WITNESS: No, as far as I'm aware, it didn't.

BY MR. CHAFFIN:

Q. Okay. And whose decision as to whether it would be a PIRC or not?

MS. PENNER: Objection.

THE WITNESS: That would be quality decision.

BY MR. CHAFFIN:

Q. And at that time who was the head of

quality in 2011?

A. I don't know.

Q. Okay. Sir, did anyone tell you prior to 2011, that there were discoloration issues dating to this product back into the 1980s?

A. No.

Q. Did anyone tell you that during the course of time the company looked and actually changed color of the pills, so that whenever they would turn yellow, for example, the common consumer wouldn't make complaints about them turning yellow? Did anyone tell you about that?

MS. PENNER: Objection.

THE WITNESS: No one told me about that, no.

BY MR. CHAFFIN:

Q. Okay. And certainly, in terms of the brown pills in the trends you learned some information later in 2015, but you didn't have information about that in 2011 either, correct?

THE WITNESS: No.

MS. PENNER: Objection.

BY MR. CHAFFIN:

Q. Sir, can I have Exhibit 407 on the screen, please. If we can go to the last page of that

exhibit, which is 604 once we look at the first screen, please.

THE VIDEOGRAPHER: Please say the exhibit number again.

(Exhibit 407, GSK Zantac Discoloration, marked for identification.)

MR. CHAFFIN: 407, it's a previously used exhibit. It's titled GlaxoSmithKline Zantac Discoloration.

John, you have it, right? We're using a lot of time with exhibits. I would like to be efficient. Is there something I can do to help you?

THE VIDEOGRAPHER: It's not in the private folder.

MR. CHAFFIN: It is. Jess, can you help him out, please.

MS. SZUMLA: It is in there. It's EXH0407. If you order by alphabetical order, it should be up towards the top.

MR. CHAFFIN: John, after this, if you and Jess could actually talk about how to number exhibits for you because it's taking up a lot of time today and, obviously, we have very little time on the record.

THE VIDEOGRAPHER: It's rotated sideways.

MR. CHAFFIN: So, that presents a difficult thing for you?

Jess, if you can go through and make sure none of the other ones are rotated sideway, please.

MS. SZUMLA: Got it.

BY MR. CHAFFIN:

Q. Sir, have you seen this document previously?

A. No.

MR. CHAFFIN: If you can to the first page, please, John.

THE WITNESS: I haven't seen this document, no.

BY MR. CHAFFIN:

Q. So, you hadn't seen it in preparation for your deposition today either?

A. No.

Q. Okay. Sir, if we could just go to the back for a moment and if you could look at the slide notes -- thank you, John -- if we could go to the slide notes you see slide 1, there's notes here.

Have you seen this statement previously?

The last statement there, The emphasis is on prevention, in all caps, of issues occurring by utilizing our knowledge and understanding to determine

what could go wrong and what we can do to mitigate and control this.

Is that a statement that you're familiar with; or is this more of a safety toxicology, PV statement?

MS. PENNER: Objection.

THE WITNESS: I don't know the -- I don't know the context of this slide patent, who it's addressed to.

BY MR. CHAFFIN:

Q. Okay. But is this a statement that you worked with previously or had been trained on?

MS. PENNER: Objection.

THE WITNESS: It's a principle of risk assessment, I think I'd say.

BY MR. CHAFFIN:

Q. Okay. And is it a principle of risk assessment that you employ?

MS. PENNER: Objection.

THE WITNESS: I don't -- you are asking me about the document. I don't know the context of who this was written for. It appears to be training material, but without seeing the rest of the slides and knowing, you know, who this training is intended for, it's really hard for me to say what this is about, but I think this is a

technical document. It talks about TRA, which is a technical risk assessment.

BY MR. CHAFFIN:

Q. Okay.

A. This is about manufacturing.

Q. Who is responsible for technical risk assessments in the company?

A. It would be the manufacturing site where something is manufactured would be responsible for ensuring that technical risk assessments are done.

Q. Okay. And who would work with a manufacturing site from a safety perspective to evaluate the TRAs?

MS. PENNER: Objection.

THE WITNESS: Can you explain what you mean by "safety"?

BY MR. CHAFFIN:

Q. Sure. Is this the PV department? Is it toxicology? Is it a PIRC? Is it someone on quality? Where would I look?

MS. PENNER: Objection. This is not a document related to safety. This is a technical risk assessment for a manufacturing process covering, you know, the control of, you know, quality, critical parameters in manufacturing attributes. So, this is not a safety

document at all.

(Exhibit 422, GSKZAN0000251138, marked for identification.)

BY MR. CHAFFIN:

Q. Okay. If we can move to Exhibit 422 then, please.

While we are waiting on that if you can tell us what a DMRC is?

MS. PENNER: Objection.

THE WITNESS: Can you repeat that? A?

BY MR. CHAFFIN:

Q. A committee called a DMRC?

A. I don't know.

Q. If you could review this document for us, have you seen this document previously?

A. I mean, I'm reading the context. This is related to the investigation that we did in 2015 with the tablets, but you know, I couldn't confirm or deny whether I have seen this specific document before.

MR. CHAFFIN: John, if you could kindly scroll down, so we can see the last two paragraphs.

BY MR. CHAFFIN:

Q. Sir, looking at the last two paragraphs does this refresh your recollection as to what -- at least this committee -- or refresh your

recollection as to what you guys were doing in 2015 when you set out to do the study in 2015?

MS. PENNER: Objection.

THE WITNESS: It states what we were doing. You know, it says GSK currently characterizing impurities in discolored tablets to enable a more robust assessment of safety. And that was the purpose of that investigation. So, it's just describing what we were doing.

BY MR. CHAFFIN:

Q. So, the goal was there wasn't enough information on impurities from a historical information, so they wanted to characterize more of the impurities. Is that correct?

MS. PENNER: Objection.

THE WITNESS: I mean, the answer was we -- until we did the study, we didn't know exactly what we would find, but the -- some of these tablets were significantly degraded because they hadn't been stored appropriately and, you know, it was a question about, you know, one tablet, what's the, you know, could we do a toxicological assessment of one tablet based on the impurities that would be present in it.

BY MR. CHAFFIN:

Q. And this was the brown tablet,

correct?

A. This was the brown tablet, yes.

Q. And, certainly, one of the options of that time could have been forced degradation of more tablets to make them brown, correct?

MS. PENNER: Objection. This is another area your partner has already covered.

MR. CHAFFIN: I am asking about a 2015 document that hasn't been covered.

BY MR. CHAFFIN:

Q. At this time you could have done a 2015 degradation test. That was not done, correct?

MS. PENNER: Objection.

THE WITNESS: In -- if you look at the reports on this work, what we did was we set up some stability studies with tablets under different conditions of temperature and humidity with the aim of simulating the appearance of the tablets that had been generated. And then, you know, we to get a similar level of degradation. And then we characterized the impurity profile of those tablets.

BY MR. CHAFFIN:

Q. Understood.

And so the goal was to look at those impurities and identify them; is that right?

MS. PENNER: Objection.

THE WITNESS: Yes, it was to -- we set out to characterize all of the impurities that were present and above not .2 percent, that being the identification threshold for drug product of the dose such as ranitidine.

BY MR. CHAFFIN:

Q. Well, you just said .2 percent is the threshold. You actually can't identify impurities below that threshold based upon GC-MS or LC-MS. Is that correct?

MS. PENNER: Objection.

THE WITNESS: Because we had to formally characterize these structures, we had to go beyond just molecular weight characterization. For something like this, molecular weight characterization would not be considered specific. So, you know, an incredibly detailed and complex piece of work was done, you know, to pull out and separate and purify these low-level impurities. So, it wasn't just a question of just going by a LC-MS profile and get a molecular weight. We had to go into the next level, which was, you know, isolating impurities and using DMNR to actually get structures.

BY MR. CHAFFIN:

Q. And, in fact, what you did was HPLC. You didn't do GC-MS or LC-MS, correct?

MS. PENNER: Objection.
THE WITNESS: We did LC-MS. That was the first thing we did.
BY MR. CHAFFIN:
Q. Okay. And did you do LC-MS to the level that would have tested for NDMA?
MS. PENNER: Objection.
THE WITNESS: No.
(Exhibit 439, 2015 Toxicology Risk Assessment, marked for identification.)
BY MR. CHAFFIN:
Q. Okay. If we can have Exhibit 439, please. Actually, is this the toxicology risk assessment that was done in 2015? If you need us to scroll through, we will, obviously.
A. There are two reports written. I don't know whether this is the full one or the summary report from the front page, but do you know how many pages this document has?
Q. This one is 11. It says "Executive Summary."
A. This is the summary report. So, this doesn't contain all of the characterization data, but it does have a list of all the structures that were identified in this study.

Q. If we can move to page 4, please and just if you could read the identification of color impurities, please, to yourself.

A. None of the impurities identified were colored, so are not responsible for the discoloration observed. Some further analytical work has indicated that the impurities responsible for the formation for the color are probably present at a very low levels and below the limited detection used, the method used for determination of the impurity profile. Which essentially refers back to the previous study we did, which showed the color could be generated by very low levels of impurities that when you analyze them on the standard HPLC method, you don't pick the peaks up because they are below the level of constation.

Q. And for the 2015 study you also stopped and did not identify all the impurities; is that correct?

MS. PENNER: Objection.

THE WITNESS: It states here our aim was to identify everything over not .2 percent. There were -- we didn't completely achieve that because it wasn't possible to get pure samples of every one of them to do sort of a full characterization, and if you see the --

BY MR. CHAFFIN:

Q. Can we stop the share for a second.
Go ahead. I want to be able to see you, sir. I can't see you.
Go ahead.
A. You have to appreciate that this sort of characterization of a very complex mixture, which, you know, contains 30 or 40 percent impurities is not a straightforward exercise and, you know, the work that was done to get to the stage is a tremendous piece of analytical work.
Q. Understood.
So, just base points for me at least I am asking you didn't do GC-MS, correct?
MS. PENNER: Objection.
THE WITNESS: GC-MS --
BY MR. CHAFFIN:
Q. I am not asking you to explain, sir. We have 10 minutes left. I am asking basic questions.
Did you use GC-MS, yes or no?
MS. PENNER: Objection.
THE WITNESS: Well, I would like to qualify my answer.
BY MR. CHAFFIN:
Q. You can clarify it with Tom on the redirect or with Kim on the redirect.

I'm just asking -- I think you already said -- you didn't use GC-MS for the study. Is that correct?

MS. PENNER: Objection. You were asking a question. The witness has answered.

MR. CHAFFIN: I have. I asked a question which is a yes-or-no question. If you can't answer it, say yes-or-no question.

BY MR. CHAFFIN:

Q. Did you use GC-MS in this 2015 study?

MS. PENNER: Objection.

THE WITNESS: No.

BY MR. CHAFFIN:

Q. Okay.

A. Would you allow me to explain why.

Q. I am sure your counsel will on cross.

On the LC-MS, you used LC-MS, but you did not test below .2 percent impurities. Is that correct?

MS. PENNER: Objection.

THE WITNESS: No. And I've explain why because its it leads to the ICH identification threshold.

BY MR. CHAFFIN:

Q. And, sir, you've already said no one told you go look for NDMA or nitrosamines, correct?

MS. PENNER: Objection.

THE WITNESS: No one told me to. And as I said many times today, there was absolutely no scientific reason based on the degradation of ranitidine to do that.

BY MR. CHAFFIN:

Q. And, sir, you weren't looking just for the degradation. You were looking for potential impurities -- or excuse me, you know, solvent issues or coming things coming in the manufacturing facility as well; is that correct?

MS. PENNER: Objection.

THE WITNESS: In what context?

BY MR. CHAFFIN:

Q. You were looking at the break down, but then also potential contamination during manufacturing process you also looked at during these reviews in, in '11 and '15; is that right?

MS. PENNER: Objection.

THE WITNESS: No --

BY MR. CHAFFIN:

Q. Correct?

A. No, we -- the studies were both done to address specific impurity issues. They weren't -- we were not looking at anything related to the manufacturing process of the active ingredient. It

wasn't in the scope for the product --

Q. So, just so we're clear 2011/'15, your testimony is we didn't look at and consider whether there was a manufacturing defect that was causing this discolored pills.

Is that correct?

MS. PENNER: Objection.

THE WITNESS: No, no. We didn't because especially in the case of the first one, had there been a manufacturing issue that caused it, then every vial would have been discolored. And what we found was it was a sporadic event that caused it. So, it was not related to the API.

BY MR. CHAFFIN:

Q. So, sir, just for the sake of time, as I understand it, if you were looking to see whether manufacturing could be the cause of the problem, that could mean there could be an environmental contaminant that can be contaminating the drugs, and, therefore, causing discoloration.

Is that a fair statement?

MS. PENNER: Objection.

BY MR. CHAFFIN:

Q. Resolvents or something. Solvent on something of that nature?

A. As I said before, you know, the conclusion from the study in 2010 with the yellow discoloration was the impurities that we identified were related to ranitidine. We could tell that from the mass spec data. So, that's not environmental contamination. It's something that's forming from ranitidine.

Q. And sir, it's fair to say that none of the 2011 or '15 assessments -- and certainly the '15 tox assessment -- had a section which discussed potential impurities within ranitidine from the public literature. Is that fair?

MS. PENNER: Objection.

THE WITNESS: Well, I think you will find that in the degradation profile that we identified we actually identified pretty much all of the known degradants in that list. So -- as well as 20 structures, but a lot of them were the known degradants that had been previously published.

BY MR. CHAFFIN:

Q. So, for example, there's nowhere cited in those studies the NDMA formation by cloramination of ranitidine kinetics on mechanism out of France. There was no reference in any of them from the Shen and Andrews work about the formation of NDMA from ranitidine. There's nothing in there from the Shen and

Andrews piece from NDMA formation kinetics from three pharmaceuticals and 4 water matrices, which is including ranitidine. Correct?

MS. PENNER: Objection. If you want to talk about what's in a document, please show him the document -

THE WITNESS: I need to see the documents because I'm guessing that those documents may well be related to -- you mentioned water.

Are they related to water treatment?

BY MR. CHAFFIN:

Q. Some of them are, yes.

A. Yeah, that's an irrelevant to the RCA because the water treatment involved substance for chloramine, which is a very reactive substance and it's the interaction of chloramine with ranitidine that caused that, which is not relevant to RCA.

Q. So, I am asking a different question, sir, and I get it.

I can see if you said, Hey, you know what we knew that we considered it, but it wasn't relevant to us. But you didn't consider it at all. Isn't that true?

MS. PENNER: Objection.

BY MR. CHAFFIN:

Q. No one brought to your attention; isn't the true?

MS. PENNER: Objection.

THE WITNESS: It wouldn't be relevant to the 2015 investigation, but in the RCA in 2019, absolutely that was considered as an -- in the brainstorm list of potential root causes. We absolutely did consider it, but, you know, based on the way things turned out it was clearly something to be discounted.

(Simultaneous crosstalk.)

Q. So, we go back and look at the documents we will see these articles cited. Is that a fair statement?

MS. PENNER: Objection.

THE WITNESS: In the RCA report it lists chloramine in interaction forming NDMA as one of the potential root causes. You know, we didn't put a lot of references to that in there, but it's a well-established phenomenon that has a number of publications, so that's why we considered it in the RCA.

BY MR. CHAFFIN:

Q. Did you write anything in any root cause analysis prior to 2019 about NDMA forming from ranitidine?

MS. PENNER: Objection.

THE WITNESS: No.

BY MR. CHAFFIN:

Q. And, in fact, you testified earlier today that you didn't even know about it being related until 2019. Isn't that correct?

MS. PENNER: Objection.

THE WITNESS: That is -- that was -- yes, that was the first link between NDMA ranitidine in terms of being present in the product.

I mean, things happening in water treatment plants, that is a completely separate issue.

BY MR. CHAFFIN:

Q. I understand that's your, sir --

A. It's a separate issues --

(Simultaneous crosstalk.)

Q. -- my question is: You can't consider something you don't know. Isn't that true?

MS. PENNER: Objection.

MR. CHAFFIN: Withdrawn. Let's move on.

(Exhibit 3158, GSKZAN0002500341, marked for identification.)

BY MR. CHAFFIN:

Q. Can I have Exhibit 3158, please.

Sir, you have three lawyers in the room with you, correct?

A. Yes.
Q. Two of them are from America; is that right?
A. Yes.
Q. They spent days quarantined, so they could be here for your deposition, to be present your deposition in the room in London. Isn't that right?
MS. PENNER: Objection.
THE WITNESS: They did, but, obviously, I don't know the relevance of that. That is just the rules of the coronavirus at the moment --
BY MR. CHAFFIN:
Q. Sir, when is the first time you started talking to the legal department or lawyers about the litigation?
A. I mean, I was aware of the litigation, as I say last year. Having specific discussions about the litigation and how it, you know, involved me started, as I mentioned this morning, in preparation for the deposition that I was meant to have in March.
Q. And this publication in front of us is from October 4, 2020; is that correct?
A. Yeah, it was published I think in December.

Q. And that's the root cause analysis that you worked on for the company internally that ultimately got published; is that right?

A. Yes.

MS. PENNER: Objection.

BY MR. CHAFFIN:

Q. And I believe if we look in the notes and back it says, "The authors declared no competing financial interest."

Is that a statement you made as an author of this article, you declared there was no competing financial interest. Is that correct?

MS. PENNER: Objection.

THE WITNESS: There is no -- there is no financial interest implication in this document at all.

BY MR. CHAFFIN:

Q. Understood. And sir you, are not -- all the authors, King, Searle, and Urquhart, those aren't the only three authors of this document. Isn't that true?

MS. PENNER: Objection.

THE WITNESS: Other people contributed to the work that's described in this, but, you know, it's not normal to -- I mean, people that do some analysis to support something wouldn't necessarily be the author and

not involved in writing anything.

BY MR. CHAFFIN:

Q. Were there any nonscientists that contributed to this work?

MS. PENNER: Objection.

THE WITNESS: No.

BY MR. CHAFFIN:

Q. Did lawyers contribute to this work?

MS. PENNER: Objection. Direct the witness not to answer.

MR. CHAFFIN: You know what? If you want to direct him not to answer I will take to the Court, that's fine. But I will ask lots of questions around this and I think I'm entitled to an answer because there's been fraud on this journal.

MS. PENNER: Excuse me?

BY MR. CHAFFIN:

Q. Has there been an attorney --

MS. PENNER: Wait. Excuse me --

(Simultaneous crosstalk.)

MR. CHAFFIN: If you want to direct him not to answer, direct him not to answer.

MS. PENNER: What are you talking about?

MR. CHAFFIN: I don't need to tell you what I am talking about. I'm entitled to ask my question.

If you want to object and direct him not to answer, do so.

MS. PENNER: All right. Ask your question.

BY MR. CHAFFIN:

Q. Sir, did any attorneys write any portion of this article?

A. No --

MS. PENNER: Objection. You can answer.

THE WITNESS: No.

BY MR. CHAFFIN:

Q. Did the attorneys make suggestions about inserting something in this article?

MS. PENNER: Objection. You can answer.

BY MR. CHAFFIN:

Q. Understanding, sir, that you declared in this journal that there was --

MS. PENNER: Wait. Wait. Did you let him answer --

MR. CHAFFIN: -- going to finish.

BY MR. CHAFFIN:

Q. Understanding, sir, there was no one - you have made the representation to this journal that no one, none of the authors have a financial interest and you only listed three authors here.

Knowing that, did any attorneys provide any sections of this article?

A. No.

MR. SHEEHAN: Erik, just so you know, you're over seven.

MR. CHAFFIN: Okay. I've got a minute 45 according to mine.

BY MR. CHAFFIN:

Q. Sir, if we can have --

MR. CHAFFIN: John, if we could have 3159, please.

MR. SHEEHAN: John, where are we at?

I don't think it's a minute 45, Eric. I mean, I'm happy for you --

Are you starting up a new line of questioning --

MR. CHAFFIN: I'm done. Literally, like, five minutes and I'll be done. All right?

MR. SHEEHAN: All right. Five minutes. Five minutes. We are setting the clock here. Let's go.

BY MR. CHAFFIN:

Q. Exhibit 3159, please.

Sir, do you see this document?

A. I could see that document, yes.

Q. Did you see it in preparation for

your deposition?

A. It's a draft of the publication.

Q. Okay. Sir, the section that reads, "Since the initial marketing of ranitidine advances in analytical technology, especially in mass spectrometry, has significantly increased the sensitivity of detection for these trace level impurities, which may have produced their discovery earlier in this product life cycle."

Did you or somebody else draft that sentence in the article before we move on to it?

MS. PENNER: Objection.

THE WITNESS: This is an abstract that summarizes the -- I wrote this abstract.

BY MR. CHAFFIN:

Q. Okay. I understand the abstract, but the article itself, the provision I just read into the record writing about analytical testing and the life cycle of it, did you or one of the authors listed write that statement, yes or no?

MS. PENNER: How about you show that statement to him?

THE WITNESS: You need to show me.

BY MR. CHAFFIN:

Q. So, if we can go back to Exhibit

3158, please, John. Last part of the first paragraph. Blow it up for the ladies and gentlemen of the jury, please. Under the introduction -- under introduction, please. Since the initial marketing of ranitidine, advances in analytical technology, especially in mass spectrometry, have significantly increased the sensitivity detection for these trace level impurities which may have precluded their discovery earlier in the product life cycle.

Did you or one of the listed authors write that statement?

A. That would have been written by the analytical contributor Fiona King.

Q. So, to the extent that someone else wrote it, you wouldn't be aware of it. Is that correct?

MS. PENNER: Objection.

THE WITNESS: I am aware of it, but, you know, there are multiple authors on this, so I didn't write every word of this.

BY MR. CHAFFIN:

Q. Understood. But I am asking whether one of the three authors wrote that statement.

MS. PENNER: Objection.

THE WITNESS: Yes.

BY MR. CHAFFIN:

Q. And did any of the reviewers suggest removing that statement from the abstract and from the introduction of the article?

MS. PENNER: Objection.

THE WITNESS: I'm not aware that they did.

BY MR. CHAFFIN:

Q. And you are aware that this goes, undergoes peer review publication or peer review for publication; is that correct?

MS. PENNER: Objection.

THE WITNESS: I know this document was peer reviewed as part of the approval process for the document externally.

BY MR. CHAFFIN:

Q. And you were part of that peer-review process, correct?

A. No --

MS. PENNER: Objection.

THE WITNESS: I wasn't. Peer review was done by independent people who had no previous knowledge of this publication.

BY MR. CHAFFIN:

Q. Understood. So, independent people who would have reviewed it, given feedback, and said to

you and the others on the article as authors, they would make constructive comments about how to edit the article. Is that correct?

MS. PENNER: Objection.

THE WITNESS: They make comments, but some of it can be taken on board, but they are just comments. Ultimately, we can say no, we want to keep things as written.

BY MR. CHAFFIN:

Q. And that particular statement, legal told you to keep in the document; isn't that correct?

MS. PENNER: Objection. Don't answer that one.

MR. CHAFFIN: Don't answer it?

MS. PENNER: Don't answer it.

(Exhibit 3159, GSKZAN0000225809, marked for identification.)

BY MR. CHAFFIN:

[redacted]

[redacted]

[redacted]

BY MR. CHAFFIN:

Q. -- things that were added on the instruction by lawyers, correct?

MS. PENNER: Objection.

THE WITNESS: And Phil. Phil is not a lawyer.

BY MR. CHAFFIN:

Q. Who is Phil?

A. Phil Dell'Orco. He was our -- on the CET sub team.

Q. I see. And so both Phil --

MR. SHEEHAN: Eric --

MS. PENNER: Eric, you are over time --

MR. SHEEHAN: You are well over. I mean, honestly, this is well over.

MR. CHAFFIN: So, you are cutting me off. We're just going to be clear about this. We have

questions pending on this issue, and we are stopping; is that right.

MR. SHEEHAN: Well, you said you will finish five minutes, and you haven't.

MR. CHAFFIN: You know, I really wish I could have, but there's been a number of objections, and I would like to finish. But if you want to stop the deposition right now, that's fine. And we will probably take it up with the magistrate to be able to come back and ask these questions.

MR. SHEEHAN: Well, we will do a short redirect, we will finish the deposition. If you want to bring it to the magistrate, that's, of course, your prerogative.

MR. CHAFFIN: Okay.

MR. SHEEHAN: All right.

Let's take 10 --

MR. CHAFFIN: Sounds good.

MR. SHEEHAN: And we will be back.

THE VIDEOGRAPHER: Going off the record. The time is 1922 UTC.

(Off the record.)

THE VIDEOGRAPHER: Please stand by.

We are back on the record. The time is 1935 UTC. Please proceed.

MR. CHAFFIN: Mr. Searle, I just want to talk to the attorneys for the second.

So, I think where we are, obviously, we were rushed, especially here at the end.

We feel that we probably need a day and a half with this witness, you know, especially as we got into things today, but certainly eight hours. You know, we certainly don't feel we've had a full opportunity to explore a number of areas of questioning, including some important documents. That combined with the tech issues that we were experiencing which certainly slowed things down, which is a problem for this international deposition, as well as the exhibits -- and in light of that, we are planning to do a written submission to the Court to ask for additional time. Additionally, we reserve on the issues of if this witness's testimony is designated under Rule 26, we reserve the right to ask appropriate questions at that time.

[redacted]

[redacted]

So, we will deal with it with the Court.

MR. CHAFFIN: Understood.

MS. PENNER: Are you ready, Mr. Searle?

THE WITNESS: Yes.

EXAMINATION BY MS. PENNER:

Q. Mr. Chaffin asked you a number of questions related to RCA.

Do you recall those?

A. Yes.

[redacted]

[redacted]

Q. Do you stand by the scientific accuracy of the article?

A. I absolutely stand by the scientific conclusions.

Q. In 2011, based on your review or based on your investigation of the yellow discoloration, did you have any reason to believe that the yellow discoloration was related to NDMA?

A. Absolutely no reason at all, no.

Q. In 2015, based on your investigation of the brown discoloration, did you have any reason to believe that the brown discoloration was NDMA?

A. No.

Q. In 2015, Mr. Chaffin -- in reference to your 2015 investigation, Mr. Chaffin asked you whether or not GC-MS was used, but did not provide you

an opportunity to complete your answer.

Would you like to do so now?

A. Yeah. I mean, the reason is that what we were looking to detect there were related impurities to ranitidine. You know, GC-MS is not a suitable technique to analyze for the presence of ranitidine or its related impurities because it's a technique that relies on vocalizing compounds and separated by boiling point. These are solid compounds that do not have a boiling point. So, it's just not a relevant analytical technique for analyzing related impurities such as that.

Q. Again, looking at the discoloration investigations, why was there no reason for you to think that the discoloration was due to NDMA?

A. So, I mean there's a very simple explanation and that is looking at the NDMA molecule. As I said before, you know, organic molecules being colored is due to absorbants in the visible region of the spectrum, which is between 400 and 700 nanometers. The spectrum for NDMA shows no absorbants in that region. So, fundamentally, NDMA is not a colored molecule. I mean, I will add, because someone may look this up, it is described as a pale, yellow liquid, but that color is not due to properties of molecule NDMA

because it doesn't -- that's most likely due to trace level impurities, which are very common in nitrogen-containing organic molecules. And furthermore, if you take, you know, as I say, a neat sample a NDMA that may be pale yellow, if you dilute that solution to a concentration of just even one percent, you see no color at all. And, clearly, one percent is 10,000 parts per million. And there's no color observed there. So, to expect NDMA, therefore, to impart color when it's present to one ppm level, there is no scientific basis for that, you know, discoloration can't be due to a molecule that's not colored.

Q. Mr. Searle, earlier in the day Ms. Luhana asked you a number of questions about your CV.

Do you recall that?

A. Yes.

Q. And were you aware of the litigation hold with respect to documents related to ranitidine?

A. Yes.

Q. And did you comply with that litigation hold --

A. Yes.

Q. Did you leave any documents relevant to the issues of ranitidine and NDMA?

A. No.

Q. You mentioned earlier that it is not reasonably predicted from the molecular structure of ranitidine that it could degrade to form NDMA.
Could you are explain why it is not reasonably predicted?
A. Yes. So, as has been covered many times a day, the formation of nitrosamine requires two components. Secondary or tertiary amine and a nitrosating source; e.g., nitrate, nitrous acid is a common example. Looking at the structure of the ranitidine molecule, it does contain a tertiary amine, but it does not contain a nitrate or nitrite group. It has been erroneously described as that in certain documents, but that is a nitro group. So, you know, the atoms are effectively connected in the different order. And that means it's, you know, not a nitrosating agent, you know, sitting there on the molecule waiting to sort of jump off and react with the dimethylamino group.
Understanding the chemistry that would be required to convert that functional group into a nitrosating agent is not something that we are able to come up with a, what we call a reasonably predicted mechanism. The phrase "reasonably predicted" I use a lot. What that means is that there's precedent within the, you know, organic chemistry knowledge and

literature and published knowledge that would indicate that a particular pathway could occur to generate a nitrosating agent. That mechanism is not known. There's no precedent and no mechanism at this point for that reaction. And that's after, you know, as part of the RCA, one of the focus was, you know, can we identify a mechanism. And we came up with a number of ideas, but you know to date, none of them have proved to be correct. We just indicate, you know, how not obvious this mechanism is.

And, furthermore, you know, I mentioned, you know, the rate of formation of NDMA without going into too much detail is incredibly slow. And that's further indication that whatever this reaction pathway is, it's not something obvious precedented. It's very unobvious. It's very, very slow, which means that it's a disfavored process.

And then finally, you know, we do know about degradation pathways of ranitidine. They have been studied historically and as part of the 2015 investigation; and that's identified, you know, a large number of structures that form from ranitidine when it degrades. Those structures do not contain any sort of markers that would suggest a degradation pathway is occurring that would release, you know, either of the

components required to form NDMA. You know, we see, you know, the relevant functional groups, you know, remaining intact in those degradation studies. There is nothing in there that would suggest this pathway is occurring.

And, finally, there's a lot been said today about the interaction of nitrite with the ranitidine molecule, but, you know, the studies that had been done on the nitrosation of ranitidine from a chemistry point of view indicate that there are three sites where nitrosation can occur and the site that would lead to the formation of NDMA is the least sort of reactive of those sites. So, small amounts of nitrite, we would predict, would be reacting to give, you know, a different product and not lead to NDMA formation. So, I think that probably sums up the position.

MS. PENNER: Thank you, Mr. Searle.

I have nothing else right now.

MR. SHEEHAN: All right. We've done.

MR. CHAFFIN: I have some redirect, actually.

MR. SHEEHAN: You should have reserved some time, Eric.

MR. CHAFFIN: So, if you don't want to offer to give me the time, that's fine. We will put it on

motion as well.

MR. SHEEHAN: How much do you have?

MR. CHAFFIN: I don't know.

MR. SHEEHAN: You can't estimate at all? You can't give any --

MR. CHAFFIN: Probably -- probably about 15 minutes on these points --

MR. SHEEHAN: 15 minutes? It wasn't even 15 minutes of redirect.

MR. CHAFFIN: Okay.

MR. SHEEHAN: How can you have 15 minutes?

MR. CHAFFIN: I'm not competent, Tom. I will try my best.

MR. SHEEHAN: Come on, Eric. Come on. Give me a break. We are more than happy to work with you, but, you know, you are making this pretty unreasonable here.

MR. CHAFFIN: Maybe it will be much quicker -- if he answers my question as easily as he answered your colleagues, this will go very quickly, but I have a feeling he won't. And so that's why I'm saying it will take 15, but if he answers my questions, I am hopeful it will go very fast.

MR. SHEEHAN: We will give five minutes.

MR. CHAFFIN: Okay. Well, we will see where it goes. I'm actually objecting to that, and I will reserve the right to take it to the Court.

EXAMINATION BY MR. CHAFFIN:

[redacted]

[redacted]

[redacted]

[redacted]

Q. Fair enough.

Sir, I talked to you a few minutes ago -- and I think you will agree with me that, obviously, what end point you define it is an important question when you are doing an scientific inquiry, is that a fair statement? You agree with me on that?

MS. PENNER: Objection --

THE WITNESS: I really don't understand your question at all. It's not clear at all.

BY MR. CHAFFIN:

Q. Do you agree --

(Simultaneous crosstalk.)

Q. Do you agree that for purposes of a study it's important to vet and understand what questions being asked for purposes of the inquiry? Do you agree with that?

MS. PENNER: Objection.

THE WITNESS: I refer to my previous answer in a root cause analysis troubleshooting type investigation, what we would tend to do is to define a problem statement, which defines what's the problem we are trying to understand. That's what we do.

BY MR. CHAFFIN:

Q. And, certainly, what question is asked is important to what the outcome may be, correct?

MS. PENNER: Objection.

THE WITNESS: You know, I don't possess a crystal ball. When you do root cause investigations, you don't actually know the answer you are trying -- you don't know the answer --

(Simultaneous crosstalk.)

BY MR. CHAFFIN:

Q. -- understood. So, the question you ask is important, correct?

So, is the coloration of the pill in 2011? That's the questions being asked. That's what you focus on the answer for. Is that correct?

MS. PENNER: Objection.

THE WITNESS: You are just repeating what I said before. Yes --

BY MR. CHAFFIN:

Q. And that --

A. That's fine.

Q. That's where I started my line of questions. You could have saved two minutes by just saying, yeah, I agree with you on that, but that's okay.

MS. PENNER: Objection.

BY MR. CHAFFIN:

Q. Ms. Penner asked you the question which she defined as discoloration of the pill mean -- is that caused by NDMA and you said, no, it's not.

Let's ask a different question.

If the pill is discolored does, it mean there may have been NDMA present as well, which would have been found if you actually did what you did in 2019 and '20? If I asked you that question, what is the answer to your question?

MS. PENNER: Objection.

THE WITNESS: It's -- as I have said before, in 2015 and 2010 and just thinking through it in great detail, NDMA is not a reasonably predicted impurity --

Q. Those --

(Simultaneous crosstalk.)

A. - therefore, we will not look for it. We don't go looking for stuff just because people think

it will jump out of the molecule.

BY MR. CHAFFIN:

Q. See, these attorneys are letting me get five minutes of questions and you say "I can't answer your question." Just tell me you can't answer the question.

MR. SHEEHAN: Eric, you are past five minutes.

(Simultaneous crosstalk.)

BY MR CHAFFIN:

Q. And so --

MR. SHEEHAN: We're done. Were done. You are over five minutes. We have been more than fair today. More than fair. You can bring your arguments to the Court. You can brings your arguments to Court. And if they rule in your favor, you know, then we will deal with it. But we are done for today.

MR. CHAFFIN: You are cutting him off and direct him not to answer my question. Is that right, Tom?

MR. SHEEHAN: There was no question pending.

MR. CHAFFIN: Yeah, there is. There is a question pending.

MR. SHEEHAN: No, that was the last

question --

THE WITNESS: I answered it.

MR. SHEEHAN: We are done.

THE WITNESS: I answered it.

MR. CHAFFIN: Okay. Listen, I am going to put on the record, if these attorneys are that desperate to end the deposition, then so being it, but I have not had an opportunity to effectively question the witness on these cross points before he is prepared yet again, which you reserve the right to talk to him subsequently about the deposition. I ask on the record that you not discuss the substance of his testimony with him between now and the time we get to cross him again.

MR. SHEEHAN: Eric, you have had well over seven hours, between you and Roopal, pursuant to PTO54. That's what you get. You now want another half day. There was enormous waste of time today about irrelevant subjects, but you guys can choose to ask him -- you choose to use your time how you want. You got to the end. We have been more than fair. We've granted you extra time.

So, we will, obviously, oppose any effort to bring this guy back. He has made himself available today. You used your time how you saw fit. We are going to oppose any effort to bring him back.

MR. CHAFFIN: And as I put on the record and I will just say, there are many issues with this witness, including, certainly, the validity of the root cause analysis, which is being offered as a defense in the litigation, has been since the beginning. We haven't had an opportunity to fully explore it. We needed at least eight hours. We've asked for that all along. I don't think it would have been unreasonable to ask for two days for this deposition. We tried to get it done. It is what it is. We each have our record, and we will make our submission to the Court.

MR. SHEEHAN: There hasn't been any meet and confer about eight hours with respect to Andy Searle that I am aware of anyways.

And I would just note for the record it took a solid four hours - you are talking about the RCA, it took a solid four hours to even bring up the RCA today before you even got into it, you used four hours of time.

MR. CHAFFIN: All right. Fair enough. We've got our record.

We can go off the record.

THE VIDEOGRAPHER: We are going off the record. The time is 1956 UTC.

-oOo-

(Deposition concluded at 1956 UTC)

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: In RE: Zantac (Ranitidine)
Dep. Date: Tuesday June 18, 2021
Deponent: ANDREW SEARLE

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that if offer these changes as if still under oath.

____________________

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS____DAY OF____________, 2021.

_______________________________

(Notary Public)

MY COMMISSION EXPIRES:_______

DEPOSITION ERRATA SHEET:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |

DEPOSITION ERRATA SHEET:

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |
| ____ | ____ | __________________ | __________________ | ________ |

SIGNATURE:___________________ DATE: ________

C E R T I F I C A T E

I, MELISSA A. MORMILE, a Certified Shorthand Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination of ANDREW SEARLE was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any party in this action and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the event nor outcome of this action.

Melissa Mormile

______________________________

Melissa Ann Mormile

Certificate No. 30X100223800

6/22/21

| | | | |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| | | | |

# EXHIBIT 28

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

________________________________/

VIDEO RECORDED DEPOSITION OF

MARY BETH TERRY, Ph.D.

Taken on behalf of the Plaintiffs

(Via videoconference)

DATE TAKEN: Tuesday, May 31, 2022

TIME: 9:12 a.m. - 8:38 p.m. EDT

PLACE: US Legal Support - Remotely

Reported by:
CANDIDA BORRIELLO
JOB NO. 6142252-001

Page 2

A P P E A R A N C E S:

Appearing on behalf of the Zantac PSC:

ANAPOL WEISS
One Logan Square
130 N. 18th Street, Suite 1600
Philadelphia, Pennsylvania 19103
BY: JAMES R. RONCA, ESQ.
TRACY A. FINKEN, ESQ.
CATELYN McDONOUGH, ESQ.
E-MAIL: jronca@anapolweiss.com
tfinken@anapolweiss.com
cmcdonough@anapolweiss.com

Appearing on behalf of the Zantac PSC:
LEVIN PAPANTONIO
316 South Baylen Street
Suite 600
Pensacola, Florida 32502
BY: DANIEL NIGH, ESQ.
E-MAIL: dnigh@levinlaw.com

Appearing on behalf of the Defendants,
Walmart, Inc. and GlaxoSmithKline, LLC
GlaxoSmithKline, PLC

SHOOK, HARDY & BACON, LLP
1325 Avenue of the Americas
28th Floor
New York, New York 10019
BY: THOMAS J. SHEEHAN, ESQ.
E-MAIL: tjsheehan@shb.com
-and-

Page 3

SHOOK, HARDY & BACON LLP
Jamboree Center
5 Park Plaza, Suite 1600
Irvine, California 92614
BY: MICHELLE M. FUJIMOTO, ESQ.
E-MAIL: mfujimoto@shb.com

-and-

SHOOK, HARDY & BACON, LLP
2555 Grand Boulevard
Kansas City, Missouri 64108
BY: JENNIFER STONECIPHER HILL, ESQ.
E-MAIL: jshill@shb.com

-and-

DECHERT, LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
BY: RACHEL PASSARETTI-WU, ESQ.
E-MAIL: rachel.passaretti-wu@dechert.com

Appearing on behalf of the Defendant,
Teva Pharmaceuticals:

GREENBERG TRAURIG, LLP
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
BY: JAMES R. BROWNING, ESQ.
E-MAIL browningj@gtlaw.com

Appearing on behalf of the Defendant,
Chattem, Inc., Sanofi U.S. Services, Inc.,
Sanofi-Avertis U.S. LLC:

DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
BY: BRADLEY JENNINGS, ESQ.
E-MAIL: bradley.jennings@dlapiper.com

Page 4

Appearing on behalf of the Defendant,
Pantheon Manufacturing Services, LLC:

BOWMAN and BROOKE, LLP
2901 Via Fortuna
Suite 500
Austin, Texas 78746
BY: JOHN D. GARRETT, ESQ.
E-MAIL: john.garrett@bowmanandbrooke.com

Appearing on behalf of the Defendant,
Mylan Pharmaceuticals, Inc.:

PIETRAGALLO, GORDON, ALFANO,
BOSICK & RASPANTI, LLP
One Oxford Centre
301 Grant Street, 38th Floor
Pittsburgh, Pennsylvania 15219
BY: JASON M. REEFER, ESQ.
E-MAIL: jmr@pietragallo.com

ALSO PRESENT:

CAROLINE CHAMPION, Scientific Specialist
King & Spalding LLP

STEVE ROTMAN, ESQ.
HAUSFELD
One Marina Park Drive
Suite 1410
Boston, Massachusetts 02210

VIDEOGRAPHER: MICHAEL HOLLANDER
DOCUMENT TECHNICIAN: JOHN SCHMITZER

Page 5


-------------------I N D E X------------------

WITNESS: MARY BETH TERRY

| EXAMINATION BY | PAGE |
|---|---|
| MR. RONCA | 8 |
| MS. FINKEN | 191 |
| MR. SHEEHAN | 381 |
| MS. FINKEN | 383 |

----------------E X H I B I T S--------------

| NUMBER | | PAGE |
|---|---|---|
| Exhibit 6727 | | 14 |
| Exhibit 6736 | | 67 |
| Exhibit 6732 | | 82 |
| Exhibit 6739 | | 104 |
| Exhibit 6403 | (Previously Marked) | 121 |
| Exhibit 6729 | | 128 |
| Exhibit 6433 | | 143 |
| Exhibit 6457 | (Previously Marked) | 152 |
| Exhibit 6737 | | 153 |
| Exhibit 6423 | (Previously Marked) | 176 |
| Exhibit 6341 | (Previously Marked) | 303 |
| Exhibit 6349 | | 342 |

-------Portion of transcript marked--------
Page 61

---------------R E Q U E S T S---------------

| | |
|---|---|
| Updated materials considered list that reflect citations contained in Dr. Terry's report | 384 |

THE VIDEOGRAPHER: We are now on the record.

Participants should be aware that this proceeding is being recorded and as such, all conversations held will be recorded unless there is a request and agreement to go off the record.

Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness-only video recording, the witness is being spotlighted or locked on all video screens while on speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather than just the witness. For anyone who doesn't want the witness' video to take up a large part of your screen, you may click the gallery view button on the upper right corner of the RemoteDepo interface.



This is the remote video-recorded deposition of Mary Beth Terry, Ph.D. being taken by counsel for the plaintiff.

Today is Tuesday, May 31, 2022. The time is now 1:12 p.m. UTC time. We are here in the matter of Zantac ranitidine products liability litigation.

My name is Michael Hollander, remote video technician on behalf of US Legal Support. I am not related to any party in this action, nor am I financially interested in the outcome.

At this time, will the reporter, Candida Borriello, on behalf of US Legal Support, please enter the statement for remote proceedings into the record.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.



They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his or her testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objection to this manner of reporting.

If there are no objections, I will now swear in the witness.

M A R Y  B E T H  T E R R Y,
called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. RONCA:

Q. Good morning, Dr. Terry.
A. Good morning, Mr. Ronca.
Q. I was just going to introduce myself, I'm Jim Ronca and I represent a number of individuals who have filed suit because they took ranitidine on a long-term basis and they had developed cancer.



I'm going to be asking you some questions today regarding your expert report that you offered in this case.
Have you ever been deposed before?
A. I have not been deposed before.
MR. SHEEHAN: Jim, one -- just one second.
Is this too loud, Mary Beth? Do you want to turn down or is it okay? Is the volume okay?
THE WITNESS: It's okay.
MR. SHEEHAN: Okay, go ahead.
MR. RONCA: Do I sound super loud in there?
MR. SHEEHAN: A little -- a little loud in this room. You know, let me just hit the V real quick.
MR. RONCA: What's it gonna sound like when I actually raise my voice?
MR. SHEEHAN: That's what I'm concerned about. Go ahead, Jim, say something.
MR. RONCA: Dr. Terry, nice to meet you this morning.
MR. SHEEHAN: Okay, perfecto.

THE WITNESS: Very nice to meet
you too.
BY MR. RONCA:
Q. Okay. Have you ever testified in court?
A. I have not testified in court.
Q. Have you ever been involved as an expert witness even on just a consulting basis in litigation before?
A. I was involved very briefly before, but I did not -- it did not go to deposition and I was involved very briefly.
Q. And what type of case was that?
A. It was DES, case on DES.
Q. How long ago was that, approximately?
A. Sorry. Yeah, I don't remember approximately, six or seven years ago. I would definitely have to look it up.
Q. And is that the only other time you've been a consultant in litigation other than in this case?
A. Yes, I've actually been approached a lot, but I -- I did not get involved in the past. Yeah.



Q. You understand that your testimony today is under oath and it's the same as if you were in court?
A. Yes, I understand that.
Q. Just a couple rules since you haven't been deposed before. I'm sure the very, very fine attorneys that are representing defendants have gone over all this with you, but I'll just go over with you briefly.
During the course of the deposition, I'll be asking you questions you'll provide answers. It's important for the court reporter that we try not to talk over one another so that the court reporter can get everything down. So, I understand from time to time we might jump in, we shouldn't try to do that.
Is that okay?
A. That makes a lot of sense. The court reporter has a very hard job.
Q. Yeah, it's always amazed me.
MR. RONCA: And while we just said that, can the court reporter -- can you send me the link for the realtime?



THE COURT REPORTER: You want me to do that right now, we'll just pause for a second. Someone from -- if you want pause for a second, I can send that now, is that okay?
MR. RONCA: Yep.
(Brief pause in the record.)
THE COURT REPORTER: Sent.
MR. RONCA: Thank you.
Q. During the course of the deposition, if I ask a question and you don't understand my question for any reason, I may ask it poorly. You may be -- have been distracted or you may be thinking about your prior answer, for whatever reason, if you don't understand the question, would you please tell me that and I'll try to repeat it or rephrase it.
A. Of course.
Q. If you answer a question, can we assume that you believe you understood it before you answered; is that fair?
A. Yes, that's fair.
Q. If you need a break, let us know and we'll try to do that. The only proviso



on that is we usually don't take a break when a question is pending and there's not been an answer, all right?
A. Okay.
Q. During the course of the deposition, we may refer to documents and I think you have access to them in the Box and I may ask for it to come up on the screen, like a screen share, I'm sure you're familiar with that, so you can also look at the document on the screen or a specific part of the document that I'm referring to, okay?
A. Okay.
Q. Who's in the room with you?
A. Just Tom Sheehan.
Q. Okay. How many hours did you spend preparing for this deposition, approximately?
A. Approximately -- approximately 10 or 11 hours.
Q. In this case, you provided an expert report dated March 7, 2022?
A. Yes.
MR. SHEEHAN: And -- and just so you know, Jim, she's got a hard copy in front of her.

MR. RONCA: Okay. Thank you.
So, can we bring up Exhibit 6727, please, see how this works.
(Exhibit 6727 was marked for identification.)
BY MR. RONCA:
Q. I know you may be waiting for it to appear in the Box, but do you see the expert report at least the first page of it on the screen, Dr. Terry?
A. I see it on the Zoom screen, I don't see it in the Box.
MR. RONCA: So, let's practice that function of getting it in the Box and the doctor being able to see it.
THE VIDEOGRAPHER: If you refresh it, it should show up.
A. Okay, I see it.
Q. All right. So, that will probably be the rule going forward, you need to refresh so you can see the document, okay?
A. Okay.
Q. Great, all right. So, now, let's go over what your report consists of. So, as I have it, pages 1 to 107 are the text of



your report, not sort of a narrative text; is that right? And you can go to page 107 of the document.
A. Yes, that's correct. That's correct.
Q. Right, okay. And then after that, you've got pages 108 to 114 and these are tables where you give certain information about the studies that you reported on in your narrative; is that fair?
A. Yes, that's fair.
Q. Okay. Then after that is Exhibit A and the pages aren't numbered that I saw, but it's pages 119 to 229 of 250 of the PDF, that's your curriculum vitae.
A. Yes, that's correct.
Q. And then Exhibit B is a document called materials considered?
A. Yes, that's correct.
Q. And that starts, I guess, at page 230 of the PDF. You can go to page 230.
A. Yes, that's correct.
MR. RONCA: So, John can we just go to 230 without scrolling through?
Q. Okay, materials considered. Okay.



So, my initial question is regarding materials considered list.
How is this made up?
A. So, this includes all of the documents that would've been cited in the report and documents that I reviewed to make this expert report.
Q. Okay. And one of the reasons I have questions is because when I look in your report, some of the items in the report are not in this materials considered list. For example, Hidajat rubber worker study and McElvenny study are cited in your report and discussed, but I don't see them on this list.
Can you check that?
A. Which specific study are you referring to?
Q. The Hidajat rubber worker 20 -- it's also been referred to 2019A?
A. Yeah, on page 8 I see the job matrix Hidajat paper.
Q. Page 8 of Exhibit B?
A. Yes, uh-huh.
Q. Yeah, that's the job exposure matrix, that's not the Hidajat study, right,



that we -- you refer to in the text?
A. No, that's a separate paper.
Q. Is that listed on your materials considered list, that paper?
A. I don't see it here now, no.
Q. And what about McElvenny, you refer to that also? They're alphabetical, so maybe if we go to the end, take a look.
MR. RONCA: You went past it, John. Go back to M, these are in alphabetical order. There you go. Go up one more page, page 13.
A. Yeah, I don't see it here, no.
Q. Okay. How is it that we have an -- and these aren't the only examples, we have referenced in your text of your report, but no reference on your materials considered list?
A. Yeah, I don't know, but all of the citations that I have in my report are the citations that I -- that I referred to, so I can prepare a revised list for the -- for the materials considered to include those two.
Q. But my inclination, I believe that you're a very careful writer and you've done

many papers that have been published which have references and I'm surprised that you would miss references here.

So, my question is, did you make up this list or did someone else make up this list?

MR. SHEEHAN: Objection to the colloquy.

You can answer when I object.

A. Okay. So, I worked on this in the rigorous way that I do all of my reports and when I add citations, I used what's called the PMID locater in the comments and I -- I would do that throughout this report. So, I would put that PMID locater in the comments and the full reference in comments, so that like I typically do where my research assistant puts the bibliography together. And so that's what I did here, I put in the text of the comments all of the references to the articles that I looked at.

Q. Okay. But how did they then not make it on to this list?

A. I don't know. I don't know.

Q. Is it because someone else made the



list and it was not you?

MR. SHEEHAN: Objection.

A. Again, I put in all of the references that I used in the body of the report.

Q. Okay. But you'll agree that I gave two examples, there are more, that some are missing?

MR. SHEEHAN: Objection.

A. Yes, I -- again, I reviewed all of the text and the articles that I cited are in the body of the report.

Q. I'm asking you about the materials considered list.

Did you make this list up yourself?

A. I did not type up this list myself, no.

Q. Was this done by the lawyers?

MR. SHEEHAN: Objection. Jim, I mean, you know that the -- the rules on drafts and that. I'll represent to you that -- that we assisted in putting together the materials considered list. So, the answer is, yes. But to the extent you're going



to get into the drafting of the report, you know that that's off limits.

MR. RONCA: Yeah, I'm not going there, Tom, you know that. I'm just trying to find out why certain items are on there that aren't referenced in the text and certain items were on there that are referenced -- aren't on there that are referenced in the text and how that came about.

MR. SHEEHAN: Understood.

And to the extent you know, Mary Beth, you can answer.

A. I don't know, but so noted.

Q. And when you made up the final version of this report, did you check the references to make sure that they were accurate?

A. I checked every reference that was in the body of the text, 107-page body. I would make sure that the reference that I wrote in the body of the text was correct.

Q. But did you check to make sure that the references, so -- let me start the



question again.

You knew that this report was going to others who were going to review it, right?

A. Yes, of course.

MR. SHEEHAN: Objection.

Q. You knew it was gonna be submitted to the court, right?

MR. SHEEHAN: Objection.

A. Yes, of course.

Q. And that other people might want to look at the references that you made?

A. Yes.

Q. So, there was an importance to the accuracy and completeness of your list of matters considered?

MR. SHEEHAN: Objection.

Q. And I'm wondering what you did to make sure that it was accurate and complete?

MR. SHEEHAN: Same objection.

A. Again, I made sure that the body of the report was accurate and complete and that all of the citations within the body of the report so when you look at the section of, you know, that referred to Hidajat that that was the right Hidajat paper and that was all

correct in the body of the report.
Q. Okay. Well, there are other Hidajat papers, how do we know which one?
A. So, again, I would've checked the body of the report.
Q. All right.
MR. RONCA: So, let's go to page 1 of the report. Okay. And John, will you call out the second paragraph there, like just the first two lines, or the whole thing. There you go, that's good. Okay.
Q. So, this reads:
I have conducted research across many different areas of cancer epidemiology for different cancer types including, for example, colorectal, esophageal stomach and breast cancer.
So, you wrote that, right?
A. I did.
Q. So, I'm wondering about the order of the listed items in parentheses.
So, is it fair to say that all of your work is represented in your curriculum vitae?


A. All of my published work, yes, uh-huh.
Q. So, as I looked at your curriculum vitae, would it be fair to say that breast cancer research has been your predominant research?
MR. SHEEHAN: Objection.
A. It would be fair to say cancer epidemiology has been my predominant area of research, that's what I teach and train and mentor in.
Q. But in terms of your published works am I wrong to say that 266 of the 382 published articles on your CV deal with breast cancer?
MR. SHEEHAN: Object. Just give a beat before you answer.
Objection to the form.
Go ahead.
A. Again, it's fair to say that the majority of my research is focused on cancer epidemiology, methodological studies, life course epidemiology, environmental epi- -- environmental epidemiology and all of these methods are methods that can be transportable


across different cancer types. Most of my grant funding and research funding, as you say, focuses on breast cancer, but the methods and the techniques and the analyses and the study designs are applicable across different cancer types. I did my doctoral dissertation in colorectal cancer. I had one of my first grants on esophageal cancer. And so, I work across many different cancers. My current funding now is focused on liver cancer, breast cancer, prostate cancer as well as colorectal cancer.
Q. Okay. And I appreciate that, I just asked you, if I'm correct if I say 266 of the 382 published articles are on breast cancer?
A. I wouldn't know the number. Again, my methods and my study designs are cancer epidemiology. And again, a lot of my funding, most of my funding has focused on breast cancer, but I have worked across many different types of cancer.
Q. Yeah. I looked at those two. So, I saw ten of the published articles were on colorectal cancer that I could find.


Is that about right?
MR. SHEEHAN: Objection.
A. Again, I don't know the number.
Q. Is it about right?
MR. SHEEHAN: Objection. Asked and answered.
A. Yeah, I don't know. Again, a lot of my studies on life course epidemiology look -- look at antecedents earlier in life that are relevant for a number of different cancers.
Q. Okay. Then I counted three that dealt with esophageal cancer.
Is that about right?
A. Again, I don't know the number off the top of my head, but, yeah, I had a grant on esophageal adenocarcinoma and gastric cancer with alcohol.
Q. That was in early 2000s?
A. Yes, that's correct.
Q. And then I counted four that involved stomach or gastric cancer described in either of those two things.
Is that number about right?
A. That number sounds approximately

right.
Q. And I didn't see any that mentioned bladder or pancreatic cancer; is that fair?
MR. SHEEHAN: Objection.
A. The methods that are being used in all of these studies are relevant across cancer types. I've worked very closely I direct a large unit of cancer epidemiologists and chronic disease epidemiologists and I mentor faculty that focus on pancreatic cancer as well.
Q. Yeah, I understand that. Let me say this: Whether it's you or some other broadly experienced cancer epidemiologist, the fact that you concentrated on one particular type of cancer does not mean that you couldn't offer expert opinion on other types of cancer because, as you put it, the methods are the same.
Is that a fair statement?
A. That's correct. The methods that ground are disciplined are used across different cancer types. I also serve as an editor in multiple journals and so I also review study designs, analytics all of that



across different cancer types.
Q. And so that if there was another expert out there who was broadly experienced in cancer or maybe not specifically the cancers involved in this particular case, they could also opine on an expert basis about these various studies that you have reviewed in your report?
MR. SHEEHAN: Objection. Calls for speculation.
Q. You can answer.
A. Okay. So, what's at issue for the ranitidine litigation is the human studies. And to the extent that the expert would have training and understanding of epidemiological study designs, the principles of data analysis and understand the role of bias and confounding and chance in contributing to findings, that would be the expertise that I would look for.
In addition to my training on cancer epidemiology, I've been doing data analysis since the late '80s and so my training in particular is in really understanding longitudinal design,



measurement error and all of the kinds of statistical biases that are at issue in this litigation.
Q. So, you had on your list of materials considered a report that was prepared by Anne McTiernan; is that right?
A. I did, yes, uh-huh.
Q. And would it be fair to say that Anne McTiernan has broad expertise and experience in cancer epidemiology?
MR. SHEEHAN: Objection.
A. Yeah, I -- I know Anne McTiernan is an expert in physical activity and I know she's had a long career in epidemiology.
Q. And what about Patricia Morgan, is she also expert enough based on the report that you reviewed and her curriculum vitae that she could offer opinions on the cancers that are involved in this case?
MR. SHEEHAN: Objection. Calls for a legal conclusion.
Go ahead.
A. Okay. I know -- I know they both did give expert opinions in this case. I very much disagree with their synthesis of



the literature. So, again, I -- the methods that they used to develop and reach their decisions, I disagree with. And I don't think that the approached they took is valid.
Q. And I understand that, but I asked you if you thought they were qualified.
A. I --
MR. SHEEHAN: Objection.
A. I don't know that that's for me to assess, but...
Q. Well, could you assess it?
MR. SHEEHAN: Objection.
A. Again, my interaction with either of the two of them might have been in reviewing their papers that have been published. So, you know, to the extent that I've read their papers and/or look at single studies, what I fundamentally disagree with here is their synthesis of the data, not in any one particular study that they would've published.
And so, there is a big difference, I would say, in epidemiology and how people come to expert opinions and the data that they chose to, you know, to synthesize into

their expert opinion and that I don't agree with at all.
Q. Understand. I obviously read everything.
My question to you --
A. I'm sorry, I couldn't hear you.
Q. I said, I understand, I obviously read everything, you probably anticipate that.
My question to you is, based on their background, are they qualified to offer opinions on cancer epidemiology? Did you dispute that that they are qualified?
MR. SHEEHAN: Objection. Calls for a legal conclusion.
Go ahead.
A. So, again, they both have long careers in cancer epidemiology. I think what's at heart here is a little different in terms of the expertise that's needed. And in particular, in my opinion, what is needed to understand the literature here is an understanding of measurement issues, statistics and validity and bias and those are topics that I've taught at a very deep



level for over 22 years, taught medical fellows, graduate students, undergraduate students. And so, I don't know their background in training these kind of statistical methods and understanding, for example, inverse probability waiting or time varying covariates. Those are topics that I teach in my methodological classes. Not all epidemiologists are trained in that. Some epidemiologists are trained more in a medical background. My training in epidemiology and how I got into epidemiology, was through the statistical background because I have my Master's in econometrics, and so really what's at play here is understanding the statistics and the bias.
Q. You're not a medical doctor, right?
A. I am not a medical doctor.
Q. Never seen a patient?
A. I've never seen a patient. I've never seen a patient as a medical doctor.
May I just get a water? It's like ten feet from here and I'll be right back.
Q. Only if it's actually only ten feet. Go ahead.



A. I'm not counting.
Q. In your published papers, have you used inverse weighting?
A. Yeah, more recently we used it mostly to understand if there's selection bias going on. So, inverse probability weight something a method to understand that the sample you have, how does it extrapolate to the sample you want to make inference about. And so -- so, we use it more frequently now to understand whether or not there's any kind of selection bias and how the cohort gets retained.
Q. And when you do that in your papers, do you reveal within the paper exactly what process you followed to do that weighting?
A. Often. Again, it will depend on the journal. These days a lot of medical journals have shortened their word count, so whereas it used to be very typical in the past to have a word count of 4,000, 4,500 words. Now, many journals limited it to 3,000 words, so there's sometimes not as much opportunity to -- to go into real



detail.
Q. And in those circumstances, do you publish supplemental materials which contain transparency about how the weighting was done?
A. If -- if that's allowable by the journal. Some journals allow that, some journals do not.
Q. Is it fair to say it's your practice in your published work when you use inverse weighting to be transparent about how you did the weighting?
MR. SHEEHAN: Objection. Vague.
A. So, again, it will depend on the journal and how it was used. Often we use it more as a sensitivity analysis to understand whether or not the results would've changed.
Q. My question is, if the journal allows it, is your practice to be transparent about how --
A. Yes. Yes, or course.
MR. SHEEHAN: Don't -- try not to talk over him and let him finish his question, then allow me to get an objection in.

Page 34
M. Terry

THE WITNESS: Okay, sorry.
Q. That's okay, I think everybody knows what your answer was and what the question was gonna be, so we're good.
All right. So, getting back to what I was talking about. Again, I looked at your list of fellowship and grant support and out of 56, I counted 36 related to breast cancer; is that about right?
MR. SHEEHAN: Objection.
A. I'm sorry. Were you saying grant support?
Q. Grant and fellowship support.
A. So, again, I would characterize -- I would characterize my work as cancer epidemiology, but the focus often in many of my grants is breast cancer, yes.
Q. Right, 'cause I only saw two related to colorectal cancer; is that right?
A. I don't know offhand. I know I've had several internal and external grants on the colorectal cancer. Right now I'm running a multimillion dollar center where one of the major projects is on colorectal cancer.
Q. But our understanding is that all

Page 35
M. Terry

of your qualifications, all of your published papers, all of your grant support, all of that is on the curriculum vitae that you attach as Exhibit A to your report.
Is Exhibit A complete and does it have on it all of your background and experience in cancer epidemiology?
MR. SHEEHAN: Objection.
A. So, my curriculum vitae will have all of my grants as well as my papers as of the date that that was submitted. All of my knowledge about cancer epidemiology is beyond just what's on the curriculum vitae and includes all of my mentoring and teaching and training over the years.
Q. Yeah, but I didn't ask you about your knowledge. I asked you about your grant support, published papers, all those things. This curriculum vitae does not look up to date -- I mean, does not look dated to me, but was it up to date as of the time you attached it to your report?
A. It definitely was up to date by the time I attached it to the report. And I'm sorry, I probably misheard you, but I did --

Page 36
M. Terry

I did think you said "knowledge" in that last question.
Q. Okay. Well, I could've misspoken, so just to -- let's straighten it out.
What I want to know is if the curriculum vitae that you attached as Exhibit A to your report lists all your grants, fellowships, all your courses that you took? I don't know why the exhibit went down.
A. Yes, the best of my knowledge, that was the complete curriculum vitae at the time that it was submitted.
Q. Okay.
MR. RONCA: Yeah, let's just go to page 119 of the PDF and actually the next page.
Q. So, when we look at this curriculum vitae marked as Exhibit A to your report, we can reliably look at that and determine all of your published works, all of your positions that you've held, courses that you've taught and the grants and fellowships, all those things are listed here, it's 100 pages. I mean, aside from just what you

Page 37
M. Terry

get from walking around the halls and talking to your colleagues, is this a good indication of the background and expertise you have in the field of cancer epidemiology?
MR. SHEEHAN: Objection.
A. Yes, this, to the best of my knowledge, is the complete listing of the papers and grants and other professional activities that I've done.
Q. So, if someone like myself was to look at this and see in terms of your fellowship and grant support two items related to colorectal cancer, those would be the universe of items under that category that exist or ever existed, right?
MR. SHEEHAN: Objection.
A. So, again, the methods and study designs and analyses that are used in all of my papers relate very much to the approach of cancer epidemiology generally. The specific focus for a paper may be related to breast cancer, but I have done many different papers that are focused on common antecedents to multiple common cancers as well.
Q. I'm asking you whether in your

grant and fellowship support as listed on your curriculum vitae, there are two items that relate to colorectal cancer, that's what I'm asking you --
MR. SHEEHAN: Objection.
Q. -- is that right?
MR. SHEEHAN: Objection. Asked and answered.
A. Yeah, I think there's more, but I haven't counted them up.
Q. Okay. But if someone wanted to, they could look and it would all be there for them to see, right?
MR. SHEEHAN: Objection.
A. Sure. But there's also -- I would say there's papers that involve again factors that are related to multiple cancers like DNA methylation and oxidative stress and some of the other kinds of outcomes that are important for multiple cancers.
Q. Okay. And then I noticed that of those 56 fellowship and grant items, eight do not relate to cancer at all; is that right?
A. I wouldn't be able to tell you the number, but I don't know how you're



characterizing doesn't relate to cancer at all, 'cause I would probably characterize it differently than that. So, I would need to understand what you mean by that.
Q. Now, would it be fair to say that none of the grant re- -- grants you got for research have dealt with stomach or esophageal cancer?
MR. SHEEHAN: Objection.
A. No, that would not be fair.
Q. Okay. Why not?
A. Because I received funding through the American Cancer Society for esophageal cancer and gastric cancer.
Q. Okay. And you've read book chapters and I counted 14 of them deal with breast cancer, right?
A. I don't know the number. But, again, I'm -- I wouldn't characterize it by that. All of my work focuses on understanding cancer and cancer risk. And so, yeah, I would have to understand more how you're characterizing things.
Q. Okay. So, what you're saying essentially is because you may focus or have



a predominance of certain cancers, that doesn't lessen your expertise in the ability to talk about other cancers because you have broad experience in cancer epidemiology; is that fair?
A. That's correct. And it also -- my training -- my training is specifically on study design and statistical analyses.
Q. Okay.
A. Which I apply to breast cancer, but I never took a class on breast cancer. I took a class on regression analysis. I took a class on study design. I took a class on inference. So, these are -- this is how we train. We train in cancer epidemiology. I took my qualifying exams on cancer epidemiology and the cancer that, you know, we could've had any topic and we focused -- the faculty focused on Burkitt's lymphoma. So, you know, I trained on the hematological cancers. But, again, these are kinds of methods that can be applied across cancer types.
Q. Now, you did do a book chapter on stomach cancer, right?



A. I did a review article on stomach cancer.
Q. You did a book chapter?
A. I would have to look at the list, I'm sorry.
MR. RONCA: Can we bring up Exhibit 736, please?
Q. So, was this a chapter in a book that you wrote?
A. It was a journal article, review article.
Q. Okay. You're the author, right?
A. I'm one of the authors, yes.
Q. And it -- subject matter is the epidemiology of gastric cancer, right?
A. That is correct.
I'm just waiting to get it into the Box. I see it on Zoom, but...
Q. Tell me when it's there.
A. Okay.
Q. So, this is a review article, right?
A. Yes.
MR. RONCA: John, if you would highlight right-hand column, the first

paragraph, not bold. There you go.
Q. So, in this review article, what you say is:
In this review, we highlight the epidemiologic literature on incidence and mortality trends and summarize the evidence of risk factors for gastric cancer, focusing on the most recent epidemiologic study.
So, is that what you were doing in doing this review?
A. Yes.
Q. And would you call this a systematic review?
A. No, this was published in 2002. And so, I would call this more of a -- what was more the norm back then, which is kind of an expert review, if you will. Systemic reviews refer to, you know, the quantification of all of the literature during a defined time window of time and then often accompanied by meta-analysis systematic reviews now because the software in the last 20 years has gotten a lot easier to do this where you can have a random selection of articles and have someone else rate them that



sort of thing. We have all of our doctoral students actually are required to do systematic reviews as part of their dissertation.
But back then, this was more what you would call an expert review and, so, yeah.
Q. Okay. And you prepared this in -- you did it in sections with different topics; is that right?
A. That's correct.
MR. RONCA: Okay, let's go to the fourth page of the document.
Q. You did a section on helicobacter -- helicobacter pylori infection, often referred to as H. pylori?
A. Yes, that's correct.
Q. And H. pylori is a common infection of the stomach?
A. Yes, it's a bacteria.
Q. And this bac- -- the presence of this bacteria changed the way the stomach functions, for example, it can change the pH of the stomach; is that correct?
A. Yes, that's correct.



MR. RONCA: Okay. Next page, please.
Q. So, in the paragraph that --
MR. RONCA: Can you highlight the paragraph that says, H. pylori is thought? It's the first full paragraph on the left. There you go.
Q. I'm particularly interested -- let's look at the first sentence:
H. pylori is thought to increase gastric cancer through a variety of mechanisms, including, but not limited to, its effect on increasing chronic gastritis.
Right? Is that what you wrote?
A. That's what we wrote, yes.
Q. Let's look at the last sentence. The last sentence says:
H. pylori infection may also affect metabolism of nitrites, nitrosamines and other N-nitroso compounds to reduce ascorbic acid in the stomach, which can affect the level of nitroso compounds in the stomach.
Is that what you wrote?
A. Yes, that's what we wrote.
Q. Is NDMA a nitrosamine?



A. Yes.
Q. Is NDMA an N-nitroso compound?
A. Yes.
MR. RONCA: I would like to go back to the page and go to the right-hand column, last paragraph. Next page. Sorry. Let me look. Hold a second. Page 5 of 17. I'm sorry it's my mistake. No, this is page 5 of 17. Oh, yeah, yeah. Highlight that. You had the right paragraph, I was wrong, okay.
Q. Now, you see the part there where it says Chow -- it says:
Chow and colleagues have found a more modest odds ratio equal 1.4 non-significant association between CAGA positive strains and non-cardia gastric cancer.
A. Uh-huh.
Q. So, is that an example of where you're reporting on a non-significant association, meaning it doesn't meet statistical significance, but has an odds ratio greater than 1?

MR. SHEEHAN: Objection.
A. So, in -- in this sentence we're -- we're referring to a finding by Wong-Ho Chow and her colleagues and we're clear that this is the magnitude of the association 1.4, but we're also clear that it's non-significant.
Q. Right. Meaning either the p-value was greater than .05 or the confidence interval included the number 1?
A. So, again, we'd have to look at this article, but if they use the 95 percent confidence limit and we say that it was non-significant, then that would mean that the p-value would be more than .05 and that the confidence limit would include one.
Q. Right. That word "non-significant," that doesn't mean that the finding is insignificant, it means that using statistical testing, the p-value was either greater than .05 or the confidence interval included 1; is that correct?
MR. SHEEHAN: Objection. Vague.
A. So, in the context here, this would've meant it was non-statistically significant.



Q. Right. But statistical significance does not measure the importance of the finding, right?
MR. SHEEHAN: Objection. Vague.
A. So, again, the importance of the finding would have to be qualified, but statistical significance itself is exactly that. And-- and so, you can have very large studies that have statistical significance, but they may not be clinically significant. So, right, statistical significance is something that you have to consider when you're evaluating literature to understand how precise the estimates are.
Q. Yeah. So, an example of reporting on an increased risk even though it was, as you stated here, a non-significant association?
MR. SHEEHAN: Objection.
A. So, this is a review article and in a review article, it's important to -- to relay all of the information on what's been found and this is not a causal analysis, this is -- this is reporting on all of the studies and we report what the magnitude of the



association is and the precision about that estimate.
Q. Okay.
MR. RONCA: Next page, let's take the paragraph that begins with Despite under Alcohol. No. Top paragraph that mean begins Despite. There you go. Okay.
Q. Now, let's look at some of the items that are reported here. Look where it says:
For example, in one study, alcohol consumption of at least one gram per day was associated with a 3.4-fold increase --
MR. RONCA: Stop, stop highlighting.
Q. -- in risk (95 percent confidence interval 0.7 to 15.6.)
Now, this is a situation where the confidence interval includes 1, right?
A. Yes, this is the situation where the confidence limit includes 1, yes.
Q. Would you call that a broad spread of the confidence interval?
A. I wouldn't call it a broad spread



of the confidence limit. I would say it's not statistically significant based on a 95 percent confidence limit -- interval.
Q. So, you wouldn't call 0.7 to 15.6 a wide confidence interval?
A. Sure, you could call it wide. You can say basically the estimate is very imprecise. So -- but, again, what I would point to here is that this is a very strong association, so everything -- when we're doing estimation in epidemiology, everything is about the signal, which is what we call the point estimate. So, in this case, the signal is really large, 3.4 versus the noise. And so, again, this is not a statistically significant association, but the signal is quite big. And so, that's why it's really important to look at the size of effect as well as the precision about that effect.
Q. Well, let's look at the next one. It says:
For gastric cardiac tumors but not other subsites (odds ratio 1.1, 95 percent confidence interval 0.8 to 1.6).
So, that confidence interval also

includes 1, right?

A. Yes, so that confidence limit also includes 1, but what you can see here is you see a very weak signal, the 1.1. So, the weaker the signal, the much more likely it is that -- that the association could be explained away by any number of biases of which we focus on looking at selection bias, information bias confounding bias, first and foremost.

So, again, the 1.1 versus the 3.4, those are quite different in terms of the size of the effect. And so, I would be much more concerned about the 1.1 in terms of that being a real association. I would want to make sure that that couldn't be explained away by bias.

And in this particular example with alcohol, we know that alcohol is severely underreported by most people, I mean, estimates of about 50 percent.

And so, again, the -- the role of bias is going to be such that it's very hard to be confident about associations that are weak, like the 1.1.



Q. But bias didn't keep you from reporting it here?

MR. SHEEHAN: Objection.

A. Again, my job here, along with my co-authors, was to review what's out there and -- and to always look at all of the data and show all of the data.

Q. Okay. So, when a reader looks at this and say, for example, at one study alcohol consumption of at least one gram per day was associated with a 3.4-fold increase risk in the 95 percent confidence interval is equal to 0.7 to 15.6 of gastric cardiac tumors, but not other gastric subsites, odds ratio equalled 1.1, 95 percent confidence interval 0.8 to 1.6, they were somehow to understand that you were saying the second one wasn't an association?

A. Yes, in fact I say that, but not other gastric subsites, so we do say that.

Q. But it wasn't -- aren't you saying that, yes, increased risk for gastric cardia tumors but no -- no evidence of other gastric subsites?

MR. SHEEHAN: Objection.



A. Again, based on this study that we were reporting on, so it was reference 56.

Q. And then in the next sentence, you say:

The difference was even stronger for wine consumption, odds ratio equals 5.1 (95 percent confidence interval equals 0.9 to 29.1) for gastric cardia cancer and odds ratio equal 1.1 (95 percent confidence interval 0.7 to 1.5) for other gastric subsites.

So, same report, none of those numbers would meet the, sort of, traditional deposition of statistical significance, but nevertheless, reported so that a reader of this review article would see the results, right?

MR. SHEEHAN: Objection.

A. Again, the reader would be able to see the results and it's more than just statistical significance. It's the magnitude of the association, plus the variance about that, so it's signal versus noise. And one of the major principles of epidemiology is to understand how -- what is the quantification



of biases and can those biases remove the association down to a one.

So, for example, if you have an association of five, even if it's imprecise, you would have to have enough selection bias or enough information bias or enough confounding bias to move that down.

When you have an association of 1.1 or even 1.2, which is what a lot of the associations are for dietary NDMA and various cancers that are alleged, it is entirely plausible and very easy for those associations to go down to a one from a little bit of measurement error, a little bit of bias. So, that's why we focus on two things; the magnitude of the association and also the statistical significance.

Q. But none of the ones reported here we just read would meet that traditional definition of statistical significance, right?

A. They -- they would not --

MR. SHEEHAN: Let me get my objection in.

Objection.

Go ahead.
THE WITNESS: Sorry.
A. They would not meet the definition of statistical significance using a 95 percent confidence limit. But, again, that's one of the two parts; the magnitude of the association is what we were writing about here. So, the three-fold, the five-fold, that sort of thing.
Q. Got it.
MR. RONCA: Let's go down a little farther where it says, in a large population up, you'll have the draw out more, it's at the very bottom, last three lines. In a large population, you see that? Yeah, there you go.
Q. Now, here, again, going down, you looked at gastric cancer related to specific items like beer. So, beer, the odds ratio was reduced, it was 0.895 percent confidence interval, 0.6 to 1.1. That one also doesn't have or does have a confidence interval that includes 1, correct?
A. Yes, that's correct.



Q. And the next one, 0.8, that looks like a repeat, doesn't it, of the same thing. All right. We'll skip that.
Liquor (1.0, 95 percent confidence interval, 0.7 to 1.4), for example.
In these circumstances, you're reporting results that would not meet the traditional definition of statistical significance, correct?
A. Again, though, here I'm not -- I'm reporting the results because this was one of the large -- largest studies by that time looking at type of alcohol and esophageal and gastric histology. So, I'm not -- I'm not saying anything about the results except for, here they are, right? So, the reader can see that there's no association going on here.
Q. Okay.
A. Right.
Q. All right.
MR. RONCA: Take that -- leave the page, but take down the callout, please.
Q. All right. Now, does tobacco smoke contain nitrosamines?



A. Yes, among many other things.
Q. And does tobacco smoke contain NDMA?
A. I don't know exactly. I would have to check. I'd have to look.
Q. Would you say that because tobacco contains N-nitroso compounds, a role for cigarette smoking and gastric cancer is plausible?
A. So, regardless of the mechanism, there have been many studies of smoking and gastric cancer.
MR. RONCA: Okay. Would you call out the bottom paragraph on the left-hand side, please? The last area that begins with because, just highlight that whole sentence.
Q. Did you write because tobacco contains N-nitroso compounds and other carcinogens, the role for cigarette smoking and gastric cancer is plausible?
A. Yes, we wrote that.
Q. One of the things about cigarette smoke that makes its role in gastric cancer plausible is that it contains N-nitroso



compounds?
MR. SHEEHAN: Objection.
A. That's what we wrote, yes.
Q. And NDMA is an N-nitroso compound, right?
A. Right.
MR. RONCA: Let's go to page 7 of 17. Under Fruits and Vegetables, will you highlight the first sentence? Most epidemiologic studies, highlight that sentence, please.
Q. In most epidemiologic studies -- the highlighted sentence is:
In most epidemiologic studies, a consistent 30 to 50 percent reduction in risk of gastric adenocarcinomas has been observed in relation to intake of fruits and vegetables measured together or grouped separately.
Did you write that?
A. Yes, we wrote that.
Q. And did you include in that discussion there of the confidence intervals?
A. No, 'cause, again, this was an expert review, qualitative review, so it was

a summary statement, we included some citations.
Q. Yeah. And the -- if the reader was interested, they could find that confidence intervals in the citations, right?
A. Again, I would need to look at those specific citations, but, yes.
Q. I mean, you wouldn't put that statement in or put references unless the reference supported what you're saying, right?
A. That's correct.
MR. SHEEHAN: Objection.
Q. I mean, that's the reason you put the reference?
A. Yes.
Q. Is the same true when you did your report, if we wanted to know where you got support for what you were saying, we could look at your reference?
A. Yes, if I was associating a number, I always would give a reference, yes.
Q. How about principles of epidemiology, would you reference this also?
MR. SHEEHAN: Objection.



A. Again, if it's -- if it's something that is well-understood within my field, I might not have given a reference for a specific topic like that. But whenever I cited numbers or papers, specific papers, I gave a reference.
MR. RONCA: Okay. Let's take down that callout and go to the next page. In the left column, one, two, three, four, five, six, seven, eight lines from the bottom of the first full paragraph it says individually, first full paragraph above that. No, down, down, down. Individually, right there. See it? You missed it. Individually, two lines up. Okay, take out that -- take the bottom paragraph from there.
Q. Starting with the word Individually, you wrote:
Individually, vitamin E has also been shown to decrease the formation of nitrosamines in the stomach.
So, based on your review at the time, it was known that vitamin E decreases



the formation of nitrosamines in the stomach, is that what you wrote?
A. Based on my review at the time we wrote this, yes.
Q. That's still true?
MR. SHEEHAN: Objection.
A. I would refer to my report which cites the World Cancer Research Foundation report which was an expert review done more recently. Again, this was, you know, an expert review summary, review paper 20 years ago. And so, based on the World Cancer Research Foundation, they, you know, examined kind of the different factors that are related to gastric cancer and something like citrus fruit at this point has limited suggests -- suggestive evidence. And so, I would refer to that 'cause that's a more recent expert review. The field has really evolved, particularly the field of nutritional epidemiology and specifically as nutrients relate to cancer. So, we wrote this review article over 20 years ago, it was published over 20 -- it was published 20 years ago, we wrote it over 20 years ago,



and at the time, especially for a rare tumor like gastric cancer, the majority of the studies were case-control studies. And one of the things that has been shown to be true in cancer epidemiology, we teach about it all the time, is that in particular for constructs like diet, so that would include fruits and vegetables, vitamin E, alcohol, any of the kinds of things in your diet that case-control studies are not valid designed to look at that, that you would need to have large cohort studies. And so, that's why, you know, for anything related to diet, I would go to more recent review articles that include those cohort studies.
Q. Okay.
MR. RONCA: And court reporter, can you mark that spot, please.
Q. Despite your answer, isn't it true that even up to today, World Cancer Research Fund or wherever you want to look, everyone agrees that vitamin E is shown to decrease the formation of nitrosamines in the stomach?
MR. SHEEHAN: Objection.
A. So, again, I wouldn't know who

everyone is, but I would just refer to kind of what the World Cancer Research Foundation has summarized for gastric cancer, of which, you know, the dietary evidence is either limited suggested or limited no conclusion, including NDMA is listed as limited no conclusion for gastric cancer. And really, the only strong evidence as they've assessed, which is called strong evidence probable, is for alcoholic drinks. Again, we saw that in some of those large signals we just looked at on the other page, as well as food preserved by salting.
So, you know, at this point, the human data is much more limited, no conclusion because of this very big issue that happens with dietary studies and recall bias. The cohort studies have not offered as much strong support.
Q. Yeah. So, while you're look at that, can you tell us, when was the last time that the World Cancer Research Fund reviewed NDMA?
A. So, this report where they reviewing -- were reviewing diet was from, I


think, 2018, I'd have to look it up, I think it's 2018.
Q. Yeah. But doesn't it say right in that report that NDMA has not been reviewed since the second expert report, which was in the time frame of 2005 to 2007?
MR. SHEEHAN: Objection.
A. I don't have the exact verbiage from the report in front of me, but we can look it up if so.
Q. Don't you have the report right in front of you?
A. I don't have the World Cancer Research Foundation report.
Q. So, do you know whether that report on stomach cancer that you're referencing in your answer talks about when the last time the World Cancer Research Fund reviewed NDMA?
MR. SHEEHAN: Objection.
A. I would have to look at the World Cancer Research Foundation report.
Q. So, you don't know without looking?
A. I don't know about looking at the report, but the way these World Cancer Research Foundation reports work is they


bring together the experts, in this case, it was for looking specifically at dietary and physical activity. And so, any -- any new data that would've changed any older assessment would've been evaluated at those expert reviews.
Q. Have you ever been on a World Cancer Research Fund expert committee?
A. I have not, no.
Q. Has Anne McTiernan?
MR. SHEEHAN: Objection.
A. I don't know. I think so.
Q. Have you ever been on an IARC expert group?
A. I have not, no.
Q. What's IARC?
A. The International Agency For Research on Cancer.
Q. That's a well-respected group?
A. I would say so. They have been around a while and they do a lot of cancer research themselves and they do a lot of expert reports.
Q. And you reference IARC in your report, right?


A. I did, of course, yes.
Q. But you've never served on one of their panels, right?
A. No, I have not served on their panels.
Q. Okay. Do you have an understanding of how those panels work?
A. I would imagine, I've been on other panels within the US and so -- -
Q. I don't want you to imagine. I want you to --
A. I have not been on an IARC panel itself --
MR. SHEEHAN: Let's not talk over each other. Jim, if you could -- if you could permit her to answer and she gives you the same courtesy when you're asking questions.
Q. The courtesy I would want is an answer to the question I ask, okay?
So, the question was, do you know how the IARC expert reviews and panels work?
MR. SHEEHAN: Objection.
A. I have not been on an IARC panel, so I am not privy to the internal workings of

an IARC panel.
Q. What about the World Cancer Research Fund, are you privy to the information about how those decisions are made?
MR. SHEEHAN: Objection.
A. The only information I have is the information that they disclose at the beginning of each report.
Q. Okay. And then returning to my earlier question, can you tell us when the last time -- when was the last time the World Cancer Research Fund reviewed NDMA in full?
MR. SHEEHAN: Objection.
A. I would have to look up that date.
Q. And can you tell us the last time IARC reviewed NDMA in full?
MR. SHEEHAN: Objection.
A. I would have to look up the date.
Q. And just like you say with this review article of yours that we would have been going on with here, Exhibit 6736, if the information is dated, there could be newer information that might change your conclusions; is that fair?



A. That is entirely fair, newer information always -- new evidence always changes an overall evaluation. In my review, 'cause I've thoroughly reviewed the NDMA and cancer epidemiology studies from the five cancers that are being alleged and if they were to have updated more recently, any update would include these cohort studies of which the cohort studies had no consistent pattern of any association with any of the five cancers.
(Exhibit 6736 was marked.)
Q. In your opinion?
MR. SHEEHAN: Objection.
A. Again, in my expert opinion of reading the published peer-reviewed data. But there's also been other experts who've weighed in on -- on this as well and I've cited some of that in my report.
Q. And when you refer to the World Cancer Research Fund or IARC in your report, did you specifically refer to how dated their statements may or may not have been?
MR. SHEEHAN: Objection. Vague.
A. Can you repeat the question?
MR. RONCA: Read it back, please.



(Referred to portion of the record was read back by the court reporter.)
MR. SHEEHAN: Same objection.
A. So, when I was referring to the World Cancer Research Fund, I stated the date of that report and if there were other -- if there were other citations from IARC, I stated those dates.
Q. Okay. So, when you say -- as we have on the screen, again, individually, vitamin E has also been shown to decrease the formation of nitrosamines in the stomach, was the point of that statement it's good to have vitamin E in your diet because it reduces the exposure of your stomach to a carcinogen known as nitrosamines?
MR. SHEEHAN: Objection. Mischaracterizes.
A. The point of this statement was to, you know, to review the data as they existed in 2002.
Q. So, the data suggested that if you wanted less nitrosamines in your stomach, you should eat more vitamin E, is that what this sentence suggests?



MR. SHEEHAN: Objection.
A. Again, this whole paragraph was about whether or not different nutrients could interact with other exposures.
Q. And the reason that you would want to have more vitamin E is because you want less nitrosamines in your stomach, right?
MR. SHEEHAN: Objection. Asked and answered.
Go ahead.
A. Okay. Right, that -- the -- this discussion of the paragraph was to -- to understand possible dietary interactions with exposures.
Q. And the reason it's in a chapter called, The Epidemiology of Gastric Cancer, is because nitrosamines have been associated with an increased risk of gastric cancer, correct?
MR. SHEEHAN: Objection.
A. So, again based on the epidemiological data that was available at that time, these are the hypotheses and the thoughts behind this.
Q. Got it.

MR. RONCA: Next page, please. Let's go to right-hand column, paragraph halfway down that begins with ecological studies. Highlight that.
Q. Last sentence says:
Also, the process of salting fish and meats involves sun drying or smoking, both of which promote the formation of nitrosamines.
So, is that a true statement at the time you wrote it?
A. Yes.
Q. And still true, right?
MR. SHEEHAN: Objection.
A. To the best of my understanding.
Q. In fact, some of the organizations you reference have said that processed meats and fish can be cancer -- or can increase the risk of cancer because of the presence of nitrosamines?
MR. SHEEHAN: Objection.
A. Some of the agencies, do you mean IARC?
Q. IARC, WCRF. Is that true?


A. Yes, I would agree with that.
Q. And one of the nitrosamines they refer to is NDMA?
MR. SHEEHAN: Objection.
Q. Right?
A. Who is they, now?
Q. IARC or WCRF?
A. Again, if there's a specific document or is this a general statement?
Q. I'm asking if you know.
A. I would imagine they would include that in the list, I don't know without looking at a document directly.
Q. Okay.
MR. RONCA: Next paragraph, please.
Q. When you wrote this review article you had a section called Nitrites, Nitrates and Nitrosamines, right?
A. Yes.
MR. RONCA: And let's highlight that first sentence.
Q. You wrote:
Nitrates alone are not toxic, but their conversion to nitrites and further


combination with secondary amines to form N-nitroso compounds have been found to induce gastric tumors in animal studies.
So, was that an accurate statement when you wrote it and included it in this review article?
A. Yes.
Q. And do you know that the method by which ranitidine degrades and forms NDMA is when a nitroso part of the molecule combines with a secondary amine and creates NDMA, did you know that?
MR. SHEEHAN: Objection.
A. Again, my expertise is in cancer epidemiology and statistics, but that is my understanding. I'm not a molecular biologist.
Q. Understood.
So, that's similar concept to what you wrote in this sentence, right?
MR. SHEEHAN: Objection.
A. Again, I'm not an expert in molecular biology, so...
Q. And when you say "induced gastric tumors in animal studies," you're talking


about stomach tumors, right?
A. Yes.
MR. RONCA: Let's go down to the last sentence on that page.
Q. You reported that case-control studies that have examined the relation between dietary intake of nitrate and gastric cancer risk in many diverse populations have yielded complex results.
Right?
A. Yes, that's correct. That's what we wrote.
MR. RONCA: Okay. Next page reading on there.
Q. It says, starting with the word whereas:
A positive relation was noted with dietary intake of nitrosamines and furthermore, the influence of nitrosamines was mitigated by high levels of vitamin C.
So, when you did your review article, was that the information that was available?
MR. SHEEHAN: Objection.
A. Yes, based on what we wrote,

reference 61, would've looked at it in our action analysis of these different dietary components within the case-control study.

Q. Okay.

MR. RONCA: And let's go to the next sentence there.

Q. It says:

In addition, case-control studies in Uruguay and France have reported a four-fold increase in risk in related to a dietary index of nitrosamines in one study and the risk was augmented to the 12-fold increase among persons who ingested heterocyclic amines.

So, you're reporting on two studies, one in Uruguay and one in France that showed a four-fold increase in risk in related to the dietary index of nitrosamines.

Is that what you reported?

A. That's what we reported in this review article over 20 years ago, which was a case-control study which hasn't been backed up by the cohort data.

Q. Okay. But dietary studies, right?

A. Dietary studies, yeah. Dietary



studies again are much more susceptible to recall bias and that's why the fields of cancer epidemiology including IARC focuses on cohort studies of diet and cancer.

Q. Got it.

MR. RONCA: Let's go back and down and under Green Tea, the next section.

Q. Let's go look at the sentence that begins little more than halfway down:

The anti-carcinogenic and anti-mutagenic activity of green tea may act via its ability to reduce [sic] apoptotic cell death and arrest of cell cycle, its inhibition of nitrosamine -- I'm sorry, nitrosation or its antibacterial effects.

That's what you wrote down?

A. Yes, we wrote that then.

Q. Point of the one part of your sentence, its inhibition of nitrosation, is if that you inhibit nitrosation, you could reduce the risk of cancer, right?

MR. SHEEHAN: Objection.

A. Again, that -- that was -- that was the hypothesized mechanism.

Q. And that's because many



nitrosamines are carcinogenic?

MR. SHEEHAN: Objection. Vague.

A. According to IARC, some nitrosamines are probable actual carcinogens, that's mostly based on animal studies and, again, the human studies which are most relevant to understanding if something is a human carcinogen. The case-control studies and the cohort studies have not supported each other. And so, whenever you have case-control studies, finding something different than what cohort studies have found, then you go to an assessment of bias. And in particular, you know, all studies, even clinical trials, have bias, but they operate in very different ways.

So, cohort studies in particular don't have the problem of recall bias. And so, again, I would -- since the field has moved on over the last 20 years, I would really focus much more on when the findings are similar across case-control study and cohort studies, then you can say at least it's not recall bias --

THE COURT REPORTER: I'm sorry.



There's a lot of interference that I'm hearing.

MR. RONCA: Somebody's phone is buzzing. Can you stop it?

Q. Okay. Go ahead, Doctor.

THE WITNESS: Where should I go back to?

THE COURT REPORTER: Cohort studies then you can say it's at least not recall bias.

THE WITNESS: Great.

A. So, that's why it's really important to find consistent associations between case-control studies and cohort studies, because then you can say it's not selective bias or information bias. In the case of the dietary data for NDMA and the different cancers that are being alleged, there's no consistency. The case-controlled studies tend to be more positive than the cohort studies, which -- and very weak effects, 1.1, 1.2. So, that suggests that it is being driven by these biases that are different and in particular, recall bias, because what's been shown to be really hard,

not for all things, but for diet is the reporting of dietary exposures.

Q. Okay.

MR. RONCA: Let's go to page 13. Can you highlight the table or bring out the table, please? There you go, that's good enough.

Q. All right. So, this is Table 1 of your review article. It says:

Summary of epidemiologic evidence of risk factors for gastric cancer.

This is the title of the table that you made up?

A. Yes.

Q. This was a summarization of all the epidemiologic evidence that you reviewed for this article?

A. Yes.

Q. And down there on the left, it says:

Modest strong risk factors (relative risk 1.1 to 2.0.) And you list one, two, three, four, five, six things under modest risk factors.

MR. RONCA: John, on the left.



No, not moderate, modest. There you go.

Q. Under modest risk factors, you list six things, correct?

A. Yes.

Q. One is cigarette smoking, right?

A. Yes.

Q. One is body size, that would be body mass index; is that fair?

A. Yes.

Q. One is gastric ulcer disease, right?

A. Yes.

Q. One is salty or salted foods, right?

A. Yes.

Q. And one is nitrosamines?

A. Yes.

Q. And I only read the five, not the six. The five are all environmental things that you could change and do something about, right?

A. Presumably.

Q. So, if you stop or reduced your cigarette smoking you might lower your risk



of stomach cancer from cigarette smoking, right?

A. Yes, that's correct.

Q. And if you lost weight and reduced your body mass index, you could reduce your risk of cancer from being overweight, right?

MR. SHEEHAN: Objection. Go ahead.

A. So, again, except for cigarette smoking, a lot of lifestyle factors have not been assessed in that way where you look at if someone actually does change their weight, do they have -- does their outcome change. But theoretically, yes.

Q. Okay. And if you reduced your exposure to nitrosamines, you could reduce your risk of stomach cancer, right?

MR. SHEEHAN: Objection.

A. So, again, when you say "reduce your risk," those kinds of studies would have to show pre/post differences. So, on a population level, how do we know that if you change an exposure it affects risk? The best way we can see that is through large population shifts, which we have that for



cigarette smoking. We don't have that for many other things, so the best we can say is something is correlated. And then, again, this -- this paper itself was not a causal analysis, this paper was showing the summary of the data that existed 20 years ago. Some of these, you know, have changed over time as I mentioned because of the cohort data.

So, throughout the '90s, it was very rare to have any kind of cohort study for cancer given the rarity of the outcome. So, most of these studies were all case-control studies and so this would be a summary of the data as they existed then.

Q. Okay.

MR. RONCA: So, you can take down that exhibit.

Q. Let's just go a little more recent. Did you --

MR. SHEEHAN: If we're at a good breaking point some time soon, we've been going about an hour and a half, I guess, Jim.

MR. RONCA: Yeah, just give me a few more minutes here, okay? It's

right in the same line.
Q. So, did you give a lecture recently, the Millikan lecture?
A. I think that's referring to a lecture I gave at the University of North Carolina.
Q. 2017?
A. I think so.
Q. Yeah.
MR. RONCA: So, let's go to Exhibit 6732. Can you show that -- there you go.
(Exhibit 6732 was marked for identification.)
BY MR. RONCA:
Q. Do you recall giving this lecture?
A. I do, yes.
Q. It's available online to watch, did you know that?
A. I did not, no.
Q. Okay. I watched it.
So, in this part of your lecture, you had a slide presentation that said at the top:
In many situations, population



based approaches are sufficient and efficient. And the transcript of what you said is indicated there at the bottom and I'll read it.
There's many situations where obviously population based approaches are really completely sufficient and case-control studies in particular are the hallmark feature is they are the most efficient kind of design and in many ways, if they can be executed, really are sort of the best design because they captured the complete exposure period throughout life, which sometimes cohorts are incomplete when capturing exposures moving forwards and backwards.
And so, the design itself is a very useful design in particular when we want to generalize to all cases and case-control studies do have that advantage that they really do have complete capture of all cases if designed that way, whereas cohorts, really by design, are picking up the earlier cases first.
Did you say that?
A. I did say that.



Q. And then looking at the poster under case-control studies, you indicate four things:
1) Easier to implement population based strategies.
2) If exposures can be recalled, can capture more complete history.
3) Issue of temporality particularly for biomarkers.
And 4) Efficient.
And then under cohorts, you put:
Challenge in population-based ascertained cohort in follow-up over time, means most cohorts highly selective.
2) Incomplete exposure assessment.
3) May still have issues of temporality.
And 4) Not efficient.
Is that what you put up on the slide for the people who were watching this lecture?
A. Yes, that's what this slide says. And I'd like to then just elaborate what my points mean.
Q. Yeah. Well --



MR. SHEEHAN: Dr. Terry, if you need to explain, please do.
Q. Go ahead.
A. Great.
So -- yeah. So, this lecture, I was speaking at the University of North Carolina School of Public Health, which is one of the largest highly rated schools of public health, so I was trying to get them to think differently about study design. And so, in particular, these points were general points, not specific to an exposure or disease, a specific exposure or a specific disease. So, each point then has to be, you know, has to be given context and that's how I teach.
So, in particular, case-control studies under Number 2, if exposures can be recalled, can capture a more complete history.
But again, the challenge here is it's highly exposure dependent.
So, can you ask a group of women, did they breast feed and how long did they breast feed for? Absolutely.

Can you ask somebody if they had five servings of broccoli last week, last month or last year? Probably not.

So, again, it's highly specific to the exposures.

Can you ask people about, you know, even cooking methods that might have happened 10 or 20 years ago? Possibly.

But can you ask them, you know, they may remember how many times they barbecued, they may not remember what they barbecued. These sorts of things. So, everything is context dependent.

Now, case-control studies do have this issue of temporarily, which is under Point 3, and this comes into play, when I say particularly for biomarkers, because a lot of the field now in order to validate some of the constructs used measurements in blood or urine. And so, that does happen even in nutritional epi because most people recognize how fraught nutritional studies are with measurement error.

The problem, though, is you can't do a case-control study where you're



collecting urine or blood at the time of diagnosis to understand what their exposure might be in terms of vitamin D or any other kind of nutrient. So, all of this is context dependent.

Now, the big challenge that's in the field for cohort studies, which actually doesn't exist for the electronic health record cohort studies that are of issue in this litigation, the challenge of a lot of cohort studies is that they -- they are often, in order to follow people over time, select group of people. So, the nurses' health study out of Harvard, which is where a lot of women's health has come from, those, you know, in order to be part of that study to begin with, you had to be married in 1976 to join the cohort because they were afraid that nurses who were not married would not report accurately on oral contraceptive use. And it was the -- one of the first cohort studies to look at oral contraceptive use and women's cancers.

So, again, these are general points that need to be considered for each and every



exposure disease association.

Q. Okay?

MR. RONCA: Next slide. Next slide, please. I'm only seeing two on mine. Okay, there we go.

Q. Then later actually in the second part you put up this slide and you said quote:

Nobody would debate, most of these, if not all of these, the main evidence came from case-control studies, and most of these, well, all of these actually were all observational studies that found those and they were all done in average risk populations.

Did you say that?

MR. SHEEHAN: Objection.

And to the extent you need to provide context, feel free, Dr. Terry.

A. Okay, let me just read it again.

Yes, I said that. I mean, this is the transcript, so I -- but I've said many things -- many similar things in other talks, yes.

MR. RONCA: Next slide.



Q. So, the list of cancer causing agents where the main evidence came from case-control studies is like a hit list of the most well-known and understood cancer causing agents; tobacco, asbestos, H. pylori infection, HPV infection, vinyl chloride, hepatitis B and C infection, maternal DES use and ionizing radiation.

Is that what you were referring to when you made this statement that's quoted at the bottom of this slide?

MR. SHEEHAN: Objection.

A. Right. So, what I was wanting the audience to appreciate is that we can determine causality without a clinical trial and that many of the causes of cancer that are -- that we know of today came from observational studies. What I would provide context for is -- and many of these also came from case-control studies, you know, but what I would provide the context for is all of these associations have a very large magnitude.

So, again, you need the -- you need the large magnitude, you need the signal, and

then you need the signal versus the noise in order to make an assessment where you can at least be confident that it's not driven by selection bias, information bias or confounding bias. So, it has to be that strong signal.
And again, the challenge if we only had case-control studies of diet, the challenge is that those signals can be easily explained by recall bias because they're weak signals given the measurement issues involving diet. In fact, most studies of diet have shown that the reliability of these measures is, you know, close to .5, a coin flip kind of thing. So, it's just you don't have that kind of consistency with dietary studies.
MR. RONCA: Go back two slides, please. Three. Go back to the first one.
Q. Can we agree that depending on the circumstances, a case-control study can capture complete exposure information throughout life?
MR. SHEEHAN: Objection. Asked


and answered.
A. So, again, it would depend on the exposure. So, you know, we would have to think about what the exposure is and, you know, whether or not it can be reliably recalled.
Q. And can we agree that cohorts sometimes only have incomplete exposure information?
MR. SHEEHAN: Objection. Asked and answered.
A. So, again, it depends on the construct and what the exposure disease association is. If a construct is genes, either study, you know, would have complete information if you do a genome-wide association test, you know, that sort of thing.
So, again, it depends on the construct and often in cohort studies we use a measurement to kind of indicate, you know, chronic exposure.
Q. Yeah. But just exclude for the purposes of the next few questions genetic epidemiology.


Is it true that large cohort studies almost always have complete exposure assessment -- I'm sorry, incomplete exposure assessment?
MR. SHEEHAN: Objection. Asked and answered.
A. Yeah. So, again, with epidemiology, and I think this is where it can get very misinterpreted by many people, it is highly context specific. It's highly the environment of the reporting has to be assessed, the measurement tools have to be assessed, the analysis has to be assessed. So, something that is valid in one context, you have to repeat that to make sure that the measurement tool is just as valid in another context. So, it's highly dependent on the context.
Q. And this incomplete exposure assessment as you have on your chart there, isn't that particularly true for administrative databases?
MR. SHEEHAN: Objection.
A. I would not say it's particularly true of one thing or another. It would


totally depend on the quality and comprehensive nature of the database.
Q. And if the database, for example, had only prescription information with no information about dose or number of pills, and didn't have whether the information about whether a prescription was filled and the same medication was available over-the-counter, would it be fair to say that in those situations, an administrative database has incomplete exposure information?
MR. SHEEHAN: Objection. Vague.
A. So, again, it would be highly context specific and we would have to look at each individual study, understand the quality of the missingness. This is something that, again, is for -- for people who are assessing kind of individual risk versus population science. It's a concept that it is quite different. So, in population science, as long as individuals stay within the same rank, so even -- even if we let's just take the example of a scale, right, and we know the scale has measurement error, whatever, but -- so, even if the scale were inaccurate,

but it allows for the person who was highest still on that scale to be first in line, the statistical methods are robust to that. And so, even if we undercount in a particular measurement, a measurement method, as long as that kind of undercounting, you know, occurs across and people stay in their same rank, the -- the methods are totally robust to that.

So, that is something that's, you know, unless you want a lot of regressions and -- and look at a lot of data analysis, it may be hard for people to kind of grasp that -- that you could be undercounting, but still get a valid answer. But -- but it is definitely through the way regression works is you're estimating the most likely summary between two factors and as long as people preserve their ranking, it doesn't matter how off you are in that way.

Q. So, what you're saying is --

MR. SHEEHAN: Jim, can we take that break when you're --

MR. RONCA: I have two more questions and then we can take a



break.

MR. SHEEHAN: Okay.

Q. So, what you're saying is that's assuming that individuals stay in the same rank?

A. Yes, if individuals stay in the same rank, the methods are absolutely robust and valid.

Q. And that assumes you have individual information, right?

MR. SHEEHAN: Objection.

A. Again, most of these studies are analyzed at the individual level.

Q. Right. So, you're not talking about aggregate information, you're talking about information on individuals, correct?

MR. SHEEHAN: Objection.

A. Yeah, I was just giving example of how regression works.

MR. RONCA: Now we can take a ten-minute break.

THE VIDEOGRAPHER: We're going off the video record. The time is 3:02 p.m. UTC time.

(Whereupon, a brief recess was



taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:18 p.m. UTC time.

BY MR. RONCA:

Q. We're back on the record, Dr. Terry.

I almost -- well, I do hesitate to ask this, I don't really like these questions, but all of our experts have been asked this, so I'm gonna ask you.

What do you charge per hour for your expert work?

A. It's $500 an hour.

Q. What are you paid per hour by Columbia?

MR. SHEEHAN: Objection.

A. Yeah, I would have to check.

Q. Well, what is your salary?

A. What is my salary?

Q. Yeah.

MR. SHEEHAN: Objection. I mean, I don't think we've asked any of these questions. You really want her to --

MR. RONCA: A hundred percent



wrong, Tom.

(Cross-talk.)

MR. SHEEHAN: We've asked salary?

MR. RONCA: Not only did they ask it, but -- but Eva asked for confirmation at the later deposition later today of Dr. Tiernan [sic] of her hourly rate. I'm only asking the question that Eva asked.

MR. SHEEHAN: Hourly -- wait, hourly rate in litigation are you talking about or...

MR. RONCA: No, no, no. Hourly rate from the University of Washington?

MR. SHEEHAN: All right.

To the extent you know, Dr. Terry, and you feel comfortable divulging that, feel free.

MR. RONCA: Tom, you know we're entitled to know this. I wouldn't ask, but it's been asked of our experts, so I'm just following suit.

A. It's approx- -- it's approximately 280.

Q. Thank you. That's all we're gonna say about that. All right. Let's go to a different topic.
Let's go back to your report, which is Exhibit 6727?
A. And I guess just clarify, I have other sources that I'm paid for leadership that's over my salary. But you just wanted my salary, right?
Q. Yeah, I'm not --
A. Okay.
Q. You're in that kind of 300,000 neighborhood, generally speaking, of what you earn?
A. Yes.
Q. That's all I care. That's all. I'm not gonna get into detail or ask you to come back later with your hourly rate. Okay.
MR. RONCA: So, let's go to page 10 of the report, Number 10 it's 14 of 250. There you go.
Q. So, Dr. Terry, you did a section in your report entitled Statistical significance, right?
A. Yes.



MR. RONCA: And then if we go to the next page and just call out that last paragraph, the last big paragraph. There you go.
Q. You wrote this paragraph regarding confidence intervals, 95 percent confidence intervals and p-values less than 0.05, right?
A. Yes, I wrote this.
Q. Okay. And in this you referenced at the bottom in 2019 -- well, you wrote:
I disagree that the plaintiffs' expert's assertion that the American Statistical Association advocates for abandoning the term "statistically significant."
You wrote that, right?
A. Yes, I wrote that.
Q. And then in the next sentence, you refer to the task force.
Can you tell us what the task force is?
A. I'm sorry. The task force was --
MR. SHEEHAN: Did you ask a question, Jim? You faded out there just for a moment.



Q. Would you tell us what the task force is?
A. The task force was convened, it was a societal task force, so...
Q. And is it your impression that this task force put out an official statement of the American Statistical Association?
MR. SHEEHAN: Objection.
A. Yeah.
THE WITNESS: Can you page down a bit?
MR. RONCA: Sure. Go to the next page.
Q. You also have it on paper in front of you, but go ahead.
MR. SHEEHAN: It's on page 11 and 12 of your report, Dr. Terry.
A. Yeah. So, that's a quote from the Benjamini, Benjamini, 2021, yes.
Q. Okay. But are you certain that the task force put out the -- an official statement of the American Statistical Association or just a statement of the task force?
MR. SHEEHAN: Objection.



A. So, the quotation that I have here is from -- from the Benjamini summary, so we'd have to pull that up.
Q. Yeah, I'm just asking you if you know, while we're sitting here.
A. I know that this, you know, that -- that there's been lots of scientific debate about the advantages and disadvantages of statistical significance testing, that's been around for a very long time. So, the point of -- that all of these -- and I read the back and forths, the point of all of this is that we always have to put things within context and it's about the magnitude of the association and not just the statistical significance. So, if anything, you could say that epidemiology has been ahead of biostatistics for many years because epidemiology has always focused on the point estimate or the risk estimate and -- and the variance around that, the variability around that. Whereas in many other fields in medicine, they sometimes focus just on the statistical significance. But statistical significance, by itself without that context,

is not helpful, because you could have something that's statistically significant, but not clinically significant or not, you know, important enough to change public health or clinical practice. So, that's why the magnitude of the association as well as whether or not that association is reliably reproduced in different settings is important.

Q. Okay. I notice that you referenced Benjamini article regarding the task force, instead of referring to the task force report itself.

Did you review the task force report itself?

A. I did look at the task force report itself, yes.

Q. Did you include it in your list of materials considered?

A. No. I mean, I -- I'm aware of the scientific debate back and forth. We use a lot of the examples in teaching. We also have had people over the years give lectures at Columbia about this. So, yeah, I'm aware of the debate.



What I included in my report which is most relevant is when I'm taking a direct quote from something, what was said.

Q. Okay. So, I want you to just focus for a second on that highlighted sentence on page 11:

I disagree with the plaintiffs' expert's association that the American Statistical Association advocates for abandoning the term "statistically significant."

Keep that in your head, I want to ask you about something.

MR. RONCA: Can you go to page 248 of this report, 248 of 250?

Q. See reference 200 at the bottom on your list of materials considered? Did you review that?

A. Yes, I would've seen that.

Q. Naturally, you wouldn't have included it if it wasn't -- you wouldn't have put on your list of materials considered, right?

A. Right.

Q. Okay.



MR. RONCA: So, let's bring up that reference, 6739.

(Exhibit 6739 was marked for identification.)

BY MR. RONCA:

Q. This is the Wasserstein, Schirm and Lazar article entitled Moving to a World Beyond p less than 0.05.

Do I have the right reference?

A. Yes.

MR. SHEEHAN: Do you have it in your Box there, Dr. Terry?

THE WITNESS: Not quite. Yeah. Now I do, yeah.

MR. RONCA: So, can we go to the third page of the -- before you move, before you move. Too late. All right.

Q. Who's Roger Wasserstein?

A. I would have to look up his full affiliation, but I would imagine -- hang on just one second, give me a minute for it to get in the Box.

I'm not seeing his full affiliation where he is right now.



Q. Is he the executive director of the American Statistical Association?

A. I would have to look that up.

Q. Has he been that for several years?

A. I don't remember who's heads of different societies, to be quite honest.

Q. You're not a member of the American Statistical Society, are you?

A. I am not, no.

Q. And -- and before Dr. Wasserstein was the executive director of the American Statistical Association, are you aware that he was full professor of statistics and had won numerous awards for his work in statistics, are you aware of that?

A. I'm not aware of that, but, yeah, I don't know his background.

MR. RONCA: Let's go to page 3 of 20 and this is -- highlight, Don't say "statistically significant," and that first paragraph.

Q. So, I'm going to read the paragraph that says, Don't say "statistically significant."

The ASA statement on P-Values and

Statistical Significance stopped just short of recommending that declarations of statistical significance be abandoned. We take that step here. We conclude, based on our review of the articles in this special issue and broader literature -- and the broader literature, that it is time to stop using the term statistically significant entirely. Nor should variants such as "significantly different," "p less than 0.05," and "non-significant" survive, whether expressed in words, by asterisks in a table or in some other way.

Now, you remember where you said in your report, I disagree with the plaintiffs' experts that the American Statistical Association has called for the abandonment for the term of the "statistical significance."

Do you remember where you said that?

A. I do, you just showed it.

Q. Yes. And that's -- that's just wrong, the American Statistical Association has recommended that it be abandoned, right?



MR. SHEEHAN: Objection. Mischaracterizes the editorial.

A. Again, written right here, it says we stopped just short of recommending them.

Q. No. Then the next sentence says, "we take that step here."

A. No, but --

MR. SHEEHAN: Objection.

A. But this is the editorial, not the ASA statement.

Q. The ASA statement referred to in the first sentence was the 2016 statement, not the task force report, right?

A. I don't know the chronology off the top of my head.

Q. So, what you think is that the ASA, the American Statistical Association, still agrees that you should use the term "statistical significance," is that what you think?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

A. Again, the scientific debate here is one that we've, in epidemiology, have participated in for years, which is the



emphasis of not just summarizing your findings in terms of p-values. So, that I have totally agreed with, that's what we teach. We teach that it has to be about one, the magnitude of the association, in this case, not the causal association, but the risk estimate. So, the magnitude of the risk estimate of what you find. And then the precision about that estimate.

So, this debate, back and forth in the literature, in the statistical literature, again, is something that we've discussed for many years in epidemiology, that you need both; the point estimate and the variability about them.

Q. But what about the term "statistical significance"? Do we need that?

A. So, again --

MR. SHEEHAN: Objection.

Let me just -- just give a beat before you answer.

Object to the form.

Go ahead.

A. So, I consider that there's two parts to everything; one is about the



magnitude of the association and two is about the precision about that. To the extent that we use terms all the time, like variants to understand the variability around an estimate and we do still rely on reporting out the statistical significance of a finding in every major medical journal.

Q. Okay.

MR. RONCA: Drop that down and go back one page. Okay. And highlight the first paragraph, "don't" are not enough. All the way down to the end of the bullet points, the whole paragraph. All the way down to where it says, "don't." All right. Well, you didn't quite get there, but we'll start with this, okay?

Q. So, this says:

There's not much we can say here about the perils of p-values and significance testing that hasn't been said already for decades.

Do you agree with that?

A. Yes. In fact --

MR. SHEEHAN: Objection.

THE WITNESS: Sorry.
MR. SHEEHAN: I'm not sure, is the question, do you agree that that's what it says or what's -- I'm not sure I'm understanding.
MR. RONCA: I think the doctor understands the concept of where we're going. I am asking her if she agrees with the concept.
Q. Do you agree with the concept?
MR. SHEEHAN: Objection. Vague.
A. So, as I stated before, since I've started doing applied epidemiological analyses decades ago, I have always been trained and I teach that it's more than just whether or not the p-value is statistically significant. You have to look at the magnitude of the association and whether or not the magnitude of the association is strong enough such that you can rule out the role of confounding information bias, selection bias. And then the variability about that is important so you can rule out the role of chance. So, both are important, but I've never relied solely on p-values at



all.
Q. So, statistical testing, which includes p-values, confidence intervals, that doesn't take care of problems in studies that involve bias or confounding or things like that.
Is that a fair statement?
A. So, this is where it's very important to have evidence from multiple types of study designs wherever possible. So, because the biases that exist in a case-control study operate differently in a cohort study, it's very important to see consistency in associations across study designs of different types. So -- so, that's what's first and foremost important is to see a consistency of evidence.
Q. Okay. So, I'm gonna read these statements here and if you agree or disagree with me.
First statement: Don't base your conclusion solely on whether an association or effect was found to be "statistically significant" that is the p-value passed some arbitrary threshold such as p less than .05.



Do you agree or disagree?
A. I agree with that general statement, yes.
Q. Second statement:
Don't believe that an association or effect exists just because it was statistically significant.
Agree or disagree?
A. So, the way that this was written is very general, but I would amend it to say, don't believe that an association that is statistically significant is clinically significant.
Q. So, you disagree with the way it's stated?
A. So, I don't know what they mean by don't believe that an association or effect exists. I'm assuming when they say "effect," they mean like a causal effect. So, but again, I -- I don't know want to assume too much, there's only a few words here.
But again, if something's statistically significant, that doesn't mean it's clinically important, public health -- has public health importance, you have to



understand whether or not that result could've been explained by bias. And then you have to understand, you know, the magnitude of that effect.
Q. Third statement:
Don't believe that an association or effect is absent just because it was not statistically significant.
Agree or disagree?
A. So, again, it's a general statement, but I would refer back to what we were discussing before. So, you know, we had an association of five-fold between alcohol and gastric cancer. That was not statistically significant.
So, again, these principles are not new. These are principles, you know, of good practice that gets people to think more about the size of effect, as well as the variability of that effect.
Q. So, you disagree with that statement?
MR. SHEEHAN: Objection.
A. No, I was saying that -- that you could have a very large association like in

the case of alcohol and gastric cancer that we saw that five-fold association, but it wasn't statistically significant.
Q. Fourth statement:
Don't believe that your p-value gives the probability that chance alone produced the observed association or effect or the probability that your test hypothesis is true.
Do you agree or disagree?
A. I agree with that statement.
Q. Fifth:
Don't conclude anything about scientific or practical importance based on statistical significance or lack thereof.
Do you agree or disagree?
A. So, again, it's a general statement. To put it in context, if a whole body of evidence was not consistent and all of that evidence was statistically insignificant, then you have to, as a body of evidence, say that there's still no -- no reason to assume that this is a causal association.
Q. So, you disagree with the


statement?
MR. SHEEHAN: Objection. Asked and answered.
A. Again, it would -- it would -- I don't know if they're talking about a specific study or if they're talking about drawing a causal conclusion. I think if they're talking about a specific study, I would agree with the statement.
Q. Okay.
MR. RONCA: Take down that callout and call out what comes right after it.
Q. So, what the paper says is:
Don't. Don't. Just...don't. Yes, we talk about a lot of don'ts. The ASA Statement on p-Values and Statistical Significant and Wasserstein and Lazar in 2016 was developed primarily because after decades, warnings about the don'ts had gone mostly unheeded the statement was about what not to do, because that was widespread agreement about the don'ts.
Now, I'm going to ask you, is this now a reference in 2019 to the actual ASA


statement on p-values as statistical significance?
A. I just have to look at the document in the Box, but...
So, what is your question that the Wasserstein and Lazar is the -- what is your question?
Q. You don't reference the actual ASA Statement on p-Values and Statistical Significance, you reference an article by someone named Benjamini which talks about a task force report; isn't that true?
A. Well, I was referencing the Benjamini because that was an example of how there still is debate about this.
MR. RONCA: And let's go back to your report for a second on page 12, I think it is. Maybe it's 11, I'm sorry. There you go.
Q. Yeah. So, you say:
In 2019, the president of the ASA could be the task force to address these concerns. And then you talk about the task force and the Benjamini article, but you don't mention the Wasserstein article that


you reference or the actual ASA statement, do you?
MR. SHEEHAN: Objection.
A. Not right here, no.
Q. Why would you do that?
A. I mean, the actual ASA statement is something that, you know, was discussed. I mean, I've read it it's -- it's was discussed by plaintiffs. My point here was that it's not just from that ASA statement that the there's still a debate going on. So, again, I think we're splitting hairs here, so to speak, because I don't disagree with any of what's written here. I've always advocated that it's not just about statistical significance, it's about the point estimate and whether or not that point estimate can be driven down to 1 on a relevant thinks scale or down to 0 on an absolute scale. So -- and that is really the practice of epidemiology. We have not focused on statistical significance testing, which is very different than, for example, laboratory scientists or some other people who do focus primarily on p-values. But, you know, the limitations of

p-values themselves are great, that's why you have to focus on the magnitude of the association as well, you need to describe the variability.

Q. Yeah. But then why would you say in your report, "I disagree with the plaintiffs' experts assertion that the American Statistical Association advocates for abandoning the term 'statistically significant," and then in reference to -- cite to the ASA statement where they say just that that, they call for abandoning it, why would you put that in your report?

MR. SHEEHAN: Objection. Mischaracterizes.

A. This is one paragraph within the background of trying to understand these concepts and to set these concepts up for the rest of the report. So, it's under the concept of statistical significance and I wanted to reference the fact that the plaintiffs' experts discussed this, this was one of the heart of their cases, which I disagree with because, again, the lack of the statistical significance in the literature



that they were prioritizing, which was the dietary NDMA studies, there was nothing in the cohort studies.

So, again, I brought it up here, because this -- to say that this is still a scientific lively debate, but, you know, I, myself, would not put all my priorities on statistical significance.

Q. Why would you say that the American Statistical Association has not abandoned the term "statistically significant" when you reference the exact document where they do so?

MR. SHEEHAN: Objection. Asked and answered. Mischaracterizes the document.

A. Yeah, I -- again, I thought it was relevant for the discussion here which is why I brought up the Benjamini piece as an example of how the debate is continuing.

Q. So, you still use the term "statistical significance" in your papers?

A. I do, yes.

Q. And you don't think it --

(Court reporter clarification.)



Q. You don't in any -- you don't think that in any way mischaracterizes the importance of results reported in studies?

MR. SHEEHAN: Objection. Vague.

A. Absolutely not. I think statistical significant testing is very important, but it's one part of what we use to assess whether or not there's a reliable valid association.

And as I said before, in epidemiology, we have always, always focused on the magnitude of the point estimate and whether or not that point estimate is large enough that we can rule out the role of bias.

Q. So, then a p-value of 0.06, that's not statistically significant in your parlance?

A. Again, using a 95 percent confidence limit, it is not. But in our papers, we focused on the magnitude of point estimate and the variability about that. It's always both things. It's never one or the other.

MR. RONCA: Let's bring up Exhibit 6403.



THE VIDEOGRAPHER: I don't see a 6403 in your private folder.

MR. RONCA: It's from prior deposition. It's not there? It's from the deposition Witte and it was also used in Porter.

DOCUMENT TECHNICIAN: Give me just a moment.

MR. RONCA: Apologize, I thought I can call any of these numbers up that have been used previously.

THE VIDEOGRAPHER: You said 6403, correct?

MR. RONCA: Yes.

THE VIDEOGRAPHER: I got it. I just put it in the shared folder for today. It should show up now.

(Exhibit 6403 was previously marked for identification.)

MR. RONCA: Okay. So, this is a -- there's an article, but I want to get to the actual statements, so go down maybe three pages. Next page.

BY MR. RONCA:

Q. So, Dr. Terry, are you familiar

with this document, the ASA Statement on Statistical Significance in p-Values?

A. Yeah, I'm just pulling it up myself right now. It's not in the Box.

THE VIDEOGRAPHER: Did you refresh it? I'm seeing it in Box.

MR. SHEEHAN: Can you hit refresh there, Dr. Terry?

MR. RONCA: Yeah. Hang on.

MR. SHEEHAN: Has it not shown up?

THE WITNESS: I don't think so. It's okay, I can see it on Zoom.

Q. So, you're familiar with this? Have you seen this before?

A. Yes, it looks very familiar. Again, we look at these documents in teaching and that sort of thing, so we reference them all the time.

Q. You didn't reference this in your report though, did you?

MR. SHEEHAN: Objection.

Q. You didn't reference Exhibit 6403, the ASA Statement on Statistical Significance and p-Values in your report, did you?

A. No, I don't think so, but --



MR. SHEEHAN: Let me just get my objection in.

Objection.

Go ahead.

Q. Your answer?

A. No.

Q. You referenced some task force report and a Benjamini article and that's it, in your text of your report, correct?

A. Yes, that's correct.

Q. And you didn't mention anywhere in the text of your report the Wasserstein article that was in your materials considered list, right?

MR. SHEEHAN: Objection.

A. No. But, again, it -- this is the topic as I mentioned of scientific debate back and forth for many years, not just the last few years, although, you know, obviously it's -- it's been discussed a lot more recently. And so, it didn't have relevance, you know, citing every single article that's been there or statements that have been there wasn't -- didn't affect my overall review and expert report because I know this debate back



and forth and I -- you know.

So, I -- again, I focused on looking at the magnitude of the point estimate as well as the variability around that, so... But we teach about p-values all the time and -- and the advantages and disadvantages and, you know, these concepts are not new.

Q. Why did you feel it was necessary to make a statement about plaintiffs' experts and criticize them for talking about abandoning the term "statistical significance"? How is that relevant to your discussion of p-value and things like that?

A. So, in my expert review of -- of the literature and then in my review of both of their reports and this is something that I do all the time with trying to understand why data are synthesized in a different way by someone and -- and what their -- what their assumptions were in doing that. And the major thrust of their reports were both on the fact that you didn't need statistical significance to see a pattern in the data. And what they both ignored, though, was that



a fundamental principle of epidemiology is that if you see only a pattern of data with one type of design, but not with the other type of design, then you have to look at the role of bias in contributing to that.

So, if all of the NDMA studies that were cohort studies supported this very weak association that's been seen in some of the case-control studies, that would be different, but that's not what the evidence shows. The evidence shows that there's a very weak association if anything and it's not statistically significant with a case-control studies but not with the cohort studies. And I've done exercises for years now with thousands of students and we always focus on not just does bias exist, but how do you quantify that bias. And anything point estimates that are 1.1, 1.2, even 1.5, it's very easy quantitatively to get that bias to go back down to one.

And so, I, myself, focus on both, the magnitude of the point estimate and then the variability about that.

Q. So, you'll agree that there is some

weak evidence of an association between ranitidine containing NDMA and some cancers?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
A. No. As I said in my report that the studies that have been published on NDMA and the five alleged cancers have no reliable or valid association with any -- any of the five cancers. And in fact, when you look at the data from the NDMA and dietary studies, you cannot rule out recall bias because the cohort studies and the case-control studies show different things.
Q. And so, it's your opinion that there is no evidence of an association between ranitidine containing NDMA and cancer?
MR. SHEEHAN: Objection.
A. It is my expert opinion that the human epidemiological studies show no valid or reliable association between ranitidine and any of the five cancers that are alleged.
Q. Not my question.
My question is, is it your opinion that there is no evidence, none, of an



association between long-term use of ranitidine containing NDMA and any human cancer?
MR. SHEEHAN: Objection. Asked and answered.
A. So, again, in the synthesis of the literature and of the 16 studies that have involved millions of people to involve any alleged association between ranitidine and any of the five cancers that are being alleged, the overall synthesis does not support any reliable or valid causal association.
Q. I want you to listen really carefully to my question.
I know it's your opinion that there's in reliable association. I'm asking you, is there no evidence, none, of an association between ranitidine use long-term and cancer?
MR. SHEEHAN: Objection. Asked and answered.
A. So, by asking if there's any evidence in the human epidemiological studies, just like any exposure disease



association, there may be a selective study that shows some correlation. But, again, the synthesis of the literature has to look at whether or not there's a pattern and whether or not that pattern cannot be explained away by bias.
Q. Got it. Okay.
MR. RONCA: So, now let's go to Exhibit 6729. Please bring it up.
Is there trouble with it, John?
THE WITNESS: I see it.
DOCUMENT TECHNICIAN: It's opening.
MR. RONCA: Okay. I'd like it on -- there you go. Just make that a little bigger. There you go.
(Exhibit 6729 was marked for identification.)
BY MR. RONCA:
Q. So, you just mentioned a pattern, right, you need to see a pattern, is that what you said?
A. Yes, that's correct.
Q. Okay. So, this is a forest plot on page 62 of your report regarding primary



findings for ranitidine and bladder cancer.
Do I have that right?
A. Yes, that's correct.
Q. You prepared this?
A. Yes, that's correct.
Q. And a forest plot is where you take results and you put them with a dot for the actual record and a line representing the confidence interval on a scale where it's either on the right side of one or the left side of one, right?
MR. SHEEHAN: Objection.
A. Yes, it's -- it's actually on a multiplicitas scale because these associations are -- these point estimates are on a ratio scale, so meaning that going from a .5 to a 1 is the same as, you know, the same type of change from a 1 to a 2. And so, on the right-hand side of 1 being for any ratio where a numerator and denominator are not different from each other, and then on the right-hand side would be the numerator would be higher than the denominator and the reverse for -- on the left-hand side.
Q. Yeah. You balanced it, so that the

distance from .05 to 1 is the same as the difference from the 1 to 2 at the bottom of the scale there, right?
A. Yes, that's the standard way of presenting it.
Q. Okay. So, you presented this forest plot in the standard way, correct?
A. So, again, it would depend on the journal, but the X axis is presented in the standard way. What I've done with this forest plot is condense what would probably be on two or three different figures in a journal article by showing all of the results on one plot. So, what I mean by that is, this is the summary of four distinct studies. And so, where I'm trying to contrast so the reader can see the different comparisons between ranitidine and other H2RAs and then also the different types of analyses that get done by dose by -- within this.
So, typically, if I were to publish this in a journal and the journal gave me more figures and things like that that I could have, I would probably have one figure that would show the overall association. I'd



have another figure that would show the, you know, the dose, if you will. So, it looks like there's a lot of different studies on this figure, but I wanted to put all the data right there to really look at whether or not there was any pattern. And so, I can walk you through this whole figure, if I have a few minutes.
Q. I have some questions, okay?
A. I'm sorry.
Q. So, you assembled this figure with all of the primary findings, right?
A. Exactly. And typically, in a journal, you would probably put like the ever never in one figure and then put the dose response in another. That kind of thing.
Q. Got it.
MR. RONCA: All right. Next slide, please.
Q. For those not used to looking at forest plots every day like you are, is it fair to say that when the dots are to the right, that's higher risk and when the dots are to the left that indicates lower risk?
MR. SHEEHAN: Objection.



A. So, again, that would be the interpretation. However, you need to think about whether or not that finding itself could be explained by -- by bias. But so -- but a general start would be things that are to the right would be above 1 and things that are to the left are below 1.
In terms of whether or not something increases risk or decreases risk, you would have to first decide whether or not -- evaluate, rather, whether or not bias could've caused that association and also you would look at the variability around that association.
Q. Right. And would you agree with me that most of the dots that you plotted here are to the right of 1?
MR. SHEEHAN: Okay. If you need to explain, Dr. Terry, as you said, please do so.
MR. RONCA: You know, John -- I'm sorry, not John. You know --
MR. SHEEHAN: Tom.
MR. RONCA: Tom, I got yelled at for speaking objections like that and



I'm gonna yell at you for the same reason. I was told 100 times you're only supposed to say objection form and not speak. So, I'm gonna ask you to follow what I ended up following except for four occasions over two depositions, all right?
BY MR. RONCA:
Q. But, Doctor, my question is, are most of the dots on the right side of 1?
MR. SHEEHAN: Objection.
A. So, again, there's -- I think I haven't -- I have to double-check, but I think there's 20 some-odd -- 20 lines here and most of the dots are to the right of 1, but these are not 20 independent point estimates. Again, they're coming from four different studies and that was deliberate so that the reader could evaluate the dose as well as the different types of analyses that were done. So, there's four studies here, the Cardwell findings, which are represented in blue, the Norgaard findings, which are represented in kind of a darker green, if you will, the Yoon findings which are like in a

brown and then the Kantor which are in a red. And these different studies do have different comparator groups. So, if you look up top, the Cardwell findings are for when the comparator group is other H2RAs, and in the middle is the Cardwell findings for PPIs and at the bottom is the non-use. So, visually you can kind of compare what's going on with H2RAs, which are at top.

So, again, if I were to do this in a journal article, I'd probably have several different figures. But if -- if we were to look at just the H2RA comparisons, which, you know, are just the first part, the top part, if you will, you can see that again, the pattern is such that there's no difference from one, based on this. There's one very, you know, decreased association with the Norgaard with more than ten -- ten prescriptions.

The other thing I do want to point out, 'cause it's very important about bladder cancer, and I mention this in my expert report, but it needs to be said again, which is: Bladder cancer is unlike some other



cancers in that a large percent of bladder cancers are non-malignant, which is also referred to as in situ. So, the Norgaard study was able to separately look at invasive bladder cancer compared to overall. And when you look at the invasive bladder cancer, you see that the results are much more close -- are closer to 1 and pretty much than on top of 1.

Q. Okay.

MR. RONCA: John, are you able to draw a line on there? I would like a line under that reference to Yoon, between Yoon and Cardwell. Down, down. Look on the left, you see Yoon's red. Right. Between Yoon -- between the red and blue there, all the way across.

DOCUMENT TECHNICIAN: I don't know if I understand. You mean through the circles or...

MR. RONCA: No. I want -- you see on the left there you see Yoon and Cardwell? Right under Yoon, right under HR there, draw a line that



separates Yoon from Cardwell all the way across.

There you go, perfect.

BY MR. RONCA:

Q. Okay. So, what you were just saying before, Doctor, is that everything above the line is ranitidine versus other H2RAs, right?

A. That's correct.

Q. And everything above the line are most of the dots to the right of the 1?

MR. SHEEHAN: Objection.

A. Again, visually looking at these types of forest plots for decades, I would say that this -- that there's no difference from 1 whatsoever. There's a few point estimates that, you know, are a hair, if you want to say a 1.0, I wouldn't even know what that is, 1. -- well, actually, we have it right there, 1.1. So -- and then there's these like two large departures on either side of 1, it's sort of like, you know, what they say for teaching evaluations, throw your best, throw out your worst and then in the middle is the truth.



So, looking at this, there's no -- there's no -- there's no there there, there's no association between ranitidine and bladder cancer compared to the H2RA comparator.

Q. Yeah. My question was, are most of the dots to the right of 1?

MR. SHEEHAN: Objection. Asked and answered.

A. So, again, if you're just counting whether or not mathematically they're different, you know, higher than 1.0, yes, most of the dots are higher than 1.0. But that does not mean that -- that those are different than 1.0 and that's because of both evaluating the role of bias in these associations and then also thinking about precision and the role of chance.

I would also like to point out -- oh, I'm sorry. I would also like to point out that the Yoon study, you know, had a 1.4 hazard ratio with a width of a confidence interval of .88 to 2.24, but that particular study only had 21 exposed cases. So, this is a challenge when you're trying to understand associations when there's so few exposed

cases from this one study.
So, again, I would want to see -- you would have to see replication of that pattern of the 1.4.
Q. Now, in your reporting on the Cardwell study on this forest plot, you have the letters DDD written several times.
Do you see that?
A. Yeah, that's the WHO definition of defined daily dose.
Q. And what is the WHO defined daily dose for ranitidine?
A. It's -- I think it's 300 per day.
Q. Okay. And in the Cardwell study, they actually measured the defined daily dose over periods of time, right?
MR. SHEEHAN: Objection.
A. So, yes, they -- well, they do analyses based on a defined daily dose.
Q. So, they know how many milligrams per day, right?
MR. SHEEHAN: Objection.
A. No, they're doing what is typical with a lot of pharmacoepidemiology studies, which is you're using a WHO standard for a



given medication and they're using that for the conversion.
Q. 300 milligrams a day, right?
A. I'm sorry, was there a question?
Q. It's 300 milligrams a day, right?
A. Yes.
Q. In the other studies you reported on there, you don't have DDD next to anything, right?
MR. SHEEHAN: Objection.
A. So, if the study reported a DDD or they reported a number of prescriptions, it would've been included here.
Q. Okay. So, some of the studies didn't have defined daily dose, they only had number of prescriptions?
A. Yes, that's correct.
Q. Okay.
MR. RONCA: Let's take a look at that. Next slide.
Q. So, I want to look at the ones you picked out under Norgaard, I have them in red boxes, okay? You picked out, let's talk about the prescription first, greater than or equal to five prescriptions or greater than



or equal to ten prescriptions, right?
MR. SHEEHAN: Objection.
A. Yes. But, again, I didn't pick these out, these were the reported results and I'm summarizing everything in a comprehensive way so that the reader can see what the reported results were.
Q. Well, Norgaard had more results than what you reported there, right?
A. Yes, Norgaard did a lot of sensitivity analyses.
Q. Weren't the five and ten prescriptions part of the sensitivity analysis?
MR. SHEEHAN: Objection. If you need to see the article, you can.
THE WITNESS: Okay.
A. Yeah, let me look at the article then.
Q. And while you're looking, I want to know if the dot you've plotted there is for the results at the date of the 10th prescriptions or ten years after the date of the ten prescriptions?
MR. SHEEHAN: Jim, we don't -- we



don't have the article, like, with us. So, when you say "while you're looking," I mean, I think she was saying she'd like to look, but we don't actually have it.
MR. RONCA: I see, okay.
Q. All right. Well, do you know, Doctor, if -- see where I have, at the date of 10th prescription and then arrow?
A. I would have to --
Q. Do you know, as you're sitting here today, whether you plotted the number given by Norgaard at the date of the 10th prescription or ten years after the date of the 10th prescription?
A. I would have to -- I would have to have the article in front of me to verify that.
Q. What would be the relevance of figuring out how many cancers there were at the date of the 10th prescription?
MR. SHEEHAN: Objection. Vague.
A. Yeah. Do you mean at the date of the 10th prescription or ten years after the prescription?

Q. As I read the article, what you plotted is the result at the date of the 10th prescription?
A. I would have to have the article in front of me.
Q. Just in general, what would be the relevance of knowing what the cancers were at the time date of the 10th prescription?
MR. SHEEHAN: Objection. Vague.
A. So, how it's plotted here is -- the relevance here is to distinguish between people who had five prescriptions versus people who had ten or more prescriptions. That's the relevance.
Q. When were the cancers determined?
A. The cancers were determined after the meeting and follow-up time.
Q. Was it?
MR. RONCA: Let's go to Exhibit 6433. Again, that's from prior deposition. 6433, not 6403, 6433.
MR. SHEEHAN: Jim, we have been going about another hour or so or just over an hour by my count. When you



get to a break, we should, which is hopefully in the not so distant future, we should talk about lunch.
MR. RONCA: Okay.
Yeah, let's find this exhibit. Do you have it or no, John?
DOCUMENT TECHNICIAN: I'm looking.
MR. RONCA: All right. Thank you.
DOCUMENT TECHNICIAN: I've got it in the shared folder, 6433.
MR. RONCA: Bring it up.
DOCUMENT TECHNICIAN: Just a moment.
(Exhibit 6433 was marked for identification.)
MR. RONCA: Thank you. Okay. Let's see go down, let's go by page. Let me look. Keep going through. Next. Next. Stop. Let's just look at the top part there.
BY MR. RONCA:
Q. So, you used, start of follow-up at date of 10th prescription?
THE WITNESS: Sorry. Can you zoom in on that while I pull it up over



here. I got it. Never mind.
A. Yeah. So, it looks like that point estimate is the .75.44 to 1. -- 1.28 or 29 my eyes are --
Q. Isn't it really the one above that, .73?
A. No, because if you look at the confidence limit, the one above it, the .73, ends at 1.01 and this confidence limit ends at 1.25 so -- or 28 or whatever. So, it's showing the 10th years after the 10th prescription, so it's showing a longer follow-up.
Q. Let me -- let's go down to the next table. How about this one? Is this the one you're referring to or is it the one before? And the reason I'm asking is because of that number above it you also reported -- prescription --
THE COURT REPORTER: I'm sorry, what?
A. Oh, I'm sorry. Yeah, I'm just -- I'm trying to read both of the documents at once.
MR. SHEEHAN: Hold on a second. I



think the court reporter was asking something.
(Cross-talk.)
A. So, yeah.
MR. SHEEHAN: Was the court reporter asking a question?
THE COURT REPORTER: Yes, I did. I didn't hear the last two words, number above it you also reported, something prescriptions.
MR. RONCA: Five prescriptions.
THE COURT REPORTER: Thank you.
Q. Can we get the right number, Dr. Terry?
A. I'm sorry. Yes. Panel A is the ranitidine versus other H2RAs. And so, I'm just trying to map it visually, so I'm going back and forth between the two documents. But the greater than or equal to 10 prescriptions in the top part of this forest plot is using the -- is using the estimate from panel A and in the bottom of this forest plot is using the estimate from panel B, yes, okay.
Q. Okay.

A. What is your question?
Q. My question is this: Now, looking at where it --
MR. SHEEHAN: I think just so the record's clear, on the screen is like a kidney cancer thing, which I don't think is what you're talking about.
MR. RONCA: I'm sorry. No. Go back up to the other one. I got us on the wrong table.
A. Yeah, I'm sorry. I have it in the Box.
Q. Bladder cancer, are we on the right screen now?
A. Yes.
Q. Okay. So, look at -- it says at the date of 10th prescription for start or follow-up, there are 55 cases?
THE WITNESS: Can you just highlight the row that you're in 'cause I see --
Q. At date of 10th prescription. At date of 10th prescription.
A. Oh, okay. I see you. I see where it is, yeah.



Q. 55 cases. Then ten years after the 10th prescription, there's 24 cases, right?
A. No. So -- so, this is starting follow-up after the 10th prescription, but they're still following the entire time they followed the whole cohort. The next line is showing just for the subset of people who -- who had a 10th prescription and then were followed for at least ten years. So, that's kind of a subanalysis.
But what we showed here, what you can see here, is -- is the estimate for overall everyone, so -- which is the .73 to .531.01 is what's in my forest plot.
Q. Okay.
A. So, I didn't -- I didn't show the sensitivity analysis, I showed the result for the whole cohort, yeah.
Q. I know that. I have a different question.
Is it true only the people under ten years after the 10th prescription were followed for at least ten years?
MR. SHEEHAN: Objection.
A. Please -- yeah, can you rephrase that or restate that?



Q. Subjects who are on the line, ten years after the 10th prescription, 24 cases, those are the only ones that were followed for at least ten years?
MR. SHEEHAN: Objection.
A. No, those are not the only ones that were followed for at least ten years. This particular study had a range of follow-up. This --- that one line of analysis would be just the subcohort of people who would've had ten prescriptions and then followed ten years.
Q. Okay. So, in the line above, is it fair to say that 31 of those people were not followed for ten years?
MR. SHEEHAN: Objection.
A. So, that would be an estimate. Again, these are inverse probability for treatment analyses. So, you know, so we would have to look at the actual numbers, but that -- that would be -- that would be -- that would be an estimate.
Q. Okay. So, these aren't the actual crude results, these are the adjusted results, right?



A. These are the results adjusting for the probability of being treated, yes.
Q. Okay.
MR. RONCA: Let's go back to Exhibit 6729. 6729. Next slide. And now I want to concentrate on the Cardwell results. Let's go to the next slide after this.
Q. So, in each of the Cardwell results, you give a number for 365 to 1,095 defined daily doses and 1,095 or greater than 1,095 defined daily doses, right?
A. Yes, that's correct.
Q. And in each case, the longer exposure increased the risk?
MR. SHEEHAN: Objection. Mischaracterizes.
Q. Designated by the blue arrows.
A. So, in -- in the first comparison with compared to other H2RAs, there is a higher point estimate and that's true for PPI and that's true for -- for non-use. Again, though, the -- what I would point out here is that that the variability about that estimate

is such that, you know, there's -- there's a lot more variability, so the finding with H2RAs, the interpretation is the that that's not different after, you know, after considering the role of chance.

MR. RONCA: Next slide.

Q. Another way to look at this is to turn it on its side so you can see the greater risk -- the risk estimate went up when you increased the duration of the defined daily dose; isn't that right?

MR. SHEEHAN: Objection. Mischaracterizes.

A. Again, you can do the same thing for the Norgaard study and it would be going down. So, you know, the pattern here, there's no consistent pattern with a dose response across these four studies.

Q. Great, okay.

MR. RONCA: You can take down that exhibit, please.

MR. SHEEHAN: Jim, we, about 15 minutes ago, asked for a break to do -- to get some lunch. What -- can we do that?



MR. RONCA: Let's go off the video record and talk.

THE VIDEOGRAPHER: Going off the record. The time is 4:33 p.m.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:45 p.m. UTC time.

MR. RONCA: Can you bring up Exhibit 6727 and go to page 39, please?

BY MR. RONCA:

Q. Dr. Terry, on page 39 of your report you talk about the Yoon study?

A. I'm on page 39, yes.

Q. And so, I'd like to look down about the third paragraph after Yoon and I'd like to focus on one sentence here where it says:

The overall cohort was followed for seven years which the authors noted may not be sufficient to assess the onset of cancer.

Is that what you wrote?

A. I did write that.

Q. Okay.



MR. RONCA: Now, I would like to go to the Yoon study itself, which is Exhibit 6457.

(Exhibit 6457 was marked for identification.)

MR. RONCA: And let's see, go down to the maybe second, third to last page. So, bring out the paragraph that starts with, this study has several limitations. And under third the follow-up period down maybe five, six lines from the bottom. There it is. That sentence.

BY MR. RONCA:

Q. The author said was:

Third, the follow-up period is restricted to seven years; thus, the overall follow-up period is not long enough to assess the onset of cancer.

Did I read that correctly?

A. Yes, the -- you read that correctly.

Q. Okay.

MR. RONCA: Now, let's go to Exhibit 6737.



(Exhibit 6737 was marked for identification.)

BY MR. RONCA:

Q. So, then quoting what we read from your report, you reported:

The overall cohort was filed for seven years which the author noted may not be sufficient to assess the onset of cancer. What the authors actually said was:

Third, the follow-up period is restricted to seven years; thus, the overall follow-up period is not long enough to assess the onset of cancer.

So, why did you modify what the authors said to say may not be sufficient from is not long enough?

MR. SHEEHAN: Objection to the characterization as a modification, but go ahead.

A. So, again, I'm -- in my thorough analysis of the ranitidine epidemiology and cancer outcomes, I state what the authors themselves have -- have described as limitations for their studies and, again, that's what I did right here.

I would just add that, again, based on my experience in doing cancer epidemiology studies that many associations that have been shown to be causal in cancer have been found in cohorts with less follow-up. One of the examples that comes to mind, 'cause we teach all the time some of the earlier work, is the doctor study from the UK, and that follow-up was only, I think, under five years and that was a study that's showing the causal association between smoking and lung cancer.

Q. Doesn't the IARC preamble say that follow-up periods for cancer sometimes need to be 20 or 30 years?

MR. SHEEHAN: Objection.

A. I don't have a preamble in front of me right now, but I do recall it says something like that. Again, these are -- these are kind of individual -- these are estimates of latency times for individual cancers, it's highly specific -- it's highly -- you need to specify though exposure itself and the outcome of interest and many factors can both affect the promotion of tumors as well as initiate tumors. And most



cancer cohorts do not follow individuals for their entire life, so you have a distribution of -- of follow-up time.

Q. So, do you disagree when the study author said, the follow-up period is restricted to seven years; thus, the overall follow-up period is not long enough to assess the onset of cancer?

A. Again, I would say it's not that simple. What you have to do when you're assessing any causal association is look at the strengths and limitations of each and every study and then look at the overall -- the overall evidence. So, you know, doing that and looking at all the studies that have been published on ranitidine and cancer outcomes, many of those cohorts have had long follow-up. And so, again, if -- if there were any association, those would've been apparent with all of the different studies that have been published, which again have followed millions of people in totality.

Q. Let me make it clear, I'm not asking about other studies. I'm asking about the Yoon study only.



When the study authors say the follow-up period is restricted to seven years; thus, the overall follow-up period is not long enough to assess the onset of cancer, are you disagreeing with the authors?

MR. SHEEHAN: Objection.

A. So, I would say a limitation of any study could be if the follow-up time is not long enough, that could be -- so I'm not disagreeing with the authors.

Q. So, you agree with the authors that for their study, the follow-up period of seven years was not long enough to assess the onset of cancer?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

A. So, again, a limitation of any study could be that the cohort wasn't followed long enough. In my review of the ranitidine and cancer outcomes studies, they all have collectively followed individuals for as long or longer than many of the medication and cancer outcomes that are known to be causal like hormone replacement therapy and breast cancer those study themselves



didn't follow cohorts for ten or 20 years and, yet, collectively given that the case-control studies and the cohort studies and then match the clinical trial data, we can rule out bias like selection bias, information bias and confounding bias.

So, again, it's not any one study, it has to be a collection of studies and there's just no consistency with the collection of studies for ranitidine epidemiology and these cancer outcomes that are being alleged.

Q. I'm going to remind you again, I am not talking about other studies. I am talking about the Yoon study only.

MR. RONCA: Now, please read back my previous question.

(Referred to portion of the record was read back by the court reporter.)

MR. SHEEHAN: Objection. Asked and answered.

Are you asking this question again, Jim? Is that the point of reading it back?

MR. RONCA: She has never answered

this question. Unless you want to
stipulate that she either agrees or
disagreed with the author.
MR. SHEEHAN: You can answer
again, Dr. Terry.
Note my objection.
A. So, I agree with the authors that it is always better to have longer follow-up time. But I would like to emphasize that plenty of cohorts have shorter follow-up times and associations between different exposures and those cancers have been consistent and valid.
Again, in this study the authors discussed wanting to have more follow-up time, which I would agree that that would be an advantage of the study. I would also just point out that the Yoon study did require that you had to have been on ranitidine for at least one year before you were eligible to be in the cohort. And so, very likely those are longer time period between the exposure and the outcomes of interest.
Q. My question is, do you agree that the study authors, when they said with



respect to that study only, the overall follow-up period is not long enough to assess the onset of cancer?
MR. SHEEHAN: Objection. Asked
and answered.
A. So, I agree that it's always better to have a longer follow-up time. In terms of whether or not it was long enough to assess the cancers, I would have to say that a latency time of ten or 20 years is for some solid tumors, but, you know, some cancers occur in shorter time periods. And so, again, I don't -- I agree with the authors that longer is always better, but I don't know that anyone can know exactly what the latency is for any individual cancer.
MR. RONCA: Next slide, please.
Q. Now, other studies you reported on, and I took these follow-up periods directly out of your report, Iwagami was 2.4 years, Kumar was 4.4 years, S. Kim was five years -- I had Kumar there twice, I must've made a mistake. Let's just go with those three for now.
Is it your opinion that those



studies were long enough to assess the onset of cancer?
MR. SHEEHAN: Objection. Just
objection to the characterization of
these studies as only following
patients for the length of time that
is indicated on the exhibit.
A. So, it's not that simple, again, because there's a range of follow-up and if we were to look at each of these individual studies, and I can pull up my table, which I give the interquartile range where reported. So, yeah -- so, it's not that simple.
Q. Let's go back to your report.
MR. RONCA: Exhibit 6727. Yeah.
Let's go page 40, up top, last
sentence of that first paragraph
limitations include.
BY MR. RONCA:
Q. Wanna read that to us, Doctor?
A. Limitations include that the authors were not able to specifically quantify NDMA content, and medication compliance was not known.
Q. In your discussion in your report



of Yoon, do you mention smoking anywhere?
A. (Document review.)
So, in my summary of the report on page 39 and 40, I don't mention smoking, but what I include in my table is for each and every study what they were able to adjust for. Yeah. And -- and this study in particular had an active comparator analysis which was very important.
Q. You don't mention smoking anywhere on page 39 or 40, do you, with respect to Yoon?
MR. SHEEHAN: Objection. Asked
and answered.
A. Not with respect to this summary of Yoon, but that mischaracterizes my report in general because I talk about the importance of -- of smoking for these alleged cancers and in particular, when it's not available, the importance of having this active comparator analysis, so that the confounders that are not measured can be adjusted for through that kind of design.
Q. You mentioned several times in your report how important it is to account for

smoking in these studies, right?

MR. SHEEHAN: Objection.

A. Yes, absolutely. In fact, we often teach that in cancer epidemiology agent smoking are the most important things to adjust for, but you don't have to always do that adjustment through statistical analysis you can do that adjustment through design. And this is actually the -- the key importance to why an active comparator is really a useful design in this case because, again, a lot of pharmacoepidemiology studies may be using databases that don't have complete data on some of the cancer risk factors that we would want to know about, including smoking, but, you know, also alcohol, frankly.

Q. Okay.

MR. RONCA: Let's go back to Exhibit 6737. Next slide.

Q. So, you said on page 40:

Limitations include that the authors were not able to specifically quantify NDMA content, and medication compliance was not known.



And we've already established that nowhere in that discussion did you even mention smoking, but the Yoon authors said right in their report among the important limitations was:

Fourth was the lack of information about potential confounders of cancer, such as smoking and other underlying diseases other than diabetes mellitus.

Is that what the authors said?

MR. SHEEHAN: Objection.

A. I was --

MR. SHEEHAN: Wait a second. Wait a second.

Are you looking at the study?

THE WITNESS: I'm not looking at the Yoon paper, no.

MR. SHEEHAN: Okay. If you know.

Q. Do you recall if the Yoon authors said this quote that I have in this slide?

A. I don't recall. I would have to read the article again, but it would sound plausible that they said that, but I would want to read the article again.

Q. Okay. So, the Yoon author states



specifically in the article that lack of information about potential confounders of cancer such as smoking and underlying diseases, that information was missing and you didn't mention it at all.

Is that right?

MR. SHEEHAN: Objection. Mischaracterizes the report.

A. Yes. I'm sorry. No, that is not correct because I do a complete assessment of what each study measured in my Table 1 as I refer to in my report. So, I describe in the second to last column what each of those studies adjusted for.

Q. And missing from that is the fact that they didn't have information on smoking or underlying diseases, right?

MR. SHEEHAN: Okay.

A. The Yoon study specifically looked at diabetes, they were able to look at sex, age and diabetes.

Q. Any other underlying diseases?

A. Again, I would want to pull up the study.

Q. Barrett's esophagus?



MR. SHEEHAN: Objection. Asked and answered.

Q. Did they adjust for Barrett's esophagus?

MR. SHEEHAN: Objection. If she's asked to see the study...

Q. If you can't answer it, just say so, Doctor.

A. So, this particular study, Yoon of 2021, I'm just looking at my summary of this. They matched -- they did the active comparator analysis and they were able to adjust for sex, age, diabetes and -- you know, so this particular study was not looking at esophageal cancer, so I don't -- again, without looking at the study, I don't think they would've adjusted for Barrett's esophagus.

Q. How about erosive gastritis?

MR. SHEEHAN: Objection.

A. Again, this is why -- why it's beneficial to use an active comparator analysis --

(Cross-talk.)

MR. SHEEHAN: Please don't cut her

off, Jim. Please don't cut her off.
MR. RONCA: If she's gonna dissemble --
MR. SHEEHAN: Jim, no, she's trying to answer and you cut it off, you cut her off and you're not supposed to.
MR. RONCA: Yeah, good work on prep.
Q. My only question --
MR. SHEEHAN: No, Jim. I don't even know what you're talking about. I have no idea what that means.
(Cross-talk.)
THE COURT REPORTER: There's a lot of cross-talk. I did not get the question on the record.
BY MR. RONCA:
Q. Did they adjust for erosive gastritis?
MR. SHEEHAN: Objection. Asked and answered. And I would ask counsel to please refrain from cutting off the witness's answer.
A. (Document review.)



I'm sorry, just repeat that very last question.
Q. Did they adjust for erosive gastritis?
MR. SHEEHAN: Same objection.
A. I would have to look at the paper, but based on my analysis in the Table 1, no.
Q. Cirrhosis?
A. Again, the design is such that you don't have to adjust for it through statistical analysis that the comparisons are more comparable. It's actually a much more powerful design, but adjusting for all these things, which may be inaccurately measured in any medical record, quite frankly, so the design itself is a powerful way. And if you can adjust for these other factors through a design as opposed to statistical analysis, that often is a more robust way of doing it.
Q. Apparently the authors didn't think so because they thought it was a limitation of the study that they lacked information about potential confounders of cancer, such as smoking and underlying disease.
Do you disagree with them?



MR. SHEEHAN: Objection.
A. So, a discussion of any paper is always to bring out the drawbacks of any one single study and that's why we need findings to be replicated and we need to look at the body of evidence. And when I've looked at the body of evidence for ranitidine, epidemiology and the five cancers being alleged, there's no consistent pattern.
Q. Do you disagree with this statement by the authors?
A. What statement.
Q. The one that's right in front of you on the slide where it says, Yoon said.
MR. SHEEHAN: Just for the record, I mean, we don't need to be condescending toward the witness and I'm not suggesting you meant that, but it comes across a little bit, Jim.
Go ahead, if you can answer the question, Dr. Terry.
A. So, it's not that simple. What I would say is, of course, there's always -- always good to have more data than not, but it's not that simple because, again, if they



were able to statistically adjust for things, then that's -- that's beneficial. But if you adjust for things that are not measured well or measured validly, then you really haven't adjusted for them. So, that's why we always teach that it's much better to deal with confounding through the design and using an active comparator design is a very robust way. And the authors are right to point out that, yes, they could've had more data on these other factors, but I guess if I was writing this sentence, I would add a comma and say, however, through the design, we were able to at least rule out confounding through the design of the active comparator.
Q. But when it came to the Cardwell study, you were critical that they only had 75 to 80 percent smoking information.
Isn't that right?
A. I would have to pull up my report. You have a page number or...
Q. You don't recall that you criticized Cardwell about not having full smoking information?
MR. SHEEHAN: Objection.

A. If you can give me a page number it would help.
Q. My question is, do you recall?
A. I don't recall exactly what I wrote, so I would need a page number for that.
So, but to give context to it, the Cardwell -- are we talking about the Cardwell and bladder cancer study now? Is that what you're talking about?
Q. Yes.
A. I'm sorry?
Q. Yes.
A. Okay. So -- so, to give context to that, what -- what would be important is the Cardwell finding was very different depending on if it was -- or what the comparison group was. So, the point estimate, when comparing to other H2RAs, was not different from one, whereas the point estimate when comparing to non-use was different than one.
So, again, you want to look at what else could've explained that and that's why the active comparator design is a robust way to get at things that might have measurement



error, including smoking.
Q. You said on page 44 of your report:
Further, the incomplete information on smoking history may have impacted the study's finding. Smoking is a known risk factor estimated to account for approximately 50 percent of bladder cancer cases in adults.
MR. SHEEHAN: Is that a question, Jim?
Q. That's what you said on page 44, right?
A. Yes, I did say that.
Q. But Yoon had no information on smoking, but it's okay.
Is that your testimony?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
A. No, that is definitely not my testimony. It is never okay not to have information on something that would be a confounder. However, you can -- when it's missing, there's again other ways to kind of get at it through the design of the study. So, that's where thee active comparator designs are very important.



Q. So, the authors of the Yoon paper thought it was important enough to say it, but you didn't think it was important enough to say it in your report, isn't that the truth?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
A. Yeah. No, I don't agree. Throughout my report, and particularly if we go to page 58 and 59, I make a very strong argument that that's exactly why we need the active comparator analysis because for these five cancers, there's risk factors that are very strongly related to the cancer, such as smoking for bladder, esophageal, gastric and factors like alcohol for liver cancer.
And -- and so, that is why if we don't have measurement of these other factors, we have to have a way of analyzing them through the design and that's really why the active comparator designs are the most important designs when assessing ranitidine epidemiology and these five cancers.
Q. It is true that the Yoon authors mentioned lack of smoking and underlying



disease information as a limitation and you did not mention those two things on page 39 and 40 of your report.
That is true, correct?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
Go ahead, Dr. Terry.
A. Sure. I did not mention those on page 39 and 40, but I did mention throughout the report, the importance of always making sure that you measure the factors that are considered confounders for any cancer outcome. And so, I gave a very detailed argument in the report throughout the report about how these factors have to be measured in observational epidemiology. And if they're not measured well, then they have to be adjusted for through some other way, whether that's through the active comparator design.
And so, I would -- I would totally disagree with you because first and foremost, my emphasis on assessing any association is always to look at the role of bias. And if there is an association, again, if there --

the risk estimate is above one, then what -- is it plausible that bias can draw it down to 1. And so, that's what I was assessing in each and every one of these summaries. And so, the summaries of each of these articles, I focus on what -- what the study found and throughout the report, I talk about the importance of smoking.

Q. Okay, but you felt it necessary to specifically say that the results of the Cardwell study may have been impacted by incomplete information on smoking?

A. Again, my orientation is always to understand, is this correlation that we see plus able or not. So, in the Cardwell study, what I wanted to understand was is it plausible that you could have this 1.4 -- hang on, let me get the estimate.

MR. RONCA: You can take down the exhibit while she's doing that. While she's doing that you can look for Exhibit 6423.

A. Okay. Yeah, I'm sorry. What I was saying was with the Cardwell study, I wanted to -- I was assessing the quality of the



study and whether or not -- how to explain the differences between the active comparator and the non-use and that's where missing data, amount of smoking data was relevant to that discussion.

Q. By the way, while we're on Cardwell, what is the treatment for carcinoma in C2 of the bladder?

A. I'm not a clinical doctor, I am an epidemiologist, but my understanding is some sort of ablation. I think it varies depending on the medical center.

Q. Isn't it surgery followed by chemotherapy?

MR. SHEEHAN: Objection.

A. Again, I'm not a medical doctor, but that's not my understanding right now. It has changed over time, the treatment.

Q. So, you would throw out all the carcinoma in situs in the bladder cancer studies, right?

MR. SHEEHAN: Objection. Misstates the testimony.

A. It's not that similar. I wouldn't throw them out. But my point of all this is



that in the -- in the very large study, Norgaard, where they were able to show the findings with and without carcinoma in situ, you can see that the findings for invasive bladder cancer were not different from 1.

So -- so, my concern as an epidemiologist would -- would be that somehow the high proportion of in situ cancers of which, as I mentioned, before is about half of all bladder cancers, but those could've gotten detected more readily in people, you know, who are more attached to the healthcare system, so to speak or being seen more frequently, rather.

So -- so, that would very much concern me as an epidemiologist.

Q. Okay.

MR. RONCA: So, let's go to Exhibit 6423.

(Exhibit 6423 was previously marked for identification.)

BY MR. RONCA:

Q. This is what we've been calling the Y. Kim study, 'cause there's another study.

You're familiar with this, right?



A. Yes, I am.

Q. So, you were the first expert for the defense that I've seen who referred to this as an aggregate study.

So, what's an aggregate study?

MR. SHEEHAN: Do you have it in your Box, Dr. Terry?

THE WITNESS: No, let me just get it.

MR. SHEEHAN: Is it in the Box, John, or Mike? I forget whose controlling that.

THE WITNESS: Yeah, I don't see it in the Box.

Q. Do you know if it's an aggregate study, as you're sitting here, without seeing it?

A. I don't see it in my Box, but do you want to tell me the page that it's referring to? But I know the database, this is the Explorys Database. Is that correct? Hang on.

THE WITNESS: Can you make it a little bigger? 'Cause it's not in my Box?

MR. SHEEHAN: Maybe we can -- maybe we can blow this up and for the purpose --

A. Yes, I'm sorry. This is using the Explorys Database.

MR. SHEEHAN: Can we check on the Box? I mean, is it on other people's boxes? Why is it not loading here?

THE VIDEOGRAPHER: You hit refresh? Just double-checking, 'because it should be -- I see it here in the Box. EX6423 is the beginning of the file name.

THE WITNESS: Oh, now I have it, yeah. I have it now.

MR. SHEEHAN: For one reason or another, it's just taking a while to load to Dr. Terry's Box, but she's got it now.

A. I have it.

Q. Okay. Is this an aggregate study?

A. So, this -- this is using this Explorys Database, which is a pretty comprehensive collection of EMR, electronic medical record data. So, they collected data



from 360 hospitals and 73 million individual patients. So, by aggregate there, what I mean is often this happens with very, very large databases like this, is you're given, not individual data, but data for, you know, chunks of people, like in this case, ten, I think it was, I have to look it up. But this happens all the time with the way data gets shared publically and some of it has to do with like HIPAA regulations and privacy and things like that. We do this all the time in cancer where you can only get data for, you know, like maybe it's a small unit like a census track or something like that. So, that's what they did here, I think, so -- let me see.

Yes, in fact they say on page -- they say in the materials and methods that's exactly why they did it that way, because of HIPAA, the Health Insurance Portability and Accountability Act.

Q. Yeah, it's an aggregate study, right?

MR. SHEEHAN: Objection. Asked and answered.



A. Yes, the data are aggregate like this, yeah.

Q. It's not individual data?

A. So, it's summarized in units of individuals, yes.

Q. So, within the units, how many people were in each unit?

A. I think the counts are per ten people, so. I think that's how the data are delivered.

MR. RONCA: Let's go to page 5 of this document.

Q. See how each number ends in zero, is that because they don't know the exact numbers, they only know numbers of tens?

MR. SHEEHAN: Objection.

Q. Every single number ends in a zero?

A. Right. I mean, these are summary percentages, yes, I would imagine that's the structure of the data, but I would have to look more carefully at that.

Q. You would imagine? You didn't look carefully at it when you prepared this report?

A. No, I did --



MR. SHEEHAN: Objection. Mischaracterizes testimony.

Go ahead.

A. I did look carefully at these results. But what I meant is, yes, I -- if the data are summarized like that in units, that's -- that's the valid summary of the data.

Q. Was this Explorys Database created for science or created for insurance?

MR. SHEEHAN: Objection.

A. I don't know why it was created. I know it's being used for a lot of research studies. And I don't know the other uses.

Q. Isn't it a claims database?

A. Again, it's -- it's taking hospital -- data from hospitals and I would have to look at whether or not -- I would imagine it matches it to medical claims data as well.

Q. Does this database have any information on duration of use?

A. So, this analysis was done -- just pulling up my notes, where they focused on concurrent use. So, yes, the people that

were in -- in the cohort for a number of years would've had a number of years of use.
Q. How many years?
A. I don't think that was reported in the paper.
Q. So, the paper doesn't report that the duration of use?
MR. SHEEHAN: Objection.
A. (Document review.)
So, again, there was a range. They looked at esophageal, gastric, liver, pancreatic, colorectal cancer over a large period of time from 2009 to 2018 and they started counting cancers one year following initiation and then they -- they counted -- again, you had to have a concurrent prescription and they counted up to ten years.
Q. Did they have any information on the duration that these people or groups of ten people used the actual drug?
MR. SHEEHAN: Objection. Asked and answered.
A. Not that it was reported.
Q. And did they have any information


on what the dose was that these people were taking in groups of ten?
A. So, no, they had to have -- they give -- in the methods, they give background on how they collected the exposure data and -- and specifically they had to have prescriptions and this particular study, you know, had over -- had -- well, several million people in it. And so, yeah, so they don't have the number of prescriptions or the duration, but again this is -- this has happened in a number of different medication analyses in the cancer epidemiology and what -- what is being examined is -- is prescription which is validly measured and longer term cancer. So, this is a, you know, a totally valid way of looking at that.
Q. And isn't it just a problem with these large cohort studies that you said in your speech in 2017, which is, they don't measure the exposure?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
A. No. What they have measured really


well is the exposure. In my speech in 2017, what I was referring to is if the exposure changes over time or if people -- so, in this case, they have these cohorts and they know whether or not -- they know the medications that that's a very valid -- a valid measurement.
Q. They know the medication, they just don't know how much for long; isn't that right?
MR. SHEEHAN: Objection.
A. Again, it's a distribution, so this particular study doesn't do any analyses by duration or by -- by, you know, intensity of the exposure.
Q. And the other H2RB comparator is famotidine?
A. Yes.
Q. And were there statistically significant or, as the authors put it, just significant differences in the risk factors for cancer amongst the ranitidine group and the famotidine group?
A. Yes, there were some statistically significant differences between the two


groups. But, again, they were able to both deal with this through the active comparator design, but also to further statistically adjust for some of these differences.
Q. And isn't it true the famotidine group had 23.5 percent more smokers?
A. I would have to look that up.
MR. RONCA: Take down the exhibit.
Q. The famotidine group had 34.8 percent more people who were obese?
MR. SHEEHAN: Objection.
Q. Do you know?
A. I'm looking at the table right now.
So, it's not that simple. You have to look at it by -- by age and by race and by sex.
Q. I'm asking if there were more obese people in the famotidine group than the ranitidine group?
MR. SHEEHAN: Objection.
Q. It's Table 2, third line down, fourth column over. 32.32 percent in the famotidine group 23.97 percent in the ranitidine group.
MR. SHEEHAN: So, are you

Page 186
M. Terry

asking --
A. Yes. Now, I am -- the table is very -- it's labeled, very hard to read 'cause the blue highlights are for a different factor. Yeah. Okay. Yes, I see where you are.
Q. 34.8 percent more obesity in the famotidine group than the ranitidine group, right?
MR. SHEEHAN: Objection.
A. No. So, the average here for obesity is 32.32 percent for the famotidine group and 23.97 percent.
Q. Yeah. And the difference between those two is that the famotidine is 34.8 percent more, if you do the math?
A. Okay.
MR. SHEEHAN: Objection.
A. It's 9 percent more on an absolute basis, but, yeah.
Q. And if you do the math, cirrhosis is 75 percent more in the famotidine group?
MR. SHEEHAN: Objection.
A. Again, it's 5.5 percent on an absolute scale.

Page 187
M. Terry

Q. Yeah, it's 11.4 percent versus 6.5 percent. It's 75 percent more. You know what I'm talking about, Doctor, you have the --
MR. SHEEHAN: Hey --
Q. -- in the statistics.
MR. SHEEHAN: Listen, Jim, you don't need -- you don't need to do that. It's condescending and disrespectful, it really is.
(Cross-talk.)
MR. RONCA: She knows exactly what I'm talking about.
MR. SHEEHAN: Jim, you do not need to condescend to the witness, please knock it off.
A. So, I'm just pointing out that the absolute difference between those two, for example, for cirrhosis is the absolute difference is 11.4 minus 6.5, which it sounds bigger on a relative scale, but what matters here, when we're doing analyses, statistical analyses, is what's the absolute difference in terms of how that will impact what percent of individuals may or may not be

Page 188
M. Terry

misclassified.
But further, in addition to the active comparator design, they were able to further statistically adjust for these factors.
Q. And the atrophic gastritis, a risk for stomach cancer group was 43.6 percent more in the famotidine group than the ranitidine group?
A. Again, on an absolute, it would be about 1.3 percent of the cohort, which is very little. So, would I expect that even, if they weren't able to justify it -- even if it -- excuse me, weren't able to adjust for it through a statistical method, which they were, I would, you know, expect that to have very little impact on a cohort with several million people because the absolute difference is only about 1.3.
Q. What's the average time that people stay in this database?
A. So, this database has been growing over time, so I would -- I would have to -- I don't know that it's reported here, I'd have to look a little bit more carefully. Like in

Page 189
M. Terry

the supplemental tables, you can see -- or actually not supplemental, Table 5, you can see kind of how the population has grown over time, so -- so, it's a database that's increasing.
Q. It's true that the patients are not identified with any unique number in this database for people doing research from the outside, right?
A. That is my understanding.
Q. And that the average time a person spends in this database is 3.5 years?
MR. SHEEHAN: Is that a question?
Q. Yeah. Isn't that true, Doctor?
MR. SHEEHAN: Objection.
A. I don't know that unless it's reported here. I'm just looking.
Q. I can save you the trouble, it's not reported in this study, it's reported in the basic studies that described by the Explorys Database. Did you look at any of those?
MR. SHEEHAN: Objection.
Objection to the colloquy.
Go ahead, Dr. Terry.

A. I did look at -- I have looked at Explorys studies that have used this database before, in addition to this one. Also, what -- how -- what Table 5 shows is that the cancer incidences for the cancers in this study for esophagus, stomach, liver, pancreatic, colorectal cancer that the database actually has valid capture of those cancer outcomes because those match very well with cancer incidences that we know from the US registry databases.
Q. I'm asking you, how long people stay in this database, on average?
MR. SHEEHAN: Objection.
Q. If you don't know, that's a fine answer.
A. Yeah, I don't know offhand.
MR. RONCA: Let's break for lunch. Half an hour?
MR. SHEEHAN: Let's go off the record.
THE VIDEOGRAPHER: We're going off the record. The time is 5:42 p.m. UTC time.
(Whereupon, a lunch recess was



taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 6:38 p.m. UTC time.
EXAMINATION BY
MS. FINKEN:
Q. Good afternoon, Dr. Terry. My name is Tracy Finken. I'm going to be taking the rest of your deposition today because Jim Ronca had another commitment.
So, the same rules that he give at the beginning of the deposition apply to me as well.
Do you understand that?
A. Yes, I do.
Q. And you understand that you're testifying today as if you were testifying in front of a judge or a jury?
A. Yes, I do.
Q. And if you don't understand any of my questions or if there's an issue with my internet connection, just let me know and I'll be happy -- we can either go off the record or I can rephrase my question so that you understand it, okay?



A. Okay. Thank you.
Q. And if you answer my question, I'm going to assume that you understood that; is that fair?
A. That's fair.
Q. Is there anything that would affect your ability to testify truthfully today?
A. No.
Q. And I don't know if -- I'm going to really try not to be repetitive at all during this deposition, but if there's something that I ask you that has already been covered, just bear be me, I'm going to try to not do that, but if there is something that has been covered that I missed, I'm sure your counsel will let me know.
A. Sorry. Can I clarify? Were you on all morning or no?
Q. I was, yes, but --
A. Okay.
Q. -- like I said, off the record, my internet connection was unstable at times, so I don't want to be repetitive. But if I happen to be repetitive, I'm sure Mr. Sheehan will object and let me know.



Do you have anything in front of you today while you're testifying?
A. Just my expert report.
Q. Do you have any type of notes or anything like that in your expert report?
A. No.
Q. Do you have any other notes or anything like that in front of you?
A. Not in front of me, no.
Q. Did you bring anything with you today that other than your expert report?
A. I brought my cell phone and my laptop. But, yeah, I'm using a company laptop, I'm not using my laptop.
Q. Do you have access to any other applications on your computer while -- during the course of this deposition, other than the Zoom?
A. I do not.
Q. And where are you physically located today?
A. I am in the Dechert offices between 41st and 42nd Street and Sixth Avenue.
Q. I understand Mr. Sheehan is present with you in the room?

A. Yes.
Q. Is there anybody else present in the room?
A. Not right now.
Q. Okay. Has there been during the course of the deposition?
A. Not during the deposition, before just to set up some IT people.
Q. Okay. So, just to go back to the questions regarding your report, let me see if I can stop that from happening, give me one second.
So, Dr. Terry, are you currently engaged in any research regarding NDMA?
A. No, I'm not engaged in any research right now.
Q. Okay. Have you ever conducted any research regarding NDMA?
A. No, I conducted dietary analyses in various different shapes and form and as relevant to this case, the NDMA studies are dietary studies and medication of ranitidine, so these types of studies I've conducted in different settings.
Q. Have you conducted any studies



pertinent -- strike that.
Have you conducted any studies specific to ranitidine?
A. I have not conducted any studies specific to ranitidine, but I've used methods that are very similar to all of the different methods that are being proposed here.
Q. Have you ever conducted any studies specific to histamine 2 receptor antagonists?
A. I have not myself led studies specific to H2RA antagonists.
Q. When you say "H2RA," are you referring to histamine 2 receptor antagonists, correct?
A. That's correct.
Q. So, if I refer to H2RAs throughout the course of this deposition, you'll understand what I'm referring to, correct?
A. Yes, that's correct.
Q. Have you ever conducted any type of epidemiological studies relating to proton pump inhibitors?
A. I have not conducted studies that specifically looked at protein pump inhibitors. But, again, I conducted many,



many different studies that use the same techniques that are being described here.
Q. And when you said that you had conducted dietary analysis, I believe was the term that you used, did you conduct any studies that specifically looked at NDMA?
A. Not the NDMA content in a diet, but other aspects that are using the same methods proposed here.
Q. And have you ever conducted any type of published peer-reviewed studies relating to nitrosamines?
A. So, I have conducted studies related to nitrosamines and brain tumors using the same methods that have been used in the dietary analyses in this case.
Q. How many different studies have you conducted relating to nitrosamines?
A. I don't know the exact count.
Q. Are they listed on your CV?
A. Yes, they would be.
Q. Okay. And what is the name of the studies that you conducted relating to nitrosamines and brain tumors?
A. (Document review.)



Can I pull it up on my virtual copy of this 'cause I'd find it quicker? I just have a few pages here and I don't remember exactly where it is on the page.
MR. SHEEHAN: Do you have a virtual copy? I mean, I don't know how critical this is, Tracy, but she's not finding it immediately in the hard copy of her CV.
Q. If you have a virtual copy and you want to pull it up that way, that would be fine.
MR. SHEEHAN: Would you have to open up your laptop, Dr. Terry?
THE WITNESS: Yeah.
MR. SHEEHAN: So, the issue, Tracy, is the laptop she's using, we didn't have the right adapter for, like, the MAC, for her MAC. So, she's not using her computer to do the Zoom, she's using a borrowed laptop. So, she would have to open up her laptop and go through that process and do it. She's happy to do it if you want her to.

MS. FINKEN: That's okay. We'll find it -- we can address it on a break.
A. Yeah, I mean the other reason why it's -- all of the work that I did on this brain tumor study, it took a little while to publish because one of our colleagues passed away untimely, so it took us a while to pick up some of that work. So, it's not -- it's not immediately the year that I would remember the year being, so... But I can definitely find it on a break.
Q. Okay. What approximate year do you believe it was?
A. So, again, if we're talking about the brain tumor study, it would've been in the aughts, but I don't remember what year exactly.
(Court reporter clarification.)
A. In like the '00s.
MR. SHEEHAN: The aughts.
A. Sorry. I will definitely pull that up during the break.
Q. Have you conducted any other studies relating to nitrosamines other than



the study involving brain tumors that you just referenced?
A. No. Although I work on very large collaborative studies and some of those studies do, you know, look at a lot of dietary analyses, so... But, yes, not specific to NDMA.
Q. Have you published any epidemiological study as a co-author with Dr. Mormon?
A. Not that I'm aware of.
Q. Have you published any epidemiological studies as a co-author with Dr. McTiernan?
A. No, not that I'm aware of. I don't think so at all.
Q. Okay. Dr. Terry, are you familiar with IARC?
A. I am familiar with IARC, yes.
Q. Have you ever sat on an IARC Working Group panel?
A. I have not sat on an IARC Working Group.
MR. SHEEHAN: That is a repetitive one, Tracy.



Q. Were you ever invited by IARC to act as an expert on a Working Group panel so assess carcinogenicity of an agent?
MR. SHEEHAN: Objection. Asked and answered.
A. No, I have not been invited to serve on those panels. I have been invited to give talks at IARC. I gave one just this past year. And I almost worked there, so I was -- yeah, I was given a job opportunity to work there.
Q. And what was your talk on?
A. So, my talk was on the changing incidence of global breast cancer trends.
Q. Have you ever been invited to sit on an expert panel for the National Toxicology Program to assess the carcinogenicity of an agent?
A. I have not, no.
Q. Where is that siren coming from? Is that from your office?
A. Outside.
MR. SHEEHAN: That's us, Tracy, and honestly it's constant. There's -- I don't know what's going



on in New York City these days, but there is a constant stream of siren noise.
A. This is quieter than my block, so I didn't even notice.
Q. All right. Let me go back.
Have you ever sat on an expert on an FDA Working Group on the carcinogenicity of an agent?
A. No, I have not sat on an FDA expert panel. I have sat on several national cancer institute panels and I am part of an NSF panel that's coming up in a couple of months. But, yeah, not on FDA.
Q. Have you ever been invited to sit on an expert panel for the FDA to assess the carcinogenicity of NDMA?
A. No, I have not been on any FDA panel.
Q. Have you ever sat on any expert panel to assess the carcinogenicity of NDMA?
A. No, I have not been on panel to assess the carcinogenicity of NDMA.
Q. And what is NDMA?
A. NDMA is a nitrosamine.

Q. And what is a nitrosamine?
A. Chemically what is a nitrosamine or --
Q. Yes.
A. Yeah. I mean, it refers to the chemical structure of, like, nitrites, nitrates those are nitrosamines, we can be exposed to them through -- through diet or through other sources.
Q. You had discussed dietary NDMA studies briefly.
Are dietary NDMA studies human epidemiological studies?
A. So, the -- the way that I was referring to them, I was referring to the human studies that have been done on dietary NDMA.
Q. So, there are human epidemiological studies that you're referring to?
A. The case-control and cohort studies that have been done on dietary NDMA, yes, those are the ones that I'm referring to.
Q. Have you published any studies that involve occupational epidemiology?
A. I mean, the methods that have been


used in patient epidemiology are methods that I teach. I commented on a multiple of different occupational cohorts. I've analyzed optional cohorts data. There's nothing specific to occupational data that's different than others. But, again, we've commented on different -- on -- in different studies, I've looked that occupational exposures, so...
MS. FINKEN: Going to move to strike as nonresponsive.
Q. Have you published any studies that involve occupational epidemiology?
MR. SHEEHAN: Objection. Asked and answered and vague.
A. So, by occupational epidemiology, if you're referring specifically to cohorts of people who may or may not or who have worked in a certain plant or something like that, no. I focus primarily -- most of my studies at least have focused primarily outside of that kind of setting. But, again, the methods and the analysis are no different and within the classes that I've taught, we use occupational cohort data.


Q. So, would you agree that occupational NDMA studies are also human epidemiological studies?
A. So, again, if -- what constitutes whether or not it's an epidemiological study is, did they use a cohort study case-control clinical trial kind of study in human populations.
Q. Dr. Terry, what is a carcinogen?
A. A carcinogen is something that can cause cancer. Again, it's more accurate to say whether or not it's been tested in humans or only animals, so...
Q. And what is a mutagen?
A. A mutagen --
MR. SHEEHAN: Hold on, just before you answer.
Let me get an objection in there as to vague.
A. Sorry. A mutagen is something that can change the DNA and -- yeah.
Q. Theoretically, can a single exposure to a mutagen result in a cancer in humans?
MR. SHEEHAN: Objection.


A. So, I'm not a molecular biologist, I'm a cancer epidemiologist. So, again, I can testify on expertise related to data, data analysis and cancer epidemiology in general.
Q. So, are you unable to answer that question?
A. Again, I'm an expert in the study of -- study of humans. And so, again, my understanding of other fields of data just through colleagues is that, no, it's not, but, you know, I'm not a molecular biologist.
Q. Have you done a comprehensive and systematic review of the medical literature to form an opinion if NDMA meets the criteria off a known human carcinogen?
MR. SHEEHAN: Objection.
A. Yes, I've done a comprehensive analysis of the cancer epidemiological literature to see if there are -- there is any causal association between NDMA and cancers, including the five cancers that are alleged in this litigation.
Q. Do you agree that the NDMA molecule is the same whether it's ingested or inhaled?

MR. SHEEHAN: Objection.
A. So, again, that is not my expertise, whether or not the molecule is the same or not. I do know from my expertise and from the years of reading cancer epidemiology studies and also performing them, that the source of exposure has very different effects in humans. So, whatever source of exposure we're thinking about the outcome in terms of cancer is very different whether or not things are inhaled or ingested.
Q. Doctor, you said that you're not a molecular biologist.
Are you a pathologist?
A. I'm not a pathologist.
Q. Okay. And would you agree that you're not a regulatory expert?
A. I would agree, I'm not a regulatory expert.
Q. And would you agree that you're not an oncologist?
A. I would agree I'm not an oncologist. I work with a lot of cancer biologists. I work with a lot of cancer oncologists. And my expertise, again, is in



epidemiology, understanding large scale studies and the role of bias in contributing to understanding and interpreting the data.
Q. And would you agree you're not a toxicologist?
A. I'm not a toxicologist.
Q. Do you consider yourself an expert in carcinogenesis?
A. I consider --
MR. SHEEHAN: Hold on.
Objection.
Go ahead.
A. I consider myself an expert in cancer epidemiology, which is a very important field within carcinogenesis to understand the effects of exposures in humans.
Q. Okay. What is carcinogenesis?
MR. SHEEHAN: Objection. Vague.
A. So, broadly speaking, carcinogenesis is a process of cancer formation, development formation, sequelae.
Q. So, I asked you previously whether or not you agree that the NDMA molecule is the same whether it's ingested or inhaled.



Do you agree that the NDMA molecule's the same whether it's in processed meat or it's attached to a pill?
A. So, again --
MR. SHEEHAN: Objection.
Just give it a beat.
Objection. Go ahead.
THE WITNESS: Sorry.
A. Okay. So, again, my expertise is in cancer epidemiology. What I can tell you from years and years of research is that exposures through the diet are a very different outcome on human health and cancer specifically than exposures ingested through pills.
Q. And is that specific -- is that -- strike that.
How is it different?
A. So, let's use the example of beta carotene. So, beta carotene is a very famous example where for a number of years it was very consistent association with fruits and vegetables relating to reduced risk of lung cancer. So, some very large trials were conducted in the '90s and those trials showed



that having beta carotene in pill-based form was very different and actually increased lung cancers compared to, you know, the observational findings looking at different sources of beta carotene, including fruits and vegetables.
Q. And my question was specific to NDMA.
How is it different when it comes to NDMA?
MR. SHEEHAN: Objection. Vague.
A. So, again, based on what we know and what we've observed over several decades is that having an exposure through your diet which comes in a very different form at a very different amount and having something similar like a nutrient, a similar nutrient ingested, does not have the same effect whatsoever on cancer incidence.
Q. How is the NDMA molecule in processed meat different from the NDMA molecule in a pill?
MR. SHEEHAN: Objection.
A. So, I can testify based on what I know from the human observational data that

the outcomes are completely different and we have many different examples, not just -- not just the one I gave you, vitamin D is another example. So, again, sources in the diet have been shown over and over again to be very different than pill-based formulations of the same things.

MS. FINKEN: I'm gonna move to strike as nonresponsive.

Q. My question's specific to NDMA. How is the NDMA molecule in processed meat different from the NDMA molecule in a pill?

A. So --

MR. SHEEHAN: Objection.

Go ahead.

A. Again, I'm not a molecular biologist to comment on how it is different. What I can comment on and what I'm an expert in is understanding cancer outcomes in individuals after observing them for years and hundreds of thousands of millions of people. So, I can say that the dietary NDMA literature is very different than what we observe for the ranitidine exposure and cancer outcomes.



Q. Have you ever assessed the amount of NDMA in ranitidine pills compared to the amount of NDMA in dietary epidemiological studies?

A. I have not done that assessment and nor would I. I'm not a laboratory scientist. My expertise is in statistics and epidemiology.

Q. Dr. Terry, you indicate in your report that the Florian study is a clear example of the lack of transportability between medication exposures and dietary NDMA.

MS. FINKEN: And that's on page 75. If we can pull up Exhibit 6727, please.

Q. And on page 75, here you indicate in the second paragraph:

A clear example of the lack of transportability between medication exposures and dietary NDMA is a randomized controlled trial conducted by FDA investigators and published in the journal of the American Medical Association, Florian 2021.

Do you see that?



A. Yes, I see that.

Q. And you indicate that the dietary NDMA exposure is clearly a different exposure construct than NDMA that may be present in ranitidine.

Do you see that?

MR. SHEEHAN: Objection.

A. Yes, I see that.

Q. And you're stating that because the levels of urinary NDMA or higher in the cured meats groups versus the non-cured meats group for the ranitidine and placebo respectively.

Do you see that?

A. Yes, I see that.

Q. And you conclude:

Thus, dietary NDMA exposure is clearly a different exposure construct than NDMA that may be present in ranitidine.

Do you see that?

A. I see that, yes.

Q. How much NDMA was contained in the single doses of ranitidine given to healthy subjects in the Florian study?

A. We would have to pull that up and look at that.



Q. So, you don't know sitting here off the top of your head?

A. No. When I wrote this, I did review that and looked at all of that. But again, the purpose of this art -- this section here is really to give many different examples of how diet and medications you cannot go from one and extrapolate from one to indicate the risk in another.

Q. What was the Florian study attempting to assess?

MR. SHEEHAN: Objection.

A. Again, it was a controlled feeding trial trying to understand differences in urinary and I think they also did biochrome levels of the NDMA. I'd have to take a look at it a little bit more.

Q. Doctor, was Florian designed to look at exogenous formation of NDMA from ranitidine?

A. My understanding of the Florian study is it was designed to look at biomarkers and how they were impacted based on different exposures.

Q. Did Florian take gastric fluid

samples in measuring NDMA?
MR. SHEEHAN: Objection.
A. I would have to take a look at it. I know they did urinary and I know they also did plasma.
Q. Did you undertake an examination of the food that was provided in the cured meats diet versus the non-cured meats diet in the Florian study?
A. I did, I looked at that information.
Q. Are you aware, Doctor, that the Florian study was designed to assess whether or not ranitidine endogenously formed NDMA inside the human body?
A. So, my understanding of the Florian study, it was an experiment to look at what would happen under these two conditions with the cured meat diet and non-cured meat and what would be the effect of the ranitidine and that's my understanding of how they did the trial.
Q. Did you -- do you understand that there's a difference between endogenous formation of NDMA from ranitidine versus


exogenous formation of NDMA from ranitidine?
MR. SHEEHAN: Objection.
A. So, again, my understanding is they wanted to mimic what would be happening from a daily dose of ranitidine versus cured meats diet.
Q. Are you aware, Doctor, sitting here today that the Florian -- strike that.
Are you aware, Doctor, sitting here today about the ranitidine doses that were provided to the healthy volunteers in the Florian study contained ten nanograms or less of NDMA?
A. I would have to take a closer look at the paper now.
Q. Doctor, on page 76 of your report --
MS. FINKEN: If we can go to the next page, please.
Q. -- you discuss an IARC 1999 Working Group regarding gastric cancer in anti-ulcer drugs?
Do you see that?
A. Yes. Is there a specific question?
Q. There will be.


Are you with me and ready to talk about the IARC 1999 Working Group you found it on page 76 of your report?
Do you see that?
A. Towards the -- yeah, towards the bottom.
Q. And if you can turn to the next page you discuss it further on page 77; is that correct?
A. Okay.
Q. So, looking at that, what is the full citation for that IARC 1999 Working Group document?
A. The La Vecchia 2003 is my understanding is the full citation.
Q. So, is it your testimony, Doctor, that the La Vecchia 2003 document provides the findings from the 1999 IARC Working Group that assessed gastric cancer relating to anti-ulcer drugs?
MR. SHEEHAN: Objection.
A. Yes, this is the docu- -- the La Vecchia 2003 is the source of this quote about the Working Group assessment that IARC did in 1999.


Q. Did you actually review any materials that were prepared by the IARC 1999 FDA Working Group that evaluated this?
A. They are included in the source from the La Vecchia source, discusses them.
Q. On page 77, you indicate that the process that the 1999 IARC Working Group undertook is the same process that the scientific community undertook after ranitidine was reported -- after NDMA was reported to be present in ranitidine.
Do you see that?
It's zoomed in on the screen if it's easier for you.
A. Yes, I see that.
Q. Now, Dr. Terry, you are not suggesting that an IARC Working Group -- an IARC expert panel evaluated whether the NDMA in ranitidine can cause human cancer since 2019, correct?
MR. SHEEHAN: Objection.
A. So, my statement here is referring to the process that the scientific community took to evaluate whether or not there is an association, which includes conducting large

scale studies ruling out the role of selection bias, information bias and confounding bias, and then ruling out the -- the role of chance. And that's what the scientific community has done now with 11 studies being published after that time. And having that evidence published in the peer review of which is open for people to comment on and to evaluate themselves and come to the same conclusion that there is no association between ranitidine and any of -- of any specific cancer.
Q. Doctor, did you -- strike that.
The IARC work --- expert Working Group has never undertaken a review of whether the NDMA in ranitidine can cause human cancer, correct?
A. Which IARC Working Group?
Q. Any of them?
MR. SHEEHAN: Objection.
A. Has there been any.
Q. I'll withdraw the question.
Has there been any IARC expert panel that has looked specifically at whether or not the NDMA in ranitidine can cause human


cancer?
A. I am not aware of any specific IARC panel that has been convened since 2019 to evaluate ranitidine and cancer.
Q. Doctor, when you evaluated the ranitidine specific epidemiology, did you take into consideration any bias on behalf of the authors of the studies?
MR. SHEEHAN: Objection.
A. Yes, I always look at -- both as a reviewer as well as an editor when I'm deciding which papers to publish, I always look at the -- and especially as a reader, frankly, when I'm just reading literature for my own work, I always look to see what disclosures people -- people give.
Q. Okay. So, you're aware that, for example, the authors in the Adami study are consultants on behalf of some of the defendants in this case, correct?
A. I am --
MR. SHEEHAN: Objection.
Give it a beat.
Objection.
A. I'm aware of that.


Q. And are you aware that some of the authors in the Y. Kim study have affiliations with pharmaceutical manufacturers of H2RAs?
MR. SHEEHAN: Objection. Vague.
A. So, I don't remember which study -- I don't remember -- I remember the Adami just because I read it recently, but I don't remember -- I do remember when I read each and every one of these studies, I looked at the disclosures. I also have to say that through the years, whenever I'm evaluating something that could have a potential conflict of interest, such as a medication, or any of these kinds of -- anything that could influence how people analyze their data, I always first and foremost look at the tables myself, calculate the crude associations myself, look at the change in the association between the adjusted and the crude. And I always do that before I read the author's interpretation of those data.
So, I always make my own conclusion based on the data and the data tables. I've always been focused on that first and foremost and -- and that really is my


expertise in terms of teaching and research and evaluation.
Again, I've been doing, kind of, applied statistics since the late '80s and so my only concern when someone reports a conflict of interest is if they don't give you the full data. But when -- when it's a study and the data are not readily assessable or you don't -- they're not clear on where the data source comes from, that's when I would ask for more information as either a viewer or editor.
Q. Dr. Terry, do you know whether or not Johnson & Johnson has a financial interest in this case?
A. I don't know off the top of my head, no.
Q. Knowing that the Adami study was conducted by consultants for Sanofi in this litigation, how did you weigh the results in that study?
MR. SHEEHAN: Objection. Just let me get my -- objection to the characterization of the Adami study being performed by consultants for

Sanofi in the litigation.
Go ahead.
A. Sure. So, again, as I do with all studies, I would review any potential conflict. But, I, myself look at the data first, not what the interpretation would say, but I draw my own conclusions based on the strength of the data and understanding the data source.
In the particular example of Adami, they were able to have outcomes data for different cancers based on the Danish cancer registry which is one of the best known cancer registries in the world and goes back a long time. So, that gives a lot of weight to the data. And also, they were linking that data to prescription database.
So, again, for there to be any concern about a conflict of interest would be when you don't have full information about the data source and the data quality and individuals are not transparent with their data. But that was not the case in this study or any of the 16 studies that I reviewed that were related to ranitidine and



cancer.
Q. Did Adami have information on smoking?
A. I have to just consult my table.
So, Adami did also this propensity score matching which allowed for comparison between different groups of people and they were able to have the two different active comparator groups, one with famotidine and one with PPIs, protein pump inhibitors.
Q. Doctor, I'm going to move to strike as nonresponsive.
Did Adami have information on smoking?
MR. SHEEHAN: Objection.
If you need the paper, Doctor.
A. Yeah, maybe we can pull up the paper.
Q. Okay. Do you have that information in your report?
A. I would have it in -- in my table if they did separately adjust for it. But, again, the beauty of the design is that it has an active comparator so -- so that is more well-balanced between the two different



groups.
Q. And Doctor, when you're looking at your table, where -- what page of your report are you referring to?
A. I'm referring to page 113.
MS. FINKEN: Can we put that up on the screen, please?
Q. Fair to say the word smoking is not included in your table as it relates to Adami?
A. Right. And that's, again, they use of propensity score method as their main method for adjusting for all these potential confounders.
Q. Doctor, what is ranitidine?
A. Ranitidine is a medication that people take for a variety of different reasons, one of which is gastrointestinal reflux.
Q. What else was it indicated for besides gastrointestinal reflux disease?
A. It's been indicated for a number of different things. I'm not a medical doctor, so I couldn't give you the full list.
Q. So, you've never prescribed



ranitidine?
A. No, I'm not a medical doctor.
Q. Okay. I noticed you use the term "therapeutic use of ranitidine" in your report.
What is therapeutic use of ranitidine?
A. So, in -- in the way that it's used in the report, it would mean using ranitidine as therapy for some of the symptoms and -- and underlying conditions that might be prescribed, ranitidine might be prescribed for, including GERD.
Q. Is a single dose of ranitidine considered therapeutic use of ranitidine?
MR. SHEEHAN: Objection. Vague.
A. Again, I'm not a medical doctor, so I couldn't tell you in terms of what amount of dose would be therapeutic. What I can tell you though -- sorry.
Q. What was the dosing for ranitidine for the indication of GERD?
MR. SHEEHAN: Objection. Vague.
A. In what context? Again, I'm not a medical doctor, so I know it's prescribed in

different ways depending on people's symptoms.

Q. Do you know what the recommended dose was for ranitidine for the indication of GERD?

MR. SHEEHAN: Objection.

A. Again, that would depend on -- I'm sure that would depend on someone's underlying symptoms and conditions and age and all of that, you know, whether they're adult, whether they're not, that kind of thing.

What I can tell you is that I reviewed the totality of ranitidine epidemiology and -- and cancer and how ranitidine is being used in millions and millions of people is absolutely not associated with cancer based on these large scale studies. So, how it's being used in reality in millions of people there's no association with cancer.

Q. How do you know how it's being used in reality with millions and millions of people?

A. Because these studies are capturing



the real world of what's happening and that's the power of observational studies. So, often when we think about -- ran my clinical trials of which it's really hard to examine different cancer risk factors and randomized clinical trials because you can't ethically randomize them, but what we haven't said through observational designs is a measure of what's happening in reality. So, that's what these studies are capturing, what's happening in reality in terms of prescribing patterns.

Q. Dr. Terry, do you understand that the dose of ranitidine, the recommended dose of ranitidine depends upon the indication?

A. I understand that the recommended dose for any medication would depend on the patient's underlying conditions.

Q. Okay. So, you understand that the recommended dose varies depending on the indication that you're taking it for?

MR. SHEEHAN: Objection.

Go ahead.

A. Yeah. Again, I think that it's just not so straightforward as that and it depends, obviously, on the medication and



that was a general statement what I said, but -- so... But again, it doesn't influence my interpretation of the literature and my overall synthesis of the literature.

Q. Does the length of time a person takes ranitidine depend on the indication?

MR. SHEEHAN: Objection. Vague.

A. Again, I'm not a medical doctor.

Q. Do you know whether the length of time a person takes ranitidine depends upon the indication?

MR. SHEEHAN: Same objection.

A. So, as a general principle, I would imagine that would be the case as with all medications.

Q. Okay. So, sitting here today, do you know, for example, for the indication of active duodenal ulcer how long is it recommended that an individual take ranitidine?

A. So, again, my expertise is an understanding epidemiology design and statistics and I don't and could not testify how long patients should take the medication for different conditions.



Q. For maintenance healing or maintenance therapy indication for ranitidine, how long is it recommended to take ranitidine, do you know?

MR. SHEEHAN: Objection. Vague.

A. I do not know.

Q. Do you know if there's a maximum recommended time for a person to take prescription ranitidine for maintenance therapy or GERD?

A. Again, my expertise as an epidemiology, my understanding is that some patients take it for a very, very long time.

Q. So, are you aware, Doctor, that depending on the indication some people may take up to 600 milligrams of ranitidine per day?

MR. SHEEHAN: Objection. Vague.

A. Again, I don't know that.

Q. Dr. Terry, are you aware that GSK sales force promoted Zantac to be taken once per day for life?

MR. SHEEHAN: Objection. Vague and mischaracterizes.

A. I am not aware of that, no.

Q. Are you aware that Zantac became a blockbuster drug by promoting it for maintenance therapy?
MR. SHEEHAN: Objection.
A. I am not aware of that.
Q. Are you aware or do you -- strike that.
Do you understand that a blockbuster drug is a drug that reaches more than one billion in sales per year?
MR. SHEEHAN: Objection.
A. Again, that would not have relevance to my review of the literature.
Q. So, are you aware that a blockbuster drug is a drug that reaches more than one billion in sales per year?
MR. SHEEHAN: Same objection.
A. I -- I heard the term used before, I don't know what the cutoffs are for that in terms of sales.
Q. Do you know how many tens of billions of dollars the manufacturers profited from selling Zantac during the life time of the product?
A. I do not --



MR. SHEEHAN: Just let me get my objection in.
THE WITNESS: Okay.
MR. SHEEHAN: Objection. Assumes facts not in evidence.
A. I mean -- it would not influence my expert opinion about the ranitidine and cancer epidemiology studies.
Q. So, going back to the term "therapeutic use of ranitidine."
Are those your words or are those the words of your lawyers?
MR. SHEEHAN: Objection.
A. Those are my words.
Q. So, you came up with the terminology "therapeutic use of ranitidine"?
MR. SHEEHAN: Objection.
A. Again, it's in my report and this is very typical way of referring to a medication.
Q. So, did you come up with that terminology yourself?
MR. SHEEHAN: Objection.
A. I would not call that terminology. I would call that a descriptor and in the



literature you hear -- I'm sorry, you see that descriptor sometimes.
Q. So, just going back to my question, the -- the descriptor, using your term, the descriptor "therapeutic use of ranitidine," is that a descriptor that you came up with yourself?
MR. SHEEHAN: Objection.
A. So, if we -- if we start on the very first -- the very first of the 16 studies, which is the one from Penston, that -- that was definitely very -- that was starting pharma study published in 1990 and that was a therapeutic use of ranitidine for treatment for ulcer, which is I think the paper you were referring to before. So, absolutely, that was a therapeutic treatment. And so, again, that's not a word I came up with or a phrase I came up with, that's just describing the fact that the very first study was looking at ranitidine as long-term therapy.
Q. And Penston's the GSK sponsored study, correct?
MR. SHEEHAN: Objection.



A. I don't know, we'd have to pull it up.
MS. FINKEN: Okay. You can take down that exhibit, please.
Q. Doctor, in your report you indicate that ranitidine epidemiology studies are the only reliable source to assess whether the presence of NDMA in ranitidine has any clinical or operative effect on cancer and --
MR. SHEEHAN: Tracy, you're in and out.
MS. FINKEN: Okay.
MR. SHEEHAN: I don't know if others can -- can -- if that's happening, but on our end it's every other word.
MS. FUJIMOTO: It is.
THE COURT REPORTER: It was a lag, it was a very slow lag.
MS. FINKEN: It's coming up that my internet connection is unstable.
Can you hear me right now?
THE COURT REPORTER: No.
MR. SHEEHAN: Yeah, it's tough.
MS. FINKEN: Hold on one second.

MR. SHEEHAN: Sometimes it's fine, Tracy. Like right there, "hold on one second," came through loud and clear, but it's when you continue talking it gets sort of distorted or something.
MS. FINKEN: Okay. Give me one sec. Hold on. This is what happens, Tom, I told you I have to kick my kids off the Xbox --
THE VIDEOGRAPHER: Do you want to go off the record?
MS. FINKEN: We can stay on the record. Hold on one second.
Okay. Can you hear me okay now?
THE WITNESS: Yes.
THE COURT REPORTER: I can hear you now.
MS. FINKEN: Let's try to move ahead and if I start going in and out again, just let me know, okay?
BY MS. FINKEN:
Q. On page 3 of your report, you indicate that the epidemiology studies are the only reliable source to assess whether the presence of NDMA in ranitidine has any



clinical or operative effect on cancer because the studies of ranitidine and cancer outcomes inherently account for any NDMA impurity that may be present in ranitidine, is that right, you state that?
A. Yeah, I didn't find exactly where I stated it, but if you give me a second, I will --
Q. It's on page 3 of your report, Doctor?
MR. SHEEHAN: Do you want to bring up the report, Tracy, or you just -- you're asking her to follow along in her hard copy?
MS. FINKEN: She can just follow along in her hard copy, that's fine.
Q. Do you see where you state --
A. Yeah, I see it. Yes.
Q. Dr. Terry, what is the maximum exposure to ranitidine measured in the ranitidine epidemiological studies you reviewed to reach your conclusions?
MR. SHEEHAN: Objection.
A. So, each of the studies -- it varied, but again, we're talking about 16



studies that started -- first one being published in 1990, the, you know, Wong-Ho Chow article that was published in the mid '90s, the Habel article. There's been a lot of studies over time, some of which had, you know, detailed the exposure window and the length of time. Some of them did not have that. But in Table 1 of my report, I -- I provide the information for each of those studies.
Q. So, if you want to take a look at Table 1 in your report, you can go ahead and do that, Doctor.
My question is, what is the maximum exposure to ranitidine measured in the ranitidine epidemiological study you reviewed to reach your conclusions?
MR. SHEEHAN: Objection.
A. So, the maximum number is, again, would vary by each study, but some of the studies that are concurrent users, so -- and they were followed-up for many years.
So, again, these studies and what's robust about them is the reporting on ranitidine use as it's used in the



population. So, there's a distribution between short-term users and long-term users.
Q. So, Doctor, what is the longest term -- the longest term of exposure to ranitidine that is evaluated in those studies?
MR. SHEEHAN: Objection.
A. So, the McDowell study, for example, has a range of six to 11 years, 11.7 years. The Yoon study did concurrent exposure and did follow people up to ten years. So -- yeah.
Again, I couldn't tell you what is the longest, but that -- those are some of the studies, you know, that have followed that for longer.
Q. So, is it your testimony, Doctor, that the McDowell study evaluated for 11 years of exposure to ranitidine?
MR. SHEEHAN: Objection. Mischaracterizes.
A. Yeah. No, my testimony is that across the 16 studies, they all had a range of exposure windows and across the range of studies there was no consistent pattern

across ranitidine use as it's used in free-living populations and any of the five cancers being alleged.
Q. Did any ranitidine epidemiological study measure ranitidine exposure for more than five years?
MR. SHEEHAN: Objection.
A. So, again, what's the relevant question is how long the follow-up was between the exposure and the cancer, not how long the exposure was and that's because, again, the exposure's being measured how it's being used out in the population in millions of people, but is relevant is -- is to make sure that the follow-up time is long enough to -- to have a valid assessment of cancer. And that's what's been done here.
And again, there's a distribution across the studies, but there's no pattern whatsoever between ranitidine use and any of the cancers.
MS. FINKEN: Move to strike as nonresponsive.
Q. Doctor, my question was, did any ranitidine epidemiological study measure


ranitidine exposure for more than --
THE COURT REPORTER: You trailed at the end there.
Q. Doctor, my question was, did any ranitidine epidemiological study measure ranitidine exposure for more than five years, yes or no?
MR. SHEEHAN: Objection. Asked and answered.
And you can provide context, Dr. Terry, if you want to.
A. So, my summary of the 16 studies that have been published using the data that's reported from these peer-reviewed publications is that some of the studies did have exposure windows that were longer. And again, importantly when we're looking at cancer is also how long have the cohorts been followed. And in my expert opinion that across these 16 studies, there's enough variation in exposure window as well as in outcome follow-up time to allow for a rigorous assessment of whether or not there is any signal related to ranitidine exposure and any of the cancers. And I carefully


evaluated that with respect to ranitidine being a promoter and ranitidine being an initiator.
Q. Doctor, can you identify for me which ranitidine specific epidemiological study measured exposure -- evaluated exposure to ranitidine for more than five years?
MR. SHEEHAN: Objection.
Q. I'm not talking about follow-up, I'm talking about exposure.
Which ranitidine specific epidemiological study looked at ranitidine exposure for more than five years?
MR. SHEEHAN: You keep cutting in and out, Tracy. I mean, we're -- I get the gist of the question, but just so you know, you are cutting in and out.
Objection. Asked --
MS. FINKEN: Go ahead.
MR. SHEEHAN: Say again, Tracy.
MS. FINKEN: I'm letting you make your objection. Go ahead.
MR. SHEEHAN: Objection. Asked and answered.


Go ahead.
Q. So, Candida managed to get my question on the realtime I see it, so I can read it again if I cut out for you.
But my question was, I'm not talking about follow-up, I'm talking about exposure.
Which ranitidine specific epidemiological study looked at ranitidine exposure for more than five years?
MR. SHEEHAN: Objection. Asked and answered. And just for the record, Dr. Terry, obviously does not have realtime.
A. So, I'm just looking at the more recent studies the Adami study, for example, included an exposure period from 1996 to 2008. The Kim study had an exposure window of 2002 to 2008.
Q. You're sure about that, Doctor?
MR. SHEEHAN: Objection.
A. Again, based on my summary in this table, but we can pull up any of the studies and I can double-check that.
Q. So, you said you believe the Adami

study specifically evaluated exposure to ranitidine for more than five years?
Is that your testimony?
MR. SHEEHAN: Objection.
A. My testimony is related to the exposure window which is what's relevant here. So, if anyone in these large cohort studies, again, Adami had over a million people, they defined an exposure window and then they defined the follow-up period.
So, if people were taking a drug that long, then they would be captured in that exposure window. So, my testimony is that these 16 studies have, across millions of people now, assessed whether or not ranitidine is associated with any of these cancers that are being alleged and there is no clear or consistent or valid pattern that that demonstrates that whatsoever. So, it's not for lack of statistical power, there's plenty of data here. So what they're evaluating is what happens in free-living people.
Q. Doctor, what was the second study that you testified that you believe evaluated



ranitidine exposure for more than five years?
MR. SHEEHAN: Objection.
Mischaracterizes testimony.
A. So, again, I want to emphasize what I'm saying is an exposure window as opposed to what -- what you may be asking about five years of exposure. If someone is taking it that long, these studies had a longer exposure window. But my point with all of this is that ranitidine has been evaluated in how it's being used in populations across the world in different settings, in cohort studies, in nested case-control studies and there's no consistent pattern with ranitidine and any of these cancers whatsoever.
Q. Dr. Terry, did Adami pull the data and look at the data specifically and analyze the data for people who took ranitidine for more than five years?
MR. SHEEHAN: Objection.
A. No, they did not. The authors did not do that.
Q. Did the Kim study same question with the Kim study. Did they pool the data and look at data specifically for people who



took ranitidine for more than five years?
MR. SHEEHAN: Objection.
A. No, they did not. But that again is not the relevant question here. The relevant question is how's ranitidine being used in the population and is there any signal and is that signal bigger than the noise after you account for confounding information and selection bias and there is no signal, there's no consistent signal, period.
Q. Doctor, isn't it true that the Adami study looked the maximum exposure that the Adami study looked at was ten prescriptions?
MR. SHEEHAN: Objection.
Mischaracterizes the study.
A. So, that was one of the analysis that they did, they looked at the ten prescriptions, yes.
Q. Did they do an analysis for any exposure more than ten prescriptions?
MR. SHEEHAN: Objection.
A. We can pull it up to verify, but my recollection is that they -- and based on my



reports here, they did it for five plus and ten plus.
Q. So, for example, if somebody took ranitidine for five years, how does the Adami study let you know what the risk of developing cancer is?
A. So, again, they looked at the prescription number, not the years. And again, the most relevant question that is important here is how is ranitidine being used in the population and do you see any signal and there's no signal at a population level that there's any association between ranitidine and any of these cancers. And this kind of methodology has been used for many, many decades and where there are -- I can give you plenty of examples where there are consistent signals with -- with similar kinds of medication measures like hormone replacement therapy or nonsteroidal anti-inflammatory medications, so even selective supplements.
Q. Are you finished, Doctor, I don't want to interrupt you?
A. That's okay.

Q. Are you finished with your answer?
A. Yes.
Q. So, Doctor, how long was each prescription in the Adami study?
MR. SHEEHAN: Objection. Vague.
A. What do you mean by how long?
Q. For example, if they're looking at ten prescriptions, are those 30-day prescriptions, are they ten-day prescriptions? Can you tell me that?
MR. SHEEHAN: Objection.
A. I think I would have to look more carefully at the methods. Right now we can pull it up, but I think just my recollection is that it's five prescriptions. So, you know, again, these are measurements, this is done all the time in population science where you have a measurement that really is all about kind of people's rank, like, where there in line. And if anything, these kinds of measurements are much more valid and have a higher sensitivity and higher specificity than the kind of dietary assessment measurements that are being examined with respect to NDMA, so...



MR. SHEEHAN: Hey, Tracy, we've been going about an, I guess, hour 15 or so, when you get to a natural break, can we just do five or ten?
MS. FINKEN: Yeah, give me like five minutes and we'll take a break, okay?
MR. SHEEHAN: Sure.
MS. FINKEN: Okay, great.
Q. Dr. Terry, isn't it true that the Cardwell study is the only ranitidine specific study that measured ranitidine exposure for more than --
MR. SHEEHAN: Objection.
(Court reporter clarification.)
Q. -- than three years?
A. My notes -- I mean, my summary on page 112 says that the Cardwell study, the median exposure was 8.4 years.
How much NDMA was quantified in the ranitidine that was studied in the ranitidine epidemiological studies?
MR. SHEEHAN: Objection. Vague.
A. So, again, this is very typical of pharmacoepidemiological studies, but you --



you quantify the exposure based on prescriptions, so...
Q. Did any ranitidine epidemiological study quantify the amount of NDMA in the ranitidine?
A. No, because that would not even have been possible. These are studies that are using individuals, millions of individuals. So, what you're asking is, did each and every individuals' pill have quantification of NDMA, is that what you're asking?
Q. I'm asking if any of the studies, at all, quantify the amount of NDMA that was contained in the ranitidine?
A. Not in the 16 epidemiological studies of ranitidine in cancer. There have been, however, and I include them in my expert opinion, three studies of an antihypertensive medication called valsartan, where some proxy for the NDMA contamination was done. And those studies also did not show any association between NDMA contaminated valsartan and cancer.
MS. FINKEN: Move to strike as



nonresponsive.
Actually, you know what, now is a good time to take a break if you want to go off the record.
MR. SHEEHAN: Okay.
THE VIDEOGRAPHER: We're going off the record. The time is 7:53 p.m. UTC time.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 8:11 p.m. UTC time.
BY MS. FINKEN:
Q. Okay. Dr. Terry, hopefully my internet connection will remain stable, just let me know if I'm going out again, okay?
Dr. Terry, you're aware that IARC classified NDMA as the probable human carcinogen in 1987, correct?
A. I'm aware of the two-way classification. I think the first IARC report was in 1987.
Q. Do you disagree with the expert's -- (technical distortion) -- in

their evaluation --
MR. SHEEHAN: Tracy, you're --
Q. -- (technical distortion) -- NDMA is a probable human carcinogen?
MR. SHEEHAN: Tracy, that was -- Candida, did you get that?
THE COURT REPORTER: No, I was trying to interrupt, but I was on mute, I was trying to, but you got it.
MS. FINKEN: Let's try this again. Can you hear me okay?
MR. SHEEHAN: You're all distorted.
MS. FINKEN: Let's go off the record. I'm going to go kick everybody off the internet.
THE VIDEOGRAPHER: The time is 8:13 p.m. UTC. We're going off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 8:17 p.m. UTC time.
BY MS. FINKEN:


Q. Dr. Terry, do you disagree with the expert's IARC classification in 1987 of NDMA as a probable human carcinogen?
A. So, based on -- based on all the data today -- based on all the data today, the difference between having a probable carcinogen Type 1 or carcinogen which is definitely carcinogenic in humans is that human evidence.
So, I understand the -- the classification of 2A and, yeah, I think 2A is -- there's 75 or more than 75 different probable carcinogens in that risk of which in order to be then carcinogenic in humans or Class 1, you would have to have the human data. So, I understand based on the animal studies to date, that it's in that classification.
Q. And my question was, do you disagree with that classification?
A. No, I wouldn't disagree with that classification 'cause again my expertise is to evaluate the human data which would be evaluating whether or not something should be Class 1.


Q. Do you agree that there's -- sorry. What did you say?
A. Sorry. Group 1 or Class 1. Sorry. I was using those interchangeably, Group 1 according to IARC.
Q. Understood.
Do you agree that there's NDMA in ranitidine?
MR. SHEEHAN: Objection. Vague.
A. So, I understand from the experimental data that NDMA, under certain experimental conditions has shown to be in ranitidine.
Q. Do you agree that the NDMA in ranitidine is variable depending on the conditions it's subjected to?
MR. SHEEHAN: Objection.
A. Again --
MR. SHEEHAN: Objection. Vague. Go ahead.
A. My expertise is not to evaluate the laboratory data, but rather the human data.
Q. Are you aware -- go ahead, sorry.
A. Most exposures it depends on the experimental conditions.


Q. Okay. Are you aware though that the NDMA in ranitidine is variable depending upon the conditions it's exposed to?
MR. SHEEHAN: Objection. Vague.
A. I'm aware there's been experiments that have suggested that -- that it's variable depending on the experimental conditions. But again, this is not my area of expertise. My area of expertise is large scale epidemiological studies and data analyses and ruling out quantitative effects of bias.
Q. Are you aware that ranitidine was globally recalled because it contained NDMA?
A. I'm aware that ranitidine was recalled, yes.
Q. Do you agree that NDMA is mutagenic?
MR. SHEEHAN: Objection. Vague.
A. Again, I am not a laboratory scientist, but I'm aware of experiments that have looked at mechanisms for NDMA and it's a potential -- potential role in carcinogenesis that's why it's labeled as such along with, you know, over 70 or 80 other kinds of

probable carcinogens. In order for it to actually be a carcinogenesis in humans, you need that epidemiological data of which there are none, whether it's assessed through diet and/or through ranitidine exposure.

Q. Is NDMA mutagenic?

MR. SHEEHAN: Objection. Vague.

A. Again, my expertise is not in laboratory science, it's in the assessment of human data. And based on the human data, there's no data to support causality in a role of NDMA in human carcinogenesis.

MS. FINKEN: Again, move to strike as nonresponsive.

Q. And Doctor, if you don't know, I don't know is a perfectly acceptable answer.

My question is, is NDMA mutagenic?

MR. SHEEHAN: Same objection. And asked and answered.

A. So, my understanding is that there are laboratory studies that support a role of NDMA in mutagenesis. But, again, that is likely why it's ruled as probable carcinogen.

Q. Is NDMA clastogenic?

MR. SHEEHAN: Objection. Vague.



A. Yeah. Again, it would be based on laboratory data of what you are describing for mutagenesis.

Q. Is there laboratory data demonstrating that NDMA is clastogenic?

MR. SHEEHAN: Objection. Vague.

A. My expertise is not in the laboratory data, I'm not a laboratory scientist, but again that's not relevant. What's relevant here is is there enough data to examine whether or not NDMA is associated with humans, human cancer. And there has been many, many studies, both in looking at dietary exposures as well as looking at ranitidine exposure itself and there's no consistent association that can't be accounted for by bias.

Q. Is NDMA carcinogenic?

MR. SHEEHAN: Objection. Vague.

A. NDMA, as classified by IARC, is classified as probably carcinogenic -- carcinogenic. But again, is not classified as a human carcinogen or Class 1, Group 1, because the human data are lacking.

Q. Dr. Terry, are you aware that the



National Toxicology Program has conducted a peer review analysis of NDMA in the '80s and determined that it should be reason- -- that it was reasonably anticipated to be a human carcinogen?

A. Again, I'm not aware of the specific report that you are alluding to, but if you wanted to pull it up, but what I would provide for context is that since the 1980s there have been many, many studies.

And I'd like to just correct how I phrased my last answer. It's not that the data are lacking. The data are there, it's that there's no consistent data to support any causal association between exposure and outcome where the exposure is either through the diet or through a pill. So, there's no association.

So, if -- if a report from the '80s or earlier or later that didn't use these human data that now exist on a very broad basis in millions of people, then I would say that report is incomplete in its assessment of causality.

Q. Dr. Terry, did you undertake a



Bradford Hill analysis regarding whether NDMA can cause human cancer?

A. So, throughout my expert report, I undertook a thorough review of the epidemiological data to assess causality, whether that be causality from NDMA in the diet or NDMA from ranitidine. So, in order to undertake a Bradford Hill causal analysis, you would first rule out the role of bias in contributing to the associations that you might see, the risk estimates that you may see.

So, in the case of dietary NDMA and the different cancers, what's -- excuse me, what's become very clear over the last two decades as more and more cohort studies have been published is that the cohort findings do not support the case-controls findings and with NDMA and -- and different cancers.

And so, in my report, for example, I describe the meta- -- systematic review of meta-analysis by Song, and in that they found they clear patterns of differences between cohort studies with dietary NDMA and case-control studies and they did a formal

assessment in a meta-analysis that's referred to as a heterogeneity index and they're looking to see, are these studies heterogenous, meaning that the findings are attributed by the fact that you have different types of design.

So, again, in dietary assessments and cancer risk, when we see something different between case-control studies and cohort studies, the number one thing that people do is they assess whether or not there's recall bias. So, I didn't even need to get to the stage of a formal Bradford Hill for NDMA and these cancers because all of the results and the consistency in the case-control compared to the cohort suggested bias to me.

So, I -- so, I understood it, understanding the causal argument throughout the whole report, including the dietary assessment.

Q. Doctor, where in your report do you undertake a Bradford Hill analysis looking at whether NDMA causes human cancer?

MR. SHEEHAN: Objection. Asked



and answered.

A. So, again, as I describe in the beginning of my report, before even getting to the stage that you would do a formal Bradford Hill causal analysis, you have to first rule out bias and I couldn't rule out bias as contributing to the patterns in NDMA, dietary NDMA and the cancers.

At the end of my report, I do do a formal review of the ranitidine and the different cancers because, again, the -- that's what's relevant for understanding the question of whether or not ranitidine is causal for the different cancers being alleged. So, I did provide that even though, again, there is no consistent pattern or reliable pattern, but I included that just to be complete.

MS. FINKEN: Hello?

MR. SHEEHAN: Hello.

THE WITNESS: Hello.

MS. FINKEN: Can you hear me?

MR. SHEEHAN: Were you asking something, Tracy? Were you asking something? The first word we heard



was "hello."

MS. FINKEN: Yes, I am. I'm having major connection issues. I'm sorry.

BY MS. FINKEN:

Q. Can you just point to me where in the body of the report you undertook a Bradford Hill analysis relating to NDMA causing human cancer?

MR. SHEEHAN: Let me -- before we even go there, Candida, did you hear?

THE COURT REPORTER: No.

MR. SHEEHAN: I just want to make sure we're not on different wave lengths here.

THE COURT REPORTER: No, I heard nothing, I thought there was just a long pause in the record.

MR. SHEEHAN: Okay. All right, fair enough.

MS. FINKEN: Can you hear me now, Candida?

THE COURT REPORTER: I can hear you now, yeah. And your face wasn't frozen so that's why I just thought



you were thinking.

MS. FINKEN: No.

MR. SHEEHAN: So can you just repeat the question, Tracy?

BY MS. FINKEN:

Q. Can you point to where in the body of your report you analyze the Bradford Hill factors in relation to NDMA causing human cancers?

MR. SHEEHAN: Objection. Asked and answered.

A. Can I clarify? Did you hear my last answer or do I -- 'cause I answered that question already.

MR. SHEEHAN: I think she's just asking it again.

But I'm assuming, Tracy, you heard all of her answers.

MS. FINKEN: I'm looking back on realtime right now because I don't know -- I thought you could hear me and you couldn't. So, let me just take a look and see what you said.

Q. So, is the answer, no, you don't conduct a formal Bradford Hill analysis in

the body of your report relating to whether or not NDMA can cause human cancer?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
A. So, to repeat what I had said earlier. In the beginning of my report, so this is on page 21, I say, quote -- this is from the top of the report:
Key to establishing reliable association from the totality of observational data is a detailed analysis on the role of bias, including confounding, selection bias and information bias may play in the observed association. Two critical pieces of this analysis involve; one, an evaluation of the role of bias given the magnitude of the observed association, the likelihood of potential biases and the likelihood that potential biases may explain the observed the association, and two, an evaluation of comparability of the groups being compared without an apples to apples comparison and showing the baseline pre-exposure risk of assessment, et cetera.
So, only after this do you then go



on to do formal evaluation of causality. And so, when it comes to the dietary studies with NDMA from the diet, there was no evidence that there was any reason to proceed, because, as I mentioned from my expert review, when I looked carefully at every single NDMA and cancer epidemiology study for these five cancers, there was no consistent association in the cohort studies and the case-control studies.
So, when you see that different kind of pattern between the two types of study designs, you cannot rule out recall bias. So, I didn't go on to formally do a causal -- a Bradford Hill for NDMA in diet. What I did at the end of the report was do a formal Bradford Hill on ranitidine, since that is the subject of -- of this litigation. So, I did a formal review, a causal review of ranitidine and the cancers being alleged.
Q. Is it your testimony today, Doctor, that NDMA does not cause human cancer?
A. It is my testimony today that NDMA sources from the diet has -- there's no association, consistent association, reliable



association in the human studies of dietary NDMA, nor in the ranitidine studies and the selected cancers that are being alleged here.
Q. What -- strike that.
So, is it your opinion, Doctor, that NDMA cannot cause cancer in humans?
MR. SHEEHAN: Objection.
A. It is my expert opinion that NDMA, as measured from the diet and/or ranitidine exposure, that there is no consistent or reliable evidence of any causal association between dietary NDMA and ranitidine and the cancers being investigated here.
Q. But you would agree, Doctor, that there is evidence -- there is some evidence of an association between NDMA and certain types of cancers in the epidemiological literature, correct?
MR. SHEEHAN: Objection. Objection. Mischaracterizes testimony.
Go ahead.
A. So, again, my expert analysis is a synthesis of the literature, which means that when you synthesize the literature you have



to look at the totality of the evidence and that includes studies that have shown no association, studies that have shown associations, studies that have shown no association. And when I say "association" here, I don't mean causal association. Typically, in epidemiology, we use the word "association" to mean correlation. And it's -- so, it's only when I preface that with a causal association that I mean causal association. So, I want to clarify that because we do use it differently sometimes. So, when I say "association," I mean correlation between two factors.
So, it is my testimony that the dietary NDMA studies and the ranitidine studies, which have taken place over the last several decades, that there's no consistent pattern that cannot be explained away by bias.
Q. Doctor, you aren't disputing that NDMA causes cancer of the many different species of animals, are you?
A. Again, I'm an expert in epidemiology in human studies, not in animal

research. For NDMA to be part of the IARC 2A classification means that there are in vitro and different types of animal studies that may be supporting probable association. But until you have human studies of which now we have many, many human studies conducted in many millions of people taking ranitidine and there is no consistent reliable link to cancer.
Q. Doctor, coming to your conclusions in this case, have you undertaken a review of the clinical trial data in relation to ranitidine?
A. Which specific clinical trials do you mean?
Q. The clinical trial data that was conducted by GSK.
A. Again, I focused on the peer-reviewed scientific literature.
Q. So, did you review any of the internal clinical trial data that was conducted by GSK?
MR. SHEEHAN: Objection.
A. I was sent -- I was sent internal documents, but, again, that would not be



relevant to my review here because my review is focused on a scientific peer-reviewed literature on epidemiological studies of ranitidine and other sources including dietary NDMA studies and occupational studies.
Q. Doctor, so, is it fair to say you did not review any of the randomized control trials that were conducted by GSK in forming your conclusions?
MR. SHEEHAN: Objection.
A. I only used epidemiological studies that are part of the peer-reviewed literature, those are the only relevant studies from my assessment.
Q. You only reviewed publically available literature, is that your testimony?
MR. SHEEHAN: Objection.
Mischaracterizes testimony.
A. Again, I was sent internal documents and I could've reviewed whatever I was sent, but then most relevant is the scientific peer review literature of which there's plenty and there's 16 separate studies of ranitidine, there's many more



studies including the diet and occupation. So, those are the studies that I reviewed that are relevant to this discussion.
Q. Did you consider biologically plausible mechanisms whereby NDMA can cause cancer?
MR. SHEEHAN: Objection. Vague.
A. So, in our practice of epidemiology, we are trained to specifically rule out the sources of bias. So, you -- first you start with a hypothesis. You look at the data and to see if the data matched the hypothesis. You get -- you evaluate the point estimate, you interrogate that point estimate, such that you want to know before you report out on a particular finding that that finding couldn't be resulting from bias, which would include section bias, how you picked your subjects, how you followed them over time or information bias, how you measured the outcome, how you measured the exposure and any of the other third variables and/or confounding bias.
When you rule out those roles of biases as contributing to the point estimate,



'cause those are systematic biases, and what that means from a statistical point of view is that they can result in an overestimate or an underestimate of the effect, depending on the direction of those associations. Then you look to see about the precision of the estimate.
So, is it plausible that what you observed, even after you remove the possibility of bias, is what you observe because of chance, and that's where the variability. So, it's about thinking about the role of biases and then the role of chance. And then after that, you can say, okay, there might be something here, is it biologically plausible. But you don't start out in epidemiology saying is something biologically plausible until you actually know that there's something that's consistent and reliable and valid.
And so, once you rule those out then you can talk about biological plausibility. So, in the case of dietary NDMA, those don't get ruled out because, in my expert opinion, those are still driven by

bias because the cohort studies did not find a consistent association.
In the case of ranitidine and the cancers being alleged, again, there's no pattern of data that suggests that there's any association whatsoever. So, you only get to the biological plausibility after you know that what you were observed is reliable and valid.
Q. So, is your answer to my question, no, Doctor?
MR. SHEEHAN: Objection.
A. My answer to your question is that there are lots of mechanisms that have an hypothesis -- excuse me, hypothesize and tested in experimental settings for NDMA. And there's no dispute there, that's why NDMA is a two-way, according to IARC.
But what -- my expert testimony is that until you have the human data of which we have plenty of human data now, until you can rule out the role of bias, the biological plausibility isn't as important as the human data at this point.
Q. Did you consider the biologically



plausible mechanisms whereby NDMA can cause cancer?
MR. SHEEHAN: Objection. Vague and asked and answered.
A. Sure. I mean -- and I understand what many of those mechanisms are, but what I'm saying, it doesn't enter into your assessment of -- of causality until you can first rule out bias and then you can say okay look I have a valid association now, it's reliable. What does it mean? Is it plausible? So, that's what we do for each and every finding that we have, we go then to our colleagues and you know, we work across many different disciplines and that's -- that's when biological mechanisms and plausibility are key, right? But you don't want the laboratory scientists to be working on associations that haven't been shown to be not explained away by bias because, you know, first you want to make sure you have something that's valid and reliable.
Q. So, Doctor, did you consider any biologically plausible mechanisms whereby ranitidine can cause cancer besides NDMA?



MR. SHEEHAN: Objection. Vague.
A. Again, my expertise is in valuating whether or not the study of ranitidine have shown any association with cancer, and they do not.
Q. Did you consider any biologically plausible mechanism whereby ranitidine can cause cancer besides NDMA?
MR. SHEEHAN: Objection. Vague.
A. Again, that would only become important if the point estimates for ranitidine and any of the cancers being alleged were consistent and valid and repeatable, and they are not. So, it is not -- it's not relevant when there's no there there, there's no association.
Q. So, is your answer no?
MR. SHEEHAN: Objection. Asked and answered.
A. Again, it's not relevant to assessing the whether or not there's a causal association in the human data. It's relevant to explain the finding once you have it, but not -- not to do the assessment with the analysis.



Q. So, Doctor, I'm not asking about whether or not you believe it's relevant, I'm asking whether or not you did consider biologically plausible mechanisms besides NDMA whereby ranitidine can cause cancer. It's simple, either you considered it or you didn't, yes or no?
MR. SHEEHAN: Objection. Asked and answered.
And you can provide context where necessary, Dr. Terry.
A. Again, the only relevant question is, does ranitidine cause cancer? And in the human studies that I evaluated, it did not.
Q. What biologically plausible mechanisms did you consider as to whether ranitidine could cause cancer besides NDMA?
MR. SHEEHAN: Objection. Vague.
A. So, again, my job as an epidemiologist is to assess the role of -- to one, examine the magnitude of the association. Two, to assess whether or not bias could change the magnitude of association. And three, to understand the variability of -- about that point estimate.

That is what I've done here, that's what I've done in my expert report.

In doing so, what I did consider quite carefully, because it's a very important issue in the interpretation of these data is whether or not there was confounding by indication. So, I did assess very carefully whether or not underlying conditions might be related to the cancer as opposed to the medication itself. So, I did do that very carefully.

But again, whether or not something is biologically plausible is a question that the biologist can answer. But epidemiologists, typically we turn to our colleagues to answer those questions once we can say to our colleagues, here, we have a reliable valid observation, what do you make of it.

Q. So, Doctor, isn't looking at biologically plausible mechanism part of the Bradford Hill analysis in assessing causality?

A. A hundred percent. And Bradford and Hill in their original article also went



through how you don't -- you can have a causal association without even knowing what the mechanisms are. Take smoking and lung cancer, those associations were known decades before actual mechanisms were available.

So, first, we have to understand is this association strong, the magnitude of the point estimate, can it be explained away by bias. So, again, the stronger the association, the stronger the point estimate, the less likely it can be explained away by bias and is it different than chance.

So, again, with the smoking and lung cancer, these associations were very, very large. And so, biological plausibility is part of a causal criteria, it's not a necessary criteria, but it does have to happen after you have ruled out whether -- you know, whether or not these associations are by chance or by bias.

Q. So, is it your testimony, Doctor, that a Bradford Hill analysis is not necessary in this case because there is no reported association of ranitidine or NDMA and cancer, is that your testimony?



MR. SHEEHAN: Objection. Mischaracterizes testimony.

A. So, my testimony, to your question, about whether or not I considered the Bradford Hill criteria for NDMA in dietary studies, my answer was yes, absolutely I considered it throughout the report. But early in the report, on page 21, I explain my thought process and how I conduct all of my reviews which is first and foremost before even going to those criteria, I have to make sure that that point estimate and -- is not explained away by bias and that it's reliable and replicable and consistent across these different types of study designs, and then it becomes relevant.

So, my testimony is I didn't include a Bradford Hill causal analysis for NDMA in diet because it wasn't relevant 'cause I never got to that stage where I could say that what was found was, you know, was valid and consistent and repeatable.

Q. And Doctor, when you conducted your analysis of the NDMA epidemiological studies, did you consider the entire universe of NDMA



observational studies?

MR. SHEEHAN: Objection. Vague.

A. I considered the NDMA studies of the cancer epidemiological studies that are available in the peer-reviewed literature.

Q. Did you -- are all of the studies that you -- strike that.

Is that noise -- that feedback coming from my connection?

MR. SHEEHAN: We have sirens here, is that what you hear?

MS. FINKEN: It's the sirens again, okay. Sorry about that.

BY MS. FINKEN:

Q. Dr. Terry, are all of the NDMA studies of the cancer, epidemiological studies, are all of those contained -- that you considered contained in your materials considered list?

A. The ones --

MR. SHEEHAN: Objection. Go ahead.

A. The ones that I considered are cited in the report, yes.

Q. Doctor, are you intending to offer

an opinion regarding the amount of NDMA contained in different ranitidine products?
A. No, I'm not offering that testimony. That is not my expertise.
Q. Do you intend to offer an opinion on whether the levels of NDMA contained in ranitidine products are capable of causing cancer in humans?
A. Again, that's not my expertise. I would defer to molecular biologists on that.
Q. Are you intending to offer an opinion on whether the levels of NDMA contained in ranitidine products are equivalent to the amounts of NDMA that have been associated with certain cancers in the published medical literature?
MR. SHEEHAN: Objection.
A. Can you repeat that?
Q. Sure.
Do you intend to offer an opinion on whether the levels of NDMA contained in ranitidine products are equivalent to the amounts of NDMA that has been associated with certain cancers in the published medical literature?



MR. SHEEHAN: Objection.
A. So, my expert opinion is based on the totality of human -- of human epidemiological studies on ranitidine and the cancers being alleged.
Q. Doctor, have you evaluated whether the levels of NDMA and ranitidine products are the same or similar to the exposures from other sources that have demonstrated an association with cancer in the published medical literature?
MR. SHEEHAN: Objection. Mischaracterizes evidence.
A. Again, when you talk about the published medical literature, you may be counting nonhuman studies.
In the human studies, what I've evaluated are the sources of NDMA based on diet, occupation and the ranitidine studies that have been conducted in humans, which is the most relevant evidence for assessing whether or not ranitidine causes cancer in humans.
Q. Have you compared whether or not the levels of NDMA in ranitidine are the



same or similar to the amounts of NDMA that are listed in the NDMA observational studies?
MR. SHEEHAN: Objection. Vague. Asked and answered.
A. So, which observational studies are you referring to?
Q. Just generally, have you done it with any of the NDMA epidemiological dietary or occupational exposure studies and looked at what the levels of NDMA in ranitidine are the same or similar to the levels of NDMA in those dietary or occupational exposure studies?
MR. SHEEHAN: Objection. Vague.
A. So, again, the beauty of epidemiology is it's about whether or not the signal is bigger than the noise, and if so, can it be accounted for by bias. And so, comparing different sources of an exposure, some that come from questionnaires, some that come from electronic health records, those sorts of things are not the relevant question.
What I've looked at, which now is



at large literature, 16 different studies for ranitidine and many more studies when you count the dietary NDMA and occupation, when you look at how ranitidine is being used in free-living populations, there's no association whatsoever between ranitidine use and/or dietary NDMA and these cancers.
Q. Doctor, what is the difference between an exposure window and the actual exposure being measured in an epidemiological study?
A. So, an exposure window typically refers to the period of time where you're collecting information on exposure and, you know, of which those are distribution that individuals, you know, individual exposure will differ depending on the individuals within that exposure window.
Q. And how does that differ from the actual exposure being measured in an epidemiological study?
MR. SHEEHAN: Objection. Vague.
A. Yeah, that's a general question, it would have to depend on what the exposure is. So, if the exposure is something that, you

know, happened in the past and is not ongoing, those two things would not differ whatsoever. If the exposure is changing over time, then they differ.
Q. So, let's assume that the exposures changing over time, how do they differ?
MR. SHEEHAN: Objection. Vague.
A. So, yes, it's -- it would be highly dependent on the context of the study and what the exposure was, you know, if you're evaluating, I don't know, let's call it some chemotherapy regime that most people take for five years, it may not differ at all. So, it's highly dependent on what the exposure is.
Q. Doctor, have you looked at all at the levels of NDMA that have been found in ranitidine products?
A. So, I have reviewed, in preparing this report, a lot of different background information about, you know, why ranitidine it was recalled, those kinds of reports, if that's what you're talking about.
Q. Have you analyzed the amount of NDMA that has been found in ranitidine



products?
A. So, again, I'm not a laboratory scientist --
MR. SHEEHAN: Let me get my objection.
THE WITNESS: Sorry.
MR. SHEEHAN: Vague.
Go ahead.
A. I'm not a laboratory scientist, so, no, I have not analyzed the NDMA levels. What I have analyzed and synthesized and interpreted are the human epidemiological studies.
Q. Doctor -- strike that.
For a study to be robust in evaluating the risk of cancer, wouldn't it have to adequately capture the exposure?
MR. SHEEHAN: Objection. Vague.
A. It's not so simple as that. Again, everything is context dependent.
Q. But you would agree that evaluating the exposure would be a critical component of assessing the list of cancer in an epidemiological study, correct?
A. Yes, I would agree that evaluating



the exposure, which often, the first thing that we do is we evaluate the measurement error around an exposure. So, typically what we do is we assess the quantity of that measurement error.
So, for example, in -- in thinking about dietary exposures, typically when the reliability of those measures, often the index that's used to look at that, which is called the CAPA, is in the range of .4, .5. So, again, a lot of measurement error.
As opposed to when you look at electronic health records, the measurement error that may exist in those may be data that are outside of the system. So, you know, there's always measurement error in whatever you do, but the -- the job is to figure out what's the degree of the measurement error and how can impact on the findings.
So -- so, with diet, the big issue is frankly the measurement error, the sensitivity of those measures for all sorts of aspects of the diet, except for things that they've shown now, have more



reliability. And so, often that may be more about food patterns as opposed to specific, you know, nutrients within a diet, which is very hard to look up.
So, even though those kind of analyses exist, it's just the quality and the measurement error is so large that, again, the concern is always that you have this kind of recall bias with those diet. So, it's very context specific.
Q. So, you would agree, Doctor, that when assessing the risk of cancer in an epidemiological -- an epidemiological study, it's critical that you adequately evaluate the exposure, correct?
MR. SHEEHAN: Objection. Asked and answered.
A. I would agree as in epidemiology, it's critical you evaluate the measurement of that exposure. Now, in thinking about how that is, it's highly dependent on the context of the exposure. So, again, outside of epidemiology it may -- it may seem if you have an undercounting of -- of an absolute amount of an exposure that that would matter.

But I can tell you from running many, many regressions and analyses for over 30 years, that it doesn't matter as long as people preserve their ranking. So, and that's -- that's true too, so that's why in my assessment and given what I know about applied statistics in conducting statistical analyses, the electronic health record studies that I reviewed, even if they undercounted over-the-counter medication, internally they were valid because they were able to have records and not rely on self-report of these prescriptions. So -- so, again, my assessment of those studies were that they were very high quality and, again, conducted in real living humans and not supporting any association whatsoever between ranitidine and different cancers.

Q. Doctor, you've used smoking as an example several times.

Would you expect to see in an epidemiological study that only looks at smoking for 30 days an increased risk of cancer?

MR. SHEEHAN: Objection. Vague.



A. Again, it's context specific. So, you would have to -- you would have to think about the population. You would have to think about, you know, the smoking rates in a population. So, again, that -- that changes over time in different populations. And so, you know, in -- in some settings, a one-day measure of smoking can be very valid, right, if people aren't changing their quit patterns, that can be a very valid association.

For many years, the best way of asking about whether or not you were a long-term question was a single question related to what time you had your first cigarette during the day. So, again, it's highly context specific.

Q. Doctor, looking at smoking, if the only information that you have is a database full of individuals who smoked for only 30 days, would you expect to see an increased risk of cancer with 30 days of exposure to cigarette smoke?

MR. SHEEHAN: Objection. Asked and answered.



A. So, it's not as simple as that, because, again, a 30-day measure, let's say a physical activity, believe it or not, reliably maps to colorectal cancer. And this has been shown over and over and over again in cohort studies and case-control studies. Even though that, you know, when you ask somebody about their physical activity, it may be underreported. And so, yes, you can have very sophisticated studies where people have accelerometers and they're measuring their daily steps and everything else or you're watching the number of, you know, hours they're at a gym. However, you want to do it, it doesn't matter.

Like, the association between colorectal cancer and physical activity is so robust that you see it over and over again, even if they were to ask about physical activity over the last 30 days.

So, you know, again, it's highly context specific.

Q. So, Doctor, you're not -- are you suggesting that 30 days of physical activity can lead to colorectal cancer, is that what



you're saying?

A. No, it -- physical activity reduces your risk of colorectal cancer. And so, what I'm saying, your question was, can -- how can any measure that's only for 30 days be reflective of cancer. And what I'm trying to give you an example of is that there are -- it's highly context specific and there are plenty of examples where you can use an exposure during a shorter exposure window, but it consistently maps to the outcome. In this case, it's reduced colorectal cancer risk.

So -- but the importance -- the reason we know that even though these factors that are measured were there because everything has some measurement error, including every laboratory study has measurement error. So, the importance here is the signal versus the noise. And the signal for physical activity in colorectal cancer is such that the signal is seen across cohort studies and case-controls which allows you to rule out selection bias and information bias.

And so, that's why even though it's very hard to measure physical activity, we can be very confident that physical activity is related to reduce risk of colorectal cancer.

Q. Doctor, going back to some of the ranitidine specific epidemiological studies, we already established that the maximum exposure that Adami looked at was ten prescriptions, right?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

A. We've -- Adami summarized their data where it was ten or more prescriptions, so that's not the maximum, but that's the category that they looked at.

Q. Ten or more prescriptions, correct?

A. Yes.

Q. Is that what you said?

A. Yes.

Q. And the exposure in Yoon that was measured was what?

MR. SHEEHAN: If you need the study, Dr. Terry, you can ask to see that.



A. So, again, we -- we can pull up the study if you have a specific question, I'm looking at page 111 of my report where the Yoon study examined defined daily dose and duration.

Q. And Yoon, the maximum exposure that Yoon evaluated was exposure for one year, correct?

MR. SHEEHAN: Objection.

A. I would need to look at the study.

Q. Would you agree with me, Doctor, that the maximum exposure that was evaluated in the Kantor study was four weeks of exposure?

MR. SHEEHAN: Objection. Mischaracterizes the study.

A. No, I would not agree with that.

So, the Kantor study was a study of almost half a million people, 460,000, 459,204 in the UK Biobank. The UK Biobank is a study of volunteers in the UK and they've also collected biospecimens. And so, they -- they looked at baseline. So, at the beginning of someone joining the cohort, they looked at a series of different questions.



And for their medication section, they asked about regular use and so they said, most days for at least four weeks. This is typical of how medication is asked about in a questionnaire study, because, again, dealing with people's recall, what they want to know really is what have you done the last month. And so, it's not just for four weeks, it's just that's how the question is asked. So -- and that would be true of other kinds of medications, typically we ask about, you know, in an average week, how many nonsteroidal anti-inflammatory medications would you have taken? Were you ever prescribed antihypertensives, if so, over the last month? And that's done, you know, purposely because of the idea of getting higher quality data, you know, asking people about recent medication. But it's not used to say that it's only four weeks of exposure.

Q. What is the maximum amount of exposure that was analyzed in the Kantor study?

A. So, again, we don't have a maximum because that's not how the study was done.



The study was done where they're basically able to look at people who have reported having regular intake compared to people who have not reported them. And -- and they actually also had a comparison with PPI as well as with non-use.

Q. So, when they're looking at exposure though, they're looking at people who had regular intake for four weeks correct?

MR. SHEEHAN: Objection. Mischaracterizes testimony.

A. So, again, how they report it is that it's based on self-reported regular use most days for at least four weeks.

Q. And what was the maximum exposure that they evaluated in the Norgaard study?

A. So, their exposure assessment, they use medical records, their exposure assessment was limited to individuals who selected or redeemed at least two prescriptions of the same drug between the period of 1996 to 2008 and had no prescriptions in 1995. They also excluded individuals who redeemed a prescription of

one of the other drug categories before the index date.

Q. So, at least two prescriptions of ranitidine; is that right?

MR. SHEEHAN: Objection.

And again, to the extent you need to see the study, Dr. Terry, feel free.

A. Yes, that's correct.

Q. And Dr. Terry, what about the Kumar study, what is the maximum amount of ranitidine exposure evaluated in the Kumar study?

A. So, this was a study that was looking at a cohort of patients that were treated for H. pylori and they did it -- they conducted it within the Veterans Health Administration and they looked specifically at people who were receiving prescriptions for at least 30 days.

Q. And looking at the -- just letting the sirens stop.

Looking at the Y. Kim study, what's the maximum amount of exposure that was done in the Y. Kim study?



MS. FINKEN: Did you catch that, Candida?

THE COURT REPORTER: I did, yes.

A. Yeah. So, this was the study that was using the Explorys Database. So, this was, you know, this is the database that is including hundreds of hospitals, I think it's 360 hospitals, almost 73 million people. And so, the way that they design their study was they -- they have concurrent medications so that's how they counted their exposed. And so -- so, someone could've been receiving the medication for many years. But we don't have a maximum number, in least in how they reported it out.

Q. So, they could've been taking it for a number of years, but they don't actually analyze the data for individuals who were taking it for a number of years, correct?

MR. SHEEHAN: Objection.

Let me get my objection.

THE WITNESS: Okay, sorry.

MR. SHEEHAN: Objection. Vague.

Go ahead.



A. Again, I would reiterate that the important part here with all of these different studies is that these are assessing how ranitidine use is being used in real -- in real life and this has been looked at in different Asian countries, it's been looked at in different Scandinavian countries, it's been looked at in the US. And there's no consistent pattern whatsoever and -- with ranitidine use, how it's used. You know, some people use it short-term, some use it long-term. So, again, the point here, just like other kinds of medication exposures, this -- they approach that these different studies have taken is very comparable to how other studies have evaluated medication and cancer risk. And, you know, of which there have been, you know, many signals that have been shown for other medications, these are using the same sort of approaches.

Q. So, Dr. Terry, can you tell from evaluating the Y. Kim study how long the individuals were taking ranitidine?

MR. SHEEHAN: Objection. Asked and answered.



A. Yeah. So, they don't report out, you know, duration in their paper.

Q. Okay. You just know that they took ranitidine at some point, correct?

MR. SHEEHAN: Objection.

Mischaracterizes the study.

A. So, we know we know a lot. We know that this was a study done in 73 million -- well, specifically, they had data on 73 million of which there were over half a million ranitidine users, over 900,000 famotidine users and over two million PPI users. So, this -- this is a study that's highly generalizable to, you know, the U.S. population because it captured a lot of the U.S. population. And they have a good reliable measure of exposure because it's using the electronic medical record and internally their results are valid. Even if they -- they're not counting over-the-counter, it's been shown actually by a lot of by different sim- -- by simulation studies that -- that given the percent of -- given -- even if over-the-counter medication was not known, that that kind of bias

wouldn't be high in this setting. And I refer to one of the simulation studies in my expert review.
So, again, the Kim study is just one of many studies that have found no association.
MS. FINKEN: I'm going to move to strike as nonresponsive.
Q. Doctor, you cannot tell from the Y. Kim study how long the individuals in that study were taking ranitidine, correct?
MR. SHEEHAN: Okay. Asked and answered.
A. Again, it would be a distribution upwards of, you know, upwards of ten years. But, again, there's gonna be a distribution where some people took it for short, some took it for intermediate and some took it for long.
Q. Is that breakdown given in the study itself?
MR. SHEEHAN: Objection.
A. No, they did not break it down further.
Q. Did they break it down like you



just suggested, short, intermediate and long?
A. We can look at the paper, but not that -- not that I recall.
Q. And Doctor, what was the maximum exposure that they evaluated in the S. Kim study?
A. So, their exposure window was from 2002 to 2008 and then they counted cancers from 2009 forward.
Q. I didn't ask what the exposure window was.
What was the maximum amount of exposure they evaluated in the Y. Kim study -- in the S. Kim study?
MR. SHEEHAN: Objection.
A. I would have to look at the paper. If we can pull up the paper, I can take a look at it.
Q. You don't have it in your table?
A. I have -- I have the exposure window is 2002 to 2008.
Q. Okay. But you don't have the actual maximum amount of exposure that they studied in the S. Kim study in your tables, correct?



MR. SHEEHAN: Objection.
A. Again, that's not what's relevant here in my expert opinion. What's relevant is in these studies of which this one is also over a million people, was there any association with how ranitidine is being used in free-living populations. And so, that is what I focused on.
MR. SHEEHAN: Tracy, we've been going for about, I don't know, I guess an hour and ten or so. Do you -- are you getting to a maybe a short breaking point?
MS. FINKEN: In about two minutes, okay?
MR. SHEEHAN: Okay.
MS. FINKEN: We can take a -- we can take a break in about just a couple of minutes, okay?
BY MS. FINKEN:
Q. Looking at the Iwagami study, Dr. Terry, what is the maximum amount of exposure to ranitidine that they evaluated in the Iwagami study?
MR. SHEEHAN: Objection. Vague.



A. So, again, I would have to look up the paper for the details. This is a study that followed individuals on average for 2 and a -- 2.4 years and the interquartile range was 1.1 to 4.5 years of follow-up. I would have to look to see if they reported out the maximum exposure.
Q. Isn't it true that the Iwagami study looked at ranitidine and nizatidine combined?
A. Yes, they were looking at ranitidine and nizatidine together, yes.
Q. And they don't have a break -- they don't have a separate analysis for ranitidine and a separate analysis for nizatidine in that paper, correct?
MR. SHEEHAN: Objection.
A. Again, my recall of this paper was they looked at them together because of the hypothesis that they both might have NDMA exposure, so that's why they put them together.
Q. Do you have an understanding of the mechanism by which nizatidine contains NDMA?
A. Again --

MR. SHEEHAN: Objection.
Hold on.
Objection. Vague.
A. Again, in my expert opinion I was evaluating the epidemiological associations and not -- not the biological mechanisms.
Q. Do you know whether or not nizatidine -- strike that.
Do you know the amount of NDMA contained in nizatidine as compared to the levels found in ranitidine?
MR. SHEEHAN: Objection. Vague.
A. Not off the top of my head. I would have to look it up.
Q. Okay.
MS. FINKEN: All right, let's take a break.
THE VIDEOGRAPHER: We're going off the record. The time is 9:26 p.m. UTC time.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 9:48 p.m. UTC time.



BY MS. FINKEN:
Q. Dr. Terry, are you communicating with anyone other than your lawyers about your deposition over the course of the day?
A. No, I'm not.
Q. Have you ever had any communications with any of the ranitidine specific study authors about their studies?
A. No, I have not.
Q. Doctor, going --
MS. FINKEN: Let's pull up Exhibit 6341.
(Exhibit 6341 was marked for identification.)
BY MS. FINKEN:
Q. And Doctor, this is a Hazard Assessment Report that was prepared by GSK and produced to us for this litigation, dated December 25, 2019 relating to NDMA.
Do you see that?
A. I do, I'm just waiting for it to come into the Box.
Q. Sure.
THE VIDEOGRAPHER: It just uploaded. You should be able to



refresh and see it now.
Q. Doctor, have you seen this document before?
MR. SHEEHAN: Do you have it on the Box?
A. Still waiting, I don't know why it's taking a while to refresh. Sorry, 63 what?
Q. 41.
A. Yes. Sorry, now I have it, yes.
Q. We're going to mark this as an exhibit to your deposition Exhibit 6341. It's the GSK Hazard Assessment Report for NDMA dated September 25, 2019.
Do you see that?
A. I do see it, yes.
Q. Have you ever seen this document before?
A. Again, I may have seen it, it's not relevant to my expert review, which is based on epidemiological studies that are in the peer-reviewed literature.
Q. Okay. Let's turn to page 5 of that document, please.
At the bottom of that page in the



section, Genotoxicity?
Do you see that? It indicates that:
There is overwhelming evidence that NDMA is mutagenic and clastogenic.
Do you see that?
A. Yes, I see that, yes.
Q. Do you agree or disagree with GSK's statement that there is overwhelming evidence that NDMA is mutagenic and clastogenic?
MR. SHEEHAN: Objection.
A. So, I have no reason to disagree with that statement. Again, this -- this assessment has been made by IARC and others. Again, there's many things that are mutagenic and clastogenic that have not been shown to be causal carcinogens in human populations. So, that is why IARC has not classified NDMA as a Type 1 human carcinogen.
Q. Can you give me specific examples of the many things that have overwhelming evidence that they're mutagenic and clastogenic, but are not carcinogens in humans?
MR. SHEEHAN: Objection.

A. I can give you -- I gave some example in my report. If we're talking about -- if we're talking about compounds that have been classified as 2A from IARC, there's 70 or 80 off the top of my head, that's the range of how many and then there's many more. There are 2B, which are possibly carcinogenic based on tests of mutagenicity as well.
So, again, there's just many, many examples of things that could be potentially mutagenic in animal models that have not been shown to be human carcinogens. So, partly that's just because, you know, the way experiments are done in animal models may not relate to human exposure. And so, there's plenty of examples of mutagens that are not human carcinogens.
Q. So, Doctor, you're not suggesting that because a compound is classified by IARC as 2A or probable human carcinogen that it's not carcinogenic in humans, are you?
MR. SHEEHAN: Objection.
A. So, again, to know whether or not something that has been classified in a lab


as mutagenic is causally related to human cancers, you need studies in humans. So, that's -- was what my assessment was for the entire scientific report.
Q. Let's turn to the next page in that document, please. I'm sorry the next page, 7. Okay. And at the top there there's a section, Carcinogenicity.
Do you see that?
A. Yes.
Q. And GSK indicates in this Hazard Assessment Report that:
In animal studies of various species, including rats and mice, exposure to NDMA has caused tumors primarily of the liver, respiratory tract, kidney and blood vessels.
Do you see that?
A. I do see that, yes.
Q. Do you agree or disagree with GSK's statement that in animal studies of various species, exposure to NDMA has caused tumors of the liver, respiratory tract, kidney and blood vessels?
MR. SHEEHAN: Objection.


A. Again, my expertise is not in laboratory science, but I would agree that that statement is consistent with what the International Agency For Research on Cancer, which evaluated the laboratory data, and that's why it's classified as a two-way.
Q. In looking down in the middle of that paragraph beginning with the sentence, Qualitatively.
Do you see that it states:
Qualitatively, the metabolism of NDMA appears to be similar in humans and animals; as a result, it is considered highly likely that NDMA is carcinogenic to humans potentially at relatively low levels of exposure.
Do you see that?
A. I do see that, yes.
Q. Do you agree or disagree with GSK's statement here?
MR. SHEEHAN: Objection.
A. So, again, the mechanisms and metabolism of NDMA in -- in animals and how it pertains to humans is not my area of expertise.


What I can say is, based now on many different studies, there has been no consistent or reliable association between NDMA even at very low levels and human cancers.
MS. FINKEN: So, going down to the bottom of that section, can you zoom out, please?
Q. Very last sentence in the conclusion of the Carcinogenicity section is:
NDMA is a genotoxic carcinogen and exposure should be reduced to the extent possible.
Do you see that?
A. Yes, I see that.
Q. Do you agree or disagree with GSK's statement that NDMA is a genotoxic carcinogen and exposure should be reduced to the extent possible?
MR. SHEEHAN: Objection.
A. So, again, it's not as simple as that. Had there been experiments to show that NDMA can be genotoxic? Yes. And whether or not exposure should be reduced to the extent possible, that's a general

statement. So, that is a general statement that you have to evaluate within the context of who's -- what your exposure for NDMA and, for example, if it's from medication, then you have to evaluate that with respect to what the medication is doing for -- for the individual person, so I think it's highly content specific.

But, yes, I would say anything that's listed in 2A, which is a probable human carcinogen, a general advice should be that exposure should be reduced. But, again, what's in 2A, for example, one is nightshift work.

So, yes, based on the human epidemiological studies and based on other types of evidence, you should reduce your exposure to night -- night work, shift work. Most people can't, right? So, you know, so that's a general statement.

And so, if -- if the person was taking a medication that had NDMA and, again, you want to evaluate it with why the medication is being used in the first place.

Q. Is nightshift work considered to be



a genotoxic carcinogen?

A. Again, it depends on -- it's classified as a two-way, classified as a two-way. And there have been -- you know, there have a number of laboratory studies related to, you know, how it affects circadian rhythm genes, so...

MS. FINKEN: You can zoom out, please.

Q. Okay. At the bottom of that page looking at human use, the very last sentence it indicates:

Relevant epidemiological studies include case-control investigations in which the potential risks of cancer of the stomach, (Risch, Gonzalez, La Vecchia, Pobel) of the upper digestive track, looking at (Rodgers), and the lung (Goodman) and if we can -- associated with the ingestion of NDMA has been assessed.

Do you see that?

MR. SHEEHAN: I think she's on page 8 if you're trying to follow on the --

A. Yeah, I see the -- yeah, that's



okay. I see the top -- top of page 8, yes.

Q. So, it starts on the previous page. And essentially, GSK is indicating that there have been relevant epidemiological studies including case-control investigations in which potential cancers -- or potential risks of cancer of the stomach the upper digestive tract, the lung, have been assoc- -- and the association with the ingestion of NDMA has been assessed.

Is that correct?

MR. SHEEHAN: Objection.

Q. That's what GSK is saying here, correct?

A. That's what they're saying there, yes. I didn't read the full paragraph, but I read up until the -- the top of page 8.

Q. Okay. So, if you go further down that paragraph it says:

In some of these reports, Goodman, Gonzalez, Pobel, the estimated intake of NDMA was based upon recollection of an individual's typical diet consumed in the year preceding the onset of illness, as well as the reported levels of nitrosamine in the



foodstuffs consumed, derived from other studies.

Do you see that?

A. I do see that, yes.

Q. Okay. And it goes on to state that:

In the studies conducted by De Stefani (1996) and Rogers (1995), subjects were asked to recall their typical diet in the 5 and 10 years respectfully prior to the onset of illness.

Do you see that?

A. I see that, yes.

Q. And then GSK states:

In the studies -- strike that.

Then GSK states:

In three of four case-control studies, there was a positive relationship with evidence of exposure response for the intake of NDMA and gastric cancer, although not in an additional study in which --

MR. SHEEHAN: Sorry, Tracy. That's us. Lord knows why this is going off.

Do you want to just go off the

record real quick? Let's go off the record.

THE VIDEOGRAPHER: Off the record --

MS. FINKEN: What is that?

MR. SHEEHAN: Actually, it stopped, it stopped.

MS. FINKEN: What was that?

MR. SHEEHAN: I think it's some sort of phone that's sitting in the middle of the conference table.

MS. PASSARETTI-WU: Yeah, it must be the Polycom in the conference room. If you wanna just unplug it, you can so that doesn't happen again.

MS. FINKEN: Okay, so...

MR. SHEEHAN: I'm not unplugging anything. Let's keep going.

BY MS. FINKEN:

Q. All right. Let's go back. Let's go back, I'm gonna start over there.

So, it says here: In three -- GSK states here in the middle of the paragraph:

In three of four case-control studies, there was a positive relationship



with evidence of exposure response for the intake of NDMA and gastric cancer.

Do you see that?

A. Yes, I see that.

Q. Okay. And it's citing to GSK is citing to (Gonzalez, 1994; La Vecchia, 1995 and Pobel, 1995, correct?

A. Yes, that's correct.

Q. When they -- when GSK is stating that there's evidence of exposure response for intake of NDMA and gastric cancer, what is exposure response referring to?

MR. SHEEHAN: Objection.

A. So, again, this document -- I -- I focused on the peer-reviewed epidemiological data, what -- what exposure response in this context likely means is the tertiles or the quartiles that these studies used in -- in looking at this association. So, again, I would point out that most of these studies as you already yourself pointed out from the previous page, most of these studies were case-control studies and I considered all the case-control studies and the cohort studies, many of the ones you're referring to now are



for gastric cancers. And so, in my report, I go into great detail about each of these studies and also specifically review the Song study, which I -- I have on page 95 now and --

Q. Sorry to interrupt you, because I'm not asking you about your report right now and we only have limited time here and we'll be here all night.

My question was, what does evidence of exposure response for the intake of NDMA and gastric cancer mean?

MR. SHEEHAN: Tracy, please try not to interrupt the witness when she's answering.

You can go ahead, Dr. Terry. To the extent you need to provide context, you're -- you're free to do so.

A. So, within this context, I would imagine -- I mean, I know because I read these studies that it pertains to tertiles quantiles, whether that's -- quantiles just meaning just cutting up the data, whether that's by tertiles into three groups or



quartiles into four groups some of the dietary studies even did it into five groups.

However, even when you break up things like that into quantiles, those studies are still susceptible to recall bias. And what we do know now is that many of these studies from the '90s have not been replicated in large cohort studies and that's what the Song meta-analysis found.

Q. Okay. Dr. Terry, I would just ask you to please respond to my questions. And I understand there's a lot of things that you want to say and you will have your opportunity when your counsel questions you at the end of the deposition. But if we want to get done tonight at a relatively decent time, I need you to respond to the questions that I'm asking and not, you know, to what you want to respond about your report.

So --

MR. SHEEHAN: And let me say -- Tracy, I don't mean to cut you off, but let me just say for the record that she's responding to your questions, obviously you disagree.

This has come up in other depositions as you well know with plaintiffs' experts. If she has context to provide, the witness is free to provide the context so that her testimony is not misconstrued.
MS. FINKEN: Okay.
BY MS. FINKEN:
Q. Dr. Terry, is it true that a positive relationship of exposure response means that the more that you are exposed to whatever the agent is, the increase -- the higher the risk -- the more increase in risk?
MR. SHEEHAN: Objection.
Q. Generally.
A. So, again, it's -- it's not so simple as that. Again, it depends on how you measure the exposure to understand the degree of bias in the different quantiles. But as a general statement, yes, the more exposure would -- I mean, the dose response would be looking at higher quantiles compared to lower quantiles. But, again, that's a general statement and it would highly depend on the measurement error for each of those



quantiles.
Q. So, do you disagree with GSK's statement here that three of the four case-control studies demonstrate -- demonstrated a positive relationship with evidence of exposure response for the intake of NDMA and gastric cancer?
Do you disagree with GSK?
MR. SHEEHAN: Objection.
A. So, I would have to look -- and this is what I've done throughout my report, but I would have to look up each of those studies before I agreed or disagreed with that statement.
MS. FINKEN: Okay, let's move down the page.
Q. So, it indicates in --
MR. SHEEHAN: Tracy, I'm gonna be out of the shot here just for a moment, I'm just grabbing a seltzer.
MS. FINKEN: Is it a hard seltzer?
MR. SHEEHAN: I wish.
MS. FINKEN: You want me to continue while you're out of the shot?
MR. SHEEHAN: Yeah, go ahead. I'm



back in my chair already.
Q. Okay. In two case-control studies in which masks were controlled for confounders was rather more extensive than that to the investigations of gastric cancer mentioned above, there were clear exposure response relationship for NDMA and lung cancer.
Do you see that?
A. Could you just highlight exactly where you are right now?
Q. Sure.
MS. FINKEN: So, it's the next sentence down. Can you high- -- no, where we just were the next sentence.
Q. In two case-control studies in which matching or control for confounders was rather more extensive than that for investigations of gastric cancer mentioned above, there were clear exposure response relationships for NDMA and lung cancer.
Do you see that?
A. I see that, yes.
Q. Did you review the Goodman 1992 study and the De Stefani 1996 study relating



to NDMA in association with lung cancer?
A. Again, I focused on reviewing the NDMA and epidemiological studies for the five cancers alleged. I did look at NDMA and other cancers. And again, I'd have to refer to my report and to those specific studies to provide more -- to provide more interpretation now. So, if you want to pull up the Goodman study or the De Stefani study, I can look at that and see whether or not I would agree with that.
Q. As you sit here today, do you have a recollection of reviewing the Goodman 1992 study or the De Stefani 1996 study regarding NDMA in association with lung cancer?
A. So, as I sit here today, I cannot tell you from many studies that I've read in the past based on a first author, except if it's a study that, for whatever reason, I remember the first author, I would need like the full title and I would need to see the study, 'cause, you know, that's a study that's 30 years old now, so I would have to see it and look at it.
Q. Going on down this page, the next

sentence, GSK notes:
In almost all studies, associations between the cancers of interest and nitrate and nitrite and NDMA were examined; results were relatively consistent in this regard, with there being an association with cancer most commonly with NDMA.
Do you see that?
A. I do see that, yes.
Q. Okay. Do you agree or disagree with GSK's statement that the results of these studies were relatively consistent showing an association with cancer with NDMA?
MR. SHEEHAN: Objection.
A. So, again, if these studies refer to all of these different studies in this paragraph, I would want to look at the studies. I know, myself, how -- how these food frequency questionnaires work and how the assessment of NDMA coming out of those food frequency questionnaires is measured, so it does not surprise me at all that there would be a positive correlation across all three of those categories.
And in fact, in the studies that


I've read for the five cancers that are being alleged. There were similar patterns. And again, that's because of the way the food frequency questionnaire works and how people are asked those questions, so... But I would want to read these studies before making that clear assessment.
Q. Okay, strike that.
Doctor, what is a DNA adduct?
A. So, a DNA adduct refers to something that attaches itself to DNA and that can change then how the DNA is read out into RNA.
Q. Further down this paragraph, GSK states:
There appears to be no qualitative difference between rodents and humans in the formation of DNA adducts following exposure to NDMA.
Do you see that?
A. I do see that, yes.
Q. Do you agree or disagree with GSK's statement that there's no qualitative difference between rodents and humans in the formation of DNA adducts following exposure


to NDMA?
MR. SHEEHAN: Objection.
A. Again, that's a general statement and requires context, so -- and I -- I reviewed the human data, not the rodent data.
I can tell you in my own research and working in the field of polycyclic aromatic hydrocarbon adducts that -- that -- that in those kind of adducts, it's highly dependent on exposure levels and there isn't a one-to-one match when you look in the animal model and you look in the human data.
MS. FINKEN: You can take that down, please.
Q. Doctor, you had indicated previously that you do not do an assessment of Bradford Hill criteria at since a finding an association.
Do you recall that?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
Go ahead.
A. I first need to rule out whether or not bias or chance have contributed to the associations that are seen. And again, just


to clarify for the record, when I say "association," I'm not meaning causal association, I'm using it in the way that it's used routinely in epidemiology, as first we see this correlation, which we often call an association, but that does not mean a causal association. We do not call something a causal association from any one study. We have to make that assessment from a collection of study after we've ruled out the role of bias contributing to those findings, as well as chance.
Q. Doctor, isn't the purpose of the Bradford Hill factors to determine whether or not an association arises to the level of causation?
MR. SHEEHAN: Objection.
A. So, again, the Bradford Hill criteria are used to make an assessment about causation, but in order to do that you have to understand first if what you observed is a real finding and different from what you would expect by chance or different -- or explained away by bias.
Q. Can you cite to any scientific

authority that indicates that you should not consider Bradford Hill criteria unless you find an association first?
MR. SHEEHAN: Objection.
A. Again, it's -- it's a common practice in the field of epidemiology and it's what we teach all of our doctoral students and doctoral level and Master's level students.
Q. Can you cite to any scientific authority that supports the proposition that you shouldn't look at Bradford Hill criteria unless you find an association?
MR. SHEEHAN: Objection. Asked and answered.
A. I mean, I would cite Bradford themselves if you read the discussion of which it's a very thorough discussion. They talk about how you should not reach causal conclusions when something could've been contributed to by bias.
Q. And you said that's in the Bradford Hill publication?
A. The original Bradford Hill publication talks about how you have to rule


out the role of chance and bias in contributing to the association.
Q. Okay. Let's look at -- well, Doctor, are there any published peer-reviewed studies reporting an association between ranitidine and bladder cancer?
A. I'm going to pull out my summary, which we looked at earlier today of the four studies that have looked at ranitidine and bladder cancer.
So, these four studies have reported out different findings and of these studies, these four studies, the Cardwell study, when it was comparing versus PPI, but not with other H2RAs, did report a statistically significant association for greater than 1,095 defined daily dose.
And then the Cardwell study found something similar too when reporting out to non-use overall and then for that higher dose. The other three studies did not find anything.
Q. In the Cardwell study, the authors concluded that in this large population-based study, the use of ranitidine, particularly


long-term use, was associated with an increased risk of bladder cancer.
Do you recall that?
MR. SHEEHAN: Objection.
A. We can pull up the papers, the paper itself, and if you pull that up, we can look at exactly what the authors say.
But, again, I would reiterate that my assessment of the literature comes first and foremost from the data and less about the interpretation of what the authors themselves think of the data. It's -- I'm doing an assessment on my own about the point estimates with my experience and knowledge of what can take a point estimate and bring it down to one.
Q. Do you disagree with the -- Dr. Terry, were you finished with your answer?
A. I was just gonna say in this situation in the Cardwell study, which is the only study of the four studies that had a statistically significant association, and even within that study, they only found it when they were comparing it to non-use or to


PPI for -- for over 1,095 defined daily dose. They did not find that when they compared it to other H2RAs.
Q. Doctor, do you disagree with authors -- the Cardwell authors' conclusion that there was an association between ranitidine and bladder cancer?
MR. SHEEHAN: Objection.
A. Again, I -- without seeing the paper --
MR. SHEEHAN: Let me just get my objection -- just let me get my objection.
THE WITNESS: Okay.
MR. SHEEHAN: Objection. Vague and asked and answered.
Go ahead.
A. If you pull up the paper, we can see what they said exactly.
Q. Do you disagree -- if the Cardwell authors concluded that there was an association between ranitidine and bladder cancer, do you disagree with that conclusion?
MR. SHEEHAN: Objection.
A. Based on my expert assessment of

that article, I disagree with that assessment. I would say that -- and that is based because on -- in their study which I reviewed, the more appropriate comparison group would be the other H2RAs.

Q. Doctor, with long-term use of ranitidine in comparison to H2RAs, it did show an increased risk of bladder cancer, although it didn't reach statistical significance; is that correct?

MR. SHEEHAN: Objection.

A. Again, with the Cardwell study, that finding was not statistically significant, that is correct.

So, what I would want to see is I would want to see that replicated in other studies. So, if four out of these four studies or even three out of these four studies, if most of these studies found something similar, then that would be a consistent pattern. But there's no consistent pattern from these different studies.

Q. Which four studies are you referring to?



A. I'm referring to the Cardwell, Norgaard, Yoon and Kantor.

Q. Doctor, are there any published peer-reviewed studies reporting an association between ranitidine and stomach cancer?

A. So, again, I have summarized literature on page 67 where you can see that the studies that have been published on ranitidine and stomach cancer are not consistent with being -- do not show a consistent pattern in the data whatsoever.

Q. Okay, that wasn't my question though.

My question was, are there any published peer-reviewed studies reporting an association between ranitidine and stomach cancer?

MR. SHEEHAN: Objection. Vague and asked and answered.

A. So, there are individual associa- -- individual studies that report a decreased association. So, if you look at the Kim YD and also Kumar, so there's two studies that report a decreased association.



And there's one study, the Lu, which reports an increased association of -- or an increased risk estimate.

Again, when I use association, I don't mean causal here, it's the use -- how we used in the field, which is a correlation.

So, there's an increase point estimates in the Lu that's statistically significant, but it's not after longer life period. So, that's suggestive that that -- that was not met, so then that that would be suggestive of reverse causality.

Q. Doctor, are there any published peer-reviewed studies reporting an association between ranitidine and liver cancer?

MR. SHEEHAN: Objection. Vague.

A. So, again, my summary of the published literature on liver cancer and ranitidine use is on page 68 and what you can see there is that the Kim study, the Kim Y study found statistically significant decreased point estimate with liver cancer. So, there was one study that found a statistically significant decrease and. Then



the Kantor study found a statistically significant increase association.

So -- and the other studies did not find anything that would be different from chance.

I do want to point out that the Tran and the Kantor analyses on my summary, that they both use the UK Biobank, so these are not independent replications of each other.

Q. Doctor, are there any published peer-reviewed studies reporting an association between ranitidine and esophageal cancer?

MR. SHEEHAN: Objection. Vague.

A. So, now, I'm referring to my summary of the results on page 65 of my report and in this report, there's the Kim study, the point estimates are statistically different from 1 and it's a decreased association or point estimates are lower than 1 for the -- for use of ranitidine, and the other ones are not statistically significant. I'm sorry, the Tan -- the Tan finding at the bottom is also decreased association.

Q. Doctor, are there any published peer-reviewed studies reporting an association between ranitidine and pancreatic cancer?
MR. SHEEHAN: Objection. Vague.
A. So, on page 69 is my summary of the published literature on ranitidine and pancreatic cancer. The Kim study found a point estimate that is below 1 for ranitidine users compared to famotidine. And the Habel study found a point estimate that was above 1 that was statistically significant.
Q. What was the point estimate for Habel?
A. The point estimate for Habel was 2.6 with a range of 1.06 to 6.38 for the confidence limit. And also the Adami study found the finding that was a decreased point estimate for less -- for -- for five or more prescriptions.
Q. Doctor, are there any published peer-reviewed studies reporting an association between NDMA and bladder cancer?
MR. SHEEHAN: Objection. Did you say bladder?



MS. FINKEN: Yeah.
MR. SHEEHAN: Oh, okay. Objection. Asked and answered.
A. Do you want me to repeat my answer from before?
Q. No, I am not asking you about ranitidine. I'm asking you, are there any published peer-reviewed studies reporting an association between NDMA and bladder cancer?
MR. SHEEHAN: Objection.
A. So, in my report, I report the dietary NDMA and occupational NDMA in my report.
Q. And which studies in your report do you report that report in -- oh, my gosh, strike that.
Which studies -- which peer-reviewed publications report an association between NDMA and bladder cancer?
MR. SHEEHAN: Objection.
A. (Document review.)
So, I report the Ronco 2014, which is a retrospective case-control study that was conducted in Uruguay and then I report the Jackson 2011 study. So, the Jackson was



a cohort study that was conducted within the European prospective investigation for cancer and nutrition. This is a very large cohort study that was started by many people at IARC and other countries in Europe specifically because of all of the -- all of the concern about case-control studies and diet and so this included almost a half a million people from ten European countries. And the cohort study did not find any consistent association whatsoever with NDMA in the diet and bladder cancer risk.
And so, I explain in my report on page 87 that the different reported results from Ronco and Jackson illustrate why cancer researchers look for consistency and replication across different study designs and populations, particularly as positive case-control studies of diet and cancer is often not replicated in cohort studies.
Q. Doctor, did the authors of the Ronco study indicate that there was a higher risk of bladder cancer observed with NDMA in that study?
MR. SHEEHAN: Objection.



If you need to see the study, you can of course get access to it, Dr. Terry.
A. Sure. Again, I don't have the study in front of me.
MS. FINKEN: Let me just respond to Tom. I don't appreciate him coaching the witness.
Q. My question was, did the authors of the Ronco study indicate that there was a higher risk of bladder cancer observed with NDMA in that study?
And you're looking at your report, do you report that in your report?
MR. SHEEHAN: Let me just say for the record that I am not coaching the witness in any way, shape or form. I'm merely -- you're asking her about a study and if she -- there's a lot of data out there, if she needs to see the study, she can have access to the study to answer your questions. I mean, this is what happens at every deposition. I didn't think that was controversial.

MS. FINKEN: Are you finished, Tom?
MR. SHEEHAN: I am now that I've responded to you, yes.
A. So, again, I heard your question as, did the authors of this Ronco paper say something, and that's why I had asked to see what the authors had said and I have asked a few times in this deposition to see the articles for more detail. But if -- if you want me to say what the authors said, I would definitely need to see that. I can tell you from my own report and expert evaluation is exactly what I say on page 87, was you have these two studies, one in Uruguay that's a case-control studies which is subject to recall bias and one of the largest cohort studies of diet and cancer which has yielded a lot of really important findings on diet and cancer. And the second one didn't find anything. And that was a cohort design which is not susceptible to recall bias.
So, based on this assessment, as well as the assessment on ranitidine and bladder cancer, there is no consistent



pattern with dietary exposure to NDMA and bladder cancer, nor with ranitidine and bladder cancer. Absolutely no consistent pattern.
MS. FINKEN: I'll move to strike as nonresponsive.
Q. Dr. Terry, in your report, do you provide the authors conclusion of the Ronco study that indicate that there was a higher risk of bladder cancer observed with NDMA intake?
MR. SHEEHAN: Objection. Asked and answered.
A. So, I provide in this paragraph context with which to evaluate the Ronco study. Did I repeat the findings that they reported in their study? I didn't repeat them here because I'm evaluating the context between these two studies of which --
Q. And what --
MR. SHEEHAN: Go ahead, Dr. Terry, if you're not done with your answer.
Q. What page of -- I wasn't trying to interrupt you, I just wanted to know what page of your report you're referring to.



A. I'm on page 86 and 87. So, I'm very transparent and I say these are different reported results. That's page 87 first full paragraph.
Q. Doctor, I want to turn your attention to page 89 of your report.
Are you there?
A. I'm here, yes.
Q. Okay. You just discuss on page 89 of your report regarding the De Stefani 2012 study.
Do you see that?
A. Yes.
Q. What was the relevant risk of -- strike that.
Okay. Looking at the -- midway down the -- that particular paragraph about the De Stefani 2012 study, you indicate the study reported statistically significant positive associations with the risk of ESCC for lamb meat, fried red meat, barbecued red meat, boiled red meat, salted meat, heterocyclic amines and NDMA.
Do you see that?
A. Yes, I see that.



Q. Okay. What was the odds ratio reported for NDMA and esophageal squamous cell carcinoma in the De Stefani 2012 study?
A. We would have to pull up the paper to look at that.
Q. Okay. You don't include it in your analysis of the study on page 89 of your report, correct?
A. I don't include it in this report. But again, what's relevant in this report is considering all of the human data on NDMA in -- in diet and occupation and ranitidine. And I've done that and I provided the context of those studies here, so...
MS. FINKEN: Let's go off the record for a minute.
THE VIDEOGRAPHER: Going off the record 10:42 p.m. UTC time.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 11:13 p.m. UTC time.
BY MS. FINKEN:
Q. Dr. Terry, I'm going to jump around

a little bit because we're getting to the end of the day, so I may jump around a little bit and we're going to try to just get through this so we can get you out of here, okay?
Quickly, I just wanted to ask you a couple of questions about the Adami study.
Did the Adami study quantify the dose of ranitidine at all?
MR. SHEEHAN: Objection. Vague.
A. Can we pull up the Adami study if we're going to be talking about it in any real detail?
Q. Sure, we can pull it up.
MS. FINKEN: Has that been marked yet? I don't think Jim marked it earlier, did he? This would be Exhibit 6349 and we'll mark it as an exhibit to your deposition.
(Exhibit 6349 was marked for identification.)
THE VIDEOGRAPHER: Added it to the Box folder, might take a moment to show up on your end.
MR. SHEEHAN: There are those sirens again. Can you guys hear those



in the background?
THE WITNESS: It is something you get inert to. But, yeah, it doesn't matter to me.
A. Okay, I'm sorry. I have it in front of me, yes.
Q. So, my question was, did the Adami study quantify the dose of ranitidine they were looking at at all?
MR. SHEEHAN: Objection. Vague.
A. So, the Adami study, which was a very large study examining a number of different cancer types and ranitidine use, did show results separately for those with at least five or at least ten prescriptions.
So, again, these cut points just represent those cut points as going into that category. But within that category, there's a range of individuals with those prescriptions and they discuss it a little bit more in their discussion. If we page down, we can see a little bit more about that range.
Q. Dr. Terry, I think you're misunderstanding my question or maybe I



wasn't clear.
Does the Adami study quantify the dose of ranitidine that's provided, for example, does it -- can you tell from the Adami study whether the prescriptions were 150 milligram dose or 300 milligram dose or 75 milligram dose?
A. So, they --
MR. SHEEHAN: Objection.
Let me get my objection in.
Go ahead.
A. They use the Danish prescription registry and they characterize the exposure based on the number of prescriptions.
Q. Okay. So, they don't quantify the milligrams of ranitidine that they are looking at in that study, correct?
A. No. In this study, they quantify the exposure based on the number of prescriptions.
Q. Can you tell from looking at the Adami study whether those prescriptions are 30-day prescriptions or 60-day prescriptions or ten-day prescriptions?
MR. SHEEHAN: Objection.



A. Again, their categories are based on number prescriptions, so it reflects the, you know, the way that ranitidine was prescribed within this very large prescription database.
Q. So, are they 30-day prescriptions?
MR. SHEEHAN: Objection. Asked and answered.
A. So, again, and this is done very commonly in pharmacoepidemiology studies. They describe the -- under the materials and methods, they describe the prescriptions generally and how they -- how -- how those were corrected from the national registry. They do go on in their results section -- I'm sorry, in their discussion section to talk about the fact that, again, this is a distribution and even though half of the -- I'm reading now from page 2307, although half of -- approximately half of the ranitidine users -- this is in, I'm sorry, the right-hand column, they say:
Approximately half of the ranitidine users had only one prescription, a substantial number had five or even ten

prescriptions enabling analysis of long-term exposure.
So, again, it's going to be a distribution of regular use of ranitidine and it's a comprehensive database and they have very good quality measurements of exposure and good quality measurements of outcomes. So, this is a very valid study that didn't rely on self-report.
Q. Dr. Terry, according to the sentence that you just read, approximately 50 percent of the ranitidine users had only one prescription, correct?
A. Again, there's a distribution such that they had short-term users, they had long-term users and this is how ranitidine is used in a general population and they were able to rule out any finding, any association between ranitidine and the cancers that they reported on.
MS. FINKEN: I'm gonna move to strike as nonresponsive.
Q. Doctor, according to the sentence that you just read, the authors are reporting that approximately 50 percent of the


ranitidine users had only one prescription, correct?
MR. SHEEHAN: Objection.
Q. Is that what it says there?
MR. SHEEHAN: Objection. Asked and answered.
A. Again, this is a distribution. So, they have, it's a very -- they have people who have used it for many, many years and they've had people who, within their database, they have one prescription, yes.
MS. FINKEN: Again, I'll move to strike as nonresponsive.
Q. Let's do it this way:
It states here in the study, the authors state in the study:
Approximately half of ranitidine users had only one prescription.
Did I read that accurately?
MR. SHEEHAN: Objection. Asked and answered.
A. Yes.
Q. Doctor, you know you had pointed to this paragraph that discusses the one description versus the five prescriptions


versus the ten prescriptions, but does it state how long those prescriptions are? Are they 30-day prescriptions? Can you tell?
MR. SHEEHAN: Objection.
A. No, it doesn't state that. But again, the power of this design is that it doesn't have to state that to look at whether or not there's correlation between regular use and the cancers that are being assessed.
Q. Doctor, can you tell from the Adami study whether or not the five or ten prescriptions are consecutive prescriptions of ranitidine?
A. I'm going back to the methods. I think it was overall, I don't think they looked whether or not it was consecutive.
Q. Doctor, can you tell from the Adami study what the majority of patients were taking ranitidine for?
MR. SHEEHAN: Objection.
A. So, again, this is a really large study and over a million patients, it's a very robust study because it doesn't rely on any self report. It has captured the exposure from an electronic pharmacy database


and its capture linked it to cancer registries.
In Table 1, they list various different GI conditions for ranitidine users for users of other H2RAs and for PPIs.
Q. I don't think you answered my question, Doctor.
Can you tell from the Adami study what the majority of patients were taking ranitidine for?
MR. SHEEHAN: Objection. Asked and answered.
A. I did explain that in Table 1 it shows a number of different underlying GI conditions and -- for each of the medication classes.
Q. Doctor, would you agree with me that if these are 30-day prescriptions, ten prescriptions would equal ten months of ranitidine use?
MR. SHEEHAN: Objection.
A. Again, the cutoff of ten -- ten or more was or more. So, again, it could be a number of different -- it's not ten in everybody, it's ten or more.

Q. It could be, but you have no way of knowing that, correct?
A. Again, that -- when people use cutoffs, that's the minimum. So, everyone that's in that group had at least ten.
Q. Okay. So, going back to my original question, would you agree with me that if these are 30-day prescriptions, it would equal ten months of ranitidine use?
MR. SHEEHAN: Objection.
A. So, again, if that -- if they each were 30-day prescription, that would be the lower bound of what it would be for ten -- ten or more.
Q. Ten months, correct?
MR. SHEEHAN: Objection. Asked and answered.
A. Again, if each prescription is one month, yes. But again, that would be the minimum because these are ten or more.
MS. FINKEN: You can take Adami down for a second.
Q. Doctor, are you aware that the World Health Organization in 2002 concluded that the human epidemiological evidence



fulfilled the criteria for causal association between NDMA and cancer?
MR. SHEEHAN: Objection. Mischaracterizes.
A. I am aware of a 2002 World Health Organization report, which I read and I considered in making this. But, again, the scientific literature has advanced in 20 years and, in particular, we have a lot more studies that are prospective cohort studies and we have a lot more studies of ranitidine specifically of which to make an evaluation of ranitidine and the specific cancers that are being alleged.
Q. So, do you agree with the World Health Organization's assessment in 2000- -- as of 2002 that the human epidemiological data fulfilled the traditional criteria for causality of an association between ingestion of NDMA and cancer?
MR. SHEEHAN: Objection. Mischaracterizes the document.
A. So, again, based on two thousand -- the data that was available in 2002, the primary human evidence on NDMA would've been



NDMA from dietary sources and it would've been specifically case-control studies with few exceptions. Since then, there's been many more cohort studies. Those cohort studies have found no consistent pattern with any of the cancers that are being alleged. So, the -- any kind of Bradford Hill causal criteria of which I have considered throughout my report would assess that there's no evidence because the case-control and the cohort studies are not consistent with each other.
Q. So, is your answer that you disagree with the findings of the World Health Organization in 2002?
A. I think --
MR. SHEEHAN: Objection.
Let me get my objection before you answer.
Objection. Asked and answered.
A. At the time, that they were writing that, the human data would've been overwhelmingly case-controlled data. So, they would've made that assessment based on case controlled data which we now have found



out would've been bias because the cohort findings were not consistent with that.
Q. So, you disagree with their findings, correct?
MR. SHEEHAN: Objection. Asked and answered.
A. Based on all of the data that is available in humans, of which there's millions of people involved in these studies at this point, I -- I would disagree with that statement based on all of the human data that has accumulated over the last 20 years.
Q. So, Dr. Terry, let's look at Y. Kim for just a moment. Well, let me ask you a question about the Y. Kim study.
You discussed that earlier with Mr. Ronca, do you recall that?
A. I recall discussing that study, yes.
Q. Okay. And you agree that the Y. Kim study was using the Explorys Database?
A. Yes, I agree that it was using the Explorys Database.
Q. And did you testify -- I apologize if I'm wrong on this but, did you testify

that you have used the Explorys Database in studies previously?
A. I don't think I testified that -- about that specifically. I probably said that I have read studies that have used the Explorys Database.
Q. Does the Y. Kim study provide information about the duration of use of ranitidine for any individual?
MR. SHEEHAN: Objection.
A. So, the way the Y. Kim study was designed is that it's looking at concurrent use. So, to the extent that they have followed people upwards of ten years, some of those users could've had that many years of duration.
Q. Is it possible to obtain information about the duration of use from the Explorys Database?
A. I would have to investigate that closely and look at the data myself.
Q. So, you don't know?
A. Again, I would have to look at the database.
Q. Did you ever look at the actual


Explorys Database design and determine whether or not it's possible to obtain information about the duration of use of prescription medication from that database?
A. So, I -- sorry.
MR. SHEEHAN: Go ahead.
A. I have looked at the Explor- -- the publications that have been published off of Explorys Database. Explorys Database is, I would imagine, the public database that people can download is -- is very different than if -- if you could obtain the individual data within the dataset, which -- because its claims data they de-identify all of it.
Q. Are you aware that the authors of the Y. Kim study have indicated that there -- it is impossible to obtain information about the duration of use from the Explorys Database?
MR. SHEEHAN: Objection.
A. If you want to pull up the study and we can see what they said exactly about it.
Q. I'm not suggesting that it was said in the study. I'm just suggesting, are you


aware -- I'm asking you if you are aware that the authors of the Y. Kim study have indicated that it's impossible to obtain information about the duration of use from the Explorys Database.
Are you aware of that?
MR. SHEEHAN: Objection.
A. So, again, I would have to read the study, if it's said in the study. If it's coming from some other source, I don't know -- I would not be privy to that source, if it's an e-mail or something else.
Q. Okay. Doctor, going back to the Norgaard study for a moment.
What was the dose of ranitidine that was studied in the Norgaard study?
A. So, in the Norgaard study, they focused on individuals within also the Danish National Prescription Registry that had at least two prescriptions.
Q. And can you tell from the Norgaard study whether those prescriptions were 150 milligrams of ranitidine or 300 milligrams of ranitidine?
MR. SHEEHAN: Objection.


Just give it a beat there, Dr. Terry.
THE WITNESS: Sorry.
MR. SHEEHAN: Go ahead.
A. Again, these are large scale studies. This one in particular had over half a million people looking -- that had reported PPI. It had 65,000 initiators of some other H2RA and it had 31,393 initiators of ranitidine. So, the overall exposure was based on prescription, not based on, you know, milligrams in a tablet. This is commonly done across cancer epi. And, again, consistent associations have been found with a number of different medications without knowing the exact doses because it's trying to -- these large scale analyses in millions of people are trying to get at whether or not -- whether or not there's any consistent pattern, and there's no consistent pattern based on this.
Q. So, are you able to tell from the Norgaard study whether they were 150 milligram prescription doses or 300 milligram prescription doses or some other?

MR. SHEEHAN: Objection.
A. No. They again focused their analysis based on the exposure of prescription, which -- which is done routinely.
MR. SHEEHAN: If you were not done, please finish your answer, Dr. Terry.
A. I was just gonna add, for example, with nonsteroidal anti-inflammatory medications, many studies that have been consistent between cohort studies and case-control studies have found just people reporting regular use, like we saw in the UK Biobank, without knowing if it's a baby aspirin or not a baby aspirin. So, these kind of things are looking -- these studies are looking at how medications are used in free-living individuals.
Q. Are you able to tell from your review of the Norgaard study the length of each prescription?
MR. SHEEHAN: Objection. Vague.
A. So, in the Norgaard study, they did look at individuals that had at least ten



prescription and they were able to also further look at individuals -- they did individuals who filled at least five and then at least ten and then they were able to look at individuals that filled ten prescriptions and were followed for ten years.
So, again, we're not talking about a study of 20 people, we're talking about a study of hundreds of thousands of people where there was no consistent signal.
Q. Any 30-day prescriptions?
MR. SHEEHAN: Objection.
A. So, again, the Danish National Prescription Registry is the source of the exposure information and they specifically report out number of prescriptions, not whether or not it's 30 days.
Q. You can't tell whether they're 30-day prescriptions from looking at the Norgaard study?
MR. SHEEHAN: Objection. Asked and answered.
A. No. But what you can tell, which is a very valuable piece of data, is you can tell that in this study, which was over half



a million people that there is no consistent signal between having at least two prescriptions, 'cause that was the eligibility criteria to get into this, whether or not having five or more, whether or not having ten or more, whether or not having ten or more for ten years, whether any of those were associated with bladder cancer.
Further, they were able to look at whether or not it was specific to invasive bladder cancer.
So, this is a very well-done study that's prospective. We know that we have a temporal association, which is an important Bradford Hill criteria, and we know that there's no signal here.
Q. Doctor, you stated -- and I don't know if this is what you meant to say or not, but I believe you said that the Norgaard study looked at -- prescriptions or more for ten years.
Is that what you meant to say?
THE COURT REPORTER: I'm sorry. You cut out just as you said the amount of prescriptions.



Q. I think that you said that the Norgaard study looks at ten prescriptions or more for ten years, is that what -- is that what you meant to say?
A. So --
MR. SHEEHAN: Objection.
Hold on, let me -- before you jump in, just give me -- give me a second.
Objection. Asked and answered.
Go ahead.
A. So, it looked at ten or more prescriptions with at least ten years of follow-up.
Q. Okay. And you would agree with me, Doctor, similarly to the Adami study, if those are 30-day prescriptions, ten prescriptions would equal ten months, correct?
MR. SHEEHAN: Objection.
A. Again, they looked at ten or more. But, yes, if it was exactly ten and each prescription was 30 days, then it would be ten months.
Q. And does the Norgaard study look at ten prescriptions consecutively, can you

tell?
A. So, the Norgaard looks at ten or more prescriptions, so they don't specify whether or not it's consecutive.
Q. Doctor, have you reviewed any of the epidemiological literature relating to pediatric cancers associated with NDMA?
A. Not for this expert review, I focused on the five cancers that were alleged.
Q. Are you aware that ranitidine was indicated for pediatric use?
A. I'm aware as general knowledge that it's used for pediatric patients in some settings.
Q. Is there a reason why you didn't look at the NDMA epidemiological literature relating to pediatric cancers?
MR. SHEEHAN: Objection.
A. So, I looked at all of the relevant -- I looked at all of the human studies of ranitidine and -- and cancers. I further also -- whether or not they were cancers, the five cancers alleged here, I looked at the other types. I also looked at


NDMA in diet and the five cancers here.
Q. Is there a reason why you didn't look at the pediatric -- strike that.
Is there a reason why you didn't look at the NDMA epidemiological literature relating to pediatric cancers?
MR. SHEEHAN: Objection.
Mischaracterizes testimony.
A. Sure. So, my -- let me answer that. So, there's a very clear reason why I didn't look at those because, again, cancer is not one entity. We know that each and every cancer is different, in the risk factors that contribute to those cancers.
And so, again, my focus here is understanding the human evidence on NDMA and the five specific cancers that are alleged for dietary NDMA.
And then further, I looked at any cancer with respect to ranitidine use that's -- that's been in the human epidemiological data, so...
Q. Are you aware of any medical literature that looks at pediatric cases of liver cancer associated with ranitidine?


MR. SHEEHAN: Objection.
A. Again, if there are case reports, I'm not aware of them, but they may exist. But my focus here was on large scale epidemiological studies.
Q. Do you understand that there is large scale epidemiological studies evaluating pediatric cancers associated with NDMA?
MR. SHEEHAN: Objection.
A. Again, for my expert, I focused on the ranitidine studies and the published data on NDMA in diet and the cancers that are being alleged here.
Q. Doctor, are you aware that there are cases in this litigation involving children who have developed cancer after taking ranitidine?
MR. SHEEHAN: Objection.
A. Again, it's not relevant to my assessment of the literature here for these five cancers, because cancers have very different risk factors. And so, something that may affect a pediatric cancer, does not necessarily affect the bladder cancer or


pancreatic cancer or liver cancer, adult liver cancer.
Q. Doctor, are you aware that there are cases in this litigation involving children who have developed liver cancer after taking ranitidine?
MR. SHEEHAN: Objection.
A. Again, that would not be relevant to my expert review of the ranitidine and cancer literature for these five cancers that I'm evaluating as well as the NDMA in diet, and the five cancers that I am evaluating, of which there are plenty of studies which we've talked about all today in millions of people that show absolutely no consistent pattern between ranitidine use and these five cancers.
Q. Do you know whether or not there are any published peer-reviewed articles that discuss pediatric liver cancer and ranitidine?
MR. SHEEHAN: Objection. Vague.
A. Again, without doing that literature search myself, I could not tell you that answer right now.

Q. Doctor, have you undertaken any type of evaluation of whether or not NDMA meets the ten key characteristics of carcinogens?
MR. SHEEHAN: Objection.
A. So, again, the ten key characteristics of -- are you referring now to the ten key characteristics that the FDA has reported out and/or are you talking about -- they build off of Michael Smith's paper that had a -- I think it's Hanahan and Weinberg paper originally. But I'm aware of how you assess the key characteristics of cancer, if that's the question.
And I would say that as a cancer epidemiologist, those are absolutely important criteria, but we do not even go to that stuff until we are confident that there's a robust association between an exposure of a disease that isn't explained away -- it can't be explained by bias and/or chance. Once we have that kind of consistency, again, consistency across cohort studies and case-control studies, then the next step is usually to look more



mechanistically at what's driving that.
So, for example, in our own research, we would look mechanistically after we've seen consistent findings and, for example, you had mentioned DNA adducts before. We would then look at whether or not the exposure we were interested in work through, you know, the exposure disease association worked by rather adduct formation.
So, that's, you know, the characteristics of cancer absolutely important, but you have to get there first by a consistent or reliable and valid association.
Q. So, is it fair to say that you did not assess the ten key characteristics of carcinogens in relation to NDMA?
MR. SHEEHAN: Objection. Mischaracterizes testimony.
A. Again, I would do that if there were consistent associations. So, with ranitidine and the five cancers that I reviewed, there was absolutely no consistent reliable or valid association. With the



dietary studies and NDMA, there were also no consistent and reliable association. What patterns exist, could easily being explained away by recall bias because the cohort studies found something very different than what the case-control studies found.
Q. Okay. Doctor, just very quickly, did you --
MS. FINKEN: You actually how much time do we have on the record?
THE VIDEOGRAPHER: We have seven hours and 56 minutes on the record.
MS. FINKEN: Okay.
Q. So, Doctor, very briefly did you review the Hidajat occupational exposure study relating to NDMA exposure?
A. I did review that, yes.
Q. Okay. And you're aware that Hidajat -- the Hidajat study found there was a linear exposure response association with NDMA and cancers of the bladder?
MR. SHEEHAN: You cut out there, Tracy, at least for us at the end of that.
Q. Okay, let me ask it again. I'll



withdraw that question.
Doctor, are you aware that the Hidajat study found linear exposure response associations where the highest exposures to NDMA was associated with cancers of the bladder?
MR. SHEEHAN: Objection.
Q. Actually, let me withdraw that question and try it one more time.
Doctor, are you aware that the Hidajat study found a linear exposure response association between the risk of mortality from cancers of the bladder with exposure to NDMA?
A. So, I am aware that the Hidajat study, which was an occupational cohort study a rubber plant workers, that they use the job information to come up with a matrix of -- to -- to estimate how much exposure would be from NDMA and then they associated that with -- with cancer mortality, as you say. Yes, I'm aware of that study.
Q. Do you disagree with the Hidajat authors' conclusions that NDMA was associated with an increase in mortality from bladder

cancer?
MR. SHEEHAN: Objection.
A. Can we just pull up the study for a minute?
Q. Do you need to pull up the study to answer the question of whether or not you agree or disagree with Hidajat studies conclusions that NDMA was associated with an increase in mortality from bladder cancer?
A. I guess it depends on how many more questions that you're gonna ask about this study. But, no, my assessment of the Hidajat study is as follows:
One is they didn't have cancers incidents, they had cancer mortality, which is challenging for a valid measurement because just a challenge you have with understanding the cause of death. So, that's one challenge.
The other major challenge from the Hidajat study is the fact that when you're working at a rubber plant, that there's many, many, carcinogens that you're exposed to. Many of those exposures, those carcinogens are actually shown to be through human



studies, Type 1 human carcinogens as it pertains to IARC. So, the Hidajat study did try to detail out the NDMA exposure from many of these other chemicals.
But, again, for bladder cancer in particular, we know a lot more about all of these different environmental chemicals and how they affect bladder cancer.
So, my biggest concern with the Hidajat study is I would want to see it repeated and I would want to -- I would really want to understand that exposure separate from some of these other major Type 1, Class 1 carcinogens, which they would've all been exposed to. And they try to get at that, but I wasn't convinced after reading that that they can really do that in -- in a really robust way.
So, I considered that paper, absolutely, but it's relevance to ranitidine and the five cancers that are being alleged is not there, because, again, we're talking about very different exposures, we're talking about inhalation versus ingestion and we're talking about, you know, individuals who are



exposed to many, many different types of carcinogen through their occupation.
Q. Did you read Dr. Hidajat's expert report in this case?
A. I did. Yes, I did.
Q. So, you disagreed with Dr. Hidajat's conclusions based upon the results of her study; is that fair?
MR. SHEEHAN: Objection.
A. So, I disagree that the Hidajat study has relevance to the question of whether or not ranitidine causes cancers of the five types that are in this report, absolutely, I disagree.
Q. Doctor, for purposes of your expert report, did you review the McDowell study?
A. So, I did review the McDowell study. Can you be more specific and tell me what year or which study or pull it up just to jog my memory? It's been a long day.
Q. Okay. Well, looking at your report. Did you review the McDowell study regarding the association between ranitidine and pancreatic cancer?
MR. SHEEHAN: Objection.



A. So, again, can you pull up the McDowell study? My recollection is that one of the McDowell studies was like a hypothesis generating study, if that's the one I'm thinking about offhand. But if you can pull it up, that would be helpful.
Q. Well, let me ask you this: Did you refer to the McDowell pancreatic study in your report?
A. Can you please let me know what's the title of the McDowell study you're talking about and/or put it up on the screen? I found one McDowell study in my report, it's a little hard to search because I don't have the electronic copy in front of me, but on page 54 I refer to it. I can read from the report if you would like.
Q. No, that's okay. There's no question pending.
Okay. Let's look at -- I don't want to pull it up, but I know that Mr. Ronca had asked you some questions about the --
THE COURT REPORTER: I'm sorry.
About the what? You cut out.
Q. The Chow study --

A. Yeah, I'm having a hard time hearing you too.
(Cross-talk.)
A. The Wong-Ho Chow study?
Q. I couldn't hear what you said. The Chow study that's on page 27 of your report.
A. Yes, I'm on that page.
Q. Does the Chow study provide the analysis of ranitidine separate and apart from the analysis of H2RAs?
A. So, in the paper itself, it discusses the findings for ranitidine separately and said that those findings did not differ. And they used, you know, this was very common at the time of data not shown, but -- but they did that analysis and said it didn't differ.
Q. But they didn't provide the analysis in the report, did they?
A. They didn't provide the numbers in the report.
MR. SHEEHAN: Just let me object. Go ahead.
THE WITNESS: Sorry.
Q. Okay. Dr. Terry, have you reviewed



any of the other epidemiological literature relating to H2RAs and increased risk of certain cancers as a class of medicines?
A. Yes, I mean, I did review the H2RA literature as a class and specifically for the five cancers here.
Q. Can you direct me to where you do a review and analysis of that literature in your report?
A. They start on page 70.
Q. Dr. Terry, let me ask you a question. Did you find any of the epidemiological literature, whether it's NDMA or ranitidine, that shows a statistically significant increased risk of cancer to be a valid and reliable study?
MR. SHEEHAN: Objection.
Q. Do you understand my question?
A. So, within my report, I give context for each and every study, each and every study has strengths and limitations. But what's important is collectively, is there consistency? Is there replication of findings?
And so, again, using Bradford Hill,



I went through very carefully from the beginning; are there any consistent patterns, does the signal -- is the signal higher than the noise, can it be accounted for by selection information or confounding bias?
And so, again, looking at the literature as the whole, there's some studies that are very individually rigorous and things like that. But again, across the pattern, across the number of studies as a whole, there's no consistent pattern. There's absolutely no consistent pattern whatsoever in ranitidine and any of these five cancers or in dietary NDMA in any of these five cancers.
Q. You indicated that there's some studies that are very individually rigorous.
Which studies were you referring to?
A. So, again, for the ranitidine studies, when -- when you have a good capture of the outcome data, so when it links to cancer registry data or has electronic health record data to verify the cancer diagnoses, that's better than self-reported cancer



diagnoses. When you have exposure data, that's from the electronic health record, that's also higher quality than self-reported use. So, you know, each study needs to be considered for their strengths and limitations and collectively the quality of the studies are higher for the cohort studies that are dietary NDMA and these cancers as well as the large studies that now involve millions of people and how ranitidine is used -- has been used every day in different countries all around the world, so...
MS. FINKEN: Okay, I'm going to move to strike as nonresponsive.
Q. Dr. Terry, my question was, which specific studies do you believe were individually rigorous or associated with either ranitidine or NDMA?
MR. SHEEHAN: Objection.
THE COURT REPORTER: Ms. Finken, you froze. I think I got the question, but you did freeze, if you want to check the realtime.
A. Okay. And --
Q. I'll say the question again just to

make sure that the record is clear.
My question was, which specific studies do you believe were individually rigorous, but demonstrated an association with either ranitidine or NDMA in cancer?
MR. SHEEHAN: Objection.
A. And I'd like to just qualify my last answer. I think I misheard you. I just thought -- I was responding to what I thought your question was was which studies are rigorous, not which studies were specifically showing a finding between ranitidine or dietary NDMA and cancer.
So, again, I would answer that it's not just for one study, it has to be collectively.
So, again, collectively, there -- there's not sufficient data that's rigorous to support either dietary NDMA and/or ranitidine exposure in any of the cancers.
Q. Dr. Terry, though, I'm just quoting what you said which is that some of the studies were individually rigorous.
Which studies were you referring to?



A. So --
MR. SHEEHAN: Hold on.
Objection.
Go ahead.
A. All right. So, for example, again, I would say the Cardwell study itself had different comparators, had an H2RA comparator, had a PPI comparator and had a non-use comparator. So, that's a study that had multiple comparisons and so allows the reader themselves to decide the quality and the rigor of this.
So, again, I disagree with the authors' conclusion that their finding -- their overall study was supporting a finding, their overall study supported no finding whatsoever when they had a comparison of H2RAs. And only found something when they were looking specifically at non-user PPI.
So, that's a study where you can look at the data more closely and you can look to see what's the more valid comparison group. So, the comparison group of H2RAs in this setting was a valid comparison.
Q. Were there any others besides



Cardwell?
A. Again, many of these studies on ranitidine and cancer were rigorous. It's -- the majority of them found absolutely no positive association and many of them also found a decreased association, so...
MS. FINKEN: Let's go off the record for just a moment, please.
THE VIDEOGRAPHER: We're going off the record. The time is 12:07 a.m. UTC time.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We are back on the record. The time is 12:31 a.m. UTC time.
MR. SHEEHAN: Tracy? I didn't mean to -- I didn't know what --
MS. FINKEN: Sorry, it's been a long day. I forgot I didn't pass before we went on a break. Sorry about that.
Dr. Terry, I have no questions for you. I'm reserving the remainder of my time for after your counsel



questions you, okay? Thank you very much for your time, I appreciate it.
THE WITNESS: Okay, thank you.
MR. SHEEHAN: Appreciate that Tracy, thanks.
FURTHER EXAMINATION BY
MR. SHEEHAN:
Q. Dr. Terry, thank you so much for your time today. As Tracy says, it's been a long day and I'll attempt to be very brief here.
I'm Tom Sheehan, as you know. I represent GlaxoSmithKline in this matter, and I'm just going to ask you a couple of questions in response to some of the questions that Ms. Finken asked, okay? Okay.
Now, Dr. Terry, Ms. Finken asked you whether you intend to offer an opinion on whether the levels of NDMA contained in ranitidine products are capable of causing cancer in humans.
Do you recall that?
A. I recall being asked that, yes.
Q. And I think you responded that you would defer to a molecular biologist.

Do you recall that testimony?
A. I recall that yes.
MS. FINKEN: Objection.
Q. Was that testimony accurate in response to that question?
A. No. I misunderstood the question. I thought it applied to specifically levels of NDMA and any one pill which is not what we would do in epidemiology.
Q. Okay. Dr. Terry, do you intend to offer an opinion on whether the levels of NDMA contained in ranitidine products are capable of causing cancer in humans?
A. Absolutely. I intend to offer an opinion on both in my expert report, as I have, and then today, my expert opinion after reviewing the 16 studies of ranitidine and cancer as well as the NDMA in dietary sources and occu- -- as estimated in dietary sources as well as occupational studies, that there is no consistent reliable finding in any of these studies. The ranitidine studies and cancer risk involve real world use of the medication in millions of people and there is no evidence that there's any consistent



pattern of -- of increased risk from ranitidine in any of the five cancers being alleged.
Q. Dr. Terry, are the studies of ranitidine and cancer outcomes a robust assessment of whether NDMA in ranitidine is capable of causing human cancer?
A. Yes, the highest level of evidence in -- because they are addressing how the medication is used in real world settings and in millions of people, so they're the highest level and that's specifically why IARC also requires human evidence in order to say something is a human carcinogen.
MR. SHEEHAN: Thank you very much, Dr. Terry. I don't have any further questions.
MS. FINKEN: Dr. Terry, I just have one question.
FURTHER EXAMINATION BY
MS. FINKEN:
Q. Are you aware of the average length of use for ranitidine for the individuals who have brought lawsuits against the manufacturers in this case?



MR. SHEEHAN: Objection.
A. I am not aware of the individual use of the medication on the individuals who have -- are part of this case. What I am aware of is the real world use of this medication in millions of people of which there is no reliable valid finding between ranitidine and these five cancers.
Q. I would only have one more request and I just want to put it on the record.
There was some issues with your report with the references and the materials considered not being consistent and we would just ask for an updated materials considered list that accurately reflects all the citations that are contained in your report because as Mr. Ronca had stated earlier, and I did as well, there were some times that there were certain citations in your report that aren't contained in your materials considered list. So, if you can update that and provide it to us, I would appreciate it.
MR. SHEEHAN: We'll -- we'll take it under consideration.
And just -- just to be very clear,



the report is very comprehensive and describes the studies that are -- that are described within the body of the report and there is a separate materials considered list. Whether there may be some delta between those two, we can -- we can go back and look, but I don't think -- to the extent there's any implication that the studies and data described in the body of the report were somehow not considered or not reviewed because they did not appear on the materials considered list, I think that would be a -- a false implication. I just want to put that on the record.
MS. FINKEN: I can disagree with you on that, but there are not full citations in the body of the report. And one of the examples that I gave was the IARC Working Group study in 1999, there's no -- I don't know what the name of that report is, there's nothing there. So, it's not in the materials considered list. What we

would ask for is you provide an updated materials considered list that's comprehensive with all of the -- the studies and the documents that are cited within the body of your report, but they are not full citations. So, I want to make sure that when we're looking at your report, that we're looking at the correct citations for the body of your report. If they're not contained on the materials considered list, I have no way of evaluating that. So, I would just appreciate it if you could provide an updated materials considered list that is comprehensive, please.

MR. SHEEHAN: And as I said, I mean, I think we disagree with -- with your characterization of the citations in the body of the report. We will certainly take it under consideration and we can have that conversation off the record in connection with this deposition.



MS. FINKEN: Great. Thank you. Thank you for your time, Dr. Terry. I appreciate it.

Let's go off the record.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: We're going off the record. The time is 12:38 a.m. UTC time.

(Time noted: 9:12 a.m. Eastern Time)



J U R A T

I, MARY BETH TERRY, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on MAY 31, 2022; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

________________________
MARY BETH TERRY, Ph.D.

Subscribed and sworn to before me

This ______ day of __________, 20__.

____________________________________
NOTARY PUBLIC



C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF RICHMOND )

I, CANDIDA BORRIELLO, a Notary Public for and within the State of New York, do hereby certify:

That the witness, MARY BETH TERRY, whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 2nd day of June, 2022.

Candida Borriello
________________________
CANDIDA BORRIELLO

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: ZANTAC LITIGATION
Dep. Date: MAY 31, 2022
Deponent: MARY BETH TERRY

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |
| ___ | ___ | ______________ | ______________ | _____ |

________________________
MARY BETH TERRY, Ph.D.

SUBSCRIBED AND SWORN BEFORE ME,

This___ day of_____________, 20__.

__________________________________
Notary Public

My Commission Expires:__________

**Exhibits**

**EX 6349 Mary Beth Terry, Ph.D. 053122**
5:17 342:17, 19
**EX 6433 Mary Beth Terry, Ph.D. 053122**
5:15 142:20 143:14
**EX 6727 Mary Beth Terry, Ph.D. 053122**
5:12 14:2,4 98:5 151:11 160:15 211:16
**EX 6729 Mary Beth Terry, Ph.D. 053122**
5:14 128:9, 17 149:6
**EX 6732 Mary Beth Terry, Ph.D. 053122**
5:13 82:11, 13
**EX 6736 Mary Beth Terry, Ph.D. 053122**
5:12 66:22 67:11
**EX 6737 Mary Beth Terry, Ph.D. 053122**
5:16 152:25 153:1 162:20
**EX 6739 Mary Beth Terry, Ph.D. 053122**
5:13 104:3

**$**

**$500**
96:14

**(**

**(1995)**
313:8
**(1996)**
313:8

**-**

**-------------------I**
5:2
**-----------------E**
5:10
**----------------R**
5:21
**-------portion**
5:19

**0**

**0**
117:19
**0.05**
99:7 104:8 106:11
**0.06**
120:15
**0.6**
54:22
**0.7**
48:18 49:4 51:13 52:10 55:5
**0.8**
49:24 51:16 55:1
**0.895**
54:21
**0.9**
52:7
**00s**
198:20
**02210**
4:18
**05**
46:8,14,20 111:25 130:1

**1**

**1**
14:25 22:7 45:25 46:9, 21 48:20,22 50:1,3 54:24 78:8 84:4 117:18 129:17,18,19 130:1,2 132:6,7,17 133:10,15 135:8,9 136:11,16, 19,22 137:6 144:3 164:11 167:7 174:3 176:5 236:8, 12 251:7,15, 25 252:3,4 255:23 305:19 333:20,22 334:9,11 349:3,13 371:1,14
**1,095**
149:11,12,13 327:17 329:1
**1.0**
55:4 136:18 137:11,12,14
**1.01**
144:9
**1.06**
334:16
**1.1**
49:23 50:4, 11,14,25 51:15 52:9 53:8 54:22 77:22 78:22 125:19 136:20 301:5
**1.2**
53:9 77:22 125:19
**1.25**
144:10
**1.28**
144:3
**1.3**
188:11,19
**1.4**
45:16 46:5 55:5 137:20 138:4 174:17
**1.5**
52:10 125:19
**1.6**
49:24 51:16
**10**
13:18 86:8 98:20 145:19 313:10
**100**
36:25 133:2
**104**
5:13
**107**
14:25 15:2
**107-page**
20:21
**108**
15:7
**10:42**
341:18
**10th**
140:22 141:9,13,15, 21,24 142:2,

8 143:23 144:11 146:17,22,23 147:2,4,8,22 148:3
**11**
13:19 100:16 103:6 116:18 218:5 237:9, 19
**11.4**
187:1,20
**11.7**
237:10
**111**
291:3
**112**
247:18
**113**
224:5
**114**
15:7
**119**
15:14 36:16
**11:13**
341:22
**12**
100:17 116:17
**12-fold**
74:12
**121**
5:14
**128**
5:14
**12:07**
380:10
**12:31**
380:15
**12:38**
387:7
**13**
17:12 78:4
**14**
5:12 39:16 98:21
**1410**
4:18
**143**
5:15
**15**
150:23 247:2
**15.6**
48:18 49:4 51:13
**150**
344:6 356:23 357:23
**152**
5:15
**15219**
4:10
**153**
5:16
**16**
127:7 222:24 232:10 235:25 237:23 239:12,20 242:14 248:16 267:24 281:1 382:17
**17**
45:8,10 57:8
**176**
5:16
**191**
5:6
**1976**
87:17
**1980s**
256:9
**1987**
249:20,23 251:2
**1990**
232:13 236:2
**1992**
320:24 321:13
**1994**
315:6
**1995**
293:24 315:6,7
**1996**
241:17 293:23 320:25 321:14
**1999**
215:20 216:2,12,18, 25 217:2,7 385:22
**1:12**
7:6

**2**

**2**
84:6,15 85:18 129:18 130:2 185:21 195:9,13 301:3
**2.0**
78:22
**2.24**
137:22
**2.4**
159:20 301:4
**2.6**
334:16
**20**
16:18 42:23 60:11,23,24, 25 74:21 76:20 81:6 86:8 105:19 133:14,16 154:14 157:1 159:10 351:9 353:12 359:8
**200**
103:16
**2000-**
351:16
**2000s**
25:19
**2002**
42:14 68:21 241:19 299:8,21 350:24 351:5,17,24 352:15
**2003**
216:14,17,23
**2005**
63:6
**2007**
63:6
**2008**
241:18,19 293:23 299:8,21
**2009**
182:13 299:9
**2011**
335:25
**2012**
340:10,18 341:3
**2014**
335:22
**2016**
107:12 115:18
**2017**
82:7 183:21 184:1
**2018**
63:1,2 182:13
**2019**
99:10 115:25 116:21 217:20 219:3 303:19 304:14
**2019A**
16:19

**2021**
100:19
165:10
211:24
**2022**
7:5 13:21
**21**
137:23 262:7
276:8
**22**
31:1
**229**
15:14
**23.5**
185:6
**23.97**
185:23
186:13
**230**
15:21,24
**2307**
345:19
**24**
147:2 148:3
**248**
103:14,15
**25**
303:19
304:14
**250**
15:14 98:21
103:15
**266**
23:13 24:14
**27**
374:6
**28**
144:10
**280**
97:25
**29**
144:3
**29.1**
52:8
**2901**
4:3
**2A**
251:11 266:1
306:4,21
310:10,13
**2B**
306:7

**3**

**3**
84:8,16
86:16 105:18
234:22 235:9
**3,000**
32:24
**3.4**
49:14 50:11
**3.4-fold**
48:14 51:11
**3.5**
189:12
**30**
57:15 154:14
286:3,23
287:21,22
288:20,24
289:5 294:20
321:23
359:17
361:22
**30-day**
246:8 288:2
344:23 345:6
348:3 349:18
350:8,12
359:11,19
361:16
**300**
138:13
139:3,5
344:6 356:24
357:24
**300,000**
98:12
**301**
4:10
**303**
5:17
**31**
7:5 148:15
**31,393**
357:9
**32.32**
185:22
186:12
**34.8**
185:10
186:7,16
**342**
5:17
**36**
34:8
**360**
179:1 295:8
**365**
149:11
**381**
5:7
**382**
23:13 24:15
**383**
5:8
**384**
5:22
**38th**
4:10
**39**
151:11,14,16
161:4,11
173:2,9
**3:02**
95:24
**3:18**
96:3

**4**

**4**
84:10,18
284:10
**4,000**
32:22
**4,500**
32:23
**4.4**
159:21
**4.5**
301:5
**40**
160:16
161:4,11
162:21
173:3,9
**41**
304:9
**41st**
193:23
**42nd**
193:23
**43.6**
188:7
**44**
171:2,10
**459,204**
291:20
**460,000**
291:19
**4:33**
151:4
**4:45**
151:8

**5**

**5**
45:8,9 90:14
129:17
180:11 189:2
190:4 284:10
304:23
313:10
**5.1**
52:6
**5.5**
186:24
**50**
50:21 57:15
171:7
346:12,25

**500**
4:3
**531.01**
147:14
**54**
373:16
**55**
146:18 147:1
**56**
34:8 38:22
52:2 368:12
**58**
172:10
**59**
172:10
**5:42**
190:23

**6**

**6.38**
334:16
**6.5**
187:2,20
**60-day**
344:23
**600**
229:16
**61**
5:20 74:1
**62**
128:25
**63**
304:7
**6341**
5:17 303:12,
13 304:12
**6349**
5:17 342:17,
19
**6403**
5:14 120:25
121:2,12,18
122:22
142:21
**6423**
5:16 174:22
176:19,20
**6433**
5:15 142:20,
21,22
143:10,14
**6457**
5:15 152:3,4
**65**
333:17
**65,000**
357:8
**67**
5:12 331:8
**6727**
5:12 14:2,4
98:5 151:11
160:15
211:16
**6729**
5:14 128:9,
17 149:6
**6732**
5:13 82:11,
13
**6736**
5:12 66:22
67:11
**6737**
5:16 152:25
153:1 162:20
**6739**
5:13 104:2,3
**68**
332:20
**69**
334:6
**6:38**
191:3

**7**

**7**
13:21 57:7
307:7
**70**
253:25 306:5
375:10
**73**
144:6,8
147:13 179:1
295:8 297:8,
9
**736**
41:7
**75**
169:18
186:22 187:2
211:15,17
251:12 344:7
**75.44**
144:3
**76**
215:16 216:3
**77**
216:8 217:6
**78746**
4:4
**7:53**
249:7

**8**

**8**
5:5 16:20,22
311:23
312:1,17
**8.4**
247:19
**80**
169:18
253:25 306:5
**80s**
27:23 221:4
256:2,19
**82**
5:13
**86**
340:1
**87**
336:14
338:14
340:1,3
**88**
137:22
**89**
340:6,9
341:7
**8:11**
249:12
**8:13**
250:18
**8:17**
250:23

**9**

**9**
186:19
**900,000**
297:11
**90s**
81:9 208:25
236:4 317:7
**95**
46:11 48:17
49:3,23
51:12,15
52:7,9 54:5
55:4 99:6
120:18 316:4
**9:12**
387:9
**9:26**
302:19
**9:48**
302:24

**A**

**a.m.**
380:10,15
387:7,9
**abandoned**
106:3,25
119:10
**abandoning**
99:14 103:10
118:9,12
124:12

**abandonment** 106:17
**ability** 40:2 75:12 192:7
**ablation** 175:11
**able** 14:15 38:24 52:19 135:4, 11 160:22 161:6 162:23 164:20 165:12 169:1,14 174:15 176:2 185:1 188:3, 13,14 222:11 223:8 286:12 293:2 303:25 346:18 357:22 358:20 359:1,4 360:9
**above** 59:13 132:6 136:7,10 144:5,8,18 145:9 148:14 174:1 320:6, 20 334:11
**absent** 113:7
**absolute** 117:19 186:19,25 187:18,19,23 188:10,18 285:24
**absolutely** 85:25 95:7 120:5 162:3 226:17 232:17 276:6 339:3 365:15 366:16 367:12,24 371:20 372:14 376:12 380:4 382:14
**accelerometers** 288:11
**acceptable** 254:16
**access** 13:7 193:15 337:2,21
**accompanied** 42:21
**account** 161:25 171:6 235:3 244:8
**Accountability** 179:21
**accounted** 255:17 280:19 376:4
**accumulated** 353:12
**accuracy** 21:14
**accurate** 20:19 21:18, 21 72:4 204:11 382:4
**accurately** 87:20 347:19 384:15
**acid** 44:21
**acknowledge** 7:22 8:1
**across** 22:14 24:1, 5,9,21 26:6, 22 27:1 40:22 76:22 94:7 111:14 135:18 136:2 150:18 168:19 237:23,24 238:1,19 239:20 242:14 243:11 271:14 276:14 289:22 322:23 336:17 357:13 366:23 376:9,10
**act** 75:11 179:21 200:2
**action** 7:13 74:2
**active** 161:8,21 162:10 165:11,22 169:8,15 170:24 171:24 172:12,21 173:19 175:2 185:2 188:3 223:8,24 228:18
**activities** 37:9
**activity** 28:13 64:3 75:11 288:3, 8,17,20,24 289:2,21 290:2,3
**actual** 76:4 115:25 116:8 117:1, 6 121:22 129:8 148:21,24 182:21 275:5 281:9,20 299:23 354:25
**Adami** 219:18 220:6 221:18,24 222:10 223:2,5,13 224:10 241:16,25 242:8 243:16 244:13,14 245:4 246:4 290:9,13 334:17 342:6,7,10 343:7,11 344:2,5,22 348:10,17 349:8 350:21 361:15
**adapter** 197:18
**add** 18:12 154:1 169:12 358:9
**Added** 342:21
**addition** 27:21 74:8 188:2 190:3
**additional** 313:21
**address** 116:22 198:2
**addressing** 383:9
**adduct** 323:9,10 367:9
**adducts** 323:18,25 324:8,9 367:5
**adenocarcinoma** 25:17
**adenocarcinomas** 57:16

**adequately** 283:17 285:14
**adjust** 161:6 162:6 165:3,13 166:19 167:3,10,17 169:1,3 185:4 188:4, 14 223:22
**adjusted** 148:25 161:23 164:14 165:17 169:5 173:18 220:19
**adjusting** 149:2 167:13 224:13
**adjustment** 162:7,8
**administered** 8:2
**Administration** 294:18
**administrative** 92:22 93:10
**adult** 226:11 365:1
**adults** 171:7
**advanced** 351:8
**advantage** 83:19 158:17
**advantages** 101:8 124:6
**advice** 310:11
**advocated** 117:14
**advocates** 99:13 103:9 118:8
**affect** 44:18,21 123:24 154:24 192:6 364:24,25 371:8
**affects** 80:23 311:6
**affiliation** 104:21,24
**affiliations** 220:2
**afraid** 87:18
**afternoon** 191:7
**age** 164:21 165:13 185:15 226:9
**agencies** 70:23
**Agency** 64:17 308:4
**agent** 162:4 200:3, 18 201:9 318:12
**agents** 89:2,5
**aggregate** 95:15 177:4, 5,15 178:21 179:2,22 180:1
**ago** 10:15,18 60:12,23,25 74:21 81:6 86:8 110:14 150:23
**agree** 19:6 30:1 71:1 90:21 91:7 109:23 110:3,10 111:19 112:1,2,8 113:9 114:10,11,16 115:9 125:25 132:15 156:11 158:7,16,24 159:6,13 172:8 204:1 205:24 206:16,18, 20,22 207:4, 24 208:1 252:1,7,14 253:17 264:14 283:21,25 285:11,18 291:11,17 305:8 307:20 308:2,19 309:16 321:11 322:10 323:22 349:17 350:7 351:15 353:20,22 361:14 370:7
**agreed** 108:3 319:13
**agreement** 6:7 115:23
**agrees** 61:22 107:18 110:8 158:2
**ahead** 9:12,21 23:19 28:22 30:16 31:25 54:1 69:10 77:5 80:8 85:3 100:15 101:17 108:23 123:4 153:19 168:20 173:7 181:3 189:25 207:12 208:7 210:15 222:2 227:22 234:19 236:12 240:20,23 241:1 252:20,23 264:22 277:22 283:8 295:25 316:16 319:25 324:22 329:17 339:21 344:11 355:6 357:4 361:10 374:23 379:4
**alcohol** 25:18 48:6, 12 50:19 51:10 55:13 61:8 113:13 114:1 162:17 172:16
**alcoholic** 62:10
**ALFANO** 4:8
**alleged** 53:11 67:6 77:18 126:7, 22 127:9,11 157:12 161:18 168:9 205:23 238:3 242:17 259:15 263:20 264:3 270:4 272:13 279:5 321:4 323:2 351:14 352:6 362:10,24 363:17 364:14

371:21 383:3
**allow**
33:7,24
239:22
**allowable**
33:6
**allowed**
223:6
**allows**
33:19 94:1
289:23
379:10
**alluding**
256:7
**alphabetical**
17:7,11
**amazed**
11:22
**amend**
112:10
**American**
39:13 99:12
100:7,22
103:8 105:2,
7,11 106:16,
24 107:17
118:8 119:9
211:23
**amine**
72:11
**amines**
72:1 74:14
340:23
**amount**
175:4 209:16
211:1,3
225:18
248:4,14
278:1 282:24
285:25
292:21
294:11,24
299:12,23
300:22 302:9
360:25
**amounts**
278:14,23

280:1
**analyses**
24:4 37:18
40:8 110:14
130:19
133:20
138:19
140:11
148:20
183:13
184:13
187:22,23
194:19
196:16 199:6
253:11 285:6
286:2,8
333:7 357:17
**analysis**
27:17,23
33:16 40:12
47:23 74:2
81:5 92:13
94:12 140:14
147:17
148:11
153:21
161:8,21
162:7
165:12,23
167:7,11,18
172:12
181:23 196:4
203:23
205:4,19
244:18,21
256:2 257:1,
8 258:23
259:5 260:8
261:25
262:11,15
264:23
272:25
274:22
275:22
276:18,24
301:14,15
341:7 346:1
358:3 374:9,

10,16,19
375:8
**analytics**
26:25
**analyze**
220:15
243:17 261:7
295:18
**analyzed**
95:13 203:4
282:24
283:10,11
292:22
**analyzing**
172:19
**And--**
47:8
**and/or**
6:8 29:17
254:5 264:9
268:23 281:7
366:9,21
373:12
378:19
**animal**
72:3,25 76:5
251:16
265:25 266:3
306:12,15
307:13,21
324:12
**animals**
204:13
265:23
308:13,23
**Anne**
28:6,9,12
64:10
**answer**
12:15,20
13:3 18:9
19:24 20:14
23:17 27:11
34:3 61:19
63:17 65:16,
20 94:15
108:21 123:5
158:4 165:7

166:5,24
168:20
190:16 192:2
204:17 205:6
246:1 254:16
256:12
261:13,24
270:10,13
272:17
274:14,16
276:6 328:19
335:4 337:22
339:22
352:13,19
358:7 363:9
365:25 370:6
378:8,14
**answered**
12:22 25:6
38:8 69:9
91:1,11 92:6
115:3 119:15
127:5,22
137:8
157:21,25
159:5 161:14
165:2 166:22
179:25
182:23 200:5
203:15 239:9
240:25
241:12
254:19 259:1
261:11,13
271:4 272:19
273:9 280:5
285:17
287:25
296:25
298:13
326:15
329:16
331:20 335:3
339:13 345:8
347:6,21
349:6,12
350:17
352:20 353:6
359:22 361:9

**answering**
316:15
**answers**
11:13 261:18
**antagonists**
195:9,11,14
**antecedents**
25:9 37:23
**anti-carcinogenic**
75:10
**anti-inflammatory**
245:21 292:13 358:10
**anti-mutagenic**
75:11
**anti-ulcer**
215:21 216:20
**antibacterial**
75:15
**anticipate**
30:8
**anticipated**
256:4
**antihypertensive**
248:20
**antihypertensives**
292:15
**anybody**
194:2
**anyone**
6:21 159:15 242:7 303:3
**apart**
374:9
**apologize**
121:9 353:24
**apoptotic**
75:12
**apparent**
155:20
**Apparently**
167:20
**Appearing**
4:1,7
**appears**
308:12 323:16
**apples**
262:22
**applicable**
24:5
**applications**
193:16
**applied**
40:22 110:13 221:4 286:7 382:7
**apply**
40:10 191:12
**appreciate**
24:13 89:14 337:7 381:2, 4 384:22 386:14 387:3
**approach**
37:19 296:14
**approached**
10:23 29:4
**approaches**
83:1,6 296:20
**appropriate**
330:4
**approx-**
97:24
**approximate**
198:13
**approximately**
10:16,18 13:17,18 25:25 97:24 171:6 345:20,23 346:11,25 347:17
**arbitrary**
111:25
**area**
23:9 56:15 253:8,9 308:24
**areas**
22:15
**argument**
172:11 173:14 258:19
**arises**
325:15
**aromatic**
324:8
**around**
37:1 64:21 101:10,21 109:4 124:4 132:13 284:3 341:25 342:2 377:12
**arrangement**
8:7
**arrest**
75:13
**arrow**
141:9
**arrows**
149:19
**art**
213:5
**article**
41:1,10,11, 21 42:2 46:11 47:20, 21 52:16 60:23 66:21 71:17 72:6 73:22 74:21 78:9,17 102:11 104:7 116:10,24,25 121:21 123:8,13,22 130:13 134:11 140:16,18 141:1,17 142:1,4 163:22,24 164:1 236:3, 4 274:25 330:1
**articles**
18:21 19:11 23:14 24:15, 24 42:25 61:14 106:5 174:5 338:10 365:19
**ASA**
105:25 107:10,11,16 115:16,25 116:8,21 117:1,6,10 118:11 122:1,23
**asbestos**
89:5
**ascertained**
84:13
**ascorbic**
44:20
**Asian**
296:6
**asked**
24:14 25:5 29:5 35:17 38:7 69:8 90:25 91:10 92:5 96:11, 23 97:3,5,9, 22 115:2 119:14 127:4,21 137:7 150:23 157:20 159:4 161:13 165:1,6 166:21 179:24 182:22 200:4 203:14 207:23 239:8

240:19,24 241:11 254:19 258:25 261:10 271:4 272:18 273:8 280:5 285:16 287:24 292:1,4,9 296:24 298:12 313:9 323:5 326:14 329:16 331:20 335:3 338:7,8 339:12 345:7 347:5,20 349:11 350:16 352:20 353:5 359:21 361:9 373:22 381:16,17,23

**asking**
9:1 11:12 19:13 37:25 38:4 65:18 71:10 97:8 101:4 110:8 127:17,23 144:17 145:1,6 155:24 157:22 185:17 186:1 190:12 235:13 243:6 248:9,12,13 259:23,24 261:16 273:1,3 287:13 292:18 316:7 317:18 335:6,7 337:18 356:1

**aspects**
196:8 284:24

**aspirin**
358:16

**assembled**
131:11

**assertion**
99:12 118:7

**assess**
29:10,11 120:8 151:22 152:18 153:8,12 155:7 156:4, 13 159:2,8 160:1 200:3, 17 201:16, 21,23 213:11 214:13 233:7 234:24 257:5 258:11 273:20,22 274:7 284:4 352:9 366:13 367:17

**assessable**
221:8

**assessed**
62:8 80:11 92:12,13 211:1 216:19 242:15 254:4 311:20 312:10 348:9

**assessing**
93:17 155:11 172:22 173:23 174:3,25 272:21 274:22 279:21 283:23 285:12 296:3

**assessment**
64:5 76:13 84:15 90:2 92:3,4,20 164:10 211:5 216:24 238:16 239:23 246:23 254:9 256:23 258:1,21 262:24 267:15 271:8 272:24 286:6,14 293:18,20 303:17 304:13 305:14 307:3,12 322:20 323:7 324:16 325:9,19 328:9,13 329:25 330:2 338:23,24 351:16 352:24 364:21 370:12 383:6

**assessments**
258:7

**assistant**
18:18

**assisted**
19:22

**assoc-**
312:8

**associa-**
331:22

**associated**
48:14 51:11 69:17 226:18 242:16 255:11 278:15,23 311:19 328:1 360:8 362:7 363:25 364:8 369:5,20,24 370:8 377:17

**associating**
58:21

**association**
45:17,23 46:5 47:18 48:1 49:10, 16 50:6,15 51:18 52:22 53:2,4,8,16 54:7 55:17 67:10 88:1 91:14,17 99:13 100:7, 23 101:15 102:6,7 103:8,9 105:2,12 106:17,24 107:17 108:5,6 109:1 110:18,19 111:22 112:5,11,17 113:6,13,25 114:2,7,24 118:3,8 119:10 120:9 125:8,12 126:1,8,15, 21 127:1,9, 13,17,19 128:1 130:25 132:12,14 134:18 137:3 154:11 155:11,19 173:23,25 205:21 208:22 211:24 217:25 218:10 220:19 226:21 245:13 248:23 255:16 256:15,18 262:10,14, 17,20 263:9,

25 264:1,11, 16 265:3,5, 6,8,10,11,13 266:4 270:2, 6 271:10 272:4,16,22 273:22,24 275:2,7,10, 24 279:10 281:6 286:17 287:11 288:16 298:6 300:6 309:3 312:9 315:19 321:1,15 322:6,13 324:18 325:2,3,6,7, 8,15 326:3, 13 327:2,5, 16 328:23 329:6,22 331:5,17,23, 25 332:2,4, 15 333:2,13, 21,25 334:3, 23 335:9,19 336:10 346:18 351:1,19 360:14 366:19 367:9,15,25 368:2,20 369:12 372:23 378:4 380:5,6

**associations** 50:24 53:10, 13 77:13 89:22 111:14 129:15 137:16,25 154:3 158:11 220:18 257:10 265:4 269:5 271:19 275:4,14,19 302:5 322:2 324:25 340:20 357:14 367:22 369:4

**assume** 12:21 112:20 114:23 192:3 282:5

**assumes** 95:9 231:4

**assuming** 95:4 112:18 261:17

**assumptions** 124:21

**asterisks** 106:12

**atrophic** 188:6

**attach** 35:4

**attached** 35:22,24 36:6 176:12 208:3

**attaches** 323:11

**attempt** 381:10

**attempting** 213:11

**attention** 340:6

**attorney-client** 6:9

**attorneys** 7:20 11:7

**attributed** 258:5

**audience** 89:14

**aughts** 198:17,21

**augmented** 74:12

**Austin** 4:4

**author** 41:12 152:15 153:7 155:5 158:3 163:25 321:18,20

**author's** 220:21

**authority** 326:1,11

**authors** 41:13 151:21 153:9,15,22 156:1,5,10, 11 158:7,14, 25 159:13 160:22 162:23 163:3,10,19 167:20 168:11 169:9 172:1,24 184:20 219:8,18 220:2 243:21 303:8 327:23 328:7,11 329:5,21 336:21 337:9 338:6,8,11 339:8 346:24 347:16 355:15 356:2

**authors'** 329:5 369:24 379:14

**available** 69:22 73:23 82:18 93:8 161:20 267:17 275:5 277:5 351:24 353:8

**Avenue** 193:23

**average** 88:14 186:11 188:20 189:11 190:13 292:12 301:3 383:22

**awards** 105:14

**aware** 6:3 102:20, 24 105:12, 15,16 199:11,15 214:12 215:7,9 219:2,17,25 220:1 229:14,20,25 230:1,5,6,14 249:18,21 252:23 253:1,5,13, 15,21 255:25 256:6 350:23 351:5 355:15 356:1,6 362:11,13 363:23 364:3,15 365:3 366:12 368:18 369:2,10,15, 22 383:22 384:2,5

**axis** 130:9

**B**

**baby** 358:15,16

**bac-** 43:21

**back** 17:10 31:23 34:5 42:16 43:5 45:5 67:25 68:2 75:6 77:7

90:18,19 96:2,6 98:4, 18 101:12 102:21 108:10 109:10 113:11 116:16 123:18,25 125:21 145:18 146:9 149:5 151:7 157:16,19,24 160:14 162:19 191:2 194:9 201:6 222:14 231:9 232:3 249:11 250:22 261:19 290:6 302:23 314:20,21 320:1 341:21 348:14 350:6 356:13 380:14 385:7

**backed**
74:22

**background**
30:11 31:4, 11,13 35:6 37:3 105:17 118:17 183:4 282:20 343:1

**backwards**
83:15

**bacteria**
43:20,22

**balanced**
129:25

**barbecued**
86:11,12 340:21

**Barrett's**
164:25 165:3,17

**base**
111:21

**based**
28:16 30:10 49:2 52:1 59:24 60:3, 12 69:21 73:25 76:5 83:1,6 84:5 106:4 114:14 134:17 138:19 154:1 167:7 209:12,24 213:23 220:23 222:7,12 226:18 241:22 244:25 248:1 251:4,5,16 254:10 255:1 279:2,18 293:14 304:20 306:8 309:1 310:15,16 312:22 321:18 329:25 330:3 338:23 344:14,19 345:1 351:23 352:24 353:7,11 357:11,21 358:3 372:7

**baseline**
262:23 291:23

**basic**
189:20

**basically**
49:7 293:1

**basis**
8:25 10:9 27:6 186:20 256:22

**bear**
192:13

**beat**
23:17 108:20 208:6 219:23 357:1

**beauty**
223:23 280:16

**beer**
54:20

**begin**
87:17

**beginning**
66:9 178:12 191:12 259:3 262:6 291:24 308:8 376:2

**begins**
48:5,7 56:16 70:3 75:9

**behalf**
4:1,7 7:11, 16 219:7,19

**behind**
69:24

**believe**
12:21 17:24 112:5,11,17 113:6 114:5 196:4 198:14 241:25 242:25 273:2 288:3 360:19 377:16 378:3

**below**
132:7 334:9

**beneficial**
165:22 169:2

**Benjamini**
100:19 101:2 102:11 116:11,14,24 119:19 123:8

**besides**
224:21 271:25 272:8 273:4,17 379:25

**best**
36:11 37:6 70:16 80:23 81:2 83:11 136:24 222:13 287:12

**beta**
208:19,20 209:1,5

**Beth**
5:3 7:2 9:8 20:14

**better**
158:8 159:6, 14 169:6 376:25

**bias**
27:17 30:24 31:16 32:6, 12 50:8,9, 17,23 51:1 53:5,6,7,15 62:18 75:2 76:13,15,18, 24 77:10,16, 24 90:4,5,10 110:21,22 111:5 113:2 120:14 125:5,17,18, 20 126:11 128:6 132:4, 11 137:15 157:5,6 173:24 174:2 207:2 218:2, 3 219:7 244:9 253:12 255:17 257:9 258:12,17 259:6,7 262:12,13,16 263:14 265:20 268:10,17, 18,20,23 269:10

270:1,22 271:9,20 273:23 275:9,12,20 276:13 280:19 285:9 289:24,25 297:25 317:5 318:19 324:24 325:11,24 326:21 327:1 338:17,22 353:1 366:21 368:4 376:5
**biases** 28:2 50:7 53:1 77:23 111:11 262:18,19 268:25 269:1,13
**bibliography** 18:18
**big** 29:22 49:17 62:16 87:6 99:3 284:21
**bigger** 128:16 177:24 187:21 244:7 280:18
**biggest** 371:9
**billion** 230:10,16
**billions** 230:22
**Biobank** 291:20 333:8 358:15
**biochrome** 213:15
**biological** 269:22 270:7,22 271:16 275:15 302:6
**biologically** 268:4 269:16,18 270:25 271:24 272:6 273:4,15 274:13,21
**biologist** 72:17 205:1,12 206:13 210:17 274:14 381:25
**biologists** 206:24 278:10
**biology** 72:23
**biomarkers** 84:9 86:17 213:23
**biospecimens** 291:22
**biostatistics** 101:18
**bit** 53:14 100:11 168:19 188:25 213:17 342:1,2 343:21,22
**bladder** 26:3 129:1 134:22,25 135:1,5,6 137:3 146:13 170:9 171:7 172:15 175:8,20 176:5,10 327:6,10 328:2 329:7,22 330:8 334:23,25 335:9,19 336:11,23 337:11 338:25 339:2,3,10 360:8,11 364:25 368:21 369:6,13,25 370:9 371:5,8
**block** 201:4
**blockbuster** 230:2,9,15
**blood** 86:19 87:1 307:16,24
**blow** 178:2
**blue** 133:23 135:17 149:19 186:4
**body** 19:4,12 20:21,23 21:20,22 22:1,5 79:8,9 80:5 114:19,21 168:6,7 214:15 260:7 261:6 262:1 385:3,11,19 386:5,10,21
**boiled** 340:22
**bold** 42:1
**book** 39:15 40:24 41:3,8
**Borriello** 7:16
**borrowed** 197:21
**BOSICK** 4:9
**Boston** 4:18
**bottom** 54:14 56:14 59:11,17 83:3 89:11 99:10 103:16 130:2 134:7 145:22 152:12 216:6 304:25 309:7 311:10 333:25
**bound** 350:13
**BOWMAN** 4:2
**Box** 13:7 14:8,12,14 41:18 104:12,23 116:4 122:4,6 146:12 177:7,10,14,18,25 178:7,12,18 303:22 304:5 342:22
**boxes** 139:23 178:8
**Bradford** 257:1,8 258:13,23 259:5 260:8 261:7,25 263:15,17 274:22,24 275:22 276:5,18 324:17 325:14,18 326:2,12,16,22,24 352:7 360:15 375:25
**brain** 196:14,24 198:6,16 199:1

**break**
12:24 13:1 94:23 95:1, 21 143:1 150:23 190:18 198:3,12,23 247:4,6 249:3 298:23,25 300:18 301:13 302:17 317:3 380:21
**breakdown**
298:20
**breaking**
81:21 300:13
**breast**
22:18 23:4, 15 24:3,11, 15,21 34:8, 17 37:22 39:17 40:10, 11 85:24,25 156:25 200:14
**brief**
12:7 95:25 151:5 249:9 250:20 302:21 341:19 380:12 381:10
**briefly**
10:10,12 11:10 202:11 368:14
**bring**
14:2 41:6 64:1 78:5 104:1 120:24 128:9 143:11 151:10 152:8 168:3 193:10 235:11 328:15
**broad**
28:9 40:4 48:23,25 256:21
**broader**
106:6,7
**broadly**
26:14 27:3 207:20
**broccoli**
86:2
**BROOKE**
4:2
**brought**
119:4,19 193:12 383:24
**brown**
134:1
**build**
366:10
**bullet**
109:13
**Burkitt's**
40:19
**button**
6:24
**buzzing**
77:4

**C**

**C2**
175:8
**CAGA**
45:17
**calculate**
220:17
**call**
22:9 42:12, 15 43:6 48:23,25 49:4,6,12 56:13 99:2 115:12 118:12 121:10 231:24,25 282:11 325:5,7
**called**
8:13 15:18 18:12 62:9 69:16 71:18 106:17 248:20 284:10
**calling**
176:23
**callout**
55:22 59:8 115:11
**Calls**
27:9 28:20 30:14
**cancer**
8:25 22:15, 16,18 23:5, 8,15,21 24:1,3,6,7, 8,11,12,16, 18,21,22,25 25:13,18,22 26:3,7,8,11, 14,16,18,23 27:1,4,22 28:10 30:12, 18 34:9,15, 17,19,22,24 35:7,12 37:4,13,20, 22 38:3,23 39:1,8,13, 14,17,21 40:4,10,11, 15,16,17,22, 25 41:2,15 42:7 44:11 45:19 52:8 54:19 56:8, 12,21,24 60:8,12,15, 22 61:2,5,20 62:2,3,7,22 63:13,16,18, 21,24 64:8, 18,21 66:2, 13 67:5,20 68:5 69:16, 18 70:19,20 72:14 73:8 75:3,4,21 78:11 80:1, 6,17 81:11 89:1,4,16 113:14 114:1 126:17 127:3,20 129:1 134:23,25 135:5,6 137:4 146:6, 13 151:22 152:19 153:8,13,22 154:2,4,11, 13 155:1,8, 16 156:5,14, 20,23,25 157:11 159:3,16 160:2 162:4, 14 163:7 164:3 165:15 167:23 170:9 171:7 172:14,16 173:12 175:20 176:5 179:12 182:12 183:13,16 184:22 188:7 190:5,7,9,10 200:14 201:11 204:11,23 205:2,4,19 206:5,10,23, 24 207:14,21 208:10,13,24 209:19 210:19,25 215:21

216:19 217:19 218:12,17 219:1,4 222:12,14 223:1 226:15,18,21 227:5 231:8 233:9 235:1, 2 238:10,16 239:18 245:6 248:17,24 255:12 257:2 258:8,24 260:9 262:2 263:7,22 264:6 265:22 266:9 268:6 271:2,25 272:4,8 273:5,13,17 274:9 275:4, 14,25 277:4, 16 278:8 279:10,22 283:16,23 285:12 286:24 287:22 288:4,17,25 289:3,6,12, 22 290:5 296:17 308:4 311:15 312:7 313:20 315:2,11 316:12 319:7 320:5,8,19, 21 321:1,15 322:6,13 327:6,10 328:2 329:7, 23 330:8 331:6,10,18 332:16,19,23 333:14 334:4,8,23 335:9,19 336:2,12,15, 19,23 337:11 338:18,20,25 339:2,3,10 343:13 349:1 351:2,20 357:13 360:8,11 363:11,13, 20,25 364:17,24,25 365:1,2,5, 10,20 366:14,15 367:12 369:21 370:1,9,15 371:5,8 372:24 375:15 376:23,24,25 378:5,13 380:3 381:21 382:13,18,23 383:5,7

**cancers**
24:9 25:11 27:5 28:18 37:24 38:17, 20 40:1,3,21 53:11 67:6, 10 77:18 87:23 126:2, 7,9,22 127:10 135:1,2 141:20 142:7,15,16 154:21 158:12 159:9,11 161:19 168:8 172:13,23 176:8,10 182:14 190:5 205:22 209:3 222:12 238:3,21 239:25 242:17 243:15 245:14 257:14,19 258:14 259:8,11,14 261:9 263:8, 20 264:3,13, 17 270:4 272:12 278:15,24 279:5 281:7 286:18 299:8 307:2 309:5 312:6 316:1 321:4,5 322:3 323:1 346:19 348:9 351:14 352:6 362:7,9,18, 22,24 363:1, 6,14,17 364:8,13,22 365:10,12,17 367:23 368:21 369:5,13 370:14 371:21 372:12 375:3,6 376:14,15 377:8 378:20 383:2 384:8

**Candida**
7:16 241:2 250:6 260:11,22 295:2

**CAPA**
284:10

**capable**
278:7 381:20 382:13 383:7

**capture**
83:20 84:7 85:19 90:23 190:8 283:17 349:1 376:21

**captured**
83:12 242:12 297:15 348:24

**capturing**
83:14 226:25 227:10

**carcinogen**
68:15 76:8 204:9,10 205:16 249:20 250:4 251:3,7 254:23 255:23 256:5 305:19 306:21 309:11,17 310:11 311:1 372:2 383:14

**carcinogenesis**
207:8,15,18, 21 253:23 254:2,12

**carcinogenic**
76:1 251:8, 14 255:18, 21,22 306:8, 22 308:14

**carcinogenicity**
200:3,18 201:8,17,21, 23 307:8 309:10

**carcinogens**
56:20 76:4 251:13 254:1 305:17,23 306:13,18 366:4 367:18 370:23,24 371:1,14

**carcinoma**
175:7,20 176:3 341:3

**cardia**
51:22 52:8
**cardiac**
49:22 51:13
**Cardwell**
133:22 134:4,6 135:14,24 136:1 138:6, 14 149:8,10 169:16,23 170:8,16 174:11,15,24 175:7 247:11,18 327:13,18,23 328:21 329:5,20 330:12 331:1 379:6 380:1
**care**
98:16 111:4
**career**
28:14
**careers**
30:18
**careful**
17:25
**carefully**
127:15 180:21,23 181:4 188:25 239:25 246:13 263:6 274:4,8,11 376:1
**Carolina**
82:6 85:7
**CAROLINE**
4:15
**carotene**
208:20 209:1,5
**case**
9:3 10:13, 14,22 13:20 27:5 28:19, 24 49:13 64:1 77:17 108:6 114:1 149:15 162:11 179:6 184:4 194:21 196:16 219:20 221:15 222:23 228:14 257:13 266:11 269:23 270:3 275:23 289:12 352:25 364:2 372:4 383:25 384:4
**case-control**
61:3,10 73:5 74:3,8,22 76:8,11,22 77:14 81:13 83:7,18 84:2 85:17 86:14, 25 88:11 89:3,20 90:8,22 111:12 125:9,14 126:12 157:3 202:20 204:6 243:13 257:25 258:9,16 263:10 288:6 311:14 312:5 313:17 314:24 315:23,24 319:4 320:2, 16 335:23 336:7,19 338:16 352:2,10 358:13 366:24 368:6
**case-controlled**
77:19 352:23
**case-controls**
257:18 289:23
**cases**
83:18,20,22 118:23 137:23 138:1 146:18 147:1,2 148:3 171:7 363:24 364:16 365:4
**catch**
295:1
**categories**
294:1 322:24 345:1
**category**
37:14 290:16 343:18
**causal**
47:23 81:4 108:6 112:19 114:23 115:7 127:12 154:4,10 155:11 156:24 205:21 256:15 257:8 258:19 259:5,14 263:15,19 264:11 265:6,10 272:21 275:2,16 276:18 305:17 325:2,7,8 326:19 332:5 351:1 352:7
**causality**
89:15 254:11 256:24 257:5,6 263:1 271:8 274:23 332:12 351:19
**causally**
307:1
**causation**
325:16,20
**caused**
132:12 307:15,22
**causing**
89:1,5 260:9 261:8 278:7 381:20 382:13 383:7
**cell**
75:13 193:12 341:3
**census**
179:14
**center**
34:23 175:12
**Centre**
4:9
**certain**
15:8 20:6,8 40:1 100:20 203:19 252:11 264:16 278:15,24 375:3 384:19
**certainly**
386:22
**cetera**
262:24
**chair**
320:1
**challenge**
84:12 85:21 87:6,10 90:7,9 137:24 370:17,19,20

**challenging** 370:16
**CHAMPION** 4:15
**chance** 27:18 110:24 114:6 137:17 150:5 218:4 269:11,14 275:12,20 324:24 325:12,23 327:1 333:5 366:22
**change** 43:23 66:24 79:21 80:12, 13,23 102:4 129:18 204:21 220:18 273:23 323:12
**changed** 33:17 43:22 64:4 81:7 175:18
**changes** 67:3 184:3 287:5
**changing** 200:13 282:3,6 287:9
**chapter** 40:24 41:3,8 69:15
**chapters** 39:16
**characteristics** 366:3,7,8,13 367:12,17
**characterization** 153:18 160:4 221:24 386:20
**characterize** 34:14,15 39:2,19 344:13
**characterizing** 39:1,23
**charge** 96:12
**chart** 92:20
**check** 16:15 20:17, 24 56:5 96:18 178:6 377:23
**checked** 20:20 22:4
**chemical** 202:6
**Chemically** 202:2
**chemicals** 371:4,7
**chemotherapy** 175:14 282:12
**children** 364:17 365:5
**chloride** 89:6
**chose** 29:25
**Chow** 45:14,15 46:3 236:3 373:25 374:4,6,8
**chronic** 26:9 44:13 91:22
**chronology** 107:14
**chunks** 179:6
**cigarette** 56:8,20,23 79:6,25 80:1,9 81:1 287:16,23
**circadian** 311:7
**circles** 135:21
**circumstances** 33:2 55:6 90:22
**cirrhosis** 167:8 186:21 187:19
**citation** 216:12,15
**citations** 5:23 17:20, 21 18:12 21:22 58:2, 5,7 68:7 384:16,19 385:19 386:7,10,20
**cite** 118:11 325:25 326:10,16
**cited** 16:5,13 19:11 59:5 67:18 277:24 386:5
**cites** 60:8
**citing** 123:22 315:5,6
**citrus** 60:16
**City** 201:1
**claims** 181:15,19 355:14
**clarification** 119:25 198:19 247:15
**clarify** 98:6 192:17 261:12 265:11 325:1
**class** 40:11,12,13 251:15,25 252:3 255:23 371:14 375:3,5
**classes** 31:8 203:24 349:16
**classification** 249:22 251:2,11,18, 20,22 266:2
**classified** 249:19 255:20,21,22 305:18 306:4,20,25 308:6 311:3
**clastogenic** 254:24 255:5 305:5,10,16, 23
**clear** 46:4,6 146:5 155:23 211:10,19 221:9 234:3 242:18 257:15,23 320:6,20 323:7 344:1 363:10 378:1 384:25
**clearly** 212:3,17
**click** 6:23
**clinical** 76:15 89:15 102:5 157:4 175:9 204:7

227:3,6 233:9 235:1 266:12,14, 16,21
**clinically** 47:10 102:3 112:12,24
**close** 90:14 135:7
**closely** 26:7 354:21 379:21
**closer** 135:8 215:14
**co-author** 199:9,13
**co-authors** 51:5
**coaching** 337:8,16
**cohort** 32:13 61:12, 15 62:18 67:8,9 74:23 75:4 76:9, 12,17,23 77:8,14,21 81:8,10 84:13 87:7, 9,11,18,21 91:20 92:1 111:13 119:3 125:7,14 126:12 147:6,18 151:20 153:6 156:18 157:3 158:21 182:1 183:20 188:11,17 202:20 203:25 204:6 242:7 243:12 257:16,17,24 258:10,16 263:9 270:1 288:6 289:23 291:24 294:15 315:24 317:8 336:1,3,9,20 338:17,21 351:10 352:4,11 353:1 358:12 366:23 368:4 369:16 377:7
**cohorts** 83:14,21 84:11,14 91:7 154:5 155:1,17 157:1 158:10 184:4 203:3, 4,17 239:18
**coin** 90:14
**collaborative** 199:4
**colleagues** 37:2 45:15 46:4 198:7 205:11 271:14 274:16,17
**collected** 178:25 183:5 291:22
**collecting** 87:1 281:14
**collection** 157:8,10 178:24 325:10
**collectively** 156:21 157:2 375:22 377:6 378:16,17
**colloquy** 18:8 189:24
**colorectal** 22:17 24:7, 12,25 34:19, 22,24 37:13 38:3 182:12 190:7 288:4, 17,25 289:3, 12,21 290:4
**Columbia** 96:16 102:24
**column** 41:25 45:6 59:9 70:2 164:13 185:22 345:22
**combination** 72:1
**combined** 301:10
**combines** 72:10
**come** 13:8 29:24 87:15 98:18 218:9 231:21 280:21,22 303:22 318:1 369:18
**comes** 86:16 115:12 154:6 168:19 209:9,15 221:10 263:2 328:9
**comfortable** 97:18
**comma** 169:12
**comment** 210:17,18 218:8
**commented** 203:2,7
**comments** 18:13,15,16, 20
**commitment** 191:10
**committee** 64:8
**common** 37:23,24 43:18 326:5 374:15
**commonly** 322:7 345:10 357:13
**communicating** 303:2
**communications** 303:7
**community** 217:9,23 218:5
**company** 193:13
**comparability** 262:21
**comparable** 167:12 296:15
**comparator** 134:3,5 137:4 161:8, 21 162:10 165:12,23 169:8,15 170:24 171:24 172:12,21 173:19 175:2 184:16 185:2 188:3 223:9, 24 379:8,9
**comparators** 379:7
**compare** 134:8
**compared** 135:5 137:4 149:21 209:3 211:2 258:16 262:22 279:24 293:3 302:10 318:22 329:2 334:10

**comparing**
170:18,20
280:20
327:14
328:25
**comparison**
149:20
170:17 223:6
262:23 293:5
330:4,7
379:17,22,
23,24
**comparisons**
130:17
134:13
167:11
379:10
**complete**
21:18,21
35:5 36:12
37:7 83:12,
20 84:7
85:19 90:23
91:15 92:2
162:14
164:10
259:18
**completely**
83:7 210:1
**completeness**
21:14
**complex**
73:9
**compliance**
160:24
162:25
**component**
283:22
**components**
74:3
**compound**
45:2 57:4
306:20
**compounds**
44:20,22
56:7,19 57:1
72:2 306:3
**comprehensive**
93:2 140:6
178:24
205:13,18
346:5 385:1
386:3,16
**computer**
193:16
197:20
**concentrate**
149:7
**concentrated**
26:15
**concept**
72:19 93:19
110:7,9,10
118:20
**concepts**
118:18 124:7
**concern**
176:6,16
221:5 222:19
285:8 336:6
371:9
**concerned**
9:21 50:14
**concerns**
116:23
**conclude**
106:4 114:13
212:15
**concluded**
327:24
329:21
350:24
**conclusion**
28:21 30:15
62:5,7,16
111:22 115:7
218:10
220:22
309:10
329:5,23
339:8 379:14
**conclusions**
66:25 222:7
235:22
236:17
266:10
267:10
326:20
369:24 370:8
372:7
**concurrent**
181:25
182:16
236:21
237:10
295:10
354:12
**condense**
130:11
**condescend**
187:15
**condescending**
168:17 187:9
**conditions**
214:18
225:11 226:9
227:17
228:25
252:12,16,25
253:3,8
274:9 349:4,
15
**conduct**
196:5 261:25
276:9
**conducted**
22:14
194:17,19,
23,25 195:2,
4,8,20,23,25
196:4,10,13,
18,23 198:24
208:25
211:22
221:19 256:1
266:6,17,22
267:9 276:23
279:20
286:16
294:17 313:7
335:24 336:1
**conducting**
217:25 286:7
**conference**
314:11,13
**confidence**
46:8,12,15,
20 48:17,20,
22,24 49:1,
3,5,24,25
50:2 51:12,
15 52:7,9
54:5,21,23
55:4 57:23
58:4 99:6
111:3 120:19
129:9 137:21
144:8,9
334:17
**confident**
50:24 90:3
290:3 366:18
**confirmation**
97:6
**conflict**
220:13 221:6
222:5,19
**confounder**
171:21
**confounders**
161:22 163:7
164:2 167:23
173:12
224:14
320:4,17
**confounding**
27:18 50:9
53:7 90:5
110:21 111:5
157:6 169:7,
14 218:3
244:8 262:12
268:23 274:7
376:5
**connection**
191:22
192:22
233:21
249:16 260:3

277:9 386:24
**consecutive** 348:12,16 362:4
**consecutively** 361:25
**consent** 8:7
**consider** 47:12 108:24 207:7,9,13 268:4 270:25 271:23 272:6 273:3,16 274:3 276:25 326:2
**consideration** 219:7 384:24 386:22
**considered** 5:22 15:18, 25 16:2,11 17:4,17,23 19:14,24 21:15 28:5 87:25 102:19 103:17,22 123:13 173:12 225:15 273:6 276:4,7 277:3,18,19, 23 308:13 310:25 315:23 351:7 352:8 371:19 377:5 384:13,14,21 385:5,12,14, 25 386:2,12, 16
**considering** 150:5 341:11
**consistency** 77:19 90:16 111:14,17 157:9 258:15 336:16
366:23 375:23
**consistent** 57:15 67:9 77:13 114:19 150:17 158:13 168:9 208:22 237:25 242:18 243:14 244:10 245:18 255:16 256:14 259:16 263:8,25 264:10 265:18 266:8 269:19 270:2 272:13 276:14,22 296:9 308:3 309:3 322:5, 12 330:21,22 331:11,12 336:10 338:25 339:3 352:5,11 353:2 357:14,19,20 358:12 359:10 360:1 365:15 367:4,14,22, 24 368:2 376:2,11,12 382:21,25 384:13
**consistently** 289:11
**consists** 14:24
**constant** 200:24 201:2
**constitutes** 204:4
**construct** 91:13,14,20 212:4,17
**constructs** 61:7 86:19
**consult** 223:4
**consultant** 10:21
**consultants** 219:19 221:19,25
**consulting** 10:8
**consumed** 312:23 313:1
**consumption** 48:13 51:10 52:6
**contained** 5:23 212:21 215:12 248:15 253:14 277:17,18 278:2,6,13, 21 302:10 381:19 382:12 384:16,20 386:11
**contains** 56:7,19,25 301:24
**contaminated** 248:24
**contamination** 248:21
**content** 160:23 162:24 196:7 310:8
**context** 46:23 85:15 86:13 87:4 88:19 89:19, 21 92:10,14, 17,18 93:14 101:14,25 114:18 170:7,14 225:24 239:10 256:9 273:10 282:9 283:20 285:10,21 287:1,17 288:22 289:8 310:2 315:17 316:18,20 318:3,5 324:4 339:15,18 341:13 375:20
**continue** 234:4 319:24
**continuing** 119:20
**contraceptive** 87:20,22
**contrast** 130:16
**contribute** 363:14
**contributed** 324:24 326:21
**contributing** 27:18 125:5 207:2 257:10 259:7 268:25 325:11 327:2
**control** 267:8 320:17
**controlled** 211:21 213:13 320:3 352:25
**controlling** 177:12
**controversial** 337:25

**convened**
100:3 219:3
**conversation**
386:23
**conversations**
6:5,8
**conversion**
71:25 139:2
**convinced**
371:16
**cooking**
86:7
**copy**
13:24 197:1, 6,9,10 235:14,16 373:15
**corner**
6:25
**correct**
15:4,5,16, 19,22 20:23 22:1 24:14 25:20 26:21 40:6 41:16 43:11,17,24, 25 46:21 54:24,25 55:9 58:12 69:19 73:11 79:4 80:3 95:16 121:13 123:9,10 128:23 129:3,5 130:7 136:9 139:17 149:14 164:10 173:4 177:21 195:14,15, 18,19 216:9 217:20 218:17 219:20 232:24 249:20 256:11 264:18 283:24 285:15 290:17 291:8 293:10 294:9 295:20 297:4 298:11 299:25 301:16 312:11,14 315:7,8 330:10,14 341:8 344:17 346:13 347:2 350:2,15 353:4 361:18 386:10
**corrected**
345:14
**correctly**
152:20,22
**correlated**
81:3
**correlation**
128:2 174:14 265:8,14 322:23 325:5 332:6 348:8
**could've**
36:3 40:18 113:2 132:12 169:10 170:23 176:10 267:21 295:12,16 326:20 354:15
**counsel**
7:3 8:6 166:22 192:15 317:14 380:25
**count**
32:20,22 142:25 196:19 281:3 295:3 360:23 373:23 377:20
**counted**
25:12,21 34:8 38:10 39:16 182:15,17 295:11 299:8
**counting**
32:1 137:9 182:14 279:16 297:20
**countries**
296:6,7 336:5,9 377:12
**counts**
180:8
**couple**
11:5 201:13 300:19 342:6 381:14
**course**
11:11 12:10, 19 13:5 21:4,9 23:23 25:8 33:21 65:1 168:23 193:17 194:6 195:17 303:4 337:2
**courses**
36:8,22
**court**
7:20 10:5,6 11:3,14,15, 21,24 12:1,8 21:7 61:17 68:2 76:25 77:8 119:25 144:20 145:1,5,7,12 157:19 166:15 198:19 233:18,23 234:16 239:2 247:15 250:7 260:12,16,23
**courtesy**
65:17,19
**covariates**
31:7
**covered**
192:12,15
**created**
181:9,10,12
**creates**
72:11
**creating**
6:12
**criteria**
205:15 275:16,17 276:5,11 324:17 325:19 326:2,12 351:1,18 352:8 360:4, 15 366:17
**critical**
169:17 197:7 262:14 283:22 285:14,19
**criticize**
124:11
**criticized**
169:23
**cross-talk**
97:2 145:3 165:24 166:14,16 187:11 374:3
**crude**
148:25 220:17,20
**cured**
212:10 214:7,19 215:5

**current**
24:10
**curriculum**
15:15 22:24 23:3 28:17 35:3,9,13,19 36:6,12,18 38:2
**cut**
165:25 166:1,5,6 241:4 317:22 343:16,17 360:24 368:22 373:24
**cutoff**
349:22
**cutoffs**
230:19 350:4
**cutting**
166:23 240:14,17 316:24
**CV**
23:14 196:20 197:9
**cycle**
75:13

**D**

**daily**
138:10,11, 15,19 139:15 149:12,13 150:11 215:5 288:12 291:4 327:17 329:1
**Danish**
222:12 344:12 356:18 359:13
**darker**
133:24
**data**
27:16,22 29:19,24 51:6,7 62:15 64:4 67:15 68:20,22 69:22 74:23 77:17 81:6, 8,14 94:12 124:19,24 125:2 126:10 131:4 157:4 162:14 168:24 169:10 175:4 178:25 179:5,8,12 180:1,3,9,20 181:6,8,17, 19 183:5 203:4,5,25 205:3,4,10 207:3 209:25 220:16,21,23 221:7,8,10 222:5,8,9, 11,16,17,21, 23 239:13 242:21 243:16,17, 18,24,25 251:5,16,23 252:11,22 253:10 254:3,10,11 255:2,4,8, 10,24 256:13,14,21 257:5 262:11 266:12,16,21 268:12 270:5,20,21, 24 272:22 274:6 284:14 290:14 292:18 295:18 297:9 308:5 315:16 316:24 324:5,12 328:10,12 331:12 337:20 341:11 351:18,24 352:22,23,25 353:7,11 354:21 355:13,14 359:24 363:22 364:12 374:15 376:22,23,24 377:1 378:18 379:21 385:10
**database**
93:2,3,11 177:20,21 178:5,23 181:9,15,21 188:21,22 189:4,8,12, 21 190:2,8, 13 222:17 287:19 295:5,6 345:5 346:5 347:11 348:25 353:21,23 354:1,6,19, 24 355:1,4, 9,10,19 356:5
**databases**
92:22 162:13 179:4 190:11
**dataset**
355:13
**date**
35:11,20,21, 23 66:15,19 68:5 140:22, 23 141:8,13, 14,21,23 142:2,8 143:23 146:17,22,23 251:17 294:2
**dated**
13:21 35:20 66:23 67:21 303:18 304:14
**dates**
68:8
**day**
48:13 51:11 131:21 138:13,21 139:3,5 229:17,22 287:16 303:4 342:2 372:20 377:11 380:20 381:10
**days**
32:19 201:1 286:23 287:21,22 288:20,24 289:5 292:2 293:15 294:20 359:17 361:22
**DDD**
138:7 139:8, 11
**De**
313:7 320:25 321:9,14 340:10,18 341:3
**de-identify**
355:14
**deal**
23:14 39:16 169:6 185:2
**dealing**
292:5

**dealt**
25:13 39:7
**death**
75:13 370:18
**debate**
88:9 101:7 102:21,25 107:23 108:10 116:15 117:11 119:6,20 123:17,25
**decades**
109:22 110:14 115:20 136:14 209:13 245:16 257:16 265:18 275:4
**December**
303:19
**decent**
317:16
**Dechert**
193:22
**decide**
132:10 379:11
**deciding**
219:12
**decisions**
29:3 66:4
**declarations**
106:2
**declare**
8:4
**decrease**
59:22 61:22 68:11 332:25
**decreased**
134:18 331:23,25 332:23 333:20,25 334:18 380:6
**decreases**
59:25 132:9
**deep**
30:25
**Defendant**
4:1,7
**defendants**
11:8 219:20
**defense**
177:3
**defer**
278:10 381:25
**defined**
42:20 138:10,11, 15,19 139:15 149:12,13 150:11 242:9,10 291:4 327:17 329:1
**definitely**
10:19 35:23 94:16 171:18 198:12,22 232:12 251:8 338:12
**definition**
53:20 54:3 55:8 138:9
**degrades**
72:9
**degree**
284:18 318:18
**deliberate**
133:18
**delivered**
180:10
**delta**
385:6
**demonstrate**
319:4
**demonstrated**
279:9 319:5 378:4
**demonstrates**
242:19
**demonstrating**
255:5
**denominator**
129:20,23
**departures**
136:21
**depend**
32:18 33:14 91:2 93:1 130:8 226:7, 8 227:16 228:6 281:24 318:24
**dependent**
85:22 86:13 87:5 92:17 282:9,14 283:20 285:21 324:10
**depending**
90:21 170:16 175:12 226:1 227:19 229:15 252:15 253:2,7 269:4 281:17
**depends**
91:12,19 227:14,25 228:10 252:24 311:2 318:17 370:10
**deposed**
9:4,5 11:6
**deposition**
6:18 7:2,21, 23,25 10:11 11:12 12:11 13:6,17 52:14 97:6 121:4,5 142:21 191:9,12 192:11 193:17 194:6,7 195:17 303:4 304:12 317:15 337:24 338:9 342:18 386:25
**depositions**
133:7 318:1
**derived**
313:1
**DES**
10:14 89:7
**describe**
118:3 164:12 257:21 259:2 345:11,12
**described**
25:22 153:23 189:20 196:2 385:3,10
**describes**
385:2
**describing**
232:20 255:2
**description**
347:25
**descriptor**
231:25 232:2,4,5,6
**design**
27:25 40:8, 13 83:10,11, 16,17,22 85:10 125:3, 4 161:23 162:8,11 167:9,13,16, 18 169:7,8, 13,15 170:24 171:23 172:20 173:20 185:3 188:3 223:23 228:22 258:6

295:9 338:21 348:6 355:1
**Designated** 149:19
**designed** 61:10 83:21 213:18,22 214:13 354:12
**designs** 24:5,18 26:25 27:16 37:18 111:10,15 171:25 172:21,22 227:8 263:13 276:15 336:17
**detail** 33:1 98:17 316:2 338:10 342:12 371:3
**detailed** 173:13 236:6 262:11
**details** 301:2
**detected** 176:11
**determine** 36:20 89:15 325:14 355:1
**determined** 142:15,16 256:3
**develop** 29:2
**developed** 8:25 115:19 364:17 365:5
**developing** 245:6
**development** 207:22
**diabetes** 163:9

164:20,21 165:13
**diagnoses** 376:24 377:1
**diagnosis** 87:2
**diet** 61:7,9,13 62:25 68:14 75:4 78:1 90:8,12,13 196:7 202:8 208:12 209:14 210:4 213:7 214:8, 19 215:6 254:4 256:17 257:7 263:3, 15,24 264:9 268:1 276:19 279:19 284:21,24 285:3,9 312:23 313:9 336:7,11,19 338:18,19 341:12 363:1 364:13 365:11
**dietary** 53:10 62:4, 17 64:2 69:13 73:7, 18 74:2,11, 18,24,25 77:17 78:2 90:16 119:2 126:10 194:19,22 196:4,16 199:6 202:10,12, 16,21 210:22 211:3,12,21 212:2,16 246:23 255:14 257:13,24

258:7,20 259:8 263:2 264:1,12 265:16 267:5 269:23 276:5 280:9,13 281:3,7 284:7 317:2 335:12 339:1 352:1 363:18 368:1 376:14 377:8 378:13,19 382:18,19
**differ** 281:17,19 282:2,4,6,13 374:14,17
**difference** 29:22 52:5 130:2 134:16 136:15 186:14 187:18,20,23 188:19 214:24 251:6 281:8 323:17,24
**differences** 80:21 175:2 184:21,25 185:4 213:14 257:23
**different** 22:15,16 24:1,6,9,22 25:10 26:23 27:1 30:19 37:22 43:9 50:12 60:14 69:3 74:2 76:12,16 77:18,24 93:20 98:3 102:8 105:6 106:10 111:15 117:22

124:19 125:10 126:13 129:21 130:12,17,19 131:3 133:18,20 134:2,12 137:11,14 147:19 150:4 155:20 158:11 170:16,19,21 176:5 183:12 186:5 194:20,24 195:6 196:1, 17 203:3,6, 7,23 206:7, 10 208:13,18 209:2,4,9, 15,16,21 210:1,2,6, 12,17,23 212:3,17 213:6,24 222:12 223:7,8,25 224:17,23 226:1 227:5 228:25 243:12 251:12 257:14,19 258:6,9 259:11,14 260:14 263:11 265:22 266:3 271:15 275:12 276:15 278:2 280:20 281:1 282:20 286:18 287:6 291:25 296:3,6,7,14 297:22 309:2 318:19

322:16 325:22,23 327:12 330:22 333:4,20 336:14,17 340:3 343:13 349:4,14,24 355:11 357:15 363:13 364:23 368:5 371:7,23 372:1 377:11 379:7

**differently** 39:3 85:10 111:12 265:12

**digestive** 311:17 312:7

**direct** 26:8 103:2 375:7

**direction** 269:5

**directly** 71:13 159:19

**director** 105:1,11

**disadvantages** 101:8 124:7

**disagree** 28:25 29:3, 18 99:11 103:7 106:15 111:19 112:1,8,14 113:9,21 114:10,16,25 117:13 118:6,24 155:4 167:25 168:10 173:22 249:24 251:1,20,21 305:8,12 307:20 308:19 309:16 317:25 319:2,8 322:10 323:22 328:17 329:4,20,23 330:1 352:14 353:3,10 369:23 370:7 372:10,14 379:13 385:17 386:19

**disagreed** 158:3 319:13 372:6

**disagreeing** 156:5,10

**disciplined** 26:22

**disciplines** 271:15

**disclose** 66:8

**disclosures** 219:16 220:10

**discuss** 215:20 216:8 340:9 343:20 365:20

**discussed** 16:14 108:13 117:7,8 118:22 123:20 158:15 202:10 353:16

**discusses** 217:5 347:24 374:12

**discussing** 113:12 353:18

**discussion** 57:23 69:12 119:18 124:14 160:25 163:2 168:2 175:5 268:3 326:17,18 343:21 345:16

**disease** 26:9 79:11 85:13,14 88:1 91:13 127:25 167:24 173:1 224:21 366:20 367:8

**diseases** 163:8 164:4, 17,22

**dispute** 30:13 270:17

**disputing** 265:21

**disrespectful** 187:10

**dissemble** 166:3

**dissertation** 24:7 43:4

**distance** 130:1

**distant** 143:2

**distinct** 130:15

**distinguish** 142:11

**distorted** 234:5 250:13

**distortion** 249:25 250:3

**distracted** 12:14

**distribution** 155:2 184:12 237:1 238:18 281:15 298:14,16 345:18 346:4,14 347:7

**diverse** 73:8

**divulging** 97:18

**DNA** 38:17 204:21 323:9,10,11, 12,18,25 367:5

**doctor** 14:15 31:17, 18,21 77:5 110:6 133:9 136:6 141:8 154:8 160:20 165:8 175:9, 16 187:3 189:14 206:12 213:18 214:12 215:7,9,16 216:16 218:13 219:5 223:11,16 224:2,15,23 225:2,17,25 228:8 229:14 233:5 235:10 236:13 237:3,17 238:24 239:4 240:4 241:20 242:24 244:12 245:23 246:3 254:15 258:22 263:21 264:5,14 265:21 266:10 267:7

270:11
271:23 273:1
274:20
275:21
276:23
277:25 279:6
281:8 282:16
283:14
285:11
286:19
287:18
288:23 290:6
291:11 298:9
299:4
303:10,16
304:2 306:19
323:9 324:15
325:13 327:4
329:4 330:6
331:3 332:13
333:11
334:1,21
336:21 340:5
346:23
347:23
348:10,17
349:7,17
350:23
356:13
360:17
361:15 362:5
364:15 365:3
366:1 368:7,
14 369:2,10
372:15
**doctoral**
24:6 43:1
326:7,8
**docu-**
216:22
**document**
4:21 13:11,
12 14:21
15:3,17
43:13 71:9,
13 116:3
119:12,16
121:7 122:1
128:12
135:19
143:7,9,12
161:2 166:25
180:12 182:9
196:25
216:13,17
304:2,17,24
307:6 315:14
335:21
351:22
**documents**
13:6 16:5,6
122:16
144:23
145:18
266:25
267:21 386:4
**doing**
27:22 42:9,
10 49:11
110:13
124:21
138:23 154:2
155:14
167:19
174:20,21
187:22 189:8
221:3 274:3
310:6 328:12
365:23
**dollar**
34:23
**dollars**
230:22
**don'ts**
115:16,20,23
**dose**
93:5 130:20
131:2,15
133:19
138:10,12,
15,19 139:15
150:11,17
183:1 215:5
225:14,19
226:4
227:13,16,19
291:4 318:21
327:17,21
329:1 342:8
343:8 344:3,
6,7 356:15
**doses**
149:12,13
212:22
215:10
357:16,24,25
**dosing**
225:21
**dot**
129:7 140:21
**dots**
131:22,23
132:16
133:10,15
136:11
137:6,12
**double-check**
133:13
241:24
**double-checking**
178:10
**download**
355:11
**drafting**
20:1
**drafts**
19:21
**draw**
54:13
135:12,25
174:2 222:7
**drawbacks**
168:3
**drawing**
115:7
**drinks**
62:10
**Drive**
4:17
**driven**
77:23 90:3
117:18
269:25
**driving**
367:1
**Drop**
109:9
**drug**
182:21
230:2,9,15
242:11
293:22 294:1
**drugs**
215:22
216:20
**drying**
70:8
**duly**
8:14
**duodenal**
228:18
**duration**
150:10
181:22
182:7,20
183:11
184:14 291:5
297:2 354:8,
16,18 355:3,
18 356:4

**E**

**e-mail**
4:5,11
356:12
**earlier**
25:9 66:11
83:22 154:7
256:20 262:6
327:8 342:16
353:16
384:17
**early**
25:19 276:8
**earn**
98:14
**easier**
42:23 84:4

217:14
**easily**
90:9 368:3
**Eastern**
387:9
**easy**
53:12 125:20
**eat**
68:24
**ecological**
70:4
**econometrics**
31:14
**editor**
26:24 219:11 221:12
**editorial**
107:2,9
**effect**
44:13 49:18, 19 50:13 111:23 112:6,17,18, 19 113:4,7, 19,20 114:7 209:18 214:20 233:9 235:1 269:4
**effects**
75:15 77:22 206:7 207:16 253:11
**efficient**
83:2,9 84:10,18
**eight**
38:22 59:10
**either**
25:23 29:13 46:7,19 62:4 91:15 129:10 136:21 158:2 191:23 221:11 256:16 273:6 377:18 378:5,19
**elaborate**
84:23
**electronic**
87:8 178:24 280:22 284:13 286:8 297:18 348:25 373:15 376:23 377:2
**eligibility**
360:4
**eligible**
158:20
**emphasis**
108:1 173:23
**emphasize**
158:9 243:4
**EMR**
178:24
**enabling**
346:1
**end**
17:8 109:12 233:15 239:3 259:9 263:16 317:15 342:1,23 368:23
**ended**
133:5
**endogenous**
214:24
**endogenously**
214:14
**ends**
144:9 180:13,17
**engaged**
194:14,15
**enter**
7:17 271:7
**entire**
147:5 155:2 276:25 307:4
**entirely**
53:11 67:1
106:9
**entitled**
97:21 98:23 104:7
**entity**
363:12
**environment**
92:11
**environmental**
23:23,24 79:20 371:7
**epi**
86:21 357:13
**epi-**
23:23
**epidemiologic**
42:5,8 57:10,12,14 78:10,16
**epidemiological**
27:15 69:22 110:13 126:20 127:24 195:21 199:9,13 202:13,18 204:3,5 205:19 211:3 235:21 236:16 238:4,25 239:5 240:5, 12 241:9 247:22 248:3,16 253:10 254:3 257:5 264:17 267:3,12 276:24 277:4,16 279:4 280:9 281:10,21 283:12,24 285:13 286:22 290:7 302:5 304:21
310:16 311:13 312:4 315:15 321:3 350:25 351:17 362:6,17 363:5,22 364:5,7 375:1,13
**epidemiologist**
26:14 175:10 176:7,16 205:2 273:20 366:16
**epidemiologists**
26:8,9 31:9, 10 274:15
**epidemiology**
22:15 23:9, 22,23,24 24:19 25:8 27:22 28:10, 14 29:23 30:12,18 31:11,12 34:16 35:7, 12 37:4,20 40:4,15,17 41:15 49:11 52:24 58:24 60:21 61:5 67:5 69:16 72:15 75:3 91:25 92:8 101:17,19 107:24 108:13 117:20 120:11 125:1 153:21 154:2 157:11 162:4 168:8 172:23 173:16 183:14 202:24 203:1,13,16

205:4 206:5 207:1,14 208:10 211:8 219:6 226:15 228:22 229:12 231:8 233:6 234:23 263:7 265:7, 25 268:9 269:17 280:17 285:18,23 325:4 326:6 382:9
**equal**
45:16 51:13 52:9 139:25 140:1 145:19 349:19 350:9 361:17
**equalled**
51:15
**equals**
52:6,7
**equivalent**
278:14,22
**erosive**
165:19 166:19 167:3
**error**
28:1 53:14 86:23 93:24 171:1 284:3, 5,11,14,16, 19,22 285:7 289:17,19 318:25
**ESCC**
340:20
**esophageal**
22:17 24:8 25:13,17 39:8,13 55:13 165:15 172:15 182:11 333:13 341:2
**esophagus**
164:25 165:4,18 190:6
**ESQ**
4:4,11,16
**essentially**
39:25 312:3
**established**
163:1 290:8
**establishing**
262:9
**estimate**
48:2 49:7,13 101:20 108:7,8,9,14 109:4 117:16,17 120:12,13,21 124:4 125:23 144:3 145:21,23 147:12 148:18,23 149:22,25 150:9 170:18,20 174:1,18 268:14,15,25 269:7 273:25 275:8,10 276:12 328:15 332:3,23 334:9,11,13, 15,19 369:19
**estimated**
171:6 312:21 382:19
**estimates**
47:14 50:21 125:19 129:15 133:17 136:17 154:20 257:11 272:11
328:14 332:8 333:19,21
**estimating**
94:17
**estimation**
49:11
**et**
262:24
**ethically**
227:6
**Europe**
336:5
**European**
336:2,9
**Eva**
97:5,9
**evaluate**
132:11 133:19 217:24 218:9 219:4 251:23 252:21 268:13 284:2 285:14,19 310:2,5,23 339:15
**evaluated**
64:5 217:3, 18 219:5 237:5,18 240:1,6 242:1,25 243:10 273:14 279:6,18 291:7,12 293:17 294:12 296:16 299:5,13 300:23 308:5
**evaluating**
47:13 137:15 220:11 242:22 251:24 282:11 283:16,21,25
296:22 302:5 339:18 364:8 365:11,12 386:13
**evaluation**
67:3 221:2 250:1 262:16,21 263:1 338:13 351:13 366:2
**evaluations**
136:23
**everybody**
34:2 250:16 349:25
**everyone**
61:21 62:1 147:13 350:4
**evidence**
42:6 51:23 60:17 62:4, 8,9 67:2 78:10,16 88:10 89:2 111:9,17 114:19,20,22 125:10,11 126:1,15,25 127:18,24 155:14 168:6,7 218:7 231:5 251:9 263:3 264:11,15 265:1 279:13,21 305:4,9,22 310:17 313:19 315:1,10 316:10 319:6 350:25 351:25 352:10 363:16 382:25 383:8,13

**evolved** 60:20
**EX6423** 178:12
**exact** 63:8 119:12 180:14 196:19 357:16
**exactly** 32:16 47:7 56:4 131:13 159:15 170:4 172:11 179:19 187:12 197:4 198:18 235:6 320:10 328:7 329:19 338:14 355:22 361:21
**examination** 5:4 8:17 191:5 214:6 381:6 383:20
**examine** 227:4 255:11 273:21
**examined** 8:15 60:13 73:6 183:15 246:24 291:4 322:4
**examining** 343:12
**examples** 17:15 19:7 102:22 154:6 210:2 213:7 245:17 289:9 305:20 306:11,17 385:20
**exams** 40:16
**exceptions** 352:3
**exclude** 91:23
**excluded** 293:24
**excuse** 188:14 257:14 270:15
**executed** 83:11
**executive** 105:1,11
**exercises** 125:15
**exhibit** 5:12,13,14, 15,16,17 14:2,4 15:12,17 16:22 35:4,5 36:7,9,19 41:7 66:22 67:11 81:17 82:11,13 98:5 104:3 120:25 121:18 122:22 128:9,17 142:20 143:5,14 149:6 150:21 151:11 152:3,4,25 153:1 160:7, 15 162:20 174:20,22 176:19,20 185:8 211:16 233:4 303:12,13 304:12 342:17,18,19
**exist** 37:15 87:8 111:11 125:17 256:21
284:14 285:6 364:3 368:3
**existed** 37:15 68:20 81:6,14
**exists** 112:6,18
**exogenous** 213:19 215:1
**expect** 188:12,16 286:21 287:21 325:23
**experience** 28:10 35:7 40:4 154:2 328:14
**experienced** 26:14 27:3
**experiment** 214:17
**experimental** 252:11,12,25 253:7 270:16
**experiments** 253:5,21 306:15 309:22
**expert** 9:2 10:8 13:21 14:8 16:7 26:17 27:3,6,14 28:13,16,24 29:24 30:1 42:17 43:6 57:25 60:9, 11,19 63:5 64:6,8,14,23 65:22 67:14 72:22 96:13 123:25 124:15 126:19 134:23 177:2 193:3,5,11 200:2,16
201:7,10,16, 20 205:8 206:17,19 207:7,13 210:18 217:18 218:14,23 231:7 239:19 248:19 257:3 263:5 264:8, 23 265:24 269:25 270:19 274:2 279:2 298:3 300:3 302:4 304:20 329:25 338:13 362:8 364:11 365:9 372:3,15 382:15,16
**expert's** 99:12 103:8 249:25 251:2
**expertise** 27:19 28:9 30:20 37:3 40:2 72:14 205:3 206:3, 4,25 208:9 211:7 221:1 228:21 229:11 251:22 252:21 253:9 254:8 255:7 272:2 278:4, 9 308:1,25
**experts** 64:1 67:16 96:10 97:23 106:16 118:7,22 124:10 318:3
**explain** 85:2 132:19 175:1 262:19 272:23 276:8

336:13 349:13
**explained** 50:7,16 90:10 113:2 128:6 132:4 170:23 265:19 271:20 275:8,11 276:13 325:24 366:20,21 368:3
**Explor-** 355:7
**Explorys** 177:21 178:5,23 181:9 189:21 190:2 295:5 353:21,23 354:1,6,19 355:1,9,18 356:5
**exposed** 137:23,25 202:8 253:3 295:11 318:11 370:23 371:15 372:1
**exposure** 16:24 68:15 80:16,23 83:12 84:15 85:12,13,22 87:2 88:1 90:23 91:3, 4,8,13,22 92:2,3,19 93:11 127:25 149:16 154:22 158:22 183:5,22 184:1,2,15 204:23 206:7,8 209:14 210:24 212:3,16,17 235:20 236:6,15 237:4,11,19, 24 238:5,10, 11 239:1,6, 16,21,24 240:6,10,13 241:7,10,17, 18 242:1,6, 9,13 243:1, 5,7,9 244:13,22 247:13,19 248:1 254:5 255:15 256:15,16 264:10 268:22 280:10,13,20 281:9,10,12, 14,16,18,20, 24,25 282:3, 10,14 283:17,22 284:1,3 285:15,20, 22,25 287:22 289:10 290:9,21 291:6,7,12, 14 292:20,22 293:8,16,18, 19 294:12,24 297:17 299:5,7,10, 13,20,23 300:23 301:7,21 306:16 307:14,22 308:16 309:12,18,24 310:3,12,18 313:19 315:1,10,12, 16 316:11 318:10,18,20 319:6 320:6, 20 323:18,25 324:10 339:1 344:13,19 346:2,6 348:25 357:10 358:3 359:15 366:20 367:7,8 368:15,16,20 369:3,11,14, 19 371:3,12 377:1 378:20
**exposure's** 238:12
**exposures** 69:4,14 78:2 83:15 84:6 85:18 86:5 158:12 203:9 207:16 208:12,14 211:12,20 213:24 252:24 255:14 279:8 282:5 284:7 296:13 369:4 370:24 371:23
**expressed** 106:12
**extensive** 320:4,18
**extent** 19:25 20:13 27:14 29:16 88:18 97:17 109:2 294:6 309:12,18,25 316:17 354:13 385:9
**external** 34:21
**extrapolate** 32:8 213:8
**eyes** 144:4

**F**

**face** 260:24
**fact** 26:15 51:19 70:17 90:12 109:24 118:21 124:23 126:9 162:3 164:15 179:17 232:20 258:5 322:25 345:17 370:21
**factor** 171:6 186:5
**factors** 38:16 42:7 60:14 78:11, 21,24 79:3 80:10 94:18 154:24 162:15 167:17 169:11 172:13,16,19 173:11,15 184:21 188:5 227:5 261:8 265:14 289:15 325:14 363:14 364:23
**facts** 231:5
**faculty** 26:10 40:19
**faded** 99:24

**fair**
12:22,23 15:10,11 22:23 23:4, 8,20 26:3,20 28:8 33:9 39:5,10 40:5 66:25 67:1 79:9 93:9 111:7 131:22 148:15 192:4,5 224:8 260:20 267:7 367:16 372:8

**false**
385:15

**familiar**
13:9 121:25 122:13,15 176:25 199:17,19

**famotidine**
184:17,23 185:5,9,18, 23 186:8,12, 15,22 188:8 223:9 297:12 334:10

**famous**
208:20

**farther**
54:12

**FDA**
201:8,10,14, 16,18 211:22 217:3 366:8

**feature**
83:9

**feed**
85:24,25

**feedback**
277:8

**feeding**
213:13

**feel**
88:19 97:18, 19 124:9 294:7

**feet**
31:23,25

**fellows**
31:2

**fellowship**
34:7,13 37:12 38:1, 22

**fellowships**
36:8,23

**felt**
174:9

**field**
37:4 59:2 60:19,20 76:19 86:18 87:7 207:15 324:7 326:6 332:6

**fields**
75:2 101:22 205:10

**Fifth**
114:12

**figure**
130:24 131:1,4,7, 11,15 284:18

**figures**
130:12,23 134:12

**figuring**
141:20

**file**
178:13

**filed**
8:23 153:6

**filled**
93:7 359:3,5

**final**
6:19 20:16

**financial**
221:14

**financially**
7:14

**find**
20:6 24:25 58:4 77:13 108:8 143:5 197:2 198:2, 12 235:6 270:1 326:3, 13 327:21 329:2 333:4 336:10 338:20 375:12

**finding**
46:3,18 47:3,6 76:11 109:6 132:3 150:2 170:16 171:5 197:8 268:16,17 271:13 272:23 324:17 325:22 330:13 333:24 334:18 346:18 378:12 379:14,15,16 382:21 384:7

**findings**
27:19 76:21 108:2 129:1 131:12 133:22,23,25 134:4,6 168:4 176:3, 4 209:4 216:18 257:17,18 258:4 284:20 325:11 327:12 338:19 339:16 352:14 353:2,4 367:4 374:12,13 375:24

**fine**
11:7 190:15 197:12 234:1 235:16

**finish**
33:23 358:7

**finished**
245:23 246:1 328:18 338:1

**Finken**
5:6,8 191:6, 8 198:1 203:10 210:8 211:14 215:18 224:6 233:3,12,20, 25 234:6,12, 18,21 235:15 238:22 240:20,22 247:5,9 248:25 249:14 250:10,14,25 254:13 259:19,22 260:2,5,21 261:2,5,19 277:12,14 295:1 298:7 300:14,17,20 302:16 303:1,11,15 309:6 311:8 314:5,8,16, 19 318:7,8 319:15,21,23 320:13 324:13 335:1 337:6 338:1 339:5 341:15,24 342:14 346:21 347:12 350:21

368:9,13
377:13,20
380:7,19
381:16,17
382:3
383:18,21
385:17 387:1
**first**
14:9 22:10
24:8 41:25
44:6,9 50:9
57:9 59:11,
12 71:22
83:23 87:21
90:19 94:2
105:21
107:12
109:11
111:16,21
132:10
134:14
139:24
149:20
160:17
173:22 177:2
220:16,24
222:6
232:10,20
236:1 249:22
257:9 259:6,
25 268:11
271:9,21
275:6 276:10
284:1 287:15
310:24
321:18,20
324:23
325:4,21
326:3 328:9
340:4 367:13
**fish**
70:7,19
**five**
53:4 59:10
67:5,10
78:23 79:19,
20 86:2
126:7,9,22
127:10
139:25
140:12
142:12
145:11
152:11 154:9
159:21 168:8
172:13,23
205:22
238:2,6
239:6 240:7,
13 241:10
242:2 243:1,
6,19 244:1
245:1,4
246:15
247:4,6
263:8 282:13
317:2 321:3
323:1 334:19
343:15
345:25
347:25
348:11 359:3
360:5 362:9,
24 363:1,17
364:22
365:10,12,16
367:23
371:21
372:13 375:6
376:14,15
383:2 384:8
**five-fold**
54:8 113:13
114:2
**flip**
90:15
**Floor**
4:10
**Florian**
211:10,24
212:23
213:10,18,
21,25 214:9,
13,16 215:8,
12
**fluid**
213:25
**focus**
26:10 34:16
37:21 39:25
50:8 53:15
76:21 101:23
103:4 117:24
118:2
125:17,22
151:19 174:6
203:20
363:15 364:4
**focused**
23:21 24:10,
20 37:23
40:18,19
101:19
117:21
120:11,20
124:2 181:24
203:21
220:24
266:18 267:2
300:8 315:15
321:2 356:18
358:2 362:9
364:11
**focuses**
24:3 39:20
75:3
**focusing**
42:7
**folder**
121:2,16
143:10
342:22
**follow**
87:12 133:5
155:1 157:1
235:13,15
237:11
311:23
**follow-up**
84:13 142:17
143:22
144:13
146:18 147:4
148:10
152:11,16,18
153:10,12
154:5,8,13
155:3,5,7,18
156:2,3,8,12
158:8,10,15
159:2,7,19
160:9 238:9,
15 239:22
240:9 241:6
242:10 301:5
361:13
**followed**
32:16 147:6,
9,23 148:4,
8,13,16
151:20
155:22
156:19,21
175:13
237:15
239:19
268:19 301:3
354:14 359:6
**followed-up**
236:22
**following**
97:23 133:5
147:5 160:5
182:14
323:18,25
**follows**
8:16 370:13
**food**
62:12 214:7
285:2
322:19,21
323:3
**foods**
79:14
**foodstuffs**
313:1
**force**
99:19,20,22
100:2,3,4,6,
21,24
102:11,12,

14,16 107:13 116:12,22,24 123:7 229:21
**foremost** 50:10 111:16 173:22 220:16,25 276:10 328:10
**forest** 128:24 129:6 130:7,11 131:21 136:14 138:6 145:20,22 147:14
**forget** 177:11
**forgot** 380:20
**form** 23:18 72:1 108:22 133:3 194:20 205:15 209:1,15 337:17
**formal** 257:25 258:13 259:4,10 261:25 263:1,17,19
**formally** 263:14
**formation** 59:22 60:1 61:23 68:12 70:9 207:22 213:19 214:25 215:1 323:18,25 367:10
**formed** 214:14
**forming** 267:9
**forms** 72:9
**formulations** 210:6
**forth** 102:21 108:10 123:18 124:1 145:18
**forths** 101:12
**Fortuna** 4:3
**forward** 14:20 299:9
**forwards** 83:15
**found** 45:15 47:23 72:2 76:13 88:13 111:23 154:4 174:6 216:2 257:22 276:21 282:17,25 298:5 302:11 317:9 327:18 328:24 330:19 332:22,24 333:1 334:8, 11,18 352:5, 25 357:14 358:13 368:5,6,19 369:3,11 373:13 379:18 380:4,6
**Foundation** 60:8,13 62:2 63:14,21,25
**four** 25:21 59:10 78:23 84:2 130:15 133:6,17,21 150:18
291:13 292:3,8,20 293:9,15 313:17 314:24 317:1 319:3 327:8, 11,13 328:22 330:17,18,24
**four-fold** 74:10,17
**fourth** 43:13 114:4 163:6 185:22
**frame** 63:6
**France** 74:9,16
**frankly** 162:17 167:15 219:14 284:22
**fraught** 86:22
**free** 88:19 97:19 294:8 316:18 318:4
**free-living** 238:2 242:22 281:5 300:7 358:19
**freeze** 377:22
**frequency** 322:19,21 323:4
**frequently** 32:11 176:14
**fried** 340:21
**front** 13:25 63:9, 12 100:14 141:17 142:5 154:16 168:13
191:18 193:1,8,9 337:5 343:6 373:15
**froze** 377:21
**frozen** 260:25
**fruit** 60:16
**fruits** 57:8,17 61:8 208:22 209:5
**FUJIMOTO** 233:17
**fulfilled** 351:1,18
**full** 18:16 44:6 59:11,13 66:13,17 104:20,24 105:13 169:23 216:12,15 221:7 222:20 224:24 287:20 312:16 321:21 340:4 385:18 386:6
**function** 14:14
**functions** 43:23
**Fund** 61:21 62:22 63:18 64:8 66:3,13 67:20 68:5
**fundamental** 125:1
**fundamentally** 29:18
**funding** 24:2,10,20 39:12

**future**
143:3

G

**gallery**
6:24
**GARRETT**
4:4
**gastric**
25:17,22 39:14 41:15 42:7 44:11 45:18 49:22 51:13,14,20, 22,23 52:8, 10 54:19 55:14 56:8, 12,21,24 57:16 60:15 61:2 62:3,7 69:16,18 72:3,24 73:7 78:11 79:11 113:14 114:1 172:15 182:11 213:25 215:21 216:19 313:20 315:2,11 316:1,12 319:7 320:5, 19
**gastritis**
44:13 165:19 166:20 167:4 188:6
**gastrointestinal**
224:18,21
**gave**
19:6 59:6 82:5 130:22 173:13 200:8 210:3 306:1 385:20
**general**
71:9 85:11 87:24 112:2, 10 113:10 114:17 132:5 142:6 161:17 205:5 228:1, 13 281:23 309:25 310:1,11,20 318:20,23 324:3 346:17 362:13
**generalizable**
297:14
**generalize**
83:18
**generally**
37:20 98:13 280:8 318:15 345:13
**generating**
373:4
**genes**
91:14 311:7
**genetic**
91:24
**genome-wide**
91:16
**genotoxic**
309:11,17,23 311:1
**Genotoxicity**
305:1
**GERD**
225:13,22 226:5 229:10
**getting**
14:14 34:5 259:3 292:17 300:12 342:1
**GI**
349:4,14
**gist**
240:16
**give**
15:8 23:16 28:24 58:22 81:24 82:2 102:23 104:22 108:20 121:7 149:11 160:12 170:1,7,14 183:4 191:11 194:11 200:8 208:6 213:6 219:16,23 221:6 224:24 234:6 235:7 245:17 247:5 289:7 305:20 306:1 357:1 361:8 375:19
**given**
59:3 81:11 85:15 90:11 139:1 141:12 157:2 179:4 200:10 212:22 262:16 286:6 297:23,24 298:20
**giving**
82:16 95:18
**Glaxosmithkline**
381:13
**global**
200:14
**globally**
253:14
**goes**
222:14 313:5
**going**
8:21 9:1 14:20 19:25 20:4 21:2,3 32:6 50:23 54:18 55:17 66:22 81:22 95:22 105:22 110:8 115:24 117:11 129:16 134:8 142:24 143:18 145:17 150:15 151:3 157:13 190:22 191:8 192:3,9,13 200:25 203:10 223:11 231:9 232:3 234:19 247:2 249:6, 17 250:15,18 276:11 290:6 298:7 300:10 302:18 303:10 304:11 309:6 313:24 314:18 321:25 327:7 341:17,25 342:3,11 343:17 346:3 348:14 350:6 356:13 377:13 380:9 381:14 387:6
**gonzalez**
311:16 312:21 315:6
**good**
8:19,20 22:12 34:4 37:2 68:13 78:7 81:20 113:17 166:8 168:24 191:7 249:3 297:16 346:6,7 376:21
**Goodman**
311:18 312:20 320:24 321:9,13

**GORDON**
4:8
**gosh**
335:15
**grabbing**
319:20
**graduate**
31:2
**gram**
48:13 51:10
**grant**
4:10 24:2 25:16 34:7, 11,13 35:2, 17 37:12 38:1,22 39:6
**grants**
24:8 34:17, 21 35:10 36:8,23 37:8 39:6
**grasp**
94:13
**great**
14:23 77:11 85:4 118:1 150:19 247:9 316:2 387:1
**greater**
45:25 46:8, 20 139:24,25 145:19 149:12 150:9 327:17
**green**
75:7,11 133:24
**ground**
26:22
**group**
64:14,19 85:23 87:13 134:5 170:17 184:22,23 185:6,9,18, 19,23,24 186:8,13,22 188:7,8,9 199:21,23 200:2 201:8 212:11 215:21 216:2,13,18, 24 217:3,7, 17 218:15,18 252:3,4 255:23 330:5 350:5 379:23 385:21
**grouped**
57:18
**groups**
134:3 182:20 183:2 185:1 212:11 223:7,9 224:1 262:21 316:25 317:1,2
**growing**
188:22
**grown**
189:3
**GSK**
229:20 232:23 266:17,22 267:9 303:17 304:13 307:11 312:3,13 313:14,16 314:22 315:5,9 319:8 322:1 323:14
**GSK's**
305:8 307:20 308:19 309:16 319:2 322:11 323:22
**guess**
15:20 81:23 98:6 169:11 247:2 300:10 370:10
**guys**
342:25
**gym**
288:14

**H**

**H2ra**
134:13 137:4 195:11,12 357:9 375:4 379:7
**H2ras**
130:18 134:5,9 136:8 145:16 149:21 150:3 170:19 195:16 220:3 327:15 329:3 330:5,7 349:5 374:10 375:2 379:18,23
**H2rb**
184:16
**Habel**
236:4 334:10,14,15
**hair**
136:17
**hairs**
117:12
**half**
81:22 176:9 190:19 291:19 297:10 336:8 345:18,19, 20,23 347:17 357:7 359:25
**halfway**
70:3 75:9
**hallmark**
83:8
**halls**
37:1
**Hanahan**
366:11
**hang**
104:21 122:9 174:18 177:22
**happen**
86:20 192:24 214:18 275:18 314:15
**happened**
86:7 183:12 282:1
**happening**
194:11 215:4 227:1,9,10 233:15
**happy**
191:23 197:24
**hard**
11:21 13:24 50:23 77:25 94:13 186:3 197:8 227:4 235:14,16 285:4 290:2 319:21 373:14 374:1
**Harvard**
87:14
**HAUSFELD**
4:17
**hazard**
137:21 303:16 304:13 307:11
**head**
25:16 103:12 107:15 213:2 221:17 302:13 306:5

**heads** 105:5
**healing** 229:1
**health** 85:7,9 87:8, 14,15 102:5 112:24,25 179:20 208:13 280:22 284:13 286:8 294:17 350:24 351:5,16 352:15 376:23 377:2
**healthcare** 176:12
**healthy** 212:22 215:11
**hear** 30:6 145:8 232:1 233:22 234:14,16 250:11 259:22 260:11,21,23 261:12,21 277:11 342:25 374:5
**heard** 230:18 259:25 260:16 261:17 338:5
**hearing** 77:2 374:2
**heart** 30:19 118:23
**held** 6:5,10 36:22
**helicobacter** 43:15
**hello** 259:19,20,21 260:1
**help** 170:2
**helpful** 102:1 373:6
**hematological** 40:20
**hepatitis** 89:7
**hesitate** 96:8
**heterocyclic** 74:14 340:23
**heterogeneity** 258:2
**heterogenous** 258:4
**Hey** 187:5 247:1
**Hidajat** 16:12,18,21, 25 21:24,25 22:3 368:15, 19 369:3,11, 15,23 370:7, 12,21 371:2, 10 372:10
**Hidajat's** 372:3,7
**high** 73:20 176:8 286:15 298:1
**high-** 320:14
**higher** 129:23 131:23 137:11,12 149:22 212:10 246:22 292:18 318:13,22 327:20 336:22 337:11 339:9 376:3 377:3, 7
**highest** 94:1 369:4 383:8,11
**highlight** 41:25 42:4 44:4 45:10 56:17 57:9, 10 70:4 71:21 78:5 105:19 109:10 146:20 320:10
**highlighted** 57:13 103:5
**highlighting** 48:16
**highlights** 186:4
**highly** 84:14 85:8, 22 86:4 92:10,17 93:13 154:21,22 282:8,14 285:21 287:17 288:21 289:8 297:14 308:13 310:7 318:24 324:9
**Hill** 257:1,8 258:13,23 259:5 260:8 261:7,25 263:15,17 274:22,25 275:22 276:5,18 324:17 325:14,18 326:2,12,23, 24 352:7 360:15 375:25
**HIPAA** 179:10,20
**histamine** 195:9,13
**histology** 55:14
**history** 84:7 85:20 171:4
**hit** 9:17 89:3 122:7 178:9
**hold** 45:7 144:25 204:16 207:10 233:25 234:2,7,13 302:2 361:7 379:2
**Hollander** 4:20 7:10
**honest** 105:6
**honestly** 200:24
**hormone** 156:24 245:19
**hospital** 181:17
**hospitals** 179:1 181:17 295:7,8
**hour** 81:22 96:12, 14,15 142:24,25 190:19 247:2 300:11
**hourly** 97:8,10,11, 13 98:18
**hours** 13:16,19 288:14 368:12

**how's**
244:5
**HPV**
89:6
**HR**
135:25
**human**
27:13 62:15 76:6,8 126:20 127:2,24 202:12,16,18 204:2,7 205:16 208:13 209:25 214:15 217:19 218:17,25 249:19 250:4 251:3,9,15, 23 252:22 254:10,12 255:12,23,24 256:4,21 257:2 258:24 260:9 261:8 262:2 263:22 264:1 265:25 266:5,6 270:20,21,23 272:22 273:14 279:3,17 283:12 305:17,19 306:13,16, 18,21 307:1 309:4 310:11,15 311:11 324:5,12 341:11 350:25 351:17,25 352:22 353:11 362:21 363:16,21 370:25 371:1 383:7,13,14
**humans**
204:12,24 205:9 206:8 207:17 251:8,14 254:2 255:12 264:6 278:8 279:20,23 286:16 305:24 306:22 307:2 308:12,14,24 323:17,24 353:8 381:21 382:13
**hundred**
96:25 274:24
**hundreds**
210:21 295:7 359:9
**hydrocarbon**
324:8
**hypotheses**
69:23
**hypothesis**
114:8 268:11,13 270:15 301:20 373:3
**hypothesize**
270:15
**hypothesized**
75:24

**I**

**IARC**
64:13,16,24 65:12,22,24 66:1,17 67:20 68:7 70:24,25 71:7 75:3 76:3 154:12 199:18,19, 20,22 200:1, 8 215:20 216:2,12,18, 24 217:2,7, 17,18 218:14,18,23 219:2 249:18,22 251:2 252:5 255:20 266:1 270:18 305:14,18 306:4,20 336:4 371:2 383:12 385:21
**idea**
166:13 292:17
**identification**
14:5 82:14 104:4 121:19 128:18 143:15 152:5 153:2 176:21 303:14 342:20
**identified**
189:7
**identify**
240:4
**ignored**
124:25
**illness**
312:24 313:11
**illustrate**
336:15
**imagine**
65:8,10 71:11 104:21 180:19,22 181:19 228:14 316:21 355:10
**immediately**
197:8 198:10
**impact**
187:24 188:17 284:19
**impacted**
171:4 174:11 213:23
**implement**
84:4
**implication**
385:9,15
**importance**
21:13 47:2,5 112:25 114:14 120:3 161:18,20 162:10 173:10 174:8 289:14,19
**important**
11:13 38:20 47:21 49:18 77:13 102:4, 9 110:23,24 111:9,13,16 112:24 120:7 134:22 161:9,25 162:5 163:4 170:15 171:25 172:2,3,22 207:15 245:10 270:23 272:11 274:5 296:2 338:19 360:14 366:17 367:13 375:22
**importantly**
239:17
**impossible**
355:17 356:3

**imprecise**
49:8 53:4
**impression**
100:5
**impurity**
235:4
**inaccurate**
93:25
**inaccurately**
167:14
**incidence**
42:5 200:14 209:19
**incidences**
190:5,10
**incidents**
370:15
**inclination**
17:24
**include**
17:23 46:15 57:22 61:7, 15 67:8 71:11 102:18 160:18,21 161:5 162:22 248:18 268:18 276:18 311:14 341:6,9
**included**
46:9,21 58:1 72:5 103:1, 21 139:13 217:4 224:9 241:17 259:17 336:8
**includes**
16:4 35:14 48:20,22 50:1,3 54:24 111:3 217:25 265:2
**including**
22:16 44:12 62:6 75:3 162:16 171:1 205:22 209:5 225:13 258:20 262:12 267:4 268:1 289:18 295:7 307:14 312:5
**incomplete**
83:14 84:15 91:8 92:3,19 93:11 171:3 174:12 256:23
**increase**
44:10 48:14 51:11 70:19 74:10,13,17 318:12,13 332:7 333:2 369:25 370:9
**increased**
47:16 51:22 69:18 149:16 150:10 209:2 286:23 287:21 328:2 330:8 332:2, 3 375:2,15 383:1
**increases**
132:9
**increasing**
44:13 189:5
**independent**
133:16 333:9
**index**
74:11,18 79:9 80:5 258:2 284:9 294:2
**indicate**
84:2 91:21 211:9,17 212:2 213:9 217:6 233:5 234:23 336:22 337:10 339:9 340:18
**indicated**
83:3 160:7 224:20,22 324:15 355:16 356:3 362:12 376:16
**indicates**
131:24 305:2 307:11 311:12 319:17 326:1
**indicating**
312:3
**indication**
37:2 225:22 226:4 227:14,20 228:6,11,17 229:2,15 274:7
**individual**
93:15,18 95:10,13 154:19,20 159:16 160:10 179:1,5 180:3 228:19 281:16 310:7 331:21,22 354:9 355:12 384:2
**individual's**
312:23
**individually**
59:12,14,16, 20,21 68:10 376:8,17 377:17 378:3,23
**individuals**
8:23 93:21 95:4,6,16 155:1 156:21 180:5 187:25 210:20 222:22 248:8,9 281:16,17 287:20 293:20,25 295:18 296:23 298:10 301:3 343:19 356:18 358:19,25 359:2,3,5 371:25 383:23 384:3
**individuals'**
248:10
**induce**
72:2
**induced**
72:24
**inert**
343:3
**infection**
43:16,18 44:18 89:6,7
**inference**
32:9 40:14
**influence**
73:19 220:15 228:2 231:6
**information**
15:8 47:22 50:9 53:6 66:4,7,8,23, 24 67:2 73:22 77:16 90:4,23 91:9,16 93:4,5,6,11 95:10,15,16 110:21 157:6 163:6 164:2, 4,16 167:22 169:18,24 171:3,13,20 173:1 174:12 181:22

182:19,25 214:11 218:2 221:11 222:20 223:2,13,19 236:9 244:9 262:13 268:20 281:14 282:21 287:19 289:25 354:8,18 355:3,17 356:4 359:15 369:18 376:5
**ingested** 74:13 205:25 206:11 207:25 208:14 209:18
**ingestion** 311:19 312:9 351:19 371:24
**inhalation** 371:24
**inhaled** 205:25 206:11 207:25
**inherently** 235:3
**inhibit** 75:20
**inhibition** 75:14,19
**inhibitors** 195:22,25 223:10
**initial** 16:1
**initiate** 154:25
**initiation** 182:15
**initiator** 240:3
**initiators** 357:8,9
**inside** 214:15
**insignificant** 46:18 114:21
**institute** 201:12
**insurance** 179:20 181:10
**intake** 57:17 73:7,18 293:3,9 312:21 313:20 315:2,11 316:11 319:6 339:11
**intend** 278:5,20 381:18 382:10,14
**intending** 277:25 278:11
**intensity** 184:14
**interact** 69:4
**interaction** 29:13
**interactions** 6:9 69:13
**interchangeably** 252:4
**interest** 154:23 158:23 220:13 221:6,15 222:19 322:3
**interested** 7:14 44:8 58:4 367:7
**interface** 6:11,25
**interference** 77:1
**intermediate** 298:18 299:1
**internal** 34:21 65:25 266:21,24 267:20
**internally** 286:11 297:19
**International** 64:17 308:4
**internet** 191:22 192:22 233:21 249:16 250:16
**interpretation** 132:2 150:3 220:21 222:6 228:3 274:5 321:8 328:11
**interpreted** 283:12
**interpreting** 207:3
**interquartile** 160:12 301:4
**interrogate** 268:14
**interrupt** 245:24 250:8 316:6,14 339:24
**interval** 46:9,20 48:18,20,24 49:3,5,24,25 51:12,16 52:7,10 54:22,23 55:5 129:9 137:22
**intervals** 57:23 58:5 99:6,7 111:3
**introduce** 8:21
**invasive** 135:4,6 176:4 360:10
**inverse** 31:6 32:3,6 33:11 148:19
**investigate** 354:20
**investigated** 264:13
**investigation** 336:2
**investigations** 311:14 312:5 320:5,19
**investigators** 211:22
**invited** 200:1,6,7,15 201:15
**involve** 38:16 111:5 127:8 202:24 203:13 262:15 377:9 382:23
**involved** 10:7,10,12,24 25:22 27:5 28:19 127:8 353:9
**involves** 70:8
**involving** 90:12 199:1 364:16 365:4
**ionizing** 89:8

**issue**
27:12 28:2 62:16 84:8 86:15 87:9 106:6 191:21 197:16 274:5 284:21
**issues**
30:23 84:16 90:11 260:3 384:11
**items**
16:10 20:6,8 22:22 37:12, 14 38:2,22 48:10 54:20
**Iwagami**
159:20 300:21,24 301:8

**J**

**Jackson**
335:25 336:15
**JASON**
4:11
**Jim**
8:22 9:6,21 13:24 19:19 65:15 81:23 94:22 99:24 140:25 142:23 150:22 157:23 166:1,4,11 168:19 171:9 187:7,14 191:9 342:15
**jmr@ pietragallo. com**
4:11
**job**
11:21 16:20, 24 51:4 200:10 273:19 284:17 369:17
**jog**
372:20
**John**
4:4,21 15:23 17:10 22:8 41:24 78:25 128:10 132:21,22 135:11 143:6 177:11
**john.garrett@ bowmanandbroo ke.com**
4:5
**Johnson**
221:14
**join**
87:18
**joining**
291:24
**journal**
32:19 33:7, 15,18 41:10 109:7 130:9, 13,22 131:14 134:11 211:23
**journals**
26:24 32:20, 23 33:7,8
**judge**
191:18
**jump**
11:17 341:25 342:2 361:7
**jury**
191:18
**Just...don't.**
115:15
**justify**
188:13

**K**

**Kantor**
134:1 291:13,18 292:22 331:2 333:1,7
**keep**
51:1 103:12 143:18 240:14 314:18
**key**
162:9 262:9 271:17 366:3,6,8,13 367:17
**kick**
234:8 250:15
**kidney**
146:6 307:16,23
**kids**
234:8
**Kim**
159:21 176:24 220:2 241:18 243:23,24 294:23,25 296:22 298:4,10 299:5,13,14, 24 331:24 332:21 333:18 334:8 353:13,15,21 354:7,11 355:16 356:2
**kind**
31:4 32:12 42:16 60:14 62:1 81:10 83:9 87:4 90:15,16 91:21 93:18 94:6,13 98:12 131:16 133:24 134:8 147:10 154:19 161:23 171:22 189:3 203:22 204:7 221:3 226:11 245:15 246:19,23 263:12 285:5,8 297:25 324:9 352:7 358:17 366:22
**kinds**
28:1 38:19 40:21 61:9 80:20 220:14 245:19 246:20 253:25 282:22 292:10 296:13
**King**
4:15
**knew**
21:2,6
**knock**
187:16
**know**
9:16 12:24 13:24 14:7 17:19 18:24 19:20 20:2, 5,13,15 21:24 22:3 24:17 25:3, 7,15 28:12, 13,23 29:9, 16,25 31:3 34:20 36:5,9 38:25 39:18 40:17,20 42:18 50:19 56:4 58:18 60:10,13

61:13,25 62:4,14 63:15,22,23 64:12 65:21 68:20 71:10, 12 72:8,12 76:14 80:22 81:7 82:19 85:15 86:6,9 87:16 89:17, 20 90:14 91:3,5,15, 17,21 93:23 94:6,11 97:17,20,21 101:5,6 102:4 105:17 107:14 112:16,20 113:3,12,17 115:5 117:7, 25 119:6 123:19,22,25 124:1,7 127:16 129:17 131:2 132:21,22 134:14,18 135:19 136:17,18,22 137:11,20 138:20 140:21 141:7,11 147:19 148:20 150:1,4,16 155:14 159:11,15 162:15,16 163:18 165:14 166:12 176:12 177:15,20 179:5,13 180:14,15 181:12,13,14 183:8,17 184:4,5,8,9, 14 185:12 187:2 188:16,24 189:16 190:10,15,17 191:22 192:9,16,25 196:19 197:6 199:5 200:25 205:12 206:4 209:3,12,25 213:1 214:4 221:13,16 225:25 226:3,10,22 228:9,17 229:4,6,7,19 230:19,21 233:1,13 234:20 236:2,6 237:15 240:17 245:5 246:16 249:2,17 253:25 254:15,16 261:21 268:15 269:19 270:7 271:14,20 275:19 276:21 281:15,16 282:1,10,11, 21 284:16 285:3 286:6 287:4,7 288:7,13,21 289:15 292:6,12,16, 18 295:6 296:10,17,18 297:2,3,7,14 298:15 300:10 302:7,9 304:6 306:14,24 310:19 311:4,6 316:21 317:6,18 318:2 321:22 322:18 339:24 345:3 347:23 354:22 356:11 357:12 360:13,15,18 363:12 365:18 367:8,11 371:6,25 373:10,21 374:14 377:4 380:18 381:12 385:22

**knowing**
142:7 221:18 275:2 350:2 357:16 358:15

**knowledge**
35:12,17 36:1,11 37:7 328:14 362:13

**known**
59:25 68:16 156:23 160:24 162:25 171:5 205:16 222:13 275:4 297:25

**Kumar**
159:21,22 294:10,12 331:24

**L**

**La**
216:14,17,23 217:5 311:16 315:6

**lab**
306:25

**labeled**
186:3 253:24

**laboratory**
117:23 211:6 252:22 253:20 254:9,21 255:2,4,8 271:18 283:2,9 289:18 308:2,5 311:5

**lack**
114:15 118:24 163:6 164:1 172:25 211:11,19 242:20

**lacked**
167:22

**lacking**
255:24 256:13

**lag**
233:18,19

**lamb**
340:21

**laptop**
193:13,14 197:14,17, 21,22

**large**
6:22 26:8 47:8 49:14 54:12,15 55:12 61:12 62:11 80:24

89:22,25 92:1 113:25 120:13 135:1 136:21 176:1 179:4 182:12 183:20 199:3 207:1 208:24 217:25 226:18 242:7 253:9 275:15 281:1 285:7 317:8 327:24 336:3 343:12 345:4 348:21 357:5,17 364:4,7 377:9

**largest**
55:12 85:8 338:17

**late**
27:23 104:17 221:4

**latency**
154:20 159:10,16

**lawsuits**
383:24

**lawyers**
19:18 231:12 303:3

**Lazar**
104:7 115:18 116:6

**lead**
288:25

**leadership**
98:7

**leave**
55:21

**lecture**
82:2,3,5,16, 22 84:21 85:5

**lectures**
102:23

**led**
195:10

**left**
44:7 59:9 78:19,25 129:10 131:24 132:7 135:15,23

**left-hand**
56:15 129:24

**legal**
7:12,17 28:21 30:15

**length**
160:6 228:5, 9 236:7 358:21 383:22

**lengths**
260:15

**lessen**
40:2

**letters**
138:7

**letting**
240:22 294:21

**level**
31:1 44:22 80:22 95:13 245:13 325:15 326:8,9 383:8,12

**levels**
73:20 212:10 213:16 278:6,12,21 279:7,25 280:11,12 282:17 283:10 302:11 308:15 309:4 312:25 324:10 381:19 382:7,11

**liability**
7:8

**lieu**
8:2

**life**
23:22 25:8,9 83:13 90:24 155:2 229:22 230:23 296:5 332:9

**lifestyle**
80:10

**likelihood**
262:18,19

**limit**
46:12,15 48:22 49:1,3 50:2 54:5 120:19 144:8,9 334:17

**limitation**
156:7,17 167:21 173:1

**limitations**
117:25 152:10 153:24 155:12 160:18,21 162:22 163:5 375:21 377:6

**limited**
32:23 44:12 60:16 62:5, 6,15 293:20 316:8

**limits**
20:3

**line**
82:1 94:2 129:8 135:12,13,25 136:7,10 147:6 148:2, 10,14 185:21 246:20

**linear**
368:20 369:3,11

**lines**
22:10 54:15 59:10,16 133:14 152:12

**link**
11:25 266:8

**linked**
349:1

**linking**
222:16

**links**
376:22

**Liquor**
55:4

**list**
5:22 16:2, 11,14 17:4, 18,22 18:5, 6,23 19:1, 14,15,16,24 21:14 28:4 34:7 41:4 71:12 78:22 79:3 89:1,3 102:18 103:17,22 123:14 224:24 277:19 283:23 349:3 384:15,21 385:5,14,25 386:2,12,16

**listed**
17:3 22:22 36:24 38:1 62:6 196:20 280:2 310:10

**listen**
127:14 187:7

**listing**
37:7

**lists**

36:7
**literature**
29:1 30:22 42:5,19 47:13 106:6, 7 108:11,12 118:25 124:16 127:7 128:3 205:14,20 210:23 219:14 228:3,4 230:13 232:1 264:18,24,25 266:19 267:3,14,17, 23 277:5 278:16,25 279:11,15 281:1 304:22 328:9 331:8 332:19 334:7 351:8 362:6, 17 363:5,24 364:21 365:10,24 375:1,5,8,13 376:7
**litigation**
7:9 10:9,21 27:13 28:3 87:10 97:11 205:23 221:20 222:1 263:18 303:18 364:16 365:4
**little**
9:15 30:19 53:14 54:11 75:9 81:18 128:16 168:19 177:24 188:12,17,25 198:6 213:17 342:1,2 343:20,22 373:14
**lively**
119:6
**liver**
24:10 172:16 182:11 190:6 307:16,23 332:15,19,23 363:25 365:1,2,5,20
**living**
286:16
**LLC**
4:1
**LLP**
4:2,9,15
**load**
178:18
**loading**
178:8
**located**
193:21
**locater**
18:13,15
**locked**
6:14
**long**
10:15 28:14 30:17 85:24 93:21 94:5, 18 101:10 152:18 153:12,16 155:7,17 156:4,9,13, 19,22 159:2, 8 160:1 184:9 190:12 222:15 228:18,24 229:3,13 238:9,11,15 239:18 242:12 243:8 246:3,6 260:18 286:3 296:22 298:10,19 299:1 348:2 372:20 380:20 381:10
**long-term**
8:24 127:1, 19 232:21 237:2 287:14 296:12 328:1 330:6 346:1, 16
**longer**
144:12 149:15 156:22 158:8,22 159:7,14 183:16 237:16 239:16 243:8 332:9
**longest**
237:3,4,14
**longitudinal**
27:25
**look**
10:19 13:10 16:9 17:8 21:11,23 25:9 27:20 29:17 35:19, 20 36:18,20 37:11 38:12 41:4 44:9,16 45:7 46:10 48:9,10 49:18,20 51:6 56:5 58:6,20 61:11,21 62:20 63:1, 10,20 66:15, 19 75:8 80:11 87:22 93:14 94:12 102:16 104:20 105:3 110:17 116:3 122:16 125:4 126:9 128:3 131:5 132:13 134:3,13 135:4,6,15 139:19,21 140:18 141:4 143:18,19 144:7 146:16 148:21 150:7 151:17 155:11,13 160:10 164:20 167:6 168:5 170:22 173:24 174:21 179:7 180:21,22 181:4,18 185:7,15 188:25 189:21 190:1 199:5 212:25 213:16,19,22 214:3,17 215:14 219:10,13,15 220:16,18 222:5 236:11 243:17,25 246:12 261:23 265:1 268:11 269:6 271:10 281:4 284:9,12 285:4 291:10 293:2 299:2, 16,18 301:1, 6 302:14 319:10,12 321:4,10,24 322:17 324:11,12 326:12 327:3 328:7 331:23 336:16 341:5 348:7 353:13

354:21,23,25 358:25 359:2,4 360:9 361:24 362:17 363:3,5,11 366:25 367:3,6 373:20 379:21,22 385:8

**looked**
18:21 23:3 24:23 34:6 54:19 62:11 74:1 164:19 168:6 182:11 190:1 195:24 196:6 203:8 213:4 214:10 218:24 220:9 240:12 241:9 244:13,14,19 245:7 253:22 263:6 280:10,25 282:16 290:9,16 291:23,25 294:18 296:5,6,8 301:9,19 327:8,9 348:16 355:7 360:20 361:11,20 362:20,21,25 363:19

**looking**
50:8 55:13 63:22,23 64:2 71:13 84:1 124:3 131:20 136:13 137:1 140:20 141:3 143:7 146:2 155:15 163:15,16 165:10,15,16 183:18 185:13 189:17 209:4 216:11 224:2 232:21 239:17 241:15 246:7 255:13,14 258:3,23 261:19 274:20 287:18 291:3 293:7,8 294:15,21,23 300:21 301:11 308:7 311:11,17 315:19 318:22 337:13 340:16 343:9 344:17,21 354:12 357:7 358:17,18 359:19 372:21 376:6 379:19 386:8,9

**looks**
51:8 55:1 122:15 131:2 144:2 286:22 361:2 362:2 363:24

**Lord**
313:23

**lost**
80:4

**lot**
10:24 11:20 24:19 25:7 32:19 42:23 53:9 64:21,22 77:1 80:10 86:17 87:10,15 94:11,12 102:22 115:16 123:20 131:3 138:24 140:10 150:2 162:12 166:15 181:13 199:5 206:23,24 222:15 236:4 282:20 284:11 297:7,15,22 317:12 337:19 338:19 351:9,11 371:6

**lots**
101:7 270:14

**loud**
9:8,13,16 234:3

**low**
308:15 309:4

**lower**
79:25 131:24 318:22 333:21 350:13

**Lu**
332:1,8

**lunch**
143:3 150:24 190:18,25

**lung**
154:11 208:23 209:3 275:3,14 311:18 312:8 320:7,21 321:1,15

**lymphoma**
40:19

**M**

**MAC**
197:19

**made**
16:3 18:25 20:16 21:11,20 66:5 78:13 89:10 159:22 305:14 352:24

**magnitude**
46:5 47:25 52:21 53:16 54:6 89:23,25 101:14 102:6 108:5,7 109:1 110:18,19 113:4 118:2 120:12,20 124:3 125:23 262:17 273:21,23 275:7

**main**
88:10 89:2 224:12

**maintenance**
229:1,2,9 230:3

**major**
34:24 52:24 109:7 124:22 260:3 370:20 371:13

**majority**
23:21 61:2 348:18 349:9 380:4

**make**
16:6 18:4,5,23 19:15 20:18,22,24 21:18 32:9 50:16 90:2

92:15 124:10 128:15 155:23 172:10 177:23 220:22 238:14 240:22 260:13 271:21 274:18 276:11 325:9,19 351:12 378:1 386:7

**makes**
11:20 56:24

**making**
173:10 323:6 351:7

**managed**
241:2

**manner**
8:8

**manufacturers**
220:3 230:22 383:25

**Manufacturing**
4:1

**map**
145:17

**maps**
288:4 289:11

**March**
13:21

**Marina**
4:17

**mark**
61:18 304:11 342:17

**marked**
5:14,15,16, 17 14:4 36:19 67:11 82:13 104:3 121:19 128:17 143:15 152:4 153:1 176:21 303:13 342:14,15,19

**marked--------**
5:19

**married**
87:17,19

**Mary**
5:3 7:2 9:8 20:13

**masks**
320:3

**mass**
79:9 80:5

**Massachusetts**
4:18

**Master's**
31:14 326:8

**match**
157:4 190:9 324:11

**matched**
165:11 268:12

**matches**
181:19

**matching**
223:6 320:17

**materials**
5:22 15:18, 25 16:2,11 17:3,17,23 19:13,23 28:5 33:3 102:19 103:17,22 123:13 179:18 217:2 277:18 345:11 384:12,14,20 385:5,13,25 386:2,12,15

**maternal**
89:7

**math**
186:16,21

**mathematically**
137:10

**matrix**
16:21,25 369:18

**matter**
7:7 8:5 41:14 94:19 285:25 286:3 288:15 343:4 381:13

**matters**
21:15 187:21

**maximum**
229:7 235:19 236:14,19 244:13 290:8,15 291:6,12 292:21,24 293:16 294:11,24 295:14 299:4,12,23 300:22 301:7

**Mcdowell**
237:8,18 372:16,17,22 373:2,3,8, 11,13

**Mcelvenny**
16:13 17:6

**Mctiernan**
28:6,9,12 64:10 199:14

**mean**
19:20 26:16 35:20 36:25 39:4 46:13, 17 48:7 50:20 58:8, 14 70:23 84:24 88:21 96:22 102:20 112:16,19,23 117:6,8 130:14 135:20 137:13 141:3,23 168:16 178:7 179:3 180:18 197:6 198:4 202:5,25 225:9 231:6 240:15 246:6 247:17 265:6,8,10, 13 266:15 271:5,11 316:12,21 317:22 318:21 325:6 326:16 332:5 337:23 375:4 380:18 386:19

**meaning**
45:23 46:7 129:16 258:4 316:24 325:2

**means**
46:18 84:14 166:13 264:24 266:2 269:2 315:17 318:11

**meant**
46:24 168:18 181:5 360:18,22 361:4

**measure**
47:2 173:11 183:22 227:8 238:5,25 239:5 287:8 288:2 289:5 290:2 297:17 318:18

**measured**
57:18 138:15 161:22

164:11
167:14
169:3,4
173:15,17
183:16,25
235:20
236:15
238:12 240:6
247:12 264:9
268:21
281:10,20
289:16
290:22
322:21

**measurement**
28:1 30:23
53:14 86:23
90:11 91:21
92:12,16
93:24 94:5
170:25
172:18 184:7
246:18
284:2,5,11,
13,16,19,22
285:7,19
289:17,19
318:25
370:16

**measurements**
86:19
246:16,21,24
346:6,7

**measures**
90:14 245:19
284:8,23

**measuring**
214:1 288:11

**meat**
208:3 209:21
210:11
214:19
340:21,22

**meats**
70:8,18
212:11
214:7,8
215:5

**mechanism**
56:10 75:24
272:7 274:21
301:24

**mechanisms**
44:12 253:22
268:5 270:14
271:1,6,16,
24 273:4,16
275:3,5
302:6 308:22

**mechanistical
ly**
367:1,3

**median**
247:19

**medical**
31:1,10,17,
18,21 32:19
109:7 167:15
175:12,16
178:25
181:19
205:14
211:24
224:23
225:2,17,25
228:8
278:16,24
279:11,15
293:19
297:18
363:23

**medication**
93:8 139:1
156:23
160:23
162:24
183:13 184:8
194:22
211:12,20
220:13
224:16
227:16,25
228:24
231:20
245:19
248:20

274:10
286:10
292:1,4,19
295:13
296:13,16
297:24
310:4,6,22,
24 349:15
355:4 382:24
383:10
384:3,6

**medications**
184:5 213:7
228:15
245:21
292:11,13
295:10
296:19
357:15
358:11,18

**medicine**
101:23

**medicines**
375:3

**meet**
9:24 10:1
45:23 52:13
53:19 54:3
55:7

**meeting**
142:17

**meets**
205:15 366:3

**mellitus**
163:9

**member**
105:7

**memory**
372:20

**mention**
116:25
123:11
134:23
161:1,4,10
163:3 164:5
173:2,8,9

**mentioned**
26:2 81:8
123:17
128:20
161:24
172:25 176:9
263:5 320:6,
19 367:5

**mentor**
23:11 26:10

**mentoring**
35:14

**met**
332:11

**meta-**
257:21

**meta-analysis**
42:21 257:22
258:1 317:9

**metabolism**
44:19
308:11,23

**method**
32:7 72:8
94:5 188:15
224:12,13

**methodologica
l**
23:22 31:8

**methodology**
245:15

**methods**
23:25 24:4,
18 26:5,19,
21 29:1 31:5
37:17 40:22
86:7 94:3,8
95:7 179:18
183:4 195:5,
7 196:8,15
202:25
203:1,23
246:13
345:12
348:14

**methylation**
38:18

**mice**
307:14
**Michael**
4:20 7:10
366:10
**mid**
236:3
**middle**
134:6 136:25
308:7
314:11,23
**midway**
340:16
**Mike**
177:11
**milligram**
344:6,7
357:24
**milligrams**
138:20
139:3,5
229:16
344:16
356:23,24
357:12
**Millikan**
82:3
**million**
179:1 183:9
188:18 242:8
291:19 295:8
297:8,10,11,
12 300:5
336:8 348:22
357:7 360:1
**millions**
127:8 155:22
210:21
226:16,17,
20,23 238:13
242:14 248:8
256:22 266:7
353:9 357:17
365:14
377:10
382:24
383:11 384:6

**mimic**
215:4
**mind**
144:1 154:6
**mine**
88:5
**minimum**
350:4,20
**minus**
187:20
**minute**
104:22
341:16 370:4
**minutes**
81:25 131:8
150:23 247:6
300:14,19
368:12
**mischaracterizes**
68:18 107:2,
22 118:15
119:15 120:2
126:4 149:18
150:13
156:16
161:16 164:8
171:17 172:7
173:6 181:2
183:24
229:24
237:21 243:3
244:17 262:4
264:20
267:19 276:2
279:13
290:12
291:16
293:12 297:6
324:21
351:4,22
363:8 367:20
**misclassified**
188:1
**misconstrued**
318:6
**misheard**
35:25 378:8

**misinterpreted**
92:9
**missed**
59:15 192:15
**missing**
19:8 164:4,
15 171:22
175:3
**missingness**
93:16
**misspoken**
36:3
**Misstates**
175:23
**mistake**
45:9 159:23
**misunderstanding**
343:25
**misunderstood**
382:6
**mitigated**
73:20
**model**
324:12
**models**
306:12,15
**moderate**
79:1
**modest**
45:16 78:21,
24 79:1,3
**modification**
153:18
**modify**
153:14
**molecular**
72:16,23
205:1,12
206:13
210:16
278:10
381:25
**molecule**
72:10 205:24
206:3 207:24
209:20,22
210:11,12
**molecule's**
208:2
**moment**
99:25 121:8
143:13
319:20
342:22
353:14
356:14 380:8
**month**
86:3 292:7,
16 350:19
**months**
201:13
349:19
350:9,15
361:17,23
**Morgan**
28:15
**Mormon**
199:10
**morning**
8:19,20 9:24
192:18
**mortality**
42:6 369:13,
21,25 370:9,
15
**move**
53:7 104:16,
17 203:10
210:8 223:11
234:18
238:22
248:25
254:13 298:7
319:15 339:5
346:21
347:12
377:14
**moved**
76:20
**moving**
83:15 104:7

**multimillion** 34:23
**multiple** 26:24 37:24 38:17,20 111:9 203:2 379:10
**multiplicitas** 129:14
**must've** 159:22
**mutagen** 204:14,15, 20,23
**mutagenesis** 254:22 255:3
**mutagenic** 253:18 254:6,17 305:5,10,15, 22 306:12 307:1
**mutagenicity** 306:8
**mutagens** 306:17
**mute** 250:9
**Mylan** 4:7

**N**

**N-NITROSO** 44:20 45:2 56:7,19,25 57:4 72:2
**name** 7:10 178:13 191:7 196:22 385:23
**named** 116:11
**nanograms** 215:12
**narrative** 15:1,10
**national** 200:16 201:11 256:1 345:14 356:19 359:13
**natural** 247:3
**Naturally** 103:20
**nature** 93:2
**NDMA** 44:25 45:2 53:10 56:3 57:4 62:6,23 63:4,18 66:13,17 67:4 71:3 72:9,11 77:17 119:2 125:6 126:2, 6,10,16 127:2 160:23 162:24 194:14,18,21 196:6,7 199:7 201:17,21, 23,24,25 202:10,12, 17,21 204:2 205:15,21,24 207:24 208:1 209:8,10,20, 21 210:10, 11,12,22 211:2,3,13, 21 212:3,4, 10,16,18,21 213:16,19 214:1,14,25 215:1,13 217:10,18 218:16,25 233:8 234:25 235:3 246:25 247:20 248:4,11,14, 21,23 249:19 250:3 251:2 252:7,11,14 253:2,14,17, 22 254:6,12, 17,22,24 255:5,11,18, 20 256:2 257:1,6,7, 13,19,24 258:14,24 259:7,8 260:8 261:8 262:2 263:3, 7,15,22,23 264:2,6,8, 12,16 265:16,22 266:1 267:5 268:5 269:24 270:16,17 271:1,25 272:8 273:5, 17 275:24 276:5,19,24, 25 277:3,15 278:1,6,12, 14,21,23 279:7,18,25 280:1,2,9, 11,12 281:3, 7 282:17,25 283:10 301:20,24 302:9 303:19 304:14 305:5,10,18 307:15,22 308:12,14,23 309:4,11,17, 23 310:3,22 311:19 312:9,21 313:20 315:2,11 316:11 319:7 320:7,21 321:1,3,4,15 322:4,7,13, 20 323:19 324:1 334:23 335:9,12,19 336:11,23 337:12 339:1,10 340:23 341:2,11 351:2,20,25 352:1 362:7, 17 363:1,5, 16,18 364:9, 13 365:11 366:2 367:18 368:1,16,21 369:5,14,20, 24 370:8 371:3 375:13 376:14 377:8,18 378:5,13,19 381:19 382:8,12,18 383:6
**necessarily** 364:25
**necessary** 124:9 174:9 273:11 275:17,23
**need** 12:24 14:20 39:3 58:6 61:11 85:2 87:25 88:18 89:24,25 90:1 108:14, 17 118:3 124:23 128:21 132:2,18 140:16 154:13,22 168:4,5,16 170:5 172:11 187:8,14 223:16 254:3

258:12 290:23 291:10 294:6 307:2 316:17 317:17 321:20,21 324:23 337:1 338:12 370:5
**needed** 30:20,21
**needs** 134:24 337:20 377:4
**neighborhood** 98:13
**nested** 243:13
**never** 31:19,20,21 40:11 65:2 110:25 120:22 131:15 144:1 157:25 171:19 218:15 224:25 276:20
**newer** 66:23 67:1
**nice** 9:23 10:1
**night** 310:18 316:9
**nightshift** 310:13,25
**nitrate** 73:7 322:3
**nitrates** 71:18,24 202:7
**nitrite** 322:4
**nitrites** 44:19 71:18, 25 202:6
**nitrosamine** 44:25 75:14 201:25 202:1,2 312:25
**nitrosamines** 44:19 55:25 59:23 60:1 61:23 68:12, 16,23 69:7, 17 70:10,21 71:2,19 73:18,19 74:11,18 76:1,4 79:17 80:16 196:12,14, 18,24 198:25 202:7
**nitrosation** 75:15,19,20
**nitroso** 44:22 72:10
**nizatidine** 301:9,12,15, 24 302:8,10
**noise** 49:14 52:23 90:1 201:3 244:8 277:8 280:18 289:20 376:4
**non-cardia** 45:18
**non-cured** 212:11 214:8,19
**non-malignant** 135:2
**non-significant** 45:17,22 46:6,13,17 47:17 106:11
**non-statistically** 46:24
**non-use** 134:7 149:23 170:21 175:3 293:6 327:20 328:25 379:9
**non-user** 379:19
**nonhuman** 279:16
**nonresponsive** 203:11 210:9 223:12 238:23 249:1 254:14 298:8 339:6 346:22 347:13 377:14
**nonsteroidal** 245:20 292:13 358:10
**Norgaard** 133:23 134:19 135:3 139:22 140:8,10 141:13 150:15 176:2 293:17 331:2 356:14,16, 17,21 357:23 358:21,24 359:20 360:19 361:2,24 362:2
**norm** 42:16
**North** 82:5 85:6
**Notary** 8:14
**Note** 158:6
**noted** 20:15 73:17 151:21 153:7 387:9
**notes** 181:24 193:4,7 247:17 322:1
**notice** 102:10 201:5
**noticed** 38:21 225:3
**NSF** 201:12
**number** 5:11 8:23 24:17 25:3, 10,15,24,25 38:25 39:18 46:9 50:7 58:21 85:18 93:5 98:20 139:12,16 141:12 144:18 145:9,13 149:11 169:21 170:1,5 180:13,17 182:1,2 183:10,12 189:7 208:21 224:22 236:19 245:8 258:10 288:13 295:14,17,19 311:5 343:12 344:14,19 345:2,25 349:14,24 357:15 359:16 376:10
**numbered** 15:13
**numbers** 52:13 59:5 121:10 148:21 180:15

374:20
**numerator**
129:20,22
**numerous**
105:14
**nurses**
87:19
**nurses'**
87:13
**nutrient**
87:4 209:17
**nutrients**
60:22 69:3 285:3
**nutrition**
336:3
**nutritional**
60:21 86:21, 22

**O**

**oath**
8:2 11:2
**obese**
185:10,17
**obesity**
186:7,12
**object**
18:9 23:16 108:22 192:25 374:22
**objection**
8:8 18:7 19:2,9,19 21:5,8,16,19 23:7,18 25:2,5 26:4 27:9 28:11, 20 29:8,12 30:14 33:13, 25 34:10 35:8 37:5,16 38:5,7,14 39:9 46:1,22 47:4,19 51:3,25 52:18 53:24, 25 57:2 58:13,25 60:6 61:24 63:7,19 64:11 65:23 66:6,14,18 67:13,23 68:3,17 69:1,8,20 70:15,22 71:4 72:13, 21 73:24 75:22 76:2 80:7,18 88:17 89:12 90:25 91:10 92:5,23 93:12 95:11, 17 96:17,22 100:8,25 107:1,8,21 108:19 109:25 110:11 113:23 115:2 117:3 118:14 119:14 120:4 122:21 123:2,3,15 126:3,18 127:4,21 129:12 131:25 133:3,11 136:12 137:7 138:17,22 139:10 140:2,15 141:22 142:9 147:24 148:6,17 149:17 150:12 153:17 154:15 156:6,15 157:20 158:6 159:4 160:3, 4 161:13 162:2 163:11 164:7 165:1, 5,20 166:21 167:5 168:1 169:25 171:16 172:6 173:5 175:15,22 179:24 180:16 181:1,11 182:8,22 183:23 184:11 185:11,20 186:10,18,23 189:15,23,24 190:14 200:4 203:14 204:18,25 205:17 206:1 207:11,19 208:5,7 209:11,23 210:14 212:7 213:12 214:2 215:2 216:21 217:21 218:20 219:9,22,24 220:4 221:22,23 223:15 225:16,23 226:6 227:21 228:7,12 229:5,18,23 230:4,11,17 231:2,4,13, 17,23 232:8, 25 235:23 236:18 237:7,20 238:7 239:8 240:8,19,23, 24 241:11,21 242:4 243:2, 20 244:2,16, 23 246:5,11 247:14,23 252:9,17,19 253:4,19 254:7,18,25 255:6,19 258:25 261:10 262:3 264:7,19,20 266:23 267:11,18 268:7 270:12 271:3 272:1, 9,18 273:8, 18 276:1 277:2,21 278:17 279:1,12 280:4,15 281:22 282:7 283:5,18 285:16 286:25 287:24 290:11 291:9,15 293:11 294:5 295:21,22,24 296:24 297:5 298:22 299:15 300:1,25 301:17 302:1,3,12 305:11,25 306:23 307:25 308:21 309:20 312:12 315:13 318:14 319:9 322:14 324:2,20 325:17 326:4,14 328:4 329:8, 12,13,15,24

330:11
331:19
332:17
333:15
334:5,24
335:3,10,20
336:25
339:12 342:9
343:10
344:9,10,25
345:7 347:3,
5,20 348:4,
20 349:11,21
350:10,16
351:3,21
352:17,18,20
353:5 354:10
355:20
356:7,25
358:1,23
359:12,21
361:6,9,19
362:19 363:7
364:1,10,19
365:7,22
366:5 367:19
369:7 370:2
372:9,25
375:17
377:19 378:6
379:3 382:3
384:1
**objections**
8:10 132:25
**observation**
274:18
**observational**
88:13 89:18
173:16
209:4,25
227:2,8
262:11 277:1
280:2,6
**observe**
210:24
269:10
**observed**
57:16 114:7
209:13
262:14,17,20
269:9 270:8
325:21
336:23
337:11
339:10
**observing**
210:20
**obtain**
354:17
355:2,12,17
356:3
**obviously**
30:3,7 83:6
123:19
227:25
241:13
317:25
**occasions**
133:6
**occu-**
382:19
**occupation**
268:1 279:19
281:3 341:12
372:2
**occupational**
202:24
203:3,5,8,
13,16,25
204:2 267:5
280:10,13
335:12
368:15
369:16
382:20
**occur**
159:12
**occurs**
94:6
**odds**
45:16,24
49:23 51:14
52:6,8 54:20
341:1
**offer**
26:17 28:18
30:11 277:25
278:5,11,20
381:18
382:11,14
**offered**
9:3 62:18
**offering**
278:3
**offhand**
34:20 190:17
373:5
**office**
200:21
**offices**
193:22
**official**
100:6,21
**okay**
9:9,10,11,
12,25 10:4
11:19 12:5
13:4,12,13,
16 14:1,18,
21,22 15:6,
12,25 16:8
17:14 18:10,
22 19:6
22:2,8,12
24:13 25:12
27:12 28:23
34:1,2 36:3,
14 38:11,21
39:11,15,24
40:9 41:12,
20 43:8,12
44:1 45:12
48:3,8 51:8
55:18 56:13
59:7,16
61:16 65:6,
20 66:10
68:9 69:11
71:14 73:13
74:4,24 77:5
78:3 80:15
81:15,25
82:21 88:2,
5,20 95:2
98:11,18
99:9 100:20
102:10
103:4,25
109:8,10,17
111:18
115:10
121:20
122:12
128:7,14,24
130:6 131:9
132:18
135:10 136:5
138:14
139:14,18,23
140:17 141:6
143:4,16
145:24,25
146:16,24
147:15
148:14,24
149:4 150:19
151:25
152:23
162:18
163:18,25
164:18
170:14
171:14,19
174:9,23
176:17
178:21
186:5,17
191:25
192:1,20
194:5,9,17
196:22
198:1,13
199:17
206:16
207:18 208:9
216:10
219:17
223:19 225:3
227:18
228:16 231:3
233:3,12
234:6,14,20

245:25
247:7,9
249:5,15,17
250:11 253:1
260:19
269:15 271:9
277:13
295:23 297:3
298:12
299:22
300:15,16,19
302:15
304:23 307:7
311:10
312:1,18
313:5 314:16
315:5 317:10
318:7 319:15
320:2 322:10
323:8 327:3
329:14
331:13 335:2
340:9,16
341:1,6
342:4 343:5
344:15 350:6
353:20
356:13
361:14
368:7,13,18,
25 372:21
373:18,20
374:25
377:13,24
381:1,3,16
382:10

**older**
64:4

**once**
144:24
229:21
269:21
272:23
274:16
366:22

**oncologist**
206:21,23

**oncologists**
206:25

**one**
4:9,17 9:6
11:15 16:8
17:12 22:3
24:7 26:15
29:20 34:23
41:13 46:15
48:12,13
49:20 51:9,
10,18 52:23
53:2,13
54:6,22
55:1,11
56:23 59:9
61:3 65:2
71:2 74:11,
16 75:18
78:23 79:6,
8,11,14,17
85:8 87:21
90:20 92:14,
25 104:22
107:24
108:4,25
109:10
118:16,23
120:7,22
125:3,21
129:10,11
130:14,24
131:15
134:17 138:1
144:5,8,15,
16 146:9
148:10
151:19 154:5
157:7 158:20
168:3,13
170:19,21
174:1,4
178:16
182:14 190:3
194:12 198:7
199:25 200:8
210:3 213:8
220:9 222:13
223:9,10
224:18
230:10,16
232:11
233:25
234:2,6,13
236:1 244:18
258:10
262:15
273:21 291:7
294:1 298:2,
5 300:4
310:13 325:8
328:16
332:1,24
338:15,17,20
345:24
346:13
347:1,11,18,
24 350:18
357:6 363:12
369:9
370:14,19
373:2,4,13
378:15 382:8
383:19 384:9
385:20

**one-day**
287:7

**one-to-one**
324:11

**ones**
53:18 139:21
148:4,7
202:22
277:20,23
315:25
333:23

**ongoing**
282:2

**online**
82:18

**onset**
151:22
152:19
153:8,13
155:8 156:4,
14 159:3
160:1 312:24
313:11

**open**
197:14,22
218:8

**opening**
128:13

**operate**
76:16 111:12

**operative**
233:9 235:1

**opine**
27:6

**opinion**
26:17 30:1,
21 67:12,14
126:14,19,24
127:16
159:25
205:15 231:7
239:19
248:19
264:5,8
269:25
278:1,5,12,
20 279:2
300:3 302:4
381:18
382:11,15,16

**opinions**
28:18,24
29:24 30:12

**opportunity**
32:25 200:10
317:14

**opposed**
167:18 243:5
274:10
284:12 285:2

**optional**
203:4

**oral**
87:20,22

**order**
17:11 22:21
86:18 87:12,
16 90:2
251:14 254:1

257:7 325:20 383:13
**Organization** 350:24 351:6 352:15
**Organization's** 351:16
**organizations** 70:17
**orientation** 174:13
**original** 274:25 326:24 350:7
**originally** 366:12
**outcome** 7:14 80:13 81:11 154:23 173:13 206:9 208:13 239:22 256:16 268:21 289:11 376:22
**outcomes** 38:19 153:22 155:17 156:20,23 157:11 158:23 190:9 210:1,19,25 222:11 235:3 346:7 383:5
**outside** 6:10 189:9 200:22 203:22 284:15 285:22
**over-the-counter** 93:9 286:10 297:21,24
**overestimate** 269:3
**overweight** 80:6
**overwhelming** 305:4,9,21
**overwhelmingly** 352:23
**Oxford** 4:9
**oxidative** 38:18

**P**

**p-value** 46:7,14,19 110:16 111:24 114:5 120:15 124:14
**p-values** 99:7 105:25 108:2 109:20 110:25 111:3 115:17 116:1,9 117:25 118:1 122:2,24 124:5
**p.m.** 7:6 95:24 96:3 151:4,8 190:23 191:3 249:7,12 250:18,23 302:19,24 341:18,22
**page** 5:4,11,20 14:9 15:2, 20,21 16:20, 22 17:12 22:7 36:16, 17 43:13 44:1 45:5,7, 8,9 48:4 55:22 57:7 59:8 62:12 70:1 73:4,13 78:4 98:20 99:2 100:10, 13,16 103:6, 14 104:16 105:18 109:10 116:17 121:23 128:25 143:17 151:11,14,16 152:8 160:16 161:4,11 162:21 169:21 170:1,5 171:2,10 172:10 173:2,9 177:19 179:17 180:11 197:4 211:15,17 215:16,19 216:3,8 217:6 224:3, 5 234:22 235:9 247:18 262:7 276:8 291:3 304:23,25 307:5,6 311:10,23 312:1,2,17 315:22 316:4 319:16 321:25 331:8 332:20 333:17 334:6 336:14 338:14 339:23,25 340:1,3,6,9 341:7 343:21 345:19 373:16 374:6,7 375:10
**pages** 14:25 15:7, 13,14 36:25 121:23 197:3
**paid** 96:15 98:7
**pancreatic** 26:3,10 182:12 190:7 334:3,8 365:1 372:24 373:8
**panel** 65:12,24 66:1 145:15, 22,23 199:21 200:2,16 201:11,13, 16,19,21,22 217:18 218:24 219:3
**panels** 65:3,5,7,9, 22 200:7 201:12
**Pantheon** 4:1
**paper** 16:21 17:2,4 21:25 32:15 37:21 60:11 81:4,5 100:14 115:14 163:17 167:6 168:2 172:1 182:5,6 215:15 223:16,18 232:16 297:2 299:2,16,17 301:2,16,18 328:6 329:10,18 338:6 341:4 366:11,12

371:19 374:11
**papers** 18:1 22:3 29:15,17 32:2,15 35:2,10,18 37:8,19,23 38:16 59:5 119:22 120:20 219:12 328:5
**paragraph** 22:9 42:1 44:3,5,7 45:6,11 48:5,6 56:14 59:12,13,18 69:2,12 70:3 71:15 99:3, 4,5 105:21, 22 109:11,14 118:16 151:18 152:8 160:17 211:18 308:8 312:16,19 314:23 322:17 323:14 339:14 340:4,17 347:24
**parentheses** 22:22
**Park** 4:17
**parlance** 120:17
**part** 6:22 13:11 43:3 45:13 72:10 75:18 82:22 87:16 88:7 120:7 134:14 140:13 143:20 145:20 201:12 266:1 267:13 274:21 275:16 296:2 384:4
**participants** 6:3,19
**participated** 107:25
**participating** 7:21
**particular** 26:16 27:5, 24 29:20 30:21 50:18 61:6 76:14, 17 77:24 83:8,17 85:11,17 94:4 137:22 148:9 161:8, 19 165:9,14 183:7 184:13 222:10 268:16 340:17 351:9 357:6 371:6
**parties** 8:6
**partly** 306:13
**parts** 54:6 108:25
**party** 7:13
**pass** 380:20
**PASSARETTI-WU** 314:12
**passed** 111:24 198:7
**past** 10:25 17:9 32:22 200:9 282:1 321:18
**pathologist** 206:14,15
**patient** 31:19,20,21 203:1
**patient's** 227:17
**patients** 160:6 179:2 189:6 228:24 229:13 294:15 348:18,22 349:9 362:14
**Patricia** 28:15
**pattern** 67:9 124:24 125:2 128:4, 5,20,21 131:6 134:16 138:4 150:16,17 168:9 237:25 238:19 242:18 243:14 259:16,17 263:12 265:19 270:5 296:9 330:21,22 331:12 339:1,4 352:5 357:20 365:15 376:10,11,12 383:1
**patterns** 227:11 257:23 259:7 285:2 287:10 323:2 368:3 376:2
**pause** 12:2,4,7 260:18
**PDF** 15:14,21 36:16
**pediatric** 362:7,12,14, 18 363:3,6, 24 364:8,24 365:20
**peer** 218:7 256:2 267:23
**peer-reviewed** 67:15 196:11 239:14 266:19 267:2,13 277:5 304:22 315:15 327:4 331:4,16 332:14 333:12 334:2,22 335:8,18 365:19
**penalty** 8:5
**pending** 13:2 373:19
**Pennsylvania** 4:10
**Penston** 232:11
**Penston's** 232:23
**people** 21:10 29:23 50:20 84:20 86:6,21 87:12,13 92:9 93:17 94:7,13,18 102:23 113:18 117:24 127:8 142:12,13 147:7,21 148:12,15 155:22

176:11 179:6 180:7,9 181:25 182:20,21 183:1,9 184:3 185:10,18 188:18,20 189:8 190:12 194:8 203:18 210:22 218:8 219:16 220:15 223:7 224:17 226:17,20,24 229:15 237:11 238:14 242:9,11,15, 23 243:18,25 256:22 258:11 266:7 282:12 286:4 287:9 288:10 291:19 292:18 293:2,3,8 294:19 295:8 296:11 298:17 300:5 310:19 323:4 336:4,8 347:8,10 350:3 353:9 354:14 355:11 357:7,18 358:13 359:8,9 360:1 365:14 377:10 382:24 383:11 384:6

**people's** 178:7 226:1 246:19 292:6

**percent** 46:11 48:17 49:3,23 50:21 51:12, 15 52:7,9 54:5,21 55:4 57:15 96:25 99:6 120:18 135:1 169:18 171:7 185:6, 10,22,23 186:7,12,13, 16,19,22,24 187:1,2,24 188:7,11 274:24 297:23 346:12,25

**percentages** 180:19

**perfect** 136:3

**perfectly** 254:16

**perfecto** 9:25

**performed** 221:25

**performing** 206:6

**perils** 109:20

**period** 83:13 152:11,16,18 153:10,12 155:5,7 156:2,3,12 158:22 159:2 182:13 241:17 242:10 244:11 281:13 293:23 332:10

**periods** 138:16 154:13 159:12,19

**perjury** 8:5

**permit** 65:16

**person** 8:3 94:1 189:11 228:5,10 229:8 310:7, 21

**persons** 74:13

**pertains** 308:24 316:22 371:2

**pertinent** 195:1

**ph** 43:23

**Ph.d.** 7:2

**pharma** 232:13

**pharmaceutical** 220:3

**Pharmaceuticals** 4:7

**pharmacoepidemiological** 247:25

**pharmacoepidemiology** 138:24 162:12 345:10

**pharmacy** 348:25

**phone** 77:3 193:12 314:10

**phrase** 232:19

**phrased** 256:12

**physical** 28:13 64:3 288:3,8,17, 19,24 289:2, 21 290:2,3

**physically** 7:22 193:20

**pick** 140:3 198:8

**picked** 139:22,23 268:19

**picking** 83:22

**piece** 119:19 359:24

**pieces** 262:15

**PIETRAGALLO** 4:8

**pill** 208:3 209:22 210:12 248:10 256:17 382:8

**pill-based** 209:1 210:6

**pills** 93:5 208:15 211:2

**Pittsburgh** 4:10

**place** 265:17 310:24

**placebo** 212:12

**plaintiff** 7:4

**plaintiffs** 117:9

**plaintiffs'** 99:11 103:7 106:15 118:7,22 124:10 318:2

**plant**
203:19 369:17 370:22
**plasma**
214:5
**plausibility**
269:23 270:7,23 271:17 275:15
**plausible**
53:12 56:9, 21,25 163:23 174:2,17 268:5 269:8, 16,18 271:1, 12,24 272:7 273:4,15 274:13,21
**play**
31:15 86:16 262:13
**please**
7:17 12:17 14:3 41:7 44:2 55:23 56:15 57:11 61:18 67:25 70:1 71:16 78:6 85:2 88:4 90:19 128:9 131:19 132:20 147:25 150:21 151:12 157:16 159:17 165:25 166:1,23 187:15 211:16 215:19 224:7 233:4 304:24 307:6 309:8 311:9 316:13 317:11 324:14 358:7 373:10 380:8 386:17
**plenty**
158:10 242:21 245:17 267:24 270:21 289:9 306:17 365:13
**plot**
128:24 129:6 130:7,11,14 138:6 145:21,23 147:14
**plots**
131:21 136:14
**plotted**
132:16 140:21 141:12 142:2,10
**PMID**
18:13,15
**Pobel**
311:16 312:21 315:7
**point**
49:9,13 60:16 62:14 68:13,19 75:18 81:21 85:14 86:16 101:10,12,19 108:14 117:9,16,17 120:12,13,20 124:3 125:18,23 129:15 133:16 134:21 136:16 137:18,19 144:2 149:22,24 157:23 158:18 169:9 170:18,20 175:25 243:9 260:6 261:6 268:14,25 269:2 270:24 272:11 273:25 275:8,10 276:12 296:12 297:4 300:13 315:20 328:13,15 332:7,23 333:6,19,21 334:9,11,13, 15,18 353:10
**pointed**
315:21 347:23
**pointing**
187:17
**points**
84:24 85:11, 12 87:24 109:13 343:16,17
**Polycom**
314:13
**polycyclic**
324:7
**pool**
243:24
**poorly**
12:13
**population**
54:13,16 80:22,25 82:25 83:6 84:4 93:18, 20 189:3 237:1 238:13 244:6 245:11,12 246:17 287:3,5 297:15,16 346:17
**population-based**
84:12 327:24
**populations**
73:8 88:15 204:8 238:2 243:11 281:5 287:6 300:7 305:17 336:18
**Portability**
179:20
**Porter**
121:6
**portion**
68:1 157:18
**positions**
36:22
**positive**
45:18 73:17 77:20 313:18 314:25 318:10 319:5 322:23 336:18 340:20 380:5
**possibility**
269:10
**possible**
69:13 111:10 248:7 309:13,19,25 354:17 355:2
**possibly**
86:8 306:7
**poster**
84:1
**potential**
163:7 164:2 167:23 220:12 222:4 224:13 253:23 262:18,19

311:15 312:6
**potentially**
306:11
308:15
**power**
227:2 242:20
348:6
**powerful**
167:13,16
**PPI**
149:22 293:5
297:12
327:14 329:1
357:8 379:8,
19
**PPIS**
134:6 223:10
349:5
**practical**
114:14
**practice**
14:13 33:10,
19 102:5
113:18
117:20 268:8
326:6
**pre-exposure**
262:24
**pre/post**
80:21
**preamble**
154:12,16
**preceding**
312:24
**precise**
47:14
**precision**
48:1 49:19
108:9 109:2
137:17 269:6
**predominance**
40:1
**predominant**
23:5,9
**preface**
265:9
**prep**
166:9
**prepare**
17:22
**prepared**
28:6 43:8
129:4 180:23
217:2 303:17
**preparing**
13:17 282:19
**prescribed**
224:25
225:12,25
292:15 345:4
**prescribing**
227:11
**prescription**
93:4,7
139:24
141:9,14,15,
21,24,25
142:3,8
143:23
144:12,19
146:17,22,23
147:2,4,8,22
148:3 182:17
183:15
222:17 229:9
245:8 246:4
293:25
344:12
345:5,24
346:13
347:1,11,18
350:12,18
355:4 356:19
357:11,24,25
358:4,22
359:1,14
361:22
**prescriptions**
134:20
139:12,16,25
140:1,13,23,
24 142:12,13
145:10,11,20
148:12
183:7,10
244:15,20,22
246:8,9,10,
15 248:2
286:13
290:10,14,17
293:22,24
294:3,19
334:20
343:15,20
344:5,14,20,
22,23,24
345:2,6,12
346:1 347:25
348:1,2,3,12
349:18,19
350:8
356:20,22
359:5,11,16,
19 360:3,20,
25 361:2,12,
16,17,25
362:3
**presence**
6:10 43:21
70:20 233:8
234:25
**present**
4:13 7:23
193:24 194:2
212:4,18
217:11 235:4
**presentation**
82:23
**presented**
130:6,9
**presenting**
130:5
**preserve**
94:19 286:4
**preserved**
62:12
**president**
116:21
**Presumably**
79:23
**pretty**
135:8 178:23
**previous**
157:17 312:2
315:22
**previously**
5:14,15,16,
17 121:11,18
176:20
207:23
324:16 354:2
**primarily**
115:19
117:24
203:20,21
307:15
**primary**
128:25
131:12
351:25
**principle**
125:1 228:13
**principles**
27:16 52:24
58:23
113:16,17
**prior**
12:15 121:3
142:21
313:10
**priorities**
119:7
**prioritizing**
119:1
**privacy**
179:10
**private**
6:8 121:2
**privy**
65:25 66:3
356:11
**probability**
31:6 32:6
114:6,8
148:19 149:3
**probable**
62:9 76:4
249:19 250:4
251:3,6,13

254:1,23 266:4 306:21 310:10
**probably** 14:19 30:8 35:25 39:2 86:3 130:11, 24 131:14 134:11 255:21 354:4
**problem** 76:18 86:24 183:19
**problems** 111:4
**proceed** 263:4
**proceeding** 6:4
**proceedings** 7:18
**process** 32:16 70:7 197:23 207:21 217:7,8,23 276:9
**processed** 70:18 208:2 209:21 210:11
**produced** 114:7 303:18
**product** 230:24
**products** 7:8 278:2,7, 13,22 279:7 282:18 283:1 381:20 382:12
**professional** 37:8
**professor** 105:13
**profited** 230:23
**Program** 200:17 256:1
**projects** 34:24
**promote** 70:9
**promoted** 229:21
**promoter** 240:2
**promoting** 230:2
**promotion** 154:24
**propensity** 223:5 224:12
**proportion** 176:8
**proposed** 195:7 196:9
**proposition** 326:11
**prospective** 336:2 351:10 360:13
**prostate** 24:11
**protein** 195:24 223:10
**proton** 195:21
**provide** 11:13 88:19 89:18,21 236:9 239:10 256:9 259:15 273:10 316:17 318:4,5 321:7 339:8, 14 354:7 374:8,18,20 384:22 386:1,15
**provided** 13:20 214:7 215:11 341:13 344:3
**provides** 216:17
**proviso** 12:25
**proxy** 248:21
**public** 8:14 85:7,9 102:4 112:24,25 355:10
**publically** 179:9 267:16
**publication** 326:23,25
**publications** 239:15 335:18 355:8
**publish** 33:3 130:21 198:7 219:12
**published** 18:1 23:1, 12,14 24:15, 24 29:16,21 32:2 33:10 35:1,18 36:21 42:14 60:24 67:15 126:6 155:16,21 196:11 199:8,12 202:23 203:12 211:23 218:6,7 232:13 236:2,3 239:13 257:17 278:16,24 279:10,15 327:4 331:3, 9,16 332:13, 19 333:11 334:1,7,21 335:8 355:8 364:12 365:19
**pull** 101:3 143:25 160:11 164:23 169:20 197:1,11 198:22 211:15 212:24 223:17 233:1 241:23 243:16 244:24 246:14 256:8 291:1 299:17 303:11 321:8 327:7 328:5, 6 329:18 341:4 342:10,13 355:21 370:3,5 372:19 373:1,5,21
**pulling** 122:3 181:24
**pump** 195:22,24 223:10
**purpose** 6:12 178:3 213:5 325:13
**purposely** 292:17
**purposes** 91:24 372:15
**put** 18:15,19 19:3 26:18 58:8,9,14 84:11,19 88:7 100:6, 21 101:13 103:22

114:18 118:13 119:7 121:16 129:7 131:4,14,15 184:20 224:6 301:21 373:12 384:10 385:16
**puts** 18:18
**putting** 19:23
**pylori** 43:15,16,18 44:5,10,18 89:5 294:16

**Q**

**qualifications** 35:1
**qualified** 29:6 30:11,13 47:6
**qualify** 378:7
**qualifying** 40:16
**qualitative** 57:25 323:16,23
**Qualitatively** 308:9,11
**quality** 93:1,15 174:25 222:21 285:6 286:15 292:18 346:6,7 377:3,6 379:11
**quantification** 42:19 52:25 248:11
**quantified** 247:20
**quantify** 125:18 160:23 162:24 248:1,4,14 342:7 343:8 344:2,15,18
**quantiles** 316:23 317:4 318:19,22,23 319:1
**quantitative** 253:11
**quantitatively** 125:20
**quantity** 284:4
**quartiles** 315:18 317:1
**question** 12:11,12,16,20 13:2 16:1 18:4 21:1 30:5,10 33:18,24 34:4 36:2 65:20,21 66:11 67:24 97:9 99:24 110:3 116:5,7 126:23,24 127:15 133:9 137:5 139:4 145:6 146:1,2 147:20 157:17,22 158:1,24 166:10,17 167:2 168:21 170:3 171:8 189:13 191:24 192:2 205:7 209:7 215:24 218:22 232:3 236:14 238:9,24 239:4 240:16 241:3,5 243:23 244:4,5 245:9 251:19 254:17 259:13 261:4,14 270:10,13 273:12 274:13 276:3 280:24 281:23 287:14 289:4 291:2 292:9 316:10 331:13,15 337:9 338:5 343:7,25 349:7 350:7 353:15 366:14 369:1,9 370:6 372:11 373:19 375:12,18 377:15,22,25 378:2,10 382:5,6 383:19
**question's** 210:10
**questionnaire** 292:5 323:4
**questionnaires** 280:21 322:19,21
**questions** 9:2 11:12 16:9 65:18 91:24 94:25 96:10,24 131:9 191:21 194:10 274:16 291:25 317:11,14,17,25 323:5 337:22 342:6 370:11 373:22 380:23 381:1,15,16 383:17
**quick** 9:17 314:1
**quicker** 197:2
**quickly** 342:5 368:7
**quieter** 201:4
**quit** 287:9
**quite** 49:17 50:12 93:19 104:13 105:6 109:16 167:15 274:4
**quotation** 101:1
**quote** 88:8 100:18 103:3 163:20 216:23 262:7
**quoted** 89:10
**quoting** 153:4 378:21

**R**

**race** 185:15
**radiation** 89:8
**raise** 9:19
**ran** 227:3

**random**
42:24
**randomize**
227:7
**randomized**
211:21 227:5 267:8
**range**
148:9 160:9, 12 182:10 237:9,23,24 284:10 301:5 306:6 334:16 343:19,23
**ranitidine**
7:8 8:24 27:13 72:9 126:2,16,21 127:2,9,19 129:1 130:18 136:7 137:3 138:12 145:16 153:21 155:16 156:20 157:10 158:19 168:7 172:22 184:22 185:19,24 186:8 188:9 194:22 195:3,5 210:24 211:2 212:5,12,18, 22 213:20 214:14,20,25 215:1,5,10 217:10,11,19 218:11,16,25 219:4,6 222:25 224:15,16 225:1,4,7,9, 12,14,15,21 226:4,14,16 227:13,14 228:6,10,20 229:3,4,9,16 231:7,10,16 232:5,14,21 233:6,8 234:25 235:2,4,20, 21 236:15, 16,25 237:5, 19 238:1,4, 5,20,25 239:1,5,6,24 240:1,2,5,7, 11,12 241:8, 9 242:2,16 243:1,10,14, 18 244:1,5 245:4,10,14 247:11,12,21 248:3,5,15, 17 252:8,13, 15 253:2,13, 15 254:5 255:15 257:7 259:10,13 263:17,20 264:2,9,12 265:16 266:7,13 267:4,25 270:3 271:25 272:3,7,12 273:5,13,17 275:24 278:2,7,13, 22 279:4,7, 19,22,25 280:11 281:2,4,6 282:18,21,25 286:18 290:7 294:4,12 296:4,10,23 297:4,11 298:11 300:6,23 301:9,12,14 302:11 303:7 327:6,9,25 329:7,22 330:7 331:5, 10,17 332:15,20 333:13,22 334:3,7,9 335:7 338:24 339:2 341:12 342:8 343:8, 13 344:3,16 345:3,20,24 346:4,12,16, 19 347:1,17 348:13,19 349:4,10,20 350:9 351:12,13 354:9 356:15,23,24 357:10 362:11,22 363:20,25 364:12,18 365:6,9,16, 21 367:23 371:20 372:12,23 374:9,12 375:14 376:13,20 377:10,18 378:5,12,20 380:3 381:20 382:12,17,22 383:2,5,6,23 384:8
**rank**
93:22 94:7 95:5,7 246:19
**ranking**
94:19 286:4
**rare**
61:1 81:10
**rarity**
81:11
**RASPANTI**
4:9
**rate**
42:25 97:8, 11,14 98:18
**rated**
85:8
**rates**
287:4
**ratio**
45:16,25 49:23 51:15 52:6,9 54:20 129:16,20 137:21 341:1
**rats**
307:14
**re-**
39:6
**reach**
29:2 235:22 236:17 326:19 330:9
**reaches**
230:9,15
**read**
29:17 30:3,8 39:15 53:19 67:25 68:2 79:19 83:4 88:20 101:11 105:22 111:18 117:8 142:1 144:23 152:20,21 153:4 157:16,19 160:20 163:22,24 186:3 220:7, 8,20 241:4 312:16,17 316:21 321:17 323:1,6,12 326:17 346:11,24 347:19 351:6 354:5 356:8 372:3 373:16

**reader**
51:8 52:15, 19 55:16 58:3 130:17 133:19 140:6 219:13 379:11
**readily**
176:11 221:8
**reading**
67:15 73:14 157:24 206:5 219:14 345:19 371:16
**reads**
22:13
**ready**
216:1
**real**
9:17 32:25 50:15 227:1 286:16 296:4,5 314:1 325:22 342:12 382:23 383:10 384:5
**reality**
226:20,23 227:9,11
**realtime**
11:25 241:3, 14 261:20 377:23
**reason**
12:12,15 58:14 69:5, 15 114:23 133:2 144:17 178:16 198:4 263:4 289:15 305:12 321:19 362:16 363:2,4,10
**reason-**
256:3
**reasons**
16:8 224:18
**recall**
62:17 75:2 76:18,24 77:10,24 82:16 90:10 126:11 154:17 163:19,21 169:22 170:3,4 258:12 263:13 285:9 292:6 299:3 301:18 313:9 317:5 324:19 328:3 338:17,22 353:17,18 368:4 381:22,23 382:1,2
**recalled**
84:6 85:19 91:6 253:14, 16 282:22
**received**
39:12
**receiving**
294:19 295:12
**recent**
42:8 60:19 61:14 81:18 241:16 292:19
**recently**
32:4 60:10 67:7 82:3 123:21 220:7
**receptor**
195:9,13
**recess**
95:25 151:5 190:25 249:9 250:20 302:21
341:19 380:12
**recognize**
86:21
**recollection**
244:25 246:14 312:22 321:13 373:2
**recommended**
106:25 226:3 227:13,15,19 228:19 229:3,8
**recommending**
106:2 107:4
**record**
6:2,7 7:19 12:7 68:1 87:9 95:23 96:3,6 129:8 151:2,4,8 157:18 166:17 167:15 168:15 178:25 190:21,23 191:3,24 192:21 234:11,13 241:13 249:4,7,12 250:15,19,23 260:18 286:8 297:18 302:19,24 314:1,2,4 317:23 325:1 337:16 341:16,18,22 368:10,12 376:24 377:2 378:1 380:8, 10,15 384:10 385:16 386:24 387:4,7
**record's**
146:5
**recorded**
6:4,6
**recording**
6:13
**records**
280:22 284:13 286:12 293:19
**red**
134:1 135:16,17 139:22 340:21,22
**redeemed**
293:21,25
**reduce**
44:20 75:12, 21 80:5,16, 19 290:4 310:17
**reduced**
54:21 79:24 80:4,15 208:23 289:12 309:12,18,24 310:12
**reduces**
68:14 289:2
**reduction**
57:15
**REEFER**
4:11
**refer**
13:6 17:1,6 42:18 60:7, 18 62:1 67:19,21 71:3 99:19 113:11 164:12 195:16 298:2 321:5 322:15 373:8,16

**reference** 17:17 18:16 20:20,22 52:2 58:10, 15,20,22,24 59:3,6 64:24 70:18 74:1 103:16 104:2,9 115:25 116:8,10 117:1 118:10,21 119:12 122:17,19,22 135:13
**referenced** 17:16 20:7, 9,10 99:9 102:10 123:7 199:2
**references** 18:2,3,20 19:4 20:18, 25 21:11 58:9 384:12
**referencing** 63:16 116:13
**referred** 16:19 17:21 21:24 43:16 68:1 107:11 135:3 157:18 177:3 258:1
**referring** 13:12 16:17 46:3 68:4 82:4 89:9 102:12 144:16 177:20 184:2 195:13,18 202:15,19,22 203:17 217:22 224:4,5 231:19 232:16 280:7 315:12,25 330:25 331:1 333:16 339:25 366:7 376:18 378:24
**refers** 202:5 281:13 323:10
**reflect** 5:23
**reflective** 289:6
**reflects** 345:2 384:15
**reflux** 224:19,21
**refrain** 166:23
**refresh** 14:16,21 122:5,7 178:10 304:1,7
**regard** 322:5
**regarding** 9:2 16:2 99:5 102:11 128:25 194:10,14,18 215:21 257:1 278:1 321:14 340:10 372:23
**regime** 282:12
**registries** 222:14 349:2
**registry** 190:11 222:13 344:13 345:14 356:19 359:14 376:23
**regression** 40:12 94:16 95:19
**regressions** 94:11 286:2
**regular** 292:2 293:3, 9,14 346:4 348:8 358:14
**regulations** 179:10
**regulatory** 206:17,18
**reiterate** 296:1 328:8
**relate** 37:19 38:3, 23 39:1 60:22 306:16
**related** 7:12 34:8,19 37:13,21 38:17 54:19 60:15 61:13 74:10,18 172:14 196:14 205:3 222:25 239:24 242:5 274:9 287:15 290:4 307:1 311:6
**relates** 224:9
**relating** 195:21 196:12,18,23 198:25 208:23 216:19 260:8 262:1 303:19 320:25 362:6,18 363:6 368:16 375:2
**relation** 57:17 73:6, 17 261:8 266:12 367:18
**relationship** 313:18 314:25 318:10 319:5 320:7
**relationships** 320:21
**relative** 78:22 187:21
**relay** 47:22
**relevance** 123:21 141:19 142:7,11,14 230:13 371:20 372:11
**relevant** 25:10 26:6 76:7 103:2 117:18 119:18 124:13 175:4 194:21 238:8,14 242:6 244:4, 5 245:9 255:9,10 259:12 267:1,14,22 268:3 272:15,20,22 273:2,12 276:16,19 279:21 280:23 300:2,3 304:20 311:13 312:4 340:14 341:10 362:21 364:20 365:8
**reliability** 90:13 284:8

285:1
**reliable**
120:8 126:7, 21 127:12,17 233:7 234:24 259:17 262:9 263:25 264:11 266:8 269:20 270:8 271:11,22 274:18 276:13 297:17 309:3 367:14,25 368:2 375:16 382:21 384:7
**reliably**
36:20 91:5 102:7 288:4
**relied**
110:25
**rely**
109:5 286:12 346:9 348:23
**remain**
249:16
**remainder**
380:24
**remember**
10:17 86:10, 11 105:5 106:14,20 197:3 198:11,17 220:5,6,8 321:20
**remind**
157:13
**remote**
6:11 7:1,11, 18
**Remotedepo**
6:25
**remotely**
7:25
**remove**
6:17 53:1

269:9
**repeat**
12:17 55:2 67:24 92:15 167:1 261:4 262:5 278:18 335:4 339:16,17
**repeatable**
272:14 276:22
**repeated**
371:11
**repetitive**
192:10,23,24 199:24
**rephrase**
12:18 147:25 191:24
**replacement**
156:24 245:20
**replicable**
276:14
**replicated**
168:5 317:8 330:16 336:20
**replication**
138:3 336:17 375:23
**replications**
333:9
**report**
5:23 9:2 13:21 14:9, 24 15:1 16:6,7,10,13 17:16,20 18:14 19:5, 12 20:2,17 21:2,21,23 22:1,5,8 27:8 28:5,16 35:4,22,24 36:7,19 47:25 52:12

58:18 60:7,9 62:24 63:4, 5,9,11,14, 15,21,24 64:25 66:9 67:18,20 68:6 87:20 98:4,20,23 100:17 102:12,15,16 103:1,15 106:15 107:13 116:12,17 118:6,13,19 122:20,24 123:8,9,12, 25 126:5 128:25 134:24 151:15 153:5 159:20 160:14,25 161:3,16,25 163:4 164:8, 12 169:20 171:2 172:4, 9 173:3,10, 14 174:7 180:24 182:6 193:3,5,11 194:10 211:10 215:17 216:3 223:20 224:3 225:5,9 231:18 233:5 234:22 235:9,12 236:8,12 249:23 256:7,19,23 257:3,20 258:20,22 259:3,9 260:7 261:7 262:1,6,8 263:16 268:16 274:2

276:7,8 277:24 282:20 291:3 293:13 297:1 303:17 304:13 306:2 307:4,12 316:1,7 317:19 319:11 321:6 327:15 331:22,25 333:18 335:11,13, 14,15,18,22, 24 336:13 337:13,14 338:13 339:7,25 340:6,10 341:8,9,10 348:24 351:6 352:9 359:16 372:4,13,16, 22 373:9,13, 17 374:6,19, 21 375:9,19 382:15 384:12,16,19 385:1,4,11, 19,23 386:6, 9,11,21
**reported**
15:9 48:10 52:15 53:18 73:5 74:9, 19,20 120:3 139:7,11,12 140:4,7,9 144:18 145:9 153:5 159:18 160:12 182:4,24 188:24 189:17,19 217:10,11 239:14 275:24 293:2,4

295:15 301:6 312:25 327:12 336:14 339:17 340:3,19 341:2 346:20 357:8 366:9

**reporter** 7:15,20 11:14,15,21, 24 12:1,8 61:17 68:2 76:25 77:8 119:25 144:20 145:1,6,7,12 157:19 166:15 198:19 233:18,23 234:16 239:2 247:15 250:7 260:12,16,23 295:3 360:23 373:23 377:20

**reporting** 7:24 8:9 45:22 47:15, 24 51:2 52:2 55:7,11 74:15 78:2 92:11 109:5 138:5 236:24 327:5,19 331:4,16 332:14 333:12 334:2,22 335:8 346:24 358:14

**reports** 18:11 63:25 64:23 124:17,22 221:5 245:1 282:22

312:20 332:1 364:2

**represent** 8:22 19:21 343:17 381:13

**represented** 22:24 133:22,24

**representing** 11:8 129:8

**reproduced** 102:8

**request** 6:6 384:9

**require** 158:18

**required** 43:2

**requires** 324:4 383:13

**research** 18:17 22:14 23:5,6,10,21 24:2 39:7 60:8,13 61:20 62:2, 22 63:14,18, 21,25 64:8, 18,22 66:3, 13 67:20 68:5 181:13 189:8 194:14,15,18 208:11 221:1 266:1 308:4 324:6 367:3

**researchers** 336:16

**reserving** 380:24

**respect** 159:1 161:11,15 240:1 246:25 310:5 363:20

**respectfully** 313:10

**respectively** 212:12

**respiratory** 307:16,23

**respond** 317:11,17,19 337:6

**responded** 338:4 381:24

**responding** 317:24 378:9

**response** 131:16 150:18 313:19 315:1,10,12, 16 316:11 318:10,21 319:6 320:7, 20 368:20 369:3,12 381:15 382:5

**rest** 118:19 191:9

**restate** 148:1

**restricted** 152:17 153:11 155:6 156:2

**result** 113:1 142:2 147:17 204:23 269:3 308:13

**resulting** 268:17

**results** 33:17 52:16, 20 55:7,11, 15 73:9 120:3 129:7 130:13 135:7 140:4,7,8,22 148:25

149:1,2,8,11 174:10 181:5 221:20 258:15 297:19 322:4,11 333:17 336:14 340:3 343:14 345:15 372:8

**retained** 32:13

**retrospective** 335:23

**returning** 66:10

**reveal** 32:15

**reverse** 129:24 332:12

**review** 21:3 26:25 41:1,10,21 42:2,4,10, 13,17 43:6 47:20,21 51:5 52:16 57:25 59:24 60:3,9,11, 19,23 61:14 66:21 67:3 68:20 71:17 72:6 73:21 74:21 78:9 102:14 103:18 106:5 123:24 124:15,16 156:19 161:2 166:25 182:9 196:25 205:14 213:4 217:1 218:8, 15 222:4 230:13 256:2 257:4,21 259:10

263:6,19 266:11,20 267:1,8,23 298:3 304:20 316:3 320:24 335:21 358:21 362:8 365:9 368:15,17 372:16,17,22 375:4,8
**reviewed**
16:6 19:10 27:8 28:17 62:22 63:4, 18 66:13,17 67:4 78:16 222:25 226:14 235:22 236:16 267:16,21 268:2 282:19 286:9 324:5 330:4 362:5 367:24 374:25 385:12
**reviewer**
219:11
**reviewing**
29:15 62:25 321:2,13 382:17
**reviews**
42:18,22 43:3 64:6 65:22 276:10
**revised**
17:22
**rhythm**
311:7
**right**
6:24 12:2 13:3 14:19, 23 15:2,6 16:25 21:3, 7,25 22:6,19 25:1,4,14,24 26:1 28:6 31:17,23 34:5,9,18, 19,22 37:15 38:6,13,23 39:17 40:25 41:12,15,22 43:10 44:14 45:11 46:7, 16 47:1,3,11 48:20 50:1 52:17 53:21 55:3,16,19, 20,24 57:5,6 58:5,11 59:14 63:3, 11 64:25 65:3 69:7,11 70:14 71:5, 19 72:20 73:1,10 74:24 75:21 78:8 79:6, 12,15,22 80:2,6,17 82:1 89:13 93:23 95:10, 14 97:16 98:2,9,24 99:7,16 103:23,24 104:9,18,25 106:25 107:3,13 109:15 115:12 117:4 122:4 123:14 128:21 129:2,10,11 130:3 131:5, 12,18,23 132:6,15,17 133:7,10,15 135:16,24 136:8,11,20 137:6 138:16,21 139:3,5,9 140:1,9 141:7 143:8 145:13 146:13 147:2 149:1,13 150:11 153:25 154:17 162:1 163:4 164:6, 17 168:13 169:9,19 171:11 175:17,21 176:25 179:23 180:18 184:10 185:13 186:9 189:9 194:4, 16 197:18 201:6 224:11 233:22 234:2 235:5 246:13 260:19 261:20 271:17 287:8 290:10 294:4 302:16 310:19 314:20 316:7 320:11 365:25 379:5
**right-hand**
41:25 45:6 70:2 129:19, 22 345:22
**rigor**
379:12
**rigorous**
18:11 239:23 376:8,17 377:17 378:4,11,18, 23 380:3
**risch**
311:16
**risk**
39:21 42:7 47:16 48:17 51:12,22 57:15 69:18 70:20 73:8 74:10,12,17 75:21 78:11, 21,22,24 79:3,25 80:6,17,20, 23 88:14 93:18 101:20 108:7 131:23,24 132:9 149:16 150:9 162:14 171:5 172:13 174:1 184:21 188:6 208:23 213:9 227:5 245:5 251:13 257:11 258:8 262:24 283:16 285:12 286:23 287:22 289:3,13 290:4 296:17 318:13 328:2 330:8 332:3 336:12,23 337:11 339:10 340:14,20 363:13 364:23 369:12 375:2,15 382:23 383:1
**risks**
311:15 312:6
**RNA**
323:13
**robust**
94:3,8 95:7 167:19 169:8 170:24 236:24

283:15 288:18 348:23 366:19 371:18 383:5
**rodent**
324:5
**rodents**
323:17,24
**Rodgers**
311:17
**Roger**
104:19
**Rogers**
313:8
**role**
27:17 50:22 56:7,20,24 110:21,24 120:14 125:5 137:15,17 150:5 173:24 207:2 218:1, 4 253:23 254:12,21 257:9 262:12,16 269:13 270:22 273:20 325:11 327:1
**roles**
268:24
**Ronca**
5:5 8:18,20, 22 9:13,18, 23 10:3 11:23 12:6,9 14:1,6,13 15:23 17:9 20:4 22:7 36:15 41:6, 24 43:12 44:1,4 45:4 48:4,15 54:11 55:21 56:13 57:7 59:7 61:17 67:25 70:1 71:15,21 73:3,13 74:5 75:6 77:3 78:4,25 81:16,24 82:10,15 88:3,25 90:18 94:24 95:20 96:5, 25 97:4,13, 20 98:19 99:1 100:12 103:14 104:1,5,15 105:18 109:9 110:6 115:11 116:16 120:24 121:3,9,14, 20,24 122:9 128:8,14,19 131:18 132:21,24 133:8 135:11,22 136:4 139:19 141:6 142:19 143:4,8,11, 16,21 145:11 146:8 149:5 150:6,20 151:1,10,13 152:1,6,14, 24 153:3 157:16,25 159:17 160:15,19 162:19 166:2,8,18 174:19 176:18,22 180:11 185:8 187:12 190:18 191:10 353:17 373:21 384:17
**Ronco**
335:22 336:15,22 337:10 338:6 339:8,15
**room**
7:23 9:16 13:14 193:25 194:3 314:13
**ROTMAN**
4:16
**routinely**
325:4 358:5
**row**
146:20
**rubber**
16:12,18 369:17 370:22
**rule**
14:20 110:20,23 120:14 126:11 157:5 169:14 257:9 259:6 263:13 268:10,24 269:21 270:22 271:9 289:24 324:23 326:25 346:18
**ruled**
254:23 269:24 275:18 325:10
**rules**
11:5 19:20 191:11
**ruling**
218:1,3 253:11
**running**
34:22 286:1

**S**

**S---------------**
5:10
**S----------------**
5:21
**salary**
96:19,20 97:3 98:8,9
**sales**
229:21 230:10,16,20
**salted**
79:14 340:22
**salting**
62:13 70:7
**salty**
79:14
**sample**
32:8,9
**samples**
214:1
**Sanofi**
221:19 222:1
**sat**
199:20,22 201:7,10,11, 20
**save**
189:18
**saying**
34:11 39:24 51:17,21 55:15 58:10, 19 94:21 95:3 113:24 136:6 141:4 174:24 243:5 269:17 271:7 289:1,4 312:13,15
**says**
44:5,17 45:14 48:11

49:21 54:12 59:12 70:6 73:15 74:7 78:9,20 84:22 105:23 107:3,5 109:15,18 110:4 115:14 146:16 151:19 154:17 168:14 247:18 312:19 314:22 347:4 381:9

**scale**
93:23,24,25 94:2 117:18, 19 129:9,14, 16 130:3 186:25 187:21 207:1 218:1 226:19 253:10 357:5,17 364:4,7

**Scandinavian**
296:7

**Schirm**
104:6

**SCHMITZER**
4:21

**School**
85:7

**schools**
85:8

**science**
93:19,20 181:10 246:17 254:9 308:2

**scientific**
4:15 101:7 102:21 107:23 114:14 119:6 123:17 217:9,23 218:5 266:19 267:2,23 307:4 325:25 326:10 351:8

**scientist**
211:6 253:21 255:9 283:3, 9

**scientists**
117:23 271:18

**score**
223:6 224:12

**screen**
6:23 13:8,9, 11 14:10,11 68:10 146:5, 14 217:13 224:7 373:12

**screens**
6:15

**scrolling**
15:24

**search**
365:24 373:14

**sec**
234:7

**second**
9:7 12:3,4 22:9 45:8 51:17 63:5 88:6 103:5 104:22 112:4 116:17 144:25 152:7 163:13,14 164:13 194:12 211:18 233:25 234:3,13 235:7 242:24 338:20 350:22 361:8

**secondary**
72:1,11

**section**
21:23 43:14 71:18 75:7 98:22 213:6 268:18 292:1 305:1 307:8 309:7,10 345:15,16

**sections**
43:9

**see**
14:3,8,11, 12,15,18,21 16:14,20 17:5,13 26:2 37:11 38:13 41:18 45:13 50:3,4 52:16,20 54:16 55:16 59:15 80:24 103:16 111:13,16 121:1 122:12 124:24 125:2 128:11,21 130:17 134:15 135:7,15,22, 23 138:2,3,8 140:6,16 141:6,8 143:17 146:21,24 147:12 150:8 152:6 165:6 174:14 176:4 177:13,18 178:11 179:16 180:13 186:5 189:1,3 194:10 205:20 211:25 212:1,6,8, 13,14,19,20 215:23 216:4 217:12,15 219:15 232:1 235:17,18 241:3 245:11 257:11,12 258:3,8 261:23 263:11 268:12 269:6 286:21 287:21 288:18 290:24 294:7 301:6 303:20 304:1,15,16 305:2,6,7 307:9,18,19 308:10,17,18 309:14,15 311:21,25 312:1 313:3, 4,12,13 315:3,4 320:9,22,23 321:10,21,24 322:8,9 323:20,21 325:5 329:19 330:15,16 331:8 332:21 337:1,20 338:7,9,12 340:12,24,25 343:22 355:22 371:10 379:22

**seeing**
88:4 104:24 122:6 177:16 329:9

**select**
87:13

**selected**
264:3 293:21

**selection**
32:5,12 42:24 50:8

53:5 90:4 110:22 157:5 218:2 244:9 262:13 289:24 376:5
**selective** 77:16 84:14 128:1 245:22
**self-report** 286:13 346:9
**self-reported** 293:14 376:25 377:3
**selling** 230:23
**seltzer** 319:20,21
**send** 11:25 12:4
**sense** 11:20
**sensitivity** 33:16 140:11,13 147:17 246:22 284:23
**sentence** 44:9,16,17 46:2 52:3 56:17 57:9, 11,13 68:25 70:6 71:22 72:20 73:4 74:6 75:8,19 99:18 103:5 107:5,12 151:19 152:13 160:17 169:12 308:8 309:9 311:11 320:14,15 322:1 346:11,23
**separate** 17:2 267:24 301:14,15 371:13 374:9 385:4
**separately** 57:19 135:4 223:22 343:14 374:13
**separates** 136:1
**September** 304:14
**sequelae** 207:22
**series** 291:25
**serve** 26:23 200:7
**served** 65:2,4
**Services** 4:1
**servings** 86:2
**set** 118:18 194:8
**setting** 6:17 203:22 298:1 379:24
**settings** 102:8 194:24 243:12 270:16 287:7 362:15 383:10
**seven** 10:18 59:10 151:21 152:17 153:7,11 155:6 156:2, 13 368:11
**several** 34:21 105:4 134:11 138:7 152:10 161:24 183:8 188:17 201:11 209:13 265:18 286:20
**severely** 50:19
**sex** 164:20 165:13 185:16
**shape** 337:17
**shapes** 194:20
**share** 13:9
**shared** 121:16 143:10 179:9
**she'd** 141:4
**Sheehan** 5:7 9:6,12, 15,20,25 13:15,23 18:7 19:2,9, 19 20:12 21:5,8,16,19 23:7,16 25:2,5 26:4 27:9 28:11, 20 29:8,12 30:14 33:13, 22 34:10 35:8 37:5,16 38:5,7,14 39:9 46:1,22 47:4,19 51:3,25 52:18 53:23 57:2 58:13, 25 60:6 61:24 63:7, 19 64:11 65:14,23 66:6,14,18 67:13,23 68:3,17 69:1,8,20 70:15,22 71:4 72:13, 21 73:24 75:22 76:2 80:7,18 81:20 85:1 88:17 89:12 90:25 91:10 92:5,23 93:12 94:22 95:2,11,17 96:17,22 97:3,10,16 99:23 100:8, 16,25 104:11 107:1,8,21 108:19 109:25 110:2,11 113:23 115:2 117:3 118:14 119:14 120:4 122:7,10,21 123:1,15 126:3,18 127:4,21 129:12 131:25 132:18,23 133:11 136:12 137:7 138:17,22 139:10 140:2,15,25 141:22 142:9,23 144:25 145:5 146:4 147:24 148:6,17 149:17 150:12,22 153:17 154:15 156:6,15 157:20 158:4 159:4 160:3 161:13 162:2 163:11,13,18

164:7,18
165:1,5,20,
25 166:4,11,
21 167:5
168:1,15
169:25
171:8,16
172:6 173:5
175:15,22
177:6,10
178:1,6,16
179:24
180:16
181:1,11
182:8,22
183:23
184:11
185:11,20,25
186:10,18,23
187:5,7,14
189:13,15,23
190:14,20
192:24
193:24
197:5,13,16
198:21
199:24
200:4,23
203:14
204:16,25
205:17 206:1
207:10,19
208:5
209:11,23
210:14 212:7
213:12 214:2
215:2 216:21
217:21
218:20
219:9,22
220:4 221:22
223:15
225:16,23
226:6 227:21
228:7,12
229:5,18,23
230:4,11,17
231:1,4,13,
17,23 232:8,
25 233:10,
13,24 234:1
235:11,23
236:18
237:7,20
238:7 239:8
240:8,14,21,
24 241:11,21
242:4 243:2,
20 244:2,16,
23 246:5,11
247:1,8,14,
23 249:5
250:2,5,12
252:9,17,19
253:4,19
254:7,18,25
255:6,19
258:25
259:20,23
260:10,13,19
261:3,10,15
262:3 264:7,
19 266:23
267:11,18
268:7 270:12
271:3 272:1,
9,18 273:8,
18 276:1
277:2,10,21
278:17
279:1,12
280:4,15
281:22 282:7
283:4,7,18
285:16
286:25
287:24
290:11,23
291:9,15
293:11 294:5
295:21,24
296:24 297:5
298:12,22
299:15
300:1,9,16,
25 301:17
302:1,12
304:4
305:11,25
306:23
307:25
308:21
309:20
311:22
312:12
313:22
314:6,9,17
315:13
316:13
317:21
318:14
319:9,18,22,
25 322:14
324:2,20
325:17
326:4,14
328:4 329:8,
11,15,24
330:11
331:19
332:17
333:15
334:5,24
335:2,10,20
336:25
337:15 338:3
339:12,21
342:9,24
343:10
344:9,25
345:7 347:3,
5,20 348:4,
20 349:11,21
350:10,16
351:3,21
352:17 353:5
354:10
355:6,20
356:7,25
357:4 358:1,
6,23 359:12,
21 361:6,19
362:19 363:7
364:1,10,19
365:7,22
366:5 367:19
368:22 369:7
370:2 372:9,
25 374:22
375:17
377:19 378:6
379:2 380:17
381:4,7,12
383:15
384:1,23
386:18

**shift**
310:18

**shifts**
80:25

**short**
106:1 107:4
298:17 299:1
300:12

**short-term**
237:2 296:11
346:15

**shortened**
32:20

**shorter**
158:10
159:12
289:10

**shot**
319:19,24

**show**
14:17 51:7
80:21 82:11
121:17
126:13,20
130:25 131:1
147:16 176:2
248:23
309:22 330:8
331:11
342:23
343:14
365:15

**showed**
74:17 106:22
147:11,17
208:25

**showing**
81:5 130:13
144:11,12

147:7 154:10 262:23 322:13 378:12
**shown** 59:22 61:4, 22 68:11 77:25 90:13 122:10 154:4 210:5 252:12 265:2,3,4 271:19 272:4 284:25 288:5 296:19 297:21 305:16 306:13 370:25 374:16
**shows** 125:11 128:2 190:4 349:14 375:14
**sic** 75:12 97:7
**side** 56:15 129:10,11, 19,22,24 133:10 136:22 150:8
**signal** 49:12,14,16 50:4,5 52:23 89:25 90:1,6 239:24 244:7,10 245:12 280:18 289:20,21,22 359:10 360:2,16 376:3
**signals** 62:11 90:9, 11 245:18 296:18
**significance** 45:24 47:2, 7,9,11 52:14,21 53:17,20 54:4 55:9 98:24 101:9, 16,24,25 106:1,3,19 107:19 108:17 109:6,20 114:15 116:2,10 117:16,22 118:20,25 119:8,22 122:2,23 124:13,24 330:10
**significant** 46:25 47:10 49:2,16 99:15 102:2, 3 103:11 105:20,24 106:8 110:17 111:24 112:7,12,13, 23 113:8,15 114:3 115:18 118:10 119:11 120:6,16 125:13 184:20,21,25 327:16 328:23 330:14 332:9,22,25 333:2,23 334:12 340:19 375:15
**significantly** 106:10
**sim-** 297:22
**similar** 72:19 76:22 88:23 175:24 195:6 209:17 245:18 279:8 280:1,12 308:12 323:2 327:19 330:20
**similarly** 361:15
**simple** 155:10 160:8,13 168:22,25 185:14 273:6 283:19 288:1 309:21 318:17
**simulation** 297:22 298:2
**single** 29:17 123:22 168:4 180:17 204:22 212:22 225:14 263:7 287:14
**siren** 200:20 201:2
**sirens** 277:10,12 294:22 342:25
**sit** 200:15 201:15 321:12,16
**sitting** 101:5 141:11 177:16 213:1 215:7,9 228:16 314:10
**situ** 135:3 176:3, 8
**situation** 48:19,21 328:21
**situations** 82:25 83:5 93:10
**situs** 175:20
**Sixth** 193:23
**size** 49:18 50:13 79:8 113:19
**skip** 55:3
**slide** 82:23 84:20, 22 88:3,4,7, 25 89:11 131:19 139:20 149:6,9 150:6 159:17 162:20 163:20 168:14
**slides** 90:18
**slow** 233:19
**small** 179:13
**Smith's** 366:10
**smoke** 55:24 56:2, 24 287:23
**smoked** 287:20
**smokers** 185:6
**smoking** 56:8,11,20 70:8 79:6,25 80:1,10 81:1 154:11 161:1,4,10,

18 162:1,5, 16 163:3,8 164:3,16 167:24 169:18,24 171:1,4,5,14 172:15,25 174:8,12 175:4 223:3, 14 224:8 275:3,13 286:19,23 287:4,8,18
**societal** 100:4
**societies** 105:6
**Society** 39:13 105:8
**software** 42:22
**solely** 110:25 111:22
**solid** 159:11
**some-odd** 133:14
**Somebody's** 77:3
**someone's** 226:8
**something's** 112:22
**Song** 257:22 316:3 317:9
**sophisticated** 288:10
**sort** 15:1 43:1 52:13 54:9 83:11 91:17 122:17 136:22 175:11 234:5 296:20 314:10
**sorts** 86:12 280:23 284:23
**sound** 9:13,18 163:22
**sounds** 25:25 187:20
**source** 206:7,8 216:23 217:4,5 221:10 222:9,21 233:7 234:24 356:10,11 359:14
**sources** 98:7 202:9 209:5 210:4 263:24 267:4 268:10 279:9,18 280:20 352:1 382:18,19
**Spalding** 4:15
**speak** 117:13 133:4 176:13
**speaker** 6:15
**speaking** 85:6 98:13 132:25 207:20
**special** 106:5
**Specialist** 4:15
**species** 265:23 307:14,22
**specific** 13:11 16:16 37:21 54:19 58:7 59:4,5 71:8 85:12, 13 86:4 92:10 93:14 115:6,8 154:21 195:3,5,9,11 199:7 203:5 208:16 209:7 210:10 215:24 218:12 219:2,6 240:5,11 241:8 247:12 256:7 266:14 285:2,10 287:1,17 288:22 289:8 290:7 291:2 303:8 305:20 310:8 321:6 351:13 360:10 363:17 372:18 377:16 378:2
**specifically** 27:4 40:7 60:21 64:2 67:21 160:22 162:23 164:1,19 174:10 183:6 195:24 196:6 203:17 208:14 218:24 242:1 243:17,25 268:9 294:18 297:9 316:3 336:5 351:12 352:2 354:4 359:15 375:5 378:11 379:19 382:7 383:12
**specificity** 246:22
**specify** 154:22 362:3
**speculation** 27:10
**speech** 183:21 184:1
**spend** 13:16
**spends** 189:12
**splitting** 117:12
**sponsored** 232:23
**spot** 61:18
**spotlight** 6:17
**spotlighted** 6:14
**spread** 48:23,25
**squamous** 341:2
**stable** 249:16
**stage** 258:13 259:4 276:20
**standard** 130:4,7,10 138:25
**start** 20:25 109:17 132:5 143:22 146:17 232:9 234:19 268:11 269:16 314:21 375:10
**started** 110:13 182:14 236:1 336:4

**starting**
59:19 73:15 147:3 232:13
**starts**
15:20 152:9 312:2
**state**
153:22 235:5,17 313:5 347:16 348:2,5,7
**stated**
47:17 68:5,8 110:12 112:15 235:7 360:17 384:17
**statement**
7:18 26:20 58:1,9 68:13,19 70:11 71:9 72:4 89:10 100:6,22,23 105:25 107:10,11,12 111:7,21 112:3,4 113:5,11,22 114:4,11,18 115:1,9,17, 21 116:1,9 117:1,6,10 118:11 122:1,23 124:10 168:10,12 217:22 228:1 305:9,13 307:21 308:3,20 309:17 310:1,20 318:20,24 319:3,14 322:11 323:23 324:3 353:11
**statements**
67:22 111:19 121:22 123:23
**states**
163:25 308:10 313:14,16 314:23 323:15 347:15
**stating**
212:9 315:9
**statistical**
28:2 31:5,13 40:8 45:24 46:19 47:1, 7,9,11 52:14,21 53:17,20 54:4 55:8 94:3 98:23 99:13 100:7, 22 101:9,15, 24 103:9 105:2,8,12 106:1,3,16, 18,24 107:17,19 108:11,17 109:6 111:2 114:15 115:17 116:1,9 117:15,21 118:8,20,25 119:8,10,22 120:6 122:2, 23 124:12,23 162:7 167:11,18 187:22 188:15 242:20 269:2 286:7 330:9
**statistically**
49:2,15 99:14 102:2 103:10 105:20,23 106:8 110:16 111:23 112:7,12,23 113:8,15 114:3,20 118:9 119:11 120:16 125:13 169:1 184:19,24 185:3 188:4 327:16 328:23 330:13 332:8,22,25 333:1,19,23 334:12 340:19 375:14
**statistics**
30:24 31:16 72:15 105:13,15 187:6 211:7 221:4 228:23 286:7
**stay**
93:21 94:7 95:4,6 188:21 190:13 234:12
**Stefani**
313:8 320:25 321:9,14 340:10,18 341:3
**step**
106:4 107:6 366:25
**steps**
288:12
**STEVE**
4:16
**stipulate**
158:2
**stomach**
22:17 25:22 39:7 40:25 41:1 43:19, 22,24 44:21, 22 59:23 60:1 61:23 63:16 68:12, 15,23 69:7 73:1 80:1,17 188:7 190:6 311:15 312:7 331:5,10,17
**stop**
48:15 77:4 79:24 106:7 143:19 194:11 294:22
**stopped**
106:1 107:4 314:7
**straighten**
36:4
**straightforwa rd**
227:24
**strains**
45:18
**strategies**
84:5
**stream**
201:2
**Street**
4:10 193:23
**strength**
222:8
**strengths**
155:12 375:21 377:5
**stress**
38:18
**strike**
195:1 203:11 208:17 210:9 215:8 218:13 223:11 230:6

238:22
248:25
254:13 264:4
277:7 283:14
298:8 302:8
313:15 323:8
335:16 339:5
340:15
346:22
347:13 363:3
377:14

**strong**
49:9 62:8,9,
19 78:21
90:6 110:20
172:10 275:7

**stronger**
52:5 275:9,
10

**strongly**
172:14

**structure**
180:20 202:6

**students**
31:2,3 43:2
125:16
326:8,9

**studied**
247:21
299:24
356:16

**studies**
15:9 23:22
25:8 26:6
27:7,13
29:18 47:9,
24 55:12
56:11 57:10,
12,14 61:3,
10,12,15
62:17,18
67:5,8,9
70:4 72:3,25
73:6 74:8,
16,24,25
75:1,4 76:5,
6,8,9,11,12,
14,17,23
77:9,14,15,
20,21 80:20
81:12,13
83:8,19 84:2
85:18 86:14,
22 87:7,9,
11,22 88:11,
13 89:3,18,
20 90:8,12,
17 91:20
92:2 95:12
111:4 119:2,
3 120:3
125:6,7,9,
14,15 126:6,
10,12,20
127:7,25
130:15 131:3
133:18,21
134:2 138:24
139:7,14
150:18
153:24 154:3
155:15,20,24
156:20
157:3,8,10,
14 159:18
160:1,5,11
162:1,12
164:14
175:21
181:14
183:20
189:20 190:2
194:21,22,
23,25 195:2,
4,8,10,21,23
196:1,6,11,
13,17,23
198:25
199:4,5,13
202:11,12,
13,16,19,20,
23 203:8,12,
21 204:2,3
206:6 207:2
211:4 218:1,
6 219:8
220:9 222:4,
24 226:19,25
227:2,10
231:8 232:11
233:6 234:23
235:2,21,24
236:1,5,10,
21,23 237:6,
15,23,25
238:19
239:12,15,20
241:16,23
242:8,14
243:8,13
247:22,25
248:7,13,17,
19,22 251:17
253:10
254:21
255:13
256:10
257:16,24,25
258:3,9,10
263:2,9,10
264:1,2
265:2,3,4,
16,17,25
266:3,5,6
267:3,5,6,
12,15,25
268:1,2
270:1 273:14
276:6,24
277:1,3,4,6,
16,17 279:4,
16,17,19
280:3,6,10,
14 281:1,2
283:13
286:9,14
288:6,10
289:23 290:7
296:3,15,16
297:23
298:2,5
300:4 303:8
304:21
307:2,13,21
309:2 310:16
311:5,13
312:4 313:2,
7,15,18
314:25
315:18,20,
22,23,24
316:3,22
317:2,5,7,8
319:4,13
320:2,16
321:3,6,17
322:2,12,15,
16,18,25
323:6 327:5,
9,11,13,21
328:22
330:17,18,
19,23,24
331:4,9,16,
22,25 332:14
333:3,12
334:2,22
335:8,14,17
336:7,19,20
338:15,16,18
339:19
341:14
345:10
351:10,11
352:2,4,5,11
353:9 354:2,
5 357:6
358:11,12,
13,17 362:22
364:5,7,12
365:13
366:24
368:1,5,6
370:7 371:1
373:3 376:7,
10,17,18,21
377:7,9,16
378:3,10,11,
23,24 380:2
382:17,20,22
383:4 385:2,
10 386:4

**study**
16:12,13,16,
25 24:5,18

26:25 27:16 29:20 37:17 40:8,13 42:8 48:12 51:9 52:1 74:3, 11,22 76:22 81:10 85:10 86:25 87:14, 16 90:22 91:15 93:15 111:10,12, 13,14 115:6, 8 128:1 135:4 137:20,23 138:1,6,14 139:11 148:9 150:15 151:15 152:2,9 154:8,10 155:4,13,25 156:1,8,12, 18,25 157:7, 15 158:14, 17,18,25 159:1 161:6, 7 163:15 164:11,19,24 165:6,9,14, 16 167:22 168:4 169:17 170:9 171:23 174:6,11,15, 24 175:1 176:1,24 177:4,5,16 178:21 179:22 183:7 184:13 189:19 190:6 198:6,16 199:1,9 204:5,6,7 205:8,9 211:10 212:23 213:10,22 214:9,13,17 215:12 219:18 220:2,5 221:8,18,21, 24 222:24 232:13,20,24 236:16,20 237:8,10,18 238:5,25 239:5 240:6, 12 241:9,16, 18 242:1,24 243:23,24 244:13,14,17 245:5 246:4 247:11,12,18 248:4 263:7, 13 272:3 276:15 281:11,21 282:9 283:15,24 285:13 286:22 289:18 290:24 291:2,4,10, 13,16,18,21 292:5,23,25 293:1,17 294:7,11,13, 14,23,25 295:4,9 296:22 297:6,8,13 298:4,10,11, 21 299:6,14, 24 300:21,24 301:2,9 303:8 313:21 316:4 320:25 321:9,14,19, 22 325:8,10 327:14,18, 23,25 328:21,22,24 330:3,12 332:1,21,22, 24 333:1,19 334:8,11,17 335:23,25 336:1,4,10, 17,22,24 337:1,5,10, 12,19,21,22 339:9,16,17 340:11,18,19 341:3,7 342:6,7,10 343:8,11,12 344:2,5,17, 18,22 346:8 347:15,16 348:11,18, 22,23 349:8 353:15,18,21 354:7,11 355:16,21,25 356:2,9,14, 16,17,22 357:23 358:21,24 359:8,9,20, 25 360:12,20 361:2,15,24 368:16,19 369:3,11,16, 22 370:3,5, 12,13,21 371:2,10 372:8,11,16, 18,19,22 373:2,4,8, 11,13,25 374:4,6,8 375:16,20,21 377:4 378:15 379:6,9,15, 16,20 385:21

**study's**
171:5

**stuff**
366:18

**subanalysis**
147:10

**subcohort**
148:11

**subject**
41:14 263:18 338:16

**subjected**
252:16

**subjects**
148:2 212:23 268:19 313:8

**submitted**
21:6 35:11 36:13

**subset**
147:7

**subsites**
49:23 51:14, 20,24 52:11

**substantial**
345:25

**sufficient**
83:1,7 151:22 153:8,15 378:18

**suggested**
62:5 68:22 253:6 258:16 299:1

**suggesting**
168:18 217:17 288:24 306:19 355:24,25

**suggestive**
60:17 332:10,12

**suggests**
60:17 68:25 77:22 270:5

**suit**
8:23 97:23

**Suite**
4:3,18

**summaries**
174:4,5

**summarization**
78:15

**summarize**
42:6
**summarized**
62:3 180:4 181:6 290:13 331:7
**summarizing**
108:1 140:5
**summary**
58:1 60:11 78:10 81:5, 14 94:17 101:2 130:15 161:3,15 165:10 180:18 181:7 239:12 241:22 247:17 327:7 332:18 333:7,17 334:6
**sun**
70:8
**super**
9:13
**supplemental**
33:3 189:1,2
**supplements**
245:22
**support**
7:12,17 34:7,12,13 35:2,18 37:12 38:1 58:19 62:19 127:12 254:11,21 256:14 257:18 378:19
**supported**
58:10 76:9 125:7 379:16
**supporting**
266:4 286:17 379:15
**supports**
326:11
**supposed**
133:3 166:7
**sure**
11:6 13:9 20:18,22,24 21:18,20 38:15 49:6 50:16 92:15 100:12 110:2,4 173:8,11 192:15,24 222:3 226:8 238:15 241:20 247:8 260:14 271:5,21 276:12 278:19 303:23 320:12 337:4 342:13 363:9 378:1 386:7
**surgery**
175:13
**surprise**
322:22
**surprised**
18:2
**survive**
106:11
**susceptible**
75:1 317:5 338:22
**swear**
8:11
**sworn**
8:14
**symptoms**
225:10 226:2,9
**synthesis**
28:25 29:19 127:6,11 128:3 228:4 264:24
**synthesize**
29:25 264:25
**synthesized**
124:19 283:11
**system**
176:13 284:15
**systematic**
42:13,21 43:3 205:14 257:21 269:1
**Systemic**
42:17

**T**

**table**
78:5,6,8,12 106:12 144:15 146:10 160:11 161:5 164:11 167:7 185:13,21 186:2 189:2 190:4 223:4, 21 224:3,9 236:8,12 241:23 299:19 314:11 349:3,13
**tables**
15:8 189:1 220:17,23 299:24
**tablet**
357:12
**take**
6:22 13:1 17:8 48:4 55:21,22 59:7,17 81:16 93:22 94:22,25 95:20 106:4 107:6 111:4 115:11 129:6 139:19 150:20 174:19 185:8 213:16,25 214:3 215:14 219:7 224:17 228:19,24 229:4,8,13, 16 233:3 236:11 247:6 249:3 261:23 275:3 282:12 299:17 300:17,18 302:16 324:13 328:15 342:22 350:21 384:23 386:22
**taken**
7:3 96:1 151:6 191:1 229:21 249:10 250:21 265:17 292:14 296:15 302:22 341:20 380:13
**takes**
228:6,10
**taking**
103:2 178:17 181:16 183:2 191:8 227:20 242:11 243:7 266:7 295:16,19 296:23 298:11 304:7 310:22

348:19 349:9 364:18 365:6
**talk**
11:14 33:23 40:3 65:14 115:16 116:23 139:23 143:3 151:2,15 161:17 174:7 200:12,13 216:1 269:22 279:14 326:19 345:16
**talked**
365:14
**talking**
34:6 37:1 72:25 95:14, 15 97:12 115:5,6,8 124:11 146:7 157:14,15 166:12 170:8,10 187:3,13 198:15 234:4 235:25 240:9,10 241:6 282:23 306:2,3 342:11 359:7,8 366:9 371:22,23,25 373:12
**talks**
63:17 88:23 116:11 200:8 326:25
**Tan**
333:24
**task**
99:19,20,22 100:1,3,4,6, 21,23 102:11,12, 14,16 107:13 116:12,22,23 123:7
**taught**
30:25 31:1 36:23 203:24
**tea**
75:7,11
**teach**
23:10 31:8 61:5 85:16 108:4 110:15 124:5 154:6 162:4 169:6 203:2 326:7
**teaching**
35:14 102:22 122:16 136:23 221:1
**technical**
249:25 250:3
**technician**
4:21 7:11 121:7 128:12 135:19 143:7,9,12
**techniques**
24:4 196:2
**tell**
12:17 38:24 41:19 62:21 66:11,16 99:20 100:1 177:19 208:10 225:18,20 226:13 237:13 246:10 286:1 296:21 298:9 321:17 324:6 338:12 344:4,21 348:3,10,17 349:8 356:21 357:22 358:20 359:18,23,25 362:1 365:24 372:18
**temporal**
360:14
**temporality**
84:8,17
**temporarily**
86:15
**ten**
24:24 31:23, 24 134:19 140:1,12,23, 24 141:14,24 142:13 147:1,9,22, 23 148:2,5, 8,12,13,16 157:1 159:10 179:6 180:8 182:17,21 183:2 215:12 237:11 244:14,19,22 245:2 246:8 247:4 290:9, 14,17 298:15 300:11 336:9 343:15 345:25 348:1,11 349:18,19, 22,24,25 350:5,9,13, 14,15,20 354:14 358:25 359:4,5,6 360:6,7,21 361:2,3,11, 12,16,17,20, 21,23,25 362:2 366:3, 6,8 367:17
**ten-day**
246:9 344:24
**ten-minute**
95:21
**tend**
77:20
**tens**
180:15 230:21
**term**
99:14 103:10 106:8,18 107:18 108:16 118:9 119:11,21 124:12 183:16 196:5 225:3 230:18 231:9 232:4 237:4
**terminology**
231:16,22,24
**terms**
23:12 30:20 37:11 50:12, 14 87:3 108:2 109:3 132:8 159:7 187:24 206:9 221:1 225:18 227:11 230:20
**Terry**
5:3 7:2 8:19 9:23 14:10 85:1 88:19 96:7 97:17 98:22 100:17 104:12 121:25 122:8 132:19 145:14 151:14 158:5 168:21 173:7 177:7 189:25 191:7 194:13 197:14 199:17 204:9 211:9 217:16 221:13 227:12 229:20

235:19
239:11
241:13
243:16
247:10
249:15,18
251:1 255:25
256:25
273:11
277:15
290:24
294:7,10
296:21
300:22 303:2
316:16
317:10 318:9
328:18 337:3
339:7,21
341:25
343:24
346:10
353:13 357:2
358:8 374:25
375:11
377:15
378:21
380:23
381:8,17
382:10
383:4,16,18
387:2

**Terry's**
5:23 178:18

**tertiles**
315:17
316:22,25

**test**
91:17 114:8

**tested**
204:12
270:16

**testified**
8:15 10:4,6
242:25 354:3

**testify**
192:7 205:3
209:24
228:23
353:24,25

**testifying**
191:17 193:2

**testimony**
8:4 11:1
107:22 126:4
156:16
171:15,17,19
172:7 173:6
175:23 181:2
183:24
216:16
237:17,22
242:3,5,13
243:3 262:4
263:21,23
264:21
265:15
267:17,19
270:19
275:21,25
276:2,3,17
278:4 290:12
293:12 318:6
324:21 363:8
367:20
382:1,4

**testing**
46:19 101:9
109:21 111:2
117:22 120:6

**tests**
306:8

**Texas**
4:4

**text**
14:25 15:1
17:1,16
18:20 19:11
20:8,10,21,
23 123:9,12

**thank**
12:9 14:1
98:1 143:8,
16 145:12
192:1 381:1,
3,8 383:15
387:1,2,5

**thanks**
381:5

**thee**
171:24

**theoretically**
80:14 204:22

**therapeutic**
225:4,6,15,
19 231:10,16
232:5,14,17

**therapy**
156:24
225:10
229:2,10
230:3 232:22
245:20

**thereof**
114:15

**thing**
22:11 43:1
54:9 55:2
90:15 91:18
92:25 122:17
131:16
134:21 146:6
150:14
226:12
258:10 284:1

**things**
25:23 35:18
36:24 39:23
53:16 56:1,
23 61:4,9
78:1,23
79:4,20 81:2
84:3 86:12
88:23 101:13
111:5 120:22
124:14
126:13
130:23
132:5,6
162:5 167:14
169:1,3
170:25 173:2
179:11
206:11 210:7
224:23
280:23 282:2
284:24
305:15,21
306:11
317:4,12
358:17 376:9

**think**
13:7 29:4
30:18 34:2
36:1 38:9
63:1 64:12
82:4,8 85:10
91:4 92:8
96:23
107:16,20
110:6 113:18
115:7 116:18
117:12
119:24
120:1,5
122:11,25
132:2
133:12,14
138:13 141:3
145:1 146:4,
7 154:9
165:17
167:20 172:3
175:11
179:7,15
180:8,9
182:4 199:16
213:15
227:3,23
232:15
246:12,14
249:22
251:11
261:15
287:2,4
295:7 310:7
311:22 314:9
328:12
337:24
342:15
343:24
348:15 349:6
352:16 354:3
361:1 366:11

377:21 378:8 381:24 385:8,14 386:19
**thinking**
12:14 137:16 206:9 261:1 269:12 284:6 285:20 373:5
**thinks**
117:18
**third**
104:16 113:5 151:18 152:7,10,16 153:10 185:21 268:22
**thorough**
153:20 257:4 326:18
**thoroughly**
67:4
**thought**
29:6 44:6,10 119:17 121:9 167:21 172:2 260:17,25 261:21 276:9 378:9 382:7
**thoughts**
69:24
**thousand**
351:23
**thousands**
125:16 210:21 359:9
**three**
25:12 54:15 59:9 78:23 90:19 121:23 130:12 159:23 247:16 248:19 273:24 313:17 314:22,24
316:25 319:3 322:24 327:21 330:18
**three-fold**
54:8
**threshold**
111:25
**throw**
136:23,24 175:19,25
**thrust**
124:22
**Tiernan**
97:7
**time**
7:6,15 10:20 11:17 31:6 35:21,24 36:12 42:20 55:12 59:25 60:3 61:1,6 62:21 63:6, 17 66:12,16 69:23 70:12 81:7,21 84:13 87:1, 12 95:23,24 96:3,4 101:10 106:7 109:3 122:18 124:6,18 138:16 142:8,17 147:5 151:4, 8,9 154:7 155:3 156:8 158:9,16,22 159:7,10,12 160:6 175:18 179:8,11 182:13 184:3 188:20,23 189:4,11 190:23,24 191:3,4 218:6 222:15 228:5,10
229:8,13 230:24 236:5,7 238:15 239:22 246:17 249:3,7,8, 12,13 250:17,23,24 268:20 281:13 282:4,6 287:6,15 302:19,20, 24,25 316:8 317:17 341:18,22,23 352:21 368:10 369:9 374:1,15 380:10,11, 15,16,25 381:2,9 387:2,7,8,9
**times**
86:10 133:2 138:7 154:20 158:11 161:24 192:22 286:20 338:9 384:18
**title**
78:12 321:21 373:11
**tobacco**
55:24 56:2, 6,18 89:5
**today**
7:5 9:2 11:2 61:20 89:17 97:7 121:17 141:12 191:9,17 192:7 193:2, 11,21 215:8, 10 228:16 251:5
263:21,23 321:12,16 327:8 365:14 381:9 382:16
**told**
133:2 234:8
**Tom**
13:15 20:5 97:1,20 132:23,24 234:8 337:7 338:2 381:12
**tonight**
317:16
**tool**
92:16
**tools**
92:12
**top**
25:16 48:6 82:24 107:15 134:3,9,14 135:8 143:20 145:20 160:16 213:2 221:16 262:8 302:13 306:5 307:7 312:1, 17
**topic**
40:18 59:4 98:3 123:17
**topics**
30:25 31:7 43:9
**totality**
155:22 226:14 262:10 265:1 279:3
**totally**
93:1 94:8 108:3 173:21 183:17
**tough**
233:24

**toxic**
71:24
**toxicologist**
207:5,6
**Toxicology**
200:17 256:1
**track**
179:14
311:17
**tract**
307:16,23
312:8
**Tracy**
191:8 197:7,
17 199:25
200:23
233:10 234:2
235:12
240:15,21
247:1 250:2,
5 259:24
261:4,17
300:9 313:22
316:13
317:22
319:18
368:23
380:17
381:5,9
**traditional**
52:13 53:19
55:8 351:18
**trailed**
239:2
**train**
23:10 40:15
**trained**
31:9,10
40:20 110:15
268:9
**training**
27:15,21,24
31:4,11
35:15 40:7
**Tran**
333:7
**transcript**
5:19 83:2
88:22
**transparency**
33:4
**transparent**
33:11,19
222:22 340:2
**transportability**
211:11,20
**transportable**
23:25
**treated**
149:3 294:16
**treatment**
148:20
175:7,18
232:15,17
**trends**
42:6 200:14
**trial**
89:15 157:4
204:7 211:22
213:14
214:22
266:12,16,21
**trials**
76:15
208:24,25
227:4,6
266:14 267:9
**trouble**
128:10
189:18
**true**
58:17 60:5
61:4,19
70:11,14,25
92:1,21,25
114:9 116:12
147:21
149:22,23
172:24 173:4
185:5 189:6,
14 244:12
247:10 286:5
292:10 301:8
318:9
**truth**
136:25 172:5
**truthfully**
192:7
**try**
11:14,18
12:17,25
33:22
192:10,13
234:18
250:10
316:13 342:3
369:9 371:3,
15
**trying**
20:6 85:9
118:17
124:18
130:16
137:24
144:23
145:17 166:5
213:14
250:8,9
289:6 311:23
339:23
357:16,18
**Tuesday**
7:5
**tumor**
61:1 198:6,
16
**tumors**
49:22 51:14,
23 72:3,25
73:1 154:25
159:11
196:14,24
199:1
307:15,22
**turn**
9:9 150:8
216:7 274:15
304:23 307:5
340:5
**twice**
159:22
**two**
17:23 19:7
22:10 24:23
25:23 29:14
34:18 37:12
38:2 53:15
54:6 59:9,16
74:15 78:23
88:4 90:18
94:18,24
108:24 109:1
130:12 133:6
136:21
145:8,18
173:2 184:25
186:15
187:18
214:18
223:8,25
257:15
262:14,20
263:12
265:14
273:22 282:2
293:21 294:3
297:12
300:14
320:2,16
331:24
338:15
339:19
351:23
356:20 360:2
385:7
**two-way**
249:21
270:18 308:6
311:3,4
**type**
10:13 19:16
26:16 55:13
125:3,4
129:18 193:4
195:20
196:11 251:7
305:19 366:2

371:1,13
**types**
22:16 24:1, 6,22 26:7, 18,23 27:1 40:23 111:10,15 130:19 133:20 136:14 194:23 258:6 263:12 264:17 266:3 276:15 310:17 343:13 362:25 372:1,13
**typical**
32:21 138:23 231:19 247:24 292:3 312:23 313:9
**typically**
18:17 130:21 131:13 265:7 274:15 281:12 284:3,7 292:11

**U**

**U.S.**
297:14,16
**uh-huh**
16:23 23:2 28:7 45:20
**UK**
154:8 291:20,21 333:8 358:14
**ulcer**
79:11 228:18 232:15
**unable**
205:6
**undercount**
94:4
**undercounted**
286:10
**undercounting**
94:6,14 285:24
**underestimate**
269:4
**undergraduate**
31:2
**underlying**
163:8 164:3, 17,22 167:24 172:25 225:11 226:9 227:17 274:8 349:14
**underreported**
50:20 288:9
**understand**
11:1,4,16 12:12,16 26:12 27:17 29:5 30:3,7, 22 32:5,7,11 33:16 39:4, 22 47:13 51:17 52:25 69:13 87:2 93:15 109:4 113:1,3 118:17 124:18 135:20 137:24 174:14,16 191:14,16, 20,25 193:24 195:18 207:16 213:14 214:23 227:12,15,18 230:8 251:10,16 252:10 271:5 273:24 275:6
317:12 318:18 325:21 364:6 371:12 375:18
**understanding**
27:15,25 30:23 31:5, 15 34:25 39:21 65:6 70:16 72:16 76:7 110:5 175:10,17 189:10 205:10 207:1,3 210:19 213:21 214:16,21 215:3 216:15 222:8 228:22 229:12 254:20 258:19 259:12 301:23 363:16 370:18
**understands**
110:7
**understood**
12:21 20:12 72:18 89:4 192:3 252:6 258:18
**undertake**
214:6 256:25 257:8 258:23
**undertaken**
218:15 266:11 366:1
**undertook**
217:8,9 257:4 260:7
**unheeded**
115:21
**unique**
189:7
**unit**
26:8 179:13 180:7
**units**
180:4,6 181:6
**universe**
37:14 276:25
**University**
82:5 85:6 97:14
**unlike**
134:25
**unplug**
314:14
**unplugging**
314:17
**unstable**
192:22 233:21
**untimely**
198:8
**update**
67:7 384:21
**updated**
5:22 67:7 384:14 386:2,15
**uploaded**
303:25
**upper**
6:24 311:17 312:7
**upwards**
298:15 354:14
**urinary**
212:10 213:15 214:4
**urine**
86:20 87:1
**Uruguay**
74:9,16 335:24 338:15
**users**
236:21 237:2

297:11,12,13 334:10 345:21,24 346:12,15,16 347:1,18 349:4,5 354:15
**UTC**
7:6 95:24 96:3 151:8 190:23 191:3 249:7,12 250:18,23 302:19,24 341:18,23 380:11,16 387:8

**V**

**vague**
33:13 46:22 47:4 67:23 76:2 93:12 110:11 120:4 141:22 142:9 203:15 204:19 207:19 209:11 220:4 225:16,23 228:7 229:5, 18,23 246:5 247:23 252:9,19 253:4,19 254:7,25 255:6,19 268:7 271:3 272:1,9 273:18 277:2 280:4,15 281:22 282:7 283:7,18 286:25 295:24 300:25 302:3,12 329:15 331:19 332:17 333:15 334:5 342:9 343:10 358:23 365:22
**valid**
29:4 61:10 92:14,16 94:15 95:8 120:9 126:8, 20 127:12 158:13 181:7 183:17 184:6 190:8 238:16 242:18 246:21 269:20 270:9 271:10,22 272:13 274:18 276:22 286:11 287:8,10 297:19 346:8 367:14,25 370:16 375:16 379:22,24 384:7
**validate**
86:18
**validity**
30:24
**validly**
169:4 183:16
**valsartan**
248:20,24
**valuable**
359:24
**valuating**
272:2
**variability**
101:21 108:15 109:4 110:22 113:20 118:4 120:21 124:4 125:24 132:13 149:25 150:2 269:12 273:25
**variable**
252:15 253:2,7
**variables**
268:22
**variance**
52:22 101:21
**variants**
106:9 109:3
**variation**
239:21
**varied**
235:25
**varies**
175:11 227:19
**variety**
44:11 224:17
**various**
27:7 53:10 194:20 307:13,21 349:3
**vary**
236:20
**varying**
31:7
**Vecchia**
216:14,17,23 217:5 311:16 315:6
**vegetables**
57:8,18 61:8 208:23 209:6
**verbally**
8:3
**verbiage**
63:8
**verify**
141:17 244:24 376:24
**version**
20:17
**versus**
49:14 50:11 52:23 90:1 93:18 136:7 142:12 145:16 187:1 212:11 214:8,25 215:5 289:20 327:14 347:25 348:1 371:24
**vessels**
307:17,24
**Veterans**
294:17
**video**
6:13,15,20, 22 7:11 95:23 151:1
**video-recorded**
7:1
**VIDEOGRAPHER**
4:20 6:1 14:16 95:22 96:2 121:1, 12,15 122:5 151:3,7 178:9 190:22 191:2 234:10 249:6,11 250:17,22 302:18,23 303:24 314:3 341:17,21 342:21 368:11 380:9,14 387:6
**view**
6:16,24 269:2
**viewer**
221:12

**vinyl**
89:6
**virtual**
197:1,6,10
**visually**
134:7 136:13 145:17
**vitae**
15:15 22:25 23:4 28:17 35:3,9,13,19 36:6,12,19 38:2
**vitamin**
59:21,25 61:8,22 68:11,14,24 69:6 73:20 87:3 210:3
**vitro**
266:2
**voice**
9:19
**volume**
9:10
**volunteers**
215:11 291:21

**W**

**wait**
97:10 163:13
**waiting**
14:7 31:6 41:17 303:21 304:6
**waive**
8:7
**walk**
131:6
**walking**
37:1
**wanna**
160:20 314:14
**want**
6:21 9:9 12:1,4 21:10 32:9 36:5 50:15 61:21 65:10,11,19 69:5,6 83:17 94:11 96:24 103:4,12 112:20 121:21 127:14 134:21 135:22 136:18 138:2 139:21 140:20 149:7 158:1 162:15 163:24 164:23 170:22 177:19 192:23 197:11,24 234:10 235:11 236:11 239:11 243:4 245:24 249:3 260:13 265:11 268:15 271:18,21 288:14 292:6 310:23 313:25 317:13,15,19 319:23 321:8 322:17 323:6 330:15,16 333:6 335:4 338:11 340:5 355:21 371:10,11,12 373:21 377:23 384:10 385:15 386:7
**wanted**
38:11 58:18 68:23 98:8 118:21 131:4 174:16,24 215:4 256:8 339:24 342:5
**wanting**
89:13 158:15
**warnings**
115:20
**Washington**
97:15
**Wasserstein**
104:6,19 105:10 115:18 116:6,25 123:12
**watch**
82:18
**watched**
82:21
**watching**
84:20 288:13
**water**
31:22
**wave**
260:14
**way**
18:11 43:22 63:24 80:11, 24 83:21 94:16,20 106:13 109:12,14 112:9,14 120:2 124:19 130:4,7,10 135:18 136:2 140:6 150:7 167:16,19 169:9 170:24 172:19 173:18 175:6 179:8,19 183:17 197:11 202:14 225:8 231:19 287:12 295:9 306:14 323:3 325:3 337:17 345:3 347:14 350:1 354:11 371:18 386:13
**ways**
76:16 83:10 171:22 226:1
**WCRF**
70:25 71:7
**weak**
50:4,25 77:21 90:10 125:7,12 126:1
**weaker**
50:5
**week**
86:2 292:12
**weeks**
291:13 292:3,8,20 293:9,15
**weigh**
221:20
**weighed**
67:17
**weight**
32:7 80:4,12 222:15
**weighting**
32:3,17 33:4,11,12
**Weinberg**
366:12
**well-balanced**
223:25
**well-done**
360:12
**well-known**
89:4

**well-respected** 64:19
**well-understood** 59:2
**went** 17:9 36:9 150:9 274:25 376:1 380:21
**whatsoever** 136:16 209:19 238:20 242:19 243:15 270:6 281:6 282:3 286:17 296:9 331:12 336:11 376:13 379:17
**who've** 67:16
**wide** 49:5,6
**widespread** 115:22
**width** 137:21
**window** 42:20 236:6 239:21 241:18 242:6,9,13 243:5,9 281:9,12,18 289:10 299:7,11,21
**windows** 237:24 239:16
**wine** 52:6
**withdraw** 218:22 369:1,8
**witness** 5:3 6:14,16, 20 8:3,11,13 9:11 10:1,8 34:1 54:2 77:6,11 100:10 104:13 110:1 122:11 128:11 140:17 143:24 146:19 163:16 168:17 177:8,13,23 178:14 187:15 197:15 208:8 231:3 234:15 259:21 283:6 295:23 316:14 318:4 329:14 337:8,17 343:2 357:3 374:24 381:3 387:5
**witness'** 6:22
**witness's** 166:24
**witness-only** 6:13
**Witte** 121:5
**women** 85:23
**women's** 87:15,23
**won** 105:14
**wondering** 21:17 22:21
**Wong-ho** 46:3 236:2 374:4
**word** 32:20,22 46:16 59:19 73:15 224:8 232:18 233:16 259:25 265:7
**words** 32:23,24 106:12 112:21 145:8 231:11,12,14
**work** 22:24 23:1 24:9 33:10 34:15 39:20 63:25 65:7, 22 96:13 105:14 154:7 166:8 198:5, 9 199:3 200:11 206:23,24 218:14 219:15 271:14 310:14,18,25 322:19 367:7
**worked** 18:10 24:21 26:7 200:9 203:19 367:9
**worker** 16:12,18
**workers** 369:17
**working** 199:21,22 200:2 201:8 215:20 216:2,12,18, 24 217:3,7, 17 218:14,18 271:18 324:7 370:22 385:21
**workings** 65:25
**works** 14:3 23:13 36:21 94:16 95:19 323:4
**world** 60:8,12 61:20 62:2, 22 63:13,18, 20,24 64:7 66:2,12 67:19 68:5 104:7 222:14 227:1 243:12 350:24 351:5,15 352:14 377:12 382:23 383:10 384:5
**worst** 136:24
**would've** 16:5 22:4 29:20 33:17 46:24 64:4,5 74:1 103:19 139:13 148:12 155:19 165:17 182:2 198:16 351:25 352:1,22,24 353:1 371:14
**write** 56:18 57:20 151:24
**writer** 17:25
**writing** 54:7 169:12 352:21
**written** 107:3 112:9 117:14 138:7
**wrong** 23:13 45:12 97:1 106:24

146:10 353:25
**wrote**
20:23 22:19 41:9 44:14, 15,23,24 56:22 57:3, 21 59:20 60:2,4,22,25 70:12 71:17, 23 72:5,20 73:12,25 75:16,17 99:5,8,10, 16,17 151:23 170:5 213:3

**X**

**X------------------**
5:2
**Xbox**
234:9

**Y**

**YD**
331:24
**yeah**
10:17,25 11:22 16:20, 24 17:13,19 20:4 24:23 25:7,16 26:12 28:12 32:4 35:16 36:15 38:9 39:22 43:7 45:10 47:15 54:16 58:3 62:20 63:3 74:25 81:24 82:9 84:25 85:5 91:23 92:7 95:18 96:18,21 98:10 100:9, 18 101:4 102:24 104:13,14 105:16 116:20 118:5 119:17 122:3,9 129:25 137:5 138:9 140:18 141:23 143:5 144:2,22 145:4 146:11,25 147:18,25 160:13,15 161:7 166:8 172:8 174:23 177:13 178:15 179:22 180:2 183:9 186:5, 14,20 187:1 189:14 190:17 193:13 197:15 198:4 200:10 201:14 202:5 204:21 216:5 223:17 227:23 233:24 235:6,18 237:12,22 247:5 251:11 255:1 260:24 281:23 295:4 297:1 311:25 314:12 319:25 335:1 343:3 374:1
**year**
86:3 158:20 182:14 198:10,11, 13,17 200:9 230:10,16 291:7 312:24 372:19
**years**
10:18 31:1 35:15 42:23 60:11,23,25 74:21 76:20 81:6 86:8 101:18 102:23 105:4 107:25 108:13 123:18,19 125:15 140:23 141:14,24 144:11 147:1,9,22, 23 148:3,5, 8,13,16 151:21 152:17 153:7,11 154:9,14 155:6 156:3, 13 157:1 159:10,20,21 182:2,3,18 189:12 206:5 208:11,21 210:20 220:11 236:22 237:9,10,12, 19 238:6 239:6 240:7, 13 241:10 242:2 243:1, 7,19 244:1 245:4,8 247:16,19 282:13 286:3 287:12 295:13,17,19 298:15 301:4,5 313:10 321:23 347:9 351:9 353:12 354:14,15 359:6 360:7, 21 361:3,12
**yell**
133:1
**yelled**
132:24
**yielded**
73:9 338:18
**Yoon**
133:25 135:13,14, 16,23,24 136:1 137:20 151:15,18 152:2 155:25 157:15 158:18 161:1,12,16 163:3,17,19, 25 164:19 165:9 168:14 171:13 172:1,24 237:10 290:21 291:4,6,7 331:2
**Yoon's**
135:16
**York**
201:1

**Z**

**Zantac**
7:7 229:21 230:1,23
**zero**
180:13,17
**zoom**
14:11 41:18 122:12 143:24 193:18 197:20 309:7 311:8
**zoomed**
217:13

# EXHIBIT

# 29

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBURG
MAGISTRATE JUDGE BRUCE E. Reinhart

/

REMOTE VIDEO RECORDED DEPOSITION OF
MICHAEL VAEZI, M.D., Ph.D.
(Pages 1 - 312)
Thursday, May 12, 2022
10:15 a.m. - 7:47 p.m.
U.S. Legal Support

(Held Remotely)

Stenographically Reported By:
Deanne M. Moore, RMR, CRR, FPR, FPR-C

APPEARANCES

On Behalf of the Plaintiffs:
ANAPOL WEISS
One Logan Square
130 North 18th Street
Suite 1600
Philadelphia, Pennsylvania 19103
(215) 735-1130
tfinken@anapolweiss.com
cmcdonough@anapolweiss.com
BY: TRACY A. FINKEN, ESQ. (Via Zoom)
CATELYN McDONOUGH, ESQ.

On Behalf of Defendants:
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
ecaanan@kslaw.com
BY: EVA CANAAN, ESQ. (Via Zoom)

GREENBURG TRAURIG, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, Georgia 30305
(678) 553-4769
browning@gtlaw.com
BY: JAMES R. BROWNING, ESQ. (Via Zoom)

PIETRAGALLO, GORDON, ALFANO, BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
(412) 263-4383
jmr@pietragallo.com
BY: JASON M. REEFER, ESQ. (Via Zoom)



APPEARANCES (Cont'd)

DLA PIPER, LLP (US)
33 Arch Street
26th Floor
Boston, Massachusetts 02110-1447
(617) 406-6000
katie.insogna@dlapiper.com
BY: KATIE INSOGNA, ESQ. (Via Zoom)

SHOOK, HARDY & BACON, L.L.P.
2555 Grand Boulevard
Kansas City, Missouri 64108
(816) 474-6550
jsh@shb.com
BY: JENNIFER STONECIPHER HILL, ESQ. (Via Zoom)

ALSO PRESENT:
KRYSTAL KELLY, Law Clerk, Anapol Weiss
NICOLE COSTELLO, Scientific Specialist & Pharmacist
King & Spalding

STEVE DECANIO, Videographer, U.S. Legal Support

MICHAEL HOLLANDER, Tech Support, U.S. Legal Support



INDEX OF PROCEEDINGS


| | PAGE |
| --- | --- |
| Deposition of MICHAEL VAEZI, M.D., Ph.D. | |
| Direct Examination by Ms. Finken | 6 |
| Cross Examination by Ms. Caanan | 301 |
| Certificate of Oath | 308 |
| Certificate of Reporter | 309 |
| Witness Notification Letter | 310 |
| Errata Sheet | 311 |


EXHIBITS


| Number | Description | Page |
| --- | --- | --- |
| 6282 | Notice of Deposition | 10 |
| 6283 | Expert Report | 16 |
| 6284 | Curriculum Vitae | 23 |
| 6285 | Materials Considered List *** NOT MARKED ON RECORD **** | |
| 6286 | AGA Clinical Practice Update | 269 |
| 6288 | AGA Clinical Practice Conference Participants | 270 |
| 6324 | AGA Clinical Practice Update | 284 |
| 6292 | McDowell Study | 291 |
| 6299 | Invoices | 24 |
| 6302 | Cardwell Study | 298 |
| 6304 | Adami Study | 293 |
| 6305 | Kantor Study | 294 |
| 6306 | Kim S Study | 294 |
| 6307 | Kim Y Study | 295 |
| 6308 | Tan Study | 296 |




EXHIBITS (Cont'd)


| Number | Description | Page |
| --- | --- | --- |
| 6309 | Tran Study | 296 |
| 6310 | Habel Study | 297 |
| 6311 | Chow Study | 297 |
| 6312 | Liu Study | 298 |
| 6313 | Yoon Study | 298 |
| 6314 | Kumar Study | 299 |
| 6315 | Mohy-ud-din Study | 299 |
| 6316 | Norgaard Study | 300 |
| 6317 | Iwagami Study | 301 |

Deposition taken before Deanne M. Moore, RMR, CRR, FPR, FPR-C and Notary Public in and for the State of Florida at Large in the above cause.

- - - - -

THE VIDEOGRAPHER: Okay. Please stand by.
We are now on the record for the remote video deposition of Dr. Michael Vaezi. The time is 10:15 a.m. on Thursday May 12th, 2022, In Re: Zantac Ranitidine Products Liability Litigation.
The court reporter is Deanne Moore. The photograph- -- the videographer is Steve Decanio, and both are representatives of U.S. Legal Support.
Court reporter will swear in the witness so we may begin.
THE COURT REPORTER: Doctor, if you'd raise your right hand for me, please.
THE COURT REPORTER: Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth, so help you God?
WHEREUPON,
MICHAEL ZAEZI, M.D., Ph.D.,
having been sworn to tell the truth and testified upon his oath as follows:



THE WITNESS: I do.
THE COURT REPORTER: Thank you.
DIRECT EXAMINATION
BY MS. FINKEN:
Q Good morning, Doctor. My name is Tracy Finken. I'm going to be taking your deposition today. Can you state your name for the record?
A Michael Vaezi.
Q Okay. So now I know how to pronounce it correctly. Dr. Vaezi. Got it.
So, Dr. Vaezi, have you had your deposition taken before?
A I have. I have had two prior depositions. I think I outlined that in my report at the bottom, I think. I've had a product liability and -- and another one, yes.
Q Okay. And have you had a deposition taken by Zoom before?
A I have. Actually the -- the second one was Zoom, yes.
Q Okay.
A The first one was in person. That was preCOVID.
Q So there are some unique challenges with taking a deposition by Zoom with technology and things of that



nature. So if at any time during the course of the deposition you can't hear me or my Internet is unstable or your Internet is unstable, just let us know so that we can go off the record and make sure we correct it and everybody can hear and take down what we're saying appropriately. Okay?
A Sounds great.
Q Okay. And where are you located today?
A I am currently in Nashville, Tennessee, and in my office, at Vanderbilt University Medical Center.
Q Okay. And you're appearing on behalf of the manufacturer defendants in this case, correct?
A I don't know what you mean by "on behalf," but if you mean I'm an expert providing an expert opinion on this matter, I am.
Q Okay. And which manufacturer defendants are you testifying on behalf of?
A I don't have a list of all of them, but I know there's GSK and Sanofi and others. I'm not quite sure of all the names.
Q Okay. And are you represented by counsel today?
A I am.
Q And who is your counsel?
A Eva Canaan.



Q Is there anyone in the room with you today?
A No.
Q Okay. And do you have anything in front of you for your deposition, notes or --
A I have a blank piece of paper to -- that's my habit to write on in case I miss something when asked. And then I have my report which is -- I have it electronically, and I also have electronically my -- the papers that I've written.
Q Do you have access to email or text messaging at all?
A My phone is not off, but it is in silent. I have minimized my email. In fact, I just -- thank you for reminding me -- I quit my email. Every now and then it makes a noise when it comes on, so the answer is no.
Q Okay. And will you agree with me that during the course of the deposition, you won't communicate with anyone while we're on the record?
A Yes, absolutely.
Q Okay. And that includes your counsel or anybody else, okay?
A Yes.
Q And that would also include all manner of communication, including text message or email, okay?
A Yes.

(Exhibit 6282 was marked for identification.)
BY MS. FINKEN:
Q Okay. Let's pull up what we've previously marked as Exhibit 6282.
Okay. And, Dr. Vaezi, this is your notice of deposition that we served in this case.
Have you seen this document before?
A Yes.
Q Okay. And did you review it before your deposition today?
A At some point. I don't recall when, but at some point in the past, yes.
Q Okay. And if you can turn to page 4, and there's a list of documents that are requested.
Did you undertake a search of your files and produce any documents that are responsive to these requests?
A Again, the only documents that I have are my PDF files that are electronic and my report, the -- the report that I believe was turned in to you. I have nothing else.
Q Okay. And you -- just to go through this very quickly, you served a copy of your curriculum vitae with your expert report, correct?
A Yes, that's correct.



Q Okay. And is that your most recent copy of your curriculum vitae?
A It was the most recent when I turned it in. I forget exactly when it was, but there may be an additional publication and/or presentations or two, but I would say that was most recent when I submitted it, yes.
Q Okay. And I understand that you produced some invoices in advance of your deposition.
Did you take -- do you have any notes that you prepared in relation to your evaluation of this -- of the case?
A Notes? I -- I don't mean -- I don't understand what you mean by "notes."
Q So when you were preparing your expert report in this case, did you take any notes as you were reviewing the literature and things of that nature?
A Well, typically what I do is I look at the PDF file. I'm more -- I used to be old fashioned, look at paper, but I converted finally to PDF, and I usually do that and then create my report. So that's how I did it.
Q Okay. So you don't have any handwritten notes or electronic notes that you took while you were reviewing the literature or anything like that; is that



fair?
A I don't have any handwritten notes. Electronically, I have my PDF, as I mentioned, that I -- but . . .
Q Okay. And do you make notes within the PDF document itself?
A I do not. I actually don't know how. Someone told me you can. I haven't gotten around learning how.
Q Okay. Just to go to the next page of this document, just quickly go through this list.
Other than the published medical literature and the documents that were provided to you by defendants that are included on your materials considered list, did you review any other material in preparing your expert report?
A Well --
MS. CANAAN: Objection, form.
A Yeah. I don't--- can you repeat that because there were a lot of questions I felt.
Q Sure.
A So can you be more clear or break it down for me? That would be great.
Q Sure. Well, let's -- let's -- I'll go through your materials considered list in a moment, but just going down this list, did you produce -- let me see.



Hold on a second.
Have you produced all documents identifying research grants that you've received involving the study of any ranitidine product?
A I -- study of ranitidine products.
Q Have you conducted any research studies involving ranitidine?
A I don't believe I have. It may have been in congregation with acid suppressive therapies. I don't believe I have.
Q Okay. If you --
A Not off my head. I can't recall that I have.
Q Okay. If any -- if you had conducted any research relating to any ranitidine or Zantac product, would that be contained or listed in your curriculum vitae?
A Again, my curriculum vitae was the most complete as of the date that I submitted it.
Q Okay. Have you conducted any research pertaining to any ranitidine products since you submitted your expert report and curriculum vitae in March of 2022?
A I have not.
MS. FINKEN: You can take that down.
BY MS. FINKEN:

Q Dr. Vaezi, who retained you in this case?
A That was a long time ago, I believe. Counsel reached out regarding my expertise in care of patients with reflux. I believe it was Ms. Eva Canaan.
Q Okay.
MS. CANAAN: And, Dr. Vaezi -- I'm sorry, Tracy.
I just want to put on the record that you should not disclose any communications that you have had with counsel, but it's okay to say that counsel retained you or who retained you.
THE WITNESS: Okay.
BY MS. FINKEN:
Q Okay. So is it your recollection that Ms. Canaan was the first person to reach out to you in relation to providing an expert opinion in this case?
A I believe so. Again, that was a while ago. I believe that was right. I can't recall specifically, but I believe that was right.
Q Do you -- do you know approximately when it was that Ms. Canaan reached out to you?
A Good question. It was a while ago. I have no idea.
Q Okay. Can you give me an estimate on the year that that would have been?



A That's a reach as well. I'm sorry, I -- I couldn't.
Q Do you know how Ms. Canaan got to you for purposes of providing an expert opinion?
A I'm going to assume, but I don't remember. Again, I don't specifically remember -- I'm going to assume it may have been through email. That would be my recollection, but, again, it was a while ago.
Q Had you ever spoken to Ms. Canaan before?
A I had not.
Q And had you ever prepared any type of expert opinion or expert report for Ms. Canaan's law firm, King & Spalding?
A I had not.
Q You had provided with your expert report your -- copy of your curriculum vitae, and there was also a list of the materials that you considered in preparation of your report.
Is it fair to say that all of the facts or the data or the materials that you considered or relied upon in forming your opinions are contained within those two documents: Your expert report and your materials considered list?
A Well, that was a long question, so if I remember everything you said right, I would say that my



report contains what I relied on, but it wasn't solely that because I also -- I may have looked up, as I often do -- on Internet, I do searches to make sure I haven't missed anything. And so that -- that may not specifically be there, but that's part of my usual practice of when I'm looking at evidence and trying to see the data.
Q Okay. And when you would look at the evidence and data to prepare your report, even if you didn't reference it in your report, did you keep a complete list of the documents that you reviewed and relied upon?
A I have not.
Q Doctor, let's mark your expert report as Exhibit 6283 to your deposition. Let me pull it up.
(Exhibit 6283 was marked for identification.)
BY MS. FINKEN:
Q And this is an electronic copy of your report. It looks like it's dated March 7, 2022. And is that your signature on the front page?
A Yes.
Q Okay. And I'd like to mark the materials considered list as Exhibit 6285 to your deposition. And let's pull that up.
(Exhibit 6285 was marked for identification.)
BY MS. FINKEN:



Q Doctor, you had provided this document as Exhibit D I-- Exhibit B, I'm sorry -- Exhibit B to your expert report. Did you prepare this materials considered list?
A What I have is within my report and they are referenced, and I believe these are the references from that. Again, I have to look at the whole thing to make sure. If you want me to go through and look, I believe they are the ones that are within my report.
Q Okay. But my question was did you prepare this list of materials considered, or is this something that would have been prepared by counsel?
A This was from my report. I believe it was created by counsel.
Q Okay. Did you review this materials considered list before your deposition today?
A Yeah, a while ago. Again, this was submitted -- I went through to make sure that there was nothing missed, and I matched to the report. And I don't recall anything that was inaccurate.
Q Okay. So just briefly just going through this materials considered list, it looks like on the first page here that you considered the expert reports of plaintiffs' experts. Do you see that? The very top of the page?

A Yes, yes, uh-huh.
Q And did you review all of these expert reports when preparing your -- your expert report?
A I -- I did not. I sort of -- I had the files. But to be honest with you, the ones I focused on were the ones that I responded to in my report, and that was Dr. McTiernan's, I believe, and Dr. Moorman. The rest I did not feel were relevant to what I was asked to do.
Q Okay. And there's some FDA documents listed next on this list. Did you -- did you consider all of these FDA documents in preparation of your report?
A I'm sorry, can you repeat that? Did I do what?
MS. CANAAN: Form.
BY MS. FINKEN:
Q Do you see the list of FDA documents that are here on your materials considered list?
A Yes, I do.
Q Okay. Did you review and consider all of those FDA documents in preparation of your report?
A I reviewed them, yes.
Q Okay. And it looks like that is followed by medical literature. Do you see that at the bottom of the page?
A Yes, I do.
Q Okay. And there's a listing of medical



literature.
MS. FINKEN: If you can scroll down and -- you can keep scrolling. I just want to get to the end of the medical literature. Okay. You can stop right there.
BY MS. FINKEN:
Q Dr. Vaezi, are these publications you would have pulled and reviewed on your own or are they publications that would have been provided by counsel?
A Combination of both. Counsel provided some documents. But, again to be fair, I wanted to make sure that nothing was missed, so that's what I meant originally when I said I did my own independent to make sure that nothing has been missed. So it's a -- it's a combination of both.
Q Okay. And if you look underneath at the bottom of that page, there's -- it's page 9 -- there's -- it lists some documents produced with some Bates numbers -- what we refer to as Bates numbers. Do you see those?
A I do.
Q Okay. And do you know what those Bates numbers pertain to?
A The numbers specifically?
Q Yeah. What documents are those?
A Again, I -- I just briefly looked at the GSK



ones, so I couldn't tell you what the numbers represent to be honest with you. But the "EMERY" I assume, again, I don't know what the numbers represent, was -- I assume that's the Emery Pharma original report to the FDA.
Q Okay. And do you know what the GSK documents are that you reviewed?
A I -- you would have to pull them up to remind me. This was a long time ago, I'm sorry.
Q Okay.
MS. FINKEN: So we can go to the next page, please.
BY MS. FINKEN:
Q Okay. And there are some additional documents listed by Bates number. Do you see the first two lines start with the word "MITCH." Do you know what those documents are that you reviewed in preparation of your expert report?
A I can't recall. I would have to pull it up and see. I'm sorry.
Q Okay. And what about the other three Bates numbers listed there, the first begins with "MSK," and the second two begin with "VAL-BI." Do you recall what those documents are?
A Again, we would have to pull them for me to remember. It was such a long time ago. I'm assuming



V-A-L is Valisure. I recall having briefly looked at that, but that's what I would assume. I don't know which is which to be honest with you.
Q Okay. And then there's some miscellaneous documents listed here. Are those documents that you would have pulled as part of your research, or are they documents provided by counsel?
A I would have to pull each one to see which I pulled. It was a combination. Like I said, all of these are a combination, so I can't recall which was which, but it was a combination of counsel as well as my reports, yeah.
Q Okay. Doctor, you had indicated that you had conducted some searches in -- in relation to preparation of your expert report.
How would you typically conduct those types of searches?
A Now that I've learned about Google, I use Google all the time, so I do Google searches. I do PubMed searches. I go into the PubMed within each of the articles and if there are references, so there are a variety of ways that I try to get information.
It depends on what information I'm looking for, so in this case, that would have been my typical approach.

Q Okay. And what specifically did you search for in this case?

A Well, it depends on what you mean "specifically," so if it relates to a topic matter that I was interested in, so if it was about FDA, I would have pulled FDA, and then I would have looked -- searched under that, see FDA report or FDA ranitidine, things of that sort.

So it's variable. It depends on what. So it's not just one thing. It would have been -- let's say I looked at an article and -- that highlighted certain things, then I would have gone and searched under the author they may have referenced to see that publication which they had referenced -- the original article had referenced.

So it all depends. There are a variety of things I would have probably done to try to look at an -- you know, an encompassing approach, if you will, of trying to find out what's going on and where the data might be.

Q Did you save any of the searches that you conducted in preparation of your expert report?

A I did not, I'm sorry.

Q Okay. Let's mark your CV as Exhibit 6284, to the report -- I mean to the deposition, sorry.



(Exhibit 6284 was marked for identification.)

BY MS. FINKEN:

Q Okay. Dr. Vaezi, this is the -- the curriculum vitae that was provided to us, and it accompanied your expert report in this case. And this would have been provided in early March of 2022.

Do you know whether or not you have updated your CV since that time?

A I have not. My typical update happens once a year. If you can imagine, I, you know, present a lot, publish a lot, do a lot of research, do a lot of education. I see a lot of patients, so I don't really have the time to do it on a regular basis.

My regular is usually once a year, so that probably is the most updated. Like I said, if there are things that I may have published and/or if there are presentations I may have had and/or educational opportunities I may have had, they may not be there because I usually update them once a year.

Q Okay. So is it your understanding or is it your belief that this version of your curriculum vitae is the most up-to-date, true and correct copy of your professional qualifications, credentials, publications and so forth?

A That is to the best of my ability at the time,



to what I recall, so my CV and curriculum vitae is always remembering what I did when, when I gave a lecture, publications.

Again going back to your original question, I usually go to PubMed, what all -- what all did I publish. I search under my name and try to come up to update my CV.

So is it as complete as it could be? It's the best I could do given the circumstances, so it's the best I have. Are there things that may be missing from it that I may have missed? I hope they're minimal, but if there are -- I know the book chapter section especially may be somewhat anemic because I don't keep track of book chapters that are published. It's hard to search those in PubMed or in Google.

So to the best of my ability, but there may be things that aren't there, but . . .

Q Fair enough, Doctor. We're going to mark -- also you had produced -- or your counsel had produced some invoices related to the work that you did in this case, and we're going to mark those as 6299 to your deposition. Let 's pull those up.

(Exhibit 6299 was marked for identification.)

BY MS. FINKEN:

Q Okay. And, Dr. Vaezi, can you see this on



screen, the invoices?

A Yes.

Q The first one is dated November 2020. Do you see that?

A I do.

Q Okay. And are these invoices that are prepared by you?

A They are.

Q Okay. And this -- the -- I'll represent to you, without going through all 29 pages of these invoices, that this is the first date in chronological order that it appears you submitted an invoice in this case. Is that accurate, do you believe?

A Again, if that's what you're provided. I don't remember when I started providing the invoice. It was a while ago, so if that's what you have, then I -- I would go with that.

Q Okay. So that comports with your recollection of when you approximately were first contacted in relation to providing an expert report in this case; is that fair to say?

A I don't recall. As I said, that's the first invoice -- if you're telling me that's the first invoice date, then, you know, you have to ask counsel. I don't know if that's the correct date.

Page 26

As far as when, the dates are long time ago. Sorry.
Q Okay. And it seems like your most recent invoice that was produced to us is dated April 22nd, 2022.
Have you provided -- or have you submitted or prepared any invoices since that date?
A I have not.
Q Okay. Have you incurred any time that you will be submitting an invoice for since April 22nd of 2022?
A I have. I had gone through my report, so there -- there are -- there are some times that I have not done yet. Normally I try to do it once a month at the end of the month or when I remember and when I have the time. So I plan to do that at the end of this month. But, yes, there are times in between the two.
Q Okay. And what type of work have you done in this case since April 22nd of 2022?
A I essentially went through my report and looked at my report, looked at some of the studies that I outlined in the report, so that was time reviewing mostly that, as well as, again, if there were studies that I needed to look closely, some of the charts, some of the graphs just to make sure that I'm as up-to-date as possible on that.

Page 27

Q Okay. How much time have you incurred since this last invoice on April 22nd, 2022?
A Good question. That takes time, so I'm happy to pull that up and go through -- to find them and go through, but I don't -- I have to put it together. I'm sorry.
Q Okay. Do you have an approximate number of hours that you would have incurred since this last invoice?
A It's so variable each time, I couldn't guess. Sorry.
Q Okay. What did you do to prepare for your deposition today, Doctor?
MS. FINKEN: You can take that down.
A I went through my report that you had shown me. I went through the studies mainly. And I had a meeting with counsel regarding just the process-related matters as far as what -- for me what to expect from this because I don't do this often, as you can see from my CV and report, to just make sure that I have the process correct as far as what to expect and also reviewing the material.
Q Okay.
MS. FINKEN: You can take those exhibits down, please. Thank you.

Page 28

BY MS. FINKEN:
Q Did you meet -- or did you meet with counsel at all to prepare for your deposition?
A I did.
Q Okay. How many times would you say that you met with counsel to prepare for your deposition?
A I would say I met with counsel about maybe twice, two or three times perhaps.
Q Okay. And were those meetings in person or were they on Zoom or some other --
A Yeah, I -- you know, I'm quite social. I wish it had been in person, but everything has been in Zoom. And this is somewhat unfortunate that things have to happen in Zoom, but hopefully next year things will be different. But it has been through Zoom yes.
Q Through Zoom, okay. And who did you meet with?
A With counsel, Eva, Ms. Canaan.
Q Was anybody else present for those meetings?
A Yes. Nicole as well, Nicole Costello was also there.
Q And anybody else?
A No.
Q Sorry about that, Doctor. I have notifications that come up on my computer as well and they make noise. Let me see if I can turn those off.

Page 29

Did you -- how long were those meetings would you say?
A Variable. I mean, 30 minutes to two hours, two or three hours, so variable.
Q Okay. And when was the last time that you met with counsel to prepare for your deposition?
A I believe counsel for about 10 minutes this morning wanted to make sure that I had all the links and -- so that I could login to make sure that everything was okay from my side. About 10 minutes perhaps.
Q Okay. Did you speak to anyone else to prepare for your deposition today besides Ms. Canaan and Ms. Costello?
A I have not.
Q Did you review any documents besides what you have already identified to prepare for your deposition today?
A I have not.
Q Okay. Did you review any deposition transcripts to prepare for your deposition today?
A I was provided those that I had listed in the document that you showed. But the ones that I really looked at were Ms. Moorman -- I'm sorry, Dr. Moorman and McTiernan were the ones that I looked at more closely.

The others I felt were irrelevant.
Q Okay. And, Doctor, I think that -- are you referring to the expert reports that were listed on the materials considered list?
A Those were the ones that you showed me, their expert report, right?
Q Yes. So my question was a little different. There have been some depositions like what we're doing today.
A Oh, I see. Oh, I see. I'm sorry. Yeah, depositions. Thank you for clarifying. I have not. I haven't seen anything in that regard.
Q Okay. Did you review any videos of any depositions that have taken -- that have taken place in this case?
A I have not.
Q Okay. Just give me one second. I need to try to take care of that notice. It's going to keep --
A Mine just came on too.
Q Oh, is it yours as well?
A Mine as well, yeah.
Q Well, we'll get through it and --
A I don't know how to turn them off, so if you know, tell me.
Q It's the perils of Zoom depositions. This is



what we've -- you know, we've become accustomed to. Hopefully it won't be too distracting.
So going back to my question, you said you did not review any video -- video depositions to prepare for today, correct?
A I have not.
Q Okay. Did you have any discussions with anyone besides your lawyers that you were going to be giving a deposition today?
A No, I have not.
Q To provide a deposition and act as an expert in a case, do you have to seek approval through Vanderbilt University, your employer?
A I have not.
Q Okay. Doctor, just -- if you can just give me a little bit of background into your day-to-day work at Vanderbilt University. What exactly is it that you do?
A It depends on how much you want to know. I can tell you everything. It's sometimes painful. But I'm a clinician. I see patients. I treat patients. I'm also a researcher. I conduct research, clinical, translational research.
I have administrative responsibilities that have been outlined on my CV. I'm the associate chief and the clinical director for the division.



I also have other responsibilities for the department and the institution as a whole. I'm the director of endoscopy -- these are my administrative roles, which take up a lot of my time, as well as research. So I meet with my research team. We conduct a lot of research. We publish. I give lectures.
And those are all outlined on my CV, but it's a lot, so it's a combination of early morning Zoom meetings to in-person meetings, to seeing patients, doing in clinic, as well as doing endoscopies, publications, Zoom meetings.
I was just in Argentina, and I was just in Hong Kong and Taiwan to give lectures, all through Zoom, so that gives you an idea. I have to prepare those.
So it's -- it's a combination of things. Keeps me busy, which is what I like.
Q It sounds like you're a busy guy.
Are you considered -- as a specialty, would you consider yourself a -- strike that.
Are you a gastroenterology?
A By some -- you know, some -- some of my colleagues -- I have a picture I can show you behind me that has me with about 20 arms, and those were given to me by fellows about how I am different things, if you will.



So I am a gastroenterology. I have a Ph.D. in bioorganic chemistry. I have a master's in epidemiology. I do a lot of stuff, so I'm a -- I'm a -- by gastroenterology, you then sub-sub-subspecialize, so for me I'm also a esophagologist. I do a lot of esophogeal work. Within esophagology, I look at motilities, reflux, laryngitis.
I've been given a degree in otolaryngology because of my interest in some of the voice-related issues and reflux.
So I'm a professor of medicine and otolaryngology. I hope that answers your question. I may have babbled on about my credentials, but I hope it was helpful.
Q Yes, it is. So let me just ask you a couple more questions about that.
You do not have a degree in statistics, correct?
A I have a master's in epidemiology, and I do a lot of statistical work. And the studies that you see on my CV, as well as things that I review, you really have to have a good knowledge of statistic and study design.
So I would say my master's in epidemiology and my 30 plus years of doing research, whether it be

Page 34

clinical or translational, has helped me with a lot of statistical questions.

Q Do you hold yourself out to be a statistician or a biostatistician in your professional work?

A I don't know what you mean by "biostatistician." I'll go back to my prior response in that it -- if by that you mean do I have knowledge of statistics, do I know the statistical protocol when it comes to study design, do I know what it takes and what the differentials might be. Yes, I do. But by that do you mean every day do I sit and -- 80 hours a work do I do just statistic? I would say, no, that -- that is not what I do, but I have a good knowledge of statistic and what it takes from a study design.

And to me that's important because, in fact, the reason -- I can tell you, the reason I got my master's in epidemiology and took a lot of statistical courses was because I wanted to make sure that I didn't miss anything, that I understood things, how it applied to care of patients, and when I did research, what could I have missed, so I -- I have knowledge of that based on my practice and studies that I've done.

Q Okay. Did you -- can you just give me the chronological order of how you obtained your degree since you have quite a few?

Page 35

A Can you pull up my CV? I can go through that and tell you.

Q Sure. It's exhibit -- if it's helpful, sure. It's exhibit -- what did we mark it as? 6284.

A If you go -- so if we could scroll down. Okay. Stop, yeah.

So -- so you were asking specifically about my degrees?

Q Uh-huh.

A So I have my bachelor of science from Birmingham Southern in '83. Then I got my Ph.D. in bioorganic chemistry from '83 to '88, and in 1988 to '92, my medical degree at University of Alabama.

There was a bit of an overlap between the Ph.D. and the M.D. I was finishing up my Ph.D. I was still in med school, so I defended my thesis after the first year of medical school.

Time is short. But I can tell you stories about that where I lost all of my Ph.D. thesis on those true floppy disk and the computers back then. But I won't go through it.

Then I did my house staff training. What was important about that is usually residency is three years. I did a four-year academic internist training, and again because of my interest in research, so that

Page 36

was a four-year rather than a three-year because that's a two-year clinical and two-year research.

Then I was recruited to go to the Cleveland Clinic. And I was there from 1996 to -- if you scroll up -- to 2005. I was faculty, not only a fellow -- chief fellow but also faculty there until 2005, and then I was recruited by different organizations.

I got tired of the gray and the snow of Cleveland. I loved the city, but then the opportunities came about, and they were looking for a clinical director here, and that's when I moved here.

But prior to my move, as you see, because of my interest in clinical research, I had submitted a grant to the NIH looking at this area of laryngitis and reflux. I really wanted to better understand the issues regarding epidemiology and statistics and what have you.

And so that's when I went to Case Western Reserve and got my master's in epidemiology, again how it fits into my global training, if you will. My wife says I'm a -- I'm a professional student, but we leave that there.

And then I was -- I moved here in 2005. I've been here since then. And because of my interest in otolaryngology, I've done a lot of research there. And as you can see, I have a professorship of medicine and

Page 37

otolaryngology, and there are a variety of appointments.

But I've been there since. I -- I don't want to bore you with the rest. If you have specific questions, I'm happy to answer.

Q So you've been at Vanderbilt since 2005?

A That's correct.

Q Okay. And just to go through some of your -- what you had discussed regarding your day-to-day work, you primarily practice as a esophagologist. Did I say that correctly?

MS. CANAAN: Objection.

A Yeah, that's right, esophagology.

Q Okay.

A Well, not really. I mean, I -- I'm a gastroenterologist with interest in esophagology, so that's from a research perspective.

Q Uh-huh.

A So when it comes to clinical care of patients, I do colonoscopies. I do endoscopies. I see patients that have abdominal pain, may have gastroparesis. They may have pancreas issues.

So I round in the -- in the hospital services where we have a variety of presentations, patients present with pancreatitis, liver issues and/or colon issues. So I'm on the services -- I'm on call on the

hospital services. So it's varied, so that -- that's where my gastroenterology training comes in, so I do see patients with different things.

So if I have a patient, let's say, that has heartburn or gastroparesis but they also have rectal bleeding, I don't pawn that off to someone else. I have the appropriate training to take care of that patient, so it's sort of a mixed practice in that sense.

Q Uh-huh. Is your research -- and you had discussed a little bit about the research that you're engaged in.

Would you agree that your research is primarily in the umbrella field of gastroenterology?

A And otolaryngology as I mentioned because of that overlap that we've done. But from clinical care perspective, I see the variety of symptomatology and disease states, yeah.

Q Okay. Are you currently engaged in any clinical research?

A I'm engaged in many clinical research, yes.

Q Okay. And what specifically?

A Well, I'm engaged in research evaluating diagnostic modalities for the esophagus. I have actually come up with a better way to diagnose reflux. Right now our methodologies are somewhat archaic.



So if you come to me with reflux symptoms, typically I would -- in the old way, if you will -- current way, hopefully old way soon -- you have to put a catheter down someone's nose to measure pH and all that.

So through my research, translational and then clinical, we've come up with a much better way to diagnose reflux where we can actually just during endoscopy, look in -- at the epithelium and find out whether or not there are alterations from reflux and use that as the marker. And that has been a -- if you look at my CV, that's the mucosal integrity testing.

I'm also involved in esophageal motility disorders, laryngeal issues. I'm involved with a variety of organizations through the research projects to make sure that we better understand how to diagnose, how to treat patients with reflux disease.

So I hope that answered your question.

Q Are you currently engaged in any research involving the use of any acid -- acid suppressive medications?

A Yes. I have been and continue to because that is my expertise, so that's -- there are many -- the good news is that we have so many options right now when it comes to acid suppressive therapy. There's constancy of evaluating efficacy of drug A versus B versus C.



So there are -- within industry, for example, right now in esophagology, their efforts in optimizing care and looking at specific agents in regards to acid suppression and/or bile suppression and/or other ways of treating reflux -- so when it comes to that, yes, we -- whether it be through multicenter, through individual center studies, yes, I have.

Q Okay. What acid suppressive agents are you currently engaged in clinical research regarding?

A I couldn't tell you the names specifically, but I can tell you there are -- within the industry there -- there's this push for what's called P-CABs. These are potassium. So if you look at acid suppression, we have the H2 receptor antagonists, and then we have the proton pump inhibitors as you're aware. And within proton pump inhibitors, there are classes of agents and differentials, and then now there are these new agents that are coming up. They're called P-CABs, and they're a slightly different way of suppressing acid.

These agents have been available in Europe -- I'm sorry, in Asia, but now there's some move by companies to bring them to market here, and I believe we are one of the sites for some of those studies.

I would have to discuss this with my research coordinator to pull the names specifically, happy to do



that. But that's part of -- again given our -- my expertise, that's part of what I do.

Q Doctor, let me ask you a question. You said -- you used -- you used the term P-CABs. Are you saying P-C-A-B?

A Yeah.

Q Okay. I just wanted to make sure for the --

A Yeah.

Q -- reporter's benefit because --

A They're potassium-competitive acid blockades, so if you need to write that. Potassium-competitive acid blockade.

So, you know, the proton pump inhibitors are really slightly different in the way they block the proton pumps, and these block the potassium pumps within the parietal cells for acid production, so they're doing the same thing, ultimately suppressing acid, but in a slightly different mechanistic way.

And by doing so, the question then becomes are they better, and in what way are they better, in what patient population we can use them, and that gets to the variety of agents that we have, which is good because patients respond, yeah, so we are involved in those things.

Q So for the P-CAB studies that you're engaged

in, are these medications that are currently approved and marketed or is that pre-market approval research that you're doing?
A They are approved in Asia. The companies -- I would have to look up the names. You'll forgive me, I can't remember. As I get older names escape me. But there are companies that want to bring it to U.S. There are active studies with different companies regarding whether it be the P-CABs and/or, for example, biosequestering agents or others.
Q Okay. Are you currently engaged in any clinical research involving histamine receptor antagonists?
A I don't believe so, no.
Q Okay. And when I refer to them throughout this deposition as histamine -- instead of "histamine receptor antagonists," I will refer to them as "H2RAs." Do you understand that H2RAs are histamine receptor antagonists?
A Yes, I do.
Q And can we agree to refer to them as "H2RAs" through the course of this deposition, just so it's easier on all of us?
A I would appreciate it. That's easier on me as well.



Q And similarly for proton pump inhibitors you had mentioned previously, we'll refer to them as "PPIs" during this deposition; is that fair?
A Perfect. Thank you.
Q Great. So -- and when you refer to proton pump inhibitors or PPIs, you're referring to a class of medications, correct?
A That is correct. These are agents that were introduced in the '90s, early '90s, started with omeprazole being one of them. And what's nice about them relative to what we used to have, there's different agents. There's omeprazole -- usually they send with "zoles," if you will: Omeprazole, lansoprazole, rabeprazole, pantoprazole, and then esomeprazole.
So essentially you have all the "zoles," but they all differ slightly in their pharmacodynamics and pharmacokinetics, so they came on at different times, and they were FDA approved at different times.
Those are the agents, going back to your original question of FDA approval, are approved as you well know in the U.S., but not the P-CABs yet.
Q And when you refer to those names, omeprazole, esomeprazole, pantoprazole, lansoprazole, they go by the common trade names of Prilosec, Nexium, Protonix and Prevacid, correct?



A That's correct.
Q Okay. And I'm just -- that's for the jury's ease.
You had also -- we had also discussed a class of medications called H2RAs. And what brand name products are -- are in the class of medications of H2RAs?
A Yeah, and those -- those were available prior to PPIs. So what's nice about H2 receptor antagonists, you know, just from a timeline perspective, prior to H2 receptor antagonists, we really just had coating agents, and our patients were suffering.
So those agents came about in the '70s and '80s, and those are things like cimetidine. That was the first one that came on. And then we had ranitidine that came on. Then we had famotidine and nizatidine, so all the "idines", if you will. That puts them in that H2 receptor antagonist category.
And that was really nice, so if you look at the timeline, you have coating agents, and then you have the H2 receptor antagonist that essentially suppress acid much more than the coating agents would, so that helped patients. And then the next level up are the proton pump inhibitors.
Q Okay. When you're referring to "coating



agents," can you give -- give me an example of what you're referring to?
A Yeah. So prior to the H2 receptor antagonists, you know, we had a lot of patients that would have, let's say, peptic ulcer disease, and they had to have surgery. In fact, surgery was not uncommon when I was in residency, in training or medical school, so many people had surgical intervention for peptic ulcer disease. That's unheard of now. And that's because we didn't have these better agents, the H2 receptor antagonist or the proton pump inhibitors.
So coating agents such as Carafate or Sucralfate is the other name, that was commonly used by our surgical colleagues, by our intensivists, by our gastroenterologists, by our primary care doctors, for patients that would come with similar symptoms. The problem is that those agents don't really help.
We also had antiacids on top of that as you're familiar, we -- you know, Tums and Rolaids and what have you. So those are things that patients would take, but they're really not effective. For short-term, they are. What's nice is they help you with the heartburn right now, and then five minutes later, you have it. My wife was pregnant, and she was going through bottles of those Tums and Rolaids. So they're not as effective.

So then when H2 receptor antagonists came around and then subsequently PPIs, they were better in way of helping our patients, which is important.

Q Okay. Doctor, you had talked a little bit about some of your roles within Vanderbilt University.

And can you give me a breakdown as to how much time you spend in clinical practice versus research versus administrative responsibilities, roughly?

A Yeah, 200 percent, perhaps 250 percent. It depends on the hours, right? So I'm pulled in different directions. Sometimes I joke about I used to have hair before all of those administrative, clinical, and now it's all gone.

But just to give you a rough idea, I mean, I start the day early, end late. It's variable, but I would say probably about 40, 50 percent clinical; the rest a mix of research and administrative.

I try to find time anywhere to do what I need to do, whether it be public -- for example, publication, whether it be various Zoom meetings for administrative or for departmental, divisional, institutional meetings.

So I would say probably 50/50 would be a fair assumption. But, again, you have to extend that time because as we all do, we -- it eats away at your personal time, and you try to accommodate --



Q There's no such thing as work life balance. We understand that in the legal field as well.

Just going back to your 50 percent of the time that you spend in clinical practice, can you break that down for me? How much of that is spent in office hours versus performing endoscopy and things of that nature?

A Well, I -- I've excluded office hours. If by office hours you mean clinic?

Q Correct.

A That's the way I'm taking it. Okay.

So in clinic, I am -- I would say, let's see, 30/20, so it would be 30 percent -- it's a mix. Perhaps a fair way to do it -- because there's some weeks I do more clinic, more endoscopy. Perhaps splitting it would be fair, 25/25, but some days -- some weeks are 20/30, some 30/20, but that's a fair mix.

Q Okay. Do you treat patients in the office as well as in the hospital setting or just one or the other?

A So I want to be clear. When I -- when you talk office, I'm talking about this office, so when I -- when you say "office," I don't treat anyone at my office. This is my private area that I do this kind of stuff or publish or review things.

But in clinic, our clinics are in the hospital,



so there are some practices where the clinics are removed from the hospital, but my clinics are actually in the hospital. And then the endoscopy that I do is also in the hospital.

We do have practices outside of the hospital. Vanderbilt is extending that to different hospitals and different settings. I'm not a part of that right now, but things could change as the demand increases.

Q Okay. Other than endoscopy, are there any other types of procedures that you perform during your practice?

A Well, there are different procedures within endoscopy. So to -- to be fair, to just outline that, so I do esophagoscopy, so I look in the esophagus. I do also look in the larynx. Remember I mentioned that I have interest in that, given patients that may have hoarseness, sore throat, various laryngeal issues, so I look in the larynx. I look in the esophagus. I look in the stomach. I look in the small bowel.

Within the colonoscopy, obviously it entails looking in the colon. From a small bowel perspective, there's what's called a push endoscopy. I can look further into the small bowel.

There are interventional procedures I do in treating patients with reflux, or I have a lot of



patients unfortunately that have laryngeal cancer, and then they have radiation and now they can't swallow, so I do interventions there to help them be able to swallow.

Patients, because of the cancer and radiation, the connection from the mouth to the esophagus is completely blocked off, and now they can't swallow. They're spitting in a cup. So what I attempt to do is go in and -- this is actually very rewarding for me as a clinician. I go in and I'm able to open that for them, and they can actually swallow and eat. So that's really rewarding.

But also in reflux, doing dilations. I have patients with motility disorders where they need the esophagus stretched or injection of Botox, so a variety of techniques that I use.

In the colon, if there are polyps that need to be removed. If I'm in the hospital and someone's bleeding, they're vomiting blood, I have to go in and stop the bleeding in the stomach or in the small bowel or in the esophagus. If they have a polyp and they're bleeding from the colon, we have to intervene.

So that gives you -- I may not have mentioned everything I do, but just a global assessment.

Q And all of that would be under the umbrella of

endoscopy?
A That would be under the umbrella endoscopic techniques and endoscopy, correct.
Q Okay. Is it fair to say that you are not a pathologist?
A I am not a pathologist.
Q Okay. And you're not a regulatory expert, correct?
A What do you mean by that?
Q Do you consider yourself an expert in regulatory matters with FDA labels or -- or approvals or recalls, things of that nature?
A If you mean am I able to assess if they have a recall or approval process, I am able to respond to that. But if you mean do I sit on a board and vote on whether something should be taken off the market or not, I am not.
Q Are you offering any opinions in this matter as to whether or not regulatory approvals, withdrawals, recalls, were appropriate or inappropriate?
A I don't know what you mean by that.
MS. CANAAN: Object to form. Object to form.
A Yeah, I don't know what you mean.
Q I'm just trying to understand if you're going to be testifying and offering opinions as a regulatory



expert in this case.
A Well, again, going to -- am I going to vote on disapproving or taking an indication of, I'm not on those boards. But as a clinician, as a physician, as someone that does research, am I aware of how products are approved, how there may be issues with them, they may have side effect profiles with them, with the process itself of what it takes to do it, I think I'm qualified to answer those questions.
Q Okay. So -- and is it fair to say you're not an oncologist?
A By training I'm not an oncologist. I do see a lot of cancer patients within my practice.
Q Okay. When you -- and I understand you had -- you had discussed that you see some laryngeal cancer patients within your practice.
Do you refer those types of patients out for further treatment?
A It depends on -- so again it depends on what you mean as far as referral. I actually see a lot of patients and take care of a lot of those patients. Those patients -- the care of those patients us somewhat complex in that they may need chemotherapy. That's where our oncologists come in. They may need radiation therapy. That's where our radiation oncologists come



in, and then they need my services for diagnosing the problem, taking still care of their symptomatology.
I already mentioned about radiation-induced or chemotherapy-induced infections, so it's -- it's a group effort as you're aware. That's how we take care of patients, so . . .
Q Okay. So when you have a patient with laryngeal cancer who needs radiation or chemotherapy, you would refer them to an oncologist; is that fair?
A If they need chemotherapy and if they need radiation, they should go to the appropriate people, yes.
Q Okay. Do you consider yourself an expert in carcinogenesis?
MS. CANAAN: Objection.
A I don't know what that means, an expert in carcinogenesis. I didn't know there was a degree in carcinogenesis. But I can tell you that I've done a lot of research. I see a lot of cancer patients, and I'm aware of the cancer process, if you will, so it depends on what you mean.
Q Okay. Well, what do you understand "carcinogenesis" to be?
A Well, that's where a normal tissue becomes apparent. They go through different processes, usually



either through -- usually DNA related, but it doesn't have to be, but they go through different stages, if you will. For example -- I can give you various examples.
But if you look at gastric cancer, for example, it goes through stages, intestinal metaplasia, and there are other things, patients that have chronic atrophic gastritis in the esophagus.
Patients can have reflux that can lead to Barrett's esophagus. Barrett's is a metaplastic condition. That metaplastic condition puts them at risk. Then when there are changes within that, they can go into low grade. They can go into high grade. They can then subsequently go into cancer of the esophagus.
Then that cancer is diagnosed, and then that's when we intervene, whether it be endoscopically, chemotherapy or radiation oncology, or the one I forgot to mention, which is an important element, is also our surgical colleagues that come into play.
Q Okay. And, Doctor, what is a carcinogen?
A A carcinogen is one that predisposes someone to carcinogenesis, I guess, to cancer.
Q Okay. Do you have -- strike that.
What is your understanding of what this case is about?
A That's a -- that's a big question. I mean, is

there something specific you want me to answer? Because I could go on for hours to tell you what I think about what this case is about, but you want me to just give you a global one or is there a specific question?

Q Just a global understanding of what this case is about.

A Very good.

So my understanding is that there was a case presented to the FDA that some ranitidine products -- that ranitidine may not be safe because of some analyses that were performed showing that some of the ranitidine products had very high NDMA levels.

And that was presented to the FDA, and that raised some initial concerns that that may lead to potentially cancer risk for patients, and that led to a variety of studies, which we can discuss.

The initial studies showing very high levels of NDMA were not proven to be accurate by the FDA, and then FDA conducted their own work showing that they were not as high, and that led to epidemiologic studies, which I've outlined in my report, showing whether or not that risk is present regarding specifically ranitidine.

And those epidemiologic studies are the ones that I've outlined in my report about this risk of cancer. But, again, that's somewhat global, but there's



a lot more into it. I'm happy to answer.

Q And we'll -- we'll break some of that down as we -- as we go along.

But you referred to "NDMA." What is "NDMA"?

A N-nitrosodimethylamine.

Q Okay. And what is your understanding of what N-nitrosodimethylamine is?

A Well, it's -- it's -- dimethylamine, there are two amine products, and there's a nitroso product within this compound, so . . . Methyl is CH3, so that's carbon, hydrogen -- three hydrogens that are attached to nitroso compounds.

This product is one that's -- well, I shouldn't say product. This is one that's available in certain food items, for example. There -- they have been shown in -- for example, alcohol has that, like beer, hot dogs.

This is one that had been of concern because of those presence, and there have been some dietary studies about that, but concerns about carcinogenesis, going to your original question, was raised with NDMA.

So it's -- it's important when we look at any of these products, especially ranitidine as we were talking about, that some of these impurities are kept to a minimum, right? So all of -- many of the drugs have



impurities. It's always good to show that the impurities are at a low level.

But NDMAs, one that's of concern clinically and present in various doses and different dietary products that have been shown, again, and the ranitidine was a study that showed high levels.

Again, I -- I hope I'm answering because your question was general, and I'm answering in different aspects to make sure I'm answering your question.

Q Okay. Have you ever conducted any research specific to NDMA?

A I have not.

Q Have you ever utilized NDMA in any type of animal studies or things of that nature to induce cancer?

A Personally, no.

Q Okay. And you referred to -- hang on one second. Strike that.

You had -- you had referred to ranitidine, and ranitidine is in the class of medications known as H2RAs, correct?

A That is correct.

Q Okay. And is it your understanding that ranitidine was primarily used to treat GERD, or gastrointestinal reflux disease?



A That is not correct.

Q Okay.

A Ranitidine was approved for different indications. One indication was gastroesophageal reflux. Another indication peptic ulcer. You may have gastric ulcer, so within the peptic ulcer group, you have gastric ulcer. You have duodenum ulcer.

So there were studies with gastric ulcers and how it helps that. There were also studies with duodenum ulcers.

There's a condition called dyspepsia, and there's condition called Zollinger-Ellison syndrome.

So it wasn't just for GERD. It's used in variety of indications.

MS. CANAAN: Tracy, we've been going for more than an hour, if we could like take a short break when --

MS. FINKEN: Sure. Now is a good time. Let's go off the record.

THE VIDEOGRAPHER: The time is 11:25 a.m., and we're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Okay. Please stand by. The time is 11:44 a.m., and we're back on the record.

BY MS. FINKEN:
Q Okay. Dr. Vaezi, I just want to -- let's pull up what we've marked -- your report we've marked as Exhibit 6283. Okay.
MS. FINKEN: And I just want to turn to page 1 of that report. Yep. There we go.
BY MS. FINKEN:
Q Okay. Dr. Vaezi, in your summary of opinions on your -- in your report, you indicate that you were "retained to provide an expert opinion on behalf of the defendants on the current evidence regarding the clinical benefits of ranitidine and the epidemiological evidence on the purported association between ranitidine and cancer."
Did I read that accurately?
A Yes. I was -- I was essentially asked to provide my opinion after I've had a chance to review the data about the potential epidemiologic evidence for ranitidine and cancer.
Q Okay. And you go on to state that it is your opinion -- "it is my opinion that (1) ranitidine is a safe and effective medication that was used clinically by gastroenterologists for decades to provide benefit to patients with acid-peptic disorders, and (2) the epidemiological evidence does not support a reliable



association or causal relationship between ranitidine and any type of cancer including gastric, esophageal, liver, pancreatic, and bladder cancer."
Did I read that accurately?
A Yes, you read that correctly.
Q Okay. And is that an accurate depiction of the opinions that you intend to offer in this case?
A Yes. I have reviewed those -- especially the five cancers and the current data that -- or the epidemiologic data that are available, and that is my conclusion.
Q Okay. Are you -- do you intend to offer any other expert opinions in this case besides the two that we just discussed?
A I mean, I'm -- I'm -- I have everything within my report, so my report contains my opinion about all the facts that I've reviewed and based my opinion on.
Q Okay. Now, to reach the conclusions that you -- that are contained in your expert report, did you undertake a review of any of the clinical trial data in relation to ranitidine?
A Clinical trial data. I'm sorry. Can you clarify that?
Q Did you review any clinical trials to reach your conclusions in this case?



A Clinical trials for what? I'm sorry.
Q For ranitidine.
A Clinical trials. I think I outlined that in my report, about their efficacy and their potential side effects. I believe it's further down when I discuss when ranitidine came about.
So there were many clinical trials of not only ranitidine, other H2 receptor antagonists. But to be more specific for ranitidine, there were many trials conducted that showed the efficacy because the FDA requires trials before approval processes, so I've outlined those in my report.
Q Okay. Did you review any clinical trials in relation to whether or not ranitidine was associated with cancers?
A Clinical trials. If by that you mean randomized controlled studies, I'm not aware of any clinical trials that specifically looked at ranitidine in association with cancer.
Q Okay. Did you review any of the manufacturers' internal clinical trial documents regarding ranitidine and its association with cancer?
A I am not --
MS. CANAAN: Objection to form.
A I am not aware --



MS. CANAAN: Give me an opportunity to object. Sorry.
THE WITNESS: Oh, I'm sorry, yes. Yes, sorry.
MS. CANAAN: Go ahead.
A I am not aware of any specific clinical trials that look specifically at randomizing patients to ranitidine or not with the goal of looking at cancer as an outcome.
Q Okay. Did you consider the ranitidine observational studies in reaching your conclusions?
A I have reached my conclusion based on everything that's on my report; the epidemiologic studies that are outlined, as well as other data that have been presented in my report.
Q Did you consider any metaanalyses of ranitidine observational studies in reaching your conclusions?
A I believe everything I have considered are in my report.
Q Did you prepare any metaanalyses of ranitidine observational studies in reaching your conclusion?
A I have -- there's -- there are a few graphs if you see in my report at the end that actually very nicely, at least for me, puts things in perspective.
So it's not a formal metaanalysis. It's more about looking at the data as a whole because it provides

a very nice picture.
So the answer for a formal metaanalysis, no, but the answer for do -- did I look at the evidence as a whole and outlined it in my report, yes.
Q Okay. Did you consider any of the experimental animal evidence that is available in relation to ranitidine?
MS. CANAAN: Objection, form.
A I don't know what you mean animal data pertaining to ranitidine. Can you be more specific?
Q Did you review any of the ranitidine carcinogenicity animal studies in reaching your conclusions?
A I didn't review them specifically, but I am aware that there are studies, if I recall from some of the studies that I was reviewing, that at very high doses, they may have had issues -- side effect profile. I believe that's part of -- majority of the compounds that are going through the process of FDA approval, but other than that, again, I don't know.
Q Okay. You indicated that -- that there are some studies that you reviewed that had a side effect profile at very high doses. What are you referring to there?
A I don't think I said high doses. I think I



said there were studies that looked at side effect profiles of ranitidine, so when you think about randomized trials that have to be done for the FDA approval, they have to track through the phases of the FDA approval. You have to sort of see what side effect profile is associated with whatever compound that's going through FDA approval process.
So that's what I meant in that there are side effect profiles for every drug, whether it be proton pump inhibitors, H2 receptor antagonists, anti-hypertensives, diabetic medications. So there are side effect profiles that have to be monitored, yeah.
Q Did you consider any of the original animal carcinogenicity studies that were submitted to the FDA for FDA approval of ranitidine?
A I -- I did not look at all of the data in that regard, but, again my point -- my task was to look at the human data rather than animal data because the question at hand for me was whether or not ranitidine is associated with increased risk, especially of those five cancers. And that's where I focused the majority of my time and research.
Q Okay. Did you look at -- you indicated that you didn't look at all of the animal data. What animal data specifically did you look at pertaining to



ranitidine?
A Again, as I mentioned before, there are -- as I was reviewing, there were some articles that outlined that at very high doses, ranitidine may be associated with potentially increased adverse outcomes, such as in the clinical practice, we see patients that might have increased symptoms, right?
So if you take any compound, you could have nausea. You could have diarrhea. You could have abdominal pain. So that's what I meant by that, not necessarily going through animal data to see -- I mean, I -- I sort of equate it to the studies with omeprazole, for example, when they first came out.
They gave very high doses of omeprazole to animals, and by that I mean rats, and they found a variety of things, and they were supraphysiologic, one that would not be used in humans.
So at the end of the day, I sort of have to divorce myself from supraphysiologic doses and go back to the question at hand here, and that's why I didn't focus on those. I was specifically interested on -- if patient's take ranitidine, is there evidence that there's cancer.
Q Okay. Did you consider biologically plausible mechanisms whereby NDMA can cause cancer in the



literature that's available to discuss that?
MS. CANAAN: Objection, form.
A Again, just looking at globally, so what is the biological plausibility that's been purported, right? So the suggestion that the NDMA in ranitidine may be problematic, one has to then -- you take it back to the NDMA level.
And within the NDMA level, I'm not aware that any of the agencies, whether it be regulatory or respected authorities, have really said that NDMA by itself is a human carcinogen; in other words, they have not come out definitively saying if you have NDMA, it's going to cause cancer in humans.
So from a biological plausibility, there's -- it's a bit shaky in that at least those authorities, when they've looked at it, have said, well, we're not convinced; maybe, it's probable but not convincingly so.
So to answer your question, based on that, I would say I don't have biological, plausible explanation in humans, so that then leads to the epidemiologic studies that also don't support that conclusion.
Q Okay. What evidence did you consider in evaluating the biologically plausible mechanisms as to whether NDMA can cause cancer in humans?
MS. CANAAN: Objection, form.

A So that is a broad question, but I can just go back to my answer on NDMA. So NDMA in animal studies at very high doses -- and when I say "animal," I'm talking about rodents -- have been shown to be associated with liver problems, right? But not in other animals, not in humans, so the evidence is weak.

And, in fact, that's the conclusion that the IRAC has put forward. They don't have convincing evidence that NDMA -- solely NDMA, getting to the biological plausibility -- is a carcinogen in human. No one's come out at least and said, this is definitively -- definitively the problem. And that's where the problem lies with biological plausibility.

The EPA hasn't done so. The NPT hasn't done that. So I think if you're asking could NDMA cause liver problems in rats at high doses, high exposure, I would say there's evidence for that, but in humans, I'm not aware that any agency's come out definitively and said that.

Q Is there evidence that NDMA can cause any other types of cancer besides liver cancer in animals?

A Again, if by "animals" you mean rodents, then the evidence is at very high exposure -- and I'm focused mainly on the five cancers that we're talking about, you know, esophageal, liver, pancreatic, bladder and



gastric. None of those, even at high doses -- I'm not aware of any animal data at high doses that would have said that the -- the animal -- in this case the rodents -- have those cancers. Liver was the only one of the five. So I would -- I would say it's somewhat shaky.

Q Okay. Have you looked at any other -- well, strike that.

Have you done a review of the literature relating to NDMA and cancer in non-human -- strike that.

Have you done a review of the literature relating to NDMA and cancer in animal species?

MS. CANAAN: Objection, form.

A I guess the question becomes should I do a review of that when the authorities in the field have done so, and I've reached the conclusions that I'm reaching based on their conclusions, right?

So IARC, EPA, NPT, they've all looked at this data, and they've all landed on the same thing that I'm talking about, that in humans, no, but again -- definitively no, but in animals, only liver at high doses in rodents.

So I think we have to be very clear in that we can't extend studies from rodents to other animals. We can't extend the studies from rodents to humans. And



that's important.

As I mentioned earlier, I'll just use the analogy I did of the different compound -- this was a PPI -- that in animals it raised concern at very high doses that, oh, my goodness this could be causing cancer in humans, we shouldn't use omeprazole.

In fact, when omeprazole first came out, it was only approved at a very short time period because of that concern. But over time we've learned that, well, that concern is not valid because it was given at such high doses, that it's unrealistic in humans, right?

So the question becomes the relevance of some of these animal studies that later don't translate into humans because we don't -- we don't go around getting exposed to millions of milligrams a day at high exposure.

I would equate that to getting a chest x-ray. I'm a clinician. I order chest x-ray. It's a radiation, but I wouldn't do that if I thought you were going to get cancer from it, right? So -- versus the exposure of, you know, you're close to a nuclear power plant, and it just goes off, right?

So it's a different dose, and it's a different animal, so to me, one really has to bring it back to the clinical terms. And in the clinical terms, NDMA, again



being very specific animals, and by that I mean rodents, high doses. And that's important. The dose is very important. You can't just say any NDMA. High unphysiologic doses and only liver.

And in fact those authorities have already established that when they review that in humans, they're not landing on my, oh, my goodness, let's get -- stop NDMA and everything because then I wouldn't be able to drink my beer and I couldn't have my hot dog because they have NDMA in it. So that's where the authorities lie.

Q Okay. So my question, and I don't know that you answered it, was is -- is -- strike that.

My question was have you done a review of the literature relating to NDMA and cancer in animal species?

A I think I answered that question before -- the first time, that authorities have looked at that, and I base my --

Q I'm asking -- I'm asking if you've looked at it.

A Well, it's -- it's -- well, to me if the authorities -- the regulatory agencies have done so and I'm basing my opinion on that, do I waste my time and look at that? If they have done an extensive work, do I

need to do it? If authorities that are in regulatory -- excuse me -- and authoritative positions have done so and they've landed on the same conclusions I am, and I'm basing mine on theirs.

Q So you're basing your opinions on the regulatory agencies' review of the -- the literature relating to NDMA and cancer in animal species; is that fair?

A It's fair to say that -- that they essentially have concluded that NDMA -- excuse me -- NDMA at high doses in rats, liver only and not in humans definitive. That would be where I would land.

Q Have the regulatory agencies found that NDMA causes any other types of cancer in any other types of species besides liver cancer in rodents?

MS. CANAAN: Objection, form.

A Yeah, I mean, that's such a broad question. The question that I would answer would be have there been studies on gastric -- the five cancers that -- of interest: Gastric, esophageal, liver, pancreas and bladder.

So the focus, at least for me, was are there studies in rodents at high doses on anything other than liver, and of those five, the answer is no.

Q Okay. Do you have an understanding as to



whether or not an agent causes cancer -- certain types of cancer in animals, whether that translates to the same type of cancer in humans?

A I don't understand. Can you repeat that?

Q Yeah. For example, are you suggesting that if an agent causes bladder cancer in rodents, then that would translate to bladder cancer in humans?

MS. CANAAN: Objection, form.

A I mean, I don't understand the question as a whole. So as a scientist, if one is looking at biological plausibility, if I come up and say, well, this causes cancer in bladder in rats, now I want to look at cancer somewhere else. Well, where there's the biological plausibility for that tissue? Then you don't have one, right?

So I -- to me there's a disconnect, what's the biological plausibility. If animal studies at high doses aren't showing it, what -- what am I basing my clinical studies on, so that's where I would question that.

Q So as part of your inquiry as to whether or not a -- an agent causes a specific type of cancer in humans, would you look at animal studies to determine whether or not it -- the same agent causes that type of cancer in animals?



A Again, I -- I don't understand the question, I'm sorry.

Q Well, you're -- you're referring to -- to studies that show liver cancer in rodents and indicating that there's no other evidence -- and if I'm -- if I'm -- if I'm misstating what your testimony was, please correct me.

But I believe you said there's no other evidence that NDMA causes any other type of cancer in any other type of animals besides liver in rodents; is that correct?

A That is not what I said.

MS. CANAAN: Object to form.

Q Okay.

A That is not what I said.

Q Do you have --

A That is not what I said. I focused on the five cancers. I said of the five cancers, the clinical ones that I looked at, there are no data of the five cancers in rodents at high doses. That's what I said, other than liver.

Q Okay. Have you looked at any other -- any literature of any other animal species and -- and -- strike that.

Have you reviewed any literature pertaining to



NDMA and cancer in any other animal species besides rodents?

A You have to be more clear, I'm sorry. Any cancer?

Q Yes.

A Well, again, I answered that already. I wasn't interested on any cancer. I was interested on the five cancers that clinically have been purported to be an issue with ranitidine.

Q Okay. Have you reviewed any literature pertaining to NDMA and the five cancers in any other animal species besides rodents?

A I am not aware of any other animals other than rodents that show at high doses that it causes those five cancers.

Q Okay. Have you -- did you consider biologically plausible mechanisms whereby ranitidine could cause cancer?

MS. CANAAN: Objection, form.

A I don't know what you mean by that. Can you clarify?

Q Sure. Well, we talked about NDMA. And did you review -- well strike that.

We've talked about NDMA. Besides NDMA, did you review -- or consider any other biologically plausible

mechanisms whereby ranitidine could cause cancer?
MS. CANAAN: Objection to form.
A Again, what started this process, if I recall correctly, was the original studies that raised question about NDMA level in ranitidine. That was the biological plausible, if you will, assertion which was then later -- by the FDA, was not shown to be at the levels of the original study.
So that was the biological plausibility that the -- the majority of the studies are assessing, and that led to not only FDA studies, it led to epidemiological studies that I've outlined.
So when you look at those studies, the biological plausibility is landing on, well, is NDMA problematic, right? So -- and that was because the ranitidine -- the original ranitidine studies showed very high levels which was then subsequently not shown to be true.
Q Okay. Do you have an opinion as to whether or not it is biologically plausible that NDMA can cause cancer?
MS. CANAAN: Objection, form.
A In rats at high doses and liver. That's where we've landed so far based on the data and based on all the regulatory agencies. I can say of the five cancers,



that's where you land.
Q Okay. And when you refer to the regulatory agencies' review of the animal cancer data associated with NDMA, what specific agencies are you referring to?
A The IARC, EPA, NTP.
Q Okay. When you conducted your analysis and reached your conclusions in this case, did you consider the universe of NDMA observational studies?
MS. CANAAN: Objection, form.
A I don't know what that means, universe of observable studies of NDMA.
Q Did you conduct a search for NDMA and cancer observational studies in humans?
MS. CANAAN: Objection, form.
A Again, you have to be more specific about what you mean. Like what would the search look like? Just observational studies in NDMA? That would be very broad.
Q Okay. You tell me. What search did you undertake regarding NDMA and cancer?
A Again I outlined the NDMA studies, the animal studies that we've talked about. We have NDMA endogenous studies that the FDA have done. Those are important studies.
Within those studies, there are other studies



that they have referenced that were the basis for what the FDA set out to assess whether or not there's any issue with ranitidine, for example, and the NDMA hypothesis.
So those are the studies. Those are important studies. But, again, you have to be more specific about what I did or didn't do.
Q Okay. Did you in -- in reaching your opinions, did you consider any metaanalyses of NDMA cancer studies?
MS. CANAAN: Object to form.
A I'll go back to my answer that I mentioned. The agencies that are responsible for looking at this issue have landed on what I mentioned, which is the IARC, EPA and NPT have all landed, after reviewing the data, on the fact that of the five cancers listed, only liver, high doses rats.
So to me, if you do a metaanalysis of a study that shows that same thing, then that's great. It will show the same thing. That's where -- the regulatory and authoritative agencies have landed on, and that's what I base my opinion on.
Q Okay. And is that also true in terms of NDMA in human cancer, you're basing your opinion on the analyses that were conducted by IARC, or I-A-R-C, EPA



and NTP in reaching your conclusions?
MS. CANAAN: Objection.
A Well, human cancer, the ones that I've outlined are the ones that with biological plausibility relate to ranitidine. Those are the ones that have been outlined in my report.
Q Okay. Have you undertaken an evaluation of the literature to determine whether or not NDMA can cause those five cancers in humans?
A You got -- again, you have to be specific about what type of studies. There are dietary studies regarding NDMA. If that's what you're assessing, that's been in my report. I looked at dietary studies that have been outlined, that have been referenced. If by your question you mean those, yes, I've looked at those.
Q Okay. And did you evaluate any other NDMA studies and the five cancers that you reviewed in humans?
A There was also the study on air exposure in rubber manufacturing, and that -- I also looked at that, and that's been outlined also in my report.
Q Okay. And what type of search did you undertake to evaluate those NDMA studies that you discuss in your report?
A Well, I considered them somewhat irrelevant, so

I didn't pursue any further because they were not directly linked to the question at hand for me. The question at hand was if someone takes ranitidine, are they at risk for the five cancers listed. And those were so far removed, you know --

If someone takes a banana can be -- I'm sorry, if they drink beer, can they get cancer, or if someone in rubber industry is exposed to a variety of agents, can they then get cancer. To me they were so far removed that they were somewhat irrelevant.

Q Are you offering an opinion in this case on whether NDMA can cause the five cancers in humans?

A I'm not aware that NDMA causes the five cancers in humans. Remember, again going back to where the authorities have landed. They've looked at all of the data, the clinical data, all of the ones that I'm talking about, and they've landed on probable, not definitive, because there aren't enough data in support of definitive association.

So to me I land where the authorities have landed. I also land where the FDA has landed on this one. They looked at this. They were not concerned regarding the epidemiologic data -- studies that I reviewed.

Q Do you know whether the FDA undertook a review



of the NDMA dietary studies and reached a conclusion whether or not NDMA can cause cancer in humans?

A I'm sure --

MS. CANAAN: Object to form.

A -- they considered it as irrelevant as I do because it's so far removed because that's not the question at hand.

Q Okay --

A The question at hand is --

Q Go ahead.

A -- that was raised about ranitidine specifically is is ranitidine associated. It's not about is drinking beer associated with whatever cancer. That's irrelevant. I'm sure they considered it equally irrelevant.

Q Okay. Did you -- strike that.

Do you know whether the FDA undertook a review of the NDMA dietary studies and reached a conclusion whether or not NDMA can cause cancer in humans?

A My answer is what I already gave. I -- again within the FDA study, if you look at Florian, for example, they said within the epidemiologic data regarding ranitidine because -- remembering, the hypothesis is that if ranitidine has NDMA, going with that biological plausibility, then you could get cancer.



That's the question. They looked at the data.

In fact, within their publication they say we see no evidence. They are not overwhelmed. So now should they do a dietary review to see? I don't know. You would have to ask the FDA on that, but I wouldn't be surprised if they equally found it irrelevant.

Q Okay. Putting the question of ranitidine aside, do you know whether the FDA undertook a review of NDMA dietary studies to reach a conclusion as to whether or not NDMA can cause cancer in humans?

MS. CANAAN: Objection. Asked and answered three times already.

BY MS. FINKEN:

Q You can answer, Doctor.

A Again, I think they would equally consider it irrelevant. The fact that they haven't even mentioned it tells me they don't even consider it irrelevant. If you want to know that, I think you would have to ask the FDA.

Q Okay. So, Doctor, sitting here today do you have an opinion on whether NDMA can cause cancer in humans?

A My opinion is what the -- all the authorities have landed on this, and that is it is not a definitive human carcinogen, so that's where I land, and I've



answered that.

Q You're aware that ranitidine has been globally recalled because it contains NDMA, correct?

MS. CANAAN: Object to form.

A Yeah, I would -- I don't know if I would agree with that completely. So I would say there was concern raised by the original study that suggested there was high level of NDMA in ranitidine.

That was then -- because of over abundance of caution -- and again that's what FDA's role is -- they said, well, let's look at this. This is concerning, let's look.

But then when they did their studies, they found flaws in the original studies that had shown very high levels, and they did not replicate that. They, in fact, said the methodology that was used in the original studies were not appropriate. That's what started this.

And, you know, as we will discuss, where it lands is exactly where the FDA lands at the end of all of this, including the epidemiologic studies. There is no evidence.

Q Do you know whether or not ranitidine has been globally recalled because it contains NDMA?

MS. CANAAN: Objection, asked and answered.

A Again, the original studies raised concern.

FDA, because that is their role, wanted to make sure that that was not, number 1, accurate; number 2, could there be an issue; number 3, look at all the evidence.

And where they landed at the end is highlighted in the Florian study that says we don't see any evidence, so to me that essentially answers your question.

Q Can you currently prescribe ranitidine for your patients in the United States?

A I wish I could.

Q Okay.

A And my understanding is that -- the FDA, in fact, said that if the companies decide to bring it back, it's really up to them. It's not that the FDA has pulled the indication or the approval. So if the companies wanted to, they could go back and actually have it, and I wish they would.

Q And so can you currently prescribe ranitidine for your patients in the United States?

A Not yet.

Q Okay. Do you know if there are any countries in the world that you can prescribe ranitidine for patients?

A I don't know about their regulatory state, so I know about U.S. I don't know about the world.



Q Okay. So when I asked you previously as to whether or not you know whether ranitidine has been globally recalled, do you know whether or not ranitidine has been globally recalled around the world because it contains NDMA?

MS. CANAAN: Objection, form.

A So, again, going back, my answer was regarding what the FDA did. As you know, FDA is a U.S. regulatory agent. It does not have power in the world or the universe, so what happens in Europe and what happens in Africa and Asia and South -- I -- you would have to ask someone in their regulatory agency.

I can tell you in U.S. where I practice, where I see patients, the FDA has the authority, and the FDA has not pulled the indication or the approval. In fact, they said that if the companies decided to come back, they would consider it.

Q Okay. So you don't know one way or the other whether you can prescribe ranitidine in Europe or Italy or Africa? Do you know?

MS. CANAAN: Objection -- objection, asked and answered.

BY MS. FINKEN:

Q It's not a trick question. I'm just asking whether you know or not sitting here today if you can



prescribe it globally, beyond the United States?

A Again, I answered about the FDA, the U.S. What started the process, that was in the U.S., right? The process started here, so if -- if one wants to hypothesize about other countries and what could happen there, one could go there.

But to me what started the process was in the U.S., was FDA, U.S. regulatory agency, what actions they have taken and what conclusion at the end they reached. That is the most important. Because other countries have their processes, and I'm sure they have scientists that will review all of this and will land where they land.

But within the U.S., the FDA already has done the initial experiments that started this, and they refuted those findings. And to me that's very important.

Q So that --

A And they refuted other studies and have concluded what they concluded, so who am I to go against the FDA?

Q So, Doctor, my question isn't about the FDA. My question is whether you, Dr. Michael Vaezi, know whether or not ranitidine has been globally recalled around the world because it contains NDMA. And if -- if



you don't know, you don't know.

But my question is do you know whether or not it has been?

A My answer is what I gave, and I stand with that answer.

Q So you don't know?

A My answer is --

MS. CANAAN: Objection.

A Yeah, it's -- it's -- it's within the U.S. -- it started within U.S. The FDA has looked at it and have concluded there is no evidence.

Q Do you know whether you can prescribe ranitidine in any other country besides the U.S.? Do you have that knowledge? Do you know?

A I -- I feel that we're going in circles, and you're interested to know what's going on in Africa rather than what the FDA -- the process that started would be. And I would say why not focus on what started the process and what the FDA did because other countries usually follow our lead, as they did with this, but I -- you know what? I -- if -- I'm not the expert in Africa or Asia or South America, I'm sorry.

Q Okay. So going back to -- let's move on.

Do you agree with me -- actually, strike that.

Would you agree with me that there are other

options to treat heartburn in the United States besides ranitidine?
A Yes.
Q Okay. So there's other H2RAs, which you had mentioned some of those previously, correct?
A That's correct. We have famotidine, Pepcid. We have cimetidine. We have nizatidine. We had nizatidine. We don't have that.
Q And you also can treat heartburn in the United States with proton pump inhibitors or PPIs, correct?
A Yeah, that's correct.
Q And there's also lifestyle modifications that can be implemented that could treat or prevent heartburn, correct?
A That's correct. But I can tell you good luck on implementing lifestyle modifications for our patients. And just speaking for myself and not putting anyone else down, I've tried to lose 10 pounds in the last year, and good luck on that.
Lifestyle -- within lifestyle modification you have avoiding so many things that you're not supposed to do, which then fails because of it, right? So lose weight, don't drink wine, don't drink beer, you know, don't eat this, don't eat that, no chocolate, no ice



cream, no -- all of that.
So that -- so that is theoretically within all the guidelines. Unfortunately, practically, as we all face some of these realities, our patients have a hard time when it comes to lifestyle modification and reflux.
But to your point, which is a valid one, is can PPIs be prescribed? Sure. Can we tell patients about lifestyle modifications? Sure. And do we? Of course, realizing they won't do it. And are there other H2 receptor antagonists? Of course.
Q Okay. Are you offering an opinion in this case on the amount of NDMA that's contained in different ranitidine products?
MS. CANAAN: Objection, form.
A I don't know what you mean "an opinion." I think within my -- I'll just answer based on what's in my report.
In my report there were levels that were expressed that were very high, and the FDA then re-looked at those levels based on their studies, so by -- if by that -- I've referenced those articles, if that's what you mean. They're within my report.
Q Have you conducted any testing on the levels of NDMA in ranitidine products?
A Myself personally?



Q Correct.
A No.
Q Are you offering an opinion on whether the levels of NDMA contained in ranitidine products are capable of causing cancer in humans?
A Well, I go -- I go to what I've mentioned and expand on that, perhaps. Remembering that what raised concern was these amazingly high levels that originally and falsely elevated numbers that then were not substantiated by the FDA. That then led to studies to suggest whether or not ranitidine, whether it be exogenously or endogenously, puts patients at risk.
As a clinician, that's important for me to know. So this -- a study that comes out that says Drug A could have problems, I think as scientist we should investigate and then land on yea or nay based on the evidence.
So initial studies raised concern, but then subsequently through FDA's work, through showing that there is nothing endogenous, and there's no concern there, then their own studies again showing that the falsely high levels were because of methodologic issues, then that -- as a clinician, I feel a lot better with that.
Then I feel a whole lot more when I look at the



epidemiologic studies of these five cancers. That made me feel a lot better about being able to prescribe ranitidine again. And if different manufacturers come back again, I would -- I will be more than happy to give it to any family members.
Q So, Doctor, you would be comfortable prescribing ranitidine containing NDMA to your family members?
A So that's an interesting question, right? So you're saying that if you put high levels of NDMA, low levels of NDMA, do you put it at thousands of fold above, so it all depends on what you mean.
But trace amounts of impurities -- you know, any drug that we prescribe has trace amounts of impurities, so if you mean trace amounts of NDMA, well, there are studies that actually have looked at that, right? So that's the epidemiologic studies.
They are showing that those trace amounts do not lead to the five cancers that we're talking about. So, yes, if it's trace amounts, I would have no hesitation.
Q And how would you define trace amounts of NDMA?
A I would define it based on the studies that are here, based on the way the FDA looked at it. At the end of the day, you want to reduce as much of the trace

amount as possible. And FDA has guidelines on that, right?

So they essentially told the manufacturers to look at your products to make sure that the level of NDMA is below a certain cutoff -- and again we can talk about that cutoff -- but below the cutoff.

When they did their studies, many of the lots were well below the cutoff, which explains why the epidemiologic studies don't show an association because the fear that originally was introduced has not materialized.

Q Okay. Which ranitidine epidemiological studies did you review that quantified the NDMA in the ranitidine?

MS. CANAAN: Objection, form.

A It doesn't matter. And the reason it doesn't matter, the -- the studies that looked at any ranitidine, right? So these five -- the epidemiologic studies that I've outlined have looked at any lot that was out there, right? And high, low, normal, abnormal, whatever cutoff one wants to use, and the question then becomes are you at risk.

The studies are so overwhelmingly -- don't show an impact that one then says, all right, if I'm worried about any of those levels, at least I can rest assured



that the epidemiologic studies don't show that association.

Q Can you identify a single ranitidine epidemiological study which quantified the amount of NDMA in the ranitidine pills?

MS. CANAAN: Objection, form.

A I answered that. It's irrelevant because it can be at any level that one wants to propose, right? We know it's not at the highest level that the original studies raised fears on.

So if you go by the FDA levels, the levels that the FDA showed on various lots -- let's go with those levels. Well, if these patients in these epidemiologic studies took those levels at whatever range they are, there's no signal. So if one accepts that -- and the FDA does.

And then, going back to your original question, if the companies then say, all right, some lots were X, some lots were Y, you can't -- these epidemiologic studies somewhat normalized this question. They tell us it really doesn't matter. So you could study --

Remember, epidemiologic studies by default cannot look at those quantification because you -- you don't have the patient randomized. You don't have the drug at hand. That's where randomized trials come in.



You have the drug at hand. You can actually look at the levels, just like the FDA did.

The FDA did a great job in their study because they actually looked at the ranitidine. They looked at the NDMA level. Then they looked at what happens in the body with that endogenously.

So you don't have a randomized trial. Your question of which of the epidemiologic studies did that is somewhat irrelevant. None of the epidemiologic studies can do that, other than a randomized trial.

And at baseline, they're essentially saying give me any range, right, because you're providing any range any of those patients took. And if the signal was there, then those studies would show it. The signal's not there. That is reassuring.

Q Are you finished with your answer, Doctor?

A I can go on longer, but I'm finished now.

Q Okay. Can you identify a single ranitidine epidemiological study that quantified the levels of NDMA in the ranitidine?

MS. CANAAN: Objection, asked and answered.

BY MS. FINKEN:

Q It's a -- it's a "yes" or "no" question. Either you can identify them or you cannot. So my --

(Crosstalk.)



MS. CANAAN: He's answered it --

MS. FINKEN: No, he did not, Eva, and we can do this all day long and not get answers to the question, and we can go back to the Court.

BY MS. FINKEN:

Q But my question is simple. Can you identify a single ranitidine epidemiological study that quantifies the amount of NDMA in the ranitidine product?

A It is irrelevant.

Q So yes or no, do they --

A It's irrelevant.

Q Can you identify one; yes or no?

A Irrelevant. I'm sorry.

Q So you're --

A Your question --

Q -- refusing to answer my question?

A I am answering your question. I think you just don't like the answer.

Q No.

A The answer is irrelevant.

Q Do they -- whether or not you believe they're irrelevant, my question is can you identify a single epidemiological study involving ranitidine that quantifies the amount of NDMA in the product? Can you identify a single one?

Page 94

A They were not randomized control studies. They did not take the patient and the product and measure the NDMA, but because they were from the same lots that the FDA essentially studied, i.e., from the vast availability of ranitidine -- these epidemiologic studies essentially are using any level that's out there.

So that the question is -- and I know that you want a yes or no, but the question here is that if I give -- I'm a clinician. I have ranitidine. I have no idea how much NDMA is in there, and I'm giving it to you. You're the patient. Well, the question then is, If that's been done over 14, 15, 16 years and no signal emerges at whatever level -- you're asking the question did they measure it.

Well, these are epidemiologic, cohort studies, so they're not randomized trial. And they're essentially saying, you know what? Let's take any level.

So I am answering the question. I'm sorry you feel I'm not.

Q Okay. So let me ask you this. Which ranitidine epidemiological studies evaluated ranitidine use over 14, 15, or 16 years to determine whether or not there was a signal of cancer?

Page 95

A Well, that's a good question because what's -- what's good about some of these epidemiologic studies that I've outlined -- and again they're all in the tables and the follow-up -- the maximum length, the medium length -- they're all in the table. We can go through all of that.

But the later studies that have been published, especially the studies from Denmark, they have very long follow-up. A lot of -- some of the studies not only looked at more than 10 years, less than 10 years. Some of the studies looked at more than five years, less than five years.

So those are the studies that one can then convincingly and -- look at and say long term is there a risk at any level that these patients were exposed at. Some of the studies actually broke it down by amount, right? So they looked at high exposure, lower exposure, no signal --

Q Okay.

A -- so --

Q Doctor, I think you misunderstood my question.

My question was which epidemiological studies evaluated ranitidine use over 14, 15 or 16 years, the exposure, not the follow-up.

My question is which studies looked at people

Page 96

who took ranitidine for 14, 15, 16 years and looked at whether or not they developed cancer?

A I -- again, those are the -- those are the studies that I've outlined. I answered that question.

Q What's the longest time frame of ranitidine exposure that was studied in the ranitidine epidemiological studies that you evaluated?

A Sure, I can answer. Look at the table. Let me go through the tables.

Q Sure.

THE VIDEOGRAPHER: You want me to keep this document up?

MS. FINKEN: You can keep it up, sure.

THE VIDEOGRAPHER: Okay.

A Okay.

MS. FINKEN: We can follow along with the doctor.

BY MS. FINKEN:

Q What page are you on?

A So Yoon -- Yoon -- yeah, sure. Yoon looked at it at 10 years. You have the Danish studies that -- Adami. You have 10 to 18 years. That's the interquartile range.

Q And, Doctor, hold on one second. What page of your report are you on?

Page 97

A Oh, I'm sorry. Let's see. Page 28, Adami.

Q Uh-huh. And you're looking where on this table, what --

A Yeah, look at -- on the left after it says "Adami et al.," and then you have the other column, cohort study sort of describes it.

Q Okay. And where does it refer to the length of exposure to ranitidine that was evaluated in the study?

A Well, these are -- again these are the epidemiologic studies that assessed exposure to ranitidine and followed the patients for, again in this study, interquartile up to 18 years.

Q Okay. So is it your understanding or your testimony, I just want to make sure I'm clear, that Adami looked at patients who were taking ranitidine for up to 18 -- they were taking ranitidine for 18 years to determine whether or not they developed cancer?

MS. CANAAN: Objection, form.

A Well, again the study specifically looked at -- and we can pull up Adami, and let -- we can go through the methodology. Let me do that.

Q Well, I'm looking here at your chart. You indicate that the median follow-up was 14 years. Do you see that on the left-hand side?

A Yes, I do.

Q And IQR 10 to 18 years. Do you see that?
A Yes, uh-huh.
Q And what does "IQR" stand for?
A Interquartile range.
Q Okay. And that is referring to -- when you're saying they're looking at the medium follow-up of 14 years, that's referring to whether or not they were diagnosed with cancer during that 14-year time frame, correct?
A That -- that is the follow-up time.
Q Yes. So how long were the patients actually exposed to ranitidine in the Adami study?
A Okay. So in the Adami study, they actually broke it down by follow-up time. They broke it down by number of prescription, right? So more than 10 prescription, less than 10 prescription. They looked at more than 10 years follow-up to your point, less than 10 years. And they're not seeing a signal.
Q Okay. What's the maximum amount of exposure to ranitidine that they looked at in the Adami study?
MS. CANAAN: Objection, form.
A I would have to go through, but this was based on prescription -- I'm looking now at Adami, the methodology section.
Q Uh-huh.



A And the first -- this is their page 2303, so these were the first prescriptions, so they say define first users, so the very first use, they have to identify where the exposure started, was between '96 and 2008.
Q So that means that somebody would have received their first prescription for ranitidine between 1996 and 2008, correct?
A Correct. So then they -- that following paragraph, they're defining the index date as the date of first prescription.
Q So what's the maximum amount of exposure to ranitidine that they looked at in the Adami study?
A They may have outlined that within their statistical analysis. I know that they have 10 year, more than 10 and less than 10-year follow-up. I know they have more than 10 prescription, less than 10 prescription of that.
And with that, that sort of gives you follow-up. That gives you exposure essentially as far as low and high dose, right? Less than 10 prescription, more than 10 prescription. I think that's what you're getting at.
Q Well, let me ask you this. You're -- you're talking about the 10-year follow-up. Is it your



testimony -- and I just -- this isn't a trick question. I just want to make sure --
A Go ahead.
Q -- I understand what you're testifying to?
Is it your testimony that when they're looking at a 10-year follow-up, that those patients would be taking ranitidine that entire 10 years?
A Yeah, so that's where -- again it goes back to the epidemiologic studies, and if you do a randomized control study, and you have, let's say, a six-month study or a year, and you assign the patients to drug versus not, then you know for sure that they took the medication, right?
So as a surrogate marker, then what they've done is they say, all right, let's make sure that we're looking at -- if we look at all the patients, let's make sure we look at those that actually took it more than 10 prescriptions, i.e., these are patients that are chronic users, right?
A chronic user means someone that actually took their medicine. And the fact that they did that, that's reassuring because what it tells me is if a patient needs medication -- and again we have a lot of patients with reflux. You just don't all of a sudden go from being a refluxer to a non-refluxer. You don't just say,



all right, I'm going to just stop taking my medicine by yourself because a chronic user, more than 10-prescription user, is your chronic disease state.
So they're using that as their surrogate marker. And with that use, they're not seeing the signal. And that's reassuring because that tells me that someone that has taken it long time, that's length to follow, long exposure, chronicity, that tells me that there's no signal.
Q You're not suggesting, though, that the follow-up time is the same as the exposure time in the Adami study, correct?
A It can be in the chronic patient, but it doesn't have to be.
Q I'm asking about the Adami study specifically. You're not suggesting that the follow-up time is the same as the exposure time in that study, are you?
A It can be in some. It doesn't have to be in all. If I am a chronic patient that needs chronic therapy, it can be that. But to your point, it doesn't have to be that in that. It could be less for some. It could be more for others, right? That's where that analysis of using more than 10 prescription becomes very helpful.
Q So do they --

MS. CANAAN: Tracy --
MS. FINKEN: No.
MS. CANAAN: Can I say something?
MS. FINKEN: Sure.
MS. CANAAN: Whenever you come to a natural break, let's take lunch, okay?
MS. FINKEN: Okay. Let me just ask a couple more questions about this, and then we'll move on.
MS. CANAAN: Okay.
BY MS. FINKEN:
Q Doctor, I just want to be clear about this. In relation to the Adami study did they quantify the ranitidine exposure in that study beyond less than 10 prescriptions or more than 10 prescriptions?
A Again, I'm answering it as a clinician because you're -- you -- you want -- the way I'm assuming you want, and I don't want to misspeak, is that do they do A or B, but in clinical scenarios -- because these are clinical scenarios, right? These are actual patients that they took. These are cohort studies, actual patients that were treated and they have a database. They're looking at their actual patients, right?
It's not a randomized trial to your point of, oh, my goodness, they're not exposed exactly for this long. But they're using it as a surrogate marker



because in a clinical situation when a patient has heartburn and needs medication, they fill their prescription because they have a chronic disease.
What happens when they don't? They have symptoms. They have to go back on it. And that's where their surrogate marker of more than 10 years comes in because those are the chronic patients that have taken it, and they also looked at follow-up, and in both categories and that combination they're not seeing a signal.
Q So are you assuming that patients who took ranitidine for more than 10 prescriptions in the Adami study were taking it during the entirety of the 10-year follow-up period?
MS. CANAAN: Objection, form.
A Again, it's -- it's a reasonable clinical scenario from which their database comes from. Their database is not just a random created database. It's a database of real patients, real GERD and/or whatever the reason for it was and real therapy.
So to me patients that have reflux disease need their medicine. They need it chronically. If I look at someone that's filled 10 prescriptions or more, they have chronic disease. It's not an unreasonable assumption. It's a good clinical assumption. You are



on your medicine chronically because you need it. So to me the idea of questioning it, whether or not that's appropriate, is not clinically valid.
Q Okay. So when they're pulling the information out about prescriptions of ranitidine, they're pulling that from a database, correct?
A Yes.
Q Okay. And in the Adami study, they quantify it by people who -- who have 10 prescriptions or less of ranitidine or 10 prescriptions or more of ranitidine; is that, correct?
A Yes.
Q So they --
A That's one of their analysis.
Q Okay. Do they quantify any further in terms of ranitidine prescriptions beyond less than or more than 10 prescriptions?
A So they used it as a surrogate marker of chronicity. That's how they assigned it.
Q Okay. And where does it say that in the study itself?
A Well, there are many things studies may or may not tell you, but as a clinician that sees patients, if I -- if I'm told someone has more than 10 prescription that they filled, that tells me they have a disease for



which they need the medication, right?
MS. FINKEN: Okay. Let's take a break.
MS. CANAAN: You want to take a break?
MS. FINKEN: Let's take a break. Do you want -- let's go off the record.
THE VIDEOGRAPHER: The time is 12:51, and we're going off the record.
(Break taken.)
THE VIDEOGRAPHER: Okay. Everyone, please stand by.
The time is 1:37 p.m., and we're back on the record.
BY MS. FINKEN:
Q Did you have a good lunch, Doctor?
A I did, yes.
Q Okay. Let's get back to it then.
So, Doctor, you had indicated previously that you have acted as an expert in two other cases; is that correct?
A Yes, that's correct.
Q Okay. And what types of cases were they?
A I believe the first one was a product liability case brought on by a patient. Do you need specifics or just that?
Q Just what type of product was it, do you

recall?
A Yeah, it was a patient that was having esophageal issue after drink soft -- they had soft drinks, so they had some esophageal issue, and later on they developed esophogeal motility disorder. And the question was could that drink have had anything to do with the motility disorder that the patient ended up having.
Q And did you act as an expert on behalf of the injured plaintiff or the defendant?
A The defendant. I was asked to review the case and see if there's any reasonable association between that soft drink and the eventual motility diagnosis, and that's what I was asked to do.
Q Okay. Did you testify at deposition or trial in that case?
A I think there was an in-person depo- -- this was prior to the COVID pandemic, and that was in-person deposition. It never went into trial.
Q Okay. And where was that located, that case, do you know?
A I don't know. I think I provided that information to counsel. And it may be also in my report, if I'm not mistaken.
Q Okay. That's okay. You don't need to look. I



just didn't know if you knew off the top of your -- of your head.
And the other case -- the second case that you referred to that you were acting as an expert in is in relation to the PPI litigation; is that correct?
A That's correct.
Q And what is that litigation involving?
A I was also -- again, because of my expertise, was asked to review the data on the role of PPIs and this adverse outcome, and I provided -- I believe the -- the counsel had gotten my name because of, again, our -- my publication and expertise, and I -- I did the same. I reviewed the specific case and provided my opinion about that case.
Q Okay. And that was at deposition as well?
A Yes, I had a deposition on it.
Q Okay. Will you be testifying at -- at trial in that case?
A I don't -- to be honest with you, I haven't heard in a long time, so I -- I don't know where it stands. I'm not sure. I'm sorry.
Q Okay. And who was the law firm that retained you in the first case involving the soft drink?
A I -- I'm sorry, I'm bad with names, so I apologize. I don't know. It's in -- I don't know that



indicated -- is there a way of pulling that up? I --
Q I don't think it's in your materials if that's what you're referencing.
A Yes, that's what I was. I'm sorry, I don't know.
Q Okay. Was it any of the same lawyers that you've been involved with in this case?
A Not that I'm aware of. And again I was asked by Ms. Canaan to do this, so I'm not aware of any other attorneys. Now, if there are some that -- that are -- that are distantly connected, I wouldn't know that. I'm sorry.
Q Okay. And as far as the PPI litigation, is it the same lawyers in the PPI litigation who you're working with in the present litigation for Zantac?
A Not that I'm aware of. They're completely different. I'm not aware of any connection.
Q Okay. And when were you first retained in the PPI litigation?
A That was a long time ago as well. I know that last year was the deposition, and I think it was a few years prior to that when I was approached first.
Q Did --
A I honestly don't remember the exact time.
Q Does 2018 ring a bell?



A It's possible. I don't remember specifics.
Q Doctor, have you heard the term "KOL" before?
A KOL. In what -- in what context? I'm sorry.
Q In the context of -- of the pharmaceutical industry.
A Oh, key opinion leaders, yes.
Q Okay. And you anticipated my next question. So KOL refers to key opinion leaders, correct?
A That's correct.
Q And what is a key opinion leader in the context of the pharmaceutical industry?
A Good question. I don't know what they consider key opinion leader is. You know, I -- I usually just do what I do, and if someone comes and says, hey, can you provide an opinion, just like in this case or in others, I -- I tend to mind my own business, and if I'm asked to help, whether it be through consulting or through educational venues -- I don't know what they consider KOL. I'm sorry.
Q Okay. Have you acted as a KOL in the past for pharmaceutical manufacturers?
A I have acted as educational as well as consulting with pharma, yes.
Q Okay. And which manufacturers have you been hired as a KOL?

A Again, I don't know if they hired me as KOL, but I know that I've been involved in consulting and educational with different companies. I can't remember all the names, but I'm sure I -- it's probably in my CV somewhere about -- I don't know. I couldn't tell you.

For example, in the -- I can give you some that I do remember, but I don't remember all of them. I'm sorry.

Q Okay.

A In the era of PPIs, when PPIs were coming out, especially with esomeprazole, this is the enantiomer of omeprazole, I was asked to do some educational and some consulting with AstraZeneca at that time.

And recently, as I mentioned, I've been asked to be consulting with some of the P-CAB companies, which I mentioned, and there's some studies we're doing.

Q And which ones are those, which companies?

A I don't know. I'm happy to find the names and provide it to counsel. I can't remember the names specifically. I'm bad with names. My apologies.

Q Did you -- do you recall any others that you did KOL work for?

A Again, I'm sure there are others. I don't recall all of them, but there were -- most of what I remember -- in fact, I would argue nearly all would --



would have been as consulting, educational opportunities as well as if there are any grants. That would be on my CV, so I didn't commit them to memory, I'm sorry.

MS. CANAAN: Excuse me, I want to put in a belated objection to form to that question. Sorry.

MS. FINKEN: Okay.

BY MS. FINKEN:

Q Did you do -- did you act as a KOL on behalf of Takeda?

MS. CANAAN: Objection, form.

A I don't know. Again, I know the term "KOL." I'm -- I have been retained as either in consulting capacity or speaking capacity and on research funds that we originated with some of those companies, and I'm sure Takeda at the time I believe was involved with Prevacid. Is that right? So Prevacid, so . . .

I'm sure -- it's on my CV if there was any grant related material and if it was speaking or educational opportunities.

Q What about Pfizer?

MS. CANAAN: Objection, form.

A Pfizer, again, if you -- I don't have the context. I'm sorry. I'm not trying to be evasive at all because these -- I haven't reviewed all my consultings. There's a long list, so I would have to



pull out a study and see who the sponsor is.

I seldom look at that. I look at more what it involves. Companies sometimes come to us. They say, hey, can you do this study, and what we do is see if that's appropriate for our patient population, is that someone we could enroll in those studies. So I -- I would have to look. I'm sorry. I don't recall.

Q Do you recall doing any speaking or educate- -- as you referred to, educational opportunities on behalf of Pfizer?

A Again, I've done speaking and educational talks for many companies. And the majority of those have been education regarding reflux, how to diagnose reflux, how to treat reflux and what to do. That's been my pattern. For many years I've done that.

So I don't do any -- I'm a bit sensitive, and I know you didn't intend it or didn't mean it. I don't do speaking for anyone because for me it's -- and in fact, I tell all the companies when they come say, hey, can you speak for us, I go no, I don't speak for you. I speak for me, and then I provide educational opportunities, so -- to just put the context there.

Q Okay. And you get compensated, though, for that -- for those speaking engagements, correct?

A I get compensated for my time for anything I



do, including those, yes.

Q Have you ever been engaged to speak at national sales meetings for companies regarding their products?

MS. CANAAN: Objection, form.

A I've been asked to -- again it goes back to the same three chunk of what I do. I don't know what meetings, but if they ask me to give a lecture about a specific topic to anyone, whether it be providers, nurse practitioners, P.A.s, general GI or primary care doctors, or anyone else, I look and see if it's appropriate for my expertise, and I provide educational opportunities.

Q And did you ever participate in speaking engagements on behalf of companies promoting H2RAs?

MS. CANAAN: Objection, form.

A I believe by the time I started, so if you look at the timeline on my CV when my residency ended and when my academic career, if you will, postresidency/fellowship started, by then the H2 receptor antagonists were not ones that were asking. It was more the PPIs, acid related or industry regarding others, but not H2 that I can recall.

Q Have you ever done any work on behalf of GlaxoSmithKline?

A Not that I recall. And again it would have to

be -- I don't remember names and companies. I don't keep those. But context. I -- I don't know. If you show me a specific meeting, then I can tell you if that was me or not.

Q Have you ever done any work on behalf of Proctor & Gamble?

A Not that I call -- recall.

Q Have you ever done any speaking engagements on behalf of Boehringer Ingelheim?

A Not that I recall.

Q Have you ever done any speaking engagements on behalf of Sanofi?

A Sanofi, I believe there's -- they may have a -- not speaking engagement, no. But I believe -- and I would have to ask my research coordinator if they are the ones involved in some products that they may have approached some -- one of my colleagues about. I'll have to look. I'm -- the name sounds familiar, but I don't --

Q Okay. So sitting here today, you recall engaging in speaking opportunities on behalf of Takeda and on behalf of AstraZeneca; is that right?

MS. CANAAN: Objection, form.

A And, again, I don't do speaking on behalf of anyone. I educate. I think -- I want to make sure --



I'm very sensitive to that because I tell them this, and I want everyone to know this because -- I don't do speaking or engage in any activity for anyone. I do it for educational research or informative matter because again for me it's -- I don't do it for them.

Q So did you ever engage in speaking opportunities where you would discuss the benefits of prescribing proton pump inhibitors for GERD?

A The speaking opportunities that I've given over the past many decades have been about patient presentation, how patients present with reflux, what symptomatology, a lot of focus on extraesophageal reflux because of my interest in the larynx, how we go about diagnosing them, what tests are appropriate at what time, and then what are the current treatment options and how effective those treatment options might be, so I usually lump them altogether.

And the reason I say that is because that's the bigger picture, right? So I -- I try to educate about how to treat a patient. I'm a clinician. How do you diagnose, how do you treat, what are the pitfalls.

That's what I do for any of the lectures I give whether it be asked by industry, by societies or by anyone. I use the same metric.

Q So when you would undertake speaking



engagements on behalf of pharmaceutical companies, you didn't discuss the products to treat those indications; is that your testimony?

MS. CANAAN: Objection.

A I don't --

MS. CANAAN: Objection, form.

Michael? Michael, just give me a second to object.

THE WITNESS: Oh, okay.

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q You can answer.

A I -- I don't -- I mean, if you could clarify because I was going to say I'm not sure what you mean because . . .

Q Okay. So, for example, when you would go and do speaking engagements on behalf of Takeda, you didn't talk about the benefits of prescribing Prevacid or Dexilant to threat certain conditions; is that what you're saying?

MS. CANAAN: Objection, form.

A That is not what I'm saying.

Q Okay. I just want to make sure I'm clear because I don't think -- I think -- I thought that you had testified that you don't actually discuss the



products that the pharmaceutical companies manufacture in treating those indications.

So you're saying you do discuss the products; is that right?

A So again I discuss all available therapies, so it is -- I don't go and just say you should only take this drug because this company paid me to tell you that.

Q Uh-huh.

A That would be wrong. That would be inappropriate. That would be not right, right? So I think if that's what you're asking, the answer is definitely no, because I've never done that.

I do in the context of all therapies. What are the options with treating? What are the PPIs? What are current PPIs? We have X, Y, Z, and you go through it. What are the differences? Which patients might do better with what?

So to put it in that context, yes, I discuss all the therapies, but not specifically a drug and not specifically only a drug. I talk about in the context of education about reflux, how do you diagnose, what are the issues, what are the dosing, how long, what do you do after someone's better, how do you taper the medication. Do I do that? Yes.

Q How many times a year do you engage in speaking

on behalf of pharmaceutical companies?
MS. CANAAN: Objection, form.
A I don't do speaking on behalf of anyone.
Q Okay. How many times a year are you paid to -- to attend and speak in relate- -- paid by -- strike that.
How many times a year would you say that you are paid by pharmaceutical companies to speak at different events?
MS. CANAAN: Objection, form.
A I'm paid for my time spent educating. How many times a year, it's variable. I am giving a lecture virtually in Argentina. I'm giving a lecture virtually in Hong Kong. These are educational opportunities by different societies that have asked. I'm giving a lecture virtually in Taiwan for their motility society.
So it's variable, either in person or virtual now with COVID, but it's variable. They're sometimes more, sometimes less, and it also depends on whether I'm available, do I have other things that I do, so it's --
I can't quanti- -- quantitate based on this year or that year, but if I'm available, if it fits within my expertise, if that's something that I want to do, then that's what I do.
Q Doctor, how many times this year have you been



paid by pharmaceutical companies to speak?
A Again --
MS. CANAAN: Objection, form.
A -- I couldn't tell you. I'm sorry. I don't keep track of that. Just like if you asked me how many times a year have I given talks for societies, I couldn't give you that answer because I don't keep track of that. I -- again looking at what it is they want me to talk about, when, what topic, does that fit within my expertise and do I have the time.
Q Okay. So we're in the month of May, and is it your testimony that you can't give me an approximate of how many times you've spoken on behalf of or -- strike that.
We're in the month of May, and is it your testimony that you can't approximate for me how many times you've been paid by pharmaceutical manufacturers to speak this year in the past five months?
MS. CANAAN: Objection, form. Also asked and answered several times already.
A It's not one that I keep track of. You know, it's like saying how many bananas did I have in the past five months. I don't know. I don't keep track of that.
As I mentioned earlier, I have so many responsibilities: Patient care, administrative,



research. I don't sit there and I go, oh, this month I did X, that month -- I think that would be artificial of me to do, and I don't do that.
Q Who keeps track of your payments that you receive from pharmaceutical companies to speak?
MS. CANAAN: Objection, form.
A I guess they do. When I give the lecture, they send me and I receive the payment in the mail.
Q Okay. So it comes directly to you; you don't have like a secretary or somebody who's in charge of following up to make sure that you get paid for these type of things?
MS. CANAAN: Objection, form.
A I have a secretary, but she's -- she's been out for three years because of Zoom. And she's right now doing everything Zoom because of COVID, but she's been out for three years.
Prior to that, she would probably remind me on my calendar because there may be some on the calendar that she had, but I -- I don't keep track of it. I'm sorry.
Q Okay. Would you say that you speak weekly?
MS. CANAAN: Objection, form.
A I -- I doubt weekly because I don't have that time.



Q Okay. Doctor, have you ever heard the term "speakers' bureau" in the context of the pharmaceutical industry?
A I have.
Q Okay. And what is a speakers' bureau?
A I think from what I understand is -- it's -- it's a list of experts that they have regarding -- for example, if a company -- let's say industry or a pharmaceutical company has certain products, if you will, and their focus let's say is on reflux, then they like to know who the experts in the field are.
My -- I'm assuming that is a list of their experts in the field that they have interests in.
Q And you understand that you've been part of the speakers' bureau on behalf of certain pharmaceutical companies over the years, correct?
MS. CANAAN: Objection, form.
A If that's the case, I -- I don't know what list I'm on. I'm sorry.
Q Back before COVID -- COVID shut the world down, did you engage in what they refer to as lunch and learns on behalf of pharmaceutical companies?
MS. CANAAN: Objection, form.
A I don't know what "lunch and learn" is. Again, I go back to the buckets. If they ask me, Dr. Vaezi,

can you give a lecture of reflux for X, Y and Z, then if I have the time, if it's within my expertise, possible.
Q Did you attend dinner programs and speak at the request of pharmaceutical companies?
MS. CANAAN: Objection, form.
A Same answer.
Q Have you ever heard the term "round tables" in the context of the pharmaceutical industry?
A I believe -- again I'm going to guess, so I don't know if this is correct. I believe they mean the consulting, like if they're asking some experts to come and give them expertise on X, Y and Z. Some companies, for example, want to know if the product they have would be good for a certain disease and they ask -- they have a group of experts come. They sit down, and they present their ideas.
And what they want is the experts to provide them the expertise from clinical care whether or not their product would fit that, how best they could do a study design if they haven't already, or critique their study design, if they have one, does that fit within the therapeutic modality of what they're thinking. I think that's what they mean.
Q Have you ever been paid by pharmaceutical companies to do radio tours and discuss their products?



MS. CANAAN: Objection, form.
A Radio tours?
Q Yeah.
A I don't know what that is. I'm sorry.
Q Okay. Have you -- do you understand that when pharmaceutical companies engage doctors to be part of their speakers' bureau, that that's one way that pharmaceutical companies promote their product to the industry. Do you understand that?
MS. CANAAN: Objection, form.
A I don't know what their goal is. I know what my goal is, right? So I can't answer for their goal. My goal is -- if they're asking my expertise for study design, for reflux, then my goal is to educate them what I know. And -- so I -- I couldn't answer for what their goal is. I'm sorry.
Q During your -- strike that.
I believe, Doctor, you testified earlier that you receive research grant support from pharmaceutical companies at times; is that correct?
MS. CANAAN: Objection, misstates his testimony.
A Yes.
Q Okay. And would the -- well, strike that.
Do you recall which pharmaceutical companies



have provided you research grant support in the past?
A That would be on my CV, so I can pull up my CV. Are you interested in knowing that?
Q That's okay. If you -- if you have been provided research grant support from a pharmaceutical company, that's information that would be contained in your CV; is that correct?
A Going back to my answer on the CV, all the ones that are listed on my CV are those that are accurate. If there are some that are not on that, that's because I wasn't as vigilant in updating my CV.
Q Okay.
A So the ones that you see there would be accurate. I wouldn't have added things that are not true. But there may be some there that I don't have because I didn't have the time to update.
Q So if I wanted to find out generally which pharmaceutical companies provide research grant support, I could look at your CV and see?
A You should be able to. The only exception would be some of the multicenter studies that we're doing. As I mentioned earlier, they -- we have many studies. We have over 130 studies right now, that they come to my research coordinator, they say, hey, do you have the population for this study.



And those normally don't end up necessarily there because they're approaching, you know, the research coordinator, so I may not have that they approached us and we're a part of that, but they don't necessarily provide research fund.
The one that you will see on my CV are the investigator initiated studies. Those are the ones that I would have thought, hey, what about the role of a PPI in treating someone with hoarseness. Could reflux cause that, or could -- what about the role of PPI in treating X, Y and Z, and the company has no interest in pursuing a multicenter study on that.
So that's the investigator initiated studies that then we apply to those companies. We say, hey, here's our research protocol, here's the population, here's what we want to do. So those are the ones that we would have initiated, that we wanted to know the answers to. And we do that all the time in clinical research, what about the role of X and Y. And so that's what you're going to see on my CV. Those are investigator initiated studies.
And then there are the multicenter studies that I mentioned to you that let's say the P-CAB companies want to know whether their product -- they want to go to the FDA to get approval. Then they would approach

multicenters, us being one, and say, hey, would you like to be a site. And I give that to our coordinator, and if they have it, they look at the population and see whether or not it's appropriate for our site.

Q Have you authored any publications that have been sponsored by any pharmaceutical companies?

MS. CANAAN: Objection, form.

A What do you mean by "sponsor"?

Q Paid for.

A Well, in that sense, then the study that I outlined, I have investigated or initiated a study that let's say is on my CV, 10 years ago, 15 years ago, 20 years ago where we wanted to study that, then in that sense, they paid for that grant, but we did the study. We came up with the design, and we published it. So that would have been one that they, quote, paid for? Yes. In that sense, yes.

Q Have you coauthored any articles with individuals within pharmaceutical companies about medications?

MS. CANAAN: Objection, form.

A So if there are some within the other studies that I've highlighted, within the multicenter, let's say, and if we are the lead center, for example, and that can be -- we could be only a part or we could be a



lead site for studies, then in that case that might include those -- their scientific individuals.

But I would have to look and see if that's the case or not. But I could see a scenario where that might be the case. I -- I would have to look. I'm sorry.

Q Okay. Have you coauthored any articles where pharm -- with -- strike that.

Have you coauthored any articles with individuals from within pharmaceutical companies that are seeking new indications for their products?

MS. CANAAN: Objection, form.

A So that would again fall within my last answer, so if they're doing a multicenter -- so remembering -- I think I have that within my report. If companies want to seek FDA approval, they have to do the studies within U.S. usually. There are only so many sites that see that type of population. So for the P-CAB studies, for example, they reach out to us, and they say, hey, can you be a site. Sure, if that's appropriate.

So in that context we -- if we're the lead, then we may very well be on the same manuscript as they take that to the FDA.

But again that -- that gets to the science of these randomized trials, which often they are when



they're multicenter, and they're trying to find efficacy for their drug for whatever the indication might be, so . . .

I can tell you just from -- I forget the year, but long time ago, AstraZeneca was trying to get approval for their product -- or find out whether or not it's effective in laryngitis, in patients with cough, and that -- that was my area of expertise, so that fell within -- they came. They asked us scientific questions. I wasn't just alone, many, and that led to a multicenter study.

And with that study -- unfortunately, the study was a negative study, and by that I mean with the randomized control trial, we didn't find that Nexium, that was the product, compared to a placebo was not more effective, so that was not able to show the benefit for them.

So that would be an example I would give you. The answer is, yes, in that context.

Q Have you ever allowed a pharmaceutical company to add your name to a publication as a co-author on an article that you had no role in writing or editing or anything of that nature?

MS. CANAAN: Form.

A I am not aware of it. Usually with any



publication, we would, you know -- if -- if my name is on it, then I would have some role, so I'm not aware of one where they just put my name on it, and I had no role in it, so . . .

Q Okay. So when you publish in medical journals, you typically have to disclose the conflicts that you have with industry, correct?

A Usually, yes.

Q So, for example, when you receive funding from a pharmaceutical company or act as a consultant, you have to disclose that information with the article that you publish, right?

A Usually --

MS. CANAAN: Form.

A Usually that would be ideal to do. And at times we fail in that process, not on purpose, but at times we fail, and many fall into that. But typically we do, so you want to be able to do that. You should be able to do that, but at times you fail in that process, and either you forget to or if you don't -- but again usually you want to if you can.

Q So is it standard within the industry to disclose conflicts in the publications that you author and that are published in medical journals?

MS. CANAAN: Objection, form.

A It would be -- it would be good if you have thought about all your conflicts, and it would be good to include them in publications if you can recall and -- yes, that would be ideal, if you can.

Q Do the journals actually require that you disclose conflicts with the articles that you publish?

A They ask for it, yes.

Q And why do journals require you to disclose potential conflicts when you publish articles?

A You have to ask them why they require it. If you're asking me what I think about why, I would answer in that sense. It's good, so that if there's a conflict --

So let's say I come out and I say drug A is the best and I am part of the company. Well, it's good for authors to know, for readers to know, that I work for the company, and there could be potential bias in that statement, so it's always good to put those biases if it impacts -- especially in that scenario, if it impacts what the reader would get out of that, right?

So remembering that there are many publications out there, and all publications have biases within them, so it would be good for the readership to get a sense for that and see whether or not that potentially would have resulted in a biased statement, if you will.



Q And, Doctor, just going back a little bit to some of your work in clinical practice. You had indicated that at times you have been -- you -- hold on. Strike that.

Going back to your work in clinical practice, you had indicated that there are times where you might diagnose certain types of cancer in some of your patients. Do you recall that?

A Yes.

Q Okay. And specifically I believe you referenced laryngeal cancer -- cancer. Are there any other types of cancer that you might diagnose in the course of your day-to-day clinical practice?

A Laryngeal cancer, esophageal cancer, gastric cancer, small bowel cancer, colon cancer, pancreatic cancer, liver cancer, and at times -- so if we're looking for --

Let's say someone presents with abdominal pain, we don't know what's going on. At times others. Just two weeks ago renal cell carcinoma. Someone had -- kidney. Because she had abdominal pain, I got a CAT scan, and there was a tumor on the kidneys.

Bladder cancer, you -- you identify it from different areas. If you're looking -- you know, the generalized presentation, I've got abdominal pain, I



have nausea, I'm throwing up, we don't know why. We do our endoscopies, everything is normal. Sometimes we order things like MRIs and CAT scans. And within that, we could then identify certain cancers that we didn't know based on patient presentation.

I've identified tumors in the brain because the patient has just came in and said I have nausea, it was a constant nausea, and we did all the searches, we couldn't find it. We got an MRI of the brain, and there was a tumor there.

So, you know, GI symptoms are nonspecific. Sometimes they are. Sometimes, you know, they're very specific. I'm bleeding, I'm throwing up blood, and we go and find out why. But sometimes they're so nonspecific. A brain tumor, why would you be nauseous? So there are all these mechanisms, but we -- we do searches. We keep searching until we find the answer.

Q And, Doctor, when you refer to gastric cancer, is that the same as stomach cancer?

A Yes.

Q Okay. And what are some causes of stomach cancer?

A Well, you can -- I've sort of outlined that in my report. As far as all the list, I can just give you the top ones that one should worry about.



H. pylori is one of those that you worry about. It's -- H. pylori is essentially a -- Helicobacter pylori is a bacteria that was -- is in the stomach. And we have learned that that is a main risk factor for gastric cancer. And that's still prevalent in many parts of the world.

When you treat that -- it causes peptic ulcer. It can cause cancer, so when you treat that, then the risk of cancer goes down in patients.

In fact, when you look at the U.S. incidence of gastric -- gastric cancer since H. pylori eradication -- and that's something we look for. We look for that in someone who has symptoms -- the incidence of gastric cancer has gone down, so that's a big factor.

In countries where H. pylori is still high in prevalence, a lot of people are still dying from gastric cancer, and that comes to the education. You've got to really try to educate people, look for H. pylori, treat it. So that's one of them.

Smoking --

Q Well, let me ask you a question about that. Is H. pylori considered a carcinogen?

A Yes.

Q Okay. And is it classified as a carcinogen by IARC?

A You know, I --
MS. CANAAN: Objection to form. Give -- give me a moment to object, Michael.
THE WITNESS: Sorry, sorry, sorry.
A You know, I haven't looked, but I would assume it would be.
Q How long does it take for stomach cancer to develop from H. pylori?
A So that's a -- that's variable, right? So it depends on the aggressiveness of it. It depends on, you know, how long the patient has had it. It depends on if they're smoking. It depends on if they're drinking. It depends on if they have a high BMI. So that's so variable, so to me --
I'll give you an analogy. Again, I always fall back on my clinical care. One of the things I teach our fellows is when you want to do research, how does it relate to clinical care and how do you improve patient care.
I had a patient I scoped, had nausea, and we treated with PPIs. They did great, and then we stopped everything. She was still doing great. We had done endoscopy. Everything was normal. We biopsied the stomach. Everything was normal. A year later, she comes back. We do endoscopy. She has gastric cancer.



So to me it's highly variable. What if you have genetic risk factor, right? That's going to increase your risk. We all know about 20 year olds -- I mean, unfortunately, I've seen too many of them, 20 year olds, 30 year olds, 40 year olds diagnosed with cancer.
So it isn't about the exposure in that case, right? So if they smoked for five years, did that cause the cancer? There's so many variables in us.
So to answer your question about H. pylori, I can't give you an answer because there's so many factors that play a role. How long does it take? Each of us are different.
Q And how long does someone need to be exposed to H. pylori to develop stomach cancer?
MS. CANAAN: Objection, asked and answered.
A Yeah, the same. You know, if you have H. pylori and if you smoke and you drink and if you have genetic factors, so it all depends. It's so variable. There's not a you take H. pylori, you come down with cancer in two years and five years. That's a -- that -- I wish it was as simple as that. It isn't.
Biologically we're made differently. We're exposed to different things. We have different risk factors. We have -- we drink, we smoke. There is too many variables.



Q Okay. Have you ever heard the term "cocarcinogen"?
A Cocarcinogen, yes.
Q How would you define the term cocarcinogen?
A Based on what I understand, they're agents, if you will, or risk factors that are both carcinogen.
Q Okay. So when you're referring to variables such as smoking and alcohol and H. pylori, would those all be considered co-carcinogens?
A They're considered --
MS. CANAAN: Objection, form.
A Yeah, they're considered risk factors, right? So alcohol is a carcinogen. It is classified as a carcinogen. H. pylori is a carcinogen. So if I drink and if I have H. pylori, would my risk be higher? Perhaps.
So you have synergistic effect, and sometimes you don't have synergistic effect. Sometimes they're just independently. Sometimes they're dependent variables. So, again we know that --
Go ahead, I'm sorry.
Q I just -- I'm just trying to get a sense. You indicated that alcohol is a carcinogen, and H. pylori is a carcinogen, so would those be considered co-carcinogens, that they both have a carcinogenic



effect?
MS. CANAAN: Objection, form.
A They are both carcinogens. They're classified as carcinogens. If by "co" meaning are they synergistic, are they not, that's a different question. But are they both carcinogens? They are both carcinogens. That's the way I'm answering based on what I understand.
Q Okay. You have indicated that you also diagnose esophageal cancer at times. What are some causes of esophageal cancer?
A Well, that's variable as well in that it depends on the type of esophageal cancer. So you have squamous cancer and you have adenocarcinoma. They're both esophageal cancers.
We have patients that have had lye ingestion, for example, and that puts them at risk for squamous cancer. We have patients that had prior radiation. They had a cancer. They got radiated for the cancer, and now they're at increased risk of getting it back, right? So radiation.
So radiation, lye ingestion. You have HPV which is a risk factor. Smoking, that's a risk factor for -- again, I'm specifically talking about squamous cancer.

For adenocarcinoma, you have -- again reflux is an important risk factor, but you also have genetic risk factors. You also have other issues regarding tobacco.

So with reflux, for example, patients can get adenocarcinoma from -- through the Barrett's mechanism. They get esophagitis. They don't even know they have it. They have chronic reflux, and that turns into Barrett's. They don't even know they have it.

When they develop Barrett's, their symptoms go away. They go, oh, great, I don't need any acid suppressive therapy because I have no symptoms anymore. Well, that's incorrect. So then they don't take something that protects them, then they come up with cancer. So reflux is a -- an important factor as well.

Q And, Doctor, when you use the term "latency period" when talking about cancer, what is that referring to?

A Where do you see that in my report?

Q I didn't. I'm just talking about generally.

A Oh.

Q When -- when you --

Do you understand what I mean when I say the term "latency period"?

A Yeah, I was going to say I haven't mentioned latency period. What do you mean? Yeah.



Q All right. I didn't mean to confuse you. I'm just referring to --

Well, I'm asking the question: Have you heard the term "latency period" when referring to cancer?

A I have, yes.

Q Okay. And what is that referring to?

A I guess -- again it's -- it's kind of variable. The way I see it, the way I look at it as a clinician based on what I see, latency period is variable is the way I see it, so that's the time from exposure to someone getting cancer. And I think that's what you're referring to, if I'm not mistaken.

So from clinical sense, if I drink alcohol today, am I going to come down with cancer tomorrow, right, from alcohol alone? So that -- that's a latency of one day. That's the way I see it. So it's from a time perspective. Is that what you mean?

Q I -- I think so. You're not suggesting, though, that alcohol and cancer develops with a one-day latency period, are you? I think we'd all be in big trouble if that's the case.

A No, no, no, no. I think -- I think -- your point is valid. No, I was using it as an example. I'm just saying that's a one-day latency. I hope not. I would be dead a long time ago.



Q As would I.

So, Doctor, just going back to that for a minute, do you have -- what is a typical latency period for stomach cancer to develop, do you know?

MS. CANAAN: Objection, form.

A Yeah, that gets to what I mentioned earlier. It's -- you know, there's not a single time point, right? Because we're all different. You know, I answered that with respect to your question on H. pylori. There's not a single answer to that. I wish there was.

I wish I would know that, you know, if you're exposed to X, you have only five years or ten years or two years to develop cancer.

It's variable. We have patients that develop it in two. We have those that developed it in five. We have those that developed it in 20. So it's highly variable.

It depends on so many other factors: Am I obese? Am I smoking? Am I drinking? Am I exposed to other things?

So I can't define it specifically. I wish I could and -- sorry, it's variable.

Q Does the same hold true for esophageal cancer?

A I think that holds true for all cancers.



Q Okay. So you would -- you would say the same thing as it relates to liver cancer or pancreatic cancer as well?

A That -- that would hold true for all cancers because -- again, I'm not a pathologist, but pathologists -- and you could ask them, there are different grades of cancer, right? One is aggressive. One is not. One is indolent. So to say that one cancer grows and develops much quicker than another or much less than another -- so there's too many variables to it and what kind of cancer.

So, yeah, I believe it applies to all. Clinically I think it applies to all.

Q Okay. Doctor, what -- and I don't know if I asked you this previously, I apologize, but can you just explain to me what gastroesophageal reflux disease is?

A Yeah, I'll be happy to.

Q I may have asked you it before, and if I did, like I said, I'm sorry.

A No, you didn't, but thank you for asking.

You know, unfortunately this is a disease that is so common around the world, including the U.S. It's essentially a -- an imbalance between our defensive factors and aggressive factors.

So we all reflux. If you ate lunch, if I

ate -- had lunch, which I did, if we're drinking tea, coffee, we all reflux, so reflux is a normal phenomenon.

With gastro reflux -- gastroesophageal reflux disease, the word "disease" is -- is this imbalance, the shifting between defensive factor and aggressive factor. So what happens is we often treat for the aggressive factor being acid, but really it's the defensive factor and imbalance that's leading to it.

So what happens is when you eat, you reflux. So why don't you have reflux disease? Well, the reason you don't have it is because you swallow your saliva. That neutralizes the acid. You have peristalsis, in other words, movement in your esophagus that then squeezes that acid back down, right? And then you have a valve that protects you.

If there's any imbalance in that, then that normal physiologic reflux is altered, and that alteration then makes you have reflux, the disease. And then when you have reflux disease, you have to have the symptom.

And the symptom -- the common symptoms, but people present differently. I may have hoarseness. That's my only symptom of reflux. I may have laryngitis or I may have cough or I make have worsening asthma. And if you asked me do you have heartburn, I would tell



you no, or I could have heartburn. I could have regurgitation. That's the classic. Or I could have abdominal pain, and that could be reflux.

So it presents different which creates a challenge for us about how do we then diagnose it, if patients present different -- heartburn is easy but with others.

So it really physiologically is that imbalance. Symptomatically it is varied. Then you have various ways of treating it.

One way of treating is acid suppression, but really acid is not the problem, right? Because acid is normal. It's not that patients with reflux have so much acid that we need to suppress that acidity. They produce the same amount of acid, so we're just trying to make them feel better.

Q So -- and you have indicated previously that you've prescribed certain medications to treat gastroesophageal reflux disease, which is also called GERD, right? Can we call it GERD for the --

A Yes.

Q Okay. Great, because that's a mouthful.

To treat GERD you've prescribed medications in your clinical practice in the past, right?

A Yes, that's correct.



Q Okay. And some of the medications you indicated that you prescribed were PPIs and H2RAs; is that correct?

A Yes. I still do, yes.

Q Okay. And what is the mechanism by which PPIs work to treat GERD?

A Yeah. So how do we make acid on a physiologic basis, and then how do we suppress it with these agents, PPIs or H2 receptor antagonists?

So PPIs work on the parietal cells. Parietal cells are in our stomachs. And what they do is they produce acid. So if you block that acid formation, then stomach parietal cell does not make acid so your stomach's acidity is reduced. By the way, not eliminated.

There's this misconception that you take a PPI or you take an H2 and you get rid of acid, and that's not true. You get rid of acid for a short period of time, and then your stomach still produces more acid.

So parietal cells make acid. We all make the same amount other than a condition called Zollinger-Ellison syndrome where they have excessive amount of acid. That's a separate process. 99.9 percent of us make the same amount of acid. It's that defensive factor.



So parietal cells work on the proton pumps that are on the parietal cells. It's a potassium Na proton pump, so it exchanges acid -- potassium and protons, so they work on the proton side, so that's why they're called proton pump inhibitors.

The P-CABS I mentioned work on the potassium side, so that's the potassium competition of the same pump. So what happens is it doesn't pump acid into the stomach, it, therefore, reduces gastric acidity for a short time, and in doing so, patients feel better if they're having their symptoms from some of those -- this acid-inducing -- again symptoms related to acid.

Q Okay. And what's the mechanism by which H2RAs work to treat GERD?

A Yeah, so H2RAs, the histamine -- so the name is the histamine receptor antagonist, so there are also -- and so I mentioned about the potassium and the proton pumps. This is a different pump. This is now histamine.

They work by blocking the histamine which then leads to acid production. So it's a different mechanism. That's why they don't -- you know, they all have different ways of affecting the body. The pharmacokinetics, the pharmacodynamics, all of them are different, but this one, especially, H2 receptor

antagonists work on the H2 -- the histamine receptors.
Q Doctor, what is pepsin?
A Pepsin?
Q Yes.
A Yeah. Pepsin is also produced in the stomach. It's a protein essentially that's produced in the stomach, and that along with acid and along with bile acids combined can then lead to severe esophageal injury.
So sometimes patients measure pepsin levels in the saliva to see whether or not someone refluxes. That's not as good a test, but pepsin's made in the stomach, and then it helps us digest food, so it breaks down things, but it also is responsible for some of the injuries in the esophagus when you combine it with acid and with bile acids.
Q So typically, Doctor, how long does food remain in the stomach after you eat a meal?
A So that's a good question. That's -- that's variable as well, so . . . You know, there's liquid, and then there's solid food. So if I drink liquid, it's going to go down into my stomach fast because of that peristalsis, especially upright. Then it's going to empty fast.
In the stomach, liquids don't last long. They



also empty fast, because at the end of the stomach -- so physiologically and pathologically, if you will, because that relates to pathology, pylorus is really tight. It's a very tight muscle.
So the job of the stomach is to grind food, to just make sure that all of these are mixed. The -- whatever we eat is mixed up, and then the acid and the pepsin is breaking things down, and then it spits out small amounts into the small bowel.
And the role of pepsin is to help with that. The role of acid is to help with that. And each of us have different rate of emptying.
The way it's assessed is over -- again, you take a group of people that have no symptoms to assess the range.
But I would say on a normal -- not an abnormal, so there are people that have abnormal emptying. I would say within two, three hours you have a substantial amount of the food you have eaten have emptied. And usually liquids empty pretty fast, within an hour.
Q Liquids within an hour, is that what you said?
A Yeah, pretty much. I mean, unless you have huge volumes, right? So if I'm just sipping on water, that is going to go down pretty fast. But solids -- and also it depends on the type of food.



So if you eat a meal that's more fatty, you know, has more fat in it, then that's going to slow down the stomach more because the body knows to slow it down because it's going to take more time.
But the flipside, if you also eat a meal that has high fiber -- we're recommending high fiber to our patients -- well, the problem is same thing happens. The stomach takes its time to empty that fiber. That's why a lot of our patients that come down with reflux, they may have stomach emptying problem. They -- their reflux is really because things aren't properly emptying from the stomach.
Q Do PPIs have any effect on the timing of -- the gastric emptying rate at all?
Do you understand my question? That was poorly articulated. I think you understood it.
MS. CANAAN: Objection, form.
BY MS. FINKEN:
Q Let me -- let me ask it again.
Do PPIs have any effect on the rate that the stomach empties?
MS. CANAAN: Objection, form.
A Not substantially. There are some studies -- so again this is -- this has been -- long time ago when PPIs were coming out what could they do, right? I



mentioned that with respect to cancers and concerns because of the studies in animals, but also some investigators looked at could PPIs by virtue of reducing acidity slow things down.
There were some studies that suggested, yes; subsequent studies suggested no. So there are variability on the studies.
I haven't looked at that recently, but I think where we've landed on that as a community is overall it does not appreciably change the gastric emptying rate.
Q What about H2RAs, does that have any effect on the gastric emptying rate?
MS. CANAAN: Objection, form.
A Again same answer because, you know, the -- the hypothesis that was there was, well, if the acidity is reduced, could that impact -- same -- same issue as with PPIs, and that was not appreciated.
At the end, you know, initial studies suggest something, and then subsequent better studies don't find it to be true, so . . .
Q So the studies also were variable on whether or not it affects gastric emptying rate?
MS. CANAAN: Objection.
A For --
MS. CANAAN: Objection. Michael, give me a

chance to object.

THE WITNESS: Sorry. Sorry.

MS. FINKEN: You're in trouble now, look out.

MS. CANAAN: Objection, misstates the testimony.

Go ahead.

BY MS. FINKEN:

Q I'm just trying to understand. I think you indicated that there were studies that did show it -- it had a delay in gastric emptying, and then there were studies that didn't. And that -- I just want to understand if that holds true for both PPIs and for H2RAs?

A Sure. More so for PPIs, less so for H2 because of the amount of acidity that's suppressed with PPIs versus H2. So the answer is more so with PPI, less so -- that was the -- so I guess my comment was there was that initial concern, but then subsequently the answer is no.

Q Okay. So just going back to some of these questions.

So, Doctor, you had mentioned I think before gastrin. What is gastrin?

A Yeah, that -- that's also produced in the stomach, so what happens physiologically in our stomach,



it's amazing -- the human body is amazing -- is all the things that adjust and what we do, right?

So one of the -- let's say I -- I eat a meal, and by doing so, the pH in the stomach goes up, or I take a PPI, and the pH goes up. Well, the stomach then has a way of sensing that and say, hey, maybe we need to produce more acid and then the gastrin level goes up.

And if you remember the comment I made about rats and omeprazole and the studies with that, that was the concern was, well, if you give very high doses of omeprazole to rats that are nonphysiologic, could there be this -- this cancer because of high level of gastrin. And then subsequent studies didn't show that. So that was the initial concern. It didn't materialize in humans, so that's where gastrin comes in.

It's a physiologic balance. Just like in reflux, we have the balance. In gastrin and in stomach and acidity, that's where gastrin balance is, do you have enough acid, do you not. The levels go up if you don't. They go down if you do.

Q Have high levels of gastrin been associated with cancer?

A That was the initial concern with omeprazole when it first came out, and again subsequent studies didn't show it. And then it's the levels, so there have



been studies from different PPIs with regards to if you're on a once-a-day dosing, what happens to the gastrin level. And that gastrin level, there was initial concern that it would really go up, but it didn't.

And the reason it doesn't -- it does go above norm but not substantially, right? So it goes to slightly above norm.

And the reason it doesn't is what I mentioned earlier. What happens is, yes, it suppresses it initially, but then you produce more acid, so that brings the balance down.

So the answer is, yes, it does go up some, but not to a level where that becomes of clinical concern.

Q So putting aside, though, PPIs, if you do high gastrin levels --

Putting aside medications as causing high gastrin levels, do high gastrin levels -- are they associated with cancer just generally?

MS. CANAAN: Objection, asked and answered.

A So it depends on the levels. So high -- if by high you mean slightly above norm -- people don't believe that's the case. If by high you mean thousand folds above norm, that's a different mechanism, different issue.



Patients with Zollinger-Ellison syndrome are going to have a much higher risk of esophagitis, peptic ulcer disease, everything else because of all of that.

So it all depends on what you mean by high. If by high you mean slightly, which is where I learned from the clinical side regarding these medications because I don't want to give something to someone if their gastrin levels go to thousands, and that doesn't happen, and that was the initial concern.

With these medications, PPIs and then H2 less of a concern because they don't suppress it as much, so H2 receptor antagonists only suppress it at about 40 to 50 percent of level of proton pump inhibitors, so the level of suppression is less. The level of gastrin response is less. So it all depends on which agent and what level of gastrin.

Q So is that a symptom of Zollinger-Elli- -- Zollinger-Elli- -- oh, my goodness, I can't pronounce the word.

Zollinger-Ellison syndrome; is that right? Did I say it correctly?

A That's right.

Q Okay.

A Zollinger-Ellison syndrome.

Q Zollinger-Ellison syndrome. Is a symptom of

Zollinger-Ellison syndrome increased gastrin levels?
A It's not a symptom. It's actually pathophysiologically. The reason people end up with a symptom is because they have such high gastrin levels, so what happens is there's this -- there's a disregulation.
So they produce a lot of gastrin, and there's no check on it, so it's a tumor essentially, and what happens is gastrin levels are so high, then acid levels are high, then the symptoms are abdominal pain, heartburn, regurgitation, nausea, vomiting, bleeding, anemia, so those would be the symptoms, and that becomes the pathophysiology.
Q And does that syndrome also -- is that also a risk factor for cancer?
A Yeah. So essentially it is cancer because it's the tumor that's producing a lot of gastrin.
Q Gotcha. Okay. Thank you for explaining that.
So you had mentioned the pH in the stomach and how that's affected by the acidity in the stomach.
So do these types of medications like PPIs and H2RAs affect the pH in the stomach?
A They -- they do. To a different level they do. And that's how they work by reducing acidity in the stomach. Proton pump inhibitors do a better job. When



I say "better," it's all relative to a -- it's to a higher extent than do H2 receptor antagonists, but, yes, they both do reduce acidity in the stomach.
Q Okay. And how does that affect the pH in the stomach?
A Good question. So it -- not only how, but for how long, right? So I sort of talked about how long. So what happens, your stomach -- all of our stomachs, unless there's pathology for some reason, the pH -- if I put a pH electrode in the stomach, it's 1, so that's pretty acidic. So acidity is anywhere between 1 to 5, 6, right? Neutral being 7, above 7 being basic.
So when we eat that acidity of 1 goes up, so just by eating, not any medicine. Then all of a sudden we neutralize that acidity to about 5, 6, so it goes up. It can even go up to 7 depending on what we eat and how much we eat, but for a short time, and then it goes back down to 1.
If we take an H2 receptor antagonist, same thing happens. It suppresses it some, short time, then it goes back to pH 1. And the level it goes to, I would say it's variable, but about 4, 5, 6, so there are different ways of assessing it.
But it changes. It goes up. Less acidic -- I hate to call it neutral because neutral would be 7. It



would really be less acidic, and then it comes back.
Q And I think you had indicated in your report that ranitidine increases the pH in the stomach, correct, for some period of time?
A That is correct.
Q Okay. And I think that you said that -- let's look at your report.
MS. FINKEN: If we can pull it up, please.
A What page?
Q It's -- we'll have -- I think it's on page 3 of your report. Let's look at page 3. Yeah, there we go.
So you say here that "gastric pH, typically less at 2, is maintained at pH 5 or above for four to six hours with ranitidine."
Do you see that? It's right above --
A Yes. It's right above, yes.
Q Okay. And that's consistent with what you're testifying to as well, correct?
A Yes.
Q Okay. And what are the consequences of increasing the pH in the stomach, or are there any?
MS. FINKEN: You can take that report down.
A Well, it depends on again the word "consequence." There's good consequence I think because that's why we treat patients. So the consequence of



reducing acidity in a patient that we give either H2 receptor antagonist or proton pump inhibitor is for them to feel better, so that's a consequence.
Is that what you mean?
Q I'm not suggesting good or bad. What are -- I'm just trying to figure out the effects of increasing the pH in the stomach. Are there any effects?
A I mean, from efficacy perspective, I mean -- again eating is another way of increasing, right? So someone that eats more frequently increases their pH more often independent of any proton pump inhibitors or H2 receptor antagonists. So is there -- is there adverse event to that? I'm not aware of necessarily just from a pH alone perspective.
Q Does -- as a consequence of increasing the pH in the stomach, does it result in an increase in bacteria in the stomach?
A That -- that -- you know, that's an interesting question because that's sort of a hypothesis that has led to so many research, whether it be epidemiologic or concern or various topic.
There were studies that -- not studies but some people that feel that because you take an H2 blocker or a PPI, you reduce so much acid that by default, then you get bacterial overgrowth.

As I've highlighted, you don't get rid of acid. In fact, we did studies -- this was a physiologic study long time ago. We gave someone once a day PPI. We gave them twice a day PPI. We gave them three times a day PPI, and we gave them three times a day PPI and an H2 receptor antagonist.

And the question was can we make them achlorhydric? Can we make it so that that concern of bacterial overgrowth for a long time comes up? We were unable to do it.

And what happens with that is the acidity in the stomach, it follows this acidtonic relationship. What happens is you reduce it some with once a day. You reduce it some with twice a day. Then no matter how much more I give you, I've only reduced it to a certain threshold, and that's about 20 to 30 percent of the original acidity. So I can only suppress so much in the stomach.

So the concept of bacterial overgrowth is not necessarily valid in that it's theoretical. It's hypothesis, but it's not necess- -- it leads to studies to just see, but it's not -- it doesn't translate in most because I can't make someone achlorhydric with, as I said, even that many PPIs.

So does it increase? Yes. Realistically does



it lead to significant -- clinically significant bacterial overgrowth? The answer is no. But what's interesting is this was the same hypothesis that led to studies on role of PPIs and pneumonia.

And in those studies -- because people were concerned. You take that, you're going to get pneumonia. They did epidemiologic studies. They showed that those that were on PPIs were more likely to have pneumonia. Well, guess what? Subsequent studies didn't prove it, and the reason, it's confounding by indication, right?

So you have reflux. You reflux a lot, and because of that, you could aspirate and get pneumonia. So now I put you on a PPI, and that treats your reflux. By doing epidemiologic studies, patients on PPIs are likely to have pneumonia. Subsequent studies didn't prove it.

So I would say it's an interesting hypothesis, and that has been proposed, especially with PPIs since they suppress more acid, but has not translated. And with the pneumonia one, better epidemiologic studies did not prove that to be the case.

Q But there are -- you would agree that there are studies out there that demonstrate that when there is an increase in pH in the stomach from taking either H2RAs



or PPIs, that it does result in an increase in bacteria in the stomach, right?

MS. CANAAN: Objection.

A So there are studies that what -- again, I would have to familiarize myself, but just globally, what I remember where they did some bacterial counts, if you will, but the question then becomes how does that translate to clinical care of our patients.

What do I -- so -- that's -- that's where I land at the end, you know. It's like you need reflux for your -- you need PPIs for your reflux. You have pneumonia because of it. I'm going to give it to you. The clinical translation is (Zoom interference).

Q Yeah. And I'm making a mess in my office. I understand what you're saying, Doctor.

I was just -- and I'm not suggesting or asking about any consequences that result from any bacterial increase in the stomach, but just generally that there is -- whether it's intermittent or long term, there is an increase in bacteria in the stomach when the pH increases; is that fair to say?

A Well --

MS. CANAAN: Objection.

A Well, the problem with that is that, remember, if -- if I made you achlorhydric, yes, if I give a lot



of PPIs, but because I'm suppressing it for a short time and the majority of the time, you're still making acid, then the answer is no, right?

So if I make you achloric -- if I do a study let's say on patients with pernicious amenia, these are patients that don't make acid. They don't have parietal cells. Well, guess what -- or patients post-gastritic, and I do a study on bacterial? Yes. The answer is "yes" in that group. But not in the general population have patients that have reflux for which they take either H2 receptor antagonists or proton pump inhibitors.

In that population, the reduction is short term, so the majority of the time you have acid, so that is not a factor in that group.

Q Okay. Have you reviewed any studies for purposes of providing your expert opinion that demonstrate over a 24-hour pH monitoring with ranitidine, that there is increase in pH and an increase in bacteria in those patients?

MS. CANAAN: Objection, form.

A I would not be surprised if there's increase in pH. I would have to look at the study that you're referring to as far as bacterial. For example, at what point did they do the sampling? Was it done right

after? How long were patients were on some -- any of these therapies? Were there other factors, like I mentioned, whether they've had surgery before, pernicious amenia and all of that.

So I would say pHs, of course, that's how they work. Bacterial overgrowth, it depends on the population and when the study was done. I would be happy to review that.

Q Is it fair to say there's lot of intragastric variability depending on the -- the conditions on -- at any given time?

MS. CANAAN: Objection.

MS. FINKEN: You know what? That's a horrible question. Let me rephrase that. I object as well, Eva. Let me rephrase.

BY MS. FINKEN:

Q Is it fair to say -- and I'm just trying to -- to understand what you had just said to me. There's a lot of factors that go into play that determine what the conditions are in anybody's stomach on any given day.

And those factors include food, and they include pH, and they include bacteria and certain gastrointestinal disorders; is that fair?

MS. CANAAN: Objection, form.

A Yeah. So let me -- let me explain. Again my



apologies if I'm not clear because that could also be the case.

So, look, we have bacteria in our stomach now. Even if I'm not on any medicine, it's the job of the stomach to get rid of it. So the idea that there's bacteria in the stomach, that's -- there is bacteria because when I eat something, it's got bacteria. I'm drinking this water. It's got bacteria, right? I hate to say it, but it does. So it's the stomach's job to get rid of it.

So the idea of bacteria in the stomach is not a new one. We have it. We had it. H. pylori is a bacteria. It's in the stomach.

The idea of --

Now, the bringing in food, medications and what have you, the question becomes the relevance -- and, again, I'm only solely speaking from clinical side. I have bacteria. Now I'm put on a PPI, and it suppresses it for a short-term. What happens to that bacteria?

Well, I still have acidity that's going to kill it, right? If you get rid of all the acid in the stomach, physiologically hard to do, but some --

And the variability I think you're talking about is patients that are post-gastrectomy or make no acid in the stomach. Of course, in that group it could.



But in the general population of patients with reflux that don't have that, I would say, yes, there is bacteria because we all have it, irrelevant of whether or not they're on H2 or PPIs.

Q So putting aside even people who have reflux, just in the normal population without reflux, the conditions within the gut in terms of pH and bacteria and -- they're variable throughout the day; is that fair to say? Okay.

A PH is variable.

Q That was --

A Yeah, pH can be variable depending on when I eat and how much I eat, yes.

Q Right. And that's just what I'm just trying to get to is that depending on when you would, for example, look at the conditions within the gut, that's going to just change depending on when you ate or what you had to drink or what medications you're on or what conditions you might have. It's something that changes over the 24-hour period in a normal person as well as in somebody who has gastroesophageal reflux disease; is that fair?

MS. CANAAN: Objection, form.

A So I would clarify by saying that I make -- I think it's important to recognize this physiological point.



Q Uh-huh.

A We -- our acidity in the stomach is low, period, right? It's low. So let's say I fast overnight, you know, I didn't -- you know, I didn't eat anything overnight, and I wake up, my stomach is acidic because it's acidic.

Let's say now I eat. Well, the pH is going to go up some. Or let's say I took a PPI, after a certain time, once it goes through what it needs to go from a medication perspective and cytochrome P450s and all of that, then it's going to go up as well, right, for a short time?

So when I wake up in the morning, I have bacteria -- I'm sorry, acidity that's essentially -- I'm at norm, and then I increase the pH.

Is that what you're asking? I want to be clear.

Q And that's -- the same holds true for ranitidine, which is what you put in your report as well, that it goes up for a period of time and then --

A Then it goes down.

Q -- goes down, correct.

So I think we're saying the same thing, that there's variability and it depends on a lot of different factors in the stomach as to what type of pH or bacteria

you might find at any given time taking a sample -- a stomach sample.

MS. CANAAN: Objection. Is there a question?

BY MS. FINKEN:

Q Is that fair, Doctor?

A Again, I -- I don't know what you're asking me.

Q Yeah, I'm just --

A That's a broad statement, but there's -- the variability -- there is no variability that -- your stomach is going to be acidic when you wake up in the morning. That is not variable, right?

Q To anybody? You're saying no matter what conditions you have, no matter what medications you're on --

A No.

Q -- if you wake up fasting, your stomach is going to be acidic?

A That's -- that's not what I said.

Q That's what I thought, okay.

A That's all right. We may -- we may be misunderstanding each other. I'm very sensitive about not coming across the wrong way as far as what I'm trying to tell you, is if you're not on any medication, you have no other diseases --

Let's say you have reflux. Let's just go with



reflux. You have reflux but no other diseases. You haven't had gastric surgery. You just have reflux, or you don't have reflux. You're -- you have zero disease. When both of those groups wake up in the morning, they're going to have acid in the stomach. And when they both eat, their pH will go up for a short time, then they'll have acid in the stomach. Let's say both, take PPI or H2, it will go up for a short time, it comes down, and then there's acid in the stomach. So that's what I'm saying.

Q Okay. So there is variability in the stomach depending on if you eat or you don't eat; is that fair?

MS. CANAAN: Objection to form.

A There's no -- yeah, there's no variability. I -- I think the word "variability" -- there is a pH increase with eating. That's not variable.

Q Is that what we're getting hung up on is the word "variable"?

A Yes.

Q Okay. Let's try it with a different term.

The pH changes within the stomach depending upon a whole different variety of conditions that might be occurring; is that fair?

A That's fair to say with food, with PPIs, with pernicious anemia, with surgery, that's correct.



Q Okay. Then that's perfect. Thank you, Doctor.

A I'm sorry.

Q I understand now where we were having a disconnect. But, I think we were ultimately saying the same thing.

Okay. So going back to the different things within the stomach. You had indicated that --

Hold on. Let me just get back to my place here. Oh, okay.

So if there's an increase in pH or an increase in bacteria in the stomach, would there be an increase in nitrite levels in the stomach?

MS. CANAAN: Objection, form.

A So let me -- let me understand your question. If there is an increase in pH and if there is bacteria in the stomach?

Q I said if there's an increase in pH or an increase in bacteria, would -- could there also be an increase in nitrite levels in the stomach?

And I'm saying nitrite with an "I." I'm watching the realtime, and it's coming up as "nitrate" with an "A."

A Yeah. So nitrite levels are -- so again, you know, if -- if we're getting to the protonation stage -- are you talking about the protonated nitrite?



Q I'm just talking about generally nitrite in the stomach. Are they variable depending upon the pH and the bacteria levels?

A Yeah, so --

MS. CANAAN: Objection, form.

A You have higher nitrite level with higher pH, right? So nitrite -- you have to have protonation of nitrite to actually get to -- and that protonation requires acidity, right? So the protonated nitrite requires acidity. I think that's what you're getting at.

Q So is it fair to say -- correct me if it's not. Is it fair to say that the nitrite levels in the stomach also change depending on a whole bunch of different conditions similar to the pH and the bacteria?

A I don't know what conditions, so I'm --

MS. CANAAN: Objection, form.

BY MS. FINKEN

Q Well, depending upon what you eat, for example.

A Okay. So if I eat a hot dog and I drink a beer, right? Is that what you mean?

Q Yes.

A Yeah. Then I would have a different level than if I don't. That is correct.

Q Okay. And --

MS. CANAAN: Tracy, do you want to take a five-minute bio break? We've been going for like an hour and a half or more.

MS. FINKEN: Yeah, we can take one. That's fine.

MS. CANAAN: Yeah, five minutes or something like that.

MS. FINKEN: Sure, no problem. Let's go off the record.

THE VIDEOGRAPHER: The time is 3:05 p.m., and we're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Okay. Everyone, please stand by.

The time is 3:19 p.m., and we're back on the record.

BY MS. FINKEN:

Q Okay. Dr. Vaezi, previously you had indicated that you have a master's degree in epidemiology; is that correct?

A Yes, that's correct.

Q Okay. And what is epidemiology?

A That's a good question. It's a broad question but a good one.

It's essen- -- essentially looking at study of



disease and outcome, if you will, so in any study -- similar to what we're discussing here, does ex- -- you know, could exposure to X cause Y, or you can also talk about randomized study, so it's really assessing an outcome, if you will, based on exposures.

Q So would it be fair to say it's assessing whether an agent can cause a disease?

A Yeah, that's -- that's -- that's one, yes.

Q And an example of that would be an epidemiological study that determines whether smoking can cause lung cancer, correct?

A Yes, that's correct.

Q And would you agree with me, Doctor -- is it fair to say that epidemiology does not determine whether an agent caused a specific person's disease?

So an epidemiological study couldn't tell me or you as an epidemi- -- as having a master's in epidemiology, it's not going to tell you whether COVID-19 caused me to have cardiac issues specifically, correct?

MS. CANAAN: Objection.

A So in you, I would have to assess your risk, right? In someone -- we would leave you out of it. An individual patient that presents, I would have to see do you -- do you smoke and do you have X, Y and Z, so --



and those are all risks.

Epidemiology assesses the risk in a population. Then when patients present, then you assess the risk in that individual patient, right? So if that patient smokes and drinks and is obese and has reflux and has hypertension and has heart disease, so that's a different risk group than someone else.

So essentially it is helping us as clinicians in better assess risk and also better take care of patients because then we go to the patient based on those epidemiologic studies that you're mentioning and say, look, there are studies that show smoking causes lung cancer, please do your best to stop or minimize because you're increasing your risk.

Q Okay. What are some types of epidemiological studies?

A Yeah. Good question. So, you know, any of the studies -- so randomized control trial, for example, is -- can be a part of that because you're assessing an exposure and an outcome, right?

So in any of the studies regarding the drugs at least I'm familiar with H2 receptor antagonists, with PPIs and all of that, they're randomized to drug A and placebo or drug A versus an active comparator, drug B, and then they show efficacy or if they don't, and then



they get FDA approval, so that is part of that efficacy issue.

Related to ranitidine specifically, then epidemiology would be looking at the data on what do we have. Do we have randomized control studies, and if not, do we have case control or cohort studies? So those are other studies.

You have case control studies that essentially look at the expose- -- I'm sorry, the outcomes. On a case control you say let's look at hundred people with breast cancer and a hundred people without breast cancer. That's your cases and control looking backward at exposure.

And then in -- going forward, if you will, you take a look at cohort studies that look at exposure and then assesses outcome.

So you have the randomized trial, case control and then cohort studies, those are all different types of studies that one could do.

Q And would case control studies and cohort studies be classified as observational studies?

A Yeah, typically that's -- that's how they are set up. But in the hierarchy of importance, if you will, right? So in -- in science and in epidemiology, if you look at what is best, if you will, from

Page 174

data reduces bias. You want randomized control trial.
If you can't get you randomized control trial, you want cohort studies. If you don't have any cohort studies, then you go to case control studies. If you don't have case control studies, then you go to case reports, right? So those are single case reports. So from the level of importance.
So if I have -- let's say I review a study that -- a single case of a person that had -- was exposed to something, came down with something, it's -- it's -- it's not uncommon that epidemiologists would say that doesn't carry as much weight as if I have a randomized control. So there's a hierarchy of importance.
Q And what is an ecological study?
A Ecology, so it's essentially looking at potentially ecologic exposures, right? So looking at, for example, exposures, looking at other things, environmental factors that would potentially be a factor.
Q Are there specific limitations when -- well, strike that.
What are the potential limitations that can exist when you're looking at observational studies?
A It depends on which observation -- so in case

Page 175

control studies, it's not unusual to -- the reason it falls short from cohort is because you're really looking at the outcome first, and your uncertainty is the exposure, so there are many biases in those studies.
You have your -- confounding by indication. You don't know why patients were put on that. You have protopathic bias, right? You have recall bias. You're -- you're asking a patient with cancer, you know, were you on X, Y and Z or did you take this medication, or you're looking at their record or, especially in the dietary ones, did you take this diet versus that diet.
So case control studies are problematic in biases and in -- in our ability to control for them, so that becomes problematic.
And then your cohort studies are better because you really didn't look at the outcome. You're looking at the exposure and then assessing the outcome. But even there, you have all of these biases.
So when -- when it comes to observational, you know, cohorts/case control, it is not uncommon that we find observations that lead to a fear -- and that's what I call it, a fear -- that then later better studies don't show it, and that -- the reason for that is all of these observational studies have problem with controlling for various biases.

Page 176

There was a study that looked at -- I forget how long ago I read this, but there were a study that looked at -- there were 52 observational studies that found an association, and then none of them ended up being confirmed by randomized control studies.
So that's important to keep in mind because it is now -- we are now in an era where observational studies are showing these small associations -- not the one you mentioned, lung cancer. Lung cancer is a no brainer, right, because when you look at the risk estimate, it is so high up.
But when you look at all of these others, they're relying on this zone of bias, if you will. You just don't know if the association exists or not, then that creates the fear.
So these limitations that you ask about are really from the observational, and they're all these publications that we have to be careful --
If we find an association, we have to be careful. If you don't find an association, well, that's great. At least you didn't create the fear, the excitement and all the patient-related effects because it makes a difference. So they -- they have biases. They have a lot of biases.
Q When -- when looking at observational studies,

Page 177

would it be fair to say that -- well, strike that.
When they're -- generally when they're conducting observational studies like case control or cohort studies, where is the data coming from?
MS. CANAAN: Objection, form.
BY MS. FINKEN:
Q Do you understand my question?
A Yeah, I mean, it's variable. It depends on which specific case control and which specific cohort, so that -- that's going to be highly variable.
Q So when you're conducting observational studies and you're pulling data from, for example, insurance databases -- that's one area where you can pull information to conduct observational studies, correct?
A Some have done that, that's correct.
Q Have you ever evaluated observational studies that have -- has pulled data from an -- a database at an aggregate level instead of an individual level?
MS. CANAAN: Objection, form.
A Yeah, if you could clarify. Have I specifically done this, or are you asking have I seen it?
Q Either. Have you seen it?
A Well, we have studies within the epidemiologic studies that are outlined that have different study

Page 178

designs. They have different sources from different countries that have done slightly different things, and that's actually good.

The way I see it is you want that variability of data so that the outcome and the estimate you're assessing is not just related to, say, of the Asian a population or just related to U.S. or just related to Denmark.

So they're different databases that all of these investigators have used at various level, so . . . One can critique all databases. I can critique every single database in the world, but guess what? That's what we have, right?

So you do the studies based on databases available to you and then an aggregate to assess a risk for my patient -- when I'm sitting across a patient, I just don't look at a study from this database or that database. I'm looking at what does the aggregate tell me? What does the result of these studies show me? If one tells me it's protective, do I believe it? If one tells me it's high, do I believe it? Where are the signals?

And that's why when you look in my report, I didn't just look at a report. You know, you have a nice -- I actually am proud of the graphs at the end of

Page 179

my report that really puts all of it together because that is how we should look at data, not individually.

I can critique every one of the data. Every study known to mankind, including mine, can be criticized, but aggregate, how do we go forward? How do we treat patients?

Q Okay. And my -- and my question's just a little bit different.

There are certain databases where you can collect information to conduct a study that provides individual patient level data, correct? There --

A Yes.

Q Yes. And there are also databases where you can get information to conduct an observational study that will only provide you the data in the aggregate, not as an individual patient data. Do you understand that?

A Yes.

Q Okay. Which one of those types of databases would be more precise in evaluating the risk in your opinion?

MS. CANAAN: Objection, form.

A Right. So there are many elements to your question, and I'll break them down, if it helps. Again, I want to make sure I understand your question.

Page 180

Precision -- which one is precise? Precision is really related to your sample size and to how wide your confidence intervals, right?

So if you're asking me which study is better than the other, I would say they're all important because they all relay different messages, but in aggregate, it completes a nice picture. But more importantly, that gets to study design for all of them, and hopefully we can talk about it.

In a randomized control study, why is it good? In a randomized control study, you're randomizing patients, and that by itself takes care of a lot of the biases, and then you're assessing exposure and then the outcome, so that reduces the bias.

So in a observational study, you don't have that opportunity, right? That's why they're not as good. So how can you make it as close to randomized -- recognizing that none of them will get there, how can we make it as closed to randomized?

Well, then you have to take into account which of those biases can I reduce. So in that -- those two examples that you mentioned, the best way to do it is to have an active comparator, right? Because if you did that for both of those, then what you're saying is in this large database, I don't have individual data.

Page 181

Well, you're not going to have it because you're limited by your database.

I'm going to look at active comparator. Let's say you do have it. Well, let's look at active comparator. So you're trying to do the best you can with the database that you have knowing the limitations of the study.

In fact, I hope all authors as they publish -- and I try to do that, and hopefully I haven't failed too many times -- you've got to put it in your limitation. Those are your limitations of the study.

But when you do that and when you try to reduce those biases, then you're getting closer to the truth rather than -- or to that randomized trial which we hope is the truth rather than saying, well, this study is -- because it's individual is better than the other.

I would argue, well, how -- how do we reduce those confounding to make it so that they're equivalent in that sense.

Q Have you ever conducted an observational study using a database that is -- that only provides you patient data in the aggregate versus individualized patient data?

A Not that I recall. I'll have to think. It's been a long time. I'm sorry, I --

Q Okay. And, Doctor, you've talked a little bit about randomized control trials. And is it fair to say that it -- in certain instances, it wouldn't be ethical to conduct a randomized control trial?

For example, would it be ethical to give somebody a carcinogen for a long period of time versus a control group and then see if they get cancer? Is that something that would be ethical to do?

A No, it would not be.

Q So in those instances where you're trying to judge the carcinogenicity of an agent, you'd have to rely on observational study data, correct?

A It -- it is -- so let me -- you're correct in a sense, and let me just -- with a caveat, if you don't mind.

So it depends -- so if you're talking about carcinogenicity, you're absolutely right. But if you're looking at side effects, right, so if you're looking at -- that's where randomized trials come in, where you've done the efficacy. You're assessing whether or not there's a specific side effect or not, and sometimes there are unanticipated side effects.

That's why you check blood work. That's why you do chest x-rays. That's why you do X, Y and Z. So if I treat someone, randomize them to drug A versus



placebo or a comparator drug B, and I'm assessing, and all of a sudden I find something that's not good, you know, my patients are having increased liver enzymes because they're -- they are on blinded -- I don't know which but on this arm over that arm, so in that sense you can randomize them if it's unex- --

If you already know, you know what? Radiation at high dose, I'm going to randomize you to radiation versus no radiation, and I think that -- that's unethical. I agree 100 percent.

Q Okay. Is it fair to say that a well-designed observational study can sometimes provide better information than a poorly-designed randomized clinical trial?

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q Just generally, as a general proposition.

A You know, you have to look at the studies to be honest with you, so I would say by design specifically, randomized control studies are better when it comes to knowing what the exposure was, at what point, the duration of the exposure as well as the outcome because that's part of that.

And the randomization takes into account your confounding, so that design -- so again if there are



specific ones, I'm happy to look at. The design is a better design. So that's why from all of these, you know, assessments of different trial designs, co- -- you know, observational studies fall shorter than randomized trials.

Q Okay. So you would agree, though, that you would have to evaluate the design of a specific study to determine how much weight you would give that study in an analysis of causal inference, right?

A Well, not only the design, you have to look at methodology. You look at the design. Is it randomized? Is it cohort? Is it case control? Did they control for the confounding? Didn't they? Did they assess all the variables? Are their conclusions appropriate?

We have studies where they actually do a great job -- a study, do a great job of actually doing the study, having all the parameters of an observational study to do their best to control for potential confounders, and their conclusions are completely different, so I'm sitting there going, okay, the study is a good study, the conclusion is not.

So it all depends on what you mean by that. But I would say it is dependent on the study and the design and all the factors of if they tried to control for the confounders or not.



Q Okay. In the context of epidemiology, what does the term "association" mean?

A Well, something is associated. So, you know, in laymen's term -- you'll forgive me if I use the analogy I use for my patients when I sit across them. They go, Doctor, I found out that this drug is associated with this, what does it mean?

So if you allow me to go there, it's -- I say I'm drinking a cup of coffee and I don't see that chair, and I fall and I break my leg, and there are enough people that have done that, then drinking a cup of coffee is associated with a fractured leg. It's true. From epidemiologic perspective, that is true. I had that exposure and that outcome, but it was also because I didn't see where I was going, right? So in this case, drinking coffee necessarily wasn't associated with the chair necessarily, but so it's -- it's that association.

So making a false or true association, it's related, if you will, in laymen's terms.

Q Would you agree that an association that is weak does not necessarily preclude a causal relationship?

MS. CANAAN: Objection, form.

A What do you mean "association that is weak"?

Q Well, that's a good question. How do you --

how do you determine whether or not there's an association in an epidemiological study?

A Yeah. So when -- when you look in -- let's say cohort study or case control study, they're looking at things, and they find that either odds ratio or a hazard or relative risk of something is more than another, right? So one being your no association and then moving away but including your confidence intervals to see whether or not there is a, quote, association.

So let's say you find that something has an association, let's say relative risk or observational 1.3 with a confidence interval that does not cross 1. Then you say there is an association between whatever that exposure you were looking at and that outcome.

But let's say you have -- and I outline that in my report.

Let's say you have the same hazard ratio relative to risk of 1.3, but the confidence interval now crosses 1, then you can't argue that there is an association. In fact, that shows there's not an association. That's where the confidence interval comes in.

So an association is, you know, you're finding an association between something and the outcome but you -- I don't personally -- speaking just from me, I



don't just look at a study that found whether it was positive, negative. I look at various factors.

I'm looking at the study design. I'm looking at the relative risk. I'm looking at did they control for biases for all of the factors. Did -- did they do something they shouldn't have? What is their conclusion? What was the exposure? How much, and did they control? Did they do a dose response? Was there a dose response?

So it's hard to say solely based on a relative risk or an odds ratio if the study is a good study, bad study, right?

Q So going back to the example that you gave of a relative risk of 1.3, would you characterize that as a weak association or a strong association?

A I would characterize -- that's all relative, so if you ask me that question regarding association, is that association a weaker association than smoking where relative risk and odds ratio are way above, I would say that's a weaker than the smoking of 20 or 10 or 30, right? So that's how I would assess it, but not excluding the confidence interval because that's where you have to see where the uncertainty lies.

Q Okay. So putting that into context, if you have a relative risk of 1.3, it doesn't necessarily



imply that there's a lack of -- let's strike that.

If you have a relative risk of 1.3, that doesn't preclude that there's a causal relationship, right?

MS. CANAAN: Objection, form.

A Just by relative risk, you can't assess it. So you have to have the confidence intervals, right? So let's say I have a confidence interval of .8 to 1.6, so that means a better done study could show that it's protected.

So to conclude that 1.3 means there's an association, ignoring that confidence interval would be not appropriate. That's why we don't conclude that. That's why we say the risk estimate is this with confidence interval that is not significant. And the word "not significant" is important. It is not significant. We can't just say, well, it's 1.3 here and 1.3, they mean the same, and as I put in my report, they don't mean the same.

It only means that one could be protective or it could not be, and the other one suggests that it isn't, but, yet, you have to look at the confidence intervals, the study of the design, how did they reach that conclusion. Did they do all the factors to reduce bias?



And I mean, again, there are studies that have clearly shown that PPIs are associated with pneumonia. And guess what? The initial studies, I have patients coming in, they've dropped their PPIs, they're symptomatic. I don't want to take them. Subsequent studies, five years later when they were doing better, they don't show the association, so it's important.

So a single study by itself is not as important as the aggregate, the study design and the confidence interval as part of that equation.

Q Okay. Would you agree with the general proposition that an associa- -- association that is weak does not necessarily imply a lack of clinical importance?

MS. CANAAN: Objection, form.

A So I don't know what you mean by that. If you're saying that if I do a study -- so I'm going to answer it in different scenarios. I have 10 studies and all of them have odds ratios of 1.1 with confidence interval that crosses 1. They are all weak risk -- risk -- risk estimates, but they're not significant. They don't have clinical relevance to me.

So if I have 10, 20 studies with relative risk of 1.5, all confidence intervals above 1, consistent, well designed, tried to control for variable -- variable

factors, biases, that is important. You have to look at that.

But it isn't an agg- -- it is not just the number. It's the how many studies, how well designed were they. Did they control for confounding? If -- in this question was an active comparator or not? Did they control for protopathic bias? That all comes into play to relate to the clinical importance, and its importance. And this is important.

I mean, at the end of the day, we've had so many of these false alarms, I put that in there because that does have clinical relevance. To me it does.

I'm faced with patients that come in and say I don't want to take this drug because I read it causes pneumonia or it causes hip fracture, for example, or X, Y and Z. I'm talking about PPIs, and they may take them off. Well, that's incorrect because the association was not proven later to be the case. But try to undo that, right?

The first two studies is hard to undo with the next better 10 studies because the cat's out of the bag. Now patients have the fear.

So to me I'm highly sensitive to make sure that we weigh the evidence in aggregate. We look at the evidence, what type of study, and we look at all of the



factors and put them together. In fact, I hope that that's what I've done in mine.

Q Okay. So going back to the term that you used, an "active comparator study," what does it mean to conduct an active comparator study?

A Yeah. So essentially what you want to do -- I'll -- I'll talk about it with respect to the studies that I've reviewed with ranitidine. If the question at hand -- at least in me as I'm looking at this -- the question is: Could ranitidine, and that's not -- could ranitidine cause cancer, right?

So if I look -- and if I'm doing an epidemiologic studies and comparing the ranitidine to the general population, that doesn't answer the question. I want to know the ranitidine takers versus something else that would control for confounding by indication, i.e., let's say Pepcid or famotidine.

In the population that took -- had the same indication for the drug but one is purported to be associated, the second is not, and I'm following them, whether it be cohort/case control, what have you, and then I find the risk. Did I control for all the factors, and do I see the risk? I think that's what we want.

And that's where the active comparator comes



in. The active being you're trying to control for your confounding by indication because those drugs are given for different reasons, right?

So if I compare it to someone that doesn't need the drug, well, I'm now comparing apples to oranges rather than apples to apples.

Q So would you agree with me that for an active comparator study to be effective, the comparator drug mustn't also be associated with the outcome that you're trying to assess?

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q Correct?

A Yeah. Can you clarify that question for me?

Q So for -- for what you're proposing, using an active comparator study, for it to be effective in answering the question, you would have to ensure that the comparator drug isn't also associated with the outcome that you're attempting to study, right?

A That would be ideal if you can have a comparator that doesn't have the risk. That's the whole reason to do it is to have it so that the active --

So, for example, in studies that I've reviewed, if you have an active comparator to, say, famotidine or cimetidine, right? So those are good active comparators



because patients were put on H2 receptor antagonists. They're the same class, so now you're follow- -- you're looking at the outcome. So those are good studies to look at so that you would know whether or not there is an association.

Q Okay. And you had talked about previously the expose- -- measuring the exposure. Would you agree that evaluating the exposure is critical to assess causal inference?

MS. CANAAN: Objection.

A So I don't know what you mean by "critical." It's an element, right? So remember the word "critical" means without it, everything falls apart. It is an important component, just as the risk estimate is, just as whether or not there's consistency. And that's what I've been sort of discussing. What is the strength of association? What is the consistency? Is their biological plausibility? Is there a dose response? Those are all part of that analysis, but remember, all of those go away and essentially are irrelevant, if you will, if you already start with the confounding.

Confounding is what's driving a lot of these. And that's not part of that Bradford Hill criteria, right? So confounding is not a part of that.

Confounding is -- by default you have to

control for. So if you have a poorly designed study with tons of confounding, and you have dose response, well, guess what? You just failed everything because you have so much confounding, that dose response doesn't come into play.

So to say critical, it all depends on the variables I discussed.

Q Okay. So we talked a little bit about significance testing. What is -- can you define for me what a p-value is?

A Sure. So traditionally we've used p-value to assess whether or not an observation can happen by chance, and by convention, we've used less than 5 percent, 0 -- .05, right, so less than 5 percent.

So if you find an observation that is statistically significant, then there's less than 5 percent chance that that observation would have occurred by chance alone because remember that if I do many comparators, I'm going to by chance find something that pops up as, quote, significant. And that's where you want to be careful with the multiple comparison studies, but that's where p-value comes in.

But I don't want to emphasize the 5 percent. I also want to emphasize that if you have so many comparators, there is the bond for wrongly correction



that actually then takes that 5 percent to lower. You could -- it would be inappropriate to say, oh, it's less than 5 percent. I see that clinically all the time when I review publications.

I've done 30, 40, a hundred comparisons, and a few of them are .04. It's clinically significant or statistically significant. Well, no, it's not because you've done so many analyses that you need to correct for that, and the way you correct it is you divide it by that number minus 1, and that's how you should do it. And so it's not just 5 percent. It's -- within multiple comparison it's even more stringent than that.

Why is that? I think if we really stuck to that, and we did it scientifically, we wouldn't be in the mess we're in right now because we have so many articles published with incorrect assessments and conclusions that this is statistically significant, so that then gets to the clinical relevance, that gets to did they correct for all the stuff, that gets to the confounding.

I'm trying to answer your question. I hope I've answered it. I apologize if I didn't answer it.

Q So do you believe that a statistically nonsignificant finding provides evidence of no association?



A That depends on the study design, right? So that's where type II error comes in, right? So type II error will say you didn't do the study the right way, and you didn't find it because you never had the opportunity to find it.

But one can't just look at the p-value by itself, but it's an important value in that if you're looking at a study design, if you're looking at a cohort design that by default gives you no association at all, then one can't assume association because the study is negative, so the reverse doesn't work.

If I have a study that shows no association, I can't assume there is one just because I would -- to argue that, well, it's a type II error. Well, not necessarily.

So, you know, I always say so you can't assume association or causality. Lack of evidence does not prove its -- its existence. And that's the issue in current epidemiology where people are assuming things that are inaccurate. They're assuming causal link even with small associations that are not consistent, that didn't control for confounding, that have issues.

So the p-value that doesn't show -- let's say I've looked at 10 studies, and they're all not significant, that is important. It didn't find an



assoc- -- 10 of them didn't show it. Let's say one did, and one had a multiple comparator, but they didn't control for it, I don't put weight on that. So you have to sort of see the aggregate.

I want to go back to that. A single study can be criticized, and -- a second study can be criticized because all studies can be criticized. There's not a single study that cannot be criticized, but then in aggregate, they paint a big picture, and lack of evidence does not prove its causality.

Q In your report you reference the Bradford Hill criteria to assess causality. Do you recall that?

A Yes.

Q Okay. And what are the Bradford Hill criteria used for in the context of epidemiology?

A I have that outlined on page 17, table 3, strength of association, consistency, specificity, temporality, biological gradient, coherence, experiment and analogy.

But I want to emphasize what I emphasized before. The Bradford Hill criteria you don't even need to use if you have all these studies that are cofounders.

So confounding is not a part of this because if you have studies that have tons of confounding and --

they don't even make it to the causal assessment.
Q So you also indicate in your report that the Bradford Hill criteria should only be considered after a study finds an association. Do you recall that?
A Can you show me?
Q Yeah.
A What page is it on?
Q On page -- I believe it's 59 on your report. You indicate --
MS. FINKEN: And if we can pull that up. Yep. Right there in the bold area.
BY MS. FINKEN
Q It says "because the current evidence does not show a reliable association between ranitidine and any type of cancer that is not the product of chance, bias or confounding, it is not necessary to apply the Bradford Hill criteria to assess whether there is a basis for finding causation."
Do you see that?
A Yes.
Q Okay. What is -- what is the basis for that statement in terms of applying Bradford Hill criteria unless you find an association?
A That is actually not what it says. It isn't that you have to find an association, so here -- I want



to clarify that. It says the studies were flawed. So if there are flawed studies that are biased because of confounding and various other biases, and you -- because of that, you have problems with the study as far as going to -- from association to causation, then you wouldn't be able to.
So in these studies that I've looked at, they don't even make it to necessarily applying this. There is no reliable association; in other words, I'm not necessary -- so if you have studies that say -- let me use an example to be clear. I know maybe I'm not being clear.
If you have studies that have hazard ratios 1.1 with confidence intervals that do not cross 1, so, i.e., they are significant statistically, and let's say you have 10 of those. Well, then you apply the Bradford Hill criteria to it. You say, all right, now you have it, can you assess strength of association? Can you assess all of the other factors?
But if you already have studies that don't show an association, which is really the case in the studies that I've reviewed, what is it that we're assessing Bradford Hill criteria for, right? So what are we suggesting? That there is no association. Now let's see if there is a causation. So we have to have an



association to then investigate whether that association is causal.
I hope I'm being clear on that.
Q Okay. Can you cite to any specific authority that indicates that proposition, that you shouldn't apply the Bradford Hill criteria unless you first find an association?
A I'm more than happy to find some and send it to you, but I can't right now offhand.
Q Can you cite to any publication by Bradford Hill himself that -- or Sir Austin Bradford Hill himself that indicates the methodology of considering the Bradford Hill criteria absent finding -- a finding of an association is inappropriate?
MS. CANAAN: Objection -- sorry. Objection, form.
A Yeah, I'll have to pull up Bradford Hill. I'm more than happy to look at his original to see if he's outlined that or not in his statement. It's been a while since I've looked at it.
Q Okay. Are there any published peer-reviewed studies reporting an association between ranitidine and bladder cancer?
A Repeat that again.
Q Are there any published peer-reviewed studies



reporting an association between ranitidine and bladder cancer?
A Association studies, so you're talking about -- so if we go to figure 6 of my report -- I'm sorry, yeah. Figure 6. It's on page 57. Yep.
Those are the studies that I've outlined that looked at -- these are again studies looking at ranitidine and bladder cancer. I've broken them down by whether that comparison was to non-users on the right-hand side in black, ranitidine versus PPI use in green, ranitidine versus other H2 receptor antagonists in blue.
And I've also highlighted if there was a dose response assessment under each one of those sections. And the dots represent the risk estimate, and the bars represent the confidence intervals for those studies.
Q So these studies that you have here in table 6 report an association between ranitidine and bladder cancer?
MS. CANAAN: Objection, form.
A These are the studies that I've reviewed. In fact, when you look -- going back to what I mentioned, look at the blue -- studies that are outlined in blue, that's the active comparator to H2 receptor antagonists. So ranitidine was compared to other H2 receptor

antagonist. There is no association from any of those studies.
     Q Okay. Do any of those published articles that you're pointing to here in your figure that are in blue, the active comparator studies, point to -- strike that.
          Do any of these studies that are here in your table in blue, the active comparator studies, report an association between ranitidine and bladder cancer?
     A Yes, this was what I commented on before. Cardwell study was -- where the author's actually conducted the right study where they looked at ranitidine versus other H2 receptor antagonists, and they don't see an association nor a dose response. If you look in blue, you can see that.
          This is the same Cardwell study that incorrectly -- the authors state in their conclusion that there was an association. And that's where the problem lies, right?
          So when you have an active comparator, but yet your focus on your conclusion is ranitidine versus non-users, which is at the bottom, that's a problem. It's a problem because what you're focusing on is the incorrect comparator and not the correct comparator which is the active comparator.
          None of the studies you see, including



Cardwell, actually show an association between ranitidine and bladder cancer, nor is there a dose response in that same study.
          Then you look at Norgaard. In fact, if one looks at Norgaard, there is the opposite, right? So look at that. I would argue, well, then, you know, with Norgaard study, if I take more ranitidine, I'm protected from bladder cancer. That would be an incorrect statement. But if one wanted to make that, one could, again, incorrectly. And the reason it's incorrect is you look at the aggregate there, just the blue. There is no signal.
          I don't believe that taking ranitidine protects you from bladder cancer even though Norgaard suggests based on that estimate, nor do I believe that in the Cardwell study that compares ranitidine to non-users as shown underneath is a good comparison.
          So I would say the author should focus on the correct assessment that they had actually done. They had done the right study, they just didn't do the right conclusion.
     Q So did Cardwell report an association between ranitidine and bladder cancer?
     A Compared to non-users --
          MS. CANAAN: Objection. Sorry give me a



chance.
          THE WITNESS: Yeah, sorry.
          MS. CANAAN: Objection, form.
BY MS. FINKEN:
     Q Okay. Let me ask my question again.
          Did the authors of the Cardwell study report an association between ranitidine and bladder cancer?
     A They did when they analyzed ranitidine versus non-users, yes.
     Q And it's my understanding from your discussion that we just had that you disagree with those authors; is that correct?
     A That is correct.
          MS. CANAAN: Objection.
     A 100 percent.
     Q Okay. Did you prepare this table yourself that's on page 57 of your report?
     A Yes.
     Q Are there any published peer-reviewed studies reporting an association between ranitidine and stomach cancer?
     A Can we go to -- can we just scroll up? That gets to page 55. Uh-huh.
          So I did the same analysis here. As you can see in the black, ranitidine versus non-users,



ranitidine versus PPIs in green, ranitidine versus other H2 receptor antagonists.
          These are all the publications that are out there. And as you can see, again, focusing on the better designed studies, but I'm happy to talk about the less well-designed studies. On those that --
     Q Let me -- let me just stop you right there.
     A Yeah.
     Q Which of those studies would you define as the better design studies?
     A The ones that had active comparator, as I outlined, you do want -- in this -- so in studies that we're trying to assess risk of ranitidine based on hypothesis that ranitidine had NDMA in it, therefore, that exogenous exposure in humans can cause cancer, that's the question, then one then has to compare apples to apples.
          Those are studies that use ranitidine against active comparator of H2 receptor antagonists. Those are the ones in blue. When you do that, those are the better studies, and what you would see is there is no association.
     Q So you would characterize Kim Y as one of the better studies associating the risk?
     A On the basis of --

MS. CANAAN: Objection.
Sorry, sorry. I just -- I'm just waiting because I'm not sure sometimes whether Tracy has finished her question or not, so I'm waiting for her to finish, and you're jumping in.
So I just want to put in an objection.
Go ahead.
BY MS. FINKEN:
Q So my question was would you characterize -- are you characterizing Kim Y as one of the better studies comparing the risk?
A I am comparing --
MS. CANAAN: Objection, form.
MS. FINKEN: Actually, let me strike that question.
BY MS. FINKEN:
Q Would you -- you're characterizing Kim Y as one of the better studies assessing study as assessing the risk?
A I'm waiting. I'm sorry.
Okay. Going back to what I was mentioning, the -- it's not about a single study as much as the whole study, so the better studies are those that compare ranitidine to active comparator. Kim Y is one of those. Iwagami is another one. Yoon another one.



Kumar is another one. Adami is another one.
But what's nice about this -- and I actually -- what I really like about this -- and I've outlined it before -- is these studies come from different parts of the world with different databases, and there is no signal.
Now, if one wanted to pick on a signal and say, oh, my goodness, protective, I'm not doing that because I personally don't think taking ranitidine necessarily protects from gastric cancer. I think it may be a confounder, but the point being I'm not seeing a risk of ranitidine causing gastric cancer, i.e., going back to that NDMA hypothesis, going back to what I was asked to look at which is could ranitidine cause in humans gastric cancer and is there evidence for it epidemiologically. This graph beautifully shows it.
Q Okay. So the five studies -- I think it's five -- one, two, three, four. The five studies that you mentioned, Kim Y, Iwagami, Yoon, Kumar and Adami, you believe are the five most well-designed studies to determine whether or not ranitidine is associated with gastric cancer; is that correct?
A They are the better design studies because of the active comparator, that is correct.
Q Okay. Now, going back to Bradford Hill for a



moment, you had gone through the nine factors to consider under the Bradford Hill assessment of causation. Do you recall that?
A Yes.
Q Okay. Would you agree that when you're applying the Bradford Hill factor -- factors, that the factor of consistency carries more weight if the studies use different designs and patient groups and still arrive at the same conclusion?
MS. CANAAN: Objection, form.
A As -- as I mentioned before, it's not just a single factor, right? So you've got to look at so many things. How were the studies designed? Were there confounders? Were there active comparators? Did they control for protopathic bias? If the answer is yes, and yet despite all of that, they show an association -- that's not the case here -- then you would apply the Bradford Hill. And then you would say are they consistent? Is there strength of evidence?
So to me whether you apply Bradford Hill or not, there is not an association, that's number 1.
Number 2, if you apply the Bradford Hill, there is no consistency, i.e., there is consistency, there's no consistency showing an effect. There is no strength of evidence. There is none. So again --



Q Doctor, I'm -- I'm going to interrupt you because we're going to be here all night if -- if we don't -- if we don't get to the crux of some of these questions, but my -- my question --
MS. CANAAN: Tracy, you've been going about an hour, so I don't know if you want to take a break, but I would appreciate a five-minute bio break at some point.
MS. FINKEN: Okay. Well, let me ask the question that I just asked, and then --
MS. CANAAN: Go ahead.
MS. FINKEN: -- we can take a break.
BY MS. FINKEN:
Q I was referring solely to the criteria, not in the context of this graph, but just generally. When you're looking at the Bradford Hill criteria of consistency, would you agree that that would carry more weight if the studies that you're assessing used different designs and different patient groups, and they still arrive at the same conclusion?
MS. CANAAN: Objection, form, asked and answered.
A It would be a factor in that analysis.
MS. FINKEN: Okay. Let's take a break. Just five minutes, is that --

MS. CANAAN: Yeah, five, ten minutes, something like that, yeah.
MS. FINKEN: Okay. Great.
THE VIDEOGRAPHER: The time is 4:15 p.m., and we're going off the record.
(Break taken.)
THE VIDEOGRAPHER: Okay. Just a moment.
Okay. Please stand by.
The time is 4:31 p.m., and we're back on the record.
BY MS. FINKEN:
Q Okay. Doctor, I just want to shift gears for a moment. We were talking previously about some of the conditions that are in the gut relating to pH and bacteria and nitrite and things like that. Do you recall that testimony?
A Yes, I do.
Q Okay. Now, would you agree that there's also nitrite in the saliva?
A There are some studies suggesting that there are nitrites, yes.
Q Okay. And are salivary nitrite levels also subject to fluctuations depending on certain factors?
MS. CANAAN: Objection, form.
A I -- I -- I don't know, because that -- I'm



sure that's going to depend on various factors, but I don't know.
Q Okay. So I -- I don't want to use the term "variable" since that hung us up previously, but it -- also nitrite -- salivary nitrite levels would change depending on things like diet, similar to the nitrite levels in the gut, correct?
MS. CANAAN: Objection, form.
A There may be some variation. I would have to look at the details. And I don't know what you mean.
Q Okay. What is thiocyanate?
A A what?
Q Do -- do you know what thiocyanate is?
A Thiocyanate. I know what it means chemically, but I don't know what -- in reference to --
Q Okay. Is thiocyanate found in saliva, do you know?
A I'm not sure.
Q Okay. Do you know whether thiocyanate is found in the gut?
A I'm not sure.
Q You had indicated in your report, I believe it's on page 7, that a combination of medications are often used over a treatment course for your patients, sometimes starting with H2RAs like ranitidine and using



step-up therapy to PPIs, or starting with PPIs and using step-down therapy to H2RAs. Do you recall that?
A Can you show me where that is?
Q Yep. It's actually right up on the screen.
MS. FINKEN: Thank you.
BY MS. FINKEN:
Q The bottom of the first paragraph, the last sentence. Do you see that? It says "lastly, a combination of medications is often used over a treatment course, sometimes starting with H2RAs and using step-up therapy to PPIs or starting with PPIs and using step-down therapy to H2RAs."
Did I read that accurately?
A Yes.
Q Okay. And when you're saying that -- that you start with H2RAs and use step-up therapy to PPIs, what do you mean when you're -- when you're using the term "step-up therapy"?
A So in the olden days, as I call it, the old recommendations, if you will, when you look at the clinical guidelines on how to treat reflux, it used to be that you did step-up therapy, and now we're doing step-down therapy.
So what is step up? It used to be -- because we weren't really sure about the efficacy of the drugs



and all of that, we would say we'll start with lifestyle modification first for reflux. If lifestyle modification doesn't work, then go to antacids, H2 receptor antagonists and then to proton pump inhibitors, so that's the step-up therapy.
Then in the '90s, we learned through various studies that it was probably not the most cost effective way to do that because later we learned that it's -- because what was happening is -- was we were seeing patients that were still symptomatic, and what we ended up doing was more procedures on them, so the cost went up.
So then the recommendation changed, and as we highlighted in the '98 AGA guidelines on GERD, we said step-down therapy would be the way to do it from cost effective, and also you're starting at -- because a patient that presents to you with a symptom, you want to help them first, then step it down. So you start with PPIs, then go to H2, and then if you can, take them off.
But again these are -- these are approaches, but not necessarily one that one takes on everyone in that it may or may not be effective in everyone. In some you're able to step down. In some you're unable to step down, and they have to stay on the same medication.
Q Okay. So is it common in your practice to

switch from H2RAs to PPIs or vice versa over the course of the patient's treatment?

A It is not common. It's -- it's a possible approach. So what happens -- again each -- we're now talking about phenotyping patients. Each patient presents as a phenotype. So if a patient comes with really severe disease, then no treatment's going to help them. It's going to be PPIs. And that's a step down. We start with PPIs.

But if a patient you started on an H2 receptor antagonist has responded to that therapy, then they're going to continue on that therapy. So you don't necessarily do the same thing for everyone. You target that patient.

So you start with H2 receptor antagonist. They're doing well. You continue with H2 receptor antagonist. So by this what I meant -- and I should have clarified -- is that they're varied approaches, but most common approach is you tried that phenotype of patient. You treat them. When they do well, you stay the course, and that patient doesn't necessarily need to go to a higher dose of anything else. You just leave them at that.

Q Okay. During the course of your clinical practice do you see that patients switch between



different types of H2RAs or different types of proton pump inhibitors based upon what might be on the formulary or insurance coverage or things of that nature?

A Commonly I don't. So this is what I see. In fact, I have a lot of calls from patients regarding this. So what happens is a patient is started on a medication. They're really reluctant -- especially the ones I talked about. When they're doing well, they're reluctant to switch. And the reason they're reluctant to switch is because they're doing well. So any -- any change is going to create some level of anxiety and fear, and they're less likely to do it. So most of the patients that are doing well that start on the medication, they're going to continue with the same.

And that's why I get a lot of calls, for example, when the FDA -- when ranitidine was taken off the market, I got a lot of calls from patients that were on ranitidine. They didn't know what to do. They said -- and I said, well, we could try a different medication. There's reluctance because I was doing so well on this, I don't want to go to another one that I'm not going to do well on it. And that is true, sometimes they won't do well on a different medicine. But commonly they like to stay on what they're doing well



on.

Q So in your experience in clinical practice do you find that patients are willing to pay out of pocket to stay on a medication versus switching because of formulary changes or things of that nature?

A So there --

MS. CANAAN: Objection -- objection, form.

A So there -- there are differences, right? The formulary issue is different, and then the -- they would rather stay on their same medication that they're doing well on. The formulary issue is a different one.

So if there is a change in their formulary, then that's when they reach out and say, hey, what do I do. Then if we switch them to something else and they're not doing well, then sometimes, yes, they go back to what they were on, and they would have to be over-the-counter. But my sense from most of the patients is they like to stay on what they're on because they're doing well.

Q So when you're prescribing medications, though, to your patients, do you take into consideration affordability that the -- especially within the class of medications, affordability in terms of what patients' insurance coverage provides versus not; is that something that you consider?



A Yeah, so you -- you do have to consider that at times. The issue here is that many patients would -- you know, it's difficult to get over-the-counter medicines because as you highlighted, they may have to pay money for it. So the issue that sometimes comes up is can you write me a prescription for this medication because my insurance covers it, but I -- if I pay for it out of pocket, it doesn't. So that issue comes up a lot where we -- they don't want to take over-the-counter, even though it's available. They would rather be on a prescription that the insurance pays for. So that happens often.

Q Okay. And that holds true whether it's an H2RA or a PPI or any type of class of medication, correct?

A Well, most commonly, if cost is the driver, they would rather be on the prescription.

Q Uh-huh. Are there times when you advise your patients to take over-the-counter medications because it might be more affordable to them than taking a prescription version?

MS. CANAAN: Objection, form.

A I don't drive that as far as me driving what they can afford. I normally prescribe medications, and if they call me and they say, hey, should I take over-the-counter -- they first call because they're --

I've heard it where they're hesitant because is that the same drug nonprescription than prescription. They rely on the prescription because that's the psychology of medicine where a prescription has more efficacy than a nonprescription. So even though they may or may not be the same compound structurally, they're hesitant to go over-the-counter. They'd rather do the prescription.

Q Are there circumstances where your patients would be taking over-the-counter medications such as PPIs or H2RAs that you are aware of that -- that you are aware of and condone versus taking the prescription version of the medication? Do you understand my question?

MS. CANAAN: Objection.

A No, I'm sorry, I don't.

Q Is there ever a circumstance where your patients come in and they're taking an over-the-counter version of a PPI or an over-the-counter version of an H2RA and because that's, you know, working for them, you just continue them on the over-the-counter version versus prescribing the prescription version?

A The reverse is usually the case in that patients don't start on over-the-counter and come and say should I start on it. They usually come with a symptom. They go I have this symptom, and then we



prescribe something, then they stay on that. And they're more like- -- they're more hesitant to switch to something else because it's working.

Q Okay. Do you find at all that there's crossover between over-the-counter use of these types of medications versus prescription?

MS. CANAAN: Objection.

A So for the same reasons that drives all of our psyches, if you will, it's very difficult. If you're doing well on a medication, it's really -- individuals have a hard time switching to something else with that uncertainty of am I going to do well.

Again just looking at the prescription and over-the-counter issue that you're highlighting, patient would rather be on prescription than over-the-counter. They're less likely to want to switch between them because they feel if they're doing well, why should I switch because now I'm afraid I may not do well on that.

Q Are there certain conditions where you -- I'll strike that.

You indicated in the past that you've prescribed Zantac or other H2RAs to your patients, correct?

A Yes.

Q Okay. And you've also prescribed PPIs to your



patients as well, right?

A Correct.

Q Are there certain conditions in which you are more likely to prescribe an H2RA over a PPI?

A So depending on if I'm doing step-up or step-down therapy like I was talking about. So it's not necessarily a situation. It's more driven by a patient comes in with heartburn, you may want to put them on a PPI, step them down to H2.

So there are times -- for example, I highlighted Zollinger-Ellison syndrome where patients we know have significant acid reflux, so you don't want to go there with an H2 receptor antagonist. What you want to do is actually start with a PPI and stay the course with a PPI. So if I understand your question right, that's the group that you wouldn't switch.

And then the other group, normally if you start with an H2 receptor antagonist and they're doing well, no reason to switch. If you start with a PPI, they're doing well, then you could switch to an H2 receptor antagonist to see if they'll equally do well.

Am I answering your question?

Q As a general proposition, would you agree that PPIs are more efficacious than H2RAs?

A They are --



MS. CANAAN: Objection, form.

A They are more efficacious in healing esophagitis. That has been shown. But more efficacious depends on the patient presentation, so, you know, if you have -- again going back to phenotyping, if you have a mild disease, you equally do well with a PPI, then an H2 receptor antagonist.

But if you have severe disease such as severe esophagitis, peptic ulcer disease that's severe, Zollinger-Ellison syndrome, you're bleeding in the stomach because of an active bleed, then that's where PPIs would be more effective.

Q Did you -- during the time frame that you prescribed Zantac to your patients, did it ever carry a warning that it contained a carcinogen?

MS. CANAAN: Objection, form.

A Not that I recall.

Q Did it ever contain a warning -- strike that.

During the time frame that you prescribed Zantac to your patients, did it ever carry a warning that it could cause cancer?

MS. CANAAN: Objection, form.

A No.

Q During the time that you prescribed Zantac to your patients, did it ever carry a warning that it

should be refrigerated?

MS. CANAAN: Objection, form.

A No.

Q During the time that you prescribed Zantac to your patients, did it ever carry a warning that it should be taken with Vitamin C or Vitamin E?

MS. CANAAN: Objection, form.

A Not that I know.

Q During the time that you prescribed Zantac to your patients, did it ever carry a warning that it could form a carcinogen if it was stored in the bathroom?

MS. CANAAN: Objection, form.

A Not that I know of.

Q Okay. Now, when you prescribe medications to your patients, is it fair to say that you conduct a risk benefit analysis? And when I say "risk benefit analysis," I mean that you weigh the risks of the medication versus the benefits of the medication before you prescribe it.

A Yes. That's -- that's what we do in clinical practice, yes.

Q And if Zantac had carried any of the warnings that I just asked you about, is that information that you would have factored into your risk benefit analysis when prescribing it to your patients?



MS. CANAAN: Objection, form.

A If that information was on the label based on accurate and consistent data that then the FDA would have required the company to do, that would have weighed in, yes.

Q Do you generally rely on the accuracy of the data that's contained in the label of the medications that you prescribe?

A Not solely the label because you -- obviously they outline -- there's clinical studies, but typically, especially in my area, I know the studies. I know, you know, the studies that have been done with various drugs and their efficacies and side effects, so it is a component, yes, that -- that does inform me. It's a part of what informs me, yes.

Q So do you assume that the information that's contained in the label that's provided by the manufacturer is accurate and complete when you're prescribing medications to your patients?

MS. CANAAN: Objection, form.

A I -- I assume its accuracy, yes. As far as completeness, again, I don't just rely on it. I -- personally I look at -- just like I do with anything else, I'm looking at all the studies. I'm looking at side effects. I'm listening to my patients



when I give them drug A, and if everybody comes back with abdominal pain, then I'm wondering, and I'm investigating. So it's a part of it, but not the sole issue.

Q Okay. One second. Bear with me for a second. I'm skipping around a little bit because I want to cover some issues that I didn't get to before we get to the end of your deposition.

So, Doctor, going back to some of the concepts of epidemiology, what is "protopathic bias"? I heard you use that term earlier when responding to one of the questions that I posed.

A Yeah, that's really an important one, especially regarding what I was looking at, to assess whether or not there's a risk with ranitidine and cancer. The reason that's important -- especially a compound like ranitidine, you know, any of the acid suppressive therapies, because the symptoms are so common, right?

So patients present with these vague symptoms or with heartburn or with abdominal pain, nausea, as I outlined before, and oftentimes patients may be put on a PPI or in this case ranitidine, but those symptoms may be from malignancy.

So what happens is that one -- one looks at



epidemiologic studies that did not control for protopathic bias, i.e., the drug was given not necessarily because of -- or was given because of a symptom that was not recognized to be cancer, and that patient is diagnosed with cancer.

And then if you don't control for that and adjust, then what happens is you're going to find an association with drug A and cancer, and that association is really not a good association because it's not valid. The drug was given for symptoms precancer.

And, in fact, if you look at my report, I've outlined it, and several studies that I looked at beautifully outlined how that's -- specifically to the ranitidine studies, the Liu study being one where there's a graph that I've outlined in my report that shows that clearly.

And there is a table at the -- in the middle or towards the end of my report that actually shows that very nicely, that patients sometimes are diagnosed with a disease and they're given a drug, and then later studies suggest an association with that drug and that outcome which is not accurate. It's due to a cancer symptom itself.

Q So how do you account for protopathic bias in a study evaluating risks of cancer?

Page 226

A That -- that's a good question. So there are a couple of ways you can do that. One, you could provide a lag time, right, between the exposure and the outcome. And that -- some studies have done that. So if you look at my report and if you go to -- I forget the page number.

Q Let me ask you a question about that specifically.

When you say apply a lag time, what are you referring to?

A So you're essentially -- so what you're trying to find out is what the time period between the exposure and the outcome was, so if someone is given the drug six months before they develop cancer, then really you don't want to necessarily include that in your analysis, do you, because that is not the appropriate time frame for that.

So what you're trying to do is find out that in -- in any study --

Again looking at page 22 you can see that most of the cancer studies in Liu has shown that if you have one- to two-year lag time, and that's where the association was the highest, so if you ignore that time period, then what you found is that there is no -- the association that was observed goes away with the time

Page 227

period of 1 to 2. And, in fact, there's a nice table as well that shows that.

Q So what is an appropriate lag time to account for protopathic bias in a study assessing the risk of cancer?

A That's variable. Just like each cancer -- I'm sorry. Go ahead.

MS. CANAAN: Go ahead.

A Yeah. That -- that's variable depending on the cancer, just like each cancer is not created the same. There's aggressiveness to them. And also that's really variable, so one can't say one year is it, six months is it, two years is it.

But what is important in epidemiology is to see if applying different lag time affects the outcome, right? So when you -- when you apply that -- again looking at page 22 and figure 4, you see that by applying different lag time, that association actually is reduced. So that tells you that you need to do that because your observation is based on an association that's due to patient's symptom from the cancer, right? And that's very important.

In fact, if you go to the table at the end that I have created -- and that actually brings it out even better if you like tables better than graphs. Let me

Page 228

see --

Q Doctor, before we go there, let me ask you a question. Would you -- are you suggesting that a one-year lag time is inappropriate to reduce the risk of protopathic bias in a study assessing the risk of cancer?

MS. CANAAN: Objection, form.

A Yeah. What I said again isn't the number, right? So each cancer is different. The lag time is going to be different. You want to see what -- what is going on when you apply a lag time, so a 1 to 2 to 3. So on this figure that you're seeing, that 1, 2, 3, that association is going away as you apply the lag time. So that tells you as you're trying to better assess whether the association is from an improper exposure, if you will, because of the cancer -- if that association goes away, then you say all right, I'm doing the better study. What is that better study?

The other way you could do it is by an active comparator. So if you do that active comparator, then you're essentially saying all right, I'm going to control for that as well.

So those are two ways you could really get at is the association you're observing really just due to some of these confounding and biases.

Page 229

Q And, Doctor, when you -- previously we talked about follow-up periods in these studies. What would be an appropriate follow-up period to account for latency periods between exposure and diagnosis of cancer?

MS. CANAAN: Objection to form.

A And that's variable as well, right? So if each cancer is variable in their development, that's going to be variable. But overall, when you look at all the studies that -- in this area of ranitidine and the five cancers, what is important to look at is not only a single study, but all the studies -- and the studies that look at long-term and short-term, more than 10 years, less than 10 years, more than 5 years, less than 5 years.

If a signal emerges that a cancer is more likely to occur after 10 years in these studies, then they would see that risk estimate go up, and they don't see that.

So a specific number would be inappropriate as your oncologist might tell you is that each cancer is different. But it's the pattern that you see with these studies that then lead us to say is there a signal or isn't there a signal.

And in those studies that applied more than 10, less than 10, in ranitidine, there was no risk. There

was no change in the risk estimate, so that's reassuring to me.

Q Okay. And how important is exposure and adequately measuring the exposure in a study to assess the risk?

MS. CANAAN: Objection, form.

A It is -- it is -- again it's part of the epidemiologic studies to assess exposure the best you can, going back to what we discussed about, there is no perfect study design. There is no perfect study in anything, whether it be related to ranitidine or to any other studies. There are always going to be issues, but the best you can with that -- and putting the pattern together.

So is exposure important? Of course. Is outcome important? Of course. All of those are important, but they're pieces of the bigger picture. What is the bigger picture? If I look at long-term versus short-term. I apply lag time. I have confounding by indication. I'm looking at all of those factors, am I seeing a signal? They're all important.

And again if a study looks at an exposure one way and another study looks at it different way, do they come with different conclusions? If everybody comes with the same conclusion looking at it differently with



different population, that's reassuring.

Q Doctor, do you agree with the general proposition that in a study assessing the risk of cancer, the exposure to the agent should be well defined in terms of timing, dose and duration of use?

MS. CANAAN: Objection, form.

A I'm sorry, can you repeat that again?

Q Sure. Do you agree with the general proposition that in a study assessing the risk of cancer, the exposure to the agent should be well defined in terms of timing, dose and duration of use?

MS. CANAAN: Objection, form.

A To the best of the ability of that database and that study, I think that's the key, right? So I -- I remain on -- on this, that there is no perfect study. The best of the ability of the investigators with the tools they have, with the database they have, they should do the best. And then at the end, they should -- you know, apply the limitation. They should discuss their limitations. That's a study.

There is no perfect study. It is not a single factor, but with the best of their ability, they should try to assess exposure and to assess dose and also to assess outcome the best they can.

Q Would you agree that when assessing the risk of



cancer in a study like this, that information about the dose and duration of exposure are essential?

MS. CANAAN: Objection, form.

A So, again, I -- I think you asked the same question, I'm not sure, but they're all important within the database the best they can to assess and to provide as much information as possible.

Q Okay. So looking at this in the context of an example that you've given several times about smoking and cancer, if you're looking at a study, and the exposure -- the smoking history is a month, and it's assessing one month of smoking with everybody in the study and their long-term cancer risk, would you agree that in a situation like that, the exposure would not be adequate to determine the risk?

MS. CANAAN: Objection, form.

A It depends. If the exposure is to high level of smoking short-term, it's like -- you know, that's going to depend. Is it to low level of exposure? It depends on the study, so that's a hypothetical to me, you know.

It's -- each study has its strengths and weaknesses, and you look at all the studies with that in mind, and then you paint the big picture by looking at all the studies, not a single study.



Q So, for example, if you have a study that shows a population of people who smoked for a month, and you assess whether or not those individuals were diagnosed with cancer down the line, and it doesn't show an increased risk, that doesn't necessarily mean that there isn't a risk of cancer from smoking, correct?

A That means there is no risk for that population, depending on the population, depending on the exposure, but that one single study would not be one that I would say I'm going to necessarily use to conclude everything from.

Again going back, it's a constellation of studies. You've got to put all of them together. You look at everything within their limitations, and you come up with that.

And again going to smoking -- you know, with smoking, the signal was really strong, wasn't it? And it didn't matter where you studied, how you studied, the signal was strong. And that gets to the strength of association, so --

Q Let me -- let me ask you a question. Going back to my hypothetical, if you have a situation like I just described, a one month -- a bunch of one-month smokers and it doesn't show an increased risk of cancer, at best that study would tell you that smoking for a

month, one month, doesn't necessarily increase your risk of developing cancer, right?

MS. CANAAN: Objection, form.

BY MS. FINKEN:

Q It's not telling you your risk of developing cancer for smoking more than a month; it's only limited within the confines of the study itself, right?

MS. CANAAN: Objection, form.

A Again, it -- it depends on the dose, but it tells me within the confines of that one single study, that that study did not show that smoking was associated with it, but that would be that one single study.

But then we would look at other studies. We would look at those that use, you know, more than 10 years, less than 10 years, more than -- you know, if they had -- if there were studies that higher exposure, lower exposure. You look at all of that. You put it together. Every single one of them is showing the same thing. One can't then say, well, none of those studies are good.

And -- and even though there's no good studies, that would be the hypothetical, then I'm going to conclude there is an association, when again, lack of an association does not prove the causal link. There is no association. One can't conclude that there is no



effect, therefore, I'm going to say there is still one. That wouldn't make sense.

Q Okay. Doctor, what is "misclassification bias"?

A Yeah. So you're essentially misclassifying the individual. I'll go back to my report. That would be under -- I guess page 14 is where you see that first; is that right? So the individual is misclassified based on exposure versus non-exposure.

Now, there are two types. You have differential and you have non-differential. And I've outlined that in the section on page 14. For example, "recall bias" would be an example of differential misclassification.

For example, in the NDMA dietary studies, when you ask patients about did you take this -- you know, what did you eat, and they're going to recall a certain fact, that's going to be a differential misclassification because they're remembering things and they're remembering it incorrectly, and they're attributing certain diets they may have heard about, read about, so that's going to by default show you a risk that is based on differential misclassification.

Q So if you're looking at a study that's looking at drug exposure and the study does not account for



over-the-counter use of the drug, it's possible that some individuals in the study can be misclassified as non-users who are actually users, correct?

A It depends. It depends on factors, right? So just OTC use, whether or not individuals may have been misclassified in one by itself is only one issue among these epidemiologic studies. You have to look at misclassi- -- misclassification based on other things, indication bias, protopathic bias. Those are going to drive everything toward -- away from the knoll, right? So you're actually going to get false positives.

So in a given study, you have other factors that are driving things away, so one can't just say misclassification. If it's non-differential, it's going to solely be away from the knoll.

When you have that second, you also have in studies -- especially in some of the cohort studies that did multiple grouping, you have this polytomous exposure where it could go in either direction, so it could be either away or towards the knoll, so that could be variable.

You have your active comparator, right? So you need to have an active comparator. In a study that had active comparator, then it really doesn't matter about the over-the-counter use, right? Because that would be



essentially among both of those groups, so . . .

And then you -- you sort of look at some of the studies among the ones I've looked at that actually did not have an opportunity to have OTCs. There are some of those studies among the ones I've listed that when they looked at their database for -- during the time when over-the-counter use was not possible, and those studies showed the same thing. They do not see an association.

So combining those studies where OTC use was not a problem with these studies and all showing the same thing --

And also I've highlighted, there's that Yoon study that if you pull that up, the significance of over-the-counter driving the estimate one way or the other is really highlighted in that study.

And that's a beautiful graph that is very informative in that if the prevalence of the drug use in this case, ranitidine, is low, which it is, 5 percent -- less than 5 percent in most of these databases, then OTC use does not impact the estimate. The best -- it goes from -- let's say 1.5 was one of their examples to 1.48, that is not a significant change.

So there are multiple variables that affect it, and one can't just say what about the OTC. The reason these studies may have not shown effect because they may

have misclassified differential or non-differential, there are too many variables at play here.

Q So going back to my question, though. Would -- when -- in the scenario that I posed where it -- a study does not account for OTC use of a drug, would that be an example of misclassification bias?

MS. CANAAN: Objection, form.

A Again it would be -- it depends on the percentage of ranitidine use. It depends on the percentage of OTC use --

Q And putting -- Doctor, I don't mean to interrupt you, but putting aside the ranitidine studies, I'm just talking about generally.

A Generally.

Q The study is not accounting for OTC use and it's possible that some individuals might be classified as non-users who are actually users, is that an example of misclassification bias?

MS. CANAAN: Objection, form.

A So in that hypothetical --

THE WITNESS: Go ahead.

MS. CANAAN: Objection, form.

A Yeah. So in the hypothetical example --

Again I go back to the ranitidine just because that's really where I put most of my effort in rather



than the hypothetical, so . . .

In the hypothetical example and solely by itself, yes, that would be. But in the studies I've looked at --

Q Thank you. I'm going -- I'm going --

MS. CANAAN: Don't -- don't -- Tracy --

MS. FINKEN: No, no.

MS. CANAAN: No talking.

MS. FINKEN: Eva? Eva, I've let this go on a lot, but I -- really we have to get through this, and I'm not --

BY MS. FINKEN

Q I'm not trying to interrupt you, Doctor, but you answered my question.

MS. CANAAN: But you are interrupting.

MS. FINKEN: You're interrupting me now. You're interrupting me. Let me finish.

BY MS. FINKEN

Q My question was whether that was an example of misclassification bias. You said yes. That was my question. And I need to interrupt you, or otherwise we're going to have to come back another day to finish this deposition and I really --

MS. CANAAN: Well, I mean, we can -- we can come back.



MS. FINKEN: I'm -- I'm creating -- I'm creating a record, Eva, and when I'm done, you can say what you want to say, but if we don't -- if we don't cut off this dialogue of simple questions, we're going to have to come back another day.

BY MS. FINKEN:

Q So I'm not trying to interrupt you, Doctor. I've let you talk as much as you want during this deposition, I have not interrupted you, but I need to cut it shorter, okay?

MS. FINKEN: And, Eva, go -- say whatever you want to say, but that's -- that's where we are.

MS. CANAAN: So, Dr. Vaezi --

First of all, Tracy, you cut him off. You did interrupt him.

Dr. Vaezi, were you finished with your answer or not, or did you have anything else to add?

THE WITNESS: No.

A I mean, the only thing I would add, to keep it short -- again I'm sensitive to the comments. I will -- I will keep it very short. I apologize.

I -- it -- it is -- it is important to note the situation, right? One can't just say in a hypothetical situation. This is about ranitidine, and it's about ranitidine potentially causing cancer. It's about



misclassification within ranitidine studies. And I'm telling you that based on all of the factors, that misclassification would not play a role on the estimate as a whole.

Q Okay. So OTC not being accounted for in a study, just generally, is an example of misclassification bias, true?

MS. CANAAN: Objection, form.

A It is an example of misclassification bias that does not have an impact on the ranitidine hypothesis in the studies.

Q Have you, Dr. Vaezi, ever conducted a study where there was -- where you found an association between an exposure and an outcome even though the study suffered from limitations such as misclassification bias?

MS. CANAAN: One second. Objection, form.

A So I've conducted studies about exposure and outcome with many limitations. And that's the point I was trying to make, that there is no perfect study. There are many. But the question at hand must be does that limitation impact an overall estimate? And in this case, that misclassification would not impact the overall estimate from the studies of ranitidine, and that's the key.

Q I'm going to move to strike your answer as nonresponsive.
My question was have you ever conducted a study where you found an association between an exposure and an outcome even though the study suffered from limitations such as misclassification bias?
MS. CANAAN: Objection, form.
A My answer is the same.
Q So I don't understand your answer, Doctor.
Have you -- have you found an association between an exposure and an outcome in studies that you've conducted where there have been limitations such as misclassification bias?
A I have been --
MS. CANAAN: Objection.
A I've conducted studies on association exposure and outcome that suffer from many limitations.
Q And when you've conducted those studies, have you -- have you ever conducted any that you still found an association despite those limitations?
A Yes, and --
MS. CANAAN: Objection.
Michael, give me a chance to object.
THE WITNESS: Okay.
MS. CANAAN: Objection, form.



A Yes. And that's why -- even my own study that shows an association, you can't necessarily say, oh, my goodness, that study shows an association. You have to take it in the broader sense. What are the limitations? What are other studies showing? Are there other factors that contribute to that?
I'm one -- I personally from clinical perspective would not take any of those studies and take to my patient and say this is causal to that. At the end of the day, we're talking about a causal link. And an association without a cause, i.e., if it's not causal, has no clinical importance, right? Because it's about taking care of patients.
So to me these studies are interesting, i.e., the ones I'm talking about that I may have done, but if they suffer significant limitations, then I wouldn't necessarily say that means it's causal. I would say it has significant limitations. Let's look at other studies. Let's see whether or not one can say it's causal.
Q Okay. Putting aside causal, though, would you look at studies -- let me strike that.
Putting aside whether it's causal -- because we understand that association and causal are two different things, correct?



A Correct.
Q Okay. You'll agree with me on that, right?
Putting aside whether it's causal, would you still conclude -- have you still concluded in a study that suffers from misclassification bias that there is an association between an exposure and an outcome?
MS. CANAAN: Objection, form.
A Yeah. Again I would have to look at my studies to see, and if the study has all of these limitations and at the end one concludes that, one would have to say that there is an association. However, be careful because of these limitations. So that's where studies have to be.
Let's say I have a study -- and again I don't know. It's hypothetical, or if you have a study, I'm happy to review it, that there is an association, and one says there is an association, to be responsible, you have to then put all the limitations and relay the message this has limitations, and it's not causal.
Q And wouldn't you agree, Doctor, that that's why when you have studies that show an association, you then go and you apply such things like the Bradford Hill criteria to all of the evidence to determine whether or not there's a causal link?
MS. CANAAN: Objection, form.



A That would be -- that would be responsible by reviewing all the data and putting it together, not just your own but others as well, and looking at the limitations and seeing whether or not there's any signal.
Q Okay. And, Doctor, you've used the term "reverse causality." When you use the term "reverse causality," are you using that interchangeably with "protopathic bias"?
A Yes.
Q Have you ever conducted a study where you concluded there was an association between an exposure and an outcome even though the study could not properly account for reverse causality?
MS. CANAAN: Objection, form. Objection, form.
A You have to show me the specific study, but, again, I've -- I've conducted many studies that have multiple limitations.
Q Doctor, are you aware of a single ranitidine study that evaluated an exposure to ranitidine more than three years?
MS. CANAAN: Objection, form.
A So again I -- I sort of outlined that maybe this morning. There are studies that look at again the length of time as far as how long patients were

assessed.

There are studies that have looked at exposures at various levels, various duration.

There was a study that looked at at least one year, for example, exposure to the compound. They also looked at high exposure.

There's studies that looked at more than 10 prescription versus less than 10 prescription, and going back to the clinical -- we've got to connect it to clinical -- is patients that require high doses, many years, are chronic patients that need it chronically. Therefore, clinically it makes sense that those studies are high exposure for long time.

Q And that's based on the assumption that if patients fill prescriptions, 10 prescriptions, that they're going to be on it long term; is that correct?

MS. CANAAN: Objection, form.

A It's a -- it's a valid clinical assumption. I see it daily, right? So if I have patients that come in and they need more than 10 prescription, they have chronic disease. They need to be on something chronically, so it -- it is not an assumption that is not based on clinical facts.

MS. FINKEN: How much time do we have on the record?



THE VIDEOGRAPHER: Just a moment. Let me total it up.

MS. CANAAN: Now might be a good time to take another five minutes, Tracy.

THE VIDEOGRAPHER: Five and a half hours, Counsel.

MS. FINKEN: Okay. Let's take a five-minute break.

THE VIDEOGRAPHER: The time is 5:22 p.m. We're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Okay. Everyone's back? Please stand by.

The time is 5:43 p.m., and we're back on the record.

BY MS. FINKEN:

Q Okay, Dr. Vaezi, I just have a few more questions. We're trying -- I'm going try to be relatively brief, but let's try to get through it.

So, Doctor, you agree that there's NDMA in ranitidine, correct?

MS. CANAAN: Objection to form.

A In some -- based on the FDA results, some of the ranitidine tablets had above their cutoff of 96 nanogram. Others did not. Some did. Some did not.



Q Are you aware that the NDMA in ranitidine is variable depending on the conditions it's subjected to?

MS. CANAAN: Objection, form.

A Can you clarify what conditions? I'm sorry.

Q Do you -- do you know that the NDMA in ranitidine increases when ranitidine is subject to heat or humidity?

MS. CANAAN: Objection, form.

A There was a mention of that. I know that in the original Valisure study when they subjected the ranitidine tablets to high heat, it produced high levels of NDMA within their study. So I am aware of that study.

Q Okay. Are you aware that the NDMA in ranitidine can increase just based upon normal storage conditions?

MS. CANAAN: Objection, form.

A I am not aware that in normal conditions it would go up significantly, no.

Q Okay. Are you aware that the NDMA in ranitidine can increase just over a matter of time?

MS. CANAAN: Objection, form.

A I am not aware of that, no.

Q Okay. Would you agree with me, Doctor, that NDMA is mutagenic?



MS. CANAAN: Objection, form.

A So I think this goes back to the original studies with the NDMA in -- in rodents, right? So in those studies, NDMA caused -- at high doses caused liver cancer in rodents at high doses. If by that -- mutagenic you mean that, yes.

Q Okay. Is NDMA clastogenic?

MS. CANAAN: Objection, form.

A I don't understand the question.

Q Is NDMA genotoxic?

MS. CANAAN: Objection, form.

A NDMA at high doses in rodents can cause liver cancer. Again that -- that essentially answers the same question in my mind.

Q Doctor, you had talked previously about the IARC classification of NDMA as a probable human carcinogen. Do you recall that?

A Yes.

Q Okay. When did IARC last undertake a peer review process to classify NDMA?

A I believe -- I have to think back. It may be in my report. I believe it was their '87 class of -- is when their classification came about, if I'm not mistaken.

Q Do you know whether or not IARC has undertaken

a peer review process since 1987 to determine whether or not that's an appropriate classification?

A I don't know that. But what I do know is that the NTP has looked at it more recently, and they land on the same conclusions as the IRAC.

Q When did the NTP last undertake a peer review process to classify NDMA?

A I don't know about the peer review. You're asking about peer review. I don't know that. But I know there was a report in 2021, if I'm not mistaken, but I'm not sure. I have to look that up.

Q Do you know the process by which NTP classifies agents as reasonably anticipated to be human carcinogens?

A I would have to refresh my mind and look at that. I don't recall.

Q Do you know whether or not the NTP undertakes a peer review process to classify agents like NDMA?

A Again, I don't know about the peer review issue, but I'm sure it -- again not knowing specifics, I'm sure they have experts that review the analyses. As far as the peer review component, I don't know.

Q When you refer to the NTP report in 2021, are you referring to the NTP annual report on carcinogens?

A Yes.



Q Okay. Do you -- is it your understanding that when the NTP issues a report annually on carcinogens, that they reevaluate the classifications for those agents each year?

MS. CANAAN: Objection, form.

A I don't know the integral of how they classify, whether it's every year or not, but I know that the last one was in 2020.

Q Okay. So is it your -- strike that.

When the NTP issued their report in 2021, do you know whether or not they undertook an evaluation of NDMA and its carcinogenicity or whether or not they carried over the classification from a peer review conference that had been conducted 20, 30 years ago?

MS. CANAAN: Objection, form.

A So that's a -- if you simplify that question for me, that would be helpful because that was a long question. I lost you in the middle. I'm sorry.

Q Okay. Well, you are relying on the fact that you believe that the NTP issued a report in 2021 categorizing NDMA as reasonably anticipated to be a human carcinogen. You've stated that, correct?

A That is correct.

Q Okay. And is it your understanding or do you -- strike that.



Do you have an understanding as to when the NTP actually issued that classification for NDMA?

A You mean not --

MS. CANAAN: Objection, form.

A Not the report, but the actual -- I -- I have to look at that, but, again, I would be surprised if an organization like NTP has a report out saying that it is, you know, reasonably anticipated in their 2021 report without having looked at the evidence in the -- in the integral, because if they're saying that, the assumption that I'm making, I hope correctly, because it's an agency that's respected, right, that have looked at the evidence up until that report time.

Q Okay. Is it your understanding that the NTP's current classification of NDMA, that it's reasonably anticipated to be a human carcinogen?

MS. CANAAN: Objection, form.

A They stated in there that -- yes, that's correct, that it was reasonably anticipated.

Q And I'm assuming, Doctor, based upon your testimony that you've never done work for the NTP, correct?

A I have not.

Q And you're not a toxicologist, correct?

MS. CANAAN: Objection.



A I'm not a toxicologist. But again within my practice, I assess the toxic effect of various drugs as -- and their clinical efficacy.

Q Have you ever sat on a peer review panel to assess the carcinogenicity of a drug or an agent for purposes of NTP or IRAC or any type of scientific authority?

MS. CANAAN: Objection, form.

A Not IRAC, not NTP. But within my organization, the American Gastroenterologic Association, the American College of Gastroenterologists, there are various committees that I've been a part of that we discuss various factors, so not IRAC nor NTP.

Q Okay. And when you -- you've referred to -- I think you said the -- was it the AGA, the American Gastroenterology Association?

A Yes.

Q Was there another organization that you referred to or was it just the AGA?

A American College of Gastroenterology. Over the past 30 years I've been a part of various committees, yeah.

Q Okay. And those two organizations are not specifically organizations that assess annually carcinogenicity of agents and their risk to the

population, right? They're gastroenterology organizations?
MS. CANAAN: Objection to form.
A Yeah, I would not minimize their importance.
Q Certainly --
A I didn't think you did, but I would highlight that their role to me is highly important because it's the clinical relevance, right? So when one looks at all of these questions about NTP and IRAC and whether or not NDMA is a risk factor in rats, at the end of day as clinicians, we sit back and say what's the evidence in humans.
So, yes, you're right, that I'm not a member of IRAC nor NTP, but it is highly important to me to look at the clinical relevance of any of these.
Q Okay. As a member of the AGA or the ACG, have you ever conducted a peer review panel to assess whether NDMA is carcinogenic in humans?
MS. CANAAN: Objection, form.
A I have not.
Q Have you ever assessed a peer review panel -- strike that.
Have you ever sat on a peer review panel as part of the AGA or ACG that assessed whether or not ranitidine was carcinogenic to humans?



MS. CANAAN: Objection to form.
A I have not.
Q Do you have an understanding, Doctor, one way or the other as to whether or not there's epidemiological evidence of an association between NDMA and human cancer?
A I believe I mentioned this before, that there are the dietary factors that looked at NDMA, and they suffered from a variety of problems, right? So the case control studies and inability for -- you know, the recall biases and what have you, so there are those studies regarding NDMA.
There's the occupational study that looked at, you know, the rubber industry that looked at NDMA and the risk at (Zoom interference). So those are the ones that essentially looked at it.
But going back to -- again those are so far removed -- diet and occupation and airborne from clinical and patients and ranitidine and the epidemiologic evidence for ranitidine, I would say those are too far removed for me to consider them informative.
Q Have you undertaken any investigation into the metab- -- how NDMA is metabolized within the body?
A I have not.
MS. CANAAN: Objection, form.



BY MS. FINKEN:
Q Have you undertaken any investigation into the bioavailability of NDMA within the body?
MS. CANAAN: Objection, form.
A No.
Q You -- you talked a little bit about Bradford Hill earlier. Did you conduct a Bradford Hill analysis relating to whether or not NDMA can cause cancer?
MS. CANAAN: Objection, form.
A And again that's irrelevant to me, and it was irrelevant, and it still is because that's so far removed, right? I was not interested in whether or not if you drink beer, you're going to get cancer.
I was interested in whether or not ranitidine specifically with epidemiologic studies have shown to be associated with the five cancers, so to me that's -- at the end of the day, that's what we're all interested in, and I hope -- at least that's what I'm interested in -- is there evidence clinically, so if it forms -- if it does -- if NDMA results in cancer in the liver at high doses in rats, that is not important to me because at the end of the day is there evidence in humans. So it doesn't inform me because it's irrelevant.
Q Okay. So you did not conduct a Bradford Hill analysis relating to whether or not NDMA can cause human



cancer; is that fair?
MS. CANAAN: Objection to form.
A Again, I -- I -- I relay everything outlined is in the study. I've outlined the dietary studies. I've outlined their limitations. I've outlined how cohort studies following case control studies do not show the impact on NDMA, even though it's so far removed, but then going back to the clinical, going back to what the FDA says about ranitidine. That's where the important -- at least to me the conclusions are.
Q If you had conducted a Bradford Hill analysis regarding the question of whether or not NDMA can cause human cancer, would that have been included in your report?
MS. CANAAN: Objection, form.
A If I had done a what, a metaanalysis?
Q No. If you had conducted a Bradford Hill analysis looking at the question of whether or not NDMA can cause human cancer, would you have included that information in your report?
A If I had done that, I would have included it. Within what I've included, again, are many case control studies and many cohort studies. And the cohort studies in general do not substantiate the case control studies.
If I had done that, again the hypothetical

Page 258

would show that, again, the cohort studies do not confirm what the case control studies do.

At least in the gastric -- in the gastric cancer, for example, there were six cohort studies, five of which did not show an association. And in gastric cancer, there were six studies that were case control, and four of them did, so you notice when you go from case control to cohort, the association goes away, which is really the pattern.

So the answer to your question is I did not perform Bradford Hill on the dietary for the reasons that I outlined. They're too far removed, and they don't answer the question at hand.

Q So just so I'm clear, Doctor, when you're referring to the case control studies and the cohort studies, the six cohort studies that you just referred to, you're talking about the ranitidine studies, correct?

A I'm talking about --

Q Or were you talking about the NDMA studies?

A I'm talking about the dietary studies that actually looked at gastric cancer. So there were six case control, six cohort. Four of the six case control suggested an association. Then when the cohort studies looked at it, five of six said no.

Page 259

So if you look at that hierarchy -- and again WCRF being an authority in here, they hi- -- they provide that hierarchy when it comes to dietary, right? They put more weight on cohort studies.

So if one wanted to go there -- then again I don't know why one would want to go there because it's so far removed from the ranitidine and NDMA hypothesis, but if one wanted to go there, then one can go to the WCRF and say, all right, is there evidence.

And there again looking at the hierarchy, the cohort studies, the evidence is weak at best. The WCRF said essentially that in the gastric, they can't make a conclusion. They didn't have enough data on the other five cancers.

So putting that together, even the authorities, or at least the ones that are experts, are suggesting it's too far removed, and there's not a lot of evidence.

Q So, Doctor, you've referred to the WCRF. You're referring to the World Cancer Research Fund, is that -- or Foundation; is that what it is?

A That's correct.

Q Okay. When was the last time the World Cancer or -- strike that.

When was the last time that the WCRF evaluated the carcinogenicity of NDMA specifically?

Page 260

A That was in 2018.

Q And is it your understanding that the WCRF performed a peer review process to evaluate the carcinogenicity of NDMA and cancer in 2018?

MS. CANAAN: Objection, form.

A I don't know whether it was peer reviewed or not. That part I don't know. But I do know that they are experts at this. This is what they do. And they looked at the five cancers in question that I looked at epidemiologically. And in those five cancers, four of them, they said there are no data at all. And in one they essentially said again, very limited data, and that's the gastric.

Q Doctor, would it surprise you if I told you that you the WCRF has not evaluated whether NDMA causes stomach cancer since 2007?

A Again, I --

MS. CANAAN: Objection, form.

A My answer would be again it's irrelevant based on what I highlighted earlier. It's so far removed from the ranitidine epidemiology and clinical care of patients, so those are irrelevant.

The question is if I give a patient ranitidine, are they at risk for those five cancers. That all falls onto the clinical epidemiology question. Not about

Page 261

diet.

Q Bear with me for a second, I'm going to jump around a little bit.

Doctor, did you ever undertake an analysis to compare the amount of NDMA that was found in ranitidine tablets versus the amount of NDMA that was being measured in the dietary studies?

MS. CANAAN: Objection, form.

A Did I personally take -- do an analysis on those?

Q Yes.

A On -- on a specific tablet, is that what you mean?

Q No. Did you ever undertake an analysis looking at the levels of NDMA found in ranitidine tablets versus the NDMA that was being studied in the dietary studies?

A So I'll answer --

MS. CANAAN: Objection -- objection, form. Sorry.

A And I'm -- I'm -- I'm not quite clear, but I'll give you an answer based on my understanding of what you're asking. I'm sorry, it wasn't clear to me.

So if you're asking me -- me personally looking at the NDMA levels within tablets, the answer is no. If you're asking me are there data? I have looked at

the FDA data regarding the NDMA levels in various ranitidine tablets, so I have looked at that. And I do know that based on those studies, there was a mixed bag, if you will. There were many that were well within their norm, and there were some that were above the 96 nanogram threshold, but, again remembering that 96 nanogram threshold is somewhat of a very conservative estimate.

And that's based on really the studies that were done on -- on 50 percent incidents of cancer in animals and rats, not necessarily in humans, and based on 1 in 100,000 risk of getting cancer at 70-year exposure.

So leaving that aside, they essentially did that analysis, so I did look at that.

Q Okay. Did you -- did you ever look in -- I just want to make sure I'm clear since it -- you said you didn't quite understand my question.

Did you ever compare the nanograms of NDMA in raniti- -- that were found in ranitidine tablets to the nanograms of NDMA that were being studied in the dietary studies?

A Oh. I understand what you're asking.

So looking at the -- the reports, I would say the dietary studies show very high levels of NDMA, and,



for example, beer and hot dog and what have you, so the levels are just astronomical when it comes to that. So if I were to believe that, then when I have a beer, I'm going to get cancer tomorrow. So it's a bit worrisome.

But the levels were much less in the FDA analysis of the ranitidine tablets where, like I said, most fell within that 96 nanogram threshold. And some were slightly higher, and I think I've outlined that in my note. I believe it went up to 800, if I'm not mistaken, on -- on the FDA analysis.

Q Do you know whether or not there are any NDMA dietary studies that are looking at 800 and -- let's just say 800 nanograms of NDMA --

MS. CANAAN: Objection to form.

BY MS. FINKEN:

Q -- risk of cancer?

A We can go to my report because if I'm not mistaken, there were a lot of dietary studies that had much, much higher levels within their studies. Again we would have to pull each one of them out, and I'm happy to review that.

Q Well --

A But within the dietary studies, it listed much higher levels of NDMA.

Q Okay. Do you list the amount of NDMA that's



contained in the dietary studies in your report?

A I -- I believe I provide -- let me see. If we go within the dietary section. I don't see it. I'm having a hard time finding it, but I do know in review of that -- and again I'll have to look at each of those studies -- they all had tables that outlined that, and they were much higher.

There were some studies that were significantly higher. And I'll have to look at the report in its entire- -- my report in its entirety to see if I've listed that or not.

Q Okay. Doctor, your report -- it looks like you start your analysis of -- or your discussion, I should say -- strike that.

It looks like you start your discussion in your report of the dietary NDMA studies on page 52 to page 53. And I don't see anywhere where you quantify the NDMA that's contained in those studies.

Can you take a look at those two pages for me and let me know if I'm missing it?

MS. CANAAN: And, Dr. Vaezi, I think you also discuss NDMA in other parts of your report, so feel free to look through your report to see.

MS. FINKEN: Okay. Thank you for coaching the witness, Eva.



MS. CANAAN: I'm not coaching. I mean, you -- you put on the record that he only discusses it on these pages, and I'm just saying I think he discusses it in other places too.

MS. FINKEN: What I'm saying is on page 52 and 53 he discusses the dietary NDMA studies, and I'm looking for where he quantifies the levels of NDMA that are evaluated in these studies.

And if he doesn't, he doesn't. I just want to make sure I'm not missing it.

A There's page 7 -- sorry, it took me a while. I apologize. It's a long report.

If you go to page 7 at the bottom, it says "in September," so you go down, it says "to put these values in perspective of dietary intake, a recent U.S. study reported a mean dietary NDMA intake of a thousand nanograms a day with a range of 100 to 19,680 nanograms a day (based on a 2,000 kilocalorie diet.)"

And that's what I meant -- I'm sorry that it took me a while to find it -- about the dietary studies are showing such high levels, and again the presumption being that, oh, my goodness, I'm taking 19,000 nanograms a day of NDMA, then everybody should be coming down with cancer with that. So that's what I meant.

Q So other than your comparison with the Zheng

study -- 2021 Zheng study, did you undertake a comparison of the other dietary NDMA studies and the levels therein compared to what has been found in ranitidine tablets?
A Well -- so the question is if the dietary levels are up to 19,000 and the FDA NDMA level says the maximum is 900 in ranitidine, that's the comparator. So to me you have 19,000, nearly 20,000 nanogram in diet versus not even a thousand in the highest dose, remembering the others were either less than 96 or slightly above, so to me that's important.
Q Do you know whether or not the defendants in this case, the manufacturer defendants, your employers, whether or not they found NDMA levels in their testing of their own product that exceeded the levels found by the FDA?
MS. CANAAN: Objection, form, "your employers."
A Yeah, I mean -- I am not their employee, so again I outlined that, and I sort of -- I'm offended that you would say that, to be honest with you, because I'm a physician. I take care of patients. My aim here is to show from a clinical perspective what's relevant. My aim is not anything but that.
I don't know what other's aims might be, but my aim is to show based on my review of the data, clinical



epidemiology, there is no signal. Based on FDA's report, there is no signal.
So they are not my employees [sic], so I'm offended you would say that.
Q I -- I -- I meant in the sense that they are employing you as an expert in this case. Are they not?
A They're not employing me to tell you what they want you to hear. They're employing me for my time. And again if you use the word "employed" in that sense, they're paying me for my time to review the data to tell you what I believe.
If I had reviewed the data and found that there was an association, I would have told them there is an association.
Q Okay.
A So --
Q Going back --
A -- I'm offended a little bit. I just want to let you know that, again I'm highly sensitive about this topic. This is very important because it gets to the core of the matter for me. My time is my time, and it is for my patients and what I do.
Q Okay. And I apologize if I offended you, Doctor.
But going back to my question. Did you look --



do you know whether or not the defendants in this case, their testing -- their NDMA testing of their product revealed higher levels of NDMA than the FDA testing?
MS. CANAAN: Objection, form.
BY MS. FINKEN:
Q Do you know one way or the other?
A Again to me I don't know that, but I can tell you that the FDA looked at this, and there is a range, and that's what one -- that's the most recent, right? That's the most recent based on the right analysis, so I can tell you --
Q So you --
A -- based on the right methodology, the FDA looked and it gave the range, and that's so much less than any diet study that shows ranges up to 20,000.
Q Okay. You understand, though, that the FDA only tested a sampling of products, correct?
MS. CANAAN: Objection, form.
A That is true for any one study. It's always a sampling of a product. It is not everything. It's always a sample.
Q And let me ask you this question because you said that the FDA testing is the most recent testing. Do you know whether or not the manufacturers have done testing since the FDA testing?



A I'm relying on the FDA's reports, not on the manufacturers' report.
Q Okay. Doctor, let's change gears for just a moment.
Going back to some of the publications that you've authored, I noted that you have recently published or been part of a publication for a clinical practice update through the AGA on the evaluation and management of GERD in 2022; is that correct?
A Do you have that up, if you could?
Q We can pull it up, sure. We're going to pull up what's been marked as 6286. And we'll mark this as an exhibit to your deposition.
(Exhibit 6286 was marked for identification.)
BY MS. FINKEN:
Q Doctor, do you see it's a "Clinical Practice Update" published by the AGA and Clinical Gastroenterology and Hepatology dated 2022. There are some authors there, but it also lists "on behalf of the CGIT GERD Consensus Conference Participants."
Do you see that?
A I do.
Q Okay. Did you participant in establishing this clinical practice update and best practice advice?
A I did, I --

MS. CANAAN: Objection. Objection to form.
Sorry.
A I -- again, my name is not up there, but again I forget specifically my role and to what extent I contributed. Normally they put that as the -- you know, the top authors, the ones that have the most significant input. So I would say I forget the specific role I had, but I'm more than happy to comment on anything on this manuscript.
Q All right. So let's pull up what we've marked as Exhibit 6288. And we'll mark this as an exhibit to your deposition.
(Exhibit 6288 was marked for identification.)
BY MS. FINKEN:
Q This is the "CGIT GERD Consensus Conference Participants" that was provided with the publication.
Do you see that?
A I do.
Q And do you see your name listed there?
A Yes, at the bottom.
Q Okay. And it says -- it -- it lists in the top -- in the "CGIT GERD Consensus Conference Participants," your name is listed -- and I believe this is in alphabetical order, Doctor, you happen to be -- end with a V, so you're at the -- the second to the last



name on that list.
Do you see that?
A I do. I'm almost to the end, you're right.
Q Yes. Okay. And if you look at the disclosures that are listed here for the GERD consensus conference participants, down at the bottom there it lists your name and it lists your conflict disclosures as "Ironwood" and "Medtronic" as a consultant.
Do you see that?
A I do.
Q Okay. What type of work are you doing for Ironwood?
A I am currently not doing anything with Ironwood. This was relating to the role of bile reflux and reflux disease and how one suppressing bile might help patients with reflux. I'm currently not doing anything with them. This was in the past.
What year was this report again? I'm sorry.
Q 2022, Doctor.
A Yeah. So there's usually a delay in submission and publication, so, yeah, I submitted it because -- last year and the year before but not this year.
Q Okay. And then what kind of work as a consultant were you doing for Medtronic?
A Yeah. So Medtronic has this device, if you



will, that is measuring different pressures within the esophagus. And what they had asked myself as well as some esophageal experts to do was to look at some of the tracings. They -- they were trying to validate some normative versus abnormal findings within their product. And they were asking me to blindly review. They were trying to see how good experts are at coming down with the diagnosis or not. And that's what I did for them.
Q Okay. And you don't disclose any of the Zantac manufacturer defendants on this disclosure, do you?
A I don't.
MS. CANAAN: Objection, form.
BY MS. FINKEN:
Q Okay. And you don't disclose any of the PPI manufacturer defendants on this disclosure, do you?
MS. CANAAN: Objection, form.
A I don't.
Q And if we can go back to the prior exhibit, Exhibit 6286, which is the clinical practice update, it lists the best practice advice number 3 as "clinicians should emphasize the safety of proton pump inhibitors (PPIs) for the treatment of GERD."
Did I read that accurately?
A Number 3? Yes, that's correct.
Q Okay. And don't you think it would have been



prudent to list that you were acting as an expert in the PPI litigation in the disclosures as part of this conference -- as being part of this conference participant?
MS. CANAAN: Objection, form.
A And again I forget exactly what my role was and in which of these statements. At the time -- normally when it's relevant, I do disclose. I must have felt based on my role that it was not relevant, so again, I forget which part of these advises I was a part of. I'm sorry.
Q Does the AGA require doctors to list and -- and disclose their conflicts?
MS. CANAAN: Objection, form.
A Yeah, so -- yes. The answer is -- I don't know about require, but they ask for the conflicts, yes.
Q Doctor, when did this conference take place that -- strike that.
When -- when did this conference take place that resulted in the best practice advice that was published in this clinical practice update in March of 2022?
MS. CANAAN: Objection, form.
A Good question. Again, it -- it would not have been in person. It would have been probably through

email back and forth. Each -- I believe each of us had a separate section. This has been a while. I can't remember, but each of us had a section. If I'm not mistaken, my role in this -- hopefully I'm not confusing it with another one -- was regarding some testing because right now my focus has been on diagnostic testing, as I highlighted before.

So I can't remember where my role was, but it would have been not in person and via various emails.

Q So looking at the second page of this document where it states methods.

MS. FINKEN: Okay. You can stop right there.

BY MS. FINKEN:

Q It says "This expert review was commissioned jointly by the American Gastroenterologic Association (AGA), Institute Clinical Practice Updates Committee, the AGA Center For GI Innovation and Technology (CGIT), and the AGA Governing Board to provide timely guidance on a topic of high clinical importance to the AGA membership."

Did I read that accurately?

A You do -- you did.

THE WITNESS: Can you scroll up, I'm sorry, on this form, about the 14 advices.

A I want to make sure that -- if I can recall



where my role might be. I'm sorry, it's been a while.

Q So, Doctor, going down to --

A I'm sorry. If I could -- if I may, that's why I wanted to look at this.

As you can see there are -- there are some statements regarding diagnostic testing. I believe my role here was regarding the 24 RPH, or pH testing, if you will, in reflux disease. But go ahead.

Q Okay. So let's go back down to the methods. And at the bottom of that paragraph it indicates that "The topic of this CPU was thoroughly discussed by expert faculty contributors selected by AGA, CGIT, industry representatives and patient advocates at the conference organized and hosted by AGA CGIT."

Do you see that?

A I -- where is that? I'm sorry.

Q The second to last sentence on the paragraph --

MS. CANAAN: It's not on the screen, Tracy. It's not being shown on the screen.

THE WITNESS: I don't --

MS. CANAAN: You're seeing it, but we're not seeing it.

MS. FINKEN: It should be at the very bottom of the "Methods" section.

Can you highlight that?



MS. CANAAN: Yeah. I think that would be easier if we could highlight the sentence.

MS. FINKEN: Yeah, there we go. Thank you.

BY MS. FINKEN:

Q Do you see what I'm -- where I read the topic?

A I do.

Q Okay. And it says that the topic was "thoroughly discussed by expert faculty contributors selected by AGA, CGIT, industry representatives and patient advocates at the conference organized and hosted by AGA CGIT."

Did I read that accurately?

A You did.

Q Then it goes on to say "the content of this expert report was generated, discussed, and voted upon by the expert --" and if you'll turn to the next page "-- faculty contributors at a closed-door meeting at the AGA CGIT conference."

Did I read that accurately?

A You did.

Q Okay. And do you recall attending a closed-door meeting at the AGA CGIT conference where this paper was discussed?

A I really don't. I wonder if they really mean closed door like we're in a closed door. I really don't



-- whether it was virtual. It would have to be virtual if it was during the pandemic, so if this is published -- I'm just going to now speculate. If this was published in 2022, then I don't see how we would have had it in person.

So if closed door -- it could have been that they sent emails and we had virtual. I really don't remember. I have so many things that I do.

Q Did you attend any in-person AGA conferences or meetings in 2021?

A AGA has been virtual for a couple of years. In fact, the last one was three years ago. And this year will be in person, but it's been virtual the entire time.

Q Okay. It goes on to state here at the top in the left-hand corner of this page that "all faculty contributors provided up-to-date declaration of conflicts of interest to ensure credibility of this document, and signed off on the final manuscript, which underwent internal peer review by the AGA Institute Clinical Practice Updates Committee as well as external peer review through standard procedures of Clinical Gastroenterology and Hepatology."

Did I read that accurately?

A You did.

Q And is it fair to say, though, that you did not provide updated disclosures of conflict of interest for purposes of this document because you did not provide disclosures that you were acting as an expert in the PPI litigation, correct?
MS. CANAAN: Objection, form.
A Again if my role there was -- and I believe it to be that -- again I don't remember, but if my role was regarding pH testing, then my conflict would have been accurate in that my role was really about providing about how best to diagnose reflux disease.
So I felt that the most prudent would be on technologies such as the one I outlined about manometry in assessing motility disorders that I outlined, so that's -- that's all I remember about it to be honest with you.
Q Well, Doctor, it indicates here that you were a conference participant, correct?
A And I don't know what it means by that because there was -- so a conference to -- to you might mean that it was in person, but I can't imagine this would have been an in-person conference --
Q Okay. But it also indicates --
A -- during the pandemic.
Q It also indicates that all contributors



provided up-to-date declarations of conflicts of interest to ensure the credibility of this document, correct?
A Right. Relevant to my contribution. Again my contribution, it makes sense, would have been on the diagnostic test based on those 14 things that you outlined.
Q Okay. And it indicates that all faculty contributors signed off on the final manuscript, correct?
A That's correct.
Q Okay. And is -- does it indicate anywhere on this document where it talks about conflict of interest that the faculty contributors only provided conflict of interest where they thought it was pertinent to topics that they contributed to?
MS. CANAAN: Objection, form.
A So, you know, what is the conflict of interest about my contribution to them is where I contributed, so the -- that's all I can say. I don't remember specifically to be honest with you, so I can't give you specifics.
But I can tell you that if my role was in diagnostic testing, which I'm landing on because I believe -- if I recall right, that's correct, but I



don't remember, then that would have been an accurate conflict of interest because I had no role on the statements regarding PPIs, for example.
Q So you wouldn't have signed off on all of the statements that are contained in this best practice update as one of the faculty contributors?
A My main role would have been on making sure that the parts that I contributed to were accurate and valid.
Q So are you suggesting, Doctor, that this publication that was peer reviewed and published by the AGA is incorrect when it states that all faculty contributors signed off on the final manuscript and provided up-to-date declarations of conflicts of interest to ensure the credibility of the document?
MS. CANAAN: Objection, form. Objection, form.
A Yeah. Again, going back to what I said, I provided conflict of interest based on my involvement. This was not an in-person meeting. This couldn't have been in person. This was during COVID. And I provided the conflict of interest based on my involvement.
If I read the statements and provided -- I have no overall disagreement with the statements, and that's probably what they mean, but you would have to ask them.
Q So when it says "best practice advice number 3"



is that "clinicians should emphasize the safety of proton pump inhibitors for the treatment of GERD," you would agree with that statement?
A That has -- that has always been the case.
Q Okay. And do you think that it could be perceived as bias that you are acting as an expert in the PPI litigation on behalf of the manufacturers but you didn't disclose that in this paper?
A If that was --
MS. CANAAN: Objection, form.
Michael, give me a chance to --
THE WITNESS: Yeah, I'm sorry.
A If that was the part I was involved in, you're absolutely right. But that was not the part I was involved in. My part was on the diagnostic tests based on my recollection.
Q Does it state that anywhere in the listing of the conference participants and the disclosures that your part was only based on the diagnostic tests and not the rest of the document?
A Neither does it --
MS. CANAAN: Objection, form.
A Neither does it list anybody else's who are -- who were responsible for different components about who was responsible for which part.

Q Okay. So have you ever participated in -- in the past in -- as part of a consensus conference on issuing guidelines?
A That's --
MS. CANAAN: Objection, form.
A Yeah, you have to be more specific. I don't know what you mean. I'm sorry.
Q Well, for purposes of the AGA, they often provide clinical practice updates, and at times it's based upon a consensus of expert participants, correct?
MS. CANAAN: Objection, form.
A I mean, if you can be more specific, I don't know what you mean by that. This was -- if you're referring to this document and this process, this was not an in-person, and this was about people doing certain segments providing information, if that's what you mean.
Q Okay. What is your understanding of the definition of "consensus"?
A So there are varied processes. There are Delphi processes, for example, that I've been involved with, and I forget who and how many, but -- that would send you a statement, then you would rate them, so I could get that on email. You would rate whether or not you agree or disagree, and that goes -- and everybody



rates it, and then that process becomes a consensus, if you will, among the experts on various statements. And it goes through that.
So if it's an in-person meeting, in the past, what we have done, you would have a meeting. You would discuss certain matters. You would have a back and forth on the topics and the data, and then you would agree or disagree or you would agree to disagree, and then that would go into the updates.
Q Okay.
MS. FINKEN: Let's pull up -- you can take this one down.
MS. CANAAN: Would this be a good time to take a small break since you're changing topics? Take a five-minute break?
MS. FINKEN: If I can finish with this document that I was going to pull up, it would be a great time to take a five-minute break because I'm almost done. But if you need one now, we can take one now.
MS. CANAAN: How -- how long -- how much longer do you think you're going to be? I mean, I can wait five minutes, but if it's going to be a while, then we probably better take one now.
MS. FINKEN: Well, let's -- let's go through this document very quickly, and then we can take a



break, and I can see what -- where I'm at to wrap up.
Can you pull up what we've marked as Exhibit 6324 to this deposition.
(Exhibit 6324 was marked for identification.)
BY MS. FINKEN:
Q Okay. And, Doctor, this is a document -- or a publication from 2018 that's another "AGA Clinical Practice Update" about "extraesophageal symptoms and diseases attributed to GERD: Where is the pendulum Swinging Now?"
And you are listed as an author on this document. Do you see that?
A Yes, uh-huh.
Q Okay. And this also gives best practice advice as well, correct?
A Yes, that's right.
Q Okay. And some of the -- the best practice advice that is given on this document, for example, best practice advice number 3 is "empiric therapy with aggressive acid suppression for 6 to 8 weeks with special focus on the response of the extraesophageal symptoms" and that "can help in assessing association between reflux and extraesophageal symptoms."
Do you see that?



A I do.
Q When you're referring to acid suppression therapy in the context of this document, you're referring to PPIs, correct?
MS. CANAAN: Objection, form.
A I would have to go through -- I would have to go through that specific of the statement to see if we suggested PPIs or other forms. Is it -- can you scroll down to where it talks specifically about --
MS. CANAAN: Doctor -- Dr. Vaezi, you should be able to scroll yourself through the document. You have a Box setup, so you should be able to scroll through it yourself, just to make things easier for you.
THE WITNESS: I don't have a -- I'm trying.
BY MS. FINKEN:
Q Well, if you'd look -- for example, I'll just point your attention to best practice advice number 6, it's -- it's talking about testing, and it says "testing may need to be off or on proton pump inhibitor therapy depending on patients' presenting demographics and symptoms."
Do you see that?
A I do.
Q Okay. Does that help you with whether or not

the -- you were referring to PPI therapy when you were referring to aggressive acid suppression in best practice advice number 3?
A Well, again, I don't --
MS. CANAAN: Objection to form, and -- and, Tracy, I'm sorry, I have to put this on the record.
I mean, he asked to be able to scroll through the document, and I think he should be entitled to scroll through the document. He can't scroll through it. We can quickly go off the record and help him, you know, with the technology so he can scroll through it. I mean --
MS. FINKEN: Actually he didn't ask. You advised him he could, but he didn't ask to scroll through the document.
MS. CANAAN: No, he did --
MS. FINKEN: He is more --
MS. CANAAN: He had asked the technician to scroll down through the document. That's what he did.
MS. FINKEN: He is more than welcome to scroll through the document. I'm not trying to inhibit his ability to scroll through the document.
THE VIDEOGRAPHER: If it helps, I can give him control of the document. He can scroll through what


we're looking at.
THE WITNESS: Yeah. Could you do that?
MS. CANAAN: That would help. I would appreciate that.
THE WITNESS: Yeah, thank you.
THE VIDEOGRAPHER: All right. Doctor, just click on it one time and you should have control.
THE WITNESS: Okay. Thank you.
BY MS. FINKEN:
Q And, Doctor, if I may, you're certainly welcome to continue scrolling, but it might assist you in speeding up the process. On the -- on page 1025 of this document, you're at 1023 right now, there's an algorithm. Do you see that? If you go down a little bit further. There you go, right there.
A Yep, I see it.
Q And it provides the recommended algorithm in figure 1. Do you see that?
A I do.
Q Okay. And it lists PPIs twice a day, six to eight weeks as part of the algorithm. Do you see that?
A I do, yeah. That's helpful. Thank you.
Q Okay. Now, going back to my question. When you were referring to acid suppressive therapy in best practice advice number 3, you were referring to PPIs,


correct?
A That's correct.
Q Okay. Now, looking at the very end of this document where you list the disclosures, under conflicts of interest, it looks like you list no conflicts. If you go to the tail end of the document.
A Right.
Q There you go. It says "Frank Zerbib" -- I don't know if I'm pronouncing that correctly or not, but Frank Z received devices for research -- "received devices for research purpose from Medtronic and Sandhill Scientific. The remaining authors disclosed no conflicts."
Did I read that accurately?
A That is correct, but Vanderbilt is where I work, and I disclosed that Vanderbilt University and DiversiTech joined Colt patent on this mucosal impedance device, so that was our disclosure for the device that was discussed.
Q Okay. And at this point in 2018 you did not disclose that you were doing any expert work on behalf of the PPI manufacturers, correct?
A I -- I was not --
MS. CANAAN: Objection -- sorry. Go ahead.
A Yeah. I wasn't -- again I wasn't at that time,


so remember, these publications come out. There's a delay in this process and when we actually prepare it, so at that time I was not working for them, no.
Q Okay. In 2017 time frame, were you doing any type of speaking on behalf of the PPI manufacturers?
A I have never done speaking on behalf of anybody.
Q Okay. At the time in 2017 -- I apologize because we've had this discussion before. In 2017 and early 2018, at that point in time, were you engaged in any speaking engagements where you were compensated by the PPI manufacturers?
A I -- not that I know of.
MS. CANAAN: Objection, form.
A I can't remember to be honest with you.
Q I'm sorry, I just want to make sure we got your answer because when you --
A I can't remember.
Q One -- one second, Doctor. When we talk over each other, whether it's Eva or me or you, the court reporter can only hear one of us, so I want to make sure that she's getting everything down. So if you can go ahead and answer, that would be helpful.
A Not that I can remember.
MS. FINKEN: Okay. All right. Let's take a

break.

THE VIDEOGRAPHER: The time is 6:43 p.m., and we're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Stand by.

The time is 7:05 p.m., and we're back on the record.

BY MS. FINKEN:

Q Doctor, I just have a quick question about your report that you -- we had talked a little bit about the Bradford Hill analysis that you conducted in your report. And I just wanted to understand if you conducted a Bradford Hill analysis for each of the five cancers that you assessed or did you conduct one Bradford Hill analysis covering all of the cancers?

A So as -- as my report outlines, it was really because of all the issues within -- and again, you don't see an association, right? These clinical studies with ranitidine and the five cancers, there is not an association that's reliable, right? So you essentially have no association based on the graphs that I showed you.

So if you don't have an association, you don't really need to apply the Bradford Hill, but if you do, which I did, you still don't see it in any of the five



cancers that are in the question. In other words, you don't have an association.

You apply Bradford Hill when you find an association. Now you say could it be causal. So the Bradford Hill is not going to be important if you don't have an association. If there's no association, then there's no causality, right? So . . .

Q Okay. So let me just -- quickly I want to mark as exhibits the ranitidine studies that you relied upon in your report and just mark them as exhibits to your deposition, so let's pull up Exhibit 6292.

(Exhibit 6292 was marked for identification.)

BY MS. FINKEN:

Q Okay. And, Doctor, this is the McDowell study that's titled "The effect of medications associated with drug-induced pancreatis on pancreatic cancer risk" that was published in 2021.

Do you see that?

A I do.

Q And is this the McDowell study that you relied upon, the raniti- -- strike that.

Is this the McDowell study that you relied upon in reaching your conclusions about ranitidine's association with pancreatic cancer?

MS. CANAAN: Objection, form.



A Okay. Let me -- I'm sorry. I'm going back to my graph on pancreatic cancer number 1. Just one second.

That's the McDowell study that compared ranitidine versus non-users, yes.

Q Okay. And, Doctor, I'm just -- I'm not going to ask you questions about all these. I just want you to identify them for me.

A I got you, yeah. I'm sorry.

Q Nope, that's okay. I just want you to identify that they're the correct study that you relied upon in your report.

A I see.

Q Okay. So we'll buzz through these pretty quickly.

So let's put up -- so McDowell is marked as 6292 to your deposition.

Let's pull up Exhibit 6302 and mark that.

(Exhibit 6302 was marked for identification.)

BY MS. FINKEN:

Q And, Doctor, this is the Cardwell study titled "Exposure to Ranitidine and Risk of Bladder Cancer: A Nested Case Control Study" that was published in 2021, correct?

A Correct.



Q And this is the same Cardwell study that you rely upon in your report?

MS. CANAAN: Objection, form.

A Correct.

Q Okay. All right. And we'll mark that as Exhibit 6302 to your deposition.

(Exhibit 6304 was marked for identification.)

BY MS. FINKEN:

Q Okay. And then let's pull up what's marked -- what we've marked as 6304 to your deposition. Okay. And this is the Adami study entitled "Ranitidine Use and Risk of Upper Gastroenterology Cancers."

Did I read that accurately?

A Yes.

Q Okay. And is this the same Adami study that you relied upon and that we discussed earlier in your deposition?

THE WITNESS: Can you scroll down on there? I'm sorry. Keep going down, yes, uh-huh. Actually go up a little. Okay.

A Yes.

Q Okay. Were you looking to see whether or not this was the one that had the -- the corrected figure?

A Yes, the figure was incorrect. It was so confusing, right?

Q Yes, I think they corrected it multiple times, but this is the most recently corrected copy from March of 2022. Is this the study that you relied upon in your report?
A Yes.
Q Okay. And we're going to mark this as 6304 to your deposition.
(Exhibit 6305 was marked for identification.)
BY MS. FINKEN:
Q And next let's pull up what we've marked as 6305. Okay. And, Doctor, this -- we're going to mark this as Exhibit 6305 to your deposition. This is the Kantor study entitled "Ranitidine Use and Cancer Risk: Results from the UK Bio Bank" that was published in 2021; is that correct?
A Yes.
Q Okay. And this is the same study that you relied upon in your report?
A Yes.
Q Okay.
MS. FINKEN: You can take that down.
BY MS. FINKEN:
Q And we're going to pull up what we're going to mark as 6306 to your deposition.
(Exhibit 6306 was marked for identification.)



BY MS. FINKEN:
Q Okay. And this is a study by Kim titled "Effect of Ranitidine Intake on the Risk of Gastric Cancer Development." And this was published in 2021.
Do you see that?
A I do.
Q Okay. And is this the same Kim S study that you relied upon in your report?
A Yes.
Q Okay. Not to be confused with the Kim Y study which we'll mark next, okay?
MS. FINKEN: All right. You can take that down.
BY MS. FINKEN:
Q And we're going to pull up what we're going to mark as Exhibit 6307 to your report -- I mean to your deposition.
(Exhibit 6307 was marked for identification.)
BY MS. FINKEN:
Q And this is the Kim Y study from 2021 titled "No association between chronic use of ranitidine compared with omeprazole or famotidine in gastrointestinal malignancies." Is that correct?
A Yes.
Q Okay. And this is the same Kim Y study that



you relied on in your report, correct?
A That's correct.
MS. FINKEN: Okay. And you can take that down.
BY MS. FINKEN:
Q And we're going to pull up what we're going to mark as Exhibit 6308 to your deposition.
(Exhibit 6308 was marked for identification.)
BY MS. FINKEN:
Q And this is the Tan study dated 2018 entitled "Acid suppression medications reduce risk of esophageal adenocarcinoma in Barrett's oesophagus: A nested case control study in U.S. male veterans."
Is that correct?
A Yes.
Q Okay. And is this the same Tan study that you relied upon in your report?
A Yes.
Q Okay. And next we're going to mark Exhibit 6309 to your deposition.
(Exhibit 6309 was marked for identification.)
BY MS. FINKEN:
Q Okay. And this is the Tran study, not to be confused with the Tan study -- the Tran study dated 2018 that's entitled "Proton pump inhibitor and histamine-2 receptor antagonist use and risk of liver cancer in two



population-based studies."
Is that correct?
A Yes.
Q Okay. And that's the same Tran study that you relied upon in your report, correct?
A Yes.
Q Okay. And next we're going to mark as Exhibit 6310 to your deposition the Habel study.
(Exhibit 6310 was marked for identification.)
BY MS. FINKEN:
Q And this is dated 2000 entitled cimetidine -- "Cimetidine Use and Risk of Breast, Prostate and Other Cancers." Is that correct?
A Yes.
Q And that's the same Habel study that you relied upon in your report, correct?
A Yeah.
(Exhibit 6311 was marked for identification.)
BY MS. FINKEN:
Q Okay. And next we're going to mark as Exhibit 6311 to your deposition the Chow study. This is dated 1995 and entitled "The Relation of Gastroesophageal Reflux Disease and Its Treatment to Adenocarcinomas of the Esophagus and Gastric Cardia."
Is that correct?

Page 298

A Yes.
Q Okay. And that's the same study that you relied upon in your report, correct?
A Yes.
Q Okay. And next we're going to mark Exhibit 6312 to your deposition.
(Exhibit 6312 was marked for identification.)
BY MS. FINKEN:
Q And this is the Liu study, correct?
A Yes.
Q And it's entitled "Use of proton pump inhibitors and histamine-2 receptor antagonists and risk of gastric cancer in two population-based studies."
Is that correct?
A Yes.
Q And this is the same Liu study that you rely upon in your report, correct?
A Yes.
Q And next we're going to mark Exhibit 6313 to your deposition, and this is the Yoon study.
(Exhibit 6313 was marked for identification.)
BY MS. FINKEN:
Q And it's entitled "Risk of cancer following the use of N-nitrosodimethylamine contaminated ranitidine products: A nationwide cohort study in South Korea."

Page 299

Did I read that accurately?
A Yes.
Q And this study is from 2021, correct?
A Correct.
Q And it's the same Yoon study that you're relying upon in your report, correct?
A Correct.
Q And next we're going to mark as Exhibit 6314 to your deposition the Kumar study.
(Exhibit 6314 was marked for identification.)
BY MS. FINKEN:
Q Okay. And this study is entitled "Ranitidine Use in Gastric Cancer Among Persons with --" H-pylori, or Helicobacter pylori; is that correct?
A Correct.
Q And is this the same Kumar study from 2021 that you relied upon in your report?
A Correct.
Q Okay. And next we're going to mark Exhibit 6315 to your deposition.
(Exhibit 6315 was marked for identification.)
BY MS. FINKEN:
Q And I'm going to butcher this name. It's Mohy-ud-din -- Mohy-ud-din. I believe that's how you pronounce it. And it's a 2020 DDW abstract entitled

Page 300

"Risk of Cancer with Use of Ranitidine: Results of a Cohort Study of 65 million U.S. Adults."
Do you see that?
A I do.
Q Okay. And is this the same abstract that you relied upon in your report?
A Yes.
Q Do you know if that study was ever actually published?
A I am not aware that it's been published.
Q Okay. And next we're going to mark as 6316 to your deposition the Norgaard study. You know, let's skip this one for a minute because I want to sub it out for the final publication. This one is the early publication.
Yeah. Well, what we'll do is we'll sub out the actual publication for this exhibit number, which is 6316, for purposes of the final deposition transcript.
MS. FINKEN: Is that okay, Eva, just for sake of time and just to identify it?
MS. CANAAN: That's fine.
(Exhibit 6316 was marked for identification.)
BY MS. FINKEN:
Q Okay. So the Norgaard study entitled "Ranitidine and Risk of Blacker and Kidney Cancer: A

Page 301

Population-Based Cohort Study" published in 2021.
Is this the Norgaard study that you relied upon in your report?
A Yes.
Q Okay. And we'll provide the final print publication for purposes of this exhibit, 6316.
Let's pull up what we're going to mark as 6317 to your report.
(Exhibit 6317 was marked for identification.)
BY MS. FINKEN:
Q Okay. And this is the Iwagami study entitled "Risk of Cancer in Association With Ranitidine and Nizatidine Versus Other H2 Blockers: Analysis of the Japan Medical Datacenter Claims Database 2005 to 2018."
Is that correct?
A Yes.
Q And this -- this is the same Iwagami study that you relied upon in your report?
A It is.
Q Okay. And, Doctor, I believe that that covers all of the ranitidine specific studies that you relied upon in reaching your conclusions in your expert report; is that correct?
A Did you show Kim Y and Habel? Yes, yep.
Q Okay. I didn't miss any?

A I don't believe so.
Q Okay. I don't believe so either, but I wanted to make sure that you -- that I crosschecked them against your tables, but I wanted to make sure that there wasn't any that I was missing.
Okay. So, Doctor, with that, I'm going to reserve the rest of my time, and I think Ms. Canaan has some questions for you so I thank you for your time.
A Thank you.
MS. CANAAN: Why don't we take maybe like a 10-minute break, and then I'll do my questions, okay?
MS. FINKEN: Yep, no problem.
THE VIDEOGRAPHER: The time is 7:19 p.m., and we're going off the record.
(Break taken.)
THE VIDEOGRAPHER: Everyone set?
Stand by.
The time is 7:35 p.m., and we're back on the record.
CROSS EXAMINATION
BY MS. CANAAN:
Q Good afternoon -- or I should say good evening, Dr. Vaezi.
Dr. Vaezi, I only have a -- a few questions for



you today.
Counsel asked you some questions about whether you applied Bradford Hill criteria to the epidemiological data on NDMA and human cancer. Do you recall that?
A I do.
Q Okay. And what types of epidemiological studies on NDMA and human cancer did you review?
A They're outlined in my report. I looked at the dietary studies. I also looked at the occupational exposure and the Welsar 10 studies (phonetic).
Q Okay. And based on those studies, did you find an association that was not due to chance, bias or confounding?
MS. FINKEN: Objection to form.
A So again I -- I highlighted that about the dietary and the occupational reports and the problems that they have, right? So a lot of case control studies that really rely on a patient to give them an accurate statement about what they ate, how much they ate, when they ate, and those are all problematic.
So I -- I really think that those studies are problematic when it comes to really assessing the risk and the NDMA and what's going on with regards to cancer especially, so there are a lot of biases there.



So I would -- I would be hesitant to draw a direct clinical correlation from those studies regarding especially the ranitidine and cancer outcome that's of interest and was put to me as is there an association.
Q Okay. So did you find an association based on those studies of NDMA in humans that was not due to chance, bias or confounding?
MS. FINKEN: Objection to form.
A Again I didn't. They all suffered from -- especially the dietary and exposure. They suffered from a variety of biases that I outlined.
Q Okay. And counsel asked you some questions about the 2022 AGA clinical practice update.
MS. CANAAN: Maybe we can bring up the document. I think it's Exhibit 6286, if I'm right.
THE VIDEOGRAPHER: 62- what, I'm sorry?
MS. FINKEN: The 2020 one?
MS. CANAAN: 6286.
MS. FINKEN: 2022?
MS. CANAAN: 2022, yeah. Am I right? Is that the one?
MS. FINKEN: 6286, yes.
MS. CANAAN: Can we -- can we scroll to the top so the doctor can see the document, so he can



remember which one it is?
BY MS. CANAAN:
Q So this is the document titled "AGA Clinical Practice Update on the Personalized Approach to the Evaluation and Management of GERD: Expert Review."
Correct?
A Yes.
Q Okay. And do you recall counsel asking you some questions about this -- this document? Do you recall that, Doctor?
A Yes, I was waiting just in case there was an objection. I'm sorry. The wait is -- I'm pausing for that reason. Sorry.
MS. FINKEN: Thank you.
BY MS. CANAAN:
Q Thank you. And, Doctor, the questions related to this document, those questions related to your conflict of interest disclosures, correct?
A That's correct.
Q Okay. And my only question is, Doctor, to your knowledge does this document even mention the word "ranitidine"?
A No, it does not.
Q Okay.
MS. CANAAN: We can take that down.

BY MS. CANAAN:

Q And counsel asked you earlier whether you had ever compared the levels of NDMA in dietary studies to those found in ranitidine product. Do you recall that?

A Yes.

Q Okay. Do you have any opinion as to the accuracy of NDMA levels in those dietary studies?

MS. FINKEN: Objection to form.

A So again just -- just going back to what I mentioned, the issue with those dietary studies is that there's this assumption that I ask a patient -- an individual about their diet, and I can accurately estimate NDMA based on what they tell me, i.e., how much I ate, when I ate, how -- whether or not it was cooked or not, and then to extrapolate from that to the way that I can actually quantitatively assess, based on that information, which may or may not be accurate, to the amount of NDMA.

So that's problematic, right? So those studies are going to be problematic when it comes to quantitation of anything.

Now, I can rely on what the FDA quantitation of the ranitidine tablets are because they actually quantitated that, so that's easier. With the diet, it's hard to do.



So again going back to the question, to me these dietary and the environmental, they're so far removed from the question at hand. You go back to the epidemiology of ranitidine exposure and cancer -- cancer outcome.

So in a real world situation as most of these studies are, right, so they're all about different databases in different countries that use -- looked at ranitidine use in real world, so let's assume they're varied levels as -- again that's the assumption, so in that group, could you then see any risk for cancer.

And the studies -- the epidemiologic studies do not show that ranitidine in a real world situation, again I refer back to the figures, have any association with cancer, especially those five that I've outlined in my report.

Q Thank you, Doctor.

MS. CANAAN: I have no further questions.

MS. FINKEN: Let's just go off the record for one minute. I just need to consult with my colleagues for a second, and then we'll finish up.

THE VIDEOGRAPHER: The time is 7:42 p.m., and we're going off the record.

(Break taken.)

THE VIDEOGRAPHER: Please let know when you're



set to go.

MS. FINKEN: Whenever you're ready.

THE VIDEOGRAPHER: All right. Please stand by. The time is 7:47 p.m., and we're back on the record.

MS. FINKEN: Dr. Vaezi, I thank you for your time. I don't have any further questions today, okay?

THE WITNESS: Thank you. I appreciate it.

MS. FINKEN: Thank you.

MS. CANAAN: Thank you, everyone.

THE VIDEOGRAPHER: That's concludes today's deposition of Dr. Michael Vaezi. The time is 7:47 p.m., and we're going off the record.

MS. FINKEN: Thank you.

(The video-recorded deposition was concluded at 7:47 p.m.)



CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF DUVAL

I, Deanne M. Moore, RMR, CRR, FPR, FPR-C mNotary Public of the State of Florida, certify that MICHAEL ZAEZI, M.D., Ph.D. personally appeared before me on the 12th of May, 2022, and was duly sworn.

Signed this 16th day of May, 2022.

Deanne M. Moore, RMR, CRR, FPR, FPR-C
Notary Public, State of Florida
Commission No: HH11232
Commission Expires: 9/11/2024

Page 310

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY DUVAL

I, Deanne M. Moore, RMR, CRR, FPR, FPR-C certify that I was authorized to and did stenographically report the deposition of MICHAEL ZAEZI, M.D., Ph.D., pages 1 through 308; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 16th day of May, 2022.

Deanne M. Moore, RMR, CRR, FPR, FPR-C

Page 311

WITNESS NOTIFICATION LETTER

May 14, 2022

MICHAEL VAEZI, M.D., Ph.D.
c/o Eva Caanan, Esq.
King & Spalding LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036

In Re: IN RE: Zantac Products Liability Litigation
Deposition taken on May 12, 2022
U.S. Legal Support Job. No. 6144953

The transcript of the above-referenced proceeding has been prepared and is being provided to your office for review by the witness.

We respectfully request that the witness complete their review within 30 days and return the errata sheet to our office at the below address or via e-mail to: southeastproduction@uslegalsupport.com.

Sincerely,
Deanne M. Moore, RMR, CRR
U.S. Legal Support, Inc.
700 East Dania Beach Boulevard
First Floor
Dania Beach, FL 33004
(904) 359-0583

Page 312

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES OF THIS PAGE

IN RE: Zantac Products Liability Litigation
Deposition taken on May 12, 2022
U.S. Legal Support Job. No. 6144953

| Page No. | Line No. | Change | Reason |
|---|---|---|---|
| | | | |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

Date ______ MICHAEL VAEZI, M.D., Ph.D.

**Exhibits**

**EX 6282 Michael Vaezi, M.D., Ph.D. 051222**
10:1,4
**EX 6283 Michael Vaezi, M.D., Ph.D. 051222**
16:14,15 58:4
**EX 6284 Michael Vaezi, M.D., Ph.D. 051222**
22:24 23:1
**EX 6285 Michael Vaezi, M.D., Ph.D. 051222**
16:22,24
**EX 6286 Michael Vaezi, M.D., Ph.D. 051222**
269:14 272:19 304:16
**EX 6288 Michael Vaezi, M.D., Ph.D. 051222**
270:11,13
**EX 6292 Michael Vaezi, M.D., Ph.D. 051222**
291:11,12
**EX 6299 Michael Vaezi, M.D., Ph.D. 051222**
24:23
**EX 6302 Michael Vaezi, M.D., Ph.D. 051222**
292:18,19 293:6
**EX 6304 Michael Vaezi, M.D., Ph.D. 051222**
293:7
**EX 6305 Michael Vaezi, M.D., Ph.D. 051222**
294:8,12
**EX 6306 Michael Vaezi, M.D., Ph.D. 051222**
294:25
**EX 6307 Michael Vaezi, M.D., Ph.D. 051222**
295:16,18
**EX 6308 Michael Vaezi, M.D., Ph.D. 051222**
296:6,7
**EX 6309 Michael Vaezi, M.D., Ph.D. 051222**
296:19,20
**EX 6310 Michael Vaezi, M.D., Ph.D. 051222**
297:8,9
**EX 6311 Michael Vaezi, M.D., Ph.D. 051222**
297:18,21
**EX 6312 Michael Vaezi, M.D., Ph.D. 051222**
298:6,7
**EX 6313 Michael Vaezi, M.D., Ph.D. 051222**
298:19,21
**EX 6314 Michael Vaezi, M.D., Ph.D. 051222**
299:8,10
**EX 6315 Michael Vaezi, M.D., Ph.D. 051222**
299:20,21
**EX 6316 Michael Vaezi, M.D., Ph.D. 051222**
300:22
**EX 6317 Michael Vaezi, M.D., Ph.D. 051222**
301:9
**EX 6324 Michael Vaezi, M.D., Ph.D. 051222**
284:4,5

**(**

**(1)**
58:21
**(2)**
58:24

**0**

**0**
194:14
**04**
195:6
**05**
194:14

**1**

**1**
58:5 82:2 155:10,11, 13,18,21 186:12,19 189:20,24 195:10 199:14 208:21 227:1 228:11,12 262:12 287:18 292:2
**1.1**
189:19 199:13
**1.3**
186:12,18 187:14,25 188:2,11,17, 18
**1.48**
237:21
**1.5**
189:24 237:21
**1.6**
188:8
**10**
29:7,10 86:19 95:10 96:21,22 98:1,16,17, 18 99:15,16, 17,18,21,22 100:7,18 101:23 102:14 103:6,12,23 104:9,10,17, 24 126:12

187:20 189:18,23 190:21 196:24 197:1 199:16 229:13,16, 24,25 234:15 246:8,15,20 303:11
**10-minute** 302:11
**10-prescription** 101:3
**10-year** 99:16,25 100:6 103:13
**100** 183:10 204:15 265:17
**100,000** 262:12
**1023** 287:13
**1025** 287:12
**10:15** 6:8
**11:25** 57:20
**11:44** 57:24
**12:51** 105:6
**12th** 6:8
**130** 124:23
**14** 94:13,24 95:23 96:1 97:23 98:7 235:7,12 274:24 279:6
**14-year** 98:8
**15** 94:13,24 95:23 96:1 126:12
**16** 94:13,24 95:23 96:1
**17** 197:16
**18** 96:22 97:12, 16 98:1
**19,000** 265:22 266:6,8
**19,680** 265:17
**1987** 250:1
**1988** 35:12
**1995** 297:22
**1996** 36:4 99:7
**1:37** 105:11

**2**

**2** 82:2 156:13 208:22 227:1 228:11,12
**2,000** 265:18
**20** 32:23 126:13 135:3,4 140:17 158:16 187:20 189:23 251:14
**20,000** 266:8 268:15
**20/30** 47:15
**200** 46:9
**2000** 297:11
**2005** 36:5,6,22 37:5 301:14
**2007** 260:16
**2008** 99:5,8
**2017** 289:4,8,9
**2018** 108:25 260:1,4 284:8 288:20 289:10 296:9,23 301:14
**2020** 25:3 251:8 299:25 304:18
**2021** 250:10,23 251:10,20 252:8 266:1 277:10 291:17 292:23 294:15 295:4,20 299:3,16 301:1
**2022** 6:8 13:22 16:18 23:6 26:5,10,18 27:2 269:9, 18 271:19 273:22 277:4 294:3 304:14,20,21
**22** 226:20 227:17
**22nd** 26:4,10,18 27:2
**2303** 99:1
**24** 275:7
**24-hour** 161:18 164:20
**25/25** 47:15
**250** 46:9
**28** 97:1
**29** 25:10

**3**

**3** 82:3 156:10, 11 197:16 228:11,12 272:20,24 280:25 284:20 286:3 287:25
**30** 29:3 33:25 47:12 135:5 158:16 187:20 195:5 251:14 253:21
**30/20** 47:12,16
**3:05** 170:10
**3:19** 170:15

## 4

**4**
10:13 155:22 227:17
**40**
46:16 135:5 153:12 195:5
**4:15**
210:4
**4:31**
210:9

## 5

**5**
155:11,15,22 156:13 194:14,17,23 195:1,3,11 229:13,14 237:18,19
**50**
46:16 47:3 153:13 262:10
**50/50**
46:22
**52**
176:3 264:16 265:5
**53**
264:17 265:6
**55**
204:23
**57**
201:5 204:17
**59**
198:8
**5:22**
247:9
**5:43**
247:14

## 6

**6**
155:12,15,22 201:4,5,17 284:21 285:18
**62-**
304:17
**6282**
10:1,4
**6283**
16:14,15 58:4
**6284**
22:24 23:1 35:4
**6285**
16:22,24
**6286**
269:12,14 272:19 304:16,19,23
**6288**
270:11,13
**6292**
291:11,12 292:17
**6299**
24:21,23
**6302**
292:18,19 293:6
**6304**
293:7,10 294:6
**6305**
294:8,11,12
**6306**
294:24,25
**6307**
295:16,18
**6308**
296:6,7
**6309**
296:19,20
**6310**
297:8,9
**6311**
297:18,21
**6312**
298:6,7
**6313**
298:19,21
**6314**
299:8,10
**6315**
299:20,21
**6316**
300:11,18,22 301:6
**6317**
301:7,9
**6324**
284:4,5
**65**
300:2
**6:43**
290:2

## 7

**7**
16:18 155:12,16,25 211:23 265:11,13
**70-year**
262:12
**70s**
44:13
**7:05**
290:6
**7:19**
302:14
**7:35**
302:19
**7:42**
307:22

## 8

**8**
188:8 284:21
**80**
34:11
**800**
263:9,12,13
**80s**
44:14
**83**
35:11,12
**87**
249:22
**88**
35:12

## 9

**9**
19:17
**900**
266:7
**90s**
43:9 213:6
**92**
35:13
**96**
99:4 247:25 262:6,7 263:7 266:10
**98**
213:14
**99.9**
144:24

## A

**a.m.**
6:8 57:20,24
**abdominal**
37:20 64:10 131:18,21,25 143:3 154:10 224:2,21

**ability**
23:25 24:16 175:13 231:13,16,22 286:23
**able**
49:3,10 50:13,14 69:8 89:2 124:20 128:16 129:18,19 199:6 213:23 285:11,12 286:7
**abnormal**
90:20 147:16,17 272:5
**above**
6:3 89:12 152:6,8,22, 24 155:12 156:13,15,16 187:19 189:24 247:24 262:5 266:11
**absent**
200:13
**absolutely**
9:19 182:17 281:14
**abstract**
299:25 300:5
**abundance**
81:9
**academic**
35:24 113:18
**accepts**
91:15
**access**
9:10
**accommodate**
46:25
**accompanied**
23:4
**account**
180:20 183:24 225:24 227:3 229:3 235:25 238:5 245:14
**accounted**
241:5
**accounting**
238:15
**accuracy**
223:6,21 306:7
**accurate**
25:13 54:18 59:6 82:2 124:9,14 223:3,18 225:22 278:10 280:1,8 303:19 306:17
**accurately**
58:15 59:4 212:13 272:23 274:21 276:12,19 277:24 288:14 293:13 299:1 306:12
**accustomed**
31:1
**ACG**
254:16,24
**achlorhydric**
158:8,23 160:25
**achloric**
161:4
**acid**
13:9 39:19, 24 40:3,8, 13,19 41:10, 12,16,17 44:21 113:21 138:10 142:7,12,14 143:11,12, 14,15 144:7, 12,13,17,18, 19,20,23,24 145:3,8,12, 21 146:7,15 147:7,11 151:7,19 152:11 154:9 157:24 158:1 159:20 161:2,6,14 163:21,25 167:5,7,9 220:12 224:17 284:21 285:2 286:2 287:24 296:10
**acid-inducing**
145:12
**acid-peptic**
58:24
**acidic**
155:11,24 156:1 165:5, 6 166:10,17
**acidity**
143:14 144:14 145:9 149:4,15 150:15 151:18 154:20,24 155:3,11,13, 15 157:1 158:11,17 163:20 165:2,14 169:9,10
**acids**
146:8,16
**acidtonic**
158:12
**across**
166:22
178:16 185:5
**act**
31:11 106:9 111:8 129:10
**acted**
105:18 109:20,22
**acting**
107:4 273:1 278:4 281:6
**actions**
84:8
**active**
42:8 172:24 180:23 181:3,4 190:6 191:4, 5,25 192:1, 7,16,22,24, 25 201:24 202:5,7,19, 24 205:11,19 206:24 207:24 208:14 221:11 228:19,20 236:22,23,24
**activity**
115:3
**actual**
102:19,20,22 252:5 300:17
**Adami**
96:22 97:1, 5,15,20 98:12,13,20, 23 99:13 101:12,15 102:12 103:12 104:8 207:1,19 293:11,15
**add**
128:21 240:17,19
**added**
124:14

**additional**
11:5 20:13
**adenocarcinoma**
137:14 138:1,5 296:11
**Adenocarcinomas**
297:24
**adequate**
232:15
**adequately**
230:4
**adjust**
151:2 225:7
**administrative**
31:23 32:3 46:8,12,17, 20 119:25
**Adults**
300:2
**advance**
11:9
**adverse**
64:5 107:10 157:13
**advice**
269:24 272:20 273:20 280:25 284:15,19,20 285:18 286:3 287:25
**advices**
274:24
**advise**
217:17
**advised**
286:14
**advises**
273:10
**advocates**
275:13 276:10
**affect**
154:22 155:4 237:23
**affected**
154:20
**affecting**
145:23
**affects**
149:22 227:15
**affirm**
6:17
**afford**
217:23
**affordability**
216:22,23
**affordable**
217:19
**afraid**
219:18
**Africa**
83:11,20 85:16,22
**afternoon**
302:23
**AGA**
213:14 253:15,19 254:16,24 269:8,17 273:12 274:16,17, 18,20 275:12,14 276:9,11,18, 22 277:9,11, 20 280:12 282:8 284:8 304:14 305:3
**agencies**
65:9 69:23 70:13 74:25 75:4 76:13, 21
**agencies'**
70:6 75:3
**agency**
83:12 84:8 252:12
**agency's**
66:18
**agent**
71:1,6,22,24 83:9 153:15 171:7,15 182:11 231:4,10 253:5
**agents**
40:3,8,16, 17,20 41:22 42:10 43:8, 12,19 44:12, 13,20,22 45:1,10,12, 17 78:8 136:5 144:8 250:13,18 251:4 253:25
**agg-**
190:3
**aggregate**
177:18 178:15,18 179:5,15 180:7 181:22 189:9 190:24 197:4,9 203:11
**aggressive**
141:7,24 142:5,6 284:21 286:2
**aggressiveness**
134:10 227:11
**ago**
14:2,17,22 15:8 17:17 20:8,25 25:16 26:1 108:20 126:12,13 128:5 131:20 139:25 148:24 158:3 176:2 251:14 277:12
**agree**
9:16 38:12 42:21 81:5 85:24,25 159:23 171:13 183:10 184:6 185:20 189:11 192:7 193:7 208:5 209:17 210:18 220:23 231:2,8,25 232:13 244:2,20 247:20 248:24 281:3 282:25 283:8
**ahead**
61:4 79:10 100:3 136:21 150:6 206:7 209:11 227:7,8 238:21 275:8 288:24 289:23
**aim**
266:21,23,25
**aims**
266:24
**air**
77:19
**airborne**
255:18
**Alabama**
35:13
**alarms**
190:11
**alcohol**
55:16 136:8, 13,23

139:13,15,19
**algorithm**
287:14,17,21
**allow**
185:8
**allowed**
128:20
**alphabetical**
270:24
**alteration**
142:18
**alterations**
39:9
**altered**
142:17
**altogether**
115:17
**amazing**
151:1
**amazingly**
88:8
**amenia**
161:5 162:4
**America**
85:22
**American**
253:10,15,20 274:15
**amine**
55:9
**amount**
87:12 90:1 91:4 93:8,24 95:16 98:19 99:12 143:15 144:21,23,24 147:19 150:15 261:5,6 263:25 306:18
**amounts**
89:13,14,15, 18,20,22 147:9
**analogy**
68:3 134:15

185:5 197:19
**analyses**
54:10 76:25 195:8 250:21
**analysis**
75:6 99:15 101:23 104:14 184:9 193:19 204:24 209:23 222:16,17,24 226:15 256:7,25 257:11,18 261:4,9,14 262:15 263:6,10 264:13 268:10 290:11,13,15 301:13
**analyzed**
204:8
**and/or**
11:5 23:16, 17 37:24 40:4 42:9 103:19
**anemia**
154:12 167:25
**anemic**
24:13
**animal**
56:14 62:6, 9,12 63:13, 18,24 64:11 66:2,3 67:2, 3,12 68:13, 24 69:15 70:7 71:17, 23 72:23 73:1,12 75:3,21
**animals**
64:15 66:5, 21,22 67:21,

24 68:4 69:1 71:2,25 72:10 73:13 149:2 262:11
**annual**
250:24
**annually**
251:2 253:24
**answer**
9:15 37:4 51:9 54:1 55:1 62:2,3 65:18 66:2 70:18,24 76:12 79:20 80:14 83:7 85:4,5,7 87:16 92:16 93:16,18,20 96:8 116:12 117:11 119:7 122:6 123:12,15 124:8 127:13 128:19 130:11 132:17 135:9,10 140:10 149:14 150:16,19 152:13 159:2 161:3,8 189:18 191:14 195:21,22 208:15 240:16 242:1,8,9 258:10,13 260:19 261:17,21,24 273:15 289:17,23
**answered**
39:17 69:13, 17 73:6 80:11 81:1,

24 83:22 84:2 91:7 92:21 93:1 96:4 119:20 135:15 140:9 152:20 195:22 209:22 239:14
**answering**
56:7,8,9 93:17 94:20 102:15 137:7 192:17 220:22
**answers**
33:12 82:6 93:3 125:18 249:13
**antacids**
213:3
**antagonist**
44:18,21 45:11 145:16 155:19 157:2 158:6 202:1 214:11,15,17 220:13,18,21 221:7 296:25
**antagonists**
40:14 42:13, 17,19 44:9, 11 45:3 46:1 60:8 63:10 87:10 113:20 144:9 146:1 153:12 155:2 157:12 161:11 172:22 193:1 201:11,24 202:12 205:2,19 213:4 298:12
**anti-hypertensives**
63:11

**antiacids**
45:18
**anticipated**
109:7 250:13 251:21 252:8,16,19
**anxiety**
215:12
**anybody**
9:21 28:18, 21 166:12 281:23 289:7
**anybody's**
162:20
**anymore**
138:11
**anyone**
9:1,18 29:12 31:7 47:22 86:19 112:18 113:8,10 114:25 115:3,24 118:3
**apart**
193:13
**apologies**
110:20 163:1
**apologize**
107:25 141:15 195:22 240:21 265:12 267:23 289:8
**apparent**
52:25
**appearing**
8:11
**appears**
25:12
**apples**
192:5,6 205:16,17
**applied**
34:19 229:24 303:3
**applies**
141:12,13
**apply**
125:14 198:16 199:16 200:6 208:17,20,22 226:9 227:16 228:11,13 230:19 231:19 244:22 290:24 291:3
**applying**
198:22 199:8 208:6 227:15,18
**appointments**
37:1
**appreciably**
149:10
**appreciate**
42:24 209:7 287:4
**appreciated**
149:17
**approach**
21:25 22:18 125:25 214:4,19 305:4
**approached**
108:22 114:17 125:4
**approaches**
213:20 214:18
**approaching**
125:2
**appropriate**
38:7 50:20 52:11 81:17 104:3 112:5 113:11 115:14 126:4 127:20 184:14 188:13 226:16 227:3 229:3 250:2
**appropriately**
8:6
**approval**
31:12 42:2 43:20 50:14 60:11 62:19 63:4,5,7,15 82:15 83:15 125:25 127:16 128:6 173:1
**approvals**
50:11,19
**approved**
42:1,4 43:18,20 51:6 57:3 68:8
**approximate**
27:7 119:12, 16
**approximately**
14:20 25:19
**April**
26:4,10,18 27:2
**archaic**
38:25
**area**
36:14 47:23 128:8 177:13 198:11 223:11 229:9
**areas**
131:24
**Argentina**
32:12 118:13
**argue**
110:25 181:17 186:19 196:14 203:6
**arm**
183:5
**arms**
32:23
**around**
12:8 46:2 68:14 83:4 84:25 141:22 224:6 261:3
**arrive**
208:9 209:20
**article**
22:11,14 128:22 129:11
**articles**
21:21 64:3 87:21 126:18 127:7,9 130:6,9 195:16 202:3
**articulated**
148:16
**artificial**
120:2
**Asia**
40:21 42:4 83:11 85:22
**Asian**
178:6
**asked**
9:6 18:8 58:16 80:11 81:24 83:1, 21 92:21 106:11,14 107:9 108:8 109:16 110:12,14 113:5 115:23 118:15 119:5,19 128:9 135:15 141:15,18 142:25 152:20 207:13 209:10,21 222:23 232:4 272:2 286:7,

18 303:2 304:13 306:2
**asking** 35:7 66:15 69:20 83:24 94:14 101:15 113:20 117:11 122:11 123:13 130:11 139:3 141:20 160:16 165:16 166:6 175:8 177:21 180:4 250:9 261:22,23,25 262:23 272:6 305:8
**aspects** 56:9
**aspirate** 159:13
**assertion** 74:6
**assess** 50:13 76:2 147:14 171:22 172:3,9 178:15 184:13 187:21 188:6 192:10 193:8 194:12 197:12 198:17 199:18,19 205:13 224:14 228:14 230:4,8 231:23,24 232:6 233:3 253:2,5,24 254:17 306:16
**assessed** 97:10 147:13 246:1 254:21,24 290:14
**assesses** 172:2 173:16
**assessing** 74:10 77:12 155:23 171:4,6 172:19 175:17 178:6 180:13 182:20 183:1 199:22 206:18 209:18 227:4 228:5 231:3, 9,25 232:12 278:14 284:23 303:23
**assessment** 49:24 198:1 201:14 203:19 208:2
**assessments** 184:3 195:16
**assign** 100:11
**assigned** 104:19
**assist** 287:11
**assoc-** 197:1
**associa-** 189:12
**associate** 31:24
**associated** 60:14 63:6, 20 64:4 66:4 75:3 79:12, 13 151:21 152:19 185:3,7,12, 16 189:2 191:20 192:9,18 207:21 234:11 256:16 291:15
**associating** 205:24
**association** 58:13 59:1 60:19,22 78:19 90:9 91:2 106:12 176:4,14,19, 20 185:2,17, 18,20,24 186:2,7,9, 11,13,20,21, 23,24 187:15,17,18 188:12 189:7,12 190:18 193:5,17 195:25 196:9,10,12, 17 197:17 198:4,14,23, 25 199:5,9, 18,21,24 200:1,7,14, 22 201:1,3, 18 202:1,8, 13,17 203:1, 22 204:7,20 205:22 208:16,21 225:8,9,21 226:23,25 227:18,20 228:13,15, 16,24 233:20 234:23,24,25 237:8 241:13 242:4,10,16, 20 243:2,3, 11,24 244:6, 11,16,17,21 245:12 253:10,16 255:5 258:5, 8,24 267:13, 14 274:15 284:23 290:18,20, 21,23 291:2, 4,6,24 295:21 301:12 303:13 304:5,6 307:14
**associations** 176:8 196:21
**assume** 15:5,7 20:2, 3 21:2 134:5 196:10,13,16 223:16,21 307:9
**assuming** 20:25 102:16 103:11 121:12 196:19,20 252:20
**assumption** 46:23 103:25 246:14,18,22 252:11 306:11 307:10
**assured** 90:25
**asthma** 142:24
**Astrazeneca** 110:13 114:22 128:5
**astronomical** 263:2
**ate** 141:25 142:1 164:17

303:20,21 306:14
**atrophic** 53:6
**attached** 55:11
**attempt** 49:8
**attempting** 192:19
**attend** 118:5 122:3 277:9
**attending** 276:21
**attention** 285:18
**attorneys** 108:10
**attributed** 284:10
**attributing** 235:21
**Austin** 200:11
**author** 22:13 129:23 203:18 284:12
**author's** 202:10
**authored** 126:5 269:6
**authoritative** 70:2 76:21
**authorities** 65:10,15 67:15 69:5, 10,18,23 70:1 78:15, 20 80:23 259:15
**authority** 83:14 200:4 253:7 259:2
**authors** 130:16 181:8 202:16 204:6,11 269:19 270:6 288:12
**availability** 94:5
**available** 40:20 44:8 55:14 59:10 62:6 65:1 117:5 118:20,22 178:15 217:10
**avoiding** 86:22
**aware** 40:15 51:5 52:5,20 60:17,25 61:5 62:15 65:8 66:18 67:2 73:13 78:13 81:2 108:8,9,16, 17 128:25 129:2 157:13 218:10,11 245:19 248:1,12,14, 18,20,23 300:10

**B**

**babbled** 33:13
**bachelor** 35:10
**back** 24:4 31:3 34:6 35:20 43:19 47:3 57:24 64:19 65:6 66:2 68:24 76:12 78:14 82:14, 16 83:7,16 85:23 89:4 91:17 93:4 100:8 103:5 105:11,16 113:5 121:20,25 124:8 131:1, 5 134:16,25 137:20 140:2 142:14 150:20 155:17,21 156:1 168:6, 8 170:15 187:13 191:3 197:5 201:22 206:21 207:12,13,25 210:9 216:16 221:5 224:1, 9 230:9 233:12,22 235:6 238:3, 24 239:22,25 240:5 246:9 247:12,14 249:2,21 254:11 255:17 257:8 267:17,25 269:5 272:18 274:1 275:9 280:17 283:6 287:23 290:6 292:1 302:19 306:9 307:1, 3,14
**background** 31:16
**backward** 173:12
**bacteria** 133:3 157:17 160:1,20 161:20 162:22 163:3,6,7,8, 11,13,18,19 164:3,7 165:14,25 168:11,15,18 169:3,15 210:15
**bacterial** 157:25 158:9,19 159:2 160:6, 17 161:8,24 162:6
**bad** 107:24 110:20 157:5 187:11
**bag** 190:21 262:3
**balance** 47:1 151:16, 17,18 152:12
**banana** 78:6
**bananas** 119:22
**Bank** 294:14
**Barrett's** 53:9 138:5, 8,9 296:11
**bars** 201:15
**base** 69:19 76:22
**based** 34:21 59:17 61:11 65:18 67:17 74:24 87:16,20 88:16 89:23, 24 98:22 118:21 132:5 136:5 137:7 139:9 171:5 172:10 178:14 187:10 203:15

205:13 215:2 223:2 227:20 235:8,23 236:8 241:2 246:14,23 247:23 248:15 252:20 260:19 261:21 262:3,9,11 265:18 266:25 267:1 268:10,13 273:9 279:6 280:18,21 281:15,19 282:10 290:21 303:12 304:6 306:13,16

**baseline**
92:11

**basic**
155:12

**basing**
69:24 70:4,5 71:18 76:24

**basis**
23:13 76:1 144:8 198:18,21 205:25

**Bates**
19:18,19,21 20:14,21

**bathroom**
222:11

**Bear**
224:5 261:2

**beautiful**
237:16

**beautifully**
207:16 225:13

**beer**
55:16 69:9 78:7 79:13

86:24 169:21 256:13 263:1,3

**begin**
6:14 20:22

**begins**
20:21

**behalf**
8:11,13,17 58:10 106:9 111:8 112:9 113:14,23 114:5,9,12, 21,22,24 116:1,17 118:1,3 119:13 121:15,22 269:19 281:7 288:21 289:5,6

**behind**
32:22

**belated**
111:5

**belief**
23:21

**believe**
10:20 13:8, 10 14:2,4, 17,18,19 17:6,8,13 18:7 25:13 29:7 40:22 42:14 60:5 61:17 62:18 72:8 93:21 105:22 107:10 111:15 113:16 114:13,14 122:9,10 123:18 131:10 141:12 152:23 178:20,21

195:23 198:8 203:13,15 207:20 211:22 249:21,22 251:20 255:7 263:3,9 264:2 267:11 270:23 274:1 275:6 278:7 279:25 299:24 301:20 302:1,2

**bell**
108:25

**below**
90:5,6,8

**benefit**
41:9 58:23 128:16 222:16,24

**benefits**
58:12 115:7 116:18 222:18

**besides**
29:13,16 31:8 59:13 66:21 70:15 72:10 73:1, 12,24 85:13 86:1

**best**
23:25 24:9, 10,16 122:19 130:15 172:13 173:25 180:22 181:5 184:18 230:8,13 231:13,16, 18,22,24 232:6 233:25 237:20 259:11 269:24

272:20 273:20 278:11 280:5,25 284:15,18,19 285:18 286:2 287:24

**better**
36:15 38:24 39:6,15 41:20 45:10 46:2 88:23 89:2 117:17, 23 143:16 145:10 149:19 154:25 155:1 157:3 159:21 172:9 175:15,22 180:4 181:16 183:12,20 184:2 188:9 189:6 190:21 205:5,10,21, 24 206:10, 18,23 207:23 227:25 228:14,17,18 283:23

**bias**
130:17 174:1 175:7 176:13 180:14 188:25 190:7 198:15 208:15 224:10 225:2,24 227:4 228:5 235:4,13 236:9 238:6, 18 239:20 241:7,9,16 242:6,13 244:5 245:9 281:6 303:13 304:8

**biased**
130:25 199:2
**biases**
130:18,22 175:4,13,18, 25 176:23,24 180:13,21 181:13 187:5 190:1 199:3 228:25 255:11 303:25 304:12
**big**
53:25 133:14 139:20 197:9 232:24
**bigger**
115:19 230:17,18
**bile**
40:4 146:7, 16 271:14,15
**bio**
170:2 209:7 294:14
**bioavailability**
256:3
**biological**
65:4,14,19 66:10,13 71:11,14,17 74:5,9,14 77:4 79:25 193:18 197:18
**biologically**
64:24 65:23 73:17,25 74:20 135:22
**bioorganic**
33:2 35:12
**biopsied**
134:23
**biosequestering**
42:10
**biostatistician**
34:4,6
**Birmingham**
35:11
**bit**
31:16 35:14 38:10 46:4 65:15 112:16 131:1 179:8 182:1 194:8 224:6 256:6 261:3 263:4 267:18 287:15 290:10
**black**
201:10 204:25
**Blacker**
300:25
**bladder**
59:3 66:25 70:21 71:6, 7,12 131:23 200:23 201:1,8,18 202:8 203:2, 8,14,23 204:7 292:22
**blank**
9:5
**bleed**
221:11
**bleeding**
38:6 49:19, 20,22 132:13 154:11 221:10
**blinded**
183:4
**blindly**
272:6
**block**
41:14,15 144:12
**blockade**
41:12
**blockades**
41:10
**blocked**
49:7
**blocker**
157:23
**Blockers**
301:13
**blocking**
145:20
**blood**
49:19 132:13 182:23
**blue**
201:12,23 202:4,7,14 203:11 205:20
**BMI**
134:13
**board**
50:15 274:18
**boards**
51:4
**body**
92:6 145:23 148:3 151:1 255:23 256:3
**Boehringer**
114:9
**bold**
198:11
**bond**
194:25
**book**
24:12,14
**bore**
37:3
**Botox**
49:15
**bottles**
45:24
**bottom**
7:14 18:22 19:16 202:21 212:7 265:13 270:20 271:6 275:10,23
**bowel**
48:19,21,23 49:20 131:15 147:9
**Box**
285:12
**Bradford**
193:23 197:11,14,21 198:3,17,22 199:16,23 200:6,10,11, 13,17 207:25 208:2,6,18, 20,22 209:16 244:22 256:6,7,24 257:11,17 258:11 290:11,13, 15,24 291:3, 5 303:3
**brain**
132:6,9,15
**brainer**
176:10
**brand**
44:5
**break**
12:21 47:4 55:2 57:16, 22 102:6 105:2,3,4,8 170:2,12 179:24 185:10 209:6,7,12, 24 210:6 247:8,11 283:14,15,18 284:1 290:1, 4 302:11,16 307:24
**breakdown**
46:6

**breaking**
147:8
**breaks**
146:13
**breast**
173:11
297:12
**brief**
247:19
**briefly**
17:21 19:25
21:1
**bring**
40:22 42:7
68:24 82:13
304:15
**bringing**
163:15
**brings**
152:12
227:24
**broad**
66:1 70:17
75:18 166:8
170:23
**broader**
243:4
**broke**
95:16 98:14
**broken**
201:8
**brought**
105:23
**buckets**
121:25
**bunch**
169:14
233:23
**bureau**
121:2,5,15
123:7
**business**
109:16
**busy**
32:16,17
**butcher**
299:23
**buzz**
292:14

**C**

**calendar**
120:19
**call**
37:25 114:7
143:20
155:25
175:22
212:19
217:24,25
**called**
40:12,18
44:5 48:22
57:11,12
143:19
144:21 145:5
**calls**
215:6,16,18
**Canaan**
8:25 12:17
14:4,6,15,21
15:3,9 18:13
28:17 29:13
37:11 50:22
52:15 57:15
60:24 61:1,4
62:8 65:2,25
67:13 70:16
71:8 72:13
73:19 74:2,
22 75:9,14
76:11 77:2
79:4 80:11
81:4,24
83:6,21 85:8
87:14 90:15
91:6 92:21
93:1 97:18
98:21 102:1,
3,5,9 103:15
105:3 108:9
111:4,10,21
113:4,15
114:23
116:4,6,10,
21 118:2,10
119:3,19
120:6,13,23
121:17,23
122:5 123:1,
10,21 126:7,
21 127:12
128:24
129:14,25
134:2 135:15
136:11 137:2
140:5
148:17,22
149:13,23,25
150:4 152:20
160:3,23
161:21
162:12,24
164:22 166:3
167:13
168:13
169:5,17
170:1,6
171:21
177:5,19
179:22
183:15
185:23 188:5
189:15
192:11
193:10
200:15
201:20
203:25
204:3,14
206:1,13
208:10
209:5,11,21
210:1,24
211:8 216:7
217:21
218:14 219:7
221:1,16,22
222:2,7,12
223:1,20
227:8 228:7
229:5 230:6
231:6,12
232:3,16
234:3,8
238:7,19,22
239:6,8,15,
24 240:13
241:8,17
242:7,15,22,
25 244:7,25
245:15,22
246:17
247:3,22
248:3,8,17,
22 249:1,8,
11 251:5,15
252:4,17,25
253:8 254:3,
19 255:1,25
256:4,9
257:2,15
260:5,18
261:8,18
263:14
264:21 265:1
266:17
268:4,18
270:1
272:12,16
273:5,14,23
275:18,21
276:1 278:6
279:17
280:16
281:10,22
282:5,11
283:13,20
285:5,10
286:5,16,18
287:3 288:24
289:14
291:25 293:3
300:21
302:7,10,22
304:15,19,
21,24 305:2,
15,25 306:1
307:18
**Canaan's**
15:12

**cancer**
49:1,5 51:13,15 52:8,19,20 53:4,13,14, 21 54:15,25 56:15 58:14, 19 59:2,3 60:19,22 61:7 64:23, 25 65:13,24 66:21 67:10, 12 68:5,20 69:15 70:7, 14,15 71:1, 2,3,6,7,12, 13,22,25 72:4,9 73:1, 4,7,18 74:1, 21 75:3,12, 20 76:9,24 77:3 78:7,9 79:2,13,19, 25 80:10,21 88:5 94:25 96:2 97:17 98:8 131:7, 11,12,14,15, 16,23 132:18,19,22 133:5,8,9, 11,14,17 134:7,25 135:5,8,14, 20 137:10, 11,13,14,18, 19,25 138:14,16 139:4,11,14, 19 140:4,14, 24 141:2,7, 8,11 151:12, 22 152:19 154:15,16 171:11 172:13 173:11,12 175:8 176:9 182:7 191:11 198:15 200:23 201:2,8,19 202:8 203:2, 8,14,23 204:7,21 205:15 207:10,12, 15,22 221:21 224:16 225:4,5,8, 22,25 226:14,21 227:5,6,10, 21 228:6,9, 16 229:4,7, 15,20 231:4, 10 232:1,10, 13 233:4,6, 24 234:2,6 240:25 249:5,13 255:6 256:8, 13,20 257:1, 13,19 258:4, 6,22 259:19, 23 260:4,16 262:10,12 263:4,16 265:24 291:16,24 292:2,22 294:13 295:4 296:25 298:13,23 299:13 300:1,25 301:12 303:4,8,24 304:3 307:4, 11,15

**cancers**
59:9 60:15 63:21 66:24 67:4 70:19 72:18,19 73:8,11,15 74:25 76:16 77:9,17 78:4,12,13 89:1,19 132:4 137:15 140:25 141:4 149:1 229:10 256:16 259:14 260:9,10,24 290:14,15,19 291:1 293:12 297:13

**capable**
88:5

**capacity**
111:13

**Carafate**
45:12

**carbon**
55:11

**carcinogen**
53:19,20 65:11 66:10 80:25 133:22,24 136:6,13,14, 23,24 182:6 221:15 222:11 249:17 251:22 252:16

**carcinogenesis**
52:14,17,18, 23 53:21 55:20

**carcinogenic**
136:25 254:18,25

**carcinogenicity**
62:12 63:14 182:11,17 251:12 253:5,25 259:25 260:4

**carcinogens**
137:3,4,6,7 250:14,24 251:2

**carcinoma**
131:20

**Cardia**
297:24

**cardiac**
171:19

**Cardwell**
202:10,15 203:1,16,22 204:6 292:21 293:1

**care**
14:3 30:18 34:20 37:18 38:7,15 40:3 45:15 51:21, 22 52:2,5 113:9 119:25 122:18 134:16,18,19 160:8 172:9 180:12 243:13 260:21 266:21

**career**
113:18

**careful**
176:18,20 194:21 244:11

**carried**
222:22 251:13

**carries**
208:7

**carry**
174:12 209:17 221:14,20,25 222:5,10

**case**
8:12 9:6 10:6 11:12, 16 14:1,16

21:24 22:2 23:5 24:21 25:13,20 26:18 30:15 31:12 36:17 51:1 53:23 54:3,5,8 59:7,13,25 67:3 75:7 78:11 87:11 105:23 106:11,16,20 107:3,13,14, 18,23 108:7 109:15 121:18 127:1,4,5 135:6 139:21 152:23 159:22 163:2 173:6,8,10, 17,20 174:4, 5,6,9,25 175:12 177:3,9 184:12 185:15 186:4 190:18 199:21 208:17 218:22 224:23 237:18 241:23 255:9 257:6,22,24 258:2,6,8, 15,23 266:13 267:6 268:1 281:4 292:23 296:11 303:18 305:11

**cases** 105:18,21 173:12

**CAT** 131:22 132:3

**cat's** 190:21

**categories** 103:9

**categorizing** 251:21

**category** 44:18

**catheter** 39:4

**causal** 59:1 184:9 185:21 188:3 193:8 196:20 198:1 200:2 234:24 243:9,10,12, 17,20,21,23, 24 244:3,19, 24 291:4

**causality** 196:17 197:10,12 245:7,8,14 291:7

**causation** 198:18 199:5,25 208:3

**caused** 171:15,19 249:4

**causing** 68:5 88:5 152:17 207:12 240:25

**caution** 81:10

**caveat** 182:14

**cell** 131:20 144:13

**cells** 41:16 144:10,11,20 145:1,2 161:7

**center** 8:10 40:7 126:24 274:17

**certain** 22:11 55:14 71:1 90:5 116:19 121:9,15 122:14 131:7 132:4 143:18 158:15 162:22 165:8 179:9 182:3 210:23 219:19 220:3 235:17,21 282:16 283:6

**certainly** 254:5 287:10

**CGIT** 269:20 270:15,22 274:17 275:12,14 276:9,11,18, 22

**CH3** 55:10

**chair** 185:9,17

**challenge** 143:5

**challenges** 7:24

**chance** 58:17 150:1 194:13,17, 18,19 198:15 204:1 242:23 281:11 303:13 304:8

**change** 48:8 149:10 164:17 169:14 211:5 215:12 216:12 230:1 237:22 269:3

**changed** 213:13

**changes** 53:11 155:24 164:19 167:21 216:5

**changing** 283:14

**chapter** 24:12

**chapters** 24:14

**characterize** 187:14,16 205:23 206:9

**characterizin g** 206:10,17

**charge** 120:10

**chart** 97:22

**charts** 26:23

**check** 154:8 182:23

**chemically** 211:14

**chemistry** 33:2 35:12

**chemotherapy** 51:23 52:8, 10 53:16

**chemotherapy-induced** 52:4

**chest** 68:17,18 182:24

**chief** 31:24 36:6

**chocolate** 86:25

**Chow**
297:21
**chronic**
53:6 100:19, 20 101:2,3, 13,19 103:3, 7,24 138:7 246:11,21 295:21
**chronically**
103:22 104:1 246:11,22
**chronicity**
101:8 104:19
**chronological**
25:11 34:24
**chunk**
113:6
**cimetidine**
44:14 86:7 192:25 297:11,12
**circles**
85:15
**circumstance**
218:16
**circumstances**
24:9 218:8
**cite**
200:4,10
**city**
36:9
**Claims**
301:14
**clarified**
214:18
**clarify**
59:23 73:21 116:13 164:23 177:20 192:14 199:1 248:4
**clarifying**
30:11
**class**
43:6 44:4,6 56:20 193:2 216:22 217:14 249:22
**classes**
40:16
**classic**
143:2
**classification**
249:16,23 250:2 251:13 252:2,15
**classifications**
251:3
**classified**
133:24 136:13 137:3 173:21 238:16
**classifies**
250:12
**classify**
249:20 250:7,18 251:6
**clastogenic**
249:7
**clear**
12:21 47:20 67:23 73:3 97:14 102:11 116:23 163:1 165:17 199:11,12 200:3 258:14 261:20,22 262:17
**clearly**
189:2 225:16
**Cleveland**
36:3,9
**click**
287:7
**clinic**
32:10 36:4 47:8,11,14, 25
**clinical**
31:21,25 34:1 36:2, 10,13 37:18 38:15,19,20 39:6 40:9 42:12 46:7, 12,16 47:4 58:12 59:20, 22,24 60:1, 3,7,13,16, 18,21 61:5 64:6 68:25 71:19 72:18 78:16 102:18,19 103:1,16,25 122:18 125:18 131:2,5,13 134:16,18 139:13 143:24 152:14 153:6 160:8,13 163:17 183:13 189:13,22 190:8,12 195:18 212:21 214:24 216:2 222:20 223:10 243:7,12 246:9,10,18, 23 253:3 254:8,15 255:19 257:8 260:21,25 266:22,25 269:7,16,17, 24 272:19 273:21 274:16,19 277:21,22 282:9 284:8 290:18 304:2,14 305:3
**clinically**
56:3 58:22 73:8 104:3 141:13 159:1 195:3,6 246:12 256:19
**clinician**
31:20 49:10 51:4 68:18 88:13,23 94:10 102:15 104:23 115:20 139:8
**clinicians**
172:8 254:11 272:20 281:1
**clinics**
47:25 48:1,2
**close**
68:21 180:17
**closed**
180:19 276:25 277:6
**closed-door**
276:17,22
**closely**
26:23 29:25
**closer**
181:13
**co-**
184:3
**co-author**
128:21
**co-carcinogens**
136:9,25
**coaching**
264:24 265:1
**coating**
44:11,20,22, 25 45:12
**coauthored**
126:18

127:7,9
**cocarcinogen** 136:2,3,4
**coffee** 142:2 185:9, 12,16
**cofounders** 197:23
**coherence** 197:18
**cohort** 94:16 97:6 102:20 173:6,15,18, 20 174:3 175:2,15 177:4,9 184:12 186:4 196:8 236:17 257:5,23 258:1,4,8, 15,16,23,24 259:4,11 298:25 300:2 301:1
**cohort/case** 191:21
**cohorts/case** 175:20
**colleagues** 32:22 45:14 53:18 114:17 307:21
**collect** 179:10
**College** 253:11,20
**colon** 37:24 48:21 49:17,22 131:15
**colonoscopies** 37:19
**colonoscopy** 48:20
**Colt** 288:17
**column** 97:5
**combination** 19:10,15 21:9,10,11 32:8,15 103:9 211:23 212:9
**combine** 146:15
**combined** 146:8
**combining** 237:9
**come** 24:6 28:24 38:24 39:1,6 45:16 51:24, 25 53:18 65:12 66:11, 18 71:11 83:16 89:3 91:25 102:5 112:3,19 122:11,15 124:24 130:14 135:19 138:13 139:14 148:9 182:19 190:13 194:5 207:4 218:17,23,24 230:24 233:15 239:22,25 240:5 246:19 289:1
**comes** 9:15 34:9 37:18 38:2 39:24 40:5 87:5 88:14 103:6,17 109:14 120:9 133:17 134:25 151:15 156:1 158:9 167:8 175:19 183:20 186:21 190:7 191:25 194:22 196:2 214:6 217:5, 8 220:8 224:1 230:24 259:3 263:2 303:23 306:20
**comfortable** 89:6
**comment** 150:17 151:8 270:8
**commented** 202:9
**comments** 240:20
**commissioned** 274:14
**commit** 111:3
**Committee** 274:16 277:21
**committees** 253:12,21
**common** 43:24 141:22 142:21 213:25 214:3,19 224:19
**commonly** 45:13 215:5, 25 217:15
**communicate** 9:17
**communication** 9:24
**communications** 14:9
**community** 149:9
**companies** 40:22 42:4, 7,8 82:13,16 83:16 91:18 110:3,15,17 111:14 112:3,12,19 113:3,14 114:1 116:1 117:1 118:1, 8 119:1 120:5 121:16,22 122:4,12,25 123:6,8,20, 25 124:18 125:14,23 126:6,19 127:10,15
**company** 117:7 121:8, 9 124:6 125:11 128:20 129:10 130:15,17 223:4
**comparator** 172:24 180:23 181:3,5 183:1 190:6 191:4,5,25 192:8,16,18, 21,24 197:2 201:24 202:5,7,19, 23,24 205:11,19 206:24 207:24 228:20 236:22,23,24 266:7
**comparators** 192:25

194:19,25 208:14
**compare** 192:4 205:16 206:24 261:5 262:19
**compared** 128:15 201:25 203:24 266:3 292:4 295:22 306:3
**compares** 203:16
**comparing** 191:13 192:5 206:11,12
**comparison** 194:21 195:12 201:9 203:17 265:25 266:2
**comparisons** 195:5
**compensated** 112:23,25 289:11
**competition** 145:7
**complete** 13:18 16:10 24:8 223:18
**completely** 49:7 81:6 108:16 184:19
**completeness** 223:22
**completes** 180:7
**complex** 51:23
**component** 193:14 223:14 250:22
**components** 281:24
**comports** 25:18
**compound** 55:10 63:6 64:8 68:3 218:6 224:17 246:5
**compounds** 55:12 62:18
**computer** 28:24
**computers** 35:20
**concept** 158:19
**concepts** 224:9
**concern** 55:18 56:3 68:4,9,10 81:6,25 88:8,18,20 150:18 151:10,14,23 152:4,14 153:9,11 157:21 158:8
**concerned** 78:22 159:6
**concerns** 54:14 55:20 149:1
**conclude** 188:11,13 233:11 234:23,25 244:4
**concluded** 70:10 84:20 85:11 244:4 245:12
**concludes** 244:10
**conclusion** 59:11 61:11, 20 65:21 66:7 79:1,18 80:9 84:9 184:21 187:7 188:24 202:16,20 203:21 208:9 209:20 230:25 259:13
**conclusions** 59:18,25 61:10,16 62:13 67:16, 17 70:3 75:7 77:1 184:14, 19 195:17 230:24 250:5 257:10 291:23 301:22
**condition** 53:10 57:11, 12 144:21
**conditions** 116:19 162:10,20 164:7,16,18 166:13 167:22 169:15,16 210:14 219:19 220:3 248:2,4,16, 18
**condone** 218:11
**conduct** 21:16 31:21 32:5 75:12 177:14 179:10,14 182:4 191:5 222:15 256:7,24 290:14
**conducted** 13:6,13,19 21:14 22:22 54:19 56:10 60:10 75:6 76:25 87:23 181:20 202:11 241:12,18 242:3,12,16, 18,19 245:11,17 251:14 254:17 257:11,17 290:11,13
**conducting** 177:3,11
**conference** 251:14 269:20 270:15,22 271:5 273:3, 17,19 275:14 276:10,18,22 278:18,20,22 281:18 282:2
**conferences** 277:9
**confidence** 180:3 186:8, 12,18,21 187:22 188:7,8,12, 15,22 189:9, 19,24 199:14 201:16
**confines** 234:7,10
**confirm** 258:2
**confirmed** 176:5
**conflict** 130:13 271:7 278:2,9 279:13,14,18 280:2,18,21 305:18

**conflicts**
129:6,23 130:2,6,9 273:13,16 277:18 279:1 280:14 288:4,5,13
**confounder**
207:11
**confounders**
184:19,25 208:14
**confounding**
159:10 175:5 181:18 183:25 184:13 190:5 191:16 192:2 193:21,22, 24,25 194:2, 4 195:20 196:22 197:24,25 198:16 199:3 228:25 230:20 303:14 304:8
**confuse**
139:1
**confused**
295:10 296:23
**confusing**
274:4 293:25
**congregation**
13:9
**connect**
246:9
**connected**
108:11
**connection**
49:6 108:17
**consensus**
269:20 270:15,22 271:5 282:2, 10,19 283:1
**consequence**
156:24,25 157:3,15
**consequences**
156:20 160:17
**conservative**
262:7
**consider**
18:10,18 32:19 50:10 52:13 61:9, 15 62:5 63:13 64:24 65:22 73:16, 25 75:7 76:9 80:15,17 83:17 109:12,18 208:2 216:25 217:1 255:21
**consideration**
216:21
**considered**
12:13,24 15:17,20,23 16:22 17:4, 11,15,22,23 18:16 30:4 32:18 61:17 77:25 79:5, 14 133:22 136:9,10,12, 24 198:3
**considering**
200:12
**consistency**
193:15,17 197:17 208:7,23,24 209:17
**consistent**
156:17 189:24 196:21 208:19 223:3
**constancy**
39:24
**constant**
132:8
**constellation**
233:12
**consult**
307:20
**consultant**
129:10 271:8,24
**consulting**
109:17,23 110:2,13,15 111:1,12 122:11
**consultings**
111:25
**contacted**
25:19
**contained**
13:15 15:21 59:19 87:12 88:4 124:6 221:15 223:7,17 264:1,18 280:5
**contains**
16:1 59:16 81:3,23 83:5 84:25
**contaminated**
298:24
**content**
276:14
**context**
109:3,4,10 111:23 112:22 114:2 117:13,18,20 121:2 122:8 127:21 128:19 185:1 187:24 197:15 209:15 232:8 285:3
**continue**
39:21 214:12,16 215:15 218:20 287:11
**contribute**
243:6
**contributed**
270:5 279:16,19 280:8
**contribution**
279:4,5,19
**contributors**
275:12 276:8,17 277:17 278:25 279:9,14 280:6,13
**control**
94:1 100:10 128:14 172:18 173:5,6,8, 10,12,17,20 174:1,2,4,5, 13 175:1,12, 13,20 176:5 177:3,9 180:10,11 182:2,4,7 183:20 184:12,18,24 186:4 187:4, 8 189:25 190:5,7 191:16,21,22 192:1 194:1 196:22 197:3 208:15 225:1,6 228:22 255:10 257:6,22,24 258:2,6,8, 15,23 286:25

287:7 292:23 296:12 303:18
**controlled** 60:17
**controlling** 175:25
**convention** 194:13
**converted** 11:20
**convinced** 65:17
**convincing** 66:8
**convincingly** 65:17 95:14
**cooked** 306:14
**coordinator** 40:25 114:15 124:24 125:3 126:2
**copy** 10:23 11:1 15:16 16:17 23:22 294:2
**core** 267:21
**corner** 277:16
**correct** 8:4,12 10:24,25 23:22 25:25 27:21 31:5 33:18 37:6 43:7,8,25 44:1 47:9 50:3,8 56:21,22 57:1 72:7,11 81:3 86:5,6, 11,12,15,16 88:1 98:9 99:8,9 101:12 104:6,11 105:19,20 107:5,6 109:8,9 112:24 121:16 122:10 123:20 124:7 129:7 143:25 144:3 156:4, 5,18 165:22 167:25 169:12,24 170:20,21 171:11,12,20 177:14,15 179:11 182:12,13 192:13 195:8,9,19 202:23 203:19 204:12,13 207:22,24 211:7 217:14 219:23 220:2 233:6 236:3 243:25 244:1 246:16 247:21 251:22,23 252:19,22,24 258:18 259:21 268:17 269:9 272:24 278:5,18 279:3,10,11, 25 282:10 284:16 285:4 288:1,2,15, 22 292:11, 24,25 293:4 294:15 295:23 296:1,2,13 297:2,5,13, 16,25 298:3, 9,14,17 299:3,4,6,7, 14,15,18 301:15,23 305:6,18,19
**corrected** 293:23 294:1,2
**correction** 194:25
**correctly** 7:10 37:10 59:5 74:4 153:21 252:11 288:9
**correlation** 304:2
**cost** 213:7,11,15 217:15
**Costello** 28:19 29:14
**cough** 128:7 142:24
**counsel** 8:21,24 9:20 14:2,10 17:12,14 19:9,10 21:7,11 24:19 25:24 27:17 28:2, 6,7,17 29:6, 7 106:23 107:11 110:19 247:6 303:2 304:13 305:8 306:2
**countries** 82:21 84:5, 10 85:19 133:15 178:2 307:8
**country** 85:13
**counts** 160:6
**couple** 33:15 102:7 226:2 277:11
**course** 8:1 9:17 42:22 87:8, 10 131:13 162:5 163:25 211:24 212:10 214:1,21,24 220:14 230:15,16
**courses** 34:18
**court** 6:10,13,15, 17 7:2 93:4 289:20
**cover** 224:6
**coverage** 215:3 216:24
**covering** 290:15
**covers** 217:7 301:20
**COVID** 106:18 118:18 120:16 121:20 280:20
**COVID-19** 171:19
**CPU** 275:11
**cream** 87:1
**create** 11:21 176:21 215:12
**created** 17:14 103:18 227:10,24
**creates** 143:4 176:15

**creating**
240:1,2
**credentials**
23:23 33:13
**credibility**
277:18 279:2 280:15
**criteria**
193:23 197:12,14,21 198:3,17,22 199:17,23 200:6,13 209:14,16 244:23 303:3
**critical**
193:8,11,12 194:6
**criticized**
179:5 197:6, 7,8
**critique**
122:20 178:11 179:3
**cross**
186:12 199:14 302:21
**crosschecked**
302:3
**crosses**
186:19 189:20
**crossover**
219:5
**Crosstalk**
92:25
**CRR**
6:1
**crux**
209:3
**cup**
49:8 185:9, 11
**current**
39:3 58:11 59:9 115:15 117:15 196:19 198:13 252:15
**curriculum**
10:23 11:2 13:15,17,21 15:16 23:3, 21 24:1
**cut**
240:4,10,14
**cutoff**
90:5,6,8,21 247:24
**CV**
22:24 23:8 24:1,7 27:19 31:24 32:7 33:21 35:1 39:11 110:4 111:3,17 113:17 124:2,7,8,9, 11,19 125:6, 20 126:12
**cytochrome**
165:10

**D**

**daily**
246:19
**Danish**
96:21
**data**
15:20 16:7,9 22:19 58:18 59:9,10,20, 22 61:13,25 62:9 63:16, 18,24,25 64:11 67:2, 19 72:19 74:24 75:3 76:16 78:16, 18,23 79:22 80:1 107:9 173:4 174:1 177:4,12,17 178:5 179:2, 3,11,15,16 180:25 181:22,23 182:12 223:3,7 245:2 259:13 260:11,12 261:25 262:1 266:25 267:10,12 283:7 303:4
**database**
102:21 103:17,18,19 104:6 177:17 178:12,17,18 180:25 181:2,6,21 231:13,17 232:6 237:6 301:14
**databases**
177:13 178:9,11,14 179:9,13,19 207:5 237:19 307:8
**Datacenter**
301:14
**date**
13:18 25:11, 24,25 26:7 99:10
**dated**
16:18 25:3 26:4 269:18 296:9,23 297:11,22
**dates**
26:1
**day**
34:11 46:15 64:18 68:15 89:25 93:3 139:16 158:3,4,5, 13,14 162:20 164:8 190:10 239:22 240:5 243:10 254:10 256:17,22 265:17,18,23 287:20
**day-to-day**
31:16 37:8 131:13
**days**
47:15 212:19
**DDW**
299:25
**dead**
139:25
**Deanne**
6:1,10
**decades**
58:23 115:10
**Decanio**
6:11
**decide**
82:13
**decided**
83:16
**declaration**
277:17
**declarations**
279:1 280:14
**default**
91:22 157:24 193:25 196:9 235:22
**defendant**
106:10,11
**defendants**
8:12,16 12:12 58:11 266:12,13 268:1 272:10,15
**defended**
35:16

**defensive** 141:23 142:5,7 144:25
**define** 89:22,23 99:2 136:4 140:22 194:9 205:9
**defined** 231:4,10
**defining** 99:10
**definitely** 117:12
**definition** 282:19
**definitive** 70:11 78:18, 19 80:24
**definitively** 65:12 66:12, 18 67:21
**degree** 33:8,17 34:24 35:13 52:17 170:19
**degrees** 35:8
**delay** 150:10 271:20 289:2
**Delphi** 282:21
**demand** 48:8
**demographics** 285:21
**demonstrate** 159:24 161:18
**Denmark** 95:8 178:8
**department** 32:2
**departmental** 46:21
**depend** 211:1 232:19
**dependent** 136:19 184:23
**depending** 155:16 162:10 164:12,15,17 167:12,21 169:2,14,19 210:23 211:6 220:5 227:9 233:8 248:2 285:21
**depends** 21:23 22:3, 9,16 31:18 46:10 51:19 52:20 89:12 118:19 134:10,11, 12,13 135:18 137:13 140:19 147:25 152:21 153:4,15 156:23 162:6 165:24 174:25 177:8 182:16 184:22 194:6 196:1 221:4 232:17,20 234:9 236:4 238:8,9
**depiction** 59:6
**depo-** 106:17
**deposition** 6:1,7 7:6, 11,17,25 8:2 9:4,17 10:6, 10 11:9 16:14,22 17:16 22:25 24:22 27:13 28:3,6 29:6, 13,17,20,21 31:9,11 42:16,22 43:3 106:15, 19 107:15,16 108:21 224:8 239:23 240:9 269:13 270:12 284:4 291:11 292:17 293:6,10,17 294:7,12,24 295:17 296:6,19 297:8,21 298:6,20 299:9,20 300:12,18
**depositions** 7:13 30:8, 11,14,25 31:4
**described** 233:23
**describes** 97:6
**design** 33:23 34:9, 14 122:20,21 123:14 126:15 180:8 183:19,25 184:1,2,7, 10,11,24 187:3 188:23 189:9 196:1, 8,9 205:10 207:23 230:10
**designed** 189:25 190:4 194:1 205:5 208:13
**designs** 178:1 184:3 208:8 209:19
**details** 211:10
**determine** 71:23 77:8 94:24 97:17 162:19 171:14 184:8 186:1 207:21 232:15 244:23 250:1
**determines** 171:10
**develop** 134:8 135:14 138:9 140:4, 14,15 226:14
**developed** 96:2 97:17 106:5 140:16,17
**developing** 234:2,5
**development** 229:7 295:4
**develops** 139:19 141:9
**device** 271:25 288:18
**devices** 288:10,11
**Dexilant** 116:19
**diabetic** 63:11
**diagnose** 38:24 39:7, 15 112:13 115:21 117:21 131:7,12 137:10 143:5 278:11
**diagnosed** 53:14 98:8 135:5 225:5,

19 233:3
**diagnosing**
52:1 115:14
**diagnosis**
106:13 229:4 272:8
**diagnostic**
38:23 274:6 275:6 279:6, 24 281:15,19
**dialogue**
240:4
**diarrhea**
64:9
**diet**
175:11 211:6 255:18 261:1 265:18 266:8 268:15 306:12,24
**dietary**
55:19 56:4 77:11,13 79:1,18 80:4,9 175:11 235:15 255:8 257:4 258:11,21 259:3 261:7, 16 262:21,25 263:12,18,23 264:1,3,16 265:6,15,16, 20 266:2,5 303:10,17 304:11 306:3,7,10 307:2
**diets**
235:21
**differ**
43:16
**difference**
176:23
**differences**
117:16 216:8
**different**
28:15 30:7 32:24 36:7 38:3 40:19 41:14,18 42:8 43:11, 17,18 46:10 48:6,7,12 52:25 53:2 56:4,8 57:3 68:3,23 87:12 89:3 108:17 110:3 118:9,15 131:24 135:12,23 137:5 140:8 141:7 143:4, 6 145:18,21, 23,25 147:12 152:1,24,25 154:23 155:23 165:24 167:20,22 168:6 169:14,23 172:7 173:18 177:25 178:1,2,9 179:8 180:6 184:3,20 189:18 192:3 207:4,5 208:8 209:19 215:1,20,24 216:9,11 227:15,18 228:9,10 229:21 230:23,24 231:1 243:24 272:1 281:24 307:7,8
**differential**
235:11,13, 18,23 238:1
**differentials**
34:10 40:17
**differently**
135:22 142:22 230:25
**difficult**
217:3 219:9
**digest**
146:13
**dilations**
49:13
**dimethylamine**
55:8
**dinner**
122:3
**direct**
7:3 304:2
**direction**
236:19
**directions**
46:11
**directly**
78:2 120:9
**director**
31:25 32:3 36:11
**disagree**
204:11 282:25 283:8
**disagreement**
280:23
**disapproving**
51:3
**disclose**
14:9 129:6, 11,23 130:6, 8 272:9,14 273:8,13 281:8 288:21
**disclosed**
288:12,16
**disclosure**
272:10,15 288:18
**disclosures**
271:4,7 273:2 278:2, 4 281:18 288:4 305:18
**disconnect**
71:16 168:4
**discuss**
40:24 54:16 60:6 65:1 77:24 81:18 115:7 116:2, 25 117:3,5, 18 122:25 231:19 253:12 264:22 283:6
**discussed**
37:8 38:10 44:4 51:15 59:14 194:7 230:9 275:11 276:8,15,23 288:19 293:16
**discusses**
265:2,4,6
**discussing**
171:2 193:16
**discussion**
204:10 264:13,15 289:9
**discussions**
31:7
**disease**
38:17 39:16 45:5,9 56:25 101:3 103:3, 21,24 104:25 122:14 141:16,21 142:4,10,18, 19 143:19 153:3 164:21 167:3 171:1, 7,15 172:6 214:7 221:6, 8,9 225:20 246:21 271:15 275:8

278:11
297:23
**diseases**
166:24 167:1
284:10
**disk**
35:20
**disorder**
106:5,7
**disorders**
39:13 49:14
58:24 162:23
278:14
**disregulation**
154:6
**distantly**
108:11
**distracting**
31:2
**Diversitech**
288:17
**divide**
195:9
**division**
31:25
**divisional**
46:21
**divorce**
64:19
**DNA**
53:1
**doctor**
6:15 7:5
16:13 17:1
21:13 24:18
27:13 28:23
30:2 31:15
41:3 46:4
53:19 80:14,
20 84:22
89:6 92:16
95:21 96:17,
24 102:11
105:14,17
109:2 118:25
121:1 123:18
131:1 132:18
138:15 140:2
141:14
146:2,17
150:22
160:15 166:5
168:1 171:13
182:1 185:6
209:1 210:12
224:9 228:2
229:1 231:2
235:3 238:11
239:13 240:7
242:9 244:20
245:6,19
247:20
248:24
249:15
252:20 255:3
258:14
259:18
260:14 261:4
264:12
267:24
269:3,16
270:24
271:19
273:17 275:2
278:17
280:10 284:7
285:10
287:6,10
289:19 290:9
291:14
292:6,21
294:11
301:20 302:6
304:25
305:10,16,20
307:17
**doctors**
45:15 113:10
123:6 273:12
**document**
10:7 12:6,10
17:1 29:23
96:12 274:10
277:19 278:3
279:2,13
280:15
281:20
282:14
283:16,25
284:7,13,19
285:3,11
286:8,9,15,
19,22,23,25
287:13
288:4,6
304:16,25
305:3,9,17,
21
**documents**
10:14,16,18
12:12 13:2
15:22 16:11
18:9,11,15,
19 19:11,18,
24 20:5,13,
16,23 21:5,7
29:16 60:21
**dog**
69:9 169:20
263:1
**dogs**
55:17
**doing**
30:8 32:10
33:25 41:16,
19 42:3
49:13 110:16
112:8 120:16
124:22
127:14
134:22
145:10 151:4
159:15
184:16 189:6
191:12 207:8
212:22
213:11
214:16
215:9,11,14,
21,25
216:10,15,19
219:10,17
220:5,18,20
228:17
271:11,13,
16,24 282:15
288:21 289:4
**don't---**
12:18
**door**
276:25 277:6
**dose**
68:23 69:2
99:21 183:8
187:8,9
193:18
194:2,4
201:13
202:13 203:2
214:22
231:5,11,23
232:2 234:9
266:9
**doses**
56:4 62:17,
23,25 64:4,
14,19 66:3,
16 67:1,2,22
68:5,11
69:2,4
70:11,23
71:18 72:20
73:14 74:23
76:17 151:10
246:10
249:4,5,12
256:21
**dosing**
117:22 152:2
**dots**
201:15
**doubt**
120:24
**draw**
304:1
**drink**
69:9 78:7
86:24 106:3,
6,13 107:23
135:17,24
136:14

139:13 146:21 164:18 169:20 256:13
**drinking** 79:13 134:12 140:20 142:1 163:8 185:9, 11,16
**drinks** 106:4 172:5
**drive** 217:22 236:10
**driven** 220:7
**driver** 217:15
**drives** 219:8
**driving** 193:22 217:22 236:13 237:14
**dropped** 189:4
**drug** 39:25 63:9 88:15 89:14 91:25 92:1 100:11 117:7,19,20 128:2 130:14 172:23,24 182:25 183:1 185:6 190:14 191:19 192:5,8,18 218:2 224:1 225:2,8,10, 20,21 226:13 235:25 236:1 237:17 238:5 253:5
**drug-induced** 291:16
**drugs** 55:25 172:21 192:2 212:25 223:12 253:2
**due** 225:22 227:21 228:24 303:13 304:7
**duodenum** 57:7,10
**duration** 183:22 231:5,11 232:2 246:3
**dying** 133:16
**dyspepsia** 57:11

**E**

**earlier** 68:2 119:24 123:18 124:22 140:6 152:10 224:11 256:7 260:20 293:16 306:2
**early** 23:6 32:8 43:9 46:15 289:10 300:14
**ease** 44:3
**easier** 42:23,24 276:2 285:13 306:24
**easy** 143:6
**eat** 49:11 86:25 142:9 146:18 147:7 148:1, 5 151:3 155:13,16,17 163:7 164:13 165:4,7 167:6,12 169:19,20 235:17
**eaten** 147:19
**eating** 155:14 157:9 167:16
**eats** 46:24 157:10
**ecologic** 174:17
**ecological** 174:15
**Ecology** 174:16
**editing** 128:22
**educate** 114:25 115:19 123:14 133:18
**educate-** 112:8
**educating** 118:11
**education** 23:12 112:13 117:21 133:17
**educational** 23:17 109:18,22 110:3,12 111:1,19 112:9,11,21 113:11 115:4 118:14
**effect** 51:7 62:17, 22 63:1,5,9, 12 136:17,18 137:1 148:13,20 149:11 182:21 208:24 235:1 237:25 253:2 291:15 295:3
**effective** 45:21,25 58:22 115:16 128:7,16 192:8,16 213:7,16,22 221:12
**effects** 60:5 157:6,7 176:22 182:18,22 223:13,25
**efficacies** 223:13
**efficacious** 220:24 221:2,3
**efficacy** 39:25 60:4, 10 128:1 157:8 172:25 173:1 182:20 212:25 218:4 253:3
**effort** 52:5 238:25
**efforts** 40:2
**eight** 287:21
**either** 53:1 92:24 111:12 118:17 129:20 157:1 159:25 161:11 177:23 186:5 236:19,20 266:10 302:2

**electrode**
155:10
**electronic**
10:19 11:24
16:17
**electronicall y**
9:8 12:3
**element**
53:17 193:12
**elements**
179:23
**elevated**
88:9
**eliminated**
144:15
**else's**
281:23
**email**
9:10,13,14,
24 15:7
274:1 282:24
**emails**
274:9 277:7
**emerges**
94:14 229:15
**Emery**
20:2,4
**emphasize**
194:23,24
197:20
272:21 281:1
**emphasized**
197:20
**empiric**
284:20
**employed**
267:9
**employee**
266:18
**employees**
267:3
**employer**
31:13
**employers**
266:13,17
**employing**
267:6,7,8
**emptied**
147:19
**empties**
148:21
**empty**
146:24
147:1,20
148:8
**emptying**
147:12,17
148:10,11,14
149:10,12,22
150:10
**enantiomer**
110:11
**encompassing**
22:18
**end**
19:3 26:14,
15 46:15
61:22 64:18
81:19 82:4
84:9 89:24
125:1 147:1
149:18 154:3
160:10
178:25
190:10 224:8
225:18
227:23
231:18
243:10
244:10
254:10
256:17,22
270:25 271:3
288:3,6
**ended**
106:7 113:17
176:4 213:10
**endogenous**
75:23 88:20
**endogenously**
88:12 92:6
**endoscopic**
50:2
**endoscopicall y**
53:15
**endoscopies**
32:10 37:19
132:2
**endoscopy**
32:3 39:8
47:6,14
48:3,9,13,22
50:1,3
134:23,25
**engage**
115:3,6
117:25
121:21 123:6
**engaged**
38:11,18,20,
22 39:18
40:9 41:25
42:11 113:2
289:10
**engagement**
114:14
**engagements**
112:24
113:14
114:8,11
116:1,17
289:11
**engaging**
114:21
**enroll**
112:6
**ensure**
192:17
277:18 279:2
280:15
**entails**
48:20
**entire**
100:7 277:13
**entire-**
264:10
**entirety**
103:13
264:10
**entitled**
286:8 293:11
294:13
296:9,24
297:11,22
298:11,23
299:12,25
300:24
301:11
**environmental**
174:19 307:2
**enzymes**
183:3
**EPA**
66:14 67:18
75:5 76:15,
25
**epidemi-**
171:17
**epidemiologic**
54:20,23
58:18 59:10
61:12 65:20
78:23 79:22
81:20 89:1,
17 90:9,18
91:1,13,19,
22 92:8,9
94:5,16 95:2
97:10 100:9
157:20
159:7,15,21
172:11
177:24
185:13
191:13 225:1
230:8 236:7
255:20
256:15
307:12
**epidemiologic al**
58:12,25
74:12 90:12
91:4 92:19
93:7,23
94:23 95:22

96:7 171:10, 16 172:15 186:2 255:5 303:4,7
**epidemiologically** 207:16 260:10
**epidemiologists** 174:11
**epidemiology** 33:3,19,24 34:17 36:16, 18 170:19,22 171:14,18 172:2 173:4, 24 185:1 196:19 197:15 224:10 227:14 260:21,25 267:1 307:4
**epithelium** 39:8
**equally** 79:14 80:6, 15 220:21 221:6
**equate** 64:12 68:17
**equation** 189:10
**equivalent** 181:18
**era** 110:10 176:7
**eradication** 133:11
**error** 196:2,3,14
**escape** 42:6
**esomeprazole** 43:14,23 110:11
**esophageal** 39:12 59:2 66:25 70:20 106:3,4 131:14 137:10,11, 13,15 140:24 146:8 272:3 296:10
**esophagitis** 138:6 153:2 221:3,9
**esophagologist** 33:5 37:9
**esophagology** 33:6 37:12, 15 40:2
**esophagoscopy** 48:14
**esophagus** 38:23 48:14, 18 49:6,15, 21 53:7,9,13 142:13 146:15 272:2 297:24
**esophogeal** 33:6 106:5
**essen-** 170:25
**essential** 232:2
**essentially** 26:19 43:15 44:21 58:16 70:9 82:6 90:3 92:11 94:4,6,18 99:20 133:2 141:23 146:6 154:8,16 165:14 170:25 172:8 173:8 174:16 191:6 193:20 226:11 228:21 235:5 237:1 249:13 255:16 259:12 260:12 262:14 290:20
**established** 69:6
**establishing** 269:23
**estimate** 14:24 176:11 178:5 188:14 193:14 201:15 203:15 229:17 230:1 237:14,20 241:3,22,24 262:8 306:13
**estimates** 189:21
**et al** 97:5
**ethical** 182:3,5,8
**Europe** 40:20 83:10, 19
**Eva** 8:25 14:4 28:17 93:2 162:15 239:9 240:2,11 264:25 289:20 300:19
**evaluate** 77:16,23 184:7 260:3
**evaluated** 94:23 95:23 96:7 97:8 177:16 245:20 259:24 260:15 265:8
**evaluating** 38:22 39:25 65:23 179:20 193:8 225:25
**evaluation** 11:11 77:7 251:11 269:8 305:5
**evasive** 111:23
**evening** 302:23
**event** 157:13
**events** 118:9
**eventual** 106:13
**everybody** 8:5 224:1 230:24 232:12 265:23 282:25
**everyone** 105:9 115:2 170:13 213:21,22 214:13 302:17
**Everyone's** 247:12
**evidence** 16:6,8 58:11,13,18, 25 62:3,6 64:22 65:22 66:6,9,17, 20,23 72:5,9 80:3 81:21 82:3,6 85:11 88:17 190:24,25 195:24 196:17 197:10 198:13 207:15

208:19,25 244:23 252:9,13 254:11 255:5,20 256:19,22 259:9,11,17

**ex-**
171:2

**exact**
108:24

**exactly**
11:4 31:17 81:19 102:24 273:6

**EXAMINATION**
7:3 302:21

**examples**
53:3 180:22 237:21

**exceeded**
266:15

**exception**
124:20

**excessive**
144:22

**exchanges**
145:3

**excitement**
176:22

**excluded**
47:7

**excluding**
187:22

**excuse**
70:2,10 111:4

**exhibit**
10:1,4 16:14,15,22, 24 17:2 22:24 23:1 24:23 35:3,4 58:4 269:13, 14 270:11,13 272:18,19 284:4,5 291:11,12 292:18,19 293:6,7 294:8,12,25 295:16,18 296:6,7,19, 20 297:8,9, 18,21 298:6, 7,19,21 299:8,10,20, 21 300:17,22 301:6,9 304:16

**exhibits**
27:24 291:9, 10

**exist**
174:24

**existence**
196:18

**exists**
176:14

**exogenous**
205:15

**exogenously**
88:12

**expand**
88:7

**expect**
27:18,21

**experience**
216:2

**experiment**
197:18

**experimental**
62:5

**experiments**
84:15

**expert**
8:14 10:24 11:15 12:14 13:21 14:16 15:4,11,12, 15,22 16:13 17:3,23 18:2,3 20:17 21:15 22:22 23:5 25:20 30:3,6 31:11 50:7,10 51:1 52:13,16 58:10 59:13, 19 85:21 105:18 106:9 107:4 161:17 267:6 273:1 274:14 275:12 276:8,15,16 278:4 281:6 282:10 288:21 301:22 305:5

**expertise**
14:3 39:22 41:2 107:8, 12 113:11 118:23 119:10 122:2,12,18 123:13 128:8

**experts**
17:24 121:7, 11,13 122:11,15,17 250:21 259:16 260:8 272:3,7 283:2

**explain**
141:16 162:25

**explaining**
154:18

**explains**
90:8

**explanation**
65:19

**expose-**
173:9 193:7

**exposed**
68:15 78:8 95:15 98:12 102:24 135:13,23 140:13,20 174:10

**exposure**
66:16,23 68:16,21 77:19 95:17, 24 96:6 97:8,10 98:19 99:4, 12,20 101:8, 11,17 102:13 135:6 139:10 171:3 172:20 173:13,15 175:4,17 180:13 183:21,22 185:14 186:14 187:7 193:7,8 205:15 226:3,12 228:15 229:4 230:3,4,8, 15,22 231:4, 10,23 232:2, 11,14,17,19 233:9 234:16,17 235:9,25 236:18 241:14,18 242:4,11,16 244:6 245:12,20 246:5,6,13 262:13 292:22 303:11 304:11 307:4

**exposures**
171:5 174:17,18 246:2

**expressed**
87:19

**extend**
46:23 67:24,

25
**extending**
48:6
**extensive**
69:25
**extent**
155:2 270:4
**external**
277:21
**extraesophageal**
115:12
284:9,22,24
**extrapolate**
306:15

F

**face**
87:4
**faced**
190:13
**fact**
9:13 34:15
45:6 66:7
68:7 69:5
76:16 80:2,
16 81:16
82:13 83:15
100:21
110:25
112:18
133:10 158:2
181:8 186:20
191:1 201:22
203:4 215:6
225:11
227:1,23
235:18
251:19
277:12
**factor**
133:4,14
135:2 137:23
138:2,14
142:5,7
144:25
154:15
161:15
174:20
208:6,7,12
209:23
231:22
254:10
**factored**
222:24
**factors**
135:10,18,24
136:6,12
138:3 140:19
141:24
162:2,19,21
165:25
174:19
184:24
187:2,5
188:24 190:1
191:1,23
199:19
208:1,6
210:23 211:1
230:21
236:4,12
241:2 243:5
253:13 255:8
**facts**
15:19 59:17
246:23
**faculty**
36:5,6
275:12
276:8,17
277:16
279:8,14
280:6,12
**fail**
129:16,17,19
**failed**
181:9 194:3
**fails**
86:23
**fair**
12:1 15:19
19:11 24:18
25:21 43:3
46:22 47:13,
15,16 48:13
50:4 51:10
52:9 70:8,9
160:21
162:9,17,23
164:8,21
166:5
167:12,23,24
169:12,13
171:6,14
177:1 182:2
183:11
222:15 257:1
278:1
**fall**
127:13
129:17
134:15 184:4
185:10
**falls**
175:2 193:13
260:24
**false**
185:18
190:11
236:11
**falsely**
88:9,22
**familiar**
45:19 114:18
172:22
**familiarize**
160:5
**family**
89:5,7
**famotidine**
44:16 86:6
191:17
192:24
295:22
**far**
26:1 27:18,
21 51:20
74:24 78:5,9
79:6 99:20
108:13
132:24
161:24
166:22 199:4
217:22
223:21
245:25
250:22
255:17,21
256:11 257:7
258:12
259:7,17
260:20 307:2
**fashioned**
11:19
**fast**
146:22,24
147:1,20,24
165:3
**fasting**
166:16
**fat**
148:2
**fatty**
148:1
**FDA**
18:9,11,15,
19 20:4
22:5,6,7
43:18,20
50:11 54:9,
13,18,19
60:10 62:19
63:3,5,7,14,
15 74:7,11
75:23 76:2
78:21,25
79:17,21
80:5,8,19
81:19 82:1,
12,14 83:8,
14 84:2,8,
14,21,22
85:10,17,19
87:19 88:10
89:24 90:1
91:11,12,16
92:2,3 94:4
125:25
127:16,23

173:1 215:17 223:3 247:23 257:9 262:1 263:5,10 266:6,16 268:3,8,13, 16,23,25 306:22
**FDA's**
81:10 88:19 267:1 269:1
**fear**
90:10 175:21,22 176:15,21 190:22 215:13
**fears**
91:10
**feel**
18:8 85:15 88:23,25 89:2 94:21 143:16 145:10 157:3,23 219:17 264:22
**fell**
128:8 263:7
**fellow**
36:5,6
**fellows**
32:24 134:17
**felt**
12:19 30:1 273:8 278:12
**fiber**
148:6,8
**field**
38:13 47:2 67:15 121:11,13
**figure**
157:6 201:4, 5 202:4 227:17
228:12 287:18 293:23,24
**figures**
307:14
**file**
11:19
**files**
10:15,19 18:4
**fill**
103:2 246:15
**filled**
103:23 104:25
**final**
277:19 279:9 280:13 300:14,18 301:5
**finally**
11:20
**find**
22:19 27:4 39:8 46:18 110:18 124:17 128:1,6,14 132:9,14,17 149:19 166:1 175:21 176:19,20 183:2 186:5, 10 191:22 194:15,19 196:4,5,25 198:23,25 200:6,8 216:3 219:4 225:7 226:12,18 265:20 291:3 303:12 304:6
**finding**
186:23 195:24 198:18 200:13 264:4
**findings**
84:16 272:5
**finds**
198:4
**fine**
170:5 300:21
**finish**
206:5 239:17,22 283:16 307:21
**finished**
92:16,17 206:4 240:16
**finishing**
35:15
**Finken**
7:4,5 10:2 13:24,25 14:13 16:16, 25 18:14 19:2,6 20:10,12 23:2 24:24 27:14,24 28:1 57:18 58:1,5,7 80:13 83:23 92:22 93:2,5 96:13,16,18 102:2,4,7,10 105:2,4,13 111:6,7 116:11 148:18 150:3,7 156:8,22 162:13,16 166:4 169:18 170:4,8,17 177:6 183:16 192:12 198:10,12 204:4 206:8, 14,16 209:9, 12,13,24 210:3,11 212:5,6
234:4 239:7, 9,12,16,18 240:1,6,11 246:24 247:7,16 256:1 263:15 264:24 265:5 268:5 269:15 270:14 272:13 274:12,13 275:23 276:3,4 283:11,16,24 284:6 285:16 286:13,17,21 287:9 289:25 290:8 291:13 292:20 293:8 294:9,21,22 295:1,12,14, 19 296:3,4, 8,21 297:10, 19 298:8,22 299:11,22 300:19,23 301:10 302:13 303:15 304:9,18,20, 23 305:14 306:8 307:19
**firm**
15:12 107:22
**first**
7:22 14:15 17:22 20:14, 21 25:3,11, 19,22,23 35:16 44:15 64:13 68:7 69:18 99:1, 2,3,7,11 105:22 107:23 108:18,22 151:24 175:3 190:20 200:6

212:7 213:2, 18 217:25 235:7 240:14
**fit**
119:9 122:19,21
**fits**
36:19 118:22
**five**
45:23 59:9 63:20 66:24 67:5 70:19, 24 72:17,18, 19 73:7,11, 15 74:25 76:16 77:9, 17 78:4,12, 13 89:1,19 90:18 95:11, 12 119:18,23 135:7,20 140:13,16 170:6 189:6 207:17,18,20 209:25 210:1 229:9 247:4, 5 256:16 258:4,25 259:14 260:9,10,24 283:22 290:13,19,25 307:15
**five-minute**
170:2 209:7 247:7 283:15,18
**flawed**
199:1,2
**flaws**
81:14
**flipside**
148:5
**floppy**
35:20
**Florian**
79:21 82:5
**Florida**
6:3
**fluctuations**
210:23
**focus**
64:21 70:22 85:18 115:12 121:10 202:20 203:18 274:6 284:22
**focused**
18:5 63:21 66:23 72:17
**focusing**
202:22 205:4
**fold**
89:11
**folds**
152:24
**follow**
85:20 96:16 101:8
**follow-**
193:2
**follow-up**
95:4,9,24 97:23 98:6, 10,14,17 99:16,20,25 100:6 101:11,16 103:8,14 229:2,3
**followed**
18:21 97:11
**following**
99:9 120:11 191:20 257:6 298:23
**follows**
6:24 158:12
**food**
55:15 146:13,17,21 147:5,19,25 162:21 163:15 167:24
**forget**
11:4 128:4 129:20 176:1 226:5 270:4, 7 273:6,10 282:22
**forgive**
42:5 185:4
**forgot**
53:16
**form**
12:17 18:13 50:22 60:24 62:8 65:2,25 67:13 70:16 71:8 72:13 73:19 74:2, 22 75:9,14 76:11 79:4 81:4 83:6 87:14 90:15 91:6 97:18 98:21 103:15 111:5,10,21 113:4,15 114:23 116:6,10,21 118:2,10 119:3,19 120:6,13,23 121:17,23 122:5 123:1, 10 126:7,21 127:12 128:24 129:14,25 134:2 136:11 137:2 140:5 148:17,22 149:13 161:21 162:24 164:22 167:13 168:13 169:5,17 177:5,19 179:22 183:15 185:23 188:5 189:15 192:11 200:16 201:20 204:3 206:13 208:10 209:21 210:24 211:8 216:7 217:21 221:1,16,22 222:2,7,11, 12 223:1,20 228:7 229:5 230:6 231:6, 12 232:3,16 234:3,8 238:7,19,22 241:8,17 242:7,25 244:7,25 245:15,22 246:17 247:22 248:3,8,17, 22 249:1,8, 11 251:5,15 252:4,17 253:8 254:3, 19 255:1,25 256:4,9 257:2,15 260:5,18 261:8,18 263:14 266:17 268:4,18 270:1 272:12,16 273:5,14,23 274:24 278:6 279:17 280:16 281:10,22 282:5,11 285:5 286:5

289:14 291:25 293:3 303:15 304:9 306:8
**formal** 61:24 62:2
**formation** 144:12
**forming** 15:21
**forms** 256:19 285:8
**formulary** 215:3 216:5, 9,11,12
**forth** 23:24 274:1 283:7
**forward** 66:8 173:14 179:5
**found** 64:15 70:13 80:6 81:14 176:4 185:6 187:1 211:16,19 226:24 241:13 242:4,10,19 261:5,15 262:20 266:3,14,15 267:12 306:4
**Foundation** 259:20
**four** 156:13 207:18 258:7,23 260:10
**four-year** 35:24 36:1
**FPR** 6:2
**FPR-C** 6:2
**fracture** 190:15
**fractured** 185:12
**frame** 96:5 98:8 221:13,19 226:16 289:4
**Frank** 288:8,10
**free** 264:23
**frequently** 157:10
**front** 9:3 16:19
**fund** 125:5 259:19
**funding** 129:9
**funds** 111:13

**G**

**Gamble** 114:6
**gastric** 53:4 57:6,7, 8 59:2 67:1 70:19,20 131:14 132:18 133:5,11,13, 16 134:25 145:9 148:14 149:10,12,22 150:10 156:12 167:2 207:10,12, 15,22 258:3, 5,22 259:12 260:13 295:3 297:24 298:13 299:13
**gastrin** 150:23 151:7,12,15, 17,18,21 152:3,16,18 153:7,14,16 154:1,4,7,9, 17
**gastritis** 53:7
**gastro** 142:3
**Gastroenterologic** 253:10 274:15
**gastroenterologist** 37:15
**gastroenterologists** 45:15 58:23 253:11
**gastroenterology** 32:20 33:1,4 38:2,13 253:16,20 254:1 269:18 277:23 293:12
**gastroesophageal** 57:4 141:16 142:3 143:19 164:21 297:23
**gastrointestinal** 56:25 162:23 295:23
**gastroparesis** 37:20 38:5
**gave** 24:2 64:14 79:20 85:4 158:3,4,5 187:13
268:14
**gears** 210:12 269:3
**general** 56:8 113:9 161:9 164:1 183:17 189:11 191:14 220:23 231:2,8 257:24
**generalized** 131:25
**generally** 124:17 138:19 152:19 160:18 169:1 177:2 183:17 209:15 223:6 238:13,14 241:6
**generated** 276:15
**genetic** 135:2,18 138:2
**genotoxic** 249:10
**GERD** 56:24 57:13 103:19 115:8 143:20,23 144:6 145:14 213:14 269:9,20 270:15,22 271:5 272:22 281:2 284:10 305:5
**getting** 66:9 68:14, 17 99:23 137:20 139:11 167:17 168:24

169:10 181:13 262:12 289:22
**GI**
113:9 132:11 274:17
**give**
6:18 14:24 30:17 31:15 32:6,13 34:23 45:1 46:6,14 53:3 54:3 61:1 89:4 92:12 94:10 110:6 113:7 115:22 116:7 119:7, 12 120:7 122:1,12 126:2 128:18 132:24 134:2,15 135:10 149:25 151:10 153:7 157:1 158:15 160:12,25 182:5 184:8 203:25 224:1 242:23 260:23 261:21 279:21 281:11 286:24 303:19
**given**
24:9 32:23 33:8 41:1 48:16 68:10 115:9 119:6 162:11,20 166:1 192:2 225:2,3,10, 20 226:13 232:9 236:12 284:19
**giving**
31:8 94:11 118:12,13,15
**Glaxosmithkline**
113:24
**global**
36:19 49:24 54:4,5,25
**globally**
65:3 81:2,23 83:3,4 84:1, 24 160:5
**goal**
61:7 123:11, 12,13,14,16
**God**
6:20
**goes**
53:5 68:22 100:8 113:5 133:9 151:4, 5,7 152:7 155:13,15, 17,21,24 165:9,20,21, 22 226:25 228:16 237:20 249:2 258:8 276:14 277:15 282:25 283:3
**going**
7:6 12:25 15:5,6 17:21 22:19 24:4, 18,21 25:10 30:18 31:3,8 43:19 45:24 47:3 50:24 51:2 55:20 57:15,21 62:19 63:7 64:11 65:13 68:20 78:14 79:24 83:7 85:15,16,23 91:17 101:1 105:7 116:14 122:9 124:8 125:20 131:1,5,19 135:2 138:24 139:14 140:2 146:22,23 147:24 148:2,4 150:20 153:2 159:6 160:12 163:20 164:16 165:7,11 166:10,17 167:5 168:6 170:2,11 171:18 173:14 177:10 181:1,3 183:8 184:20 185:15 187:13 189:17 191:3 194:19 199:5 201:22 206:21 207:12,13,25 209:1,2,5 210:5 211:1 214:7,8,12 215:12,15,23 219:12 221:5 224:9 225:7 228:10,11, 13,21 229:7 230:9,12 232:19 233:10,12, 16,21 234:22 235:1,17,18, 22 236:9,11, 14 238:3 239:5,22 240:5 242:1 246:9,16 247:10,18 255:17 256:13 257:8 261:2 263:4 267:17,25 269:5,11 275:2 277:3 280:17 283:17,21,22 287:23 290:3 291:5 292:1, 6 293:19 294:6,11,23 295:15 296:5,18 297:7,20 298:5,19 299:8,19,23 300:11 301:7 302:6,15 303:24 306:9,20 307:1,23
**good**
7:5 14:22 27:3 33:22 34:13 39:22 41:22 54:7 56:1 57:18 86:16,20 95:1,2 103:25 105:14 109:12 122:14 130:1,2,12, 15,18,23 146:12,19 155:6 156:24 157:5 170:23,24 172:17 178:3 180:10,17 183:2 184:21 185:25 187:11 192:25 193:3 203:17 225:9 226:1 234:20,21 247:3 272:7

273:24 283:13 302:23
**goodness** 68:5 69:7 102:24 153:18 207:8 243:3 265:22
**Google** 21:18,19 24:15
**Gotcha** 154:18
**Governing** 274:18
**grade** 53:12
**grades** 141:7
**gradient** 197:18
**grant** 36:13 111:18 123:19 124:1,5,18 126:14
**grants** 13:3 111:2
**graph** 207:16 209:15 225:15 237:16 292:2
**graphs** 26:24 61:21 178:25 227:25 290:21
**gray** 36:8
**great** 8:7 12:22 43:5 76:19 92:3 134:21,22 138:10 143:22 176:21
184:15,16 210:3 283:17
**green** 201:11 205:1
**grind** 147:5
**group** 52:4 57:6 122:15 147:14 161:9,15 163:25 172:7 182:7 220:16,17 307:11
**grouping** 236:18
**groups** 167:4 208:8 209:19 237:1
**grows** 141:9
**GSK** 8:19 19:25 20:5
**guess** 27:10 53:21 67:14 120:7 122:9 139:7 150:17 159:9 161:7 178:12 189:3 194:3 235:7
**guidance** 274:18
**guidelines** 87:3 90:1 212:21 213:14 282:3
**gut** 164:7,16 210:14 211:7,20
**guy** 32:17

**H**

**H-PYLORI** 299:13
**H2** 40:14 44:9,11,18,21 45:3,10 46:1 60:8 63:10 87:10 113:20,22 144:9,17 145:25 146:1 150:14,16 153:10,12 155:2,19 157:2,12,23 158:6 161:11 164:4 167:8 172:22 193:1 201:11,24,25 202:12 205:2,19 213:4,19 214:10,15,16 220:9,13,18,20 221:7 301:13
**H2ra** 217:13 218:19 220:4
**H2ras** 42:17,18,21 44:5,7 56:21 86:4 113:14 144:2 145:13,15 149:11 150:13 154:22 159:25 211:25 212:2,10,12,16 214:1 215:1 218:10 219:22 220:24
**Habel** 297:8,15 301:24
**habit** 9:6
**hair** 46:11
**half** 170:3 247:5
**hand** 6:16 63:19 64:20 78:2,3 79:7,9 91:25 92:1 191:9 241:21 258:13 307:3
**handwritten** 11:23 12:2
**hang** 56:17
**happen** 28:14 84:5 153:8 194:12 270:24
**happening** 213:9
**happy** 27:3 37:4 40:25 55:1 89:4 110:18 141:17 162:8 184:1 200:8,18 205:5 244:16 263:20 270:8
**hard** 24:14 87:4 163:22 187:10 190:20 219:11 264:4 306:25
**hate** 155:25 163:8
**hazard** 186:5,17 199:13

**head**
13:12 107:2
**healing**
221:2
**hear**
8:2,5 267:8 289:21
**heard**
107:20 109:2 121:1 122:7 136:1 139:3 218:1 224:10 235:21
**heart**
172:6
**heartburn**
38:5 45:22 86:1,9,15 103:2 142:25 143:1,6 154:11 220:8 224:21
**heat**
248:6,11
**Helicobacter**
133:2 299:14
**help**
6:20 45:17, 22 49:3 109:17 147:10,11 213:18 214:7 271:16 284:23 285:25 286:11 287:3
**helped**
34:1 44:22
**helpful**
33:14 35:3 101:24 251:17 287:22 289:23
**helping**
46:3 172:8
**helps**
57:9 146:13 179:24 286:24
**Hepatology**
269:18 277:23
**hesitant**
218:1,6 219:2 304:1
**hesitation**
89:21
**hey**
109:14 112:4,19 124:24 125:8,14 126:1 127:19 151:6 216:13 217:24
**hi-**
259:2
**hierarchy**
173:23 174:13 259:1,3,10
**high**
53:12 54:12, 17,20 56:6 62:16,23,25 64:4,14 66:3,16,23 67:1,2,21 68:4,11,15 69:2,3 70:10,23 71:17 72:20 73:14 74:17, 23 76:17 81:8,15 87:19 88:8, 22 89:10 90:20 95:17 99:21 133:15 134:13 148:6 151:10,12,21 152:15,17, 18,21,22,23 153:4,5 154:4,9,10 176:11 178:21 183:8 232:17 246:6,10,13 248:11 249:4,5,12 256:20 262:25 265:21 274:19
**higher**
136:15 153:2 155:2 169:6 214:22 234:16 263:8,19,24 264:7,9 268:3
**highest**
91:9 226:23 266:9
**highlight**
254:6 275:25 276:2
**highlighted**
22:11 82:4 126:23 158:1 201:13 213:14 217:4 220:11 237:12,15 260:20 274:7 303:16
**highlighting**
219:14
**highly**
135:1 140:17 177:10 190:23 254:7,14 267:19
**Hill**
193:23 197:11,14,21 198:3,17,22 199:17,23 200:6,11,13, 17 207:25 208:2,6,18, 20,22 209:16 244:22 256:7,24 257:11,17 258:11 290:11,13, 15,24 291:3, 5 303:3
**hip**
190:15
**hired**
109:25 110:1
**histamine**
42:12,16,18 145:15,16, 19,20 146:1
**histamine-2**
296:24 298:12
**history**
232:11
**hoarseness**
48:17 125:9 142:22
**hold**
13:1 34:3 96:24 131:3 140:24 141:4 168:8
**holds**
140:25 150:12 165:18 217:13
**honest**
18:5 20:2 21:3 107:19 183:19 266:20 278:15 279:21 289:15
**honestly**
108:24

**Hong**
32:12 118:14
**hope**
24:11 33:12, 13 39:17 56:7 139:24 181:8,14 191:1 195:21 200:3 252:11 256:18
**horrible**
162:13
**hospital**
37:22 38:1 47:18,25 48:2,3,4,5 49:18
**hospitals**
48:6
**hosted**
275:14 276:10
**hot**
55:17 69:9 169:20 263:1
**hour**
57:16 147:20,21 170:3 209:6
**hours**
27:8 29:3,4 34:11 46:10 47:5,7,8 54:2 147:18 156:14 247:5
**house**
35:22
**HPV**
137:22
**huge**
147:23
**human**
63:18 65:11 66:10 76:24 77:3 80:25 151:1 249:16 250:13 251:22 252:16 255:6 256:25 257:13,19 303:4,8
**humans**
64:17 65:13, 20,24 66:6, 17 67:20,25 68:6,11,14 69:6 70:11 71:3,7,23 75:13 77:9, 18 78:12,14 79:2,19 80:10,22 88:5 151:15 205:15 207:14 254:12,18,25 256:22 262:11 304:7
**humidity**
248:7
**hundred**
173:10,11 195:5
**hung**
167:17 211:4
**hydrogen**
55:11
**hydrogens**
55:11
**hypertension**
172:6
**hypothesis**
76:4 79:24 149:15 157:19 158:21 159:3,18 205:14 207:13 241:10 259:7
**hypothesize**
84:5
**hypothetical**
232:20 233:22 234:22 238:20,23 239:1,2 240:23 244:15 257:25

**I**

**I--**
17:2
**I-A-R-C**
76:25
**i.e.**
94:4 100:18 191:17 199:14 207:12 208:23 225:2 243:11,14 306:13
**IARC**
67:18 75:5 76:15,25 133:25 249:16,19,25
**ice**
86:25
**idea**
14:23 32:14 46:14 94:11 104:2 163:5, 11,14
**ideal**
129:15 130:4 192:20
**ideas**
122:16
**identification**
10:1 16:15, 24 23:1 24:23 269:14 270:13 284:5 291:12 292:19 293:7 294:8,25 295:18 296:7,20 297:9,18 298:7,21 299:10,21 300:22 301:9
**identified**
29:17 132:6
**identify**
91:3 92:18, 24 93:6,12, 22,25 99:4 131:23 132:4 292:8,10 300:20
**identifying**
13:2
**idines**
44:17
**ignore**
226:23
**ignoring**
188:12
**II**
196:2,14
**imagine**
23:10 278:21
**imbalance**
141:23 142:4,8,16 143:8
**impact**
90:24 149:16 237:20 241:10,22,23 257:7
**impacts**
130:19
**impedance**
288:17
**implemented**
86:14
**implementing**
86:17
**imply**
188:1 189:13

**importance** 173:23 174:7,14 189:14 190:8,9 243:12 254:4 274:19
**important** 34:15 35:23 46:3 53:17 55:22 68:1 69:2,3 75:24 76:5 84:10, 17 88:13 138:2,14 164:24 176:6 180:5 188:16 189:7,8 190:1,9 193:14 196:7,25 224:13,16 227:14,22 229:10 230:3,15,16, 17,21 232:5 240:22 254:7,14 256:21 257:10 266:11 267:20 291:5
**importantly** 180:8
**improper** 228:15
**improve** 134:18
**impurities** 55:24 56:1,2 89:13,15
**in-person** 32:9 106:17, 18 277:9 278:22 280:19 282:15 283:4
**inability** 255:10
**inaccurate** 17:20 196:20
**inappropriate** 50:20 117:10 195:2 200:14 228:4 229:19
**incidence** 133:10,13
**incidents** 262:10
**include** 9:23 127:2 130:3 162:21,22 226:15
**included** 12:13 257:13,19, 21,22
**includes** 9:20
**including** 9:24 59:2 81:20 113:1 141:22 179:4 186:8 202:25
**incorrect** 138:12 190:17 195:16 202:23 203:8,10 280:12 293:24
**incorrectly** 202:16 203:10 235:20
**increase** 135:3 157:16 158:25 159:25 160:1,18,20 161:19,22 165:15 167:16 168:10,11, 15,17,18,19 234:1 248:15,21
**increased** 63:20 64:5,7 137:20 154:1 183:3 233:5, 24
**increases** 48:8 156:3 157:10 160:21 248:6
**increasing** 156:21 157:6,9,15 172:14
**incurred** 26:9 27:1,8
**independent** 19:13 157:11
**independently** 136:19
**index** 99:10
**indicate** 58:9 97:23 198:2,9 279:12
**indicated** 21:13 62:21 63:23 105:17 108:1 131:3, 6 136:23 137:9 143:17 144:2 150:9 156:2 168:7 170:18 211:22 219:21
**indicates** 200:5,12 275:10 278:17,23,25 279:8
**indicating** 72:4
**indication** 51:3 57:4,5 82:15 83:15 128:2 159:11 175:5 191:17,19 192:2 230:20 236:9
**indications** 57:4,14 116:2 117:2 127:11
**individual** 40:6 171:24 172:4 177:18 179:11,16 180:25 181:16 235:6,8 306:12
**individualized** 181:22
**individually** 179:2
**individuals** 126:19 127:2,10 219:10 233:3 236:2,5 238:16
**indolent** 141:8
**induce** 56:14
**industry** 40:1,11 78:8 109:5,11 113:21 115:23 121:3,8 122:8 123:9 129:7,22 255:14 275:13 276:9
**infections** 52:4

**inference** 184:9 193:9
**inform** 223:14 256:23
**information** 21:22,23 104:4 106:23 124:6 129:11 177:14 179:10,14 183:13 222:23 223:2,16 232:1,7 257:20 282:16 306:17
**informative** 115:4 237:17 255:21
**informs** 223:15
**Ingelheim** 114:9
**ingestion** 137:16,22
**inhibit** 286:22
**inhibitor** 157:2 285:20 296:24
**inhibitors** 40:15,16 41:13 43:1,6 44:24 45:11 63:10 86:10 115:8 145:5 153:13 154:25 157:11 161:12 213:5 215:2 272:21 281:2 298:12
**initial** 54:14,17 84:15 88:18 149:18 150:18 151:14,23 152:4 153:9 189:3
**initially** 152:11
**initiated** 125:7,13,17, 21 126:11
**injection** 49:15
**injured** 106:10
**injuries** 146:15
**injury** 146:9
**Innovation** 274:17
**input** 270:7
**inquiry** 71:21
**instances** 182:3,10
**Institute** 274:16 277:20
**institution** 32:2
**institutional** 46:21
**insurance** 177:12 215:3 216:24 217:7,11
**intake** 265:15,16 295:3
**integral** 251:6 252:10
**integrity** 39:11
**intend** 59:7,12 112:17
**intensivists** 45:14
**interchangeably** 245:8
**interest** 33:9 35:25 36:13,23 37:15 48:16 70:20 115:13 125:11 277:18 278:2 279:2,13,15, 18 280:2,15, 18,21 288:5 304:4 305:18
**interested** 22:5 64:21 73:7 85:16 124:3 256:12,14, 17,18
**interesting** 89:9 157:18 159:3,18 243:14
**interests** 121:13
**interference** 160:13 255:15
**intermittent** 160:19
**internal** 60:21 277:20
**Internet** 8:2,3 16:3
**internist** 35:24
**interquartile** 96:23 97:12 98:4
**interrupt** 209:1 238:12 239:13,21 240:7,15
**interrupted** 240:9
**interrupting** 239:15,16,17
**interval** 186:12,18,21 187:22 188:8,12,15 189:10,20
**intervals** 180:3 186:8 188:7,23 189:24 199:14 201:16
**intervene** 49:22 53:15
**intervention** 45:8
**interventional** 48:24
**interventions** 49:3
**intestinal** 53:5
**intragastric** 162:9
**introduced** 43:9 90:10
**investigate** 88:16 200:1
**investigated** 126:11
**investigating** 224:3
**investigation** 255:22 256:2
**investigator** 125:7,13,21
**investigators** 149:3 178:10 231:16
**invoice** 25:12,15,23 26:4,10 27:2,9

**invoices**
11:9 24:20 25:1,6,11 26:7
**involved**
39:12,13 41:23 108:7 110:2 111:15 114:16 281:13,15 282:21
**involvement**
280:18,21
**involves**
112:3
**involving**
13:3,7 39:19 42:12 93:23 107:7,23
**IQR**
98:1,3
**IRAC**
66:8 250:5 253:6,9,13 254:9,14
**Ironwood**
271:8,12,14
**irrelevant**
30:1 77:25 78:10 79:5, 14,15 80:6, 16,17 91:7 92:9 93:9, 11,13,20,22 164:3 193:20 256:10,11,23 260:19,22
**issue**
73:9 76:3,14 82:3 106:3,4 149:16 152:25 173:2 196:18 216:9,11 217:2,5,8 219:14 224:4 236:6 250:20 306:10
**issued**
251:10,20 252:2
**issues**
33:10 36:15 37:21,24,25 39:13 48:17 51:6 62:17 88:22 117:22 138:3 171:19 196:22 224:7 230:12 251:2 290:17
**issuing**
282:3
**Italy**
83:19
**items**
55:15
**Iwagami**
206:25 207:19 301:11,17

**J**

**Japan**
301:14
**job**
92:3 147:5 154:25 163:4,9 184:16
**joined**
288:17
**jointly**
274:15
**joke**
46:11
**journals**
129:5,24 130:5,8
**judge**
182:11
**jump**
261:2
**jumping**
206:5
**jury's**
44:2

**K**

**Kantor**
294:13
**keep**
16:10 19:3 24:13 30:18 96:11,13 114:2 119:5, 7,21,23 120:20 132:17 176:6 240:19,21 293:19
**kept**
55:24
**key**
109:6,8,10, 13 231:14 241:25
**kidney**
131:21 300:25
**kidneys**
131:22
**kill**
163:20
**kilocalorie**
265:18
**Kim**
205:23 206:10,17,24 207:19 295:2,7,10, 20,25 301:24
**kind**
47:23 139:7 141:11 271:23
**King**
15:13
**knew**
107:1
**knoll**
236:10,15,20
**know**
7:9 8:3,13, 18 12:7 14:20 15:3 19:21 20:3, 5,15 21:2 22:18 23:7, 10 24:12 25:24,25 28:11 30:23, 24 31:1,18 32:21 34:5, 8,9 41:13 43:21 44:10 45:4,19 50:21,23 52:16,17 62:9,20 66:25 68:21 69:12 73:20 75:10 78:5, 25 79:17 80:4,8,18 81:5,18,22 82:21,24,25 83:2,3,8,18, 20,25 84:23 85:1,2,6,12, 14,16,21 86:24 87:15 88:14 89:13 91:9 94:8,18 99:15,16 100:12 106:21,22 107:1,20,25 108:5,11,20 109:12,13,18 110:1,2,5,18 111:11 112:17 113:6 114:2 115:2 119:21,23 121:11,18,24

122:10,13 123:4,11,15 125:2,17,24 129:1 130:16 131:19,24 132:1,5,11, 12 134:1,5, 11 135:3,16 136:20 138:6,8 140:4,7,8,12 141:14,21 145:22 146:20 148:2 149:14,18 157:18 160:10 162:13 165:4 166:6 168:24 169:16 171:3 172:17 175:6,8,20 176:14 178:24 183:3,4,7,18 184:3,4 185:3 186:23 189:16 191:15 193:4,11 196:16 199:11 203:6 209:6 210:25 211:2,10,13, 14,15,17,19 215:19 217:3 218:19 220:12 221:4 222:8,13 223:11,12 224:17 231:19 232:18,21 233:16 234:14,15 235:16 244:15 248:5,9 249:25 250:3,8,9, 10,12,17,19, 22 251:6,7, 11 252:8 255:10,14 259:6 260:6, 7 262:3 263:11 264:4,20 266:12,24 267:19 268:1,6,7,24 270:5 273:15 278:19 279:18 282:7,13 286:11 288:9 289:13 300:8,12 307:25

**knowing** 124:3 181:6 183:21 250:20

**knowledge** 33:22 34:7, 13,21 85:14 305:21

**known** 56:20 179:4

**KOL** 109:2,3,8, 19,20,25 110:1,22 111:8,11

**Kong** 32:13 118:14

**Korea** 298:25

**Kumar** 207:1,19 299:9,16

**L**

**label** 223:2,7,9,17

**labels** 50:11

**lack** 188:1 189:13 196:17 197:9 234:23

**lag** 226:3,9,22 227:3,15,18 228:4,9,11, 13 230:19

**land** 70:12 75:1 78:20,21 80:25 84:12, 13 88:16 160:10 250:4

**landed** 67:19 70:3 74:24 76:14, 15,21 78:15, 17,21 80:24 82:4 149:9

**landing** 69:7 74:14 279:24

**lands** 81:19

**lansoprazole** 43:13,23

**large** 6:3 180:25

**laryngeal** 39:13 48:17 49:1 51:15 52:8 131:11, 14

**laryngitis** 33:7 36:14 128:7 142:23

**larynx** 48:15,18 115:13

**lastly** 212:8

**late** 46:15

**latency** 138:15,23,25 139:4,9,15, 20,24 140:3 229:3

**law** 15:12 107:22

**lawyers** 31:8 108:6, 14

**laymen's** 185:4,19

**lead** 53:8 54:14 85:20 89:19 126:24 127:1,21 146:8 159:1 175:21 229:22

**leader** 109:10,13

**leaders** 109:6,8

**leading** 142:8

**leads** 65:20 145:21 158:21

**learn** 121:24

**learned** 21:18 68:9 133:4 153:5 213:6,8

**learning** 12:8

**learns** 121:21

**leave** 36:20 171:23 214:22

**leaving** 262:14

**lecture** 24:3 113:7 118:12,13,16

120:7 122:1
**lectures**
32:6,13
115:22
**led**
54:15,20
74:11 88:10
128:10
157:20 159:3
**left**
97:4
**left-hand**
97:24 277:16
**leg**
185:10,12
**legal**
6:12 47:2
**length**
95:4,5 97:7
101:7 245:25
**level**
44:23 56:2
65:7,8 74:5
81:8 90:4
91:8,9 92:5
94:6,14,19
95:15 151:7,
12 152:3,14
153:13,14,16
154:23
155:21
169:6,23
174:7 177:18
178:10
179:11
215:12
232:17,19
266:6
**levels**
54:12,17
56:6 74:7,17
81:15 87:18,
20,23 88:4,
8,22 89:10,
11 90:25
91:11,13,14
92:2,19
146:10
151:19,21,25
152:16,18,21
153:8 154:1,
4,9 168:12,
19,23 169:3,
13 210:22
211:5,7
246:3 248:11
261:15,24
262:1,25
263:2,5,19,
24 265:7,21
266:3,6,14,
15 268:3
306:3,7
307:10
**liability**
6:9 7:15
105:22
**lie**
69:11
**lies**
66:13 187:23
202:18
**life**
47:1
**lifestyle**
86:13,17,21
87:5,8
213:1,2
**like-**
219:2
**limitation**
181:10
231:19
241:22
**limitations**
174:21,23
176:16
181:6,11
231:20
233:14
241:15,19
242:6,12,17,
20 243:4,16,
18 244:9,12,
18,19 245:4,
18 257:5
**limited**
181:1 234:6
260:12
**line**
233:4
**lines**
20:14
**link**
196:20
234:24
243:10
244:24
**linked**
78:2
**links**
29:8
**liquid**
146:20,21
**liquids**
146:25
147:20,21
**list**
8:18 10:14
12:10,13,24,
25 15:17,23
16:11,22
17:4,11,16,
22 18:10,15,
16 30:4
111:25
121:7,12,18
132:24
263:25 271:1
273:1,12
281:23
288:4,5
**listed**
13:15 18:9
20:14,21
21:5 29:22
30:3 76:16
78:4 124:9
237:5 263:23
264:11
270:19,23
271:5 284:12
**listening**
223:25
**listing**
18:25 281:17
**lists**
19:18 269:19
270:21
271:6,7
272:20
287:20
**literature**
11:17,25
12:11 18:22
19:1,4 65:1
67:9,11
69:15 70:6
72:23,25
73:10 77:8
**litigation**
6:9 107:5,7
108:13,14,
15,19 273:2
278:5 281:7
**little**
30:7 31:16
38:10 46:4
131:1 179:8
182:1 194:8
224:6 256:6
261:3 267:18
287:14
290:10
293:20
**Liu**
225:14
226:21
298:9,16
**liver**
37:24 59:3
66:5,16,21,
25 67:4,21
69:4 70:11,
15,20,24
72:4,10,21
74:23 76:17
131:16 141:2
183:3 249:4,
12 256:20
296:25

**located**
8:8 106:20
**login**
29:9
**long**
14:2 15:24 20:8,25 26:1 29:1 93:3 95:8,14 98:11 101:7, 8 102:25 107:20 108:20 111:25 117:22 128:5 134:7,11 135:11,13 139:25 146:17,25 148:24 155:7 158:3,9 160:19 162:1 176:2 181:25 182:6 245:25 246:13,16 251:17 265:12 283:20
**long-term**
229:12 230:18 232:13
**longer**
92:17 283:20
**longest**
96:5
**look**
11:18,19 16:8 17:7,8 19:16 22:17 26:23 33:6 39:8,10 40:13 42:5 44:19 48:14, 15,18,19,22 53:4 55:22 61:6 62:3 63:16,17,23, 24,25 69:25 71:13,23 74:13 75:16 79:21 81:11, 12 82:3 88:25 90:4 91:23 92:1 95:14 96:8 97:4 100:16, 17 103:22 106:25 112:2,7 113:10,16 114:18 124:19 126:3 127:3,5 133:10,12,18 139:8 150:3 156:7,11 161:23 163:3 164:16 172:12 173:9,10,15, 25 175:16 176:10,12 178:17,23,24 179:2 181:3, 4 183:18 184:1,10,11 186:3 187:1, 2 188:22 190:1,24,25 191:12 193:4 196:6 200:18 201:22,23 202:14 203:4,6,11 207:14 208:12 211:10 212:20 223:23 225:11 226:4 229:8,10,12 230:18 232:23 233:14 234:13,14,17 236:7 237:2 243:18,22 244:8 245:24 250:11,15 252:6 254:14 259:1 262:15,16 264:5,9,19, 23 267:25 271:4 272:3 275:4 285:17
**looked**
16:2 19:25 21:1 22:6,11 26:19,20 29:24,25 60:18 63:1 65:16 67:7, 18 69:18,20 72:19,22 77:13,15,20 78:15,22 80:1 85:10 89:16,24 90:17,19 92:4,5 95:10,11,17, 25 96:1,20 97:15,19 98:16,20 99:13 103:8 134:5 149:3, 8 176:1,3 196:24 199:7 200:20 201:7 202:11 225:12 237:3,6 239:4 246:2, 4,6,7 250:4 252:9,12 255:8,13,14, 16 258:22,25 260:9 261:25 262:2 268:8, 14 303:9,10 307:8
**looking**
16:6 21:23 36:10,14 40:3 48:21 61:7,25 65:3 71:10 76:13 97:2,22 98:6,23 100:5,16 102:22 119:8 131:17,24 170:25 173:4,12 174:16,17, 18,24 175:2, 10,16 176:25 178:18 182:18 186:4,14 187:3,4 191:9 193:3 196:8 201:7 209:16 219:13 223:24,25 224:14 226:20 227:17 230:20,25 232:8,10,24 235:24 245:3 257:18 259:10 261:14,23 262:24 263:12 265:7 274:10 287:1 288:3 293:22
**looks**
16:18 17:22 18:21 203:5 224:25 230:22,23 254:8 264:12,15 288:5
**lose**
86:19,23
**lost**
35:19 251:18

**lot**
12:19 23:10, 11,12 32:4, 6,8 33:3,5, 20 34:1,17 36:24 45:4 48:25 51:13, 20,21 52:18, 19 55:1 88:23,25 89:2 90:19 95:9 100:23 115:12 133:16 148:9 154:7,17 159:12 160:25 162:9,19 165:24 176:24 180:12 193:22 215:6,16,18 217:8 239:10 259:17 263:18 303:18,25
**lots**
90:7 91:12, 18,19 94:3
**loved**
36:9
**low**
53:12 56:2 89:10 90:20 99:21 165:2, 3 232:19 237:18
**lower**
95:17 195:1 234:17
**luck**
86:16,20
**lump**
115:17
**lunch**
102:6 105:14 121:21,24 141:25 142:1
**lung**
171:11 172:13 176:9
**lye**
137:16,22

**M**

**M.D.**
6:22 35:15
**made**
89:1 135:22 146:12 151:8 160:25
**mail**
120:8
**main**
133:4 280:7
**maintained**
156:13
**majority**
62:18 63:21 74:10 112:12 161:2,14
**make**
8:4 12:5 16:3 17:7,18 19:11,13 26:24 27:20 28:24 29:8,9 34:18 39:15 41:7 56:9 82:1 90:4 97:14 100:2, 15,16 114:25 116:23 120:11 142:24 143:16 144:7,13,20, 24 147:6 158:7,8,23 161:4,6 163:24 164:23 179:25 180:17,19 181:18 190:23 198:1 199:8 203:9 235:2 241:20 259:12 262:17 265:10 274:25 285:13 289:16,21 302:3,4
**makes**
9:15 142:18 176:23 246:12 279:5
**making**
160:14 161:2 185:18 252:11 280:7
**male**
296:12
**malignancies**
295:23
**malignancy**
224:24
**management**
269:9 305:5
**mankind**
179:4
**manner**
9:23
**manometry**
278:13
**manufacture**
117:1
**manufacturer**
8:12,16 223:18 266:13 272:10,15
**manufacturers**
89:3 90:3 109:21,24 119:17 268:24 281:7 288:22 289:5,12
**manufacturers '**
60:20 269:2
**manufacturing**
77:20
**manuscript**
127:22 270:9 277:19 279:9 280:13
**March**
13:22 16:18 23:6 273:21 294:2
**mark**
16:13,21 22:24 24:18, 21 35:4 269:12 270:11 291:8,10 292:18 293:5 294:6,11,24 295:11,16 296:6,18 297:7,20 298:5,19 299:8,19 300:11 301:7
**marked**
10:1,4 16:15,24 23:1 24:23 58:3 269:12, 14 270:10,13 284:3,5 291:12 292:16,19 293:7,9,10 294:8,10,25 295:18 296:7,20 297:9,18 298:7,21 299:10,21 300:22 301:9
**marker**
39:10 100:14

101:5 102:25 103:6 104:18
**market**
40:22 50:16 215:18
**marketed**
42:2
**master's**
33:2,19,24 34:17 36:18 170:19 171:17
**matched**
17:19
**material**
12:14 27:22 111:18
**materialize**
151:14
**materialized**
90:11
**materials**
12:13,24 15:17,20,22 16:21 17:3, 11,15,22 18:16 30:4 108:2
**matter**
8:15 22:4 50:18 90:16, 17 91:21 115:4 158:14 166:12,13 233:18 236:24 248:21 267:21
**matters**
27:17 50:11 283:6
**maximum**
95:4 98:19 99:12 266:7
**Mcdowell**
291:14,20,22 292:4,16
**Mctiernan**
29:25
**Mctiernan's**
18:7
**meal**
146:18 148:1,5 151:3
**mean**
8:13,14 11:13,14 22:3,25 29:3 34:5,7,11 37:14 46:14 47:8 50:9, 13,15,21,23 51:20 52:21 53:25 59:15 60:16 62:9 64:11,15 66:22 69:1 70:17 71:9 73:20 75:16 77:15 87:15, 22 89:12,15 112:17 116:13,14 122:10,23 126:8 128:13 135:4 138:22,25 139:1,17 147:22 152:22,23 153:4,5 157:4,8 169:21 177:8 184:22 185:2,7,24 188:18,19 189:1,16 190:10 191:4 193:11 211:10 212:17 222:17 233:5 238:11 239:24 240:19 249:6 252:3 261:13 265:1,16 266:18 276:24 278:20 280:24 282:7,12,13, 17 283:21 286:7,12 295:16
**meaning**
137:4
**means**
52:16 75:10 99:6 100:20 188:9,11,20 193:13 211:14 233:7 243:17 278:19
**meant**
19:12 63:8 64:10 214:17 265:19,24 267:5
**measure**
39:4 94:2,15 146:10
**measured**
261:7
**measuring**
193:7 230:4 272:1
**mechanism**
138:5 144:5 145:13,22 152:24
**mechanisms**
64:25 65:23 73:17 74:1 132:16
**mechanistic**
41:18
**med**
35:16
**median**
97:23
**medical**
8:10 12:11 18:22,25 19:4 35:13, 17 45:7 129:5,24 301:14
**medication**
58:22 100:13,23 103:2 105:1 117:24 165:10 166:23 175:9 213:24 215:8,15,21 216:4,10 217:6,14 218:12 219:10 222:18
**medications**
39:20 42:1 43:7 44:5,6 56:20 63:11 126:20 143:18,23 144:1 152:17 153:6,10 154:21 163:15 164:18 166:13 211:23 212:9 216:20,23 217:18,23 218:9 219:6 222:14 223:7,19 291:15 296:10
**medicine**
33:11 36:25 100:21 101:1 103:22 104:1 155:14 163:4 215:24 218:4

**medicines**
217:4
**medium**
95:5 98:6
**Medtronic**
271:8,24,25
288:11
**meet**
28:2,16 32:5
**meeting**
27:16 114:3
276:17,22
280:19
283:4,5
**meetings**
28:9,18 29:1
32:9,11
46:20,21
113:3,7
277:10
**member**
254:13,16
**members**
89:5,8
**membership**
274:20
**memory**
111:3
**mention**
53:17 248:9
305:21
**mentioned**
12:3 38:14
43:2 48:15
49:23 52:3
64:2 68:2
76:12,14
80:16 86:5
88:6 110:14,
16 119:24
124:22
125:23
138:24 140:6
145:6,17
149:1 150:22
152:9 154:19
162:3 176:9
180:22
201:22
207:19
208:11 255:7
306:10
**mentioning**
172:11
206:21
**mess**
160:14
195:15
**message**
9:24 244:19
**messages**
180:6
**messaging**
9:10
**met**
28:6,7 29:5
**metaanalyses**
61:15,19
76:9
**metaanalysis**
61:24 62:2
76:18 257:16
**metab-**
255:23
**metabolized**
255:23
**metaplasia**
53:5
**metaplastic**
53:9,10
**methodologic**
88:22
**methodologies**
38:25
**methodology**
81:16 97:21
98:24 184:11
200:12
268:13
**methods**
274:11
275:9,24
**Methyl**
55:10
**metric**
115:24
**Michael**
6:7,22 7:8
84:23 116:7
134:3 149:25
242:23
281:11
**middle**
225:17
251:18
**mild**
221:6
**milligrams**
68:15
**million**
300:2
**millions**
68:15
**mind**
109:16 176:6
182:15
232:24
249:14
250:15
**mine**
30:19,21
70:4 179:4
191:2
**minimal**
24:11
**minimize**
172:13 254:4
**minimized**
9:13
**minimum**
55:25
**minus**
195:10
**minute**
140:3 300:13
307:20
**minutes**
29:3,7,10
45:23 170:6
209:25 210:1
247:4 283:22
**miscellaneous**
21:4
**misclassi-**
236:8
**misclassification**
235:3,14,19,
23 236:8,14
238:6,18
239:20
241:1,3,7,9,
15,23 242:6,
13 244:5
**misclassified**
235:8 236:2,
6 238:1
**misclassifying**
235:5
**misconception**
144:16
**missed**
16:4 17:19
19:12,14
24:11 34:21
**missing**
24:10 264:20
265:10 302:5
**misspeak**
102:17
**misstates**
123:21 150:4
**misstating**
72:6
**mistaken**
106:24
139:12
249:24
250:10
263:10,18
274:4
**misunderstanding**
166:21
**misunderstood**
95:21

**MITCH** 20:15
**mix** 46:17 47:12, 16
**mixed** 38:8 147:6,7 262:3
**modalities** 38:23
**modality** 122:22
**modification** 86:21 87:5 213:2,3
**modifications** 86:13,17 87:8
**Mohy-ud-din** 299:24
**moment** 12:24 134:3 208:1 210:7, 13 247:1 269:4
**money** 217:5
**monitored** 63:12
**monitoring** 161:18
**month** 26:13,14,16 119:11,15 120:1,2 232:11,12 233:2,23 234:1,6
**months** 119:18,23 226:14 227:12
**Moore** 6:1,10
**Moorman** 18:7 29:24
**morning** 7:5 29:8 32:8 165:13 166:11 167:4 245:24
**motilities** 33:7
**motility** 39:12 49:14 106:5,7,13 118:16 278:14
**mouth** 49:6
**mouthful** 143:22
**move** 36:12 40:21 85:23 102:8 242:1
**moved** 36:11,22
**movement** 142:13
**moving** 186:7
**MRI** 132:9
**MRIS** 132:3
**MSK** 20:21
**mucosal** 39:11 288:17
**multicenter** 40:6 124:21 125:12,22 126:23 127:14 128:1,11
**multicenters** 126:1
**multiple** 194:21 195:11 197:2 236:18 237:23 245:18 294:1
**muscle** 147:4
**mustn't** 192:9
**mutagenic** 248:25 249:6

**N**

**N-NITROSODIMETHYLAMINE** 55:5,7 298:24
**Na** 145:2
**name** 7:5,7 24:6 44:5 45:13 107:11 114:18 128:21 129:1,3 145:15 270:3,19,23 271:1,7 299:23
**names** 8:20 40:10, 25 42:5,6 43:22,24 107:24 110:4,18,19, 20 114:1
**nanogram** 247:25 262:6,7 263:7 266:8
**nanograms** 262:19,21 263:13 265:17,22
**Nashville** 8:9
**national** 113:2
**nationwide** 298:25
**natural** 102:5
**nature** 8:1 11:17 47:6 50:12 56:14 128:23 215:4 216:5
**nausea** 64:9 132:1, 7,8 134:20 154:11 224:21
**nauseous** 132:15
**nay** 88:16
**NDMA** 54:12,18 55:4,21 56:11,13 64:25 65:5, 7,8,10,12,24 66:2,9,15,20 67:10,12 68:25 69:3, 8,10,15 70:7,10,13 72:9 73:1, 11,22,24 74:5,14,20 75:4,8,11, 12,17,20,21, 22 76:3,9,23 77:8,12,16, 23 78:12,13 79:1,2,18, 19,24 80:9, 10,21 81:3, 8,23 83:5 84:25 87:12, 24 88:4 89:7,10,11, 15,22 90:5, 13 91:5 92:5,19 93:8,24

94:3,11 205:14 207:13 235:15 247:20 248:1,5,12, 14,20,25 249:3,4,7, 10,12,16,20 250:7,18 251:12,21 252:2,15 254:10,18 255:5,8,12, 14,23 256:3, 8,20,25 257:7,12,18 258:20 259:7,25 260:4,15 261:5,6,15, 16,24 262:1, 19,21,25 263:11,13, 24,25 264:16,18,22 265:6,7,16, 23 266:2,6, 14 268:2,3 303:4,8,24 304:7 306:3, 7,13,18

**NDMAS**
56:3

**necess-**
158:21

**necessarily**
64:11 125:1, 5 157:13 158:20 185:16,17,21 187:25 189:13 196:15 199:8 207:9 213:21 214:13,21 220:7 225:3 226:15
233:5,10 234:1 243:2, 17 262:11

**necessary**
198:16 199:10

**need**
30:17 41:11 46:18 49:14, 17 51:23,24 52:1,10 70:1 103:21,22 104:1 105:1, 23 106:25 135:13 138:10 143:14 151:6 160:10,11 192:4 195:8 197:21 214:21 227:19 236:23 239:21 240:9 246:11,20,21 283:19 285:20 290:24 307:20

**needed**
26:23

**needs**
52:8 100:23 101:19 103:2 165:9

**negative**
128:13 187:2 196:11

**nested**
292:23 296:11

**neutral**
155:12,25

**neutralize**
155:15

**neutralizes**
142:12

**never**
106:19 117:12 196:4 252:21 289:6

**news**
39:23

**Nexium**
43:24 128:14

**nice**
43:10 44:9, 19 45:22 62:1 178:25 180:7 207:2 227:1

**nicely**
61:23 225:19

**Nicole**
28:19

**night**
209:2

**NIH**
36:14

**nine**
208:1

**nitrate**
168:21

**nitrite**
168:12,19, 20,23,25 169:1,6,7,8, 9,13 210:15, 19,22 211:5, 6

**nitrites**
210:21

**nitroso**
55:9,12

**nizatidine**
44:16 86:7,8 301:13

**noise**
9:15 28:24

**non-differential**
235:11 236:14 238:1

**non-exposure**
235:9

**non-human**
67:10

**non-refluxer**
100:25

**non-users**
201:9 202:21 203:16,24 204:9,25 236:3 238:17 292:5

**nonphysiologic**
151:11

**nonprescription**
218:2,5

**nonresponsive**
242:2

**nonsignificant**
195:24

**nonspecific**
132:11,15

**Norgaard**
203:4,5,7,14 300:12,24 301:2

**norm**
152:7,8,22, 24 165:15 262:5

**normal**
52:24 90:20 132:2 134:23,24 142:2,17 143:13 147:16 164:6,20 248:15,18

**normalized**
91:20

**normative**
272:5

**nose**
39:4
**Notary**
6:2
**note**
240:22 263:9
**noted**
269:6
**notes**
9:4 11:10, 13,14,16,23, 24 12:2,5
**notice**
10:5 30:18 258:7
**notifications**
28:23
**November**
25:3
**NPT**
66:14 67:18 76:15
**NTP**
75:5 77:1 250:4,6,12, 17,23,24 251:2,10,20 252:1,7,21 253:6,9,13 254:9,14
**NTP's**
252:14
**nuclear**
68:21
**number**
20:14 27:7 82:2,3 98:15 190:4 195:10 208:21,22 226:6 228:8 229:19 272:20,24 280:25 284:20 285:18 286:3 287:25 292:2 300:17
**numbers**
19:18,19,21, 23 20:1,3,21 88:9
**nurse**
113:8

**O**

**oath**
6:24
**obese**
140:20 172:5
**object**
50:22 61:1 72:13 76:11 79:4 81:4 116:8 134:3 150:1 162:14 242:23
**objection**
12:17 37:11 52:15 60:24 62:8 65:2,25 67:13 70:16 71:8 73:19 74:2,22 75:9,14 77:2 80:11 81:24 83:6,21 85:8 87:14 90:15 91:6 92:21 97:18 98:21 103:15 111:5,10,21 113:4,15 114:23 116:4,6,10, 21 118:2,10 119:3,19 120:6,13,23 121:17,23 122:5 123:1, 10,21 126:7, 21 127:12 129:25 134:2 135:15 136:11 137:2 140:5 148:17,22 149:13,23,25 150:4 152:20 160:3,23 161:21 162:12,24 164:22 166:3 167:13 168:13 169:5,17 171:21 177:5,19 179:22 183:15 185:23 188:5 189:15 192:11 193:10 200:15 201:20 203:25 204:3,14 206:1,6,13 208:10 209:21 210:24 211:8 216:7 217:21 218:14 219:7 221:1,16,22 222:2,7,12 223:1,20 228:7 229:5 230:6 231:6, 12 232:3,16 234:3,8 238:7,19,22 241:8,17 242:7,15,22, 25 244:7,25 245:15,22 246:17 247:22 248:3,8,17, 22 249:1,8, 11 251:5,15 252:4,17,25 253:8 254:3, 19 255:1,25 256:4,9 257:2,15 260:5,18 261:8,18 263:14 266:17 268:4,18 270:1 272:12,16 273:5,14,23 278:6 279:17 280:16 281:10,22 282:5,11 285:5 286:5 288:24 289:14 291:25 293:3 303:15 304:9 305:12 306:8
**observable**
75:11
**observation**
174:25 194:12,15,17 227:20
**observational**
61:10,16,20 75:8,13,17 173:21 174:24 175:19,24 176:3,7,17, 25 177:3,11, 14,16 179:14 180:15 181:20 182:12 183:12 184:4,17 186:11
**observations**
175:21
**observed**
226:25
**observing**
228:24

**obtained**
34:24
**obviously**
48:20 223:9
**occupation**
255:18
**occupational**
255:13
303:10,17
**occur**
229:16
**occurred**
194:18
**occurring**
167:23
**odds**
186:5
187:11,19
189:19
**oesophagus**
296:11
**offended**
266:19
267:4,18,23
**offer**
59:7,12
**offering**
50:18,25
78:11 87:11
88:3
**offhand**
200:9
**office**
8:10 47:5,7,
8,17,21,22
160:14
**oftentimes**
224:22
**okay**
6:5 7:9,17,
21 8:6,8,11,
16,21 9:3,
16,20,21,24
10:3,5,9,13,
22 11:1,8,23
12:5,9
13:11,13,19
14:5,10,12,
14,24 16:8,
21 17:10,15,
21 18:9,18,
21,25 19:4,
16,21 20:5,
9,13,20
21:4,13
22:1,24
23:3,20
24:25 25:6,
9,18 26:3,9,
17 27:1,7,
12,23 28:5,
9,16 29:5,
10,12,20
30:2,13,17
31:7,15
34:23 35:5
37:7,13
38:18,21
40:8 41:7
42:11,15
44:2,25 46:4
47:10,17
48:9 50:4,7
51:10,14
52:7,13,22
53:19,22
55:6 56:10,
17,23 57:2,
23 58:2,4,8,
20 59:6,12,
18 60:13,20
61:9 62:5,21
63:23 64:24
65:22 67:7
69:12 70:25
72:14,22
73:10,16
74:19 75:2,
6,19 76:8,23
77:7,16,22
79:8,16
80:7,20
82:11,21
83:1,18
85:23 86:4
87:11 90:12
92:18 94:22
95:19 96:14,
15 97:7,13
98:5,13,19
102:6,7,9
104:4,8,15,
20 105:2,9,
16,21
106:15,20,25
107:15,17,22
108:6,13,18
109:7,20,24
110:9 111:6
112:23
114:20
116:9,16,23
118:4 119:11
120:9,22
121:1,5
123:5,24
124:4,12
127:7 129:5
131:10
132:21
133:24
136:1,7
137:9 139:6
141:1,14
143:22
144:1,5
145:13
150:20
153:23
154:18 155:4
156:6,17,20
161:16 164:9
166:19
167:11,20
168:1,6,9
169:20,25
170:13,18,22
172:15
179:7,19
182:1 183:11
184:6,20
185:1 187:24
189:11 191:3
193:6 194:8
197:14
198:21
200:4,21
202:3 204:5,
16 206:21
207:17,25
208:5 209:9,
24 210:3,7,
8,12,18,22
211:3,11,16,
19 212:15
213:25
214:24
217:13
219:4,25
222:14 224:5
230:3 232:8
235:3 240:10
241:5 242:24
243:21 244:2
245:6 247:7,
12,17
248:14,20,24
249:7,19
251:1,9,19,
24 252:14
253:14,23
254:16
256:24
259:22
262:16
263:25
264:12,24
267:15,23
268:16
269:3,23
270:21
271:4,11,23
272:9,14,25
274:12 275:9
276:7,21
277:15
278:23
279:8,12
281:5 282:1,
18 283:10
284:7,15,18
285:25
287:8,20,23
288:3,20

289:4,8,25 291:8,14 292:1,6,10, 14 293:5,9, 10,15,20,22 294:6,11,17, 20 295:2,7, 10,11,25 296:3,15,18, 22 297:4,7, 20 298:2,5 299:12,19 300:5,11,19, 24 301:5,11, 20,25 302:2, 6,12 303:7, 12 304:6,13 305:8,20,24 306:6

**olden**
212:19

**older**
42:6

**olds**
135:3,5

**omeprazole**
43:10,12,13, 22 64:12,14 68:6,7 110:12 151:9,11,23 295:22

**once**
23:9,14,19 26:13 158:3, 13 165:9

**once-a-day**
152:2

**oncologist**
51:11,12 52:9 229:20

**oncologists**
51:24,25

**oncology**
53:16

**one**
7:16,19,22 21:8 22:10 25:3 30:17 40:23 43:10 44:15 47:18 53:16,20 54:4 55:13, 14,18 56:3, 17 57:4 64:16 65:6 67:4 68:24 71:10,15 78:22 83:18 84:4,6 87:6 90:21,24 91:8,15 93:12,25 95:13 96:24 104:14 105:22 114:17 119:21 122:21 123:7 125:6 126:1, 16 129:3 132:25 133:1,19 134:16 139:16 141:7,8 143:11 145:25 151:3 159:21 163:12 170:4,24 171:8 173:19 176:9 177:13 178:11,20 179:3,19 180:1 186:7 188:20,21 191:19 196:6,10,13 197:1,2 201:14 203:4,9 205:16,23 206:10,17, 24,25 207:1, 7,18 213:21 215:22 216:11 224:5,11,13, 25 225:14 226:2 227:12 230:22 232:12 233:9,23 234:1,10,12, 18,19,25 235:1 236:6, 13 237:14, 21,24 240:23 241:17 243:7,19 244:10,17 246:4 251:8 254:8 255:3 259:5,6,8 260:11 263:20 268:6,9,19 271:15 274:5 277:12 278:13 280:6 283:12,19,23 287:7 289:19,21 290:14 292:2 293:23 300:13,14 304:18,22 305:1 307:20

**one's**
66:11

**one-**
226:22

**one-day**
139:19,24

**one-month**
233:23

**one-year**
228:4

**ones**
17:9 18:5,6 20:1 29:23, 25 30:5 54:23 72:18 77:3,4,5 78:16 110:17 113:20 114:16 124:8,13 125:7,16 132:25 175:11 184:1 205:11,20 215:9 237:3, 5 243:15 255:15 259:16 270:6

**open**
49:10

**opinion**
8:14 14:16 15:4,12 58:10,17,21 59:16,17 69:24 74:19 76:22,24 78:11 80:21, 23 87:11,15 88:3 107:13 109:6,8,10, 13,15 161:17 179:21 306:6

**opinions**
15:21 50:18, 25 58:8 59:7,13 70:5 76:8

**opportunities**
23:18 36:9 111:1,19 112:9,22 113:12 114:21 115:7,9 118:14

**opportunity**
61:1 180:16 196:5 237:4

**opposite**
203:5

**optimizing**
40:2

**options**
39:23 86:1
115:15,16
117:14
**oranges**
192:5
**order**
25:12 34:24
68:18 132:3
270:24
**organization**
252:7 253:9,
18
**organizations**
36:7 39:14
253:23,24
254:2
**organized**
275:14
276:10
**original**
20:4 22:14
24:4 43:20
55:21 63:13
74:4,8,16
81:7,14,16,
25 91:9,17
158:17
200:18
248:10 249:2
**originally**
19:13 88:8
90:10
**originated**
111:14
**OTC**
236:5 237:9,
19,24 238:5,
10,15 241:5
**OTCS**
237:4
**other's**
266:24
**otolaryngolog
y**
33:8,12
36:24 37:1
38:14
**outcome**
61:8 107:10
171:1,5
172:20
173:16
175:3,16,17
178:5 180:14
183:22
185:14
186:14,24
192:9,19
193:3 225:22
226:3,13
227:15
230:16
231:24
241:14,19
242:5,11,17
244:6 245:13
304:3 307:5
**outcomes**
64:5 173:9
**outline**
48:13 186:15
223:10
**outlined**
7:14 26:21
31:24 32:7
54:21,24
60:3,12
61:13 62:4
64:3 74:12
75:21 77:3,
5,14,21
90:19 95:3
96:4 99:14
126:11
132:23
177:25
197:16
200:19
201:6,23
205:12 207:3
224:22
225:12,13,15
235:12
245:23
257:3,4,5
258:12 263:8
264:6 266:19
278:13,14
279:7 303:9
304:12
307:15
**outlines**
290:16
**outside**
48:5
**over-the-
counter**
216:17
217:3,9,18,
25 218:7,9,
17,18,20,23
219:5,14,15
236:1,25
237:7,14
**overgrowth**
157:25
158:9,19
159:2 162:6
**overlap**
35:14 38:15
**overnight**
165:4,5
**overwhelmed**
80:3
**overwhelmingl
y**
90:23

**P**

**P-C-A-B**
41:5
**P-CAB**
41:25 110:15
125:23
127:18
**P-CABS**
40:12,18
41:4 42:9
43:21 145:6
**p-value**
194:10,11,22
196:6,23
**P.a.s**
113:9
**p.m.**
105:11
170:10,15
210:4,9
247:9,14
290:2,6
302:14,19
307:22
**P450s**
165:10
**page**
10:13 12:9
16:19 17:23,
25 18:23
19:17 20:10
58:5 96:19,
24 97:1 99:1
156:9,10,11
197:16
198:7,8
201:5
204:17,23
211:23
226:5,20
227:17
235:7,12
264:16,17
265:5,11,13
274:10
276:17
277:16
287:12
**pages**
25:10 264:19
265:3
**paid**
117:7 118:4,
5,8,11
119:1,17
120:11
122:24
126:9,14,16

**pain**
37:20 64:10 131:18,21,25 143:3 154:10 224:2,21
**painful**
31:19
**paint**
197:9 232:24
**pancreas**
37:21 70:20
**pancreatic**
59:3 66:25 131:15 141:2 291:16,24 292:2
**pancreatis**
291:16
**pancreatitis**
37:24
**pandemic**
106:18 277:2 278:24
**panel**
253:4 254:17,21,23
**pantoprazole**
43:14,23
**paper**
9:5 11:20 276:23 281:8
**papers**
9:9
**paragraph**
99:10 212:7 275:10,17
**parameters**
184:17
**parietal**
41:16 144:10,13,20 145:1,2 161:6
**part**
16:5 21:6 41:1,2 48:7 62:18 71:21 121:14 123:6 125:4 126:25 130:15 172:19 173:1 183:23 189:10 193:19,23,24 197:24 223:15 224:3 230:7 253:12,21 254:24 260:7 269:7 273:2,3,10 281:13,14,15,19,25 282:2 287:21
**participant**
269:23 273:4 278:18
**participants**
269:20 270:16,23 271:6 281:18 282:10
**participate**
113:13
**participated**
282:1
**parts**
133:6 207:4 264:22 280:8
**past**
10:12 109:20 115:10 119:18,22 124:1 143:24 219:21 253:21 271:17 282:2 283:4
**patent**
288:17
**pathologically**
147:2
**pathologist**
50:5,6 141:5
**pathologists**
141:6
**pathology**
147:3 155:9
**pathophysiologically**
154:3
**pathophysiology**
154:13
**patient**
38:4,7 41:21 52:7 91:24 94:2,12 100:22 101:13,19 103:1 105:23 106:2,7 112:5 115:10,20 119:25 132:5,7 134:11,18,20 157:1 171:24 172:4,10 175:8 178:16 179:11,16 181:22,23 208:8 209:19 213:17 214:5,6,10,14,20,21 215:7 219:14 220:7 221:4 225:5 243:9 260:23 275:13 276:10 303:19 306:11
**patient's**
64:22 214:2 227:21
**patient-related**
176:22
**patients**
14:3 23:12 31:20 32:9 34:20 37:18,19,23 38:3 39:16 41:23 44:12,23 45:4,16,20 46:3 47:17 48:16,25 49:1,5,14 51:13,16,17,21,22 52:6,19 53:6,8 54:15 58:24 61:6 64:6 82:9,19,23 83:14 86:18 87:4,7 88:12 91:13 92:13 95:15 97:11,15 98:11 100:6,11,16,18,23 102:19,21,22 103:7,11,19,21 104:23 115:11 117:16 128:7 131:8 133:9 137:16,18 138:4 140:15 143:6,13 145:10 146:10 148:7,9 153:1 156:25 159:15 160:8 161:5,6,7,10,20 162:1 163:24 164:1 172:3,10 175:6 179:6 180:12 183:3 185:5 189:3 190:13,22 193:1 211:24 213:10 214:5,25 215:6,14,18 216:3,18,21

217:2,18 218:8,17,23 219:22 220:1,11 221:14,20,25 222:5,10,15, 25 223:19,25 224:20,22 225:19 235:16 243:13 245:25 246:10,11, 15,19 255:19 260:22 266:21 267:22 271:16

**patients'**
216:23 285:21

**pattern**
112:14 229:21 230:13 258:9

**pausing**
305:12

**pawn**
38:6

**pay**
216:3 217:5, 7

**paying**
267:10

**payment**
120:8

**payments**
120:4

**pays**
217:11

**PDF**
10:19 11:19, 20 12:3,6

**peer**
249:19 250:1,6,8,9, 18,19,22 251:13 253:4 254:17,21,23 260:3,6 277:20,22 280:11

**peer-reviewed**
200:21,25 204:19

**pendulum**
284:10

**people**
45:8 52:11 95:25 104:9 133:16,18 142:22 147:14,17 152:22 154:3 157:23 159:5 164:5 173:10,11 185:11 196:19 233:2 282:15

**Pepcid**
86:6 191:17

**pepsin**
146:2,3,5,10 147:8,10

**pepsin's**
146:12

**peptic**
45:5,8 57:5, 6 133:7 153:2 221:9

**perceived**
281:6

**percent**
46:9,16 47:3,12 144:24 153:13 158:16 183:10 194:14,17,23 195:1,3,11 204:15 237:18,19 262:10

**percentage**
238:9,10

**perfect**
43:4 168:1 230:10 231:15,21 241:20

**perform**
48:10 258:11

**performed**
54:11 260:3

**performing**
47:6

**perils**
30:25

**period**
68:8 103:14 138:16,23,25 139:4,9,20 140:3 144:18 156:4 164:20 165:3,20 182:6 226:12,24 227:1 229:3

**periods**
229:2,4

**peristalsis**
142:12 146:23

**pernicious**
161:5 162:4 167:25

**person**
7:22 14:15 28:9,12 118:17 164:20 174:9 273:25 274:9 277:5,13 278:21 280:20

**person's**
171:15

**personal**
46:25

**Personalized**
305:4

**personally**
56:16 87:25 186:25 207:9 223:23 243:7 261:9,23

**Persons**
299:13

**perspective**
37:16 38:16 44:10 48:21 61:23 139:17 157:8,14 165:10 185:13 243:8 265:15 266:22

**pertain**
19:22

**pertaining**
13:20 62:10 63:25 72:25 73:11

**pertinent**
279:15

**Pfizer**
111:20,22 112:10

**ph**
39:4 151:4,5 154:19,22 155:4,9,10, 21 156:3,12, 13,21 157:7, 10,14,15 159:25 160:20 161:18,19,23 162:22 164:7,10,12 165:7,15,25 167:6,15,21 168:10,15,17 169:2,6,15 210:14 275:7 278:9

**Ph.d.**
6:22 33:1 35:11,14,15, 19
**pharm**
127:8
**pharma**
20:4 109:23
**pharmaceutical**
109:4,11,21 116:1 117:1 118:1,8 119:1,17 120:5 121:2, 9,15,22 122:4,8,24 123:6,8,19, 25 124:5,18 126:6,19 127:10 128:20 129:10
**pharmacodynamics**
43:16 145:24
**pharmacokinetics**
43:17 145:24
**phases**
63:4
**phenomenon**
142:2
**phenotype**
214:6,19
**phenotyping**
214:5 221:5
**phone**
9:12
**phonetic**
303:11
**photograph-**
6:11
**phs**
162:5
**physician**
51:4 266:21
**physiologic**
142:17 144:7 151:16 158:2
**physiological**
164:24
**physiologically**
143:8 147:2 150:25 163:22
**pick**
207:7
**picture**
32:22 62:1 115:19 180:7 197:9 230:17,18 232:24
**piece**
9:5
**pieces**
230:17
**pills**
91:5
**pitfalls**
115:21
**place**
30:14 168:8 273:17,19
**placebo**
128:15 172:24 183:1
**places**
265:4
**plaintiff**
106:10
**plaintiffs'**
17:24
**plan**
26:15
**plant**
68:22
**plausibility**
65:4,14 66:10,13 71:11,14,17 74:9,14 77:4 79:25 193:18
**plausible**
64:24 65:19, 23 73:17,25 74:6,20
**play**
53:18 135:11 162:19 190:7 194:5 238:2 241:3
**please**
6:5,16 20:11 27:25 57:23 72:6 105:9 156:8 170:13 172:13 210:8 247:13 307:25
**pneumonia**
159:4,7,9, 13,16,21 160:12 189:2 190:15
**pocket**
216:3 217:8
**point**
10:11,12 63:17 87:6 98:17 101:20 102:23 139:23 140:7 161:25 164:25 183:21 202:5 207:11 209:8 241:19 285:18 288:20 289:10
**pointing**
202:4
**polyp**
49:21
**polyps**
49:17
**polytomous**
236:18
**poorly**
148:15 194:1
**poorly-designed**
183:13
**pops**
194:20
**population**
41:21 112:5 124:25 125:15 126:3 127:18 161:9,13 162:7 164:1, 6 172:2 178:7 191:14,18 231:1 233:2, 8 254:1
**population-based**
297:1 298:13 301:1
**posed**
224:12 238:4
**positions**
70:2
**positive**
187:2
**positives**
236:11
**possible**
26:25 90:1 109:1 122:2 214:3 232:7 236:1 237:7 238:16
**post-gastrectomy**
163:24
**post-gastritic**
161:7
**postresidency/fellowship**
113:19

**potassium**
40:13 41:15 145:2,3,6,7, 17
**potassium-competitive**
41:10,11
**potential**
58:18 60:4 130:9,17 174:23 184:18
**potentially**
54:15 64:5 130:24 174:17,19 240:25
**pounds**
86:19
**power**
68:21 83:9
**PPI**
68:4 107:5 108:13,14,19 125:8,10 144:16 150:16 151:5 157:24 158:3,4,5 159:14 163:18 165:8 167:8 201:10 217:14 218:18 220:4,9,14, 15,19 221:6 224:23 272:15 273:2 278:4 281:7 286:1 288:22 289:5,12
**PPIS**
43:2,6 44:9 46:2 86:10 87:7 107:9 110:10 113:21 117:14,15 134:21 144:2,5,9,10 148:13,20,25 149:3,17 150:12,14,15 152:1,15 153:10 154:21 158:24 159:4,8,15, 19 160:1,11 161:1 164:4 167:24 172:23 189:2,4 190:16 205:1 212:1,11,16 213:19 214:1,8,9 218:10 219:25 220:24 221:12 272:22 280:3 285:4,8 287:20,25
**practically**
87:3
**practice**
16:6 34:22 37:9 38:8 46:7 47:4 48:11 51:13, 16 64:6 83:13 131:2, 5,13 143:24 213:25 214:25 216:2 222:21 253:2 269:8,16,24 272:19,20 273:20,21 274:16 277:21 280:5,25 282:9 284:9, 15,18,20 285:18 286:3 287:25 304:14 305:4
**practices**
48:1,5
**practitioners**
113:9
**pre-market**
42:2
**precancer**
225:10
**precise**
179:20 180:1
**Precision**
180:1
**preclude**
185:21 188:3
**precovid**
7:23
**predisposes**
53:20
**pregnant**
45:24
**preparation**
15:18 18:11, 19 20:16 21:14 22:22
**prepare**
16:9 17:3,10 27:12 28:3,6 29:6,12,17, 21 31:4 32:14 61:19 204:16 289:2
**prepared**
11:11 15:11 17:12 25:6 26:7
**preparing**
11:15 12:14 18:3
**prescribe**
82:8,18,22 83:19 84:1 85:12 89:2, 14 217:23 219:1 220:4 222:14,19 223:8
**prescribed**
87:7 143:18, 23 144:2 219:22,25 221:14,19,24 222:4,9
**prescribing**
89:7 115:8 116:18 216:20 218:21 222:25 223:19
**prescription**
98:15,16,23 99:7,11,17, 18,21,22 101:23 103:3 104:24 217:6,11,16, 20 218:2,3, 4,7,11,21 219:6,13,15 246:8,20
**prescriptions**
99:2 100:18 102:14 103:12,23 104:5,9,10, 16,17 246:15
**presence**
55:19
**present**
23:10 28:18 37:24 54:22 56:4 108:15 115:11 122:16 142:22 143:6 172:3 224:20
**presentation**
115:11 131:25 132:5 221:4
**presentations**
11:5 23:17 37:23

**presented** 54:9,13 61:14
**presenting** 285:21
**presents** 131:18 143:4 171:24 213:17 214:6
**pressures** 272:1
**presumption** 265:21
**pretty** 147:20,22,24 155:11 292:14
**Prevacid** 43:25 111:15,16 116:18
**prevalence** 133:16 237:17
**prevalent** 133:5
**prevent** 86:14
**previously** 10:3 43:2 83:1 86:5 105:17 141:15 143:17 170:18 193:6 210:13 211:4 229:1 249:15
**Prilosec** 43:24
**primarily** 37:9 38:12 56:24
**primary** 45:15 113:9
**print** 301:5
**prior** 7:13 34:6 36:12 44:8,10 45:3 106:18 108:22 120:18 137:18 272:18
**private** 47:23
**probable** 65:17 78:17 249:16
**probably** 22:17 23:15 46:16,22 110:4 120:18 213:7 273:25 280:24 283:23
**problem** 45:17 52:2 66:12,13 143:12 148:7,10 160:24 170:8 175:24 202:18,21,22 237:10 302:13
**problematic** 65:6 74:15 175:12,14 303:21,23 306:19,20
**problems** 66:5,16 88:15 199:4 255:9 303:17
**procedures** 48:10,12,24 213:11 277:22
**process** 27:20 50:14 51:8 52:20 62:19 63:7 74:3 84:3,4,7 85:17,19 129:16,19 144:23 249:20 250:1,7,12,18 260:3 282:14 283:1 287:12 289:2
**process-related** 27:17
**processes** 52:25 60:11 84:11 282:20,21
**Proctor** 114:6
**produce** 10:16 12:25 143:15 144:12 151:7 152:11 154:7
**produced** 11:8 13:2 19:18 24:19 26:4 146:5,6 150:24 248:11
**produces** 144:19
**producing** 154:17
**product** 7:15 13:4,14 55:9,13,14 93:8,24 94:2 105:22,25 122:13,19 123:8 125:24 128:6,15 198:15 266:15 268:2,20 272:5 306:4
**production** 41:16 145:21
**products** 6:9 13:5,20 44:6 51:5 54:9,12 55:9,23 56:4 87:13,24 88:4 90:4 113:3 114:16 116:2 117:1,3 121:9 122:25 127:11 268:17 298:25
**professional** 23:23 34:4 36:20
**professor** 33:11
**professorship** 36:25
**profile** 62:17,23 63:6
**profiles** 51:7 63:2,9,12
**programs** 122:3
**projects** 39:14
**promote** 123:8
**promoting** 113:14
**pronounce** 7:9 153:18 299:25
**pronouncing** 288:9
**properly** 148:11 245:13
**propose** 91:8
**proposed** 159:19

**proposing**
192:15
**proposition**
183:17
189:12 200:5
220:23
231:3,9
**Prostate**
297:12
**protected**
188:10 203:7
**protective**
178:20
188:20 207:8
**protects**
138:13
142:15
203:13
207:10
**protein**
146:6
**protocol**
34:8 125:15
**proton**
40:15,16
41:13,15
43:1,5 44:24
45:11 63:10
86:10 115:8
145:1,2,4,5,
17 153:13
154:25
157:2,11
161:11 213:4
215:2 272:21
281:2 285:20
296:24
298:11
**protonated**
168:25 169:9
**protonation**
168:24
169:7,8
**Protonix**
43:24
**protons**
145:3
**protopathic**
175:7 190:7
208:15
224:10
225:2,24
227:4 228:5
236:9 245:9
**proud**
178:25
**prove**
159:10,17,22
196:18
197:10
234:24
**proven**
54:18 190:18
**provide**
31:11 58:10,
17,23 109:15
110:19
112:21
113:11
122:17
124:18 125:5
179:15
183:12 226:2
232:6 259:3
264:2 274:18
278:2,3
282:9 301:5
**provided**
12:12 15:15
17:1 19:9,10
21:7 23:4,6
25:14 26:6
29:22 106:22
107:10,13
124:1,5
223:17
270:16
277:17
279:1,14
280:14,18,
20,22
**providers**
113:8
**provides**
61:25 179:10
181:21
195:24
216:24
287:17
**providing**
8:14 14:16
15:4 25:15,
20 92:12
161:17
278:10
282:16
**prudent**
273:1 278:12
**psyches**
219:9
**psychology**
218:3
**public**
6:2 46:19
**publication**
11:5 22:13
46:19 80:2
107:12
128:21 129:1
200:10 269:7
270:16
271:21
280:11 284:8
300:14,15,17
301:6
**publications**
19:7,9 23:23
24:3 32:11
126:5 129:23
130:3,21,22
176:18 195:4
205:3 269:5
289:1
**publish**
23:11 24:6
32:6 47:24
129:5,12
130:6,9
181:8
**published**
12:11 23:16
24:14 95:7
126:15
129:24
195:16
200:21,25
202:3 204:19
269:7,17
273:21
277:3,4
280:11
291:17
292:23
294:14 295:4
300:9,10
301:1
**Pubmed**
21:20 24:5,
15
**pull**
10:3 16:14,
23 20:7,18,
24 21:8
24:22 27:4
35:1 40:25
58:2 97:20
112:1 124:2
156:8 177:13
198:10
200:17
237:13
263:20
269:11
270:10
283:11,17
284:3 291:11
292:18 293:9
294:10,23
295:15 296:5
301:7
**pulled**
19:8 21:6,9
22:6 46:10
82:15 83:15
177:17
**pulling**
104:4,5
108:1 177:12
**pump**
40:15,16
41:13 43:1,5

44:24 45:11 63:10 86:10 115:8 145:3, 5,8,18 153:13 154:25 157:2,11 161:11 213:4 215:2 272:21 281:2 285:20 296:24 298:11

**pumps**
41:15 145:1, 18

**purported**
58:13 65:4 73:8 191:19

**purpose**
129:16 288:11

**purposes**
15:4 161:17 253:6 278:3 282:8 300:18 301:6

**pursue**
78:1

**pursuing**
125:11

**push**
40:12 48:22

**put**
14:8 27:5 39:3 66:8 89:10,11 111:4 112:22 117:18 129:3 130:18 155:10 159:14 163:18 165:19 175:6 181:10 188:18 190:11 191:1 193:1 197:3 206:6 220:8 224:22 233:13 234:17 238:25 244:18 259:4 265:2,14 270:5 286:6 292:16 304:4

**puts**
44:17 53:10 61:23 88:12 137:17 179:1

**putting**
80:7 86:18 152:15,17 164:5 187:24 230:13 238:11,12 243:21,23 244:3 245:2 259:15

**pylori**
133:1,2,3, 11,15,18,22 134:8 135:9, 14,17,19 136:8,14,15, 23 140:10 163:12 299:14

**pylorus**
147:3

## Q

**qualification s**
23:23

**qualified**
51:9

**quanti-**
118:21

**quantificatio n**
91:23

**quantified**
90:13 91:4 92:19

**quantifies**
93:7,24 265:7

**quantify**
102:12 104:8,15 264:17

**quantitate**
118:21

**quantitated**
306:24

**quantitation**
306:21,22

**quantitativel y**
306:16

**question**
14:22 15:24 17:10 24:4 27:3 30:7 31:3 33:12 39:17 41:3, 19 43:20 53:25 54:4 55:21 56:8,9 63:19 64:20 65:18 66:1 67:14 68:12 69:12,14,17 70:17,18 71:9,19 72:1 74:4 77:15 78:2,3 79:7, 9 80:1,7 82:7 83:24 84:22,23 85:2 89:9 90:21 91:17, 20 92:8,23 93:4,6,15, 16,17,22 94:8,9,12, 14,20 95:1, 21,22,25 96:4 100:1 106:6 109:7, 12 111:5 133:21 135:9 137:5 139:3 140:9 146:19 148:15 155:6 157:19 158:7 160:7 162:14 163:16 166:3 168:14 170:23 172:17 177:7 179:24,25 185:25 187:17 190:6 191:8,10,15 192:14,17 195:21 204:5 205:16 206:4,9,15 209:4,10 218:13 220:15,22 226:1,7 228:3 232:5 233:21 238:3 239:14,19,21 241:21 242:3 249:9,14 251:16,18 257:12,18 258:10,13 260:9,23,25 262:18 266:5 267:25 268:22 273:24 287:23 290:9 291:1 305:20 307:1,3

**question's**
179:7

**questioning**
104:2

**questions**
12:19 33:16 34:2 37:4 51:9 102:8 128:10 150:21 209:4

224:12 240:4 247:18 254:9 292:7 302:8, 11,25 303:2 304:13 305:9,16,17 307:18

**quick**
290:9

**quicker**
141:9

**quickly**
10:23 12:10 283:25 286:10 291:8 292:15

**quit**
9:14

**quite**
8:19 28:11 34:25 261:20 262:18

**quote**
126:16 186:9 194:20

**R**

**rabeprazole**
43:14

**radiated**
137:19

**radiation**
49:2,5 51:24,25 52:8,11 53:16 68:19 137:18,21,22 183:7,8,9

**radiation-induced**
52:3

**radio**
122:25 123:2

**raise**
6:15

**raised**
54:14 55:21 68:4 74:4 79:11 81:7, 25 88:7,18 91:10

**random**
103:18

**randomization**
183:24

**randomize**
182:25 183:6,8

**randomized**
60:17 63:3 91:24,25 92:7,10 94:1,17 100:9 102:23 127:25 128:14 171:4 172:18,23 173:5,17 174:1,2,13 176:5 180:10,11, 17,19 181:14 182:2,4,19 183:13,20 184:4,11

**randomizing**
61:6 180:11

**range**
91:14 92:12, 13 96:23 98:4 147:15 265:17 268:8,14

**ranges**
268:15

**raniti-**
262:20 291:21

**ranitidine**
6:9 13:4,5, 7,14,20 22:7 44:15 54:9, 10,11,22 55:23 56:5, 19,20,24 57:3 58:12, 13,19,21 59:1,21 60:2,6,8,9, 14,18,21 61:7,9,15,19 62:7,10,11 63:2,15,19 64:1,4,22 65:5 73:9,17 74:1,5,16 76:3 77:5 78:3 79:11, 12,23,24 80:7 81:2,8, 22 82:8,18, 22 83:2,3,19 84:24 85:13 86:2 87:13, 24 88:4,11 89:3,7 90:12,14,18 91:3,5 92:4, 18,20 93:7, 8,23 94:5, 10,23 95:23 96:1,5,6 97:8,11,15, 16 98:12,20 99:7,13 100:7 102:13 103:12 104:5,10,16 156:3,14 161:19 165:19 173:3 191:8,10,11, 13,15 198:14 200:22 201:1,8,10, 11,18,25 202:8,12,20 203:2,7,13, 16,23 204:7, 8,20,25 205:1,13,14, 18 206:24 207:9,12,14, 21 211:25 215:17,19 224:15,17,23 225:14 229:9,25 230:11 237:18 238:9,12,24 240:24,25 241:1,10,24 245:19,20 247:21,24 248:1,6,11, 15,21 254:25 255:19,20 256:14 257:9 258:17 259:7 260:21,23 261:5,15 262:2,20 263:6 266:4, 7 290:19 291:9 292:5, 22 293:11 294:13 295:3,21 298:24 299:12 300:1,25 301:12,21 304:3 305:22 306:4,23 307:4,9,13

**ranitidine's**
291:23

**rate**
147:12 148:14,20 149:10,12,22 282:23,24

**rates**
283:1

**ratio**
186:5,17 187:11,19

**ratios**
189:19

199:13
**rats**
64:15 66:16 70:11 71:12 74:23 76:17 151:9,11 254:10 256:21 262:11
**re-looked**
87:20
**reach**
14:15 15:1 59:18,24 80:9 127:19 188:23 216:13
**reached**
14:3,21 61:11 67:16 75:7 79:1,18 84:9
**reaching**
61:10,16,20 62:12 67:17 76:8 77:1 291:23 301:22
**read**
58:15 59:4,5 176:2 190:14 212:13 235:22 272:23 274:21 276:5,12,19 277:24 280:22 288:14 293:13 299:1
**reader**
130:20
**readers**
130:16
**readership**
130:23
**real**
103:19,20 307:6,9,13
**Realistically**
158:25
**realities**
87:4
**realizing**
87:9
**realtime**
168:21
**reason**
34:16 90:16 103:20 115:18 142:10 152:6,9 154:3 155:9 159:10 175:1,23 192:22 203:10 215:10 220:19 224:16 237:24 305:13
**reasonable**
103:16 106:12
**reasons**
192:3 219:8 258:11
**reassuring**
92:15 100:22 101:6 230:1 231:1
**recall**
10:11 13:12 14:18 17:20 20:18,22 21:1,10 24:1 25:22 50:14 62:15 74:3 106:1 110:21,24 112:7,8 113:22,25 114:7,10,20 123:25 130:3 131:8 175:7 181:24 197:12 198:4 208:3 210:16 212:2 221:17 235:13,17 249:17 250:16 255:11 274:25 276:21 279:25 303:5 305:8,10 306:4
**recalled**
81:3,23 83:3,4 84:24
**recalls**
50:12,20
**receive**
120:5,8 123:19 129:9
**received**
13:3 99:6 288:10
**recent**
11:1,3,6 26:3 265:15 268:9,10,23
**recently**
110:14 149:8 250:4 269:6 294:2
**receptor**
40:14 42:12,17,18 44:9,11,18,21 45:3,10 46:1 60:8 63:10 87:10 113:20 144:9 145:16,25 153:12 155:2,19 157:2,12 158:6 161:11 172:22 193:1 201:11,24,25 202:12 205:2,19 213:4 214:10,15,16 220:13,18,20 221:7 296:25 298:12
**receptors**
146:1
**recognize**
164:24
**recognized**
225:4
**recognizing**
180:18
**recollection**
14:14 15:8 25:18 281:16
**recommendation**
213:13
**recommendations**
212:20
**recommended**
287:17
**recommending**
148:6
**record**
6:6 7:7 8:4 9:18 14:8 57:19,21,25 105:5,7,12 170:9,11,16 175:10 210:5,10 240:2 246:25 247:10,15 265:2 286:6,10 290:3,7 302:15,20 307:19,23
**recruited**
36:3,7
**rectal**
38:5

**reduce**
89:25 155:3 157:24 158:13,14 180:21 181:12,17 188:24 228:4 296:10
**reduced**
144:14 149:16 158:15 227:19
**reduces**
145:9 174:1 180:14
**reducing**
149:3 154:24 157:1
**reduction**
161:13
**reevaluate**
251:3
**refer**
19:19 42:15, 17,21 43:2, 5,22 51:17 52:9 75:2 97:7 121:21 132:18 250:23 307:14
**reference**
16:10 197:11 211:15
**referenced**
17:6 22:13, 14,15 76:1 77:14 87:21 131:11
**references**
17:6 21:21
**referencing**
108:3
**referral**
51:20
**referred**
55:4 56:17, 19 107:4 112:9 253:14,19 258:16 259:18
**referring**
30:3 43:6 44:25 45:2 62:23 72:3 75:4 98:5,7 136:7 138:17 139:2,4,6,12 161:24 209:14 226:10 250:24 258:15 259:19 282:14 285:2,4 286:1,2 287:24,25
**refers**
109:8
**reflux**
14:4 33:7,10 36:15 38:24 39:1,7,9,16 40:5 48:25 49:13 53:8 56:25 57:5 87:5 100:24 103:21 112:13,14 115:11,12 117:21 121:10 122:1 123:14 125:9 138:1,4,7,14 141:16,25 142:2,3,9, 10,17,18,19, 23 143:3,13, 19 148:9,11 151:17 159:12,14 160:10,11 161:10 164:2,5,6,21 166:25 167:1,2,3 172:5 212:21 213:2 220:12 271:14,15,16 275:8 278:11 284:24 297:23
**refluxer**
100:25
**refluxes**
146:11
**refresh**
250:15
**refrigerated**
222:1
**refusing**
93:16
**refuted**
84:16,19
**regard**
30:12 63:17
**regarding**
14:3 27:17 36:16 37:8 40:9 42:8 54:22 58:11 60:21 75:20 77:12 78:23 79:23 83:7 112:13 113:3,21 121:7 138:3 153:6 172:21 187:17 215:6 224:14 255:12 257:12 262:1 274:5 275:6, 7 278:9 280:3 304:3
**regular**
23:13,14
**regulatory**
50:7,11,19, 25 65:9 69:23 70:1, 6,13 74:25 75:2 76:20 82:24 83:8, 12 84:8
**regurgitation**
143:2 154:11
**relate**
77:4 134:18 190:8
**relate-**
118:5
**related**
24:20 53:1 111:18 113:21 145:12 173:3 178:6,7 180:2 185:19 230:11 305:16,17
**relates**
22:4 141:2 147:3
**relating**
13:14 67:10, 12 69:15 70:7 210:14 256:8,25 271:14
**relation**
11:11 14:16 21:14 25:20 59:21 60:14 62:6 102:12 107:5 297:22
**relationship**
59:1 158:12 185:22 188:3
**relative**
43:11 155:1 186:6,11,18 187:4,10,14, 16,19,25 188:2,6 189:23

**relay**
180:6 244:18 257:3
**relevance**
68:12 163:16 189:22 190:12 195:18 254:8,15
**relevant**
18:8 266:22 273:8,9 279:4
**reliable**
58:25 198:14 199:9 290:20
**relied**
15:20 16:1, 11 291:9,20, 22 292:11 293:16 294:3,18 295:8 296:1, 16 297:5,15 298:3 299:17 300:6 301:2, 18,21
**reluctance**
215:21
**reluctant**
215:8,10
**rely**
182:12 218:2 223:6,22 293:2 298:16 303:19 306:22
**relying**
176:13 251:19 269:1 299:6
**remain**
146:17 231:15
**remaining**
288:12
**remember**
15:5,6,25 20:25 25:15 26:14 42:6 48:15 78:14 91:22 108:24 109:1 110:3, 7,19,25 114:1 151:8 160:6,24 193:12,19 194:18 274:3,8 277:8 278:8, 15 279:20 280:1 289:1, 15,18,24 305:1
**remembering**
24:2 79:23 88:7 127:14 130:21 235:19,20 262:6 266:10
**remind**
20:7 120:18
**reminding**
9:14
**remote**
6:6
**removed**
48:2 49:18 78:5,10 79:6 255:18,21 256:12 257:7 258:12 259:7,17 260:20 307:3
**renal**
131:20
**repeat**
12:18 18:12 71:4 200:24 231:7
**rephrase**
162:14,15
**replicate**
81:15
**report**
7:14 9:7 10:19,20,24 11:15,21 12:15 13:21 15:12,15,18, 22 16:1,9, 10,13,17 17:3,5,9,13, 19 18:3,6, 11,19 20:4, 17 21:15 22:7,22,25 23:5 25:20 26:11,19,20, 21 27:15,20 30:6 54:21, 24 58:3,6,9 59:16,19 60:4,12 61:12,14,18, 22 62:4 77:6,13,21, 24 87:17,18, 22 96:25 106:24 127:15 132:24 138:18 156:2,7,11, 22 165:19 178:23,24 179:1 186:16 188:18 197:11 198:2,8 201:4,18 202:7 203:22 204:6,17 211:22 225:11,15,18 226:5 235:6 249:22 250:10,23,24 251:2,10,20 252:5,7,9,13 257:14,20 263:17 264:1,9,10, 12,16,22,23 265:12 267:2 269:2 271:18 276:15 290:10,12,16 291:10 292:12 293:2 294:4,18 295:8,16 296:1,16 297:5,16 298:3,17 299:6,17 300:6 301:3, 8,18,22 303:9 307:16
**reported**
265:16
**reporter**
6:10,13,15, 17 7:2 289:21
**reporter's**
41:9
**reporting**
200:22 201:1 204:20
**reports**
17:23 18:2 21:12 30:3 174:6 262:24 269:1 303:17
**represent**
20:1,3 25:9 201:15,16
**representatives**
6:12 275:13 276:9
**represented**
8:21
**request**
122:4
**requested**
10:14
**requests**
10:17

**require**
130:5,8,10
246:10
273:12,16
**required**
223:4
**requires**
60:11 169:9,
10
**research**
13:3,6,14,19
21:6 23:11
31:21,22
32:5,6 33:25
34:20 35:25
36:2,13,24
37:16 38:9,
10,12,19,20,
22 39:5,14,
18 40:9,24
42:2,12
46:7,17 51:5
52:19 56:10
63:22 111:13
114:15 115:4
120:1 123:19
124:1,5,18,
24 125:3,5,
15,19 134:17
157:20
259:19
288:10,11
**researcher**
31:21
**reserve**
36:18 302:7
**residency**
35:23 45:7
113:17
**respect**
140:9 149:1
191:7
**respected**
65:10 252:12
**respond**
41:23 50:14
**responded**
18:6 214:11
**responding**
224:11
**response**
34:6 153:15
187:8,9
193:18
194:2,4
201:14
202:13 203:3
284:22
**responsibilit ies**
31:23 32:1
46:8 119:25
**responsible**
76:13 146:14
244:17 245:1
281:24,25
**responsive**
10:16
**rest**
18:7 37:3
46:17 90:25
281:20 302:7
**result**
157:16
160:1,17
178:19
**resulted**
130:25
273:20
**results**
247:23
256:20
294:14 300:1
**retained**
14:1,11
58:10 107:22
108:18
111:12
**revealed**
268:3
**reverse**
196:11
218:22
245:7,14
**review**
10:9 12:14
17:15 18:2,
18 29:16,20
30:13 31:4
33:21 47:24
58:17 59:20,
24 60:13,20
62:11,14
67:9,11,15
69:6,14 70:6
73:23,25
75:3 78:25
79:17 80:4,8
84:12 90:13
106:11 107:9
162:8 174:8
195:4 244:16
249:20
250:1,6,8,9,
18,19,21,22
251:13 253:4
254:17,21,23
260:3 263:21
264:4 266:25
267:10 272:6
274:14
277:20,22
303:8 305:5
**reviewed**
16:11 18:20
19:8 20:6,16
59:8,17
62:22 72:25
73:10 77:17
78:24 107:13
111:24
161:16 191:8
192:23
199:22
201:21 260:6
267:12
280:11
**reviewing**
11:17,25
26:21 27:21
62:16 64:3
76:15 245:2
**rewarding**
49:9,12
**rid**
144:17,18
158:1 163:5,
10,21
**right**
6:16 14:18,
19 15:25
19:5 30:6
37:12 38:25
39:23 40:2
45:22 46:10
48:7 55:25
64:7 65:4
66:5 67:17
68:11,20,22
71:15 74:15
84:3 86:23
89:9,17
90:2,18,20,
24 91:8,18
92:12 95:17
98:15 99:21
100:13,15,19
101:1,22
102:19,22
105:1 111:16
114:22
115:19
117:4,10
120:15
123:12
124:23
129:12
130:20 134:9
135:2,7
136:12
137:21
139:1,15
140:8 141:7
142:14
143:12,20,24
147:23
148:25 151:2
152:7
153:20,22
155:7,12

156:15,16
157:9 159:11
160:2 161:3,
25 163:8,21
164:14
165:3,11
166:11,20
169:7,9,21
171:23
172:4,20
173:24
174:6,17
175:7 176:10
178:13
179:23
180:3,16,23
182:17,18
184:9 185:15
186:7
187:12,21
188:4,7
190:19
191:11
192:3,19,25
193:12,24
194:14
195:15
196:1,2,3
198:11
199:17,23
200:9
202:11,18
203:5,20
205:7 208:12
212:4 216:8
220:1,15
224:19 226:3
227:16,21
228:9,17,21
229:6 231:14
234:2,7
235:8 236:4,
10,22,25
240:23
243:12 244:2
246:19 249:3
252:12
254:1,8,13
255:9 256:12
259:3,9
268:9,10,13
270:10 271:3
274:6,12
279:4,25
281:14
284:17
287:6,13,15
288:7 289:25
290:18,20
291:7 293:5,
25 295:12
303:18
304:16,21
306:19 307:7

**right-hand**
201:10

**ring**
108:25

**risk**
53:11 54:15,
22,24 63:20
78:4 88:12
90:22 95:15
133:4,9
135:2,3,23
136:6,12,15
137:17,20,23
138:2 153:2
154:15
171:22
172:2,3,7,9,
14 176:10
178:15
179:20
186:6,11,18
187:4,11,14,
19,25 188:2,
6,14 189:20,
21,23
191:22,23
192:21
193:14
201:15
205:13,24
206:11,19
207:11
222:15,16,24
224:15 227:4
228:4,5
229:17,25
230:1,5
231:3,9,25
232:13,15
233:5,6,7,24
234:1,5
235:23
253:25
254:10
255:15
260:24
262:12
263:16
291:16
292:22
293:12
294:13 295:3
296:10,25
297:12
298:12,23
300:1,25
301:12
303:23
307:11

**risks**
172:1 222:17
225:25

**RMR**
6:1

**rodents**
66:4,22
67:4,22,24,
25 69:1
70:15,23
71:6 72:4,
10,20 73:2,
12,14 249:3,
5,12

**Rolaids**
45:19,25

**role**
81:10 82:1
107:9 125:8,
10,19 128:22
129:2,3
135:11
147:10,11
159:4 241:3
254:7 270:4,
7 271:14
273:6,9
274:4,8
275:1,7
278:7,8,10
279:23
280:2,7

**roles**
32:4 46:5

**room**
9:1

**rough**
46:14

**roughly**
46:8

**round**
37:22 122:7

**RPH**
275:7

**rubber**
77:20 78:8
255:14

## S

**safe**
54:10 58:22

**safety**
272:21 281:1

**sake**
300:19

**sales**
113:3

**saliva**
142:11
146:11
210:19
211:16

**salivary**
210:22 211:5

**sample**
166:1,2
180:2 268:21

**sampling**
161:25
268:17,20
**Sandhill**
288:11
**Sanofi**
8:19 114:12,
13
**sat**
253:4 254:23
**save**
22:21
**saying**
8:5 41:4
65:12 89:10
92:11 94:18
98:6 116:20,
22 117:3
119:22
139:24
160:15
164:23
165:23
166:12
167:10
168:4,20
180:24
181:15
189:17
212:15
228:21
252:7,10
265:3,5
**says**
36:20 82:5
88:14 90:24
97:4 109:14
198:13,24
199:1 212:8
244:17 257:9
265:13,14
266:6 270:21
274:14 276:7
280:25
285:19 288:8
**scan**
131:22
**scans**
132:3
**scenario**
103:17 127:4
130:19 238:4
**scenarios**
102:18,19
189:18
**school**
35:16,17
45:7
**science**
35:10 127:24
173:24
**scientific**
127:2 128:9
253:6 288:12
**scientificall y**
195:14
**scientist**
71:10 88:15
**scientists**
84:11
**scoped**
134:20
**screen**
25:1 212:4
275:18,19
**scroll**
19:2 35:5
36:4 204:22
274:23
285:8,11,12
286:7,9,12,
14,19,21,23,
25 293:18
304:24
**scrolling**
19:3 287:11
**search**
10:15 22:1
24:6,15
75:12,16,19
77:22
**searched**
22:7,12
**searches**
16:3 21:14,
17,19,20
22:21 132:8,
17
**searching**
132:17
**second**
7:19 13:1
20:22 30:17
56:18 96:24
107:3 116:7
191:20 197:6
224:5 236:16
241:17 261:2
270:25
274:10
275:17
289:19 292:3
307:21
**secretary**
120:10,14
**section**
24:12 98:24
235:12 264:3
274:2,3
275:24
**sections**
201:14
**see**
12:25 16:7
17:24 18:15,
22 19:19
20:14,19
21:8 22:7,13
23:12 24:25
25:4 27:19
28:25 30:10
31:20 33:20
36:12,25
37:19 38:2,
16 47:11
51:12,15,20
52:19 61:22
63:5 64:6,11
80:3,4 82:5
83:14 97:1,
24 98:1
106:12
112:1,4
113:10
124:13,19
125:6,20
126:3 127:3,
4,17 130:24
138:18
139:8,9,10,
16 146:11
156:15
158:22
171:24 178:4
182:7 185:9,
15 186:8
187:23
191:23 195:3
197:4 198:19
199:25
200:18
202:13,14,25
204:25
205:4,21
212:8 214:25
215:5 220:21
226:20
227:14,17
228:1,10
229:17,18,21
235:7 237:8
243:19 244:9
246:19
264:2,3,10,
17,23
269:16,21
270:17,19
271:2,9
272:7 275:5,
15 276:5
277:4 284:1,
13,25 285:7,
23 287:14,
16,18,21
290:18,25
291:18
292:13
293:22 295:5
300:3 304:25
307:11

**seeing**
32:9 98:18 101:5 103:9 207:11 213:9 228:12 230:21 245:4 275:21,22
**seek**
31:12 127:16
**seeking**
127:11
**sees**
104:23
**segments**
282:16
**seldom**
112:2
**selected**
275:12 276:9
**send**
43:12 120:8 200:8 282:23
**sense**
38:8 126:10, 14,17 130:12,23 136:22 139:13 181:19 182:14 183:5 216:17 235:2 243:4 246:12 267:5,9 279:5
**sensing**
151:6
**sensitive**
112:16 115:1 166:21 190:23 240:20 267:19
**sentence**
212:8 275:17 276:2
**separate**
144:23 274:2
**September**
265:14
**served**
10:6,23
**services**
37:22,25 38:1 52:1
**set**
76:2 173:23 302:17
**setting**
47:18
**settings**
48:7
**setup**
285:12
**several**
119:20 225:12 232:9
**severe**
146:8 214:7 221:8,9
**shaky**
65:15 67:6
**shift**
210:12
**shifting**
142:5
**short**
35:18 57:16 68:8 144:18 145:10 155:17,20 161:1,13 165:12 167:6,8 175:2 240:20,21
**short-term**
45:21 163:19 229:12 230:19 232:18
**shorter**
184:4 240:10
**show**
32:22 56:1 72:4 73:14 76:20 90:9, 23 91:1 92:14 114:3 128:16 150:9 151:13,25 172:12,25 175:23 178:19 188:9 189:7 196:23 197:1 198:5, 14 199:20 203:1 208:16 212:3 233:4, 24 234:11 235:22 244:21 245:16 257:6 258:1,5 262:25 266:22,25 301:24 307:13
**showed**
29:23 30:5 56:6 60:10 74:16 91:12 159:7 237:8 290:21
**showing**
54:11,17,19, 21 71:18 88:19,21 89:18 176:8 208:24 234:18 237:10 243:5 265:21
**shown**
27:15 55:15 56:5 66:4 74:7,17 81:14 189:2 203:17 221:3 226:21 237:25 256:15 275:19
**shows**
76:19 186:20 196:12 207:16 225:16,18 227:2 233:1 243:2,3 268:15
**shut**
121:20
**sic**
267:3
**side**
29:10 51:7 60:5 62:17, 22 63:1,5,8, 12 97:24 145:4,7 153:6 163:17 182:18,21,22 201:10 223:13,25
**signal**
91:15 92:13 94:13,25 95:18 98:18 101:6,9 103:10 203:12 207:6,7 229:15,22,23 230:21 233:17,19 245:5 267:1, 2
**signal's**
92:14
**signals**
178:22
**signature**
16:19
**signed**
277:19 279:9 280:4,13
**significance**
194:9 237:13
**significant**
159:1

188:15,16,17 189:21 194:16,20 195:6,7,17 196:25 199:15 220:12 237:22 243:16,18 270:6

**significantly** 248:19 264:8

**silent** 9:12

**similar** 45:16 169:15 171:2 211:6

**similarly** 43:1

**simple** 93:6 135:21 240:4

**simplify** 251:16

**single** 91:3 92:18 93:7,22,25 140:7,10 174:6,9 178:12 189:8 197:5,8 206:22 208:12 229:11 231:21 232:25 233:9 234:10,12,18 245:19

**sipping** 147:23

**Sir** 200:11

**sit** 34:11 50:15 120:1 122:15 185:5 254:11

**site** 126:2,4 127:1,20

**sites** 40:23 127:17

**sitting** 80:20 83:25 114:20 178:16 184:20

**situation** 103:1 220:7 232:14 233:22 240:23,24 307:6,13

**six-month** 100:10

**size** 180:2

**skip** 300:13

**skipping** 224:6

**slightly** 40:19 41:14, 18 43:16 152:8,22 153:5 178:2 263:8 266:11

**slow** 148:2,3 149:4

**small** 48:19,21,23 49:20 131:15 147:9 176:8 196:21 283:14

**smoke** 135:17,24 171:25

**smoked** 135:7 233:2

**smokers** 233:24

**smokes** 172:5

**smoking** 133:20 134:12 136:8 137:23 140:20 171:10 172:12 187:18,20 232:9,11,12, 18 233:6,16, 17,25 234:6, 11

**snow** 36:8

**social** 28:11

**societies** 115:23 118:15 119:6

**society** 118:16

**soft** 106:3,13 107:23

**sole** 224:3

**solely** 16:1 66:9 163:17 187:10 209:14 223:9 236:15 239:2

**solid** 146:21

**solids** 147:24

**someone's** 39:4 49:18 117:23

**sore** 48:17

**sort** 18:4 22:8 38:8 63:5 64:12,18 97:6 99:19 132:23 155:7 157:19 193:16 197:4 237:2 245:23 266:19

**sounds** 8:7 32:17 114:18

**sources** 178:1

**South** 83:11 85:22 298:25

**Southern** 35:11

**Spalding** 15:13

**speak** 29:12 112:20,21 113:2 118:5, 8 119:1,18 120:5,22 122:3

**speakers'** 121:2,5,15 123:7

**speaking** 86:18 111:13,18 112:8,11,18, 24 113:13 114:8,11,14, 21,24 115:3, 6,9,25 116:17 117:25 118:3 163:17 186:25 289:5,6,11

**special** 284:22

**specialty** 32:18

**species** 67:12 69:16 70:7,15 72:23 73:1,

12
**specific**
37:3 40:3
54:1,4 56:11
60:9 61:5
62:10 69:1
71:22 75:4,
15 76:6
77:10 107:13
113:8 114:3
132:13
171:15
174:21 177:9
182:21
184:1,7
200:4 229:19
245:16
261:12 270:7
282:6,12
285:7 301:21
**specifically**
14:18 15:6
16:5 19:23
22:1,4 35:7
38:21 40:10,
25 54:22
60:18 61:6
62:14 63:25
64:21 79:12
97:19 101:15
110:20
117:19,20
131:10
137:24
140:22
171:19 173:3
177:21
183:19
225:13 226:8
253:24
256:15
259:25 270:4
279:21 285:9
**specificity**
197:17
**specifics**
105:23 109:1
250:20

279:22
**speculate**
277:3
**speeding**
287:12
**spend**
46:7 47:4
**spent**
47:5 118:11
**spits**
147:8
**spitting**
49:8
**splitting**
47:14
**spoken**
15:9 119:13
**sponsor**
112:1 126:8
**sponsored**
126:6
**squamous**
137:14,17,24
**squeezes**
142:14
**staff**
35:22
**stage**
168:24
**stages**
53:2,5
**stand**
6:5 57:23
85:4 98:3
105:10
170:14 210:8
247:13 290:5
302:18
**standard**
129:22
277:22
**stands**
107:21
**start**
20:15 46:15
193:21
212:16

213:1,18
214:9,15
215:14
218:23,24
220:14,17,19
264:13,15
**started**
25:15 43:9
74:3 81:17
84:3,4,7,15
85:10,17,18
99:4 113:16,
19 214:10
215:7
**starting**
211:25
212:1,10,11
213:16
**state**
6:2 7:7
58:20 82:24
101:3 202:16
277:15
281:17
**stated**
251:22
252:18
**statement**
130:18,25
166:8 198:22
200:19 203:9
281:3 282:23
285:7 303:20
**statements**
273:7 275:6
280:3,5,22,
23 283:2
**states**
38:17 82:9,
19 84:1
86:1,10
274:11
280:12
**statistic**
33:22 34:12,
13
**statistical**
33:20 34:2,

8,17 99:15
**statistically**
194:16
195:7,17,23
199:15
**statistician**
34:3
**statistics**
33:17 34:8
36:16
**stay**
213:24
214:20
215:25
216:4,10,18
219:1 220:14
**step**
212:24
213:18,23,24
214:8 220:9
**step-down**
212:2,12,23
213:15 220:6
**step-up**
212:1,11,16,
18,22 213:5
220:5
**Steve**
6:11
**stomach**
48:19 49:20
132:19,21
133:3 134:7,
24 135:14
140:4
144:13,19
145:9 146:5,
7,13,18,22,
25 147:1,5
148:3,8,10,
12,21 150:25
151:4,5,17
154:19,20,
22,25 155:3,
5,8,10
156:3,21
157:7,16,17
158:12,18

159:25 160:2,18,20 162:20 163:3,5,6, 11,13,22,25 165:2,5,25 166:2,10,16 167:5,7,9, 11,21 168:7, 11,12,16,19 169:2,13 204:20 221:11 260:16

**stomach's**
144:14 163:9

**stomachs**
144:11 155:8

**stop**
19:4 35:6 49:20 69:8 101:1 172:13 205:7 274:12

**stopped**
134:21

**storage**
248:15

**stored**
222:11

**stories**
35:18

**strength**
193:16 197:17 199:18 208:19,24 233:19

**strengths**
232:22

**stretched**
49:15

**strike**
32:19 53:22 56:18 67:8, 10 69:13 72:24 73:23 79:16 85:24 118:5 119:13 123:17,24 127:8 131:4 174:22 177:1 188:1 202:5 206:14 219:20 221:18 242:1 243:22 251:9,25 254:22 259:23 264:14 273:18 291:21

**stringent**
195:12

**strong**
187:15 233:17,19

**structurally**
218:6

**stuck**
195:13

**student**
36:20

**studied**
94:4 96:6 233:18 261:16 262:21

**studies**
13:6 26:20, 22 27:16 33:20 34:22 40:7,23 41:25 42:8 54:16,17,20, 23 55:19 56:14 57:8,9 60:17 61:10, 13,16,20 62:12,15,16, 22 63:1,14 64:12 65:21 66:2 67:24, 25 68:13 70:19,23 71:17,19,23 72:4 74:4, 10,11,12,13, 16 75:8,11, 13,17,21,22, 23,24,25 76:5,6,10 77:11,13,17, 23 78:23 79:1,18 80:9 81:13,14,17, 20,25 84:19 87:20 88:10, 18,21 89:1, 16,17,23 90:7,9,12, 17,19,23 91:1,10,14, 20,22 92:8, 10,14 94:1, 6,16,23 95:2,7,8,9, 11,13,16,22, 25 96:4,7,21 97:10 100:9 102:20 104:22 110:16 112:6 124:21,23 125:7,13,21, 22 126:22 127:1,16,18 148:23 149:2,5,6,7, 18,19,21 150:9,11 151:9,13,24 152:1 157:22 158:2,21 159:4,5,7,9, 15,16,21,24 160:4 161:16 172:11,12, 16,18,21 173:5,6,7,8, 15,18,19,20, 21 174:3,4, 5,24 175:1, 4,12,15,22, 24 176:3,5, 8,25 177:3, 4,11,14,16, 24,25 178:14,19 183:18,20 184:4,15 189:1,3,6, 18,23 190:4, 20,21 191:7, 13 192:23 193:3 194:22 196:24 197:7,22,25 199:1,2,7, 10,13,20,21 200:22,25 201:3,6,7, 16,17,21,23 202:2,5,6,7, 25 204:19 205:5,6,9, 10,12,18,21, 24 206:11, 18,23 207:4, 17,18,20,23 208:7,13 209:18 210:20 213:7 223:10,11, 12,24 225:1, 12,14,21 226:4,21 229:2,9,11, 16,22,24 230:8,12 232:23,25 233:13 234:13,16, 19,21 235:15 236:7,17 237:3,5,7,9, 10,25 238:12 239:3 241:1, 11,18,24 242:11,16,18 243:5,8,14, 19,22 244:8, 12,21

245:17,24 246:2,7,12 249:3,4 255:10,12 256:15 257:4,6,23, 24 258:1,2, 4,6,15,16, 17,20,21,24 259:4,11 261:7,16 262:3,9,22, 25 263:12, 18,19,23 264:1,6,8, 16,18 265:6, 8,20 266:2 290:18 291:9 297:1 298:13 301:21 303:8,10,11, 12,18,22 304:2,7 306:3,7,10, 19 307:7,12

**study**
13:3,5 33:22 34:9,14 56:6 74:8 76:18 77:19 79:21 81:7 82:5 88:14 91:4, 21 92:3,19 93:7,23 97:6,8,12,19 98:12,13,20 99:13 100:10,11 101:12,15,17 102:12,13 103:13 104:8,20 112:1,4 122:20,21 123:13 124:25 125:12 126:10,11, 13,14 128:11,12,13 158:2 161:4, 8,23 162:7 170:25 171:1,4,10, 16 174:8,15 176:1,2 177:25 178:17 179:4,10,14 180:4,8,10, 11,15 181:7, 11,15,20 182:12 183:12 184:7,8,16, 17,18,20,21, 23 186:2,4 187:1,3,11, 12 188:9,23 189:8,9,17 190:25 191:4,5 192:8,16,19 194:1 196:1, 3,8,10,12 197:5,6,8 198:4 199:4 202:10,11,15 203:3,7,16, 20 204:6 206:18,22,23 225:14,25 226:19 227:4 228:5,18 229:11 230:4,10,22, 23 231:3,9, 14,15,20,21 232:1,10,13, 20,22,25 233:1,9,25 234:7,10,11, 12 235:24,25 236:2,12,23 237:13,15 238:4,15 241:6,12,14, 20 242:3,5 243:1,3 244:4,9,14, 15 245:11, 13,16,20 246:4 248:10,12,13 255:13 257:4 265:15 266:1 268:15,19 291:14,20,22 292:4,11,21, 23 293:1,11, 15 294:3,13, 17 295:2,7, 10,20,25 296:9,12,15, 22,23 297:4, 8,15,21 298:2,9,16, 20,25 299:3, 5,9,12,16 300:2,8,12, 24 301:1,2, 11,17

**stuff**
33:3 47:23 195:19

**sub**
300:13,16

**sub-sub-subspecialize**
33:4

**subject**
210:23 248:6

**subjected**
248:2,10

**submission**
271:20

**submitted**
11:6 13:18, 21 17:18 25:12 26:6 36:13 63:14 271:21

**submitting**
26:10

**subsequent**
149:6,19 151:13,24 159:9,16 189:5

**subsequently**
46:2 53:13 74:17 88:19 150:18

**substantial**
147:18

**substantially**
148:23 152:7

**substantiate**
257:24

**substantiated**
88:10

**Sucralfate**
45:13

**sudden**
100:24 155:14 183:2

**suffer**
242:17 243:16

**suffered**
241:15 242:5 255:9 304:10,11

**suffering**
44:12

**suffers**
244:5

**suggest**
88:11 149:18 225:21

**suggested**
81:7 149:5,6 258:24 285:8

**suggesting**
71:5 101:10, 16 139:18 157:5 160:16 199:24 210:20 228:3 259:16 280:10

**suggestion**
65:5

**suggests**
188:21
203:14
**summary**
58:8
**support**
6:12 58:25
65:21 78:18
123:19
124:1,5,18
**supposed**
86:22
**suppress**
44:21 143:14
144:8
153:11,12
158:17
159:20
**suppressed**
150:15
**suppresses**
152:10
155:20
163:18
**suppressing**
40:19 41:17
161:1 271:15
**suppression**
40:4,13
143:11
153:14
284:21 285:2
286:2 296:10
**suppressive**
13:9 39:19,
24 40:8
138:11
224:18
287:24
**supraphysiologic**
64:16,19
**sure**
8:4,19
12:20,23
16:3 17:8,18
19:11,14
26:24 27:20
29:8,9 34:18
35:3 39:15
41:7 56:9
57:18 73:22
79:3,14 82:1
84:11 87:7,8
90:4 96:8,
10,13,20
97:14 100:2,
12,15,17
102:4 107:21
110:4,23
111:14,17
114:25
116:14,23
120:11
127:20 147:6
150:14 170:8
179:25
190:23
194:11 206:3
211:1,18,21
212:25 231:8
232:5
250:11,20,21
262:17
265:10
269:11
274:25 280:7
289:16,21
302:3,4
**surgery**
45:6 162:3
167:2,25
**surgical**
45:8,14
53:18
**surprise**
260:14
**surprised**
80:6 161:22
252:6
**surrogate**
100:14 101:4
102:25 103:6
104:18
**swallow**
49:2,4,7,11
142:11
**swear**
6:13,17
**Swinging**
284:11
**switch**
214:1,25
215:10,11
216:14
219:2,16,18
220:16,19,20
**switching**
216:4 219:11
**sworn**
6:23
**symptom**
142:20,21,23
153:17,25
154:2,4
213:17
218:25
225:4,23
227:21
**symptomatic**
189:5 213:10
**Symptomatically**
143:9
**symptomatology**
38:16 52:2
115:12
**symptoms**
39:1 45:16
64:7 103:5
132:11
133:13
138:9,11
142:21
145:11,12
147:14
154:10,12
224:18,20,23
225:10
284:9,23,24
285:22
**syndrome**
57:12 144:22
153:1,20,24,
25 154:1,14
220:11
221:10
**synergistic**
136:17,18
137:5

**T**

**table**
95:5 96:8
97:3 197:16
201:17 202:7
204:16
225:17
227:1,23
**tables**
95:4 96:9
122:7 227:25
264:6 302:4
**tablet**
261:12
**tablets**
247:24
248:11
261:6,15,24
262:2,20
263:6 266:4
306:23
**tail**
288:6
**Taiwan**
32:13 118:16
**take**
8:5 11:10,16
13:24 27:14,
24 30:18
32:4 38:7
45:20 51:21
52:5 57:16
64:8,22 65:6
94:2,18
102:6 105:2,
3,4 117:6

127:23 134:7 135:11,19 138:12 144:16,17 147:14 148:4 151:5 155:19 156:22 157:23 159:6 161:10 167:8 170:1,4 172:9 173:15 175:9,11 180:20 189:5 190:14,16 203:7 209:6, 12,24 213:19 216:21 217:9,18,24 235:16 243:4,8 247:3,7 261:9 264:19 266:21 273:17,19 283:11,13, 14,18,19,23, 25 289:25 294:21 295:12 296:3 302:10 305:25

**Takeda**
111:9,15 114:21 116:17

**taken**
6:1 7:12,17 30:14 50:16 57:22 84:9 101:7 103:7 105:8 170:12 210:6 215:17 222:6 247:11 290:4 302:16 307:24

**takers**
191:15

**takes**
27:3 34:9,14 51:8 78:3,6 148:8 180:12 183:24 195:1 213:21

**taking**
7:6,24 47:10 51:3 52:2 97:15,16 100:7 101:1 103:13 159:25 166:1 203:13 207:9 217:19 218:9,11,17 243:13 265:22

**talk**
47:20 90:5 116:18 117:20 119:9 171:3 180:9 191:7 205:5 240:8 289:19

**talked**
46:4 73:22, 24 75:22 155:7 182:1 193:6 194:8 215:9 229:1 249:15 256:6 290:10

**talking**
47:21 55:24 66:3,24 67:20 78:17 89:19 99:25 137:24 138:16,19 163:23 168:25 169:1 182:16 190:16 201:3 210:13 214:5 220:6 238:13 239:8 243:10,15

258:17,19, 20,21 285:19

**talks**
112:11 119:6 279:13 285:9

**Tan**
296:9,15,23

**taper**
117:23

**target**
214:13

**task**
63:17

**tea**
142:1

**teach**
134:16

**team**
32:5

**technician**
286:18

**techniques**
49:16 50:3

**technologies**
278:13

**technology**
7:25 274:17 286:11

**tell**
6:23 20:1 30:24 31:19 34:16 35:2, 18 40:10,11 52:18 54:2 75:19 83:13 86:16 87:7 91:20 104:23 110:5 112:19 114:3 115:1 117:7 119:4 128:4 142:25 166:23 171:16,18 178:18 229:20 233:25 267:7,10

268:7,11 279:23 306:13

**telling**
25:23 234:5 241:2

**tells**
80:17 100:22 101:6,8 104:25 178:20,21 227:19 228:14 234:10

**temporality**
197:18

**ten**
140:13 210:1

**tend**
109:16

**Tennessee**
8:9

**term**
41:4 95:14 109:2 111:11 121:1 122:7 136:1,4 138:15,23 139:4 160:19 161:14 167:20 185:2,4 191:3 211:3 212:17 224:11 245:6,7 246:16

**terms**
68:25 76:23 104:15 164:7 185:19 198:22 216:23 231:5,11

**test**
146:12 279:6

**tested**
268:17

**testified**
6:23 116:25
123:18
**testify**
106:15
**testifying**
8:17 50:25
100:4 107:17
156:18
**testimony**
6:18 72:6
97:14 100:1,
5 116:3
119:12,16
123:22 150:5
210:16
252:21
**testing**
39:11 87:23
194:9 266:14
268:2,3,23,
25 274:5,7
275:6,7
278:9 279:24
285:19
**tests**
115:14
281:15,19
**text**
9:10,24
**thank**
7:2 9:13
27:25 30:11
43:4 141:20
154:18 168:1
212:5 239:5
264:24 276:3
287:5,8,22
302:8,9
305:14,16
307:17
**theoretical**
158:20
**theoretically**
87:2
**therapeutic**
122:22
**therapies**
13:9 117:5,
13,19 162:2
224:18
**therapy**
39:24 51:25
101:20
103:20
138:11
212:1,2,11,
12,16,18,22,
23 213:5,15
214:11,12
220:6 284:20
285:3,20
286:1 287:24
**thesis**
35:16,19
**thing**
17:7 22:10
41:17 47:1
67:19 76:19,
20 141:2
148:7 155:20
165:23 168:5
214:13
234:19
237:8,11
240:19
**things**
7:25 11:17
22:8,12,17
23:16 24:10,
17 28:13,14
32:15,24
33:21 34:19
38:3 41:24
44:14 45:20
47:6,24 48:8
50:12 53:6
56:14 61:23
64:16 86:22
104:22
118:20
120:12
124:14 132:3
134:16
135:23
140:21
146:14 147:8
148:11 149:4
151:2 168:6
174:18 178:2
186:5 196:19
208:13
210:15 211:6
215:3 216:5
235:19
236:8,13
243:25
244:22 277:8
279:6 285:13
**think**
7:14,15 30:2
51:8 54:2
60:3 62:25
63:2 66:15
67:23 69:17
80:15,18
87:16 88:15
93:17 95:21
99:22
106:17,22
108:2,21
114:25
116:24
117:11 120:2
121:6 122:22
127:15
130:11
139:11,18,
20,22 140:25
141:13
148:16 149:8
150:8,22
156:2,6,10,
24 163:23
164:24
165:23
167:15 168:4
169:10
181:24 183:9
191:23
195:13
207:9,10,17
231:14 232:4
249:2,21
253:15 254:6
263:8 264:21
265:3 272:25
276:1 281:5
283:21 286:8
294:1 302:7
303:22
304:16
**thinking**
122:22
**thiocyanate**
211:11,13,
14,16,19
**thoroughly**
275:11 276:8
**thought**
68:19 116:24
125:8 130:2
166:19
279:15
**thousand**
152:23
265:16 266:9
**thousands**
89:11 153:8
**threat**
116:19
**three**
20:20 28:8
29:4 35:23
55:11 80:12
113:6
120:15,17
147:18
158:4,5
207:18
245:21
277:12
**three-year**
36:1
**threshold**
158:16
262:6,7
263:7
**throat**
48:17

**throwing**
132:1,13
**Thursday**
6:8
**tight**
147:3,4
**time**
6:7 8:1 14:2 20:8,25 21:19 23:8, 13,25 26:1, 9,15,21 27:1,3,10 29:5 32:4 35:18 46:7, 18,23,25 47:3 57:18, 20,24 63:22 68:8,9 69:18,24 87:5 96:5 98:8,10,14 101:7,11,16, 17 105:6,11 107:20 108:20,24 110:13 111:15 112:25 113:16 115:15 118:11 119:10 120:25 122:2 124:16 125:18 128:5 139:10,17,25 140:7 144:19 145:10 148:4,8,24 155:17,20 156:4 158:3, 9 161:1,2,14 162:11 165:9,12,20 166:1 167:6, 8 170:10,15 181:25 182:6 195:3 210:4, 9 219:11 221:13,19,24 222:4,9 226:3,9,12, 16,22,23,25 227:3,15,18 228:4,9,11, 13 230:19 237:6 245:25 246:13,24 247:3,9,14 248:21 252:13 259:22,24 264:4 267:8, 10,21 273:7 277:14 283:13,18 287:7 288:25 289:3,4,8,10 290:2,6 300:20 302:7,8,14, 19 307:22
**timeline**
44:10,20 113:17
**timely**
274:18
**times**
26:12,16 28:5,8 43:17,18 80:12 117:25 118:4,7,12, 25 119:6,13, 17,20 123:20 129:16,17,19 131:3,6,16, 19 137:10 158:4,5 181:10 217:2,17 220:10 232:9 282:9 294:1
**timing**
148:13 231:5,11
**tired**
36:8
**tissue**
52:24 71:14
**titled**
291:15 292:21 295:2,20 305:3
**tobacco**
138:3
**today**
7:6 8:8,22 9:1 10:10 17:16 27:13 29:13,18,21 30:9 31:5,9 80:20 83:25 114:20 139:14 303:1
**told**
12:8 90:3 104:24 260:14 267:13
**tomorrow**
139:14 263:4
**tons**
194:2 197:25
**tools**
231:17
**top**
17:24 45:18 107:1 132:25 270:6,22 277:15 304:24
**topic**
22:4 113:8 119:9 157:21 267:20 274:19 275:11 276:5,7
**topics**
279:15 283:7,14
**total**
247:1
**tours**
122:25 123:2
**toxic**
253:2
**toxicologist**
252:24 253:1
**trace**
89:13,14,15, 18,20,22,25
**tracings**
272:4
**track**
24:14 63:4 119:5,7,21, 23 120:4,20
**Tracy**
7:5 14:7 57:15 102:1 170:1 206:3 209:5 239:6 240:14 247:4 275:18 286:6
**trade**
43:24
**traditionally**
194:11
**training**
35:22,24 36:19 38:2,7 45:7 51:12
**Tran**
296:22,23 297:4
**transcript**
300:18
**transcripts**
29:21
**translate**
68:13 71:7 158:22 160:8
**translated**
159:20
**translates**
71:2

**translation**
160:13
**translational**
31:22 34:1
39:5
**treat**
31:20 39:16
47:17,22
56:24 86:1,
9,14 112:14
115:20,21
116:2 133:7,
8,18 142:6
143:18,23
144:6 145:14
156:25 179:6
182:25
212:21
214:20
**treated**
102:21
134:21
**treating**
40:5 48:25
117:2,14
125:9,10
143:10,11
**treatment**
51:18
115:15,16
211:24
212:10 214:2
272:22 281:2
297:23
**treatment's**
214:7
**treats**
159:14
**trial**
59:20,22
60:21 92:7,
10 94:17
102:23
106:15,19
107:17
128:14
172:18
173:17
174:1,2
181:14 182:4
183:14 184:3
**trials**
59:24 60:1,
3,7,9,11,13,
16,18 61:5
63:3 91:25
127:25
182:2,19
184:5
**trick**
83:24 100:1
**trouble**
139:21 150:3
**true**
23:22 35:20
74:18 76:23
124:15
140:24,25
141:4 144:18
149:20
150:12
165:18
185:12,13,18
215:23
217:13 241:7
268:19
**truth**
6:19,20,23
181:13,15
**try**
21:22 22:17
24:6 26:13
30:17 46:18,
25 115:19
133:18
167:20
181:9,12
190:19
215:20
231:23
247:18,19
**trying**
16:6 22:19
50:24 111:23
128:1,5
136:22
143:15 150:8
157:6 162:17
164:14
166:23 181:5
182:10
192:1,10
195:21
205:13
226:11,18
228:14
239:13 240:7
241:20
247:18
272:4,7
285:15
286:22
**tumor**
131:22
132:10,15
154:8,17
**tumors**
132:6
**Tums**
45:19,25
**turn**
10:13 28:25
30:23 58:5
276:16
**turned**
10:20 11:3
**turns**
138:7
**twice**
28:8 158:4,
14 287:20
**two**
7:13 11:5
15:21 20:14,
22 26:16
28:8 29:3
55:9 59:13
105:18
131:20
135:20
140:14,16
147:18
180:21
190:20
207:18
227:13
228:23
235:10
243:24
253:23
264:19
296:25
298:13
**two-year**
36:2 226:22
**type**
15:11 26:17
56:13 59:2
71:3,22,24
72:9,10
77:11,22
105:25
120:12
127:18
137:13
147:25
165:25
190:25
196:2,14
198:15
217:14 253:6
271:11 289:5
**types**
21:16 48:10
51:17 66:21
70:14 71:1
105:21
131:7,12
154:21
172:15
173:18
179:19 215:1
219:5 235:10
303:7
**typical**
21:24 23:9
140:3
**typically**
11:18 21:16
39:2 129:6,
17 146:17
156:12

173:22 223:10

U

**U.S.** 6:12 42:7 43:21 82:25 83:8,13 84:2,3,8,14 85:9,10,13 127:17 133:10 141:22 178:7 265:15 296:12 300:2
**uh-huh** 18:1 35:9 37:17 38:9 97:2 98:2,25 117:8 165:1 204:23 217:17 284:14 293:19
**UK** 294:14
**ulcer** 45:5,8 57:5,6,7 133:7 153:3 221:9
**ulcers** 57:8,10
**ultimately** 41:17 168:4
**umbrella** 38:13 49:25 50:2
**unable** 158:10 213:23
**unanticipated** 182:22
**uncertainty** 175:3 187:23 219:12
**uncommon** 45:6 174:11 175:20
**underneath** 19:16 203:17
**understand** 11:8,13 36:15 39:15 42:18 47:2 50:24 51:14 52:22 71:4,9 72:1 100:4 121:6,14 123:5,9 136:5 137:8 138:22 148:15 150:8,12 160:15 162:18 168:3,14 177:7 179:16,25 218:12 220:15 242:9 243:24 249:9 262:18,23 268:16 290:12
**understanding** 23:20 53:23 54:5,8 55:6 56:23 70:25 82:12 97:13 204:10 251:1,24 252:1,14 255:3 260:2 261:21 282:18
**understood** 34:19 148:16
**undertake** 10:15 59:20 75:20 77:23 115:25 249:19 250:6 261:4,14 266:1
**undertaken** 77:7 249:25 255:22 256:2
**undertakes** 250:17
**undertook** 78:25 79:17 80:8 251:11
**underwent** 277:20
**undo** 190:19,20
**unethical** 183:10
**unex-** 183:6
**unfortunate** 28:13
**unheard** 45:9
**unique** 7:24
**United** 82:9,19 84:1 86:1,10
**universe** 75:8,10 83:10
**University** 8:10 31:13,17 35:13 46:5 288:16
**unphysiologic** 69:4
**unrealistic** 68:11
**unreasonable** 103:24
**unstable** 8:2,3
**unusual** 175:1
**up-to-date** 23:22 26:24 277:17 279:1 280:14
**update** 23:9,19 24:7 124:16 269:8,17,24 272:19 273:21 280:6 284:9 304:14 305:4
**updated** 23:7,15 278:2
**updates** 274:16 277:21 282:9 283:9
**updating** 124:11
**Upper** 293:12
**upright** 146:23
**user** 100:20 101:2,3
**users** 99:3 100:19 236:3 238:17
**usual** 16:5
**utilized** 56:13

V

**V-A-L** 21:1
**Vaezi** 6:7 7:8,10,11 10:5 14:1,6 19:7 23:3 24:25 58:2,8 84:23 121:25 170:18 240:13,16 241:12 247:17

264:21 285:10 302:24,25
**vague** 224:20
**VAL-BI** 20:22
**valid** 68:10 87:6 104:3 139:23 158:20 225:9 246:18 280:9
**validate** 272:4
**Valisure** 21:1 248:10
**value** 196:7
**values** 265:14
**valve** 142:15
**Vanderbilt** 8:10 31:12, 17 37:5 46:5 48:6 288:15, 16
**variability** 149:7 162:10 163:23 165:24 166:9 167:11,14,15 178:4
**variable** 22:9 27:10 29:3,4 46:15 118:12,17,18 134:9,14 135:1,18 137:12 139:7,9 140:15,18,23 146:20 149:21 155:22 164:8,10,12 166:11 167:16,18 169:2 177:8, 10 189:25 211:4 227:6, 9,12 229:6, 7,8 236:21 248:2
**variables** 135:8,25 136:7,20 141:10 184:14 194:7 237:23 238:2
**variation** 211:9
**varied** 38:1 143:9 214:18 282:20 307:10
**variety** 21:22 22:16 37:1,23 38:16 39:14 41:22 49:15 54:16 57:14 64:16 78:8 167:22 255:9 304:12
**various** 46:20 48:17 53:3 56:4 91:12 143:9 157:21 175:25 178:10 187:2 199:3 211:1 213:6 223:12 246:3 253:2, 11,13,21 262:1 274:9 283:2
**vast** 94:4
**venues** 109:18
**versa** 214:1
**version** 23:21 217:20 218:12,18, 20,21
**versus** 39:25 46:7,8 47:6 68:20 100:12 150:16 172:24 175:11 181:22 182:6,25 183:9 191:15 201:10,11 202:12,20 204:8,25 205:1 216:4, 24 218:11,21 219:6 222:18 230:19 235:9 246:8 261:6, 15 266:9 272:5 292:5 301:13
**veterans** 296:12
**vice** 214:1
**video** 6:6 31:4
**videographer** 6:5,11 57:20,23 96:11,14 105:6,9 170:10,13 210:4,7 247:1,5,9,12 286:24 287:6 290:2,5 302:14,17 304:17 307:22,25
**videos** 30:13
**vigilant** 124:11
**virtual** 118:17 277:1,7,11, 13
**virtually** 118:13,16
**virtue** 149:3
**vitae** 10:23 11:2 13:16,17,21 15:16 23:4, 21 24:1
**Vitamin** 222:6
**voice-related** 33:9
**volumes** 147:23
**vomiting** 49:19 154:11
**vote** 50:15 51:2
**voted** 276:15

**W**

**wait** 283:21 305:12
**waiting** 206:2,4,20 305:11
**wake** 165:5,13 166:10,16 167:4
**want** 14:8 17:8 19:3 31:18 37:2 42:7 47:20 54:1,3 58:2,5 71:12 80:18 89:25 94:9 96:11 97:14 100:2

102:11,16,17 105:3,5 111:4 114:25 115:2 116:23 118:23 119:8 122:13,17 125:16,24 127:15 129:18,21 134:17 150:11 153:7 165:16 170:1 174:1,3 178:4 179:25 189:5 190:14 191:6,15,24 194:21,23,24 197:5,20 198:25 205:12 206:6 209:6 210:12 211:3 213:17 215:22 217:9 219:16 220:8,12,13 224:6 226:15 228:10 240:3,8,12 259:6 262:17 265:9 267:8, 18 274:25 289:16,21 291:8 292:7, 10 300:13

**wanted**
19:11 29:8 34:18 36:15 41:7 82:1,16 124:17 125:17 126:13 203:9 207:7 259:5, 8 275:4 290:12 302:2,4

**warning**
221:15,18, 20,25 222:5, 10

**warnings**
222:22

**waste**
69:24

**watching**
168:21

**water**
147:23 163:8

**way**
38:24 39:2, 3,6 40:19 41:14,18,20 46:3 47:10, 13 83:18 89:24 102:16 108:1 123:7 137:7 139:8, 10,16 143:11 144:14 147:13 151:6 157:9 166:22 178:4 180:22 187:19 195:9 196:3 213:8, 15 228:19 230:23 237:14 255:3 268:6 306:15

**ways**
21:22 40:4 143:10 145:23 155:23 226:2 228:23

**WCRF**
259:2,9,11, 18,24 260:2, 15

**weak**
66:6 185:21, 24 187:15 189:12,20 259:11

**weaker**
187:18,20

**weaknesses**
232:23

**weekly**
120:22,24

**weeks**
47:13,15 131:20 284:21 287:21

**weigh**
190:24 222:17

**weighed**
223:4

**weight**
86:24 174:12 184:8 197:3 208:7 209:18 259:4

**well-designed**
183:11 205:6 207:20

**Welsar**
303:11

**went**
17:18 26:19 27:15,16 36:17 106:19 213:11 263:9

**Western**
36:17

**wide**
180:2

**wife**
36:19 45:23

**wine**
86:24

**withdrawals**
50:19

**witness**
6:13 7:1 14:12 61:3 116:9 134:4 150:2 204:2 238:21 240:18 242:24 264:25 274:23 275:20 281:12 285:15 287:2,5,8 293:18

**wonder**
276:24

**wondering**
224:2

**word**
20:15 142:4 153:19 156:23 167:15,18 188:16 193:12 267:9 305:21

**words**
65:11 142:13 199:9 291:1

**work**
24:20 26:17 31:16 33:6, 20 34:4,11 37:8 47:1 54:19 69:25 88:19 110:22 113:23 114:5 130:16 131:2,5 144:6,10 145:1,4,6, 14,20 146:1 154:24 162:6 182:23 196:11 213:3 252:21 271:11,23 288:16,21

**working**
108:15 218:19 219:3 289:3

**world**
82:22,25 83:4,9 84:25 121:20 133:6 141:22

178:12 207:5 259:19,22 307:6,9,13
**worried** 90:24
**worrisome** 263:4
**worry** 132:25 133:1
**worsening** 142:24
**wrap** 284:1
**write** 9:6 41:11 217:6
**writing** 128:22
**written** 9:9
**wrong** 117:9 166:22
**wrongly** 194:25

**X**

**x-ray** 68:17,18
**x-rays** 182:24

**Y**

**yea** 88:16
**yeah** 12:18 17:17 19:24 21:12 28:11 30:10, 21 35:6 37:12 38:17 41:6,8,23 44:8 45:3 46:9 50:23 63:12 70:17 71:5 81:5 85:9 86:12 96:20 97:4 100:8 106:2 123:3 135:16 136:12 138:24,25 140:6 141:12,17 144:7 145:15 146:5 147:22 150:24 154:16 156:11 160:14 162:25 164:12 166:7 167:14 168:23 169:4,23 170:4,6 171:8 172:17 173:22 177:8,20 186:3 191:6 192:14 198:6 200:17 201:4 204:2 205:8 210:1,2 217:1 224:13 227:9 228:8 235:5 238:23 244:8 253:22 254:4 266:18 271:20,21,25 273:15 276:1,3 280:17 281:12 282:6 287:2,5,22 288:25 292:9 297:17 300:16 304:21
**year** 14:24 23:10, 14,19 28:14 35:17 86:20 99:15 100:11 108:21 117:25 118:4,7,12, 22,25 119:6, 18 128:4 134:24 135:3,4,5 227:12 246:5 251:4,7 271:18,22 277:12
**years** 33:25 35:24 94:13,24 95:10,11,12, 23 96:1,21, 22 97:12,16, 23 98:1,7, 17,18 100:7 103:6 108:22 112:15 120:15,17 121:16 126:12,13 135:7,20 140:13,14 189:6 227:13 229:13,14,16 234:15 245:21 246:11 251:14 253:21 277:11,12
**Yoon** 96:20 206:25 207:19 237:12 298:20 299:5

**Z**

**ZAEZI** 6:22
**Zantac** 6:9 13:14 108:15 219:22 221:14,20,24 222:4,9,22 272:9
**Zerbib** 288:8
**zero** 167:3
**Zheng** 265:25 266:1
**zoles** 43:13,15
**Zollinger-elli-** 153:17,18
**Zollinger-ellison** 57:12 144:22 153:1,20,24, 25 154:1 220:11 221:10
**zone** 176:13
**zoom** 7:18,20,25 28:10,12,14, 15,16 30:25 32:8,11,13 46:20 120:15,16 160:13 255:15

# EXHIBIT

# 30

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

________________________________/

VIDEO RECORDED DEPOSITION OF

TIMOTHY C. WANG, M.D.

Taken on behalf of the Plaintiffs

(Via videoconference)

DATE TAKEN: Thursday, May 26, 2022

TIME: 9:04 a.m. - 8:06 p.m. EDT

PLACE: US Legal Support - Remotely

Reported by:
CANDIDA BORRIELLO
JOB NO. 6152887-001

A P P E A R A N C E S:

Appearing on behalf of the Zantac PSC:

LEVIN PAPANTONIO
316 South Baylen Street
Suite 600
Pensacola, Florida 32502
BY: DANIEL NIGH, ESQ.
MADELINE PENDLEY, ESQ.
E-MAIL: dnigh@levinlaw.com
mpendley@levinlaw.com

Appearing on behalf of the Defendants, Walmart, Inc. and GlaxoSmithKline, LLC GlaxoSmithKline, PLC
SHOOK, HARDY & BACON, LLP
1325 Avenue of the Americas
28th Floor
New York, New York 10019
BY: THOMAS J. SHEEHAN, ESQ.
E-MAIL: tjsheehan@shb.com

-and-

SHOOK, HARDY & BACON LLP
1 Seneca Street
29th Floor
Buffalo, New York 14203
BY: PEIYUAN GUO, ESQ.
E-MAIL: pguo@shb.com

-and-

DECHERT, LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
BY: RACHEL PASSARETTI-WU, ESQ.
E-MAIL: rachel.passaretti-wu@dechert.com



Appearing on behalf of the Defendant, Teva Pharmaceuticals:

GREENBERG TRAURIG, LLP
1717 Arch Street
Suite 400
Philadelphia, Pennsylvania 19109
BY: BRIAN RUBENSTEIN, ESQ.
E-MAIL: rubenstein@gtlaw.com

Appearing on behalf of the Defendant, Chattem, Inc., Sanofi U.S. Services, Inc., Sanofi-Avertis U.S. LLC:
ARNOLD & PORTER KAYE SCHOLER, LLP
777 South Figueroa Street
44th Floor
Los Angeles, California 90017-5844
BY: KATHRYN PODSIADLO, ESQ.
E-MAIL: kathryn.podsiadlo@arnoldporter.com

-and-

DLA PIPER
550 South Hope Street
Suite 2400
Los Angeles, California 90071-2678
BY: CONNOR SCOTT, ESQ.
E-MAIL: connor.scott@dlapiper.com

ALSO PRESENT:
MARLENE GOLDENBERG, ESQ.
GoldenbergLaw

CAROLINE CHAMPION, Scientific Specialist
King & Spalding LLP
BETH BEHRENS, ESQ.
Barnes & Thornburg LLP

LAUREN MASSEY, Paralegal,
Levin Papantonio
VIDEOGRAPHER: GREG CASSIN
DOCUMENT TECHNICIAN: JOHN SCHMITZER



-------------------I N D E X-------------------


WITNESS: TIMOTHY C. WANG

| EXAMINATION BY | PAGE |
|---|---|
| MR. NIGH | 8 |


----------------E X H I B I T S--------------


| NUMBER | | PAGE |
|---|---|---|
| Exhibit 6647 | | 15 |
| Exhibit 6648 | | 42 |
| Exhibit 6649 | | 92 |
| Exhibit 6650 | | 94 |
| Exhibit 6651 | | 118 |
| Exhibit 6382 | Previously Marked | 126 |
| Exhibit 6652 | | 130 |
| Exhibit 6653 | | 139 |
| Exhibit 6654 | | 150 |
| Exhibit 6655 | | 184 |
| Exhibit 6656 | | 194 |
| Exhibit 6657 | | 201 |
| Exhibit 6658 | | 220 |
| Exhibit 6659 | | 231 |
| Exhibit 6660 | | 233 |
| Exhibit 6661 | | 238 |
| Exhibit 6662 | | 240 |
| Exhibit 6663 | | 250 |
| Exhibit 6664 | | 255 |
| Exhibit 6665 | | 258 |
| Exhibit 6666 | | 263 |
| Exhibit 6667 | | 266 |
| Exhibit 6668 | | 271 |
| Exhibit 6669 | | 279 |
| Exhibit 6670 | | 282 |
| Exhibit 6671 | | 289 |
| Exhibit 6672 | | 289 |


(Exhibits continued on next page.)



(Exhibits continued.)


| | |
|---|---|
| Exhibit 6673 | 305 |
| Exhibit 6674 | 312 |
| Exhibit 6675 | 319 |
| Exhibit 6676 | 327 |
| Exhibit 6677 | 340 |
| Exhibit 6678 | 350 |
| Exhibit 6679 | 353 |
| Exhibit 6680 | 371 |
| Exhibit 6681 | 381 |
| Exhibit 6682 | 394 |

Page 6

THE VIDEOGRAPHER: We are now on the record.

Participants should be aware that this proceeding is being recorded and as such, all conversations held will be recorded unless there is a request and agreement to go off the record.

Private conversations and/or attorney-client interactions should be held outside the presence of the remote interface.

For the purpose of creating a witness only video recording, the witness is being spotlighted or locked on all video screens while in speaker view. We ask that the witness not remove the spotlight setting during the deposition as it may cause other participants to appear on the final video rather just the witness. For anyone who doesn't want the witness's video to take up the large part of your screen, you may click the gallery view button in the upper right corner of the RemoteDepo interface.

Page 7

This is the remote video-recorded deposition of Timothy C. Wang, MD, being taken by counsel for the plaintiff.

Today is Thursday May 26, 2022. The time is now 13:04 UTC. We are here in the matter of In re: Zantac ranitidine products liability litigation.

My name is Greg Cassin, remote video technician on behalf of US Legal Support. I am not related to any party in this action, nor am I financially interested in the outcome.

At this time, will the reporter, Candida Borriello, on behalf of US Legal Support, please enter the statement for remote proceedings into the record.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

Page 8

They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his or her testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objection to this manner of reporting.

If there are no objections, I will now swear in the witness.

T I M O T H Y   W A N G,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. NIGH:

Q. Good morning, Doctor. My name is Daniel Nigh and I represent the plaintiffs in the MDL.

Can you please state and spell your last name, please?

A. My last name, W-A-N-G, it's actually pronounced Wong, but many people say

Page 9

Wang and that's fine.

Q. Okay. Thank you, Dr. Wang.

Where are you currently located?

A. I'm currently in New York City and I'm at the Dechert office right now, but I work in New York at Columbia University Medical Center.

Q. And is anyone else in the room with you right now?

A. Just legal counsel here, Tom Sheehan.

Q. Anyone else?

A. No.

Q. Okay. Do you have any electronics in the room with you?

A. Electronics. Well, we've got this computer that I'm speaking from. I've got my cell phone, but it's -- it's off. I have no other computers nothing here.

Q. How many screens do you have in front of you?

A. Well, I've got my laptop, then I've got another larger video screen here to my left for documents and there's a screen on the wall and I'm not sure what this little

iPad is for.
MR. SHEEHAN: Dan, just so you know, we -- we set this up, there's actually a big screen in this room that's on where Tim is spotlighted.
MR. NIGH: Okay.
MR. SHEEHAN: And on the first break, we're gonna -- we're gonna shut all that down. I see that even the room itself is, like, there's a camera on the room or whatever, it's all unnecessary because Tim's got his laptop and --
THE WITNESS: And then the extra video screen.
MR. SHEEHAN: -- the video -- the monitor to see exhibits. But we can just go ahead and turn off the extraneous stuff at the first break.
MR. NIGH: Okay.
BY MR. NIGH:
Q. Doctor, other than this case, have you testified in any other case?
A. Yes, I have testified in several previous legal matters. The most recent one



was the Victoza litigation where I was expert for Novo Nordisk.
Q. And Novo Nordisk, that is a manufacturer?
A. Yeah, pharmaceutical company based in New York that makes the GLP-1 drug.
Q. And before Victoza, what other cases have you testified in?
A. Pfizer, on a celecoxib matter.
Q. Did you represent Pfizer in that case?
A. Yes, I did.
Q. Let me reword that question.
Did you testify on behalf of or were you retained by Pfizer in that case?
A. Yes.
Q. And Pfizer is a pharmaceutical -- Pfizer is a pharmaceutical company, correct?
A. That's correct.
Q. When did you testify in that Celexin case?
A. Could you repeat the question?
Q. When did you testify in that case you were just describing for Pfizer?
A. I'm not sure of the date, I think



it was around 2007, 2008 around that time.
Q. And how about Victoza?
A. That was more recently, I'm guessing 2012, 2013 maybe.
Q. Okay. And what other cases, other than Victoza Celexin and this case, have you been involved in?
A. Those are all the cases that I've been in involved in and testified for.
Q. Okay. Have you had your expert report disclosed in any other case?
A. I have had an expert report submitted in another ongoing case.
Q. Which case -- which case is that?
A. That is a case involving omeprazole for AstraZeneca.
Q. Now, is that omeprazole case where the injuries that are claimed are cancer or is it a different type of injury?
A. I don't know if I'm at liberty to discuss that case.
MR. SHEEHAN: If your expert report has been disclosed, I mean, in general, I think you can describe the allegations that you're aware of.



A. Okay. Yes. So, that case involves an allegation of cancer related to omeprazole, that's correct.
Q. Okay. And were you retained on behalf of the defendants in that case?
A. Yes.
Q. And that's a pharmaceutical company as well?
A. That's correct.
Q. And when did you submit that expert report?
A. I think around a month or two ago.
Q. Other than Victoza, Celexin and omeprazole and this case, are -- is there any other case where you submitted an expert report?
A. Not that I recall.
Q. Okay. And have you ever been retained by plaintiffs?
A. I'm sorry. Have I been retained by individuals alleging what?
Q. Have you ever been retained by plaintiffs at all in any capacity or any case?
A. No, no.

Q. All right. Let me go through a couple ground rules.
You've testified before, so you probably know several of these, but I'll go through them again with you, okay?
A. That would be fine.
Q. All right. First one is, we have a court reporter who's trying to take down what you say. So, every answer needs to be a verbal response as opposed to uh-huh, ah-huhs or shaking of the head, okay?
A. Understood.
Q. Second, it's not an endurance test, so if you need a break, just let me know, we can take a break, okay?
A. Thank you, yes.
Q. And finally, if I ask a question and you answer the question, I'm gonna assume that you understood the question.
Is that fair?
A. Yes, understood.
Q. Okay. Doctor, it looks -- from looking at your invoices, it looks like you had billed approximately 75 hours.
Is that a good estimate of the time


you spent in this case?
A. Last I checked, I think it was around 100 or so hours, but that's -- yeah, it's in the range.
MR. NIGH: Okay. All right. And let's go ahead and pull up Exhibit LP538 and we'll go ahead and attach this as an exhibit.
Q. And Doctor, this is your -- the expert report you've submitted for this case?
THE VIDEOGRAPHER: Counsel, what exhibit number are we starting that at?
MR. NIGH: That's what I'm looking for here. 6647.
THE VIDEOGRAPHER: Thank you.
(Exhibit 6647 was marked for identification.)
BY MR. NIGH:
Q. Doctor, you see the part of this says, Rule 26 Expert Report of Timothy C. Wang.
Do you see that?
A. Yes, I do.
Q. And that's you, correct?


A. That is indeed me.
Q. And then that -- the date there is March 7th, that's the date that you disclosed this expert report?
A. Yes, that's correct.
Q. And then that's your signature right next to it, correct?
A. Correct.
Q. And Doctor, are all the opinions and the bases for your opinion contained in this report, correct?
A. Yes, that's correct.
Q. Doctor, first I want to ask you some questions about epidemiology in general. Two of -- two the main principles are important issues that you're trying to study in epidemiology studies are exposure and the outcome, correct?
A. Yes. So, I guess you're asking about epidemiology studies in general and epidemiology studies can vary widely in terms of the information they track. But I guess relevant to your question, two of the things that are often looked at, particularly I guess in cancer risk studies, would be


exposure and outcomes, that's correct.
Q. And so, it's important to have adequate information on exposure and adequate information on outcome and epidemiology studies, correct?
A. I'm not sure what you mean by "adequate." One thing to understand in epidemiology studies you're often limited by the databases that you're able to interrogate. And so, I think we need to recognize that epidemiology studies in general can only take advantage of the databases that are available.
So, in many studies, the information is extracted from a variety of databases. And while the information is never perfect, I think many of them do reach excellent conclusions based on the information that is available. So, I'm not sure what you mean by adequate. I'm not sure that's a criteria used when reviewing these sorts of studies. But in general, you'd like as much information as you can, you know, in order to -- to analyze the question that you're investigating in that setting.

Q. Doctor, what are the shortcomings or difficulties with epidemiological studies utilizing health insurance databases?

A. Well, health insurance databases have been extremely useful in the last several decades and have been a major source of studies in the clinical epidemiology fields, particularly in -- in also to medical conditions. And so, they differ -- they're retrospective studies and so they differ, I think, from prospective studies where you can decide what sort of information you want to gather and record it as the study goes along. These are retrospective and so you're interrogating essentially issues such as health outcomes and drug use. It doesn't include all of the information you'd like about patients, but they're very useful for making associations and raising hypotheses, I think and -- but in many case they have been very, very effective in answering clinical questions as well.

Q. And Doctor, health databases in the United States, they would be based on the health insurance that -- that people have, in



other words, the captured data from various health insurances, correct?

A. I'm sorry. Can you repeat that question again?

Q. I said, health insurance databases in the US are dependent on getting that information from health insurance companies, correct?

A. The information is obtained from -- from a variety of sources. Often they're from billing information, hospital, doctors' offices. Some of it is actually provided by the patient, so it comes from a variety of sources. But, yes, they don't actually query patients themselves, they rely on other providers and mid level managers to provide the information.

Q. But they relay on that information in the context of that insurance company collecting that information, correct?

A. Yes.

Q. So, if a person switches health insurances, then information may be lost or you may lose follow-up on that individual, correct?



A. I think -- I guess what you're asking about is how thorough is the follow-up in studies that are based on these sorts of insurance databases. And I would say that similar to clinical studies, you know, the information is never a hundred percent perfect. There's always the possibility of patients being lost to follow-up, but I don't know necessarily that the follow-up, for example, in insurance databases is worse than other types of studies.

But yes, it's not a hundred percent, I would agree with that.

Q. Well, Doctor, isn't it true that health insurance databases have been widely criticized for epidemiological studies in measuring latent adverse events?

A. I don't know if that's true or not.

Q. And isn't the reason because in the US people switch jobs often so they are switching insurance companies often?

A. Yeah, that's an interesting theory. I don't know if that's a bit -- if it's been widely criticized or -- so I -- I can't answer that question.



Q. Did you look for any publications as you set out in putting forth your opinion in this case, did you look for any publications that discuss or criticize health insurance databases in the United States for epidemiological studies?

A. I read the clinical literature pretty widely, but I didn't look specifically for critical editorials, if that's what you're asking.

Q. Have you reviewed any that -- that discuss -- that are critical of utilizing health insurance databases for latent adverse events in the United States?

A. I haven't read any recently that I can recall.

Q. Okay. Do you recall reading any at any time?

A. Not that I recall.

Q. Doctor, in terms of your prior work before being retained as an expert in this case, none of your prior research involved ranitidine and cancer, correct?

A. No, I don't believe that I've -- I worked a lot in the field in the secretory

Page 22

medication, but I don't believe I've done any studies with ranitidine in the past.
Q. And none of your prior research has involved the carcinogen NDMA specifically, correct?
MR. SHEEHAN: Objection.
A. I don't think I've specifically used that nitrosamine in any research study that I can recall.
Q. Has any of your prior research involved research on nitrosamines?
A. Yeah, I have done research on nitrosamines.
Q. Which nitrosamines?
A. MNU primarily.
Q. And what is MNU?
A. It's a methylnitrosourea, that's a standard carcinogen used to induce gastric cancer.
I've also, I think, used an nitrosamine DMBA, which is another nitrosamine that's been used to induce cancer. So, these compounds -- I've also worked with MNNG, but I don't believe I've published with MNNG. So, I've used a number

Page 23

of nitrosamines in the laboratory.
Q. And which laboratory do you use these nitrosamines in?
A. My laboratory, which is currently at Columbia University Medical Center since 2004. I believe I've used the drug in my laboratory at the University of Massachusetts. And then prior to that, in my laboratory in Boston Massachusetts at Mass General Hospital.
Q. So, in your laboratory, you have used those nitrosamines to induce tumors inside of animals?
A. Yes.
Q. Okay. Do any of your published papers use inverse probability of treatment waiting?
A. I'm sorry, I don't understand that question. Could you explain what you're asking?
Q. Do you know what inverse probability of treatment waiting is?
MR. SHEEHAN: Objection.
A. Doesn't ring a bell offhand.
Q. Are you aware of whether or not any

Page 24

of your published papers used inverse probability of treatment waiting?
A. I am not understanding your last word "inverse probability of" what again?
Q. Inverse probability of treatment waiting.
A. Waiting. Yeah. No, no, doesn't ring a bell, sorry.
Q. Have you published any studies regarding nutritional epidemiology?
A. Nutritional epidemiology. Well, I've been in interested in nutrition, but I haven't done epidemiology studies in that area.
Q. And dietary studies are human study -- human epidemiological studies, correct?
MR. SHEEHAN: Objection.
A. Didn't follow it. So, diet- -- I've done dietary studies in animal models and that's, you know, as you probably infer from my CV, I'm primarily a bench researcher, a translational researcher. I've also been involved in clinical research. But most of my research has been in animal models and

Page 25

I've done a number of studies with a variety of diets in animal models, primarily in mice. But in terms of dietary studies in humans, I -- I don't do much human research, so I certainly haven't done dietary studies in humans, if that's what you're asking.
Q. It is. And you haven't published any studies that involved occupational epidemiology, correct?
A. No, I had not done research in occupational epidemiology.
Q. Doctor, what is a carcinogen?
MR. SHEEHAN: Objection.
A. Well, I discussed that in my report. Should we look at my report? I have a detailed description of carcinogenesis in my report.
Q. Do you have a printed out version of your report in front of you?
A. I do.
Q. You're free to refer to your report for any of my questions.
So, my question is simply, what is a carcinogen?
MR. SHEEHAN: Same objection.

Page 26

A. Well, as I discuss in my report in terms of cancer and carcinogenesis on pages 5 to 6 of my report, carcinogens are exposures, chemicals, processes that induce cancer, it involves both initiation and promotion. And so, I do carcinogenesis experiments in the laboratory.

You know, one of the most classic carcinogens that I work with is an infectious agent, if you look back to pylori where we infect mice with this bacteria and both initiates and promotes cancer. So, a carcinogen is sort of defined as a molecule or organism or exposure that both initiates and promotes cancer. And as I've discussed in my report, the most common set of feature apart -- apart from DNA damage is -- is chronic inflammation. So, we've done a lot of carcinogenesis experiments in the laboratory. As we're discussed already, I've been using more recently Helicobacter pylori combination with, for example, MNU. And I've written several papers on the process of how cancer is formed through the combination of those two exposures.

Page 27

Q. Doctor, what -- what -- the ten key characteristics of the carcinogens, are you aware of that principle?

A. Yes, I actually discuss that in my report as well.

Q. And many of the published articles that you've published reflect that terminology as well, ten key characteristics of carcinogens, correct?

MR. SHEEHAN: Objection.

A. Though, to be honest, the -- most of the sort of cutting edge research, cancer, biology does not really discuss those sorts of terms. Those are terms that are often more of interest to -- to invest to epidemiologists who are trying to look at environmental exposures. But I don't think that concept really is as relevant for basic biology research and cancer experiments in animals.

So -- so, I do discuss, of course, those key characteristics in my report.

Q. Doctor, what is a mutagen?

MR. SHEEHAN: Objection.

A. I also, I think, refer several

Page 28

times to mutagenesis and this is something that we actually look at in the laboratory. You know, one of the best mutagens is actually aging, because, as you know, mutations occur normally with aging. But a mutation is a change -- typically a change in DNA sequence that arises during replication of DNA chromosomal duplication, and it's a natural process. But many investigators are interested in, sort of, exposures that can increase that rate, for example, sunlight exposure, other sorts of exposures. So, it's a change in DNA sequence, sometimes that DNA sequence change can be, sort of, passive and unimportant, sometimes it can result in an increase in oncogenesis often it leads to the death of the cells. So, mutagenesis is a change in DNA sequence that we are able to assess by sequencing DNA.

Q. Doctor, theoretically, a single exposure to a mutagen can, after several steps, result in cancer in humans, correct?

MR. SHEEHAN: Objection.

A. I don't think it's as simple as that actually. Cancer is a multi-step

Page 29

process that takes year and years to develop. Mutations are part of it. As I outline in my report, it involves genetic as well as epigenetic changes. And it's -- in answer to your question, it's highly unlikely, I won't say nearly impossible for a single DNA base change to result in cancer. Cancer is a complex process that requires multiple genetic hits, as described by Bob Weinberg, usually in humans more than three or four and the odds of getting those three or four changes are quite low. So, it really requires a lot of time, a lot of exposure and it involves more than just mutations in the end.

Q. Doctor, theoretically, it's possible that a single exposure to a mutagen can, after several steps, result in cancer in humans, correct?

MR. SHEEHAN: Objection. Asked and answered.

A. I disagree --

MR. SHEEHAN: The exact same question. You just asked the exact same question in the exact same words.

MR. NIGH: Tom, Tom. Don't -- don't -- don't use speaking objections. You can look at the realtime and see that it's a different question. Please don't litter the -- litter the deposition with speaking objections, it's not the same question.

MR. SHEEHAN: It's the same question.

MR. NIGH: No, it's not. I used the word "possible" at this point. I can point out the two questions if you really want to look at them and see if they're not the same exact question --

MR. SHEEHAN: Possible and theoretical, I mean, give me a break.

MR. NIGH: Please don't litter --

MR. SHEEHAN: Go ahead.

MR. NIGH: -- with speaking objections.

MR. SHEEHAN: If you want him to answer --

MR. NIGH: It's completely improper.



MR. SHEEHAN: Dan, if you want him to answer, just ask him to answer.

MR. NIGH: Okay. You're doing all right with the objections in just as in form or just objection. But to come out and say it's exactly the same question, it's not. You can read the two questions. All right. I'll read the question again.

BY MR. NIGH:

Q. Doctor, give me one second.

Doctor, theoretically, it's possible that a single exposure to a mutagen can, after several steps, result in cancer in humans, correct?

MR. SHEEHAN: Objection. Asked and answered.

A. As I mentioned before, I don't think it's as simple as that. And is it possible? I guess anything's possible, but it's extremely unlikely. And in my experience in the laboratory, a single exposure is insufficient.

Q. Doctor, are you aware that Zantac has been recalled in every country that has



sold it?

MR. SHEEHAN: Objection.

A. I understand, I mostly focused on the US. But I think I'm aware that Zantac has been recalled in the US, probably other countries.

Q. And the reason Zantac was recalled in the US was due to presence of NDMA in Zantac, correct?

MR. SHEEHAN: Objection.

A. It's my understanding that -- that the finding of NDMA in some Zantac preparations led to the recall by the FDA.

Q. Is NDMA a mutagen?

MR. SHEEHAN: Objection.

A. Yes, I've looked at a lot of the research and it has been shown that NDMA causes mutations in cancer cell lines and other cell lines that have been studied.

Q. Is NDMA a carcinogen?

MR. SHEEHAN: Objection.

A. NDMA has been shown to be carcinogenic in several animals species. I believe that would include rat, rabbit and mouse, but has not been shown to be a



carcinogen in primates. For example, we can quote the Adamson study there and has been not shown to be a carcinogen in humans.

Q. It's the Thorgeirsson, the Adamson study that you're quoting to to suggest that it's not been demonstrated to be carcinogenic in -- in primates?

A. That's correct.

Q. You're aware that the primates that were administered NDMA in that study they all died due to toxic effects, correct?

MR. SHEEHAN: Objection.

A. I do describe that in my report and if you don't mind, I'll take a look at that particular section in my report. But I do understand -- I do recall that the animals did die. On the other hand, they lived long enough to develop cancer in response to NDEA. So, that would not be a valid criticism to suggest that the study was -- was negative with respect to NDMA.

Q. Sorry. Your -- your thinking is that because they lived long enough to developed a response for NDEA, that somehow this -- this shows that NDMA did not detect

Page 34

cancer in the animals that all died due to toxic effects?

MR. SHEEHAN: Objection.

A. Again, NDMA did not cause cancer in the primates.

Q. Right. Because they all died due to toxic effects in the study, correct?

MR. SHEEHAN: Objection.

A. So, NDMA was given to the primates, they did not develop cancer, they developed liver fibrosis and they did not develop cancer.

In a similar study, NDEA did induce cancer in the primates. So, we can certainly that the primates, during the duration of the study, did not develop cancer.

Q. But the NDEA did not kill all of the monkeys in the study where -- where you can see the cancer effects of NDEA in the monkeys, correct?

MR. SHEEHAN: Objection.

A. I think we'd have to look at the study to look at the details of that. If you want to pull up the study, we can go through it.

Page 35

Q. Do you -- do you recall, without pulling up the study, do you recall that all the animals -- all the monkeys did not die when they were administered the NDEA?

A. Again, I do know that the monkeys developed cancer with NDEA. And I don't recall the details of their survival rate study, but if you want to pull it up we can certainly discuss it.

Q. Doctor, when all the animals die from a toxic effect, is it your belief that they're also looking for tumors in those animals that died from the toxic effects?

A. You know, when you do a study and I don't know the details about that protocol, but I do know that when we do these sorts of studies, we look at several things. We look at survival from the drug. We look at the development of cancer. I would say having done lots and lots of carcinogenesis studies that if a particular agent is able to induce cancer, you'll see the cancer prior to the death of the animals. It is sort of interesting that they -- the monkeys or the primates died from NDMA, it does suggest it's

Page 36

a fairly -- it can be a fairly toxic compound at those high doses.

But in my experience, if the agent was going to be a significant carcinogen, the animals prior to their death would've developed cancer or certainly signs of cancer. So, I understand your point perhaps in saying, well, you know, maybe we just -- maybe it is -- maybe you're suggesting it is can- -- a carcinogenic and we just didn't see it because they died, but I find that explanation weak. And having done a lot of carcinogenesis studies, I have a lot of faith in the fact that if they didn't find the cancer prior to the death of those animals, and they did live a number of months, it's unlikely to have been carcinogenic in that species at least at the doses given.

Q. Doctor, have you reviewed other studies where they measured DNA adducts after NDMA was given to monkeys?

A. So, you're talking perhaps about 06 methylguanine, is that what you're referring to?

Q. One of them, yes.

Page 37

A. Are you referring to others?

Q. Doctor, are there other adducts that can form from the administration of NDMA?

A. Yes.

MR. SHEEHAN: Objection.

A. Yes, and they are well-outlined in my report, but if you don't want to ask specifically about the others. Yes, so, I was -- so, I've looked at several of the studies, that I have looked at 06 methylguanine, which I think is probably the adduct of -- of greatest relevance. And I think we need to be careful in looking at that as a "biomarker," yes, it has been associated with the development of cancer, but it's not the exact same thing as mutagenesis or cancer.

So, simply finding 06 methylguanine in the liver or other organs, does not give you confidence necessarily that the agent is carcinogenic.

Q. Did you review any studies where monkeys administered NDMA developed DNA adducts 06?

MR. SHEEHAN: Objection.
A. I don't recall, I'd have to look at my report.
Q. You're free to look at the report if you need to.
A. So, you're asking specifically with that 06 methylguanine or other adducts in the primate studies; is that right?
Q. Yes.
A. I see in the section I wrote on the primate studies, I don't see that I specifically referred to any DNA adducts. But I comment on 06 methylguanine and several methly- -- and 7-methylguanine, 04-methylthymine, M3 methyladenine, et cetera, et cetera, are a number of the DNA adducts that have been formed.
I don't see that I wrote much here on anything related to the primate studies, but I guess your question is if -- if -- if there were studies that showed presence of adducts in the primates, again, I don't think you can certainly equate that with necessarily the outcome of cancer.
As you know, mammals, humans


particularly, but certainly also primates, have very, very strong DNA repair system. And so, simply the finding of the adducts doesn't necessarily lead to cancer. You know, there's the AGT, MGMT system that is able to repair significant amounts of DNA damage. And so, I don't understand the significance of finding any DNA adducts from NDMA.
Q. Doctor, it's been discussed extensively that there are lots of interindividual differences when it comes to a human's ability for MGMT repair, correct?
MR. SHEEHAN: Objection.
A. I haven't -- haven't looked in detail about the degree of interindividual variability. But I would say that for most physiologic processes, of course there's some degree of variability. I don't know how I'd classify it in terms of the range, but certainly there is individual variability in most physiologic responses.
Q. I mean, there are some humans that have complete lack of MGMT repair, correct?
MR. SHEEHAN: Objection.


A. Yes, deficiencies have been described.
Q. And there are humans that have complete lack of repair of 06 methylguanine using MGMT repair, correct?
MR. SHEEHAN: Objection.
A. I don't think I've commented on that specific deficiency in the pathways, so I don't know the answer to that.
Q. Doctor, is NDMA a carcinogen?
MR. SHEEHAN: Objection.
A. I believe I addressed that question earlier as -- I'll restate my answer again. It's been shown to be a carcinogen in rats, rabbits, mice, perhaps a few other mammalian species, but has not been shown to be a carcinogen in primates and humans. And so, it is a carcinogen in some animal species that have been studied, but not humans.
Q. Doctor, is NDMA a probable human carcinogen?
A. So, the IARC, a branch of the World Health Organization, has examined the data and I think based on primarily the animal data that I've described has listed it as a


Class 2A, which is a probable human carcinogen which, of course, means they've decided that they have not classified it specifically as a known human carcinogen.
Q. Doctor, probable means more likely than not, correct?
MR. SHEEHAN: Objection.
A. I think that interpretation is -- is absolutely wrong. By probable, the classification of probable is based on the strength of the experimental evidence. Again, primarily the animal studies and specifically they have stated that this should not be interpreted as -- in any way as a quantitative estimate of the likelihood that it will cause cancer in humans.
So, I think that is a misinterpretation and probable is simply based on the strength of the experimental evidence, primarily in animals.
Q. So, you disagree that the word "probable" means more likely than not?
MR. SHEEHAN: Objection.
A. I think in this instance and as defined by the IARC and the WHO, I do

Page 42

disagree with it because it's been used somewhat differently here, yes, that's correct.

Q. And Doctor, IARC is an arm of the World Health Organization, correct?

A. Yes, that's what I did state in my last answer.

Q. Okay.

MR. NIGH: Let's go ahead and pull up LP279. This will be marked as Exhibit 6648.

(Exhibit 6648 was marked for identification.)

BY MR. NIGH:

Q. And Doctor, you'll see at the bottom of this document it shows World Health Organization Geneva 2002.

Do you see that?

A. Yes, I do.

Q. And --

MR. SHEEHAN: You can look at it yourself there, Dr. Wang, if you refresh your Box to the extent you want to.

A. Yeah, I want to see the whole

Page 43

document, if I could.

Q. Yeah. And obviously, you're free to look at the document. I'll ask you some questions, if you need to look at more of the document to answer the answer to that questions, feel free to.

My -- my next question is this document, it says it's a Concise International Assessment Document 38, and right below it says, N-nitrosodimethylamine.

Do you see that?

A. Yes, I do.

Q. And N-nitrosodimethylamine stands for NDMA, correct?

A. Yes, that's correct.

MR. NIGH: Let's go ahead and turn to page 4.

Q. Here you can see Executive Summary and I'm going to draw your attention, it's on the right side, if we can bold up the paragraph that says, Based upon laboratory studies, it says:

Based upon laboratory studies in which tumors have been induced in all species examined at relatively low doses, NDMA is

Page 44

clearly carcinogenic.

Do you see that?

A. Yes.

Q. And this is in 20 -- published in 2002, this is nearly two decades after the primate study that we were discussing previously the Adamson study, correct?

A. Correct.

Q. And so, the World Health Organization interpreted the information as:

Based on laboratory studies in which tumors have been induced in all species examined at relatively low doses, NDMA is clearly carcinogenic.

Do you disagree with that statement from the World Health Organization?

A. Well, I think I've already answered that question. I believe that NDMA has been shown to be carcinogenic in a number of animal species. I guess the -- the question remains in terms of humans, it has not been shown to be carcinogenic.

Q. Next, Doctor, it says:

There's overwhelming evidence that NDMA is mutagenic and clastogenic.

Page 45

Do you see that?

A. Yes.

Q. Do you agree with that statement by the World Health Organization?

A. NDMA has been shown to be mutagenic and in both rodent and human cell line, so I would agree with that.

Q. And next it shows -- I'm gonna to point the attention to qualitatively:

Qualitatively, the metabolism of NDMA appears to be similar in humans and animals.

Do you agree with that statement?

A. I'm not sure about that. I would say that the processes do appear to be similar. I guess trying to decide whether qualitatively they are highly similar or not similar is more difficult for me. I think there are significant differences between humans and animals, so I'm not -- I don't quite agree with that, no.

Q. Next it says:

As a result, it is considered highly likely that NDMA is carcinogenic to humans.

Do you agree with that statement from the World Health Organization?

A. I don't -- I would not use the term "highly likely." I understand what they're trying to do here and this, you know, the World Health Organization has sort of a different mission than, for example, cancer biologist who's interested in mechanisms and causation. I think this is a document that's presenting a word of caution about this particular substance. I think highly likely is an overestimation of the evidence to date, particularly for humans. So, I would not use that word if I was assessing the data myself, no. I'd say possible, but not highly likely.

Q. And next it says:

Potentially at relatively low levels of exposure.

Do you agree with that statement?

A. No, I don't. I think -- I think the evidence has indicated that low levels are highly likely not carcinogenic. So -- so, I would not agree with that. And I think potentially is -- is -- suggests a strong word of caution here in terms of what the WHO is saying.



MR. NIGH: Let's take a look at the next page. If we can blow up the first paragraph here.

Q. Next, Doctor, it says:

Cancer is clearly the critical endpoint for quantitation of exposure response for risk characterization of NDMA.

Do you see that?

A. Yes.

Q. Do you agree with that statement?

A. I'm not sure exactly what they're trying to say here, but certainly in studies of NDMA, cancer is an important endpoint in terms of those studies looking at carcinogenesis by NDMA. I think that's fair to say.

Q. Next it says:

In addition to it being best characterized, in general, tumors occur at lowest concentration compared with those typically reported to induce non-cancer effects.

Do you agree with the World Health Organization where they're discussing the NDMA tumors occur at lowest concentration compared with those typically reported to induce non-cancer effects?

MR. SHEEHAN: Objection.



A. I'm not sure I follow the statement here. Let me read it again. It's written a little awkwardly.

Q. Okay. Let me breakdown the question.

You see that it says, in addition to it. What do you think "it" refers to, NDMA?

A. Not sure, could be.

Q. The sentence right before it discusses NDMA, correct?

A. Yeah, it discusses cancer too, so that's why it's a bit confusing.

Q. Do you think that -- do you think you could misinterpret this as in addition to cancer being best characterized, in general, tumors occur at lowest concentration, that wouldn't make sense, right?

MR. SHEEHAN: Objection.

A. I -- I have trouble with this sentence. I'm not sure what they're trying to say, to be honest.



Q. So, as you read this sentence, you can't tell that this sentence is stating that NDMA occur -- tumors occur for NDMA at lowest concentration compared with those typically reported to induce non-cancer effects?

A. Yeah, I don't know if I would interpret it that way.

Q. Wouldn't that --

A. I have trouble with this sentence in general because -- you know, and it gets also to a lot of the animal models. When they use the word "tumor," also that -- I find that complicating because tumors can include benign, not -- essentially non-neoplastic lesions, as well as adenocarcinoma or squamous cell carcinoma, for example. So -- and they're referring to a broad range of studies, many of which I've read. So, I -- yeah. No, I -- I am not sure about this sentence.

Q. So, the fact that tumors can refer to different types of tumors, gives you pause to whether or not this sentence is referring to NDMA that for NDMA tumors occur at lowest

concentration compared with those typically reported to induce non-cancer effects?
MR. SHEEHAN: Objection.
A. Yeah. Again, I just -- I just -- not sure what they're saying here. But if you have a specific question you want to ask me, that's not related to interpreting this sentence, I'll be happy -- happy to listen to it.
Q. Did you -- did you review this as part of the materials that you included as part of your opinion, expert opinion?
A. I have seen this document before, yes.
Q. What about this paragraph, do you recall how you would've interpreted this in part of forming your opinion?
A. I -- I don't remember this paragraph specifically, but I did look at it. I did look at the document.
Q. Now, the next sentence says:
The lowest tumorigenic dose for the development of hepatic tumors in male and female rats exposed to NDMA in the critical study was 34 micrograms per kilogram body


weight per day for the development of biliary cystadenomas in female animals.
Do you see that?
A. Yes.
Q. Doesn't that sentence also support that the sentence before it is discussing that, in general, for NDMA, tumors occur at lowest concentration compared with those typically reported to induce non-cancer effects?
MR. SHEEHAN: Objection.
A. Well, I see the sentence and I see the reference to "tumorigenic doses." And again, I've already raised the concern about what tumorigenic dose means. And also, it's talking here about biliary cystoadenomas, which are benign tumors. And I see the dose is listed.
But I guess -- this is a WHO document and I think -- I might guess that it refers to studies done by others. It's a concern that this is actually trying to cite data here and there's not a reference given. Perhaps you could go back and look at the specific reference for the study is not --


not done. So, I think we've got to go back and look at the original studies that they're sort of quoting from.
But having read a lot of the rat studies and in particular having reviewed in detail Peto, which I'm sure you've read in my report, I comment on extensively and criticize extensively, I don't -- I noted specifically that in those rat studies, NDMA at the lowest doses did not induce -- did not raise the risk of tumors and in particular cancer. So -- so, I have a little bit of problem with this, this looks a little loose and dirty here in terms of their citing the literature. So, yeah, I -- I don't -- I don't buy that statement really at all.
Q. You don't recall which study that comes from?
A. I don't -- I don't recall, it certainly could be Peto, could be another study. Again, they don't reference it, so -- so how would we know really? I don't think either of us know exactly what study they're quoting from perhaps.
Q. Okay. Doctor, there's a -- you


mention that at the lowest levels, Peto doesn't show two increasing tumors.
Is that what you just mentioned?
A. Yes, that's correct.
Q. But actually, at the lowest level, it doesn't show statistical significant increase in tumors, but it does show an increase in tumors, right, compared to control?
MR. SHEEHAN: Objection.
Mischaracterizes the study.
MR. NIGH: Doesn't mischaracterize the study.
A. No, I did not see any significant increase in tumors.
Q. What's the difference between a statistical significant increase and an increase?
MR. SHEEHAN: Objection.
A. It would be a statistical analysis would be the difference.
Q. Did you look at the bottom four levels of the Peto study to see whether or not there were actually more tumors in those bottom four levels compared to the control?

MR. SHEEHAN: Objection.
A. I looked at the data, yes.
Q. And there were more tumors at the bottom four levels, not talking about statistical significance, but more total tumors compared to the control, correct?
MR. SHEEHAN: Objection.
A. There was really no statistical difference.
Q. I'm not asking about statistical difference, statistical significant tests. I'm asking about whether or not the number was higher.
MR. SHEEHAN: Objection.
A. Well, if you're asking me is five greater than four, I would say that's true.
Q. My question is, in the Peto study there were more tumors in the bottom four levels in the animals administered the NDMA compared to the control, correct?
MR. SHEEHAN: Objection. Asked and answered.
MR. NIGH: Not answered.
A. I think I answered your question that there were minor differences in the



numbers of tumors at the lower doses, but they were not statistically significant. In having done numerous animal models and studies, I can certainly say that I would not regard those as different without any statistical analysis. So, in a research study, if the differences are, you know, less than a statistically significant difference, which required larger numbers in more animals. But overall, even looking at the data, it's clear that there was no increase until a -- a pretty high dose of NDMA was given.
And I would also say that, again, having done these sorts of animal studies extensively in the laboratory, I found issues with them calling them "tumors." And, yeah, when -- in some of their studies they actually group them together with other "lesions." There was no evidence of an increase in cancer in those animals until fairly high doses were used.
So -- so, yeah, that's why I have a problem with the term "tumors" and with minor differences that don't rise to the level of



statistical significance. My conclusion is, there's no increase in tumors up to the -- at least six -- for the lowest six levels, six doses of NDMA.
Q. Doctor, statistic -- when you're testing for statistical significance, you test the null hypothesis in a statistical significant test, correct?
A. Yes, that's correct.
Q. And if the finding has a p-value of less than .05 if you're doing a test at 95 percent confidence intervals, if the p finding is less than .05, then you can reject the null hypothesis, correct?
MR. SHEEHAN: Objection.
A. Depending upon the design of the study and what it is you're testing, that sort of analysis is correct and we use it for many of your studies. But again, it depends on what kind of question you're asking and the design of the study, but that is sort of a simplified version of how you use statistics, yes.
Q. And the Peto study testing for the null hypoth- -- they tested the null



hypothesis using statistical significance, correct?
A. Well, we'd have to look at the study. I'm not sure what comparison you're talking about here.
Q. Isn't the null hypothesis -- what would be the null hypothesis be that was tested in the Peto study?
MR. SHEEHAN: Objection. And if you need to see the document, Dr. Wang, feel free.
A. Yeah. I think we need -- well, specifically, if you want to look at a specific -- so, when we do statistics, we do them in any different settings and many comparisons. But I would just say, in general, what they're often trying to do in these sorts of studies is compare whether or not there's an increase in tumors or cancer specifically in one group of animals versus another. And so, typically in this sort of study, you would compare animals that received no NDMA to animals that received -- to a group of animals that received a certain dose of NDMA and then they would ask the

question, is that difference statistically significant.
Q. Now, Doctor, the null hypothesis that's actually tested would be -- in the Peto study would be whether there are the same number of tumors in animals with NDMA versus number of tumors with animals that did not get NDMA, correct?
MR. SHEEHAN: Objection.
A. Again, we'd have to look at the exact comparison, but what you're describing is -- is a reasonable summary, I think, of the application statistics in this study.
Q. And isn't it true that the basic principle is that if you can -- if you cannot reject the null hypothesis, the 95 percent statistical significance, that does not mean you've proven the null hypothesis, correct?
MR. SHEEHAN: Objection.
A. Again, it's hard to discuss this without looking at a specific example.
Q. Doctor, do you know that concept that when you're testing a statistical significant test and you're testing the null hypothesis that just because you can't reject


the null hypothesis, does not mean you've proven the null hypothesis? Are you aware of that concept?
MR. SHEEHAN: Objection.
A. Yes. So, statistics are used to give you an increased confidence that it's not a random difference. It doesn't prove that there's not a difference, that's correct. But it gives you confidence as to whether the difference might be real.
Q. So, just because something lacks statistical significance, does not mean that the null hypothesis is proven true, correct?
MR. SHEEHAN: Objection.
A. Again, I think you need to give me an example of what sort of study or conclusion you're asking for here.
Q. I'm asking the basic concept of statistical test using p -- null test hypotheses, not -- not a specific example.
So, again, my question is, just because something lacks statistical significance, that does not mean that the null hypothesis is proven true, correct?
MR. SHEEHAN: Objection.


A. So, in answer to your question, if the p-value, for example, is not less than .05, doesn't mean that the two groups are absolutely the same. I think you're asking the question, does it prove that there's really no difference between the two groups. And I think the answers that I would agree that it doesn't prove that the two groups are identical, it just proves that in the -- in the setting of the study, you did not prove that it was significantly likely that the two groups were different.
I think I'm saying similar things to what you just said, but I hope I restated it in a way that makes sense to you.
Q. You are. Okay. Let's turn back to the WHO, put that document back up and let's take a look at page 22. And you'll see at the top here says, Effects Evaluation.
Do you see that on the right side?
A. Yes, yes.
Q. And underneath it it says, Hazard identification.
MR. NIGH: If we can blow up that first paragraph.


Q. Do you see that?
A. Yes.
Q. And it says:
Although NDMA is acutely toxic and induces hepatic damage in several species at dose levels of approximately 1 mg per kg body weight per day in short-term experiments, the main concern is its carcinogenicity.
Do you see that?
A. Yes.
Q. And it says:
NDMA has been consistently shown to be a potent carcinogen in all experimental species studied.
Do you see that?
A. Yes.
Q. And do you agree with that statement from the World Health Organization?
MR. SHEEHAN: Objection. Asked and answered.
A. Yeah, I think I've already addressed that -- that question. And as I pointed out before, I think NDMA has been shown to be a carcinogen and a limited number of animal species, rats, rabbits, mice, but

has not been shown to be a carcinogen in primates or in humans. And so, I don't think that sentence is accurate.
Q. Next, 22 at the bottom, we'll look at the first full paragraph and go to the next page. So, first, we'll start with this.
Do you see where I'm reading from? We can look at the --
A. I'm sorry.
(Cross-talk.)
Q. Yes, there.
A. Bottom there.
Q. It says:
Although the database is rather limited, data from epidemiological studies are at least suggestive of -- and let's take a look at the rest of the paragraph -- of an association between exposure to NDMA and several forms of cancer. And they -- they show gastric cancer there.
Do you see that?
A. Yes.
Q. Were you aware that the World Health Organization in 2002 had stated that epidemiological studies are at least


suggestive of the association between exposure to NDMA and gastric cancer?
A. Yes, I was aware of that.
Q. And at the bottom we can see it says:
The data fulfill, at least in part, some of the traditional criteria for causality of an association between ingestion of NDMA and cancer.
Do you see that?
A. Yes.
Q. So, here the World Health Organization is discussing these epidemiological dietary studies, correct?
A. Yes.
Q. And they suggest that the data fulfilled, at least in part, some of the traditional criteria for causality of an association between ingestion of NDMA and cancer.
Do you see that?
MR. SHEEHAN: Objection.
A. I see what they've written.
Q. And you disagree with that statement?


A. Well, as I've said before, I don't think that NDMA is proven to be a human carcinogen and -- and I think the WHO would agree with me in that sense because the IARC has classified NDMA as Class 2A, they have not classified it as a known human carcinogen. I think they are pointing out here -- they are pointing to the studies that have been done, the association studies with dietary and occupational exposure and they point out that some of it is suggestive. I would agree that that sort of epidemiologic data with NDMA and humans is hypothesis generating and does raise the question as to whether NDMA might also be a human carcinogen. But proof is lacking and when it says here, at least in part, they're saying it, it's sort of -- it raises some questions, it's suggestive, but it certainly is not saying definitively here that NDMA is a human carcinogen. I have not seen a statement here in this document saying, NDMA is a human carcinogen, so I take it that there's -- they are in the same position as they are as the IARC, which is, it's -- it's a possibility


and we're gonna classify it as 2A and we should be careful with this -- this compound, at least keep -- keep an eye on it.
But it's certainly not reaching the conclusion here in any other citations or any other statements that's it's definitely a human carcinogen.
Q. Okay. Let's take a look at the next column and the first full paragraph we can blow -- not -- not that one, the other, on the right side. Thank you.
And the first full paragraph it says:
Therefore, owing to the considerable evidence of carcinogenicity of NDMA in laboratory species, evidence of direct interaction with DNA consistent with tumor formation and the apparent lack of qualitative species-specific differences in the metabolism of the substance, NDMA is highly likely to be carcinogenic in humans -- to humans.
Do you see that?
A. Yes.
Q. And do you agree with the World

Health Organization's statement that NDMA is highly likely to be carcinogenic to humans?

A. As I've said before, I don't agree with this statement. I think it's a possibility based on the data that we've seen, but I find that the data falls short of -- of proving that. But I can understand the World Health Organization in terms of their role of sort of protecting human health and being very conservative and this document not a causality document, but trying to call attention to this as a potential contaminant that should be looked at. I understand their reason for having what I think is sort of excessively strong scientific language. So, as I said before, I don't -- I don't agree with the term highly likely. I don't think that the evidence meets that bar, but certainly possible, I would agree with, yes.

Q. And they're basing that on carcinogenicity of NDMA and laboratory species in part, correct?

A. They're basing it primarily on the basis of the experimental carcinogenesis in rats, rabbits, mice. The human data, we've



already discussed, is -- is associations and weak, but they can -- perhaps they feel it's enough of it -- of it there to at least create this sort of conclusion for the WHO.

Q. Well, they're also basing it on evidence of direct interaction with DNA consistent with tumor formation, that includes human cells, correct?

A. Yes, that would include the mutagenesis studies in human cells.

Q. And then they discuss an apparent lack of qualitative species-specific differences in the metabolism of the substance as another part of the basis of this finding, correct?

A. Well, I think they conclude that many of the pathways are the same. Again, I disagree with the -- as noted before to say that there's really no significant species differences. I don't think that's really been shown, I think the evidence suggests otherwise. But -- but I understand that they feel the pathways are the same.

Q. Okay.

MR. NIGH: We can go ahead and



take this document down.

Q. Doctor, have you done a comprehensive and systematic review of the medical literature to form an opinion on whether NDMA meets the criteria of being a human carcinogen?

MR. SHEEHAN: Objection.

A. Well, in my research and due diligence, I've looked at a lot of different sources of information. Certainly this is -- you know, the focus we should remember here is on ranitidine, doesn't seem we've talked about ranitidine very much, but, you know, that really is the focus, I think, of this case. So, I've looked in -- in great depth at all the literature on ranitidine and cancer and its potential or lack of potential to be a carcinogen.

But in my due diligence, I've certainly looked also at the NDMA literature and so I've looked at that as well, including occupational studies, dietary studies, previous evidence of other NDMA contaminated drugs. And we can certainly talk about valsartan, if you want. And I've read the



plaintiffs' experts reports and I've commented on many of those.

So, yeah, I've done a broad review and search of the literature.

Q. Doctor, I'm gonna get to the ranitidine, we're only the first hour in. And I'm gonna to get to the valsartan epi. But for now my question is focused on NDMA purposely.

My question is, have you done a comprehensive and systematic review of the medical literature to form an opinion as to whether NDMA meets the criteria of being a human carcinogen?

MR. SHEEHAN: Objection. Asked and answered.

A. Yeah, I think I've already answered that. And so my answer is, yes, I've reviewed that literature. I've reviewed the literature and I've -- I've given my conclusions already about NDMA and the fact that it is -- it is a possible human carcinogen and certainly it's a rat carcinogen for sure.

Q. Doctor, is it your opinion that

NDMA is a human carcinogen?
A. Again, I think I've -- I've answered that. It's a possible human carcinogen and I think the classification is two-way, seems quite -- quite reasonable and conservative.
Q. Is it your opinion that NDMA is a probable human carcinogen?
MR. SHEEHAN: Objection.
A. Yeah, we've already discussed the term of probable. I think as used by the WHO and IARC, probable means there's sort of extensive experimental evidence, primarily in rats and as we've talked about the human association studies. It doesn't -- it certainly doesn't indicate a quantitative aspect to it. I think, you know, for my own purposes possible I think is a better term, but probable is the term that's -- that's used here by the IARC to indicate extensive experimental evidence in animal models.
Q. Doctor, is it your opinion that NDMA is reasonably anticipated to cause cancer in humans?
MR. SHEEHAN: Objection.



A. Again, I would frame it that it's certainly possible. There's enough of a chance that I think a classification is IARC as a two-way compound is perfectly reasonable.
Q. Would you disagree with the statement that NDMA is reasonably anticipated to cause cancer in humans?
MR. SHEEHAN: Objection.
A. Again, I think it could possibly cause cancer in humans, particular at high doses. So, I think, again, it's classification as a two-way compound is perfectly reasonable.
Q. You use the word "possibly." My question is, would you agree that NDMA is reasonably anticipated to cause cancer in humans?
MR. SHEEHAN: Objection. Asked and answered.
A. Again, I wouldn't use the term "reasonably anticipated" myself.
Q. So, you would disagree with that terminology?
MR. SHEEHAN: Okay.



A. When I say that NDMA is a possible carcinogen, am I disagreeing with that? I don't know.
Q. And would you disagree with the statement that NDMA is highly likely to be carcinogenic to humans?
A. I've already answered that question and I think the term "highly likely" is overly strong and inappropriate.
Q. Okay.
MR. SHEEHAN: So, Dan, we've been going about, I guess, a little over an hour. You wanna take five?
MR. NIGH: We never take five-minute breaks, so I think we go ahead and to ten minutes.
MR. SHEEHAN: Ten, you want to take ten?
MR. NIGH: Yeah, let's do ten. We all say five and it never ends up being five, so that sounds good.
THE VIDEOGRAPHER: The time is 14:19 UTC. We're going off the record.
(Whereupon, a brief recess was taken.)



THE VIDEOGRAPHER: We're back on the record. The time is 14:34 UTC.
BY MR. NIGH:
Q. Doctor, do you agree the NDMA molecule is the same whether it's ingested or inhaled?
MR. SHEEHAN: Objection.
A. So, you're asking if the NDMA molecule is significantly different depending on what it's carried in. In other words, whether it's carried in the air or whether it's carried in liquid or solid, no, the molecular structure should be the same if it's NDMA. Of course the biological effects will be quite different.
Q. Do you agree that the NDMA molecule is the same whether it is in processed meat or it's attached to a pill?
MR. SHEEHAN: Objection.
A. Again, if we're talking about the NDMA molecule if you define it as NDMA, then its molecular structure is identical regardless of what it's carried in.
Q. Doctor, do you agree that

epidemiology is not designed to determine if an individual exposure to a single person resulted in cancer, but rather epidemiology is designed to determine effects of exposure over groups?
A. Well, I find that -- sorry. I find that question confusing. Again, it sort of assumes that epidemiology is primarily designed to study cancer, which it's not. Epidemiology is a broad field of clinical investigation that uses databases to make associations. So, I guess you would have to define a specific study that you're -- you're asking about in this particular case.
Q. Doctor, is it your opinion that there's no evidence that exposure to ranitidine containing NDMA increases risk of developing cancer in humans?
A. So, again, I think the question -- let me understand the question. The question is, in terms of the epidemiologic studies of ranitidine, are there any that suggest an increased risk of cancer or are they all uniformly showing no increase risk of cancer.
Well, I'll say the -- just to


summarize the epidemiologic study I think they really do show that ranitidine is not associated with any increase in human cancer. Are there some studies that show an increased association? There are a few. And I discuss the reasons for that, of course, you know, some of them, particularly those where they don't use an active comparator, they show an increased risk, but most of that is explained by confounding by indication or reverse causality. So -- so, the studies are -- there are a few studies that show an increase in association. But taken together, there really is no signs of an increased risk of cancer.
Q. And Doctor, you answered that by just limiting my question to epidemiological studies. But I didn't ask in limited just to epidemiological studies, so I'll ask the question again.
Is it your opinion that there is no evidence that exposure to ranitidine containing NDMA increases risk of developing cancer in humans?
MR. SHEEHAN: Objection.


A. So, I guess your question then is a bit broader in terms of ranitidine, any study with ranitidine. So, I guess that would encompass clinical and nonclinical studies.
I would say that as outlined in my report, I don't think there is any evidence that ranitidine increases the risk of human cancer.
Q. And my -- you went specifically to ranitidine, but my question is ranitidine-containing NDMA.
So, it your opinion that there's no evidence that exposure to ranitidine containing NDMA increases risk of developing cancer in humans?
MR. SHEEHAN: Objection. Asked and answered.
A. So, ranitidine containing NDMA versus ranitidine, I find that confusing. I guess I had thought that we had agreed that ranitidine itself, the products that are sold, some do contain -- some or many do contain small amounts of NDMA. So, I don't think that's a distinction that represents a difference here.


So -- so, just to put a fine point on it ranitidine containing NDMA, which I believe is the same thing as NDMA, again, I don't -- have not come across any study that really suggests that it indicates an increased risk of cancer.
Q. Doctor, did you not review any of the ranitidine bladder cancer studies?
A. Clearly not discussed in my report. I did look at several of them, but that's not contained in my report. But what I saw in terms of the ranitidine bladder studies, I didn't them suggestive at all of an increased risk of bladder cancer.
Q. And you would find that the ranitidine bladder cancer study were not suggestive of an increased risk of bladder cancer even though every single study that's compared ranitidine to any control has found an increase, whether it be statistically significant, every single one has found an increase in the rate of cancer for bladder cancer for ranitidine compared to control?
MR. SHEEHAN: Objection. Mischaracterizes the evidence.

MR. NIGH: Doesn't.
A. Again, the studies I looked at and again they're not in my report and I wasn't asked to do a deep dive on those studies, but the ones I saw, I must say, yes, they were not suggested to me that there was actually an increased risk of cancer or any causal relationship.
Q. Okay. Doctor, you did a Bradford Hill analysis, correct?
A. As noted in my report, I did a Bradford Hill analysis, yes, on ranitidine.
Q. And you did a Bradford --
A. It came with my report.
Q. Sorry. You did a Bradford Hill specifically for esophogeal cancer, gastric cancer, colorectal cancer and pancreatic cancer and liver cancer, correct?
A. That's correct.
Q. You did not do a Bradford Hill analysis for bladder cancer, correct?
A. That's correct.
Q. I want to make sure I understand your Bradford Hill analyses.
As I go through your Bradford Hill



analyses, other than an analogy, I don't see where you discuss dietary studies or occupational studies; is that correct?
MR. SHEEHAN: Objection. Do you mean in that specific section of the report or do you mean in his report in general?
MR. NIGH: I'll ask the question again.
Q. I want to make sure I understand your Bradford Hill analysis.
As I go through your Bradford Hill analysis, other than the individual section for analogy in each Bradford Hill analysis, I don't see where you discuss dietary studies or occupational exposure studies for any of those criteria; is that accurate?
MR. SHEEHAN: Objection.
A. Well, the question's a bit confusing. I did a Bradford Hill analysis of ranitidine. And then I think you're asking about dietary and occupational studies of ranitidine, that doesn't really make a whole lot of sense that someone would have a dietary study with ranitidine or an



occupational study with ranitidine.
Perhaps you're sort of alluding to whether or not I included the NDMA dietary and occupational studies, which, again, I think if we're talking about cancer risk with ranitidine, we really need to focus on ranitidine and not -- and not get lost with other types of studies. So, no, I don't think that would've been appropriate to include those sorts of NDMA studies because ranitidine has NDMA in it. And so, if you want to know about the NDMA risk from ranitidine, I think you should look at ranitidine studies.
So, no, I would not have found it appropriate and I think any Bradford Hill study that included those would've been, in my mind, highly flawed.
Q. So, you did not include the dietary studies or the occupational exposure study in your Bradford Hill analysis, correct?
MR. SHEEHAN: Objection. Asked and answered.
A. So, as I indicated in my last answer, inclusion of a dietary and



occupational studies of NDMA in a ranitidine Bradford Hill analysis would've been highly inappropriate and so they were not included in my analysis.
Q. Okay. Even though NDMA would go to the potential carcinogen that's found in ranitidine, you did not include evidence regarding NDMA in your Bradford Hill analysis if it wasn't attached to ranitidine, correct?
MR. SHEEHAN: Objection. Mischaracterizes his report. I think, Dan, you --
MR. NIGH: No, no, no. Don't -- don't give speaking objections.
MR. SHEEHAN: At the beginning at this line of questioning --
(Cross-talk.)
MR. NIGH: Let me ask my question again. This is inappropriate.
Q. My question again, even though NDMA has the potential carcinogen in ranitidine, even though that's found in ranitidine, you did not include evidence regarding NDMA in your Bradford Hill analysis if it was not attached to ranitidine, correct?

Page 82

MR. SHEEHAN: Objection. Mischaracterizes his report.
Q. You can answer.
A. So, the Bradford Hill analysis that I did was focused on ranitidine. I think in terms of understanding the cancer risk --
THE COURT REPORTER: I'm sorry. The doctor muted.
MR. SHEEHAN: We're muted? You can't hear us?
THE COURT REPORTER: I can hear you now.
MR. NIGH: Let's start that over.
Q. My question again, even though NDMA has the potential carcinogen in ranitidine, you did not include evidence regarding NDMA in your Bradford Hill analysis if it was not attached to ranitidine, correct?
MR. SHEEHAN: Objection. Mischaracterizes the report.
A. So, in my report, I discuss in detail the occupational and dietary studies with NDMA. But with respect to the Bradford Hill analysis, under analogy, in fact, I do comment on the dietary exposure to NDMA and

Page 83

the occupational study. So, let me just read just from the sentence under analogy:
There is no reliable consistent association between dietary exposure to NDMA and increased risk of esophogeal cancer. One occupational study reported an increased risk for esophogeal cancer from NDMA exposure.
So, in fact, under analogy, I do comment on those. But, again, the Bradford Hill analysis really needs to focus primarily on ranitidine. But I do allude and refer to those in my -- under analogy in my Bradford Hill analysis.
Q. Okay. Let me ask the question a little bit differently.
Even though ranitidine has the carcinogen NDMA, you did not include evidence regarding NDMA in your Bradford Hill analysis for any of the criteria other than analogy, correct?
MR. SHEEHAN: Object to the form.
A. I'm not sure. I think in the -- in the Bradford Hill analysis, let me just say, I looked at all the evidence, the totality of evidence, and again, I think the

Page 84

Bradford Hill analysis needs to focus primarily on ranitidine. But certainly all of the evidence was considered and certainly I discussed NDMA specifically in the Bradford Hill analysis. But the most relevant NDMA exposure in -- in the clinical studies is from ranitidine. And so, exposure from other sources is certainly less relevant.
But I think I weighed all the evidence and all this is taken into account in my Bradford Hill analysis.
Q. Let's take a look at page 44 of your report, we don't have to pull it up. But here you have esophogeal cancer.
Did you include any dietary study or did you mention any dietary study or Hidajat in your Bradford Hill criteria other than for analogy?
MR. SHEEHAN: Hold on one second.
Objection. Asked and answered.
Go ahead.
A. Yeah, I mentioned the dietary exposure in the analogy, I think that's where it belongs.
Q. Well, that's not actually

Page 85

responsive to my question because my question I'm saying other than for analogy, okay? So, I'll start it over again.
Other than for analogy, did you mention any dietary study or Hidajat in any of your other Bradford Hill criteria?
MR. SHEEHAN: Objection.
A. Well, certainly I took into account all the dietary and optional exposure, but it's not specifically -- if you're asking if it's specifically mentioned in the other Bradford Hill criteria, it's mentioned primarily in analogy. It's not reported in the other categories.
Q. Okay. Page 45 for gastric cancer.
Other than for analogy, did you mention any dietary study or Hidajat in any of your other Bradford Hill criteria?
A. Again, I took into account certainly all the evidence from the dietary and occupational exposure, but I didn't mention those exposures specifically in analogy, but I do not mention them in the other criteria.
Q. Okay. Page 46 for colorectal

cancer.
Other than for analogy, did you mention any dietary study or Hidajat for any of your other Bradford Hill criteria?
A. Again, I took into account in the Bradford Hill analysis all of the dietary and optional expose data, but I don't mention them in any data -- in any category except under analogy.
Q. For pancreatic cancer, would your answer be the same?
A. Yes, my answer would be the same.
Q. And for liver cancer, would your answer be the same?
A. Yes, it would be the same.
Q. Okay. Doctor, I want to direct your attention to page 16.
Do you recall discussing the endogenous amount of NDMA that can be formed, you know, background regardless of ranitidine ingestion?
A. Are you asking about endogenous NDMA formation from ranitidine versus dietary of food ingestion or are you speaking about NDMA --


(Cross-talk.)
A. -- formed endogenously?
Q. No, let me be more clear.
You discuss on page 16 endogenous formation of NDMA from diets, correct?
Let me strike that question. I'm in the wrong spot.
A. I'm not finding that. I do discuss from diet on page 16 in my copy.
Q. On page 20, do you see the paragraph where it starts with:
Before evaluating the alleged risk of GI or -- or any cancer due to NDMA exposure from ranitidine use, it is important to put NDMA in context?
Do you see that?
A. Yes, I do.
Q. And your last two sentences you say:
In fact, it is estimate that endogenous exposure to NDMA is at least two to four orders of magnitude higher than exogenous exposure.
Do you see that?
A. Yes.


Q. And it's your opinion then that, in other words, NDMA exposure for endogenous sources is considered negligible compared to endogenous exposure that results from normal human physiology.
Do you see that?
A. Yes, that's what those studies suggest is that the endogenous exposure is greater than intake from normal diets, for example.
Q. And one of those studies that you rely on is the Hrudey study?
A. Yes, 2013.
Q. And Doctor, are you aware that the FDA panel met and discussed that trying to measure the amounts of endogenous formation of NDMA that they've been unreliably measured?
A. I do understand that NDMA is difficult to measure. I don't recall a specific FDA document that commented on that, but happy to review that if you want to show it to me.
Q. Okay. Have you reviewed any panel discussions by panelists invited by the FDA


that agree that as of 2020 that attempting to measure the amounts of endogenous formation of NDMA is unreliable as of that time?
MR. SHEEHAN: Objection.
A. I don't recall the reference you're referring to.
Q. And Doctor, are you aware that the Hrudey study and Fristachi made many assumptions in order to try to calculate what the endogenous formation of NDMA is in the human body?
MR. SHEEHAN: Objection.
A. I don't recall all the assumptions and calculations that went into their conclusions, but happy to look at the document and review it if you'd like.
Q. Doctor, are you aware that the studies use Monte Carlo simulations?
MR. SHEEHAN: Objection.
A. I do know what Monte Carlo simulations are, I don't recall whether these studies used those or not.
Q. Doctor, are you aware that if any of the Monte Carlo assump- -- any of the assumptions utilized for the Monte Carlo

calculations are off, then they can have drastic effects to the ultimate output for the Monte Carlo calculation?
MR. SHEEHAN: Objection.
A. I can't comment on that statement without seeing specific examples.
Q. Are you aware that that's a shortcoming of using Monte Carlo simulations?
A. I know that Monte Carlo simulations have limitations, but it all depends on the specific study in terms of the utility of that type of modeling.
Q. Doctor, you cited the Florian study in your report, correct?
A. I did.
Q. Did you ever look at the Hrudey study to see the inputs that they relied upon for assumptions of NDMA in plasma and urine to formulate their calculation?
MR. SHEEHAN: Objection.
A. I'm sorry, I'm confused. Are we talking about the Florian study now or the Hrudey study?
Q. The Hrudey study. Did you ever look at the Hrudey study to look at the


assumptions that were made in terms of the amount of NDMA found in plasma and urine?
A. I do remember the Hrudey study made a number of assumptions. I can't recall the details of what those assumptions were.
Q. Did you ever look to see whether or not those assumptions made in Hrudey were inconsistent with the values given by Florian?
MR. SHEEHAN: Objection.
A. I don't remember comparing those two studies directly, so I -- I don't remember doing that.
Q. Doctor, you didn't consider the Zeilmaker study when you made this conclusion, correct?
MR. SHEEHAN: Objection.
A. I'm sorry, which -- which study?
Q. Zeilmaker, Z-E-I-L-M-A-K-E-R. You didn't cite that here, correct?
A. Well, I didn't cite it in this particular section of my report. I don't recall whether or not -- I'd have to look at the study whether I've ever seen that before.


Q. Okay.
MR. NIGH: Let's go ahead and take a look at Hrudey first, it's LP551. This will be marked as Exhibit 6649.
(Exhibit 6649 was marked for identification.)
BY MR. NIGH:
Q. And do you see at the front here it says, Drinking Water is Proportion of Total Human Exposure to Volatile N-nitrosamines, and the first author is Steve -- I'm gonna to keep calling H-R Rudy, Hrudey, I'm not sure if that's how it's pronounced, but it makes it easier to follow.
Do you see that?
A. Yes, I see the first page of that study.
MR. SHEEHAN: And do you have the document, Dr. Wang, in your Box?
THE WITNESS: Yeah, it just showed up in the box.
Q. And this document has been marked as Exhibit 6649. I want to draw your attention to Table -- Table VII, it's on page 2191.


Doctor, you can see here it says, Inputs to the Dietary Exposure Module with Consumption Data Presented for Two of the Eight Age Cohorts.
Do you see that?
A. Yes, I see Table VII.
Q. And do you see at the top it says Biau- -- Biaudet et al.
Do you see that?
A. Yes.
Q. And underneath that it shows NDMA nanograms per gram?
A. Yes.
Q. And underneath that, the one that has the most NDMA for nanograms per gram, that's fish and seafood, correct?
A. It says, fish and seafood has 0.37 nanograms per gram.
Q. And that's more than cheese, beef, pork, poultry, they're all lower in terms of nanograms per gram, correct?
A. They're a similar range, but, yes, quantitatively lower.
Q. Okay.
MR. NIGH: Let's go ahead and take

Page 94

a look at the Zeilmaker study, LP560. And this is marked as Exhibit 6650.
(Exhibit 6650 was marked for identification.)
BY MR. NIGH:
Q. And do you see it says, Risk Assessment of NDMA Formed Endogenously After Fish-With-Vegetable Meals?
Do you see that?
A. Yes.
Q. And the first author is Marco Zeilmaker.
Do you see that?
A. Yes.
Q. And wanna draw your attention to the summary where it shows the 95 percentile of long-term exposure distribution was around 4 nanograms per kilogram body weight in young children and .4 kilogram per .4 nanogram per kilogram body weight in adults.
Do you see that?
A. Yes.
Q. Now, if an adult weighs 50 kilograms, that would only be 20 nanograms per day, correct?

Page 95

Strike that. Let me reword that.
A. Yeah, I lost the math there.
Q. Now, if an adult weighs 50 kilograms, then that would be 20 total nanograms, correct? 50 times .4?
A. For adults, yeah. Yes, that's correct.
Q. Did you ever consider this study in terms of your thinking that the 95th percentile of long-term exposure would only have 20 nanograms per adults, if they're 50 kilograms?
MR. SHEEHAN: Objection.
A. So, are you asking me whether I've -- I considered this particular study in my report? I don't remember if I -- I don't know if I referenced this one or not in my report. Let me see if I -- yeah. Actually, I do reference this in my report, I think, 336. Sorry, I did see this before and -- and I took this into account. And so, I'm not sure this changes anything in terms of my assessment, I think my assessment still stands. I'm not sure how this is -- how relevant this particular statistical modeling

Page 96

and estimation of fish and nitrate rich vegetables in NDMA ingestion really is here.
Again, this is a -- an estimation, as we've pointed out, there's no real measurements of NDMA here. And this seemed to be a bit of a higher estimate than other studies I've looked at. So, I did take this into account, I don't think it really alters my conclusions in any way.
Q. You mean this -- this appears to be a much, much lower estimation than what Hrudey and Fristachi show, correct?
MR. SHEEHAN: Objection.
A. So, this is 20 nanograms?
Q. Yeah.
A. Let's go back and look at Hrudey, it was in the name range, I think it was also in the nanogram range.
Q. Well, Hrudey -- let's go back and look at Hrudey. Hrudey --
A. This is Table VIII.
Q. Hrudey showed that for fish exogenously it had the highest amount of nanograms per gram, correct?
A. Yes, it was nanograms per gram.

Page 97

Q. But when you look at this food inside of the body formed, according to Zeilmaker, it's only 20 nanograms that are forming exogenously, correct?
A. Yeah.
MR. SHEEHAN: Objection.
A. We're getting to some numbers here. So, let's just slow down and take a look at those. So, Hrudey said --
MR. NIGH: We can pull this off the screen.
A. -- 37 -- this is 37 nanograms per gram in fish, right? So, for a hundred gram piece of fish, that would be 37 nanograms.
Now, if we go back to Zeilmaker, they talked about, as you said, 20 nanograms, but it wasn't -- didn't have a denominator of how many grams the fish weighed, so I'm assuming that it's -- again, a hundred grams of fish would be about 20 nanograms. You know, I think they're all in sort of same range, to be honest, but -- but please correct me if I'm wrong here.
Q. The table you're looking at Hrudey is exogenous amounts of NDMA. Zeilmaker is

speaking to endogenous amounts of NDMA being formed, correct? Inside the body.
A. Uh...
MR. NIGH: Let's go ahead and pull up Zeilmaker again. It's Exhibit 6650.
Q. And maybe this helps, if we look at the sentence right before what's highlighted:
The experimental results were combined with statistical modeling of Dutch food consumption data resulting in -- in predicted exposures to endogenously formed NDMA in the population.
Do you see that?
A. Yes.
Q. And the next sentence says:
The 95 percentile of the long-term exposure distribution was around 4 nanograms per kilograms in young children and .4 nanograms per kilogram in adults.
Do you see that?
A. Yes.
Q. So, the 95th percentile, you know, in terms of that exposure, that would be much higher than the median or the mean, correct?


A. Yeah. So, the 95th exposure would be the higher level, so...
Q. So, the higher level of this population would be getting 20 nanograms per day if they weigh 50 kilograms, correct?
MR. SHEEHAN: Objection.
A. Yeah, I'm not -- I'm not sure about their conclusions and their modeling here. I think I have to go back to the article here. I see what you're -- you're highlighting there and I think you're saying that that is their modeling of endogenous generated NDMA, I think that's what you're saying that sentence refers to, I'm a little unsure about that. But seeing more data on this -- let's see. The endogenous NDMA formation... Don't really have any tables that are showing endogenous formation here, so I'm not sure how they got that number. It's probably from their modeling, isn't it.
Q. Doctor, you realize that all these endogenous formation of NDMA studies are doing complicated modeling, including Zeilmaker, Hrudey and Fristachi, correct?
A. Correct, I understand that.


Q. And do you understand that the health organizations that have weighed in on this have criticized the measurements of endogenous formation of NDMA as being unreliable or trying to calculate and quantify how much NDMA is formed endogenously?
MR. SHEEHAN: Objection.
A. Again, I haven't -- I haven't -- I don't recall reading any criticism of that, so I can't really comment on that sort of concern.
Q. And one of the reasons is that depending on which study you look at, there are very wide variations in the estimated or predicted amount of NDMA that's forming inside of the body?
MR. SHEEHAN: Objection.
A. So, I do recognize that there's some uncertainties, certainly about NDMA levels. You're raising the concerns here about what are the exact endogenous levels, the same concerns have been raised about what the exogenous levels are. The same concerns can be raised about all the occupational


exposure and dietary studies. And I think that's a reasonable question and point and I think, for that reason, if your question really is regarding the NDMA in ranitidine, the best way to look at that is to recognize various invariability and then to look at the cancer rates in patients who take ranitidine. So, trying to drill down on trying to say the rates -- the levels of NDMA and -- and the drug equivalent to the lows to foods or optional exposure, those are tricky as you pointed out. And therefore, looking at cancer rates in ranitidine treated patients is the best way to answer those sorts of questions.
Q. Doctor, the amount of uncertainty that's raised for endogenous formation of NDMA is nowhere close to the amount of uncertainty that's raised for exogenous amounts of NDMA in a food, correct?
MR. SHEEHAN: Objection.
A. I wouldn't necessarily agree with that statement.
Q. Isn't it true that the amount of the uncertainty for endogenous formation of

NDMA depending on the study you look it can be as much as five magnitude?
MR. SHEEHAN: Objection.
A. I can't give you a number, I don't know if that's -- that's correct or not.
Q. How much NDMA do you think forms endogenous -- how much NDMA do you think was predicted to form endogenously for the Hrudey study?
A. Well, I think -- I mean, as I comment on my report, it's higher than the typical -- as I say here, the reasonable worst case estimates the total NDMA exposure from endogenous sources is 2.1 micrograms per day and the endogenous exposure to NDMA could be at least two to four orders of magnitudes higher than exogenous exposure. So, I think we do have a bit of a range here, but my reading of literature suggests that endogenous is probably greater than exogenous. But I agree that there is probably a range and the numbers are probably not as precise as we would like them to be.
Q. Doctor, do you -- in terms of your opinion that endogenous is probably greater


than exogenous, have you reviewed any of the health authority statements that suggest that any attempts to measure exogenous formation of NDMA and quantify are unreliable?
MR. SHEEHAN: Objection.
A. I'm not familiar with the reports you're referring to. Be happy to look at them. And I don't know what you mean exactly by exogenous formation of NDMA.
So, a lot of the exogenous NDMA, I think, is contained, right, within food stuffs, various medicinals, other types of things that are ingested or inhaled. I think -- I'm not sure if you're talking about forming NDMA exogenously as -- are you referring to in vitro experiments? Or I am not sure what you -- what you mean.
Q. Let me -- let me strike my last question, it's worded wrong.
Doctor, have you -- in terms of your -- in terms of your opinion that endogenous formation of NDMA is probably greater than exogenous formation of NDMA, have you reviewed any of the health authority statements that suggest any attempts to


measure endogenous formation of NDMA and quantify it are unreliable?
MR. SHEEHAN: Objection.
A. You know, I think you asked that question before about those reports. Again, I don't recall specific reports, so I can't really comment on those.
Q. Okay. So, previously you said you didn't -- you didn't read the statements by the FDA panelists, correct?
MR. SHEEHAN: Objection.
A. I don't recall reading the documents you're alluding to or at least I'm not -- maybe I don't -- I'm not sure what documents you are referring to.
Q. You don't recall reviewing any documents by the EMA, European Medical Agency, that discussed the unreliability of quantifying NDMA formed endogenously, correct?
MR. SHEEHAN: Objection.
A. I don't recall the EMA reports I think you're referring to, yeah, I don't recall those.
Q. And you don't recall reviewing any


other health agency or regulatory agency documents that discuss the unreliability of quantifying NDMA formed endogenously, correct?
MR. SHEEHAN: Objection.
A. I don't recall what documents you're referring to there.
Q. Okay, let's switch to exogenous amounts of NDMA.
Doctor, on page 19, Exogenous amounts of NDMA in ranitidine.
MR. NIGH: Okay, let's go ahead and take this document down.
Q. And Doctor, on page -- sorry, not 15, 19 of your expert report, you give amounts of -- exogenous amounts of NDMA that were found in the ranitidine pill, correct?
A. Yes, I refer to the analyses by FDA and GSK in terms of the amounts the upper limits of -- of NDMA within ranitidine tablets that they analyzed from drugs off the shelf.
Q. Okay. Let's talk about some of the testing that the FDA and defendants have done in terms of measuring exogenous amounts of

Page 106

NDMA in ranitidine.
First, you're aware that the FDA did baseline testing where they tested the pill itself to see how much NDMA was formed -- was in the pill, correct?
A. Yeah, the FDA measured the amount of NDMA in the pill.
Q. Now, the FDA also did testing of aging the pill and seeing how much NDMA formed in the pill, correct?
A. I believe that's correct, yes.
Q. Now, are you aware that -- are you aware of whether or not the product that was purchased off the shelves that the FDA used for testing, the product purchase off the shelves, whether or not it was for the aging, the stability testing that the FDA did?
MR. SHEEHAN: Objection.
A. I don't recall the sources of all these pills.
Q. Are you aware that after the FDA did the stability testing at room temperature, that that's what initiated the full recall of Zantac in the United States?
MR. SHEEHAN: Objection.

Page 107

A. I don't remember the exact time course or which -- exactly which tests led to the recall. I just do recall that -- that they found some NDMA that was above the limits of 96 nanograms per day.
Q. Are you aware that the testing that you've cited to on page 19 does not look at the additional amount of NDMA formed after the product is aged or stability testing or after the consumers' experience after they've opened up the bottle and broken the seal?
MR. SHEEHAN: Objection.
A. I'm not sure what data or documents you're referring to here.
Q. I'm referring to the data that you have on your paragraph where you talk about the F -- the amounts of NDMA that GSK found in their pill?
A. Yes.
Q. And the amounts of NDMA that the FDA found. Are you aware --
A. Yes.
Q. -- that that testing is simply opening up the bottle and testing the pill without seeing the effects of aging, heat or

Page 108

humidity or any sort of stability testing on those pills?
A. Yes, that's my understanding is they -- they tested drugs off -- off the shelf, yes.
Q. This testing isn't the testing the drugs off the shelves, is it? This testing was the testing where the defendants supplied them the bottles for their testing, right?
MR. SHEEHAN: Objection.
A. Again, I'm not sure exactly where the -- where the pills came from that they tested.
Q. Are you aware that later when the FDA did stability testing that they purchased those products off the shelves?
A. Well, I am aware that stability testing was done and I think I comment on that in my report that ranitidine undergoes a slow -- very slow degradation and that occurs over time and is affected by heat, humidity and the crystal morphology. So, I presume that testing was done, and I cite the King article here, that further testing revealed that the levels increased over time, I think

Page 109

I alluded to that in my report.
Q. But you don't allude to how much -- how much the -- how much additional amounts are forming in the ranitidine bottle over time, right?
A. I don't --
MR. SHEEHAN: Objection.
A. No, I don't -- I don't allude to the amounts that -- that occurred with aging, no.
Q. The FDA initial baseline testing that you've pointed to here that's up to 2.97 ppm, that doesn't answer the question of what happens when the product is aged and goes through the shipping and supply chain, does it?
MR. SHEEHAN: Objection.
A. Again, I just cite the numbers that were revealed by the initial testing.
Q. That testing doesn't include what would occur after the consumer purchases the product, breaks the seal and stores it in common places that consumers would store the product, does it?
MR. SHEEHAN: Objection.

A. I don't provide data on that in my report, no, that's correct.
Q. Okay. In terms of the defendants' testing, the defendants' testing that you've cited here GSK 7.6 ppm.
Do you see that?
A. Yes.
Q. That testing doesn't answer the question of what happens when the product is aged and goes through shipping and supply chain, correct?
MR. SHEEHAN: Objection.
A. I don't comment on that in my report, so I can't answer anymore -- provide anymore information about that here.
Q. And that testing doesn't give information as to what happens when the consumer purchases the product, breaks the seal and the amount of NDMA that can form in those pills after the consumers purchase the product, correct?
MR. SHEEHAN: Objection.
A. I think I've already answered that question.
Q. Well, I asked for FDA, now I'm


asking for defendants' internal testing.
A. I see.
I don't have any information in my report about additional testing here.
Q. Doctor, are you aware that the defendants decided to do two types of testing, see how much was in the bottle -- the pills in the bottle from retained product and then do stability testing, but at very extreme conditions that human -- that 50, 60, 70 degree Celsius, are you aware of that?
A. Yes, I am aware that additional testing was done by the defendants, correct.
Q. Are you aware of any stability testing by the defendants that looks at the extra amount of NDMA that can form when the ranitidine is exposed to temperatures and humidity -- or temperatures between 20 to 40 degrees Celsius?
MR. SHEEHAN: Objection.
A. I did look at the defendants' reports, I don't know if you want to -- are referring to some specific test here or some information.
Q. I'm not, there isn't anything


specific.
My question is, are you aware of any stability tests done by the defendants that looks at the extra amount of NDMA that can form when ranitidine is exposed to temperatures between 20 to 40 degrees Celsius?
MR. SHEEHAN: Objection.
A. Again, I read the defendants' reports, but I don't remember the details of their experiments if they did them.
Q. The defendants have very scant information for that sort of stability testing, correct?
MR. SHEEHAN: Objection.
A. I don't recall.
Q. And have you seen any testing from the defendants that shows how much NDMA would form in pills after the consumer would purchase it and break the seal and store it in a common place that consumers store their product? Have you seen any testing like that from the defendants?
MR. SHEEHAN: Objection.
A. I don't recall seeing any.


Q. Okay. Did you review the testing that Emery Pharma did that would simulate the consumer experience and/or conditions that would be seen in shipping and supply?
MR. SHEEHAN: Objection.
A. I did review Emery Pharma's data. I cite their citizen petition and also the FDA response to Emery Pharma's citizen petition. Yeah, so, I started -- did -- did see that.
Q. But Doctor, you don't cite any of Dr. Najafi's finding or Emery Pharma's findings as to how much NDMA is formed after a consumer would purchase the product and break the seal and store it in a commonplace, you don't mention that testing anywhere, correct?
MR. SHEEHAN: Objection.
A. Well, I do cite Emery Pharma's citizen petition. Yeah, so I -- so I did look at that. As I understand it, they found higher levels, but I'm not sure how reproducible they were and they did a number of manipulations as you're alluding to. So, yeah, but I certainly took that into account.

Q. Well, in terms of scenarios, they'd be similar to consumer where they purchase the product and break the seal and store it in a common area that a consumer would store it.

Have you -- other than Emery Pharma, nobody else has done that sort of testing, correct?

MR. SHEEHAN: Objection.

A. I'm not sure that's -- that's right.

Q. Well, who has?

A. I don't recall.

Q. Who can you cite to that's done that sort of testing?

A. I think other testing has been done, but to be honest, I can't recall exactly who might've done the other testing.

Q. Well, who can you -- are there any defendants where they've done testing to simulate that experience?

MR. SHEEHAN: Objection.

A. Not that I recall.

Q. Can you point to any testing done by the defendants that would simulate real



world conditions such as 20 to 40 degrees Celsius for stability testing?

MR. SHEEHAN: Objection to the characterization of Najafi's testing as to real world.

A. Yeah, I read the reports, I looked at the testing by GSK and FDA, I find them to be pretty valid. You're suggesting that unless you test in a steam cabinet for days it's not really real world. I don't think that's -- that's correct, so that we know that it does go under some degree of degradation, but to suggest that the baseline levels are totally irrelevant, I think, is a bit far off the mark.

Q. Doctor, I'm not suggesting the baseline levels are totally irrelevant. They're a starting point because we know that they're -- it's going to continue to degrade based on heat and humidity, correct?

MR. SHEEHAN: Objection.

A. So, there's a slow degradation process, it's probably somewhat variable and the factors are time, heat and humidity, but that doesn't mean that in every case, the



levels rise to much, much higher levels. I think we don't have data certainly that this degradation process is -- is always significant or accelerated. And so, the -- the experiments that have been done, certainly raise a hypothesis that there can be more formed and I would not disagree that the levels can increase over time and with heat and humidity. But I don't find those sorts of experiments to really be that informative or really raise any other questions that I haven't already considered in my report.

Q. Doctor, you give the -- you give the levels of how much NDMA was found when the FDA and the defendants do their baseline testing. But what would the levels be that simulate shipping and supply chain and/or consumer experience, do you have any idea?

MR. SHEEHAN: Objection.

A. I don't think there's really good data on this. It's probably true. But, again, I'm not sure how important a question it is. I think we can assume that they are higher. But are they higher enough to be



carcinogenic? I think we have real world data on consumption of ranitidine by patients and given the absence of any increase in cancer, I think the conclusion is that whatever the levels are in these heated or degraded tablets, they're not high enough to cause cancer and I think that's the bottom line.

Q. Doctor, I'm gonna get to the ranit- -- I think you're referring to ranitidine epidemiology studies, I'll get there. But right now I'm asking about the amount of NDMA in the pills.

So, I guess the answer is, you haven't seen from the defendants or from the FDA anything that reflects how much additional NDMA would form due to conditions that these products would go through in the shipping and supply chain or due to consumers' experience; is that accurate?

MR. SHEEHAN: Objection. Asked and answered.

A. I believe I already answered that question, yes. I don't recall any other information beyond what we've discussed.

Q. Okay. Did you review the Abe study?

A. The Abe?

Q. Abe, A-B-E.

A. That sounds familiar, I think I did.

MR. NIGH: Let's go ahead and pull it up, LP107.

A. I don't think I cited that in my report.

MR. NIGH: And we'll mark this as Exhibit 6651.

(Exhibit 6651 was marked for identification.)

BY MR. NIGH:

Q. Doctor, you'll see the title says, Temperature-dependent formation of NDMA during the storage of ranitidine reagent powders and tablets, and you'll see the name Dr. Abe.

Do you see that?

A. Yes, I do.

Q. And if we take a look at the next page, just the summary. If we can go ahead and blow that up there. I'm gonna start



with, when ranitidine tablets from two different brands, let's go ahead and highlight that. You see where I'm at?

So, I'll read this off, it says:

When ranitidine tablets from two different brands designated as tablet A and tablet B were stored under accelerated conditions 40 degree Celsius with 75 percent relative humidity following, the drug stability guidelines issued by the ICH for up to two -- for up to eight weeks, the amount of NDMA in them substantially increased from 1.9 to 116 parts part million.

Do you see that?

A. Yes.

Q. And Doctor, that would be over a 600-fold increase in the amount of NDMA forming under those conditions, correct?

MR. SHEEHAN: Objection.

And if you need time to review the study, Dr. Wang, please do.

A. Well, I see their conclusion there, so they say that NDMA increased from .1 million to 116 ppm. And they're two different brands, one increased from 2.9 to



18, so that's not much of an increase. So, there's a larger increase 40 degrees for eight weeks. So, let me just take a look at the results here.

Q. Doctor, my question was simply, that would be over a 600-fold increase in the amount of NDMA forming under those conditions, correct?

MR. SHEEHAN: Objection. And I think Dr. Wang is reviewing the article.

MR. NIGH: Tom, it's completely inappropriate at this point.

Q. My question is, those numbers, that would be a 600-fold increase in the amount of NDMA forming under those conditions, correct?

MR. SHEEHAN: So, Dan, you're telling him not to review the article?

MR. NIGH: Mr. Sheehan, what I'm asking you to do is to stop instructing your witness during the deposition, it's inappropriate.

Q. Now, my question is, based on just that information that you see right there, when ranitidine tablets from two different



brands were stored and under accelerated conditions, 40 degrees Celsius with 75 relevant humidity following the drug stability guidelines issued by the International Conference of Harmonization for up to eight weeks, the amount of NDMA in them substantially increased from .19 to 116 parts per million.

My question is, .19 to 116 points per million, that's a 600 fold increase, correct?

MR. SHEEHAN: Mr. Nigh, I'd appreciate it if you wouldn't yell at the witness or at me. I think we've been very civil. All I did was ask whether you're instructing him not to review the article that you put up. I think we can -- I think we can -- I think we can be civil.

MR. NIGH: I agree, but I think it's inappropriate to continue to prompt over and over. My question is on this very specific information here, and I'm gonna ask it again, but the prompts are inappropriate. And

I'm not yelling, I think the video will be very clear, this is not yelling. This is precisely --
MR. SHEEHAN: I think the video will be clear as well, you're raising your voice at the witness and it's disrespectful, to be honest.
MR. NIGH: It's not disrespectful.
BY MR. NIGH:
Q. My question here is, again, when ranitidine tablets from two different brands designated as tablet A and B were stored under accelerated conditions, 40 degrees Celsius with 75 percent relative humidity, following the drug stability guidelines issued by the International Conference of Harmonization for up to eight weeks, the amount of NDMA in them substantially increased from .19 to 116 parts per million, that's a 6- -- 600-fold increase, correct?
MR. SHEEHAN: Objection.
A. So, I guess -- let's just be clear about the results here. They -- they tested two different drugs, so they have A and B. We don't know what tablets they are. And I


guess if you're asking about simple math for one of the drugs, I guess that was tablet A, it increased from .19 to 116 ppm, that one tablet, tablet A, did show, and I think your math is right, 600-fold increase.
Tablet B, which is 2.89 to 18, obviously showed a lesser, sort of, increase, perhaps, you know, six to seven-fold, but both of them increased at this really temperature 40 degrees C, I guess, that's, you know, well, 102 or higher for eight weeks. So -- so, but they did show an increase in NDMA. Yes, so, I think -- yeah, I think that's correct.
Q. Doctor, in your report, did you ever consider that when exposed to conditions like this, that the amount of NDMA can rise up to 600 times what's seen in baseline testing?
MR. SHEEHAN: Objection.
A. So, I don't think I cited this particular study in my report, but I am certainly aware that NDMA can -- the amount in ranitidine in preparations does increase with heat. This sounds like an interesting


experiment at 40 degrees for eight weeks, but I -- I certainly took this possibility into account in my report, sure.
Q. You said this is an interesting experiment, 40 degrees per eight weeks, do you recognize that those are stability guidelines set forth by the ICH?
A. I did not know the exact stability guidelines off the top of my head, no. I didn't know that that -- that that -- if that's -- if that's what the guidelines suggests, that's -- that is interesting, but, no, I didn't know the details of it.
Q. Doctor, did you ever consider the background amounts of NDMA that were seen in the Braunstein study?
A. The Braunstein study, I do remember that name and I think I do comment on that in my report. I don't know if there's something specific about it you want to discuss.
Q. My question is, did you consider that for Braunstein that they found a background amount of 900 to 1,400 nanograms of NDMA for the branded cool mint product that they purchased?


MR. SHEEHAN: Objection.
A. I don't remember the exact amounts from the study, no.
Q. Did you consider those levels at all or cite to those in your expert report?
A. I don't know if I cited those levels, certainly I considered all of that data in my -- in my expert report. I cite two papers by Braunstein. Yes, JAMA Open 2021. I mean, he did a simulated physiologic study, now that I'm recalling.
Yeah. So, there was a simulated physiology in one of the studies, but in terms of the background levels, I don't recall the amounts.
Q. Were you aware that Braunstein opines -- I mean, not Braunstein, Bumpus opines levels found between zero amount of nitrite and .25 amount of nitrite that those would be background levels seen in the pill?
MR. SHEEHAN: Objection.
A. Which report are you referring to now.
Q. Defense expert, Bumpus?
A. Bumpus, I did read Bumpus'

testimony, I don't remember the reference to the background levels.
MR. NIGH: Let's go ahead and pull up Exhibit 6382. I'm sorry, LP523. And this was previously marked as Exhibit 6382 and we'll stick with that.
(Exhibit 6382 was previously marked for identification.)
BY MR. NIGH:
Q. Do you see this here where it says report of Dr. Bumpus?
A. Yes.
Q. And you reviewed this expert report, correct?
A. Yes, I did.
Q. And if we go to page 33 of your expert report and under Braunstein, the sentence starts with, this is highly misleading.
Do you see that?
A. Yes.
Q. Says:
This is highly misleading as for instance, the concentration of NDMA is


virtually the same with 0 millimolar (921 nanograms) as it is with 1 millimolar (940 -- (947 nanograms) and the concentrations of nitrite ranging from 1.0 millimolar to 2.5 millimolar (1270 to 1440 nanograms) are all higher than the data for 1 millimole and 2.5 millimole that are shown on the graph.
Do you see that?
A. I see that section, yes.
Q. So, here she shows that between 0 millimolar, it's 921 nanograms, to .25 millimolar of sodium nitrite, it's 1440 nanograms.
A. Certainly 1440 with a higher concentration, correct.
Q. And on the next page the bottom paragraph, it says:
The consistent NDMA levels observed above 5 millimolar are likely the background levels in the tablet itself as discussed by the FDA and Gao et al.
And I represent to you that she recognized that was a mistake and needed the word below 5 millimolars.
Do you see that? Do you see that


statement?
A. Yes.
Q. And she says:
Notably, Braunstein et al did not report the background amounts of NDMA present in the ranitidine product they used in the study. Thus, the constant amount of NDMA that they detected at the lower nitrite conditions may be the result of background NDMA being present in the ranitidine tablets before being placed in simulated gastric fluid and not the result of ranitidine to NDMA conversion and simulated gastric fluid. None of the experiments in the study by Braunstein et al included physiological conditions.
And she says, this assessment is consistent with my own.
Do you see that?
A. Yes.
Q. Were you aware that Dr. Bumpus has opined that the 921 nanograms to 1,440 nanograms of NDMA that were seen in this cool mint branded product likely background amounts of NDMA that were in the pill before


any simulations were done?
MR. SHEEHAN: Objection.
A. Yeah. No, I see the report, I see what you're saying about background levels. I'm not quite clear on this.
Q. Doctor, are aware that our plaintiffs, many of them have taken branded cool mint Zantac?
MR. SHEEHAN: Objection.
A. I don't -- I don't know much about the plaintiffs, I haven't received much information on them.
Q. You didn't cite these background levels in your expert report, correct?
A. No, I did not.
Q. Okay.
MR. NIGH: I think now is a pretty good time to take a break. I'm going to switch to a new topic, so...
MR. SHEEHAN: Okay.
THE VIDEOGRAPHER: The time is 15:47 UTC. We're going off the record.
(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 16:12 UTC.
MR. NIGH: Let's go ahead and pull up LP233, this will be marked as Exhibit 6652.
(Exhibit 6652 was marked for identification.)
BY MR. NIGH:
Q. And Doctor, do you see that it has the FDA symbol at the top of this?
A. Yes, I do.
Q. And you see this is addressed to Dr. Najafi, President and CEO of Emery Pharma?
A. Yes, I do.
Q. And it starts out with, Dear Dr. Najafi.
Do you see that?
A. Yes.
Q. Okay. So, this is a letter that the FDA is sending to Dr. Najafi, correct?
A. Yes.
Q. And let's go ahead and blow up the first paragraph where it says, after Dear Dr. Najafi, it says -- let's go ahead and


highlight:
This letter responds to your citizen petition submitted on behalf of Emery Pharma received on January 2, 2022 [sic].
Do you see that?
A. Yes.
Q. According to the petition, Emery's preliminary study indicates that the ranitidine molecule may not be heat stable and under elevated temperatures, it generates significant amounts of NDMA, a probable human carcinogen.
Do you see that?
A. Yes.
Q. Okay. Have you reviewed this response from the FDA to Emery Pharma?
A. I don't recall whether I reviewed this or not. I reviewed a number of FDA documents. I'm just looking in my list of exhibits. There's a lot of FDA exhibits here. I don't see it in my documents offhand. I can't tell you for sure that I have reviewed it.
Q. Doctor, I think when you say "I'm not sure if I reviewed it" and you're looking


to see if you can go to your exhibits, are you looking at your list of materials considered?
A. Yes, yes.
Q. Okay. So, this list of materials considered has hundreds, if not thousand documents in the list of materials considered, correct?
A. There's a large number, I don't know the exact number.
Q. Doctor, in the approximate hundred hours of work that you've taken to review this literature and write this report, is it your testimony that you looked at all these documents on are on this list of materials considered?
A. Yes, I have.
Q. Okay. Does that mean some of the documents you spent about one minute looking at them or less?
A. I read the documents, some of them I skimmed through parts, I certainly spent more than a minute on each document. I can't tell you how long, but I looked at all the documents.


Q. Okay. But you didn't have this one on your list of materials considered, correct?
A. I don't think so.
Q. Now, this document, it's addressed to Dr. Najafi and that's the same Dr. Najafi who's one of the plaintiffs' experts, correct?
A. Yes, I believe so.
Q. And so, you've reviewed that Dr. Najafi's expert report, correct?
A. Yes, I did.
Q. Okay. And that's the same expert that you previously said had what you felt were some unreliable findings?
A. I commented on Dr. Najafi's report and some of his claims in my report. We can -- we can look at that if you want. But, yes, I do comment on his report.
Q. Okay. Let's take a look at page 10 of this pet- -- of this response to Emery Pharma's petition. Under discussion and it says -- if we can blow up that paragraph, it says:
Your petition specifically requests

that FDA take eight actions based on the results of your preliminary testing and one action based on statements made in the Valisure petition.
You see that?
A. Yes.
Q. And then it says that:
We are granting your petition with respect to the following requests. One, recall. Two, investigate. Three, inform the public and, five, require manufacturers to conduct stability assessment.
Do you see that?
A. Yes.
Q. Were you aware that the FDA granted Emery Pharma's request that all the Zantac products in the United States be recalled?
MR. SHEEHAN: Objection.
A. I was aware that the FDA asked that ranitidine be removed from the market, yes.
Q. Were you aware that the FDA specifically stated that they're granting Emery Pharma's petition wherein they request this recall?
A. I think I was aware that the


decision by the FDA to withdraw ranitidine from the market was in response to this petition, yes.
Q. Okay. Let's take a look at the next page, and let's blow up the FDA's investigation, here is says:
FDA's investigation into NDMA impurities in ranitidine is ongoing.
Says:
Recently, preliminary findings from stability testing raised concerns that NDMA levels in some ranitidine products stored at room temperature can increase with time to unacceptable levels, although in other products smaller changes were observed.
Do you see that?
A. Yes, I see that.
Q. And it says:
FDA's preliminary stability testing using standard accelerated stability testing conditions demonstrated that elevated levels of NDMA were measured in all products after two weeks.
Do you see that?
A. Yes.


Q. Were you aware that the -- that they demonstrated that elevated levels of NDMA were measured in all products after two weeks?
A. I understood the FDA also found the levels went up during some of their stability testing, yes.
Q. And it says:
Other testing conducted by FDA suggests that there is a correlation between NDMA levels and expiration date.
Do you see that?
A. Yes.
Q. And then it says:
Based on the data from NDMA testing ranitidine drug products and drug substances, the preliminary results from FDA's stability testing and other information available to the FDA, FDA is no longer confident that any ranitidine product will remain stable through its labeled expiration date.
Do you see that?
A. Yes.
Q. Were you aware of the statement that the FDA made that they are no longer


confident that any ranitidine product will remain stable through its labeled expiration date?
A. Yes, this is essentially what I understood the reason the FDA withdrew ranitidine from the market was its finding of elevated levels of NDMA in many of the products and I was aware that they found that the levels went up during stability testing with heat and time. And although the levels are certainly variable and perhaps not every product tested had elevated levels, a number of the products had levels that were above the 96 nanograms per day that they have laid down as the benchmark around so this is the reason they withdraw ranitidine from the market.
Q. And you just said perhaps not all products had elevated levels, do you see that sentence we read earlier said:
Demonstrated elevated levels of NDMA were measured in all products after two weeks.
A. Yes, yes.
Q. Okay.

A. Under accelerated stability conditions, yeah.
Q. For just two weeks, right?
A. Yes, but these are sort of extreme conditions. You know, I think you're talking about the 40 degrees and so on, this is accelerated stability testing, yes. But I'm talking about bottles of ranitidine that are not in stability testing, they did not find elevated levels in all of them.
Q. For the -- for the baseline testing you mean?
A. Yes.
Q. But here, the FDA makes the statement that the FDA is no longer confident that any ranitidine product will remain stable through its labeled expiration date, correct?
A. Yes, I think that's a fair statement that if you find that a number of them had elevated levels of baseline and stability testing, the levels go up above the levels, that would suggest that a significant number would have elevated levels. But certainly they're not saying that they know


that every bottle has elevated levels regardless. I think that's -- that's not what the data show.
Q. When you say "that's not what the data show," you're talking about the baseline data before it's exposed to conditions that would simulate heat and humidity, correct?
MR. SHEEHAN: Objection.
A. I'm talking about all the products that are not subjected to accelerated stability testing.
Q. Okay. And let's go ahead and take a look, now we're gonna switch gears, we're talk about that valsartan epidemiology.
Do you remember you reviewed the Dr. Chan -- not Dr. Chan, the Chan 2022 study?
A. I'd have to look at the study.
MR. NIGH: It will be marked as Exhibit 6653. And again, this is LP574.
(Exhibit 6653 was marked for identification.)
BY MR. NIGH:
Q. And title here says, Cancer Risk of


Angiotensin II Receptor Blocker Valsartan: A Population-based Study. And the first author is Dr. Chan, correct?
A. Yes, I see the document, yes.
MR. NIGH: And if we can blow up the abstract.
Q. I want to point your attention to the definition of the cohort, like, the time frame, you see where it says:
Patients describe valsartan or amlodipine control group from January 1, 2003 to June 30, 2010 where identified using the clinical data analysis and reporting system of the Hong Kong Hospital Authority.
Do you see that?
A. Yes.
Q. Does that help you to see that the time frame as to when these valsartan or amlodipine users were using the product for the studies between January of 2003 to June 30th of 2010?
A. Yes.
Q. Okay. If you take a look at the next page -- I mean on the other -- if we pull that back, the right side of the column,


you can see it shows -- actually, no. I'm going to go to the second page under Study Population and we can blow up that first sentence there. Then it says:
Patients who had initiation of prescriptions of valsartan or amlodipine from January 1, 2003 to June 30, 2010 were identified by the generic name of valsartan and amlodipine from the database in the initial sample population.
Do you see that?
A. Yes.
Q. And so, you're aware that this study is only looking at, in terms of its cohort, valsartan or amlodipine users between January 2003 to June of 2010, correct?
A. Yes.
Q. And Doctor, when was -- when did the valsartan contamination actually occur?
A. I'm sorry, you're talking about when did valsartan contamination with NDMA, I presume, occur?
Q. Yes.
A. I don't know. It's my understanding that similar to other studies,

Page 142

samples of valsartan were analyzed and found to have higher levels of NDMA. Again, I'm not sure really what you're asking here.

Q. When was the valsartan NDMA actually -- when was valsartan actually contaminated with NDMA, when did that first happen?

A. I presume it's always been contaminated.

Q. Would you be surprised to recognize or know that the valsartan contamination did not occur until at least 2011 or later?

A. I don't know that to be true, but...

Q. Doctor, if the valsartan contamination starts in 2011 or later, this cohort would not be measuring users who took contaminated valsartan, correct?

MR. SHEEHAN: Objection. Mischaracterizes the study.

A. Well, to answer that question, let me just say that I don't know that the valsartan here did not contain NDMA, but I guess if you're asking a hypothetical, if a study is done with a drug that's not

Page 143

contaminated, then the study would not be able to show effects of the contaminant. I think that -- that hypothetical is true. I'm not sure it applies to this study. And I'm pretty confident that the valsartan here probably contained NDMA similar to the situation with ranitidine. I guess you could ask the same question, was ranitidine contaminated with NDMA 23 years ago. I guess, you know.

So, I -- my understanding again of this study is that valsartan used in this study also contained NDMA.

Q. Doctor, do you understand the difference between the allegations in valsartan versus the allegation in ranitidine that valsartan is a manufacturing defect in ranitidine is not only a manufacturing defect?

A. Yes. No, I'm aware of that, yes.

Q. Are you aware of any allegations that suggest that there was a manufacturing defect of valsartan that caused an NDMA contamination before 2011?

MR. SHEEHAN: Objection.

Page 144

A. I answer that question by saying I know of no evidence that manufacturing of valsartan before 2010 did not result in NDMA contamination.

Q. How can you be pretty confident that this time frame when January 1, 2003 to June of 2010 would include users who took contaminated valsartan?

A. Well, I guess I'd respond to that by saying that I know of no data that there are -- 2010 there was a major change in the manufacturing of valsartan, so I have no reason to believe really that things changed in a convenient way around that time. So -- so, no reason to believe that there's any difference in this earlier batch versus the later batches.

Q. Do you see anything in this study that suggests that there was a contamination of valsartan before 2011?

A. I don't think -- I see nothing here in this abstract, but let me -- I can go back and look at the paper itself. Thinking most of these epidemiologic studies, they don't go into studying contaminants, but they're just

Page 145

looking at the drugs themselves in the real world and it does reference studies on NDMA.

Q. Doctor, I'll remind you of my question. My question is, do you see anything in this study that suggests there was a contamination of valsartan before 2011?

MR. SHEEHAN: And if you need to review the study to answer the question, go for it.

A. Okay. It actually gives some good background here.

As I said, they did not investigate specifically NDMA contamination in their batches they looked at. This again is a registry study, so I think the assumption here is that the manufacturing was similar and I guess this is a real world study looking at patients who took valsartan between that time period. And, yeah, so they don't specifically address the amount of NDMA in their -- in the drugs -- that's certainly the case.

Q. Doctor, have you seen information that actually shows that the valsartan contamination was in 2012?

A. I don't know what you mean by the 2012. I think 2012 is when they found the contamination. Is that what you're referring to?
Q. Now, if you look at this study, let's go to the first page again. On the right side at the top, we'll just blow up that very --
MR. NIGH: Yeah, that first part, blow up that first paragraph.
Q. You can see:
Initial voluntary recalls in July of 2018 involved valsartan containing pharmaceutical products produced by three manufacturers, Major Pharmaceuticals, Solco Healthcare and Actavis LLC.
Do you see that?
A. Yes.
Q. So, the recalls start occurring in -- in July of 2018 for contaminated valsartan, correct?
A. Yes, that appears to the be case, yes.
Q. Have you seen any information that shows that the contamination seems to be


related to a change in the manufacturing process that was implemented in 2012?
A. Well, it says here the -- all it says is, the incident lead to investigations to possible contamination during manufacturing, doesn't talk about a change in manufacturing in 2012, I haven't seen that.
Q. Let's go ahead and take this, let's back out of this blowup 'cause my question's not about this study.
My question is, Doctor, have you seen any information that suggests that this NDMA contamination seems to be related to a change in the manufacturing process that was implemented in 2012?
A. Haven't seen that recently. I don't recall that.
Q. Were you aware that the contamination of valsartan is in the valsartan active pharmaceutical ingredient -- are you aware of that? Doctor?
MR. SHEEHAN: You -- you cut out there for a question.
A. I didn't hear the rest of your


question.
Q. Were you aware that the contamination of valsartan is in the valsartan active pharmaceutical ingredient?
A. Well, as I understand it and I think you asked this in a previous question. My understanding is that the contamination in the case of valsartan is with part of the manufacturing process, rather than the simple degradation process.
Q. Were you aware --
(Cross-talk.)
Q. Sorry, go ahead.
A. Yeah. So, I'm not -- I'm not aware exactly the details of what it is in the manufacturing process. I think you're suggesting that it was a specific ingredient. I don't -- I don't recall the details of that.
Q. Were you aware that this manufacturing process contamination was first discovered for the Zhejiang Huahai pharmaceutical factory in China?
A. I do recall that it was a small number, maybe one particular manufacturer,


yes.
Q. And were you aware that those recalls in July of 2018 are related to that API manufacturer supplying API to Major Pharmaceuticals, Solco Healthcare and Actavis LLC?
A. Yes, it was -- it was three pharmaceutical companies, I don't remember the names of them, but I think they're -- they're actually in this article you have here highlighted in yellow.
Q. Are you aware that Zhejiang Huahai Pharmaceuticals did not make that change to quince -- quenching with sodium nitrite until 2011 for their manufacturing process?
A. No, I wasn't aware of the time course exactly.
Q. And are you aware that they did not start using DEA -- I mean, DMF as a solvent until later?
A. I was not aware of that specific change.
Q. Doctor, are you aware that the Pottegard study actually states that the contamination was specific to drug products

manufactured by Zhejiang Huahai Pharmaceuticals and seems to be related to a change in the manufacturing process that was implemented in 2012?

A. Can you repeat that question?

Q. Were you aware that the Pottegard study --

MR. NIGH: Actually let's go ahead pull up the Pottegard study, LP629. It's Exhibit 6654. And under the introduction, if we can blow up that first paragraph.

(Exhibit 6654 was marked for identification.)

BY MR. NIGH:

Q. Do you see where it says:

In July 2018, some valsartan products were discovered to have been contaminated with NDMA.

Do you see that?

A. Yes, I do.

Q. And it says:

This contamination, which far exceeded regulatory exposure limits, was specific to drug products manufactured by



Zhejiang Huahai Pharmaceuticals, a company in Linhai, China, and seems to be related to a change in the manufacturing process that was implemented in 2012.

Do you see that?

A. Correct.

Q. Were you aware that that manufacturing process change happened in or was implemented in 2012?

A. I do see it now, yes.

Q. Are you aware of any manufacturing process that any of the API that's manufactured for valsartan would have a contamination before 2011 or 2012?

A. Again, I don't know of any analysis of the drug before then. On the other hand, I certainly don't know for sure that they were not contaminated. I haven't seen testing of the drug prior to 2012, so I think it remains sort of unknown. It's an interesting hypothesis that -- that the contamination was directly related to these changes, it's certainly a possibility.

Again, I don't think it's proof that this is the change that resulted in



the contamination, but certainly a possibility.

Q. Doctor, are you a -- have you reviewed any information regarding name brand Novartis Diovan that shows that they did not have NDMA contamination for their products they were selling in the US?

A. What I do know is, as we talked about, the contaminations appear to be primarily of those three manufacturers, the three pharmaceutical companies.

Q. Do you know that Novartis sold its name brand valsartan in the United States for over a decade before ZHP API product made its way on the market in the US?

A. I don't know the details of that, no, sorry.

Q. And do you know that Novartis tested their product, their name brand Diovan, and reported that they did not have NDMA contamination?

A. Yes, I don't know. I didn't know about that specific testing.

Q. Did you know that Health Canada also tested that name brand Diovan that was



on the product for over a decade -- on the market for over a decade, that Health Canada specifically tested name brand Diovan and it did not find NDMA in their product?

A. No, I do not know about that testing.

Q. Doctor, have you done a comprehensive search to see whether or not there's any product that was contaminated with NDMA for valsartan before 2011?

A. Again, I know of no data on NDMA contamination of valsartan before then and no evidence that it was not contaminated. So, I think as we've discussed, the contamination is not entirely clear for valsartan prior to that period.

Q. I recognize that you're not aware of either of those conditions.

My question is, have you done a comprehensive search to see whether or not there's any product that was contaminated with NDMA for valsartan before 2011?

MR. SHEEHAN: Objection.

A. I did not do a search of NDMA contamination prior to 2012, no, I have not

done that search.
Q. Have you seen that the FDA in 2018 stated that the impurity for valsartan has been in the product for at least four years?
A. I haven't seen an FDA statement -- at least four years would imply four years or longer, so I guess it's a little open-ended there.
Q. Have you seen the EMA statement that states that the contamination -- in 2018, that states the contamination was for six years?
A. I haven't seen that statement and don't know the details of it.
Q. Sorry, go ahead, I didn't know you weren't finished.
A. Yeah. No. Perhaps you want to put up that statement so we can take a look at it or is that something that's -- that's accurately phrased here.
Q. Doctor, as the co-lead counsel for the valsartan litigation, I am the co-lead counsel in the valsartan NDMA litigation.
Were you aware of that?
A. No, I did not know of your role in



valsartan.
Q. We are not aware of any information that there's any contaminated valsartan before 2011.
Are you aware of any information that shows that there's contaminated valsartan before 2011? 'Cause if you are, we would love to know about it.
A. I think I answered that question.
Q. Do you understand that we've done extensive discovery of many of the active pharmaceutical manufacturers, active ingredient pharmaceutical manufacturers and finished-dose manufacturers and we don't have any information that we're aware of that shows that there's a contamination for NDMA before 2011?
A. Understood.
Q. Have you seen anywhere any allegation printed anywhere that shows that there's NDMA contamination of any product in valsartan before 2011?
A. Again, I have no information that any valsartan products have been shown to have or not to have NDMA.



Q. Without knowing that any product has been contaminated with valsartan before 2011, the Chan study is simply showing us whether or not valsartan, irrespective of whether it's contaminated with NDMA, whether or not valsartan is capable of increasing the risk of cancer, correct?
A. I would say that the study shows that valsartan taken between those time periods that we discussed did not cause cancer. So, essentially, that's -- that's -- I think that's essentially what you asked.
Q. And if valsartan wasn't contaminated with NDMA between the time frame of 2003 to 2010, that study would be uninformative in whether or not NDMA is capable of causing cancer in humans, correct?
MR. SHEEHAN: Objection.
A. Well, I think that that's -- the study needs to be interpreted in the light of what it is, it's a study in a certain time period, as we've discussed, up to I think it was 2010, and it answers the question that valsartan, whether or not it was contaminated with NDMA, did not cause cancer.



Your statement I think is correct, that if it did not contain NDMA, and, again, we don't know since we don't have data on this either way, but if it did not contain NDMA, then obviously the study would not be informative about NDMA. I -- and certainly would not be informative -- but again, it provides no evidence that it causes cancer, but probably could not be informative about patients who took NDMA after 2012, if that was the question in terms of whether or not later drugs were more carcinogenic, that's an interesting theory. But again, you'd have to do studies with that particular batch of valsartan, so I think we're left wondering a lot of questions here.
Q. When you state "we don't have data either way," you haven't seen the statement from the NDM -- from the EMA or the testing results for Diovan name brand, which is name brand valsartan, right?
A. I'm not sure what testing results you're referring to.
Q. I'll represent to you that Novartis tested their name brand Diovan.

Page 158

A. Yes.
Q. And they represent that they do not have NDMA in their name brand Diovan.
Were you aware of that?
A. Yes, I think we've already talked about the Novartis drug preparation. I was referring to the NDMA contamination that you were raising the question of NDMA contamination before 2010 during the period of the study and I was saying that I haven't seen any data either way about NDMA contamination during the period of the Chan study.
Q. You realize name brand Diovan is the valsartan that's on the market between 2003 to 2010, right?
A. Okay. But -- and that test -- I'm sorry, and you're indicating there was testing done in what per- -- when was that done?
Q. When was the testing for Novartis done?
A. Yes.
Q. 2018.
A. Okay. So, we had no testing from

Page 159

the period before 2010.
Q. Okay. But in terms of testing their name brand product, they weren't able to find NDMA in their products?
A. I understand, I understand what that means, yes.
Q. Okay. So, when you say "we have no data," you're not referring to that data or the statement from the EMA, correct?
A. Correct.
Q. Let's take a look at -- you mention the Pottegard study in your report.
Do you remember that?
A. Yes, it's in my report on page 21.
MR. NIGH: I want to go ahead and pull that up LP629. And if we can go to conclusion.
MR. SHEEHAN: What number is this gonna be, Dan?
MR. NIGH: It's previously marked as Exhibit 6654.
THE VIDEOGRAPHER: Counsel, I'm looking for 629 if it's newly added, so it's going to take a second to get into the Box.

Page 160

MR. NIGH: I'm sorry. You're looking for LP69?
THE WITNESS: I have it in the box already.
MR. NIGH: Yeah, we've already -- we've already moved it over.
THE VIDEOGRAPHER: Okay, copy that.
MR. NIGH: I used this earlier.
THE VIDEOGRAPHER: Understood, that's why I didn't see it.
MR. NIGH: No problem, no problem.
BY MR. NIGH:
Q. So, under Conclusion, doctor, it says:
The results do not imply a markedly increased short-term overall risk of cancer in users of valsartan contaminated with NDMA.
Do you see that?
A. Yes.
Q. Now, their conclusion discusses whether or not there's a short-term overall risk of cancer, correct?
A. Yes.
Q. They don't opine on whether or not

Page 161

that was a long-term risk of cancer in valsartan users contaminated with NDMA, correct?
MR. SHEEHAN: Objection.
A. Well, in this statement, it says it's a -- does not apply in markedly increased short-term risk. I don't see a comment here. It says, longer follow-up is needed to assess long-term cancer risk. Yeah, that's what it says in terms of the conclusions.
Q. And are you aware that the study authors also discussed that their study -- this didn't have a lot of power?
MR. SHEEHAN: Objection.
A. I've looked at the power calculations here, study of 5,000 patients.
MR. NIGH: Well, let's go to the full conclusion on page 6.
Q. Do you see where it says:
Furthermore, owing to the limited follow-up assessment of long-term affects was not possible in the low number of events makes interpretation of estimates per single cancer outcomes difficult.

Page 162

A. I see that, yes, they qualify the results.

Q. You didn't mention in your study that the low -- their statement that the -- I mean, you didn't mention in your report that the low number of events makes interpretation of estimates for single cancer outcomes difficult, did you?

MR. SHEEHAN: Objection.

A. In my report, you're asking if I commented specifically on that language?

Q. Yes.

A. I did not. This is about single cancer outcomes. I think the major conclusion was about cancer overall, but, yeah, I didn't pay attention to or didn't mention that particular sentence, no.

Q. And what the study actually found was a --

MR. NIGH: Let's go back to the first page for Results. We can blow up the results at the bottom of the page there.

Q. It shows with 104 cancer outcomes among NDMA unexposed participants and 198

Page 163

among the exposed participants, the adjusted hazard ratio for cancer was 1.09.

Do you see that?

A. Yes.

Q. So, they found a nine percent increase that was not statistically significant for overall cancer, correct?

MR. SHEEHAN: Objection.

A. Yeah. And that's not how I interpret that. You know, these hazard ratios, 1.09 in general is not considered to be any kind of a significant increase. And no, it's not a nine percent increase. And the p-value for this is -- is .7, which is not even suggesting a trend. So, there's -- there's no hint of any increase in cancer in this study.

Q. So, you believe it's inappropriate even though the point estimate is above one, that that point estimate refers to an increased risk even though it's not statistically significant.

Is that your testimony?

MR. SHEEHAN: Objection. Asked and answered.

Page 164

A. The hazard ratio of 1.09 does not suggest an increased risk of cancer in this study.

Q. If you look at the next paragraph specifically for colorectal cancer, it says:

For single cancer outcomes, increases in risk were observed for colorectal cancer.

Do you see that?

A. Yes.

Q. So, the study authors themselves, even though it's not statistically significant, remark that there's an increase in risk when their hazard ratio is above 1, correct?

MR. SHEEHAN: Objection. Includes only part of the sentence.

A. Yeah. So, I think if you read the whole sentence, it says:

Over the con- -- wide con- -- with wide confidence intervals that included the null.

So, they did note that the numerically the numbers were elevated, but it didn't fall outside of the null hypothesis as

Page 165

we've discussed.

So, again, concluding that this study suggests an increase in -- in risk of -- of colorectal and uterine cancer, I think is a misinterpretation of what they're trying to say here. But I think they're sort of being straightforward in noting the increase and numerical increase here.

MR. NIGH: Can we underline the words increases in risk?

Q. Do you see that? Those are the study authors words --

A. Yes.

Q. -- increases in risk, correct?

A. When they say increases in risk they're simply saying the numbers were higher. They're not talking about, this means an increased risk for patients in general. That's not what they're saying. They're saying that in the study, the numbers were higher in the exposure group.

Q. They're showing increases in risk were observed for colorectal cancer.

Do you see that?

A. Yes.

Q. That's their interpretation of the results, increases in risk. I understand they also talk about it's not statistically significant, but they use the terminology, "increases in risk were observed," correct?
MR. SHEEHAN: Objection.
A. As I said, they use the term "increases in risk," that's not a conclusion, that is their observation that the numbers were higher in the colorectal cancer group and for the uterine cancer group.
Again, they're not implying that -- that this means the conclusion is an increased risk of colorectal cancer, they're simply saying the numbers were higher in those exposure groups.
Q. Let's take a look at page 4 in the study and let's look at that paragraph where it starts with, in analyses of single cancer outcomes. Says:
In analyses of single cancer outcomes, increased risks were seen for colorectal cancer (hazard ratio 1.46, 95 percent confidence intervals .79 to 2.73) and for uterine cancer, although neither



these more other single outcomes reached statistical significance.
Do you see that?
A. Yes.
Q. And then next it says:
Analyses of other cancer outcomes were not possible owing to low numbers.
Do you see that?
A. Yes.
Q. Were you aware that the Pottegard study authors themselves stated that analyses of their other single cancer outcomes, other than colorectal cancer and uterine cancer, were not possible?
MR. SHEEHAN: Objection.
A. Well, they point out several times that there is uncertainty about single cancer outcomes and they do comment on that they felt the study was not necessarily powered to reach -- to map small differences in the patient groups I think that's -- that's correct. The numbers of the other cancers were low, so this gives you confidence that whatever those other single cancers are, there's not a plethora of cancers in the



valsartan group. But, yes, excluding an effective cancer is difficult in studies that are not really powered for -- four small differences.
Q. Your report doesn't mention that the study authors themselves said that the analyses of the other cancer outcomes were not possible due to the owe- -- were not possible owing to low numbers, correct?
MR. SHEEHAN: Objection.
A. No, I think my report just indicates the major findings from the study. It didn't include every qualification of every study. But, no, so it didn't include this information, if that's what you're asking.
Q. Were you aware they also did an incident users analysis in this study?
A. An incident users analysis. I don't recall anything about that.
Q. Are you aware of publications that state that it's more informative that study may be more informative, the incident user analysis may be more informative than analyses that include prevalent users?



MR. SHEEHAN: Objection.
A. I am not aware of that.
Q. Do you have any information or have you reviewed any study articles that suggest that incident user analyses are more informative than overall analyses that include prevalent users?
MR. SHEEHAN: Objection.
A. I'm not aware that's true, but it's an interesting idea.
Q. Do you know of any reason as to why incident user analyses may be more informative than overall analyses that include prevalent users?
MR. SHEEHAN: Objection.
A. I'm not aware of that.
Q. Were you aware of the finding in this study that showed that --
MR. NIGH: Well, let's go to the next page. I'm sorry, not next page, that same page, page 4, the right column.
Q. Were you aware of the finding that stronger association was seen when we restricted incident users during the study

period (hazard ratio 1.5 confidence intervals .99 to 2.52)?
A. Okay. Well, that's an interesting post hoc analysis. I don't think you can put much weight on that, at least it's a post hoc analyses, if it wasn't predefined in their original protocol, you can do a variety of analyses of one's data and increase some associations and decrease other associations. So, it's -- I would take this with a grain of salt. But it would need to be confirmed in further studies.
Q. Doctor, you just mentioned it as post hoc analyses, it was prespecified.
Were you aware of whether or not the -- the incident user analysis was prespecified for Pottegard?
MR. SHEEHAN: Objection.
A. I'd have to look at this, I didn't see that quickly in this.
Q. How about, this public -- published study has many published studies, they don't necessarily indicate all the prespecified analyses on the publication itself, correct?
A. Usually they indicate their primary


analysis and their primary outcomes. I'm looking at the cancer outcome and their methods, it doesn't say anything about incident users as being one of their primary endpoints.
Q. Have you reviewed?
A. Analysis comparison of cancer occurrence. I don't see anything about restricting it to incident users.
Q. But my question is --
A. Restricted it to prevalent valsartan users at the start of the study to the incident users during the study period.
This was a sensitivity analysis, wasn't their primary endpoint. So, I'd have to look at their original protocol. Doesn't sound like it, but I understand your point.
Q. Without looking at the original protocol, you can't determine whether or not it's a post hoc analysis, correct?
MR. SHEEHAN: Objection.
A. I'd have to see the original protocol, but I would say having been at least supervising and being involved in a number of studies, I think that would be


unusual. It does sound like a post hoc analysis, but, again, we can debate this without seeing the protocol, I don't think we know for sure.
Q. Secondary endpoints are oftentimes prespecified in a prespecified analysis, correct?
A. There are secondary endpoints and secondary -- yes, analyses that are prespecified.
MR. SHEEHAN: You want to get lunch? Are you -- are you moving on, Dan, or are you --
MR. NIGH: Yeah, if we want to take a break now, it's okay.
MR. SHEEHAN: Are you hungry?
THE WITNESS: Yeah, it's 1:00, I think it's a good time.
MR. SHEEHAN: Fair enough, let's go off the record.
THE VIDEOGRAPHER: The time is 17:06 UTC. We're going off the record.
(Whereupon, a lunch recess was taken.)


THE VIDEOGRAPHER: We're back on the record. The time is 17:58 UTC.
MR. NIGH: Okay. Let's go ahead and pull up LP629 again, this was previously marked as 6654, this was the Pottegard study.
BY MR. NIGH:
Q. And Doctor, you recall earlier the study authors pointed out the non-statistically significant increased risk of colorectal cancer, correct?
MR. SHEEHAN: Objection.
A. Correct, the author did comment on the numerical increase in colorectal cancer for that -- for that single disease --
THE COURT REPORTER: I'm sorry.
A. -- but also pointed out that it was not specifically significantly and it was consistent also with null hypothesis, so --
THE COURT REPORTER: I'm sorry. Can we just repeat that? The siren in the background is a little distracting. I don't know where it's coming from, but...
MR. SHEEHAN: It's -- it's in New

Page 174

York. There's nothing -- there's nothing I can do about it unfortunately.
THE COURT REPORTER: Okay.
THE WITNESS: Yeah, I'll repeat my -- you got -- you got the question right?
THE COURT REPORTER: Yes, yes.
A. So, I would agree that the authors did point out the numerical increase in colorectal cancer numbers for that single disease, but they also pointed out that it was not statistically significant and was also consistent with the null hypothesis. So, they did not emphasize that particularly, in my view, as an important finding.
Q. Doctor, the use of your terminology consistent with the null hypothesis is concerning. They don't say it's consistent with the null hypothesis they just say that it includes the null hypothesis and the confidence intervals, correct?
MR. SHEEHAN: Objection. Asked and answered.
A. We can go back and look at their

Page 175

specific wording, but they did comment on it, not on the null hypothesis, in my view that's what they meant that it was consistent with the null hypothesis, although I'll take your word in terms of the exact wording.
Q. Doctor, there's a difference between a test that's looking for consistency with the null hypothesis and a test that's looking to reject a null hypothesis, correct?
MR. SHEEHAN: Objection.
A. Well, there's two different ways to design a study, one is -- yes, to exclude the null hypothesis another to say that it is exact -- if you're saying was this study designed for equivalence, it was not designed for that. It was designed to determine or not whether the difference was different from the null hypothesis.
So -- so, yes, there's a different way in terms of designing the study and doing the statistics depending upon whether you're trying to show equivalency or differences.
Q. And their testing is set up to see whether or not there are differences or to reject the null hypothesis, correct?

Page 176

A. Yes, the study is set up to show differences, yes, that's correct.
MR. NIGH: Let's take a look at page 6.
Q. And if you see the left-hand side at the top of the page, we can blow up that paragraph. Here it's the study authors state:
However, as some dietary products (processed meat) are known to contain small amounts of NDMA, epidemiological studies based on food frequency questionnaire data have been performed. Even though such studies are highly prone to confounding, three found an increased risk of gastrointestinal cancer with exposure to NDMA predominantly colorectal corner. This finding, together with that from animal studies, provides some support for the increased although statistically non-significant risk for this particular cancer observed in our study.
Do you see that?
A. Yes.
Q. So, even the study authors are not

Page 177

only looking at the question of valsartan with NDMA having an increased risk of cancer, but also including the animal data and they're including the NDMA dietary studies as they assess that question, correct?
MR. SHEEHAN: Objection.
A. So, I think in their conclusion -- their discussion here, they are commenting -- trying to highlight the potential significance of their findings and I think this was pretty much of a -- a null study, so to speak, and I think the authors are trying to find something interesting in their study.
And so, they're commenting on colorectal cancer. And, yes, so animal studies have shown NDMA can increase a number of cancers and there's also the dietary studies, as you pointed out, so they're, again, noting that the finding of this particular cancer is non-significant, but they're saying perhaps it does raise the hypothesis that there could be something there which would be required, of course, future studies and more -- and much more evidence than they've got so far.

Page 178

So, they're raising hypothesis here in this -- in this discussion and, yeah, they're commenting on other -- other lines of evidence.

MR. NIGH: And if we take a look under Principle findings, if we can blow up that first paragraph.

Q. Do you see where it discusses, while the estimate for our primary outcome?

Do you see that?

A. Yeah.

Q. Says:

While the estimate for our primary outcome suggests the negligible and statistically non-significant increase in cancer risk of 9 percent.

Do you remember previously I asked you if this study showed a 9 percent statistically non-significant increase in cancer risk?

A. Yes.

Q. The study authors actually say that's what it shows, right?

MR. SHEEHAN: Objection.

A. I can read what they wrote. They

Page 179

state that it suggests a negligible and statistically non-significant increase in cancer risk of 9 percent, that's -- that is what they have written.

Q. Now, they next say:

It might be argued that a more cautious interpretation, reflecting the nature of the study question, would be to consider the upper limit of the confidence interval.

Do you see that?

A. Yes.

Q. Doctor, when you're doing a test to see whether or not you can reject the null hypothesis, why would it be a more cautious interpretation to reflecting the nature of that study question to consider the upper limit of the confidence interval?

MR. SHEEHAN: Objection.

A. Well, I -- I don't know how best to answer that question. I think -- so, the confidence intervals tell you the range of findings and if you have a -- I think, a fairly narrow confidence interval, it gives you for confidence that it's -- the

Page 180

differences are not gonna overlap with -- with what you might otherwise expect.

So, I think if you have wide confidence intervals, particularly in the upper side, then there's perhaps possible overlap and I think -- nevertheless, I think if you look at the p-value in this study and I think it was something, what was it, 0.7, there really was no sign of -- of any likelihood that this was statistically significant. I'd have to go back and see what the numbers were here again.

Yeah, again, coming up with 0.70 here for this study. So, I don't really understand their argument here. I guess my take on this -- on this discussion is that, you know, they're trying to get their paper published and this was one of the few small findings that they had in their study, it was really a -- a -- basically a study that confirms the valsartan study where there was no NDMA, which is really there's no differences really overall in any -- in these cancers. And I think they're trying to, little bit, massage their data here and

Page 181

highlighted it in a way to make it more interesting perhaps to the readers. That would be my take on it, because I really don't think there really is any signal here or any sign that there's an increased cancer risk.

And so, I'm a little surprise by this discussion. But I guess on the other hand I can sort of understand it, they undoubtedly put a lot of effort into this study.

Q. Doctor, isn't the -- isn't this explaining the difference between a test for rejecting a null hypothesis and a test as to whether or not there's sameness? This is a test whether or not to reject the null hypothesis, so they're adequately interpreting the results from a test of whether or not it rejected the null hypothesis, correct?

MR. SHEEHAN: Objection.

A. Again, this study was designed to try to show differences. It -- so -- so, I think you're right in the sense that this was not a test to show equivalence between the

two, in other words, to show that they were not ident- -- non-identical. So, I don't -- it is not proved that there's -- there is absolutely no difference between the -- between this and the control group.
That said, I don't find that there's any signal here suggesting that there's a likelihood of a difference.
Q. And the next sentence says:
Doing so leads to the different, although related, conclusion that we can reasonably exclude a more than 40 percent increased short-term risk of cancer from exposure to NDMA contaminated valsartan products.
Do you see that?
A. I see that sentence, yes.
Q. And that's because the upper end of that confidence interval, the 95 percent confidence interval, is 1.4, correct?
MR. SHEEHAN: Objection.
A. The upper level is 1.49 and 1.41. Yes, but I -- that's true, but -- yes, this is a hypothetical and they're saying that if we can consider that we can -- we can suggest


that there might be this particular outcome, that's what -- they're simply defining what that confidence interval is. But I certainly -- again, there's no evidence here that there is -- there's a possibility of a 40 percent increase short-term risk of cancer.
And I think, again, my interpretation of this study is that it's a negative study, it shows no increase in cancer. And so, all this discussion is -- is interesting, but entirely speculative hypothetical based on data they really don't have.
Q. Doctor, you realize that Dr. Pottegard is well-known in the field of epidemiology?
A. I don't know about the reputation of Dr. Pottegard.
Q. Have you read his textbook in the field of epidemiology?
A. No, I have not read his book.
Q. Are you aware he's well-published in the field of epidemiology?
A. I have not looked at his CV or


publication record.
Q. Are you aware of whether or not he's well-published in how you interpret results from epidemiological studies?
A. I don't know much about his other publications, no.
Q. Okay.
MR. NIGH: We can pull that down.
Let's go ahead and pull up LP543.
This will be marked as Exhibit 6655.
(Exhibit 6655 was marked for identification.)
BY MR. NIGH:
Q. And this study the title, Dietary nitrosamines, heterocyclic amines, and risk of gastric corner: A risk of control study in Uruguay.
Do you see that?
A. Yes, I do.
MR. NIGH: Let's go ahead and turn to page, it doesn't have page number on the bottom, it's 158. It's the next page, yeah. That's 159, let's go to the page before that. Thank you.
Q. And this shows Dietary


nitrosamines, heterocyclic amines and risk of gastric cancer: A case control study in Uruguay. And the first doctor is Dr. De Stefani.
Do you see that?
A. Yes.
Q. And Doctor, this is one of the studies that you cite to in your expert report, correct?
A. Yes, it is.
Q. But you don't give the finding of how much the or the magnitude of the increased risk, correct?
A. I'm sorry. Can you repeat that question?
Q. In your expert report, you don't discuss the magnitude of the increased risk found in this dietary study, correct?
A. The magnitude, you mean the numerical increase?
Q. Yes.
A. In my report, I do not comment on that.
Q. Okay. You don't comment on that for any of the dietary studies, correct?

MR. SHEEHAN: Objection.
A. I don't recall if I did in every case, but certainly in this paragraph here on page 21, I did not comment on it.
Q. Okay.
MR. NIGH: Let's take a look at page 161 and we can look -- if we can blow up Table 4.
Q. Doctor, here it says:
ORs of Gastric Cancer, the time is covering it up, OR is for Gastric Cancer for NDMA and PhIP Dietary Exposures.
Do you see that?
A. Yes.
Q. Do you know what the PhIP stands for?
A. I'd have to go back and look at the -- looks like it's 2 amino, 1 mythyl, 6 phenylimid, 4.5 b/pyridine. Sounds about right?
Q. It does. Do you know what that -- do you know what that is known as commonly?
A. Let's see if they describe it. I presume it's some form of carcinogen. Is it another name for NDMA? I don't know, they


don't -- no, NDMA is different here. It's called nitrosodimethylamine. It's another compound, they don't define it as a common name.
Q. Okay. Do you know whether or not some foods have more PhIP but less NDMA and other foods have more NDMA and less PhIP?
A. Well, I'm sure there's variability from food to food in the contents of these compounds. So, those are -- in this study, those are the two focuses of this study are PhIP and NDMA. And looking at the Uruguayan and diet, salted and barbecued meat. Yeah, seems to be a fairly typical dietary study of cooked -- cooked meat. So, yeah, I don't know -- I'm sorry, what was your question?
Q. Do you know if this is one of the ways in which bacon and processed meats differ, that they have different levels of PhIP?
A. Okay, I'll take your word for it.
Q. No, I'm asking you, do you know?
A. I don't know much about PhIP in relation to bacon, if that's what you're asking.


Q. Or in relation to processed meat?
A. No, I'm guessing it's a form of preservative, but I don't know much more about it.
Q. Okay. For NDMA starting at the second quartile .15 to .1, they found an odds ratio of 2.07 that was statistically significant, correct?
MR. SHEEHAN: Objection.
A. So, now you're looking at Table 4 and they're doing this by quartile range. And so, the bottom quartile, the second quartile with NDMA and PhIP, the odds ratio they say in the table is 2.07, so I see what you're looking at here.
Q. For NDMA specifically, it would be more than a doubling of the risk at the second quartile after you adjust for those confounding factors, correct?
MR. SHEEHAN: Objection.
A. So, as I take it, this is a dietary study where they estimate intake of these compounds, these are not measurements, but estimates. And they're looking -- they're focused on just these two compounds in


dietary studies, looks like it's a case control-study and they're looking at two different regions, which is typical in South America, one has high rates of gastric cancer and the other lower rates and this does tend to correlate with actually elevation in studies that we've written about in terms of gastric cancer, which is something I know pretty well.
And in terms of the diets in these two regions, different regions, there's many differences in the diet besides just cooked red meat, but that's certainly one of the things that does vary in these different regions. And again, they're estimating the amounts of these compounds based on history. Let's see what their controls are, 6798 patient is controls... And so -- yeah, so it's showing an association here, call this association a risk based on -- this is a particular marker of this particular group. And so, yes, the odds ratio is two, which might suggest that a doubling of risk as your sort of suggesting.
Q. And that would be at levels of 150

to 180 nanograms, correct, or .15 to .18 micrograms?
A. Well, that's the estimated -- the estimated risk of ingestion based on their -- their dietary histories, yes.
Q. And this study adjusts for age, sex, residence, urban/rural status, tobacco duration, total alcohol consumption and mate drinking?
A. Yes, down here they were adjusted as ratios, along the parameters that you just read.
Q. And then fourth quartile at greater than or equal to 270 nanogram or .27 micrograms, it's an odds ratio of 3.62, correct, for NDMA?
A. That's the odds ratio they calculated for that particular group with that estimated NDMA level, yes.
Q. Now, the odds ratio is for PhIP for each quartile, those are different than what they are for NDMA, correct?
A. Different. Well, looking at the table, the odds ratio for PhIP is around 3.1, which is about the same in for the last


quartile -- they calculated the quartile a little differently. 3.86 odds ratio, similar odds to ratios in many ways to the NDMA ratios.
Q. Did you ever look at this NDMA PhIP interaction?
A. Yes, the last -- the last is if I try to calculate interaction with low low, high low, low high, high high. Yes, so they try to look to see whether or not there's any additive or synergistic interaction between PhIP and NDMA and they do that sort of analysis as well.
Q. So, if a food is low and -- is high in NDMA and low in PhIP, it still has more than a tripling for the odds ratio, correct, 3.07?
A. Yeah, that's right.
Q. And if a food is high in or if the diets are high in NDMA and high in PhIP, then it has more than a 12-fold increase or an OR of 12.73, correct?
MR. SHEEHAN: Objection.
A. Repeat the question.
Q. If the dietary is high in NDMA and


high in PhIP, it has more than a 12-fold increase or odds ratio of 12.73, correct?
MR. SHEEHAN: Objection.
A. So, according to their analysis, when they identify these groups with the highest levels, if they are high in both of these, they find a much higher rate of -- of gastric cancer.
So -- so, yes, their table does suggest some sort of interaction between them based on these -- analysis of these -- these two groups and based on the anal- -- and based on their estimation of intake, they appear to have identified a high risk group based on these as markers, yeah.
Q. Doctor, in terms of the trend seen for NDMA, it shows a statistically significant trend that as the amount of NDMA increases in the diet, so too does the risk of cancer, correct?
A. I think they -- this study suggests that NDMA is a marker for a diet that seems to be associated with a greater risk of cancer, yes.
Q. And that's a p-value of less than


.001, correct?
A. That's the p-value they cite in this table.
MR. NIGH: And if we take a look at Table 5, we can drop this out.
Q. Table 5, micronutrients. NDMA is mentioned as a micronutrient in this table, correct?
A. Yes, under micronutrients, they include NDMA.
Q. Is it your understanding that NDMA is a micronutrient or classified as a micronutrient?
A. Actually, I haven't -- I'm not familiar with what all is classified as micronutrients. Certainly classified here in this table as a micronutrient, that is an interesting way to classify it. I hadn't heard that before, but -- so I can't really comment further.
Q. Okay.
MR. NIGH: Let's take a look at -- take this down, let's take a look at LP545. This will be marked as Exhibit 6656. And if we can go ahead

Page 194

and blow up the summary. And we'll look at the last couple of sentences.
(Exhibit 6656 was marked for identification.)
BY MR. NIGH:
Q. Doctor, at the bottom, do you see -- sorry, let's go ahead and let's back, I want to talk about the title and the author first.
Doctor, the title says, Processed meat consumption, dietary nitrosamines in stomach cancer risk in a cohort of Swedish women.
Do you see that?
A. Yes, I do.
Q. And this is Dr. Larsson, correct?
A. Correct.
Q. Okay. And now, if we can take a look at the summary. You see where it says, stomach cancer risk, one of the last -- second to last sentence, stomach cancer risk was twofold.
See that where -- where I'm reading from?
A. Yes.

Page 195

Q. Stomach cancer was twofold higher among women in the top quintile of NDMA intake when compared with those in the bottom quintile.
Do you see that?
A. Yes.
Q. And so, this study's showing that NDMA intake at the highest quintile is associated with a -- nearly a doubling of the risk for stomach cancer for the women in this study, correct?
MR. SHEEHAN: Objection.
A. Can you repeat that statement again?
Q. And so, this study's showing that NDMA intake at the highest quintile is associated with nearly a doubling of the risk for the stomach cancer for the women in this study, correct?
MR. SHEEHAN: Objection.
A. Yeah. So, again, we don't know for sure in these studies, in this one and the previous one, whether or not there was actually increased NDMA intake. It's estimated, but certainly this top quintile

Page 196

with this estimated NDMA intake in however that was calculated is -- is a risk group that they've identified. So, however they did -- certainly this is a marker of a group that seemed to have a higher risk twofold, as you said, of stomach cancer.
MR. NIGH: If we take a look at page 918, take a look at that chart, Table 6, we can blow that up.
Q. And the top of this -- this title of this table says, Hazard ratios of stomach cancer by NDMA intake.
Do you see that?
A. Yes.
Q. And for the fifth quintile for the Multivariate HR, it shows a 1.96 HR, that's statistically significant, correct?
A. Yes. So, I see that the ratio 1.96 and the p-trend is .02, so it does look like a significant difference in that group compared to the other.
Q. And of the factors that are adjusted for, it includes BMI, intake of total energy and alcohol, correct?
A. Yes, I see that.

Page 197

Q. And if we go back the median intake for the highest quartile was 277 nanograms, correct?
MR. SHEEHAN: Objection.
Q. Or .277 micrograms per day, correct?
MR. SHEEHAN: Objection.
A. I'm sorry, I'm looking at this. So, I'm sorry, can you repeat that?
Q. Do you see where it says, Median intake, at the --
A. Yes, Median intake. Yes, I see it.
Q. If you follow that over to the fifth quintile, see the 0.277?
A. Yes.
Q. And then if you look at quintile, the title above says, Quintile of NDMA intake, micrograms per day.
Do you see that?
A. Yes.
Q. So, the median intake for that highest quintile is .277 micrograms or 277 nanograms per day, correct?
MR. SHEEHAN: Objection.
A. Again, those are estimates very,

very rough and of course error prone estimates, but that is their estimate for that quintile, yes.
Q. Now, you've used this statement of error prone estimates. If the error is identifying the amount of NDMA in these diets and separating them, that would lead more toward non-differential misclassification, correct?
MR. SHEEHAN: Objection.
A. I'm not sure about that.
Q. You have some reason why it would be a differential misclassification?
A. Explain to me what you mean by "misclassification."
Q. Well, Doctor, are you aware that it's been discussed that error in measurements for dietary studies would actually attenuate the risk or lead to more likely bias toward the null?
MR. SHEEHAN: Objection. Mischaracterizes.
A. I'm not sure about that.
Q. Did you review the Freedman 2010 study?


A. I don't recall whether I read that one or not.
Q. Did you review the Prentice 2020 study? You cite to that one in your report, correct?
A. Let me take a look. Did you say Prentice?
Q. Prentice, P-R-E-N-T-I-C-E.
A. Yes, yes. I cite that, Annals of Internal Medicine 2020.
Q. Yes. And you actually state -- you cite where it quotes:
The random component of measurement error may substantially attenuate estimated associations.
No, I'm sorry, you cite:
The rough error prone estimation undermines the reliability of the dietary studies.
Do you see that?
A. Yes.
Q. But you didn't discuss how it might underline -- undermine the estimations and the dietary studies, correct?
MR. SHEEHAN: Objection.


A. I don't comment on that here, no.
Q. Doctor, there's -- there is a Type I error and a Type II error, correct?
MR. SHEEHAN: Objection.
A. Are you talking about in terms of statistical analysis? Yes, Type I and Type II errors in statistical analysis.
Q. And Type I errors are typically discussed as biases toward the null or attenuating the risk for the null, correct?
A. True.
MR. SHEEHAN: Objection.
Q. In Type II --
(Cross-talk.)
MR. SHEEHAN: Hold on.
A. I'm sorry, repeat that again.
Q. And Type II biases, would be biases that may lead to false positive risk or increase the risk toward a positive association, correct?
MR. SHEEHAN: Objection.
A. I think that's -- that's a common understanding of Type I and Type II errors.
Q. Did you do a comprehensive review of the literature to see whether or not


misclassification or misestimization [sic] of NDMA would be more likely to lead to Type I bias, or bias toward the null, versus Type II bias?
MR. SHEEHAN: Objection.
A. I did not do that sort of analysis, no.
Q. Are you aware that there are many studies that have been published where they've measured whether or not misestimization leads to Type I bias or Type II bias?
A. No, I haven't read those studies.
MR. NIGH: Let's go ahead and take a look at Freedman 2010. We'll mark this as exhibit -- sorry, this is LP624, it will be marked as Exhibit 6657.
(Exhibit 6657 was marked for identification.)
BY MR. NIGH:
Q. And Doctor, this study is not on your list of materials considered, correct?
A. I don't recall, but let me look in my reference list. I don't believe I have

this one.
Q. The title of this is Dealing With Dietary Measurement Error in Nutritional Cohort Studies.
Do you see that?
A. Yes, I do.
Q. And the author is Freedman and it's published in October of 2010, correct?
A. Yes, that's correct.
Q. And before today, you haven't seen this paper that you know of, correct?
A. I don't recall this paper.
Q. And let's go ahead and blow up the summary paragraph beginning and it states:
Dietary measurement error creates serious challenges to reliably discovering new diet-disease associations in nutritional cohort studies.
Do you see that?
A. I see that, yes.
Q. And it says:
Such error causes substantial underestimation of relevant -- relative risk and reduction of statistical power for detecting associations.


Do you see that?
A. I see this statement, yes.
Q. And if you haven't seen this paper, you probably haven't seen all the studies that also they cite that shows misclassification or missed dietary measurement error can lead to bias toward the null, correct?
MR. SHEEHAN: Objection.
A. I'm not sure what it can lead to, but, no, I understand the point here.
Q. Doctor, interpreting dietary studies or frequency food questionnaires is not one of your areas of expertise, correct?
MR. SHEEHAN: Objection.
A. Well, I'm very familiar with them. We do -- I don't do them personally, but many of my close colleagues in the cancer center do dietary studies and they will all tell you, they are very inexact. And again, most of what they can do or conclude is to generate hypotheses about diet. There's a long history of dietary studies, particularly in cancer.
As an example, let me just tell


you, going back to the 1960s and 1970s, there were a lot of dietary studies that sort of tried to reach the conclusion that gastric cancer was primarily due to different sort of diet. Gastric cancer was very, very common in Japan, but not so common in the United States. Still isn't very common in the United States, despite all of the carcinogens that we're alleging here. But the investigators in the 1960s and 1970s, reached a conclusion that gastric cancer was due to too much salted and preserved food. They did discuss nitrates even back then and the deficiency in vitamin E, vitamin C and selenium. But then made people question this because, you know, it was hard to show the role of specific nutrients in a diet and the diets differed in a -- in many things. And then of course it turned out that they realized that the major cause of gastric cancer was in fact Helicobacter pylori infection. And the puzzling thing about many of these studies is they didn't even talk about Helicobacter pylori, which is primary cause of gastric cancer in the vast majority


of individuals.
So, I find all of this sort of a bit of rearranging the chairs on the Titanic, it's sort of missing the major point. And certainly, it's possible that diet can modify the risk of gastric cancer. I don't doubt that it has some influence, but many of these studies seem to be highly focused on just a specific group of nutrients and many of them have a -- a model of a single -- a single factor, a single nutrient when in fact diets are very, very complex. And so, when you increase something, you decrease something else.
So, I find this -- this whole field -- I mean, I think it does raise a hypothesis I think of nitrosamines and NDMA and so on, but it's certainly far from proof and certainly in any case the diet is probably gonna modify chronic inflammation from Helicobacter pylori, which is the cause of gastric cancer. So, I'm not quite following what the point of some of these questions is.
Q. Have you seen many of these dietary

studies adjust for H. pylori?
MR. SHEEHAN: Objection.
A. Some of them do, not all of them do.
Q. Okay. Let's take a look at the Freedman 1087. Actually, before I go to that page, before I go to that.
You recognize that there's a lot of money spent at numerous health organizations where they spend a lot of focus on looking at whether or not what's in your diet can increase your risk of cancer, right?
A. There's been a whole area of research and a whole industry. I'm familiar with many of the leaders of diet and cancer, many of whom were they Harvard School of Public Health and I interacted with mainly. The interesting thing is that many of the recent AACR meetings they've done sort of mea culpa indicating that by focusing on diet and micronutrients, they may have missed the boat, which is the main mechanisms by which diets may increase the risk of cancer is to modify the microbiome. And several of the Harvard School of Public Health leaders have


indicated as such and that they are focusing on small groups of micronutrients really has missed the boat for how diet may interact with cancer.
So, again, I think this is another example of those sorts of studies that in their, sort of, sharp narrow focus on a few micronutrients are missing the fact that these diets differ in many ways and having affects other than simply the inclusion of -- of nitrosamines and other preservatives.
Q. Doctor, are you aware of the National Cancer Institute's metabolic epidemiology branch?
A. I'm familiar that there is a branch, I don't know that much about the work there.
Q. Are you aware that they've opined that potentially modifiable exposures that can decrease the risk of cancer include diet?
A. Yes, I'm aware of that general conclusion.
Q. Are you aware that the American Institute for Cancer Research funds research that focuses on how nutrition can affect


prevention, treatment and survival of cancer?
A. I'm aware of such efforts.
Q. Are you aware that the World Cancer Research Fund International, which you've cited to in your expert report, seeks ways to prevent cancer, improve the quality of life of people living with cancer and increase our understanding of the underlying cellular and molecular links between diet and cancer?
A. It sounds like a worthy effort.
Q. Are you aware that the WHO and IARC has the nutrition and meta- -- metabolism branch?
A. Yes, I'm aware of that branch.
Q. And these are all institutions that clearly indicate that dietary studies remain an important part of epidemiological research, correct?
A. Diet can be important that's true.
Q. Now, I want to go back to the -- go to page 1087 on the left side the second to last paragraph, says, in 1999, the US National Cancer Institute.
Are you aware of the US National Cancer Institute?


A. The NCI, is that the NCI that you're talking about?
Q. Yes.
A. Yes, they funded my work for 25 years.
Q. The US National Cancer Institute initiated the Observing Protein and Energy Nutrition study in which 261 male and 223 female adult volunteers completed and FFQ, a 24-hour recall, ones doubly labeled water assessment and a 24-hour urinary potassium and urinary nitrogen assessments.
Do you see that?
A. I do, I see that.
Q. And they state:
From the study, it was possible to estimate the level of relative risk attenuation when using an FFQ and as the main instrument in a cohort study for five exposures; energy, protein, potassium, protein density and potassium density.
Do you see that?
A. Yes.
Q. And you understand that even in 1999, it would've been unethical to

Page 210

specifically give NDMA to volunteers, correct?
A. Yes.
Q. Okay.
MR. NIGH: So, next, if we look at the findings in the next paragraph, we can blow that up. The last paragraph on the left side, and it will be that bottom paragraph on the left side there. We can blow that portion up.
DOCUMENT TECHNICIAN: None of my tools are working, one second.
MR. NIGH: No problem.
Q. And here you can see, Doctor, it says:
Attenuation is quantified by the attenuation factor, a multiplicative factor that operates on the true regression coefficient in the disease model. The smaller the coefficient the greater the attenuation of the relative risk estimate.
Do you see that?
A. Yes.
Q. And below it says:
The attenuation --

Page 211

MR. NIGH: Yes, right there.
Q. The attenuation factors would cause a true relative risk of 2.0 to be estimated on average as 1.03 to 1.06 for energy.
Do you see that?
A. Yes.
Q. So, what this is showing is even if there was a doubling of the risk for energy, what would show up in this FFQ is just a risk of 1.03 to 1.06 for energy, correct?
MR. SHEEHAN: Objection.
A. That's not exactly what they're saying, but it does say -- it does suggest that on the average, that the attenuation factor would reduce -- would show up as a slightly reduced risk for this particular study looking at, as you said, energy and protein with these particular macronutrients.
Q. You said "slightly reduced," but going from 2.0 to 1.03, that would be a marked reduction or attenuation of the risk, correct?
A. Well, I guess it depends on how you defined marked or -- yeah, so, it would reduce -- it would reduce a risk exactly in

Page 212

the range that you said.
Q. So, for energy, a 1 -- if it were a true relative risk of 2.0, it would go from 100 percent increase risk to just a three to six percent increase risk for energy, correct?
MR. SHEEHAN: Objection.
A. Well, those are the numbers that they're citing for this attenuation on the average, yes.
Q. And you don't consider that to be a marked reduction in terms of the attenuation to the risk of the null?
A. I think -- I think for this particular instance, I'd be fine with a marked -- your term here, marked reduction risk, I think is fair.
Q. Okay. If we look at the next statement, it says -- at the bottom, it says:
Although this attenuation for the micronutrient potassium, namely, reduction to the relevant risk of 1. -- 1.17 to 1.22 appeared less extreme than that for macronutrient protein, it was nevertheless substantial.

Page 213

Do you see that?
A. Yes.
Q. So, one of the micronutrients that they were able to look to see how it attenuates or creates bias toward the null, this misclassification of exposure, they were able to see a reduction five-fold in the risk of what the true relative risk would've been, correct?
MR. SHEEHAN: Objection.
A. Well, I see the numbers, potassium, they're classifying which I think is appropriate as a micronutrient. And here looking at these particular endpoints, they are indicating that there's a slight reduction with the estimation of the effects of potassium, and -- but it's not as significant as the earlier risk that we just looked at.
So, the attenuation was less, I think that was one of their conclusions.
Q. It's a substantial reduction to go from a 2.0 true relative risk to only then see a 1.17 to 1.22, that's almost a five --
THE WITNESS: We lost him.

MR. SHEEHAN: We lost somebody.
Can you hear us?
MR. NIGH: Yeah, I can hear you just fine.
MR. SHEEHAN: You just -- you actually just popped back in, we lost the last ten seconds or so...
MR. NIGH: Okay.
A. Can you repeat your question?
Q. Yeah, no problem. One second.
Doctor, it's a substantial reduction to go from a 2.0 relative risk to only then see a 1.17 to 1.22, that's almost a five-fold reduction in risk, correct?
MR. SHEEHAN: Objection.
A. Understood. Okay. Yeah, I think -- I think that is a substantial reduction that they're describing here in this particular study.
Q. And next it shows in terms of loss of statistical power --
MR. NIGH: We can zoom out of here and let's blow up the Statistical Power.
Q. It says:


Loss of Statistical Power.
Accompanying the severe degree of attenuation is an equally severe loss of statistical power.
Do you see that?
A. Yes, I see that statement.
Q. Doctor, did you consider, as part of your opinion, that FFQ misclassifications often lead toward bias toward the null and/or a reduction of loss of statistical power?
MR. SHEEHAN: Objection.
A. Yes, I considered that. I hadn't looked in detail at this study, which is interesting, of course, focused on two very specific endpoints. It's a -- it's a short-term study, it requires only 24-hour recall, which I don't think is true of every dietary study and very simple and easy to measure endpoints.
So, I think -- I think it -- but it does show that it -- that this -- that it can lead to an underestimation of the differences, but I think it would be a mistake and an incorrect assumption to assume this sort of regression to the mean


under estimation of effect is always true with problems in dietary recall.
And again, we don't have any cancer endpoints here, so the relevance of this to cancer studies is yet unclear and hypothetical, but I -- I would acknowledge that in some cases, it can lead to an underestimation of effects.
Q. Doctor, review of any other studies that actually show the longer the period of recall the more the likelihood of attenuation of the relative risk towards the null?
MR. SHEEHAN: Objection.
A. I guess we have to look at those studies. But, again, I'd be most interested if anyone has looked at this in the area of cancer endpoints.
Q. Whether or not anybody has asked about their recall of their cancer?
A. Well, I think in cancer studies, you know, that's -- that's really -- I'm in the, you know, cancer center at Columbia University and the dietary studies that are done are looking at cancer endpoints. And, again, my experience and experience of my


colleagues in the leadership committee at the cancer center recognize a lot of flaws in the dietary questionnaires and the dietary recall and it's always been a problem in the field. And, again, I don't know how you would prove that you're -- if anything, you're underestimating endpoints here. I think that's an assumption that's not been shown in the cancer and diet field, but I understand your point.
Sometimes, at least in the studies you've shown me so far, it does look like they -- they do show some attenuation of effects here.
Q. Doctor, remember we talked about there's two parts of a study, exposure and outcome, in an epidemiological study?
MR. SHEEHAN: Objection.
A. So, I remember you asking me about that at the very beginning of the deposition. And, again -- again, two parts of the study, there are two things you can certainly look at, perhaps those are the things you're most focused on, but there's many parts in epidemiologic study and those are two aspects

of it. But I understand those two aspects, endpoints, the outcomes and exposure are two things worth considering, particularly if you're looking at studies of cancer risk.
Q. This issue of non-differential misclassification as it relates to FFQs, is an exposure question, not an outcome question, correct?
A. So, yes, I guess in these sorts of studies, the outcome that we're generally looking at is cancer and it's right that when we talk about dietary estimation of intake that's an exposure question, yes.
Q. And you under- -- do you understand that in many of these dietary studies, these questionnaires are asked before the person ever even realizes they have cancer --
MR. SHEEHAN: Objection.
Q. -- or not?
A. That's probably true in some studies I've looked at. I don't recall whether -- what percentage of the studies they were prospective. Would have to go back and look I think at the -- at that. I mean, if we can talk about specific studies in


terms of whether the questions were done before and after.
But, yes, in many of them, they were done before.
Q. And Doctor, most people don't have the common knowledge that NDMA leads to cancer or at least didn't in the 1990s and 2000s, right?
MR. SHEEHAN: Object to the premise of the question.
A. I don't know what they knew or what they didn't know. So, NDMA has been studied for a long time. I'm not sure in terms of cancer dietary epidemiology what the knowledge was of the investigators at the time.
I mean, perhaps your point was that they were not focused on that as much. I mean, certainly they've been focused on nitrates and nitrites for 60 years or more, but I don't -- can't tell you specifically about NDMA.
Q. Okay.
MR. NIGH: Let's take a look at LP636. This will be marked as


Exhibit 6658. And let's take a look at the right side of page 354.
(Exhibit 6658 was marked for identification.)
Q. Actually, first, the title of this study Dietary Assessment and Opportunities to Enhance Nutritional Epidemiology Evidence and the author is Dr. Prentice.
Do you see that?
A. Yes, I do.
Q. As we discussed earlier, you cited this study in your report, correct?
A. Yes, this is the 2020 annals paper, yes.
Q. And you quoted the language:
The rough error prone estimation undermines the reliability of the dietary studies, right?
A. That's correct.
Q. Now, you didn't cite this statement on the right side -- actually, strike that question.
MR. NIGH: Let's go ahead and take a look at the right side, let's blow up the full paragraph.


Q. You see the statement that says:
The random component of measurement error may substantially attenuate estimated associations, so that a recommendation to consume a nutrient or food that seems to convey a small health benefit may reflect a much stronger disease prevention potential.
Do you see that?
A. Yes, I see that.
Q. So, Dr. Prentice actually discusses how this random component of measurement error may substantially attenuate the estimated associations, correct?
MR. SHEEHAN: Objection.
A. I don't think he's talking about NDMA and cancer here and I'd like to go back and look at what sort of endpoints they're talking -- Ross, it's a he, he is talking about here. But I do see that statement and I understand that as we've talked about that and they're talking here about the measurement errors, so acknowledging that there's a lot of error here in dietary assessment. I would not disagree that in some cases and particularly they're talking

here about health benefits, so they're talking about, I think, altering the diet -- primarily, I guess, preventing cardiovascular disease and other things, so that it may underestimate the benefit.

Here, I don't think we're talking about benefit and I think, you know, in terms of cancer causality, there's no specific statement here, so I wouldn't generalize this too much to some of the specifics that we've been discussing, but I do acknowledge the point that the dietary error sometimes can be in the favor of underestimating the benefit of nutritious diet.

Q. Doctor, I -- I pulled up this study because you cited it and referenced it in your report, must have been to suggest unreliability of dietary studies as it pertains to NDMA and cancer.

That was the question you were looking at, right?

MR. SHEEHAN: Objection.

A. Yes, I was simply commenting on the error prone nature of dietary studies and this statement sort of reinforces that and



makes the point that in some cases it can underestimate the differences, that's true.

Q. But Doctor, it's important as opposed to just talking about error or ability to error, it's important to understand how that error may affect the result, is it Type I error that leads to bias toward the null, or is it Type II error that leads to false positive, right?

MR. SHEEHAN: Objection.

A. I'm not -- so, there's two types of errors, we already discussed that. I don't think we can make any assumptions or predictions here which type of error we're actually looking at except to say that the dietary studies are not assessments, the questionnaires are not entirely accurate. And I think apart from the error prone estimation that we're focused on here, I think we're missing the larger concern about these sorts of dietary associations in that they're simply associations. Some seem to want to -- to look at this as -- as proof because of these correlative natures of these NDMA estimates is really proving that NDMA



causes human cancer. And, again, I would certainly accept that they are hypothesis generating.

But the major point, I think, of my report on the dietary studies is that the two groups eating very to very different diets, even though the NDMA may have differ, the diets differ in many other ways and simply taking one micronutrient out of context and saying, here, look, here's an association, certainly doesn't provide very strong evidence.

And I'd say also, we've looked at a few dietary studies. But the overall dietary studies, if you look at the results, are pretty inconsistent in terms of the degree of risk that they come up with, the degree of specific cancers that they find associated with it.

So, I think that there is -- there are some interesting findings here that are hypothesis generating, but I think it's not really worth spending our time guessing as to whether the estimates in any study undershoot or overshoot. I think -- again, I don't



believe that you can -- you can make much of a conclusion from dietary associations, except to say that there's a hypothesis that needs to be tested.

Q. Doctor, isn't it true that non-differential misclassification of exposure generally leads to bias towards the null?

MR. SHEEHAN: Objection.

A. I know that some have claimed this broadly. I don't know specifically in the cancer field if that's true, given the fact that most of the dietary epidemiology in cancer has been wrong for many years, there are still some associations that have been described in the cancer field, the associations are not strong. And in the cancer field, we don't believe that diet is the primarily -- primary cause of cancer. So, I don't know what to conclude about the dietary studies and whether or not they are overshooting or undershooting.

There's -- there's not a strong association with most cancers, aside from things such as obesity, which -- and I think

Page 226

if you look at obesity and overall caloric intake that is the strongest association in terms of perhaps dietary intake in cancer. The micronutrients, not so much. As I mentioned before, there are a lot of studies suggesting that selenium and vitamin E and vitamin C were protective against cancer getting back to all the nitrate theories. But as you should know, the randomized control trials that examined the gastric cancer the effects of adding selenium, vitamin A -- vitamin E and vitamin C to the diets, actually resulted in an increase of incidence cancer.

So, despite the very solid nutritional epidemiology suggesting that deficiency was harmful, in fact it was almost the reverse.

So, until you show me a randomized control trial that -- that validates some of these associations based on dietary recall, I'm just not buying that this is -- that this is solid evidence, at least in the cancer field there's a whole history of this in cancer and it's not been validated.

Page 227

Q. Doctor, until we show you a randomized clinical trial of people who ingest high amounts of NDMA versus people who have low amounts of NDMA in a clinical trial, you wouldn't buy the results?

MR. SHEEHAN: Objection.

A. Well, I wouldn't buy the dietary studies alone. There are certainly other ways, I think, to be able to show that NDMA is carcinogenic. And, you know, for example, the human -- I think the human epidemiology studies, particularly with ranitidine, I think the most relevant here. Certainly, I think that you can show these in human epidemiologic studies with ranitidine using that analysis that we referred to before. So, if there was a compelling Bradford Hill analysis, I think that would convincing.

I think with respect to ranitidine, if there was compelling evidence that the ranitidine that patients are taking can cause cancer in an animal on its own, I think that would be compelling, but I think these sorts of dietary studies, again, they are hypothesis generating, but they're far from

Page 228

definitive proof.

And again, I think the much stronger question would be what is ranitidine doing and not focusing just on diets that are that are rich in -- in bacon. I mean, I think bacon is -- as we've sort of discussed, has a number of things in it, we've looked at a couple of them. You've discussed PhIP along with NDMA. But I think there's many other compounds that could be related to the differences assuming that that's the explanation.

MR. NIGH: Move to strike as nonresponsive.

Q. Doctor, I specifically asked about NDMA. I know you want to talk about ranitidine. I'm gonna get there. My question is about NDMA.

Until you -- we show you a randomized clinical trial with people who ingest high amounts of NDMA versus people who ingest no or low amounts of NDMA in a clinical trial, you wouldn't buy the results?

MR. SHEEHAN: Objection. Asked and answered.

Page 229

MR. NIGH: Not answered.

MR. SHEEHAN: Disagree with you there, Mr. Nigh.

A. I'm sorry. Can you repeat the question?

Q. Doctor, until we show you a randomize clinical trial of people who ingest high amounts of NDMA versus people who have low amounts of NDMA in a clinical trial, you wouldn't buy the results?

MR. SHEEHAN: Objection. Asked and answered.

A. Okay. So -- so, certainly, let's be clear, I'm not -- and I think you suggested this, I'm not suggesting a randomized controlled trial of NDMA in humans, an interesting idea, but certainly not something that I would suggest. But I am suggesting that these sorts of dietary recall epidemiologic studies will never get too very far and the conclusions are highly likely to be in error. Some of these conclusions could possibly be true. But I think putting too much weight in them and assuming that they're proof, I think, is a

mistake that we, in the cancer field, have -- have learned to get beyond. And I think it's -- it does require validation in some ways.

Now, I don't think that -- in many ways, I don't think it's necessary to go that far. I think, you know, what the WHO and IARC is they've classified it as a -- as a 2A, it's possible, let's be careful with it. Do we really need to -- to go there and prove a hundred percent that it can cause cancer in humans? Probably not. I think the safe thing to do is say, even though there's -- there's, you know, it's possible to be careful with the agent. There's no read -- need to -- to do further studies.

And so, I think the association studies are fine, but I just don't think we -- I think we need to be careful about over interpreting them and putting too much weight in them in the absence of further validation in humans.

MR. NIGH: Let's take a look at LP3 -- 458. Sorry, LP548.

MR. SHEEHAN: Before we get into


this one, we've been going about an hour 20, I guess, or so.

MR. NIGH: Let's go ahead and take a break.

MR. SHEEHAN: Ten minutes?

MR. NIGH: Yeah, ten minutes is good.

MR. SHEEHAN: Let's go off the record.

THE VIDEOGRAPHER: The time is 19:11 UTC. We're going off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 19:25 UTC.

MR. NIGH: Let's go ahead and pull up LP548. This will be marked as Exhibit 6659.

(Exhibit 6659 was marked for identification.)

BY MR. NIGH:

Q. Doctor, this study is titled Nitrosamine, nitrate and nitrite in relation to gastric cancer: A case-control study


Marseille, France. And the first author is Dr. Pobel, correct?

A. That's correct.

MR. NIGH: And if we can blow up the abstract, look at the right side of the abstract.

Q. Here it states -- draw your attention, it states:

The results indicated that high intake of NDMA was associated with an increased risk for gastric cancer. The ORs for the second and third tertile of NDMA intake were 4.13 and 7.0.

Do you see that?

A. Yes, I do.

Q. And for the third tertile, those results would illustrate a seven-fold in the increase of cancer, correct?

A. That's what it says, that's correct.

Q. And those results were found to be statistically significant, correct?

A. Give me a second. Looks like it from the confidence intervals, but if I look a little more carefully at this in the


results it says p-value is .04.

Q. That's the p-value for trend, right?

A. Yes.

Q. And the p-value for trend is also statistically significant, correct?

A. It is for NDMA, but not for nitrates and nitrites according to their study.

Q. Right. And the odds ratio for NDMA at the third tertile is also statistically significant, correct?

A. That's what their results show.

Q. Okay.

MR. NIGH: Let's take a look at LP563. We'll go ahead and mark this as Exhibit 6660.

(Exhibit 6660 was marked for identification.)

BY MR. NIGH:

Q. And the title of this is Nitrosamine intake and gastric cancer risk with the first author being Dr. La Vecchia.

Do you see that?

A. Yes, I do.

Page 234

MR. NIGH: And let's go ahead and blow up the summary.
Q. And in the middle it says:
Compared with subjects in the lowest tertile of NDMA intake, the odds ratios were 1.1 in the intermediate and 1.6 in the highest tertile of intake.
Do you see that?
A. Yes, I see that.
Q. And then it says:
These estimates were not appreciably modified after allowance for total energy intake, other major dietary and non-dietary correlates of gastric cancer, and estimated intake of nitrite and nitrate.
You see that?
A. I see that, yes.
Q. And then it states:
The multi-variant OR for the highest NDMA intake tertile was 1.4.
Do you see that?
A. I do.
Q. And that was -- that finding was statistically significant, correct?
A. I don't have all those stats here.

Page 235

MR. NIGH: If we turn to page 471, Table 2, we can blow up that table. The one before that, that's Table 3. Table 2.
Thank you.
A. I see a p-value of less than .01 in the very bottom of the table.
Q. And here it shows for NDMA at 191 nanograms, greater than or equal to 191 nanograms, that's the third tertile, correct?
A. Yes, that's the third tertile.
Q. To be more clear, it's .191 micrograms per day or 191 nanograms per day of NDMA, correct?
MR. SHEEHAN: Objection.
A. So, in that tertile, that is the -- the estimated NDMA intake in that particular group.
Q. Okay. And whether you adjust for nitrite and nitrate as a potential confounder or not, OR2 and OR3, it's still statistically significant at the third tertile of usage, correct?
A. Let me just take a quick look at this again.

Page 236

Q. Let me break that question down a little bit.
Do you see at the bottom under footnote A, it says:
Estimates for multiple logistic regression equations, including terms for OR1, age and sex, OR2, age, sex, family history of gastric cancer, combined food score intake, intake of beta carotene, vitamin C and total calories. And then 3 as OR2 plus nitrite and nitrate intake.
Do you see that?
A. Yes.
Q. So, Column 2 would be adjusting for age, sex, education, family history of gastric cancer, combined score index, intake of beta carotene, vitamine C and total calories, correct?
A. Yes.
Q. And then Column 3 adjusts for all those plus nitrite and nitrate intake, correct?
A. Yes.
Q. And whether or not you adjust for nitrite or nitrate intake, OR2 and OR3 they are still statistically significant when there's more than 191 nanograms of NDMA ingested per day, correct?

Page 237

MR. SHEEHAN: Objection.
A. So, in the third group, they've adjusted for all of those parameters, age, sex, et cetera, education and they have adjusted for nitrate and nitrate intake, I believe. And although, the odds ratio come down, that quartile 3 with the estimated NDMA intake of greater than 191 nanograms per day still shows a significant difference in the range of seven or so.
Q. No matter which of those three ORs that you use for adjusting for potential confounding factors, the p-value as indicated in footnote C, shows p-value for trend of less than .01, correct?
A. Yes. So, for all three groups, 1, 2 and 3, the p-value is less than 0.01.
Q. Okay.
MR. NIGH: We can put that one away.
Next, LP638. We'll mark this as Exhibit 6661. We can go ahead and

take this one down.
(Exhibit 6661 was marked for identification.)
BY MR. NIGH:
Q. Doctor, you mentioned that the amount of time it takes for onset of a cancer from exposure to a carcinogen is often decades, correct?
MR. SHEEHAN: Objection.
A. Yes, it can be somewhat variable. There are some cases that can arise more quickly, but the classic teaching is it takes 10 to 20 years from the time of cancer initiation for many solid malignancies, pancreatic in particular has been the best study. But certainly gastric cancer that we've discussed tends to proceed through a series of histopathologic stages, including atrophy, metaplasia, dysplasia and cancer, primarily initiate and induced by chronic inflammation.
So, yes, the patients who develop GI cancers tend to be middle aged or older and the cancer process takes a number of years to develop typically.


Q. Doctor, experience from studies of cancer in humans indicates that the period from first exposure to the development of the clinical cancer is sometimes longer than 20 years, correct?
MR. SHEEHAN: Objection.
A. Of course it would depend upon the particular type of cancer, but as I mentioned it could be somewhat variable. Twenty years is a long time. I mean, most -- for example, gastric cancers are due to Helicobacter pylori is the primary agent in certainly the vast majority of cases. And patients with H. pylori are typically infected for several decades before the emergence of cancer.
Q. For stomach, colorectal, pancreatic esophogeal and liver cancer, the statement would be true, correct?
MR. SHEEHAN: What statement are we talking about?
Q. I'll rephrase.
For stomach cancer, colorectal cancer, pancreatic cancer, esophogeal cancer and liver cancer, the statement would be true that experiences from studies that are


studying those types of cancer in humans indicates that the period from first exposure to the development of clinical cancer is sometimes longer than 20 years, correct?
MR. SHEEHAN: Objection.
A. I think sometimes, yes, sometimes it's longer than 20 years. That's -- that would be fair to say for most GI cancers, including the ones you mentioned.
Q. Sorry.
MR. NIGH: Let's go ahead and take a look at LP616. This will be marked as Exhibit 6662.
(Exhibit 6662 was marked for identification.)
BY MR. NIGH:
Q. Doctor, you see this document is from IARC, correct?
A. Yes, it's from IARC, correct.
Q. And it is amended January 2019.
Do you see that?
A. Yes, I see that.
Q. And this is the IARC Monograph on the Indemnification [sic] of Carcinogenic Hazards to Humans, and it has the word


Preamble, correct?
A. Yes.
MR. NIGH: And let's draw attention to page 22.
A. I see 22.
Q. And if we can take a look at where it says, experience from studies of cancer in humans.
Do you see that? It's line 31.
A. Yes.
Q. It says:
Experience from studies of cancers in humans indicates that the period from first exposure to the development of clinical cancer is sometimes longer than 20 years.
Do you see that?
A. Yes.
Q. And it says:
Therefore, latency periods substantially shorter than about 30 years cannot provide evidence of lack of carcinogenicity.
Do you see that?
A. Yes, I do.
Q. And you would agree with that

statement, correct?

MR. SHEEHAN: Objection.

A. No, no, not -- no, I would not. Perhaps it would be fair to say that to exclude 100 percent that something is carcinogenic would require a period in that range. But, for example, many or most of the carcinogens that have been studied, there's a signal way before, 20 or 30 years, that there's an increase in cancer. I mean, the signal may not be as strong as it is at 20 years and I don't think you want to say for 100 percent certainty that it is not carcinogenic, but in terms of the weight of the evidence, most carcinogens show a signal way before that.

So, I think that's a conservative statement and I think for the IARC, which is trying to look at environmental carcinogens, it's not an unreasonable sort of approach or policy for their organization to monitor for much longer periods of time. But for my own purposes, I think -- I think ignoring all evidence particularly clinical evidence that comes around for less than 30 years is not



correct.

Q. Doctor, isn't this a lesson that was learned after what occurred in the 1900s with lead cancer research?

A. I'm not sure what lessons were learned from lead, but I can certainly say that the lessons learned from smoking is probably the best example where rates started to increase as early as five years, but by ten years, I think, it was clear that individuals who smoke cigarettes for greater than ten years began developing cancer. Now, it's true that with lung cancer and smoking, the cancer rates started to peak around 20 years. But by ten yeas, rates were totally increased for something -- for exposure to something that was clearly carcinogenic.

Q. I'm glad you pointed out smoking, 'cause I was gonna ask that next.

Isn't it true that many of epidemiological studies that came out initially that had shorter follow-up than ten years, demonstrated a lack of statistical significance for increased risk of smoking



and cancers?

MR. SHEEHAN: Objection.

A. I'd have to go back and look. I can't tell you I examined every one of the smoking studies, but I can say that the studies that I've examined, and I don't know when they came out or whether they were first studies or not, have shown an significant increase in cancer rates after ten years of smoking.

Q. Doctor, isn't that what tobacco industry lawyers used to point to in defending the tobacco industry, epidemiological studies that show shorter follow-up up than ten years that didn't demonstrate a lack of increase risk of cancer in the 1950s?

MR. SHEEHAN: Objection. You're asking him to comment on what tobacco lawyers did?

MR. NIGH: Absolutely.

MR. SHEEHAN: If you know. Go for it.

A. I don't really know what the tobacco lawyers did or what data they showed.



But I would say that the epidemiologic studies that I've looked at have clearly shown an increase in lung cancer rates, a significant increase in lung cancer rates more than twofold by ten years.

And I guess smoking is another perhaps good example in terms of looking for the signal because I think a lot of epidemiologists and clinicians in general saw a correlation between smoking rates and the emergence of lung cancer. So, lung cancer rates in the United States also began to skyrocket as smoking became more prevalent.

And so, I think that the other thing to look for is that in terms of rates of cancer in the United States, if there is a new drug or some exposure that is really causing cancer at a large scale, you'd expect to see large increases in that type of cancer in many areas and certainly we're not seeing increases in cancer, we're seeing, in general, decreases in most forms of cancer.

So, I think, again, looking for that broader signal, I think, is important in terms of assessing the risk of exposure.

Q. Doctor, I think it's interesting you keep speaking to lung cancer. My questions have not been focused on lung cancer.
Smoking has now been demonstrated to show an epidemiological studies increased risk of many other forms of cancer, correct?
A. That's -- that's true.
Q. And those studies had difficulty detecting increased risk of the other types of cancers until there was a much longer follow-up in the studies, correct?
MR. SHEEHAN: Objection.
A. I'm not sure about that. But smoking has been associated with many other forms of cancer, that's correct.
Q. And that lung cancer is -- your risk of lung cancer from smoking is very prevalent compared to the risk of other cancer types from smoking, correct?
A. Lung cancer and head and neck cancer are the most common risks from -- from smoking.
Q. So, it can be even more difficult to find a cancer that's less prevalent of an


increased risk with less follow-up than a cancer that's more prevalent, correct?
MR. SHEEHAN: Objection.
A. I think that in the setting of carcinogenic exposure, that longer follow-up generally reveals more cancers than shorter follow-up. But, again, I would certainly expect a clear signal after five or ten years of exposure if there's an agent that really is truly carcinogenic.
Q. For something that has a prevalent increased risk like tobacco smoke, correct?
MR. SHEEHAN: Objection.
A. Really for any carcinogenic exposure.
Q. Well, there's many other carcinogenic exposures that needed much more long-term follow up in order to be able to see the statistically significant increased risk, correct?
MR. SHEEHAN: Objection. Vague.
A. I'm not sure what you're referring to.
Q. I'm asking you, are you aware of many other carcinogens that needed a longer


follow-up in order to detect statistically significant risk in the studies -- in epidemiological studies?
A. Well, I'm not -- sorry.
MR. SHEEHAN: Go ahead.
A. I'm not clear about other carcinogens that are co-linked to human cancer that have been proven to be carcin- -- proven to cause human cancers besides smoking that are generally accepted, but there must be some, I'm just not aware of.
Q. How about hexavalent chromium?
A. Yes, I've heard of hexavalent chromium.
Q. Didn't it take longer term follow-up in epidemiological studies to be able to determine that that's a known car- -- carcinogen?
MR. SHEEHAN: Objection. Beyond the scope and calls for speculation.
A. I'm just not familiar. I do understand that it has been linked to cancer, it's sort of related to toxic spills. I just know the movie with Julia Roberts in it and she talked about hexavalent chromium, but I


don't know the details of that particular cancer type and how long it took. It took a -- I think the cancers occurred -- I don't know the details of it, but...
Q. Doctor, how would you characterize the follow-up in the ranitidine studies the length of the follow-up as a whole?
A. I'm sorry, which studies would you like me to refer to?
Q. Any of them.
A. Well, the follow-up vary between study and study. Some of them had really long follow-ups, some of them shorter follow-up.
MR. NIGH: Let's take a look at --
A. There was a collection of studies, I think, that together, I think, as I've written in my report provide very strong evidence for the absence of any cancer signal or carcinogenesis. And, you know, I think that they're extremely strong evidence demonstrating that ranitidine is not associated with human cancer.
MR. NIGH: Let's take a look at LP435.

Q. Doctor, you reviewed the Yoon study, correct?
A. Yes, I did.
MR. NIGH: This will be marked as Exhibit 6663.
A. I think we're looking at the Florian study.
MR. NIGH: Take this one down. LP435 this is Yoon study this will be marked as Exhibit 6663.
(Exhibit 6663 was marked for identification.)
BY MR. NIGH:
Q. And Doctor, do you see that says, Risk of Cancer Following the Use of NDMA Contaminated Ranitidine Products: A Nationwide Cohort Study in South Korea?
A. Yes.
Q. The first author is Dr. Yoon?
A. Yes.
MR. NIGH: And if we take a look at the last page, is that page 7 of 8, we'll see -- if we can blow up that middle paragraph.
Q. And in the middle we can see third.



You see:
Third, the follow-up period is restricted to seven years. Thus, the overall follow-up period is not long enough to assess the onset of cancer.
Do you see that?
A. Yes.
Q. Do you agree with the author's statement that the follow-up period of being restricted to seven years is not a long enough follow-up period to assess the onset of cancer?
A. No, I don't agree with that.
Q. Okay.
A. And in fact, I'm not sure -- I'm not sure that the authors agree with that because in -- their study actually gives light of that statement because, in fact, this study does assess the onset of cancer and comments on it.
I think in my opinion, and I can't certainly prove this, I think something was lost in translation here. I think in translating this from Korean to English or in their writing the paper, they sort of



misspoke. I think, what they meant to say, again, I can't prove this a hundred percent, is that the overall follow-up period is not long enough to totally exclude a cancer risk, but in fact, this -- this paper is all about assessing cancer risk in this population. And I think if they really believe that it was not a long enough period, they wouldn't have written this article.
And so, I think that they did believe that seven years is a reasonable period to take a look at whether there's any cancer signal and that's otherwise they probably wouldn't have done the study.
So, I think, again, this is a bit of a probably misstatement or mistranslation in their part and I don't think we should put too much credence into that statement, taking in context with the rest of the paper, they do in fact look at cancer -- onset of cancer. And they -- they have conclusions indicating there's no significant differences in 12 single cancer outcomes.
So, I think this is a very solid study and I think I feel bad the authors sort



of misspoke here.
Q. So, you disagree with the authors' statement that the follow-up period is restricted to seven years, that's the overall follow-up period is not long enough to assess the onset of cancer?
A. As I said, I think that the authors did -- probably did not intend that, so I probably agree with the authors that this a good study looking at cancer outcomes in seven years. And again, if the authors did not believe that it was long enough period, they wouldn't have published the paper. So, I believe that they do believe that this is a long enough period to assess the onset of cancer. The publication in fact demonstrates that they believe it's long enough to assess cancer.
Q. Have you reviewed the South Korean transcript itself to see if that's what the words actually say in Korean?
A. I have not.
Q. This was published in the Journal of Clinical Medicine, correct?
A. Yes, Journal of Clinical Medicine.

Q. Do you believe that the Journal of Clinical Medicine is even published in a different language other than English?
A. Perhaps you misunderstood what I was trying to say. And I guess not having worked with agent postdocs who are writing in English, you probably don't appreciate that. I have a large number of Chinese, Japanese and Korean postdocs in my life who are all fantastic, but the language of science really internationally is English. So, I would -- I didn't intend to say that they published this first in Korean, maybe they did, it's possible. I think they probably wrote this in English and the wording here reflects their difficulty with the English language. So, I have had hundreds of papers written by Asian postdocs who try to write drafts in English and unless there's someone like myself to edit it and translate it to some extent -- not translate it, but to correct their English. Sometimes the words come out a bit awkwardly.
So, what I was trying to say is, they probably tried to write in this English


and not having good English grammar and syntax misspoke and did not convey what they intended to convey, which is that the overall follow-up period is not long enough to completely exclude the onset of cancer. And so, that's what I was trying to say.
Q. Okay.
MR. NIGH: Let's take a look at LP552. And this will be marked as Exhibit 6664.
(Exhibit 6664 was marked for identification.)
BY MR. NIGH:
Q. The title is Effect of Ranitidine Intake on the Risk of Gastric Cancer Development, the first author is Dr. Kim.
Do you see that?
A. Yes, I do.
MR. NIGH: And let's go to page 7 of 9. And we can blow up that paragraph. Sorry, the third paragraph. Right, that's it.
Q. And it says, starting with fourth:
Fourth, this study had a follow-up period -- had a five-year follow-up period,


which may not be long enough to detect gastric cancer development.
Do you see that?
A. Yes.
Q. So, this is another study that suggests that the five-year follow-up period may not be long enough to detect their specific type of cancer development, correct?
MR. SHEEHAN: Objection.
A. So, I think that this sentence is reasonable and, again, indicating that they cannot exclude completely the development of GI cancer. When they say, it may not be long enough, and certainly -- and they're implying it may be long enough. And so, they're leaving some uncertainty here, which I think is a reasonable limitation of any study.
But again, they wouldn't have done the study if they didn't think that the data that they got with this five-year follow-up was important and significant.
So, again, a five-year follow-up study, again, another study showing really no increase in gastric cancer risk and no difference between ranitidine, famotidine and


omeprazole. I think this is another study that reinforces the notion that there's no cancer risk here with ranitidine.
Q. With short term use, correct?
MR. SHEEHAN: Objection.
A. I'm sorry, what's the question?
Q. I said with short-term use, correct?
A. So, this is just a real world study of patients who are taking this drug and, you know, the study is the time period that it is, which is five-year follow-up period. Whether that would be considered -- I mean, in our clinical, you know, context, short-term use really means like two or three weeks and I don't think that's what you're trying to say here. This is a pretty good follow-up, five years. And so, that's -- that's a good follow-up, five-year -- five-year period for most clinical studies, this is pretty good follow-up.
Q. Now, follow-up is a different -- is different than the amount of exposure, right?

A. That's true, follow-up period is different from exposure.
MR. NIGH: Let's take a look at LP430. This will be marked as Exhibit 6665.
(Exhibit 6665 was marked for identification.)
BY MR. NIGH:
Q. First, we can see the title is Risk of Cancer in Association with Ranitidine and Nizatidine versus Other H2 Blockers; Analysis of Japan Medical Claims Database [sic] 2005 to 2018. And the first author is Dr. Iwagami.
Do you see that?
A. Yes, I do.
MR. NIGH: And if we take a look at the fourth page, under results. We blow up that first paragraph.
Q. And in the middle we can see medium follow up 2.4 years.
Do you see that?
A. Yes, I do.
Q. Were you aware that the medium follow-up in Iwagami was 2.4 years?



A. Yes, I was.
Q. Okay. Were you aware that --
A. It's in my report.
Q. I'm sorry, what?
A. It's in my report. I write the median follow-up in the ranitidine, nizatidine and other H2R groups was 2.4 years with a range from 1.1 to 4.5 years.
Q. Were you aware that over 90 percent of the users in this study, they only captured less than six months of DDD?
MR. SHEEHAN: Objection.
A. I'm sorry. So, less than six months of -- what was that again? I lost your last word there.
Q. Do you know what DDD stands for?
A. I see it in the paper here. DDD define daily doses I think is the definition, right?
Q. Okay. And in terms of the defined daily dose, take a look at --
MR. NIGH: Let's take a look at Table 3. And let's go ahead and -- yep.
Q. Do you see at the bottom where it



shows Cumulative analysis dose?
A. Yep.
Q. Are you aware that 90 percent of the users were using this for less than six months DDD?
MR. SHEEHAN: Objection.
A. Well, I did look at the exposure levels which you're referring to and they're extremely variable. A number of the patients may have been on shorter term use, but to be honest, this is a drug-based study. I think this is the amount of drugs that could be documented. I would not be surprised if many of the patients took longer amounts of drugs. I mean, these days I guess most patients who are on either H2 blockers or PPIs tend to be on them fairly long-term. But I did see this -- this information in terms of the exposure levels they were able to document.
But this is a nice study that really shows real world use of H2 receptor antagonists and this is, again, a wide swath of -- of users of ranitidine and nizatidine and other drugs and this is what we are



seeing in the real world. And so, I think it's -- it's highly relevant to informing us about relative cancer risk by users of ranitidine and other H2 blockers.
Q. It's your belief that over 90 percent of users are using it for less than six months, using ranitidine for less than six months?
MR. SHEEHAN: Objection.
A. I know they were using it for at least that time period, perhaps they were using it for longer. I'm not quite sure. This is what the -- is captured in this pharmacy sort of database. But I -- I'm aware of that and I -- I find the information extremely useful.
Q. So, you say "it's a drug-based study, I think this is the amount of drugs that can be documented."
Remember you said that?
A. Yes.
Q. Isn't it true that these sorts of drug-based studies utilizing these sorts of databases oftentimes miss exposure to various drugs?

MR. SHEEHAN: Objection. Calls for speculation.
A. I don't know the details of how often that happens, so I can't comment any further.
Q. When you said "be honest with you, this is a drug-based study, I think this is the amount of drugs that can be documented," what did you mean by that?
A. I mean that in my experience -- I'm a little surprised at the low level of use here, but I think it could be close to on target. But in my experience as a clinician who treats patients with -- with gastro esophogeal disorders, I would say the majority of patients who are on these drugs are on them for long periods of time.
Q. And when you say "long periods of time," what do you mean by that?
A. Years, lifetime.
Q. And that would be true for ranitidine?
A. It was true for ranitidine, yes.
Q. And that's true for ranitidine in the United States according to your


experience?
A. The majority of patients do -- are on them chronically in my experience.
Q. And by "chronically," what do you mean by that?
A. They take them every day for a year or more.
Q. And do many of them take them every day for ten plus years?
A. Some of them do. I don't have the data in terms of how often they take them for a year versus ten years, but in my experience, most patients take them chronically.
Q. Is it your experience that most patients in the United States are taking drugs like ranitidine for more than ten years?
MR. SHEEHAN: Objection. Asked and answered.
A. I can't tell you about ten years.
MR. NIGH: Let's go ahead and take a look at LP553. This will be marked as Exhibit 6666.
(Exhibit 6666 was marked for


identification.)
BY MR. NIGH:
Q. And Doctor, this is titled Ranitidine Use and Gastric Cancer Among Persons with Helicobacter pylori, correct?
A. Yes.
Q. And the first author is Dr. Kumar, correct?
A. Yes.
Q. And if we take a look to the third page, we can see the medium follow-up as 4.4 years, underneath results, correct?
A. Yes, 4.4 years is correct with a range from 1.7 to 9.2 years, so -- so for up to as long as nine years.
Q. But you don't know how many people would've had a follow-up as long as nine years in the study, correct?
A. No, we don't. I don't think so. No. Can't see that.
And again, this study shows no association between ranitidine and gastric adenocarcinoma.
Q. Let's take a look at last sentence before the conclusion. And the study authors


say:
Our follow-up time was similar to other recent pharmacoepidemiologic studies investigating contaminant and future cancer risk, but, as in those studies, longer follow-up is necessary to confirm those findings.
Do you see that?
A. Yes, I do.
I think, again, the authors are pretty confident of their results, otherwise they probably wouldn't have published them, but they're providing an appropriate caveat, which is, even though the studies really show no signal of increased risk cancer risk with ranitidine, they can't rule out 100 percent that there could be some small late signal. And so, therefore they are appropriately qualifying their results and saying that we need more follow-up studies probably and although the studies are solid, it's always nice to have additional studies to confirm them with longer follow-up, but I think that's a very reasonable conclusion by these doctors.

MR. NIGH: Take a look at LP550.
This will be marked as Exhibit 6667.
(Exhibit 6667 was marked for identification.)
A. Yes, I see the Tran study.
Q. And for the conclusion -- sorry. This is the Proton pump inhibitor and histamine-2 receptor antagonist use and risk of liver cancer in two population-based studies. And the leading author is Dr. Tran, correct?
A. That's correct.
Q. And the -- one of the conclusions is that we found some evidence that PPI use was associated with liver cancer.
Do you see that?
A. Yes.
Q. And is this -- this is a study that you would've also reviewed for your work as an expert in the PPI litigation?
A. I can't recall. We wrote whether it's relevant to other activities, but I have reviewed this study before and I certainly think that this statement about residual confounding or reverse causality is



certainly relevant, I think, to this particular study.
Q. Well, there are numerous studies that have actually discussed whether there might be an association between PPI use and liver cancer, correct?
A. There's -- there are several other studies, that's correct.
Q. And this study in terms of the results demonstrated in the UK Biobank right before this, in the UC Biobank cohort 182 of 475,768 patients developed liver cancer. If both, ever use of PPIs was associated with increased live cancer risk.
Do you see that?
A. Yes.
Q. Okay. And so, it showed an adjusted odds ratio of 1.8 and an odds HR hazard ratio of 1.99, correct?
A. That's correct.
Q. And for both of those, it shows a statistically significant increased risk of liver cancer associated with PPI use, correct?
A. That's correct.



Q. And then it talks about there is little evidence of association with H2RA use, correct?
A. That's correct.
Q. Now, this study actually gives findings specifically to ranitidine as well, correct?
A. Let's see.
Q. Take a look at Exhibit 2. You see at the bottom --
A. Ranitidine, yep. The very bottom it has --
(Cross-talk.)
Q. Right. It shows H2RA by type and it shows cimetidine and ranitidine.
Do you see that?
A. Yes, that's correct, yes.
Q. Over to the right, that would be fully adjusted odds ratio, correct?
A. Yes.
Q. And for cimetidine, it actually shows a non-statistically significant decreased risk of liver cancer is cimetidine, correct?
MR. SHEEHAN: Objection.



A. So, for the H2RAs, the p-value is -- they have an adjusted -- unadjusted p-value and fully adjusted p-values. So, if we look at the fully adjusted p-values, they are both non-significant.
Q. That's not my question.
In looking at the odds ratio, the odds ratio for cimetidine is 0.97 and it's not statistically significant, correct?
A. The fully adjusted odds ratio for cimetidine is 0.97.
Q. So, that odds ratio is below one for cimetidine, correct?
A. Correct.
Q. And for ranitidine, the fully adjusted odds ratio is 1.41. That's not statistically significant, correct?
A. That's correct.
Q. Can we take a look at the next page, Table 4. I'm sorry, let's go back to Table 2 first. I need to find out one thing.
At the top of Table 2, the title, that's The association between PPI and H2RA use and risk of cancer in the Primary Care Clinical Informatics Unit, correct?

Page 270

A. Yeah, that's what it says on Table 2.

Q. So, that's one of the databases that they looked at in this study, correct?

A. Correct.

Q. And they also looked at the database in Table 4, they're looking at the UK Biobank, correct?

A. Table 4 is the UK Biobank.

Q. And for ranitidine and liver cancer, they found a fully adjusted odds ratio of 1.82, correct?

A. Correct, 1.82.

Q. That's above 1, but it's not statistically significant, correct?

A. That's correct.

Q. And page 59 shows that this study had a median follow-up of 5.6 years for the UK Biobank, correct?

MR. NIGH: Let's go ahead and blow up the first paragraph on 59 under UK Biobank.

Q. It shows a median follow-up of 5.6 years, correct?

A. Yes, 5.6 years for the UK Biobank.

Page 271

Q. And for the PCCIU, the Primary Care Clinical Informatics Unit on page 57.

MR. NIGH: We can blow that up, 3.1, at the bottom right.

Q. That shows a median exposure of 5.5 years, correct?

A. That's correct.

MR. NIGH: We can take this down. Let's take a look at LP490. This is Exhibit 6668.

(Exhibit 6668 was marked for identification.)

BY MR. NIGH:

Q. And the title is Ranitidine Use and Cancer Risk: Results from UK Biobank, with the leading author Dr. Kantor.

A. Yes, Dr. Kantor, that's correct.

Q. And this uses the UK Biobank which is -- was also used in the Tran study, correct?

A. Yes, I believe so.

Q. They utilized different time frames for their cohorts, correct?

A. I don't recall offhand the time frame.

Page 272

Q. Okay. Is that something you noted as you looked across these studies?

A. I did look at it when I read the papers, yes.

Q. And for the Kantor study utilizing the UK Biobank, the second page for liver cancer regular ranitidine use compared to the general population, you can see has an increased risk of 1.91 for the multi-variable adjusted, correct?

A. Yes, it says 1.91.

Q. And that would be a statistically significant increased risk for liver cancer for ranitidine users compared to the general population, correct?

MR. SHEEHAN: Objection.

A. But I think --

Q. Strike that. Let me reword that.

And that could be a statistically significant increased risk for liver cancer for ranitidine users compared to non-users, correct?

A. So, Kantor did a number of different comparisons, I think it's important to remember that -- and I think the FDA would

Page 273

agree with this, as they outlined in one of their papers, that the important comparison so is to -- is to an active comparator, so comparing to non-ranitidine users or non -- individuals who don't use either an H2 blocker or PPI will usually give increase rates for a number of things because the patients who are on H2 blockers or PPIs tend to be much sicker. And so, confounding by indication and also reverse causality, leads to a slight increase in rates.

So, I think the important comparison is the one they did here, which is to an active user, which here was omeprazole users. And so, when you compare ranitidine users to omeprazole users, as you can probably see in this table, the hazard ratio which they used here is 1.15 or no difference. And so, I think the authors in their discussion mention that confounding by indication is a potential explanation for this increase number compared to non-ranitidine users.

So -- so -- so, yes, I noticed -- I did comment in my report on this comparison

to non-ranitidine users, but I think overall the findings are very, very consistent that when you use an active comparator, there really is no increased risk here of liver cancer.

Q. Doctor, I didn't ask about that, I'm going to. But my question is simply on this finding. And my question was, that this demonstrates statistically significant increased risk for liver cancer for ranitidine users compared to non-users correct?

MR. SHEEHAN: Objection. Asked and answered.

MR. NIGH: Not answered.

A. Yes. No. So, let me just answer it again. There is an increased risk of liver cancer in ranitidine users compared to non-ranitidine users, but the explanation is confounding by indication.

Q. Okay. Couldn't the explanation also be that PPIs cause liver cancer or had an increased risk of liver cancer seen in the UK Biobank?

A. PPIs do not cause an increase in



liver cancer. And, you know, I think if the explan- -- if the hypothesis is that ranitidine is causing cancer by NDMA, there's no evidence that omeprazole contains NDMA. And otherwise, the drugs are very comparable, omeprazole is a very powerful acid suppressant. So, I think certainly there's no evidence -- no accepted scientific evidence or consensus that omeprazole causes liver cancers.

So, again, I don't find that to be believable. And I think, you know, if you also -- if you look at the other studies where they've used increased lag time, you know, these cancers that tend to -- they come up in these comparisons to nonactive users tend to dissipate with increasing lag time. And so, again, one can make up a number, sort of, ad hoc hypothesis to otherwise ex- -- to explain it. But I think I -- indication -- confounding by indication is by far the best explanation, certainly the one I think the authors refer to as well.

Q. Doctor, let's take a look back at the Tran study again.



MR. NIGH: It's marked Exhibit 6667, LP550. And if we can request to Table 2.

Q. Do you see in the middle, PPIs by type, omeprazole?

A. Yes.

Q. And do you see that omeprazole in the PCCIU database had a fully adjusted OR of 1.83?

A. In the last column, the OR fully adjusted 1.83, I see that, yes.

Q. That was a statistically significant finding with a p-value of less than .001 correct?

A. Yes, I see that.

Q. Now, lansoprazole was not statistically significant, correct?

A. Yes, I see that here.

Q. Doctor, hasn't there been multiple studies that indicate PPIs have increased risk or associations demonstrating increased risk of liver cancer, especially omeprazole?

MR. SHEEHAN: Objection.

A. Well, I think my charge here was not to investigate omeprazole, but I will



just say that -- and I don't go into omeprazole in my report, but I will say that PPIs in general have been reported to have numerous associations and complications, including cancers of all types, as well as many other diseases, including Alzheimer's, heart attacks, pneumonia, et cetera, et cetera. And this has been looked at by a number of GI organizations, the AGA, the ACG and others and editorials have been written about this, this is all confounding by indication, reverse causality, sick patients tend to get this. I don't know why in this study omeprazole seems different than lansoprazole, but I guess in most studies there hasn't been a difference.

And again, I think this just goes to the fact that patients who are prescribed PPIs and the same is true of H2 antagonists tend to be sicker than patients who don't get them.

So, most of us in the GI field believe these drugs -- the use of these drugs is a marker of disease, rather than causing these complications. And so, again, we've

been able to sort of view these sorts of complications in light that is appropriate, which is that they are markers of disease, rather than causative agents.
Q. Doctor, isn't one of the challenges of utilizing active comparators in cancer studies is that the active comparator may also have an increased risk of cancer?
MR. SHEEHAN: Objection.
A. Well, anything is possible. But I guess it comes down to the issue of, you know, multiple different comparisons. So, if you compare to PPIs, if you compare to different H2 blockers, all of these -- I think the only mistake would be comparing these to a non-active comparator and is pointed out, I think, by the FDA, those sorts of studies are highly flawed. So, I think using a variety of different comparators, which have been done in these studies, in some cases there are about PPIs and some cases there are other H2 blockers. And if it comes down to the NDMA hypothesis, these other drugs do not have NDMA and I think they are the best and the most appropriate


comparators for these sorts of studies.
MR. NIGH: I think we've been going over an hour. Is now a good time to take a break?
MR. SHEEHAN: Sure.
THE VIDEOGRAPHER: Time is 20:30 UTC. We're going off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We're back on the record. The time is 20:48 UTC.
MR. NIGH: Okay. Let's go ahead and pull up LP635 and we will mark this as Exhibit 6669.
(Exhibit 6669 was marked for identification.)
BY MR. NIGH:
Q. Doctor, this study is titled A Search for Recall Bias in a Case-Control Study of Diet and Breast Cancer.
Do you see that?
Doctor, can you hear me?
MR. NIGH: Let's go off the record.
MR. SHEEHAN: I'm sorry. I'm


sorry. That's my fault, Dan. I didn't hit the button.
MR. NIGH: It's no problem, let's go back on.
THE VIDEOGRAPHER: We stayed on the video for that, so we're on.
MR. NIGH: Okay.
BY MR. NIGH:
Q. Doctor, this study is titled A Search for Recall Bias in a Case-Control Study of Diet and Breast Cancer.
Do you see that?
A. Yes, I do.
Q. And the first author is Dr. Holmberg.
Do you see that?
A. Yes, Dr. Holmberg.
Q. Okay.
MR. NIGH: Let's go ahead and blow up the summary of this.
Q. For methods, it says:
In a case-control study of diet and breast cancer risk nested within a cohort of women screened with mammography.
How do you pronounce that, Doctor?


A. Mammography.
Q. Mammography, that's right.
Screened with mammography, we contrasted answers to a retrospective dietary interview with answers to a dietary questionnaire which was filled out before any diagnostic procedures for breast cancer were undertaken.
Do you see that?
A. Yes, under methods. Yes.
Q. Here they're comparing the answers prospectively on a dietary questionnaire compared to the answers retrospectively on a dietary questionnaire, correct?
A. Yes, correct.
Q. And if we go to the conclusions, it says:
We found few signs of recall bias, and the few indications of a differential misclassification that we found were not in food groups that had been publically discussed as causes of breast cancer.
Do you see that?
A. Yes, I do.
Q. Okay.

Page 282

MR. NIGH: Let's go ahead and pull that down. Let's take a look at LP633. We'll mark this as Exhibit 6670.
(Exhibit 6670 was marked for identification.)
MR. NIGH: And let's go ahead and blow up the summary --
BY MR. NIGH:
Q. I mean, first off, this is titled An Investigation of Recall Bias in the Reporting of Past Food Intake Among Breast Cancer Cases and Controls. And first author is Dr. Friedenreich, correct?
A. Yes, Christine Friedenreich.
MR. NIGH: And let's go ahead and blow up the summary at the top.
Q. And here it says:
A nested case-control study was conducted within the Canadian National Breast Screening Study to examine whether there was evidence of biased reporting for past food intake. A total of 325 patients with breast cancer and 628 match control subjects completed a self-administered food frequency

Page 283

questionnaire in 1998, recalling their diets originally reported on enrollment into the National Breast Screening Study between 1982 and 1985.
Do you see this?
A. Yes.
Q. So, again, they're comparing their prospective answers to a dietary questionnaire with their retrospective answers in a dietary questionnaire, correct?
A. Let me just take a minute to look at this.
MR. NIGH: If we look at the bottom of the introduction, let's zoom out --
MR. SHEEHAN: Take your time, Dr. Wang, if you need.
Q. You can take a look at the last paragraph.
MR. NIGH: Let's blow that up.
Q. And it says:
The present investigation -- the sentence:
The present investigation examined the validity of recalled food intake for case

Page 284

patients versus control subjects by comparing retro- -- prospectively collected dietary data, which is used as the gold standard, to data collected retrospectively after the breast cancer diagnosis.
Do you see that?
A. I see that text, yes.
Q. Does that help show that they were looking to compare the answers in a prospective questionnaire versus -- answer prospectively versus data answered retrospectively?
A. Yes, I guess what I'm sort of looking into is how they did the prospective questionnaire and what kind of information they recorded. In the last study, for example, they just simply divided the food into food groups. You know, did you have cereals, did you have fruits and veg- -- you know. So, it wasn't really a very fine analysis just a broad analysis. But here I'm trying to understand and look -- okay. So, here they have mean food groups, dairy products, high-fat dairy producers, vegetables, fruits. So, just the general

Page 285

categories, high fat foods, caffeine, alcohol. So, I guess at that level of just looking at general food groups which was -- I guess somewhere to the last one as well, there seems to be reasonable correspondence here.
Of course, if one is interested in sort of micronutrients, this would be totally insufficient. But I do see that in this particular study, they're getting some reproducibility in terms of retrospective analysis. And I understand why they're doing this, these researches are certainly interested in nutrition and cancer and they want to, sort of, validate their own methodologic approaches. So, they have generated these sorts of studies, sort of, supporting that their data collection is not entirely useless. And I think they've made a reasonable argument that there is some -- some utility to this sort of retrospective dietary questionnaire.
Q. Doctor, on dietary questionnaires or food frequency questionnaires, they don't ask people to recall their micronutrients

Page 286

such as NDMA and/or PhIP. They ask about broad categories of the foods they consumed, correct?

A. Yes, that's generally what they do in these sorts of food questionnaires, which is why it's -- it's -- when you start to drill down in more specifics and extrapolate from there, it's often very limited in terms of the accuracy of looking for specify items. And that is the weakness of this field. But -- but this -- I'm not disagreeing that this is, in the field of nutrition and disease, a standard approach.

MR. NIGH: And if we can back out of this and go back to the summary.

Q. It says:

Recall of food items was very similar for case patients and control subjects.

Do you see that?

A. Yes.

Q. And it says:

The magnitude of the odds ratios for the association between these food groups and breast cancer from the prospectively and

Page 287

retrospectively collected data was not systematically different.

Do you see that?

A. Yes.

Q. And then it says:

There was little evidence for recall bias in the reporting of past food intake from these data.

Do you see that?

A. Yes, I do.

Q. Okay.

MR. NIGH: We can go ahead and take that down.

Let's go ahead and pull up -- let's go ahead and take this document down.

Q. Doctor, you discussed Mohy-ud-din abstracts in your expert report, correct?

A. What was the name again that you mentioned Mohy-ud-din, is that -- is that --

Q. Mohy-ud-din.

A. Mohy-ud-din abstracts. I see them, yes. Cancer with ranitidine -- yes, correct.

Q. Okay. And you also discussed Y. Kim study as well, correct?

Page 288

A. YD Kim, yes.

Q. Yes.

Doctor, did you ever compare these two studies side by side?

A. Are you asking did I compare Mohy-ud-din versus YD Kim abstracts?

Q. Yes.

A. I don't recall making any kind of comparison of those two, no.

Q. Were you aware that they were both presented -- their abstracts were presented for the first time in a DDW in May of 2020?

A. Yes, I'm aware that they were presented at DDW.

Q. Were you aware they both used the same data place the Explorys Database?

A. I did know the database, I hadn't realized that they were the same database, but -- so wasn't paying attention to that.

MR. NIGH: Let's go ahead and pull up LP230. And if we can, let's put 232 side by side with it.

Q. Doctor, do you see both of these papers?

A. Yes, I see the two abstracts, yes,

Page 289

I do.

Q. Okay.

MR. NIGH: So, we'll mark the Mohy-ud-din abstract as Exhibit 6671. And we'll mark the Kim abstract on the right as Exhibit 6672, okay.

(Exhibit 6671 was marked for identification.)

(Exhibit 6672 was marked for identification.)

BY MR. NIGH:

Q. Now, if we look on the left --

DOCUMENT TECHNICIAN: Counsel, I'm sorry, what was the second LP number for 6672?

MR. NIGH: That's LP232.

THE VIDEOGRAPHER: Okay, copy that.

MR. NIGH: If we can blow up just the title with the author, the top part of this on the left side. That's right. No, on the left side. You had it, sorry.

Q. And Doctor, you can see here this is -- it says, Risk of Cancer with Use of

Ranitidine. And below it shows
Dr. Mohy-ud-din, correct?
A. Yes, Dr. Mohy-ud-din.
Q. And if we look at the -- so, you
recognize this to be a Mohy-ud-din poster
abstract that was presented in May of 2020,
correct?
A. Yes, I believe so. I did see the
abstract to -- when it was first -- was first
made available online, yes.
Q. Okay. And let's take a look at the
right side, that study says -- the title is,
Chronic Use of Ranitidine Associated with an
Increased Risk of Developing Gastrointestinal
Malignancies and Leading Authors, Dr. YD Kim,
correct?
A. Yes, YD Kim.
Q. And that was also presented in May
of 2020 by DDW, correct?
A. Yes, appears so.
Q. Okay.
MR. NIGH: Let's go ahead and back
out the titles.
Q. Now, the Kim study, if you go to
the methods --


MR. NIGH: Let's blow up the
methods section. I mean, not Kim,
Mohy-ud-din, sorry, on the left side.
If we blow up the section on
Mohy-ud-din...
Q. We can see it says:
The Explorys Database is a search
the longitudinal real world identified data
collected from electronic medical records.
Do you see that?
A. Yes.
Q. And this study used -- looked at
the Explorys Database, correct?
A. Yes.
Q. Okay.
MR. NIGH: And if we pull that
down, let's look at the other side,
the Kim DDW.
Q. And there we can go under methods
and you can see there that it says:
Cohort analysis was performed using
the multi-institutional database, the IBM
Explorys Database.
You see that?
A. Yes.


Q. So, both of these studies utilize
the same database, correct?
A. Yes.
MR. NIGH: Let's go ahead and back
that down.
Q. If we look at the left side, we can
see the Mohy-ud-din study. If we look at
results, we can see that the Explorys
Database contains over 65 million patients
and it shows 1.62 million users of ranitidine
were identified, 3.37 million users of
famotidine were identified.
Do you see that?
A. Yes.
Q. This study compares the risk of
cancer with ranitidine and it compares it to
famotidine as one of its comparisons,
correct?
A. Yes, they're comparing ranitidine
users to famotidine users.
MR. NIGH: And if we put that
back.
Q. We also know that DDW did the same
thing, it compared ranitidine users to
famotidine users as one of its comparisons,


correct?
A. I can't read -- can you blow that
up?
Q. Yeah.
MR. NIGH: I'll blow it up.
Q. We can see among patients who
developed cancer, second sentence -- I'm
sorry, first sentence.
A total of 1,710 patients developed
new GI cancers within a one-to-ten-year
window and the ranitidine, famotidine and
omeprazole cohorts.
You see that?
A. Yes, they also included omeprazole.
Q. So, one of the comparisons in the
Kim study is ranitidine to famotidine,
correct?
A. Yes.
Q. So, both of these studies compared
ranitidine risk to famotidine risk, correct?
A. It appears so.
Q. Now, let's look at the risk factors
for ranitidine compared to famotidine.
MR. NIGH: On the left side, let's
blow up the results, the first

paragraph.
Q. And do you see where it says:
Users of ranitidine and famotidine when compared to the general population and users of famotidine when compared to ranitidine.
MR. NIGH: Let's highlight years of famotidine when compared to ranitidine.
Q. Those are my questions here now. Users of famotidine when compared to ranitidine.
So, users of famotidine when compared to ranitidine, they were older, correct?
A. It appears so, yes.
Q. Okay. So, according to this abstract in the Explorys Database, famotidine patients were older than ranitidine patients with the p-value of less than .001, correct?
A. Yes, that's what -- what's included in their abstract.
Q. And famotidine users were more often to be smokers than ranitidine users with the p-value of less than .001, correct?



A. Yes.
Q. And famotidine users were more often to be obese than ranitidine users with the p-value of less than .001, correct?
A. Yes.
Q. And famotidine users were more often to have liver cirrhosis with a p-value of less than .001, correct?
A. Yes.
Q. And famotidine users were more often to have a history of alcohol use compared to ranitidine users with the p-value of less than .001, correct?
A. Correct.
Q. And famotidine users were more likely to have a history of family cancer when compared to ranitidine users with the p-value of less than .001, correct?
A. Yes, that's what they say on their abstract.
MR. NIGH: Can we go ahead and take that down.
Q. Let's look at the Kim study. And then the last line of the Kim study says:
Prevalence of risk factors for GI



cancers were all lower in ranitidine cohort p-value less than .001 compared to famotidine and omeprazole cohorts.
Do you see that?
A. Yes.
Q. Doctor, as you considered the Kim study, did you consider that the famotidine population is a more diseased population than the ranitidine population?
MR. SHEEHAN: Objection.
A. Well, I guess this is a recent set of data and in these studies, it's a little unclear, you've just presented both abstracts, and it does appear that they both appear to show that the risk factors that we've discussed were lower than ranitidine cohort.
On the other hand, if you look at the data just right above here, the patients on ranitidine compared to famotidine had an odds ratio that was much lower for all the cancers compared to famotidine.
So, I would say that, yes, in general these studies suggest that patients of ranitidine did not have an increased risk



of any of these GI cancers and probably had a lower risk. But they -- patients in the famotidine group probably had higher risk factors, which explains the difference.
So, overall, the data are totally consistent with all the other studies we've seen, and again, showed no overall difference in GI cancer risk.
So, yes, I did consider all of these factors in evaluating these abstracts.
Q. Now, as you just mentioned, Kim demonstrated statistically significantly decreased risk when comparing ranitidine to famotidine, correct?
A. Well, they were lower. I'm just looking now. Yeah, he -- it says here, p-value is less than 0.05. That's correct.
MR. NIGH: Now, let's take a look at the Kim -- at the Mohy-ud-din abstract, if we can blow up the last paragraph.
Q. And the Mohy-ud-din abstract shows among subjects without risk factors including smoking, obesity, alcohol use, family history, cirrhosis and GERD, the risk of all

Page 298

cancers was identical for ranitidine and famotidine in the Mohy-ud-din paper, correct?
A. Yes, that's what it says.
Q. And actually, they did a p analysis for sameness as opposed to p analysis to reject the null hypothesis, correct?
A. I don't know -- I'm not sure about that. Well, looks like that's -- I think -- I think that's probably right because they show a p-value of .001 and they say that's identical. So, I believe that they did an analysis, as you said, to show sameness or equivalence, yes.
Q. Now, Doctor, these were both published around the same time utilizing the same database, but Mohy-ud-din shows the risk of all cancers to be identical between ranitidine and famotidine and Kim DDW shows statistically significant decreased risk from famotidine versus ranitidine, correct?
MR. SHEEHAN: Objection. Completely mischaracterizes the data. You're comparing --
MR. NIGH: Tom, this is an appropriate speaking objection.

Page 299

(Cross-talk.)
MR. NIGH: This is completely in appropriate --
MR. SHEEHAN: What --
(Cross-talk.)
MR. NIGH: No, I'm not gonna let you finish, we'll call the judge if you want to litter with in appropriate speaking objections.
MR. SHEEHAN: Call him up. If you're gonna -- if you're going to make such blatant misrepresentations, please do call the judge.
MR. NIGH: You can question him afterwards. My question stands, it's not a misrepresentation. This is completely inappropriate --
MR. SHEEHAN: Holy cow.
MR. NIGH: -- and you know it.
MR. SHEEHAN: I don't know, Dan. I don't. No, I don't. I don't know it at all.
(Cross-talk.)
MR. NIGH: It is completely inappropriate.

Page 300

MR. SHEEHAN: I will object to such blatant misrepresentations.
MR. NIGH: There is no doubt it's inappropriate.
BY MR. NIGH:
Q. My question again --
MR. NIGH: You've -- that was a completely inappropriate objection.
Q. My question is --
MR. SHEEHAN: I disagree. I disagree with you, Dan.
Q. -- as you --
MR. NIGH: I understand you disagree and we'll bring it up later.
Q. My question right now is --
MR. SHEEHAN: Please do. Please do. Make me a promise.
Q. As you compare the results of the Mohy-ud-din abstract compared to the results in the Kim abstract, Mohy-ud-din found the rates to be identical, the Kim abstract finds the rates to be statistically significant decrease for famotidine compared to ranitidine, right?
MR. SHEEHAN: Same objection based

Page 301

on a misrepresentation of the data.
A. So, I looked at both these studies and I think that -- excuse me. I don't think that the studies and their conclusions are at all inconsistent and let me explain why:
I think in both -- both studies they're showing that the overall cancer rate was lower in the ranitidine group compared to the famotidine group. And as you pointed out in the Kim study, they did an analysis and actually showed that ranitidine was statistically lower than famotidine in their study. And this is of course explained by the greater risk factors in the famotidine group as you have pointed out.
Now, in the Mohy-ud-din study the rates of cancer in the ranitidine group are lower, I don't see a p-value here at least, in this abstract, comparing ranitidine to famotidine. I'm guessing it wasn't statistically significant even though it was lower. So, they went back and, although they're saying they're exactly identical, that's not the entire patient group. They clearly point out that what they did was they

looked at just the subgroup of subjects without risk factors in the groups. So, that's a subset of the ranitidine and famotidine patients. And then they compared them and they -- and they found and came to the conclusion that basically they are -- the two group -- abstracts taken together do indicate that the difference between ranitidine and famotidine shown in the Kim study is almost certainly due to the change in the risk factors, the baseline characteristics of the two groups and not to the two drugs.
So, it seems pretty clear that in the ab- -- if you had patients that had the same risk factors, the two drugs would behave identically. And so, that's the way I would take the two abstracts taken together and the way I interpreted the data.
Q. I understand.
And so, as you look at the Mohy-ud-din finding, that's what we have up here on the screen, you see overall incidence of cancer was 26.4 percent, 31.1 percent and 13 percent in ranitidine, famotidine and


general population.
So, I think your -- as you just addressed, the overall cancer incidence for the famotidine users was higher than the overall cancer incidence for the ranitidine users before adjusting for these confounding factors in the study, correct?
MR. SHEEHAN: Objection.
A. That is my interpretation of the data, yes.
Q. And then ranitidine users was -- the overall incidence of cancer for ranitidine users was higher than the general population, correct?
A. So, the cancer incidence for ranitidine was -- was 26.4 percent compared to 13 percent for the general population and I think as you pointed out, what's driving any of these differences are the baseline characteristics of the individuals. And the fact that patients on acid suppressive drugs, H2 blockers or PPIs, tend to be sicker than the general population, that's why the cancer rates in general, all these studies are higher in non -- patients that are not taking


active comparators.
So -- so, yes, it is higher in the ranitidine group compared to the general population.
Q. Now, the Kim study doesn't ever give you the comparison of the ranitidine incidence of cancer for ranitidine compared to the general population, correct?
A. Let me go back and look at that.
So, they didn't -- doesn't appear they included nonactive users, just the ranitidine, famotidine omeprazole cohorts. So, instead of a general -- a non -- non-active comparator, they included omeprazole cohort, yeah, in the Kim study.
Q. Okay.
MR. NIGH: Let's go ahead and take both of these down and let's go ahead and pull up LP447.
Q. Doctor, are you aware that other defense experts are relying on unpublished draft papers that were obtained in response to subpoenas for this litigation?
MR. SHEEHAN: Objection.
A. Well, I've looked at the other


expert reports. I don't recall specifically references to unpublished draft reports, so I'd have to look at specific examples.
Q. Doctor, are you aware that Dr. Bumpus is a defense expert who was testified that she relied on Braunstein's unpublished manuscript?
MR. SHEEHAN: Objection.
A. I did see a reference in Dr. Bumpus' report to a Braunstein paper, yes, I don't recall -- did not recall that it was unpublished.
MR. NIGH: Now, this is marked as Exhibit 6673.
(Exhibit 6673 was marked for identification.)
BY MR. NIGH:
Q. And the title is Incidence of Cancer Among Users of Ranitidine: Results of a Cohort Study of 65 million US adults. And the first author is Dr. Mohy-ud-din.
Do you see that?
A. Yes.
Q. And Doctor, as you turn through the pages, we can see that this is a draft

Page 306

manuscript for the full publication study.
You see that?
A. Yes, it's a full manuscript.
Q. And Doctor, I'll draw your attention to page 11, Table 4.
MR. NIGH: If we can blow up that table.
Q. Here it shows an analysis of the incidence of cancer with ranitidine versus the general population with adjustment for risk factors.
Do you see that?
A. Yes.
Q. And for all cancers compared to ranitidine users compared to the general population.
Do you see the odds ratio of 6.38?
A. Yes, I do.
Q. Now, Doctor, in terms of any of the other ranitidine studies, epidemiological studies that compare ranitidine to the general population or to odd -- or to non-users, none of those other studies have findings even close to a sixfold increase when comparing ranitidine users to the

Page 307

general population for all cancers, correct?
A. I -- I think this is a bit of an outlier, it does seem higher than anything I remember reading in any of the other studies. So, I'd say that what you're saying is true, it's probably an outlier.
Q. And Doctor, specifically as we look at liver cancer, we go to the second page, you see liver cancer with an odds ratio of 9.12.
Do you see that?
A. Yes.
Q. And that would be the odds ratio that they're reporting in this draft manuscript for ranitidine users versus general population with adjustment for risk factors, right?
MR. SHEEHAN: Objection.
A. I'm sorry, can you repeat that question?
Q. I said, and that would be the odds ratio that they're reporting in this draft manuscript for the incident of cancer with ranitidine versus general population with adjustment for risk factors, correct?

Page 308

A. Yeah. So, I believe that's the odds ratio with the adjustment for risk factors. So, I think looking at these numbers and the different cancers, I think this is really -- a good example of why, I guess, in these sorts of case-control studies it hasn't pointed out that even adjusting for risk factors the factors of confounding by indication in reverse causality can never be completely controlled for. It's almost certainly the case that this is due to the fact that this -- the patient population taking ranitidine is sicker and more likely to take the drug for symptomatic reasons. So, although the numbers here are -- certainly appear to be a lot higher than we've seen in other studies, I'm totally convinced this is another example of confounding in these sort of case control studies.
Q. Doctor, there's no other study where they compared liver cancer to -- from the general population with -- versus ranitidine users and found a ninefold increase after adjustment for risk factors.

Page 309

There's no other study that you've looked at that's even close to that finding, right?
A. No. And it's not just -- it's interesting you're just looking at the liver cancer here. You know, if you look at, in fact, all the -- all the cancers in your tables seem to be a lot higher in the same range. Again, pointing to sort of a lack of specificity here.
So, yes, all the numbers are higher than I've seen in other studies.
Q. And I'm gonna point out the other ones, but you're right, all of them are much higher than the odds ratio for any other study where they've compared ranitidine to the general population, correct?
A. Correct. Can I -- if I could clarify. This is a manuscript now, has this been published or has this not been published?
Q. It's a draft manuscript.
A. Draft manuscript, okay. Understood.
Q. And you'd never seen this information before today, correct?

A. I don't recall this manuscript, but I looked at a lot of things, so I can't say for sure, but I don't remember seeing this before.

Q. And the esophogeal, when comparing the ranitidine users to the general population showed an odds ratio of over tenfold increased risk for the ranitidine users after adjusting for the confounding factors that they adjust for, correct?

A. Correct. Those are the numbers.

Q. But there's no other -- sorry. I didn't know if you weren't done.

A. No, I was just gonna say that -- that this is interesting and it certainly raises questions on why the results here are different from all the other studies that I've really looked at many of the same things. I'd be interested in sort of reading this further and understanding how they arrived at their analysis. But I would say that it really doesn't change my opinion at all that I don't think this at all demonstrates that ranitidine is carcinogenic. And again, I think almost all of this is --



is confounding by indication and reverse causality and so it really doesn't change my opinion. I'd be interested to look in and see if they did a lag analysis at all.

But any case, we can discuss this further or move on, however you like.

Q. Well, the question is, doesn't the fact that this finding comparing ranitidine to the general population that it's wildly different than all the other databases where this has been studied, doesn't this call into question the Explorys Database as a whole?

MR. SHEEHAN: Objection.

A. I don't -- so, I can't answer that question without reading these papers in more detail. Is it a question of the Explorys Database? Is it a question of the type or approach to the analysis? Is it something about the way the researcher did this particular analysis? I don't know. I mean, but I certainly would say that -- and this is a draft manuscript. I mean who knows if now the authors have analyzed the data in more detail and come to a completely set -- different set of numbers and figures in their



final submission that this is a work in progress.

So, I -- I don't think you should read too much into a draft manuscript in terms of making any big conclusions. But, yeah, that's all I can -- I can say for now about this particular study.

Q. Doctor, do you realize this draft manuscript was submitted to various journals for attempted publication?

MR. SHEEHAN: Objection.

A. Again, this is the first time I'm seeing the manuscript, so obviously I don't know about the history of this manuscript being submitted. And so -- so, no, I'm not aware of that.

Q. Isn't it true that these -- actually, strike that.

MR. NIGH: Let's take a look at -- let's go ahead and take this down, take a look at LP441. This is marked as Exhibit 6674.

(Exhibit 6674 was marked for identification.)

BY MR. NIGH:



Q. And Doctor, I'm going to draw your attention to the second to last page, so if we can go there. The page right before this one at the bottom you can see an e-mail.

You see that?

A. Yes, I see the e-mail and there's some things whited out there, but anyway, or blacked out, yeah.

Q. Yeah, some much the --

A. AP&T, I know that journal.

Q. Some of the recipients and/or those that are cc'd has been redacted or blacked out, correct?

A. Yes, and it's from Colin Howden who I just saw at the DDW meeting two days ago. So, yes, I know the editor. And yes, I can see it's a decision letter.

Q. You know Colin Howden?

A. I do.

Q. How do you know Colin Howden?

A. He is a gastric clinical researcher.

Q. And so, as a gastric clinical researcher, how do you know him?

A. I'm a gastric researcher as well.

Page 314

He's a member of the AGA and I've been at many meetings with Colin.
Q. Okay. And do you see in the CC you see that G. Mohy-ud-din?
A. Yes, I see that.
Q. And here it says:
Dear, Dr. Thakkar, your paper Incidence of Cancer Among Users of Ranitidine Results of a Cohort Study of 65 million US --
MR. NIGH: Take a look at the second page, the next page, if we can blow that up.
Q. -- of 65 million US adults has now been reviewed preliminary by members of the AP&T editorial team.
Do you see that?
A. Yes.
Q. And you said you know what the AP&T refers to?
A. Yes, it's elementary, pharmaceutical, oncology and therapeutics, it's a journal that does primarily a sort of digestive GI journal, yes.
Q. Next it says:
Unfortunately, we are unable to

Page 315

accept your paper for publication at AP&T. We felt AP&T was not the most suitable journal for this study. We respectfully suggest this would be better suited for a pharmacy journal. There is insufficient information obtainable from the database related to the duration of ranitidine use.
Do you see that?
A. Yes.
Q. So, the reason that they give for rejecting the publication is that there's insufficient information obtainable from the Explorys Database related to the duration of ranitidine use.
Do you see that?
A. Yes, I do.
Q. Do you realize the Kim study has the same problem?
MR. SHEEHAN: Objection.
A. So, again, I've read and written a lot of these sort of decision letters. I wouldn't necessarily put too much weight into the rationale that they're giving for rejecting the paper. Usually, the editors, when they look at a paper like this, sort of,

Page 316

they comment on the quality and interest of the manuscript to their readership. Many times when they -- when we write rejection letters like this, we find some reason that is comprehensible as opposed to saying, we just didn't like the paper or felt that it was interesting.
So -- so, again, certainly it's a criticism that can be made of a lot of clinical studies, but these sorts of comments and decision letters, you know, they don't -- may not seem fair since in fact other papers have been published with the same weaknesses.
Again, I just wouldn't read that much into it in terms of evaluating this paper. I, myself, you know, I don't think that -- that's necessarily a fatal flaw, but if the editors are not interested in this paper, they could certainly use that as a rationale I suppose. So, that's all I can say, I don't think you can read too much into these sorts of decision letters.
Q. Next it states:
Since we have no clear idea as to the extent of the NDMA contamination, nor

Page 317

when it first occurred, it is unsurprising even if the contaminant does act as a carcinogen, that you were unable to find increased rates of various cancers among individuals who had been exposed to ranitidine.
Do you see that?
A. Yes, I see that.
Q. Doctor, are you aware that one or more of the Kim study authors have been previously paid by Johnson & Johnson?
MR. SHEEHAN: Objection.
A. I'm sorry, I don't know much about the Kim authors. Certainly don't know anything about their relationship with various pharmaceutical companies. Can't comment on that.
Q. Are you aware of whether Johnson & Johnson has a financial interest in the outcome of this litigation?
MR. SHEEHAN: Objection.
A. I don't know in detail issues regarding Johnson & Johnson's financial interests, that's certainly not something I'm really aware of.

Page 318

Q. You wouldn't have considered that as part of your opinion in this case, correct?
A. I'm sorry, can you repeat the question?
Q. I said, you wouldn't have considered that as part of your opinion in this case, correct?
A. I wouldn't have considered what? I'm sorry.
Q. That one or more of the study authors have been paid by Johnson & Johnson and whether Johnson & Johnson has a financial interest in the outcome of this litigation?
MR. SHEEHAN: Objection.
A. Now, are you speaking specifically to a particular paper at this point? Are you talking about the Kim paper?
Q. The Y. Kim paper yes?
A. The Y. Kim paper. The paper or abstract?
Q. Both. They both have the same authors.
A. Yes, yes. So, again, and it's not something I considered in great detail,

Page 319

industry relationships. No, wasn't really a factor in looking at their data.
Q. Okay. You said not in great detail, industry relationships, did you consider that for any of the ranitidine epidemiological studies?
MR. SHEEHAN: Objection.
A. I was not aware of any industry ties for -- that were apart from those that were sort of indicated in the -- in the -- in the acknowledgments. I didn't really look into detail into the industry ties.
Q. Okay.
MR. NIGH: Let's go ahead and take this down.
Let's take a look at the Kim published the Y. Kim published study, LP432. This will be marked as Exhibit 6675.
(Exhibit 6675 was marked for identification.)
BY MR. NIGH:
Q. Doctor, see that this states, No association between chronic use of ranitidine, compared with omeprazole or

Page 320

famotidine, and gastrointestinal malignancies. And the first author is Y.D. Kim?
You see that?
A. Yes, I see that.
Q. Doctor, the Explorys Database, do you understand that it uses a combination of SNOMED and ICD-9 codes. Sorry, strike that.
The Explorys Database, do you understand that it uses a combination and SNOMED and ICD codes?
A. Yeah, says in the -- it mentions SNOMED-CT codes, and I'm also very familiar with ICD-9 codes and that's -- that's not atypical for medical databases.
Q. Have you seen any publications that discuss the problems with being able to match these codes utilizing the Explorys Database?
MR. SHEEHAN: Objection.
A. I haven't looked in detail, I haven't seen specific manuscripts talking about the difficulties, but I do understand in terms of clinical research that a lot of these codes, particularly ICD-9, are primarily designed for billing. And so, in

Page 321

terms of clinical research, researchers in general struggle a bit to find the information they want on patient diagnoses and patient care in the way they would like to do clinical research.
So, I understand the challenges of clinical databases and also matching up codes, so I haven't read specific papers about that, but I'm familiar with the challenge.
Q. Did you check for any validation of these SNOMED codes?
A. No, I haven't checked for validation of SNOMED codes.
Q. Did you note in your report any validation of these SNOMED codes?
A. No, my report does not mention any validation of SNOMED codes.
Q. Are you aware that for age, gender, race, ethnicity, tobacco and alcohol, Explorys has a custom autology?
MR. SHEEHAN: Objection.
A. I'm afraid I don't know the details of that aspect of the Explorys Database.
Q. Are you aware in a 2017 study of

esophagitis, validation of the SNOMED codes was not possible?
MR. SHEEHAN: Objection.
A. I'm not familiar with that item that you just referred to.
Q. Are you aware if there's a lack of the ability to validate the codes utilized in an insurance claims database, that that can call into question the validity of the results of the study?
MR. SHEEHAN: Objection.
A. Well, I would certainly say that some validation of the codes is always useful, but certainly doesn't invalidate the findings from any particular study.
Q. Are you aware that other studies have suggested that the inability to validate the SNOMED codes invalidated the findings of the study?
MR. SHEEHAN: Objection.
A. I haven't heard specific criticism of this study based on SNOMED codes, no.
Q. Are you aware that the -- this study can only report aggregate data?
A. I don't know about that limitation.


Q. Have you noticed that all the information, the findings have to be rounded to tens, can't report individual data?
MR. SHEEHAN: Objection.
A. Let me take a second to read through this study design here since this seems to be so interesting.
It actually says they used ICD-10, I think you said ICD-9, but you probably meant ICD-10, that's what it says on the paper.
Q. I actually struck my question on the ICD-9 and reworded it and said ICD codes, so, yes.
A. Okay. Thank you. Thank you for that correction.
Okay. We're talking about the -- I'm sorry, the aggregation of data for analysis.
Q. Make it a little bit more clear, maybe this will help.
MR. NIGH: If we can go to Table 1, page 5, and let's go ahead and just blow up, you know, some of those findings, the first half.


Q. You notice how every single finding, the end number, the number of people with a certain age, the -- what their gender, all of them are rounded to ten?
A. Yeah, that does seem a bit unusual, doesn't it?
Q. And if you look at the bottom half of the table, you can see that's still true, they're all rounded to ten?
A. Yes, I see that.
Q. And if you take a look at the next page, you see the same thing.
MR. NIGH: Can we blow up that table?
Q. They're all rounded to ten.
A. Yes, that's correct.
Q. Okay.
MR. NIGH: Let's go ahead and take that down.
Q. And were you also aware that the incidence data is always queried on a one-year basis?
MR. SHEEHAN: Objection.
Q. Go to Study design, we pull that up and you can see it says, incidence data for


each cancer were queried up to ten years in one-year intervals.
Do you see that?
A. Yes, it's under study design. I can -- I can see that that's -- incidence data for cancer queried up to ten years in one-year intervals, with the first-time cancer diagnosis indexed at a minimum of one-year following initiation of anti-reflex therapy.
Q. And Doctor, this means that if a person entered the database on January 1st, cancer risk would be counted for one year, for the whole year. And if a person entered that database on December 30th, there would only be one day of risk, but it would still be counted as a whole year. Each person would contribute one person year regardless of the date, specific date as to when they actually have the cancer, correct?
MR. SHEEHAN: Objection.
A. I'm not actually sure about that, but I do understand they used one-year intervals. I'm not sure exactly how they used that, but what you said sounds like a --

plausible approach, but I can't confirm that that's exactly what they did.
Q. And Doctor, because there is no individualized data, the people can move in and out of the database and you wouldn't be able to detect that, correct?
MR. SHEEHAN: Objection.
A. I can't -- I can't reach that conclusion yet on my own. Not sure about that.
Q. Did you look to see if there are any other studies that showed how often people move in and out of this database?
A. Are you asking specifically about this Explorys Database?
Q. Yes.
A. I don't have any further information about that question.
Q. And this database also has no way of knowing if someone died, correct?
A. Again, I don't know enough about this database to comment on that.
MR. NIGH: Okay, we can go ahead and take that down. Actually, let's pull it back up. And let's go to page



5. No, never mind. Take it down.
Let's go ahead and pull up the Adami study. This is LP618. This is marked as Exhibit 6676.
(Exhibit 6676 was marked for identification.)
BY MR. NIGH:
Q. Doctor, the first thing -- first off, the title of this article is, Ranitidine Use and Risk of Upper Gastrointestinal Cancers and the first author is Dr. Adami, correct?
A. That's correct.
Q. And if we look at the Authors' Disclosure on 2308. We can also see it discusses the authors' disclosure H.-O Adami and E.T. Chang report consulting for Sanofi and ranitidine litigation and E.T. Chang has provided ongoing consulting support for Sanofi in other matters.
Do you see that?
A. Yes, I do.
Q. So, they do disclose that they were reporting and/or continued to report -- consult for Sanofi for the ranitidine



litigation, correct?
MR. SHEEHAN: Objection.
A. Well, they report they have consulted for Sanofi in ranitidine litigation. It doesn't say what time period. I don't know anymore details than that.
Q. Doctor, are you aware of whether or not E.T. Chang worked for a company that is known to provide consulting for pharmaceutical industry?
MR. SHEEHAN: Objection.
A. I don't know much background about E.T. Chang.
Q. Are you aware of whether or not E.T. Chang works for a consulting firm that has been accused of manipulating scientific studies that are published, have you heard anything about that?
MR. SHEEHAN: Objection. I wasn't sure whether you were done there, Dan. Objection.
MR. NIGH: No problem.
A. I don't know anything about that. It says in the acknowledgements that E.T. Chang works for the Center for Health



Sciences Exponent, Inc., Menlo Park, California.
Q. Are you aware -- sorry, go ahead. You can finish.
A. That's all I know. Go ahead.
Q. Are you aware of whether or not Exponent has been accused of manipulating scientific articles and publications?
MR. SHEEHAN: Objection.
Q. Your volume just went out.
A. I have no knowledge of that, I don't know that to be true.
Q. So, you certainly wouldn't have considered that as you formulated your opinion, correct?
A. I have not considered things that I have no knowledge of, that would be correct.
MR. NIGH: Let's go ahead and take a look at page 3, this is Table 1. It's 2304. That's the -- right here. We can go ahead and blow up that table. Thank you.
Q. And Doctor, this table shows baseline characteristics of cohort participants.

Do you see that?
A. Yes.
Q. Now, in terms of underlying gastrointestinal disease, do you see where it shows that 2.6 percent of the ranitidine population have GERD?
A. Yes, I see that.
Q. Do you see where it says 1.2 percent of the other H2RAs had GERD?
A. Yes, I see that.
Q. Do you see where it shows 2.5 percent of the PPI population had GERD?
A. Yes, I see that.
Q. Doctor, do those numbers make any sense in terms of what you understand to be the incidence of GERD for people that are taking H2RAs and PPIs?
A. It does seem a little bit low, I can't really comment more than that. My experience, patients treated with H2 blockers and PPIs have a higher incidence of GERD, but -- and I don't know if the issue is their -- their database or their particular patient mix, there are a lot of other significant diseases here for which the PPIs



and H2 blockers are being used. So, yeah, I really can't comment except to say it seems a little bit low.
Q. Doctor, have you looked at the incidence of the GERD in Denmark?
A. Not specifically in Denmark. I imagine it's similar to the US, although they're not as obese, so probably less than the US.
Q. And this -- this publication, it's looking at the Danish population, Denmark, correct?
A. This is a study based on the Danish prescription registry, so I would assume that most of the patients would be Danish.
Q. Doctor, did you review any materials that demonstrate that the incidence of GERD in benchmark is over 20 percent?
MR. SHEEHAN: Objection.
A. I don't know the exact number. Twenty percent is again pretty close to the US numbers, I would've thought it would've been less. So, I can't tell you the exact number in Denmark.
Q. And are you aware of whether the



incidence in Denmark or people taking ranitidine or other H2RAs or PPIs is higher than 20 percent?
A. I'm sorry, can you repeat that question?
Q. Are you aware of whether the incidence of people that have GERD for ranitidine users other H2RAs or PPI users is higher than 20 percent?
MR. SHEEHAN: Objection.
A. Higher than 20 percent for GERD? Certainly depends a certain -- of course how you define GERD, whether it's -- it's two to three times a week of symptoms or more. I don't think it's higher than 20 percent. That's probably around that or lower, depending on what country you look at.
Q. Doctor, have you reviewed any of the Denmark data that demonstrates that most of the people are taking H2RAs or PPIs with the diagnosis of GERD?
MR. SHEEHAN: Objection.
A. Again, I'm not sure what data you're referring to, but I think, you know, GERD is one of the primary indications for



taking H2R blockers or PPIs.
Q. Doctor, did you ever look at the Schaffalitzky study?
A. Schaffalitzky? I don't think that's on my records list, so I may not have looked at that. I certainly don't recall the name.
Q. Doctor, are you aware that the Danish National Patient Registry, whether or not it includes -- are you aware -- sorry, strike that.
Are you aware that the Danish National Patient Registry does not include medications used in the hospital?
MR. SHEEHAN: Objection.
A. Not that familiar with the Danish Patient Registry, so I don't know whether that to be true or not.
Q. Doctor, the cohort for ranitidine in this study had no subjects over 64 years of age at index date and it had a median age of 50 years old, correct?
A. The median age in all the groups were in around 50, it does appear that's correct. What was the first part of your

Page 334

question? I'm sorry.

Q. In the Adami study for the ranitidine cohort had no subjects that were over the age of 64 at index date, correct?

A. They range from 36 to 64, so that's -- that is correct.

Q. And Doctor, the median age for being diagnosed with stomach cancer, pancreatic cancer, liver cancer and esophogeal cancer is over 64 years old, correct?

MR. SHEEHAN: Objection.

A. The median age is around the 60s to 70s in the US for gastric cancer and esophogeal cancer.

Q. Doctor, do you know what percentage of -- what percentage of ranitidine users that they had the information on whether they were a smoker or not in the Adami study?

A. Your question is whether we have information on smoking on these patient cohorts? I'm looking through the tables here. I don't see that information offhand. I don't know whether it was present in the Danish National Patient Registry or not.

Page 335

They retrieved a lot of data here, mostly diagnoses and medications, but I don't see -- they may not have had patient risk factors such as smoking.

Q. Doctor, do you know what factors were adjusted for in their sIPT adjustment?

MR. SHEEHAN: Objection.

A. Let's see, in terms of their statistical analysis, it says they made an adjustment with their sIPT, which you had referred to earlier, I think, in a question to me and doesn't really go into details.

As you know, the inverse probability of the treatment weights the sIPT as you referred to is meant to balance the two patient groups with specific, perhaps, risk factors, but it doesn't -- certainly doesn't -- they do reference it, reference 23. So, maybe that's a published methodology. Perhaps if you wanted we can look at that. But they did try to balance them out using incidence probability of treatment weights.

Q. And Doctor, I'll go to 2303, under Statistical Analyses, we can look at that.

Page 336

MR. NIGH: And we'll blow up the second paragraph under statistical analyses.

Q. Do you see where it says:

To control for potential confounding, we then used the propensity scores to compute stabilize inverse probability of treatment weights.

Do you see that?

A. Yes, I was just reading from that sentence and you reference 23, yes.

Q. Do you know what factors they looked at -- what potential confounding factors are part of that sIPT specifically for this study?

A. I think I already answered that question just now indicating that they don't have the information here in this paper and that potentially there's some more clues about it in reference 23, but it doesn't indicate it in the methodology that I read through.

Q. Doctor, isn't it important that those sorts of diagnostics are published in the paper of supplemental materials?

Page 337

MR. SHEEHAN: Objection.

A. Well, often they are. They're not always included in -- ideally they -- a lot of information such as that would be included. Again, if the approach is more or less standard or pretty established from a previous publication because of space limitations, such information isn't always included and sometimes it's referenced as it seems to be here. But, again, I -- I haven't checked the reference, so I don't know if it includes additional information about how they use sIPT in this particular instance.

Q. Doctor, isn't it true because there's no gold standard how to judge that a good sample balance has been achieved, previous studies suggest that they need to publish what their samples looked at before and after sIPT so that they can prove that they have conducted the balancing correctly?

MR. SHEEHAN: Objection.

A. I can't say for sure if that's a standard in -- in the literature or in clinical studies, but certainly more transparency is always desirable.

Page 338

Q. Have you looked for studies that show that they -- that -- when adjusting for stabilized inverse probability of treatment, that the papers should publish what their samples look like before and after a stabilized inverse probability treatment of weighting, so that they can prove that they conducted the balancing correctly?
MR. SHEEHAN: Objection. Asked and answered.
A. Yes. As I just stated, I don't know that that's necessarily the standard in the field, but again, better -- more transparency is always desirable.
Q. My question actually, the beginning part, is different so, I'm gonna ask it again.
Have you looked for that to see what the standard is in terms of reporting on stabilized inverse probability of treatment weights?
MR. SHEEHAN: Objection.
A. Well, I would say that I have not looked in more detail about standards for stabilized inverse probability of treatment

Page 339

weights. It's -- this approach is -- you know, there's different approaches to try to match your two groups and one approach is, you know, in case-control series is match your patients exactly in these sorts of cohort models. You're not allowed to sort of match your controls exactly, so there's different approaches to try and balance them out. Linear aggression models is one, sIPT is another. I haven't looked in terms of the literature in terms of what the standard is in the field, so -- and I haven't researched in more detail standards for sIPT.
So, I guess the answer to your question is, no, I have not.
Q. Doctor, have you looked for publications that discuss the difficulties in assessing risks for drugs when over the counter use is prevalent?
MR. SHEEHAN: Objection.
A. I have not researched that question in detail, but I am familiar with the challenges of doing drug studies when there is over-the-counter use. I understand that that's always a limitation, although many

Page 340

investigators will try to query patients if it's a prospective study, but certainly in these sorts of retrospective analyses there certainly could be some contamination. So -- so, it's one of the limitations of the field, that that's something you have to live with as a clinical investigator.
Q. Doctor, are you aware that the Adami study shows higher over-the-counter usage for a higher percentage of over-the-counter usage versus prescription usage for ranitidine versus famotidine and PPIs?
MR. SHEEHAN: Objection.
A. I don't remember seeing that in the study.
MR. NIGH: Let's go ahead and take a look at the Supplemental 2 materials. Mark this as L -- this is LP487. We'll mark this -- we'll mark this as Exhibit 6677.
(Exhibit 6677 was marked for identification.)
BY MR. NIGH:
Q. Doctor, you see here it says

Page 341

Supplemental material?
A. Yeah, I do see Supplemental material.
MR. NIGH: Let's take a look at page 2 at the bottom -- it's bottom right corner, page two.
Q. Says supplemental tab- -- Supplementary Table 2, the annual proportion of defined daily doses of medication sold by prescription in Denmark.
Do you see that?
A. Yes, I do.
Q. And you'll notice that between 2005 to 2018, it does not report the percentage for famotidine, correct?
A. Yes, it's missing that information.
Q. But if you compare 1999 to 2004, you can see that ranitidine, it starts at 84 percent it drops to 49 percent, correct?
A. Yes, ranitidine dropped in terms of the portion of the defined daily doses and medication sold by prescription. So, suggests fewer prescriptions of ranitidine and perhaps more growth of other drugs perhaps. Yeah.

Page 342

Q. That would suggest the percentage that it's available by prescription, the other way that it's available is via over-the-counter, correct?
A. Yes, that's true.
Q. Okay. So, as the prescript- -- as the percentages drop for being available by prescription, you would assume the percentages increase for being available via over-the-counter, correct?
MR. SHEEHAN: Objection.
A. I understand what you're saying and the math sort of makes sense, but I'm just not sure if it's the right conclusion or not. All I can see is the data before me, the percent of medications sold by prescription, yeah.
Q. As you could see that ranitidine drops from 84 percent to 49 percent, but famotidine holds pretty steady from 98 percent to 97 percent between the years of 1999 and 2004, correct?
A. Yes, I do see that.
Q. Were you aware of these differences as to how ranitidine is prescribed versus

Page 343

famotidine prescribed in the Danish population?
MR. SHEEHAN: Objection.
A. Well, I hadn't looked at these numbers recently. I did know that they were available over-the-counter, yes.
MR. SHEEHAN: We've been going about an hour and 20, Dan. Do you have more on this study or...
MR. NIGH: Give me about, if we can, one or two more minutes, I'm gonna see if I have anything else on this. Actually, you know, we can go and take a break for ten minutes now.
THE VIDEOGRAPHER: The time is 22:12 UTC. We're going off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We're back on the record. The time is 22:36 UTC.
BY MR. NIGH:
Q. Doctor, you reviewed the Hidajat study, correct?
A. Yes, I did review the Hidajat

Page 344

study.
Q. And you reviewed other studies where they explained the exposure assessment, correct?
A. Are you asking did I review other occupational studies?
Q. Other studies that explain the exposure assessment that was utilized in the Hidajat study, correct?
A. Yes.
Q. Doctor, are you aware if there's any correlation between amounts of exposure to NDMA and rubber dust or rubber fumes?
MR. SHEEHAN: Objection.
A. Well, I think it's pretty clear that rubber fumes include a number of carcinogenic substances that includes NDMA. So, yes, I think there is correlation between exposure to rubber fumes and NDMA levels.
Q. Have you seen any calculations in any of the exposure documents where they're measuring the amounts of exposure to rubber dust and rubber fumes versus the amount of exposure to NDMA in the various departments?
MR. SHEEHAN: Objection.

Page 345

A. Sorry, in the various departments?
Q. Departments of the factory, yes, factories.
A. Oh, different parts of the factory?
Q. Yes.
A. I understand what you're saying.
I don't recall the breakdown by departments in the factory, but I have seen estimates of exposure based on working in the rubber plant certainly in the fumes.
Q. Doctor, are you aware of whether these exposure assessment studies for these factories as discussed in the Hidajat study demonstrates that people in the vulcanizing department are exposed to high amounts of the NDMA compared to other departments in the factory?
A. The vulcanizing department, that's interesting. I don't recall specifically about the vulcanizing department, but I would not be surprised if certain jobs within the rubber industry, certain departments would have higher exposure and it would makes sense to me that vulcanizing would be one of the higher ones, yeah.

Page 346

Q. Are you aware that people in the vulcanizing departments are exposed to lower amounts of rubber dust and fumes compared to other departments in the factory?

MR. SHEEHAN: Objection.

A. Again, I -- as I answered before, I don't know the details of the different departments in the rubber industry.

Q. Are you aware that the exposure assessment studies actually demonstrate an inverse relationship that people exposed to higher amounts of NDMA in various departments are actually exposed to lower amounts of rub other dust and rubber fumes?

MR. SHEEHAN: Objection.

A. Again, I'm not aware of those details of that break down in the factory departments as you suggested.

Q. Are you aware of any correlation in terms of the quantity or the amounts of exposure to NDMA in these factories and any other carcinogen in these factories?

MR. SHEEHAN: Objection.

A. Well, I don't think -- in terms of the studies I've seen, a few chemicals have

Page 347

been looked at, but I think the primary focus has been on NDMA as a biomarker. Again, I think in terms of rubber dust exposure, there's an exposure to a diverse array of chemicals in the rubber industry, most of them have not been studied. So, I think because of the focus on NDMA, that there hasn't been as much interest in looking at other chemicals, but I think the majority of observers have suggested that it's probably a combination of chemicals and not just NDMA exposure. And again, I think inhalation certainly leads to higher amounts than oral injection and often bypasses first pass metabolism by the liver. So, there's no question that working in the rubber industry leads to specific carcinogenic exposure.

And if you're suggesting that the data supports that it's primarily NDMA, I think that's -- is not a conclusion that most organizations have reached yet.

Q. Doctor, are you aware of the purpose of a single pollutant model?

A. I'm aware of the single pollutant model, yes.

Page 348

Q. And that is to look at the increasing amount -- the affect based and on increasing amounts of that pollutant, correct?

A. I think --

MR. SHEEHAN: Give it a beat. Objection. Go ahead.

A. Yeah. So, I understand the rationale for doing the single pollutant model, I guess it's a simpler model to do, easier to investigate if your focus is on one particular chemical and to develop a model for. Of course, it's highly flawed in the sense that instead of -- makes the assumption that it's the only factor responsible. Often it could be a factor that's associated with another factor causing the actual carcinogenic injury.

So, I'm aware of what both the strengths and limitations of the single pollutant model and I just would not necessarily, based on those sorts of studies, necessarily reach the conclusion that that compound or that chemical is the primary culprit in carcinogenic injury.

Page 349

Q. In a single pollutant model, the shortcoming as to whether or not another pollutant may be driving the results, you would need to demonstrate or it would need to be that there's a higher corre- -- or there's a correlation or higher correlation in the amounts of one pollutant with the amounts of another pollutant, correct?

MR. SHEEHAN: Objection.

A. I think if you have data from a single pollutant model, you would need another chemical or another pathway to prove that there's something else causing it. But, again, many -- there have been many sort of misleading conclusions based on, sort of, a single identified factor when in fact it's often multiple factors that are involved.

So, I guess I would just say that I understand again the reasons for modeling using a single pollutant model, but I think it's highly limited and highly flawed and one just needs to be very careful in not making too many assumptions and conclusions based on that sort of data.

MR. NIGH: Okay, let's go ahead

and take a look at LP579. This will be marked as Exhibit 6678.

(Exhibit 6678 was marked for identification.)

BY MR. NIGH:

Q. And the title of this study, Chemicals Studied and Evaluated in Long-Term Carcinogenesis Bioassays by Both the Ramazzini Foundation and National Toxicology Program, in Tribute to Cesare Maltoni and David Rall.

Do you see that?

A. Yes, I see that.

Q. And the leading author here is James Huff?

A. Yes, James Huff.

Q. And this was published in 2002.

Do you see that?

A. Correct, 2002.

Q. Take a look at page 209 under the Introduction. Doctor, it says:

Long-term chemical carcinogenesis bioassays are the cornerstone for primary prevention and for protection of the worker and the general public from chemically and



occupationally associated cancers.

Do you see that?

A. Yes, I do.

Q. And do you agree with that statement?

A. Well, I'm not sure. I think -- so, the sentence is commenting on what is the best approach to protect the general public and here it's not cancer in general, it's from chemically and occupationally associated cancers, which are probably a very, very small minority of cancers, which, of course, we know are primarily induced by inflammatory injury and genetic inherited predispositions, but no doubt there are some cancers that are related to chemical and occupational injury. And so, they're saying the best way to protect them is from long-term chemical carcinogenesis bioassays. I think that's one approach. Whether they're really the Cornerstone, I don't know, but I think they are a available piece of information.

So -- so, I guess I have no major problem with this statement. I think it's sort of reasonable to sort of introduce



their -- their efforts, their work. And it is one approach to looking at chemicals that could be linked potentially to cancer.

MR. NIGH: Let's take a look at the next page, 210, under Carcinogenesis Bioassays. If we can blow up that first paragraph.

Q. Here it says:

Experimental long-term carcinogenesis bioassays are designed and carried out to identify potential carcinogenic effects for humans. Carcinogenesis results in rodents, mainly rats and mice, have been shown to be a consistent and reliable indicator and predictor of human cancer. All known human cancer carcinogens that have been evaluated adequately in animal bioassays are also carcinogenic in animal bioassays. Of the nearly 100 recognized human carcinogens, about one-third were shown first to be carcinogenic in experimental animals.

Do you see that?

A. Yes.

Q. Doctor, do you agree with these



statements?

A. I'm not sure. I think carcinogenesis studies in rodents, rats and mice had been useful. I would question whether -- they're actually suggesting it has a very, very high prediction rate, I'm not sure about that. In general, animal studies have not been shown to be highly predictive of human cancer biology. So, I would question that. There's no doubt that some and many human carcinogens have been shown to be carcinogenic in animal assays, but the reverse that every carcinogen shown to be active in rats and mice has been proven in humans, I would question that. It seems to be a bit of an overstatement.

So, I -- I can't agree with it, but I -- but I recognize that there is some correlation.

MR. NIGH: Let's take a look at LP580. This is marked as Exhibit 6679.

(Exhibit 6679 was marked for identification.)

MR. NIGH:

Page 354

Q. And do you see this, the title is Chemicals and Cancers in Humans: First Evidence in Experimental Animals.
Do you see that?
A. Yes, I do.
Q. And the author is Dr. Huff.
Do you see that?
A. Yes, Dr. Huff.
MR. NIGH: And the last two sentences of the summary, if we can blow that up.
Q. It says:
For those that can be studied experimentally, the qualitative concordance between humans and animals approaches unity, and in every case there as at least one common organ site of cancer in both species. The evidence of carcinogenicity in experimental animals preceded that observed in humans for nearly 30 agents and is the subject of this paper.
Do you see that?
A. Yes, I do.
Q. Doctor, were you aware of these statements by Dr. Huff that for those that

Page 355

can be studied experimentally, the qualitative concordance between humans and animals approaches unity?
A. So, I see his statement, it's an interesting statement. I don't know that many experimental toxicologists and carcinogenesis investigators who have parroted that broad statement. I would say it's interesting that this appears to be a single author paper, I am not sure who else agrees with this, but it's an interesting opinion. I mean, I guess he is very much in favor of animal models as being predictive of carcinogens, but many other investigators, and including Boushey, who I cite, has -- and others, have cautioned against extrapolating from animal models. And in my own experience, having done extensive carcinogenesis studies in animal models, I really would question how easy it is to extrapolate from -- from animal models, mice and rats to humans. So, I would -- I would disagree that there's such a linearity here that the concordance is -- he says approaches unity, I'm not sure exactly what he means.

Page 356

But I don't think it's such a linear step from humans and animals. And if it was, I think the IARC would've classified NDMA as a classic carcinogen if it was simply based on -- if the animal models were so predictive. And I think, to be honest, I agree that you cannot classify NDMA as a known human carcinogen and I would stick with my belief that it's possible human carcinogen, probably, you know -- and but is not a known human carcinogen. And so, you can't extrapolate so easily, you need human data.
Q. Doctor, are you aware that these two studies are very well-cited by numerous other study authors?
MR. SHEEHAN: Objection.
A. I don't know how many -- what the citation rate is for this. But no doubt this is something that would be of interest to other people who are studying carcinogenesis. And I don't know if they cite it in a positive or negative manner, but I -- certainly this would catch someone's eye to make such a dramatic statement based on --

Page 357

and again, I haven't seen all the evidence and the arguments, be happy to read through this paper, if you want. But I don't think I would agree with this conclusion at all, which is too broad and sweeping.
Q. Doctor, are you aware that your own publications have cited these two studies?
A. I don't recall which paper I might have used to cite this. But happy to listen and to hear which publication I used to cite this, this paper.
MR. NIGH: Let's take a look at -- let's take a look at page 205 of this study.
Q. Where it states, Experimental Chemical Carcinogenesis: First Evidence.
A. Okay, I see that.
Q. And specifically it states:
These chemical carcinogenesis results.
Do you see that?
A. Yes, I see that.
Q. It says:
These chemical carcinogenesis

results in laboratory animals frequently, if not always -- almost always constitute the primary basis for identifying and predicting potential human health hazards. Several chemicals identified first as causing cancer in laboratory animals show associations with human cancers.

Do you see that?

A. Yes.

Q. And do you see for that statement that's highlighted, there are numerous studies that are cited for this?

MR. SHEEHAN: Objection.

A. Yes, there are several references there, correct.

Q. And have you seen that those references also support that statement?

MR. SHEEHAN: Objection.

A. I have not seen those references yet, so I can't say what they support. But, again, I think the major question here is whether or not those chemicals are in fact human carcinogens in every case. There have been so many animal carcinogenesis studies done, I just think it's -- seems a reach to



say that it's always the case.

MR. NIGH: Let's take a look at 207.

Q. It states, the second paragraph:

The decades-old question remains: How confident should we be that consensus experimental carcinogens will predict cancers in populations exposed to the same chemical or exposure circumstance? History, biology, and theme of this paper certainly support concept of extrapolating carcinogenesis finding from animals to humans. Even more basic, will chemicals shown conclusively to cause cancers in laboratory animals also eventually be found to cause cancer in humans.

Do you see that?

A. Yes.

Q. And it says:

Ignoring for the moment the important and controversial issue of exposure, the answer is yes.

Do you see that?

A. Yes, I do.

Q. Do you agree with that statement?



A. As I've said before, I don't. There's a lot of broad talking conclusions here, I'd have to see all of the data and the examples in terms of whether the chemicals in the animal models were actually shown definitively to cause cancer in humans, which is a difficult proposition. So, I assume that this writer and investigator is making a number of assumptions about the human data. It almost seems as an advertisement or marketing tool for rodent carcinogenesis research and the importance of funding it perhaps, who knows what the motivation is.

But again, it just seems to be a gross overestimation, a gross overstatement regarding the value of rodent carcinogenesis studies based on my own experience.

Q. And let's take a look at the bottom paragraph, says:

Data reported herein show that nearly 25 to 30 percent of those agents, substances or chemicals that have been causally or strongly associated with cancer in humans were first identified as being carcinogenic in experimental animals.



Do you see that?

A. Yeah, that's interesting in the wording here. It really does make me wonder about -- even more about his conclusions and what he's really talking about here.

So, as I mentioned, the key thing is has the data been shown to prove that it's a human carcinogen. In other words, has every agent that's caused cancer in animals been shown to be a Class I carcinogen. In here, you can see where it begins to slip a bit, chemicals that have been causally or strongly associated, so that falls short of being a clear human carcinogen.

So, my best guess is, not having read this paper, is that he's using a broad umbrella to include anything that's a human carcinogen, perhaps anything classified as Class 1, 2 or even 3 by the IARC. So, I'm not -- just not sure what he's talking about here.

And, of course, what we're most interested in is things that are so clearly known carcinogens and I just -- again, from what you've shown me, the data seems to be

Page 362

missing -- convincing me that that's always the case.
Q. Doctor, isn't he talking about looking at those that are known human carcinogens and seeing how often it was confirmed that they were carcinogenic in animals and every time it's demonstrated as a known human carcinogen, it was demonstrated in animals that it's carcinogenic?
MR. SHEEHAN: Objection.
A. I don't know what he's talking about here.
Q. You couldn't infer that from the two sentences that I read from the summary previously?
A. Possibly he's saying that. Again, not sure it's true. I haven't seen the data. And I think it's almost certainly an overstatement.
Q. Have you ever looked at that, looked at studies that looked at the classified known human carcinogens and looked to see the animal study information to demonstrate that it has been confirmed, as long as there was adequate animal data, that

Page 363

it's been confirmed that it was carcinogenic in animals as well? Have you ever done that sort of research?
MR. SHEEHAN: Objection.
A. I have not looked at every human carcinogen or every animal carcinogenesis experiment. Again, I'm trying to understand now from what you said whether the question is whether every human -- known human carcinogen has been shown to be carcinogenic in animals that's probably closer to the case of the but whether every chemical or substance that's been shown to be carcinogenic animal models has later been shown to be a class one carcinogen. I don't think that's the case even based on my knowledge of animal experiments.
So, again, I'm finding his language and claims particularly broad and not specific enough, almost again seems like a cheerleading exercise for rodent carcinogenesis and just not buying it for now. Don't see the data.
Q. Doctor, isn't it true that when animal carcinogenicity has been confirmed

Page 364

around numerous species including pigs, monkeys -- sorry, pigs, monkeys. Strike that.
Doctor, isn't it true that when carcinogenicity has been demonstrated over numerous species that that is oftentimes very strong evidence that it's a human carcinogen?
MR. SHEEHAN: Objection. Asked and answered.
A. Again, sometimes, not always. And again, depends on the animal species. So, we'd agree that the larger the number of animal species that are -- that behave consistently with the carcinogen, the more likely it would probably be the case. Particularly as you were sort of alluding to, I know you struck that, but primates data would be key to convincing me that something is a human carcinogen. It's surprising that, for example, in the case of NDMA causes cancer in rats and mice, but so far no evidence in primates. So -- and the primates are very close to humans, so one can almost argue that that's -- that one example seems to disprove the entire conclusion here.

Page 365

So, I think these animal experiments are useful, but trying to suggest that it's close to unity, I think is a way overstatement of the data from the carcinogenesis field. And again, doesn't convince me, certainly that the animal experiments will always prove to be untrue in humans.
Q. I want to make sure I understand your testimony.
Doctor, you understand that other than rodents, NDMA has been demonstrated to be carcinogenic in numerous other species, including swine, correct?
MR. SHEEHAN: Objection.
A. So, several species, yes, that's correct.
Q. Including pigs -- I mean, including frogs, correct?
A. Yes, I did not review the frog data.
Q. It's been demonstrated to be carcinogenic in fish, correct?
MR. SHEEHAN: Objection.
A. I saw a reference to other nonhuman

Page 366

species, but I didn't review fish or frogs.

Q. It's been demonstrated to be carcinogenic in dogs, correct?

MR. SHEEHAN: Objection. Mischaracterizes the data.

A. I don't know that to be the case.

Q. It's been demonstrated to be carcinogenic in hamsters, correct?

A. I don't recall whether hamsters were studied or not.

Q. It's been demonstrated to be carcinogenic in several other mammals, correct?

MR. SHEEHAN: Objection.

A. I don't know how many -- I could not give you a total number. But again, as I pointed to before, what is most important is primates, non-human primates and humans. And I would say that again, carcinogens have not -- have not always been shown to be the same in humans as there are in animals. And again, human data is -- is really needed to evaluate and to conclude that a particular agent is carcinogenic in humans.

Q. And I want to make sure I

Page 367

understand this correctly, even though it's been demonstrated in all these other species, the fact that in the one study, the Thorgeirsson study, all the primates died after being administrated NDMA due to toxic effects, you would take that study and suggest that that showed -- demonstrates inner species differences that are more closely related to the -- to the humans?

MR. SHEEHAN: Objection.

A. I do think the primate data is important and requires one to be a little bit cautious about making conclusions to humans. And I'd also say that the -- the human exposure data is far from conclusive. It's a mixed bag. So, I think it's, as I said before, it's possible that NDMA is a human carcinogen, but the data is not conclusive.

Q. Doctor, do you believe that most cancers are not preventable?

A. Certainly some cancers are preventable. I think I've alluded to that a bit in my report. There have been several studies that have come out that I've actually challenged that said that cancer is simply a

Page 368

matter of bad luck, that all cancer is stochastic and simply ramR (phonetic) mutations, and that there's very little that slows down or accelerates cancer. And I'm not of the opinion that that's always the case as suggested in papers by some of the leading cancer researchers, Bert Vogelstein. So, I do think that some cancers can be prevented.

As you know, I'm the senior deputy editor of the Journal of Cancer Prevention Research, and part of the group that has advocated that many more cancers can and should be prevented and we should focus on prevention, rather than simply trying to treat a very difficult and recalcitrant Stage IV cancers.

So, yes, I believe that some are prevented and as outlined in my report, I do think that the majority of cancers are linked to chronic inflammatory disorders and outline this in terms of the GI cancers we discussed. Esophogeal cancer is primarily related to gastroesophageal reflux. Stomach cancer is primarily related Helicobacter pylori

Page 369

infection. Liver cancer is primarily related to inflammation of the liver from hepatitis B, hepatitis C, non-alcoholic fatty liver disease. And so, all these cancers have really known causes and known predisposing factors. And so, I think that these can be prevented in identifying these major sort of inflammatory risk factors is very important and could -- could certainly prevent a number of these cancers, if not the majority of them.

I'm almost convinced that other sort of environmental exposures or diet are as critical, but certainly they can modify these other major cancer pathogenic factors.

So, yes, I do believe that a lot of GI cancers can be prevented. Pancreatic cancer, of course, is the major one that's been the most difficult in terms of both identifying the premium classic conditions and identifying biomarkers and clinical factors that can lead to early diagnosis. But cancer is difficult to treat once it's advanced, so preventing it seems to make sense. But I think we're a long ways away

from being able to identify and prevent cancer in most cancers.

Q. Doctor, what are extrinsic factors and intrinsic factors?

MR. SHEEHAN: Objection.

A. You'll have to be a little more precise. Those sorts of terms can be used in a number of different contexts. So, please specify a little bit more clearly what in what context you're using those terms.

Q. What are intrinsic risk factors in terms of the cancer development?

MR. SHEEHAN: Objection.

A. I'm still not entirely clear as to what you're referring to.

Q. Doctor, what are intrinsic risk factors in terms of cancer development?

MR. SHEEHAN: Objection.

A. So, I've done a lot of work in cancer and risk factors and there's different ways to define what is intrinsic and what is extrinsic, intrinsic to the cancer, intrinsic to the patient, different ways of classifying it, you may be using your own terminology, but there are patient-based intrinsic risk



factors to the patient.

So, for example, if the patient has inherited genes, that can lead the patient to be highly at risk for cancer, that would be, I think, under many definitions considered an intrinsic risk factor.

Extrinsic risk factors would be possibly things that the patient is -- that are not biologically ingrained in their DNA, but maybe various types of exposures, for example, secondhand smoke, the town or city they live in, infections passed down perhaps by the mother, maybe dietary factors would be included. So, certainly there's a variety of different types of risk factors for cancer. I'm not sure what you're asking about specifically.

MR. NIGH: Let's take a look at LP585. This is marked as Exhibit 6680.

(Exhibit 6680 was marked for identification.)

BY MR. NIGH:

Q. Substantial -- and the title is Substantial contribution of extrinsic risk



factors to cancer development. And the first author is Dr. Wu.

Have you seen this study before?

A. Not sure, although I do know Wei Zhu. I have not read this one in detail. Let's see. Okay. Well, I see the paper. Do you have a question about this? I guess it addresses the --

(Court reporter clarification.)

A. The "bad luck" hypothesis, that's Bert Vogelstein's paper that many of us commented on.

MR. NIGH: So, let's take a look at the -- not the summary, but in the first full paragraph. We can blow that up.

Q. And it says, starting with many arguments:

Many arguments against the "bad luck" hypothesis have been made, yet none of these offered specific alternatives to quantitatively evaluate the contribution of extrinsic risk factors in cancer development. Applying several distinct modelling approaches, here we provide strong evidence



that unavoidable intrinsic risk factors contribute only modestly less than 10 to 30 percent to the development of many common cancers.

Do you see that?

A. Yes.

Q. Were you aware of this information that the study demonstrated that in terms of intrinsic factors and "bad luck" that they provided strong evidence that unavoidable intrinsic risk factors contribute only modestly less than 10 to 30 percent to the development of many common cancers.

MR. SHEEHAN: Objection.

A. I think that they provide evidence. I am sort of remembering this paper a bit since I was involved in some of the discussions about the "bad luck" hypothesis. And I think calling this "strong evidence" is -- again, I'm not sure -- it was Tomassetti and Vogelstein paper that this was reacting to. In Vogelstein, as it shows in Figure 2, came up with this idea of a relationship between the number of stem cells in any tissue and the risk of cancer. And

myself as well as many other cancer researchers pushed bag a little bit on it because there are a number of assumptions and hypotheses made and it was simply a modeling study. And I think looking at this particular paper, they re-analyze to some extent this -- this stem cell number cancer theory. And I think rightly pushed back and say that the correlation is not so strong. However, the evidence for extrinsic factors is again a bit of a modeling exercise and I -- they fall short of really providing convincing evidence of what is going on with the extrinsic factors. But I don't just disagree with the conclusion that -- and that's -- and that's nothing new, really, that people have discussed before the role of genetic predisposition to cancer. And it is clear that the genetic contribution to cancer is more modest than many other diseases and that cancer is much more influenced by external factors. I think that's clear, it's been known for many, many years.

And I think the best example, of


course, is gastric cancer which is caused primarily by helicobacter pylori infection. So, studies back in the 60s showed that patients who grew up, for example, in Japan and moved to Hawaii and then later on their descendents moved to California, that the risk in that family and those families for gastric cancer was primarily related to whether they were living in Japan or Hawaii or California. And I think many cancers are related to the environment that the patients live on.

And so, now, the more evidence is emerging that this is, to a large extent, dictated by cultural aspects and the microbiome probably.

So -- so, yes, cancer is primarily related to environmental influences, including things like smoking and so on, and less so to inherited genetic factors. And I think I would not disagree that the data showing that there's a perfect correlation with stem cell divisions is probably not -- not the single driving factor, although certainly there's some correlation.


Q. Doctor, you mentioned immigrant studies just now where people living in Japan move to Hawaii, is often times referred to as immigrant studies that measure whether or not it's environment or intrinsic factors, correct?
A. Correct.
MR. NIGH: And let's go -- let's turn to page 4 of this study and the very first full paragraph.
Q. And it says:
More importantly, cancers known to have substantial environmental risk proportions, for example, breast cancer, prostate cancer, colorectal cancer, melanoma, esophogeal cancer, cervical cancer, liver cancer and stomach cancer, all harbor large percentages of total extrinsic mutational signatures.
Do you see that?
A. Yes, I see that.
Q. So, you mentioned stomach cancer, and it's true that liver cancer, esophogeal cancer and colorectal cancer that it has been demonstrated that they have substantial


environmental risk proportions for those types of cancer, correct?
MR. SHEEHAN: Objection.
A. Yeah, I'm not entirely sure what they're talking about here. So -- so, there's been a lot of work recently on mutational signatures and mutational burdens for different tumors and, you know, melanoma and head and neck cancer have a large number of mutations, some of the others particularly prostate cancer has a much lower number of total mutations, and that's mostly what people have looked at recently as the number of mutations does correlate with the response to the mean checkpoint therapy. So, I don't -- and there are specific mutational burdens, it's not that specific, but there are mutational signatures, for example, of tobacco smoke with lung cancer and head and neck cancer. But I don't know what they mean by "total extrinsic mutational signature". I'd have to read their paper a little more closely, so I can't really address whether that's true.
But I do know, for example, stomach

Page 378

cancer and esophogeal cancer have a moderate number of mutations, much less than melanoma head and neck. And so, again, I don't know what they mean there.

Q. Doctor, isn't it true that immigrant studies and identical twin studies have demonstrated the substantial environmental risk proportions for esophogeal cancer, liver cancer, stomach cancer and colorectal cancer?

MR. SHEEHAN: Objection.

A. So, a number of -- so, a number of studies have been done, both sibling studies and twin studies look -- trying to identify the proportion of clearly inherited risk of cancer. And as I mentioned before, there's been a general consensus in the field way before this paper came out that most cancers are determined environmentally. And as I pointed out, I think the majority of those are related to cultural, infectious and perhaps dietary factors that all relate primarily, I think, to microbiome influences, as well as other types of infectious factors.

So, I don't know that -- you know,

Page 379

so when they do these studies looking at and reaching conclusions about inherited versus environmental, all they can do really is point out what percentages of tumors are eviron- -- are genetically determined, based on family history, twin studies and sibling studies. The hardest part has been teasing out the environmental influences and I think stomach cancer is a perfect example where, you know, the vast majority of these tumors are determined by Helicobacter pylori infection.

Q. Doctor, would you agree that for cervical -- or for colorectal cancer, liver cancer, stomach cancer and colorectal cancer that the majority in terms of looking at extrinsic versus intrinsic factors, the majority of those are extrinsic risk factors that are known to cause those types of cancers?

MR. SHEEHAN: Objection. Asked and answered.

A. Yeah, I think I've already answered that question.

Q. I actually asked a different

Page 380

question.

Isn't it true that the majority of the colorectal cancers, liver cancers, stomach cancers and esophogeal cancers have been demonstrated that the majority of those cancers are due to extrinsic factors as opposed to intrinsic factors?

MR. SHEEHAN: Objection.

A. Well, again, I think we need to define what is meant by extrinsic versus intrinsic factors. But as I said, for most cancers, and that would include all the cancers that you recently listed, the evidence is clear that the majority of cancers are not inherited genetically -- primarily genetically determined. And how that falls into intrinsic versus extrinsic, I'll leave it to you to, sort of, decipher.

But the question really hasn't -- people in the field don't always use the terms intrinsic and extrinsic, the question really is genetic verses non-genetic. And, again, for all these solid malignancies, particularly in the GI tract, most of the

Page 381

cancers are not inherited.

MR. NIGH: Let's take a look at LP602. This will be marked as Exhibit 6681. And let's take a look at page 682 under the -- sorry.

(Exhibit 6681 was marked for identification.)

BY MR. NIGH:

Q. First, let's take a look at the title. The title of the study is Carcinogenesis Bioassay in Perspective: Application in Identifying Human Cancer Hazards with leading author Dr. Fung.

Do you see that?

A. Yes, I do.

MR. NIGH: And let's take a look at the page 682.

Q. On the right side the paragraph that begins, our evaluation and the knowledge that all chemicals.

Do you see that?

A. Yes.

Q. Our evaluation and the knowledge that all chemicals known to induce cancer in humans that have been studied under

adequate experimental protocols also cause cancer in laboratory animals leads to the persuasive speculation that the obverse would often hold true. Chemicals shown to unequivocally induce cancer in laboratory animals, especially in multiple species, must consider -- must be considered capable ever causing cancer in humans.

Do you see that?

A. Yes.

Q. And then the next says:

Obviously further and detailed evaluations need to be made.

Do you see that as well?

A. Yes.

Q. And it says:

The International Agency for Research on Cancer adopted this widely accepted scientific view: In the absence of adequate data in humans, it is biologically plausible and prudent to regard agents and mixtures for which there is sufficient evidence of carcinogenicity in experimental animals as if they presented a carcinogenic risk to humans.



Do you see that?

A. Yes, I do.

Q. And do you agree with the IARC statement that in the absence of adequate data in humans, it is biologically plausible and prudent to regard agents and mixtures for which there's sufficient evidence of carcinogenesis in experimental animals as if they presented a carcinogenic risk to humans?

MR. SHEEHAN: Objection.

A. So, I think I've -- I've commented on this sort of question before, but let me sort of spell it out again once more.

So, I think -- and I think -- thank you for showing me this table, I think this clarifies what Huff has been trying to state, perhaps overstate.

So, I would agree that if there -- if there's consistent evidence showing that an agent is carcinogenic in animal models, that one needs to take it very seriously and I think it is prudent and this is the, I think, the job by the IARC to sort of raise a red flag and caution that this agent has the



potential, could possibly cause cancer in humans. And so, I think now that I see this entire IARC list, it's clear that the agents that actually are listed as Category 1 are known carcinogens is -- is a bit -- a bit -- here they're listing -- let's see, IARC, yeah -- are listed as -- are rather low. And I think what this really calls attention to is that many of these -- of these should be certainly classified and caution placed, but not -- it doesn't say that they are known carcinogens. Again, most of these agents are Category 2A, Category 2B, et cetera, et cetera, reasonably anticipated to be carcinogens. I think caution should be given to those chemicals and regulated and monitored.

But it's -- again, I don't think this is saying that they are known carcinogens that they're shown to be cancer in animals, they're simply classified by the IARC as something that needs to be regulated such as Category 2A or 2B.

MR. NIGH: Let's take a look at the beginning of this paper and second



sentence, we can blow that up.

Q. It says: Due largely to the limited number of animals per test, generally 50 to 60 animals of each sex of two species, rats and mice, and each experimental group, bioassays are conducted at relatively high exposure concentrations to optimize the probability of detecting a carcinogenic response.

Do you see that?

A. Yes.

Q. And doctor, isn't it true that in order to detect -- have adequate power to detect carcinogenic responses at lower levels, it can sometimes take thousands or tens of thousands of animals at those lower levels to have adequate power to detect?

MR. SHEEHAN: Objection.

A. It's hard to know what the right answer is. I guess, if you're looking for something that's extremely carcinogenic, you probably don't need thousands and thousands of animals. And you are correct that in many of these studies, they use relatively high concentrations to address the question of

whether it can cause cancer at high doses. But the truth is that for most of these chemicals, there is a threshold effect and as we talked about for NDMA, it's pretty clear to me that there is threshold effect and that going above that threshold effect is necessary to cause cancer. And certainly, we see this in our own studies where we've done carcinogenicity studies in mice with MNU causing stomach cancer and azoxymethane causing cancer -- colon cancer. And it's clear that low doses rarely, if ever, give rise to cancer in animals if they're -- if they're below the threshold needed to induce cancer. So, yes, I understand the reason for using pretty large groups of animals in high doses as long as that data is not extrapolated to, sort of, much lower doses in terms of the ability to cause cancer.

Q. Doctor, there's a difference between demonstrating a threshold of the NOEL effect and having inadequate power to demonstrate whether or not there is a threshold at lower levels?

MR. SHEEHAN: Objection.



A. I am not sure I follow. Certainly, you know, the -- to demonstrate a threshold, I guess it depends on what you mean by "threshold." You know, we've -- for example, we've done studies with MNU at low doses in dozens and dozens and dozens of animals. If you're asking the question as have I proven that it can't cause cancer in .1 percent of animals, probably not. But I think the fact that it doesn't cause cancer 99.9 percent of animals, is -- is pretty good.

So -- so, yeah, I think if there -- if the agent is -- is carcinogenic, you'd certainly expect it to cause cancer in specific number of animals in large animal studies. And so, to me, that is sort of definition of a threshold that if it rarely, rarely causes cancer or if it's very, very close to the spontaneous cancer background, that for us is really not -- not carcinogenic.

Q. That's your definition of a threshold?

A. No significant increase in cancer, yes.



Q. No statistical significant increase in cancer is your definition of a threshold?

MR. SHEEHAN: Objection.

A. Yeah, not causing cancer, that would be my definition.

Q. Those are different -- that's a different answer than my question.

My question is, is it your definition that a threshold is that it doesn't demonstrate a statistical significant increase at that level?

MR. SHEEHAN: Objection.

A. There's different definitions of threshold. I guess I told you how I view cancer in the laboratory. I think defining a threshold in human studies might be somewhat different. But, yes, I think the data certainly suggests that -- I think the point of my statement was that the data certainly suggests that for most carcinogens there is a threshold necessary to induce cancer and it's very much dose -- dose related.

And as I pointed out before, the body is able to deal with many carcinogenic insults and want to maintain -- minimize



cancer risk. And as suggested by these studies, agents that are identified as carcinogenic in animals should be closely monitored and regulated. But concluding that they are known carcinogens in humans requires a higher level of evidence.

And so, yes, so -- so, I understand this -- this particular study and article is -- is attempting to screen agents, identify potential risks and preserve human health and that all seems very admirable.

MR. NIGH: Let's go ahead take the article down.

Q. I want to be clear on my question.

Is it your definition that a threshold is demonstrated in animal studies if those animal studies do not demonstrate a statistical significant increase at those levels?

MR. SHEEHAN: Objection. Asked and answered.

MR. NIGH: It was a long answer, but there was no answer to it.

A. I think -- I think I've answered that. I think I've answered what the

Page 390

threshold is. I don't think I need to revisit my -- my answers again.

Q. I'm entitled to this answer, okay? I can ask the question, I'm entitled to an answer.

My question is, is it your definition that a threshold in animal studies -- that there's a threshold in animal studies if it doesn't demonstrate a statistical significant increase at that level?

MR. SHEEHAN: Objection. Asked and answered.

A. So, I discussed before the notion of a threshold with carcinogens and that the evidence is quite clear that for most carcinogens, low doses don't induce cancer in animals and that you need to exceed a certain level in order to get cancers, at which point cancer's become more common and more frequently and faster induced.

And if we want to take this for as example to the Pino study, as I pointed out before, it's very clear in the Pino study that the low doses of NDMA are not

Page 391

carcinogenic, they don't -- they have not been shown to induce adenocarcinoma, they don't shorten the lives of the animals, the rats, and they don't show a significant increase in the number of tumors at the lower doses. So, there's a combination of things.

But in general, again, in answer to your question, a threshold means that the -- at lower doses, there is no -- there's no increase in cancer, and that above the threshold, there is an increase in cancer. And to some extent, this does require a statistical analysis to show these differences. But I think -- I think we understand what a threshold means in cancer studies.

Q. I'm not sure I understand your answer and you keep using the words "significant." I want to be clear about my question again.

My question is, is it your definition that a threshold exists in animal studies if the animal studies at that level do not demonstrate a statistical significant increase at that level?

Page 392

MR. SHEEHAN: Objection. Asked and answered.

A. I have already answered your question and if you want me to repeat my answer again, I'll be happy to do so.

Q. I want you to answer this question, which is talking about statistical significant increase. So, I'm gonna to ask it again.

My question is, is it your definition that a threshold exists in animal studies if the animal studies at those levels do not demonstrate a statistical significant increase at that level?

MR. SHEEHAN: Objection. Asked and answered.

A. So, again, your question is about the threshold for adduction of cancer by carcinogens and it's a multi-pronged assessment of whether or not the carcinogen is causing cancer and in a dose dependent fashion and at low doses. The data is very clear from a number of animal studies that carcinogens, whether it's MNU or whether it's azoxymethane or whether it's NDMA at low

Page 393

doses, one sees no tumors, no cancers in multiple, multiple animals and the tumors are only seen once a threshold has been exceeded, presumably that threshold relates to both the dose required to induce sufficient DNA damage and to overcome the detoxifying mechanisms that are inherent to most tissues to handle these sorts of toxic chemicals. And so, you know, so the threshold is the transition from no tumors, no cancers in animals to the point at which an increased number of cancers or tumors are seen. And again, to some extent in a scientific laboratory, this requires some statistical analysis to show that transition point.

MR. NIGH: Okay. Let's go ahead and take a break at this time.

THE VIDEOGRAPHER: Time is 23:42 UTC. We're going off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record. The time is 00:00 UTC.

MR. NIGH: Can we pull up LP576.

BY MR. NIGH:
Q. Doctor, these are the invoices that you presented or that you prepared for this case.
Do you see that here on the screen?
A. Yes, I do.
Q. Okay.
MR. NIGH: These will be marked as Exhibit 6682.
(Exhibit 6682 was marked for identification.)
MR. NIGH: And Doctor, I don't have any further questions. I'll reserve the balance of my time for any follow-up, after your -- if your attorney asks questions.
Thank you.
MR. SHEEHAN: Okay. Give me just -- let's go off the record.
MR. NIGH: Okay.
THE VIDEOGRAPHER: The time is 00:01 UTC. We're going off the record.
(Whereupon, a brief recess was taken.)



THE VIDEOGRAPHER: We're back on the record. The time is 00:05 UTC.
MR. SHEEHAN: Dr. Wang, thank you so much for your time today. I don't have any questions. I think we can wrap this up.
MR. NIGH: Thank you, Doctor.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: The time is 00:06 UTC. We're going off the record.
(Time noted: 8:06 p.m. Eastern Time)



J U R A T

I, TIMOTHY C. WANG, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on MAY 26, 2022; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

_______________________
TIMOTHY C. WANG

Subscribed and sworn to before me

This ______ day of _________, 20__.

___________________________________
NOTARY PUBLIC



C E R T I F I C A T E

STATE OF NEW YORK )
: SS.:
COUNTY OF RICHMOND )

I, CANDIDA BORRIELLO, a Notary Public for and within the State of New York, do hereby certify:

That the witness, TIMOTHY C. WANG, whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of May, 2022.

Candida Borriello
_________________________
CANDIDA BORRIELLO

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name: ZANTAC LITIGATION
Dep. Date: MAY 26, 2022
Deponent: TIMOTHY C. WANG

| Pg. | Ln. | Now Reads | Should Read | Reason |
|---|---|---|---|---|
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |
| ___ | ___ | ______________ | _______________ | _____ |

________________________
TIMOTHY C. WANG

SUBSCRIBED AND SWORN BEFORE ME,

This___ day of_____________, 20__.

__________________________________
Notary Public

My Commission Expires:__________

**Exhibits**

**EX 6647 Timothy C. Wang, M.D. 052622** 4:10 15:17
**EX 6648 Timothy C. Wang, M.D. 052622** 4:11 42:11,12
**EX 6649 Timothy C. Wang, M.D. 052622** 4:11 92:4,5,23
**EX 6650 Timothy C. Wang, M.D. 052622** 4:12 94:2,3 98:6
**EX 6651 Timothy C. Wang, M.D. 052622** 4:12 118:12,13
**EX 6652 Timothy C. Wang, M.D. 052622** 4:13 130:5,6
**EX 6653 Timothy C. Wang, M.D. 052622** 4:14 139:20,22
**EX 6654 Timothy C. Wang, M.D. 052622** 4:14 150:10,13 159:21
**EX 6655 Timothy C. Wang, M.D. 052622** 4:15 184:10,11
**EX 6656 Timothy C. Wang, M.D. 052622** 4:15 193:25 194:3
**EX 6657 Timothy C. Wang, M.D. 052622** 4:16 201:18,19
**EX 6658 Timothy C. Wang, M.D. 052622** 4:16 220:1,3
**EX 6659 Timothy C. Wang, M.D. 052622** 4:17 231:19,20
**EX 6660 Timothy C. Wang, M.D. 052622** 4:17 233:17,18
**EX 6661 Timothy C. Wang, M.D. 052622** 4:18 237:25 238:2
**EX 6662 Timothy C. Wang, M.D. 052622** 4:18 240:13,14
**EX 6663 Timothy C. Wang, M.D. 052622** 4:19 250:5,10,11
**EX 6664 Timothy C. Wang, M.D. 052622** 4:19 255:10,11
**EX 6665 Timothy C. Wang, M.D. 052622** 4:20 258:5,6
**EX 6666 Timothy C. Wang, M.D. 052622** 4:20 263:24,25
**EX 6667 Timothy C. Wang, M.D. 052622** 4:21 266:2,3 276:2
**EX 6668 Timothy C. Wang, M.D. 052622** 4:21 271:10,11
**EX 6669 Timothy C. Wang, M.D. 052622** 4:22 279:14,15
**EX 6670 Timothy C. Wang, M.D. 052622** 4:22 282:4,5
**EX 6671 Timothy C. Wang, M.D. 052622** 4:23 289:4,7
**EX 6672 Timothy C. Wang, M.D. 052622** 4:23 289:6,9
**EX 6673 Timothy C. Wang, M.D. 052622** 5:3 305:14,15
**EX 6674 Timothy C. Wang, M.D. 052622** 5:3 312:22,23
**EX 6675 Timothy C. Wang, M.D. 052622** 5:4 319:19,20
**EX 6676 Timothy C. Wang, M.D. 052622** 5:4 327:4,5
**EX 6677 Timothy C. Wang, M.D. 052622** 5:5 340:21,22
**EX 6678 Timothy C. Wang, M.D. 052622** 5:5 350:2,3
**EX 6679 Timothy C. Wang, M.D. 052622** 5:6 353:22,23
**EX 6680 Timothy C. Wang, M.D. 052622** 5:6 371:20,21
**EX 6681 Timothy C. Wang, M.D. 052622** 5:7 381:4,6
**EX 6682 Timothy C. Wang, M.D. 052622** 5:7 394:9,10

**-**

**------------------I** 4:2
**----------------E** 4:7
**-and-** 3:12

**0**

**0** 127:1,10

**0.01**
237:20
**0.05**
297:17
**0.277**
197:14
**0.37**
93:17
**0.7**
180:8
**0.70**
180:13
**0.97**
269:8,11
**001**
193:1 276:14 294:20,25 295:4,8,13, 18 296:2 298:10
**00:00**
393:24
**00:01**
394:22
**00:05**
395:2
**00:06**
395:10
**01**
235:6 237:18
**02**
196:19
**04**
233:1
**04-methylthymine**
38:15
**05**
56:11,13 60:3
**06**
36:22 37:11, 19,25 38:7, 13 40:4

**1**

**1**
61:6 119:24 127:2,6 140:11 141:7 144:6 164:14 186:18 188:6 212:2,22 237:19 270:14 323:23 329:19 361:19 384:4 387:8
**1,400**
124:23
**1,440**
128:22
**1,710**
293:9
**1.0**
127:4
**1.03**
211:4,10,20
**1.06**
211:4,10
**1.09**
163:2,11 164:1
**1.1**
234:6 259:8
**1.15**
273:18
**1.17**
212:22 213:24 214:13
**1.2**
330:9
**1.22**
212:22 213:24 214:13
**1.4**
182:20 234:20
**1.41**
182:22 269:16
**1.46**
166:23
**1.49**
182:22
**1.5**
170:1
**1.6**
234:6
**1.62**
292:10
**1.7**
264:14
**1.8**
267:18
**1.82**
270:12,13
**1.83**
276:9,11
**1.9**
119:13
**1.91**
272:9,11
**1.96**
196:16,18
**1.99**
267:19
**10**
133:20 238:13 373:2,12
**100**
15:3 212:4 242:5,13 265:16 352:20
**102**
123:11
**104**
162:24
**1087**
206:6 208:21
**11**
306:5
**116**
119:13,24 121:7,9 122:19 123:3
**118**
4:12
**12**
252:22
**12-fold**
191:21 192:1
**12.73**
191:22 192:2
**126**
4:13
**1270**
127:5
**13**
302:25 303:17
**130**
4:13
**139**
4:14
**13:04**
7:6
**1440**
127:5,12,14
**14:19**
72:23
**14:34**
73:3
**15**
4:10 105:15 188:6 190:1
**150**
4:14 189:25
**158**
184:22
**159**
184:23
**15:47**
129:22
**16**
86:17 87:4,9
**161**
186:7

**16:12**
130:2
**1717**
3:3
**17:06**
172:22
**17:58**
173:2
**18**
120:1 123:6 190:2
**180**
190:1
**182**
267:11
**184**
4:15
**19**
105:10,15 107:7 121:7, 9 122:19 123:3
**1900s**
243:3
**191**
235:8,9,13 237:2,11
**19109**
3:4
**194**
4:15
**1950s**
244:17
**1960s**
204:1,10
**1970s**
204:1,10
**198**
162:25
**1982**
283:3
**1985**
283:4
**1990s**
219:7
**1998**
283:1
**1999**
208:22 209:25 341:17 342:22
**19:11**
231:11
**19:25**
231:16
**1:00**
172:17
**1st**
325:12

## 2

**2**
131:4 186:18 235:2,4 236:14 237:20 268:9 269:21,22 270:2 276:3 340:18 341:5,8 361:19 373:23
**2.0**
211:3,20 212:3 213:23 214:12
**2.07**
188:7,14
**2.1**
102:14
**2.4**
258:21,25 259:7
**2.5**
127:5,7 330:12
**2.52**
170:2
**2.6**
330:5
**2.73**
166:24
**2.89**
123:6
**2.9**
119:25
**2.97**
109:13
**20**
44:4 87:10 94:24 95:4, 11 96:14 97:3,16,20 99:4 111:18 112:6 115:1 231:2 238:13 239:5 240:4, 7 241:15 242:9,12 243:15 331:18 332:3,9,11, 15 343:8
**2000s**
219:8
**2002**
42:17 44:5 62:24 350:17,19
**2003**
140:11,20 141:7,16 144:6 156:15 158:16
**2004**
23:6 341:17 342:22
**2005**
258:12 341:13
**2007**
12:1
**2008**
12:1
**201**
4:16
**2010**
140:12,21 141:7,16 144:3,7,11 156:15,23 158:9,16 159:1 198:24 201:15 202:8
**2011**
142:12,16 143:24 144:20 145:6 149:15 151:14 153:10,22 155:4,7,17, 22 156:3
**2012**
12:4 145:25 146:2 147:2, 7,16 150:4 151:4,9,14, 19 153:25 157:10
**2013**
12:4 88:13
**2017**
321:25
**2018**
146:13,20 149:3 150:17 154:2,11 158:24 258:13 341:14
**2019**
240:20
**2020**
89:1 199:3, 10 220:13 288:12 290:6,19
**2021**
125:10
**2022**
7:5 131:4 139:16
**205**
357:14
**207**

359:3
**209**
350:20
**20:30**
279:6
**20:48**
279:11
**21**
159:14 186:4
**210**
352:5
**2191**
92:25
**22**
60:18 62:4
241:4,5
**220**
4:16
**223**
209:8
**22:12**
343:16
**22:36**
343:21
**23**
143:9 335:19
336:11,20
**2303**
335:24
**2304**
329:20
**2308**
327:15
**231**
4:17
**232**
288:22
**233**
4:17
**238**
4:18
**23:42**
393:19
**24-hour**
209:10,11
215:16
**240**
4:18
**2400**
3:14
**25**
125:19
127:12 209:5
360:21
**250**
4:19
**255**
4:19
**258**
4:20
**26**
7:5 15:21
**26.4**
302:24
303:16
**261**
209:8
**263**
4:20
**266**
4:21
**27**
190:14
**270**
190:14
**271**
4:21
**277**
197:2,5,22
**279**
4:22
**282**
4:22
**289**
4:23
**2A**
41:1 64:5
65:1 230:9
384:13,23
**2B**
384:13,23

**3**

**3**
235:3
236:10,20
237:10,20
259:23
329:19
361:19
**3.07**
191:17
**3.1**
190:24 271:4
**3.37**
292:11
**3.62**
190:15
**3.86**
191:2
**30**
140:12 141:7
241:20
242:9,25
354:20
360:21
373:3,12
**305**
5:3
**30th**
140:21
325:15
**31**
241:9
**31.1**
302:24
**312**
5:3
**319**
5:4
**325**
282:23
**327**
5:4
**33**
126:17
**336**
95:20
**34**
50:25
**340**
5:5
**350**
5:5
**353**
5:6
**354**
220:2
**36**
334:5
**37**
97:12,14
**371**
5:6
**38**
43:9
**381**
5:7
**394**
5:7

**4**

**4**
43:17 94:18,
19 95:5
98:18,19
166:17
169:21 186:8
188:10
269:20
270:7,9
306:5 376:9
**4.13**
232:13
**4.4**
264:12,13
**4.5**
186:19 259:8
**40**
111:19 112:6
115:1 119:8
120:2 121:2

122:13 123:10 124:1,5 138:6 182:12 183:6
**400** 3:3
**42** 4:11
**44** 84:12
**44th** 3:10
**45** 85:15
**458** 230:24
**46** 85:25
**471** 235:1
**475,768** 267:12
**49** 341:19 342:19

## 5

**5** 26:2 127:19, 24 193:5,6 323:23 327:1
**5,000** 161:17
**5.5** 271:6
**5.6** 270:18,24,25
**50** 94:24 95:4, 5,12 99:5 111:10 333:22,24 385:4
**550** 3:14
**57** 271:2
**59** 270:17,21

## 6

**6** 26:3 161:19 176:4 186:18 196:9
**6-** 122:20
**6.38** 306:17
**60** 111:10 219:20 385:4
**600** 121:10 123:18
**600-fold** 119:17 120:6,15 122:20 123:5
**60s** 334:13 375:3
**628** 282:24
**629** 159:23
**6382** 4:13 126:4, 6,8
**64** 333:20 334:4,5,10
**65** 292:9 305:20 314:9,13
**6647** 4:10 15:15, 17
**6648** 4:11 42:11, 12
**6649** 4:11 92:4,5, 23
**6650** 4:12 94:2,3 98:6
**6651** 4:12 118:12, 13
**6652** 4:13 130:5,6
**6653** 4:14 139:20, 22
**6654** 4:14 150:10, 13 159:21 173:5
**6655** 4:15 184:10, 11
**6656** 4:15 193:25 194:3
**6657** 4:16 201:18, 19
**6658** 4:16 220:1,3
**6659** 4:17 231:19, 20
**6660** 4:17 233:17, 18
**6661** 4:18 237:25 238:2
**6662** 4:18 240:13, 14
**6663** 4:19 250:5, 10,11
**6664** 4:19 255:10, 11
**6665** 4:20 258:5,6
**6666** 4:20 263:24, 25
**6667** 4:21 266:2,3 276:2
**6668** 4:21 271:10, 11
**6669** 4:22 279:14, 15
**6670** 4:22 282:4,5
**6671** 4:23 289:4,7
**6672** 4:23 289:6, 9,15
**6673** 5:3 305:14, 15
**6674** 5:3 312:22, 23
**6675** 5:4 319:19, 20
**6676** 5:4 327:4,5
**6677** 5:5 340:21, 22
**6678** 5:5 350:2,3
**6679** 5:6 353:22, 23
**6680** 5:6 371:20, 21
**6681** 5:7 381:4,6
**6682** 5:7 394:9,10

**6798**
189:17
**682**
381:5,17

## 7

**7**
163:14
250:22
255:19
**7-methylguanine**
38:14
**7.0**
232:13
**7.6**
110:5
**70**
111:11
**70s**
334:14
**75**
14:24 119:8
121:2 122:14
**79**
166:24
**7th**
16:3

## 8

**8**
4:5 250:22
**84**
341:19
342:19
**8:06**
395:12

## 9

**9**
178:16,18
179:3 255:20
**9.12**
307:10
**9.2**
264:14
**90**
259:9 260:3
261:6
**900**
124:23
**90017-5844**
3:10
**90071-2678**
3:15
**918**
196:8
**92**
4:11
**921**
127:1,11
128:22
**94**
4:12
**940**
127:2
**947**
127:3
**95**
56:12 58:16
94:16 98:17
166:24
182:19
**95th**
95:10 98:23
99:1
**96**
107:5 137:14
**97**
342:21
**98**
342:21
**99**
170:2
**99.9**
387:10

## A

**A-B-E**
118:4
**AACR**
206:19
**ab-**
302:15
**Abe**
118:1,3,4,20
**ability**
39:13 223:5
322:7 386:19
**able**
17:9 28:18
35:21 39:6
143:2 159:3
213:4,7
227:9 247:18
248:17
260:19 278:1
320:17 326:6
370:1 388:24
**above**
107:4 127:19
137:13
138:22
163:19
164:14
197:17
270:14
296:19 386:6
391:10
**absence**
117:3 230:21
249:19
382:19 383:4
**absolutely**
41:9 60:4
182:4 244:21
**abstract**
140:6 144:22
232:5,6
289:4,5
290:6,9
294:18,22
295:20
297:20,22
300:19,20,21
301:19
318:21
**abstracts**
287:18,22
288:6,11,25
296:14
297:10
302:7,18
**accelerated**
116:4 119:7
121:1 122:13
135:20
138:1,7
139:10
**accelerates**
368:4
**accept**
224:2 315:1
**accepted**
248:10 275:8
382:19
**Accompanying**
215:2
**account**
84:10 85:8,
19 86:5
95:21 96:8
113:25 124:3
**accuracy**
286:9
**accurate**
62:3 79:17
117:20
223:17
**accurately**
154:20
**accused**
328:16 329:7
**ACG**
277:9
**achieved**
337:16
**acid**
275:7 303:21

**acknowledge** 7:22 8:1 216:6 222:11
**acknowledgements** 328:24
**acknowledging** 221:22
**acknowledgments** 319:11
**across** 77:4 272:2
**act** 317:2
**Actavis** 146:16 149:5
**action** 7:13 134:3
**actions** 134:1
**active** 75:8 147:21 148:4 155:11,12 273:3,14 274:3 278:6,7 304:1 353:14
**activities** 266:22
**actual** 348:18
**acutely** 61:4
**ad** 275:19
**Adami** 327:3,11,16 334:2,19 340:9
**Adamson** 33:2,4 44:7
**added** 159:23
**adding** 226:11
**addition** 47:19 48:10,19
**additional** 107:8 109:3 111:4,12 117:17 265:22 337:12
**additive** 191:11
**address** 145:20 377:23 385:25
**addressed** 40:12 61:22 130:12 133:5 303:3
**addresses** 372:8
**adduct** 37:13
**adduction** 392:18
**adducts** 36:20 37:2,25 38:7,12,17,22 39:3,8
**adenocarcinoma** 49:17 264:23 391:2
**adequate** 17:3,7,20 362:25 382:1,20 383:4 385:13,17
**adequately** 181:17 352:18
**adjust** 188:18 206:1 235:19 236:24 310:10
**adjusted** 163:1 190:10 196:23 237:6,8 267:18 268:19 269:2,3,4,10,16 270:11 272:10 276:8,11 335:6
**adjusting** 236:14 237:15 303:6 308:7 310:9 338:2
**adjustment** 306:10 307:16,25 308:2,25 335:6,10
**adjusts** 190:6 236:20
**administered** 8:2 33:10 35:4 37:24 54:19
**administrated** 367:5
**administration** 37:3
**admirable** 389:11
**adopted** 382:18
**adult** 94:23 95:3 209:9
**adults** 94:20 95:6,11 98:20 305:20 314:13
**advanced** 369:24
**advantage** 17:12
**adverse** 20:17 21:13
**advertisement** 360:10
**advocated** 368:13
**affect** 207:25 223:6 348:2
**affected** 108:21
**affects** 161:22 207:10
**afraid** 321:23
**afterwards** 299:15
**AGA** 277:9 314:1
**age** 93:4 190:6 236:7,15 237:6 321:19 324:3 333:21,23 334:4,7,13
**aged** 107:9 109:14 110:10 238:23
**agency** 104:18 105:1 382:17
**agent** 26:10 35:21 36:3 37:21 230:15 239:12 247:9 254:6 361:9 366:24 383:21,25 387:13
**agents** 278:4 354:20

360:21 382:21 383:6 384:3,12 389:2,9
**aggregate** 322:24
**aggregation** 323:18
**aggression** 339:9
**aging** 28:4,5 106:9,16 107:25 109:9
**ago** 13:12 143:9 313:15
**agree** 20:13 45:3, 7,13,21 46:1,19,23 47:11,24 60:7 61:17 64:4,12 65:25 66:3, 16,19 71:16 73:5,17,25 89:1 101:22 102:21 121:20 174:9 241:25 251:8,13,16 253:9 273:1 351:4 352:25 353:17 356:7 357:4 359:25 364:12 379:13 383:3,19
**agreed** 76:20
**agreement** 6:7
**agrees** 355:11
**AGT** 39:5
**ah-huhs** 14:10
**ahead** 10:18 15:6,7 30:19 42:9 43:16 67:25 72:16 84:21 92:2 93:25 98:4 105:12 118:7,24 119:2 126:3 130:3,23,25 139:12 147:9 148:13 150:8 154:15 159:15 173:3 184:9,20 193:25 194:7 201:14 202:13 220:23 231:3,17 233:16 234:1 237:25 240:11 248:5 259:23 263:22 270:20 279:12 280:19 282:1,7,16 287:12,14,15 288:20 290:22 292:4 295:21 304:17,18 312:20 319:14 323:23 324:18 326:23 327:2 329:3,5,18, 21 340:17 348:7 349:25 389:12 393:17
**air** 73:12
**alcohol** 190:8 196:24 285:2 295:11 297:24 321:20
**allegation** 13:2 143:16 155:20
**allegations** 12:25 143:15,21
**alleged** 87:12
**alleging** 13:21 204:9
**allowance** 234:12
**allowed** 339:6
**allude** 83:11 109:2, 8
**alluded** 109:1 367:22
**alluding** 80:2 104:13 113:24 364:16
**altering** 222:2
**alternatives** 372:21
**alters** 96:8
**Alzheimer's** 277:6
**amended** 240:20
**America** 189:4
**American** 207:23
**amines** 184:15 185:1
**amino** 186:18
**amlodipine** 140:11,19 141:6,9,15
**amount** 86:19 91:2 96:23 100:16 101:16,18,24 106:6 107:8 110:19 111:16 112:4 117:13 119:11,17 120:7,15 121:6 122:18 123:17,23 124:23 125:18,19 128:7 145:20 192:18 198:6 238:6 257:24 260:12 261:18 262:8 344:23 348:2
**amounts** 39:6 76:23 88:16 89:2 97:25 98:1 101:20 105:9,11,16, 19,25 107:17,20 109:3,9 124:15 125:2,15 128:5,25 131:11 176:11 189:16 227:3,4 228:21,22 229:8,9 260:14 344:12,22 345:15 346:3,12,13, 20 347:13 348:3 349:7, 8

**anal-**
192:12
**analogy**
79:1,14 82:24 83:2,8,12,19 84:18,23 85:2,4,13,16,23 86:2,9
**analyses**
78:24 79:1 105:18 166:19,21 167:6,11 168:7,25 169:5,6,12,13 170:6,8,14,24 172:9 335:25 336:3 340:3
**analysis**
53:20 55:6 56:18 78:10,12,21 79:11,13,14,20 80:21 81:2,4,8,24 82:4,17,24 83:10,13,18,23 84:1,5,11 86:6 140:13 151:15 168:18,19,24 170:4,16 171:1,7,14,20 172:2,6 191:13 192:4,11 200:6,7 201:6 227:16,18 258:11 260:1 284:21 285:12 291:21 298:4,5,12 301:10 306:8 310:21 311:4,18,20 323:19 335:9 391:13 393:15
**analyze**
17:24
**analyzed**
105:21 142:1 311:23
**and/or**
6:8 113:3 116:18 215:9 286:1 313:11 327:24
**Angeles**
3:10,15
**Angiotensin**
140:1
**animal**
24:20,25 25:2 40:18,24 41:12 44:20 49:12 55:3,15 61:25 70:21 176:18 177:3,15 227:22 352:18,19 353:7,12 355:13,17,19,21 356:5 358:24 360:5 362:23,25 363:6,14,17,25 364:11,13 365:1,6 383:21 387:15 389:16,17 390:7,8 391:22,23 392:11,12,23
**animals**
23:13 27:20 32:23 33:16 34:1 35:3,10,13,23 36:5,15 41:20 45:12,20 51:2 54:19 55:10,21 57:20,22,23,24 58:6,7 352:22 354:3,15,19 355:3 356:2 358:1,6 359:12,14 360:25 361:9 362:7,9 363:2,11 366:21 382:2,6,24 383:8 384:21 385:3,4,16,23 386:13,16 387:6,9,11,15 389:3 390:18 391:3 393:2,11
**annals**
199:9 220:13
**annual**
341:8
**answer**
14:9,18 20:25 29:4 30:23 31:2 40:9,13 42:7 43:5 60:1 69:18 80:25 82:3 86:11,12,14 101:14 109:13 110:8,14 117:14 142:21 144:1 145:8 179:21 274:16 284:10 311:14 339:14 359:22 385:20 388:7 389:22,23 390:3,5 391:7,18 392:5,6
**answered**
29:21 31:17 44:17 54:22,23,24 61:20 69:16,17 70:3 71:20 72:7 75:16 76:17 80:23 84:20 110:23 117:22,23 155:9 163:25 174:24 228:25 229:1,12 263:20 274:14,15 284:11 336:16 338:10 346:6 364:9 379:22,23 389:21,24,25 390:13 392:2,3,16
**answering**
18:21
**answers**
60:7 156:23 281:4,5,11,13 283:8,10 284:9 390:2
**antagonist**
266:8
**antagonists**
260:23 277:19
**anti-reflex**
325:9
**anticipated**
70:23 71:7,17,22 384:14
**anybody**
216:18
**anymore**
110:14,15

328:6
**anyone**
6:21 9:8,12 216:16
**anything's**
31:20
**AP&T**
313:10 314:15,18 315:1,2
**apart**
26:17 223:18 319:9
**API**
149:4 151:12 152:14
**apparent**
65:18 67:11
**appeared**
212:23
**Appearing**
3:1,7
**appears**
45:11 96:10 146:22 290:20 293:21 294:16 355:9
**application**
58:13 381:12
**applies**
143:4
**apply**
161:6
**Applying**
372:24
**appreciably**
234:12
**appreciate**
121:13 254:7
**approach**
242:20 286:13 311:18 326:1 337:5 339:1,3 351:8,20 352:2
**approaches**
285:16 339:2,8 354:15 355:3,24 372:25
**appropriate**
80:9,16 213:13 265:13 278:2,25 298:25 299:3,8
**appropriately**
265:18
**approximate**
132:11
**approximately**
14:24 61:6
**Arch**
3:3
**area**
24:14 114:4 206:13 216:16
**areas**
203:14 245:20
**argue**
364:24
**argued**
179:6
**argument**
180:15 285:20
**arguments**
357:2 372:18,19
**arise**
238:11
**arises**
28:7
**arm**
42:4
**ARNOLD**
3:9
**around**
12:1 13:12 15:3 94:17 98:18 137:15 144:14 190:24 242:25 243:14 298:15 332:16 333:24 334:13 364:1
**arrangement**
8:7
**array**
347:4
**arrived**
310:21
**article**
99:9 108:24 120:11,18 121:17 149:10 252:9 327:9 389:8,13
**articles**
27:6 169:4 329:8
**Asian**
254:18
**asked**
29:20,24 31:16 54:21 61:19 69:15 71:19 76:16 78:4 80:22 84:20 104:4 110:25 117:21 134:19 148:6 156:12 163:24 174:23 178:17 216:18 218:16 228:15,24 229:11
263:19 274:13 338:9 364:8 379:21,25 389:20 390:12 392:1,15
**asking**
16:19 20:2 21:10 23:20 25:6 38:6 54:10,12,15 56:20 59:17,18 60:4 73:9 74:14 79:21 85:10 86:22 95:14 111:1 117:12 120:20 123:1 142:3,24 162:10 168:16 187:22,25 217:19 244:19 247:24 288:5 326:14 344:5 371:16 387:7
**asks**
394:16
**aspect**
70:17 321:24
**aspects**
217:25 218:1 375:15
**assays**
353:12
**assess**
28:19 161:9 177:5 251:4,11,19 253:5,15,17
**assessing**
46:14 245:25 252:6 339:18
**assessment**
43:9 94:7 95:23 128:17

134:12 161:22 209:11 220:6 221:24 344:3,8 345:12 346:10 392:20
**assessments** 209:12 223:16
**associated** 37:16 75:3 192:23 195:9,17 224:18 232:10 246:15 249:23 266:15 267:13,23 290:13 348:17 351:1,10 360:23 361:13
**association** 62:18 63:1, 8,19 64:9 70:15 75:5, 13 83:4 169:24 189:19,20 200:20 224:10 225:24 226:2 230:17 258:10 264:22 267:5 268:2 269:23 286:24 319:24
**associations** 18:19 67:1 74:12 170:9 199:15 202:17,25 221:4,13

223:21,22 225:2,15,17 226:21 276:21 277:4 358:7
**assume** 14:18 116:24 215:25 331:14 342:8 360:7
**assumes** 74:8
**assuming** 97:19 228:11 229:25
**assump-** 89:24
**assumption** 145:15 215:24 217:8 348:15
**assumptions** 89:9,13,25 90:18 91:1, 4,5,7 223:13 349:23 360:9 374:3
**Astrazeneca** 12:16
**atrophy** 238:19
**attach** 15:7
**attached** 73:19 81:9, 25 82:18
**attacks** 277:7
**attempted** 312:10
**attempting** 89:1 389:9
**attempts** 103:3,25
**attention** 43:19 45:9 66:12 86:17

92:24 94:15 140:7 162:16 232:8 241:4 288:19 306:5 313:2 384:8
**attenuate** 198:19 199:14 221:3,12
**attenuates** 213:5
**attenuating** 200:10
**attenuation** 209:18 210:16,17, 21,25 211:2, 14,21 212:9, 12,20 213:20 215:3 216:11 217:13
**attorney** 394:16
**attorney-client** 6:9
**attorneys** 7:20
**atypical** 320:15
**author** 92:11 94:11 140:2 173:13 194:8 202:7 220:8 232:1 233:23 250:19 255:16 258:13 264:7 266:10 271:16 280:14 282:13 289:20 305:21 320:2 327:11 350:14 354:6 355:10 372:2

381:13
**author's** 251:8
**authority** 103:2,24 140:14
**authors** 161:13 164:11 165:12 167:11 168:6 173:9 174:9 176:7,25 177:12 178:22 251:16 252:25 253:7,9,11 264:25 265:10 273:19 275:23 290:15 311:23 317:10,14 318:12,23 356:16
**authors'** 253:2 327:14,16
**autology** 321:21
**available** 17:13,19 136:18 290:10 342:2,3,7,9 343:6 351:22
**average** 211:4,14 212:10
**aware** 6:3 12:25 23:25 27:3 31:24 32:4 33:9 59:2 62:23 63:3 88:14 89:7,

17,23 90:7 106:2,12,13, 21 107:6,21 108:14,17 111:5,11,12, 14 112:2 123:23 125:16 128:21 129:6 134:15,19, 21,25 136:1, 24 137:8 141:13 143:20,21 147:19,22 148:2,11,14, 20 149:2,12, 16,18,21,23 150:6 151:7, 11 153:17 154:24 155:2,5,15 158:4 161:12 167:10 168:17,21 169:2,9,16, 17,23 170:15 183:23 184:2 198:16 201:8 207:12,18, 21,23 208:2, 3,11,14,24 247:24 248:11 258:24 259:2,9 260:3 261:15 288:10,13,15 304:20 305:4 312:16 317:9,18,25 319:8 321:19,25 322:6,16,23 324:20 328:7,14 329:3,6 331:25 332:6 333:8,10,12 340:8 342:24 344:11 345:11 346:1,9,16, 19 347:22,24 348:19 354:24 356:14 357:6 373:7

**awkwardly** 48:7 254:23

**azoxymethane** 386:10 392:25

**B**

**b/pyridine** 186:19

**back** 26:10 51:24 52:1 60:16, 17 73:2 96:16,19 97:15 99:9 130:1 140:25 144:22 147:10 162:20 173:1 174:25 180:11 186:17 194:7 197:1 204:1, 13 208:20 214:6 218:23 221:16 226:8 231:15 244:3 269:20 275:24 279:10 280:4 286:14,15 290:22 292:4,22 301:22 304:9 326:25 343:20 374:8 375:3 393:23 395:1

**background** 86:20 124:15,23 125:14,20 126:2 127:19 128:5,9,24 129:4,13 145:11 173:22 328:12 387:19

**bacon** 187:18,24 228:5,6

**bacteria** 26:11

**bad** 252:25 368:1 372:10,19 373:9,18

**bag** 367:16 374:2

**balance** 335:15,21 337:16 339:8 394:14

**balancing** 337:20 338:8

**bar** 66:18

**barbecued** 187:13

**Barnes** 3:21

**base** 29:6

**based** 11:5 17:18 18:24 20:3 40:24 41:10, 19 43:21,23 44:11 66:5 115:20 120:23 134:1,3 136:15 176:12 183:13 189:16,20 190:4 192:11,12, 13,15 226:21 300:25 322:22 331:13 345:9 348:2,22 349:15,23 356:5,25 360:17 363:16 379:5

**baseline** 106:3 109:11 115:13,17 116:16 123:18 138:11,21 139:5 302:11 303:19 329:24

**bases** 16:10

**basic** 27:18 58:14 59:18 359:13

**basically** 180:20 302:6

**basing** 66:20,23 67:5

**basis** 66:24 67:14 324:22 358:3

**batch** 144:16 157:14

**batches** 144:17 145:14

**beat** 348:6

**beef** 93:19

**began** 243:12

245:12
**beginning**
81:15 202:14 217:20 338:15 384:25
**begins**
361:11 381:19
**behalf**
3:1,7 7:11, 16 11:14 13:5 131:3
**behave**
302:16 364:13
**BEHRENS**
3:21
**belief**
35:11 261:5 356:9
**believable**
275:12
**believe**
21:24 22:1, 24 23:6 32:24 40:12 44:18 77:3 106:11 117:23 133:9 144:13,15 163:18 201:25 225:1,18 237:9 252:7, 11 253:12, 14,17 254:1 271:21 277:23 290:8 298:11 308:1 367:19 368:18 369:16
**bell**
23:24 24:8
**belongs**
84:24
**below**
43:10 127:24 210:24 269:12 290:1 386:14
**bench**
24:22
**benchmark**
137:15 331:18
**benefit**
221:6 222:5, 7,13
**benefits**
222:1
**benign**
49:15 51:17
**Bert**
368:7 372:11
**besides**
189:12 248:9
**best**
28:3 47:19 48:20 101:5, 14 179:20 238:15 243:8 275:21 278:25 351:8,17 361:15 374:25
**beta**
236:9,17
**BETH**
3:21
**better**
70:18 315:4 338:13
**bias**
198:20 201:3,4,11, 12 203:7 213:5 215:9 223:7 225:7 279:19 280:10 281:18
282:11 287:7
**biased**
282:22
**biases**
200:9,17
**Biau-**
93:8
**Biaudet**
93:8
**big**
10:4 312:5
**biliary**
51:1,16
**billed**
14:24
**billing**
19:11 320:25
**Bioassay**
381:11
**bioassays**
350:8,23 351:19 352:6,10,18, 19 385:6
**Biobank**
267:10,11 270:8,9,19, 22,25 271:15,18 272:6 274:24
**biological**
73:15
**biologically**
371:9 382:20 383:5
**biologist**
46:8
**biology**
27:13,19 353:9 359:9
**biomarker**
37:15 347:2
**biomarkers**
369:21
**bit**
20:23 48:17 52:12 76:2
79:19 83:15 96:6 102:18 115:15 180:25 205:3 236:2 252:15 254:23 307:2 321:2 323:20 324:5 330:18 331:3 353:16 361:12 367:12,23 370:9 373:16 374:2,11 384:5
**blacked**
313:8,12
**bladder**
77:8,12,14, 16,17,22 78:21
**blatant**
299:12 300:2
**blocker**
140:1 273:6
**blockers**
258:11 260:16 261:4 273:8 278:14,22 303:22 330:20 331:1 333:1
**blow**
47:3 60:24 65:10 118:25 130:23 133:23 135:5 140:5 141:3 146:7,10 150:11 162:21 176:6 178:7 186:8 194:1 196:9 202:13 210:7,10 214:23 220:24 232:4 234:2 235:2

250:23 255:20 258:19 270:20 271:3 280:19 282:8,17 283:20 289:19 291:1,4 293:2,5,25 297:20 306:6 314:12 323:24 324:13 329:21 336:1 352:7 354:11 372:15 385:1
**blowup** 147:10
**BMI** 196:23
**boat** 206:22 207:3
**Bob** 29:9
**body** 50:25 61:6 89:11 94:18, 20 97:2 98:2 100:17 388:24
**bold** 43:20
**book** 183:22
**Borriello** 7:16
**Boston** 23:9
**bottle** 107:11,24 109:4 111:7, 8 139:1
**bottles** 108:9 138:8
**bottom** 42:16 53:22, 25 54:4,18 62:4,12 63:4 117:7 127:16 162:22 184:22 188:12 194:6 195:3 210:9 212:19 235:7 236:3 259:25 268:10,11 271:4 283:14 313:4 324:7 341:5 360:18
**Boushey** 355:15
**box** 42:23 92:19, 21 159:25 160:3
**Bradford** 78:9,12,13, 15,20,24,25 79:11,12,14, 20 80:16,21 81:2,8,24 82:4,17,23 83:9,12,18, 23 84:1,4, 11,17 85:6, 12,18 86:4,6 227:17
**branch** 40:22 207:14,16 208:13,14
**brand** 152:4,13,19, 25 153:3 157:20,21,25 158:3,14 159:3
**branded** 124:24 128:24 129:7
**brands** 119:2,6,25 121:1 122:11
**Braunstein** 124:16,17,22 125:9,16,17 126:18 128:4,15 305:10
**Braunstein's** 305:6
**break** 10:8,19 14:14,15 30:17 112:20 113:15 114:3 129:18 172:15 231:4 236:1 279:4 343:14 346:17 393:18
**breakdown** 48:8 345:7
**breaks** 72:15 109:22 110:18
**breast** 279:20 280:11,23 281:7,22 282:12,20,23 283:3 284:5 286:25 376:14
**BRIAN** 3:4
**brief** 72:25 129:24 231:13 279:8 343:18 393:21 394:24
**bring** 300:14
**broad** 49:19 69:3 74:10 284:21 286:2 355:8 357:5 360:2 361:16 363:19
**broader** 76:2 245:24
**broadly** 225:11
**broken** 107:11
**Bumpus** 125:17,24,25 126:12 128:21 305:5
**Bumpus'** 125:25 305:10
**burdens** 377:7,17
**button** 6:24 280:2
**buy** 52:16 227:5, 7 228:23 229:10
**buying** 226:22 363:22
**bypasses** 347:14

## C

**cabinet** 115:9
**caffeine** 285:1
**calculate** 89:9 100:5 191:8
**calculated** 190:18 191:1 196:2
**calculation** 90:3,19
**calculations** 89:14 90:1 161:17 344:20

**California**
3:10,15 329:2 375:6, 10
**call**
66:11 189:19 299:7,10,13 311:11 322:9
**called**
8:13 187:2
**calling**
55:17 92:12 373:19
**calls**
248:20 262:1 384:8
**caloric**
226:1
**calories**
236:10,18
**camera**
10:10
**can-**
36:10
**Canada**
152:24 153:2
**Canadian**
282:20
**cancer**
12:18 13:2 16:25 21:23 22:19,23 26:2,4,12, 15,24 27:12, 19 28:22,25 29:7,18 31:14 32:18 33:18 34:1, 4,10,12,14, 16,19 35:6, 19,22 36:6, 7,15 37:16, 18 38:24 39:4 41:16 46:7 47:6,14 48:16,20 52:12 55:21 57:19 62:19, 20 63:2,9,20 68:17 70:24 71:8,11,17 74:3,9,18, 23,24 75:3, 15,24 76:8, 15 77:6,8, 14,16,18,22, 23 78:7,16, 17,18,21 80:5 82:6 83:5,7 84:14 85:15 86:1, 10,13 87:13 101:7,13 117:4,7 139:25 156:7,11,17, 25 157:8 160:17,23 161:1,9,25 162:7,14,15, 24 163:2,7, 16 164:2,5, 6,8 165:4,23 166:10,11, 14,19,21,23, 25 167:6,12, 13,17 168:2, 7 171:2,7 173:11,14 174:11 176:16,22 177:2,15,20 178:16,20 179:3 181:5 182:13 183:7,11 185:2 186:10,11 189:4,8 192:8,20,24 194:12,20,21 195:1,10,18 196:6,12 203:18,24 204:4,5,11, 21,25 205:6, 22 206:12, 15,23 207:4, 13,20,24 208:1,3,6,7, 9,23,25 209:6 216:3, 5,17,19,20, 22,24 217:2, 9 218:4,11, 17 219:7,14 221:16 222:8,19 224:1 225:12,14, 16,18,19 226:3,7,11, 14,23,25 227:22 230:1,11 231:25 232:11,18 233:22 234:14 236:8,16 238:6,13,16, 19,24 239:2, 4,8,15,17, 22,23,24 240:1,3 241:7,15 242:10 243:4,12,13, 14 244:9,16 245:3,4,11, 16,18,19,21, 22 246:2,4, 7,16,17,18, 20,21,22,25 247:2 248:8, 22 249:2,19, 23 250:15 251:5,12,19 252:4,6,13, 20,23 253:6, 10,16,18 255:5,15 256:2,8,13, 24 257:3 258:10 261:3 264:4 265:4, 15 266:9,15 267:6,12,14, 23 268:23 269:24 270:11 271:15 272:7,13,20 274:5,10,18, 22,23 275:1, 3 276:22 278:6,8 279:20 280:11,23 281:7,22 282:13,24 284:5 285:14 286:25 287:23 289:25 292:16 293:7 295:16 297:8 301:7,17 302:24 303:3,5,12, 15,23 304:7 305:19 306:9 307:8,9,23 308:22 309:5 314:8 325:1, 6,8,13,20 334:8,9,10, 14,15 351:9 352:3,16,17 353:9 354:17 358:6 359:15 360:6,23 361:9 364:21 367:25 368:1,4,7, 11,23,24 369:1,15,18, 23 370:2,12, 17,20,22 371:4,15 372:1,23 373:25 374:1,7,18, 20,21 375:1,

8,17 376:14, 15,16,17,22, 23,24 377:2, 9,11,19,20 378:1,9,10, 16 379:9,14, 15 381:12,24 382:2,5,8,18 384:1,20 386:1,7,10, 11,13,15,19 387:8,10,14, 18,19,24 388:2,4,15, 21 389:1 390:17 391:10,11,15 392:18,21

**cancer's**
390:20

**cancers**
167:22,24,25 177:17 180:24 224:18 225:24 238:23 239:11 240:8 241:12 244:1 246:11 247:6 248:9 249:3 275:10,15 277:5 293:10 296:1,22 297:1 298:1, 17 306:14 307:1 308:4 309:6 317:4 327:11 351:1,11,12, 15 354:2 358:7 359:7, 14 367:20,21 368:8,13,17, 20,22 369:4, 10,17 370:2 373:4,13 375:10

376:12 378:18 379:20 380:3,4,6, 12,13,15 381:1 390:19 393:1,11,12

**Candida**
7:16

**capable**
156:6,17 382:7

**capacity**
13:23

**captured**
19:1 259:11 261:13

**car-**
248:17

**carcin-**
248:8

**carcinogen**
22:4,18 25:12,24 26:13 32:20 33:1,3 36:4 40:10,14,17, 18,21 41:2,4 61:13,24 62:1 64:3,7, 16,21,23 65:7 68:6,18 69:14,23,24 70:1,4,8 72:2 81:6,21 82:15 83:17 131:12 186:24 238:7 248:18 317:3 346:22 353:13 356:4,8,10, 11 361:8,10, 14,18 362:8 363:6,10,15 364:7,14,19 367:18 392:20

**carcinogenesis**
25:16 26:2, 6,19 35:20 36:13 47:16 66:24 249:20 350:8,22 351:19 352:6,10,13 353:3 355:7, 19 356:21 357:17,20,25 358:24 359:11 360:11,16 363:6,22 365:5 381:11 383:8

**carcinogenic**
32:23 33:6 36:10,17 37:22 44:1, 14,19,22 45:24 46:22 65:21 66:2 72:6 117:1 157:12 227:10 240:24 242:6,14 243:18 247:5,10,14, 17 310:24 344:17 347:17 348:18,25 352:12,19,22 353:12 360:25 362:6,9 363:1,10,14 365:13,23 366:3,8,12, 24 382:24 383:9,21 385:8,14,21 387:13,21 388:24 389:3 391:1

**carcinogenicity**
61:8 65:15 66:21 241:22 354:18 363:25 364:5 382:23 386:9

**carcinogens**
26:3,9 27:2, 9 204:8 242:8,15,19 247:25 248:7 352:17,20 353:11 355:14 358:23 359:7 361:24 362:5,22 366:19 384:5,12,15, 20 388:20 389:5 390:15,17 392:19,24

**carcinoma**
49:17

**cardiovascular**
222:3

**care**
269:24 271:1 321:4

**careful**
37:14 65:2 230:9,15,19 349:22

**carefully**
232:25

**Carlo**
89:18,20,24, 25 90:3,8,9

**CAROLINE**
3:19

**carotene**
236:9,17

**carried**
73:11,12,13, 24 352:11

**case**
10:22,23 11:11,15,21, 23 12:6,11, 13,14,15,17, 21 13:1,5, 14,15,24 15:1,10 18:20 21:3, 22 68:15 74:14 102:13 115:25 145:22 146:22 148:8 185:2 186:3 189:1 205:19 283:25 286:18 308:11,19 311:5 318:2, 8 354:16 358:23 359:1 362:2 363:11,16 364:15,20 366:6 368:6 394:4

**case-control**
231:25 279:19 280:10,22 282:19 308:6 339:4

**cases**
11:8 12:5,8 216:7 221:25 223:1 238:11 239:13 278:21,22 282:13

**Cassin**
3:24 7:10

**catch**
356:24

**categories**
85:14 285:1 286:2

**category**
86:8 384:4, 13,23

**causal**
78:7

**causality**
63:8,18 66:11 75:11 222:8 266:25 273:10 277:12 308:9 311:2

**causally**
360:23 361:12

**causation**
46:9

**causative**
278:4

**caused**
143:23 361:9 375:1

**causing**
156:17 245:18 275:3 277:24 348:17 349:13 358:5 382:8 386:10,11 388:4 392:21

**caution**
46:10,25 383:25 384:10,15

**cautioned**
355:16

**cautious**
179:7,15 367:13

**caveat**
265:13

**CC**
314:3

**cc'd**
313:12

**celecoxib**
11:9

**Celexin**
11:21 12:6 13:13

**cell**
9:18 32:18, 19 45:6 49:17 374:7 375:23

**cells**
28:17 67:8, 10 373:24

**cellular**
208:8

**Celsius**
111:11,19 112:7 115:2 119:8 121:2 122:14

**center**
9:7 23:5 203:19 216:22 217:2 328:25

**CEO**
130:13

**cereals**
284:19

**certain**
57:24 156:21 324:3 332:12 345:21,22 390:18

**certainly**
25:5 34:14 35:9 36:6 38:23 39:1, 21 47:13 52:20 55:4 64:19 65:4 66:19 68:10, 20,24 69:23 70:16 71:2 84:2,3,8 85:8,20 100:20 113:25 116:2,6 123:23 124:2 125:7 127:14 132:22 137:11 138:25 145:21 151:17,23 152:1 157:6 183:4 186:3 189:13 193:16 195:25 196:4 205:5,18,19 217:22 219:19 224:2,11 227:8,13 229:13,17 238:16 239:12 243:6 245:20 247:7 251:22 256:14 266:24 267:1 275:7,22 285:13 302:10 308:11,16 310:15 311:21 316:8,19 317:14,24 322:12,14 329:13 332:12 333:6 335:17 337:24 340:2,4 345:10 347:13 356:24 359:10 362:18 365:6 367:21 369:9,14 371:14 375:25 384:10 386:7

387:1,14 388:18,19
**certainty** 242:13
**cervical** 376:16 379:14
**Cesare** 350:10
**cetera** 38:16 237:7 277:7,8 384:13,14
**chain** 109:15 110:11 116:18 117:19
**chairs** 205:3
**challenge** 321:10
**challenged** 367:25
**challenges** 202:16 278:5 321:6 339:23
**CHAMPION** 3:19
**Chan** 139:16 140:3 156:3 158:12
**chance** 71:3
**Chang** 327:17,18 328:8,13,15, 25
**change** 28:6,13,14, 18 29:7 144:11 147:1,6,15 149:13,22 150:3 151:3, 8,25 302:10 310:22 311:2
**changed** 144:13
**changes** 29:4,12 95:22 135:15 151:23
**characteristics** 27:2,8,22 302:12 303:20 329:24
**characterization** 47:8 115:4
**characterize** 249:5
**characterized** 47:20 48:20
**charge** 276:24
**chart** 196:8
**Chattem** 3:7
**check** 321:11
**checked** 15:2 321:13 337:11
**checkpoint** 377:15
**cheerleading** 363:21
**cheese** 93:19
**chemical** 348:12,24 349:12 350:22 351:16,18 357:17,20,25 359:8 363:12
**chemically** 350:25 351:10
**chemicals** 26:4 346:25 347:5,9,11 350:7 352:2 354:2 358:5, 22 359:13 360:4,22 361:12 381:20,24 382:4 384:16 386:3 393:9
**children** 94:19 98:19
**China** 148:23 151:2
**Chinese** 254:8
**Christine** 282:15
**chromium** 248:12,14,25
**chromosomal** 28:8
**chronic** 26:18 205:20 238:20 290:13 319:24 368:21
**chronically** 263:3,4,14
**cigarettes** 243:11
**cimetidine** 268:15,21,23 269:8,11,13
**circumstance** 359:9
**cirrhosis** 295:7 297:25
**citation** 356:19
**citations** 65:5
**cite** 51:22 91:20, 21 108:23 109:18 113:7,11,19 114:14 125:5,8 129:13 185:8 193:2 199:4, 9,12,16 203:5 220:20 355:15 356:22 357:10,11
**cited** 90:13 107:7 110:5 118:9 123:21 125:6 208:5 220:11 222:16 357:7 358:12
**citing** 52:14 212:9
**citizen** 113:7,8,20 131:3
**city** 9:4 371:11
**civil** 121:15,19
**claimed** 12:18 225:10
**claims** 133:17 258:12 322:8 363:19
**clarification** 372:9
**clarifies** 383:17
**clarify** 309:18
**class** 41:1 64:5 361:10,19 363:15
**classic** 26:8 238:12 356:4 369:20

**classification**
41:10 70:4
71:3,13
**classified**
41:3 64:5,6
193:12,15,16
230:8 356:3
361:18
362:22
384:10,21
**classify**
39:20 65:1
193:18 356:7
**classifying**
213:12
370:23
**clastogenic**
44:25
**clear**
55:11 87:3
122:2,5,22
129:5 153:15
229:14
235:12
243:10 247:8
248:6 302:14
316:24
323:20
344:15
361:14
370:14
374:19,23
380:14 384:3
386:5,12
389:14
390:16,24
391:19
392:23
**clearly**
44:1,14 47:6
77:9 208:16
243:17 245:2
301:25
361:23 370:9
378:15
**click**
6:23
**clinical**
18:7,21 20:5
21:7 24:24
74:10 76:4
84:6 140:13
227:2,4
228:20,23
229:7,9
239:4 240:3
241:14
242:24
253:24,25
254:2
257:14,21
269:25 271:2
313:21,23
316:10
320:23
321:1,5,7
337:24 340:7
369:21
**clinician**
262:13
**clinicians**
245:9
**close**
101:18
203:18
262:12
306:24 309:2
331:21
364:23 365:3
387:19
**closely**
367:9 377:23
389:3
**closer**
363:11
**clues**
336:19
**co-lead**
154:21,22
**co-linked**
248:7
**codes**
320:8,11,13,
14,18,24
321:8,12,14,
16,18 322:1,
7,13,18,22
323:13
**coefficient**
210:19,20
**cohort**
140:8 141:15
142:17
194:12
202:4,18
209:19
250:17
267:11
280:23
291:21
296:1,17
304:15
305:20 314:9
329:24
333:19 334:3
339:6
**cohorts**
93:4 271:23
293:12 296:3
304:12
334:22
**Colin**
313:14,18,20
314:2
**colleagues**
203:18 217:1
**collected**
284:2,4
287:1 291:9
**collecting**
19:20
**collection**
249:16
285:18
**colon**
386:11
**colorectal**
78:17 85:25
164:5,8
165:4,23
166:10,14,23
167:13
173:11,14
174:11
176:17
177:15
239:16,22
376:15,24
378:10
379:14,15
380:3
**Columbia**
9:6 23:5
216:22
**column**
65:9 140:25
169:22
236:14,20
276:10
**combination**
26:22,24
320:7,10
347:11 391:6
**combined**
98:10 236:8,
16
**come**
31:6 77:4
224:17 237:9
254:22
275:15
311:24
367:24
**comes**
19:13 39:12
52:18 242:25
278:11,23
**comment**
38:13 52:7
82:25 83:9
90:5 100:11
102:11 104:7
108:18
110:13
124:18
133:19 161:8
167:18
173:13 175:1
185:22,24
186:4 193:20
200:1 244:19

262:4 273:25 316:1 317:17 326:22 330:19 331:2
**commented**
40:7 69:2 88:21 133:16 162:11 372:12 383:12
**commenting**
177:8,14 178:3 222:23 351:7
**comments**
251:20 316:10
**committee**
217:1
**common**
26:16 109:23 112:21 114:4 187:3 200:22 204:5,6,7 219:6 246:22 354:17 373:3,13 390:20
**commonly**
186:22
**commonplace**
113:15
**companies**
19:7 20:21 149:8 152:11 317:16
**company**
11:5,18 13:7 19:19 151:1 328:8
**comparable**
275:6
**comparator**
75:8 273:3 274:3 278:7, 16 304:14
**comparators**
278:6,19 279:1 304:1
**compare**
57:18,22 273:15 278:13 284:9 288:3,5 300:18 306:21 341:17
**compared**
47:21 48:2 49:5 50:1 51:8 53:8,25 54:6,20 77:19,23 88:3 195:3 196:21 234:4 246:19 272:7,14,21 273:22 274:11,18 281:13 292:24 293:19,23 294:4,5,8, 11,14 295:12,17 296:2,20,22 300:19,23 301:8 302:4 303:16 304:3,7 306:14,15 308:22 309:15 319:25 345:16 346:3
**compares**
292:15,16
**comparing**
91:11 273:4 278:15 281:11 283:7 284:1 292:19 297:13 298:23
301:19 306:25 310:5 311:8
**comparison**
57:4 58:11 171:7 273:2, 13,25 288:9 304:6
**comparisons**
57:16 272:24 275:16 278:12 292:17,25 293:15
**compelling**
227:17,20,23
**complete**
39:24 40:4
**completed**
209:9 282:25
**completely**
30:24 120:12 255:5 256:12 298:22 299:2,17,24 300:8 308:10 311:24
**complex**
29:8 205:12
**complicated**
99:23
**complicating**
49:14
**complications**
277:4,25 278:2
**component**
199:13 221:2,11
**compound**
36:1 65:2 71:4,13 187:3 348:24
**compounds**
22:23 187:10 188:23,25 189:16
228:10
**comprehensible**
316:5
**comprehensive**
68:3 69:11 153:8,20 200:24
**compute**
336:7
**computer**
9:17
**computers**
9:19
**con-**
164:20
**concentration**
47:21 48:1, 21 49:5 50:1 51:8 126:25 127:15
**concentrations**
127:3 385:7, 25
**concept**
27:18 58:22 59:3,18 359:11
**concern**
51:14,22 61:8 100:12 223:20
**concerns**
100:21,23,24 135:11
**Concise**
43:8
**conclude**
67:16 203:21 225:20 366:23
**concluding**
165:2 389:4
**conclusion**
56:1 59:17 65:5 67:4

91:16 117:4 119:22 159:17 160:14,21 161:19 162:15 166:8,13 177:7 182:11 204:3,11 207:22 225:2 264:25 265:24 266:6 302:6 326:9 342:14 347:20 348:23 357:4 364:25 374:15

**conclusions** 17:18 69:21 89:15 96:9 99:8 161:11 213:21 229:21,23 252:21 266:13 281:16 301:4 312:5 349:15,23 360:2 361:4 367:13 379:2

**conclusive** 367:15,18

**conclusively** 359:13

**concordance** 354:14 355:2,24

**conditions** 18:9 111:10 113:3 115:1 117:17 119:8,18 120:8,16 121:2 122:13 123:16 128:9,16 135:21 138:2,5 139:6 153:18 369:20

**conduct** 134:12

**conducted** 136:9 282:20 337:20 338:8 385:6

**Conference** 121:5 122:16

**confidence** 37:21 56:12 59:6,9 164:21 166:24 167:23 170:1 174:22 179:9,18,22, 24,25 180:4 182:19,20 183:3 232:24

**confident** 136:19 137:1 138:15 143:5 144:5 265:11 359:6

**confirm** 265:6,22 326:1

**confirmed** 170:11 362:6,24 363:1,25

**confirms** 180:21

**confounder** 235:20

**confounding** 75:10 176:14 188:19 237:16 266:25 273:9,20 274:20 275:21 277:11 303:6 308:8,19 310:9 311:1 336:6,13

**confused** 90:21

**confusing** 48:17 74:7 76:19 79:20

**CONNOR** 3:15

**connor.scott@ dlapiper.com** 3:16

**consensus** 275:9 359:6 378:17

**consent** 8:7

**conservative** 66:10 70:6 242:17

**consider** 91:14 95:8 123:16 124:14,21 125:4 179:9, 17 182:25 212:11 215:7 296:7 297:9 319:5 382:7

**considerable** 65:15

**considered** 45:23 84:3 88:3 95:15 116:12 125:7 132:3,6,8,16 133:2 163:11 201:23 215:12 257:13 296:6 318:1,7,9,25 329:14,16 371:5 382:7

**considering** 218:3

**consistency** 175:7

**consistent** 65:17 67:7 83:3 127:18 128:18 173:19 174:14,18,19 175:3 274:2 297:6 352:15 383:20

**consistently** 61:12 364:14

**constant** 128:7

**constitute** 358:2

**consult** 327:25

**consulted** 328:4

**consulting** 327:17,19 328:9,15

**consume** 221:5

**consumed** 286:2

**consumer** 109:21 110:18 112:19 113:3,14 114:2,4 116:19

**consumers** 109:23 110:20 112:21

**consumers'** 107:10 117:20

**consumption** 93:3 98:11 117:2 190:8 194:11

**contained** 16:10 77:11 103:11

143:6,13
**contains**
275:4 292:9
**contaminant**
66:12 143:2
265:4 317:2
**contaminants**
144:25
**contaminated**
68:23 142:6,
9,18 143:1,9
144:8 146:20
150:19
151:18
153:9,13,21
155:3,6
156:2,5,14,
24 160:18
161:2 182:14
250:16
**contamination**
141:19,21
142:11,16
143:24
144:4,19
145:6,13,25
146:3,25
147:5,14,20
148:3,7,21
149:25
150:23
151:14,22
152:1,6,21
153:12,14,25
154:10,11
155:16,21
158:7,9,12
316:25 340:4
**contamination s**
152:9
**contents**
187:9
**context**
19:19 87:15
224:9 252:19
257:14
370:10
**contexts**
370:8
**continue**
115:19
121:21
**continued**
4:25 5:2
327:24
**contrasted**
281:4
**contribute**
325:18
373:2,11
**contribution**
371:25
372:22
374:19
**control**
53:9,25
54:6,20
77:19,23
140:11 182:5
184:16 185:2
226:10,20
282:24 284:1
286:18
308:19 336:5
**control-study**
189:2
**controlled**
229:16
308:10
**controls**
189:17,18
282:13 339:7
**controversial**
359:21
**convenient**
144:14
**conversations**
6:5,8
**conversion**
128:13
**convey**
221:6 255:2,
3
**convince**
365:6
**convinced**
308:18
369:12
**convincing**
227:18 362:1
364:18
374:13
**cooked**
187:15
189:12
**cool**
124:24
128:23 129:8
**copy**
87:9 160:7
289:17
**corner**
6:24 176:17
184:16 341:6
**cornerstone**
350:23
351:21
**corre-**
349:5
**correct**
11:18,19
13:3,9 15:25
16:5,7,8,11,
12,18 17:1,5
19:2,8,20,25
21:23 22:5
24:17 25:9
27:9 28:22
29:19 31:15
32:9 33:8,11
34:7,20
39:13,24
40:5 41:6
42:3,5
43:14,15
44:7,8 48:15
53:4 54:6,20
56:8,9,14,18
57:2 58:8,18
59:9,13,24
63:14 66:22
67:8,15
78:10,18,19,
21,22 79:3
80:21 81:9,
25 82:18
83:20 87:5
90:14 91:16,
20 93:16,21
94:25 95:5,7
96:12,24
97:4,23
98:2,25
99:5,24,25
101:20 102:5
104:10,20
105:4,17
106:5,10,11
110:2,11,21
111:13
112:14
113:17 114:8
115:11,20
119:18
120:8,16
121:11
122:20
123:14
126:15
127:15
129:14
130:21 132:8
133:3,8,11
138:18 139:7
140:3 141:16
142:18
146:21 151:6
156:7,17
157:1 159:9,
10 160:23
161:3 163:7
164:15
165:14 166:5
167:22 168:9
170:24
171:20 172:7
173:11,13
174:22
175:9,25
176:2 177:5

181:20 182:20 185:9,13,18, 25 188:8,19 190:1,16,22 191:16,22 192:2,20 193:1,8 194:16,17 195:11,19 196:17,24 197:3,6,23 198:9 199:5, 24 200:3,10, 20 201:23 202:8,9,11 203:8,14 208:18 210:2 211:10,22 212:6 213:9 214:14 218:8 220:12,19 221:13 232:2,3,18, 20,22 233:6, 12 234:24 235:10,14,23 236:18,22 237:3,18 238:8 239:5, 18 240:4,18, 19 241:1 242:1 243:1 246:7,12,16, 20 247:2,12, 20 250:2 253:24 254:21 256:8 257:4,8 264:5,8,12, 13,18 266:11,12 267:6,8,19, 20,24,25 268:3,4,7, 17,19,24 269:9,13,14, 17,18,25 270:4,5,8, 12,13,15,16, 19,24 271:6, 7,17,20,23 272:10,15,22 274:12 276:14,17 281:14,15 282:14 283:10 286:3 287:18,23,25 290:2,7,16, 19 291:13 292:2,18 293:1,17,20 294:15,20,25 295:4,8,13, 14,18 297:14,17 298:2,6,20 303:7,14 304:8 307:1, 25 309:16, 17,25 310:10,11 313:13 318:3,8 324:16 325:20 326:6,20 327:12,13 328:1 329:15,17 331:12 333:22,25 334:4,6,11 341:15,19 342:4,10,22 343:24 344:4,9 348:4 349:8 350:19 358:15 365:14,17, 19,23 366:3, 8,13 376:6,7 377:2 385:23

**correction**
323:16

**correctly**
337:20 338:8 367:1

**correlate**
189:6 377:14

**correlates**
234:14

**correlation**
136:10 245:10 344:12,18 346:19 349:6 353:19 374:9 375:22,25

**correlative**
223:24

**correspondence**
285:5

**counsel**
7:3 8:6 9:10 15:11 154:21,23 159:22 289:13

**counted**
325:13,17

**counter**
339:19

**countries**
32:6

**country**
31:25 332:17

**couple**
14:2 194:2 228:8

**course**
27:21 39:18 41:2 73:15 75:6 107:2 149:17 177:23 198:1 204:19 215:14 239:7 285:7 301:13 332:12 348:13 351:12 361:22 369:18 375:1

**court**
7:20 14:8 82:7,11 173:16,20 174:4,8 372:9

**covering**
186:11

**cow**
299:18

**create**
67:4

**creates**
202:15 213:5

**creating**
6:12

**credence**
252:18

**criteria**
17:21 63:7, 18 68:5 69:13 79:17 83:19 84:17 85:6,12,18, 24 86:4

**critical**
21:9,12 47:6 50:24 369:14

**criticism**
33:19 100:10 316:9 322:21

**criticize**
21:4 52:8

**criticized**
20:16,24 100:3

**Cross-talk**
62:10 81:17 87:1 148:12 200:14 268:13 299:1,5,23

**crystal**
108:22

**culpa**
206:20
**culprit**
348:25
**cultural**
375:15
378:21
**Cumulative**
260:1
**custom**
321:21
**cut**
147:23
**cutting**
27:12
**CV**
24:22 183:25
**cystadenomas**
51:2
**cystoadenomas**
51:16

**D**

**daily**
259:18,21
341:9,21
**dairy**
284:23,24
**damage**
26:17 39:7
61:5 393:6
**Dan**
10:2 31:1
72:11 81:12
120:17
159:19
172:13 280:1
299:20
300:11
328:20 343:8
**Daniel**
8:20
**Danish**
331:11,13,15
333:9,12,16
334:25 343:1
**data**
19:1 40:23,
25 46:14
51:23 54:2
55:11 62:15
63:6,16
64:13 66:5,
6,25 86:7,8
93:3 98:11
99:15
107:13,15
110:1 113:6
116:2,22
117:2 125:8
127:6 136:15
139:3,5,6
140:13
144:10
153:11
157:3,17
158:11 159:8
170:8 176:12
177:3 180:25
183:13
244:25
256:19
263:11
284:3,4,11
285:18
287:1,8
288:16 291:8
296:12,19
297:5 298:22
301:1 302:19
303:10
311:23 319:2
322:24
323:3,18
324:21,25
325:6 326:4
332:19,23
335:1 342:15
347:19
349:10,24
356:13
360:3,9,20
361:7,25
362:17,25
363:23
364:17
365:4,21
366:5,22
367:11,15,18
375:21
382:20 383:5
386:17
388:17,19
392:22
**database**
62:14 141:9
258:12
261:14 270:7
276:8
288:16,17,18
291:7,13,22,
23 292:2,9
294:18
298:16
311:12,17
315:6,13
320:6,9,18
321:24 322:8
325:12,15
326:5,13,15,
19,22 330:23
**databases**
17:9,13,16
18:3,4,23
19:5 20:4,
10,15 21:5,
13 74:11
261:24 270:3
311:10
320:15 321:7
**date**
11:25 16:2,3
46:12
136:11,21
137:3 138:17
325:19
333:21 334:4
**David**
350:11
**day**
51:1 61:7
94:25 99:5
102:15 107:5
137:14
197:5,18,23
235:13,14
237:3,11
263:6,9
325:16
**days**
115:9 260:15
313:15
**DDD**
259:11,16,17
260:5
**DDW**
288:12,14
290:19
291:18
292:23
298:18
313:15
**De**
185:3
**DEA**
149:19
**deal**
388:24
**Dealing**
202:2
**Dear**
130:16,24
314:7
**death**
28:17 35:23
36:5,15
**debate**
172:2
**decade**
152:14
153:1,2
**decades**
18:6 44:5
238:8 239:15
**decades-old**
359:5
**December**
325:15
**Dechert**
9:5

**decide**
18:12 45:16
**decided**
41:3 111:6
**decipher**
380:19
**decision**
135:1 313:17
315:21
316:11,22
**declare**
8:4
**decrease**
170:9 205:13
207:20
300:23
**decreased**
268:23
297:13
298:19
**decreases**
245:22
**deep**
78:4
**defect**
143:17,19,23
**Defendant**
3:1,7
**defendants**
13:5 105:24
108:8 111:6,
13,15 112:3,
12,18,23
114:20,25
116:16
117:15
**defendants'**
110:3,4
111:1,21
112:9
**defending**
244:13
**defense**
125:24
304:21 305:5
**deficiencies**
40:1
**deficiency**
40:8 204:14
226:17
**define**
73:22 74:13
187:3 259:18
332:13
370:21
380:10
**defined**
26:13 41:25
211:24
259:20
341:9,21
**defining**
183:2 388:15
**definitely**
65:6
**definition**
140:8 259:18
387:17,22
388:2,5,9
389:15 390:7
391:22
392:11
**definitions**
371:5 388:13
**definitive**
228:1
**definitively**
64:20 360:6
**degradation**
108:20
115:13,22
116:3 148:10
**degrade**
115:19
**degraded**
117:6
**degree**
39:16,19
111:11
115:12 119:8
215:2
224:16,17
**degrees**
111:19 112:6
115:1 120:2
121:2 122:13
123:10
124:1,5
138:6
**demonstrate**
244:16
331:17
346:10 349:4
362:24
386:23 387:2
388:10
389:17 390:9
391:24
392:13
**demonstrated**
33:6 135:21
136:2 137:21
243:24 246:5
267:10
297:12
362:7,8
364:5
365:12,22
366:2,7,11
367:2 373:8
376:25 378:7
380:5 389:16
**demonstrates**
253:16 274:9
310:24
332:19
345:14 367:7
**demonstrating**
249:22
276:21
386:21
**Denmark**
331:5,6,11,
24 332:1,19
341:10
**denominator**
97:17
**density**
209:21
**department**
345:15,18,20
**departments**
344:24
345:1,2,8,
16,22 346:2,
4,8,12,18
**depend**
239:7
**dependent**
19:6 392:21
**depending**
56:16 73:10
100:14 102:1
175:21
332:17
**depends**
56:19 90:10
211:23
332:12
364:11 387:3
**deposition**
6:18 7:2,21,
23,25 30:6
120:22
217:20
**depth**
68:15
**deputy**
368:10
**descendents**
375:6
**describe**
12:24 33:13
140:10
186:23
**described**
29:9 40:2,25
225:16
**describing**
11:24 58:11
214:18
**description**
25:16
**design**
56:16,21
175:12 323:6
324:24 325:4

**designated** 119:6 122:12
**designed** 74:1,4,9 175:15,16 181:22 320:25 352:10
**designing** 175:20
**desirable** 337:25 338:14
**detail** 39:16 52:6 82:22 215:13 311:16,24 317:22 318:25 319:4,12 320:20 338:24 339:13,22 372:5
**detailed** 25:16 382:12
**details** 34:23 35:7, 15 91:5 112:10 124:13 148:15,18 152:16 154:14 249:1,4 262:3 321:23 328:6 335:12 346:7,17
**detect** 33:25 248:1 256:1,7 326:6 385:13,14,17
**detected** 128:8
**detecting** 202:25 246:10 385:8
**determine** 74:1,4 171:19 175:16 248:17
**determined** 378:19 379:5,11 380:16
**detoxifying** 393:7
**develop** 29:1 33:18 34:10,11,16 238:22,25 348:12
**developed** 33:24 34:10 35:6 36:6 37:24 267:12 293:7,9
**developing** 74:18 75:23 76:14 243:12 290:14
**development** 35:19 37:16 50:23 51:1 239:3 240:3 241:14 255:16 256:2,8,12 370:12,17 372:1,23 373:3,13
**diagnosed** 334:8
**diagnoses** 321:3 335:2
**diagnosis** 284:5 325:8 332:21 369:22
**diagnostic** 281:7
**diagnostics** 336:24
**dictated** 375:15
**die** 33:17 35:3, 10
**died** 33:11 34:1,6 35:13,25 36:11 326:20 367:4
**diet** 87:9 187:13 189:12 192:19,22 203:22 204:5,17 205:5,19 206:11,15,20 207:3,20 208:9,19 217:9 222:2, 14 225:18 279:20 280:11,22 369:13
**diet-** 24:19
**diet-disease** 202:17
**dietary** 24:15,20 25:3,5 63:14 64:10 68:22 79:2,15,22, 25 80:3,19, 25 82:22,25 83:4 84:15, 16,22 85:5, 9,17,20 86:3,6,23 93:2 101:1 176:9 177:4, 17 184:14,25 185:18,25 186:12 187:14 188:21 189:1 190:5 191:25 194:11 198:18 199:18,24 202:3,15 203:6,12,19, 23 204:2 205:25 208:16 215:18 216:2,23 217:3 218:12,15 219:14 220:6,17 221:23 222:12,18,24 223:16,21 224:5,14 225:2,13,21 226:3,21 227:7,24 229:19 234:13 281:4,5,12, 14 283:8,10 284:2 285:22,23 371:13 378:22
**diets** 25:2 87:5 88:9 189:10 191:20 198:6 204:18 205:11 206:23 207:9 224:6,8 226:13 228:4 283:1
**differ** 18:9,10 187:19 207:9 224:7,8
**differed** 204:18
**difference** 53:16,21 54:9,11 55:9

58:1 59:7,8, 10 60:6 76:25 143:15 144:16 175:6,17 181:13 182:4,8 196:20 237:12 256:25 273:19 277:16 297:4,7 302:8 386:20
**differences** 39:12 45:19 54:25 55:7, 25 65:19 67:13,20 167:20 168:4 175:22,24 176:2 180:1, 23 181:23 189:12 215:23 223:2 228:11 252:22 303:19 342:24 367:8 391:14
**different** 12:19 30:4 46:7 49:23 55:5 57:15 60:12 68:9 73:10,16 119:2,6,25 120:25 122:11,24 175:11,17,19 182:10 187:1,19 189:3,11,14 190:21,23 204:4 224:6 254:3 257:23,24 258:2 271:22 272:24 277:14 278:12,14,19 287:2 308:4 310:17 311:10,25 338:16 339:2,8 345:4 346:7 370:8,20,23 371:15 377:8 379:25 388:6,7,13, 17
**differential** 198:13 281:19
**differently** 42:2 83:15 191:2
**difficult** 45:18 88:20 161:25 162:8 168:2 246:24 360:7 368:16 369:19,23
**difficulties** 18:2 320:22 339:17
**difficulty** 246:9 254:16
**digestive** 314:23
**diligence** 68:9,19
**Diovan** 152:5,20,25 153:3 157:20,25 158:3,14
**direct** 65:17 67:6 86:16
**directly** 91:12 151:22
**dirty** 52:14
**disagree** 29:22 41:21 42:1 44:15 63:24 67:18 71:6,23 72:4 116:7 221:24 229:2 253:2 300:10,11,14 355:23 374:15 375:21
**disagreeing** 72:2 286:12
**disclose** 327:23
**disclosed** 12:11,23 16:3
**disclosure** 327:15,16
**discovered** 148:22 150:18
**discovering** 202:16
**discovery** 155:11
**discuss** 12:21 21:4, 12 26:1 27:4,13,21 35:9 58:20 67:11 75:5 79:2,15 82:21 87:4,8 105:2 124:20 185:17 199:22 204:13 311:5 320:17 339:17
**discussed** 25:14 26:15, 20 39:10 67:1 70:10 77:9 84:4 88:15 104:18 117:25 127:20 153:14 156:10,22 161:13 165:1 198:17 200:9 220:11 223:12 228:6,8 238:17 267:4 281:22 287:17,24 296:16 345:13 368:22 374:17 390:14
**discusses** 48:15,16 160:21 178:8 221:10 327:16
**discussing** 44:6 47:25 51:6 63:13 86:18 222:11
**discussion** 133:22 177:8 178:2 180:16 181:8 183:11 273:20
**discussions** 88:25 373:18
**disease** 173:15 174:12 210:19 221:7 222:4 277:24 278:3 286:13 330:4 369:4
**diseased** 296:8
**diseases** 277:6 330:25 374:21
**disorders** 262:15 368:21

**disprove**
364:25
**disrespectful**
122:7,8
**dissipate**
275:17
**distinct**
372:24
**distinction**
76:24
**distracting**
173:23
**distribution**
94:17 98:18
**dive**
78:4
**diverse**
347:4
**divided**
284:17
**divisions**
375:23
**DLA**
3:13
**DMBA**
22:21
**DMF**
149:19
**DNA**
26:17 28:7, 8,13,18,19 29:6 36:20 37:24 38:12, 16 39:2,6,8 65:17 67:6 371:9 393:6
**doctor**
8:19 10:22 14:22 15:9, 20 16:9,13 18:1,23 20:14 21:20 25:12 27:1, 23 28:20 29:16 31:11, 12,24 35:10 36:19 37:2 39:10 40:10, 20 41:5 42:4,15 44:23 47:5 52:25 56:5 58:3,22 68:2 69:5,25 70:22 73:5, 25 74:15 75:16 77:7 78:9 82:8 86:16 88:14 89:7,17,23 90:13 91:14 93:1 99:21 101:16 102:24 103:20 105:10,14 111:5 113:11 115:16 116:14 117:9 118:16 119:16 120:5 123:15 124:14 129:6 130:9 131:24 132:11 141:18 142:15 143:14 145:3,23 147:12,22 149:23 152:3 153:7 154:21 160:14 170:13 173:8 174:17 175:6 179:13 181:12 183:15 185:3,7 186:9 192:16 194:6,10 198:16 200:2 201:22 203:12 207:12 210:14 214:11 215:7 216:9 217:15 219:5 222:15 223:3 225:5 227:1 228:15 229:6 231:23 238:5 239:1 240:17 243:2 244:11 246:1 249:5 250:1, 14 264:3 274:6 275:24 276:19 278:5 279:18,22 280:9,25 285:23 287:17 288:3,23 289:24 296:6 298:14 304:20 305:4,24 306:4,19 307:7 308:21 312:8 313:1 317:9 319:23 320:6 325:11 326:3 327:8 328:7 329:23 330:14 331:4,16 332:18 333:2,8,19 334:7,16 335:5,24 336:23 337:14 339:16 340:8,25 343:23 344:11 345:11 347:22 350:21 352:25 354:24 356:14 357:6 362:3 363:24 364:4 365:11 367:19 370:3,16 376:1 378:5 379:13 385:12 386:20 394:2,12 395:7
**doctors**
265:25
**doctors'**
19:11
**document**
3:25 42:16 43:1,3,5,8,9 46:9 50:13, 20 51:20 57:10 60:17 64:22 66:10, 11 68:1 88:21 89:16 92:19,22 105:13 132:23 133:5 140:4 210:11 240:17 260:20 287:15 289:13
**documented**
260:13 261:19 262:8
**documents**
9:24 104:13, 15,17 105:2, 6 107:13 131:19,21 132:7,15,19, 21,25 344:21
**dogs**
366:3
**doing**
31:3 56:11 91:13 99:23 175:20 179:13 182:10 188:11 228:4

285:12 339:23 348:9
**dose**
50:22 51:15, 17 55:12 57:25 61:6 259:21 260:1 388:22 392:21 393:5
**doses**
36:2,18 43:25 44:13 51:13 52:10 55:1,22 56:4 71:12 259:18 341:9,21 386:1,12,17, 18 387:5 390:17,25 391:6,9 392:22 393:1
**doubling**
188:17 189:23 195:9,17 211:8
**doubly**
209:10
**doubt**
205:6 300:3 351:15 353:10 356:19
**dozens**
387:6
**draft**
304:22 305:2,25 307:14,22 309:21,22 311:22 312:4,8
**drafts**
254:18
**dramatic**
356:25
**drastic**
90:2
**draw**
43:19 92:23 94:15 232:7 241:3 306:4 313:1
**drill**
101:8 286:7
**drinking**
92:9 190:9
**driving**
303:18 349:3 375:24
**drop**
193:5 342:7
**dropped**
341:20
**drops**
341:19 342:19
**drug**
11:6 18:16 23:6 35:18 101:10 119:9 121:3 122:15 136:16 142:25 149:25 150:25 151:16,19 158:6 245:17 257:10 308:14 339:23
**drug-based**
260:11 261:17,23 262:7
**drugs**
68:24 105:21 108:4,7 122:24 123:2 145:1,21 157:12 260:12,15,25 261:18,25 262:8,16 263:17 275:5 277:23
278:24 302:13,16 303:21 339:18 341:24
**due**
32:8 33:11 34:1,6 68:8, 19 87:13 117:17,19 168:8 204:4, 11 239:11 302:10 308:11 367:5 380:6 385:2
**duly**
8:14
**duplication**
28:8
**duration**
34:15 190:8 315:7,13
**dust**
344:13,23 346:3,14 347:3
**Dutch**
98:10
**dysplasia**
238:19

**E**

**e-mail**
3:5,11,16 313:4,6
**E.T.**
327:17,18 328:8,13,15, 24
**earlier**
40:13 137:20 144:16 160:9 173:8 213:18 220:11 335:11
**early**
243:9 369:22
**easier**
92:14 348:11
**easily**
356:12
**Eastern**
395:12
**easy**
215:18 355:20
**eating**
224:6
**edge**
27:12
**edit**
254:20
**editor**
313:16 368:11
**editorial**
314:15
**editorials**
21:9 277:10
**editors**
315:24 316:18
**education**
236:15 237:7
**effect**
35:11 216:1 255:14 386:3,5,6,22
**effective**
18:21 168:2
**effects**
33:11 34:2, 7,19 35:13 47:23 48:3 49:6 50:2 51:10 60:19 73:15 74:4 90:2 107:25 143:2 213:16 216:8 217:14 226:11 352:12 367:6

**effort**
181:10
208:10
**efforts**
208:2 352:1
**eight**
93:4 119:11
120:3 121:6
122:17
123:11
124:1,5
134:1
**either**
52:23 153:18
157:4,18
158:11
260:16 273:5
**electronic**
291:9
**electronics**
9:14,16
**elementary**
314:20
**elevated**
131:10
135:21 136:2
137:7,12,19,
21 138:10,
21,24 139:1
164:24
**elevation**
189:6
**EMA**
104:17,22
154:9 157:19
159:9
**emergence**
239:15
245:11
**emerging**
375:14
**Emery**
113:2,6,8,
12,19 114:6
130:13
131:3,16
133:21
134:16,23
**Emery's**
131:7
**emphasize**
174:15
**encompass**
76:4
**end**
29:15 182:18
324:2
**endogenous**
86:19,22
87:4,21
88:2,4,8,16
89:2,10 98:1
99:12,16,18,
22 100:4,22
101:17,25
102:7,14,15,
20,25 103:22
104:1
**endogenously**
87:2 94:7
98:12 100:7
102:8 104:19
105:3
**endpoint**
47:7,14
171:15
**endpoints**
171:5 172:5,
8 213:14
215:15,19
216:4,17,24
217:7 218:2
221:17
**ends**
72:20
**endurance**
14:13
**energy**
196:24
209:7,20
211:4,8,10,
17 212:2,6
234:13
**English**
251:24
254:3,7,11,
15,16,19,22,
25 255:1
**Enhance**
220:7
**enrollment**
283:2
**enter**
7:17
**entered**
325:12,14
**entire**
301:24
364:25 384:3
**entirely**
153:15
183:12
223:17
285:19
370:14 377:4
**entitled**
390:3,4
**environment**
375:11 376:5
**environmental**
27:17 242:19
369:13
375:18
376:13 377:1
378:8 379:3,
8
**environmentally**
378:19
**epi**
69:7
**epidemiologic**
64:12 74:21
75:1 144:24
217:25
227:15
229:20 245:1
**epidemiological**
18:2 20:16
21:6 24:16
62:15,25
63:14 75:17,
19 176:11
184:4 208:17
217:17
243:22
244:14 246:6
248:3,16
306:20 319:6
**epidemiologists**
27:16 245:9
**epidemiology**
16:14,17,20,
21 17:4,8,11
18:7 24:10,
11,13 25:9,
11 74:1,3,8,
10 117:11
139:14
183:17,21,24
207:14
219:14 220:7
225:13
226:16
227:11
**epigenetic**
29:4
**equal**
190:14 235:9
**equally**
215:3
**equate**
38:23
**equations**
236:6
**equivalence**
175:15
181:25
298:13
**equivalency**
175:22
**equivalent**
101:10
**error**
198:1,5,17

199:14,17 200:3 202:3, 15,22 203:7 220:16 221:3,12,23 222:12,24 223:4,5,6,7, 8,14,18 229:22
**errors** 200:7,8,23 221:22 223:12
**esophagitis** 322:1
**esophogeal** 78:16 83:5,7 84:14 239:17,23 262:15 310:5 334:10,15 368:23 376:16,23 378:1,8 380:4
**ESQ** 3:4,11,15, 18,21
**essentially** 18:15 49:15 137:4 156:11,12
**established** 337:6
**estimate** 14:25 41:15 87:20 96:6 163:19,20 178:9,13 188:22 198:2 209:17 210:21
**estimated** 100:15 190:3,4,19 195:25 196:1 199:14 211:3 221:3,13
234:15 235:17 237:10
**estimates** 102:13 161:24 162:7 188:24 197:25 198:2,5 223:25 224:24 234:11 236:5 345:9
**estimating** 189:15
**estimation** 96:1,3,11 192:13 199:17 213:16 216:1 218:12 220:16 223:19
**estimations** 199:23
**et** 38:15,16 237:7 277:7 384:13
**et al** 93:8 127:21 128:4,15
**ethnicity** 321:20
**European** 104:17
**evaluate** 366:23 372:22
**evaluated** 350:7 352:17
**evaluating** 87:12 297:10 316:15
**evaluation** 60:19 381:19,23
**evaluations** 382:13
**events** 20:17 21:14 161:23 162:6
**eventually** 359:15
**evidence** 41:11,20 44:24 46:12, 21 55:20 65:15,16 66:18 67:6, 21 68:23 70:13,21 74:16 75:22 76:6,13 77:25 81:7, 23 82:16 83:17,24,25 84:3,10 85:20 144:2 153:13 157:8 177:25 178:4 183:4 220:7 224:12 226:23 227:20 241:21 242:15,24 249:19,21 266:14 268:2 275:4,8,9 282:22 287:6 354:3,18 357:1,17 364:7,22 372:25 373:10,15,19 374:10,13 375:13 380:14 382:23 383:7,20 389:6 390:16
**eviron-** 379:5
**ex-** 275:19
**exact** 29:23,24,25 30:15 37:17 58:11 100:22 107:1 124:8 125:2 132:10 175:5,14 331:20,23
**exactly** 31:6 47:12 52:23 103:8 107:2 108:11 114:18 148:15 149:17 211:12,25 301:23 325:24 326:2 339:5,7 355:25
**EXAMINATION** 4:4 8:17
**examine** 282:21
**examined** 8:15 40:23 43:25 44:13 226:10 244:4,6 283:24
**examples** 90:6 305:3 360:4
**exceed** 390:18
**exceeded** 150:24 393:4
**excellent** 17:18
**excessively** 66:15
**exclude** 175:12 182:12 242:5 252:4 255:5

256:12
**excluding** 168:1
**excuse** 301:3
**Executive** 43:18
**exercise** 363:21 374:11
**exhibit** 4:10,11,12, 13,14,15,16, 17,18,19,20, 21,22,23 5:3,4,5,6,7 15:6,8,12,17 42:11,12 92:4,5,23 94:2,3 98:6 118:12,13 126:4,6,8 130:5,6 139:20,22 150:10,13 159:21 184:10,11 193:25 194:3 201:16,18,19 220:1,3 231:19,20 233:17,18 237:25 238:2 240:13,14 250:5,10,11 255:10,11 258:5,6 263:24,25 266:2,3 268:9 271:10,11 276:2 279:14,15 282:4,5 289:4,6,7,9 305:14,15 312:22,23 319:19,20 327:4,5 340:21,22 350:2,3 353:22,23 371:20,21 381:4,6 394:9,10
**exhibits** 4:25 5:2 10:17 131:20 132:1
**exists** 391:22 392:11
**exogenous** 87:23 97:25 100:24 101:19 102:17,21 103:1,3,9, 10,23 105:8, 10,16,25
**exogenously** 96:23 97:4 103:15
**expect** 180:2 245:18 247:8 387:14
**experience** 31:22 36:3 107:10 113:3 114:21 116:19 117:20 216:25 239:1 241:7,12 262:10,13 263:1,3,13, 15 330:20 355:18 360:17
**experiences** 239:25
**experiment** 124:1,5 363:7
**experimental** 41:11,19 61:13 66:24 70:13,21 98:9 352:9, 22 354:3,19 355:6 357:16 359:7 360:25 382:1,23 383:8 385:5
**experimentally** 354:14 355:1
**experiments** 26:6,19 27:19 61:7 103:16 112:11 116:5,10 128:14 363:17 365:2,7
**expert** 11:1 12:10, 12,22 13:10, 15 15:10,21 16:4 21:21 50:12 105:15 125:5,8,24 126:14,18 129:14 133:11,13 185:8,16 208:5 266:20 287:18 305:1,5
**expertise** 203:14
**experts** 69:1 133:7 304:21
**expiration** 136:11,21 137:2 138:17
**explain** 23:19 198:14 275:20 301:5 344:7
**explained** 75:9 301:13 344:3
**explaining** 181:13
**explains** 297:4
**explan-** 275:2
**explanation** 36:12 228:12 273:21 274:19,21 275:22
**Explorys** 288:16 291:7,13,23 292:8 294:18 311:12,16 315:13 320:6,9,18 321:21,24 326:15
**Exponent** 329:1,7
**expose** 86:7
**exposed** 50:24 111:17 112:5 123:16 139:6 163:1 317:5 345:15 346:2,11,13 359:8
**exposure** 16:17 17:1,3 26:14 28:12, 21 29:13,17 31:13,23 46:18 47:7 62:18 63:2 64:10 74:2, 4,16 75:22 76:13 79:16 80:20 82:25 83:4,7 84:6, 7,23 85:9,21 87:14,21,23 88:2,4,8 92:10 93:2

94:17 95:10 98:18,24 99:1 101:1, 11 102:13, 15,17 150:24 165:21 166:16 176:16 182:14 213:6 217:16 218:2,7,13 225:7 238:7 239:3 240:2 241:14 243:17 245:17,25 247:5,9,15 257:24 258:2 260:7,19 261:24 271:5 344:3,8,12, 19,21,22,24 345:9,12,23 346:9,21 347:3,4,12, 17 359:9,22 367:15 385:7

**exposures**
26:3,25 27:17 28:10, 12 85:22 98:12 186:12 207:19 209:20 247:17 369:13 371:10

**extensive**
70:13,20 155:11 355:18

**extensively**
39:11 52:7,8 55:16

**extent**
42:23 254:21 316:25 374:7 375:14

391:12 393:13

**external**
374:22

**extra**
10:14 111:16 112:4

**extracted**
17:15

**extraneous**
10:19

**extrapolate**
286:8 355:21 356:12

**extrapolated**
386:18

**extrapolating**
355:16 359:11

**extreme**
111:10 138:4 212:23

**extremely**
18:5 31:21 249:21 260:9 261:16 385:21

**extrinsic**
370:3,22 371:7,25 372:23 374:10,14 376:18 377:21 379:17,18 380:6,10,18, 22

**eye**
65:3 356:24

**F**

**fact**
36:14 49:22 69:21 82:24 83:8 87:20 204:21

205:11 207:8 225:12 226:17 251:15,18 252:5,20 253:16 277:18 303:21 308:12 309:6 311:8 316:12 349:16 358:22 367:3 387:9

**factor**
205:11 210:17 211:15 319:2 348:15,16,17 349:16 371:6 375:24

**factories**
345:3,13 346:21,22

**factors**
115:24 188:19 196:22 211:2 237:16 293:22 295:25 296:15 297:4,10,23 301:14 302:2,11,16 303:7 306:11 307:17,25 308:3,8,25 310:10 335:3,5,17 336:12,14 349:17 369:6,8,15, 22 370:3,4, 11,17,20 371:1,7,13, 15 372:1,23 373:1,9,11 374:11,14,22

375:20 376:5 378:22,24 379:17,18 380:6,7,11

**factory**
148:23 345:2,4,8,17 346:4,17

**fair**
14:20 47:16 138:19 172:19 212:17 240:8 242:4 316:12

**fairly**
36:1 55:22 179:24 187:14 260:17

**faith**
36:13

**fall**
164:25 374:12

**falls**
66:6 361:13 380:17

**false**
200:18 223:9

**familiar**
103:6 118:5 193:15 203:16 206:14 207:15 248:21 320:13 321:9 322:4 333:16 339:22

**families**
375:7

**family**
236:7,15 295:16 297:24 375:7 379:6

**famotidine**

256:25 292:12,17, 20,25 293:11,16, 20,23 294:3, 5,8,11,13, 18,23 295:2, 6,10,15 296:2,7,20, 22 297:3,14 298:2,18,20 300:23 301:9,12,14, 20 302:4,9, 25 303:4 304:12 320:1 340:12 341:15 342:20 343:1

**fantastic** 254:10

**far** 115:15 150:23 177:25 205:18 217:12 227:25 229:21 230:7 275:21 364:21 367:15

**fashion** 392:22

**faster** 390:21

**fat** 285:1

**fatal** 316:17

**fatty** 369:3

**fault** 280:1

**favor** 222:13 355:13

**FDA** 32:13 88:15, 21,25 104:10 105:18,24 106:2,6,8, 14,17,21 107:21 108:15 109:11 110:25 113:8 115:7 116:16 117:16 127:21 130:10,21 131:16,18,20 134:1,15,19, 21 135:1 136:5,9,19, 25 137:5 138:14,15 154:2,5 272:25 278:17

**FDA's** 135:5,7,19 136:17

**feature** 26:16

**feel** 43:6 57:11 67:2,23 252:25

**felt** 133:14 167:19 315:2 316:6

**female** 50:24 51:2 209:9

**fewer** 341:23

**FFQ** 209:9,18 211:9 215:8

**FFQS** 218:6

**fibrosis** 34:11

**field** 21:25 74:10 183:16,21,24 205:16 217:4,9 225:12,16,18 226:24 230:1 277:22 286:11,12 338:13 339:12 340:5 365:5 378:17 380:21

**fields** 18:8

**fifth** 196:15 197:14

**Figueroa** 3:9

**Figure** 373:23

**figures** 311:25

**filled** 281:6

**final** 6:19 312:1

**finally** 14:17

**financial** 317:19,23 318:13

**financially** 7:14

**find** 36:11,14 49:14 66:6 74:6 76:19 77:15 115:7 116:9 138:9, 20 153:4 159:4 177:13 182:6 192:7 205:2,15 224:18 246:25

261:15 269:21 275:11 316:4 317:3 321:2

**finding** 32:12 37:19 39:3,8 56:10,13 67:15 87:8 113:12 137:6 169:17,23 174:16 176:18 177:19 185:11 234:23 274:8 276:13 302:22 309:2 311:8 324:2 359:12 363:18

**findings** 113:13 133:15 135:10 168:12 177:10 178:6 179:23 180:19 210:6 224:21 265:7 268:6 274:2 306:24 322:15,18 323:2,25

**finds** 300:21

**fine** 9:1 14:6 77:1 212:15 214:4 230:18 284:20

**finish** 299:7 329:4

**finished** 154:16

**finished-dose** 155:14

**firm**
328:15
**first**
10:7,19 14:7 16:13 47:4 60:25 62:5,6 65:9,12 69:6 92:3,11,16 94:11 106:2 130:24 140:2 141:3 142:6 146:6,9,10 148:21 150:12 162:21 178:7 185:3 194:9 220:5 232:1 233:23 239:3 240:2 241:14 244:7 250:19 254:13 255:16 258:9,13,19 264:7 269:21 270:21 280:14 282:10,13 288:12 290:9 293:8,25 305:21 312:12 317:1 320:2 323:25 327:8,11 333:25 347:14 352:7,21 354:2 357:17 358:5 360:24 372:1,15 376:10 381:9
**first-time**
325:7
**fish**
93:16,17 96:1,22 97:13,14,18, 20 365:23 366:1
**Fish-with-vegetable**
94:8
**five**
54:15 72:13, 20,21 102:2 134:11 209:19 213:24 243:9 247:8 257:18
**five-fold**
213:7 214:14
**five-minute**
72:15
**five-year**
255:25 256:6,20,22 257:12,20
**flag**
383:25
**flaw**
316:17
**flawed**
80:18 278:18 348:13 349:21
**flaws**
217:2
**Floor**
3:10
**Florian**
90:13,22 91:9 250:7
**fluid**
128:12,13
**focus**
68:11,14 80:6 83:10 84:1 206:10 207:7 347:1, 7 348:11 368:14
**focused**
32:3 69:8 82:5 188:25 205:8 215:14 217:24 219:18,19 223:19 246:3
**focuses**
187:11 207:25
**focusing**
206:20 207:1 228:4
**fold**
121:10
**follow**
24:19 48:5 92:14 197:13 247:18 258:21 387:1
**follow-up**
19:24 20:2, 8,9 161:8,22 243:23 244:15 246:12 247:1,5,7 248:1,16 249:6,7,11, 14 251:2,4, 9,11 252:3 253:3,5 255:4,24,25 256:6,20,22 257:12,18, 19,22,23 258:1,25 259:6 264:11,17 265:2,6,20, 23 270:18,23 394:15
**follow-ups**
249:13
**following**
119:9 121:3 122:15 134:9 205:23 250:15 325:9
**follows**
8:16
**food**
86:24 97:1 98:11 101:20 103:11 176:12 187:9 191:14,19 203:13 204:12 221:5 236:8 281:21 282:12,22,25 283:25 284:17,18,23 285:3,24 286:5,17,24 287:7
**foods**
101:10 187:6,7 285:1 286:2
**footnote**
236:4 237:17
**form**
31:5 37:3 68:4 69:12 83:21 102:8 110:19 111:16 112:5,19 117:17 186:24 188:2
**formation**
65:18 67:7 86:23 87:5 88:16 89:2, 10 99:16,18, 22 100:4 101:17,25 103:3,9,22, 23 104:1 118:17
**formed**
26:24 38:17 86:19 87:2 94:7 97:2 98:2,12 100:6 104:19 105:3 106:5, 10 107:8 113:13 116:7

**forming**
50:17 97:4 100:16 103:15 109:4 119:18 120:7,16
**forms**
62:19 102:6 245:22 246:7,16
**formulate**
90:19
**formulated**
329:14
**forth**
21:2 124:7
**found**
55:16 77:19, 21 80:15 81:6,22 91:2 105:17 107:4,17,21 113:21 116:15 124:22 125:18 136:5 137:8 142:1 146:2 162:18 163:5 176:15 185:18 188:6 232:21 266:14 270:11 281:18,20 300:20 302:5 308:24 359:15
**Foundation**
350:9
**four**
29:10,11 53:22,25 54:4,16,18 87:22 102:16 154:4,6 168:3
**fourth**
190:13
255:23,24 258:18
**frame**
71:1 140:9, 18 144:6 156:14 271:25
**frames**
271:22
**France**
232:1
**free**
25:21 38:4 43:2,6 57:11
**Freedman**
198:24 201:15 202:7 206:6
**frequency**
176:12 203:13 282:25 285:24
**frequently**
358:1 390:21
**Friedenreich**
282:14,15
**Fristachi**
89:8 96:12 99:24
**frog**
365:20
**frogs**
365:19 366:1
**front**
9:21 25:19 92:8
**fruits**
284:19,25
**fulfill**
63:6
**fulfilled**
63:17
**full**
62:5 65:9,12 106:24 161:19
220:25 306:1,3 372:15 376:10
**fully**
268:19 269:3,4,10, 15 270:11 276:8,10
**fumes**
344:13,16, 19,23 345:10 346:3,14
**Fund**
208:4
**funded**
209:4
**funding**
360:12
**funds**
207:24
**Fung**
381:13
**future**
177:24 265:4

**G**

**gallery**
6:23
**Gao**
127:21
**gastric**
22:18 62:20 63:2 78:16 85:15 128:11,13 184:16 185:2 186:10,11 189:4,8 192:8 204:3, 5,11,20,25 205:6,22 226:10 231:25 232:11 233:22
234:14 236:8,16 238:16 239:11 255:15 256:2,24 264:4,22 313:21,23,25 334:14 375:1,8
**gastro**
262:14
**gastroesophageal**
368:24
**gastrointestinal**
176:16 290:14 320:1 327:10 330:4
**gather**
18:13
**gears**
139:13
**gender**
321:19 324:3
**general**
12:24 16:14, 20 17:12,22 23:10 47:20 48:20 49:11 51:7 57:17 79:7 163:11 165:19 207:21 245:9,22 272:8,14 277:3 284:25 285:3 294:4 296:24 303:1,13,17, 23,24 304:3, 8,13 306:10, 15,22 307:1, 16,24 308:23 309:16 310:6 311:9 321:2 350:25

351:8,9 353:7 378:17 391:7
**generalize** 222:9
**generally** 218:10 225:7 247:6 248:10 286:4 385:3
**generate** 203:22
**generated** 99:12 285:17
**generates** 131:10
**generating** 64:14 224:3, 22 227:25
**generic** 141:8
**genes** 371:3
**genetic** 29:3,9 351:14 374:18,19 375:20 380:23
**genetically** 379:5 380:15,16
**Geneva** 42:17
**GERD** 297:25 330:6,9,12, 16,21 331:5, 18 332:7,11, 13,21,25
**getting** 19:6 29:11 97:7 99:4 226:8 285:10
**GI** 87:13 238:23 240:8 256:13 277:9,22
293:10 295:25 297:1,8 314:23 368:22 369:17 380:25
**give** 30:17 31:11 37:20 59:6, 15 81:14 102:4 105:15 110:16 116:14 185:11 210:1 232:23 273:6 304:6 315:10 343:10 348:6 366:16 386:12 394:18
**given** 34:9 36:18, 21 51:23 55:13 69:20 91:8 117:3 225:12 384:15
**giving** 315:23
**glad** 243:19
**GLP-1** 11:6
**goes** 18:13 109:15 110:10 277:17
**going** 36:4 43:19 72:12,23 115:19 129:18,22 141:2 159:24 172:22 204:1 211:20 231:1,11 274:7 279:3,
7 299:11 313:1 343:7, 16 374:13 386:6 393:20 394:22 395:10
**gold** 284:3 337:15
**GOLDENBERG** 3:18
**Goldenberglaw** 3:18
**good** 8:19 14:25 72:21 116:21 129:18 145:10 172:18 231:7 245:7 253:10 255:1 257:18,19,21 279:3 308:5 337:16 387:11
**grain** 170:10
**gram** 93:12,15,18, 21 96:24,25 97:13
**grammar** 255:1
**grams** 97:18,19
**granted** 134:15
**granting** 134:8,22
**graph** 127:7
**great** 68:15 318:25 319:3
**greater** 54:16 88:9 102:20,25 103:23
190:13 192:23 210:20 235:9 237:11 243:11 301:14
**greatest** 37:13
**GREENBERG** 3:2
**Greg** 3:24 7:10
**grew** 375:4
**gross** 360:15
**ground** 14:2
**group** 55:19 57:20, 24 140:11 165:21 166:10,11 168:1 182:5 189:21 190:18 192:14 196:2,4,20 205:9 235:18 237:5 297:3 301:8,9,15, 17,24 302:7 304:3 368:12 385:5
**groups** 60:3,6,8,12 74:5 166:16 167:21 192:5,12 207:2 224:6 237:19 259:7 281:21 284:18,23 285:3 286:24 302:2,12 333:23 335:16 339:3 386:16

**growth**
341:24
**GSK**
105:19 107:17 110:5 115:7
**guess**
16:19,22,25 20:1 31:20 38:20 44:20 45:16 51:19, 20 72:12 74:12 76:1, 3,20 117:14 122:22 123:1,2,10 142:24 143:7,10 144:9 145:17 154:7 180:15 181:8 211:23 216:14 218:9 222:3 231:2 245:6 254:5 260:15 277:15 278:11 284:13 285:2,4 296:11 308:6 339:14 348:10 349:18 351:23 355:12 361:15 372:7 385:20 387:3 388:14
**guessing**
12:4 188:2 224:23 301:20
**guidelines**
119:10 121:4 122:15 124:7,9,11

**H**

**H-R**
92:12
**H.-o**
327:16
**H2**
258:11 260:16,22 261:4 273:5, 8 277:19 278:14,22 303:22 330:20 331:1
**H2r**
259:7 333:1
**H2ra**
268:2,14 269:23
**H2ras**
269:1 330:9, 17 332:2,8, 20
**half**
323:25 324:7
**hamsters**
366:8,9
**hand**
33:17 151:16 181:9 296:18
**handle**
393:8
**happen**
142:7
**happened**
151:8
**happy**
50:8 88:22 89:15 103:7 357:2,10 392:5
**harbor**
376:17
**hard**
58:20 204:16 385:19
**hardest**
379:7
**harmful**
226:17
**Harmonization**
121:5 122:17
**Harvard**
206:16,25
**Hawaii**
375:5,9 376:3
**hazard**
60:22 163:2, 10 164:1,14 166:23 170:1 196:11 267:19 273:17
**hazards**
240:25 358:4 381:13
**head**
14:11 124:9 246:21 377:9,19 378:3
**health**
18:3,4,16, 23,25 19:2, 5,7,22 20:15 21:4,13 40:23 42:5, 16 44:9,16 45:4 46:2,6 47:24 61:18 62:24 63:12 66:1,8,9 100:2 103:2, 24 105:1 152:24 153:2 206:9,17,25 221:6 222:1 328:25 358:4 389:11
**Healthcare**
146:16 149:5
**hear**
82:10,11
147:25 214:2,3 279:22 357:11
**heard**
193:19 248:13 322:21 328:17
**heart**
277:7
**heat**
107:25 108:21 115:20,24 116:9 123:25 131:9 137:10 139:7
**heated**
117:5
**held**
6:5,10
**helicobacter**
26:21 204:21,24 205:21 239:11 264:5 368:25 375:2 379:11
**help**
140:17 284:8 323:21
**helps**
98:7
**hepatic**
50:23 61:5
**hepatitis**
369:2,3
**heterocyclic**
184:15 185:1
**hexavalent**
248:12,13,25
**Hidajat**
84:17 85:5, 17 86:3 343:23,25 344:9 345:13

**high**
36:2 55:12, 22 71:11 117:6 189:4 191:9,14,19, 20,25 192:1, 6,14 227:3 228:21 229:8 232:9 285:1 345:15 353:6 385:6,24 386:1,16

**high-fat**
284:24

**higher**
54:13 87:22 96:6 98:25 99:2,3 102:11,17 113:22 116:1,25 123:11 127:6,14 142:2 165:17,21 166:10,15 192:7 195:1 196:5 297:3 303:4,13,25 304:2 307:3 308:16 309:7,10,14 330:21 332:2,9,11, 15 340:9,10 345:23,25 346:12 347:13 349:5,6 389:6

**highest**
96:23 192:6 195:8,16 197:2,22 234:7,20

**highlight**
119:3 131:1 177:9 294:7

**highlighted**
98:8 149:11 181:1 358:11

**highlighting**
99:10

**highly**
29:5 45:17, 24 46:4,11, 15,22 65:21 66:2,17 72:5,8 80:18 81:2 126:19, 24 176:14 205:8 229:21 261:2 278:18 348:13 349:21 353:8 371:4

**Hill**
78:10,12,15, 20,24,25 79:11,12,14, 20 80:16,21 81:2,8,24 82:4,17,24 83:10,13,18, 23 84:1,5, 11,17 85:6, 12,18 86:4,6 227:17

**hint**
163:16

**histamine-2**
266:8

**histopatholog ic**
238:18

**histories**
190:5

**history**
189:16 203:23 226:24 236:8,15 295:11,16 297:25 312:14 359:9 379:6

**hit**
280:2

**hits**
29:9

**hoc**
170:4,6,14 171:20 172:1 275:19

**hold**
84:19 200:15 382:4

**holds**
342:20

**Holmberg**
280:15,17

**Holy**
299:18

**honest**
27:11 49:1 97:22 114:17 122:7 260:11 262:6 356:6

**Hong**
140:14

**hope**
3:14 60:14

**hospital**
19:11 23:10 140:14 333:14

**hour**
69:6 72:13 231:2 279:3 343:8

**hours**
14:24 15:3 132:12

**Howden**
313:14,18,20

**HR**
196:16 267:18

**Hrudey**
88:12 89:8 90:16,23,24, 25 91:3,7 92:3,12

96:12,16,19, 20,22 97:9, 24 99:24 102:8

**Huahai**
148:22 149:12 150:1 151:1

**Huff**
350:15,16 354:6,8,25 383:17

**human**
24:15,16 25:4 40:20 41:1,4 45:6 64:2,6,15, 20,22 65:7 66:9,25 67:8,10 68:6 69:14,22 70:1,3,8,14 75:3 76:7 88:5 89:11 92:10 111:10 131:11 224:1 227:11,14 248:7,9 249:23 352:16,20 353:9,11 356:8,9,11, 12 358:4,7, 23 360:9 361:8,14,17 362:4,8,22 363:5,9 364:7,19 366:22 367:14,17 381:12 388:16 389:10

**human's**
39:13

**humans**
25:3,6 28:22 29:10,19

31:15 33:3 38:25 39:23 40:3,17,19 41:16 44:21 45:11,20,25 46:13 62:2 64:13 65:21, 22 66:2 70:24 71:8, 11,18 72:6 74:18 75:24 76:15 156:17 229:17 230:12,22 239:2 240:1, 25 241:8,13 352:12 353:15 354:2,15,20 355:2,22 356:2 359:12,16 360:6,24 364:23 365:8 366:18,21,24 367:9,13 381:25 382:8,20,25 383:5,10 384:2 389:5

**humidity** 108:1,21 111:18 115:20,24 116:9 119:9 121:3 122:14 139:7

**hundred** 20:6,12 97:13,19 132:11 230:11 252:2

**hundreds** 132:6 254:17

**hungry** 172:16

**hypoth-** 56:25

**hypotheses** 18:19 59:20 203:22 374:4

**hypothesis** 56:7,14 57:1,6,7 58:3,16,18, 25 59:1,2, 13,24 64:13 116:6 151:21 164:25 173:19 174:14,18, 20,21 175:2, 4,8,9,13,18, 25 177:22 178:1 179:15 181:14,17,20 205:17 224:2,22 225:3 227:25 275:2,19 278:23 298:6 372:10,20 373:18

**hypothetical** 142:24 143:3 182:24 183:13 216:6

## I

**IARC** 40:22 41:25 42:4 64:4,25 70:12,20 71:3 208:11 230:8 240:18,19,23 242:18 356:3 361:19 383:3,24 384:3,6,22

**IBM** 291:22

**ICD** 320:11 323:13

**ICD-10** 323:8,10

**ICD-9** 320:8,14,24 323:9,13

**ICH** 119:10 124:7

**idea** 116:19 169:10 229:17 316:24 373:23

**ideally** 337:3

**ident-** 182:2

**identical** 60:9 73:23 298:1,11,17 300:21 301:23 378:6

**identically** 302:17

**identification** 15:18 42:13 60:23 92:6 94:4 118:14 126:9 130:7 139:23 150:14 184:12 194:4 201:20 220:4 231:21 233:19 238:3 240:15 250:12 255:12 258:7 264:1 266:4 271:12 279:16 282:6 289:8,10 305:16 312:24 319:21 327:6 340:23 350:4 353:24

371:22 381:7 394:11

**identified** 140:12 141:8 192:14 196:3 291:8 292:11,12 349:16 358:5 360:24 389:2

**identify** 192:5 352:11 370:1 378:14 389:10

**identifying** 198:6 358:3 369:7,20,21 381:12

**ignoring** 242:23 359:20

**II** 140:1 200:3, 7,13,17,23 201:3,12 223:8

**illustrate** 232:17

**imagine** 331:7

**immigrant** 376:1,4 378:6

**implemented** 147:2,16 150:4 151:4, 9

**imply** 154:6 160:16

**implying** 166:12 256:14

**importance** 360:12

**important** 16:16 17:2 47:14 87:14 116:23

174:16 208:17,19 223:3,5 245:24 256:21 272:24 273:2,12 336:23 359:21 366:17 367:12 369:8

**importantly** 376:12

**impossible** 29:6

**improper** 30:25

**improve** 208:6

**impurities** 135:8

**impurity** 154:3

**inability** 322:17

**inadequate** 386:22

**inappropriate** 72:9 81:3,19 120:13,22 121:21,25 163:18 299:17,25 300:4,8

**incidence** 226:14 302:23 303:3,5,12, 15 304:7 305:18 306:9 314:8 324:21,25 325:5 330:16,21 331:5,17 332:1,7 335:22

**incident** 147:4 168:18,19,23 169:5,12,25 170:16 171:4,9,13 307:23

**include** 18:17 32:24 49:15 67:9 80:10,19 81:7,23 82:16 83:17 84:15 109:20 144:7 168:13,14,25 169:7,14 193:10 207:20 333:13 344:16 361:17 380:12

**included** 50:11 80:3, 17 81:3 128:15 164:21 293:14 294:21 304:11,14 337:3,5,9 371:14

**includes** 67:8 164:16 174:21 196:23 333:10 337:12 344:17

**including** 68:21 99:23 177:3,4 236:6 238:18 240:9 277:5, 6 297:23 355:15 364:1 365:14,18

375:19

**inclusion** 80:25 207:10

**inconsistent** 91:8 224:16 301:5

**incorrect** 215:24

**increase** 28:11,16 53:7,8,15, 17,18 55:12, 21 56:2 57:19 74:24 75:3,12 77:20,22 116:8 117:3 119:17 120:1,2,6,15 121:10 122:20 123:5,7,13, 24 135:13 163:6,12,13, 16 164:13 165:3,8 170:8 173:14 174:10 177:16 178:15,19 179:2 183:6, 10 185:20 191:21 192:2 200:19 205:13 206:12,23 208:7 212:4, 5 226:13 232:18 242:10 243:9 244:9,16 245:3,4 256:24 273:6,11,22 274:25 306:24 308:25 342:9 387:24

388:1,11 389:18 390:10 391:5,10,11, 25 392:8,14

**increased** 59:6 74:23 75:4,9,14 77:6,13,17 78:7 83:5,6 108:25 119:12,23,25 121:7 122:19 123:3,9 160:17 161:7 163:21 164:2 165:18 166:14,22 173:10 176:15,20 177:2 181:5 182:13 185:13,17 195:24 232:11 243:16,25 246:6,10 247:1,12,19 265:15 267:14,22 272:9,13,20 274:4,10,17, 23 275:14 276:20,21 278:8 290:14 296:25 310:8 317:4 393:12

**increases** 74:17 75:23 76:7,14 164:7 165:10,14, 15,22 166:2, 5,8 192:19 245:19,21

**increasing** 53:2 156:6 275:17

348:2,3
**indeed**
16:1
**Indemnification**
240:24
**index**
236:16
333:21 334:4
**indexed**
325:8
**indicate**
70:16,20
170:23,25
208:16
276:20 302:8
336:21
**indicated**
46:21 80:24
207:1 232:9
237:16
319:10
**indicates**
77:5 131:8
168:12 239:2
240:2 241:13
**indicating**
158:18
206:20
213:15
252:21
256:11
336:17
**indication**
75:10
273:10,21
274:20
275:20,21
277:12 308:9
311:1
**indications**
281:19
332:25
**indicator**
352:15
**individual**
19:24 39:21
74:2 79:13
323:3
**individualized**
326:4
**individuals**
13:21 205:1
243:11 273:5
303:20 317:5
**induce**
22:18,22
23:12 26:4
34:13 35:21
47:22 48:3
49:6 50:2
51:9 52:10
381:24 382:5
386:14
388:21
390:17 391:2
393:5
**induced**
43:24 44:12
238:20
351:13
390:21
**induces**
61:5
**industry**
206:14
244:12,13
319:1,4,8,12
328:10
345:22 346:8
347:5,16
**inexact**
203:20
**infect**
26:11
**infected**
239:14
**infection**
204:22 369:1
375:2 379:12
**infections**
371:12
**infectious**
26:9 378:21,
24
**infer**
24:21 362:13
**inflammation**
26:18 205:20
238:21 369:2
**inflammatory**
351:13
368:21 369:8
**influence**
205:7
**influenced**
374:22
**influences**
375:18
378:23 379:8
**inform**
134:10
**Informatics**
269:25 271:2
**information**
16:22 17:3,
4,15,16,19,
23 18:12,17
19:7,9,11,
17,18,20,23
20:6 44:10
68:10
110:15,17
111:3,24
112:13
117:25
120:24
121:23
129:12
136:18
145:23
146:24
147:13 152:4
155:2,5,15,
23 168:15
169:3 260:18
261:15
284:15
309:25
315:6,12
321:3 323:2
326:18
334:18,21,23
336:18
337:4,8,12
341:16
351:22
362:23 373:7
**informative**
116:11
157:6,7,9
168:22,23,24
169:6,13
**informing**
261:2
**ingest**
227:3
228:21,22
229:7
**ingested**
73:6 103:13
237:3
**ingestion**
63:8,19
86:21,24
96:2 190:4
**ingrained**
371:9
**ingredient**
147:21
148:4,17
155:13
**inhalation**
347:12
**inhaled**
73:7 103:13
**inherent**
393:7
**inherited**
351:14 371:3
375:20
378:15 379:2
380:15 381:1
**inhibitor**
266:7
**initial**
109:11,19

141:10 146:12
**initially** 243:23
**initiate** 238:20
**initiated** 106:23 209:7
**initiates** 26:12,14
**initiation** 26:5 141:5 238:14 325:9
**injection** 347:14
**injuries** 12:18
**injury** 12:19 348:18,25 351:14,16
**inputs** 90:17 93:2
**inside** 23:13 97:2 98:2 100:17
**instance** 41:24 126:25 212:15 337:13
**Institute** 207:24 208:23,25 209:6
**Institute's** 207:13
**institutions** 208:15
**instructing** 120:21 121:16
**instrument** 209:19
**insufficient** 31:23 285:9 315:5,12
**insults** 388:25
**insurance** 18:3,4,25 19:5,7,19 20:4,10,15,21 21:5,13 322:8
**insurances** 19:2,23
**intake** 88:9 188:22 192:13 195:3,8,16,24 196:1,12,23 197:1,11,12,18,21 218:12 226:2,3 232:10,13 233:22 234:5,7,13,15,20 235:17 236:9,11,16,21,25 237:8,11 255:15 282:12,23 283:25 287:8
**intend** 253:8 254:12
**intended** 255:3
**interact** 207:3
**interacted** 206:17
**interaction** 65:17 67:6 191:6,8,11 192:10
**interactions** 6:9
**interest** 27:15 316:1 317:19 318:14 347:8 356:20
**interested** 7:14 24:12 28:10 46:8 216:15 285:7,14 310:19 311:3 316:18 361:23
**interesting** 20:22 35:24 123:25 124:4,12 151:21 157:13 169:10 170:3 177:13 181:2 183:12 193:18 206:18 215:14 224:21 229:17 246:1 309:4 310:15 316:7 323:7 345:19 355:5,9,11 361:2
**interests** 317:24
**interface** 6:11,25
**interindividual** 39:12,16
**intermediate** 234:6
**internal** 111:1 199:10
**International** 43:9 121:5 122:16 208:4 382:17
**internationally** 254:11
**interpret** 49:8 163:10 184:3
**interpretation** 41:8 161:24 162:6 166:1 179:7,16 183:9 303:9
**interpreted** 41:14 44:10 50:16 156:20 302:19
**interpreting** 50:7 181:18 203:12 230:20
**interrogate** 17:10
**interrogating** 18:15
**interval** 179:10,18,24 182:19,20 183:3
**intervals** 56:12 164:21 166:24 170:1 174:22 179:22 180:4 232:24 325:2,7,24
**interview** 281:5
**intrinsic** 370:4,11,16,21,22,25 371:6 373:1,9,11 376:5 379:17 380:7,11,17,22
**introduce** 351:25
**introduction** 150:11 283:14 350:21
**invalidate** 322:14

**invalidated** 322:18
**invariability** 101:6
**inverse** 23:16,21 24:1,4,5 335:13 336:7 338:3,6,20, 25 346:11
**invest** 27:15
**investigate** 134:10 145:12 276:25 348:11
**investigating** 17:25 265:4
**investigation** 74:11 135:6, 7 282:11 283:22,24
**investigations** 147:4
**investigator** 340:7 360:8
**investigators** 28:9 204:10 219:15 340:1 355:7,14
**invited** 88:25
**invoices** 14:23 394:2
**involved** 12:7,9 21:22 22:4,11 24:24 25:8 146:13 171:24 349:17 373:17
**involves** 13:1 26:5 29:3,14
**involving** 12:15
**ipad** 10:1
**irrelevant** 115:14,17
**irrespective** 156:4
**issue** 218:5 278:11 330:22 359:21
**issued** 119:10 121:4 122:16
**issues** 16:16 18:15 55:16 317:22
**item** 322:4
**items** 286:10,17
**IV** 368:17
**Iwagami** 258:14,25

**J**

**JAMA** 125:9
**James** 350:15,16
**January** 131:4 140:11,20 141:7,16 144:6 240:20 325:12
**Japan** 204:6 258:12 375:4,9 376:2
**Japanese** 254:8
**job** 383:24
**jobs** 20:20 345:21
**JOHN** 3:25
**Johnson** 317:11,18, 19,23 318:12,13
**Johnson's** 317:23
**journal** 253:23,25 254:1 313:10 314:22,23 315:3,5 368:11
**journals** 312:9
**judge** 299:7,13 337:15
**Julia** 248:24
**July** 146:12,20 149:3 150:17
**June** 140:12,21 141:7,16 144:7

**K**

**Kantor** 271:16,17 272:5,23
**KATHRYN** 3:11
**kathryn.podsiadlo@arnoldporter.com** 3:11
**KAYE** 3:9
**keep** 65:3 92:12 246:2 391:18
**key** 27:1,8,22 361:6 364:18
**kg** 61:6
**kill** 34:17
**kilogram** 50:25 94:18, 19,20 98:20
**kilograms** 94:24 95:4, 12 98:19 99:5
**Kim** 255:16 287:25 288:1,6 289:5 290:15,17,24 291:2,18 293:16 295:23,24 296:6 297:11,19 298:18 300:20,21 301:10 302:9 304:5,15 315:17 317:10,14 318:18,19,20 319:16,17 320:3
**kind** 56:20 163:12 284:15 288:8
**King** 3:20 108:23
**knew** 219:11
**know** 10:3 12:20 14:4,14 17:23 20:5, 9,18,23 23:21 24:21

26:8 28:3,4 35:5,14,15, 16 36:8 38:25 39:5, 19 40:9 46:5 49:7,11 52:22,23 55:7 58:22 68:11,13 70:17 72:3 75:6 80:12 86:20 89:20 90:9 95:17 97:21 98:23 102:5 103:8 104:4 111:22 115:11,18 122:25 123:8,11 124:8,10,13, 19 125:6 129:10 132:10 138:5,25 141:24 142:11,13,22 143:10 144:2,10 146:1 151:15,17 152:8,12,16, 18,22,24 153:5,11 154:14,15,25 155:8 157:3 163:10 169:11 172:4 173:23 179:20 180:17 183:18 184:5 186:15,21, 22,25 187:5, 16,17,22,23 188:3 189:8 195:21 202:11 204:16 207:16 216:21,22 217:5 219:11,12 222:7 225:10,11,20 226:9 227:10 228:16 230:7,14 244:6,22,24 248:24 249:1,4,20 257:11,14 259:16 261:10 262:3 264:16 275:1,12,15 277:13 278:12 284:18,20 288:17 292:23 298:7 299:19,20,21 309:5 310:13 311:20 312:14 313:10,16, 18,20,24 314:18 316:11,16 317:13,14,22 321:23 322:25 323:24 326:21 328:6,12,23 329:5,12 330:22 331:20 332:24 333:17 334:16,24 335:5,13 336:12 337:11 338:12 339:2,4 343:5,13 346:7 351:13,21 355:5 356:10,18,22 362:11 364:17 366:6,15 368:10 372:4 377:8,20,25 378:3,25 379:10 385:19 387:2,4 393:9

**knowing**
156:1 326:20

**knowledge**
219:6,15 329:11,17 363:17 381:19,23

**known**
41:4 64:6 176:10 186:22 248:17 328:9 352:16 356:8,11 361:24 362:4,8,22 363:9 369:5 374:23 376:12 379:19 381:24 384:5,11,19 389:5

**Kong**
140:14

**Korea**
250:17

**Korean**
251:24 253:19,21 254:9,13

**Kumar**
264:7

**L**

**La**
233:23

**labeled**
136:21 137:2 138:17 209:10

**laboratory**
23:1,2,4,7, 9,11 26:7,20 28:2 31:22 43:21,23 44:11 55:16 65:16 66:21 358:1,6 359:14 382:2,5 388:15 393:14

**lack**
39:24 40:4 65:18 67:12 68:17 241:21 243:24 244:16 309:8 322:6

**lacking**
64:16

**lacks**
59:11,22

**lag**
275:14,17 311:4

**laid**
137:14

**language**
66:15 162:11 220:15 254:3,10,16 363:18

**lansoprazole**
276:16 277:15

**laptop**
9:22 10:13

**large**
6:22 132:9 245:18,19 254:8 375:14 376:17 377:9 386:16 387:15
**largely**
385:2
**larger**
9:23 55:9 120:2 223:20 364:12
**Larsson**
194:16
**late**
265:17
**latency**
241:19
**latent**
20:17 21:13
**LAUREN**
3:22
**lawyers**
244:12,20,25
**lead**
39:4 147:4 198:7,19 200:18 201:2 203:7,10 215:9,22 216:7 243:4, 6 369:22 371:3
**leaders**
206:15,25
**leadership**
217:1
**leading**
266:10 271:16 290:15 350:14 368:7 381:13
**leads**
28:16 182:10 201:11 219:6 223:7,9 225:7 273:10 347:13,17 382:2
**learned**
230:2 243:3, 6,7
**leave**
380:18
**leaving**
256:16
**led**
32:13 107:2
**left**
9:24 157:15 208:21 210:8,9 289:12,21,22 291:3 292:6 293:24
**left-hand**
176:5
**legal**
7:11,17 9:10 10:25
**length**
249:7
**lesions**
49:16 55:20
**lesser**
123:7
**lesson**
243:2
**lessons**
243:5,7
**letter**
130:20 131:2 313:17
**letters**
315:21 316:4,11,22
**level**
19:16 53:5 55:25 99:2,3 182:22 190:19 209:17 262:11 285:2 388:11 389:6 390:11,19 391:23,25 392:14
**levels**
46:18,21 53:1,23,25 54:4,19 56:3 61:6 100:21, 22,24 101:9 108:25 113:22 115:14,17 116:1,8,15, 17 117:5 125:4,7,14, 18,20 126:2 127:18,20 129:4,14 135:12,14,21 136:2,6,11 137:7,9,10, 12,13,19,21 138:10,21, 22,23,24 139:1 142:2 187:19 189:25 192:6 260:8,19 344:19 385:15,17 386:24 389:19 392:12
**Levin**
3:23
**liability**
7:8
**liberty**
12:20
**lieu**
8:2
**life**
208:6 254:9
**lifetime**
262:20
**light**
156:20 251:18 278:2
**likelihood**
41:15 180:10 182:8 216:11
**limit**
179:9,18
**limitation**
256:17 322:25 339:25
**limitations**
90:10 337:8 340:5 348:20
**limited**
17:8 61:24 62:15 75:18 161:21 286:9 349:21 385:3
**limiting**
75:17
**limits**
105:20 107:5 150:24
**line**
45:6 81:16 117:8 241:9 295:24
**linear**
339:9 356:2
**linearity**
355:23
**lines**
32:18,19 178:3
**Linhai**
151:2
**linked**
248:22 352:3 368:20
**links**
208:9
**liquid**
73:13
**list**
131:19

132:2,5,7,15 133:2 201:23,25 333:5 384:3
**listed**
40:25 51:18 380:13 384:4,7
**listen**
50:8 357:10
**listing**
384:6
**literature**
21:7 52:15 68:4,16,20 69:4,12,19, 20 102:19 132:13 200:25 337:23 339:11
**litigation**
7:9 11:1 154:22,23 266:20 304:23 317:20 318:14 327:18 328:1,5
**litter**
30:5,6,18 299:8
**little**
9:25 48:7 52:12,13 72:12 83:15 99:14 154:7 173:22 180:25 181:7 191:2 232:25 236:2 262:11 268:2 287:6 296:13 323:20 330:18 331:3 367:12 368:3 370:6,9

374:2 377:22
**live**
36:16 267:14 340:6 371:12 375:12
**lived**
33:17,23
**liver**
34:11 37:20 78:18 86:13 239:17,24 266:9,15 267:6,12,23 268:23 270:10 272:6,13,20 274:4,10,18, 22,23 275:1, 10 276:22 295:7 307:8, 9 308:22 309:4 334:9 347:15 369:1,2,3 376:16,23 378:9 379:14 380:3
**lives**
391:3
**living**
208:7 375:9 376:2
**LLC**
3:8 146:16 149:6
**LLP**
3:2,9,20,21
**located**
9:3
**locked**
6:14
**logistic**
236:5
**long**
33:17,23 132:24 203:23

219:13 239:10 249:2,13 251:4,10 252:4,8 253:5,12,15, 17 255:4 256:1,7,13, 15 262:17,18 264:15,17 362:25 369:25 386:17 389:22
**long-term**
94:17 95:10 98:17 161:1, 9,22 247:18 260:17 350:7,22 351:18 352:9
**longer**
136:19,25 138:15 154:7 161:8 216:10 239:4 240:4, 7 241:15 242:22 246:11 247:5,25 248:15 260:14 261:12 265:5,23
**longitudinal**
291:8
**look**
21:1,3,8 25:15 26:10 27:16 28:2 30:3,14 33:14 34:22, 23 35:17,18 38:2,4 42:21 43:3,4 47:2 50:19,20 51:24 52:2 53:22 57:3,

13 58:10 60:18 62:4, 8,17 65:8 77:10 80:13 84:12 89:15 90:16,25 91:6,23 92:3 94:1 96:16, 20 97:1,8 98:7 100:14 101:5,6 102:1 103:7 107:7 111:21 113:21 118:23 120:3 133:18,20 135:4 139:13,18 140:23 144:23 146:5 154:18 159:11 164:4 166:17,18 170:19 171:16 174:25 176:3 178:5 180:7 186:6,7,17 191:5,10 193:4,22,23 194:2,19 196:7,8,19 197:16 199:6 201:15,24 206:5 210:5 212:18 213:4 216:14 217:12,22 218:24 219:24 220:1,24 221:17 223:23 224:10,15 226:1 230:23 232:5,24 233:15 235:24 240:12 241:6

242:19 244:3 245:15 249:15,24 250:21 252:12,20 255:8 258:3, 17 259:21,22 260:7 263:23 264:10,24 266:1 268:9 269:4,19 271:9 272:3 275:13,24 282:2 283:11,13,18 284:22 289:12 290:4,11 291:17 292:6,7 293:22 295:23 296:18 297:18 302:21 304:9 305:3 307:7 309:5 311:3 312:19,21 314:10 315:25 319:11,16 324:7,11 326:11 327:14 329:19 332:17 333:2 335:21,25 338:5 340:18 341:4 348:1 350:1,20 352:4 353:20 357:13,14 359:2 360:18 371:18 372:13 378:14 381:2,4,9,16 384:24

**looked**
16:24 32:16 37:10,11 39:15 54:2 66:13 68:9, 15,20,21 78:2 83:24 96:7 115:6 132:14,24 145:14 161:16 183:25 213:19 215:13 216:16 218:21 224:13 228:7 245:2 270:4, 6 272:2 277:8 291:12 301:2 302:1 304:25 309:1 310:2,18 320:20 331:4 333:6 336:13 337:18 338:1,18,24 339:10,16 343:4 347:1 362:20,21,22 363:5 377:13

**looking**
14:23 15:14 35:12 37:14 47:15 55:10 58:21 97:24 101:12 131:19,25 132:2,19 141:14 145:1,18 159:23 160:2 171:2,18 175:7,9 177:1 187:12 188:10,15,24 189:2 190:23 197:8 206:10 211:17 213:14 216:24 218:4,11 222:21 223:15 245:7,23 250:6 253:10 269:7 270:7 284:9,14 285:3 286:9 297:16 308:3 309:4 319:2 331:11 334:22 347:8 352:2 362:4 374:5 379:1, 16 385:20

**looks**
14:22,23 52:13 111:15 112:4 186:18 189:1 232:23 298:8

**loose**
52:13

**Los**
3:10,15

**lose**
19:24

**loss**
214:20 215:1,3,10

**lost**
19:23 20:8 80:7 95:2 213:25 214:1,6 251:23 259:14

**lot**
21:25 26:18 29:13 32:16 36:12,13 49:12 52:4 68:9 79:24 103:10 131:20 157:16 161:14 181:10 204:2 206:8,10 217:2 221:23 226:5 245:8 308:16 309:7 310:2 315:21 316:9 320:23 330:24 335:1 337:3 360:2 369:16 370:19 377:6

**lots**
35:20 39:11

**love**
155:8

**low**
29:12 43:25 44:13 46:17, 21 161:23 162:4,6 167:7,23 168:9 191:8, 9,14,15 227:4 228:22 229:9 262:11 330:18 331:3 384:7 386:12 387:5 390:17,25 392:22,25

**lower**
55:1 93:20, 23 96:11 128:8 189:5 296:1,16,21 297:2,15 301:8,12,18, 22 332:16 346:2,13 377:11 385:14,16 386:18,24 391:5,9

**lowest**
47:21 48:1, 21 49:4,25 50:22 51:8

52:10 53:1,5 56:3 234:5
**lows**
101:10
**LP**
289:14
**LP107**
118:8
**LP230**
288:21
**LP232**
289:16
**LP233**
130:4
**LP279**
42:10
**LP3**
230:24
**LP430**
258:4
**LP432**
319:18
**LP435**
249:25 250:9
**LP441**
312:21
**LP447**
304:19
**LP487**
340:20
**LP490**
271:9
**LP523**
126:4
**LP538**
15:7
**LP543**
184:9
**LP545**
193:24
**LP548**
230:24 231:18
**LP550**
266:1 276:2
**LP551**
92:3
**LP552**
255:9
**LP553**
263:23
**LP560**
94:1
**LP563**
233:16
**LP574**
139:21
**LP576**
393:25
**LP579**
350:1
**LP580**
353:21
**LP585**
371:19
**LP602**
381:3
**LP616**
240:12
**LP618**
327:3
**LP624**
201:17
**LP629**
150:9 159:16 173:4
**LP633**
282:3
**LP635**
279:13
**LP636**
219:25
**LP638**
237:24
**LP69**
160:2
**luck**
368:1 372:10,20 373:9,18
**lunch**
172:12,24
**lung**
243:13 245:3,4,11 246:2,3,17, 18,21 377:19

**M**

**M3**
38:15
**macronutrient**
212:24
**macronutrients**
211:18
**made**
89:8 91:1,3, 7,15 134:3 136:25 152:14 204:15 285:19 290:10 316:9 335:9 372:20 374:4 382:13
**magnitude**
87:22 102:2 185:12,17,19 286:23
**magnitudes**
102:16
**main**
16:15 61:8 206:22 209:18
**maintain**
388:25
**major**
18:6 144:11 146:15 149:4 162:14 168:12 204:20 205:4 224:4 234:13 351:23 358:21
369:7,15,18
**majority**
204:25 239:13 262:16 263:2 347:9 368:20 369:10 378:20 379:10,16,18 380:2,5,14
**make**
48:22 74:11 78:23 79:10, 23 149:13 181:1 223:13 225:1 275:18 299:12 300:17 323:20 330:14 356:25 361:3 365:9 366:25 369:24
**makes**
11:6 60:15 92:13 138:14 161:24 162:6 223:1 342:13 345:23 348:14
**making**
18:19 288:8 312:5 349:22 360:8 367:13
**male**
50:23 209:8
**malignancies**
238:14 290:15 320:2 380:24
**Maltoni**
350:10
**mammalian**
40:15
**mammals**
38:25 366:12
**mammography**
280:24

281:1,2,3
**managers**
19:16
**manipulating**
328:16 329:7
**manipulations**
113:24
**manner**
8:8 356:23
**manufactured**
150:1,25
151:13
**manufacturer**
11:4 148:25
149:4
**manufacturers**
134:11
146:15
152:10
155:12,13,14
**manufacturing**
143:17,18,22
144:2,12
145:16
147:1,6,7,15
148:9,16,21
149:15 150:3
151:3,8,11
**manuscript**
305:7 306:1,
3 307:15,23
309:18,21,22
310:1 311:22
312:4,9,13,
14 316:2
**manuscripts**
320:21
**map**
167:20
**March**
16:3
**Marco**
94:11
**mark**
115:15
118:11
201:15
233:16
237:24
279:13 282:3
289:3,5
340:19,20
**marked**
4:13 15:17
42:10,12
92:4,5,22
94:2,3
118:13
126:5,9
130:4,6
139:19,22
150:13
159:20 173:5
184:10,11
193:24 194:3
201:17,19
211:21,24
212:12,16
219:25 220:3
231:18,20
233:18 238:2
240:12,14
250:4,10,11
255:9,11
258:4,6
263:23,25
266:2,3
271:11 276:1
279:15 282:5
289:7,9
305:13,15
312:21,23
319:18,20
327:4,5
340:22
350:2,3
353:21,23
371:19,21
381:3,6
394:8,10
**markedly**
160:16 161:6
**marker**
189:21
192:22 196:4
277:24
**markers**
192:15 278:3
**market**
134:20 135:2
137:6,17
152:15 153:2
158:15
**marketing**
360:11
**MARLENE**
3:18
**Marseille**
232:1
**Mass**
23:9
**Massachusetts**
23:8,9
**massage**
180:25
**MASSEY**
3:22
**match**
282:24
320:17
339:3,4,7
**matching**
321:7
**mate**
190:8
**material**
341:1,3
**materials**
50:11 132:2,
5,7,15 133:2
201:23
331:17
336:25
340:19
**math**
95:2 123:1,5
342:13
**matter**
7:7 8:5 11:9
237:14 368:1
**matters**
10:25 327:20
**MD**
7:2
**MDL**
8:21
**mea**
206:20
**Meals**
94:8
**mean**
12:23 17:6,
20 30:17
39:23 58:17
59:1,12,23
60:3 79:5,6
96:10 98:25
102:10
103:8,17
115:25
125:10,17
132:18
138:12
140:24 146:1
149:19 162:5
185:19
198:14
205:16
215:25
218:24
219:17,19
228:5 239:10
242:10
257:13
260:15
262:9,10,19
263:5 282:10
284:23 291:2
311:20,22
355:12
365:18
377:15,20
378:4 387:3
**means**
41:2,5,22
51:15 70:12
159:6 165:18
166:13
257:15
325:11

355:25 391:8,15
**meant** 175:3 252:1 323:10 335:15 380:10
**measure** 88:16,20 89:2 103:3 104:1 215:19 376:4
**measured** 36:20 88:18 106:6 135:22 136:3 137:22 201:10
**measurement** 199:13 202:3,15 203:7 221:2, 11,22
**measurements** 96:5 100:3 188:23 198:18
**measuring** 20:17 105:25 142:17 344:22
**meat** 73:18 176:10 187:13,15 188:1 189:13 194:11
**meats** 187:18
**mechanisms** 46:8 206:22 393:7
**median** 98:25 197:1, 10,12,21 259:6 270:18,23 271:5 333:21,23 334:7,13
**medical** 9:7 18:8 23:5 68:4 69:12 104:17 258:12 291:9 320:15
**medication** 22:1 341:9, 22
**medications** 333:14 335:2 342:16
**medicinals** 103:12
**Medicine** 199:10 253:24,25 254:2
**medium** 258:20,24 264:11
**meeting** 313:15
**meetings** 206:19 314:2
**meets** 66:18 68:5 69:13
**melanoma** 376:15 377:8 378:2
**member** 314:1
**members** 314:14
**Menlo** 329:1
**mention** 53:1 84:16 85:5,17,22, 23 86:3,7 113:16 159:11 162:3,5,17 168:5 273:20 321:17
**mentioned** 31:18 53:3 84:22 85:11, 12 170:13 193:7 226:5 238:5 239:8 240:9 287:20 297:11 361:6 376:1,22 378:16
**mentions** 320:12
**met** 88:15
**meta-** 208:12
**metabolic** 207:13
**metabolism** 45:10 65:20 67:13 208:12 347:15
**metaplasia** 238:19
**methly-** 38:14
**methodologic** 285:16
**methodology** 335:20 336:21
**methods** 171:3 280:21 281:10 290:25 291:2,19
**methyladenine** 38:15
**methylguanine** 36:23 37:12, 19 38:7,13 40:4
**methylnitrosourea** 22:17
**mg** 61:6
**MGMT** 39:5,13,24 40:5
**mice** 25:2 26:11 40:15 61:25 66:25 352:14 353:4,14 355:21 364:21 385:5 386:9
**microbiome** 206:24 375:16 378:23
**micrograms** 50:25 102:14 190:2,15 197:5,18,22 235:13
**micronutrient** 193:7,12,13, 17 212:21 213:13 224:9
**micronutrients** 193:6,9,16 206:21 207:2,8 213:3 226:4 285:8,25
**mid** 19:16
**middle** 234:3 238:23 250:24,25 258:20 276:4
**might've** 114:18
**millimolar** 127:1,2,4,5, 11,12,19
**millimolars** 127:24
**millimole** 127:6,7

**million** 119:13,24 121:8,10 122:19 292:9,10,11 305:20 314:9,13
**mind** 33:14 80:18 327:1
**minimize** 388:25
**minimum** 325:8
**minor** 54:25 55:24
**minority** 351:12
**mint** 124:24 128:24 129:8
**minute** 132:19,23 283:11
**minutes** 72:16 231:5, 6 343:11,14
**mischaracterize** 53:12
**mischaracterizes** 53:11 77:25 81:11 82:2, 20 142:20 198:22 298:22 366:5
**misclassification** 198:8,13,15 201:1 203:6 213:6 218:6 225:6 281:20
**misclassifications** 215:8
**misestimization** 201:1,11
**misinterpret** 48:19
**misinterpretation** 41:18 165:5
**misleading** 126:20,24 349:15
**misrepresentation** 299:16 301:1
**misrepresentations** 299:12 300:2
**missed** 203:6 206:21 207:3
**missing** 205:4 207:8 223:20 341:16 362:1
**mission** 46:7
**misspoke** 252:1 253:1 255:2
**misstatement** 252:16
**mistake** 127:23 215:24 230:1 278:15
**mistranslation** 252:16
**misunderstood** 254:4
**mix** 330:24
**mixed** 367:16
**mixtures** 382:22 383:6
**MNNG** 22:24,25
**MNU** 22:15,16 26:22 386:9 387:5 392:24
**model** 205:10 210:19 347:23,25 348:10,13,21 349:1,11,20
**modeling** 90:12 95:25 98:10 99:8, 12,20,23 349:19 374:4,11
**modelling** 372:24
**models** 24:20,25 25:2 49:12 55:3 70:21 339:6,9 355:13,17, 19,21 356:5 360:5 363:14 383:21
**moderate** 378:1
**modest** 374:20
**modestly** 373:2,12
**modifiable** 207:19
**modified** 234:12
**modify** 205:5,20 206:24 369:14
**Module** 93:2
**Mohy-ud-din** 287:17,20, 21,22 288:6 289:4 290:2, 3,5 291:3,5 292:7 297:19,22 298:2,16 300:19,20 301:16 302:22 305:21 314:4
**molecular** 73:14,23 208:9
**molecule** 26:13 73:6, 10,17,22 131:9
**moment** 359:20
**money** 206:9
**monitor** 10:17 242:21
**monitored** 384:17 389:4
**monkeys** 34:18,20 35:3,5,24 36:21 37:24 364:2
**Monograph** 240:23
**Monte** 89:18,20,24, 25 90:3,8,9
**month** 13:12
**months** 36:16 259:11,14 260:5 261:7, 8
**morning** 8:19
**morphology** 108:22

**mother**
371:13
**motivation**
360:13
**mouse**
32:25
**move**
228:13 311:6 326:4,13 376:3
**moved**
160:6 375:5, 6
**movie**
248:24
**moving**
172:12
**multi-institutional**
291:22
**multi-pronged**
392:19
**multi-step**
28:25
**multi-variable**
272:9
**multi-variant**
234:19
**multiple**
29:8 236:5 276:19 278:12 349:17 382:6 393:2
**multiplicative**
210:17
**Multivariate**
196:16
**mutagen**
27:23 28:21 29:17 31:13 32:14
**mutagenesis**
28:1,17 37:18 67:10
**mutagenic**
44:25 45:5
**mutagens**
28:3
**mutation**
28:6
**mutational**
376:18 377:7,16,18, 21
**mutations**
28:5 29:2,14 32:18 368:3 377:10,12,14 378:2
**muted**
82:8,9
**mythyl**
186:18

**N**

**N-NITROSAMINES**
92:10
**N-NITROSODIMETHYLAMINE**
43:10,13
**Najafi**
130:13,17, 21,25 133:6
**Najafi's**
113:12 115:4 133:11,16
**name**
7:10 8:19, 23,24 96:17 118:19 124:18 141:8 152:4,13,19, 25 153:3 157:20,25 158:3,14 159:3 186:25 187:4 287:19 333:7
**names**
149:9
**nanogram**
94:19 96:18 190:14
**nanograms**
93:12,15,18, 21 94:18,24 95:5,11 96:14,24,25 97:3,12,14, 16,20 98:18, 20 99:4 107:5 124:23 127:2,3,5, 11,13 128:22,23 137:14 190:1 197:2,23 235:9,10,13 237:2,11
**narrow**
179:24 207:7
**National**
207:13 208:23,24 209:6 282:20 283:3 333:9, 13 334:25 350:9
**Nationwide**
250:17
**natural**
28:9
**nature**
179:8,16 222:24
**natures**
223:24
**NCI**
209:1
**NDEA**
33:18,24 34:13,17,19 35:4,6
**NDM**
157:19
**NDMA**
22:4 32:8, 12,14,17,20, 22 33:10,21, 25 34:4,9 35:25 36:21 37:4,24 39:9 40:10,20 43:14,25 44:13,18,25 45:5,11,24 47:8,14,16 48:1,12,15 49:4,25 50:24 51:7 52:9 54:19 55:13 56:4 57:23,25 58:6,8 61:4, 12,23 62:18 63:2,9,19 64:2,5,13, 15,20,22 65:16,20 66:1,21 68:5,20,23 69:8,13,21 70:1,7,23 71:7,16 72:1,5 73:5, 9,15,17,22 74:17 75:23 76:11,14,18, 23 77:2,3 80:3,10,11, 12 81:1,5,8, 20,23 82:14, 16,23,25 83:4,7,17,18 84:4,5 86:19,23,25 87:5,13,15, 21 88:2,17, 19 89:3,10 90:18 91:2 93:11,15 94:7 96:2,5 97:25 98:1, 13 99:12,16,

22 100:4,6, 16,20 101:4, 9,18,20 102:1,6,7, 13,15 103:4, 9,10,15,22, 23 104:1,19 105:3,9,11, 16,20 106:1, 4,7,9 107:4, 8,17,20 110:19 111:16 112:4,18 113:13 116:15 117:13,17 118:17 119:12,17,23 120:7,16 121:6 122:18 123:13,17,23 124:15,24 126:25 127:18 128:5,7,10, 13,23,25 131:11 135:7,11,22 136:3,11,15 137:7,22 141:21 142:2,4,6,23 143:6,9,13, 23 144:3 145:2,13,20 147:14 150:19 152:6,21 153:4,10,11, 22,24 154:23 155:16,21,25 156:5,14,16, 25 157:2,5, 6,10 158:3, 7,8,11 159:4 160:18 161:2 162:25 176:11,16 177:2,4,16 180:22 182:14 186:12,25 187:1,6,7,12 188:5,13,16 190:16,19,22 191:3,5,12, 15,20,25 192:17,18,22 193:6,10,11 195:2,8,16, 24 196:1,12 197:17 198:6 201:2 205:17 210:1 219:6, 12,22 221:16 222:19 223:25 224:7 227:3,4,9 228:9,16,18, 21,22 229:8, 9,16 232:10, 12 233:7,10 234:5,20 235:8,14,17 237:2,10 250:15 275:3,5 278:23,24 286:1 316:25 344:13,17, 19,24 345:16 346:12,21 347:2,7,11, 19 356:4,7 364:20 365:12 367:5,17 386:4 390:25 392:25

**necessarily**
20:9 37:21 38:24 39:4 101:22 167:19 170:23 315:22 316:17 338:12 348:22,23

**necessary**
230:6 265:6 386:7 388:21

**neck**
246:21 377:9,20 378:3

**need**
14:14 17:10 37:14 38:5 43:4 57:10, 12 59:15 80:6 119:20 145:7 170:11 230:10,16,19 265:20 269:21 283:17 337:17 349:4,11 356:12 380:9 382:13 385:22 390:1,18

**needed**
127:23 161:9 247:17,25 366:22 386:14

**needs**
14:9 83:10 84:1 156:20 225:4 349:22 383:22 384:22

**negative**
33:20 183:10 356:23

**negligible**
88:3 178:14 179:1

**nested**
280:23 282:19

**never**
17:17 20:6 72:14,20 229:20 308:9 309:24 327:1

**newly**
159:23

**nice**
260:21 265:22

**Nigh**
4:5 8:18,20 10:6,20,21 15:5,14,19 30:1,11,18, 20,24 31:3, 10 42:9,14 43:16 47:2 53:12 54:23 60:24 67:25 72:14,19 73:4 78:1 79:8 81:13, 18 82:13 92:2,7 93:25 94:5 97:10 98:4 105:12 118:7,11,15 120:12,19 121:12,20 122:8,9 126:3,10 129:17 130:3,8 139:19,24 140:5 146:9 150:8,15 159:15,20 160:1,5,9, 12,13 161:18 162:20 165:9 169:19 172:14 173:3,7 176:3 178:5 184:8,13,20 186:6 193:4, 22 194:5 196:7 201:14,21

210:5,13 211:1 214:3, 8,22 219:24 220:23 228:13 229:1,3 230:23 231:3,6,17, 22 232:4 233:15,20 234:1 235:1 237:22 238:4 240:11,16 241:3 244:21 249:15,24 250:4,8,13, 21 255:8,13, 19 258:3,8, 17 259:22 263:22 264:2 266:1 270:20 271:3,8,13 274:15 276:1 279:2,12,17, 23 280:3,7, 8,19 282:1, 7,9,16 283:13,20 286:14 287:12 288:20 289:3,11,16, 19 290:22 291:1,16 292:4,21 293:5,24 294:7 295:21 297:18 298:24 299:2,6,14, 19,24 300:3, 5,7,13 304:17 305:13,17 306:6 312:19,25 314:10 319:14,22 323:22 324:13,18 326:23 327:7 328:22 329:18 336:1 340:17,24 341:4 343:10,22 349:25 350:5 352:4 353:20,25 354:9 357:13 359:2 371:18,23 372:13 376:8 381:2,8,16 384:24 389:12,22 393:17,25 394:1,8,12, 20 395:7

**nine** 163:5,13 264:15,17

**ninefold** 308:24

**nitrate** 96:1 226:8 231:24 234:15 235:20 236:11,21,25 237:8

**nitrates** 204:13 219:20 233:8

**nitrite** 125:19 127:4,12 128:8 149:14 231:24 234:15 235:20 236:11,21,25

**nitrites** 219:20 233:8

**nitrogen** 209:12

**nitrosamine** 22:8,21,22 231:24 233:22

**nitrosamines** 22:11,13,14 23:1,3,12 184:15 185:1 194:11 205:17 207:11

**nitrosodimethylamine** 187:2

**nizatidine** 258:11 259:7 260:24

**NOEL** 386:21

**non-active** 278:16 304:14

**non-alcoholic** 369:3

**non-cancer** 47:22 48:3 49:6 50:2 51:9

**non-dietary** 234:14

**non-differential** 198:8 218:5 225:6

**non-genetic** 380:23

**non-human** 366:18

**non-identical** 182:2

**non-neoplastic** 49:16

**non-ranitidine** 273:4,23 274:1,19

**non-significant** 176:21 177:20 178:15,19 179:2 269:5

**non-statistically** 173:10 268:22

**non-users** 272:21 274:11 306:23

**nonactive** 275:16 304:11

**nonclinical** 76:4

**nonhuman** 365:25

**nonresponsive** 228:14

**Nordisk** 11:2,3

**normal** 88:4,9

**Notably** 128:4

**Notary** 8:14

**note** 164:23 321:15

**noted** 52:8 67:18 78:11 272:1 395:12

**notice** 324:1 341:13

**noticed** 273:24 323:1

**noting** 165:7 177:19

**notion** 257:2 390:14

**Novartis**
152:5,12,18 157:24 158:6,21
**Novo**
11:2,3
**null**
56:7,14,25 57:6,7 58:3, 16,18,24 59:1,2,13, 19,24 164:22,25 173:19 174:14,18, 20,21 175:2, 4,8,9,13,18, 25 177:11 179:14 181:14,16,19 198:20 200:9,10 201:3 203:8 212:13 213:5 215:9 216:12 223:8 225:8 298:6
**number**
4:9 15:12 22:25 25:1 36:16 38:16 44:19 54:12 58:6,7 61:24 91:4 99:19 102:4 113:23 131:18 132:9,10 137:12 138:20,24 148:25 159:18 161:23 162:6 171:25 177:16 184:21 228:7 238:24 254:8 260:9 272:23 273:7,22 275:18 277:9 289:14 324:2 331:20,24 344:16 360:9 364:12 366:16 369:9 370:8 373:24 374:3,7 377:9,11,13 378:2,12 385:3 387:15 391:5 392:23 393:12
**numbers**
55:1,9 97:7 102:22 109:18 120:14 164:24 165:16,20 166:9,15 167:7,22 168:9 174:11 180:12 212:8 213:11 308:4,15 309:10 310:11 311:25 330:14 331:22 343:5
**numerical**
165:8 173:14 174:10 185:20
**numerically**
164:24
**numerous**
55:3 206:9 267:3 277:4 356:15 358:11 364:1,6 365:13
**nutrient**
205:11 221:5
**nutrients**
204:17 205:9
**nutrition**
24:12 207:25 208:12 209:8 285:14 286:13
**nutritional**
24:10,11 202:3,17 220:7 226:16
**nutritious**
222:14

**O**

**oath**
8:2
**obese**
295:3 331:8
**obesity**
225:25 226:1 297:24
**object**
83:21 219:9 300:1
**objection**
8:8 22:6 23:23 24:18 25:13,25 27:10,24 28:23 29:20 31:5,16 32:2,10,15, 21 33:12 34:3,8,21 37:6 38:1 39:14,25 40:6,11 41:7,23 48:4,23 50:3 51:11 53:10, 19 54:1,7, 14,21 56:15 57:9 58:9,19 59:4,14,25 61:19 63:22 68:7 69:15 70:9,25 71:9,19 73:8,20 75:25 76:16 77:24 79:4, 18 80:22 81:10 82:1, 19 84:20 85:7 89:4, 12,19 90:4, 20 91:10,17 95:13 96:13 97:6 99:6 100:8,18 101:21 102:3 103:5 104:3, 11,21 105:5 106:18,25 107:12 108:10 109:7,17,25 110:12,22 111:20 112:8,15,24 113:5,18 114:9,22 115:3,21 116:20 117:21 119:19 120:9 122:21 123:20 125:1,21 129:2,9 134:18 139:8 142:19 143:25 153:23 156:18 161:4,15 162:9 163:8, 24 164:16 166:6 167:15 168:10 169:1,8,15 170:18 171:21 173:12 174:23 175:10 177:6 178:24

179:19 181:21 182:21 186:1 188:9,20 191:23 192:3 195:12,20 197:4,7,24 198:10,21 199:25 200:4,12,21 201:5 203:9, 15 206:2 211:11 212:7 213:10 214:15 215:11 216:13 217:18 218:18 221:14 222:22 223:10 225:9 227:6 228:24 229:11 235:15 237:4 238:9 239:6 240:5 242:2 244:2,18 246:13 247:3,13,21 248:19 256:9 257:5 259:12 260:6 261:9 262:1 263:19 268:25 272:16 274:13 276:23 278:9 296:10 298:21,25 300:8,25 303:8 304:24 305:8 307:18 311:13 312:11 315:19 317:12,21 318:15 319:7 320:19 321:22 322:3,11,20 323:4 324:23 325:21 326:7 328:2,11,19, 21 329:9 331:19 332:10,22 333:15 334:12 335:7 337:1,21 338:9,22 339:20 340:14 342:11 343:3 344:14,25 346:5,15,23 348:7 349:9 356:17 358:13,18 362:10 363:4 364:8 365:15,24 366:4,14 367:10 370:5,13,18 373:14 377:3 378:11 379:21 380:8 383:11 385:18 386:25 388:3,12 389:20 390:12 392:1,15

**objections**
8:10 30:3,7, 21 31:4 81:14 299:9

**observation**
166:9

**observed**
127:18 135:15 164:7 165:23 166:5 176:22 354:19

**observers**
347:10

**Observing**
209:7

**obtainable**
315:6,12

**obtained**
19:9 304:22

**obverse**
382:3

**obviously**
43:2 123:7 157:5 312:13 382:12

**occupational**
25:8,11 64:10 68:22 79:3,16,22 80:1,4,20 81:1 82:22 83:1,6 85:21 100:25 344:6 351:16

**occupationall y**
351:1,10

**occur**
28:5 47:20 48:1,21 49:4,25 51:7 109:21 141:19,22 142:12

**occurred**
109:9 243:3 249:3 317:1

**occurrence**
171:8

**occurring**
146:19

**occurs**
108:20

**October**
202:8

**odd**
306:22

**odds**
29:11 188:6, 13 189:22 190:15,17, 20,24 191:2, 3,16 192:2 233:10 234:5 237:9 267:18 268:19 269:7,8,10, 12,16 270:11 286:23 296:21 306:17 307:9,13,21 308:2 309:14 310:7

**offered**
372:21

**offhand**
23:24 131:22 271:24 334:23

**office**
9:5

**offices**
19:12

**oftentimes**
172:5 261:24 364:6

**okay**
9:2,14 10:6, 20 12:5,10 13:1,4,18 14:5,11,15, 22 15:5 21:17 23:15 31:3 42:8 48:8 52:25 60:16 65:8 67:24 71:25 72:10 78:9 81:5 83:14 85:2,15,25 86:16 88:24 92:1 93:24 104:8 105:8, 12,23 110:3

113:1 118:1 129:16,20 130:20 131:15 132:5,18 133:1,13,20 135:4 137:25 139:12 140:23 145:10 158:17,25 159:2,7 160:7 170:3 172:15 173:3 174:4 184:7 185:24 186:5 187:5,21 188:5 193:21 194:18 206:5 210:4 212:18 214:8,16 219:23 229:13 233:14 235:19 237:21 251:14 255:7 259:2,20 267:17 272:1 274:21 279:12 280:7,18 281:25 284:22 287:11,24 289:2,6,17 290:11,21 291:15 294:17 304:16 309:22 314:3 319:3,13 323:15,17 324:17 326:23 342:6 349:25 357:18 372:6 390:3 393:17 394:7,18,20

**older** 238:23 294:14,19

**omeprazole** 12:15,17 13:3,14 257:1 273:14,16 275:4,6,9 276:5,7,22, 25 277:2,14 293:12,14 296:3 304:12,15 319:25

**once** 369:23 383:14 393:3

**oncogenesis** 28:16

**oncology** 314:21

**one** 10:25 14:7 17:7 26:8 28:3 31:11 36:25 57:20 65:10 77:21 83:5 84:19 88:11 93:14 95:17 100:13 119:25 123:2,3 125:13 132:19 133:1,7 134:2,9 148:25 163:19 171:4 175:12 180:18 185:7 187:17 189:4,13 194:20 195:22,23 199:2,4 202:1 203:14 210:12 213:3,21 214:10 224:9 231:1 235:3 237:22 238:1 244:4 250:8 266:13 269:12,21 270:3 273:1, 13 275:18,22 278:5 285:4, 7 292:17,25 293:15 313:4 317:9 318:11 325:13,16,18 332:25 339:3,9 340:5 343:11 345:24 348:12 349:7,21 351:19 352:2 354:16 363:15 364:23,24 367:3,12 369:18 372:5 383:22 393:1

**one's** 170:8

**one-third** 352:21

**one-to-ten-year** 293:10

**one-year** 324:22 325:2,7,9,23

**ones** 78:5 209:10 240:9 309:13 345:25

**ongoing** 12:13 135:8 327:19

**online** 290:10

**onset** 238:6 251:5, 11,19 252:20 253:6,15 255:5

**Open** 125:9

**open-ended** 154:7

**opened** 107:11

**opening** 107:24

**operates** 210:18

**opine** 160:25

**opined** 128:22 207:18

**opines** 125:17,18

**opinion** 16:10 21:2 50:12,17 68:4 69:12, 25 70:7,22 74:15 75:21 76:12 88:1 102:25 103:21 215:8 251:21 310:22 311:3 318:2,7 329:15 355:12 368:5

**opinions** 16:9

**Opportunities** 220:6

**opposed** 14:10 223:4 298:5 316:5 380:7

**optimize** 385:7

**optional** 85:9 86:7 101:11

**OR1**
236:7
**OR2**
235:21
236:7,11,25
**OR3**
235:21
236:25
**oral**
347:13
**order**
17:24 89:9
247:18 248:1
385:13
390:19
**orders**
87:22 102:16
**organ**
354:17
**organism**
26:14
**organization**
40:23 42:5,
17 44:10,16
45:4 46:2,6
47:25 61:18
62:24 63:13
66:8 242:21
**Organization's**
66:1
**organizations**
100:2 206:9
277:9 347:21
**organs**
37:20
**original**
52:2 170:7
171:16,18,22
**originally**
283:2
**ORS**
186:10
232:11
237:14
**outcome**
7:14 16:18
17:4 38:24
171:2 178:9,
14 183:1
217:17
218:7,10
317:20
318:14
**outcomes**
17:1 18:16
161:25
162:7,14,24
164:6
166:20,22
167:1,6,12,
18 168:7
171:1 218:2
252:23
253:10
**outlier**
307:3,6
**outline**
29:2 368:21
**outlined**
76:5 273:1
368:19
**output**
90:2
**outside**
6:10 164:25
**over-the-counter**
339:24
340:9,11
342:4,10
343:6
**overcome**
393:6
**overestimation**
46:12 360:15
**overlap**
180:1,6
**overly**
72:9
**overshoot**
224:25
**overshooting**
225:22
**overstate**
383:18
**overstatement**
353:16
360:15
362:19 365:4
**overwhelming**
44:24
**owe-**
168:8
**owing**
65:14 161:21
167:7 168:9

**P**

**P-R-E-N-T-I-C-E**
199:8
**p-trend**
196:19
**p-value**
56:10 60:2
163:14 180:7
192:25 193:2
233:1,2,5
235:6
237:16,17,20
269:1,3
276:13
294:20,25
295:4,7,12,
18 296:2
297:17
298:10
301:18
**p-values**
269:3,4
**p.m.**
395:12
**page**
4:4,9,25
43:17 47:3
60:18 62:6
84:12 85:15,
25 86:17
87:4,9,10
92:16,24
105:10,14
107:7 118:24
126:17
127:16
133:20 135:5
140:24 141:2
146:6 159:14
161:19
162:21,23
166:17
169:20,21
176:4,6
184:21,23,24
186:4,7
196:8 206:7
208:21 220:2
235:1 241:4
250:22
255:19
258:18
264:11
269:20
270:17 271:2
272:6 306:5
307:8 313:2,
3 314:11
323:23
324:12
326:25
329:19
341:5,6
350:20 352:5
357:14 376:9
381:5,17
**pages**
26:2 305:25
**paid**
317:11
318:12
**pancreatic**
78:17 86:10
238:15
239:16,23
334:9 369:17

**panel**
88:15,24
**panelists**
88:25 104:10
**Papantonio**
3:23
**paper**
144:23 180:17 202:11,12 203:3 220:13 251:25 252:5,19 253:13 259:17 298:2 305:10 314:7 315:1,24,25 316:6,16,19 318:17,18, 19,20 323:11 336:18,25 354:21 355:10 357:3,9,12 359:10 361:16 372:6,11 373:16,21 374:6 377:22 378:18 384:25
**papers**
23:16 24:1 26:23 125:9 254:17 272:4 273:2 288:24 304:22 311:15 316:12 321:8 338:4 368:6
**paragraph**
43:21 47:4 50:15,19 60:25 62:5, 17 65:9,12 87:11 107:16 127:17 130:24 133:23 146:10 150:12 164:4 166:18 176:7 178:7 186:3 202:14 208:22 210:6,7,9 220:25 250:24 255:21,22 258:19 270:21 283:19 294:1 297:21 336:2 352:7 359:4 360:19 372:15 376:10 381:18
**Paralegal**
3:22
**parameters**
190:11 237:6
**Park**
329:1
**parroted**
355:8
**part**
6:22 15:20 29:2 50:11, 12,17 63:6, 17 64:17 66:22 67:14 119:13 146:9 148:8 164:17 208:17 215:7 252:17 289:21 318:2,7 333:25 336:14 338:16 368:12 379:7
**participants**
6:3,19 162:25 163:1 329:25
**participating**
7:21
**particular**
33:15 35:21 46:11 52:5, 11 71:11 74:14 91:22 95:15,25 123:22 148:25 157:14 162:17 176:21 177:20 183:1 189:21 190:18 211:16,18 212:15 213:14 214:19 235:17 238:15 239:8 249:1 267:2 285:10 311:20 312:7 318:17 322:15 330:23 337:13 348:12 366:23 374:6 389:8
**parties**
8:6
**parts**
119:13 121:8 122:19 132:22 217:16,21,24 345:4
**party**
7:13
**pass**
347:14
**passed**
371:12
**passive**
28:14
**past**
22:2 282:12, 22 287:7
**pathogenic**
369:15
**pathway**
349:12
**pathways**
40:8 67:17, 23
**patient**
19:13 167:21 189:18 301:24 308:12 321:3,4 330:24 333:9,13,17 334:21,25 335:3,16 370:23 371:1,2,3,8
**patient-based**
370:25
**patients**
18:18 19:15 20:8 101:7, 13 117:2 140:10 141:5 145:18 157:10 161:17 165:18 227:21 238:22 239:13 257:10 260:9,14,16 262:14,16 263:2,13,16 267:12 273:8 277:12,18,20 282:23 284:1 286:18 292:9 293:6,9 294:19 296:19,24 297:2 302:4,

15 303:21,25 330:20 331:15 339:5 340:1 375:4, 11

**pause**
49:23

**pay**
162:16

**paying**
288:19

**PCCIU**
271:1 276:8

**peak**
243:14

**penalty**
8:5

**Pennsylvania**
3:4

**people**
8:25 18:25 20:20 204:15 208:7 219:5 227:2,3 228:20,21 229:7,8 264:16 285:25 324:2 326:4,13 330:16 332:1,7,20 345:14 346:1,11 356:21 374:17 376:2 377:13 380:21

**per-**
158:19

**percent**
20:6,13 56:12 58:16 119:8 122:14 163:5,13 166:24 178:16,18 179:3 182:12,19 183:6 212:4, 5 230:11 242:5,13 252:2 259:9 260:3 261:6 265:16 302:24,25 303:16,17 330:5,9,12 331:18,21 332:3,9,11, 15 341:19 342:16,19,21 360:21 373:3,12 387:8,10

**percentage**
218:22 334:16,17 340:10 341:14 342:1

**percentages**
342:7,9 376:18 379:4

**percentile**
94:16 95:10 98:17,23

**perfect**
17:17 20:7 375:22 379:9

**perfectly**
71:4,14

**performed**
176:13 291:21

**period**
145:19 153:16 156:22 158:9,12 159:1 170:1 171:13 216:10 239:2 240:2 241:13 242:6 251:2, 4,9,11 252:3,8,12 253:3,5,12, 15 255:4,25 256:6 257:11,12,20 258:1 261:11 328:5

**periods**
156:10 241:19 242:22 262:17,18

**perjury**
8:5

**person**
8:3 19:22 74:2 218:16 325:12,14, 17,18

**personally**
203:17

**Persons**
264:5

**Perspective**
381:11

**persuasive**
382:3

**pertains**
222:19

**pet-**
133:21

**petition**
113:7,9,20 131:3,7 133:22,25 134:4,8,23 135:3

**Peto**
52:6,20 53:1,23 54:17 56:24 57:8 58:5

**Pfizer**
11:9,10,15, 17,18,24

**Pharma**
113:2 114:7 130:14 131:4,16

**Pharma's**
113:6,8,12, 19 133:22 134:16,23

**pharmaceutical**
11:5,17,18 13:7 146:14 147:21 148:4,23 149:8 152:11 155:12,13 314:21 317:16 328:10

**Pharmaceuticals**
3:1 146:15 149:5,13 150:2 151:1

**pharmacoepidemiologic**
265:3

**pharmacy**
261:14 315:5

**phenylimid**
186:19

**Philadelphia**
3:4

**Phip**
186:12,15 187:6,7,12, 20,23 188:13 190:20,24 191:5,12,15, 20 192:1 228:8 286:1

**phone**
9:18

**phonetic**
368:2

**phrased**
154:20

**physically**
7:22

**physiologic**
39:18,22

125:10
**physiological** 128:15
**physiology** 88:5 125:13
**piece** 97:14 351:22
**pigs** 364:1,2 365:18
**pill** 73:19 105:17 106:4,5,7,9, 10 107:18,24 125:20 128:25
**pills** 106:20 108:2,12 110:20 111:8 112:19 117:13
**Pino** 390:23,24
**PIPER** 3:13
**place** 112:21 288:16
**places** 109:23
**plaintiff** 7:4
**plaintiffs** 8:20 13:19, 23 129:7,11
**plaintiffs'** 69:1 133:7
**plant** 345:10
**plasma** 90:18 91:2
**plausible** 326:1 382:21 383:5
**please** 7:17 8:22,23 30:5,18 97:22 119:21 299:13 300:16 370:8
**plethora** 167:25
**pneumonia** 277:7
**Pobel** 232:2
**PODSIADLO** 3:11
**point** 30:12,13 36:7 45:9 64:11 77:1 101:2 114:24 115:18 120:13 140:7 163:19,20 167:16 171:17 174:10 203:11 205:4,23 217:10 219:17 222:12 223:1 224:4 244:12 301:25 309:12 318:17 379:4 388:18 390:19 393:11,16
**pointed** 61:23 96:4 101:12 109:12 173:9,17 174:12 177:18 243:19 278:17 301:9,15 303:18 308:7 366:17 378:20 388:23 390:23
**pointing** 64:7,8 309:8
**points** 121:9
**policy** 242:21
**pollutant** 347:23,24 348:3,9,21 349:1,3,7,8, 11,20
**popped** 214:6
**population** 98:13 99:4 141:3,10 252:6 272:8, 15 294:4 296:8,9 303:1,14,17, 23 304:4,8 306:10,16,22 307:1,16,24 308:12,23 309:16 310:7 311:9 330:6, 12 331:11 343:2
**population-based** 140:2 266:9
**populations** 359:8
**pork** 93:20
**PORTER** 3:9
**portion** 210:10 341:21
**position** 64:24
**positive** 200:18,19 223:9 356:23
**possibility** 20:7 64:25 66:5 124:2 151:23 152:2 183:5
**possible** 29:17 30:12, 16 31:13,20 46:15 66:19 69:22 70:3, 18 71:2 72:1 147:5 161:23 167:7,14 168:8,9 180:5 205:5 209:16 230:9,14 254:14 278:10 322:2 356:9 367:17
**possibly** 71:10,15 229:23 362:16 371:8 384:1
**post** 170:4,5,14 171:20 172:1
**postdocs** 254:6,9,18
**poster** 290:5
**potassium** 209:11,20,21 212:21 213:11,17
**potent** 61:13
**potential** 66:12 68:17 81:6,21 82:15 177:9 221:7 235:20 237:15 273:21 336:5,13 352:11 358:4 384:1 389:10

**potentially** 46:17,24 207:19 336:19 352:3
**Pottegard** 149:24 150:6,9 159:12 167:10 170:17 173:6 183:16,19
**poultry** 93:20
**powders** 118:19
**power** 161:14,16 202:24 214:21,24 215:1,4,10 385:13,17 386:22
**powered** 167:19 168:3
**powerful** 275:6
**PPI** 266:14,20 267:5,23 269:23 273:6 330:12 332:8
**PPIS** 260:17 267:13 273:8 274:22,25 276:4,20 277:3,19 278:13,21 303:22 330:17,21,25 332:2,20 333:1 340:13
**ppm** 109:13 110:5 119:24 123:3
**Preamble** 241:1
**preceded** 354:19
**precise** 102:23 370:7
**precisely** 122:3
**predefined** 170:6
**predict** 359:7
**predicted** 98:12 100:16 102:8
**predicting** 358:4
**prediction** 353:6
**predictions** 223:14
**predictive** 353:9 355:13 356:6
**predictor** 352:16
**predisposing** 369:5
**predisposition** 374:18
**predispositions** 351:14
**predominantly** 176:17
**preliminary** 131:8 134:2 135:10,19 136:17 314:14
**premise** 219:10
**premium** 369:20
**Prentice** 199:3,7,8 220:8 221:10
**preparation** 158:6
**preparations** 32:13 123:24
**prepared** 394:3
**prescribed** 277:18 342:25 343:1
**prescript-** 342:6
**prescription** 331:14 340:11 341:10,22 342:2,8,16
**prescriptions** 141:6 341:23
**presence** 6:10 32:8 38:21
**present** 3:17 7:23 128:5,10 283:22,24 334:24
**presented** 93:3 288:11, 14 290:6,18 296:13 382:24 383:9 394:3
**presenting** 46:10
**preservative** 188:3
**preservatives** 207:11
**preserve** 389:10
**preserved** 204:12
**President** 130:13
**prespecified** 170:14,17,23 172:6,10
**presumably** 393:4
**presume** 108:22 141:22 142:8 186:24
**pretty** 21:8 55:12 115:8 129:17 143:5 144:5 177:11 189:9 224:16 257:18,21 265:11 302:14 331:21 337:6 342:20 344:15 386:4,16 387:11
**Prevalence** 295:25
**prevalent** 168:25 169:7,14 171:11 245:13 246:19,25 247:2,11 339:19
**prevent** 208:6 369:9 370:1
**preventable** 367:20,22
**prevented** 368:9,14,19 369:7,17
**preventing** 222:3 369:24
**prevention** 208:1 221:7 350:24 368:11,15
**previous** 10:25 68:23 148:6 195:23 337:7,17

**previously**
4:13 44:7 104:8 126:5, 8 133:14 159:20 173:5 178:17 317:11 362:15
**primarily**
22:15 24:22 25:2 40:24 41:12,20 66:23 70:13 74:8 83:10 84:2 85:13 152:10 204:4 222:3 225:19 238:20 314:22 320:25 347:19 351:13 368:23,25 369:1 375:2, 8,17 378:23 380:16
**primary**
170:25 171:1,4,15 178:9,13 204:24 225:19 239:12 269:24 271:1 332:25 347:1 348:24 350:23 358:3
**primate**
38:8,11,19 44:6 367:11
**primates**
33:1,7,9 34:5,9,14,15 35:25 38:22 39:1 40:17 62:2 364:17, 22 366:18 367:4
**principle**
27:3 58:15 178:6
**principles**
16:15
**printed**
25:18 155:20
**prior**
21:20,22 22:3,10 23:8 35:22 36:5, 15 151:19 153:15,25
**Private**
6:8
**probability**
23:16,22 24:2,4,5 335:14,22 336:8 338:3, 6,20,25 385:8
**probable**
40:20 41:1, 5,9,10,18,22 70:8,11,12, 19 131:11
**probably**
14:4 24:21 32:5 37:12 99:19 102:20,22,25 103:22 115:23 116:22 143:6 157:9 203:4 205:20 218:20 230:12 243:8 252:14,16 253:8,9 254:7,14,25 265:12,20 273:17 297:1,3 298:9 307:6 323:9 331:8 332:16
347:10 351:11 356:10 363:11 364:15 375:16,23 385:22 387:9
**problem**
52:13 55:24 160:12 210:13 214:10 217:4 280:3 315:18 328:22 351:24
**problems**
216:2 320:17
**procedures**
281:7
**proceed**
238:17
**proceeding**
6:4
**proceedings**
7:18
**process**
26:23 28:9 29:1,8 115:23 116:3 147:2,15 148:9,10,16, 21 149:15 150:3 151:3, 8,12 238:24
**processed**
73:18 176:10 187:18 188:1 194:10
**processes**
26:4 39:18 45:15
**produced**
146:14
**producers**
284:24
**product**
106:13,15
107:9 109:14,22,24 110:9,18,21 111:8 112:22 113:14 114:3 124:24 128:6,24 136:20 137:1,12 138:16 140:19 152:14,19 153:1,4,9,21 154:4 155:21 156:1 159:3
**products**
7:8 76:21 108:16 117:18 134:17 135:12,15,22 136:3,16 137:8,13,19, 22 139:9 146:14 149:25 150:18,25 152:6 155:24 159:4 176:9 182:15 250:16 284:24
**Program**
350:10
**progress**
312:2
**promise**
300:17
**promotes**
26:12,15
**promotion**
26:5
**prompt**
121:22
**prompts**
121:25
**prone**
176:14

198:1,5 199:17 220:16 222:24 223:18
**pronounce** 280:25
**pronounced** 8:25 92:13
**proof** 64:16 151:24 205:18 223:23 228:1 229:25
**propensity** 336:6
**proportion** 92:9 341:8 378:15
**proportions** 376:14 377:1 378:8
**proposition** 360:7
**prospective** 18:11 218:23 283:8 284:10,14 340:2
**prospectively** 281:12 284:2,11 286:25
**prostate** 376:15 377:11
**protect** 351:8,18
**protecting** 66:9
**protection** 350:24
**protective** 226:7
**protein** 209:7,20,21 211:18
212:24
**protocol** 35:15 170:7 171:16,19,23 172:3
**protocols** 382:1
**Proton** 266:7
**prove** 59:7 60:5,8, 10 217:5 230:10 251:22 252:2 337:19 338:7 349:12 361:7 365:7
**proved** 182:3
**proven** 58:18 59:2, 13,24 64:2 248:8,9 353:14 387:7
**proves** 60:9
**provide** 19:16 110:1, 14 224:11 241:21 249:18 328:9 372:25 373:15
**provided** 19:12 327:19 373:10
**providers** 19:16
**provides** 157:8 176:19
**providing** 265:13 374:12
**proving** 66:7 223:25
**prudent** 382:21
383:6,23
**public** 8:14 134:11 170:21 206:17,25 350:25 351:8
**publically** 281:21
**publication** 170:24 184:1 253:16 306:1 312:10 315:1,11 331:10 337:7 357:11
**publications** 21:1,4 168:21 184:6 320:16 329:8 339:17 357:7
**publish** 337:18 338:4
**published** 22:25 23:15 24:1,9 25:7 27:6,7 44:4 170:21,22 180:18 201:9 202:8 253:13,23 254:2,12 265:12 298:15 309:19,20 316:13 319:17 328:17 335:19 336:24 350:17
**pull** 15:6 34:24 35:8 42:9 84:13 97:10 98:4 118:7 126:3 130:3 140:25 150:9 159:16 173:4
184:8,9 231:17 279:13 282:1 287:14 288:20 291:16 304:19 324:24 326:25 327:2 393:25
**pulled** 222:15
**pulling** 35:2
**pump** 266:7
**purchase** 106:15 110:20 112:20 113:14 114:2
**purchased** 106:14 108:15 124:25
**purchases** 109:21 110:18
**purpose** 6:12 347:23
**purposely** 69:9
**purposes** 70:18 242:23
**pushed** 374:2,8
**put** 60:17 77:1 87:15 121:17 154:17 170:5 181:10 237:22 252:17 288:21 292:21 315:22

**putting**
21:2 229:24
230:20
**puzzling**
204:22
**pylori**
26:10,21
204:21,24
205:21 206:1
239:12,14
264:5 368:25
375:2 379:11

## Q

**qualification**
168:13
**qualify**
162:1
**qualifying**
265:19
**qualitative**
65:19 67:12
354:14 355:2
**qualitatively**
45:9,10,17
**quality**
208:6 316:1
**quantified**
210:16
**quantify**
100:6 103:4
104:2
**quantifying**
104:19 105:3
**quantitation**
47:7
**quantitative**
41:15 70:16
**quantitatively**
93:23 372:22
**quantity**
346:20
**quartile**
188:6,11,12,
13,18
190:13,21
191:1 197:2
237:10
**quenching**
149:14
**queried**
324:21
325:1,6
**query**
19:14 340:1
**question**
11:13,22
14:17,18,19
16:23 17:24
19:4 20:25
23:19 25:23
29:5,24,25
30:5,8,10,15
31:7,9 38:20
40:12 43:7
44:18,20
48:9 50:6
54:17,24
56:20 58:1
59:21 60:1,5
61:22 64:14
69:8,10
71:16 72:7
74:7,19,20
75:17,20
76:1,10 79:8
81:18,20
82:14 83:14
85:1 87:6
101:2,3
103:19 104:5
109:13
110:9,24
112:2 116:23
117:24
120:5,14,23
121:9,22
122:10
124:21
142:21 143:8
144:1 145:4,
9 147:12,24
148:1,6
150:5 153:19
155:9 156:23
157:11 158:8
171:10 174:6
177:1,5
179:8,17,21
185:15
187:16
191:24
204:15 214:9
218:7,8,13
219:10
220:22
222:20
228:3,18
229:5 236:1
257:6 269:6
274:7,8
299:14,15
300:6,9,15
307:20
311:7,12,15,
16,17 318:5
322:9 323:12
326:18 332:5
334:1,20
335:11
336:17
338:15
339:15,21
347:16
353:4,10,15
355:20
358:21 359:5
363:8 372:7
379:24
380:1,20,22
383:13
385:25 387:7
388:7,8
389:14
390:4,6
391:8,20,21
392:4,6,10,
17
**question's**
79:19 147:10
**questioning**
81:16
**questionnaire**
176:12
281:6,12,14
283:1,9,10
284:10,15
285:22
**questionnaires**
203:13 217:3
218:16
223:17
285:23,24
286:5
**questions**
16:14 18:22
25:22 30:13
31:8 43:4,6
64:18 101:15
116:12
157:16
205:24 219:1
246:3 294:10
310:16
394:13,16
395:5
**quick**
235:24
**quickly**
170:20
238:12
**quince**
149:14
**quintile**
195:2,4,8,
16,25 196:15
197:14,16,
17,22 198:3
**quite**
29:12 45:21
70:5 73:16
129:5 205:22
261:12
390:16
**quote**
33:2
**quoted**
220:15

**quotes**
199:12
**quoting**
33:5 52:3,24

**R**

**rabbit**
32:24
**rabbits**
40:15 61:25 66:25
**race**
321:20
**raise**
52:11 64:14 116:6,11 177:21 205:16 383:24
**raised**
51:14 100:23,25 101:17,19 135:11
**raises**
64:18 310:16
**raising**
18:19 100:21 122:5 158:8 178:1
**Rall**
350:11
**Ramazzini**
350:9
**ramr**
368:2
**random**
59:7 199:13 221:2,11
**randomize**
229:7
**randomized**
226:9,19 227:2 228:20 229:16
**range**
15:4 39:20 49:19 93:22 96:17,18 97:22 102:18,22 179:22 188:11 212:1 237:13 242:7 259:8 264:14 309:8 334:5
**ranging**
127:4
**ranit-**
117:10
**ranitidine**
7:8 21:23 22:2 68:12, 13,16 69:6 74:17,22 75:2,22 76:2,3,7,10, 13,18,19,21 77:2,8,12, 16,19,23 78:12 79:21, 23,25 80:1, 6,7,11,13,14 81:1,7,9,21, 22,25 82:5, 15,18 83:11, 16 84:2,7 86:20,23 87:14 101:4, 7,13 105:11, 17,20 106:1 108:19 109:4 111:17 112:5 117:2,11 118:18 119:1,5 120:25 122:11 123:24 128:6,10,12 131:9 134:20 135:1,8,12 136:16,20 137:1,6,16 138:8,16 143:7,8,16, 18 227:12, 15,19,21 228:3,17 249:6,22 250:16 255:14 256:25 257:3 258:10 259:6 260:24 261:4,7 262:22,23,24 263:17 264:4,22 265:16 268:6,11,15 269:15 270:10 271:14 272:7,14,21 273:15 274:11,18 275:3 287:23 290:1,13 292:10,16, 19,24 293:11,16, 20,23 294:3, 6,9,12,14, 19,24 295:3, 12,17 296:1, 9,16,20,25 297:13 298:1,18,20 300:24 301:8,11,17, 19 302:3,9, 25 303:5,11, 13,16 304:3, 6,7,12 305:19 306:9,15,20, 21,25 307:15,24 308:13,24 309:15 310:6,8,24 311:8 314:8 315:7,14 317:6 319:5, 25 327:9,18, 25 328:4 330:5 332:2, 8 333:19 334:3,17 340:12 341:18,20,23 342:18,25
**ranitidine-containing**
76:11
**rarely**
386:12 387:17,18
**rat**
32:24 52:4,9 69:23
**rate**
28:11 35:7 77:22 192:7 301:7 353:6 356:19
**rates**
101:7,9,13 189:4,5 243:8,14,15 244:9 245:3, 4,10,12,15 273:7,11 300:21,22 301:17 303:24 317:4
**ratio**
163:2 164:1, 14 166:23 170:1 188:7, 13 189:22 190:15,17, 20,24 191:2, 16 192:2 196:18 233:10 237:9 267:18,19 268:19 269:7,8,10,

12,16 270:12 273:17 296:21 306:17 307:9,13,22 308:2 309:14 310:7
**rationale** 315:23 316:20 348:9
**ratios** 163:11 190:11 191:3,4 196:11 234:6 286:23
**rats** 40:14 50:24 61:25 66:25 70:14 352:14 353:3,14 355:22 364:21 385:5 391:4
**re-analyze** 374:6
**reach** 17:17 167:20 204:3 326:8 348:23 358:25
**reached** 167:1 204:10 347:21
**reaching** 65:4 379:2
**reacting** 373:22
**read** 21:7,15 31:7,8 48:6 49:2,20 52:4,6 68:25 83:1 104:9 112:9 115:6 119:4 125:25 132:21 137:20 164:18 178:25 183:20,22 190:12 199:1 201:13 230:15 272:3 293:2 312:4 315:20 316:14,21 321:8 323:5 336:21 357:2 361:16 362:14 372:5 377:22
**readers** 181:2
**readership** 316:2
**reading** 21:17 62:7 100:10 102:19 104:12 194:23 307:4 310:19 311:15 336:10
**reagent** 118:18
**real** 59:10 96:4 114:25 115:5,10 117:1 145:1, 17 257:9 260:22 261:1 291:8
**realize** 99:21 158:14 183:15 312:8 315:17
**realized** 204:20 288:18
**realizes** 218:17
**realtime** 30:4
**rearranging** 205:3
**reason** 20:19 32:7 66:14 101:3 137:5,16 144:13,15 169:11 198:12 315:10 316:4 386:15
**reasonable** 58:12 70:5 71:5,14 101:2 102:12 252:11 256:11,17 265:24 285:5,20 351:25
**reasons** 75:6 100:13 308:14 349:19
**recalcitrant** 368:16
**recall** 13:17 21:16, 17,19 22:9 32:13 33:16 35:1,2,7 38:2 50:16 52:17,19 86:18 88:20 89:5,13,21 91:4,23 100:10 104:6,12,16, 22,24,25 105:6 106:19,24 107:3 112:16,25 114:13,17,23 117:24 125:15 131:17 134:10,24 147:18 148:18,24 168:20 173:8 186:2 199:1 201:24 202:12 209:10 215:17 216:2,11,19 217:3 218:21 226:21 229:20 266:21 271:24 279:19 280:10 281:18 282:11 285:25 286:17 287:7 288:8 305:1, 11 310:1 333:6 345:7, 19 357:9 366:9
**recalled** 31:25 32:5,7 134:17 283:25
**recalling** 125:11 283:1
**recalls** 146:12,19 149:3
**received** 57:23,24 129:11 131:4
**recent** 10:25 206:19 265:3 296:11
**recently** 12:3 21:15 26:21 135:10 147:17 343:5 377:6,13 380:13
**receptor** 140:1 260:22

266:8
**recess**
72:25 129:24 172:24 231:13 279:8 343:18 393:21 394:24
**recipients**
313:11
**recognize**
17:11 100:19 101:5 124:6 142:10 153:17 206:8 217:2 290:5 353:18
**recognized**
127:23 352:20
**recommendation**
221:4
**record**
6:2,7 7:19 18:13 72:24 73:3 129:23 130:2 172:20,23 173:2 184:1 231:9,12,16 279:7,11,24 343:17,21 393:20,24 394:19,23 395:2,11
**recorded**
6:4,6 284:16
**recording**
6:13
**records**
291:9 333:5
**red**
189:13 383:25
**redacted**
313:12
**reduce**
211:15,25
**reduced**
211:16,19
**reduction**
202:24 211:21 212:12,16,21 213:7,16,22 214:12,14,18 215:10
**refer**
25:21 27:25 49:22 83:11 105:18 249:9 275:23
**reference**
51:13,23,25 52:21 89:5 95:19 126:1 145:2 201:25 305:9 335:18 336:11,20 337:11 365:25
**referenced**
95:17 222:16 337:9
**references**
305:2 358:14,17,19
**referred**
38:12 227:16 322:5 335:11,15 376:3
**referring**
36:23 37:1 49:18,24 89:6 103:7,16 104:15,23 105:7 107:14,15 111:23 117:10 125:22 146:3 157:23 158:7 159:8 247:22 260:8 332:24 370:15
**refers**
48:11 51:21 99:14 163:20 314:19
**reflect**
27:7 221:6
**reflecting**
179:7,16
**reflects**
117:16 254:15
**reflux**
368:24
**refresh**
42:23
**regard**
55:5 382:21 383:6
**regarding**
24:10 81:8,23 82:16 83:18 101:4 152:4 317:23 360:16
**regions**
189:3,11,15
**registry**
145:15 331:14 333:9,13,17 334:25
**regression**
210:18 215:25 236:6
**regular**
272:7
**regulated**
384:16,22 389:4
**regulatory**
105:1 150:24
**reinforces**
222:25 257:2
**reject**
56:13 58:16,25 175:9,25 179:14 181:16 298:6
**rejected**
181:19
**rejecting**
181:14 315:11,24
**rejection**
316:3
**relate**
378:22
**related**
7:12 13:2 38:19 50:7 147:1,14 149:3 150:2 151:2,22 182:11 228:10 248:23 315:7,13 351:16 367:9 368:23,25 369:1 375:8,11,18 378:21 388:22
**relates**
218:6 393:4
**relation**
187:24 188:1 231:24
**relationship**
78:8 317:15 346:11 373:24
**relationships**
319:1,4
**relative**
119:9 122:14 202:23 209:17 210:21 211:3 212:3 213:8,23 214:12 216:12 261:3
**relay**

19:18
**relevance** 37:13 216:4
**relevant** 16:23 27:18 84:5,8 95:25 121:3 202:23 212:22 227:13 261:2 266:22 267:1
**reliability** 199:18 220:17
**reliable** 83:3 352:15
**reliably** 202:16
**relied** 90:17 305:6
**rely** 19:15 88:12
**relying** 304:21
**remain** 136:20 137:2 138:16 208:16
**remains** 44:21 151:20 359:5
**remark** 164:13
**remember** 50:18 68:11 91:3,11,13 95:16 107:1 112:10 124:17 125:2 126:1 139:15 149:8 159:13 178:17 217:15,19 261:20 272:25 307:4 310:3 340:15
**remembering** 373:16
**remind** 145:3
**remote** 6:11 7:1,10, 18
**Remotedepo** 6:25
**remotely** 7:25
**remove** 6:17
**removed** 134:20
**repair** 39:2,6,13,24 40:4,5
**repeat** 11:22 19:3 150:5 173:21 174:5 185:14 191:24 195:13 197:9 200:16 214:9 229:4 307:19 318:4 332:4 392:4
**rephrase** 239:21
**replication** 28:7
**report** 12:11,12,23 13:11,16 15:10,21 16:4,11 25:15,17,19, 21 26:1,3,16 27:5,22 29:3 33:13,15 37:8 38:3,4 52:7 76:6 77:9,11 78:3,11,14 79:6 81:11 82:2,20,21 84:13 90:14 91:22 95:16, 18,19 102:11 105:15 108:19 109:1 110:2,14 111:4 116:13 118:10 123:15,22 124:3,19 125:5,8,22 126:12,15,18 128:5 129:3, 14 132:13 133:11,16, 17,19 159:12,14 162:5,10 168:5,11 185:9,16,22 199:4 208:5 220:12 222:17 224:5 249:18 259:3,5 273:25 277:2 287:18 305:10 321:15,17 322:24 323:3 327:17,24 328:3 341:14 367:23 368:19
**reported** 47:22 48:2 49:6 50:2 51:9 83:6 85:13 152:20 277:3 283:2 360:20
**reporter** 7:15,20 14:8 82:7,11 173:16,20 174:4,8 372:9
**reporting** 7:24 8:9 140:13 282:12,22 287:7 307:14,22 327:24 338:19
**reports** 69:1 103:6 104:5,6,22 111:22 112:10 115:6 305:1,2
**represent** 8:20 11:10 127:22 157:24 158:2
**represents** 76:24
**reproducibili ty** 285:11
**reproducible** 113:23
**reputation** 183:18
**request** 6:6 134:16, 23 276:3
**requests** 133:25 134:9
**require** 134:11 230:3 242:6 391:12
**required** 55:9 177:23 393:5
**requires** 29:8,13 215:16 367:12 389:5 393:14
**research** 21:22 22:3, 8,10,11,12 24:24,25 25:4,10 27:12,19 32:17 55:6 68:8 206:14

207:24 208:4,18 243:4 320:23 321:1,5 360:12 363:3 368:12 382:18
**researched** 339:12,21
**researcher** 24:22,23 311:19 313:22,24,25
**researchers** 321:1 368:7 374:2
**researches** 285:13
**reserve** 394:14
**residence** 190:7
**residual** 266:25
**respect** 33:21 82:23 134:9 227:19
**respectfully** 315:3
**respond** 144:9
**responds** 131:2
**response** 14:10 33:18, 24 47:8 113:8 131:16 133:21 135:2 304:22 377:15 385:9
**responses** 39:22 385:14
**responsible** 348:16
**responsive** 85:1
**rest** 62:17 147:25 252:19
**restate** 40:13
**restated** 60:14
**restricted** 169:25 171:11 251:3,10 253:4
**restricting** 171:9
**result** 28:15,22 29:7,18 31:14 45:23 128:9,12 144:3 223:7
**resulted** 74:3 151:25 226:13
**resulting** 98:11
**results** 88:4 98:9 120:4 122:23 134:2 136:17 157:20,22 160:16 162:2,21,22 166:2 181:18 184:4 224:15 227:5 228:23 229:10 232:9,17,21 233:1,13 258:18 264:12 265:11,19 267:10 271:15 292:8 293:25 300:18,19 305:19 310:16 314:9 322:10 349:3
352:13 357:21 358:1
**retained** 11:15 13:4, 19,20,22 21:21 111:8
**retrieved** 335:1
**retro-** 284:2
**retrospective** 18:10,14 281:4 283:9 285:11,21 340:3
**retrospectively** 281:13 284:4,12 287:1
**revealed** 108:24 109:19
**reveals** 247:6
**reverse** 75:10 226:18 266:25 273:10 277:12 308:9 311:1 353:13
**review** 37:23 50:10 68:3 69:3,11 77:7 88:22 89:16 113:1, 6 118:1 119:20 120:18 121:17 132:12 145:8 198:24 199:3 200:24 216:9 331:16 343:25 344:5 365:20 366:1
**reviewed** 21:11 36:19
52:5 69:19 88:24 103:1, 24 126:14 131:15,17, 18,23,25 133:10 139:15 152:4 169:4 171:6 250:1 253:19 266:19,23 314:14 332:18 343:23 344:2
**reviewing** 17:21 104:16,25 120:10
**revisit** 390:2
**reword** 11:13 95:1 272:18
**reworded** 323:13
**rich** 96:1 228:5
**right** 6:24 9:5,9 14:1,7 15:5 16:7 31:4,8 34:6 38:8 43:10,20 48:14,22 53:8 60:20 65:11 97:13 98:8 103:11 108:9 109:5 114:11 117:12 120:24 123:5 138:3 140:25 146:7 157:21 158:16 169:21 174:7 178:23 181:24 186:20 191:18

206:12 211:1 218:11 219:8 220:2,18,21, 24 222:21 223:9 232:5 233:3,10 255:22 257:25 259:19 267:10 268:14,18 271:4 281:2 289:6,22 290:12 296:19 298:9 300:15,24 307:17 309:2,13 313:3 329:20 341:6 342:14 381:18 385:19

**rightly**
374:8

**ring**
23:24 24:8

**rise**
55:25 116:1 123:17 386:13

**risk**
16:25 47:8 52:11 74:17, 23,24 75:9, 14,23 76:7, 14 77:6,14, 17 78:7 80:5,12 82:6 83:5,6 87:12 94:6 139:25 156:7 160:17,23 161:1,7,9 163:21 164:2,7,14 165:3,10,14, 15,18,22 166:2,5,8,14 173:10 176:15,21 177:2 178:16,20 179:3 181:6 182:13 183:6 184:15,16 185:1,13,17 188:17 189:20,23 190:4 192:14,19,23 194:12,20,21 195:10,17 196:2,5 198:19 200:10,18,19 202:23 205:6 206:12,23 207:20 209:17 210:21 211:3,8,9, 16,21,25 212:3,4,5, 13,17,22 213:7,8,18, 23 214:12,14 216:12 218:4 224:17 232:11 233:22 243:25 244:16 245:25 246:7,10,18, 19 247:1,12, 20 248:2 250:15 252:4,6 255:15 256:24 257:3 258:9 261:3 265:5,15 266:8 267:14,22 268:23 269:24 271:15 272:9,13,20 274:4,10,17, 23 276:21,22 278:8 280:23 289:25 290:14 292:15 293:20,22 295:25 296:15,25 297:2,3,8, 13,23,25 298:16,19 301:14 302:2,11,16 306:11 307:16,25 308:2,8,25 310:8 325:13,16 327:10 335:3,17 369:8 370:11,16, 20,25 371:4, 6,7,15,25 372:23 373:1,11,25 375:7 376:13 377:1 378:8, 15 379:18 382:25 383:9 389:1

**risks**
166:22 246:22 339:18 389:10

**Roberts**
248:24

**rodent**
45:6 360:11, 16 363:21

**rodents**
352:13 353:3 365:12

**role**
66:9 154:25 204:17 374:17

**room**
7:23 9:8,15 10:4,10,11 106:22 135:13

**Ross**
221:18

**rough**
198:1 199:17 220:16

**rounded**
323:2 324:4, 9,15

**rub**
346:13

**rubber**
344:13,16, 19,22,23 345:10,22 346:3,8,14 347:3,5,16

**RUBENSTEIN**
3:4

**rubenstein@ gtlaw.com**
3:5

**Rudy**
92:12

**rule**
15:21 265:16

**rules**
14:2

S

**S------------ --**
4:7

**safe**
230:12

**salt**
170:11

**salted**
187:13 204:12

**sameness**
181:15
298:5,12
**sample**
141:10
337:16
**samples**
142:1 337:18
338:5
**Sanofi**
3:7 327:17,
20,25 328:4
**Sanofi-avertis**
3:8
**saying**
36:8 47:1
50:5 60:13
64:17,20,22
85:2 99:11,
13 129:4
138:25
144:1,10
158:10
165:16,19,20
166:15
175:14
177:21
182:24
211:13
224:10
265:19
301:23 307:5
316:5 342:12
345:6 351:17
362:16
384:19
**says**
15:21 43:8,
10,21,22
44:23 45:22
46:16 47:5,
18 48:10
50:21 60:19,
22 61:3,11
62:13 63:5
64:17 65:13
92:9 93:1,7,
17 94:6
98:16 118:16
119:4
126:11,23
127:17
128:3,17
130:24,25
133:23,24
134:7 135:6,
9,18 136:8,
14 139:25
140:9 141:4
147:3,4
150:16,22
160:15
161:5,8,10,
20 164:5,19
166:20 167:5
178:12 182:9
186:9
194:10,19
196:11
197:10,17
202:21
208:22
210:15,24
212:19
214:25 221:1
232:19 233:1
234:3,10
236:4 241:7,
11,18 250:14
255:23 270:1
272:11
280:21
281:17
282:18
283:21
286:16,22
287:5 289:25
290:12
291:6,20
294:2 295:24
297:16 298:3
314:6,24
320:12
323:8,10
324:25
328:24 330:8
335:9 336:4
340:25 341:7
350:21 352:8
354:12
355:24
357:24
359:19
360:19
372:17
376:11
382:11,16
385:2
**scale**
245:18
**scant**
112:12
**scenarios**
114:1
**Schaffalitzky**
333:3,4
**SCHMITZER**
3:25
**SCHOLER**
3:9
**School**
206:16,25
**science**
254:10
**Sciences**
329:1
**scientific**
3:19 66:15
275:8 328:16
329:8 382:19
393:14
**scope**
248:20
**score**
236:9,16
**scores**
336:7
**SCOTT**
3:15
**screen**
6:23 9:23,24
10:4,15
97:11 302:23
389:9 394:5
**screened**
280:24 281:3
**Screening**
282:21 283:3
**screens**
6:15 9:20
**seafood**
93:16,17
**seal**
107:11
109:22
110:19
112:20
113:15 114:3
**search**
69:4 153:8,
20,24 154:1
279:19
280:10 291:7
**second**
14:13 31:11
84:19 141:2
159:24
188:6,12,18
194:21
208:21
210:12
214:10
232:12,23
272:6 289:14
293:7 307:8
313:2 314:11
323:5 336:2
359:4 384:25
**secondary**
172:5,8,9
**secondhand**
371:11
**seconds**
214:7
**secretory**
21:25
**section**
33:15 38:10
79:5,13
91:22 127:9

291:2,4
**see**
10:9,17 15:20,23 30:4,14 34:19 35:22 36:10 38:10, 11,18 42:15, 18,25 43:11, 18 44:2 45:1 47:9 48:10 51:3,12,17 53:14,23 57:10 60:18, 20 61:1,9,15 62:7,21 63:4,10,21, 23 65:23 79:1,15 87:10,16,24 88:6 90:17 91:6 92:8, 15,16 93:1, 5,6,7,9 94:6,9,13,21 95:18,20 98:14,21 99:10,16 106:4 110:6 111:2,7 113:10 118:16,19,21 119:3,14,22 120:24 126:11,21 127:8,9,25 128:19 129:3 130:9,12,18 131:5,13,21 132:1 134:5, 13 135:16, 17,24 136:12,22 137:19 140:4,9,15, 17 141:1,11 144:18,21 145:4 146:11,17 150:16,20 151:5,10 153:8,20 160:11,19 161:7,20 162:1 163:3 164:9 165:11,24 167:3,8 170:20 171:8,22 175:23 176:5,23 178:8,10 179:11,14 180:11 182:16,17 184:18 185:5 186:13,23 188:14 189:17 191:10 194:7,14,19, 23 195:5 196:13,18,25 197:10,12, 14,19 199:20 200:25 202:5,19,20 203:1,2 209:13,14,22 210:14,22 211:5 213:1, 4,7,11,24 214:13 215:5,6 220:9 221:1, 8,9,19 232:14 233:24 234:8,9,16, 17,21 235:6 236:3,12 240:17,21,22 241:5,9,16, 23 245:19 247:19 250:14,23,25 251:1,6 253:20 255:17 256:3 258:9,15,20, 22 259:17,25 260:18 264:11,20 265:8 266:5, 16 267:15 268:8,9,16 272:8 273:17 276:4,7,11, 15,18 279:21 280:12,16 281:9,23 283:5 284:6, 7 285:9 286:20 287:3,9,22 288:23,25 289:24 290:8 291:6,10,20, 24 292:7,8, 13 293:6,13 294:2 296:4 301:18 302:23 305:9,22,25 306:2,12,17 307:9,11 311:4 313:4, 5,6,17 314:3,4,5,16 315:8,15 317:7,8 319:23 320:4,5 324:8,10,12, 25 325:3,5 326:11 327:15,21 330:1,4,7,8, 10,11,13 334:23 335:2,8 336:4,9 338:18 340:25 341:2,11,18 342:15,18,23 343:12 350:12,13,18 351:2 352:23 354:1,4,7,22 355:4 357:18,22,23 358:8,10 359:17,23 360:3 361:1, 11 362:23 363:23 372:6 373:5 376:20,21 381:14,21 382:9,14 383:1 384:2, 6 385:10 386:8 394:5
**seeing**
90:6 99:15 106:9 107:25 112:25 172:3 245:20,21 261:1 310:3 312:13 340:15 362:5
**seeks**
208:5
**sees**
393:1
**selenium**
204:15 226:6,11
**self-administered**
282:25
**selling**
152:7
**sending**
130:21
**senior**
368:10
**sense**
48:22 60:15 64:4 79:24 181:24 330:15 342:13

345:23 348:14 369:25
**sensitivity** 171:14
**sentence** 48:14,25 49:2,3,10, 21,24 50:8, 21 51:5,6,12 62:3 83:2 98:8,16 99:14 126:19 137:20 141:4 162:17 164:17,19 182:9,17 194:21 256:10 264:24 283:23 293:7,8 336:11 351:7 385:1
**sentences** 87:18 194:2 354:10 362:14
**separating** 198:7
**sequence** 28:7,13,14, 18
**sequencing** 28:19
**series** 238:18 339:4
**serious** 202:16
**seriously** 383:22
**Services** 3:7
**set** 10:3 21:2 26:16 124:7 175:23 176:1 296:12 311:24,25
**setting** 6:17 17:25 60:10 247:4
**settings** 57:15
**seven** 237:13 251:3,10 252:11 253:4,11
**seven-fold** 123:8 232:17
**several** 10:24 14:4 18:6 26:23 27:25 28:21 29:18 31:14 32:23 35:17 37:10 38:13 61:5 62:19 77:10 167:16 206:24 239:14 267:7 358:5,14 365:16 366:12 367:23 372:24
**severe** 215:2,3
**sex** 190:7 236:7, 15 237:7 385:4
**shaking** 14:11
**sharp** 207:7
**Sheehan** 9:11 10:2,7, 16 12:22 22:6 23:23 24:18 25:13, 25 27:10,24 28:23 29:20, 23 30:9,16, 19,22 31:1, 16 32:2,10, 15,21 33:12 34:3,8,21 37:6 38:1 39:14,25 40:6,11 41:7,23 42:21 48:4, 23 50:3 51:11 53:10, 19 54:1,7, 14,21 56:15 57:9 58:9,19 59:4,14,25 61:19 63:22 68:7 69:15 70:9,25 71:9,19,25 72:11,17 73:8,20 75:25 76:16 77:24 79:4, 18 80:22 81:10,15 82:1,9,19 83:21 84:19 85:7 89:4, 12,19 90:4, 20 91:10,17 92:18 95:13 96:13 97:6 99:6 100:8, 18 101:21 102:3 103:5 104:3,11,21 105:5 106:18,25 107:12 108:10 109:7,17,25 110:12,22 111:20 112:8,15,24 113:5,18 114:9,22 115:3,21 116:20 117:21 119:19 120:9,17,19 121:12 122:4,21 123:20 125:1,21 129:2,9,20 134:18 139:8 142:19 143:25 145:7 147:23 153:23 156:18 159:18 161:4,15 162:9 163:8, 24 164:16 166:6 167:15 168:10 169:1,8,15 170:18 171:21 172:11,16,19 173:12,25 174:23 175:10 177:6 178:24 179:19 181:21 182:21 186:1 188:9,20 191:23 192:3 195:12,20 197:4,7,24 198:10,21 199:25 200:4,12,15, 21 201:5 203:9,15 206:2 211:11 212:7 213:10 214:1,5,15 215:11 216:13 217:18 218:18 219:9 221:14 222:22 223:10 225:9

227:6 228:24 229:2,11 230:25 231:5,8 235:15 237:4 238:9 239:6, 19 240:5 242:2 244:2, 18,22 246:13 247:3,13,21 248:5,19 256:9 257:5 259:12 260:6 261:9 262:1 263:19 268:25 272:16 274:13 276:23 278:9 279:5,25 283:16 296:10 298:21 299:4,10,18, 20 300:1,10, 16,25 303:8 304:24 305:8 307:18 311:13 312:11 315:19 317:12,21 318:15 319:7 320:19 321:22 322:3,11,20 323:4 324:23 325:21 326:7 328:2,11,19 329:9 331:19 332:10,22 333:15 334:12 335:7 337:1,21 338:9,22 339:20 340:14 342:11 343:3,7 344:14,25 346:5,15,23 348:6 349:9 356:17 358:13,18 362:10 363:4 364:8 365:15,24 366:4,14 367:10 370:5,13,18 373:14 377:3 378:11 379:21 380:8 383:11 385:18 386:25 388:3,12 389:20 390:12 392:1,15 394:18 395:3

**shelf**
105:22 108:5

**shelves**
106:14,16 108:7,16

**shipping**
109:15 110:10 113:4 116:18 117:19

**short**
66:6 257:4 361:13 374:12

**short-term**
61:7 160:17, 22 161:7 182:13 183:6 215:16 257:7,15

**shortcoming**
90:8 349:2

**shortcomings**
18:1

**shorten**
391:3

**shorter**
241:20 243:23 244:14 247:6 249:13 260:10

**show**
53:2,6,7 62:20 75:2, 4,8,12 88:22 96:12 123:4, 12 139:3,5 143:2 175:22 176:1 181:23,25 182:1 204:16 211:9,15 215:21 216:10 217:13 226:19 227:1,9,14 228:19 229:6 233:13 242:15 244:14 246:6 265:14 284:8 296:15 298:10,12 338:2 358:6 360:20 391:4,13 393:15

**showed**
38:21 92:20 96:22 123:7 169:18 178:18 244:25 267:17 297:7 301:11 310:7 326:12 367:7 375:3

**showing**
74:24 99:17 156:3 165:22 189:19 195:7,15 211:7 256:23 301:7 375:22 383:16,20

**shown**
32:17,22,25 33:3 40:14, 16 44:19,22 45:5 61:12, 24 62:1 67:21 127:7 155:24 177:16 217:8,12 244:8 245:3 302:9 352:14,21 353:8,12,13 359:13 360:5 361:7,10,25 363:10,13,15 366:20 382:4 384:20 391:2

**shows**
33:25 42:16 45:8 93:11 94:16 112:18 127:10 141:1 145:24 146:25 152:5 155:6,16,20 156:8 162:24 178:23 183:10 184:25 192:17 196:16 203:5 214:20 235:8 237:12,17 260:1,22 264:21 267:21 268:14,15,22 270:17,23 271:5 290:1 292:10 297:22 298:16,18 306:8 329:23

330:5,11 340:9 373:22
**shut**
10:8
**sibling**
378:13 379:6
**sic**
131:4 201:1 240:24 258:12
**sick**
277:12
**sicker**
273:9 277:20 303:22 308:13
**side**
43:20 60:20 65:11 140:25 146:7 176:5 180:5 208:21 210:8,9 220:2,21,24 232:5 288:4, 22 289:21,22 290:12 291:3,17 292:6 293:24 381:18
**sign**
180:9 181:5
**signal**
181:4 182:7 242:9,11,15 245:8,24 247:8 249:19 252:13 265:15,17
**signature**
16:6 377:21
**signatures**
376:19 377:7,18
**significance**
39:8 54:5 56:1,6 57:1 58:17 59:12, 23 167:2 177:10 243:25
**significant**
36:4 39:6 45:19 53:6, 14,17 54:11 55:2,8 56:8 58:2,24 67:19 77:21 116:4 131:11 138:23 163:7,12,22 164:13 166:4 173:10 174:13 180:11 188:8 192:18 196:17,20 213:18 232:22 233:6,12 234:24 235:22 237:1,12 244:8 245:4 247:19 248:2 252:22 256:21 267:22 268:22 269:9,17 270:15 272:13,20 274:9 276:13,17 298:19 300:22 301:21 330:25 387:24 388:1,10 389:18 390:10 391:4,19,24 392:8,13
**significantly**
60:11 73:10 173:18 297:12
**signs**
36:6 75:14 281:18
**similar**
20:5 34:13 45:11,16,17, 18 60:13 93:22 114:2 141:25 143:6 145:16 191:2 265:2 286:18 331:7
**simple**
28:24 31:19 123:1 148:9 215:18
**simpler**
348:10
**simplified**
56:22
**simply**
25:23 37:19 39:3 41:18 107:23 120:5 156:3 165:16 166:15 183:2 207:10 222:23 223:22 224:8 274:7 284:17 356:4 367:25 368:2,15 374:4 384:21
**simulate**
113:2 114:21,25 116:18 139:7
**simulated**
125:10,12 128:11,13
**simulations**
89:18,21 90:8,9 129:1
**single**
28:20 29:6, 17 31:13,22 74:2 77:18, 21 161:24 162:7,13 164:6 166:19,21 167:1,12,17, 24 173:15 174:11 205:10,11 252:23 324:1 347:23,24 348:9,20 349:1,11,16, 20 355:10 375:24
**sipt**
335:6,10,14 336:14 337:13,19 339:9,13
**siren**
173:21
**site**
354:17
**situation**
143:7
**sixfold**
306:24
**skimmed**
132:22
**skyrocket**
245:13
**slight**
213:15 273:11
**slightly**
211:16,19
**slip**
361:11
**slow**
97:8 108:20 115:22
**slows**
368:4
**small**
76:23 148:24 167:20 168:3

176:10 180:18 207:2 221:6 265:17 351:12
**smaller** 135:15 210:20
**smoke** 243:11 247:12 371:11 377:19
**smoker** 334:19
**smokers** 294:24
**smoking** 243:7,13,19, 25 244:5,10 245:6,10,13 246:5,15,18, 20,23 248:9 297:24 334:21 335:4 375:19
**SNOMED** 320:8,11 321:12,14, 16,18 322:1, 18,22
**SNOMED-CT** 320:13
**sodium** 127:12 149:14
**Solco** 146:15 149:5
**sold** 32:1 76:22 152:12 341:9,22 342:16
**solid** 73:13 226:15,23 238:14 252:24
265:21 380:24
**solvent** 149:19
**someone's** 356:24
**sort** 18:12 26:13 27:12 28:10, 14 35:23 46:6 52:3 56:18,21 57:21 59:16 64:12,18 66:9,14 67:4 70:12 74:7 80:2 97:21 100:11 108:1 112:13 114:7,15 123:7 138:4 151:20 165:6 181:9 189:24 191:12 192:10 201:6 204:2,4 205:2,4 206:19 207:7 215:25 221:17 222:25 228:6 242:20 248:23 251:25 252:25 261:14 275:18 278:1 284:13 285:8,15,17, 21 308:19 309:8 310:19 314:22 315:21,25 319:10 339:6 342:13 349:14,15,24 351:25 363:3 364:16
369:7,13 373:16 380:18 383:13,14,24 386:18 387:16
**sorts** 17:22 20:3 27:13 28:12 35:16 55:15 57:18 80:10 101:14 116:10 207:6 218:9 223:21 227:23 229:19 261:22,23 278:1,17 279:1 285:17 286:5 308:6 316:10,22 336:24 339:5 340:3 348:22 370:7 393:8
**sound** 171:17 172:1
**sounds** 72:21 118:5 123:25 186:19 208:10 325:25
**source** 18:6
**sources** 19:10,14 68:10 84:8 88:3 102:14 106:19
**South** 3:9,14 189:3 250:17 253:19
**space** 337:7
**Spalding** 3:20
**speak** 177:12
**speaker** 6:15
**speaking** 9:17 30:2,6, 20 81:14 86:24 98:1 246:2 298:25 299:9 318:16
**Specialist** 3:19
**species** 32:23 36:18 40:16,18 43:24 44:12, 20 61:5,14, 25 65:16 66:22 67:19 354:17 364:1,6,11, 13 365:13,16 366:1 367:2, 8 382:6 385:4
**species-specific** 65:19 67:12
**specific** 40:8 50:6 51:25 57:14 58:21 59:20 74:13 79:5 88:21 90:6, 11 104:6 111:23 112:1 121:23 124:20 148:17 149:21,25 150:25 152:23 175:1 204:17 205:9 215:15 218:25 222:8 224:18 256:8 305:3 320:21 321:8 322:21

325:19
335:16
347:17
363:20
372:21
377:16,17
387:15
**specifically**
21:8 22:4,7
37:9 38:6,12
41:4,13
50:19 52:9
57:13,20
76:9 78:16
84:4 85:10,
11,22 133:25
134:22
145:13,20
153:3 162:11
164:5 173:18
188:16 210:1
219:21
225:11
228:15 268:6
305:1 307:7
318:16
326:14 331:6
336:14
345:19
357:19
371:17
**specificity**
309:9
**specifics**
222:10 286:7
**specify**
286:10 370:9
**speculation**
248:20 262:2
382:3
**speculative**
183:12
**spell**
8:22 383:14
**spend**
206:10
**spending**
224:23
**spent**
15:1 132:19,
22 206:9
**spills**
248:23
**spontaneous**
387:19
**spot**
87:7
**spotlight**
6:17
**spotlighted**
6:14 10:5
**squamous**
49:17
**stability**
106:17,22
107:9 108:1,
15,17 111:9,
14 112:3,13
115:2 119:10
121:4 122:15
124:6,8
134:12
135:11,19,20
136:6,17
137:9 138:1,
7,9,22
139:11
**stabilize**
336:7
**stabilized**
338:3,6,20,
25
**stable**
131:9 136:20
137:2 138:17
**Stage**
368:16
**stages**
238:18
**standard**
22:18 135:20
284:3 286:13
337:6,15,23
338:12,19
339:11
**standards**
338:24
339:13
**stands**
43:13 95:24
186:15
259:16
299:15
**start**
62:6 82:13
85:3 118:25
146:19
149:19
171:12 286:6
**started**
113:9 243:8,
14
**starting**
15:12 115:18
188:5 255:23
372:17
**starts**
87:11 126:19
130:16
142:16
166:19
341:18
**state**
8:22 42:6
157:17
168:22 176:8
179:1 199:11
209:15
383:17
**stated**
41:13 62:24
134:22 154:3
167:11
338:11
**statement**
7:18 44:15
45:3,13
46:1,19
47:11 48:5
52:16 61:18
63:25 64:21
66:1,4 71:7
72:5 90:5
101:23 128:1
136:24
138:15,20
154:5,9,13,
18 157:1,18
159:9 161:5
162:4 195:13
198:4 203:2
212:19 215:6
220:20
221:1,19
222:9,25
239:17,19,24
242:1,18
251:9,18
252:18 253:3
266:24
351:5,24
355:4,5,8
356:25
358:10,17
359:25 383:4
388:19
**statements**
65:6 103:2,
25 104:9
134:3 353:1
354:25
**states**
18:24 21:5,
14 106:24
134:17
149:24
152:13
154:10,11
202:14
204:7,8
232:7,8
234:18
245:12,16
262:25
263:16
316:23
319:23
357:16,19
359:4
**stating**
49:3

**statistic**
56:5
**statistical**
53:6,17,20 54:5,8,10,11 55:6 56:1,6, 7 57:1 58:17,23 59:12,19,22 95:25 98:10 167:2 200:6, 7 202:24 214:21,23 215:1,4,10 243:24 335:9,25 336:2 388:1, 10 389:18 390:10 391:13,24 392:7,13 393:15
**statistically**
55:2,8 58:1 77:20 163:6, 22 164:12 166:3 174:13 176:20 178:15,19 179:2 180:10 188:7 192:17 196:17 232:22 233:6,11 234:24 235:21 237:1 247:19 248:1 267:22 269:9,17 270:15 272:12,19 274:9 276:12,17 297:12 298:19 300:22 301:12,21
**statistics**
56:23 57:14 58:13 59:5 175:21
**stats**
234:25
**status**
190:7
**stayed**
280:5
**steady**
342:20
**steam**
115:9
**Stefani**
185:4
**stem**
373:24 374:7 375:23
**step**
356:2
**steps**
28:22 29:18 31:14
**Steve**
92:11
**stick**
126:6 356:8
**stochastic**
368:2
**stomach**
194:12,20,21 195:1,10,18 196:6,11 239:16,22 334:8 368:24 376:17,22 377:25 378:9 379:9,15 380:4 386:10
**stop**
120:20
**storage**
118:18
**store**
109:23 112:20,21 113:15 114:3,4
**stored**
119:7 121:1 122:12 135:12
**stores**
109:22
**straightforward**
165:7
**Street**
3:3,9,14
**strength**
41:11,19
**strengths**
348:20
**strike**
87:6 95:1 103:18 220:21 228:13 272:18 312:18 320:8 333:11 364:2
**strong**
39:2 46:24 66:15 72:9 224:11 225:17,23 242:11 249:18,21 364:7 372:25 373:10,19 374:10
**stronger**
169:24 221:7 228:3
**strongest**
226:2
**strongly**
360:23 361:13
**struck**
323:12 364:17
**structure**
73:14,23
**struggle**
321:2
**studied**
32:19 40:19 61:14 219:12 242:8 311:11 347:6 350:7 354:13 355:1 366:10 381:25
**studies**
16:17,20,21, 25 17:5,8, 11,14,22 18:2,7,10,11 20:3,5,11,16 21:6 22:2 24:9,13,15, 16,20 25:1, 3,5,8 35:17, 20 36:13,20 37:11,23 38:8,11,19, 21 41:12 43:22,23 44:11 47:13, 15 49:19 51:21 52:2, 5,9 55:4,15, 18 56:19 57:18 62:15, 25 63:14 64:8,9 67:10 68:22 70:15 74:21 75:4, 11,12,18,19 76:4 77:8,12 78:2,4 79:2, 3,15,16,22 80:4,8,10, 14,20 81:1 82:22 84:6 88:7,11 89:18,22 91:12 96:7 99:22 101:1

117:11
125:13
140:20
141:25
144:24 145:2
157:14 168:2
170:12,22
171:25
176:11,14,19
177:4,16,18,
24 184:4
185:8,25
189:1,7
195:22
198:18
199:19,24
201:9,13
202:4,18
203:4,13,19,
23 204:2,23
205:8 206:1
207:6 208:16
216:5,9,15,
20,23 217:11
218:4,10,15,
21,22,25
220:18
222:18,24
223:16
224:5,14,15
225:21 226:5
227:8,12,15,
24 229:20
230:16,18
239:1,25
241:7,12
243:22
244:5,6,8,14
245:2 246:6,
9,12 248:2,
3,16 249:6,
8,16 257:21
261:23
265:3,5,14,
20,21,22
266:10
267:3,8
272:2 275:13
276:20
277:15
278:7,18,20
279:1 285:17
288:4 292:1
293:19
296:12,24
297:6 301:2,
4,6 303:24
306:20,21,23
307:4 308:6,
17,20 309:11
310:17
316:10 319:6
322:16
326:12
328:17
337:17,24
338:1 339:23
344:2,6,7
345:12
346:10,25
348:22
353:3,8
355:19
356:15 357:8
358:12,24
360:17
362:21
367:24 375:3
376:2,4
378:6,13,14
379:1,6,7
385:24
386:8,9
387:5,16
388:16
389:2,16,17
390:8,9
391:16,23
392:12,23

**study**
16:16 18:13
22:8 24:16
33:2,5,10,20
34:7,13,16,
18,23,24
35:2,8,14
44:6,7 50:25
51:25 52:17,
21,23 53:11,
13,23 54:17
55:7 56:17,
21,24 57:4,
8,22 58:5,13
59:16 60:10
74:9,13 75:1
76:2 77:4,
16,18 79:25
80:1,17,20
83:1,6
84:15,16
85:5,17 86:3
88:12 89:8
90:11,13,17,
22,23,24,25
91:3,15,18,
24 92:17
94:1 95:8,15
100:14
102:1,9
118:2 119:21
123:22
124:16,17
125:3,11
128:7,14
131:8
139:17,18
140:2 141:2,
14 142:20,25
143:1,4,12,
13 144:18
145:5,8,15,
17 146:5
147:11
149:24
150:7,9
156:3,8,15,
20,21 157:5
158:10,13
159:12
161:12,13,17
162:3,18
163:17
164:3,11
165:3,12,20
166:18
167:11,19
168:6,12,14,
18,22 169:4,
18,25 170:22
171:12,13
173:6,9
175:12,14,20
176:1,7,22,
25 177:11,13
178:18,22
179:8,17
180:7,14,19,
20,21
181:11,22
183:9,10
184:14,16
185:2,18
187:10,11,14
188:22 190:6
192:21
195:11,19
198:25 199:4
201:22
209:8,16,19
211:17
214:19
215:13,16,18
217:16,17,
21,25 220:6,
12 222:15
224:24
231:23,25
233:9 238:16
249:12
250:2,7,9,17
251:17,19
252:14,25
253:10
255:24
256:5,17,19,
23 257:1,9,
11 259:10
260:11,21
261:18 262:7
264:18,21,25
266:5,18,23
267:2,9
268:5 270:4,
17 271:19
272:5 275:25
277:14

279:18,20
280:9,11,22
282:19,21
283:3 284:16
285:10
287:25
290:12,24
291:12
292:7,15
293:16
295:23,24
296:7
301:10,13,16
302:10 303:7
304:5,15
305:20 306:1
308:21
309:1,15
312:7 314:9
315:3,17
317:10
318:11
319:17
321:25
322:10,15,
19,22,24
323:6 324:24
325:4 327:3
331:13
333:3,20
334:2,19
336:15
340:2,9,16
343:9,24
344:1,9
345:13 350:6
356:16
357:15
362:23
367:3,4,6
372:3 373:8
374:5 376:9
381:10 389:8
390:23,24

**study's**
195:7,15

**studying**
144:25 240:1
356:21

**stuff**
10:19

**stuffs**
103:12

**subgroup**
302:1

**subject**
354:21

**subjected**
139:10

**subjects**
234:4 282:24
284:1 286:19
297:23 302:1
333:20 334:3

**submission**
312:1

**submit**
13:10

**submitted**
12:13 13:15
15:10 131:3
312:9,15

**subpoenas**
304:23

**subset**
302:3

**substance**
46:11 65:20
67:14 363:13

**substances**
136:16
344:17
360:22

**substantial**
202:22
212:25
213:22
214:11,17
371:24,25
376:13,25
378:7

**substantially**
119:12 121:7
122:18
199:14
221:3,12
241:20

**sufficient**
382:22 383:7
393:6

**suggest**
33:5,20
35:25 63:16
74:22 88:8
103:2,25
115:13
138:23
143:22 164:2
169:4 182:25
189:23
192:10
211:13
222:17
229:18
296:24 315:4
337:17 342:1
365:2 367:7

**suggested**
78:6 229:15
322:17
346:18
347:10 368:6
389:1

**suggesting**
36:9 115:8,
16 148:17
163:15 182:7
189:24
226:6,16
229:15,19
347:18 353:5

**suggestive**
62:16 63:1
64:11,19
77:13,17

**suggests**
46:24 67:21
77:5 102:19
124:12
136:10
144:19 145:5
147:13 165:3
178:14 179:1
192:21 256:6
341:23
388:18,20

**suitable**
315:2

**Suite**
3:3,14

**suited**
315:4

**summarize**
75:1

**summary**
43:18 58:12
94:16 118:24
194:1,19
202:14 234:2
280:20
282:8,17
286:15
354:10
362:14
372:14

**sunlight**
28:11

**supervising**
171:24

**supplemental**
336:25
340:18
341:1,2,7

**Supplementary**
341:8

**supplied**
108:8

**supply**
109:15
110:10 113:4
116:18
117:19

**supplying**
149:4

**support**
7:12,17 51:5
176:19
327:19
358:17,20
359:10

**supporting** 285:18
**supports** 347:19
**suppose** 316:20
**suppressant** 275:7
**suppressive** 303:21
**sure** 9:25 11:25 17:6,20 45:14 47:12 48:5,13,25 49:20 50:5 52:6 57:4 69:24 78:23 79:10 83:22 92:12 95:22, 24 99:7,18 103:14,17 104:14 107:13 108:11 113:22 114:10 116:23 124:3 131:22,25 142:3 143:4 151:17 157:22 172:4 187:8 195:22 198:11,23 203:10 219:13 243:5 246:14 247:22 251:15,16 261:12 279:5 298:7 310:3 325:22,24 326:9 328:20 332:23 337:22 342:14 351:6 353:2,7 355:10,25 361:20 362:17 365:9 366:25 371:16 372:4 373:20 377:4 387:1 391:17
**surprise** 181:7
**surprised** 142:10 260:13 262:11 345:21
**surprising** 364:19
**survival** 35:7,18 208:1
**swath** 260:23
**swear** 8:11
**Swedish** 194:12
**sweeping** 357:5
**swine** 365:14
**switch** 20:20 105:8 129:19 139:13
**switches** 19:22
**switching** 20:21
**sworn** 8:14
**symbol** 130:10
**symptomatic** 308:14
**symptoms** 332:14
**synergistic** 191:11
**syntax** 255:2
**system** 39:2,5 140:13
**systematic** 68:3 69:11
**systematically** 287:2

**T**

**tab-** 341:7
**table** 92:24 93:6 96:21 97:24 186:8 188:10,14 190:24 192:9 193:3,5,6,7, 17 196:9,11 235:2,3,4,7 259:23 269:20,21,22 270:1,7,9 273:17 276:3 306:5,7 323:22 324:8,14 329:19,22,23 341:8 383:16
**tables** 99:17 309:7 334:22
**tablet** 119:6,7 122:12 123:2,4,6 127:20
**tablets** 105:21 117:6 118:19 119:1,5 120:25 122:11,25 128:10
**take** 6:22 14:8,15 17:12 33:14 47:2 60:18 62:16 64:23 65:8 68:1 72:13,14,18 84:12 92:2 93:25 96:7 97:8 101:7 105:13 118:23 120:3 129:18 133:20 134:1 135:4 139:12 140:23 147:9 154:18 159:11,24 166:17 170:10 172:15 175:4 176:3 178:5 180:16 181:3 186:6 187:21 188:21 193:4,22,23 194:18 196:7,8 199:6 201:14 206:5 219:24 220:1,23 230:23 231:3 233:15 235:24 238:1 240:11 241:6 248:15 249:15,24 250:8,21 252:12 255:8 258:3,17 259:21,22 263:6,8,11, 13,22 264:10,24 266:1 268:9 269:19 271:8,9 275:24 279:4

282:2
283:11,16,18
287:13,15
290:11
295:22
297:18
302:18
304:17
308:14
312:19,20,21
314:10
319:14,16
323:5
324:11,18
326:24 327:1
329:18
340:17 341:4
343:14
350:1,20
352:4 353:20
357:13,14
359:2 360:18
367:6 371:18
372:13
381:2,4,9,16
383:22
384:24
385:15
389:12
390:22
393:18

**taken**
7:3 73:1
75:13 84:10
129:7,25
132:12 156:9
172:25
231:14 279:9
302:7,18
343:19
393:22
394:25

**takes**
29:1 238:6,
12,24

**taking**
224:9 227:21
252:18

257:10
263:16
303:25
308:13
330:17
332:1,20
333:1

**talk**
68:24 105:23
107:16
139:14 147:6
166:3 194:8
204:23
218:12,25
228:16

**talked**
68:12 70:14
97:16 152:8
158:5 217:15
221:20
248:25 386:4

**talking**
36:22 51:16
54:4 57:5
73:21 80:5
90:22 103:14
138:5,8
139:5,9
141:20
165:17 200:5
209:2
221:15,18,
21,25 222:2,
6 223:4
239:20
318:18
320:21
323:17 360:2
361:5,20
362:3,11
377:5 392:7

**talks**
268:1

**target**
262:13

**teaching**
238:12

**team**
314:15

**teasing**
379:7

**technician**
3:25 7:11
210:11
289:13

**tell**
49:3 131:22
132:24
179:22
203:20,25
219:21 244:4
263:21
331:23

**telling**
120:18

**temperature**
106:23
123:10
135:13

**Temperature-dependent**
118:17

**temperatures**
111:17,18
112:6 131:10

**ten**
27:1,8
72:16,17,18,
19 214:7
231:5,6
243:10,12,
15,23 244:9,
15 245:5
247:8 263:9,
12,17,21
324:4,9,15
325:1,6
343:14

**tend**
189:5 238:23
260:17 273:8
275:15,17
277:13,20
303:22

**tenfold**
310:8

**tens**
323:3 385:16

**term**
46:3 55:24
66:17 70:11,
18,19 71:21
72:8 166:7
212:16
248:15 257:4
260:10

**terminology**
27:8 71:24
166:4 174:17
370:24

**terms**
16:21 21:20
25:3 26:2
27:14 39:20
44:21 46:25
47:15 52:14
66:8 74:21
76:2 77:12
82:6 90:11
91:1 93:20
95:9,22
98:24 102:24
103:20,21
105:19,25
110:3 114:1
125:14
141:14
157:11 159:2
161:10
175:5,20
189:7,10
192:16 200:5
212:12
214:20
219:1,13
222:7 224:16
226:3 236:6
242:14
245:7,15,25
259:20
260:19
263:11 267:9

285:11 286:9 306:19 312:5 316:15 320:23 321:1 330:3,15 335:8 338:19 339:10,11 341:20 346:20,24 347:3 360:4 368:22 369:19 370:7,10,12, 17 373:8 379:16 380:22 386:19

**tertile**
232:12,16 233:11 234:5,7,20 235:10,11, 16,22

**test**
14:13 56:7, 8,11 58:24 59:19 111:23 115:9 158:17 175:7,8 179:13 181:13,14, 16,18,25 385:3

**tested**
56:25 57:8 58:4 106:3 108:4,13 122:23 137:12 152:19,25 153:3 157:25 225:4

**testified**
8:15 10:23, 24 11:8 12:9 14:3 305:6

**testify**
11:14,20,23

**testimony**
8:4 126:1 132:14 163:23 365:10

**testing**
56:6,17,24 58:23,24 105:24 106:3,8,15, 17,22 107:6, 9,23,24 108:1,6,7,8, 9,15,18,23, 24 109:11, 19,20 110:4, 8,16 111:1, 4,7,9,13,15 112:14,17,22 113:1,16 114:8,15,16, 18,20,24 115:2,4,7 116:17 123:19 134:2 135:11,19,20 136:7,9,15, 18 137:9 138:7,9,11, 22 139:11 151:19 152:23 153:6 157:19,22 158:19,21,25 159:2 175:23

**tests**
54:11 107:2 112:3

**Teva**
3:1

**text**
284:7

**textbook**
183:20

**Thakkar**
314:7

**thank**
9:2 14:16 15:16 65:11 184:24 235:5 323:15 329:22 383:15 394:17 395:3,7,8

**theme**
359:10

**theoretical**
30:17

**theoretically**
28:20 29:16 31:12

**theories**
226:8

**theory**
20:22 157:13 374:8

**therapeutics**
314:21

**therapy**
325:10 377:15

**thing**
17:7 37:17 77:3 204:22 206:18 230:13 245:15 269:21 292:24 324:12 327:8 361:6

**things**
16:23 35:17 60:13 103:13 144:13 189:14 204:18 217:22,23 218:3 222:4 225:25 228:7 273:7 310:2, 19 313:7 329:16 361:23 371:8 375:19 391:6

**think**
11:25 12:24 13:12 15:2 17:10,17 18:11,20 20:1 22:7,20 27:17,25 28:24 31:19 32:4 34:22 37:12,14 38:22 40:7, 24 41:8,17, 24 44:17 45:18 46:9, 11,20,23 47:16 48:11, 18 51:20 52:1,22 54:24 57:12 58:12 59:15 60:4,7,13 61:21,23 62:2 64:2,3, 7 66:4,14,17 67:16,20,21 68:14 69:17 70:2,4,11, 17,18 71:3, 10,12 72:8, 15 74:19 75:1 76:6,24 79:21 80:5, 9,13,16 81:11 82:5 83:22,25 84:9,23 95:19,23 96:8,17 97:21 99:9, 11,13 101:1, 3 102:6,7, 10,17 103:11,14 104:4,23 108:18,25 110:23 114:16 115:10,14 116:2,21,24

117:1,4,7,10 118:5,9 120:10 121:14,18, 19,20 122:1, 4 123:4,13, 14,21 124:18 129:17 131:24 133:4 134:25 138:5,19 139:2 143:3 144:21 145:15 146:2 148:6,16 149:9 151:19,24 153:14 155:9 156:12,19,22 157:1,15 158:5 162:14 164:18 165:5,6 167:21 168:11 170:4 171:25 172:3,18 177:7,10,12 179:21,23 180:3,6,8,24 181:4,24 183:8 192:21 200:22 205:16,17 207:5 212:14,17 213:12,21 214:17 215:17,20,23 216:20 217:7 218:24 221:15 222:2,6,7 223:13,18,20 224:4,20,22, 25 225:25 227:9,11,13, 14,18,19,22, 23 228:2,6,9 229:14,24,25 230:2,5,6,7, 12,17,18,19 240:6 242:12,17, 18,23 243:10 245:8,14,23, 24 246:1 247:4 249:3, 17,20 250:6 251:21,22,23 252:1,7,10, 15,17,24,25 253:7 254:14 256:10,16,19 257:1,16 259:18 260:11 261:1,18 262:7,12 264:19 265:10,23 266:24 267:1 272:17,24,25 273:12,19 274:1 275:1, 7,12,20,22 276:24 277:17 278:15,17, 18,24 279:2 285:19 298:8,9 301:3,6 303:2,18 307:2 308:3, 4 310:23,25 312:3 316:16,21 323:9 332:15,24 333:4 335:11 336:16 344:15,18 346:24 347:1,3,6,9, 12,20 348:5 349:10,20 351:6,19,21, 24 353:2 356:1,3,6 357:3 358:21,25 362:18 363:16 365:1,3 367:11,16,22 368:8,20 369:6,25 371:5 373:15,19 374:5,8,22, 25 375:10,21 378:20,23 379:8,23 380:9 383:12,15, 16,23,24 384:2,8,15, 18 387:9,12 388:15,17,18 389:24,25 390:1 391:14 395:5

**thinking**
33:22 95:9 144:23

**third**
232:12,16 233:11 235:10,11,22 237:5 250:25 251:2 255:21 264:10

**Thorgeirsson**
33:4 367:4

**Thornburg**
3:21

**thorough**
20:2

**thought**
76:20 331:22

**thousand**
132:6

**thousands**
385:15,16,22

**three**
29:10,11 134:10 146:14 149:7 152:10,11 176:15 212:5 237:14,19 257:16 332:14

**threshold**
386:3,5,6, 14,21,24 387:2,4,17, 23 388:2,9, 14,16,21 389:16 390:1,7,8,15 391:8,11,15, 22 392:11,18 393:3,4,10

**Thursday**
7:5

**ties**
319:9,12

**Tim**
10:5

**Tim's**
10:12

**time**
7:6,15 12:1 14:25 21:18 29:13 72:22 73:3 89:3 107:1 108:21,25 109:5 115:24 116:8 119:20 129:18,21 130:2 135:13 137:10 140:8,18 144:6,14 145:19 149:16 156:9,14,21 172:18,21 173:2 186:10 219:13,16

224:23
231:10,16
238:6,13
239:10
242:22
257:11
261:11
262:17,19
265:2
271:22,24
275:14,17
279:4,6,11
283:16
288:12
298:15
312:12 328:5
343:15,21
362:7
393:18,19,24
394:14,21
395:2,4,9,12
**times**
28:1 95:5
123:18
167:16 316:3
332:14 376:3
**Timothy**
4:3 7:2
15:21
**tissue**
373:25
**tissues**
393:8
**Titanic**
205:3
**title**
118:16
139:25
184:14
194:8,10
196:10
197:17 202:2
220:5 233:21
255:14 258:9
269:22
271:14
289:20
290:12
305:18 327:9
350:6 354:1
371:24
381:10
**titled**
231:23 264:3
279:18 280:9
282:10
**titles**
290:23
**tobacco**
190:7
244:11,13,
19,25 247:12
321:20
377:19
**today**
7:5 202:10
309:25 395:4
**told**
388:14
**Tom**
9:10 30:1
120:12
298:24
**Tomassetti**
373:21
**tool**
360:11
**tools**
210:12
**top**
60:19 93:7
124:9 130:10
146:7 176:6
195:2,25
196:10
269:22
282:17
289:20
**topic**
129:19
**total**
54:5 92:9
95:4 102:13
190:8 196:24
234:13
236:10,17
282:23 293:9
366:16
376:18
377:12,21
**totality**
83:25
**totally**
115:14,17
243:16 252:4
285:8 297:5
308:17
**town**
371:11
**toxic**
33:11 34:2,7
35:11,13
36:1 61:4
248:23 367:5
393:8
**toxicologists**
355:6
**Toxicology**
350:9
**track**
16:22
**tract**
380:25
**traditional**
63:7,18
**Tran**
266:5,10
271:19
275:25
**transcript**
253:20
**transition**
393:10,15
**translate**
254:20,21
**translating**
251:24
**translation**
251:23
**translational**
24:23
**transparency**
337:25
338:14
**TRAURIG**
3:2
**treat**
368:16
369:23
**treated**
101:13
330:20
**treatment**
23:16,22
24:2,5 208:1
335:14,23
336:8 338:3,
6,20,25
**treats**
262:14
**trend**
163:15
192:16,18
233:2,5
237:17
**trial**
226:20
227:2,4
228:20,23
229:7,9,16
**trials**
226:10
**Tribute**
350:10
**tricky**
101:11
**tripling**
191:16
**trouble**
48:24 49:10
**true**
20:14,18
54:16 58:14
59:13,24
101:24
116:22
142:13 143:3
169:9 182:23

200:11
208:19
210:18 211:3
212:3 213:8,
23 215:17
216:1 218:20
223:2 225:5,
12 229:23
239:18,24
243:13,21
246:8 258:1
261:22
262:21,23,24
277:19 307:5
312:17 324:8
329:12
333:18
337:14 342:5
362:17
363:24 364:4
376:23
377:24 378:5
380:2 382:4
385:12

**truth**
386:2

**try**
89:9 181:23
191:8,10
254:18
335:21
339:2,8
340:1

**trying**
14:8 16:16
27:16 45:16
46:5 47:13
48:25 51:22
57:17 66:11
88:15 100:5
101:8 165:6
175:22
177:9,12
180:17,24
242:19
254:5,24
255:6 257:17
284:22 363:7
365:2 368:15
378:14
383:17

**tumor**
49:13 65:18
67:7

**tumorigenic**
50:22 51:13,
15

**tumors**
23:12 35:12
43:24 44:12
47:20 48:1,
21 49:4,14,
22,23,25
50:23 51:7,
17 52:11
53:2,7,8,15,
24 54:3,6,18
55:1,17,24
56:2 57:19
58:6,7 377:8
379:4,10
391:5 393:1,
2,10,12

**turn**
10:18 43:16
60:16 184:20
235:1 305:24
376:9

**turned**
204:19

**Twenty**
239:9 331:21

**twin**
378:6,14
379:6

**two**
13:12 16:15,
23 26:25
30:13 31:8
44:5 53:2
60:3,6,8,11
87:18,21
91:12 93:3
102:16 111:6
119:1,5,11,
24 120:25
122:11,24
125:9 134:10
135:23 136:3
137:22 138:3
175:11 182:1
187:11
188:25
189:2,11,22
192:12
215:14
217:16,21,
22,25 218:1,
2 223:11
224:5 257:15
266:9 288:4,
9,25 302:7,
12,13,16,18
313:15
332:13
335:16 339:3
341:6 343:11
354:9 356:15
357:7 362:14
385:4

**two-way**
70:5 71:4,13

**twofold**
194:22 195:1
196:5 245:5

**type**
12:19 90:12
200:2,3,6,8,
13,17,23
201:2,3,11
223:7,8,14
239:8 245:19
249:2 256:8
268:14 276:5
311:17

**types**
20:11 49:23
80:8 103:12
111:6 223:11
240:1
246:10,20
277:5
371:10,15
377:2 378:24
379:19

**typical**
102:12
187:14 189:3

**typically**
28:6 47:22
48:2 49:5
50:1 51:9
57:21 200:8
238:25
239:14

## U

**U.S.**
3:7,8

**UC**
267:11

**Uh**
98:3

**uh-huh**
14:10

**UK**
267:10
270:8,9,19,
21,25
271:15,18
272:6 274:24

**ultimate**
90:2

**umbrella**
361:17

**unable**
314:25 317:3

**unacceptable**
135:14

**unadjusted**
269:2

**unavoidable**
373:1,10

**uncertainties**
100:20

**uncertainty**
101:16,19,25
167:17
256:16

**unclear**
216:5 296:13
**under-**
218:14
**underestimate**
222:5 223:2
**underestimating**
217:7 222:13
**underestimation**
202:23
215:22 216:8
**undergoes**
108:19
**underline**
165:9 199:23
**underlying**
208:8 330:3
**undermine**
199:23
**undermines**
199:18
220:17
**underneath**
60:22 93:11,
14 264:12
**undershoot**
224:24
**undershooting**
225:22
**understand**
17:7 23:18
32:3 33:16
36:7 39:7
46:4 66:7,13
67:22 74:20
78:23 79:10
88:19 99:25
100:1 113:21
143:14 148:5
155:10 159:5
166:2 171:17
180:15 181:9
203:11
209:24 217:9
218:1,14
221:20 223:6
248:22
284:22
285:12
300:13
302:20
320:7,10,22
321:6 325:23
330:15
339:24
342:12 345:6
348:8 349:19
363:7 365:9,
11 367:1
386:15 389:7
391:15,17
**understanding**
24:3 32:11
82:6 108:3
141:25
143:11 148:7
193:11
200:23 208:8
310:20
**understood**
14:12,19,21
136:5 137:5
155:18
160:10
214:16
309:23
**undertaken**
281:8
**undoubtedly**
181:10
**unequivocally**
382:5
**unethical**
209:25
**unexposed**
162:25
**uniformly**
74:24
**unimportant**
28:15
**uninformative**
156:16
**Unit**
269:25 271:2
**United**
18:24 21:5,
14 106:24
134:17
152:13
204:6,8
245:12,16
262:25
263:16
**unity**
354:15
355:3,25
365:3
**University**
9:6 23:5,7
216:23
**unknown**
151:20
**unnecessary**
10:12
**unpublished**
304:21
305:2,7,12
**unreasonable**
242:20
**unreliability**
104:18 105:2
222:18
**unreliable**
89:3 100:5
103:4 104:2
133:15
**unreliably**
88:17
**unsure**
99:14
**unsurprising**
317:1
**untrue**
365:7
**unusual**
172:1 324:5
**upper**
6:24 105:19
179:9,17
180:5
182:18,22
327:10
**urban/rural**
190:7
**urinary**
209:11,12
**urine**
90:18 91:2
**Uruguay**
184:17 185:3
**Uruguayan**
187:12
**usage**
235:22
340:10,11,12
**useless**
285:19
**user**
168:23
169:5,12
170:16
273:14
**users**
140:19
141:15
142:17 144:7
160:18 161:2
168:18,19,25
169:7,14,25
171:4,9,12,
13 259:10
260:4,24
261:3,6
272:14,21
273:4,15,16,
23 274:1,11,
18,19 275:16
292:10,11,
20,24,25
294:3,5,11,
13,23,24
295:2,3,6,
10,12,15,17
303:4,6,11,
13 304:11
305:19
306:15,25

307:15 308:24 310:6,9 314:8 332:8 334:17
**UTC** 7:6 72:23 73:3 129:22 130:2 172:22 173:2 231:11,16 279:7,11 343:16,21 393:20,24 394:22 395:2,10
**uterine** 165:4 166:11,25 167:13
**utility** 90:11 285:21
**utilize** 292:1
**utilized** 89:25 271:22 322:7 344:8
**utilizing** 18:3 21:12 261:23 272:5 278:6 298:15 320:18

**V**

**Vague** 247:21
**valid** 33:19 115:8
**validate** 285:15 322:7,17
**validated** 226:25
**validates** 226:20
**validation** 230:3,22 321:11,14, 16,18 322:1, 13
**validity** 283:25 322:9
**Valisure** 134:4
**valsartan** 68:25 69:7 139:14 140:1,10,18 141:6,8,15, 19,21 142:1, 4,5,11,15, 18,23 143:5, 12,16,17,23 144:3,8,12, 20 145:6,18, 24 146:13,21 147:20,21 148:3,4,8 150:17 151:13 152:13 153:10,12, 15,22 154:3, 22,23 155:1, 3,7,22,24 156:2,4,6,9, 13,24 157:15,21 158:15 160:18 161:2 168:1 171:12 177:1 180:21 182:14
**value** 360:16
**values** 91:8
**variability** 39:17,19,21 187:8
**variable** 115:23 137:11
238:10 239:9 260:9
**variations** 100:15
**variety** 17:15 19:10, 13 25:1 170:7 278:19 371:14
**various** 19:1 101:6 103:12 261:24 312:9 317:4,16 344:24 345:1 346:12 371:10
**vary** 16:21 189:14 249:11
**vast** 204:25 239:13 379:10
**Vecchia** 233:23
**veg-** 284:19
**vegetables** 96:2 284:25
**verbal** 14:10
**verbally** 8:3
**verses** 380:23
**version** 25:18 56:22
**versus** 57:20 58:7 76:19 86:23 143:16 144:16 201:3 227:3 228:21 229:8 258:11 263:12 284:1,10,11
288:6 298:20 306:9 307:15,24 308:23 340:11,12 342:25 344:23 379:2,17 380:10,17
**Victoza** 11:1,7 12:2, 6 13:13
**video** 6:13,15,20, 22 7:11 9:23 10:15,16 122:1,4 280:6
**video-recorded** 7:1
**VIDEOGRAPHER** 3:24 6:1 15:11,16 72:22 73:2 129:21 130:1 159:22 160:7,10 172:21 173:1 231:10,15 279:6,10 280:5 289:17 343:15,20 393:19,23 394:21 395:1,9
**view** 6:16,24 174:16 175:2 278:1 382:19 388:14
**VII** 92:24 93:6
**VIII** 96:21
**virtually** 127:1

**vitamin**
204:14
226:6,7,12
236:10
**vitamine**
236:17
**vitro**
103:16
**Vogelstein**
368:7
373:21,22
**Vogelstein's**
372:11
**voice**
122:6
**Volatile**
92:10
**volume**
329:10
**voluntary**
146:12
**volunteers**
209:9 210:1
**vulcanizing**
345:14,18,
20,24 346:2

**W**

**W-A-N-G**
8:24
**waiting**
23:17,22
24:2,6,7
**waive**
8:7
**wall**
9:25
**Wang**
4:3 7:2 9:1,
2 15:22
42:22 57:11
92:19 119:21
120:10
283:17 395:3
**wanna**
72:13 94:15
**want**
6:21 16:13
18:12 30:14,
22 31:1
34:24 35:8
37:8 42:24,
25 50:6
57:13 68:25
72:17 78:23
79:10 80:12
86:16 88:22
92:23 111:22
124:20
133:18 140:7
154:17
159:15
172:11,14
194:8 208:20
223:23
228:16
242:12
285:15 299:8
321:3 357:3
365:9 366:25
388:25
389:14
390:22
391:19
392:4,6
**wanted**
335:20
**water**
92:9 209:10
**way**
41:14 49:8
60:15 96:9
101:5,14
144:14
152:15
157:4,18
158:11
175:20 181:1
193:18
242:9,16
302:17,19
311:19 321:4
326:19 342:3
351:17 365:3
378:17
**ways**
175:11
187:18 191:3
207:9 208:5
224:8 227:9
230:4,6
369:25
370:21,23
**weak**
36:12 67:2
**weakness**
286:10
**weaknesses**
316:13
**week**
332:14
**weeks**
119:11 120:3
121:6 122:17
123:12
124:1,5
135:23 136:4
137:23 138:3
257:16
**Wei**
372:4
**weigh**
99:5
**weighed**
84:9 97:18
100:2
**weighs**
94:23 95:3
**weight**
51:1 61:7
94:18,20
170:5 229:24
230:21
242:14
315:22
**weighting**
338:7
**weights**
335:14,23
336:8 338:21
339:1
**Weinberg**
29:9
**well-cited**
356:15
**well-known**
183:16
**well-outlined**
37:7
**well-published**
183:23 184:3
**went**
76:9 89:14
136:6 137:9
301:22
329:10
**whited**
313:7
**wide**
100:15
164:20,21
180:3 260:23
**widely**
16:21 20:15,
24 21:8
382:18
**wildly**
311:9
**window**
293:11
**withdraw**
135:1 137:16
**withdrew**
137:5
**witness**
4:3 6:13,14,
16,20 8:3,
11,13 10:14
92:20 120:21
121:14 122:6
160:3 172:17
174:5 213:25
395:8
**witness's**
6:21
**women**
194:13

195:2,10,18 280:24
**wonder** 361:3
**wondering** 157:15
**Wong** 8:25
**word** 24:4 30:12 41:21 46:10, 14,25 49:13 71:15 127:24 175:5 187:21 240:25 259:15
**worded** 103:19
**wording** 175:1,5 254:15 361:3
**words** 19:1 29:25 73:11 88:2 165:10,12 182:1 253:21 254:22 361:8 391:18
**work** 9:6 21:20 26:9 132:12 207:16 209:4 266:19 312:1 352:1 370:19 377:6
**worked** 21:25 22:24 254:6 328:8
**worker** 350:24
**working** 210:12 345:9 347:16
**works** 328:15,25
**world** 40:22 42:5, 16 44:9,16 45:4 46:2,6 47:24 61:18 62:23 63:12 65:25 66:8 115:1,5,10 117:1 145:2, 17 208:3 257:9 260:22 261:1 291:8
**worse** 20:10
**worst** 102:13
**worth** 218:3 224:23
**worthy** 208:10
**would've** 36:5 50:16 80:9,17 81:2 209:25 213:8 264:17 266:19 331:22 356:3
**wrap** 395:6
**write** 132:13 254:18,25 259:5 316:3
**writer** 360:8
**writing** 251:25 254:6
**written** 26:23 48:6 63:23 179:4 189:7 249:18 252:9 254:17 277:10 315:20
**wrong** 41:9 87:7 97:23 103:19 225:14
**wrote** 38:10,18 178:25 254:14 266:21
**Wu** 372:2

**X**

**X------------------** 4:2

**Y**

**Y.D.** 320:2
**YD** 288:1,6 290:15,17
**yeah** 11:5 15:3 20:22 22:12 24:7 42:25 43:2 48:16 49:7,20 50:4 52:15 55:17, 23 57:12 61:21 69:3, 17 70:10 72:19 84:22 92:20 95:2, 6,18 96:15 97:5 99:1,7 104:23 106:6 113:9,20,25 115:6 123:13 125:12 129:3 138:2 145:19 146:9 148:14 154:17 160:5 161:10 162:16 163:9 164:18 172:14,17 174:5 178:2, 11 180:13 184:23 187:13,15 189:18 191:18 192:15 195:21 211:24 214:3,10,16 231:6 270:1 293:4 297:16 304:15 308:1 312:6 313:8, 9 320:12 324:5 331:1 341:2,25 342:17 345:25 348:8 361:2 377:4 379:23 384:7 387:12 388:4
**year** 29:1 263:6, 12 325:13, 14,17,18
**years** 29:1 143:9 154:4,6,12 209:5 219:20 225:14 238:13,25 239:5,9 240:4,7 241:15,20 242:9,12,25 243:9,10,12, 15,24 244:9, 15 245:5 247:8 251:3, 10 252:11 253:4,11 257:18 258:21,25 259:7,8 262:20 263:9,12,18, 21 264:12, 13,14,15,18 270:18,24,25

271:6 294:7 325:1,6 333:20,22 334:10 342:21 374:24
**yeas** 243:15
**yell** 121:13
**yelling** 122:1,3
**yellow** 149:11
**Yoon** 250:1,9,19
**York** 9:4,6 11:6 174:1
**young** 94:18 98:19

**Z**

**Z-E-I-L-M-A-K-E-R** 91:19
**Zantac** 7:7 31:24 32:4,7,9,12 106:24 129:8 134:16
**Zeilmaker** 91:15,19 94:1,12 97:3,15,25 98:5 99:24
**zero** 125:18
**Zhejiang** 148:22 149:12 150:1 151:1
**ZHP** 152:14
**Zhu** 372:5
**zoom** 214:22 283:14