# EXHIBIT 51

# COVER EMAIL REDACTED PER ORDER AT DE 6123

# Ranitidine use, N-Nitrosodimethylamine (NDMA) production and variations in cancer diagnoses.

Lior Z. Braunstein MD[1], Elizabeth D. Kantor PhD[1], Kelli O'connell MSc[1], William A Mitch PhD[2], Nicola Zenzola Heimbach MSc[3], Amber Jessop MSc[3], Kaury Kucera PhD[3], David Y. Light BSc[3]

[1] Memorial Sloan Kettering Cancer Center, New York, NY
[2] Stanford University, Stanford, CA
[3] Valisure LLC, New Haven, CT

Manuscript word count: 639

JAMA Network Open guidelines:
600 words, 7 authors, 6 references, 2 figures

Correspondence:
Lior Z. Braunstein, MD
Memorial Sloan Kettering Cancer Center
1275 York Ave – Box 22
New York, NY 10065
Email: BRAUNSTL@mskcc.org



Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order 

Introduction: N-Nitrosodimethylamine (NDMA), a probable human carcinogen, was recently detected in ranitidine products, prompting widespread regulatory recalls. An $H_2$-receptor antagonist that inhibits gastric acid secretion, ranitidine bears a molecular structure that putatively supports NDMA production under suitable reactive conditions.[1] We sought to characterize conditions of NDMA production from ranitidine, and to evaluate the implications for human carcinogenesis.

Methods: To identify the conditions under which ranitidine may yield NDMA, we employed liquid chromatography – high resolution mass spectrometry (LC-HRMS)[2] on simulated gastric fluid while varying pH, incubation time, and concentrations of ranitidine and nitrite (Supplementary Methods).

To assess potential epidemiologic implications of ranitidine exposure, we conducted a cross-sectional analysis of ranitidine versus active comparator use (i.e. a proton pump inhibitor [PPI] or other $H_2$-blocker) among a cohort of non-metastatic invasive or *in situ* cancer patients. Multivariable logistic regression was employed to identify associations between ranitidine and certain cancers, adjusted for age, sex, race, and body-mass index (BMI) where possible (e.g. sex was excluded from models for breast, ovarian, endometrial and prostate cancers) (Supplementary methods).

Results: Using LC-HRMS, we detected NDMA formation from ranitidine in simulated gastric fluid across a range of physiologic conditions (Figure 1). Whereas the U.S. FDA has advised that



Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order 

NDMA intake below 96/ng may be considered reasonably safe[3], we detected levels several-thousand-fold beyond this threshold. Under optimal reactive physiologic conditions, NDMA yield from a 300mg ranitidine tablet rose to 0.612mg (612,000ng).

To evaluate the epidemiologic implications of these findings, we analyzed a population of 10,347 patients diagnosed with non-metastatic cancer from 2013 to 2019 (mean age was 56.3 years and 50.0% were male). At the time of cancer diagnosis, 8.4% (n = 871) exhibited oral ranitidine use, while the remainder were recorded to be using another $H_2$-blocker or PPI (n = 9,476).

Use of ranitidine, as compared to active comparators, was associated with a significant increase in the adjusted odds ratio (OR) of presenting with breast cancer as compared to other cancers (OR=1.58; 95%CI: 1.23-2.01). Positive associations were also observed for cancers of the thyroid (OR=1.89; 95%CI: 1.18-2.92), bladder (OR=1.58; 95%CI: 1.10-2.21), and prostate (OR=1.80; 95%CI: 1.34-2.39). A negative association was observed for colorectal cancer (OR=0.80; 95%CI: 0.30-0.74) and brain malignancies (OR=0.56; 95%CI: 0.33-0.89) (Figure 2). In sensitivity analyses excluding *in situ* cases, interpretations remained unchanged with the exception of bladder cancer which exhibited a lower effect estimate (OR=1.41; 95%CI:0.91-2.07).

Discussion: Our results, in conjunction with corroborating studies[4], suggest that ranitidine in the presence of nitrite may be a source of NDMA, with a possible link between ranitidine use and certain cancer presentations.



Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order 

These analyses are not without limitation, yet raise concern given the widespread use of ranitidine in pediatric and adult populations. Our findings are based on a select population of cancer patients from a single institution, limiting generalizability. Efforts were made to account for confounding by comparing ranitidine to comparable agents (other $H_2$-blockers and PPIs), and adjusting where possible for demographic features. However, other significant exposures were not available for adjustment and should be further studied (e.g. smoking history, alcohol use, ranitidine dosing, duration of exposure). Moreover, since exposure to the medications of interest is self-reported after the onset of disease, measurement error and reverse causality are possible. Importantly, results do not directly represent risk, but rather the relative odds of each cancer presentation among a cohort of cancer patients using ranitidine.

Our findings should prompt investigation of more broadly diverse populations and discrete disease-site histologies (e.g. distinguishing estrogen-receptor positive from triple-negative breast cancers, etc). Given that the putative carcinogenic mechanism of NDMA arises from DNA alkylation, studies of tumor mutational signatures may further inform suspected etiologies.[5]

While confirmatory studies are ongoing, these data may present a case for limiting ranitidine administration among patients who otherwise have feasible therapeutic alternatives. Population-level epidemiologic analyses will characterize the extent to which our findings represent a public health concern.



Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order 

Acknowledgement

Lior Z. Braunstein had full access to all the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.

LZB, KO and EK were supported by grant P30CA008748 from the National Cancer Institute.

NZH, AJ, KK and DYL are employees of Valisure, LLC, which conducted all chemical and molecular assays reported herein.

Figure 1: Liquid chromatography – high resolution mass spectrometry measurement of NDMA (ng) in simulated gastric fluid with varying conditions of ranitidine dose, incubation time, pH and nitrite concentrations.

Box/whisker visualization would be better here:

Table 1. LC-HRMS measurement of NDMA (ng) under variable conditions of ranitidine dose, time, pH and NO2 concentrations (all conditions in triplicate showing mean).

A. Ranitidine in SGF at 50mM N02- varying pH.

| | Time | pH = 1.2 | pH = 2.5 | pH = 3.5 | pH = 4.5 | pH = 5.5 |
|---|---|---|---|---|---|---|
| Ranitidine 150 mg | 1 H | 46100 | 269000 | 124000 | 7480 | 1100 |
| | 2 H | 106000 | 409000 | 187000 | 8300 | 3500 |
| Ranitidine 300 mg | 1 H | 81900 | 512000 | 172000 | 12000 | 1130 |
| | 2 H | 198000 | 612000 | 204000 | 11900 | 3310 |

B. Ranitidine 150mg in SGF at pH=2.5 varying NO2- concentrations.

| $NaNO_2$ (mM) | 0 | 0.005 | 0.01 | 0.025 | 0.05 | 0.25 | 0.5 | 1 | 2.5 | 5 | 10 | 25 | 50 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mean | 921 | 824 | 1440 | 1400 | 1270 | 1340 | 902 | 947 | 1070 | 3680 | 15800 | 113000 | 320000 |
| SD | 182 | 154 | 249 | 112 | 302 | 308 | 119 | 286 | 149 | 421 | 5240 | 15900 | 19400 |

C. Ranitidine 150mg in SGF at 2 hours varying pH and NO2-.

| | [NO2-] 25mM | | [NO2-] 50mM | |
|---|---|---|---|---|
| | Mean | SD | Mean | SD |
| pH=1.2 | 56800 | 1620 | 116000 | 705 |
| pH=2.5 | 114000 | 20000 | 343000 | 12600 |

Figure 2: Adjusted odds ratios of presenting cancer diagnoses in an oncology population among those receiving ranitidine versus other $H_2$-blockers or proton-pump inhibitors.

| Site | Number of Cases | Ranitidine Only vs Non-Ranitidine Only |
|---|---|---|
| Lung | 880 | 0.80 (0.60, 1.03) |
| Colorectal | 460 | 0.48 (0.30, 0.74) |
| Thyroid | 159 | 1.89 (1.18, 2.92) |
| Kidney | 244 | 1.34 (0.86, 2.00) |
| Bladder | 340 | 1.58 (1.10, 2.21) |
| Melanoma | 144 | 1.41 (0.80, 2.32) |
| Brain | 343 | 0.56 (0.33, 0.89) |
| Hematologic | 1484 | 0.94 (0.76, 1.15) |
| Breast | 866 | 1.58 (1.23, 2.01) |
| Ovarian | 190 | 1.39 (0.87, 2.13) |
| Endometrial | 179 | 0.99 (0.55, 1.65) |
| Prostate | 547 | 1.80 (1.34, 2.39) |






Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order

**Supplementary methods**

## Equipment, Supplies, and Chemicals

SCIEX EXIONLC AD (LC) coupled with X500R time of flight high resolution mass spectrometry (HRMS) was purchased from SCIEX (Framingham, MA). Kinetex F5 HPLC column (2.6 µm, 4.6 × 100 mm) was purchased from Phenomenex (Torrance, CA). Certified reference materials (CRM) of N-Nitrosodimethylamine (NDMA) and ranitidine (≥ 99.2 %) were purchased from Sigma-Aldrich (St. Louis, MO). Isotopic labeled NDMA standard $^{13}C_2$-$D_6$-NDMA was purchased from Cambridge Isotope Laboratories (Tewksbury, MA). All other chemicals and reagents are ACS grade from Sigma-Aldrich.

## Experiments

Simulated gastric fluid (SGF) was prepared at various pH and nitrite concentrations. To initially evaluate NDMA formation dynamic at different human stomach relevant pH conditions, 100 mL SGF containing 50 mM nitrite was prepared at pH=1.2, 2.5, 3.5, 4.5, and 5.5. Ranitidine prescriptions of 150 and 300 mg were added to the SGF. To directly replicate previously investigated conditions that had utilized GC-MS methodologies, and to further evaluate dynamic NDMA formation at different human stomach relevant nitrite conditions, 100 mL SGF containing 25 mM and 50 mM nitrite was prepared at pH=1.2 and 2.5. Ranitidine prescription of 150 mg was added to the SGF. To demonstrate the hypothesis that NDMA formation could occur at very low nitrite concentrations, 100 mL SGF containing 50, 25, 10, 5, 2.5, 1, 0.5, 0.25, 0.05, 0.025, 0.01, 0.005, and 0 mM nitrite were prepared at pH=2.5. A “cool mint” flavored brand Zantac 150 mg OTC was added to the SGF. All experiments were conducted at 37 °C incubation, and samples were taken at 1-hour (initial experiment only) and 2-hour time point, respectively. One milliliter of incubated SGF was transferred, centrifuged, and filtered by a 0.2



Highly Confidential – Attorneys’ Eyes Only – Subject to Protective Order

μm nylon filter into HPLC vial. A known amount of $^{13}C_2$-$D_6$-NDMA was spiked into the sample targeting the final internal standard concentration of 40 ng/mL. The ranitidine and Zantac tablets were also directly diluted and run by LC-HRMS as control samples. To demonstrate the ability of ranitidine to react with itself to form NDMA, 50 mg of ranitidine CRM was dissolved in 1 mL N-Methyl-2-Pyrrolidone (NMP), incubated at 130 °C for 15 minutes in a sealed glass amber vial, then diluted with methanol to proper LC-HRMS calibration range, followed by LC-HRMS analysis. Direct LC-HRMS analysis of ranitidine CRM in methanol was used as control in this experiment.

**Instrumental Analysis**

NDMA data was generated by a method developed from the FDA recommended liquid chromatography – high resolution mass spectrometry (LC-HRMS) method for determination of nitrosamines in ranitidine drug substance and drug products [8], with proper modifications to improve the accuracy and precision. Briefly, chromatographic separation started at gradient of 90% of mobile phase A (0.1% formic acid in water) and 10% of mobile phase B (0.1% formic acid in methanol) and was held for 1 minute. Mobile phase B ramped up to 100% at 5 minutes and was held for 2 minutes, followed by B ramped down to 10% and held till 10 minutes. NDMA elutes at 1.71 minute. Atmospheric pressure chemical ionization mode (APCI+) was selected to ionize NDMA and its isotopic labeled internal standard. Mass identification for NDMA was done by detecting the accurate mass of $[M+1]^+$ in MRMHR acquisition mode for NDMA 75.0553>75.0553, and $^{13}C_2$-$D_6$-NDMA 83.0997>83.0997, respectively. The mass accuracy was set at 15 parts per million (ppm) and mass resolution was greater than 25,000.

**Quality Assurance and Quality Control**



Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order 

Linear calibration curve was established by an eight-point calibration ranged from 0.5 to 200 ng/mL containing the same internal standard concentration as samples. Calibration is accepted if the $r^2$ is equal or greater than 0.99. The limit of quantification (LOQ) is defined as the lowest acceptable calibration point. The lowest calibration point must have a minimum signal to noise ratio of 10. Concentrations of NDMA in samples were quantified by internal standard method. The LOQ was 1 ng/mL for NDMA and was equivalent to 100 ng in each incubation.



Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order 

References

1. Mitch WA, Sharp JO, Trussell RR, Valentine RL, Alvarez-Cohen L, Sedlak DL. N-nitrosodimethylamine (NDMA) as a drinking water contaminant: a review. Environmental Engineering Science 2003;20:389-404.
2. Liquid Chromatography-High Resolution Mass Spectrometry (LC-HRMS) Method for the Determination of NDMA in Ranitidine Drug Substance and Drug Product. (Accessed November 13, 2019, at https://www.fda.gov/media/130801/download.)
3. Laboratory analysis of valsartan products. (Accessed August 13, 2020, at https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products.)
4. Zeng T, Mitch WA. Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine. Carcinogenesis 2016;37:625-34.
5. Alexandrov LB, Nik-Zainal S, Wedge DC, et al. Signatures of mutational processes in human cancer. Nature 2013;500:415-21.



Highly Confidential – Attorneys' Eyes Only – Subject to Protective Order 

# EXHIBIT

# 52

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION**

**MDL DOCKET NO. 2924**

**Civil Action No. 9:20-md-2924**

**JUDGE ROBIN L. ROSENBERG**
**MAGISTRATE JUDGE BRUCE E. REINHART**

**THIS DOCUMENT RELATES TO:**

**ALL CASES**

**DECLARATION OF Patrick Steffes, P. Chem.**

COMES NOW Patrick Steffes, and hereby attests as follows:

1. I am a professional chemist with 28 years of experience in the field of analytical chemistry. I have been factory trained on analytical instrumentation by Dionex (now Thermo), Hewlett-Packard, and Agilent Technologies. Over this time I have provided technical expertise on chemical analysis, installation, repair, method development, method validation, data processing and troubleshooting. In the past eight years, I have concentrated on data and document review as related to analytical instrumentation. During this time, my focus has been on data integrity, laboratory systems and processes, validation, and instrument qualification. I have reviewed hundreds of data packages over the past decade, for a wide range of regulated industries. I am in good standing with the Association of the Chemical Profession of Alberta and have maintained my professional status since being admitted. I am a member of the Chemical Institute of Canada (MCIC), and an associate member of the Alberta Society of Human Toxicology. I have a Bachelor of Science in Chemistry from the University of Alberta (1993). I am factory trained by HP and Agilent on LCMS (Liquid

Chromatography Mass Spectrometry) hardware and software. I have provided training to a diverse range of customers on LCMS techniques, MassHunter software, method development, method validation, and data integrity. I have been asked to review a sampling of the electronic data files of Emery Pharma in their ranitidine testing, discuss the acceptance of Agilent LC-MS equipment and MassHunter analytical software in pharmaceutical analytical chemistry, explain in general the data that LC-MS collects, demonstrate the reliability and reproducibly of using the LC-MS native data files with the MassHunter software.

2. Emery uses a LC-MS chromatographic system by Agilent Technologies, the 1290 UHPLC (Ultra High Performance Liquid Chromatograph) with Agilent Triple Quadrupole (QQQ) Mass Spectrometer (either 6460 or 6470 model) and data processing analytical software by Agilent named MassHunter Acquisition and Quantitative Data Analysis software. The Agilent 1290 UHPLC is a high precision separation system, coupled with the highly sensitive 6470 or 6460 mass spectrometer, it is capable of reproducibly detecting compounds into low femtogram ($1 \times 10^{-15}$ gram) levels. The system is manufactured by one of the key innovators in mass spectrometry, Agilent Technologies, headquartered in the USA, with worldwide manufacturing and distribution. Agilent is a spin-off from Hewlett-Packard, and has been developing and manufacturing chromatography and mass spectrometry equipment since the 1970's. This system uses Agilent's well known and highly regarded MassHunter analytical data software which has been used and relied upon by analytical chemists in pharmaceutical development and quality control, forensics, regulatory agencies, industry processes and other chemical analysis organizations worldwide since about 2008.

3. Agilent is one of four major chromatography and mass spectrometer manufacturers that have most of the analytical chemistry market share. Each vendor uses its own proprietary software to control their instrument and process the acquired data. The above noted Agilent liquid chromatography and mass spectrometer instruments are widely known, accepted and used in the pharmaceutical and analytical chemistry industries. The Agilent Fact Sheet notes that Agilent is a $6.3 billion company, that Pharma represents 33% of Agilent's business and that Agilent has 37% of market share in the Americas, 25% in Europe and 38% market share in Asia Pacific.[1]

4. The MassHunter software has the capability to perform quantitation in compliance with US EPA and 21 CFR Part 11 for those laboratories performing analytical work that requires FDA regulatory compliance such as drug makers. It is highly capable and deemed reliable for performing basic research and development chemistry analytics on impurities in drug products as well as for cGMP pharmaceutical development and testing for new drug approval to the FDA and other regulatory authorities.

5. Agilent LC-MS/MS and 6460/6470 Triple Quadrupole Mass Spectrometers are used by analytical laboratories for many purposes including identifying impurities such as NDMA in API and drug products. There are case studies and testimonials documenting this. [2]

6. Agilent MassHunter software is reported by Agilent to have "Over 40 integrated quality test criteria and a parameter-less integrator with built-in peak validation

[1] Appendix A; Agilent Fact Sheet, Jan. 2022
[2] Appendix A; Agilent Case Study; Trace Level Quantification of Mutagenic Nitrosamine Impurities, Dr. A. Siva Lakshmi Devi, April 2022. (note: the LC/MS referenced is a Agilent 6470 triple quadrupole LC/MS)

capability that lets you focus exclusively on problem peaks and minimize manual integration."[3] This same brochure lists testimonials from LC/MS chemists in hospitals, University chemistry departments, Bayer's testing laboratory, by a Director of mass spectrometry at the University of Utah, by the Department of Food Science at University of Udine, Italy and others. Other case studies document analytical laboratories' preference in using Agilent triple quadrupole mass spectrometers as their preferred instrument along with the MassHunter software.[4]

7. Original scientific research is also conducted on Agilent LC/MS and mass spectrometer systems including for cancer research.[5] The MassHunter software is used for each of these Agilent LC/MS and Triple Quadrupole mass spectrometer instruments.

8. The Agilent MassHunter acquisition software brochure states as follows: "MassHunter acquisition software is used across all Agilent 6200 Series LC/TOF, Ultivo, 6400 Series triple quadrupole and 6500 Series Q-TOF LC/MS systems, reducing the need for training…" and; "Meeting data integrity standards - Provides the technical controls to securely acquire, process, report and store data in laboratories that must follow the compliance guidelines of FDA 21 CFR Part 11, EU Annex 11, GAMP5 as well as ISO/IEC 17025 and EPA's 40 CFR Part 160".[6]

9. In the case of Agilent MassHunter, the original native data generated from the LC-MS analysis is preserved and remains unchanged. The data may be reviewed and processed, but the original unadulterated data is always intact. This is a critical feature of

---

[3] Appendix A; Agilent MassHunter Software brochure, "Your Faster Route to Insight", p.2.
[4] Appendix A; Agilent Case Study; "Why We Switched to Agilent", Ken Lewis, Ph.D., OpAns, June 2020.
[5] Appendix A; Agilent Case Study; "Could a Deadly Form of Algae Kill Cancer?", Paul Zimba, Ph.D., November 2016
[6] Appendix A; Agilent MassHunter Data Acquisition Software for LC/MS, 2022.

the software, and an important reason this product is used in regulated environments. The MassHunter software uses a "method" file to automatically process that preserved and inalterable native data. When that method file is used to automatically process that data, the software will *always* generate the same native data chromatogram and results. As a reviewer, I processed the same Emery native data multiple times using the "method" files turned over to Defendants in this case. That processing *always* generated the same chromatogram and values (to 15 significant figures). I performed this exercise using six unique data sets. For each, I processed the data sets repeatedly (up to 10 times), and each time the MassHunter software generated the same chromatogram and values which include:

- Target compound response
- Internal standard compound response
- Target compound result
- Target compound/internal standard response ratio
- Associated data of sample information, sample name, acquisition method, acquisition date/time stamp.

10. With the original native data, it is possible for any trained analyst to generate the chromatogram and other numerical results and determine the amount of an analyte, like NDMA, in any given sample. The analyst, by using the original native data can evaluate and interpret the chromatogram and data to arrive at a result.

11. Trained analysts may have different subjective interpretation of the chromatogram and resulting data which can result in variations of the interpreted results from one user to another. This interpretation involves reviewing the integrations of the

LC-MS peaks performed by the MassHunter software, and if the analyst notes that the software's automated peak is not properly integrated then an adjustment may be made known as manual integration. An analyst's review and interpretation of the peaks in the native data chromatogram is a necessary and well-accepted practice in the field of analytical chemistry. The resulting variations are well-accepted in the field of analytical chemistry and considered as part of the overall tolerance (variance) of the values produced by the method.

12. LC-MS systems and the associated software are robust and reliable, but like an autonomous vehicle, we are not ready to let it drive down the road entirely unattended yet. Trained analysts review LC-MS results, and where incorrect automated interpretations are found, the analyst will correct this inconsistency, and the change is documented.

13. It is important to understand that the native electronic data as provided is a complex set of interconnected files. A single native data file (either a calibration standard, quality control sample, or unknown sample) contains graphical information and meta data that includes:

a. Acquisition Method (instrument settings that define how the instrument was set at the time of data collection). The location of this method, the time stamp of this method.

b. User entered sample parameters (dilutions, amounts, injection volume, sample position, calibration information, quality control information, sample details)

c. Meta data associated with the run: date/time of the data collection, instrument tune, location of the data, system conditions at the time of the data collection, operator.

d. The data itself is a complex 3-dimensional group of data, that has information on response, sampling rates, masses, and time intervals.

14. A single sample (individual native datafile) in the Emery data is comprised of 39 individual files spread over 5 subfolders. A data set may include over 100 datafiles. The raw data is highly complex, but it is incredibly consistent, and the depth of meta data associated with even a single file, is to provide a true and accurate record of the conditions associated with the generation of the data. Although the data is complex, the processing software allows reviewers to generate highly reproducible results from the raw data. As a reviewer, I can process the same data multiple times, and always generate the same values (to 15 significant figures).

15. The datasets provided are well organized, with file naming conventions that clearly define calibrations, quality control samples, blanks, and customer samples. This makes the processing and review of these datasets logical and easy to a trained analyst, familiar with the Agilent MassHunter software. The structure of what was presented is well laid out, logically named, and contains all critical audit trail details in the file structure. I have reviewed the following sample datasets

- 211006_BaselinePilltesting
- 211201_Patheonbaseline
- 211102_JurongAPI_Tanner
- 211109_GSK

- 211105_baselines_uniformity
- 220118_stabilityEP

16. In each of the datasets, there is a complete group of runs, including calibration standards, blanks, Quality Control (QC) runs, and Batch.Bin files. **Native data (also referred to as raw data, or the original, unprocessed data)** as collected in the data system associated with the physical instrument which in this case would be the Agilent Triple Quadrupole LC/MS. The native data contains graphical data information, and the associated meta data such as the AcqData (additional information on how the data was acquired), the **Quant Method** (additional information including setpoints used to collect the data, and conditions on the instrument at the time of data collection). Native data is frequently in a digital record that is not readable outside of the native data system used to collect it but readable and usable when read within it. In this case, the native data is the MassHunter proprietary file format, which is a subdirectory of files with a ".D" extension contained within the selected data folder. The native data is the unmodified information that has not been interpreted into results. The native data must be interpreted to generate results, and this is done through a Quant Method. With this native data, there are several processes that an analyst could use to generate the chromatogram and other numerical results and determine the amount of an analyte, like NDMA, in any given sample. Four of the processes available to the analyst are:

- **Create a New Batch.Bin file from Native Data, create a new Method.** Create a new Batch.Bin file by selecting all data files from a data set, create a new method file and calibration curve, and process the complete data set. It is possible to create a method from the native data, build a calibration table, and

analyze the data without any manual user intervention or interpretation. I have performed this operation on data sets listed in item (15) above at least six times; and repeated processing of the native data results in the exact same results summary export each time.

- **Extract the Method file from the Batch.Bin file, create a new Batch.Bin file, apply the extracted Method file.** Load a Batch.Bin file. Save the Method file from that Batch.Bin file as a new Method name. Create a new Batch.Bin file by selecting all data files from a data set, Load the previously saved Method file, and process the complete data set, and analyze the data without any manual user intervention or interpretation. I have performed this operation on data sets listed in item (15) above at least six times; and repeated processing of the native data results in the exact same results summary export each time.

- **Process using the Batch.Bin file.** Load the existing Batch.Bin file, and process the complete data set, and analyze the data using the setpoints and user interpretation found in the Batch.Bin files. I have performed this operation on data sets listed in item (15) above at least six times; and repeated processing of the native data results in the exact same results summary export each time.

- **Load and review each file, generate peak area values.** Load native data, interpret and export area counts. Plot calibration curves and interpret internal standard and target responses against that curve manually or using a spreadsheet. This technique can be used to spot check results, but with large sets of data, it is cumbersome. Similarly, when trying to confirm or certify large

groups of data, creating multiple PDF reports for each data file is completely out of context for normal lab processes.

17. In any of the above data processing cases, a trained chemist with an understanding of the analytical procedure must review and interpret data. Where automated processes fail to make correct interpretations of baselines, those baselines should be manually interpreted following normal data integration processes, or procedures established by the testing lab. These may include by are not limited to: peak area accepted to baseline penetration; adjustments to reduce impact of baseline noise; and automatic integrations have incorrectly identified fluctuations in a peak as baseline noise. In performing such review and data interpretation, different reviewers on different dates may find minor variation with the final results. This is acceptable when the variation is within the reproducibility of the testing method and precision of the results.

I declare under the penalty of perjury that the foregoing is true and correct.

This 31st day of July, 2022.

Patrick Steffes

Patrick Steffes, B.Sc, MCIC, P. Chem.

# APPENDIX A

# Agilent Fact Sheet

## At a Glance:

President and CEO: Mike McMullen
Headquarters: Santa Clara, California
Number of Employees: Approximately 17,000
NYSE: A

## Total Market Profile:

Global Leader in Life Sciences, Diagnostics and Applied Markets

- Market size[1]: $58 billion

## Key Platforms:

- Liquid and gas chromatography
- Mass spectrometry
- Spectroscopy
- Genomics and diagnostics
- Consumables, services and software

## Growth Drivers:

- Food and water quality
- Rising energy demands
- Healthy and aging population
- Emerging economies

## FY21 Financial Stats:

- Revenues: U.S. $6.3 billion + 15% core growth[3,4]
- Adjusted operating margin[2]: 25.5%[4] of revenue

## Revenue Mix by End Market




## Revenue by Geography




## Headcount by Geography




January 2022

1. Total Available Market. Market size per Company estimates.
2. FY20 Revenue
3. Core growth is reported growth adjusted for the effects of acquisitions and FX.
4. Presented on a non-GAAP basis, reconciliations to closest GAAP equivalent provided.



Agilent Case Study:

# A Conversation with Dr. A. Siva Lakshmi Devi of Laurus Labs

## Trace-Level Quantification of Mutagenic Nitrosamine Impurities

Dr. A. Siva Lakshmi Devi is the Assistant Vice President and Head of AD-Generics at Laurus Labs of Hyderabad, India. A pharmaceuticals industry professional for nearly 20 years, she has expertise in solid-state and impurity characterization, encompassing advanced analytical techniques such as LC/MS/MS, GC/MS/MS, NMR, and XRD.

Dr. Devi has been using an Agilent 6470 LC/TQ in her lab for more than 18 months to perform trace-level quantification of potential genotoxic impurities in APIs and formulation products, which are analyzed to ensure the quality and safety of pharmaceuticals. She recently spoke with Agilent about her experiences using the 6470 LC/TQ.



Dr. A. Siva Lakshmi Devi

Assistant Vice President and Head of AD-Generics
Laurus Labs, Hyderabad, India

### *Agilent:* Describe some of the analytical challenges faced by the pharma industry today, and what your lab has done to address these challenges.

***Dr. Devi:*** With increasing regulatory requirements, and to help ensure safe products, today's analytical labs have to deliver highly sensitive and reproducible results. Our major focus is to support quantitative LC/MS/MS method development for the analysis of N-nitrosamine impurities in various APIs and formulations at very low levels. To achieve this, I wanted to have a triple quadrupole mass spectrometer in our laboratory, which I felt was the instrument that best matched our analytical requirements.

Agilent
Trusted Answers

## *Agilent:* How have the Agilent team and the 6470 LC/TQ helped you achieve your goals?

***Dr. Devi:*** We approached the Agilent team to discuss instrumentation options and how the latest technological advantages of their triple quadrupole mass spectrometers addressed our needs. Agilent has developed quantitative workflows that enable highly sensitive quantification of N-nitrosamine in various challenging APIs and formulation products using their 6470 LC/TQ, which can deliver detection limits even lower than those specified by the regulatory requirements. We made the decision to purchase an Agilent 6470 LC/TQ, and the Agilent team supported us with successful installation of the instrument and in-depth familiarization with the software and hardware features – all the necessary handholding we needed to become familiar with the instrument and get up to speed with our analysis.

## *Agilent:* Has the 6470 LC/TQ met your expectations?

***Dr. Devi:*** I am happy with Agilent 6470 LC/TQ – the lowest LOD and LOQ levels are easily achievable, as baseline noise is minimal and stable.

In addition to sensitivity, it's important to have an instrument that is stable and requires minimal maintenance during daily operations, so that the downtime can be reduced. The 6470 in our lab has been running for more than a year and half, and we have successfully developed and transferred highly sensitive LC/MS/MS methods for N-nitrosamine and other genotoxic impurities. The solution includes a client-server based data management platform (OpenLab ECM) that provides technical controls to securely acquire, process, report, and store data in accordance with the data integrity and compliance guidelines of US FDA 21 CFR Part 11.

In addition, I am happy with the on-time application and service support provided by Agilent. They have always been there to help us to meet our project timelines.

**"Agilent has developed quantitative workflows that enable highly sensitive quantification of N-nitrosamine in various challenging APIs and formulation products using their 6470 LC/TQ, which can deliver detection limits even lower than those specified by the regulatory requirements."**

Dr. A. Siva Lakshmi Devi



**Figure 1.** Agilent 6470B triple quadrupole LC/MS.

See how an Agilent LC/MS/MS system can help further your drug discovery and development success.

Learn More

DE16460492

This information is subject to change without notice.

© Agilent Technologies, Inc. 2022
Published in the INDIA, April 25, 2022
5994-4933ENIN

Agilent
Trusted Answers



Agilent MassHunter Software

# YOUR FASTER ROUTE TO INSIGHT

The Measure of Confidence

Agilent Technologies

# MASS SPECTROMETRY AND THE DATA CHALLENGE

Mass spectrometry continues to provide more comprehensive data than we ever imagined possible, enabling us to detect and identify analytes orders of magnitude lower than just five years ago. With this abundance of data comes additional challenges related to fast interpretation to achieve actionable results.

### Scientists often struggle with:

- Large data sets that reduce throughput
- High training costs for multiple software platforms across the lab
- Manual review of the data—requiring significant time and introducing inconsistencies
- Dealing with the complexities of exporting and cross referencing data with other programs.

Agilent MassHunter software is designed to make your MS analyses faster, easier, and more productive. In addition to data acquisition and instrument control for your Agilent LC/MS, GC/MS, CE/MS, and ICP-MS, the software incorporates advanced data mining and processing tools. These let you rapidly and accurately extract all available information from the analytes in your samples—not just peaks and data points, but answers.

*"The software is very, very user-friendly. Step-by-step, I learned quite easily on my own. So many possibilities to give meaning to my data. And all of them are efficient and powerful, and help me to get some nice conclusions on the hypotheses I have made at the outset."*

**DR. LUIGI LUCINI,** LC/MS USER, INSTITUTE OF ENVIRONMENTAL AND AGRICULTURAL CHEMISTRY AND RESEARCH, CENTRE FOR PROTEOMICS AND NUTRIGENOMICS, UNIVERSITY CATTOLICA DEL SACRO CUORE

See MassHunter in action online. Experts demonstrate the capabilities of various MassHunter features at **www.agilent.com/chem/masshunter**





*"At the American games in Mexico, having an option like Compounds-at-a-Glance made it very easy to detect which compounds are positive. Also, having the capability to customize our reporting is very important because we are continuously adding new compounds to the methods and we need to incorporate them into the reporting template."*

**DR JOSEP MARCOS,** LC/MS USER THE HOSPITAL DEL MAR IN BARCELONA

*"I see software as a tool for me to get to my really exciting stuff, the biology. MassHunter is really good—it's developed over time and it's gotten better and better. It also interacts really well with some of the non-proprietary software we use. With MassHunter, we don't suffer the frustration of delayed results that we do with some other software packages."*

**DR. NICOLAS TAYLOR,** LC/MS USER, MOLECULAR ACCLIMATION LABORATORY, ARC CENTRE OF EXCELLENCE IN PLANT ENERGY BIOLOGY, UNIVERSITY OF WESTERN AUSTRALIA

## A SINGLE, CONSISTENT USER EXPERIENCE ACROSS ALL YOUR AGILENT MS PLATFORMS

One easy-to-learn software platform handles all your qualitative and quantitative analysis tasks. Because common data analysis tools are shared from one Agilent MS platform to the next, you will reduce training time, minimize operator errors—and significantly increase your lab's productivity.

### Comprehensive software for LC/MS, GC/MS, CE/MS, and ICP-MS workflows

MassHunter uses dedicated software modules for instrument-specific tasks including identification, characterization, quantitation, target analyte screening and confirmation, unknown identification, characterization of biomolecules, nanoparticles, elemental species, and protein and metabolite identification. This comprehensive suite of software programs creates seamless workflows for your application from sample submission to reporting. With hyphenated systems composed of multiple Agilent instruments such as LC- or GC-ICP-MS, MassHunter integrates the software components into a single tool for the specific task.

### Customizable to your workflow

Agilent MassHunter enables analyzing hundreds of thousands of compounds or thousands of samples per day. Powerful modules let you to integrate new features that support specific workflow solutions, such as BioConfirm for biopharmaceuticals, PCDLs for food, environmental, forensics, and pharmaceutical applications, DrugQuant for drug confirmation, and specific solutions for USEPA and USP methods. Mass Profiler Professional, Unknowns Analysis, and characterization and quantitation of nanomaterials also help you extract the maximum information from your samples.

*"One of the great things about MassHunter is that you can walk up to a triple quad to do acquisition, and it's the same software that you walk up to for the Q-TOF and even a GC/MS instrument. That really makes training a lot easier because we haven't got different software for every different instrument."*

**DR. NICOLAS TAYLOR**, LC/MS USER, MOLECULAR ACCLIMATION LABORATORY, ARC CENTRE OF EXCELLENCE IN PLANT ENERGY BIOLOGY, UNIVERSITY OF WESTERN AUSTRALIA

## SHORTEN THE PATH TO YOUR RESULTS WITH MASSHUNTER QUANTITATIVE ANALYSIS

### MassHunter quantitative tools support you with quick analysis and review

- Time-saving features such as batch-at-a-glance data review, compounds-at-a-glance, dynamically linked results, and customizable views
- Over 40 integrated quality test criteria, and a parameter-less integrator with built-in peak validation capability that lets you focus exclusively on problem peaks and minimize manual reintegration
- Simple, quick creation of quantitative methods with tools such as Concentration Setup Assistant
- Comprehensive features to support quantitation in compliance with US EPA and 21 CFR Part 11 with OpenLAB Enterprise Content Manager (ECM)
- Color-coded outlier detection complements flexible, spreadsheet-like organization of the data for predefined quality tests, drawing your attention to results that require closer inspection.
- Click a result and all associated peaks, spectra, and calibration data are immediately displayed. Additional pop-up information is available.

*"We work with QC analyses that involves tracking 40 parameters, looking at a sequence of 10 samples at a time... before, we had to go sample by sample, data file by data file to evaluate the sequence... Now, with MassHunter, we have created one customized overview screen that enables us to scroll parameter by parameter all the QCs for the full sequence very quickly."*

**DR. ARMAND VERBUEKEN**, GC/MS USER, BAYER, ANTWERP, BELGIUM ENVIRONMENTAL TESTING LAB

*"MassHunter Quantitative Analysis accelerates our time to results. Integrating historic compound-specific performance as set points for the immense number of flagging options in the software provides us a high level of quality control for our assays. The review-by-exception approach with Outliers is helping us to dramatically reduce the time we spend reviewing data without any concerns over loss of quality."*

**FREDERICK G. STRATHMANN, PHD, DABCC (CC, TC);** MEDICAL DIRECTOR OF TOXICOLOGY AND ASSOCIATE SCIENTIFIC DIRECTOR OF MASS SPECTROMETRY, ARUP LABORATORIES, ASSISTANT PROFESSOR, DEPARTMENT OF PATHOLOGY, UNIVERSITY OF UTAH

# QUALITATIVE—LC/MS, GC/MS—POWERFUL AND CUSTOMIZABLE

## No more missing information

The powerful tools of MassHunter Qualitative Analysis help you extract all the information from your samples. Advanced data mining and processing options, such as Molecular Feature Extractor and integrated deconvolution algorithms, let you rapidly and accurately find all detectable compounds and easily confirm targets or identify unknowns. MassHunter's unique, compound-centric data organization and navigation lets you easily compare complex MS data files, and review results quickly and efficiently.



MassHunter Qualitative Analysis has a compound-centric user interface that allows for quick review of chromatograms and spectra across data files.

# BRING NEW POWER TO YOUR LC/MS WORKFLOW

## MassHunter Walkup software makes LC/MS accessible to more scientists—for medicinal chemistry, drug discovery, chemistry, and biopharmaceutical labs

Agilent MassHunter Walkup software helps users of different skill levels to perform their own automated LC and LC/MS analyses. All that's required is to input some basic information, choose a method, and place samples as directed. Results show up in the submitter's email in-box automatically.

The software also enables administrators to tailor user access to instrument parameters, significantly reducing the possibility of operational errors that can lead to costly instrument down time. Automatic notifications can be delivered when there is an instrument error.

## Mass Profiler Professional lets you easily classify, compare, and analyze sample groups

Agilent Mass Profiler Professional's powerful analytical capabilities fully exploit the high information content of mass spectrometry data.



Agilent Mass Profiler Professional helps you easily detect differences in your data. Brain tumor subgroups were identified using 370 differential proteins with sample-to-sample correlation and Principal Component Analysis.

*"Using MassHunter Qualitative, we were able to develop personal data reference standards for selected defects in olive oil. This helps to ensure confident classification of olive oils, and resolve disputes when the sensory assessors conflict."*

**DR. LANFRANCO CONTE**, GC/MS USER, DEPT. OF FOOD SCIENCE, UNIVERSITY OF UDINE, ITALY

*"MassHunter Walkup makes our instruments 'easy to use and hard to break'. MassHunter's ease of use helps us bring complex assays done by experts to a Walkup method."*

**MUHAMMAD ASIF ALIMUDDIN**, OPEN ACCESS LAB ADMINISTRATOR, MAJOR PHARMACEUTICAL COMPANY



# FAST, INTEGRATED LIBRARY SEARCHES SUPPORT YOUR UNDERSTANDING

To enhance your productivity and more easily identify targeted and untargeted analytes, MassHunter Workstation can automatically search significant compounds against METLIN, the Fiehn Library, NIST, Spectrum Mill, and many other application-focused databases. Best-in-class algorithms, optimized for your MS platform, ensure the highest accuracy.

Market-focused MS and MS/MS libraries for pesticides in food safety and forensics/toxicology provide specific information for your application, for example:

- The Fiehn GC/MS library contains the most comprehensive GC/MS EI library of metabolite spectra
- The METLIN Library contains MS/MS spectra for high confidence identification of thousands of metabolites



# PERSONAL COMPOUND DATABASE AND LIBRARIES ENHANCE TARGETED SCREENING

The Agilent Personal Compound Database and Library (PCDL) is an integral part of our targeted screening workflows that use the All Ions MS/MS technique for LC and GC TOF and Q-TOF. Identification results from databases and libraries can easily be used in other MassHunter programs such as Pathway Architect for pathway analysis.



Agilent MassHunter Qualitative Analysis software supports peak finding of GC/MS data files, and compound identification via library matching.

### Agilent is the leader in identification!

Here's a list of the Agilent databases and PCDLs that are currently available. We continually work to develop new databases and enhance our existing databases.

- Pesticides PCDL
- Mycotoxins PCDL
- Veterinary drugs PCDL
- METLIN database



Agilent's Mycotoxins PCDL ensures fast, customized method development.

# MASSHUNTER EASES YOUR ICP-MS WORKFLOW

## ICP-MS MassHunter Workstation for comprehensive control and analysis

MassHunter software for ICP-MS includes complete instrument control, acquisition, and data analysis modules for stand-alone ICP-MS, as well as for hyphenated systems including HPLC and GC sample introduction. LabQC provides automatic flagging of outliers in quantitative analysis. Isotope ratio determination and time-resolved analysis are standard features, with optional modules that provide advanced functions such as real-time Intelligent QC, advanced chromatographic data analysis, and integration with Agilent OpenLAB Enterprise Content Manager.



Powerful qualitative and semi-quantitative ICP-MS data analysis. ICP-MS MassHunter Workstation provides comprehensive spectral processing tools for evaluating, comparing, and reporting information on uncalibrated analytes.

## MassHunter single nanoparticle application mode

The fully integrated Agilent nanoparticle application module incorporates the entire process of nanoparticle determination into ICP-MS MassHunter software. The method wizard guides you through the automated creation of new nanoparticle methods for Agilent 7900 ICP-MS and 8800 Triple Quadrupole ICP-MS, and supports data acquisition in both FFF-ICP-MS and single nanoparticle modes. With a few mouse clicks, a complete analytical method, including optimized acquisition parameters, reference material values, and data analysis parameters, is set up and ready to run. The familiar "Batch at a Glance" table summarizes reference material and sample results for an entire batch. Paper or electronic reports including all data and graphics are automatically generated.




Nanoparticle application module final batch results are reported in tabular and graphical formats. Tab through individual samples in the table and review individual graphical results with powerful optimization tools.





### OpenLAB—Agilent software gets you to the answers faster

MassHunter is part of Agilent's comprehensive, integrated OpenLAB software portfolio. From instrument control to enterprise content management, we recognize the critical role software plays in your lab's operation. We're working towards a single goal: to help you reduce the time, effort, and cost to get from raw data to final insight.

### Other MassHunter literature:

Qualitative add-on modules: MassHunter Profiler Professional (MPP): 5990-4164EN

Pathway Architect: 5991-1459EN

Mass Profiler: 5991-5511EN

Spectrum Mill: 5991-5250EN

MassHunter and Skyline Integration: 5991-5248EN

MassHunter Walkup: 5991-3836EN

MassHunter BioConfirm: 5991-3643EN

### Databases and PCDLs

METLIN: 5990-7854EN

Mycotoxins PCDL overview: 5991-5691EN

GC Q-TOF Pesticides PCDL Application Kit: 5991-5021EN

All Ions MS/MS: Targeting screening and quantitation using Agilent TOF and Q-TOF LC/MS (technical overview): 5991-2465EN

Learn more
**www.agilent.com/chem/masshunter**

Buy online
**www.agilent.com/chem/store**

Find an Agilent customer center in your country
**www.agilent.com/chem/contactus**

U.S. and Canada
**1-800-227-9770**
**agilent_inquiries@agilent.com**

Europe
**info_agilent@agilent.com**

Asia Pacific
**adinquiry_aplsca@agilent.com**

India
**lsca-india_marketing@agilent.com**

For Research Use Only. Not for use in diagnostic procedures.
Product specifications and descriptions in this document are subject to change without notice. For Research Use Only.
Not for use in diagnostic procedures.

© Agilent Technologies, Inc., 2015
Published in the USA, October 8, 2015
5991-5851EN

Agilent Technologies



Agilent Case Study: OpAns

# Why We Switched To Agilent

## CEO Standardizes on Employees' Instrument of Choice for Clinical Testing

**Ken Lewis, the founder and CEO of OpAns—a provider of optimized analytical solutions—noticed a pattern among the analysts in his lab soon after buying his first Agilent triple quadrupole mass spectrometer.**

"We found that people would let the other instruments sit idle, coming in on the weekend to run their samples on the Agilent instrumentation," Lewis says. "That was because they found it so much easier to use the Agilent software and the Agilent instrument over the other machines."

In fact, he noted that the Agilent triple quad was running pretty much all day, every day, while instruments from other vendors stood idle half the time.

"It was only when people couldn't get onto the Agilent instrument that they would use something else," Lewis says. "It was at that point that we started to standardize on Agilent equipment."

Based in Durham, North Carolina, Lewis started OpAns in 2004 as an analytical contract research organization serving the biotech industry. He added bioanalysis services compliant with good laboratory practice (GLP) in 2008, and expanded into clinical diagnostics in 2010.

The lab is staffed from 6 a.m. until 9 p.m., but machines continue to run samples overnight. Breakdowns, he notes, are extremely rare on the Agilent instruments.

**"We have worked with all the major mass spec instrument manufacturers, and have a long relationship with all of them," Lewis says. "What caused us to standardize on Agilent instrumentation is a combination of two things: ease of use and cost of operation."**

Lewis has always taken a holistic approach to costs. It's not just the purchase price of the instrument that interests him, but also the cost of maintaining it—and having access to factory-trained experts who can help when needed.



Ken Lewis, PhD

Founder and CEO
OpAns
Durham, North Carolina

Agilent
Trusted Answers

"All of that together figures into the total productivity of our Agilent instrumentation," he says. "Agilent instruments are robust. If you're putting a mass spec into clinical diagnostics, it has to be a production workhorse. That's what is needed. Agilent instruments are very will engineered."

Lewis also has high praise for Agilent's data acquisition and analysis software.

**"The advantage of MassHunter software is that it's intuitive and does not require detailed training to be productive," he says. "With MassHunter, you literally show someone one time, and when they do it by themselves the first time they may have a question or two, but that's about it."**

Lewis notes that, if you want to take advantage of everything MassHunter has to offer, then, yes, you will want additional training—and Agilent offers plenty of online and in-person instruction.

"MassHunter is quite powerful, particularly when you combine the scripting programs that enable you to automate steps within MassHunter." he says. "Using that process, we're able to do our full data analysis in MassHunter and come out with completely reviewed data that goes back into our informatics system for reporting to the physician. I think that's a unique capability of MassHunter: the ability to automate the review of assays with as many as 50 or 100 different analytes."

What's more, MassHunter software provides alerts that focus on exceptions. What that means to OpAns is simple: "No one has to be bored to death looking at thousands of chromatograms over and over such that you go blind and don't even realize what you're looking at anymore."

"We hired lots of people who had experience from large pharma, and they had experience on the other major platforms that have historically been popular in pharmaceutical clinical-trial support. So they came in and learned to use the Agilent software, and every one of them has preferred using MassHunter over what they were using before. I think that is a clear statement about the ease of use of MassHunter, and that's why I say that from an operator standpoint that MassHunter has made us more productive."

Learn about Agilent clinical LC/MS products at
**www.agilent.com/chem/K6460S**

For In Vitro Diagnostic Use

DE.5227199074

Information, descriptions and specifications in this publication are subject to change without notice.

© Agilent Technologies, Inc. 2020
Published in the USA, June 15, 2020
5994-1848EN

Agilent
Trusted Answers

AGILENT CASE STUDY: EMPOWERING RESEARCHERS

# COULD A DEADLY FORM OF ALGAE KILL CANCER?

## AGILENT INSTRUMENTS HELP SCIENTIST ISOLATE AND ANALYZE UNIQUE TOXIN



**Paul Zimba, PhD**
Professor of Life Sciences and
Director of the Center for Coastal Studies
Texas A&M University Corpus Christi
Corpus Christi, Texas

Over the course of his 40-year career, Paul Zimba has become something of a Renaissance researcher, developing skills in diverse fields, including taxonomy, physiology, and analytical chemistry—all in the service of protecting water quality and improving the health of both marine and fresh water ecosystems.

Perhaps the most exciting discovery he has made along the way (using Agilent instruments) is that a mysterious fish-killing algal toxin could be especially good at killing cancer cells.

The algae, *Euglena sanguinea*, was already well known; the toxin was new.

"We were alerted to this by a farm in North Carolina, where fish were dying off," says Zimba, who was working for the U.S. Department of Agriculture in Mississippi at the time. "I looked at the samples they forwarded and thought, 'This can't be a Euglena. Everybody knows that Euglenas are benign.' We put it in culture and sure enough it was killing things."

**Using Agilent single and triple quadrupole LC/MS systems, Zimba and his team were able to isolate toxins from these unialgal cultures, proving the presence of a toxin that was new to science.**

Following standard practice, they dosed a tissue culture with the compound and watched for bioactivity.

"Tissue cultures are typically composed of cancer cells, often taken from either humans or rats, because cancer cells are easy to grow," Zimba explains. "They basically will grow forever. They don't go through some of the problems you have with normal cells of aging and not growing well in media."

What Zimba observed surprised him.

"We were just looking for bioactivity, and from that we were able to suddenly notice that there was quite a gradient, if you will, with regard to attacks on the cancerous cells," he says. "So we did LD50 testing and saw that there was a dose dependent response of the tissue culture to the toxin."

**Zimba and his colleagues have described the toxin as an alkaloid similar in structure to fire ant venom. They note that the compound exhibits anticancer activity at low parts per million and parts per billion dosages.**

"Work we are continuing to do involves animal testing, and those results are looking very promising in terms of this compound having some great anticancer properties," Zimba says. "It's neat when you find a problem and are able to work all the way through it, and that's what I hope we will end up with. It would be nice to find a great use for a harmful algae."

Agilent Technologies

*"It's neat when you find a problem and are able to work all the way through it, and that's what I hope we will end up with. It would be nice to find a great use for a harmful algae."*

Zimba is now a professor of life sciences at Texas A&M University, Corpus Christi, where he also directs the Center for Coastal Studies. His home turf naturally includes Corpus Christi Bay on the Gulf of Mexico, but also the Nueces River that feeds into it.

His interests include harmful algae, algal toxins, aquatic ecosystems, wetlands, aquaculture, microalgal taxonomy and physiology, remote sensing, carbon fixation assessment, aquatic ecosystem stressors, and cyanobacteria.

"It's always fun when you have a number of diverse projects that are all moving forward. It keeps you motivated," he says. "In a number of cases, I have been in the right position to recognize a problem and suggest a solution that maybe I didn't yet know how to do but was then able to build that expertise."

**His lab includes a range of Agilent instruments, including gas and liquid chromatographs, time-of-flight and triple quadrupole mass spectrometers, and a mass-directed fractionation analyzer.**

Zimba notes that obtaining results that can be reproduced is vital in all areas of research—and he gets that by first using high-performance liquid chromatography to separate compounds and then confirming the results through mass spectrometry. The fractionation system is a huge help as well.

"One of the neat features with that is you, in effect, optimize things at the analytical level and you then just change out a column. When you tell the system to go to the larger size, everything is worked out for you in terms of being able to do separations on that larger scale," Zimba says. "That scale-up factor is a huge one. The old way was you calculated the size of the tubing and all that and then you hoped you were right. This gets you out of those kinds of issues. As a result, reproducibility goes way up."

Zimba's diverse skills and interests have enabled him to enjoy a range of successes, from developing a way to prevent sodium adduct formation (which makes certain compounds hard to quantify) to identifying a new genus and species of toxin-producing algae.

"I had never described a genus or a species before, so that involved a lot of learning in order to do all the genetics, biochemistry, and the morphological work required under the current classification system. There was a lot of characterization to provide the most complete description of this new genus and species, including profiles of lipid and fatty acid, of chlorophyll and carotenoids, as well as discerning which of the known 48 classes of cyanotoxins were being produced by the culture. The project included SEM and TEM microscopy, then comparing to all other known species genetically," Zimba says.

"It was an interesting task. I started off at a microscope and now 40 years later I'm still using the skills I learned back then, but of course complementing them with the analytical approaches that Agilent products offer, where we can provide more of an answer than we could years ago."

To learn more about how Agilent is striving to meet the complex needs of scientists and researchers around the world, visit **www.agilent.com/chem/academia**

For Research Use Only. Not for use in diagnostic procedures. Information, descriptions and specifications in this publication are subject to change without notice.

© Agilent Technologies, Inc. 2016

Published in USA, November 10, 2016
5991-7638EN

Agilent Technologies

# Acquisition for LC/MS

MassHunter acquisition software for LC/MS systems provides powerful instrument control and data acquisition. Instrument and method setup are easy and fast, with automated tuning for straightforward and reliable operation.

MassHunter Acquisition Software unleashes the power of your Agilent triple quadrupole, time-of-flight (TOF), and quadrupole time-of-flight (Q-TOF) LC/MS systems. With its intuitive design and easy-to-access instrument-specific features, it enables you to focus on sample analysis, not instrument setup.

PRODUCT DETAILS RELATED PRODUCTS PROMOTIONS



Dialog Box for Entering Audit Trail Reasons



| Part Number | Description | |
|---|---|---|
| + G3337AA | MassHunter WorkStation for LC/QQQ SW - Upgrade to latest version. | QTY |
| + G3338AA | MassHunter Workstation Offline Software - Upgrade to latest version. | QTY |
| + M5960AA | MassHunter Workstation for LC/TOF and LC/Q-TOF. | QTY |
| + M5961AA | MassHunter Workstation for LC/TOF and LC/Q-TOF - Upgrade to latest version. | QTY |
| + M5970AA | MassHunter Networked Workstation for LC/TOF and LC/QTOF. | QTY |
| + M5971AA | MassHunter Networked Workstation for LC/TOF and LC/QTOF - Upgrade to latest version. | QTY |
| + M6010AA | MassHunter Workstation Data Analysis Software for LC/MS. | QTY |
| + M6020AA | MassHunter Networked Workstation Data Analysis Software. | QTY |

1 - 8 of 8 results

REQUEST QUOTE

Product Details

Features

Literature

Tools

Videos

News

Related Products

Promotions

## Features

- MassHunter acquisition software is used across all Agilent 6200 Series LC/TOF, Ultivo, 6400 Series triple quadrupole and 6500 Series Q-TOF LC/MS systems, reducing the need for training
- Meeting data integrity standards - Provides the technical controls to securely acquire, process, report and store data in laboratories that must follow the compliance guidelines of FDA 21 CFR Part 11, EU Annex 11, GAMP5 as well as ISO/IEC 17025 and EPA's 40 CFR Part 160
- Importing worklists from spreadsheets saves time in method development and high-throughput screening
- Optimizer software for Ultivo and 6400 Series triple quadrupole LC/MS systems seamlessly optimizes ion source parameters and MRM transitions of compounds by infusion, flow injection, or chromatographic separation
- Study Manager for Ultivo and 6400 Series triple quadrupole LC/MS systems enables queue management of worklists submitted to the instrument
- Optional acquisition add-on software packages such as RapidFire and StreamSelect are supported
- Agilent's proprietary SWARM autotune quickly and easily tunes the instrument to its peak performance
- All Ions MS/MS Technique for targeted and untargeted screening on TOF and Q-TOF LC/MS
- Interactive MS/MS increases data quality of Q-TOF LC/MS by focusing on what matters
- Supports optional MassHunter WalkUp software for TOF and Q-TOF LC/MS systems which enables anyone to submit a sample to a HRAM instrument

Return to top

0 part selected.

## Literature

Clear All

COMPARE

### Key Literature

**Agilent MassHunter Software: Your Faster Route to Insight**

Agilent MassHunter software is designed to make your MS analyses faster, easier, and more productive.

Brochures / English / 15 Mar 2016 / 13.53 MB / PDF

**Make Your Mass Spectrometry More Powerful**

There's never been a better time to upgrade to the latest MassHunter software for GC/MS and LC/MS systems

Flyers / English / 11 May 2021 / 1.30 MB / PDF

**Auto MS/MS and Identification of Unknowns in Water Samples**

In this Technical Overview, we carefully explain and optimize all the parameters included in the data dependent acquisition mode of Agilent quadrupole time-of-flight instruments, Auto MS/MS.

Technical Overviews / English / 16 Oct 2018 / 1.17 MB / PDF

+ Application Notes

+ Technical Overviews

+ White Papers

Return to top

## Tools



**Data Integrity Resource Center**

Explore relevant information on data integrity

Return to top

## Videos



0 part selected.

Clear All

Agilent MassHunter Networked Workstation 11.0
00:02:19

Return to top

COMPARE

## News

Agilent Announces New Revolutionary Quadrupole Mass Spectrometers at ASMS 2022

The Agilent 6475 triple quadrupole LC/MS system, 5977C GC/MSD, plus the 7000E GC/TQ and the 7010C GC/TQ represent the latest revolution in Agilent's 50-plus year history in mass spectrometry. The new LC/TQ and GC/TQ products offer built-in instrument intelligence to simplify lab operations. The new GC/SQ and GC/TQ products with the HydroInert source help customers overcome key performance challenges with Hydrogen carrier gas.

06 Jun 2022

Agilent Announces New Oligonucleotide Analysis Software for Biopharma Research

Agilent MassHunter BioConfirm 12.0 software introduces enhancements to existing capabilities for protein analysis and adds support for ligonucleotide analysis. The addition of oligonucleotide support significantly extends the capabilities of MassHunter BioConfirm, adding critical functionality for assessing oligonucleotide purity and sequence confirmation – important analytical steps in the use of oligonucleotides for biotherapeutics and vaccine research and development.

05 Jun 2022

Return to top

## Related Products

0 part selected.

Clear All

COMPARE



[OpenLab CDS]

Combines productivity, usability, and data integrity for fast reliable results

*Category: Analytical Software Suite*





[WalkUp Software]

Intuitive sample submission and method selection software allows open access to LC and LC/MS

*Category: Mass Spectrometry Software*



[OpenLab ECM XT]

Secure cloud-ready data storage designed to meet current security standards

*Category: Analytical Software Suite*



[OpenLab Server]

Secure cloud-ready data storage for Agilent data systems designed to meet current security standards

*Category: Analytical Software Suite*

Return to top

## Promotions

Commercial end user customers who upgrade and purchase MassHunter Acquisition, Qualitative...

Not for profit customers (academic and government) who upgrade and purchase MassHunter Acquisition...

0 part selected.

Clear All

Customers currently own Agilent or competitor instruments can trade up to a new Agilent instrument and...

COMPARE

See All ›

Return to top

# EXHIBIT 53

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

*THIS DOCUMENT RELATES TO ALL CASES*

MDL NO. 2924
20-MD-2924

# REBUTTAL EXPERT REPORT

# RAMIN (RON) NAJAFI, Ph.D.

Date: April 12, 2022

________________________________

Ramin (Ron) Najafi, Ph.D.

**<u>In Re: Zantac (Ranitidine) Products Liability Litigation</u>**

**Rebuttal Report in Response to Dr. Namandjé N. Bumpus's Supplemental Report**

I submit the following as a rebuttal to the defense expert **Dr. Namandjé N. Bumpus's Supplemental Report** dated March 22, 2022. This rebuttal should be considered in conjunction with my expert report filed in January 2022. It should not be implied if I do not address a specific representation or argument made by Dr. Bumpus that I agree with the representation or argument. I reserve my right to supplement this rebuttal if defendants serve further reports or additional information is made available. As in my expert report, all of my opinions stated in this rebuttal are made with a reasonable degree of scientific certainty.

**Dr. Bumpus in her supplemental report comments that "newly produced documents consisted of laboratory notebooks, data related to the development of analytical methods, and tables of experimental data," and that a sizable portion of these materials included data and testing which were not provided (and sometimes not even mentioned) in Dr. Najafi's report." Then goes on to conclude "this selective reporting of methods and findings, which is inherently biased, is contrary to what is accepted and expected in the scientific community."**

I could not disagree with this conclusion more. Emery Pharma has been investigating ranitidine's degradation and potential for NDMA formation since November 2019—before the point in time when I was retained by the Plaintiffs. Hence, the defense experts reviewed Emery Pharma's material (data, reports, presentations, lab notebooks, citizen petition, etc.) spanning over 2 years of continued research and development. Over this 2-year time period, Emery Pharma's work went through many stages: First, making an initial observation of data being generated on GC/MS and recognizing that heat may initiate formation of NDMA in ranitidine; identification and evaluation of the issue of NDMA formation from ranitidine; generation of hypotheses; evaluations of different analytical modalities; conducting pilot experiments; establishment of preliminary methodology; performing additional trials to evaluate and finalize methods; validation of the methods; developing protocols for broad analysis around ranitidine API and drug product testing, SGF studies, NAP studies, stability assessment (climatic zones, stress tests, simulated user experience), assessment for the role of nitrite, DMA, KSCN, etc. in NDMA formation from ranitidine; and then defendants' ranitidine API and product testing and associated studies (stability, SGF, consumer experience etc.).

I strongly disagree with Dr. Bumpus's characterization that we engaged in 'selective reporting of methods and findings – as a matter of fact, it was quite the opposite. Beyond my Expert report, Defendants have been provided with extensive protocols, over 1.5 TB of data, laboratory notebooks, and other associated documents. There was no selective reporting of methods and findings.

**Dr. Bumpus in her supplemental report states "After a review of Emery's laboratory documents, it is clear that Emery's testing does not even come close to FDA's well-designed studies that showed no NDMA formation from ranitidine after ingestion, which I discussed**

**in my prior report. As I stated in my prior report, the totality of the evidence demonstrates that NDMA is not formed from ranitidine in vivo under clinically relevant conditions**."

Again, I strongly disagree with Dr. Bumpus's characterization – on the contrary, the work done by Emery Pharma followed generally accepted practices and standards, using methods and protocols that chemists and research laboratories routinely use to conduct research. Experiments were performed on instruments that underwent extensive qualification (IQ – installation qualification, OQ – operational qualification, PQ – performance qualification), with established protocols and methods that were validated and ensured fit-for-purpose. The scientists involved in the study were extensively trained, all holding advanced degrees in chemistry (mostly with Ph.Ds.).

All associated records, electronic data, etc. are stored in a computer system that requires individual user login. Documentation (e.g., certificates of analyses) related to chemicals and standards, etc. used for the study were retained. All standards were stored per manufacturer recommendations and with expiration dates. The number/identity of the products analyzed are well described in my report, as well as provided in the associated documentation (appendices, raw data, spreadsheets, lab notebooks, etc.).

**Dr. Bumpus mischaracterizes the deposition of Emery Pharma's representative (Anahita Najafi, Pharm.D.).**

Emery Pharma does not leave it up to the Analyst as to whether records should be maintained. There is a requirement at Emery Pharma for record keeping for all projects, but the Analyst can use their discretion as to how experimental data is recorded. For R&D projects, Emery Pharma does not offer a template of how notebook entries should be made. To that end, each Analyst/Scientist at Emery Pharma may have their unique approach to filling out their notebooks as it is used as a 'lab journal' in an R&D setting. In a research project such as this when there is a computer record maintained of all testing data, there is less reliance on the notebook to record the final LC-MS/MS data, as there are references in the notebook to the storage location of the complete data files.

**Dr. Bumpus comments that the documentation Emery has recently produced does not meet established scientific standards, and that the laboratory notebooks do not clarify the goals of the experiment or what hypothesis was being tested.**

As is clear from my report, the analysis Emery Pharma performed on Defendant's products had a single overarching hypothesis: to evaluate the extent, if any, of NDMA formation from ranitidine. Thus, reiterating this central hypothesis in every notebook page is superfluous and unnecessary. The goal of each experiment was generally clearly indicated on the top of each page, and/or in the "purpose" section of the protocols referenced in the notebook. So, it is not clear to me if Dr. Bumpus reviewed the notebooks or protocols properly.

**Dr. Bumpus states that "the analyst did not record any meaningful study designs aside from some cut-and-pasted sections of method descriptions."**

There is nothing wrong with 'cut-and-pasted sections of method descriptions' if the Analyst follows the steps. The study designs are well laid out in the associated testing protocols that have all been produced. The same have been indicated in the notebooks; again, reiterating the same designs that are included in a written protocol is superfluous and irrelevant. Below is an example taken from lab notebook 078-RC page 42. This page demonstrates the exact testing conditions for breakfast sausage and ham steak. The serving size is noted on the right-hand side and the protocol is referred to on the bottom. Within the protocol, PLEV-NB210812C, the purpose, instrument parameters, equipment, calibration/QC standards, and sample preparation are all detailed. The protocol describes the use of "food" which is defined on page 42 as breakfast sausage and ham steak.




**Dr. Bumpus states "There is no record of what steps were actually taken or any observations from the analysts about the samples, the testing, or the results."**

This statement directly contradicts her prior comment – experimental steps were clearly indicated, e.g., printed method descriptions. Observations were indicated, e.g., observations of 'pill exploding'. If in a specific experiment no observation was recorded, per established general understanding in the scientific community, no specific out-of-ordinary observations were made about the samples. Below is an image from 070-RC page 4 which demonstrates an observation of odor/discoloration from tablets after 168 hours at 60 °C/95% RH. Photographs were taken and added to the lab notebook. Additionally, there is another image added which shows no observation change in tablets after exposure to 50 cycles of "simulated car in sun". As noted above, no observations were recorded if no changes were observed.







Tablets show no observable differences from initial (left tablet) to after 50 cycles of exposure to "car in sun" simulated condition (right tablet). The pills "look" normal.

I have previously commented extensively on how LC-MS/MS results are too data-dense to record manually on notebooks. Instead, all LC-MS/MS data is stored and backed up electronically. Specialized LC-MS/MS software is used to open and analyze this data. Hence, it is not feasibly practicable for LC-MS/MS data to be captured on notebook pages. LC-MS/MS combine two separate technologies: HPLC for chromatographic separations and tandem Mass Spec (MS/MS) for detection. For standalone HPLC data (usually collected with UV-Vis detection), it is possible for scientists to print copies of the chromatograms and attach them to a notebook given that the data collected is much less dense. However, the Mass Spec detector adds significant complexity to the nature and size of the data, so much so, that even chromatograms from a single sequence (including calibration standards + QC samples + ~40 test samples) cannot be printed or exported as a PDF due to the sheer size of the file. Thus, they were provided to defendants on an external hard drive.

I am frankly quite surprised at these comments by Dr. Bumpus, as an expert in mass spectrometry, should be well aware of the challenges with manually recording LC-MS/MS data.

**Dr. Bumpus comments that “Data was put into printed slides and cut-and-pasted into the notebook.”**

Again, it is not clear what the problem is. The necessary data is entered as required, whether it is manually written by hand, or entered as part of a printout is irrelevant.

**Dr. Bumpus states “One notebook has entries dated months before the notebook was issued (which naturally leads to the question of whether the analysts were filling in notebook pages after the fact to give the appearance of record keeping).”**

As I have mentioned in my previous rebuttal report, the work was conducted as R&D. The ‘notebook issue’ date is the date when it is entered in Emery Pharma’s QA system; for R&D sometimes this is delayed because it is not cGMP work and not required. There is no bearing otherwise as to when the Scientists conducted the experiments. This can easily be cross-referenced to the raw LC-MS/MS data files produced to the Defendants, which are time-stamped from the instrument used.

**Dr. Bumpus in her supplemental report states: “In my prior report, I explained that the World Health Organization Nitrosation Assay Procedure (WHO NAP) test is not intended to represent physiological levels of nitrite. In Dr. Najafi’s report, he provided the results of one experiment where he conducted testing of ranitidine following the WHO NAP procedure. Based on the newly produced materials, however, it appears that Emery also conducted a second test *resembling* the WHO NAP procedure but utilizing lower levels of nitrite. The levels of nitrite (0.3 mM) used in the experiment are the same as GSK’s Tanner 1982 study. These data are notable for three reasons.**

**First, the records related to this experiment do not follow scientifically accepted laboratory standards and do not allow for proper replication or understanding of how the experiment was performed. For example, the notebook maintained for this experiment is just cut-and-pasted slides with scribbled text to the side. Unlike a true scientific notebook, there**

**is no articulation of the goal of the experiment, the testing that will occur, how it will occur, contemporaneous documentation of the steps, or any true data.**

**Second, the results of Dr. Najafi's re-test of Tanner 1982 exhibited much lower levels of NDMA formed in this experiment than the levels reported in Dr. Najafi's report. For instance, Emery reported NDMA formed at about 0.02% to 0.04% molar yield in the first hour (interday and intraday variability unknown). At four hours, Emery reported that NDMA formed at 0.09% to 0.10% molar yield (interday and intraday variability unknown). These are much lower values than those in the selected results noted by Dr. Najafi in his report (reporting NDMA formation up to 3.4% to 3.8% NDMA (interday and intraday variability unknown) at four hours). The data omitted by Dr. Najafi show 34 times less DMA formation than what he disclosed in his report.**

**Third, irrespective of the low yields of NDMA shown in the lab notebook, Dr. Najafi's Tanner re-test results are inconsistent with essentially all other studies that have tested this hypothesis. No other studies have ever observed NDMA formation from ranitidine when incubated at 0.3 mM of nitrite. As noted in Gao 2021, which collected published work by multiple researchers, NDMA does not form under these conditions. The main difference between the WHO NAP procedure and the SGF studies conducted and summarized by Gao 2021 is that the inert solution varies between the two experiments. Given that no NDMA formed under similar pH and nitrite conditions in any other experiment, Emery's Tanner 1982 re-test is inconsistent with the body of published scientific literature and thus its validity is questionable."**

It is not exactly clear what problem Dr. Bumpus has with printed material in notebooks – it is perfectly acceptable practice. So far as the particular example is concerned, the printed material clearly describes the experiment being conducted. The goal was to repeat GSK Tanner experimental conditions, again clearly stated in the notebook. The experimental steps, requirements, etc. were all noted in the associated protocols. 'True data' for LC-MS/MS cannot be simply manually recorded in notebooks. Further, 'contemporaneous documentation' is an oxymoronic statement – it is not possible to document (i.e., write) and run an experiment at the same time. In protocol-driven experiments, the protocols serve as the guide, all relevant details not included or specified in the protocol are then recorded.

I strongly disagree with Dr. Bumpus's assessment about the WHO NAP test. The WHO NAP test conditions are clearly laid out in The International Agency for Research on Cancer (IARC) monograph, Volume 24, September 1980. Though extensively covered in my report, for the uninitiated, the WHO NAP test offers a standardized platform for evaluating nitrosation potential for a drug in the human stomach, and not to mimic the exact concentrations, conditions, or timeline for endogenous formation of nitrosamines from a drug.

As mentioned by Dr. Bumpus, the lower nitrite was conducted as a repeat of the Tanner Study, and as such has no bearing to the WHO NAP test. Thus, the results are separate from the NAP discussion in my report.

The experimental set up between Tanner and Gao are completely different (volume, content, pH, timelines, material used, etc.) with the only common factor being the nitrite concentration at 0.3 mM which is just one condition amongst many explored in each study (Gao/Tanner). Our results actually mimic Tanner very well, as pointed out by another Defendant's expert. We have independently repeated experiments laid out in Gao as well and have seen similar results. There is no extensive 'body of published scientific literature' around ranitidine SGF studies, with the few direct published examples being Braunstein *et al*. and Gao *et al.*

**Dr. Bumpus reports:**

**IV. <u>INITIAL SGF STUDY</u>**

**In his expert report, Dr. Najafi states that various pH and nitrite concentrations were used during his SGF study. In his report, he noted that he tested various concentrations, but the newly produced documents show that he only reported the results form the experiments using the higher levels of nitrite (Table 1). Notably, the omitted results demonstrate that NDMA was *not* detected at physiologically relevant nitrite levels (0, 10, 50, 100 µM nitrite) at all pHs tested. Therefore, the data omitted by Dr. Najafi show no NDMA formation at physiological levels to 100 µM nitrite, which is consistent with the study conducted by the FDA (GAO 2021).**

| Selective Data Reporting by Dr. Najafi | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nitrite (µM) | | 0 | 1 | 10 | 50 | 100 | 300 | 750 | 1,000 | 5,000 | 10,000 | 25,000 | 50,000 |
| NDMA (ng/pill) | pH 1.2 | BLOD | BLOD | BLOD | BLOD | BLOD | 120 | 360 | 810 | 37260 | 71460 | 161820 | 265290 |
| | pH 1.5 | BLOD | BLOD | BLOD | BLOD | BLOD | 136.8 | 420 | 870 | 38820 | 68580 | 155010 | 259020 |
| | pH 2.0 | BLOD | BLOD | BLOD | BLOD | BLOD | 159 | 409.5 | 900 | 37050 | 68670 | 146370 | 279060 |
| | pH 2.5 | BLOD | BLOD | BLOD | BLOD | BLOD | 117 | 397 | 930 | 26280 | 47250 | 145170 | 277440 |
| | pH 3.0 | BLOD | BLOD | BLOD | BLOD | BLOD | 96 | 270 | 810 | 18360 | 38790 | 114750 | 237960 |
| | pH 3.5 | BLOD | BLOD | BLOD | BLOD | BLOD | 81 | 262.8 | 660 | 14460 | 38580 | 100770 | 200040 |
| | pH 4.5 | BLOD | BLOD | BLOD | BLOD | BLOD | 66 | 201 | 420 | 8730 | 27900 | 51060 | 98580 |
| | pH 5.5 | BLOD | BLOD | BLOD | BLOD | BLOD | 45 | 96 | 210 | 3150 | 14040 | 41850 | 71340 |

Legend: Data Unreported | Data Reported

***<u>Table 1:</u> The above graph illustrates that Dr. Najafi selectively omitted results when no NDMA was detected. Red cells represent NDMA measurements not reported in Dr. Najafi's expert report. Blue cells represent NDMA measurements reported in Dr. Najafi's expert report. BLOD: below limit of detection (i.e., no NDMA was detected). (data from Data-SGF_pH _nitritetesting.pdf)***

First, BLOD = below limit of detection. BLOD does not mean that no NDMA was formed, specifically, as initial SGF studies were conducted at ~1 L volumes, NDMA is significantly diluted, and the limit of detection was quite high at ~1250 ng / 150 mg ranitidine. The above table and resulting data were work product, part of our method development and unpublished. In this rebuttal, we are taking an opportunity to correct the units. The units shown above are ng/mL as

opposed to ng/pill. This may be the cause of confusion for Dr. Bumpus. For example, 45 ng/mL translated into 45,000 ng/pill.

Second, since these trial experiments, we have significantly updated conditions for SGF studies, benchmarked our conditions and results against Gao's data (using 50, 250 mL total solution) hence lowering the level of detection. So, it is possible to have 1 ng/mL of NDMA in the 100 uM concentration of nitrite and not be able to detect it. Example: 1 ng/mL translates into 1000 ng/pill, which is ~ 10 times higher than FDA daily intake limit.

Finally, if Dr. Bumpus cared to review my report properly, she would realize that I take strong exception to the suggestion that <100 mM nitrite is 'physiological' from ranitidine's intake perspective. Moreover, we experimentally, and quite unequivocally show that nitrite is NOT the only factor in food that influences NDMA formation from ranitidine.

**Dr. Bumpus in her supplemental report Section V states:**

**EMERY'S GAO RE-TEST**

**Emery performed several experiments intended to replicate the conditions used in the study performed by FDA scientists, Gao 2021, but Dr. Najafi omitted the results of those experiments from his report. For this testing, Emery incubated 150 mg ranitidine drug product at 0, 100, 1000, 5000, and 10000 µM nitrite for either 0, 1, 2, 3, and 4 hours or 0, 2, 3, 4, and 6 hours. Emery also tested at 2 reaction volumes for 50mL and 250 mL (meaning that the test-tube has either 50 mL or 250 mL of total solution, a factor which may affect how chemicals react).**

**The results of these experiments by Emery show increasing NDMA levels with increasing time and high (supra-physiologic) nitrite concentrations. The results, however, did not demonstrate an increase in NDMA at lower nitrite concentrations. Without knowing the interday and intraday variability and the replicate measurements, it is impossible to identify exactly when increases in NDMA could become meaningfully attributed to the experimental conditions; in any event, there is no clear effect until incubation with around 5000 and 10000 µM nitrite (above physiologic range) for long incubations times (generally 4 hours). The omitted data are significant because Dr. Najafi expressed doubt as to the validity of the Gao 2021 study, but his own results are generally consistent with the results he is attempting to discredit in so far as his results also demonstrate that no NDMA formation occurs until around 5000 and 10000 µM of nitrite are added to the SGF. Therefore, the data omitted by Dr. Najafi undermine his own opinions.**

This is yet another example of how Dr. Bumpus failed to review my report properly. I have extensively justified our use of nitrite levels in SGF and strongly disagree that the nitrite levels are 'supraphysiological'. The confusion arises when considering nitrite levels for healthy individuals under fasting/starved/empty stomach, irrelevant from the perspective of ranitidine used. There were no 'interday' or 'intraday' variability concerns with regard to NDMA quantitation as evident from the trove of raw data produced.

Our criticism of Gao was not based on faulty experimental data presented – as mentioned here, we were able to replicate Gao's results very well. Instead, my criticism of Gao stems from making massive blanket and incorrect statements about endogenous NDMA formation from ranitidine based on a simulated model that considered just one primary variable, i.e., the role of nitrite concentration in NDMA formation from ranitidine.

**Dr. Bumpus reported in Section VI:**

**SGF AT 2.5 PH STUDY**

**In his expert report, Dr. Najafi reported results from an SGF study at a steady pH of 2.5 but omitted results that cast doubt on the experimental methodology being used by his laboratory. In the experiment reported by Dr. Najafi, he concluded that NDMA formed even at 0 µM nitrite. Strangely, however, more NDMA formed at 0 µM versus at higher nitrite concentrations, a finding which is the opposite of what one might expect. The newly produced materials from Emery indicate that Emery then retested this and again found NDMA formation at 0 µM nitrite, but at much lower levels than the prior test. The reason this is important is that no other researchers (including scientists from the FDA) have found NDMA formation at 0 µM nitrite. In this case, Emery's replication of the same irregular finding does not weigh in favor of reliability, but rather actually suggests that Emery is causing NDMA formation from ranitidine through an experimental parameter other than the added nitrite. In fact, if one were testing the hypothesis that additional nitrite increases NDMA formation, typically findings at 0 µM nitrite would serve as a control. Here, to the contrary, Dr. Najafi draws conclusions from the irregular control results, when those same conclusions should caution that the experimental procedure is flawed and yields results inconsistent with those of every other researcher who has studied this issue.**

Dr. Bumpus mentions that the irregular findings we observed demonstrates an experimental flaw since we experienced inconsistent results from every other researcher who has studied this issue. To my knowledge, there has been only 2 other publications performing these studies. To say "every other researcher" is an extreme exaggeration by Dr. Bumpus meant to add doubt to the validity of our data. During the developmental phase of our experiments, we used Zantac purchased from eBay. These tablets had significantly higher amounts of starting NDMA than the other researchers Dr. Bumpus is referring to. It is entirely possible that with high existing amounts of NDMA other breakdown products and mechanisms may be contributing to the formation of more NDMA. FDA researchers used pills with very little NDMA. In fact, when we used pills with little NDMA we observed similar behaviors. To make a direct comparison of our two studies, without consideration of the initial starting NDMA levels is scientifically flawed. Understanding NDMA formation in the presence of initially high amounts of NDMA may be contributing to the differences we describe. To dismiss our finding, especially when repeat experiments with the same pills give rise to same result is short sighted, unscientific, and self-serving.

**In her supplemental report, Dr. Bumpus writes:**

## VII. SGF PLUS FOOD PRODUCTS STUDY

**In addition to conducting SGF studies in which ranitidine was incubated in SGF alone, Emery Pharma conducted SGF studies in which ranitidine was incubated with "cooked" meat products. The newly produced Emery materials cast doubt on the validity of this testing.**

**Dr. Najafi omitted a significant amount of test data from his report. Specifically, recently produced documents show that Emery conducted experiments with many more food products than just the four discussed by Dr. Najafi in his expert report.**

**In addition to the products clearly noted in the file names of the productions, there appears to also have been the intent to use "fully cooked" "boneless ham steak" with and without coffee. The results for the experiments with these two food products have not been produced or included in Dr. Najafi's report.**

Emery developed SGF testing over the course of two years before submitting the MDL expert report. Throughout development, the overall procedure went through multiple rounds of trials, edits, and updates. In some cases, changes were made to have conditions match with the published literature (e.g., publications from Braunstein, Gao, Florian, etc.) for comparison purposes. During these trials, many food products, potential variables (varying nitrite, nitrate, KSCN, pH, SGF components), extraction methodology, etc. were evaluated.

**Dr. Bumpus states "the newly produced Emery materials are inconsistent with the results reported in the expert report. For example, instead of the "one serving size" used according to Dr. Najafi, higher amounts of sausage (2 servings and 1.2 servings), bacon (2.2 servings), and hot dog (2 servings) are documented in the productions. It is therefore unclear exactly how much meat product, and in turn how much nitrite, was added in certain experiments."**

For any given experiment, many conditions/controls were set up – each individual condition/control used a single serving of meat, hence, to account for all of the controls/conditions (i.e., the full experiment) many servings of meat were processed upfront, and then distributed to make up 1 serving per condition. The serving size are all noted in the excel sheets and lab notebooks, just in different locations, all refer to a single serving size.

**Dr. Bumpus goes on to state: "Furthermore, there was an additional experiment with SGF plus bacon where bacon alone resulted in levels of NDMA above the LOD. The results for this additional bacon experiment are not accounted for in the results presented by Dr. Najafi. These are just a few examples of the many instances of cherry-picking of data that have occurred."**

I can only respond by stating that I believe Dr. Bumpus is confused here, and not accurately understanding the testing or data. We have conducted the bacon SGF study once and have reported those data in my expert report. We have included the raw data and excel files for those as well. Dr. Bumpus may be referring to a developmental excel file which contains GC-MS data for DMA not NDMA. There are figures within the excel file that show the measurement is for DMA. These analyses are also located on notebook 079-PP pages 26-28. All notable DMA analyses were

provided but are not relied on as those data were inconclusive. However, these analyses were not measuring NDMA, so Dr. Bumpus's assessment is incorrect.

**Dr. Bumpus goes on in her supplemental report to state: Additionally, even with the belated production materials, a significant amount of information is still missing which would be required to substantiate the validity of the tests. For example, there are no records of method validation, which is an absolute minimum when determining the validity of experimental parameters**.

This is another example that Dr. Bumpus did not review my report properly. All validation protocols and associated summary reports were provided with my report with supporting LC-MS/MS data.

**Dr. Bumpus states in her supplemental report "There is also still no mention of how Emery cooked the meats, which can significantly affect the results. It is well known and documented that frying and smoking meats results in elevated levels of NDMA (Li 2012)."**

Meats were purchased fully cooked and safe to be consumed as is and hence used in our study as is.

**Dr. Bumpus goes on to discuss the "Prague Salt" stating that "there is no way to ascertain whether Emery Pharma had added Prague Salt to the meat products during food preparation or cooking, which could have skewed NDMA levels upwards (including for the experiments discussed in Dr. Najafi's expert report)."**

On the contrary, there are perfectly legitimate avenues to ascertain what was done with the Prague salt by reviewing the provided protocols. Prague salt was evaluated independently as a component used for curing meat during the SGF development period. Prague salt was not mentioned elsewhere, because it was not used anywhere else.

# EXHIBIT 54

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | | |
|---|---|---|
| *In Re*: Valsartan, Losartan, and Irbesartan Products Liability Litigation | ) | **19-MD-2875 (RBK-SAK)** |
| | ) | ***DAUBERT* HEARING ORDER 1: REGARDING PARTIES' MOTIONS TO PRECLUDE TESTIMONY BY EXPERT WITNESSES** |
| *This document applies to all cases.* | ) | |

**KUGLER, District Judge:**

**THIS MATTER HAVING COME BEFORE** the Court upon the parties' motions *in limine* pursuant to Federal Rules of Evidence 702, 403, and 104 to preclude testimony of various experts, especially upon:

**Motions by all Defendants** to preclude the testimony of Plaintiffs' experts:

Stephen Hecht, Ph.D. (Doc. Nos. 1714, 1793, and 1854);

David Madigan, Ph.D. (Doc. Nos. 1715, 1797, and 1851);

Dipak Panigrahy, M.D. (Doc. Nos. 1716, 1794, and 1852);

Mahyar Etminan, Pharm.D., M.S. (Doc. Nos. 1717, 1795, and 1850);

Stephen Lagana, M.D. (Doc. Nos. 1718, 1792, and 1853); and

**Motions by all Plaintiffs** to preclude the testimony of Defendants' experts:

Lee-Jen Wei, Ph.D. (Doc. Nos. 1703, 1788, and 1859);

Janice K. Britt, Ph.D. (Doc. Nos. 1704, 1787, and 1857);

John M. Flack, M.D. (Doc Nos. 1706, 1791, and 1858);

Jon P. Fryzek, MPH, Ph.D. (Doc. Nos. 1713, 1786, and 1862);

**THE COURT HAVING SET FORTH PROCEDURE** for two *Daubert*[1] hearings, which:

Required those experts selected to testify at the *Daubert* hearings to submit sworn certifications as the accuracy of their opinions ["the Certifications"]; and

[1] Following *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S.Ct. 2786 (1993), in which the Supreme Court required federal district courts to make a "preliminary assessment" of the admissibility of expert testimony. *Id.* at 2796.

Authorized that the *Daubert* hearings would elicit only cross-examination testimony relating to only the opinions in the Certifications;

**THE COURT HAVING HELD** a first *Daubert* hearing on 2 March 2022 for the Cross-Examination of Plaintiffs' selected experts;

**THE COURT HAVING CONSIDERED** the parties' briefs, oppositions and replies in the above Motions, the submitted Certifications, and the cross-examination testimony elicited at the *Daubert* hearing on 2 March 2022; and

for the reasons expressed on the record at the 2 March 2022 *Daubert* hearing;

**IT IS HEREBY ORDERED** regarding the Motions to Preclude the Testimony of Plaintiffs' Experts**:**

As to the opinions of **Stephen Lagana**, M.D., Defendants' Motion to Preclude is **DENIED**;

As to the opinions of **Dipak Panigrahy**, M.D., which concern NDMA and all cancers as well as NDEA and pancreatic cancer, Defendant's Motion to Preclude is **DENIED**;

However, as to the opinions of **Dipak Panigrahy**, M.D., which concern NDEA and all other cancers, Defendant's Motion to Preclude is **GRANTED**;

As to the opinions of **Mahyar Etminan**, Pharm.D., M.S., which concern NDMA and all cancers as well as NDEA and pancreatic cancer, Defendant's Motion to Preclude is **DENIED**;

However, as to the opinions of **Mahyar Etminan**, Pharm.D., M.S., which concern NDEA and all other cancers, Defendant's Motion to Preclude is **GRANTED**;

As to the opinions of **Stephen Hecht**, Ph.D., Defendant's Motion to Preclude is **DENIED**;

As to the opinions of **David Madigan**, Ph.D., which concern NDMA and all cancers, Defendant's Motion to Preclude is **DENIED**;

However, as to the opinions of **David Madigan**, Ph.D., which concern NDEA and all cancers, Defendant's Motion to Preclude is **GRANTED**;

**AND**

**IT IS FURTHER ORDERED** regarding the Motions to Preclude the Testimony of Defendants' Experts**:**

As to the opinions of **John Flack**, M.D., Plaintiff's Motion to Preclude is **GRANTED**, except as to Dr. Flack's testimony regarding that those persons exhibiting hypertension ["hypertensives"] have a higher incidence of cancer, and that hypertensives who are obese have an even higher risk of cancer because of these underlying conditions;

As to the opinions of **Janice Britt**, Ph.D., Plaintiff's Motion to Preclude is **GRANTED**;

As to the opinions of **Jon Fryzek**, MPH, Ph.D., Plaintiff's Motion to Preclude is **DENIED**;

As to the opinions of **Lee-Jen Wei**, Ph.D., which concern NDMA and all cancers as well as NDEA and all cancers, Plaintiff's Motion to Preclude is **GRANTED;**

However, as to the opinions of **Lee-Jen Wei**, Ph.D., which concern only scientifically appropriate use of statistical techniques, Plaintiff's Motion to Preclude is **DENIED.**

Dated: 4 March 2022

s/ Robert B. Kugler
Honorable Robert B. Kugler
United States District Judge

# EXHIBIT 55

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924
JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

# Report of Bernard A. Olsen, Ph.D.

Date: March 7, 2022

Bernard A. Olsen, Ph.D.

# Table of Contents

**I. Background & Qualifications** .... 3
**II. Disclosures** .... 4
**III. Summary of Opinions** .... 4
**IV. Introduction** .... 5
**V. Scientific Principles** .... 6
**a. How Pharmaceuticals are Made** .... 6
**i. Manufacture of Active Pharmaceutical Ingredient ("API")** .... 6
**ii. Manufacture of Drug Product** .... 7
**iii. Packaging** .... 7
**b. Principles of Drug Stability** .... 7
**c. Methods to Assess Drug Stability** .... 7
**i. Select Features of a Stability Study** .... 8
**ii. Stability Testing** .... 10
**iii. Postmarket Surveillance Testing** .... 12
**d. Principles of Analytical Chemistry** .... 12
**e. Interpretation of Analytical Data** .... 15
**i. Pre-Requisite #1: Sound Record Keeping** .... 15
**ii. Pre-Requisite #2: Procedure Validation** .... 18
**iii. Pre-Requisite #3: Analytical Procedure and Sample Performance Verification** .... 20
**iv. Data Interpretation** .... 20
**f. Translating Real-World Conditions for Non-Scientists** .... 21
**VI. NDMA Findings in Medicinal Products** .... 22
**VII. Analysis of Plaintiffs' Expert Opinions** .... 25
**a. Emery Pharma's Citizen Petition, Omitted Data, and Subsequent Testing** .... 25
**b. Insufficient Pre-Requisites for Data Interpretation** .... 30
**i. Deficient Record Keeping** .... 30
**ii. Deficient Procedure Validation** .... 34
**iii. Deficient Analytical Procedure and Sample Method Performance** .... 37
**c. Emery's "Content Uniformity" Testing** .... 37
**d. Emery's "Baseline Testing"** .... 41

**e. Emery's Unsealed Versus Sealed/Unsealed Analysis** ..... 48
**f. Emery's "Stability" Studies** ..... 51
**g. Emery's "Consumer Experience Testing (Post Purchase)"** ..... 53
**i. Hot Car Study** ..... 54
**ii. Shower Study** ..... 59
**iii. Zone Studies** ..... 63
**iv. Summary of Consumer Experience Testing** ..... 64
**h. Emery's Refrigeration Study** ..... 65
**i. Emery's Study on Emery-Manufactured Tablets** ..... 66
**j. Emery's API Stability Study** ..... 68
**k. Conclusion** ..... 69
**VIII. Reference List** ..... 70

## I. Background & Qualifications

I am currently an independent pharmaceutical consultant in Wake Forest, North Carolina. I received my Ph.D. in analytical chemistry from the University of Wisconsin-Madison. I also have an undergraduate degree in chemistry from Nebraska Wesleyan University.

After receiving my doctorate, I worked in the pharmaceutical industry for twenty-nine years at Eli Lilly and Company, where I achieved the rank of Senior Research Fellow. At Eli Lilly, I held a variety of senior research positions in the areas of analytical and bioanalytical development and chemistry.

I have supported the development and/or manufacture of more than twenty-five marketed products. For over twenty years, on nearly a daily basis, I performed hands-on development and analysis using a variety of analytical techniques with an emphasis on chromatographic techniques. These analyses included determination of purity and impurities in drug substances, drug products, intermediates, and starting materials to generate development information and for quality control purposes. I personally conducted impurity investigations and advised others on how to investigate impurities in pharmaceuticals.

I have been involved in many activities within the scientific community. I am a member of the American Chemical Society (Analytical Division) and the American Association of Pharmaceutical Scientists (AAPS). In 2010, I was elected as a Fellow of the AAPS. For ten years, I served as an expert committee member for monograph development for the United States Pharmacopeia (USP). I was also elected to two 5-year terms as chair of a USP expert committee for monograph development. I am a reviewer for the Journal of Chromatography A and the Journal of Pharmaceutical and Biomedical Analysis. I am also on the Editorial Advisory Board of the Journal

of Pharmaceutical and Biomedical Analysis. From 2007 to 2010, I served as an adjunct professor in the Department of Industrial and Physical Pharmacy at Purdue University.

I have delivered over ninety external presentations, including many invited presentations at international venues, on topics related to analytical chemistry. I have also authored or co-authored fifty-five publications, including several invited papers and book chapters, and an edited book. Most of these publications have directly focused on topics and techniques in analytical chemistry as they relate to pharmaceutical analysis.

**II. Disclosures**

I am being compensated at my customary rate of $450 per hour for work in connection with this proceeding and $550 per hour for deposition and trial attendance. My compensation does not affect my opinion and my compensation is not contingent on the outcome in this matter. I have not provided any testimony in the past four years.

**III. Summary of Opinions**

For purposes of this report, I refer to ranitidine's degradation into N-nitrosodimethylamine (NDMA) as "exogenous formation" which is distinct from "endogenous formation" (what may occur in the human body either though interaction with nitrite or via metabolism). In forming my opinions, I have analyzed public literature related to the exogenous formation of NDMA. I have also reviewed documents produced by pharmaceutical manufacturers who are Defendants in this litigation, documents and reports produced by Plaintiffs' experts, and documents produced by non-party scientists. A full list of documents is also disclosed in Exhibit B.

I have been retained to provide opinions on behalf of the Defendants to analyze and comment on the scientific reliability of the opinions expressed in the reports of Plaintiffs' experts Ramin Najafi, Ph.D., Charles Davis, Ph.D., Andrew Salmon, M.A., D.Phil., C.Chem., M.R.S.C., Jennifer Le PharmD, MAS, BCPS-ID, FIDSA, FCCP, FCSHP, and Dipak Panigrahy, M.D. A summary of my opinions is below, and I hold all opinions stated in this report to a reasonable degree of scientific certainty:

- The report by Dr. Najafi lacks critical information which is necessary to evaluate whether the testing was completed according to a pre-specified protocol, how the studies were conducted, and whether appropriate controls were in place to ensure the reliability of the study results. Beyond the study design, the report by Dr. Najafi also lacks essential information that is necessary to evaluate whether the analytical methods used to quantify the NDMA in ranitidine were fully validated and reliable.
- Even if I assume Dr. Najafi's testing is valid, his "baseline" NDMA levels are highly elevated compared to baseline values reported by FDA, international regulatory bodies, peer-reviewed literature, and Emery's own prior testing. Dr. Najafi does not acknowledge most of these other sources of baseline data, but to the extent he does, he claims his testing is more representative of what a consumer might ingest. This conclusion is fundamentally flawed because Dr. Najafi


Contains Confidential Information – Subject to Protective Order

actually ignores results from ranitidine samples obtained from the market and instead claims that his samples (which were not obtained from the market) are more representative.

- Even if I assume Dr. Najafi's testing is valid, Dr. Najafi's stability testing has produced inconsistent and highly variable results which, in many instances, have no logical interpretation. Even though the data is too weak, inconsistent, and cannot be generalized, Dr. Najafi draws broad and unsupported conclusions regarding what his testing can purportedly demonstrate.
- Dr. Davis, a biostatistician, conducts unreliable statistical analyses of Dr. Najafi's data. Dr. Davis offers two types of analyses. First, he identifies factors associated with increases in baseline NDMA levels, but his analyses are based on a flawed dataset. Therefore, the statistical results cannot be generalized. Second, he calculates the average rate of NDMA formation under certain conditions. These analyses were based, in part, on observations between only two data-points and ignore the high levels of variability and inconsistent results which preclude any reliable conclusion.
- Although Dr. Najafi's data is highly variable and uncertain, Dr. Panigrahy and Dr. Salmon use the data to conduct crude extrapolations regarding the likely dose of NDMA that a ranitidine consumer would ingest. Their calculations further exacerbate the errors already contained in Dr. Najafi's dataset because they start with an unreliable dose.

I reserve the right to supplement my report with additional information if new documents or information are provided by Dr. Najafi or other Plaintiffs' experts. I also reserve the right to supplement my report with additional opinions related to other matters that may be at issue at later stages of these cases.

## IV. Introduction

The scientific methodology employed by Plaintiffs' experts is largely misused in ways that are not accepted or routine in the field of chemistry. When quality issues arise, such as discovery of an impurity, chemists often conduct investigations and refine processes to ensure quality going forward. Chemists can also assist in providing estimates of what impurity levels existed at the time the impurity was discovered. Chemists do not, however, typically conduct *post hoc* analyses for the purposes of estimating what level of impurities might have existed under hypothetical consumer circumstances many years ago. This would necessarily be mere speculation and prone to substantial error. Given the significant limitations and assumptions that would be required to quantify a reliable estimate of past exposure via chemical analysis, the scientific community generally defers to medical and epidemiological professionals to assess risk by looking at human outcomes data.

Nevertheless, given the unique context of this situation, I apply well-established methodology in the field of chemistry to comment on the reliability of Plaintiffs' expert witness reports. Scientific standards in chemistry for pharmaceutical analysis and drug stability are greatly influenced by regulatory agency guidelines and organizations that set (or recommend) standard practices in the

pharmaceutical industry. Because these organizations are referenced throughout the report as authoritative on the scientific discipline, I briefly describe them here:

- **United States Pharmacopeia (USP):** The United States Pharmacopeia (USP) is an independent, non-profit organization that sets legally binding public quality standards for drugs marketed in the United States and publishes "general chapters" which provide guidance on best practices in analytical testing and data interpretation related to pharmaceutical analysis.
- **United States Food & Drug Administration (FDA):** FDA is a federal agency in charge of regulating many aspects of the pharmaceutical industry. FDA both establishes regulations and disseminates non-binding "guidance" documents which heavily influence the fields of chemistry and drug stability.
- **European Medicines Agency (EMA):** EMA is an agency of the European Union that operates similar to FDA. In addition to regulating aspects of drug development and marketing, the EMA publishes guidance documents that establish best practices in the fields of chemistry and drug stability.
- **International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH):** ICH is an organization consisting of various stakeholders, such as regulatory authorities and the pharmaceutical industry, to formulate guidelines for harmonized (i.e., consistent) regulatory requirements across different regions in the world. FDA and EMA both participate in development of ICH guidelines.

## V. Scientific Principles

### a. How Pharmaceuticals are Made

#### i. Manufacture of Active Pharmaceutical Ingredient ("API")

Most drugs, including ranitidine, are man-made compounds that are created when pharmaceutical manufacturers follow a recipe that uses raw starting materials to synthesize the base Active Pharmaceutical Ingredient ("API" or "drug substance").

Once an API is synthesized, a pharmaceutical manufacturer usually crystallizes the API to generate it in a solid powdered form. Crystallization refers to a process where many molecules organize into a "crystal form," meaning there is a repetitive pattern in how the molecules are arranged respective to each other. The shape of the API crystals is referred to as "crystal morphology." The pattern and organization of molecules within the crystal allow molecules to align so that the stability of the API is often increased when pharmaceuticals are crystallized.

As for ranitidine, the API is called "ranitidine hydrochloride" (ranitidine HCl).

### ii. Manufacture of Drug Product

Before a patient receives the medication, the pharmaceutical manufacturer will manufacture the API into its final dosage form (for instance, a tablet). This process typically involves mixing the API with excipients (inactive ingredients), sieving, compressing, coating, etc. In addition to crystallization, the formulation process can increase the stability of the drug product.

As for ranitidine, ranitidine hydrochloride was formulated into Zantac-brand tablets for over-the-counter (OTC) and prescription use. For prescription use, Zantac was also available in other formulations, such as IV and liquid formulations.

### iii. Packaging

Product packaging is any part of the manufacturing process when the drug is packaged into containers for shipment, storage, and/or patient use. Product packaging can include both primary and secondary packaging. For instance, a pill bottle (the primary packaging), may be further packaged into a box (a secondary packaging). The product packaging can inhibit or delay degradation (i.e., changes to the product). This is because product packaging can significantly reduce the effects of humidity, light, and atmospheric oxygen.

As for Zantac, the specific product packaging varied depending on the formulation. For instance, for OTC Zantac, there were various packages used including bottles, blisters, and individual pouches. Before being packaged in its final packaging, Zantac could be temporarily packaged into "bulk" packaging, which is not sold to consumers.

## b. Principles of Drug Stability

Drug stability is a product attribute concerned with the manner in which chemicals in a drug chemically change ("degrade") over time. In addition to chemical changes, drug stability is also concerned with physical changes, such as when solids deliquesce (liquify) into liquids. Drug stability is used to ensure a drug's efficacy (i.e., whether the API is present in sufficient quantity to exert its pharmacological effect). If the chemicals in a drug also degrade into toxic or potentially unsafe compounds, drug stability can also help ensure a drug's safety.

It is important to not lose sight that <u>all</u> drugs degrade over time. As such once a drug is made, the next questions are *under what conditions* and *at what rate* does the drug product degrade?

## c. Methods to Assess Drug Stability

Drug manufacturers are required to test drug products to determine their stability, in order to – among other things – establish the expiration date and recommended storage conditions. There are a variety of studies or tests which may be conducted and interpreted to generate "stability indicating data". In the following section, I describe select features of stability studies that are relevant to my opinion in this case. After that, I describe several types of testing that can be used to assess drug stability, but this list is not intended to be exhaustive.


Contains Confidential Information – Subject to Protective Order

**i. Select Features of a Stability Study**

The following features are derived from FDA's Guidance, *Q1A(R2) Stability Testing of New Drug Substances and Products*, and the United States Pharmacopeia General Chapters <1010> Analytical Data – Interpretation and Treatment. These represent important criteria which can alter the results of a stability study.

**1. Storage Conditions**

An investigator should consider whether the storage conditions (such as temperature, humidity, light, etc.) used in a study are representative of real-world conditions. Storage conditions should be justified based on the purpose of the test. Results of tests using high heat and humidity conditions may not be representative of what occurs under realistic storage conditions, and "[i]nvestigators are often cautioned against extrapolating too far between stress/accelerated and normal conditions." *(B. Olsen et al., "Rapid stress stability studies for evaluation of manufacturing changes, materials from multiple sources, and stability-indicating methods," in Pharmaceutical Stress Testing, (S. Baertschi et al., Eds., 2011, 2nd Ed.) p. 461*). The definitions of "stress" and "accelerated" conditions are given below.

**2. Container Closure System**

An investigator should also consider whether the drug was within a proper "container closure system" (i.e., the product's packaging) when assessing whether the resulting data is representative of real-world conditions.

To be representative, the test should occur in "the same container-closure system as that in which the drug product is marketed." (*FDA, Expiration Dating and Stability Testing for Human Drug Products, Nov. 11, 2014*). If drugs are placed into different containers for testing, this can affect the potential stability of the product which would otherwise not occur in the drug's actual packaging. FDA recognizes that "the event of placing the dosage unit into a different storage unit may and often does affect the product's shelf life." Simply stating that the container is of the same or similar material is insufficient because there may still be differences in the permeability of oxygen and water (humidity), especially when different closures or lids are used.

Another major issue related to the container closure system is the amount of head-space (amount of atmosphere) in the container. If a stability study is performed with significantly more headspace than would exist in actual packaging, this can alter the drug product's stability. If someone conducts a long-term stability study with significantly more head-space in the bottle than normal for the duration of the study, the results may have limited relevance.




*Fig. 1, Having more headspace allows more atmosphere to react with the drug. As consumers ingest pills, the headspace will gradually increase, but when stability studies are conducted with significant headspace during the full course of the study, this needs to be taken into account when considering the relevance of results.*

**3. Selection of Samples**

Because specific quality attributes may vary from tablet-to-tablet or batch-to-batch, an investigator should consider the number of representative samples to support any conclusion derived from stability-indicating data.

Usually, many tablets (e.g., 10-30) are needed for a single timepoint in a stability study when using composite sampling. Composite sampling uses multiple tablets to prepare a single "composite" sample for analysis. Composite sampling is done to reduce the uncertainty in analysis caused by variation from tablet-to-tablet if only a single tablet were to be analyzed.

In addition to the number of tablets, the correct number of *batches* to test can vary depending on what is being tested and whether the results need to be generalized. For instance, to support a New Drug Application ("NDA"), FDA requires at least three batches (but many tablets) of drug product and where possible, each batch should have been made from different batches of API. The tests "should be performed on each individual strength and container size of the drug product" unless the investigator uses a bracketing or matrixing approach.[1]

More relevant here, the United States Pharmacopeia notes that when testing a hypothesis, one should assess whether the sample size is sufficiently large to draw an inference from the data prior to starting the experiment. *(USP General Chapter <1010>)*. This would affect both the number of tablets and the number of batches. Having a sufficient sample size is important to reduce the chance of potential error. Likewise, when appropriate, the selection of tablets and batches should be based on a pre-specified protocol to ensure that sample selection is not biased.

[1] Pharmaceutical manufacturers do not need to study each individual strength and container size when bracketing or matrixing is used. Bracketing allows testing only "the extremes of certain design factors (e.g., strength, container size and/or fill)" which "assumes that the stability of any intermediate levels is represented by the stability of the extremes tested." (EMA *Note for Guidance on Bracketing and Matrixing Designs for Stability Testing of Drug Substances and Drug Products*). Likewise, matrixing allows that, at intermediate timepoints, only a subset of samples would be tested, which "assumes that the stability of each subset of samples tested represents the stability of all samples at a given time point." (EMA). These approaches provide suitable information and are more efficient in terms of resources required. FDA, *Q1A(R2) Stability Testing of New Drug Substances and Products*, Guidance for Industry (Nov. 2003).

**ii. Stability Testing**

A "stability test" is an umbrella term used to describe various forms of testing which answer different questions related to a drug's stability. FDA defines: "The purpose of stability testing is to provide evidence of how the quality of a drug substance or drug product varies with time under the influence of a variety of environmental factors such as temperature, humidity, and light, and to establish a re-test period for the drug substance or a shelf life for the drug product and recommended storage conditions." *(FDA, Q1A(R2) Stability Testing of New Drug Substances and Products, Guidance for Industry, Nov. 2003).*

Certain types of stability studies are required by FDA, in which case FDA dictates the parameters of those studies. In the absence of an FDA directive, pharmaceutical scientists must justify the study design. For purposes of this report, I describe four basic study designs: (1) Stress testing; (2) Accelerated stability testing; (3) Long-term testing; and (4) In-use stability testing.

**1. Stress Testing**

The purpose of stress testing is to intentionally degrade the drug as a means of understanding the conditions that cause the drug to degrade. The testing can also be useful in identifying major degradation products (degradation products that form in larger proportion than minor impurities). FDA's definition of stress testing varies slightly depending on whether the testing is conducted on a drug substance or drug products. FDA defines stress testing for drug substance as "Studies undertaken to elucidate the intrinsic stability of the drug substance. Such testing is part of the development strategy and is normally carried out under more severe conditions than those used for accelerated testing."

The definition of stress testing for drug product is "Studies undertaken to assess the effect of severe conditions on the drug product. Such studies include photostability testing (see ICH Q1B) and specific testing of certain products (e.g., metered dose inhalers, creams, emulsions, refrigerated aqueous liquid products)." *(FDA, Q1A(R2))*.

Fundamentally, stress testing will expose the drug product to severe storage conditions (usually at or above 50°C and 75% relative humidity and in solution) for short periods of time. Since degradation is intentional, stress testing is usually not conducted in a container closure system.[2] The selection of batches is not set by FDA guidance, but should be justified based on the intent of the experiment. By design, stress testing grossly exaggerates the degradants in a pill beyond the levels that a consumer would ingest.

[2] FDA notes that "Any available studies carried out on the drug product outside its immediate container or in other packaging materials can form a useful part of the stress testing of the dosage form or can be considered as supporting information, respectively." Importantly, this is only supporting information for drug approval and cannot be used to calculate a product's expiry date.


Contains Confidential Information – Subject to Protective Order

**2. Accelerated Stability Testing**

The purpose of accelerated stability testing is to quickly generate stability data under more severe conditions under the assumption that, if the product meets its quality specifications under more severe conditions, it will also meet them under less severe conditions for a longer period of time. FDA defines accelerated stability testing as "Studies designed to increase the rate of chemical degradation or physical change of a drug substance or drug product by using exaggerated storage conditions as part of the formal stability studies." (*FDA, Q1A(R2)).* Essentially, accelerated stability testing exposes a product to elevated storage conditions, but not as elevated as stress testing. For example, if a drug product is meant to be stored at room temperature and ambient humidity (25°C, 60% RH), the accelerated testing condition would be 40°C, 75% RH for 6 months. *(FDA, Q1A(R2)).* Also, unlike stress testing, accelerated stability testing should be conducted in the proper container closure system and the FDA's guidelines regarding selection of batches must be followed.

FDA states that "Data from these studies, in addition to long-term stability studies, can be used to assess longer term chemical effects at nonaccelerated conditions and to evaluate the effect of short-term excursions outside the label storage conditions such as might occur during shipping." *(FDA, Q1A(R2)).* To be clear, this does not mean that the degradation results reported during accelerated testing are equivalent to the results that might be obtained if products undergo a short excursion from the products' intended storage conditions. Rather, since accelerated testing exposes the product to an elevated condition for six months, the testing can justify a product's stability under storage excursions which are usually shorter than six-months. By design, accelerated stability testing will likely exaggerate the degradants in a pill beyond the levels that a consumer would ingest. FDA also notes that "Results from accelerated testing studies are not always predictive of physical changes" because products may, for instance, change physical form under accelerated conditions which may not occur under normal conditions. *(FDA, Q1A(R2)).*

**3. Long Term Testing**

The purpose of long-term testing is to assess whether a product stays within its specifications throughout its shelf life. FDA defines long-term testing as "Stability studies under the recommended storage condition for the re-test period or shelf life proposed (or approved) for labeling." *(FDA, Q1A(R2)).* In other words, long term testing uses intended storage conditions for the product without intentionally exposing it to high temperature or humidity. The testing is also conducted in the product's container closure system and the process for the selection of batches is mandated by FDA. Long-term testing is used to demonstrate that the drug product will meet quality expectations for the shelf-life of the product.

**4. In-Use Stability Testing**

The purpose of in-use stability testing is to assess a product's stability during use. In use stability testing is not a routine test and is usually limited to pharmaceutical formulations which are

prepared in a hospital or pharmacy for special administration to a patient.[3] The goal of these studies is to give health-care providers information about the stability of products after they are prepared for administration. Except under special circumstances, in-use stability is not generally required for solid oral dosage form products, but FDA could request such data should the need arise. Although in-use studies are intended to mimic how healthcare providers or consumers handle drugs, they may often make overly conservative assumptions that exaggerate the conditions that would actually occur. For example, although most consumers would be able to remove a pill and seal the bottle cap back on within a matter of seconds, an in-use study may specify several minutes to remove a single pill and reseal the bottle. In-use stability studies should be performed in the product's container closure system and the number of batches should be appropriately justified. The specific design and parameters of the in-use stability study will determine whether the samples from the study are representative of what a consumer would ingest.

In-use studies would not be relevant to blister or individually packaged products since the products should be consumed shortly after the consumer alters the original packaging around the specific tablet.

**iii. Postmarket Surveillance Testing**

Postmarket surveillance testing is a type of *ad hoc* testing which assesses the quality of drugs after they have been manufactured and released to the market.[4] Postmarket surveillance testing can include testing of drugs already on the market (i.e., taken from the shelves) as well as products sent directly from manufacturers or other entities in the supply-chain. Postmarket surveillance testing can be useful to assess whether the results of stability testing are representative of what occurs under real-world conditions. This is especially true because for products actually obtained from the market, the storage conditions, container closure system, and sample selection are *de facto* representative of real-world conditions.

**d. Principles of Analytical Chemistry**

The validity of all stability-indicating data is contingent on having used proper analytical methodology. Analytical chemistry is a discipline concerned with developing methods to qualitatively and quantitatively evaluate chemical substances. It answers questions such as these for materials of interest: "What chemicals are present?" and "How much of a chemical is there?" In addition to these questions, there are threshold issues such as "Is this method suitable for measuring this compound?" and "What amount of error is present in results using this analytical method?" While

[3] For instance, ICH Q1A(R2) states: "Stability testing of the drug product after constitution or dilution, if applicable, should be conducted to provide information for the labeling on the preparation, storage condition, and in-use period of the constituted or diluted product."

[4] FDA uses "Drug Quality Sampling and Testing Programs", which "includes testing selected finished drug products and the active ingredients used to make these products after they are on the market." *(FDA, Drug Quality Sampling and Testing Programs, Feb. 3, 2020, https://www.fda.gov/drugs/science-and-research-drugs/drug-quality-sampling-and-testing-programs).*

the field of analytical chemistry includes many methods of analysis, this section details the principles of analytical chemistry and select testing methods which are relevant to the current litigation.

A pharmaceutical scientist will design and evaluate whether an analytical method is suitable for a particular purpose. While the process of developing and evaluating analytical methods is complex, I provide a high-level overview of the most central analytical method used for analysis of NDMA in ranitidine: chromatography.

Chromatography is an analytical technique used to separate a sample into its component parts. For instance, if a sample contains compounds A and B, the goal of chromatography is to separate compound A from compound B so that each compound can be measured separately. Once the compounds are separated, they can be measured via a detector and the detector signal can be plotted on a graph called a "chromatogram." The different compounds in the sample will elute (exit) at different times, appearing as a series of "peaks" on the chromatogram. The size of the peak is generally proportional to the amount of compound detected. By comparing the sizes of peaks to a known standard of a compound, one can then calculate the amount of that compound present in the sample. The graph below shows an example of a chromatogram where the compound A (blue) and compound B (yellow) are sufficiently separated:




*Fig. 2, Proper separation of compound is a necessary to allow an investigator to accurately quantify the exact amount of Compounds A and B, subject to additional requirements. Detector response is on the y-axis and time is on the x-axis (not shown).*

If compounds are not separated during testing, this can potentially cause "interference" which will affect the reliability of the measurement. In other words, portions of the peaks overlap and therefore complicate accurate quantification because it will be difficult to discern whether the overlapping region is associated with compound A or compound B. A demonstration of this phenomenon is below:




*Fig. 3, A visual depiction of how the interference of Compound A and Compound B make it difficult to attribute which portion of the overlapping area is associated with Compound A versus Compound B.*

There is also the possibility that one peak is entirely overlapped with the other, i.e., the compounds are not properly separated. In the below example, if one tries to quantify Compound A, they will inadvertently include the interference caused by Compound B, which leads to an over-estimation of the amount of Compound A present. To fully illustrate this, I also provide an example, such that the total amount of substance is all attributed to one compound, while the second compound present is not identified. Below is how a chromatogram would appear when Compounds A and B are not separated, leading to inaccurate results.




*Fig. 4, A visual depiction of the interference of Compound B with Compound A.*



*Fig. 5, A visual depiction of how the chromatogram would actually appear to illustrate that interference is not obvious.*

There are many different modes of chromatography, such as liquid chromatography and gas chromatography, described below:

- **Liquid Chromatography (LC):** In liquid chromatography, a liquid facilitates the separation of compounds. Because a liquid is used, the experiment normally occurs at lower temperatures.
- **Gas Chromatography (GC):** In gas chromatography, a gas facilitates the separation of compounds. Because most molecules must have a lot of thermal energy to be in gaseous form, heat is generally needed to conduct the experiment. An investigator must be careful that the heat used will not cause a change of the sample and compromise the reliability of the experiment.


Contains Confidential Information – Subject to Protective Order

Even within liquid chromatography, the specific methods can depend on the specific parameters ("mode") used. Importantly, the mode can produce drastically different degrees of separations for the same sample compounds. The mode used for any analysis needs to be evaluated through proper validation (as described below) to ensure reliability.

Lastly, chromatography equipment is attached to a detector which is the equipment used to measure the material once separation occurs. The type of detector used in most modern work related to NDMA in ranitidine is called a "Mass Spectrometer" (MS). This is what puts the "MS" is LC-MS or GC-MS, or other similar acronyms. Important here, the sensitivity of analytical chemistry equipment has improved markedly over the last 20-30 years. At present, a mass spectrometer is very sensitive, allowing for the detection of trace impurities.

**e. Interpretation of Analytical Data**

Data from a scientific investigative study, and any assumptions or uncertainties, must be carefully evaluated when making conclusions about the results of the study. As recognized by the United States Pharmacopeia: "A measurement process like a study is designed to reduce uncertainty in order to make a more informed decision. No measurement or study result can provide exact knowledge. Proper interpretation and treatment of analytical data requires an understanding of the inherent sources of uncertainty in measurement outcomes and their impact on the information they provide." *(USP General Chapter <1010>, Appendix 4).*

There are certain prerequisite laboratory practices and principles that are closely tied to the analysis, interpretation, and validity of analytical data. For instance, three fundamental practices are "Sound Record Keeping," "Procedure Validation," and "Analytical Procedure and Sample Performance Verification." I will discuss each prerequisite in turn.

**i. Pre-Requisite #1: Sound Record Keeping**

Sound record keeping is an essential prerequisite for any reliable analysis. It is so fundamental that multiple organizations reiterate basic principles of sound record keeping, and access to analytical records, such as:

- **United States Pharmacopeia (USP):** In terms of record keeping, the USP notes that investigators should use the following record keeping practice: "Laboratory records are maintained with sufficient detail, so that other equally qualified analysts can reconstruct the experimental conditions and review the results obtained. When collecting data, the data should be obtained with more decimal places than the specification or study acceptance criterion requires. Rounding of results from uses of analytical data should occur only after final calculations are completed as per the *General Notices*. Study protocols and data analyses should be adequately documented so that a reviewer can understand the bases of the study design and the pathway to study decisions." *(USP General Chapter <1010>).*
- **World Health Organization (WHO):** "To achieve robust decisions, the supporting data set needs to be reliable and complete" and "Data should be reviewed and, where appropriate,

evaluated statistically after completion of the process to determine whether outcomes are consistent and compliant with established standards. The evaluation should take into consideration all data, including atypical, suspect or rejected data, together with the reported data. This includes a review of the original paper and electronic records." (*WHO Annex 5, Guidance on good data and record management practices (p. 174, 187)).*[5]

- **FDA:** Through the articulation of Current Good Manufacturing Practices (cGMP), FDA has set a standard for record keeping in laboratory testing of pharmaceuticals. Formal compliance with cGMP is generally only required for products intended for release on the market, but the basic record-keeping requirements still reflect industry standards and laboratories may voluntarily comply with the guidance. The record-keeping requirements of cGMP ensures data integrity which is related to the "completeness, consistency, and accuracy of data." *(FDA, Data Integrity and Compliance With Drug CGMP – Questions and Answers).* The specifics of cGMP requirements for finished pharmaceuticals are articulated in 21 CFR Part 211. Retention of "[a]ll raw data, documentation, protocols, final reports, and specimens…" is also a requirement for Good Laboratory Practice for Nonclinical Laboratory Studies (GLP) as articulated in 21 CFR Part 58.

- **National Academy of Science:** The National Academy of Sciences published a book titled "Responsible Science: Ensuring the Integrity of the Research Process: Volume I". The book discusses a wide array of issues related to data integrity, but notable here is that the section on "Data Handling" states: "The general norms of science emphasize the principle of openness. Scientists are generally expected to exchange research data as well as unique research materials that are essential to the replication or extension of reported findings." (p. 48). The Academy also noted: "Responsible practice requires that scientists disclose the basis for omitting or modifying data in their analyses of research results, especially when such omissions or modifications could alter the interpretation or significance of their work." (p. 48).

- **Academia:** An example chemistry textbook used to teach university students cautions that "[n]o matter how high the standard of experimental technique employed during a reaction, the results will be of little use unless an accurate record is kept of how that reaction was carried out and of the data obtained on the product(s). Individuals or individual research groups will develop their own style for recording experimental data, but no matter what format you chose to follow, there are certain pieces of vital information that should always be included." The textbook also explains that for lab notebooks, they should "record your scientific reasoning", "be a record of the exact procedure that was followed for the entire experiment", be the "main index point" and the "main source of reference when you write reports, papers, theses, and so on." It continues that "[i]mportantly it is the point of refence for other workers to follow your work" and "it should allow you to say exactly when a particular experiment was carried out."

[5] Available at https://www.who.int/medicines/publications/pharmprep/WHO_TRS_996_annex05.pdf


Contains Confidential Information – Subject to Protective Order

With respect to laboratory records: "It is vital that laboratory records are dated as they are carried out and that appropriate supporting analytical evidence is collected" and that "Fraudulent results have been reported from time to time and there can be disputes over originality or plagiarism, so having evidence of when an experiment was carried out is always of the utmost importance." *(J. Leonard et al., "Chapter Three: Keeping Records of Laboratory Work" in Advanced Practical Organic Chemistry, 3rd Ed. p. 13-15)*. While parts of this chapter focus on providing best practices for protection of intellectual property rights, the protection of intellectual property is not the only reason, and the same principles of ensuring scientific accuracy and rigor apply across all laboratory practices.

- **Peer Review:** Peer reviewed journals often require authors of manuscripts to make their underlying data available for review by peer-reviewers either at the time of submissions, or if requested during the review process. For example, the journal *Science* requires authors to upload "Auxiliary files" of "Data files required for review of your manuscript." (*Information for authors at https://www.science.org/content/page/science-information-authors*), and authors are required to disclose "where all data underlying the study are available, or will be deposited, and whether there are any restrictions on data availability." Likewise, Elsevier, a publisher for many preeminent journals established that: "Authors may be asked to provide the research data supporting their paper for editorial review and/or to comply with the open data requirements of the journal." (*Elsevier, Publishing Ethics, https://www.elsevier.com/about/policies/publishing-ethics#Authors*). Similarly, the American Chemical Society, which publishes many of the preeminent chemistry journals established a Research Data Policy that states "where ethically and legally feasible, all research data should be findable, accessible, interoperable, and reusable." (*ACS Research Data Policy at https://publish.acs.org/publish/data_policy*), and the Journal of the American Chemical Society defines: "Research data is defined as materials and information used in the experiments that enable the validation of the conclusions drawn in the article, including primary data produced by the authors for the study being reported, secondary data reused or analyzed by the authors for the study, and any other materials necessary to reproduce or replicate the results." (*Journal of the American Chemical Society, Author Guidelines at https://publish.acs.org/publish/author_guidelines?coden=jacsat*).

- **Laboratory Notebooks:** Laboratory notebooks often provides "instructions" on the first few pages about best practices for recording scientific evidence such that it can withstand scrutiny, especially to potential challenges on intellectual property rights or other legal challenges. For instance, Emery's notebooks that have been produced in this litigation instructed: "Give a complete account of your experiments and the results, both positive and negative, including your observations." "Record all diagrams, layouts, plans, procedures, new ideas, or anything pertinent to your work…" "Do not try to erase any incorrect entries; draw lines deleting them, note the corrections, sign and date the changes" *(Notebook No. 088-KG)*.

What all of these organizations have in common is the directive that all documents needed to ensure the validity of the test results should be maintained and available for examination. One important requirement to ensure the validity of the test results is that a predetermined protocol exists which states the purpose of the study and the details for its execution. Predetermining a protocol is essential to ensuring the data are the results of an unbiased experimental design. The protocol should specifically include details regarding the testing that will be performed, the methods used for testing, the number of replicate tests that will be done for a given sample, and other information sufficient to allow someone who picked up the protocol to conduct the same experiment to assess whether the results can be replicated. Details about the samples used, such as their origin, rationale for choosing them, and any treatments done on them should be described. Factors that are not controlled in the study but that could impact the results of the study should be acknowledged and addressed.

Likewise, all data generated in the study need to be included in the analysis, not just those that confirm or refute the hypothesis. If data are excluded, this must be documented and justified, especially if such data could impact the results. All supporting data (in other words, not just the primary measurements, but the preliminary analyses used to design the experiment or ensure its reliability) should also be documented and made available.

**ii. Pre-Requisite #2: Procedure Validation**

"Validation of an analytical procedure is the process by which it is established, by laboratory studies, that the performance characteristics of the procedure meet the requirements for the intended analytical applications." *(USP General Chapter <1225> Validation of Compendial Procedures)*. In other words, validation of an analytical method ensures that the results from the test are actually valid.

There are several typical analytical characteristics that are routinely assessed during method validation. These characteristics are expressed in FDA Q2(R1) guidance, the ICH Q2(R1) Guideline for Validation of Analytical Procedures, and USP. These include:

- **Accuracy:** "The accuracy of an analytical procedure is the closeness of test results obtained by that procedure to the true value." *(USP General Chapter <1225>)*.
- **Precision:** "The precision of an analytical procedure is the degree of agreement among individual test results when the procedure is applied repeatedly to multiple samplings of a homogeneous sample." *(USP General Chapter <1225>)*. In other words, when one tests the same homogenous sample, what is the variation in results irrespective of whether the result is accurate? Precision can be broken down into two parts: *Repeatability* and *Intermediate Precision*. Repeatability, also known as intraday precision, refers to the agreement of results when the same sample is analyzed on a single day in the same analytical run. Intermediate precision, also known as interday precision, refers to the agreement of results when the same sample is analyzed on different days. Intermediate precision would include the effects of day-to-day differences such as the equipment and chemicals used, the analyst performing the method, and preparation of calibration curves and samples.


Contains Confidential Information – Subject to Protective Order

- **Specificity:** Specificity is "the ability to assess unequivocally the analyte in the presence of components that may be expected to be present, such as impurities, degradation products, and matrix components." *(USP General Chapter <1225>)*. In other words, when one tests for a specific compound, will the result reflect just that compound or might other compounds add to the results. Specificity is necessary to have accuracy and lack of specificity is known as interference.

- **Detection Limit:** The detection limit is "the lowest amount of analyte in a sample that can be detected, but not necessarily quantitated, under the stated experimental conditions." *(USP General Chapter <1225>)*. In other words, if an impurity is present but at such low levels that the levels fall below the detection limit, one cannot be sure whether that impurity is present at all in the sample.

- **Quantitation Limit:** The quantitation limit (sometimes referred to as the limit of quantification) is "the lowest amount of analyte in a sample that can be determined with acceptable *Precision* and *Accuracy* under the stated experimental conditions." *(USP General Chapter <1225>)*.

- **Linearity:** "The linearity of an analytical procedure is its ability to elicit test results that are directly, or by a well-defined mathematical transformation, proportional to the concentration of analyte in samples within a given range." *(USP General Chapter <1225>)*. In other words, linearity provides the lower and upper limits where an analytical method can reliably measure a compound.

- **Range:** "The range of an analytical procedure is the interval between the upper and lower levels of analyte (including these levels) that have been demonstrated to be determined with a suitable level of precision, accuracy, and linearity using the procedure as written." *(USP General Chapter <1225>)*. In other words, the range is the lower and upper limits noted in *Linearity*.

- **Robustness:** "The robustness of an analytical procedure is a measure of its capacity to remain unaffected by small but deliberate variations in procedural parameters listed in the procedure documentation and provides an indication of its suitability during normal usage." *(USP General Chapter <1225>)*. In other words, robustness confirms that small variations in the analytical procedure will not significantly affect the results.

These parameters are important to establish during the validation of an analytical procedure because they confirm that the results are valid for their intended purpose. Therefore, it is important to know how results from the method will be used. For example, if accuracy is not established, results could be compromised by interferences. Also, it is not possible to evaluate whether differences between results are significant or just due to measurement variability if the precision of the method is not known.


Contains Confidential Information – Subject to Protective Order

### iii. Pre-Requisite #3: Analytical Procedure and Sample Performance Verification

Once an analytical method is validated, the next step would be to ensure that on the day of the experiment, the analytical method still works as intended. Investigators should also conduct a type of test called "system suitability testing" which, like its name suggests, determines whether the method is performing suitably under the given conditions on a particular day. These types of tests are generally conducted prior to the start of the experiment to ensure there is nothing amiss, such as equipment abnormalities or solvent contamination that might undermine the reliability of the analysis.

Sample performance verification refers to sample specific requirements that must be met to have confidence that reliable results have been generated. For example, acceptable variability among replicates for the same sample can indicate whether results can be considered valid.

These verification steps are critical to demonstrate that the method is performing as it did when it was validated. Validation is usually done at an earlier point in time, so verification is necessary to tie results from future analyses back to the validated characteristics such as accuracy and precision. Results cannot be considered reliable if procedure verification is not in place.

### iv. Data Interpretation

If the prerequisite laboratory practices exist, an investigator may proceed with interpretation of the results. When interpreting data generated from a study there are several considerations. First, one must consider the objective of the study. An analytical study may attempt "estimation," which is "when the investigator wishes to report results that estimate true quantities that underlie the data generating process and are the subject of the study." *(USP General Chapter <1010>)*. In other words, estimation considers whether the analytical results accurately reflect the true values for the samples that were actually tested. A study may go a step further and include "inference," which is "the additional step of using these estimates to make a decision about the unknown true value of the population parameter." *(USP General Chapter <1010>)*. In other words, inference considers whether results from the tested samples can be generalized to draw conclusions about untested samples.

When assessing the results of an estimation study, one should consider uncertainty. "Uncertainty arises from sources of variability inherent in the measurement process, as well as from statistical sampling and study factors." *(USP General Chapter <1010>, Appendix 4)*. Importantly, when there is large variability in analytical results of a single study, there is larger uncertainty about whether the results represent the true values. Additionally, inconsistencies in the data set raise concerns that there may be uncontrolled variables influencing the results of the study.

When assessing the results of an inference study, all the same considerations regarding an estimation study would apply along with additional considerations. Specifically, for inference studies, the representativeness of samples is an important factor to consider. A "sampling plan should be established to provide details on how the sample is to be obtained to ensure that it is representative of the entirety of the population of interest." *(USP General Chapter <1010>)*. Additionally, any assumptions should be carefully supported.

The overall conclusions drawn in any study should be evaluated in the context of the hypothesis being tested and the existence of other data pertaining to the purpose of the study. Inconsistencies in results within a study or inconsistencies with other studies need to be acknowledged. The possibility that uncontrolled and/or unknown variables contributed to discrepancies in results would need to be added as qualifiers to tentative conclusions drawn from limited data. Any limitations or constraints in the study design need to be described before inferences or conclusions can be extrapolated or applied to a more general situation.

**f. Translating Real-World Conditions for Non-Scientists**

Scientists can often speak in terms where the significance of testing parameters or data may not be apparent to non-scientists. One concept that may be confusing is the concept of "relative humidity". Relative humidity (RH) is a measure of the amount of water in air compared to how much water the air can hold at a given temperature. Since warmer air can hold more water, RH is a function of temperature.

In other words, there is more absolute water in the air at 50°C/50% RH than at 25°C/50% RH, even though at both temperatures the Relative Humidity is 50%.

This is important to understand because temperature-humidity combinations may, when combined, be more extreme than they might otherwise appear. For instance, we can all appreciate that in the southern part of the United States outdoor temperatures can occasionally reach more than 38.8°C (over 100°F) during specific days on the hottest days of the year. We can also imagine days when the weather was 100% RH when especially foggy or muggy. But these conditions do not often occur together, because even humid places will have decreasing relative humidity as temperature increases. In fact, using the National Weather Service's online calculator, 38.8°C/100% RH has a heat index or "feels like" temperature of 209°F. The fact that these conditions do not usually occur together becomes more apparent to non-scientists when reporting figures as "feels like" temperatures.

Therefore, for purposes of this report, knowing that non-scientists need to understand the significance of the conditions being used in the testing discussed below, I will report more severe study conditions using both standard scientific reporting methods of degrees Celsius/ percent relative humidity and the "feels like" temperature in degrees Fahrenheit as calculated with the National Weather Service calculator. (*Brice, T. and Hall, T., Heat Index Calculator, National Weather Service, https://www.weather.gov/epz/wxcalc_heatindex*). While all these "feels like" temperatures here and below are calculated using a standard formula, many are outside the range of realistic conditions and already constitute "extreme danger" according to National Weather Service. Therefore, as depicted in *Fig. 6*, "feels like" temperatures calculated to be above 137°F are reported only for illustrative purposes.


Contains Confidential Information – Subject to Protective Order




| RH (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

*Fig. 6, National Weather Service, Heat Index Chart.*

## VI. NDMA Findings in Medicinal Products

In 2018, FDA announced a voluntary recall of several medications containing the API valsartan because it contained an impurity, N-nitrosodimethylamine (NDMA).[6] (FDA News Release (July 12, 2018)).[7] Shortly after announcing the recall, FDA established an interim daily intake limit for NDMA in medications of 96 nanograms (ng) per day.[8] To put this into context, one nanogram is one billionth of a gram, so these are very small levels of impurities.

Prior to the finding on NDMA in sartans, there was no specific daily intake limit for NDMA. An FDA Guidance called *M7(R1) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk*, provided general guidance for impurities which are mutagenic (DNA reactive), and the guidance notes that "N-nitroso-" compounds are within the "cohort of concern," meaning that each such compound must have interim limits established on a "case-by-case approach" rather than treating all compounds within the same class as the same. (*FDA, M7(R1) Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals To Limit Potential Carcinogenic Risk, March 2018*).

FDA calculated the nitrosamine specific limits based on its M7 guidance (cited above). This means that the acceptable intake (AI) calculation is based on a theoretical 1 in 100,000 cancer risk over 70 years of daily exposure using linear extrapolation of TD50 (rodent) data, which FDA

[6] NDMA is a semi-volatile organic chemical which is a member of the family of N-nitrosamine compounds. It is commonly found in certain foods such as grilled and cured meats. It is classified as a "probable human carcinogen" based on animal studies. (EPA, *Technical Fact Sheet - N-Nitroso-dimethylamine (NDMA)*, Nov. 2017).

[7] FDA News Release (July 12, 2018), https://www fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicines-containing-valsartan-following-detection-impurity.

[8] FDA, FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan), current as of Nov. 7, 2019.

acknowledges is "highly conservative". The doses are based on a "highly hypothetical concept that should not be regarded as a realistic indication of the actual risk". The guidance also cautions that "any exposure to an impurity that is later identified as a mutagen is not necessarily associated with an increased cancer risk for patients already exposed to the impurity." This conservative calculation is what FDA used to derive the 96 ng/day limit for NDMA.

FDA reported finding NDMA in valsartan up to 20,190 ng/tablet. (*FDA, Laboratory analysis of valsartan products, current as of May 2, 2019*). When discussing the valsartan findings, FDA noted that "NDMA has been found to increase the occurrence of cancer in animal studies. These animal studies were done using amounts of NDMA much higher than the impurity levels in recalled valsartan batches." (*FDA, Analysis of N-nitrosdimethylamine (NDMA) Levels in Recalled Valsartan in the U.S., July 27, 2018*).

On September 13, 2019, FDA published a statement reporting "low levels" of NDMA in some ranitidine products. Shortly after, FDA reported the levels of NDMA found in ranitidine products it tested and reported a maximum of level of approximately 860 ng/daily dose (300 mg). (*FDA, Laboratory Tests | Ranitidine, current as of Nov. 1, 2019*). Note that later, FDA provided slightly updated numbers in a Grand Rounds presentation, discussed below.

FDA's testing is further discussed below, but it is significant that these levels were much lower than in valsartan. In fact, FDA commented that the levels of NDMA "are similar to the levels you would expect to be exposed to if you ate common foods like grilled or smoked meats." (*FDA, Laboratory Tests | Ranitidine, current as of Nov. 1, 2019*).

On the same day, Valisure LLC ("Valisure"), a private analytical pharmacy, submitted a Citizen Petition reporting extremely high levels of NDMA in ranitidine. Valisure conducted testing for samples of ranitidine using gas chromatography (the high heat method described above) using a temperature of 130°C (266°F). FDA responded to Valisure's Citizen Petition noting that the elevated temperature used to heat the sample solution was "inappropriate and contributed to or caused the levels of NDMA to be artificially high." (*FDA Response to Valisure Citizen Petition, April 1, 2020*). Notably, Valisure also conducted testing on ranitidine drug tablets using a low-temperature method and reported no detectable NDMA.

After becoming aware of the Valisure Citizen Petition, the FDA CDER Office of Pharmaceutical Quality conducted their own testing of ranitidine OTC products. Upon replicating Valisure's experimental methods, the FDA observed a color change in the headspace vials containing ranitidine, which they described in a recent Grand Rounds presentation to be "a clear indication of sample degradation during the test." On an additional presentation slide also containing a photo of sample discoloration in a headspace vial, it is noted that "levels of NDMA in ranitidine cannot be accurately determined by GC/MS due to thermal degradation of ranitidine." *(Fig 7).* Valisure should likewise have known based on the appearance of the headspace vials after heating that the gas chromatography method causes degradation of ranitidine so, in turn, the measured levels of NDMA would be unreliable.


Contains Confidential Information – Subject to Protective Order




*Fig. 7, Left: headspace vials containing ranitidine OTC before (left) and after (right) heating for gas chromatography. Right: headspace vial containing thermally degraded ranitidine. (adapted from FDA Grand Rounds, Slides 18 and 19, Oct. 14, 2021).*

The same finding that ranitidine significantly degraded in headspace vials was observed by Emery Pharma, Dr. Najafi's laboratory. In an email to David Light at Valisure (Emery's client), Dr. Najafi suspected that high temperatures used during GC/MS could introduce a "confounding factor" to the analysis. *(EMERY 0141-0150)*. During an initial report, Emery Pharma disclosed: "During the analysis, which entails heating the sample in a sealed vial at 125 °C for 15 min in DMSO, the resultant slurry of Zantac was significantly discolored (darkened) in both cases." *(EMERY 0151-0153)*. Further emails indicate that Emery's client requested that Emery remove the discussion of discoloration from the report. *(EMERY 2019-2033)*. Consequently, a copy of the final report omits the discussion of discoloration *(VAL 00068-00069)*. During a deposition, Emery stated that it was appropriate to remove this information because clients may request data with no interpretation. *(Deposition of Emery 30(b)(6) Witness Anahita Najafi, March 5, 2022)*. Removing the data about discoloration, however, is not scientifically justified since Emery viewed this as a "confounding factor". As a preliminary matter, discoloration is an observation, not an interpretation. Additionally, as noted by FDA, discoloration was a "clear indication" that the method was not suitable, and the discoloration confirmed Dr. Najafi's earlier suspicion that heat would introduce a confounding factor. Removing this information distorted the ability to draw reliable conclusions from the data, and it is concerning that Emery would be willing to remove information that suggests the results may be unreliable just because a client requested it to do so. Valisure proceeded to submit its Citizen Petition with artifactual data that, as noted above, was discredited by FDA. Despite the initial unreliable work by Valisure and Emery, other scientists have since developed valid methods for quantifying the levels of NDMA in ranitidine.

Since the discovery of NDMA in ranitidine, a significant amount of work has been published by regulators and in peer-review literature. Importantly, scientists at GlaxoSmithKline (GSK) found that NDMA forms through a "slow degradation of the ranitidine molecule." *(King 2020)*. GSK also found that heat and humidity can influence the rate of NDMA formation over time and that different crystal structures or "crystal morphologies" may be associated with differences in the rates of NDMA formation. To come to this conclusion on crystal morphology, GSK prepared two batches of API, one with "columnar" crystal morphology and one with "irregular" crystal morphology. After subjecting the API to stress conditions, GSK found that the columnar crystal had lower levels of NDMA than the irregular crystal. Notably, while GSK focused on these two morphologies, more could exist, and each have unique physical characteristics. The finding that crystal morphologies might impact the rate of NDMA formation is important to consider when attempting to generalize the findings of some ranitidine batches to all ranitidine batches which may have varying morphologies.

Aside from peer-reviewed work, additional non-peer reviewed research exists. For instance, UQUIFA, a manufacturer of API, conducted a root cause analysis and reported that certain quality parameters such as residual solvent levels and pH of the API might be factors in influencing the rate of NDMA formation. *(SANOFI_ZAN_MDL_000722379-2534)*.

Also, beyond the testing conducted for Valisure, Ron Najafi, Ph.D., Emery Pharma's CEO, has released more non-peer reviewed research related to NDMA formation from ranitidine. In early 2020, Dr. Najafi expressed that he intended to publish his ranitidine research in peer-reviewed literature. *(Emery Pharma Citizen Petition, Jan. 2, 2020)*. Two years later, at the time of writing this report, I am not aware that any of Dr. Najafi's testing of ranitidine has ever been published in a peer-reviewed journal. His work is further discussed below.

## VII. Analysis of Plaintiffs' Expert Opinions

I have reviewed the reports of Ron Najafi, Ph.D., Michael Marletta, Ph.D, Andrew Salmon, M.A., D.Phil., C.Chem., M.R.S.C., Dipak Panigrahy, M.D., and Jennifer Le, Pharm.D. I have found that their conclusions regarding exogenous formation of NDMA from ranitidine are not supported by reliable scientific methodology and reasoning for the reasons below.

### a. Emery Pharma's Citizen Petition, Omitted Data, and Subsequent Testing

Emery submitted a Citizen Petition to FDA on January 2, 2020, claiming that the ranitidine molecule is not stable, and that it generates "significant amounts" of NDMA under elevated temperatures.

The Citizen Petition described testing that Emery conducted starting in 2019. Specifically, Emery conducted stress testing on ranitidine samples to test whether ranitidine API and drug product would form NDMA under elevated and stressed conditions. Although the Citizen Petition does not disclose the source of the samples, based on the timing, I presume Emery's samples were at one point sold on the market, such that Emery's samples were purchased directly from a store shelf. I presume the API was purchased from an API supplier.

Emery subjected the ranitidine API samples to both 25°C and 75°C for 12 days with testing on days 5 and 12. Emery also subjected the ranitidine drug product samples to 75°C for 14 days with testing on days 1, 2, 5, 9, and 14. Humidity conditions were not reported for any testing but are assumed to be ambient. I presume these samples were not within their protective packaging during this study because Emery did not report what container closure systems, if any, were used. During deposition, Emery's representative could not identify the container closure system or supporting documentation. *(Deposition of Emery 30(b)(6) Witness Anahita Najafi, March 5, 2022)*.

For the baseline levels of NDMA, Emery found relatively small amounts of NDMA with all the samples being below FDA's 96 ng/day limit. Specifically, the drug product had 19 ng NDMA in the 150 mg dose. During the stability testing, Emery found no appreciable NDMA formation at 25°C (77°F) —the highest value recommended for storage on the product label—in ranitidine API. At 70°C (158°F) for up to fourteen days, NDMA levels increased, ending at 142 ng NDMA/150 mg ranitidine API and 70 ng NDMA/150 mg for ranitidine drug product.

Using the data at 25°C (77°F), Emery concluded that the product was "seemingly stable" at room temperature given that essentially no NDMA formed during the experiment. This is important because the testing and conclusions were derived from ranitidine API data, and one would reasonably expect tablets to be even more stable, given the lower results for the Zantac product.

Emery Pharma's preliminary analysis revealed that while seemingly stable at room temperature, the ranitidine molecule is heat-labile and under elevated temperatures (e.g., 70 °C) progressively accumulates NDMA (**Figure 1** and **Table 1**).




**Figure 1.** Preliminary stability study with USP ranitidine standard at 25 °C (black), USP ranitidine standard at 70 °C (red), and Zantac® cool mint, lot# 18G542 at 70 °C (blue). NDMA analysis performed via LC-MS/MS (*vide infra*), and quantified based on a calibration curve generated using an NDMA reference standard.

Dotted line approximately indicates the daily intake limit of 96 ng for NDMA.

*Fig. 8, Data from Emery's Citizen Petition.*

Despite concluding that the API was seemingly stable at room temperature, Dr. Najafi and Emery expressed concerns that ranitidine would degrade to form unacceptable levels of NDMA under elevated storage and transport conditions. This concern, however, is undermined by his own data. Specifically, all of Emery's samples had already undergone transport and storage prior to being tested. So, the baseline level in the drug product observed by Emery closely reflects what a consumer would have ingested under real world conditions, and this level was 19 ng/150 mg dose (which is below the

FDA acceptable daily intake). In fact, Emery only found that the product slightly exceeded FDA's limit when they exposed the drug product to 158°F (conditions well beyond the product's labelling) for an extended period of time. These findings, while limited by sample size, suggest that, even if temperature excursions occurred during transport and storage, NDMA would be unlikely to form in appreciable quantities unless under extremely hot conditions for a long period of time. Additionally, the container closure system was not reported, so the samples may have been exposed to ambient conditions which would exaggerate the amount of NDMA that would actually form when compared to a drug product within product packaging.

Dr. Najafi and Emery's concerns are even further undermined by the data which they omitted from their Citizen Petition. Dr. Najafi and Emery Pharma conducted additional testing which was not disclosed to FDA, to the public, or in Dr. Najafi's report for this litigation. Approximately one month prior to the submission of the Citizen's Petition, Emery prepared a slide deck *(EMERY 0574-0585)*, dated November 26, 2019, and this slide deck reveals that Emery found low levels of NDMA in ranitidine drug product which was presumably purchased directly from the marketplace. It its Citizen Petition, signed by Dr. Najafi, Emery only disclosed the highest value of four values. As depicted in the graph below, the value Emery disclosed (in blue) is much higher than the three values it withheld from FDA (in red). During deposition, Emery's representative confirmed that all of Emery's baseline testing from products purchased from the market were within FDA's acceptable daily intake limit. *(Deposition of Emery 30(b)(6) Witness Anahita Najafi, March 5, 2022)*.




| Reported | Unreported | | |
|---|---|---|---|
| Zantac® Cool Mint Lot. 18G542 | Zantac® 18N475U | Signature Care® 8DE1363A | Top Care® 8LE2198 |
| 19.43 ng/pill | 0.74 ng/pill | 2.88 ng/pill* | 1.33 ng/pill |

*Fig. 9 & Table 1, Emery did not report to FDA that it observed lower baseline levels of NDMA in ranitidine. *data extrapolated to 150 mg pill; original finding was 1.44 ng/75 mg pill.*

Even worse, Emery reported the results of stress testing only on the drug product with the highest NDMA level. In his report, Dr. Najafi's claimed that Emery "chose" a ranitidine product with low baseline levels of NDMA, but this statement is demonstrably false given that Emery actually chose the product with the highest level of NDMA. There is no valid scientific basis for selecting and reporting only the highest result to serve as the baseline for stress testing.

Additionally, Emery exposed the drug product with higher initial NDMA levels to elevated temperatures (98.6°F) for up to 30 days (~720 hours). This data was included in a draft of Emery's Citizen Petition *(EMERY 0369-0374)*, but not in the final version submitted to FDA. Humidity and the container closure system were not reported. Despite being exposed to a high temperature for a long period of time, Emery concluded that "no differences" in NDMA levels were observed at this temperature. The data is limited based on the narrow selection of samples (although Emery chose the worst case) and the container closure system is not reported (although if no container closure system was used, this would mean even less NDMA would form had the proper container been used).




| Day | Ng NDMA/150 mg Ranitidine Reported to FDA | Ng NDMA/150 mg Ranitidine Unreported to FDA |
|---|---|---|
| | 75°C (167°F)* | 37°C (98.6°F) |
| 0 | 19.4 | 19.4 |
| 1 | 34.9 | 18.4 |
| 2 | 36.4 | - |
| 5 | 58.4 | 19.5 |
| 9 | 67.5 | - |
| 12 | - | - |

| | | |
|---|---|---|
| 14 | 70.5 | 17.3 |
| 30 | - | 20.8 |

*Fig. 10 & Table 2, Emery did not report to FDA that it observed no NDMA formation at the elevated temperature of 37°C. *Emery's slide deck reports the temperature was 75°C, but the Citizen Petition reports that it was 70°C.*

After submitting the Citizen Petition reporting only the highest level of NDMA that Emery purportedly identified, Emery Pharma continued to generate new analytical data related to ranitidine's stability and the numbers continued to grow higher. In a presentation posted on YouTube in the summer of 2020 (after being retained as Plaintiffs' experts), Emery Pharma conducted additional stability testing on different batches and found much faster rates of NDMA formation than reported in their Citizen Petition. (Emery YouTube Presentation June 2020). Notable comparisons are:

- Drug Product: At **70°C for 5 days** in the Citizen Petition, Emery reported the level of NDMA increased **39 ng**. In the YouTube data, at **70°C for ~4 days**, Emery reported the level of NDMA increased by **over 600ng**.
- Drug Product: At **37°C for 30 days** in Emery's undisclosed data, Emery reported that **no differences in NDMA formation were observed**. In the YouTube data, at **40°C for ~35 days**, Emery reported the level of NDMA increased by **~350 ng**.
- API: At **70°C for 5 days** in the Citizen Petition, Emery reported the level of NDMA increased **88 ng.** In the YouTube data, at **70°C for 4 days**, Emery reported the level of NDMA increased by **over 6,900 ng**.

Emery did not comment on this high variability in results between their own testing or explain why their later testing results are orders of magnitude higher than what they previously reported. In fact, Emery is silent regarding the limitations of their work.

It is also important to note that Emery's notebook documentation suggests that during testing pills visibly degraded and some pills exploded, which call into question whether Emery's studies have any practical relevance given that consumers would not plausibly ingest obviously degraded or exploded pills. *(EMERY 02553-02639)*. It is difficult, however, to compare the physical observations with NDMA levels based on this notebook because the notebook is poorly maintained.

Based on the above, I have significant concerns regarding the integrity of Emery Pharma's data and Dr. Najafi's analysis. As noted by WHO, "evaluation should take into consideration all data, including atypical, suspect or rejected data, together with the reported data." Here, there was no justification for omitting contrary data, and even if justification could be articulated, there is no scientific justification for omitting data which directly undermines one's hypothesis. The omitted data reflected stability not only at room temperature, but also moderately elevated temperatures, which casts doubt on the entire premise of the Citizen Petition. Emery's data also varies by orders of magnitude between testing, but Emery is completely silent, even in public-facing video presentations,

about the limitations of their data. The selective reporting and omission of crucial data raises significant concerns about the data integrity of Emery Pharma's results and Dr. Najafi's report.

**b. Insufficient Pre-Requisites for Data Interpretation**

In addition to the data integrity issues discussed above, I am further alarmed by the inadequate record keeping by Emery Pharma. I have asked to see actual laboratory documentation to assess whether Emery's testing is analytically valid, but I understand that Emery and Dr. Najafi have not produced them, to the extent they exist, as of the date of this report.

As described previously, thorough documentation is a foundation and prerequisite for the interpretation of data. *(USP General Chapter <1010>)*. Likewise, even though Dr. Najafi cites Emery as being a GMP and GLP compliant facility in his report discussing the results of his data, his documentation does not satisfy basic requirements for either GMP or GLP.

There are many fundamental laboratory documents missing in Dr. Najafi's report that prevent a complete analysis of his results. In the below sections, I discuss the issues with Emery's record keeping with respect to its protocols, data, and quality assurance documentation. The insufficient record keeping precludes Dr. Najafi from being able to draw any reliable interpretation or inference from the data.

**i. Deficient Record Keeping**

**1. Deficient Protocols**

Many tests have no protocols at all. The protocols that Dr. Najafi has produced (Appendix A) lack sufficient detail and are incomplete. None of the protocols or methods is dated, which prevents me from being assured that the protocol was developed prior to the initiation of the experiment. The protocols, or lack thereof, do not meet acceptable scientific standards in the field, and this type of documentation would not be sufficient to support publication in peer-reviewed literature as I explain below.

This is not a trivial issue. The available materials suggest that protocols may have been developed after testing was complete in order to give a false impression that the data was truly the product of an unbiased and predetermined experimental design. As evidence of this, Dr. Davis' report (Appendices 5 and 6) indicates that for the Sun-Shade-Shower datapoints, Dr. Davis was given data at a timepoint of "6 cycles." Of concern here, however, is that the data is completely absent from Dr. Najafi's report, even though Dr. Najafi is the one who generated the data. Even more concerning, Dr. Najafi's protocol *(PLEV-NB210812B)* does not specify that data would be collected at "6 cycles." These facts lead to the natural suspicion that Dr. Najafi intentionally omitted results and then drafted an undated protocol *post hoc* to give the false impression that the data was the result of a prespecified experimental design. If true, this is a prime example of research misconduct. Moreover, even if there were a scientifically reasonable explanation for this discrepancy, the poor documentation practices alone would preclude drawing any reliable conclusions based on the data generated.

Another concerning example of poor documentation is that the same protocol *(PLEV-NB210812B)* does not state the numbers or identities of batches that will be used for the studies. Prespecifying the number and identity of samples to use in the testing is important for the same reason as stated above—because it prevents investigators from cherry-picking data which support their hypothesis while omitting data which contradict their hypothesis. Without this basic information, one cannot be assured that the data is complete. And if the data is not complete, it would not be scientifically reliable to draw conclusions based on the incomplete data.

Also, again for the same protocol *(PLEV-NB210812B)*, the protocol does not disclose the container closure system to be used during the study. Disclosing the container closure system used is an absolute requirement in stability studies intending to represent real-world conditions. Prespecifying the container closure system to be used in the experiment ensures that investigators do not test products in various containers that may or may not be representative of the commercial product and only report the results which best suit their hypothesis. The failure to prespecify the container closure system is especially problematic because Dr. Najafi appears to recognize that container closure systems can affect the stability of the product, and, although I do not find the evidence reliable, Dr. Davis reported that different container closure systems are associated with statistically significant differences in the level of NDMA. Again, without this basic information, which is routinely specified in stability protocols prepared before any testing takes place, one cannot be assured that the data is complete. If the data is not complete, it would not be scientifically reliable to draw conclusions based on the incomplete data.

Again, for the same protocol *(PLEV-NB210812B)*, even more examples of poor documentation practice exist with respect to the equipment to be used. Prespecifying the equipment that will be used during studies is essential because equipment can affect the reliability of the analysis and would need to be understood. In his protocol, Dr. Najafi has a section for "equipment, materials, and reagent" but refers to another document which is specific to the analytical procedure. The document he cites, however, only covers two of the relevant steps (3.1 and 3.11). Notably, the equipment Dr. Najafi used to grind the tablets and control the storage conditions were not disclosed, nor were the materials used for the container closure system. The types of storage chambers and how they are monitored for temperature and humidity should be specified, especially since some of the stability studies use non-standard conditions (e.g., 60°C, 95% RH). The failure to prespecify and report this information precludes a reliable and accurate interpretation of the analytical results, as I detail with respect to specific analyses below. Additionally, disclosing the equipment used is essential for study replication, so other researchers can independently confirm study results.

**2. Deficient Data**

There has been a significant amount of data collected by Emery which has not been reported. The standards of record-keeping and production of data practiced by Emery does not meet acceptable scientific standards in the field, and this type of documentation would not be sufficient to support publication in peer-reviewed literature. As noted previously, full disclosure of all data is a core

scientific principle and ensures reliable science. Below I give a non-exhaustive list of data missing from Dr. Najafi's report:

- No raw chromatograms have been provided, so I cannot determine whether separation was proper and whether data can be accurately quantified.
- No processed chromatograms have been provided, so I cannot determine how Emery's integration parameters were set, whether they were appropriate, whether they may have led to under or over estimation, and ultimately whether the quantification is reliable.
- Some data is mentioned in Dr. Davis' report but is absent from Dr. Najafi's report. Other data appears in Emery's notebooks which does not appear to Dr. Najafi's report. This is concerning, especially because I was only provided a limited time to review these notebooks given that these were given about 4 weeks into a 6 week deadline to review and opine on the test, and many of the notebook pages are not legible (and are unacceptable by established scientific standards of notebook keeping).
- In the report, some data is only graphed, but the actual values were not initially provided. As with notebooks, that data was provided late, giving limited time to review.
- Data related to the visual inspection of samples prior to analysis which was required by Emery's protocol is not provided anywhere in Dr. Najafi's report. The physical condition of the tablets would be an important part of the study and crucial for assessing real-world significance of data, especially if some samples were visibly degraded such that consumption by a consumer would not be plausible.

**3. Deficient Quality Control Documentation**

Important quality control documentation that is routinely available in scientific laboratories was missing or insufficient to allow a complete evaluation of Dr. Najafi's conclusions. Such documentation is a prerequisite for laboratories performing pharmaceutical analysis. This documentation would also be necessary for Dr. Najafi to rely on the integrity of the data from which he draws conclusions. The documentation is necessary for Dr. Najafi (and anyone else) to be assured that all necessary quality procedures and practices were followed. Without this, the way experiments were conducted and the suitability of equipment used cannot be reconstructed or verified as correct and data from the experiments could not be relied on. The overall lack of documentation does not meet acceptable scientific standards and this type of documentation would not be sufficient to support publication in peer-reviewed literature. Types of missing documentation are:

- Sufficient notebook descriptions of work performed including references to computerized data system files;
- Second person verification of calculated results;
- Rationale and approval for retesting samples;

- Equipment qualification reports demonstrating that the equipment used was installed properly and performed according to vendors' specifications;
- Equipment maintenance logs and adherence to specified preventive maintenance;
- Documentation of analyst training on the equipment and methods used for testing;
- Documentation of sample storage conditions before and during analysis;
- Batch numbers and expiration dates for all chemicals (reagents, solvents, standards) used in experiments; and
- Certificates of analysis for analytical standards.

Examples of notebooks were supplied by Dr. Najafi and his lab but these are primarily methods and data summaries that were literally cut and taped into notebooks from printouts of Word files or PowerPoint slides. The analysts did not record experimental execution such as sample weights, equipment used, reagents used, timing of sample pulls for stability, etc. This essentially defeats the purpose of a lab notebook, including the specific instructions of the front of Emery's notebooks and established best practices in the field. It is not possible to follow the actual work that was performed so results cannot be viewed with confidence. Results were usually listed as being present in a file server (under Levin Law) or some Master spreadsheet but the content of these files is unknown. It is not known if these result repositories were subject to controlled access and audit trail requirements to prevent unauthorized or undocumented changes from being made.

There were several other practices that would be unacceptable documentation practices. Protocols and methods are not dated and there is no indication of review and approval. There has been no justification, documentation, or approval of changes in protocols if they have occurred. Again, dating all laboratory documentation is an absolute minimum to ensuring reliability. In some notebooks, entries were crossed out without initials and date to show when the deletion occurred *(Notebook No. 070-RC, pg. 13 of pdf, Notebook No. 078-RC pp. 12-13 of pdf)*. Countersigning was performed but sometimes not until three months later *(Notebook No. 079-PP pg. 11 of pdf)*. An additional entry was made on a later date without initials/date after the page had been countersigned *(Notebook No. 070-RC, pg. 11 of pdf)*. At least one notebook has entries before the notebook was ever issued *(Notebook No. 088-KG)*. Any one of these deficiencies would cause lack of confidence in the integrity of Emery's results, and the combination demonstrates a lack of scientific rigor in Dr. Najafi's laboratory.

**4. Deficient Method Descriptions**

The failure to properly describe the analytical method used can introduce uncontrolled variation in results that would make it impossible for Dr. Najafi to rely on the data generated. For example, sample selection was not controlled and could introduce bias or variability. He would not be able to conclude that differences in results for time points in a stability study were not caused by differences in how the method was performed rather than an actual change in the sample. An

incomplete method description is also important because it prevents another scientist from replicating the exact conditions used by Emery. The following information was missing or incomplete:

- How the analyst should choose a tablet from a bottle to avoid potential bias was not specified;
- The sources of the NDMA standard and NDMA-d6 internal standard are not listed under Materials/Reagents;
- The type of sonic bath was not listed under Equipment. Sonic baths can generate heat but temperature control of the bath during the sonication step was not indicated;
- Sample preparation – The method does not state what kind of equipment is used to crush tablets. It does not state how aggressively the crushing operation is to be carried out;
- The number of replicate samples to prepare was not specified;
- Qualifier ions for the NDMA standard and NDMA-d6 internal standard are listed but no indication of how those ions are used is given;
- The calculations used to process acquired data were not given. For example, the regression model used for the calibration curve was not specified;
- No sequence of injections was given including frequency of blanks, calibration standards, QC checks, and the number of samples;
- No system suitability criteria were given. These are necessary to confirm that the method performs as expected for each analytical run;
- No information is given about the stability of standards or sample solutions for analysis;
- No criteria for lack of carryover during an analytical run are given;
- No illustrative chromatograms are shown; and
- Only broad criteria are given for re-test/re-analysis. It is not specified when original sample solutions should be re-injected (re-test) or when a new sample preparation should be performed (re-analysis). What is meant by "To ensure assay robustness" is unclear. No criteria for replicate testing as part of "Assessment of NDMA uniformity within a production lot/batch" are given. The lack of specific criteria allows inconsistent practices for repeat testing.

**5. Deficient Validation Reports and System Suitability Runs**

Lastly, there is insufficient record keeping related to the *procedure validation* and the *analytical procedure and sample method performance verification*, but since these are also two independent pre-requisites, I will address them in the following sections.

**ii. Deficient Procedure Validation**

Dr. Najafi cannot reach reliable conclusions about NDMA levels in any sample, the differences among samples, or differences between stability time points without knowing the accuracy and precision of the analytical method being used to measure NDMA levels.

Inaccuracies in the method would cause inaccurate results to be obtained and preclude any conclusions—let alone reliable conclusions—about the amount of NDMA consumers might have ingested. Also, when two samples differ in NDMA level by some amount, it is not possible to make a reliable conclusion about the significance of the difference without knowing the precision of the measurements.

The validation summary given in Appendix A is insufficient to demonstrate the validity of the method Emery used for tablet analysis. Below I explain my concerns regarding why Emery's method may not be properly validated, which undermines the reliability of their test results. Ultimately, however, information was not provided to fully evaluate this potential error. Emery's documentation of its validation, therefore, does not meet scientifically acceptable standards in the field and this type of documentation would not be sufficient to support publication in peer-reviewed literature.

The accuracy of the method is of particular concern because Emery uses a mode of separation that is different from the one recommended by FDA and used by numerous other researchers.

FDA recommends the use of a type of liquid chromatography called "reversed phase" chromatography. This "reversed phase" method is widely used by other researchers. (Yamamoto 2022, Abe 2020, Yokoo 2021, King 2021, Waters 2020, Scheibner 2021, Mani 2020, EMA-Official Medicines Control Laboratory[9], Health Canada[10]). In fact, in Emery's Citizen Petition, they also used a "reversed phase" method. Further, for all other sample types (simulated gastric fluid, nitrosation assay procedure, syrup, injectables, effervescent tablets), Emery also used "reversed phase" chromatography.

For its most recent analyses (API and tablet analysis), however, Emery uses a completely different mode of chromatography known as hydrophilic interaction chromatography (HILIC). The key issue for this method is how the material flows through the chromatographic column to ensure sufficient separation of ranitidine from NDMA. As noted above, sufficient separation is necessary to ensure reliable quantification of the results. Emery, however, does not provide any proper validation or any sample chromatograms to evaluate whether their method allows for sufficient separation.

Other researchers have published on how sufficient separation is needed specifically in analysis of NDMA in ranitidine. For instance, Waters (an instrument vendor) noted: "Separation of the API from the impurities is critical, as it allows use of the divert valve to send the API to waste during analysis, minimizing impact of large quantities of the API (mg/mL) from interfering in the

---

[9] EMA-Official Medicines Control Laboratory, *Test method for the determination of NDMA by LC-MS/MS in Ranitidine Drug Substance and Film Coated Tablets*, October 23, 2019.
[10] Health Canada, *Nitrosamine impurities in medications: test methods*, July 28, 2021, https://www.canada.ca/en/health-canada/services/drugs-health-products/compliance-enforcement/information-health-product/drugs/nitrosamine-impurities/test-methods.html#a2

trace analysis (pg/mL) of the nitrosamine impurities."[11] Yamamoto makes a similar comment about the large amount of ranitidine injected[12]:

> "Impediments to accurate quantitation of NDMA in drug substances using LC–MS/MS and insufficient durability of the system are attributed to the extremely large amounts of active pharmaceutical ingredients (APIs) in sample solutions in comparison to the trace amount of NDMA. A reduced retention of NDMA and/or decreased separation from other substances in LC, matrix effect in MS detection, and undesirable contamination of instruments with API and other substances may be occasionally encountered, all of which consequently result in deterioration of system performance and generation of unreliable data, even in the cases where a divert valve is configured between the column and ion source of the MS instrument."

Since Emery chose to use a different mode of separation from the liquid chromatography method recommended by FDA and used by other researchers, they should have properly validated the methodology and provided sufficient documentation for their different methodology.

In addition to potential separation issues, the interday precision of the testing is unknown because it was not included in the validation summary. It is important to know the variability of results when the same samples are analyzed on different days, with different sample preparations, different calibration curves, different analytical reagents, different instruments, and different analysts. This is necessary to evaluate if differences in the levels of NDMA between different samples are due to lack of analytical precision or some other factor. In other words, without this information, Dr. Najafi could not exclude the possibility that any difference in NDMA levels observed between samples was due simply to a lack of analytical precision.

Lastly, the accuracy of the data (a fundamental and threshold issue) is unknown based on Dr. Najafi's report because insufficient documentation has been furnished regarding the validation of the method. Accuracy is often determined using a "spiked" sample. Specifically in this case, to determine accuracy, Dr. Najafi would be required to test both a spiked (ranitidine + NDMA) sample and an unspiked (ranitidine alone) sample. This is an absolute requirement to ensure that the samples spiked with a known amount of NDMA give an expected result, which ensures that the sample without spiked NDMA would give a similarly reliable result. This, however, was not done. Instead, an *undated* validation protocol *(Validation Protocol of Quantitation of NDMA in Ranitidine Pills)* was furnished by Dr. Najafi's laboratory. Aside from being undated which violates best practices, the protocol has inconsistencies that preclude interpretation of the accuracy results reported by Dr. Najafi. The protocol calls for performing a spiking study into a ranitidine product using QC samples as described in the method CHM-021.00. However, as per the method, the QC samples are not spiked in ranitidine product. In fact, there is no indication that Dr. Najafi ever performed this type of spiking study, so the accuracy of Dr. Najafi's method cannot be determined. To make matters worse, Emery also made errors when calculating some of the results of the experiments that they did conduct.

---

[11] Mary Trudeau Lame & Lindsay Hatch, *Application Note*, Waters Corporation, https://www.waters.com/webassets/cms/library/docs/720006899en.pdf

[12] Yamamoto 2022, p. 1 114561

Specifically, the equation given in the protocol to calculate recovery of the spiked amount is incorrect and instead gives a value for percent (%) error.

Section 3.4.1 of the protocol on determination of intraday precision also mentions using a spiked drug product sample. There is no indication of what sample was used or even if one was used for spiking. The acceptance criterion for intraday precision was given as a coefficient of variation (%CV, also known as % relative standard deviation) of not greater than 20%. This means Emery viewed results with a %CV of 20% as acceptable. A level of variability this high can affect interpretation of results as discussed later.

The validation protocol states "Selectivity/specificity is assessed by evaluating the matrix blank (ranitidine drug product) for interference. Any signal that occurs at the same retention time of NDMA mentioned in the test method CHM-021.00 is compared to the responses of NDMA spiked samples in matrix blank at 100 ng/mL to determine selectivity/specificity." Note that method CHM-021.00 does not give a retention time for NDMA. The validation summary furnished by Emery does not give results for selectivity/specificity demonstrating that their own protocol was not followed.

To note, it is unclear at the time of writing this report whether the correct validation summary has been provided. The validation summary has the correct document number for the method (CHM-021.00), but incorrectly states that the method utilizes reverse-phase HPLC (instead of HILIC which was reportedly used). Notably, no chromatograms have been furnished illustrating standards, samples, spiked samples, or retention of ranitidine and other impurities. The separation of NDMA from ranitidine and other ranitidine impurities is necessary to prevent interference with the measurement of NDMA. Also, no validation of the stability of standard and sample solutions was given. This information is needed to validate the accuracy of the method.

**iii. Deficient Analytical Procedure and Sample Method Performance**

Even assuming that the accuracy and precision of the method have been validated, Dr. Najafi cannot rely on data generated without knowing that appropriate system suitability criteria were met for each analytical run. System suitability checks are required to show that the method was performing as it did when it was validated such that accuracy and precision information apply to any particular analytical run from day-to-day. Insufficient documentation has been furnished regarding the system suitability of the method at time of use, so the accuracy of the data is unknown. The data cannot be viewed as reliable if system suitability criteria were not in place or were not met.

By failing to document or provide this information, Emery's documentation of its system suitability runs do not meet scientifically acceptable standards in the field and this type of documentation would not be sufficient to support publication in peer-reviewed literature.

**c. Emery's "Content Uniformity" Testing**

Although proper documentation, analytical validation, and method performance are all prerequisites for the interpretation of analytical data, taking the data at face value, I will proceed to interpret Emery's "Content Uniformity" Testing.



Contains Confidential Information – Subject to Protective Order

Emery Pharma conducted testing to assess whether NDMA levels would vary from tablet-to-tablet within the same finished dose container (for purposes of this report, I will refer to this concept as “tablet-to-tablet variability”). The purpose of this test was to assess whether testing one tablet from a bottle or container would be representative of the levels of NDMA for all other tablets in the same bottle or container. This is significant because when an investigator conducts a stability study over time, new tablets are tested at each timepoint (in other words, no single tablet is tested at multiple timepoints). Therefore, if there is significant tablet-to-tablet variability, this alone may be the sole or partial cause of differences between the measurements between any two timepoints.

Emery reported results which demonstrate significant variation between individual tablets from the same dosage container. In one example, with 30 tablets tested, Emery observed a difference of 930.5 ng NDMA between the lowest and highest result. For the six batches studied, Emery calculated the coefficient of variation (a metric which considers percent standard deviation from the mean value) and found a coefficient of variation of up to 10.9%. Dr. Najafi concludes this is sufficiently uniform to allow him to test representative samples, although he does not justify this conclusion against any apparent standard. I disagree with Dr. Najafi and instead find that the test results raise concerns about needing to account for tablet-to-tablet variability in all testing. This is significant because the high level of tablet-to-tablet variability in Emery’s results raises doubts about a fundamental assumption built into *all* of Emery’s test results.

To provide background, “content uniformity” is generally a requirement to confirm that the drug substance is sufficiently uniform across tablets within a batch. *(USP General Chapter <905>)*. In other words, the test is used to ensure the strength (i.e., presence of drug substance) is uniform across tablets. Content uniformity is calculated based on how the observed strength compares to the intended strength (or “label claim”). Content uniformity is not used to justify testing only one dosage unit to represent the entire batch as Dr. Najafi does in his report. Therefore, he misapplies the concept of content uniformity.

Dr. Najafi found what could be significant variability (depending on use of the data) in the levels of NDMA in samples from the same bottle. For example, in one test, as mentioned above, he found that the lowest pill had 3,041 ng NDMA while the highest pill had 3,972.1 ng NDMA. This is a difference of 930.5 ng NDMA. In other words, when he conducts testing only on some tablets in that bottle, he cannot exclude the possibility that differences in the level of NDMA up to 930.5 ng NDMA were due to tablet-to-tablet variability alone. The significance of this source of variation and its level would need to be determined when reaching conclusions based on testing data from only one tablet. High variability between replicates was observed for some of the baseline results given in Appendix B. The range of five replicates (assuming the results were for independent tablet preparations) for batch 958032 was 6063.1 ng/150 mg (9,329.4 -15,392.5). This was 48% of the average. The bottles with lower levels of NDMA showed lower absolute variability, but some bottles had even higher statistical variability. For instance, as referenced above, the most statistically variable batch had a coefficient of variation of 10.9%. An example of variation for lower levels in Appendix

B is given by the range for baseline batch 957266. This time, four replicates were run and the range was from 78.7 to 150.7 for a difference of 72 ng/150 mg or 63% of the average result.

Dr. Najafi did not employ composite sample testing (described in *Select Features of a Stability Study* above) to reduce the effect of tablet-to-tablet variability. The method for NDMA in tablets indicates that two 75 mg tablets can be used to obtain the amount of ranitidine equivalent to 150 mg, but for 150 mg doses, only a single tablet was used. A more robust and reliable way of conducting sample preparation to reduce the impact of variation among tablets is to use multiple tablets to prepare a sample solution for testing. That would be more representative of the entire bottle and is routinely done to determine the content and impurities for pharmaceuticals.

Additionally, Dr. Najafi did not conduct a study of bottle-to-bottle variability. This is another source of variability that could be significant and understanding it would be important for generalizing results from a single bottle to the entire batch. To put this into perspective, across all of Emery's studies there is a potential variability in the analytical performance (20%, %CV), there is known tablet-to-tablet variability (reported up to 10%, %CV) and suspected bottle-to-bottle variability, but with an unknown magnitude. This large amount of variability increases the uncertainty of results and can preclude precise conclusions from Emery's data.

Because I disagree with Dr. Najafi's conclusions regarding uniformity, which are the basis for an assumption built into all of his testing, I will explain how it affects proper interpretation of his data. As USP notes, "Uncertainty is associated with variability and communicates the closeness of a result to its true value." Here, where there is significant variability, an investigator should be cautious to appropriately design studies to account for this variability; if they do not, their results should be appropriately qualified in terms of the level of uncertainty associated with those results. Dr. Najafi does not appear to do either. The absolute and relative magnitudes of these sampling variabilities need to be considered to properly evaluate results for any particular study.

I comment on specific study designs when discussing those designs later in this report, but one major issue that affects all designs is the selection of samples to test. USP notes: "It is important to avoid introducing systematic error or bias into the study results. Bias can be introduced through unintentional changes in experimental conditions, due to either known or unknown factors. Effective sampling and randomization are important considerations in mitigating the impact of bias. Sampling is performed after the study has been designed and constitutes the selection of test articles within the structure of the design. How to attain such a sample depends entirely on the question that is to be answered by the data. When possible, use of a random process is considered the most appropriate way of selecting samples." *(USP General Chapter <1010>)*. USP further notes: "a sampling plan should be established to provide details on how the sample is to be obtained to ensure that it is representative of the entirety of the population of interest."

A universal problem present across all of Emery's testing is that there appear to be major limitations in the way Emery conducted sampling. For instance, many tests appear to have no sampling plan, and I have not identified a single test that randomized sample selection. Moreover, this source of potential bias actually has two main issues, which I discuss below.


Contains Confidential Information – Subject to Protective Order

The first main issue relates to how Emery chose to select batches to test, and how many bottles from the batch were used. Emery does not appear to use a sampling plan for many tests and does not randomize sample selection for any testing. In some instances, the batches were selected to include batches with varying levels of NDMA, which can be justified depending on the context and purpose of the experiment.[13] For example, GSK used a similar sampling plan during their root cause investigations, but the key issue here is that if a non-random sampling plan is used, the results should be interpreted with the appropriate level of caution. In GSK's case, they were investigating many different hypotheses which were exploratory in nature and, if significant findings arose and follow-up was warranted, GSK investigated further with additional experimental designs. In Emery's case, the context is different because Emery is generalizing broad conclusions based on a non-random sampling plan even though non-random sample selection can introduce bias.

The second main issue deals with the selection of a tablet for analysis within a single bottle. As noted above, Emery found variable levels of NDMA between tablets of the same bottle or container. Moreover, Dr. Najafi suggests that color and odor are obvious signs of ranitidine's degradation. Assuming all this is true, there should be an established, unbiased way to determine how to sample ranitidine tablets such that results are truly representative of the set being sampled. Dr. Najafi claims that the results of his study enabled him "to use representative tablets for each lot in future analysis," but there appear to be no protocol instructions for determining which tablet is truly representative. In other words, allowing an analyst to unilaterally select 1 tablet out of 90 to test can introduce significant bias into the study if there is no established methodology for selecting a representative tablet. For instance, during baseline testing, an analyst may, consciously or unconsciously, choose to select the tablet which is most discolored. Differences among tablets taken from the top, middle, or bottom of the container were not investigated and no instructions for choosing the position of the tablet in the bottle were given. Or, during stability testing, if there are multiple tablets in a stability chamber for Months 3, 6, and 9, an analyst may, consciously or unconsciously, withdraw one sample over another based on obvious signs of degradation which would create a false trend and biased results over time. As far as I can tell from Emery's protocols, no tests employed any instructions or measures to control this source of bias. In light of the observed tablet-to-tablet variability, this may have introduced significant bias to all of Emery's results.

Given the above, and again assuming Emery's results and calculations are accurate, the summary of my conclusions on this issue are six-fold. First, Dr. Najafi concluded that tablets in a given bottle had acceptable uniformity in their NDMA content to justify testing only one tablet in subsequent studies. He provided no context or criteria for what is acceptable, however, so this broad conclusion is unwarranted. Second, Dr. Najafi did not assess bottle-to-bottle variability between the same batches. Third, the observed variability raises uncertainty regarding the validity of Emery's results. Fourth, given the variability, appropriate study designs should have been used to limit the effect of potential bias. Fifth, to the extent designs of the studies cannot adequately control for

[13] USP gives the example: "Sometimes it's impossible to utilize sampling plans which are random or systematic in nature. This is especially true when the population is infinite." (USP General Chapter <1010>).


Contains Confidential Information – Subject to Protective Order

potential bias, the results should be interpreted and reported with the appropriate caution and uncertainty. Sixth, Dr. Najafi did not appropriately control for tablet-to-tablet or bottle-to-bottle variability in his study designs nor did he interpret results with the appropriate level of caution (a point I further discuss study-by-study below).

**d. Emery's "Baseline Testing"**

Although proper documentation, analytical validation, and method performance are all prerequisites for the interpretation of analytical data, taking the data at face value, I will proceed to interpret Emery's Baseline data, including the data Dr. Najafi did not report or consider. I will also assess both whether this data provides reliable estimates of the true values and whether proper inferences can be drawn from this data.

Before considering Emery's data, it is important to recognize that there are various other sources available regarding "baseline data" and that many of these sources provide the levels of NDMA that were actually observed on the market. Dr. Najafi did not account for these sources when calculating his mean level of NDMA, choosing instead to rely solely on Emery's test results even though those results were clearly (and inexplicably) much higher than those reported by the other sources. Briefly I will describe other sources of baseline data:

- FDA tested thirty-five ranitidine tablets, some which were purchased directly from the marketplace and found a range from below 3 ng/150 mg pill (the LOQ) to a maximum of 465 ng/ 150 mg tablet. Of these, 60% of samples were within the FDA acceptable daily intake limit. *(FDA Grand Rounds, Slide 21, Oct. 14, 2021)*.
- FDA also tested "180 ranitidine samples, including prescription and OTC products," but it is unclear whether this data partly or wholly encompass the data mentioned above. "Samples were purchased from the marketplace, collected by FDA inspectors, or received in response to information requests." This testing included tablets and other formulations such as injectables and liquid syrups. FDA reported that the "range of NDMA observed in ranitidine was 0.013 ppm to 2.97 ppm." The FDA reported that 46 samples from DMF or ANDA holders have levels above FDA's limit, but it is unclear if this means the remaining 134 samples were below FDA's limit. If that is true, then about 74% of samples were within the FDA acceptable daily intake limit. *(FDA Response to Emery Pharma's Citizen Petition, Apr. 1, 2020)*.
- Health Canada tested ranitidine tablets from eight lots and reported a range of 7.9 ng/150 mg tablet ppm to 71.685 ng/150 mg tablet. Of these, 87.5% were within the FDA acceptable daily intake limit.
- Saudi Food & Drug Authority tested eleven ranitidine solid dosage forms collected from the local Saudi Arabian market and reported a range from non-detectable to 108 ng/ 150 mg tablet. Of these, 81.8% were within FDA acceptable limit. *(Alshehri 2020)*.

- The Australian Therapeutic Goods Administration tested approximately 128 tablet dosage form samples of ranitidine and reported a range from below 15 ng/ 150 mg tablet (the LOQ) to approximately 2,100 ng/ 150 mg tablet (above LOQ). Of these, 24.2% were within the FDA acceptable daily intake limit. *(Australia TGA 2019).*
- Researchers in Spain tested seven ranitidine products purchased from local pharmacies in Spain and reported a range from not detectable to 280.35 ng/ 150 mg tablet. Of these, 71.4% were within FDA acceptable limit. *(Gimenez-Campillo 2021)*.
- Before being retained by Plaintiffs, Emery tested four lots of ranitidine tablets presumably purchased from the marketplace and documented a range of 0.74 ng/ 150 mg tablet to 19.43 ng/ 150 mg tablet. Of these, 100% were within the FDA acceptable daily intake limit. *(EMERY 0574-0585).*

Baseline data for liquid formulations have also been reported with levels of NDMA generally consistent with solid formulations. *(FDA Grand Rounds, Oct. 14, 2021, FDA Response to Valisure Citizen Petition, April 1, 2020, Alshehri 2020, King 2020, Australia TGA 2019)*. In contrast to the sources and data listed above, after being retained by Plaintiffs, Emery reported test results for 254 batches of expired and unexpired product which were not purchased from the marketplace, but rather were supplied by manufacturers two years or longer after being manufactured. Emery reported results ranging from 11.7 ng/ 150 mg tablet to 14,991.6 ng/ 150 mg tablet. Of these, Emery reported 1.96% were within the FDA acceptable daily intake limit.

Dr. Najafi did not appropriately account for the inconsistencies between his new (post-retention) data and the sizeable body of available data demonstrated above. Instead, Dr. Najafi reports already elevated results of NDMA and characterizes the data as "starting baseline levels" which gives the impression every consumer would receive these levels at a minimum. I disagree with the conclusions Dr. Najafi makes based on his "baseline" testing for a number of reasons.

First, it is important to establish that Emery's baseline testing is not the result of a well-defined experimental process. The testing does not follow a prespecified protocol and testing appeared to be at random, as demonstrated by the inconsistent number of replicates tested. There was not an attempt to prespecify a sampling protocol, which can introduce bias. This can be justified, and in fact surveillance-type testing may often be exploratory in nature, but if that is the case, the resulting conclusions should be appropriately qualified. Dr. Najafi did not provide any pre-specified analysis plan, nor did he attempt to assess whether atypical results might be statistical outliers, such that exclusion could be warranted. He also did not provide critical information about how samples were stored and monitored prior to testing. Overall, this testing lacks scientific rigor both in design and analysis. As such, Dr. Najafi should exercise caution when interpreting the results.

Second, none of the samples analyzed by Dr. Najafi were purchased from the marketplace. Rather, these samples were furnished by manufacturers in litigation. His baseline testing included API samples more than 10 years old. His drug products samples include samples that were expired (88 samples) and unexpired (166 samples). Of the unexpired product, all samples were at least 2 years

old with a maximum shelf-life of 3 years. Additionally, for unexpired product, only a subset had been placed into their final packaging (116 samples) which consumers would actually purchase. Further, the samples were all either "retained, unsold, or returned", so there is no evidence that any of these samples underwent typical supply-chain processes and would thus be comparable to tablets consumers would purchase.

Using these samples, Dr. Najafi reports mean values of NDMA content for expired and unexpired tablets. It is not clear how many different batches of API were used to manufacture the tablets or how robust Dr. Najafi's sampling is. The range of NDMA levels found in the tablets was from 11.7 ng/150 mg to 14,991.6 ng/150 mg. For the unexpired product tested, the mean NDMA level for a 150 mg dose was 1,096.6 ng. Dr. Najafi misinterprets the significance of his results and improperly claims his baseline data (conducted on samples not from the market) are representative of what a consumer might purchase on the market. This is inappropriate since there is plentiful data, described above (and including from Emery itself), derived from samples which were actually on the market which are inconsistent with Dr. Najafi's most recent data.

Comparison of Dr. Najafi's baseline results to other available baselines results demonstrate that Dr. Najafi's observed figures are much higher than the data from all other available sources. Using the mean value of Emery's "baseline" tablet results of 1096.6 ng/150 mg, I will conduct some comparisons (note, the different between *mean* values and *highest* values is important because if I compared *mean* to *mean*, the differences would be even greater):

- Emery's *mean* value is approximately 2.35 times greater than the *highest* value reported by FDA (465 ng/150 mg). FDA's dataset includes samples pulled from the marketplace.
- Emery's *mean* value is approximately 15.30 times greater than the *highest* value reported by Health Canada (71.685 ng/150 mg).
- Emery's *mean* value is approximately 10.15 times greater than the *highest* value reported by Saudi Food & Drug Authority (108 ng/150 mg). Saudi FDA's dataset included samples from the Saudi Arabian marketplace.
- Emery's *mean* value is approximately half the *highest* value reported by Australian Therapeutic Goods Administration (2,100 ng/150 mg), which was itself an atypical finding. Comparing *mean* to *mean*, Emery's *mean* value is approximately 5.42 times greater than TGA's *mean* value (202.15 ng/150 mg). TGA's dataset included samples about to expire.
- Emery's *mean* value is approximately 3.91 times greater than the *highest* value reported by Gimenez-Campillo 2021 (280.35 ng/150 mg). Gimenez-Campillo's dataset included samples from the Spanish marketplace.
- Emery's *mean* value is approximately 71.69 times greater than the *highest* value observed by Emery prior to being hired by Plaintiffs.

It is unclear why Dr. Najafi did not include his prior baseline results in any of his calculations or even consider the fact that the prior baseline results were actually for samples from the market and demonstrate much lower levels of NDMA. Although four values are a small number of datapoints, these results are significant because they represent true values for products which actually were obtained from the marketplace and were found by Dr. Najafi. In future analyses, if results are generated from products which were not purchased from the marketplace and are significantly different from these values, there must be a sufficient justification for why the non-marketplace samples are representative.

To illustrate just how unrepresentative Dr. Najafi's new dataset is, I have prepared the below scatterplot which further illustrates that Emery's data is highly elevated from every other available source.




*Fig. 11, Purple Line is median, Red Dimond is mean; This figure illustrates that even when graphing results from unexpired products, Dr. Najafi's data "Emery – Najafi" is much higher than all other sources, including his own prior analysis "Emery – Market". Note, given the scale, a graph break on the x-axis is provided so one can see the very high, atypical results in Dr. Najafi's baseline dataset.*[14]

[14] FDA Data (*FDA Laboratory Tests | Ranitidine. November 1, 2019; SANOFI_ZAN_MDL_0000101357*); Health Canada Data (*Health Canada Nitrosamine impurities in medications, July 28, 2021*); TGA Data (*TGA Laboratory Testing | Ranitidine, October 22, 2019*); Emery - Najafi Data (*Najafi Report, Appendix B*); Emery - Market Data (*EMERY 0574-0585*); Alshehri Data (*Alshehri 2020*); Giménez-Campillo Data (*Giménez-Campillo 2021*).




*Fig. 12, Purple Line is median, Red Dimond is mean; This figure has an expanded scale (highest points of Emery data not shown) illustrating that Dr. Najafi's Baseline data for unexpired products, mean, and median, are demonstrably elevated from all other sources, which include samples from the market.*

Dr. Najafi does not acknowledge the existence of much of the other baseline data, including data derived from samples directly from the market, from most of the available sources. Dr. Najafi does acknowledge the baseline levels reported by FDA, GSK, and Sanofi, but completely dismissed the data and did not include it in his baseline averages. Dr. Najafi cites the results for tablet analysis by GSK and Sanofi in his report. The range for Sanofi tablets was from below the limit of quantification to 420.15 ng/150 tablet. For GSK film-coated tablets, the range was 36 to 1140 ng/150 tablet. Although I do not rely on the data from GSK and Sanofi for my opinions, the results of their testing are consistent with those from independent parties such as FDA and TGA and are not consistent with Emery's results. The only justification Dr. Najafi makes to say his baseline testing is more "explanatory" is his belief that consumers would only be able to purchase ranitidine that was at least two years old (in other words, either expired ranitidine, or within one year of expiry). This belief is based on his analysis of three instances where one pharmaceutical manufacturer (Pfizer) sent another pharmaceutical manufacturer (Boehringer) products in 2007, shortly after the business transferred from Pfizer to Boehringer. On its face, attempting to generalize the supply-chain activity that occurred during this unique instance to what would be typical of the supply chain has no scientific justification. Additionally, even if the three instances relied on by Dr. Najafi were representative of the typical supply chain, the documents do not support his conclusion. He cites three instances of products being delivered after 10, 16, and 24 months. His baseline data, however, was derived from samples exclusively 24 months or older. Thus, having product in the supply chain for 10 and 16 months, even if true, does not support and even casts doubt on the validity of his assumption. Lastly, it is important to note that Dr. Najafi does not have any baseline NDMA levels for ranitidine products

cited in these three examples, but instead draws conclusions about likely NDMA levels using time alone. His own data, however, do not support such a broad assumption. In fact, Dr. Davis analyzed Dr. Najafi's baseline data and found no association when comparing the age of samples to NDMA levels in Dr. Najafi's dataset. This finding is discussed further below.

It is also important to note that the representativeness of Emery's testing is theoretical and based on assumptions, while representativeness of samples obtained from the market is definitive. When a theory is inconsistent with real-world observations, reliable scientific investigation would reject the theory and accept reality. Here, more reliable real-world data from samples from the marketplace suggest Emery's results are inflated and not representative of what true "baseline" would have been for consumers purchasing ranitidine on the market.

Lastly, Dr. Najafi's summary of test results were reported in terms of the "mean," meaning all samples added together and divided by the number of samples. Means can often be misleading because they are heavily influenced by atypical or outlier data. For instance, there are 3 results out of 166 for unexpired lots that are above 11,000 ng/150 mg. All other results are below 3000 ng/150 mg. The mean without the 3 atypical results is approximately 879.60 ng/150 mg, which is 20% lower than Emery's reported value. The relevance of the mean value also assumes that one consumer would ingest all products in the lot at the mean value at the same frequency over time.

Rather than using the mean, the median is the more appropriate statistic because it is not heavily influenced by atypical or outlier data. It is also not influenced by approximations which must be made when results fall either below and above the limit of quantification (assuming the median value does not also fall above or below the limit of quantification). Median values may give a more realistic picture of the probability of a consumer getting a certain dose because half of the results are above and half are below the median. The median of unexpired tablet results from the Emery data set was 602.7 ng/150 mg, which demonstrates a significantly different likely dose than the one predicted using the mean value. Note, still, however, that the *median* value of Emery's unexpired tablets is still higher than the *maximum* value observed by FDA (465 ng/150 mg).

These distinctions matter because the data has been further misinterpreted by other experts. For instance, Dr. Panigrahy used the mean baseline estimate of 1,096.6 ng/150 mg to calculate the years it would take to reach a cumulative NDMA exposure that was purportedly associated with a statistically significant increase in risk of certain types of cancers based on doses reported in an occupational epidemiological study. Thus, by using means and not taking outliers into account, he too overestimated the probable exposure to NDMA and underestimated the years to reach a given cumulative exposure. To put this into perspective, Dr. Panigrahy conducts calculations based on a level of 1096.6 ng/150 mg pill, which is 2.36 times higher than the *highest* value reported by FDA.

Additionally, another expert, Dr. Davis, statistically analyzed Dr. Najafi's baseline data and his analyses show that the dataset is not reliable. Dr. Davis conducted a linear regression analysis of NDMA levels versus time between manufacturing and testing. Dr. Davis limited his analysis to only Emery's new baseline data and did not consider any of the other available sources. Dr. Davis concluded that there was "no natural interpretation" in the analysis. If ranitidine consistently


Contains Confidential Information – Subject to Protective Order

developed increasing levels of NDMA over time, the time between manufacturing and testing should show a consistent trend toward higher values for older batches. Dr. Davis highlighted that even the summary statistics indicate much to the contrary. This is shown as a graph using Dr. Davis's tabular results (Appendix 3, p. 2). In his analysis, the oldest batches have the lowest mean NDMA content.




*Fig. 13, The levels of NDMA in Emery's baseline data plotted versus the number of years between manufacture and testing. Dr. Davis concluded there was "no natural interpretation" of the data.*

Dr. Davis' analysis also found that the "mean for controlled temperature/humidity is more than twice as large as the mean for ambient" with a statistically significant difference. If true, this would mean that having no temperature or humidity controls is actually associated with a lower baseline level of NDMA and that attempts to control storage conditions makes the NDMA levels rise, a conclusion that is directly contrary to Dr. Najafi's own opinions. This finding lost statistical significance when limiting the analysis to unexpired product only.

This is further evidence of the difficulty in assigning levels of NDMA exposure to consumers with confidence. It also underscores the significant limitations of Dr. Najafi's baseline dataset and the unreliability of the conclusions Dr. Najafi draws from the Emery test results. Therefore, there no scientifically valid reason to dismiss FDA's, GSK's, or Sanofi's data, nor was he justified in not considering the remaining data from other regulatory agencies and independent researchers (including his own prior research).

Therefore, to a reasonable degree of scientific certainty, I come to the following conclusions regarding Emery's baseline data: First, additional documentation is needed to support that the results are valid. Second, given the lack of experimental design, results should be interpreted with caution and interpreted with the appropriate level of uncertainty. Third, comparing the results with other available data, including data derived mostly from samples on the market, demonstrates that Emery's latest results are grossly inflated against other sources and likely do not represent the typical values

that would be found on the market. Fourth, Emery's baseline data is demonstrably variable and shows no trend between NDMA levels and time, which raises the level of uncertainty and complicates any conclusions which could be drawn from the data. Fifth, even if levels comparable to Emery's latest test results were actually found on the market, the median value is more appropriate than the mean for extrapolation. Sixth, other experts misinterpret Dr. Najafi's baseline results with no consideration regarding the uncertainty of the results or proper consideration of inconsistent data.

**e. Emery's Unsealed Versus Sealed/Unsealed Analysis**

Proper documentation, analytical validation, and method performance are all prerequisites for the interpretation of analytical data. Analysis of samples from this study is described in Notebook No. 070-RC. A partial printout of the method used is taped into the notebook, but the method is different than CHM-021.00 given in Dr. Najafi's report. Specifically, samples were sonicated for 20 minutes rather than the 5 minutes given in CHM-021.00. No temperature control of the sonic bath was indicated. This is important because heat generated by sonication could impact NDMA levels. No change control documentation with rationale for changing from 20 minutes to 5 minutes sonication was provided. Nevertheless, taking the data at face value, I will proceed to interpret Emery's sealed versus unsealed analysis.

Emery conducted a study which I will refer to as the "Unsealed versus Sealed/Unsealed Test." Dr. Najafi reported that the purpose of the study was two-fold: (1) to evaluate the amount of NDMA formed under the set stability conditions; and (2) to evaluate if unsealing the bottle prior to placing the bottles in storage influence ranitidine stability. It is unclear what practical purpose the results of this study would have on any real-life scenario. Rather, Dr. Najafi's conclusion (discussed later) suggests that this study was meant to justify using only unsealed bottles in future analyses. In other words, it appears that Emery wanted to demonstrate that even if their testing used only unsealed bottles, the results would apply equally to sealed bottles. Regardless of purpose, the Unsealed versus Sealed/Unsealed Test suffers from basic methodological flaws that preclude any reliable inference to be drawn from the results.

For this study, Emery exposed ranitidine tablets to stressed conditions (60°C, 95% RH) (a "feels like" temperature of 604°F) for seven days. At the start of the study, one bottle ("Unsealed") was unsealed and 30 tablets were removed, increasing the available headspace in the bottle. During the course of the study, the Unsealed bottle samples had tablets withdrawn 10 more times, further increasing the available headspace. As for the other bottle ("Sealed/Unsealed"), it was kept sealed for the first 3 days. After 3 days it was unsealed, but the samples were only withdrawn 3 more times, providing overall less headspace.

There are basic methodological flaws with the study design. One core scientific principle of controlled experiments is that an investigator should only change one variable at a time unless multifactor statistical design of experiments methodology is used. If a study changes multiple variables, there is no way to discern whether an observed effect is associated with one variable over the other, or if the combination of variables interacts in either an additive or nullifying manner. For

this test, the sealed-unsealed conditions should be the only variable. But there are several additional variables changing between study conditions. First, the available headspace between the bottles is different. As noted above, headspace can be an important factor in considering stability and should be controlled. Second, there was no confirmation that the beginning levels of NDMA were the same between bottles. Dr. Najafi states: "The timepoint 0 analysis for Set 1 provided baseline NDMA levels," but it is an unfounded assumption. While these are from the same lot and presumably purchased from the same eBay seller, whether these bottles were subject to the same conditions prior to testing is unknown. Moreover, given samples in the same bottle can have high variability (discussed above), it is completely unsupported to presume that samples from different bottles stored under unknown conditions would have the same baseline levels of NDMA.

Additional problems with the methodology arise when considering how the study attempted to assess precision and tablet-to-tablet variability. In terms of the graphical representation, it appears that during all testing, only a single tablet was tested for each measurement except for the 150 mg Unsealed bottle at hour 172 which had replicate measurements (as demonstrated by that datapoint having the only visible error bars in *Fig. 14*). The graph is copied below for reference. Given that the scale is large, it is possible the error bars exist for the other measurements, but they are not visible, but as noted above, the data is not provided. Even if replicate values were tested, given that there is no protocol, there is also no sampling plan or randomization in sample selection, introducing likely bias into the study.




*Fig. 14, Dr. Najafi reports this figure represents: "NDMA levels during 60 degrees C and 95% RH storage in 150 mg Zantac tablets in Set 1 (unsealed) vs. Set 2 (sealed)." Notably, only one error bar is provided calling into question whether a protocol was prespecified, why replicate measurements were only taken once, and whether variability was properly controlled.*

Beyond the methodology problems, Dr. Najafi's conclusions do not follow from the available data even if I assume the data are valid. First, related to the sealed versus unsealed conditions, he concludes: "At 60 ˚C and 95% relative humidity NDMA formation is significant, rapid and occurs despite starting with sealed or unsealed bottles" and "In the sealed bottle arm of the study (Set 2),

starting out with sealed containers did not prevent NDMA formation under these storage conditions." I disagree insofar as Dr. Najafi does not present any evidence that NDMA formation is rapid when the bottle was sealed. Dr. Najafi reports only a single datapoint measuring the NDMA after the Sealed/Unsealed bottle was stored under the sealed conditions. That was the measurement at 72 hours. Since there is no baseline to compare this to, Dr. Najafi has no basis to say whether the levels of NDMA levels observed at 72 hours represent an increase, decrease, or no change from baseline. After 72 hours, the Sealed/Unsealed bottle was unsealed for the remainder of the experiment, so those data cannot be used to compare what occurred when the bottle was sealed.

Dr. Najafi also concludes that "NDMA formation occurred in the first 24 hours." Again, even if I assume the data are valid, I disagree that the data supports Dr. Najafi's conclusion. Tabular data is not provided but the graphical representation (*Fig. 15*) of the data shows almost no change in the levels of NDMA in the first 24 hours. The scale is large, precluding the ability to visually see smaller changes, but some data points in the first 24 hours appear to actually decrease from the measurements before them, such as the 150 mg at ~hour 8. Because of the high variability and the small change (if any), one cannot reliably conclude there is a true change in the levels of NDMA in the first 24 hours. In fact, this situation is analogous to Dr. Najafi's refrigeration experiment where analytically he detected a net increase of ~20 ng NDMA, but because of variability between datapoints, he concluded there was "no appreciable NDMA formation."




*Fig 15, Dr. Najafi reports this figure represents: "NDMA levels during 60 degrees C and 95% RH storage in Zantac tablets in Set 1 (unsealed)." Notably, NDMA levels do not appear to appreciably increase in the first 24 hours, despite Dr. Najafi's claim that they do.*

Dr. Najafi did not mention that different bottles can affect the rate of NDMA formation. Figures D and E in his report compare rates of NDMA formation starting after 72 hours when the sealed bottle was unsealed. After that point the rates of NDMA formation for unsealed and


Contains Confidential Information – Subject to Protective Order

sealed/unsealed bottles of 75 mg appear similar. However, the 150 mg sealed/unsealed bottle formed NDMA at a much lower rate than the unsealed bottle. (*Fig. 14*). In fact, the sealed/unsealed result decreased from 72 hours to 120 hours. It was unexplained and not even noted by Dr. Najafi that both bottles started with the same NDMA level at 72 hours, were both unsealed for the rest of the study, but yet showed much different rates of NDMA formation. The uncontrolled differences in headspace may have contributed to the different rates, but that does not explain the roughly equivalent results at 72 hours unless his baseline level assumption was faulty. This high variability between bottles has not been accounted for in any of Dr. Najafi's studies or conclusions.

Lastly, Dr. Najafi notes that the method is "a scientifically accepted method" under certain circumstances. It is worth noting that this is stress testing or "forced degradation" testing, where the intent of the experiment is to induce degradation. In a laboratory notebook *(Notebook No. 070-RC, pg. 11 of pdf)* a "bitter odor" was noted for 120 and 168 hour unsealed samples. This was not reported by Dr. Najafi. A patient would not plausibly take pills with such an odor and this highlights the non-relevance of stress conditions to real-world consumer experience. Neither regulatory authorities nor the scientific community view stress testing as representative of real-world conditions and so the doses of NDMA reported in this testing are not representative of real-world use and Dr. Najafi's opinions that it is are contrary to well-established stability practices.

**f. Emery's "Stability" Studies**

Although proper documentation, analytical validation, and method performance are all prerequisites for the interpretation of analytical data, taking the data at face value, I will proceed to interpret Emery's stability (stress) testing.

Dr. Najafi conducted several stress studies that are discussed in his report but also some additional studies not discussed in his report. Dr. Najafi states: "The rate of ranitidine's transformation into NDMA is accelerated by heat and humidity." But he fails to acknowledge the large variation in the rate of NDMA formation that has been observed. The statement also fails to acknowledge the role that packaging plays in exposure to humidity. Based on the studies in his report, he concludes: "ranitidine is a highly unstable molecule and forms NDMA in 'real-life' storage conditions." The conditions in his studies, however, do not represent plausible real-life conditions and the results suggest that his pills may have liquified – which would yield results irrelevant to consumer use. Without further information from his studies, one cannot assess whether his results are representative of what might actually occur.

Before addressing Dr. Najafi's data it is important to recognize that a number of researchers have conducted stress testing on ranitidine drug product. Based on the available data, I will briefly discuss some basic findings which will assist in the interpretation of Dr. Najafi's data:

- GlaxoSmithKline has conducted stress testing on ranitidine drug product under various stress conditions, using no container closure system, and by leaving the product in solid state. GSK concluded that a combination of elevated and prolonged temperature and humidity conditions can increase the rate of NDMA formation. GSK

observed that the product turned dark brown upon significant degradation. GSK also observed that at a relative humidity of 50% and above, the film coat was lost, which is correlated with a decrease in the levels of NDMA over time. At high temperature and humidity conditions, GSK observed that ranitidine API deliquesces (liquefies) into a brown oil-like substance. *(GSK RCA)*.

- Japanese researchers reported conducting stress and accelerated stability studies and reported that NDMA formed, although there was no attempt to differentiate the effects of temperature and humidity. The researchers' findings report that tablet browning occurred during the study, calling into question the practical significance of their data. *(Abe 2020)*.

- FDA has conducted stability testing on ranitidine, but limited information is available. (*FDA Response to Valisure Citizen Petition*). FDA reported testing ranitidine under Accelerated Stability Conditions (presumedly 40°C, 75% RH, "feels like" 171°F) and reported elevated levels of NDMA were measured in all products after 2 weeks. FDA did not specify whether this testing was on drug products or API, whether a container closure system was used, or how "elevated" these levels were or whether they exceeded FDA's limit. FDA has also reported testing the product at room temperature and observing that levels can rise above the FDA limit over time, but FDA did not specify whether this testing was done inside a container closure system and how much time it took for the product to exceed the daily limit. FDA noted one batch increased in the level of NDMA over a period of 5 months.

- Before being retained by Plaintiffs, Emery exposed the drug product to elevated temperatures (98.6°F) for up to 30 days. Humidity and the container closure system were not reported. Despite being exposed to a high temperature for a month, Emery found no appreciable NDMA formation (approximately 1.4 ng or less of NDMA formed). This data was selectively omitted from the Citizen Petition and not even mentioned in Dr. Najafi's report.

In contrast, after being retained by Plaintiffs, Emery conducted additional testing and found much higher levels of NDMA formation. For example, at a lower temperature (25°C/65% RH) and in less time (21 days), Emery reports finding an increase of 321 ng NDMA (compared to only 1.4 ng formed at a higher temperature of 37°C for 30 days). An analysis of this testing is provided below.

There are many problems with Emery's latest testing. First, as a preliminary matter, there is no protocol, so one cannot be guaranteed that this is the product of a true experimental design. Nevertheless, Emery reports exposing the product to 25°C/65%, 25°C/95%, 40°C/65% ("feels like" 153°F), and 40°C/95% ("feels like" 214°F) for 180 days.

Dr. Najafi claims to have followed FDA's Guidance for Industry, Q1A(R2), but the conditions in Q1A(R2) were not followed. In addition to not following the conditions set forth in Q1A(R2), Dr. Najafi also did not comply with the container closure system requirements of the Guidance. Dr. Najafi

specifically says Emery only tested two pill bottles which were apparently opened and the pills re-packaged in High Density Poly Ethylene (HDPE) pill bottles. Dr. Najafi does not provide any information whether the replacement HDPE bottles and closure systems ("lids") are representative of the bottles and lids used by Zantac manufacturers. He also did not report the available headspace in each bottle. Nor did he report whether an induction seal was made and whether other product packaging features were sufficiently similar. Ultimately, without this essential information, which is necessary to be justified under Q1A(R2), one cannot claim to have followed the Guidance and this testing would not satisfy the requirements set forth in the Guidance.

In all testing, the NDMA levels rose, but subsequently fell, indicating that the tablets may have lost their film coating or deliquesced. Dr. Najafi did not report the physical conditions of the tablets, so this cannot be determined. A portion of the data was provided in tabular format, but the table omitted the significant error bars seen in the graph. Additionally, while Emery tested multiple samples at earlier timepoints, they were only testing a single sample at later timepoints. The haphazard collection and/or reporting of data is suspect and calls into question the validity of the results.

Lastly, even if one assumed all the results were valid and the testing properly conducted, Dr. Najafi does nothing to justify and explain the highly variable results observed between his varying tests. He concludes NDMA forms in "real-life" storage conditions, but based on his data, this can be as little as a few nanograms, the levels may increase and decrease, and there is no evidence from his stability studies that any particular levels of NDMA would be expected under any set storage condition.

**g. Emery's "Consumer Experience Testing (Post Purchase)"**

Although proper documentation, analytical validation, and method performance are all prerequisites for the interpretation of analytical data, taking the data at face value, I will proceed to interpret Emery's Consumer Experience Testing Data, including the data Dr. Najafi failed to report, in light of the conclusions Dr. Najafi draws from the data.

Formal "in-use" stability protocols are established scientific methods that assess whether degradation may occur during consumer handling of their products. As noted above, regulators usually do not require in-use studies for solid oral dosage forms of pharmaceuticals. To the extent in-use testing is necessary, regulators generally suggest the studies be conducted at the recommended storage conditions. *(EMA, Note for Guidance on In-Use Stability Testing of Human Medicinal Products, March 1, 2001)*. It is generally understood that an in-use study can often lead to elevated levels of degradation beyond what a consumer would actually ingest depending on whether conservative conditions are used in the study design. In 2020, FDA's Information Request suggested an in-use protocol designed with highly conservative assumptions (storage at 30°C/75% RH with container opening for two minutes every day for a total number of openings/day that correspond to the most frequent dosing regimen in the product labeling), which would likely lead to much higher results than a consumer would actually ingest but would ensure compliance through in-use studies.

Dr. Najafi did not follow any well-established methodology and instead developed *ad hoc* methodologies which have not been demonstrated to be representative of consumer experience. For the reasons I describe below, Dr. Najafi did not utilize a scientifically reliable methodology.

**i. Hot Car Study**

First, the protocol for this experiment is not dated and provides no assurance that the experimental design was created before the experiment was run. In fact, there is evidence, discussed below, to suggest the protocol was drafted *after* the experiment concluded. The protocol specifically omits mentioning that certain data was collected but not reported. Under such suspect data integrity issues, it would not be reliable to even begin an analysis, but for the sake of completeness, I will proceed.

Dr. Najafi reported that his experimental designs were "to simulate a few examples of common consumer experience with Zantac to determine if NDMA would be formed while in storage." But he did not provide sufficient justification for his claim that storage of medicine in a hot car is "common consumer experience." In fact, in other places in his report, Dr. Najafi acknowledges Zantac is commonly taken in close temporal proximity with a meal, so unless the average Zantac user eats dinner in their car every day, there is no clear connection between Zantac's indication and reasons why Zantac users would store their medication in their cars.

Even assuming storage in a hot car was common, Dr. Najafi does not provide sufficient justification that the study design mimics real-world hot car conditions, nor has he reported any attempt to validate his study design through comparison to real-world data. These issues can be broken down to three separate parts below.

First, the temperature used in his study (75°C for sun, 50°C for shade) were purportedly derived from Vanos 2018, but Vanos does not provide adequate support for these assumptions. The Vanos study sought to demonstrate the impact of solar radiation on the heat balance of a hypothetical child left in a closed vehicle on a hot day *(Vanos 2018)*. Given that goal, the authors selected extreme weather conditions. Specifically, the Vanos publication measured interior car temperatures during June and July in Arizona. So already, this testing was conducted in one of the hottest climates in the United States during some of the hottest times of the year. The Vanos publication then reported several values: The air cabin temperature, and the surface temperatures of the dashboard, wheel, and seat. The average interior car temperatures (all measurements combined) reported in that study were 46.7°C and 38.3°C for sun and shade exposure, respectively. Average air cabin temperature (which is likely to be the most representative of what heat will actually transfer to the tablet) was 47.6°C and 39.5°C for sun and shade respectively. Average surface temperatures of 68.9°C, 53.3°C, and 50.6°C were reported for dashboard, steering wheel, and seat with exposure to sun. Without explaining or justifying his decision, Dr. Najafi chose to use a temperature even higher than the average *dashboard* temperature reported by Vanos, purportedly to simulate "real life". It is unclear why the dashboard measurement would be the relevant measure here, when it is much more likely that the air cabin temperature would be the more relevant metric (47.6°C and 39.5°C for sun and shade, respectively)


Contains Confidential Information – Subject to Protective Order

– to the extent any temperatures reported in the study are representative at all. The air cabin temperatures are much lower than what Dr. Najafi used. He then repeated these conditions for up to 50 "cycles" where the temperature would rise and fall in cycles.

Another flaw with Dr. Najafi's experimental design is that he does not disclose any information related to the container closure system used in his studies or the amount of headspace in each bottle. Both of these can greatly impact the exposure of each pill to the atmosphere. This type of information is necessary in stability studies and is specifically controlled for in FDA's in-use stability protocol. The fact that Emery did not prespecify these conditions in the protocol indicates a lack of scientific rigor. Additionally, Dr. Najafi does not consider these factors when interpreting results nor did he make any attempt to justify how the container closure systems used and available headspace would be relevant to real-world Zantac use.

Yet another flaw in Dr. Najafi's study design is that he did not make any attempt to control for variability or consider the representativeness of the tablets. His protocol does not provide any information for how sample selection was to occur. His report notes the sample selection was not randomized but states instead that "These lots were selected as they had varying levels of baseline NDMA in the tablets." This method of non-random selection can introduce bias and some samples may not be representative of what actual starting baseline levels may be. Moreover, Dr. Najafi does not report any replicate runs, so there are no measurements to address potential variability between tablets.

Additionally, five of the nine batches used by Dr. Najafi were expired and two more were within two months of expiring, so they would not represent consumer experience. Batches selected for additional studies started on January 5, 2022 included seven expired batches out of the ten batches used. For these ten batches, data from 15 sun and shade cycles were reported.

Since the design of this testing is intended to represent what might occur in a real situation, Dr. Najafi should have "validated" that the experiment was truly representative of real-world values. (Note, this type of validation is different from analytical validation, which is concerned with ensuring the analytical measurements are correct.) Validating the design would entail, for instance, reliably measuring the levels of NDMA that occur when consumers left their ranitidine in their car and then comparing the actual naturally occurring levels with the levels produced by the experiment. This type of validation is important because it not only ensures the factors controlled by the design are representative, but it also helps to ensure that there are not additional uncontrolled factors that could undermine the reliability of the study design.

Additionally, it is not clear whether this study used any true control. I assume that Dr. Najafi intended for his "0 cycle" data to serve as a control, but this is not appropriate. Rather, Dr. Najafi should have analyzed a control tablet with each set of samples at the same time, to ensure that the effect of time did not confound any observed effect of the "cycle".

Beyond the methodology, there are also issues in the way Dr. Najafi reported the data. First, for Dr. Najafi's first round of hot-car testing (listed in Figures JJ and KK in Dr. Najafi's report), he

reported the results of 9 batches (including one duplicate) but he actually tested a total of 15 batches during his initial study. Dr. Najafi's report provides no mention of collecting data after 6 cycles. His undated protocol likewise provides no mention of this data collection. This data is only available from the report of Dr. Davis, who conducted statistical analyses of all the results.

Second, Dr. Najafi did not report his visual and odor observations to justify whether each tablet was sufficiently intact for consumption. Step 3.10 in his protocol notes that the Emery analyst would "[v]isually inspect samples for any foreign particles or distinctive changes in color and/or odor prior to NDMA analysis." Given that his protocol specifically called for this information to be reported, it is unclear why no documentation to this effect was provided. One might suspect that at some of the higher levels of NDMA, a consumer could observe noticeable degradation either by sight or smell. Under such circumstances, a reasonable consumer is unlikely to ingest a spoiled tablet, which would undermine the practical relevance of this data.

Third, even if there were no data integrity issues here and the pills were suitable for consumption, some of the data raises additional flags. In some instances, the "shade" conditions resulted in higher NDMA levels than the "sun" conditions for the same batch, even though the "sun" conditions used 25°C higher temperatures (batch 19E573-50 cycles, batch 753969-30 cycles), In many instances, there does not appear to be any significant effect (or any apparent effect at all), until 50 cycles.

Additionally, there are unexplained inconsistencies even among the Dr. Najafi's baseline testing. For instance, he provides two sets of test results for lot 19D561. One set starts with a baseline level of 241.4 ng and the other with 818.3 ng. He doesn't address this difference. This may be due to tablet-to-tablet variability, but if so, Dr. Najafi would need to qualify that any observed differences may be due to variability between tablets and that predictions about the rate of NDMA formation cannot be made with a reasonable degree of confidence.




*Fig. 16, The above graph plots all data from Dr. Najafi's "shade" experiments showing high variability among batches. Several instances exist where decreasing levels of NDMA are observed with an increasing number of cycles (in addition to the haphazard collection of data) that prevent determination of an accurate rate of NDMA formation that could be generalized to other samples.*




*Fig. 17, The above graph plots all data from Dr. Najafi's "sun" experiments showing high variability among batches. Several instances exist where decreasing levels of NDMA are observed with additional cycles (in addition to the haphazard collection of data) that prevent determination of an accurate rate of NDMA formation that could be generalized to other samples.*

An overall average increase in NDMA levels is not consistent across all time points as shown by several instances where NDMA levels decreased with additional cycles. Also, tablet-to-tablet variability is not shown in these results and Dr. Najafi does not consider this variability when interpreting levels of NDMA. Even if a trend was present, the overall variability would preclude confident prediction of what levels of NDMA would be generated for any given tablet or other batch.

In her report, Dr. Le speculates that the decreases in NDMA observed with increasing cycles "suggest that NDMA may have transformed to other entities, that can be potentially its toxic metabolite that mediates cancer formation." (pg. 58). She provides no evidence to support her statement, and Dr. Le failed to account for tablet-to-tablet variability and that the potential loss of NDMA may be due to the loss of the film coat and other associated physical changes like browning of the tablet which may undermine the practical relevance of the data given that consumers would not plausibly ingest the tablets at this point.

Lastly, I would like to briefly address the statistical analysis performed by Dr. Davis. As a preliminary matter, it is important to note that usually an analytical chemist and a statistician would


Contains Confidential Information – Subject to Protective Order

collaborate *before* analytical testing to determine the experimental design, making sure that appropriate sample size, randomization, and other controls are present in the study design to yield reliable and well-powered results to address the hypothesis being tested. *(USP General Chapter <1010>).* Nothing like this was done. As noted several times, it does not even appear that Dr. Najafi's experiment was prespecified. Dr. Davis claims that he developed his statistical analysis plan prior to seeing any data, but later reversed and acknowledged that "alternative approaches" were used because of small sample sizes.

Dr. Davis attempted to determine the rate of NDMA formation under the stress conditions for shade, car, and shower. He calculates "slopes" for each condition where a *positive slope* indicates increasing NDMA levels while a *negative slope* indicates decreasing levels of NDMA. Dr. Davis recognizes that negative slopes exist, which he attributes to high baseline values. Negative slopes, however, exist beyond just the high baseline levels, but Dr. Davis only calculates the average slope, and does not comment on the fact that slopes with positive averages also contain instances of decreasing levels of NDMA between specific cycles, which raises questions regarding the practical relevance of the data if the tablets lost their film coatings and turned brown. In fact, Dr. Davis does not acknowledge the several instances where NDMA levels fell between Cycle 30 and 50, which occurred in lots with lower baseline values. Likely, Dr. Davis' slopes had a poor "fit" to the data as suggested by the high standard deviations associated with the mean slopes. This greatly reduces any ability to generalize NDMA formation rates.

Dr. Davis concludes the "estimated mean increases in NDMA level per 1 cycle increase in the number of cycles" are 54.5 ng for shade and 55.0 ng for sun in unexpired product. This type of crude "averaging" is misleading because it ignores the high variability, including negative slopes, observed in the dataset. This average is also reached, in part, based on observations between only two data-points. Essentially, there appears to be no collaboration between the testing conducted by Dr. Najafi and the subsequent analysis by Dr. Davis, and at no point do either of them acknowledge that the dataset is extremely limited and that no reliable conclusions can be drawn from it.

**ii. Shower Study**

Looking now to the shower experiments, many of the same criticisms apply such that I will only briefly cover criticisms already covered above.

As with the hot car study, the protocol is undated and provides no assurance that the experimental design was completed before the experiment was conducted. In fact, as with the hot car study, there is evidence to suggest that the protocol was drafted after the experiment concluded. The protocol specifically omits mentioning that certain data was collected but not reported. Under such suspect data integrity issues, it would not be reliable to even begin an analysis, but for sake of completeness, I will proceed.

First, as with the hot car study, the design of this study does not follow any recognizable or generally accepted experimental design. The conditions used in the shower experiment were purportedly based on the conditions reported in Aizawa 2006, a nonpeer-reviewed paper presented at

a conference about healthy houses. Putting aside the lack of peer-review, the conditions used by Emery do not even appear in the publication. For instance, the conditions used by Emery were 40°C/100% RH (a "feels like" 226°F) for 30 minutes. He then repeated these conditions for up to 50 "cycles". Comparatively, Aizawa 2006 found that the conditions in the "changing room" (where a medicine cabinet would presumably be located) reached 25°C/85% RH for about five minutes when starting at about room temperature. Even if we used the absolute highest value from the Aizawa paper, it was *at most* approximately 32°C/90% RH ("feels like" 120°F) for about five minutes. But even that value was derived based on summer conditions with no air conditioning. Thus, to the extent the study is applicable at all, Emery used much more severe conditions than are supported by the study.

However, I would also caution against considering Aizawa 2006 to be representative of an American bathroom. The Aizawa authors actually tested two rooms: the "bathroom" and the "changing room", which were separated by a folding door and were ventilated but not air conditioned. The bathroom was a Japanese bathroom that was 3.7 ft x 5.2 ft x 6.6 ft, so the entire room was slightly larger than the size of a bathtub. Practically speaking, there would be no room to store ranitidine and take a shower in a bathroom this size. Given the dimensions and purpose of the rooms in the Aizawa paper, the changing room is presumably where one might store ranitidine if in a bathroom at all, and the authors reported even lower temperature and humidity conditions in the changing room. It is unclear how Emery derived the conditions they used in their experiment, because even if one presumed ranitidine users physically took their pills into the shower and had no air conditioning, the authors report reaching a maximum of about 37°C/100% RH. So even if one makes exaggerated and implausible assumptions about how ranitidine users store their medications by their showers, Emery's conditions are still not supported by the study.

It is also important to note that the authors do not interpret their results in the same way that Emery does. The authors report their results in terms of temperature increase, finding that there is a 2°C and 5°C increase in summer and winter, respectively (note the winter increase was more dramatic because it started at ~10°C). Room temperature is generally considered 20-25°C, so even a 5°C increase is still far from the 40°C used by Emery. The point here is that these findings, even if assumed to be representative, cannot be combined with any plausible assumptions to arrive at the conditions Emery used.

Lastly, it is important to note that beyond the small dimensions and lack of air conditioning, there may be other differences that make the conditions in Aizawa 2006 unrepresentative. For instance, the windows were sealed and the authors described that the tub water was preheated with a cover and that the bathroom reached 100% humidity "right after" removing the cover, which suggests something different from a typical American shower routine.

In addition to the conditions used, this study also suffers from the failure to report the container closure system or the integrity of the tablets during the study. In fact, the results indicate that in some instances Emery observed that NDMA levels plateaued or even began to decrease, which generally occurs once the tablet has completely deliquesced into liquid. These tablets are often described as turning brown and losing their film coating. *(GSKZAN0000051927-2018)*. So even if

one were to assume the conditions used were representative, there is not sufficient evidence that the results are practically relevant.

Also, as with the hot shower experience, since the design of this testing is intended to represent what might occur in real situation, Dr. Najafi should have validated that the experiment was truly representative of real-world values. Without ever validating the study design, he cannot rule out the possibility that uncontrolled factors may be influencing the results of the study.

The same batches used in the hot car studies, most of which were expired, were also used for the bathroom studies. Again, using expired lots introduces doubt regarding the validity of any results.

Additionally, it not clear whether this study uses any true control. Again, I assume that Dr. Najafi intended for his "0 cycle" data to serve as a control, but this is not appropriate. Rather, Dr. Najafi should have analyzed a control tablet with each set of samples at the same time, to ensure that the effect of time did not confound any observed effect of the "cycle".

Beyond the methodology, there are also issues in the way Dr. Najafi interpreted the data. For the second bathroom study, ten batches were used but data from only eight batches was reported. However, Figure NN and Figure PP are different versions of the same data for the eight batches reported. Dr. Najafi appears to have made an error in preparing his report that resulted in omission of bathroom data for two batches. Dr. Najafi's also does not even mention collecting data after 6 cycles and his undated protocol likewise provides no mention of this data collection. Dr. Najafi does not mention this data or rationalize the reason for omitting it. Rather, he omitted the data from his report, which raises serious data integrity issues.




*Fig. 18, The above graph plots all data from Dr. Najafi's "shower" experiments. High variability, along with several instances where decreasing levels of NDMA are observed with an increasing number of cycles (in addition to the haphazard collection of data) prevent determination of an accurate rate of NDMA formation that could be generalized to other samples.*

An overall average increase in NDMA levels is not consistent across all time points as shown by several instances where NDMA levels decreased with additional cycles. Also, tablet-to-tablet variability is not shown in these results and Dr. Najafi does not consider this source of variability in his interpretation of NDMA levels.

Lastly, as with the hot car study, Dr. Davis attempted to statistically analyze this data. I share many of the same concerns regarding lack of overall scientific rigor and concerns related to the failure to pre-specify the statistical design prior to analytical experimentation as above, so I will not repeat them here.

In terms of the analysis, again, Dr. Davis fails to adequately consider whether the observed negative slopes undermine the experimental validity of the data. Instead, he provides a misleading estimated mean increase of 101.0 ng per cycle. This average assumes a continual increase and does not properly account for the several instances where NDMA levels decrease per each cycle and is made, in part, based on observations between only two data-points. The figure also ignored the high

variability and is based on a dataset including samples which may have turned brown and lost their film coating, leading to questionable real-world relevance.

**iii. Zone Studies**

Looking now to the climate zone studies, many of the same criticisms apply such that I will only briefly cover criticisms already covered above.

As with the prior two studies, the protocol is undated and provides no assurance that the experimental design was pre-specified. Again, there is evidence to suggest the protocol was drafted after the experiment concluded. The protocol specifically omits mentioning that certain data was collected but not reported. In light of such suspect data integrity issues, it would not be reliable to even begin an analysis, but for the sake of completeness, I will proceed.

Next, considering the climatic zone methodology, one fundamental flaw is that the climatic zone testing assumes consumers store their medication outside or have no air conditioning such that the atmosphere inside the house is the same as outside the house. In fact, Zones III and IVa are not reasonably predicted to be relevant to the United States, where air conditioning and interior environmental controls are widely accessible. In fact, FDA does not require manufacturers to test in Zones III and IVa even though some parts of the country have environmental temperatures that rise to this level. *(FDA, Guidance for Industry, Q1A(R2) Stability Testing of New Drug Substances and Products)*.

There is no rationale for the choice of samples used in the climatic zone study. Three of the five batches used were expired at the time of the study, so their relevance and reliability is questionable. As with other studies (such as API zone stability), some of the NDMA levels show numerical increases that are not consistent with the age of the sample. For example, batch HF6N was manufactured on June 1, 2017 so it was over 4 years old at the time the study was initiated on November 11, 2021. According to Appendix B, batch HF6N had been packaged in blister packs and had been stored at ambient temperature prior to shipment to Emery. Therefore, the batch had over 4 years to reach the baseline level of 203.3 ng/150 mg, assuming the baseline result is correct. Then, in just 2 weeks, the levels jumped by 139.2 and 148.1 ng/150 mg for the Zone I and II conditions, respectively. This apparent rate of NDMA formation (~72 ng/week) is much greater than supported by the baseline level (<1 ng/week assuming no NDMA present at time of manufacture), casting doubt on the validity of the study. Dr. Najafi overlooks this inconsistency in his report.

Dr. Najafi states that "… all samples tested, regardless of starting NDMA level, formed more NDMA when stored in each of the five test climatic zone conditions." A simple examination of graphs QQ and RR shows this statement to be false. A decrease in NDMA is reported for Batch AL4891B with Zones I and II. Since there are no error bars or replicate results reported for each time point, it is not possible to evaluate the significance of differences in most of the reported NDMA levels. However, the result for batch HA4J goes from a baseline of 330.7 ng/150 mg to 348.3 ng/150 mg for Zone I. Given the tablet-to-tablet variability observed by Emery, a difference of 17.6 ng/150 mg


Contains Confidential Information – Subject to Protective Order

(~5%) cannot be considered significant so the conclusion that the NDMA level increased is unfounded.

Given the many questions and flaws regarding the design of this study and the faulty conclusion reached by Dr. Najafi, the study cannot be considered relevant or reliable for assessing NDMA levels a consumer might ingest.

Dr. Davis' analysis, as with his prior analyses, is again unreliable. I share many of the same concerns regarding the lack of overall scientific rigor and concerns related to failure to pre-specify the statistical design prior to analytical experimentation as above, so I will not repeat them here.

In terms of the analysis, again, Dr. Davis calculated that some values resulted in negative slopes but failed to adequately consider whether the observed negative slopes undermine the experimental validity of the data. Instead, he provides an "estimated increase in NDMA level per 1-week change is 6.5, 9.7, 22.7, 64.0, and 97.7 for zones 1, 2, 3, 4A, and ACC, respectively", but these results are misleading based on the high level of variability observed. For instance, for the subject-specific slopes, some of the standard deviations are more than twice the mean, so no reliable prediction could be made regarding the levels of NDMA that might form in a specific tablet or batch under a given set of circumstances.

**iv. Summary of Consumer Experience Testing**

As noted above, there are significant flaws related to documentation practice, study design, execution, data interpretation, and statistical analyses conducted by Dr. Najafi and Dr. Davis related to this set of testing.

These shortcomings matter because the data has been misused by another expert, Dr. Salmon. Dr. Salmon used Emery's mean NDMA level observed after consumer handling to calculate the years it would take to reach a "significant finding level," i.e., years to reach a cumulative NDMA exposure that was purportedly associated with a statistically significant increase in risk of all cancers or gastric, esophageal, bladder, pancreatic, or liver cancer according to Dr. Salmon's interpretation of past epidemiological studies. By using these figures, he is making unfounded and implausible assumptions such as:

- For the hot car data, Dr. Salmon would need to assume ranitidine users store their medicine in the car for up to 50 "cycles" *before* ingestion; the car is hotter than a car in the *sun* in *Arizona* in *summer*; and the car gets this hot *year-round*.
- For the bathroom data, Dr. Salmon would need to assume ranitidine users store their medicine for up to 50 "cycles" *before* ingestion; ranitidine users live in a home with room temperatures, *year round*, of 35°C (95°F) before the shower begins; the bathroom temperature increases by the maximum amount (5°C) for every shower; the ranitidine user endures a "feels like" temperature well beyond what is considered "extreme danger" (226°F) for 30 minutes every day; and the entire bathroom is about

the size of a bathtub, but that the ranitidine user still stores the medicine in the bathroom.

- For the zone data, Dr. Salmon would need to assume ranitidine users store their medicine for up to 8 weeks *before* ingestion; that ranitidine users store their medicine *outside* or have no air conditioning; that the same environmental temperature is consistent *year-round* (i.e., the seasons no longer change). For instance, at the highest temperature used, he would need to assume ranitidine is stored at 40°C (104°F) every day year-round.

Despite these implausible assumptions, Dr. Salmon uses this data as the basis for his opinions. He also further calculates a multiplier of 2.5 which he applies to FDA's highest data point, which again, assumes that every time a ranitidine user purchases ranitidine, they pick the worst batch tested by FDA, they stored it either outside or in an unairconditioned room 2 to 8 weeks prior to consumption. He then takes a crude average from all weeks and all zones combined and uses this to estimate how NDMA levels might increase during consumer handling. Given the sheer number of implausible assumptions made about already inconsistent analytical data, Dr. Salmon's use of this data fails to meet well-accepted scientific principles and is unreliable.

Therefore, to a reasonable degree of scientific certainty, I conclude that Dr. Najafi's data and opinions regarding his "consumer experience" studies and the opinions offered by Dr. Davis and Dr. Salmon which extrapolate from these studies, are scientifically unreliable.

**h. Emery's Refrigeration Study**

Although proper documentation, analytical validation, and method performance are all prerequisites for the interpretation of analytical data, taking the data at face value, I will proceed to interpret Emery's refrigerated stability study.

Emery conducted a stability study on samples stored under refrigeration (2-8°C) and presumably ambient humidity (although the humidity conditions are not specified). A protocol for the study was not provided, so there is no evidence that this data is the product of any proper experimental design. Moreover, Dr. Najafi reported the results of only a single batch of tablets and did not use any control group (in other words, comparison to the same product kept under room temperature conditions for the same period of time). The container closure system used to store the medicine during the stability portion of the experiment was not described or justified. Error bars are shown on the graph, but it is not clear what error is represented. The data summary furnished by plaintiffs *(Data_4C Long term Stability)* showed that 7 replicates were used for the first three time points and 3 replicates for the next five points, indicating an inconsistent protocol if one was used at all. Overall, the scientific rigor in this study design and execution is demonstrably poor. For reference a copy of the graph provided by Dr. Najafi is copied below:




*Fig. 19, Dr. Najafi's Results from Dr. Najafi's Refrigeration Study*

Dr. Najafi concludes that ranitidine does not degrade appreciably under refrigerated conditions, but he does not justify why generalization is appropriate from his limited testing. Nevertheless, this is the one set of testing where Dr. Najafi appears to recognize that when there is variability in levels between time points, with the slope going up and down, one cannot conclude that there is a meaningful difference. It is unclear why he recognizes this scientific principle here but does not apply it to his other data. This study was poorly designed and the results are relatively null.

**i. Emery's Study on Emery-Manufactured Tablets**

Although proper documentation, analytical validation, and method performance are all prerequisites for the interpretation of analytical data, taking the data at face value, I will proceed to interpret Emery's manufactured tablet experiment.

Emery manufactured ranitidine tablets using API from GSK Jurong and BI Promeco in an attempt to compare the stabilities of product made with the two sources of API. The report stated that the protocol for drug product manufacturing and confirmatory tests was provided as Appendix A, but no protocol for manufacturing was present.

The study design is flawed from the outset because the tablets are not representative of real-world tablets. Manufacturers of ranitidine tablets (or the raw ingredient manufacturers) have their own proprietary formulations and manufacturing processes. The ingredients used and the process for making the tablets can impact the rate of NDMA formation so results obtained for one formulation cannot be applied to others. The API batches used in the Emery study were manufactured from 1-17-


Contains Confidential Information – Subject to Protective Order

2011 to 12-29-2014 and would not represent recently manufactured batches that would typically be used in drug product. The "direct comparison of stability of the APIs with a consistent tablet formulation" is not representative or applicable to products made by ranitidine tablet manufacturers.

Emery conducted a 4-week stability study of their self-manufactured tablets under climatic zone I, II, III, IVa, and accelerated conditions. No indication of how many tablets were used for the study or of the packaging was given. No error bars were included in the figures showing results and no uncertainties were reported in the tabular results. As with other Emery studies, the scientific rigor in this study design and execution is demonstrably poor.

Even if this study were relevant to approved manufacturers' tablets, the conclusions drawn from the data are unsupported. Dr. Najafi states that all samples progressively accumulated NDMA under all tested conditions within a period of 2-4 weeks, but his data demonstrates some uncertainty which he does not appear to consider. For example, tablets from API batch K26718 in all zones did not show any appreciable NDMA formation. Dr. Najafi does not appear to account for this discrepancy when coming to his conclusion.

Dr. Najafi's failure to account for discrepant data is concerning when comparing how Dr. Najafi's interpretation of data changes depending on the dataset. For instance, in Dr. Najafi's refrigeration study (discussed above), he concluded that NDMA formation was "not appreciable" during the course of the study. In this study, however, a similar amount of analytical variability was observed between datapoints, but rather than concluding that some batches had no appreciable formation of NDMA, he concludes they all did.

He also concluded, "all tablets developed more than an additional 96 ng of NDMA in the first 2 week time period", but this is demonstrably inaccurate. In fact, 8 of the 35 available comparisons available actually undermine this conclusion. For instance:

1. Zone I, K264718: The reported level of NDMA decreased between baseline and 2 weeks.
2. Zone I, K300726: The reported level of NDMA increased less than 96 ng in the first two weeks.
3. Zone II, K264718: The reported level of NDMA decreased between baseline and 2 weeks.
4. Zone III, K264718: The reported level of NDMA decreased between baseline and 2 weeks.
5. Zone IVa, K300200: The reported level of NDMA increased less than 96 ng in the first two weeks.
6. Zone IVa, K264718: The reported level of NDMA decreased between baseline and 2 weeks.
7. Zone IVa, K300726: The reported level of NDMA increased less than 96 ng in the first two weeks.
8. Accelerated, K264718: The reported level of NDMA decreased between baseline and 2 weeks.


Contains Confidential Information – Subject to Protective Order

Dr. Najafi reaches his opinion that "all tablets developed more than an additional 96 ng of NDMA in the first 2 week time period" despite this data, and he provides no explanation regarding why this data does not contradict his conclusion or otherwise account for this data.

Lastly, Dr. Najafi concludes that these samples "behave similar to other ranitidine drug products tested by Emery Pharma" and further concluded that "As will all other ranitidine drug products tested, these ranitidine tablets demonstrated instability for ranitidine towards NDMA formation when subjected to elevated heat and humidity over time." Notably, Dr. Najafi does not conclude that these data reflect similar rates of NDMA formation. Accordingly, the specific NDMA levels observed for one product in one test may not necessarily be translatable to these samples and vice-versa.

**j. Emery's API Stability Study**

Although proper documentation, analytical validation, and method performance are all prerequisites for the interpretation of analytical data, taking the data at face value, I will proceed to interpret Emery's API stability study.

Emery conducted a 4-week stability study on ranitidine API using conditions for climatic zones I, II, III, IVa, and accelerated stability. The reliability and relevance of the study are questionable for the following reasons. First, Emery did not conduct any testing to confirm that the API could have been used for commercial manufacturing. There is a chance that given their age (noted below), these batches would not meet specifications and thus would not be used to manufacture drug product. If they could not pass standard specifications, the samples would not be relevant. Second, the packaging conditions for the study were not disclosed. This would be necessary to evaluate the results and compare them to how ranitidine API is stored by manufacturers before processing into drug product. Third, the results simply do not make sense. For example, batch K280417 was manufactured in Sept. 2012, so it had about 9 years to accumulate NDMA, if Dr. Najafi's degradation theory is correct. Yet its baseline level was 91.6 ng/150 mg (assumed units since they are not reported in Figure AAA) and the level increased to 410.8 ng/150 mg in just 2 weeks under zone I conditions (21°C/45% RH). Dr. Najafi makes no attempt to explain why NDMA did not appreciably form for 9 years, but then began to rapidly form 2 weeks into his study while in his care, under conditions that were supposed to be similar to the prior 9 years of storage. Other discrepant results are apparent when looking at batch 1903000391. Despite Dr. Najafi's opinion that temperature and humidity accelerate NDMA formation, the results for that batch are similar at 4 weeks across all conditions in the study, including the accelerated conditions. Also, the accelerated conditions showed a lower NDMA level at 2 weeks compared to zones II, III, and IVa despite being at higher temperature and humidity than the other conditions.

Further, no control was used with the study. Previously, Dr. Najafi claimed that no appreciable formation of NDMA occurred in ranitidine when held under refrigerated conditions. A control held at 4°C for each sample should have been added to the study. Results, especially those for climatic zones III and IVa need to be evaluated in comparison with how ranitidine API is actually stored by


Contains Confidential Information – Subject to Protective Order

manufacturers. Finally, consumers do not take API, and given the other flaws in the study and/or its description, levels in drug product cannot be inferred from this study.

**k. Conclusion**

Plaintiffs' experts opine that ranitidine is an unstable molecule. Simply stating a molecule is "unstable" has no scientific value without an indication of what constitutes "unstable." Many things that we ingest on a daily basis would be considered unstable. For instance, perishable foods, such as milk, fruits, vegetables, or meat products, are prime examples of products we consume which degrade at room temperature. Moreover, even many non-perishable food items have a use-by date because essentially all organic products will degrade over time.

All drugs could be considered "unstable" under certain conditions. And since all drugs are unstable under certain conditions, regulatory authorities require stability data to demonstrate that a drug will maintain acceptable quality throughout its shelf life when stored under designated conditions. A key aspect of the evaluation of drug stability is the measurement of impurity levels. Under USP, for impurities in ranitidine HCl, the acceptable limits for total impurities are 0.5% and 2.0% in the API and tablets, respectively. *(USP Monograph Ranitidine HCl; USP Monograph Ranitidine Tablets)*. This means that 99.5% and 98.0% of the drug would still remain in API and tablets, respectively at the maximum levels allowed for impurities. These are stringent limits that would prevent highly degraded materials from being marketed. Ranitidine was marketed for nearly 40 years by many manufacturers around the world and has undergone extensive stability testing to demonstrate that it meets quality expectations for a room temperature product when placed within its container closure systems. This is demonstrated by its approval by FDA for the United States and other regulatory authorities worldwide.

As of around 2019 or 2020, new and unexpected evidence arose that some batches of ranitidine exceeded nitrosamine-specific thresholds which were not part of the FDA or USP specifications for the product. The nitrosamine-specific thresholds require the control of impurities to an extremely trace level. For context, in his report, Dr. Najafi referred to "less than 300ppm" as an "extremely low concentration." Now compare that to the relevant regulatory limit for NDMA in ranitidine which is 0.32 ppm. Manufacturers must control NDMA to nearly three-orders of magnitude less than what would already be an extremely low concentration. To put this into perspective, under the regulatory limit, NDMA cannot constitute more than 0.000032% of the API, by weight. Or, in other words, having 0.32 ppm of NDMA could mean 99.9999% of the ranitidine remains (without considering other degradation product that would be formed). Therefore, to say ranitidine is "highly unstable" because about one-millionth of the molecule degrades into NDMA is extremely misleading.

The science presented in Plaintiffs' expert witness reports is a misuse of chemistry in an attempt to rationalize that high doses of NDMA may have formed under hypothetical consumer circumstances. I am not aware of any examples, and Dr. Najafi has not provided sufficient examples of his own, where these methods are accepted to reliably determine a dose a consumer may have

ingested many years ago. In fact, given variability in results, there is no reliable methodology to determine with any precision the level of NDMA a consumer might have ingested.

Currently, the best evidence is provided by a range of results as reported by regulatory agencies and independent scientists. These results indicate that the levels of NDMA are much lower than the levels reported and used by Plaintiffs' experts in reaching their conclusions.

There is no scientific basis for discounting the data reported by FDA, other regulatory agencies, and independent scientists, but even considering all the data, one is left with a high degree of uncertainty and inability to reliably estimate consumer exposure to NDMA from ranitidine. In circumstances such as this, it is appropriate to defer to the medical and epidemiological community to answer questions related to risk by assessing real-world human outcomes data rather than speculating about what a dose might have been.

## VIII. Reference List


1. 21 CFR Parts 58, 211.
2. Abe, Y., Yamamoto, E., Yoshida, H., Usui, A., Tomita, N., Kanno, H., ... & Okuda, H. (2020). Temperature-dependent formation of N-nitrosodimethylamine during the storage of ranitidine reagent powders and tablets. Chemical and Pharmaceutical Bulletin, c20-00431.
3. American Chemical Society, Research Data Policy. https://publish.acs.org/publish/data_policy.
4. Aizawa, Y., Tanabe, S., Amai, H., Watanabe, K., & Yokoo, K. (2006). Thermal environment and moisture production in the bathroom. In Proceedings of Healthy Buildings.
5. Alshehri, Y. M., Alghamdi, T. S., & Aldawsari, F. S. (2020). HS-SPME-GC-MS as an alternative method for NDMA analysis in ranitidine products. Journal of pharmaceutical and biomedical analysis, 191, 113582.
6. Australia TGA. Contamination of ranitidine medicines with the nitrosamine NDMA - TGA laboratory testing. October 22, 2019. https://www.tga.gov.au/tga-laboratories-testing-ranitidine-medicines.
7. Baertschi, S.W.; Olsen, B.A., Alsante, K.M. "Stress Testing: Relation to the Development Timeline", in Pharmaceutical Stress Testing, Baertschi, S.W., Ed., Taylor and Francis, Boca Raton, 2005, pp. 173-179, invited chapter.
8. Brice, T. & Hall, T., Heat Index Calculator, National Weather Service, https://www.weather.gov/epz/wxcalc_heatindex.
9. Deposition of Emery 30(b)(6) Witness Anahita Najafi, March 5, 2022.
10. Elsevier, Publishing Ethics, https://www.elsevier.com/about/policies/publishing-ethics#Authors.
11. EMA Note for Guidance on Bracketing and Matrixing Designs for Stability Testing of Drug Substances and Drug Products. February 2002. https://www.ema.europa.eu/en/documents/scientific-guideline/ich-q-1-d-bracketing-matrixing-designs-stability-testing-drug-substances-drug-products-step-5_en.pdf.



Contains Confidential Information – Subject to Protective Order

12. EMA Note for Guidance on In-Use Stability Testing of Human Medicinal Products. March 1, 2001. https://www.ema.europa.eu/en/documents/scientific-guideline/note-guidance-use-stability-testing-human-medicinal-products_en.pdf.

13. EMA-Official Medicines Control Laboratory Test method for the determination of NDMA by LC-MS/MS in Ranitidine Drug Substance and Film Coated Tablets. October 23, 2019. https://www.edqm.eu/sites/default/files/medias/fichiers/OMCL/omcl_cvua_karlsruhe_method_for_determination_of_nitrosamines_in_ranitidine_-_25102019.pdf.

14. EMERY 0141-0150.

15. EMERY 0151-0153.

16. EMERY 0574-0585.

17. EMERY 2019-2033.

18. EMERY 02553-02639.

19. Emery Pharma Citizen Petition. January 2, 2020.

20. Emery YouTube Presentation June 2020, https://www.youtube.com/watch?v=yptaLtg2yj0.

21. EPA. Technical Fact Sheet – N-Nitroso-dimethylamine (NDMA). November 2017. https://www.epa.gov/sites/default/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

22. FDA Analysis of N-nitrosdimethylamine (NDMA) Levels in Recalled Valsartan in the U.S. July 27, 2018.

23. FDA Data Integrity and Compliance With Drug CGMP Questions and Answers Guidance for Industry. December 2018.

24. FDA Drug Quality Sampling and Testing Programs. July 3, 2020. https://www.fda.gov/drugs/science-and-research-drugs/drug-quality-sampling-and-testing-programs.

25. FDA Expiration Dating and Stability Testing for Human Drug Products. November 11, 2014. https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-technical-guides/expiration-dating-and-stability-testing-human-drug-products.

26. FDA Grand Rounds: Laboratory and Clinical Studies to Investigate Whether Ranitidine Converts to a Probable Human Carcinogen in Humans. October 14, 2021.

27. FDA Guidance for Industry: ICH M7 Assessment and Control of DNA Reactive (Mutagenic) Impurities in Pharmaceuticals to Limit Potential Carcinogenic Risk. 2015 and 2018 (R1).

28. FDA Guidance for Industry: ICH Q1A Stability Testing of New Drug Substances and Products. November 2013 (R2).

29. FDA Guidance for Industry: ICH Q1B Photostability Testing of New Active Substances and Medicinal Products. November 1996.

30. FDA Laboratory analysis of valsartan products. May 2, 2019.



Contains Confidential Information – Subject to Protective Order

31. FDA Laboratory Tests | Ranitidine. November 1, 2019.

32. FDA News Release. July 12, 2018. https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-several-medicines-containing-valsartan-following-detection-impurity.

33. FDA Response to Emery Pharma Citizen Petition. April 1, 2020

34. FDA Response to Valisure Citizen Petition. April 1, 2020.

35. FDA Updates and Press Announcements on Angiotensin II Receptor Blocker (ARB) Recalls (Valsartan, Losartan, and Irbesartan). July 11, 2019. https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan.

36. Giménez-Campillo, C., Pastor-Belda, M., Campillo, N., Hernández-Córdoba, M., & Viñas, P. (2021). Development of a new methodology for the determination of N-nitrosamines impurities in ranitidine pharmaceuticals using microextraction and gas chromatography-mass spectrometry. Talanta, 223, 121659.

37. GSKZAN0000051927-2018.

38. Health Canada Nitrosamine impurities in medications. July 28, 2021. https://www.canada.ca/en/health-canada/services/drugs-health-products/compliance-enforcement/information-health-product/drugs/nitrosamine-impurities.html.

39. Journal of the American Chemical Society, Author Guidelines at https://publish.acs.org/publish/author_guidelines?coden=jacsat

40. King, F. J., Searle, A. D., & Urquhart, M. W. (2020). Ranitidine—investigations into the root cause for the presence of N-nitroso-N, N-dimethylamine in ranitidine hydrochloride drug substances and associated drug products. Organic Process Research & Development, 24(12), 2915-2926.

41. Mani, C., & Banerjee, S., Determination of NDMA Impurity in Ranitidine Using the Agilent 6470 Triple Quadrupole LC/MS, Agilent Technologies, Inc. January 6, 2020. https://www.agilent.com/cs/library/applications/application-ndma-ranitidine-6470a-tq-lcms-5994-1668en-agilent.pdf.

42. National Academy of Sciences, National Academy of Engineering, & Institute of Medicine. (1992). Responsible Science: Ensuring the Integrity of the Research Process: Volume I. The National Academies Press. https://doi.org/10.17226/1864.

43. National Weather Service, Heat Index Chart, https://www.weather.gov/images/wrn/social_media/2017/heat_index.jpg.

44. SANOFI_ZAN_MDL_0000101357.

45. SANOFI_ZAN_MDL_000722379-2534.

46. Scheibner, O., Guo, T., Merrett, A., Calvet, M., & Comstock, K., High-resolution accurate-mass liquid chromatography mass spectrometry (HRAM LC-MS) methodology for the determination and quantitation of nitrosamine impurities in drug products. Thermoscientific. August 18, 2021. https://assets.thermofisher.com/TFS-Assets/CMD/Application-Notes/an-73472-hram-lc-ms-nitrosamine-impurities-in-drugs-an73472-en.pdf.

47. *Science*. Information for authors. https://www.science.org/content/page/science-information-authors.

48. Trudeau Lame, M., & Hatch, L. (2020). Photostability Testing of New Active Substances and Medicinal Products. Waters Corporation. https://www.waters.com/webassets/cms/library/docs/720006899en.pdf.

49. USP General Chapter <1010> Analytical Data—Interpretation and Treatment.

50. USP General Chapter <1225> Validation of Compendial Procedures.

51. USP General Chapter <905> Uniformity of Dosage Units.

52. USP Monograph Ranitidine HCl.

53. USP Monograph Ranitidine Tablets.

54. VAL 00068-00069.

55. Valisure Citizen Petition. September 2019.

56. Vanos, J. K., Middel, A., Poletti, M. N., & Selover, N. J. (2018). Evaluating the impact of solar radiation on pediatric heat balance within enclosed, hot vehicles. Temperature, 5(3), 276-292.

57. World Health Organization. (2016). Annex 5 Guidance on good data and record management practices. In WHO Expert Committee on Specifications for Pharmaceutical Preparations. Fifteenth Report. World Health Organization. http://academy.gmp-compliance.org/guidemgr/files/WHO_TRS_996_ANNEX05.PDF

58. Yamamoto, E., Kan-No, H., Tomita, N., Ando, D., Miyazaki, T., & Izutsu, K. I. (2022). Isolation of N-nitrosodimethylamine from drug substances using solid-phase extraction-liquid chromatography–tandem mass spectrometry. Journal of Pharmaceutical and Biomedical Analysis, 210, 114561.

59. Yokoo, H., Yamamoto, E., Masada, S., Uchiyama, N., Tsuji, G., Hakamatsuka, T., ... & Goda, Y. (2021). N-Nitrosodimethylamine (NDMA) Formation from Ranitidine Impurities: Possible Root Causes of the Presence of NDMA in Ranitidine Hydrochloride. Chemical and Pharmaceutical Bulletin, 69(9), 872-876.



Contains Confidential Information – Subject to Protective Order

# EXHIBIT
# 56

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION**

**MDL NO. 2924**
**20-MD-2924**

**JUDGE ROBIN L. ROSENBERG MAGISTRATE JUDGE BRUCE E. REINHART**

**THIS DOCUMENT RELATES TO: ALL CASES**

**DEFENDANT SANOFI'S AMENDED AND SUPPLEMENTAL ANSWERS AND OBJECTIONS TO FINAL SET OF INTERROGATORIES TO BRAND DEFENDANTS**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., Sanofi France (as defined in Dkt. 1450), and Chattem, Inc. (collectively, "Sanofi") hereby submit the following amended answers and objections to Plaintiffs' Final Set of Interrogatories to Brand Defendants (the "Final Interrogatories").

**OBJECTIONS AND RESPSONSES TO DEFINITIONS AND INSTRUCTIONS**

1. Sanofi objects to the definition of the terms "YOU" and "YOUR" as improper and overly broad to the extent they refer to Brand Defendants other than Sanofi. Sanofi further objects to the definition of the terms "YOU" and "YOUR" as vague to the extent they include other persons or entities other than Sanofi that are not defined with reasonable particularity and may refer to entities that are not relevant to this case. Answers and testimony given pursuant to the Final Interrogatories will be by and for Sanofi, as defined herein and subject to the Stipulation between the parties related to specific Sanofi-affiliated entities from which discovery is being provided. *See* Joint Stipulation Relating to Sanofi Defendants, ECF Doc. No. 1450, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, MDL 2924, (S.D. Fla. August 12, 2020). Sanofi

further objects to the definition to the extent the inclusion of "attorneys" implicates any privileged information or materials.

2. Sanofi objects to the definition of the term "Sanofi" as vague to the extent it includes persons or entities other than Sanofi that are not defined with reasonable particularity and may refer to entities that are not relevant to this case. Answers and testimony given pursuant to the Final Interrogatories will be by and for Sanofi, as defined herein and subject to the Stipulation between the parties related to specific Sanofi-affiliated entities from which discovery is being provided. *See* Joint Stipulation Relating to Sanofi Defendants, ECF Doc. No. 1450, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, MDL 2924, (S.D. Fla. August 12, 2020).

3. Sanofi objects to Plaintiffs' definition of "RANITIDINE-CONTAINING PRODUCT(S)" as irrelevant and disproportionate to the needs of the case to the extent it seeks production from Sanofi of documents and information relating to products to which Sanofi did not hold the marketing rights and to the extent it includes products marketed outside the United States, which is outside the scope of this litigation. Sanofi will interpret "RANITIDINE-CONTAINING PRODUCT(S)" to mean ranitidine-containing Zantac that Sanofi developed, marketed, or sold in the United States pursuant to New Drug Applications ("NDAs") 21,698 and 20,520 ("U.S. OTC ZANTAC").

4. Sanofi objects to the Instructions set forth in the Interrogatories because "[a] party propounding discovery cannot impose legal obligations on the respondent through the use of Instructions." *See* Standing Discovery Order for Magistrate Judge Bruce Reinhart.

5. The Final Interrogatories define the "Relevant Time Period" for each request as "the time period for which YOU marketed Zantac." Sanofi entered into an agreement with Boehringer Ingelheim on June 26, 2016, by which it acquired over-the-counter Zantac and

Sanofi has owned the rights to market and sell Zantac in the United States since January 1, 2017. Based on the date of its acquisition of U.S. OTC ZANTAC, Sanofi will apply a relevant beginning time period of January 1, 2016 unless stated or agreed otherwise.

6. Pursuant to the Stipulation Regarding Plaintiffs' Request to Serve Additional Interrogatories (the "Stipulation") (Dkt. 4674), Sanofi stipulated that it would not oppose Plaintiffs' request for leave to serve the Final Interrogatories and reserved the right to raise any objections to the Final Interrogatories, other than the objection that the Final Interrogatories exceed the number permitted by Rule 33. Pursuant to the Stipulation, Plaintiffs represented and agreed that they will not argue in response to any objections by Sanofi to the Final Interrogatories (other than as to number per Rule 33) that Sanofi waived the objection by agreeing not to oppose leave to serve the Final Interrogatories.

## INTERROGATORIES AND ANSWERS

**INTERROGATORY NO. 14:**

With regard to the samples of RANITIDINE-CONTAINING PRODUCT that YOU provided to Plaintiffs which are itemized on EXHIBIT A hereto, describe with particularity the following (as was requested on the Chain of Custody form that is attached hereto as EXHIBIT B):

a. Identity of the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT 's manufacturer;

b. RANITIDINE-CONTAINING PRODUCT type (i.e., API or type of finished dose and dosage);

c. Lot/Batch number(s) of RANITIDINE API or RANITIDINE-CONTAINING PRODUCT;

d. Manner in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was shipped to you including the packaging and transportation type;

e. Whether the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT provided to plaintiffs was unsold or returned. If returned, manner in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was returned to you including the packaging and transportation type.;

f. Manner of Storage of RANITIDINE-CONTAINING PRODUCT while it was in your possession or in the possession of any third-party such as, but not limited to, Inmar Inc. before it was shipped to plaintiffs including:

1. Physical location of storage;

2. Container or packaging of the RANITIDINE API of RANITIDINE-CONTAINING PRODUCT while in storage;

3. The temperature in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was stored:

i. When describing the temperature, provide a temperature or temperature range in terms of degrees;

ii. If using the term “temperature controlled,” describe with particularity the temperature or temperature range to which it was controlled;

iii. If using the term “ambient conditions,” describe with particularity the temperature or temperature range that constitutes ambient conditions;

4. The humidity conditions in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was stored:

i. When describing humidity conditions, provide a percent humidity or range of humidity conditions;

ii. If using the term "humidity monitored" describe with particularity the percent humidity or range of percent humidity conditions that were observed through monitoring;

iii. If using the term ambient conditions, describe with particularity the percent humidity or humidity range that constitutes ambient conditions;

g. The RANITIDINE API or RANITIDINE-CONTAINING PRODUCT manufacturing date;

h. Manner of Shipping of RANITIDINE API or RANITIDINE-CONTAINING PRODUCT to Emery Pharma;

i. Identity of who the shipment was released by;

j. Identity of the Company or Organization with physical address that released the shipment;

k. Date and Time RANITIDINE-CONTAINING PRODUCT shipped to Emery Pharma.

**ANSWER:**

Sanofi objects to this Interrogatory as seeking discovery duplicative to that which Sanofi already has produced to Plaintiffs. Sanofi refers Plaintiffs to its production of product inventories for information responsive to this Interrogatory as follows:

- SANOFI_ZAN_MDL_0000040296: recalled drug product
- SANOFI_ZAN_MDL_0000040297: packaged unsold drug product
- SANOFI_ZAN_MDL_0000443744: bulk unpackaged inventory

Sanofi further refers Plaintiffs to the chain of custody forms that it provided to Plaintiffs via email on September 27, 2021.

**AMENDED AND SUPPLEMENTAL ANSWER:**

Sanofi hereby incorporates by reference in response to this Interrogatory, as if fully set forth herein, the updated and corrected chain of custody forms and attachments produced with the Bates range SANOFI_ZAN_MDL_0000751756 - SANOFI_ZAN_MDL_0000751770.

Sanofi further provides the following manufacturing dates for the API that it received from Uquifa after September 13, 2019:

| Procured By | Lot Numbers | Manufacturing Date |
|---|---|---|
| Promeco | 1903000396 | 1/28/2019 |
| | 1903000391 | 1/22/2019 |
| | 1903000392 | 1/15/2019 |
| | 1903000397 | 1/23/2019 |
| Patheon | AK4903 | 7/27/2018 |
| | AK8989 | 7/11/2018 |
| | AK9765 | 12/6/2018 |

Sanofi further provides the following chart setting forth the expiration dates for packaged finished product sold by Sanofi:

| Product | Container/Closure System | Expiration Date (months) |
|---|---|---|
| Zantac 75 | Pouch | 36 |
| Zantac 75 | Blister | 36 |
| Zantac 75 | Bottle | 36 |
| Zantac 150 | Pouch | 24 |
| Zantac 150 | Blister | 36 |
| Zantac 150 | Bottle | 36 |
| Zantac 150 Cool Mint | Blister | 24 |
| Zantac 150 Cool Mint | Bottle | 24 |

January 18, 2021

/s/ _______________________

Paige Sharpe
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
paige.sharpe@arnoldporter.com

Leeanne Sara Mancari
DLA Piper LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067-4704
leeanne.mancari@us.dlapiper.com

# EXHIBIT 57

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)
PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924
JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

**THIS DOCUMENT RELATES TO: ALL ACTIONS**

**GLAXOSMITHKLINE LLC'S ANSWERS AND OBJECTIONS TO PLAINTIFFS' FINAL SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the Southern District of Florida, and all applicable orders of this Court (including PTO Nos. 25, 26, 28, 29, and 32), Defendant GlaxoSmithKline LLC ("GSK") serves its responses and objections to Plaintiffs' Final Set of Interrogatories.

**RESPONSE TO PLAINTIFFS' INSTRUCTIONS AND DEFINITIONS**

GSK objects to and has not considered Plaintiffs' "instructions" or "definitions" to the extent they purport to impose obligations on GSK inconsistent with or in addition to those required by the Federal Rules of Civil Procedure, Local Rules, and applicable Orders of the Court in this case. *See* PTO 32 at ¶ II.G.

**ANSWER TO FINAL SET OF INTERROGATORIES**

INTERROGATORY NO. 1: State the gross profit YOU recognized from the sale of RANITIDINE-CONTAINING PRODUCT in the United States for each year it was sold by state.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 2: State the gross profit YOU recognized from the sale of RANITIDINE-CONTAINING PRODUCT Worldwide for each year it was sold.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 3: For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the Net Income derived from the sale of RANITIDINE-CONTAINING PRODUCT in the United States by state.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 4: For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the Net Income derived from the sale of RANITIDINE-CONTAINING PRODUCT Worldwide.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 5: For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the gross revenues derived from the sale of RANITIDINE-CONTAINING PRODUCT in the United States by state.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 6: For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the gross revenues derived from the sale of RANITIDINE-CONTAINING PRODUCT Worldwide.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 7: State the net worth of BRAND DEFENDANT at the time of answering this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 8: State the cash on hand for BRAND DEFENDANT at the time of answering this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 9: State the total compensation (including salary, bonus, stock options, fringe benefits, deferred compensation of any type) of the most highly paid employee at the time of answering this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 10: State the following information at the time of answering this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT:

a. YOUR gross revenues;

b. YOUR gross profits; and

c. YOUR Net Income.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 11: State the total number of containers YOU sold in the United States of RANITIDINE - CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT per state.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 12: State the total number of containers YOU sold Worldwide of RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

ANSWER: The Parties have reached agreement that GSK does not need to further answer this Interrogatory in light of sales data GSK provided Plaintiffs on December 1, 2021.

INTERROGATORY NO. 13: IDENTIFY each and every RANITIDINE-CONTAINING PRODUCT that is or has been in YOUR possession since March 2019 for purposes of investigating or defending, including affirmative defenses, the claims, allegations and causes of action brought against YOU in this litigation, including but not limited to either TESTING or potential TESTING by YOU or on YOUR behalf, and including in your response with respect to each and every RANITIDINE-CONTAINING PRODUCT:

a. The dates during which each RANITIDINE-CONTAINING PRODUCT has been or was in YOUR possession;

b. The commercial or brand name, LOT NUMBER, FORM, DOSAGE, COUNT and expiration date of each RANITIDINE-CONTAINING PRODUCT;

c. The IDENTITY of the manufacturer and distributor listed on the packaging of each RANITIDINE-CONTAINING PRODUCT;

d. The IDENTIFY of each PERSON who sold, gave, or transferred each RANITIDINE-CONTAINING PRODUCT to YOU;

e. Whether each RANITIDINE-CONTAINING PRODUCT remains in YOUR possession, or if not, the disposition of each RANITIDINE-CONTAINING PRODUCT, including the IDENTITY of all PERSONS known to have had possession of the RANITIDINE-CONTAINING PRODUCT since it left YOUR possession;

f. All transport and storage locations and conditions (including, without limitation, temperature and humidity) for each RANITIDINE-CONTAINING PRODUCT;

g. Chain of custody information for each RANITIDINE-CONTAINING PRODUCT that was or is in YOUR possession.

ANSWER: First, with respect to subparts (a) through (d), GSK refers Plaintiffs, pursuant to Federal Rule of Civil Procedure 33(d), to the Master Data Sheet produced by GSK. (GSKZAN0000845208).

Second, with respect to subparts (e) through (g), GSK states that it has retained certain samples of ranitidine-containing products that are responsive to this Interrogatory at its Stevenage, United Kingdom facility. GSK is aware of other information potentially responsive to subparts (e) through (g) as written, but objects to searching for or providing the information because the requests are unduly burdensome, and further objects to the extent it would require GSK to do more than make reasonable searches and inquiries of information available to it.

INTERROGATORY 14: With regard to the samples of RANITIDINE-CONTAINING PRODUCT that YOU provided to Plaintiffs which are itemized on EXHIBIT A

hereto, describe with particularity the following (as was requested on the Chain of Custody form that is attached hereto as EXHIBIT B):

a. Identity of the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT 's manufacturer;

b. RANITIDINE-CONTAINING PRODUCT type (i.e., API or type of finished dose and dosage);

c. Lot/Batch number(s) of RANITIDINE API or RANITIDINE-CONTAINING PRODUCT;

d. Manner in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was shipped to you including the packaging and transportation type;

e. Whether the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT provided to plaintiffs was unsold or returned. If returned, manner in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was returned to you including the packaging and transportation type.;

f. Manner of Storage of RANITIDINE-CONTAINING PRODUCT while it was in your possession or in the possession of any third-party such as, but not limited to, Inmar Inc. before it was shipped to plaintiffs including:

1. Physical location of storage;

2. Container or packaging of the RANITIDINE API of RANITIDINE-CONTAINING PRODUCT while in storage;

3. The temperature in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was stored:

i. When describing the temperature, provide a temperature or temperature range in terms of degrees;

ii. If using the term "temperature controlled," describe with particularity the temperature or temperature range to which it was controlled;

iii. If using the term "ambient conditions," describe with particularity the temperature or temperature range that constitutes ambient conditions;

4. The humidity conditions in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was stored:

i. When describing humidity conditions, provide a percent humidity or range of humidity conditions;

ii. If using the term "humidity monitored" describe with particularity the percent humidity or range of percent humidity conditions that were observed through monitoring;

iii. If using the term ambient conditions, describe with particularity the percent humidity or humidity range that constitutes ambient conditions;

g. The RANITIDINE API or RANITIDINE-CONTAINING PRODUCT manufacturing date;

h. Manner of Shipping of RANITIDINE API or RANITIDINE-CONTAINING PRODUCT to Emery Pharma;

i. Identity of who the shipment was released by;

j. Identity of the Company or Organization with physical address that released the shipment;

k. Date and Time RANITIDINE-CONTAINING PRODUCT shipped to Emery Pharma.

ANSWER: GSK provided the information this Interrogatory seeks in its Zantac GSK Finished Product Samples Chain of Custody Form, which was provided to Plaintiffs on October 12, 2021.

Responding in part to subsection (e), GSK states that the packaging type for returned product is consistent with the product's container or packaging while stored at GSK.

Responding further, GSK states that information responsive to this Interrogatory is set forth in the charts below.

| GSK Ranitidine-Containing Product Samples Manufactured With DRL Ranitidine Hydrochloride API | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Zantac Product Type** | **Batch No.** | **Date of Manuf.** | **Manufacturer** | **Return Product or Stock** | **Return Product Transport to GSK** | **Storage Place Prior to Shipment to Plaintiffs / Shipment Released By** | **Storage Condition Prior to Shipment to Plaintiffs** | **Storage Container** | **GSK Storage Temperature** | **GSK Storage Humidity** | **Method of Shipment to Emery Pharma** | **Date of Shipment to Emery Pharma (2021)** |
| API | EKH001804T | Feb-17 | DRL /India | Stock | N/A | Italy /Parma | Controlled | Opened drum | 15°C/25°C | Monitored | Air | 21/Sep |
| Injection | SA5V | Sep-18 | GSK /Italy | Stock | N/A | Spain /CEVA Ontigola (MMW Spain) | Controlled | Sealed primary packaging | Controlled | Controlled | Air | 20/Sep |
| Injection | DK3X | Sep-18 | GSK /Italy | Stock | N/A | Italy /Parma | Controlled | Sealed secondary packaging | 15°C/25°C | Monitored | Air | 21/Sep |
| Injection | U28T | Oct-18 | GSK /Italy | Stock | N/A | Italy /CEVA Stradella (MMW Italy) | Controlled | Sealed secondary packaging and outer boxes | Controlled | Controlled | Air | 23/Sep |
| Injection | 5T5V | Nov-18 | GSK /Italy | Stock | N/A | Italy /CEVA Stradella (MMW Italy) | Controlled | Sealed secondary packaging and outer boxes | Controlled | Controlled | Air | 23/Sep |
| Injection | 2N9W | Jan-19 | GSK /Italy | Stock | N/A | Italy /Parma | Controlled | Sealed secondary packaging | 15°C/25°C | Monitored | Air | 21/Sep |
| Injection | 3B3C | Jan-19 | GSK /Italy | Stock | N/A | Italy /Parma | Controlled | Sealed secondary packaging | 15°C/25°C | Monitored | Air | 21/Sep |
| Tablets | 1724100017 | Jan-17 | Mexico | Returned | No information | Panama /PA Rx Multimarket Warehouse | Ambient | Primary packaging | Uncontrolled | Uncontrolled | Air | 17/Sep |
| Tablets | 4C6X | Apr-17 | GSK /Spain | Stock | N/A | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | Ambient | Ambient | Air | 20/Sep |
| Tablets | 572F | Apr-17 | GSK /Spain | Stock | N/A | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | Ambient | Ambient | Air | 20/Sep |
| Tablets | HA4J | Jun-17 | GSK /Spain | Stock | N/A | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | Ambient | Ambient | Air | 20/Sep |
| Tablets | E93E | Jun-17 | GSK /Spain | Returned /Retain Samples | Road | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | 15°C/25°C | Ambient | Air | 20/Sep |
| Tablets | G57D | Jun-17 | GSK /Spain | Returned /Retain Samples | Road | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | 15°C/25°C | Ambient | Air | 20/Sep |
| Tablets | HF6N | Jun-17 | GSK /Spain | Returned /Retain Samples | Road | Greece /PA Rx Multimarket Warehouse | Ambient | Sealed secondary packaging | 15°C/25°C | Ambient | Air | 20/Sep |

| GSK Ranitidine-Containing Product Samples Manufactured With DRL Ranitidine Hydrochloride API | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Zantac Product Type** | **Batch No.** | **Date of Manuf.** | **Manufacturer** | **Return Product or Stock** | **Return Product Transport to GSK** | **Storage Place Prior to Shipment to Plaintiffs / Shipment Released By** | **Storage Condition Prior to Shipment to Plaintiffs** | **Storage Container** | **GSK Storage Temperature** | **GSK Storage Humidity** | **Method of Shipment to Emery Pharma** | **Date of Shipment to Emery Pharma (2021)** |
| Tablets | 1816600012 | Oct-17 | Mexico | Returned | No information | Panama /PA Rx Multimarket Warehouse | Ambient | Primary packaging | Uncontrolled | Uncontrolled | Air | 17/Sep |
| Eff. Tablets | 180005749 | Apr-18 | Losan /Germany | Stock | N/A | France /Ceva Vatry (MMW France) | Ambient | Primary/ secondary packaging | Ambient | Ambient | Air | 20/Sep |
| Eff. Tablets | 180005749 | Apr-18 | Losan /Germany | Returned | Road | France /Ceva Vatry (MMW France) | Ambient | Sealed primary/ secondary packaging | 15/25°C | 45-47% | Air | 20/Sep |
| Eff. Tablets | 170004723 | Feb-17 | Losan /Germany | Returned /Retain Samples | Road | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | 15°C/25°C | Ambient | Air | 20/Sep |
| Eff. Tablets | 180000848 | Dec-17 | Losan /Germany | Returned /Retain Samples | Road | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | 15°C/25°C | Ambient | Air | 20/Sep |
| Eff. Tablets | 180005538 | Apr-18 | Losan /Germany | Returned /Retain Samples | Road | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | 15°C/25°C | Ambient | Air | 20/Sep |
| Eff. Tablets | 170004842 | Feb-17 | Losan /Germany | Returned /Retain Samples | Road | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | 15°C/25°C | Ambient | Air | 20/Sep |
| Eff. Tablets | 170008358 | Mar-17 | Losan /Germany | Returned /Retain Samples | Road | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | 15°C/25°C | Ambient | Air | 20/Sep |
| Eff. Tablets | 170010385 | May-17 | Losan /Germany | Returned /Retain Samples | Road | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | 15°C/25°C | Ambient | Air | 20/Sep |
| Eff. Tablets | 170010386 | May-17 | Losan /Germany | Returned /Retain Samples | Road | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | 15°C/25°C | Ambient | Air | 20/Sep |
| Eff. Tablets | 180003097 | Feb-18 | Losan /Germany | Returned | No information | Panama /PA Rx Multimarket Warehouse | Ambient | Secondary packaging | Uncontrolled | Uncontrolled | Air | 17/Sep |
| Eff. Tablets | 170019297 | Oct-17 | Losan /Germany | Returned | No information | Ecuador | Ambient | Secondary packaging | Uncontrolled | Uncontrolled | Air | 17/Sep |
| Injection | 5T5S | Nov-18 | GSK /Italy | Stock | N/A | Italy /CEVA Stradella (MMW Italy) | Ambient | Sealed secondary packaging/ outer boxes | Uncontrolled | Uncontrolled | Air | 23/Sep |
| Injection | FA4H | Nov-18 | GSK /Italy | Stock | N/A | Italy /CEVA Stradella (MMW Italy) | Ambient | Sealed secondary packaging/ outer boxes | Uncontrolled | Uncontrolled | Air | 23/Sep |
| Injection | 928W | Sep-18 | GSK /Italy | Stock | N/A | Italy /CEVA Stradella (MMW Italy) | Ambient | Sealed secondary packaging/ outer boxes | Uncontrolled | Uncontrolled | Air | 23/Sep |

| GSK Ranitidine-Containing Product Samples Manufactured With DRL Ranitidine Hydrochloride API | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Zantac Product Type | Batch No. | Date of Manuf. | Manufacturer | Return Product or Stock | Return Product Transport to GSK | Storage Place Prior to Shipment to Plaintiffs / Shipment Released By | Storage Condition Prior to Shipment to Plaintiffs | Storage Container | GSK Storage Temperature | GSK Storage Humidity | Method of Shipment to Emery Pharma | Date of Shipment to Emery Pharma (2021) |
| Injection | CM4B | May-18 | GSK /Italy | Stock | N/A | Italy /CEVA Stradella (MMW Italy) | Ambient | Sealed secondary packaging/ outer boxes | Uncontrolled | Uncontrolled | Air | 23/Sep |
| Injection | YJ6B | Sep-17 | GSK /Italy | Returned /Retain Samples | Road | Greece /ΦΑΜΑΡ Α.Ε.Β.Ε. Π.ΤΡ. ΛΩΝΑ | Ambient | Sealed secondary packaging | 15°C/25°C | Ambient | Air | 20/Sep |
| Injection | RJ2U | Jul-18 | GSK /Italy | Returned | Road | UK /UK Alloga Rx | Ambient | Secondary packaging | Max 25°C | Ambient | Air | 20/Sep |
| Suspension | 18F392 | Jun-18 | Abdi Ibrahim Turkey | Returned | Road | Turkey /GSK Turkey Rx ZET | Ambient | Secondary packaging | Uncontrolled | Uncontrolled | Air | 17/Sep |
| Syrup | 1728200002 | Dec-17 | Mexico | Returned | No information | Panama /PA Rx Multimarket Warehouse | Ambient | Sealed primary packaging | Uncontrolled | Uncontrolled | Air | 17/Sep |
| Syrup | B30819A | Jan-19 | Aspen BO /Germany | Returned | Road | UK /UK Alloga Rx | Ambient | Sealed primary packaging | Max 25°C | Ambient | Air | 20/Sep |

| **GSK Jurong Manufactured and Stored Ranitidine Hydrochloride API Retained Product Samples** | |
|---|---|
| **Storage Containers** | Sealed glass bottles |
| **Storage Condition Prior to Shipment to Plaintiffs** | Controlled conditions |
| **GSK Storage Temperature** | <25°C |
| **GSK Storage Humidity** | Not controlled |
| **Method of Shipment to Emery Pharma** | Air |
| **Shipment Released By** | GSK, Glaxo Wellcome Manufacturing Pte Ltd (Co Regn Number 199101682N), 1, Pioneer Sector 1, Singapore 628413 |
| **Date of Shipment to Emery Pharma** | September 2021 |
| **Batch Numbers & Dates of Manufacture** | In Plaintiffs' Possession |

INTERROGATORY NO. 15: With respect to YOUR RANITIDINE-CONTAING PRODUCT(S), please provide the specific dates where you manufactured, distributed, marketed, or sold the RANITIDINE-CONTAINING PRODUCT(S), including the specific dates and entities that served as your agents or third-party contractors that manufactured, marketed, tested, created, warehoused, stored, distributed, packaged, promoted, and/or sold YOUR RANITIDINE-CONTAINING PRODUCT(S).

ANSWER: Pursuant to Federal Rule of Civil Procedure 33(d), GSK refers Plaintiffs to Exhibit 3348 of the Federal Rule of Civil Procedure 30(b)(6) Distribution and Storage Deposition of Stephen McGhie dated July 19, 2021. GSK objects to searching for or providing further information requested to the extent it would require GSK to do more than make reasonable searches and inquiries of information available to it. GSK further objects to this Interrogatory to the extent it would require GSK to search for information not related to ranitidine-containing products for the U.S. market. Such information is irrelevant to the claims in this litigation, which relate solely to U.S. plaintiffs and ranitidine-containing products marketed and sold in the U.S.

INTERROGATORY NO. 16: Describe with particularity any and all TESTING of any RANITIDINE-CONTAINING PRODUCT conducted by YOU or on YOUR behalf, including in your response:

a. The commercial or brand name, LOT NUMBER, FORM, COUNT, DOSAGE, and expiration date of each RANITIDINE-CONTAINING PRODUCT tested;

b. The manufacturer and distributor listed on the packaging of each RANITIDINE-CONTAINING PRODUCT tested;

c. Chain of custody information for each RANITIDINE-CONTAINING PRODUCT tested;

d. The date(s) on which each RANITIDINE-CONTAINING PRODUCT underwent TESTING;

e. The design and testing protocols, methodologies, and specifications for each TESTING, including a description of the equipment, material and supplies used (for example, without limitation, all chemical supplies, such as solvents, and non-chemical supplies); storage locations; times and storage conditions (including, without limitation, packaging, container closure system, temperature and humidity) for each sample of each RANITIDINE-CONTAINING PRODUCT ; the method of sample preparation used (including, without limitation, water source, air ventilation, and filtration); the TESTING parameters used; any mathematical or statistical analyses necessary to interpret the results; and all other information necessary to understand the scope and details of the TESTING performed;

f. The results of the TESTING (whether oral or written), including interim results, draft results, and final results;

g. The accreditation status and credentials of the entity or entities performing the testing.

ANSWER: Pursuant to Federal Rule of Civil Procedure 33(d), GSK refers Plaintiffs to the Master Data Sheet, produced by GSK (GSKZAN0000845208), and to other documents related to its Ranitidine Product Incident Review Committee concerning the global voluntary recalls of ranitidine in 2019 and 2020, which relate specifically to the testing of ranitidine-containing products for presence of NDMA, and the subsequent Root Cause Analysis. (*See* GSKZAN0000051927–GSKZAN0000101480, GSKZAN0000102905–GSKZAN0000131173, and GSKZAN0000388969–GSKZAN0000389217). GSK objects to this Interrogatory as overbroad and unduly burdensome to the extent it asks for information about GSK's routine testing of all batches of ranitidine API and Zantac finished product in the ordinary course of

manufacturing those products over a period of nearly four decades. GSK therefore objects to searching for or providing further information requested to the extent it would require GSK to do more than make reasonable searches and inquiries of information available to it. GSK further objects to this Interrogatory to the extent it would require GSK to search for information not related to ranitidine-containing products for the U.S. market. Such information is irrelevant to the claims in this litigation, which relate solely to U.S. plaintiffs and ranitidine-containing products marketed and sold in the U.S.

INTERROGATORY NO. 17: With regard to RANITIDINE API marketed by YOU in the United States, describe with particularity the following:

a. The average amount of time in days Your RANITIDINE API was stored at the RANITIDINE API manufacturer before being transported to the United States;

b. The average amount of time in days Your RANITIDINE API was stored at port, airfield, or facility by YOU or on YOUR behalf before being transported to the United States.

c. The average amount of time in days Your RANITIDINE API was transported from RANITIDINE API manufacturer to the United States overseas by vessel;

d. The average amount of time in days Your RANITIDINE API was transported from RANITIDINE API manufacturer to the United States by airplane;

e. The average amount of time in days Your RANITIDINE API was transported from RANITIDINE API manufacturer to the United States over land by vehicle;

f. The average amount of time in days Your RANITIDINE API was stored at port, airfield, or other facility by YOU or on YOUR behalf after arriving in the United States.

ANSWER: GSK objects to this Interrogatory for the following reasons. First, GSK objects to this Interrogatory because "Ranitidine API" is not a GSK product approved by the Food

and Drug Administration ("FDA") for marketing in the U.S., and construes this Interrogatory as referring to ranitidine API used in the manufacture of GSK's finished dose ranitidine-containing products that were approved by the FDA for marketing in the U.S. Second, GSK objects to this Interrogatory because this information is not reasonably available. Third, GSK objects to this Interrogatory because collecting data and calculating responses on a batch-by-batch basis to average over the product line lifetime would require GSK to do more than make reasonable searches and inquiries of information available to it.

Responding further, GSK states that its policies, procedures, and agreements were intended to aid compliance with registered storage, transportation, and expiry conditions of the ranitidine-containing products it marketed.

INTERROGATORY NO. 18: With regard to FINISHED DOSE RANITIDINE marketed by YOU in the United States, describe with particularity the following:

g. The average amount of time in days Your FINISHED DOSE RANITIDINE was stored at the FINISHED DOSE RANITIDINE manufacturer before being transported to the United States;

h. The average amount of time in days Your FINISHED DOSE RANITIDINE was stored at port, airfield, or facility by YOU or on YOUR behalf before being transported to the United States.

i. The average amount of time in days Your FINISHED DOSE RANITIDINE was transported from FINISHED DOSE RANITIDINE manufacturer to the United States overseas by vessel.;

j. The average amount of time in days Your FINISHED DOSE RANITIDINE was transported from FINISHED DOSE RANITIDINE manufacturer to the United States by airplane;

k. The average amount of time in days Your FINISHED DOSE RANITIDINE was transported from FINISHED DOSE RANITIDINE manufacturer to the United States over land by vehicle;

l. The average amount of time in days Your FINISHED DOSE RANITIDINE was stored at port, airfield, or other facility by YOU or on YOUR behalf after arriving in the United States.

ANSWER: GSK objects to this Interrogatory because this information is not reasonably available. GSK further objects to this Interrogatory because collecting data and calculating responses on a batch-by-batch basis to average over the product line marketing lifetime would require GSK to do more than make reasonable searches and inquiries of information available to it.

Responding further, GSK states that its policies, procedures, and agreements were intended to aid compliance with registered storage, transportation, and expiry conditions of the ranitidine-containing products it marketed.

INTERROGATORY NO. 19: Identify every SKU (Stock Keeping Unit) associated with each OTC Zantac product sold by you. For each SKU identified, identify the associated National Drug Code for the respective product, the name of the product, the form of the product, the dosage of the product, and the package size.

ANSWER: Pursuant to Federal Rule of Civil Procedure 33(d), GSK refers Plaintiffs to Annual Reports for NDA 20520 produced by GSK, which contain the National Drug Codes for

OTC Zantac products sold by GSK. (*See* GSKZNDAH0000000001–GSKZNDAH0000067464).

By agreement, GSK refers Plaintiffs to responses from Brand Co-Defendants with regard to SKUs.

Dated: December 20, 2021

Respectfully submitted,
GLAXOSMITHKLINE LLC,
By its attorneys,

*/s/ Will W. Sachse*

Will W. Sachse
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-2496
Facsimile: (215) 994-2222
will.sachse@dechert.com

*Attorneys for Defendant GlaxoSmithKline LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of December, 2021, I caused the foregoing the foregoing GLAXOSMITHKLINE LLC'S ANSWERS AND OBJECTIONS TO PLAINTIFFS' FINAL SET OF INTERROGATORIES to be served by electronic mail on the Plaintiffs Steering Committee, as follows:

Robert C. Gilbert
KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT
2800 Ponce de Leon Boulevard,
Suite 1100
Coral Gables, FL 33134
(305) 384-7269
gilbert@kolawyers.com

Michael L. McGlamry
POPE McGLAMRY, P.C.
3391 Peachtree Road NE,
Suite 300
Atlanta, GA 30326
(404) 523-7706
mmcglamry@pmkm.com

Tracy A. Finken
ANAPOL WEISS
One Logan Square
130 North 18th Street,
Philadelphia, PA 19103
(215) 735-1130
tfinken@anapolweiss.com

Adam Pulaski
PULASKI KHERKHER, PLLC
2925 Richmond Avenue,
Suite 1725
Houston, TX 77098
(713) 664-4555
adam@pulaskilawfirm.com

Roopal P. Luhana
CHAFFIN LUHANA LLP
600 Third Ave., 12th Floor
New York, NY 10016
Luhana@chaffinluhana.com

*/s/ Will W. Sachse*
Will W. Sachse

# EXHIBIT

# 58

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION**

**MDL NO 2924**
**20-MD-2924**

**JUDGE ROBIN L ROSENBERG**
**MAGISTRATE JUDGE BRUCE REINHART**

**THIS DOCUMENT RELATES TO: ALL CASES**

**DEFENDANT BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FINAL SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Southern District of Florida, and PTO Nos. 25, 26, 28, 29, 32, and 45, Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI") serves upon Plaintiffs' Steering Committee the following responses and objections to Plaintiffs' Final Set of Interrogatories.

## PRELIMINARY STATEMENT

BIPI's and its attorneys' factual investigation and preparation for trial is ongoing. These responses are made in good faith based on a reasonable and diligent inquiry and based on information presently available to BIPI and its attorneys. BIPI marketed and sold over-the-counter Zantac in the United States from 2006 to 2017. Effective January 1, 2017, BIPI's parent company, Boehringer Ingelheim International GmbH, divested its entire Consumer Healthcare business to Sanofi, including the marketing authorization for over-the-counter Zantac. Consequently, few employees remain at BIPI that had responsibility for Zantac, which creates challenges in identifying custodians, potentially responsive information, data sources, and documents.

Future discovery and investigation may supply additional facts or information, add meaning to known facts, and may establish entirely new factual conclusions and contentions, all of which may lead to substantial additions to, changes in, and variations from the responses set forth herein. Accordingly, these responses are made without prejudice to BIPI using or relying on at trial any subsequently discovered information, any evidence not currently known or existing, or information not included in these responses.

These responses are made solely for purposes of these actions. Further, in providing any information, BIPI does not admit or agree that the information sought or provided is necessarily relevant to the subject matter of these actions. BIPI reserves all rights to object to the introduction into evidence at trial, or any other proceeding, any information provided in these responses on grounds of competence, relevance, materiality, admissibility, or any other basis.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

To the extent Plaintiffs' interrogatories purport to apply to "all cases" filed in or transferred to MDL 2924, the interrogatories were improperly served because they were not properly served on xServiceZantac@arnoldporter.com as required by PTO No. 45. PTO No. 45, which governs service of discovery, requires in pertinent part, "Plaintiffs shall serve written discovery . . . by sending electronic copies of such materials to: (1) the counsel of record for the individual Defendant to which such discovery is directed, if applicable; and (2) the following email address: xServiceZantac@arnoldporter.com." Plaintiffs' interrogatories and the accompanying request for production violated PTO No. 45 by failing to serve xServiceZantac@arnoldporter.com.

BIPI also objects to Plaintiffs' "instructions." "A party propounding discovery cannot impose legal obligations on the respondent through the use of Instructions. Discovery is governed by the rules of the Court, which cannot be unilaterally supplemented by a party. Any Instruction that purports to impose a duty not otherwise mandated by the Federal Rules of Civil Procedure or

Local Rules of this Court has no legal effect and only serves to waste the time and resources of the Court and the parties." [PTO 32, Doc. 877; *see also* Standing Discovery Order for Magistrate Judge Bruce Reinhart]. BIPI therefore objects to Plaintiffs' "instructions" and "definitions" on the grounds that they seek to impose obligations on BIPI beyond those set forth in the Federal Rules of Civil Procedure, this Court's Local Rules, and orders entered by this Court, including PTO Nos. 25, 26, 28, 29, and 32. BIPI's responses are made without consideration of Plaintiffs' instructions to the extent they are inconsistent with these applicable standards.

BIPI also objects to the definitions of the terms "YOU," "YOUR," and "BI" to the extent they include persons or entities other than BIPI that are not defined with reasonable particularity. BIPI further objects that the definitions may include persons or entities that are not relevant to this matter. BIPI objects to the definitions to the extent that they seek privileged information or work product by including attorneys and other entities that may have provided or received privileged information. BIPI will construe the terms "YOU", "YOUR," and "BI" to include Boehringer Ingelheim Pharmaceuticals, Inc. pursuant to the stipulation between the parties related to specific BIPI-affiliated entities from which discovery is being provided. *See In re Zantac (Ranitidine) Prods. Liab. Litig.*, MDL 2924, Case No. 20-MD-2924, Joint Stipulation Relating to Boehringer Ingelheim Defendants, ECF Doc. No. 1478 (S.D. Fla. August 14, 2020).

BIPI further objects to Plaintiffs' definition of "RANITIDINE-CONTAINING PRODUCT(S)" on the basis that it seeks to include within the scope of these interrogatories information that is not relevant, is not proportional to the needs of these cases, and seeks to impose an unreasonable burden on BIPI. BIPI's responses herein are limited to "OTC Zantac," which refers to the over-the-counter branded Zantac associated with NDA numbers 20-250 and 21-698

that BIPI marketed in the United States from approximately December 20, 2006 until January 1, 2017, and which Plaintiffs allege caused the injuries identified in their respective Complaints.

**RESPONSE TO INTERROGATORIES**

**INTERROGATORY NO. 1**:

State the gross profit YOU recognized from the sale of RANITIDINE-CONTAINING PRODUCT in the United States for each year it was sold by state.

**RESPONSE TO INTERROGATORY NO. 1**:

Pursuant to Fed. R. Civ. P. 33(d), BIPI refers Plaintiffs to the profit and loss data, including gross profits, for OTC Zantac by year at BOE_ZAN_MDL_0000566106 and BOE_ZAN_MDL_0000566109, produced in Vol. 20 on December 16, 2020. BIPI further refers Plaintiffs to the transaction-level sales data identifying the state of the purchasing entity and location of the transaction's delivery from 2006 to 2016 in Production Vols. 6, 20, and 35, and to BI Promeco sales data from 2012 to 2019 in Production Vol. 23. BIPI additionally refers Plaintiffs to the following document as a definition key for the terms used in the transaction-level spreadsheets identified in this response: BOE_ZAN_MDL_0000954925.

To the extent this interrogatory seeks different or additional information, BIPI objects to this interrogatory on the basis that it requests that BIPI examine, audit, compile, abstract or summarize business records in order to respond, the burden of which is substantially the same for Plaintiffs as it is for BIPI. Accordingly, BIPI is responding by producing to Plaintiffs records from which responsive information regarding OTC Zantac can be obtained. BIPI also objects to this request on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac. BIPI also objects to this request as duplicative of Interrogatory No. 5 in Plaintiffs' First Set of Interrogatories.

**<u>INTERROGATORY NO. 2</u>**:

State the gross profit YOU recognized from the sale of RANITIDINE-CONTAINING PRODUCT Worldwide for each year it was sold.

**<u>RESPONSE TO INTERROGATORY NO. 2</u>**:

BIPI states that based on information available, BIPI and its affiliates sold OTC Zantac only in the United States. BIPI accordingly refers Plaintiffs to Response to Interrogatory No. 1.

To the extent this interrogatory seeks different or additional information, BIPI objects to this interrogatory on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information concerning acts, events, or regulatory environments outside of the United States, but BIPI only sold OTC Zantac in the United States. BIPI does not agree to search for or produce information concerning regulatory environments outside the United States or produce information concerning products other than OTC Zantac.

**<u>INTERROGATORY NO. 3</u>**:

For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the Net Income derived from the sale of RANITIDINE-CONTAINING PRODUCT in the United States by state.

**<u>RESPONSE TO INTERROGATORY NO. 3</u>**:

Pursuant to Fed. R. Civ. P. 33(d), BIPI refers Plaintiffs to the profit and loss data, including net income, for OTC Zantac by year at BOE_ZAN_MDL_0000566106 and BOE_ZAN_MDL_0000566109, produced in Vol. 20 on December 16, 2020. BIPI further refers Plaintiffs to the transaction-level sales data identifying the state of the purchasing entity and location of the transaction's delivery from 2006 to 2016 in Production Vols. 6, 20, and 35, and to BI Promeco sales data from 2012 to 2019 in Production Vol. 23. BIPI additionally refers Plaintiffs to the following document as a definition key for the terms used in the transaction-level spreadsheets identified in this response: BOE_ZAN_MDL_0000954925.

To the extent this interrogatory seeks different or additional information, BIPI objects to this interrogatory on the basis that it requests that BIPI examine, audit, compile, abstract or summarize business records in order to respond, the burden of which is substantially the same for Plaintiffs as it is for BIPI. Accordingly, BIPI is responding by producing to Plaintiffs records from which responsive information regarding OTC Zantac can be obtained. BIPI also objects to this request on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac.

**INTERROGATORY NO. 4**:

For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the Net Income derived from the sale of RANITIDINE-CONTAINING PRODUCT Worldwide.

**RESPONSE TO INTERROGATORY NO. 4**:

BIPI states that based on information available, BIPI and its affiliates sold OTC Zantac only in the United States. BIPI accordingly refers Plaintiffs to Response to Interrogatory No. 3.

To the extent this interrogatory seeks different or additional information, BIPI objects to this interrogatory on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information concerning acts, events, or regulatory environments outside of the United States, but BIPI only sold OTC Zantac in the United States. BI does not agree to search for or produce information concerning regulatory environments outside the United States or produce information concerning products other than OTC Zantac.

**INTERROGATORY NO. 5**:

For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the gross revenues derived from the sale of RANITIDINE-CONTAINING PRODUCT in the United States by state.

**<u>RESPONSE TO INTERROGATORY NO. 5</u>**:

Pursuant to Fed. R. Civ. P. 33(d), BIPI refers Plaintiffs to the profit and loss data, including gross revenues, for OTC Zantac by year at BOE_ZAN_MDL_0000566106 and BOE_ZAN_MDL_0000566109, produced in Vol. 20 on December 16, 2020. BIPI further refers Plaintiffs to the transaction-level sales data identifying the state of the purchasing entity and location of the transaction's delivery from 2006 to 2016 in Production Vols. 6, 20, and 35, and to BI Promeco sales data from 2012 to 2019 in Production Vol. 23. BIPI additionally refers Plaintiffs to the following document as a definition key for the terms used in the transaction-level spreadsheets identified in this response: BOE_ZAN_MDL_0000954925.

To the extent this interrogatory seeks different or additional information, BIPI objects to this interrogatory on the basis that it requests that BIPI examine, audit, compile, abstract or summarize business records in order to respond, the burden of which is substantially the same for Plaintiffs as it is for BIPI. Accordingly, BIPI is responding by producing to Plaintiffs records from which responsive information regarding OTC Zantac can be obtained. BIPI also objects to this request on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac. BIPI also objects to this request as duplicative of Interrogatory No. 5 in Plaintiffs' First Set of Interrogatories.

**<u>INTERROGATORY NO. 6</u>**:

For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the gross revenues derived from the sale of RANITIDINE-CONTAINING PRODUCT Worldwide.

**<u>RESPONSE TO INTERROGATORY NO. 6</u>**:

BIPI states that based on information available, BIPI and its affiliates sold OTC Zantac only in the United States. BIPI accordingly refers Plaintiffs to Response to Interrogatory No. 5.

To the extent this interrogatory seeks different or additional information, BIPI objects to this interrogatory on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information concerning acts, events, or regulatory environments outside of the United States, but BIPI only sold OTC Zantac in the United States. BIPI does not agree to search for or produce information concerning regulatory environments outside the United States or produce information concerning products other than OTC Zantac.

**INTERROGATORY NO. 7**:

State the net worth of BRAND DEFENDANT at the time of answering this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

**RESPONSE TO INTERROGATORY NO. 7**:

BIPI objects to this interrogatory on the basis that it seeks information not relevant or proportional to the needs of this case. BIPI further objects to this interrogatory to the extent that it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac. BIPI further objects to the term "BRAND DEFENDANT" which is not defined, including to the extent that it seeks information in the possession of third parties and not in the possession, custody, or control of BIPI.

**INTERROGATORY NO. 8**:

State the cash on hand for BRAND DEFENDANT at the time of answering this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

**RESPONSE TO INTERROGATORY NO. 8**:

BIPI objects to this interrogatory on the basis that it seeks information not relevant or proportional to the needs of this case. BIPI further objects to this interrogatory to the extent that it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac. BIPI further objects to

the term "BRAND DEFENDANT" which is not defined, including to the extent that it seeks information in the possession of third parties and not in the possession, custody, or control of BIPI.

**INTERROGATORY NO. 9**:

State the total compensation (including salary, bonus, stock options, fringe benefits, deferred compensation of any type) of the most highly paid employee at the time of answering this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

**RESPONSE TO INTERROGATORY NO. 9**:

BIPI objects to this interrogatory on the basis that it seeks information not relevant or proportional to the needs of this case. BIPI further objects to this interrogatory to the extent that it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac. BIPI further objects to the term "BRAND DEFENDANT" which is not defined, including to the extent that it seeks information in the possession of third parties and not in the possession, custody, or control of BIPI.

**INTERROGATORY NO. 10**:

State the following information at the time of answering this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT:

a. YOUR gross revenues;

b. YOUR gross profits; and

c. YOUR Net Income.

**RESPONSE TO INTERROGATORY NO. 10**:

In response to this request, BIPI refers Plaintiffs to and incorporates as its response to this Interrogatory as if fully set forth here its responses to Interrogatories Nos. 1-6, herein.

To the extent this interrogatory seeks different or additional information, BIPI objects to this interrogatory on the basis that it requests that BIPI examine, audit, compile, abstract or summarize business records in order to respond, the burden of which is substantially the same for

Plaintiffs as it is for BIPI. Accordingly, BIPI is responding by producing to Plaintiffs records from which responsive information regarding OTC Zantac can be obtained. BIPI also objects to this request on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac. BIPI also objects to this request as duplicative of Interrogatory No. 5 in Plaintiffs' First Set of Interrogatories.

**INTERROGATORY NO. 11**:

State the total number of containers YOU sold in the United States of RANITIDINE – CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT per state.

**RESPONSE TO INTERROGATORY NO. 11**:

The term "containers" is vague and undefined. BIPI's response construes "containers" to mean units. Pursuant to Fed. R. Civ. P. 33(d), BIPI refers Plaintiffs to the transaction-level sales spreadsheets produced in Vols. 6, 20, and 35.

To the extent this interrogatory seeks different or additional information, BIPI objects to this interrogatory on the basis that it requests that BIPI examine, audit, compile, abstract or summarize business records in order to respond, the burden of which is substantially the same for Plaintiffs as it is for BIPI. Accordingly, BIPI is responding by producing to Plaintiffs records from which responsive information regarding OTC Zantac can be obtained. BIPI also objects to this request on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac.

**INTERROGATORY NO. 12**:

State the total number of containers YOU sold Worldwide of RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

**RESPONSE TO INTERROGATORY NO. 12**:

BIPI states that it or its affiliates sold OTC Zantac only in the United States. BIPI accordingly refers Plaintiffs to BIPI's Response to Interrogatory No. 11.

To the extent this interrogatory seeks different or additional information, BIPI objects to this interrogatory on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac. BIPI objects to this interrogatory on the basis that it seeks information not relevant or proportional because it seeks information concerning acts, events, or regulatory environments outside of the United States, but BIPI only sold OTC Zantac in the United States. BIPI does not agree to search for or produce information concerning regulatory environments outside the United States.

**INTERROGATORY NO. 13**:

IDENTIFY each and every RANITIDINE-CONTAINING PRODUCT that is or has been in YOUR possession since March 2019 for purposes of investigating or defending, including affirmative defenses, the claims, allegations and causes of action brought against YOU in this litigation, including but not limited to either TESTING or potential TESTING by YOU or on YOUR behalf, and including in your response with respect to each and every RANITIDINE-CONTAINING PRODUCT:

a. The dates during which each RANITIDINE-CONTAINING PRODUCT has been or was in YOUR possession;

b. The commercial or brand name, LOT NUMBER, FORM, DOSAGE, COUNT and expiration date of each RANITIDINE-CONTAINING PRODUCT;

c. The IDENTITY of the manufacturer and distributor listed on the packaging of each RANITIDINE-CONTAINING PRODUCT;

d. The IDENTIFY of each PERSON who sold, gave, or transferred each RANITIDINE-CONTAINING PRODUCT to YOU;

e. Whether each RANITIDINE-CONTAINING PRODUCT remains in YOUR possession, or if not, the disposition of each RANITIDINE-CONTAINING PRODUCT , including the IDENTITY of all PERSONS known to have had

possession of the RANITIDINE-CONTAINING PRODUCT since it left YOUR possession;

f. All transport and storage locations and conditions (including, without limitation, temperature and humidity) for each RANITIDINE-CONTAINING PRODUCT ;

g. Chain of custody information for each RANITIDINE-CONTAINING PRODUCT that was or is in YOUR possession.

**RESPONSE TO INTERROGATORY NO. 13**:

Following a reasonable inquiry and based on present information, BIPI states that it has no information responsive to this interrogatory.

To the extent this interrogatory seeks different or additional information, BIPI objects to this interrogatory to the extent that it seeks premature disclosure of expert witness information. BIPI also objects to this interrogatory because the term “TESTING” is undefined. BIPI further objects to this interrogatory to the extent it seeks information protected from disclosure from the attorney work product doctrine and/or attorney-client privilege.

**INTERROGATORY 14**:

With regard to the samples of RANITIDINE-CONTAINING PRODUCT that YOU provided to Plaintiffs which are itemized on EXHIBIT A hereto, describe with particularity the following (as was requested on the Chain of Custody form that is attached hereto as EXHIBIT B):

a. Identity of the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT’s manufacturer;

b. RANITIDINE-CONTAINING PRODUCT type (i.e., API or type of finished dose and dosage);

c. Lot/Batch number(s) of RANITIDINE API or RANITIDINE-CONTAINING PRODUCT;

d. Manner in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was shipped to you including the packaging and transportation type;

e. Whether the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT provided to plaintiffs was unsold or returned. If returned, manner in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was returned to you including the packaging and transportation type.;

f. Manner of Storage of RANITIDINE-CONTAINING PRODUCT while it was in your possession or in the possession of any third-party such as, but not limited to, Inmar Inc. before it was shipped to plaintiffs including:

1. Physical location of storage;

2. Container or packaging of the RANITIDINE API of RANITIDINE-CONTAINING PRODUCT while in storage;

3. The temperature in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was stored:

i. When describing the temperature, provide a temperature or temperature range in terms of degrees;

ii. If using the term "temperature controlled," describe with particularity the temperature or temperature range to which it was controlled;

iii. If using the term "ambient conditions," describe with particularity the temperature or temperature range that constitutes ambient conditions;

4. The humidity conditions in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was stored:

i. When describing humidity conditions, provide a percent humidity or range of humidity conditions;

ii. If using the term "humidity monitored" describe with particularity the percent humidity or range of percent humidity conditions that were observed through monitoring;

iii. If using the term ambient conditions, describe with particularity the percent humidity or humidity range that constitutes ambient conditions;

g. The RANITIDINE API or RANITIDINE-CONTAINING PRODUCT manufacturing date;

h. Manner of Shipping of RANITIDINE API or RANITIDINE-CONTAINING PRODUCT to Emery Pharma;

i. Identity of who the shipment was released by;

j. Identity of the Company or Organization with physical address that released the shipment;

k. Date and Time RANITIDINE-CONTAINING PRODUCT shipped to Emery Pharma.

**RESPONSE TO INTERROGATORY NO. 14**:

Pursuant to Rule 33(d), BIPI refers Plaintiffs to and incorporates as its response to this interrogatory as if fully set forth herein, the Chain of Custody Forms for the September 14, 2021 and October 6, 2021 shipments previously served on Plaintiffs and attached hereto. BIPI further directs Plaintiffs to and incorporates as its response to this interrogatory as if fully set forth herein its response to Interrogatory Nos. 3(c) and 4(c) in Plaintiffs' Third Set of Interrogatories, dated July 12, 2021.

For additional information regarding the specific environmental conditions of the warehouse in which Promeco stored the Product Samples shipped on September 14, 2021, pursuant to Rule 33(d), BIPI refers Plaintiffs to the temperature and humidity monitoring data in Production Vol. 90. For additional information regarding the specific environmental conditions of the storage facility in which Promeco maintained regulatory retention samples shipped on October 6, 2021, BIPI refers Plaintiffs to the temperature and humidity monitoring measurements from April 1, 2020 to October 5, 2021 in Production Vol. 113.

To the extent that this request seeks different or additional information, BIPI objects to this interrogatory on the basis that it seeks information not relevant or proportional to the needs of this case. BIPI further objects to this interrogatory's characterization that the requested information was to be produced in the "Chain of Custody" forms agreed to by the parties. BIPI states that it provided complete Chain of Custody Forms in the format agreed to by the parties. BIPI further objects to this interrogatory on the basis that it requests that BIPI examine, audit, compile, abstract or summarize business records in order to respond, the burden of which is substantially the same

for Plaintiffs as it is for BIPI. Accordingly, BIPI is responding in part by producing to Plaintiffs records from which information responsive to this interrogatory can be readily obtained.

**INTERROGATORY NO. 15**:

With respect to YOUR RANITIDINE-CONTAINING PRODUCT(S), please provide the specific dates where you manufactured, distributed, marketed, or sold the RANITIDINE-CONTAINING PRODUCT(S), including the specific dates and entities that served as your agents or third-party contractors that manufactured, marketed, tested, created, warehoused, stored, distributed, packaged, promoted, and/or sold YOUR RANITIDINE-CONTAINING PRODUCT(S).

**RESPONSE TO INTERROGATORY NO. 15**:

In response to this request, BIPI directs Plaintiffs to and incorporates as its response to this interrogatory as if fully set forth herein its response to Interrogatory No. 2 in Plaintiffs' First Set of Interrogatories, dated September 15, 2020. Pursuant to Rule 33(d), BIPI further directs Plaintiffs to the batch records for OTC Zantac produced in Vols. 50, 52, 57, 61, 64, 68, 70, 75, 77, 82, 92, 96, and 97.

To the extent that this request seeks different or additional information, BIPI objects to this interrogatory on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac. BIPI further objects to this interrogatory on the basis that it requests that BIPI examine, audit, compile, abstract or summarize business records in order to respond, the burden of which is substantially the same for Plaintiffs as it is for BIPI. BIPI further objects to this interrogatory as duplicative of Plaintiffs' Interrogatory No. 2 in Plaintiffs' First Set of Interrogatories.

**INTERROGATORY NO. 16**:

Describe with particularity any and all TESTING of any RANITIDINE-CONTAINING PRODUCT conducted by YOU or on YOUR behalf, including in your response:

a. The commercial or brand name, LOT NUMBER, FORM, COUNT, DOSAGE, and expiration date of each RANITIDINE-CONTAINING PRODUCT tested;

b. The manufacturer and distributor listed on the packaging of each RANITIDINE-CONTAINING PRODUCT tested;

c. Chain of custody information for each RANITIDINE-CONTAINING PRODUCT tested;

d. The date(s) on which each RANITIDINE-CONTAINING PRODUCT underwent TESTING;

e. The design and testing protocols, methodologies, and specifications for each TESTING, including a description of the equipment, material and supplies used (for example, without limitation, all chemical supplies, such as solvents, and non-chemical supplies); storage locations; times and storage conditions (including, without limitation, packaging, container closure system, temperature and humidity) for each sample of each RANITIDINE-CONTAINING PRODUCT ; the method of sample preparation used (including, without limitation, water source, air ventilation, and filtration); the TESTING parameters used; any mathematical or statistical analyses necessary to interpret the results; and all other information necessary to understand the scope and details of the TESTING performed;

f. The results of the TESTING (whether oral or written), including interim results, draft results, and final results;

g. The accreditation status and credentials of the entity or entities performing the testing.

**RESPONSE TO INTERROGATORY NO. 16**:

BIPI objects to this interrogatory because the term "TESTING" is undefined. However, to avoid duplication of prior written discovery Plaintiffs served on BIPI, BIPI interprets this interrogatory to seek information regarding testing conducted for purposes this litigation, consistent with the interrogatory Defendants served on Plaintiffs from which this appears copied. With that understanding, following a reasonable inquiry and based on present information, BIPI states that it has no information responsive to this interrogatory.

To the extent that this interrogatory seeks information regarding testing BIPI has conducted related to OTC Zantac during the entire time it or its affiliates manufactured and sold OTC Zantac, BIPI refers Plaintiffs to its responses to Interrogatories 6, 14, 15, and 16 in Plaintiffs' First Set of

Interrogatories, dated September 15, 2020, and, pursuant to Rule 33(d), BIPI refers Plaintiffs to the bulk product, semi-finished and finished product testing and batch records produced in Vols. 13, 19, 20, 22, 31, 38, 38, 40, 44, 47, 49, 50, 52, 57, 61, 64, 68, 70, 75, 77, 82, 92, 96, and 97.

To the extent this interrogatory seeks different or additional information, BIPI objects to this interrogatory on the basis that it requests that BIPI examine, audit, compile, abstract or summarize business records in order to respond, the burden of which is substantially the same for Plaintiffs as it is for BIPI. Accordingly, BIPI is responding in part by producing to Plaintiffs records from which responsive information regarding OTC Zantac can be obtained. BIPI also objects to this interrogatory on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac.

**INTERROGATORY NO. 17**:

With regard to RANITIDINE API marketed by YOU in the United States, describe with particularity the following:

a. The average amount of time in days Your RANITIDINE API was stored at the RANITIDINE API manufacturer before being transported to the United States;

b. The average amount of time in days Your RANITIDINE API was stored at port, airfield, or facility by YOU or on YOUR behalf before being transported to the United States.

c. The average amount of time in days Your RANITIDINE API was transported from RANITIDINE API manufacturer to the United States overseas by vessel;

d. The average amount of time in days Your RANITIDINE API was transported from RANITIDINE API manufacturer to the United States by airplane;

e. The average amount of time in days Your RANITIDINE API was transported from RANITIDINE API manufacturer to the United States over land by vehicle;

f. The average amount of time in days Your RANITIDINE API was stored at port, airfield, or other facility by YOU or on YOUR behalf after arriving in the United States.

**RESPONSE TO INTERROGATORY NO. 17**:

In response to this request, BIPI states that following a reasonable inquiry and based on information presently available, BIPI and its affiliates did not market ranitidine HCL API for OTC Zantac in the United States.

To the extent that this request seeks different or additional information, BIPI objects to this interrogatory on the basis that it seeks information not relevant or proportional to the needs of this case because it seeks information regarding products not at issue in these lawsuits. BIPI does not agree to search for or produce information concerning products other than OTC Zantac. BIPI further objects to this interrogatory on the basis that it requests that BIPI examine, audit, compile, abstract or summarize business records in order to respond, the burden of which is substantially the same for Plaintiffs as it is for BIPI.

**INTERROGATORY NO. 18**:

With regard to FINISHED DOSE RANITIDINE marketed by YOU in the United States, describe with particularity the following:

a. The average amount of time in days Your FINISHED DOSE RANITIDINE was stored at the FINISHED DOSE RANITIDINE manufacturer before being transported to the United States;

b. The average amount of time in days Your FINISHED DOSE RANITIDINE was stored at port, airfield, or facility by YOU or on YOUR behalf before being transported to the United States.

c. The average amount of time in days Your FINISHED DOSE RANITIDINE was transported from FINISHED DOSE RANITIDINE manufacturer to the United States overseas by vessel.;

d. The average amount of time in days Your FINISHED DOSE RANITIDINE was transported from FINISHED DOSE RANITIDINE manufacturer to the United States by airplane;

e. The average amount of time in days Your FINISHED DOSE RANITIDINE was transported from FINISHED DOSE RANITIDINE manufacturer to the United States over land by vehicle;

f. The average amount of time in days Your FINISHED DOSE RANITIDINE was stored at port, airfield, or other facility by YOU or on YOUR behalf after arriving in the United States.

**RESPONSE TO INTERROGATORY NO. 18**:

BIPI objects to this interrogatory because the term "FINISHED DOSE RANITIDINE" is undefined. However, BIPI interprets this interrogatory to be seeking information regarding bulk finished OTC Zantac tablets and OTC Zantac tablets in primary packaging. In response to this request, BIPI directs Plaintiffs to and incorporates as its response to this interrogatory as if fully set forth herein its response to Interrogatory 4(b) in Plaintiffs' Third Set of Interrogatories, dated July 12, 2021.

To the extent that this interrogatory seeks additional information, BIPI objects to the request as unduly burdensome. The request would require calculations concerning thousands of batches of OTC Zantac manufactured and shipped to multiple locations over the course of more than a decade. BIPI further objects to this interrogatory on the basis that it requests that BIPI examine, audit, compile, abstract or summarize business records in order to respond, the burden of which is substantially the same for Plaintiffs as it is for BIPI.

**INTERROGATORY NO. 19**:

Identify every SKU (Stock Keeping Unit) associated with each OTC Zantac product sold by you. For each SKU identified, identify the associated National Drug Code for the respective product, the name of the product, the form of the product, the dosage of the product, and the package size.

**<u>RESPONSE TO INTERROGATORY NO. 19</u>:**

In response to this request, pursuant to Fed. R. Civ. Proc. 33(d), BIPI refers Plaintiffs to and incorporates herein as its response, the list of SKUs and UPC codes for OTC Zantac produced at BOE_ZAN_MDL_0003019915 in Vol. 114.

To the extent that this request seeks different or additional information, BIPI objects to this interrogatory as unduly burdensome and not proportionate to the needs of this case to the extent that it seeks information that is in the public domain or in the possession of third parties, and therefore equally accessible to Plaintiffs as it is to BIPI from other sources. BIPI also objects to this interrogatory on the basis that it requests that BIPI examine, audit, compile, abstract or summarize business records in order to respond, the burden of which is substantially the same for Plaintiffs as it is for BIPI. Accordingly, BIPI is responding by producing to Plaintiffs records from which responsive information regarding OTC Zantac can be obtained.

Date: December 20, 2021

**KING & SPALDING, LLP**

*/s/ Michael B. Shortnacy*
Andrew T. Bayman
Robert B. Friedman
1180 Peachtree Street, NE
Atlanta, GA 30309-3521
Tel: (404) 572-4600
Fax: (404) 572-5100
abayman@kslaw.com
rfriedman@kslaw.com

Michael B. Shortnacy
KING & SPALDING LLP
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071
Tel: (213) 443-4344
mshortnacy@kslaw.com

Stephen J. Krigbaum
Fla. Bar No.: 978019
Garth Thomas Yearick
Fla. Bar No.: 96105
**CARLTON FIELDS, P.A.**
CityPlace Tower
525 Okeechobee Blvd., Suite 1200
West Palm Beach, Florida 33401-6350
561-659-7070
skrigbaum@carltonfields.com
gyearick@carltonfields.com

*Attorneys for Boehringer Ingelheim Pharmaceuticals, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of December, 2021, I caused the foregoing **DEFENDANT BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FINAL SET OF INTERROGATORIES** to be served by electronic mail on Plaintiffs Steering Committee, as follows:

Robert C. Gilbert
KOPELOWITZ OSTROW FERGUSON WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
(305) 384-7269
gilbert@kolawyers.com

Michael L. McGlamry
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
(404) 523-7706
mmcglamry@pmkm.com

Tracy A. Finken
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
(215) 735-1130
tfinken@anapolweiss.com

Adam Pulaski
PULASKI KHERKHER, PLLC
2925 Richmond Avenue,
Houston, TX 77098
(713) 664-4555
adam@pulaskilawfirm.com

Roopal P. Luhana
CHAFFIN LUHANA LLP
600 Third Ave., 12th Floor
New York, NY 10016
luhana@chaffinluhana.com

*/s/ Michael B. Shortnacy*
Michael B. Shortnacy

# EXHIBITS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION**

**MDL NO. 2924**
**20-MD-2924**

**JUDGE ROBIN L. ROSENBERG**
**MAGISTRATE JUDGE BRUCE E. REINHART**

______________________________/

**THIS DOCUMENT RELATES TO: ALL CASES**

**CHAIN OF CUSTODY FORM**

**Released By:**

Name:

Marcelo Carracedo

Company/Organization:

Boehringer Ingelheim Promeco, SA de CV ("Promeco")

Address:

Maíz No. 49 Barrio Xaltocan, Xochimilco México, CIUDAD DE MEXICO, 16090 Mexico

Telephone Number:

Care of Counsel, King & Spalding LLP

Date / Time:

The samples in this shipment left the Promeco site via DB Schenker to the Mexico City Airport on September 14, 2021 at 6:28 p.m. EDT.

Signature:

[signature] MCARRACEDO 27 Sep 2021

**Item Description:**

| Product Manu-facturer | Product Type (API, Semi-Finished, Finished, Return) | Lot / Batch No. | Manner of Shipping (description of manner in which product was shipped to you, including packaging and transport type (overnight, 2Day, etc.) | Manner of Storage (description of manner and conditions of storage while in your possession, including location, manner of storage, and environmental conditions) | Manufacturing Date | Quantity of Product (kg) |
|---|---|---|---|---|---|---|
| Uquifa | API | 1908000252 | Uquifa shipped this lot of API to Promeco by sea in commercial containers selected by Uquifa in a reefer container. | Promeco stored API in commercial containers recommended by the manufacturer in a temperature controlled, humidity monitored warehouse. | 7/14/2019 | 0.2 kg |
| Uquifa | API | 1908000196 | Same as above. | Same as above. | 7/7/2019 | 0.2 kg |
| Uquifa | API | 1908000119 | Same as above. | Same as above. | 6/24/2019 | 0.2 kg |
| Uquifa | API | 1908000116 | Same as above. | Same as above. | 6/16/2019 | 0.2 kg |
| Promeco | Bulk finished OTC Zantac tablets | 961314 | Not applicable as Promeco was the product manufacturer. | Stored in metal hobbock containers in a temperature controlled, humidity monitored | 9/18/2019 | 2,000 tablets |

| Product Manu-facturer | Product Type (API, Semi-Finished, Finished, Return) | Lot / Batch No. | Manner of Shipping (description of manner in which product was shipped to you, including packaging and transport type (overnight, 2Day, etc.) | Manner of Storage (description of manner and conditions of storage while in your possession, including location, manner of storage, and environmental conditions) | Manufacturing Date | Quantity of Product (kg) |
|---|---|---|---|---|---|---|
| | | | | warehouse, at the Promeco site. | | |
| Promeco | Bulk finished OTC Zantac tablets | 961998 | Not applicable as Promeco was the product manufacturer. | Stored in metal hobbock containers in a temperature controlled, humidity monitored warehouse, at the Promeco site. | 9/18/2019 | 2,000 tablets |
| Promeco | Bulk finished OTC Zantac tablets | 961321 | Not applicable as Promeco was the product manufacturer. | Stored in metal hobbock containers in a temperature controlled, humidity monitored warehouse, at the Promeco site. | 10/3/2019 | 2,000 tablets |
| Promeco | Bulk finished OTC Zantac tablets | 962250 | Not applicable as Promeco was the product manufacturer. | Stored in metal hobbock containers in a temperature controlled, humidity monitored warehouse, at the Promeco site. | 9/9/2019 | 2,000 tablets |

Notes of Any Change In Condition While In Possession / Control:

The variances from specification for these samples will be memorialized in a separate document.

**Received By:**

Name:

______________________________________________

Company/Organization:

______________________________________________

Address:

______________________________________________

Telephone Number:

______________________________________________

Date / Time:

______________________________________________

Signature:

______________________________________________

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION**

**MDL NO. 2924**
**20-MD-2924**

**JUDGE ROBIN L. ROSENBERG**
**MAGISTRATE JUDGE BRUCE E. REINHART**

______________________________/

**THIS DOCUMENT RELATES TO: ALL CASES**

**CHAIN OF CUSTODY FORM**

**Released By:**

Name:

Marcelo Carracedo

Company/Organization:

Boehringer Ingelheim Promeco, SA de CV ("Promeco")

Address:

Maíz No. 49 Barrio Xaltocan, Xochimilco México, CIUDAD DE MEXICO, 16090 Mexico

Telephone Number:

Care of Counsel, King & Spalding LLP

Date / Time:

The samples in this shipment left the Promeco site via DB Schenker to the Mexico City Airport on October 6, 2021 at 5:00 p.m. CDT.

Signature:

[signature] M CARRACEDO 08oct 21

**Item Description:**

| Product Manu-facturer | Product Type (API, Semi-Finished, Finished, Return) | Lot / Batch No. | Manner of Shipping (description of manner in which product was shipped to you, including packaging and transport type (overnight, 2Day, etc.) | Manner of Storage (description of manner and conditions of storage while in your possession, including location, manner of storage, and environmental conditions) | Manu-facturing Date | Quantity of Product Requested |
|---|---|---|---|---|---|---|
| Uquifa | API | 1602000357 | Uquifa shipped this lot of API to Promeco by sea in commercial containers selected by Uquifa in a reefer container. | Promeco stored API retention samples in sealed amber glass containers in a temperature controlled, humidity monitored facility. | 12/19/2015 | 0.02 kg |
| Uquifa | API | 1602000360 | Uquifa shipped this lot of API to Promeco by sea in commercial containers selected by Uquifa in a reefer container. | Same as above. | 12/22/2015 | 0.02 kg |
| Uquifa | API | 1710000034 | Uquifa shipped this lot of API to Promeco by sea in commercial | Same as above. | 6/27/2017 | 0.02 kg |

| **Product Manu-facturer** | **Product Type (API, Semi-Finished, Finished, Return)** | **Lot / Batch No.** | **Manner of Shipping (description of manner in which product was shipped to you, including packaging and transport type (overnight, 2Day, etc.)** | **Manner of Storage (description of manner and conditions of storage while in your possession, including location, manner of storage, and environmental conditions)** | **Manu-facturing Date** | **Quantity of Product Requested** |
|---|---|---|---|---|---|---|
| | | | containers selected by Uquifa in a reefer container. | | | |
| Uquifa | API | 1710000035 | Uquifa shipped this lot of API to Promeco by sea in commercial containers selected by Uquifa in a reefer container. | Same as above. | 6/28/2017 | 0.02 kg |
| Uquifa | API | 1802000334 | Uquifa shipped this lot of API to Promeco by sea in commercial containers selected by Uquifa in a reefer container. | Same as above. | 12/10/2017 | 0.02 kg |
| Uquifa | API | 1803000463 | Uquifa shipped this | Same as above. | 1/26/2018 | 0.02 kg |

| **Product Manu-facturer** | **Product Type**<br><br>**(API, Semi-Finished, Finished, Return)** | **Lot / Batch No.** | **Manner of Shipping**<br><br>**(description of manner in which product was shipped to you, including packaging and transport type (overnight, 2Day, etc.)** | **Manner of Storage**<br><br>**(description of manner and conditions of storage while in your possession, including location, manner of storage, and environmental conditions)** | **Manu-facturing Date** | **Quantity of Product Requested** |
|---|---|---|---|---|---|---|
| | | | lot of API to Promeco by sea in commercial containers selected by Uquifa in a reefer container. | | | |
| Uquifa | API | 1901000177 | Uquifa shipped this lot of API to Promeco by sea in commercial containers selected by Uquifa in a reefer container. | Same as above. | 10/12/2018 | 0.02 kg |
| Uquifa | API | 1902000193 | Uquifa shipped this lot of API to Promeco by sea in commercial containers selected by Uquifa in a | Same as above. | 11/28/2018 | 0.02 kg |

| Product Manu-facturer | Product Type (API, Semi-Finished, Finished, Return) | Lot / Batch No. | Manner of Shipping (description of manner in which product was shipped to you, including packaging and transport type (overnight, 2Day, etc.) | Manner of Storage (description of manner and conditions of storage while in your possession, including location, manner of storage, and environmental conditions) | Manu-facturing Date | Quantity of Product Requested |
|---|---|---|---|---|---|---|
| | | | reefer container. | | | |
| Uquifa | API | 1604000011 | Uquifa shipped this lot of API to Promeco by sea in commercial containers selected by Uquifa in a reefer container. | Same as above. | 2/15/2016 | 0.02 kg |
| Uquifa | API | 1604000177 | Uquifa shipped this lot of API to Promeco by air in commercial containers selected by Uquifa. | Same as above. | 3/7/2016 | 0.02 kg |
| Uquifa | API | 1703000525 | Uquifa shipped this lot of API to Promeco by sea in commercial containers | Same as above. | 1/6/2017 | 0.02 kg |

| Product Manu-facturer | Product Type (API, Semi-Finished, Finished, Return) | Lot / Batch No. | Manner of Shipping (description of manner in which product was shipped to you, including packaging and transport type (overnight, 2Day, etc.) | Manner of Storage (description of manner and conditions of storage while in your possession, including location, manner of storage, and environmental conditions) | Manu-facturing Date | Quantity of Product Requested |
|---|---|---|---|---|---|---|
| | | | selected by Uquifa in a reefer container. | | | |
| Uquifa | API | 1705000045 | Uquifa shipped this lot of API to Promeco by sea in commercial containers selected by Uquifa in a reefer container. | Same as above. | 2/3/2017 | 0.02 kg |
| Uquifa | API | 1406000061 | Uquifa shipped this lot of API to Promeco by air in commercial containers selected by Uquifa. | Same as above. | 5/12/2014 | 0.02 kg |
| Uquifa | API | 1501000158 | Uquifa shipped this lot of API to Promeco by sea in | Same as above. | 10/8/2014 | 0.02 kg |

| **Product Manu-facturer** | **Product Type (API, Semi-Finished, Finished, Return)** | **Lot / Batch No.** | **Manner of Shipping (description of manner in which product was shipped to you, including packaging and transport type (overnight, 2Day, etc.)** | **Manner of Storage (description of manner and conditions of storage while in your possession, including location, manner of storage, and environmental conditions)** | **Manu-facturing Date** | **Quantity of Product Requested** |
|---|---|---|---|---|---|---|
| | | | commercial containers selected by Uquifa in a reefer container. | | | |
| Uquifa | API | 1506000345 | Uquifa shipped this lot of API to Promeco by air in commercial containers selected by Uquifa. | Same as above. | 5/5/2015 | 0.02 kg |
| Uquifa | API | 1506000346 | Uquifa shipped this lot of API to Promeco by air in commercial containers selected by Uquifa. | Same as above. | 4/1/2015 | 0.02 kg |
| Uquifa | API | 1506000347 | Uquifa shipped this lot of API to Promeco by air in | Same as above. | 5/17/2015 | 0.02 kg |

| Product Manu-facturer | Product Type (API, Semi-Finished, Finished, Return) | Lot / Batch No. | Manner of Shipping (description of manner in which product was shipped to you, including packaging and transport type (overnight, 2Day, etc.) | Manner of Storage (description of manner and conditions of storage while in your possession, including location, manner of storage, and environmental conditions) | Manu-facturing Date | Quantity of Product Requested |
|---|---|---|---|---|---|---|
| | | | commercial containers selected by Uquifa. | | | |
| Promeco | Finished OTC Zantac | 856905 | Not applicable as Promeco was the product manufacturer. | Stored in a temperature controlled, humidity monitored storage facility. | 5/16/2018 | 3 packages |
| Promeco | Finished OTC Zantac | 858132 | Not applicable as Promeco was the product manufacturer. | Same as above. | 5/29/2018 | 3 packages |
| Promeco | Finished OTC Zantac | 858855 | Not applicable as Promeco was the product manufacturer. | Same as above. | 8/16/2018 | 3 packages |
| Promeco | Finished OTC Zantac | 857941 | Not applicable as Promeco was the product manufacturer. | Same as above. | 7/5/2018 | 60 packages |

| **Product Manu-facturer** | **Product Type**<br><br>**(API, Semi-Finished, Finished, Return)** | **Lot / Batch No.** | **Manner of Shipping**<br><br>**(description of manner in which product was shipped to you, including packaging and transport type (overnight, 2Day, etc.)** | **Manner of Storage**<br><br>**(description of manner and conditions of storage while in your possession, including location, manner of storage, and environmental conditions)** | **Manu-facturing Date** | **Quantity of Product Requested** |
|---|---|---|---|---|---|---|
| Promeco | Finished OTC Zantac | 760513 | Not applicable as Promeco was the product manufacturer. | Same as above. | 10/19/2017 | 15 packages |
| Promeco | Finished OTC Zantac | 853347 | Not applicable as Promeco was the product manufacturer. | Same as above. | 1/16/2018 | 2 packages |
| Promeco | Finished OTC Zantac | 857170 | Not applicable as Promeco was the product manufacturer. | Same as above. | 4/26/2018 | 2 packages |
| Promeco | Finished OTC Zantac | 853411 | Not applicable as Promeco was the product manufacturer. | Same as above. | 3/13/2018 | 8 packages |
| Promeco | Finished OTC Zantac | 856495 | Not applicable as Promeco was the product manufacturer. | Same as above. | 4/26/2018 | 8 packages |

| Product Manu-facturer | Product Type (API, Semi-Finished, Finished, Return) | Lot / Batch No. | Manner of Shipping (description of manner in which product was shipped to you, including packaging and transport type (overnight, 2Day, etc.) | Manner of Storage (description of manner and conditions of storage while in your possession, including location, manner of storage, and environmental conditions) | Manu-facturing Date | Quantity of Product Requested |
|---|---|---|---|---|---|---|
| Promeco | Finished OTC Zantac | 856897 | Not applicable as Promeco was the product manufacturer. | Same as above. | 5/7/2018 | 8 packages |
| Promeco | Finished OTC Zantac | 759346 | Not applicable as Promeco was the product manufacturer. | Same as above. | 9/7/2017 | 3 packages |

Notes of Any Change In Condition While In Possession / Control: The variances from specification for these samples will be memorialized in a separate document.

**Received By:**

Name:

______________________________________________

Company/Organization:

______________________________________________

Address:

______________________________________________

Telephone Number:

---

Date / Time:

---

Signature:

---

# EXHIBIT 59

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

MDL NO. 2924
20-MD-2924

JUDGE ROBIN L. ROSENBERG
MAGISTRATE JUDGE BRUCE E. REINHART

THIS DOCUMENT RELATES TO: ALL CASES

**DEFENDANT SANOFI'S ANSWERS AND OBJECTIONS TO FINAL SET OF INTERROGATORIES TO BRAND DEFENDANTS**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., Sanofi France (as defined in Dkt. 1450), and Chattem, Inc. (collectively, "Sanofi") hereby submit the following answers and objections to Plaintiffs' Final Set of Interrogatories to Brand Defendants (the "Final Interrogatories").

**OBJECTIONS AND RESPSONSES TO DEFINITIONS AND INSTRUCTIONS**

1. Sanofi objects to the definition of the terms "YOU" and "YOUR" as improper and overly broad to the extent they refer to Brand Defendants other than Sanofi. Sanofi further objects to the definition of the terms "YOU" and "YOUR" as vague to the extent they include other persons or entities other than Sanofi that are not defined with reasonable particularity and may refer to entities that are not relevant to this case. Answers and testimony given pursuant to the Final Interrogatories will be by and for Sanofi, as defined herein and subject to the Stipulation between the parties related to specific Sanofi-affiliated entities from which discovery is being provided. *See* Joint Stipulation Relating to Sanofi Defendants, ECF Doc. No. 1450, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, MDL 2924, (S.D. Fla. August 12, 2020). Sanofi further objects

to the definition to the extent the inclusion of "attorneys" implicates any privileged information or materials.

2. Sanofi objects to the definition of the term "Sanofi" as vague to the extent it includes persons or entities other than Sanofi that are not defined with reasonable particularity and may refer to entities that are not relevant to this case. Answers and testimony given pursuant to the Final Interrogatories will be by and for Sanofi, as defined herein and subject to the Stipulation between the parties related to specific Sanofi-affiliated entities from which discovery is being provided. *See* Joint Stipulation Relating to Sanofi Defendants, ECF Doc. No. 1450, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, MDL 2924, (S.D. Fla. August 12, 2020).

3. Sanofi objects to Plaintiffs' definition of "RANITIDINE-CONTAINING PRODUCT(S)" as irrelevant and disproportionate to the needs of the case to the extent it seeks production from Sanofi of documents and information relating to products to which Sanofi did not hold the marketing rights and to the extent it includes products marketed outside the United States, which is outside the scope of this litigation. Sanofi will interpret "RANITIDINE-CONTAINING PRODUCT(S)" to mean ranitidine-containing Zantac that Sanofi developed, marketed, or sold in the United States pursuant to New Drug Applications ("NDAs") 21,698 and 20,520 ("U.S. OTC ZANTAC").

4. Sanofi objects to the Instructions set forth in the Interrogatories because "[a] party propounding discovery cannot impose legal obligations on the respondent through the use of Instructions." *See* Standing Discovery Order for Magistrate Judge Bruce Reinhart.

5. The Final Interrogatories define the "Relevant Time Period" for each request as "the time period for which YOU marketed Zantac." Sanofi entered into an agreement with Boehringer Ingelheim on June 26, 2016, by which it acquired over-the-counter Zantac and Sanofi

has owned the rights to market and sell Zantac in the United States since January 1, 2017. Based on the date of its acquisition of U.S. OTC ZANTAC, Sanofi will apply a relevant beginning time period of January 1, 2016 unless stated or agreed otherwise.

6. Pursuant to the Stipulation Regarding Plaintiffs' Request to Serve Additional Interrogatories (the "Stipulation") (Dkt. 4674), Sanofi stipulated that it would not oppose Plaintiffs' request for leave to serve the Final Interrogatories and reserved the right to raise any objections to the Final Interrogatories, other than the objection that the Final Interrogatories exceed the number permitted by Rule 33. Pursuant to the Stipulation, Plaintiffs represented and agreed that they will not argue in response to any objections by Sanofi to the Final Interrogatories (other than as to number per Rule 33) that Sanofi waived the objection by agreeing not to oppose leave to serve the Final Interrogatories.

## INTERROGATORIES AND ANSWERS

**INTERROGATORY NO. 1:**

State the gross profit YOU recognized from the sale of RANITIDINE-CONTAINING PRODUCT in the United States for each year it was sold by state.

**ANSWER:**

Sanofi objects to this Interrogatory as overly burdensome and not proportional to the needs of the case to the extent it seeks financial data on a state-by-state basis that is not maintained by Sanofi in the ordinary course of business.

Sanofi has produced documents reflecting annual sales and profits and other financial data associated with U.S. OTC ZANTAC in the custodial files of Alan Main and Luigi Cappello, and directs Plaintiffs to those documents for information responsive to this Interrogatory. *See* Sanofi's production volumes 17, 24, 26, 28, and 30. Sanofi objects to further responding to this

Interrogatory on the basis that it requests Sanofi to compile, examine, or analyze business records in order to do so, the burden of which is substantially the same for Plaintiffs as for Sanofi.

**INTERROGATORY NO. 2:**

State the gross profit YOU recognized from the sale of RANITIDINE-CONTAINING PRODUCT Worldwide for each year it was sold.

**ANSWER:**

Sanofi objects to this Interrogatory as seeking information that is irrelevant and disproportionate to the needs of the case to the extent it seeks gross profit information for non-U.S. OTC ZANTAC products. Sanofi will limit its Answer to information regarding U.S. OTC ZANTAC only.

Sanofi has produced documents reflecting annual sales and profits and other financial data associated with U.S. OTC ZANTAC in the custodial files of Alan Main and Luigi Cappello, and directs Plaintiffs to those documents for information responsive to this Interrogatory. *See* Sanofi's production volumes 17, 24, 26, 28, and 30. Sanofi objects to further responding to this Interrogatory on the basis that it requests Sanofi to compile, examine, or analyze business records in order to do so, the burden of which is substantially the same for Plaintiffs as for Sanofi.

**INTERROGATORY NO. 3:**

For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the Net Income derived from the sale of RANITIDINE-CONTAINING PRODUCT in the United States by state.

**ANSWER:**

Sanofi objects to this Interrogatory as overly burdensome and not proportional to the needs of the case to the extent it seeks financial data on a state-by-state basis that is not maintained by Sanofi in the ordinary course of business.

Sanofi has produced documents reflecting annual sales and profits and other financial data associated with U.S. OTC ZANTAC in the custodial files of Alan Main and Luigi Cappello, and directs Plaintiffs to those documents for information responsive to this Interrogatory. *See* Sanofi's production volumes 17, 24, 26, 28, and 30. Sanofi objects to further responding to this Interrogatory on the basis that it requests Sanofi to compile, examine, or analyze business records in order to do so, the burden of which is substantially the same for Plaintiffs as for Sanofi.

**INTERROGATORY NO. 4:**

For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the Net Income derived from the sale of RANITIDINE-CONTAINING PRODUCT Worldwide.

**ANSWER:**

Sanofi objects to this Interrogatory as seeking information that is irrelevant and disproportionate to the needs of the case to the extent it seeks gross profit information for non-U.S. OTC ZANTAC products. Sanofi will limit its Answer to information regarding U.S. OTC ZANTAC only.

Sanofi has produced documents reflecting annual sales and profits and other financial data associated with U.S. OTC ZANTAC in the custodial files of Alan Main and Luigi Cappello, and directs Plaintiffs to those documents for information responsive to this Interrogatory. *See* Sanofi's production volumes 17, 24, 26, 28, and 30. Sanofi objects to further responding to this Interrogatory on the basis that it requests Sanofi to compile, examine, or analyze business records in order to do so, the burden of which is substantially the same for Plaintiffs as for Sanofi.

**INTERROGATORY NO. 5:**

For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the gross revenues derived from the sale of RANITIDINE-CONTAINING PRODUCT in the United States by state.

**ANSWER:**

Sanofi objects to this Interrogatory as overly burdensome and not proportional to the needs of the case to the extent it seeks financial data on a state-by-state basis that is not maintained by Sanofi in the ordinary course of business.

Sanofi has produced documents reflecting annual sales and profits and other financial data associated with U.S. OTC ZANTAC in the custodial files of Alan Main and Luigi Cappello, and directs Plaintiffs to those documents for information responsive to this Interrogatory. *See* Sanofi's production volumes 17, 24, 26, 28, and 30. Sanofi objects to further responding to this Interrogatory on the basis that it requests Sanofi to compile, examine, or analyze business records in order to do so, the burden of which is substantially the same for Plaintiffs as for Sanofi.

**INTERROGATORY NO. 6:**

For Each year YOU sold RANITIDINE-CONTAINING PRODUCT, state the gross revenues derived from the sale of RANITIDINE-CONTAINING PRODUCT Worldwide.

**ANSWER:**

Sanofi objects to this Interrogatory as seeking information that is irrelevant and disproportionate to the needs of the case to the extent it seeks gross profit information for non-U.S. OTC ZANTAC products. Sanofi will limit its Answer to information regarding U.S. OTC ZANTAC only.

Sanofi has produced documents reflecting annual sales and profits and other financial data associated with U.S. OTC ZANTAC in the custodial files of Alan Main and Luigi Cappello, and

directs Plaintiffs to those documents for information responsive to this Interrogatory. *See* Sanofi's production volumes 17, 24, 26, 28, and 30. Sanofi objects to further responding to this Interrogatory on the basis that it requests Sanofi to compile, examine, or analyze business records in order to do so, the burden of which is substantially the same for Plaintiffs as for Sanofi.

**INTERROGATORY NO. 7:**

State the net worth of BRAND DEFENDANT at the time of answering this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

**ANSWER:**

Sanofi objects to this Interrogatory as premature in that it seeks discovery relevant to punitive damages, when Plaintiffs have not proffered evidence to support a punitive damages claim.

**INTERROGATORY NO. 8:**

State the cash on hand for BRAND DEFENDANT at the time of answering this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

**ANSWER:**

Sanofi objects to this Interrogatory as premature in that it seeks discovery relevant to punitive damages, when Plaintiffs have not proffered evidence to support a punitive damages claim.

**INTERROGATORY NO. 9:**

State the total compensation (including salary, bonus, stock options, fringe benefits, deferred compensation of any type) of the most highly paid employee at the time of answering

this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

**ANSWER:**

Sanofi objects to this Interrogatory as premature in that it seeks discovery relevant to punitive damages, when Plaintiffs have not proffered evidence to support a punitive damages claim.

**INTERROGATORY NO. 10:**

State the following information at the time of answering this interrogatory and for each year YOU sold RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT:

a. YOUR gross revenues;

b. YOUR gross profits; and

c. YOUR Net Income.

**ANSWER:**

Sanofi objects to this Interrogatory as premature in that it seeks discovery relevant to punitive damages, when Plaintiffs have not proffered evidence to support a punitive damages claim.

**INTERROGATORY NO. 11:**

State the total number of containers YOU sold in the United States of RANITIDINE - CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT per state.

**ANSWER:**

Sanofi objects to this Interrogatory as vague and ambiguous in that "containers" is not a defined term and it is unclear what constitutes a "container."

Sanofi has produced non-privileged sales data for U.S. OTC ZANTAC from Nielsen and Nicholas Hall, and directs Plaintiffs to those documents for information responsive to this Interrogatory. *See* Sanofi's production volume 18.

**INTERROGATORY NO. 12:**

State the total number of containers YOU sold Worldwide of RANITIDINE-CONTAINING PRODUCT starting with the year YOU first sold the RANITIDINE-CONTAINING PRODUCT.

**ANSWER:**

Sanofi objects to this Interrogatory as seeking information that is irrelevant and disproportionate to the needs of the case to the extent it seeks gross profit information for non-U.S. OTC ZANTAC products. Sanofi will limit its Answer to information regarding U.S. OTC ZANTAC only. Sanofi further objects to this Interrogatory as vague and ambiguous in that "containers" is not a defined term and it is unclear what constitutes a "container."

Sanofi has produced non-privileged sales data for U.S. OTC ZANTAC from Nielsen and Nicholas Hall, and directs Plaintiffs to those documents for information responsive to this Interrogatory. *See* Sanofi's production volume 18.

**INTERROGATORY NO. 13:**

IDENTIFY each and every RANITIDINE-CONTAINING PRODUCT that is or has been in YOUR possession since March 2019 for purposes of investigating or defending, including affirmative defenses, the claims, allegations and causes of action brought against YOU in this litigation, including but not limited to either TESTING or potential TESTING by YOU or on

YOUR behalf, and including in your response with respect to each and every RANITIDINE-CONTAINING PRODUCT:

a. The dates during which each RANITIDINE-CONTAINING PRODUCT has been or was in YOUR possession;

b. The commercial or brand name, LOT NUMBER, FORM, DOSAGE, COUNT and expiration date of each RANITIDINE-CONTAINING PRODUCT;

c. The IDENTITY of the manufacturer and distributor listed on the packaging of each RANITIDINE-CONTAINING PRODUCT;

d. The IDENTIFY of each PERSON who sold, gave, or transferred each RANITIDINE-CONTAINING PRODUCT to YOU;

e. Whether each RANITIDINE-CONTAINING PRODUCT remains in YOUR possession, or if not, the disposition of each RANITIDINE-CONTAINING PRODUCT , including the IDENTITY of all PERSONS known to have had possession of the RANITIDINE-CONTAINING PRODUCT since it left YOUR possession;

f. All transport and storage locations and conditions (including, without limitation, temperature and humidity) for each RANITIDINE-CONTAINING PRODUCT;

g. Chain of custody information for each RANITIDINE-CONTAINING PRODUCT that was or is in YOUR possession.

**ANSWER:**

Sanofi objects to this Interrogatory as overly broad and a mischaracterization of the record to the extent it suggests Sanofi was investigating or defending claims in this litigation as of March 2019, when the first cases were not filed until September 13, 2019. Sanofi does not have information responsive to this Interrogatory because it has not obtained U.S. OTC ZANTAC for the purpose of

investigating or defending, including affirmative defenses, the claims, allegations and causes of action brought against Sanofi in this litigation.

**INTERROGATORY NO. 14:**

With regard to the samples of RANITIDINE-CONTAINING PRODUCT that YOU provided to Plaintiffs which are itemized on EXHIBIT A hereto, describe with particularity the following (as was requested on the Chain of Custody form that is attached hereto as EXHIBIT B):

a. Identity of the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT 's manufacturer;

b. RANITIDINE-CONTAINING PRODUCT type (i.e., API or type of finished dose and dosage);

c. Lot/Batch number(s) of RANITIDINE API or RANITIDINE-CONTAINING PRODUCT;

d. Manner in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was shipped to you including the packaging and transportation type;

e. Whether the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT provided to plaintiffs was unsold or returned. If returned, manner in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was returned to you including the packaging and transportation type.;

f. Manner of Storage of RANITIDINE-CONTAINING PRODUCT while it was in your possession or in the possession of any third-party such as, but not limited to, Inmar Inc. before it was shipped to plaintiffs including:

1. Physical location of storage;

2. Container or packaging of the RANITIDINE API of RANITIDINE-CONTAINING PRODUCT while in storage;

3. The temperature in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was stored:

i. When describing the temperature, provide a temperature or temperature range in terms of degrees;

ii. If using the term "temperature controlled," describe with particularity the temperature or temperature range to which it was controlled;

iii. If using the term "ambient conditions," describe with particularity the temperature or temperature range that constitutes ambient conditions;

4. The humidity conditions in which the RANITIDINE API or RANITIDINE-CONTAINING PRODUCT was stored:

i. When describing humidity conditions, provide a percent humidity or range of humidity conditions;

ii. If using the term "humidity monitored" describe with particularity the percent humidity or range of percent humidity conditions that were observed through monitoring;

iii. If using the term ambient conditions, describe with particularity the percent humidity or humidity range that constitutes ambient conditions;

g. The RANITIDINE API or RANITIDINE-CONTAINING PRODUCT manufacturing date;

h. Manner of Shipping of RANITIDINE API or RANITIDINE-CONTAINING PRODUCT to Emery Pharma;

i. Identity of who the shipment was released by;

j. Identity of the Company or Organization with physical address that released the shipment;

k. Date and Time RANITIDINE-CONTAINING PRODUCT shipped to Emery Pharma.

**ANSWER:**

Sanofi objects to this Interrogatory as seeking discovery duplicative to that which Sanofi already has produced to Plaintiffs. Sanofi refers Plaintiffs to its production of product inventories for information responsive to this Interrogatory as follows:

- SANOFI_ZAN_MDL_0000040296: recalled drug product
- SANOFI_ZAN_MDL_0000040297: packaged unsold drug product
- SANOFI_ZAN_MDL_0000443744: bulk unpackaged inventory

Sanofi further refers Plaintiffs to the chain of custody forms that it provided to Plaintiffs via email on September 27, 2021.

**INTERROGATORY NO. 15:**

With respect to YOUR RANITIDINE-CONTAING PRODUCT(S), please provide the specific dates where you manufactured, distributed, marketed, or sold the RANITIDINE-CONTAINING PRODUCT(S), including the specific dates and entities that served as your agents or third-party contractors that manufactured, marketed, tested, created, warehoused, stored, distributed, packaged, promoted, and/or sold YOUR RANITIDINE-CONTAINING PRODUCT(S).

**ANSWER:**

Sanofi objects to this Interrogatory to the extent it suggests that Sanofi manufactured the API or finished drug product for U.S. OTC ZANTAC, which Sanofi never did. Sanofi further objects to

this Interrogatory as seeking discovery duplicative to that which Sanofi already has produced to Plaintiffs. Sanofi refers Plaintiffs to its original answers and its amended and supplemental answers to Interrogatory Nos. 2-3 of Plaintiffs' First Set of Interrogatories and the documents identified therein for information responsive to this Interrogatory.

**INTERROGATORY NO. 16:**

Describe with particularity any and all TESTING of any RANITIDINE-CONTAINING PRODUCT conducted by YOU or on YOUR behalf, including in your response:

a. The commercial or brand name, LOT NUMBER, FORM, COUNT, DOSAGE, and expiration date of each RANITIDINE-CONTAINING PRODUCT tested;

b. The manufacturer and distributor listed on the packaging of each RANITIDINE-CONTAINING PRODUCT tested;

c. Chain of custody information for each RANITIDINE-CONTAINING PRODUCT tested;

d. The date(s) on which each RANITIDINE-CONTAINING PRODUCT underwent TESTING;

e. The design and testing protocols, methodologies, and specifications for each TESTING, including a description of the equipment, material and supplies used (for example, without limitation, all chemical supplies, such as solvents, and non-chemical supplies); storage locations; times and storage conditions (including, without limitation, packaging, container closure system, temperature and humidity) for each sample of each RANITIDINE-CONTAINING PRODUCT ; the method of sample preparation used (including, without limitation, water source, air ventilation, and filtration); the TESTING parameters used; any mathematical or statistical analyses necessary

to interpret the results; and all other information necessary to understand the scope and details of the TESTING performed;

f. The results of the TESTING (whether oral or written), including interim results, draft results, and final results;

g. The accreditation status and credentials of the entity or entities performing the testing.

**ANSWER:**

Sanofi objects to this Interrogatory as seeking discovery duplicative to that which Sanofi already has produced to Plaintiffs. Sanofi refers Plaintiffs to its original answer and its amended and supplemental answer to Interrogatory No. 16 of Plaintiffs' First Set of Interrogatories and the documents identified therein for information responsive to this Interrogatory. Sanofi further refers Plaintiffs to its production of hard-copy stability testing documents, *see* Sanofi's production volume 92; submissions and correspondence for NDA 020520 and NDA 021698 with FDA from February 2021 through December 2021, *see* Sanofi's production volume 94; and to testing and other documents related to Sanofi's patent application for ranitidine, *see* Sanofi's production volumes 85, 86, 93, and 94.

**<u>INTERROGATORY NO. 17</u>:**

With regard to RANITIDINE API marketed by YOU in the United States, describe with particularity the following:

a. The average amount of time in days Your RANITIDINE API was stored at the RANITIDINE API manufacturer before being transported to the United States;

b. The average amount of time in days Your RANITIDINE API was stored at port, airfield, or facility by YOU or on YOUR behalf before being transported to the United States.

c. The average amount of time in days Your RANITIDINE API was transported from RANITIDINE API manufacturer to the United States overseas by vessel;

d. The average amount of time in days Your RANITIDINE API was transported from RANITIDINE API manufacturer to the United States by airplane;

e. The average amount of time in days Your RANITIDINE API was transported from RANITIDINE API manufacturer to the United States over land by vehicle;

f. The average amount of time in days Your RANITIDINE API was stored at port, airfield, or other facility by YOU or on YOUR behalf after arriving in the United States.

**ANSWER:**

Sanofi does not have information responsive to this Interrogatory because Sanofi never marketed ranitidine API in the United States. Sanofi directs Plaintiffs to Boehringer Ingelheim Promeco, S.A. de C.V. ("BI Promeco") and Patheon Manufacturing Services LLC ("Patheon"), each of which sourced the API for U.S. OTC ZANTAC from UNION QUIMICO FARMACEUTICA SA (UQUIFA), Barcelona, Spain.

**INTERROGATORY NO. 18:**

With regard to FINISHED DOSE RANITIDINE marketed by YOU in the United States, describe with particularity the following:

g. [*sic*]The average amount of time in days Your FINISHED DOSE RANITIDINE was stored at the FINISHED DOSE RANITIDINE manufacturer before being transported to the United States;

h. The average amount of time in days Your FINISHED DOSE RANITIDINE was stored at port, airfield, or facility by YOU or on YOUR behalf before being transported to the United States.

i. The average amount of time in days Your FINISHED DOSE RANITIDINE was transported from FINISHED DOSE RANITIDINE manufacturer to the United States overseas by vessel.;

j. The average amount of time in days Your FINISHED DOSE RANITIDINE was transported from FINISHED DOSE RANITIDINE manufacturer to the United States by airplane;

k. The average amount of time in days Your FINISHED DOSE RANITIDINE was transported from FINISHED DOSE RANITIDINE manufacturer to the United States over land by vehicle;

l. The average amount of time in days Your FINISHED DOSE RANITIDINE was stored at port, airfield, or other facility by YOU or on YOUR behalf after arriving in the United States.

**ANSWER:**

Sanofi objects to this Interrogatory as overly burdensome and not proportionate to the needs of the case to the extent it requests Sanofi to calculate average time periods for storage of finished dose ranitidine by finished dose manufacturers, before finished product for U.S. OTC ZANTAC came into Sanofi's possession and when Sanofi never manufactured finished product for U.S. OTC ZANTAC. Sanofi directs Plaintiffs to BI Promeco and to Patheon, each of which manufactured U.S. OTC ZANTAC for Sanofi, for information responsive to this Interrogatory.

Sanofi further objects to this Interrogatory as seeking discovery duplicative to that which Sanofi already has produced to Plaintiffs to the extent it requests the average amount of time that Sanofi stored U.S. OTC ZANTAC at its facilities. Sanofi refers Plaintiffs to its answer to

Supplemental Interrogatory No. 5 of Plaintiffs' Second Set of Interrogatories for information responsive to this Interrogatory.

**INTERROGATORY NO. 19:**

Identify every SKU (Stock Keeping Unit) associated with each OTC Zantac product sold by you. For each SKU identified, identify the associated National Drug Code for the respective product, the name of the product, the form of the product, the dosage of the product, and the package size.

**ANSWER:**

Sanofi objects to the request for SKUs for U.S. OTC ZANTAC as overly burdensome and not proportional to the needs of the case because of the burden to compile and produce these unique product identifiers. Pursuant to meet and confers with Plaintiffs, Sanofi understands that Plaintiffs are in fact seeking Universal Product Codes ("UPCs") and National Drug Codes ("NDCs") for U.S. OTC ZANTAC. As a result of those meet and confers Sanofi produced UPCs and NDCs for U.S. OTC ZANTAC. *See* Sanofi's production volume 92.

December 20, 2021

*/s/ Paige Sharpe*

Anand Agneshwar
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
anand.agneshwar@arnoldporter.com

Paige Sharpe
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue
Washington, DC 20002
paige.sharpe@arnoldporter.com

Leeanne Sara Mancari
DLA Piper LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067-4704
leeanne.mancari@us.dlapiper.com

Joanne M. O'Connor
Jones Foster Johnston & Stubbs
505 S Flagler Drive Suite 1100 Po Box 3475
West Palm Beach, FL 33402-3475
Joconnor@jonesfoster.com

# EXHIBIT

# 60

# DECLARATION OF PATHEON CUSTODIAN OF RECORDS AND INVENTORY

**Mindy Raynor**

I, the undersigned, declare:

1. I am over 18 years of age.
2. My position at Patheon is Lead QC Technician.
3. I am the duly authorized custodian of ranitidine and ranitidine-containing product inventory at Patheon and have the authority to certify the following.
4. The spreadsheets attached hereto as Exhibit A are true copies of ranitidine and ranitidine-containing product inventory within Patheon's custody, control, or possession as of November 5, 2021.
5. The ranitidine and ranitidine-containing product inventory in Exhibit A was collected and maintained in the ordinary course of business.
6. The ranitidine and ranitidine-containing product inventory in Exhibit A was stored at the following locations: Patheon (by Thermo Fisher Scientific), Building 1, Rooms R1-50 & R1-56, 5900 Martin Luther King Jr. Hwy, Greenville, N.C., U.S.
7. The ranitidine and ranitidine-containing product inventory in Exhibit A was stored at the above referenced locations from or shortly after the date of manufacture as listed on Exhibit A for each particular sample retain.
8. The ranitidine and ranitidine-containing product inventory in Exhibit A was stored under ambient temperature controlled conditions, 15° - 25°C (59° - 77°F), provided that there may have been instances where an excursion occurred that resulted in a higher or lower temperature condition.
9. The ranitidine and ranitidine-containing product inventory in Exhibit A was stored in humidity monitored areas within the range of 0 – 60% relative humidity, provided

that there may have been instances where an excursion occurred that resulted in a higher or lower relative range of humidity.

10. The Plaintiffs' selected ranitidine and ranitidine-containing product inventory from Exhibit A were prepared and packaged by personnel of Patheon and shipped to Plaintiffs overnight Federal Express on November 18, 2021

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on the 12th day of January, 2022, in Greenville, N.C.

Mindy Raynor 01/12/2022

Mindy Raynor

Attachments

# EXHIBIT A

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) |
|---|---|---|---|---|
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH0149C | 300.000 | 2/9/2017 | 2/29/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH0150C | 300.000 | 2/10/2017 | 2/29/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH0201B | 300.000 | 1/23/2017 | 1/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH1926A | 300.000 | 3/13/2017 | 3/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH1927A | 300.000 | 3/14/2017 | 3/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH1928A | 300.000 | 3/23/2017 | 3/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH1929A | 300.000 | 3/23/2017 | 3/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH2135C | 300.000 | 4/24/2017 | 4/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH2136C | 300.000 | 4/24/2017 | 4/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH2137B | 300.000 | 4/24/2017 | 4/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH3067A | 300.000 | 4/24/2017 | 4/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH3068A | 300.000 | 4/25/2017 | 4/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH4660A | 300.000 | 5/26/2017 | 5/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH4661A | 300.000 | 5/26/2017 | 5/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH4662A | 300.000 | 6/7/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH4663A | 300.000 | 6/8/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH4664A | 300.000 | 6/8/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH4666A | 300.000 | 6/7/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH4667A | 300.000 | 6/7/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH4668A | 300.000 | 6/7/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH4669A | 300.000 | 6/6/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH5900A | 300.000 | 7/13/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH5901A | 300.000 | 7/13/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH5902A | 300.000 | 7/13/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH6652A | 300.000 | 7/14/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH6653A | 300.000 | 7/14/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH7325A | 300.000 | 7/26/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH7727A | 300.000 | 8/21/2017 | 8/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH8951A | 300.000 | 9/5/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH8952A | 300.000 | 9/4/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH8953A | 300.000 | 9/1/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH8984A | 300.000 | 8/21/2017 | 8/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH9083A | 300.000 | 9/8/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AH9084A | 300.000 | 9/5/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ0158A | 300.000 | 10/9/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ0234A | 300.000 | 10/12/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1315A | 300.000 | 11/3/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1316A | 300.000 | 11/6/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1317A | 300.000 | 11/6/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1318A | 300.000 | 11/13/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1324A | 300.000 | 11/14/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1325A | 300.000 | 11/15/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1326A | 300.000 | 11/15/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1327A | 300.000 | 11/15/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1328A | 300.000 | 11/15/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1387B | 300.000 | 11/3/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1388A | 300.000 | 11/6/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1389A | 300.000 | 11/13/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1525A | 300.000 | 11/23/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1526A | 300.000 | 11/23/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1527A | 300.000 | 11/23/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1528A | 300.000 | 11/23/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1529A | 300.000 | 11/23/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1530A | 300.000 | 11/24/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1532A | 300.000 | 11/29/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1533A | 300.000 | 11/28/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1534A | 300.000 | 11/28/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1592A | 300.000 | 11/24/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1593A | 300.000 | 11/24/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1594A | 300.000 | 11/28/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1595A | 300.000 | 11/28/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1596A | 300.000 | 11/24/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1597A | 300.000 | 11/27/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ1598A | 300.000 | 11/27/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ5494A | 300.000 | 1/23/2018 | 1/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ5495A | 300.000 | 1/24/2018 | 1/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ5496A | 300.000 | 1/24/2018 | 1/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ6119B | 300.000 | 12/12/2017 | 12/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ6192B | 300.000 | 1/26/2018 | 1/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ6242A | 300.000 | 2/19/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ6243A | 300.000 | 2/19/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ6244A | 300.000 | 2/21/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ6245A | 300.000 | 2/20/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ6246A | 300.000 | 2/20/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ6247A | 300.000 | 2/20/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ6248A | 300.000 | 2/20/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ7945A | 300.000 | 2/26/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ7946A | 300.000 | 2/26/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ7947A | 300.000 | 3/8/2018 | 3/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ7948A | 300.000 | 3/8/2018 | 3/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ7949A | 300.000 | 3/9/2018 | 3/31/2021 |

| | | | | |
|---|---|---|---|---|
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ7950A | 300.000 | 3/9/2018 | 3/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ7951A | 300.000 | 3/12/2018 | 3/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ7952A | 300.000 | 3/12/2018 | 3/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ7953A | 300.000 | 3/13/2018 | 3/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X60 2022 | AJ7954A | 300.000 | 3/13/2018 | 3/31/2021 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) |
|---|---|---|---|---|
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH0151B | 325.000 | 2/10/2017 | 2/29/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH0152B | 325.000 | 2/10/2017 | 2/29/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH0153B | 325.000 | 2/10/2017 | 2/29/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH1923B | 325.000 | 3/23/2017 | 3/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH1924B | 325.000 | 3/21/2017 | 3/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH1925B | 325.000 | 3/21/2017 | 3/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH1930A | 325.000 | 3/23/2017 | 3/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH1931A | 325.000 | 3/14/2017 | 3/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH2571A | 325.000 | 3/15/2017 | 3/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH3069A | 325.000 | 4/25/2017 | 4/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH3072A | 325.000 | 3/23/2017 | 3/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH3481B | 325.000 | 4/26/2017 | 4/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH3484B | 325.000 | 5/18/2017 | 5/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH3485A | 325.000 | 5/18/2017 | 5/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH3486A | 325.000 | 5/25/2017 | 5/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH3487A | 325.000 | 5/2/2017 | 5/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH4670A | 325.000 | 6/6/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH4671A | 325.000 | 6/6/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH4677A | 325.000 | 5/26/2017 | 5/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH5903B | 325.000 | 7/14/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH5912B | 325.000 | 6/13/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH5913B | 325.000 | 6/13/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH5914B | 325.000 | 6/13/2017 | 6/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH6685A | 325.000 | 7/24/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH6686A | 325.000 | 7/24/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH7773B | 325.000 | 7/24/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH7775A | 325.000 | 7/25/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH7776A | 325.000 | 7/25/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH7777A | 325.000 | 7/25/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH9345A | 325.000 | 9/12/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH9346A | 325.000 | 9/28/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH9348A | 325.000 | 9/27/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH9407A | 325.000 | 9/27/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH9408A | 325.000 | 9/28/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH9409A | 325.000 | 9/28/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH9754A | 325.000 | 10/13/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH9922A | 325.000 | 10/11/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ0153A | 325.000 | 10/26/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ0154A | 325.000 | 10/26/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ0155A | 325.000 | 10/27/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ0156A | 325.000 | 10/27/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ0157A | 325.000 | 10/27/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ0232A | 325.000 | 10/12/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ0703A | 325.000 | 10/31/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ0704A | 325.000 | 10/11/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1314A | 325.000 | 11/10/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1603A | 325.000 | 11/17/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1604A | 325.000 | 11/23/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1605A | 325.000 | 11/15/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1606A | 325.000 | 11/15/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1607A | 325.000 | 11/16/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1608A | 325.000 | 11/22/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1609A | 325.000 | 11/22/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1641A | 325.000 | 11/14/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1642A | 325.000 | 11/17/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1643A | 325.000 | 11/22/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1644A | 325.000 | 11/22/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1645A | 325.000 | 11/22/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1646A | 325.000 | 11/17/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1647A | 260.000 | 11/17/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ1648A | 165.000 | 11/22/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ5493B | 325.000 | 1/23/2018 | 1/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6108A | 325.000 | 1/24/2018 | 1/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6109A | 325.000 | 1/24/2018 | 1/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6112A | 325.000 | 1/25/2018 | 1/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6249A | 325.000 | 2/12/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6250A | 325.000 | 2/12/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6251A | 325.000 | 2/13/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6252A | 325.000 | 2/16/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6253A | 325.000 | 2/13/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6254A | 325.000 | 2/16/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6821B | 325.000 | 2/22/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6822B | 325.000 | 2/26/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6823A | 325.000 | 2/21/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X65 1465 | AJ6824A | 325.000 | 2/22/2018 | 2/28/2021 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| ZANTAC 150MG TABLETS BOTTLE X40 1911 | AH3483C | 320.000 | 4/26/2017 | 4/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X40 1911 | AH7774B | 320.000 | 7/25/2017 | 7/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X40 1911 | AH8950B | 240.000 | 9/4/2017 | 9/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X40 1911 | AJ0233A | 240.000 | 10/12/2017 | 10/31/2020 |
| ZANTAC 150MG TABLETS BOTTLE X40 1911 | AJ1385A | 320.000 | 11/3/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X40 1911 | AJ1386A | 320.000 | 11/3/2017 | 11/30/2020 |
| ZANTAC 150MG TABLETS BOTTLE X40 1911 | AJ5492A | 320.000 | 1/22/2018 | 1/31/2021 |
| ZANTAC 150MG TABLETS BOTTLE X40 1911 | AJ6255B | 320.000 | 2/1/2018 | 2/28/2021 |
| ZANTAC 150MG TABLETS BOTTLE X40 1911 | AJ6256B | 320.000 | 1/30/2018 | 1/31/2021 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) |
|---|---|---|---|---|
| ZANTAC 150MG COOL TABS BTLX65 1717 | AJ6116A | 325.000 | 2/6/2018 | 2/29/2020 |
| ZANTAC 150MG COOL TABS BTLX65 1717 | AJ7959A | 325.000 | 3/5/2018 | 3/31/2020 |
| ZANTAC 150MG COOL TABS BTLX65 1717 | AJ7960A | 325.000 | 2/27/2018 | 2/29/2020 |
| ZANTAC 150MG COOL TABS BTLX65 1717 | AK0117A | 325.000 | 3/5/2018 | 3/31/2020 |
| ZANTAC 150MG COOL TABS BTLX65 1717 | AK0118B | 325.000 | 4/2/2018 | 4/30/2020 |
| ZANTAC 150MG COOL TABS BTLX65 1717 | AK0119A | 325.000 | 4/2/2018 | 4/30/2020 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| Zantac 150 mg F/C Tablets | AJ5792A | 300.000 | 4/5/2018 | 4/30/2021 | AH8894 |
| | | | | | AH8893 |
| Zantac 150 mg F/C Tablets | AJ5793A | 300.000 | 4/6/2018 | 4/30/2021 | AH8894 |
| Zantac 150 mg F/C Tablets | AJ5794A | 300.000 | 4/6/2018 | 4/30/2021 | AH8894 |
| Zantac 150 mg F/C Tablets | AJ5795A | 300.000 | 4/6/2018 | 4/30/2021 | AH8894 |
| Zantac 150 mg F/C Tablets | AJ5796A | 300.000 | 4/8/2018 | 4/30/2021 | AH8894 |
| | | | | | AJ4326 |
| Zantac 150 mg F/C Tablets | AJ5802A | 192.000 | 6/6/2018 | 6/30/2021 | AJ5940 |
| Zantac 150 mg F/C Tablets | AJ5803A | 204.000 | 6/6/2018 | 6/30/2021 | AJ5940 |
| | | | | | AJ5941 |
| Zantac 150 mg F/C Tablets | AJ5804A | 192.000 | 6/8/2018 | 6/30/2021 | AJ5941 |
| Zantac 150 mg F/C Tablets | AJ5805A | 159.000 | 6/8/2018 | 6/30/2021 | AJ5941 |
| Zantac 150 mg F/C Tablets | AJ5806A | 399.000 | 6/8/2018 | 6/30/2021 | AJ5941 |
| Zantac 150 mg F/C Tablets | AJ5807A | 100.000 | 6/8/2018 | 6/30/2021 | AJ5941 |
| Zantac 150 mg F/C Tablets | AJ5808A | 200.000 | 6/9/2018 | 6/30/2021 | AJ5942 |
| | | | | | AJ5941 |
| Zantac 150 mg F/C Tablets | AJ5809A | 398.000 | 6/9/2018 | 6/30/2021 | AJ5942 |
| Zantac 150 mg F/C Tablets | AJ5810A | 200.000 | 6/9/2018 | 6/30/2021 | AJ5942 |
| Zantac 150 mg F/C Tablets | AJ5811A | 220.000 | 6/9/2018 | 6/30/2021 | AJ5942 |
| Zantac 150 mg F/C Tablets | AJ5812A | 200.000 | 6/10/2018 | 6/30/2021 | AJ5942 |
| Zantac 150 mg F/C Tablets | AJ5813A | 200.000 | 6/10/2018 | 6/30/2021 | AJ6261 |
| | | | | | AJ5942 |
| Zantac 150 mg F/C Tablets | AJ5814A | 220.000 | 6/10/2018 | 6/30/2021 | AJ6261 |
| Zantac 150 mg F/C Tablets | AJ5815A | 200.000 | 6/10/2018 | 6/30/2021 | AJ6261 |
| Zantac 150 mg F/C Tablets | AJ5816A | 200.000 | 6/11/2018 | 6/30/2021 | AJ6261 |
| Zantac 150 mg F/C Tablets | AJ5817A | 397.000 | 6/11/2018 | 6/30/2021 | AJ6264 |
| | | | | | AJ6261 |
| Zantac 150 mg F/C Tablets | AJ5818A | 200.000 | 6/12/2018 | 6/30/2021 | AJ6264 |
| Zantac 150 mg F/C Tablets | AJ5819A | 200.000 | 6/13/2018 | 6/30/2021 | AJ6261 |
| | | | | | AJ6264 |
| | | | | | AJ6262 |
| Zantac 150 mg F/C Tablets | AJ5820A | 399.000 | 6/15/2018 | 6/30/2021 | AJ6262 |
| Zantac 150 mg F/C Tablets | AJ5821A | 397.000 | 6/15/2018 | 6/30/2021 | AJ6262 |
| | | | | | AJ6264 |
| Zantac 150 mg F/C Tablets | AJ5822A | 222.000 | 6/16/2018 | 6/30/2021 | AJ6264 |
| Zantac 150 mg F/C Tablets | AJ5823A | 247.000 | 6/16/2018 | 6/30/2021 | AJ6264 |
| Zantac 150 mg F/C Tablets | AJ5824A | 220.000 | 6/17/2018 | 6/30/2021 | AJ6264 |
| | | | | | AJ6262 |
| Zantac 150 mg F/C Tablets | AJ5825A | 200.000 | 6/17/2018 | 6/30/2021 | AJ6262 |
| Zantac 150 mg F/C Tablets | AJ5826A | 398.000 | 6/18/2018 | 6/30/2021 | AJ6263 |
| | | | | | AJ6262 |
| Zantac 150 mg F/C Tablets | AJ5827A | 397.000 | 6/19/2018 | 6/30/2021 | AJ6262 |
| Zantac 150 mg F/C Tablets | AJ5828A | 200.000 | 6/19/2018 | 6/30/2021 | AJ6263 |
| | | | | | AJ6262 |
| Zantac 150 mg F/C Tablets | AJ5829A | 399.000 | 6/20/2018 | 6/30/2021 | AJ6263 |
| Zantac 150 mg F/C Tablets | AJ6639A | 399.000 | 6/20/2018 | 6/30/2021 | AJ6263 |
| Zantac 150 mg F/C Tablets | AJ6640A | 200.000 | 6/20/2018 | 6/30/2021 | AJ8376 |
| | | | | | AJ6263 |
| Zantac 150 mg F/C Tablets | AJ6641A | 200.000 | 6/21/2018 | 6/30/2021 | AJ8376 |
| Zantac 150 mg F/C Tablets | AJ6642A | 222.000 | 6/21/2018 | 6/30/2021 | AJ8376 |
| Zantac 150 mg F/C Tablets | AJ6643A | 200.000 | 6/21/2018 | 6/30/2021 | AJ8376 |
| Zantac 150 mg F/C Tablets | AJ6644A | 200.000 | 6/21/2018 | 6/30/2021 | AJ8376 |
| | | | | | AJ8377 |

| | | | | | |
|---|---|---|---|---|---|
| Zantac 150 mg F/C Tablets | AJ6645A | 220.000 | 6/21/2018 | 6/30/2021 | AJ8377 |
| Zantac 150 mg F/C Tablets | AJ6646A | 200.000 | 6/22/2018 | 6/30/2021 | AJ8377 |
| Zantac 150 mg F/C Tablets | AJ6647A | 200.000 | 6/22/2018 | 6/30/2021 | AJ8377 |
| Zantac 150 mg F/C Tablets | AJ6648A | 220.000 | 6/22/2018 | 6/30/2021 | AJ8377 |
| | | | | | AJ8378 |
| Zantac 150 mg F/C Tablets | AJ6649A | 200.000 | 6/23/2018 | 6/30/2021 | AJ8378 |
| Zantac 150 mg F/C Tablets | AJ6650A | 397.000 | 6/23/2018 | 6/30/2021 | AJ8378 |
| Zantac 150 mg F/C Tablets | AJ6651A | 397.000 | 6/23/2018 | 6/30/2021 | AJ8378 |
| Zantac 150 mg F/C Tablets | AJ6652A | 200.000 | 6/23/2018 | 6/30/2021 | AJ8378 |
| Zantac 150 mg F/C Tablets | AJ6653A | 200.000 | 6/24/2018 | 6/30/2021 | AJ8379 |
| | | | | | AJ8378 |
| Zantac 150 mg F/C Tablets | AJ6654A | 399.000 | 6/24/2018 | 6/30/2021 | AJ8379 |
| Zantac 150 mg F/C Tablets | AJ6655A | 399.000 | 6/24/2018 | 6/30/2021 | AJ8379 |
| Zantac 150 mg F/C Tablets | AJ6656A | 200.000 | 7/16/2018 | 7/31/2021 | AJ8379 |
| | | | | | AJ8380 |
| Zantac 150 mg F/C Tablets | AJ6657A | 397.000 | 7/16/2018 | 7/31/2021 | AJ8380 |
| Zantac 150 mg F/C Tablets | AJ6658A | 243.000 | 7/17/2018 | 7/31/2021 | AJ8380 |
| Zantac 150 mg F/C Tablets | AJ6659A | 220.000 | 7/17/2018 | 7/31/2021 | AJ8882 |
| | | | | | AJ8380 |
| Zantac 150 mg F/C Tablets | AJ6660A | 220.000 | 7/17/2018 | 7/31/2021 | AJ8380 |
| Zantac 150 mg F/C Tablets | AJ6702A | 229.000 | 7/17/2018 | 7/31/2021 | AJ8380 |
| Zantac 150 mg F/C Tablets | AJ6703A | 220.000 | 10/12/2018 | 10/31/2021 | AK4903 |
| | | | | | AK2957 |
| Zantac 150 mg F/C Tablets | AJ6704A | 200.000 | 10/15/2018 | 10/31/2021 | AK4903 |
| Zantac 150 mg F/C Tablets | AJ6705A | 220.000 | 10/15/2018 | 10/31/2021 | AK4903 |
| | | | | | AK4904 |
| Zantac 150 mg F/C Tablets | AJ6706A | 200.000 | 10/15/2018 | 10/31/2021 | AK4904 |
| Zantac 150 mg F/C Tablets | AJ7294A | 220.000 | 10/16/2018 | 10/31/2021 | AK4904 |
| Zantac 150 mg F/C Tablets | AJ7295A | 199.000 | 10/16/2018 | 10/31/2021 | AK4904 |
| Zantac 150 mg F/C Tablets | AJ7296A | 200.000 | 10/17/2018 | 10/31/2021 | AK4904 |
| Zantac 150 mg F/C Tablets | AJ7297A | 399.000 | 10/17/2018 | 10/31/2021 | AK4905 |
| | | | | | AK4904 |
| Zantac 150 mg F/C Tablets | AJ7298A | 399.000 | 10/17/2018 | 10/31/2021 | AK4905 |
| Zantac 150 mg F/C Tablets | AJ7299A | 200.000 | 10/18/2018 | 10/31/2021 | AK4905 |
| Zantac 150 mg F/C Tablets | AJ7300A | 220.000 | 10/18/2018 | 10/31/2021 | AK4905 |
| Zantac 150 mg F/C Tablets | AJ7301A | 220.000 | 10/18/2018 | 10/31/2021 | AK4905 |
| Zantac 150 mg F/C Tablets | AJ7302A | 200.000 | 10/19/2018 | 10/31/2021 | AK4906 |
| | | | | | AK4905 |
| Zantac 150 mg F/C Tablets | AJ7303A | 200.000 | 10/19/2018 | 10/31/2021 | AK4906 |
| Zantac 150 mg F/C Tablets | AJ7304A | 200.000 | 10/19/2018 | 10/31/2021 | AK4906 |
| Zantac 150 mg F/C Tablets | AJ7305A | 220.000 | 10/20/2018 | 10/31/2021 | AK4906 |
| Zantac 150 mg F/C Tablets | AJ7306A | 220.000 | 10/20/2018 | 10/31/2021 | AK4906 |
| | | | | | AK5325 |
| Zantac 150 mg F/C Tablets | AJ7307A | 200.000 | 10/20/2018 | 10/31/2021 | AK5325 |
| Zantac 150 mg F/C Tablets | AJ7308A | 397.000 | 10/21/2018 | 10/31/2021 | AK5325 |
| Zantac 150 mg F/C Tablets | AJ7309A | 399.000 | 10/21/2018 | 10/31/2021 | AK5325 |
| Zantac 150 mg F/C Tablets | AJ7310A | 200.000 | 10/21/2018 | 10/31/2021 | AK5325 |
| Zantac 150 mg F/C Tablets | AJ8691A | 200.000 | 10/22/2018 | 10/31/2021 | AK5326 |
| Zantac 150 mg F/C Tablets | AK0507A | 397.000 | 10/22/2018 | 10/31/2021 | AK5326 |
| Zantac 150 mg F/C Tablets | AK0508A | 200.000 | 10/22/2018 | 10/31/2021 | AK5326 |
| Zantac 150 mg F/C Tablets | AK0509A | 220.000 | 10/23/2018 | 10/31/2021 | AK5326 |
| Zantac 150 mg F/C Tablets | AK0510A | 220.000 | 10/23/2018 | 10/31/2021 | AK5326 |
| | | | | | AK5327 |
| Zantac 150 mg F/C Tablets | AK0511A | 200.000 | 10/23/2018 | 10/31/2021 | AK5327 |
| Zantac 150 mg F/C Tablets | AK0512A | 200.000 | 10/23/2018 | 10/31/2021 | AK5327 |
| Zantac 150 mg F/C Tablets | AK0513A | 220.000 | 10/24/2018 | 10/31/2021 | AK5327 |
| Zantac 150 mg F/C Tablets | AK0514A | 200.000 | 10/24/2018 | 10/31/2021 | AK5327 |
| Zantac 150 mg F/C Tablets | AK0515A | 200.000 | 10/24/2018 | 10/31/2021 | AK5328 |
| | | | | | AK5327 |
| Zantac 150 mg F/C Tablets | AK0516A | 220.000 | 10/25/2018 | 10/31/2021 | AK5328 |
| Zantac 150 mg F/C Tablets | AK0517A | 220.000 | 10/25/2018 | 10/31/2021 | AK5328 |
| Zantac 150 mg F/C Tablets | AK0518A | 200.000 | 11/8/2018 | 11/30/2021 | AK5328 |
| Zantac 150 mg F/C Tablets | AK0519A | 220.000 | 11/9/2018 | 11/30/2021 | AK5328 |
| Zantac 150 mg F/C Tablets | AK0520A | 200.000 | 11/9/2018 | 11/30/2021 | AK6451 |
| | | | | | AK5328 |
| Zantac 150 mg F/C Tablets | AK0521A | 398.000 | 11/9/2018 | 11/30/2021 | AK6451 |
| Zantac 150 mg F/C Tablets | AK0522A | 200.000 | 11/11/2018 | 11/30/2021 | AK6451 |
| Zantac 150 mg F/C Tablets | AK0523A | 398.000 | 11/11/2018 | 11/30/2021 | AK6452 |
| | | | | | AK6451 |
| Zantac 150 mg F/C Tablets | AK0524A | 220.000 | 11/12/2018 | 11/30/2021 | AK6452 |
| Zantac 150 mg F/C Tablets | AK0525A | 399.000 | 11/13/2018 | 11/30/2021 | AK6452 |
| Zantac 150 mg F/C Tablets | AK0526A | 200.000 | 11/13/2018 | 11/30/2021 | AK6453 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | AK6452 |
| Zantac 150 mg F/C Tablets | AK0527A | 200.000 | 11/13/2018 | 11/30/2021 | AK6453 |
| Zantac 150 mg F/C Tablets | AK0528A | 200.000 | 11/14/2018 | 11/30/2021 | AK6453 |
| Zantac 150 mg F/C Tablets | AK4359A | 399.000 | 11/14/2018 | 11/30/2021 | AK6453 |
| Zantac 150 mg F/C Tablets | AK4360A | 200.000 | 11/14/2018 | 11/30/2021 | AK6453 |
| | | | | | AK6454 |
| Zantac 150 mg F/C Tablets | AK4361A | 200.000 | 11/16/2018 | 11/30/2021 | AK6454 |
| Zantac 150 mg F/C Tablets | AK4362A | 399.000 | 11/16/2018 | 11/30/2021 | AK6454 |
| | | | | | AK6455 |
| Zantac 150 mg F/C Tablets | AK4363A | 200.000 | 11/16/2018 | 11/30/2021 | AK6455 |
| Zantac 150 mg F/C Tablets | AK4364A | 200.000 | 11/16/2018 | 11/30/2021 | AK6455 |
| Zantac 150 mg F/C Tablets | AK4365A | 398.000 | 11/17/2018 | 11/30/2021 | AK6455 |
| Zantac 150 mg F/C Tablets | AK4366A | 221.000 | 12/21/2018 | 12/31/2021 | AK7829 |
| Zantac 150 mg F/C Tablets | AK4367A | 230.000 | 12/22/2018 | 12/31/2021 | AK7829 |
| | | | | | AK7830 |
| Zantac 150 mg F/C Tablets | AK4368A | 216.000 | 12/22/2018 | 12/31/2021 | AK7830 |
| Zantac 150 mg F/C Tablets | AK4369A | 220.000 | 12/23/2018 | 12/31/2021 | AK7830 |
| Zantac 150 mg F/C Tablets | AK4370A | 264.000 | 12/26/2018 | 12/31/2021 | AK7830 |
| Zantac 150 mg F/C Tablets | AK4371A | 200.000 | 12/26/2018 | 12/31/2021 | AK7830 |
| Zantac 150 mg F/C Tablets | AK4372A | 200.000 | 12/27/2018 | 12/31/2021 | AK7830 |
| | | | | | AK7831 |
| Zantac 150 mg F/C Tablets | AK4373A | 398.000 | 12/27/2018 | 12/31/2021 | AK7831 |
| Zantac 150 mg F/C Tablets | AK4374A | 200.000 | 12/28/2018 | 12/31/2021 | AK7831 |
| Zantac 150 mg F/C Tablets | AK4375A | 398.000 | 12/28/2018 | 12/31/2021 | AK7831 |
| Zantac 150 mg F/C Tablets | AK4376A | 399.000 | 12/28/2018 | 12/31/2021 | AK7831 |
| Zantac 150 mg F/C Tablets | AK4377A | 200.000 | 12/28/2018 | 12/31/2021 | AK7922 |
| | | | | | AK7831 |
| Zantac 150 mg F/C Tablets | AK4378A | 200.000 | 1/2/2019 | 12/31/2021 | AK7922 |
| Zantac 150 mg F/C Tablets | AK4379A | 399.000 | 1/2/2019 | 12/31/2021 | AK7922 |
| Zantac 150 mg F/C Tablets | AK4380A | 200.000 | 1/4/2019 | 11/30/2021 | AK7923 |
| Zantac 150 mg F/C Tablets | AK4381A | 220.000 | 1/4/2019 | 11/30/2021 | AK7923 |
| | | | | | AK7922 |
| Zantac 150 mg F/C Tablets | AK4382A | 200.000 | 1/4/2019 | 1/31/2022 | AK7923 |
| Zantac 150 mg F/C Tablets | AK4383A | 200.000 | 1/5/2019 | 1/31/2022 | AK7923 |
| Zantac 150 mg F/C Tablets | AK4384A | 220.000 | 1/5/2019 | 1/31/2022 | AK7923 |
| | | | | | AK7924 |
| Zantac 150 mg F/C Tablets | AK4385A | 220.000 | 1/5/2019 | 11/30/2021 | AK7924 |
| Zantac 150 mg F/C Tablets | AK4386A | 200.000 | 1/5/2019 | 11/30/2021 | AK7924 |
| Zantac 150 mg F/C Tablets | AK4387A | 398.000 | 1/6/2019 | 1/31/2022 | AK7924 |
| Zantac 150 mg F/C Tablets | AK5691A | 200.000 | 1/6/2019 | 1/31/2022 | AK7924 |
| Zantac 150 mg F/C Tablets | AK5692A | 397.000 | 1/6/2019 | 1/31/2022 | AK8011 |
| | | | | | AK7924 |
| Zantac 150 mg F/C Tablets | AK5693A | 200.000 | 1/3/2019 | 11/30/2021 | AK7922 |
| Zantac 150 mg F/C Tablets | AK5694A | 200.000 | 1/3/2019 | 1/31/2022 | AK7922 |
| Zantac 150 mg F/C Tablets | AK5695A | 200.000 | 1/6/2019 | 1/31/2022 | AK8011 |
| Zantac 150 mg F/C Tablets | AK5696A | 200.000 | 1/7/2019 | 1/31/2022 | AK8011 |
| Zantac 150 mg F/C Tablets | AK5697A | 220.000 | 1/7/2019 | 1/31/2022 | AK8011 |
| Zantac 150 mg F/C Tablets | AK5698A | 200.000 | 1/7/2019 | 1/31/2022 | AK8011 |
| Zantac 150 mg F/C Tablets | AK5699A | 220.000 | 1/8/2019 | 1/31/2022 | AK8012 |
| | | | | | AK8011 |
| Zantac 150 mg F/C Tablets | AK5700A | 220.000 | 1/8/2019 | 1/31/2022 | AK8012 |
| Zantac 150 mg F/C Tablets | AK5702A | 200.000 | 1/9/2019 | 1/31/2022 | AK8012 |
| Zantac 150 mg F/C Tablets | AK5703A | 265.000 | 1/9/2019 | 1/31/2022 | AK8012 |
| Zantac 150 mg F/C Tablets | AK5705A | 220.000 | 1/25/2019 | 1/31/2022 | AK8014 |
| | | | | | AK8013 |
| Zantac 150 mg F/C Tablets | AK5706A | 200.000 | 1/25/2019 | 1/31/2022 | AK8014 |
| Zantac 150 mg F/C Tablets | AK5707A | 398.000 | 1/25/2019 | 1/31/2022 | AK8014 |
| Zantac 150 mg F/C Tablets | AK5708A | 200.000 | 1/26/2019 | 1/31/2022 | AK8014 |
| Zantac 150 mg F/C Tablets | AK5709A | 200.000 | 1/27/2019 | 1/31/2022 | AK8014 |
| Zantac 150 mg F/C Tablets | AK5710A | 266.000 | 1/27/2019 | 1/31/2022 | AK8334 |
| | | | | | AK8014 |
| Zantac 150 mg F/C Tablets | AK5711A | 200.000 | 1/28/2019 | 1/31/2022 | AK8334 |
| Zantac 150 mg F/C Tablets | AK5712A | 200.000 | 1/28/2019 | 1/31/2022 | AK8334 |
| Zantac 150 mg F/C Tablets | AK5713A | 220.000 | 1/29/2019 | 1/31/2022 | AK8334 |
| | | | | | AK8335 |
| Zantac 150 mg F/C Tablets | AK8651A | 399.000 | 2/7/2019 | 2/28/2022 | AK8927 |
| | | | | | AK8928 |
| Zantac 150 mg F/C Tablets | AK8652A | 200.000 | 2/7/2019 | 2/28/2022 | AK8928 |
| Zantac 150 mg F/C Tablets | AK8653A | 264.000 | 2/7/2019 | 2/28/2022 | AK8928 |
| Zantac 150 mg F/C Tablets | AK8654A | 220.000 | 2/8/2019 | 2/28/2022 | AK8928 |
| Zantac 150 mg F/C Tablets | AK8655A | 200.000 | 2/8/2019 | 2/28/2022 | AK8928 |
| Zantac 150 mg F/C Tablets | AK8656A | 200.000 | 2/8/2019 | 2/28/2022 | AK8929 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | AK8928 |
| Zantac 150 mg F/C Tablets | AK8657A | 220.000 | 2/9/2019 | 2/28/2022 | AK8929 |
| Zantac 150 mg F/C Tablets | AK8658A | 220.000 | 2/9/2019 | 2/28/2022 | AK8929 |
| Zantac 150 mg F/C Tablets | AK8659A | 200.000 | 2/10/2019 | 2/28/2022 | AK8929 |
| Zantac 150 mg F/C Tablets | AK8660A | 220.000 | 4/5/2019 | 4/30/2022 | AK8989 |
| | | | | | AK8988 |
| Zantac 150 mg F/C Tablets | AK9256A | 220.000 | 4/5/2019 | 4/30/2022 | AK8989 |
| Zantac 150 mg F/C Tablets | AK9257A | 200.000 | 4/6/2019 | 4/30/2022 | AK8989 |
| Zantac 150 mg F/C Tablets | AK9258A | 398.000 | 4/6/2019 | 4/30/2022 | AK8989 |
| Zantac 150 mg F/C Tablets | AK9259A | 200.000 | 4/6/2019 | 4/30/2022 | AK8989 |
| Zantac 150 mg F/C Tablets | AK9260A | 398.000 | 4/6/2019 | 4/30/2022 | AK9764 |
| | | | | | AK8989 |
| Zantac 150 mg F/C Tablets | AK9261A | 398.000 | 4/7/2019 | 4/30/2022 | AK9764 |
| Zantac 150 mg F/C Tablets | AK9262A | 200.000 | 4/7/2019 | 4/30/2022 | AK9764 |
| Zantac 150 mg F/C Tablets | AK9263A | 200.000 | 4/8/2019 | 4/30/2022 | AK9764 |
| Zantac 150 mg F/C Tablets | AK9264A | 399.000 | 4/8/2019 | 4/30/2022 | AK9764 |
| | | | | | AK9765 |
| Zantac 150 mg F/C Tablets | AK9265A | 395.000 | 4/8/2019 | 4/30/2022 | AK9765 |
| Zantac 150 mg F/C Tablets | AL1178A | 200.000 | 4/8/2019 | 4/30/2022 | AK9765 |
| Zantac 150 mg F/C Tablets | AL1179A | 200.000 | 4/9/2019 | 4/30/2022 | AK9765 |
| Zantac 150 mg F/C Tablets | AL1180A | 200.000 | 4/9/2019 | 4/30/2022 | AK9765 |
| Zantac 150 mg F/C Tablets | AL1181A | 200.000 | 4/9/2019 | 4/30/2022 | AK9765 |
| | | | | | AK9766 |
| Zantac 150 mg F/C Tablets | AL1182A | 200.000 | 4/10/2019 | 4/30/2022 | AK9766 |
| Zantac 150 mg F/C Tablets | AL1183A | 200.000 | 4/10/2019 | 4/30/2022 | AK9766 |
| Zantac 150 mg F/C Tablets | AL1184A | 397.000 | 4/10/2019 | 4/30/2022 | AK9766 |
| Zantac 150 mg F/C Tablets | AL1185A | 399.000 | 4/10/2019 | 4/30/2022 | AK9767 |
| | | | | | AK9766 |
| Zantac 150 mg F/C Tablets | AL1186A | 200.000 | 4/11/2019 | 4/30/2022 | AK9767 |
| Zantac 150 mg F/C Tablets | AL1187A | 396.000 | 4/11/2019 | 4/30/2022 | AK9767 |
| Zantac 150 mg F/C Tablets | AL1188A | 399.000 | 4/11/2019 | 4/30/2022 | AK9767 |
| Zantac 150 mg F/C Tablets | AL1189A | 200.000 | 4/14/2019 | 4/30/2022 | AK9766 |
| Zantac 150 mg F/C Tablets | AL1190A | 200.000 | 4/15/2019 | 4/30/2022 | AK9767 |
| | | | | | AK9766 |
| Zantac 150 mg F/C Tablets | AL1191A | 396.000 | 4/15/2019 | 4/30/2022 | AK9845 |
| | | | | | AK9767 |
| Zantac 150 mg F/C Tablets | AL1192A | 200.000 | 5/18/2019 | 5/31/2022 | AK9845 |
| | | | | | AL0146 |
| Zantac 150 mg F/C Tablets | AL1193A | 200.000 | 5/18/2019 | 5/31/2022 | AK9845 |
| | | | | | AK9846 |
| Zantac 150 mg F/C Tablets | AL1196A | 220.000 | 5/18/2019 | 5/31/2022 | AL0146 |
| Zantac 150 mg F/C Tablets | AL1197A | 220.000 | 5/19/2019 | 5/31/2022 | AK9846 |
| Zantac 150 mg F/C Tablets | AL1198A | 200.000 | 5/20/2019 | 5/31/2022 | AK9846 |
| Zantac 150 mg F/C Tablets | AL1199A | 398.000 | 5/21/2019 | 5/31/2022 | AK9846 |
| | | | | | AK9847 |
| Zantac 150 mg F/C Tablets | AL1200A | 200.000 | 5/21/2019 | 5/31/2022 | AK9847 |
| Zantac 150 mg F/C Tablets | AL1201A | 200.000 | 5/22/2019 | 5/31/2022 | AK9847 |
| Zantac 150 mg F/C Tablets | AL1202A | 200.000 | 5/22/2019 | 5/31/2022 | AK9847 |
| Zantac 150 mg F/C Tablets | AL2812A | 200.000 | 5/22/2019 | 5/31/2022 | AK9847 |
| Zantac 150 mg F/C Tablets | AL2814A | 200.000 | 5/23/2019 | 5/31/2022 | AK9847 |
| | | | | | AL0147 |
| Zantac 150 mg F/C Tablets | AL2815A | 220.000 | 5/23/2019 | 5/31/2022 | AL0147 |
| Zantac 150 mg F/C Tablets | AL2816A | 220.000 | 5/23/2019 | 5/31/2022 | AL0147 |
| Zantac 150 mg F/C Tablets | AL2817A | 200.000 | 5/23/2019 | 5/31/2022 | AL0147 |
| Zantac 150 mg F/C Tablets | AL2818A | 200.000 | 5/24/2019 | 5/31/2022 | AL0147 |
| Zantac 150 mg F/C Tablets | AL2819A | 220.000 | 6/9/2019 | 6/30/2022 | AL0146 |
| Zantac 150 mg F/C Tablets | AL2820A | 200.000 | 6/11/2019 | 6/30/2022 | AL0148 |
| Zantac 150 mg F/C Tablets | AL2821A | 200.000 | 6/11/2019 | 6/30/2022 | AL0148 |
| Zantac 150 mg F/C Tablets | AL2822A | 396.000 | 6/12/2019 | 6/30/2022 | AL0148 |
| | | | | | AL0149 |
| Zantac 150 mg F/C Tablets | AL4207A | 200.000 | 6/13/2019 | 6/30/2022 | AL0149 |
| Zantac 150 mg F/C Tablets | AL4208A | 399.000 | 6/13/2019 | 6/30/2022 | AL0149 |
| Zantac 150 mg F/C Tablets | AL4209A | 200.000 | 6/13/2019 | 6/30/2022 | AL0149 |
| Zantac 150 mg F/C Tablets | AL4210A | 200.000 | 6/14/2019 | 6/30/2022 | AL0149 |
| Zantac 150 mg F/C Tablets | AL4211A | 200.000 | 6/14/2019 | 6/30/2022 | AL0149 |
| | | | | | AL0364 |
| Zantac 150 mg F/C Tablets | AL4212A | 200.000 | 6/14/2019 | 6/30/2022 | AL0364 |
| Zantac 150 mg F/C Tablets | AL4213A | 220.000 | 6/15/2019 | 6/30/2022 | AL0364 |
| Zantac 150 mg F/C Tablets | AL4214A | 220.000 | 6/16/2019 | 6/30/2022 | AL0364 |
| Zantac 150 mg F/C Tablets | AL4215A | 200.000 | 6/17/2019 | 6/30/2022 | AL0364 |
| Zantac 150 mg F/C Tablets | AL4216A | 200.000 | 6/17/2019 | 6/30/2022 | AL0365 |
| | | | | | AL0364 |

| | | | | | |
|---|---|---|---|---|---|
| Zantac 150 mg F/C Tablets | AL4888A | 397.000 | 6/18/2019 | 6/30/2022 | AL0365 |
| Zantac 150 mg F/C Tablets | AL4889A | 200.000 | 6/19/2019 | 6/30/2022 | AL0365 |
| Zantac 150 mg F/C Tablets | AL4890A | 200.000 | 6/19/2019 | 6/30/2022 | AL0365 |
| Zantac 150 mg F/C Tablets | AL4891A | 220.000 | 6/20/2019 | 6/30/2022 | AL0366 |
| | | | | | AL0365 |
| Zantac 150 mg F/C Tablets | AL4892A | 200.000 | 7/9/2019 | 7/31/2022 | AL3318 |
| Zantac 150 mg F/C Tablets | AL4893A | 398.000 | 7/9/2019 | 7/31/2022 | AL3318 |
| Zantac 150 mg F/C Tablets | AL4894A | 200.000 | 7/10/2019 | 7/31/2022 | AL3318 |
| Zantac 150 mg F/C Tablets | AL4895A | 399.000 | 7/11/2019 | 7/31/2022 | AL3318 |
| | | | | | AL3319 |
| Zantac 150 mg F/C Tablets | AL4896A | 200.000 | 7/12/2019 | 7/31/2022 | AL3319 |
| Zantac 150 mg F/C Tablets | AL4897A | 398.000 | 7/12/2019 | 7/31/2022 | AL3319 |
| Zantac 150 mg F/C Tablets | AL5792A | 399.000 | 7/13/2019 | 7/31/2022 | AL3319 |
| Zantac 150 mg F/C Tablets | AL5793A | 200.000 | 7/13/2019 | 7/31/2022 | AL3320 |
| Zantac 150 mg F/C Tablets | AL5794A | 399.000 | 7/13/2019 | 7/31/2022 | AL3320 |
| Zantac 150 mg F/C Tablets | AL5795A | 200.000 | 7/14/2019 | 7/31/2022 | AL3320 |
| Zantac 150 mg F/C Tablets | AL5796A | 220.000 | 7/14/2019 | 7/31/2022 | AL3320 |
| Zantac 150 mg F/C Tablets | AL5797A | 200.000 | 7/15/2019 | 7/31/2022 | AL3320 |
| | | | | | AL3319 |
| Zantac 150 mg F/C Tablets | AL5798A | 200.000 | 7/15/2019 | 7/31/2022 | AL3319 |
| | | | | | AL3320 |
| Zantac 150 mg F/C Tablets | AL5799A | 398.000 | 7/16/2019 | 7/31/2022 | AL3321 |
| | | | | | AL3319 |
| Zantac 150 mg F/C Tablets | AL5800A | 200.000 | 7/16/2019 | 7/31/2022 | AL3321 |
| Zantac 150 mg F/C Tablets | AL5801A | 399.000 | 7/17/2019 | 7/31/2022 | AL3321 |
| Zantac 150 mg F/C Tablets | AL5802A | 398.000 | 7/17/2019 | 7/31/2022 | AL3321 |
| Zantac 150 mg F/C Tablets | AL5803A | 200.000 | 7/17/2019 | 7/31/2022 | AL3322 |
| | | | | | AL3321 |
| Zantac 150 mg F/C Tablets | AL5804A | 200.000 | 7/18/2019 | 7/31/2022 | AL3322 |
| | | | | | AL3321 |
| Zantac 150 mg F/C Tablets | AL5805A | 220.000 | 7/18/2019 | 7/31/2022 | AL3322 |
| Zantac 150 mg F/C Tablets | AL5806A | 220.000 | 7/18/2019 | 7/31/2022 | AL3322 |
| | | | | | AL3321 |
| Zantac 150 mg F/C Tablets | AL5807A | 220.000 | 7/18/2019 | 7/31/2022 | AL3322 |
| | | | | | AL3321 |
| Zantac 150 mg F/C Tablets | AL5808A | 200.000 | 7/19/2019 | 7/31/2022 | AL3323 |
| | | | | | AL3322 |
| Zantac 150 mg F/C Tablets | AL5809A | 399.000 | 7/19/2019 | 7/31/2022 | AL3323 |
| Zantac 150 mg F/C Tablets | AL5810A | 200.000 | 7/20/2019 | 7/31/2022 | AL3323 |
| Zantac 150 mg F/C Tablets | AL5811A | 200.000 | 7/20/2019 | 7/31/2022 | AL3323 |
| Zantac 150 mg F/C Tablets | AL5812A | 398.000 | 7/20/2019 | 7/31/2022 | AL3323 |
| Zantac 150 mg F/C Tablets | AL5813A | 200.000 | 7/20/2019 | 7/31/2022 | AL3324 |
| | | | | | AL3323 |
| Zantac 150 mg F/C Tablets | AL5814A | 398.000 | 7/20/2019 | 7/31/2022 | AL3324 |
| Zantac 150 mg F/C Tablets | AL5815A | 220.000 | 8/9/2019 | 8/31/2022 | AL4385 |
| Zantac 150 mg F/C Tablets | AL5816A | 200.000 | 8/9/2019 | 8/31/2022 | AL4385 |
| Zantac 150 mg F/C Tablets | AL5817A | 220.000 | 8/10/2019 | 8/31/2022 | AL4385 |
| | | | | | AL4386 |
| Zantac 150 mg F/C Tablets | AL5818A | 220.000 | 8/10/2019 | 8/31/2022 | AL4386 |
| Zantac 150 mg F/C Tablets | AL5819A | 200.000 | 8/11/2019 | 8/31/2022 | AL4386 |
| Zantac 150 mg F/C Tablets | AL7673A | 200.000 | 8/11/2019 | 8/31/2022 | AL4386 |
| Zantac 150 mg F/C Tablets | AL7674A | 200.000 | 8/12/2019 | 8/31/2022 | AL4386 |
| Zantac 150 mg F/C Tablets | AL7675A | 397.000 | 8/13/2019 | 8/31/2022 | AL4387 |
| | | | | | AL4386 |
| Zantac 150 mg F/C Tablets | AL7676A | 200.000 | 8/13/2019 | 8/31/2022 | AL4387 |
| Zantac 150 mg F/C Tablets | AL7677A | 220.000 | 8/13/2019 | 8/31/2022 | AL4387 |
| Zantac 150 mg F/C Tablets | AL7678A | 200.000 | 8/13/2019 | 8/31/2022 | AL4387 |
| Zantac 150 mg F/C Tablets | AL7679A | 200.000 | 8/13/2019 | 8/31/2022 | AL4387 |
| Zantac 150 mg F/C Tablets | AL7680A | 200.000 | 8/14/2019 | 8/31/2022 | AL4388 |
| | | | | | AL4387 |
| Zantac 150 mg F/C Tablets | AL7681A | 200.000 | 8/14/2019 | 8/31/2022 | AL4388 |
| Zantac 150 mg F/C Tablets | AL7682A | 200.000 | 8/15/2019 | 8/31/2022 | AL4388 |
| Zantac 150 mg F/C Tablets | AL7683A | 220.000 | 8/15/2019 | 8/31/2022 | AL4388 |
| Zantac 150 mg F/C Tablets | AL7684A | 200.000 | 8/15/2019 | 8/31/2022 | AL4388 |
| | | | | | AL4389 |
| Zantac 150 mg F/C Tablets | AL7685A | 399.000 | 8/15/2019 | 8/31/2022 | AL4389 |
| Zantac 150 mg F/C Tablets | AL7686A | 398.000 | 8/16/2019 | 8/31/2022 | AL4389 |
| Zantac 150 mg F/C Tablets | AL7687A | 200.000 | 8/16/2019 | 8/31/2022 | AL4389 |
| Zantac 150 mg F/C Tablets | AM0104A | 200.000 | 9/14/2019 | 9/30/2022 | AL4391 |
| Zantac 150 mg F/C Tablets | AM0105A | 383.000 | 9/15/2019 | 9/30/2022 | AL4391 |
| Zantac 150 mg F/C Tablets | AM0106A | 200.000 | 9/16/2019 | 9/30/2022 | AL4391 |
| Zantac 150 mg F/C Tablets | AM0107A | 220.000 | 9/18/2019 | 9/30/2022 | AL7320 |

| | | | | | |
|---|---|---|---|---|---|
| Zantac 150 mg F/C Tablets | AM0108A | 398.000 | 9/18/2019 | 9/30/2022 | AL7320 |
| | | | | | AL7321 |
| Zantac 150 mg F/C Tablets | AM0109A | 200.000 | 9/18/2019 | 9/30/2022 | AL7321 |
| Zantac 150 mg F/C Tablets | AM0110A | 399.000 | 9/18/2019 | 9/30/2022 | AL7320 |
| Zantac 150 mg F/C Tablets | AM0111A | 397.000 | 9/19/2019 | 9/30/2022 | AL7320 |
| | | | | | AL7321 |
| Zantac 150 mg F/C Tablets | AM0112A | 200.000 | 9/19/2019 | 9/30/2022 | AL7321 |
| Zantac 150 mg F/C Tablets | AM0113A | 200.000 | 9/20/2019 | 9/30/2022 | AL7321 |
| Zantac 150 mg F/C Tablets | AM0114A | 200.000 | 9/22/2019 | 9/30/2022 | AL7321 |
| Zantac 150 mg F/C Tablets | AM0115A | 220.000 | 9/22/2019 | 9/30/2022 | AL7322 |
| | | | | | AL7321 |
| Zantac 150 mg F/C Tablets | AM0116A | 200.000 | 9/23/2019 | 9/30/2022 | AL7322 |
| Zantac 150 mg F/C Tablets | AM0117A | 397.000 | 9/24/2019 | 9/30/2022 | AL7322 |
| Zantac 150 mg F/C Tablets | AM0118A | 397.000 | 9/24/2019 | 9/30/2022 | AL7322 |
| Zantac 150 mg F/C Tablets | AM0119A | 200.000 | 9/24/2019 | 9/30/2022 | AL7322 |
| | | | | | AL7323 |
| Zantac 150 mg F/C Tablets | AM0120A | 399.000 | 9/24/2019 | 9/30/2022 | AL7323 |
| Zantac 150 mg F/C Tablets | AM0121A | 200.000 | 9/25/2019 | 9/30/2022 | AL7323 |
| Zantac 150 mg F/C Tablets | AM0302A | 200.000 | 9/25/2019 | 9/30/2022 | AL7323 |
| Zantac 150 mg F/C Tablets | AM0303A | 220.000 | 9/25/2019 | 9/30/2022 | AL7323 |
| Zantac 150 mg F/C Tablets | AM0304A | 200.000 | 9/26/2019 | 9/30/2022 | AL7323 |
| | | | | | AL7324 |
| Zantac 150 mg F/C Tablets | AM0305A | 200.000 | 9/26/2019 | 9/30/2022 | AL7324 |
| Zantac 150 mg F/C Tablets | AM0306A | 220.000 | 9/26/2019 | 9/30/2022 | AL7324 |
| Zantac 150 mg F/C Tablets | AM0308A | 399.000 | 9/29/2019 | 9/30/2022 | AL7832 |
| Zantac 150 mg F/C Tablets | AM0309A | 399.000 | 9/29/2019 | 9/30/2022 | AL7832 |
| Zantac 150 mg F/C Tablets | AM0310A | 200.000 | 10/4/2019 | 9/30/2022 | AL7833 |
| | | | | | AL7832 |
| Zantac 150 mg F/C Tablets | AM0311A | 220.000 | 10/4/2019 | 10/31/2022 | AL7833 |
| Zantac 150 mg F/C Tablets | AM0312A | 200.000 | 10/5/2019 | 10/31/2022 | AL7833 |
| Zantac 150 mg F/C Tablets | AM0313A | 200.000 | 10/6/2019 | 10/31/2022 | AL7833 |
| Zantac 150 mg F/C Tablets | AM0314A | 220.000 | 10/7/2019 | 10/31/2022 | AL7833 |
| | | | | | AL7834 |
| Zantac 150 mg F/C Tablets | AM0315A | 200.000 | 10/7/2019 | 10/31/2022 | AL7834 |
| Zantac 150 mg F/C Tablets | AM0316A | 398.000 | 10/8/2019 | 10/31/2022 | AL7834 |
| Zantac 150 mg F/C Tablets | AM0317A | 200.000 | 10/8/2019 | 10/31/2022 | AL7834 |
| Zantac 150 mg F/C Tablets | AM0318A | 200.000 | 10/9/2019 | 10/31/2022 | AL7834 |
| Zantac 150 mg F/C Tablets | AM0320A | 220.000 | 10/10/2019 | 10/31/2022 | AL7835 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| Zantac 75 mg F/C Tablets | AL7318A | 200.000 | 7/8/2019 | 7/31/2022 | AL3318 |
| | AL7318A | | | | AL0366 |
| Zantac 75 mg F/C Tablets | AL7319A | 200.000 | 7/9/2019 | 7/31/2022 | AL3318 |
| Zantac 75 mg F/C Tablets | AM0131A | 300.000 | 9/29/2019 | 3/31/2020 | AL7832 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| Zantac 150mg x60 | AJ5797B | 300.000 | 4/8/2018 | 4/30/2021 | AJ4326 |
| Zantac 150mg x60 | AJ5798B | 300.000 | 4/9/2018 | 4/30/2021 | AJ4326 |
| Zantac 150mg x60 | AJ5799B | 300.000 | 4/9/2018 | 4/30/2021 | AJ4326 |
| Zantac 150mg x60 | AJ5800B | 300.000 | 4/9/2018 | 4/30/2021 | AJ4326 |
| Zantac 150mg x60 | AJ5801B | 300.000 | 4/10/2018 | 4/30/2021 | AJ4326 |
| | AJ5801B | | | | AJ4327 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| Zantac 75mg 30ct (CHATTEM) | AL7318B | 300.000 | 7/8/2019 | 7/31/2022 | AL0366 |
| | | | | | AL3318 |
| Zantac 75mg 30ct (CHATTEM) | AL7319B | 300.000 | 7/9/2019 | 7/31/2022 | AL3318 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| Zantac 150mg 8ct (CHATTEM) | AL5792B | 304.000 | 7/13/2019 | 7/31/2022 | AL3319 |
| Zantac 150mg 8ct (CHATTEM) | AL5794B | 304.000 | 7/13/2019 | 7/31/2022 | AL3320 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| Zantac 150mg 8ct Dollar Store (CHATTEM) | AL5793C | 304.000 | 7/13/2019 | 7/31/2022 | AL3320 |
| Zantac 150mg 8ct Dollar Store (CHATTEM) | AL5794C | 304.000 | 7/13/2019 | 7/31/2022 | AL3320 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| Zantac 150mg 24ct (CHATTEM) | AL5795B | 312.000 | 7/14/2019 | 7/31/2022 | AL3320 |
| Zantac 150mg 24ct (CHATTEM) | AL5796B | 312.000 | 7/14/2019 | 7/31/2022 | AL3320 |
| Zantac 150mg 24ct (CHATTEM) | AL5797B | 312.000 | 7/15/2019 | 7/31/2022 | AL3320 |
| | | | | | AL3319 |
| Zantac 150mg 24ct (CHATTEM) | AL5798B | 312.000 | 7/15/2019 | 7/31/2022 | AL3319 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | AL3320 |
| Zantac 150mg 24ct (CHATTEM) | AL5799B | 312.000 | 7/16/2019 | 7/31/2022 | AL3321 |
| | | | | | AL3319 |
| Zantac 150mg 24ct (CHATTEM) | AL5800B | 312.000 | 7/16/2019 | 7/31/2022 | AL3321 |
| Zantac 150mg 24ct (CHATTEM) | AL5801B | 312.000 | 7/17/2019 | 7/31/2022 | AL3321 |
| Zantac 150mg 24ct (CHATTEM) | AL5802B | 312.000 | 7/17/2019 | 7/31/2022 | AL3321 |
| Zantac 150mg 24ct (CHATTEM) | AL5805B | 312.000 | 7/18/2019 | 7/31/2022 | AL3322 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| Zantac 150mg 24ct Dollar Store (CHATTEM) | AL5803B | 312.000 | 7/17/2019 | 7/31/2022 | AL3322 |
| | AL5803B | | | | AL3321 |
| Zantac 150mg 24ct Dollar Store (CHATTEM) | AL5804B | 312.000 | 7/18/2019 | 7/31/2022 | AL3322 |
| | AL5804B | | | | AL3321 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| Zantac 75mg 10ct (CHATTEM) | AL7319C | 300.000 | 7/9/2019 | 7/31/2022 | AL3318 |

| Material Description | Batch | Sample Quantity (grams) | Mfg Date | SLED (Exp Date) |
|---|---|---|---|---|
| RANITIDINE HCL, USP | AG9926 | 100.000 | 2/16/2017 | 2/29/2020 |
| RANITIDINE HCL, USP | AG9929 | 100.000 | 2/9/2017 | 2/29/2020 |
| RANITIDINE HCL, USP | AH8893 | 100.000 | 9/15/2017 | 9/14/2020 |
| RANITIDINE HCL, USP | AJ4326 | 100.000 | 1/16/2018 | 1/31/2021 |
| RANITIDINE HCL, USP | AJ4327 | 100.000 | 1/17/2018 | 1/31/2021 |
| RANITIDINE HCL, USP | AJ5939 | 100.000 | 2/13/2018 | 2/28/2021 |
| RANITIDINE HCL, USP | AJ5940 | 100.000 | 2/17/2018 | 2/28/2021 |
| RANITIDINE HCL, USP | AJ5941 | 100.000 | 2/19/2018 | 2/28/2021 |
| RANITIDINE HCL, USP | AJ5942 | 100.000 | 2/20/2018 | 2/28/2021 |
| RANITIDINE HCL, USP | AJ6261 | 100.000 | 2/25/2018 | 2/28/2021 |
| RANITIDINE HCL, USP | AJ6262 | 100.000 | 2/27/2018 | 2/28/2021 |
| RANITIDINE HCL, USP | AJ6263 | 100.000 | 2/28/2018 | 2/28/2021 |
| RANITIDINE HCL, USP | AJ6264 | 100.000 | 3/1/2018 | 3/31/2021 |
| RANITIDINE HCL, USP | AJ8376 | 100.000 | 3/28/2018 | 3/31/2021 |
| RANITIDINE HCL, USP | AJ8377 | 100.000 | 3/29/2018 | 3/31/2021 |
| RANITIDINE HCL, USP | AJ8378 | 100.000 | 3/31/2018 | 3/31/2021 |
| RANITIDINE HCL, USP | AJ8379 | 100.000 | 4/6/2018 | 4/30/2021 |
| RANITIDINE HCL, USP | AJ8380 | 100.000 | 4/6/2018 | 4/30/2021 |
| RANITIDINE HCL, USP | AJ8882 | 100.000 | 4/7/2018 | 4/30/2021 |
| RANITIDINE HCL, USP | AJ8883 | 100.000 | 4/13/2018 | 4/30/2021 |
| RANITIDINE HCL, USP | AJ9782 | 100.000 | 3/29/2018 | 3/31/2021 |
| RANITIDINE HCL, USP | AJ9783 | 100.000 | 3/28/2018 | 3/31/2021 |
| RANITIDINE HCL, USP | AJ9784 | 100.000 | 4/6/2018 | 4/30/2021 |
| RANITIDINE HCL, USP | AK2954 | 100.000 | 7/20/2018 | 7/31/2021 |
| RANITIDINE HCL, USP | AK2955 | 100.000 | 7/22/2018 | 7/31/2021 |
| RANITIDINE HCL, USP | AK2956 | 100.000 | 7/24/2018 | 7/31/2021 |
| RANITIDINE HCL, USP | AK2957 | 100.000 | 7/25/2018 | 7/31/2021 |
| RANITIDINE HCL, USP | AK4903 | 50.000 | 7/27/2018 | 7/31/2021 |
| RANITIDINE HCL, USP | AK4904 | 100.000 | 8/3/2018 | 8/31/2021 |
| RANITIDINE HCL, USP | AK4905 | 100.000 | 8/4/2018 | 8/31/2021 |
| RANITIDINE HCL, USP | AK4906 | 100.000 | 8/5/2018 | 8/31/2021 |
| RANITIDINE HCL, USP | AK5325 | 100.000 | 8/9/2018 | 8/31/2021 |
| RANITIDINE HCL, USP | AK5326 | 100.000 | 8/24/2018 | 8/31/2021 |
| RANITIDINE HCL, USP | AK5327 | 100.000 | 8/26/2018 | 8/31/2021 |
| RANITIDINE HCL, USP | AK5328 | 100.000 | 8/28/2018 | 8/31/2021 |
| RANITIDINE HCL, USP | AK6451 | 100.000 | 9/29/2018 | 9/30/2021 |
| RANITIDINE HCL, USP | AK6452 | 100.000 | 10/1/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK6453 | 100.000 | 10/4/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK6454 | 100.000 | 9/2/2018 | 9/30/2021 |
| RANITIDINE HCL, USP | AK6455 | 100.000 | 9/22/2018 | 9/30/2021 |
| RANITIDINE HCL, USP | AK6456 | 100.000 | 9/24/2018 | 9/30/2021 |
| RANITIDINE HCL, USP | AK7829 | 100.000 | 10/22/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK7830 | 100.000 | 10/23/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK7831 | 100.000 | 10/24/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK7922 | 100.000 | 10/17/2018 | 10/31/2021 |

| | | | | |
|---|---|---|---|---|
| RANITIDINE HCL, USP | AK7923 | 100.000 | 10/21/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK7924 | 100.000 | 10/21/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK8011 | 100.000 | 10/26/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK8012 | 100.000 | 10/28/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK8013 | 100.000 | 10/30/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK8014 | 100.000 | 10/31/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK8334 | 100.000 | 10/31/2018 | 10/31/2021 |
| RANITIDINE HCL, USP | AK8335 | 100.000 | 11/1/2018 | 11/30/2021 |
| RANITIDINE HCL, USP | AK8336 | 100.000 | 11/2/2018 | 11/30/2021 |
| RANITIDINE HCL, USP | AK8337 | 100.000 | 11/4/2018 | 11/30/2021 |
| RANITIDINE HCL, USP | AK8987 | 100.000 | 11/5/2018 | 11/30/2021 |
| RANITIDINE HCL, USP | AK8988 | 100.000 | 11/6/2018 | 11/30/2021 |
| RANITIDINE HCL, USP | AK8989 | 50.000 | 11/7/2018 | 11/30/2021 |
| RANITIDINE HCL, USP | AK9764 | 100.000 | 12/5/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AK9765 | 50.000 | 12/6/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AK9766 | 100.000 | 12/7/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AK9767 | 100.000 | 12/8/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AK9845 | 100.000 | 12/10/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AK9846 | 100.000 | 12/11/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AK9847 | 100.000 | 12/12/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AL0146 | 100.000 | 12/12/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AL0147 | 100.000 | 12/13/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AL0148 | 100.000 | 12/15/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AL0149 | 100.000 | 12/16/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AL0364 | 100.000 | 12/18/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AL0365 | 100.000 | 12/19/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AL0366 | 100.000 | 12/19/2018 | 12/31/2021 |
| RANITIDINE HCL, USP | AL3318 | 100.000 | 2/8/2019 | 2/28/2022 |
| RANITIDINE HCL, USP | AL3319 | 100.000 | 2/13/2019 | 2/28/2022 |
| RANITIDINE HCL, USP | AL3320 | 100.000 | 2/15/2019 | 2/28/2022 |
| RANITIDINE HCL, USP | AL3321 | 100.000 | 2/16/2019 | 2/28/2022 |
| RANITIDINE HCL, USP | AL3322 | 100.000 | 2/17/2019 | 2/28/2022 |
| RANITIDINE HCL, USP | AL3323 | 100.000 | 2/21/2019 | 2/28/2022 |
| RANITIDINE HCL, USP | AL3324 | 100.000 | 2/22/2019 | 2/28/2022 |
| RANITIDINE HCL, USP | AL3325 | 100.000 | 2/22/2019 | 2/28/2022 |
| RANITIDINE HCL, USP | AL4385 | 100.000 | 3/14/2019 | 3/31/2022 |
| RANITIDINE HCL, USP | AL4386 | 100.000 | 3/15/2019 | 3/31/2022 |
| RANITIDINE HCL, USP | AL4387 | 100.000 | 3/17/2019 | 3/31/2022 |
| RANITIDINE HCL, USP | AL4388 | 100.000 | 3/18/2019 | 3/31/2022 |
| RANITIDINE HCL, USP | AL4389 | 100.000 | 3/7/2019 | 3/31/2022 |
| RANITIDINE HCL, USP | AL4390 | 100.000 | 3/10/2019 | 3/31/2022 |
| RANITIDINE HCL, USP | AL4391 | 100.000 | 3/11/2019 | 3/31/2022 |
| RANITIDINE HCL, USP | AL7320 | 100.000 | 4/27/2019 | 4/30/2022 |
| RANITIDINE HCL, USP | AL7321 | 100.000 | 4/28/2019 | 4/30/2022 |
| RANITIDINE HCL, USP | AL7322 | 100.000 | 4/29/2019 | 4/30/2022 |
| RANITIDINE HCL, USP | AL7323 | 100.000 | 4/30/2019 | 4/30/2022 |
| RANITIDINE HCL, USP | AL7324 | 100.000 | 5/1/2019 | 5/31/2022 |

| | | | | |
|---|---|---|---|---|
| RANITIDINE HCL, USP | AL7832 | 100.000 | 5/17/2019 | 5/31/2022 |
| RANITIDINE HCL, USP | AL7833 | 100.000 | 5/19/2019 | 5/31/2022 |
| RANITIDINE HCL, USP | AL7834 | 100.000 | 5/19/2019 | 5/31/2022 |
| RANITIDINE HCL, USP | AL7835 | 100.000 | 5/6/2019 | 5/31/2022 |
| RANITIDINE HCL, USP | AL7836 | 100.000 | 3/1/2019 | 3/31/2022 |
| RANITIDINE HCL, USP | AL7837 | 100.000 | 3/1/2019 | 3/31/2022 |
| RANITIDINE HCL, USP | AL7838 | 100.000 | 3/6/2019 | 3/31/2022 |
| RANITIDINE HCL, USP | AL7839 | 100.000 | 3/9/2019 | 3/31/2022 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150MG TABS BCX3 CAN | AJ5570C | 300.000 | 5/8/2018 | 4/30/2020 | AJ5939 |
| ZANTAC 150MG TABS BCX3 CAN | AK0102B | 300.000 | 9/18/2018 | 8/31/2020 | AK2954 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150MG TABS B/C 8'S CANADA | AJ5570E | 304.000 | 5/8/2018 | 4/30/2020 | AJ5939 |
| ZANTAC 150MG TABS B/C 8'S CANADA | AK0102C | 304.000 | 9/18/2018 | 8/30/2020 | AK2954 |
| ZANTAC 150MG TABS B/C 8'S CANADA | AK5589B | 304.000 | 1/31/2019 | 12/31/2020 | AK8335 |
| | AK5589B | | | | AK8334 |
| ZANTAC 150MG TABS B/C 8'S CANADA | AL0626D | 304.000 | 3/29/2019 | 2/28/2021 | AK8930 |
| ZANTAC 150MG TABS B/C 8'S CANADA | AL5742C | 304.000 | 7/21/2019 | 6/30/2021 | AL3324 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150MG TABS BCX24 CAN | AK0103B | 312.000 | 9/19/2018 | 8/30/2020 | AK2955 |
| | AK0103B | | | | AK2954 |
| ZANTAC 150MG TABS BCX24 CAN | AK3008B | 312.000 | 11/18/2018 | 10/31/2020 | AK6455 |
| | AK3008B | | | | AK6456 |
| ZANTAC 150MG TABS BCX24 CAN | AK4323B | 312.000 | 11/18/2018 | 10/31/2020 | AK6456 |
| ZANTAC 150MG TABS BCX24 CAN | AL5743B | 312.000 | 7/21/2019 | 6/30/2021 | AL3324 |
| ZANTAC 150MG TABS BCX24 CAN | AL8736B | 312.000 | 7/23/2019 | 6/30/2021 | AL3325 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150 MG TABS X 50 CANADA | AJ3308B | 300.000 | 3/27/2018 | 2/28/2020 | AH8893 |
| ZANTAC 150 MG TABS X 50 CANADA | AJ5571B | 300.000 | 5/9/2018 | 4/30/2020 | AJ5939 |
| ZANTAC 150 MG TABS X 50 CANADA | AJ5572B | 300.000 | 5/10/2018 | 4/30/2020 | AJ5940 |
| ZANTAC 150 MG TABS X 50 CANADA | AJ6859D | 300.000 | 7/20/2018 | 6/30/2020 | AJ8883 |
| ZANTAC 150 MG TABS X 50 CANADA | AJ6860B | 300.000 | 9/17/2018 | 8/31/2020 | AK2954 |
| ZANTAC 150 MG TABS X 50 CANADA | AJ6861C | 300.000 | 7/18/2018 | 6/30/2020 | AJ8882 |
| ZANTAC 150 MG TABS X 50 CANADA | AK0100B | 300.000 | 9/18/2018 | 8/31/2020 | AK2954 |
| ZANTAC 150 MG TABS X 50 CANADA | AK1866B | 300.000 | 9/23/2018 | 8/31/2020 | AK2956 |
| ZANTAC 150 MG TABS X 50 CANADA | AK3004C | 300.000 | 9/24/2018 | 8/31/2020 | AK2956 |
| ZANTAC 150 MG TABS X 50 CANADA | AK3005B | 300.000 | 9/24/2018 | 8/31/2020 | AK2957 |
| | AK3005B | | | | AK2956 |
| ZANTAC 150 MG TABS X 50 CANADA | AK3006B | 300.000 | 9/25/2018 | 8/31/2020 | AK2957 |
| ZANTAC 150 MG TABS X 50 CANADA | AK4324B | 300.000 | 11/18/2018 | 10/31/2020 | AK6456 |
| ZANTAC 150 MG TABS X 50 CANADA | AK5511B | 300.000 | 1/29/2019 | 12/31/2020 | AK8335 |
| ZANTAC 150 MG TABS X 50 CANADA | AK5590B | 300.000 | 1/31/2019 | 12/31/2020 | AK8335 |
| ZANTAC 150 MG TABS X 50 CANADA | AK5593B | 300.000 | 2/1/2019 | 1/31/2021 | AK8336 |
| ZANTAC 150 MG TABS X 50 CANADA | AK6950B | 300.000 | 2/1/2019 | 1/31/2021 | AK8336 |
| ZANTAC 150 MG TABS X 50 CANADA | AK6951B | 300.000 | 2/5/2019 | 1/31/2021 | AK8336 |
| | AK6951B | | | | AK8927 |
| ZANTAC 150 MG TABS X 50 CANADA | AL0626E | 300.000 | 3/29/2019 | 2/28/2021 | AK8930 |
| ZANTAC 150 MG TABS X 50 CANADA | AL1811B | 300.000 | 4/1/2019 | 3/31/2021 | AK8930 |
| | AL1811B | | | | AK8987 |
| ZANTAC 150 MG TABS X 50 CANADA | AL1812B | 300.000 | 4/2/2019 | 3/31/2021 | AK8987 |
| ZANTAC 150 MG TABS X 50 CANADA | AL1813B | 300.000 | 4/2/2019 | 3/31/2021 | AK8987 |
| ZANTAC 150 MG TABS X 50 CANADA | AL1814B | 300.000 | 4/3/2019 | 3/31/2021 | AK8987 |
| ZANTAC 150 MG TABS X 50 CANADA | AL1815B | 300.000 | 4/3/2019 | 3/31/2021 | AK8987 |
| ZANTAC 150 MG TABS X 50 CANADA | AL7097D | 300.000 | 7/22/2019 | 6/30/2021 | AL3325 |
| ZANTAC 150 MG TABS X 50 CANADA | AL7098C | 300.000 | 7/23/2019 | 6/30/2021 | AL3325 |
| ZANTAC 150 MG TABS X 50 CANADA | AL8738B | 300.000 | 8/16/2019 | 7/31/2021 | AL4389 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| Zantac150mg Cool Mint (J&J Can) Top Coat | AL5744B | 200.000 | 7/22/2019 | 6/30/2021 | AL3325 |
| | AL5744B | | | | AL3324 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150MG CM TAB BCX24 CAN | AK0465C | 312.000 | 9/25/2018 | 8/30/2020 | AK2957 |
| ZANTAC 150MG CM TAB BCX24 CAN | AK4328C | 312.000 | 11/19/2018 | 10/31/2020 | AK6456 |
| ZANTAC 150MG CM TAB BCX24 CAN | AK4331D | 312.000 | 2/5/2019 | 1/31/2021 | AK8927 |
| ZANTAC 150MG CM TAB BCX24 CAN | AL5744C | 312.000 | 7/22/2019 | 6/30/2021 | AL3325 |
| | AL5744C | | | | AL3324 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150MG COOL TABS BC X48 CANADA | AJ1966E | 336.000 | 3/28/2018 | 2/28/2020 | AH8893 |
| ZANTAC 150MG COOL TABS BC X48 CANADA | AJ4817C | 336.000 | 6/5/2018 | 5/31/2020 | AJ5940 |
| ZANTAC 150MG COOL TABS BC X48 CANADA | AJ7383C | 336.000 | 7/21/2018 | 6/30/2020 | AJ9782 |
| | AJ7383C | | | | AJ9783 |
| ZANTAC 150MG COOL TABS BC X48 CANADA | AK0466C | 336.000 | 9/25/2018 | 8/31/2021 | AK2957 |
| ZANTAC 150MG COOL TABS BC X48 CANADA | AK0467D | 336.000 | 9/22/2018 | 8/31/2021 | AK2955 |
| | AK0467D | | | | AK2956 |
| ZANTAC 150MG COOL TABS BC X48 CANADA | AK4330C | 336.000 | 2/3/2019 | 1/31/2021 | AK8927 |

| | | | | | |
|---|---|---|---|---|---|
| ZANTAC 150MG COOL TABS BC X48 CANADA | AK6954C | 336.000 | 2/3/2019 | 1/31/2021 | AK8337 |
| ZANTAC 150MG COOL TABS BC X48 CANADA | AL0628D | 336.000 | 4/5/2019 | 3/31/2021 | AK8988 |
| ZANTAC 150MG COOL TABS BC X48 CANADA | AL1818C | 336.000 | 4/4/2019 | 3/31/2021 | AK8988 |
| ZANTAC 150MG COOL TABS BC X48 CANADA | AL7403C | 336.000 | 7/23/2019 | 6/30/2021 | AL3325 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150MG TABS CARTON X130 CANADA | AJ6862B | 390.000 | 7/18/2018 | 6/30/2020 | AJ8882 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AJ6863B | 390.000 | 7/18/2018 | 6/30/2020 | AJ8882 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AJ7387B | 390.000 | 7/19/2018 | 6/30/2020 | AJ8882 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AK0104B | 390.000 | 9/21/2018 | 8/31/2020 | AK2955 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AK0105B | 390.000 | 9/21/2018 | 8/31/2020 | AK2955 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AK0106B | 390.000 | 9/21/2018 | 8/31/2020 | AK2955 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AK4326B | 390.000 | 1/10/2019 | 12/31/2020 | AK8013 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AK5512C | 390.000 | 1/30/2019 | 12/31/2020 | AK8334 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AK6952B | 390.000 | 2/2/2019 | 1/31/2021 | AK8337 |
| | AK6952B | | | | AK8336 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AK9702B | 390.000 | 2/2/2019 | 1/31/2021 | AK8337 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AL0627B | 390.000 | 3/30/2019 | 3/31/2021 | AK8929 |
| | AL0627B | | | | AK8930 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AL1816B | 390.000 | 4/4/2019 | 3/31/2021 | AK8987 |
| | AL1816B | | | | AK8988 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AL3342B | 390.000 | 4/16/2019 | 3/31/2021 | AK9846 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AL3343B | 390.000 | 4/16/2019 | 3/31/2021 | AK9846 |
| | AL3343B | | | | AK9845 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AL8739B | 390.000 | 8/17/2019 | 7/31/2021 | AL4390 |
| | AL8739B | | | | AL4389 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AL8740B | 390.000 | 8/18/2019 | 7/31/2021 | AL4390 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AM0425B | 390.000 | 9/16/2019 | 8/31/2021 | AL4391 |
| ZANTAC 150MG TABS CARTON X130 CANADA | AM0994B | 390.000 | 9/16/2019 | 8/31/2021 | AL4391 |
| | AM0994B | | | | AL7320 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150MG TABLETS BTL X 84 CANADA | AK0101B | 336.000 | 7/20/2018 | 6/30/2020 | AJ8883 |
| | AK0101B | | | | AJ8882 |
| ZANTAC 150MG TABLETS BTL X 84 CANADA | AK0468B | 336.000 | 9/22/2018 | 8/31/2020 | AK2956 |
| ZANTAC 150MG TABLETS BTL X 84 CANADA | AK0469B | 336.000 | 9/23/2018 | 8/31/2020 | AK2956 |
| ZANTAC 150MG TABLETS BTL X 84 CANADA | AK3007B | 336.000 | 11/17/2018 | 10/31/2020 | AK6455 |
| ZANTAC 150MG TABLETS BTL X 84 CANADA | AK4327B | 336.000 | 1/29/2019 | 12/31/2020 | AK8335 |
| ZANTAC 150MG TABLETS BTL X 84 CANADA | AK5591B | 336.000 | 1/31/2019 | 12/31/2020 | AK8335 |
| | AK5591B | | | | AK8336 |
| ZANTAC 150MG TABLETS BTL X 84 CANADA | AL1810D | 336.000 | 3/31/2019 | 2/28/2021 | AK8930 |
| | AL1810D | | | | AK8929 |
| ZANTAC 150MG TABLETS BTL X 84 CANADA | AL3341B | 336.000 | 4/15/2019 | 3/31/2021 | AK9845 |
| | AL3341B | | | | AK9846 |
| ZANTAC 150MG TABLETS BTL X 84 CANADA | AL8737C | 336.000 | 7/24/2019 | 6/30/2021 | AL4385 |
| | AL8737C | | | | AL3325 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150MG COOL TABS BC X 80 CANADA | AJ6709C | 240.000 | 7/21/2018 | 6/30/2020 | AJ8379 |
| | AJ6709C | | | | AJ5939 |
| ZANTAC 150MG COOL TABS BC X 80 CANADA | AK4329E | 320.000 | 11/19/2018 | 10/31/2020 | AK6452 |
| | AK4329E | | | | AK6456 |
| ZANTAC 150MG COOL TABS BC X 80 CANADA | AK8650C | 320.000 | 2/3/2019 | 1/31/2021 | AK8927 |
| | AK8650C | | | | AK8337 |
| ZANTAC 150MG COOL TABS BC X 80 CANADA | AL1817D | 320.000 | 4/4/2019 | 3/31/2021 | AK8988 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150MG CM TAB BCX24 CAN (w/coup) | AJ1967D | 312.000 | 3/28/2018 | 2/28/2020 | AH8892 |
| | AJ1967D | | | | AH8893 |
| ZANTAC 150MG CM TAB BCX24 CAN (w/coup) | AJ5573C | 312.000 | 6/5/2018 | 5/31/2020 | AJ5940 |
| ZANTAC 150MG CM TAB BCX24 CAN (w/coup) | AK0107C | 312.000 | 7/21/2018 | 6/30/2020 | AJ8883 |
| | AK0107C | | | | AJ8379 |
| ZANTAC 150MG CM TAB BCX24 CAN (w/coup) | AK6953E | 300.000 | 2/3/2019 | 1/31/2021 | AK8337 |
| ZANTAC 150MG CM TAB BCX24 CAN (w/coup) | AL0629C | 312.000 | 4/5/2019 | 3/31/2021 | AK8988 |
| ZANTAC 150MG CM TAB BCX24 CAN (w/coup) | AL4136C | 312.000 | 6/18/2019 | 5/31/2021 | AL0365 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150MG TABS BCX24 CAN (w/coup) | AJ3309B | 312.000 | 3/28/2018 | 2/28/2020 | AH8893 |
| ZANTAC 150MG TABS BCX24 CAN (w/coup) | AJ8421B | 312.000 | 7/19/2018 | 6/30/2020 | AJ8883 |
| ZANTAC 150MG TABS BCX24 CAN (w/coup) | AJ8422B | 312.000 | 7/20/2018 | 6/30/2020 | AJ8883 |

| | | | | | |
|---|---|---|---|---|---|
| ZANTAC 150MG TABS BCX24 CAN (w/coup) | AJ8422D | 312.000 | 7/20/2018 | 6/30/2020 | AJ8883 |
| ZANTAC 150MG TABS BCX24 CAN (w/coup) | AK4325C | 312.000 | 1/9/2019 | 12/31/2020 | AK8012 |
| | AK4325C | | | | AK8013 |
| ZANTAC 150MG TABS BCX24 CAN (w/coup) | AK5592C | 312.000 | 2/1/2019 | 1/31/2021 | AK8336 |
| ZANTAC 150MG TABS BCX24 CAN (w/coup) | AK9703C | 312.000 | 2/2/2019 | 1/31/2021 | AK8337 |
| ZANTAC 150MG TABS BCX24 CAN (w/coup) | AL3344B | 312.000 | 4/16/2019 | 3/31/2021 | AK9845 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 150MG TABS BCX3 CAN (w/coup) | AK5589C | 300.000 | 1/31/2019 | 12/31/2020 | AK8335 |
| | AK5589C | | | | AK8334 |
| ZANTAC 150MG TABS BCX3 CAN (w/coup) | AL5742B | 300.000 | 7/21/2019 | 6/30/2021 | AL3324 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 75 MG TABS B/C X 10 CANADA | AG8686B | 300.000 | 5/5/2017 | 4/30/2020 | AG5655 |
| ZANTAC 75 MG TABS B/C X 10 CANADA | AH5735E | 300.000 | 10/10/2017 | 9/30/2020 | AG9926 |
| | AH5735E | | | | AG9929 |
| ZANTAC 75 MG TABS B/C X 10 CANADA | AJ1968B | 300.000 | 3/27/2018 | 2/28/2021 | AH8893 |
| ZANTAC 75 MG TABS B/C X 10 CANADA | AJ6858B | 300.000 | 5/8/2018 | 4/30/2021 | AJ5939 |
| ZANTAC 75 MG TABS B/C X 10 CANADA | AK2570C | 300.000 | 9/11/2018 | 8/31/2021 | AK2954 |
| ZANTAC 75 MG TABS B/C X 10 CANADA | AK5594D | 300.000 | 12/17/2018 | 11/30/2021 | AK6452 |
| | AK5594D | | | | AK6451 |
| ZANTAC 75 MG TABS B/C X 10 CANADA | AL1809B | 300.000 | 3/29/2019 | 2/28/2022 | AK8930 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 75 MG TAB B/C X 30 CANADA | AG8686C | 300.000 | 5/5/2017 | 4/30/2020 | AG5655 |
| ZANTAC 75 MG TAB B/C X 30 CANADA | AH5735D | 300.000 | 10/10/2017 | 9/30/2020 | AG9926 |
| | AH5735D | | | | AG9929 |
| ZANTAC 75 MG TAB B/C X 30 CANADA | AJ6858C | 300.000 | 5/8/2018 | 4/30/2021 | AJ5939 |
| ZANTAC 75 MG TAB B/C X 30 CANADA | AK2570B | 300.000 | 9/11/2018 | 8/31/2021 | AK2954 |
| ZANTAC 75 MG TAB B/C X 30 CANADA | AK5594C | 300.000 | 12/17/2018 | 11/30/2021 | AK6452 |
| | AK5594C | | | | AK6451 |
| ZANTAC 75 MG TAB B/C X 30 CANADA | AL1809C | 300.000 | 3/29/2019 | 2/28/2022 | AK8930 |

| Material Description | Batch | Sample Quantity | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| ZANTAC 75 MG TABS X 60 CANADA | AH2184B | 150.000 | 7/20/2017 | 6/30/2020 | AG5659 |
| | AH2184B | | | | AG9925 |
| ZANTAC 75 MG TABS X 60 CANADA | AH2184D | 300.000 | 7/20/2017 | 6/30/2020 | AG5659 |
| | AH2184D | | | | AG9925 |
| ZANTAC 75 MG TABS X 60 CANADA | AH5736B | 300.000 | 10/10/2017 | 9/30/2020 | AG9929 |
| ZANTAC 75 MG TABS X 60 CANADA | AJ1968C | 240.000 | 3/27/2018 | 2/28/2021 | AH8893 |
| ZANTAC 75 MG TABS X 60 CANADA | AK0108B | 300.000 | 9/10/2018 | 8/31/2021 | AK2954 |
| | AK0108B | | | | AJ9784 |
| | AK0108B | | | | AJ9783 |
| ZANTAC 75 MG TABS X 60 CANADA | AK4388B | 300 | 12/17/2018 | 11/30/2021 | AK6451 |
| ZANTAC 75 MG TABS X 60 CANADA | AL0631B | 300 | 3/28/2019 | 2/28/2022 | AK8930 |
| ZANTAC 75 MG TABS X 60 CANADA | AL5745C | 300 | 8/8/2019 | 7/31/2022 | AL4385 |
| ZANTAC 75 MG TABS X 60 CANADA | AM0140B | 240 | 9/27/2019 | 8/31/2022 | AL7832 |

# EXHIBIT 61

intertek
Total Quality. Assured.

# INVOICE

| | |
|---|---|
| Invoice No. : | 1005777980 |
| Invoice Date : | 07-Oct-2019 |
| Original Invoice Date : | 07-Oct-2019 |
| Intertek Job ID : | UK720-0019193 |
| GIN# : | G104110110 |
| Customer Number : | 13008 |
| Payment Terms : | Due EOM + 65 Days |
| Due Date : | 03-Jan-2020 |
| Client Ref Nos : | PO: 3001881113 |

Bill To :
GlaxoSmithKline Services Unlimited
Accounts Payable
PO Box 436
Hoddesdon EN11 1JX
United Kingdom

For account balance inquiries, please call
0333 3660 117
For billing questions, please call 44 161 721 1057

All services or work performed by ITS Testing Services (UK) Ltd are pursuant to the terms and conditions set at http://www.intertek.com/terms/

For Card Payment, please use:
https://pay.intertek.com/uk001/

EORI: GB672763996008

Remittance by Post :
ITS Testing Services (UK) Ltd
UK OTC
PO Box 11167, Academy Place
1-9 Brook Street
Brentwood CM14 9LA
GBR

Electronic Remittance :
National Westminster Bank
National Westminster House
4 - 5 High Street
Chelmsford, ESSEX CM1 1FZ
Swift Code: NWBKGB2L
Bank Id: 600513
Bank Acct: 55431070
IBAN: GB92NWBK60051355431070

**Reference :** FEASIBILITY/VALIDATION NDMA IN RANITIDINE BY LC-HRMS
REQUESTER: HLACK MOHAMMED
OUR QUOTATION: E190926-609951

MILESTONE PAYMENT AS PER QUOTATION - DETAILED BELOW

| Description | Price | Ext Price | VAT |
|---|---|---|---|
| METHOD DEVELOPMENT - 100% ON SIGNATURE OF QUOTATION | 15,400.00 | 15,400.00 | 20.00 % |
| METHOD VALIDATION - 50% ON SIGNATURE OF QUOTATION | 30,000.00 | 30,000.00 | 20.00 % |
| SUBTOTAL : | | 45,400.00 | |
| VAT | | 9,080.00 | |

| | | |
|---|---|---|
| TOTAL AMOUNT DUE : | GBP | 54,480.00 |

** REFERENCE INVOICE NO. ON ALL REMITTANCES ** Intertek values your business greatly!

| Registration IDs | | VAT Analysis | | | GBP Equivalent | |
|---|---|---|---|---|---|---|
| | | Tax Rates | Goods/Serv's | VAT | | |
| Sellers VAT Registration Id: | GB 672763996 | 20.00 % | 45,400.00 | 9,080.00 | Goods/Serv's | 45,400.00 |
| Company Registration: | 01408264 | | | | VAT | 9,080.00 |
| | | | | | Total: | 54,480.00 |

ITS Testing Services (UK) Limited

Academy Place, 1-9 Brook Street, Brentwood, ESSEX CM14 5NQ United Kingdom

# Purchase Order

## Order No: 3001911100

**Vendor Details**
ITS TESTING SERVICES (UK) LTD
PO BOX 42
BLACKLEY
HEXAGON TOWER
MANCHESTER M9 8ZS

**Tel** 0161 721 1057
**Fax** 0161 721 1654
**Email** ruth.frater@intertek.com
**Vendor No.** 9910037005

**Information**

**Order Date** 24.10.2019

**Organization** NAJG
**Buyer** Clare Smith
**Tel** +440
**Fax**
**Email** clare.x.smith@gsk.com

**Incoterms**
**Terms of payment** 60d from rcpt, 5th next month

Page 1 of 1

**Delivery Details**
**Organization** NAJG
**Person Responsible** Clare Smith

GMS
GSK Global Manufacturing Services
980 Great West Road
LONDON, MIDDLESEX TW8 9GS

**General Terms and Conditions:**Acceptance or execution of this order constitutes agreement to GSK`s UK General Terms and Conditions (Goods and Services),a copy of which is available at www.gsk.com/procurement, to the exclusion of any terms and conditions of the supplier,unless the parties have previously agreed in writing a specific contract in respect of the goods or services identified on this order, which contract shall in such case govern this order.
**No PO no Pay:** Invoices without a Purchase Order number will not be accepted. See below footer for invoice Address Details.
**Buyer:** The GSK Buying entity is displayed at the Purchase Order footer with the trading address and VAT registration number.
**Queries:** For GSK`s Terms and Conditions of purchase, contact details for payment queries and registering for electronic invoicing visit https://supplier.gsk.com
*Glaxo Operations UK Limited (711851) & GlaxoSmithKline Services Unlimited (1047315) are members of the GlaxoSmithKline Group of companies registered in England and Wales.*

| Line Item | Item / Item Description | Vendor Item Code / Quantity | Unit | Required Delivery Date / Unit Price | Value |
|---|---|---|---|---|---|
| 1 | Analytical testing on Ranitidine | | | 300,000.00 / 1 | 300,000.00 |

**Total value tax excluded** **300,000.00 GBP**
**Tax to be included when appropriate**

| Buyer/Sold to: | Send Paper Invoice to: | Send Electronic Invoice to: |
|---|---|---|
| Glaxo Operations UK Limited<br>980 Great West Road<br>Brentford<br>United Kingdom<br>TW8 9GS<br>Company Reg. no. 00711851<br>VAT No: GB239820839 | GSK Services Unlimited<br>PO Box 395<br>Hoddesdon<br>United Kingdom<br>EN11 1GX | GSK Services Unlimited<br>Tungsten Network<br>AAA249049453 |

# Purchase Order

## Order No: 3001881113

**Vendor Details**
INTERTEK PHARMACEUTICAL SERVICES
Blackley
Hexagon Tower
Manchester
Essex M9 8GQ

**Tel** 1617211057
**Fax**
**Email** ruth.frater@intertek.com
**Vendor No.** 9910114326

| **Information** | |
|---|---|
| **Order Date** | 03.10.2019 |
| **Organization** | GSK Global Manufacturing Services |
| **Buyer** | Kathleen Stacey |
| **Tel** | +442080472184 |
| **Fax** | |
| **Email** | Kathy.A.Stacey@gsk.com |
| **Incoterms** | |
| **Terms of payment** | Within 30 days Due net |

**Delivery Details**
**Organization** GSK Global Manufacturing Services
**Person Responsible** Kathleen Stacey

Page 1 of 1

GMS
GSK Global Manufacturing Services
980 Great West Road
LONDON, MIDDLESEX TW8 9GS

**General Terms and Conditions:**Acceptance or execution of this order constitutes agreement to GSK`s UK General Terms and Conditions (Goods and Services),a copy of which is available at www.gsk.com/procurement, to the exclusion of any terms and conditions of the supplier,unless the parties have previously agreed in writing a specific contract in respect of the goods or services identified on this order, which contract shall in such case govern this order.
**No PO no Pay:** Invoices without a Purchase Order number will not be accepted. See below footer for invoice Address Details.
**Buyer:** The GSK Buying entity is displayed at the Purchase Order footer with the trading address and VAT registration number.
**Queries:** For GSK`s Terms and Conditions of purchase, contact details for payment queries and registering for electronic invoicing visit https://supplier.gsk.com
*Glaxo Operations UK Limited (711851) & GlaxoSmithKline Services Unlimited (1047315) are members of the GlaxoSmithKline Group of companies registered in England and Wales.*

| Line Item | Item / Item Description | Vendor Item Code / Quantity | Unit | Required Delivery Date / Unit Price | Value |
|---|---|---|---|---|---|
| 1 | Analytical Testing on Ranitidine | | | 116,565.00 / 1 | 116,565.00 |

**Total value tax excluded** **116,565.00 GBP**
**Tax to be included when appropriate**

| **Buyer/Sold to:** | **Send Paper Invoice to:** | **Send Electronic Invoice to:** |
|---|---|---|
| Glaxo Operations UK Limited<br>980 Great West Road<br>Brentford<br>United Kingdom<br>TW8 9GS<br>Company Reg. no. 00711851<br>VAT No: GB239820839 | GSK Services Unlimited<br>PO Box 395<br>Hoddesdon<br>United Kingdom<br>EN11 1GX | GSK Services Unlimited<br>Tungsten Network<br>AAA249049453 |

# RE: Purchase Order 3001881180 FYI: Approved

**From:** Kathy Stacey <kathy.a.stacey@gsk.com>
**To:** Hlack Mohammed <hlack.2.mohammed@gsk.com>
**Cc:** Usman Muhammad <muhammad.s.usman@gsk.com>, Paul Spear <paul.a.spear@gsk.com>, Shenaz Lawton <shenaz.x.lawton@viivhealthcare.com>
**Date:** Thu, 03 Oct 2019 09:17:46 +0000

**From:** Global ERP-System <global.erp-system@gsk.com>
**Sent:** 03 October 2019 10:00
**To:** Kathy Stacey <kathy.a.stacey@gsk.com>
**Subject:** Purchase Order 3001881180 FYI: Approved

The shopping cart 12579489 you recently created or was created on your behalf , has been converted into Purchase Order 3001881180, which is now fully approved.

**Purchase Order Details:**

| | |
|---|---|
| Purchase Order: | 3001881180 |
| Vendor Name: | LGC LIMITED |
| Vendor (ERP) Number: | 9910033481 |
| Purchase Order Value: | 150.000,00 GBP |
| Purchase Order Created: | 03.10.2019 |
| Approved by: | PAS0242 |

**Item Details:**

| Line# | Item Description | Quantity | UOM | Unit Price | Line Value |
|---|---|---|---|---|---|
| 1 | Analytical Testing NDMA in Ranitidine | 1 | AU | 150.000,00 | 150.000,00 |

If anything above needs to be changed, please email your local Procurement contact (or Purchase Operations Centre (POC) in applicable markets).

To view further details of the PO, please see the Track PO and Invoice app link Fiori Link

| | |
|---|---|
| PO Type | Service PO |

This PO is Service PO, so the following actions will be needed to receive it.

Service Invoice - Acceptance Required: Once you have received an agreed -upon portion of services, your supplier will send Accounts Payable an invoice. You will find this invoice in your SAP Worklist.

You can access further information relating to Goods Receipting and Service Invoices from LearnERP .

# EXHIBIT 62

intertek
Total Quality. Assured.

# CONFIDENTIAL
# QUOTATION

| | | | |
|---|---|---|---|
| **TO:** | **GSK MEDICINES RESEARCH CENTRE** | **INTERTEK PHARMACEUTICAL SERVICES MANCHESTER** | |
| **ADDRESS:** | Gunnels Wood Road,<br>Stevenage, Hertfordshire,<br>SG1 2NY, UK | Hexagon Tower<br>Blackley<br>Manchester<br>M9 8GQ | |
| **FAO:** | ANDY SEARLE | **QUOTE REF.:** | E190910-603013 |
| | | **DATE:** | 10 SEPTEMBER 2019 |
| **TELEPHONE:** | +44 7717 801444 | **CONTACT:** | Matthew Dennen |

Dear Andy,

Thank you for your interest in Intertek. We are pleased to submit our quotation in response to your request for **Method Validation of a LC-MS/MS method for the analysis of ranitidine.**

For more than 130 years, Intertek has been a valued and trusted partner to companies around the world in ensuring product quality and safety. We go beyond testing, inspecting and certifying products; delivering Total Quality Assurance solutions to the pharmaceutical industry worldwide. Through our global network of state-of-the-art facilities and industry-leading technical expertise, we provide innovative and bespoke Assurance, Testing, Inspection and Certification services to our customers.

Intertek is an industry leader with more than 43,000 employees in 1,000 locations in over 100 countries. We hold extensive global accreditations, recognitions and agreements, and our knowledge of and expertise in overcoming regulatory, market, and supply chain hurdles is unrivalled.

Once again, we appreciate your consideration of Intertek and look forward to establishing a long-term partnership and commitment with GSK Medicines Research Centre. Having reviewed the information supplied we would recommend the following scope of work. Please do not hesitate to contact me with any questions.

Sincerely,

**Matthew Dennen**
Business Development Executive
+44 (0)161 721 1181
+44 (0) 748 305 5230
Matthew.dennen@Intertek.com



Highly Confidential Information – Attorneys' Eyes Only Subject to Protective Order

GSKZAN0000676730

# 1. PROGRAM SUMMARY

## 1.1 Summary

This quotation has been written in response to a request by GSK Medicines Research centre in order to validate a method capable of determining N-nitrosodimethylamine (NDMA) in their ranitidine sample. The method is required to be a fully quantitative method with a target LOQ of 0.03ppm.

Intertek have previously developed a method for this analysis on a different sample type. This methodology will be used for validation following successful feasibility.

## 1.2 Program of Work

**Method Feasibility**

Initially Intertek will perform method feasibility to assess if the Intertek method is suitable for this sample type. Intertek will analyse one sample according to the current method. Some development may be required dependant on the results of this initial feasibility. This will be communicated to GSK prior to any further work commencing.

This analysis is non-regulatory.
Although the analysis will be performed in a GxP compliant laboratory, no formal GxP compliance will be claimed.

*Given the complex nature of this work and the inherent technical challenges of analytics of this type, unforeseeable circumstances are occasionally encountered requiring further work or rendering the analysis unachievable. It is also possible that an agreed work programme, undertaken in good faith and executed in full could result in ambiguous data not fully meeting the clients' objectives. In circumstances where additional work is required, Intertek would detail the work necessary (which is outside the scope of this quotation) and any fees above quotation value which would then be agreed with the client prior to additional work beginning.*

**Method Validation**

Following successful completion of the method development stage as defined above, Intertek will formally assess the validity of the method as a Quantitative Test. The following parameters will be included in the validation:

- Specificity
- SST
- Selectivity
- Linearity
- Precision
- Accuracy
- LOD/LOQ
- Solution Stability

These parameters are subject to change dependant on requirements. If there are significant changes to the parameters in this quotation, an updated quotation may be required to reflect changes in cost.

This analysis will be performed as a full GMP method validation.

*Target acceptance criteria will be defined prior to commencing. If these acceptance criteria are not met and redevelopment is required, further costs will be incurred including a repeat of the validity assessment. This is with*



Highly Confidential Information – Attorneys' Eyes Only Subject to Protective Order

GSKZAN0000676731

*the exclusion of any activity that is due to an avoidable error.*

**<u>GMP sample analysis</u>**
Following successful method validation, Intertek will perform batch analysis on 6 samples of solid active and 6 batches of solution formulation according to the validated method.

This analysis will be performed to GMP with QA audit

*Should for any reason a laboratory investigation be required, a charge of GBP £800 plus reanalysis value(s) will be incurred except if the root cause or fault is found to be the responsibility of Intertek, in which case no charge will be applied.*

### 1.3 Timescales
It is estimated that this programme of work will be completed within the following timescales, following receipt of the required documentation and samples (see How to Proceed section).

Method Feasibility: 5 working days from sample receipt
Method Validation: 2 weeks following method feasibility
GMP Sample Analysis: 10 working days following Method Validation. Samples may be analysed according to the tentative method in order to speed up the reporting time

Due to the variation in laboratory workload, exact turnaround times will be confirmed on receipt of samples by Intertek, or once a sample delivery schedule has been established with GSK Medicines Research Centre.

### 1.4 Deliverables
Method Feasibility: A peer reviewed technical report will be issued upon completion
Method Validation: A validation plan, validation report and validated test method will be issued as part of the method validation study.
GMP Sample analysis: A Certificate of Analysis will be issued upon completion

**SIGNED for and on behalf of GSK Medicines Research Centre**

Signature: ................................................

Name: ................................................

Title: ................................................

Date: ................................................



Highly Confidential Information – Attorneys' Eyes Only Subject to Protective Order

## 2. COMMERCIAL TERMS

### 2.1 Price Summary

| DESCRIPTION | NO. OF SAMPLES | TOTAL PRICE (£) |
|---|---|---|
| Method Feasibility | - | 7,500 |
| Method Validation | - | 35,000 |
| GMP sample analysis | 12 | 9,000 |
| Consumables | - | 1,132 |
| | **NET TOTAL** | **£52,632** |

**All prices + VAT**

### 2.2 How to Proceed

In order to proceed with the quoted programme of work, Intertek require the following from GSK Medicines Research Centre:

- Signed technical agreement
- Completed Sample Submission Form
- Purchase order document

Work will not commence until the above has been agreed/provided.

### 2.3 Payment Terms

Payment terms are detailed in the MSA in place between GSK Medicines Research Centre and Intertek.

Payment Schedule

Invoices will be issued at the following milestones:

- Method Development: 100% (£7,500) upon signature of the quotation
- Method Validation:
  - 40% (£14000) on signature of protocol
  - 60% (£21,000) on issue of draft report
- Sample Analysis: 100% upon commencement of analysis
- Consumable items: 100% on purchase by Intertek.

### 2.4 Consumable Items & Courier Fees

If further consumable purchases outside of standard reagents and laboratory equipment are required and are not already defined in the quotation, Intertek will confirm the price by email with GSK Medicines Research Centre and will charge against the Purchase Order provided for the project.



Highly Confidential Information – Attorneys' Eyes Only Subject to Protective Order

If samples or other project related items are to be shipped at Intertek's expense, the associated courier charges will be confirmed by email GSK Medicines Research Centre and will be charged against the Purchase Order provided for the project.

All consumables purchased by Intertek are subject to a 15% administration fee, which will be included in the price.

## 3. LOGISTICS AND SAMPLE RETENTION

### 3.1 Sample Delivery

For shipment of the sample(s), please address as follows:

Sample Reception (E190910-603013 )
Intertek Pharmaceutical Services Manchester
Hexagon Tower,
Blackley,
Manchester.
M9 8GQ

### 3.2 Sample Storage/Disposal/Return

Unless instructed otherwise by GSK Medicines Research Centre, samples will be stored at ambient temperatures at IPSM for a minimum period of one month following analysis with no guarantee of integrity, after which they may be stored further, disposed of or returned to the client at the client's expense.

Where relevant, fees incurred by IPSM for sample packaging and transportation will be added to the final invoice at cost.

Disposal of analysed samples will occur no less than 12 weeks after issue of the final analytical report/ certificate unless otherwise specified. Sample disposal will not occur without the consent of the client.

### 3.3 Dataloggers

As Intertek Manchester isn't able to validate the process of downloading information from data loggers received with sample submissions, all dataloggers received where information is to be downloaded will be returned to the address in the quotation (unless GSK Medicines Research Centre advises otherwise). Return shipments will be charged back to GSK Medicines Research Centre including a 15% administration fee.

Dataloggers that have a visual display will continue to be received with the temperature read and documented on arrival. These data loggers will then be discarded unless GSK Medicines Research Centre requests otherwise (return shipment will be charged back inclusive of 15% administration fee).

***This quote is valid for 30 days from the date of issue.***
***Following this date, pricing and timescales are subject to change and a new quote may be required.***



Highly Confidential Information – Attorneys' Eyes Only Subject to Protective Order

GSKZAN0000676734

# QUOTATION APPROVAL FORM

**Completion, in full, of all parts of this Customer Approval Section including the provision of any necessary Purchase Order (PO) and VAT numbers as acceptance of this quotation and Intertek General Terms & Conditions of Services United Kingdom (unless superseded by a Master Service Agreement or equivalent), are required prior to Intertek Pharmaceutical Services Manchester commencing the specified programme of work.**

| NAME | SIGNATURE | DATE |
|---|---|---|
| [PRINT NAME HERE] | [SIGN HERE] | [DATE HERE] |
| **Company Name** | | |
| **Telephone Number** | | |
| **Email Address** | | |
| **VAT Number**<br>New clients only | | |
| **Company Reg. No.**<br>New clients only | | |
| **Purchase Order No.** | Please note: Purchase Orders should be made out to ITS Testing Services (UK) Ltd | |
| **Accounts Payable Email Address** | | |
| **Invoice Address**<br>(PLEASE SUPPLY IF DIFFERENT FROM THE ADDRESS ON PAGE 1 OF THE QUOTE): | | |

Please return a copy of this signed quotation by email to pharmamanchester@intertek.com and include a copy with the sample shipment.

Note that no conditions or stipulations (i) in, or attached to, any purchase order (or other form of order) or (ii) implied by trade, custom, practice or course of dealing, and which, in any such case, are inconsistent with the Intertek's terms and conditions of business, or which purport to add to them or to modify them in any way, will have any effect (and are hereby excluded) unless expressly accepted by the Intertek in writing and in advance. By the submission of samples for analysis and/or the provision of a purchase order or other instruction to invoice you will be deemed to have accepted the terms and conditions set out within this quotation.



Highly Confidential Information – Attorneys' Eyes Only Subject to Protective Order

GSKZAN0000676735

# IMPORTANT NOTICE

## Safety, Health & Environmental Considerations for Sample Submission

To comply with current legislation, safeguarded staff and sample couriers, and ensure that we provide you with the best service possible, please ensure that that the following procedures are observed in full.

Formally notify us by e-mail (sample.management@Intertek.com) or fax the following information:

- The nature and number of samples being submitted.
- The nature of all associated hazards.
- The date of sample despatch.
- The mode of transport (e.g. name of courier).
- Any applicable special transportation/storage conditions.
- The expected date/time of arrival at Intertek Pharmaceutical Services Manchester.
- Whether or not chain of custody records are required.

## Sample Packaging

Sample packaging should be appropriate to the nature of any associated hazards and comply with current applicable legislative requirements. Additional information regarding the safe packaging and transportation of toxic and hazardous chemical substances can be found at the following locations:

- EU CLP Regulation on classification, labelling and packaging of substances and mixtures, amending and repealing Directives 67/548/EEC and 1999/45/EC, and amending Regulation (EC) No 1907/2006
- The UK Carriage of Dangerous Goods and Use of Transportable Pressure Equipment Regulations 2009, as amended, implementing the European regulation on transport of dangerous goods by Road (ADR).
- The Control of Substances Hazardous to Health 2002

Please note: the failure to comply with these guidelines may result in delays to agreed experimental programme, the loss/damage of highly valuable test samples or additional costs being incurred. Any time and materials involved in resolving packaging issues and/or the lack of hazard data/information not supplied prior to quotation will be charged in addition to the quoted analytical programme.

In addition to the legislative requirements as above, the following guidelines are also strongly recommended when applicable:

1. Securely attach the sample's MSDS to the package's exterior.
2. Outer and inner packaging should clearly state if the contents of the package are hazardous and should also indicate the nature of the hazard. Please note: it is a legal requirement that the carrier of the goods knows the nature of any hazard in the event of an accident or spillage during transportation.
3. Place sample in a sturdy box, preferably surrounded by packing material, and seal up box securely. If possible, place this within a secondary box.
4. Avoid sample containers that may leak during transit – such as plastic bags.
5. Seal sample containers with sticky tape where feasible. If the sample container has a screw-top, ensure that this process does not loosen the bond.

## Samples should be shipped to:

**Sample Reception**
**Intertek Pharmaceutical Services Manchester**
**Hexagon Tower**
**Blackley**
**Manchester**
**M9 8GQ**



Highly Confidential Information – Attorneys' Eyes Only Subject to Protective Order

## Intertek Pharmaceutical Services Manchester - Terms and Conditions

Unless superseded by a mutually agreed and approved Master Services Agreement, Intertek General Terms & Conditions of Services (Global) (http://www.intertek.com/terms) shall apply.

Additional Terms and Conditions specific to Intertek Pharmaceutical Services Manchester (IPSM) include:

### Seller's Terms and Conditions Prevail / Acceptance of Quotations

1. In these terms and conditions (i) 'the Seller' means Intertek Pharmaceutical Services Manchester, a business unit of ITS Testing Services (UK) Ltd, a company incorporated in England under no. 1408264 whose registered office is situated at 3rd Floor, 25 Savile Row, London W1S 1ES (ii) 'the Buyer' means any person, firm, company or other entity accepting the Seller's offer to purchase goods and (iii) 'goods' means any goods, materials or services that are offered for sale by the Seller.
2. No conditions or stipulations (i) in, or attached to, the Buyer's purchase order (or other form of order) or (ii) implied by trade, custom, practice or course of dealing, and which, in any such case, are inconsistent with the Seller's terms and conditions of business, or which purport to add to them or to modify them in any way, will have any effect (and are hereby excluded) unless expressly accepted by the Seller in writing and in advance. In the absence of any acceptance by the Seller (in writing and in advance) of any such variation(s), the Buyer will be deemed (a) to have withdrawn or waived the said conditions or stipulations and (b) to contract solely on the Seller's terms and conditions of business. Only a Vice President (or more senior) of the Seller has the authority to vary any of these terms and conditions of business.
3. Any quotation or estimate issued by the Seller is subject to correction for errors or adjustments and should not be considered or construed as an offer which is capable of acceptance by the Buyer. Each order constitutes an offer by the Buyer to purchase the specified goods from the Seller in accordance with these terms and conditions and a contract will not come into existence until the Seller has expressly accepted the Buyer's order (in such manner as the Seller determines). The Buyer must ensure that the terms of each order, and any related specification(s), are clear, complete and accurate.

4 Quotation is valid for 30 days from the issue date and is exclusive of VAT, which, if appropriate will be charged at the current applicable rate.

5 Quotation is inclusive of an analytical report. If the format of the report is not specified by the customer, IPSM will decide on appropriate format and information to be provided including data interpretation and whether electronic and/or hard copy. Request for changes to the analytical report format/content, or the provision of copies of analytical raw data and/or other supporting records which have not been specified as part of the original request/quotation will be subject to additional charges on a time and materials basis.

6 By signing and accepting the quotation the client confirms that they are authorised to incur the detailed expenditure.

7 All quotations must be signed and returned as soon as possible indicating agreement and acceptance of the quotation and the Terms and Conditions of business. **Failure to return the signed quote could delay the start of the agreed analytical programme.**

8 Where clients will not accept and process payment of invoices which do not reference a valid Purchase Order (PO) number for the work carried out, IPSM will not initiate work until they are in receipt of a valid PO number.

### Client Accounts and Payment Terms

9 New clients will require satisfactory recent credit references before being accepted as a new account client and full pre-payment of the first quotation will be required.

10 Where the client does not meet the necessary credit requirements we will require pre-payment for all work undertaken.

11 Where the period for carrying out the work is to exceed one month, payment may be requested on a monthly basis as work is performed.

12 We reserve the right to withhold reports and discussions, and to discontinue the provision of services at any time when there are outstanding fees owed by a client. Intertek will accept no responsibility for the consequences of withholding reports or discontinuing work in such circumstances.

13 The client agrees to punctually pay not later than 30 days after the relevant invoice date.

14 When a credit account is outstanding we reserve the right to charge interest at the rate of 2% per month from the date of invoice until the debt is cleared.

15 Intertek reserves the right to forward unpaid accounts at the end of the credit period to a debt- collecting agency.

### Confidentiality

16 Subject to clause 17 and clause 18, each party will keep confidential and will not disclose to any third party (other than any associated or subsidiary companies, which shall be subject to confidentiality obligations identical hereto) for a period of 5 calendar years from the date of disclosure or receipt of any confidential data by either party hereunder:-

- Any information (whether oral or written) disclosed by the other party arising out of the operation of the contracted work
- Any information arising from visits to the other's premises

17 There is no obligation to observe confidentiality on:-

- Any information which at the time of disclosure is (or subsequently becomes) published or generally available to the public (other than by a breach of the receiving party's obligations under this clause).
- Any information which is received from a third party with good legal title thereto and under no obligation of confidentiality; or
- Any information which at the time of disclosure was already in the possession of the receiving party (other than under obligation to the disclosing party), or can be demonstrated by either party as having been developed independently of any information received from the other party.

18 Each party shall take reasonable steps to ensure that their employees and representatives shall maintain confidentiality under the terms of clause 16.

19 The requirements of confidentiality clauses 16 - 18 inclusive shall apply unless superseded by a separate mutually agreed Confidential Disclosure Agreement (CDA) or Master Services Agreement (MSA)

### Sample Submission

20 Wherever possible samples submitted for routine/standard testing can typically be scheduled for analysis within 10 working days from receipt. A faster turnaround service is also available by arrangement for which a surcharge may be applicable. Samples submitted for analyses of a non-routine or problem solving nature should have a turnaround time agreed as part of the work programme/quotation process.

21 Samples should be delivered to IPSM, Hexagon Tower, Crumpsall Vale, off Delaunays Road, Blackley, Manchester, M9 8GQ and be marked for the attention of 'Sample Reception'.

22 Additional work (e.g. method development) above and beyond that cited on the quotation will be charged on an hourly basis, any need for which will be discussed and agreed with the client in advance and incorporated into a revised quotation for approval prior to the commencement of the work.

23 Failure to adhere to the agreed sample delivery date may lead to:-

- A delay in meeting any agreed/specified turnaround times (TAT) and/or:
- IPSM not being able to honour its commitment, in which case a new quotation will have to be negotiated.

24 In the event of insufficient notice of failure to meet a sample delivery date, IPSM reserve the right to reschedule the analysis/consultancy and charge back any non-recoverable costs.

### Sample Storage/Return

25 Unless instructed otherwise samples will be stored at ambient temperatures at IPSM for a minimum period of one month following analysis with no guarantee of integrity, after which they may be stored further, disposed of or returned to the client at the client's expense.

26 Where relevant, fees incurred by IPSM for sample packaging and transportation will be added to the final invoice at cost.



Highly Confidential Information – Attorneys' Eyes Only Subject to Protective Order
GSKZAN0000676737

# EXHIBIT

# 63

**NOTEBOOK NO.** 078-RC

**ISSUED TO:** Ryan Cheu

**DATE ISSUED:** 07/23/2021

**PROJECT / PROGRAM:** Levin Law (Zantac)

**DEPARTMENT:** Chemistry

**RETURNED ON:**

**Catalog number 1201**

Scientific Notebook Company

WWW.SNCO.COM - 800.537.3028

CONFIDENTIAL INFORMATION

# INSTRUCTIONS

1. **The primary purpose of this notebook is to protect your and the Company's Patent-Rights by keeping records of all original work in a form acceptable as evidence if any legal conflict arises.**

2. • When starting a page, enter the title, project number, and book number.
   • Use ink for permanence -- avoid pencil.
   • Record your work as you progress, including any spur-of-the-moment ideas which may be developed later.
   • Avoid making notes on loose paper to be recopied.
   • Record your work in such a manner that a co-worker can continue from where you stop. You might be ill and to protect your priority it could be urgent that the work continue while you are absent.

3. • Give a complete account of your experiments and the results, both positive and negative, including your observations.
   • Record all diagrams, layouts, plans, procedures, new ideas, or anything pertinent to your work including the details of any discussions with suppliers, or other people outside the Company.
   • Do not try to erase any incorrect entries; draw lines deleting them, note the corrections, sign and date the changes. This extra care is worthwhile because of the necessity of original data to prove priority of new discoveries.

4. • After entering your data, sign and date the entries.
   • Explain your work to at least two witnesses who are not co-inventors, and have them sign and date the pages in the place provided.
   • Record the names of operators and witnesses present during any demonstration and have at least two witnesses sign the page. If no witnesses are present during an experiment of importance, repeat it in the presence of two witnesses.

5. Since computer programs can be patented these instructions apply to the development of computer software. In this case a description of the structure and operation of the program should be recorded in the notebook, together with a basic flow diagram which illustrates the essential features of the program. In the course of developing the code, the number of lines of code written each day should be recorded in the notebook, together with a statement of the portion of the flow diagram to which the section of code is directed.

6. This notebook and its contents are the exclusive property of the Company. It is confidential and the contents are not to be disclosed to anyone unless authorized by the Company. You must return it when completed, upon request, or upon termination of employment. It should be kept in a protected place. **If loss occurs, notify your supervisor immediately, and make a written report describing the circumstances of the loss.**

Copyright Harold Gallup

Form 590

CONFIDENTIAL INFORMATION

| Table of Contents | Page |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

CONFIDENTIAL INFORMATION

| Table of Contents | Page |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Table of Contents | Page |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Table of Contents | Page |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Table of Contents | Page |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Table of Contents | Page |
| --- | --- |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| Table of Contents | Page |
|---|---|
| | |

| Table of Contents | Page |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

TITLE urine stability study

Project No. LEV

Book No. 078-RC

From Page No. 1

RC 8/16/21

1. **PROCEDURE**

1.1. PREPARATION OF SOLUTIONS

The volume of mobile phases and solutions described in this section may be varied as required, while maintaining the proper ratios as described below.

1.1.1. **Mobile Phase A (25 mM $NH_4Ac$ 5% ACN in Water)**

1.1.2. **Mobile Phase B (Methanol)**

1.1.3. **Standard Stock Solution**: Stock solution of 5 mg/mL NDMA was diluted to a concentration of 100 µg/mL in methanol.

1.1.4. **Internal Standard Solution (IS)**: Stock solution of 400ug/mL NDMA-$d_6$ was diluted to a concentration of 7600 ng/mL by taking 19 µL of stock into 981 µL of methanol.

1.2. PREPARATION OF CALIBRATION STANDARDS

1.2.1. Prepare a series of Secondary solutions (SS) by performing serial dilutions per the table below.

| Name | Volume of Solution (µL) | Volume Methanol (µL) | Concentration NDMA (ng/mL) |
|---|---|---|---|
| PS | 20 | 980 | 100000 |
| SS1 | 100 | 900 | 10000 |
| SS2 | 500 | 500 | 5000 |
| SS3 | 200 | 800 | 1000 |
| SS4 | 750 | 250 | 750 |
| SS5 | 667 | 333 | 500 |
| SS6 | 500 | 500 | 250 |
| SS7 | 400 | 600 | 100 |
| SS8 | 500 | 500 | 50 |
| SS9 | 200 | 800 | 10 |
| SS10 | 500 | 500 | 5 |

To Page No. 2

Witnessed & Understood by me, [signature] Date 8/17/21

Invented by: Date 8/16/21

Recorded by: [signature]

CONFIDENTIAL INFORMATION

2

Project No. Lev
Book No. 078-RL TITLE urine stability study

From Page No. 2

| Secondary Stock | Volume SS (µL) | Urine (µL) | Concentration (ng/mL) | Calibration Curve | IS Volume (µL) | IS Concentration (ng/mL) |
|---|---|---|---|---|---|---|
| SS1 | 200 | 1780 | 1000 | CC1 | 20 | 76 |
| SS2 | 200 | 1780 | 500 | CC2 | 20 | 76 |
| SS3 | 200 | 1780 | 100 | CC3 | 20 | 76 |
| SS4 | 200 | 1780 | 75 | CC4 | 20 | 76 |
| SS5 | 200 | 1780 | 50 | CC5 | 20 | 76 |
| SS6 | 200 | 1780 | 25 | CC6 | 20 | 76 |
| SS7 | 200 | 1780 | 10 | CC7 | 20 | 76 |
| SS8 | 200 | 1780 | 5 | CC8 | 20 | 76 |
| SS9 | 200 | 1780 | 1 | CC9 | 20 | 76 |
| SS10 | 200 | 1780 | 0.5 | CC10 | 20 | 76 |

1.2.2. Add 2.5 mL of DCM

1.2.3. Vortex the tubes for 10 minutes.

1.2.4. Centrifuge samples at 3000rpm for 10 minutes.

1.2.5. Aliquot 2 mL of bottom layer and add to 1 mL methanol in a new falcon tube.

1.2.6. Dry until 1 mL volume of methanol is remaining (~20 minutes at RT).

1.2.7. Aliquot filtered sample into autosampler vials with inserts for injection.

1.3. PREPARATION OF QC AND SYSTEM SUITABILITY SAMPLES

1.3.1. Prepare a series of Quality Control Pre-Standards (QCPS) by performing a serial dilution as below.

| Secondary Stock | SS Solution | Volume SS (µL) | Urine (µL) | Concentration (ng/mL) | IS Volume (µL) | IS Concentration (ng/mL) |
|---|---|---|---|---|---|---|
| QC-H | SS1 | 15 | 1965 | 750 | 20 | 76 |
| QC-M | SS2 | 6 | 1974 | 30 | 20 | 76 |
| QC-L | SS4 | 12 | 1968 | 7.5 | 20 | 76 |

1.3.2. Follow steps ~~10~~1.2.2 to ~~10~~1.2.7

1.4. PREPARATION OF SAMPLES

1.4.1. Pool urine from >3 individuals and vortex.

1.4.2. Take 1780 uL of urine into 15 mL conical tubes.

1.4.3. Add 200 uL of appropriate stock NDMA.

1.4.4. Add 20 uL IS

RL 8/16/21

To Page No. 3

Witnessed & Understood by me, [signature] | Date 8/17/21 | Invented by: | Recorded by: [signature] | Date 8/16/21

CONFIDENTIAL INFORMATION

TITLE urine stability study

Project No. Lev

Book No. 078-RC

3

From Page No. 3

1.4.4.1. Follow steps ~~10~~.2.2 to ~~10~~.2.~~11~~ 7 RC 8/16/21

1.4.5. Prepare blank urine samples: Take 1980 uL of urine into 15 mL conical tubes.

1.4.6. Add 20 uL IS

## 2. LC-MS/MS PARAMETERS

### 2.1.1. UHPLC Parameters

| | |
|---|---|
| **HPLC Instrument** | Agilent® 1290 Infinity UHPLC with MassHunter™ Acquisition Software and Quantitative Analysis Software |
| **Column** | Waters® Cortecs T3 column (2.7 µm particle size, 3 x 100 mm) |
| **Column Temperature** | 37 °C |
| **Autosampler Temperature** | 4 °C |
| **Mobile Phase A** | 25 mM $NH_4Ac$ 5% ACN in Water |
| **Mobile Phase B** | Methanol |
| **Flow Rate** | 0.4 mL/min |
| **Injection Volume** | 8 µL |
| **Method Run-time** | 6 minutes |

| Time (min) | %B |
|---|---|
| 0.0 | 30 |
| 1.5 | 30 |
| 1.51 | 99 |
| 2.5 | 99 |
| 2.51 | 30 |
| 4.5 | 30 |

### 2.1.2. Mass Spectrometer Parameters

| | |
|---|---|
| **Ion Source** | Agilent Jet Stream Electrospray Ionization (AJS ESI) |
| **Gas Temperature** | ~~250°C~~ 300°C |
| **Gas Flow** | 11 L/min |
| **Nebulizer pressure** | 60 psi |
| **Capillary Voltage** | 2500 V |
| **Injection Mode** | Injection with needle wash |
| **Needle Wash time** | 3.0 seconds |

### 2.1.3. MRM Method Parameters

| Compound Name | Precursor Ion | Product Ion | Dwell time (ms) | Fragmentor (V) | Collision Energy (V) | Cell Accelerator (V) | Polarity |
|---|---|---|---|---|---|---|---|
| NDMA (Quant) | 75.1 | 43.3 | ~~100~~ 20 | 48 | 17 | 4 | Positive |
| NDMA (Qual) | 75.1 | 58.3 | ~~100~~ | 60 | 15 | 4 | Positive |
| NDMA-$d_6$ (Quant) | 81.1 | 46.1 | ~~100~~ | 48 | 15 | 4 | Positive |
| NDMA-$d_6$ (Qual) | 81.1 | 64.3 | ~~100~~ | 48 | 17 | 4 | Positive |

To Page No. 4

Witnessed & Understood by me, [signature] Date 8/17/21

Invented by: Date 8/16/21

Recorded by: [signature]

4 Project No. Lov
Book No. 078-RL TITLE plasma Unis stability study
From Page No. 4

| Secondary Stock | Volume SS (µL) | Plasma (µL) | Concentration (ng/mL) | Calibration Curve | IS Volume (µL) | IS Concentration (ng/mL) |
|---|---|---|---|---|---|---|
| SS1 | 200 | 1780 | 1000 | CC1 | 20 | 76 |
| SS2 | 200 | 1780 | 500 | CC2 | 20 | 76 |
| SS3 | 200 | 1780 | 100 | CC3 | 20 | 76 |
| SS4 | 200 | 1780 | 75 | CC4 | 20 | 76 |
| SS5 | 200 | 1780 | 50 | CC5 | 20 | 76 |
| SS6 | 200 | 1780 | 25 | CC6 | 20 | 76 |
| SS7 | 200 | 1780 | 10 | CC7 | 20 | 76 |
| SS8 | 200 | 1780 | 5 | CC8 | 20 | 76 |
| SS9 | 200 | 1780 | 1 | CC9 | 20 | 76 |
| SS10 | 200 | 1780 | 0.5 | CC10 | 20 | 76 |

1.1.1. Protein Precipitation: Add 2 mL ACN

1.1.2. Vortex the tubes for 10 minutes

1.1.3. Centrifuge samples at 3000rpm for 10 minutes.

1.1.4. Aliquot 1 mL of supernatant into new 15 mL conical

1.1.5. Add 1.25 mL of DCM

1.1.6. Vortex the tubes for 10 minutes.

1.1.7. Centrifuge samples at 3000rpm for 10 minutes.

1.1.8. Aliquot 1 mL of bottom layer and add to 1 mL methanol in a new falcon tube.

1.1.9. Dry until 1 mL volume of methanol is remaining (~15 minutes at RT).

1.1.10. Aliquot filtered sample into autosampler vials with inserts for injection.

1.2. PREPARATION OF QC AND SYSTEM SUITABILITY SAMPLES

1.2.1. Prepare a series of Quality Control Pre-Standards (QCPS) by performing a serial dilution as below.

| Secondary Stock | SS Solution | Volume SS (µL) | Plasma (µL) | Concentration (ng/mL) | IS Volume (µL) | IS Concentration (ng/mL) |
|---|---|---|---|---|---|---|
| QC-H | SS1 | 15 | 1965 | 750 | 20 | 76 |
| QC-M | SS2 | 6 | 1974 | 30 | 20 | 76 |
| QC-L | SS4 | 12 | 1968 | 7.5 | 20 | 76 |

1.2.2. Follow steps 1.1.1 to 1.1.10 RL 8/16/21

To Page No.

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 8/19/21 | Recorded by: [signature] | 8/16/21 |

CONFIDENTIAL INFORMATION

TITLE Plasma/urine stability study

Project No. lev

Book No. 078-RL

From Page No. 5

1.3. PREPARATION OF SAMPLES

1.3.1. Pool plasma from >3 individuals and vortex.

1.3.2. Take 1780 uL of plasma into 15 mL conical tubes.

1.3.3. Add 200 uL of appropriate stock NDMA.

1.3.4. Add 20 uL IS

1.3.4.1. Follow steps 1.1.1 to 1.1.10

1.3.5. Prepare blank plasma samples: Take 1980 uL of plasma into 15 mL conical tubes.

1.3.6. Add 20 uL IS

8/16/21 RL













8/16/21 RL

To Page No. 6

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 8/19/21 | Recorded by: [signature] | 8/16/21 |

Project No. Lev

Book No. 018-RL

TITLE urine/plasma stability study

From Page No. 6













8/16/21 RC

To Page No. 6

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| 8/19/21 [signature] | 8/19/21 | Recorded by: [signature] | 8/16/21 |

RC 10/6/21

- Eppendorf microcentrifuge tubes, DNA LoBind Tube
- Autosampler vials and inserts

7. **PROCEDURE**

7.1. PREPARATION OF SOLUTIONS

The volume of mobile phases and solutions described in this section may be varied as required, while maintaining the proper ratios as described below.

7.1.1. **Mobile Phase A (5 mM $NH_4Ac$ in Water)**: Transfer ~800 mL LC-MS grade water to a 1 L volumetric flask. Transfer 385.4mg $NH_4Ac$ to the volumetric flask and mix well. Dilute to volume with LC-MS grade water.

7.1.2. **Mobile Phase B (Methanol)**: Transfer 1L LC-MS grade methanol to a 1 L volumetric flask.

7.1.3. **Standard Stock Solution**: Stock solution of 5 mg/mL NDMA was diluted to a concentration of 100 µg/mL in methanol.

7.1.4. **Internal Standard Solution (IS)**: Stock solution of 400ug/mL NDMA-$d_6$ was diluted to a concentration of 7600 ng/mL by taking 19 µL of stock into 981 µL of methanol.

7.2. PREPARATION OF CALIBRATION STANDARDS

7.2.1. Prepare a series of Secondary solutions (SS) by performing serial dilutions per the table below.

| Name | Volume of Solution (µL) | Volume Methanol (µL) | Concentration NDMA (ng/mL) |
|---|---|---|---|
| PS | 20 | 980 | 100000 |
| SS1 | 100 | 900 | 10000 |
| SS2 | 500 | 500 | 5000 |
| SS3 | 200 | 800 | 1000 |
| SS4 | 750 | 250 | 750 |
| SS5 | 667 | 333 | 500 |
| SS6 | 500 | 500 | 250 |
| SS7 | 400 | 600 | 100 |
| SS8 | 500 | 500 | 50 |

7.2.2. Follow table below to create the calibration standards C1-C8.

7.2.3. Vortex the tubes for 10 minutes.

7.2.4. Centrifuge samples at 3000rpm for 15 minutes.

7.2.5. Filter ~200 µL aliquot of the recovered sample using nylon filter tubes.

7.2.6. Aliquot filtered sample into autosampler vials with inserts for injection.

| Secondary Stock | Volume SS (µL) | Methanol (µL) | Concentration (ng/mL) | Calibration Curve | IS Volume (µL) | IS Concentration (ng/mL) |
|---|---|---|---|---|---|---|
| SS1 | 50 | 445 | 1000 | C1 | 5 | 76 |
| SS2 | 50 | 445 | 500 | C2 | 5 | 76 |



Witnessed & Understood by me, [signature] Date 10/18/21
Invented by:
Recorded by: [signature]
Date 10/6/21

CONFIDENTIAL INFORMATION

RC 10/6/21

| | | | | | | |
|---|---|---|---|---|---|---|
| SS3 | 50 | 445 | 100 | C3 | 5 | 76 |
| SS4 | 50 | 445 | 75 | C4 | 5 | 76 |
| SS5 | 50 | 445 | 50 | C5 | 5 | 76 |
| SS6 | 50 | 445 | 25 | C6 | 5 | 76 |
| SS7 | 50 | 445 | 10 | C7 | 5 | 76 |
| SS8 | 50 | 445 | 5 | C8 | 5 | 76 |

7.3. **PREPARATION OF QC AND SYSTEM SUITABILITY SAMPLES**

7.3.1. Prepare a series of Quality Control Pre-Standards (QCPS) by performing a serial dilution as below.

| Secondary Stock | SS Solution | Volume SS (µL) | Methanol (µL) | Concentration (ng/mL) | IS Volume (µL) | IS Concentration (ng/mL) |
|---|---|---|---|---|---|---|
| QC-H | SS2 | 75 | 420 | 750 | 5 | 76 |
| QC-M | SS2 | 15 | 480 | 150 | 5 | 76 |
| QC-L | SS5 | 12.5 | 482.5 | 12.5 | 5 | 76 |

7.3.2. Vortex the tubes for 10 minutes.

7.3.3. Centrifuge samples at 3000rpm for 15 minutes.

7.3.4. Filter centrifuge a 200 µL aliquot of the recovered sample using nylon filter tubes for 6 minutes at 15000 rpm.

TI

TITLE NDMA from Ranitidine Test Method

Project No. lev

Book No. 078-RC



From Page No. 8

RC 10/6/21

7.4. PREPARATION OF TEST SAMPLES

7.4.1. Remove test sample from storage at 4°C.

7.4.2. Obtain 150mg ranitidine

7.4.2.1. Crush 1 150mg Zantac tablet and powder the pill or weigh out 150mg Ranitidine.

7.4.3. Transfer to 15mL conical tube.

7.4.4. Add 990 µL methanol and 10 µL IS to conical tube.

7.4.5. Sonicate samples for 5 minutes.

7.4.6. Vortex for 10 minutes.

7.4.7. Centrifuge samples at 3000 rpm for 10 minutes.

7.4.8. Filter centrifuge a 200 µL aliquot of the recovered sample using nylon filter tubes for 6 minutes at 15000 rpm.

7.4.9. Aliquot filtered sample to autosampler vials with inserts for injection. → Set at 150 mL




7.5. LC-MS/MS PARAMETERS

7.5.1. UHPLC Parameters

| | |
|---|---|
| **HPLC Instrument** | Agilent® 1290 Infinity UHPLC with MassHunter™ Acquisition Software and Quantitative Analysis Software |
| **Column** | Waters® Acquity UPLC™ BEH Amide 1.7 µm particle size, 2.1 x 50 mm column |
| **Column Temperature** | 37 °C |
| **Autosampler Temperature** | 4 °C |
| **Mobile Phase A** | 5 mM $NH_4Ac$ in Water |
| **Mobile Phase B** | Methanol |
| **Flow Rate** | 0.1 mL/min |
| **Injection Volume** | 8 µL |
| **Method Run-time** | 8 minutes |

MRM_NDMA_Acquity Amide_Final → A'h

| Time (min) | %B |
|---|---|
| 0.0 | 99 |
| 1.5 | 99 |
| 2.0 | 95 |
| 2.01 | 95 |

To Page No. 10

Witnessed & Understood by me, [signature]

Date 10/18/21

Invented by:

Recorded by: [signature]

Date 10/6/21

CONFIDENTIAL INFORMATION

Project No. lew
Book No. 018-RC
TITLE NDMA from Ranitidine Test Method

From Page No. 9

RC 10/6/21

| | |
|---|---|
| 4.0 | 1 |
| 4.01 | 99 |
| 8.0 | 99 |

7.5.2. Mass Spectrometer Parameters

| | |
|---|---|
| **Ion Source** | Agilent Jet Stream Electrospray Ionization (AJS ESI) |
| **Gas Temperature** | 250°C |
| **Gas Flow** | 11 L/min |
| **Nebulizer pressure** | 60 psi |
| **Capillary Voltage** | 2500 V |
| **Injection Mode** | Injection with needle wash |
| **Needle Wash time** | 3.0 seconds |

7.5.3. MRM Method Parameters

| Compound Name | Precursor Ion | Product Ion | Dwell time (ms) | Fragmentor (V) | Collision Energy (V) | Cell Accelerator (V) | Polarity |
|---|---|---|---|---|---|---|---|
| NDMA (Quant) | 75.1 | 43.3 | 100 | 48 | 17 | 4 | Positive |
| NDMA (Qual) | 75.1 | 58.3 | 100 | 60 | 15 | 4 | Positive |
| NDMA-$d_6$ (Quant) | 81.1 | 46.1 | 100 | 48 | 15 | 4 | Positive |
| NDMA-$d_6$ (Qual) | 81.1 | 64.3 | 100 | 48 | 17 | 4 | Positive |

7.6. INSTRUMENT TUNING

7.6.1. Prior to running a batch of samples, the Tuning of the LC-MS/MS should be checked, and instrument should be tuned if necessary. Refer to the appropriate SOP on how to tune the LC-MS/MS (e.g. EQP-013 Agilent 1200 Series HPLC and 6410 Triple Quad LCMS).

7.7. SYSTEM SUITABILITY REQUIREMENTS

7.7.1. The peak areas obtained for the five High Concentration System suitability injections must have a coefficient of variance ($C_V$, % precision) below 15%.

7.7.2. The signal in the methanol Blank following the System Suitability High injections should be less than 1/5 of the lower limit of quantitation for each analyte.

7.7.3. The response of the System Suitability Low injection must have a peak area ≥ 5 times the signal in the methanol Blank.

8. DATA ANALYSIS AND PROCESSING

7.8.1. Use appropriate software to process the acquired data (e.g. MassHunter™ **Quantitative** Analysis Software for Data Processing, per EQP-013).

7.8.2. QC Calculations

QC Accuracy shall be calculated per the following equation:

$$Accuracy\ (\%\ Error) = \left(\frac{C_{QC} - C_{Nom}}{C_{Nom}}\right) * 100$$

To Page No. 10

Witnessed & Understood by me, [signature] | Date 10/18/21 | Invented by: | Recorded by: [signature] | Date 10/6/21

CONFIDENTIAL INFORMATION

TITLE Validation

Project No. lev
Book No. 078-RC



From Page No. 11

8. **PROCEDURE** RC 10/6/21

8.1. SYSTEM SUITABILITY

8.1.1. Before running any of the following tests in this protocol, system suitability must be performed and pass per CHM-XXX.

8.2. SELECTIVITY/SPECIFICITY

Selectivity/specificity is assessed by evaluating the matrix blank (ranitidine drug product) for interference. Any signal that occurs at the same retention time of NDMA mentioned in the test method CHM-XXX is compared to the responses of NDMA spiked samples in matrix blank at 100ng/mL to determine selectivity/specificity. Multiple reaction monitoring chromatograms (MRMs) of matrix blank and NDMA at 100 ng/mL should be used to demonstrate specificity.

8.2.1. Prepare one matrix blank sample as described in CHM-XXX.

8.2.2. Prepare one C3 calibration standard at 100ng/ mL as described in CHM-XXX.

8.2.3. Analyze the samples as described in CHM-XXX.

8.2.4. Assess the Blank samples for the presence of interfering substances by obtaining MRM chromatogram as described in CHM-XXX.

8.2.4.1. Blank samples should be free of interference at the same retention times of the NDMA.

8.2.4.2. Any signals in the Matrix Blank samples should be less than one-tenth of the signal in C8 (lowest point of calibration curve).

8.3. LINEARITY AND RANGE

8.3.1. The following table lists the target ranges for quantitation of NDMA:

| Target analyte | Concentration Range (ng/mL) |
|---|---|
| NDMA | 5 – 1000 |

8.3.2. Prepare all calibration standards as described in test method CHM-XXX.

*THIS DOCUMENT CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION FOR EMERY PHARMA AND ITS RECIPIENTS. IT MAY NOT BE COPIED OR REPRODUCED WITHOUT PERMISSION.*
*UNCONTROLLED IF PRINTED*

To Page No. 12

Witnessed & Understood by me, [signature] Date 10/18/21

Invented by:

Recorded by: [signature] Date 10/6/21

CONFIDENTIAL INFORMATION

RC 10/6/21

8.3.3. Analyze the Calibration Standards per CHM-XXX.

8.3.4. Lowest Point of Calibration Curve:

8.3.4.1. Analyte response at C8 should be at least 10 times the response compared to matrix blank.

8.3.4.2. Analyte response should have an accuracy of 80-120%.

8.3.5. Calibration Curve:

8.3.5.1. Obtain correlation coefficient, y-intercept, slope of the regression line, residual sum of squares of the curve.

8.3.5.2. At least five out of eight non-zero standards should be within [80-120%] of the nominal concentration.

8.4. ACCURACY

Accuracy is determined by spiking drug product with a known amount of NDMA and comparing the resulting concentration to the nominal value. Accuracy should be reported as percent recovery by the assay of known added amount of NDMA in the drug product or as the difference between the mean and the accepted true value together with the confidence intervals.

Prepare all accuracy samples in triplicate replicates:

8.4.1.1. Prepare Quality Control Samples (QCs), as described in CHM-XXX.

8.4.1.2. Transfer QC-High to each of three individual autosampler vials fitted with insert labeled "Accuracy High."

8.4.1.3. Transfer QC-Medium to each of three individual autosampler vials fitted with insert labeled "Accuracy Med."

8.4.1.4. Transfer QC-Low to each of three individual autosampler vials fitted with insert labeled "Accuracy Low."

8.4.1.5. Absolute amounts and concentrations of all accuracy samples are listed in the table below:

| Name | Concentration (ng/mL) |
|---|---|
| Accuracy High | 750 |
| Accuracy Med | 150 |
| Accuracy Low | 12.5 |

8.4.2. Analyze all samples according to test method CHM-XXX.

8.4.3. Calculate the average concentration of NDMA for each accuracy level and compare this to the nominal concentrations.

8.4.4. Determine the mean spiked concentration obtained for each Accuracy level. The mean should be within [80-120%] of the actual value using the equation shown below:

$$Accuracy\ (\%\ Error) = \left(1 - \frac{C_{Accuracy}}{C_{Spike}}\right) * 100$$

$C_{Accuracy}$ = Calculated mean concentration NDMA in the Accuracy Sample from the calibration

To Page No. 13

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 10/18/21 | Recorded by: [signature] | 10/6/21 |

CONFIDENTIAL INFORMATION

TITLE Validation Project No. lov
Book No. 078-RC



From Page No. 12

RC 10/6/21

curve

$C_{Spike}$ = Nominal spiked concentration of NDMA listed in the table (see section 8.5.1.5)

8.5. PRECISION

The precision describes the closeness of individual measures of an analyte when the procedure is repeatedly applied. It can be further expanded to within-run, intra-batch, or repeatability.

8.5.1. Prepare three independent spiked samples of NDMA in drug product indicated concentration in the following table per CHM-XXX:

| Name | Spiked Concentration (ng/mL) |
|---|---|
| QC High | 750 |
| QC Med | 150 |
| QC Low | 12.5 |
| Drug product test sample | N/A |

8.5.2. Analyze the samples as described in CHM-XXX, performing each QC level in triplicate (High, Med, and Low) and drug product in triplicate.

8.5.3. Calculate the spiked concentration of each replicate and determine the average concentration at each level.

Data → lovo Lov → Validation _ Batch pill lot

To Page No. 13

Witnessed & Understood by me, [signature] Date 10/18/21

Invented by:

Recorded by: [signature] Date 10/6/21

CONFIDENTIAL INFORMATION

14

Project No. low

Book No. 078-RC TITLE Baseline testing

From Page No. 14

- Baseline testing follow protocol page 7-10
  - sample list on drive → Brecher → 7/1014

| | | NDMA Results | |
|---|---|---|---|
| Name | Exp Conc | Final Conc | Accuracy |
| 5ngmL | 5 | 7.0 | 139.8 |
| 10ngmL | 10 | 10.8 | 107.6 |
| 25ngmL | 25 | 24.0 | 95.9 |
| 50ngmL | 50 | 43.4 | 86.7 |
| 100ngmL | 75 | 62.5 | 83.3 |
| 250ngmL | 100 | 83.6 | 83.6 |
| 500ngmL | 500 | 497.1 | 99.4 |
| 1000ngmL | 1000 | 1036.7 | 103.7 |
| QC-L | 12.5 | 14.4 | 114.8 |
| QC-M | 150 | 120.1 | 80.0 |
| QC-H | 750 | 737.6 | 98.3 |
| QC-L | 12.5 | 12.7 | 101.5 |
| QC-M | 150 | 160.8 | 107.2 |
| QC-H | 750 | 789.2 | 105.2 |
| Pill | | 402.2 | |
| Pill + 500ngmL | | 982.7 | |
| 500ngmL | | 485.3 | |

| Sample | NDMA | NDMA | Average |
|---|---|---|---|
| 1 | 376.5 | 444.0 | 410.2 |
| 2 | 285.4 | 270.7 | 278.1 |
| 3 | 709.2 | 777.5 | 743.3 |
| 4 | 431.6 | 451.0 | 441.3 |
| 5 | 298.7 | 394.2 | 346.5 |
| 6 | 396.2 | 505.4 | 450.8 |
| 7 | 196.4 | 333.2 | 264.8 |
| 8 | 131.1 | 238.1 | 184.6 |
| 9 | 432.8 | 542.1 | 487.4 |
| 10 | 141.1 | 288.5 | 214.8 |
| 11 | 136.7 | 230.1 | 183.4 |
| 12 | 122.5 | 225.1 | 173.8 |
| 13 | 113.6 | 235.1 | 174.4 |
| 14 | 829.6 | 807.0 | 818.3 |
| 15 | 909.0 | 771.2 | 840.1 |
| 16 | 287.0 | 319.7 | 303.3 |
| 17 | 204.4 | 300.8 | 252.6 |
| 18 | 192.5 | 252.4 | 222.4 |
| 19 | 169.6 | 215.9 | 192.8 |
| 20 | 168.6 | 213.1 | 190.9 |
| 21 | 168.4 | 255.6 | 212.0 |
| 22 | 357.7 | 382.9 | 370.3 |
| 23 | 722.1 | 720.6 | 721.4 |
| 24 | 420.5 | 482.0 | 451.2 |

| Sample | NDMA | NDMA | Average |
|---|---|---|---|
| 25 | 533.3 | 539.4 | 536.4 |
| 26 | 602.1 | 884.2 | 743.1 |
| 27 | 851.1 | 797.5 | 824.3 |
| 28 | 555.2 | 607.9 | 581.5 |
| 29 | 411.3 | 459.3 | 435.3 |
| 30 | 535.5 | 531.0 | 533.3 |
| 31 | 310.1 | 396.9 | 353.5 |
| 32 | 284.3 | 291.0 | 287.7 |
| 33 | 500.5 | 553.4 | 526.9 |
| 34 | 294.4 | 385.9 | 340.2 |
| 35 | 280.6 | 298.6 | 289.6 |
| 36 | 304.3 | 276.1 | 290.2 |
| 37 | 216.1 | 266.7 | 241.4 |
| 38 | 709.4 | 646.6 | 678.0 |
| 39 | 97.3 | 226.4 | 161.9 |
| 40 | 193.1 | 154.8 | 174.0 |
| 41 | 322.0 | 318.7 | 320.4 |
| 42 | 299.3 | 285.8 | 292.6 |
| 43 | 260.3 | 288.8 | 274.5 |
| 44 | 276.9 | 278.4 | 277.7 |
| 45 | 286.2 | 311.5 | 298.9 |
| 46 | 484.1 | 482.9 | 483.5 |
| 47 | 789.3 | 810.0 | 799.6 |
| 48 | 485.9 | 563.3 | 524.6 |



RC 10/13/21

- protocol updated as CHM-2021-[illegible]
- data stored in ww Mass hunter
  + Drive → team box → Brecher Stuff RP
- data not printed but on slides, emailed excel w/ "Master Sheet"

To Page No. 14

Witnessed & Understood by me, [signature] Date 10/18/21

Invented by:

Recorded by: [signature] Date 10/13/21

CONFIDENTIAL INFORMATION

TITLE Sanofi RP Baseline testing

Project No. [illegible]

Book No. 078-RL



From Page No. 13

RL 10/11/21

| ITEM_DESCRIPTION | LOT# | LOT_EXPIRATION | INVOICED | QTY | BILLTO_NAME | SHIPTO_NAME | ZIPCODE | Plaintiffs Selection | NDMA (ng/tab) |
|---|---|---|---|---|---|---|---|---|---|
| Zantac 150mg Cool Mint 90ct | 18C502 | 2020-03-04 | 2018-05-15 | 32 | AMAZON.COM | AMAZON.COM TRENTON NJ | 08691 | 5 packages | |
| Zantac 150mg 3s x 36 ND | 753969 | 2020-04-24 | 2018-07-10 | 126 | ALBERTSON'S | ALBERTSON'S TRACY GM/HBC | 95377 | 10 packages | |
| Zantac 150mg 3s x 36 ND | 753969 | 2020-04-24 | 2018-07-12 | 229 | ALBERTSON'S | ALBERTSON'S AUBURN GM/HBC | 98047 | 10 packages | 264.8 |
| Zantac 150mg 3s x 36 ND | 753969 | 2020-04-24 | 2017-10-18 | 180 | CENTRAL SALES CO | CENTRAL SALES CO | 25705 | 10 packages | |
| Zantac 150mg 3s x 36 ND | 753969 | 2020-04-24 | 2017-12-15 | 154 | CORE-MARK / ALLIED MERCHAN | AMR/ARTIC NORTH EAST | 18706 | 10 packages | |
| Zantac 150mg 3s x 36 ND | 753969 | 2020-04-24 | 2018-08-13 | 72 | CVS MERIDIAN, INC. | CVS DISTRIBUTION CTR K101 | 64153 | 10 packages | |
| Zantac 150mg 3s x 36 ND | 753969 | 2020-04-24 | 2019-01-15 | 57 | CVS MERIDIAN, INC. | CVS DISTRIBUTION CTR N101 | 08048 | 5 packages | |
| Zantac 150mg 3s x 36 ND | 753969 | 2020-04-24 | 2017-09-22 | 57 | MCLANE PACIFIC | MCLANE/SOUTHEAST | 30601 | 5 packages | |
| Zantac 150mg 3s x 36 ND | 753969 | 2020-04-24 | 2017-11-14 | 60 | PRICE MASTER CORP. | PRICE MASTER CORP. | 11377 | 5 packages | |
| Zantac 150mg 3s x 36 ND | 753969 | 2020-04-24 | 2017-10-16 | 132 | SANOFI-AVENTIS PUERTO RICO | SANOFI-AVENTIS C/O CESAR CASTILLO INC | 00971 | 10 packages | |
| Zantac 150mg 120ct Twin Pack | 07J17104TR | 2020-04-30 | 2017-08-07 | 45 | BJ'S WHOLESALE CLUB | BJ'S 820 BRISTOL DIST CT | 08016 | 3-120CT twin packs | 743.1 |
| Zantac 150mg Cool Mint 90ct | 18D529 | 2020-07-28 | 2019-01-15 | 44 | AMAZON.COM | AMAZON.COM CARTERET NJ | 07008 | 5 packages | |
| Zantac 150mg 65s x 24 ND | A0154A | 2020-10-26 | 2018-01-02 | 34 | HARRIS-TEETER SUPMKT | HARRIS TEETER FOOD WORLD | 27410 | 3-65CT packages | 533.3 |
| ZANTAC COOL MINT 150MG 24CT SH | 198530 | 2021-02-04 | 2019-06-01 | 26 | WAL-MART INC | WAL-MART DC 6092A-ASM | 61362 | 5-24CT packages | |
| Zantac 150mg 120ct Twin Pack | 0717181227TR | 2021-03-18 | 2018-09-14 | 20 | SAM'S CLUB | SAMS DIST CTR 6409 | 30180 | 3-120CT twin packs | |
| Zantac 150mg 120ct Twin Pack | 0719183 22TR | 2021-01-19 | 2019-02-15 | 24 | SANOFI-AVENTIS PUERTO RICO | SANOFI-AVENTIS C/OCESAR CASTILLO INC | 00871 | 3-120CT twin packs | 526.9 |
| ZANTAC COOL MINT 150MG 24CT SH | 19C541 | 2021-03-23 | 2019-07-17 | 24 | KROGER NASHVILLE-RASC | ROUNDY'S GENERAL MERCH | 53560 | 5-24CT packages | 458.8 |
| Zantac 150mg Cool Mint 90ct | 190559 | 2021-04-22 | 2019-08-15 | 46 | MEIJER INC | MEIJER DC 86 | 48817 | 5-90CT packages | 840.1 |
| Zantac 150mg Cool Mint 90ct | 190559 | 2021-04-22 | 2019-08-12 | 20 | WALGREEN 049155 | WALGREEN WHSE 17 | 06095 | 5-90CT packages | 274.5 |
| Zantac 150mg Cool Mint 90ct | 190559 | 2021-04-22 | 2019-08-14 | 24 | WALGREEN 049155 | WALGREEN WHSE 10 | 75167 | 5-90CT packages | |
| Zantac 150mg Cool Mint 90ct | 190561 | 2021-04-24 | 2019-08-28 | 66 | MEIJER INC | MEIJER DC 86 | 48817 | 5-90CT Packages | 441.3 |
| Zantac 150mg Cool Mint 90ct | 190561 | 2021-04-24 | 2019-09-03 | 10 | TARGET'S CENTRAL PROC CTR | TARGET DIST CTR 590 | 50813 | 2-90CT packages | |
| Zantac 150mg Cool Mint 90ct | 190561 | 2021-04-24 | 2019-09-02 | 28 | WAL-MART INC | WAL-MART DC 6038R-REGULAR | 75801 | 5-90CT packages | 241.4 |
| Zantac 150mg Cool Mint 90ct | 190561 | 2021-04-24 | 2019-09-04 | 16 | WAL-MART INC | WAL-MART DC 7045R-REGULAR | 22841 | 5-90CT packages | 670.0 |
| Zantac 150mg Cool Mint 90ct | 190561 | 2021-04-24 | 2019-09-04 | 26 | WALGREEN 049155 | WALGREEN WHSE 10 | 75167 | 5-90CT packages | 818.1 |
| Zantac 150mg Cool Mint 90ct | 19E573 | 2021-05-09 | 2019-10-08 | 64 | AMAZON.COM | AMAZON.COM IND9 | 46143-7830 | 5-90 CT packages | |
| Zantac 150mg Cool Mint 90ct | 19E573 | 2021-05-09 | 2019-10-01 | 36 | AMAZON.COM | AMAZON.COM WHITESTOWN IN | 46075 | 5-90 CT packages | |
| Zantac 150mg Cool Mint 90ct | 19E573 | 2021-05-09 | 2019-10-02 | 10 | WAL-MART INC | WAL-MART DC 7026A-REGULAR | 84029 | 5-90 CT packages | |
| ZANTAC 75MG 30CT SHIPPER ONLY | 18H008M | 2021-08-29 | 2018-11-20 | 60 | TARGET'S CENTRAL PROC CTR | TARGET DIST CTR 3802 | 12010 | 5-30CT packages | 722.4 |
| Zantac 150mg 65s x 24 ND | 18K401M | 2021-09-09 | 2019-01-17 | 18 | MCKESSON FINANCIAL CTR DOC | MCKESSON DRUG WILSONVILLE | 97070 | 3-65CT packages | |
| Zantac 75mg 80s x 24 ND | 18L014U | 2021-10-13 | 2019-02-15 | 44 | CVS MERIDIAN, INC | CVS DISTRIBUTION CTR N101 | 08048 | 3-80CT packages | 188.4 |
| Zantac 150mg 90ct Tablet | 18M487M | 2021-11-14 | 2019-04-05 | 82 | CVS MERIDIAN, INC. | CVS DISTRIBUTION CTR N101 | 08048 | 3-90CT packages | 169.3 |
| Zantac 150mg 40ct | 18M465M | 2021-11-23 | 2019-03-13 | 18 | TARGET'S CENTRAL PROC CTR | TARGET DIST CTR 3809 | 66609 | 3-40CT packages | 546.5 |
| Zantac 150mg 90ct Tablet | 18M468M | 2021-11-24 | 2019-03-19 | 62 | TARGET'S CENTRAL PROCCTR | TARGET DIST CTR 589 | 17201 | 3-90CT packages | 743.3 |
| Zantac 75mg 1s x 100 Pouch | 18N024U | 2021-12-26 | 2019-10-02 | 16000 | PRICE MASTER CORP. | PRICE MASTER CORP. | 11377 | 2-100 Pouch or 200 tablets, whichever is greater | ? |
| Zantac 75mg 1ct Pouches x 3000 | 18N024U | 2021-12-26 | 2019-08-06 | 6000 | JC WORLD BELL WHOLESALE CO | JC WORLD BELL WHOLESALE CO INC | 07601 | 1-3000 pouch or 3000 tablets, whichever is greater | 790.6 |
| Zantac 75mg 2ct | 18N024U | 2021-12-26 | 2019-08-16 | 610 | DOLLAR TREE STORES INC | DOLLAR TREE DISTRIBUTION CENTER-OCB | 73449 | 100-2CT packages | |
| Zantac 75mg 2ct | 18N024U | 2021-12-26 | 2019-09-13 | 338 | DOLLAR TREE STORES INC | DOLLAR TREE DISTRIBUTION CENTER-OC3 | 60436 | 100-2CT packages | |
| Zantac 150mg 50s x 24 ND | 19A428U | 2022-01-01 | 2019-04-17 | 24 | CARDINAL DIST INC | CARDINAL - KINRAY | 11357 | 3-50CT packages | 392.8 |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19A469U | 2022-01-02 | 2019-06-18 | 27 | AMERISOURCEBERGEN-THOROF | AMERISOURCE BERGEN | 96819 | 5-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19A469U | 2022-01-02 | 2019-05-24 | 219 | WALGREEN 049155 | WALGREEN WHSE 10 | 75167 | 10-8CT packages | |
| Zantac 150mg 65s x 24 ND | 19A409U | 2022-01-05 | 2019-04-17 | 16 | CARDINAL DIST INC | CARDINAL - KINRAY | 11357 | 3-65CT packages | |
| Zantac 150mg 90ct Tablet | 19A423M | 2022-01-05 | 2019-04-18 | 20 | WAL-MART INC | WAL-MART DC 6025A-REGULAR | 54751 | 3-90CT packages | |
| Zantac 150mg 65s x 24 ND | 19A408U | 2022-01-14 | 2019-05-20 | 88 | CVS MERIDIAN, INC | CVS DISTRIBUTION CTR N101 | 08048 | 3-65CT packages | 190.9 |
| ZANTAC 150MG 27PC CLUB PACK | 9193CCWS | 2022-01-15 | 2019-07-22 | 25 | BJ'S WHOLESALE CLUB | BJ'S 820 BRISTOL DIST CT | 08016 | 5 packages | |
| ZANTAC 150MG 12PC CLUB PK-SAMS | 9113CAWS | 2022-01-25 | 2019-08-06 | 12 | SAM'S CLUB | SAMS DIST CTR 6496 | 66106 | 2 packages | 483.5 |
| ZANTAC 150MG 27PC CLUB PACK | 9113CBWS | 2022-01-25 | 2019-06-17 | 24 | BJ'S WHOLESALE CLUB | BJ'S 800 DIST CTR | 01569 | 5 packages | 536.4 |
| ZANTAC 150MG 27PC CLUB PACK | 9113CBWS | 2022-01-25 | 2019-06-11 | 98 | COSTCO | COSTCO 0262 | 30349 | 5 packages | 581.5 |
| ZANTAC 150MG 27PC CLUB PACK | 9113CBWS | 2022-01-25 | 2019-06-17 | 48 | COSTCO | COSTCO 0267 | 60450 | 5 packages | |
| ZANTAC 150MG 27PC CLUB PACK | 9114CAWS | 2022-01-25 | 2019-06-17 | 48 | COSTCO | COSTCO 1203 | 48111 | 5 packages | |
| ZANTAC 150MG 8CT 36PC EAS TAG | 19A452M | 2022-01-26 | 2019-05-23 | 66 | DOLGENCORP LLC | DOLLAR GEN WHSE | 32615 | 5 8CT 36PC packages | 487.4 |
| ZANTAC 150MG 27PC CLUB PACK | 9116CAWS | 2022-01-26 | 2019-07-15 | 54 | COSTCO | COSTCO 0175 | 08031 | 5 packages | |
| ZANTAC 150MG 24CT SHIPPER ONLY | 19A426M | 2022-01-29 | 2019-04-25 | 56 | WAL-MART INC | WAL-MART DC 6027A-REGULAR | 16881 | 5-24CT packages | 280.6 |
| ZANTAC 150MG 24CT SHIPPER ONLY | 19B464M | 2022-02-02 | 2019-05-06 | 192 | CVS MERIDIAN, INC. | CVS DISTRIBUTION CTR N101 | 08048 | 5-24CT packages | |
| ZANTAC 150MG 24CT SHIPPER ONLY | 19B464M | 2022-02-02 | 2019-05-01 | 32 | MCKESSON FINANCIAL CTR DOC | MCKESSON DRUG OKLAHOMA CITY OK | 73179 | 5 24CT packages | 524.6 |
| Zantac 150mg 50s x 24ND | 19B483M | 2022-02-07 | 2019-06-19 | 22 | ALBERTSONS COMPANIES, LLC | ALBERTSON'S DIST CTR 8720 | 74601 | 5 packages | 340.2 |
| Zantac 150mg 50s x 24ND | 19B483M | 2022-02-07 | 2019-06-21 | 66 | ALBERTSONS COMPANIES, LLC | ALBERTSONS LANCASTER | 17517 | 5 packages | |
| Zantac 150mg 50s x 24 ND | 19B483M | 2022-02-07 | 2019-07-10 | 200 | CASAMERICA INT INC DBA CASA | CASAMERICA INT INC DBA CASAMERICA MARINE | 33172 | 5 packages | |
| Zantac 150mg 50s x 24 ND | 19B483M | 2022-02-07 | 2019-07-16 | 24 | HARRIS TEETER SUPMKT | HARRIS TEETER FOOD WORLD | 27410 | 5 packages | |
| Zantac 150mg 50s x 24 ND | 19B483M | 2022-02-07 | 2019-06-21 | 60 | PUBLIX SUPER MARKETS | PUBLIX MKTS-HBB DIV | 33811 | 5 packages | |
| Zantac 150mg 50s x 24 ND | 19B483M | 2022-02-07 | 2019-06-27 | 40 | SUPERVALU - RETURNS LA 1 | SUPERVALU - STOCKTON | 95206 | 5 packages | |
| ZANTAC 75MG 30CT SHIPPER ONLY | 19B001M | 2022-02-15 | 2019-06-26 | 28 | RITE AID CORP | RITE AID DISTRIBUTION CTR | 21001 | 5-30CT package | 420.2 |

- add'l data of dilution on excel sheet on Srin[illegible]
- additional data saved & presented in slides & on "Master Sheet", not pasted cause too small to read
- start stability: PLEV-MB21 0812B

To Page No. 16

Witnessed & Understood by me, [signature] Date 10/25/21

Invented by: Date 10/19/21

Recorded by: [signature]

CONFIDENTIAL INFORMATION

Project No. Lev

Book No. 078-RC

TITLE Sanofi RP Batches

From Page No. 16

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Zantac 75mg 80s x 24 ND | 19B004M | 2022-02-16 | 2019-10-08 | 16 AMAZON.COM | AMAZON.COM IND9 | 46143-7830 | 3-80CT packages | |
| Zantac 75mg 80s x 24 ND | 19B004M | 2022-02-16 | 2019-09-03 | 44 CVS MERIDIAN, INC. | CVS DISTRIBUTION CTR W101 | 02895 | 3-80CT packages | 212.8 |
| Zantac 150mg 90ct Tablet | 19B490M | 2022-02-17 | 2019-06-20 | 44 TARGET'S CENTRAL PROC CTR | TARGET DIST CTR 560 | 24477 | 3-90CT packages | |
| ZANTAC 150MG 3CT SHIPPER ONLY | 19C468M | 2022-03-14 | 2019-09-18 | 378 CENTRAL SALES CO | CENTRAL SALES CO | 25705 | 50 3-CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19C468M | 2022-03-14 | 2019-10-11 | 153 ASSOC WHSL GROCERS/VALU M | VALU MDSE CO | 66701-1249 | 5-8CT packages | 222.4 |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19C468M | 2022-03-14 | 2019-10-07 | 42 PUBLIX SUPER MARKETS | PUBLIX MKTS-ATLANTA DIV | 30019 | 5-8 CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19C468M | 2022-03-14 | 2019-10-02 | 24 WAL-MART INC | WAL-MART DC 6011A-ASM | 39601 | 3-80 CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19C468M | 2022-03-14 | 2019-10-02 | 24 WAL-MART INC | WAL-MART DC 6010A-ASM | 31533 | 5-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19C468M | 2022-03-14 | 2019-10-02 | 102 WALGREEN 049155 | WALGREEN WHSE 18 | 29697 | 10-8CT packages | 174.4 |
| ZANTAC 150MG 12PC CLUB PK-SAMS | 9238CAWS | 2022-03-27 | 2019-09-17 | 25 SAM'S CLUB | SAMS DIST CTR 8206 | 28273 | 5 packages | 214.8 |
| ZANTAC 150MG 12PC CLUB PK-SAMS | 9239CBWS | 2022-03-28 | 2019-09-24 | 31 SAM'S CLUB | SAMS DIST CTR 8229 | 33801 | 5 bottles/packs | |
| ZANTAC 150MG 12PC CLUB PK-SAMS | 9239CBWS | 2022-03-28 | 2019-09-24 | 20 SAM'S CLUB | SAMS DIST CTR 6496 | 66106 | 5 bottles/packs | 298.9 |
| ZANTAC 150MG 12PC CLUB PK-SAMS | 9239CAWS | 2022-03-28 | 2019-10-01 | 26 SAM'S CLUB | SAMS DIST CTR 8229 | 33801 | 5 packages | 287.7 |
| ZANTAC 150MG 24CT SHIPPER ONLY | 19D462M | 2022-04-01 | 2019-08-13 | 38 AMERISOURCEBERGEN-THOROF | AMERISOURCE BERGEN | 23060 | 5-24CT packages | |
| ZANTAC 150MG 24CT SHIPPER ONLY | 19D441M | 2022-04-03 | 2019-08-05 | 240 CVS MERIDIAN, INC. | CVS DISTRIBUTION CTR F101 | 32966 | 5-24CT packages | 278.1 |
| Zantac 150mg 65s x 24 ND | 19D432U | 2022-04-04 | 2019-07-26 | 66 C&S WHOLESALE GROCERS | C&S WHOLESALE GROCERS - BETHLEHEM | 18020 | 3-65CT packages | 435.3 |
| ZANTAC 150MG 24CT SHIPPER ONLY | 19D422M | 2022-04-30 | 2019-09-02 | 38 ALBERTSONS COMPANIES, LLC | ALBERTSON'S DIST CTR 8720 | 74601 | 5-24CT packages | |
| ZANTAC 150MG 24CT SHIPPER ONLY | 19D422M | 2022-04-30 | 2019-09-02 | 56 C&S WHOLESALE | C&S WHOLESALE-JACKSONVILLE | 32254 | 5-24CT packages | 184.6 |
| ZANTAC 150MG 24CT SHIPPER ONLY | 19D422M | 2022-04-30 | 2019-09-02 | 60 PUBLIX SUPER MARKETS | PUBLIX MKTS-ATLANTA DIV | 30019 | 5-24CT packages | 277.7 |
| ZANTAC 150MG 24CT SHIPPER ONLY | 19D421M | 2022-04-30 | 2019-08-12 | 48 RITE AID CORP | RITE AID DISTRIBUTION CTR | 13088 | 5-24CT package | 370.3 |
| ZANTAC 150MG 24CT SHIPPER ONLY | 19D412M | 2022-04-30 | 2019-09-02 | 56 WALGREEN 049155 | WALGREEN WHSE 04 | 32809 | 5-24 CT packages | 824.3 |
| Zantac 150mg 90ct Tablet | 19E401M | 2022-05-03 | 2019-10-01 | 16 TARGET'S CENTRAL PROC CTR | TARGET DIST CTR 551 | 55432 | 3-90 CT packages | 320.4 |
| Zantac 150mg 90ct Tablet | 19E401M | 2022-05-03 | 2019-10-01 | 20 TARGET'S CENTRAL PROC CTR | TARGET DIST CTR 590 | 50613 | 3-90 CT packages | |
| Zantac 150mg 90ct Tablet | 19E401M | 2022-05-03 | 2019-10-03 | 20 WAL-MART INC | WAL-MART DC 6030R-REGULAR | 03077 | 3-90 CT packages | |
| Zantac 150mg 90ct Tablet | 19E401M | 2022-05-03 | 2019-10-03 | 20 WAL-MART INC | WAL-MART DC 6025R-REGULAR | 54751 | 3-90 CT packages | |
| Zantac 150mg 90ct Tablet | 19E401M | 2022-05-03 | 2019-10-02 | 32 WALGREEN 049155 | WALGREEN WHSE 10 | 75167 | 3-90 CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-09-09 | 42 ALBERTSONS COMPANIES, LLC | ALBERTSON'S AUBURN GM/HBC | 98047 | 5-8CT packages | 451.2 |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-09-05 | 81 AMERISOURCEBERGEN-THOROF | AMERISOURCEBERGEN-ORLANDO (VISTA) | 32829 | 5-8CT packages | 173.8 |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-08-19 | 144 ASSOC WHSL GROCERS/VALU M | VALU MDSE CO | 66701-1249 | 10-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-08-27 | 24 CARDINAL DIST INC | CARDINAL - KINRAY | 11357 | 5-8CT packages | 161.9 |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-09-02 | 48 CVS MERIDIAN, INC. | CVS DISTRIBUTION CTR W101 | 02895 | 5-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-09-03 | 33 CVS MERIDIAN, INC. | CVS DISTRIBUTION CTR N101 | 08048 | 5-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-08-16 | 33 CVS MERIDIAN, INC. | CVS DISTRIBUTION CTR N101 | 08048 | 5-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-09-03 | 168 FOODLION, INC (U) | FOOD LION DC 9 | 27509 | 5-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-09-13 | 84 PUBLIX SUPER MARKETS | PUBLIX MKTS-H&B DIV | 33811 | 5-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-08-19 | 84 RITE AID CORP | RITE AID DISTRIBUTION CTR | 21001 | 5-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-08-16 | 27 WAL-MART INC | WAL-MART DC 6068A-ASM | 76266 | 5-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-08-22 | 36 WAL-MART INC | WAL-MART DC 6092A-ASM | 61362 | 5-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-08-19 | 72 WALGREEN 049155 | WALGREEN WHSE 01 | 33478 | 5-8CT packages | 292.6 |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-09-03 | 63 WALGREEN 049155 | WALGREEN WHSE 08 | 62864 | 5-8CT packages | |
| ZANTAC 150MG 8CT SHIPPER ONLY | 19E413M | 2022-05-30 | 2019-08-16 | 42 WALGREEN 049155 | WALGREEN WHSE 04 | 32809 | 5-8CT packages | |
| ZANTAC 75MG 30CT SHIPPER ONLY | AL7318 | 2022-07-08 | 2019-10-07 | 180 ASSOC WHSL GROCERS/VALU M | VALU MDSE CO | 66701-1249 | 5-30CT package | |
| ZANTAC 75MG 30CT SHIPPER ONLY | AL7318 | 2022-07-08 | 2019-10-04 | 56 PUBLIX SUPER MARKETS | PUBLIX MKTS-H&B DIV | 33811 | 5-30CT package | |
| ZANTAC 75MG 30CT SHIPPER ONLY | AL7318 | 2022-07-08 | 2019-10-11 | 28 PUBLIX SUPER MARKETS | PUBLIX MKTS-H&B DIV | 33811 | 5-30CT package | 353.5 |
| ZANTAC 75MG 30CT SHIPPER ONLY | AL7318 | 2022-07-08 | 2019-10-02 | 26 WAL-MART INC | WAL-MART DC 7034A-ASM | 19977 | 5-30CT package | 252.6 |
| ZANTAC 75MG 30CT SHIPPER ONLY | AL7318 | 2022-07-08 | 2019-10-03 | 28 WAL-MART INC | WAL-MART DC 7038A-ASM | 34981 | 5-30CT package | 298.2 |
| ZANTAC 75MG 30CT SHIPPER ONLY | AL7318 | 2022-07-08 | 2019-10-02 | 86 WALGREEN 049155 | WALGREEN WHSE 18 | 29697 | 5-30CT package | |
| ZANTAC 75MG 30CT SHIPPER ONLY | AL7319 | 2022-07-09 | 2019-09-26 | 24 WAL-MART INC | WAL-MART DC 6021A-ASM | 93257 | 5-30CT packages | |
| ZANTAC 75MG 30CT SHIPPER ONLY | AL7319 | 2022-07-09 | 2019-09-27 | 32 WAL-MART INC | WAL-MART DC 6094A-ASM | 72712 | 5-30CT packages | [illegible] |

RC 10/19/21

- see pg 15 explanation

Witnessed & Understood by me, [signature]

Date 10/25/21

Invented by:

Recorded by: [signature]

Date 10/19/21

To Page No. 16

CONFIDENTIAL INFORMATION

TITLE Add'l Sanofi RP batch testing Project No. Lev
From Page No. 14 Book No. 018-RC



- follow page 7-10
- add QC - Matrix

7.4. PREPARATION OF QC AND SYSTEM SUITABILITY SAMPLES – IN-MATRIX

7.4.1. Crush 1 150mg Zantac tablet. Repeat 2x.

7.4.2. Prepare a series of Quality Control Pre-Standards (QCPS) by performing a serial dilution as below.

| Secondary Stock | SS Solution | Volume SS (µL) | Methanol (µL) | Concentration (ng/mL) | IS Volume (µL) | IS Concentration (ng/mL) |
|---|---|---|---|---|---|---|
| QC-H | SS1 | 75 | 915 | 750 | 10 | 76 |
| QC-M | SS1 | 15 | 975 | 150 | 10 | 76 |
| QC-L | SS3 | 12.5 | 977.5 | 12.5 | 10 | 76 |

7.4.3. Add directly to each of the Zantac tablets.

7.4.4. Repeat 7.3.2 -7.3.4.

*This Document contains confidential and proprietary information for Nowarta BioPharma, Inc. and Emery Pharma use ONLY. It may not be copied or reproduced without permission.*
*UNCONTROLLED IF PRINTED*

RC 10/19/21

- see pg 15 explanation
Lauren Low → excel & Master Sheet

To Page No. 18

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 10/25/21 | Recorded by: [signature] | 10/19/21 |

Project No. Lev
Book No. 018-RC
TITLE NAP test

From Page No. 18

RC 10/22/21

**NAP Conditions:**

- 10mM drug
- 40mM Nitrite
- 37C
- pH 3-4
- Reaction times 1 hour and 4 hours.

**Ranitidine**

1) Make 25mL Nitrite solution (40mM)
    a. Weigh out 69 mg Sodium Nitrite
2) Aliquot 2x10 mL in 15mL tubes
3) Add ~~7.4mg~~ 35.6 ranitidine
4) Adjust pH to 3-4
5) Take timepoints at 0hr, 1hr, 4hr → add 10μL IS →
6) Centrifuge at 3000rpm for 10 minutes
7) Take supernatant and filter → dilute 1:1000
8) Transfer eluent to MS vial

**Zantac**

1) Make 200mL Nitrite solution (40mM)
    a. Weigh out 551.9mg Sodium Nitrite
2) Aliquot 4x48 mL in 50mL tubes
3) Add 1 – 150mg Zantac tablet to each (crushed)
4) Adjust pH to 3-4
5) Take timepoints at 0hr, 1hr, 4hr
6) Centrifuge at 3000rpm for 10 minutes
7) Take supernatant and filter → dilute 1:1000
8) Transfer eluent to MS vial

RC 10/22/21

Sanofi: AL 7681B 150mg
BI: 961321 150mg
GSK: 18032000963 Ranitidine

use this (see pg 20)

- NAP protocol: PLEV-NB210120

To Page No. 19

Witnessed & Understood by me, [signature] Date 10/25/21
Invented by:
Recorded by: [signature] Date 10/22/21

CONFIDENTIAL INFORMATION

Project No. lov
Book No. 079-RC

19

TITLE Car/shower simulation

From Page No. 18

RC 10/22/21

**Shade**

| Storage Condition | 0 hour | 0 - 2 hour | 2 - hours |
|---|---|---|---|
| 25 °C/65% RH | X | | X |
| 40 °C/65% RH | | X | |

**Sun**

| Storage Condition | 0 hour | 0 - 2 hour | 2 - 4 hours | 4 - hours |
|---|---|---|---|---|
| 25 °C/65% RH | X | | | X |
| 50 °C/65% RH | | | X | |
| 75 °C/65% RH | | X | | |

-no RH Control!

**Shower**

| Storage Condition | 0 hour | 0 – 0.5 hour | 0.5 - 1 hours |
|---|---|---|---|
| 25 °C/40% RH | X | | X |
| 40°C/100% RH | | X | |

- 6 cycles Samples processed as page 9

PLEV-M[illegible]12B

To Page No. 20

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 10/25/21 | Recorded by: [signature] | 10/22/21 |

CONFIDENTIAL INFORMATION

Project No. ___ lev ___
Book No. ___ 078-RC ___
TITLE ___ NAP + 6 cycle stability results ___

From Page No. 10



















RC 10/26/21

v = 1mL
Nitrite = 40mM
pH = 3.42
Ranitidine = 10mM

GSK : EKHO0TS04T




+ data on ManMentor & detailed lens on ...

Witnessed & Understood by me, [signature]

Date 10/27/21

Invented by:

Recorded by: [signature]

Date 10/26/21

To Page No. 20

CONFIDENTIAL INFORMATION

TITLE SGF - ham/coffee

Project No. Lev
Book No. 078-RC



From Page No. 20

RC 10/26/21

**Ham**

1) Grind "food" in a 1 serving amount in water (<200mL).
2) Pour into 1L beaker and Q.S. to 250mL.
3) Add 931.9mg KCl and adjust pH to 2.5 using HCl.
4) Crush 1 Zantac tablet and add to beaker.
5) Take 1mL at time 0, 1, 4 hours.
6) Add 10 uL IS (19uL stock + 981uL MeOH)
7) Centrifuge at 3950RPM for 10 minutes.
8) Filter centrifuge a 200 µL aliquot for 6 minutes at 15000 rpm.
9) Aliquot filtered sample to autosampler vials with inserts for injection.

Smithfield
Boneless Ham Steak
- fully cooked
- contains sodium nitrite

**Coffee**

1) Make 250mL coffee and pour into 1L beaker. Follow steps 3-9 above.

Ham and Coffee Alone

1) Follow Ham procedure, excluding step 4.

Ham and Coffee Recovery

1) Follow Ham procedure, excluding step 4.
2) Add 25uL of SS3 (5000ng/mL) to make final concentration of 500ng/mL in 250mL.

**Prep**

- 1L beakers: H, H-Zantac, H-NDMA, C, C-Zantac, C-NDMA ✓
- Label 10 microcentrifuge tubes: PS, S1-S9, IS ✓
- Label 15mL conical tubes: C1-C8, QC-L, QC-M, QC-H, 1-18 ✓
- Label filter tubes: 1-18 ✓
- Label MS vials w/ inserts: C1-C8, QC-L, QC-M, QC-H, 1-18, B, NW
- Crush Zantac (2), Weigh out KCl 6 times (931.9mg)

PLEV-RB21051 2C

150mg
AM03D813
E: Sept 2022
Aithen Smofi

| Sample | Food | Condition | Time |
|---|---|---|---|
| 1 | Ham | Alone | 0 hour |
| 2 | Ham | Zantac | 0 hour |
| 3 | Ham | NDMA | 0 hour |
| 4 | Coffee | Alone | 0 hour |
| 5 | Coffee | Zantac | 0 hour |
| 6 | Coffee | NDMA | 0 hour |
| 7 | Ham | Alone | 1 hour |
| 8 | Ham | Zantac | 1 hour |
| 9 | Ham | NDMA | 1 hour |
| 10 | Coffee | Alone | 1 hour |
| 11 | Coffee | Zantac | 1 hour |
| 12 | Coffee | NDMA | 1 hour |
| 13 | Ham | Alone | 4 hour |
| 14 | Ham | Zantac | 4 hour |
| 15 | Ham | NDMA | 4 hour |
| 16 | Coffee | Alone | 4 hour |
| 17 | Coffee | Zantac | 4 hour |
| 18 | Coffee | NDMA | 4 hour |

To Page No. 22

Witnessed & Understood by me, [signature]

Date 10/28/21

Invented by:

Recorded by: [signature]

Date 10/26/21

Project No. Lov

Book No. 078-KL

TITLE SGF-coffee/ham

From Page No. 21

RC 10/26/21

Method: C:\MassHunter\Methods\Nitrosamines\MRM_NDMA_020720-FINAL.m
Column: Agilent Zorbax SB-Aq column (2.1 x 100 mm, 1.8 µm particle size)
RT: 1.6 min
Mobile Phase A: 5 mM NH4Ac in H2O
Mobile Phase B: Methanol
NDMA Quantifier Transition: m/z 75.1 -> 43.3
NDMA IS Quantifier Transition: m/z 81.1 -> 46.1
IS (7600 ng/mL): 19 uL of stock IS + 981 uL of Methanol

**Calibration Curve**
*Secondory Solutions*

| | Volume (µL) | Methanol Volume (µL) | Concentration (ng/mL) | |
|---|---|---|---|---|
| PS | | | 5000000 | |
| SS1 | 36 | 1764 | 100000 | 1.8mL |
| SS2 | 180 | 1620 | 10000 | 1.8mL |
| SS3 | 900 | 900 | 5000 | 1.8mL |
| SS4 | 400 | 1600 | 1000 | *2mL |
| SS5 | 1350 | 450 | 750 | 1.8mL |
| SS6 | 1200 | 600 | 500 | 1.8mL |
| SS7 | 900 | 900 | 250 | 1.8mL |
| SS8 | 720 | 1080 | 100 | 1.8mL |
| SS9 | 900 | 900 | 50 | 1.8mL |

75 ng/mL

**Calibration Curve**

| SS | Volume SS (µL) | SGF (uL) | Concentration (ng/mL) | Calibration Curve | IS Volume (µL) |
|---|---|---|---|---|---|
| SS2 | 500 | 4450 | 1000 | CC1 | 50 |
| SS3 | 500 | 4450 | 500 | CC2 | 50 |
| SS4 | 500 | 4450 | 100 | CC3 | 50 |
| SS5 | 500 | 4450 | 75 | CC4 | 50 |
| SS6 | 500 | 4450 | 50 | CC5 | 50 |
| SS7 | 500 | 4450 | 25 | CC6 | 50 |
| SS8 | 500 | 4450 | 10 | CC7 | 50 |
| SS9 | 500 | 4450 | 5 | CC8 | 50 |

| Quality Control: | Solution | Volume (µL) | SGF (uL) | Concentration (ng/mL) | IS Volume (µL) |
|---|---|---|---|---|---|
| QC-High | SS1 | 37.5 | 4912.5 | 750 | 50 |
| QC-Mid | SS1 | 15 | 4935 | 300 | 50 |
| QC-Low | SS2 | 15 | 4935 | 30 | 50 |

To Page No. 22

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| Mayda | 10/28/21 | Recorded by: | 10/26/21 |

CONFIDENTIAL INFORMATION

TITLE GSK/BI baseline Project No. lev

Book No. 018-kc

From Page No. 23

- page 9

[illegible]

→ Samples > 1000ng/tablet were diluted 1:10 or 1:100 to fit linear range

[illegible]

[illegible]

[illegible]

KC 11/1/21

- CHM-0021.xls
- data on Oaktown Lemon Lav

- excel w/ dilutions of baseline
- update sheet!!!!

To Page No. 23

Witnessed & Understood by me, [signature] Date 10/29/21

Invented by:

Recorded by: [signature]

Date 10/27/21

Project No. ________

Book No. ________ TITLE ________

From Page No. ____

To Page No. ____

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| | | Recorded by: | |

CONFIDENTIAL INFORMATION

Project No. lev

TITLE Zone I-IVa + 15 cycles Book No. OTT-NC

From Page No. 25

- page 9

2c 11/2/21

























- PLEV-MBU8128
- Data → Lenne Lan

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| Majida | 11/01/21 | Recorded by: [signature] | 10/28/21 |

To Page No. 26

26 Project No. Lev

Book No. 078-Re TITLE Jenny API

11/4/21

From Page No. 26

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sample1 | 10g | K277082 | May-21 | Sample25 | 10g | K277082 | May-21 |
| Sample2 | 5g | K270276 | Aug-11 | Sample26 | 5g | K270276 | Apr-21 |
| Sample3 | 10g | K280719 | Oct-20 | Sample27 | 10g | K280719 | Oct-20 |
| Sample4 | 10g | K275985 | Apr-21 | Sample28 | 10g | K275985 | Apr-21 |
| Sample5 | 5g | K276459 | Apr-21 | Sample29 | 5g | K276459 | Apr-21 |
| Sample6 | 5g | K281431 | Oct-21 | Sample30 | 5g | K281431 | Oct-21 |
| Sample7 | 10g | K300203 | Dec-23 | Sample31 | 10g | K300203 | Dec-23 |
| Sample8 | 10g | K280403 | Sep-21 | Sample32 | 10g | K280403 | Sep-21 |
| Sample9 | 5g | K264718 | Jan-20 | Sample33 | 5g | K264718 | Jan-20 |
| Sample10 | 5g | K280417 | Sep-21 | Sample34 | 5g | K280417 | Sep-21 |
| Sample11 | 5g | K263347 | Nov-19 | Sample35 | 5g | K263347 | Nov-19 |
| Sample12 | 5g | K260780 | Aug-19 | Sample36 | 5g | K260780 | Aug-19 |
| Sample13 | 5g | K267448 | Apr-20 | Sample37 | 5g | K267448 | Apr-20 |
| Sample14 | 5g | K260742 | Aug-19 | Sample38 | 5g | K260742 | Aug-19 |
| Sample15 | 5g | K281156 | Sep-21 | Sample39 | 5g | K281156 | Sep-21 |
| Sample16 | 10g | K300726 | Dec-23 | Sample40 | 10g | K300726 | Dec-23 |
| Sample17 | 10g | K294122 | Apr-23 | Sample41 | 10g | K294122 | Apr-23 |
| Sample18 | 10g | K261244 | Aug-19 | Sample42 | 10g | K261244 | Aug-19 |
| Sample19 | 5g | K276228 | Apr-21 | Sample43 | 5g | K276228 | Apr-21 |
| Sample20 | 10g | K300200 | Dec-23 | Sample44 | 10g | K300200 | Dec-23 |
| Sample21 | 5g | K281132 | Sep-21 | Sample45 | 5g | K281132 | Sep-21 |
| Sample22 | 10g | K259632 | Jul-19 | Sample46 | 10g | K259632 | Jul-19 |
| Sample23 | 10g | K261062 | Aug-19 | Sample47 | 10g | K261062 | Aug-19 |
| Sample24 | 10g | K280387 | Sep-21 | Sample48 | 10g | K280387 | Sep-21 |

| | | | |
|---|---|---|---|
| Sample49 | K281408 | Sample 73 | K281408 |
| Sample50 | K294481 | Sample 74 | K294481 |
| Sample51 | K300197 | Sample 75 | K300197 |
| Sample52 | K300206 | Sample 76 | K300206 |
| Sample53 | K300723 | Sample 77 | K300723 |
| Sample54 | K299934 | Sample 78 | K299934 |
| Sample55 | K259937 | Sample 79 | K259937 |
| Sample56 | K261374 | Sample 80 | K261374 |
| Sample57 | K263023 | Sample 81 | K263023 |
| Sample58 | K263139 | Sample 82 | K263139 |
| Sample59 | K263321 | Sample 83 | K263321 |
| Sample60 | K265136 | Sample 84 | K265136 |
| Sample61 | K265915 | Sample 85 | K265915 |
| Sample62 | K266286 | Sample 86 | K266286 |
| Sample63 | K266590 | Sample 87 | K266590 |
| Sample64 | K270508 | Sample 88 | K270508 |
| Sample65 | K270717 | Sample 89 | K270717 |
| Sample66 | K270956 | Sample 90 | K270956 |
| Sample67 | K271740 | Sample 91 | K271740 |
| Sample68 | K271928 | Sample 92 | K271928 |
| Sample69 | K272338 | Sample 93 | K272338 |
| Sample70 | K275964 | Sample 94 | K275964 |
| Sample71 | K276668 | Sample 95 | K276668 |
| Sample72 | K280281 | Sample 96 | K280281 |

Jenny API testing
-procedure pg 9 or
CAM-5021,00

- data on excel master
- power point
- dilutions on excel

To Page No. 28

Witnessed & Understood by me, Date 11/03/21 Invented by: Recorded by: Date 11/2/21

[signature]

CONFIDENTIAL INFORMATION

TITLE "Gao" repeat study

Project No. Lev

Book No. 078-KC



From Page No. 27

Gao Conditions:

- 150mg tablet ranitidine
- 0.3mM Nitrite
- 37°C
- pH 1.2
- Reaction times 0 hour, 1 hour, 2 hour, 3 hour, and 4 hours.

1) Add 345mg sodium nitrite and 3.2g pepsin to 500mL water to make 10,000uM solution with pepsin activity 400.
2) For 5000uM: Take 25mL into 25mL water.
3) For 1000uM: Take 5mL into 45mL water.
4) For 100uM: Take 0.5mL into 49.5mL water.
5) For 0uM: Take 50mL water.
6) Adjust pH to 1.2.
7) Add 1-150mg ranitidine tablet.
8) Take timepoints at 0hr, 1hr, 2hr, 3hr, 4hr.
9) Centrifuge at 3000rpm for 10 minutes.
10) Take supernatant and filter.
11) Transfer to MS vial.

1) Add 345mg sodium nitrite and 3.2g pepsin to 500mL water to make 10,000uM solution with pepsin activity 400.
2) For 5000uM: Take 125mL into 125mL water.
3) For 1000uM: Take 25mL into 225mL water.
4) For 100uM: Take 2.5mL into 247.5mL water.
5) For 0uM: Take 250mL water.
6) Adjust pH to 1.2.
7) Add 1-150mg ranitidine tablet.
8) Take timepoints at 0hr, 1hr, 2hr, 3hr, 4hr.
9) Centrifuge at 3000rpm for 10 minutes.
10) Take supernatant and filter.
11) Transfer to MS vial.

11/4/21 KC

**Calibration Curve**

*Secondary Solutions*

| | Volume (µL) | Methanol Volume (µL) | Concentration (ng/mL) | |
|---|---|---|---|---|
| PS | | | 5000000 | |
| SS1 | 36 | 1764 | 100000 | 1.8mL |
| SS2 | 180 | 1620 | 10000 | 1.8mL |
| SS3 | 900 | 900 | 5000 | 1.8mL |

**Calibration Curve**

| SS | Volume SS (µL) | SGF (uL) | Concentration (ng/mL) | Calibration Curve | IS Volume (µL) |
|---|---|---|---|---|---|
| SS1 | 50 | 445 | 10000 | CC1 | 5 |
| SS1 | 25 | 470 | 5000 | CC2 | 5 |
| SS1 | 12.5 | 482.5 | 2500 | CC3 | 5 |
| SS2 | 50 | 445 | 1000 | CC4 | 5 |
| SS2 | 25 | 470 | 500 | CC5 | 5 |
| SS3 | 10 | 485 | 100 | CC6 | 5 |

| Quality Control: | Solution | Volume (µL) | SGF (uL) | Concentration (ng/mL) | IS Volume (µL) |
|---|---|---|---|---|---|
| QC-High | SS1 | 37.5 | 457.5 | 7500 | 5 |
| QC-Mid | SS1 | 15 | 480 | 3000 | 5 |
| QC-Low | SS2 | 15 | 480 | 300 | 5 |

11/4/21 KC

To Page No. 27

Witnessed & Understood by me, [signature]

Date 11/8/21

Invented by: [signature]

Recorded by:

Date 11/4/21

CONFIDENTIAL INFORMATION

Project No. Lw

Book No. OTHER

TITLE Jiang ABB data

From Page No. 26

26 11/5/21

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sample1 | 10g | K277082 | May-21 | 108.9 | Sample25 | 10g | K277082 | May-21 |
| Sample2 | 5g | K270276 | Aug-11 | 183.2 | Sample26 | 5g | K270276 | Apr-21 |
| Sample3 | 10g | K280719 | Oct-20 | 196.9 | Sample27 | 10g | K280719 | Oct-20 |
| Sample4 | 10g | K275985 | Apr-21 | 265.9 | Sample28 | 10g | K275985 | Apr-21 |
| Sample5 | 5g | K276459 | Apr-21 | 312.9 | Sample29 | 5g | K276459 | Apr-21 |
| Sample6 | 5g | K281431 | Oct-21 | 235.5 | Sample30 | 5g | K281431 | Oct-21 |
| Sample7 | 10g | K300203 | Dec-23 | 65.7 | Sample31 | 10g | K300203 | Dec-23 |
| Sample8 | 10g | K280403 | Sep-21 | 148.2 | Sample32 | 10g | K280403 | Sep-21 |
| Sample9 | 5g | K264718 | Jan-20 | 642.3 | Sample33 | 5g | K264718 | Jan-20 |
| Sample10 | 5g | K280417 | Sep-21 | 91.6 | Sample34 | 5g | K280417 | Sep-21 |
| Sample11 | 5g | K263347 | Nov-19 | 206.4 | Sample35 | 5g | K263347 | Nov-19 |
| Sample12 | 5g | K260780 | Aug-19 | 879.4 | Sample36 | 5g | K260780 | Aug-19 |
| Sample13 | 5g | K267448 | Apr-20 | 1104.0 | Sample37 | 5g | K267448 | Apr-20 |
| Sample14 | 5g | K260742 | Aug-19 | 1827.1 | Sample38 | 5g | K260742 | Aug-19 |
| Sample15 | 5g | K281156 | Sep-21 | 408.2 | Sample39 | 5g | K281156 | Sep-21 |
| Sample16 | 10g | K300726 | Dec-23 | 409.9 | Sample40 | 10g | K300726 | Dec-23 |
| Sample17 | 10g | K294122 | Apr-23 | 258.2 | Sample41 | 10g | K294122 | Apr-23 |
| Sample18 | 10g | K261244 | Aug-19 | 642.3 | Sample42 | 10g | K261244 | Aug-19 |
| Sample19 | 5g | K276228 | Apr-21 | 403.5 | Sample43 | 5g | K276228 | Apr-21 |
| Sample20 | 10g | K300200 | Dec-23 | 85.1 | Sample44 | 10g | K300200 | Dec-23 |
| Sample21 | 5g | K281132 | Sep-21 | 279.5 | Sample45 | 5g | K281132 | Sep-21 |
| Sample22 | 10g | K259632 | Jul-19 | 1195.7 | Sample46 | 10g | K259632 | Jul-19 |
| Sample23 | 10g | K261062 | Aug-19 | 2237.6 | Sample47 | 10g | K261062 | Aug-19 |
| Sample24 | 10g | K280387 | Sep-21 | 308.5 | Sample48 | 10g | K280387 | Sep-21 |

| | | |
|---|---|---|
| Sample49 | K281408 | 173.4 |
| Sample50 | K294481 | 261.1 |
| Sample51 | K300197 | 295.5 |
| Sample52 | K300206 | 305.5 |
| Sample53 | K300723 | 249.1 |
| Sample54 | K299934 | 113.7 |
| Sample55 | K259937 | 112.5 |
| Sample56 | K261374 | 302.0 |
| Sample57 | K263023 | 558.2 |
| Sample58 | K263139 | 265.3 |
| Sample59 | K263321 | 283.2 |
| Sample60 | K265136 | 1198.4 |
| Sample61 | K265915 | 1210.1 |
| Sample62 | K266286 | 2099.8 |
| Sample63 | K266590 | 523.6 |
| Sample64 | K270508 | 498.5 |
| Sample65 | K270717 | 454.1 |
| Sample66 | K270956 | 683.6 |
| Sample67 | K271740 | 401.3 |
| Sample68 | K271928 | 112.2 |
| Sample69 | K272338 | 367.5 |
| Sample70 | K275964 | 1386.9 |
| Sample71 | K276668 | 2214.2 |
| Sample72 | K280281 | 343.1 |

To Page No. 30

Witnessed & Understood by me,

Date 11/8/21

Invented by:

Recorded by:

Date 11/5/21

TITLE Tanner repeat

Project No. Len

Book No. 018-RL



From Page No. 29







RL 11/8/21

- Gao study from pg 27 was incorrect & not performed/analyzed
- after discussion w/ team will follow PLEV-N021921-D

V = 10mL

Nitrite = 0.3mM

pH: 3.0

Ranitidine = 1mM

To Page No. 29

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 11/8/21 | Recorded by: | 11/5/21 |

Project No. Lev
Book No. 018-Lev
TITLE Baseline Condition / uniformity testing

From Page No. 30

- protocol pg 9

RC 11/18/21

| | | | | | | |
|---|---|---|---|---|---|---|
| Sample1 | BI | 961314 | Sample25 | Sanofi Bulk Total | 960738 | |
| Sample2 | BI | 961998 | Sample26 | Sanofi Bulk Total | 958258 | |
| Sample3 | BI | 961321 | Sample27 | Sanofi Bulk Total | 960740 | |
| Sample4 | BI | 962250 | Sample28 | Sanofi Bulk Total | 960303 | |
| Sample5 | Sanofi Bulk Total | AL7681B | Sample29 | Sanofi Bulk Total | 960810 | |
| Sample6 | Sanofi Bulk Total | AL5815B | Sample30 | Sanofi Bulk Total | 958032 | |
| Sample7 | Sanofi Bulk Total | AM0306C | Sample31 | Sanofi Bulk Total | 960803 | |
| Sample8 | Sanofi Bulk Total | AL7685B | Sample32 | Sanofi Bulk Total | 960302 | |
| Sample9 | Sanofi Bulk Total | AM0116B | Sample33 | Sanofi Bulk Total | 957078 | |
| Sample10 | Sanofi Bulk Total | AM0320B | Sample34 | Sanofi Bulk Total | 960677 | |
| Sample11 | Sanofi Bulk Total | AM0308B | Sample35 | Sanofi Bulk Total | 960679 | |
| Sample12 | Sanofi Bulk Total | AL5812B | Sample36 | ZANTAC 75MG 10CT | 19A003U | 6.2 |
| Sample13 | Sanofi Bulk Total | AL5809B | Sample37 | Zantac 150mg Cool Mint 90ct | 19F506 | 2958.7 |
| Sample14 | Sanofi Bulk Total | 957264 | Sample38 | ZANTAC 150MG 12PC CLUB PK-SAMS | 9238CAWS | 137.1 |
| Sample15 | Sanofi Bulk Total | 960741 | Sample39 | Ranitidine | 1811000145 | 6517.2 |
| Sample16 | Sanofi Bulk Total | 960736 | Sample40 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample17 | Sanofi Bulk Total | 958256 | Sample41 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 |
| Sample18 | Sanofi Bulk Total | 960737 | Sample42 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 |
| Sample19 | Sanofi Bulk Total | 957265 | Sample43 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 |
| Sample20 | Sanofi Bulk Total | 957427 | Sample44 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 |
| Sample21 | Sanofi Bulk Total | 958263 | Sample45 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 |
| Sample22 | Sanofi Bulk Total | 958264 | Sample46 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 |
| Sample23 | Sanofi Bulk Total | 960739 | Sample47 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 |
| Sample24 | Sanofi Bulk Total | 960734 | Sample48 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sample49 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample73 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample50 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample74 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample51 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample75 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample52 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample76 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample53 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample77 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample54 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample78 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample55 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample79 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample56 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample80 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample57 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample81 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample58 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample82 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample59 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample83 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample60 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample84 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample61 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample85 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample62 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample86 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample63 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample87 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample64 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample88 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample65 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample89 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample66 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample90 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample67 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample91 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample68 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample92 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample69 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample93 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample70 | Zantac 150mg Cool Mint 90ct | 18C502 | 560.3 | Sample94 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample71 | ZANTAC TAB 150MG | Panama | 3451.0 | Sample95 | ZANTAC TAB 150MG | Panama | 3451.0 |
| Sample72 | ZANTAC TAB 150MG | Panama | 3451.0 | Sample96 | ZANTAC TAB 150MG | Panama | 3451.0 |
| | | | | Sample97 | ZANTAC TAB 150MG | Panama | 3451.0 |
| | | | | Sample98 | ZANTAC TAB 150MG | Panama | 3451.0 |
| | | | | Sample99 | ZANTAC TAB 150MG | Panama | 3451.0 |
| | | | | Sample100 | ZANTAC TAB 150MG | Panama | 3451.0 |

- AM-0021
- Data → Lam Lan

excel w/ dilution & master sheet

To Page No. 30

Witnessed & Understood by me, [signature] Date 11/18/21
Invented by: [signature] Date 11/18/21
Recorded by:

CONFIDENTIAL INFORMATION

TITLE Tanner/Gao/Outlier/uniformity results

Project No. Lev

Book No. GTB-RC



From Page No. 31






















RC 11/10/21

Data → Lemme Lev

To Page No. 31

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 11/11/21 | Recorded by: [signature] | 11/10/21 |

CONFIDENTIAL INFORMATION

Project No. Lev
Book No. 077 RC
TITLE SGF - salmon / ham

From Page No. 32

**"Food"**

1) Grind "food" in a 1 serving amount in water (<200mL).
2) Pour into 1L beaker and Q.S. to 250mL. **(Take aliquot for nitrite analysis)**
3) *Add 931.9mg KCl, add 1.6g pepsin, and adjust pH to 2.5 using HCl.*
4) Crush 1 Zantac tablet and add to beaker.
5) Take 1mL at time 0, 1, 2, 3, 4 hours. **Take pH at each timepoint.**
6) Add 10 uL IS (19uL stock + 981uL MeOH)
7) Centrifuge at 3950RPM for 10 minutes.
8) Filter centrifuge a 200 μL aliquot for 6 minutes at 15000 rpm.

**"Food" Alone**

- for nitrite analysis see 070-RC pg 29

1) Follow above procedure, excluding step 4.

**"Food" Recovery**

1) Follow above procedure, excluding step 4.
2) Add 25uL of SS3 (5000ng/mL) to make final concentration of 500ng/mL in 250mL.

| ADD PEPSIN | Food | Type | Timepoint |
|---|---|---|---|
| *Sample1* | Smoked Salmon | Alone | T0 |
| *Sample2* | Smoked Salmon | Zantac | T0 |
| *Sample3* | Smoked Salmon | NDMA | T0 |
| *Sample4* | Ham | Alone | T0 |
| *Sample5* | Ham | Zantac | T0 |
| *Sample6* | Ham | NDMA | T0 |
| *Sample7* | Smoked Salmon | Alone | T1.5 |
| *Sample8* | Smoked Salmon | Zantac | T1.5 |
| *Sample9* | Smoked Salmon | NDMA | T1.5 |
| *Sample10* | Ham | Alone | T1.5 |
| *Sample11* | Ham | Zantac | T1.5 |
| *Sample12* | Ham | NDMA | T1.5 |
| *Sample13* | Smoked Salmon | Alone | T2.5 |
| *Sample14* | Smoked Salmon | Zantac | T2.5 |
| *Sample15* | Smoked Salmon | NDMA | T2.5 |
| *Sample16* | Ham | Alone | T2.5 |
| *Sample17* | Ham | Zantac | T2.5 |
| *Sample18* | Ham | NDMA | T2.5 |
| *Sample19* | Smoked Salmon | Alone | T4 |
| *Sample20* | Smoked Salmon | Zantac | T4 |
| *Sample21* | Smoked Salmon | NDMA | T4 |
| *Sample22* | Ham | Alone | T4 |
| *Sample23* | Ham | Zantac | T4 |
| *Sample24* | Ham | NDMA | T4 |

Ham - pH
2.5, 2.7, 2.9, 2.9

Salmon - pH
2.5, 2.8, 2.7, 2.7

RC 11/10/21

Witnessed & Understood by me, Prajita
Date 11/11/21
Invented by:
Recorded by:
Date 11/10/21

To Page No. 32

CONFIDENTIAL INFORMATION

TITLE Simulation, long-term stability Project No. Lev 33
Book No. 078-RC

From Page No. 33

Sanofi 150mg_Shade_30cycles
Sanofi Cool Mint_Shade_30cycles
Sanofi 75mg_Shade_30cycles
BI 150mg_Shade_30cycles
GSK 150mg Spain_Shade_30cycles
GSK 150mg Greece_Shade_30cycles

Sanofi 150mg_Sun_30cycles
Sanofi Cool Mint_Sun_30cycles
Sanofi 75mg_Sun_30cycles
BI 150mg_Sun_30cycles
GSK 150mg Spain_Sun_30cycles
GSK 150mg Greece_Sun_30cycles

Sanofi 150mg_Shower_30cycles
Sanofi Cool Mint_Shower_30cycles
Sanofi 75mg_Shower_30cycles
BI 150mg_Shower_30cycles
GSK 150mg Spain_Shower_30cycles
GSK 150mg Greece_Shower_30cycles

AL7319_Shade_15cycles
19D561_Shade_15cycles
753969_Shade_15cycles
18H008M_Shade_15cycles
19D561_Shade_15cycles
9116CAWS_Shade_15cycles
18N024U_Shade_15cycles
19E573_Shade_15cycles
9238CAWS_Shade_15cycles

AL7319_Sun_15cycles
19D561_Sun_15cycles
753969_Sun_15cycles
18H008M_Sun_15cycles
19D561_Sun_15cycles
9116CAWS_Sun_15cycles
18N024U_Sun_15cycles
19E573_Sun_15cycles
9238CAWS_Sun_15cycles

AL7319_Shower_15cycles
19D561_Shower_15cycles
753969_Shower_15cycles
18H008M_Shower_15cycles
19D561_Shower_15cycles
9116CAWS_Shower_15cycles
18N024U_Shower_15cycles
19E573_Shower_15cycles
9238CAWS_Shower_15cycles

Sanofi AL4219B 75mg_ZoneI_4 weeks
Sanofi AL4891B 150mg_ZoneI_4 weeks
Sanofi 19D563 Cool Mint 150mg_ZoneI_4 weeks
GSK 150mg Spain_ZoneI_4 weeks
GSK 150mg Greece_ZoneI_4 weeks
BI 853526 75mg_ZoneI_4 weeks

Sanofi AL4219B 75mg_ZoneII_4 weeks
Sanofi AL4891B 150mg_ZoneII_4 weeks
Sanofi 19D563 Cool Mint 150mg_ZoneII_4 weeks
GSK 150mg Spain_ZoneII_4 weeks
GSK 150mg Greece_ZoneII_4 weeks
BI 853526 75mg_ZoneII_4 weeks

Sanofi AL4219B 75mg_ZoneIII_4 weeks
Sanofi AL4891B 150mg_ZoneIII_4 weeks
Sanofi 19D563 Cool Mint 150mg_ZoneIII_4 weeks
GSK 150mg Spain_ZoneIII_4 weeks
GSK 150mg Greece_ZoneIII_4 weeks
BI 853526 75mg_ZoneIII_4 weeks

Sanofi AL4219B 75mg_ZoneIVa_4 weeks
Sanofi AL4891B 150mg_ZoneIVa_4 weeks
Sanofi 19D563 Cool Mint 150mg_ZoneIVa_4 weeks
GSK 150mg Spain_ZoneIVa_4 weeks
GSK 150mg Greece_ZoneIVa_4 weeks
BI 853526 75mg_ZoneIVa_4 weeks

Sanofi AL4219B 75mg_Accel_4 weeks
Sanofi AL4891B 150mg_Accel_4 weeks
Sanofi 19D563 Cool Mint 150mg_Accel_4 weeks
GSK 150mg Spain_Accel_4 weeks
GSK 150mg Greece_Accel_4 weeks
BI 853526 75mg_Accel_4 weeks

RC 11/11/21

- see protocol on step 9 or CAM 021.00
- continuing stability study (4 weeks).
- continuing simulation study (30 cycles / 15 cycles).
per PLEV-NB210812C
- add'l baseline per CAM 021.00
- see master sheet for samples & dilutions (1:10 or 1:100)
data → Learn Lev

To Page No. 33

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| pratiba | 11/15/21 | Recorded by: [signature] | 11/11/21 |

CONFIDENTIAL INFORMATION

Project No. lov

Book No. 078-RC

TITLE Results- content uniformity/SGF-ham/salmon

From Page No. 34




3




4










To Page No. 34

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 11/15/21 | Recorded by: [signature] | 11/12/21 |

CONFIDENTIAL INFORMATION

TITLE Results - simulated (30 cycles) & stability (4 weeks)

Project No. Lev

Book No. 078-RC

From Page No. 35

- cont from 20







RC 11/12/21
















- data on Lowe Lon folder

To Page No. 35

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| Prajita | 11/15/21 | Recorded by: [signature] | 11/12/21 |

CONFIDENTIAL INFORMATION

Project No. Lev

Book No. 018-RL

TITLE Results - Sanofi RP - simulated (15 cycles)

From Page No. 36




15

Rc 11/10/21




16

- Ref NB 2108/213

- per request for Sanofi RP to be exposed to condition










To Page No. 36

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 11/15/21 | Recorded by: [signature] | 11/12/21 |

Project No. Len
Book No. 079-RC

TITLE Outlier Re-analysis

From Page No. 37

- see protocol on page 9

RC 11/12/21

| Description | Lot # | Expiration Date | NDMA |
|---|---|---|---|
| BULK ZANTAC 150MG | 960738 | 12/22/2019 | 14029.0 |
| BULK ZANTAC 150MG | 958258 | 12/10/2019 | 12696.5 |
| BULK ZANTAC 150MG | 960740 | 12/23/2019 | 12522.7 |
| BLK ZANTAC COOL MNT 150MG TABS | 960303 | 12/26/2019 | 12931.9 |
| BLK ZANTAC COOL MNT 150MG TABS | 960810 | 2/5/2020 | 12747.3 |
| BLK ZANTAC COOL MNT 150MG TABS | 958032 | 12/4/2019 | 13938.0 |
| BLK ZANTAC COOL MNT 150MG TABS | 960803 | 1/30/2020 | 13587.4 |
| BLK ZANTAC COOL MNT 150MG TABS | 960302 | 12/25/2019 | 12246.1 |

## Sanofi Bulk Ps Selection Outlier Re-analysis

| Description | Lot # | Expiration Date | NDMA | Re-analysis 1 | Re-analysis 2 | Re-analysis 3 |
|---|---|---|---|---|---|---|
| BULK ZANTAC 150MG | 960738 | 12/22/2019 | 14029.0 | 16817.8 | 15220.8 | 14861.6 |
| BULK ZANTAC 150MG | 958258 | 12/10/2019 | 12696.5 | 11061.5 | 9780.8 | 10893.9 |
| BULK ZANTAC 150MG | 960740 | 12/23/2019 | 12522.7 | 10364.6 | 13055.4 | 11917.3 |
| BLK ZANTAC COOL MNT 150MG TABS | 960303 | 12/26/2019 | 12931.9 | 13470.0 | 11974.0 | 10522.6 |
| BLK ZANTAC COOL MNT 150MG TABS | 960810 | 2/5/2020 | 12747.3 | 9992.3 | 10128.2 | 10506.7 |
| BLK ZANTAC COOL MNT 150MG TABS | 958032 | 12/4/2019 | 13938.0 | 14507.5 | 9329.4 | 12043.5 |
| BLK ZANTAC COOL MNT 150MG TABS | 960803 | 1/30/2020 | 13587.4 | 13404.9 | 14517.2 | 12009.5 |
| BLK ZANTAC COOL MNT 150MG TABS | 960302 | 12/25/2019 | 12246.1 | 11395.5 | 12672.4 | 11564.4 |

RC 11/12/21

- Sample diluted 1:100
- data → Levine
- CAM Ø2100

To Page No. 37

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 11/14/21 | Recorded by: [signature] | 11/12/21 |

CONFIDENTIAL INFORMATION

38 Project No. Lev
Book No. 015-Rc TITLE Gao Repeat
From Page No. 35

Gao Conditions:

- 150mg tablet ranitidine
- 0.3mM Nitrite
- Pepsin activity 400
- 37°C
- pH 1.2
- Reaction times 0 hour, 2 hour, 3 hour, 4 hour, and 6 hour.

RC 11/17/21

1) *Add 345mg sodium nitrite and 3.2g pepsin to 500mL water to make 10,000uM solution with pepsin activity 400.*
2) For 5000uM: Take 25mL into 25mL water.
3) For 1000uM: Take 5mL into 45mL water.
4) For 100uM: Take 0.5mL into 49.5mL water.
5) For 0uM: Take 50mL water.
6) Adjust pH to 1.2.
7) Add 1-150mg ranitidine tablet.
8) Take timepoints at 0hr, 1hr, 2hr, 3hr, 4hr.
9) Centrifuge at 3000rpm for 10 minutes.
10) Take supernatant and filter.
11) Transfer to MS vial.

RC 11/17/21

1) *Add 345mg sodium nitrite and 3.2g pepsin to 500mL water to make 10,000uM solution with pepsin activity 400.*
2) For 5000uM: Take 125mL into 125mL water.
3) For 1000uM: Take 25mL into 225mL water.
4) For 100uM: Take 2.5mL into 247.5mL water.
5) For 0uM: Take 250mL water.
6) Adjust pH to 1.2.
7) Add 1-150mg ranitidine tablet.
8) Take timepoints at 0hr, 1hr, 2hr, 3hr, 4hr.
9) Centrifuge at 3000rpm for 10 minutes.
10) Take supernatant and filter.
11) Transfer to MS vial.

- need + Ali said to follow PLAN-NB21812D

To Page No. 37

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 11/22/21 | Recorded by: [signature] | 11/17/21 |

TITLE Gao Repeat Results

Project No. Lev

Book No. 078-RL



From Page No. 39







RL 11/17/21



RL 11/17/21

~~10mL~~ 1mL volume

- data leave Lev

PLEV-NB 210812D → protocol

To Page No. 39

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 11/22/21 | Recorded by: [signature] | 11/17/21 |

CONFIDENTIAL INFORMATION

Project No. lav
Book No. OTT-RR
TITLE ~~Flavor in vitro~~ SGF + DMA

From Page No. 90

RC 11/22/21

Condition 1 - "Food"

1) Grind "food" in a 1 serving amount in water (<200mL).
2) Pour into 1L beaker and Q.S. to 250mL. **(Take aliquot for nitrite analysis)**
3) *Add 931.9mg KCl, add 1.6g pepsin, and adjust pH to 2.5 using HCl.*
4) Take 990uL at time 0, 0.5, 1, 1.5, 2, 2.5, 3, 3.5, 4 hours. Add to 15mL conical. **Take pH at each timepoint.**
   a. **Take additional 150uL at each timepoint for DMA analysis.**
5) Add 10 uL IS (19uL stock + 981uL MeOH).
6) Centrifuge at 3950RPM for 10 minutes.
7) Filter centrifuge a 200 µL aliquot for 6 minutes at 15000 rpm.

Condition 2 - "Food" then Zantac

1) Grind "food" in a 1 serving amount in water (<200mL).
2) Pour into 1L beaker and Q.S. to 250mL.
3) *Add 931.9mg KCl, add 1.6g pepsin, and adjust pH to 2.5 using HCl. Wait 30 minutes.*
4) Crush 1 Zantac tablet and add to beaker.
5) Follow steps 4-7 from Condition 1.

Condition 3 – Zantac then "Food"

1) *Add 931.9mg KCl and 1.6g pepsin to 250mL water in 1L beaker. Adjust pH to 2.5 using HCl.*
2) Crush 1 Zantac tablet and add to beaker. *Wait 30 minutes.*
3) Grind "food" and add to 1L beaker and Q.S. to 250mL.
4) Follow steps 4-7 from Condition 1.

Condition 4 - "Food" and NDMA Recovery

1) Grind "food" in a 1 serving amount in water (<200mL).
2) Pour into 1L beaker and Q.S. to 250mL.
3) *Add 931.9mg KCl, add 1.6g pepsin, and adjust pH to 2.5 using HCl.*
4) Add 25uL of **SS3** (5000ng/mL) to make final concentration of 500ng/mL in 250mL.
5) Follow steps 4-7 from Condition 1.

Condition 5 – Zantac Alone

1) *Add 931.9mg KCl and 1.6g pepsin to 250mL water in 1L beaker. Adjust pH to 2.5 using HCl.*
2) Crush 1 Zantac tablet and add to beaker.
3) Follow steps 4-7 from Condition 1.

To Page No. 40

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| prajila | 11/24/21 | Recorded by: [signature] | 11/22/21 |

CONFIDENTIAL INFORMATION

TITLE Ali Pill testing

Project No. [illegible]

Book No. [illegible]

From Page No. 41

1- BI tablets (2x75mg)

2- "

3- BI API (Exp Jan 2022) 150mg
12071910007

4- GSK tablets

5- GSK tablets

6- GSK Api (exp Dec 29 2023)
K300726

- protocol pg 9

API - K300200, K300203, K280417, K265915, K264718, K300726

BI H060006 G1

follow PLEN-N3210812B

To Page No. 41

Witnessed & Understood by me, [signature]

Date 11/29/21

Invented by:

Recorded by: [signature]

Date 11/23/21

Project No. lev

Book No. 078-RC

TITLE SGF - sausage & ham

From Page No. 42




55g serving size

RC 12/2




84g serving size

RC 12/2

PLOV-NB210812C

- Data → Letter lav → SGF_ reprocals

Witnessed & Understood by me,

Date 12/3/21

Invented by:

Recorded by:

To Page No. 42

Date

TITLE BASELINE - Patheon

Project No. Lev

Book No. 078-rec

From Page No. 43

- more baseline testing for late arriving samples

| | Chattem Material Description | Batch | Mfg Date | SLED (Exp Date) |
|---|---|---|---|---|
| 1 | Zantac 150 mg F/C Tablets | AK4384A | 11/16/2018 | 11/30/2021 |
| 2 | Zantac 150 mg F/C Tablets | AK5712A | 1/28/2019 | 1/31/2022 |
| 3 | Zantac 150 mg F/C Tablets | AK5713A | 1/29/2019 | 1/31/2022 |
| 4 | Zantac 150 mg F/C Tablets | AK8860A | 4/5/2019 | 4/30/2022 |
| 5 | Zantac 150 mg F/C Tablets | AK9258A | 4/5/2019 | 4/30/2022 |
| 6 | Zantac 150 mg F/C Tablets | AL1178A | 4/8/2019 | 4/30/2022 |
| 7 | Zantac 150 mg F/C Tablets | AL1193A | 5/18/2019 | 5/31/2022 |
| 8 | Zantac 150 mg F/C Tablets | AL1198A | 5/20/2019 | 5/31/2022 |
| 9 | Zantac 150 mg F/C Tablets | AL4888A | 6/18/2019 | 6/30/2022 |
| 10 | Zantac 150 mg F/C Tablets | AL4890A | 6/19/2019 | 6/30/2022 |
| 11 | Zantac 150 mg F/C Tablets | AL5814A | 7/20/2019 | 7/31/2022 |
| 12 | Zantac 150 mg F/C Tablets | AL5816A | 8/9/2019 | 8/31/2022 |
| 13 | Zantac 150 mg F/C Tablets | AK4365A | 11/17/2018 | 11/30/2021 |
| 14 | Zantac 150 mg F/C Tablets | AM0309A | 9/29/2019 | 9/30/2022 |
| 15 | Zantac 150mg 24ct (CHATTEM) | AL5800B | 7/16/2019 | 7/31/2022 |
| 16 | Zantac 150mg 24ct Dollar Store (CHATTEM) | AL5803B | 7/17/2019 | 7/31/2022 |
| 17 | ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH1925B | 3/21/2017 | 3/31/2020 |
| 18 | ZANTAC 150MG TABLETS BOTTLE X65 1465 | AH7776A | 7/25/2017 | 7/31/2020 |
| 19 | ZANTAC 150MG TABLETS BOTTLE X66 1465 | AJ1646A | 11/17/2017 | 11/30/2020 |
| 20 | ZANTAC 150MG COOL TABS BTLX65 1717 | AK0118B | 4/2/2018 | 4/30/2020 |
| 21 | ZANTAC 150MG COOL TABS BTLX65 1717 | AK0119A | 4/2/2018 | 4/30/2020 |

| | Sanofi Material Description | Batch | Mfg Date | SLED (Exp Date) | Patheon API batch |
|---|---|---|---|---|---|
| 22 | ZANTAC 75 MG TABS X 60 CANADA | AM0140B | 9/27/2019 | 8/31/2022 | AL7832 |
| 23 | ZANTAC 150MG COOL TABS BC X48 CANADA | AJ1966E | 3/28/2018 | 2/28/2020 | AH8893 |
| 24 | ZANTAC 150MG COOL TABS BC X48 CANADA | AK0466C | 9/25/2018 | 8/31/2021 | AK2957 |
| 25 | ZANTAC 150MG TABLETS BTL X 84 CANADA | AK3007B | 11/17/2018 | 10/31/2020 | AK6455 |
| 26 | Zantac150mg Cool Mint (J&J Can) Top Coat | AL5744B | 7/22/2019 | 6/30/2021 | AL3325 |
| 27 | ZANTAC 150MG COOL TABS BC X 80 CANADA | AJ6709C | 7/21/2018 | 6/30/2020 | AJ8379 |
| 28 | ZANTAC 150MG TABS CARTON X130 CANADA | AL1816B | 4/4/2019 | 3/31/2021 | AK8987 |
| 29 | ZANTAC 150MG TABLETS BTL X 84 CANADA | AL3341B | 4/15/2019 | 3/31/2021 | AK9845 |
| 30 | ZANTAC 150MG TABLETS BTL X 84 CANADA | AL8737C | 7/24/2019 | 6/30/2021 | AL4385 |
| 31 | ZANTAC 150MG CM TAB BCX24 CAN (w/coup) | AL0629C | 4/5/2019 | 3/31/2021 | AK8988 |
| 32 | ZANTAC 150MG CM TAB BCX24 CAN (w/coup) | AL4136C | 6/18/2019 | 5/31/2021 | AL0365 |
| 33 | ZANTAC 75 MG TABS B/C X 10 CANADA | AJ6858B | 5/8/2018 | 4/30/2021 | AJ5939 |
| 34 | ZANTAC 75 MG TAB B/C X 30 CANADA | AJ6858C | 5/8/2018 | 4/30/2021 | AJ5939 |
| 35 | ZANTAC 150MG TABS B/C 8'S CANADA | AK5589B | 1/31/2019 | 12/31/2020 | AK8335 |

| | API Material Description | Batch | Mfg Date | SLED (Exp Date) |
|---|---|---|---|---|
| 36 | RANITIDINE HCL, USP | AL7832 | 5/17/2019 | 5/31/2022 |
| 37 | RANITIDINE HCL, USP | AH8893 | 9/15/2017 | 9/14/2020 |
| 38 | RANITIDINE HCL, USP | AK2957 | 7/25/2018 | 7/31/2021 |
| 39 | RANITIDINE HCL, USP | AK6455 | 9/22/2018 | 9/30/2021 |
| 40 | RANITIDINE HCL, USP | AL3325 | 2/22/2019 | 2/28/2022 |
| 41 | RANITIDINE HCL, USP | AJ8379 | 4/6/2018 | 4/30/2021 |
| 42 | RANITIDINE HCL, USP | AK8987 | 11/5/2018 | 11/30/2021 |
| 43 | RANITIDINE HCL, USP | AK9845 | 12/10/2018 | 12/31/2021 |
| 44 | RANITIDINE HCL, USP | AL4385 | 3/14/2019 | 3/31/2022 |
| 45 | RANITIDINE HCL, USP | AK8988 | 11/8/2018 | 11/30/2021 |
| 46 | RANITIDINE HCL, USP | AL0365 | 12/19/2018 | 12/31/2021 |
| 47 | RANITIDINE HCL, USP | AJ5939 | 2/13/2018 | 2/28/2021 |
| 48 | RANITIDINE HCL, USP | AK8335 | 11/1/2018 | 11/30/2021 |

RC 12/2

- data → Lerm Lev
→ excel w/ dilutions & update "master sheet" !!!!

To Page No. 43

Witnessed & Understood by me, [signature]

Date 12/6/21

Invented by:

Recorded by: [signature]

Date 12/2/21

CONFIDENTIAL INFORMATION

Project No. Lev

Book No. 078-[illegible]

TITLE SGF-bacon

From Page No. 44




RL 12/2/21

14g serving size

PLev-NB2[illegible]c

Dating Lemme Low

nitrite on donor

To Page No. 44

| Witnessed & Understood by me, | Date | Invented by: | Date |
| --- | --- | --- | --- |
| [signature] | 12/6/21 | Recorded by: [signature] | 12/3/21 |

CONFIDENTIAL INFORMATION

TITLE Baseline - Pathway data

Project No. Lev

Book No. 078-RC

From Page No. 45

| | Name | Final Conc. | Accuracy |
|---|---|---|---|
| 5 | 5ngmL | 5.7 | 113.5 |
| 10 | 10ngmL | 9.8 | 98.3 |
| 25 | 25ngmL | 24.3 | 97.0 |
| 50 | 50ngmL | 46.4 | 92.8 |
| 75 | 75ngmL | 77.7 | 103.6 |
| 100 | 100ngmL | 98.1 | 98.1 |
| 500 | 500ngmL | 462.1 | 92.4 |
| 1000 | 1000ngmL | 1040.9 | 104.1 |
| 12.5 | QC-12.5ngmL | 11.9 | 94.9 |
| 150 | QC-150ngmL | 148.6 | 99.1 |
| 750 | QC-750ngmL | 749.9 | 100.0 |
| 12.5 | QC-12.5ngmL | 12.0 | 96.0 |
| 150 | QC-150ngmL | 179.9 | 119.9 |
| 750 | QC-750ngmL | 775.8 | 103.4 |

RC 12/3/21







RC 12/3/21

CHM-S021.06

Data → Lam Lav

- update excel & email

To Page No. 45

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| prajila. | 12/6/21 | Recorded by: | 12/3/21 |

Project No. LW
Book No. 078-RC
TITLE SGF - Sausage data

From Page No. 46







RC 12/13/21




12/13/21 RC

– data Low Low → SGF_ repeats
Plan - NB210812C

To Page No. 46

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 12/6/21 | Recorded by: [signature] | RC 12/13/21 |

TITLE SGF - Ham/Bacon results

Project No. Len

Book No. 078-RC

From Page No. 47







RC 12/6/21







RC 12/6/21







RC 12/6/21

- data Leon Leon → SGF_repeats
- excel

To Page No. 47

Witnessed & Understood by me, Prajakta

Date 12/7/21

Invented by:

Recorded by: [signature]

Date 12/6/21

Project No. lav

Book No. OTT-RL

TITLE SGF - hot dog results

From Page No. 47













RC 12/7/21

-50 g serving size

PLev-NB210812C

data lemon lav → SGF_repeats

To Page No. 49

| Witnessed & Understood by me, | Date | Invented by: / Recorded by: | Date |
|---|---|---|---|
| [signature] | 12/8/21 | [signature] | 12/7/21 |

TITLE NDMA testing - stability / SGF

Project No. Lev

Book No. 078 [illegible]

From Page No. 48

- initiated Ali tablet zone stability 12/20
- initiated API stab 12/20 PLOV-NB210812B
- initiated Syrup stab 12/20






















- dilutions see excel on data → Lev
- added baseline testing!
- excel w/ sample dilution

To Page No. 50

Witnessed & Understood by me, [signature]

Date 1/14/22

Invented by: [illegible] 1/12/22

Recorded by: [signature]

Date 1/12/22

Project No. Ur
Book No. 078-Ur
TITLE EP tablet /API Stab. 4 week

From Page No. 50

-all tablet stability at 4 weeks

- test 1/17 for Plav -M3210812B

-API 4 week on same

## Zone I




| | K300200 | K300203 | K280417 | K265915 | K264718 | K300726 | 1406000061 |
|---|---|---|---|---|---|---|---|
| Baseline | 94.3 | 61.3 | 95.6 | 1300.2 | 702.5 | 420.6 | 57.9 |
| 2 week | 222.6 | 269.3 | 404.1 | 2434.6 | 646.0 | 459.0 | 325.2 |
| 4 week | 326.2 | 452.8 | 602.3 | 3519.4 | 731.8 | 735.4 | 429.7 |

1/18/22

## Zone II




| | K300200 | K300203 | K280417 | K265915 | K264718 | K300726 | 1406000061 |
|---|---|---|---|---|---|---|---|
| Baseline | 94.3 | 61.3 | 95.6 | 1300.2 | 702.5 | 420.6 | 57.9 |
| 2 week | 310.8 | 214.6 | 378.9 | 2747.2 | 595.8 | 590.8 | 381.4 |
| 4 week | 315.4 | 428.4 | 583.4 | 3911.6 | 637.3 | 798.0 | 474.0 |

1/18/22

To Page No. 51

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| [signature] | 1/20/22 | Recorded by: [signature] | 1/18/22 |

CONFIDENTIAL INFORMATION

Case 9:20-md-02924-RLR Document 6169-6 Entered on FLSD Docket 12/30/2022 Page 319 of 325



TITLE 4 week stab

Project No. lev

Book No. 018-rl

From Page No. 50

1/18/22

## Zone III




| | K300200 | K300203 | K280417 | K265915 | K264718 | K300726 | 1406000061 |
|---|---|---|---|---|---|---|---|
| Baseline | 94.3 | 61.3 | 95.6 | 1300.2 | 702.5 | 420.6 | 57.9 |
| 2 week | 198.9 | 269.0 | 430.3 | 2396.5 | 609.5 | 552.8 | 400.2 |
| 4 week | 335.7 | 450.9 | 635.4 | 3680.9 | 713.3 | 704.6 | 502.3 |

1/17/22

## Zone IVa




| | K300200 | K300203 | K280417 | K265915 | K264718 | K300726 | 1406000061 |
|---|---|---|---|---|---|---|---|
| Baseline | 94.3 | 61.3 | 95.6 | 1300.2 | 702.5 | 420.6 | 57.9 |
| 2 week | 162.9 | 307.5 | 411.2 | 2425.4 | 591.1 | 439.9 | 440.9 |
| 4 week | 346.2 | 493.9 | 625.5 | 3613.6 | 718.0 | 715.9 | 622.9 |

To Page No. 52

Witnessed & Understood by me, [signature]

Date 1/20/22

Invented by:

Recorded by: [signature]

Date 1/18/22

CONFIDENTIAL INFORMATION

Project No. Lev
Book No. 018 [illegible]
TITLE 4 week Stab.

From Page No. 52

Accelerated 1/18/22




| | K300200 | K300203 | K280417 | K265915 | K264718 | K300726 | 1406000061 |
|---|---|---|---|---|---|---|---|
| ■ Baseline | 94.3 | 61.3 | 95.6 | 1300.2 | 702.5 | 420.6 | 57.9 |
| ■ 2 week | 336.3 | 418.6 | 518.9 | 2409.5 | 640.6 | 596.8 | 511.9 |
| ■ 4 week | 477.6 | 644.8 | 797.1 | 4326.9 | 797.5 | 858.6 | 699.3 |

- CAM 021 for testing
- see excel on DATA → Lev for dilutions
- samples >1000 at 2 weeks will be diluted 1:10 or 1:100 (on excel on [illegible] Lev folder)



| Witnessed & Understood by me, | Date | Invented by: / Recorded by: | Date |
|---|---|---|---|
| [signature] | 1/20/22 | [signature] | 1/18/22 |

CONFIDENTIAL INFORMATION

TITLE 4 week stab

Project No. lev

Book No. 018-PC

From Page No. 52

Rc 1/18/22

## Zone I




| | 1602000360 | 1604000011 | K280417 | K259632 | 1903000391 |
|---|---|---|---|---|---|
| Baseline | 1163.6 | 340.0 | 91.6 | 1195.7 | 251.7 |
| 2 week | 2518.0 | 436.1 | 410.8 | 2977.5 | 433.9 |
| 4 week | 3582.1 | 760.5 | 705.7 | 4539.4 | 773.1 |

## Zone II




| | 1602000360 | 1604000011 | K280417 | K259632 | 1903000391 |
|---|---|---|---|---|---|
| Baseline | 1163.6 | 340.0 | 91.6 | 1195.7 | 251.7 |
| 2 week | 2931.7 | 553.8 | 471.1 | 2814.4 | 617.8 |
| 4 week | 3441.2 | 720.4 | 732.6 | 3274.0 | 732.9 |

## Zone III




| | 1602000360 | 1604000011 | K280417 | K259632 | 1903000391 |
|---|---|---|---|---|---|
| Baseline | 1163.6 | 340.0 | 91.6 | 1195.7 | 251.7 |
| 2 week | 1936.5 | 474.3 | 516.9 | 2825.3 | 659.1 |
| 4 week | 3534.9 | 855.0 | 652.4 | 4702.9 | 775.2 |

To Page No. 53

Witnessed & Understood by me, [signature] Date 1/20/22

Invented by: Date 1/18/22

Recorded by: [signature]

CONFIDENTIAL INFORMATION

Project No. Lev

Book No. 0118-RL

TITLE 4 week stab

From Page No. 53

RC Zone IVa 1/18/22




| | 1602000360 | 1604000011 | K280417 | K259632 | 1903000391 |
|---|---|---|---|---|---|
| Baseline | 1163.6 | 340.0 | 91.6 | 1195.7 | 251.7 |
| 2 week | 2319.4 | 542.1 | 527.0 | 3346.5 | 623.6 |
| 4 week | 3710.4 | 874.2 | 831.6 | 4423.1 | 798.5 |

- stability studies done!
- excel or data → Levin w/ figs + dilutions for samples > 1000 ng/mL (1:10 or 1:100) → on Levin Lar folder

PLev-NB2108121R or Server

To Page No. 55

Witnessed & Understood by me, [signature] Date 1/20/22

Invented by:

Recorded by: [signature] Date 1/18/22

CONFIDENTIAL INFORMATION

TITLE Validation Summary Table

Project No. Ken
Book No. Oxin

From Page No. 53

**Validation Summary Table for NDMA Quantitation in Ranitidine in SGF**

| Description | NDMA |
|---|---|
| Short description of method | Reverse-phase HPLC with MS/MS detection |
| Matrix | 50 mM KCl, Pepsin activity 400, 1 N HCl |
| Analyte | NDMA |
| Internal Standard (IS) | NDMA-$d_6$ |
| Calibration concentrations | 5 ng/mL to 1000 ng/mL |
| QC concentrations | 12.5 ng/mL (QC-L), 150 ng/mL (QC-M), 750 ng/mL (QC-H) |
| Lower limit of quantitation | 5 ng/mL<br>Within run accuracy 91.8% |
| Linearity | $R^2$ = 0.9985 (1/x weighting) |
| QC accuracy | QC low: 97.5%<br>QC mid: 105.1%<br>QC high: 100.4% |
| QC % Cv (within-run precision) | QC low: 0.3%<br>QC mid: 0.8%<br>QC high: 0.4% |

- add'l work w/ Eshan's draft manuscript

**Validation Summary Table for NDMA Quantitation in Ranitidine Pills**

| Description | NDMA |
|---|---|
| Short description of method | Reverse-phase HPLC with MS/MS detection |
| Analyte | NDMA |
| Internal Standard (IS) | NDMA-$d_6$ |
| Calibration concentrations | 5 ng/mL to 1000 ng/mL |
| QC concentrations | 12.5 ng/mL (QC-L), 150 ng/mL (QC-M), 750 ng/mL (QC-H) |
| Lower limit of quantitation | 5 ng/mL<br>Within run accuracy 87.3% |
| Linearity | $R^2$ = 0.996 (1/x weighting) |
| QC accuracy | QC low: 119.8%<br>QC mid: 102.1%<br>QC high: 97.4% |
| QC % Cv (within-run precision) | QC low: 4.9%<br>QC mid: 8.7%<br>QC high: 4.5% |

**Validation Summary Table for NDMA Quantitation in Ranitidine in NAP Studies**

| Description | Ranitidine |
|---|---|
| Short description of method | Reverse-phase HPLC with MS/MS detection |
| Matrix | 6% Acetic acid with 40 mM nitrite |
| Analyte | NDMA |
| Internal Standard (IS) | NDMA-$d_6$ |
| Calibration concentrations | 5 ng/mL to 1000 ng/mL |
| QC concentrations | 12.5 ng/mL (QC-L), 150 ng/mL (QC-M), 750 ng/mL (QC-H) |
| Lower limit of quantitation | 5 ng/mL<br>Within run accuracy 86.9% |
| Linearity | $R^2$ = 0.9978 (1/x weighting) |
| QC accuracy | QC low: 97.6%<br>QC mid: 91.2%<br>QC high: 89.7% |
| QC % Cv (within-run precision) | QC low: 1.3%<br>QC mid: 12.6%<br>QC high: 2.6% |

RC 1/19/22

To Page No. 55

Witnessed & Understood by me, [signature] Date 1/20/22

Invented by:

Recorded by: [signature] Date 1/19/22

56 Project No. 078-RC Lw
Book No. 6 TITLE KSCN study

From Page No. 56

- Plan - NB21081210
- from Neal & documents add 100 μM nitrite & 1000 μM nitrite w/ Ø, 500 μM KSCN, & 1000 μM KSCN
- data stored on lab Lan server







To Page No. 56

| Witnessed & Understood by me, | Date | Invented by: | Date |
|---|---|---|---|
| Mujita | 01/24/22 | Recorded by: [signature] | 1/20/22 |

CONFIDENTIAL INFORMATION

TITLE

Project No.

Book No.

From Page No.

To Page No.

Witnessed & Understood by me, | Date | Invented by: | Date

Recorded by: