**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                    MDL NO. 2924
PRODUCTS LIABILITY                            20-MD-2924
LITIGATION

                                    JUDGE ROBIN L. ROSENBERG
                            MAGISTRATE JUDGE BRUCE E. REINHART

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**


**PLAINTIFFS' OPPOSITION TO BRAND DEFENDANTS' MOTION TO EXCLUDE
PLAINTIFFS' EXPERTS, RAMIN NAJAFI, PH.D., CHARLES DAVIS, PH.D. AND
OTHER EXPERTS WHO RELY ON THEIR OPINIONS[1]**


DATED: August 1, 2022

_____

[1] This Motion is filed under seal pursuant to the Order at D.E. 5684.

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

FACTUAL BACKGROUND ...........................................................................................3

    A.    Analytic Chemistry Reveals NDMA in Ranitidine ................................................3

    B.    Dr. Ron Najafi and Emery Pharma .........................................................................4

    C.    Emery Pharma's Ranitidine Research and Citizen Petition to the FDA.................5

    D.    Liquid Chromatography and Mass Spectrometry ....................................................6

    E.    Governmental Agencies, Independent Laboratories, and Pharmaceutical
           Companies Use LC-MS/MS to Test Ranitidine for NDMA Contamination .........11

    F.    Emery Pharma's Testing of NDMA in Ranitidine .................................................12

LEGAL STANDARD.......................................................................................................17

ARGUMENT 19

I.    Dr. Najafi's Opinion is Based on State-of-the-Art Liquid Chromatography
    and Mass Spectrometry Techniques that Reliably Measure NDMA Quantities
    in Ranitidine..............................................................................................................19

II.    Dr. Najafi's Opinion is Based on Experiments that Reliably Measure NDMA
    Concentrations in Ranitidine in a Range of Conditions that Simulate Real-World
    Circumstances ...........................................................................................................27

    A.    Baseline Testing......................................................................................................29

    B.    Consumer Experience .............................................................................................31

    C.    Meat Matrix ............................................................................................................34

III.    Emery Pharma Meticulously Documented its Testing, Enabling Any Scientist
    to Evaluate its Results...............................................................................................38

IV.    Plaintiffs' Experts Reasonably Relied on Emery Pharma's Reliable Testing ..................43

V.    Defendants' Remaining Arguments Lack Merit.............................................................46

CONCLUSION..................................................................................................................48

# TABLE OF AUTHORITIES

*Barnes v. Gen. Motors Corp.*,
547 F.2d 275 (5th Cir. 1977) ...........................................................................18

*Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*,
No. 10-23869-CIV, 2012 WL 13012778 (S.D. Fla. May 24, 2012)...............................42

*Black v. Rhone-Poulenc, Inc.*,
19 F. Supp. 2d 592 (S.D.W. Va. 1998)...........................................................43

*Burchfield v. CSX Transp., Inc.*,
636 F.3d 1330 (11th Cir. 2011) ..........................................................................18

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993).........................................................................18, 46

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ..............................................................................26

*Hamilton v. Southland Christian Sch., Inc.*,
680 F.3d 1316 (11th Cir. 2012) ..........................................................................45

*Hi-Tech Pharms. Inc. v. Dynamic Sports Nutrition, LLC*,
No. 1:16-CV-949-MLB, 2021 WL 2185699 (N.D. Ga. May 28, 2021)....................19, 26

*In re Egidi*,
571 F.3d 1156 (11th Cir. 2009) ..........................................................................45

*Johnson v. Mead Johnson & Co., LLC*,
754 F.3d 557 (8th Cir. 2014) ..............................................................................19

*Jones v. Otis Elevator Co.*,
861 F.2d 655 (11th Cir.1988) ....................................................................30, 31, 38, 44

*Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours & Co.*,
90 F. Supp. 3d 746 (S.D. Ohio Mar. 10, 2015)...................................................30

*Manpower, Inc. v. Ins. Co. of Pa.*,
732 F.3d 796 (7th Cir. 2013) ..............................................................................30

*MidAmerica C2L Inc. v. Siemens Energy Inc.*,
25 F.4th 1312 (11th Cir. 2022) ..........................................................................18

*Moore v Intuitive Surgical, Inc.*,
995 F.3d 839 (11th Cir. 2021) ..........................................................................18

*Morehouse v. Louisville Ladder*,
  No. CIV.A. 3:03-887-22, 2004 WL 2431796 (D.S.C. June 28, 2004) .............................43

*Nelson v. Freightliner, LLC*,
  154 F. App'x 98 (11th Cir. 2005) ...................................................................................31

*Palazzolo v. Hoffman La Roche, Inc.*,
  No. A-3789-07T3, 2010 WL 363834 (N.J. Super. Ct. App. Div. Feb. 3, 2010) ..............43

*Quiet Tech, DC-8 v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) .............................................................................19, 46

*Reese v. CSX Transp., Inc.*,
  No. CV 118-215, 2020 WL 5740253 (S.D. Ga. Sept. 24, 2020) .....................................24

*Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*,
  282 F.R.D. 655 (M.D. Fla. 2012).....................................................................................43

*Residences at Ocean Grande, Inc. v. Allianz Glob. Risks U.S. Ins. Co.*,
  No. 07-22656, 2009 WL 7020044 (S.D. Fla. Sept. 9, 2009) ......................................29–30

*Robinson v. Nationstar Mortg. LLC*,
  No. CV TDC-14-3667, 2019 WL 4261696 (D. Md. Sept. 9, 2019) ................................25

*Rutz v. Novartis Pharms. Corp.*,
  No. 12-CV-0026-MJR, 2012 WL 12842794 (S.D. Ill. Dec. 7, 2012) .............................25

*Smelser v. Norfolk S. Ry. Co.*,
  105 F.3d 299 (6th Cir. 1997) ......................................................................................42–43

*Snoznik v. Jeld-Wen*, Inc.,
  No. CIV.1:09CV42, 2010 WL 1924483 (W.D.N.C. May 12, 2010)................................42

*United States v. Chiaradio*,
  684 F.3d 265, 278 (1st Cir. 2012)....................................................................................25

*United States v. Diaz*,
  2006 WL 3512032 (N.D. Ca., 2006) ................................................................................40

*United States v. Hebshie*,
  754 F. Supp. 2d 89 (D. Mass. 2010) ................................................................................43

*United States v. Gissantaner*,
  990 F.3d 457 (6th Cir. 2021) ...........................................................................................19

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
  395 F.3d 416 (7th Cir. 2005) ...........................................................................................43

Fed. R. Evid. 702 ...........................................................................................17–18, 19

NATIONAL RESEARCH COUNCIL, REFERENCE MANUAL ON
        SCIENTIFIC EVIDENCE, at 529 (3d ed. 2011)................................................................18, 19

Plaintiffs submit this Response in Opposition to Brand Defendants' Motion to Exclude Opinions and Testimony of Plaintiffs' Experts, Ramin Najafi, Ph.D., Charles Davis, Ph.D., and Other Experts Who Rely on Their Opinions [D.E. 5732].

## INTRODUCTION

Dr. Ron Najafi, Ph.D. is a highly qualified, internationally recognized analytical chemist. He leads Emery Pharma, a renowned independent research laboratory that conducts research and development work relied on by the pharmaceutical industry and government. Emery Pharma specializes in analytical and bioanalytical chemistry, microbiology and cell biology services, custom synthesis, and general research and development. It is FDA inspected and registered, authorizing it to support pharmaceutical development including performing testing under cGMP/GLP standards as drugmakers prepare to submit new drugs for FDA approval. It is, by any measure, a world-leading analytical chemistry laboratory.

Defendants attempt to impugn Dr. Najafi's opinions as "litigation-driven" and thus unreliable. That accusation is both improper and implausible. On January 2, 2020, Dr. Najafi submitted a Citizen Petition to the Food and Drug Administration reporting the results of Emery Pharma's preliminary testing of ranitidine. Emery Pharma performed that testing using its sophisticated liquid chromatography and mass spectrometry (LC-MS/MS) techniques on its state-of-the-art instrumentation. That testing showed levels of NDMA, universally recognized as a potent carcinogen, that far exceeded the levels that the FDA had deemed safe. On April 1, 2020, after it conducted its own investigation that confirmed the results of Emery Pharma's testing, the FDA *granted* that petition and requested a full market withdrawal of all ranitidine products.

After the FDA's decisive action based on their research, Dr. Najafi and Emery Pharma continued their investigation into the presence of NDMA in ranitidine. That investigation ultimately yielded testing results that showed even higher levels of NDMA, especially when ranitidine is exposed to heat and humidity simulating the real-world conditions that consumers are likely to experience. Dr. Najafi's opinions in this litigation are based on that further testing.

Put plainly: prior to this litigation, the FDA trusted Dr. Najafi's work based on Emery Pharma's testing enough to pull every Zantac pill from every shelf in the country. Corporate clients have trusted Emery Pharma's laboratories for more than ten years. Yet Defendants nonetheless accuse Dr. Najafi and Emery Pharma of deploying an "unreliable" methodology to test ranitidine—despite the fact that their testing here used the same LC-MS/MS techniques that the

FDA deemed reliable enough to warrant initiating a historic product recall of the precise drug products that are at issue in this litigation. The Court should ignore that fantastical charge.

Beyond that baseless accusation, Defendants' substantive attacks on Dr. Najafi's expert scientific methodology are wholly without merit. Their complaints almost entirely rely on misrepresenting the factual record of Emery Pharma's sophisticated testing. First, they suggest that Emery Pharma's LC-MS/MS testing does not reliably measure the levels of NDMA in a sample of ranitidine. That is absurd. Courts, the FDA, and Defendants themselves rely on LC-MS/MS testing every day to evaluate pharmaceutical products for impurities. Indeed, the FDA recommended using precisely the technique that Emery Pharma used here to test NDMA levels in ranitidine. It even recommended the precise Agilent instrumentation that Emery Pharma used— except Emery Pharma used a newer and more advanced model. Defendants quibble with the "column" that Emery Pharma used, but that instrumentation was both scientifically sound and well-supported in the literature. They inaccurately claim that Emery Pharma's method was not validated, ignoring the Validation Summary Reports in Appendix A to Dr. Najafi's expert report, and his above-and-beyond "internal standard" confirmation of the accuracy of every single test. They complain that Emery Pharma used "manual integrations" to interpret the underlying raw LC-MS/MS data, but they fail to mention that manual integrations are widely accepted as a valid and often necessary step in LC-MS/MS data analysis.

Second, their attacks on Emery Pharma's consumer experience testing fare no better. That testing sought to determine the levels of NDMA that form in ranitidine exposed to levels of heat and humidity that consumers are likely to experience, and to simulated stomach conditions with foods consumers are likely to eat when taking an antacid. Defendants' complaints again misrepresent the record. They accuse Emery Pharma of lacking an "experimental design" in its selection of samples to test, ignoring that it ensured that it tested a wide cross section of products by different manufacturers with different batch and lot numbers. They suggest that the heat and humidity parameters Emery Pharma used do not accurately reflect real-world conditions, ignoring the host of independent scientific studies on which it relied to set those parameters. And they similarly complain about the parameters of Emery Pharma's simulated gastric fluid and meat studies. But Emery Pharma's testing of meat comports with the World Health Organization's methodology and other similar tests. Its reasonable and reliable innovation was to use actual meat rather than approximating food combinations with nitrite levels. In any event, all of these

concerns—even if they were valid—would go to the weight and not to the admissibility of Dr. Najafi's opinion.

Finally, Defendants accuse Emery Pharma of failing to adequately document its testing. That, too, is impossible to square with the record. Emery Pharma created and produced detailed protocols for each of its tests, prescribing precisely the instrumentation and parameters used and specifying the exact steps in the procedure. Defendants ignore those protocols. Emery Pharma then recorded what the analyst actually did in each testing run in detailed laboratory notebooks. Defendants complain, nonsensically, that those notebooks are insufficient because they refer back to the written protocols that Defendants previously ignored. And most importantly, Emery Pharma disclosed almost 100 gigabits of raw LC-MS/MS data that provides a comprehensive record of every single test run it performed, including the test's parameters, date, time, method, and results. A more comprehensive documentation of scientific tests is difficult to imagine.

In the end, Defendants faced a difficult challenge. The FDA, their federal regulator, accepted Dr. Najafi's opinions that ranitidine contains dangerous levels of NDMA. The FDA does not lightly initiate a total market withdrawal of a drug, doing so for only a handful of the thousands of OTC drugs on the market over the past 25 years. But it found Emery Pharma's testing so reliable, and Defendants' ranitidine so dangerous, that it did precisely that here. Defendants nonetheless attempt to convince this Court that, contrary to the opinion of the expert federal agency responsible for drug safety, Dr. Najafi's opinions and the testing by Emery Pharma was so unscientific that it could not even be *considered* by a jury. In that attempt, Defendants resorted to misrepresenting the record of Dr. Najafi's reliable opinions based on Emery Pharma's scientifically sound testing. The Court should reject that attempt and deny Defendants' motion.

## FACTUAL BACKGROUND

### A.    Analytic Chemistry Reveals NDMA in Ranitidine

On September 9, 2019, Valisure filed a Citizen Petition with the FDA explaining that it tested Zantac using gas chromatography-mass spectrometry (GC-MS), revealing concentrations of NDMA in excess of 2 million nanograms per tablet.[2] Over the next month, FDA published two methods to detect nitrosamines in ranitidine drug products. On September 13, 2019, the FDA

---

[2] Def. Ex. 100 (Valisure Citizen Petition) at tbl. 1.

published a liquid chromatography, high resolution mass spectrometry (LC-HRMS) method.[3] On October 17, 2019, the FDA published a liquid chromatography, tandem mass spectrometry (LC-MS/MS) method.[4] The FDA released this second method because it uses a triple quadruple (QQQ) platform, which is more widely available than the LC-HRMS platform.[5]

In November of 2019, the FDA announced two findings from its own testing of Zantac and other ranitidine drug products. First, the FDA reported that Valisure's GC-MS technique exposed ranitidine to high temperatures that caused it to degrade into high levels of NDMA. Second, the FDA reported that its own testing using LC-HRMS and LC-MS/MS, neither of which expose the sample to heat, still detected elevated levels of NDMA that exceeded the acceptable daily intake limit of 96 nanograms. In light of its findings, the FDA asked manufacturers to conduct their own laboratory testing and to voluntarily recall ranitidine if that testing found NDMA levels above the acceptable limit of 96 nanograms per day (or 0.32 ppm).[6]

## B.    Dr. Ron Najafi and Emery Pharma

Dr. Ron Najafi is a highly credentialed organic chemist who received B.S., M.S., and Ph.D. degrees in organic chemistry from the University of California. He has authored numerous peer-reviewed publications in chemistry and holds over 70 patents and pending patent applications on novel inventions. Dr. Najafi has extensive academic experience.[7] He has also worked in the pharmaceutical industry, holding scientific roles at Rhone Poulenc Rorer (now Sanofi-Aventis), Applied Biosystems (a division of Perkin Elmer, now Thermo Fisher), and Aldrich Chemical Company (now Millipore Sigma). In these roles, Dr. Najafi developed expertise in research and development of pharmaceuticals and pilot plant manufacturing. He has worked as a medicinal chemist and analytical chemist for decades, and as a lead scientist he has supervised dozens of

---

[3] Def. Ex. 89 (FDA, Liquid Chromatography-High Resolution Mass Spectrometry (LC-HRMS) Method for Determination of NDMA in Ranitidine Drug Substance and Drug Product, Sep. 13, 2019).

[4] *See* FDA, Liquid Chromatography-Tandem Mass Spectrometry (LC-MS/MS) Method for the Determination of NDMA in Ranitidine Drug Substance and Solid Dose Drug Product (https://www.fda.gov/media/131829/download) (last accessed July 31, 2022) ("FDA Method for the Determination of NDMA").

[5] *Id.*

[6] FDA, Statement on New Testing Results, Including Low Levels of Impurities in Ranitidine Drugs (https://www.fda.gov/news-events/press-announcements/statement-new-testing-results-including-low-levels-impurities-ranitidine-drugs) (last accessed July 30, 2022).

[7] Def. Ex. 17 (Najafi Rep.), Ex. 1: Curriculum Vitae.

chemists in pharmaceutical testing and research. He has shepherded numerous pharmaceutical products through development and FDA market approval and conducted root cause analyses into unknown impurities in pharmaceuticals already on the market. Defendants do not question Dr. Najafi's remarkable qualifications to testify on analytical testing.

Dr. Najafi founded three companies: CP Lab Safety, a company focused on environmental laboratory safety; NovaBay Pharmaceuticals, Inc., a pharmaceutical company centered on developing non-antibiotic antimicrobial therapies; and Najafi Pharma Inc. (doing business as Emery Pharma), where he currently serves as Chairman and CEO. Emery Pharma is a full-service contract research laboratory, specializing in analytical, bioanalytical chemistry, microbiology and cell biology services, custom synthesis, and general R&D and cGMP/GLP support. Emery Pharma employs eight Ph.D. chemists and biologists who work on research and development projects for the pharmaceutical industry. Emery Pharma is also an FDA registered and inspected laboratory, which authorizes it to conduct cGMP/GLP compliant work for pharmaceutical companies seeking to secure regulatory approval of a drug or manufacture a drug for sale.[8]

### C.    Emery Pharma's Ranitidine Research and Citizen Petition to the FDA

Prior to submitting its Citizen's Petition, Valisure asked Emery Pharma to corroborate its testing results using the GC-MS method. Emery Pharma reached similar results: its testing detected millions of nanograms of NDMA in each tablet of ranitidine. However, Emery Pharma—as the FDA later did—recognized that the GC-MS testing method itself could potentially cause NDMA to form by heating the sample 130ºC.[9] Accordingly, Emery Pharma began developing more accurate methods of measuring the quantity of NDMA in ranitidine and investigating its root cause.

Paralleling the FDA's efforts, Emery Pharma developed and validated an Ultrahigh Performance Liquid Chromatography ("UPLC") —Multiple Reaction Monitoring ("MRM", a type of LC-MS/MS) method for detecting NDMA that, in contrast to the GC-MS method, was designed to avoid heating the ranitidine samples to high temperatures.[10] From its preliminary investigation,

---

[8] Def. Ex. 40 (Najafi Dep. Tr.) at 471:3–9; 515:16–21.

[9] *Id.* at 472:3–14.

[10] As detailed in Emery Pharma's Citizen Petition, this method used the following LC-MS/MS instrumentation: Agilent 1290 Infinity UHPLC system, Agilent Zorbax SB-Aq, 2.1 x 100 mm, 1.8 μm particle size column, and Agilent Jet Stream Electrospray Ionization (AJS ESI) source. The Multiple Reaction Monitoring (MRM) transitions and mass spectrometry (MS) conditions for the

Emery Pharma learned that NDMA formed from degradation of the ranitidine molecule itself. And it confirmed that NDMA formation was not solely an artifact of high temperature testing methods, it detected elevated levels of NDMA in ranitidine using its LC-MS/MS technique.

Accordingly, on January 2, 2020, Dr. Najafi, on behalf of Emery Pharma, submitted a Citizen Petition to inform the FDA of its preliminary findings that the ranitidine molecule is inherently unstable and progressively accumulates NDMA at elevated temperatures.[11] On April 1, 2020, after conducting its own investigation, the FDA granted Emery Pharma's Citizen Petition, and requested a market withdrawal of all ranitidine (Zantac) products.[12]

### D.    Liquid Chromatography and Mass Spectrometry

Liquid chromatography (LC) and mass spectrometry (MS) are widely accepted scientific methods that are used together to measure the molecular components of a sample. In an LC-MS system, LC is used to physically separate molecular components. MS then tests isolated physical components to determine their chemical composition by subjecting the analyte to an electrical or magnetic field to measure its mass-to-charge ratio.[13] In Multiple Reaction Monitoring (MRM), a more sophisticated version of MS that Emery Pharma used in its testing, the MS apparatus uses two sequential mass analyzers to further improve sample identification and quantification by removing any remaining impurities after LC. In conjunction, the methods can thus be used to measure how much of a particular chemical—like NDMA—is present in a sample—like a Zantac tablet.

#### *Liquid Chromatography*

The first stage of the process, LC, physically separates a sample into its individual molecular components.[14] The LC apparatus separates the components of the sample by pushing a liquid (called the "liquid mobile phase") through a solid (called the "solid stationary phase")

---

identification of NDMA were 75.1 precursor and 43.3 product ions paired with fragmentor voltage of 48v, Collision Energy of 17 eV, retention time of 1.2 minutes with collision cell accelerator voltage of 4v, and 75.1 precursor and 58.3 product ions paired with fragmentor voltage of 60v and Collision Energy of 15 eV, retention time of 1.2 minutes with collision cell accelerator voltage of 4v. *See* Emery Pharma Citizen Petition to FDA dated January 2, 2020 (https://emerypharma.com/wp-content/uploads/2020/01/EP-Ranitidine-FDA-Citizen-Petition-v21-January-2-2020.pdf) (last accessed July 31, 2022).

[11] *See* Emery Pharma Citizen Petition to FDA dated January 2, 2020, *supra* note 10.

[12] Def. Ex. 95 (FDA Recall Notice).

[13] An "analyte" is a substance whose chemical constituents are being identified and measured.

[14] Def. Ex. 17 (Najafi Rep.) at ¶ 21.

composed of a fine-grained substance like silica or the carbon compound C18. The solid stationary phase is held in a "column." The liquid mobile phase transports the sample through the column holding the solid stationary phase. Standard LC uses gravity to move the liquid phase through the column, and high-performance or ultra-high-performance LC (HPLC or UPLC) forces the liquid phase through the column under high mechanical pressure using a pump.

This separation results from differential affinity between each chemical component of the sample and the liquid mobile phase versus the solid stationary phase.[15] For example, a chemical that binds strongly to the liquid mobile phase and repels the solid stationary phase will travel through the column quickly as it is flushed through with the liquid mobile phase. By contrast, a chemical that repels the liquid mobile phase and binds strongly to the solid stationary phase will travel through the column slowly as it clings to the solid stationary phase. Over time, chemicals traveling at these different rates through the column will travel different distances and therefore the separated chemical components emerge from the column at different times.

Different LC techniques use different columns containing different substances as their liquid mobile phases and solid stationary phases. These different columns offer different advantages for the separation of different mixes of chemical compounds. Two primary categories of columns are *normal phase* and *reverse phase* columns, which are differentiated by the polarity of their phases. Polar molecules have parts with a positive electrical charge and a negative chemical charge, analogous to a magnet with a positive pole and a negative pole. Non-polar molecules lack those differences in charge. There are a variety of subtypes of reverse phase columns, including a bonded ACE Excel C18-AR column suggested by the FDA's 2019 LC-MS/MS method,[16] and a hydrophilic interaction liquid chromatography (HILIC) column used by Emery Pharma.[17] GSK used both an ACE C18-AR column and a Phenomenex Synergi Hydro RP 150 x 2mm, 4-micron column in its Root Cause Analysis.[18] Peer-reviewed studies measuring NDMA in or formed from ranitidine have also used a wide range of columns: Abe et al., utilized a Shimpack ARATA C18

---

[15] *Id.*
[16] *See* FDA Method for the Determination of NDMA, *supra* note 4.
[17] Def. Ex. 18 (Najafi Rebuttal Rep.) at 9.
[18] *See* Ex. 43, GSK Root Cause Analysis at GSKZAN0000052018; King, et al., *Ranitidine Investigations into the Root Cause for the Presence of N-Nitroso-N,N-dimethylamine in Ranitidine Hydrochloride Drug Substances and Associated Drug Products*, Organic Process Research & Development, American Chemical Society, 2020.

7

column (also used by Yokoo et al.);[19] Braunstein, et al. used a Kinetex F5 HPLC column; Florian, et al., a study conducted in part by scientists affiliated with the FDA departed from the 2019 FDA method by using a Kinetex Biphenyl 100 Å column;[20] and Gao, et al., used an alternative LC-HRMS method.[21] No scientist has suggested that these different columns are unable to test NDMA accurately.

### *Mass Spectrometry*

After the LC isolates the various chemical components, an isolated component can be fed into a mass spectrometer to determine its chemical formula. Standard MS systems ionize——that is, change the charge of—the analyte, and then subject the ions to an electrical or magnetic field. The field deflects the ions in proportion to their mass-to-charge ratio. By measuring how much the ions are deflected, the MS detector can identify the analyte. The sophisticated MRM system that Emery Pharma used (and that the FDA recommended) adds steps to the MS process that offer even greater accuracy.[22] The output of the LC column is an imperfectly isolated chemical—for example, the peak containing NDMA may also contain trace amounts of other chemicals with similar affinity to the LC phases. The MRM system filters out any such remaining traces of other chemicals using quadrupoles, increasing the accuracy of the ultimate quantitation.[23] A quadrupole is a set of metal rods surrounding an empty center that are calibrated such that only ions of a particular sort will pass through.

As explained by Dr. Najafi in his Rebuttal Report,[24] MRM uses three quadrupoles (labeled Q1, Q2, and Q3) to further separate the sample before the MS detector measures both the deflection of the ions (which contains the information necessary to infer its chemical identity) and the relative intensity of the ion beam:

---

[19] *See* Abe et al., *Temperature-Dependent Formation of NDMA during the Storage of Ranitidine Reagent Powders and Tablets*, CHEM. PHARM. BULL. ADV. PUB. (2020); Yokoo et al., *Possible Root Causes of the Presence of NDMA in Ranitidine Hydrochloride*, Chem. Pharm. Bull 69, 872-876 at 876 (2021).
[20] *See* Def. Ex. 47 (Braunstein et al. 2021); Def. Ex. 49 (Florian et al. 2021).
[21] *See* Def. Ex. 50 (Gao et al. 2021).
[22] Def. Ex. 18 (Najafi Rebuttal Rep.) at 9-10.
[23] *Id.*
[24] *Id.* at 10.



The MRM's first quadrupole, a mass/charge (m/z) analyzer, specifically selects and isolates the analyte of interest. The ionized analyte (called "precursor ion" or "parent ion") then enters the second quadrupole, the collision cell, and fragments by colliding with an inert gas (such as nitrogen). Next, the fragments (called "product ions" or "daughter ions") enter the third quadrupole, another m/z analyzer, which separates analyte-specific product ions from the background. Finally, as in traditional MS, the ions that emerge from the third quadrupole pass through an electrical or magnetic field that deflects them in proportion to their mass-to-charge ratio. That deflected beam of ions then hits a detector that measures both the degree of deflection and the relative intensity of the ion beam.

The data generated by this detector can be plotted on a chromatograph, which depicts time on the X-axis and quantity on the Y-axis:



Each peak represents a different chemical component of the sample. The size of a peak represents the quantity of that chemical in the sample.[25] To measure the total quantity of a particular chemical in the sample, the analyst must calculate the area under each peak. Determining the area under the peak (and therefore the quantity of the chemical) is called integration. Computer programs can calculate that area using an algorithm, which is called automatic integration. However, because determining the beginning and end of each peak can be a matter of expert judgment, a skilled analyst sometimes overrides those computer-generated calculations, which is called manual integration. See Def. Ex. 40 (Najafi Dep. Tr.) at 444:22–445:9

_Validation_

Analytical chemists confirm the accuracy of their quantitation method by _validation_. The FDA established a standard set of criteria for LC validation: accuracy, precision, linearity of quantitation, range for quantitation, and specificity and selectivity.[26] These criteria collectively confirm that the technique consistently returns reliable and accurate measurements—for example, that it returns a measurement of 1000 nanograms of NDMA in a 150-milligram tablet of ranitidine when, and only when, the sample actually contains 1000 nanograms of NDMA.

In addition to validation, an analyst can confirm the accuracy of an LC-MS/MS measurement by using an _internal standard_. This technique is essential when the samples being tested already contain an unknown amount of the contaminant of interest, for example as all ranitidine tablets already contain an unknown quantity of NDMA. An internal standard involves

---

[25] In LC-MS/MS systems, the quantitation of the analyte is performed by integrating the chromatograph generated directly by the LC. That chromatograph plots the quantity of each chemical component that eluates from the column over time. The area under a peak is thus a direct measurement of the quantity of each chemical component. In LC-MS/MS using MRM, the curve records the intensity of the beam of ions hitting the detector. These peak integrations are then compared to a standard called a "calibration curve." That calibration curve reflects the MRM peak intensities for a series of standards with known analyte amounts. The calibration curve thus records the relationship between amounts of the analyte and MRM peak intensities. Using calibration curves, the analyst can convert the MRM peak integrations of an unknown sample into the amount of the analyte in the sample. Most of these tasks are performed by the Agilent MassHunter Quant software, including specifically peak integrations, calculations, calibration equation, and calculation of final concentration.

[26] _See_ FDA, Q2(R1) Validation of Analytical Procedures: Text and Methodology Guidance for Industry (November 2005) (https://www.fda.gov/media/152208/download) (last accessed July 31, 2022); ICH Harmonized Tripartite Guideline, Validation of Analytical Procedures: Text and Methodology   Q2(R1)   (November   2005)   (https://database.ich.org/sites/default/files/ Q2%28R1%29%20Guideline.pdf) (last accessed July 31, 2002).

spiking a sample with a known quantity of an isotope[27] of the contaminant of interest. For example, to validate an LC-MS/MS technique to measure NDMA in ranitidine, a lab spikes a ranitidine sample with NDMA-d6, which is chemically identical to NDMA except that it substitutes a heavier isotope of carbon in the dimethyl group. As a result, NDMA-d6 interacts with the LC-MS/MS system identically to NDMA *except* that its mass-to-charge ratio is different (because its mass is different) and therefore the MS detector will measure a different deflection of the NDMA-d6 ions. The lab can then compare the quantity of NDMA-d6 that the LC-MS/MS system measures in the sample with the known quantity of NDMA-d6 with which the lab spiked the sample to properly account for variability and accurately determine the amount of NDMA in the sample.[28] The analyst can thus determine degree of accuracy that the LC-MS/MS system measures the quantity of NDMA-d6 in the spiked sample. Because NDMA-d6 and NDMA interact with the LC-MS/MS system identically except for the degree of ion deflection, the system will measure the quantity of NDMA-d6 in the sample to the same degree of accuracy.

### E.   Governmental Agencies, Independent Laboratories, and Pharmaceutical Companies Use LC-MS/MS to Test Ranitidine for NDMA Contamination

After the FDA began its investigation, numerous governmental agencies, independent laboratories, and Defendants themselves used LC-MS/MS or LC-HRMC to test the levels of NDMA present in ranitidine. The FDA requested that manufacturers of ranitidine investigate the "true source of NDMA" and to understand the root cause.[29] For example, GSK conducted a Root Cause Analysis (RCA) into the presence of NDMA in "Ranitidine Hydrochloride Drug Substance and Associated Drug Products."[30] GSK's RCA determined that ranitidine degrades into NDMA through an intermolecular reaction between ranitidine molecules, in which the dimethyl group of one ranitidine molecule reacts with the nitrite of an adjacent ranitidine molecule to form NDMA. GSK determined that "NDMA levels increase over time" and "both temperature and relative humidity are significant factors impacting the actual rate of NDMA formation." The GSK RCA thus confirmed the findings of Emery Pharma that NDMA formation resulted from the self-

---

[27] An isotope is an atom with the same number of protons but more (or fewer) neutrons. For example, standard hydrogen atoms have one proton. Deuterium is an isotope of hydrogen that has one proton and one neutron. Most isotopes have similar chemical properties, but slightly different mass.

[28] Def. Ex. 17 (Najafi Rep.) at ¶ 109, 110, 112; Najafi Depo: 499:4-504:13.

[29] *See* Def. Ex. 92 (FDA Statement on New Testing Results).

[30] Ex. 43 GSK Root Cause Analysis.

catalyzed degradation of drug substance; and that time, heat and humidity generate NDMA.[31]

GSK's RCA utilized LC-MS/MS as a testing methodology. Foreign regulatory agencies, including EMA, Health Canada, Swissmedic, and the Australian Therapeutic Goods Administration, also used LC-MS/MS.[32] So too did scores of peer-reviewed studies, including Abe,[33] Gao,[34] and Florian.[35]

### F.    Emery Pharma's Testing of NDMA in Ranitidine

Dr. Najafi and Emery Pharma were retained by Plaintiffs "to investigate the presence of N-nitrosodimethylamine (NDMA) in ranitidine active pharmaceutical ingredient (API) and Zantac/ranitidine finished drug products including analyzing samples of ranitidine API and Zantac/ranitidine finished drug product for the possible presence of NDMA," among other things.[36] Emery Pharma performed the testing using state-of-the-art LC-MS/MS instrumentation: an Agilent 1290 Infinity UHPLC with either an Agilent 6470 Triple Quadrupole mass spectrometer or an Agilent 6460 Triple Quadrupole mass spectrometer. Emery Pharma tailored its choice of LC column to the specific needs of each of its tests: a Waters Acquity UPLC BEH Amide for baseline analyses of NDMA in ranitidine; an Agilent Zorbax C18 SB-aq column for NDMA in SGF and related studies; and a Waters Cortecs T3 column for ranitidine syrup analysis. It then used Agilent's MassHunter software for data processing and analysis. Emery Pharma's protocols for each test, including the instrumentation, preparation of the samples (including the temperature and humidity conditions for stability testing), preparation of the quality control samples, LC-MS/MS parameters (both UHPLC, MS/MS, and MRM parameters), and data analysis and processing protocols, are produced in Appendix A of Dr. Najafi's report. Emery Pharma validated its LC-MS/MS method for each type of study, demonstrating high levels of linearity and accuracy. Emery

---

[31] Ex. 43 GSK RCA at '51933.

[32] *See* EMA (https://www.ema.europa.eu/en/documents/referral/nitrosamines-emea-h-a53-1490-assessment-report_en.pdf); Health Canada (https://www.canada.ca/en/health-canada/services/drugs-health-products/compliance-enforcement/information-health-product/drugs/nitrosamine-impurities/test-methods.html#a2); Swissmedic (https://www.swissmedic.ch/swissmedic/en/home/news/mitteilungen/aufforderung-zlinhaberinnen-ham.html ); and Australian Therapeutic Goods Administration (https://www.tga.gov.au/alert/nitrosamine-impurities-medicines-information-sponsors-and-manufacturers#useful-resources) (all last accessed Aug. 1, 2022).

[33] Abe et al. (2020), *supra* note 19.

[34] Def. Ex. 50 (Gao et al. 2021).

[35] Def. Ex. 49 (Florian et al. 2021).

[36] Def. Ex. 17 (Najafi Rep.) at ¶9.

Pharma's summary of its validation of its method for each type of study are also produced in Appendix A to Dr. Najafi's report. Emery Pharma also utilized an internal standard, exceeding the validation of other ranitidine testing.

Using these sophisticated LC-MS/MS techniques, Dr. Najafi and Emery Pharma conducted numerous tests on ranitidine to investigate its potential to degrade into NDMA under a range of circumstances relevant to real-world consumers. Three types of Emery Pharma's studies are relevant to Defendants' motion. First, Emery Pharma conducted baseline testing, which tests ranitidine products directly from the manufacturers, on samples it received directly from GSK, Boehringer Ingelheim, Sanofi, and Patheon.[37] Emery Pharma's baseline testing evaluated 254 batches in total, including 166 unexpired batches and 88 expired batches. Of the 254 total batches, 249 contained levels of NDMA exceeding the FDA's acceptable daily intake of 96 nanograms. For tablets, the level of NDMA ranged from 11.7 nanograms/150 mg to 14,991.6 nanograms/150 mg. For the unexpired tablets, the mean NDMA level for a 150 mg dose was 1,096.6 nanograms. For expired tablets, the mean NDMA level for a 150 mg dose was 2,222.2 nanograms. Emery Pharma's testing of ranitidine syrup, injectables, and effervescent doses showed that those products also contained NDMA. Emery Pharma also conducted baseline testing of ranitidine API—that is, the ranitidine hydrochloride drug substance that had not yet been incorporated into a finished product like a tablet. The baseline average NDMA levels in the equivalent of a 150 mg dose of ranitidine ranged from 57.9 to 6,671.4 nanograms. Every single lot of ranitidine API contained some level of NDMA.

Second, Emery Pharma conducted a series of consumer experience stability tests. Stability testing is a widely recognized method in analytical chemistry used by the pharmaceutical industry to investigate whether and how a drug changes or degrades over time when subjected to heat, humidity, and light.[38] The purpose of this testing was to investigate how much NDMA a consumer might be exposed to by ingesting ranitidine after storing it post-purchase, given that heat and humidity are known to accelerate ranitidine's degradation into NDMA. Emery Pharma's consumer experience stability testing subjected ranitidine to various combinations of temperature, humidity,

---

[37] Pfizer did not give Plaintiffs samples of its ranitidine.
[38] *See* Def. Ex. 17 (Najafi Rep.) at ¶ 140; FDA, Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products (November 2003) at 2 (https://www.fda.gov/media/71707/download) (last accessed July 31, 2022).

and time to simulate a range of real-life circumstances that consumers are likely to encounter: storage in a hot car, either in the sun or in the shade; storage in a bathroom; and storage in each of the climatic zones found in the continental United States. This is consistent with the recognition in March 2021 of the FDA Expert Working Panel, after ranitidine was withdrawn from the market, which stressed the importance of testing in "real world conditions," like a "hot mailbox," "glovebox in a car," "human bathroom," or "truck in the middle of summer in the southern U.S." to assess drug stability.[39] To simulate these physical conditions, Emery Pharma placed the samples in a Darwin chamber, a laboratory instrument that produces precise temperatures and humidity conditions.

The temperature and humidity parameters of Emery Pharma's consumer experience stability testing for the car and bathroom storage are as follows:

- To simulate storage in a car in the shade, Emery Pharma subjected the sample to a cycle that began with an ambient temperature of 25°C, then two hours at 40°C, followed by allowing the sample to return to an ambient temperature of 25°C.

- To simulate storage in a car in the sun, Emery Pharma subjected the sample to a cycle that began with an ambient temperature of 25°C, then two hours at 75°C, then four hours at 50°C, followed by allowing the sample to return to an ambient temperature of 25°C.

- To simulate storage in a bathroom, Emery Pharma subjected the sample to a cycle that began with samples at ambient bathroom conditions of 25°C and 40% relative humidity, then stored for 30 minutes at 40°C and 100% relative humidity (to replicate a hot shower in the bathroom), followed by allowing the sample to return to ambient conditions of 25°C and 40% relative humidity.

Emery Pharma measured the baseline levels of NDMA in these samples at the beginning of the testing, after 15 cycles, after 30 cycles, and after 50 cycles. All three types of storage showed extremely high levels of NDMA:

| | Baseline | NDMA per 150-mg tablet of ranitidine (baseline values from 174 ng – 2651.8 ng) |
|---|---|---|
| | | |

[39] Ex. 36 (FDA Working Group Transcript, Day 2) at 129:6-21.

14

| Car in Shade | 15 Cycles | 190.9 to 2778.0 ng |
| | 30 Cycles | 229.5 to 3279.9 ng |
| | 50 Cycles | 1045.3 to 6061.6 ng |
| Car in Sun | 15 Cycles | 262.9 to 3167.7 ng |
| | 30 Cycles | 264.0 to 3858.9 ng |
| | 50 Cycles | 1015.5 to 6981.1 ng |
| Bathroom/Shower | 15 Cycles | 411.1 to 3612.8 ng |
| | 30 Cycles | 850.1 to 4264.8 ng |
| | 50 Cycles | 2869.3 to 5322.2 ng |

The temperature and humidity parameters of Emery Pharma's consumer experience stability testing for the climatic zone testing are as follows:

- Zone I: 21°C ± 2°C with relative humidity of 45% ± 5%;

- Zone II: 25°C ± 2°C with relative humidity of 60% ± 5%;

- Zone III: 30°C ± 2°C with relative humidity of 35% ± 5%;

- Zone IVa: 30°C ± 2°C with relative humidity of 65% ± 5%;

- Accelerated Ambient: 40°C ± 2°C with relative humidity of 75% ± 5%.

The climatic zone testing exposed the samples to these conditions consistently for longer periods of time, rather than repeated cycles tested for the simulated storage in a car or in a bathroom. The purpose of this testing is to simulate storing ranitidine in various parts of the country with similar storage conditions. Like the other consumer experience testing, the climatic zone testing showed extremely high levels of NDMA develop over time:

| | Baseline | NDMA per 150-mg tablet of ranitidine (baseline values from 77.0 ng to 435.4 ng) |
| --- | --- | --- |
| Zone I | 2 weeks | 136.9 to 522.6 ng |
| | 4 weeks | 240.0 to 563.7 ng |

|  | 8 weeks | 232.2 to 452.3 ng |
| Zone II | 2 weeks | 102.4 to 540.3 ng |
|  | 4 weeks | 195.5 to 754.6 ng |
|  | 8 weeks | 252.9 to 897.3 ng |
| Zone III | 2 weeks | 131.5 to 537.3 ng |
|  | 4 weeks | 317.5 to 960.3 ng |
|  | 8 weeks | 335.9 to 1147.2 ng |
| Zone IVa | 2 weeks | 151.4 to 734.4 ng |
|  | 4 weeks | 490.4 to 786.8 ng |
|  | 8 weeks | 549.0 to 970.6 ng |
| Accelerated Ambient | 2 weeks | 182.3 to 1146.1 ng |
|  | 4 weeks | 404.0 to 1746.0 ng |
|  | 8 weeks | 765.8 to 2265.6 ng |

Third, Emery Pharma tested the levels of NDMA in ranitidine exposed to simulated gastric fluid (SGF). This testing was designed to measure the levels of NDMA that form from ranitidine endogenously—that is, after a person ingests a tablet. The scientific community commonly uses such *in vitro* studies, in laboratory equipment, to predict how a drug reacts *in vivo*, inside the human body. Pursuant to accepted scientific standards, Emery Pharma conducted its SGF studies at 37°C to mimic the temperature of the human body. Because stomach pH and nitrite levels can vary,[40] Emery Pharma also used varying pH and nitrite conditions to stimulate relevant conditions in the human stomach.

Emery Pharma conducted two types of SGF studies where the methods were modeled after

---

[40] Xu et al., N-Nitroso Compounds in Fresh Gastric Juice and Their Relation to Intragastric pH and Nitrite Employing an Improved Analytical Method, Carcinogenesis. 14(12): pp. 2547-51, 248 (Dec 1993).

the methods used by Braunstein[41] and Gao[42] The first set of studies tested NDMA formation at a variety of pH levels and nitrite levels. Ranitidine has a propensity to react with nitrite to form NDMA, and nitrite levels vary in the human stomach depending on a person's diet. Accordingly, these studies investigated how much NDMA would form *in vivo* in different stomach conditions— with more or less acidic conditions, and with more or less nitrite present. These studies demonstrated that NDMA formation increased with increasing nitrite levels, irrespective of the pH. They also showed that a constant pH of 2.5, more nitrites led to more NDMA formation. These studies thus confirmed that ranitidine reacts with nitrite in SGF to form NDMA.

The second set of studies investigated how ranitidine interacts with various foods in a typical American diet in SGF to form NDMA. These studies used several types of fully cooked meats: Smithfield Anytime Favorites Boneless Ham Steak Hickory Smoked; Oscar Mayer Center Cut Bacon; Ballpark Angus Beef Franks Original; and Johnsonville 100% Premium Pork Fully-Cooked Breakfast Sausage. The studies incubated a serving of the meat product with 150 mg of Zantac in SGF. The meat was pulverized prior to testing, to mimic the condition of food in the stomach after being chewed. The tests also varied the sequence of introducing the meat product and the Zantac: either introducing the Zantac 30 minutes before the meat, to mimic a person taking Zantac before a meal to prevent heartburn; or introducing Zantac 30 minutes after the meat, to mimic a person taking Zantac after a meal to relieve heartburn that had already developed. To confirm the validity of testing NDMA formation in a meat matrix, Emery Pharma also tested controlled SGF conditions with Zantac alone, meat alone, and meat with 500 ng/mL of NDMA spiked. Every meat study showed significant levels of NDMA, ranging as high as 78,500 ng of NDMA from a 150 mg tablet of Zantac incubated with ham for four hours.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert opinions. Under that rule:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will

---

[41] Def. Ex. 47 (Braunstein et al. 2021).

[42] Def. Ex. 50 (Gao et al. 2021). As Dr. Najafi explains, Gao et al. "relied heavily on literature sources for nitrite levels in human stomach that are many decades old" and "failed to acknowledge the dynamic nature of the stomach under physiological conditions and how that would contribute to the reaction of ranitidine with nitrite-rich food." Def. Ex. 17 (Najafi Rep.) at ¶¶ 179, 181.

help the trier of fact to understand the evidence or to determine a fact in issue;

      (b) the testimony is based on sufficient facts or data;

      (c) the testimony is the product of reliable principles and methods; and

      (d) the expert has reliably applied the principles and methods to the facts of

the case.

Fed. R. Evid. 702.

"[T]he purpose of the expert admissibility rules is to enlist the federal courts as 'gatekeepers' tasked with screening out 'speculative' and 'unreliable expert testimony.'" *MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1326 (11th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). The Eleventh Circuit has "distilled the expert admissibility inquiry into the following three factors:

      (1) the expert is qualified to testify competently regarding the matters he intends to address;

      (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and

      (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*Id.* There is no question of Dr. Najafi's qualifications.

The helpfulness prong "goes primarily to relevance." *Daubert*, 509 U.S. at 591. A "district court generally has 'wide discretion to admit evidence of experiments conducted under substantially similar conditions.'" *Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330, 1336 (11th Cir. 2011) (quoting *Barnes v. Gen. Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977)). Whether the conditions are substantially similar, and so helpful, will depend on Plaintiff-specific facts.

In analyzing reliability, the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "[W]hen analytical work is performed in certified, highly experienced laboratories, there is a reasonably high likelihood that the analytical results are reliable." NATIONAL RESEARCH COUNCIL, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, at 529 (3d ed. 2011) ("REFERENCE MANUAL").

"[T]he rejection of expert testimony is the exception rather than the rule." *Moore v Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) (quoting Fed. R. Evid. 702 Advisory

Committee's Note to 2000 Amendments); *see also Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) ("[C]ases are legion that, correctly, under *Daubert*, call for the liberal admission of expert testimony.").

## ARGUMENT

I.   **Dr. Najafi's Opinion is Based on State-of-the-Art Liquid Chromatography and Mass Spectrometry Techniques that Reliably Measure NDMA Quantities in Ranitidine.**

Defendants allege that Dr. Najafi's expert opinions are based on unreliable testing by Emery Pharma. That claim is simply false. Emery Pharma is an FDA-certified laboratory that routinely performs analytical chemistry testing on drug products for clients in the pharmaceutical industry and relied on by government. *See* REFERENCE MANUAL at 529–530 ("[W]hen analytical work is performed in certified, highly experienced laboratories, there is a reasonably high likelihood that the analytical results are reliable.").

For the testing on which Dr. Najafi relied in forming his expert opinions, Emery Pharma used state-of-the-art liquid chromatography and mass spectrometry instrumentation and techniques to measure the amounts of NDMA in ranitidine. *See, e.g.*, *Hi-Tech Pharms. Inc. v. Dynamic Sports Nutrition, LLC*, No. 1:16-CV-949-MLB, 2021 WL 2185699, at *7 (N.D. Ga. May 28, 2021) (recognizing that chromatography and mass spectrometry performed under standard operating procedures is a reliable methodology); *see also Quiet Tech, DC-8 v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1344 (11th Cir. 2003) (noting that computational flow dynamics testing software can produce reliable results). The protocols for Emery Pharma's LC-MS/MS testing are reported in Appendix A to Dr. Najafi's expert report.[43]

Emery Pharma's protocols are consistent with the FDA's published "LC-MS/MS Method for the Determination of NDMA impurity in Ranitidine Drug Substance or Solid Dosage Drug Product."[44] Both Emery Pharma's method and the FDA's published method use high pressure LC and MS with multiple reaction monitoring (MRM). For its LC system, the FDA's method suggested a "HPLC or UHPLC system equipped with temperature-controlled autosampler and column compartment" without specifying a particular brand or model.[45] Emery Pharma used an Agilent 1290 UHPLC, which is an "ultra-high performance" instrument that exceeds the FDA's

---

[43] *See* Def. Ex. 17 (Najafi Rep.), App'x A.
[44] *See* FDA Method for the Determination of NDMA, *supra* note 4.
[45] *Id.*

minimum specifications.[46] For its MS (MRM) system, the FDA method suggested an "Agilent 6420 Triple Quad LC/MS system with APCI source or equivalent."[47] Emery Pharma used an "Agilent 6470 Triple Quadrupole Mass Spectrometer,"[48] which is a more advanced model of the exact system the FDA recommended.[49] Indeed, the manufacturer specifically boasts that the 6470 is "one of the first triple quadrupole LC/MS analysis methods for the routine analysis of Nitrosamines."[50]

Agilent chromatographic instruments and the accompanying proprietary MassHunter software are widely known, used and accepted in the field of analytical chemistry. The LC-MS/MS systems, like the qualified ones at Emery Pharma, are routinely used in the pharmaceutical industry for research and development including identification and quantitation of impurities,[51] the general acceptance in the scientific community of Agilent's instruments and its MassHunter software satisfies Rule 702's requirement that the testing was the product of reliable principles and methods. *See United States v. Gissantaner*, 990 F.3d 457, 466–67 (6th Cir. 2021).

Emery Pharma validated its LC-MS/MS method for measuring NDMA. The data confirming that validation, for each type of study Emery Pharma performed, appear in Appendix A to Dr. Najafi's report.[52] That data show that Emery Pharma performed state-of-the-art validation, which shows an extremely accurate measurement of NDMA and thus demonstrates the reliability of its LC-MS/MS method. In addition, Emery Pharma used NDMA-d6 as an internal standard in every sample it tested.[53] As explained above, using NDMA-d6 as an internal standard confirms that the system accurately measures the amount of NDMA in a sample by exogenously spiking the sample with a known quantity of an isotope of NDMA that interacts with the LC-MS/MS system identically to NDMA except that it has a different mass-to-charge ratio and thus can be measured

---

[46] Def. Ex. 17 (Najafi Rep.), App'x A, p. 2. *See also* https://www.agilent.com/en/product/liquid-chromatography/hplc-systems/analytical-hplc-systems/1290-infinity-ii-lc-system (last accessed July 30, 2022).

[47] FDA Method for the Determination of NDMA, *supra* note 4.

[48] Def. Ex. 17 (Najafi Rep.), App'x A, p. 2.

[49] https://www.agilent.com/en/product/liquid-chromatography-mass-spectrometry-lc-ms/lc-ms-instruments/triple-quadrupole-lc-ms/6470b-triple-quadrupole-lc-ms.

[50] *Id.*

[51] Ex. 52 Steffes Decl. at ¶¶ 2-8; Def. Ex. 40 (Najafi Dep. Tr.) at 333:17–23.

[52] Def. Ex. 17 (Najafi Rep.), App'x A, pp. 29-33.

[53] *See, e.g.*, Def. Ex. 17 (Najafi Rep.), App'x A at 3 ("6.4.4. Add 990 μL methanol and 10 μL IS [i.e., internal standard NDMA-d6] to conical tube for a final concentration of 76 ng/mL for IS.").

separately from NDMA. The analyst then compares the LC-MS/MS system's measurement of NDMA-d6 to the known quantity with which the sample was spiked. Emery Pharma's use of an internal standard thus confirms—in every single sample tested—that its LC-MS/MS system accurately measured the amount of NDMA.

Defendants' arguments to the contrary rest on misunderstanding or misrepresenting the record. First, Defendants contend in passing that Emery Pharma failed to use standard operating procedures (SOPs) to guide its testing of NDMA levels in ranitidine. That contention misunderstands Emery Pharma's processes, which comport with industry standards. In this research investigation, Emery Pharma did not use the SOPs it uses for GMP/GLP work because those SOPs are designed to apply to the process of developing a drug for FDA approval (GLP)[54] or manufacturing a drug (GMP).[55] Those SOPs would therefore be inappropriate for the forensic studies Emery Pharma conducted here (which neither develop nor manufacture a drug).[56] Laboratories frequently perform work that is not developing drugs or manufacturing drugs, and do not use the inapplicable and unnecessary GLP or GMP for that work. Instead, Emery Pharma established detailed protocols for each of its tests[57] and performed its work in this case consistent with the methods Emery Pharma uses doing research and development work in the pharmaceutical field.[58] Those detailed protocols, which appear in Appendix A to Dr. Najafi's report, provide the specific parameters for each test and specify the exact steps the analysts followed in conducting the tests.

---

[54] *See* 81 Fed. Reg. 58,342 (Aug. 24, 2016) (https://www.govinfo.gov/content/pkg/FR-2016-08-24/pdf/2016-19875.pdf) ("The Food and Drug Administration (FDA) is proposing to amend the regulations for good laboratory practice (GLP) for nonclinical laboratory studies to require a complete quality system approach, referred to as a GLP Quality System, *when safety and toxicity studies support or are intended to support applications or submissions for products regulated by FDA*.") (emphasis added).

[55] *See* FDA, Current Good Manufacturing Practice (CGMP) Regulations (https://www.fda.gov/drugs/pharmaceutical-quality-resources/current-good-manufacturing-practice-cgmp-regulations) (last accessed July 31, 2020).

[56] *See* Def. Ex. 40 (Najafi Dep. Tr.) at 48:15–19.; Def. Ex. 18 (Najafi Rebuttal Rep.) at 1 ("It is well-accepted that research done to answer questions such as: *'Is NDMA present in ranitidine? If so, what is the source of NDMA and what factors give rise to its presence? Can ranitidine cause NDMA formation in vivo?'* entail research and development hypotheses, which by definition are not GLP/cGMP processes.").

[57] Def. Ex. 40 (Najafi Dep. Tr.) at 48:20–25, 49:1–3.

[58] Def. Ex. 17 (Najafi Rep.) at ¶ 11; Def. Ex. 40 (Najafi Dep. Tr.) at 333:5–334:22; 498:11–21.

Second, Defendants suggest (at 38) that "Emery invented all-new testing for litigation which has not been properly validated or subject to peer review." That, too, is false. As explained above, Emery Pharma used a state-of-the-art LC-MS/MS method for quantifying the amount of NDMA in ranitidine. The same overall method was used by the regulatory agencies and investigators in many peer-reviewed studies. And as explained above, Emery Pharma validated its method and instrumentation.

Defendants' argument appears to rest on a basic misunderstanding of that instrumentation. They note (at 38) that "[e]very regulatory body (e.g., FDA, Health Canada, Australian Therapeutic Goods Administration) and every peer-reviewed author who has ever reported on the levels of NDMA in ranitidine use a reverse-phase liquid chromatography mass spectrometry technique." But then they complain that "[d]espite the entire scientific community using one method, Emery used a completely different method for its baseline testing in litigation." That, again, is simply false. Defendants point to Emery Pharma's use of a HILIC column in its LC apparatus— specifically, in some of its testing Emery Pharma used a BEH Amide column manufactured by Waters Corporation.[59] But they fail to recognize that a HILIC column is a *type* of reverse-phase column. Thermo Fisher Scientific, a leading manufacturer of LC instruments and the parent company of Defendant Patheon, explains that "HILIC can be described as a variation of reversed phase chromatography performed using a polar stationary phase."[60] It elaborates that the "primary advantage of HILIC as a separation technique is the strong retention of polar, hydrophilic compounds that are unretained under conventional reversed phase conditions."[61] Waters Corporation similarly states that the BEH Amide column that Emery Pharma used is well-suited to "retain extremely polar compounds."[62] NDMA is widely recognized as an extremely polar, hydrophilic compound.[63] Accordingly, Dr. Najafi explained that "Emery determined that the BEH

---

[59] https://www.waters.com/webassets/cms/library/docs/720003122en.pdf (last accessed July 30, 2022).

[60] *HILIC Overview*, available at https://www.thermofisher.com/us/en/home/industrial/chromatography/chromatography-learning-center/liquid-chromatography-information/hilic-hplc-uhplc-columns-information/hilic-overview.html (last accessed July 30, 2022).

[61] *Id.*

[62] https://www.waters.com/webassets/cms/library/docs/720003122en.pdf (last accessed July 30, 2022).

[63] *See, e.g.*, National Toxicology Program, Dep. Health & Human Servs., *Report on Carcinogens*

Amide column offers better selectivity and separation for NDMA" because "NDMA is a highly polar analyte, and HILIC was developed as an alternative to *traditional* reversed phase just for such analytes."[64] Defendants' attack is like complaining that FDA said to use a BB gun, but Emery Pharma instead used an "official Red Ryder, carbine action, two-hundred shot range model air rifle."[65]

In summary, Emery Pharma used a validated LC-MS/MS method with instrumentation consistent with the FDA's published methodology. Emery Pharma selected a HILIC column— specifically, the BEH Amide column—from the various types of reverse phase LC columns because that column is particularly well-suited to separate a highly polar, hydrophilic compound like NDMA. Emery Pharma's LC-MS/MS method for measuring NDMA concentrations in ranitidine is plainly reliable.

Defendants also misunderstand the processes of analytical chemistry by suggesting that Emery Pharma's testing is unreliable because its analysts sometimes used manual integrations in quantitating the levels of NDMA in the tested samples of ranitidine. The process of integrating a chromatograph interprets the underlying raw data produced by the LC-MS/MS system. Modern LC-MS/MS MRM systems, like the ones Emery Pharma uses, can perform that integration automatically. But software is not perfect, and cannot override expert judgment. The software's developer agrees: "[a]t all times, *whether performed automatically or manually*, the integration must be scientifically justifiable."[66] Defendants' experts concede as much.[67]

Emery Pharma performed manual integrations only when the default integration was

---

(https://ntp.niehs.nih.gov/ntp/roc/content/profiles/nitrosamines.pdf) (last accessed July 30, 2022) (NDMA is "very soluble in water" and thus is hydrophilic); https://superfund.berkeley.edu/pdf/231.pdf ("Due to the presence of polar functional groups, NDMA is hydrophilic, with a $K_{OW}$ value of -0.57.") (citing Toxicology profile for *N*-nitrosodimethylamine, Agency for Toxic Substances and Disease Registry, U.S. Public Health Service).

[64] Def. Ex. 18 (Najafi Rebuttal Rep.) at 9 (emphasis added).

[65] *A Christmas Story*, Metro-Goldwyn-Mayer (1983) (Ralphie Parker).

[66] Controlling Chromatographic Integration to Ensure Data Integrity, at 1, available at https://www.agilent.com/cs/library/articlereprints/public/executivesummary-controlling-chromatographic-integration-LCGC-openlab-agilent.pdf (emphasis added) (last accessed July 30, 2022).

[67] *See* Ex. 3 Guengerich Supp. Rep. at 6 ("[I]t may sometimes be appropriate to make adjustments through manual integration.").

scientifically unsound.[68] As explained by Dr. Najafi, manual integration is a best-practices methodology that requires scientific judgment and analyst expertise.[69] Emery Pharma's sophisticated analysts are trained in manual integration techniques beginning in graduate school, with additional training at Emery Pharma based on Agilent's guidance.[70] In addition to covering regulatory cGMP and GLP requirements that are not applicable to this Research and Development project, the Agilent guidance covers topics including chromatographic processes to reportable result including second analyst review, review of an analytical run, inappropriate integration practices such as peak shaving, enhancing and evaluation of the chromatograms in a sequence (system suitability test injections, standards, controls and samples).[71]

　　　　Defendants' motion does not attempt to explain how *even one* of the manual integrations performed by Emery Pharma's highly skilled, Ph.D.-holding analysts were not scientifically justifiable. They passingly cite to Dr. Guengerich's supplemental report, but his purported criticisms of Emery Pharma's integrations are based on PDFs created for Defendants which do not show Emery Pharma's integrations, the positive control chromatogram, the internal standard and qualifier ion transitions. He thus attacks an incomplete data set upon which an opinion on *Emery Pharma's* integrations cannot properly be based.[72] In any event, integrations are interpretations of the underlying raw chromatogram about which expert opinions may reasonably differ. "[I]t is not the Court's responsibility to decide different interpretations of data, and Defendant[s] point[] to no justification under *Daubert* to exclude [an expert's] opinion" simply because his interpretation of the data differs from their experts' interpretation. *Reese v. CSX Transp., Inc.*, No. CV 118-215, 2020 WL 5740253, at *6 (S.D. Ga. Sept. 24, 2020). To the extent that Defendants' experts belatedly elect to explain their disagreement with the manual integrations contained in Dr. Najafi's report, that difference of opinion can go to the jury. *Id.*

　　　　Defendants' remaining complaints about Emery Pharma's testing methodology are similarly without merit. They note throughout their motion that Emery Pharma's testing has not been peer-reviewed, but they omit the fact that the materials produced to Plaintiffs were to be used

---

[68] Def. Ex. 40 (Najafi Dep. Tr.) at 449:13-450:11.
[69] Def. Ex. 40 (Najafi Dep. Tr.) 445:19–445:22; 441:9–441:15; 442:23–443:7; 445:10–445:14.
[70] *Id.* at 445:23–446:5; 447:10–450:11; Newton et al., *Integration and Interpretation of Data*, (Ebook sponsored by Agilent Technologies and presented in partnership with LCGC, June 2018).
[71] *Id.*
[72] Def. Ex. 40 (Najafi Dep. Tr.) at 433:3–18; 540:8–541:14.

for litigation purposes only, thus preventing publication and peer review.[73] Dr. Najafi has explained his intent to submit Emery Pharma's results for peer review and publication as soon as he is permitted to do so under the protective order.[74] Dr. Marletta testified that in his view Emery Pharma's testing would be published in a peer-reviewed scientific journal once the protective order is lifted.[75] Courts have consistently held, in accord with common sense, that no adverse inference may be drawn from an expert's work not having been peer reviewed when the sole reason is that it is subject to a protective order preventing publication.[76] *See Robinson v. Nationstar Mortg. LLC*, No. CV TDC-14-3667, 2019 WL 4261696, at *14 (D. Md. Sept. 9, 2019) ("Because Oliver analyzed proprietary databases and data specifically disclosed for this litigation pursuant to a protective order, such that Oliver's peers lack access to the same information, Oliver's expert testimony is not of the type that ordinarily would be subject to peer review, and it would be unfair to require 'general acceptance within a relevant scientific community.'" (citation omitted)). Defendants also err in complaining (at 39) that Dr. Najafi used a team of skilled analysts, most of

---

[73] *See, e.g.*, Order dated Sept. 15, 2021 (D.E. 4272), drafted by Defendants, ("BIPI is ordered to import into the United States and make full production . . . samples of active pharmaceutical ingredient (ranitidine) and bulk samples of finished Zantac tablets, which Plaintiffs and their designees are directed to use for non-commercial, litigation-related testing purposes only."). *See also* D.E. 4485 (October 6, 2021) and D.E. 4679 (November 18, 2021) (similar). Additionally, Defendants asserted that samples were being provided to Plaintiffs solely for purposes of use in these proceedings, and designated their documents that referenced these samples as Highly Confidential pursuant to PTO 26.
[74] *See* Def. Ex. 40 (Najafi Dep. Tr.) at 561:16-19 ("And, you know, so our hope is to be able to publish once the Court order confidentiality goes away and we would be able to publish.").
[75] *See* Def. Ex. 31 (Marletta Dep. Tr.) at 255:7–256:9.
[76] *See also Rutz v. Novartis Pharms. Corp.*, No. 12-CV-0026-MJR, 2012 WL 12842794, at *9 (S.D. Ill. Dec. 7, 2012) ("It is disingenuous to obtain a protective order precluding dissemination of certain documents and then claim that [the expert's] opinion is flawed because he did not seek peer review, which would have required him to violate the order."); *United States v. Chiaradio*, 684 F.3d 265, 278 (1st Cir. 2012) (internal citations and quotations omitted) ("[T]he defendant laments that [the computer analysis] has not been subjected to peer review in the scientific community. This is true as far as it goes—but it does not take the defendant very far. The *Daubert* factors are not a definitive checklist or test, but form the basis for a flexible inquiry into the overall reliability of a proffered expert's methodology. Here, moreover, there is a credible explanation for the absence of peer review. The record shows that the source code is purposely kept secret because the government reasonably fears that traders of child pornography (a notoriously computer-literate group) otherwise would be able to use the source code to develop ways either to evade apprehension or to mislead the authorities. This circumstance satisfactorily explains the absence of any peer review.").

25

whom have Ph.D. degrees, to assist in Emery Pharma's testing. That is routine, and no ground for exclusion. "An expert witness is permitted to use assistants in formulating his or her expert opinion …." *Hi-Tech Pharms. Inc.*, 2021 WL 2185699, at \*7 (citing *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002)).

Finally, Defendants err in contending (at 40-41) that Emery Pharma's meat incubation studies are unreliable because it did not validate its method for each meat matrix. The record says otherwise. Emery Pharma validated its method for measuring NDMA in SGF, which was present in every sample for every meat incubation study.[77] Emery Pharma used two additional techniques to confirm the reliability of its NDMA measurements in each meat matrix. First, every single sample it tested used NDMA-d6 as an internal standard.[78] That internal standard confirms that, for every single test of every single sample including every test of a sample in a meat matrix, Emery Pharma's LC-MS/MS method accurately measured the amount of NDMA in the sample. Second, in addition to validating its LC-MS/MS method for SGF, Emery Pharma considered several "control conditions" that further confirmed the reliability of its meat matrix studies. Def. Ex. 17 (Najafi Rep.) at ¶¶ 206-209. The "Control 1" condition tested meat alone, confirming that "none of the meat products evaluated inherently contained any detectable NDMA levels." *Id.* ¶ 207. The "Control 2" condition tested meat exogenously spiked with NDMA. *Id.* ¶ 206. Because meat alone had no detectable level of NDMA, as shown by Control 1, Control 2 confirmed that "the extraction recovery of NDMA from the complex meat matrix is acceptable (98.1% for Bacon to 103.1% for Ham), which underscores the validity of the data." *Id.* ¶ 209. Control 2 established this rate of extraction recovery because the only NDMA present in Control 2 was the exogenous NDMA spike, so Emery Pharma could compare the amount of NDMA measured in the meat matrix with the known quantity of the NDMA exogenous spike. *Id.* ¶¶ 197, 209. These additional steps further confirm, above and beyond the validation of the LC-MS/MS system with SGF, that Emery Pharma's measurements of NDMA in the meat matrix studies were reliable.

---

[77] *See* Def. Ex. 17 (Najafi Rep,) at App'x A, p. 30.

[78] *See* Def. Ex. 17 (Najafi Rep.), App'x A, p, 13 (providing that "Preparation of Test Samples" for meat matrix studies includes "[a]dd[ing] 10 µL IS [i.e., internal standard of NDMA-d6] to conical tube for final concentration of 76 ng/mL for IS.").

## II.    Dr. Najafi's Opinion is Based on Experiments that Reliably Measure NDMA Concentrations in Ranitidine in a Range of Conditions that Simulate Real-World Circumstances

A key question in this litigation is the level of NDMA present in ranitidine products that consumers might actually ingest. There is overwhelming evidence, which Defendants do not dispute, that heat and humidity accelerate ranitidine's decay into NDMA. Common sense therefore tells us that as those ranitidine products progressed through the supply chain, sat on store shelves, and waited while stored in consumers' homes and cars, they could have been exposed to conditions that caused them to degrade into higher levels of NDMA than found in factory-fresh ranitidine right off the manufacturing line.

To answer that key question, Emery Pharma used its sophisticated LC-MS/MS method to test the levels of NDMA in samples of ranitidine that had been exposed to laboratory simulations of those real-word conditions. The FDA has stressed the importance of such testing.[79] But to date, the FDA has not conducted testing on ranitidine in real-world conditions. Nor have Defendants, despite its obvious relevance to the safety of the tablets that Plaintiffs actually ingested.

Emery Pharma's testing of ranitidine in simulated real-world conditions thus asks, and answers, a critical scientific question that no other scientist has even attempted to address. For that reason, Defendants' protestations that the results of that testing are higher than other studies that tested only pristine product ring hollow. Based on the universally acknowledged scientific fact that ranitidine degrades into NDMA in heat and humidity, *of course* ranitidine products that had been stored in a hot car or medicine cabinet—or even just passed through Defendants' supply chains on unrefrigerated trucks and in warehouses without climate control—would have higher levels of NDMA. Defendants could easily have done their own testing on real-world conditions to verify that Emery Pharma's methods were accurate. Fearing that their results would confirm Emery Pharma's, they have not done so.

Defendants' accusation that Emery Pharma's real-world tests were "litigation-driven" is nothing but word games. A critical question in this litigation is how much NDMA Plaintiffs actually consumed. Answering that question—which Defendants utterly failed to do despite

---

[79] At a critical March 2021 FDA Expert Workshop on Nitrosamines, Dr. Keire, the FDA Director of Division of Pharmaceutical Analysis, stressed the importance of testing in "real world conditions" like the "hot mailbox" "glovebox in the car" and the "human bathroom" and a "truck in the middle of summer in the southern U.S. *See* Ex. 35 (FDA Working Group Transcript, Day 2) at 129:6–21.

regulations requiring otherwise—is "litigation-driven" in the same way all expert opinions are. Emery Pharma is providing considerable scientific expertise to help the jury determine "a fact in issue" in the litigation. Fed. R. Evid. 702(a). Perhaps Defendants should undertake some "litigation-driven" testing of their own, which will only confirm the sound results in Dr. Najafi's report.

The implication of Defendants' smear is that Dr. Najafi is some venal, serial expert witness selling dubious opinions to the plaintiffs' bar for money. That calumny is baseless. When he filed his expert report, Dr. Najafi had not testified in deposition or trial in the last four years. To the contrary, as its website confirms,[80] Emery Pharma principally performs rigorous testing for *corporate* clients, from "virtual start-ups to the top 5 largest global companies."[81] Defendants' suggestion that Dr. Najafi and Emery Pharma willfully disregarded the world-class scientific standards that made it one of the most successful independent laboratories serving *pharmaceutical companies* is a serious accusation for which Defendants have not a whit of evidence—despite extraordinarily extensive discovery.

Their refrain that Emery Pharma was compensated for its testing is both unsound and hypocritical. Emery Pharma—which was compensated, while Dr. Najafi was not—did not simply sit in an office to opine on a document, charging by the hour. It performed an immense number of highly sophisticated tests using state-of-the-art—and extraordinarily expensive—LC-MS/MS instrumentation. Defendants themselves are acutely aware of the costs of such testing. In September and October 2019 alone, GSK spent $755,000 on NDMA testing for ranitidine by a single outside laboratory.[82] Intertek, a third-party testing laboratory for method validation of a LC-MS/MS method for the analysis, quoted GSK a cost of $63,985.51 for just 12 samples.[83] Extrapolating this quote *just to the baseline testing* of the 254 batches analyzed by Emery Pharma equates to an approximate cost of $1,354,000. In that context, Emery Pharma's charges for far more research and analysis are plainly justified, and Defendants' suggestion that Emery Pharma was excessively compensated in exchange for unsound science is clearly incorrect.

---

[80] *See generally* https://www.emerypharma.com (last accessed July 31, 2022).
[81] *See* https://emerypharma.com/news/celebrating-10-years/ (last accessed July 31, 2022).
[82] *See* Ex. 61 GSK Invoices (GSKZAN0002492528, GSKZAN0000850384, GSKZAN0000856674, and GSKZAN00002489366).
[83] Ex. 62 Intertek Quotation (GSKZAN0000676733).

Defendants' related complaint that Emery Pharma's "litigation-driven" testing was unreliable because it reached different results than other testing is incorrect for three reasons. As an initial matter, no other study even attempted to test ranitidine in these simulated real-world conditions, so that comparison is inapt. Moreover, the differences in results are more modest than Defendants portray. And in any event, Defendants' disagreement with Emery Pharma's results goes to the weight of Dr. Najafi's opinion, not its admissibility.

Beyond that baseless accusation of misconduct and its misplaced dispute with Emery Pharma's results, Defendants attack the methodology of three of its studies: (a) its baseline testing of ranitidine products; (b) its consumer experience stability testing, which simulated exposure in a car in sun and shade, a bathroom with a shower, and various climatic zones; and (c) its meat matrix testing, which simulated exposure to simulated gastric fluid and nitrite-rich foods in the human stomach. Those attacks, which Defendants couch as criticisms of Emery Pharma's "experimental designs," lack merit.

### A.     Baseline Testing

Defendants' disjointed arguments against Emery Pharma's baseline testing ultimately reduce to complaining not that Emery Pharma's testing was unreliable, but that it tested the wrong ranitidine samples. That is mistaken, both factually and legally.

On the facts, and contrary to Defendants' mischaracterization (at 21-22), Emery Pharma's selection of samples to test was scientifically sound. Their complaint that it did not purchase Defendants' products from store shelves is absurd in light of the fact that their products are no longer commercially available due to the FDA's recall. Indeed, the FDA *required* manufacturers to test product that was "recently manufactured" and that had not gone through the supply chain. Defendants thus criticize Emery Pharma for failing to select its samples in a manner that the FDA specifically rejected.

Emery Pharma accordingly received the samples it tested directly from Defendants. Contrary to their contention that Emery Pharma lacked a protocol for selecting samples, Dr. Najafi ensured that its analysts tested "a very good cross-section of [samples by] locations, batch numbers, manufacturers."[84] And any shortcomings in the sample selection, if they even exist, go to the weight and not the admissibility of his opinion. *See, e.g.*, *Residences at Ocean Grande, Inc.*

---

[84] Def. Ex. 40 (Najafi Dep. Tr.) at 366:4–367:5.

*v. Allianz Glob. Risks U.S. Ins. Co.*, No. 07-22656-CIV, 2009 WL 7020044, at *3 & n.3 (S.D. Fla. Sept. 9, 2009) (refusing to exclude expert on ground "the sample size was too small, the samples had been painted on, and too few samples were tested" because "any deviations from ASTM testing goes to the weight of the report's findings, not its admissibility").

Notably, Defendants' own testing did not meet the standard they seek to impose on Emery Pharma. Like Emery Pharma, GSK's own Root Cause Analysis tested both unexpired and expired samples.[85] Indeed, testing expired samples is "more explanatory" because it takes into account that "it could take many months for a product to reach a consumer from date of manufacture."[86] And GSK took much less care than Emery Pharma did in selecting those samples. GSK's chemist Andy Searle testified that when he selected samples to test for GSK's Root Cause Analysis there "was no methodology at all."[87]

On the law, Defendants misunderstand the applicable legal standard. Dr. Najafi's opinion based on Emery Pharma's testing "is admissible [because it] connects conditions existing later to those existing earlier [and] the connection is concluded logically. Whether this logical basis has been established is within the discretion of the trial judge and the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662–63 (11th Cir.1988). It is of course true in most every pharmaceutical case that subsequent testing of a dangerous drug did not test the precise tablets that had previously been ingested by consumers. The law does not impose that impossible standard.[88] And the necessary logical connection is plainly present here, where federal law required that the ranitidine products that Defendants manufactured and provided to Emery Pharma for its testing be bioequivalent to the ranitidine products that they previously sold to consumers. Defendants are free to argue to a jury that, in defiance of federal law, the ranitidine products they provided to Emery Pharma were

---

[85] *See* Ex. 47 Master Data Spreadsheet, GSKZAN0000883508.
[86] Def. Ex. 17 (Najafi Rep.) at ¶134; *see also* Def. Ex. 21 (Phiroz Rep.) at ¶28–29.
[87] Ex. 27 Searles Dep. at 266:18–267:15.
[88] *See generally Jones,* 861 F.2d 655; *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013) ("Whether Sullivan selected the best data set to use ... is a question for the jury, not the judge. Assuming a rational connection between the data and the opinion—as there was here—an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility."); *Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours & Co.*, 90 F. Supp. 3d 746, 770 (S.D. Ohio Mar. 10, 2015) ("An expert need not base her opinion on the best possible evidence, or the most ideal scientific evidence in order for it to gain admissibility.") (internal quotation marks and citation omitted).

not bioequivalent to their consumer products. But that curious argument is no reason to exclude Dr. Najafi's expert opinion.

### B.    Consumer Experience

Defendants' attacks on Emery Pharma's consumer experience testing also fail. As explained at an FDA-sponsored *Nitrosamines as Impurities in Drugs -Health Risk Assessment and Mitigation Public Workshop*, these "real world conditions" are necessary "to get appropriate data that can be predictive of stability under a variety of conditions."[89] Emery Pharma used testing methods and parameters based on widely accepted guidelines for stability testing of drugs established by the FDA.[90] Emery Pharma's testing also reflects FDA guidance on stress testing,[91] which can "help identify the degradation products, establish degradation pathways, and evaluate the intrinsic stability of the molecule."[92]

For each of the three types of testing, Defendants charge that the simulated parameters do not accurately simulate the real-world conditions in which consumers ingested their ranitidine. That complaint again misunderstands the applicable legal standard. Just as with their unfounded concern about the sampling of ranitidine products that Emery Pharma tested, here is plainly a "logical connection" between Emery Pharma's testing of ranitidine's accelerated degradation in heat and humidity and the hot and humid conditions in which many consumers stored ranitidine. *See Jones*, 861 F.2d at 662–63; *see also Nelson v. Freightliner, LLC*, 154 F. App'x 98, 113 (11th Cir. 2005) ("As a general rule, the district court has wide discretion to admit evidence of

---

[89] Ex. 36 Excerpt of transcript of FDA sponsored public workshop, Nitrosamines as Impurities in Drugs-Health Risk Assessment and Mitigation Public Workshop, March 29-30, 2021; day 2 transcript at pp. 129-130 (*"By Dr. Eisenbrand; …the question of stability then, needs to be widened by this consideration. That it may be the drug is sitting in a car- or sitting somewhere else- or you have it in a bar, where (there) is smoking, and this sort of thing. …" By Dr. Keire: Yeah, …I think there is a big focus on real world conditions, right? You know, the hot mailbox, the glovebox in the car, you know, the human bathroom….if you think about those things, what does it experience in the truck in the middle of summer in the southern U.S., right? …you know, before it gets to the shelf. … [Y]ou try to get appropriate data that can be predictive of stability under a variety of conditions. [Those have been] internationally harmonized in ICH documents, about -you know, which conditions are standard conditions that can be used to establish stability.*").
[90] FDA, Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products, *supra* note 38, p. 1–2.
[91] *Id.* at 20 (noting that stress testing applies "more severe conditions than those used for accelerated testing" to "elucidate the intrinsic stability" of the product under extreme conditions).
[92] Def. Ex. 17 (Najafi Rep.) at ¶141.

experiments conducted under substantially similar conditions." (citation omitted)). To the extent that Defendants seek to quibble about how hot and how humid, that again goes to the weight and not the admissibility of Dr. Najafi's opinion.

And in any event, Emery Pharma's testing parameters were well-grounded in the scientific literature.[93] In its simulation of storage in a hot car, Emery Pharma based its testing parameters on several peer-reviewed studies.[94] First, a 2018 study by Vanos, et. al., measured the average interior car temperatures in Tempe, Arizona of 46.7°C and 38.3°C for sun and shade exposure; the average air cabin temperature of 47.6°C and 39.5°C for sun and shade; and average surface temperatures of 68.9°C, 53.3°C, and 50.6°C for the dashboard, steering wheel, and seat with exposure to sun.[95] A study by Grunstein measured car passenger compartment temperatures in Athens, Georgia and found maximum cabin temperatures ranged from 41 to 76°C and varied considerably. The Grunstein study found clear days had the highest cabin temperatures with average values of 68°C in the summer and 61°C in the spring, which were higher cabin temperatures than the Vanos study.[96] In addition, the *Assessment of the Common Carrier Shipping Environment General Technical Report (1979)* establishes that under maximum solar radiation the cargo surface temperatures of a truck could reach 71°C (160°F) and relative humidity varied from 21 to 85%.[97] These studies adequately support Emery Pharma's testing conditions of 75°C for sun and 50°C for shade as representative of levels that can be reached inside passenger and common carrier vehicles.

In its simulation of storage in a bathroom with a shower, Emery Pharma again based its testing parameters on independent scientific studies.[98] A study by Aizawa which studied bathroom temperature and humidity conditions in both a bathroom with shower and adjacent "changing

---

[93] Def. Ex. 40 (Najafi Dep. Tr.) at 562:19–25 ("However, as I've stated probably a dozen times during this testimony, everything we've done is rooted in peer-reviewed publications for LC-MS testing of NDMA, for SGF testing of Zantac, you know. Everything is rooted in some publication or in some guidance.").

[94] *See* Ex. 18 (Najafi Rebuttal Rep.) at 13–18.

[95] Vanos, et. al., *Evaluating the impact of solar radiation on pediatric heat balance with enclosed, hot vehicles,* Temperature 5.3 (2018). Defendants' focus on the purpose of the Vanos study which addressed child safety is a red-herring, since the pertinent information was the interior temperatures that can exist in automobiles.

[96] Grundstein, et. al, *Maximum vehicle cabin temperatures under different meteorological conditions,* International Journal of Biometeorology, March 2009.

[97] Def. Ex. 18 (Najafi Rebuttal Rep.), at 15.

[98] Def. Ex. 17 (Najafi Expert Rep.) at 116–121.

room." This study had results for bathrooms reaching maximums of about 37°C/100% RH and changing rooms reached 25°C/85% RH.[99] The Yokoo, et. al study which measured bathroom temperature and humidity conditions and reported results that temperature could reach about 37°C with maximum humidity of 100%.[100] These studies adequately support Emery Pharma's testing conditions: initiating the test at 25°C/40% RH; then storing the sample at 40°C/100% RH for 30 minutes (a reasonable length of time for a humid bathroom during and after a shower); followed by allowing it to equilibrate back to ambient conditions 25°C/40% RH. These conditions were run for up to 50 "cycles" to simulate a consumer taking a shower each day.

Finally, in its simulation of storage in different climatic zones, Emery Pharma again based its testing parameters on independent scientific studies. The International Council for Harmonization (ICH) Q1A(R2) guidelines for temperature and humidity conditions found across the United States.[101] Emery Pharma's parameters matched the standard temperatures and humidity from the FDA's *Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products*[102]: Zone 1: 21°C ± 2°C/RH 45% ± 5%; Zone II: 25°C ± 2°C/RH 60% ± 5%; Zone III: 30°C ± 2°C/RH 35% ± 5%; Zone IVa: 30°C ± 2°C/RH 65% ± 5%; and Accelerated Ambient: 40°C ± 2°C/RH 75% ± 5%.[103] Defendants suggest (at 31) that Emery Pharma's climatic zone testing is invalid because the ranitidine was stored in a different container. HDPE bottles specifically designed for pharmaceutical uses that and are very similar to the original packaging, but this again goes to weight and not admissibility of Dr. Najafi's opinion. *See Jones*, 861 F.2d at 662–63.

Defendants err in alleging (at 28 and elsewhere) that Emery Pharma's consumer experience testing has no "error rate" and thus is unreliable: "The significant discrepancy [in results]

---

[99] Fernandez, da Silvia and Pinto, HB Healthy Building, Official Conference of International Society of Indoor Air Quality and Climate, Aizawa et al, Influence of Bathing and Ventilation on Thermal Environment and Moisture Movement in Bathroom and Dressing Room, (June 2006).

[100] K. Yokoo1† et al, Amount of Moisture Produced Inside Bathroom and Appurtenant Changing Room, *1Waseda University, Dept. of Architecture, Tokyo, Japan, Tokyo Gas Co. Ltd. (January 2007).*

[101] Def. Ex. 17 (Najafi Rep.) at 116, citing ICH Harmonized Tripartite Guideline, Stability Testing of New Drug Substances and Products Q1A(R2) (Feb. 6, 2003) (https://database.ich.org/sites/default/files/Q1A%28R2%29%20Guideline.pdf) (last accessed July 31, 2022).

[102] FDA, Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products, *supra* note 38, p. 5.

[103] Def. Ex. 17 (Najafi Rep.) at 122–125.

demonstrates that this testing has an extremely high error rate and could never be used to reliably estimate how much NDMA would form in any particular product that any one person may have taken many years ago." That misunderstands the concept of error rate. As Dr. Najafi explained, the variability in the testing results of different samples is explained by variation in the amount of NDMA in each tested sample.[104] Defendants' contrary view rests on a pair of implausible premises: that every single sample of ranitidine begins with precisely the same amount of NDMA, and that every single sample of ranitidine degrades into NDMA at precisely the same rate. Defendants' own testing disproves those premises, showing that factory-fresh samples contain a wide range of NDMA concentrations and that samples of ranitidine stored in ambient conditions degrades into NDMA at different rates, disproves both premises. There is every reason to believe that those samples also degrade into NDMA at different rates in simulated consumer conditions, and the variation in the results of testing those samples in no way suggests a high error rate.

### C.      Meat Matrix

Finally, Dr. Najafi's opinion that ranitidine forms NDMA endogenously as a result of nitrosation in the stomach including the "meat study" is properly based on a collection of reliable independent studies. Contrary to Defendants' assertions, the methodology employed by Emery Pharma for its SGF studies including those with meat are based on a series of well-established assays and peer-reviewed studies. The first of these studies is the World Health Organization nitrosation assay procedure (known as the "NAP test"), which was developed and presented at the WHO symposium in 1978.[105] This test was developed to provide a systematic approach to the investigation of the potential hazards of nitrosable drugs based on two considerations: the relative speed at which drugs of secondary and tertiary amines structure undergo N-nitrosation under standardized, *in vitro* conditions, and the potential carcinogenicity of the more strongly-reacting compounds in suitable animal models. *Id*. It was recognized that tertiary amines (like the one in ranitidine) can react to produce a well-characterized low-molecular weight nitrosamines, like NDMA. *Id*. This testing was specifically prioritized for drugs in wide-use and taken for prolonged periods, like ranitidine. *Id*.

The NAP study test procedure calls for concentration of ranitidine of 10 mmol/L (mM);

---

[104] Def. Ex. 18 (Najafi Rebuttal Rep.) at 13–15.
[105] The Potential Carcinogenicity of Nitrosatable Drugs, WHO Symposium, Geneva, June 1978, Ablex Publishing Corp., pp. 8–13; IARC monograph Vol. 24 in 1980.

concentration of nitrite: 40 mmol/L (mM), reaction temperature: 37ºC, pH: 3-4, and reaction times of 1 hour and 4 hours to evaluate rapidly and slowly reacting compounds. This test, which was conducted per the established NAP protocol, demonstrated that ranitidine can undergo nitrosation to produce NDMA.

Ranitidine is an oral medication and nitrites readily exist in the human stomach, so the classic combination needed for endogenous formation is present every time a tablet is swallowed. Emery Pharma's test results confirmed that after 1 hour, NDMA was formed at an equivalent of 1.4-1.6% yield, and after 4 hours, NDMA was formed at an equivalent of 3.4-3.8% yield. This result is similar to GSK's 3.1% yield in its Tanner study in 1982. Based on the 4-hour results, ranitidine would rank third on the list of ten nitrosatable drugs listed on the IARC monograph.[106] Emery Pharma thus confirmed what GSK knew from its 1982 Tanner study that nitrite reacts with ranitidine hydrocholoride to form NDMA.[107]

Dr. Najafi and Emery Pharma continued its investigation into endogenous formation by conducting studies to mimic *in vitro* simulation of gastrointestinal conditions to predict the *in vivo* behavior of ranitidine known as simulated gastric fluid (SGF) studies. Contrary to defendants' contention, SGF studies have been long established in the field of chemistry to predict *in vivo* formation. Two published peer-reviewed studies, Braunstein and Gao, utilized SGF study methodologies to investigate conditions under which ranitidine may yield NDMA.[108] The study method involves adding ranitidine to a known quantity of SGF at known nitrite concentration and varying pH levels at 37°C to reflect the human body temperature. Within a SGF study protocol, the volume can be varied, and a range of nitrite and pH levels can be tested to mimic different stomach conditions. These conditions were varied in both the Braunstein and Gao *s*tudies, and Emery Pharma also varied the conditions testing additional conditions and time-points.[109] Emery Pharma found that generally NDMA formed most readily at a pH of 2-2.5, and that NDMA formation increased with increasing SGF nitrite levels.[110] These findings matched those of *Braunstein* and *Gao*—again showing the reliability and replicability of Emery Pharma's testing.

---

[106] IARC Monograph, Volume 24, Page 303.
[107] Def. Ex. 109, Tanner et al., The determination of N-nitrosodimethylamine formed by reaction of ranitidine hydrochloride with sodium nitrite (1982); GSKZAN0000084994–85002.
[108] Def. Ex. 47 (Braunstein et al. 2021); Def. Ex. 50 (Gao et al. 2021).
[109] Def. Ex. 17 (Najafi Rep.) at ¶ 186.
[110] Def. Ex. 17 (Najafi Rep.) at ¶ 190.

However, Gao et al. did not consider conditions when ranitidine would encounter the stomach content, for example after a large acidic meal, individuals with a larger stomach capacity, or a meal consisting of processed nitrite-rich ingredients.[111] The investigators acknowledged the study's limitations of not reflecting "all aspects of human physiology," and specifically mentions that "the *in vitro* studies performed here did not include gastric conditions in the presence of a meal aside from experiments at higher pH levels that occur following a meal, which lead to decreased formation of NDMA."[112]

Given these admitted limitations of Gao et al., Emery Pharma conducted additional SGF studies using various food matrices to identify the potential, if any, for NDMA formation with ranitidine. This study was based on the method used in Gao.[113] This was not a litigation driven methodology with a results-oriented approach evidenced by Dr. Najafi testing high nitrate foods, such as arugula, to determine whether it influenced the formation of NDMA from ranitidine and found that it did not. (Najafi Report ¶ 215). It was Dr. Najafi's objective to determine what foods, if any, when interacting with ranitidine cause NDMA to form. What he found was high nitrite foods such as sausage, ham, bacon and hot dog cause NDMA to form.

Defendants contend (at 37) that SGF with food testing is flawed, not reflective of "real-world" human diet, and "do not fit the litigation." Apparently, the defendants' argument is premised on no consumers eat sausage, ham, bacon or hot dog, and these foods present in the stomach are not representative of physiological conditions. This defies common sense. Here, Dr. Najafi went one step further than Gao to more closely simulate actual physiological conditions and use food instead of using nitrite to mimic physiological levels. This type of testing is commonly performed to study the endogenous formation of nitrosamines, including NDMA, and this methodology has been peer-reviewed, accepted and published in leading scientific journals for over 40 years.[114] This is not an analytical gap, and most certainly not the type of analytical gap

---

[111] Def. Ex. 17 (Najafi Rep.) at 180.
[112] Def. Ex. 50 (Gao et al. 2021) at 8, 11.
[113] Def. Ex. 17 (Najafi Rep.) at ¶195 and App'x A.
[114] *See* Krul et al., *Intragastric Formation and Modulatio of N-Nitrosodimethylamine in a Dynamic In Vitro Gastrointestinal Model under Human Physiological Conditions*, FOOD AND CHEMICAL TOXICOLOGY 42 (2004) 51-63; *see also* Mirvish, *Formation of N-Nitroso Compounds: Chemistry, Kinetics and in Vivo Occurrence*, TOXICOLOGY AND APPLIED PHARMACOLOGY 31, 325-351

that results in exclusion.

Defendants' other criticisms similarly lack merit. They contend Dr. Najafi did not test ranitidine with meat and a natural source of Vitamin C. It is undisputed that there is not one set of "actual human physiological conditions,"[115] and there are numerous variables that affect the amount of nitrites in the stomach, including diet, bacterial content of the stomach, inflammation, pH, volume of gastric fluid, thiocyanate levels and stomach emptying rates.[116] At the general causation phase of this litigation, Dr. Najafi offers an example of the stomach conditions in which NDMA *can* form from ranitidine and supports the conditions with peer-reviewed literature evidencing the amount of time processed meat remains in the stomach, the varying stomach pH levels, and ranitidine peak serum concentrations and half-life to support the measuring time-points used in his studies.[117] Defendants' attempt to use Gao and Florian as undisputed proof that NDMA does not form endogenously from ranitidine but even the studies themselves do not represent such a broad conclusion.[118] Plaintiffs' experts, including Dr. Najafi, have detailed the various limitations of the Florian and Gao studies, explaining why each study was not supportive of

---

(1975); LaBar et al., *Carcinogenic N-Nitroso-Dimethylamine from the Reaction of the Analgesic Amidopyrine and Nitrite Extracted from Foodstuffs*, Z. Krebsforsch, 84, 299-310 (1975); Groenen et al., *Formation of N-Nitrosamines from Food Products, especially Fish, under Simulated Gastric Conditions*, IARC SCI. PUBL. 41, 99-112 (1982).

[115] *See e.g.*, Xu et a. , *N-nitroso compounds in fresh gastric juice and their relation to intragastric pH and nitrite employing an improved analytical method*, CARCINOGENESIS 14, 2547-2551, doi:10.1093/carcin/14.12.2547 (1993) (study authors reported that intra-gastric nitrosation was complicated based on finding significantly higher n-nitroso concentration at both low and high pH ranges), Barnard et al., *Gastric Juice, Nitrite, and Nitroso Compounds*, BANBURY REPORT, 12:369-377 (1982) (finding that during a 24-hour period nitrite concentration in gastric juice varies significantly depending on food consumption and higher nitrite concentrations were found at pH values above 5), Hall et al., *Evaluation of the nitrosamine hypothesis of gastric carcinogenesis in precancerous conditions*, GUT 27, 491-498, doi:10.1136/gut.27.5.491 (1986) (in a 24-hour monitoring study finding that nitrite concentrations in gastric juice increased with increasing pH and the total n-nitroso compounds were highest with pH ranging from 5 to 6); *see also* Def. Ex. 8 (Marletta Rebuttal Rep.) at 1–2.

[116] Def. Ex. 17 (Najafi Rep.) at 103, discussing nitrite levels at 7,400 μM – 84,100 μM expected in real human stomach after intake of meat products like bacon and ham; *see also* Plaintiff's Motion to Exclude Defendants' Putative Expert Opinions on General Causation Under Rule 702 (D.E. 5841) at 19–24, discussing the routes of endogenous formation, including conditions and variables of nitrosation.

[117] Def. Ex. 17 (Najafi Rep.) ¶¶ 39, 106, 107, 190, and 196.

[118] Florian limited its findings to the general, healthy population, and did not exclude formation of NDMA in the gastrointestinal tract. *See* Def. Ex. 49 (Florian et al. 2021) at 241, 247.

Defendants' position.[119] Nevertheless, the Gao study certainly does not undermine the methodology used by Dr. Najafi as the Emery Pharma SGF meat study was modeled after Gao.[120]

At most, Defendants' arguments that the conditions Emery Pharma tested used the wrong parameters again go to weight, not admissibility. *See Jones*, 861 F.2d at 662–63. Defendants' criticisms of Dr. Najafi reflect their dissatisfaction of Dr. Najafi's results, rather than a substantive claim regarding his testing methodologies. Dr. Najafi's testing experiments were designed based on varying conditions and were influenced by his prior findings and the previous experiments conducted in peer-reviewed studies.

## III. Emery Pharma Meticulously Documented its Testing, Enabling Any Qualified Analyst to Evaluate its Results

Defendants' accusation that Emery Pharma failed to adequately document its testing is based on a comprehensive mischaracterization of the data that Emery Pharma recorded in its testing and disclosed in this litigation. Defendants ignore, or misunderstand, the LC-MS/MS method Emery Pharma employed and the data it produces. Properly understood, the meticulous data that Emery Pharma has provided Defendants and this Court confirms that its testing was scientifically sound. Dr. Najafi's opinions based on that well-documented testing are therefore reliable.

### *Prescriptive Documentation*

Defendants first complain (at 43) that Emery Pharma failed to use "necessary prescriptive documents to establish scientific reliability." They repeat this same criticism with respect to Emery Pharma's baseline testing (at 43), its consumer experience testing (at 44), and its meat matrix testing (at 47). In each case, the record refutes Defendants' claims.

Emery Pharma created and disclosed detailed protocols that prescribed specific testing parameters and a step-by-step process for performing each series of tests. The protocols for Emery Pharma's baseline testing appear on pages 2 to 7 of Appendix A to Dr. Najafi's report.[121] Those protocols specify the instrumentation and reagents to be used in LC-MS/MS testing. Def. Ex. 17

---

[119] *See* Def. Ex. 7 (Marletta Rep.) at 46, 52–56; Def. Ex. 13 (Michaels Rep.) at 48–49, 59–60; Def. Ex. 19 (Panigrahy Rep.) at 107; Def. Ex. 17 (Najafi Rep.) at ¶¶ 216–227.
[120] Def. Ex. 17 (Najafi Rep.), App'x A (Stability Assessment of Ranitidine Towards NDMA formation by LC-MS/MS in Simulated Gastric Fluid Protocol).
[121] *See* Def. Ex. 17 (Najafi Rep.), App'x A, pp. 2–7; *see also* Def. Ex. 17 (Najafi Rep.) at ¶ 129 ("Baseline testing of tablets was performed in accordance with the LC-MS/MS protocol set forth above.").

(Najafi Rep.), App'x A, p. 2, §§ 4-5. The protocols further specified "LC-MS/MS parameters," (§ 6.5) including "UHPLC Parameters," (§ 6.5.1) "Mass Spectrometer Parameters," (§ 6.5.2) and "MRM Method Parameters" (§ 6.5.2). They specify step-by-step "procedures" for the "preparation of solutions," (§ 6.1) the "preparation of calibration standards," (§ 6.2) the "preparation of QC [quality control] samples," (§ 6.3) and the "preparation of test samples" (§ 6.4). It then provides steps for "Data Analysis and Processing" (§ 6.6). Finally, it provides detailed criteria for "Sample Re-Test [or] Re-Analysis," (§ 7) including "instrument malfunction" (§ 7.1.1).

In addition, Emery Pharma records confirm that its baseline testing reflected a broad cross-section of ranitidine products. It tested products by GSK, Boehringer Ingelheim, and Sanofi. *See* Def. Ex. 17 (Najafi Rep.) at ¶ 127. The products were either regular Zantac or Zantac Cool Mint, contained API by either Dr. Reddy's or Uquifa, and were of a variety of doses. *Id.* at ¶ 132. Emery Pharma tracked all such information about each batch tested, which is reported in Appendix B to Dr. Najafi's report. *Id.* at App'x B. Those products were shipped directly from Defendants to Emery Pharma, and Defendants have provided chain-of-custody documentation to prove their provenance.[122] Emery Pharma tested 254 batches in total, of which 166 were not expired and 88 were expired. Def. Ex. 17 (Najafi Rep.) at ¶ 130. That large pool of test samples is "a very good cross-section [by] locations, batch numbers, manufacturers." Def. Ex. 40 (Najafi Dep. Tr.) at 366:4–367:5.

Emery Pharma created supplemental protocols that detail the additional steps it took in its consumer experience testing and climatic zone testing, which appear at pages 8 to 9 of Appendix A to Dr. Najafi's report. *See* Def. Ex. 17 (Najafi Rep.), App'x A, pp. 8–9. They detail the precise steps for those stability studies, including specifying the precise parameters of temperature and humidity conditions (§§ 3.4, 3.5, 3.6, 3.7) and the amount of time and number of cycles a sample was subjected to those conditions (§ 3.8).

Emery Pharma's protocols for its SGF and meat matrix testing appear at pages 10 to 11 of Appendix A to Dr. Najafi's report. *Id.* at 10–11. Like the baseline testing protocols, they specify the LC-MS/MS instrumentation and parameters (§§ 3, 5.6), as well as the procedures for preparing the calibration samples and quality control samples (§§ 5.2, 5.3). The SGF and meat matrix

---

[122] *See* Exs. 57, 58, 59 Defendants GSK's, BI's, and Sanofi's Answers to Interrogatory 14 (Dec. 20, 2021); Ex. 56 Defendant Sanofi's Supplemental and Amended Answer to Interrogatory 14 (Jan. 18, 2022); and Ex. 60 Defendant Patheon's Declaration (Jan. 12, 2022).

supplement the baseline protocols by specifying procedures for preparing the SGF and the preparation of the meat matrix by "blending [one serving size] for at least 60 seconds at the highest setting or until food is pulverized." *Id.* at § 5.5.2. Finally, the SGF and meat matrix protocols specify the procedures and parameters for each test condition, including the quantity of meat, the time and temperature of incubation, and the times at which samples would be drawn. *Id.* § 5.3, Table 4.

*Descriptive Documentation*

Defendants next complain (at 43) that Emery Pharma provides "next to nothing" "in terms of descriptive documentation." That, too, is simply false. As Defendants concede (at 43, 44, 47), Emery Pharma's analysts recorded what they did in laboratory notebooks.[123] Defendants suggest that those notebooks are somehow insufficient because they refer to the previously prepared prescriptive protocols. Defendants cite no case for that curious proposition, which defies common sense. As Dr. Najafi explained, it is "superfluous" to "reiterat[e] the same designs that are included in a written protocol."[124] On Defendants' apparent view, an expert could be disqualified if he recorded his laboratory procedures by a checklist rather than re-writing each step again. The Court should reject that pointless requirement. *See United States v. Diaz*, No. CR 05-0167 WHA, 2006 WL 3512032, *14–16 (N.D. Ca. Dec. 6, 2006) (that testing reports "did not contain documentation of the precise observations of the analyst does not mean that the analyst did not perform the tests or did not actually observe" certain findings, and rejecting argument for exclusion because "the mere fact that the analysts' reports are cursory is not a basis for exclusion under *Daubert*").

Moreover, Defendants ignore that "descriptive documentation" Emery Pharma created and produced in the form of almost 100 gigabits of LC-MS/MS data.[125] As Dr. Patrick Steffes, an

---

[123] *See* Exhibit A to Plaintiffs' Opposition to Motion to Strike Dr. Najafi (D.E. 5755).
[124] Ex. 53 Najafi Supp. Rebuttal Report (Apr. 12, 2022) at 4.
[125] *See* Exhibit A to Plaintiffs' Opposition to Motion to Strike Dr. Najafi (D.E. 5755, 5756) (including 133-page narrative expert report with appendices listing every testing result considered and relied on by Dr. Najafi, including detailed information regarding the testing methodology and protocols used by Emery Pharma; Plaintiffs also provided additional materials on February 23 (SEM instrument specifications, Standard Operating Procedures (SOP's) (2372 pages of SEM images); on February 24 (Project Photo Inventory 380 pages of photographs); on February 25 (33 spreadsheets and 5 laboratory notebooks); on February 27 (Validation protocols); and on February 28 (chain of custody documents); on March 11, 2022 hard drive with the raw and processed data

expert on analytical instrumentation who was factory-trained by Agilent, explains:

> Agilent MassHunter, the original native data generated from the LC-MS analysis is preserved and remains unchanged. The data may be reviewed and processed, but the original unadulterated data is always intact. This is a critical feature of the software, and an important reason this product is used in regulated environments. Ex. 52 Steffes Decl. at ¶ 9.

The "MassHunter software uses a 'method' file to automatically process that preserved and inalterable native data." *Id.* And "[w]hen that method file is used to automatically process that data, the software will always generate the same native data chromatogram and results." *Id.* Professional Chemist Steffes confirmed that Emery Pharma's native LC-MS/MS data, processed automatically with the method files that Emery Pharma produced to Defendants, "*always* generated the same chromatogram and values (to 15 significant figures)." *Id.* Moreover, there was no document dump. The datasets provided were well organized, with file naming conventions that clearly define calibrations, quality control samples, blanks, and customer samples which make the processing and review of these datasets logical and easy to a trained analyst, familiar with the Agilent MassHunter software. *Id.* at ¶ 15.  That data includes the "[t]arget compound response," "[i]nternal standard compound response," "[t]arget compound result," "[t]arget compound/internal standard response ratio," and "[a]ssociated data of sample information, sample name, acquisition method, acquisition date/time stamp." *Id.* It is difficult to imagine a more detailed and comprehensive catalogue of "descriptive documentation" of Emery Pharma's testing that Defendants demand.[126]

Defendants' contention that they are unable to "trace" the baseline testing back to processed chromatograms also misunderstands the record. As Dr. Najafi testified, the Agilent MassHunter software can trace all of[127] For example, Defendants misrepresent the documentation

---

including seventy-three (73) batch files; May 2, 2022 second hard drive with raw and processed data including the seventy-three (73) batch files that were sent on March 11, 2022 and additional pre-retention and post-retention folders totaling 165 batch folders).

[126] As explained in Plaintiffs' Opposition to Defendants Motion to Strike, Emery Pharma has disclosed all native LC-MS/MS data. *See* D.E. 5755. As Dr. Steffes explains, using that native data along with the method files that Emery Pharma also disclosed to Defendants, he was repeatedly able to generate identical chromatograms and associated metadata from that raw data using the Agilent MassHunter software. Defendants' contention that they are unable to do so and are unable to trace that data to Emery Pharma's testing, is therefore factually incorrect.

[127] Def. Ex. 17 (Najafi Dep Tr.) 112:19–112:22; 113:16–113:21; 114:6–114:10; 115:4–115:6.

of Sample 19B001M in lab notebook, 078-RC page 14.[128] The sample has *preliminary* NDMA values of 376.5 and 444.0 posted on October 13, 2021—the date the LC-MSMS was performed-- but these results preceded the final interpretations by analysts. Pursuant to Emery Pharma's procedure, preliminary results are reviewed by two highly-skilled analysts to ensure consistency and accuracy of integrations and quantitations before final results are reported. This final review occurred on October 18, 2021, as indicated by the Witnessed & Understood signature that appears left bottom corner of the same page. Only after this second review were the final values reported on the Master Spreadsheet that appears as Appendix B. The final results, after that review, were reported with values of 412.9 ng and 407.5 ng. Defendants also misunderstand Sample 16 1.d, for which the printed PDF shows a preliminary result of 376.4595 ng. But is not same sample. As explained in Plaintiffs' Opposition to the Motion to Strike, the accuracy of the PDFs created *by Defendants* is in question and Dr. Najafi cannot attest their accuracy because of the discrepancies.[129] Defendants' straightforward mistakes in *reading* the record that Emery Pharma created and produced to document its results is no basis for excluding Dr. Najafi's opinion based on its testing.

The cases Defendants cite to support their contention that Emery Pharma failed to adequately document its methods confronted dramatically different circumstances than those present here. In some cases, the challenged expert produced no documentation at all. For example, in *Snoznik v. Jeld-Wen*, Inc., No. 1:09CV42, 2010 WL 1924483 (W.D.N.C. May 12, 2010), the purported expert tested an allegedly faulty window hinge but "aside from a few photographs, taken sporadically over the months that the testing was performed, [he] made no written or video recordings to document his testing of the exemplar window." *Id.* at *13. And "[t]o the extent that he took measurements of the force required to disconnect the hinge from the hinge post, he took such measurements only occasionally and in any event did not record them." *Id.*[130] In other cases,

---

[128] *See* Exhibit A to Plaintiffs' Opposition to Motion to Strike Dr. Najafi (D.E. 5755); *see also* Ex. 63 Lab Notebook No. 078-RC.

[129] Def. Ex. 40 (Najafi Dep. Tr.) at 304:2–7, 305:23–306:2; Plaintiffs' Opposition to Motion to Strike (D.E. 5755), Ex. 52 Steffes Decl.

[130] *See also Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, No. 10-23869-CIV, 2012 WL 13012778, at *10 (S.D. Fla. May 24, 2012) ("Photos or video of Coté's test were not taken, nor was a report drafted documenting the test."); *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 304 (6th

the challenged expert *admitted* to discarding their written methodology and keeping *no* records of what they actually did.[131] And in the remainder of the cases Defendants cite, the problem was not documentation at all but rather that the expert's methodology itself was incomplete.[132] Those cases are hardly comparable to the extensive protocols, laboratory notebooks, and computerized LC-MS/MS native data and method files that Emery Pharma provided. That documentation confirms that Emery Pharma's testing was scientifically sound, and that Dr. Najafi's opinions relying on that testing are reliable.

## IV.    Plaintiffs' Experts Reasonably Relied on Emery Pharma's Reliable Testing.

Defendants glancingly attack several other of Plaintiffs' experts who relied on Dr. Najafi's

---

Cir. 1997) ("Huston took the pick-up truck on a drive through suburban Batavia, Ohio and tested the seat belt. . . . [A]lthough he performed this test "about a hundred times," he took measurements only five or six times."); *Morehouse v. Louisville Ladder*, No. CIV.A. 3:03-887-22, 2004 WL 2431796, at *7 (D.S.C. June 28, 2004) ("For example, Dr. Durig stated in his report that '[a]fter numerous ascending and descending trips on the exemplar ladder, both front side rails show evidence of permanent deformation." In making this sweeping assertion, however, Dr. Durig failed to include several critical details of his hypothesis testing, such as the number of ascending and descending trips he took on the exemplar ladder before this 'deformation' took place, or his body weight on the day of testing the exemplar ladder in comparison to Plaintiff's weight on the day of the accident.") (citation omitted); *Black v. Rhone-Poulenc, Inc.*, 19 F. Supp. 2d 592, 598–99 (S.D.W. Va. 1998) ("Dr. Scotti did not make a list of the 2000 people he phoned to participate in the study…. Dr. Scotti also kept no records of those who (1) responded to a flyer he posted at a college located near the site of the fire; and (2) ultimately participated in the study as a result.").

[131] *See Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 655, 667 & n.14 (M.D. Fla. 2012) ("Dr. Beebe's testing, however, was not reproducible because he failed to document and disclose the procedures he used to conduct his tests. This is because, as previously discussed, Dr. Beebe's laboratory records and expert report describe an entirely different testing regimen."); *Palazzolo v. Hoffman La Roche, Inc.*, No. A-3789-07T3, 2010 WL 363834, at *4–5 (N.J. Super. Ct. App. Div. Feb. 3, 2010) ("The trial judge concluded that Bremner did not actually use the methodology he claimed to have used. Although his PET scan article was peer-reviewed, he admitted that he did not in fact follow the steps described in the article.").

[132] *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("Neither Shapiro nor any of WH–TV's lawyers discussed statistical or econometric means of coping with variance across markets; the record contains nothing suggesting that these would have been inadequate if tried. Indeed, the record does not contain any hint why Shapiro preferred intuition to the empirical toolkit of the social sciences."); *United States v. Hebshie*, 754 F. Supp. 2d 89, 97, 125 (D. Mass. 2010) ("Neither he nor Domingos directed the dog to any other areas in the building-like the basement-apart from the convenience store's left side to see whether she would register the same kind of 'alert….' . . . [The court's] greater concern about the investigator's failure to document any other potential cause—take photographs of the basement, take samples from other areas of the store for laboratory analysis.") (citation omitted).

opinions. To the extent those attacks are predicated on the erroneous premise that Dr. Najafi's opinion is unreliable, they fail for the reasons stated above. In addition, Defendants suggest specific shortcomings in Dr. Charles Davis's opinion and Dr. Andrew Salmon's opinion. Those brief criticisms lack merit.

First, Defendants repeatedly but summarily assert that Dr. Davis's opinion is flawed because, they claim (at 25), "none of the products in his dataset, by definition, were ingested by consumers, let alone Plaintiffs in this litigation." That criticism, which Defendants repeat over and again, is nonsensical and fundamentally misunderstands the purpose of Dr. Davis's statistical analysis. As explained above,[133] expert testimony based on Emery Pharma's testing "is admissible [when it] connects conditions existing later to those existing earlier provided the connection is concluded logically" *Jones*, 861 F.2d at 662. Such a connection is plainly present here where all Defendants' products, from any manufacturer and in any year, contained chemically identical ranitidine.

In any event, Defendants' argument misunderstands that Dr. Davis's statistical analysis provides evidence about the statistical power of Emery Pharma's testing. He concluded that "[t]here appear to be substantive increases in the NDMA level due to the number of cycles of shade, sun, and shower and due to the number of weeks for each zone."[134] Before conducting any statistical analyses, Dr. Davis prepared a pre-specified Statistical Analysis Plan (SAP) for each data set.[135] He then reported the findings from each SAP, as well as any deviations from the pre-specified plans after seeing the data.[136] Dr. Davis's analysis shows that the observed increases in NDMA *among the tested samples* were not due to mere chance. For that reason, Dr. Davis explained that he "estimated the effects in these experiments, and the null hypothesis that there is no effect was tested nonparametrically, and that was extremely statistically significant."[137] His analysis does not, however, purport to provide direct evidence about ranitidine products that were *not* tested. *Id*. at 60:7-11.

Defendants ignore the straightforward chain of scientific reasoning: Dr. Najafi and Emery

---

[133] *Supra* Section II.
[134] Def. Ex. 2 (Davis Rep.) at 7.
[135] Def. Ex. 2 (Davis Rep.), App'x. 1.
[136] *Id*. at App. 2.
[137] Def. Ex. 28 (Davis Dep. Tr.) at 252:2-23; *see also id.* ("You're testing the null hypothesis that there is no effect. And I'm telling you it's highly statistically significant that there is an effect.")

Pharma tested ranitidine products using LC-MS/MS, finding the tested samples degraded into high levels of NDMA. Dr. Davis's statistical analysis shows those results *about those samples* were "extremely statistically significant." And because those samples, by law, must be bioequivalent to the ranitidine products that Defendants sold and that consumers ingested, a jury could reasonably infer that those products contained NDMA that caused their cancers. Defendants' attempt to exclude Dr. Davis, a highly trained statistician, on the grounds that his analysis does not prove what no statistical analysis ever could, is wholly without merit.

Defendants incorrectly interpret Dr. Salmon's analysis. First, when the FDA and the Defendants tested ranitidine for NDMA, they found NDMA in almost every ranitidine sample tested. Therefore, it is clear that ranitidine, prior to being unsealed and stored in consumer homes, already contains NDMA. The Braunstein study confirmed this simple fact; the updated March 2022 version reflected at baseline that the 150 mg ranitidine tablets contained 921 ng.[138] Therefore, Dr. Salmon appropriately used a baseline NDMA amount from the FDA and Defendants' ranitidine testing. *See* Def. Ex. 22 (Salmon Rep.) at 217–220. Next, Dr. Salmon evaluated the NDMA baseline and after exposure levels for all the tablets exposed to Zone testing at 2, 4 and 8 weeks in the various zones. He utilized the average ratio from this testing from multiple batches and not just "a single product" as Defendants misrepresent. *Id.* Moreover, while the Defendants raise that the Zone ACC refers to an accelerated stability condition and were included in Dr. Salmon's average, Dr. Salmon correctly highlights that a review of the averages from Zones 3 and 4a confirm that ratio is above 2.5 when the Accelerated Zone averages are excluded. See Def. Ex. 23 (Salmon Rebuttal Rep.) at 11. Therefore, as Dr. Salmon states "the 2.5 ratio is a realistic multiplier to use to evaluate the real world scenario of the NDMA levels consumers are exposed to with ranitidine. Additionally, the 2.5 ratio from the Zone averages is also more conservative than the increases in NDMA seen from the Sun, Shade and Shower conditions." Id.

---

[138] *See* Error in a Figure. JAMA Netw Open. 2022 Mar 1;5(3):e227178. doi: 10.1001/jamanetworkopen.2022.7178, Erratum for: Braunstein et al., *Analysis of Ranitidine-Associated N-Nitrosodimethylamine Production Under Simulated Physiologic Conditions*, JAMA NETW. OPEN., 2021 Jan 4;4(1):e2034766.; *see also* Ex. 51 Ranitidine MSK Data (MSK00007347) at '7353 (Table 1.B. details ranitidine 150mg tablets at pH 2.5 in simulated gastric fluid with varying sodium nitrite concentrations and respective NDMA means, e.g., .25 mmol/L with 1340 ng, .5 mmol/L with 902ng and 1.0 mmol/L with 947 ng).

## V.      Defendants' Remaining Arguments Lack Merit

With no credible basis for excluding Dr. Najafi's principal opinions, Defendants take (at 48) a sinful shot-gun approach to his "remaining opinions" by only "mentioning" them. Categorizing a potpourri of challenges hardly merits consideration; such off-hand remarks with no substantive argument do not raise issues adequately. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented ... are deemed waived."). In any event, Defendants' grab-bag of superficial arguments against Dr. Najafi have no merit:

- Defendants do not challenge the methodology behind Dr. Najafi's performance of a WHO NAP Test, since the protocol established by the World Health Organization' Nitrosation Assay Procedure enjoys general acceptance. Instead, they quibble over its relevance as a surrogate for *in vivo* findings based on their experts' critiques. Since Dr. Najafi's methodology is uncontested, this Court should not entangle itself in the jury's task of weighing the validity of these differences of opinion. *See, e.g., Quiet Tech.*, 326 F.3d at 1345 ("[A]ppellant's arguments go to the weight, not the admissibility, of the evidence [the expert] offered.").

- Defendants question (at 48) the results of Emery Pharma's SGF testing, contending that the "control group formed higher levels of NDMA than the experimental group." But the proper inquiry for purposes of admissibility focuses "on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

- Similarly, Defendants summarily assert (at 48) that Dr. Najafi's KSCN testing "is invalid." This conclusory argument is unsupported except to allege that Dr. Najafi's "conclusions were based on a single data point." *Id.* (citing Dr. Guengerich's March 7, 2022 Report at 175). That criticism goes to the weight of Dr. Najafi's opinion, not its admissibility.

- Defendants' challenge (at 49) Dr. Najafi's stress testing, arguing that the conditions chosen do not fit "typical consumer experiences." That misunderstands stress testing, as the FDA recognizes that stress testing applies "more severe conditions than those used for

46

accelerated testing" and anticipates the application of extreme conditions like those employed by Dr. Najafi.[139]

- Defendants challenge (at 49) as *irrelevant* Emery Pharma results finding a small range of NDMA content variability within a bottle averaging 7.8%, (with a range of 4.4% to 10.9%).[140] Defendants' argument that this testing is unreliable—for reasons they do not even hint at—is not properly before the Court on this *Daubert* motion. Defendants cite to USP 905 which ensures medication strength of drug substance across a batch (for example a 150 mg Zantac tablet contains 150 mg of ranitidine) and is completely inapplicable to the testing of a drug for a contaminant.

- Defendants challenge Dr. Najafi's methodology of examination by SEM (scanning electron microscope)—to assess ranitidine's crystal morphology, but he employs the identical methodology of GSK in its Root Cause Analysis.[141] Based on his review of the SEM images and the subsequent NDMA testing of the samples, it was clear that no trend or association existed between columnar morphology and low NDMA levels within the GSK Jurong API or other API manufacturers. Dr. Marletta confirmed that result, reaching similar findings that columnar morphology did not have a slower rate of NDMA formation, especially when ranitidine was exposed to humidity.[142]

- Defendants also suggest (at 49) that Emery Pharma's refrigeration testing is not relevant, and they do not challenge the methodology behind it. That omission is likely because GSK used the same method in its Root Cause Analysis.[143] Nevertheless, that argument is not properly before the Court in these *Daubert* motions.

---

[139] *See* FDA, *Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products*, supra note 38, p.20.

[140] *See* Ex. 55 (Olsen Rep.) at 38–41.

[141] *See* Ex. 43 GSK Root Cause Analysis, GSKZAN0000051927 at '962

[142] Def. Ex. 7 (Marletta Rep.) at 20–24; see also at 16–17 (showcasing examples of columnar ranitidine product with similar manufacture dates forming varying, and sometimes significant, amounts of NDMA).

[143] *See* Ex. 43, GSK Investigation into the Root Cause for the presence of NDMA in Ranitidine Hydrochloride Drug Substance and associated Drug Products; GSK0000051927 at 51950.

- Finally, Defendants appear to argue (at 49-50) that Dr. Najafi's opinions lack "fit" because Emery Pharma did not test the precise tablets actually consumed by Plaintiffs years or even decades ago. That argument is absurd; no pharmaceutical case in history has required that impossible proof. It is also not the law of this Circuit, as explained above. *See* Section D.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion.

Dated: August 1, 2022

Respectfully submitted,

*/s/ Tracy A. Finken*
Tracy A. Finken
Email: tfinken@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

By: */s/ Robert C. Gilbert*
Robert C. Gilbert, FBN 561861
Email: gilbert@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7270

*/s/ Michael L. McGlamry*
Michael L. McGlamry
Email: efile@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

*/s/ Adam Pulaski*
Adam Pulaski
Email: adam@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

*Plaintiffs' Co-Lead Counsel*

Rosemarie R. Bogdan
Email: Rosemarie.bogdan@1800law1010.com
MARTIN, HARDING & MAZZOTTI
1 Wall Street
Albany, NY 12205
Tel: (518) 862-1200

Mark J. Dearman, FBN 0982407
Email: mdearman@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000

Elizabeth A. Fegan
Email: beth@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd.
Yorkville, IL 60560
Tel: (312) 741-1019

Marlene J. Goldenberg
Email: mjgoldenberg@goldenberglaw.com
GOLDENBERG LAW, PLLC
800 LaSalle Avenue, Suite 2150
Minneapolis, MN  55402
Tel: (855) 333-4662

Ashley Keller
Email: ack@kellerpostman.com
KELLER | POSTMAN
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL  33134
Tel: (312) 741-5222

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Francisco R. Maderal, FBN 0041481
Email: frank@maderalbyrne.com
MADERAL BYRNE PLLC
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 520-5690

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Lauren S. Miller
Email: laurenm@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1914 4th Avenue North
Suite 320
Birmingham, AL 35203
Tel: (205) 533-4175

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4629

Daniel A. Nigh, FBN 30905
Email: dnigh@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (888) 435-7001

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX  78257
Tel: (800) 294-0055

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA  70130
Tel: (504) 524-5777

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

Steven B. Rotman
Email: srotman@housfeld.com
HAUSFELD, LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0602

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington, DC 20032
Tel: (202) 506-3591

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

*Plaintiffs' Steering Committee*

Brooke Achua
Email: brooke@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd., 46th Floor
Yorkville, IL 60560
Tel: (646) 502-7910

Harrison M. Biggs
Email: hbiggs@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4633

Lea P. Bucciero
Email: lbucciero@podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Marlo E. Fisher
Email: marlo@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

Noah Heinz
Email: noah.heinz@kellerpostman.com
KELLER | POSTMAN
1100 Vermont Avenue NW, Floor 12
Washington, DC 20005
Tel: (202) 918-1841

Caroline G. McGlamry
Email: carolinemcglamry@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

Laura K. Stemkowski
Email: lstemkowski@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9165

Alexander C. Cohen
Email: acohen@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000

Kendra Goldhirsch
Email: goldhirsch@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Catelyn McDonough
Email: cmcdonough@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

Madeline Pendley
Email: mpendley@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (850) 435-7003

Daniel E. Tropin
Email: tropin@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (954) 990-2216

*Plaintiffs' Leadership Development Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2022, a copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF and is being served on counsel via email pursuant to ECF No. 5684.

*/s/ Robert C. Gilbert*
Robert C. Gilbert

**Motion to Seal/Sealed and Exparte Filings:**

9:20-md-02924-RLR IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

<div align="center">

**U.S. District Court**

**Southern District of Florida**

</div>

**Notice of Electronic Filing**

The following transaction was entered by Gilbert, Robert on 8/1/2022 at 11:52 PM EDT and filed on 8/1/2022

| | |
|---|---|
| **Case Name:** | IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION |
| **Case Number:** | 9:20-md-02924-RLR |
| **Filer:** | Zantac (Ranitidine) Products Liability Litigation |
| **Document Number:** | 5914 |

**Docket Text:**
**Plaintiff's SEALED MOTION *Plaintiffs Opposition to Brand Defendants Motion to Exclude Plaintiffs General Causation Experts Opinions Related to Analytical Chemistry* by Zantac (Ranitidine) Products Liability Litigation. (Gilbert, Robert)**

**9:20-md-02924-RLR** No electronic public notice will be sent because the case/entry is sealed.

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1105629215 [Date=8/1/2022] [FileNumber=22428908-0
] [7f418e68fca1ae87f846e507302273bb01066149a4c45e8af5794929e39b49a66ca
ecf4d24445e7ff0202153eac91fb714b5628552f3583b156e5078217a1568]]