**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                                    MDL NO. 2924
PRODUCTS LIABILITY                                              20-MD-2924
LITIGATION

                                                    JUDGE ROBIN L. ROSENBERG
                                   MAGISTRATE JUDGE BRUCE E. REINHART

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**

**PLAINTIFFS' OPPOSITION TO BRAND DEFENDANTS' MOTION TO**
**EXCLUDE PLAINTIFFS' GENERAL CAUSATION EXPERTS' OPINIONS RELATED**
**TO EPIDEMIOLOGY[1]**

        DATED: August 1, 2022

---

[1] This Motion is filed under seal pursuant to the Order at D.E. 5684.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 4

I.     Ranitidine Can Cause Cancer Because It Degrades into NDMA ..................................... 4

      A.     NDMA Is a Well-Established Carcinogen.............................................................. 4

           1.     Defendants Do Not Dispute That NDMA Is a Carcinogen ....................... 5

           2.     Overwhelming Evidence Supports the Conclusion That NDMA Can Cause Cancer ......................................................................................... 6

           3.     Regulators and Other Authorities Have Concluded NDMA Can Cause Cancer ......................................................................................... 6

      B.     Ranitidine Was Withdrawn from the Market Because It Degrades into NDMA ................................................................................................................ 9

II.    The Weight of the Evidence Supports Causation ........................................................... 11

      A.     Considered Together, the Epidemiological Evidence Supports Causation for Each Cancer ......................................................................................................... 12

           1.     Bladder Cancer................................................................................... 12

           2.     Esophageal Cancer.............................................................................. 15

           3.     Gastric (Stomach) Cancer ................................................................... 18

           4.     Liver Cancer....................................................................................... 20

           5.     Pancreatic Cancer............................................................................... 22

      B.     The Active Comparator Studies Defendants Solely Rely on Do Not Outweigh This Body of Evidence............................................................................................ 24

           1.     The Human Ranitidine Active Comparator Studies Have Severe Limitations that Impair Their Applicability to Plaintiffs in This Litigation........................................................................................... 25

           2.     Dietary Studies Are Reliable and Commonly Used by Scientists and Regulators ......................................................................................... 26

i

III.   Overview of Plaintiffs' Experts' Qualifications and Analyses ........................................ 29

    A.   Anne McTiernan, M.D., Ph.D. ........................................................................ 29

    B.   Patricia Moorman, Ph.D. ................................................................................ 34

    C.   Andrew Salmon, D.Phil. ................................................................................. 37

    D.   Paul Michaels, M.D. ....................................................................................... 41

    E.   Jennifer Le, PharmD ...................................................................................... 42

    F.   Mira Hidajat, Ph.D. ........................................................................................ 44

LEGAL STANDARD ............................................................................................................ 44

ARGUMENT .......................................................................................................................... 46

I.   The Court Should Resolve General Causation Under *McClain* Category One
Because NDMA Is a Well-Established Carcinogen .......................................................... 46

    A.   Virtually All Scientific Authorities Recognize NDMA as Capable of Causing
Cancer ............................................................................................................. 47

    B.   Any Questions About the Amount of NDMA in Ranitidine Goes to Specific
Causation ......................................................................................................... 49

II.   Plaintiffs' Experts' Methodologies Are Generally Accepted ........................................... 50

III.   Plaintiffs' Experts Conducted Reliable Analyses of the Weight of the Evidence ............ 54

    A.   Plaintiffs' Experts Identified Considerable Limitations in the Ranitidine
Epidemiology, Following Best-Practices Identified by IARC, the *Reference
Manual*, and Other Authorities ...................................................................... 54

        1.   "[L]ack of suitably large groups of individuals exposed for a sufficient
period of time" ................................................................................... 55

        2.   "Long latency periods between exposure and manifestation of disease" . 58

        3.   Other limitations .................................................................................. 61

    B.   Plaintiffs' Experts Properly Accounted for Bias and Confounding .................... 62

        1.   Each Expert Appropriately Factored in Misclassification Bias ............... 63

        2.   Defendants Misstate Both Expert's Position on Active Comparator
Studies .................................................................................................. 65

3.     PPIs and H2RAs Are not Clean Active Comparators for Ranitidine ....... 67

4.     Plaintiffs' Experts Do not Contradict the Study Authors ......................... 69

5.     Defendants' Position on Statistical Significance Defies Scientific and Legal Authorities ..................................................................................... 70

C.     Plaintiffs' Experts Properly Weighed and Evaluated the Limited Ranitidine Data ................................................................................................................... 75

D.     Plaintiffs' Experts Properly Weighed and Evaluated Studies of NDMA ............ 77

1.     Dietary Studies Are Useful and Reliable ................................................... 79

2.     Occupational Studies ............................................................................... 83

IV.     Drs. Moorman and McTiernan Properly Conducted Bradford Hill Analyses ................ 86

V.     Drs. Salmon, Michaels, and Le's Opinions Are Reliable and Helpful ............................ 93

A.     Dr. Salmon's Bradford Hill Analysis Is Reliable ................................................. 93

B.     Dr. Salmon's Dose-Response Analysis Is Reliable ............................................. 94

C.     Dr. Michaels Considered All Relevant Evidence ................................................. 96

D.     Defendants' Anemic Attack on Dr. Le Mischaracterizes Her Testimony ........... 98

CONCLUSION ................................................................................................................ 99

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*Burst v. Shell Oil Co.*,
   No. CIV.A. 14-109, 2015 WL 3755953 (E.D. La. June 16, 2015)............................................ 78

*Childress v. Johnson & Johnson*,
   No. 2:12-cv-01564, 2017 WL 6350504 (S.D. W. Va. Dec. 12, 2017) ..................................... 41

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)............................................................................................. 45, 46, 50, 51

*Daubert v. Merrell Dow Pharms., Inc., (Daubert II)*,
   43 F.3d 1311 (9th Cir. 1995) ....................................................................................... 51, 52

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
   285 F.3d 609 (7th Cir. 2002) ............................................................................................. 96

*Geery v. Ethicon, Inc.*,
   No. 6:20-cv-1975, 2021 WL 2580144 (M.D. Fla. Apr. 9, 2021) ............................................ 41

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997).......................................................................................................... 46

*Hardeman v. Monsanto Co.*,
   997 F.3d 941 (9th Cir. 2021) ....................................................................................... 46, 54

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
   299 F. Supp. 3d 1291 (N.D. Fla. 2018) ..................................................................... 51, 86, 99

*In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*,
   9 F.4th 768 (8th Cir. 2021) ...................................................................................... 45, 46, 51

*In re Ethicon, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*,
   No. 2:12-cv-02512, 2017 WL 2840473 (S.D. W. Va. June 30, 2017) ..................................... 41

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*,
   509 F. Supp. 3d 116 (D.N.J. 2020) ...................................................................... 31, 38, 80, 81

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
   289 F. Supp. 2d 1230 (W.D. Wash. 2003).......................................................................... 84

*In re Prempro Prods. Liab. Litig.*,
   No. 4:03-cv-1507, 2012 WL 13033298 (E.D. Ark. Apr. 11, 2012) ........................................ 41

*In re Prempro Prods. Liab. Litig.*,
   No. 4:03-cv-1507, 2012 WL 13034062 (E.D. Ark. Apr. 9, 2012) .......................................... 41

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
    858 F.3d 787 (3d Cir. 2017) ................................................................ 51

*Jazairi v. Royal Oaks Apartment Assocs., L.P.*,
    No. 404CV091, 2005 WL 6750570 (S.D. Ga. June 23, 2005) ................................... 47

*Johnson v. Mead Johnson & Co., LLC*,
    754 F.3d 557 (8th Cir. 2014) ............................................................... 46

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................... 46, 80

*Lauzon v. Senco Prods., Inc.*,
    270 F.3d 681 (8th Cir. 2001) ............................................................... 51

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ....................................................................... 72

*McClain v. Metabolife Intern., Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ................................................. 38, 46, 47, 50

*MidAmerica C2L Inc. v. Siemens Energy Inc.*,
    25 F.4th 1312 (11th Cir. 2022) ............................................................. 45

*Milward v. Acuity Specialty Prod. Grp., Inc.*,
    639 F.3d 11 (1st Cir. 2011) ........................................................ 84, 86, 99

*Moore v. Intuitive Surgical, Inc.*,
    995 F.3d 839 (11th Cir. 2021) ...................................................... 45, 46, 96

*Ramirez v. E.I. DuPont de Nemours & Co.*,
    579 F. App'x 878 (11th Cir. 2014) .......................................................... 98

*Rider v. Sandoz Pharms. Corp.*,
    295 F.3d 1194 (11th Cir. 2002) ..................................................... 1, 45, 78

*St. Louis Condo. Ass'n v. Rockhill Ins. Co.*,
    5 F.4th 1235 (11th Cir. 2021) ......................................................... 97, 98

*Townsend v. Ethicon, Inc.*,
    No. 2:20-cv-01984, 2021 WL 304555 (D. Nev. Jan. 29, 2021) ................................. 41

*United States v. Brown*,
    415 F.3d 1257 (11th Cir. 2005) ............................................................. 46

*United States v. Downing*,
    753 F.2d 1224 (3d Cir. 1985) ............................................................... 50

*Vision I Homeowners Ass'n v. Aspen Specialty Ins. Co.*,
  674 F. Supp. 2d 1321 (S.D. Fla. 2009), and should be denied. ................................................ 98

*Wells v. Ortho Pharm. Corp.*,
  788 F.2d 741 (11th Cir. 1986) ................................................................................................ 72

*Williams v. Int'l Paper Co.*,
  No. CV 108-45, 2009 WL 10678630 (S.D. Ga. July 19, 2009) ........................................ 47, 50

**Other Authorities**

Federal Rule of Evidence 702 ......................................................................................... 44, 46, 97

Fla. Admin. Code R. 62-777.170 ................................................................................................ 8

Plaintiffs submit this Response in Opposition to Brand Defendants' Motion to Exclude Plaintiffs' General Causation Experts' Opinions Related to Epidemiology, [D.E. 5736].

## INTRODUCTION

The question for this Court is straightforward: can any expert witness opine that the NDMA in ranitidine can cause cancer? The question is not whether NDMA in ranitidine actually *did* cause a Plaintiff's cancer—that is a specific causation question. Instead, the relevant inquiry is categorical, and asks whether *any* Plaintiff, whatever the facts of his cancer or usage, *could possibly* have cancer caused by NDMA in ranitidine. Plaintiffs' experts concluded the answer to that question is "yes." This Court must decide if that affirmative opinion was based on such a flawed methodology that a jury cannot even hear it, let alone consider it.

Once the underbrush of Defendants' confused arguments is cleared away, this Motion is easy to resolve. All agree NDMA can cause cancer. Regulators have said so; international scientific authorities have said so; and even *Defendants* have said so. And all agree ranitidine degrades into NDMA. The serious concern that the NDMA in ranitidine can cause cancer is why regulators around the world have pulled it from the shelves. Plaintiffs' experts concluded the regulators were right, because NDMA in ranitidine can cause cancer. They have prepared magisterial expert reports spanning thousands of pages and analyzing every angle of the question. They have sterling credentials, with terminal degrees in medicine, epidemiology, toxicology, pathology, and other specialties, and appointments in medical schools, at epidemiology departments, on prestigious medical journals, and for non-governmental organizations. They have experience working for regulators and grant-making institutions and have published *hundreds* of peer-reviewed studies on cancer and other topics. They have been recognized as experts in the field by premiere scientific organizations. They are, in short, bona fide scientific experts.

This group of experts, following the same methodology highlighted as authoritative by the *Reference Manual*, evaluated and weighed *all* of the evidence. They considered the animal and mechanistic studies that uniformly show that NDMA causes cancer in animals, and that the same biological mechanisms apply to humans. This is the evidence authoritative international bodies relied upon in concluding that NDMA is a probable carcinogen in humans. This evidence, by itself, could support causation, since the Eleventh Circuit "has long held that epidemiology is not required to prove causation in a toxic tort case." *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1199 (11th Cir. 2002).

But no expert stopped there. Each considered more recent human epidemiology, which includes scores of dietary studies with careful measurements of NDMA, which lead to the clear-cut conclusion that NDMA causes cancer and demonstrate a dose-response relationship: the more NDMA, the more likely cancer becomes. Each considered occupational studies released in just the last few years that examined NDMA exposures in rubber plants for almost *fifty years* to assess its effects on cancer. Each considered the studies from FDA, Defendants, and Emery Pharma demonstrating that ranitidine degrades into NDMA.

And, of course, each considered the human ranitidine epidemiology. Multiple human epidemiological studies of ranitidine demonstrate an association between consuming ranitidine and developing each cancer at issue in this litigation: bladder, liver, pancreas, stomach, and esophageal. Not one expert ignored the human ranitidine epidemiological studies—to the contrary, this literature was a core pillar of each general causation opinion in this case. But, despite a remarkable consistency between the animal studies, dietary studies, occupational studies, and human ranitidine studies, some epidemiological studies—the ones Defendants emphasize—did not find an association between ranitidine and cancer. Some of these studies were "active comparator" studies, that compared the cancer risks of ranitidine to the risks of another acid suppressor. Plaintiffs' experts weighed those studies as well, and meticulously explained why those studies' limitations undermine their explanatory power.

Yet those studies are what Defendants rely upon *exclusively*. On their argument, the null results from a handful of active comparator ranitidine epidemiology studies are so compelling that no expert could give *any* weight to dietary studies, occupational studies, animal studies, *or even ranitidine epidemiology comparing users to non-users*. This is especially true, in their view, because dietary and occupational studies deserve practically no weight anyway in light of their intrinsic unreliability. Any expert who concludes otherwise is an irredeemable hack whose methodology is *per se* unreliable.

That argument is wrong. Employing the ordinary methodology of their craft, Plaintiffs' experts weighed each study carefully. They agree that active comparator studies can be probative—but dispute that active comparator studies are exempt from the ordinary critiques that apply to all epidemiological studies.

Take, for example, exposure. If all studies of cigarettes and lung cancer examined only a few years of use, Brown & Williamson would still be claiming cigarettes are harmless. Plaintiffs

in this case claim the NDMA in ranitidine causes cancer after *long-term use*. But that is not what the active comparator studies Defendants tout tested. Many looked at one or two prescriptions' worth; others, use for a few weeks or months—the very longest assessed dose-response for three years (and found a strong association). Paying close attention to exposure is not a Plaintiffs' lawyer trick—it is an established best practice recommended by the *Reference Manual*, the International Agency for Research on Cancer (IARC), and regulators worldwide. All agree the cumulative dose is critical. But Defendants say nothing about the limited exposure in the studies they emphasize.

Or take the follow-up period. Even a substance that clearly causes cancer will not cause it right away. Cancer can take *decades* to develop. And so, the epidemiological community prizes studies with long follow-up periods. IARC has explained that a study with follow-up of less than *thirty years* cannot adequately test for cancer risk. But Defendants say nothing about the follow-up in the studies they rely on, which are almost all below *ten* years (some far below).

Some studies have more exotic problems. For example, many study populations are young, and so not likely to get cancer—whatever the cause—for many years. Other studies use arcane aggregated databases that take a snapshot once per year, but do not track exposure *at all* and cannot even tell when participants leave the study. Other studies are simply too small to show much of anything, or failed to measure important confounding factors such as smoking or alcohol (which vary between ranitidine consumers and consumers of other medications). Apart from these limitations are basic data quality questions: Where does the data come from, and is that source of reliable? Were the statistical adjustments the authors used valid and helpful?

The question of how much weight to give each study in light of its strengths and limitations is a familiar one for doctors and scientists. Evaluating and weighing evidence is a cornerstone of research, evidence-based medicine, and sound regulation. And so, using the ordinary methodologies they apply in their research and day-jobs, Plaintiffs' experts dove into the studies, exhaustively analyzing each one and applying a consistent set of criteria to assess which studies were sound (and so deserved high weight) and which were inapplicable (and so deserved low weight). After applying that methodology, Plaintiffs' experts determined that, under the standards of their craft, the active comparator studies Defendants claim to be definitive are anything-but. They are, in fact, studies with serious limitations, and their conclusions do not map onto the population of Plaintiffs. Still, no expert ignored the studies. Instead, they weighed them according to their merit after careful—and carefully explained—analysis.

But the weight of these studies—such as it was—did not resolve the question of causation by itself. And so, Plaintiffs' experts weighed the other evidence too: the dietary studies, the occupational studies, and animal studies. They found a surprising consistency, despite the many limitations that biased the results downward. After carefully weighing the evidence, they performed a Bradford Hill analysis, assessing the likelihood that the *association* between the NDMA in ranitidine and cancer is *causal*. They concluded it was. That conclusion followed from sound methodology that no one questions, and it followed from a thorough, rigorous review of all available evidence. It is correct. And, at minimum, it vastly surpasses the admissibility requirements of Rule 702. After confirming their credentials and rigor, this Court should deny the Motion, open the gate, and allow Plaintiffs' experts to meet the jury.

## FACTUAL BACKGROUND

### I.      Ranitidine Can Cause Cancer Because It Degrades into NDMA

There are two fundamental facts in this litigation that are undisputed. The first is that NDMA can cause cancer. The second is that ranitidine contains NDMA. The fact-finder must ultimately decide whether that NDMA *can* cause cancer (general causation), and whether each plaintiff has been exposed to enough NDMA from ranitidine that it caused or contributed to his or her development of cancer (specific causation).

#### A.      NDMA Is a Well-Established Carcinogen

Defendants do not dispute that NDMA is widely recognized within the medical and scientific community as a genotoxic carcinogen—because they cannot. The medical and scientific communities have recognized the genotoxicity and carcinogenicity of NDMA for almost a century and no credible scientist can deny this well-known fact. Ordinary dictionaries agree. Merriam-Webster defines NDMA as "a carcinogenic nitrosamine $C_2H_6N_2O$ that occurs especially in tobacco smoke."[2] Medical dictionaries agree. Dorland's Medical Dictionary defines it as "a carcinogenic and hepatotoxic organic compound found at trace levels in tobacco smoke and in some cured meats …."[3] Standard medical textbooks utilized by world-renowned teaching and research institutions likewise agree, stating, without qualification, that NDMA is "known to be

---

[2] https://www.merriam-webster.com/dictionary/dimethylnitrosamine
[3] https://www.dorlandsonline.com/dorland/definition?id=14201

carcinogenic."[4] It is simply fundamental bench science taught in every basic toxicology course.[5]

<em>1.    Defendants Do Not Dispute That NDMA Is a Carcinogen</em>

Defendants have repeatedly admitted that NDMA is a known carcinogen. In GSK's Health Hazard Report on NDMA, GSK concludes that "*NDMA is a genotoxic carcinogen, and exposure should be reduced to the extent possible*."[6] That conclusion applies to humans: "[q]ualitatively, the metabolism of NDMA appears to be similar in humans and animals; as a result, it is considered *highly likely that NDMA is carcinogenic to humans, potentially at relatively low doses of exposure.*" *Id.* (emphasis added). In 2019, GSK stated that "NDMA is a known carcinogen" in a confidential internal document.[7] Another internal GSK document admits "Nitrosamine diseases can cause cancer and thus represent a serious health hazard."[8] In documentation for their ranitidine lab experiments, GSK identifies NDMA as a carcinogenic worker hazard, stating, "*Hazard Notes: Ranitidine hydrochloride may potential contain < 15 ppm of an impurity N-nitrosodimethylamine (NDMA) which is designated as OHC5 carcinogen*."[9] 15 ppm is equivalent to 2,250 nanograms for a 150mg tablet. Further, GSK admits that it has known that ranitidine forms NDMA under certain conditions since 1982.[10]

Likewise, Sanofi's 2019 Health Hazard Evaluation recognized NDMA to be mutagenic and carcinogenic to humans, stating, "NDMA requires metabolic activation to express its mutagenic and carcinogenic effects and this metabolism route exists in rodents and man," and further noting that "NDMA should be regarded for practical purposes as if it was carcinogenic to

---

[4] Klaassen, *Casarett and Doull's Toxicology: The Basic Science of Poisons* at 1351 (9th ed. 2019); *see also A Textbook of Modern Toxicology* (Ernest Hodgson ed., 4th ed. 2011) at 252-253, Figure 11.10; Schottenfeld & Fraumeni, *Cancer Epidemiology and Prevention* at 314 (4th ed. 2018).

[5] Defense experts even admit that it is a "core part of the medical toxicology curriculum." Ex. 17, (Hatten Dep. Tr.) at 51:12-18.

[6] Ex. 41 (GSK Hazard Assessment Report on N-Nitroso-dimethylamine (NDMA), September 25, 2019, GSKZAN0003419540) ("GSK Hazard Assessment Report, GSKZAN0003419540") (emphasis added).

[7] Ex. 42 (GSKZAN0000178581, Dated 7/29/2019 in metadata, Internal comms- Ranitidine NDMA Query- 29 July.docx).

[8] Ex. 40 (GSKZAN0000430892).

[9] Ex. 39 (GSKZAN0000389009, GSK Chemistry Experiment AH19065 - Particle imaging of Saraca Grade 1 and grade III processes to convert ranitidine free base to hydrochloride) at 389014 (emphasis in original).

[10] Ex. 16 (Deposition of GSK 30(b)(6) Witness, James Harvey) at 165:16-24.

5

humans."[11] In 2020, Sanofi described NDMA as part of the "high potency mutagenic carcinogens referred to as the cohort of concern."[12]

Beyond company documents, a crowd of witnesses for GSK, Pfizer, BI, and Sanofi admitted at their depositions that NDMA is a known carcinogen.[13] Defendants' own experts have also recognized that NDMA is a carcinogen.[14] Defendants have admitted it because the evidence is irresistible.

        2.    *Overwhelming Evidence Supports the Conclusion That NDMA Can Cause Cancer*

IARC is the most prestigious and well-respected scientific body that evaluates the carcinogenicity of different agents. IARC developed the 10 key characteristics of carcinogens to provide a broad view of the properties of human carcinogens leading to cancer.[15] This is an established objective methodology to identify the carcinogenicity of a chemical such as NDMA.[16] Scientists evaluate the key characteristics using evidence from animal cancer bioassays, studies of specific biological mechanisms in tissues and cells derived from humans, studies of specific biological mechanisms in tissues and cells derived from animals, and studies from exposures to humans. Carcinogens need not exhibit every key characteristic. Many known carcinogens like Benzene have 3 to 4 key characteristics. As explained at length in Dr. Panigrahy's and Dr. Michaels' reports (and outlined in Plaintiffs' offensive *Daubert* Motion) NDMA exhibits 9 out of the 10 key characteristics of carcinogens, providing overwhelming evidence of its carcinogenicity.[17]

        3.    *Regulators and Other Authorities Have Concluded NDMA Can Cause Cancer*

Non-governmental scientific authorities have exhaustively evaluated the data for NDMA

---

[11] Ex. 48 (SANOFI_ZAN_MDL_0000206858) at 8.

[12] Ex. 49 (SANOFI_ZAN_MDL_0000278477).

[13] D.E. 5841 at 5-7.

[14] *Id.* at 7.

[15] Smith, M. T. *et al.*, *Key Characteristics of Carcinogens as a Basis for Organizing Data on Mechanisms of Carcinogenesis*, 124 ENVIRON HEALTH PERSPECT., 713-721 (2016), https://doi.org/10.1289/ehp.1509912.

[16] IARC Monographs on the Identification of Carcinogenic Hazards to Humans, Preamble, Amended January 2019; *see also* Smith 2016, *supra* note 15.

[17] *See* D.E. 5841 at 8-17; *see also* Def. Ex. 13 (Michaels Rep.) at 3, 62; and Def. Ex. 19 (Panigrahy Rep.) at 15, 74-77. Citations here and below to "Def. Ex." are to the exhibits attached to the Declaration of Loren H. Brown filed in support of the Motion.

and concluded it can cause cancer. The methodology IARC employs in evaluating carcinogens is firmly established as reliable and sound. IARC considers all available evidence including human and animal studies, mechanistic and other relevant data to determine whether the weight of the evidence reflects that a chemical is carcinogenic.[18] IARC carcinogenicity evaluations are considered authoritative in the legal, medical, and scientific communities.[19] Several of Plaintiffs' experts, including Dr. McTiernan, Dr. Melnick, and Dr. Zeiger, are well-positioned to apply IARC's methodology in this litigation, since they have previously applied it as invited experts/members of IARC working groups tasked with evaluating the carcinogenicity of agents.[20]

In 1978, IARC determined that NDMA "is carcinogenic *in all animal species tested*" including "mice, rats, Syrian golden, Chinese and European hamsters, guinea-pigs, rabbits, ducks, mastomys, various fish, newts and frogs."[21] Given its universally carcinogenic nature in every test subject, IARC advised that NDMA "should be regarded for practical purposes as if it were carcinogenic to humans." *Id.* IARC is in good company. In 2002, the World Health Organization published a detailed report about NDMA.[22] WHO noted that "tumours have been induced in all species examined at relatively low doses" and that "NDMA is mutagenic and clastogenic." *Id.* at 4. Because NDMA is genotoxic and clastogenic, "exposure to NDMA should be reduced to the extent possible." *Id.* at 5. WHO reviewed NDMA dietary epidemiological studies—the same kind Defendants deem irrelevant and unreliable—and determined that these results demonstrated a consistent association between cancer and NDMA. *Id.* at 21. WHO's bottom line: due to "the considerable evidence of carcinogenicity of NDMA in laboratory species, evidence of direct interaction with DNA consistent with tumour formation, and the apparent lack of qualitative species-specific differences in the metabolism of this substance, *NDMA is highly likely to be*

---

[18] National Research Council, *Reference Manual on Scientific Evidence: Third Edition*. Washington, DC: The National Academies Press., at 20 (2011), https://doi.org/10.17226/13163 ("*Reference Manual*").

[19] *Id.* at 564.

[20] Def. Ex. 10 (McTiernan Rebuttal Rep.) at 27; Def. Ex. 11 (Melnick Rep.) at 6; Def. Ex. 25 (Zeiger CV) at 3-4.

[21] IARC Monographs on the Evaluation of Carcinogenic Risk of Chemicals to Man, vol. 17. IARC, Lyon, France, 125-75, 1978; Overall evaluations of carcinogenicity: an updating of IARC Monographs volumes 1 to 42. IARC Monogr Eval Carcinog Risks Hum Suppl. 1987;7:1-440. PMID: 3482203.

[22] Liteplo RG, Meek ME, Windle W., World Health Organization, *Concise International Chemical Assessment Document 38: N-Nitrosodimethylamine*, at 15 (2002).

*carcinogenic to humans.*" *Id.* at 23 (emphasis added).

Regulators too have long warned that NDMA causes cancer. In 1987, California listed NDMA as carcinogenic under Proposition 65,[23] and Florida does the same under Administrative Code, Rule Chapter 62-777.170.[24] The Agency for Toxic Substances and Disease Registry (ATSDR) states that "it is appropriate to predict NDMA poses a genotoxic threat to humans."[25] In 1981, the National Toxicology Program (NTP), classified NDMA as "reasonably anticipated to be a human carcinogen."[26] The EPA classifies NDMA as a probable human carcinogen.[27] The FDA's Nitrosamine Guidance for Industry cited IARC and EPA's classification of NDMA as a mutagenic carcinogen and a probable human carcinogen.[28] The Canadian Environmental Protection Act of 1999 lists NDMA as "highly likely to be carcinogenic to humans."[29] Most recently, in 2022, ATSDR concluded that the "carcinogenicity of NDMA is widely recognized."[30] It is.

That is why Plaintiffs' experts opine that NDMA is a genotoxic carcinogen.[31] *Defendants have not moved to exclude these opinions.* This Court should take as the foundation of its *Daubert* analysis this undisputed fact: NDMA can cause cancer.

---

[23] State of California, *Chemicals Known to the State of California to Cause Cancer or Reproductive Toxicity* (Feb. 2022), https://oehha.ca.gov/media/downloads/proposition-65//p65chemicalslistsinglelisttable2021p.pdf.

[24] Fla. Admin. Code R. 62-777.170.

[25] Agency for Toxic Substances and Disease Registry (ATSDR), U.S. Department of Health and Human Services, *Toxicological Profile for n-Nitrosodimethylamine*, at 42 (1989) ("ATSDR NDMA Tox. Profile (1989)").

[26] U.S. Department of Health and Human Services, National Toxicology Program (NTP). *Report on Carcinogens* (2d ed. 1981).

[27] EPA, *Technical Fact Sheet: N-Nitroso-dimethylamine (NDMA)* (Nov. 2017), https://www.epa.gov/sites/default/files/2017-10/documents/ndma_fact_sheet_update_9-15-17_508.pdf.

[28] U.S. Dep't of Health and Human Servs., Food and Drug Admin., Center for Drug Evaluation and Research, *Control of Nitrosamine Impurities in Human Drugs: Guidance for Industry*, at 5, App'x B (Feb. 2021), https://www.fda.gov/media/141720/download.

[29] Ex. 34 (Canadian Environmental Protection Act, *N-Nitrosodimethylamine*, GSKZAN0000620057 (1999)).

[30] Agency for Toxic Substances and Disease Registry (ATSDR), U.S. Department of Health and Human Services, *Toxicological profile for N-Nitrosodimethylamine (Draft for Public Comment)* (2022) ("ATSDR NDMA Tox. Profile (2022)").

[31] Def. Ex. 7 (Marletta Rep.) at 3; Def. Ex. 11 (Melnick Rep.) at 11-19; Def. Ex. 25 (Zeiger Rep.) at 1; Def. Ex. 19 (Panigrahy Rep.) at 9-10; Def. Ex. 13 (Michaels Rep.) at 2-3; Def. Ex. 15 (Moorman Rep.) at 230; Def. Ex. 9 (McTiernan Rep.) at 55; Def. Ex. 22 (Salmon Rep.) at 4; Def. Ex. 5 (Le Rep.) at 34; Def. Ex. 4 (Hidajat Rebuttal Rep.) at 28; Def. Ex. 17 (Najafi Rep.) at 5.

**B.**    **Ranitidine Was Withdrawn from the Market Because It Degrades into NDMA**

NDMA forms in ranitidine under labelled conditions of storage, shipping, and transport, and under common consumer handling (and even more when those conditions are not followed). Defendants and regulators consistently found NDMA when testing ranitidine: "Test results from industry and from samples obtained and tested by FDA showed that NDMA was consistently detected in ranitidine, and in many instances, NDMA was detected above the A[cceptable] D[aily] I[ntake]."[32] The consistent degradation of ranitidine alarmed the FDA. "FDA [wa]s no longer confident that *any* ranitidine product will remain stable through its labeled expiration date." *Id.* (emphasis added). In fact, GSK's own testing found 41.4 mcg/g of NDMA, equivalent to **12,420 ng** of NDMA for a 300 mg tablet, in its **unexpired** ranitidine API carefully preserved in its own facilities.[33]

As ranitidine is exposed to increasing humidity, heat, and time, the FDA recognized that more and more NDMA will form, concluding "[n]ew FDA testing and evaluation prompted by information from third-party laboratories [e.g., Emery Pharma] confirmed that NDMA levels increase in ranitidine even under normal storage conditions."[34] The FDA also recognized ranitidine is not always transported or stored under normal conditions. The distribution chain may sometimes be hot or humid, as are the bathrooms, gloveboxes, and purses of ranitidine consumers, and this would increase NDMA even more: "NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by consumers. The testing also showed that the older a ranitidine product is, or the longer the length of time since it was manufactured, the greater the level of NDMA."[35]

FDA tested pristine ranitidine provided to it by manufacturers, not ranitidine in real-world conditions.[36] Recognizing this, in March 2021, after ranitidine was withdrawn from the market, the FDA Expert Working Panel stressed the importance of testing in "real world conditions," like a "hot mailbox," "glovebox in the car," "human bathroom," or a "truck in the middle of summer

---

[32] FDA Response to Emery Citizen's Petition (April 1, 2020), at 9, https://emerypharma.com/wp-content/uploads/2020/04/FDA-2020-P-0042-CP-Response-4-1-2020.pdf.

[33] Ex. 47 (GSKZAN0000883508, Ex. 3142 Master Data Sheet); Ex. 27 (Searle Dep. Tr.) at 152:17-153:3 (testifying that API has a shelf life of five years).

[34] Def. Ex. 95 (April 1, 2020 FDA Recall Notice) at 2.

[35] *Id.*

[36] Def. Ex. 93 (Nov. 1, 2019 FDA Laboratory Tests Ranitidine).

in the southern U.S." to assess drug stability.[37] Defendants have emphasized the testing results
from pristine product and not attempted to test NDMA levels under real-world conditions. When
GSK exposed its tablets to varying conditions, the amount of NDMA at Day 0 was 46.5 ng (.31
μg/g) at 50°C/65% RH and 114 ng (.38 μg/g) at 60°C/65% RH, and at Day 14 rapidly increased
to **26,730 ng** (178.2 μg/g) at 50° C and 65% RH and at Day 7 was **84,270 ng** (280.9 μg/g) at 60°
C and 65% RH.[38] These numbers make it obvious why Defendants have not conducted real-world
testing: it would be closer to the 50° C result than the results they prefer. Based on the high levels
of NDMA—which can cause cancer—FDA and other regulators worldwide pulled ranitidine from
the market. It has not been reintroduced.

To distract from the clear finding of excessive NDMA in their ranitidine, Defendants focus
on testing that Plaintiffs are not relying on. They raise the Valisure Petition, the Zeng study, and
the GC/MS testing method. To clarify, the GC/MS method is not improper because it *miscalculates*
the amount of NDMA in ranitidine. The GC/MS method is improper because the heat from the
process forms even more NDMA. That explains some of the Valisure results, and it explains the
Zeng result (which found NDMA in urine). Urine is not a reliable measure for NDMA in the body
because NDMA is rapidly metabolized—that is, it breaks down into other substances in the body,
rather than passing into urine. The FDA itself discussed this fact at the FDA Expert Working Group
in March 2021.[39]

That fact is why Defendants' presentation of the Florian study is so misleading. Defendants
argue that study used "the 'gold standard' for assessing causal relationships in humans" and it
"assess[ed] whether ranitidine converted to NDMA in the human body." Motion at 13. But because
NDMA is so quickly metabolized, Florian could not measure whether ranitidine breaks down into
NDMA in the body through *urine*, since vanishingly little additional NDMA would be present
either way. Tellingly, Florian also measured plasma levels and found that NDMA plasma levels
of those who consumed ranitidine and ate a cured meat diet were nearly double those of the placebo
cured meat group (29.0 pg/mL v. 16.2 pg/mL).[40] And, of course, Florian says nothing about the
NDMA levels in ranitidine *before* it enters the body.

---

[37] Ex. 36 (FDA Working Group Transcript, Day 2) at 129:6-21.
[38] Ex. 43 (GSKZAN0000051927, Exh. 3138 June 2020 RCA) at 79-80.
[39] FDA, *Nitrosamines as Impurities in Drugs—Health Risk Assessment and Mitigation Public
Workshop*, at 5 (March 29-30, 2021), https://www.fda.gov/media/150932/download.
[40] Def. Ex. 49 (Florian, *et al.* 2021) at E7.

## II.     The Weight of the Evidence Supports Causation

Basic logic suggests that the NDMA in ranitidine causes cancer in humans just as NDMA demonstrably causes cancer in animals. Epidemiology confirms this logic. In addition to mechanistic and animal evidence, there are three sources of human epidemiologic evidence supporting general causation in this case: (1) observational studies evaluating ranitidine users as compared to non-users (use vs. non-use) or compared to other acid suppressants (active comparator studies), (2) observational studies evaluating dietary exposure to NDMA and cancer, and (3) observational studies evaluating occupational exposure to NDMA and cancer mortality. While all observational studies have limitations, consistency across a variety of study designs, in different populations with different exposures is strong evidence of causation.[41]

Despite short duration of use, short follow-up, lack of OTC use information, and other limitations, seven ranitidine epidemiologic studies reported that ranitidine is associated with increased risks for bladder cancer, three for liver cancer, five for gastric cancer, three for pancreatic cancer, and four for esophageal cancer. But these studies are not conclusive by themselves. To interpret them, one must ask questions that are not answered by the studies, namely, what would the results be if, instead of low exposures with short follow-up and incomplete information, the studies were gold-standard, long-term, and controlled all confounders? The human ranitidine epidemiology leaves this question open, because it did not test populations like Plaintiffs here (over 60% of whom used ranitidine for more than 10 years). Expert judgment must answer that question by reference to other bodies of evidence.

Human epidemiological evidence from dietary and occupational studies on NDMA answers the questions left by the ranitidine studies, showing what a long-term, high-exposure, long-follow-up study would find. There are far more dietary studies on NDMA, which have exposure and follow-up that the ranitidine studies lack. Defendants have repeatedly told the Court that ranitidine has NDMA levels at amounts "like grilled or smoked meats." D.E. 1580 at 8. The logical question to ask is: does ranitidine cause cancer just like the NDMA in those foods does? The evidence suggests it does. The occupational studies confirm the dietary studies. The largest and most important occupational study is Hidajat, *et al.*,[42] which had *decades* of follow-up, validated cancer diagnoses, and detailed NDMA exposure information allowing for a dose-

---

[41] Def. Ex. 46 (Bradford Hill 1965).
[42] Def. Ex. 54 (Hidajat, *et al.* 2019).

response analysis for multiple cancers. In the absence of any ranitidine studies that even approach the exposures and follow-up, Hidajat provides powerful evidence of what those studies—if conducted—would show. Plaintiffs' experts considered the full body of evidence, weighed it carefully, and concluded that the NDMA in ranitidine can cause cancer.

### A.    Considered Together, the Epidemiological Evidence Supports Causation for Each Cancer

There is evidence in the peer-reviewed ranitidine studies that ranitidine use is associated with an increased risk of each of the five cancers at issue in this litigation. There is an overall consistency, and there is evidence of dose-response. There also is abundant epidemiological evidence from diet and limited but important evidence from occupational exposure, consistently reporting that NDMA is associated with increased risk for bladder, esophageal, stomach, liver, and pancreatic cancer, with consistent evidence of a dose response, confirming the decades of accumulated animal study evidence, and human cell line evidence that led IARC and FDA to conclude that NDMA is a probable human carcinogen.

Forest plots have been charted for bladder, esophageal, stomach, liver, and pancreatic cancer to demonstrate the findings of the ranitidine, dietary, and occupational studies. These forest plots demonstrate visually the overall consistent evidence in the human epidemiologic studies of an association with an increased risk of each of the five designated cancers [43]

#### 1.    Bladder Cancer

The totality of the evidence overwhelmingly demonstrates that consumption of NDMA in ranitidine causes bladder cancer. Each type of study—ranitidine (green in the forest plot below), dietary (blue), and occupational (red)—supports an increased risk of bladder cancer.

---

[43] For NDMA dietary studies and occupational studies, only studies that quantified NDMA and assessed whether cancer was associated with increased exposure to NDMA have been included in the forest plots. The Keszei study was not included because it assessed cancer subtypes only (*i.e.*, squamous cell, adenocarcinoma) and not the overall cancer type (*i.e.*, Esophageal). Also, meta-analyses were not included. The highest quartile (tertile or quintile) of exposure was compared to the lowest quartile (tertile or quintile) of exposure. For the Loh dietary study, increased cancer risk was measured per standard deviation of NDMA exposure. For ranitidine studies, studies that did not assess risk of ranitidine and specific cancer types were not included (*i.e.*, studies that measured only class risk of H2Ras or studies like Michaud and Iwagami that presented a combined analysis of ranitidine and another H2RA were not included). Because there are multiple findings reported in studies, the Forest Plots focused on the main analyses of each selected study.



a)      Ranitidine Epidemiological Studies Support a Consistent Increased Risk of Bladder Cancer and Evidence of Dose Response

Every ranitidine epidemiological study assessing bladder cancer demonstrates consistent results of an increased risk of bladder cancer. First, Cardwell demonstrated an overall 22% statistically significant increased risk of bladder cancer when comparing users to non-users and a 43% statistically increased risk of bladder cancer when comparing users with at least 3 years of use compared to non-users. Def. Ex. 48 (Cardwell, *et al.* 2021). When comparing ranitidine users to PPI users, Cardwell found an overall 20% statistically significant increased risk of bladder cancer and a 45% statistically significant increased risk for ranitidine users with at least 3 years of use compared to PPI users with at least 3 years of use. *Id.* Cardwell also found a 27% non-statistically significant increased risk of bladder cancer when comparing ranitidine users with at least 3 years of use compared to other H2RA users with at least 3 years of use. *Id.* Next, the Yoon study reported a 41% non-statistically significant increased risk of bladder cancer for ranitidine users compared to famotidine users. Def. Ex. 77 (Yoon, *et al.* 2021). The Kantor study reported a 22% non-statistically significant increased risk of bladder cancer for ranitidine users compared to non-users and a 30% non-statistically significant increased risk of bladder cancer for ranitidine users compared to omeprazole users. Def. Ex. 57 (Kantor, *et al.* 2021). In addition, Norgaard shows a 33% statistically significant increased risk of bladder cancer for ranitidine users versus other

H2RAs without adjustments for potential confounders and an 11% non-statistically significant increased risk of bladder cancer for ranitidine users versus other H2RAs when applying the standard inverse of probability of treatment (sIPT) adjustment. Def. Ex. 68 (Norgaard, *et al.* 2021). Also, Habel demonstrated a 56% non-statistically significant increased risk of bladder cancer or kidney cancer for ranitidine users versus non-users. Def. Ex. 53 (Habel, *et al.* 2000). A cross-sectional analysis of patients at Memorial Sloane Kettering hospital found a 58% statistically significant increased risk of reporting ratio of bladder cancer for ranitidine users compared to other acid-suppressing drug users.[44] Finally, Michaud reported a 58% non-statistically significant increased risk of bladder cancer for ranitidine or cimetidine users compared to non-users.[45]

Overall, the study limitations bias the results toward showing less association than a study of the population of Plaintiffs would have, but the studies nevertheless provide consistent evidence of an increased risk for bladder cancer among ranitidine users whether compared to non-users[46] or to users of other acid-suppressing drugs.[47] As the *Reference Manual* explains, if the relative risk exceeds 1.0, "the risk in exposed individuals is greater than the risk in unexposed individuals. There is a positive association between exposure and disease which could be causal." *Reference Manual* at 567. There are several well-established causal relationships, where the magnitude of the risk is between 1.0 and 2.0, like the relative risk in these studies. The magnitude of risk for passive smoking and lung cancer and between smoking and heart disease are well-known examples.

        b)      Dietary and Occupational Epidemiological Studies Demonstrate an Increased Risk of Bladder Cancer and Evidence of Dose Response

Studies of NDMA from dietary exposure provide consistent evidence of increased risk for bladder cancer with evidence of dose-response. One cohort[48] and one case-control study[49] evaluated bladder cancer risk in relation to estimated NDMA intake from dietary sources. A dose-

---

[44] Braunstein, *et al.*, *Ranitidine Use, N-Nitrosodimethylamine (NDMA) Production and Variations in Cancer Diagnoses*, JAMA Network Open (2021).

[45] Michaud, D.S. *et al.*, *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, 13(2) CANCER EPIDEMIOL. BIOMARKERS PREV., 250 (2004).

[46] Def. Ex. 57 (Kantor, *et al.* 2021); Def. Ex. 53 (Habel, *et al.* 2000); Def. Ex. 48 (Cardwell, *et al.* 2021).

[47] Def. Ex. 68 (Norgaard, *et al.* 2021); Def. Ex. 77 (Yoon, *et al.* 2021); Def. Ex. 57 (Kantor, *et al.* 2021); Def. Ex. 48 (Cardwell, *et al.* 2021).

[48] Def. Ex. 56 (Jakszyn, *et al.* 2011).

[49] Ronco, A.L. *et al.*, *Meat Consumption, Animal Products, and the Risk of Bladder Cancer: A Case-Control Study in Uruguayan Men*, 15 ASIAN PAC. J. CANCER PREV., 5805-09 (2014).

response trend of increasing risk with increasing NDMA intake was reported in the case-control study,[50] and a non-statistically significant increase in risk was reported in the cohort study.[51] As summarized in a 2018 meta-analysis of 11 studies,[52] there was a significant dose-response relationship between intake of processed meats (which are a major dietary source of NDMA) and bladder cancer.[53]

Both occupational cohort studies[54] reported increased risks for bladder cancer, which was statistically significant in the larger study by Hidajat, *et al.*, which also reported a significant dose-response trend of greater risk with higher exposure to NDMA.

> c) The Totality of the Evidence Demonstrates Overwhelmingly That NDMA in Ranitidine Can Cause Bladder Cancer

Each category of epidemiology (ranitidine, dietary, and occupational) demonstrates consistent evidence of increased risk of bladder cancer. Coupled with the animal studies and human cell studies, the evidence is overwhelming that consumption of NDMA in ranitidine causes bladder cancer.[55]

> 2. *Esophageal Cancer*

Strong evidence from the human ranitidine, dietary, and occupational studies shows that NDMA in ranitidine is associated with an increased risk of esophageal cancer, and evidence of a dose-response effect in the studies that assessed it.[56]

---

[50] Ronco, *supra*, note 49.

[51] Def. Ex. 56 (Jakszyn, *et al.* 2011).

[52] Crippa, A. *et al.*, *Red and Processed Meat Consumption and Risk of Bladder Cancer: A Dose-Response Meta-Analysis of Epidemiological Studies*, 57 EUR. J. NUTR., 689-701 (2018).

[53] Def. Ex. 15 (Moorman Rep.) at 99-103; 107. Def. Ex. 9 (McTiernan Rep.) at 192-99; 201. The dose-response meta-analysis by Crippa, *et al.* reported an increased risk for each 50g/day increase in exposure (RR 1.20, 95% CI 1.06-1.37). Crippa, A. (2018), *supra* note 52. In two studies published after the 2018 meta-analysis, an increased risk of bladder cancer was found in a cohort study, Xu, X., *Processed Meat Intake and Bladder Cancer Risk in the Prostate, Lung, Colorectal, and Ovarian (PLCO) Cohort*, 28 CANCER EPIDEMIOL. BIOMARKERS PREV., 1993-97 (2019), but a pooled analysis did not find increased risk. Dianatinasab, M. *et al.*, *The Association Between Meat and Fish Consumption and Bladder Cancer Risk: A Pooled Analysis of 11 Cohort Studies*, 36 EUR. J. EPIDEMIOL. 781-92 (2021).

[54] Def. Ex. 54 (Hidajat, *et al.* 2019); Vlaanderen, J., *et al.*, *Extended Cancer Mortality Follow-Up of a German Rubber Industry Cohort*, 55(8) J. OCCUP. ENVIRON. MED., 966-72 (2013).

[55] *See* Def. Ex. 15 (Moorman Rep.) at 87-116 & Table 5; Def. Ex. 9 (McTiernan Rep.) at 183-206.

[56] *See* Def. Ex. 15 (Moorman Rep.) at 171-97 & Table 8; Def. Ex. 9 (McTiernan Rep.) at 206-24.



a)      Ranitidine Epidemiological Studies Demonstrate an Increased Risk of Esophageal Cancer

Despite significant limitations, the ranitidine epidemiology shows an increased risk of esophageal cancer. For example, the Habel study compared ranitidine users to non-users, and reported a 142% statistically significant increased risk for esophageal and gastric cancers combined. Def. Ex. 53 (Habel, *et al.* 2000). The Adami study reported a statistically significant 30% increased risk for esophageal adenocarcinoma for ranitidine users compared to other H2RA users. Def. Ex. 45 (Adami, *et al.* 2021). In an analysis comparing ranitidine users with at least ten prescriptions with other H2RA users with at least ten prescriptions, the Adami study demonstrated an 8% non-statistically significant increased risk before 10 years follow-up that increased to a 32% non-statistically significant increased risk after 10 years follow-up for ranitidine users. *Id.* A study utilizing the FDA's voluntary reporting system performed an evaluation of adverse events reported to the FDA and found a 256% increased proportional reporting ratio for esophageal cancer for ranitidine compared to other acid-suppressing drugs.[57]

---

[57] McGwin G., *The Association between Ranitidine Use and Gastrointestinal Cancers*, 13 CANCERS (BASEL) 24 (2020).

        b)      **Dietary and Occupational Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Esophageal Cancer and Evidence of Dose Response**

Multiple dietary studies have assessed the risk of NDMA on esophageal cancer. Two cohort studies (Loh (2011) and Keszei (2013)) and one case-control study (Rogers (1995)) that estimated total dietary NDMA intake provide evidence of increased risk of esophageal cancer with NDMA exposure,[58] and a meta-analysis, a systematic review and several case-control studies provide consistent evidence of increased risk, with evidence of dose response, from consumption of processed meat (which contains NDMA).[59] Dose-response analyses were reported in three studies assessing dietary NDMA intake in relation to esophageal cancer risk.[60]

Workers with NDMA exposure in the rubber industry were at increased risk for esophageal cancer, with a particularly strong association in the cohort that estimated individual NDMA exposure levels, with a 3-fold increased risk for those in the highest exposure category.[61] The Hidajat 2019 occupational study provided important evidence of dose response with increasing exposure to NDMA, reporting increasing risk within quartiles of increasing exposure to NDMA:

---

[58] Def. Ex. 64 (Loh, *et al.* 2011); Def. Ex. 58 (Keszei, *et al.* 2013); Rogers, *et al.*, *Consumption of Nitrate, Nitrite, and Nitrosodimethylamine and the Risk of Upper Aerodigestive Tract Cancer*, 4 CANCER EPIDEMIOL. BIOMARKERS & PREV. 29 (1995) (for esophageal cancer).

[59] Def. Ex. 78 (Vingeliene, *et al.* 2017) (reporting a RR of 1.44 for each 50 g/day increase in consumption.) Several case-control studies of processed meat intake and esophageal cancer also reported significant trends of increased risk with higher consumption of processed meats. Rosato, V., *et al.*, *Processed Meat and Risk of Selected Digestive Tract and Laryngeal Cancers*, 73 EUR. J. CLIN. NUTR., 141-149 (2019); De Stefani, E. *et al.*, *Processed Meat Consumption and Risk of Cancer: A Multisite Case-Control Study in Uruguay*, 107 BR. J. CANCER, 1584-88 (2012); Brown, L.M. *et al.*, *Dietary Factors and the Risk of Squamous Cell Esophageal Cancer Among Black and White Men in the United States*, 9 CANCER CAUSES CONTROL, 467-74 (1998); Yu, M.C. *et al.*, *Tobacco, Alcohol, Diet, Occupation, and Carcinoma of the Esophagus*, 48 CANCER RES., 3843-48 (1988); Levi, F. *et al.*, *Processed Meat and the Risk of Selected Digestive Tract and Laryngeal Neoplasms in Switzerland*, 15 ANN. ONCOL. 346-49 (2004); Jakszyn, *et al.*, *Nitrosamine and Related Food Intake and Gastric and Oesophageal Cancer Risk: A Systematic Review of the Epidemiological Evidence*, 12 WORLD J. GASTROENTEROL., 4296-303 (2006) (2020 systematic review, reporting stronger associations for squamous cell carcinoma than for adenocarcinoma).

[60] The Loh, *et al.* cohort study reported a 13% increase in risk with each standard deviation increase in intake. Keszei, *et al.* reported statistically significant associations with each 0.1 μg/day increase in NDMA intake for both men and women for esophageal squamous cell carcinoma, (RR 1.15 and 1.34, respectively). The Rogers, *et al.* case control study reported increasing risk in the second and third tertile of NDMA intake (OR 1.31 and 1.86, p-trend 0.063).

[61] Def. Ex. 54 (Hidajat, *et al.* 2019); Vlaanderen (2013), *supra* note 54.

1.7 for quartile II, 2.43 for quartile III, and 3.04 for quartile IV.[62]

    c)    The Totality of the Evidence Clearly Demonstrates That NDMA in Ranitidine Can Cause Esophageal Cancer

Altogether, these three bodies of epidemiological studies in combination with the animal studies and human cell studies, demonstrate clear evidence that consumption of NDMA at levels that have been detected in ranitidine can cause esophageal cancer. Def. Ex. 15 (Moorman Rep.) at 171-74; 179-85; 188-91; Def. Ex. 9 (McTiernan Rep.) at 212-18; 220-22.

    *3.*    *Gastric (Stomach) Cancer*

There is evidence from the human ranitidine, dietary and occupational studies that NDMA in ranitidine is associated with an increased risk of gastric (stomach) cancer, and evidence of a dose-response effect in the studies that assessed it.[63]



    a)    Ranitidine Epidemiological Studies Demonstrate Some Results of Increased Risk of Gastric Cancer and Some Evidence of Dose Response

Despite their design limitations, the ranitidine studies assessing gastric cancer show evidence of increased risk and some evidence of dose response. For example, the Habel study

---

[62] Def. Ex. 54 (Hidajat, *et al.* 2019) at 255.
[63] *See* Def. Ex. 15 (Moorman Rep.) at 198-230, and Table 9, 199-203 (Ranitidine, and NDMA dietary and occupational study results); Def. Ex. 9 (McTiernan Rep.) at 257-85.

compared ranitidine users to non-users, and reported a 142% increased risk for esophageal and gastric cancers combined. Def. Ex. 53 (Habel, *et al.* 2000). Liu also demonstrated a 42% statistically significant increased risk for gastric cancer with 1 year lag for ranitidine users compared to non-users. Def. Ex. 63 (Liu, *et al.* 2020). In an analysis comparing ranitidine users with at least ten prescriptions with other H2RA users with at least ten prescriptions, the Adami study demonstrated a non-statistically significant decreased risk before 10 years follow-up that increased to a 53% non-statistically significant increased risk after 10 years follow-up for ranitidine users. Def. Ex. 45 (Adami, *et al.* 2021). A study utilizing the FDA's voluntary reporting system performed an evaluation of adverse events reported to the FDA and found a 48% increased proportional reporting ratio for stomach cancer for ranitidine compared to other acid-suppressing drugs.[64]

  b)  Dietary and Occupational Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Gastric Cancer and Evidence of Dose Response

The risk for gastric cancer from exposure to NDMA in the diet and consumption of processed meats has been described in *several dozen* studies that have been summarized in various meta- and pooled analyses. Each of the meta- and pooled analyses *consistently* report increased gastric cancer risk at the highest NDMA consumption levels, and evidence of dose response [65]

Two occupational studies of rubber industry workers assessed cancer mortality among industry workers and their cohorts. The large Hidajat 2019 cohort study found increasing gastric cancer risk with increasing levels of NDMA exposure.[66] Additionally, among industry workers in the highest exposure quartile, the authors calculated a 1.72 hazard risk. In a second, smaller cohort study (Vlaandaren 2013), with questionable power, the authors reported an elevated risk that was not statistically significant.

  c)  The Totality of the Evidence Clearly Demonstrates That NDMA in Ranitidine Can Cause Gastric Cancer

The three bodies of epidemiological studies in combination with the animal studies and

---

[64] McGwin G. (2020), *supra* note 57.

[65] Def. Ex. 15 (Moorman Rep.) at 219 (citing Song (2015); Kim (2019); Zhao (2017); Ferro (2020)).

[66] The Hidajat 2019 study demonstrated increasing gastric cancer mortality with increasing NDMA exposure (1.32, 95% CI 1.10-1.57 for quartile II, 1.62, 95% CI 1.32-1.98 for quartile III, and 1.72, 95% CI 1.41-2.10 for quartile IV.

human cell studies demonstrate clear evidence that consumption of NDMA in ranitidine causes gastric cancer. Even the ranitidine studies demonstrate evidence of an increased risk of gastric cancer, while the better designed dietary and occupational studies demonstrate consistent evidence of an increased risk of gastric cancer with NDMA consumption and consistent evidence of dose response.[67]

4.   *Liver Cancer*

The human epidemiologic studies provide overall evidence of an increased risk of liver cancer and of a dose-response effect in some studies that assessed dose-response.



a)   Ranitidine Epidemiological Studies Demonstrate Some Results of Increased Risk of Liver Cancer

Despite their limitations, the ranitidine studies assessing liver cancer show some evidence of increased risks. Kantor demonstrated a 91% statistically significant increased risk of liver cancer for ranitidine users compared to non-users and a 15% non-statistically significant increased risk of liver cancer for ranitidine users compared to omeprazole users.[68] Tran found a 41% non-statistically significant increased risk of liver cancer for ranitidine users compared to non-users when utilizing the UK Biobank database and an 82% non-statistically significant increased risk of

_____

[67]Def. Ex. 15 (Moorman Rep.) at 213-19, 221-23; Def. Ex. 9 (McTiernan Rep.) at 265-78, 281-83.
[68] Def. Ex. 57 (Kantor, *et al.* 2021).

liver cancer for ranitidine users compared to non-users when utilizing the PCCIU database.[69] A study utilizing the FDA's voluntary reporting system performed an evaluation of adverse events reported to the FDA and found a 164% increased proportional reporting ratio for liver cancer for ranitidine compared to other acid-suppressing drugs.[70]

> b) Dietary and Occupational Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Liver Cancer and Evidence of Dose Response

The better designed dietary studies show that NDMA exposure, including through processed meat intake, increases risk of liver cancer with evidence of dose-response. [71] *See* detailed discussion in D.E. 5841, at 54-55.

The Hidajat 2019 occupational study that estimated NDMA exposure among workers in the rubber industry found increasing risk of liver cancer with increasing exposure to NDMA (i.e., evidence of dose response), with a relative risk of 2.86, 95% CI 1.78-4.59 for individuals in the highest quartile of exposure. Vlaanderen (2013) was a much smaller occupational cohort of

---

[69] Def. Ex. 76 (Tran, *et al.* 2018).

[70] McGwin G. (2020), *supra* note 57.

[71] A statistically significant increased risk of liver cancer was reported for individuals in the highest quartile of NDMA intake from plant sources, while a smaller, non-significant increase in risk was observed for NDMA intake from animal sources. Zheng, *et al.*, *Dietary N-Nitroso Compounds and Risk of Hepatocellular Carcinoma: A USA-Based Study*, 74 HEPATOL., 3161-73 (2021) PMID: 34233041. Among the studies evaluating processed meat intake, a meta-analysis of six large cohort studies reported a relative risk of 1.17. Farvid, M.S., *et al.*, *Consumption of Red Meat and Processed Meat and Cancer Incidence: A Systematic Review and Meta-Analysis of Prospective Studies*, 36(9) EUR. J. EPIDEMIOL. 937-51 (2021). The case-control studies that evaluated processed meat intake and liver cancer risk reported higher relative risks ranging from 1.64 to 2.56 for the highest level of processed meat consumption. Rosato V., *supra* note 59; Phukan, R.K., *et al.*, *Association of Processed Food, Synergistic Effect of Alcohol and HBV with Hepatocellular Carcinoma in a High Incidence Region of India*, 53 CANCER EPIDEMIOL., 35-41 (2018). Four studies reported increased risk with greater consumption of NDMA in processed meats. Rosato, *supra* note 59; Ma, Y., *et al.*, *Meat Intake and Risk of Hepatocellular Carcinoma In Two Large U.S. Prospective Cohorts of Women and Men*, 48 INT. J. OF EPIDEMIOL., 1863-71 (2019); Rizk, M. *et al.*, *Dietary Components Modulate the Risk of Hepatocellular Carcinoma in Cirrhotic Patients*, 61 NUTR. RES., 82-94 (2019); Phukan, *supra* note 71. No dose-response trend was reported in three other processed meat studies. Cross, A.J., *et al.*, *A Prospective Study of Red and Processed Meat Intake in Relation to Cancer Risk*, 4 PLoS MED., e325 (2007); Fedirko, V., *et al.*, *Consumption of Fish and Meats and Risk of Hepatocellular Carcinoma: the European Prospective Investigation into Cancer and Nutrition (EPIC)*, 24 ANN ONCOL., 2166-73 (2013); Talamini, R., *et al.*, *Food Groups and Risk of Hepatocellular Carcinoma: A Multicenter Case-Control Study in Italy*, 119 INT'L J. CANCER, 2916-21 (2006).

workers in the rubber industry, with more substantial limitations in its study design, and did not find increased risk of liver/ gallbladder cancer.

   c)  The Totality of the Evidence Clearly Demonstrates NDMA in Ranitidine Can Cause Liver Cancer

   The ranitidine studies demonstrate evidence of an increased risk of liver cancer with ranitidine use. The dietary studies demonstrate consistent evidence of an increased risk of liver cancer with NDMA consumption and consistent evidence of dose response. The occupational studies demonstrate consistent evidence of an increased risk of liver cancer with NDMA exposure and evidence of dose response. Altogether, these three bodies of epidemiological studies in combination with the animal studies and human cell studies demonstrate clear evidence that consumption of NDMA in ranitidine causes liver cancer. *See* Def. Ex. 15 (Moorman Rep.) at 141-69 and Table 7, 142-45; Def. Ex. 9 (McTiernan Rep.) at 225-38.

   *5.* *Pancreatic Cancer*

   The human epidemiologic studies provide overall evidence of an increased risk of pancreatic cancer and of a dose-response effect in the studies that assessed dose-response.



   a)  Ranitidine Epidemiological Studies Demonstrate Some Results of Increased Risk of Pancreatic Cancer

   Despite the design limitations, the ranitidine studies assessing pancreatic cancer still show evidence of increased risk. First, the Habel study demonstrated a 160% statistically significant

increased risk of pancreatic cancer for ranitidine users versus non-users.[72] Second, McDowell found a 37% statistically significant increased risk of pancreatic cancer for ranitidine users versus non-users.[73] A study utilizing the FDA's voluntary reporting system performed an evaluation of adverse events reported to the FDA and found a 118% increased proportional reporting ratio for pancreatic cancer for ranitidine compared to other acid-suppressing drugs.[74]

> b) Dietary and Occupational Epidemiological Studies Demonstrate Consistent Results of an Increased Risk of Pancreatic Cancer and Evidence of Dose Response

A substantial body of evidence from dietary studies assessed pancreatic cancer risk in relation to NDMA intake,[75] nitrosamine intake,[76] and processed meat intake.[77] A 2017 meta-analysis reported increased risks for pancreatic cancer when comparing highest to lowest level of intake, *i.e.,* dose-response, for both case-control and cohort studies, although the risk was statistically significant only in the case-control studies,[78] and a 2012 meta-analysis reported a significant increase in risk with evidence of dose-response from increasing consumption of processed meat.[79]

A large occupational cohort study, (Hidajat 2019), reported increasing risk for pancreatic cancer with increasing NDMA exposure, with relative risks for the 2nd, 3rd and 4th quartiles of exposure of 1.59, 2.19 and 2.6 compared to the lowest quartile. A smaller cohort of tire workers found increased risk of pancreatic cancer among women but not men (Vlaandaren 2013).

---

[72] Def. Ex. 53 (Habel, *et al.* 2000).

[73] Def. Ex. 66 (McDowell, *et al.* 2021).

[74] McGwin G. (2020), *supra* note 57.

[75] Zheng, *et al.*, *Dietary N-Nitroso Compounds and Risk of Pancreatic Cancer: Results from A Large Case-Control Study*, 40 CARCINOGENESIS, 254-62 (2019).

[76] Baghurst, *et al.*, *A Case-Control Study of Diet and Cancer of the Pancreas*, 134(2) AM. J. EPIDEMIOL. 167-79 (1991). In the two dietary studies that estimated NDMA or nitrosamine intake, increasing risk of pancreatic cancer with increasing nitrosamine exposure was observed in the Baghurst 1991 study and for plant sources of NDMA in the Zheng 2019 study.

[77] Zhao, Z. *et al.*, *Association Between Consumption of Red and Processed Meat and Pancreatic Cancer Risk: A Systematic Review and Meta-analysis*, 15(4) CLIN. GASTROENTEROL. HEPATOL 486-93 (2017) ("Zhao (2017)") (increased risk of pancreatic cancer was reported for estimated dietary intake of NDMA from plant sources but not animal sources and for nitrosamine intake.)

[78] *See* Zhao (2017), *supra* note 77.

[79] Larsson, S.C. and A. Wolk, *Red and processed meat consumption and risk of pancreatic cancer: meta-analysis of prospective studies*, 106(3) BR. J CANCER, 603-7 (2012) (reporting a dose-response trend for processed meat intake on a continuous scale (RR 1.19, 95% CI 1.04-1.36 for each 50 g/day increase in processed meat intake).

> c)   The Totality of the Evidence Clearly Demonstrates NDMA in Ranitidine Can Cause Pancreatic Cancer

Evidence from different types of studies, including studies comparing ranitidine users to non-users, occupational studies of NDMA exposure, and dietary studies of estimated NDMA intake or processed meat, provide evidence of an increased risk of pancreatic cancer with exposure to ranitidine or NDMA. These three bodies of epidemiological studies in combination with the animal studies and human cell studies demonstrate clear evidence that consumption of NDMA in ranitidine causes pancreatic cancer. *See* Def. Ex. 15 (Moorman Rep.) at 117-40, and Table 6 (p.118-21); Def. Ex. 9 (McTiernan Rep.) at 238-57.

***

More studies on ranitidine and NDMA continue to come out. A new study was recently presented at the American Gastroenterology Association's (AGA) Digestive Disease Week (DDW) Conference. *See* Wang, *et al.*, *Pharmacoepidemiological Research on N-Nitrosodimethylamine Contaminated Ranitidine Use and Long-Term Cancer Risk: A Population-Based Longitudinal Cohort Study*, DDW 2022 Poster Presentation. This study demonstrated statistically significant increased risks of hepatocellular carcinoma (liver cancer) HR 1.22, 95% CI 1.09 to 1.36 (p<0.001), gastric cancer HR 1.26, 95% CI 1.05 to 1.52 (p=0.012), and pancreatic cancer HR 1.35, 95% CI 1.03-1.77 (p=0.030). The authors concluded the long-term use of NDMA-contaminated ranitidine was associated with an increased risk of hepatocellular carcinoma, pancreatic cancer, and gastric cancer.

## B.   The Active Comparator Studies Defendants Solely Rely on Do Not Outweigh This Body of Evidence

Despite putting up little fight against the premises that NDMA can cause cancer, and ranitidine degrades into NDMA, Defendants vociferously fight the ineluctable conclusion: NDMA in ranitidine can cause cancer. To be clear, Defendants do not, and cannot argue that the NDMA in ranitidine is different in any respect from the NDMA that is widely recognized as a carcinogen, was banned from commercial use in the early 2000s, and caused tumors in every species tested.[80] The molecule is identical. And Defendants do not, and cannot, argue that ranitidine has a protective effect against the cancer-causing properties of NDMA. It has no such effect.

---

[80] Liteplo (2002), *supra* note 22, at 4 ("Based upon laboratory studies in which tumours have been induced in all species examined at relatively low doses, NDMA is clearly carcinogenic. There is overwhelming evidence that NDMA is mutagenic and clastogenic.").

Instead, their answer appears to be two-pronged. First, that however strong the logic that ranitidine can cause cancer, the ranitidine-specific active-comparator epidemiological studies are the best evidence, and that best evidence points in the other direction. And second, the science on NDMA is simply too unreliable to bear any weight. Both are false.

Ultimately, Defendants have hinged their entire *Daubert* Motion on these two points. That is so because Defendants provide no argument against Dr. Salmon's, Dr. Michaels', and Dr. Le's general causation opinions. Each conducted a full general causation analysis, complete with a full literature review and Bradford Hill analyses (Dr. Salmon evaluated each cancer in detail). But Defendants do not discuss these opinions as part of their argument. Instead, they generically claim those experts "suffer from many of the same flaws," namely underweighting "the results of the ranitidine active comparator studies," and relying "on dietary and occupational studies of NDMA," and so should be excluded "[f]or the reasons already stated as to Drs. Moorman and McTiernan." Motion at 96. If, as this Response demonstrates, those reasons do not warrant exclusion, Defendants have provided no other arguments for excluding their general causation opinions.

1.    *The Human Ranitidine Active Comparator Studies Have Severe Limitations that Impair Their Applicability to Plaintiffs in This Litigation*

Plaintiffs—and Plaintiffs' experts—agree that human ranitidine active comparator epidemiological studies investigating long-term risk at high exposures with long follow-up could be highly probative. But, as Plaintiffs' experts explained at great length, no such study has taken place. Defendants say scarcely anything about the study designs other than—incessantly—that they were "active comparator" studies, and so *per se* definitive. But an active comparator study is strong—or weak—according to the same standards as any other study: the size of the study; the duration; the follow-up period; the controls for confounders; the quality of the underlying dataset; and more technical factors of that sort that epidemiologists consider every time they evaluate a study. Plaintiffs refer this Court to D.E. 5841, at 27-41 for a study-by-study summary of the considerable limitations. But, on this point, there is no substitute for reading the extraordinary and careful analysis in the expert reports.

Plaintiffs' epidemiologists evaluated the studies Defendants tout as definitive and found them otherwise. "Nearly all of the studies of ranitidine and cancer risk were unable to adequately assess risk associated with long-term use." Def. Ex. 15 (Moorman Rep.) at 47. "Exposure assessment based on short-term use will not capture the risk associated with long-term use…."

Def. Ex. 15 (Moorman Rep.) at 98.

Many of the studies are almost comically inapplicable. For example, Defendants cite the Iwagami study *twenty-three* times in their Motion, but breathe not a word about what it studied: 96% of the study participants took ranitidine for *less than six months*; the study "follow-up" period (i.e., how long they looked for cancer after exposure) was a median of 2.4 years; 72% of study participants were *under 50 years old* (and so had very low risk of cancer in a 3-year period); and the study lumped consumers of ranitidine *and a completely different drug* (nizatidine) together.[81] So, if there is an under-45-year-old Plaintiff who took ranitidine *or* nizatidine for six months, then was diagnosed with cancer within 2.4 years, this study provides evidence Defendants can use at the specific causation stage that ranitidine (or nizatidine) did not cause his cancer. But for everyone else, the study's value is slim to nil. This Court deserves to know this context.

Repeating each of the limitations for each study would be cumulative, but the Court should know where the battle lines have been drawn: Plaintiffs' experts, for neutral, valid methodological reasons, concluded the active comparator studies Defendants point to are of little weight for the population of Plaintiffs in this litigation—and certainly not of such prodigious weight that they render the consistent body of contrary evidence (other ranitidine studies, dietary studies, occupational studies, animal studies) irrelevant. Defendants cannot overcome their careful analyses merely by hyping up "active comparator" studies. In fact, "FDA discourages investigators from applying a one size fits all approach to study design," and does *not* endorse favoring active comparator studies irrespective of other design features.[82]

2.    *Dietary Studies Are Reliable and Commonly Used by Scientists and Regulators*

Turning to the second point, Defendants make a bold claim:

> If extrapolating from these occupational and dietary studies were a generally accepted methodology for assessing whether ranitidine causes cancer, Plaintiffs' experts would be able to point to at least a single regulator, medical organization, or scientific organization that relied on them to consider causation. But they cannot.

---

[81] Def. Ex. 55 (Iwagami, 2021). The study authors acknowledged that "[o]ne possible explanation of the lack of association in the current study may be that few people were exposed to a high enough level of NDMA to increase the risk of cancer."

[82] Def. Ex. 85 (FDA Electronic Healthcare Guidance) at 13.

Motion at 4. The fact is, *every* regulator and scientific organization did this.[83] In its response to the Emery Pharma Petition, the FDA cited the very NDMA studies and documents reviewed by IARC, the EPA, and ATSDR that Plaintiffs' experts have also appropriately considered.[84] Or take the Sept. 17, 2020 EMA Assessment Defendants cite prominently. While the EMA did not do a complete review of the science, it reviewed *NDMA diet studies* to assess *ranitidine's* safety, and highlighted, like the Plaintiffs' experts do, the challenges and limitations of the human ranitidine epidemiological studies (noting they were scarce, with "limited data," making any interpretation challenging).[85] The EMA "recommended the suspension of the marketing authorisations for ranitidine-containing medicinal products" in light of the NDMA evidence and stated "[t]he extent of formation of NDMA especially due to degradation of the drug substance and the potential endogenous formation raise serious concerns related to the safety of ranitidine-containing medicinal products."[86] Plaintiffs are not aware of regulators or scientific authorities that have *ignored* the NDMA research, as Defendants advocate.

To the contrary, the gold standard methodology employed by scientific authorities and regulators considers the totality of the evidence and *relies on dietary studies*. The NIH makes critical public health recommendations based on the results from nutritional epidemiology. The American Institute for Cancer Research relies on dietary studies.[87] And IARC has a Nutrition and Metabolism Branch, which has as its goal, to "provide robust scientific evidence on the role of nutrition, obesity, and metabolic dysfunction in cancer development...."[88] Several authoritative

---

[83] Since their statement directly contradicts the analysis every authority has used, Defendants likely meant this statement to be trivial—namely, that regulators and scientific authorities have only done *precautionary* analyses, and have not "consider[ed] causation." If so, Defendants' bold claim amounts to a No True Scotsman fallacy. Obviously, Plaintiffs cannot cite an analysis that has not yet taken place. But when IARC, FDA, ATSDR, the WHO, or comparable authorities *do* analyze causation, Plaintiffs are highly confident that they will prominently cite their own analysis of NDMA and the underlying NDMA literature, which is precisely what Plaintiffs' experts did here.

[84] FDA Response to Emery Citizen's Petition (April 1, 2020) *supra* note 32, at FN 5-13, citing IARC, EPA and ATSDR.

[85] Def. Ex. 83 (EMA Assessment Report) at 16-18. Several ranitidine studies that found an association between ranitidine use and cancer (including Cardwell) were not published when the EMA released this Assessment.

[86] Def. Ex. 83 (EMA Assessment Report) at 28.

[87] *See* https://www.aicr.org/research/ (accessed June 16, 2022); https://www.aicr.org/cancer-prevention/healthy-eating/ (accessed July 24, 2022).

[88] *See* https://www.iarc.who.int/branches-nme/ (accessed June 16, 2022).

scientific bodies have evaluated dietary NDMA studies to analyze carcinogenicity:

- The WHO's 2002 NDMA assessment reviewed NDMA dietary epidemiology and stated that in almost all the studies there was an association between certain cancers and NDMA.[89]
- In its 2021 15th Report on Carcinogens, the National Toxicology Program classified NDMA as reasonably anticipated to be a human carcinogen and reviewed dietary NDMA studies, reporting several case-control studies with dose-related association, including stomach and esophageal cancer.[90]
- In its draft for public comment early this year, ATSDR reviewed NDMA diet studies and stated that "[e]pidemiological studies of general population exposure showed associations between dietary intake and cancers of the gastrointestinal tract, especially the stomach[.]"[91]

Many of the dietary NDMA epidemiological studies are large, well-designed studies, that use validated methods, and included large cohorts across different populations.[92] They are *all* peer-reviewed and have been published in reputable journals. Defendants challenge the reliability of these dietary studies primarily due to potential measurement error in dietary exposure measurement. This is a well-known problem, which both Drs. McTiernan and Moorman acknowledged and analyzed. Def. Ex. 15 (Moorman Rep.) at 49-51; Def. Ex. 9 (McTiernan Rep.) at 41, 68.

Most of the dietary studies measured dietary intakes via a questionnaire administered by a trained interviewer.[93] A common concern of food frequency questionnaires (FFQ's) is the potential for recall bias; however, in its recent draft for public comment Toxicological Profile for NDMA (January 2022), the ASTDR indicates that this will bias the findings toward null (no association) for intake of NDMA and cancer.[94] That means the studies likely *understate* the risk that the studied agent causes the subject disease. A group of scientists at the National Cancer Institute, have published that "[d]ietary measurement error …. causes substantial underestimation of relative risks

---

[89] Liteplo (2002), *supra* note 22, at 21.

[90] NTP (National Toxicology Program), U.S. Department of Health and Human Services, *15th Report on Carcinogens* (2021), https://ntp.niehs.nih.gov/go/roc15 ("NTP 15th Report").

[91] ATSDR NDMA Tox. Profile (2022), *supra* note 30, at 4.

[92] Def. Ex. 58 (Keszei, *et al.* 2013); Larsson, *et al.*, *Processed Meat Consumption, Dietary Nitrosamines and Stomach Cancer Risk in a Cohort of Swedish Women*, 119 INT'L J. CANCER, 915-19 (2006); La Vecchia, *et al.*, *Nitrosamine Intake and Gastric Cancer Risk*, 4 EUR. J. CANCER PREV., 469 (1995); Pobel D., *et al.*, *Nitrosamine, Nitrate and Nitrite in Relation to Gastric Cancer: A Case-Control Study in Marseille, France*, 11 EUR. J. EPIDEMIOL., 67-73 (1995).

[93] De Stefani, *et al.*, *Dietary Nitrosamines, Heterocyclic Amines, and Risk of Gastric Cancer: A Case-Control Study in Uruguay*, 30 NUTRIENTS, 158-62 (1998); La Vecchia, *supra* note 92. Pobel, *supra* note 92. Zheng, *et al.* (2019), *supra* at 75,; Zheng, *et al.* 2021, *supra* note 71.

[94] ATSDR NDMA Tox. Profile (1989), *supra* note 25, at 2.

and reduction of statistical power for detecting associations" in dietary cohort studies.[95] While that drawback—and every drawback—should be considered in interpreting each study, that is not a reason to disregard this important and substantial body of science.

Recall that outside litigation, Defendant GSK has relied on this same body of epidemiologic studies. GSK's NDMA Hazard Assessment Report, authored and reviewed by GSK's occupational toxicologists, cites the same NDMA evaluations by IARC and ATSDR, explaining that the "relevant epidemiological studies showed dose-response relationships between NDMA and certain cancers."[96] GSK's document admits that "[i]n almost all studies, associations between the cancers of interest and nitrate, nitrite, and NDMA were examined; results were relatively consistent in this regard, with there being an association with cancer most commonly with NDMA...." *Id.* at 5, 8. Yet, while *internally* GSK's scientists rely on NDMA dietary studies, and find them probative, its outside attorneys want this Court to deem this evidence categorically unreliable and irrelevant.

There simply are no grounds to say the extensive body of animal studies, dietary studies, and occupational studies on NDMA are not worth considering. To the contrary, to do as Defendants suggest, cherry-picking from the pertinent science as the defense experts have done, is in direct contrast to the reliable methodology set forth by IARC and others of analyzing *all* the evidence and weighing it.

## III.   Overview of Plaintiffs' Experts' Qualifications and Analyses

Plaintiffs have assembled a dream team of experts with impeccable credentials and professionalism, that bring to bear considerable expertise on the precise fields of study at issue in this case. While many of their opinions stand alone, the whole of their consistent, careful analysis is more than the sum of its parts. Each specialty and expert opinion interlocks to bolster the other.

### A.   Anne McTiernan, M.D., Ph.D.

Dr. Anne McTiernan will opine that the NDMA in ranitidine can cause the five cancers at issue in this litigation. She is highly qualified, and her analysis is consistent and reliable.

Anne McTiernan is a full Professor of Epidemiology at the world-renowned Fred Hutchinson Cancer Center (where she was the director for 10 years), and the epidemiology and

---

[95] Freedman, *et al.*, *Dealing with Dietary Measurement Error in Nutritional Cohort Studies*, 103 J. NAT'L CANCER INST., 1086-92 (2011).
[96] Ex. 41 (GSK Hazard Assessment Report, GSKZAN0003419540), at 6-7.

medicine departments of the University of Washington School of Public Health and School of Medicine respectively. Dr. McTiernan has done extensive research on the risk of cancer from ingesting medication and food. Dr. McTiernan was the project director and co-investigator for the Women's Health Initiative hormone therapy, vitamin D, and low-fat diet trials and a principal investigator of trials testing cancer risk for aspirin, exemestane, tamoxifen, and Vitamin D. She has authored over 70 peer-reviewed papers on the effect of medication and supplements on cancer risk factors, and over 130 peer-reviewed papers on diet and cancer amongst her 400 plus peer-reviewed papers. The parties and this Court have recognized IARC and WCRF as authorities in this litigation—Dr. McTiernan is the only expert who has been a member of both an IARC Expert Working Group[97] and a WCRF Expert Advisory Panel. She has unparalleled expertise:

> Several of the defense expert witnesses cite reports from the World Cancer Research Fund meta-analyses and systematic reviews on diet and cancer, misstating the findings of that organization with regard to associations of eating processed meats with risk for various cancers. *I was a member of the advisory panel that reviewed the meta-analyses of epidemiologic studies on diet, physical activity, adiposity and cancer risk and survival*, from 2010 to 2021. In his report, Dr. Chan cites *that panel* as "This authoritative, independent expert panel".[98]

Already a Ph.D. epidemiologist, Dr. McTiernan went to medical school and did a full residency in internal medicine because she "realized" the "physicians had an advantage in understanding the diseases we're studying" and

> being a physician really helps me understand what data means in terms of a medical diagnosis or comorbidities or how things are collected in a clinic setting. If we see something that's a database, a medical database, what goes into that data being there? It relies on that interaction between the physician and the patient, or it might rely on somebody being admitted to a hospital. What does that mean in terms of how things get put into a medical record?[99]

In short, one could hardly do better than Dr. McTiernan for an expert to evaluate and

---

[97] Def. Ex. 10 (McTiernan Rebuttal Rep.) at 27 ("I am very familiar with IARC's methods, because I served as Chair on Mechanisms for the Working Group for International Agency for Research on Cancer Handbook of Cancer Prevention: Volume 6 – Weight control and physical activity, 2000-2001. (Vainio, Kaaks, and Bianchini 2002) In developing our handbook, we reviewed the totality of epidemiologic studies ….").

[98] Def. Ex. 10 (McTiernan Rebuttal Rep.) at 25.

[99] Def. Ex. 32 (McTiernan Dep. Tr.) at 664:12-21.

interpret cancer research. She has testified in only one other litigation, the talc MDL, where Judge Wolfson found her qualified and her opinions reliable and helpful. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116 (D.N.J. 2020).

As detailed in her Report on pages 96-108, Dr. McTiernan started with a comprehensive literature review to find studies about ranitidine and the cancer-causing chemical in ranitidine, NDMA. She was asked to review 10 cancers.[100] Her review followed standard epidemiological practice, using the same methods as her peer-reviewed papers and her work with IARC and WCRF. Neither the defense experts nor Defendants' Motion have challenged the comprehensiveness of her literature review. After amassing all the relevant studies, Dr. McTiernan reviewed and subjected each study to detailed scrutiny to determine its design, available information on the dataset, the results, and each of the studies' limitations, including any confounding or bias.[101]

In her report, Dr. McTiernan first describes the different types of epidemiological studies at issue: cohort, case control, metanalysis, ecologic, and FDA adverse events. Def. Ex. 9 (McTiernan Rep.) at 36-46. She specifically described the critical components of the two most important types of studies in this case, cohort and case-control, and emphasized the strengths of "nested case control studies" which is the method used in several of the strongest studies. *Id.* at 41-43. After accounting for the characteristics of each study under review (both the type of study and the question it investigated), *id.* at 101, Dr. McTiernan evaluated each study in detail. The depth of this study-by-study review is evident in the meticulous discussions of the individual studies themselves. Notably, Dr. McTiernan applied the *same* consistent criteria in assessing the strengths and weaknesses of each study, and clearly documented that analysis in her report in a way the Court can review.

Dr. McTiernan assessed the study size, exposure duration, exposure frequency, OTC usage information, the age of the participants, method and reliability of outcome measurement, accuracy of the determination of exposure, accuracy of the determination of cancer, data accuracy, and whether populations are well characterized so that confounding variables can be accounted for. *Id.* at 101-08. Dr. McTiernan also exhaustively analyzed all potential biases and confounding, including missing data (especially on ranitidine use or other exposure), incomplete follow-up (i.e.,

---

[100] Bladder, stomach/gastric, liver, esophagus, pancreas, breast, prostate, lung, kidney and colorectal.
[101] Def. Ex. 32 (McTiernan Dep. Tr.) at 677-79.

a follow-up period shorter than the plausible latency period), publication bias, indication bias, protopathic bias, confounders, channeling bias, recall bias, non-response bias. *Id.* at 47-68.

She then reliably concluded, based on those criteria, how much weight to give each study. Dr. McTiernan's work was "very similar to what we did in IARC. We looked at totality of evidence."[102] Dr. McTiernan then prepared a table of the most important potential biases for the types of studies examined here and their likely effect, including nonresponse, exclusion, nondifferential misclassification outcomes, nondifferential misclassification exposure, differential misclassification exposure, confounding, overadjustment, indication bias, channeling, healthy worker effect, hospital patient bias, loss to follow up and publication bias.[103] Citing authoritative sources, the report explains in detail how these biases may affect studies, including the advantages and disadvantages of certain databases.[104] She also explains the specifics of dietary and occupational epidemiology.

In a separate section, she explains common misconceptions regarding epidemiological research, including:

- Larger studies are always better than smaller studies (not true)
- Studies that include entire populations are more valid than smaller samples (not true)
- A hierarchy of studies applies to the determination of causality (not true)
- Hospital based studies are better (not true)
- One should discard results without "statistical significance" as unreliable (not true)
- There is a defined relative risk for causality (not true)
- For cancer, a cohort study of more people followed for a shorter time is as valid as a smaller group followed for a longer period of time (not true)

Then, she applied those criteria. The Kim Y.D. study is illustrative. Dr. McTiernan first reviewed the number of subjects and the results of that study. She then detailed the study strengths including large sample size, use of medical prescription data, the fact that the data included diagnosis codes for co-morbidities and the fact that the database included medical records.[105] Dr. McTiernan then reviewed the study weaknesses, including:

1. The study's database was designed for insurance billing and not scientific research. FDA Guidance explains why this limitation is important.
2. The database only had aggregate data in groups of 10. There is no data on individuals.

---

[102] Def. Ex. 32 (McTiernan Dep. Tr.) at 680. *See also* Def. Ex. 10 (McTiernan Rebuttal Rep.) at 28.
[103] Def. Ex. 9 (McTiernan Rep.) at table 2, at 69-71.
[104] Def. Ex. 9 (McTiernan Rep.) at 73-80.
[105] Def. Ex. 9 (McTiernan Rep.) at 115-20.

3. The database has no explanation of the source of cancer diagnosis. There is no indication that cancers were confirmed with pathology reports. Dr. McTiernan noticed the cancer rates in the database were inconsistent with cancer statistics of the US population. The authors, surprisingly, state that the database cancer rates are consistent with world cancer rates, but all the subjects in the database are in the US. For many cancers, US rates and world rates are substantially different.

4. The database had no information on how long patients stayed in the database over time, and Dr. McTiernan cited studies suggesting 20-30% of patients change health systems each year (meaning they would drop out of the database, which the study did not track). The study also removed any patient who switched to a different acid suppressor, further increasing the drop-out rate.

5. The study was biased because its exposure measurement method caused the omeprazole group to be younger.

6. The study did not account for OTC use of ranitidine or comparator medicines, which causes misclassification bias.[106]

The authors themselves acknowledged many of these limitations: "The limitations of our study primarily involve the nature of the Explorys database system. While Explorys offers broad population-level patient information that confers high generalisability, several patient data points such as mortality rates, and medication compliance were not available at the population level. In addition, over-the-counter (OTC) use of medications were unable to be accounted for as this behavioural factor is not normalized into the Explorys system."[107] After her lengthy review, and based on these substantial limitations, Dr. McTiernan gave little weight to this study.[108]

Another example is the Cardwell study which used the Scottish PCCIUR data. Dr. McTiernan spent 6 pages discussing the data source for this study.[109] Again she carefully reviewed the strengths and limitations of this study. Applying the very same criteria, Dr. McTiernan determined studies from this database were the "most informative," and gave it greater weight.

Dr. McTiernan approached all of the other studies—including dietary and occupational studies—in the same way, assigning more or less weight to each strand of evidence based on the overall strengths or weaknesses of the study. She was consistent in this regard. The same weakness

---

[106] By contrast, Defendants' putative experts did not mention most of these limitations, and Dr. Terry was not even aware that Explorys is a claims database. *E.g.*, Ex. 7 (Witte Rep.) at App'x 1, 3-4; Ex. 32 (Witte Dep. Tr.) at 252; Ex. 28 (Terry Dep. Tr.) at 181.

[107] Def. Ex. 60 (Kim Y.D. *et al.*, 2021) at 6.

[108] Def. Ex. 9 (McTiernan Rep.) at 120 ("Given the significant methodological problems with this study, it was not informative.").

[109] Def. Ex. 9 (McTiernan Rep.) at 142-147.

of one study was flagged as a weakness in another study, even if the latter study contained results more favorable to plaintiffs.[110] And after consistently applying her system of weighting each piece of evidence, Dr. McTiernan reached a conclusion based on her considerable expertise, experience, and judgment.

After reviewing all the studies in detail and assigning weight, Dr. McTiernan applied a Bradford Hill analysis for causal inference. The Bradford Hill criteria are an accepted method for determining a causal relationship both in science, by cancer research groups like IARC the WCRF[111] and by courts.[112] Based on the ranitidine studies, dietary studies, and occupational studies, Dr. McTiernan concluded that the NDMA in ranitidine can cause bladder, stomach, liver, pancreas, and esophageal cancer.

**B.     Patricia Moorman, Ph.D.**

Defendants do not challenge Dr. Moorman's qualifications, and for good reason: since earning an epidemiology Ph.D. from UNC, Dr. Moorman has more than 30 years of experience teaching, conducting research on cancer, and analyzing epidemiologic studies. She is Professor Emeritus at Duke University School of Medicine, where she served for 21 years as a tenured professor. She has taught courses in Cancer Epidemiology for graduate students in public health and Evidence-Based Medicine for physician assistant students. She is an author of over 150 scientific publications, mostly focused on cancer epidemiology. Her research focus was women's cancers, but her published work includes multiple cancers. Dr. Moorman has received funding from the NIH and similar bodies for more than 25 years. She was an editorial reviewer for numerous journals and a peer reviewer of grant applications. She applied the same reliable methodology in this case as she used in her research and taught to students at Duke:

> I considered studies that specifically examined risk of cancer with ranitidine exposure, as well as studies that assessed cancer risk with exposure to NDMA through dietary or occupational exposures. As I have done throughout my career when evaluating epidemiologic evidence for different risk factors for cancer, I considered the strengths and weaknesses of individual studies, the role of chance, and if biases were identified, the likely effect of those biases on the association between the exposure and cancer risk. I also considered

---

[110] *Compare*, *e.g.*, *id.* at 115-120 (Kim Y.D.) *with id.* at 147-50 (evaluating the Habel study based on the same factors).

[111] Def. Ex. 79 (World Cancer Research Fund Report 2018) at 5.

[112] *Reference Manual*, *supra* note 18, at 599-600.

> supporting information from animal and mechanistic studies to address biological mechanisms underlying the association between NDMA and cancer. I considered the totality of the evidence and applied the aspects of causality articulated by Sir Austin Bradford Hill,[10] which is a well-established standard for assessing causal relationships from epidemiologic data.[113]

Dr. Moorman's approach was rigorous and methodical. First, she gathered all published studies attempting to measure the effect of ranitidine or NDMA and cancer. Next, based on her extensive training and experience, she applied a consistent list of criteria to identify the strengths and weaknesses of these studies. Those criteria included (i) the study type (e.g., case control vs cohort), (ii) the study size, (iii) how the study assessed exposure to ranitidine or NDMA, (iv) whether the follow-up time was adequate to detect cancer from long-term exposure to ranitidine, (v) whether the study accounted for OTC use, dose, frequency of use, duration of use, or information about switching from one acid suppressant to another, (vi) whether individual data within each data source was dependent on employment or health insurance changes, the timeframe for which the database had prescription information, whether the data source limited the ability of the study's follow-up, and (vii) whether the study introduced or accounted for bias and confounders such as obesity, smoking or alcohol use and limited information on relevant medical conditions. *See, e.g.*, Def. Ex. 15 (Moorman Rep.) at 16-17, 77, 87-88, 123.

Importantly, Dr. Moorman applied her criteria in a neutral way. For instance, she did not flag inadequate follow-up time in studies that seemed to support Defendants' position while ignoring it in studies that support causation. Instead, she even-handedly noted the strengths and weaknesses for each piece of evidence to reach an objective, scientifically grounded conclusion. Applying her criteria, Dr. Moorman weighted each study based on its relative strengths and weaknesses, and reached a conclusion based on the totality of the available evidence.

Defendants claim Dr. Moorman failed to consider statistical significance, but that is false. Dr. Moorman paid due attention to statistical significance. *Id.* at 14-15. She used P values and confidence intervals as a "tool for interpreting how likely the observed outcomes could be due to chance." But, consistent with best practices, she avoided common pitfalls:

> [It is] improper and overly simplistic to consider studies with a p-value less than 0.05 (the standard value for statistical significance) or with confidence intervals that do not include the null value of 1.0

---

[113] Def. Ex. 15 (Moorman Rep.) at 5-6; *see also* Def. Ex. 39 (Moorman Dep. Tr.) at 478:6-22; 479:5-7; 491:14-492:8.

> as informative and those with p-values greater than 0.05 or with confidence intervals that include the null value of 1.0 as having no association and being non-informative. [12, 22]. The prevailing view among epidemiologists is that the traditional cut point for what is or is not statistically significant is arbitrary and using statistical significance as a cut point for considering or disregarding findings in studies is not good practice. [22-25]. *Id.* at 14.

Defendants accuse Dr. Moorman of ignoring bias and confounding, but that too is false. In particular, Dr. Moorman took account of protopathic bias (reverse causation) and indication bias. *Compare id.* at 21-25 (protopathic bias), 25-26 (indication bias) *with* Motion at 50-54. Protopathic bias or reverse causality is the bias that results if early symptoms of the cancer lead to use of the drug. In considering protopathic bias, Dr. Moorman evaluated the published literature to determine: 1) if early symptoms of the specific cancers are indications for using acid-suppressant drugs, 2) the typical duration between onset of symptoms and diagnosis of cancer, 3) whether use of acid-suppressant drugs is likely to delay the diagnosis of cancer and 4) the timeframe before a diagnosis of cancer when increases in the use of acid-suppressing drugs have been reported. Based on her evaluation of the literature, she concluded that protopathic bias is a greater concern for some cancers (e.g., gastric and esophageal because early symptoms of these diseases could be a reason to take acid-suppressing drugs) than others (e.g., bladder because the early symptoms of the cancer are not indications for acid-suppressing drugs). Dr. Moorman's further evaluation of the literature indicated that the mean duration of symptoms before diagnosis of the cancers was a few months, and that at least for esophageal cancer, the use of acid-suppressant drugs was not thought to delay the diagnosis of cancer. Finally, a pharmacy database study reported that increases in acid-suppressant drug use was observed only within a few months of cancer diagnosis. Taken as a whole, these data indicate that protopathic bias is a phenomenon that can occur, however by incorporating an appropriate lag time into the analysis, this bias can be minimized.[114] She also considered the potential bias that could result if the lag time used in the analysis was longer than needed to rule out protopathic bias.

Dr. Moorman also evaluated whether there was likely to be confounding by indication for each

---

[114] Dr. Moorman cited epidemiologic research findings that using a "lag time" of one year is commonly used in studies of pharmaceuticals and cancer risk, Def. Ex. 15 (Moorman Rep.) at 23-24, and she considered whether adequate lag times were used in the studies that she considered. Due to the lack of early symptoms in bladder, pancreatic, and liver cancer, protopathic bias is an unlikely concern. *Id.* at 22-24.

cancer. Def. Ex. 15 (Moorman Rep.) at 25-28. In other words, were the indications for the use of ranitidine (ulcers, reflux, etc.) known risk factors for the cancers considered? She also evaluated whether the drugs chosen as active comparators met key assumptions for this type of analysis including whether there was evidence that the active comparators also increased the risk of certain cancers, whether the active comparators were used for similar conditions and for conditions of similar severity, and whether the users of each of the comparators were comparable based on cancer risk factors.

Despite their protestations to the contrary, Defendants offer no viable criticism of Dr. Moorman's *methodology*. Her careful review of a large body of scientific evidence is the paradigm example of how seasoned epidemiologists evaluate causation. Defendants' true quibble is that they prefer active comparator studies' results, and so attack any method of addressing bias other than using an active comparator study. But that is no reason to exclude Dr. Moorman.

### C.     Andrew Salmon, D.Phil.

Dr. Salmon will opine that the NDMA in ranitidine can cause all five cancers in this litigation, based on a full Bradford Hill analysis, exhaustive review of all sources of evidence, and a rigorous dose-response calculation. Dr. Salmon is fully qualified to render these opinions.

Andrew Salmon, M.A., D.Phil., C.Chem., M.R.S.C., Plaintiffs' toxicology expert, received his BA in biochemistry, MA, and doctorate degree from the University of Oxford.[115] Dr. Salmon conducted postdoctoral research at the University of California, Berkeley and then worked for the ICI Central Toxicology Laboratory and as an Associate Research Fellow in the University College's Department of Clinical Pharmacology.[116] Since the 1980s, Dr. Salmon has worked in the field of public health. He was a Lecturer in Industrial Toxicology at the London School of Hygiene and Tropical Medicine, a consultant for the World Health Organization, and a toxicologist for the California Public Health Foundation.

For more than 3 decades at the California Environmental Protection Agency in the Office of Environmental Health Hazard Assessment, Dr. Salmon led health hazard and cancer risk assessment teams, developed guidelines for cancer and non-cancer risk assessment methodology, prepared technical support documents and position papers used to advise regulatory agencies on carcinogenic risks, and served as an advisor on health risk assessment projects. *Id.* Dr. Salmon regularly conducted dose response assessments for carcinogenic compounds, and carcinogenic

---

[115] Def. Ex. 22 (Salmon Rep.) at 1; Def. Ex. 43 (Salmon Dep. Tr.) at 34:9-22.
[116] Def. Ex. 22 (Salmon Rep.) at Ex. 2: Curriculum Vitae.

potency modeling using standard and time-dependent analysis, benchmark dose modeling, and compound-specific pharmacokinetic modeling. *Id.* He has sat on peer review panels for several US regulatory agencies including OSHA, EPA, CDC and ASTDR. *Id.* For example, he served as a peer reviewer for ATSDR's Toxicological Profile on Ethyl Benzene, a resource for toxicological and epidemiological data. *Id.*

In addition to his agency work, Dr. Salmon has taught undergraduate and graduate risk assessment methodology. He held a faculty position at the London School of Hygiene and Topical Medicine, and has lectured at Stanford University and U.C. Berkeley, Davis, and Los Angeles. *Id.* Dr. Salmon has published extensively in the areas of toxicology, carcinogenesis and genotoxicity, quantitative cancer risk estimation and risk assessment, and data extrapolation.[117] He has also co-authored epidemiologic publications.[118] Dr. Salmon is a member of the Society of Toxicology, Royal Society of Chemistry, and the Genetic and Environmental Toxicology Association.

When describing his qualifications, Defendants blithely suggest Dr. Salmon is unqualified, Motion at 55, but that accusation has no basis. That Dr. Salmon is a toxicologist does not mean he cannot read, interpret, and analyze epidemiological studies. Indeed, toxicologists routinely rely on epidemiological studies as part of their analysis and specifically Dr. Salmon has co-authored publications that are primarily epidemiological. *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1251 (11th Cir. 2005) (recommending that toxicologists also consider epidemiological data); *In re Johnson & Johnson*, 509 F. Supp. 3d at 160.

The methodology Dr. Salmon used is laid out in great detail in his Reports, which collectively span over 230 pages of analysis, and in his two days of deposition testimony. Dr. Salmon conducted unrestricted key word searches of the PubMed database to collect all relevant literature and studies; he also checked citations, cross-references, and guidance documents, which included a review of over 1100 scientific studies, data and related materials.[119] He also requested and reviewed internal GSK animal studies, nitrosation studies, toxicology studies, and internal documents from Pfizer, BI, and Sanofi. which informed his review and analysis. *Id.* He evaluated the literature addressing the association between NDMA and the NDMA in ranitidine and cancer,

---

[117] *See generally* Def. Ex. 22 (Salmon Rep.), Attachment A: List of Publications.
[118] *E.g.*, Andersson, N., *et al.*, *Exposure and Response to MIC: results of a community based survey in Bhopal*, 82 INDIAN J. MED. RES. (Supp. 1985); Andersson, N. *et al.*, *Exposure and Response to MIC: results of a community based survey in Bhopal*, 45 BRIT. J. IND. MED. 469 (1985).
[119] Def. Ex. 22 (Salmon Rep.) at Ex. 1: Materials Considered.

including bladder, breast, colorectal, esophageal, kidney, liver, lung, pancreatic, prostate and stomach cancer.[120] He carefully reviewed pertinent studies that found an association, and those that did not. *Id.* Dr. Salmon scrutinized every study's design, methodology, limitations, and reporting of results and explained in detail how he evaluated and weighed each study. *Id.*

This analysis was not perfunctory or cherry-picked—for example, he discusses the Adami study on pages 138-40, exhaustively summarizing its results, design, strengths, and weaknesses. Contrary to Defendants' argument, he did explain why he considered the unadjusted numbers (concerns about the opaque statistical adjustments),[121] but, in any case, he considered both. As for reporting "use v. non-use" results for Cardwell, Motion at 57 n.206, this is the main analysis that the study authors view as the bottom-line conclusion of their study.[122]

Dr. Salmon used the weight-of-evidence approach,[123] and applied the gold-standard Bradford Hill considerations to assess causality.[124] His Bradford Hill analysis was not a side-show. Dr. Salmon evaluated in exhaustive detail each Bradford Hill factor for each cancer over the course of 28 pages. *See* Def. Ex. 22 (Salmon Rep.) at 178-205. As an example of the rigor, for the biological plausibility sub-factor for each cancer, Dr. Salmon examined IARC's 10 key characteristics of a human carcinogen, and cited studies showing the mechanism by which cancer would be caused. *E.g., Id.* at 182-83. He also considered the availability of studies showing dose response, another Branford Hill consideration. *Id.* at 184.

Beyond his extensive Bradford Hill analysis, Dr. Salmon also performed a toxicological dose-response assessment, applying his considerable experience and training in doing calculations just like this. This analysis proceeded in several steps, the first of which was identifying source data for his calculation. Dr. Salmon identified the studies that provided quantitative NDMA exposure data that could then ultimately be used to create dose response slopes.[125] Dr. Salmon carefully assessed the specificity and reliability of the exposure data provided in each study in order to weigh each study. *Id.* at 49. Dr. Salmon reported that many studies he reviewed failed to

---

[120] Def. Ex. 22 (Salmon Rep.) at 4.

[121] A corrected article was published online on March 21, 2022, well after Dr. Salmon submitted his initial report in January 2022. *See* Def. Ex. 23 (Salmon Rebuttal Rep.) at 3.

[122] Def. Ex. 48 (Cardwell, *et al.* 2021).

[123] Def. Ex. 43 (Salmon Dep. Tr.) at 347:13-19, 399:21-400:3.

[124] Def. Ex. 22 (Salmon Rep.) at 10; Def. Ex. 43 (Salmon Dep. Tr.) at 398:21-401:7; *see also* Def. Ex. 46 (Bradford Hill 1965) at 295-300.

[125] Def. Ex. 22 (Salmon Rep.) at 105-130, 221; Def. Ex. 43 (Salmon Dep. Tr.) at 434:21-437:18.

provide usable exposure data because NDMA exposure was described in such broad terms (e.g., non-exposed vs exposed) or exposure could not be traced to specific NDMA concentrations (e.g., number of prescriptions or doses or amounts of food). *Id.* Dr. Salmon determined that the studies suffering from these limitations were not appropriate to use in his quantitative dose response assessment but could still be used for the hazard identification assessment. *Id.*

Next, Dr. Salmon calculated a dose-response curve for NDMA. Dr. Salmon provided detailed explanations of the mathematical assumptions and modeling approaches he used in this analysis, which are standard and accepted methods used for risk assessment and scientific causality analysis. Some dietary studies reported the levels of NDMA exposure from food and beverage consumption, which allowed Dr. Salmon to perform calculations to estimate the cumulative intake of NDMA reported for specified group. Dr. Salmon provided detailed information about the methodology he used to calculate cumulative exposure estimates from the dietary NDMA studies. To perform such calculations, Dr. Salmon identified information regarding exposure duration, level of NDMA in the consumed food or beverage, and the amounts consumed. *Id.* at 57. He noted that while some of this information is provided in the studies, it was necessary in certain cases to make some reasonable assumptions. *Id.* Dietary studies typically measure NDMA intake using point-in-time intake questionnaires taken by a trained interviewer. *Id.* Therefore, cumulative exposure was estimated for the time that the study subject would have consumed an adult diet and up to the study cutoff time. *Id.* In line with what the study authors did in their analyses Dr. Salmon assumed the subjects' diets were constant over this period. *Id.*

Where appropriate, Dr. Salmon sought to minimize the impact of potential uncertainties by performing calculations using different assumptions. For example, to account for the uncertainty surrounding the extent to which the diet of children resembles that same individuals' diet as an adult, Dr. Salmon conducted two separate analyses: one where consumption of an adult diet began at age 10 to account for some intake in childhood and adolescence and a second where consumption of an adult diet began at age 16. *Id.* In studies that provided quantified NDMA levels from alcohol, it was assumed that consumption started at age 21 or 18. *Id.* These alternative scenarios allowed Dr. Salmon to show that the potential uncertainties did not impair the usefulness or reliability of the calculations. *Id.*

Last, armed with his calculations about NDMA, Dr. Salmon calculated a dose-response assessment for ranitidine under alternative sets of assumptions about how much NDMA is in

ranitidine (i.e., based on Dr. Najafi's testing, based on manufacturer and FDA testing, with high and low estimates for each). In conducting his review, Dr. Salmon applied the standard methods used for scientific research and regulatory risk assessment, which he has decades of experience applying. *Id.* at 3.

### D.      Paul Michaels, M.D.

Dr. Paul Michaels is a board-certified medical doctor and pathologist with extensive training and experience in cancer diagnoses and tumor pathology. *See* Def. Ex. 13 (Michaels Rep.) at 2. Dr. Michaels has published peer-reviewed cancer research including on pancreatic cancer. *Id.* Dr. Michaels routinely interprets, analyzes and relies upon epidemiological data in his daily practice as an anatomic and clinical pathologist and is qualified to do so by his medical and scientific training and expertise. *Id.* at 3; *see also* Def. Ex. 36 (Michaels Dep. Tr.) at 302:9-304:18. Dr. Michaels's general and specific causation opinions on chemical exposure and cancer have survived past *Daubert* challenges.[126]

In this case, Dr. Michaels was initially asked to evaluate the scientific and medical literature to assess the biologic plausibility that ranitidine can be a cause of malignancies originating in the liver, stomach, esophagus, pancreas, and bladder. Def. Ex. 13 (Michaels Rep.) at 2. Dr. Michaels utilized the same scientific and professional standards—and methodology—to reach his opinions as he uses in his daily practice as an anatomic and clinical pathologist, and that he has used performing peer-reviewed studies. *Id.* at 2-3.

To reach his conclusions, Dr. Michaels methodically and systematically searched and reviewed the medical literature from many sources for pertinent animal and human studies that address ranitidine, NDMA, and carcinogenesis. *Id.* The literature contains a diverse array of study designs, follow-up periods, statistical power, possible sources of bias, replication of study findings, confounding variables, type and degree of exposure, and biological plausibility. *Id.* Dr. Michaels considered each of these factors as relative strengths or weaknesses for each strand of evidence.

---

[126] *See In re Ethicon, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:12-cv-02512, 2017 WL 2840473 (S.D. W. Va. June 30, 2017); *see also Childress v. Johnson & Johnson*, No. 2:12-cv-01564, 2017 WL 6350504 (S.D. W. Va. Dec. 12, 2017); *In re Prempro Prods. Liab. Litig.*, No. 4:03-cv-1507, 2012 WL 13033298 (E.D. Ark. Apr. 11, 2012); *In re Prempro Prods. Liab. Litig.*, No. 4:03-cv-1507, 2012 WL 13034062 (E.D. Ark. Apr. 9, 2012); *Townsend v. Ethicon, Inc.*, No. 2:20-cv-01984, 2021 WL 304555 (D. Nev. Jan. 29, 2021); *Geery v. Ethicon, Inc.*, No. 6:20-cv-1975, 2021 WL 2580144 (M.D. Fla. Apr. 9, 2021).

Dr. Michaels then evaluated the totality and weight of the evidence regarding IARC's 10 key characteristics of carcinogens and the Bradford Hill factors. This methodology is well-regarded and established.[127] Dr. Michaels' biological plausibility and general causation opinions were based on the totality and weight of the evidence. Def. Ex. 13 (Michaels Rep.) at 64.

Because his methodology was beyond reproach, Defendants only move to exclude two of Dr. Michael's opinions: (1) Because of its genotoxic characteristics and ability to initiate mutations by directly interacting with the underlying DNA framework, there is no safe exposure threshold or dose for NDMA.[128] (2) Treatment with ranitidine in doses and regimens that were directed by its manufacturers can cause cancer of the liver, stomach, esophagus, pancreas, and bladder.

Because Defendants have not even moved to exclude *most* of Dr. Michael's opinions, those opinions undisputedly can be presented to a jury. As for the two challenged opinions, Dr. Michaels reached both of them applying the same sound, well-established, scientifically grounded methodology used to reach his unchallenged opinions. Defendants point to no methodological flaw that renders Dr. Michael's opinions unreliable.

### E.    Jennifer Le, PharmD

Dr. Jennifer Le is a board-certified Pharmacotherapeutic Specialist with extensive training in clinical research encompassing three domains: 1) clinical pharmacology, 2) pharmacovigilance (i.e., medication safety), and 3) patient outcomes associated with medication use. Def. Ex. 5 (Le Rep.) at 1-2. Dr. Le serves on an FDA advisory board, evaluating all data and studies for drugs (including epidemiological studies) to provide recommendations on product labeling (including warnings) and to monitor adverse effects for post-marketing surveillance. *Id.* at 3. Dr. Le also serves as a scientific reviewer for the NIH (multiple study sections), the Agency for Healthcare Research and Quality (AHRQ), and the American Institute of Biological Sciences. *Id.* at 1. And Dr. Le serves as an editor and journal reviewer for many peer-reviewed journals, including *Pharmacotherapy, Therapeutic Drug Monitoring* and *Annals of Internal Medicine*. *Id.* at 7.

In this case, Dr. Le was asked to evaluate the scientific and medical literature to assess whether Zantac can cause cancer. Dr. Le formed her opinions using the same standard methods that she applies "in all of [her] work as a pharmacist, clinical pharmacologist and researcher that is related to assessing the risks and benefits of therapeutic products." *Id.* This method includes

---

[127] *Reference Manual*, *supra* note 18, at 20, 564, 599-600, 651.
[128] Defendants challenge this opinion in their Motion at D.E. 5696. Plaintiffs respond separately.

reviewing the scientific literature and data describing the effects of a drug on humans using pre-clinical (animals) and human studies (including epidemiology), and then using an "evidence-based medicine" weight-of-the-evidence methodology to analyze the information. *Id.* Dr. Le applies "this methodology frequently: 1) within [her] scope as an advisory member, with voting rights, on the FDA, NIH and AHRG; 2) while publishing [her] scholarly work in clinical pharmacology and pharmacovigilance that includes national guidelines; and 3) serving as editorial member and journal reviewer for many peer-reviewed journals." *Id.*

Dr. Le relied upon 379 sources. Some were Defendants' internal documents or unpublished studies, but the vast majority Dr. Le found herself by comprehensively searching medical literature. Dr. Le summarizes her general causation[129] opinions as follows:

1) Overall, ranitidine can and does convert to NDMA and both the drug and this metabolite can penetrate tissues to potentially induce carcinogenic effects.

2) The carcinogenic effects of NDMA, are mechanistically facilitated by the activation of RAS oncogenes and the denitrosation by CYP2E1 to the DNA alkylating agent methyldiazonium that is present in the liver and other organs.

3) Pharmacologic, toxicologic and epidemiologic data of ranitidine and its direct metabolite NDMA all suggest that ranitidine is capable of causing organ-related cancers, including bladder, liver, stomach, esophagus and pancreas.

*Id.* at 10. Defendants do not challenge the first two summary opinions, and only partly challenge the third. Rather, Defendants' challenge Dr. Le's analysis of the ranitidine epidemiology and argue her opinions regarding the NDMA epidemiology are irrelevant.

Dr. Le provides numerous sub-opinions that support her summary opinions. These include: 1) NDMA is "one of the most toxic, carcinogenic, and mutagenic compounds among the 300 known nitrosamines." *Id.* at 9. 2) IARC in 1978 identified dimethylamine as a source for NDMA formation and demonstrated the presence of NDMA in some drugs containing a tertiary amine—and that ranitidine is a tertiary amine with a dimethylamine group. *Id.* 3) NDMA is absorbed rapidly (>90%) after oral ingestion, and "enters the blood and extensively distributes to many organs throughout the body." *Id.* 4) The low protein binding of ranitidine facilitates transfer of ranitidine from the blood with significantly high concentration in the liver, stomach, pancreas, and

---

[129] Dr. Le also has a number of opinions—such as on pharmacovigilance—that are not general causation opinions.

kidneys (with implication of bladder concentration) where it can induce its toxic effects, *id.* at 8. 5) Epidemiological studies of dietary NDMA exposure as low as >125 ng/day have demonstrated an increased risk of cancer. *Id.* at 10. 6) The levels of NDMA based on defendants' and FDA's baseline testing alone would be enough to support causation and the results demonstrated by Emery Pharma would further exceed the levels of NDMA necessary to cause cancer. *Id.* Defendants do not challenge any of these supporting opinions; they should be deemed admissible.

### F.     Mira Hidajat, Ph.D.

Mira Hidajat, Ph.D., is a Senior Research Associate in Medical Statistics and Health Data Science at the Medical Research Council Integrative Epidemiology Unit of Bristol Medical School. The University of Bristol is internationally recognized as a leading research institution in methodological and applied epidemiology. Before working at Bristol, she was a Medical Research Specialist at the Texas Department Health Services from 2013-15. She has published 21 papers (12 as lead author) in peer-reviewed academic journals as well as 8 book chapters or reports.

Dr. Hidajat, along with her colleagues, conducted robust and extensive research in occupational epidemiology focused on associations between occupational exposures and mortality from cancer and non-cancer diseases among UK rubber workers. She was the lead author on the study "Lifetime exposure to rubber dusts, fumes and n-Nitrosamines and cancer mortality in a cohort of British rubber workers with 49 years follow-up"[130] which has been peer-reviewed and published in a leading occupational epidemiology journal. This study finds an association between NDMA exposure and cancer. Defendants have argued this study is flawed and is not relevant.

Dr. Hidajat is only a rebuttal witness. Her opinions refute the attacks and assumptions made by the defense experts about her NDMA studies. She is not providing an opinion on general causation. As such, Dr. Hidajat is eminently qualified and her study design, methodology of her studies and opinions are not the subject of any *Daubert* challenges asserted by the defense.

### LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert opinions. Under that rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine

---

[130] Def. Ex. 54 (Hidajat, *et al.* 2019).

a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

"[T]he purpose of the expert admissibility rules is to enlist the federal courts as 'gatekeepers' tasked with screening out 'speculative' and 'unreliable expert testimony.'" *MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1326 (11th Cir. 2022) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). The Eleventh Circuit has "distilled the expert admissibility inquiry into the following three factors:

(1) the expert is qualified to testify competently regarding the matters he intends to address;
(2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and
(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* The qualification prong is not onerous, and district courts should not be overly strict in assessing qualifications. *See Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021) (vacating the exclusion of an expert on qualifications grounds because the standard was "too high"). The helpfulness prong "goes primarily to relevance." *Daubert*, 509 U.S. at 591. Even a reliable methodology will not be helpful if it (reliably) addresses the wrong question.

In analyzing reliability, the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. In toxic torts, courts have set forth multiple guidelines in the reliable use of epidemiology. The Eleventh Circuit "has long held that epidemiology is not required to prove causation in a toxic tort case." *Rider*, 295 F.3d at 1199. Moreover, "'epidemiology cannot prove causation,'" but instead "enables experts to find associations," which are evidence to consider in coming to an expert judgment about causation. *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 779 (8th Cir. 2021) (quoting *Reference Manual* at 598). In any case involving epidemiology, "'the key questions' in evaluating epidemiological evidence 'are the extent to which a study's limitations compromise its findings and permit inferences about causation.'" *Id.* at 780 (quoting *Reference Manual* at 553). Differences in assessing the limitations of epidemiological studies are within the

"'range where experts might reasonably differ,'" so long as each expert provides "a reasonable basis for placing less weight" on the evidence supporting the other side. *Hardeman v. Monsanto Co.*, 997 F.3d 941, 964 (9th Cir. 2021) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)). And an expert may use epidemiology in combination with other forms of evidence to come to a conclusion based on the overall weight of the evidence. *E.g.*, *Bair Hugger*, 9 F.4th at 781 (citing cases).

On every prong, district courts have considerable discretion, but "the rejection of expert testimony is the exception rather than the rule." *Moore*, 995 F.3d at 850 (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments); *see also Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014) ("[C]ases are legion that, correctly, under Daubert, call for the liberal admission of expert testimony."). Indeed, the Eleventh Circuit's case law "is consistent with the 'liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony,'" *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Daubert*, 509 U.S. at 588), and the Eleventh Circuit follows the Supreme Court's reminder that "the Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under *Frye*." *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)).

## ARGUMENT

### I.      The Court Should Resolve General Causation Under *McClain* Category One Because NDMA Is a Well-Established Carcinogen

NDMA in ranitidine is so clearly carcinogenic that this Court's *Daubert* analysis should proceed to bellwether trials and specific causation. The Eleventh Circuit has demarcated two categories of cases:

> [F]irst, those cases in which the medical community generally recognizes the toxicity of the drug or chemical at issue, and second, those cases in which the medical community does not generally recognize the agent as both toxic and causing the injury plaintiff alleges. Examples of the first type include toxins like asbestos, which causes asbestosis and mesothelioma; silica, which causes silicosis; and cigarette smoke, which causes cancer. … The court need not undertake an extensive Daubert analysis on the general toxicity question when the medical community recognizes that the agent causes the type of harm a plaintiff alleges.

*McClain*, 401 F.3d at 1239.

Cases in this Circuit have applied *McClain* category 1 beyond asbestos, silica, and cigarette smoke. For example, the "inhalation of mold spores can cause hypersensitivity pneumonitis" under *McClain* category 1. *Jazairi v. Royal Oaks Apartment Assocs., L.P.*, No. 404CV091, 2005 WL 6750570, at \*8 (S.D. Ga. June 23, 2005), *aff'd*, 217 F. App'x 895 (11th Cir. 2007). And cases about chlorine gas "belong[] in Category I," due to "its ability to cause" chronic breathing problems. *Williams v. Int'l Paper Co.*, No. CV 108-45, 2009 WL 10678630, at \*1–2 (S.D. Ga. July 19, 2009). Where a toxin is in category 1, the *Daubert* analysis "focuses on plaintiff-specific questions: was plaintiff exposed to the toxin, was plaintiff exposed to enough of the toxin to cause the alleged injury, and did the toxin in fact cause the injury?" *McClain*, 401 F.3d at 1239.

### A.      Virtually All Scientific Authorities Recognize NDMA as Capable of Causing Cancer

Worldwide authorities recognize NDMA as a carcinogen. In 2002 the WHO issued a 50-page report on NDMA.[131] The "numerous studies conducted *in vitro*" provided "overwhelming evidence that NDMA is mutagenic and clastogenic." *Id.* at 17. And *in vivo*, "NDMA has been *consistently* shown to be a potent carcinogen in *all experimental species* studied." *Id.* at 22 (emphasis added). Not only did NDMA cause cancer in every species tested, it did so "irrespective of the route of exposure" (for example, by ingestion, by inhalation, etc.) and "in a wide range of tissues." *Id.* at 23. The WHO considered human NDMA dietary studies from the 1990s, noting a "consistent … association with cancer." *Id.* at 21. Its executive summary put these pieces together: "tumours have been induced in all species examined at relatively low doses, [and so] NDMA is clearly carcinogenic. … Qualitatively, the metabolism of NDMA appears to be similar in humans and animals; as a result, it is considered highly likely that NDMA is carcinogenic to humans, potentially at relatively low levels of exposure." *Id.* at 4.[132] The 2021 National Toxicology Program report on nitrosamines makes the same points in its NDMA section,[133] as do IARC, EPA, FDA,

---

[131] Liteplo (2002), *supra* note 22, at 4.

[132] GSK appears to have copied this sentence in its Health Hazard Report. *See* Ex. 41 (GSK Hazard Assessment Report, GSKZAN0003419540).

[133] *See* NTP, *2021 Report on Carcinogens, Fifteenth Edition, N-Nitrosodimethylamine*, https://ntp.niehs.nih.gov/ntp/roc/content/profiles/nitrosamines.pdf at 7 (NDMA caused tumors "in all species tested, including mice, rats, hamsters, guinea pigs, … rabbits, frogs, newts, and various fish." NDMA caused many different kinds of cancers, whether exposure was "oral administration … inhalation … prenatal exposure … subcutaneous administration … injection … [or] exposure via tank water in frogs and fish." Newer studies on "mollusks," "foxes," "toads," and "rats"

and many others. Plaintiffs' Motion to Exclude Defendants' Putative Expert Opinions on General Causation sets forth authority-after-authority, study-after-study, and numerous quotations of Defendants' own employees and experts, uniformly stating that NDMA is a carcinogen. *See* D.E. 5841 at § I, pages 2-17.

As explained at length in Dr. Panigrahy's and Dr. Michaels' reports, NDMA exhibits 9 out of the 10 key characteristics of carcinogens, providing overwhelming evidence of its carcinogenicity.[134] Dr. Panigrahy explains that "[s]ince NDMA reliably and reproducibly causes cancer, it is used routinely world-wide by many scientists as a gold-standard to initiate tumor growth in the laboratory."[135] Defendants have not challenged these opinions.

Defendants have not pointed to *any* organization or study that has said NDMA does *not* or is unlikely to cause cancer. Every scientist knows it does. Defendants have argued instead that IARC classifies NDMA as a "probable" carcinogen because human epidemiological studies are scarce. However, this argument falls flat since IARC's last review and classification was in 1987 (when human NDMA studies were scarce) and has not yet revisited that determination in light of the many peer-reviewed observational studies that have been published since 1987 which demonstrate an increased risk of cancers with exposure to NDMA from a variety of sources. These studies strongly confirm the consensus view that NDMA can cause cancer.

In fact, NDMA is so uniformly recognized to cause cancer that testing it on humans is unthinkable. Once a substance is shown to be carcinogenic in animals, "deliberate exposure is not possible in humans," and so "prospective epidemiological study often is not possible, and even the ability to do retrospective studies is constrained."[136] Defendants' experts agree that it would be unethical to test NDMA on humans.[137] There simply is no genuine dispute in the scientific community—or even between the parties—that NDMA can cause cancer.

Unlike ephedrine or caffeine, which were the compounds at issue in *McClain,* or even

---

showed that NDMA "caused tumors at additional tissue sites and in additional species." NTP also looked at human dietary studies, finding them consistent.).

[134] *See* Def. Ex. 13 (Michaels Rep.) at 3, 62; and Def. Ex. 19 (Panigrahy Rep.) at 15, 74-77.

[135] Def. Ex. 19 (Panigrahy Rep.) at 141.

[136] *Reference Manual*, *supra* note 18, at 659.

[137] Ex. 10 (Chodosh Dep. Tr.) at 173:14-174:17; Ex. 29 (Vaezi Dep. Tr.) at 182:1-9; Ex. 15( Guengerich Dep. Tr.), vol. 1, at 138:16-21; Ex. 30 (Wang Dep. Tr.) at 209:24-210:3; Ex. 28 (Terry Dep. Tr.) at 227:1-7.

asbestos or silica, NDMA "is no longer used industrially or commercially."[138] Like mold, chlorine gas, cigarette smoke, silica, and asbestos, NDMA is widely recognized to cause the injuries Plaintiffs' allege. Defendants have not even moved to exclude Dr. Panigrahy's opinion that NDMA causes liver cancer, Def. Ex. 19 (Panigrahy Rep.) at 201-08, bladder cancer, *id.* at 208-13, gastric cancer, *id.* at 213-15, pancreatic cancer, *id.* at 215-18, and esophageal cancer, *id.* at 218-19.

## B.    Any Questions About the Amount of NDMA in Ranitidine Goes to Specific Causation

Due to the overwhelming scientific consensus that NDMA can cause cancer, *McClain* instructs that the proper question is whether the NDMA in ranitidine *actually was a likely* cause of Plaintiff's cancer, which turns on the amount of NDMA in ranitidine that each Plaintiff consumed, and other potential risk factors that could explain their cancer.[139] The Court should deny Defendants' Motion and proceed to those questions.

Defendants may argue that the question under *McClain* is not whether *NDMA* can cause cancer, but whether *ranitidine* can cause cancer, but that is nonsense. If manufacturers could *remove* the NDMA from ranitidine—and ensure it does not form in the body—Plaintiffs do not argue that *other* toxins in ranitidine would still cause cancer. The toxin *is* NDMA. And it is undisputed that all ranitidine breaks down into NDMA, so consuming the former *means* consuming the latter. Consider, as an analogy, a water contamination case. Suppose a plaintiff alleged that a factory dumped NDMA into the groundwater, which caused the plaintiff to develop cancer after she drank water from her well. Well water has many substances besides NDMA (likely in higher concentrations), but none of them matter to *McClain* categorization if the plaintiff's theory is that the NDMA in the water (rather than some other chemical, or combination of chemicals) caused her cancer.

The same is true here. Ranitidine, much like the well water, is the route of exposure for NDMA. No evidence suggests (and no party argues) that the NDMA in ranitidine is a different toxin from NDMA anywhere else. To the contrary, counsel for Defendants recently agreed that this "litigation is about whether NDMA in ranitidine can cause the types of cancers being alleged by the Plaintiffs." Ex. 50 (July 7 Disc. Hr'g Tr.) at 9:8-11 (Ms. Hill). Because, under *McClain*

---

[138] Liteplo (2002), *supra* note 22, at 4.

[139] In most states (including Florida), this standard will be the substantial contributing factor test, under which the agent need not be the sole cause, or even the primary cause, but need only be *a* cause among others.

category 1, NDMA plainly *can* cause cancer, the NDMA in ranitidine can too.

Defendants' primary argument on why ranitidine cannot cause cancer boils down to saying there is not enough NDMA in ranitidine (or perhaps that consumers do not take enough ranitidine). But that argument cannot move this case to *McClain* category 2 because "the inquiry for purposes of *McClain* categorization concerns the chemical at issue, but not the dose at issue." *Williams*, 2009 WL 10678630, at *1. In *Williams*, the defendant "argue[d] that this is a Category II case because 'a single heavy chlorine gas inhalation episode'" could not cause the injury, but the court rejected that argument because the "question is whether [chlorine gas] can—without regard to a specific dose—cause those injuries." *Id.* (citing *McClain*, 401 F.3d at 1239). Here, the question for general causation is whether NDMA can, without regard to dose, cause cancer, and it certainly can. Dose is a separate question; a *specific* causation question. The Court should deny Defendants' general causation Motion to "focus[] on plaintiff-specific questions: was plaintiff exposed to the toxin, was plaintiff exposed to enough of the toxin to cause the alleged injury, and did the toxin in fact cause the injury?" *McClain*, 401 F.3d at 1239. The answer to that question will vary from those who took one or two prescriptions' worth (which the Adami study examined, finding—with other limitations—that dose is not enough to cause certain cancers), to those who took high doses of ranitidine for 30 years who are in a dramatically different category.

## II.    Plaintiffs' Experts' Methodologies Are Generally Accepted

The methodologies used by Plaintiffs' Experts are mainstream and well-accepted. After explaining that Rule 702 loosened the strictures of the "general acceptance" standard from *Frye*, the Supreme Court noted that "[w]idespread acceptance" nonetheless "can be an important factor in ruling particular evidence admissible, [under Rule 702, because] 'a known technique which has been able to attract only minimal support within the community' may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594 (quoting *United States v. Downing*, 753 F.2d 1224, 1238 (3d Cir. 1985)); *see also id.* at 597 ("To summarize: 'General acceptance' is not a necessary precondition to the admissibility of scientific evidence."). The "technique"—that is, principles and methodology—Plaintiffs' experts applied in this case are weight-of-the-evidence and Bradford Hill analysis, which are accepted, mainstream tools. Defendants admit that "epidemiologists often employ a framework known as the Bradford Hill criteria." Motion at 23. And there is little question

that a weight-of-the-evidence approach is appropriate under *Daubert*.[140] Even assuming this is a *McClain* category 2 case, Plaintiffs' experts' methodologies are plainly generally accepted.

Defendants dispute this basic truth by wrenching the "widespread acceptance" quotation from *Daubert* out of context to argue that Plaintiffs' experts' *conclusion* that ranitidine causes cancer is not generally accepted, but that argument is flawed in multiple respects.[141] To begin with, a *Daubert* analysis's "focus, of course, must be solely on *principles* and *methodology*, **not** on the conclusions that they generate." *Daubert*, 509 U.S. at 595 (emphasis added). And the methodologies, as explained, are mainstream. To demand acceptance of the conclusion itself would doubly disregard "the Supreme Court's admonition that 'a rigid "general acceptance" requirement would be at odds with the "liberal thrust" of the Federal Rules.'" *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 691 (8th Cir. 2001) (quoting *Daubert*, 509 U.S. at 588-89).

But even accepting Defendants' misdirection to conclusions themselves, this case is different in every way that matters from *Daubert II*, in which the proffered opinions did "not, to understate the point, reflect the consensus within the scientific community." Motion at 71 (quoting *Daubert v. Merrell Dow Pharms., Inc. (Daubert II)*, 43 F.3d 1311, 1314 (9th Cir. 1995)).

- There, Plaintiffs proposed that consuming Bendectin had caused birth defects, but their experts *did not know*—and did not try to propose—the "biological chain of events that leads from an expectant mother's ingestion" of Bendectin "to the stunted development of a baby's limbs." *Daubert II*, 43 F.3d at 1313. Here, Plaintiffs have proposed a specific

---

[140] *See, e.g.*, *Bair Hugger*, 9 F.4th at 781 (finding exclusion an abuse-of-discretion because "[a]n inference of causation based on the totality of the evidence may be reliable even if no one line of evidence supports a reliable inference of causation by itself") (internal citation omitted) (; *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017) (finding that a "weight of the evidence" approach is a reliable and accepted methodology); *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1311 (N.D. Fla. 2018) ("This 'weight of the evidence' approach to analyzing causation can be considered reliable, provided the expert considers all available evidence carefully and explains how the relative weight of the various pieces of evidence led to his conclusion.").

[141] In fact, Defendants erred not only on the context but *text* of this quotation, improperly inserting a period after "admissible" without indicating any alteration. *Compare* Motion at 70 ("'admissible.'") *with Daubert*, 509 U.S. at 594 ("admissible, and 'a known technique'"). This oversight is what allows Defendants to pretend the Supreme Court is addressing the widespread acceptance of a *conclusion*, ignoring that the word "technique" appears in the very same sentence.

mechanism for how ranitidine causes cancer: NDMA, a well-recognized carcinogen.[142]

- There, "[e]very published study here and abroad—and there have been many—conclude[d] that Bendectin" could not cause birth defects. *Id.* at 1314. But here, *multiple* studies show that ranitidine can cause cancer (in far lower doses than Plaintiffs allege), and even more epidemiological studies show that NDMA can cause cancer.

- There, "FDA … continue[d] to approve Bendectin for use by pregnant women because 'available data do not demonstrate an association between birth defects and Bendectin.'" *Id.* at 1314. But here, FDA—and all regulators worldwide—have withdrawn ranitidine from the market *because* it degrades into NDMA, a carcinogen, and have held firm in that conclusion for years.

- There, "no one in the scientific community—except defendant's experts—has deemed" the experts' claims that Bendectin can cause birth defects "worthy of verification, refutation or even comment" suggesting a "tacit understanding … that what's going on here is not science at all." *Id.* at 1318. But here, not only does the scientific community engage with the theory that ranitidine can cause cancer, papers continue to be published at prominent scientific conferences *confirming* the theory.[143]

Defendants ignore these obvious differences, clinging to their made-up argument that no scientists have looked to NDMA evidence (as opposed to ranitidine) to evaluate whether ranitidine can cause cancer. Defendants cite no scientific organization, government agency, peer-reviewed scientific publication, or scientist anywhere who has ever stated that evidence of NDMA and cancer is irrelevant to the general causation issues in this case. Ironically, Defendant GSK relied on the same studies in its own assessment of NDMA hazards, concluding that the studies found consistent evidence of an association with several human cancers, evidence of a dose-response

---

[142] At risk of gilding the lily, Plaintiffs' experts went far deeper, identifying the precise mechanisms by which *NDMA* causes cancer. *See, e.g.*, Def. Ex. 9 (McTiernan Rep.) at 233 (explaining that "scientists have determined that the mechanism through which NDMA causes cancer is through increasing DNA methylation which leads to DNA damage and cancer formation" and citing sources). Drs. Michaels and Panigrahy went into considerable detail in their reports to detail the mechanism and biological plausibility evidence. *See, e.g.*, Def. Ex. 13 (Michaels Rep.) at 10-25; Def. Ex. 19 (Panigrahy Rep.) at 151-84, 201-25.
[143] *See, e.g.*, Wang, *et al.*, *Pharmacoepidemiological Research on N-Nitrosodimethylamine Contaminated Ranitidine Use and Long-Term Cancer Risk: A Population-Based Longitudinal Cohort Study*, DDW 2022 Poster Presentation (American Gastroenterology Association Digestive Disease Week Conference).

relationship,[144] and concluded that it is "highly likely that NDMA is carcinogenic to humans."[145] GSK was right then. Comprehensive analyses like that undertaken by Drs. McTiernan and Moorman[146] evaluating a product containing a carcinogen, routinely consider evidence about the carcinogen (including dietary and occupational studies). That is what happened when asbestos (a well-known carcinogen) was discovered in talcum powder: "IARC has stated that talc containing asbestos is carcinogenic to humans (group 1) based on IARC's classification of asbestos as a human carcinogen (group 1) coupled with information that talc is often contaminated with asbestos."[147] That is what happened when NDMA was discovered in Valsartan—peer-reviewed literature examining its cancer risk cite the *very same* dietary studies as Plaintiffs' experts do.[148] No outside scientist has yet published a comprehensive analysis of ranitidine (which is not surprising, since the public has known that ranitidine degrades into NDMA for only a few years), but when they do, they will invoke the same sources.

Defendants also mischaracterize a sentence in the Florian study as well as the study itself.[149] That paper studied NDMA levels in urine and plasma in 18 healthy people administered ranitidine on an empty stomach. Florian was not (and did not purport to be) a comprehensive assessment of cancer risk from ranitidine. Defendants claim that the Florian paper "[s]ummariz[ed] the totality of peer-reviewed evidence," Motion at 2. Not so: a single sentence, without any analysis, cited a few ranitidine studies.[150] The reference was not exhaustive and did not consider any limitations of the studies (even those the authors themselves emphasized), such as duration of

---

[144] Ex. 41 (GSK Hazard Assessment Report, GSKZAN0003419540), at 8.

[145] Ex. 41 (GSK Hazard Assessment Report, GSKZAN0003419540), at 6-7.

[146] Drs. Moorman and McTiernan's reports, are 230 and 384 pages, respectively, and each has over 225 references, and detailed Tables summarizing and analyzing the epidemiologic data. That is what a comprehensive analysis entails, and that has not been undertaken by the FDA, the National Cancer Institute, the World Health Organization (WHO), IARC, or any other scientific body, or group of scientists.

[147] Def. Ex. 10 (McTiernan Rebuttal Rep.) at 37 (citing https://inchem.org/documents/ iarc/suppl7/talc.html).

[148] Pottegard, *et. al.*, *Use of N-nitrosodimethylamine (NDMA) contaminated valsartan products and risk of cancer: Danish nationwide cohort study*, BMJ (Sept. 12, 2018), https://doi.org/10.1136/bmj.k3851. The Pottegard study paper did not discuss the Hidajat NDMA occupational study, probably because the Hidajat study had not yet been published.

[149] Def. Ex. 49 (Florian, *et al.* 2021) at 247.

[150] Florian was published in June 2021 but failed to cite at least 2 studies (Liu and McDowell) that were published in January or earlier. Of course, Florian also did not consider the 5 studies published after June 2021.

use, duration of follow-up, lack of OTC information, no or incomplete information about smoking and other confounding factors.

Plaintiffs' experts' methodologies are generally accepted. If it were relevant, their conclusions are too.

## III.   Plaintiffs' Experts Conducted Reliable Analyses of the Weight of the Evidence

Defendants' main focus is challenging the reliability of Drs. McTiernan's and Moorman's opinions. This challenge is largely based on stringing together a grab-bag of quotations from over 25 hours of deposition and over 600 pages of reports from these two witnesses. Notably, Defendants *do not* explain their actual methodologies and the bases for their opinions. The lack of explanation is not harmless. Rather, it allows Defendants to repeatedly misrepresent—yes, *misrepresent*—what each expert said. Without analysis of the methodology, Defendants invite this Court to err by basing its *Daubert* ruling entirely on their *conclusions*, which is improper.

Though Defendants pretend otherwise, the principal factors Plaintiffs' experts pointed to in reducing the weight they gave particular studies were the limited exposure, short follow-up time, lack of data on smoking and other risk factors, and failure to measure OTC exposure (which causes misclassification bias, understating cancer risk). For certain studies, Plaintiffs' experts also flagged when the study participants were young (which would mean the follow-up time needs to be far longer, since cancer is uncommon for young-or-middle-aged people even with exposure to a carcinogen), and when the data was aggregated from health claims databases, which, as FDA has itself noted, have a high potential for error. Where one side claims certain studies are "the most powerful evidence," but the other side's experts provide "a reasonable basis for placing less weight" on that evidence, that is a classic battle of the experts that the jury should hear. *See Hardeman*, 997 F.3d at 963-64. That is what happened here.

### A.   Plaintiffs' Experts Identified Considerable Limitations in the Ranitidine Epidemiology, Following Best-Practices Identified by IARC, the *Reference Manual*, and Other Authorities

The ranitidine epidemiology either fully supports or is consistent with causation for each of the five cancers. Defendants conclude otherwise only by ignoring the associations the ranitidine study authors recognize, by disregarding increased risk that is not "statistically significant" (contrary to mainstream practice), and by inappropriately extending the no-association findings from the limited contexts of the studies to the very different population of Plaintiffs here. Plaintiffs' experts properly recognized the merits and limitations of each study and weighted each

54

accordingly. Dr. Moorman explained:

> [M]y evaluation of the active comparator studies considered other aspects of the studies including the duration of follow-up, completeness of exposure ascertainment, assessment of other confounding factors, crossover between acid-suppressing drugs, age of the study population, dose-response analyses, and conflicts of interest and how these factors impacted the validity of the findings.[151]

Dr. McTiernan similarly parsed each study finely, discerning both strengths and weaknesses.[152] Their evaluation of the epidemiology properly considered not only the relative risk, but the limitations and biases of each study.[153] In doing so, both experts were heeding the *Reference Manual*'s caution that certain "concerns"—"including the lack of suitably large groups of individuals exposed for a *sufficient period of time*, *long latency periods* between exposure and manifestation of disease, … and the inability to measure *actual exposure levels* … have led some researchers to conclude that 'many negative epidemiological studies must be considered inconclusive' for exposures to low doses or weak carcinogens."[154] Plaintiffs' experts identified each of those concerns—and more—leading them to give little weight to the few no-association results (especially in light of the other evidence strongly supporting causation). Their analysis was, in short, textbook.

### 1. "[L]ack of suitably large groups of individuals exposed for a sufficient period of time"

Plaintiffs' experts properly discounted the weight of studies addressing patients who consumed ranitidine for short time periods. The Plaintiffs in this litigation consumed ranitidine for many years—often, for decades. The Zantac MDL claims registry data as of June 2022 shows that nearly 60% of Plaintiffs allege they used ranitidine for more than ten years. Plaintiffs' experts were addressing the question of general causation: could NDMA in ranitidine have caused cancer for *any* of these Plaintiffs? A one-year study with no association would not be very informative: "Exposure assessment based on short-term use will not capture the risk associated with long-term

---

[151] Def. Ex. 15 (Moorman Rep.) at 69-86; Def. Ex. 16 (Moorman Rebuttal Rep.) at 4.

[152] *See, e.g.*, Def. Ex. 32 (McTiernan Dep. Tr.) at 677-79; Def. Ex. 9 (McTiernan Rep.) at 96-99.

[153] Def. Ex. 16 (Moorman Rebuttal Rep.) at 4-10; Def. Ex. 15 (Moorman Rep.) at 14-15; Def. Ex. 9 (McTiernan Rep.) at 29-32, 86-87.

[154] *Reference Manual, supra* note 18, at 660 n.74 (quoting H. Pitot, *et al.*, *Chemical Carcinogenesis*, in *Casarett and Doull's Toxicology: The Basic Science of Poisons* 201, 240–41 (Curtis D. Klaassen ed., 5th ed. 1996)) (emphasis added).

use…"[155] As IARC explains, "[r]egardless of the agent, all exposures have two principal dimensions: intensity (sometimes defined as concentration or dose) and time. Time considerations include duration (time from first to last exposure), pattern or frequency (whether continuous or intermittent), and windows of susceptibility."[156]

Carcinogenic exposures that may not cause cancer in one year commonly can over longer periods. For example, Defendants' expert Andrew Chan was co-author on a paper that noted "increasing risk of pancreatic cancer with increasing duration of use [of aspirin], particularly after *more than 20 years*."[157] Yet, as Plaintiffs' Motion to Exclude Defendants' Putative Expert Opinions on General Causation D.E. 5841 explains in depth at pages 28-41, few of the studies Defendants emphasize even measured exposure for *one year*, much less ten. A few highlights:

- In the Adami study,[158] "approximately half of the ranitidine users had only one prescription."

- Both the Adami and Norgaard[159] studies assessed risk for more than 5 or 10 prescriptions respectively in their *longest* sub-analysis, which is less than a year of use.

- The Kantor study[160] considered regular exposure for no more than *four weeks*.

- The Tran study[161] similarly relied on self-reported usage for 4-6 weeks.

- In the Iwagami study,[162] only 0.2% of study participants—not two percent, *two in one thousand*—took ranitidine for more than *two years*; more than 96% had exposure of six months or less.

- The Kim, Y.D. study[163] used a database that lacked any information on duration of use.[164]

---

[155] Def. Ex. 15 (Moorman Rep.) at 98. This principle is not symmetric. An association in a short-term study would be *dramatic* proof of general causation for a ten-year consumer.

[156] IARC Preamble 2019, *supra*, note 16, at 15; *see also id.* at 19-20 ("[A]dequate exposure contrast (intensity, frequency, and/or duration),"and "biologically relevant definitions of exposure" are "key determinants" as to "whether a study can show a true association if there is one, between the agent and cancer, and the lack of an association, if no association exists.").

[157] Eva S. Schernhammer, *et al.*, *A Prospective Study of Aspirin Use and the Risk of Pancreatic Cancer in Women*, J. NAT'L CANCER INST. (2004) at 27 (emphasis added).

[158] Def. Ex. 45 (Adami, *et al.* 2021).

[159] Def. Ex. 68 (Norgaard, *et al.* 2021).

[160] Def. Ex. 57 (Kantor, *et al.* 2021).

[161] Def. Ex. 76 (Tran, *et al.* 2018).

[162] Def. Ex. 55 (Iwagami, *et al.* 2021).

[163] Def. Ex. 60 (Kim Y.D. *et al.* 2021).

[164] Ex. 38 (Mohy-ud-din Document Production) at 23, 26 ("I think we should exclude mentioning

- The Kim, S. study[165] included any patients prescribed the medications for *one month* between January 2002 and December 2008, and with no sub-analysis of anyone who took it for longer (if any such participants existed).

- The Kumar study[166] similarly included anyone with *one month* of exposure, similarly with no longer-duration sub-analysis.

As Dr. Moorman explained:

> [N]early all of studies of ranitidine and cancer risk were unable to adequately assess risk associated with long-term use. Some of the studies grouped all users together regardless of duration or did not do any dose-response analyses specifically for ranitidine.[31, 50, 54-56, 71, 104-108] The obvious problem is that some unknown proportion of the people classified as ranitidine users had minimal use of the drug (or no use if the drug was prescribed but never taken). This would minimize the likelihood of detecting an increased risk with ranitidine use and would not provide a reliable estimate of the risk from long-term use.[167]

The issue here is not the terminology of "long-term" or "short-term" use, but whether the exposure duration in the studies matches the exposure duration for Plaintiffs in this case. It does not.

Depending on the study design, *duration* may only be half of the picture—equally important to the dose is the frequency of use within the time period. But "none of [the ranitidine active comparator studies] even discussed frequency of use with the possible exception of the Kantor study." Def. Ex. 39 (Moorman Dep. Tr.) at 476:21-477:5. If a study measured whether a user took ranitidine for 3 months (duration), that does not give the dose unless the study says *how much* ranitidine they took per day (or per week or month). For example, the Yoon study included participants who took ranitidine for at least one year, but did not measure *how often* users took ranitidine within that year.[168] Users could have been taking multiple tablets every day, or only once every few months—a gulf of difference for the dosage.

Nonetheless, some studies were better than others. For example, both experts gave a high

---

time period altogether because we don't know how long these people were on ranitidine for (and there isn't a way to find out)."). This led a journal editor to write that it was not surprising that they did not find an association between ranitidine use and cancer risk. *Id.* at 32.

[165] Def. Ex. 59 (Kim S, *et al.* 2021).

[166] Def. Ex. 61 (Kumar, *et al.* 2021).

[167] Def. Ex. 15 (Moorman Rep.) at 47; *accord*, Def. Ex. 9 (McTiernan Rep.) at 99, 233, 251 ("none assessed long-term use").

[168] Def. Ex. 77 (Yoon, *et al.* 2021) at 2. Yoon specifically noted its findings applied to "the short-term risk of cancer" but not "the long-term cancer risk." *Id.* at 7.

degree of weight to the Cardwell study, which had actual prescription records (frequency) and an "exposure period within each matched set was 8.4 years"[169] (duration)—longer than most other studies, though still shorter than the median for Plaintiffs.

The absence of human ranitidine epidemiology on long-term use renders these studies of lesser weight to the question of whether NDMA in ranitidine can cause cancer when used long-term. Defendants do not claim otherwise—in fact, they barely mention this key issue at all. Studies of smoking and lung cancer illustrate the importance of this study limitation. People who quit smoking after just a few years have essentially the same risk of lung cancer as a non-smoker.[170] If studies of smoking had the same design and limitations as the ranitidine epidemiology Defendants tout, they would show no association. There is nothing methodologically flawed about identifying an undeniable deficiency in a study and affording it less weight as a result. At most, Defendants' experts disagree over how much of a discount the flawed ranitidine studies deserve. That difference in professional judgment is a classic question for the jury to resolve; it does not show a departure from accepted scientific methods that is the hallmark of a Rule 702 violation.

### 2.   *"Long latency periods between exposure and manifestation of disease"*

Plaintiffs' experts properly discounted the weight of studies with short follow-up periods. The epidemiology textbook *Epidemiology in Medicine* explains that the "length of the required period of follow-up … will be related to the length of the latency period for the outcome of interest."[171] Here, the outcome of interest is cancer. Because cancer can have a long latency period, epidemiological studies can seriously understate an association by missing cancers that did not manifest until after the study follow-up period. For that reason, long-term follow-up is one of the "key determinants" of "whether a study is able to show … the lack of an association, if no association exists."[172] IARC forcefully argues that "[e]xperience from studies of cancer in humans

---

[169] Def. Ex. 48 (Cardwell, *et al.* 2021) at 4.

[170] Doll, *et al.*, *Mortality in relation to smoking: 50 years' observations on male British doctors*, BMJ (published 22 June 2004), https://doi.org/10.1136/bmj.38142.554479.AE.

[171] Hennekins & Buring, *Epidemiology in Medicine*, at 167 (1987).

[172] IARC Preamble 2019, *supra* note 16, at 19-20; *see also* Def. Ex. 85 (FDA Electronic Healthcare Guidance) at 10, 18. ("It is important for investigators to ensure that the data source(s) contain a sufficient number of patients or patient follow-up time to ascertain outcomes of interest based on the hypothesized exposure risk window." The "time window defines the period after the beginning of exposure during which the occurrence of an event (safety outcome) of interest will be attributed to the exposure.")

indicates that the period from first exposure to the development of clinical cancer is sometimes longer than 20 years," and consequently studies with follow-up "periods substantially shorter than about 30 years *cannot provide evidence of lack of carcinogenicity*."[173] That is why optimal cancer studies employ long follow-up periods (for example, the Hidajat occupational study had a 49-year follow-up).[174]

So, how many human ranitidine studies have a follow-up period of about 30 years? *None*. 20 years? *None*. Plaintiffs' experts evaluated each study, and "[n]one of the studies had adequate follow-up time to capture the full latency period of cancer development, but several of the studies had such short follow-up times that they were virtually guaranteed not to detect an increased risk of cancer with ranitidine use."[175] The study authors were candid about this limitation:

|  | Follow-Up | Author Comment |
|---|---|---|
| Yoon | 7 years (maximum) | "the follow-up period is restricted to seven years; thus, the overall follow-up period is not long enough to assess the onset of cancer" |
| Kantor | 6.7 years (median) | "We did not capture long-term outcomes; some data suggest longer latency between NDMA exposure and cancer." |
| Iwagami | 2.4 years (median) | "longer follow-up, especially among those with a high cumulative dose, may be warranted" |
| Kumar | 4.4 years (median) | "longer follow-up is necessary |
| Adami | 12-14 years | "the most severe shortcoming of our study is the limited number of participants with long-term follow-up" |
| Norgaard | 11-14 years (median) | |
| Kim Y.D. | 10 years (maximum) Below 5 years (median)[176] | |

---

[173] IARC Preamble 2019, *supra*, note 16, at 22.
[174] Def. Ex. 54 (Hidajat, *et al.* 2019).
[175] Def. Ex. 16 (Moorman Rebuttal Rep.) at 9. *Accord* Def. Ex. 9 (McTiernan Rep.) at 26, 29, 65-6, 136, 151 (Table 4).
[176] Def. Ex. 60 (Kim Y.D., *et al.* 2021). The study does not report a median, and the aggregate data makes calculating one impossible. Still, it must have been below five years—probably 3 or less. The study covered 10 years ("ten-year maximum follow-up"), but participants joined (and left) each year (participants who were prescribed a different acid suppressor were removed, as was anyone who changed healthcare providers). If the earliest patients stayed in the aggregated dataset the full 10 years, they would have 10-year follow-up. The patients who joined in the final year would have 1 year follow-up. If nobody left, and there were equal numbers of people joining in each of the 10 years of the study, the median would be 5. But it is certainly below that for two reasons. First, Dr. McTiernan cited evidence that 20-30% of patients dropped out of the database

| Kim S. | 5 years | "this study had a 5-year follow-up period, which may not be long enough to detect gastric cancer development" |
|---|---|---|
| Habel | 8-13 years | |
| Tran | 5.6 (median) | "further research is needed to assess the long-term cancer risk" |
| Cardwell | Similar to 18 years[177] | |
| McDowell | Same as Cardwell | |

Defendants provide no argument for why the limited follow-up factor should not, as IARC recommends, mean the studies "cannot provide evidence of lack of carcinogenicity,"[178] *much less* why anyone should disagree with the study authors and Plaintiffs' experts that this factor reduces the weight a study can bear. Instead, Defendants fault Dr. Moorman for being unable to provide a specific "cut point for what follow up time is long enough." Motion at 54. Though saying "30 years" (as IARC suggests) would be defensible, this question has no binary answer. Longer follow-up is better (and so deserving of more weight); shorter follow-up is worse (and so deserving of less weight). That is the rule both experts followed. For example, the 18-year nested case-control study by Cardwell has the best follow-up of any study, and Dr. Moorman concluded that "the nested case-control study by Cardwell, was the strongest of the studies, with the largest number of cases, longest follow-up, [and] most complete exposure ascertainment."[179] Plaintiffs' experts evaluated this key factor properly.

---

every year. If that is right (the authors provided no estimate), the median even if *all* participants joined in year 1 would be 3 or 4 years (assuming a conservative 20% churn: 20% leave after 1 year, and so would have only 1 year follow-up; 16% 2 year; 13% 3 year, which adds up to 49%—putting the median in year 4). This does not even consider those switching to a different acid suppressor. Second, as Table 5 of the study illustrates, more people joined later: "the total population and size of Explorys increased as more institutions and patients were incorporated." The number of patients in the database exploded over the course of the study from 13 million to 68 million (which means the number of new joiners *vastly exceeded* the 20-30% leaving each year). That means there are *far* more observations in later years of the study, and each of those late joiners had shorter follow-up than the year 1 participants, which shifts the median follow-up period far below 3-4 years. FDA was certainly correct in warning that aggregate data is difficult to interpret.

[177] Cardwell was a nested case-control study, for which the concept of "median follow-up" is not the same as a cohort study. But the length of the study conveys analogous information.

[178] Again, this principle is not symmetric. Finding a cancer association even in a study with limited follow-up would suggest the true association is stronger than the reported value.

[179] Def. Ex. 15 (Moorman Rep.) at 106.

3.    *Other limitations*

Though the follow-up and duration were the main limitations, Plaintiffs' experts also reliably identified others. For example, they noted that the authors of the Adami study are paid consultants for Defendant Sanofi, which surely is relevant to the weight of that study.[180] In some studies, the population was too young measure the incidence of cancer.[181] Most did not have any information on the actual dose of ranitidine within a prescription or the number of days in a prescription.[182]

Most of the studies had no information on smoking. Defendants agree that "smoking is an established risk factor and known cause of each cancer in this litigation." Motion at 22. A study with no smoking information has a high risk of confounding. Yet, as Plaintiffs' experts catalogued exhaustively, many studies did not even measure smoking, and so could not control for it (for example, Adami, Norgaard, Yoon, Iwagami, Habel, Kim S).[183] Notably, the Scottish PCCIUR database was the rare exception, which had the "strength[]" of "access to a wide range of confounders including smoking and alcohol use."[184] Inexplicably, Defendants attack Cardwell as possibly confounded by smoking when it was the study that had the *best* data on smoking.

Beyond that, many of the active comparator studies used information from electronic health records and administrative claims databases. FDA advises caution in interpreting such studies because these data sources "are generated to support payment for care," and "were generated for

---

[180] *E.g.*, Def. Ex. 16 (Moorman Rebuttal Rep.) at 11 (noting "a conflict of interest due to a consulting relationship with Sanofi).

[181] *E.g.,* Def. Ex. 55 (Iwagami, *et al.* 2021) at 365 (the average participant was 41 years old, and 72.4% were under age 50, leading the authors to note: "[T]he median age of patients with an incident cancer diagnosis was around 53 years in the current study, which is obviously lower than the average age of patients with cancer in Japan (even among those aged < 75 years).").

[182] For example, Adami did not report the number of pills per prescription. There is no way to know if 10 prescriptions is 300 pills (assuming that a prescription is for 30 days), or less, nor the dose (75, 150, or 300 mg) in each prescription. Ten or more prescriptions— the highest exposure category—is likely equivalent to just 10 months of use.

[183] Dr. McTiernan's analysis was far more granular than Plaintiffs can present. For example, though the Kumar study did try to control for smoking, Dr. McTiernan noted that its data suggested 60% of veterans had never smoked, which contradicted large, public survey data suggesting only 34% of veterans had never smoked. If, as this discrepancy suggests, the data is questionable, the smoking control is too, which Dr. McTiernan noted is an example of the difficulties in interpreting studies based on electronic health records. Def. Ex. 9 (McTiernan Rep.) at 80-81.

[184] Def. Ex. 48 (Cardwell, *et al.* 2021) at 7.

purposes other than drug safety investigations."[185] The Kim Y.D. and Mohy-ud-Din studies used the Explorys database. Dr. McTiernan stated "the database was not designed for research studies, but rather was a compilation of data designed for billing insurance companies and patients." Def. Ex. 9 (McTiernan Rep.) at 117. There is no data on individual patients. All data is in groups of 10, and is based on one snapshot each year. A mind-bending implication of this data structure is that a study with one observation of 10 people across 10 years could be *the same* ten people who stayed in the system for 10 years, or *one hundred different people* (10 each year) or anything in-between. Given this bizarre limitation, no study conducted on Explorys can measure (or even guess at) exposure duration or follow-up.[186] Explorys also has no explanation of the source of the cancer diagnosis. Rates of cancer in the Explorys database differ from the rates in the United States population (which makes sense, since the institutions that join are not random, and the population that goes to those hospitals is not random). Explorys also had no information on how long patients stayed in the database over time (*i.e.*, "churning"), which is estimated at 20-30% per year based on how often people change insurance plans.

As part of her extremely thorough analysis of the ranitidine studies, Dr. McTiernan spent 37 pages analyzing the databases from the United States, Scotland, United Kingdom, South Korea, the Netherlands, and Japan. Def. Ex. 9 (McTiernan Rep.) at 113-150.

### B.    Plaintiffs' Experts Properly Accounted for Bias and Confounding

Dr. Moorman and Dr. McTiernan carefully considered each potential source of bias and confounding. Defendants admit this, citing up-front sections of their reports and depositions identifying confounding-by-indication, reverse causation, and residual confounding as pitfalls to avoid. *See* Motion at 21-22, 73. In fact, both experts identified many more potential sources of bias and confounding, drawn from their decades of experience, research, and training. Rather than identifying methodological flaws, Defendants simply *disagree* with how each expert applied her admittedly reliable methodology in assessing misclassification bias, active comparator studies, and statistics, and claimed both contradict study authors. No attack has merit.

---

[185] Def. Ex. 85 (FDA Electronic Healthcare Guidance 2013) at 7.
[186] Ex. 38 (Mohy-ud-din Document Production) at 23 (Attachment to E-mail from Nabeeha Mohyuddin to Ghulam Rehman Mohyuddin (Nov. 22, 2019 01:34) ("I think we should exclude mentioning time period altogether because we don't know how long these people were on ranitidine for (and there isn't a way to find out).")).

*1.     Each Expert Appropriately Factored in Misclassification Bias*

Plaintiffs' experts identified a serious drawback in the human ranitidine studies: they tracked only *some* of the ranitidine study participants took. None of the studies had any information about OTC ranitidine use, meaning they "missed use of ranitidine that was obtained without a prescription." Def. Ex. 15 (Moorman Rep.) at 17. An analogy would be a study on the effect of alcohol on cancer that had data on liquor consumption, but no information about wine or beer. Such a study would misclassify a huge population of beer and wine drinkers in the teetotaler group simply because they did not consume liquor. The *relative* risk of liquor would be measured as lower, because the teetotaler group in fact would have a large amount of alcohol consumption.

The same is true of OTC ranitidine for any study after its approval in 1995. Whatever effect OTC ranitidine had would show up either in the "non-user" group, or people who were prescribed one of the active comparators, causing serious misclassification bias. That bias would artificially decrease the relative risk. In most countries, "a prescriptions database almost certainly represents *only a small slice* of ranitidine exposure," since OTC sales dominate prescription sales. Def. Ex. 9 (McTiernan Rep.) at 79 (emphasis added). The proportion of OTC use to prescription use varies by country, by medication, by year, and by how consumers pay. At minimum, this bias introduces uncertainty, and understates the risk by some amount. *See, e.g.*, *id.* at 59, 69-70, 77; Def. Ex. 15 (Moorman Rep.) at 29-30, 63. Experts must therefore weigh the effect of misclassification in each study individually.

For example, the Cardwell study explained that sales data suggested that "UK over-the-counter purchases account for only around 10% of ranitidine," suggesting misclassification may be less of a problem in that study. Def. Ex. 48 (Cardwell, *et al.* 2021) at 7. By contrast, in Denmark, where the Adami and Norgaard studies are from, OTC PPI and famotidine was trivial (less than 4%), while OTC ranitidine took the country by storm, accounting for 82% of ranitidine by the end of the study.[187] Other studies in other countries did not say how much ranitidine was OTC versus prescription.[188] Misclassification bias goes to the weight of each study in differing degrees, based

---

[187] Def. Ex. 45 (Adami, *et al.* 2021) at Supp. Table 2; *see also* Def. Ex. 16 (Moorman Rebuttal Rep.) at 8 (analyzing this issue, and concluding "the inclusion of [OTC] ranitidine users in the comparator groups would tend to result in an underestimate of the true relative risk associated with ranitidine use."); Def. Ex. 9 (McTiernan Rep.) at 50; Def. Ex. 15 (Moorman Rep.) at 17.

[188] *See, e.g.*, Def. Ex. 61 (Kumar, *et al.* 2021) at 8 ("We were unable to ascertain whether patients

on expert judgment.

Misclassification may bias active comparator studies more seriously than other study designs. Consumers commonly take an OTC medication, then, if the problem continues (or worsens), switch to a more efficacious prescription medication, meaning those who consumed "active comparator" drugs are disproportionately likely to have previously taken OTC ranitidine compared to non-users (and therefore disproportionately *misclassified*).

Defendants do not deny that misclassification bias exists and should affect the weight given to a study. Instead, they point to an absurd question in Dr. McTiernan's deposition in which she agreed she could not confirm "even a single person was definitively misclassified in any study of ranitidine and cancer." Motion at 45. This gotcha question is unserious. Even Adami—Sanofi's paid consultant—recognized that "over-the-counter use *inevitably* led to underestimation of ranitidine exposure." Def. Ex. 45 (Adami, *et al.* 2021) at 2308. There is no credible reason to think *nobody* in *any* of the studies ever took OTC ranitidine, one of the top-selling drugs on earth. Dr. McTiernan did not need to "definitively" identify "a single person" in the study who did.

Defendants also argue Dr. McTiernan and Dr. Moorman should be excluded for failing to *quantify* the effect of exposure misclassification bias. Motion at 77-78. But Defendants cite no authority suggesting that an expert should *ignore* a bias simply because she cannot precisely quantify its effect for each study individually. The blood of quantification cannot be squeezed from the stone of these studies. When directly asked "[c]an you, within a reasonable degree of scientific certainty, quantify the impact that any misclassification of exposure had on the results in any of the studies," Dr. Moorman responded: "one knows only what is reported … in the study, you can't give a precise quantification of the amount of misclassification. And so consequently, you cannot give a precise quantification of how much it affected the relative risk." Def. Ex. 39 (Moorman Dep. Tr.) at 119:14-120:10. Undeterred, Defendants claim Dr. Moorman "admitted she could have" calculated the effect of exposure misclassification, Motion at 54, but this statement takes some liberties with the transcript. Far from admitting she *could*, Dr. Moorman *repeatedly* stated she *could not* because high-quality data about OTC prevalence in the relevant populations over the

---

also used acid suppressants OTC or from another health system, leading to misclassification of data."); Def. Ex. 60 (Kim, Y., *et al.* 2021) ("In addition, over-the-counter (OTC) use of medications were unable to be accounted for" because OTC usage is not tracked in "the Explorys system"). The same is true of other studies.

relevant time periods was unavailable—including in the very sections Defendants cite.[189] Instead, Dr. Moorman applied "reason[ed] judgment as to the likely impact on the relative risk, would it bias it towards the null, and my conclusion was that it probably did." *Id.* at 436:3-6.

Last, Defendants fault each expert for concluding that misclassification bias produced an "*underestimate*[ of] the true relative risk," vaguely suggesting that "the direction of the bias is not clear." Motion at 77. Defendants' logic is unstated and inscrutable. Even Defense expert Dr. Terry acknowledged that "OTC[] medications … likely have measurement error (information bias), which can lead to … non-differential misclassification in cohort studies." Ex. 6 (Terry Rep.) at 14. Defense expert Dr. Vaezi recently recognized in his peer-reviewed published research that misclassification bias from OTC use leads "to an underestimation of the risk."[190] The *Reference Manual* explains at page 589 that "nondifferential misclassification bias leads to a shift in the odds ratio toward one, or, in other words, toward a finding of no effect" and so "nondifferential misclassification generally underestimates the true size of the association." That precisely matches what Plaintiffs' experts said. *E.g.*, Def. Ex. 9 (McTiernan Rep.) at 74, 184; Def. Ex. 15 (Moorman Rep.) at 19-21, 158 (OTC "misclassification would tend to classify some ranitidine users as non-users, which would result in an underestimate of the true relative risk").

> 2.       *Defendants Misstate Both Expert's Position on Active Comparator Studies*

Defendants' argument to exclude the opinions of Drs. McTiernan and Moorman regarding active comparator studies is predicated on a straw man. Neither expert denies that active comparator studies are a useful epidemiologic study type to address indication bias. But usefulness for one purpose does not cure other flaws, and both experts identified myriad reasons to discount the studies, largely unrelated to the fact that they were active comparator studies. *See, e.g.*, Def.

---

[189] *Compare* Motion at 54, n.191 (citing Def. Ex. 39 (Moorman Dep. Tr.) at 359:16-362:17; *id.* at 350:14-352:17; *id.* at 435:15-436:16) *with* Def. Ex. 39 (Moorman Dep. Tr.) at 359:16-362:17 (explaining that "you can't absolutely estimate how much misclassification occurred" and so must "make some reason[ed] judgments"; noting Dr. Chan's estimate had "faulty assumptions" and stating she had "not done those calculations"); *id.* at 350:14-352:17 (perhaps a scrivener's error— this line range says nothing about quantifying misclassification bias); *id.* at 435:15-436:16 (explaining she could not quantify misclassification without data on the "prevalence of OTC use in the population" and "you really don't have the data"; "the information on the amount of misclassification was just not available from the studies).

[190] Lei, *et al.*, *Association Between Use of Proton Pump Inhibitors and Colorectal Cancer: A nation-wide population-based study*, 45(1) Clinics & Res. Hepatol. & Gastroent., 101397 (2021) (Epub 2020), https://doi.org/10.1016/j.clinre.2020.02.017 at 7.

Ex. 16 (Moorman Rebuttal Rep.) at 4-11.

Defendants claim to boil down Dr. McTiernan's and Dr. Moorman's analysis of the ranitidine active comparator epidemiology to two points: "that other H2RAs and PPIs may *also* increase the risk of cancer," Motion at 42, 73, and that ranitidine users "have important baseline differences from users of other H2RAs and PPIs." *Id.* at 42, 74. Though both of these points are true, neither was a point the experts emphasized. The notion that their analysis rests *entirely* (or even mostly) on these two points is one Defendants invented out of whole cloth. As this Response has repeatedly explained, Drs. McTiernan and Moorman evaluated each study using the same set of criteria—whether the study had an active comparator design or not.

An example helps illustrate the point. In analyzing liver cancer, Dr. McTiernan discusses the Yoon 2021 study on pages 228-229 of her report. After summarizing the results, she notes strengths and weaknesses of the study. The strengths included the "large database," "comparison to another H2 blocker" which may have "removed the potential confounding effect of medical indication for use of an H2 blocker" and "linkage to medical datasets for cancer determination." Def. Ex. 9 (McTiernan Rep.) at 228. But, the study had weaknesses too, including "a very short time period" of both exposure and follow-up, OTC misclassification bias, and the unexplained choice of examining "only subsets of ranitidine and famotidine users," which "reduced the number of cases included, thereby reducing power to detect associations." *Id.* at 229. In the overall analysis, Dr. McTiernan explained that Yoon "adjusted for some potential confounders" but did not "assess[] long-term use," and so "the risk of liver cancer with ranitidine use likely exceeds the levels" reported in Yoon. *Id.* at 233.

Dr. Moorman's analysis of the Yoon paper is broadly similar. She noted "limitations" that would create misclassification bias, namely the lack of information on OTC use (meaning the "famotidine" arm of the study may well have been taking *OTC ranitidine* before or even during the study period). Def. Ex. 15 (Moorman Rep.) at 74. She quoted the *authors*, who characterized the study as "not long enough to assess the onset of cancer." *Id.* Then, she summed up her analysis: "In total, the limitations of the study, including misclassification of ranitidine users, the lack of information regarding the risk of long-term use and the short duration of follow-up would tend to reduce the likelihood of detecting increased risk of cancer with ranitidine use. *For these reasons*, I put little weight on the results of this study." *Id.* (emphasis added).

As this example shows, Dr. McTiernan's and Dr. Moorman's analyses are in-line with their

consistent, reliable methodology described above, and do not vary depending on whether the study has an active comparator design. Defendants' description of their analyses is unrecognizable. Neither of them simply said that (1) Yoon compared ranitidine to famotidine, which also causes cancer, and (2) famotidine users have important baseline differences and moved on. Those points were not even close to their "primary justifications for discounting the results of the active comparator studies." Motion at 73. In fact, those reasons did not even appear in their bottom-line explanation. Both identified *other* problems with Yoon as why it was less informative. All of the discussions of each study for each cancer are like this, carefully cataloguing strengths and limitations. Plaintiffs could not identify *any* section of either expert's report that proceeds along the lines Defendants propose. The Court cannot exclude expert opinions based on a strawman description.

### 3.      *PPIs and H2RAs Are not Clean Active Comparators for Ranitidine*

Though neither expert focused on the two points Defendants fixate upon, both are serious concerns in interpreting the active comparator sub-analyses. Active comparator studies work only if all differences in the risk being measured is attributable to the medication and not to (a) the comparator itself, or (b) an undetected difference in the underlying risks of the target medication population and the comparator medication population. Following this logic, FDA Guidance has emphasized the importance of selecting appropriate comparators.[191] Multiple potential confounding factors apply to PPIs and H2RAs.

Neither assumption holds for PPIs, which may well cause cancer and are routinely prescribed for patients with more serious conditions than ranitidine. Defendants' expert John Witte, for example, warned that PPIs were not a good comparator for ranitidine "due to different patterns and indications of use and potential hypotheses regarding PPIs and cancer."[192] Other scientists agree: the S. Kim study "excluded patients who were prescribed proton-pump inhibitors because of their potential carcinogenicity … arising from hypergastrinemia, gastric atrophy and bacterial overgrowth in the stomach."[193] Both Dr. McTiernan and Dr. Moorman cited published studies supporting the view that PPIs can cause cancer and are taken by less healthy individuals

---

[191] Def. Ex. 85 (FDA Electronic Healthcare Guidance 2013) at 7.
[192] Ex. 7 (Witte Rep.) at 9.
[193] Def. Ex. 59 (Kim S, *et al.* 2021) at 2.

than ranitidine.[194] Contrary to Defendants' argument, Motion at 51, neither needed to perform a full Bradford Hill analysis on *each* PPI to take this well-recognized potential risk into account.[195] No expert in this litigation has performed a full Bradford Hill analysis before opining that a given comparator is appropriate or inappropriate. Doing so is not required.

The main concern for other H2RAs as comparators is differences in the underlying population. The Kim, Y.D., study of Americans reported substantial differences in the health profiles of the underlying populations of ranitidine and famotidine (another H2RA). The famotidine group had 25% more smokers, nearly 20% higher diabetes rates (38% versus 45%); 35% higher obesity (24% versus 32%); almost double the rate for liver cirrhosis (6.5% versus 11.4%); on and on for irritable bowel syndrome and atrophic gastritis.[196] The other studies did not provide sufficient information to make this comparison (and were in different populations with different usage facts), but an unmeasured and uncontrolled confounding factor of that magnitude violates a fundamental assumption for using active comparators, because the study cannot attribute differences in cancer incidence solely to the drug. This concern simply must be considered (indeed, Defendants' experts' failure to even discuss this source of confounding is one aspect of why their analysis is unreliable). *See* Def. Ex. 10 (McTiernan Rebuttal Rep.) at 30.

Another way to see the same point is to consider the differing indications for ranitidine, PPIs, and other H2RAs. Defendants make much of their claim that Dr. McTiernan "could not name any indications for ranitidine that differ from indications for other H2RAs or PPIs," Motion at 43, but depositions are not meant to be a memory test—the labels speak for themselves. PPI indications, as Drs. Witte, McTiernan, and Moorman all noted, are different from ranitidine. The indications for ranitidine are also different from other H2RAs (for example, ranitidine—but not other H2RAs—is indicated for maintenance use).[197] Much more important than the general uses listed as label indications are the *actual* reasons the drugs were prescribed to the patents in the study. In many of the active comparator studies, information on what the drugs were actually

---

[194] *E.g.*, Def. Ex. 15 (Moorman Rep.) at 27-31, 123; Def. Ex. 16 (Moorman Rebuttal Rep.) at 5; Def. Ex. 9 (McTiernan Rep.) at 112, 135, 206, 229, 257.

[195] Notably, bias from this source would always be toward the null (RR of 1 or less). If PPIs cause cancer or are given to less healthy populations and one is comparing ranitidine to PPIs, any result will show *less* of an association than the true value. It would never result in *overstating* the risk of ranitidine.

[196] Def. Ex. 60 (Kim, Y, *et al.* 2021) at Table 2.

[197] *See* Ex. 32 (Witte Dep. Tr.) at 274-81 (discussing the maintenance therapy difference).

prescribed for was missing or facially erroneous. For example, in the Adami study the authors noted that ranitidine was prescribed for GERD, Barrett's Esophagus, and ulcers for less than 10% of patients—but those are the principal uses for the drug, suggesting a "garbage-in, garbage-out" data error.[198] Drs. McTiernan and Moorman were examining the actual data to determine how comparable the active comparator populations were to the ranitidine populations. As Dr. McTiernan testified, the populations were "often quite different."[199]

### 4.     Plaintiffs' Experts Do not Contradict the Study Authors

Defendants argue that Drs. Moorman and McTiernan's opinions should be excluded because they disagree with the authors of active comparator studies, but this argument is flawed. Motion at 75-76. Foremost, Defendants quote authors such as Iwagami saying things such as active comparator studies are "less prone to indication bias than a comparison between users and non-users of ranitidine." Plaintiffs' experts do not question that active comparator studies are a useful epidemiologic study type to address indication bias—that is why they listed this design as a strength. But in reducing *some* indication bias, certain active comparator studies may introduce a *different* problem, for example, that the comparator drug increases cancer risk.

Defendants also quote various no-association study findings (either in a main analysis or sub-analysis), Motion at 27-28, each of which Plaintiffs' experts have acknowledged. For the duration and frequency of use of ranitidine among the study participants, and for the period of time they were followed, Drs. Moorman and McTiernan do not disagree that certain studies found no association. The question is how much that matters and whether it was biased; the study authors have not said anything on those questions. True, Iwagami noted that "[t]he results of this study may alleviate concerns about a potential risk of cancer in people exposed to ranitidine/nizatidine, although assessment with more accurate measurements of the exposure level, inclusion of older people, and longer follow-up may be warranted." That two-edged statement does not *really* alleviate many concerns, because the study lumped together ranitidine and nizatidine, had an average follow-up of 2.5 years, and used study population 2 decades younger than the mean for cancer diagnoses. Perhaps it "may" be reassuring for young people who took both ranitidine and nizatidine for a short period and were concerned about getting cancer in the next 2.5 years, but that describes few-to-no Plaintiffs.

---

[198] *See* Def. Ex. 45 (Adami, *et al.* 2021) at 2304.
[199] Def. Ex. 32 (McTiernan Dep. Tr.) at 718.

5. *Defendants' Position on Statistical Significance Defies Scientific and Legal Authorities*

Defendants argue that "[i]f the confidence interval" for a study "includes 1.0, *there is no statistical association between the exposure and the disease*." Motion at 21 (emphasis added). This flawed, but repeated, view is pseudoscience.

Confidence intervals are important because of the difference between a sample and a population. Picture a large party (say, 500 people) that was supposed to end in thirty minutes. The host could pay extra to rent the space for longer and would do so if he believed it probable that at least 100 people wanted to stay more than 30 minutes. Asking people until he found 100 who wanted to stay would be burdensome, so he randomly asks 30 people, and 7 say they would like to stay. That means 23% of the *sample* want to stay. But perhaps through random chance, the sample is not representative of the entire population of partiers. Maybe 40% of partiers want to keep reveling until the sun rises. Or it could be that only 10% do.

Hypothesis testing and confidence intervals are a statistician's way to address how likely it is that the actual population deviates, and by how much, from a random sample. The size of the confidence interval mostly depends on the sample size (larger samples mean a narrower range), and how probable it must be that the true value is within the range (more probable means a larger range). One convention is to give a range that is 95% likely to contain the true value. For instance, if the 95% confidence interval for the above hypothetical is 20% to 26%, that means there is only a 5% chance that fewer than 20% and or greater than 26% of the total guests want to stay late based on the sample being non-representative by chance.[200] There is nothing magical about 95% as the relevant confidence interval. One could calculate a confidence interval for 80%, 90% or 99% (or, equivalently, p-values of .2, .1 or .01). The same is true of hypothesis testing. There is no threshold beyond which the sample value becomes the population value, only varying levels of confidence. Importantly, the confidence interval indicates imprecision in *both* directions—if the true value could be much smaller, it could also be much larger.[201]

---

[200] Confidence intervals do not purport to measure bias, confounding, or anything other than random chance.

[201] The host example illustrates this. Suppose the host calculated that the sampling left a high degree of uncertainty: there was a 20% chance one would find 7 partiers out of a sample of 30 if fewer than 100 people were partiers. Here, deciding "well, the sample result is not statistically significant at a 95% level, so I guess I should not extend" would be irrational, since it avoids the

The same applies to epidemiology. As the authoritative textbook *Modern Epidemiology* explains:

> Simply put, studies in which there are true causal effects may yield results that are not statistically significant…. [U]sing P≤.05 as a criterion to determine 'whether or not there is an effect' is particularly problematic and can lead to absurdities. It suggests that P = 0.04 implies there is an effect, whereas P = 0.06 implies there is no effect. But the P-value is in fact a continuous measure of evidence, and there is no appreciable difference between P = 0.04 and P = 0.06[202].… *The conclusion that 'there is no effect' as a conclusion drawn solely from a P-value above 0.05 is never justified*…. Imprecision will be reflected by a wide confidence interval, *which may contain large and important effect sizes* even though the interval also contains the null effect.[203]

Put another way, if a study shows an association of 1.6, but the confidence interval is wide and includes "1.0," that *might* mean that the study picked up a spurious association—but the very same confidence interval conveys that the study may have *understated* a hefty "2.2" association. The P-value is agnostic on which is the proper inference (and, in fact, neither inference is proper).

The American Statistical Association issued a statement in 2016 regarding statistical significance and p-values, to address "misconceptions and misuse" of these concepts, stating that "scientific conclusions … should not be based only on whether a p-value passes a specific threshold," and that "statistical significance does not measure the size of an effect or the importance of a result."[204] The *Reference Manual* makes the same point.[205] A 2019 statement from the ASA is even clearer:

> The [2016 ASA Statement] stopped just short of recommending that declarations of "statistical significance" be abandoned. We take that step here. We conclude … that it is time to stop using the term

---

20% risk of random error in one direction only at the cost of the *80% risk* of error in the other direction.

[202] Dr. Moorman makes exactly this point: "The prevailing view among epidemiologists is that the traditional cut point for what is or is not statistically significant is arbitrary and using statistical significance as a cut point for considering or disregarding findings in studies is not good practice." Def. Ex. 16 (Moorman Rebuttal Rep.) at 14.

[203] Lash, Timothy L., *et al.*, *Modern Epidemiology* at ch. 2 (4th ed. 2021) (emphasis added).

[204] American Statistical Association Statement on Statistical Significance and P-Values (March 2016), https://www.amstat.org/asa/files/pdfs/p-valuestatement.pdf.

[205] *Reference Manual*, *supra* note 18, at 579 (epidemiologists interpret a study to determine what can be ascertained about whether an exposure is associated with a disease "without the necessity of rejecting all studies that are not statistically significant").

> "statistically significant" entirely. Nor should variants such as "significantly different," "p < 0.05," and "nonsignificant" survive, whether expressed in words, by asterisks in a table, or in some other way. Regardless of whether it was ever useful, a declaration of "statistical significance" has today become meaningless.[206]

Not every scientist has discarded the *terminology*, of course, but even those who retain it would reject Defendants' simplistic and discredited view that "[i]f the confidence interval" for a study "includes 1.0, there is no statistical association between the exposure and the disease." Motion at 21 (emphasis added). Frankly, that view is scientifically indefensible.[207]

Defendants' misapprehension of statistical significance is particularly inappropriate in civil litigation, where the burden of proof for causation is *preponderance of the evidence*. That legal test states that if it is even slightly more likely (i.e. 50.1%) that ranitidine can cause a subject cancer, Plaintiffs have met their burden of proof (and, of course, when deciding summary judgment and the admissibility of evidence, the standard is far lower: whether the jury *could* find causation by 50.1%). That standard means the civil law abhors equally an improper verdict for the plaintiff as for the defendant (or, in statistical parlance, type 1 and type 2 errors). Civil law therefore does not countenance conservative presumptions that would discard probative evidence merely because it may be spurious 5.1% of the time. That is not the law. So, it is unsurprising that courts have rejected Defendants' flawed view. *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40-41 (2011) ("courts frequently permit expert testimony on causation based on evidence other than statistical significance"); *Wells v. Ortho Pharm. Corp.*, 788 F.2d 741, 745 (11th Cir. 1986) ("Plaintiffs' burden of proving [the injuries] were caused by the Product did not necessarily require them to produce scientific studies showing a statistically significant association"). Regulators have rejected it too. *See Matrixx*, 563 U.S. at 41 ("The FDA similarly does not limit the evidence it considers for purposes of assessing causation ... to statistically significant data."). There is no basis in fact or law for considering *only* statistically significant associations, and so obviously

---

[206] Editorial, Moving to a World Beyond "p<0.05", The American Statistician, 2019, vol.73,1-19. In 2019, a comment appeared in the journal Nature, one of the highest impact journals in the world calling for the elimination of the term "statistical significance. Attached to the article is a supporting statement signed by 834 epidemiologists and statisticians around the world. Amrhein, *et al., Scientists Rise Up Against Statistical Significance*, NATURE (March 20, 2019).

[207] Defendants also state: "Study results that are not statistically significant do not sufficiently rule out the possibility of chance. *See Ref. Man.* at 573." Motion at 21. Perhaps this was scrivener's error, but the claim simply is not supported by page 573 of the *Reference Manual*—at all.

Plaintiffs' experts cannot be excluded for properly considered all associations. Doing otherwise would have been unreliable.

Defendants also accuse Dr. McTiernan of inconsistency with her prior views on statistical significance, Motion at 94-95, but that is not true. Both experts' publications treat statistical significance the same way they treated statistical significance in their reports.[208] Multiple published studies by Dr. McTiernan have described an association above 1.0 without statistical significance as a positive association.[209] Her analysis—both here and in her peer-reviewed research—has not turned on statistical significance, but on whether the association is meaningful, which depends much more on the details of the study and the nature of the risk than the confidence interval.[210]

Even apart from that sound explanation, Dr. McTiernan is an author on more than 400 studies across many decades. With multiple co-authors, one simply cannot infer that *each* author vetted *each* description to conform with a lifetime-long approach to describing results. Even a few examples of genuine inconsistency would not be meaningful. For example, it is easy to find five

---

[208] Notably, Defendants do not appear to dispute that Dr. Moorman has repeatedly described relative risks above 1.0 that are not statistically significant as a positive association in her research. *E.g.*, Schildkraut, *et al.*, *Impact of Progestin and Estrogen Potency in Oral Contraceptives on Ovarian Cancer Risk*, 94(1) JNCI: JOURNAL OF THE NATIONAL CANCER INSTITUTE, 32–38 (2002); Huang, *et al.*, *Hormone-related Factors and Risk of Breast Cancer in Relation to Estrogen Receptor and Progesterone Receptor Status* [abstract], 151(7) AM. J. EPIDEMIOL., 703–714 (2000); Davis, *et al.*, *Genital Powder Use and Risk of Epithelial Ovarian Cancer in the Ovarian Cancer in Women of African Ancestry Consortium* [abstract], 30(9) CANCER EPIDEMIOL. BIOMARKERS PREV., 1660–1668 (2001); *see also* Def. Ex. 39 (Moorman Dep. Tr.) at 444:19-450:17.

[209] Phipps, *et al.*, *Body Size, Physical Activity, and Risk of Triple-Negative and Estrogen Receptor–Positive Breast Cancer* [abstract], 20(3) CANCER EPIDEMIOL. BIOMARKERS PREV., 454–463 (2011) (describing a 1.35 hazard ration that was not statistically significant as a "1.35 fold…increased risk[]."); Phipps, *et al.*, *Reproductive History and Oral Contraceptive Use in Relation to Risk of Triple-Negative Breast Cancer* [abstract], 103(6) JOURNAL OF THE NATIONAL CANCER INSTITUTE, 470–477 (2011) (describing a hazard ratio of 1.46 that was not statistically significant as "positively associated with risk."); Stikbakke, *et al.*, *Inflammatory serum markers and risk and severity of prostate cancer: The PROCA-life study* [abstract], 147(1) CANCER EPIDEMIOLOGY, 84-92 (2020) (describing a hazard ratio of 1.3 that was not statistically significant, as a "positive dose-response relationship").

[210] *See* Def. Ex. 32 (McTiernan Dep. Tr.) at 704:10-19 ("I'm looking at studies, not just what their relative risk is, but what other studies' relative risks are. And also, what -- what are the studies themselves' strengths and limitations; how is that study conceived, conducted; how is the data analyzed and presented. So one individual study's particular relative risk isn't going to have the same meaning, when you're looking across a number of studies and the totality of evidence.").

examples of studies with Defense expert Chan as a co-author, where results with a confidence interval including 1.0 were still called "associations."[211] Despite his criticism of Dr. McTiernan, Dr. Chan also co-authored studies that relied on dietary questionnaires, found a not-statistically-significant 1.09 to be an association (Bull 2020)) and compared medication users to non-users and not active comparators. As Dr. McTiernan testified, in the past some journal protocols required reporting only "statistically significant results,[212] *but now*, many journals have changed their protocols and to exclude the use of the term.[213] That is up to the editors, not every co-author.

Finally, Defendants argue that Dr. McTiernan used the phrase "statistical significance" many times in her talc report, and "across more than 450 pages of three expert reports in this litigation, Dr. McTiernan never describes a risk estimate below 1.0 as reflecting a 'decreased risk.' This inconsistency is another indicator of her results-driven approach." Motion at 96. Wrong. Just as she did in Talc, Dr. McTiernan used the phrases "statistical significance" or "statistical association" more than 100 times in her primary report alone. She noted decreased risk multiple times,[214] not "never."

Plaintiffs' experts' consideration of bias and confounding was nuanced and reliable.

---

[211] *See, e.g.*, Zhang, *et al.*, *Calcium intake and colorectal cancer risk: Results from the nurses' health study and health professionals follow-up study* [abstract], 139 INT. J. CANCER, 2232–2242 (2016) ("Similar results were observed by different sources of calcium (from all foods or dairy products only). The inverse association was linear and suggestively stronger for distal colon cancer (0.65, 0.43–0.99) than for proximal colon cancer (0.94, 0.72–1.22, p-common effects 0.14).") (Andrew T. Chan, coauthor); Kwon, *et al.*, *Association Between Aspirin Use and Gastric Adenocarcinoma: A Prospective Cohort Study*, 15(4) CANCER PREV. RES. (PHILA.), 265-272 (2022) ("The association between regular aspirin use and risk of adenocarcinoma among women appeared consistent for intestinal-type adenocarcinoma (multivariable HR, 0.55; 95% CI, 0.27–1.11).") (Andrew T. Chan, coauthor); Bull, *et al.*, *Adiposity, metabolites, and colorectal cancer risk: Mendelian randomization study* [abstract], 18 BMC MEDICINE, 396 (2020) ("[A]mong women, higher BMI (per 5.2 kg/m2 ) was associated with 1.09 (95% CI = 0.97, 1.22) times higher CRC odds.") (Andrew T. Chan, coauthor).

[212] Def. Ex. 32 (McTiernan Dep. Tr.) at 705.

[213] For example, after the 2016 statement by the ASA, listed protocols for the International Journal of Epidemiology were revised to state, "In the IJE, we *actively discourage* the use of the term 'statistically significant' or just 'significant' and such statements in method sections as 'findings at P<0.05 were considered significant'." *International Journal of Epidemiology: Information for Authors*, Oxford Academic, https://academic.oup.com/ije/pages/general_instructions (last visited July 29, 2022) (emphasis added).

[214] *E.g.*, Def. Ex. 9 (Mc Tiernan Rep.) at 94, 131, 267, 270.

C.      **Plaintiffs' Experts Properly Weighed and Evaluated the Limited Ranitidine Data**

Plaintiffs' experts' judgment on how to weigh each study flowed from their careful and individualized analyses of the strengths and weaknesses of each study.[215] Based on that analysis, they concluded that most of the human epidemiological ranitidine studies warranted fairly low weight in assessing general causation for Plaintiffs. That methodology is explained in section II, and the many criteria they consistently applied have been discussed throughout this Response.

Defendants dispute the conclusion, but point to no flaws in the methodology. In truth, Defendants have not even given the Court the tools to evaluate their shotgun attack because they do not accurately summarize the reasons each expert gave for her weighting. *Daubert* motions are not meant to be a game of legal whack-a-mole. Without the basic groundwork of summarizing the methodology, then *explaining* which important aspect they contend is flawed, Defendants come nowhere near demonstrating they used an unreliable methodology. Nevertheless, Plaintiffs provide here a scattershot response to Defendants' scattershot arguments.

*First*, Defendants argue that Dr. Moorman "inexplicably categorized the Scottish ranitidine analyses as 'strong,' but assigned 'little' weight to analysis of a different UK database performed by the same research group," Motion at 49, but this choice is explicable based on consistently applied principles. The Scottish studies (Cardwell) were from a primary care database with long-term exposure, long-term follow-up, and a dose-response analysis, while the UK database study (Kantor) gleaned exposure data from self-reporting, had no measurement of the duration of use, only 6.7 years of follow-up, and no dose-response analysis. That both were from the "same research group" is irrelevant—the quality of the study design and data is what matters.[216] Cardwell is much better on that metric and deserves greater weight.

*Second*, Defendants argue—with no citation—that both experts always "assigned greater weight" to studies that showed an association, Motion at 76, but this is simply false. For example, the Michaud and Habel studies reported positive associations for multiple cancers, but both experts

---

[215] *See* Def. Ex. 15 (Moorman Rep.) at 66-68 (Kantor); 69-71 (Adami); 71-72 (Norgaard); 72-74 (Iwagami) 74-75 (Yoon); 75-77 (Kim Y.D.); *see also id.* at Tables 5-9 (analyzing each study for each cancer).

[216] These are simply the largest concerns—both reports gave other reasons too. For example, the Scottish database had actual pharmacy records while Kantor had only self-reporting. And oddities in the UK Biobank data suggested substantial misclassification. Def. Ex. 15 (Moorman Rep.) at 67-68, 147.

nonetheless discounted those results for most cancers, applying consistent methodology. *See* Def. Ex. 15 (Moorman Rep.) at 78 (Habel), 97 (Michaud); Def. Ex. 9 (McTiernan Rep.) at 211, 219 (Habel), 186-87 (Michaud).[217] True, most of the stronger studies show an association, but there is nothing unreliable about pointing that out. To prevail, Defendants must identify a methodological error in the experts' assessment of which studies are strong, and they have not done so.

*Third*, Defendants argue that Dr. McTiernan was "result-driven" because she "gave less weight to the relative risks that were not greater than 1.0, and put more weight on relative risks that were greater than 1.0." Motion at 78 (quoting Def. Ex. 9 (McTiernan Rep.) at 145). Dr. McTiernan did this *only* for the studies she concluded were biased toward the null (usually because of short-term exposure, short-term follow-up, a young study population, and/or OTC misclassification). Each tend to bias study results downward, meaning that a positive association that shines through *after* overcoming multi-fold bias in the opposite direction deserves particular weight. These studies are like a sprinter who cannot train for a month before a race due to injury, has no coaching, and runs barefoot after a competitor steals his shoes, but still wins the race. A win like that demonstrates remarkable abilities—on the other hand, a loss under those conditions would not mean much. Defendants have not demonstrated that Dr. McTiernan's analogous judgment about the ranitidine studies was unreliable.

*Fourth*, Defendants claim that Dr. McTiernan erred in following laws of mathematics to the conclusion that "any relative risk greater than 1.0 [i]s a 'positive association.'" Motion at 78; *id.* at 94-95. The *Reference Manual* unequivocally refutes Defendants' argument: "If the relative risk is greater than 1.0, the risk in exposed individuals is greater than the risk in unexposed individuals. There is a positive association between exposure and disease which could be causal." *Reference Manual* at 567.

*Fifth*, Defendants argue Dr. McTiernan improperly used "unadjusted risk estimates,"

---

[217] Defendants claim Dr. McTiernan "extrapolates from lumped exposure data when it suits her and rejects such extrapolation when it does not advance her bottom line," Motion at 47, but they know better: "let's move on now to the Habel study…. I will represent to you, Dr. McTiernan, you state that that finding is uninformative for you because they're lumping two different cancer types together." Def. Ex. 32 (McTiernan Dep. Tr.) at 568:20-69:6; *see also* Def. Ex. 9 (McTiernan Rep.) at 186-87 ("the [Michaud] study did not differentiate between use of cimetidine or ranitidine … therefore it did not weigh in my causal analysis of ranitidine and bladder cancer."). Again, both Michaud and Habel showed *an increased risk*, yet Plaintiffs' experts gave them low weight due partly to lumping.

Motion at 46, but she explained why. The "'trimming' that occurs with propensity score matching results in cases being discarded from analyses, which lowers the precision of relative risks and decreases study power to detect statistically significant associations." Def. Ex. 9 (McTiernan Rep.) at 107. That is what Adami did, but with no explanation of how or why, resulting "in a markedly reduced number of ranitidine-using cancer cases" and so Dr. McTiernan presented the unadjusted "hazard ratio results from logistic regression with all cases included *since the authors do not state why they eliminated so many* of the cases from their first analyses." Def. Ex. 9 (McTiernan Rep.) at 124 (emphasis added). At her deposition, she explained that "reporting guidelines" recommend making "raw data available so that the readers can understand what the data set actually looks like. And in this case, the raw data provides some information that it's not clear from the … propensity weighted analyses exactly what was done for the main analyses." Def. Ex. 32 (McTiernan Dep. Tr.) at 729-30.

Defendants can only argue that Drs. McTiernan and Moorman applied their methodology unreliably by eliding what their methodology was. With the methodology itself in view, the consistency jumps out. But neither Dr. McTiernan nor Dr. Moorman stopped after considering all the ranitidine studies. Each also considered studies on NDMA, and did so reliably.

### D.     Plaintiffs' Experts Properly Weighed and Evaluated Studies of NDMA

Defendants argue Plaintiffs' experts erred by giving dietary and occupational studies *any* weight, Motion at 79-87, but their demands contradict well-established scientific standards. The *Reference Manual* explains on page 20 that "the most well-respected and prestigious scientific bodies" (here they list entities such as IARC, the Institute of Medicine, NRC, etc.) "consider *all the relevant available scientific evidence, taken as a whole*, to determine which conclusion or hypothesis regarding a causal claim is best supported by the body of evidence." Defendants fault Plaintiffs' experts for not including an opinion "based specifically on the ranitidine data," Motion at 48, but doing so would require ignoring a vast swathe of probative studies, which is bad science. The *Reference Manual* explains "[i]n applying the scientific method, scientists do not review each scientific study individually for whether by itself it reliably supports the causal claim being advocated or opposed," and surely the same applies to *categories* of studies. *Reference Manual* at 20. It would be cumulative to cite each of those "well-respected and prestigious scientific bodies" which say the same thing, but suffice to say, they do.

Beyond the basic methodological requirement to consider all sources of evidence,

analyzing NDMA dietary and occupational studies in humans is critical because of the limitations of the ranitidine studies. They give hints and glimpses of what a well-designed, high-powered, long-term exposure, long-term follow-up, full study with OTC data would show, but leave important questions unanswered. The dietary and occupational studies supply those answers.

Suffusing Defendants' Motion is an implicit argument that NDMA in ranitidine is different from NDMA in anything else. They principally rely on the out-of-circuit, unpublished case *Burst v. Shell Oil Co.*, No. CIV.A. 14-109, 2015 WL 3755953, at *10 (E.D. La. June 16, 2015), which held that while "benzene literature is generally relevant" to whether gasoline can cause cancer, "it, alone, cannot provide a reliable basis" for that conclusion.[218] Although the scientific community had known for decades that benzene is a carcinogen and is present in gasoline, after extensive, multi-decade testing and investigation, IARC, OSHA, EPA, and others *all* had concluded benzene is carcinogenic, and *all* had found insufficient evidence to believe gasoline is carcinogenic. *Id.* at 9. Defendants "cit[ed] multiple studies" to explain this, arguing that benzene *in gasoline* was not carcinogenic because "competitive inhibition occurs between toluene and benzene [two components of gasoline] whereby co-exposure to the substances, as opposed to exposure to just benzene, results in the reduced metabolism of benzene." *Id.* at 10. Here, Defendants never argued that the NDMA in ranitidine differs from the NDMA anywhere else *in any respect whatsoever*.[219] No Defendant has suggested that some feature of ranitidine renders NDMA less carcinogenic.

Defendants sometimes argue the same point a different way, saying Plaintiffs' experts inappropriately "extrapolated." For this flavor of the argument, Defendants repeatedly cite the admonition that "even minor deviations in chemical structure can radically change a particular substance's properties and propensities." *Rider*, 295 F.3d at 1201. That case is inapposite, since it involved comparing entirely different chemicals based on a "chemical analogy." *Id.* Here, there are undisputely not "even minor deviations in chemical structure" between the NDMA in ranitidine and NDMA in foods. It is not analogous—it is identical. The concept of "extrapolation" is also inapt, since it usually means using an inference based on an analogy, such as from one chemical to another, or from animal studies to humans. *E.g.*, *Reference Manual* at 633. That is a

---

[218] Already, *Burst* does not apply on its facts, since Plaintiffs' experts certainly did not base their conclusion on the NDMA literature "alone."

[219] Defense expert Chodosh acknowledged that NDMA that forms in ranitidine is the "identical molecule" to NDMA in foods. Ex. 10 (Chodosh Dep. Tr.) at 154:17-18.

conceptual mismatch for what happened here, which is looking at different studies of NDMA, the *exact* chemical at issue. "This is not extrapolating from one exposure to another [because] [t] he exposure of interest—NDMA—is the same."[220] The Court should see this argument for what it is: a red herring.

Defendants proffer three other arguments for ignoring *all* dietary and occupational studies: dietary studies have such extreme "inherent flaws and methodological shortcomings" that they cannot be relied upon; the route of exposure (inhalation versus ingestion) is too different between ranitidine and occupational studies; and the dose of NDMA in ranitidine is too different from dietary or occupational studies for them to be of any use. Motion at 80. Each argument fails.

### 1.   Dietary Studies Are Useful and Reliable

As both reports and Plaintiffs' Motion to Exclude Defendants' Putative Expert Opinions on General Causation explains in detail, the dietary studies strongly support causation. *See* D.E. 5841 § III.C, D at pages 41-59. Defendants do not challenge the particulars of how each expert applied the dietary studies, so Plaintiffs will not explain the methodology in-depth—the gist is that each expert considered studies in which the amount of NDMA was comparable to the levels that form in ranitidine based on conservative testing by FDA, then used the dose-response evidence in those studies as part of their causation assessment.

Defendants' principal argument is that dietary studies are so inherently unreliable that the Court should exclude them. This argument essentially invites this Court to deny the reliability of an entire area of scientific inquiry relied upon by authorities and regulators every day—including their own putative expert witnesses.[221] That overreaching request misstates the "objective" of

---

[220] Def. Ex. 16 (Moorman Rebuttal Rep.) at 1; *accord* Def. Ex. 10 (McTiernan Rebuttal Rep.) at 37.

[221] Each of the following (which is not exhaustive) is a case-control dietary study on cancer involving a defense expert: Zhang FF, Haslam DE, **Terry MB**, Knight JA, Andrulis IL, Daly MB, Buys SS & John EM, *Dietary Isoflavone Intake and All-Cause Mortality in Breast Cancer Survivors: The Breast Cancer Family Registry*, 123 CANCER, 2070-79 (2017); Zhang FF, John EM, Knight JA, Kaur M, Daly M, Buys S, Andrulis IL, Stearman B, West D & **Terry MB**, *Total energy intake and breast cancer risk in sisters: the Breast Cancer Family Registry*, 137 BREAST CA. RES TREAT, 541-551 (2013); **Terry MB**, Howe G, Pogoda JM, Zhang FF, Ahlbom A, Choi W, Giles GG, Little J, Lubin F, Menegoz F, Ryan P, Schlehofer B & Preston-Martin S., *An International Case-Control Study of Adult Diet and Brain Tumor Risk: A Histology-Specific Analysis by Food Group*, 19(3) ANNALS EPIDEMIOL., 161–171 (2009); Hardin J, Cheng I & **Witte JS**, *Impact of Consumption of Vegetable, Fruit, Grain, and High Glycemic Index Foods on*

*Daubert*, which "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Studies of diet and cancer are an accepted and important component of nutritional epidemiology and cancer research. Authoritative scientific bodies have evaluated dietary NDMA studies to analyze carcinogenicity.[222] The WHO's 2002 NDMA assessment reviewed NDMA dietary epidemiology and found an association between certain cancers and NDMA.[223] The WHO's 2008 Guidelines for Drinking-Water Quality reiterated that NDMA diet studies support an association between certain cancers and NDMA.[224] In 2021, the National Toxicology Program reviewed dietary NDMA studies before concluding that NDMA was reasonably anticipated to be a human carcinogen.[225] And in its draft for public comment early this year, the Agency for Toxic Substances and Disease Registry reviewed NDMA diet studies and stated that "[e]pidemiological studies of general population exposure showed associations between dietary intake and cancers of the gastrointestinal tract, especially the stomach[.]"[226] To declare, as Defendants request, that such studies bear irredeemable "inherent flaws and methodological shortcomings," Motion at 80, would vastly overstep this Court's gatekeeping role.

Next, Defendants perversely suggest that Dr. McTiernan's testimony in the *Talc* litigation contradicts her view here, because, supposedly, she "previously acknowledged" that case-control studies are unreliable, Motion at 81, 94. That would be news to Dr. McTiernan, who based her opinion in *Talc* on a "total of *28 case-control studies*, 3 prospective cohort studies, 2 meta-analyses, and one pooled analysis." *In re Johnson & Johnson Prods.*, 509 F. Supp. 3d at 162 (emphasis added). Dr. McTiernan specifically rejected the notion of a "hierarchy of evidence" with case-control studies at the bottom, explaining that she "looked at the totality" of the evidence. Def.

---

*Aggressive Prostate Cancer*, 63 RISK NUTRITION AND CANCER , 860-872 (2011); Reese AD, Fradet V & **Witte JS**, OMEGA–3 FATTY ACIDS, GENETIC VARIANTS IN COX-2 AND PROSTATE CANCER, 2 J. NUTRIGENET NUTRIGENOMICS, 149–158 (2009); Punnen S, Hardin J, Cheng I, Klein EA & **Witte JS**, *Impact of Meat Consumption, Preparation, and Mutagens on Aggressive Prostate Cancer*, 6(11) PLOS ONE, e27711 (2011), https://doi.org/10.1371/journal.pone.0027711.

[222] *See, e.g.*, materials cited in Section I.A. *supra*.
[223] Liteplo (2002), *supra* note 22, at 15, at 21.
[224] WHO/HSE/AMR08.03/8 WHO, N-Nitrosodimethylamine in Drinking-water (2008), at 12-13.
[225] NTP 15th Report, *supra* note 90.
[226] ATSDR NDMA Tox. Profile (2022), *supra* note 30, at 4.

Ex. 34 (*In re Johnson & Johnson* Hr'g Tr.) at 736. She discussed "recall bias" as a potential weakness of case-control studies, *id.* at 738, but explained that such studies are nonetheless reliable:

> [In] my overall research, [I have] published 17-case-control studies. I have been principal investigator of a case-control study. I participated in a pooled analysis involving my data from case-control studies.

*Id.* at 739. Defendants in *Talc* argued that case-control studies are simply too unreliable, quoting the exact same testimony from Dr. McTiernan out of context. Judge Wolfson completely rejected the argument:

> [T]he Court finds that the experts' reliance on the case-control studies does not render their opinions unreliable under *Daubert*. Defendants submit that there is a hierarchy of observational epidemiologic studies, "which include[s] in descending order of reliability—cohort studies, case-control studies and cross-sectional studies." … Defendants contend that Plaintiffs' experts fail to consider the weaknesses of the case-control studies, *i.e.*, recall bias and confounding. …The Court finds that Plaintiffs' experts reliably considered all the relevant studies. Dr. McTiernan explained at the Daubert hearing, which I found credible, that there are "benefits and drawbacks" to both the case-control and cohort studies. (McTiernan Daubert Hr'g Tr., at 737.).

*In re Johnson & Johnson*, 509 F. Supp. 3d at 164-65. In the end, "Defendants and their experts may disagree with Plaintiffs' general causation experts' assessment of recall bias in the case-control studies, but that does not render their opinions unreliable under *Daubert*." *Id.* at 168. Defendants' insinuation at her deposition that her *Talc* testimony is inconsistent is nothing more than a trick-question sneaked into a 12-hour deposition.

Research on recall bias shows it does not vitiate study results. Dr. McTiernan discussed two published, peer-reviewed studies that validate the reliability of food frequency questionnaires. Def. Ex. 9 (McTiernan Rep.) at 42, 53, 171, 176. Dietary studies that she and Dr. Moorman relied on also addressed the reliability of the food frequency questionnaires used in their studies.[227] Defense expert Dr. Witte's 2011 paper (Hardin, 2011) stated that because of the use of a food

---

[227] For example, DeStefani (1998) explains that the questionnaire was "tested for reproducibility." Keszei (2013) reported that the "questionnaire was validated against a 9-d diet record." The Ronco case-control reported that the questionnaire was "tested for reproducibility with good results." Loh (2011) obtained dietary NDMA information using a "validated FFQ method."

frequency questionnaire "the potential for recall bias in this study is minimal," and Dr. Terry's 2009 paper states that reporting bias is "possible" but "there is little evidence of its existence in studies designed to specifically evaluate recall bias." Dr. Terry's 2013 paper (Zhang, 2013) reached the same conclusion.

But, if recall bias did affect the studies, it would *understate* the relative risk. That is what ATSDR concluded, evaluating the NDMA dietary studies.[228] Defense expert Dr. Witte agrees; his paper (Punnen, 2011) stated: "misclassification bias would be non-differential and would only attenuate the results." Dr. Moorman agreed that potential recall bias and non-differential misclassification would tend to understate risk estimates in dietary studies, and her report cited published data supporting that view. Def. Ex. 15 (Moorman Rep.) at 48-51. Defendants make much of a stray "not always," Motion at 82, but if recall bias *usually* causes the study to understate the risk, and *very occasionally* overstates it, that provides no justification to discount every study to 0.

Defendants next argue that dietary studies of meat are not informative because they may contain other carcinogens beyond NDMA, Motion at 83, but that goes to weight, and these studies were given less weight. *See* Def. Ex. 15 (Moorman Rep.) at 51-53; Def. Ex. 9 (McTiernan Rep.) at 55-56. Dr. Moorman explained: "Given that processed meats are a major source of dietary NDMA, I consider it important to include these studies in my evaluation of the evidence that NDMA causes specific types of cancer in humans. However, recognizing that other components of processed meat could contribute to cancer risk as well, these studies were given lesser weight in my evaluation of the evidence, but were considered important for evaluating the overall consistency of the evidence." Def. Ex. 15 (Moorman Rep.) at 53.

Defendants half-heartedly suggest that the dose of NDMA is not comparable to ranitidine, but provide no explanation for why either experts' estimate was incorrect (for either ranitidine or the dietary studies). Dr. Moorman explained that "[t]he studies of dietary intake of NDMA … reflect the type of exposure that one would expect with ranitidine for many people, namely daily consumption over a period of many years," Def. Ex. 15 (Moorman Rep.) at 45. In fact, "the levels

---

[228] ATSDR NDMA Tox. Profile (1989), *supra* note 25, at 2 ("In the dietary intake studies, exposure to NDMA was assessed using concentrations of NDMA in various foodstuffs combined with food frequency questionnaires administered on a single or a few occasions. As a result, the potential for random misclassification of exposure, which would bias the findings toward the null (no association), is high.").

of NDMA in ranitidine products *as reported by the FDA analysis*[81][229] are in line with daily intake levels reported in many of the dietary studies and represent a long-term, frequent or daily exposure similar to what ranitidine users would experience," making these studies "very informative for the question at hand." Def. Ex. 15 (Moorman Rep.) at 196 (emphasis added). Table 3 on page 41-43 of Dr. Moorman's report summarizes the dietary NDMA studies that report cancer risk by levels of NDMA. *See also* Def. Ex. 9 (McTiernan Rep.), Table 6, at 295-98. Defendants' unsupported, non-specific criticisms are no reason to find either experts' analysis unreliable. Even if the critique were valid, it would go to *specific* causation, since the dose of NDMA a particular individual had can vary (some might be more similar to dietary studies than others). General causation is satisfied if *any* Plaintiff could have NDMA exposure from ranitidine that was similar to dietary studies—and surely the answer is yes.

Finally, Defendants attack Dr. McTiernan for "lumping," but identify no methodological inconsistency. Dr. McTiernan discounted studies with an unquantified combination of ranitidine-or-nizatidine. She also discounted studies with outcomes of kidney-or-bladder cancer. There is no lumping issue in the dietary studies, because each one measured NDMA exposure, not NDMA-or-something else. And so, though it is possible that *no* ranitidine users were in the ranitidine-or-nizatidine group, and *no* kidney cancers in the kidney-or-bladder cancer groups, it is *not* possible that there was *no* NDMA exposure in the dietary studies. In fact, there was a precisely quantified amount. That difference is critical. There is method, not madness.

2.     *Occupational Studies*

Occupational studies were able to estimate NDMA exposure levels and assess human cancer risk associated with increasing NDMA exposure levels. "IARC relies heavily on occupational exposure studies in evaluating carcinogens. IARC's evaluation of arsenic and asbestos risks for cancer, for example, included occupations, food, and water, as well as other exposures…. IARC scientists state that: The recognition of occupational carcinogens is important for …identifying causes of cancer in the general population. (Loomis, *et al.* 2018)." Def. Ex. 10 (McTiernan Rebuttal Rep.) at 24. The most important study was by Hidajat, *et al.*, which assessed risk based on decades of follow-up, reporting an increased cancer risk for each of the five designated cancers, with consistent evidence of dose-response. The study and related studies by

---

[229] Notably, this is the pristine conditions testing *Defendants* prefer, not the real-world testing performed by Dr. Najafi.

the same group was referenced multiple times in the ATSDR toxicological assessment of NDMA (4, 37, 38, 40, 50, 51, 120), stating that "Hidajat, *et al.* 2019 had a number of strengths, including large cohort size with lengthy (49-year) follow-up and quantitative cumulative exposure estimates based on historic exposure measurements."[230]

Defendants argue that the different route of exposure (*i.e.*, inhalation vs. ingestion) renders occupational studies irrelevant. This may well be a reason occupational study evidence is not *independently sufficient* to support causation,[231] but weight-of-the-evidence methodology often considers evidence that would not be enough on its own. "Scientific inference typically requires consideration of numerous findings, which, when considered alone, may not individually prove the contention." *Reference Manual* at 19-20; *see also Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 23 (1st Cir. 2011) (rejecting an approach where "the separate evidentiary components of [the expert's] analysis" was analyzed "atomistically, as though [the expert's] ultimate opinion was independently supported by each"). In this argument, "Defendants isolate these sources, rather than considering the whole." *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F. Supp. 2d 1230, 1242 (W.D. Wash. 2003).

The bottom line is that inhaling NDMA causes the very same five cancers, with dose-response data, and that surely makes causation more probable. That is why scientific authorities regularly review all exposure methods. Dr. Moorman recognized "that the occupational exposures to NDMA may represent a different pattern and route of exposure to NDMA than what would be experienced by users of ranitidine." Def. Ex. 15 (Moorman Rep.) at 105 & 130. Dr. McTiernan recognized that too, but explained that "[r]egardless of route, NDMA enters the blood stream where it can pass through the body and reach any organ." Def. Ex. 9 (McTiernan Rep.) at 51. In animals, NDMA "induces benign and malignant tumors following its administration by various routes, including ingestion an inhalation, in various organs in various species."[232] EPA reached the same conclusion in its 1989 "Toxicological Profile for N-Nitrosodimethylamine." And "[n]umerous experimental animal studies have shown that NDMA can induce multiple types of

---

[230] ATSDR NDMA Tox. Profile (2022), *supra* note 30, at 50. ATSDR also considered the Straif and other occupational NDMA studies. *Id.*, at 51.

[231] Though perhaps not—Dr. Panigrahy's undisputed opinion extensively analyzes the evidence supporting his conclusion that "NDMA is a potent carcinogen regardless of the route of administration." Def. Ex. 19 (Panigrahy Rep.) at 146, 146-51.

[232] 1982 Third Annual Report on Carcinogens (Dept. of Health and Human Services), at 219.

cancer in a variety of species…. from exposure through oral administration, inhalation, and subcutaneous or intraperitoneal injection." Def. Ex. 15 (Moorman Rep.) at 112.

Defendants also argue occupational studies are irrelevant because the amount of NDMA may differ from what a Plaintiff would get from ranitidine. Whether true or not, this is obviously a specific causation question, which is why Dr. McTiernan "assumed that data would be 'presented at trial'" Motion at 85. Either way, the analysis Defendants demand was performed by Plaintiffs' toxicology expert Dr. Andrew Salmon, who has the expertise to convert the Hidajat study inhalation exposures to oral ingested dose, and concluded that the NDMA exposures in the Hidajat study is in the same range as levels that can form in ranitidine. Def. Ex. 22 (Salmon Rep.) at 49-54, 220-23; *see also* Def. Ex. 15 (Moorman Rep.) at 105. Def. Ex. 9 (McTiernan Rep.) at 161, 29. Defendants have not challenged this opinion.

Drs. McTiernan and Moorman considered the strengths and limitation of the occupational studies in their reports. Def. Ex. 15 (Moorman Rep.) at 86, 104-16; Def. Ex. 9 (McTiernan Rep.) at 161-64. Dr. Moorman stated "[t]he occupational studies provide corroborating evidence that NDMA exposure increases risk" for each of the five designated cancers and she explained how these studies factored into her causation assessment: "While recognizing these limitations, these studies, particularly the more detailed analyses reported in the Hidajat study[163], were considered important when evaluating the consistency of findings related to NDMA exposure and bladder cancer risk." Def. Ex. 15 (Moorman Rep.) at 105-06.

Defendants' final argument is that occupational studies are unusable because "work in the rubber factory industry includes multiple carcinogenic exposures other than NDMA." Motion at 86. Yet, in this attack, Defendants are simply disagreeing with the conclusion of a published, peer-reviewed study, which concluded it *did* find a non-spurious dose-response relationship between NDMA and the five cancers at issue. Dr. Hidajat's study recognized the issue Defendants point out, and the authors were confident they overcame it: "it was possible to reasonably separate NDMA exposure and examine the exposure-disease relationship." Def. Ex. 4 (Hidajat Rebuttal Rep.) at 26. Because different carcinogenic exposures are higher or lower in different stages of production, the study ingeniously could calculate whether non-NDMA carcinogens were to blame by "examining their usage in the rubber production process." *Id.* The "lowest levels of rubber dust," for example, are found "in the curing and vulcanizing process where NDMA concentrations are highest"—so, rubber dust confounding could not explain the dose-response effect for NDMA

because the doses *were not positively correlated*. *Id.* at 24. A similar analysis (sometimes using different levels over time, different areas of the factor, or regulatory actions with disparate impacts) excludes each exposure Defendants flag. *See id.* at 23-27. As Dr. Moorman explained, "one wouldn't expect that there would be some other chemical that would basically track with the NDMA that could explain the risk when looking specifically at NDMA." [233]

*** 

Defendants mention *only* Drs. McTiernan and Moorman, apparently believing the other experts' opinions are derivative. But they are not. Consider Dr. Salmon. He exhaustively analyzed every dietary and occupational study, *see* Def. Ex. 22 (Salmon Rep.) at 57-131. Dr. Michaels similarly analyzed dietary and occupational studies. *See* Def. Ex. 13 (Michaels Rep.) at 44-61. Each explained why doing so was reliable. Defendants say nothing about why these extensive analyses are unreliable.

## IV.    Drs. Moorman and McTiernan Properly Conducted Bradford Hill Analyses

Application of the Bradford Hill factors is a well-established methodology in the scientific community for determining whether a causal relationship exists between an exposure and a disease. The nine factors were first set forth by Sir Austin Bradford Hill in 1965.[234] These are: (1) temporal relationship; (2) strength of the association; (3) dose-response relationship; (4) replication of the findings; (5) biological plausibility; (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge. *Id.*, *see also Reference Manual* at 599-600. No one factor is dispositive. "Determining whether an association is causal is a matter of scientific judgment, and scientists reliably applying the Bradford Hill factors may reasonably come to different conclusions about whether a causal inference may be drawn." *See In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1307 (N.D. Fla. 2018) (citing *Milward*, 639 F.3d at 18).

Defendants' criticism of Drs. Moorman's and McTiernan's Bradford Hill analyses has no solid basis in fact or law. Both experts utilized the Bradford Hill factors to assess whether the NDMA in ranitidine could cause stomach, esophageal, liver, pancreatic, and bladder cancers. It does not matter that *every* factor did not cut in favor of causation. That is rarely true even where a true causal relationship exists. *Reference Manual* at 599-600. Because causation cannot be

---

[233] Def. Ex. 39 (Moorman Dep. Tr.) at 417:24-418:18.
[234] Def. Ex. 46 (Bradford Hill 1965).

observed directly, it always involves an inferential process where direct observations—the Bradford Hill factors—are used to draw a causation (or no causation) conclusion based on the weight of the evidence and the scientist's experience and judgment. *Id.* at 553, n.7.

Dr. Moorman followed this approach to a T. She provided a detailed analysis of the relevant human epidemiological literature including the ranitidine studies, the NDMA dietary studies and the NDMA occupational exposure studies, assessing the strengths and limitations of each study. She then applied the Bradford Hill factors for each individual cancer in light of the totality of the evidence for each individual cancer. For example, for bladder cancer alone, Dr. Moorman devoted twenty pages of her report to assessing the strengths and limitation of each human epidemiological study with a detailed discussion of potential bias and confounding. Def. Ex. 15 (Moorman Rep.) at 88-108. She then thoroughly considered and applied the Bradford Hill criteria her assessment of the weight of the epidemiological evidence related to NDMA, ranitidine and bladder cancer. *Id.* at 108-17. Dr. Moorman further reported on the strengths and weaknesses of each study and noted that the "limitations in the exposure assessment to ranitidine probably resulted in an underestimate of the true relative risk of bladder cancer." *Id.* at 108. Dr. Moorman conducted similar analyses for each of the five cancers. *Id.* at 132-41 (pancreatic cancer), 159-70 (liver cancer), 186-97 (esophageal cancer), and 219-29 (stomach cancer).

Defendants essentially re-hash their made-up attack on Plaintiffs' experts in saying that because the "strength" was not above 2.0 *considering only the active comparator studies*, Plaintiffs' experts failed to adequately consider confounding and bias. Motion at 88-89. But, as explained above, Plaintiffs' experts' assessment of confounding and bias was sterling. *See supra* § III.B. Defendants admit the experts identified and considered each relevant confounding factor or bias. Motion at 21. They simply think that active comparator studies are uniquely not subject to bias or confounding, and everything else is. That absurd view does not undermine Plaintiffs' experts' contrary, considered expert view. And contrary to Defendants' argument, Motion at 92, the Florian study on endogenous NDMA formation is entirely immaterial to a Bradford Hill analysis. *See also supra* text accompanying notes 149-50.

On dose-response, Dr. Moorman analyzed each study to determine whether dose-response was assessed and whether there was evidence of a dose-response relationship. For example, with bladder cancer, Dr. Moorman found that there was a significant trend of increasing risk with greater exposure to ranitidine reported by Cardwell, *et al.*, and a dose-response relationship

reported in the occupational NDMA exposure study conducted by Hidajat, *et al.*, as well as a significant increased risk reported with increased exposure in the dietary studies (Crippa, Xu).[235] Dr. Moorman correctly testified that the majority of the ranitidine epidemiological studies did not assess long-term exposure to ranitidine such that a dose-response relationship would be observed. The longest dose-response measurement was three years (Cardwell) and that study did demonstrate a dose-response relationship as reported by the authors.[236]

Defendants' first attack Dr. Moorman's "particular lack of rigor" in defining "dose response" as meaning "'that as the level of exposure increases the risk of the disease decreases.' Moorman Rep. at 59." Motion at 90. This backwards definition would indeed show a lack of rigor, but Defendants' purported quotation is inaccurate—page 59 of her report says "increases," not "decreases." Next, Defendants cite studies they claim examined dose-response that Dr. Moorman ignored, Motion at 90, but she did consider these studies. One did not even analyze *ranitidine* in particular for dose-response,[237] and the others looked at such small doses that Dr. Moorman would not expect any effect (for example 5 prescriptions versus 10 prescriptions as assessed in Adami and Norgaard). A "dose-response" analysis of people who took ranitidine for five months compared to ten—at the high end—is not probative at all of the effects Dr. Moorman was investigating. The studies Defendants point to only measured limited exposure, as explained extensively above, and as the authors themselves acknowledged.[238] Some studies, for example McDowell, did not report a dose-response relationship, but did find a statistically significant increased risk of cancer associated with ranitidine use.[239] Dr. Moorman addresses this during her analysis of the individual studies in her report, including McDowell, Norgaard and Adami,[240] as well as during her Bradford Hill analyses on dose-response (biological gradient).[241]

While evidence of a dose-response relationship in epidemiological and animal studies is strong evidence of causality, the inquiry of how much exposure to NDMA in ranitidine caused a Plaintiff's cancer is a case-specific analysis and is inappropriate for general causation. Defendants

---

[235] Def. Ex. 15 (Moorman Rep.) at 110-111.

[236] *See* Def. Ex. 48 (Cardwell, *et al.* 2021).

[237] *See* Def. Ex. 76 (Tran, *et al.* 2018) at 59 (analyzing dose-response for all acid reducers).

[238] *See* Def. Ex. 68 (Norgaard, *et al.* 2021) at 50; Def. Ex. 45 (Adami, *et al.* 2021) at 2307-2308; Def. Ex. 66 (McDowell, *et al.* 2021) at 7.

[239] *See* Def. Ex. 66 (McDowell, *et al.* 2021) at 7.

[240] *See* Def. Ex. 15 (Moorman Rep.) at 64, 87, 222.

[241] Def. Ex. 15 (Moorman Rep.) at 110, 134-135, 162-163, 190-191, 222-223.

conflate the two.

Dr. Moorman also analyzed the consistency of an association across the three types of human epidemiological evidence for each cancer.[242] Even a layperson can detect this consistency.[243] Dr. Moorman factored into her assessment that certain studies were likely biased toward the null (i.e., they understated the risk of cancer from exposure to ranitidine). When reviewed in conjunction with the animal and mechanistic evidence, her analysis overwhelmingly leads to a conclusion that NDMA in ranitidine can cause bladder, pancreatic, liver, stomach and esophageal cancer.

Dr. McTiernan independently followed a similarly rigorous approach. She evaluated the epidemiologic evidence in total, along with the biological and pathological evidence and applied the Bradford Hill factors. Def. Ex. 9 (McTiernan Rep.) at 16. She then concluded that the weight of the evidence related to ranitidine, NDMA, and cancer development demonstrates a consistent increased risk for bladder, esophagus, liver, pancreas and stomach cancer. *Id.* She conducted the same analysis for other cancers and found that while there was an association, the weight of the evidence did not support causation at this time. *Id.* Dr. McTiernan's opinion as an epidemiologist and physician stated to a reasonable degree of medical and scientific certainty that use of ranitidine can cause the five cancers based on the relative risk estimates for use of ranitidine as well as for other sources of NDMA, the pathological evidence, the consistency of results across geographic areas and in different race/ethnic groups, the evidence of a positive dose-response effect, and the plausible biological mechanisms. *Id.* Further, in reaching her conclusions, she considered the number of studies, quality of studies, size of studies, potential biases, completeness of ranitidine and NDMA exposure assessment, relative risks, variables available for dose-response, statistical tests, adjustment for potential confounding variables, consistency of magnitude of relative risk across studies and populations. *Id.* at 96.

Like Dr. Moorman, Dr. McTiernan conducted a Bradford Hill analysis for each cancer she evaluated.[244] Like Dr. Moorman, Defendants criticize Dr. McTiernan's analysis of the Bradford Hill factors including the strength of the association, dose-response and consistency but also

---

[242] Def. Ex. 15 (Moorman Rep.) at 109-110, 133-134, 161-162, 189-190, 221-222.
[243] *See* Forest Plots *supra* at 12, 15, 18, 20, 22.
[244] Def. Ex. 9 (McTiernan Rep.) at 199-205 (bladder cancer), 218-225 (esophageal cancer), 233-238 (liver cancer), 250-257 (pancreatic cancer) and 279-286 (stomach cancer).

further criticize Dr. McTiernan's assessment of temporality. *See* Motion at 88-93. Defendants' arguments are meritless. And their false representations of Dr. McTiernan's testimony stray perilously close to—or perhaps over—the line of zealous advocacy into lack of candor.

Defendants contend that Dr. McTiernan's assessment of strength of the association "*is based overwhelmingly on non-ranitidine data, including the occupational NDMA and nitrate-nitrite studies*." Motion at 89 (emphasis added). This misrepresentation blinkers the opinions expressed in Dr. McTiernan's report.

For example, Dr. McTiernan's Bradford Hill analysis regarding bladder cancer can be found on page 201 of her report. Dr. McTiernan specifically reported that *a review of the ranitidine epidemiologic studies found that risk of bladder cancer is 10 to 40% higher in ranitidine users compared to non-users*. Def. Ex. 9 (McTiernan Rep.) at 201. Dr. McTiernan further explains that the study by Cardwell with 3260 cases, had a narrow confidence interval that did not include 1.0, making it statistically significant under even Defendants' flawed paradigm. Dr. McTiernan further explained in contrast, the other ranitidine studies on ranitidine use and bladder cancer risk had between 139 and 554 cases which provides lower power to detect a relationship. *Id.* In addition, Dr. McTiernan reported that occupational studies show that individuals exposed to NDMA in rubber manufacturing have risks of bladder cancer that are more than 5 times greater than in the general population and dietary NDMA studies demonstrate the risk of bladder cancer is 10-50% higher. *Id.* This is clear evidence of consistency across *all three* categories of relevant human epidemiological data demonstrating that no matter the route of exposure, NDMA can cause bladder cancer in humans.

Dr. McTiernan conducted similar analyses for the other 4 cancers.[245] For example, with regard to pancreatic cancer, Dr. McTiernan specifically stated that 2 of the 3 ranitidine epidemiological studies found that the risk of pancreatic cancer was increased, by 37% in one (McDowell) and by more than double in another (Habel). *Id.* at 252. Dr. McTiernan also considered the occupational NDMA exposure studies and the dietary NDMA exposure studies for her Bradford Hill analysis and found that the occupational studies showed that individuals highly exposed in the rubber manufacturing industry have more than double the risk of pancreatic cancer than the general population and the dietary studies reveal the risk of pancreatic cancer is almost

---

[245] Def. Ex. 9 (McTiernan Rep.) at 199-205 (bladder cancer), 218-225 (esophageal cancer), 233-238 (liver cancer), 250-257 (pancreatic cancer), and 279-286 (stomach cancer).

double in persons with highest exposure. Dr. McTiernan also discussed statistical significance of the ranitidine studies indicating that pancreatic cancer is rare and the presence and/or absence of statistical significance largely reflected the numbers of cases in individual studies. For example, McDowell had 1069 cases and reported a relative risk of 1.37. The confidence interval did not include 1.0. Meanwhile the other ranitidine studies had between 5 and 525 cases, which provide lower power to detect a relationship. *Id.*

Again, in relation to the dose-response factor of her Bradford Hill analyses, Defendants' arguments rely on misstating Dr. McTiernan's report, opinion and methodology, stating that she relied almost exclusively on dietary and occupational NDMA and nitrate/nitrite studies. Motion at 91. The report says otherwise. In her Bradford Hill analysis of bladder cancer, Dr. McTiernan specifically discusses the dose-response found in the Cardwell study stating that "use for three years or longer showed higher effects on bladder cancer risk than use overall."[246] This is extraordinary evidence for dose-response, since 3 years is a short period. In relation to pancreatic cancer, Dr. McTiernan stated "dose-response was directly assessed in one of the epidemiologic studies of ranitidine use and pancreas cancer risk" and the "risk for more than 6 prescriptions was slightly lower than that for 1-6 prescriptions," but this is far too short to mean anything. Def. Ex. 9 (McTiernan Rep.) at 254. Similar analyses were conducted of all relevant evidence in relation to dose-response for each of the five cancers which are detailed in Dr. McTiernan's report.

Defendants criticize and again blatantly misstate Dr. McTiernan's opinions regarding the consistency factor in her Bradford Hill analyses for each cancer. Defendants point to one example in support of their position and state that "the ranitidine studies show no adjusted risk estimate above 1.0 for esophageal cancer, aside from a single sub-analysis in a single study that reported an overall non-significant decreased risk and no positive dose response." Motion at 93 (referring to the Tan study). However, once again, Defendants misrepresent the facts. The Adami study reported a statistically significant increased risk of esophageal cancer with ranitidine use and increase in risk when evaluating different sub-types of esophageal cancer. This was discussed at length in Dr. McTiernan's report at page 208. Habel, *et al.*, also reported an increased risk in esophageal and stomach cancers which Dr. McTiernan also addresses in her report at page 211. These studies taken together with the NDMA occupational and dietary studies demonstrate

---

[246] Def. Ex. 9 (McTiernan Rep.) at 203.

consistency that is exactly the type contemplated by Bradford Hill across different study populations, different study designs, and different exposures.

Last, Defendants attack Dr. McTiernan's Bradford Hill analyses on the temporality factor. This factor of Bradford Hill is simply that the exposure comes before the disease. All of the epidemiological evidence evaluates exposure and then diagnoses during a follow-up period. This holds true for the ranitidine studies, the NDMA dietary and the NDMA occupational studies. Dr. McTiernan properly assesses this factor and notes that reverse causality is a potential issue in the ranitidine studies (meaning the person took ranitidine for the symptoms from cancer) however, Dr. McTiernan notes that some studies adjusted their analysis by incorporating a lag period – which excludes ranitidine exposure that occurs in the 1-2 years before cancer diagnosis. Dr. McTiernan considered each study individually and assessed whether a lag period was incorporated in the study design. She further testified that when assessing this issue, she looked at the "overall design and quality of the studies and identified the strengths and weaknesses of each study and then considered the evidence all together."[247] Reverse causality is not a concern with the NDMA dietary or occupational studies.

Defendants further misrepresent Dr. McTiernan's opinions and testimony when they state that she failed "to include the lagged analyses from the Liu study showing no statistically significant increased risks." Motion at 93. This is not even debatably true. Dr. McTiernan explicitly addresses the 1, 2 and 3 year lagged analyses in the Liu study on page 147 of her report noting "Liu, *et al.*, interpreted the relative risks seen in ranitidine users versus nonusers (removing cases 1, 2 and 3 years prior to diagnosis yielded relative risks of 1.42, 1.22 and 1.17 respectively) as no association."[248] To further demonstrate the dishonest and unfair tactics that Defendants are engaging in, Attorney Eva Canaan made false representations to Dr. McTiernan on the record stating "I'll represent to you that in your report you did not include the risk estimates for the two-year lag and the three-year lag and my question is as you sit here today, do you know why you did not include those risk estimates?"[249] Dr. McTiernan was appropriately wary, stating that she would need to review what she wrote in her report about the Liu study (which, of course, was contrary to

---

[247] Def. Ex. 32 (McTiernan Dep. Tr.) at 192:18-23.
[248] Def. Ex. 9 (McTiernan Rep.) at 147.
[249] Def. Ex. 32 (McTiernan Dep. Tr.) at 454:13-22.

the false representation counsel made).[250] Yet in their brief, Defendants have the audacity to compound their duplicity and make the same false representations to this Court.

Besides the 3 Bradford Hill factors that Defendants assert were not adequately assessed by Drs. Moorman and McTiernan (strength of the association, dose-response, and consistency), Drs. Moorman and McTiernan further provided detailed analyses of the other six Bradford Hill factors in their reports in relation to each cancer. Based upon their detailed analyses of all of the evidence and all nine of the Bradford Hill factors, Drs. Moorman and McTiernan reached their conclusions within a reasonable degree of medical and/or scientific certainty that the NDMA in ranitidine can cause bladder, stomach, pancreatic, liver and esophageal cancer. Their conclusions were based on a reliable and sound methodology that is accepted within the field of epidemiology and therefore Defendants' Motion should be denied.

## V.    Drs. Salmon, Michaels, and Le's Opinions Are Reliable and Helpful

Defendants decline to challenge virtually all opinions by Drs. Salmon, Michaels, and Le, leaving their hundreds of pages of careful analysis across six reports unchallenged. *See* Motion at 96-100 (challenging just one opinion each). The few blows they attempt do not land.

### A.    Dr. Salmon's Bradford Hill Analysis Is Reliable

Though Defendants ignore it, Dr. Salmon's Bradford Hill analysis is reliable. Defendants claim (in their facts section only, Motion at 56) Dr. Salmon did not perform a reliable evaluation of relevant epidemiology. This is patently false. Dr. Salmon devotes an entire section of his report to individually discussing the ranitidine-specific epidemiological studies. Def. Ex. 22 (Salmon Rep.) at 138-161. He critically reviewed each ranitidine study and identified critical weaknesses in the studies' designs and appropriately determined they deserved less weight.[251] Peer-reviewed publications have said the same: the studies are "underpowered, focus on few specific cancers, lack appropriate case definition, and/or appropriate control populations as well as long-term

---

[250] *Id.*

[251] Def. Ex. 22 (Salmon Rep.) at 138-161; Def. Ex. 45 (Adami, *et al.* 2021) (did not quantify dose; short exposure periods); Def. Ex. 47 (Braunstein, *et al.* 2021) (no control group; did not quantify dose); Hsu *et al* (2013) (does not quantify dose; short follow up period; limited to Type 2 Diabetes patients); Def. Ex. 55 (Iwagami, *et al.* 2021) (2.4-year median follow-up period is too short to observe an association); Def. Ex. 57 (Kantor, *et al.* 2021) (does not quantify dose; lacks appropriate case definition); Def. Ex. 61 (Kumar, *et al.* 2021) (lacks a control group; authors unable to determine individual exposure levels of NDMA).

follow-up, and were uninformed about potential NDMA presence."[252] For example, the Kim Y.D. study did not find an elevated risk of gastric cancer associated with ranitidine-use compared to use of either famotidine or omeprazole.[253] However, Dr. Salmon noted that Kim Y.D. lacked critical information regarding dosage or duration of ranitidine use, excluded OTC ranitidine use altogether, and involved a limited 10-year follow-up period, which is likely to underestimate gastric cancer which is a latent disease and may take years or decades to develop. Def. Ex. 22 (Salmon Rep.) at 151, 187. Dr. Salmon considered the findings, but reasonably did not ascribe it significant weight in his Bradford Hill analysis.[254] Dr. Salmon exhaustively canvassed the dietary and occupational studies, and his careful analysis of those studies was also reliable. Defendants have not argued otherwise, except in saying *all* dietary studies are unreliable.

### B.   Dr. Salmon's Dose-Response Analysis Is Reliable

Defendants disingenuously cite to the subsection of the EPA's Guidelines for Carcinogenic Risk Assessment, which addresses choice of mathematical extrapolation model, to attack Dr. Salmon's methodology for calculated dose response.[255] To be clear, this mathematical extrapolation model is used by EPA is for extrapolating from animal carcinogenicity studies to determine the risk of carcinogenicity at low doses.[256] This modeling method is irrelevant to Dr. Salmon's dose-response slope calculations that utilize *human* data from the epidemiological diet

---

[252] Wagner, J.A., *et al.*, *Is this the end for ranitidine? NDMA presence continues to confound*, 14 CLINICAL & TRANSLATIONAL SCI., 1197-1200 (2021), https://doi.org/10.1111/cts.12995; *see also* Wei P., *et al.*, *The efficacy and safety of the short-term combination therapy with ticagrelor and PPIs or H2RA in patients with acute STEMI who underwent emergency PCI*, 15 CLINICAL & TRANSLATIONAL SCI., 477–489 (2022), https://doi.org/10.1111/cts.13165 (citing Wagner, *et al.*, and agreeing: "there is no long-term epidemiological studies on the risk of cancer caused by long-term exposure to NDMA from specific drugs…. More studies are needed on the safety of ranitidine.").

[253] Famotidine [adjusted OR 0.49 (95% CI 0.40-0.60)] or omeprazole [adjusted OR 0.93 (95% CI 0.76-1.13)] (p < 0.001).

[254] Def. Ex. 22 (Salmon Rep.) at 152.

[255] Although Dr. Salmon does not rely on the subsection, Defendants disingenuously cite in EPA's Guidelines for Carcinogenic Risk Assessment, the Guidelines also contain information on other risk assessment concepts, such as weight of the evidence.

[256] In the section of his Report addressing dose response, Dr. Salmon referenced the 2005 EPA Guidance to explain: "regulatory authorities have produced risk assessment guidance which clearly states that dose-response for chemically induced cancer is expected to be linear at low doses." Def. Ex. 22 (Salmon Rep.) at 17, 132. Dr. Salmon is not using a regulatory limit like the FDA's ADI, based on the Peto rat studies to opine that exposure to NDMA ADI (i.e., 96 ng), established for regulatory purposes, will cause cancer.

and occupational studies. Relying on decades of experience conducting dose response modeling, Dr. Salmon calculated dose response slopes from the statistically significant findings from human epidemiologic studies which provided quantitative NDMA amounts. Dr. Salmon did not omit any of the studies as Defendants incorrectly assert.

As for the analysis being results-driven, Dr. Salmon simply followed commonly applied principles for dose response assessment, like the principles used by WHO that provide "if several studies exist, that quantify excess risk and dose-response, "the best representative study should be selected, or several risk estimates evaluated."[257] That is what Dr. Salmon did, both in selecting representative studies, and in calculating alternative risk estimates under different assumptions. Def. Ex. 22 (Salmon Report) at 57. Def. Ex. 43 (Salmon Dep. Tr.) at 322:23-323:17. Dr. Salmon did not use most ranitidine studies because they did not have actual data on dose-response that would be relevant.[258] Cardwell was the rare exception, which at least had 3 years—still low, but more than any other study. *Id.* at 142-44. Contrary to Defendants' argument, the EPA Guidelines do not say to somehow incorporate weak studies with null results to calculate dose-response slopes. Finally, Salmon also provided pooled mean slopes which averaged the individual dose response slopes of cancer specific studies to illustrate the combined mean slope. *Id.* at 127-130. Dr. Salmon, however, used the individual study calculations to determine the dose response analysis for the various cancers by site and not the pooled values. The Defendants seem to misunderstand this analysis and conflate Dr. Salmon's individual dose-response slope for each study with the pooled

---

[257] *See also* WHO, Air Quality Guidelines, Chapter 2: Criteria used in establishing guideline values, p. 10; *see also* Environmental Health Criteria 240, Updated Chapter 5: Dose-response assessment and derivation of health-based guidance values, 2nd ed. (2020), pp. 9-10 (finding that a dose–response relationship is usually supported by statistically significant differences between dosed and control groups versus where the response is not statistically significant which would indicate that the exposure level "is without biologically significant adverse health effects.").

[258] For example, the Adami study's 5-versus-10 prescriptions is not relevant, and most studies had no dose-response data at all. *See, e.g.*, Def. Ex. 22 (Salmon Rep.) at 140 (Adami: "It is not clear from the study narrative how much exposure to ranitidine the individual study participants had."); at 142 (Braunstein: "...this study...did not consider any available data on dose or duration of use and had no data on prior use, so no dose-response evaluation is possible."); at 144 (Chow: "Doses of these drugs were estimated from prescription number only, which prevents making a quantitative determination of cumulative dose."); at 145 (Habel: "The limited definition of exposure as users and nonusers...prevents dose-response analysis..."); at 146 (Hsu: "[T]he study does not account for over-the-counter ranitidine therapies and then number of filled prescriptions actually ingested is unknown."); at 146 (Iwagami: "Nearly all analyses in the study lumped in ranitidine users with nizatidine users.").

averages.[259] *See* Def. Ex. 22 (Salmon Report) at 205-06.[260]

## C.   Dr. Michaels Considered All Relevant Evidence

Defendants dedicate only four pages of their brief to Dr. Michaels, Motion at 59-61, 98-99 but, impressively, manage to make two arguments that are not only incorrect, but mutually contradictory. Defendants argue that Dr. Michaels, a pathologist, is not qualified to opine "*based on*" epidemiology, *and* that his opinions should be excluded because he did not focus *enough* on epidemiology. The unstated, unsupportable implication is that only an epidemiologist is qualified to offer general causation opinions—a proposition that no court has endorsed. Defendants reject their own conjured rule, proffering a non-epidemiologists to provide general causation opinions.[261]

Pathologists study the causes and effects of diseases or injuries. Def. Ex. 13 (Michaels Rep.) at 3. Opinions regarding biologic plausibility and general causation, *see id.* at 2-3, are well within the scope of Dr. Michael's knowledge, skill, experience, training, and education. *See id.* at 3-4. The Eleventh Circuit has warned not to set the qualification bar "too high," *Moore*, 995 F.3d at 854, and has "never" endorsed applying an "'exacting analysis' … to an expert's qualifications." *Id*. at 852. To be sure, Dr. Michaels relies on information from Plaintiffs' epidemiology experts, but that is routine, both in his practice as a pathologist, *see* Def. Ex. 13 (Michaels Rep.) at 3 (explaining how he "heavily relies on the daily incorporation of basic scientific and biological mechanisms of disease including cause, pertinent clinical information, and epidemiological data regarding diagnostic entities, ultimately combined with successful interpretation of the diagnostic laboratory material at hand, in order to come to the best diagnosis with the highest degree of medical certainty possible."), and for scientific experts under the Rules 702 and 703. *See, e.g.*, *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) ("[I]t is common in

---

[259] Def. Ex. 43 (Salmon Dep. Tr.) at 307:17-308:11, 310:23-312:8 (testifying mean slopes were used for the NDMA impact assessments to show hypothetical scenarios).

[260] Weighing and pooling the results from multiple scientific studies is a commonly used and appropriate method based on epidemiologic findings. *See e.g.,* Haidich (2010) Meta-analysis in medical research. Hippokratia 2010 dec; 14(Suppl 1):29-37 [discusses meta-analysis research considerations and methods]; *See also* Song JH (2020) Acid-suppressive agents and survival outcomes in patients with cancer: a systematic review and meta-analysis. International Journal of Clinical Oncology.

[261] *See* Ex. 10 (Chodosh Rep.) at ¶ 39. Chodosh has experience and expertise in epidemiology, but so does Dr. Michaels. *See* Def. Ex. 36 (Michaels Dep. Tr.) at 91:17-92:6 ("quite a bit of experience and expertise in epidemiology" and has lectured on cancer epidemiology); 93:17-25 (deals with epidemiology on a "daily basis").

technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert").

More to the point, Dr. Michaels *did* consider the studies Defendants accuse him of missing. Defendants claim he may have "missed" studies, then suggest he missed the "Adami," "Kim Y," "Yoon," "Iwagami," and "Liu" studies. Motion at 60-61. But in fact, Dr. Michaels was simply being precise. His "attempt was to review all of the ones that [he] was able to search for and find," Def. Ex. 36 (Michaels Dep. Tr.) at 79:16-18, but he *might* have missed a study if, say, his keyword searches did not work. In fact, he did *not* miss those studies; he reviewed, cited, *and discussed*, each of the studies Defendants reference.[262] He *independently* identified many of the same flaws Drs. McTiernan and Moorman identified. *E.g.*, Def. Ex. 13 (Michaels Rep.) at 64 (discussing many "significant design element weaknesses" and concluding "My specific opinions are based on the weight of all lines of evidence, including the clear consistency evident across the NDMA and ranitidine epidemiological literature and the compelling non-epidemiologic studies and results.").

He synthesized multiple lines of evidence, including: (1) NDMA epidemiological literature; (2) ranitidine epidemiological literature; (3) non-epidemiological studies; (4) carcinogenesis mechanisms of NDMA in multiple animal models and human cell lines; (5) the chemical structure of ranitidine; (6) documented evidence of high levels of NDMA in tested ranitidine samples; and (7) numerous other large studies that show an increase in cancer risk within parts of the human body known to be exposed to NDMA or involved with NDMA metabolism, degradation, and excretion, to form his opinions. *See id.* Dr. Michaels explains this in his deposition, testifying that in weighing the epidemiological evidence, he "did what [he] would do in [his] practice, which is evaluate it with a degree of certainty that is consistent with [his] practice and then use that in conjunction with the other data [he] evaluated to form [his] opinions." Def. Ex. 36 (Michaels Dep. Tr.) at 252:5-10.

Under *Daubert*, "the evidence an expert relies on simply must be 'based on *sufficient* facts or data,'" *St. Louis Condo. Ass'n v. Rockhill Ins. Co.*, 5 F.4th 1235, 1244-45 n.8 (11th Cir. 2021) (quoting Fed. R. Evid. 702) (emphasis added). That, Dr. Michaels did. Dr. Michaels did not "ignore" anything. Ultimately, Dr. Michaels's methodology, which included reviewing the "vast majority" of literature on the relevant subjects, *see* Def. Ex. 13 (Michaels Rep.) at 64, and a

---

[262] *See* Def. Ex. 13 (Michaels Rep.) at 53, 56, 57, 61 (discussing Adami); 64 (discussing Kim Y.D.); 61, 64 (discussing Yoon); 64 (discussing Iwagami); and 32 (discussing Liu).

synthesis of over half a dozen different lines and types of evidence was based on facts and data far surpassing what would be necessary to be "simply" "sufficient." *St. Louis Condo. Ass'n*, 5 F.4th at 1244-45 n.8. As such, Defendants' Motion merely goes to the weight his opinions should be given, not admissibility, *see Ramirez v. E.I. DuPont de Nemours & Co.*, 579 F. App'x 878, 882-83 (11th Cir. 2014); *see also Vision I Homeowners Ass'n v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009), and should be denied.

### D.       Defendants' Anemic Attack on Dr. Le Mischaracterizes Her Testimony

Defendants fault Dr. Le for relying on unadjusted data, Motion at 62, but Dr. Le's analysis and tables use adjusted data. Def. Ex. 5 (Le Rep.) at 96-104. The only unadjusted data was from the Adami and Norgaard studies ("as well as considering sIPT adjusted" data[263]), but without transparency about the adjustments made to the crude data, as was the case in Adami and Norgard, important confounders might not be properly considered[264] or over-adjusting may occur.[265] Next, Defendants criticize Dr. Le for not relying on ranitidine epidemiological studies, but Dr. Le relied on multiple studies supporting a causal link between ranitidine and each of the five cancers at issue.[266]

Defendants next erroneously alleged that Dr. Le further relied upon unadjusted data to opine on liver, stomach and pancreatic cancers. Motion at 62-63. Dr. Le's tables list an increased risk of liver cancer using unadjusted data. Def. Ex. 5 (Le Rep.) at 96-104. Dr. Le's tables demonstrate a statistically significant increase risk for liver cancer in the Kantor study when comparing ranitidine users versus non-users, and a non-statistically significant increased risk in the Tran study. *Id.* at 99 (Kantor), 102 (Tran). Contrary to Defendants' claims, these results are all based on adjusted data. Similarly, Dr. Le's opinions regarding stomach cancer are supported by the Habel study (which notes a statistically significant increased risk of 142% for

---

[263] Def. Ex. 30 (Le Dep. Tr.) at 238:7-24; 239:15-24; Def. Ex. 5 (Le Rep.) at 96 (discussing the adjusted data).

[264] *See* Reiffel, J.A., *Propensity Score Matching: The 'Devil is in the Details' Where More May Be Hidden Than You Know*, 133 AM. J. MED., 178 (2020); Nuttall, G.A., et al., *Lairs, Damn Liars, and Propensity Scores*, 108 ANESTHES, 3 (2008).

[265] *See* Schisterman, E.F., et al., *Overadjustment Bias and Unnecessary Adjustment in Epidemiological Studies*, 20 EPIDEMIOL. 488 (2009).

[266] *E.g.*, Def. Ex. 5 (Le Rep.) at 9 ("Of the 7 studies that concluded an association between ranitidine use and certain cancers, the cancer types affected were bladder (2 studies), esophagus (2 studies), stomach (2 studies), pancreas (2 studies), and liver (2 studies)."); *id.* at 96-104 (detailing results of these studies that support the link between ranitidine and cancer).

stomach/esophageal cancers for users compared to non-users), *id.* at 97-98 (adjusted data), and the Liu study (which found a statistically significant increased risk of 42% for users compared to non-users), *id.* at 101 (adjusted data). Finally, Dr. Le's opinions on pancreatic cancer are supported by the Habel and McDowell studies, which, using adjusted data, found a statistically significant 160% increased risk of pancreatic cancer for users versus non-users, and a statistically significant 37% increased risk of pancreatic cancer for users versus non-users, respectively. *Id.* at 97-98 (Habel), 101 (McDowell).

Defendants accuse Dr. Le of cherry-picking from the main analysis or active comparator analysis, Motion at 63-64, but the front-page, bottom-line summary on page 1 of the Cardwell study states exactly what Dr. Le claims: "use of ranitidine, particularly long-term use, was associated with an increased risk of bladder cancer." Def. Ex. 48 (Cardwell 2021). The authors did not deem the H2RA sub-analysis to be the "real" result, but only a cross-check. It is Defendants, then, not Dr. Le, who is cherry-picking contrary to the authors' stated results.[267]

Dr. Le's methodology is sound. Indeed, she took into account more evidence than Defendants' experts, who ignored decades of data linking ranitidine and NDMA to cancer. In considering all available lines of evidence, Dr. Le reasonably concluded that ranitidine does cause the five cancers at issue. "The hallmark of the weight of the evidence approach is reasoning to the best explanation for all of the available evidence." *Milward*, 639 F.3d at 23; *In re Abilify*, 299 F. Supp. 3d at 1352. She did so.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion.

---

[267] While pages 96-104 of Dr. Le's report do not include all results that she considered, Dr. Le expressly noted, at 97, that she considered Cardwell's active comparator analyses. Def. Ex. 5 (Le Rep.) at 97. Defendants accuse Dr. Le of cherry picking even when the study *had only one analysis*, such as Adami (which did not compare non-users). Reporting the only result cannot be cherry-picking.

Dated: August 1, 2022

Respectfully submitted,

*/s/ Tracy A. Finken*
Tracy A. Finken
Email: tfinken@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

By: */s/ Robert C. Gilbert*
Robert C. Gilbert, FBN 561861
Email: gilbert@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7270

*/s/ Michael L. McGlamry*
Michael L. McGlamry
Email: efile@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

*/s/ Adam Pulaski*
Adam Pulaski
Email: adam@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

*Plaintiffs' Co-Lead Counsel*

Rosemarie R. Bogdan
Email: Rosemarie.bogdan@1800law1010.com
MARTIN, HARDING & MAZZOTTI
1 Wall Street
Albany, NY 12205
Tel: (518) 862-1200

Mark J. Dearman, FBN 0982407
Email: mdearman@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000

Elizabeth A. Fegan
Email: beth@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd.
Yorkville, IL 60560
Tel: (312) 741-1019

Marlene J. Goldenberg
Email: mjgoldenberg@goldenberglaw.com
GOLDENBERG LAW, PLLC
800 LaSalle Avenue, Suite 2150
Minneapolis, MN  55402
Tel: (855) 333-4662

Ashley Keller
Email: ack@kellerpostman.com
KELLER | POSTMAN
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL  33134
Tel: (312) 741-5222

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4629

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

Francisco R. Maderal, FBN 0041481
Email: frank@maderalbyrne.com
MADERAL BYRNE PLLC
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 520-5690

Lauren S. Miller
Email: laurenm@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1914 4th Avenue North
Suite 320
Birmingham, AL 35203
Tel: (205) 533-4175

Daniel A. Nigh, FBN 30905
Email: dnigh@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (888) 435-7001

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX  78257
Tel: (800) 294-0055

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA  70130
Tel: (504) 524-5777

Steven B. Rotman
Email: srotman@housfeld.com
HAUSFELD, LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0602

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington, DC 20032
Tel: (202) 506-3591

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

*Plaintiffs' Steering Committee*

Brooke Achua
Email: brooke@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd., 46th Floor
Yorkville, IL 60560
Tel: (646) 502-7910

Harrison M. Biggs
Email: hbiggs@yourlawayer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4633

Lea P. Bucciero
Email: lbucciero@podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Marlo E. Fisher
Email: marlo@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

Noah Heinz
Email: noah.heinz@kellerpostman.com
KELLER | POSTMAN
1100 Vermont Avenue NW, Floor 12
Washington, DC 20005
Tel: (202) 918-1841

Caroline G. McGlamry
Email: carolinemcglamry@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

Laura K. Stemkowski
Email: lstemkowski@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9165

Alexander C. Cohen
Email: acohen@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road
Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000

Kendra Goldhirsch
Email: goldhirsch@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Catelyn McDonough
Email: cmcdonough@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

Madeline Pendley
Email: mpendley@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (850) 435-7003

Daniel E. Tropin
Email: tropin@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (954) 990-2216

*Plaintiffs' Leadership Development Committee*

103

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

*/s/ Robert C. Gilbert*
Robert C. Gilbert

**Motion to Seal/Sealed and Exparte Filings:**

9:20-md-02924-RLR IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

### U.S. District Court

### Southern District of Florida

## Notice of Electronic Filing

The following transaction was entered by Gilbert, Robert on 8/1/2022 at 11:54 PM EDT and filed on 8/1/2022

| | |
|---|---|
| **Case Name:** | IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION |
| **Case Number:** | 9:20-md-02924-RLR |
| **Filer:** | Zantac (Ranitidine) Products Liability Litigation |
| **Document Number:** | 5915 |

**Docket Text:**
**Plaintiff's SEALED MOTION** *Plaintiffs Opposition to Brand Defendants Motion to Exclude Plaintiffs General Causation Experts Opinions Related to Epidemiology* **by Zantac (Ranitidine) Products Liability Litigation. (Gilbert, Robert)**

**9:20-md-02924-RLR** No electronic public notice will be sent because the case/entry is sealed.

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1105629215 [Date=8/1/2022] [FileNumber=22428914-0
] [3db41fdc621bf3168549c6dc13121c5efb6fbdae635ac951a0d1c6c7d29ed3e6555
d84e9c7e2fccf671c53d1a8cb650a7961eafd5e9bdea86c64695fd7294d38]]