UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

**IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION**

**MDL No. 2924**
**20-MD-2924**

**JUDGE ROBIN L. ROSENBERG**
**MAGISTRATE JUDGE BRUCE E. REINHART**

_________________________________/

**THIS DOCUMENT RELATES TO: ALL CASES**

**BRAND DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE REMAINING EXPERT OPINIONS RELATING TO GENERAL CAUSATION[1]**

[1] This Motion is filed under seal pursuant to the Order at ECF No. 5684.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

ARGUMENT ..... 1

I Plaintiffs' Expert s' Endogenous Formation Opinions Lack A Reliable Scientific Basis and Should Be Excluded ..... 1

A. Application of the Weight of the Evidence Methodology Does Not Preclude This Court's Rule 702 Review ..... 2

B. Plaintiffs' Experts Apply Unreliable Methodologies in "Weighing" The Evidence ..... 5

II Plaintiffs' Experts' Opinions Based On Animal Studies Should Be Excluded Because Those Studies Do Not "Fit" The Question of General Causation In Humans ..... 9

III Plaintiffs' Experts' "No Threshold" Opinions Should Be Excluded As Unreliable ..... 10

IV Dr. Panigrahy's Opinion That FDA's Acceptable Daily Intake Limit Is Evidence Of General Causation Should Be Precluded ..... 11

CONCLUSION ..... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,
299 F. Supp. 3d 1291 (N.D. Fla. 2018)....................4, 6, 7

*Allison v. McGhan Med. Corp.*,
184 F.3d 1300 (11th Cir. 1999) ....................10

*In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*,
9 F.4th 768 (8th Cir. 2021) ....................6

*Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co.*,
189 F. Supp. 2d 482 (S.D.W. Va. 2002), *aff'd*, 85 F. App'x 964 (4th Cir. 2004) ....................10

*Chapman v. Procter & Gamble Distrib., LLC*,
766 F.3d 1296 (11th Cir. 2014) ....................3

*Daubert v. Merrell Dow Pharm. Inc.*,
509 U.S. 579 (1993)....................3

*In re Incretin-Based Therapies Prod. Liab. Litig.*,
524 F. Supp. 3d 1007 (S.D. Cal. 2021),
*aff'd*, No. 21-55342, 2022 WL 898595 (9th Cir. Mar. 28, 2022) ....................4

*Kilpatrick v. Breg, Inc.*,
613 F.3d 1329 (11th Cir. 2010) ....................5, 10

*Magistrini v. One Hour Martinizing Dry Cleaning*,
180 F. Supp. 2d 584 (D.N.J. 2002), *aff'd*, 68 F. App'x 356 (3d Cir. 2003) ....................3

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
639 F.3d 11 (1st Cir. 2011)....................6

*In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig.*
(No. II), 341 F. Supp. 3d 213 (S.D.N.Y. 2018)
*aff'd*, 982 F.3d 113 (2d Cir. 2020)....................4

*In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) ....................4

*Renaud v. Martin Marietta Corp., Inc.*,
972 F.2d 304 (10th Cir. 1992) ....................10

*Rink v. Cheminova, Inc.*,
400 F.3d 1286 (11th Cir. 2005) ....................................................................................3, 5

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*
No. 14 C 1748, 2017 WL 1833173 (N.D. Ill. May 8, 2017) ....................................................6

*In re Zoloft (Sertraline hydrochloride) Prods. Liab. Litig.*,
176 F. Supp. 3d 483 (E.D. Pa. 2016), *aff'd,* 858 F.3d 787 (3d Cir. 2017)................................5

**Other Authorities**

Michael D. Green, et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence*, (Fed. Jud. Ctr., 3d. ed. 2011)...............................................................5

Margaret Berger, *The Admissibility of Expert Testimony*, *in Reference Manual on Scientific Evidence*, (Fed. Jud. Ctr., 3d. ed. 2011)....................................................................7

Rule 702 ......................................................................................................................... *passim*

## INTRODUCTION

As they have done throughout this litigation, Plaintiffs ask the Court to shrug off the results of rigorous, carefully designed studies conducted by real-world scientists that provide answers to the precise question at issue in this litigation: whether therapeutic doses of ranitidine cause one or more of the Designated Cancers, a question that has been answered by the scientific community in patients' and Defendants' favor. Plaintiffs' continued insistence that the Court focus on NDMA, rather than ranitidine, is an attempt to sidestep the key data and results—generated by independent scientists through the use of valid and reliable methods—which investigate the true scientific inquiry at the heart of this litigation. In the face of reliable and highly relevant studies debunking their general causation theories, Plaintiffs attempt to discard core scientific principles, including the hierarchy of evidence and internal consistency, and assign significant weight to obscure animal and *in vitro* studies, many of them decades old. At the same time, Plaintiffs seek to deprive the Court of its crucial Rule 702 gatekeeping role with the repeated incantation that any methodology involving "weighing" can only be evaluated by the jury. The "weight of the evidence" approach purportedly employed by Plaintiffs' experts does not remove Plaintiffs' experts' opinions from this Court's Rule 702 scrutiny.

## ARGUMENT

### I Plaintiffs' Experts' Endogenous Formation Opinions Lack A Reliable Scientific Basis and Should Be Excluded

The speculative hypothesis that NDMA forms endogenously with ranitidine has been disproven by well-designed studies conducted by FDA researchers[2] and published in the peer-

---

[2] The FDA has publicly endorsed the Florian (2021) and Gao (2021) studies as the work of the FDA Center for Drug Evaluation and Research, noting, "The combined findings from CDER's in vivo clinical trial and in vitro experiments do not support the conclusion that ranitidine is converted to NDMA in humans." FDA: Ensuring the Rigor of Regulatory Science: CDER Conducts Laboratory and Clinical Studies to Investigate Reports of NDMA Production from Ingested

reviewed scientific literature, Florian (2021) and Gao (2021). Gao (2021) systematically determined the appropriate conditions to assess whether ranitidine can form in the human stomach through literature review and laboratory experiments; Florian (2021) was a clinical trial designed to maximize the potential for endogenous NDMA formation and measure whether and how much NDMA forms, both with and without nitrite- and nitrate-rich meals. Florian (2021) and Gao (2021) found no evidence of endogenous formation of NDMA from ranitidine, leading FDA to conclude that "[t]he combined findings from [FDA's Center for Drug Evaluation and Research (CDER)] in vivo clinical trial [Florian] and in vitro experiments [Gao] do not support the conclusion that ranitidine is converted to NDMA in humans."[3] Plaintiffs' experts can point to no affirmative evidence to support their theory. Instead, their opinions are based on speculative criticisms of Florian (2021) and Gao (2021), paired with reliance on studies that are unreliable and less relevant. To support this unscientific and unreliable approach, Plaintiffs argue that their experts considered the "weight of the evidence" such that the Court may not further scrutinize their weighing exercise. For the reasons discussed below, Plaintiffs' framing of the law and their experts' approach to the science are both incorrect and should be rejected.

### A. Application of the Weight of the Evidence Methodology Does Not Preclude This Court's Rule 702 Review

To defend their experts'[4] continued adherence to the debunked endogenous formation theory, Plaintiffs argue that their opinions are shielded from this Court's Rule 702 scrutiny under

---

Ranitidine Products (July 2, 2021), https://www.fda.gov/drugs/news-events-human-drugs/ensuring-rigor-regulatory-science-cder-conducts-laboratory-and-clinical-studies-investigate-reports.

[3] FDA, *Ensuring the Rigor of Regulatory Science: CDER Conducts Laboratory and Clinical Studies to Investigate Reports of NDMA Production from Ingested Ranitidine Products*, (7/2/21) at https://www.fda.gov/drugs/news-events-human-drugs/ensuring-rigor-regulatory-science-cder-conducts-laboratory-and-clinical-studies-investigate-reports.

[4] Although Plaintiffs wrongly suggest Defendant somehow "forfeited" any attack on Dr. Salmon's abandoned opinion about hypothetical endogenous formation, Pls.' Opp'n at 13 n.60, to the extent

a "weight of the evidence theory." *See* Pls.' Opp'n at 18–19. Under Plaintiffs' view, the Court's role would be simply to check boxes, asking only (1) whether an expert considered various types of evidence and (2) whether the expert provided what they purport to be a scientific reason for how they weighted the evidence. Plaintiffs assert that the Court is *barred* from evaluating (1) the methodology and rationale underlying expert's selection of evidence to consider and (2) the validity of the expert's weighting process. *See* Pls.' Opp'n at 18 ("It is a textbook rule under *Daubert*, however, that Courts cannot weigh evidence—that's the jury's job."). Plaintiffs also suggest their experts need not consider or individually weigh every study, or at least that the Court need not scrutinize the experts' methodology in assigning weight. Pls.' Opp'n at 14–15. If Plaintiffs are right about this Court's role, any expert's invocation of a "weight of the evidence" methodology would effectively shield that expert from any meaningful Rule 702 review. Plaintiffs are wrong.

Plaintiffs' position is contrary to the role district courts play when implementing Rule 702 in this circuit; district courts must evaluate not just the mere existence of a methodology, but the methodology itself. *See e.g., Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293–94 (11th Cir. 2005); *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305–06 (11th Cir. 2014). Courts have repeatedly rejected entreaties not to scrutinize an expert's weighting of studies considered under a "weight of the evidence" approach. "While flexible application of the *Daubert* factors permits this Court to find that, properly applied, the weight-of-the-evidence methodology is not an unreliable methodology, in order for [an expert's] opinion to go to a jury, the *application* of that methodology also must be reliable." *Magistrini v. One Hour Martinizing Dry Cleaning*, 180

Plaintiffs now intend to revive that disclaimed opinion, it is based on substantially the same methodology as Plaintiffs' other experts and therefore must be excluded for the same reasons.

F. Supp. 2d 584, 602 (D.N.J. 2002), *aff'd*, 68 F. App'x 356 (3d Cir. 2003);*see also In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig.* (No. II), 341 F. Supp. 3d 213, 248 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020) (finding plaintiff expert's weight of the evidence methodology unreliable after detailed evaluation and noting that "such rigor guards against the pitfall of which Judge Seibel warned in excluding expert testimony in [prior litigation]: 'reverse-engineering a theory to fit the desired outcome.'" (quoting *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016))). "Courts have recognized that it is imperative that experts who apply multi-criteria methodologies such as 'weight of the evidence' must 'rigorously explain how they have weighted the criteria. Otherwise, such methodologies are virtually standardless and their applications to a particular problem can prove unacceptably manipulable.'" *In re Incretin-Based Therapies Prod. Liab. Litig.*, 524 F. Supp. 3d 1007, 1043 (S.D. Cal. 2021), *aff'd*, No. 21-55342, 2022 WL 898595 (9th Cir. Mar. 28, 2022) (quoting *In re Mirena* (No. II), 341 F. Supp. 3d at 247). Even cases cited by Plaintiffs make clear that when evaluating an expert's weight of the evidence methodology, the Court should ensure that "*every aspect of the expert's analysis*—including his methodology, the combination of facts and scientific evidence on which he relies, and the links between the evidence and his conclusions… satisf[ies] Rule 702 and Daubert." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1312 (N.D. Fla. 2018) (emphasis added).

Here, Plaintiffs' experts purport to apply "weighting" methodologies to disregard Florian (2021) and Gao (2021), the two most relevant, rigorously designed, and well-accepted studies of endogenous formation of NDMA from ranitidine. It is within the Court's power to scrutinize how Plaintiffs' experts reached such a radical opinion that is at odds with the FDA, and whether those methods are reliable.

### B. Plaintiffs' Experts Apply Unreliable Methodologies When "Weighting" The Evidence

When assessing whether Plaintiffs' experts used reliable methodologies in weighing their chosen studies, the Court may consider whether Plaintiffs' methods are contrary to scientific principles of reliable evidence, whether they depend upon an unproven or unprovable theory, whether their purported reasons for assigning weight to studies are internally inconsistent, and whether the cited evidence supports the conclusions Plaintiffs' experts draw from them. *See, e.g.*, *Rink*, 400 F.3d at 1292–93 (11th Cir. 2005) (affirming exclusion of expert whose "methods were not tested . . . or generally accepted in the scientific community"); *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1340–41 (11th Cir. 2010) (affirming exclusion of expert where district court reviewed cited studies and determined they did not support the expert's conclusion); *In re Zoloft (Sertraline hydrochloride) Prods. Liab. Litig.*, 176 F. Supp. 3d 483 (E.D. Pa. 2016) (excluding expert who "failed to consistently apply the scientific methods he articulated, deviated from or downplayed certain well-established principles of his field, and inconsistently applied methods and standards to the data"), *aff'd,* 858 F.3d 787 (3d Cir. 2017).

Plaintiffs do not dispute that under the universally accepted hierarchy of scientific evidence, "a randomized trial, clinical trial, or true experiment, is considered the gold standard," followed closely by human observational studies. Michael D. Green, et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 549, 555 (Fed. Jud. Ctr., 3d. ed. 2011). Yet Plaintiffs' experts provide no explanation for why they declined to assign any significant weight to the only "gold standard" evidence addressing the question at issue. Of the cases Plaintiffs cite to support their "weight of the evidence" methodology, none allowed expert

testimony that disregarded or provided little weight to relevant human studies.[5] To be clear, while Plaintiffs attempt to characterize Florian (2021) as a "urine study," it is a randomized controlled clinical study conducted in humans specifically to determine if endogenous formation of NDMA from ranitidine occurs in the human body. The Florian (2021) study was designed to maximize the potential for endogenous formation of NDMA from ranitidine, building upon the Gao (2021) findings that showed maximum NDMA formation at high acidity. The experimental conditions evaluated in Gao (2021) were further informed by a systematic review of the literature on physiologically relevant gastric conditions as reflected in measurements of actual human stomachs. Contrary to Plaintiffs' arguments, it is not "tunnel vision" to rely predominately on certain studies—particularly "gold standard" randomized controlled clinical studies—when those studies are determinative of the question at issue. *See* Pls.' Opp'n at 14. Plaintiffs' experts' unscientific choice to disregard or under-weight Florian (2021) and Gao (2021) does not withstand scrutiny.

Plaintiffs' experts attempt to justify their decision to disregard Florian (2021) and Gao (2021) primarily by asserting that NDMA cannot be reliably measured in urine and therefore, even if NDMA was forming from ranitidine, there would be no way to detect it. *See* Pls.' Opp'n at 17. It is axiomatic that reliable scientific methodology turns upon the existence of objective

---

[5] *E.g.*, *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 23 (1st Cir. 2011) (addressing "weight of the evidence" approach in the *absence* of human data that weighs against the expert's proffered causation theory); *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 780–81 (8th Cir. 2021) (addressing a weight of the evidence methodology in which the expert considered and relied upon relevant human observational studies); *In re Abilify*, 299 F. Supp. 3d at 1311 (addressing a weight of the evidence methodology in which the expert considered and relied upon an epidemiological study); *In re Testosterone Replacement Therapy Prods. Liab. Litig.* No. 14 C 1748, 2017 WL 1833173, at *9–10 (N.D. Ill. May 8, 2017) (addressing a weight of the evidence methodology in which experts considered and relied on epidemiology studies).

measurements to support a theory. "Whether a theory or technique can be (and has been) tested is the methodology that distinguishes science from other fields of human inquiry." Margaret Berger, *The Admissibility of Expert Testimony*, *in Reference Manual on Scientific Evidence*, at 12, 13 (Fed. Jud. Ctr., 3d. ed. 2011) (quoting *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 593-94 (1993)) (quotations and alterations omitted). But Plaintiffs' experts' belief that NDMA cannot be measured is contradicted by the actual NDMA measurements taken in the Florian (2021) study, which detected statistically significant NDMA differences between patients who ate cured meat diets and those who did not—a point Plaintiffs' Opposition does not address. Plaintiffs' experts cannot disregard concrete data like that collected in Florian (2021) and Gao (2021) simply by pointing to decades-old studies of limited relevance and questionable reliability. "[A]n expert cannot merely aggregate various categories of otherwise unreliable evidence to form a reliable [expert opinion]." *In re Abilify*, 299 F. Supp. 3d at 1311. Yet Plaintiffs' experts do exactly that.

Plaintiffs' experts' other reasons for disregarding Florian (2021) and Gao (2021) are internally inconsistent and rely on studies that do not support the experts' conclusions. For instance, Plaintiffs argue that Florian (2021) and Gao (2021) do not accurately assess the stomach chemistry of ranitidine patients, pointing to Krawczynski (2002).[6] Plaintiffs fail to mention that the gastric samples in the study were collected 4–6 weeks after treatment ended, long after ranitidine and any endogenously formed NDMA from ranitidine would have been cleared from the body, making it impossible to reliably draw conclusions from the study. Plaintiffs also argue that their expert, Dr. Le, under-weighted Florian (2021) based on her reasoning that urine findings

---

[6] Krawczynski et al., *Nitrosamines in children with chronic gastritis*, J. POLISH PAEDIATRIC SOC'Y 2022;1-11 (2002).

do not reflect plasma findings, without addressing that Florian (2021) did, in fact, measure plasma for NDMA levels (which their expert also ignored). Pls.' Opp'n at 17.

Plaintiffs argue that "endogeneity is not informed by one variable alone" alluding to Gao's focus on physiologically relevant nitrite concentrations—meaning nitrite concentrations that are consistent with levels that could plausibly exist in the human stomach. Pls.' Opp'n at 7. However, Plaintiffs simultaneously point to *in vitro* studies that focus on nitrite concentrations *far above* what would exist in a human stomach, failing to explain why their experts weigh those studies more heavily than Gao (2021), while baldly asserting the studies "demonstrate that NDMA can form endogenously." Pls.' Opp'n at 6. The facts Plaintiffs chose to omit from their descriptions of these studies, Pls.' Opp'n at 5–6, demonstrate the lack of support these studies lend to Plaintiffs' experts' conclusions and, consequently, the unreliability of Plaintiffs' experts weighing methodology. Plaintiffs describe Brambilla (1983)[7] as "confirming" DNA fragmentation with high doses of ranitidine and sodium nitrite in rats. This study was specifically considered by FDA researchers, who pointed out that it used amounts of ranitidine that "vastly exceed[]" human dosing and sodium nitrite doses that "were close to the median lethal dose in rats."[8] Braunstein (2021),[9] cited by Plaintiffs, was also specifically called out by FDA researchers, who found that "None of the experiments in the study by Braunstein et al included physiological conditions."[10] Brambilla

---

[7] Brambilla et al., *Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite*, Carcinogensis 1983;4:1281–85 (1983).
[8] Florian et al., *Effect of oral ranitidine on urinary excretion of n-nitrosodimethylamine (NDMA): A Randomized Clinical Trial*, J. AM. MED. ASS'N 2021;326(3):240–249 (2021)
[9] Braunstein et al., *Analysis of Ranitidine-Associated N-Nitrosodimethylamine Production Under Simulated Physiologic Conditions*, JAMA NETWORK OPEN 2021;4(1):e2034766 (2021), Brown Decl. Ex. 47.
[10] Gao et al., *In vitro analysis of N-nitrosodimethylamine (NDMA) formation from ranitidine under simulated gastrointestinal conditions*, JAMA NETWORK OPEN 2021;4(6):e2118253 (2021).

(1983), DeFlora (1981), Franekic (1989), Maura (1983), Martelli (1983), and Ozhan (2003)[11] offer no measurements of NDMA. Furthermore, Franekic (1989), Maura (1983), and Martelli (1983) incubated ranitidine with supraphysiologic levels of nitrite, rendering the results inapplicable to the question of endogenous formation of NMDA from ranitidine. Plaintiffs' experts do not—and cannot—provide a scientifically valid reason for over-weighting these studies and drawing conclusions that are unsupported by the data, while under-weighting Florian (2021) and Gao (2021). As such, the Court should exclude Plaintiffs' experts' opinions on endogenous formation and related testimony.

## II Plaintiffs' Experts' Opinions Based On Animal Studies Should Be Excluded Because Those Studies Do Not "Fit" The Question of General Causation In Humans

Plaintiffs effectively concede their experts' use of animal studies is only arguably permissible when taken in conjunction with epidemiological studies on NDMA carcinogenicity. Opp. at 20–22. This is precisely Defendants' point. As explained more fully in Brand Defendants' Motion to Exclude Plaintiffs' General Causation Experts' Opinions Related to Epidemiology (at 79–87), Plaintiffs' experts' reliance on non-ranitidine epidemiological studies and under-weighting of ranitidine human epidemiological studies is not based on a reliable methodology sufficient to survive Rule 702. Should the Court preclude Plaintiffs' experts from proffering a general causation theory based on epidemiology, the Court should similarly preclude Plaintiffs' experts from opining that the animal studies provide reliable causation evidence.

---

[11] De Flora et al., *Cimetidine, ranitidine, and their mutagenic nitroso derivatives*, LANCET 1981;2:993–94 (1981); Franekic et al., *Genotoxicity of nitrosated ranitidine*, MUTATION RES. 1989;227:13–16 (1989); Maura et al., *DNA damage induced by nitrosated ranitidine in cultured mammalian cells*, TOXICOLOGY LETTERS 1983;18:97–102 (1983); Martelli et al., *Unscheduled DNA synthesis induced by nitrosated ranitidine in primary cultures of rate hepatocytes*, MUTATION RES. 1983;122: 373–376 (1983); Ozhan et al., *Genotoxic activities of drug-nitrite interaction products*, DRUG CHEMICAL TOXICOLOGY 2003;26:295-308.

Notably, Plaintiffs again assert that this Court is incapable of reviewing the methodology applied by Plaintiffs' experts to general causation because Plaintiffs' experts employed a "weight of the evidence" approach and—in Plaintiffs' view—the Court is prohibited from assessing weighting. Pls.' Opp'n at 23. It is within the Court's power to determine that a general causation opinion based only on animal studies is insufficient to meet the requirements of Rule 702. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1314 (11th Cir. 1999) (affirming the district court's exclusion of expert testimony where plaintiff's expert "[did] not explain why the results of these animal studies should trump more than twenty controlled epidemiological studies"); *Kilpatrick*, 613 F.3d at1340–41 (affirming district court's exclusion of causation testimony based on animal studies); *Renaud v. Martin Marietta Corp., Inc.,* 972 F.2d 304, 307 (10th Cir. 1992) ("The etiological evidence proffered by the plaintiff was not sufficiently reliable, being drawn from tests on non-human subjects without confirmatory epidemiological data."); *Bourne ex rel. Bourne v. E.I. Dupont de Nemours & Co.*, 189 F. Supp. 2d 482, 497 (S.D.W. Va. 2002), *aff'd,* 85 F. App'x 964 (4th Cir. 2004) (excluding plaintiff expert testimony based on animal and *in vitro* studies where "[t]he only existing epidemiological evidence is contrary to plaintiff's position"). Because Plaintiffs' experts have not used a reliable methodology when weighing or drawing conclusions from either the epidemiology or the animal studies, their opinions and testimony should be excluded.

**III Plaintiffs' Experts' "No Threshold" Opinions Should Be Excluded As Unreliable**

Plaintiffs cannot avoid application of established law on a "no threshold" theory simply by downplaying their experts' opinions. Plaintiffs do not dispute that their experts offer "no threshold" opinions. *See* Pls.' Opp'n at 23–24. Plaintiffs do not dispute the applicability of law that has held "no threshold" opinions unreliable and subject to exclusion under Rule 702. As such,

Plaintiffs' experts should be precluded from offering "no threshold" opinions and related testimony.

### IV Dr. Panigrahy's Opinion That FDA's Acceptable Daily Intake Limit Is Evidence Of General Causation Should Be Precluded

Again, Plaintiffs neither dispute that their expert, Dr. Panigrahy, characterized the FDA's Acceptable Daily Intake ("ADI") for NDMA as evidence of real-world cancer causation in humans, nor do they dispute the law holding that regulatory determinations are not evidence of causation. Pls.' Opp'n at 24. As such, Dr. Panigrahy should be precluded from offering opinions or related testimony regarding FDA's ADI for NDMA.

## CONCLUSION

Plaintiffs' experts' opinions on endogenous formation of NDMA from ranitidine, the use of animal NDMA studies to support general causation, and the mischaracterization of regulatory and toxicology thresholds are based on unreliable methodology and should be excluded.

Dated: August 22, 2022

Respectfully submitted,

**Lead Counsel:**

*/s/ Mark Cheffo*
Mark S. Cheffo
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 698-3500
Fax: (212) 698-3599
mark.cheffo@dechert.com

*Counsel for Defendant GlaxoSmithKline LLC*

*/s/ Andrew T. Bayman*
Andrew T. Bayman
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521

Tel: (404) 572-4600
Fax: (404) 572-5100
abayman@kslaw.com

*Counsel for Defendant Boehringer Ingelheim Pharmaceuticals, Inc.*

/s/ *Anand Agneshwar*
Anand Agneshwar
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Tel: (212) 836-8000
Fax: (212) 836-8689
anand.agneshwar@arnoldporter.com

*Counsel for Defendants Sanofi US Services Inc., Sanofi-Aventis U.S. LLC, and Chattem, Inc.*

*/s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
Fax: (202) 434-5029
jpetrosinelli@wc.com

*Counsel for Defendant Pfizer Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed on August 22, 2022 using the Court's CM/ECF system, which will provide automatic notification to all counsel of record.

*/s/ Mark Cheffo*
Mark S. Cheffo