# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)     MDL NO. 2924
PRODUCTS LIABILITY        20-MD-2924
LITIGATION

          **JUDGE ROBIN L. ROSENBERG**
      **MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**


**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO EXCLUDE
DEFENDANTS' PUTATIVE EXPERT OPINIONS ON GENERAL CAUSATION
UNDER RULE 702[1]**


DATED: September 14, 2022

---

[1] This Motion is filed under seal pursuant to the Order at D.E. 5684.

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

I.     Defendants Cannot Escape the Consensus that NDMA Can Cause Cancer ....................... 2

II.    The Weight of the Evidence Supports Causation. ............................................................ 5

     A.     Experts Should Give Studies the Weight They Are Due Based on Their Design and Sound Epidemiological Principles ........................................................ 6

     B.     The Studies Defendants Rely Upon Are Quite Limited ......................................... 7

     C.     Dietary and Occupational Studies Help Inform the Jury How Exposure to NDMA Increases the Risk of Certain Cancers ....................................................... 9

     D.     Available Epidemiological Literature Supports a Causal Connection Between Ranitidine and Cancer ......................................................................................... 10

         1.     Defendants Undermine their Daubert Challenge to Drs. Moorman and McTiernan ................................................................................................. 10

         2.     The Forest Plots Are Fair Summaries of the Data ................................... 10

         3.     Defendants Misconceive Statistical Significance ..................................... 12

         4.     Defendants' Criticism Would Cherry-Pick Results ................................. 13

         5.     NDMA Science Supports Causation ........................................................ 15

         6.     Animal In-Vivo Studies and In-Vitro Human and Animal Tissue/Cellular Studies Support Causation .............................................. 16

LEGAL STANDARD ..................................................................................................... 18

ARGUMENT .................................................................................................................. 18

III.   Defendants' Experts Repeatedly Err in Similar Ways ..................................................... 18

     A.     Plaintiffs Do Not Seek to Shift the Burden to Defendants .................................. 19

     B.     General Causation Requires an Expert to Consider the Very Strongest Possible Facts ....................................................................................................... 19

     C.     The Relevant Toxin in This Case Is NDMA ........................................................ 22

IV.   John Witte ....................................................................................................................... 26

     A.     Witte Ignored NDMA Science ............................................................................. 27

i

B.      Witte's Methodology Is Unreliable Because It Assumes that Plaintiffs Are at No Greater Risk Than the Consumers in Ranitidine Study Populations ............. 29

      1.     Witte Improperly Extrapolates from Low-Exposure Studies .................. 29

      2.     Witte Improperly Extrapolates from Studies of Short-Term Cancer Risk 30

C.      Witte Ignored Limitations and Confounders in Studies He Preferred for No Discernible Reason ......................................................................... 31

      1.     Even Though the Study Populations for H2RAs and Ranitidine Were Consistently Different, Witte Assumed the Only Difference Was the Drug. ........................................................................ 32

      2.     Witte Disregards What Many Studies Say with Insufficient Reason ....... 33

      3.     Witte Ignored the Limitations of Aggregate Data. ................................... 34

D.      Witte's Bradford Hill Analysis Is Unhelpful and Unreliable ............................... 34

V.      Andrew Chan ........................................................................................ 35

A.      Dr. Chan Ignored the Literature About NDMA and Cancer Risk ....................... 36

B.      Dr. Chan Ignored the Deficient Exposure Measurements in the Ranitidine Literature ....................................................................................... 38

C.      Dr. Chan Ignored the Deficient Follow Up Periods in the Ranitidine Literature ....................................................................................... 40

VI.      Mary Beth Terry ................................................................................... 42

A.      Dr. Terry Gave an Opinion About Long-Term Ranitidine Use That Is Not Supported By The Human Ranitidine Studies ...................................................... 42

B.      Dr. Terry Ignores Short Follow-Up Periods ......................................................... 43

C.      Dr. Terry Ignores NDMA Data............................................................................. 44

D.      Dr. Terry Ignores Confounding Factors................................................................ 44

E.      Dr. Terry's Prior Statements Regarding Case-Control Studies Are Inconsistent ...................................................................................... 45

VII.      Michael Vaezi ...................................................................................... 45

A.      Vaezi's Deposition Testimony Confirms that He Included NDMA Literature in His Report, but Entirely Ignored It in His Analysis Based on Mistaken Premises ......................................................................................... 45

| | B. | Vaezi Misstated the Positions of IARC, EPA, and NTP | 46 |
|---|---|---|---|
| | C. | Defendants Fail to Rehabilitate Vaezi's Errors in Evaluating the Ranitidine Epidemiology | 48 |
| VIII. | | Benjamin Hatten | 49 |
| | A. | Dr. Hatten's Opinion Regarding NDMA Should Be Excluded Because It is Based on an Undocumented, Ad Hoc Analysis | 49 |
| | B. | Dr. Hatten's Opinion that Therapeutic Use of Ranitidine Does Not Cause Any Designated Cancer is Unreliable and Should Be Excluded | 51 |
| IX. | | Michael Porter | 53 |
| | A. | Porter Overstates Evidence That Agrees with Him | 53 |
| | B. | Porter Understates Evidence That Disagrees with Him | 55 |
| | C. | Porter's Bradford Hill Analysis Should Be Excluded. | 55 |
| X. | | Frederick Guengerich | 56 |
| | A. | Dr. Guengerich Cannot Reliably Apply a Threshold and Logarithmic Scale to NDMA | 56 |
| | B. | Dr. Guengerich Cannot Conceal the Unreliability of his Theory of DNA Repair | 58 |
| | C. | Dr. Guengerich's Disregard of Available Epidemiology Reflects an Unsound Methodology | 59 |
| XI. | | Timothy Wang | 60 |
| | A. | Wang's Opinions Regarding the Amount of NDMA in Ranitidine Remain Incomplete and Therefore Unreliable | 60 |
| | B. | Dr. Wang's Opinions on Threshold Dose Are Indefensible | 61 |
| | C. | Wang's Opinions Concerning NDMA in Valsartan Studies are Baseless | 62 |
| | D. | Dr. Wang's Opinions on Background Formation of NDMA Remain Unsound | 63 |
| | E. | Dr. Wang's Conclusions about NDMA and Primates Are Unreliable | 64 |
| XII. | | Lewis Chodosh | 65 |
| | A. | Chodosh's Dose-Response Opinions Are Premised Upon Junk Science | 65 |

B.    Chodosh Does Not Consider All DNA Adducts For His DNA-Repair Opinion ........................................................................................ 67

XIII.  Namandjé Bumpus ........................................................................................... 68

A.    Defendants Cannot Withdraw Dr. Bumpus As an Expert and Then Ask The Court to Rely on Her Testimony As If She Would Appear at Trial ..................... 68

CONCLUSION .............................................................................................................. 69

# TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page(s)**

*Allison v. McGhan Med. Corp.*,
   184 F.3d 1300 (11th Cir. 1999) ............................................................ 41, 58, 69

*Andrade v. Merson*,
   2021 WL 7451931 (S.D. Fla. Dec. 3, 2021) ................................................ 68

*Buland v. NCL (Bahamas) Ltd.*,
   992 F.3d 1143 (11th Cir. 2021) ............................................................ *passim*

*Burst v. Shell Oil Co.*,
   2015 WL 3755953 (E.D. La. June 16, 2015) ............................................ 25, 48

*Campos v. Safety-Kleen Sys., Inc.*,
   98 F. Supp. 3d 372 (D.P.R. 2015) ............................................................ 25

*Chapman v. Procter & Gamble Distrib., LLC*,
   766 F.3d 1296 (11th Cir. 2014) ........................................................ 19, 23, 24

*Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*,
   402 F.3d 1092 (11th Cir. 2005) ............................................................ 40

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ............................................................ 40

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ................................................................ 56, 65, 68

*Exxon Shipping Co. v. Baker*,
   554 U.S. 471 (2008) ........................................................................ 57

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) .............................................................. 18, 39, 59, 61

*Guinn v. AstraZeneca Pharms. LP*,
   602 F.3d 1245 (11th Cir. 2010) ............................................................ 19

*Hanson v. Colgate-Palmolive Co.*,
   353 F. Supp. 3d 1273 (S.D. Ga. 2018) .................................................. 23

*Hardeman v. Monsanto Co.*,
   997 F.3d 941 (9th Cir. 2021) ............................................................ 18

*Hendrix ex rel. G.P. v. Evenflo Co.*,
 609 F.3d 1183 (11th Cir. 2010) ........................................................................ 19, 24

*Henricksen v. ConocoPhillips Co.*,
 605 F. Supp. 2d 1142 (E.D. Wash. 2009) .......................................................... 25, 48

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
 2021 WL 765019 (N.D. Fla. Feb. 28, 2021) ............................................................ 19

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*,
 299 F. Supp. 3d 1291 (N.D. Fla. 2018) ......................................................... *passim*

*In re Accutane Prod. Liab.*,
 511 F.Supp.2d 1288 (M.D. Fla. 2007) .................................................................... 57

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*,
 185 F. Supp. 3d 761 (D.S.C. 2016) ................................................................... 18, 27

*In re Rezulin Prod. Liab. Litig.*,
 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................... 18, 27

*In re Roundup Prod. Liab. Litig.*,
 390 F. Supp. 3d 1102 (N.D. Cal. 2018) ................................................................. 20

*In re Seroquel Prod. Liab. Litig.*,
 2009 WL 3806435 (M.D. Fla. June 23, 2009) ....................................................... 60

*In re Trasylol Prod. Liab. Litig.*,
 2010 WL 1489793 (S.D. Fla. Feb. 24, 2010) ........................................................ 12

*Jones v. Otis Elevator Co.*,
 861 F.2d 655 (11th Cir. 1988) ............................................................................... 61

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999) ............................................................................................... 60

*Lowery v. Sanofi-Aventis LLC*,
 2021 WL 872620 (N.D. Ala. Mar. 9, 2021) .......................................................... 27

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011) ................................................................................................. 13

*McClain v. Metabolife Int'l, Inc.*,
 401 F.3d 1233 (11th Cir. 2005) ...................................................................... *passim*

*McDowell v. Brown*,
 392 F.3d 1283 (11th Cir. 2004) ............................................................................. 56

*MidAmerica C2L Inc. v. Siemens Energy Inc.*,
  25 F.4th 1312 (11th Cir. 2022) ...................................................................... 36, 39, 50

*Milward v. Acuity Specialty Prod. Grp., Inc.*,
  639 F.3d 11 (1st Cir. 2011) ................................................................................ 12, 24

*Monje v. Spin Master Inc.*,
  2015 WL 11117070 (D. Ariz. May 6, 2015) ............................................................ 60

*Price v. Carnival Cruise Lines*,
  2022 WL 951318 (S.D. Fla. Mar. 30, 2022) ........................................................... 53

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
  326 F.3d 1333 (11th Cir. 2003) ............................................................................. 18

*Rhyne v. United States Steel Corp.*,
  474 F. Supp. 3d 733 (W.D.N.C. 2020) ............................................................... 25, 48

*Rink v. Cheminova, Inc.*,
  400 F.3d 1286 (11th Cir. 2005) .......................................................................... 37, 45

*Schultz v. Akzo Nobel Paints, LLC*,
  721 F.3d 426 (7th Cir. 2013) ............................................................................. 18, 21

*Theofanis v. Boston Sci. Corp.*,
  2005 WL 731080 (S.D. Ind. Mar. 16, 2005) ............................................................ 14

*Thompson v. DePuy Orthopaedics, Inc.*,
  2015 WL 7888387 (S.D. Ohio Dec. 4, 2015) ........................................................... 14

*Tillman v. C. R. Bard, Inc.*,
  96 F. Supp. 3d 1307 (M.D. Fla. 2015) .................................................................... 14

*United States v. Pon*,
  963 F.3d 1207 (11th Cir. 2020) .............................................................................. 51

*Wagoner v. Exxon Mobil Corp.*,
  813 F. Supp. 2d 771 (E.D. La. 2011) ..................................................................... 24

*Waite v. AII Acquisition Corp.*,
  194 F. Supp. 3d 1298 (S.D. Fla. 2016) ............................................................... 56, 57

*Wells v. Ortho Pharm. Corp.*,
  788 F.2d 741 (11th Cir. 1986) ............................................................................... 13

*Williams v. Mosaic Fertilizer*,
  889 F.3d 1239 (2018) ........................................................................................... 20

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................... 69

Fed. R. Evid. 403 ........................................................................................................... 64

## INTRODUCTION

Two judges have examined NDMA science and determined suits can proceed: Judge Smith in Illinois state court applying the *Frye* standard in a Zantac case, and Judge Kugler in the *Valsartan* MDL applying *Daubert*.[2] In fact, Judge Kugler *excluded* a number of defense witnesses, including the unsupportable opinion that NDMA does not cause cancer. Many of Defendants' experts in this case seek to present that same patently unreliable opinion.

Seeking to turn the tide, Defendants' new strategy on both offense and defense is to redefine the general causation question and then declare victory on their new definition. But when this Court asks the proper questions, it becomes clear that Defendants' experts failed to answer them with reliable methodologies.

The proper question on general causation is whether the NDMA in ranitidine could cause cancer to the plaintiff with the strongest possible case. That inquiry follows from sound precedent and basic logic. But Defendants spend no time on that question. Instead, they focus on identifying the *lowest* amount of NDMA in ranitidine that could cause cancer, an issue that is not relevant to general causation. Defendants' experts similarly spent no time on that question, baselessly assuming that the Plaintiffs in this litigation matched the study population for their preferred ranitidine epidemiology studies. As a result, expert after expert opines that ranitidine *cannot* cause cancer based solely on studies with ranitidine exposure of three years or less, and follow-up periods that the study authors themselves recognize are too short to evaluate long-term risk.

The proper object of the general causation inquiry is the *NDMA* in ranitidine. That is what courts did with calcium-zinc in Fixodent, asbestos in talc, and benzene in an array of different products. But Defendants run fast from NDMA science. Instead, they redirect this Court to ranitidine epidemiology *alone*, with no better argument than two out-of-circuit cases about benzene in gasoline. Those cases are no help. They expressly held that *both* benzene and gasoline epidemiology were relevant, and excluded plaintiffs' expert *for failing to consider* gasoline studies—what Defendants did, in reverse. But, more to the point, benzene literature did not carry over well in those cases because, for documented chemical reasons, benzene in gasoline acts differently (or so it was argued). Defendants have never suggested that NDMA is any different in ranitidine from food or any other source. Their own cases condemn their method.

---

[2] *See* Ex. 76 (Valsartan *Daubert* Tr.); Ex. 77 (Valsartan *Daubert* Order); Ex. 78 (*Bayer Frye* Order).

Even considering just the ranitidine epidemiology, Defendants' experts' opinions are unreliable because they feel no need to apply their opinions to the strongest possible case. For example, Dr. Witte (and all Defendants' experts) relies on the Yoon study to conclude that ranitidine cannot cause cancer, but the Yoon authors stated that the follow-up period was "not long enough to assess the onset of cancer." Dr. Witte flatly disagreed in his deposition, but Defendants now find a deeper "unison": "just as Dr. Witte stated, Yoon (2021) was able to assess *some* (i.e., short-term) cancer risk." Opp'n at 42. The problem is that none of the experts cabined their opinions to "short-term cancer risk"—they opined against general causation, which is meant to be about the *strongest* case, which surely means long-term risk. Many of the studies—predominantly those that found no association—are *shorter* than Yoon.

At this point, Defendants' plan is clear. First, limit the inquiry to ranitidine studies. Second, look at short-term studies with low exposure to guarantee null findings. Third, opine—based on the short-term studies—that ranitidine *cannot* cause cancer *long term*. That method is unreliable, and any opinions rooted in it should be excluded.

## I.     Defendants Cannot Escape the Consensus that NDMA Can Cause Cancer.

An overwhelming body of evidence demonstrates that the NDMA in ranitidine can cause the five designated cancers in this MDL. A wealth of peer-reviewed human *epidemiological* dietary and occupational exposure studies of NDMA have been published over the past twenty years that demonstrate a significantly increased risk of the five designated cancers with exposure to NDMA through diet and inhalation. These studies are consistent with the animal and mechanistic evidence on NDMA's carcinogenicity that has been recognized for over fifty years.

To evade the NDMA science, Defendants wrongly state that no regulatory or scientific authority has considered the NDMA epidemiological studies when evaluating the risk of cancer from ranitidine. This is patently false. The EMA conducted a review of nitrosamine impurities in medicinal products, including ranitidine, in June 2020.[3] The EMA review included an evaluation of the root cause of NDMA in ranitidine (and other medicines) as well as the safety and/or risk of exposure to NDMA from ranitidine. As part of the review of the epidemiological evidence, the EMA evaluated the NDMA dietary studies and the Hidajat occupational exposure study as well as

_____

[3] European Medicines Agency, Assessment Report, *Nitrosamine Impurities in Human Medicinal Products*, (June 25, 2020), https://www.ema.europa.eu/en/documents/referral/nitrosamines-emea-h-a53-1490-assessment-report_en.pdf.

the epidemiological studies related to the risk of cancer from valsartan medicines contaminated with NDMA. *Id.* at 43-47.

Defendants astutely point out that in 2002, the "WHO published a report on NDMA that examined the exact kinds of dietary epidemiological studies on which Plaintiffs' experts rely to support their causation opinions." Opp'n at 22. The 2002 WHO report is a perfect example of how the epidemiological evidence has evolved over time to provide consistent evidence which confirms the carcinogenicity findings in animal, mechanistic and in vitro studies:

> Information relevant to assessment of the carcinogenicity of NDMA has been derived from epidemiological (case-control) studies of the general population, carcinogenesis bioassays involving laboratory animals, and supporting data related to the genotoxicity, metabolism, and interaction of this compound with biological macromolecules.
> *… the data fulfill, at least in part, some of the traditional criteria for causality of an association between ingestion of NDMA and cancer.…*
> Therefore, owing to the considerable evidence of carcinogenicity of NDMA in laboratory species, evidence of direct interaction with DNA consistent with tumour formation, and the apparent lack of qualitative species-specific differences in the metabolism of this substance, NDMA is highly likely to be carcinogenic to humans.[4]

Defendants themselves reviewed the NDMA epidemiological studies when conducting a review of the literature and evaluating the risk from NDMA in ranitidine. For example, GSK's Hazard Assessment reviewed the same exact NDMA epidemiological evidence that Plaintiffs experts reviewed and reached the same conclusion – NDMA can cause cancer and exposure should be avoided to the extent possible. Ex. 60 (GSK Hazard Assessment Report, GSKZAN0003419540), at 545-46. And, of course, it is undisputed that ranitidine has been removed from the global market because it contains NDMA—based on NDMA science.

In ignoring the NDMA science, Defendants stand alone, so they pivot to claiming scientific authorities reviewed the literature and found it unconvincing: "despite decades of research, IARC has never concluded that there is sufficient evidence to upgrade NDMA from 'probably' carcinogenic in humans to a 'known' human carcinogen." Opp'n at 22. The flaw here is that IARC has not convened a working group or undertaken a review of the classification of NDMA since

---

[4] Liteplo RG, Meek ME, Windle W., World Health Organization, *Concise International Chemical Assessment Document 38: N-Nitrosodimethylamine*, at 22-23 (2002) https://apps.who.int/iris/bitstream/handle/10665/42422/a73568.pdf.

1987. *In 1987*, there *was* limited evidence in humans and the IARC classification was based primarily on animal and mechanistic evidence. Since the early 2000s, there have been dozens of peer-reviewed studies demonstrating an increased risk of cancer with exposure to NDMA.Examples of these include dietary studies such as Ronco, *et al.*, (2014) which demonstrated a 2.16 OR (1.46-3.21) for bladder cancer with NDMA consumption, Zheng, *et al.*, (2018) which demonstrated a 1.93 OR (1.42-2.61) for pancreatic cancer with NDMA exposure from plant sources; Keszei, *et al.* (2012) which demonstrated an association of esophageal cancer with dietary intake of NDMA HR 1.15 (1.05-1.25); Zheng, *et al.* (2021) which demonstrated an increased risk of liver cancer with ingestion of NDMA from plant sources OR 1.54 (1.01-2.34); and a meta-analysis conducted by Song, *et al.*, (2015) which demonstrated an increased risk of stomach cancer of 1.34 (1.02-1.76) with dietary intake of NDMA.And, of course, Hidajat (2019) demonstrated an increased risk of mortality from bladder, pancreatic, liver, stomach and esophageal cancers with occupational exposure to NDMA. Many of these studies also demonstrated evidence of dose response. *None of these studies were available when IARC classified NDMA in 1987.*

Dr. Errol Zeiger, plaintiffs' expert, who is a member of the FDA working group on Potential Human Health Effects of Nitrosamines Present as Contaminants in Drugs, Brown Ex. 25 (Zeiger Rep.) at 4, has opined that "[T]he carcinogenicity and mutagenicity of N-Nitrosodimethylamine (NDMA) has been well-established among the scientific and regulatory communities in the US and internationally for more than 50 years. NDMA is generally accepted by the scientific and regulatory communities in the US and internationally as genotoxic and carcinogenic." *Id.* at 1. Dr. Zeiger is well-suited to offer this opinion as he has been an invited expert to multiple IARC working groups to evaluate the carcinogenicity of agents including the IARC Working Group on the evaluation of carcinogenic risk of chemicals to humans in Lyon, France, which evaluated the carcinogenicity of NDMA in 1987. *Id.* at 3. Defendants did not even move to exclude Dr. Zeiger's opinions—they stand unchallenged and unrebutted.

Similarly, Dr. Ronald Melnick, a senior toxicologist in the National Toxicology Program ("NTP") for over 28 years, and an invited member of IARC working groups who has prepared cancer risk evaluations on nearly 100 agents for IARC, Brown Ex. 11 (Melnick Rep.) at 5-6, opined that "the studies and data relating to NDMA carcinogenicity have continued to develop since the IARC classification was made in 1987," *id.* at 12, and "multiple human studies published after the

IARC, NTP, and EPA evaluations of NDMA have found significant positive associations between NDMA intake and increased cancer risk," *id.* at 16, and "NDMA meets the criteria for a Group 1 carcinogen under IARC's classification system… based on my expertise and experience as part of IARC's working group where I was routinely tasked with evaluating the data to determine a carcinogen's potential classification under IARC's standards." *Id.* at 17.

NDMA is a genotoxic carcinogen. Every regulatory and scientific authority agrees on this point. Defendants also agree on this point—behind closed doors and outside of the context of litigation. *See* D.E. 5841 (the Motion) § I.A-C. Common sense suggests that if ranitidine contains NDMA (which it undisputedly does) and NDMA causes cancer, then ranitidine-containing NDMA can also cause cancer. Perhaps Defendants could refute this inference if they proposed some mechanism by which NDMA in ranitidine is less harmful—but no Defendant and no expert has ever suggested that. NDMA in ranitidine is no different than NDMA in cigarette smoke or NDMA in certain types of foods or water or vulcanizing vapors in the rubber industry. NDMA is NDMA, and it causes cancer. Defendants cannot escape the fact that the drug is not available anywhere in the world *because* it contains NDMA.

## II.    The Weight of the Evidence Supports Causation.

Defendants incorrectly contend that Plaintiffs "brush[] aside," Opp'n at 2, the ranitidine specific studies, and later insist that "if" the ranitidine studies were "uninformative," Plaintiffs could not carry their burden, Opp'n at 4. Both contentions are false. Plaintiffs need not rely exclusively on ranitidine-specific epidemiology, and Plaintiffs' experts in fact relied extensively on *both* ranitidine epidemiology, *and* extensive NDMA epidemiology (along with other evidence from animals). Defendants' strategy is to insist that the ranitidine evidence is definitive as a way of overcoming the NDMA evidence. If, as Plaintiffs argue, the ranitidine epidemiology is strongly biased toward underestimating the risks, then Defendants' strategy fails. If the limitations are so patent that the argument amounts to an unreliable methodology, then Defendants' experts should be excluded. Only Defendants' experts consider less than all the evidence, gerrymandering the studies in a manner at odds with how IARC, the WCRF, and their ilk, approach causation.[5]

---

[5] Just this year, the Agency for Toxic Substances and Disease Registry (ATSDR) published Toxicological Profile for N-Nitrosodimethylamine (NDMA), Draft for Public Comment, (Jan. 2022) https://www.atsdr.cdc.gov/ToxProfiles/tp141.pdf. In that document, under "U.S. Exposures" the Agency says "some people may have had exposures to NDMA through the use of

## A.      Experts Should Give Studies the Weight They Are Due Based on Their Design and Sound Epidemiological Principles

Some of the data produced in the ranitidine specific studies is of good quality. Some is not. Many of the studies Defendants call the "best data," is inapposite, having no information on the amount of ranitidine the subjects were exposed to, let alone NDMA. Many had exposure periods that were too short (one prescription; two prescriptions; one month; one week), very short follow-up periods, or that examined groups of subjects too young to have developed any cancers. Many of the studies could not account for over-the-counter use, crossover use, or a series of substantial confounders, like smoking and drinking alcohol. Two of them (Kim S. and Iwagami) lumped ranitidine together with nizatidine, making any meaningful inference impossible. Yet, the Defendants would not only have this Court deem this the "best evidence" but definitive.

No one outside this litigation believes that. The researchers (Adami, *et al*) Defendants cite as "reject[ing] the approach Plaintiffs advanced here," Opp'n at 4, in favor of ranitidine-studies-only, are, no surprise, consultants for Defendants in this litigation.[6] Without that quotation, Defendants' claim amounts to the fallacy that just because researchers study ranitidine, those researchers would reject other lines of evidence in evaluating causation. They would not.

Defendants' arguments are a surface treatment, which tries to hide the weakness underneath. Defendants want to describe "best evidence" categorically (ranitidine specific active comparator) without considering the limitations of each study. An active comparator study can be good or bad, depending on the data and how it is analyzed. Proper scientific method evaluates the specifics. That is what Plaintiffs' experts did in reaching their opinions in this case.

Sometimes, study limitations cause the results to be uninformative. For *Daubert* purposes, the important aspect is that an expert carefully review each study and explain the reasons for

---

contaminated medications." *Id*. at 1, 114.  The Report has a specific section on "Pharmaceuticals" which discusses ranitidine and the amount of NDMA the FDA found in samples. *Id.* at 112-113. The Report includes detailed discussion of many of the dietary and occupational studies reviewed by Plaintiffs' experts. Notably, this report also concludes that dietary studies *understate* the risk, just as Plaintiffs' experts stated (but contrary to Defendants' experts): "In the dietary intake studies, exposure to NDMA was assessed using concentrations of NDMA in various foodstuffs combined with food frequency questionnaires administered on a single or a few occasions. As a result, the potential for random misclassification of exposure, **which would bias the findings toward the null** (no association), is high." *Id.* at 2 (emphasis added).
[6] Adami and Chang are Sanofi consultants, and Chang works at the largest defense litigation expert service in the world.

assigning weight or importance to results. And the Court should note that several of the ranitidine specific studies provide positive evidence that exposure to ranitidine causes cancer, as the Forest Plots make clear. These positive results help Plaintiffs carry the burden of proof. Defendants seem to argue that Plaintiffs experts have rejected all the ranitidine specific epidemiology. They clearly have not. For example, Dr. Moorman concludes with respect to bladder cancer: "The findings of increased risk for bladder cancer among ranitidine users, despite these limitations, across multiple studies whether compared to non-users [109, 110, 113] or to users of other acid-suppressing drugs [36, 54, 109] provide strong evidence that ranitidine exposure can cause bladder cancer."[7] All of the referenced studies are ranitidine specific studies.

### B.     The Studies Defendants Rely Upon Are Quite Limited

In reviewing the studies, Plaintiffs' experts have detailed their reasons for applying more or less weight to each study, all of which are scientifically sound and rigorous. Plaintiffs' experts examined strengths, limitations, and results, study by study . This represents the accepted scientific method. Contrast this with Defendants' experts. For example, Defendants cite the Iwagami study to show that "more use of ranitidine" did not "demonstrate an increased risk of cancer." Opp'n at 6. These generalizations, without further explanation, are not representative of a scientific method. Rather, a reliable scientific method includes an evaluation of the studies' strengths and weaknesses, including referencing outside validation where necessary. Dr. McTiernan, for example, discussed the Iwagami study in 2,000 words, over five and one half pages, non-inclusive of the Iwagami information she provided in tables. The weaknesses were numerous. It lumped nizatidine and ranitidine together (ranitidine was less than half). The mean age of the study participants was 41 years, and no one was over age 75. The follow up period was 2.4 years, a particular problem for such a young study population. The exposure was from 1 to 730 days,[8] with 113,745 in the (0-180) day range, and less than 4,500 *total* in every other range (181-365, 366-730, 730+). Within the 4,500, there were fewer than 100 cancer diagnoses. Iwagami's sub-analysis comparing ever-smaller subsets of the 4,500 against each other (181-365 versus 366-730) was trying to measure a tiny risk (the one-year dose difference), with a tiny, young, study population fewer than half of which took *any* ranitidine, while chopping off the majority of cases (most of

---

[7] All the referenced studies are ranitidine specific studies.
[8] Technically defined daily dose, so someone who took a standard ranitidine dose of 300 mg once per week for one year would count as "52."

which would occur *more than 2.4 years later*). That the study did not find "dose-response" with that set up was a *fait accompli*, and provides no support for Defendants' no-dose-response claim.

As the Iwagami authors noted, one "explanation of the lack of association in the current study may be that few people were exposed to a high enough level of NDMA to increase the risk of cancer." Exactly. What did Defendants' experts say about this dose-response analysis? Just that Iwagami "considered the potential dose-response between ranitidine use and all cancer and did not observe a positive trend with increasing dose (Table 2.3). If ranitidine had a true association with cancer, *one would expect increasing dose to have larger relative risks*, which was not seen here." Ex. 22 (Witte Rep.) at 13 (emphasis added). In other words, Defendants' experts said *nothing* about the obvious reasons one would *not* expect to see dose-response in this sub-analysis even if a dose-response existed in reality. Such an approach is unreliable, and, indeed, unserious.

Insufficient follow-up is a major limitation of the ranitidine studies. Defendants again reference Iwagami (!) and Kantor to make generalized claims about follow-up times. Iwagami is addressed above, and the Kantor authors are similar: "Exposure was self-reported and *we were unable to examine associations by dose or distinguish long- vs short-term use.* Variables were captured at 1 timepoint; secular changes in exposure could lead to measurement error, attenuating results, and changes in covariates could lead to residual confounding. *We did not capture long-term outcomes*; some data suggest *longer latency between NDMA exposure and cancer*." Kantor 2021 at 7 (emphasis added). Again, exactly the points raised by Plaintiffs' experts. Adami and Norgaard were still not as long as IARC suggests is the minimum, but in any case measured such small exposures that even a long follow-up would not be expected to find much.

Defendants then go farther out on a limb by contending Plaintiffs' experts opine that cancer should be observable in as little as six months or that cancer could arise from exposure to one pill. This contention conflates what is scientifically *possible* with what is sufficiently likely to constitute a legal cause, as is discussed in section III.B. That genotoxins have no safe dose is well recognized[9]

---

[9] Dr. Errol Zeiger, who spoke at FDA's conference on NDMA in medications, explained; "Another presumption is that there is no lower limit of toxicity because, in theory, a single molecule of a mutagen is sufficient to induce a mutation, and that the ensuing mutation, if in a critical gene (i.e., a gene whose activity or inactivity can lead to the development of a cancer) can eventually lead to a cancer. Based on these presumptions, risk assessment of genotoxic substances for germ cell mutation or cancer is considered linear from zero dose. That is, there is no dose without an effect [NRC, 2009]." Brown Ex. 25 (Zeiger Rep.). Defendants did not challenge this opinion.

but has nothing to do with setting an appropriate follow-up period to detect cancer (indeed, IARC states *both* that genotoxins have no safe dose *and* that follow-up should be 30 years).

Another important flaw in many ranitidine studies is OTC misclassification. Reprising an argument they have made repeatedly, Defendants argue that "all other H2RA medications were similarly affected by the availability of OTC use. Therefore, any theoretical bias from OTC use would not be expected to affect the results of the active comparator studies." Opp'n at 8. But consider a study including a user who took OTC Zantac for 10 years, then an H2RA via prescription for 6 months, and developed cancer. He would be misclassified as an H2RA cancer (driving down the ranitidine relative risk). Adding in undetected OTC H2RA use in the ranitidine branch of the study would do nothing counterbalance this error, since it would *not cause any extra cancer* on the ranitidine side of the study.

### C.    Dietary and Occupational Studies Help Inform the Jury How Exposure to NDMA Increases the Risk of Certain Cancers

In a continued push to exclude all reference to dietary and occupational studies, Defendants cite far afield cases about benzene and gasoline, which are addressed below. For now, it suffices to say that Defendants' argument, though in its background section, is purely legal, not factual, since numerous regulators have considered NDMA science.

Defendants next specifically criticize the dietary and occupational studies, which show NDMA causes cancer with dose-response. While all studies have strengths and weaknesses, dietary studies have less inherent limitations than the ranitidine specific studies relied on by the defense. They should be subjected to rigorous analysis for strengths and weaknesses, similar to the ranitidine-specific studies, just as plaintiffs' experts did. As Dr. McTiernan testified:

> A. What I did is very similar to what we did in IARC. We looked at totality of evidence. We looked at studies in humans. And there was a systematic review done by the working group itself, a systematic review to collect all of the human data that was available as of the time that the committee met. The different working groups then collected studies that were relevant to their own focus, whether it was the animal studies or mechanism studies in humans, and then we evaluated these studies and put them together. We did not grade the individual studies, but we looked at the overall evidence.

Brown Ex. 32 (McTiernan Dep. Tr.) at 680.

The occupational studies, principally the Hidajat study, show that exposure to NDMA can cause specific cancer in humans and dose-response. Hidajat 2019 has exposure estimates, large

numbers, and decades of follow-up through death for 94% of the over 36,000 participants.

**D.  Available Epidemiological Literature Supports a Causal Connection Between Ranitidine and Cancer**

Defendants next challenge Plaintiffs' series of forest plots that appeared in D.E. 5841 at 43-60. Defendants claim that Plaintiffs "mischaracterize" and "cherry pick" the data, disregard basic epidemiological principles by "jettisoning the foundational principle of statistical significance," and assume that every risk estimate above 1.0 shows an increased risk. Opp'n at 14. None of these arguments are valid. Plaintiffs stand by the forest plots, which accurately depict the epidemiological data. Of course, the forest plots only illustrate results, and do not address strengths or limitations or the weight to be given to any of the studies. Plaintiffs' experts address the strengths and limitations of each study in detail in their reports, and the briefing separately addresses those issues. *See, e.g.*, D.E. 5915, at 24-29; D.E. 5841 at 25-56; Ex. 10 (McTiernan Rep.) at 99-147; 167-285; Ex. 12 (Moorman Rep.) at 62-84; 87-98; 99-106; 117-130; 141-157; 170-185; 198-217. The forest plots served a different purpose, namely to summarize the data for the Court.

*1.  Defendants Undermine their Daubert Challenge to Drs. Moorman and McTiernan*

Defendants support their argument, in part, by citing Drs. McTiernan and Moorman, who are critical of some of the studies included in the forest plots. This reaffirms how scrupulous their analysis was, and shatters the Defendants principal *Daubert* challenge to these two expert witnesses. Defendants provide several examples where Drs. Moorman and McTiernan identify important limitations in studies even where those studies reported increased cancer risks. For example, that the McGwin study was of "limited utility" with "many weaknesses" and did not provide "incidence rates and relative risks"; that the Habel study was "uninformative," due to combining multiple cancers; that the Braunstein/Memorial Slone Kettering Hospital (MSK) study "does not provide useful data for the assessment of ranitidine as a potential etiologic factor for bladder cancer"; and that the Liu study result could perhaps be explained by reverse causation. *See* Opp'n at 15, nn. 41-44, 16 nn. 48 & 51, 17 nn. 56 & 59. This exposes the false defense narrative that Drs. McTiernan and Moorman selectively interpreted the evidence to support their causation opinions. They applied a consistent methodology that targeted positive and negative studies alike.

*2.  The Forest Plots Are Fair Summaries of the Data*

Plaintiffs explained that the forest plots presented the results of the main findings of all

ranitidine studies and human epidemiologic studies that quantified NDMA and provided cancer risk results based on NDMA levels. *See* D.E. 5841, at 43-44. Plaintiffs included *every* study in the forest plot, regardless of what weight experts gave. The forest plots therefore also included studies from Y. Kim, Yoon, Adami, and Iwagami (studies that Drs. Moorman and McTiernan were highly critical of), even though they had no long-term use results (as Defendants now agree), missing data pertinent to confounding, abbreviated follow-up periods, utilized electronic claims data that was not designed to study cancer risk, did not account for the extensive OTC use, and had no or inadequate dose information and dose response results.

As Plaintiffs stated, "[b]ecause there are multiple findings reported in studies, the forest plots focused on the main analyses of each selected study." D.E. 5841 at 44. This is not cherry-picking; it is deferring to the study authors. Defendants insist on *excluding* studies they dislike, and *including* multiple sub-analyses from studies they prefer, which would populate the forest plots with under-powered results. *See* D.E. 5831, at 33; D.E. 5915 at 66, 70, 90, 93-94, n. 252.

Defendants prefer H2RA active comparator sub-analyses, but even if this were better epidemiology—it is not for these studies, as Plaintiffs' experts explained—the Eleventh Circuit allows general causation to be demonstrated using "background risk," by which it means use versus non-use studies just like these:

> [Background risk] is the risk a plaintiff and other members of the general public have of suffering the disease or injury that plaintiff alleges without exposure to the drug or chemical in question. The background risks include **all those causes of a disease**, whether known or unknown, **excluding the drug or chemical in question**. So, the background risk for heart attack is very high because heart disease is the leading cause of morbidity and mortality in America. …. Thus, in evaluating the reliability of the experts' opinions on general causation, it would help to know how much additional risk for heart attack or ischemic stroke Metabolife consumers have over the risks the general population faces. If ephedrine or an ephedrine/caffeine combination do not increase the incidence of heart attack and ischemic stroke in persons who ingest it, as opposed to all those who do not and still have heart attacks and strokes, that fact would reduce the likelihood that Metabolife harmed Plaintiffs. Likewise, if Plaintiffs could show that taking Metabolife increases the risk of heart attack and ischemic stroke beyond the usual incidence of these common diseases, that would support their methodology in this case.

*McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243-44 (11th Cir. 2005) (emphasis added).

Because the use versus non-use analyses demonstrate increases from the "background risk," they are a means of showing general causation.

The forest plots include results regardless of statistical significance, instead providing a confidence interval. The visual confidence interval demonstrates truthfully that the risk could be lower—or higher—than the midpoint, a truth that omitting non-statistically significant results obscures. For example, the bladder cancer result from the Yoon study shown at page 45, is not "statistically significant" because the confidence interval (the horizontal line) includes 1.0. But a visual inspection makes it clear that because almost all of the horizontal line lies to the right of 1.0. In contrast, the result for Cardwell for the "other H2RA" result has only about half of the confidence interval line to the right of 1.0. Defendants' position would draw a false equivalence between them as "not statistically significant," even though each result is different.

In short, the forest plots are fair, inclusive, and helpful. Inclusion of a study result in a forest plot is not an endorsement of a study.

### 3.    *Defendants Misconceive Statistical Significance*

Defendants' wooden approach to statistical significance is unscientific and unjustifiable. Defense expert Dr. Terry included results that were not statistically significant in forest plots in her report. *See* Ex. 19 (Terry Rep.) at 62, 67. Defense expert Dr. Chan testified that it would be inappropriate to disregard a study result just because the result was not statistically significant. Ex. 25 (Chan Dep. Tr.) at 240:13-241:17; 98:1-3. Defendants' position also is inconsistent with the American Statistical Association, *see* D.E. 5915 at 72, n. 206, and with the authoritative textbook *Modern Epidemiology,* which strongly warns that disregarding results due to a lack of statistical significance "is never justified." *See* D.E. 5915 at 71, n. 203.

The *Reference Manual* teaches (at 567) that if the relative risk exceeds 1.0, "There is a positive association between exposure and disease which could be causal."[10] Courts around the country have rejected Defendants' approach. *See In re Trasylol Prod. Liab. Litig.*, No. 08-MD-01928, 2010 WL 1489793, at *7 (S.D. Fla. Feb. 24, 2010) (holding that an "opinion should not be excluded simply because it is based on data that is not statistically significant"); *Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 24 (1st Cir. 2011) ("The court erred in treating the lack of

---

[10] National Research Council, *Reference Manual on Scientific Evidence: Third Edition*. Washington, DC: The National Academies Press (2011), https://doi.org/10.17226/13163 ("*Reference Manual*").

statistical significance as a crucial flaw."); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40-41 (2011) ("courts frequently permit expert testimony on causation based on evidence other than statistical significance"); *Wells v. Ortho Pharm. Corp.*, 788 F.2d 741, 745 (11th Cir. 1986) ("Plaintiffs' burden of proving [the injuries] were caused by the Product did not necessarily require them to produce scientific studies showing a statistically significant association").

### 4.    *Defendants' Criticism Would Cherry-Pick Results*

Defendants argue that Plaintiffs "cherry picked" which results to include in the forest plots. Not true. The ranitidine epidemiological studies alone had over 200 analyses. For example, the Cardwell study presented over 15 results in Tables 2 and 3, but the authors included only two results in the study abstract on page 1, stating "There was evidence of an increased risk of bladder cancer in ranitidine users, compared with nonusers (fully adjusted OR =1.22;95% CI 1.06–1.40), which was more marked with use for over 3 years of ranitidine (fully adjusted OR = 1.43; 95% CI 1.05–1.94)." Plaintiffs' forest plot included the 1.22 OR result, because it was the main study finding, but did not include the even more favorable 1.43 OR, based on higher dose, because that was based on a sub-analysis. Consistently listing the main finding is the opposite of cherry picking.

**MSK Study**: Defendants attack the MSK study because it was "co-authored by Valisure"[11] and "four scientific publications declined to publish the results." Opp'n at 15-16. But Defendants would like to see *more* results from the Norgaard and Adami studies, even though Norgaard was rejected for publication 3 times, D.E. 5841 at 30, and the Adami study was conducted by their own paid consultants. Dr. Braunstein testified, "While you can't generate definitive conclusions, you can generate an estimate, a better understanding of risk" and the preprint was published online only to "provide associations to inform other investigators." Brown Ex. 101 (Braunstein Dep. Tr.) at 68:1-5. Cross sectional studies, like the MSK study, are recognized as valuable tools.[12]

**De Stefani (2001)**: Contrary to Defendants' argument that the De Stefani result is not a "fully adjusted risk ratio[]," OR 1 is "adjusted for age, gender, residence, urban/rural status,

---

[11] The MSK paper was a combined laboratory and epidemiology paper. Representatives of Valisure were co-authors concentrating on the laboratory parts, while Braunstein and Kantor concentrated on their specialty, epidemiology.

[12] *See Modern Epidemiology* at 289-92 ("Despite these limitations, there are circumstances when associations from cross-sectional study designs reliably estimate causal effects. First, the difference in prevalence between two exposure groups can be viewed as a causal effect itself. Prevalence is a widely reported epidemiologic measure, and a cross-sectional study is a natural design to estimate and compare prevalences at a specified point in time.").

tobacco smoking, alcohol drinking, and mate drinking." Defendants apparently also wanted adjustment for total energy intake, but do not explain why that would conceivably be confounding for cancer. OR 2, which Defendants wanted, is 1.5 rather than 2.2—it still shows increased risk.

**Liu (2020)**: Defendants' own expert Dr. Terry included the exact same result in a forest plot. *See* Ex. 19 (Terry Rep.) at 67. The study authors *did not* "explicitly ascribed [the result] to confounding and bias," Opp'n at 17, but instead explained that their study "avoid[ed] bias from reverse causation" and "avoid[ed] recall bias." Dr. McTiernan's statement is out of context—she actually concluded that "[t]he risks for stomach cancer in ranitidine users vs. non-users was increased by 42% (RR 1.42, 95% CI 1.1-1.85)," which matches the forest plot. Last, the reported result was not "crude" or "unadjusted," but came from a "fully-adjusted" column in Table 3.

**Habel (2000)**: The Habel authors did not "explicitly attribute" the elevated risk for esophageal/stomach cancer to reverse causation, Opp'n at 17, but said it "might reflect" reverse causation. The authors also note at page 153 that the increased risk they found are understated. Defendants again err in claiming the Habel studies are unadjusted, Opp'n at 17. Table 1 states that the relative risks were *adjusted*.

**McGwin (2020)**: The McGwin study was based on data from the FDA's FAERS adverse event database. It was peer-reviewed and published. The conclusion was: "The results of the current study provided direct support for the assertion that NDMA contaminated ranitidine is associated with the occurrence of gastrointestinal cancer. This assertion was bolstered by an abundance of evidence demonstrating that NDMA exposure is associated with an increased risk of cancer in humans as well as animals."[13] Courts have permitted expert opinions based on FDA adverse event data analyses. *E.g.*, *Tillman v. C. R. Bard, Inc.* 96 F. Supp. 3d 1307, 1332 (M.D. Fla. 2015).[14] Defendants point out that Drs. Moorman and McTiernan found the study of "limited utility." That is why they gave little weight to those studies in their causation assessments, but is not a reason to leave it off—the forest plots include other studies they gave little weight to. Of

---

[13] McGwin, G. *The Association between Ranitidine Use and Gastrointestinal Cancers*, 13 CANCERS (BASEL) 24 (2020), https://doi.org/10.3390/cancers13010024.

[14] *Accord*, *Theofanis v. Boston Sci. Corp.*, No. IP-01-752-C-Y/K, 2005 WL 731080, at *3 (S.D. Ind. Mar. 16, 2005) (rejecting challenge to the expert's reliance on FDA adverse event data); *Thompson v. DePuy Orthopaedics, Inc.,* No. 1:13-CV-00602, 2015 WL 7888387, at *5–7 (S.D. Ohio Dec. 4, 2015) (rejecting *Daubert* challenge to expert who reviewed FDA adverse event data regarding bone cement as part of his product defect analysis).

course, adverse event data is a secondary methodology, and insufficient by itself under *McClain*, but it can supplement other methodologies.

**Adami (corrected March 2022)**: Defendants also criticize the Adami study's elevated risk result for esophageal adenocarcinoma, claiming the authors "attributed" the result to chance, but Adami merely said that "chance *might* explain the modest excess risk of esophageal adenocarcinoma." Adami at 2306 (emphasis added). The forest plot used the main finding result for esophageal adenocarcinoma reported by the study, not the sub-analysis result that Defendants suggest (which the authors acknowledge have "small numbers" *id.* at 2305).

**Norgaard (2021)**: Defendants accuse Plaintiffs of cherry picking by omitting the decreased risk result in the Norgaard study for kidney cancer, Opp'n at 19, but it was hardly cherry picking to include no kidney cancer results from any study. Defendants also criticize Plaintiffs for cherry-picking results for bladder cancer by excluding results from the Norgaard study that "were not statistically significant and were below 1." Opp'n at 19. Those results were all from subgroup analyses and sensitivity analyses. The results in Plaintiffs' forest plots were all from main analyses.

    *5.*    *NDMA Science Supports Causation*

Studies evaluating the human risk of cancers from NDMA, the genotoxin that is the basis of the ranitidine recall, are directly relevant to the general causation inquiry. Plaintiffs' experts assessed pertinent NDMA epidemiological studies, carefully considering the strengths and weakness of the study designs. The NDMA dietary and occupational epidemiological studies provide supportive evidence of increased risk of cancer (both statistically significant and other positive study results) and powerful evidence of dose-response that Plaintiffs' experts have relied on to reach their conclusions that each of the designated cancers is to a reasonable degree of medical and scientific certainty caused by ranitidine exposure. There are multiple positive and/or statistically significant studies and evidence of dose response for bladder cancer,[15] esophageal

---

[15] D.E. 5915 at 12-15; *see* Ex. 12 (Moorman Rep.) at 87-116 & Table 5; Ex. 10 (McTiernan Rep.) at 183-206.

cancer,[16] gastric cancer,[17] liver cancer,[18] and pancreatic cancer.[19]

Significantly, the NDMA epidemiological studies are consistent across different large populations, in different countries, using different databases, and conducted by different investigators and different study designs. The studies have been peer-reviewed, are generally accepted and utilized routinely by authoritative bodies (like NTP in the 2021 National Toxicology Program 15th Report on Carcinogens, which reported the findings from dietary NDMA studies)[20], and many are statistically significant. Dietary studies are particularly relevant here based on FDA's summary of its laboratory analysis of ranitidine products in which it concluded that the amount of NDMA in ranitidine is similar to the amount in smoked or grilled meats.[21]

Findings from the dietary exposure studies are consistent with the findings of animal carcinogenicity and genotoxicity for NDMA, and with the occupational exposure studies. Hidajat, et al. (2019)[22], for example, evaluated NDMA exposure in UK rubber workers in a large cohort of 36,441 followed over 49 years and found consistent dose response with NDMA exposure and bladder, esophageal, liver, pancreatic and stomach cancer.  As detailed by Plaintiffs' epidemiology experts, the dietary and occupational studies are one part of the complete corpus of reliable evidence Plaintiffs' experts have reviewed and evaluated, and Defendants' experts have all but ignored, which collectively proves that exposure to the NDMA in ranitidine causes bladder, esophageal, stomach, liver, and pancreatic cancer.

6.     *Animal In-Vivo Studies and In-Vitro Human and Animal Tissue/Cellular Studies Support Causation*

Defendants argue that the animal *in-vivo* and *in-vitro* studies should be ignored because animal studies are not equivalent to human studies and involve high doses of NDMA. Opp'n at

---

[16] D.E. 5915 at 15-18; *see* Ex. 12 (Moorman Rep.) at 171-97 & Table 8; Ex. 10 (McTiernan Rep.) at 206-24.

[17] D.E. 5915 at 18-20; *see* Ex. 12 (Moorman Rep.) at 213-19, 221-23; Ex. 10 (McTiernan Rep.) at 265-78, 281-83.

[18] D.E. 5915 at 20-22; *see* Ex. 12 (Moorman Rep.) at 141-69 and Table 7, 142-45; Ex. 10 (McTiernan Rep.) at 225-38.

[19] D.E. 5915 at 22-24; *see* Ex. 12 (Moorman Rep.) at 117-40, and Table 6 (118-21); Ex. 10 (McTiernan Rep.) at 238-57.

[20] NTP (National Toxicology Program), U.S. Department of Health and Human Services, *15th Report on Carcinogens* (2021), https://ntp.niehs.nih.gov/go/roc15 ("NTP 15th Report").

[21] *See* Ex. 12 (Moorman Rep.) at 40, 45.

[22] Brown Ex. 54 (Hidajat, *et al.* 2019).

20-21. Again, Defendants justify this argument by asserting that the ranitidine-specific studies are the only relevant studies. But animal *in-vivo* and *in-vitro* testing (as well as *in-vitro* human tissue/cell testing) provides direct evidence concerning carcinogenicity, genotoxicity and mutagenicity, which are highly relevant and unethical to procure any other way. *Ref. Man.* at 639.

The *Reference Manual* advises (at 645) that "expert opinion on potentially cancer-causing chemicals almost always is based on a review of research studies that extrapolate from animal experiments involving doses significantly higher than that to which humans are exposed." The value of animal studies is widely accepted because "one can usually rely on the fact that a compound causing an effect in one mammalian species will cause it in another species." *Id.* at 646. For example, the WHO, IARC, and NTP have formal processes to evaluate the weight of evidence that a chemical causes cancer, including not just epidemiological evidence but toxicological studies of animals and mechanistic studies as necessary components. *Id.* at 655-56. Similarly, federal regulatory bodies require carcinogenicity tests on two species, typically rats and mice and for both sexes. *Id.* at 644. Animal testing, *in vivo,* is a required and accepted methodology to test for carcinogenicity in every drug approval process, including Zantac/ranitidine. *Id.* at 640.

NDMA has been found to be carcinogenic in **all** animal species tested.[23] The *in-vivo* and *in-vitro* studies demonstrate that NDMA follows the same mechanism of action to damage human tissue and cells as that of animals.[24] Peer-reviewed animal study-based research shows that exposure to NDMA causes the five designated cancers. Ex. 16 (Panigrahy Rep.) at 144, 201-219. The *in-vitro* research also demonstrates that human tissue can metabolize NDMA, and when exposed to NDMA suffers DNA damage similar to the DNA damage seen in animal models. *Id.* In-vitro studies also show that human tissue treated with NDMA becomes cancerous.[25] No competent or authoritative study on carcinogenicity or genotoxicity would ignore the extensive scientific research conducted on animals or the *in-vitro* studies. These peer-reviewed studies are

---

[23] IARC Monographs on the Evaluation of Carcinogenic Risk of Chemicals to Man, Vol. 17. IARC, Lyon, France, 125-75, 1978 ("IARC 1978"); Overall evaluations of carcinogenicity: an updating of IARC Monographs volumes 1 to 42. IARC Monogr Eval Carcinog Risks Hum Suppl. 1987;7:1-440. PMID: 3482203 ("IARC 1987").

[24] Liteplo, *supra* note 4, at 27.

[25] Parsa, I., Marsh, W. H. & Sutton, A. L., *An in vitro model of human pancreas carcinogenesis: effects of nitroso compounds.* CANCER, 47, 1543-1551 (1981).
Parsa, I., Marsh, W. H., Sutton, A. L. & Butt, K. M., *Effects of dimethylnitrosamine on organ-cultured adult human pancreas*. AM J PATHOL. 102, 403-411 (1981).

valuable, necessary scientific components in assessing whether an agent causes cancer in humans.

## LEGAL STANDARD

While this reply will not repeat the Rule 702 standard, given the cross-motions and detailed factual presentation, it may be helpful to set forth the legal principles demarcating the role of the Court in deciding *Daubert* motions.

Courts evaluate methodologies, not the underlying facts or ultimate conclusions. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Where both sides rely heavily on epidemiology, but identify different studies as compelling, "Rule 702 d[oes] not require, or even permit, the district court to choose between those two studies at the gatekeeping stage." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 432–33 (7th Cir. 2013); *Hardeman v. Monsanto Co.*, 997 F.3d 941, 964 (9th Cir. 2021) (expert testimony was properly admitted despite reliance on competing studies). To the contrary, "a district court may not 'evaluate the credibility of opposing experts' or 'the persuasiveness of competing scientific studies.'" *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1372 (N.D. Fla. 2018) (quoting *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). For example, if a defense expert opines that the Adami study is more persuasive than the Kantor study, or that the Kim study is more persuasive than the Hidajat study, this Court should leave those disputes for the jury.

Though the Court should not weigh the evidence, it can assess whether experts followed a consistent methodology that is reliable. For example, internal inconsistency can require exclusion. Similarly, courts may "preclude[] an expert from testifying in part because he ignored available information that was vital to his opinion." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004). If a witness says there is "***no*** evidence" (rather than "that there is conflicting evidence"), that opinion is unreliable unless the expert "considered all relevant evidence" and it is *true* "that there is 'no' such evidence." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 185 F. Supp. 3d 761, 778-79 (D.S.C. 2016).

## ARGUMENT

### III.   Defendants' Experts Repeatedly Err in Similar Ways

None of the global reasons Defendants offer for their experts' unreliable methodologies hold water.

### A.      Plaintiffs Do Not Seek to Shift the Burden to Defendants

Defendants of course have no burden to disprove causation—they could put forward no expert witnesses, or only rebuttal witnesses. But, having offered expert witnesses that purport to opine on general causation, those opinions must surmount *Daubert*.[26] Defendants' experts' opinions are regularly excluded on *Daubert* challenges if they are unreliable, even though it is always true that a defendant does not bear the burden on liability. *E.g.*, *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d at 1368-72 (excluding some opinions from several different defense experts); *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 765019, at *11 (N.D. Fla. Feb. 28, 2021) (same); Ex. 77 (Valsartan *Daubert* Order) (same).

### B.      General Causation Requires an Expert to Consider the Very Strongest Possible Facts

General causation is an especially important element in an MDL because it is not plaintiff-specific, and so a ruling would presumptively apply to every case. That follows from its definition. "General causation is established by demonstrating, often through a review of scientific or medical literature, that a drug or chemical can, in general, cause the type of harm alleged by the plaintiff." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d at 1306 (citing *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1196 (11th Cir. 2010)); *see also Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1249 n.1 (11th Cir. 2010) ("whether a substance has the potential to cause the plaintiff's injury"). In contrast to specific causation, which can focus intensely on exposure and the dose, general causation is not about dose or exposure, since the question is whether the effect is possible *at all*, not at any particular dose.

Defendants disagree, but do so by conflating dose-response with dose. Dose-response is one of three primary methodologies to prove general causation (along with epidemiology and background risk). *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014). "The dose-response relationship is '[a] relationship in which a change in amount,

---

[26] Defendants seek to sidestep this problem by claiming their experts merely "opine that available ranitidine data do not support a causal association between ranitidine and the Designated Cancers," Opp'n at 25, but gerrymandering an experts' opinion to a subset of relevant evidence cannot immunize him from *Daubert* challenges, and, in any case, the experts did not confine their opinions in that way.  Dr. Hatten, for example, describes his principal opinion as: "Therapeutic use of ranitidine **is not a cause** of esophageal, gastric, pancreatic, liver, or bladder cancer in humans." Ex. 7 (Hatten Rep.) at 3 (emphasis added).

intensity, or duration of exposure to an agent is associated with a change—either an increase or decrease—in risk of disease.'" *McClain*, 401 F.3d at 1241-42 (quoting *Reference Manual* at 392). Dose-response, then, is not about a *number* (1,463 mg of NDMA causes liver cancer), but a *relationship* (as NDMA increases, so does cancer risk). To show this relationship an expert need not "give precise numbers about a dose-response relationship. Some ambiguity about individual responses is expected. However, the link between an expert's opinions and the dose-response relationship is a key element of reliability in toxic tort cases." *Id.* at 1241, n.6. The Eleventh Circuit has reemphasized this point in recent cases: "To be clear, we have never required an expert to 'give precise numbers about a dose-response relationship,' and we do not do so here." *Williams v. Mosaic Fertilizer*, 889 F.3d 1239, 1248 (2018).

Outside the Eleventh Circuit, courts have allowed dose—not just dose-response—to play a limited role in general causation. Judge Chhabria explained:

> the inquiry at the general causation phase is not whether glyphosate gave NHL to any of the particular plaintiffs who brought these lawsuits, and the plaintiffs need not establish any particular level of exposure. It's enough in this litigation, at this stage, for the plaintiffs to show that glyphosate can cause NHL when people are exposed to the highest dose people might plausibly experience. Picture, for instance, a professional gardener who has applied Roundup without using protective equipment several times per week, many hours per day, for decades.

*In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d 1102, 1113 (N.D. Cal. 2018). This approach is a practical one, since it does not ask whether *in theory, somewhere* the toxin could cause the injury, but whether it could cause injury to a Plaintiff in the litigation with the very strongest facts (with some margin for error). While a long-time gardener had the strongest facts in RoundUp, here that Plaintiff would be a fairly old person who took high doses of Zantac every day—multiple times per day (high frequency)—from 1983 until its recall (long duration), living the whole time in a hot humid place (high NDMA degradation), who is diagnosed with cancer a few years later. That is the Plaintiff to which Defendants' experts' general causation opinion must apply.

Defendants' repeated attacks on Dr. Moorman and demands for a "threshold" turn this inquiry on its head. Identifying the minimum dose that could cause cancer would identify the *most marginal* Plaintiff, not the strongest Plaintiff, and arises only in specific causation—if at all. Besides that, as a scientific matter, Dr. Moorman is correct that a single molecule of NDMA *could*

cause cancer,[27] and so there is "no safe dose or threshold for NDMA toxicity." Opp'n at 7. But Plaintiffs have never argued that NDMA (or ranitidine) "can cause" cancer with a single pill or molecule as a legal matter. The Seventh Circuit eloquently dismantled a similar attempt, when an honest expert carefully calculated dose-response and applied it to a plaintiff's actual usage, but also noted that there was no threshold for mutagens: "It is important to understand the difference between these two statements. The first says, in essence, that scientific studies confirm the danger of exposure to more than 10 ppm-years of benzene. The second says that no one is sure whether 10 ppm-years is the floor for risk, or 5 ppm-years, or 1 ppm-year, or nothing. There is nothing inconsistent between these two assertions." *Akzo Nobel Paints, LLC*, 721 F.3d at 432. Plaintiffs' experts can—and will for specific causation—say what doses *are* sufficient to cause cancer, but need not opine on the *minimum* dose that could pass legal muster.[28]

Here, Plaintiffs' experts assessed dose-response by two independent routes. First, multiple different experts employed epidemiology (both of ranitidine and NDMA) to identify a relationship between increasing dose and increasing cancer risk. This calculation is not a "precise number," but hews closely to the studies (for example, relying on the dose-response calculation in the

---

[27] Defendants claim that this fact is inconsistent with criticizing low exposure and follow-up, but it is not. Consider a rudimentary hypothetical in which taking one 150 mg Zantac pill every day for 10 years doubled the risk of liver cancer (RR=2), and the risk increased in equal increments with each pill. The relative risk from a single pill would be less than 1.00027. Obviously, this trivial risk would not show up on any study, much less the studies thus far conducted (which have fewer than one million participants, not "millions" as Defendants claim). A well-designed study with ten years of exposure and long follow-up could identify the long-term risk.

[28] Regulatory agencies recognize that a linear dose response relationship exists for NDMA and cancer, i.e., more NDMA results in an increased risks for cancer. *See e.g.*, U.S. Dep't of Health and Human Servs., Food and Drug Admin., Center for Drug Evaluation and Research, Control of Nitrosamine Impurities in Human Drugs: Guidance for Industry, at 5, App'x B, (Feb. 2021), https://www.fda.gov/media/141720/download.FDA Center for Drug Evaluation and Research (CDER) (using Peto data to calculate ADI for NDMA); European Medicines Agency, Nitrosamines impurities in human medicinal products, at 50, (June 25, 2020) (same); Food and Drug Administration, Nitrosamines as Impurities in Drugs - Health Risk Assessment and Mitigation Public Workshop Notes, at 11, (March 29-30, 2021). The NDMA dose response for carcinogenesis is demonstrably linear down to low doses which is aligned with mechanistic studies including the DNA adduct formation studies and confirmed by the dose response curve in the Peto study. *See* Brown Ex. 23 (Salmon Rebuttal Rpt.) at 6. This is also evident in Dr. Salmon's analysis of the NDMA occupational and dietary epidemiological studies where he quantifies NDMA exposure and cancer association. *See* Canaan Ex. 15 (Salmon Updated Rep.) at 105-11 (e.g., Hidajat dose response slopes).

Cardwell study). Second, over and beyond what experts in almost any other case have done, Drs. Salmon and Panigrahy quantitatively calculated dose-response for NDMA, and used testing data for ranitidine to calculate dose-response for it as well. *See* D.E. 5915 at 38-41 (explaining this calculation). Dr. Salmon even calculated—using alternative assumptions for the amount of NDMA in ranitidine—how much ranitidine one would need to consume to ingest NDMA levels associated with statistically significant risks of *each* cancer. *See* Ex. 18 (Salmon Rep.) at 221-23. Amazingly, the estimated cumulative dose (using the Emery average after consumer storage) to incur a statistically significant risk of bladder cancer is a bit over three years, which agrees with Cardwell's result calculated from different data using a different method. *Id.*

Dr. Panigrahy also detailed the NDMA cumulative doses associated with increased risk of each of the designated cancers. Dr. Panigrahy assessed and quantified the cumulative exposures of NDMA associated with the statistically significant elevated risk of death from bladder, stomach, esophageal, pancreas and liver cancers, statistically increased risk of gastric cancer and demonstrated how these exposures may be reached from a consumer's ranitidine use. *See* Panigrahy Rep. at 195-197, 198-199; Panigrahy Rebuttal Rep. at 13-16. Notably, Judge Kugler held that Dr. Panigrahy's opinions passed muster under *Daubert* in the Valsartan MDL.

### C.    The Relevant Toxin in This Case Is NDMA

Ranitidine delivers the cancer-causing substance NDMA into consumers' bodies, and this delivery mechanism causes cancer the same way dietary NDMA and workplace exposure does. In keeping with Defendants' truncated focus on ranitidine in this MDL, Defendants' experts averted their eyes from the research on NDMA exposures in similar amounts in other contexts. That choice was driven by a legal strategy, not the scientific method, and produces unreliable expert opinions.

Defendants chiefly defend that choice in legal terms, by citing cases involving benzene and zinc, but the best analogy is the only other case involving *NDMA*—the Valsartan MDL. In that case, Defendants argued there was no "association between the drug and the injury," which Judge Kugler shot down: "Wait a minute. You're suggesting there's no evidence of an association between NDMA and cancer?" Ex. 76 (Valsartan *Daubert* Tr.) at 138:2-4. Defendants tried the same distinction: "Not the compound [NDMA], not the, you know, contaminant, but the medicine and the injury." *Id.* at 138:16-18. The colloquy continued:

> [A]re you suggesting that the plaintiffs in this case have not
> established the association element of that requirement?
> MS. BROWN: Yes, Your Honor. In terms of the medicine, I am. So

> I understand they're relying on sort of general studies, food studies, occupational studies, about the compound itself [NDMA]. But I would suggest, Your Honor, because dose is so important, Your Honor, that they would – before they even get to a Bradford Hill, they would have to establish that at this dose, these trace levels are generally capable of causing the nine cancers.
>
> THE COURT: Ms. Brown, that's very clever, but perhaps you can explain to me why there was the recall by all these government agencies if there's no association…. We'll set aside all the government agencies …. What about the statements made by the officers, employees of the defendants, the vice presidents and officers who clearly state that this stuff is a human carcinogen? That's not an association? Your clients think it is. Why is more even required?
>
> MS. BROWN: …. [NDMA may be] a substance that in certain circumstances may be able to cause cancer, but I think the inquiry has to be here for this Court in this circumstance, **in this medicine**, could it do it?
>
> THE COURT: …. I really do believe that the association element has been clearly demonstrated, both through all the action by the government agencies and through the words of the defendants themselves. So now we're at weight of the evidence, and now we're its -- where it gets tricky, Bradford Hill…. So let's move on, please.

*Id.* at 139:8-142:19 (emphasis added). In summarizing his rulings from the bench, Judge Kugler revisited this issue, conclusively rejecting Defendants' position:

> Defendants further complain he makes an impermissible inferential leap from dietary and NDMA occupational exposure to pharmaceutical exposure. Again, how and why experts rely on certain studies and not on other studies is a jury question.

*Id.* at 158:6-10. Just as in the Valsartan case, this case is about pharmaceutical exposure to NDMA, and so the science about NDMA is critical, not only ranitidine studies. That is why, just as in cases involving asbestos in talc, this case likely fits within *McClain* category 1: "A general causation inquiry is unnecessary here because Plaintiff makes the widely accepted claim asbestos causes mesothelioma rather than claiming talc powder itself causes mesothelioma." *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1287 (S.D. Ga. 2018). *See* D.E. 5915 at 46-50.

Defendants' case law does not require otherwise. The only binding authority Defendants cite is *Chapman*, 766 F.3d at 1296, which actually supports Plaintiffs' approach. The plaintiff in *Chapman* claimed that using Fixodent caused her myelopathy because it contained zinc, which can cause copper deficiency, which can cause myelopathy. But this theory had two problems. Zinc is a common, essential nutrient, so the plaintiffs had to show it *became* toxic over a certain

threshold. *Id.* at 1300. And Fixodent actually had "calcium-zinc," a compound that "is less bioavailable than other zinc compounds," meaning the threshold may be higher—or nonexistent. *Id.* Applying *McClain*'s two-part test for toxic torts, the Eleventh Circuit instructed that the general causation question is whether "the [substance] *can* cause the harm plaintiff alleges." *Id.* at 1303 (quoting *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1196 (11th Cir. 2010)) (alteration in original). Next, it applied the test, ruling that the plaintiffs' experts "fail to show that ***the zinc compound in Fixodent*** is in *McClain* category one of medically accepted, cause-and-effect toxins." *Id.* at 1304 (emphasis added). And in *McClain* category two, plaintiffs had no epidemiology or dose-response—at all—connecting calcium-zinc to myelopathy. *Id.* at 1307.[29]

Just as *Chapman* looked at the "zinc compound in Fixodent" (calcium-zinc) here the Court should examine the nitrosamine in ranitidine (NDMA). The Court must of course pay due attention to "even minor deviations in chemical structure," *McClain*, 401 F.3d at 1246, which is why the difference between less-bioavailable "calcium-zinc" and more-bioavailable "zinc-acetate" mattered in *Chapman*. Again, the *Valsartan* court illustrates how this can work for nitrosamines. One of the experts opined "that NDEA and NDMA are similar, however, he provides no explanation as to how that is so … he will not be permitted to testify about NDEA." Ex. 76 (Valsartan *Daubert* Tr.) at 158:12:16. But Defendants do not maintain that NDMA in ranitidine has *any* "deviations in chemical structure" from NDMA in anything else. It does not.

Defendants' benzene cases illustrate similar principles. Defendants argue that in cases involving products with benzene as a component, courts consider only the product itself (gasoline, for example), not the toxin (benzene). But, in fact, many courts have rejected this exact argument, ruling that experts *could* rely primarily on benzene studies as long as benzene was the agent the plaintiff claims caused the harm.[30] Neither case Defendants cite supports their rigid rule, rather

---

[29] Plaintiffs' experts in *Chapman* also did not assess the background risk of myelopathy; they agreed *some* zinc was perfectly healthy, but failed to show a dose-response relationship explaining when calcium-zinc became toxic; and so, they "failed to demonstrate the primary methods for proving **the zinc** in Fixodent causes myelopathy." 766 F.3d at 1308 (emphasis added).

[30] *E.g.*, *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 802 n.10 (E.D. La. 2011) (products were Varsol and Liquid Wrench, but "Plaintiff has framed her theory of liability as one that is focused on benzene as a cause of blood disorders, such as MM. Thus, the general causation question in this case is whether benzene can cause MM. In light of this, Plaintiff's focus on studies that examine exposure to benzene and benzene-containing products is appropriate."); *Milward*, 639 F.3d at 14-15 (reversing exclusion of expert who relied on benzene studies in addressing

*both* cases extensively discuss benzene literature, finding it highly relevant (unlike Defendants' experts' approach to the NDMA literature). *See Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1156 (E.D. Wash. 2009) ("evaluations of both gasoline and its toxic component benzene are obviously relevant"); *Burst v. Shell Oil Co.*, 14-109, 2015 WL 3755953, at *9 (E.D. La. June 16, 2015) ("literature pertaining to benzene is generally relevant to the causation question").

Both cases instead turned on different principles:

> [I]n both *Henricksen* and *Burst* … there was a body of scientific literature that specifically investigated the association between exposure to gasoline and the risk of AML that was inconsistent and failed to support a causal relationship between exposure to gasoline and the risk of AML. And in both cases, the defense experts provided a scientific explanation as to why exposure to benzene in gasoline does not cause an increased risk of AML despite the known causal relationship between benzene and the risk of AML.

*Rhyne v. United States Steel Corp.*, 474 F. Supp. 3d 733, 747 (W.D.N.C. 2020). On the first point, the court in *Rhyne* determined that the studies done on the benzene-containing-product ("mineral spirits") were "not uniformly negative," which distinguished the gasoline studies. *Id.* The same is true here: the ranitidine-specific studies are not "uniformly negative"—to the contrary, a substantial number of them show an increased risk, and even the "negative" studies are not "inconsistent" with the risk Plaintiffs have proposed because they do not measure comparable populations who took ranitidine over similar durations with adequate follow-up.  Second:

> the defense experts in *Henricksen* and *Burst* opined that exposure to benzene in gasoline does not cause an increased risk of AML due to competitive inhibition between the various components of gasoline that mitigates the carcinogenic properties of benzene. Here … Safety Kleen has not provided any explanation for why exposure to benzene in mineral spirits should be evaluated differently than exposure to benzene in other solvents.

*Id.* at 748. Here, just as in the *Rhyne* case, Defendants have provided zero reason for why the NDMA in ranitidine would cause less cancer than the NDMA in food or other exposures. The benzene cases fully support paying close attention to NDMA literature.

Apart from the law, it simply makes no sense to ignore NDMA literature. The dietary and

---

exposure of refrigeration technician to various products); *Campos v. Safety-Kleen Sys., Inc.*, 98 F. Supp. 3d 372, 379 (D.P.R. 2015) (Defendants argued that the product, "SK–105" is "not benzene" and has only "trace amounts of benzene" and so the expert should have relied on product-specific research; but the court disagreed).

occupational studies are *epidemiological* studies—the best evidence, as Defendants emphasize.[31] Consider, for example, the EMA Assessment Report prepared after NDMA was found in ranitidine.[32] The authors conducted a full search of epidemiological evidence, not distinguishing between dietary studies and other kinds. Then, the sections on dietary versus medicine-specific epidemiology are right next to each other, with nearly the same title.[33] Section 2.4.6.1 is: "**Epidemiological studies on the association of potent mutagenic N-nitrosamines in medicinal products with the risk of cancer**." And section 2.4.6.2 is identical, except with the words "**from dietary sources**" substituted for "**medicinal products**." In-line with Plaintiffs' experts, the EMA document warns about short follow-up periods in the "medicinal products" studies.[34] The 2022 draft Toxicological Profile for NDMA from ATSDR followed essentially the same methodology as EMA, again considering NDMA dietary studies in-depth, as well as exposure via medicines:

> It appears that those segments of the general population with potentially high exposure to NDMA from exogenous sources would include tobacco smokers … people who consume large quantities of foods or beverages containing NDMA … and individuals who have **taken medications containing NDMA** or its precursors (FDA 2019a, 2019b, 2020a) **for prolonged periods of time**.[35]

Defendants are simply wrong that regulators do not consult NDMA literature, and have provided no examples of any expert or regulator declining to do so.

**IV.    John Witte**

Dr. Witte's opinions are based on an incomplete review of the evidence, inconsistent evaluations of the evidence, and improper extrapolation.

---

[31] Perplexingly, Defendants claim that pages "44-59" of the Motion cite "animal and *in vitro* studies as epidemiological studies," Opp'n at 27, but those pages speak for themselves, and on their face analyze human epidemiological studies. It is true that Defendants' experts also ignored animal and *in vitro* studies, but Plaintiffs focused on epidemiology.

[32] European Medicines Agency, Assessment Report, *Nitrosamine Impurities in Human Medicinal Products*, (June 25, 2020), https://www.ema.europa.eu/en/documents/referral/nitrosamines-emea-h-a53-1490-assessment-report_en.pdf.

[33] The report also cites and discusses the Hidajat occupational study. *Id.* at 46.

[34] EMA had Valsartan studies, but no ranitidine studies. A similar analysis today would of course include the ranitidine-specific studies, but there is no reason to think it would omit or discount the dietary and occupational studies.

[35] Agency for Toxic Substances and Disease Registry (ATSDR), U.S. Department of Health and Human Services, *Toxicological Profile for N-Nitrosodimethylamine (NDMA) (Draft for Public Comment)*, at 117 (Jan. 2022) https://www.atsdr.cdc.gov/toxprofiles/tp141.pdf.

## A.  Witte Ignored NDMA Science

Imagine if, after discovering listeria in its ice cream and recalling it, Blue Bell scientists attempted to reassure customers by explaining that, if one looks *only* at the product at issue (ice cream), and ignores all the science about listeria, there is little evidence that ice cream causes listeriosis. Such an analysis would be patently unreliable, since listeria evidence from the laboratory, meats, milk, fruit, and all other sources are highly informative on how listeria affects humans[36]—but that is exactly the type of analysis Witte submitted to this Court. Defendants do not dispute that Witte entirely ignored the extensive science about NDMA. Opp'n at 37. And they cannot, since Witte admitted he did not review, and was not familiar with, the NDMA literature. *E.g.*, Ex. 43 (Witte Dep. Tr.) at 94:16-19 ("I didn't review the … cancer biology of NDMA"); 95:1-7 (asked whether he agrees "that NDMA is mutagenic," Witte responded "I haven't evaluated this"); 104:25-105:9 (asked if he was aware that "GSK had classified NDMA as a genotoxin," Witte admitted "I was not familiar and … did not consider this document").

Witte's opinion that NDMA in ranitidine cannot cause cancer should be excluded "because he ignored available information that was vital to his opinion." *In re Rezulin*, 309 F. Supp. 2d at 563. That an expert "considered all relevant evidence" is doubly important where that expert claims there is "no evidence" (rather than "conflicting evidence"). *In re Lipitor*, 185 F. Supp. 3d at 779. Here, Witte testified that "there's no evidence" that NDMA in ranitidine can cause cancer: "[T]here's no reliable evidence…. Q. Is there some evidence? [objection omitted] A. No. …. Q. You said taken as a whole there's no reliable evidence. But is some of that whole evidence showing an association? A. Not a reliable, valid association …." Ex. 43 (Witte Dep. Tr.) at 97:6-98:17.

Defendants' first parry is that "Dr. Witte assessed the same relevant body of evidence as … experts and regulatory bodies that addressed the issue." Opp'n at 37. That is unsupported and not true. To begin with, there is no expert anywhere (except Defendants' *other* experts) that has looked at the same body of evidence Dr. Witte considered. Defendants claim his methodology is similar to the published ranitidine studies, but, of course, none of those studies even purport to conduct a full causation analysis (for example, they did not analyze *any* other studies, whether of

---

[36] Indeed, applying *McClain*, cases involving medical devices have looked to "whether the contaminant caused Plaintiff's injuries," which meant looking at evidence to see if "methylobacterium thiocyanatum could cause the" infection at issue, not whether the *product*-contaminated-by-the-bacteria could do so. *Lowery v. Sanofi-Aventis LLC*, No. 7:18-CV-00376-RDP, 2021 WL 872620, at *13 (N.D. Ala. Mar. 9, 2021).

NDMA or ranitidine, and they did not apply Bradford Hill criteria, weight-of-the-evidence, or another methodology). What may be proper in a primary study supplying new data is not proper in what purports to be a complete causal analysis.[37] As for regulatory bodies, they *uniformly did* consider the NDMA evidence, (indeed, most regulators acted when no ranitidine-specific epidemiology was even available).

Next, Defendants flip 180 degrees to the argument that Witte is reliable precisely because he *did not* follow regulators or other experts. Responding to the correct observation that "FDA obviously" relied on NDMA evidence in withdrawing ranitidine, Defendants do not defend Witte's false belief that FDA ignored NDMA evidence, instead moving the goalposts to say FDA considered NDMA evidence only because it was applying a "precautionary regulatory standard[]." Opp'n at 40. There is no principle that would explain why NDMA science is relevant to regulation, but not causation. As to other experts, Defendants accuse Plaintiffs of "rewrit[ing]" his report to falsely "imply his decision not to approximate NDMA was predicated on following the decisions of others," when actually it was his *own* decision. Opp'n at 39.[38] Plaintiffs agree that on this point, Witte is not following anyone—he is out in front.

After admitting Witte did not follow regulators (who were "precautionary") or other experts (he was not merely "following the decisions of others"), Defendants appeal to Witte's own authority and reasoning as sufficient, but it is not. The key language for this argument, is, apparently, that "*the exposure of concern is ranitidine, which includes any consequential or incidental exposure to NDMA from ingestion of the drug.*" Opp'n at 39 (quoting Witte Rep. at 11). This generality is no reason to ignore evidence. The same could be said for listeria and ice cream: the exposure of concern is ice cream, which includes any consequential or incidental exposure to listeria. In that context, all would recognize that studies of similar listeria-contaminated products

---

[37] Dr. Chan disagrees; he recalls that ranitidine studies "often cited other studies relating to, for example, the mechanism by which ranitidine may be associated with cancer." Brown Ex. 27 (Chan Dep. Tr.) at 37:1-14.

[38] Defendants quote the Motion's argument that "There is no basis to infer from the existence of studies on ranitidine that scientists *considered*, but *decided not* to study NDMA" as an example of a deceptive "rewrite." Opp'n at 39. Defendants appear to agree the inference is weak—so weak that they see it as a strawman. But they can hardly complain that the attack is unfair when they drew *precisely* the same weak inference just two pages earlier. *See* Opp'n at 37-38 (drawing the inference that Dr. Witte was correct to ignore NDMA evidence from the mere fact that epidemiologists conducted ranitidine-specific studies).

are probative precisely because listeria in other products behaves similarly and there are not enough studies on ice cream to draw definitive conclusions. That is true for ranitidine and NDMA.

Dr. Witte claims that applying the NDMA science would require speculation, but he apparently *did not even know* that many dietary studies carefully tracked how much NDMA the study participants consumed, meaning that little speculation is needed. Defendants completely fail to grapple with the extensive NDMA literature by ridiculing studies of "fumes," "organ meat," "whole milk and eggs," Opp'n at 38, as though that were the whole picture, when the truth is that dozens of studies using different methodologies in different places and tracking different kinds of foods consistently find that NDMA causes cancer in amounts comparable to what is in ranitidine. Dr. Witte cannot dismiss dozens of studies without even reading them merely because he has an epidemiology professorship.

**B.     Witte's Methodology Is Unreliable Because It Assumes that Plaintiffs Are at No Greater Risk Than the Consumers in Ranitidine Study Populations**

For Witte's opinion to fit the question of general causation in this MDL, it would need to apply to *all* the Plaintiffs in the MDL. His principal opinion is that ranitidine *does not cause cancer in anyone*. Ex. 22 (Witte Rep.) at 2. He comes to that conclusion *solely* based on ranitidine epidemiology (really just based on active comparator studies), ignoring all NDMA science. *See Id.* at 11. If the Plaintiff population—or even part of the Plaintiff population—had far more exposure to ranitidine than the study participants, or were diagnosed with cancer after a longer latency period than that captured in the studies (or were different in other ways), their risk profiles would not be reflected by looking at the studies alone. Dr. Witte completely ignores this problem.

*1.     Witte Improperly Extrapolates from Low-Exposure Studies*

Defendants respond to this argument by accusing Plaintiffs of cherry-picking the Norgaard and Adami studies as examples, protesting that he analyzed "substantially more literature than the two papers Plaintiffs raised." Opp'n at 40-41. This response would be fair if Norgaard and Adami were outliers, but they are not. As the Motion explained in detail, the problem is intractable for *each and every* ranitidine active comparator study Dr. Witte relied upon. *See* Motion at 28 (Adami, 10-months of exposure at most); 30 (Norgaard, same); 33 (Cardwell, for some, more than 3 years);[39] 34 (Iwagami, about one year); 35 (Kantor, 4 weeks); 36 (Kim Y.D., no exposure data);

---

[39] The Cardwell study—which had the longest exposure—*did* find an association, which Dr. Witte is forced to argue must be residual confounding.

38 (Kumar, one month); 39 (Kim S, same); 40 (Yoon, 30 months or less). There is no valid epidemiological principle stating that many studies of low exposures can be aggregated to show that risk is not increased with high exposure. Analyzing "substantially more literature" that all has the same gap does not address the gap.

Despite having *no studies* on the risks of taking ranitidine for 10 years, Dr. Witte plans to tell juries that the ranitidine epidemiology demonstrates that ranitidine could not have caused the cancer of a Plaintiff that took ranitidine for 10 years. The analytical gap is yawning and entirely unexplained in his report.

2.       *Witte Improperly Extrapolates from Studies of Short-Term Cancer Risk*

An analogous problem of short follow-up plagues the ranitidine epidemiology, but, in the teeth of recommendations from IARC, the *Reference Manual*, and the authors of the very studies he relies upon, Witte ignores this problem. IARC's view is that "latency periods substantially shorter than about 30 years cannot provide evidence of lack of carcinogenicity."[40] When asked whether IARC's position is "a pretty good source for determining the latency period for studies," he agreed that "IARC is considered a—a very highly reputable institution." Ex. 43 (Witte Dep. Tr.) at 128:17-24. But Witte had no trouble disregarding this well-known principle from IARC in service of his opinions.

Defendants suggest that this argument relies on out-of-context quotations, but it does not. Consider the full context from his deposition regarding the Yoon paper:

> [T]he follow-up period is restricted to seven years; thus, the overall follow-up period is not long enough to assess the onset of cancer. You see that?
> A. I do see that.
> Q. Do you agree with that?
> A. **No, I don't**.· I think that obviously this study has cancer cases in it so the follow-up period was long enough to assess the onset of some cancer…. There's been cancer onset that happened in this study, so I'm not sure exactly what they mean.
> Q. Isn't what they mean that most often it's thought that cancer development takes 20 to 30 years.· In order to really see an effect in a population, you need to follow them for that period? [objection omitted]
> A. I don't know what they mean actually.

---

[40] IARC Monographs on the Identification of Carcinogenic Hazards to Humans, Preamble, at 22 (Amended January 2019).

Ex. 43 (Witte Dep. Tr.) at 122:13-123:11 (emphasis added). Seeking to rescue Witte from his clear disagreement with Yoon, Defendants have a new theory: "Just as Dr. Witte stated, Yoon (2021) was able to assess *some* (i.e., short-term) cancer risk. Dr. Witte and Yoon (2021) are not at odds, but in unison, when the actual text is read." Opp'n at 42. This explanation is helpful and refreshing, and Plaintiffs fully agree. As Yoon explained—and as Defendants now agree—Yoon was only "able to assess … short-term[] cancer risk" because its follow-up was less than seven years. And by the same logic, Kantor, Iwagami, Kumar, Kim Y.D., Kim S., and Tran also studied only short-term cancer risk, because each of those studies had follow-up of *less* than seven years. By contrast, Cardwell's study, though still only 18 years total, studied long-term risk and found that "the use of ranitidine particularly **long-term** use was associated with an increased risk."[41]

If Witte's opinion were that ranitidine does not cause *short-term cancer risk*, there would be nothing wrong with relying on studies with short follow-up. But the vast majority of Plaintiffs in this MDL claim that ranitidine's *long-term cancer risk* caused their cancer. When one of those Plaintiffs goes to trial, Defendants seek to put Stanford Epidemiologist Dr. Witte on the stand to tell juries *that is not possible* because ranitidine does not cause cancer. He is expressly basing that opinion on Kantor, Yoon, Iwagami, Kumar, Kim Y.D., Kim S., and Tran, *all* of which, by Defendants' own admission, address only short-term risk, and are not applicable to long-term risk. Because that opinion is based on studies that Witte "in unison" agrees did not even assess long-term cancer risk, it is unreliable and highly prejudicial. It cannot be presented to juries.[42]

## C. Witte Ignored Limitations and Confounders in Studies He Preferred for No Discernible Reason

The unreliability of Witte's opinions is clearest in what evidence he overlooked. He claimed—without citation—that smoking was associated with ranitidine and H2RAs, then ignored data in studies he reviewed that showed H2RA users smoked more. He discounted associations in studies using PPIs as an active comparator even though, by his own logic, those studies were biased toward showing decreasing risk. And he completely failed to mention that the Y. Kim study he relied on used an aggregated database the FDA has warned about using, with the result that one

---

[41] Cardwell 2021.

[42] Defendants suggest that all is well because Witte "considered" the short follow-up as a "limitation," Opp'n at 43, but simply stating "this was a limitation" is not enough unless it actually affected his analysis. It clearly did not, which is why Witte knew he had to disagree with Yoon's statement that the studies were not long enough to assess the onset of cancer.

cannot discern from the study the exposure duration, follow-up time, or even how many unique individuals were in the study. The lack of rigor is inexplicable except as motivated reasoning.

    *1.*     *Even Though the Study Populations for H2RAs and Ranitidine Were Consistently Different, Witte Assumed the Only Difference Was the Drug.*

Defendants openly embrace the very criticism Plaintiffs levied about active comparators, confirming his analysis is unfounded. The entire point of an active comparator study is to reduce bias or confounding by examining a population that is similar *except for* using a different drug. FDA Guidance that Defendants cited in their own *Daubert* briefing clearly warns that "[s]election of an appropriate comparator group or control group is [] critical."[43] FDA specifically flags the importance of the "level of disease severity of the exposed group and the comparator group." *Id.* The reason is obvious: if one compares a *healthier* ranitidine-consuming population to a *less healthy* H2RA-consuming population, one should expect—all else equal—that the less healthy group will develop more cancer, biasing the study toward a finding of less risk.

That is what Plaintiffs meant in saying "Witte's entire report is premised on the presumption that 'H2RA and ranitidine [users] *are the same with respect to confounders*.'" Opp'n at 44 (quoting Motion at 70). Plaintiffs' argument is that this critical premise is unsupported, since, as the Y. Kim study confirms, ranitidine users smoke less and most of the studies had no data on smoking at all (meaning—if the smoking data matched Y. Kim—the non-ranitidine group's risk would be higher, and this risk difference could not be controlled for). Amazingly, Defendants simply deny that Dr. Witte presumed that H2RAs and ranitidine are the same with respect to confounders, Opp'n at 44, *and* agree that "smoking differences … could lead to bias *in either* direction." Opp'n at 45. This is a glaring flaw in Dr. Witte's analysis, since he relied on active comparator studies *without* checking—as FDA recommends—the "level of disease severity of the exposed group and the comparator group," even though he knew that could cause the ranitidine risk to be understated. This unreliable analytical step renders the ultimate conclusion unreliable.[44]

_____

[43] FDA, Guidance for Industry and FDA Staff Best: Practices for Conducting and Reporting Pharmacoepidemiologic Safety Studies Using Electronic Healthcare Data, at 14 (2013) ("FDA Electronic Healthcare Guidance"); *see also* Brown Decl. Ex. 85 (same document).

[44] Witte's report hand-waived the problem away by asserting that "smoking is associated with heartburn and GERD" (and so would be associated with H2RAs and ranitidine), but, as he acknowledged at his deposition "there's no reference cited for that statement," (in fact, he agreed it's "correct" that there were "two instances where you make this statement, and have no

Defendants' only response is to re-assert the non-sequitur: that "confounding by smoking … is one of the reasons Dr. Witte explained that the active comparator design is particular methodologically appropriate." Opp'n at 46. But again, the active comparator studies either *had no data* on smoking (nearly all of them), or showed higher rates of smoking for non-ranitidine users. In that context, the studies that *controlled for smoking* (for example, Cardwell) are plainly superior. But Witte turned this reasoning upside down, favoring the studies with no data on smoking over those that controlled for it.

As to the baseline differences, Defendants argue Witte *did* "reduce baseline differences," Opp'n at 45, but say not one word about the many problems Plaintiffs briefed: the unique maintenance therapy indication for ranitidine; formulary status for ranitidine (in Denmark, for example, ranitidine apparently was not reimbursable during the Adami study, while other drugs were); and comparisons of drugs taken at different times. FDA Guidance specifically flags these as pitfalls. But Witte said nothing about them, and Defendants' opposition similarly ignores them.

2.    *Witte Disregards What Many Studies Say with Insufficient Reason*

Defendants' only response to the many problems with how Witte describes the study data (for example, describing *five* findings of an association as *no* association) are to dismiss them as "[l]awyer speculation" with no citation "to any scientific sources." Opp'n at 47. But the Motion cited Witte's own report as well as the underlying ranitidine studies. Witte can of course opine that associations reported in five different studies are not valid due to "chance, bias, or confounding," Opp'n at 46, but must then *explain* why that conclusion makes sense. He does not. Plaintiffs cited the explanation Witte offered (that PPI studies are not good "due to different patterns and indications of use and potential hypotheses regarding PPIs and cancer" Motion at 72 (quoting Witte Rep. at 9)), and Plaintiffs explained why this conclusion is nonsensical. Again, it is nonsensical because if PPIs may cause cancer and are indicated for more serious diseases, one would expect *artificially reduced* risk in active comparator PPI studies. That is what Kim S. said,[45]

---

reference"). Ex. 22 (Witte Dep. Tr.) at 149-152; *see also id.* at 152:6-17 ("Based on what? A. I'm sorry. Was there a question? Q. Yes. Based on what? … A. Yeah. So I didn't actually cite a paper there."). Witte's inference (that H2RAs and ranitidine are equally associated with smoking) was contrary to data he reviewed (the Y. Kim study, which showed more smoking for H2RA users).
[45] Kim S, 2021 at 2.

what Dr. McTiernan said,[46] what Dr. Moorman said, and what many other sources cited by Plaintiffs' experts said. Dr. Witte *agrees* with this critique, but nonetheless ignores PPI active comparator studies showing an increased risk *precisely because the risk is likely understated*. That is facially unreliable.

> ### 3. Witte Ignored the Limitations of Aggregate Data.

As Plaintiffs' Motion explained, FDA has warned about aggregated databases, and the Mohy-ud-din study reviewers flagged Explorys as "unable to find any increased rates of various cancers" because of the "insufficient information obtainable from the database." Motion at 36-37 (quoting Ex. 52 and FDA Guidance). The fact is, Witte said nothing about this large issue in his report when discussing the Y. Kim Explorys study, which is why Defendants cite only his deposition responses. *See* Opp'n at 47. In that deposition, Witte admitted that if anyone changed to a different health system or changed to a different medication (say, after three years), *then got cancer*, "[t]hey get counted as three person-years, *no cancer*, right? A. Right." Ex. 43 (Witte Dep. Tr.) at 261:3-5 (emphasis added). How many people stayed in the same health system *and* never switched medications? Witte does not know, but said nothing about this issue, instead relying heavily on the Y. Kim study.

> ## D. Witte's Bradford Hill Analysis Is Unhelpful and Unreliable

Defendants all-but-admit that Witte's Bradford Hill analysis is cursory, but explain that "no Bradford Hill analysis was warranted" anyway. Opp'n at 48. But this Court may apply *Daubert* opinion-by-opinion, and can conclude that the Bradford Hill opinion itself is unhelpful and unreliable, and exclude it for that reason—that Defendants do not believe it was necessary is even more reason to exclude it, since they seem to agree it would not be helpful to the jury.

On temporality, Defendants do nothing to defend Witte's blunderbuss approach that reverse-causation affects *all* studies and *all* cancers, with no further analysis. It is of course not true that "Plaintiffs accept Dr. Witte's lag-time reasoning for most cancers." Opp'n at 48. Witte provided essentially no reasoning in his drive-by paragraph, so Plaintiffs listed bladder cancer merely as one example. The point remains that unsupported speculation that individuals take ranitidine to alleviate symptoms for every form of cancer is not rigorous. Defendants do not defend

---

[46] Ex. 12 (Moorman Rep.) at 27-31, 123 (citing sources); Brown Ex. 16 (Moorman Rebuttal Rep.) at 5; Ex. 10 (McTiernan Rep.) at 112, 135, 206, 229, 257 (citing sources).

his speculation, but merely assert a generalized "risk of reverse causation, bias, and confounding in all cancers." Opp'n at 48. These are non-responsive, and not even internally consistent. For example, if, as Witte insists elsewhere, the positive association in the Cardwell study is the result of confounding from smoking (even though Cardwell disagreed), this is *inconsistent* with saying reverse-causation explains the finding. Experts must at minimum keep straight which supposed confounding factor applies. Moreover, it helps Witte not at all that Defendants' *other* expert (Dr. Chan) offered a basis for *his* reverse-causation opinion, since Witte has never suggested that he was relying on Dr. Chan's report for this point (or was even aware of it).

On consistency, Defendants do not deny that Witte entirely ignored NDMA evidence, and never engage with the problem that Bradford Hill recommended employing a variety of approaches, while Witte "*prioritizes*" just one approach. Opp'n at 49. Witte essentially hid the ball on what he believes "consistency" requires, but it appears to be "that the Bradford Hill factor of consistency can only be satisfied by the existence of multiple epidemiological studies." *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d at 1368 n.171. If that is his opinion, it should be excluded "because this opinion is not supported by the scientific literature." *Id.*

On plausibility, Defendants suggest that by deferring to other experts (without even noting their conclusion), Witte "appropriately stayed" in his lane, Opp'n at 49, but if Witte is unqualified to evaluate a key factor of his own Bradford Hill analysis, that infirmity calls the reliability of the ultimate conclusion into question. In truth, Witte attempts to hedge, disclaiming expertise but suggesting that NDMA *might not plausibly* cause cancer. Judge Kugler recently excluded that view under *Daubert*, and this Court should do the same. Ex. 76 (Valsartan *Daubert* Tr.) at 162:3-11 ("he's not going to be permitted to offer any opinion that exposure to NDMA will not result or increase the risk of any cancers.").

In short, Witte's cursory Bradford Hill analysis is unreliable, and certainly cannot help the jury since he believes it was not proper to conduct one to begin with.

## V.      Andrew Chan

In their opposition, Defendants attempt an after-the-fact rewrite of what Dr. Chan actually testified during his deposition. But the transcript is clear on the two following, determinative points. First, Dr. Chan reached his conclusions about the cancer risk of NDMA in ranitidine *before* he conducted a systematic review of the literature about the cancer risk from NDMA—in part because he considered such literature irrelevant, in part because he lacked the expertise to review

much of it, and in part because he misunderstood what international organizations have said about NDMA. Second, for the studies he *did* systematically review—those looking at the epidemiology of cancer in humans taking ranitidine—he engaged in a results-oriented review that failed to properly account for critical deficiencies in exposure measurement and follow-up time. These critical errors make his opinions "speculative" and "unreliable" under *Daubert*. *MidAmerica C2L Inc. v. Siemens Energy Inc*., 25 F.4th 1312, 1326 (11th Cir. 2022). The Court should exclude them.

### A.        Dr. Chan Ignored the Literature About NDMA and Cancer Risk

In his deposition, Dr. Chan made clear the "question . . . that [he] specifically focused on" and which was "the focus of [his] report": "does *ranitidine* associate with any of the five cancers." Ex. 25 (Chan Dep. Tr.) at 33:3-7 (emphasis added). But the relevant question in this case is subtly but crucially different: whether the *NDMA* in ranitidine can cause these cancers. To answer that question, an expert of course needs to systematically examine not only the literature on ranitidine, but on NDMA itself. This is what Dr. Chan failed to do. After reviewing the *ranitidine-only* studies, Dr. Chan testified, he decided that there was "no basis" to review "other" literature that he deemed "less relevant." Ex. 2 (Chan Rep.) at 4; *see also* Ex. 25 (Chan Dep. Tr.) at 33:10-14 (stating that "other studies of NDMA in cancer" "do not have a direct level of relevan[ce] to the question at hand").

Indeed, the only reason the NDMA literature makes any appearance *at all* in Dr. Chan's report is because *Plaintiffs'* experts brought them to his attention. Dr. Chan testified "I don't know, to be honest," when he was asked whether he would have even *considered* the NDMA literature if the plaintiffs' experts had not done so themselves. Ex. 25 (Chan Dep. Tr.) at 34:20-24. This literature includes "animal studies," "mechanistic evidence," "toxicology evidence," "in-vitro studies," and "tissue studies" "concerning NDMA and cancer." Ex. 25 (Chan Dep. Tr.) at 39:1-5. *None* of those studies appear in Dr. Chan's report *at all*; Dr. Chan did "not feel it was necessary" to review that literature; and Dr. Chan did "not feel [he] had the specific expertise to do that sort of review." Ex. 25 (Chan Dep. Tr.) at 40:1-4; *see also* Ex. 25 (Chan Dep. Tr.) at 266:2-4 ("I did not really attempt in any way in my report to provide an assessment of the animal studies or the experimental studies.").

This failure is unsurprising given Dr. Chan's mistaken view of the basic science concerning NDMA. In his deposition, he refused to agree that it is "biologically plausible for NDMA to cause cancer in humans." Ex. 25 (Chan Dep. Tr.) at 265-66 ("I would say based on the review of the

epidemiological studies, there is no [biological plausibility] to human[s].”). This is absolutely contrary to everything that the scientific community says about NDMA. IARC states that NDMA is a probable carcinogen *in humans*. *See* IARC, List of Classifications, https://monographs.iarc.who.int/list-of-classifications. The same is true for the WHO. *See* World Health Organization (2002) at 23. And the NTP specifically bases its classification in part on *human* epidemiological studies. *See* NTP, *2021 Report on Carcinogens, Fifteenth Edition, N-Nitrosodimethylamine*, https://ntp.niehs.nih.gov/ntp/roc/content/profiles/nitrosamines.pdf. Based on this overwhelming scientific consensus, Judge Kugler excluded defense expert opinions just like Dr. Chan’s: “to the extent he’s trying to express opinions that exposure to NDMA does not cause cancer, that will be prohibited.” Ex. 76 (Valsartan *Daubert* Tr.) at 162:3-11.

Here, that faulty opinion is a premise of his methodological decision to ignore NDMA evidence. In sum, Dr. Chan began with a mistaken premise (that NDMA is not carcinogenic in humans). He failed to review much of the relevant literature (the literature on NDMA and cancer). And as a result, his opinion about the cancer risk of ranitidine (which of course contains NDMA) is “unreliable” under *Daubert* and therefore “inadmissible.” *Buland v. NCL (Bahamas) Ltd*., 992 F.3d 1143 (11th Cir. 2021).

Defendants respond that Dr. Chan “conducted a comprehensive analysis of the entire body of epidemiological literature” on NDMA, Opp’n at 31, but the true timeline surrounding his review is now clear from his deposition. Dr. Chan formed his opinions (and indeed began drafting his report) *before* he saw any of the NDMA literature contained in plaintiffs’ expert reports. *See* Ex. 25 (Chan Dep. Tr.) at 20:3-6 (“Q. Oh, by the way, so you started writing your report before you -- before you read any of the plaintiff expert reports, correct? A. Yes.”). Once he realized that he had missed vast swaths of the relevant science, and “having seen the plaintiffs’ reports,” Ex. 25 (Chan Dep. Tr.) at 33:9-10, he performed a cursory “review of the studies that plaintiffs have also cited in their reports” so that he could state that he “remain[ed] convinced that there is no association with ranitidine and any type of cancer.” Ex. 25 (Chan Dep. Tr.) at 33:20-21. *Daubert* does not permit this kind of post-hoc, results-driven rationalization of critical scientific literature to fit a conclusion an expert has *already arrived* at. *See Rink v. Cheminova, Inc*., 400 F.3d 1286, 1293 n.7 (11th Cir. 2005) (“[A] district court may properly consider whether the expert’s methodology has been contrived to reach a particular result.”).

With respect to Dr. Chan’s view of NDMA itself, Defendants simply try to line-edit his

testimony in order to make it fit reality. In their opposition, Defendants claim that Dr. Chan simply "opined that no scientific organization in the world classifies NDMA as a *known* human carcinogen." Opp'n at 32 (emphasis added). But that is not what Dr. Chan actually said. He went much further, testifying that IARC has never "stated anywhere that there is evidence in human studies that NDMA is genotoxic in humans," Ex. 25 (Chan Dep. Tr.) at 115:22-116:4, and disputing whether it is "biologically plausible for NDMA to cause cancer in humans." Ex. 25 (Chan Dep. Tr.) at 265-66. Defendants do not even *attempt* to rehabilitate those (false) statements about the science, a tacit admission that Dr. Chan began his review from an "unsupported assumption"—namely that NDMA is not carcinogenic in humans—which makes his ultimate opinion "testimony unreliable." *Buland*, 992 F.3d at 1151. This Court should follow the *Valsartan* ruling, and exclude Dr. Chan's flawed opinions.

### B.     Dr. Chan Ignored the Deficient Exposure Measurements in the Ranitidine Literature

From Dr. Chan's deposition, it is evident that he employed a different (and far more forgiving) standard for evaluating the strength of the ranitidine studies' exposure measurements than the scientific community does—and than Dr. Chan himself does in his day-job academic pursuits. In his other work, Dr. Chan has repeatedly noted the importance of accurately defining exposure. *See* Mot. at 88 n. 275 (collecting citations). And during his deposition in this case, he repeatedly consented to that general principle—that accurately measuring exposure is *critical* to the integrity of an epidemiological study. *See* Ex. 25 (Chan Dep. Tr.) at 78:15-18 ("[Understanding the total duration of exposure . . . will help the interpretation of the results because that gives you a better, more complete picture of whether there is a potential causal association."); Ex. 25 (Chan Dep. Tr.) at 87:2-3 ("We prefer obviously to have complete data for both exposure and outcomes."); Ex. 25 (Chan Dep. Tr.) at 99:11-13 ("[Y]ou want to define exposure with the best available data, and if you're able to adequately differentiate someone who's exposed versus unexposed, that's the critical question."); Ex. 25 (Chan Dep. Tr.) at 290:1-4 ("So again the biological hypothesis is that ranitidine specifically differentially associated, so it's really important to have clean data for that exposure group.").

The problem is that, when it came time to *apply* that general principle to the ranitidine epidemiology, Dr. Chan failed to stay true to it. He testified that ""[i]n the case of ranitidine, I don't really understand how exposure levels would be defined." Ex. 25 (Chan Dep. Tr.) at 103:13-

14. Given the importance of exposure classifications, this admission makes clear that Dr. Chan is simply engaging in "scientific guesswork" when he opines that the human ranitidine epidemiology has valid enough exposure data—and can therefore provide reliable evidence that ranitidine does not cause cancer. *McClain*, 401 F.3d at 1247.

Further compounding this error, Dr. Chan made another (erroneous) assumption that the number of *prescriptions* filled by patients in certain studies somehow correlated (one-to-one) with the number of *years* a patient was taking ranitidine. *See* Ex. 25 (Chan Dep. Tr.) at 169:15-19 ("[T]here's simply no scientific, clinical or medical reason why someone [who] has been filling 10 prescriptions of ranitidine would not be taking ranitidine for 10 years."). That is simply not true, as Defendants' other experts concede. *See* Ex. 40 (Terry Dep. Tr.) at 350:6-20 (admitting that 10 prescriptions might well indicate 10 *months* of ranitidine use, not 10 *years*). That kind of "unsupported assumption" about the exposure data in the underlying studies "makes [Dr. Chan's] expert testimony unreliable." *Joiner*, 522 U.S. at 146. Indeed, these failures demonstrate that Dr. Chan failed to reliably apply his own expert methods (and those of the scientific community) when evaluating the ranitidine literature—and that his opinions should be excluded under *Daubert*.

In response, Defendants argue that "Dr. Chan systematically considered the studies' frequency and duration of use" when he arrived at his opinion." Opp'n at 33. In support, they point out specific aspects of exposure in the studies that Dr. Chan cherry-picked and analyzed in support of his opinion—for example, the note that, in the Iwagami study, "[a]s the cumulative dose increased, the risk decreased." Opp'n at 34. But this simply misses the point. If the *overall* exposure data was deficient, then it is no answer to say that Dr. Chan performed various sub-analyses of specific *parts* of that exposure data. *See MidAmerica C2L Inc*., 25 F.4th at 1328 (noting that an "expert must be able to adequately explain how the data he relied on led him to his conclusions"). The fundamental problem with the ranitidine epidemiology is that it lacks data on patients who used ranitidine for truly long-term periods—more than five or ten years. Defendants provide no solution to that problem in their opposition. If the overall exposure was not long enough, it is no answer to say that comparing various (even shorter) *short-term* use periods did not reveal a difference in cancer risk between them.[47] But this kind of short-term vs. short-term comparison is all Defendants appear to have and all Dr. Chan appears to have done. That leaves

---

[47] That is why, for example, the Kantor study authors *themselves* say that they were "unable to examine associations by dose or distinguish long- vs. short-term use." Kantor at 1859.

the "factual basis" for Dr. Chan's opinions "not adequately explained." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla*., 402 F.3d 1092, 1111 (11th Cir. 2005) (holding that courts should exclude such testimony).

Defendants also assure the Court that these studies are "capturing real-world long-term use" based on Dr. Chan's "experience as a gastroenterologist." Opp'n at 35. But the law is clear that "the expert's bald assurance of validity is not enough." *Daubert v. Merrell Dow Pharms., Inc*., 43 F.3d 1311, 1316 (9th Cir. 1995). When the *studies* themselves *disclaim* the ability to measure long-term use, an expert is hardly satisfying *Daubert*'s reliability standard by giving an opinion that everything is nevertheless fine. *Compare* Opp'n at 35 ("[T]hese studies . . . are capturing real-world long-term use") *with* Kantor at 1859 ("[W]e were unable to . . . distinguish long- vs short-term use."); Iwagami at 9 ("[W]hether an even higher cumulative dose of ranitidine/nizatidine is associated with an increased risk of cancer remains unknown."); Yoon at 7 ("further research is needed to assess the long-term cancer risk"). That is not the methodology that the scientific community applies, which means the Court must exclude Dr. Chan's opinions.

## C.   Dr. Chan Ignored the Deficient Follow Up Periods in the Ranitidine Literature

Dr. Chan's error with respect to the follow-up period is similar. The problem was (again) not in the general principle to which he assented. In his own work, Dr. Chan has repeatedly noted how critical it is to ensure that a study is long enough to account for the latency period of a certain disease. And Dr. Chan repeatedly agreed with that principle in his deposition. *See* Ex. 25 (Chan Dep. Tr.) at 61:9-11 ("We'd also want to ensure that there is a reasonable period of time in which someone was expected to be exposed to the drug before the cancer was diagnosed."); Ex. 25 (Chan Dep. Tr.) at 111:11-17 ("And in many of those cases there are data where people have been followed for 30-plus years, and in those studies, you clearly would want to favor the studies that have 30 years of follow-up.); Ex. 25 (Chan Dep. Tr.) at 110: 6-9 ("So 30 years from now, yeah, we should do ranitidine studies and look back at people who have been exposed for 30 years and see if there's a link to cancer."); Ex. 25 (Chan Dep. Tr.) at 111:3-6 ("in an ideal world in which we had the ability to look back 30, 40 years, that would be the most informative data we could possibly have.").

The problem (again) came when Dr. Chan failed to actually *apply* that general principle when evaluating the ranitidine epidemiology in particular. He testified that he did not have "any

data to go on to define what the latency is" for cancer in patients taking ranitidine, Ex. 25 (Chan Dep. Tr.) at 109:2-4, meaning that his opinion that the relevant studies were long enough amounts to inappropriate "scientific guesswork." *McClain*, 401 F.3d at 1247. Meanwhile, Dr. Chan acknowledged that, for certain types of cancers, the latency period is in the *decades*. *See* Ex. 25 (Chan Dep. Tr.) at 251:2-13. Despite this, he chose to rely exclusively on ranitidine epidemiology with far shorter evaluation times: 12-14 years for Adami, 11-14 years for Norgaard, 7 years for Yoon, 7 years for Tran, 7 years for Kantor, 5 years for Kim S., 5 years for Kim Y.D., 4 years for Kumar, and just 2 years for Iwagami. That kind of whistling past the graveyard is not consistent with Dr. Chan's academic practice, it is not consistent with the practices of the broader scientific community, and it makes his opinions inadmissible under *Daubert*. Although plaintiffs do not doubt Dr. Chan's credentials, on this point his opinion—that the studies were long enough to capture the true cancer risk from ranitidine—amounts to "unscientific speculation offered by a genuine scientist." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316-17 (11th Cir. 1999).

In response, Defendants point to Dr. Chan's analysis of *even smaller* time periods within the *already small* time periods examined by these studies.[48] For example, Defendants point out that, in the Iwagami study, the authors found decreased risk with longer follow up. But just as with exposure, this further dissection of the already unreliable data does not cure the fundamental problem. In Iwagami, the average follow-up period was less than two years. The relevant question is whether ranitidine causes cancer after a truly long-term lag period—up to decades. Earlier this year in its NDMA draft profile, ATSDR remarked that "follow up of only 4.6 years" "is likely inadequate for most cancer types."[49] It is no answer to that question to say (as Dr. Chan does) that more patients did not get cancer after waiting slightly more than 2 years than after waiting slightly less than 2 years. Even the most well-established of carcinogens—smoking for example—would not show meaningful differences in risk based on such thinly-sliced follow-up periods. There is

---

[48] This is what Defendants actually mean by "stratification," *i.e.*, creating "subgroups where individuals who have only longer follow-up times can be analyzed separately from individuals with shorter follow-up times." Opp'n at 36. But the critical words in that sentence are long<u>er</u> and short<u>er</u>. If the *aggregate* follow-up time was not long enough to allow cancer to develop, then comparing not-long-enough to not-long-enough will naturally reveal no differences. If one compared smokers after two months to smokers after four months, one would not notice a difference, either. The lag time must be long enough to allow cancer to develop *at all* before such comparisons can have any practical meaning.

[49] ATSDR Tox. Profile *supra* note 35, at 52.

simply no way to bootstrap around this problem in the ranitidine literature on which Dr. Chan relies. If the follow-up period was not long enough (and it was not), further sub-comparisons of follow-up periods will not fix the glitch. Dr. Chan's decision to ignore that critical defect illustrates that his opinions are litigation-driven, rather than the product of a reliable scientific method. It provides yet another reason to exclude his opinions under *Daubert.*

## VI.    Mary Beth Terry

Instead of addressing the methodological errors set forth in Plaintiffs' brief, Defendants orbit the issues, making references to vague "acknowledgements" or unaccepted methodology, which fail to address Plaintiffs' motion. Defendants neglect to show that Dr. Terry incorporated a reliable, objective methodology, by which study strengths and limitations were properly assessed and weighed. Dr. Terry's conclusion-driven opinions are unreliable and should be excluded.

### A.    Dr. Terry Gave an Opinion About Long-Term Ranitidine Use That Is Not Supported By The Human Ranitidine Studies

First, Defendants attempt to shift the blame for Dr. Terry's disregard for missing data on dose and long-term use by contending that Plaintiffs contrived Dr. Terry having assigned "considerable weight" to the flawed Explorys Database studies. At the same time Defendants pedal back their commitment to the Explorys studies, they defend Dr. Terry's dismissal of missing data with the tenuous argument, that Dr. Terry "described the Explorys Database as 'an aggregated, deidentified electronic medical record registry.'" Opp'n at 51. However, the mere acknowledgement that Explorys is an aggregated database is an inadequate methodology for addressing missing study data, which renders the Explorys studies uninformative, or minimally informative, to *this case.*

For example, the Kim Y. (2021) study is an Explorys study with inherent weaknesses—there is no information in the published paper regarding duration of exposure, dose, or frequency of exposure. Notwithstanding, Dr. Terry opines that the study "validly measured exposure," Opp'n at 51; *accord* Ex. 40 (Terry Dep. Tr.) at 183:19-184:7, without any explanation for how the missing study data affects exposure measurements and study outcomes. Such unsupported conclusions cannot assist a jury and should be excluded.

Second, Defendants attempt to justify Dr. Terry's disregard for prescription exposure limitations in the Adami study by pointing to Dr. Terry's deposition testimony, "Adami looked at exposure as a distribution." Opp'n at 52. However, "distribution," as Dr. Terry testified, only refers

to some subjects taking a study drug for a short time, some for intermediate, and some for long. Defendants' argument is circular, because the distribution is the precise problem with prescription exposure in the Adami study—the distribution is heavily skewed. Defendants do not address the half of study participants with only one prescription. Had the distribution resembled Plaintiffs in this case, that would be one thing, but it is decisively non-representative and inapposite.

Defendants likewise ask the Court to overlook Dr. Terry's dismissal of limited exposure data in the Norgaard study, because Dr. Terry "specifically referenced Norgaard's definition of 'first time users' in her report." Opp'n at 52. This so-what argument fails to address Dr. Terry's *methodology*, as to how Dr. Terry weighed Norgaard's material exposure limitations. Referencing the definition is not the same as addressing the exposure problem in evaluating the study.

Fourth, Defendants, in a single sentence, attempt to defend Dr. Terry's disregard for limited exposure data in the Iwagami (2021) study by pointing to the authors' sensitivity analyses, but those analyses were for all cancer, and necessarily conducted on tiny subsets of the data.

B.     **Dr. Terry Ignores Short Follow-Up Periods**

Defendants confuse Dr. Terry's role by contending that Dr. Terry's methodology need not include analyses of whether the active comparator studies are sufficiently long to detect cancer outcomes relevant to this case. Opp'n at 52-53. More specifically, Defendants response brief states: "To reach her opinion that the evidence is insufficient to conclude that ranitidine causes cancer in humans, Dr. Terry need not demonstrate…that 'longer follow-up times would *not* detect more cancers.'" Opp'n at 52-53. Defendants are wrong: Dr. Terry's methodology must be both reliable *and* relevant. Dr. Terry's role in this case includes review of whether, and how, the epidemiology is relevant *to this case*, *i.e.*, whether longer follow-up times would or would not result in increased cancer outcomes. Terry's opinions that there is no evidence that ranitidine increases human cancer risk is contradicted by IARC's position in its Preamble that, unless there is adequate follow-up, a study cannot rule out carcinogenicity. *See* D.E. 5841 at 81-82

Notwithstanding, Defendants contend that Dr. Terry nonetheless "did not ignore follow-up periods; rather, she addressed them and weighed them in her analysis." Opp'n at 53. This also is wrong. Contrary to Defendants' illusion, Dr. Terry fails to address in her report the effect of short follow-times on relative risk findings and how *she* weighed comparator studies with short, or—in defense parlance—possibly short, Opp'n at 52-53, follow-up times, as is required under *Daubert*.

In fact, Dr. Terry only approaches *analysis* of short follow-up times when citing, or more

precisely, mis-citing, Yoon (2021). Regarding Yoon, Defendants contend that Plaintiffs "mischaracterize" Dr. Terry's words. However, Plaintiffs cite Dr. Terry's precise words, *and* those of the Yoon authors. There is nothing to mischaracterize: Dr. Terry's own words *changed the Yoon study's meaning to downplay the short follow-up problem to support her narrative.* Dr. Terry's "own words" are incorrect, unreliable, and impermissible under *Daubert.* The legal standard before a jury in this case is more probable than not. Thus, the distinction between possible and certain is significant. Dr. Terry's mischaracterization of the Yoon study, which conveys that the study follow-up time "may not" be long enough, when it absolutely "is not long enough," will misguide and confuse a jury and *must* be excluded.

### C.    Dr. Terry Ignores NDMA Data

Dr. Terry admits that she predetermined that only the ranitidine studies were capable of measuring cancer outcomes. Ex. 19 (Terry Rep.) at 24. Accordingly, Dr. Terry reports that her "analysis" "focused" on studies that "sufficiently compared ranitidine users to a group of non-ranitidine users." *Id.* In other words, Dr. Terry brushed off the NDMA studies, providing limited review and scientific discussion. Dr. Terry did *not* complete a comprehensive review of the NDMA-related scientific evidence, as required under *Daubert.*

### D.    Dr. Terry Ignores Confounding Factors

Defendants make the incomplete argument that it was unnecessary for Dr. Terry to consider smoking as a confounder in the Yoon (2021), Adami (2021), and Norgaard (2021) studies—despite *complete* lack of smoking information—because these comparator studies have no non-user groups. Defendants suggest that, because smoking *may* be associated with conditions for which ranitidine and other H2RAs are prescribed, smoking is therefore inherently controlled-for in strict active comparator studies. Certainly, not all, or even most, patients prescribed H2RAs for indications, *e.g.,* GERD, smoke. On the other hand, smoking is associated with certain cancers, making control for smoking as a confounding factor pertinent. That Dr. Terry turned a blind eye to the *missing* smoking information in the Yoon, Adami, and Norgaard studies, but heavily critiqued the *existing* smoking information in the Cardwell study, is impermissible cherry picking.

Defendants additionally contend that Dr. Terry's reliance on propensity scoring alone to control for smoking as a confounder is reliable. Again, this assertion that propensity scoring is a *magic wand* is not supported with any citation to the literature. For propensity scoring to have *any* value in minimizing confounding, the information concerning possible confounders must be

available. Otherwise, propensity matching cannot be effective.[50] Neither Norgaard nor Adami obtained *any* information on smoking, making propensity matching as a control for smoking completely ineffective in these studies.

### E. Dr. Terry's Prior Statements Regarding Case-Control Studies Are Inconsistent

Defendants attempt to rehabilitate Dr. Terry by claiming that her prior statements regarding case control studies are consistent with her deposition testimony in this litigation. Tellingly, Defendants do not point to any prior work by Dr. Terry, outside this litigation, by which Dr. Terry stated that dietary case control studies must be corroborated by cohort studies to be valid. This methodology, instead, is manufactured and raises concern that it is "contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7. Dr. Terry's new methodology is not an accepted methodology, one reason being, because it blanketly ignores individual study strengths and limitations. For this reason, Dr. Terry's opinions are unreliable and inadmissible.

## VII.  Michael Vaezi

In deciding whether to exclude Michael Vaezi's opinions under Rule 702, the Court must distinguish among three things: (1) what scientific authority has established; (2) what Defendants *allege* to be Vaezi's positions on key scientific questions; and (3) what Vaezi *actually testified to* under oath at his deposition. If the Court views these three things with clear eyes, it will see that there are conflicts between (2) and (3): Defendants misrepresent what Vaezi said under oath. And what he said under oath contradicts scientific consensus. Because Vaezi demonstrates a lack of familiarity with the basic facts of this lawsuit, he should be disqualified under Evidence Rule 702.

### A. Vaezi's Deposition Testimony Confirms that He Included NDMA Literature in His Report, but Entirely Ignored It in His Analysis Based on Mistaken Premises

Defendants claim that Vaezi conducted "a comprehensive analysis" of the "NDMA epidemiological studies." D.E. 5968 at 58 (citing Vaezi's Report). But they cite only two scant sections of Vaezi's deposition testimony, neither of which support the proposition that Vaezi reviewed NDMA epidemiology or NDMA animal studies in his Report. *See id*. (citing Ex. 41

---

[50] J. Reiffel, M.D., *Propensity score matching: the 'devil is in the details' where more may be hidden that you know*, 133(2) Am. J. Med. 178–81 (Feb. 2020); V.J. Cogliano, Ph.D., *Preventable exposures associated with human cancers*, 103(24) JNCI 1827–39 (Oct. 2011).

(Vaezi Dep. Tr.) at 78:25-80:19, 256:6-227:10 [sic][51]). To the contrary, Vaezi testified under oath that he ignored these studies because they were "irrelevant" and a "waste of his time":

> Q: Okay. And what type of search did you undertake to evaluate those NDMA studies that you discuss in your report?
> A: Well, I considered them somewhat irrelevant, so I didn't pursue any further because they were not directly linked to the question at hand for me.

Ex. 41 (Vaezi Dep. Tr.) at 77:22 – 78:2.

> Q: My question was have you done a review of the literature relating to NDMA and cancer in animal species? . . .
> A: Well, it's – it's – well, to me if the authorities – the regulatory agencies have done so and I'm basing my opinion on that, do I waste my time and look at that? If they have done an extensive work, do I need to do it?

*Id*. at 69:14 – 70:1. Vaezi thought not. He acknowledged that Defendants found NDMA in Defendants' ranitidine, *see id*. at 263: 5-10, but ignored the carcinogen at the heart of this litigation because he believed regulators had already reviewed NDMA. But Vaezi badly misinterpreted those regulators' findings.

### B.    Vaezi Misstated the Positions of IARC, EPA, and NTP

In their Response, Defendants emphasize that Vaezi testified that "no agency has stated that NDMA is a known carcinogen in humans[.]" D.E. 5968 at 59. True or not, this is a red herring. In his deposition, Vaezi testified that NDMA had *only* been shown to cause (1) liver cancer, (2) in rodents, (3) at high doses, and that (4) IARC, EPA, and NTP had concluded that NDMA did *not* cause cancer in humans. *See* Ex. 41 (Vaezi Dep. Tr.) at 67: 18-22 ("So IARC, EPA, NPT, they've all looked at this data, and they've all landed on the same thing that I'm talking about, that in humans, no [cancer], but again – definitively no, but in animals, only liver at high doses in rodents."); *id*. at 65:8-11 ("I'm not aware that any of the agencies, whether it be regulatory or respected authorities, have really said that NDMA by itself is a human carcinogen"). All four of Vaezi's claims are factually incorrect.

No regulator has concluded that NDMA only causes liver cancer. NTP concluded that several human epidemiological studies have "reported dose related- associations, some statistically significant," between NDMA and countless cancers *other* than liver cancer, including

---

[51] Plaintiffs have interpreted the typo in Defendants' citation to refer to Vaezi Dep. Tr. at 256:6-257:10, though Vaezi Dep. Tr. at 226:6-227:10 equally fails to support Defendants' proposition.

"oropharyngeal cancer, stomach cancer, esophageal cancer, [and] colorectal cancer."[52] As early as 1978, IARC found that NDMA induced "malignant tumours following its administration by various routes, including ingestion and inhalation, in various organs" including tumours "of the liver, kidney and respiratory tract."[53] NDMA induces multiple cancers.

No regulator has concluded that NDMA only causes liver cancer in rodents. IARC has found that NDMA "is carcinogenic in all animal species tested" including "mice, rats, Syrian golden, Chinese and European hamsters, guinea-pigs, rabbits, ducks, mastomys, various fish, newts and frogs." *Id*. NDMA thus caused cancer in numerous non-rodents because—to state the obvious—ducks, fish, newts, and frogs are not rodents.

No regulator has concluded that NDMA only causes cancer at high doses. The World Health Organization determined that "NDMA is clearly carcinogenic" based on "laboratory studies in which tumours have been induced in all species examined at *relatively low doses*[.]"[54]

Last, no regulator has concluded that NDMA does not cause cancer in humans. IARC has classified NDMA as "reasonably anticipated to be a human carcinogen."[55] NTP classifies NDMA as "reasonably anticipated to be a human carcinogen."[56] The WHO has concluded that the human epidemiological "data fulfill, at least in part, some of the traditional criteria for causality of an association between ingestion of NDMA and cancer" and that therefore "NDMA is highly likely to be carcinogenic to humans."[57] The most recent profile from ATSDR examines the same epidemiology from occupational and dietary studies that Plaintiffs' experts considered and identifies associations between NDMA and gastric, liver, bladder, prostate, and other cancers.[58] Every notable scientific authority has concluded that NDMA is a likely human carcinogen.

Vaezi's misinterpretation of regulator conclusions on NDMA is inexplicable. These are

---

[52] NTP, *2021 Report on Carcinogens, Fifteenth Edition, N-Nitrosodimethylamine*, https://ntp.niehs.nih.gov/ntp/roc/content/profiles/nitrosamines.pdf.

[53] IARC 1978 at 151.

[54] Liteplo RG, Meek ME, Windle W., World Health Organization, *Concise International Chemical Assessment Document 38: N-Nitrosodimethylamine*, at 4 (2002) (emphasis added).

[55] IARC, List of Classifications, https://monographs.iarc.who.int/list-of-classifications.

[56] U.S. Department of Health and Human Services, National Toxicology Program (NTP). *Report on Carcinogens*, (2d ed. 1981).

[57] World Health Organization (2002) at 23.

[58] ATSDR Tox. Profile (2022) *supra* note 35 at 4. Notably, the profile explains that liver cancer is a "primary tumor type seen in laboratory animals exposed to NDMA," but there have been "[n]o human studies examining" that association at this time. *Id.*

public documents. Moreover, the pretense that regulators already agreed with his tendentious conclusion that NDMA is not that relevant to cancer in humans is the reason he gave for not ignoring the NDMA science. With that pretense exposed as fallacious, Vaezi's opinion is infirm at a critical point, and therefore unreliable.

To illustrate how outlandish Vaezi's dismissal of the NDMA science is, consider that even the benzene cases Defendants cite clearly hold that science about the toxin at issue is "relevant." *See Henricksen*, 605 F. Supp. 2d at 1156 ("evaluations of both gasoline and its toxic component benzene are obviously relevant"); *Burst*, 2015 WL 3755953, at *9 ("literature pertaining to benzene is generally relevant to the causation question"). And in those cases, Defendants had *explained* why the toxin might not be relevant, namely, "competitive inhibition," *Rhyne*, 474 F. Supp. 3d at 747. Here, Defendants proffer no explanation for why NDMA in ranitidine is unlikely *a priori* to cause cancer.

Defendants might respond that the dose of NDMA is too low, but Vaezi does not think that matters at all. Asked how he "evaluate[d] those NDMA studies that you discuss in your report," Vaezi answered that he "considered them somewhat irrelevant, so [he] didn't pursue any further." Ex. 41 (Vaezi Dep. Tr.) at 77:22-78:5. When asked if he knew how the FDA addressed NDMA studies, he speculated: "they considered it as irrelevant as I do." *Id.* at 79:5-7. He went further still, absurdly announcing that the NDMA literature was irrelevant to the FDA even with respect to NDMA itself: "do you know whether the FDA undertook a review of NDMA dietary studies to reach a conclusion as to whether or not NDMA can cause cancer in humans?" *Id.* at 80:7-10. Answer: "I think they would equally consider it irrelevant." *Id.* at 15-16 (objection omitted). He declared the *amount* of NDMA in ranitidine to be "irrelevant" too, *id.* at 91:7, refusing to answer any questions related to that topic. *E.g.*, *id.* at 91-93:20 ("[T]hat is somewhat irrelevant…. It is irrelevant…. It's irrelevant…. Irrelevant…. The answer is irrelevant."). But every case holds that the nature and dose of the alleged toxin *is* relevant. Vaezi's contrary view is indefensible.

## C.   Defendants Fail to Rehabilitate Vaezi's Errors in Evaluating the Ranitidine Epidemiology

Like all Defendants' experts, Vaezi relied upon studies with short exposure windows. Plaintiffs' Motion highlighted an amazing fact: the longest exposure time in the studies Vaezi relied upon was 3 years (Cardwell). *See* D.E. 5841 at 90. And that study showed a statistically significant association between bladder cancer and ranitidine consumption. Defendants' Response

makes no attempt to rebut this three-year figure. This matters when "all cancers" have variable latency periods, Ex. 41 (Vaezi Dep. Tr.) at 140:25, and studies must therefore effectively define exposure to a toxin in terms of "timing, dose and duration of use," *id*. at 231:8-14.

Vaezi thought the studies were much longer. He testified that he could be confident because "that's been done over 14, 15, 16 years and no signal emerges at whatever level." *Id.* at 94:12-15. When asked which studies examined ranitidine consumption for 14-16 years, Vaezi slowly read through his report, suggesting: "So Yoon—Yoon—yeah, sure.· Yoon looked at it at 10 years.· You have the Danish studies that—Adami.· You have 10 to 18 years." *Id.* at 94:20-22. This is an egregious misreading of those studies. Yoon reported hazard ratios only for those who consumed ranitidine for less than 30 months (presumably there were precious few above 30), and the "follow-up period is restricted to seven years." Yoon (2021) at 7. Recall, Defendants agree that Yoon only "was able to assess *some* (i.e., short-term) cancer risk." Opp'n at 42. As for Adami, most of the participants had a single prescription, and the extreme end that the study tracked was only 10 prescriptions. Of *all* the participants (not just the 10-prescription subgroup), there were a "limited number of participants with long-term follow-up."

Vaezi's conclusions may well survive *Daubert* if there were multiple studies of exposure over 14-16 years with long follow-up and if regulators worldwide agreed that NDMA did not cause cancer. But neither of those premises is true. Since that is the basis of Vaezi's opinions, they must be excluded.

## VIII.   Benjamin Hatten

### A.    Dr. Hatten's Opinion Regarding NDMA Should Be Excluded Because It is Based on an Undocumented, Ad Hoc Analysis

Dr. Hatten's opinion that NDMA is not carcinogenic should be excluded because his conclusions rely on an alleged analysis that he concedes is "ad hoc" and which he wholly failed to document in his report. Defendants do not dispute that "consideration of the Bradford Hill factors is a reliable methodology for determining causation" in epidemiology. *In re Roundup Prod. Liab. Litig.*, 390 F. Supp. 3d at 1130 (N.D. Cal. 2018). And indeed, neither Dr. Hatten nor Defendants offer any alternative rigorous methodology that he relied on in forming his conclusions.

Yet Defendants concede that "Dr. Hatten did not 'formally' document a Bradford Hill analysis for the NDMA literature." Br. at 67. Dr. Hatten's lax methodology in forming his opinion about NDMA goes deeper than a mere failure to document his analysis. Defendants fail to address

his concession that he merely "kind of . . . performed an ad hoc review" of the epidemiological literature regarding NDMA. Ex. 33 (Hatten Dep. Tr.) at 180; *see also id*. at 176 ("*I think* I evaluated the literature and informally appl[ied] those criteria . . . but I did not formalize an analysis within my report.") (emphasis added); *id*. at 174 ("I reviewed that literature, but I didn't do a specific separate causation analysis of NDMA and bladder cancer, so I don't have a structured analysis available."). Defendants nonetheless contend that Dr. Hatten "did in fact review the NDMA epidemiology and apply the Bradford Hill criteria." Br. at 67. And they argue that this undocumented alleged "analysis for the ranitidine epidemiology supports and is consistent with his opinion that '[t]herapeutic use of ranitidine is not a cause of esophageal, gastric, pancreatic, liver, or bladder cancer in humans.'" *Id*.

That argument finds no support in Dr. Hatten's Report and is flatly inconsistent with Dr. Hatten's own deposition testimony. Dr. Hatten testified that he did not perform a Bradford Hill analysis to support his conclusion that NDMA does not cause the designated cancers because "performing a Bradford-Hill analysis [was] not necessary." Ex. 33 (Hatten Dep. Tr.) at 229. Instead of performing that analysis, he just "reviewed the supporting literature" and, based on that review that Dr. Hatten himself characterized as "ad hoc," he "did not find evidence of a true causal association." *Id*.

This sort of "ad hoc" review, amounts to little more than his assertion that he read the literature and based on his reading he decided that NDMA does not cause cancer. That falls far short of the rigor that *Daubert* demands. An "expert must be able to adequately explain how the data he relied on led him to his conclusions." *MidAmerica C2L Inc.*, 25 F.4th at 1328. By his own admission, Dr. Hatten has not offered any explanation at all, much less an adequate one. Judge Kugler excluded a nearly identical opinion under *Daubert* in the Valsartan MDL. Ex. 77 (Valsartan *Daubert* Order).

Indeed, Dr. Hatten's misconceptions about what the literature about NDMA actually says calls into question the care he took in his "ad hoc" review. Defendants do not dispute that numerous international organizations have categorized NDMA as a probable or likely human carcinogen. *See* Pls. Mot. at 95-96. Yet they offer no defense for the fact that Dr. Hatten opined that NDMA *is not* a human carcinogen, and then falsely testified that "kind of every other body that has looked into this question has also not identified NDMA as a – as a human carcinogen or cause of cancer in humans and I don't think what I'm saying is any different than that." Ex. 33 (Hatten Dep. Tr.)

at 176-77. Either Dr. Hatten's "review" of the literature was so cursory that he was ignorant of the conclusions of every major organization to render an opinion about NDMA's carcinogenicity, or he failed to understand the difference between those organizations' conclusions that NDMA is a probable (but not yet definite) human carcinogen and his own opinion that NDMA is affirmatively *not* a human carcinogen. Either way, Dr. Hatten's opinion is so lacking in factual support and logical connections to the literature that it must be excluded, just like the Valsartan expert.

In sum, Dr. Hatten's report leaves the Court and ultimately the jury in the dark about how he reached his conclusion, at odds with the scientific consensus, that NDMA does not cause cancer. To be admissible, an expert must provide "good grounds for each step in the analysis," and Dr. Hatten's complete failure to do so here "renders [his] testimony inadmissible." *Buland*, 992 F.3d at 1151. "Instead of properly bridging the gap" between his "ad hoc" review of the literature and his unqualified conclusion that NDMA does not cause cancer, Dr. Hatten "tried to ipse dixit over it; but a bald assertion cannot carry the *Daubert* burden." *United States v. Pon*, 963 F.3d 1207, 1221 (11th Cir. 2020).

### B.    Dr. Hatten's Opinion that Therapeutic Use of Ranitidine Does Not Cause Any Designated Cancer is Unreliable and Should Be Excluded

Defendants' attempt to rescue Dr. Hatten's opinion that ranitidine does not cause any of the designated cancers fares little better. They wholly ignore the fact that Dr. Hatten conceded that he again failed to include a formal Bradford Hill analysis in his report. *See* Pls. Mot. At 97; Ex. 33 (Hatten Dep. Tr.) at 133. That analysis, he claims, is "embedded in the discussion of the literature." Ex. 33 (Hatten Dep. Tr.) at 133. But the Bradford Hill analysis requires far more than simply discussing the literature. The entire point of the Bradford Hill factors is to structure an epidemiologist's analysis so the competing considerations in a complicated factual landscape can be reconciled and synthesized into a rigorous conclusion. Dr. Hatten's failure to include any formal Bradford Hill analysis again leaves the Court and the jury to guess about how his "review" of the literature led to his ultimate conclusion that ranitidine does not cause cancer. And as with his undocumented "analysis" of the epidemiological literature about NDMA, that gap in his reasoning renders his opinion unreliable and inadmissible. *See Pon*, 963 F.3d at 1221.

Defendants' effort to paper over the substantive flaws in Dr. Hatten's fatally flawed "analysis" that he "embedded in the discussion of the literature" likewise fails. First, Plaintiffs explained that "in forming his opinion about whether NDMA *in ranitidine* causes cancer, [Dr.

Hatten] *disregarded* the epidemiological studies about whether NDMA *in general* causes cancer." Pls. Mot. at 97-98 (second emphasis added). Defendants counter by citing the several pages of Dr. Hatten's report in which he discusses NDMA studies. That misses the point. By his own admission, Dr. Hatten decided that the NDMA studies he discussed in his report are irrelevant because "whatever exposure occurs via ranitidine – is captured by these ranitidine epidemiological studies. That's where we should be putting our focus on. That's where I put my focuses and that's the appropriate exposure outcome analysis in this assessment." Ex. 33 (Hatten Dep. Tr.) at 166. But Dr. Hatten never offered a cogent explanation of *why* he disregarded the NDMA epidemiology. For example, using a factor from the formal Bradford Hill analysis that Dr. Hatten never performed or at least never wrote down, he never offered an argument that it is biologically implausible that NDMA in ranitidine would cause cancer even though it causes cancer through dietary or workplace exposure. That unreasoned dismissal of countervailing evidence fails the requirement that an "expert considers all available evidence carefully *and explains how the relative weight of the various pieces of evidence led to his conclusion.*" *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d at 1311 (emphasis added).

Second, Plaintiffs explained that Dr. Hatten's discounting of the NDMA epidemiology is especially egregious in light of the limitations in the ranitidine epidemiology—in particular, insufficient exposure and insufficient follow-up period. Pls. Mot. at 98-99. Defendants offer only the cursory, single-sentence response that "Dr. Hatten, and the study authors themselves, acknowledged and accounted for purported limitations." Br. at 65-66 (citing Br. Background Section I.B). Defendants tellingly fail to cite to anywhere in Dr. Hatten's Report itself where he "acknowledged and accounted" for the insufficient exposure and follow-up times in the ranitidine epidemiology. Dr. Hatten's Report nowhere discusses those fundamental limitations. That failure renders his exclusive reliance on those flawed studies unexplained, and therefore unreliable and inadmissible. *Buland*, 992 F.3d at 1151 ("any step that renders the analysis unreliable under the [*Daubert*] factors renders the expert's testimony inadmissible").

Third, Plaintiffs explained that Dr. Hatten incorrectly concluded that "there is *no evidence* in the human epidemiology data of an association . . . between *any* ranitidine exposure and *any* cancer." Ex. 33 (Hatten Dep. Tr.) at 125 (emphases added). In reaching that conclusion, Dr. Hatten improperly disregarded the numerous studies showing such an effect. And as Plaintiffs explained, the impropriety of that exclusion of those studies was not merely a matter of contradicting the

authoritative text on epidemiological statistics—Dr. Hatten himself *agrees* that a group of studies can "demonstrate an effect [even though] most of the individual studies do not demonstrate a statistically significant effect." Ex. 33 (Hatten Dep. Tr.) at 128-29. Defendants counter that "Dr. Hatten referred to general statistical principles and was not referring specifically to ranitidine literature." Br. at 66. But neither Defendants nor Dr. Hatten explain why that "general statistical principle" would not apply in the context of ranitidine epidemiology," and there is no basis for such an arbitrary exception to "*general* statistical principles."

Finally, Plaintiffs explained that Dr. Hatten cherry-picked active comparator data even within the studies he favored, ignoring the active comparator data that refuted his conclusion. *See* Pls. Mot. at 100. Defendants oddly respond that there is "no evidence" that Dr. Hatten did so. Br. at 67. The "evidence" is Dr. Hatten's Rreport, which Defendants do not deny does not mention, much less account for, that countervailing data. For example, they do not deny that Dr. Hatten simply failed to consider the Caldwell study's adjusted odds ratio of 1.27 when comparing ranitidine users to users of other histamine-2 receptor agonists for daily defined doses greater than 1,095. *See* Ex. 33 (Hatten Dep. Tr.) at 152. And when pressed on that failure, Dr. Hatten speculated that it was "likely noise." *Id.* at 152. He thus *admitted* that he cherry-picked data, contrary to Defendants' denial, and proffered nothing more than ipse dixit to justify that cherry picking. That is not reliable scientific methodology. *See Price v. Carnival Cruise Lines*, No. 1:20-cv-20621-BLOOM/Louis, 2022 WL 951318, at *3–4 (S.D. Fla. Mar. 30, 2022) (excluding expert opinion for failure to consider all of the available evidence).

## IX.    Michael Porter

Like ships passing in the night, Defendants' Response fails to engage the actual arguments made in the Motion. They stand and require that Porter be excluded.

### A.    Porter Overstates Evidence That Agrees with Him

The vast overreach explained in the Motion is that Porter relied on Florian—a study about endogenous formation of NDMA from ranitidine based on testing urine—to conclude that FDA has endorsed the conclusion that NDMA in ranitidine does not cause bladder cancer. Porter Rep. at 3. Experts need not agree with Plaintiffs' view of Florian, but cannot invent conclusions out of whole cloth. That study at most suggests that NDMA does not form endogenously from ranitidine. Defendants can cite it for that conclusion. But Dr. Porter inferred from an absence of endogenous formation that there was no "biologically plausible mechanism of an increased risk of bladder

cancer." *Id.* This is a complete non-sequitur, since the study had nothing to do with bladder cancer, and, there is undisputely *exogenously formed* NDMA in most ranitidine, meaning that the absence of endogenously formed NDMA does not eliminate the biological mechanism at all.

Defendants say not one word in defense of this absurd inference. Instead, they cite a Webcast that talked about Florian's negative answer to whether "ranitidine is converted to NDMA in humans," Opp'n at 70, and other comments about the sensitivity of Florian's equipment. *Id.* True or not, Porter should have mentioned that 73% of the samples had no results, and should not have jumped from endogenous formation to bladder cancer in one flying leap.

Next, Defendants craft their own strawman, the argument that authorities have determined NDMA is a "known human carcinogen," Opp'n at 70, and knock it down. But this phrase, though twice-quoted, does not even appear in the Motion. The public health community does not call something a "known" carcinogen until after extensive human testing, which is, of course, unethical. But that does not mean Defendants can baselessly argue that NDMA does not cause cancer. The Motion argued that Porter's opinion that NDMA does not cause cancer should be excluded, a step Judge Kugler recently took in the Valsartan MDL for defense experts. Defendants do not even pretend to respond to the regulatory estoppel argument, which should bar at least certain Defendants from presenting evidence that NDMA does not cause cancer. Defendants forfeited any response on this point.

Last, rather than trying to defend Porter's indefensible reading of the Yoon study, Defendants attack Dr. Moorman. *See supra* section III.B (addressing this attack). The fact is, most participants in Yoon took ranitidine for less than thirty months, and none had longer than seven years' follow-up, which caused Yoon to say the study measured short-term, but not long-term risk—a statement Defendants now embrace. Opp'n at 42. In that context, Dr. Porter badly erred in saying that the study "evaluated long-term use." Ex. 17 (Porter Rep.) at 15. That is false. And it matters, because the critical flaw in his opinion is assuming that low-duration, short-follow-up studies accurately show the risks for long-term, heavy use. If Dr. Porter actually thought the Yoon study addressed long-term risk—a proposition the author disclaimed—it makes sense that he would come to his erroneous ultimate conclusion. The problem with Dr. Porter's statements about smoking is that he identified smoking as a problem only when the study showed a positive association, and irrespective of whether the study controlled for it or not. This is particularly odd because the Y. Kim study suggested that H2RA users smoked *more* than ranitidine users,

54

undermining Dr. Porter's assumption of parity between them. Yet, Dr. Porter did not mention this, and did not seek in any way to verify that ranitidine and H2RA users smoke at similar rates (it appears they do not).

### B.      Porter Understates Evidence That Disagrees with Him

By now, the Cardwell, Habel, Kantor, and Hidajat studies are well-understood by this Court. The visual of Porter's own summary of the bladder cancer epidemiology (presented at page 45 of the Motion) is striking—all the midpoints show increased risk. Yet Porter says *none* show an association. And he simply disagrees with the Ronco NDMA study, because—though the study authors disagreed—he believes recall bias will affect a 64-item food frequency questionnaire. Ex. 17 (Porter Rep.) at 24-25. The notion that men in Uruguay are selectively recalling high-NDMA foods because they have cancer is fanciful, since no ordinary person even knows which foods contain NDMA or that it causes cancer—in fact, ATSDR's Toxicological review this year predicted misclassification would result in risk *understatement*. *See supra* note 5. Porter's attacks on the Hidajat study show a lack of rigor—he appears not even to have seen multiple sensitivity analyses; not to have noticed the personal samples in the exposure matrix. The rebuttal report simply points out those facts from the original paper.

### C.      Porter's Bradford Hill Analysis Should Be Excluded.

As with every other expert, Defendants argue that Porter's Bradford Hill analysis should be admissible *because* they believe it was improper (because, implausibly, he denies an association). But if even Defendants agree the analysis was improper, it is admittedly unreliable and should be excluded. Defendants' arguments on the other prongs appear to restate the points made in his report, which themselves were unreliable. The dose-response analysis, for example, is jumbled nonsense. He relies on the fact that Yoon "only included long-term users," but Defendants have conceded it only assessed *short-term* risk, meaning Porter badly misread the study. He tries to explain away Cardwell's dose-response finding by hypothesizing that those who take more ranitidine must have smoked more (but hidden that fact from their medical records, else it would have been controlled for); he provides no reasoning or citation for this theory. Ex. 17 (Porter Rep.) at 29. Last, he relied on Norgaard, but this is the dose-response analysis from that study, in its entirety: "we found no dose–response association when restricting to persons who redeemed at least five and persons who redeemed at least 10 prescriptions." Ex. 71 at 6. In other words, when the dose changes from 5 to 10 prescriptions, the response is, unsurprisingly, not measurably

different. Each prong is like this, and the entire opinion should be excluded.

**X.    Frederick Guengerich**

### A.    Dr. Guengerich Cannot Reliably Apply a Threshold and Logarithmic Scale to NDMA

NDMA is a genotoxic carcinogen. *See* FDA Guidance on Nitrosamines at 1 n. 4 (stating that NDMA "is a genotoxic and carcinogenic agent"). That means, as GSK admits, that NDMA is "highly likely" to be "carcinogenic to humans potentially at *low levels* of exposure." Ex. 60 (GSKAN0003419540), at 3419545 (emphasis added). That makes the chemical NDMA *fundamentally different* from the chemicals referred to in Defendants' "often-cited principle that 'the dose makes the poison.'" Opp'n at 78 (quoting Guengerich Report). Although there are certainly many *other* substances that become harmful *only at* a certain dose, for NDMA, there is no evidence of a cancer "threshold dose," nor has a "no observed effect level" or NOEL been demonstrated. There is no accepted threshold at which any authoritative or regulatory body has concluded that NDMA does not cause cancer. Although *more* NDMA is of course *more* carcinogenic, NDMA is not considered safe even at small doses.

That is why the FDA says that the Peto study showed "a linear dose response *without evidence of a threshold*." *See* FDA, *Nitrosamines as Impurities in Drugs—Health Risk Assessment and Mitigation Public Workshop*, at 11 (March 29-30, 2021) (emphasis added), available at https://www.fda.gov/media/150932/download. That is why the FDA says that "a NOEL was not identified" for NDMA. *Id.* And that is why the FDA noted that its "expert panelists did not consider deriving a NOEL for nitrosamines to be appropriate, and it is *not accepted for genotoxic carcinogens*" like NDMA.  *Id.* (emphasis added). Other regulatory agencies agree. *See* Mot. at 109 n.307.

Dr. Guengerich apparently disagrees with these authorities. But apart from Dr. Guengerich, no one accepts that the non-linear threshold dose model applicable to non-genotoxic carcinogens applies to NDMA. As a result, Dr. Guengerich's pet theory—applying a non-linear threshold dose to NDMA—"may properly be viewed with skepticism" as it has been "able to attract only minimal support within the community." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993). And meanwhile his theory about NDMA does not "fit" the facts of this case. *See Waite v. AII Acquisition Corp.*, 194 F. Supp. 3d 1298, 1305 (S.D. Fla. 2016) ("To be appropriate, a 'fit' must exist between the offered opinion and the facts of the case") (citing *McDowell v. Brown*, 392

F.3d 1283, 1299 (11th Cir. 2004)). Because a too "large analytical leap must be made between the facts and the opinion," Dr. Guengerich's unique theory must be excluded. *Id.*

Defendants' efforts to bolster Dr. Guengerich's whimsical opinion fail. They suggest that the authorities referenced in Table 4 of his Report stand for the proposition that a non-linear threshold dose can be applied to NDMA. They do not. Even Dr. Guengerich qualifies these authorities as only being "consistent" with the Peto et al (1991) study,[59] and Peto itself expressly recognized "there was 'no indication of any 'threshold[.]'"[60] It is improper to extend the findings of studies beyond the conclusions reached by their authors. *See McClain*, 401 F.3d at 1248 ("But this shows again [the expert's] lack of scientific rigor in that he draws unauthorized conclusions from limited data—conclusions the authors of the study do not make."); *In re Accutane Prod. Liab.*, 511 F.Supp.2d 1288, 1291 (M.D. Fla. 2007) ("When an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study."). But that is precisely what Dr. Guengerich proposes to do here, providing another basis to exclude his opinions.

Defendants' attempt to downplay Dr. Guengerich's reliance on Waddell's use of a logarithmic scale is for obvious reasons: the former chief statistician for the National Toxicology Program at the U.S. Department of Health and Human Services in a peer-reviewed journal stated that "[i]t would be a serious mistake . . . to adopt Waddell's log linear extrapolation model for chemical carcinogenesis risk assessment." J.K. Haseman (2003), Mot. at 106 n. 299. This Court should not propagate that mistake.

Equally mistaken is Dr. Guengerich's reliance on the industry-sponsored study of Johnson (2021). Unmentioned in their defense is how the conclusion of 6 mcg/day of NDMA reached by Johnson and his co-authors was predetermined and established by GSK *before* Johnson began his "data analysis" and research for the article.[61] Given this obvious conflict of interest, coupled with the intrinsic bias of its authors, the study is suspect, and its persuasiveness must be properly discounted. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 501 n.17 (2008) ("Because this research

---

[59] Ex. 6 (Guengerich Rep.) at 122.
[60] Ex. 6 (Guengerich Rep.) at 122, n. 20.
[61] *See* Ex. 30, December 2019 email from Dr. James Harvey, GSK's Director of the Target Systems Safety Group at GSK (stating that GSK "need[s] to generate data to improve the SAR and we need to hook up with George [Johnson] to support the BMD work that will be inevitable for the ranitidine and established products").

was funded in part by Exxon, we decline to rely on it"). There is no indication that Dr. Guengerich applied the appropriate discounting here.

In sum, Dr. Guengerich's non-linear threshold dose stands alone. It was created for litigation purposes and unsupported by any scientific consensus, except for that presented by Dr. Guengerich's disproven hypotheses. It is "unscientific speculation offered by a genuine scientist." *Allison*, 184 F.3d at 1316-17. And thus it should be excluded.

### B.    Dr. Guengerich Cannot Conceal the Unreliability of his Theory of DNA Repair

"I didn't really mention this."[62] That is the best answer Dr. Guengerich could conjure when confronted with the fact that his report only addressed $O^6$-methylguanine adducts and failed to consider a plethora of other types of DNA damage when exposed to NDMA. In his report, Dr. Guengerich blanketly opined that human DNA-repair mechanisms will reverse damage caused by NDMA but supported his thesis with a discussion and analysis of only one type of DNA adduct all the while ignoring that there are several other DNA adducts formed by exposure to NDMA, and polymorphisms of the DNA repaired enzymes (resulting in differences in an individual's repair capacity) exist in the human population.[63] At deposition, Dr. Guengerich conceded that he "didn't really mention" polymorphisms, or, for that matter, any of the other potential causes for cancer resulting from the formation of adducts resulting from exposure to NDMA—such as $N^7$-methlguanine, $N^3$-methyladenine, and $O^4$-methylthymine.[64] And he feigned ignorance of the FDA Expert Working Panel's conclusion that his theory of DNA repair was "controversial" and not reliable to assess the risks posed by NDMA.[65]

Defendants claim that Plaintiffs mischaracterize Dr. Guengerich's Report and testimony, but a plain reading of both proves that assertion false. The truth is that Dr. Guengerich's novel

---

[62] Ex. 32 (Guengerich Dep. Tr.) at 423:18-20.

[63] Ex. 6 (Guengerich Rep.) at 108.

[64] Ex. 32 (Guengerich Dep. Tr.) at 417:6-13; 419:16-24; *see N*-Nitrosodimethylamine in Drinking-water, Background document for development of WHO Guidelines for Drinking-water Quality (2008) at 11 (World Health Organization specifically concluded that "[t]he principal DNA adduct formed following exposure to NDMA is N7-methylguanine (representing about 65% of all adducts formed initially upon exposure); $O^6$-methylguanine is a secondary adduct (representing about 7% of all adducts formed initially). Other DNA adducts formed in smaller amounts include N3-methyladenine and O4-methylthymine.").

[65] Ex. 32 (Guengerich Dep. Tr.) at 426: 13 – 427: 14 ("When you say 'controversial,' I'm not quite sure what you're talking about."); Ex. 50 (GSKZAN0003505669).

theory has no support other than on his say-so, and that is not sufficient grounds for his opinion testimony to be admissible.[66]

### C.    Dr. Guengerich's Disregard of Available Epidemiology Reflects an Unsound Methodology

When he is not a paid consultant, Dr. Guengerich routinely evaluates epidemiological evidence in his studies of the carcinogenesis of chemicals. Epidemiology is "[t]he most informative data on whether a substance causes cancer in humans," according to his Report.[67] When deposed, he resorted to epidemiology concerning an entirely different chemical—Aflatoxin –to answer whether there is any human benefit to ingesting NDMA.[68] Indeed, outside of litigation, in his published literature, he regularly reviews, assesses and analyzes epidemiology to evaluate cancers.[69] However, for this litigation, he avoided any evaluation of epidemiological evidence about the carcinogenicity of NDMA in humans. He repeatedly acknowledged that he made no effort to review any human epidemiology studies on the subject.[70] He also conceded to being only "vaguely familiar with Bradford Hill" criteria.[71] And, he eschewed any need to consider the totality of the evidence to reach his so-called mechanistic evaluation of whether it is biologically plausible that the NDMA in ranitidine can cause cancer in humans.

Defendants defend Dr. Guengerich's abandonment of his typical practice outside of this litigation as a "classic opinion on biologic plausibility." Opp'n at 83-84. To justify his change from the norm, they contend that toxicologists are "unapparelled" by the need to consider the totality of the evidence. Opp'n at 84. But toxicologists routinely consider the weight of all the evidence,

---

[66] *See Joiner*, 522 U.S. at 146 ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

[67] Ex. 6 (Guengerich Rep.) at 32.

[68] Ex. 32 (Guengerich Dep. Tr.) at 216:5 – 219:18.

[69] Ex. 32 (Guengerich Dep. Tr.) at 244:6 – 255:14, citing Kelly JD, Eaton DL, Guengerich FP, Coulombe RA Jr. Aflatoxin B1 activation in human lung. TOXICOL. APPL. PHARMACOL. 1997 May;144(1):88-95 (Ex. 6829); Guengerich FP, *The Environmental Genome Project: functional analysis of polymorphisms*, 106 ENVIRON HEALTH PERSPECT. 365-68, 365 (1998) (Ex. 6830).

[70] Ex. 32 (Guengerich Dep. Tr.) at 199:10-19; 200:1-6; 232:4-8; 232:23 – 233:1; 235:23-25; 240:3-6; 244:1-5.

[71] Ex. 32 (Guengerich Dep. Tr.) at 213:25 – 214:22.

including epidemiology and Bradford Hill criteria, to inform their opinions.[72] Despite his lack of the review of the totality of the evidence and epidemiological evidence, Dr. Guengerich concludes that "[ranitidine's] safety has been repeatedly demonstrated, including in preclinical toxicology studies that showed no evidence that ranitidine is carcinogenic or mutagenic" and "[t]herefore, even if NDMA were an established human carcinogen, any achievable dose of NDMA from ranitidine use is too low to plausibly case cancer because repair mechanisms will reverse any potential DNA damage from NDMA."[73] Dr. Guengerich cannot reliably opine that NDMA or ranitidine cannot cause cancer without reviewing the epidemiological evidence that examines that very question. Dr. Guengerich's convenient departure from his routine methodology for this litigation renders his opinions unreliable.[74] His testimony on these points should be excluded.

Defendants have failed to meet their burden of proving that Dr. Guengerich's opinions are supported by a reliable methodology. These opinions should be excluded.

**XI.     Timothy Wang**

**A.     Wang's Opinions Regarding the Amount of NDMA in Ranitidine Remain Incomplete and Therefore Unreliable**

To opine that there is *not enough* NDMA in ranitidine to cause cancer in these plaintiffs (as Dr. Wang does), one must first determine *how much NDMA* is actually in ranitidine when these plaintiffs took the drug. But this is exactly what Dr. Wang failed to do. Although he conceded that NDMA forms in ranitidine over time and when exposed to heat and humidity, Ex. 42 (Wang Dep. Tr.) at 108-11, he bases his opinions on NDMA levels demonstrated in *baseline* testing, *i.e.*, testing done *before* ranitidine has been exposed to heat, humidity, and time. *See* Ex. 21 (Wang Rep.) at

---

[72] *See McClain,* 401 F.3d at 1244 ("Toxicologists . . . doing research commonly assess risks posed by drugs, chemicals and other agents."); *In re Seroquel Prod. Liab. Litig.*, No. 6:06-MD-1769, 2009 WL 3806435, at *4 (M.D. Fla. June 23, 2009) (toxicologists' 'weight of the evidence' evaluation of the medical literature coupled with Bradford Hill considerations was considered reliable methodology); *Monje v. Spin Master Inc.*, No. 09-01713, 2015 WL 11117070, at *2 n.2 (D. Ariz. May 6, 2015), aff'd, 679 F. App'x 535 (9th Cir. 2017) ("toxicologists and other experts use [Bradford Hill considerations] to evaluate general causation."); *In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d at 1308 ("a failure to identify or describe the background risk of a disease is a 'serious methodological deficiency' and 'substantial weakness' in an expert's general causation opinion.").

[73] Ex. 6 (Guengerich Rep.) at 6-7.

[74] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (to be admissible experts must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

19. Indeed, as he admitted in his deposition, the testing he relied upon in his report "doesn't answer the question of what happens when the product is aged and goes through shipping and supply chain." Ex. 42 (Wang Dep. Tr.) at 110:8-11 ("I don't comment on that in my report, so I can't answer anymore—provide anymore information about that here."). That means there is simply "too great an analytical gap between the data and the opinion proffered," *Joiner*, 522 U.S. at 146, and provides ample reason to exclude Dr. Wang's opinion.

In response, Defendants first argue that Dr. Wang did not actually "opine on how much NDMA would be 'enough' or 'not enough' to cause cancer in humans." Opp'n at 87. But in the next breath, they admit that he did *exactly that* when assessing the "biological plausibility of whether NDMA exposure from ranitidine use can cause cancer of *any type* in humans." *Id.* (emphasis added). That assessment—whether it is even *plausible* that NDMA *could* cause cancer—is obviously a central pillar of Dr. Wang's analysis about whether NDMA-containing-ranitidine causes cancer. And because Dr. Wang made erroneous and "unsupported assumption[s]" about the amount of NDMA in ranitidine, that pillar is entirely unsupported—and requires exclusion of his opinion. *Buland*, 992 F.3d at 1151.

Defendants only other response is that the studies showing *real world* NDMA amounts are somehow "unreliable." Opp'n at 87-88. But Dr. Wang himself decided simply *not to account for* the formation of NDMA in ranitidine after the point of manufacture. Dr. Wang may believe that the FDA, EMA, and Dr. Najafi's testing are unreliable, but he did not substitute some other allegedly *more* reliable NDMA testing data; he instead used nothing. In fact, Wang used nothing despite his admission that ranitidine does in fact degrade due to time, temperature, and humidity.[75] Yet, having full knowledge that additional NDMA should be accounted for, Wang instead baldly opines that there just is not enough NDMA in ranitidine to cause cancer in humans. Wishing facts into existence is not an admissible methodology.[76] Dr. Wang's opinions should be excluded.

### B.    Dr. Wang's Opinions on Threshold Dose Are Indefensible

Compounding this problem, Dr. Wang's opinions are based on an erroneous assumption

---

[75] Ex. 42 (Wang Dep. Tr.) at 108:14-111:04, 115:16-116:13; Ex. 21 (Wang Rep.) at 19; *See also* Opp'n at 87-88 (explaining that Dr. Wang did not account for NDMA formation after manufacture because he does not believe reliable data exists).

[76] *See In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d at 1336 ("expert must 'know[ ] of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation.'") (citing *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)).

about the underlying science surrounding NDMA, namely that there is a "threshold dose" below which NDMA will not cause cancer. *See* Ex. 21 (Wang Rep.) at 5. There is simply no such threshold, as explained in Plaintiffs' Motion, and as recognized by numerous regulatory authorities. *See* Mot. at 116 (citing to conclusions reached by the FDA, EPA, and WHO that there is no threshold dose for NDMA). Yet again, this "unsupported assumption" is fatal to Dr. Wang's opinions. *Buland*, 992 F.3d at 1151.

In response, Defendants first attempt to run away from the point entirely. They argue that Dr. Wang's misunderstanding about threshold doses was somehow not a "premise" or "foundation" of Dr. Wang's opinions at all. Opp'n at 85-86. This is evident from the title of their argument on this point, which is *not* that Dr. Wang is *correct* about threshold doses, but rather that ("Dr. Wang Does Not Premise His Opinions On Whether There Is a Threshold Amount of NDMA Required to Cause Cancer."). But a black-and-white section of his Report—in the "summary of opinions" no less—states this premise in no uncertain terms: "published data . . . instead indicate the presence of a minimum NDMA threshold dose needed to induce cancer." Ex. 21 (Wang Rep.) at 6. And Defendants admit that this opinion indeed forms part of Dr. Wang's assessment of "whether it is biologically plausible that NDMA exposure from ranitidine can cause cancer of any type in humans." Opp'n at 86. There is simply no running away from it.

Besides disputing whether it was a "premise," Defendants essentially fail to offer a substantive defense of Wang's methodology on threshold dose. Opp'n at 85-86. They downplay the importance of the Peto study to Dr. Wang's opinions, stating that it was just one of many studies Dr. Wang considered, *id.*, at 86, despite it appearing more than 40 times in his expert report. They fail to explain why Peto in fact (as they say) demonstrates a threshold dose, given that the rats in that study given *small* doses of NDMA *still* developed more tumors than the control group— as Dr. Wang himself conceded. Ex. 42 (Wang Dep. Tr.) at 53-54. And they fail to engage with the uniform body of regulatory authorities who say that there is no threshold dose for NDMA. *See* Mot. at 116 (citing conclusions reached by the FDA, EPA, and WHO that there is no threshold dose for NDMA). Dr. Wang is simply mistaken about the existence of a threshold dose, and that mistake is central enough to his overall opinions to warrant exclusion.

### C.    Wang's Opinions Concerning NDMA in Valsartan Studies are Baseless

As the Motion explained, and as Defendants concede (by not arguing otherwise), Dr. Wang relied on a study of Valsartan and cancer (Chan 2022) in which the Valsartan *contained no NDMA*.

*See* Opp'n at 89.[77] Far from "supposed limitations in the study period," Opp'n at 89, this is an insurmountable problem. If the Valsartan in the Chan study did not have NDMA in it (and it did not), then that study has *zero* relevance to this case. With almost comical acrobatics, Defendants argue that Dr. Wang's testimony is not that there is no increased risk, but that the Chan study shows a "lack of evidence of an association." Opp'n at 89. No doubt the Chan study does not provide *evidence* of an association, but any other result would be highly perplexing, considering it is a study of an unrelated drug *that does not* contain a carcinogen. Framed differently, Wang's Report uses the Chan study to support his conclusion that "NDMA epidemiology studies showed no reliable, consistent association between NDMA exposure and specific cancer outcomes." Opp'n at 89. The basic problem is that the Chan study *is not* an NDMA epidemiology study at all.

The fact that Dr. Wang relied on this study says everything the Court needs to know about Wang's methodology and the time he spent reviewing the materials on his reference list.[78] It makes all the sense in the world that Valsartan *without* NDMA would not cause cancer but that Valsartan *with* NDMA would. This study underscores Plaintiffs' point that it is not Valsartan or ranitidine that is the issue: the true culprit is NDMA. Because Dr. Wang did not distinguish between Valsartan that contained NDMA and Valsartan which did not, these opinions would be confusing to a jury and are unreliable.

### D.    Dr. Wang's Opinions on Background Formation of NDMA Remain Unsound

Plaintiffs' Motion argued that Dr. Wang failed to apply a reliable process in determining that the amount of NDMA in ranitidine would be inconsequential when compared to the amount of NDMA produced in the human body. Specifically, Plaintiffs argued that Dr. Wang had cherry-picked studies and ignored other authorities, in particular the Zeilmaker study, which found scant amount of background NDMA formation, and the EMA, which noted that estimates of NDMA formation inside the body were variable and unreliable.

In response, Defendants argue that Dr. Wang did consider the EMA and Zeilmaker authorities. Opp'n at 90-91. But their citations only highlight the unreliability of Dr. Wang's

---

[77] *See* Pottegard, *et al.*, *Use of N-Nitrosodimethylamine (NDMA) Contaminated Valsartan Products and Risk of Cancer: Danish Nationwide Cohort Study*, 362 BMJ 3851 (2018); Ex. 42 (Wang Dep. Tr.) at 149:12-149:22. Valsartan's NDMA is caused by a manufacturing problem, not internal degradation like ranitidine, and so the line is sharp between Valsartan with NDMA and without it.

[78] *Id.*

conclusion that background rates of NDMA exceed the amount of NDMA in ranitidine.[79] Dr. Wang's report cites the Zeilmaker study (at pages 24-25), but he does not consider the study in the context of background formation of NDMA. Ex. 21 (Wang Rep.) at 20. This further highlights Plaintiffs' point that Dr. Wang did *not* consider this substantial variability of background NDMA levels shown in the medical literature in reaching his conclusions.[80] Dr. Wang's methodology of selecting only studies that showed the highest background rates of endogenous NDMA formation skewed his results in a manner that would be deceptive to a jury.[81]

### E.  Dr. Wang's Conclusions about NDMA and Primates Are Unreliable

Despite a clear statement by the WHO that NDMA causes tumors in *every species* tested, Dr. Wang persists in his opinion that it somehow does not cause cancer in primates. In support of that opinion, Dr. Wang primarily relies upon the Thorgeirsson study. Ex. 21 (Wang Rep.) at 23. In that study, the primates administered NDMA *died* from NDMA toxicity before the study could be concluded. One can debate what the result of that study actually *does* show about the risks of NDMA, but it hardly stands for the proposition that NDMA does not cause cancer in primates. Indeed, if this were true, the WHO would say that NDMA causes cancer in every animal species tested *except for primates*. That is of course not what the WHO actually says.

In response, Defendants argue Dr. Wang's opinion remains valid because the Thorgeirsson study went on long enough for a *different* nitrosamine to cause cancer. Opp'n at 88-89. That in no way shows that NDMA *does not* cause cancer. And in any event, Defendants neglect to mention that this other nitrosamine, NDEA, is even more potent that NDMA, such that the FDA and other international agencies set the acceptable intake limits for NDEA at one third of the levels of the NDMA limits.[82] The fact that a nitrosamine that is more potent was able to cause cancer faster

---

[79] European Medicines Agency, Committee for Medicinal Products for Human Use (CHMP), *Ranitidine Assessment Report*, 15 (2020) https://www.ema.europa.eu/en/documents/referral/ranitidine-article-31-referral-assessmentreport_en.pdf.

[80] *See* Ex. 42 (Wang Dep. Tr.) at 88:14-23 (endogenous formation of NDMA "is difficult to measure").

[81] *See* Fed. R. Evid. 403 (allowing for the exclusion of evidence that would mislead the jury).

[82] *See* FDA Interim limits for NDMA and NDEA in Valsartan, *available at* https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan (setting limits for NDEA at one third of the permissible NDMA levels). *See also* Ishinishi, N., Tanaka, A., Hisanaga, A., Inamasu, T., & Hirata, M., *Comparative study on the carcinogenicity of N-nitrosodiethylamine, N-*

than NDMA is expected and is not a valid reason to conclude that NDMA does not cause cancer in primates. Dr. Wang failed to acknowledge or even discuss the differences between NDMA and NDEA in his report. Thus, these opinions are unreliable and should be excluded.

## XII.   Lewis Chodosh

### A.     Chodosh's Dose-Response Opinions Are Premised Upon Junk Science

Outside of Dr. Guengerich, Dr. Chodosh is essentially the sole member of the scientific community promoting the theory that a genotoxic and clastogenic carcinogen, such as NDMA, has "a non-linear dose response for both mutagenesis and carcinogenesis." Ex. 3 (Chodosh Rep.) at 92. The failure of this made-for-litigation theory to gain any traction in the scientific community is itself reason to "view[ these opinions] with skepticism." *Daubert*, 509 U.S. at 594.

Perhaps recognizing the weakness in that Dr. Chodosh stands alone in his views, Defendants first mischaracterize Plaintiffs' arguments as "substituting regulatory assumptions for causation," Opp'n at 91, but the fact remains that Dr. Chodosh has ignored well-established, mainstream public health sources (which say that genotoxic carcinogens like NDMA do not have a threshold dose) and substituted his own unaccepted, contrarian theories. That maneuver does not make Dr. Chodosh's opinions any more reliable, it makes them junk science and, in fact, illustrates just how weak they are.[83]

Defendants also attempt to bolster Dr. Chodosh's dose-response opinions by misleadingly quoting from Plaintiffs' experts[84] and other sources to argue that because chemicals that cause

---

*nitrosodimethylamine, N-nitrosomorpholine, N-nitrosopyrrolidine and N-nitrosodi-n-propylamine to the lung of Syrian golden hamsters following intermittent instillations to the trachea*. CARCINOGENESIS, 9(6), 947–950 (1988), https://doi.org/10.1093/carcin/9.6.947 (finding NDEA to be far more carcinogenic in the respiratory pathway of golden hamsters).

[83] And importantly, Plaintiffs are not "substituting regulatory assumptions for causation" in the first place. While Plaintiffs' experts, of course, consider ***information and/or data from regulatory authorities*** as part of the basis of their opinions, Plaintiffs' experts are not substituting or relying upon regulatory ***assumptions*** as some sort of stand-in for reaching their own conclusions based on the totality of the evidence reviewed.

[84] For example, Defendants claim that Nohmi "agrees" that "the existence of threshold doses is generally accepted in biology and has specifically been demonstrated for NDMA and O6-methylguanine." *Id.* at 92 (citing Nohmi T, Matsumoto K., *Effects of DNA Polymerase Kappa and Mismatch Repair On Dose-Responses of Chromosome Aberrations Induced By Three Oxidative Genotoxins In Human Cells*, ENVIRON. MOL. MUTAGEN. 2020;61(1):193, 194, Cheffo Decl. Ex. 11.). But Nohmi does not say anything of the sort. Rather, Nohmi said that "it is unclear"

oxidative stress "may" have non-linear dose responses, that NDMA (which also causes oxidative stress) is "expected" to have a non-linear dose response, too. Opp'n at 92-93. But Defendants conveniently omit the fact that NDMA is a carcinogen not only because it causes oxidative stress, but also because it causes profound damage through a variety of ***additional mechanisms***, including (but certainly not limited to) by acting as: (1) an electrophile after metabolic activation[85]; (2) a genotoxic agent that induces DNA damage (including DNA strand breaks, DNA adducts, DNA-DNA cross links, and DNA-protein cross links)[86]; (3) a cause of genomic instability[87]; (4) a stimulator or chronic inflammation[88]; and (5) an immunosuppressant.[89]

Finally, and relatedly, Defendants' proposition is a logically-unsound non sequitur because it begs the very question it purports to answer. Simply put, just because chemicals that cause oxidative stress "may" have non-linear dose responses, does not mean that NDMA—a substance with multiple properties which jointly and severally bear upon its harmfulness—is necessarily "expected" to be the same. To say otherwise would be like claiming that since a fire "may" be extinguished with water, a kitchen ablaze from a grease fire would be "expected" to be extinguished with water as well (**disclaimer**: do not attempt to put out a grease fire with water). They are orders of magnitude different, both qualitatively and quantitatively. And with nothing

---

whether the assumptions applied to other genotoxic molecules "should be applied to oxidative genotoxic chemicals because they do not interact with DNA directly but interact with DNA indirectly via generated ROS." Defendants omit this important qualifier. And because NDMA (and O6-methylguanine) interact both directly with DNA through several different mechanisms, and indirectly with DNA via generated ROS, Defendants' reliance on Nohmi's statements regarding practical thresholds is misplaced and deeply misleading.

[85] Smith, M.T. *et al.*, *Key Characteristics of Carcinogens as a Basis for Organizing Data on Mechanisms of Carcinogenesis*, 124 ENVIRON HEALTH PERSPECT., 713-21 (2016).

[86] IARC Monographs on the Evaluation of Carcinogenic Risk of Chemicals to Man, vol. 17. IARC, Lyon, France, 125-75, 1978 ("IARC 1978"); Overall evaluations of carcinogenicity: an updating of IARC Monographs volumes 1 to 42. IARC Monogr Eval Carcinog Risks Hum Suppl. 1987;7:1-440. PMID: 3482203; Ex. 60 (GSKZAN0003419540).

[87] Souliotis, et al., Intra-and Intercellular Variations in the Repair Efficiency of O6-Methylguanine, and Their Contribution to Kinetic Complexity, 568 MUTAT. RES., 155-70, (2004).

[88] Kim E-M et al., Connexin 43 Plays an Important Role in the Transformation of Cholangiocytes with Clonochis Sinensis Excretory-Secretory Protein and N-Nitrosodimethylamine, 13(4) PLOS NEGL. TROP. DIS. 13 (2019).

[89] Desjardins, et al., Immunosuppression by Chronic Exposure to N-Nitrosodimethylamine (NDMA) in Mice, 37 J. TOXICOL. ENVIRON. HEALTH, 351-61 (1992); Ratajczak-Wrona, W. et al., PI3K-Akt/PKB Signaling Pathway in Neutrophils and Mononuclear Cells Exposed to N-Nitrosodimethylamine, 11 J. IMMUNOTOXICOL., 231-37 (2014).

left to support them, Chodosh's dose-response opinions cannot meet muster, and must be excluded.

### B. Chodosh Does Not Consider All DNA Adducts For His DNA-Repair Opinion

The Parties agree that NDMA causes multiple types of DNA adducts. Dr. Chodosh opines that the body's DNA-repair mechanisms are sufficient to repair the DNA adducts caused by NDMA such that it renders NDMA non-carcinogenic below a certain doses. *See* Ex. 3 (Chodosh Rep.) at 35. To reach such a conclusion, an expert must address *each type* of DNA adduct caused by NDMA, and the respective repair mechanisms, in order to explain why NDMA is nevertheless not carcinogenic. But Dr. Chodosh failed to do this kind of complete analysis.

In his Report, Chodosh states that there are *four* DNA adducts generated by NDMA: (1) $N^7$-methylguanine; (2) $N^3$-methyladenine; (4) $O^6$-methylguanine; and (4) $O^4$-methylthymine. *See* Chodosh Rep. at 34. But with respect to his threshold-dose theory, Dr. Chodosh fails to analyze two of them. After his sentence introducing the four adducts, $O^4$-methylthymine is not subsequently mentioned in his entire Report. $N^3$-methyladenine is only later mentioned once in passing. Chodosh Rep. at 35. And Dr. Chodosh stated that he did not know if other DNA repair mechanisms could repair $O^4$-methylthymine and $N^3$-methyladenine adducts. *See* Ex. 26 (Chodosh Dep. Tr.) at 159:3-11; Ex. 26 (Chodosh Dep. Tr.) at 158:20-159:2. This is clearly an insufficient basis for his opinion about NDMA having a threshold dose.

Perhaps recognizing this, Defendants make one last-ditch effort to salvage Chodosh's DNA-repair opinions by claiming that his failure to address two of the four DNA adducts and their repair mechanisms is of no import, because "O6-methylguanine is the *only* mechanism by which NDMA exerts its potential carcinogenicity." Opp'n at 94 (emphasis in original). In support, Defendants claim that this position is agreed to by "[t]he WHO, Dr. Chodosh, and Plaintiffs' own expert Dr. Panigrahy." *Id.* But none of this is true.[90]

_____

[90] None of these sources say what Defendants claim. The supposed WHO report Defendants cite does not speak for the WHO. *See* Cheffo Decl. Ex. 9 at 211 (the report "does not necessarily represent the decisions or state the policy of … the World Health Organization."). Dr. Panigrahy did not state that $O^6$-methylguanine is the "only" mechanism by which NDMA exerts carcinogenicity. Rather, he said that while $O^6$-methylguanine was "the most potent premutagenic lesion induced by NDMA," "[t]he mechanism of action of NDMA is related to metabolism by cytochrome P-450 enzymes to generate methyldiazonium ions and subsequent DNA adducts, predominantly ***N7-methylguanine and O6-methylguanine***." Ex. 16 (Panigrahy Rep.) at 159-60 (emphasis added). In fact, Dr. Panigrahy specifically explained that three additional DNA adducts are caused by NDMA aside from $O^6$-methylguanine ($N^7$-methylguanine, $N^3$-methyladenine, and

O⁶-methylguanine is not the "only" mechanism by which NDMA exerts its potential carcinogenicity. As previously discussed, NDMA is a genotoxic carcinogen that can exponentially accelerate the DNA damage exerted because it has other characteristics that act to accelerate cancer causation and promotion. *See* Brown Ex. 20 (Panigrahy Rebuttal Rep.) at 45. Thus, Chodosh's failure to consider all of the types of DNA adducts and their respective repair mechanisms cannot be excused, and cannot serve as a sufficient basis for his opinions. As such, his DNA-repair opinions should be excluded.

## XIII. Namandjé Bumpus

### A. Defendants Cannot Withdraw Dr. Bumpus As an Expert and Then Ask The Court to Rely on Her Testimony As If She Would Appear at Trial

Dr. Bumpus has been withdrawn as an expert in this case. Nonetheless, Defendants maintain that that Court may "consider Dr. Bumpus' reports and opinions as part of its general causation Rule 702/*Daubert* analysis." Opp'n at 97. That is illogical. Rule 702 governs when an expert "may testify." Likewise, *Daubert* concerns "the proper standard for the *admission* of expert testimony." *Daubert*, 509 U.S. at 585 (emphasis added). Here, Dr. Bumpus will not testify. There is nothing for the Court to admit. As a result, and as noted in Plaintiffs' initial submission, any motion to exclude Dr. Bumpus would be moot. *See Andrade v. Merson*, Case No. 21-cv-60563, 2021 WL 7451931, * 4 (S.D. Fla. Dec. 3, 2021).

The Court also cannot consider Dr. Bumpus' withdrawn testimony as part of a so-called "general causation . . . analysis." Opp'n at 97. First, despite Defendants' repeated invitations, the Court is not deciding general causation on the instant motions. It is deciding whether it will exclude the general causation opinions of either side's experts—specifically, here, challenges to Defendants' experts. To the extent that Defendants are asking the Court to decide whether Dr. Bumpus' (now withdrawn) conclusions are correct and should be credited over the testimony of one or more of Plaintiffs' experts, that is not the Court's role. "Such an inquiry would inexorably

---

O⁴-methylthymine), and that O⁶-methylguanine DNA-methyltransferase will not repair these three tumor-initiating DNA adducts. Significantly, both N⁷-methylguanine (which yields apurinic sites) and O⁴-methylthymine (which results in direct DNA mispairing) are known to cause DNA damage. *See* Panigrahy Reb. Rep. at 20-22, 45. Last, where they claim that Dr. Chodosh said that "O6-methylguanine is the *only* mechanism by which NDMA exerts its potential carcinogenicity," Defendants do not cite Chodosh's Report, but instead cite two portions of his deposition transcript which do not contain that quotation. *See* Opp'n at 94, n.432.

lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury." *Allison*, 184 F.3d at 1321 (citation omitted). Second, even could the Court declare the winner of the proverbial battle of the experts at this stage, it would have to base any such ruling on admissible evidence. *Cf.* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Defendants have conceded that they cannot admit Dr. Bumpus' testimony at trial. *See* D.E. 5856 at 2 ("Dr. Bumpus cannot consult for or testify in this litigation.") Accordingly, the Court cannot base any of its rulings on Dr. Bumpus' opinions.

Defendants' attempt to distinguish this situation from those present in *Andrade* by arguing that Dr. Bumpus is "unexpectedly unavailable," making this a different situation from an expert who is voluntarily withdrawn. As an initial matter, there is no record before the Court on the extent to which Dr. Bumpus' new position with the FDA was unexpected. But, in any event, the reason is irrelevant, Defendants have withdrawn her as an expert—just as occurred in *Andrade*. Defendants also note that they did not withdraw Dr. Bumpus until after she was deposed, distinguishing this case from *Morrison*. But that misses the point. This is not question of procedure, such as whether a party should be permitted to replace (or redesignate) a withdrawn expert given the stage of the case when the motion is filed. Rather, it is a question of evidence: Can the Court rely on testimony that a party will not be able to present at trial? As explained above, and as found in *Morrison*, the answer is no. For the same evidentiary reasons, the cases Defendants cite are of no help to them. In both *Soldo* and *Wade-Greaux*, the courts were deciding whether they could consider admissions secured from a withdrawn expert against the party that withdrew him. There, the courts found that a party is not permitted to shield itself from unhelpful testimony simply by withdrawing an expert that provided the admissions. We are not dealing with an admission of party opponent here. Rather, the reverse. Defendants ask the Court to rely on the testimony of their own expert in the face of their concession that she cannot offer admissible testimony at trial. Defendants have provided the Court with no authority permitting such a maneuver. The Court should not consider the withdrawn testimony of Dr. Bumpus.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' putative expert witnesses on general causation be excluded under Rule 702.

Dated: September 14, 2022

Respectfully submitted,

/s/ Tracy A. Finken
Tracy A. Finken
Email: tfinken@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

By: /s/ Robert C. Gilbert
Robert C. Gilbert, FBN 561861
Email: gilbert@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7270

/s/ Michael L. McGlamry
Michael L. McGlamry
Email: efile@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

/s/ Adam Pulaski
Adam Pulaski
Email: adam@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

*Plaintiffs' Co-Lead Counsel*

Rosemarie R. Bogdan
Email: Rosemarie.bogdan@1800law1010.com
MARTIN, HARDING & MAZZOTTI
1 Wall Street
Albany, NY 12205
Tel: (518) 862-1200

Mark J. Dearman, FBN 0982407
Email: mdearman@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000

Elizabeth A. Fegan
Email: beth@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd.
Yorkville, IL 60560
Tel: (312) 741-1019

Marlene J. Goldenberg
Email: mjgoldenberg@goldenberglaw.com
GOLDENBERG LAW, PLLC
800 LaSalle Avenue, Suite 2150
Minneapolis, MN  55402
Tel: (855) 333-4662

Ashley Keller
Email: ack@kellerpostman.com
KELLER | POSTMAN
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL  33134
Tel: (312) 741-5222

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY  10016
Tel: (888) 480-1123

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4629

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

Francisco R. Maderal, FBN 0041481
Email: frank@maderalbyrne.com
MADERAL BYRNE PLLC
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 520-5690

Lauren S. Miller
Email: laurenm@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1914 4th Avenue North
Suite 320
Birmingham, AL 35203
Tel: (205) 533-4175

Daniel A. Nigh, FBN 30905
Email: dnigh@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL  32502
Tel: (888) 435-7001

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX  78257
Tel: (800) 294-0055

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA  70130
Tel: (504) 524-5777

Steven B. Rotman
Email: srotman@housfeld.com
HAUSFELD, LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0602

Je Yon Jung
Email: JJung@maylightfootlaw.com
MAY LIGHTFOOT PLLC
3200 Martin Luther King Jr. Avenue SE
Third Floor
Washington, DC 20032
Tel: (202) 506-3591

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@saunderslawyers.com
SAUNDERS & WALKER, P.A.
3491 Gandy Boulevard North, Suite 200
Pinellas Park, FL 33781
Tel: (727) 579-4500

*Plaintiffs' Steering Committee*

Brooke Achua
Email: brooke@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd., 46th Floor
Yorkville, IL 60560
Tel: (646) 502-7910

Harrison M. Biggs
Email: hbiggs@yourlawayer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4633

Lea P. Bucciero
Email: lbucciero@podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Marlo E. Fisher
Email: marlo@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

Noah Heinz
Email: noah.heinz@kellerpostman.com
KELLER | POSTMAN
1100 Vermont Avenue NW, Floor 12
Washington, DC 20005
Tel: (202) 918-1841

Caroline G. McGlamry
Email: carolinemcglamry@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

Laura K. Stemkowski
Email: lstemkowski@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9165

Alexander C. Cohen
Email: acohen@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
120 East Palmetto Park Road
Suite 500
Boca Raton, FL 33432
Tel: (561) 750-3000

Kendra Goldhirsch
Email: goldhirsch@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY 10016
Tel: (888) 480-1123

Catelyn McDonough
Email: cmcdonough@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

Madeline Pendley
Email: mpendley@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7003

Daniel E. Tropin
Email: tropin@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (954) 990-2216

*Plaintiffs' Leadership Development Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 14, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

*/s/ Robert C. Gilbert*
Robert C. Gilbert

# EXHIBIT 76

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

1

2

3  ────────────────────────────

4   **IN RE:  VALSARTAN PRODUCTS**          **CIVIL ACTION NUMBER:**
    **LIABILITY LITIGATION**                **19-md-02875-RBK-KMW**

5                                            **EVIDENTIARY HEARING**
                                            **via ZOOM TELECONFERENCE**
6  ────────────────────────────

7

8        Mitchell H. Cohen Building & U.S. Courthouse
         4th & Cooper Streets
9        Camden, New Jersey  08101
         March 2, 2022
10       Commencing at 9:32 a.m.

10

11  **B E F O R E:**              **THE HONORABLE ROBERT B. KUGLER**
                                  **UNITED STATES DISTRICT JUDGE**

12  **A P P E A R A N C E S:**

13       MAZIE SLATER KATZ & FREEMAN, LLC
         BY:  ADAM M. SLATER, ESQUIRE
14       103 Eisenhower Parkway
         Roseland, New Jersey  07068
15       For the Plaintiffs

16       LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY PROCTOR, P.A.
         BY:  DANIEL A. NIGH, ESQUIRE
17       316 S. Baylen, Suite 600
         Pensacola, Florida 32502
18       For the Plaintiffs

19       HOLLIS LAW FIRM
         BY:  C. BRETT VAUGHN, RN, BSN, ESQUIRE
20       8101 College Boulevard, Suite 260
         Overland Park, Kansas 66210
21       For the Plaintiffs

22

23           Ann Marie Mitchell, Official Court Reporter
                   AnnMarie@AMreporting.com
24                     (856) 906-8171

25   Proceedings recorded by mechanical stenography; transcript
             produced by computer-aided transcription.

**A P P E A R A N C E S (Continued):**

        SKADDEN, ARPTS, SLATE, MEAGHER & FLOM LLP
        BY:  ALLISON BROWN, ESQUIRE
        One Manhattan West
        New York, New York 10001
        For the Defendants, Prinston Pharmaceuticals,
        Solco Healthcare U.S. LLC, and
        Zhejiang Huahai Pharmaceuticals Ltd.

        PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
        BY:  CLEM C. TRISCHLER, ESQUIRE
        One Oxford Centre, 38th Floor
        Pittsburgh, Pennsylvania  15219
        For the Defendant, Mylan Pharmaceuticals, Inc.

        GREENBERG TRAURIG LLP
        BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
        3333 Piedmont Road, NE, Suite 2500
        Atlanta, Georgia  30305
        For the Defendants, Teva Pharmaceutical Industries Ltd.,
        Teva Pharmaceuticals USA, Inc., Actavis LLC,
        and Actavis Pharma, Inc.

        **ALSO PRESENT:**

        LORETTA SMITH, ESQUIRE
        Judicial Law Clerk to The Honorable Robert B. Kugler

        Larry MacStravic, Courtroom Deputy

1                          - - -

2                       I N D E X

3                          - - -

4

5                 E X A M I N A T I O N S

6     <u>Witness</u>              <u>Direct</u>   <u>Cross</u>   <u>Redirect</u>   <u>Recross</u>

7     STEPHEN LAGANA, MD
        BY MS. LOCKARD          6
8
      DIPAK PANIGRAHY, MD
9       BY MR. TRISCHLER       54
        BY MR. NIGH                    93
10
      MAHYAR ETMINAN,
11    PharmD, MSC
        BY MS. BROWN           98
12      BY MR. VAUGHN                  144

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (PROCEEDINGS held via Zoom before The Honorable
 2    ROBERT B. KUGLER at 9:30 a.m.)
 3              THE COURT:  Well, I think we're all here.  And good
 4    morning, everybody.  As you know, I'm Judge Kugler.
 5              What we need to do this morning is set some ground
 6    rules.
 7              The first is, if you're not participating, we would
 8    appreciate if you would go off the video, because we have a
 9    lot of people on the screen, and we have a court reporter who
10    is trying to figure out who is saying what to whom.
11              The second thing is, I need you to identify now, for
12    us, who is going to do the questioning of the witness, and
13    who, on the odd chance there might be an objection, will be
14    speaking on behalf of the plaintiff.
15              So who is going to be doing the questioning?
16              MS. LOCKARD:  Your Honor, Victoria Lockard.
17              THE COURT:  Ms. Lockard, you have some feedback going
18    on big time.
19              MS. LOCKARD:  I understand.  Our tech is taking care
20    of that in the room.
21              THE COURT:  Okay.  In fact, I barely heard what you
22    said, Ms. Lockard.
23              Are you doing the questioning or --
24              MS. LOCKARD:  Yes, Your Honor.  I'll be doing the
25    questioning.
```

```
1          THE COURT:  And then who will be speaking on behalf
2   of the plaintiff, if it's necessary to raise any objections?
3          MR. SLATER:  Good morning, Your Honor, Adam Slater
4   for the plaintiffs.  I'll be, quote/unquote, defending
5   Dr. Lagana at the hearing.
6          THE COURT:  Okay.
7          MS. BROWN:  Good morning, Your Honor.  This is Alli
8   Brown, and I'll be doing the questioning for Dr. Etminan later
9   today.
10         THE COURT:  Okay.
11         MS. BROWN:  Thank you.
12         THE COURT:  By the way, did we work out the timing
13  later today?  I know one of the counsel had a potential
14  conflict with another case.
15         MS. BROWN:  It was me, Your Honor.  And we're hopeful
16  that if necessary, I understand the plaintiffs are amenable
17  to -- with the Court's permission, a short 30-minute recess at
18  2:00 if we are in the middle of the questioning.
19         THE COURT:  Sure.
20         MS. BROWN:  Thank you, Your Honor.
21         THE COURT:  No problem.
22         THE COURT:  Mr. Trischler, how are you?  You wanted
23  to say something.
24         MR. TRISCHLER:  I was just going to finish if the
25  Court wanted the full game plan for today.
```

*United States District Court*

```
 1          I will be doing the questioning of Dr. Panigrahy.

 2          THE COURT:  He's next, as I understand it.  Correct?

 3          MS. BROWN:  I believe that's the order, yes, sir.

 4          MR. SLATER:  Correct.

 5          THE COURT:  Mr. Slater, are you going to, quote,

 6 defend that one also?

 7          MR. SLATER:  I am not going to.  That will be I think

 8 Mr. Nigh.

 9          MR. NIGH:  That's correct.  That would be me, Your

10 Honor, Daniel Nigh.

11          THE COURT:  Then why don't we get started with

12 Dr. Lagana.

13          Dr. Lagana, I see you on here.  Would you raise your

14 right hand.

15          THE WITNESS:  Yes, sir.

16          STEPHEN LAGANA, MD, PLAINTIFFS' WITNESS, after being

17 duly sworn, was examined and testified as follows:

18          THE COURT:  State your full name.

19          THE WITNESS:  Stephen Michael Lagana.

20          THE COURT:  All right, Ms. Lockard.  He's all yours.

21                     DIRECT EXAMINATION

22 BY MS. LOCKARD:

23 Q.  Good morning, Dr. Lagana.

24 A.  Good morning.

25 Q.  You and I haven't had an occasion to meet quite yet, have
```

LASANA - Direct                                7

 1 │ we?

 2 │ A.   Not to my knowledge.

 3 │ Q.   Last week you submitted a certification in further

 4 │ support of your general causation opinions in this case.

 5 │ Correct?

 6 │ A.   Correct.

 7 │ Q.   And that was dated February 23, 2022.  Correct?

 8 │      Do you have that in front of you?

 9 │ A.   I do.

10 │ Q.   Just --

11 │ A.   Yes, that is the correct date.

12 │ Q.   All right.  And did you draft that certification

13 │ yourself?

14 │ A.   No.

15 │ Q.   Okay.  So you didn't write that certification, the

16 │ lawyers did?

17 │ A.   The lawyers drafted it with my input.  We discussed

18 │ everything in it in great detail, and they transcribed my

19 │ thoughts.

20 │ Q.   Now, you understand we're not here today to discuss the

21 │ challenges defendants have made as to your qualifications as a

22 │ pathologist.  Do you understand that?

23 │ A.   That's my understanding, yep.

24 │ Q.   And is it your understanding that one of the reasons

25 │ we're here today is to discuss the challenges defendants have

*LAGANA - Direct*                                                 8

 1  made to your methodology in arriving at your conclusions?

 2  A.   Correct.

 3  Q.   And your methodology in this case was to evaluate and

 4  take into account the various categories of medical and

 5  scientific literature and evidence discussed in your report

 6  and in your deposition.  Correct?

 7  A.   Yes.  As I stated, I applied a weight of evidence

 8  methodology and applied the guidelines of Sir Bradford Hill.

 9  Q.   Exactly.  And so essentially what you did in terms of

10  your methodology is you applied Bradford Hill, you did a

11  weight of the evidence analysis, you did a research project,

12  and you looked at the articles and literature that were

13  generated based on your research and rendered opinions based

14  on those -- that research alone.  Correct?

15  A.   I think that what you just described gets to the -- gets

16  to the essence of what I did.

17  Q.   Now, just for background, you are an anatomic

18  pathologist.  Correct?

19  A.   Correct.

20  Q.   You spend 75 percent of your time on clinical commitments

21  and reviews of specimens.  Right?

22  A.   Correct.

23  Q.   And your professional time, when you're not doing legal

24  work like today, is first and foremost clinical work, then

25  administrative, which has continued to increase, then teaching

 1  and then research?

 2  A.   Absolutely not.

 3       MR. SLATER:  I'm sorry, Your Honor.  I'm very

 4  hesitant to object, because I do understand what Your Honor

 5  said earlier.  I don't -- and I certainly don't want to

 6  disrupt.  I'm just concerned that we're not within the

 7  parameters Your Honor set.

 8       MS. LOCKARD:  Your Honor, if I may, Dr. Lagana, he

 9  has set forth a methodology in this case that defendants have

10  challenged as being outside of his normal expertise and

11  practice in the scope of his duties.

12       I'm not challenging -- we are not challenging or

13  getting into his background credentials and qualifications,

14  how many papers he's written and that sort of thing.  But when

15  this Court gave us the parameters at this hearing, the

16  Judge -- you were very specific.  You said, we need to know if

17  this is something that the witness does outside of litigation,

18  and if there wasn't litigation or compensation involved, that

19  he would apply the very same methodology that he has applied

20  in this case.

21       So I am not getting into his background, but I do

22  think we have a need -- a fair opportunity to get into his

23  methodology and how it differs from his normal work.

24       THE COURT:  How is this any different from what you

25  raised in your motion?

*LaGANA - Direct*                        10

        1           MS. LOCKARD:  Well, it is -- there are certainly
        2   questions in -- issues in the motion that bear on this which
        3   is why we are trying to get this testimony in the record today
        4   to support the arguments that we made in our motion.
        5           THE COURT:  Well, you cited extensively to his
        6   deposition testimony in your motion papers.  I'm well aware of
        7   the fact that you assert that he does not follow the same
        8   methodology he follows in his normal daily activities as a
        9   pathologist.  I get that.  Really, I do.
       10           The point of this is really the question about what
       11   he put in his certification.  So let's -- I mean, I'm going to
       12   give you some leeway to get some background information done,
       13   but let's please focus on his certification.  Okay?
       14           Thank you.
       15           MS. LOCKARD:  Understood, Your Honor.  We'll move
       16   forward.
       17   BY MS. LOCKARD:
       18   Q.   In terms of your certification, you make reference in it
       19   to a differential diagnosis.  Correct?
       20   A.   Correct.
       21   Q.   And in your practice as a pathologist, you can and
       22   frequently do diagnose cancers without giving an etiology of
       23   the cancer.  True?
       24   A.   You know, in a general sense, it's not always required to
       25   provide an etiology, but there are certainly plenty of

```
 1   examples, not terribly rare examples, in which providing an
 2   etiology is absolutely expected of an anatomic pathologist.
 3   So there's no real blanket answer to that.  It's sometimes yes
 4   and sometimes no.  It depends if it's clinically useful or
 5   not.
 6   Q.   Well, the truth of the matter, Dr. Lagana, is that the
 7   etiology of a cancer essentially never goes into your report.
 8   Isn't that right?
 9   A.   No, that's not right.  No.
10   Q.   Do you have a copy of your deposition with you?
11   A.   Uh-huh.
12   Q.   And we can pull that into the chat feature potentially if
13   we have that access of others.
14        MS. LOCKARD:  But Your Honor, may I read from
15   Dr. Lagana's deposition?
16        MR. SLATER:  We'd just request that the pages and
17   lines be identified so that we can all get to those first.
18        MS. LOCKARD:  Sure.
19        THE COURT:  I would like to -- give us a page,
20   please.
21   BY MS. LOCKARD:
22   Q.   Absolutely.  Turn to page 80, Dr. Lagana, line 15.
23   A.   Sure.
24   Q.   Let me know when you're there.
25   A.   Uh-huh.
```

1   Q.   When my partner, Ms. Cohen, was deposing you in your

2   sworn deposition back on August of 2021, you were asked the

3   question at line 15:  Have you ever used those words in a

4   report?

5        And your response, line 17, was, and I'll read:  The

6   etiology of a cancer essentially never goes into a report.

7        Did I read that correctly?

8   A.   Yep.

9   Q.   And so even if you diagnose a lung cancer, you don't say

10  lung adenocarcinoma, smoking related.  You just put lung

11  adenocarcinoma.   True?

12  A.   For lung adenocarcinoma, that's true.  And when I

13  answered the question previously, I stated that there are some

14  cancers in which the etiology is clinically relevant and

15  expected that a pathologist will include it, and there are

16  some that it is not.

17       So lung cancer for the most part is an example where the

18  etiology is assumed in most cases and the pathologist would

19  not include that in a report.

20       And I am aware of the testimony that I gave, that you

21  cited.  And in looking back on it, it was inartful.

22       And I think if we look at further testimony, specifically

23  on page 87, when Ms. Cohen continued -- I'm sorry, I'm still

24  answering.

25       Am I allowed to finish my answer?

1    Q.   I would like for you to answer the question.  I

2    understand there's no direct testimony allowed.  And I think

3    you have answered my question, Dr. Lagana.

4          THE COURT:  Ms. Lockard, you need to let the witness

5    finish.  And if you don't think it's responsive, if you need

6    the assistance of the Court, you can ask for the Court's

7    assistance, but we have to let the witnesses finish their

8    testimony.  Okay?  Thank you.

9          MS. LOCKARD:  Understood.

10   BY MS. LOCKARD:

11   Q.   Go ahead, Doctor.

12   A.   Thank you.  As the questioning in my deposition

13   continued, examples came to my mind where actually it is very

14   important for an etiology to be included in a report.  And I

15   brought those out during deposition, specifically on page 87

16   where I talk about the need to identify human papillomavirus

17   related to cancers of the oral cavity as opposed to

18   smoking-related cancers of the oral cavity.  And the reason

19   for that is because the human papillomavirus-related cancers

20   respond quite well to radiotherapy.

21        And so it is true on page 80 I gave an answer that if I

22   had more time to think or if I could redo it, I would put it a

23   little bit differently.  But as we went on with questioning,

24   clearly there are times when I do give an etiology for a

25   particular patient's cancer.

*LAGANA - Direct*                                    14

```
 1   Q.   Well, human papillomavirus is not one of the claimed

 2   cancers that's at issue in this litigation, is it, Doctor?

 3   A.   Well, I was speaking of an example; I was not speaking

 4   directly to this litigation.

 5   Q.   And you submitted an errata to your deposition, is that

 6   right, where you had a chance to read your deposition and make

 7   any corrections?

 8   A.   I don't recall submitting any errata.

 9   Q.   Well, nonetheless, your chosen choice of words were --

10   were that the etiology never goes into a report.

11        And in some other examples, you were asked about, well,

12   have you ever used the words "pharmaceutical-induced cancer"

13   in your pathology reports?  And the answer is no.  Correct?

14   A.   I would be -- so pharmaceutical-related injury has gone

15   into my reports dozens or hundreds of times, but

16   pharmaceutical-related cancer, no.

17   Q.   That would not be something you would put in your

18   report -- in a pathology report you generated.  Correct?

19   A.   Well, the state of knowledge previously, there -- there

20   aren't many examples that I can think of of

21   pharmaceutical-related cancer prior to this issue coming to

22   light.  So this is not something that I would have put in a

23   report previously.  I'm not sure that I would agree that I

24   would never put it in a report going forward.

25   Q.   All right.  Well, this issue came to light, and I believe
```

 1  you were retained back in 2018.  Correct?

 2  A.   It seems a little early to me, but I don't totally

 3  recall.

 4  Q.   So you don't know when the issue of nitrosamines in

 5  valsartan was first discovered and reported by the FDA?

 6  A.   Oh.  That is 2018.  I was talking about when I was

 7  retained I don't recall.

 8  Q.   So since 2018, you've never put in a pathology report

 9  you've generated the words "pharmaceutical-induced cancer" or

10  "valsartan-induced cancer."  Correct?

11  A.   Correct.

12  Q.   And as a matter of fact, a patient's history in taking

13  NDMA is not something that would normally be provided to you,

14  is it?

15  A.   On the scale of carcinogenesis, this is still a very new

16  issue, so, you know, before 2018, there would have been no

17  real reason, at least with respect to medications, to include

18  that sort of history on a pathologic requisition.  What

19  happens in the future, I don't know.

20  Q.   Okay.  Well, Dr. Lagana, if you could turn with me to

21  page 83 of your deposition, line 1.

22  A.   Okay.

23  Q.   You were asked:  And sitting here today, you can't think

24  of any time when you thought that something was NDMA or NDEA

25  induced.  You can't come up in your mind of any instance where

1  you thought that was the cause or genesis.

2      And your answer was:  I think a patient's exposure

3  history to NDMA is not something that would normally be

4  provided to me.  It's not something that would typically enter

5  my thinking.

6      Were those your words, Doctor?

7  A.   Sorry, what page and what line were you talking about?

8  Q.   Page 83, line 1, sir.

9  A.   83.  Okay.  Sorry, I was on 81.

10 Q.   No problem.

11 A.   Yep, that's what I said.

12 Q.   All right.  And before this valsartan litigation and your

13 meeting with Mr. Slater in the fall of 2020, you had never

14 done any research outside of the litigation on NDMA or NDEA.

15 True?

16 A.   True.

17 Q.   And prior to this litigation, the question of whether

18 ingestion of NDMA or NDEA as an impurity in valsartan and

19 whether that can cause cancer in humans had never even come up

20 in your practice.  Correct?

21 A.   I wouldn't have expected it to, but no.

22 Q.   But as a scientist or a clinician or an MD, you had never

23 looked at this issue before.  Correct?

24 A.   Well, I wouldn't say that.  I mean, it depends how

25 specific you want to define this issue as.  Certainly I had

*LAGANA - Direct*                                      17

 1   some background knowledge of nitrosamines and what they are

 2   thought to do before I entered into this litigation.  I did go

 3   to medical school, and I performed a residency and fellowship.

 4   Q.   I understand.  But the specific question I'm asking you

 5   is, as a scientist or a medical doctor, prior to being

 6   retained, you had never looked at the issue of whether

 7   nitrosamines in valsartan causes cancer.  That's a true

 8   statement.  Right?

 9   A.   Yes.  When Mr. Slater gave me this question, I approached

10   it with an open mind.  I didn't have a preconceived sense that

11   the amount of nitrosamine in valsartan would or would not

12   cause cancer.  I went through the literature, and I performed

13   a literature review the same way I would if I was writing a

14   review article of which I've written several.

15   Q.   Right.  And we'll get to that in a moment.

16        But my question to you is that you've been retained by

17   Mr. Slater before, in the Benicar litigation.  Right?

18   A.   Correct.

19   Q.   And in the Benicar litigation, the diagnostic approach

20   you took there was standardized, and it was the approach

21   utilized in your clinical practice.  Right?

22   A.   I am both a clinician and a researcher.  Research is my

23   second largest responsibility at work.  And so I -- there are

24   clinical methods that I use.  If Mr. Slater were to want to

25   ask me about a particular patient in this matter, I would look

*LASANA - Direct*                                    18

 1   at the slides and the history in the same way I described in

 2   Benicar when multiple cases were presented to me.

 3        In Benicar, I also looked at the question of general

 4   causation.  And in that sense, I reviewed the literature in

 5   the same way I do here, which is to take an open -- open mind,

 6   look through the literature, weigh the evidence, and use my

 7   judgment to draw a conclusion.

 8   Q.   Well, in Benicar, you started with a review of clinical

 9   information for the patients and the slides for those

10   plaintiffs.  Correct?

11   A.   I don't remember which I did first.

12   Q.   Okay.  Take a look at page 104 of your deposition,

13   please, sir.

14   A.   Okay.

15   Q.   Down on line 16, you were asked:  And then when we get

16   into Benicar in 2016 in your report, or 2017, you said, quote,

17   the diagnostic approach I take to such cases is standardized

18   and is the approach utilized in my clinical practice in

19   connection with the studies of authors in the peer-reviewed

20   medical literature and presentations given at major

21   professional meetings.

22        I start with the review of very basic clinical

23   information, generally limited to the presenting symptoms, for

24   example, diarrhea, and then begin my slide review.  Right?

25        And your answer was:  Remains true.

*LAGANA - Direct*                                      19

 1        Next question:  And that's how you do your clinical work
 2   also.  Correct?
 3        And you said yes.
 4        Is that testimony still accurate, sir?
 5   A.   100 percent, but we're conflating clinical work and
 6   research work.
 7   Q.   Right.  I understand.  But my point is that the
 8   standardized approach you described as what you used in
 9   Benicar is not the same approach you used in valsartan where
10   you didn't have clinical patient information, data and slides.
11   Correct?
12   A.   I'll rephrase what I said before, which is -- more
13   accurately is you're conflating clinical work and research.
14        If I was asked to review a particular patient's case and
15   determine whether I believed that individual person's cancer
16   was caused in part or in total by valsartan, I would follow
17   the exact process that I described in this snippet that you
18   just read.  That's how I approach a clinical case.
19        As a researcher, I have written many review articles in
20   which I did not personally review any cases.  I looked at the
21   literature.  And those have been peer-reviewed, and some of
22   them have been widely cited.  So in my second role as a
23   physician researcher, the researcher part, that does not play
24   out in the same fashion as looking at a particular patient's
25   pathologic material does.

*LASANA - Direct*                                20

```
 1   Q.   I'm just simply asking you about your methodology in
 2   Benicar as an expert witness versus your methodology in the
 3   valsartan litigation as an expert witness.
 4        Do you understand?
 5   A.   The difference is -- there's a difference between general
 6   causation and specific caution.  And the things that you're
 7   talking -- the examples that you're reading are the way I
 8   would approach the question of specific causation, not the way
 9   I would necessarily approach the question of general
10   causation.
11   Q.   And in this case, though, you're not being asked to give
12   a specific causation opinion.  True?
13   A.   Thus far I have not been asked to opine about any
14   specific patient.
15   Q.   Now, in your practice, in your research engagements,
16   you've never researched to publish an epidemiology review
17   answering the question of general causation.  Correct?
18   A.   Well, I've written several review articles with
19   subcategories on epidemiology, specific subheadings of
20   epidemiology as well as causation.  So I think that that is an
21   incorrect -- it's a very, very precise wording that you used
22   there.  I don't quite know exactly how to answer it.
23        But the -- but if the general question is, have you ever
24   done research studies dealing with epidemiology and causation,
25   the answer to that is absolutely.  And they've been published
```

*LASANA - Direct*                                                21

```
 1    in the peer-reviewed medical literature.
 2    Q.   But you've never published an article that answers the
 3    question, based on a literature review, does exposure X cause
 4    cancer in the general population.  Correct?
 5    A.   I'd need to take a few minutes to look through my
 6    bibliography.
 7    Q.   Well, I'm sure plaintiffs' counsel can address that with
 8    you on redirect if needed.
 9         Let me change gears for just a moment.
10         In looking at your certification, you represent that you
11    took into account the various categories of medical and
12    scientific literature.  Correct?
13    A.   Correct.
14    Q.   But your discussion of valsartan in your report was
15    focused almost exclusively on NDMA.  True?
16    A.   NDMA is by far the most prevalent nitrosamine in humans,
17    and so, you know, the majority of the research that's
18    available to review does deal with NDMA.  But there are
19    certainly examples in my report where I speak to the potent
20    carcinogenicity of NDEA, such as -- just give me one second --
21    the Thresher paper and the Zheng paper on pancreatic
22    adenocarcinoma.
23    Q.   And those --
24    A.   And also --
25    Q.   Go ahead.
```

LABANA - Direct                                    22

 1  A.   That's okay.  I'm done.

 2  Q.   Right.  And so it's true that NDMA is by far the most

 3  commonly studied nitrosamine of the two.  You agree with that.

 4  Right?

 5  A.   I do.

 6  Q.   Now, despite there being significantly more literature

 7  addressing NDMA than NDEA, you felt it was appropriate to

 8  extrapolate NDMA literature in rendering your NDEA opinions.

 9  Correct?

10  A.   I wouldn't put it in such a black and white phraseology.

11  I did review original medical literature related specifically

12  to NDEA.  I gave two examples a moment ago.  I don't know that

13  those are the only examples, but they're the ones that come to

14  mind.  And furthermore, I went with the -- I did also follow

15  the guidance afforded by WHO who has said that the two should

16  be looked at equivalently.

17       Further, I read what FDA said about the issue.  And

18  actually, FDA set the acceptable maximum limit of NDEA quite a

19  bit lower than NDMA, implying that they too consider it more

20  dangerous even than NDMA.

21       So given imperfect evidence, not as robust as NDMA, as

22  you said, I addressed it in as scientific a method as I

23  could -- as I could.  And I think I did do that fairly.

24  Q.   But the only two peer-reviewed, published articles you

25  can cite to that address NDEA are Thresher and Zheng.  Right?

LAGANA - Direct                          23

1   A.   No, I don't agree with that at all.  Those are the two

2   that are on the top of my head.  I mean, I did not study as if

3   I was going to be given an exam on this.  I'm happy to go

4   through the report again and look at the details of

5   everything.  The fact that only two of them come to my mind is

6   really immaterial.  That's a question of my memory, not a

7   question of what I looked at.

8   Q.   Well, certainly you expected you would be asked these

9   questions today.  Correct?

10            MR. SLATER:  Objection.

11   BY MS. LOCKARD:

12   Q.   About --

13            MR. SLATER:  I'm sorry, Your Honor, again, I'm very,

14   very, very hesitant to object, but the word "NDEA" doesn't

15   even appear in this certification.  Again, I'm being very,

16   very restrained, but I would object at this point and ask to

17   get back on course.

18            MS. LOCKARD:  Well, Your Honor --

19            THE COURT:  Counsel, where are we going with this?

20   He doesn't discuss NDEA in this certification.

21            MS. LOCKARD:  Well, correct, but he does say in his

22   certification in paragraph 3 that I evaluated and took into

23   account various categories of medical and scientific

24   literature and that that formed the basis for his methodology.

25            My point is that the various categories of medical

```
 1  and scientific literature did not include NDEA literature.
 2          THE COURT:  Well, but paragraph 3 is in response to
 3  what the defense raised about null hypothesis.  And he's
 4  trying to explain where he began.  It has nothing to do with
 5  NDEA.  So let's move on, please.
 6  BY MS. LOCKARD:
 7  Q.   Okay.  Dr. Lagana, the question you were asked to answer
 8  in this case is whether ingestion of NDMA and NDEA as a
 9  contaminant or impurity of valsartan is a cause of cancer in
10  humans.  True?
11  A.   Well, I would say the question was -- basically I agree
12  with you.  But just to make the wording a little bit more
13  refined, I would say the question I was asked to answer was,
14  is the NDMA and NDEA that contaminated valsartan pills
15  probably or a probable carcinogen to the humans who ingested
16  those pills or not.  And I did approach that question from a
17  neural standpoint, weighing the evidence, positive and
18  negative studies and equivocal studies, all of which I
19  considered, and I reached a judgment, which is in my report.
20  Q.   Well, Dr. Lagana, if you could turn to your deposition,
21  page 21, line 17.  Let me know when you're there.
22  A.   Uh-huh.
23  Q.   You were asked, you understand -- and again, in this
24  report you start with a sentence that says:  This report sets
25  forth my opinions with regard to the question of whether
```

*LAGANA - Direct*                                25

 1   ingestion of NDMA and NDEA as a contaminant or impurity of

 2   valsartan can cause cancer in humans.  Can cause cancer in

 3   humans.

 4        Did I read that correctly?

 5   A.   Yes.  And I believe that's what I just said.

 6   Q.   Well, the question, you would agree, of whether NDMA or

 7   NDEA can cause cancer in humans is a different one from

 8   whether it is a probable human carcinogen.  Right?

 9   A.   I --

10   Q.   I'll move on, Dr. Lagana.

11        You've heard and read that the scientific method should

12   start with a null hypothesis, which is a hypothesis that there

13   is no association of causation unless it's proven otherwise.

14   Right?  You've heard that.

15   A.   Yeah.  The null hypothesis is the statistical starting

16   point of any scientific experiment and it's why we set a

17   p-value for significance at .05.  So if I do an experiment and

18   I get a positive result and the p-value is .51, that's

19   really -- or sorry, .49, that's really saying that it's more

20   likely than not that my experiment is true.  But it's only

21   2 percent more likely, so it's -- so because we have to start

22   with the null hypothesis in statistics, we as a medical and

23   scientific community have set the typical acceptable p-value

24   as .05.

25        So meaning that, you know, there has to be less than a

```
 1  5 percent chance that an association is -- is a false -- a
 2  false signal for us to take the results as positive.
 3  Q.   But you don't believe you were required to start from the
 4  null hypothesis because you didn't perform a statistical
 5  analysis.  Right?
 6  A.   Well, we can colloquially talk about null hypothesis in
 7  that you should keep an open mind.  And I did keep an open
 8  mind.  I approached this question without a preconceived
 9  concept that NDMA or NDEA in valsartan pills were going to
10  cause cancer in humans.  I approached it with a open mind and
11  a neutral starting point, and I read the literature and
12  reached my judgment.
13  Q.   Well, in your certification you attempt to explain your
14  commentary on the report about your assumptions going into the
15  case by saying that you were simply discussing the concept of
16  a differential diagnosis.  Correct?
17  A.   I'm sorry, my assumptions about -- I'm not sure I
18  understand exactly what you're asking me.
19  Q.   Well, in your report, and what we asked you about on
20  cross-examination in your deposition and what we raised in the
21  briefing, is a comment that you made in your report on page 11
22  and 12 that states:  In any patient who develops cancer and is
23  known to have a significant exposure to a probable human
24  carcinogen, it should be assumed that the carcinogenic
25  exposure increased the risk or contributed to the cancer.
```

 1         That was from your report.  Correct?

 2             MR. SLATER:  Objection.  It's not an accurate reading

 3    of what the report says.  It's an inaccurate paraphrase.

 4    BY MS. LOCKARD:

 5    Q.   Okay.  Let's take out the report and turn to page 11 and

 6    12, Dr. Lagana.

 7    A.   Sure.

 8         Can I respond now or wait --

 9    Q.   Let me ask my question.

10    A.   Sure.

11    Q.   So if you put down -- about halfway down the page there's

12    a bold heading.  And the heading says:  Does NDMA likely cause

13    cancer in humans at the levels in the contaminated valsartan?

14    Correct?

15    A.   Yes.

16    Q.   And is that -- that's the header you drafted yourself.

17    Right?

18    A.   Correct.

19    Q.   You authored it?

20    A.   Yes.

21    Q.   And that is the general causation question, is it not,

22    does NDMA likely cause cancer in humans at the levels in the

23    contaminated valsartan?

24    A.   Absolutely.

25    Q.   That's not a specific causation inquiry, is it?

LAGANA - Direct                    28

```
 1   A.   That, no.  That statement does not refer to specific

 2   causation.  It's a general causation question.

 3   Q.   So if you follow along with me, third sentence after this

 4   general causation heading --

 5   A.   Uh-huh.

 6   Q.   -- you state:  Therefore, for any patient who develops

 7   cancer and is known to have a significant exposure to a

 8   probable human carcinogen (the levels documented above

 9   constitute a significant exposure in my opinion), it should be

10   assumed that the carcinogen -- or excuse me, carcinogenic

11   exposure at least increased the risk or contributed to the

12   subsequent cancer, unless there is a convincing body of

13   evidence to suggest that the carcinogenic insult is null with

14   respect to the specific cancer in question.

15        So first of all, did I read it correctly that time?

16   A.   Definitely.

17   Q.   Okay.  Embedded in this sentence is the assumption that

18   you're representing should be made that a carcinogenic

19   exposure at least increased the risks or contributes to the

20   cancer unless there's convincing evidence otherwise.  That's

21   the essence of your statement.  Correct?

22   A.   Well, again, we're conflating the idea of a particular

23   patient with the idea of general causation.  So as it states

24   very clearly -- I'm not done.

25        As it states very clearly in this sentence, for any
```

*LAGANA - Direct*                    29

1    patient who develops cancer.  And as it goes on to say, it

2    should be assumed that the carcinogenic exposure at least

3    increased the risk or.  So a carcinogen is something that

4    increases the risk of cancer.  It's basically definitional.

5         And so what I'm talking about in this sentence is how I

6    would approach a particular patient if the general causation

7    question had already been firmly established.  For example, if

8    I see a patient who has been smoking cigarettes for 60 years

9    and develops a lung cancer, it would be wildly inappropriate

10   to say, hmm, I wonder -- let me take a few years to study --

11   you know, to start researching whether it's possible that

12   cigarettes can cause lung cancer.

13        The research is established.  The association and

14   causative nature of the relationship is clear.  And as a

15   physician treating a specific patient, not answering a general

16   question, I would apply -- I would use the applied medical

17   literature to answer the question.

18   Q.   Well, I understand the explanation that you've given in

19   the certification, Dr. Lagana, but the fact is, you're not

20   being asked in this case to make a specific causation

21   determination.  Correct?

22   A.   I have not thus far been asked to make a specific

23   causation -- to opine about the specific causation in any

24   specific patient.

25        So this -- this sentence that we're talking about here

```
 1  really doesn't even relate to the question of general
 2  causation.  It's quite clear because it does say for a patient
 3  in it.
 4  Q.  Well, and that's my point as well.  If these statements
 5  don't relate to the question at hand, it's not helpful to the
 6  exercise today, is it, Dr. Lagana?
 7  A.  Give me a moment to think about how I'd like to answer
 8  that, please.
 9      Well, look, I'm not a professional witness.  I'm a
10  doctor.  I perform research.  Perhaps I put more thinking or I
11  explain more of my thinking in more depth than was needed to
12  in this report, and it has certainly given people who are
13  motivated to misunderstand me tremendous opportunity to
14  misrepresent what I said, even though the specific words are
15  in the sentence, including for any patient.
16  Q.  And I certainly don't intend to misrepresent you, Doctor,
17  but these are your words.  You wrote this report.  Correct?
18  A.  And the words are true and correct.  You keep
19  misunderstanding them or misstating their meaning, when I
20  believe we've said several times at this point that it relates
21  to dealing with a specific patient if the science is already
22  settled.
23      If the defense believes that the science is totally
24  settled, that the amounts of NDMA in these pills are probable
25  human carcinogen, then, I mean, we could just -- you should
```

 1  settle the case now.

 2  Q.  Well, you understand, don't you, that the science isn't

 3  settled with respect to general causation, unlike your

 4  cancer-smoking analogy.  Right?

 5  A.  Well, I think the science is less mature than cigarette

 6  smoking and cancer, but I have looked through quite a bit of

 7  literature, all of which is cited or most of which is cited in

 8  my report.  And I have given weight to the various forms of

 9  evidence, and I have come to the conclusion, the conclusions

10  that are stated in my report.

11      So I -- to me, it is certainly more likely than not that

12  the amounts of NDMA in contaminated valsartan are carcinogenic

13  in humans.

14  Q.  Exposure to cigarette smoke is a known carcinogen.

15  Correct?

16  A.  Yes.

17  Q.  It's a group 1 carcinogen as determined by IARC.  Right?

18  A.  Yes.

19  Q.  You're aware, that's not the case with NDMA or NDEA.

20  It's not a known carcinogen according to IARC.  Correct?

21  A.  It's a probable human carcinogen according to IARC.

22  Q.  Now, I understand that -- this language that you have put

23  under -- in your report under the general causation heading,

24  you now say in your certification that that really goes to a

25  differential diagnosis.

```
 1       But no --
 2  A.   It was --
 3  Q.   -- nowhere in your report do you even talk about
 4  differential diagnosis.  The words "differential diagnosis"
 5  don't even appear in your report, do they?
 6  A.   I'd have to have it virtual -- on my computer and
 7  control-F it to know for sure, but that statement is an ex --
 8  it starts -- it's an introductory statement to how a doctor
 9  approaches a particular patient.
10       And then I get into the, you know, dozens of studies
11  regarding NDMA and NDEA in human cancer.  And those are the
12  studies that form the basis of my general causation opinion.
13       These sentences that have been plucked out and
14  misrepresented in my opinion are background sentences about
15  how I would approach a specific patient with cancer, not how I
16  would answer a general causation question.
17  Q.   Right.  And that's not surprising given that 75 percent
18  of your time is dealing with specific patients, correct, as
19  opposed to answering a general causation question?
20  A.   Yeah.  Earlier you mentioned that my -- you kind of tried
21  to get into my job description.  And yes, clinical medicine,
22  anatomic pathology, is 75 percent of my life.
23       But the next largest area is research.  And also, I don't
24  want to draw some phony distinction between clinical practice
25  and general causation of disease.  Pathology is the study of
```

```
 1   disease.  That absolutely includes the causation of disease.
 2   So thinking about, reading about and talking about causation
 3   of disease is part and parcel of what I do almost every day.
 4        I'm a teacher as well.  That time when I'm doing clinical
 5   work, I'm also often about half that time, I have a trainee
 6   with me, and I'm explaining to that trainee causes,
 7   manifestations, everything else that's part and parcel of
 8   disease, which is absolutely a pathologist's business.
 9   Q.   Doctor, did you apply the null hypothesis in this case,
10   yes or no?
11   A.   I didn't do a statistical analysis, so I didn't use null
12   or not null hypothesis.  But colloquially, I did approach it
13   with an open and neutral position, and I looked at the
14   literature to convince me one way or the other.
15   Q.   Did you adhere to the scientific method?
16   A.   Yes, to the extent that you can when you're not
17   performing experiments.  I mean, the scientific method is
18   hypothesis-driven -- generally speaking is hypothesis-driven
19   experimental work.  I didn't do any experiments.  I didn't
20   have a hypothesis.
21        As I've mentioned before, I have written several review
22   articles in the peer-reviewed medical literature.  And that
23   entails exactly what I did here, which is to pick a topic.  In
24   this case I was provided a topic.  And look at what I
25   considered to be the relevant original research and use my
```

*LASANA - Direct*                                           34

1    judgment to form an opinion based on the weight of the

2    evidence.  That's what I did.

3    Q.   So just so I understand, so you did not start with a

4    hypothesis when you approached this case?

5    A.   That's true.

6    Q.   And your position is that's not required because you

7    didn't do any original clinical research, and you didn't do

8    any statistical work.  Right?

9    A.   Correct.  I started with a neutral mindset.  I had no

10   particular opinion one way or the other.

11   Q.   In your description and explanation of your methodology

12   and process for reaching a conclusion, you likened this case

13   to a scenario of whether jumping out of a ninth floor building

14   causes harm.

15        Do you remember that discussion?

16   A.   I think you're misrepresenting the discussion.  I did use

17   that analogy, but I don't believe it was in the context of

18   whether -- of any specific case.  I think it was a general

19   statement.

20   Q.   Well, your position was that in some situations, you can

21   just use a little bit of common sense rather than the null

22   hypothesis.  Right?

23   A.   In some situations, yes.  In a general sense, yes.  I

24   never said that that's what I did here or that that statement

25   even has anything to do with this litigation.

*LAGANA - Direct*                                35

```
 1   Q.   Right.  Obviously, this is not one of those situations
 2   where the conclusion relies on common sense.  Right?
 3   A.   Well, any conclusion worth making usually requires a
 4   little bit of common sense, but for the most part, I would
 5   agree with you, that to have a conclusion here requires a
 6   careful analysis of the literature, the medical and scientific
 7   literature, and requires one to -- at some level, I mean, one
 8   does have to make a judgment.  There are a number of papers.
 9   In my opinion, most of them clearly go in a certain direction,
10   and that's using the weight of evidence.  I reached my
11   conclusion.  But there does -- there is an element of human
12   judgment in this matter.
13   Q.   Right.  But if a conclusion can be reached based on
14   common sense, then we don't need experts like yourself to come
15   in and explain it to a jury who has already possessed their
16   own common sense.  Right?  That's my point.
17   A.   Sure.  Of course, there's no -- common sense does not
18   answer this question by itself, no.
19   Q.   So you don't agree that the Bradford Hill methodology
20   itself requires that -- that requires a null hypothesis in the
21   beginning of the review prior to applying the nine viewpoints?
22   A.   Well, Bradford Hill is a guideline.  It's a way to
23   evaluate the epidemiologic and other forms of literature, but
24   originally epidemiologic.
25        I think -- I think it requires -- to apply it fairly
```

1   requires starting from a neutral position, which is what I did

2   here.  Whether you want to call that the null hypothesis, it's

3   sort of misusing the term.  So I do think if you start with a

4   preconceived answer and just cherry-pick stuff to support your

5   preconceived answer, that would not be a proper application of

6   any methodology, including Bradford Hill's.

7   Q.   So --

8   A.   That's not what I did here in any sense.

9   Q.   So just to be clear, you do not agree that the Bradford

10  Hill methodology requires a starting point with a null

11  hypothesis.  Correct?  That's your testimony?

12  A.   My testimony is that in spirit, I think that it basically

13  does, but it's using an overly technical term in my opinion

14  that's incorrectly used in that context.

15  Q.   Dr. Lagana, your certification explains that you took

16  into account the various categories of medical and scientific

17  literature and evidence discussed in your report.

18       And those -- the categories that you're referring to,

19  those are the citations that are listed at the end of your

20  paper.  Correct?

21  A.   At the end of my initial report?

22  Q.   Yes.

23  A.   Yes, yes.

24  Q.   Now, your references cited did not include and 2021

25  article entitled "Permitted daily exposure limits for

1    noteworthy N-nitrosamines" by Dr. George Johnson, did it?

2    A.   What is the date of publication on that article?

3    Q.   It is April 2021.

4    A.   April 2021.

5         Do you have the date of my...

6         When was my report filed?  July 2021.

7         What is the citation again?

8    Q.   The title of the article is "Permitted daily exposure

9    limits for the N-nitrosamines" that was written by Dr. George

10   Johnson.  It's not on your citation list.  Correct?

11   A.   Allow me to review it.  I don't recall.

12        No, I don't believe that I did rely on that study.

13   Q.   And so you don't recall coming across Dr. Johnson's paper

14   when you did your literature review and research?

15   A.   I don't recall, no.

16   Q.   And so Dr. Johnson's paper did not factor into your

17   weight of the evidence analysis.  Correct?

18   A.   Nope, not if I didn't see it.

19   Q.   And you were asked about this article in your deposition.

20        Have you not gone back to look at this article since you

21   were deposed?

22   A.   I don't remember the questioning, and I did not go look

23   for the article.

24   Q.   Well, I'll be glad to direct you to page 25 of your

25   deposition, if necessary, to refresh your recollection --

LASANA - Direct                    38

```
 1   A.   Okay.
 2   Q.   -- line 25.
 3        And you were asked:  Do you know Dr. Johnson, a
 4   toxicologist, who came out with a recent article on NDMA and
 5   NDEA?
 6        And your answer was no.
 7        Have you ever heard -- excuse me.  You never heard of
 8   him?
 9        Not that I recall.
10        Did you read his article?
11        You said:  We'd have to check the list.
12        And the question to you was:  Sitting here right now, do
13   you have any recollection of reading Dr. Johnson's recent
14   article that came out in 2021?
15        And your answer was:  I might recall the article.  I
16   don't recall the name.  I'd have to see what article we're
17   talking about.
18        Do you see that testimony?
19   A.   Yes, yes.
20   Q.   Okay.
21   A.   I'd never read the article before or since, or I have no
22   recollection of having seen the article before or since.
23   Q.   So did you not think that a recent 2021 article on
24   "Permitted daily exposure limits for noteworthy N-nitrosamines
25   found in valsartan" would be important to your opinions in
```

 1  this case?

 2  A.   Well, certainly it'd be -- if I were to be called to

 3  trial, it would be extremely important for me to fill in all

 4  the -- to review all the literature that's been published from

 5  the time when I drafted my report until the time that I was

 6  going to speak to a jury.  I don't think that I need to be

 7  constantly monitoring it.  I think it's -- I have not produced

 8  a document with new opinions, so I have not -- I don't think

 9  that it's necessary to talk about -- about my methods.

10  Looking at a new study is a new study.  And I'd be happy to

11  deal with it and present it -- you know, present my opinions

12  to a jury on it should that become relevant.  But that has

13  nothing to do with my methods that I took into -- that I used

14  to produce this report.

15  Q.   Well, you understand that you're testifying here today

16  under oath in an MDL in federal court before a federal judge

17  to defend your methodology.  And you didn't think that it was

18  important to go back and review the literature you'd relied

19  on?

20  A.   I did review some of the literature I relied on.  I

21  believe I just told you that the study that you're

22  highlighting is not one of the studies I relied on.

23  Q.   Now, keeping in mind that there is a dearth of literature

24  published specifically on NDEA, wouldn't you want to see

25  Dr. Johnson's paper if it addresses NDEA?

                              *LASANA - Direct*                    40

 1   A.   Well, I have no knowledge of the paper, so it's hard for
 2   me to speak to it, but I'd certainly -- if I were to be asked,
 3   again, to opine about my general causation opinions, I would
 4   review any literature that had been published in the time
 5   between my production of the -- of my report and me delivering
 6   my opinions again.
 7   Q.   Well, you were made familiar with the paper when you were
 8   asked about it in your deposition last year.  Correct?
 9   A.   It was mentioned to me.  I was questioned for nine hours.
10   I'm sorry, I don't, you know, go home and start poring through
11   PubMed.
12   Q.   Now, shifting gears for a moment, you -- in your
13   literature citations, you also cite to the WHO document.
14   Correct?  That's another document you relied upon?
15   A.   Yeah.  There were several.  I believe there was more than
16   one WHO citation, but, yes, the WHO's comments did inform my
17   thinking, along with the rest of the medical and scientific
18   literature.
19   Q.   Well, and one of the bases for the WHO's conclusion about
20   carcinogenicity of nitrosamines according to your report was
21   the direct interaction with DNA consistent with tumor
22   formation.
23        Do you recall that from the WHO?
24   A.   If you could just point out the part of my report that
25   you're referencing, I'd like to look it over for myself.

1  Q.   Sure.  It's page 12 and note 18, right in the middle of

2  the page.

3  A.   Uh-huh.

4  Q.   So in your report, you're talking about the World Health

5  Organization issuing a summary analysis.  Right?

6  A.   Correct.

7  Q.   And you go on to talk about what the authors observed,

8  and you quote from the WHO:  "Putative pathways for the

9  metabolism of" DNMA -- excuse me -- "NDMA are similar in

10 rodents and humans, and indeed the formation of the

11 06-methylguanine have been detected in human tissues exposed

12 to NDMA."  They concluded, "Therefore, owing to the

13 considerable evidence of carcinogenicity in NDMA in laboratory

14 species, and evidence of direct interaction with DNA

15 consistent with tumor formation..."

16      That's the reference I'm directing you to.  Do you see

17 that?

18 A.   Yes.

19 Q.   So my question to you is, did you in your literature

20 review take into account categories of medical and scientific

21 literature addressing the impact of DNA --

22 A.   Sorry, there was a ding there.

23      Addressing what?

24 Q.   I'll repeat it.

25      My question to you is, when you did your literature

 1  review, did you take into account categories of medical and

 2  scientific literature addressing the impact of DNA repair?

 3  A.   Absolutely.  Yes.  I have a rather lengthy section about

 4  Lynch syndrome, which is a congenital deficiency of DNA

 5  repair.  So, yes, I did -- I did indeed think of DNA repair.

 6  Q.   Other than your reference to Lynch syndrome in your

 7  discussion of the Danish study that you cite in your report --

 8  other than discussion of Lynch syndrome, there's nowhere else

 9  in your report that you considered or discussed the DNA

10  repair.  Correct?

11  A.   Certainly not true.  I considered it.  It's pathobiology

12  of cancer.  You can -- I considered it throughout the drafting

13  of the entirety of the report.  DNA can be injured by various

14  substances, including nitrosamines.  And oftentimes that

15  insults or that injury is repaired, and sometimes it's not.

16  And when it's not, then you get a tumor.  So that's just

17  pathobiology.  And I did discuss it, that pathobiology, in

18  detail in the section about Lynch syndrome.

19       So to say, you know, I didn't think about it and didn't

20  write about it is totally inaccurate.  I did think about it

21  and included it in my report.

22  Q.   Well, my question is not did you think about it, but did

23  you actually look into the research on DNA repair?

24  A.   Well, your question was did I consider it.  You used the

25  words "did I consider it?"  And I absolutely considered it.

```
 1       As far as did I look into the research on DNA repair, to
 2   an extent.  And I quoted -- I cited it in the context of Lynch
 3   syndrome.  But also, it's background knowledge that I have
 4   that I know well.  It's part of my training.
 5   Q.   Okay.  So in rendering your opinion, you didn't think
 6   that it was necessary to do any literature review with respect
 7   to DNA repair mechanisms then.  Is that fair?  You just relied
 8   on your background and training?
 9   A.   I believe I said pretty clearly at least twice that I did
10   cite literature related to this in the context of Lynch
11   syndrome.
12   Q.   Outside of Lynch syndrome, did you do any research into
13   DNA repair mechanisms?
14   A.   I mean, as I sit here today, except for the example in
15   which I did do it, I don't remember a second example.
16   Q.   You agree that dose and length of exposure are reasonable
17   things to consider when testing the hypothesis.  Correct?
18       MR. SLATER:  Your Honor, again, I would object at
19   this point.  I believe that counsel's gone so far beyond the
20   certification that at this point I would ask that counsel be
21   limited to the certification.
22       THE COURT:  Sustained.
23       Let's focus, please, on the certification.
24   BY MS. LOCKARD:
25   Q.   Well, your various categories of medical and scientific
```

 1  literature that you took into account, as mentioned in

 2  paragraph 5 of your certification, those categories did not

 3  take into account specific literature regarding a

 4  dose-response curve.  Correct?

 5  A.   Completely incorrect.

 6  Q.   You did not look at specific literature addressing a

 7  dose-response curve by each of the cancers alleged in this

 8  case, did you?

 9          THE COURT:  Excuse me.  Let me interrupt.

10          Counsel, paragraph 5 of the certification is a

11  continuation of his discussion of null hypothesis.  It doesn't

12  open the door to all the questions you asked him at his

13  deposition and all the grounds that you submitted in your

14  motion.  Let's move on to what's in the certification, please.

15          MS. LOCKARD:  Okay.  I understand, Your Honor.  I

16  hear you.

17  BY MS. LOCKARD:

18  Q.   In paragraph 6 of your certification, Dr. Lagana, you

19  provide the example that you briefly referenced earlier

20  regarding a patient with cancer who is a lifetime cigarette

21  smoker.  In that case, one would have a high index of

22  suspicion and place cigarette smoking high on the differential

23  diagnosis.

24      Do you see that in your certification?

25  A.   I do.

```
 1   Q.   When making such an assessment to place cigarette smoking
 2   on the differential, wouldn't it be important to you to assess
 3   the dose and duration of the smoking?
 4   A.   Yes.  Well, I think I said -- hold on one second.
 5        I believe I said a lifetime cigarette smoker in my
 6   certification.  So yes, that would include, obviously,
 7   considerations of dose and duration.
 8   Q.   So the statement in your report recognizes that dose and
 9   duration are important when you're deriving a differential
10   diagnosis for a particular patient as to the cause of their
11   cancer.  Correct?
12   A.   I don't think it's controversial to say that more
13   cigarette smoking throughout one's lifetime is more risk to
14   you than less.  That's well established.  And I do.  I have no
15   argument with the idea that dose and duration are important
16   when looking at any carcinogen.
17   Q.   You would agree that that's true for any carcinogen,
18   correct, that more of the carcinogen is bad, less is less bad.
19   Correct?
20   A.   That's a very general way of putting it.  I think that,
21   you know, there are -- for some carcinogens there are
22   threshold levels.  I wouldn't want to -- generally, I agree
23   with what you just said.
24   Q.   Wouldn't it also be important to consider the type of
25   cancer when presented with a cancer patient with a history of
```

LASANA - Direct                              46

```
 1  smoking, to determine etiology?
 2  A.   Absolutely.  I think I said lung cancer in this example
 3  that I gave, or at least I hope I did.  Yes.  Cigarettes are
 4  well known to cause cancers of the lung, they cause cancer of
 5  the bladder, they cause cancer of the head and neck.  There
 6  are some cancers that they specifically have been shown not to
 7  cause, such as mesothelioma, for example.
 8       So yes, the specific cancers are relevant when
 9  considering the impact of a carcinogen.
10  Q.   Well, in fact in your statement in your certification you
11  don't specify lung cancer.
12  A.   Okay.  I should have.
13  Q.   Okay.  And just like in your report and conclusions, you
14  discuss the risk of cancer generally, but you don't specify
15  individualized risks for each of the cancers that are alleged
16  in the suit, do you?
17  A.   I'm not sure I totally understand the question.  I dealt
18  specifically with whatever cancers were specifically in the
19  literature, such as gastric cancer, colorectal cancer, brain
20  tumors, lung cancer, liver cancer, pancreatic cancer.  These
21  are the ones that -- bladder cancer, kidney cancer, ureter
22  cancer.  These are the ones that come to mind as having had
23  specific literature references -- oh, esophageal cancer of
24  course.
25  Q.   But you didn't do a Bradford Hill analysis with respect
```

 1    to each of these individual cancer types.  Right?

 2    A.   Each of those cancer types went into my overall Bradford

 3    Hill analysis.

 4    Q.   Right.  But your overall analysis was applying the nine

 5    viewpoints to the issue of cancer in general, not specific

 6    cancers.  In other words, you didn't take a body of literature

 7    that related to liver cancer and apply the nine viewpoints

 8    from Bradford Hill to that body.  Right?

 9    A.   Well, one of the important mechanistic pieces of this was

10    entry into the bloodstream.  And I did deal with that directly

11    in my report.  When the carcinogen does get into the

12    bloodstream, it becomes quite plausible that it can cause

13    cancer in generally any organ that receives blood.

14         A counter-example, for instance, would be asbestos.

15    Asbestos is a terrible carcinogen.  It causes cancers, well

16    established to cause cancers of the lung and pleura, but it

17    doesn't get into the blood.  So no one's had, like, I don't

18    know, brain cancer because of asbestos.  So --

19    Q.   And the answer to my question, respectfully, Doctor, was

20    no, you did not do an independent Bradford Hill analysis for

21    each of the cancer types.  Right?

22    A.   Well, I considered the viewpoints and I considered the

23    weight of the evidence.  I did not do a formalized Bradford

24    Hill recitation for every type of cancer that is likely to be

25    caused by contaminated valsartan.

 1   Q.   But you would agree there was some inconsistency in the

 2   literature when you look at these individual cancer types in

 3   terms of the findings from the reports.  Right?

 4           MR. SLATER:  Your Honor, I would place the same

 5   objection.

 6           MS. LOCKARD:  I'm wrapping up, Judge.

 7           THE COURT:  Let's get it done, please.  Let's get

 8   focus back on the certification, please.  Thank you.

 9   BY MS. LOCKARD:

10   Q.   Dr. Lagana, in terms of your literature review and your

11   Bradford Hill analysis which you have described, you didn't

12   seek to do an individual analysis from the literature or the

13   various categories of literature mentioned in paragraph 5.

14   You didn't do that, did you?

15   A.   I did apply a weight of evidence approach to the specific

16   cancers where I felt -- where I felt it was appropriate.

17   Q.   And then in your conclusion, you lumped your conclusions

18   in your report into one statement regarding the risk of

19   cancer, the potential causation of cancer in general.

20   Correct?

21   A.   What exactly are you referring to?

22   Q.   Well, you didn't seek to determine if there were

23   different dose curves for each of the cancers.  You didn't

24   provide any analysis of different latency periods for each of

25   the cancers.  Correct?

*LAGANA - Direct*                                    49

```
 1  A.   I discussed dose curves when they were available.  I
 2  discussed latency in the few examples in which it was
 3  available.  Whether I applied -- discussed those concepts in
 4  detail in every type of cancer, I don't recall.  But certainly
 5  if I was looking at an individual patient, those would be
 6  things that I would take into account.
 7  Q.   Correct.  But looking at individual types of cancers, you
 8  didn't do that in your report?
 9  A.   That's not true.  I mean, there are plenty of references
10  to dose within the report related to specific cancers.
11  Q.   But you didn't do a Bradford Hill analysis taking into
12  account the literature on a cancer-by-cancer basis.  Right?
13  A.   I worked with the guidelines in mind.  And I took a
14  weight of evidence approach with respect to each individual
15  cancer.
16  Q.   So your opinion in this case is the same regarding
17  colorectal, gastric, bladder, blood, pancreatic, esophageal,
18  prostate, lung or kidney, in terms of the relative risk
19  presented?
20  A.   No.  I didn't say that.
21  Q.   Well, where in your -- where in your expert report do you
22  make an effort to assess individualized cancer risks?  It's
23  not in there, is it?
24  A.   It's certainly in there.  Absolutely.  I reviewed the
25  literature, and in places -- and with respect to specific
```

1    cancers where there are ranges of increased risk, absolutely.

2    That's all over my report.

3    Q.   Well, you discussed the literature in your report that

4    was part of your various categories of medical and scientific

5    literature review.  And where the literature discussed a

6    particular cancer, you included some of that language.  Right?

7    A.   Yeah.  Where the literature gave a relative risk, and

8    particularly when it equated it to a particular dose, I

9    absolutely included that discussion in my -- in my report as

10   much as I could.

11   Q.   Well, in your final conclusion in the case, however,

12   after looking at that body of literature that did provide

13   information about individualized relative risks of various

14   cancer, instead of putting that information into your

15   conclusion, your overall conclusion was all have an increased

16   risk of cancer as a result, and as a general matter, without

17   reference to individual predispositions or concurrent risk

18   factors, further increasing the risk on a case-by-case basis,

19   the larger the contamination and/or dose and the longer used,

20   the higher the increased risk of cancer.  Cancer generally.

21       Correct?  That was your conclusion in your report?

22   A.   Well, the conclusion at the end of the report doesn't

23   negate any other conclusions that were drawn throughout the

24   body of the report.  It's one report.

25       And so if I looked at -- if we look at -- if we turn to

     1    the page on colorectal cancer -- let me find that.

     2         On page 13, for example, that's looking at a study of --

     3    a dietary study with respect to colon cancer.  And they found

     4    that there was a 46 percent increased risk of rectal cancer

     5    compared to -- in high consumers of NDMA compared to low

     6    consumers.  And they actually also were able to put together a

     7    dose for that, which was 126 nanograms per day.

     8         So in this example, we had both an odds radio or an -- a

     9    specific increased risk and a dose.

    10         And as I go through the papers, you know, the next

    11    paragraph also shows what the strength of the association was,

    12    how much elevation and risk was there.

    13         So, you know, these are -- these paragraphs, they

    14    summarize the increased risk with respect to colorectal

    15    cancer.

    16         Then if you look at page 14, I get into stomach cancer

    17    and do the same -- the same thing.

    18         So the fact that on the conclusion page paragraph I don't

    19    rehash everything that has been in the report prior to it is

    20    in no way a disavowal or a negation of everything that went

    21    into the remainder of the report.

    22    Q.   Well, just taking NDEA for an example, you identified

    23    Thresher and Zheng as literature supporting your opinion that

    24    NDEA in the amounts in the valsartan caused cancer.

    25         How do those two articles, the only finding of a

LAGANA - Direct                                      52

1   statistical significance at all was with respect to pancreatic

2   cancer from NDEA.  Correct?

3           MR. SLATER:  Your Honor, once again, I'll object.  I

4   think we actually addressed NDEA and Your Honor asked counsel

5   to move on.  I feel like we're going back to an area that was

6   already moved on from.

7           MS. LOCKARD:  Your Honor, I appreciate that.  Those

8   are all the questions I have at this time.

9           THE COURT:  Thank you.

10          Mr. Slater, did you want to ask any questions?

11          MR. SLATER:  I have no questions, Your Honor.

12          THE COURT:  All right.  Why don't we take a

13  ten-minute break and we'll get set up for the next one.  Okay?

14          MR. SLATER:  Thank you very much.

15          MS. LOCKARD:  Thank you.

16          THE COURT:  Thank you, everybody.

17          (Recess at 10:57 a.m. until 11:08 a.m.)

18          THE COURT:  Mr. Nigh, you ready?  Mr. Trischler, you

19  ready?

20          MR. NIGH:  Yes, Your Honor.

21          MR. TRISCHLER:  Yes, Your Honor.

22          THE COURT:  Let's get started.  The witness is here,

23  I see.

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Dr. Panigrahy, how are you?

```
 1              THE WITNESS:  Good, good.  Thank you.
 2              THE COURT:  Raise your hand.  I'm going to put you
 3    under oath.
 4              DIPAK PANIGRAHY, MD, PLAINTIFFS' WITNESS, after
 5    having affirmed, was examined and testified as follows:
 6              THE COURT:  Would you state your full name, please,
 7    sir.
 8              THE WITNESS:  Dipak Panigrahy.
 9              THE COURT:  Thank you.
10              Mr. Trischler, you may begin, sir.
11              MR. TRISCHLER:  Thank you, Your Honor.
12              Before I do, in the event that there are certain
13    exhibits that are made part of the record, does the Court have
14    a preference for purposes of this hearing as to how we
15    identify Panigrahy-A, B, C, or whatever method the Court
16    prefers?
17              THE COURT:  Have you previously identified them at
18    depositions and do you want to keep the same system?  It's up
19    to you.
20              MR. TRISCHLER:  Some we may have, but I can't say for
21    certain.  That's why -- whatever the Court's preference is.
22              THE COURT:  Well, probably Panigrahy-1 through
23    whatever would work.  Thank you, sir.
24              MR. TRISCHLER:  All right.  Then we'll proceed in
25    that fashion.  Thank you, Your Honor.
```

```
 1          May I begin?

 2          THE COURT:  Please do.

 3          MR. TRISCHLER:  Thank you.

 4                    DIRECT EXAMINATION

 5  BY MR. TRISCHLER:

 6  Q.   Dr. Panigrahy, good morning.

 7  A.   Good morning, sir.

 8  Q.   In your supplemental declaration that is dated

 9  February 24, 2022, you cite three articles that were published

10  by Gombar that deal with the pharmacokinetics of NDMA in

11  certain animal species.  Is that true?

12  A.   Yes.

13  Q.   And for the record, a paper that's entitled

14  "Pharmacokinetics of NDMA in beagles," a 1987 paper; is that

15  right?

16  A.   Yes.

17  Q.   And I will have that paper marked as Panigrahy-1.  All

18  right?

19          And then you have a second paper that you referenced

20  entitled "Pharmacokinetics of NDMA in swine," a 1988 paper; is

21  that correct?

22  A.   Correct.

23  Q.   And we'll mark that as Panigrahy Exhibit 2.  Okay?

24  A.   Thank you.

25  Q.   And then there's a third paper that you cite to entitled
```

1    "Interspecies scaling of the pharmacokinetics of NDMA,"

2    published in 1990; is that correct?

3    A.   Correct.

4    Q.   And we'll have that marked as Panigrahy Exhibit 3.

5         Sir, in these three animal studies by Gombar, NDMA was

6    administered to these animals both intravenously and through

7    oral doses.  Correct?

8    A.   Correct.

9    Q.   And many of the doses that were administered in Gombar's

10   animal studies were massively large.  Would you agree?

11   A.   I'm not sure.  You'd have to clarify what you mean by

12   massively large.

13   Q.   Well, let's take a look at it and see if we can maybe

14   define it with a little more precision then.

15        If we start with Panigrahy-1, the beagle study.  All

16   right?

17        In that study, is it true that the dogs were given two

18   doses totalling 1.5 milligrams per kilogram of NDMA

19   intravenously?  If you can look at the first page of the --

20   paragraph of the abstract to help you if you need to, sir.

21   A.   Yes.  IV administration was 0.5 milligram per kilogram

22   and 1 milligram per kilogram.

23   Q.   Right.  So the total IV dose was 1.5 milligrams per

24   kilogram.  Correct?

25   A.   No.  These dogs were getting separate doses.  So one set

1   of dogs got 0.5 mg per kg.  And then a different set of dogs

2   got 1 mg per kg.

3   Q.   Take a look at Table 1 of that study.

4   A.   Oh, yeah.  Sorry, you're right.

5   Q.   Okay.

6   A.   Yeah.  For the total amount.

7   Q.   So just to be clear, the dogs in the beagle study were

8   given intravenous doses totalling 1.5 milligrams per kilogram.

9   Correct?

10  A.   Correct.

11  Q.   And in addition to those intravenous doses, each of the

12  dogs in Gombar's study were given two oral doses totalling

13  6 milligrams per kilogram?

14  A.   Yes.

15          MR. TRISCHLER:  And I apologize, Your Honor, we

16  have a -- these exhibits were loaded into a portal, and I

17  don't know if they have been made available to you and to

18  others, but there should be a way to access them.  And I

19  apologize for not pointing that out a little bit --

20          THE COURT:  I think they're attached to his

21  declaration.

22          MR. TRISCHLER:  These ones are, yes.  Yes, Your

23  Honor.

24          THE COURT:  Okay.

25          MR. TRISCHLER:  But there may be other exhibits that

1  I reference that are not attached, so I just wanted to let you

2  and Mr. Nigh and others know that there is a method to access

3  them as we identify them.

4  BY MR. TRISCHLER:

5  Q.   But in any event, I apologize for digressing there,

6  Dr. Panigrahy.

7       But what I think we were getting at in walking through

8  the methods of this dog study was that a total dose of

9  7.5 milligrams for every kilogram was administered to the dogs

10 in the 1987 paper we've marked as Exhibit Number 1.  Right?

11 A.   Well, just to clarify, the total dose at one time was --

12 for orally was 1 mg per kg and then a different time was 5 mg

13 per kg.

14 Q.   Yes, we've already covered that.  But the total amount of

15 NDMA administered to these dogs in this study was

16 7.5 milligrams per kilogram?

17 A.   Correct.

18 Q.   Okay.  And if we convert that to nanograms, we're talking

19 about a total dose of 7,500,000 nanograms per kilogram being

20 given to these dogs?

21 A.   Correct.

22 Q.   And would you agree with me that the average beagle

23 weighs about 10 kilograms?

24 A.   Yes.

25 Q.   All right.  And so if we factor in the total weight of

```
 1   the animal, these dogs received a dose of NDMA totaling

 2   75 million nanograms as part of this study.  True?

 3   A.   Correct.

 4   Q.   Do you know over what period of time this 75 million

 5   nanogram dose was given to these dogs?

 6   A.   The study -- I believe it was over a month.  They took a

 7   two-week break between each of the IV dose and the oral dose.

 8   Q.   Can you show me where in the Exhibit 1 the time between

 9   doses is discussed?

10   A.   Yeah.  Just looking at the Method section -- sorry.

11   Q.   If you don't know or can't find it, I can move on for the

12   sake of time, Doctor.

13   A.   Yeah.  I believe they say somewhere in their paper they

14   waited about two weeks between the IV and the PO.

15   Q.   But whatever the time period, whether it was two weeks, a

16   month, two days, whatever the case may be, over that period of

17   time, each of the beagles in the study received 75 million

18   nanograms of NDMA.  True?

19   A.   Correct.

20   Q.   Can we agree, Dr. Panigrahy, that there's no plaintiff in

21   this litigation that ever ingested doses of

22   valsartan-containing medications having anything close to 75

23   million nanograms of NDMA?

24   A.   So when converting -- for the mechanism of action for

25   NDMA, we don't use body weight from animals to humans.  So
```

1   bioavailability, which is what this paper talks about, its

2   entire definition of area under the curve oral versus

3   intravenous, it's the amount of drug that will get into --

4   that gets into the systemic circulation.  It's not -- doesn't

5   take into account the weight of the animal.

6       So there are two concepts here.  One is the

7   bioavailability, which is what they're studying, which by

8   definition is the oral NDMA area under the curve divided by

9   the intravenous.  And that doesn't -- the amount of NDMA --

10  actually, these doses in the dogs, 1 milligram per kilogram,

11  IV 0.5 mg per kg IV in the oral --

12          (Court reporter clarification.)

13          THE WITNESS:  Oh, sorry.

14          Yeah.  The 1 mg per kg IV and the 1 mg per kg and 5

15  mg per kg orally are actually in a dog quite low.

16          We do animal experiments in multiple species, in

17  rabbits, in goats, in mice, and that 1 mg per kg, many people

18  in the field would call that low.

19          But the mechanism of action of the cancer causation

20  is independent of the body weight going from animals to

21  humans.

22  BY MR. TRISCHLER:

23  Q.  Doctor, respectfully, I didn't ask anything about

24  mechanism of the action or what was an appropriate dose for a

25  dog or bioavailability.  I simply asked you if there's any

1  plaintiff in this action who ever ingested doses of

2  valsartan-containing medications having anything close to 75

3  million nanograms of NDMA?

4  A.   No.

5  Q.   In fact, in your work in this case, you had an

6  opportunity to review data and levels that were seen in the

7  valsartan-containing medications.  True?

8  A.   Correct.

9  Q.   And you report on that at page 10, and I think maybe

10  page -- primarily on page 10 of your report.  Correct?

11  A.   Yes.

12  Q.   And you -- for instance, you cite that Mylan's levels of

13  NDMA were found to be in the range of .01 to .09 parts per

14  million?

15  A.   Correct.

16  Q.   Do you remember that?

17  A.   Yes.

18  Q.   And if we use a dose of 320 milligrams, which is the

19  highest dose any patient could have ever received, that high

20  and low range translates to an NDMA level of between 3 and

21  28 nanograms per day.  Correct?

22  A.   Correct.

23  Q.   And so let's say someone took NDMA in Mylan's valsartan

24  every day for four years.  The total NDMA load on -- from the

25  low side to the high side over four years would be between

PANIGRAHY - Direct                    61

1   4,300 nanograms to 40,000 nanograms.

2        Can we agree on that math?

3   A.   Correct.

4   Q.   And on the other end of the spectrum, if we look at

5   another party to this case, ZHP, and on page 10 of your

6   report, you note that depending on the process that ZHP used,

7   their NDMA levels were observed to range anywhere from not

8   detected to 188.1 parts per million.

9        Do you remember writing that?

10  A.   Yes.

11  Q.   And the midpoint of that range is 94.05 parts per

12  million.  Do you agree with that?

13  A.   Yes.

14  Q.   And then a 320 milligram tablet, using that midpoint of

15  94.05 parts per million, that's approximately 30,000 nanograms

16  of NDMA.   True?

17  A.   Correct.

18  Q.   And so if someone were to take ZHP's valsartan for four

19  years, and we use that midpoint level for the NDMA content,

20  the total nanogram exposure of taking that drug every day for

21  four years at midpoint exposure gets you around 43 million

22  nanograms ingested over that four years.  Would you agree with

23  that?

24  A.   Yes.

25  Q.   So after four years of taking valsartan at those levels,

PANIGRAHY - Direct                    62

 1  we're still almost half or a little less than half -- a little
 2  more than half of what the dogs received in this one Gombar
 3  study that you cite in your supplemental declaration.  Right?
 4  A.   We're mixing two concepts here.  The important part, as I
 5  wrote in my report, is that the levels of the NDMA in the
 6  contaminated valsartan are about on the average 200-fold
 7  higher than the levels that the FDA allows, than the 96
 8  nanogram per day for NDMA.
 9       And then in the dog study, which is bioavailability, the
10  weight of the animal is irrelevant.  By definition,
11  bioavailability is the amount of drugs that is -- that is not
12  metabolized by the liver and goes into the circulation.  The
13  Gombar studies address what is the bioavailability -- what is
14  the amount of NDMA that gets into the systemic circulation --
15          THE COURT:  Doctor, excuse me.  Please stop shuffling
16  your papers.  We can't hear a word you're saying when you're
17  shuffling your papers, please.
18          THE WITNESS:  Sorry.
19          THE COURT:  Thank you.  That's okay.
20          THE WITNESS:  So the body weight of the -- the amount
21  of NDMA that is given to the dog is not relevant to the amount
22  of NDMA that I -- in my report, I calculate the amount of NDMA
23  in these contaminated tablets, which was on the average about
24  200-fold higher than the amount the FDA allows.
25  BY MR. TRISCHLER:

 1   Q.   Let me ask you about the swine study, which I think we've

 2   marked as Exhibit 2.

 3        Do you have that one in front of you?

 4   A.   Yes, sir.

 5   Q.   Good.  In this study, the swine were, again, dosed both

 6   orally and intravenously.  Correct?

 7   A.   Correct.

 8   Q.   And the oral doses were 1.0 milligrams per kilogram and

 9   5.0 milligrams per kilogram?

10   A.   Correct.

11   Q.   And according to this paper, if we look at page 1351, the

12   first page of Exhibit 2, down in the Materials and Methods

13   section, the average swine in this study weighted between 38

14   and 42 kilograms.  Correct?

15   A.   Correct.

16   Q.   So we can use 40 kilograms as an average.  You with me?

17   A.   Yes.

18   Q.   And just looking at the oral dose then, setting aside the

19   intravenous dose for the time period, let's just talk about

20   the oral dose, what this paper tells us is that the swine in

21   Gombar's study received an oral NDMA dose of 40 milligrams

22   followed by a second dose of 200 milligrams.  True?

23   A.   Sorry.  I'm following -- the oral dose for a pig 9 to 11

24   is 1 mg per kg orally, and then pigs 12 to 14 were given 5 mg

25   per kg.

PANIGRAHY - Direct                         64

```
 1   Q.   Okay.  So some received 40 milligrams and some received

 2   200 milligrams?

 3   A.   Yes.

 4   Q.   And talk about -- and when you do that inversion to

 5   nanograms, what's that?  200 million?

 6   A.   Sorry, I'm not following you.

 7   Q.   200 milligrams is -- equals 200 million nanograms?

 8   A.   Right, right.

 9   Q.   So the doses of NDMA that were administered to the swine

10   in this Gombard study or Gombar study were even higher than

11   the doses in the beagle study?

12   A.   Correct.

13   Q.   And at the risk of stating the obvious, the Gombar papers

14   involve administration of NDMA to animals at doses that are

15   hundreds, thousands of times higher than the doses we're

16   dealing with in this litigation.  Agreed?

17   A.   No, I don't agree, because they're mixing two different

18   concepts.  The doses that we give the animals to measure

19   bioavailability is different from the amount of doses in the

20   contaminated valsartan tablets.

21   Q.   I agree it's different than the doses in the tablets.

22   That's my point.

23        And you've already told us that there's no plaintiff in

24   this litigation that ever ingested valsartan doses having

25   anything close to 75 million nanograms, and so it only
```

1    logically follows that there's no plaintiff in this litigation

2    that ever ingested valsartan-containing medications having

3    anything close to 200 million nanograms?

4    A.   So for the case of genotoxic mutagenic chemicals that are

5    highly carcinogenic such as NDMA and NDEA, where the mechanism

6    of action is similar in animals and humans, IARC, WHO, many

7    agencies have said it's inappropriate to convert any type of

8    animal weight to human weight, because the mechanism of action

9    is through a metabolic activation through an ion.

10        So the weight of the beagle or the weight of the swine

11   isn't relevant in this case to the amount of NDMA that's in

12   the contaminated valsartan.  What is relevant is the amount of

13   contaminated NDMA, that level compared to the level that the

14   FDA allows.  And in my report, I carefully went through each

15   of the amounts of NDMA in the contaminated tablets.  And on an

16   average it was around 187 to 200-fold increase over the FDA

17   levels.

18   Q.   You've said that, sir.  And none of that was responsive

19   to my question, respectfully.  My only question to you was,

20   isn't it true that no one -- no plaintiff in this case was --

21   took a valsartan-containing medication containing 200 million

22   nanograms NDMA, yes or no?

23   A.   Correct.  But as I said, it's inappropriate to compare

24   the amount of NDMA -- or the body weight of the animal

25   compared to in the human, the amount of NDMA in the tablet.

1  Q.   Doctor, if I could step back for a minute.

2      Are you familiar with the phrase "the dose makes the

3  poison"?

4  A.   Yes.

5  Q.   Do you agree with that fundamental concept?

6  A.   Yes.

7  Q.   Do you agree that dose matters when we evaluate the

8  toxicological and carcinogenic effects of a compound?

9  A.   In general, the dose matters; but in the context of a

10 genotoxic versus nongenotoxic, it depends on the type of

11 carcinogen in this case.

12 Q.   The dose matters whether you're talking about a genotoxic

13 or nongenotoxic compound.  Water is vital to sustain life, but

14 if you take it in large enough doses, it can kill you.  Right?

15 A.   Right.  But in a genotoxic mutagenic carcinogen as NDMA

16 and NDEA, there's no threshold with the dose.  There's no --

17 the FDA has established an acceptable index, but when --

18 that's where we have to separate genotoxic mutagenic chemicals

19 versus non-genotoxic chemicals.

20 Q.   When you say there's no threshold, what you're talking

21 about is that there's no regulatory agency that has

22 established a threshold, saying if you exceed that level, you

23 will sustain cancer or you will sustain certain types of human

24 cancers.  That's what you're referring to.  Correct?

25           MR. NIGH:  If I may at this point, our certification

PANIGRAHY - Direct                    67

 1  is on bioavailability, saturation and first pass metabolism.

 2  This gets way outside of -- there's numerous pages dedicated

 3  to dose.  They've had ample opportunity to cross-examine him

 4  in deposition.  That is not the scope of his declaration.

 5  It's bioavailability, saturation, and first pass metabolism.

 6          THE COURT:  Mr. Trischler, let's move on.  Let's

 7  concentrate, please, on the certification/declaration.

 8          MR. TRISCHLER:  If I may, Your Honor, I think my last

 9  question was following up on the witness's answer, which I

10  would think I would be entitled to do.

11          If I could just make perhaps a larger proffer, the --

12  it's the defendants' position that those matters, those matter

13  to carcinogenicity, those matters to bioavailability, and in

14  his declaration and in the -- that this witness has submitted,

15  I submit that he ignores the significance of those since

16  Daubert requires an analysis of whether the expert reliably

17  applied science to the facts at hand.

18          I think that the marked differences in doses between

19  studies and the facts in this case need to be exposed and

20  explored.  And that's what I'm trying to do.  And I think

21  that's entirely relevant to inquiry whether the methodology

22  has been reliably applied to the facts at hand, which is part

23  of the -- I respectfully believe, the Daubert analysis.  So I

24  think this is entirely relevant, appropriate.

25          MR. NIGH:  Your Honor, may I respond?

 1          THE COURT:  I don't need it.

 2          Mr. Trischler, were you able to ask during the

 3   deposition of this witness about dose?

 4          MR. TRISCHLER:  Yes, sir.

 5          THE COURT:  And in your motion, the NDEA motion, you

 6   raised the issue of exposure levels, don't you?

 7          MR. TRISCHLER:  I don't have the motion committed to

 8   memory, but I would certainly hope so, Your Honor.

 9          THE COURT:  So I think we've plowed this ground a few

10   times.  So let's move on, please.  Thank you.

11   BY MR. TRISCHLER:

12   Q.  One of the claims, Dr. Panigrahy, that has been made in

13   this case by plaintiffs is that exposure to NDMA is capable of

14   causing multiple cancers.  Are you aware of that fact?

15   A.  Yes, correct.

16   Q.  And I have -- the plaintiffs have filed a disclosure of

17   cancer types at issue.

18          Have you seen that document before?

19   A.  I'm not sure what you're referring to.

20   Q.  Perhaps -- I don't know if the technician has that

21   document.  It was sent to the portal.  It's the plaintiffs'

22   disclosure and designation of expert types.  It might have

23   been premarked as H.  If we can mark it as Exhibit 4.

24          MR. NIGH:  Judge, I can't see this document yet, but

25   I have a pretty good idea what's being referred to.  It's a

 1   certification made by plaintiffs' counsel as to the various

 2   cancer types that they expect that experts may file expert

 3   reports on.  I think this is irrelevant and outside the scope

 4   of Dr. Panigrahy's expert report.  He has specific cancers

 5   that he opines on that are related.  Whether or not it's in a

 6   certification is irrelevant by plaintiffs' lawyers.

 7            THE COURT:  Mr. Trischler, I don't have the document.

 8   And I don't know who you're referring to about a technician

 9   loading it into the system.

10            But what does this have to do with what he wrote in

11   his report or his declaration?

12            MR. TRISCHLER:  It's really simply a predicate for

13   the question, Your Honor.  I'm just trying to establish

14   that -- that he's aware of the fact that allegation has been

15   made that there were -- that NDMA exposure can cause cancer

16   types downstream of the liver.  That's really all I'm trying

17   to establish by it.

18            I can do it without --

19            THE COURT:  I'm sure he can answer that question,

20   whether he's aware that the downstream cancer types are being

21   alleged in this case.

22            MR. TRISCHLER:  Right.  That's all I was trying to

23   do, perhaps inartfully through the document.

24            THE WITNESS:  Sorry, yes.  In my report I detail ten

25   tumor types where I go into detailed -- actually Bradford Hill

1    criteria and nine different criteria of ten different tumor

2    types, in addition to liver, nine other tumor types.

3    BY MR. TRISCHLER:

4    Q.   Based on your supplemental declaration, it's obvious to

5    me that you read the reports of defendants' expert and the

6    Daubert challenges that have been filed.

7         And do you understand that it's the defendants' position

8    that NDMA cannot cause cancers in downstream organs because of

9    the ingested NDMA cannot escape first pass metabolism in the

10   liver?  Do you understand that to be the defendants' position?

11   A.   Correct.

12   Q.   And you disagree with that premise, as I understand it,

13   and you cite the Gombar papers in support of that position in

14   the supplemental declaration.  Right?

15   A.   Right.  And also in my original report, of the 255-page

16   report, page 77 to page 80, four pages are dedicated solely to

17   the importance of bioavailability, which is studied in these

18   Gombar papers.

19   Q.   But Gombar recognizes that dose matters when evaluating

20   the ability of the NDMA to escape the liver.  Right?

21   A.   Yes.  In my report I have sections with five, ten pages

22   at a time where NDMA and NDEA have dose responses.  I cited 32

23   publications just on the liver cancer section alone, 32 papers

24   where at least 10 have a dose response.

25        In science, you have to put it in context.  So in the 580

 1  papers I cite, if you're talking about a dose response, NDMA,

 2  NDEA do exhibit dose responses in multiple tumor types, not

 3  just liver cancer, lung cancer.

 4       So dose does matter in -- it depends on the context.

 5  Q.   In the beagle study that we marked as Exhibit Number 1,

 6  Gombar commented on rat studies, and he observed that -- of

 7  what was classified as low doses resulted primarily in liver

 8  tumors, but high-dose administration of NDMA resulted in renal

 9  tumors.  Isn't at that true?

10  A.   Yes.

11  Q.   And Gombar theorized that the low doses -- that at low

12  doses, little NDMA escapes the liver, but at high doses, the

13  liver can become saturated and a larger fraction of the dose

14  can reach systemic circulation.

15  A.   Right.

16  Q.   Do you recall reading that in Exhibit 1?

17  A.   Yes.

18  Q.   And again, the dose at which saturation was observed to

19  occur in Gombar in the beagle study was a single oral dose of

20  5 kilograms, which in the beagle we know to be 50 million

21  nanograms.  Right?

22  A.   Correct.

23  Q.   Gombar never predicted that saturation occurs below a 50

24  million nanogram exposure, did he?

25  A.   Well, Gombar did study this.  At the 1 mg per kg there

PANIGRAHY - Direct                    72

```
 1  was no saturation and they calculated the bioavailability to
 2  be 93 percent.
 3  Q.   Right.  So I guess I asked the question in a different
 4  way than you answered it, but I think we arrived at the same
 5  point.  And that is, the only time in the beagle study that
 6  Gombar observed any liver saturation was at the 550 million
 7  nanogram dose?
 8  A.   Yes.  The 5 mg per kg oral dose.
 9  Q.   And Gombar also reported in this study that DNA repair
10  enzymes in the liver of humans were likely to be more than
11  sufficient to prevent cancer from low-dose exposures.  Isn't
12  that true?
13  A.   I would have to see where -- where you're referring to.
14  Q.   Can you look at page 346 of Exhibit 1, please.
15  A.   Yes.
16  Q.   Gombar writes:  If humans are exposed to NDMA through
17  environmental exposure, not deliberate poisoning, the dose
18  will be exceedingly low.  Based on rat data, it would be
19  expected that a very small fraction of the dose would pass
20  through the liver.  The ability of the human liver to repair a
21  lesion such as O-methylguanine should be sufficient to
22  substantially reduce the risk of liver cancer from this type
23  of exposure.  Correct?
24  A.   Right.  They're citing a paper, reference 36.
25  Q.   Right.  And there's nothing in Gombar's beagle study that
```

PANIGRAHY - Direct                          73

1   suggests that liver saturation is going to occur at doses as

2   low as 150 nanograms, is it?  Is there?

3   A.   Sorry, I didn't follow the question.

4   Q.   I apologize if it wasn't clear.

5        What I was asking is, there's nothing in Gombar's beagle

6   study that would suggest or support the proposition that liver

7   saturation in the human is going to occur at doses like 150

8   nanograms or a 1,000 nanograms or even 10,000 nanograms?

9   A.   So by definition, bioavailability is -- doesn't calculate

10  saturation.  There are two different concepts that are being

11  mixed here.

12       Bioavailability by definition is just the amount of NDMA

13  that gets past the liver unmetabolized and gets into the

14  systemic blood flow and can cause cancer throughout the body.

15  Q.   All right.  Well, that's -- that's fine.  But it wasn't,

16  respectfully, responsive to my question.

17       I think what I asked you was, the only time -- I asked

18  you about saturation, not bioavailability.  I think I

19  understand that there's a difference.

20       And the only time Gombar observed saturation was at the

21  high dose of 5 milligrams per kilogram.  Correct?

22  A.   Correct.

23  Q.   So there's nothing in Gombar's study that you brought to

24  the attention to the Court in your supplemental declaration to

25  suggest that the human liver becomes saturated if it receives

PANIGRAHY - Direct                    74

1    a dose of NDMA of 1,000 nanograms or 10,000 nanograms or even

2    100,000 nanograms.   True?

3    A.   It's not relevant here.  The saturation at the high dose

4    actually has higher bioavailability.  What Gombar has studied

5    at the 1 mg per kg dose where they calculated 93 percent

6    bioavailability, there was no saturation.

7         Bioavailability is independent of the saturation.  By

8    definition, it's -- I won't go into it's area under the curve,

9    it's just when you give the NDMA orally versus when you give

10   it intravenously, which by definition, you get 100 percent.

11   Saturation is just the amount of extent a chemical can be

12   either solubilized or permeabilized.  Saturation is a

13   different definition from bioavailability.  Gombar was

14   addressing what the bioavailability is here.

15        MR. TRISCHLER:  Your Honor, I'm going to object and

16   move to strike as nonresponsive.  I don't think I've gotten an

17   answer to the question of whether there's anything in this

18   paper that would allow a research scientist to conclude that

19   the human liver becomes saturated at doses of NDMA below

20   100,000 nanograms.

21        MR. NIGH:  Your Honor, if I may, our certification

22   never says that we need to have saturation in order for NDMA

23   to get past the liver.  Our certification is clear that all it

24   takes is bioavailability, even without saturation.  That's his

25   opinion.  49 to 93 percent gets past the liver without

PANIGRAHY - Direct                    75

1    saturation.  That's what we're trying to make clear in the

2    declaration.  And Mr. Trischler keeps going on to when it's

3    going to be saturated and how much does it take to be

4    saturated.  That's not his declaration opinion.  49 to

5    93 percent gets past the liver without saturation.

6          THE COURT:  Well, clearly he's trying to say that

7    saturation is irrelevant to the amount of NDMA that enters the

8    human bloodstream.  But to Mr. Trischler's point, that whether

9    or not this Gombar study means that human livers can be

10   saturated at the low levels, the relatively low levels,

11   relative to these animals, of NDMA ingestion is his precise

12   question.

13         I agree that it doesn't have a whole lot of

14   relevance, but that's his question, and the witness hasn't

15   answered that yet.

16         Doctor, can you answer the question about saturation

17   of human livers and whether you can take anything from the

18   Gombar study regarding saturation?  I understand your point

19   about bioavailability, but the question's about saturation.

20         THE WITNESS:  Oh, sorry.  I missed the -- so, yes, we

21   cannot -- in the -- we can't conclude from the 1987, this

22   particular study, what amount in the human would saturate the

23   liver.

24         But what we can conclude, if we jump to the -- I

25   think this is where you're getting at is what would be the

1   bioavailability in humans, what would be -- and that's

2   addressed in the 1990 Gombar paper I cited.

3          THE COURT:  Well, that's not what Mr. Trischler is

4   getting at at the moment.  He's focusing on saturation.  I

5   understand your point, though, about bioavailability, but

6   let's just focus on what Mr. Trischler is asking, which is

7   about saturation at this time.  Okay?

8          Thank you.

9          THE WITNESS:  Sorry, just to clarify the question

10  again.  I missed it.

11         MR. TRISCHLER:  I'll reask it.

12         THE COURT:  Please.

13  BY MR. TRISCHLER:

14  Q.   There is no -- nothing in the beagle study that would

15  support a conclusion that the human liver becomes saturated at

16  relatively low levels of NDMA exposure on the order of 10,000

17  to 100,000 nanograms, is there?

18  A.   Correct.

19  Q.   Now, are you familiar with the work of Professor Maria

20  Diaz Gomez on the pharmacokinetics of NDMA?

21  A.   Yes.  I did -- you know, I cited one paper with -- she

22  was a co-author, and there's several papers.  I'm not sure

23  which one.

24  Q.   Well, I was referring to the papers that Gombar cites to

25  that we've marked as Exhibits 1, 2 and 3.

PANIGRAHY - Direct                    77

 1        Have you read the papers of hers that are cited by Gombar
 2   in his work?
 3   A.   Yes.  There's several papers.  I have the one, actually,
 4   right in front of me.  1977?
 5   Q.   I think so.
 6   A.   Yeah.  Yep.
 7   Q.   Okay.  And isn't it true that Dr. Gomez reported that
 8   when orally administered, liver prevents nitrosamines from
 9   reaching other organs?
10   A.   Yes.  And this is consistent with my report where low
11   doses can get metabolized by the liver, and at higher doses,
12   the NDMA gets past the liver and you can get other cancer
13   types.
14   Q.   And so far in the papers that we've talked about, the
15   high doses getting past the liver have been defined as -- by
16   Gombar as 5 milligrams per kilogram.  Correct?
17   A.   No.  The 1 mg per kg, the low oral dose, is what they
18   used to calculate the bioavailability, not the 5 mg per kg.
19   And at that low dose, there's no saturation.  And the
20   bioavailability in the dogs was 93 percent, you know, swine,
21   67 percent.
22   Q.   In the Diaz Gomez paper that you read and that Gombar
23   cites to, the scientists in that paper write that:  These
24   experiments would imply that in a healthy man, the metabolism
25   and activation of NDMA in the diet would take place in the

 1  liver, and that the liver would remove the nitrosamine from

 2  the portal blood and prevent it from reaching other organs.

 3      Do you agree with that?

 4  A.  I'm sorry.  I'm just getting to -- what page?

 5  Q.  499, sir.

 6  A.  Yes.  Which paragraph?

 7  Q.  It's in the bottom right-hand column, last paragraph.

 8  A.  Yes.  I see it.

 9  Q.  Do you agree with that statement, sir?

10  A.  That can happen in a certain -- what I wrote in my report

11  is that -- so we don't rely on one paper.  In certain papers,

12  NDMA can cause liver cancer, but in other papers, the NDMA can

13  cause kidney cancer and many other types.  And that's -- by

14  definition, the NDMA is getting past the liver.

15      And in science, we don't rely on two, three papers.  When

16  I cited all these papers and, for example, the Anderson paper,

17  which is a 1994, oral NDMA in a monkey caused DNA adducts in

18  32 different tissues.  So that's an important finding, that in

19  a species that's similar to humans, that one single dose can

20  get past the liver and cause DNA adducts, which is one of the

21  initiators of the mechanism, how it causes cancer, in 32

22  different tissues.

23      So, yes, there are papers, and I do agree with the

24  sentence that at low doses in certain papers NDMA in a rodent

25  can cause liver cancer, but then I cite other papers where

PANIGRAHY - Direct                    79

 1    NDMA in the mouse or the rat or rodent can cause other tumor

 2    types, like kidney cancer.

 3         In fact, this is an important point, that when a chemical

 4    is multi-species, multi-organ by different administrations,

 5    that's when -- and it's genotoxic, that's why this chemical

 6    has been studied in hundreds of papers, which I cited.  So we

 7    don't rely on just one paper on this.

 8    Q.   Sir, I don't think -- somewhere in there, there might

 9    have been an answer to my question, but if there was, I missed

10    it, so let me try again.

11         All I asked you is if you agree or disagree with this

12    statement, quote:  If man and the rat are comparable, these

13    experiments would imply that in a healthy man, the metabolism

14    and activation of NDMA in the diet would take place in the

15    liver, and the liver would remove the nitrosamine from portal

16    blood and prevent it from reaching other organs.

17         That was the conclusion from Diaz Gomez.

18         Do you agree with it?

19    A.   No, I don't.  Because as I cite in my report, the NDMA

20    given in a rodent can cause other tumor types.  If we only saw

21    one tumor type, I would agree with this comment that, yes, the

22    liver is the only organ that can metabolize NDMA, but we know

23    NDMA in rodents causes a -- and I wrote in my report at least

24    seven different type of tumor types that are beyond the liver.

25         So in discussions you can say anything you want in a

1  scientific paper.  Usually peer reviews are more critical on

2  the data generation.  So to back up a sentence like that, I

3  would have to see a peer-reviewed paper to support that.

4  Q.   Did you also read the -- well, isn't Professor Diaz

5  Gomez's paper published in 1977 peer reviewed?

6  A.   Yes, yes.  No, but I --

7  Q.   And her statement would have been peer reviewed?

8  A.   Right.  So where I say we don't rely on one paper in

9  science, like, for example, I gave -- I'll just give one paper

10  example, the Anderson paper that I cited, 1994, that an oral

11  administration of NDMA in the monkey, which is genetically

12  closer to a human, induced 32 different tissues to have DNA

13  adducts.

14      So by definition, when you get DNA adducts beyond the

15  liver, that's showing absorption and excretion and

16  bioavailability in an indirect way.  The Gombar studies

17  bioavailability directly by measuring the concentration.  But

18  there are indirect measures in science.

19      And so, yeah, that's where I say this one sentence, I

20  actually support -- certainly, papers that I cite in my report

21  do support that NDMA causes liver cancer.  In fact, I cited 32

22  publications in the liver section part that NDMA causes liver

23  cancer.  But you can't ignore the other papers that NDMA can

24  cause other types of cancers, like seven different types of

25  cancers in ten different species via six different

PANIGRAHY - Direct                    81

```
 1  administration methods.
 2  Q.   I didn't -- sir, I didn't ask you about cancer causation.
 3  All we're talking about is metabolism right now.  I thought
 4  you knew that.
 5       But since you brought it up, this Anderson paper that
 6  you've mentioned, can you give us a citation to that whole
 7  paper, please?
 8  A.   Sure.  It's actually reference 121 in my -- it's
 9  reference 121 in my report on page 228.
10  Q.   Okay.  And what was the dose that was given to the
11  monkeys to induce cancer in that study?
12  A.   Let's see.  I have to -- I believe it was on the order of
13  1 mg per kg or 0.1 mg per kg.
14  Q.   Well, why don't you take the time to look at it, because
15  I'd like an answer that we can rely on.
16  A.   Sure.
17          THE COURT:  While we're waiting, for the
18  court reporter, Ms. Mitchell, when the witness testified
19  adducts DNA, it's A-D-D-U-C-T-S, adducts.  Okay?
20          THE TECHNICIAN:  Good morning or good afternoon,
21  everyone, depending on where you are.  This is James Budkins,
22  your concierge for today.
23          THE WITNESS:  So the dose, adult monkeys received
24  0.1 mg per kg NDMA orally by gavage.
25  BY MR. TRISCHLER:
```

1   Q.   And is this study called "NDMA derived O-methylguanine in

2   DNA of monkey gastrointestinal and urogenital organs and

3   enhancement by ethanol"?

4   A.   Yes.

5   Q.   That's a mouthful.

6   A.   Yeah.

7   Q.   Glad I was able to spit it out.

8        But in this study what was done was that alcohol was

9   administered to the monkeys in addition to NDMA in order to

10  defeat the DNA enzymes of that mammal.  Correct?  The DNA

11  repair enzymes of that mammal, I should say.

12  A.   Correct.  In some of the monkeys, they did receive

13  ethanol too.

14  Q.   Right.

15  A.   Yes.

16  Q.   So going back to the issue that I wanted to talk about,

17  because I thought this is what your supplemental declaration

18  dealt with, where the Gombar papers and the materials that

19  were relied upon by Gombar to determine whether or not there's

20  a scientific basis to support this idea of -- about NDMA's

21  ability to cause cancer downstream of the liver.  Are you with

22  me?

23  A.   Yes.

24  Q.   So we were talking about the Diaz Gomez paper.

25       Another paper that Gombar cites is the paper by Mico,

1    M-I-C-O.  Do you remember reading that paper?

2    A.   Yes.

3    Q.   I think you also cited to that paper in your own report.

4    Correct?

5    A.   Correct.

6    Q.   And just like Diaz Gomez, Mico and his colleagues

7    reported in their study that the results support the previous

8    conclusion that the liver is the site of NDMA-induced lesions

9    after low chronic doses because it is the virtual -- it is

10   virtually the exclusive site of metabolism after oral

11   administration.  Isn't that what Mico found?

12   A.   Well, Mico did find that the bioavailability in the

13   rodents are in that 8 to 10 percent range.  And that's what

14   Gombar does cite in the Gombar papers.  And that's an

15   important concept, that in the animals with lower body weight,

16   the rodents, that the bioavailability was only in that 8 to

17   10 percent, and that in the higher animals, the swine, the

18   dog, the monkey, the bioavailability was almost 12-fold higher

19   than the rodents, even though all the species -- the seven

20   species they studied had very high clearance.  So that's a

21   very important point.  And this gets back to because

22   obviously -- because NDMA is a human carcinogen, we can't test

23   it in animal -- in humans.

24        And so the third paper that I cited for the declaration,

25   which we may get to, that's where they actually do cite the

 1  Mico paper.  And Figure 3 has an extrapolation between the

 2  mouse, the hamster, the rat, and then the pig, the swine, and

 3  the monkey.

 4       And that -- that's where -- the bottom line, as I wrote

 5  in the declaration, the larger animals have higher

 6  bioavailability, up to 12-fold higher than the rodents.

 7       And this would argue and suggest that NDMA in larger

 8  species, including human, would have much more systemic

 9  bioavailability of NDMA and it can get past the liver.

10  Q.   Is a pig a good comparison to the human?

11  A.   So I actually did cite in my report that a pig -- there

12  are a lot of advantages.  The pig has a similar cardiovascular

13  system, similar immune system, similar physiology as humans.

14  So in certain ways, a pig would be better than a rodent.

15  Q.   Okay.  But let me focus on Mico for a minute.

16       Do you have that study?

17  A.   Let me see.  I can probably pull it up on my computer.  I

18  don't have a printout.

19       MR. NIGH:  Is this an exhibit that you're using?

20  Because he doesn't have this printed out.  And if we're going

21  to use this as an exhibit, I'd like a copy of the exhibit as

22  well.

23       MR. TRISCHLER:  Yes.  I can mark it as Exhibit E,

24  Mr. Nigh, if you'd like.  And there should be an ability to --

25  I don't know if our concierge has that ability, but there

```
 1   should be an ability to display it.

 2          THE WITNESS:  I do have the paper on my computer.

 3   BY MR. TRISCHLER:

 4   Q.  All right.  Then in the interest of time to try to move

 5   forward, if you have the paper in front of you --

 6          MR. TRISCHLER:  And I apologize, Mr. Nigh, that you

 7   don't have it.  If you want --

 8          MR. NIGH:  I would object.  If we're using an

 9   exhibit, he didn't print out 600 page -- you know, every

10   single exhibit in his expert report.  If we're using it, I

11   believe I'm entitled to a copy.

12          MR. TRISCHLER:  I don't disagree.

13          Your Honor, may we take a recess so I can figure out

14   how I can get the exhibit to Mr. Nigh?  I'm not as proficient

15   with remote procedures as I should be.

16          THE COURT:  Somebody came -- yes, the answer your

17   question, sure.

18          But somebody came on as a concierge.

19          Who set that up?

20          MR. TRISCHLER:  I thought it was set up to assist in

21   providing the exhibits and presenting them.

22          THE COURT:  We didn't.  The Court didn't set that up,

23   so --

24          MR. TRISCHLER:  We did.  The defendants did.

25          THE COURT:  Okay.  Well, then why don't you get in
```

 1   touch with your concierge and find out if we can get this

 2   stuff up.  We'll take a little break.

 3           MR. TRISCHLER:  May we take five minutes to figure

 4   out some administrative issues?

 5           THE COURT:  Sure.

 6           (Recess at 12:07 p.m. to 12:24 p.m.)

 7           MR. NIGH:  Can I raise my objection to showing the

 8   Mico.  The declaration clearly mentions the Gombar study

 9   and the human -- I mean the pigs, the monkeys and the dogs

10   being the larger species, and Panigrahy's opinion being that

11   the bioavailability would be the similar to the larger

12   species, not the rodents.  And I see that we're going to be

13   showing another rodent study.  This is outside of his scope.

14   His opinion is based on larger species compared to -- in

15   larger species being similar to the human.

16           MR. TRISCHLER:  The Mico study is cited by Gombar.

17   The witness has cited to 268 animal studies in his report,

18   over 150 of which involve rats and rodents.  Considering that

19   this is a paper cited in -- cited by Gombar, I think it's

20   directly probative of the issues of bioavailability,

21   saturation and metabolism of NDMA.

22           THE COURT:  I'm not familiar with the Mico study,

23   Mr. Trischler.

24           How about the Reader's Digest version of it.  What

25   does the Mico study say in your estimation?

PANIGRAHY - Direct                    87

```
 1              MR. TRISCHLER:  Essentially what the Mico study says

 2     is that at low doses, the liver is the site of metabolism of

 3     NDMA and --

 4              THE COURT:  Why can't we ask the witness that

 5     question, whether he agrees or not with that?

 6              MR. TRISCHLER:  That's what I was trying to do.  I

 7     was going to refer to a specific statement when we got

 8     sidetracked by trying to find the document so that the witness

 9     could see the statement that I was going to ask about.  But --

10              THE COURT:  Why don't you just read him the statement

11     and ask if he agrees or disagrees with it and what his reasons

12     are and we'll go with there.  Why do we need to spend all this

13     time trying to find this thing?

14              MR. TRISCHLER:  Very well, Your Honor.

15              MR. NIGH:  Your Honor, there is over 90 to 100

16     different studies that are cited by Gombar and there's over

17     600 studies cited in his expert report.  I don't think that's

18     a basis to say that's within the parameters of his

19     declaration.  His declaration is much more limited than that.

20              THE COURT:  It's a very limited declaration.  It's

21     about saturation and bioavailability and how bioavailability

22     is not dependent on saturation.  I get it.  But I'm going to

23     let him ask this question about -- because we have talked

24     about the relative size of the animal and that effect on the

25     bioavailability of NDMA.
```

```
 1              So go ahead, Mr. Trischler, ask your question.

 2              MR. TRISCHLER:  All right.

 3  BY MR. TRISCHLER:

 4  Q.   Dr. Panigrahy, referring to the Mico study, do you agree

 5  that the authors of the Mico paper concluded that at low doses

 6  the liver is the site of metabolism of NDMA?

 7  A.   Yes.

 8  Q.   Have you -- now, have you read all of the work by Gombar

 9  and his colleagues on the subject of the pharmacokinetics of

10  NDMA?

11  A.   I've read the three Gombar papers, if you're asking, the

12  three papers that I cited in this declaration, so yes.

13  Q.   Are you familiar with the paper by Harrington entitled

14  "The Formation, Disposition and Hepatic Metabolism of NDMA in

15  the Pig"?

16  A.   Which reference are you -- I don't know that offhand.

17  Which reference are you...

18  Q.   It's cited -- it's a paper by Harrington cited in the

19  Gombar papers that you have mentioned in your declaration.

20  A.   Which of the three Gombar papers?  And I can probably

21  find the reference.

22  Q.   Let me show you the first page of the document and see if

23  it refreshes your recollection.

24       James, can you display that, please?

25              THE TECHNICIAN:  Yes, no problem.  This is J which
```

*PANIGRAHY - Direct*                     *89*

```
 1  will be 5.  Correct?

 2          MR. TRISCHLER:  6, but --

 3          THE TECHNICIAN:  This is the Mico.  Correct?

 4          MR. TRISCHLER:  5 is Mico.  This is Harrington.

 5          THE TECHNICIAN:  Harrington.

 6          MR. NIGH:  Judge, I would renew my objection.  I

 7  don't see how it's fair, even for foundational questions, to

 8  show a document that's not being provided to the witness as a

 9  whole copy or to Your Honor or to myself.

10          Judge, you're on mute.

11          THE COURT:  Thank you.

12          Doctor, this is I think the swine study, and it's

13  note number 8 I think is the Harrington paper he's referring

14  to?  I think.  Harrington, McGee.

15          MR. TRISCHLER:  Yes, Your Honor.

16          THE COURT:  Can you see that, Doctor?

17          THE WITNESS:  I see reference 8, yes.

18          THE COURT:  Are you familiar with that paper?

19          THE WITNESS:  Yeah.  I think in the thousand

20  publications over that I reviewed, I did remember, you know,

21  this could have been one of them.

22          THE COURT:  Okay.

23  BY MR. TRISCHLER:

24  Q.  In Harrington, the lead author on this paper, Exhibit 6,

25  Harrington is actually one of the co-authors of the three
```

*PANIGRAHY - Direct*                              90

1   Gombar papers that we've been talking about.  Correct?

2   A.   Right.

3   Q.   And if I can direct your attention to this paper, you've

4   already told us that the pig is a good model for the human.

5   If we look at page 627 of this paper, we see three graphs on

6   the bottom right side of the document.

7          MR. NIGH:  Judge, now we're actually using the

8   document.  I'm going to object to this because my witness

9   doesn't have a copy of the document.  It sounds like we're

10  going to start selectively choosing a few phrases, and the

11  doctor doesn't have the context around it, neither do I, and I

12  don't believe Your Honor has it either.

13         MR. TRISCHLER:  The doctor has already said he's read

14  it and he's familiar with it.  If he needs time to review it,

15  we can provide him the time to review it.  But I think it's

16  fair cross-examination of a paper by the same authors who

17  wrote the papers on which he's relying upon.

18         THE COURT:  Mr. Trischler, what's the point?  Where

19  are we going with this?

20         MR. TRISCHLER:  The point, this paper, I believe,

21  contradicts his conclusions concerning the pharmacokinetics of

22  NDMA.

23         THE COURT:  You have experts who directly contradict

24  his conclusions who cite other papers.  So what?  I'm aware of

25  that.

1          Unless you think you can get him to recant,

2    completely recant his declaration, there's no point to this.

3    It's not helping me at all.

4          MR. TRISCHLER:  I want -- fine, Your Honor.  If the

5    ruling is that I can't cross-examine on the document, I'll

6    respect the ruling.

7          THE COURT:  Well, nobody has it.  It's going to take

8    us hours apparently to get it and have everybody have an

9    opportunity to look at it.

10          So I'm going to sustain the objection.  Let's move

11    on.

12    BY MR. TRISCHLER:

13    Q.  You have embraced the -- Professor Gombar's work and

14    findings in these three papers that we have marked as

15    Panigrahy-1, -2 and -3.  Fair to say?

16    A.  Correct.

17    Q.  And -- but given species to species differences, the

18    differences in doses between animal studies and humans and

19    other factors, do you agree that Professor Gombar and others

20    have repeatedly cautioned against using animal data like this

21    to extrapolate carcinogenicity to humans?

22          MR. NIGH:  I'm going to object.  This is going

23    outside the scope.  Carcinogenicity is not bioavailability,

24    it's not saturation, it's not first metabolism.  We're going

25    outside the scope again.

```
 1           THE COURT:  Mr. Trischler, what does this have to do

 2   with saturation and bioavailability, which is the subject of

 3   this declaration?

 4           MR. TRISCHLER:  It's right in the papers that he

 5   cited that are in his declaration that --

 6           THE COURT:  Well, that's not -- first of all, that's

 7   not what he cited the papers for.

 8           Second of all, I've already addressed this on Monday.

 9   I understand and we all understand and all scientists

10   understand the difficulties in extrapolating human studies --

11   I mean, animal studies to humans.  That's a given.  We all get

12   that.  And it's got nothing to do with bioavailability and

13   saturation.  Let's move on.

14   BY MR. TRISCHLER:

15   Q.  You agree that Gombar has admitted it himself that proof

16   of NDMA as a human carcinogen is lacking?

17           MR. NIGH:  Again, outside the scope.

18           THE COURT:  Sustained.

19           MR. TRISCHLER:  Your Honor, if I may make a proffer,

20   the doctrine of completeness, if a witness relies on a study,

21   you should be permitted to introduce evidence of other

22   relevant information in the same study that the witness is

23   relying upon.

24           THE COURT:  Counsel, you're forgetting where you are.

25   This is not a jury.  This is me trying to answer the questions
```

PANIGRAHY - Cross                    93

```
 1   raised in your motions, the very, very limited role that I
 2   have.  This is not helping me decide your motions.
 3          I understand that there's weaknesses in all the
 4   reports.  I understand -- and both sides have pointed them out
 5   very well, which I tried to say the other day.  I get all
 6   that.  This is not an opportunity to refile your motions,
 7   reargue your motions.  This is not a jury who is going to
 8   determine who has got the better witnesses.  This is not a
 9   jury who is going to determine whether or not a particular
10   expert should or shouldn't have relied heavily on a particular
11   study.  That's not what we're doing here.
12          Focus on the declaration, please.  Thank you.
13          MR. TRISCHLER:  Understanding the Court's ruling, I
14   have no further questions.
15          THE COURT:  Mr. Nigh, any questions?
16          MR. NIGH:  Briefly, Your Honor.
17                    CROSS-EXAMINATION
18   BY MR. NIGH:
19   Q.  Doctor, do you have your declaration in front of you?
20   A.  Yes.
21   Q.  And did you read page 11 of the defendants' reply brief
22   wherein they criticized your opinions because you did not
23   state the level of NDMA required to saturate the liver?
24   A.  Yes.
25   Q.  Doctor, can you explain what bioavailability means?
```

*PANIGRAHY - Cross*                                    94

1  A.   Yes.  I defined it in the document number 4.

2  Bioavailability is the percentage of the NDMA dose that will

3  pass the liver without being metabolized and thereby be

4  available in the systemic circulation.

5  Q.   Doctor, how does saturation relate to bioavailability?

6  A.   Saturation is the -- by definition is the extent where

7  NDMA could be solubilized or permeabilized.  The definition of

8  bioavailability is independent of saturation.  So there are

9  two concepts that the defendants are conflicting --

10  conflating.

11  Q.   Doctor, once the liver is fully saturated, what

12  percentage of the remaining dose becomes bioavailable?

13  A.   Then 100 percent will become bioavailable.

14  Q.   Doctor, does the liver need to be saturated before

15  bioavailability can occur?

16  A.   No, it does not, and that's why I cited the three Gombar

17  papers.  At the low oral dose, there's no saturation, yet

18  there's high bioavailability.

19  Q.   And Doctor, does the liver need to be saturated before

20  some of the substance gets past or a percentage of the

21  substance gets past the liver?

22  A.   No.

23  Q.   Why not?

24  A.   Because by definition, the systemic bioavailability is

25  the amount of the chemical, in this case NDMA, that gets into

1    the systemic circulation, and that's independent of that

2    saturation.

3    Q.   And Doctor, specifically for NDMA, does the liver need to

4    be saturated for NDMA to get past the liver?

5    A.   No.

6    Q.   Why not?

7    A.   Because the blood will flow -- you'll have a -- there's

8    no 0 percent bioavailability.  Even in the rodent, which is 8

9    to 10 percent, a certain amount of the NDMA can get past the

10   liver.  So the bioavailability -- again, I define it, it's the

11   amount of drug that gets past the liver.  And that's, as I

12   said before, the area under the curve through the oral

13   delivery divided by the intravenous.  It's just the definition

14   that's independent of saturation.

15   Q.   Doctor, are there any studies that support the idea that

16   NDMA gets past the liver regardless of whether the liver is

17   saturated?

18   A.   Yes.  So the Gombar papers I cited, they clearly show at

19   the low oral dose, at the 1 mg per kg, there's no saturation.

20   And in the swine, there is 67 percent bioavailability.  In the

21   dog -- beagle study was 93 percent, again, at the low oral

22   dose where there's no saturation.  And then in the monkey,

23   there was 49 percent bioavailability, independent of the

24   saturation.

25   Q.   So did the Gombar studies support that for the dog,

1  93 percent of the NDMA is getting past the liver and into the

2  bloodstream?

3  A.   Yes.

4  Q.   Doctor, and that's before saturation.  Correct?

5  A.   Right.

6  Q.   If it were saturated, the liver -- then saturated a

7  higher amount gets past the liver than the 93 percent in the

8  dogs.  Correct?

9  A.   Correct.  And that's what Gombar showed.  Actually at the

10 higher doses where there was saturation at the 5 mg per kg

11 orally, the percent of bioavailability was even higher than

12 the 93 percent in the dog and the 67 percent in the swine.

13 Q.   Doctor, did the Gombar study author suggest any

14 differences in the amount of NDMA that gets past the liver

15 between larger animals versus smaller animals?

16 A.   Yes.  These studies would suggest more NDMA would get in

17 the systemic circulation in a larger species such as the dog,

18 swine, and pig.  And they suggest in their 1990 paper that a

19 human would be more like a larger species, so it would have

20 higher bioavailability than a rodent.

21       MR. NIGH:  I don't have any further questions, Your

22 Honor.

23       THE COURT:  Mr. Trischler, do you want to ask any

24 questions about that?

25       MR. TRISCHLER:  No.  Thank you, sir.

```
 1            THE COURT:  All right.  Thank you.

 2            All right.  What's the status on the next witness?

 3    Do we need to take a -- it's 12:43.  Can we start, and then if

 4    we have to break, because Ms. Brown needs to go?  Do you want

 5    to start, Ms. Brown, with the next witness?

 6            MS. BROWN:  I completely defer to the Court, Your

 7    Honor, whatever is best.  I was going to ask for a few minutes

 8    with the tech person to just see if I can get my Elmo working

 9    so I myself could show a document and save us trouble.  But if

10    Your Honor's preference is to just keep going, we can do that

11    too.

12            THE COURT:  Well, let's take a 10-minute break and

13    then try to get set up and get the witness --

14            MS. BROWN:  I appreciate it.

15            THE COURT:  -- who's somewhere far away, I think I

16    remember.  So let's get the witness.  We'll take ten minutes.

17    Okay?  Thank you.

18            MS. BROWN:  I appreciate it, Your Honor.  Thank you.

19            (Recess at 12:42 p.m. until 12:50 p.m.)

20            THE COURT:  All right.  I don't want to butcher your

21    name.  Etminan?

22            THE WITNESS:  That's right.

23            THE COURT:  Dr. Etminan, would you raise your right

24    hand, please.

25            MAHYAR ETMINAN, PharmD, MSC, PLAINTIFFS' WITNESS,
```

```
 1  after having affirmed, was examined and testified as follows:

 2           THE WITNESS:  Yes.

 3           THE COURT:  State your full name, sir.

 4           THE WITNESS:  Mahyar Etminan.

 5           THE COURT:  All right.  The lawyers are going to ask

 6  you some questions.  Let's get started.

 7           MS. BROWN:  May I proceed, Your Honor?

 8           Thank you.

 9                     DIRECT EXAMINATION

10  BY MS. BROWN:

11  Q.  Good afternoon, Dr. Etminan.  How are you?

12  A.  I'm good.  Thank you.

13  Q.  My name is Alli Brown, and I have some questions for you

14  on behalf of the folks at ZHP and the other defendants.  Okay?

15  A.  Okay.

16  Q.  All right.  And to set the stage, Doctor, I understand

17  that in this case you've written a report, and you are of the

18  opinion that exposure to NDMA and NDEA can cause nine

19  different types of cancers; is that right?

20  A.  That's right.

21  Q.  Okay.  And the methodology, Doctor, that you used to form

22  that opinion, as I understand it, was a systematic search of

23  the scientific literature and a systematic appraisal of the

24  available evidence.  Does that sound familiar, sir?

25  A.  Yes.
```

 1  Q.   Okay.  And essentially what you did, Doctor, is you

 2  conducted a literature search.  Correct?

 3  A.   That's right.

 4  Q.   Okay.  And then you performed a Bradford Hill analysis on

 5  a subset of the literature that you looked at.  Is that fair?

 6          MR. VAUGHN:  Object to the scope, Your Honor.

 7          If I may explain myself.

 8          THE COURT:  Sure.

 9          MR. VAUGHN:  Dr. Etminan's entire declaration is just

10  him explaining and providing evidence of how the defense took

11  a partial quote from his report out of context.  The scope of

12  his cross should be limited as to whether he was taken out of

13  context and if the contents of his declaration are the correct

14  context.  Allowing the defense to revisit topics which they

15  have already extensively deposed Dr. Etminan on will only

16  reward and incentivize their tactics.

17          THE COURT:  No, I understand.  And we're not getting

18  far afield.  Don't worry about it.  But I think some

19  background information is certainly relevant here as to how he

20  arrived at his opinions, and then we'll move into the

21  declaration.

22          MR. VAUGHN:  Thank you, Your Honor.

23          THE COURT:  Go ahead.

24          MS. BROWN:  Thank you, Your Honor.  Appreciate it.

25  BY MS. BROWN:

```
 1  Q.  So just to reorient us, Dr. Etminan, after doing the
 2  literature search, I understand you did a Bradford Hill on a
 3  subset of some of the literature you found.  Right?
 4  A.  I did a Bradford Hill on the studies or the evidence that
 5  met my inclusion criteria that are laid out in my report, yes.
 6  Q.  Understood, sir.  And what you mean by that is you
 7  determined what studies to include and what studies to exclude
 8  in your Bradford Hill.  Is that fair?
 9  A.  That's right.
10  Q.  Okay.  And to be fair, Doctor, and it's the subject of
11  your declaration that we're getting to right away, you didn't
12  give all of the studies the same amount of weight in your
13  analysis.  Is that true?
14          MR. VAUGHN:  I'm going to relaunch my objections to
15  scope.
16          THE COURT:  Well, I understand that, but I think it's
17  pretty obvious that none of the experts in this case or any
18  case ever gives equal weight to all the studies.
19          MS. BROWN:  I understand.
20          THE COURT:  I think we can all guess at what the
21  answer is, but go ahead.
22          MS. BROWN:  Thank you.
23          THE COURT:  Let's move along.
24  BY MS. BROWN:
25  Q.  And that's true, right, Doctor, is that you made a
```

*EIFINAN - Direct*                    101

```
 1   determination about what weight to give to what studies.
 2   Correct?
 3   A.   That's right.
 4   Q.   And that was part of your methodology.  Right?
 5   A.   Correct.
 6   Q.   Okay.  And in your declaration in this case that we're
 7   here to talk to you about, you talk about two studies that you
 8   gave little weight to.  Right?
 9   A.   That's right.
10   Q.   Okay.  And what you tell us in your declaration at
11   paragraph 3 is that you gave little weight to studies called
12   Gomm and Pottegard; is that right?
13   A.   Correct.
14   Q.   Okay.  And in terms of all the studies cited in your
15   report, those are the only two studies that evaluated exposure
16   to NDMA and NDEA from valsartan, the medicine.  Right?
17   A.   That's right.
18   Q.   Okay.  And the other studies you relied on, sir, were
19   occupational or dietary studies.  Is that true?
20   A.   True.
21   Q.   Okay.  And neither of the two studies, Gomm or Pottegard,
22   that you gave little weight to, neither of those two studies
23   found an association between exposure to the medicine
24   valsartan and overall cancer risk.  Right?
25   A.   Generally speaking, yes, although they did show some
```

```
 1   increase in risk of some cancers, but globally, even they
 2   looked at all cancers.  I believe Pottegard showed a very
 3   small increase in risk that was not statistically significant,
 4   and Gomm I believe showed an increase in risk with liver
 5   cancer only.
 6   Q.  So in terms of the analysis, though, of whether exposure
 7   to these compounds from the medicine valsartan increased the
 8   overall risk of cancer, both of these studies found no
 9   association with the overall risk of cancer.
10        Would you agree with that, sir?
11   A.  Again, I'd like to be a bit more specific.
12        With Pottegard, they do report a 9 percent increase in
13   risk that was not significant statistically; nevertheless,
14   they do present a 9 percent increase in risk.
15   Q.  And, actually, though, when Pottegard reports that
16   nonstatistical finding, they report it as no association with
17   an overall cancer risk.  Right, sir?
18   A.  That's what they report.
19   Q.  Okay.  And when you say in your declaration, that that's
20   the issue of the question in here, sir, you say that you gave
21   these studies little weight, because in your view, these
22   studies were what you call inconclusive.  Right?
23   A.  I came to the conclusion that they were inconclusive as a
24   result of a number of limitations that I also discuss in
25   detail.
```

ETHNAN - Direct                                103

```
 1  Q.   Okay.  And the word "inconclusive," that's your word.
 2  Right?  The word "inconclusive," it doesn't appear in either
 3  of those articles.  Correct?
 4  A.   That's my word, yes.
 5  Q.   Okay.  And, in fact, Doctor, you wrote a letter to the
 6  authors of the Pottegard study about whether or not the study
 7  was inconclusive.  Do you remember that?
 8           MR. VAUGHN:  Object to the scope.  Your Honor, this
 9  is completely outside of what's in his declaration, and it's
10  been taken out of context.
11           MS. BROWN:  May I be heard, Judge?
12           THE COURT:  Well, I need to know what's in the
13  letter, to be honest with you, to find out whether this is
14  relevant to what's in his declaration.  So you can ask him
15  about what he wrote, what was the point, what was the purpose
16  of the letter and all that kind of stuff.
17           MS. BROWN:  Thank you, Your Honor.
18  BY MS. BROWN:
19  Q.   And so just to set the stage, Doctor, and get us all on
20  the same page, paragraph 3 of your declaration, you tell us
21  that these two studies were inconclusive in your view.  Right?
22  A.   Yes.
23  Q.   And that's why you gave them in your analysis little
24  weight.  Correct?
25  A.   Yeah.
```

```
 1  Q.   Okay.  And the idea of whether or not the Pottegard study
 2  was inconclusive or not, as you say in your declaration,
 3  that's something that you've actually raised with the author
 4  of the Pottegard study.  True?
 5  A.   I remember that I did write a letter.  I don't remember
 6  the details, but I did read -- write a letter, yes, bringing
 7  up some of the points that I also bring up in the report
 8  regarding the study.
 9  Q.   Okay.  And what I'd like to do is hope -- we'll see if we
10  can do it, but hope that I can share my screen.
11       We'll mark as Etminan-1 a copy of that letter.  And I'm
12  going to see if I can show it to everyone here.
13       Okay.  So can everyone see that?  Most importantly the
14  Judge and you, Doctor?
15  A.   Yes.
16  Q.   Okay.  Terrific.
17       All right.  And so let's just orient ourselves about --
18  this letter is coming from you in September of 2018.  Right,
19  sir?
20  A.   Yes.
21  Q.   Okay.  And you're writing this letter to the author of
22  one of the two studies that you determined was inconclusive,
23  and therefore, you gave it little weight.  Right?
24  A.   That's right.
25  Q.   Okay.  And the title of your letter to the author
```

 1   actually uses the word "inconclusive."  Right, sir?

 2   A.   Yes.

 3   Q.   What you title your letter is:  Epidemiologic Study of

 4   NDMA-Contaminated Valsartan Use and Risk of Cancer, Reassuring

 5   or Inconclusive?  Right?

 6   A.   Yes.

 7   Q.   And you had a series of comments about whether or not the

 8   findings were reassuring or inconclusive that you asked the

 9   authors about.  Right?

10   A.   Yes.

11   Q.   And there were some other folks who also sent some

12   letters.  Right?

13   A.   Yes.

14   Q.   Okay.  And you know that the authors responded to you.

15   Right?

16   A.   Yes.

17   Q.   Okay.  And in the authors' opinion, sir, in answering the

18   question you raised, are the findings reassuring or are they

19   inconclusive, the authors actually told you and others that

20   they were -- the findings were reassuring.  Right?

21        Let's take a look at what they said.

22        This is from around the same time, from the Pottegard

23   author responding to your letter and somebody else's letter.

24   And the authors say:  While we can't rule out a small increase

25   even several magnitudes larger than the one estimated by the

ETMINAN - Direct                           106

1   FDA, our estimates do provide some reassurance that no major

2   increase in cancer incidence could be detected.

3        Do you see that?

4   A.   Yes.  That's their opinion.  Yes.

5   Q.   So as to the question you raise to the very authors of

6   the study, are they inconclusive or are they reassuring, the

7   authors, the folks who wrote the study, believed the results

8   were reassuring.  True?

9   A.   That's what they say, yes.

10  Q.   Okay.  And they also answered directly, sir, some of the

11  issues and critiques that you raise in your declaration.

12  Isn't that right?

13  A.   If you could put it back.  It's been a while since I saw

14  that letter, so if I could just --

15  Q.   Absolutely.  Fair enough, sir.  Let me help orient us a

16  little bit.

17       I'm going to your declaration here to get us oriented to

18  another critique you tell us in your declaration and a

19  critique that you raise with the authors --

20  A.   Sorry, can I see the response from the authors again?

21  That's what I meant.

22  Q.   Oh, sure.  Absolutely, sir.

23  A.   Thank you.

24  Q.   I don't know if we can put it in the chat so that --

25  okay.

```
 1        This is what we were looking at, Doctor, the response
 2  from the author.  Right?
 3  A.   Okay.  So can I just have a few minutes just to read the
 4  whole response?
 5  Q.   Oh, yeah, absolutely.  And there's another response I
 6  want to show you.
 7        This is a response to Dr. Zhou that we were looking at.
 8  He's the other author attached here.  And then there was a
 9  specific response that I wanted to show you, addressed to
10  yourself.  Okay?
11  A.   Okay.  Can I then just -- if you want to ask me about the
12  responses, can I read them all, please, and then --
13  Q.   Absolutely.  Absolutely.  What I want to ask you about is
14  what I have highlighted here, which is a response to you
15  specifically.  And I'll just put it up.  I don't know if I can
16  zoom it in.  If you want a minute, just tell me when you're
17  ready to go to the next page.
18  A.   Okay.
19        Can you please flip the page?
20  Q.   Sure thing.  Absolutely.
21  A.   Okay.
22  Q.   So one of -- going back to your declaration that's the
23  subject of our questioning here today, in telling the Court in
24  this declaration that you gave limited weight to these studies
25  because you found them to be inconclusive, you listed a number
```

1    of specific critiques about the study.

2        Are you with me?

3    A.    Yes.

4    Q.    Okay.  And on one of them is that the authors didn't

5    account for the possibility that a patient could be switched

6    from a nonNDMA-containing valsartan to an NDMA-containing

7    valsartan during the follow-up period.  Right?

8    A.    Yes.

9    Q.    Okay.  And you also raised along the same lines the issue

10   of misclassification of exposure in paragraph number 1.

11   Right?

12   A.    That's right.

13   Q.    Okay.  And that concept is actually something that you

14   had raised when you wrote to the authors of the Pottegard

15   study.  Right?

16        MR. VAUGHN:  I want to put an objection on the record

17   really quickly.

18        I don't believe that response that you were showing

19   was in regards to Dr. Etminan's email.  And the letters that

20   you are showing are not peer reviewed.  And they're not

21   experts in this case.

22        THE COURT:  Well, wait a minute.  I'm really worried

23   about the first.  Say the first objection again.

24        MR. VAUGHN:  I don't believe that was a response to

25   Dr. Etminan's email to the study authors that she was going

*ETMINAN - Direct*                                    109

```
 1  over.
 2           THE COURT:  Oh.  Can we ask the witness if he
 3  recognizes that as the response to his letter.
 4           MR. VAUGHN:  I'm having difficulty following you,
 5  Ms. Brown.  I'm trying to get the exhibits that you're using,
 6  and I'm not seeing the stuff that you're showing him.
 7           MS. BROWN:  No problem.
 8           MR. VAUGHN:  Thank you.
 9           MS. BROWN:  We can separately email it to you.
10           And I'll try to make it clear for the record.
11  BY MS. BROWN:
12  Q.   Dr. Etminan, I'm going to direct you to a letter that was
13  sent to you.
14       Dear Dr. Etminan.  Do you see that?
15  A.   That's right.
16  Q.   Okay.  And I'm going to talk to you about what the
17  authors said.
18       But before we do that, I want to go back to your letter,
19  okay, and talk about another critique that you raised with the
20  authors themselves.  Okay?  Are you with me?
21  A.   All right.  Right.
22  Q.   So one of the issues that you raised when you -- in your
23  comment about whether it was reassuring or inconclusive, one
24  of the things you raised is the same thing you raised in your
25  declaration, is that it's possible that patients taking -- I'm
```

ETMINAN - Direct                          110

```
 1    sorry, folks.

 2        That patients taking NDMA valsartan may switch to other

 3    generic formulations during follow-up, increasing the

 4    possibility of exposure misclassification.

 5        Do you see that as something that you raised with the

 6    authors?

 7    A.   Yes.

 8    Q.   Okay.  And to reorient us, that's something that you

 9    raised in your declaration to the Court.  Right?

10    A.   That's right.

11    Q.   Okay.  And you raised -- you put that in your declaration

12    to the Court as a reason why the study was inconclusive and

13    the reason that you gave it, to use your words, little weight.

14    Right?

15    A.   Yes.

16    Q.   Okay.  But the authors responded to you on this exact

17    point.  Right, Doctor?

18    A.   Can you please put back the author's response?

19    Q.   Sure.

20        MR. VAUGHN:  Doctor, do you have access to this

21    entire document so you can review it in its entirety?

22        Ms. Brown, can you provide a copy of the entire

23    document to Dr. Etminan and myself?

24        MS. BROWN:  I'd be absolutely glad to.  As I

25    understand it, we're prevented from putting it in the chat.
```

1          If you want give me an email address, we can send it

2    off right now.  I do want to make sure he has the ability to

3    look at it.

4          MR. VAUGHN:  Mine is brett@hollislawfirm.com.  I can

5    forward it to him if you get it sent to me.

6          MS. BROWN:  Perfect.  I'm sorry.  It's Brett what?

7          MR. VAUGHN:  @hollislawfirm, H-O-L-L-I-S,

8    lawfirm.com.

9          MS. BROWN:  Terrific.  We'll get that right to you

10   right now.

11         MR. VAUGHN:  And I want to relaunch the objection

12   that this would not be competent evidence.  This was not peer

13   reviewed.  These are not experts in this case.

14         THE COURT:  They don't have to be peer reviewed or be

15   experts in the case.  She's asking whether or not his specific

16   complaint or criticism was responded to by the author.

17         MR. VAUGHN:  Thank you.

18         THE COURT:  That's all we're trying to find out at

19   this point.

20         MS. BROWN:  May I proceed, Judge?

21         THE WITNESS:  Well, I think you asked me a question,

22   so can I take a couple of minutes to formulate my response?

23         THE COURT:  You can take a couple minutes to look at

24   the letter.  You have to wait for the letter.

25         MR. VAUGHN:  We're waiting on the letter.

```
 1          MS. BROWN:  As I understand it, we've sent it to you,
 2   Mr. Vaughn, so hopefully it arrives momentarily.
 3          MR. VAUGHN:  I'll let you know when I receive it.
 4          MS. BROWN:  Thank you.
 5          MR. VAUGHN:  All right.  I'm forwarding it to him.
 6          MS. BROWN:  Thank you very much.
 7          MR. VAUGHN:  Let me know when you get it,
 8   Dr. Etminan.  And please take your time to review the whole
 9   document.
10   BY MS. BROWN:
11   Q.  Doctor, have you received the copy?
12   A.  Sorry, how am I receiving the copy?
13          MR. VAUGHN:  I just emailed it to you.
14          THE WITNESS:  Okay.  So if I could respond to your
15   first point on the response of the authors to my criticism or
16   however you like me to go about it.
17   BY MS. BROWN:
18   Q.  Thanks, Doctor.  I wanted to ask you a question about the
19   critique that you raised to the authors about the potential
20   misclassification that you also raised in your declaration.
21       Do you have that question in mind?
22   A.  Yes.
23   Q.  And in looking at the response, and now you have a copy,
24   that came to you from the authors themselves, they address
25   that critique.  Right, sir?
```

```
 1           MR. VAUGHN:  Counsel, will you put the first page of
 2   the document up so we can see who it's actually addressed to?
 3           MS. BROWN:  Yup.  Dear Dr. Etminan.
 4           MR. VAUGHN:  No, that's not the first page of the
 5   document.  That's page two of the document.  The response that
 6   you were going over earlier and you're acting like it was
 7   forwarded to the Doctor, is titled to Dr. Zhou.  Page 1.
 8           MS. BROWN:  I don't want there to be any confusion,
 9   so I'll just address it for the record.
10   BY MS. BROWN:
11   Q.   There are a number of letters, right, that you and others
12   sent.  And the letter I want to talk to you about right now is
13   a letter addressed to you on the misclassification critique
14   that you raised.
15        Are you with me on that, Doctor?
16   A.   Yes.
17   Q.   And it's true that what -- that what the author said was
18   that:  The ever use analyses do not introduce exposure
19   misclassification.  By definition, a patient is considered an
20   ever user after the first NDMA-contaminated prescription fill,
21   regardless of whether the patient uses non-contaminated
22   valsartan later.
23        That was the author's response to the critique you raised
24   in your letter and in the declaration you did for the Court.
25   Correct?
```

EITHNAN - Direct                                    114

 1   A.   That's right.

 2   Q.   And even though the authors, Doctor, responded to you on

 3   that critique, you continued to maintain that critique as a

 4   reason that you gave Pottegard little weight in your analysis;

 5   is that right?

 6   A.   That's right.  Because they address my critique -- they

 7   respond to my critique but they don't really address my

 8   critique.

 9   Q.   In their view, sir, the authors believed that their paper

10   and their research did not introduce exposure

11   misclassification.  That's what they told you, right, sir?

12   A.   That's what they told me.  But the reasoning that follows

13   that statement is not satisfying to me, because they're

14   basically saying, look, with respect to misclassification that

15   you're raising, all we did was we made sure that the first

16   prescription was a prescription that had NDMA-contaminated

17   valsartan.

18        Somebody -- that same subject could have been followed

19   later on and received a prescription with a different dose --

20   a different level of NDMA or no NDMA in valsartan during the

21   follow-up of that patient.  We didn't really care about that.

22   All we cared about was that the very first prescription was

23   NDMA contaminated.

24        And, again, that goes to my point that if you follow that

25   patient who may be switching from -- you know, different

```
 1   batches of the same formulation which may have different
 2   content of NDMA or different manufacturers of, say, valsartan
 3   which also may have different levels of NDMA, there is going
 4   to be measurement error in the level of NDMA in that patient's
 5   follow-up, which can introduce a bias into this study.
 6        So to answer your question, they address my comment, but
 7   they don't really answer my comment to my satisfaction.
 8   Q.   Sir, just to be fair, you raised the issue of exposure
 9   misclassification with the authors.  Right?
10   A.   Yes.
11   Q.   Okay.  And in their response to you, they told you they
12   didn't believe that was an issue in their study, and you
13   disagree with the authors.  Right?
14   A.   I -- well, they explain -- they explain why there is --
15   there shouldn't be misclassification, but the scientific
16   reasoning that they provide that you're showing in the letter
17   to me is sort of counterintuitive and is not satisfying
18   scientifically.
19   Q.   Okay.  So when it comes to the issue of misclassification
20   or potential exposure misclassification, you have a different
21   view of that than the authors of the Pottegard study.  Is that
22   fair?
23   A.   I don't think we have -- misclassification in
24   epidemiology -- if you open an epidemiology textbook,
25   misclassification is one of the major biases that is very well
```

EITHNAN – Direct                          116

```
 1  defined.  What I'm saying is that the issue of

 2  misclassification that I raised is not really answered or

 3  addressed by the response that they provided.

 4  Q.   Okay.  Let's move on, Doctor, and let's talk about the

 5  two reasons that you give in your declaration for why you

 6  found these studies to be inconclusive and why you give them

 7  little weight.  Okay?

 8  A.   Okay.

 9  Q.   And the two issues that you raise in your declaration

10  are, number one, that there was a short duration of follow-up.

11  Right?

12  A.   That's right.

13  Q.   And, number two, what you say, most importantly, there

14  was an inability in these studies to precisely quantify the

15  amount of NDMA in the valsartan formulations.  Right?

16  A.   That's right.

17  Q.   Those were your two critiques why you gave these studies

18  less weight than other studies you reviewed.  Fair?

19  A.   I believe in my report I also discuss, perhaps, competing

20  risk analyses, but in my declaration, yes.

21  Q.   Right.  And I'm trying to limit my questions, sir, to

22  your declaration, so --

23  A.   Okay.  I appreciate that.

24  Q.   -- in your declaration, you tell us about these two.

25  Right?
```

*EITHNAN - Direct*                    117

```
 1   A.   Yes.
 2   Q.   And so I want to start with the one that you tell us is
 3   most important to you, and that has to deal with the
 4   quantification of NDMA in valsartan in these studies.  Okay?
 5   A.   Okay.
 6   Q.   Okay.  And the fact is, sir, is that this issue of
 7   quantification of valsartan exposure is true in all of the
 8   studies that you rely on in your report.  Isn't that right?
 9   A.   The issue of quantification of NDMA, yes.
10   Q.   Okay.  And, in fact, you told us that -- you know, for
11   example, it's an issue in the study that most of your report
12   is based on the Hidajat -- am I pronouncing that correctly?
13   A.   Hidajat, yes.
14   Q.   Hidajat.
15        MR. VAUGHN:  Object to the scope of the question.
16   Hidajat is not mentioned anywhere in his declaration.  This is
17   getting far afield.
18        MS. BROWN:  And, Your Honor, what is mentioned, of
19   course, are the two critiques of the studies he gave little
20   weight to.  And I'm just exploring how that applies to the
21   studies he did give weight to.
22        THE COURT:  I'm not following you at all.
23        How could it possibly apply to the studies he gave
24   weight to?
25        MS. BROWN:  Well, Your Honor, the critique that he
```

1   has of two studies that he did not give weight to, right, is

2   the same critique that applies to the studies he did give

3   weight to, so --

4            THE COURT:  Well, what do you mean it's the same

5   critique?  That's what I'm not understanding.  What do you

6   mean by the same critique?

7            MS. BROWN:  Sure, Your Honor.  He admitted in his

8   deposition, that, for example, the Hidajat study also had to

9   use estimates of NDMA exposure.  And in his words, he said

10  it's pretty much impossible to have a precise quantification,

11  which is, of course, the critique he says in his declaration

12  for why he gave little weight to Gomm and Pottegard.

13           THE COURT:  Well, it's one of the reasons he cites.

14           MS. BROWN:  Correct.

15           THE COURT:  Okay.  Well, so you want to ask him why

16  he didn't apply the same standard to Hidajat?

17           MS. BROWN:  Sure, Your Honor.  Basically, the

18  critique he gives the Court for why he didn't give Gomm and

19  Pottegard the same amount of weight is a critique he admits

20  applies to the study he gave the most weight to.

21           MR. VAUGHN:  These are not the same critiques he even

22  gives to Hidajat.  They don't even -- they're not even able to

23  quantify it in Pottegard and Gomm.  It's a completely

24  different critique.

25           MS. BROWN:  I just have two questions on it.

1          THE COURT:  Well, the Hidajat study is the subject of

2     deposition questioning, I assume.  Right?  Yes?

3          MS. BROWN:  Yes, Your Honor, it is.

4          THE COURT:  Okay.  Well, you can ask him whether or

5     not he applied the same critique to the studies he relied on.

6          MS. BROWN:  Understood.  Thank you, Your Honor.

7     BY MS. BROWN:

8     Q.   And so just to wrap this up, then, Doctor, and consistent

9     with the Court's order, you were critical of Gomm and

10    Pottegard for not having precise quantification of the NDMA

11    exposure.  Right?

12    A.   Yes.

13    Q.   Okay.  But what you told us in your deposition is that

14    that's also a problem with the study you rely on like Hidajat.

15    Right?

16    A.   Yes.  And, again, every epidemiological study has

17    limitations, but the Hidajat was an environmental epi study

18    that explained in their methodology how they actually measured

19    NDMA for their analysis.  The Pottegard and Gomm studies are

20    the only two studies that actually set out to answer this very

21    specific question:  Does NDMA in valsartan increase the risk

22    of cancer?

23         So the amount of NDMA in the different dosages is the

24    underpinning of this -- of the question that they set out to

25    answer.  And so I had a much higher expectation for these

ETMINAN - Direct                    120

1  authors to provide information, at least say they attempted to

2  get the information on the amounts of NDMA in valsartan, which

3  they did not do.

4      Hidajat was a different study with a different scope;

5  nevertheless, they did provide the methodology that they used

6  to measure NDMA.

7  Q.  Okay.  And that methodology, sir, was to rely on

8  estimates of exposure, right, in the Hidajat study?

9  A.  Yes.

10 Q.  Okay.  And you were not critical of the Hidajat author's

11 decision to rely on those estimates.  Correct?

12 A.  Again, I did mention the Hidajat limitations.  I was more

13 critical on the NDMA amounts and concentrations in the

14 Pottegard and Gomm studies because they -- again, this very

15 important issue of NDMA concentration, they mainly relied on

16 one citation that they report.  And they made a -- sort of a

17 bold assumption which we know today after knowing the

18 information about the amount of NDMA in these dosages is not

19 true in that they made the assumption that the higher the

20 doses of valsartan, the higher the NDMA.  So, again, I wanted

21 to see more sort of discussion -- attempts to get NDMA-level

22 data on these valsartan dosages, knowing that there's a huge

23 variation between manufacturers and within manufacturers,

24 which was not done.

25 Q.  And one of the things both Gomm and Pottegard did to

```
 1   address the issue that you're raising is they conducted
 2   sensitivity analyses.  Correct?
 3   A.   Yes.
 4   Q.   Okay.  And in both instances, in both studies, those
 5   sensitivity analyses produced comparable results.  Correct?
 6   A.   They did.  But, again, the underpinning of that
 7   sensitivity analysis was the same flaw that I raised in that
 8   they assumed that NDMA concentration goes up with increasing
 9   the dosages of valsartan, and we know that's not true.  We
10   know that high dosages of a valsartan tablet would have a
11   lower concentration of NDMA than a lower dose valsartan.  And
12   so the assumption that they used that I criticized their
13   results for, they used the same assumption for the sensitivity
14   analysis, and, hence, they got similar results.
15   Q.   Okay.  Another reason, Doctor, you've been critical of
16   Gomm and Pottegard is because you said, and you reference it
17   in your declaration, that NDMA exposure was not specified in
18   the control group.  Correct?
19   A.   That's right.
20   Q.   And you told us that you would have liked to have seen
21   the control group broken down by high exposure, medium
22   exposure, and low exposure.  Correct?
23   A.   That's right.
24   Q.   Okay.  And the reason for that, Doctor, is because dose
25   and duration are important to determining carcinogenicity.
```

*ETHNAN - Direct*                                        *122*

 1   True?

 2   A.   Yes.

 3   Q.   Okay.  And when it comes to the compounds that are the

 4   subject of your report and your declaration and your

 5   testimony, NDMA and NDEA are found everywhere.  Right?

 6   A.   That's right.

 7   Q.   They're in the air we breathe, the food we eat, everybody

 8   is exposed to some amount of these compounds.  Correct?

 9   A.   That's right.

10   Q.   And in addition to being exposed through food and water

11   and air, our body also makes these compounds.  Right?

12           MR. VAUGHN:  Object to the scope of the question.

13   She's getting into endogenous formation of NDMA.  That's not

14   mentioned anywhere in his declaration.  They took him out of

15   context on one quote in his expert report.

16           THE COURT:  Ms. Brown, I'm well aware of endogenous,

17   exogenous.  It's all through all the papers.  Where are we

18   going with this?

19           MS. BROWN:  Absolutely, Your Honor.  And I'll just

20   tie it up to the critique he raises in his declaration about

21   the quantification.  I'm not looking to replow old ground.  I

22   promise.

23           THE COURT:  Thank you.

24           MS. BROWN:  Okay.

25   BY MS. BROWN:

ETMINAN - Direct                          123

 1  Q.   And so, Doctor, we're not going to spend a lot of time on
 2  endogenous, but you would agree that in addition to exogenous
 3  exposure, our bodies make some amount of endogenous NDMA and
 4  NDEA as well.  Right?
 5  A.   Yes.
 6  Q.   Okay.  And you are critical of the two papers in your
 7  declaration, Gomm and Pottegard, for not quantifying NDMA
 8  exposure.
 9       But the fact is, Doctor, you haven't attempted to
10  quantify anybody's baseline exposure to these compounds.
11  Right?
12            MR. VAUGHN:  Object to the scope.  We're going
13  straight to endogenous formation, which is not mentioned
14  anywhere in his declaration.
15            THE COURT:  I'm not sure where this is going,
16  Ms. Brown.  Where are we going with this?
17            MS. BROWN:  Understood, Judge.  If I could just have
18  two questions to tie it to the declaration, I'll move on to my
19  next topic.
20            THE COURT:  Okay.  Let's go.
21            MS. BROWN:  Okay.
22  BY MS. BROWN:
23  Q.   And what I mean, Doctor, is even though you gave
24  critiques about quantification in your declaration, your work
25  in this case was not aimed at trying to figure out whether a

ETHNAN - Direct                        124

```
 1  particular increase in exposure to these compounds increases

 2  any individual's risk of cancer.  Right?

 3  A.   Can you repeat that question, please?

 4  Q.   Sure.  The work that you did in this case was not aimed

 5  at answering the question about whether or not any particular

 6  increase in the NDMA or NDEA exposure that people have on a

 7  regular basis is enough to cause cancer.  Right?  You didn't

 8  answer that question?

 9        MR. VAUGHN:  Object to the scope again.  Nowhere in

10  his declaration does he discuss an increased risk; he was

11  simply talking about how he was taken out of context.

12        THE COURT:  Ms. Brown, you raised this in your motion

13  about this baseline stuff.

14        MS. BROWN:  Understood, Judge, and I really --

15        THE COURT:  Do we --

16        MS. BROWN:  Sorry, go ahead.

17        THE COURT:  Do we have to do it again?

18        MS. BROWN:  I just want -- I was hoping to get an

19  answer to one question, Judge, because he raises this

20  quantification issue in his declaration.  And I just want to

21  make clear, following up on that, that that's not even a

22  question he looked at here.

23        THE COURT:  I'm sorry.  I didn't hear the end of

24  that.  That's not even what?

25        MS. BROWN:  That's not even something he's prepared
```

ERITHNAN - Direct                    125

```
 1   to give an opinion on, Judge, meaning he didn't try and figure
 2   out what everybody's exposed to normally and whether
 3   particular increases increase your risk of cancer.  His
 4   question didn't have anything to do with this -- the
 5   individual dose or exposure; he just looked at the question in
 6   general.  And so the critique that he's raising in his
 7   declaration is really not tied to any opinion he even is
 8   giving in his --
 9           THE COURT:  Well, no, he's --
10           (Court reporter clarification.)
11           THE COURT:  I'm sorry, Ms. Mitchell.
12           Go ahead.  Repeat what you were saying, Ms. Brown.
13   The court reporter didn't get it.
14           MS. BROWN:  What I was saying, Judge, is that the
15   critique that he's raising on the quantification of these
16   compounds is not tied to any opinion that he's giving in this
17   case.
18           THE COURT:  Well, yeah, but the point of the
19   declaration was to respond to criticisms that you, the
20   defendants, have raised.
21           MS. BROWN:  Yes, sir.
22           THE COURT:  I don't think he's trying to express any
23   new opinions here.
24           MS. BROWN:  I understand, Your Honor.
25           THE COURT:  Let's move on, please.
```

*ETMINAN - Direct*                              126

1   BY MS. BROWN:

2   Q.   Let's move on, then, Doctor, to the second reason you

3   give in your declaration for giving little weight to these two

4   studies.  And that has to do with the amount of follow-up that

5   was covered in the studies.  Right?

6   A.   That's right.

7   Q.   Okay.  And in Pottegard, the mean follow-up was about 4.6

8   years.  Correct?

9   A.   The total follow-up, yes.

10  Q.   Okay.  And in Gomm it was three years.  Is that accurate?

11  A.   Yes.

12  Q.   And you would agree that three to five years is too short

13  a period of time to determine if NDMA in valsartan can cause

14  cancer.  Right?

15          MR. VAUGHN:  Object.  Object to the scope.  He does

16  not give any latency opinions in here.  He's simply correcting

17  how he was taken out of context and what the correct context

18  is.

19          MS. BROWN:  Your Honor, this is a squarely within his

20  declaration as a reason why he disregarded two studies that

21  show no increased risk of overall cancer with valsartan.

22          MR. VAUGHN:  You're trying to get him to give an

23  opinion now on how much latency is needed for individual

24  cancers.  That's not addressed anywhere in his declaration.

25          THE COURT:  He raises the issue in paragraph 3 about

ETMINAN - Direct                    127

```
 1    the short duration.  I think he can be asked what would be an
 2    appropriate duration for a study.  But you're right about
 3    latency.  He's not given any opinions about latency periods
 4    for any of these cancers.  But he can certainly give an
 5    opinion about what an appropriate study -- what time frame an
 6    appropriate study would encompass.
 7            So go ahead, Doctor.
 8            THE WITNESS:  Yes.  So, I mean, there is really no
 9    set sort of fixed number of years that has been agreed on as
10    to the optimal follow-up.  Obviously, cancer being a latent
11    condition, the longer the follow-up, the more cancers that
12    will develop.  So, you know, methodologically, probably better
13    to have longer follow-up.
14            But as I mention in my report, we do -- we are aware
15    of studies of drugs that have caused cancer within a year,
16    being promoters, cancer promoters, similar to NDMA.
17            So again, there is a range, the longer the better,
18    that it could happen, you know, in a year or so, probably less
19    likely than five years or ten years.  But, you know, it is
20    possible for a shorter duration as well.
21    BY MS. BROWN:
22    Q.  Well, what you told us, sir, before, Doctor, is that
23    three to five years is too short a period of time for cancer
24    to develop from valsartan medicines.  Right?
25            MR. VAUGHN:  Object.  Object to the scope, and you're
```

 1  misstating his prior testimony.

 2          MS. BROWN:  Well, we can take a look at it.  Why

 3  don't we take a look at it, Doctor.

 4          THE COURT:  Well, the Doctor can certainly tell us

 5  whether that's his opinion in his prior testimony, but I'm not

 6  sure what this has got to do with his declaration.  He doesn't

 7  opine on latency periods.  He just says that these studies

 8  weren't following up long enough.  And you just asked him,

 9  well, how long is long enough, and you got the answer you got.

10          MS. BROWN:  I understand, Judge.  I'm just looking to

11  test that answer against what his prior testimony was on the

12  years, because he raised it in his declaration.

13          THE COURT:  You can ask him what he said at his

14  deposition or whatever about the number of years that would be

15  ideal for a follow-up on the study of NDMA.

16          MS. BROWN:  Thank you, Your Honor.

17  BY MS. BROWN:

18  Q.   And so Dr. Etminan, you raised the objection to these

19  studies being too short.  And you told us in your deposition

20  that three to five years is just not long enough to study --

21          MR. VAUGHN:  Objection.  You're misstating his

22  testimony.  If you're going to quote him, please put it up so

23  we can review it.

24          MS. BROWN:  Your Honor, could I get the question out

25  first?

```
 1          THE COURT:  Are you asking him whether or not he
 2  recalls stating in his deposition that three to five years was
 3  not sufficient?
 4          MS. BROWN:  I am, Judge.
 5          THE COURT:  Doctor, do you remember saying that at
 6  your deposition?
 7          THE WITNESS:  Honestly, it was a ten-hour deposition,
 8  so no.
 9          THE COURT:  So perhaps counsel can find us a page and
10  line number.
11          MS. BROWN:  Sure.  Sure, I can.
12  BY MS. BROWN:
13  Q.  And Doctor, I'll put it up on the screen.
14  A.  I appreciate it.
15  Q.  If you have your transcript from 8/25, it looks like it
16  is at page 52.  And let me try to get it for you so I can help
17  you.
18      I'll put it up to make it easier.
19      Okay.  So we are at page 52 of your deposition, Doctor.
20  And we're looking at line 5.  And you were asked this
21  question:  I wasn't asking about whether there's a particular
22  individual that might have a shorter latency period than
23  another.  I was asking about study design.
24      And what you told us yesterday was that a study period of
25  four or five years, which I believe is the time frame in the
```

 1   Pottegard and Gomm studies, is just too short, and it's too

 2   early to tell whether or not nitrosamines in

 3   valsartan-containing medications can cause an increased risk

 4   of cancer.  You need a longer period of time to study that.

 5         And your answer on that day, sir, under oath, was yes.

 6   Correct?

 7   A.   Yes.  I mean, that is what I say.  But again, going back

 8   to what I also said, the four to five years being too short,

 9   again, the sort of -- there may be some lack of context here.

10   But too short doesn't mean that there won't be any cancers

11   whatsoever.  Too short means that optimally we like to see

12   longer follow-ups.

13         And again, back to my declaration, the reasons I gave low

14   weight to these two studies wasn't just because of the short

15   follow-up.  I list in detail a number of other limitations,

16   the -- collectively, you know, which collectively led me to

17   giving them a lower rate in terms of their validity.

18   Q.   Yes, sir.  And in terms of how long you would need a

19   study to figure out whether these compounds in valsartan can

20   increase the risk of cancer, you told us that most cancers

21   take at least ten years to develop.  Right, sir?

22         MR. VAUGHN:  Objection.  That misstates his

23   testimony.  Again, we're getting outside of his declaration.

24   We're getting back again to cancer latency in general.

25         THE COURT:  Well, no.

 1          Doctor, do you remember saying that, about the ten

 2   years for most cancers to develop?

 3          THE WITNESS:  I don't.  I don't remember saying that.

 4   Again, if you want to -- I could have said it.  It's not

 5   something that I wouldn't have said it.  But specifically in,

 6   you know, the context and when I said it or where I said it, I

 7   don't remember.

 8          THE COURT:  Okay.  Well, do you agree that that's

 9   accurate?

10          THE WITNESS:  I would -- again, optimally, the longer

11   follow-ups, like ten years, yes, most cancers would be able to

12   develop that -- as you know, we work with an L-shaped curve in

13   pretty much everything, including cancer, so it doesn't mean

14   that cancers wouldn't develop in shorter periods.

15          And in my report, I do talk about examples of

16   prescription drugs that have been shown to cause cancer within

17   a year.  So, you know, it is a wide range.

18          MS. BROWN:  And may I just show that testimony, Your

19   Honor?

20          THE COURT:  Sure.

21          I don't think he denies giving that testimony, but if

22   you want to show it, that's fine.

23   BY MS. BROWN:

24   Q.  So Doctor, we're going to page 50 of that same

25   transcript.

ELHINAN - Direct                                    132

 1        And you were asked, do you know the average latency --
 2   I'm sorry.
 3        Do you know the latency period -- I'm sorry.
 4        Do you know the average latency period for colorectal
 5   cancer?
 6        And your answer was:  The latency period for cancer in
 7   general is usually around, give or take, ten years.
 8        That was your testimony under oath in August of this
 9   year.  Right, sir?
10   A.   Yes.  I mean, general that I stand by that.
11   Q.   Right.  And in terms of this issue that you raise in your
12   declaration about the short duration of follow-up, you were of
13   the view that the Gomm and Pottegard studies shouldn't have
14   even been conducted until more time passed.  Right?
15   A.   Well, I mean, if you look at Gomm, if you count for
16   latency, meaning that let's say the cancers that happen in the
17   first year after follow-up, there are probably cancers that
18   have started way before the use of the drug.
19        So if you exclude those, they only have maybe about a
20   year of -- or two years of follow-up.  That is inadequate.
21   Pottegard had, you know, a bit longer of a follow-up, but Gomm
22   had much less.
23   Q.   Right.  And what you told us is you should wait until you
24   have adequate follow-up.  And these studies that had three,
25   four, four-and-a-half years, shouldn't have even been done

ETHNAN – Direct                               133

```
 1  until you had adequate follow-up time.  Right?
 2  A.   Well, I mean, optimally that's what you want.  Whether
 3  you should have waited and not have done this study, again, my
 4  concern -- my other limitations that I brought up and you also
 5  alluded to by pointing to my letter is the misclassification
 6  and the measurement error and other limitations, all of which
 7  collectively led me to giving them a lower weight.  It wasn't
 8  just the follow-up issue.
 9  Q.   Under -- sorry, sir.
10  A.   Yeah, that's it.
11  Q.   Okay.  But on this issue, when we asked you about this
12  issue, this follow-up issue --
13  A.   Uh-huh.
14  Q.   -- you said these studies shouldn't have been done
15  because there just simply isn't enough data.  Right?
16  A.   Is this -- are you going back to my deposition again,
17  or --
18  Q.   Yes.  Do you want me to show it to you?
19  A.   Please.
20       MR. VAUGHN:  Doctor, I think you might have a
21  transcript as well, so when she shows it to you, if you need
22  to review other pages for the full context, please feel free
23  to take your time.
24  BY MS. BROWN:
25  Q.   We're going to go to the first day, Doctor, to page 172.
```

ETHNAN - Direct                                    134

 1   And we're going to go to line 3.

 2       All right.  And you were asked this question:  And with

 3   respect to just discussing the limitation you have identified

 4   of time to follow-up, you understand these products were on

 5   the market only relatively recently, so approximately 2014 and

 6   2018.  There's not at the moment an opportunity for any longer

 7   follow-up?

 8       There was an objection, and your answer was:  Yes.  I

 9   mean, that's the problem.  But that doesn't take away from the

10   fact -- I mean, if you can't do this study, you shouldn't do

11   it.  You should wait until you have adequate follow-up.  You

12   cannot do sort of a -- you cannot disregard an important part

13   of this study design, which is adequate follow-up, because

14   there just simply isn't enough data.  I mean, they could have

15   waited until more data is accumulated before they actually did

16   this study.

17       That was your testimony in August of this year.  Right,

18   sir?

19   A.   Yes.  Can you please go maybe a bit higher up right

20   before this?

21   Q.   Yeah, absolutely.

22       This Q and A is sort of going to an issue that we talked

23   about earlier, right, sir, the control group?

24   A.   Uh-huh.

25       Okay.  So can you rephrase your question again, please?

1  Q.   Sure.  I just want to confirm that the testimony we

2  looked at about whether or not there was enough data available

3  today for the Gomm and Pottegard study design, if this

4  testimony I read to you was accurate?

5  A.   Yes.  I'm basically saying the longer or the more time

6  you have, the better.  And perhaps if the follow-up time that

7  you have is really short, like Gomm, perhaps it's better to

8  wait until more data is accrued and collected to do this

9  study.

10  Q.   Doctor, the final area of inquiry for you today has to do

11  with the methodology that's at issue in your declaration.

12       This is not the first time that you have served as an

13  expert witness for plaintiffs' lawyers in litigation.  Right?

14            MR. VAUGHN:  There's no methodology in his

15  declaration.  He's correcting how he was taken out of context,

16  and I don't understand how him being a plaintiffs' expert

17  previously has to do with his declaration.

18            MS. BROWN:  May I be heard, Judge?

19            THE COURT:  Yeah.  What is the methodology that's

20  contained in the declaration?

21            MS. BROWN:  Yes, sir.  The methodology I think is

22  critical, Judge, because what the declaration deals with is

23  how based on the doctor's methodology, he has decided to give

24  two studies less weight than others in his Bradford Hill

25  analysis.  And the fact is, Your Honor, is that he's done this

```
 1   before and his opinion has been excluded because that
 2   methodology is unreliable.  And that's what I want to ask him
 3   about.
 4              THE COURT:  He's done --
 5              MR. VAUGHN:  His declar- --
 6              THE COURT:  Excuse me.  He's done what before?
 7              MS. BROWN:  He's performed a Bradford Hill analysis
 8   by disregarding certain information, and that has been found
 9   unreliable, and his general causation opinion has been
10   excluded on that basis, Your Honor.
11              THE COURT:  And when and where was that?
12              MS. BROWN:  That was in the Fosamax case, Your Honor,
13   in the Southern District of New York.  And the opinion that
14   excluded his methodology on general causation is from July 27,
15   2009.
16              THE COURT:  Do you cite that in your brief?
17              MS. BROWN:  Your Honor, I am very new here, and I do
18   not believe so, which is why I was going to ask the doctor
19   about it.
20              THE COURT:  So you've never raised this before?
21              MS. BROWN:  I'm hoping somebody on the line might be
22   able to step in and help me on this.  I apologize, Your Honor,
23   I've only been involved in the case for a few days, but I do
24   not believe this has --
25              MR. VAUGHN:  I'm unaware of it being raised.
```

*EITHNAN - Direct*                    137

```
 1          MS. BROWN:  -- been part of the briefing.

 2          THE COURT:  It's not part of the briefing that I can

 3  recall or I can find at the moment.

 4          The whole purpose of this was really not to get into

 5  new issues.

 6          MS. BROWN:  I --

 7          THE COURT:  I went to some great extent on Monday --

 8          MS. BROWN:  I know, Judge.

 9          THE COURT:  -- with defense counsel about their

10  opportunity to present everything they wanted to present, but

11  I didn't hear a word from you or Mr. Trischler that -- about

12  any of this.

13          MS. BROWN:  Yeah.  And I apologize.  I'm brand new

14  here.  As you know, I just entered my appearance.  And in

15  looking at the supplemental declaration and understanding

16  completely that we are to tailor our questioning specifically

17  to that declaration, I couldn't help but see that the very

18  same methodology led to this exclusion, and I think it's

19  exactly on point.

20          I mean, there are two reasons he was excluded there:

21  One was disregarding certain information that, you know, went

22  the other way, as we would argue these two studies do; and two

23  is even doing a Bradford Hill analysis in the face of not

24  having an association between the drug and the injury, which

25  we would argue is the same here.  So the exclusions seem sort
```

ETMINAN - Direct                    138

```
 1    of directly on point here, Your Honor, and --

 2            THE COURT:  Wait a minute.

 3            You're suggesting there's no evidence of an

 4    association between NDMA and cancer?

 5            MS. BROWN:  No, Your Honor.  It's between the

 6    medicine.

 7            So I think what this Court was holding is that you

 8    would have to have established causation between the drug --

 9    before you even do the Bradford Hill.  Right?  The Court in

10    two parts -- one, the Court questioned what happened here,

11    right, which is where you sort of give little weight to

12    certain studies and exclude it on that basis.  But, two, the

13    Court also said, Your Honor, look, we're questioning whether a

14    Bradford Hill under these circumstances is even appropriate

15    where it hasn't been conclusively established that there's an

16    association between the medicine.  Right?  Not the compound,

17    not the, you know, contaminant, but the medicine and the

18    injury.

19            And so on those two points, Judge, it seems, you

20    know, kind of on the four corners here of what's happened in

21    this case.

22            MR. VAUGHN:  Your Honor --

23            THE COURT:  Wait a minute, wait a minute, wait a

24    minute, Mr. --

25            MR. VAUGHN:  Sorry.
```

*EHRNAN - Direct*                           *139*

```
 1            THE COURT:  Wait a minute, wait a minute.
 2            Yeah, I think you're correct.  The Third Circuit, in
 3  order to get to causation, you have to establish association,
 4  and then you apply either the Bradford Hill principles or the
 5  weight of the evidence principles to that to give your
 6  causation opinion.  Okay?
 7            And I don't know what happened in Zoloft with this
 8  witness.  I don't really care.
 9            But are you suggesting that the plaintiffs in this
10  case have not established the association element of that
11  requirement?
12            MS. BROWN:  Yes, Your Honor.  In terms of the
13  medicine, I am.  So I understand they're relying on sort of
14  general studies, food studies, occupational studies, about the
15  compound itself.  But I would suggest, Your Honor, because
16  dose is so important, Your Honor, that they would -- before
17  they even get to a Bradford Hill, they would have to establish
18  that at this dose, these trace levels are generally capable of
19  causing the nine cancers.
20            THE COURT:  Ms. Brown, that's very clever, but
21  perhaps you can explain to me why there was the recall by all
22  these government agencies if there's no association.
23            MS. BROWN:  I understand, Your Honor, completely.
24  And I would suggest, though, that regulatory decisions like
25  that are often not in complete concert with the law on
```

 1   causation and particularly the law on Daubert, Your Honor.

 2           And I understand out of an abundance of caution,

 3   there were actions taken by the FDA.  I understand that

 4   completely.  But I would suggest, Your Honor, just on the

 5   methodology, that this Fosamax opinion is enormously

 6   instructive and I think raises real questions about the

 7   analysis that this doctor did.

 8           THE COURT:  We'll set aside all the government

 9   agencies around the world who decided there's an association,

10   therefore, we have to order a recall.

11           What about the statements made by the officers,

12   employees of the defendants, the vice presidents and officers

13   who clearly state that this stuff is a human carcinogen?

14   That's not an association?  Your clients think it is.  Why is

15   more even required?

16           MS. BROWN:  I understand that completely, Judge.  And

17   I guess I would just say this.  Like I would use, Your Honor,

18   asbestos as an example, let's just say.  Right?  I mean, we

19   would all agree asbestos is a carcinogen.  Everybody agrees

20   asbestos causes cancer.  But at the same time, the EPA allows

21   a certain amount of asbestos in our drinking water.  Right?

22   We know that everybody's exposed to asbestos.  We all have

23   asbestos in our lungs.  And we know that the FDA has recalled

24   products because of a concern about potential asbestos

25   contamination; but we know upon further investigation, those

```
 1    products don't have enough asbestos in them to cause cancer.

 2            So I would just suggest to the Court, I completely

 3    understand, you know, the concept that this is, you know, a

 4    substance that in certain circumstances may be able to cause

 5    cancer, but I think the inquiry has to be here for this Court

 6    in this circumstance, in this medicine, could it do it?  And I

 7    would suggest to Your Honor that these experts just on their

 8    own admissions haven't done that.

 9            THE COURT:  There is no answer to the question yet in

10    science.  You have two sides to this question.  You have two

11    groups of experts totally opposed to each other in this case

12    as to what the science says, which is not really unusual, I

13    think you'll admit, because you've been involved in a lot of

14    cases.  Right?

15            MS. BROWN:  Yeah, Judge, a lot of cases like this

16    with trace contamination where you've got to figure out how

17    much, you know?  I mean --

18            THE COURT:  No, I get it.  But that's the fun of

19    being a lawyer, because who knows.  I mean, you take it to a

20    jury, and the jury says, well, I know --

21            MS. BROWN:  I know.

22            THE COURT:  I think that what you're trying to --

23            MS. BROWN:  Yeah.  There is like an initial -- you

24    know, we got to obviously get past -- they have to get past

25    you, Judge, as the gatekeeper.  Right?  And I would just
```

 1   suggest to the Court that means they have to be able to show

 2   in the way that these plaintiffs were exposed, can it

 3   generally cause cancer?  And that requires an analysis that I

 4   would submit hasn't been done here, and that, you know, the

 5   Fosamax court excluded on those very grounds.

 6        THE COURT:  Well, I don't see any parallel between

 7   this and the Fosamax case, because I think -- I really do

 8   believe that the association element has been clearly

 9   demonstrated, both through all the action by the government

10   agencies and through the words of the defendants themselves.

11        So now we're at weight of the evidence, and now we're

12   its -- where it gets tricky, Bradford Hill.  And the jury's

13   going to have to hear all this argument, and, you know, you're

14   going to -- defense is going to cross-examine vigorously the

15   plaintiffs' experts.  And they're doing a great job so far of

16   doing it, and the jury's going to have to determine.

17        But I don't see any basis that this Fosamax case

18   should at all influence what I think of the declaration of

19   this witness.  So let's move on, please.

20        MS. BROWN:  Okay.  Understood, Your Honor.

21        I think with that, Your Honor, I can conclude.

22        Could I submit the opinion to the Court, though, for

23   consideration, the Fosamax --

24        THE COURT:  Just give me the citation.  I'll look at

25   it, then, you know --

ETMINAN - Direct                           143

```
 1           MS. BROWN:  Okay.  Terrific.

 2           Your Honor, it's In re:  Fosamax Products Liability

 3   Litigation, 645 F. Supp. 2d 164 (2009).  And I would direct

 4   the Court to -- at 187 is where the discussion of Dr. Etminan

 5   begins.

 6           THE COURT:  Okay.

 7           MS. BROWN:  I appreciate it, Judge.  Thank you.

 8           And thank you, Doctor, for your time.  I don't have

 9   any more questions.

10           THE WITNESS:  Thank you.

11           THE COURT:  Mr. Vaughn, did you want to ask any

12   questions?

13           MR. VAUGHN:  Yes, if that's okay.

14           THE COURT:  Sure.

15           MR. VAUGHN:  Are we good to start now?

16           THE WITNESS:  Sure.

17           MR. VAUGHN:  You're on mute, Judge, Your Honor.

18           THE COURT:  Ms. Brown, when do you have to leave?

19   It's almost 2:00.

20           MS. BROWN:  I just had my paralegal say -- tell me

21   when the judge gets on.  So I think I'm okay for right now.

22   We have --

23           THE COURT:  If you're going to start at 2:00, then

24   let's not, you know, interrupt in the middle of a question.

25           How long are you going to be on with this other
```

ETMINAN - Cross                          144

```
 1   judge?
 2           MS. BROWN:  I just am going to be on, Judge, for 30
 3   minutes or less, if I can, and if that would be okay, with
 4   your indulgence.
 5           THE COURT:  That's fine.
 6           Who is this judge?
 7           MS. BROWN:  It's Judge Licht in Rhode Island, Your
 8   Honor.  I have a case set for trial up there in the spring.
 9           THE COURT:  Okay.  All right.  Well, then why don't
10   we break till 2:30.
11           MS. BROWN:  I appreciate it, Your Honor.
12           THE COURT:  And we'll come back on at 2:30, and we'll
13   go from there.  Okay?  Thank you.
14           MS. BROWN:  Thank you very much, Judge.
15           Thanks, everyone.
16           (Recess at 1:56 p.m. until 2:32 p.m.)
17           THE COURT:  Go ahead.  Let's get started.
18                        CROSS-EXAMINATION
19   BY MR. VAUGHN:
20   Q.  Dr. Etminan, what was the purpose of your declaration?
21   A.  The defendants had brought up a few issues regarding my
22   report, so that's what I tried to clarify, some of those
23   issues in my declaration.
24   Q.  And what were you trying to clarify exactly?
25   A.  That I had disregarded the valsartan-specific studies,
```

```
 1   mainly the studies from Gomm and Pottegard.
 2   Q.   And did you disregard the studies, Pottegard and Gomm?
 3   A.   I did not.  I allocate two pages of my report to each
 4   study.  I summarized the study design and the study findings
 5   and then provided line-by-line detailed discussion of the
 6   methodology and its limitations.
 7            MR. VAUGHN:  Thank you, Dr. Etminan.  I have no
 8   further questions.
 9            THE COURT:  Ms. Brown, do you have any questions on
10   that?
11            MS. BROWN:  I do not.  Thank you, Your Honor.
12            THE COURT:  All right.  Well, look.
13            I did look at the Fosamax case.  First off, the
14   ground wasn't raised in the motion to exclude the doctor's
15   opinion.  But having looked at the Fosamax case, I'm not
16   impressed.
17            He was permitted to testify on the limitation of
18   certain clinical trials.  But the problem there in that case
19   for this witness was, as the court noted, there really wasn't
20   any associational evidence and there was no methodological
21   reason for him to have gotten to Bradford Hill without first
22   the association of evidence.
23            Here that's completely different.  As I've said --
24   and I understand Ms. Brown's point that there is no strong --
25   there is no association evidence as to the particular
```

1   prescribed medicine that was contaminated and the ultimate

2   tumors that are formed.  In fact, the two studies which we've

3   spent a lot of time talking about seem to indicate that

4   there's not a lot of strong associational evidence, although

5   they do indicate an increased risk of certain cancers.

6           Anyway, I've already decided that there is strong

7   associational evidence, so there was no reason why Dr. Etminan

8   could not get to the Bradford Hill factors in this case.  So I

9   don't think the Fosamax case is terribly helpful.

10          All right.  This is what I want to do, folks.  I want

11  to take just a couple more minutes, give me about ten more

12  minutes.  And then I want to come back on the record and talk

13  about some things.  Okay?  So give me ten minutes.  Thank you.

14          MS. BROWN:  Thank you, Your Honor.

15          THE WITNESS:  Can I be dismissed or --

16          THE COURT:  Yes, Doctor.  We're done.  Thank you.

17          THE WITNESS:  Thank you.  Thanks, everyone.

18          (Recess at 2:36 p.m. until 2:48 p.m.)

19          THE COURT:  Okay.  Anybody wants to join back in and

20  listen, I want to go back through some things with you at this

21  point.

22          Ms. Mitchell, are you ready?

23          All right.  I want to go through some of these

24  witnesses, these experts, and tell you my decision on your

25  motions.

 1          Let me first thank you for the extraordinary work you
 2     did on these motions.  I mean, you put in a heck of a lot of
 3     time and effort.  A heck of a lot of thought went into these
 4     things.  It was very illuminating in many instances.
 5          I follow up what I said on Monday, that I think some
 6     of you may have misunderstood my role in all this, but we'll
 7     get into all that.
 8          The declarations I think were helpful but not
 9     dispositive.
10          Let's start with Dr. Lagana, who, by the way, said
11     something very interesting during his testimony today, which
12     may be obvious, but it needed to be said.  And that when these
13     experts are determining which studies they want to rely on and
14     which studies they don't want to rely on, there is an element
15     of human judgment involved in this.
16          And I think that's true of every expert on both sides
17     of this case.  I don't think that's objectionable at all.
18          But anyway, the first issue that we dealt with and
19     you dealt with in your motions to bar his testimony about this
20     null hypothesis, he explained in his certification,
21     particularly starting at paragraph 3, that he starts with
22     certain assumptions when he's doing a differential diagnosis
23     of a patient, and indeed, that is good medical practice.  And
24     he talked about it.
25          And I think we all know that if a doctor prescribes a

1   medication to someone and they come back to the doctor

2   complaining of certain side effects and the doctor knows that

3   that medicine has those known side effects, there is no reason

4   why she should have to start with a null hypothesis.  And I

5   think it's pretty clear that what he was talking about applied

6   only to the clinical practice of medicine.

7          Now, defendants also complained that he uses

8   different methodology than he does in his job as a

9   pathologist, and they point to the Benicar case and the use of

10  slides.  But he explained all that.  And I think that Benicar

11  really is not a good comparison.  And Benicar slides had to be

12  examined in order to diagnose the specific injury that was

13  involved, because if you didn't have a specific injury, you

14  couldn't file suit in that case.

15         Furthermore, examination of the slides in the Benicar

16  case yielded no information whatsoever on the cause of those

17  diseases.  Just as would be here, I don't see how in a general

18  causation opinion examination of any slides of these tumors is

19  going to tell you how they were caused.

20         Defendants also raised the issue of, again, which

21  studies he relied on, which studies he didn't rely on, why

22  didn't he give certain weight to some studies, why did he give

23  so much weight to other studies.  And this is a complaint that

24  both sides have as to every single expert in this case.  And

25  this is about the cherry-picking of the data.  But really

1   that's what experts do.  They look at the data, they decide

2   and they express their reasons why some data is more important

3   at arriving at their opinions than others.

4          So long as they explain how they come to their

5   opinions, and so long as they attempt to explain why they

6   didn't think contrary data is not relevant to their opinion,

7   then that's not objectionable.

8          His opinion about increased risk is not

9   controversial.  It's not an ipse dixit assertion that he

10  makes.  I think you also need to look at the whole picture.

11  Like I said, like the Third Circuit has said, we're not

12  looking for better experts and better opinions, we're just

13  looking at what's there and whether or not methodology was

14  followed.

15         And what he did in this is he employed the usual

16  research in finding and discussing relevant animal studies,

17  observational studies and other data.  He does discuss the

18  contrary data.  Noting the associational evidence, he moves on

19  to the Bradford Hill Principles to render his conclusion of

20  general causation.  He has an opinion as to how these

21  chemicals can cause cancer.  The alkylating agent or the

22  activation, as he explains, of oncogenes.  Accordingly, I find

23  no problems with his methodology, and the motion to bar his

24  testimony is denied.

25         Dr. Panigrahy, I think there was a misunderstanding

1  by defense counsel here as to what he was talking about in his

2  certification, and that's the concept of bioavailability.

3  According to him, bioavailability is not dependent whatsoever

4  on saturation.  They're really not related, except if you

5  reach a total saturation point, then the bioavailability

6  increases to 100 percent.  But he's very clear that there is

7  NDMA that escapes through the liver into the bloodstream, and

8  he relies on animal studies to do that.

9        Now, I've talked about animal studies.  We all are

10  aware that there are certain shortcomings of animal studies.

11  But folks, that's what researchers use, particularly where you

12  can't do human studies, as you can't do here.

13        And I think it's important that we remember, and I

14  referred to this earlier about the words of some of the

15  defendants and some other scientists about how this substance,

16  it can be dangerous, how the substance can lead to cancer.  I

17  think the associational evidence is certainly sufficient to

18  get this to the jury.

19        Dr. -- Mylan's senior director Lance Molnar testified

20  about the categorization of nitrosamines by the regulatory

21  bodies as -- he talked about non-threshold or not subject to

22  the presumed acceptable thresholds set forth in applicable

23  guidelines and set forth in EMA, et cetera.  And that means a

24  single molecule could be detrimental.  And that's from his

25  deposition.

1          Here as to Panigrahy, the defendants complain about

2     the heavy reliance on Hidajat.  Of course there are

3     limitations.  I've talked about that already.

4          But this is a jury question.  The jury is going to

5     have to determine which of these studies they think are

6     important and which are not for the reasons that you're going

7     to illustrate to them.

8          Defendants complain that the daily accepted intake

9     level is an improper proxy for general causation.  The problem

10    is, once again, that the various government agencies have

11    determined that NDMA is a probable carcinogen.  These public

12    health guidelines alone of course cannot establish general

13    causation, but he never claims that they do.

14         He has an opinion about the development of cancer in

15    downstream organs, how much NDMA survives the liver.  And

16    again, it's based on animal studies and based on these studies

17    that show, for whatever reason, the larger the animal species,

18    the greater the amount that escapes through the liver.

19         There's nothing new about extrapolating from animal

20    studies, particularly here where apparently every species of

21    animal seems to have been studied and seems to have developed

22    cancer.

23         He uses the same methodology he would in his own

24    research, and of course the jury doesn't have to believe

25    anything he says, but that's up to them.  So the motion is

152

 1    denied.

 2         Etminan, the most recent witness, defendants complain

 3    that he does not calculate or consider baseline NDMA or NDEA

 4    exposure.  And that, frankly, is a weakness in all the reports

 5    that I've seen.  Based on the exposure apparently meaning that

 6    you have to measure what people eat, what they drink, where

 7    they live, what they breathe; all contributing to baseline

 8    exposure.  That's not fatal, because again, the methodology

 9    Dr. Etminan uses is sound.

10         And again, the defendants raise the issue of, you

11    know, he raised -- he relies on some studies and not others.

12    And in his declaration and in his testimony today, we spent a

13    lot of time talking about why the Gomm and the Pottegard

14    studies weren't terribly helpful in arriving at his opinions.

15         The jury may reject that.  They're free to reject

16    that, and you're free to argue to the jury that they have to

17    reject that.

18         Defendants complain of his reliance on Hidajat.  And

19    they say, well, you know, he didn't apply the same standards.

20    Well, he did, as far as I could tell, apply the same standards

21    as to why he accepted some and not others.  I'm not going to

22    be the one to determine whether these are good studies or bad

23    studies.

24         The defendants raised the issue that he misapplies

25    his own criteria, things of that nature.  He did examine a

1  significant number of studies.  Again, he provides an

2  explanation as to why some are noteworthy and some aren't.

3  Again, this is a jury question.

4       Defendants complain he misapplies Bradford Hill.

5  This again is a disagreement as to what studies are

6  significant and what aren't, particularly the Hidajat study.

7       Again, you need to focus on the big picture,

8  the whole picture, what has he done in this and what has he

9  not done.  We're not trying to find a better expert report,

10 we're just trying to find out if he follows accepted

11 methodology, which I find that he has.

12      Defendants are correct, though, about the NDEA.

13 There's very little on that.  And there's -- he can express an

14 opinion as to the association between NDEA and pancreatic

15 cancer because that's the only data apparently that's

16 available, but he cannot express an opinion as to NDEA

17 exposure in esophageal, stomach, colorectal, liver, lung,

18 bladder or prostate cancer.  So the motion is denied except as

19 to those cancers.

20      I'm going to go through some of the ones who have not

21 testified because there's no point in waiting on that, because

22 that's not going to change.

23      Hecht, Stephen Hecht, H-E-C-H-T.

24      This is again another complaint about failure to

25 consider dose threshold for his conclusion that NDMA and NDEA

1  cause cancer at the levels present in this

2  valsartan-containing drug.  But the FDA and other regulatory

3  agencies have already done threshold level calculations.  And

4  he's entitled to rely on those.  Again, the jury doesn't have

5  to agree, but he's entitled to rely on those.

6       There's the issue of extrapolation from animal

7  studies.  I've spoken about this.  There's no reason to

8  continue that discussion.

9       I understand that the point being made by defense

10 counsel about the high doses of these substances that are

11 force-fed to these animals, but I think the experts will tell

12 you and have told us that's just the way they do the test,

13 primarily because of the relatively short lifespan for these

14 animals.  And the FDA and the EMA and all the regulatory

15 agencies rely on these animal studies.

16      Defendants complain that Hecht didn't do any

17 independent testing.  Well, nor did most other people in this

18 case.  They complain there's no definitive study that shows

19 that these drugs, these contaminants cause -- any of these

20 drugs cause cancer.  Well, that's true.  But again, it's a

21 difficult proposition, because you cannot do any human

22 clinical studies because of the danger of this drug.

23      And remember Daubert.  The opinion expressed does not

24 have to be generally accepted in the scientific community.

25 What has to be accepted is the way you go about doing your

1   research.

2        The methodology he uses is the same as everyone else.

3   He examines all the studies that are available, he explains

4   why he thought some were not terribly helpful or relevant and

5   why some were.  The jury will have to straighten this out.

6        And there's an issue about background exposure.  He

7   acknowledged that.  Others did also, did not take into account

8   background exposure.  But again, you need to focus on the

9   whole picture, what was done and what wasn't done.  These

10  weaknesses in all these experts are certainly going to be

11  fertile ground for counsel in examining and cross-examining

12  these experts.

13       What he does do is refer to the various government

14  agencies and their findings.  He analyzes the studies.  He

15  discusses the defendants' own statements and explains why he

16  believes the contrary studies, Pottegard, Yoon, everyone else,

17  are not terribly helpful.  Accordingly, the motion is denied.

18       David Madigan.  Defendants complain he does not give

19  an opinion on general causation, and indeed he does not.  He's

20  only going to be offering opinions on the strength of

21  association evidence, which as we know is the beginning of the

22  road that may lead to causation by applying Bradford Hill or

23  weight of the evidence.

24       Defendants, interestingly enough, cite cases in which

25  Madigan's been barred from testifying as to certain opinions.

1    And one of them is the incretin, I-N-C-R-E-T-I-N, case, which

2    interestingly is going to be argued Monday in the Ninth

3    Circuit.  I'm not sure whether the Madigan issue has been

4    raised in that because I didn't read the briefs in that case.

5    But that might be interesting to tune in.

6          But the incretin case really doesn't apply, because

7    in that case the court noted that there were absolutely no

8    studies or animal experiments or clinical trials or

9    observational studies or any analysis that a single researcher

10   or organization had up to that point concluded that incretin

11   caused pancreatic cancer.  And indeed, the FDA had spent a

12   decade studying it and had consistently said that there was no

13   causal association even between incretin and pancreatic

14   cancer.

15         This is entirely different from our case here.  We

16   have numerous studies that make the argument and numerous

17   government agencies who found that these substances are

18   probably carcinogenic.

19         In incretin, Madigan also had an updated history for

20   it, and he had changed his methodology and the opinion he was

21   going to offer.  Actually, probably I would have barred anyway

22   but not on Daubert grounds because I didn't think it was very

23   relevant anyhow.

24         But anyway, in Vioxx he was permitted to express his

25   opinion on the statistics.

1          And the other cases they rely on I don't think are

2    controlling this question.

3          The defendants claim that it's really an

4    epidemiological opinion and of course he's not an

5    epidemiologist.  He's a statistician.  But all epidemiological

6    conclusions are based on statistics.  Of course metaanalyses

7    are only as good as the underlying data.  Distortions do

8    exist.  But that doesn't mean they aren't recognized in the

9    scientific community.  Many disciplines, sociology, you name

10   it, use metaanalysis.  They are recognized in scientific

11   circles as having some value.

12         Defendants claim he only reviewed studies that were

13   hand-picked for him.  But he uses studies cited by Etminan,

14   who did a thorough review, which Fryzek, the defense expert,

15   comments favorably on.

16         The defendants' claim about his conclusions from

17   Hidajat, I don't need to further comment on that.

18         There's the issue of dose, timing, duration of

19   individual exposure, and the defendants rely on the Hoffeditz,

20   H-O-F-F-E-D-I-T-Z, case from the District of New Jersey about

21   the single exposure, single molecule theory.  And indeed, that

22   case did condemn that.

23         But it was applying Pennsylvania asbestosis law in

24   that case.  And under Pennsylvania law, you had to prove that

25   the exposure was frequent, regular and proximate.  And the

 1   testimony that each and every exposure of asbestos is

 2   causative of mesothelioma, it was not permitted.  But that was

 3   Pennsylvania law about asbestos.  That's not really the law

 4   here.  And incidentally, the expert was permitted to testify,

 5   because the amount of exposure was significant.

 6        Defendants further complain he makes an impermissible

 7   inferential leap from dietary and NDMA occupational exposure

 8   to pharmaceutical exposure.  Again, how and why experts rely

 9   on certain studies and not on other studies is a jury

10   question.

11        We raise the issue again about NDEA because you only

12   have the Zheng, Z-H-E-N-G study.  Madigan does say that NDEA

13   and NDMA are similar, however, he provides no explanation as

14   to how that is so, and he provides no analysis of bladder,

15   breast, kidney, pharyngeal, or uterine cancers.  Consequently,

16   he will not be permitted to testify about NDEA.  Otherwise,

17   that motion is denied.

18        Turning to some of the defense experts who are not

19   going to be giving testimony, John Flack, F-L-A-C-K,

20   plaintiffs point out that he has no experience with NDMA or

21   NDEA, has no background in toxicology or oncology or cancer

22   research and doesn't consider a lot of the relevant

23   literature.  He acknowledged in his deposition that his

24   opinion would be quote, blasted, B-L-A-S-T-E-D, in the

25   academic world.

1    I find he does not consistently apply any recognized

2    methodology to his opinions, but he does have experience in

3    treating hypertension.  And therefore, he is competent and

4    capable of testifying that hypertensives have a higher

5    incidence of cancer, and obese hypertensives, an even higher

6    risk of cancer because of these underlying conditions.

7    Otherwise, the motion is granted and he'll be barred from

8    testifying about anything other than these two.

9        Janice Britt, B-R-I-T-T, this one is simple.

10   Although Daubert and other cases hold that the conclusions

11   don't necessarily have to be supported by general acceptance

12   in the relevant scientific community, the methodology must be

13   acceptable.

14       The problem for Britt is that the methodology she

15   uses, EBT, is not recognized in the scientific community as a

16   standard used by toxicologists to weigh dangers caused by any

17   substance.  She didn't even use the EBT methodology that she

18   describes.  So that one's easy, and that motion to strike her

19   opinion is granted.

20       John Fryzek, F-R-Y-Z-E-K.  I have to comment

21   that there are all kinds of interesting cross-examination

22   materials here:  The employment discrepancies, the resume

23   discrepancies, the alleged professorships at Vanderbilt and

24   elsewhere that apparently weren't so, the absolutely baffling

25   billing discrepancies in this case and in the Welding Rod MDL.

 1   But this is all ammunition that you can use for

 2   cross-examination, and we'll see what the jury says about it.

 3   It has nothing to do with the issues that I need to decide.

 4          His methodology is he says that he did a systematic

 5   literature review based on certain standard techniques.  He

 6   looked for studies that described the risk of cancer with

 7   exposure to valsartan-containing drugs, and he looked for

 8   studies that described the risks of cancer with dietary

 9   exposure to NDMA and NDEA.  By definition and by his search

10   terms, he probably missed some.

11          But his methodology in and of itself is not

12   objectionable.  He says that his search yielded 1,884 results

13   on these studies.  He reduces that to 109 articles using, he

14   says, his criteria.  He added 8 by a process I don't really

15   understand.  But that leaves 117 which he examined in full.

16   He eliminated 92 for various and sundry and good reasons, so

17   he ends up with, you know, a couple dozen.  And of course,

18   like all defense experts, relies heavily on Pomm, P-O-M-M,

19   Pottegard, P-O-T-T-E-G-A-R-D, Al-Kindi, A-L-K-I-N-D-I, and

20   Yoon, Y-O-O-N.

21          He reviews the same studies as plaintiffs' experts

22   which plaintiffs show -- claim show a connection between NDMA

23   and various cancers, but he disagrees with those conclusions.

24   He criticizes the plaintiffs' experts in much detail and the

25   studies they rely on in an attempt to distinguish them.  For

1  having used the basic methodology, that motion to bar his

2  testimony is denied.

3       Lee-Jei Wei, it's L-E-E dash J-E-I, last name W-E-I.

4  I'm sure I'm not pronouncing that correctly.  I assume that

5  the sole purpose of his testimony is to refute Madigan's

6  findings and the data that Madigan relied on.

7       The plaintiffs raise some interesting points, which

8  probably deserve some comment.  The witness seems to have used

9  a template from other cases he had written reports on.  He

10 spends pages discussing human clinical trials which have

11 absolutely no relevance to this case.

12      And as to his methodology, his criticism of

13 metaanalysis, again, a technique used in all scientific

14 disciplines, results in no metaanalysis passing his test.  He

15 states no recognized methodology that can lead one to this

16 result, thus, he will not be permitted to testify about

17 metaanalysis.

18      There's no basis for any opinion he has on lifetime

19 cumulative exposure, LCE.  He's never done any calculation,

20 can't even approximate the amount of NDMA in these medicines

21 and doesn't have any idea how Madigan calculated it.  Thus,

22 the basis for his criticism of Madigan's calculation is

23 unknown, and he won't be permitted to testify about that.

24      He also -- it's hard to tell -- it's hard to tell

25 about a lot of what he says.  He's hard to follow in his

1    deposition.  And I'm sure plaintiffs are going to have fun

2    cross-examining him on some of the things he said about, you

3    know, society being better off, et cetera, et cetera.  But to

4    the extent he's trying to express opinions that exposure to

5    NDMA does not cause cancer, that will be prohibited, because

6    as best as I can determine, the only basis for that opinion

7    is, well, Madigan makes the connection and Madigan is wrong,

8    so therefore the opposite must be true.

9         So he's not going to be permitted to offer any

10   opinion that exposure to NDMA will not result or increase the

11   risk of any cancers.  Other than that, he has methodology, he

12   cites to certain techniques he says Madigan should have used

13   and should have followed, and he's permitted to testify about

14   those things.

15        All right.  The only two we have left.  And plaintiff

16   apparently wishes to question or -- Bottoroff and Johnson if

17   they want.

18        Have we made arrangements for a time to start on the

19   15th?  Or are you still working on that, guys?  What's going

20   on?

21        MS. LOCKARD:  Your Honor, we can have our witnesses

22   here, you know, if you want to start around the same time,

23   9:30.  We are -- we have worked it out so that we can have

24   Dr. Johnson and Dr. Bottoroff both on the 15th, if that still

25   works.  So we'll plan to proceed at this point.  I don't know

```
 1   exactly who will be first, but I can let Your Honor know when

 2   we know that.

 3              THE COURT:  That's fine.  That's great.

 4         I think the plaintiffs need to decide whether they're

 5   going to go through with the exercise first.  But anyway, if

 6   they do, I'll be here.

 7              All right.  I think that concludes what we're doing

 8   today.  Thank you, everybody.  Have a great evening, and we'll

 9   see you in a couple of weeks.

10              RESPONSE:  Thank you, Your Honor.

11              (Proceedings concluded at 3:18 p.m.)

12

13

14                             -  -  -

15         I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18   /S/ Ann Marie Mitchell, CCR, CRR, RDR, RMR
     Court Reporter/Transcriber
19

20   4th day of March, 2022
           Date
21

22

23

24

25
```

*United States District Court*

*/S* [1] - 163:18
*0* [1] - 95:8
*0.1* [2] - 81:13, 81:24
*0.5* [3] - 55:21, 56:1, 59:11
*01* [1] - 60:13
*05* [2] - 25:17, 25:24
*06-methylguanine* [1] - 41:11
*09* [1] - 60:13
*1* [25] - 15:21, 16:8, 31:17, 55:22, 56:2, 56:3, 57:10, 57:12, 58:8, 59:10, 59:14, 59:17, 63:24, 71:5, 71:16, 71:25, 72:14, 74:5, 76:25, 77:17, 81:13, 95:19, 108:10, 113:7
*1,000* [2] - 73:8, 74:1
*1,884* [1] - 160:12
*1.0* [1] - 63:8
*1.5* [3] - 55:18, 55:23, 56:8
*10* [8] - 57:23, 60:9, 60:10, 61:5, 70:24, 83:13, 83:17, 95:9
*10,000* [3] - 73:8, 74:1, 76:16
*10-minute* [1] - 97:12
*100* [5] - 19:5, 74:10, 87:15, 94:13, 150:6
*100,000* [3] - 74:2, 74:20, 76:17
*104* [1] - 18:12
*109* [1] - 160:13
*10:57* [1] - 52:17
*11* [4] - 26:21, 27:5, 63:23, 93:21
*117* [1] - 160:15
*11:08* [1] - 52:17
*12* [4] - 26:22, 27:6, 41:1, 63:24
*12-fold* [2] - 83:18, 84:6
*121* [2] - 81:8, 81:9
*126* [1] - 51:7
*12:07* [1] - 86:6
*12:24* [1] - 86:6
*12:42* [1] - 97:19
*12:43* [1] - 97:3
*12:50* [1] - 97:19
*13* [1] - 51:2
*1351* [1] - 63:11
*14* [2] - 51:16, 63:24
*144* [1] - 3:12
*15* [2] - 11:22, 12:3
*150* [3] - 73:2, 73:7, 86:18
*15th* [2] - 162:19, 162:24
*16* [1] - 18:15
*164* [1] - 143:3
*17* [2] - 12:5, 24:21
*172* [1] - 133:25
*18* [1] - 41:1
*187* [2] - 65:16, 143:4
*188.1* [1] - 61:8
*1977* [2] - 77:4, 80:5
*1987* [3] - 54:14, 57:10, 75:21
*1988* [1] - 54:20
*1990* [3] - 55:2, 76:2, 96:18
*1994* [2] - 78:17, 80:10

*1:56* [1] - 144:16
*2* [6] - 25:21, 54:23, 63:2, 63:12, 76:25, 91:15
*200* [7] - 63:22, 64:2, 64:5, 64:7, 65:3, 65:21
*200-fold* [3] - 62:6, 62:24, 65:16
*2009* [1] - 136:15
*2009)* [1] - 143:3
*2014* [1] - 134:5
*2016* [1] - 18:16
*2017* [1] - 18:16
*2018* [6] - 15:1, 15:6, 15:8, 15:16, 104:18, 134:6
*2020* [1] - 16:13
*2021* [7] - 12:2, 36:24, 37:3, 37:4, 37:6, 38:14, 38:23
*2022* [3] - 7:7, 54:9, 163:20
*21* [1] - 24:21
*228* [1] - 81:9
*23* [1] - 7:7
*24* [1] - 54:9
*25* [2] - 37:24, 38:2
*255-page* [1] - 70:15
*268* [1] - 86:17
*27* [1] - 136:14
*28* [1] - 60:21
*2:00* [3] - 5:18, 143:19, 143:23
*2:30* [2] - 144:10, 144:12
*2:32* [1] - 144:16
*2:36* [1] - 146:18
*2:48* [1] - 146:18
*2d* [1] - 143:3
*3* [12] - 23:22, 24:2, 55:4, 60:20, 76:25, 84:1, 91:15, 101:11, 103:20, 126:25, 134:1, 147:21
*30* [1] - 144:2
*30,000* [1] - 61:15
*30-minute* [1] - 5:17
*32* [6] - 70:22, 70:23, 78:18, 78:21, 80:12, 80:21
*320* [2] - 60:18, 61:14
*346* [1] - 72:14
*36* [1] - 72:24
*38* [1] - 63:13
*3:18* [1] - 163:11
*4* [2] - 68:23, 94:1
*4,300* [1] - 61:1
*4.6* [1] - 126:7
*40* [3] - 63:16, 63:21, 64:1
*40,000* [1] - 61:1
*42* [1] - 63:14
*43* [1] - 61:21
*46* [1] - 51:4
*49* [4] - 25:19, 74:25, 75:4, 95:23
*499* [1] - 78:5
*4th* [1] - 163:20
*5* [16] - 26:1, 44:2, 44:10, 48:13, 57:12, 59:14, 63:24, 71:20, 72:8, 73:21, 77:16, 77:18, 89:1,

89:4, 96:10, 129:20
*5.0* [1] - 63:9
*50* [3] - 71:20, 71:23, 131:24
*51* [1] - 25:18
*52* [2] - 129:16, 129:19
*54* [1] - 3:9
*550* [1] - 72:6
*580* [1] - 70:25
*6* [5] - 3:7, 44:18, 56:13, 89:2, 89:24
*60* [1] - 29:8
*600* [2] - 85:9, 87:17
*627* [1] - 90:5
*645* [1] - 143:3
*67* [3] - 77:21, 95:20, 96:12
*7,500,000* [1] - 57:19
*7.5* [2] - 57:9, 57:16
*75* [9] - 8:20, 32:17, 32:22, 58:2, 58:4, 58:17, 58:22, 60:2, 64:25
*77* [1] - 70:16
*8* [6] - 83:13, 83:16, 89:13, 89:17, 95:8, 160:14
*8/25* [1] - 129:15
*80* [3] - 11:22, 13:21, 70:16
*81* [1] - 16:9
*83* [3] - 15:21, 16:8, 16:9
*87* [2] - 12:23, 13:15
*9* [3] - 63:23, 102:12, 102:14
*90* [1] - 87:15
*92* [1] - 160:16
*93* [10] - 3:9, 72:2, 74:5, 74:25, 75:5, 77:20, 95:21, 96:1, 96:7, 96:12
*94.05* [2] - 61:11, 61:15
*96* [1] - 62:7
*98* [1] - 3:11
*9:30* [2] - 4:2, 162:23
*a.m* [3] - 4:2, 52:17
*ability* [7] - 70:20, 72:20, 82:21, 84:24, 84:25, 85:1, 111:2
*able* [8] - 51:6, 68:2, 82:7, 118:22, 131:11, 136:22, 141:4, 142:1
*above-entitled* [1] - 163:16
*absolutely* [25] - 9:2, 11:2, 11:22, 20:25, 27:24, 33:1, 33:8, 42:3, 42:25, 46:2, 49:24, 50:1, 50:9, 106:15, 106:22, 107:5, 107:13, 107:20, 110:24, 122:19, 134:21, 156:7, 159:24, 161:11
*absorption* [1] - 80:15
*abstract* [1] - 55:20
*abundance* [1] - 140:2
*academic* [1] - 158:25
*acceptable* [5] - 22:18, 25:23, 66:17, 150:22, 159:13
*acceptance* [1] - 159:11
*accepted* [5] - 151:8, 152:21, 153:10, 154:24, 154:25

*access* [4] - 11:13, 56:18, 57:2, 110:20
*according* [5] - 31:20, 31:21, 40:20, 63:11, 150:3
*accordingly* [2] - 149:22, 155:17
*account* [13] - 8:4, 21:11, 23:23, 36:16, 41:20, 42:1, 44:1, 44:3, 49:6, 49:12, 59:5, 108:5, 155:7
*accrued* [1] - 135:8
*accumulated* [1] - 134:15
*accurate* [5] - 19:4, 27:2, 126:10, 131:9, 135:4
*accurately* [1] - 19:13
*acknowledged* [2] - 155:7, 158:23
*acting* [1] - 113:6
*action* [7] - 58:24, 59:19, 59:24, 60:1, 65:6, 65:8, 142:9
*actions* [1] - 140:3
*activation* [4] - 65:9, 77:25, 79:14, 149:22
*activities* [1] - 10:8
*Adam* [1] - 5:3
*added* [1] - 160:14
*addition* [5] - 56:11, 70:2, 82:9, 122:10, 123:2
*address* [10] - 21:7, 22:25, 62:13, 111:1, 112:24, 113:9, 114:6, 114:7, 115:6, 121:1
*addressed* [9] - 22:22, 52:4, 76:2, 92:8, 107:9, 113:2, 113:13, 116:3, 126:24
*addresses* [1] - 39:25
*addressing* [6] - 22:7, 41:21, 41:23, 42:2, 44:6, 74:14
*ADDUCTS* [1] - 81:19
*adducts* [6] - 78:17, 78:20, 80:13, 80:14, 81:19
*adenocarcinoma* [4] - 12:10, 12:11, 12:12, 21:22
*adequate* [4] - 132:24, 133:1, 134:11, 134:13
*adhere* [1] - 33:15
*administered* [7] - 55:6, 55:9, 57:9, 57:15, 64:9, 77:8, 82:9
*administration* [6] - 55:21, 64:14, 71:8, 80:11, 81:1, 83:11
*administrations* [1] - 79:4
*administrative* [2] - 8:25, 86:4
*admissions* [1] - 141:8
*admit* [1] - 141:13
*admits* [1] - 118:19
*admitted* [2] - 92:15, 118:7
*adult* [1] - 81:23
*advantages* [1] - 84:12
*affirmed* [2] - 53:5, 98:1
*afforded* [2] - 22:15
*afield* [2] - 99:18, 117:17

**afternoon** [2] - 81:20, 98:11
**agencies** [9] - 65:7, 139:22, 140:9, 142:10, 151:10, 154:3, 154:15, 155:14, 156:17
**agency** [1] - 66:21
**agent** [1] - 149:21
**ago** [1] - 22:12
**agree** [38] - 14:23, 22:3, 23:1, 24:11, 25:6, 35:5, 35:19, 36:9, 43:16, 45:17, 45:22, 48:1, 55:10, 57:22, 58:20, 61:2, 61:12, 61:22, 64:17, 64:21, 66:5, 66:7, 75:13, 78:3, 78:9, 78:23, 79:11, 79:18, 79:21, 88:4, 91:19, 92:15, 102:10, 123:2, 126:12, 131:8, 140:19, 154:5
**agreed** [2] - 64:16, 127:9
**agrees** [3] - 87:5, 87:11, 140:19
**ahead** [9] - 13:11, 21:25, 88:1, 99:23, 100:21, 124:16, 125:12, 127:7, 144:17
**aimed** [2] - 123:25, 124:4
**air** [2] - 122:7, 122:11
**AI** [1] - 160:19
**Al-Kindi** [1] - 160:19
**alcohol** [1] - 82:8
**ALKINDI** [1] - 160:19
**alkylating** [1] - 149:21
**allegation** [1] - 69:14
**alleged** [4] - 44:7, 46:15, 69:21, 159:23
**Alli** [2] - 5:7, 98:13
**allocate** [1] - 145:3
**allow** [2] - 37:11, 74:18
**allowed** [2] - 12:25, 13:2
**Allowing** [1] - 99:14
**allows** [4] - 62:7, 62:24, 65:14, 140:20
**alluded** [1] - 133:5
**almost** [5] - 21:15, 33:3, 62:1, 83:18, 143:19
**alone** [3] - 8:14, 70:23, 151:12
**amenable** [1] - 5:16
**ammunition** [1] - 160:1
**amount** [37] - 17:11, 56:6, 57:14, 59:3, 59:9, 62:11, 62:14, 62:20, 62:21, 62:22, 62:24, 64:19, 65:11, 65:12, 65:24, 65:25, 73:12, 74:11, 75:7, 75:22, 94:25, 95:9, 95:11, 96:7, 96:14, 100:12, 116:15, 118:19, 119:23, 120:18, 122:8, 123:3, 126:4, 140:21, 151:18, 158:5, 161:20
**amounts** [6] - 30:24, 31:12, 51:24, 65:15, 120:2, 120:13
**ample** [1] - 67:3
**analogy** [2] - 31:4, 34:17
**analyses** [4] - 113:18, 116:20,

121:2, 121:5
**analysis** [31] - 8:11, 26:5, 33:11, 35:6, 37:17, 41:5, 46:25, 47:3, 47:4, 47:20, 48:11, 48:12, 48:24, 49:11, 67:16, 67:23, 99:4, 100:13, 102:6, 103:23, 114:4, 119:19, 121:7, 121:14, 135:25, 136:7, 137:23, 140:7, 142:3, 156:9, 158:14
**analyzes** [1] - 155:14
**anatomic** [3] - 8:17, 11:2, 32:22
**Anderson** [3] - 78:16, 80:10, 81:5
**animal** [26] - 54:11, 55:5, 55:10, 58:1, 59:5, 59:16, 62:10, 65:8, 65:24, 83:23, 86:17, 87:24, 91:18, 91:20, 92:11, 149:16, 150:8, 150:9, 150:10, 151:16, 151:17, 151:19, 151:21, 154:6, 154:15, 156:8
**animals** [14] - 55:6, 58:25, 59:20, 64:14, 64:18, 65:6, 75:11, 83:15, 83:17, 84:5, 96:15, 154:11, 154:14
**Ann** [1] - 163:18
**answer** [41] - 11:3, 12:25, 13:1, 13:21, 14:13, 16:2, 18:25, 20:22, 20:25, 24:7, 24:13, 29:17, 30:7, 32:16, 35:18, 36:4, 36:5, 38:6, 38:15, 47:19, 67:9, 69:19, 74:17, 75:16, 79:9, 81:15, 85:16, 92:25, 100:21, 115:6, 115:7, 119:20, 119:25, 124:8, 124:19, 128:9, 128:11, 130:5, 132:6, 134:8, 141:9
**answered** [6] - 12:13, 13:3, 72:4, 75:15, 106:10, 116:2
**answering** [6] - 12:24, 20:17, 29:15, 32:19, 105:17, 124:5
**answers** [1] - 21:2
**anyhow** [1] - 156:23
**anyway** [5] - 146:6, 147:18, 156:21, 156:24, 163:5
**apologize** [7] - 56:15, 56:19, 57:5, 73:4, 85:6, 136:22, 137:13
**appear** [3] - 23:15, 32:5, 103:2
**appearance** [1] - 137:14
**applicable** [1] - 150:22
**application** [1] - 36:5
**applied** [10] - 8:7, 8:8, 8:10, 9:19, 29:16, 49:3, 67:17, 67:22, 119:5, 148:5
**applies** [3] - 117:20, 118:2, 118:20
**apply** [13] - 9:19, 29:16, 33:9, 35:25, 47:7, 48:15, 117:23, 118:16, 139:4, 152:19, 152:20, 156:6, 159:1
**applying** [4] - 35:21, 47:4,

155:22, 157:23
**appraisal** [1] - 98:23
**appreciate** [8] - 4:8, 52:7, 97:14, 97:18, 116:23, 129:14, 143:7, 144:11
**Appreciate** [1] - 99:24
**approach** [15] - 17:19, 17:20, 18:17, 18:18, 19:8, 19:9, 19:18, 20:8, 20:9, 24:16, 29:6, 32:15, 33:12, 48:15, 49:14
**approached** [4] - 17:9, 26:8, 26:10, 34:4
**approaches** [1] - 32:9
**appropriate** [8] - 22:7, 48:16, 59:24, 67:24, 127:2, 127:5, 127:6, 138:14
**approximate** [1] - 161:20
**April** [2] - 37:3, 37:4
**area** [7] - 32:23, 52:5, 59:2, 59:8, 74:8, 95:12, 135:10
**argue** [4] - 84:7, 137:22, 137:25, 152:16
**argued** [1] - 156:2
**argument** [3] - 45:15, 142:13, 156:16
**arguments** [1] - 10:4
**arrangements** [1] - 162:18
**arrived** [2] - 72:4, 99:20
**arrives** [1] - 112:2
**arriving** [3] - 8:1, 149:3, 152:14
**article** [16] - 17:14, 21:2, 36:25, 37:2, 37:8, 37:19, 37:20, 37:23, 38:4, 38:10, 38:14, 38:15, 38:16, 38:21, 38:22, 38:23
**articles** [9] - 8:12, 19:19, 20:18, 22:24, 33:22, 51:25, 54:9, 103:3, 160:13
**asbestos** [13] - 47:14, 47:15, 47:18, 140:18, 140:19, 140:20, 140:21, 140:22, 140:23, 140:24, 141:1, 158:1, 158:3
**asbestosis** [1] - 157:23
**aside** [2] - 63:18, 140:8
**assert** [1] - 10:7
**assertion** [1] - 149:9
**assess** [2] - 45:2, 49:22
**assessment** [1] - 45:1
**assist** [1] - 85:20
**assistance** [2] - 13:6, 13:7
**association** [21] - 25:13, 26:1, 29:13, 51:11, 101:23, 102:9, 102:16, 137:24, 138:4, 138:16, 139:3, 139:10, 139:22, 140:9, 140:14, 142:8, 145:22, 145:25, 153:14, 155:21, 156:13
**associational** [5] - 145:20, 146:4, 146:7, 149:18, 150:17
**assume** [2] - 119:2, 161:4
**assumed** [5] - 12:18, 26:24, 28:10, 29:2, 121:8

**assumption** [5] - 28:17, 120:17, 120:19, 121:12, 121:13
**assumptions** [3] - 26:14, 26:17, 147:22
**attached** [3] - 56:20, 57:1, 107:8
**attempt** [3] - 26:13, 149:5, 160:25
**attempted** [2] - 120:1, 123:9
**attempts** [1] - 120:21
**attention** [2] - 73:24, 90:3
**August** [3] - 12:2, 132:8, 134:17
**author** [11] - 76:22, 89:24, 96:13, 104:3, 104:21, 104:25, 105:23, 107:2, 107:8, 111:16, 113:17
**author's** [3] - 110:18, 113:23, 120:10
**authored** [1] - 27:19
**authors** [30] - 18:19, 41:7, 88:5, 89:25, 90:16, 103:6, 105:9, 105:14, 105:19, 105:24, 106:5, 106:7, 106:19, 106:20, 108:4, 108:14, 108:25, 109:17, 109:20, 110:6, 110:16, 112:15, 112:19, 112:24, 114:2, 114:9, 115:9, 115:13, 115:21, 120:1
**authors'** [1] - 105:17
**available** [9] - 21:18, 49:1, 49:3, 56:17, 94:4, 98:24, 135:2, 153:16, 155:3
**average** [8] - 57:22, 62:6, 62:23, 63:13, 63:16, 65:16, 132:1, 132:4
**aware** [10] - 10:6, 12:20, 31:19, 68:14, 69:14, 69:20, 90:24, 122:16, 127:14, 150:10
**background** [12] - 8:17, 9:13, 9:21, 10:12, 17:1, 32:14, 43:3, 43:8, 99:19, 155:6, 155:8, 158:21
**bad** [3] - 45:18, 152:22
**baffling** [1] - 159:24
**bar** [3] - 147:19, 149:23, 161:1
**barely** [1] - 4:21
**barred** [3] - 155:25, 156:21, 159:7
**based** [15] - 8:13, 21:3, 34:1, 35:13, 70:4, 72:18, 86:14, 117:12, 135:23, 151:16, 152:5, 157:6, 160:5
**baseline** [4] - 123:10, 124:13, 152:3, 152:7
**bases** [1] - 40:19
**basic** [2] - 18:22, 161:1
**basis** [13] - 23:24, 32:12, 49:12, 50:18, 82:20, 87:18, 124:7, 136:10, 138:12, 142:17, 161:18, 161:22, 162:6

*batches* [1] - 115:1
*beagle* [13] - 55:15, 56:7, 57:22, 64:11, 65:10, 71:5, 71:19, 71:20, 72:5, 72:25, 73:5, 76:14, 95:21
*beagles* [2] - 54:14, 58:17
*bear* [1] - 10:2
*become* [3] - 39:12, 71:13, 94:13
*becomes* [5] - 47:12, 73:25, 74:19, 76:15, 94:12
*began* [1] - 24:4
*begin* [3] - 18:24, 53:10, 54:1
*beginning* [2] - 35:21, 155:21
*begins* [1] - 143:5
*behalf* [3] - 4:14, 5:1, 98:14
*believes* [2] - 30:23, 155:16
*below* [2] - 71:23, 74:19
*Benicar* [12] - 17:17, 17:19, 18:2, 18:3, 18:8, 18:16, 19:9, 20:2, 148:9, 148:10, 148:11, 148:15
*best* [2] - 97:7, 162:6
*better* [10] - 84:14, 93:8, 127:12, 127:17, 135:6, 135:7, 149:12, 153:9, 162:3
*between* [24] - 20:5, 32:24, 40:5, 58:7, 58:8, 58:14, 60:20, 60:25, 63:13, 67:18, 84:1, 91:18, 96:15, 101:23, 120:23, 137:24, 138:4, 138:5, 138:8, 138:16, 142:6, 153:14, 156:13, 160:22
*beyond* [3] - 43:19, 79:24, 80:14
*bias* [1] - 115:5
*biases* [1] - 115:25
*bibliography* [1] - 21:6
*big* [2] - 4:18, 153:7
*billing* [1] - 159:25
*Bioavailability* [1] - 74:7
*bioavailability* [56] - 59:1, 59:7, 59:25, 62:9, 62:11, 62:13, 64:19, 67:1, 67:5, 67:13, 70:17, 72:1, 73:9, 73:12, 73:18, 74:4, 74:6, 74:13, 74:14, 74:24, 75:19, 76:1, 76:5, 77:18, 77:20, 80:16, 80:17, 83:12, 83:16, 83:18, 84:6, 84:9, 86:11, 86:20, 87:21, 87:25, 91:23, 92:2, 92:12, 93:25, 94:2, 94:5, 94:8, 94:15, 94:18, 94:24, 95:8, 95:10, 95:20, 95:23, 96:11, 96:20, 150:2, 150:3, 150:5
*bioavailable* [2] - 94:12, 94:13
*bit* [11] - 13:23, 22:19, 24:12, 31:6, 34:21, 35:4, 56:19, 102:11, 106:16, 132:21, 134:19
*black* [1] - 22:10
*bladder* [5] - 46:5, 46:21, 49:17,

153:18, 158:14
*blanket* [1] - 11:3
*blasted* [1] - 158:24
*BLASTED* [1] - 158:24
*blood* [7] - 47:13, 47:17, 49:17, 73:14, 78:2, 79:16, 95:7
*bloodstream* [5] - 47:10, 47:12, 75:8, 96:2, 150:7
*bodies* [2] - 123:3, 150:21
*body* [12] - 28:12, 47:6, 47:8, 50:12, 50:24, 58:25, 59:20, 62:20, 65:24, 73:14, 83:15, 122:11
*bold* [2] - 27:12, 120:17
*bottom* [3] - 78:7, 84:4, 90:6
*Bottorff* [2] - 162:16, 162:24
*Bradford* [31] - 8:8, 8:10, 35:19, 35:22, 36:6, 36:9, 46:25, 47:2, 47:8, 47:20, 47:23, 48:11, 49:11, 69:25, 99:4, 100:2, 100:4, 100:8, 135:24, 136:7, 137:23, 138:9, 138:14, 139:4, 139:17, 142:12, 145:21, 146:8, 149:19, 153:4, 155:22
*brain* [2] - 46:19, 47:18
*brand* [1] - 137:13
*break* [6] - 52:13, 58:7, 86:2, 97:4, 97:12, 144:10
*breast* [1] - 158:15
*breathe* [2] - 122:7, 152:7
*Brett* [1] - 111:6
*brett@hollislawfirm.com* [1] - 111:4
*brief* [2] - 93:21, 136:16
*briefing* [3] - 26:21, 137:1, 137:2
*briefly* [2] - 44:19, 93:16
*briefs* [1] - 156:4
*bring* [1] - 104:7
*bringing* [1] - 104:6
*Britt* [2] - 159:9, 159:14
*BRITT* [1] - 159:9
*broken* [1] - 121:21
*brought* [5] - 13:15, 73:23, 81:5, 133:4, 144:21
*Brown* [11] - 5:8, 98:13, 109:5, 110:22, 122:16, 123:16, 124:12, 125:12, 139:20, 143:18, 145:9
*BROWN* [97] - 3:11, 5:7, 5:11, 5:15, 5:20, 6:3, 97:6, 97:14, 97:18, 98:7, 98:10, 99:24, 99:25, 100:19, 100:22, 100:24, 103:11, 103:17, 103:18, 109:7, 109:9, 109:11, 110:24, 111:6, 111:9, 111:20, 112:1, 112:4, 112:6, 112:10, 112:17, 113:3, 113:8, 113:10, 117:18, 117:25, 118:7, 118:14, 118:17, 118:25, 119:3, 119:6, 119:7, 122:19,

122:24, 122:25, 123:17, 123:21, 123:22, 124:14, 124:16, 124:18, 124:25, 125:14, 125:21, 125:24, 126:1, 126:19, 127:21, 128:2, 128:10, 128:16, 128:17, 128:24, 129:4, 129:11, 129:12, 131:18, 131:23, 133:24, 135:18, 135:21, 136:7, 136:12, 136:17, 136:21, 137:1, 137:6, 137:8, 137:13, 138:5, 139:12, 139:23, 140:16, 141:15, 141:21, 141:23, 142:20, 143:1, 143:7, 143:20, 144:2, 144:7, 144:11, 144:14, 145:11, 146:14
*brown* [2] - 97:4, 97:5
*Brown's* [1] - 145:24
*Budkins* [1] - 81:21
*building* [1] - 34:13
*business* [1] - 33:8
*butcher* [1] - 97:20
*calculate* [4] - 62:22, 73:9, 77:18, 152:3
*calculated* [3] - 72:1, 74:5, 161:21
*calculation* [2] - 161:19, 161:22
*calculations* [1] - 154:3
*Cancer* [1] - 105:4
*cancer* [151] - 10:23, 11:7, 12:6, 12:9, 12:17, 13:25, 14:12, 14:16, 14:21, 15:9, 15:10, 16:19, 17:7, 17:12, 19:15, 21:4, 24:9, 25:2, 25:7, 26:10, 26:22, 26:25, 27:13, 27:22, 28:7, 28:12, 28:14, 28:20, 29:1, 29:4, 29:9, 29:12, 31:4, 31:6, 32:11, 32:15, 42:12, 44:20, 45:11, 45:25, 46:2, 46:4, 46:5, 46:11, 46:14, 46:19, 46:20, 46:21, 46:22, 46:23, 47:1, 47:2, 47:5, 47:7, 47:13, 47:18, 47:21, 47:24, 48:2, 48:19, 49:4, 49:12, 49:15, 49:22, 50:6, 50:14, 50:16, 50:20, 51:1, 51:3, 51:4, 51:15, 51:16, 51:24, 52:2, 59:19, 66:23, 68:17, 69:2, 69:15, 69:20, 70:23, 71:3, 72:11, 72:22, 73:14, 77:12, 78:12, 78:13, 78:21, 78:25, 79:2, 80:21, 80:23, 81:2, 81:11, 82:21, 101:24, 102:5, 102:8, 102:9, 102:17, 106:2, 119:22, 124:2, 124:7, 125:3, 126:14, 126:21, 127:10, 127:15, 127:16, 127:23, 130:4, 130:20, 130:24, 131:13, 131:16, 132:5, 132:6, 138:4, 140:20, 141:1, 141:5, 142:3, 149:21, 150:16, 151:14, 151:22, 153:15, 153:18, 154:1, 154:20, 156:11,

156:14, 158:21, 159:5, 159:6, 160:6, 160:8, 162:5
*cancer-by-cancer* [1] - 49:12
*cancer-smoking* [1] - 31:4
*cancers* [46] - 10:22, 12:14, 13:17, 13:18, 13:19, 14:2, 44:7, 46:4, 46:6, 46:8, 46:15, 46:18, 47:6, 47:15, 47:16, 48:16, 48:23, 48:25, 49:7, 49:10, 50:1, 66:24, 68:14, 69:4, 70:8, 80:24, 80:25, 98:19, 102:1, 102:2, 126:24, 127:4, 127:11, 130:10, 130:20, 131:2, 131:11, 131:14, 132:16, 132:17, 139:19, 146:5, 153:19, 158:15, 160:23, 162:11
*cannot* [8] - 70:8, 70:9, 75:21, 134:12, 151:12, 153:16, 154:21
*capable* [3] - 68:13, 139:18, 159:4
*carcinogen* [24] - 24:15, 25:8, 26:24, 28:8, 28:10, 29:3, 30:25, 31:14, 31:17, 31:20, 31:21, 45:16, 45:17, 45:18, 46:9, 47:11, 47:15, 66:11, 66:15, 83:22, 92:16, 140:13, 140:19, 151:11
*carcinogenesis* [1] - 15:15
*carcinogenic* [9] - 26:24, 28:10, 28:13, 28:18, 29:2, 31:12, 65:5, 66:8, 156:18
*carcinogenicity* [7] - 21:20, 40:20, 41:13, 67:13, 91:21, 91:23, 121:25
*carcinogens* [1] - 45:21
*cardiovascular* [1] - 84:12
*care* [3] - 4:19, 114:21, 139:8
*cared* [1] - 114:22
*careful* [1] - 35:6
*carefully* [1] - 65:14
*case* [75] - 5:14, 7:4, 8:3, 9:9, 9:20, 19:14, 19:18, 20:11, 24:8, 26:15, 29:20, 31:1, 31:19, 33:9, 33:24, 34:4, 34:12, 34:18, 39:1, 44:8, 44:21, 49:16, 50:11, 50:18, 58:16, 60:5, 61:5, 65:4, 65:11, 65:20, 66:11, 67:19, 68:13, 69:21, 94:25, 98:17, 100:17, 100:18, 101:6, 108:21, 111:13, 111:15, 123:25, 124:4, 125:17, 136:12, 136:23, 138:21, 139:10, 141:11, 142:7, 142:17, 144:8, 145:13, 145:15, 145:18, 146:8, 146:9, 147:17, 148:9, 148:14, 148:16, 148:24, 154:18, 156:1, 156:4, 156:6, 156:7, 156:15, 157:20, 157:22, 157:24, 159:25, 161:11
*case-by-case* [1] - 50:18
*cases* [10] - 12:18, 18:2, 18:17, 19:20, 141:14, 141:15, 155:24,

157:1, 159:10, 161:9
**categories** [12] - 8:4, 21:11, 23:23, 23:25, 36:16, 36:18, 41:20, 42:1, 43:25, 44:2, 48:13, 50:4
**categorization** [1] - 150:20
**causal** [1] - 156:13
**causation** [45] - 7:4, 18:4, 20:6, 20:8, 20:10, 20:12, 20:17, 20:20, 20:24, 25:13, 27:21, 27:25, 28:2, 28:4, 28:23, 29:6, 29:20, 29:23, 30:2, 31:3, 31:23, 32:12, 32:16, 32:19, 32:25, 33:1, 33:2, 40:3, 48:19, 59:19, 81:2, 136:9, 136:14, 138:8, 139:3, 139:6, 140:1, 148:18, 149:20, 151:9, 151:13, 155:19, 155:22
**causative** [2] - 29:14, 158:2
**caused** [8] - 19:16, 47:25, 51:24, 78:17, 127:15, 148:19, 156:11, 159:16
**causes** [9] - 17:7, 33:6, 34:14, 47:15, 78:21, 79:23, 80:21, 80:22, 140:20
**causing** [2] - 68:14, 139:19
**caution** [1] - 20:6, 140:2
**cautioned** [1] - 91:20
**cavity** [2] - 13:17, 13:18
**CCR** [1] - 163:18
**certain** [25] - 35:9, 53:12, 53:21, 54:11, 66:23, 78:10, 78:11, 78:24, 84:14, 95:9, 136:8, 137:21, 138:12, 140:21, 141:4, 145:18, 146:5, 147:22, 148:2, 148:22, 150:10, 155:25, 158:9, 160:5, 162:12
**certainly** [21] - 9:5, 10:1, 10:25, 16:25, 21:19, 23:8, 30:12, 30:16, 31:11, 39:2, 40:2, 42:11, 49:4, 49:24, 68:8, 80:20, 99:19, 127:4, 128:4, 150:17, 155:10
**certification** [32] - 7:3, 7:12, 7:15, 10:11, 10:13, 10:18, 21:10, 23:15, 23:20, 23:22, 26:13, 29:19, 31:24, 36:15, 43:20, 43:21, 43:23, 44:2, 44:10, 44:14, 44:18, 44:24, 45:6, 46:10, 48:8, 66:25, 69:1, 69:6, 74:21, 74:23, 147:20, 150:2
**certification/declaration** [1] - 67:7
**certify** [1] - 163:15
**cetera** [3] - 150:23, 162:3
**challenged** [1] - 9:10
**challenges** [3] - 7:21, 7:25, 70:6
**challenging** [2] - 9:12
**chance** [3] - 4:13, 14:6, 26:1

**change** [2] - 21:9, 153:22
**changed** [1] - 156:20
**chat** [3] - 11:12, 106:24, 110:25
**check** [1] - 38:11
**chemical** [4] - 74:11, 79:3, 79:5, 94:25
**chemicals** [4] - 65:4, 66:18, 66:19, 149:21
**cherry** [2] - 36:4, 148:25
**cherry-pick** [1] - 36:4
**cherry-picking** [1] - 148:25
**choice** [1] - 14:9
**choosing** [1] - 90:10
**chosen** [1] - 14:9
**chronic** [1] - 83:9
**cigarette** [7] - 31:5, 31:14, 44:20, 44:22, 45:1, 45:5, 45:13
**cigarettes** [3] - 29:8, 29:12, 46:3
**circles** [1] - 157:11
**Circuit** [3] - 139:2, 149:11, 156:3
**circulation** [7] - 59:4, 62:12, 62:14, 71:14, 94:4, 95:1, 96:17
**circumstance** [1] - 141:6
**circumstances** [2] - 138:14, 141:4
**citation** [6] - 37:7, 37:10, 40:16, 81:6, 120:16, 142:24
**citations** [2] - 36:19, 40:13
**cite** [19] - 22:25, 40:13, 42:7, 43:10, 54:9, 54:25, 60:12, 62:3, 70:13, 71:1, 78:25, 79:19, 80:20, 83:14, 83:25, 84:11, 90:24, 136:16, 155:24
**cited** [32] - 10:5, 12:21, 19:22, 31:7, 36:24, 43:2, 70:22, 76:2, 76:21, 77:1, 78:16, 79:6, 80:10, 80:21, 83:3, 83:24, 86:16, 86:17, 86:19, 87:16, 87:17, 88:12, 88:18, 92:5, 92:7, 94:16, 95:18, 101:14, 157:13
**cites** [5] - 76:24, 77:23, 82:25, 118:13, 162:12
**citing** [1] - 72:24
**claim** [4] - 157:3, 157:12, 157:16, 160:22
**claimed** [1] - 14:1
**claims** [2] - 68:12, 151:13
**clarification** [2] - 59:12, 125:10
**clarify** [5] - 55:11, 57:11, 76:9, 144:22, 144:24
**classified** [1] - 71:7
**clear** [11] - 29:14, 30:2, 36:9, 56:7, 73:4, 74:23, 75:1, 109:10, 124:21, 148:5, 150:6
**clearance** [1] - 83:20
**clearly** [10] - 13:24, 28:24, 28:25, 35:9, 43:9, 75:6, 86:8, 95:18, 140:13, 142:8

**clever** [1] - 139:20
**clients** [1] - 140:14
**clinical** [21] - 8:20, 8:24, 17:21, 17:24, 18:8, 18:18, 18:22, 19:1, 19:5, 19:10, 19:13, 19:18, 32:21, 32:24, 33:4, 34:7, 145:18, 148:6, 154:22, 156:8, 161:10
**clinically** [2] - 11:4, 12:14
**clinician** [2] - 16:22, 17:22
**close** [4] - 58:22, 60:2, 64:25, 65:3
**closer** [1] - 80:12
**co** [2] - 76:22, 89:25
**co-author** [1] - 76:22
**co-authors** [1] - 89:25
**Cohen** [2] - 12:1, 12:23
**colleagues** [2] - 83:6, 88:9
**collected** [1] - 135:8
**collectively** [3] - 130:16, 133:7
**colloquially** [2] - 26:6, 33:12
**colon** [1] - 51:3
**colorectal** [6] - 46:19, 49:17, 51:1, 51:14, 132:4, 153:17
**column** [1] - 78:7
**coming** [3] - 14:21, 37:13, 104:18
**comment** [8] - 26:21, 79:21, 109:23, 115:6, 115:7, 157:17, 159:20, 161:8
**commentary** [1] - 26:14
**commented** [1] - 71:6
**comments** [3] - 40:16, 105:7, 157:15
**commitments** [1] - 8:20
**committed** [1] - 68:7
**common** [6] - 34:21, 35:2, 35:4, 35:14, 35:16, 35:17
**commonly** [1] - 22:3
**community** [5] - 25:23, 154:24, 157:9, 159:12, 159:15
**comparable** [2] - 79:12, 121:5
**compare** [1] - 65:23
**compared** [5] - 51:5, 65:13, 65:25, 86:14
**comparison** [2] - 84:10, 148:11
**compensation** [1] - 9:18
**competent** [2] - 111:12, 159:3
**competing** [1] - 116:19
**complain** [9] - 151:1, 151:8, 152:2, 152:18, 153:4, 154:16, 154:18, 155:18, 158:6
**complained** [1] - 148:7
**complaining** [1] - 148:2
**complaint** [3] - 111:16, 148:23, 153:24
**complete** [1] - 139:25
**completely** [11] - 44:5, 91:2, 97:6, 103:9, 118:23, 137:16, 139:23, 140:4, 140:16, 141:2,

145:23
**completeness** [1] - 92:20
**compound** [4] - 66:8, 66:13, 138:16, 139:15
**compounds** [8] - 102:7, 122:3, 122:8, 122:11, 123:10, 124:1, 125:16, 130:19
**computer** [3] - 32:6, 84:17, 85:2
**concentrate** [1] - 67:7
**concentration** [4] - 80:17, 120:15, 121:8, 121:11
**concentrations** [1] - 120:13
**concept** [7] - 26:9, 26:15, 66:5, 83:15, 108:13, 141:3, 150:2
**concepts** [6] - 49:3, 59:6, 62:4, 64:18, 73:10, 94:9
**concern** [2] - 133:4, 140:24
**concerned** [1] - 9:6
**concerning** [1] - 90:21
**concert** [1] - 139:25
**concierge** [4] - 81:22, 84:25, 85:18, 86:1
**conclude** [4] - 74:18, 75:21, 75:24, 142:21
**concluded** [4] - 41:12, 88:5, 156:10, 163:11
**concludes** [1] - 163:7
**conclusion** [22] - 18:7, 31:9, 34:12, 35:2, 35:3, 35:5, 35:11, 35:13, 40:19, 48:17, 50:11, 50:15, 50:21, 50:22, 51:18, 76:15, 79:17, 83:8, 102:23, 149:19, 153:25
**conclusions** [1] - 8:1, 31:9, 46:13, 48:17, 50:23, 90:21, 90:24, 157:6, 157:16, 159:10, 160:23
**conclusively** [1] - 138:15
**concurrent** [1] - 50:17
**condemn** [1] - 157:22
**condition** [1] - 127:11
**conditions** [1] - 159:6
**conducted** [3] - 99:2, 121:1, 132:14
**confirm** [1] - 135:1
**conflating** [4] - 19:5, 19:13, 28:22, 94:10
**conflict** [1] - 5:14
**conflicting** [1] - 94:9
**confusion** [1] - 113:8
**congenital** [1] - 42:4
**connection** [3] - 18:19, 160:22, 162:7
**consequently** [1] - 158:15
**consider** [8] - 22:19, 42:24, 42:25, 43:17, 45:24, 152:3, 153:25, 158:22
**considerable** [1] - 41:13
**consideration** [1] - 142:23

**considerations** *[1]* - 45:7
**considered** *[9]* - 24:19, 33:25, 42:9, 42:11, 42:12, 42:25, 47:22, 113:19
**considering** *[2]* - 46:9, 86:18
**consistent** *[4]* - 40:21, 41:15, 77:10, 119:8
**consistently** *[2]* - 156:12, 159:1
**constantly** *[1]* - 39:7
**constitute** *[1]* - 28:9
**consumers** *[2]* - 51:5, 51:6
**contained** *[1]* - 135:20
**containing** *[11]* - 58:22, 60:2, 60:7, 65:2, 65:21, 108:6, 130:3, 154:2, 160:7
**contaminant** *[1]* - 24:9, 25:1, 138:17
**contaminants** *[1]* - 154:19
**contaminated** *[16]* - 24:14, 27:13, 27:23, 31:12, 47:25, 62:6, 62:23, 64:20, 65:12, 65:13, 65:15, 113:20, 113:21, 114:16, 114:23, 146:1
**Contaminated** *[1]* - 105:4
**contamination** *[3]* - 50:19, 140:25, 141:16
**content** *[2]* - 61:19, 115:2
**contents** *[1]* - 99:13
**context** *[20]* - 34:17, 36:14, 43:2, 43:10, 66:9, 70:25, 71:4, 90:11, 99:11, 99:13, 99:14, 103:10, 122:15, 124:11, 126:17, 130:9, 131:6, 133:22, 135:15
**continuation** *[1]* - 44:11
**continue** *[1]* - 154:8
**continued** *[4]* - 8:25, 12:23, 13:13, 114:3
**contradict** *[1]* - 90:23
**contradicts** *[1]* - 90:21
**contrary** *[3]* - 149:6, 149:18, 155:16
**contributed** *[2]* - 26:25, 28:11
**contributes** *[1]* - 28:19
**contributing** *[1]* - 152:7
**control** *[4]* - 32:7, 121:18, 121:21, 134:23
**control-F** *[1]* - 32:7
**controlling** *[1]* - 157:2
**controversial** *[2]* - 45:12, 149:9
**convert** *[2]* - 57:18, 65:7
**converting** *[1]* - 58:24
**convince** *[1]* - 33:14
**convincing** *[2]* - 28:12, 28:20
**copy** *[10]* - 11:10, 84:21, 85:11, 89:9, 90:9, 104:11, 110:22, 112:11, 112:12, 112:23
**corners** *[1]* - 138:20
**Correct** *[3]* - 40:14, 63:6, 101:2
**correct** *[128]* - 6:2, 6:4, 6:9, 7:5,

7:6, 7:7, 7:11, 8:2, 8:6, 8:14, 8:18, 8:19, 8:22, 10:19, 10:20, 14:13, 14:18, 15:1, 15:10, 15:11, 16:20, 16:23, 17:18, 18:10, 19:2, 19:11, 20:17, 21:4, 21:12, 21:13, 22:9, 23:9, 23:21, 26:16, 27:1, 27:14, 27:18, 28:21, 29:21, 30:17, 30:18, 31:15, 31:20, 32:18, 34:9, 36:11, 36:20, 37:10, 37:17, 40:8, 41:6, 42:10, 43:17, 44:4, 45:11, 45:18, 45:19, 48:20, 48:25, 49:7, 50:21, 52:2, 54:21, 54:22, 55:2, 55:3, 55:7, 55:8, 55:24, 56:9, 56:10, 57:17, 57:21, 58:3, 58:19, 60:8, 60:10, 60:15, 60:21, 60:22, 61:3, 61:17, 63:7, 63:10, 63:14, 63:15, 64:12, 65:23, 66:24, 68:15, 70:11, 71:22, 72:23, 73:21, 73:22, 76:18, 77:16, 82:10, 82:12, 83:4, 83:5, 89:1, 89:3, 90:1, 91:16, 96:4, 96:8, 96:9, 99:2, 99:13, 101:5, 101:13, 103:3, 103:24, 113:25, 118:14, 120:11, 121:2, 121:5, 121:18, 121:22, 122:8, 126:8, 126:17, 130:6, 139:2, 153:12, 163:15
**correcting** *[2]* - 126:16, 135:15
**corrections** *[1]* - 14:7
**correctly** *[5]* - 12:7, 25:4, 28:15, 117:12, 161:4
**counsel** *[13]* - 5:13, 21:7, 43:20, 44:10, 52:4, 69:1, 92:24, 113:1, 129:9, 137:9, 150:1, 154:10, 155:11
**Counsel** *[1]* - 23:19
**counsel's** *[1]* - 43:19
**count** *[1]* - 132:15
**counter** *[1]* - 47:14
**counter-example** *[1]* - 47:14
**counterintuitive** *[1]* - 115:17
**couple** *[5]* - 111:22, 111:23, 146:11, 160:17, 163:9
**course** *[13]* - 23:17, 35:17, 46:24, 117:19, 118:11, 151:2, 151:12, 151:24, 157:4, 157:6, 160:17
**court** *[4]* - 4:9, 39:16, 125:10, 142:5
**Court** *[5]* - 9:15, 59:12, 138:7, 141:5, 163:18
**Court's** *[5]* - 5:17, 13:6, 53:21, 93:13, 119:9
**covered** *[2]* - 57:14, 126:5
**credentials** *[1]* - 9:13
**criteria** *[5]* - 70:1, 100:5, 152:25, 160:14
**critical** *[7]* - 80:1, 119:9,

120:10, 120:13, 121:15, 123:6, 135:22
**criticism** *[4]* - 111:16, 112:15, 161:12, 161:22
**criticisms** *[1]* - 125:19
**criticized** *[2]* - 93:22, 121:12
**criticizes** *[1]* - 160:24
**critique** *[24]* - 106:18, 106:19, 109:19, 112:19, 112:25, 113:13, 113:23, 114:3, 114:6, 114:7, 114:8, 117:25, 118:2, 118:5, 118:6, 118:11, 118:18, 118:19, 118:24, 119:5, 122:20, 125:6, 125:15
**critiques** *[6]* - 106:11, 108:1, 116:17, 117:19, 118:21, 123:24
**Cross** *[1]* - 3:6
**CROSS** *[2]* - 93:17, 144:18
**cross** *[10]* - 26:20, 67:3, 90:16, 91:5, 99:12, 142:14, 155:11, 159:21, 160:2, 162:2
**CROSS-EXAMINATION** *[2]* - 93:17, 144:18
**cross-examination** *[4]* - 26:20, 90:16, 159:21, 160:2
**cross-examine** *[3]* - 67:3, 91:5, 142:14
**cross-examining** *[2]* - 155:11, 162:2
**CRR** *[1]* - 163:18
**cumulative** *[1]* - 161:19
**curve** *[7]* - 44:4, 44:7, 59:2, 59:8, 74:8, 95:12, 131:12
**curves** *[2]* - 48:23, 49:1
**daily** *[5]* - 10:8, 36:25, 37:8, 38:24, 151:8
**danger** *[1]* - 154:22
**dangerous** *[2]* - 22:20, 150:16
**dangers** *[1]* - 159:16
**Daniel** *[1]* - 6:10
**Danish** *[1]* - 42:7
**dash** *[1]* - 161:3
**data** *[20]* - 19:10, 60:6, 72:18, 80:2, 91:20, 120:22, 133:15, 134:14, 134:15, 135:2, 135:8, 148:25, 149:1, 149:2, 149:6, 149:17, 149:18, 153:15, 157:7, 161:6
**date** *[3]* - 7:11, 37:2, 37:5
**Date** *[1]* - 163:20
**dated** *[2]* - 7:7, 54:8
**Daubert** *[7]* - 67:16, 67:23, 70:6, 140:1, 154:23, 156:22, 159:10
**David** *[1]* - 155:18
**days** *[2]* - 58:16, 136:23
**deal** *[5]* - 21:18, 39:11, 47:10, 54:10, 117:3
**dealing** *[4]* - 20:24, 30:21, 32:18, 64:16

**deals** *[1]* - 135:22
**dealt** *[4]* - 46:17, 82:18, 147:18, 147:19
**dear** *[1]* - 109:14
**Dear** *[1]* - 113:3
**dearth** *[1]* - 39:23
**decade** *[1]* - 156:12
**decide** *[4]* - 93:2, 149:1, 160:3, 163:4
**decided** *[3]* - 135:23, 140:9, 146:6
**decision** *[2]* - 120:11, 146:24
**decisions** *[1]* - 139:24
**declar** *[1]* - 136:5
**declaration** *[84]* - 54:8, 56:21, 62:3, 67:4, 67:14, 69:11, 70:4, 70:14, 73:24, 75:2, 75:4, 82:17, 83:24, 84:5, 86:8, 87:19, 87:20, 88:12, 88:19, 91:2, 92:3, 92:5, 93:12, 93:19, 99:9, 99:13, 99:21, 100:11, 101:6, 101:10, 102:19, 103:9, 103:14, 103:20, 104:2, 106:11, 106:17, 106:18, 107:22, 107:24, 109:25, 110:9, 110:11, 112:20, 113:24, 116:5, 116:9, 116:20, 116:22, 116:24, 117:16, 118:11, 121:17, 122:4, 122:14, 122:20, 123:7, 123:14, 123:18, 123:24, 124:10, 124:20, 125:7, 125:19, 126:3, 126:20, 126:24, 128:6, 128:12, 130:13, 130:23, 132:12, 135:11, 135:15, 135:17, 135:20, 135:22, 137:15, 137:17, 142:18, 144:20, 144:23, 152:12
**declarations** *[1]* - 147:8
**dedicated** *[2]* - 67:2, 70:16
**defeat** *[1]* - 82:10
**defend** *[2]* - 6:6, 39:17
**defendants** *[28]* - 7:21, 7:25, 9:9, 85:24, 94:9, 98:14, 125:20, 140:12, 142:10, 144:21, 148:7, 148:20, 150:15, 151:1, 151:8, 152:2, 152:10, 152:18, 152:24, 153:4, 153:12, 154:16, 155:18, 155:24, 157:3, 157:12, 157:19, 158:6
**defendants'** *[7]* - 67:12, 70:5, 70:7, 70:10, 93:21, 155:15, 157:16
**defending** *[1]* - 5:4
**defense** *[11]* - 24:3, 30:23, 99:10, 99:14, 137:9, 142:14, 150:1, 154:9, 157:14, 158:18, 160:18
**defer** *[1]* - 97:6
**deficiency** *[1]* - 42:4
**define** *[3]* - 16:25, 55:14, 95:10
**defined** *[3]* - 77:15, 94:1, 116:1

**definitely** [1] - 28:16
**definition** [16] - 59:2, 59:8, 62:10, 73:9, 73:12, 74:8, 74:10, 74:13, 78:14, 80:14, 94:6, 94:7, 94:24, 95:13, 113:19, 160:9
**definitional** [1] - 29:4
**definitive** [1] - 154:18
**deliberate** [1] - 72:17
**delivering** [1] - 40:5
**delivery** [1] - 95:13
**demonstrated** [1] - 142:9
**denied** [6] - 149:24, 152:1, 153:18, 155:17, 158:17, 161:2
**denies** [1] - 131:21
**dependent** [2] - 87:22, 150:3
**deposed** [2] - 37:21, 99:15
**deposing** [1] - 12:1
**deposition** [32] - 8:6, 10:6, 11:10, 11:15, 12:2, 13:12, 13:15, 14:5, 14:6, 15:21, 18:12, 24:20, 26:20, 37:19, 37:25, 40:8, 44:13, 67:4, 68:3, 118:8, 119:2, 119:13, 128:14, 128:19, 129:2, 129:6, 129:7, 129:19, 133:16, 150:25, 158:23, 162:1
**depositions** [1] - 53:18
**depth** [1] - 30:11
**derived** [1] - 82:1
**deriving** [1] - 45:9
**described** [7] - 8:15, 18:1, 19:8, 19:17, 48:11, 160:6, 160:8
**describes** [1] - 159:18
**description** [2] - 32:21, 34:11
**deserve** [1] - 161:8
**design** [4] - 129:23, 134:13, 135:3, 145:4
**designation** [1] - 68:22
**despite** [1] - 22:6
**detail** [7] - 7:18, 42:18, 49:4, 69:24, 102:25, 130:15, 160:24
**detailed** [2] - 69:25, 145:5
**details** [2] - 23:4, 104:6
**detected** [3] - 41:11, 61:8, 106:2
**determination** [2] - 29:21, 101:1
**determine** [11] - 19:15, 46:1, 48:22, 82:19, 93:8, 93:9, 126:13, 142:16, 151:5, 152:22, 162:6
**determined** [4] - 31:17, 100:7, 104:22, 151:11
**determining** [2] - 121:25, 147:13
**detrimental** [1] - 150:24
**develop** [6] - 127:12, 127:24, 130:21, 131:2, 131:12, 131:14
**developed** [1] - 151:21
**development** [1] - 151:14
**develops** [4] - 26:22, 28:6,

29:1, 29:9
**diagnose** [3] - 10:22, 12:9, 148:12
**diagnosis** [8] - 10:19, 26:16, 31:25, 32:4, 44:23, 45:10, 147:22
**diagnostic** [2] - 17:19, 18:17
**diarrhea** [1] - 18:24
**Diaz** [6] - 76:20, 77:22, 79:17, 80:4, 82:24, 83:6
**diet** [2] - 77:25, 79:14
**dietary** [4] - 51:3, 101:19, 158:7, 160:8
**difference** [3] - 20:5, 73:19
**differences** [4] - 67:18, 91:17, 91:18, 96:14
**different** [38] - 9:24, 25:7, 48:23, 48:24, 56:1, 57:12, 64:17, 64:19, 64:21, 70:1, 72:3, 73:10, 74:13, 78:18, 78:22, 79:4, 79:24, 80:12, 80:24, 80:25, 87:16, 98:19, 114:19, 114:20, 114:25, 115:1, 115:2, 115:3, 115:20, 118:24, 119:23, 120:4, 145:23, 148:8, 156:15
**differential** [9] - 10:19, 26:16, 31:25, 32:4, 44:22, 45:2, 45:9, 147:22
**differently** [1] - 13:23
**differs** [1] - 9:23
**difficult** [1] - 154:21
**difficulties** [1] - 92:10
**difficulty** [1] - 109:4
**Digest** [1] - 86:24
**digressing** [1] - 57:5
**ding** [1] - 41:22
**DIPAK** [2] - 3:8, 53:4
**Dipak** [1] - 53:8
**direct** [7] - 13:2, 37:24, 40:21, 41:14, 90:3, 109:12, 143:3
**DIRECT** [3] - 6:21, 54:4, 98:9
**Direct** [1] - 3:6
**directing** [1] - 41:16
**direction** [1] - 35:9
**directly** [7] - 14:4, 47:10, 80:17, 86:20, 90:23, 106:10, 138:1
**director** [1] - 150:19
**disagree** [4] - 70:12, 79:11, 85:12, 115:13
**disagreement** [1] - 153:5
**disagrees** [2] - 87:11, 160:23
**disavowal** [1] - 51:20
**disciplines** [2] - 157:9, 161:14
**disclosure** [2] - 68:16, 68:22
**discovered** [1] - 15:5
**discrepancies** [3] - 159:22, 159:23, 159:25
**discuss** [9] - 7:20, 7:25, 23:20, 42:17, 46:14, 102:24, 116:19, 124:10, 149:17

**discussed** [10] - 7:17, 8:5, 36:17, 42:9, 49:1, 49:2, 49:3, 50:3, 50:5, 58:9
**discusses** [1] - 155:15
**discussing** [4] - 26:15, 134:3, 149:16, 161:10
**discussion** [11] - 21:14, 34:15, 34:16, 42:7, 42:8, 44:11, 50:9, 120:21, 143:4, 145:5, 154:8
**discussions** [1] - 79:25
**disease** [5] - 32:25, 33:1, 33:3, 33:8
**diseases** [1] - 148:17
**dismissed** [1] - 146:15
**display** [2] - 85:1, 88:24
**Disposition** [1] - 88:14
**dispositive** [1] - 147:9
**disregard** [2] - 134:12, 145:2
**disregarded** [2] - 126:20, 144:25
**disregarding** [2] - 136:8, 137:21
**disrupt** [1] - 9:6
**distinction** [1] - 32:24
**distinguish** [1] - 160:25
**distortions** [1] - 157:7
**District** [2] - 136:13, 157:20
**divided** [2] - 59:8, 95:13
**dixit** [1] - 149:9
**DNA** [21] - 40:21, 41:14, 41:21, 42:2, 42:4, 42:5, 42:9, 42:13, 42:23, 43:1, 43:7, 43:13, 72:9, 78:17, 78:20, 80:12, 80:14, 81:19, 82:2, 82:10
**DNMA** [1] - 41:9
**Doctor** [61] - 13:11, 14:2, 16:6, 30:16, 33:9, 47:19, 58:12, 59:23, 62:15, 66:1, 75:16, 89:12, 89:16, 93:19, 93:25, 94:5, 94:11, 94:14, 94:19, 95:3, 95:15, 96:4, 96:13, 98:16, 98:21, 99:1, 100:10, 100:25, 103:5, 103:19, 104:14, 107:1, 110:17, 110:20, 112:11, 112:18, 113:7, 113:15, 114:2, 116:4, 119:8, 121:15, 121:24, 123:1, 123:9, 123:23, 126:2, 127:7, 127:22, 128:3, 128:4, 129:5, 129:13, 129:19, 131:1, 131:24, 133:20, 133:25, 135:10, 143:8, 146:16
**doctor** [10] - 17:5, 30:10, 32:8, 90:11, 90:13, 136:18, 140:7, 147:25, 148:1, 148:2
**doctor's** [2] - 135:23, 145:14
**doctrine** [1] - 92:20
**document** [23] - 39:8, 40:13, 40:14, 68:18, 68:21, 68:24, 69:7, 69:23, 87:8, 88:22, 89:8, 90:6, 90:8, 90:9, 91:5, 94:1,

97:9, 110:21, 110:23, 112:9, 113:2, 113:5
**documented** [1] - 28:8
**dog** [10] - 57:8, 59:15, 59:25, 62:9, 62:21, 83:18, 95:21, 95:25, 96:12, 96:17
**dogs** [16] - 55:17, 55:25, 56:1, 56:7, 56:12, 57:9, 57:15, 57:20, 58:1, 58:5, 59:10, 62:2, 77:20, 86:9, 96:8
**done** [23] - 10:12, 16:14, 20:24, 22:1, 28:24, 48:7, 82:8, 120:24, 132:25, 133:3, 133:14, 135:25, 136:4, 136:6, 141:8, 142:4, 146:16, 153:8, 153:9, 154:3, 155:9, 161:19
**door** [1] - 44:12
**dosages** [5] - 119:23, 120:18, 120:22, 121:9, 121:10
**dose** [75] - 43:16, 44:4, 44:7, 45:3, 45:7, 45:8, 45:15, 48:23, 49:1, 49:10, 50:8, 50:19, 51:7, 51:9, 55:23, 57:8, 57:17, 57:19, 58:1, 58:5, 58:7, 59:24, 60:18, 60:19, 63:18, 63:19, 63:20, 63:21, 63:22, 63:23, 66:2, 66:7, 66:9, 66:12, 66:16, 67:3, 68:3, 70:19, 70:22, 70:24, 71:1, 71:2, 71:4, 71:8, 71:13, 71:18, 71:19, 72:7, 72:8, 72:11, 72:17, 72:19, 73:21, 74:1, 74:3, 74:5, 77:17, 77:19, 78:19, 81:10, 81:23, 94:2, 94:12, 94:17, 95:19, 95:22, 114:19, 121:11, 121:24, 125:5, 139:16, 139:18, 153:25, 157:18
**dose-response** [2] - 44:4, 44:7
**dosed** [1] - 63:5
**doses** [40] - 55:7, 55:9, 55:18, 55:25, 56:8, 56:11, 56:12, 58:9, 58:21, 59:10, 60:1, 63:8, 64:9, 64:11, 64:14, 64:15, 64:18, 64:19, 64:21, 64:24, 66:14, 67:18, 71:7, 71:11, 71:12, 73:1, 73:7, 74:19, 77:11, 77:15, 78:24, 83:9, 87:2, 88:5, 91:18, 96:10, 120:20, 154:10
**down** [5] - 18:15, 27:11, 63:12, 121:21
**downstream** [5] - 69:16, 69:20, 70:8, 82:21, 151:15
**dozen** [1] - 160:17
**dozens** [2] - 14:15, 32:10
**Dr** [61] - 5:5, 5:8, 6:1, 6:12, 6:13, 6:23, 9:8, 11:6, 11:15, 11:22, 13:3, 15:20, 24:7, 24:20, 25:10, 27:6, 29:19, 30:6, 36:15, 37:1, 37:9, 37:13, 37:16, 38:3, 38:13, 39:25, 44:18, 48:10, 52:25, 54:6, 57:6, 58:20, 68:12,

69:4, 77:7, 88:4, 97:23, 98:11, 99:9, 99:15, 100:1, 107:7, 108:19, 108:25, 109:12, 109:14, 110:23, 112:8, 113:3, 113:7, 128:18, 143:4, 144:20, 145:7, 146:7, 147:10, 149:25, 150:19, 152:9, 162:24

**draft** [1] - 7:12

**drafted** [3] - 7:17, 27:16, 39:5

**drafting** [1] - 42:12

**draw** [2] - 18:7, 32:24

**drawn** [1] - 50:23

**drink** [1] - 152:6

**drinking** [1] - 140:21

**driven** [1] - 33:18

**drug** [8] - 59:3, 61:20, 95:11, 132:18, 137:24, 138:8, 154:2, 154:22

**drugs** [6] - 62:11, 127:15, 131:16, 154:19, 154:20, 160:7

**duly** [1] - 6:17

**duration** [11] - 45:3, 45:7, 45:9, 45:15, 116:10, 121:25, 127:1, 127:2, 127:20, 132:12, 157:18

**during** [8] - 13:15, 68:2, 108:7, 110:3, 114:20, 147:11

**duties** [1] - 9:11

**early** [2] - 15:2, 130:2

**easier** [1] - 129:18

**easy** [1] - 159:18

**eat** [2] - 122:7, 152:6

**EBT** [2] - 159:15, 159:17

**effect** [1] - 87:24

**effects** [3] - 66:8, 148:2, 148:3

**effort** [2] - 49:22, 147:3

**either** [4] - 74:12, 90:12, 103:2, 139:4

**element** [4] - 35:11, 139:10, 142:8, 147:14

**elevation** [1] - 51:12

**eliminated** [1] - 160:16

**Elmo** [1] - 97:8

**elsewhere** [1] - 159:24

**EMA** [2] - 150:23, 154:14

**email** [4] - 108:19, 108:25, 109:9, 111:1

**emailed** [1] - 112:13

**embedded** [1] - 28:17

**embraced** [1] - 91:13

**employed** [1] - 149:15

**employees** [1] - 140:12

**employment** [1] - 159:22

**encompass** [1] - 127:6

**end** [5] - 36:19, 36:21, 50:22, 61:4, 124:23

**endogenous** [5] - 122:13, 122:16, 123:2, 123:3, 123:13

**ends** [1] - 160:17

**engagements** [1] - 20:15

**enhancement** [1] - 82:3

**enormously** [1] - 140:5

**entails** [1] - 33:23

**enter** [1] - 16:4

**entered** [2] - 17:2, 137:14

**enters** [1] - 75:7

**entire** [4] - 59:2, 99:9, 110:21, 110:22

**entirely** [3] - 67:21, 67:24, 156:15

**entirety** [2] - 42:13, 110:21

**entitled** [10] - 36:25, 54:13, 54:20, 54:25, 67:10, 85:11, 88:13, 154:4, 154:5, 163:16

**entry** [1] - 47:10

**environmental** [2] - 72:17, 119:17

**enzymes** [3] - 72:10, 82:10, 82:11

**EPA** [1] - 140:20

**epi** [1] - 119:17

**Epidemiologic** [1] - 105:3

**epidemiologic** [2] - 35:23, 35:24

**epidemiological** [3] - 119:16, 157:4, 157:5

**epidemiologist** [1] - 157:5

**epidemiology** [6] - 20:16, 20:19, 20:20, 20:24, 115:24

**equal** [1] - 100:18

**equals** [1] - 64:7

**equated** [1] - 50:8

**equivalently** [1] - 22:16

**equivocal** [1] - 24:18

**errata** [2] - 14:5, 14:8

**error** [2] - 115:4, 133:6

**escape** [2] - 70:9, 70:20

**escapes** [3] - 71:12, 150:7, 151:18

**esophageal** [3] - 46:23, 49:17, 153:17

**essence** [2] - 8:16, 28:21

**essentially** [5] - 8:9, 11:7, 12:6, 87:1, 99:1

**establish** [5] - 69:13, 69:17, 139:3, 139:17, 151:12

**established** [9] - 29:7, 29:13, 45:14, 47:16, 66:17, 66:22, 138:8, 138:15, 139:10

**estimated** [1] - 105:25

**estimates** [4] - 106:1, 118:9, 120:8, 120:11

**estimation** [1] - 86:25

**et** [3] - 150:23, 162:3

**ethanol** [2] - 82:3, 82:13

**etiology** [11] - 10:22, 10:25, 11:2, 11:7, 12:6, 12:14, 12:18, 13:14, 13:24, 14:10, 46:1

**Etminan** [20] - 5:8, 97:21, 97:23, 98:4, 98:11, 99:15, 100:1, 109:12, 109:14, 110:23,

112:8, 113:3, 128:18, 143:4, 144:20, 145:7, 146:7, 152:2, 152:9, 157:13

**ETMINAN** [2] - 3:10, 97:25

**Etminan's** [3] - 99:9, 108:19, 108:25

**Etminan-1** [1] - 104:11

**evaluate** [3] - 8:3, 35:23, 66:7

**evaluated** [2] - 23:22, 101:15

**evaluating** [1] - 70:19

**evening** [1] - 163:8

**event** [2] - 53:12, 57:5

**everywhere** [1] - 122:5

**evidence** [35] - 8:5, 8:7, 8:11, 18:6, 22:21, 24:17, 28:13, 28:20, 31:9, 34:2, 35:10, 36:17, 37:17, 41:13, 41:14, 47:23, 48:15, 49:14, 92:21, 98:24, 99:10, 100:4, 111:12, 138:3, 139:5, 142:11, 145:20, 145:22, 145:25, 146:4, 146:7, 149:18, 150:17, 155:21, 155:23

**ex** [1] - 32:7

**exact** [2] - 19:17, 110:16

**exactly** [8] - 8:9, 20:22, 26:18, 33:23, 48:21, 137:19, 144:24, 163:1

**exam** [1] - 23:3

**examination** [6] - 26:20, 90:16, 148:15, 148:18, 159:21, 160:2

**EXAMINATION** [5] - 6:21, 54:4, 93:17, 98:9, 144:18

**examine** [4] - 67:3, 91:5, 142:14, 152:25

**examined** [5] - 6:17, 53:5, 98:1, 148:12, 160:15

**examines** [1] - 155:3

**examining** [3] - 155:11, 162:2

**example** [19] - 12:17, 14:3, 18:24, 29:7, 43:14, 43:15, 44:19, 46:2, 46:7, 47:14, 51:2, 51:8, 51:22, 78:16, 80:9, 80:10, 117:11, 118:8, 140:18

**examples** [5] - 11:1, 13:13, 14:11, 14:20, 20:7, 21:19, 22:12, 22:13, 49:2, 131:15

**exceed** [1] - 66:22

**exceedingly** [1] - 72:18

**except** [5] - 43:14, 150:4, 153:18

**exclude** [4] - 100:7, 132:19, 138:12, 145:14

**excluded** [5] - 136:1, 136:10, 136:14, 137:20, 142:5

**exclusion** [1] - 137:18

**exclusions** [1] - 137:25

**exclusive** [1] - 83:10

**exclusively** [1] - 21:15

**excretion** [1] - 80:15

**excuse** [6] - 28:10, 38:7, 41:9,

44:9, 62:15, 136:6

**exercise** [2] - 30:6, 163:5

**exhibit** [7] - 71:2, 84:19, 84:21, 85:9, 85:10, 85:14

**Exhibit** [12] - 54:23, 55:4, 57:10, 58:8, 63:2, 63:12, 68:23, 71:5, 71:16, 72:14, 84:23, 89:24

**Exhibits** [1] - 76:25

**exhibits** [5] - 53:13, 56:16, 56:25, 85:21, 109:5

**exist** [1] - 157:8

**exogenous** [2] - 122:17, 123:2

**expect** [1] - 69:2

**expectation** [1] - 119:25

**expected** [5] - 11:2, 12:15, 16:21, 23:8, 72:19

**experience** [2] - 158:20, 159:2

**experiment** [3] - 25:16, 25:17, 25:20

**experimental** [1] - 33:19

**experiments** [6] - 33:17, 33:19, 59:16, 77:24, 79:13, 156:8

**expert** [19] - 20:2, 20:3, 49:21, 67:16, 68:22, 69:2, 69:4, 70:5, 85:10, 87:17, 93:10, 122:15, 135:13, 135:16, 147:16, 148:24, 153:9, 157:14, 158:4

**expertise** [1] - 9:10

**experts** [22] - 35:14, 69:2, 90:23, 100:17, 108:21, 111:13, 111:15, 141:7, 141:11, 142:15, 146:24, 147:13, 149:1, 149:12, 154:11, 155:10, 155:12, 158:8, 158:18, 160:18, 160:21, 160:24

**explain** [11] - 24:4, 26:13, 30:11, 35:15, 93:25, 99:7, 115:14, 139:21, 149:4, 149:5

**explained** [3] - 119:18, 147:20, 148:10

**explaining** [2] - 33:6, 99:10

**explains** [4] - 36:15, 149:22, 155:3, 155:15

**explanation** [4] - 29:18, 34:11, 153:2, 158:13

**explored** [1] - 67:20

**exploring** [1] - 117:20

**exposed** [8] - 41:11, 67:19, 72:16, 122:8, 122:10, 125:2, 140:22, 142:2

**exposure** [65] - 16:2, 21:3, 26:23, 26:25, 28:7, 28:9, 28:11, 28:19, 29:2, 31:14, 36:25, 37:8, 38:24, 43:16, 61:20, 61:21, 68:6, 68:13, 69:15, 71:24, 72:17, 72:23, 76:16, 98:18, 101:15, 101:23, 102:6, 108:10, 110:4, 113:18, 114:10, 115:8, 115:20, 117:7, 118:9, 119:11, 120:8, 121:17, 121:21, 121:22,

123:3, 123:8, 123:10, 124:1,
124:6, 125:5, 152:4, 152:5,
152:8, 153:17, 155:6, 155:8,
157:19, 157:21, 157:25, 158:1,
158:5, 158:7, 158:8, 160:7,
160:9, 161:19, 162:4, 162:10
**exposures** [2] - 72:11
**express** [6] - 125:22, 149:2,
153:13, 153:16, 156:24, 162:4
**expressed** [1] - 154:23
**extensively** [2] - 10:5, 99:15
**extent** [6] - 33:16, 43:2, 74:11,
94:6, 137:7, 162:4
**extraordinary** [1] - 147:1
**extrapolate** [2] - 22:8, 91:21
**extrapolating** [2] - 92:10,
151:19
**extrapolation** [2] - 84:1, 154:6
**extremely** [1] - 39:3
**F-R-Y-Z-E-K** [1] - 159:20
**face** [1] - 137:23
**fact** [19] - 4:21, 10:7, 15:12,
23:5, 29:19, 46:10, 51:18, 60:5,
68:14, 69:14, 79:3, 80:21,
103:5, 117:6, 117:10, 123:9,
134:10, 135:25, 146:2
**factor** [2] - 37:16, 57:25
**factors** [3] - 50:18, 91:19, 146:8
**facts** [3] - 67:17, 67:19, 67:22
**failure** [1] - 153:24
**fair** [12] - 9:22, 43:7, 89:7,
90:16, 91:15, 99:5, 100:8,
100:10, 106:15, 115:8, 115:22,
116:18
**fairly** [2] - 22:23, 35:25
**fall** [1] - 16:13
**false** [2] - 26:1, 26:2
**familiar** [8] - 40:7, 66:2, 76:19,
86:22, 88:13, 89:18, 90:14,
98:24
**far** [12] - 20:13, 21:16, 22:2,
29:22, 43:1, 43:19, 77:14,
97:15, 99:18, 117:17, 142:15,
152:20
**fashion** [2] - 19:24, 53:25
**fatal** [1] - 152:8
**favorably** [1] - 157:15
**FDA** [14] - 15:5, 22:17, 22:18,
62:7, 62:24, 65:14, 65:16,
66:17, 106:1, 140:3, 140:23,
154:2, 154:14, 156:11
**feature** [1] - 11:12
**February** [2] - 7:7, 54:9
**fed** [1] - 154:11
**federal** [2] - 39:16
**feedback** [1] - 4:17
**fellowship** [1] - 17:3
**felt** [2] - 22:7, 48:16
**fertile** [1] - 155:11
**few** [9] - 21:5, 29:10, 49:2, 68:9,

90:10, 97:7, 107:3, 136:23,
144:21
**field** [1] - 59:18
**Figure** [1] - 84:1
**figure** [7] - 4:10, 85:13, 86:3,
123:25, 125:1, 130:19, 141:16
**file** [2] - 69:2, 148:14
**filed** [3] - 37:6, 68:16, 70:6
**fill** [1] - 39:3, 113:20
**final** [2] - 50:11, 135:10
**findings** [8] - 48:3, 91:14,
105:8, 105:18, 105:20, 145:4,
155:14, 161:6
**fine** [5] - 73:15, 91:4, 131:22,
144:5, 163:3
**finish** [4] - 5:24, 12:25, 13:5,
13:7
**firmly** [1] - 29:7
**first** [32] - 4:7, 8:24, 11:17,
15:5, 18:11, 28:15, 55:19,
63:12, 67:1, 67:5, 70:9, 88:22,
91:24, 92:6, 108:23, 112:15,
113:1, 113:4, 113:20, 114:15,
114:22, 128:25, 132:17,
133:25, 135:12, 145:13,
145:21, 147:1, 147:18, 163:1,
163:5
**five** [9] - 70:21, 86:3, 126:12,
127:19, 127:23, 128:20, 129:2,
129:25, 130:8
**fixed** [1] - 127:9
**Flack** [1] - 158:19
**FLACK** [1] - 158:19
**flaw** [1] - 121:7
**flip** [1] - 107:19
**floor** [1] - 34:13
**flow** [2] - 73:14, 95:7
**focus** [6] - 10:13, 43:23, 48:8,
76:6, 84:15, 93:12, 153:7,
155:8
**focused** [1] - 21:15
**focusing** [1] - 76:4
**folks** [6] - 98:14, 105:11, 106:7,
110:1, 146:10, 150:11
**follow** [36] - 10:7, 19:16, 22:14,
28:3, 73:3, 108:7, 110:3,
114:21, 114:24, 115:5, 116:10,
126:4, 126:7, 126:9, 127:10,
127:11, 127:13, 128:15,
130:12, 130:15, 131:11,
132:12, 132:17, 132:20,
132:21, 132:24, 133:1, 133:8,
133:12, 134:4, 134:7, 134:11,
134:13, 135:6, 147:5, 161:25
**follow-up** [26] - 108:7, 110:3,
114:21, 115:5, 116:10, 126:4,
126:7, 126:9, 127:10, 127:11,
127:13, 128:15, 130:15,
132:12, 132:17, 132:20,
132:21, 132:24, 133:1, 133:8,

133:12, 134:4, 134:7, 134:11,
134:13, 135:6
**follow-ups** [2] - 130:12, 131:11
**followed** [4] - 63:22, 114:18,
149:14, 162:13
**following** [7] - 63:23, 64:6,
67:9, 109:4, 117:22, 124:21,
128:8
**follows** [7] - 6:17, 10:8, 53:5,
65:1, 98:1, 114:12, 153:10
**food** [3] - 122:7, 122:10, 139:14
**force** [1] - 154:11
**force-fed** [1] - 154:11
**foregoing** [1] - 163:15
**foremost** [1] - 8:24
**forgetting** [1] - 92:24
**form** [3] - 32:12, 34:1, 98:21
**formalized** [1] - 47:23
**Formation** [1] - 88:14
**formation** [4] - 40:22, 41:10,
122:13, 123:13
**formation..** [1] - 41:15
**formed** [2] - 23:24, 146:2
**forms** [2] - 31:8, 35:23
**formulate** [1] - 111:22
**formulation** [1] - 115:1
**formulations** [2] - 110:3,
116:15
**forth** [4] - 9:9, 24:25, 150:22,
150:23
**forward** [4] - 10:16, 14:24,
85:5, 111:5
**forwarded** [1] - 113:7
**forwarding** [1] - 112:5
**Fosamax** [10] - 136:12, 140:5,
142:5, 142:7, 142:17, 142:23,
143:2, 145:13, 145:15, 146:9
**foundational** [1] - 89:7
**four** [12] - 60:24, 60:25, 61:18,
61:21, 61:22, 61:25, 70:16,
129:25, 130:8, 132:25, 138:20
**four-and-a-half** [1] - 132:25
**fraction** [2] - 71:13, 72:19
**frame** [2] - 127:5, 129:25
**frankly** [1] - 152:4
**free** [3] - 133:22, 152:15,
152:16
**frequent** [1] - 157:25
**frequently** [1] - 10:22
**front** [5] - 7:8, 63:3, 77:4, 85:5,
93:19
**Fryzek** [2] - 157:14, 159:20
**full** [6] - 5:25, 6:18, 53:6, 98:3,
133:22, 160:15
**fully** [1] - 94:11
**fun** [2] - 141:18, 162:1
**fundamental** [1] - 66:5
**furthermore** [2] - 22:14, 148:15
**future** [1] - 15:19
**game** [1] - 5:25

**gastric** [2] - 46:19, 49:17
**gastrointestinal** [1] - 82:2
**gatekeeper** [1] - 141:25
**gavage** [1] - 81:24
**gears** [2] - 21:9, 40:12
**general** [42] - 7:4, 10:24, 18:3,
20:5, 20:9, 20:17, 20:23, 21:4,
27:21, 28:2, 28:4, 28:23, 29:6,
29:15, 30:1, 31:3, 31:23, 32:12,
32:16, 32:19, 32:25, 34:18,
34:23, 40:3, 45:20, 47:5, 48:19,
50:16, 66:9, 125:6, 130:24,
132:7, 132:10, 136:9, 136:14,
139:14, 148:17, 149:20, 151:9,
151:12, 155:19, 159:11
**generally** [10] - 18:23, 33:18,
45:22, 46:14, 47:13, 50:20,
101:25, 139:18, 142:3, 154:24
**generated** [3] - 8:13, 14:18,
15:9
**generation** [1] - 80:2
**generic** [1] - 110:3
**genesis** [1] - 16:1
**genetically** [1] - 80:11
**genotoxic** [7] - 65:4, 66:10,
66:12, 66:15, 66:18, 66:19,
79:5
**George** [2] - 37:1, 37:9
**given** [19] - 18:20, 22:21, 23:3,
29:18, 30:12, 31:8, 32:17,
55:17, 56:8, 56:12, 57:20, 58:5,
62:21, 63:24, 79:20, 81:10,
91:17, 92:11, 127:3
**glad** [2] - 37:24, 110:24
**Glad** [1] - 82:7
**globally** [1] - 102:1
**goats** [1] - 59:17
**Gombar** [49] - 54:10, 55:5,
62:2, 62:13, 64:10, 64:13,
70:13, 70:18, 70:19, 71:6,
71:11, 71:19, 71:23, 71:25,
72:6, 72:9, 72:16, 73:20, 74:4,
74:13, 75:9, 75:18, 76:2, 76:24,
77:1, 77:16, 77:22, 80:16,
82:18, 82:19, 82:25, 83:14,
86:8, 86:16, 86:19, 87:16, 88:8,
88:11, 88:19, 88:20, 90:1,
91:19, 92:15, 94:16, 95:18,
95:25, 96:9, 96:13
**Gombar's** [7] - 55:9, 56:12,
63:21, 72:25, 73:5, 73:23,
91:13
**Gombard** [1] - 64:10
**Gomez** [6] - 76:20, 77:7, 77:22,
79:17, 82:24, 83:6
**Gomez's** [1] - 80:5
**Gomm** [22] - 101:12, 101:21,
102:4, 118:12, 118:18, 118:23,
119:9, 119:19, 120:14, 120:25,
121:16, 123:7, 126:10, 130:1,

*132:13, 132:15, 132:21, 135:3, 135:7, 145:1, 145:2, 152:13*
**government** *[6] - 139:22, 140:8, 142:9, 151:10, 155:13, 156:17*
**granted** *[2] - 159:7, 159:19*
**graphs** *[1] - 90:5*
**great** *[5] - 7:18, 137:7, 142:15, 163:3, 163:8*
**greater** *[1] - 151:18*
**ground** *[5] - 4:5, 68:9, 122:21, 145:14, 155:11*
**grounds** *[3] - 44:13, 142:5, 156:22*
**group** *[4] - 31:17, 121:18, 121:21, 134:23*
**groups** *[1] - 141:11*
**guess** *[3] - 72:3, 100:20, 140:17*
**guidance** *[1] - 22:15*
**guideline** *[1] - 35:22*
**guidelines** *[4] - 8:8, 49:13, 150:23, 151:12*
**guys** *[1] - 162:19*
**H-E-C-H-T** *[1] - 153:23*
**half** *[5] - 33:5, 62:1, 62:2, 132:25*
**halfway** *[1] - 27:11*
**hamster** *[1] - 84:2*
**hand** *[8] - 6:14, 30:5, 53:2, 67:17, 67:22, 78:7, 97:24, 157:13*
**hand-picked** *[1] - 157:13*
**happy** *[2] - 23:3, 39:10*
**hard** *[4] - 40:1, 161:24, 161:25*
**harm** *[1] - 34:14*
**Harrington** *[8] - 88:13, 88:18, 89:4, 89:5, 89:13, 89:14, 89:24, 89:25*
**head** *[2] - 23:2, 46:5*
**header** *[1] - 27:16*
**heading** *[4] - 27:12, 28:4, 31:23*
**health** *[1] - 151:12*
**Health** *[1] - 41:4*
**healthy** *[2] - 77:24, 79:13*
**hear** *[5] - 44:16, 62:16, 124:23, 137:11, 142:13*
**heard** *[7] - 4:21, 25:11, 25:14, 38:7, 103:11, 135:18*
**hearing** *[3] - 5:5, 9:15, 53:14*
**heavily** *[2] - 93:10, 160:18*
**heavy** *[1] - 151:2*
**Hecht** *[3] - 153:23, 154:16*
**heck** *[2] - 147:2, 147:3*
**held** *[1] - 4:1*
**help** *[5] - 55:20, 106:15, 129:16, 136:22, 137:17*
**helpful** *[6] - 30:5, 146:9, 147:8, 152:14, 155:4, 155:17*
**helping** *[2] - 91:3, 93:2*

**hence** *[1] - 121:14*
**Hepatic** *[1] - 88:14*
**hesitant** *[2] - 9:4, 23:14*
**Hidajat** *[18] - 117:12, 117:13, 117:14, 117:16, 118:8, 118:16, 118:22, 119:1, 119:14, 119:17, 120:4, 120:8, 120:10, 120:12, 151:2, 152:18, 153:6, 157:17*
**high** *[15] - 44:21, 44:22, 51:5, 60:19, 60:25, 71:8, 71:12, 73:21, 74:3, 77:15, 83:20, 94:18, 121:10, 121:21, 154:10*
**high-dose** *[1] - 71:8*
**higher** *[21] - 50:20, 62:7, 62:24, 64:10, 64:15, 74:4, 77:11, 83:17, 83:18, 84:5, 84:6, 96:7, 96:10, 96:11, 96:20, 119:25, 120:19, 120:20, 134:19, 159:4, 159:5*
**highest** *[1] - 60:19*
**highlighted** *[1] - 107:14*
**highlighting** *[1] - 39:22*
**highly** *[1] - 65:5*
**Hill** *[30] - 8:8, 8:10, 35:19, 35:22, 36:10, 46:25, 47:3, 47:8, 47:20, 47:24, 48:11, 49:11, 69:25, 99:4, 100:2, 100:4, 100:8, 135:24, 136:7, 137:23, 138:9, 138:14, 139:4, 139:17, 142:12, 145:21, 146:8, 149:19, 153:4, 155:22*
**Hill's** *[1] - 36:6*
**himself** *[1] - 92:15*
**history** *[6] - 15:12, 15:18, 16:3, 18:1, 45:25, 156:19*
**hmm** *[1] - 29:10*
**Hoffeditz** *[1] - 157:19*
**HOFFEDITZ** *[1] - 157:20*
**hold** *[2] - 45:4, 159:10*
**holding** *[1] - 138:7*
**HOLLIS** *[1] - 111:7*
**hollislawfirm** *[1] - 111:7*
**home** *[1] - 40:10*
**honest** *[1] - 103:13*
**honestly** *[1] - 129:7*
**Honor** *[93] - 4:16, 4:24, 5:3, 5:7, 5:15, 5:20, 6:10, 9:3, 9:4, 9:7, 9:8, 10:15, 11:14, 23:13, 23:18, 43:18, 44:15, 48:4, 52:3, 52:4, 52:7, 52:11, 52:20, 52:21, 52:24, 53:11, 53:25, 56:15, 56:23, 67:8, 67:25, 68:8, 69:13, 74:15, 74:21, 85:13, 87:14, 87:15, 89:9, 89:15, 90:12, 91:4, 92:19, 93:16, 96:22, 97:7, 97:18, 98:7, 99:6, 99:22, 99:24, 103:8, 103:17, 117:18, 117:25, 118:7, 118:17, 119:3, 119:6, 122:19, 125:24, 126:19, 128:16, 128:24, 131:19,*

*135:25, 136:10, 136:12, 136:17, 136:22, 138:1, 138:5, 138:13, 138:22, 139:12, 139:15, 139:16, 139:23, 140:1, 140:4, 140:17, 141:7, 142:20, 142:21, 143:2, 143:17, 144:8, 144:11, 145:11, 146:14, 162:21, 163:1, 163:10*
**Honor's** *[1] - 97:10*
**Honorable** *[1] - 4:1*
**hope** *[4] - 46:3, 68:8, 104:9, 104:10*
**hopeful** *[1] - 5:15*
**hopefully** *[1] - 112:2*
**hoping** *[2] - 124:18, 136:21*
**hour** *[1] - 129:7*
**hours** *[2] - 40:9, 91:8*
**huge** *[1] - 120:22*
**human** *[38] - 13:16, 13:19, 14:1, 25:8, 26:23, 28:8, 30:25, 31:21, 32:11, 35:11, 41:11, 65:8, 65:25, 66:23, 72:20, 73:7, 73:25, 74:19, 75:8, 75:9, 75:17, 75:22, 76:15, 80:12, 83:22, 84:8, 84:10, 86:9, 86:15, 90:4, 92:10, 92:16, 96:19, 140:13, 147:15, 150:12, 154:21, 161:10*
**humans** *[24] - 16:19, 21:16, 24:10, 24:15, 25:2, 25:3, 25:7, 26:10, 27:13, 27:22, 31:13, 41:10, 58:25, 59:21, 65:6, 72:10, 72:16, 76:1, 78:19, 83:23, 84:13, 91:18, 91:21, 92:11*
**hundreds** *[3] - 14:15, 64:15, 79:6*
**hypertension** *[1] - 159:3*
**hypertensives** *[2] - 159:4, 159:5*
**hypothesis** *[21] - 24:3, 25:12, 25:15, 25:22, 26:4, 26:6, 33:9, 33:12, 33:18, 33:20, 34:4, 34:22, 35:20, 36:2, 36:11, 43:17, 44:11, 147:20, 148:4*
**hypothesis-driven** *[2] - 33:18*
**IARC** *[4] - 31:17, 31:20, 31:21, 65:6*
**idea** *[8] - 28:22, 28:23, 45:15, 68:25, 82:20, 95:15, 104:1, 161:21*
**ideal** *[1] - 128:15*
**identified** *[4] - 11:17, 51:22, 53:17, 134:3*
**identify** *[4] - 4:11, 13:16, 53:15, 57:3*
**ignore** *[1] - 80:23*
**ignores** *[1] - 67:15*
**illuminating** *[1] - 147:4*
**illustrate** *[1] - 151:7*
**immaterial** *[1] - 23:6*

**immune** *[1] - 84:13*
**impact** *[3] - 41:21, 42:2, 46:9*
**imperfect** *[1] - 22:21*
**impermissible** *[1] - 158:6*
**imply** *[2] - 77:24, 79:13*
**implying** *[1] - 22:19*
**importance** *[1] - 70:17*
**important** *[22] - 13:14, 38:25, 39:3, 39:18, 45:2, 45:9, 45:15, 45:24, 47:9, 62:4, 78:18, 79:3, 83:15, 83:21, 117:3, 120:15, 121:25, 134:12, 139:16, 149:2, 150:13, 151:6*
**importantly** *[2] - 104:13, 116:13*
**impossible** *[1] - 118:10*
**impressed** *[1] - 145:16*
**improper** *[1] - 151:9*
**impurity** *[3] - 16:18, 24:9, 25:1*
**inability** *[1] - 116:14*
**inaccurate** *[2] - 27:3, 42:20*
**inadequate** *[1] - 132:20*
**inappropriate** *[3] - 29:9, 65:7, 65:23*
**inartful** *[1] - 12:21*
**inartfully** *[1] - 69:23*
**incentivize** *[1] - 99:16*
**incidence** *[2] - 106:2, 159:5*
**incidentally** *[1] - 158:4*
**include** *[7] - 12:15, 12:19, 15:17, 24:1, 36:24, 45:6, 100:7*
**included** *[4] - 13:14, 42:21, 50:6, 50:9*
**includes** *[1] - 33:1*
**including** *[5] - 30:15, 36:6, 42:14, 84:8, 131:13*
**inclusion** *[1] - 100:5*
**inconclusive** *[16] - 102:22, 102:23, 103:1, 103:2, 103:7, 103:21, 104:2, 104:22, 105:1, 105:8, 105:19, 106:6, 107:25, 109:23, 110:12, 116:6*
**Inconclusive** *[1] - 105:5*
**inconsistency** *[1] - 48:1*
**incorrect** *[2] - 20:21, 44:5*
**incorrectly** *[1] - 36:14*
**increase** *[15] - 8:25, 65:16, 102:1, 102:3, 102:4, 102:12, 102:14, 105:24, 106:2, 119:21, 124:1, 124:6, 125:3, 130:20, 162:10*
**increased** *[16] - 26:25, 28:11, 28:19, 29:3, 50:1, 50:15, 50:20, 51:4, 51:9, 51:14, 102:7, 124:10, 126:21, 130:3, 146:5, 149:8*
**increases** *[4] - 29:4, 124:1, 125:3, 150:6*
**increasing** *[3] - 50:18, 110:3, 121:8*

**incretin** [5] - 156:1, 156:6, 156:10, 156:13, 156:19
**INCRETIN** [1] - 156:1
**indeed** [6] - 41:10, 42:5, 147:23, 155:19, 156:11, 157:21
**independent** [8] - 47:20, 59:20, 74:7, 94:8, 95:1, 95:14, 95:23, 154:17
**index** [2] - 44:21, 66:17
**indicate** [2] - 146:3, 146:5
**indirect** [2] - 80:16, 80:18
**individual** [12] - 19:15, 47:1, 48:2, 48:12, 49:5, 49:7, 49:14, 50:17, 125:5, 126:23, 129:22, 157:19
**individual's** [1] - 124:2
**individualized** [3] - 46:15, 49:22, 50:13
**induce** [1] - 81:11
**induced** [6] - 14:12, 15:9, 15:10, 15:25, 80:12, 83:8
**indulgence** [1] - 144:4
**inferential** [1] - 158:7
**influence** [1] - 142:18
**inform** [1] - 40:16
**information** [14] - 10:12, 18:9, 18:23, 19:10, 50:13, 50:14, 92:22, 99:19, 120:1, 120:2, 120:18, 136:8, 137:21, 148:16
**ingested** [7] - 24:15, 58:21, 60:1, 61:22, 64:24, 65:2, 70:9
**ingestion** [4] - 16:18, 24:8, 25:1, 75:11
**initial** [2] - 36:21, 141:23
**initiators** [1] - 78:21
**injured** [1] - 42:13
**injury** [6] - 14:14, 42:15, 137:24, 138:18, 148:12, 148:13
**input** [1] - 7:17
**inquiry** [4] - 27:25, 67:21, 135:10, 141:5
**instance** [3] - 15:25, 47:14, 60:12
**instances** [2] - 121:4, 147:4
**instead** [1] - 50:14
**instructive** [1] - 140:6
**insult** [1] - 28:13
**insults** [1] - 42:15
**intake** [1] - 151:8
**intend** [1] - 30:16
**interaction** [2] - 40:21, 41:14
**interest** [1] - 85:4
**interesting** [4] - 147:11, 156:5, 159:21, 161:7
**interestingly** [2] - 155:24, 156:2
**interrupt** [2] - 44:9, 143:24
**Interspecies** [1] - 55:1
**intravenous** [6] - 56:8, 56:11, 59:3, 59:9, 63:19, 95:13

**intravenously** [4] - 55:6, 55:19, 63:6, 74:10
**introduce** [4] - 92:21, 113:18, 114:10, 115:5
**introductory** [1] - 32:8
**inversion** [1] - 64:4
**investigation** [1] - 140:25
**involve** [2] - 64:14, 86:18
**involved** [5] - 9:18, 136:23, 141:13, 147:15, 148:13
**ion** [1] - 65:9
**ipse** [1] - 149:9
**irrelevant** [4] - 62:10, 69:3, 69:6, 75:7
**Island** [1] - 144:7
**issue** [42] - 14:2, 14:21, 14:25, 15:4, 15:16, 16:23, 16:25, 17:6, 22:17, 47:5, 68:6, 68:17, 82:16, 102:20, 108:9, 115:8, 115:12, 115:19, 116:1, 117:6, 117:9, 117:11, 120:15, 121:1, 124:20, 126:25, 132:11, 133:8, 133:11, 133:12, 134:22, 135:11, 147:18, 148:20, 152:10, 152:24, 154:6, 155:6, 156:3, 157:18, 158:11
**issues** [10] - 10:2, 86:4, 86:20, 106:11, 109:22, 116:9, 137:5, 144:21, 144:23, 160:3
**issuing** [1] - 41:5
**it'd** [1] - 39:2
**itself** [4] - 35:18, 35:20, 139:15, 160:11
**IV** [7] - 55:21, 55:23, 58:7, 58:14, 59:11, 59:14
**James** [2] - 81:21, 88:24
**Janice** [1] - 159:9
**Jei** [1] - 161:3
**JEI** [1] - 161:3
**Jersey** [1] - 157:20
**job** [3] - 32:21, 142:15, 148:8
**John** [2] - 158:19, 159:20
**Johnson** [5] - 37:1, 37:10, 38:3, 162:16, 162:24
**Johnson's** [4] - 37:13, 37:16, 38:13, 39:25
**join** [1] - 146:19
**Judge** [29] - 4:4, 9:16, 48:6, 68:24, 89:6, 89:10, 90:7, 103:11, 104:14, 111:20, 123:17, 124:14, 124:19, 125:1, 125:14, 128:10, 129:4, 135:18, 135:22, 137:8, 138:19, 140:16, 141:15, 141:25, 143:7, 143:17, 144:2, 144:7, 144:14
**judge** [4] - 39:16, 143:21, 144:1, 144:6
**judgment** [7] - 18:7, 24:19, 26:12, 34:1, 35:8, 35:12, 147:15

**July** [2] - 37:6, 136:14
**jump** [1] - 75:24
**jumping** [1] - 34:13
**jury** [19] - 35:15, 39:6, 39:12, 92:25, 93:7, 93:9, 141:20, 150:18, 151:4, 151:24, 152:15, 152:16, 153:3, 154:4, 155:5, 158:9, 160:2
**jury's** [2] - 142:12, 142:16
**keep** [5] - 26:7, 30:18, 53:18, 97:10
**keeping** [1] - 39:23
**keeps** [1] - 75:2
**kg** [21] - 56:1, 56:2, 57:12, 57:13, 59:11, 59:14, 59:15, 59:17, 63:24, 63:25, 71:25, 72:8, 74:5, 77:17, 77:18, 81:13, 81:24, 95:19, 96:10
**kidney** [5] - 46:21, 49:18, 78:13, 79:2, 158:15
**kill** [1] - 66:14
**kilogram** [14] - 55:18, 55:21, 55:22, 55:24, 56:8, 56:13, 57:9, 57:16, 57:19, 59:10, 63:8, 63:9, 73:21, 77:16
**kilograms** [4] - 57:23, 63:14, 63:16, 71:20
**kind** [3] - 32:20, 103:16, 138:20
**Kindi** [1] - 160:19
**kinds** [1] - 159:21
**knowing** [2] - 120:17, 120:22
**knowledge** [5] - 7:2, 14:19, 17:1, 40:1, 43:3
**known** [6] - 26:23, 28:7, 31:14, 31:20, 46:4, 148:3
**knows** [2] - 141:19, 148:2
**KUGLER** [1] - 4:2
**Kugler** [1] - 4:4
**L-shaped** [1] - 131:12
**laboratory** [1] - 41:13
**lack** [1] - 130:9
**lacking** [1] - 92:16
**Lagana** [20] - 5:5, 6:12, 6:13, 6:19, 6:23, 9:8, 11:6, 11:22, 13:3, 15:20, 24:7, 24:20, 25:10, 27:6, 29:19, 30:6, 36:15, 44:18, 48:10, 147:10
**LAGANA** [2] - 3:7, 6:16
**Lagana's** [1] - 11:15
**laid** [1] - 100:5
**Lance** [1] - 150:19
**language** [2] - 31:22, 50:6
**large** [3] - 55:10, 55:12, 66:14
**larger** [4] - 50:19, 67:11, 71:13, 84:5, 84:7, 86:10, 86:11, 86:14, 86:15, 96:15, 96:17, 96:19, 105:25, 151:17
**largest** [2] - 17:23, 32:23
**last** [5] - 7:3, 40:8, 67:8, 78:7, 161:3

**latency** [14] - 48:24, 49:2, 126:16, 126:23, 127:3, 128:7, 129:22, 130:24, 132:1, 132:3, 132:4, 132:6, 132:16
**latent** [1] - 127:10
**law** [6] - 139:25, 140:1, 157:23, 157:24, 158:3
**lawfirm.com** [1] - 111:8
**lawyer** [1] - 141:19
**lawyers** [5] - 7:16, 7:17, 69:6, 98:5, 135:13
**LCE** [1] - 161:19
**lead** [4] - 89:24, 150:16, 155:22, 161:15
**leap** [1] - 158:7
**least** [10] - 15:17, 28:11, 28:19, 29:2, 43:9, 46:3, 70:24, 79:23, 120:1, 130:21
**leave** [1] - 143:18
**leaves** [1] - 160:15
**led** [3] - 130:16, 133:7, 137:18
**Lee** [1] - 161:3
**LEE** [1] - 161:3
**Lee-Jei** [1] - 161:3
**leeway** [1] - 10:12
**left** [1] - 162:15
**legal** [1] - 8:23
**length** [1] - 43:16
**lengthy** [1] - 42:3
**lesion** [1] - 72:21
**lesions** [1] - 83:8
**less** [11] - 25:25, 31:5, 45:14, 45:18, 62:1, 116:18, 127:18, 132:22, 135:24, 144:3
**letter** [24] - 103:5, 103:13, 103:16, 104:5, 104:6, 104:11, 104:18, 104:21, 104:25, 105:3, 105:23, 106:14, 109:3, 109:12, 109:18, 111:24, 111:25, 113:12, 113:13, 113:24, 115:16, 133:5
**letters** [1] - 105:12, 108:19, 113:11
**level** [12] - 35:7, 60:20, 61:19, 65:13, 66:22, 93:23, 114:20, 115:4, 120:21, 151:9, 154:3
**levels** [18] - 27:13, 27:22, 28:8, 45:22, 60:6, 60:12, 61:7, 61:25, 62:5, 62:7, 65:17, 68:6, 75:10, 76:16, 115:3, 139:18, 154:1
**Liability** [1] - 143:2
**Licht** [1] - 144:7
**life** [2] - 32:22, 66:13
**lifespan** [1] - 154:13
**lifetime** [4] - 44:20, 45:5, 45:13, 161:18
**light** [2] - 14:22, 14:25
**likely** [8] - 25:20, 25:21, 27:12, 27:22, 31:11, 47:24, 72:10, 127:19

*likened* [1] - 34:12
*limit* [2] - 22:18, 116:21
*limitation* [2] - 134:3, 145:17
*limitations* [8] - 102:24, 119:17, 120:12, 130:15, 133:4, 133:6, 145:6, 151:3
*limited* [7] - 18:23, 43:21, 87:19, 87:20, 93:1, 99:12, 107:24
*limits* [3] - 36:25, 37:9, 38:24
*line* [16] - 11:22, 12:3, 12:5, 15:21, 16:7, 16:8, 18:15, 24:21, 38:2, 84:4, 129:10, 129:20, 134:1, 136:21, 145:5
*line-by-line* [1] - 145:5
*lines* [2] - 11:17, 108:9
*list* [3] - 37:10, 38:11, 130:15
*listed* [2] - 36:19, 107:25
*listen* [1] - 146:20
*literature* [65] - 8:5, 8:12, 17:12, 17:13, 18:4, 18:6, 18:20, 19:21, 21:1, 21:3, 21:12, 22:6, 22:8, 22:11, 23:24, 24:1, 26:11, 29:17, 31:7, 33:14, 33:22, 35:6, 35:7, 35:23, 36:17, 37:14, 39:4, 39:18, 39:20, 39:23, 40:4, 40:13, 40:18, 41:19, 41:21, 41:25, 42:2, 43:6, 43:10, 44:1, 44:3, 44:6, 46:19, 46:23, 47:6, 48:2, 48:10, 48:12, 48:13, 49:12, 49:25, 50:3, 50:5, 50:7, 50:12, 51:23, 98:23, 99:2, 99:5, 100:2, 100:3, 158:23, 160:5
*litigation* [17] - 9:17, 9:18, 14:2, 14:4, 16:12, 16:14, 16:17, 17:2, 17:17, 17:19, 20:3, 34:25, 58:21, 64:16, 64:24, 65:1, 135:13
*Litigation* [1] - 143:3
*live* [1] - 152:7
*liver* [71] - 46:20, 47:7, 62:12, 69:16, 70:2, 70:10, 70:20, 70:23, 71:3, 71:7, 71:12, 71:13, 72:6, 72:10, 72:20, 72:22, 73:1, 73:6, 73:13, 73:25, 74:19, 74:23, 74:25, 75:5, 75:23, 76:15, 77:8, 77:11, 77:12, 77:15, 78:1, 78:12, 78:14, 78:20, 78:25, 79:15, 79:22, 79:24, 80:15, 80:21, 80:22, 82:21, 83:8, 84:9, 87:2, 88:6, 93:23, 94:3, 94:11, 94:14, 94:19, 94:21, 95:3, 95:4, 95:10, 95:11, 95:16, 96:1, 96:6, 96:7, 96:14, 102:4, 150:7, 151:15, 151:18, 153:17
*livers* [2] - 75:9, 75:17
*load* [1] - 60:24
*loaded* [1] - 56:16
*loading* [1] - 69:9

*LOCKARD* [27] - 3:7, 4:16, 4:19, 4:24, 6:22, 9:8, 10:1, 10:15, 10:17, 11:14, 11:18, 11:21, 13:9, 13:10, 23:11, 23:18, 23:21, 24:6, 27:4, 43:24, 44:15, 44:17, 48:6, 48:9, 52:7, 52:15, 162:21
*Lockard* [5] - 4:16, 4:17, 4:22, 6:20, 13:4
*logically* [1] - 65:1
*look* [39] - 12:22, 17:25, 18:6, 18:12, 21:5, 23:4, 30:9, 33:24, 37:20, 37:22, 40:25, 42:23, 43:1, 44:6, 48:2, 50:25, 51:16, 55:13, 55:19, 56:3, 61:4, 63:11, 72:14, 81:14, 90:5, 91:9, 105:21, 111:3, 111:23, 114:14, 128:2, 128:3, 132:15, 138:13, 142:24, 145:12, 145:13, 149:1, 149:10
*looked* [18] - 8:12, 16:23, 17:6, 18:3, 19:20, 22:16, 23:7, 31:6, 33:13, 50:25, 99:5, 102:2, 124:22, 125:5, 135:2, 145:15, 160:6, 160:7
*looking* [20] - 12:21, 19:24, 21:10, 39:10, 45:16, 49:5, 49:7, 50:12, 51:2, 58:10, 63:18, 107:1, 107:7, 112:23, 122:21, 128:10, 129:20, 137:15, 149:12, 149:13
*looks* [1] - 129:15
*low* [26] - 51:5, 59:15, 59:18, 60:20, 60:25, 71:7, 71:11, 72:11, 72:18, 73:2, 75:10, 76:16, 77:10, 77:17, 77:19, 78:24, 83:9, 87:2, 88:5, 94:17, 95:19, 95:21, 121:22, 130:13
*low-dose* [1] - 72:11
*lower* [6] - 22:19, 83:15, 121:11, 130:17, 133:7
*lumped* [1] - 48:17
*lung* [15] - 12:9, 12:10, 12:12, 12:17, 29:9, 29:12, 46:2, 46:4, 46:11, 46:20, 47:16, 49:18, 71:3, 153:17
*lungs* [1] - 140:23
*Lynch* [7] - 42:4, 42:6, 42:8, 42:18, 43:2, 43:10, 43:12
*M-I-C-O* [1] - 83:1
*Madigan* [9] - 155:18, 156:3, 156:19, 158:12, 161:6, 161:21, 162:7, 162:12
*Madigan's* [3] - 155:25, 161:5, 161:22
*magnitudes* [1] - 105:25
*mahyar* [1] - 184:25
*MAHYAR* [2] - 3:10, 97:25
*maintain* [1] - 114:3
*major* [3] - 18:20, 106:1, 115:25

*majority* [1] - 21:17
*mammal* [2] - 82:10, 82:11
*man* [3] - 77:24, 79:12, 79:13
*manifestations* [1] - 33:7
*manufacturers* [3] - 115:2, 120:23
*March* [1] - 163:20
*Maria* [1] - 76:19
*Marie* [1] - 163:18
*mark* [4] - 54:23, 68:23, 84:23, 104:11
*marked* [8] - 54:17, 55:4, 57:10, 63:2, 67:18, 71:5, 76:25, 91:14
*market* [1] - 134:5
*massively* [2] - 55:10, 55:12
*material* [1] - 19:25
*materials* [2] - 82:18, 159:22
*Materials* [1] - 63:12
*math* [1] - 61:2
*matter* [8] - 11:6, 15:12, 17:25, 35:12, 50:16, 67:12, 71:4, 163:16
*matters* [6] - 66:7, 66:9, 66:12, 67:12, 67:13, 70:19
*mature* [1] - 31:5
*maximum* [1] - 22:18
*McGee* [1] - 89:14
*MD* [5] - 3:7, 3:8, 6:16, 16:22, 53:4
*MDL* [2] - 39:16, 159:25
*mean* [32] - 10:11, 16:24, 23:2, 30:25, 33:17, 35:7, 43:14, 49:9, 55:11, 86:9, 92:11, 100:6, 118:4, 118:6, 123:23, 126:7, 127:8, 130:7, 130:10, 131:13, 132:10, 132:15, 133:2, 134:9, 134:10, 134:14, 137:20, 140:18, 141:17, 141:19, 147:2, 157:8
*meaning* [5] - 25:25, 30:19, 125:1, 132:16, 152:5
*means* [5] - 75:9, 93:25, 130:11, 142:1, 150:23
*meant* [1] - 106:21
*measure* [3] - 64:18, 120:6, 152:6
*measured* [1] - 119:18
*measurement* [2] - 115:4, 133:6
*measures* [1] - 80:18
*measuring* [1] - 80:17
*mechanism* [6] - 58:24, 59:19, 59:24, 65:5, 65:8, 78:21
*mechanisms* [2] - 43:7, 43:13
*mechanistic* [1] - 47:9
*medical* [20] - 8:4, 17:3, 17:5, 18:20, 21:1, 21:11, 22:11, 23:23, 23:25, 25:22, 29:16, 33:22, 35:6, 36:16, 40:17, 41:20, 42:1, 43:25, 50:4,

147:23
*medication* [2] - 65:21, 148:1
*medications* [6] - 15:17, 58:22, 60:2, 60:7, 65:2, 130:3
*medicine* [12] - 32:21, 101:16, 101:23, 102:7, 138:6, 138:16, 138:17, 139:13, 141:6, 146:1, 148:3, 148:6
*medicines* [2] - 127:24, 161:20
*medium* [1] - 121:21
*meet* [1] - 6:25
*meeting* [1] - 16:13
*meetings* [1] - 18:21
*memory* [2] - 23:6, 68:8
*mention* [2] - 120:12, 127:14
*mentioned* [11] - 32:20, 33:21, 40:9, 44:1, 48:13, 81:6, 88:19, 117:16, 117:18, 122:14, 123:13
*mentions* [1] - 86:8
*mesothelioma* [2] - 46:7, 158:2
*met* [1] - 100:5
*metaanalyses* [1] - 157:6
*metaanalysis* [4] - 157:10, 161:13, 161:14, 161:17
*metabolic* [1] - 65:9
*Metabolism* [1] - 88:14
*metabolism* [12] - 41:9, 67:1, 67:5, 70:9, 77:24, 79:13, 81:3, 83:10, 86:21, 87:2, 88:6, 91:24
*metabolize* [1] - 79:22
*metabolized* [3] - 62:12, 77:11, 94:3
*method* [6] - 22:22, 25:11, 33:15, 33:17, 53:15, 57:2
*Method* [1] - 58:10
*methodological* [1] - 145:20
*methodologically* [1] - 127:12
*methodology* [50] - 8:1, 8:3, 8:8, 8:10, 9:9, 9:19, 9:23, 10:8, 20:1, 20:2, 23:24, 34:11, 35:19, 36:6, 36:10, 39:17, 67:21, 98:21, 101:4, 119:18, 120:5, 120:7, 135:11, 135:14, 135:19, 135:21, 135:23, 136:2, 136:14, 137:18, 140:5, 145:6, 148:8, 149:13, 149:23, 151:23, 152:8, 153:11, 155:2, 156:20, 159:2, 159:12, 159:14, 159:17, 160:4, 160:11, 161:1, 161:12, 161:15, 162:11
*Methods* [1] - 63:12
*methods* [5] - 17:24, 39:9, 39:13, 57:8, 81:1
*methylguanine* [2] - 72:21, 82:1
*mg* [21] - 56:1, 56:2, 57:12, 59:11, 59:14, 59:15, 59:17, 63:24, 71:25, 72:8, 74:5, 77:17, 77:18, 81:13, 81:24, 95:19, 96:10

*mice* [1] - 59:17
*Michael* [1] - 6:19
*Mico* [15] - 82:25, 83:6, 83:11, 83:12, 84:1, 84:15, 86:8, 86:16, 86:22, 86:25, 87:1, 88:4, 88:5, 89:3, 89:4
*middle* [3] - 5:18, 41:1, 143:24
*midpoint* [4] - 61:11, 61:14, 61:19, 61:21
*might* [8] - 4:13, 38:15, 68:22, 79:8, 129:22, 133:20, 136:21, 156:5
*milligram* [4] - 55:21, 55:22, 59:10, 61:14
*milligrams* [16] - 55:18, 55:23, 56:8, 56:13, 57:9, 57:16, 60:18, 63:8, 63:9, 63:21, 63:22, 64:1, 64:2, 64:7, 73:21, 77:16
*million* [18] - 58:2, 58:4, 58:17, 58:23, 60:3, 60:14, 61:8, 61:12, 61:15, 61:21, 64:5, 64:7, 64:25, 65:3, 65:21, 71:20, 71:24, 72:6
*mind* [13] - 13:13, 15:25, 17:10, 18:5, 22:14, 23:5, 26:7, 26:8, 26:10, 39:23, 46:22, 49:13, 112:21
*mindset* [1] - 34:9
*mine* [1] - 111:4
*minute* [11] - 52:13, 66:1, 84:15, 107:16, 108:22, 138:2, 138:23, 138:24, 139:1
*minutes* [11] - 21:5, 86:3, 97:7, 97:16, 107:3, 111:22, 111:23, 144:3, 146:11, 146:12, 146:13
*misapplies* [2] - 152:24, 153:4
*misclassification* [15] - 108:10, 110:4, 112:20, 113:13, 113:19, 114:11, 114:14, 115:9, 115:15, 115:19, 115:20, 115:23, 115:25, 116:2, 133:5
*misrepresent* [2] - 30:14, 30:16
*misrepresented* [1] - 32:14
*misrepresenting* [1] - 34:16
*missed* [4] - 75:20, 76:10, 79:9, 160:10
*misstates* [1] - 130:22
*misstating* [3] - 30:19, 128:1, 128:21
*misunderstand* [1] - 30:13
*misunderstanding* [2] - 30:19, 149:25
*misunderstood* [1] - 147:6
*misusing* [1] - 36:3
*Mitchell* [4] - 81:18, 125:11, 146:22, 163:18
*mixed* [1] - 73:11
*mixing* [2] - 62:4, 64:17
*model* [1] - 90:4
*molecule* [2] - 150:24, 157:21
*Molnar* [1] - 150:19

*moment* [8] - 17:15, 21:9, 22:12, 30:7, 40:12, 76:4, 134:6, 137:3
*momentarily* [1] - 112:2
*Monday* [4] - 92:8, 137:7, 147:5, 156:2
*monitoring* [1] - 39:7
*monkey* [6] - 78:17, 80:11, 82:2, 83:18, 84:3, 95:22
*monkeys* [5] - 81:11, 81:23, 82:9, 82:12, 86:9
*month* [2] - 58:6, 58:16
*morning* [9] - 4:4, 4:5, 5:3, 5:7, 6:23, 6:24, 54:6, 54:7, 81:20
*most* [17] - 12:17, 12:18, 21:16, 22:2, 31:7, 35:4, 35:9, 104:13, 116:13, 117:3, 117:11, 118:20, 130:20, 131:2, 131:11, 152:2, 154:17
*motion* [18] - 9:25, 10:2, 10:4, 10:6, 44:14, 68:5, 68:7, 124:12, 145:14, 149:23, 151:25, 153:18, 155:17, 158:17, 159:7, 159:18, 161:1
*motions* [7] - 93:1, 93:2, 93:6, 93:7, 146:25, 147:2, 147:19
*motivated* [1] - 30:13
*mouse* [2] - 79:1, 84:2
*mouthful* [1] - 82:5
*move* [19] - 10:15, 24:5, 25:10, 44:14, 52:5, 58:11, 67:6, 68:10, 74:16, 85:4, 91:10, 92:13, 99:20, 100:23, 116:4, 123:18, 125:25, 126:2, 142:19
*moved* [1] - 52:6
*moves* [1] - 149:18
*MR* [125] - 3:9, 3:9, 3:12, 5:3, 5:24, 6:4, 6:7, 6:9, 9:3, 11:16, 23:10, 23:13, 27:2, 43:18, 48:4, 52:3, 52:11, 52:14, 52:20, 52:21, 53:11, 53:20, 53:24, 54:3, 54:5, 56:15, 56:22, 56:25, 57:4, 59:22, 62:25, 66:25, 67:8, 67:25, 68:4, 68:7, 68:11, 68:24, 69:12, 69:22, 70:3, 74:15, 74:21, 76:11, 76:13, 81:25, 84:19, 84:23, 85:3, 85:6, 85:8, 85:12, 85:20, 85:24, 86:3, 86:7, 86:16, 87:1, 87:6, 87:14, 87:15, 88:2, 88:3, 89:2, 89:4, 89:6, 89:15, 89:23, 90:7, 90:13, 90:20, 91:4, 91:12, 91:22, 92:4, 92:14, 92:17, 92:19, 93:13, 93:16, 93:18, 96:21, 96:25, 99:6, 99:9, 99:22, 100:14, 103:8, 108:16, 108:24, 109:4, 109:8, 110:20, 111:4, 111:7, 111:11, 111:17, 111:25, 112:3, 112:5, 112:7, 112:13, 113:1, 113:4, 117:15, 118:21, 122:12,

123:12, 124:9, 126:15, 126:22, 127:25, 128:21, 130:22, 133:20, 135:14, 136:5, 136:25, 138:22, 138:25, 143:13, 143:15, 143:17, 144:19, 145:7
*MS* [124] - 3:7, 3:11, 4:16, 4:19, 4:24, 5:7, 5:11, 5:15, 5:20, 6:3, 6:22, 9:8, 10:1, 10:15, 10:17, 11:14, 11:18, 11:21, 13:9, 13:10, 23:11, 23:18, 23:21, 24:6, 27:4, 43:24, 44:15, 44:17, 48:6, 48:9, 52:7, 52:15, 97:6, 97:14, 97:18, 98:7, 98:10, 99:24, 99:25, 100:19, 100:22, 100:24, 103:11, 103:17, 103:18, 109:7, 109:9, 109:11, 110:24, 111:6, 111:9, 111:20, 112:1, 112:4, 112:6, 112:10, 112:17, 113:3, 113:8, 113:10, 117:18, 117:25, 118:7, 118:14, 118:17, 118:25, 119:3, 119:6, 119:7, 122:19, 122:24, 122:25, 123:17, 123:21, 123:22, 124:14, 124:16, 124:18, 124:25, 125:14, 125:21, 125:24, 126:1, 126:19, 127:21, 128:2, 128:10, 128:16, 128:17, 128:24, 129:4, 129:11, 129:12, 131:18, 131:23, 133:24, 135:18, 135:21, 136:7, 136:12, 136:17, 136:21, 137:1, 137:6, 137:8, 137:13, 138:5, 139:12, 139:23, 140:16, 141:15, 141:21, 141:23, 142:20, 143:1, 143:7, 143:20, 144:2, 144:7, 144:11, 144:14, 145:11, 146:14, 162:21
*MSC* [2] - 3:11, 97:25
*multi* [2] - 79:4
*multi-organ* [1] - 79:4
*multi-species* [1] - 79:4
*multiple* [4] - 18:2, 59:16, 68:14, 71:2
*must* [2] - 159:12, 162:8
*mutagenic* [3] - 65:4, 66:15, 66:18
*mute* [2] - 89:10, 143:17
*my..* [1] - 37:5
*Mylan's* [3] - 60:12, 60:23, 150:19
*N-nitrosamines* [3] - 37:1, 37:9, 38:24
*name* [8] - 6:18, 38:16, 53:6, 97:21, 98:3, 98:13, 157:9, 161:3
*nanogram* [5] - 58:5, 61:20, 62:8, 71:24, 72:7
*nanograms* [27] - 51:7, 57:18, 57:19, 58:2, 58:18, 58:23, 60:3, 60:21, 61:1, 61:15, 61:22, 64:5,

64:7, 64:25, 65:3, 65:22, 71:21, 73:2, 73:8, 74:1, 74:2, 74:20, 76:17
*nature* [2] - 29:14, 152:25
*NDEA* [47] - 15:24, 16:14, 16:18, 21:20, 22:7, 22:8, 22:12, 22:18, 22:25, 23:14, 23:20, 24:1, 24:5, 24:8, 24:11, 25:1, 25:7, 26:9, 31:19, 32:11, 38:5, 39:24, 39:25, 51:22, 51:24, 52:2, 52:4, 65:5, 66:16, 68:5, 70:22, 71:2, 98:18, 101:16, 122:5, 123:4, 124:6, 152:3, 153:12, 153:14, 153:16, 153:25, 158:11, 158:12, 158:16, 158:21, 160:9
*NDMA* [182] - 15:13, 15:24, 16:3, 16:14, 16:18, 21:15, 21:16, 21:18, 22:2, 22:7, 22:8, 22:19, 22:20, 22:21, 24:8, 24:14, 25:1, 25:6, 26:9, 27:12, 27:22, 30:24, 31:12, 31:19, 32:11, 38:4, 41:9, 41:12, 41:13, 51:5, 54:10, 54:14, 54:20, 55:1, 55:5, 55:18, 57:15, 58:1, 58:18, 58:23, 58:25, 59:8, 59:9, 60:3, 60:13, 60:20, 60:23, 60:24, 61:7, 61:16, 61:19, 62:5, 62:8, 62:14, 62:21, 62:22, 63:21, 64:9, 64:14, 65:5, 65:11, 65:13, 65:15, 65:22, 65:24, 65:25, 66:15, 68:13, 69:15, 70:8, 70:9, 70:20, 70:22, 71:1, 71:8, 71:12, 72:16, 73:12, 74:1, 74:9, 74:19, 74:22, 75:7, 75:11, 76:16, 76:20, 77:12, 77:25, 78:12, 78:14, 78:17, 78:24, 79:1, 79:14, 79:19, 79:22, 79:23, 80:11, 80:21, 80:22, 80:23, 81:24, 82:1, 82:9, 83:8, 83:22, 84:7, 84:9, 86:21, 87:3, 87:25, 88:6, 88:10, 88:14, 90:22, 92:16, 93:23, 94:2, 94:7, 94:25, 95:3, 95:4, 95:9, 95:16, 96:1, 96:14, 96:16, 98:18, 101:16, 105:4, 108:6, 110:2, 113:20, 114:16, 114:20, 114:23, 115:2, 115:3, 115:4, 116:15, 117:4, 117:9, 118:9, 119:10, 119:19, 119:21, 119:23, 120:2, 120:6, 120:13, 120:15, 120:18, 120:20, 120:21, 121:8, 121:11, 121:17, 122:5, 122:13, 123:3, 123:7, 124:6, 126:13, 127:16, 128:15, 138:4, 150:7, 151:11, 151:15, 152:3, 153:25, 158:7, 158:13, 158:20, 160:9, 160:22, 161:20, 162:5, 162:10
*NDMA's* [1] - 82:20
*NDMA-containing* [1] - 108:6
*NDMA-contaminated* [3] -

105:4, 113:20, 114:16
**NDMA-induced** [1] - 83:8
**NDMA-level** [1] - 120:21
**necessarily** [2] - 20:9, 159:11
**necessary** [5] - 5:2, 5:16, 37:25, 39:9, 43:6
**neck** [1] - 46:5
**need** [29] - 4:5, 4:11, 9:16, 9:22, 13:4, 13:5, 13:16, 21:5, 35:14, 39:6, 55:20, 67:19, 68:1, 74:22, 87:12, 94:14, 94:19, 95:3, 97:3, 103:12, 130:4, 130:18, 133:21, 149:10, 153:7, 155:8, 157:17, 160:3, 163:4
**needed** [4] - 21:8, 30:11, 126:23, 147:12
**needs** [2] - 90:14, 97:4
**negate** [1] - 50:23
**negation** [1] - 51:20
**negative** [1] - 24:18
**neural** [1] - 24:17
**neutral** [4] - 26:11, 33:13, 34:9, 36:1
**never** [19] - 11:7, 12:6, 14:10, 14:24, 15:8, 16:13, 16:19, 16:22, 17:6, 20:16, 21:2, 34:24, 38:7, 38:21, 71:23, 74:22, 136:20, 151:13, 161:19
**nevertheless** [2] - 102:13, 120:5
**New** [2] - 136:13, 157:20
**new** [9] - 15:15, 39:8, 39:10, 125:23, 136:17, 137:5, 137:13, 151:19
**next** [9] - 6:2, 19:1, 32:23, 51:10, 52:13, 97:2, 97:5, 107:17, 123:19
**NIGH** [18] - 3:9, 6:9, 52:20, 66:25, 67:25, 68:24, 74:21, 84:19, 85:8, 86:7, 87:15, 89:6, 90:7, 91:22, 92:17, 93:16, 93:18, 96:21
**nigh** [1] - 6:8
**Nigh** [7] - 6:10, 52:18, 57:2, 84:24, 85:6, 85:14, 93:15
**nine** [8] - 35:21, 40:9, 47:4, 47:7, 70:1, 70:2, 98:18, 139:19
**Ninth** [1] - 156:2
**ninth** [1] - 34:13
**nitrosamine** [5] - 17:11, 21:16, 22:3, 78:1, 79:15
**nitrosamines** [11] - 15:4, 17:1, 17:7, 37:1, 37:9, 38:24, 40:20, 42:14, 77:8, 130:2, 150:20
**nobody** [1] - 91:7
**non** [3] - 66:19, 113:21, 150:21
**non-contaminated** [1] - 113:21
**non-genotoxic** [1] - 66:19
**non-threshold** [1] - 150:21
**none** [2] - 65:18, 100:17

**nonetheless** [1] - 14:9
**nongenotoxic** [2] - 66:10, 66:13
**nonNDMA** [1] - 108:6
**nonNDMA-containing** [1] - 108:6
**nonresponsive** [1] - 74:16
**nonstatistical** [1] - 102:16
**normal** [3] - 9:10, 9:23, 10:8
**normally** [3] - 15:13, 16:3, 125:2
**note** [3] - 41:1, 61:6, 89:13
**noted** [2] - 145:19, 156:7
**noteworthy** [3] - 37:1, 38:24, 153:2
**nothing** [9] - 24:4, 39:13, 72:25, 73:5, 73:23, 76:14, 92:12, 151:19, 160:3
**noting** [1] - 149:18
**nowhere** [3] - 32:3, 42:8, 124:9
**null** [17] - 24:3, 25:12, 25:15, 25:22, 26:4, 26:6, 28:13, 33:9, 33:11, 33:12, 34:21, 35:20, 36:2, 36:10, 44:11, 147:20, 148:4
**number** [14] - 35:8, 89:13, 94:1, 102:24, 107:25, 108:10, 113:11, 116:10, 116:13, 127:9, 128:14, 129:10, 130:15, 153:1
**Number** [2] - 57:10, 71:5
**numerous** [3] - 67:2, 156:16
**O-methylguanine** [2] - 72:21, 82:1
**oath** [4] - 39:16, 53:3, 130:5, 132:8
**obese** [1] - 159:5
**object** [19] - 9:4, 23:14, 23:16, 43:18, 52:3, 74:15, 85:8, 90:8, 91:22, 99:6, 103:8, 117:15, 122:12, 123:12, 124:9, 126:15, 127:25
**objection** [14] - 4:13, 23:10, 27:2, 48:5, 86:7, 89:6, 91:10, 108:16, 108:23, 111:11, 128:18, 128:21, 130:22, 134:8
**objectionable** [3] - 147:17, 149:7, 160:12
**objections** [2] - 5:2, 100:14
**observational** [2] - 149:17, 156:9
**observed** [6] - 41:7, 61:7, 71:6, 71:18, 72:6, 73:20
**obvious** [4] - 64:13, 70:4, 100:17, 147:12
**obviously** [5] - 35:1, 45:6, 83:22, 127:10, 141:24
**occasion** [1] - 6:25
**occupational** [3] - 101:19, 139:14, 158:7
**occur** [4] - 71:19, 73:1, 73:7,

94:15
**occurs** [1] - 71:23
**odd** [1] - 4:13
**odds** [1] - 51:8
**offer** [2] - 156:21, 162:9
**offering** [1] - 155:20
**offhand** [1] - 88:16
**officers** [2] - 140:11, 140:12
**often** [2] - 33:5, 139:25
**oftentimes** [1] - 42:14
**old** [1] - 122:21
**once** [3] - 52:3, 94:11, 151:10
**oncogenes** [1] - 149:22
**oncology** [1] - 158:21
**one** [60] - 5:13, 6:6, 7:24, 14:1, 21:20, 25:7, 33:14, 34:10, 35:1, 35:7, 39:22, 40:16, 40:19, 44:21, 45:4, 47:9, 48:18, 50:24, 52:13, 55:25, 57:11, 59:6, 62:2, 63:3, 65:20, 68:12, 76:21, 76:23, 77:3, 78:11, 78:19, 78:20, 79:7, 79:21, 80:8, 80:9, 80:19, 89:21, 89:25, 104:22, 105:25, 107:22, 108:4, 109:22, 109:23, 115:25, 116:10, 117:2, 118:13, 120:16, 120:25, 122:15, 124:19, 137:21, 138:10, 152:22, 156:1, 159:9, 161:15
**one's** [3] - 45:13, 47:17, 159:18
**ones** [5] - 22:13, 46:21, 46:22, 56:22, 153:20
**open** [9] - 17:10, 18:5, 26:7, 26:10, 33:13, 44:12, 115:24
**opine** [4] - 20:13, 29:23, 40:3, 128:7
**opines** [1] - 69:5
**opinion** [49] - 20:12, 28:9, 32:12, 32:14, 34:1, 34:10, 35:9, 36:13, 43:5, 49:16, 51:23, 74:25, 75:4, 86:10, 86:14, 125:1, 125:7, 125:16, 126:23, 127:5, 128:5, 136:1, 136:9, 136:13, 139:6, 140:5, 142:22, 145:15, 148:18, 149:6, 149:8, 149:20, 151:14, 153:14, 153:16, 154:23, 155:19, 156:20, 156:25, 157:4, 158:24, 159:19, 161:18, 162:6, 162:10
**opinions** [22] - 7:4, 8:13, 22:8, 24:25, 38:25, 39:8, 39:11, 40:3, 40:6, 93:22, 99:20, 125:23, 126:16, 127:3, 149:3, 149:5, 149:12, 152:14, 155:20, 155:25, 159:2, 162:4
**opportunity** [8] - 9:22, 30:13, 60:6, 67:3, 91:9, 93:6, 134:6, 137:10
**opposed** [3] - 13:17, 32:19,

141:11
**opposite** [1] - 162:8
**optimal** [1] - 127:10
**optimally** [3] - 130:11, 131:10, 133:2
**oral** [23] - 13:17, 13:18, 55:7, 56:12, 58:7, 59:2, 59:8, 59:11, 63:8, 63:18, 63:20, 63:21, 63:23, 71:19, 72:8, 77:17, 78:17, 80:10, 83:10, 94:17, 95:12, 95:19, 95:21
**orally** [8] - 57:12, 59:15, 63:6, 63:24, 74:9, 77:8, 81:24, 96:11
**order** [9] - 6:3, 74:22, 76:16, 81:12, 82:9, 119:9, 139:3, 140:10, 148:12
**organ** [3] - 47:13, 79:4, 79:22
**organization** [1] - 156:10
**Organization** [1] - 41:5
**organs** [6] - 70:8, 77:9, 78:2, 79:16, 82:2, 151:15
**orient** [2] - 104:17, 106:15
**oriented** [1] - 106:17
**original** [4] - 22:11, 33:25, 34:7, 70:15
**originally** [1] - 35:24
**otherwise** [4] - 25:13, 28:20, 158:16, 159:7
**ourselves** [1] - 104:17
**outside** [12] - 9:10, 9:17, 16:14, 43:12, 67:2, 69:3, 86:13, 91:23, 91:25, 92:17, 103:9, 130:23
**overall** [8] - 47:2, 47:4, 50:15, 101:24, 102:8, 102:9, 102:17, 126:21
**overly** [1] - 36:13
**owing** [1] - 41:12
**own** [6] - 35:16, 83:3, 141:8, 151:23, 152:25, 155:15
**p-value** [3] - 25:17, 25:18, 25:23
**p.m** [9] - 86:6, 97:19, 144:16, 146:18, 163:11
**page** [47] - 11:19, 11:22, 12:23, 13:15, 13:21, 15:21, 16:7, 16:8, 18:12, 24:21, 26:21, 27:5, 27:11, 37:24, 41:1, 41:2, 51:1, 51:2, 51:16, 51:18, 55:19, 60:9, 60:10, 61:5, 63:11, 63:12, 70:16, 72:14, 78:4, 81:9, 85:9, 88:22, 90:5, 93:21, 103:20, 107:17, 107:19, 113:1, 113:4, 113:5, 129:9, 129:16, 129:19, 131:24, 133:25
**Page** [1] - 113:7
**pages** [7] - 11:16, 67:2, 70:16, 70:21, 133:22, 145:3, 161:10
**pancreatic** [7] - 21:21, 46:20, 49:17, 52:1, 153:14, 156:11, 156:13

*Panigrahy* [13] - 6:1, 52:25, 53:8, 53:15, 54:6, 54:23, 55:4, 57:6, 58:20, 68:12, 88:4, 149:25, 151:1

*PANIGRAHY* [2] - 3:8, 53:4

*Panigrahy's* [2] - 69:4, 86:10

*Panigrahy-1* [4] - 53:22, 54:17, 55:15, 91:15

*Panigrahy-A* [1] - 53:15

*paper* [58] - 21:21, 36:20, 37:13, 37:16, 39:25, 40:1, 40:7, 54:13, 54:14, 54:17, 54:19, 54:20, 54:25, 57:10, 58:13, 59:1, 63:11, 63:20, 72:24, 74:18, 76:2, 76:21, 77:22, 77:23, 78:11, 78:16, 79:7, 80:1, 80:3, 80:5, 80:8, 80:9, 80:10, 81:5, 81:7, 82:24, 82:25, 83:1, 83:3, 83:24, 84:1, 85:2, 85:5, 86:19, 88:5, 88:13, 88:18, 89:13, 89:18, 89:24, 90:3, 90:5, 90:16, 90:20, 96:18, 114:9

*papers* [42] - 9:14, 10:6, 35:8, 51:10, 62:16, 62:17, 64:13, 70:13, 70:18, 70:23, 71:1, 76:22, 76:24, 77:1, 77:3, 77:14, 78:11, 78:12, 78:15, 78:16, 78:23, 78:24, 78:25, 79:6, 80:20, 80:23, 82:18, 83:14, 88:11, 88:12, 88:19, 88:20, 90:1, 90:17, 90:24, 91:14, 92:4, 92:7, 94:17, 95:18, 122:17, 123:6

*papillomavirus* [3] - 13:16, 13:19, 14:1

*papillomavirus-related* [1] - 13:19

*paragraph* [16] - 23:22, 24:2, 44:2, 44:10, 44:18, 48:13, 51:11, 51:18, 55:20, 78:6, 78:7, 101:11, 103:20, 108:10, 126:25, 147:21

*paragraphs* [1] - 51:13

*paralegal* [1] - 143:20

*parallel* [1] - 142:6

*parameters* [3] - 9:7, 9:15, 87:18

*paraphrase* [1] - 27:3

*parcel* [2] - 33:3, 33:7

*part* [18] - 12:17, 19:16, 19:23, 33:3, 33:7, 35:4, 40:24, 43:4, 50:4, 53:13, 58:2, 62:4, 67:22, 80:22, 101:4, 134:12, 137:1, 137:2

*partial* [1] - 99:11

*participating* [1] - 4:7

*particular* [19] - 13:25, 17:25, 19:14, 19:24, 28:22, 29:6, 32:9, 34:10, 45:10, 50:6, 50:8, 75:22, 93:9, 93:10, 124:1, 124:5,

125:3, 129:21, 145:25

*particularly* [6] - 50:8, 140:1, 147:21, 150:11, 151:20, 153:6

*partner* [1] - 12:1

*parts* [5] - 60:13, 61:8, 61:11, 61:15, 138:10

*party* [1] - 61:5

*pass* [5] - 67:1, 67:5, 70:9, 72:19, 94:3

*passed* [1] - 132:14

*passing* [1] - 161:14

*past* [20] - 73:13, 74:23, 74:25, 75:5, 77:12, 77:15, 78:14, 78:20, 84:9, 94:20, 94:21, 95:4, 95:9, 95:11, 95:16, 96:1, 96:7, 96:14, 141:24

*pathobiology* [3] - 42:11, 42:17

*pathologic* [2] - 15:18, 19:25

*pathologist* [8] - 7:22, 8:18, 10:9, 10:21, 11:2, 12:15, 12:18, 148:9

*pathologist's* [1] - 33:8

*pathology* [5] - 14:13, 14:18, 15:8, 32:22, 32:25

*pathways* [1] - 41:8

*patient* [27] - 17:25, 19:10, 20:14, 26:22, 28:6, 28:23, 29:1, 29:6, 29:8, 29:15, 29:24, 30:2, 30:15, 30:21, 32:9, 32:15, 44:20, 45:10, 45:25, 49:5, 60:19, 108:5, 113:19, 113:21, 114:21, 114:25, 147:23

*patient's* [6] - 13:25, 15:12, 16:2, 19:14, 19:24, 115:4

*patients* [4] - 18:9, 32:18, 109:25, 110:2

*peer* [12] - 18:19, 19:21, 21:1, 22:24, 33:22, 80:1, 80:3, 80:5, 80:7, 108:20, 111:12, 111:14

*peer-reviewed* [6] - 18:19, 19:21, 21:1, 22:24, 33:22, 80:3

*Pennsylvania* [3] - 157:23, 157:24, 158:3

*people* [6] - 4:9, 30:12, 59:17, 124:6, 152:6, 154:17

*per* [41] - 51:7, 55:18, 55:21, 55:22, 55:23, 56:1, 56:2, 56:8, 56:13, 57:12, 57:13, 57:16, 57:19, 59:10, 59:11, 59:14, 59:15, 59:17, 60:13, 60:21, 61:8, 61:11, 61:15, 62:8, 63:8, 63:9, 63:24, 63:25, 71:25, 72:8, 73:21, 74:5, 77:16, 77:17, 77:18, 81:13, 81:24, 95:19, 96:10

*percent* [30] - 8:20, 19:5, 25:21, 26:1, 32:17, 32:22, 51:4, 72:2, 74:5, 74:10, 74:25, 75:5, 77:20, 77:21, 83:13, 83:17, 94:13, 95:8, 95:9, 95:20, 95:21, 95:23,

96:1, 96:7, 96:11, 96:12, 102:12, 102:14, 150:6

*percentage* [3] - 94:2, 94:12, 94:20

*perfect* [1] - 111:6

*perform* [2] - 26:4, 30:10

*performed* [4] - 17:3, 17:12, 99:4, 136:7

*performing* [1] - 33:17

*perhaps* [9] - 30:10, 67:11, 68:20, 69:23, 116:19, 129:9, 135:6, 135:7, 139:21

*period* [13] - 58:4, 58:15, 58:16, 63:19, 108:7, 126:13, 127:23, 129:22, 129:24, 130:4, 132:3, 132:4, 132:6

*periods* [4] - 48:24, 127:3, 128:7, 131:14

*permeabilized* [2] - 74:12, 94:7

*permission* [1] - 5:17

*permitted* [10] - 92:21, 145:17, 156:24, 158:2, 158:4, 158:16, 161:16, 161:23, 162:9, 162:13

*Permitted* [3] - 36:25, 37:8, 38:24

*person* [1] - 97:8

*person's* [1] - 19:15

*personally* [1] - 19:20

*pharmaceutical* [6] - 14:12, 14:14, 14:16, 14:21, 15:9, 158:8

*pharmaceutical-induced* [2] - 14:12, 15:9

*pharmaceutical-related* [3] - 14:14, 14:16, 14:21

*pharmacokinetics* [5] - 54:10, 55:1, 76:20, 88:9, 90:21

*Pharmacokinetics* [2] - 54:14, 54:20

*PharmD* [2] - 3:11, 97:25

*pharyngeal* [1] - 158:15

*phony* [1] - 32:24

*phrase* [1] - 66:2

*phraseology* [1] - 22:10

*phrases* [1] - 90:10

*physician* [2] - 19:23, 29:15

*physiology* [1] - 84:13

*pick* [2] - 33:23, 36:4

*picked* [1] - 157:13

*picking* [1] - 148:25

*picture* [4] - 149:10, 153:7, 153:8, 155:9

*pieces* [1] - 47:9

*pig* [8] - 63:23, 84:2, 84:10, 84:11, 84:12, 84:14, 90:4, 96:18

*Pig* [1] - 88:15

*pigs* [2] - 63:24, 86:9

*pills* [4] - 24:14, 24:16, 26:9, 30:24

*place* [5] - 44:22, 45:1, 48:4, 77:25, 79:14

*places* [1] - 49:25

*plaintiff* [8] - 4:14, 5:2, 58:20, 60:1, 64:23, 65:1, 65:20, 162:15

*plaintiffs* [12] - 5:4, 5:16, 18:10, 68:13, 68:16, 139:9, 142:2, 158:20, 160:22, 161:7, 162:1, 163:4

*plaintiffs'* [9] - 21:7, 68:21, 69:1, 69:6, 135:13, 135:16, 142:15, 160:21, 160:24

*PLAINTIFFS'* [3] - 6:16, 53:4, 97:25

*plan* [2] - 5:25, 162:25

*plausible* [1] - 47:12

*play* [1] - 19:23

*plenty* [1] - 10:25, 49:9

*pleura* [1] - 47:16

*plowed* [1] - 68:9

*plucked* [1] - 32:13

*PO* [1] - 58:14

*point* [41] - 10:10, 19:7, 23:16, 23:25, 25:16, 26:11, 30:4, 30:20, 35:16, 36:10, 40:24, 43:19, 43:20, 64:22, 66:25, 72:5, 75:8, 75:18, 76:5, 79:3, 83:21, 90:18, 90:20, 91:2, 103:15, 110:17, 111:19, 112:15, 114:24, 125:18, 137:19, 138:1, 145:24, 146:21, 148:9, 150:5, 153:21, 154:9, 156:10, 158:20, 162:25

*pointed* [1] - 93:4

*pointing* [2] - 56:19, 133:5

*points* [3] - 104:7, 138:19, 161:7

*poison* [1] - 66:3

*poisoning* [1] - 72:17

*Pomm* [1] - 160:18

*POMM* [1] - 160:18

*population* [1] - 21:4

*poring* [1] - 40:10

*portal* [4] - 56:16, 68:21, 78:2, 79:15

*position* [8] - 33:13, 34:6, 34:20, 36:1, 67:12, 70:7, 70:10, 70:13

*positive* [3] - 24:17, 25:18, 26:2

*possessed* [1] - 35:15

*possibility* [2] - 108:5, 110:4

*possible* [3] - 29:11, 109:25, 127:20

*possibly* [1] - 117:23

*potent* [1] - 21:19

*potential* [5] - 5:13, 48:19, 112:19, 115:20, 140:24

*potentially* [1] - 11:12

*POTTEGARD* [1] - 160:19

*Pottegard* [31] - 101:12, 101:21, 102:2, 102:12, 102:15, 103:6, 104:1, 104:4, 105:22, 108:14, 114:4, 115:21, 118:12, 118:19, 118:23, 119:10, 119:19, 120:14, 120:25, 121:16, 123:7, 126:7, 130:1, 132:13, 132:21, 135:3, 145:1, 145:2, 152:13, 155:16, 160:19
*practice* [9] - 9:11, 10:21, 16:20, 17:21, 18:18, 20:15, 32:24, 147:23, 148:6
*precise* [4] - 20:21, 75:11, 118:10, 119:10
*precisely* [1] - 116:14
*precision* [1] - 55:14
*preconceived* [4] - 17:10, 26:8, 36:4, 36:5
*predicate* [1] - 69:12
*predicted* [1] - 71:23
*predispositions* [1] - 50:17
*preference* [3] - 53:14, 53:21, 97:10
*prefers* [1] - 53:16
*premarked* [1] - 68:23
*premise* [1] - 70:12
*prepared* [1] - 124:25
*prescribed* [1] - 146:1
*prescribes* [1] - 147:25
*prescription* [6] - 113:20, 114:16, 114:19, 114:22, 131:16
*present* [6] - 39:11, 102:14, 137:10, 154:1
*presentations* [1] - 18:20
*presented* [3] - 18:2, 45:25, 49:19
*presenting* [2] - 18:23, 85:21
*presidents* [1] - 140:12
*presumed* [1] - 150:22
*pretty* [6] - 43:9, 68:25, 100:17, 118:10, 131:13, 148:5
*prevalent* [1] - 21:16
*prevent* [3] - 72:11, 78:2, 79:16
*prevented* [1] - 110:25
*prevents* [1] - 77:8
*previous* [1] - 83:7
*previously* [5] - 12:13, 14:19, 14:23, 53:17, 135:17
*primarily* [3] - 60:10, 71:7, 154:13
*principles* [2] - 139:4, 139:5
*Principles* [1] - 149:19
*print* [1] - 85:9
*printed* [1] - 84:20
*printout* [1] - 84:18
*probable* [7] - 24:15, 25:8, 26:23, 28:8, 30:24, 31:21, 151:11
*probative* [1] - 86:20
*problem* [9] - 5:21, 16:10,

88:25, 109:7, 119:14, 134:9, 145:18, 151:9, 159:14
*problems* [1] - 149:23
*procedures* [1] - 85:15
*proceed* [4] - 53:24, 98:7, 111:20, 162:25
*PROCEEDINGS* [1] - 4:1
*Proceedings* [1] - 163:11
*proceedings* [1] - 163:16
*process* [4] - 19:17, 34:12, 61:6, 160:14
*produce* [1] - 39:14
*produced* [2] - 39:7, 121:5
*production* [1] - 40:5
*Products* [1] - 143:2
*products* [3] - 134:4, 140:24, 141:1
*professional* [3] - 8:23, 18:21, 30:9
*Professor* [4] - 76:19, 80:4, 91:13, 91:19
*professorships* [1] - 159:23
*proffer* [2] - 67:11, 92:19
*proficient* [1] - 85:14
*prohibited* [1] - 162:5
*project* [1] - 8:11
*promise* [1] - 122:22
*promoters* [2] - 127:16
*pronouncing* [2] - 117:12, 161:4
*proof* [1] - 92:15
*proper* [1] - 36:5
*proposition* [2] - 73:6, 154:21
*prostate* [2] - 49:18, 153:18
*prove* [1] - 157:24
*proven* [1] - 25:13
*provide* [10] - 10:25, 44:19, 48:24, 50:12, 90:15, 106:1, 110:22, 115:16, 120:1, 120:5
*provided* [6] - 15:13, 16:4, 33:24, 89:8, 116:3, 145:5
*provides* [3] - 153:1, 158:13, 158:14
*providing* [3] - 11:1, 85:21, 99:10
*proximate* [1] - 157:25
*proxy* [1] - 151:9
*public* [1] - 151:11
*publication* [1] - 37:2
*publications* [3] - 70:23, 80:22, 89:20
*publish* [1] - 20:16
*published* [9] - 20:25, 21:2, 22:24, 39:4, 39:24, 40:4, 54:9, 55:2, 80:5
*PubMed* [1] - 40:11
*pull* [2] - 11:12, 84:17
*purpose* [4] - 103:15, 137:4, 144:20, 161:5
*purposes* [1] - 53:14

*put* [25] - 10:11, 12:10, 13:22, 14:17, 14:22, 14:24, 15:8, 22:10, 27:11, 30:10, 31:22, 51:6, 53:2, 70:25, 106:13, 106:24, 107:15, 108:16, 110:11, 110:18, 113:1, 128:22, 129:13, 129:18, 147:2
*putative* [1] - 41:8
*putting* [3] - 45:20, 50:14, 110:25
*qualifications* [2] - 7:21, 9:13
*quantification* [9] - 117:4, 117:7, 117:9, 118:10, 119:10, 122:21, 123:24, 124:20, 125:15
*quantify* [3] - 116:14, 118:23, 123:10
*quantifying* [1] - 123:7
*question's* [1] - 75:19
*questioned* [2] - 40:9, 138:10
*questioning* [14] - 4:12, 4:15, 4:23, 4:25, 5:8, 5:18, 6:1, 13:12, 13:23, 37:22, 107:23, 119:2, 137:16, 138:13
*questions* [22] - 10:2, 23:9, 44:12, 52:8, 52:10, 52:11, 89:7, 92:25, 93:14, 93:15, 96:21, 96:24, 98:6, 98:13, 116:21, 118:25, 123:18, 140:6, 143:9, 143:12, 145:8, 145:9
*quickly* [1] - 108:17
*quite* [8] - 6:25, 13:20, 20:22, 22:18, 30:2, 31:6, 47:12, 59:15
*quote* [8] - 6:5, 18:16, 41:8, 79:12, 99:11, 122:15, 128:22, 158:24
*quote/unquote* [1] - 5:4
*quoted* [1] - 43:2
*rabbits* [1] - 59:17
*radio* [1] - 51:8
*radiotherapy* [1] - 13:20
*raise* [13] - 5:2, 6:13, 53:2, 86:7, 97:23, 106:5, 106:11, 106:19, 116:9, 132:11, 152:10, 158:11, 161:7
*raised* [34] - 9:25, 24:3, 26:20, 68:6, 93:1, 104:3, 105:18, 108:9, 108:14, 109:19, 109:22, 109:24, 110:5, 110:9, 110:11, 112:19, 112:20, 113:14, 113:23, 115:8, 116:2, 121:7, 124:12, 125:20, 128:12, 128:18, 136:20, 136:25, 145:14, 148:20, 152:11, 152:24, 156:4
*raises* [4] - 122:20, 124:19, 126:25, 140:6
*raising* [4] - 114:15, 121:1, 125:6, 125:15
*range* [7] - 60:13, 60:20, 61:7, 61:11, 83:13, 127:17, 131:17

*ranges* [1] - 50:1
*rare* [1] - 11:1
*rat* [5] - 71:6, 72:18, 79:1, 79:12, 84:2
*rate* [1] - 130:17
*rather* [2] - 34:21, 42:3
*rats* [1] - 86:18
*RDR* [1] - 163:18
*re* [1] - 143:2
*reach* [2] - 71:14, 150:5
*reached* [4] - 24:19, 26:12, 35:10, 35:13
*reaching* [4] - 34:12, 77:9, 78:2, 79:16
*read* [26] - 11:14, 12:5, 12:7, 14:6, 19:18, 22:17, 25:4, 25:11, 26:11, 28:15, 38:10, 38:21, 70:5, 77:1, 77:22, 80:4, 87:10, 88:8, 88:11, 90:13, 93:21, 104:6, 107:3, 107:12, 135:4, 156:4
*Reader's* [1] - 86:24
*reading* [6] - 20:7, 27:2, 33:2, 38:13, 71:16, 83:1
*ready* [4] - 52:18, 52:19, 107:17, 146:22
*real* [3] - 11:3, 15:17, 140:6
*really* [31] - 10:9, 10:10, 23:6, 25:19, 30:1, 31:24, 69:12, 69:16, 108:17, 108:22, 114:7, 114:21, 115:7, 116:2, 124:14, 125:7, 127:8, 135:7, 137:4, 139:8, 141:12, 142:7, 145:19, 148:11, 148:25, 150:4, 156:6, 157:3, 158:3, 160:14
*reargue* [1] - 93:7
*reask* [1] - 76:11
*reason* [14] - 13:18, 15:17, 110:12, 110:13, 114:4, 121:15, 121:24, 126:2, 126:20, 145:21, 146:7, 148:3, 151:17, 154:7
*reasonable* [1] - 43:16
*reasoning* [2] - 114:12, 115:16
*reasons* [9] - 7:24, 87:11, 116:5, 118:13, 130:13, 137:20, 149:2, 151:6, 160:16
*reassurance* [1] - 106:1
*Reassuring* [1] - 105:4
*reassuring* [6] - 105:8, 105:18, 105:20, 106:6, 106:8, 109:23
*recalled* [1] - 140:23
*recant* [2] - 91:1, 91:2
*receive* [2] - 82:12, 112:3
*received* [10] - 58:1, 58:17, 60:19, 62:2, 63:21, 64:1, 81:23, 112:11, 114:19
*receives* [2] - 47:13, 73:25
*receiving* [1] - 112:12
*recent* [4] - 38:4, 38:13, 38:23, 152:2

**recently** [1] - 134:5
**recess** [7] - 5:17, 52:17, 85:13, 86:6, 97:19, 144:16, 146:18
**recitation** - 47:24
**recognized** [5] - 157:8, 157:10, 159:1, 159:15, 161:15
**recognizes** [3] - 45:8, 70:19, 109:3
**recollection** [4] - 37:25, 38:13, 38:22, 88:23
**record** [8] - 10:3, 53:13, 54:13, 108:16, 109:10, 113:9, 146:12, 163:16
**Recross** [1] - 3:6
**rectal** [1] - 51:4
**redirect** [1] - 21:8
**Redirect** [1] - 3:6
**redo** [1] - 13:22
**reduce** [1] - 72:22
**reduces** [1] - 160:13
**refer** [3] - 28:1, 87:7, 155:13
**reference** [13] - 10:18, 41:16, 42:6, 50:17, 57:1, 72:24, 81:8, 81:9, 88:16, 88:17, 88:21, 89:17, 121:16
**referenced** [2] - 44:19, 54:19
**references** [3] - 36:24, 46:23, 49:9
**referencing** [1] - 40:25
**referred** [2] - 68:25, 150:14
**referring** [9] - 36:18, 48:21, 66:24, 68:19, 69:8, 72:13, 76:24, 88:4, 89:13
**refile** [1] - 93:6
**refined** [1] - 24:13
**refresh** [1] - 37:25
**refreshes** [1] - 88:23
**refute** [1] - 161:5
**regard** [1] - 24:25
**regarding** [8] - 32:11, 44:3, 44:20, 48:18, 49:16, 75:18, 104:8, 144:21
**regardless** [2] - 95:16, 113:21
**regards** [1] - 108:19
**regular** [2] - 124:7, 157:25
**regulatory** [5] - 66:21, 139:24, 150:20, 154:2, 154:14
**rehash** [1] - 51:19
**reject** [3] - 152:15, 152:17
**relate** [3] - 30:1, 30:5, 94:5
**related** [13] - 12:10, 13:17, 13:18, 13:19, 14:14, 14:16, 14:21, 22:11, 43:10, 47:7, 49:10, 69:5, 150:4
**relates** [1] - 30:20
**relationship** [1] - 29:14
**relative** [5] - 49:18, 50:7, 50:13, 75:11, 87:24
**relatively** [4] - 75:10, 76:16, 134:5, 154:13

**relaunch** [2] - 100:14, 111:11
**relevance** [2] - 75:14, 161:11
**relevant** [19] - 12:14, 33:25, 39:12, 46:8, 62:21, 65:11, 65:12, 67:21, 67:24, 74:3, 92:22, 99:19, 103:14, 149:6, 149:16, 155:4, 156:23, 158:22, 159:12
**reliably** [2] - 67:16, 67:22
**reliance** [2] - 151:2, 152:18
**relied** [12] - 39:18, 39:20, 39:22, 40:14, 43:7, 82:19, 93:10, 101:18, 119:5, 120:15, 148:21, 161:6
**relies** [5] - 35:2, 92:20, 150:8, 152:11, 160:18
**rely** [20] - 37:12, 78:11, 78:15, 79:7, 80:8, 81:15, 117:8, 119:14, 120:7, 120:11, 147:13, 147:14, 148:21, 154:4, 154:5, 154:15, 157:1, 157:19, 158:8, 160:25
**relying** [3] - 90:17, 92:23, 139:13
**remainder** [1] - 51:21
**remaining** [1] - 94:12
**remains** [1] - 18:25
**remember** [18] - 18:11, 34:15, 37:22, 43:15, 60:16, 61:9, 83:1, 89:20, 97:16, 103:7, 104:5, 129:5, 131:1, 131:3, 131:7, 150:13, 154:23
**remote** [1] - 85:15
**remove** [2] - 78:1, 79:15
**renal** [1] - 71:8
**render** [1] - 149:19
**rendered** [1] - 8:13
**rendering** [2] - 22:8, 43:5
**renew** [1] - 99:6
**reorient** [2] - 100:1, 110:8
**repair** [11] - 42:2, 42:5, 42:10, 42:23, 43:1, 43:7, 43:13, 72:9, 72:20, 82:11
**repaired** [1] - 42:15
**repeat** [3] - 41:24, 124:3, 125:12
**repeatedly** [1] - 91:20
**rephrase** [2] - 19:12, 134:25
**replow** [1] - 122:21
**reply** [1] - 93:21
**report** [103] - 8:5, 11:7, 12:4, 12:6, 12:19, 13:14, 14:10, 14:18, 14:23, 14:24, 15:8, 18:16, 21:14, 21:19, 23:4, 24:19, 24:24, 26:14, 26:19, 26:21, 27:1, 27:3, 27:5, 30:12, 30:17, 31:8, 31:10, 31:23, 32:3, 32:5, 36:17, 36:21, 37:6, 39:5, 39:14, 40:5, 40:20, 40:24, 41:4, 42:7, 42:9, 42:13, 42:21, 45:8,

46:13, 47:11, 48:18, 49:8, 49:10, 49:21, 50:2, 50:3, 50:9, 50:21, 50:22, 50:24, 51:19, 51:21, 60:9, 60:10, 61:6, 62:5, 62:22, 65:14, 69:4, 69:11, 69:24, 70:15, 70:16, 70:21, 77:10, 78:10, 79:19, 79:23, 80:20, 81:9, 83:3, 84:11, 85:10, 86:17, 87:17, 98:17, 99:11, 100:5, 101:15, 102:12, 102:16, 102:18, 104:7, 116:19, 117:8, 117:11, 120:16, 122:4, 122:15, 127:14, 131:15, 144:22, 145:3, 153:9
**reported** [4] - 15:5, 72:9, 77:7, 83:7
**reporter** [5] - 4:9, 59:12, 81:18, 125:10, 125:13
**Reporter/Transcriber** [1] - 163:18
**reports** [9] - 14:13, 14:15, 48:3, 69:3, 70:5, 93:4, 102:15, 152:4, 161:9
**represent** [1] - 21:10
**representing** [1] - 28:18
**request** [1] - 11:16
**required** [5] - 10:24, 26:3, 34:6, 93:23, 140:15
**requirement** [1] - 139:11
**requires** [10] - 35:3, 35:5, 35:7, 35:20, 35:25, 36:1, 36:10, 67:16, 142:3
**requisition** [1] - 15:18
**research** [26] - 8:11, 8:13, 8:14, 9:1, 16:14, 17:22, 19:6, 19:13, 20:15, 20:24, 21:17, 29:13, 30:10, 32:23, 33:25, 34:7, 37:14, 42:23, 43:1, 43:12, 74:18, 114:10, 149:16, 151:24, 155:1, 158:22
**researched** [1] - 20:16
**researcher** [5] - 17:22, 19:19, 19:23, 156:9
**researchers** [1] - 150:11
**researching** [1] - 29:11
**residency** [1] - 17:3
**respect** [13] - 15:17, 28:14, 31:3, 43:6, 46:25, 49:14, 49:25, 51:3, 51:14, 52:1, 91:6, 114:14, 134:3
**respectfully** [5] - 47:19, 59:23, 65:19, 67:23, 73:16
**respond** [6] - 13:20, 27:8, 67:25, 112:14, 114:7, 125:19
**responded** [4] - 105:14, 110:16, 111:16, 114:2
**responding** [1] - 105:23
**RESPONSE** [1] - 163:10
**response** [24] - 12:5, 24:2, 44:4, 44:7, 70:24, 71:1, 106:20,

107:1, 107:4, 107:5, 107:7, 107:9, 107:14, 108:18, 108:24, 109:3, 110:18, 111:22, 112:15, 112:23, 113:5, 113:23, 115:11, 116:3
**responses** [3] - 70:22, 71:2, 107:12
**responsibility** [1] - 17:23
**responsive** [3] - 13:5, 65:18, 73:16
**rest** [1] - 40:17
**restrained** [1] - 23:16
**result** [5] - 25:18, 50:16, 102:24, 161:16, 162:10
**resulted** [2] - 71:7, 71:8
**results** [8] - 26:2, 83:7, 106:7, 121:5, 121:13, 121:14, 160:12, 161:14
**resume** [1] - 159:22
**retained** [4] - 15:1, 15:7, 17:6, 17:16
**review** [35] - 17:13, 17:14, 18:8, 18:22, 18:24, 19:14, 19:19, 19:20, 20:16, 20:18, 21:3, 21:18, 22:11, 33:21, 35:21, 37:11, 37:14, 39:4, 39:18, 39:20, 40:4, 41:20, 42:1, 43:6, 48:10, 50:5, 60:6, 90:14, 90:15, 110:21, 112:8, 128:23, 133:22, 157:14, 160:5
**reviewed** [16] - 18:4, 18:19, 19:21, 21:1, 22:24, 33:22, 49:24, 80:3, 80:5, 80:7, 89:20, 108:20, 111:13, 111:14, 116:18, 157:12
**reviews** [3] - 8:21, 80:1, 160:21
**revisit** [1] - 99:14
**reward** [1] - 99:16
**Rhode** [1] - 144:7
**right-hand** [1] - 78:7
**risk** [42] - 26:25, 28:11, 29:3, 29:4, 45:13, 46:14, 48:18, 49:18, 50:1, 50:7, 50:16, 50:17, 50:18, 50:20, 51:4, 51:9, 51:12, 51:14, 64:13, 72:22, 101:24, 102:1, 102:3, 102:4, 102:8, 102:9, 102:13, 102:14, 102:17, 116:20, 119:21, 124:2, 124:10, 125:3, 126:21, 130:3, 130:20, 146:5, 149:8, 159:6, 160:6, 162:11
**Risk** [1] - 105:4
**risks** [5] - 28:19, 46:15, 49:22, 50:13, 160:8
**RMR** [1] - 163:18
**road** [1] - 155:22
**ROBERT** [1] - 4:2
**robust** [1] - 22:21
**Rod** [1] - 159:25
**rodent** [7] - 78:24, 79:1, 79:20,

84:14, 86:13, 95:8, 96:20
**rodents** [8] - 41:10, 79:23, 83:13, 83:16, 83:19, 84:6, 86:12, 86:18
**role** [3] - 19:22, 93:1, 147:6
**room** [1] - 4:20
**rule** [1] - 105:24
**rules** [1] - 4:6
**ruling** [3] - 91:5, 91:6, 93:13
**sake** [1] - 58:12
**satisfaction** [1] - 115:7
**satisfying** [2] - 114:13, 115:17
**saturate** [2] - 75:22, 93:23
**saturated** [14] - 71:13, 73:25, 74:19, 75:3, 75:4, 75:10, 76:15, 94:11, 94:14, 94:19, 95:4, 95:17, 96:6
**saturation** [46] - 67:1, 67:5, 71:18, 71:23, 72:1, 72:6, 73:1, 73:7, 73:10, 73:18, 73:20, 74:3, 74:6, 74:7, 74:11, 74:12, 74:22, 74:24, 75:1, 75:5, 75:7, 75:16, 75:18, 75:19, 76:4, 76:7, 77:19, 86:21, 87:21, 87:22, 91:24, 92:2, 92:13, 94:5, 94:6, 94:8, 94:17, 95:2, 95:14, 95:19, 95:22, 95:24, 96:4, 96:10, 150:4, 150:5
**save** [1] - 97:9
**saw** [2] - 79:20, 106:13
**scale** [1] - 15:15
**scaling** [1] - 55:1
**scenario** [1] - 34:13
**school** [1] - 17:3
**science** [11] - 30:21, 30:23, 31:2, 31:5, 67:17, 70:25, 78:15, 80:9, 80:18, 141:10, 141:12
**scientific** [27] - 8:5, 21:12, 22:22, 23:23, 24:1, 25:11, 25:16, 25:23, 33:15, 33:17, 35:6, 36:16, 40:17, 41:20, 42:2, 43:25, 50:4, 80:1, 82:20, 98:23, 115:15, 154:24, 157:9, 157:10, 159:12, 159:15, 161:13
**scientifically** [1] - 115:18
**scientist** [3] - 16:22, 17:5, 74:18
**scientists** [3] - 77:23, 92:9, 150:15
**scope** [18] - 9:11, 67:4, 69:3, 86:13, 91:23, 91:25, 92:17, 99:6, 99:11, 100:15, 103:8, 117:15, 120:4, 122:12, 123:12, 124:9, 126:15, 127:25
**screen** [3] - 4:9, 104:10, 129:13
**search** [5] - 98:22, 99:2, 100:2, 160:9, 160:12
**second** [10] - 4:11, 17:23, 19:22, 21:20, 43:15, 45:4, 54:19, 63:22, 92:8, 126:2

**section** [6] - 42:3, 42:18, 58:10, 63:13, 70:23, 80:22
**sections** [1] - 70:21
**see** [40] - 6:13, 29:8, 37:18, 38:16, 38:18, 39:24, 41:16, 44:24, 52:23, 55:13, 68:24, 72:13, 78:8, 80:3, 81:12, 84:17, 86:12, 87:9, 88:22, 89:7, 89:16, 89:17, 90:5, 97:8, 104:9, 104:12, 104:13, 106:3, 106:20, 109:14, 110:5, 113:2, 120:21, 130:11, 137:17, 142:6, 142:17, 148:17, 160:2, 163:9
**seeing** [1] - 109:6
**seek** [2] - 48:12, 48:22
**seem** [2] - 137:25, 146:3
**selectively** [1] - 90:10
**send** [1] - 111:1
**senior** [1] - 150:19
**sense** [11] - 10:24, 17:10, 18:4, 34:21, 34:23, 35:2, 35:4, 35:14, 35:16, 35:17, 36:8
**sensitivity** [4] - 121:2, 121:5, 121:7, 121:13
**sent** [6] - 68:21, 105:11, 109:13, 111:5, 112:1, 113:12
**sentence** [10] - 24:24, 28:3, 28:17, 28:25, 29:5, 29:25, 30:15, 78:24, 80:2, 80:19
**sentences** [2] - 32:13, 32:14
**separate** [2] - 55:25, 66:18
**separately** [1] - 109:9
**September** [1] - 104:18
**series** [1] - 105:7
**served** [1] - 135:12
**set** [22] - 4:5, 9:7, 9:9, 22:18, 25:16, 25:23, 52:13, 55:25, 56:1, 85:19, 85:20, 85:22, 97:13, 98:16, 103:19, 119:20, 119:24, 127:9, 140:8, 144:8, 150:22, 150:23
**sets** [1] - 24:24
**setting** [1] - 63:18
**settle** [1] - 31:1
**settled** [3] - 30:22, 30:24, 31:3
**seven** [3] - 79:24, 80:24, 83:19
**several** [8] - 17:14, 20:18, 30:20, 33:21, 40:15, 76:22, 77:3, 105:25
**shaped** [1] - 131:12
**share** [1] - 104:10
**shifting** [1] - 40:12
**short** [14] - 5:17, 116:10, 126:12, 127:1, 127:23, 128:19, 130:1, 130:8, 130:10, 130:11, 130:14, 132:12, 135:7, 154:13
**shortcomings** [1] - 150:10
**shorter** [3] - 127:20, 129:22, 131:14
**show** [17] - 58:8, 88:22, 89:8,

95:18, 97:9, 101:25, 104:12, 107:6, 107:9, 126:21, 131:18, 131:22, 133:18, 142:1, 151:17, 160:22
**showed** [3] - 96:9, 102:2, 102:4
**showing** [7] - 80:15, 86:7, 86:13, 108:18, 108:20, 109:6, 115:16
**shown** [2] - 46:6, 131:16
**shows** [3] - 51:11, 133:21, 154:18
**shuffling** [2] - 62:15, 62:17
**side** [5] - 60:25, 90:6, 148:2, 148:3
**sides** [4] - 93:4, 141:10, 147:16, 148:24
**sidetracked** [1] - 87:8
**signal** [1] - 26:2
**significance** [3] - 25:17, 52:1, 67:15
**significant** [8] - 26:23, 28:7, 28:9, 102:3, 102:13, 153:1, 153:6, 158:5
**significantly** [1] - 22:6
**similar** [11] - 41:9, 65:6, 78:19, 84:12, 84:13, 86:11, 86:15, 121:14, 127:16, 158:13
**simple** [1] - 159:9
**simply** [8] - 20:1, 26:15, 59:25, 69:12, 124:11, 126:16, 133:15, 134:14
**single** [8] - 71:19, 78:19, 85:10, 148:24, 150:24, 156:9, 157:21
**sit** [1] - 43:14
**site** [4] - 83:8, 83:10, 87:2, 88:6
**sitting** [2] - 15:23, 38:12
**situations** [3] - 34:20, 34:23, 35:1
**six** [1] - 80:25
**size** [1] - 87:24
**SLATER** [13] - 5:3, 6:4, 6:7, 9:3, 11:16, 23:10, 23:13, 27:2, 43:18, 48:4, 52:3, 52:11, 52:14
**Slater** [7] - 5:3, 6:5, 16:13, 17:9, 17:17, 17:24, 52:10
**slide** [1] - 18:24
**slides** [7] - 18:1, 18:9, 19:10, 148:10, 148:11, 148:15, 148:18
**small** [3] - 72:19, 102:3, 105:24
**smaller** [1] - 96:15
**smoke** [1] - 31:14
**smoker** [2] - 44:21, 45:5
**smoking** [10] - 12:10, 13:18, 29:8, 31:4, 31:6, 44:22, 45:1, 45:3, 45:13, 46:1
**smoking-related** [1] - 13:18
**snippet** [1] - 19:17
**society** [1] - 162:3
**sociology** [1] - 157:9
**sole** [1] - 161:5

**solely** [1] - 70:16
**solubilized** [2] - 74:12, 94:7
**someone** [3] - 60:23, 61:18, 148:1
**sometimes** [3] - 11:3, 11:4, 42:15
**somewhere** [3] - 58:13, 79:8, 97:15
**sorry** [31] - 9:3, 12:23, 16:7, 16:9, 23:13, 25:19, 26:17, 40:10, 41:22, 56:4, 58:10, 59:13, 62:18, 63:23, 64:6, 69:24, 73:3, 75:20, 76:9, 78:4, 106:20, 110:1, 111:6, 112:12, 124:16, 124:23, 125:11, 132:2, 132:3, 133:9, 138:25
**sort** [13] - 9:14, 15:18, 36:3, 115:17, 120:16, 120:21, 127:9, 130:9, 134:12, 134:22, 137:25, 138:11, 139:13
**sound** [2] - 98:24, 152:9
**sounds** [1] - 90:9
**Southern** [1] - 136:13
**speaking** [6] - 4:14, 5:1, 14:3, 33:18, 101:25
**species** [19] - 41:14, 54:11, 59:16, 78:19, 79:4, 80:25, 83:19, 83:20, 84:8, 86:10, 86:12, 86:14, 86:15, 91:17, 96:17, 96:19, 151:17, 151:20
**specific** [40] - 9:16, 16:25, 17:4, 20:6, 20:8, 20:12, 20:14, 20:19, 27:25, 28:1, 28:14, 29:15, 29:20, 29:22, 29:23, 29:24, 30:14, 30:21, 32:15, 32:18, 34:18, 44:3, 44:6, 46:8, 46:23, 47:5, 48:15, 49:10, 49:25, 51:9, 69:4, 87:7, 102:11, 107:9, 108:1, 111:15, 119:21, 144:25, 148:12, 148:13
**specifically** [11] - 12:22, 13:15, 22:11, 39:24, 46:6, 46:18, 95:3, 107:15, 131:5, 137:16
**specified** [1] - 121:17
**specify** [2] - 46:11, 46:14
**specimens** [1] - 8:21
**spectrum** [1] - 61:4
**spend** [3] - 8:20, 87:12, 123:1
**spends** [1] - 161:10
**spent** [3] - 146:3, 152:12, 156:11
**spirit** [1] - 36:12
**spit** [1] - 82:7
**spoken** [1] - 154:7
**spring** [1] - 144:8
**squarely** [1] - 126:19
**stage** [2] - 98:16, 103:19
**stand** [1] - 132:10
**standard** [3] - 118:16, 159:16, 160:5

*standardized* [3] - 17:20, 18:17, 19:8
*standards* [2] - 152:19, 152:20
*standpoint* [1] - 24:17
*start* [20] - 18:22, 24:24, 25:12, 25:21, 26:3, 29:11, 34:3, 36:3, 40:10, 55:15, 90:10, 97:3, 97:5, 117:2, 143:15, 143:23, 147:10, 148:4, 162:18, 162:22
*started* [7] - 6:11, 18:8, 34:9, 52:22, 98:6, 132:18, 144:17
*starting* [5] - 25:15, 26:11, 36:1, 36:10, 147:21
*starts* [2] - 32:8, 147:21
*state* [7] - 6:18, 14:19, 28:6, 53:6, 93:23, 98:3, 140:13
*statement* [17] - 17:8, 28:1, 28:21, 32:7, 32:8, 34:19, 34:24, 45:8, 46:10, 48:18, 78:9, 79:12, 80:7, 87:7, 87:9, 87:10, 114:13
*statements* [3] - 30:4, 140:11, 155:15
*states* [4] - 26:22, 28:23, 28:25, 161:15
*stating* [2] - 64:13, 129:2
*statistical* [5] - 25:15, 26:4, 33:11, 34:8, 52:1
*statistically* [2] - 102:3, 102:13
*statistician* [1] - 157:5
*statistics* [3] - 25:22, 156:25, 157:6
*status* [1] - 97:2
*step* [2] - 66:1, 136:22
*Stephen* [2] - 6:19, 153:23
*STEPHEN* [2] - 3:7, 6:16
*still* [6] - 12:23, 15:15, 19:4, 62:1, 162:19, 162:24
*stomach* [2] - 51:16, 153:17
*stop* [1] - 62:15
*straight* [1] - 123:13
*straighten* [1] - 155:5
*strength* [2] - 51:11, 155:20
*strike* [2] - 74:16, 159:18
*strong* [3] - 145:24, 146:4, 146:6
*studied* [6] - 22:3, 70:17, 74:4, 79:6, 83:20, 151:21
*studies* [119] - 18:19, 20:24, 24:18, 32:10, 32:12, 39:22, 55:5, 55:10, 62:13, 67:19, 71:6, 80:16, 86:17, 87:16, 87:17, 91:18, 92:10, 92:11, 95:15, 95:25, 96:16, 100:4, 100:7, 100:12, 100:18, 101:1, 101:7, 101:11, 101:14, 101:15, 101:18, 101:19, 101:21, 101:22, 102:8, 102:21, 102:22, 103:21, 104:22, 107:24, 116:6, 116:14, 116:17, 116:18, 117:4, 117:8, 117:19, 117:21, 117:23,

118:1, 118:2, 119:5, 119:19, 119:20, 120:14, 121:4, 126:4, 126:5, 126:20, 127:15, 128:7, 128:19, 130:1, 130:14, 132:13, 132:24, 133:14, 135:24, 137:22, 138:12, 139:14, 144:25, 145:1, 145:2, 146:2, 147:13, 147:14, 148:21, 148:22, 148:23, 149:16, 149:17, 150:8, 150:9, 150:10, 150:12, 151:5, 151:16, 151:20, 152:11, 152:14, 152:22, 152:23, 153:1, 153:5, 154:7, 154:15, 154:22, 155:3, 155:14, 155:16, 156:8, 156:9, 156:16, 157:12, 157:13, 158:9, 160:6, 160:8, 160:13, 160:21, 160:25
*Study* [1] - 105:3
*study* [103] - 23:2, 29:10, 32:25, 37:12, 39:10, 39:21, 42:7, 51:2, 51:3, 55:15, 55:17, 56:3, 56:7, 56:12, 57:8, 57:15, 58:2, 58:6, 58:17, 62:3, 62:9, 63:1, 63:5, 63:13, 63:21, 64:10, 64:11, 71:5, 71:19, 71:25, 72:5, 72:9, 72:25, 73:6, 73:23, 75:9, 75:18, 75:22, 76:14, 81:11, 82:1, 82:8, 83:7, 84:16, 86:8, 86:13, 86:16, 86:22, 86:25, 87:1, 88:4, 89:12, 92:20, 92:22, 93:11, 95:21, 96:13, 103:6, 104:1, 104:4, 104:8, 106:6, 106:7, 108:1, 108:15, 108:25, 110:12, 115:5, 115:12, 115:21, 117:11, 118:8, 118:20, 119:1, 119:14, 119:16, 119:17, 120:4, 120:8, 127:2, 127:5, 127:6, 128:15, 128:20, 129:23, 129:24, 130:4, 130:19, 133:3, 134:10, 134:13, 134:16, 135:3, 135:9, 145:4, 153:6, 154:18, 158:12
*studying* [2] - 59:7, 156:12
*stuff* [6] - 36:4, 86:2, 103:16, 109:6, 124:13, 140:13
*subcategories* [1] - 20:19
*subheadings* [1] - 20:19
*subject* [8] - 88:9, 92:2, 100:10, 107:23, 114:18, 119:1, 122:4, 150:21
*submit* [3] - 67:15, 142:4, 142:22
*submitted* [4] - 7:3, 14:5, 44:13, 67:14
*submitting* [1] - 14:8
*subsequent* [1] - 28:12
*subset* [2] - 99:5, 100:3
*substance* [6] - 94:20, 94:21, 141:4, 150:15, 150:16, 159:17
*substances* [3] - 42:14, 154:10, 156:17

*substantially* [1] - 72:22
*sufficient* [4] - 72:11, 72:21, 129:3, 150:17
*suggest* [13] - 28:13, 73:6, 73:25, 84:7, 96:13, 96:16, 96:18, 139:15, 139:24, 140:4, 141:2, 141:7, 142:1
*suggesting* [2] - 138:3, 139:9
*suggests* [1] - 73:1
*suit* [2] - 46:16, 148:14
*summarize* [1] - 51:14
*summarized* [1] - 145:4
*summary* [1] - 41:5
*sundry* [1] - 160:16
*Supp* [1] - 143:3
*supplemental* [7] - 54:8, 62:3, 70:4, 70:14, 73:24, 82:17, 137:15
*support* [13] - 7:4, 10:4, 36:4, 70:13, 73:6, 76:15, 80:3, 80:20, 80:21, 82:20, 83:7, 95:15, 95:25
*supported* [1] - 159:11
*supporting* [1] - 51:23
*surprising* [1] - 32:17
*survives* [1] - 151:15
*suspicion* [1] - 44:22
*sustain* [4] - 66:13, 66:23, 91:10
*sustained* [2] - 43:22, 92:18
*swine* [14] - 54:20, 63:1, 63:5, 63:13, 63:20, 64:9, 65:10, 77:20, 83:17, 84:2, 89:12, 95:20, 96:12, 96:18
*switch* [1] - 110:2
*switched* [1] - 108:5
*switching* [1] - 114:25
*sworn* [2] - 6:17, 12:2
*symptoms* [1] - 18:23
*syndrome* [7] - 42:4, 42:6, 42:8, 42:18, 43:3, 43:11, 43:12
*system* [4] - 53:18, 69:9, 84:13
*systematic* [3] - 98:22, 98:23, 160:4
*systemic* [9] - 59:4, 62:14, 71:14, 73:14, 84:8, 94:4, 94:24, 95:1, 96:17
*Table* [1] - 56:3
*tablet* [3] - 61:14, 65:25, 121:10
*tablets* [4] - 62:23, 64:20, 64:21, 65:15
*tactics* [1] - 99:16
*tailor* [1] - 137:16
*talks* [1] - 59:1
*teacher* [1] - 33:4
*teaching* [1] - 8:25
*tech* [2] - 4:19, 97:8
*technical* [1] - 36:13
*TECHNICIAN* [1] - 81:20, 88:25, 89:3, 89:5

*technician* [2] - 68:20, 69:8
*technique* [1] - 161:13
*techniques* [2] - 160:5, 162:12
*template* [1] - 161:9
*ten* [14] - 52:13, 69:24, 70:1, 70:21, 80:25, 97:16, 127:19, 129:7, 130:21, 131:1, 131:11, 132:7, 146:11, 146:13
*ten-hour* [1] - 129:7
*ten-minute* [1] - 52:13
*term* [2] - 36:3, 36:13
*terms* [12] - 8:9, 10:18, 48:3, 48:10, 49:18, 101:14, 102:6, 130:17, 130:18, 132:11, 139:12, 160:10
*terrible* [1] - 47:15
*terribly* [5] - 11:1, 146:9, 152:14, 155:4, 155:17
*Terrific* [1] - 111:9
*terrific* [4] - 104:16, 143:1
*test* [4] - 83:22, 128:11, 154:12, 161:14
*testified* [6] - 6:17, 53:5, 81:18, 98:1, 150:19, 153:21
*testify* [6] - 145:17, 158:4, 158:16, 161:16, 161:23, 162:13
*testifying* [4] - 39:15, 155:25, 159:4, 159:8
*testimony* [30] - 10:3, 10:6, 12:20, 12:22, 13:2, 13:8, 19:4, 36:11, 36:12, 38:18, 122:5, 128:1, 128:5, 128:11, 128:22, 130:23, 131:18, 131:21, 132:8, 134:17, 135:1, 135:4, 147:11, 147:19, 149:24, 152:12, 158:1, 158:19, 161:2, 161:5
*testing* [2] - 43:17, 154:17
*textbook* [1] - 115:24
*The court* [174] - 4:3, 4:17, 4:21, 5:1, 5:6, 5:10, 5:12, 5:19, 5:21, 5:22, 5:24, 6:2, 6:5, 6:11, 6:18, 6:20, 9:24, 10:5, 11:19, 13:4, 13:6, 23:19, 24:2, 43:22, 44:9, 48:7, 52:9, 52:12, 52:16, 52:18, 52:22, 52:25, 53:2, 53:6, 53:9, 53:13, 53:15, 53:17, 53:22, 54:2, 56:20, 56:24, 62:15, 62:19, 67:6, 68:1, 68:5, 68:9, 69:7, 69:19, 73:24, 75:6, 76:3, 76:12, 81:17, 85:16, 85:22, 85:25, 86:5, 86:22, 87:4, 87:10, 87:20, 89:11, 89:16, 89:18, 89:22, 90:18, 90:23, 91:7, 92:1, 92:6, 92:18, 92:24, 93:15, 96:23, 97:1, 97:6, 97:12, 97:15, 97:20, 97:23, 98:3, 98:5, 99:8, 99:17, 99:23, 100:16, 100:20, 100:23, 103:12, 107:23, 108:22, 109:2, 110:9, 110:12, 111:14, 111:18,

*tied* [2] - 125:7, 125:16
*timing* [2] - 5:12, 157:18
*tissues* [4] - 41:11, 78:18, 78:22, 80:12
*title* [3] - 37:8, 104:25, 105:3
*titled* [1] - 113:7
*today* [20] - 5:9, 5:13, 5:25, 7:20, 7:25, 8:24, 10:3, 15:23, 23:9, 30:6, 39:15, 43:14, 81:22, 107:23, 120:17, 135:3, 135:10, 147:11, 152:12, 163:8
*together* [1] - 51:6
*took* [12] - 17:20, 21:11, 23:22, 36:15, 39:13, 44:1, 49:13, 58:6, 60:23, 65:21, 99:10, 122:14
*top* [1] - 23:2
*topic* [3] - 33:23, 33:24, 123:19
*topics* [1] - 99:14
*total* [12] - 19:16, 55:23, 56:6, 57:8, 57:11, 57:14, 57:19, 57:25, 60:24, 61:20, 126:9, 150:5
*totaling* [1] - 58:1
*totalling* [3] - 55:18, 56:8, 56:12
*totally* [5] - 15:2, 30:23, 42:20, 46:17, 141:11
*touch* [1] - 86:1
*toxicological* [1] - 66:8
*toxicologist* [1] - 38:4
*toxicologists* [1] - 159:16
*toxicology* [1] - 158:21
*trace* [2] - 139:18, 141:16
*trainee* [2] - 33:5, 33:6
*training* [2] - 43:4, 43:8
*transcribed* [1] - 7:18
*transcript* [4] - 129:15, 131:25, 133:21, 163:15
*translates* [1] - 60:20
*treating* [2] - 29:15, 159:3
*tremendous* [1] - 30:13
*trial* [2] - 39:3, 144:8
*trials* [3] - 145:18, 156:8, 161:10
*tricky* [1] - 142:12
*tried* [3] - 32:20, 93:5, 144:22
*Trischler* [15] - 5:22, 52:18, 53:10, 67:6, 68:2, 69:7, 75:2, 76:3, 76:6, 86:23, 88:1, 90:18, 92:1, 96:23, 137:11
*TRISCHLER* [51] - 3:9, 5:24, 52:21, 53:11, 53:20, 53:24, 54:3, 54:5, 56:15, 56:22, 56:25, 57:4, 59:22, 62:25, 67:8, 68:4, 68:7, 68:11, 69:12, 69:22, 70:3, 74:15, 76:11, 76:13, 81:25, 84:23, 85:3, 85:6, 85:12, 85:20, 85:24, 86:3, 86:16, 87:1, 87:6, 87:14, 88:2, 88:3, 89:2, 89:4, 89:15, 89:23, 90:13, 90:20, 91:4, 91:12, 92:4, 92:14, 92:19,

93:13, 96:25
*Trischler's* [1] - 75:8
*trouble* [1] - 97:9
*True* [1] - 122:1
*true* [43] - 10:23, 12:11, 12:12, 13:21, 16:15, 16:16, 17:7, 18:25, 20:12, 21:15, 22:2, 24:10, 25:20, 30:18, 34:5, 42:11, 45:17, 49:9, 54:11, 55:17, 58:2, 58:18, 60:7, 61:16, 63:22, 65:20, 71:9, 72:12, 74:2, 77:7, 100:13, 100:25, 101:19, 101:20, 104:4, 106:8, 113:17, 117:7, 120:19, 121:9, 147:16, 154:20, 162:8
*truth* [1] - 11:6
*try* [6] - 79:10, 85:4, 97:13, 109:10, 125:1, 129:16
*trying* [24] - 4:10, 10:3, 24:4, 67:20, 69:13, 69:16, 69:22, 75:1, 75:6, 87:6, 87:8, 87:13, 92:25, 109:5, 111:18, 116:21, 123:25, 125:22, 126:22, 141:22, 144:24, 153:9, 153:10, 162:4
*tumor* [11] - 40:21, 41:15, 42:16, 69:25, 70:1, 70:2, 71:2, 79:1, 79:20, 79:21, 79:24
*tumors* [5] - 46:20, 71:8, 71:9, 146:2, 148:18
*tune* [1] - 156:5
*turn* [5] - 11:22, 15:20, 24:20, 27:5, 50:25
*turning* [1] - 158:18
*twice* [1] - 43:9
*two* [54] - 22:3, 22:12, 22:15, 22:24, 23:1, 23:5, 51:25, 55:17, 56:12, 58:7, 58:14, 58:15, 58:16, 59:6, 62:4, 64:17, 73:10, 78:15, 94:9, 101:7, 101:15, 101:21, 101:22, 103:21, 104:22, 113:5, 116:5, 116:9, 116:13, 116:17, 116:24, 117:19, 118:1, 118:25, 119:20, 123:6, 123:18, 126:3, 126:20, 130:14, 132:20, 135:24, 137:20, 137:22, 138:10, 138:12, 138:19, 141:10, 145:3, 146:2, 159:8, 162:15
*two-week* [1] - 58:7
*type* [8] - 45:24, 47:24, 49:4, 65:7, 66:10, 72:22, 79:21, 79:24
*types* [23] - 47:1, 47:2, 47:21, 48:2, 49:7, 66:23, 68:17, 68:22, 69:2, 69:16, 69:20, 69:25, 70:2, 71:2, 77:13, 78:13, 79:2, 79:20, 79:24, 80:24, 98:19
*typical* [1] - 25:23
*typically* [1] - 16:4

*ultimate* [1] - 146:1
*unaware* [1] - 136:25
*under* [13] - 31:23, 39:16, 53:3, 59:2, 59:8, 74:8, 95:12, 130:5, 132:8, 133:9, 138:14, 157:24
*underlying* [2] - 157:7, 159:6
*underpinning* [2] - 119:24, 121:6
*understood* [7] - 10:15, 13:9, 100:6, 119:6, 123:17, 124:14, 142:20
*unknown* [1] - 161:23
*unless* [4] - 25:13, 28:12, 28:20, 91:1
*unlike* [1] - 31:3
*unmetabolized* [1] - 73:13
*unreliable* [2] - 136:2, 136:9
*unusual* [1] - 141:12
*up* [61] - 15:25, 16:19, 48:6, 52:13, 53:18, 67:9, 80:2, 81:5, 84:6, 84:17, 85:19, 85:20, 85:22, 86:2, 97:13, 104:7, 107:15, 108:7, 110:3, 113:2, 114:21, 115:5, 116:10, 119:8, 121:8, 122:20, 124:21, 126:4, 126:7, 126:9, 127:10, 127:11, 127:13, 128:8, 128:15, 128:22, 129:13, 129:18, 130:15, 132:12, 132:17, 132:20, 132:21, 132:24, 133:1, 133:4, 133:8, 133:12, 134:4, 134:7, 134:11, 134:13, 134:19, 135:6, 144:8, 144:21, 147:5, 151:25, 156:10, 160:17
*updated* [1] - 156:19
*ups* [2] - 130:12, 131:11
*ureter* [1] - 46:21
*urogenital* [1] - 82:2
*useful* [1] - 11:4
*user* [1] - 113:20
*uses* [8] - 105:1, 113:21, 148:7, 151:23, 152:9, 155:2, 157:13, 159:15
*usual* [1] - 149:15
*uterine* [1] - 158:15
*utilized* [2] - 17:21, 18:18
*validity* [1] - 130:17
*Valsartan* [1] - 105:4
*valsartan* [60] - 15:5, 15:10, 16:12, 16:18, 17:7, 17:11, 19:9, 19:16, 20:3, 21:14, 24:9, 24:14, 25:2, 26:9, 27:13, 27:23, 31:12, 38:25, 47:25, 51:24, 58:22, 60:2, 60:7, 60:23, 61:18, 61:25, 62:6, 64:20, 64:24, 65:2, 65:12, 65:21, 101:16, 101:24, 102:7, 108:6, 108:7, 110:2, 113:22, 114:17, 114:20, 115:2, 116:15, 117:4, 117:7, 119:21, 120:2, 120:20, 120:22, 121:9, 121:10,

121:11, 126:13, 126:21, 127:24, 130:3, 130:19, 144:25, 154:2, 160:7
**valsartan-containing** [8] - 58:22, 60:2, 60:7, 65:2, 65:21, 130:3, 154:2, 160:7
**valsartan-induced** [1] - 15:10
**valsartan-specific** [1] - 144:25
**value** [4] - 25:17, 25:18, 25:23, 157:11
**Vanderbilt** [1] - 159:23
**variation** [1] - 120:23
**various** [16] - 8:4, 21:11, 23:23, 23:25, 31:8, 36:16, 42:13, 43:25, 48:13, 50:4, 50:13, 69:1, 151:10, 155:13, 160:16, 160:23
**VAUGHN** [43] - 3:12, 99:6, 99:9, 99:22, 100:14, 103:8, 108:16, 108:24, 109:4, 109:8, 110:20, 111:4, 111:7, 111:11, 111:17, 111:25, 112:3, 112:5, 112:7, 112:13, 113:1, 113:4, 117:15, 118:21, 122:12, 123:12, 124:9, 126:15, 126:22, 127:25, 128:21, 130:22, 133:20, 135:14, 136:5, 136:25, 138:22, 138:25, 143:13, 143:15, 143:17, 144:19, 145:7
**Vaughn** [2] - 112:2, 143:11
**version** [1] - 86:24
**versus** [6] - 20:2, 59:2, 66:10, 66:19, 74:9, 96:15
**via** [2] - 4:1, 80:25
**vice** [1] - 140:12
**Victoria** [1] - 4:16
**video** [1] - 4:8
**view** [5] - 102:21, 103:21, 114:9, 115:21, 132:13
**viewpoints** [4] - 35:21, 47:5, 47:7, 47:22
**vigorously** [1] - 142:14
**Vioxx** [1] - 156:24
**virtual** [2] - 32:6, 83:9
**virtually** [1] - 83:10
**vital** [1] - 66:13
**W-E-I** [1] - 161:3
**Wait** [1] - 139:1
**wait** [11] - 27:8, 108:22, 111:24, 132:23, 134:11, 135:8, 138:2, 138:23, 139:1
**waited** [3] - 58:14, 133:3, 134:15
**waiting** [3] - 81:17, 111:25, 153:21
**walking** [1] - 57:7
**wants** [1] - 146:19
**water** [3] - 66:13, 122:10, 140:21
**ways** [1] - 84:14
**weakness** [1] - 152:4

**weaknesses** [2] - 93:3, 155:10
**week** [2] - 7:3, 58:7
**weeks** [3] - 58:14, 58:15, 163:9
**Wei** [1] - 161:3
**weigh** [2] - 18:6, 159:16
**weighing** [1] - 24:17
**weighs** [1] - 57:23
**weight** [53] - 8:7, 8:11, 31:8, 34:1, 35:10, 37:17, 47:23, 48:15, 49:14, 57:25, 58:25, 59:5, 59:20, 62:10, 62:20, 65:8, 65:10, 65:24, 83:15, 100:12, 100:18, 101:1, 101:8, 101:11, 101:22, 102:21, 103:24, 104:23, 107:24, 110:13, 114:4, 116:7, 116:18, 117:20, 117:21, 117:24, 118:1, 118:3, 118:12, 118:19, 118:20, 126:3, 130:14, 133:7, 135:24, 138:11, 139:5, 142:11, 148:22, 148:23, 155:23
**weighted** [1] - 63:13
**Welding** [1] - 159:25
**whatsoever** [3] - 130:11, 148:16, 150:3
**wherein** [1] - 93:22
**white** [1] - 22:10
**WHO** [6] - 22:15, 40:13, 40:16, 40:23, 41:8, 65:6
**whole** [9] - 75:13, 81:6, 89:9, 107:4, 112:8, 137:4, 149:10, 153:8, 155:9
**wide** [1] - 131:17
**widely** [1] - 19:22
**wildly** [1] - 29:9
**wishes** [1] - 162:16
**witness** [14] - 20:2, 20:3, 30:9, 67:14, 68:3, 90:8, 92:20, 97:2, 97:5, 135:13, 139:8, 142:19, 145:19, 152:2
**Witness** [1] - 3:6
**WITNESS** [3] - 6:16, 53:4, 97:25
**witness's** [1] - 67:9
**witnesses** [4] - 13:7, 93:8, 146:24, 162:21
**wonder** [1] - 29:10
**word** [8] - 23:14, 62:16, 103:1, 103:2, 103:4, 105:1, 137:11
**wording** [2] - 20:21, 24:12
**words** [15] - 12:3, 14:9, 14:12, 15:9, 16:6, 30:14, 30:17, 30:18, 32:4, 42:25, 47:6, 110:13, 118:9, 142:10, 150:14
**works** [1] - 162:25
**world** [2] - 140:9, 158:25
**World** [1] - 41:4
**worried** [1] - 108:22
**worry** [1] - 99:18
**worth** [1] - 35:3
**wrap** [1] - 119:8

**wrapping** [1] - 48:6
**write** [5] - 7:15, 42:20, 77:23, 104:5, 104:6
**writes** [1] - 72:16
**writing** [3] - 17:13, 61:9, 104:21
**written** [8] - 9:14, 17:14, 19:19, 20:18, 33:21, 37:9, 98:17, 161:9
**wrote** [11] - 30:17, 62:5, 69:10, 78:10, 79:23, 84:4, 90:17, 103:5, 103:15, 106:7, 108:14
**Y-O-O-N** [1] - 160:20
**year** [8] - 40:8, 127:15, 127:18, 131:17, 132:9, 132:17, 132:20, 134:17
**years** [27] - 29:8, 29:10, 60:24, 60:25, 61:19, 61:21, 61:22, 61:25, 126:8, 126:10, 126:12, 127:9, 127:19, 127:23, 128:12, 128:14, 128:20, 129:2, 129:25, 130:8, 130:21, 131:2, 131:11, 132:7, 132:20, 132:25
**yesterday** [1] - 129:24
**yielded** [2] - 148:16, 160:12
**Yoon** [2] - 155:16, 160:20
**York** [1] - 136:13
**you..** [1] - 88:17
**yourself** [4] - 7:13, 27:16, 35:14, 107:10
**Yup** [1] - 113:3
**ZHENG** [1] - 158:12
**Zheng** [4] - 21:21, 22:25, 51:23, 158:12
**Zhou** [2] - 107:7, 113:7
**ZHP** [3] - 61:5, 61:6, 98:14
**ZHP's** [1] - 61:18
**Zoloft** [1] - 139:7
**Zoom** [1] - 4:1
**zoom** [1] - 107:16

# EXHIBIT 77

Case 1:19-md-02875-RBK-SAK   Document 1974   Filed 03/17/22   Page 1 of 7 PageID: 58891
Case 1:19-md-02875-RBK-SAK   Document 1621   Filed 10/28/21   Page 1 of 7 PageID: 58891
275

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| _____ ) | |
| *In Re*: Valsartan, Losartan, and Irbesartan ) | **19-MD-2875 (RBK-SAK)** |
| Products Liability Litigation ) | |
| ) | **Daubert ORDER 2 / Accompanying Opinion:** |
| ) | **REGARDING PARTIES' MOTIONS TO** |
| ) | **PRECLUDE TESTIMONY BY EXPERT** |
| ) | **WITNESSES** |
| *This document applies to all cases.* ) | |
| _____ ) | |

**KUGLER, District Judge:**

**THIS MATTER HAVING COME BEFORE** the Court upon the parties' motions *in limine* pursuant to Federal Rules of Evidence 702, 403, and 104 to preclude testimony of various experts, especially upon:

**Motions by all Plaintiffs** to preclude the testimony of Defendants' experts:

    Michael B. Bottorff, Pharm.D.:  (Doc. Nos. 1712, 1789, and 1862);

    George E. Johnson, Ph.D.:      (Doc. Nos. 1711, 1796, and 1856);

**THE COURT HAVING SET FORTH PROCEDURE** for two *Daubert*[1] hearings, which:

Required those experts selected to testify at the *Daubert* hearings to submit sworn certifications as to the accuracy of their opinions ["the Certifications"]; and

Authorized that the *Daubert* hearings would elicit only cross-examination testimony relating to only the opinions in the Certifications;

**THE COURT HAVING HELD** a first *Daubert* hearing on 2 March 2022 for the Cross-Examination of Plaintiffs' selected experts and, on 4 March 2022, issued *Daubert* Order 1 (Doc. No. 1958); and

**PLAINTIFFS CANCELLING** the second *Daubert* hearing and therefore not cross-examining Defendants' Experts Bottorff and Johnson;

---

[1] Following *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S.Ct. 2786 (1993), in which the Supreme Court required federal district courts to make a "preliminary assessment" of the admissibility of expert testimony. *Id.* at 2796.

**THE COURT HAVING CONSIDERED** the parties' briefs, oppositions and replies in the above Motions, and the submitted Certifications, for good cause shown, and for the reasons expressed herein:

**IT IS HEREBY ORDERED** regarding the Motions to Preclude the Testimony of Defendants' Experts**:**

As to the opinions of **Michael B. Bottorf**, Pharm.D., Plaintiff's Motion to Preclude (Doc. 1712)  is **DENIED**; and

As to the opinions of **George E. Johnson**, Ph.D., Plaintiff's Motion to Preclude (Doc. 1711) is **DENIED.**

**DISCUSSION**

At the first *Daubert* hearing held on 2 March 2022, defense counsel cross-examined three of plaintiffs' expert witnesses.  At the conclusion of the hearing, the Court read into the record its decision on those *Daubert* motions as well as other motions filed by both sides.  (Doc. No. 1954).  The second *Daubert* hearing, scheduled for 15 March 2022, was to cross-examine the remaining defense experts, Michael B. Bottorff, Pharm.D., and George E. Johnson, Ph.D.

However, plaintiffs' lead counsel, Adam Slater, Esq., emailed the court on 11 March 2022 that plaintiffs no longer wished to cross-examine Dr. Bottorff or Dr. Johnson, and the second *Daubert* hearing was cancelled.  What follows here is the Court's decision on plaintiffs' two remaining motions to preclude: the opinions of Michael  B. Bottorff and George Johnson.

**Michael B. Bottorff, Pharm.D.**

Dr. Bottorff's Declaration[2] (Doc. No.  1929-1) dated 24 February 2022 addresses many of the objections in plaintiffs'  motion to preclude.  The Court assumes he will testify at trial that his opinion is: because of  the capacity of the liver to completely metabolize what Dr. Bottorff describes as the trace levels of NDMA and NDEA in the contaminated Valsartan,

---

[2] As reported in *Daubert* Order 1 (Doc. No. 1958), the Court's procedure for the *Daubert*[2] hearings was this: those experts selected to testify at the *Daubert* hearings were required to submit sworn certifications as the accuracy of their opinions ["the Certifications"], and at the *Daubert* hearings, the opposing party could elicit from each selected expert only cross-examination testimony relating to only their opinions in the Certifications.

virtually no NDMA or NDEA could have or did reach the systemic circulation or organs beyond the liver.  In his deposition, Dr. Bottorff stated he was only looking at research that informed on doses that did not cause cancer.  In his Declaration (Doc. No. 1929-1), however, Dr. Bottorff states he examined  all animal studies and does acknowledge there are animal studies that did demonstrate cancers associated with the intake of NDMA/NDEA.   Although I fully expect Dr. Bottorf will be vigorously cross-examined at trial about how and whether NDMA ingested amounts overload the liver's metabolization process, I find his methodology acceptable.

Dr. Bottorff's dose conversion methodology is not what the FDA or other government health agencies across the world use.  But, there is no showing that his conversion to 70 kilograms to account for what he terms a normal size human adult is not an accepted methodology. That is, there is no showing that the FDA method is the only acceptable methodology.  Dr. Bottorff explains that he never attempted to calculate a dose that would or could cause cancer in humans because, in his opinion, the amounts of NDMA or NDEA contaminants in even the highest dosage of Valsartan would never approach a cancer-causing amount in humans.  (Bottorff Declaration, Doc. No. 1929-1, ¶17)

In their motion to preclude (Doc. No. 1712-2), plaintiffs complain Dr. Bottorff lacks sufficient knowledge of NDMA metabolism and relies on " underpowered" studies. Again, these perceived weaknesses in the substance of his opinion can be more thoroughly disputed during cross-examination.  Despite such disputed weaknesses in his opinion, the methodology that grounds Dr. Bottorff's opinion is acceptable in the relevant scientific community.

Accordingly, plaintiffs' motion to preclude (Doc. No. 1712) the testimony of Dr. Michael Bottorff is **DENIED.**

## George E. Johnson, Ph.D.

As to Dr. George E. Johnson, the dispute centers on his benchmark dose methodology [" BDM"] to calculate that amount of ingested NDMA/NDEA likely to cause cancer.   Clearly this is not the methodology used by many scientists, which  Dr. Johnson addresses extensively in his Declaration beginning at ¶3.  Doc. No.  1929-2.

While possibly not the best methodology by which to measure the probable cancer-causing ingestion amount of NDMA/NDEA in contaminated valsartan, BDM is nonetheless used by some in the relevant scientific community.  The PETO study relied on or cited by most parties' experts may or not entirely support  Dr. Johnson' s  conclusion.  But, once again, the

jury will have to decide--as for all the experts--whether an individual expert should or not have relied on certain studies.

Like all other defendants' experts, Dr. Johnson does not conduct research independent of this litigation, which is not necessarily fatal to his conclusions. I'm confident plaintiffs' counsel will point that out to the jury.

As to his threshold and conceptual assumptions, Dr. Johnson addresses these in his Declaration at ¶14. Doc. No. 1929-2. He uses the average weight of the plaintiffs for whom he had data. As with Dr. Bottorff's methodology, it is not unacceptable even though not the method used by the FDA and other governmental health agencies. In particular, Dr. Johnson does not use the TD- 50 linear extrapolation method used by all government health agencies, including the FDA and the WHO. Though fertile ground for cross-examination, the TD- 50 method has not been shown to be the only acceptable methodology by which to calculate a dosage of NDMA contaminant statistically likely to induce human cancer.

Dr. Johnson's work for large pharmaceutical companies may influence the jury that his opinion is biased in these companies' favor. But as defendants' counsel recognized, this potential bias goes to the weight of the evidence, not to admissibility. In in his Declaration, ¶17, Dr. Johnson explains why he thinks dietary studies are not significant and at ¶9 why he believes the human DNA repair mechanism completely eliminates mutations below the PDG. (Doc. No. 1929-2). The jury need not accept any of his opinions, but these are sufficiently grounded in recognized scientific methodology.

Accordingly, plaintiffs' motion to preclude (Doc. No. 1711) the testimony of defendants' expert Dr. George Johnson is **DENIED**.

Dated: 17 March 2022

s/ Robert B. Kugler
Honorable Robert B. Kugler
United States District Judge

# EXHIBIT 78

**IN THE CIRCUIT COURT**
**OF THE THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**



FILED

AUG 16 2022

CLERK OF CIRCUIT COURT #91
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

| | |
|---|---|
| JOSEPH BAYER and GWENDOLYN CULVERSON, | ) ) ) |
| Plaintiffs, | ) ) |
| -vs- | ) )   Case No.: 2021-L-000915 |
| BOEHRINGER INGELHEIM PHARMACEUTICALS, INC. et al., | ) ) ) ) |
| Defendants. | ) ) |

**ORDER DENYING BRAND DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF NAGI B. KUMAR, PH.D.**

This matter is before the Court on Defendants Boehringer Ingelheim Pharmaceuticals Inc., GlaxoSmithKline LLC, GlaxoSmithKline Holdings (Americas) Inc., and Pfizer Inc.'s (collectively, "Brand Defendants") Motion to Exclude Certain Opinions of Nagi B. Kumar, Ph.D., pursuant to Illinois Rule of Evidence 702. The Court held a hearing on this and other motions on August 9, 2022, and **ORDERED** that:

Brand Defendants' Motion to Exclude Certain Opinions of Nagi B. Kumar, Ph.D. is **DENIED**.

Dated: 16 Aug 2022

_____
HONORABLE SARAH D. SMITH
CIRCUIT JUDGE

**Motion to Seal/Sealed and Exparte Filings:**

9:20-md-02924-RLR IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

## U.S. District Court

## Southern District of Florida

### Notice of Electronic Filing

The following transaction was entered by Gilbert, Robert on 9/14/2022 at 11:14 PM EDT and filed on 9/14/2022

| | |
|---|---|
| **Case Name:** | IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION |
| **Case Number:** | 9:20-md-02924-RLR |
| **Filer:** | Zantac (Ranitidine) Products Liability Litigation |
| **Document Number:** | 6011 |

**Docket Text:**
**Sealed Document *Plaintiffs' Reply in Support of Their Motion to Exclude Defendants' Putative Expert Opinions on General Causation Under Rule 702* by Zantac (Ranitidine) Products Liability Litigation. (Attachments: # (1) Exhibit Ex. 76 2022.03.02 Valsartan Daubert Tr., # (2) Exhibit Ex. 77 2022.03.17 Valsartan Daubert Order 2, # (3) Exhibit Ex. 78 2022.08.16 Bayer et al - Kumar Frye Order[99]) (Gilbert, Robert)**

**9:20-md-02924-RLR No electronic public notice will be sent because the case/entry is sealed.**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1105629215 [Date=9/14/2022] [FileNumber=22556850-0] [658bbcf5fe1ffe5977567f9739cc8d04766c6f502918dedd9d90d63bf462e1629f9eaa70801ba0d00456358508c541579a00a4026053f64e23f767d719091994]]
**Document description:**Exhibit Ex. 76 2022.03.02 Valsartan Daubert Tr.
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1105629215 [Date=9/14/2022] [FileNumber=22556850-1] [35528c0caedb1db33b6be2a3b36dc622f57b498dd6d7f33b8e91f014f057f81f35436eb6f17477d4a607ac54b5ee50ca3f865c66713cb7326e9870aff75a9fda]]
**Document description:**Exhibit Ex. 77 2022.03.17 Valsartan Daubert Order 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1105629215 [Date=9/14/2022] [FileNumber=22556850-2] [79351922032beb9b8e6013bdb33dc816e12ef37b5892e885f5862f8e49f51b3cc79ecc35889475ed0a90252dfb09dad6007c1b6114fb04b8c2ef8c6a584efb68]]
**Document description:**Exhibit Ex. 78 2022.08.16 Bayer et al - Kumar Frye Order[99]
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1105629215 [Date=9/14/2022] [FileNumber=22556850-3] [26c83e02bc50ddcfc86348f33497107592a49618211293cdbe686df63430a86976a59347f76d2d2683a7600ffc98547db1ed981a19f243f7635656ee5478c0c4]]