**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE:  ZANTAC (RANITIDINE)                                          MDL NO. 2924
PRODUCTS LIABILITY LITIGATION                                        20-MD-2924

                                                    JUDGE ROBIN L. ROSENBERG
                                         MAGISTRATE JUDGE BRUCE E. REINHART

_____/

THIS DOCUMENT RELATES TO:  ALL ACTIONS


**BRAND DEFENDANTS' OPPOSITION TO MOTION**
**TO EXCLUDE TESTIMONY OF DR. ROBERT GIBBONS**[1]

---

[1] This Motion is filed under seal pursuant to the Order at ECF No. 5684.

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ......................................................................................................................... 2

I.      THE EMERY STUDIES AND DR. DAVIS' STATISTICAL ANALYSIS ..................... 2

II.     DR. GIBBONS' QUALIFICATIONS AND OPINIONS ................................................. 4

ARGUMENT ............................................................................................................................... 7

I.      DR. GIBBONS' OPINIONS ARE PROPER REBUTTAL OPINIONS
UNDER RULE 702 ........................................................................................................ 7

II.     PLAINTIFFS' CRITICISMS DO NOT MAKE DR. GIBBONS' OPINIONS
INADMISSIBLE UNDER RULE 702 ........................................................................... 8

      A.     Dr. Gibbons' Supposed Misunderstandings About the Emery Studies
Underscore Why Dr. Davis' Statistical Analysis Is Unreliable ............................. 8

      B.     Dr. Gibbons Applies the Same Generally Accepted Statistical Standards
that the FDA Uses When Assessing Statistical Significance ............................... 11

      C.     Dr. Gibbons' Simulations Provide Further Support for His Conclusions ........... 13

CONCLUSION .......................................................................................................................... 15

# TABLE OF AUTHORITIES

## CASES

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) -------------------------------------------------------------------------------- 1, 7

*Diamond Resorts U.S. Collection Dev., LLC v. Newton Group Transfers, LLC*,
  No. 9:18-CV-80311, 2022 WL 1642865 (S.D. Fla. Mar. 31, 2022) ------------------------------ 15

*In re Zyprexa Prods. Liab. Litig.*,
  489 F. Supp. 2d 230 (E.D.N.Y. 2007) ------------------------------------------------------------ 15

*Interra Int'l LLC v. Al Khafaji*,
  No. 1:16-CV-1523-MHC, 2020 WL 10727982 (N.D. Ga. Sept. 18, 2020) --------------------- 15

*Lewis v. Carnival Corp.*,
  570 F. Supp. 3d 1189 (S.D. Fla. 2021) ------------------------------------------------------------- 7

*Navelski v. Int'l Paper Co.*,
  244 F. Supp. 3d 1275 (N.D. Fla. 2017) ------------------------------------------------------------- 7

*Wreal LLC v. Amazon.com, Inc.*,
  No. 14-21385, 2016 WL 8793317 (S.D. Fla. Jan. 7, 2016) ------------------------------------7, 15


## RULES

Fed. R. Evid. 702 ------------------------------------------------------------------------------------- 7, 8

**INTRODUCTION**

Despite being framed as a *Daubert* motion, Plaintiffs do not—because they cannot—challenge Dr. Robert Gibbons' qualifications or methodology.  Dr. Gibbons is a biostatistician with more than forty years of experience, who the Brand Defendants retained to assess the statistical analysis of Plaintiffs' expert, Dr. Charles Davis.  Dr. Davis had analyzed data from various tests that Plaintiffs' expert, Dr. Ron Najafi, conducted on ranitidine samples.  Dr. Gibbons reviewed that analysis and identified numerous flaws in Dr. Davis' methods.  He concluded, among other things, that the sample sizes were too small for any meaningful statistical analysis.  And he criticized Dr. Davis for failing to make the statistical adjustments needed when multiple tests are involved.  That is a proper rebuttal opinion based on well-established and generally accepted statistical methods, and the Court should deny Plaintiffs' motion to exclude Dr. Gibbons.[2]

None of Plaintiffs' other arguments affect the admissibility of Dr. Gibbons' opinions.  Plaintiffs criticize Dr. Gibbons for failing to understand how Dr. Najafi conducted the tests, *see* Opp. at 5–9, but that is precisely Dr. Gibbons' point.  Dr. Gibbons carefully reviewed Dr. Najafi's report and observed that it lacked basic information about how the experiments were conducted and how the data was collected, which made Dr. Davis' statistical analysis of the data suspect.  Plaintiffs argue that Dr. Gibbons' opinion about the small sample size should be disregarded, *id.*, because he did not know that each observation was the result of testing on a single pill that was destroyed with each test.  But that fact is irrelevant, because the sample size is the number of observations reported—and it is undisputed that Dr. Gibbons used the correct number of

---

[2] The Brand Defendants have separately moved to exclude the opinions of Dr. Davis.  *See generally* Brand Defs.' Mot. to Exclude Ops. and Testimony of Pls.' Experts, Ramin Najafi, Ph.D., and Charles Davis, Ph.D. and Other Experts Who Rely on Their Ops. (June 13, 2022) (ECF No. 5732).  If the Court grants that motion and excludes Dr. Davis' opinions, the Brand Defendants will withdraw Dr. Gibbons as a rebuttal expert.

observations in his analysis of the sample size.  Plaintiffs claim that Dr. Gibbons is holding Dr. Najafi's testing and Dr. Davis' statistical analysis to unreasonably strict standards that not even the FDA would require.  *Id.* at 9, 11.  But Dr. Gibbons applies basic statistical concepts that researchers—including the FDA—routinely use in designing and evaluating studies.  Finally, Plaintiffs accuse Dr. Gibbons of not believing in his own opinions, because he did not make certain statistical adjustments in running his own simulations of the data.  *Id.* at 9–10.  Putting aside Plaintiffs' mischaracterizations of those simulations, that critique misses the point of Dr. Gibbons' simulations:  Dr. Gibbons designed the simulations to show how ***not*** adjusting for multiplicity can lead to the spurious results reported by Dr. Davis.

## BACKGROUND

### I.      THE EMERY STUDIES AND DR. DAVIS' STATISTICAL ANALYSIS

In September 2019, the FDA announced that N-Nitrosodimethylamine ("NDMA") was found in "some ranitidine products . . . at low levels" that "barely exceed amounts you might expect to find in common foods."  FDA, *Statement Alerting Patients and Health Care Professionals of NDMA Found in Samples of Ranitidine* (Sept. 13, 2019), www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine.  The FDA, as well as other international regulatory agencies and independent researchers, conducted additional testing on ranitidine and reported similar findings.  *See* Olsen Rep. at 41–42 (Pl.'s Ex. 14) (describing baseline NDMA data found by the FDA, Health Canada, the Saudi Food & Drug Authority, the Australian Therapeutic Goods Administration, and researchers in Spain).[3]

---

[3] Citations to Plaintiffs' exhibits are to those attached to the Declaration of Tracy Finken in Support of Plaintiffs' Motions to Exclude Defendants' Expert Opinions (July 6, 2022) (ECF No. 5840).

Rather than rely on this regulatory and peer-reviewed testing, Plaintiffs retained Dr. Najafi—a chemist at Emery Pharma—to run additional experiments on ranitidine tablets. Dr. Najafi tested expired and unexpired ranitidine samples that Defendants produced in litigation years after the drug was withdrawn from the U.S. market,[4] and reported baseline NDMA results that were much higher than those found by the FDA. *See* Najafi Rep. at 62–63 (Pl.'s Ex. 13); Olsen Rep. at 41–43 (Pl.'s Ex. 14). By varying storage temperatures, Dr. Najafi also purported to simulate different post-purchase conditions, such as storing ranitidine in the car or bathroom medicine cabinet (the "Sun, Shade, and Shower" or "SSS" studies) and in various climatic zones (the "Zone" studies). *See* Najafi Rep. at 115–16 (Pl.'s Ex. 13).

Plaintiffs then retained Dr. Davis to perform a statistical analysis of the results. In preparation of his analysis, Dr. Davis developed a Statistical Analysis Plan ("SAP"). *See* Davis Rep. at 2 (Pl.'s Ex. 4). That SAP was not peer-reviewed, and after Dr. Davis received the Emery data, he had to alter the SAP because the testing did not fit within his pre-specified methods. *Id.*; Gibbons Dep. at 87 (Pl.'s Ex. 31). With respect to the baseline data, Dr. Davis organized the data based on twelve factors (*e.g.*, temperature control, manufacturer, etc.) to see whether those factors affected NDMA levels in ranitidine. *See* Davis Rep. at 2 (Pl.'s Ex. 4) ("The purpose of the baseline data analysis was to investigate the association between each of multiple factors (described in the Baseline SAP) and the baseline NDMA level."). For eight of the factors, Dr. Davis concluded that there was a statistically significant difference in the baseline NDMA levels. *See id.* at 3–4, 6–7 (describing the "factors for which there are statistically significant differences in the baseline NDMA levels"). With respect to the SSS and Zone data, Dr. Davis concluded that "[t]here appear

---

[4] At his deposition, Dr. Najafi did not know whether his laboratory tested all of the samples produced in litigation and could not explain how samples were selected for testing. *See* Najafi Dep. at 366–67 (Ex. C).

to be substantive increases in the NDMA level" with exposure to more cycles of heat and humidity. *Id.* at 7.

## II.     DR. GIBBONS' QUALIFICATIONS AND OPINIONS

The Brand Defendants retained Dr. Gibbons—a biostatistician with four decades of experience—to review Dr. Davis' statistical analysis.  Dr. Gibbons is a Professor of Biostatistics at the University of Chicago.  *See* Gibbons Rep. at 4 (Pl.'s Ex. 5); *id.* at App. 2 (curriculum vitae). He has authored seven books, including one of the leading textbooks on statistics, and has published more than 350 peer-reviewed scientific papers.  *Id.* at 4.  He is a peer-reviewer for top journals in the field of statistics, including *The Journal of the American Statistical Association*, *Biometrics*, and *Statistics in Medicine*.  *Id.* at App. 2.

Dr. Gibbons also has extensive experience in designing and analyzing data in studies involving pharmaceutical drugs.  For example, he analyzed clinical trial data that looked at the safety and efficacy of antidepressants fluoxetine, venlafaxine, and varenicline.  *Id.* at 5.  He helped develop the statistical methodology used to show that the sedative Halcion had comparable efficacy and safety to other drugs in its class.  *Id.* at 4.  He reviewed data relating to the use of antiepileptic drugs in studies involving 180,000 patients.  *Id.*  And he looked at the safety data for Chantix, an antismoking drug, which led the FDA to remove the boxed warning from the label. *Id.*; Gibbons Dep. at 203 (Pl.'s Ex. 31).

In reviewing Dr. Davis' statistical analysis, Dr. Gibbons approached the task as if he were peer-reviewing an article for publication.  *See* Gibbons Dep. at 91–92 (Pl.'s Ex. 31) ("[I]f I had reviewed as an independent statistician [Dr. Davis'] statistical analysis plan, I would've never approved it for reasons that were obvious before anyone looked at the data.").  Specifically, Dr. Gibbons reviewed (1) Dr. Davis' report and appendices, including the SAPs and data, and (2) Dr. Najafi's report and appendices, including the testing protocols.  *See* Gibbons Rep. at App. 1 (Pl.'s

Ex. 5).  Following his review, Dr. Gibbons concluded that "[t]here are numerous design and statistical methodological flaws with the study that Dr. Najafi designed and the data that Dr. Davis analyzed."  *Id*. at 6.

Dr. Gibbons has three opinions of particular relevance to this Motion.  ***First***, Dr. Gibbons concludes that Dr. Najafi's study designs are flawed.  The baseline samples, for example, were not randomized.  *See id*. at 15.  "Randomization" refers to the "process by which subjects are assigned to experimental conditions by chance alone," *see id*. at 11, and helps rule out biases that may be produced because of differences in the characteristics of the subjects, *see id.* at 12.  Dr. Najafi's report, moreover, lacks sufficient details about how the data was collected:  it does not "provide [ ] information on how specific samples were identified [or] whether there was any processing that took place prior to delivery of the data to the expert[.]  For example, were any samples initially identified but eventually excluded because, say, of technical issues regarding the measurement of NDMA?  Similarly, were any samples excluded because of missing data?"  *Id.* at 21.

***Second***, Dr. Gibbons opines that Dr. Davis' statistical analysis of the baseline data is "invalid due to multiplicity of testing and confounding factors."  *Id*. at 6.  "Multiplicity" is the increased likelihood of false positives based on multiple testing.  *See id.* at 10; Davis Dep. at 139 (Pl.'s Ex. 28).  For example, when one test is performed at the 5% significance level, there is a 1 in 20 chance of obtaining a statistically significant result by chance alone; if more than one test is performed each at the 5% significance level, the likelihood of at least one statistically significant result by chance alone increases with each test.  *See* Gibbons Rep. at 10 (Pl.'s Ex. 5); Gibbons Dep. at 116 (Pl.'s Ex. 31).  Plaintiffs' own expert, Dr. Davis, agrees that statisticians typically account for multiplicity by adjusting the significance level.  *See* Davis Dep. at 163–64 (Pl.'s Ex.

28).  But Dr. Davis made no such adjustments, risking false positive results.  *See* Gibbons Rep. at 12 (Pl.'s Ex. 5); Davis Dep. at 137 (Pl.'s Ex. 28).

"Confounding" refers to an extra factor that influences the explanatory and response variables, and can therefore create useless results.  *See* Gibbons Rep. at 10 (Pl.'s Ex. 5).  For example, Dr. Davis compared NDMA levels and manufacturers (BI Patheon, BI Patheon Chattem USA for Sanofi, BI Patheon Sanofi Canada, and BI Promeco), as well as NDMA levels and temperature control (controlled versus ambient).  *Id.* at 15.  But because BI Promeco stored almost all of its samples at ambient temperatures, whereas BI Patheon Chattem USA for Sanofi and BI Patheon Sanofi Canada stored none at ambient temperatures, the manufacturer and temperature control factors were confounded.  "[A]ny differences between manufacturers and differences between temperature control during storage cannot be separately estimated."  *Id.* at 15–16.

***Third***, with respect to the SSS and Zone studies, Dr. Gibbons concludes that they were unreliable because the sample sizes were "too small . . . to support valid statistical inferences."  *Id.* at 6; *see also id.* ("Based on the small samples and lack of details on how they were collected (by Dr. Najafi), it is unclear how the statistical estimates that are presented by Dr. Davis, generalize to the population.").  To determine the appropriate sample size needed to detect whether there is an effect, Dr. Davis agreed that a "power calculation" is typically run before conducting the study.  *See* Davis Dep. at 193–94 (Pl.'s Ex. 28).  But, as Dr. Gibbons observed, "there was no power calculation or other statistical analysis reported prior to the experimentation to support . . . the number of samples that would be sufficient to generalize to the population of samples and test the hypotheses of interest."  Gibbons Rep. at 21 (Pl.'s Ex. 5).  Dr. Gibbons therefore did not understand how Dr. Najafi justified using, for example, a sample size of 2 in some of the tests.  *See* Davis Rep. at App. 6, pg. 1 (Pl.'s Ex. 4) (noting a sample size (n) of 2).

## ARGUMENT

**I.     DR. GIBBONS' OPINIONS ARE PROPER REBUTTAL OPINIONS UNDER RULE 702**

For expert testimony to be admissible under Fed. R. Evid. 702, the witness must be qualified, the opinions must be based on sound methodology, and the testimony must be helpful to the trier of fact.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993); *Lewis v. Carnival Corp.*, 570 F. Supp. 3d 1189, 1191 (S.D. Fla. 2021) (Rosenberg, J.) (citing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005)).  A rebuttal expert like Dr. Gibbons can critique and refute Plaintiffs' experts' methodologies and opinions without offering alternative analyses.  *See, e.g.*, *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1302 (N.D. Fla. 2017) ("The task of a rebuttal expert is different from that of an affirmative expert.  A rebuttal expert, by definition, criticizes or rebuts the methodology or opinions of another expert.  There is no requirement that a rebuttal expert offer a competing [ ] analysis, for example; his opinions properly may be limited to criticizing the analysis and conclusions presented by another party." (citations omitted)); *see also* Brand Defs.' Resp. to Pls.' Mot. to Exclude Inadmissible Ops. of Dr. Bernard Olsen at 7 (Aug. 24, 2022) (citing additional cases).

Plaintiffs do not dispute that Dr. Gibbons satisfies these basic requirements.  Dr. Gibbons has spent more than forty years teaching statistics, has authored hundreds of articles, and has peer-reviewed countless others.  *See supra* p. 4.  Tasked with assessing Dr. Davis' statistical analysis, Dr. Gibbons reviewed that expert report and calculations as if he were peer-reviewing an article for publication and applied generally accepted statistical concepts.  *See supra* p. 4.  And allowing Dr. Gibbons to testify will no doubt help the jury understand the limitations of Dr. Davis' opinions. *See Wreal LLC v. Amazon.com, Inc.*, No. 14-21385, 2016 WL 8793317, at *17 (S.D. Fla. Jan. 7,

2016) ("[T]he jury would benefit from Dr. Maronick's opinion reviewing and critiquing Dr. Sarel's methodology.  He would explain why he believes the alleged flaws in Dr. Sarel's survey are important and why they bias the results. . . . That is appropriate rebuttal testimony, and it would be helpful to the jury.").  There is, accordingly, no basis to exclude Dr. Gibbons from testifying at trial.

## II.    PLAINTIFFS' CRITICISMS DO NOT MAKE DR. GIBBONS' OPINIONS INADMISSIBLE UNDER RULE 702

Rather than challenge Dr. Gibbons' qualifications or methodology, as Plaintiffs must, they (1) take issue with Dr. Gibbons' understanding of Dr. Najafi's studies, (2) claim Dr. Gibbons is applying unreasonably strict standards in reviewing Dr. Davis' work, and (3) criticize the simulations that Dr. Gibbons ran in illustrating certain concepts.  Even if these were valid arguments (they are not), none of them renders Dr. Gibbons' opinions inadmissible.

### A.    Dr. Gibbons' Supposed Misunderstandings About the Emery Studies Underscore Why Dr. Davis' Statistical Analysis Is Unreliable

Dr. Gibbons' so-called misunderstandings about how Dr. Najafi designed the studies do not require this Court to exclude him at trial; they in fact support his opinion that the studies were poorly designed and that reliable statistical inferences cannot be drawn from the data.  *See supra* p. 5.

*First*, Plaintiffs criticize Dr. Gibbons' "characteriz[ation of] Emery Pharma's testing as 'poorly designed'" despite his "admi[ssion that] he has no idea *how* it was designed."  Mot. at 7 (emphasis in original).  That is Dr. Gibbons' point:  although he carefully reviewed Dr. Najafi's report, it was not clear how Emery "actually designed the experiments."  Gibbons Dep. at 37 (Pl.'s Ex. 31).  Dr. Najafi's report, for example, failed to explain how or from where the data was collected.  *See supra* p. 5.  It failed to explain why the samples were not randomized.  *See supra*

8

p. 5.  And it failed to include any power calculations justifying the very small sample sizes.  *See supra* p. 6.

Dr. Gibbons, moreover, was not alone in his confusion about the study design.  Dr. Davis also did not understand how Dr. Najafi had conducted the experiments.

> Q.    [Y]ou don't know how any of the samples that are—that formed the data that was in the spreadsheet, you have not [*sic*] idea how those samples were collected?
>
> A.    No, I wasn't involved in that.
>
> Q.    Okay.  You have no idea [ ] how any of those samples were chosen? . . .
>
> A.    No.
>
> Q.    Okay.  You don't know if there was data or samples that were asked for and not received?
>
> A.    I don't know that.
>
> Q.    You don't know if there were samples that were received, but that were not tested?
>
> A.    I would have no way of knowing that.

Davis Dep. at 59 (Pl.'s Ex. 28); *id.* at 195 (admitting that "I have no knowledge or information of what was done" to support the sample size); *id.* at 239 ("Q.  [Y]ou don't know how this data was collected. . . .  A.  I don't have the information."); *see also id.* at 55 (admitting that he "skim[med]" Dr. Najafi's report and only "after my report was written").

***Second***, Plaintiffs claim that Dr. Gibbons' criticism about the small sample size should not be credited, because he did not "understand just how large the sample size truly was."  Mot. at 8; *see supra* p. 6 (Dr. Gibbons opined that the SSS and Zone studies were "too small . . . to support valid statistical inferences").  According to Plaintiffs, Dr. Gibbons did not know that liquid chromatography-mass spectrometry testing "destroys each individual pill after testing," and that

each observation actually involves "at least two test results for each reported value."  Mot. at 6.[5]

But whether each individual pill is destroyed is irrelevant.  Here, it is undisputed that the sample

size is the number of observations *regardless of* the number of pills tested.  *See* Gibbons Rep. at

11 (Pl.'s Ex. 5) (the sample size in the Emery studies refers to the "number of subject[s] that are

enrolled into each experimental condition, or into the study as a whole"); Davis Rep. at 2 (Pl.'s

Ex. 4) (noting some of the comparisons in the Zone studies "are based on a sample size of only 2

observations per zone").   What matters is that Dr. Gibbons correctly used the number of

observations when evaluating sample size, and it is undisputed that he did so.

Indeed, using the number of observations as the sample size, Plaintiffs' own expert Dr.

Davis similarly concludes that the sample sizes are too small.  With respect to the SSS and Zone

data, Dr. Davis explains that "these analyses are limited by the very small sample sizes."  Davis

Rep. at 7 (Pl.'s Ex. 4); *see also id.* at 4 ("[With respect to the SSS data set], the sample sizes were

too small to fit the types of prespecified repeated measures and analysis of variance models

specified in the SAP."); *id.* at 6 (noting that the "sample size for [certain of the Zone observations]

is only equal to 2").  And after seeing the data generated by Dr. Najafi, Dr. Davis had to modify

his prespecified SAP to account for the "extremely small sample sizes" in some of the baseline

data.  *Id.* at 2.[6]

---

[5] Although Plaintiffs claim that Dr. Gibbons does not understand how Dr. Najafi conducted the testing, Plaintiffs do not appear to have a firm grasp either.  Plaintiffs' Motion claims Dr. Najafi used Gas Chromatography-Mass Spectrometry (GC/MS), but Dr. Najafi purportedly used Liquid Chromatography-Mass Spectrometry (LC/MS).  *See* Najafi Rep. 60–61 (Pl.'s Ex. 13).  These are two significantly different processes.  *See* Olsen Rep. at 14 (Pl.'s Ex. 14).

[6] *See also* Gibbons Dep. at 90 (Pl.'s Ex. 31) ("Q.  Is it your opinion that Dr. Davis threw away most of his plan because the data that were actually available were inadequate to carry out those analyses? A.  It's my opinion that for the sun, shade and shower and zone studies, that's exactly what happened.").

*Third*, Plaintiffs criticize Dr. Gibbons for being "unfamiliar with the statistical analysis of drug testing generally," *see* Mot. at 6–7, but fail to explain what that specific background in "pill testing" is, let alone why it is required to review Dr. Davis' work, *see id.*[7]  As a biostatistician with more than four decades of experience, Dr. Gibbons understands the statistical concepts that Dr. Davis used (or in many cases did not use).  A particular background in pill testing is not required, for instance, to explain why the Emery sample sizes are too small or why the data should have been randomized.  Plaintiffs' myopic focus on pill testing, moreover, ignores Dr. Gibbons' extensive background in interpreting data related to drug safety.  *See supra* p. 4; *see also* Gibbons Dep. at 195 (Pl.'s Ex. 31) ("Q.  Can you think of any situation that you've been in where you've analyzed statistical properties related to pills that were tested?  A.  Well, I've analyzed lots of data on concentration distributions that are a function of characteristics of the sample.  So, lots of analogies to this.").[8]

## B.    Dr. Gibbons Applies the Same Generally Accepted Statistical Standards that the FDA Uses When Assessing Statistical Significance

Plaintiffs wrongly accuse Dr. Gibbons of imposing unreasonably strict standards on the Emery studies and on Dr. Davis' analysis of that data.  *See* Mot. at 9.  According to Plaintiffs, for

---

[7] It is also unclear what specific "pill testing" background Dr. Davis has—and Dr. Gibbons supposedly lacks—that qualifies Dr. Davis to analyze this particular data.

[8] Plaintiffs also claim that "Dr. Gibbons did not refute Dr. Davis' analyses that the likelihood that these findings [*i.e.*, the amount of NDMA found in the various Emery tests] were due to chance was extremely low."  Mot. at 8.  It is unclear how Plaintiffs can support this statement.  As Dr. Gibbons explains, "Dr. Davis uses analyses of variance (ANOVA) to examine the effects of 12 factors, such as temperature control, form, manufacturer, storage dose . . . that may affect NDMA levels in Zantac products. . . . For the 12 ANOVAs . . . [each yielded] a 46% chance of finding one or more significant results by chance alone."  Gibbons Rep. at 16 (Pl.'s Ex. 5); *see also id.* ("The probability of one or more of those pairwise comparisons being statistically significant by chance is . . . 76%."); *id.* at 17 ("The differences reported by Dr. Davis are consistent with what is found by chance alone."); *id.* at 18 ("These findings make it clear that the results of Dr. Davis's analyses [ ] could be produced by chance alone.").

"pill testing experiments, a power calculation is not commonly set up" and "[i]n fact, when the FDA tested pills and reported the results, the FDA did not perform a power calculation." *Id.* Similarly, Plaintiffs claim that "the FDA did not randomly select pills before testing ranitidine for NDMA." *Id.*

When the FDA assesses statistical significance, as Dr. Davis purports to do, it ***does*** routinely perform power calculations and randomization of subjects. For instance, in comparing urinary excretion of NDMA after ranitidine use versus placebo, FDA researchers performed a power calculation to determine the appropriate study size and randomized the study participants. *See* Jeffry Florian *et al.*, *Effect of Oral Ranitidine on Urinary Excretion of N-Nitrosodimethylamine (NDMA): A Randomized Clinical Trial*, 326 J. Am. Med. Ass'n 240, 243 (2021) (Ex. A) ("A sample size of 14 participants was determined to have a greater than 90% power to detect an increase in 24-hour urinary excretion of NDMA."); *id.* at 241 ("Study participants were randomized . . . using a random number generator.").[9]

Likewise, the United States Pharmacopeia ("USP"), the leading authority on public quality standards for the pharmaceutical industry, recommends power calculations and randomization. *See* USP General Ch. 1010, at 5 (Ex. B) ("It is important to determine the required sample size."); *id.* at 6 ("When possible, use of a random process is considered the most appropriate way of selecting samples.").

---

[9] The FDA's use of power calculations is consistent with Dr. Gibbons' own experience in analyzing the statistical significance of study results. *See* Gibbons Dep. at 87 (Pl.'s Ex. 31) (noting that Dr. Davis' "statistical analysis plan also did not include a power analysis, which is typical of statistical analysis plans"); *id.* at 90 ("Certainly in every statistical analysis plan that I've helped write or—or—or reviewed, the sample sizes, the statistical power analyses are prespecified, known in advance and known to be adequate for the purposes of testing hypotheses, that's certainly not the case here.").

The goal of the FDA in testing certain ranitidine samples, on the other hand, was different. The FDA set out to investigate whether elevated levels of NDMA was present, which simply requires the measurement of NDMA in those samples. The agency then recalled the product out of an abundance of caution based on a finding that some samples exceeded the acceptable daily limit—*not* based on a finding that the samples tested were representative of other pills in any statistically significant way. There was no reason for the FDA to conduct a power calculation or randomize samples in this situation. But Dr. Davis *did* claim to reach statistically significant results and was therefore required to follow generally accepted methods when doing so. Dr. Gibbons therefore correctly held the Emery testing to generally accepted statistical standards.

### C.      Dr. Gibbons' Simulations Provide Further Support for His Conclusions

To show that Dr. Davis' findings of statistical significance can be explained by chance alone, Dr. Gibbons ran a number of simulations using Dr. Najafi's data. These simulations provide further support for Dr. Gibbons' opinion regarding the flaws in Dr. Davis' statistical analysis.

For example, to demonstrate the effect of multiplicity, Dr. Gibbons took the baseline data, randomly re-assigned that data to different factors (*e.g.*, temperature control, manufacturer, etc.), and looked to see if there were any statistically significant differences. *See* Gibbons Rep. at 17 (Pl.'s Ex. 5); Gibbons Dep. at 120–21 (Pl.'s Ex. 31). Because Dr. Gibbons randomly re-assigned the data, any differences found had to be from chance alone. *See* Gibbons Rep. at 17 (Pl.'s Ex. 5) (explaining that the simulation created a "counterfactual experiment, where we know by design that none of the factors are related to NDMA levels. Any significant associations identified . . . are [therefore] false positive results"); Gibbons Dep. at 121 (Pl.'s Ex. 31) (explaining that any statistically significant differences "would be by chance because we'd simply randomly assign[ed] them to the different factors"). And in fact, Dr. Gibbons found—similar to what Dr. Davis found— several statistically significant differences in the randomly re-assigned data. *See* Gibbons Rep. at

17 (Pl.'s Ex. 5). This suggests that the differences reported by Dr. Davis are not actually differences, but are instead "consistent with what is found by chance alone." *Id.*[10] Dr. Gibbons then repeated the simulation 1,000 times and found similar results. *Id.* at 17–18.

Plaintiffs criticize these simulations because Dr. Gibbons did not "adjust for multiplicity." Mot. at 11. But that was intentional and precisely the purpose of Dr. Gibbons' experiment: to show what happens when a statistician fails to adjust for multiplicity as Dr. Davis failed to do. Dr. Gibbons' experiment illustrates that, without adjusting for multiplicity, many of the same statistically significant differences Dr. Davis found could be reached by chance alone. *See* Gibbons Dep. at 171 (Pl.'s Ex. 31) ("My point in my report is to indicate that there was no adjustment for multiplicity and therefore many of these results may well be due to chance alone."); *id.* at 98 ("[T]he very nature of my analyses show what happens if you don't adjust for multiplicity using exactly the data that Dr. Davis used.").

Plaintiffs also suggest that because none of the 1,000 simulations "had five or more statistically significant results . . . the chances that eight factors [as Dr. Davis found] had statistically significant results would be extremely low." Mot. at 9. Not so. Dr. Gibbons explained that his simulations "represent the lower bound of the effect, since [Dr. Davis] repeated these analyses on unexpired products, doubling the number of comparisons" and the effect of multiplicity. Gibbons Rep. at 17 (Pl.'s Ex. 5). Moreover, Dr. Davis' findings are inflated, because while Dr. Gibbons' simulations were "independent, that's not true for Dr. Davis' analyses . . . . [In

---

[10] *See also* Gibbons Dep. at 148–49 (Pl.'s Ex. 31) ("I'm showing the most conservative case of the effective multiples and showing that even in the most conservative case, because of the repeating of 12 different tests, I'm getting statistically significant results of the same magnitude as shown by Dr. Davis in his analysis of the actual data.").

Dr. Davis' analysis,] the factors themselves are—are confounded, they're not independent factors." Gibbons Dep. at 128 (Pl.'s Ex. 31).

In any event, as a rebuttal witness, Dr. Gibbons is not required to conduct his own statistical analysis, let alone run any simulations. *See, e.g.*, *Diamond Resorts U.S. Collection Dev., LLC v. Newton Group Transfers, LLC*, No. 9:18-CV-80311, 2022 WL 1642865, at *12 (S.D. Fla. Mar. 31, 2022) (Reinhart, J.) (allowing defendants' statistics expert, who was tasked to provide a rebuttal opinion, to testify, even though the expert had not "run his own model" of the data); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("[D]efendant's experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiff's experts.").[11]  Rather, Dr. Gibbons was asked to review Dr. Davis' statistical analysis to "assist the trier of fact in determining the weight, if any, to give to [Dr Davis' analysis]." *Wreal LLC*, 2016 WL 8793317, at *16.  Dr. Gibbons should be permitted to do just that.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to exclude Dr. Robert Gibbons.


Dated: August 24, 2022                          Respectfully submitted,


                                   By:  */s/ Anand Agneshwar*
                                        Anand Agneshwar
                                        ARNOLD & PORTER KAYE SCHOLER LLP
                                        250 West 55th Street

---

[11] *See also Interra Int'l LLC v. Al Khafaji*, No. 1:16-CV-1523-MHC, 2020 WL 10727982, at *5 (N.D. Ga. Sept. 18, 2020) ("As a rebuttal expert, Dopp is permitted to offer testimony that is critical of Hampton and Hampton's Report without offering his own opinion as to the amount of Plaintiff's damages.").

New York, NY 10019
Tel: (212) 836-8000
Fax: (212) 836-8689
anand.agneshwar@arnoldporter.com

*Attorneys for Defendants Sanofi US Services Inc.,
Sanofi-Aventis U.S. LLC, and Chattem, Inc.*

By:   */s/ Andrew T. Bayman*
        Andrew T. Bayman
        KING & SPALDING LLP
        1180 Peachtree Street, NE, Suite 1600
        Atlanta, GA 30309
        Tel: (404) 572-4600
        Fax: (404) 572-5100
        abayman@kslaw.com

        *Attorneys for Defendant Boehringer Ingelheim
        Pharmaceuticals, Inc.*

By:   */s/ Mark Cheffo*
        Mark S. Cheffo
        DECHERT LLP
        1095 Avenue of the Americas
        New York, NY 10036
        Tel: (212) 698-3500
        Fax: (212) 698-3599
        mark.cheffo@dechert.com

        *Attorneys for Defendant GlaxoSmithKline LLC*

By:   */s/ Joseph G. Petrosinelli*
        Joseph G. Petrosinelli
        WILLIAMS & CONNOLLY LLP
        680 Maine Ave. SW
        Washington, DC 20024
        Tel: (202) 434-5000
        Fax: (202) 434-5029
        jpetrosinelli@wc.com

        *Attorneys for Defendant Pfizer Inc.*

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of August, 2022, I electronically filed the foregoing document through the CM/ECF system, which will provide automatic notification to all CM/ECF participants.

*/s/ Anand Agneshwar*
*Anand Agneshwar*

1