## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)           MDL NO. 2924
PRODUCTS LIABILITY           20-MD-2924
LITIGATION

         **JUDGE ROBIN L. ROSENBERG**
         **MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**

### ORDER TO SHOW CAUSE WHY SUMMARY JUDGMENT SHOULD
### NOT BE ENTERED FOR DESIGNATED CANCERS AS TO ALL DEFENDANTS

This matter is before the Court on the Retailers' and Distributors' Motion for Summary Judgment at docket entry 6233, the Generic Defendants' Motion for Entry of Final Judgment at docket entry 6236, the Generic Defendants' Motion for Entry of Judgment at docket entry 6237, the Brand Defendants' Memorandum of Law Addressing Entry of Final Judgment at docket entry 6235, and the Plaintiffs' Memorandum Addressing Final Judgment at docket entry 6234. The Motions have been fully briefed and each matter is ripe for adjudication.

Each of the filings referenced above either seeks entry of final judgment or opposes entry of final judgment. After careful consideration, the Court concludes that its decision to enter final judgment or to decline the entry of final judgment must await certain threshold determinations. One such threshold determination is whether certain Defendants are entitled to summary judgment because, if they are, summary judgment would in turn entitle those Defendants to the entry of final judgment. The purpose of this Order is to resolve the question of summary judgment and, once

the question of summary judgment is resolved, the Court will return to the question[1] of which Defendants are entitled to final judgment and how final judgment will be entered.

The Court organizes this order as follows.  First, the Court (A) addresses why the Retailer, Distributor, and Generic Defendants (whom the Court will collectively refer to as the "Non-Brand Defendants") have standing to seek entry of final judgment.  Next, the Court (B) explains the Non-Brand Defendants' basis for the entry of final judgment.  Finally, the Court (C) issues an order to show cause why the Non-Brand Defendants should not receive the entry of summary judgment for the same reasons the Brand Defendants were entitled to summary judgment and (D) the Court sets a schedule for future briefing.

**A.  The Non-Brand Defendants' Standing to Request Entry of Final Judgment**

The Court concludes that the Non-Brand Defendants have standing to request the entry of final judgment.  To explain this conclusion, the Court must first (1) explain the structure of the pleadings in this MDL, (2) explain its prior rulings on those pleadings, and (3) explain how its prior rulings apply to specific, individual cases.

1.  The Structure of the Pleadings in this MDL

In Pretrial Order 31, this Court created a structure for personal injury pleadings.  That structure consists of two operative pleadings.  The first operative pleading is a master complaint, drafted by Plaintiffs' lead counsel and filed on the main MDL docket.  The second operative pleading is a Short Form Complaint, drafted by each individual Plaintiff's counsel (or *pro se* Plaintiff) and filed in each Plaintiff's individual case.

---

[1] The Court will soon enter other orders on other threshold issues as part of its resolution of the parties' competing requests for final judgment.  For example, the Court will enter a separate order requesting that the Eleventh Circuit return jurisdiction to this Court in the form of an indicative ruling.

The master complaint contains many claims arising under the laws of many jurisdictions, and the large number of claims stems from the fact that the master complaint is brought by Plaintiffs' lead counsel on behalf of *every* individual Plaintiff in this MDL.  Because individual Plaintiffs may elect to pursue only some of the claims in the master complaint, the individual Short Form Complaints are the vehicle by which individual Plaintiffs choose the claims in the master complaint that they are pursuing.  For example, each Short Form Complaint contains checkboxes for the claims pled in the master complaint.  An individual Plaintiff selects claims from the master complaint by checking the boxes for the appropriate claims, as shown in the following excerpt from a recently-filed[2] Short Form Complaint:

| [X] | IX | Negligent Product Containers: (Against Brand-Name and Generic Manufacturers of pills) | All States and Territories |
|---|---|---|---|
| [] | X | Negligent Storage and Transportation Outside the Labeled Range (Against All Retailer and Distributor Defendants) | All States and Territories |
| [X] | XI | Negligent Storage and Transportation Outside the Labeled Range (Against All Brand-Name and Generic Manufacturer Defendants) | All States and Territories |
| [] | XII | Negligent Misrepresentation (Against Brand-Name Manufacturers by Generic Consumers in California) | CA only |
| [] | XIII | Reckless Misrepresentation (Against Brand-Name Manufacturers by Generic Consumers in Massachusetts) | MA only |
| [X] | XIV | Unjust Enrichment (Against All Defendants) | All States and Territories |

In this example, the individual Plaintiff has elected to bring Count IX in the master complaint, a negligence claim against Brand Defendants and Generic Defendants, but has not elected to bring Count X, a negligence claim against Retailer Defendants or Distributor

---

2 This example is taken from case 23-CV-11202.

Defendants.  The individual Plaintiff in this example also elected to bring Count XIV, an unjust

enrichment claim against all Defendants.  These elections by the Plaintiffs do not name the *specific*

Defendants they are suing; rather, the Plaintiffs merely check the box in the Short Form Complaint

for the claim(s) they wish to bring against a *category* of Defendants.

 To show how individual Plaintiffs specify the Defendants in their Short Form Complaint,

the Court sets forth below another example.[3]  In this example, the Plaintiff brought claims against

the following Defendants:

> 6. Plaintiff(s) name(s) the following Defendants from the Amended Master Personal Injury Complaint in this action:
>
>  **a. Brand-Name Manufacturers:**
>  Boehringer Ingelheim Pharmaceuticals, Inc.; Boehringer Ingelheim Corporation; Boehringer Ingelheim USA Corporation; Boehringer Ingelheim International GmbH; Boehringer Ingelheim Promeco, S.A. de C.V.; GLAXOSMITHKLINE LLC; GLAXOSMITHKLINE HOLDINGS (AMERICAS) INC.; GlaxoSmithKline PLC; PFIZER INC.
>
>  **b. Generic Manufacturers:**
>  Amneal Pharmaceuticals of New York, LLC; Amneal Pharmaceuticals LLC; Apotex Corp.; Apotex Inc.; Dr. Reddy's Laboratories, Inc.; Dr. Reddy's Laboratories, Ltd.; Dr. Reddy's Laboratories LOUISIANA LLC; Dr. Reddy's Laboratories SA; Glenmark Pharmaceuticals, Inc. USA; L. Perrigo Co; Perrigo Company; Perrigo Research & Development Company; Sandoz, Inc.; Strides Pharma, Inc.; Ranbaxy, Inc.; Sun Pharmaceutical Industries, Inc.; Sun Pharmaceutical Industries Ltd.; Teva Pharmaceuticals USA, Inc.; Actavis Mid Atlantic LLC; Watson Laboratories, Inc.; Wockhardt Ltd.; Wockhardt USA LLC; Wockhardt USA, Inc
>
>  **d. Retailers:**
>  John Doe
>
>  **e. Others Not Named in the AMPIC:**
>  John Doe

---

3 This example is taken from case 23-CV-10154.

(The Short Form Complaint's reference to "AMPIC" corresponds to the master complaint at docket entry 2759).  Important to this Order, the individual Plaintiff in the immediately preceding example brings claims against many Brand Defendants, many Generic Defendants, and certain unidentified Retailer and Distributor Defendants.  This fact—the naming of non-Brand Defendants in the Short Form Complaints—is important because of the Court's prior rulings on motions to dismiss, as discussed below.

    2.   <u>The Court's Prior Rulings on the Master Complaints</u>

The first master personal injury complaint, the Master Personal Injury Complaint at docket entry 887, brought many different counts against Retailer and Distributor Defendants.   In December of 2020, the Court ruled on several motions to dismiss, and one of the Court's key rulings was the conclusion that most of the Plaintiffs' claims against Retailer and Distributor Defendants were pre-empted under federal law and were therefore dismissed.  However, one claim against the Retailer and Distributor Defendants, a claim for negligence, survived the Court's initial rulings and the Court permitted the Plaintiffs to replead the claim in a future master pleading.

Consistent with the Court's ruling on the initial motions to dismiss, Plaintiffs' lead counsel filed an Amended Master Personal Injury Complaint at docket entry 2759.  That master pleading contained one count against the Retailer and Distributor Defendants, a negligence count.  After a second round of motions to dismiss in July of 2021, however, the Court dismissed the negligence count without leave to amend.  The Court also dismissed with prejudice all claims against the Generic Defendants on pre-emption grounds.  Plaintiffs' lead counsel filed a Second Amended Master Personal Injury Complaint at docket entry at 3887 which, consistent with the Court's rulings, no longer contained any claim against the Generic, Retailer, or Distributor Defendants.  It

is this pleading, the second amended pleading filed in August of 2021, which is the operative master personal injury complaint in this MDL.

This brings the Court to a confusing case management issue.  The Court's Short Form Complaint examples above were filed very recently—February of 2023.  Yet they bring claims against Generic, Retailer, and Distributor Defendants who were dismissed in July of 2021.  In doing so, the Plaintiffs do not incorporate or rely upon the current, operative master pleading. Instead, the Short Form Complaints utilize and incorporate claims from an earlier, interim pleading, the Amended Master Personal Injury Complaint at docket entry 2759.

As a threshold matter, the Court is perplexed by the decision of many Plaintiffs to rely upon outdated, non-operative pleadings with claims that were previously dismissed.  For example, in one of the individual cases cited above (23-CV-10154), in February of 2023, the Plaintiff brought a negligence claim against a Retailer Defendant that the Court dismissed in July of 2021:

| | | Name and Generic Manufacturers of pills) | Territories |
|---|---|---|---|
| ✕ | X | Negligent Storage and Transportation Outside the Labeled Range (Against All Retailer and Distributor Defendants) | All States and Territories |
| | XI | Negligent Storage and Transportation Outside the | All States and |

The Plaintiffs' reliance upon non-operative pleadings in their Short Form Complaints conflicts with Pretrial Order 31, the pretrial order governing Short Form Complaints.  Pursuant to Pretrial Order 31, all claims in a master complaint "supersede and replace all claims pleaded in any complaint previously filed" in this MDL.  Thus, when Plaintiffs' lead counsel filed the operative master pleading, it superseded and replaced all prior master complaints and all prior pled claims.  This Court is not alone in struggling with some individual Plaintiffs' reliance upon dismissed, non-operative pleadings.  In an earlier appeal in this MDL, the Eleventh Circuit puzzled:

> At the time he filed the second amended [Short Form Complaint], it purported to incorporate the allegations of the [Master Personal Injury Complaint], but there was no operative [Master Personal Injury Complaint] to incorporate because the [Master Personal Injury Complaint] had been dismissed.
>
> . . .
>
> [T]he district court had no opportunity to enter any final judgment because [Plaintiff] filed a notice of appeal the very day he filed the second amended [Short Form Complaint] and at a time when there was no MPIC to incorporate.

DE 6146 at 12, 13.

The Court's best guess is that individual Plaintiffs have relied upon non-operative pleadings to preserve their right to appeal the Court's prior dismissal of certain claims in the master complaints. But Pretrial Order 31 contains a procedure that would, if invoked, permit a Plaintiff to preserve his or her right to appeal. Pursuant to Pretrial Order 31, individual Plaintiffs may include "additional allegations or causes of action not pleaded" in the master personal injury complaints. Thus, because the current operative master pleading does not contain any causes of action against Retailer, Distributor, or Generic Defendants, Pretrial Order 31 permits Plaintiffs to separately plead those causes of action. At the appropriate time, such claims could be adjudicated upon motion. For example, if applicable, the Court could dismiss claims in Short Form Complaints for all of the reasons set forth in its prior rulings on identical claims in the master complaints.[4] This brings the Court to another topic generating confusion in the context of the entry of final judgment: how the Court's rulings on the master complaints apply to individual cases.

---

4 Even though such a procedure would be grounded in Pretrial Order 31 and avoid the incorporation of non-operative pleadings, to the best of the Court's knowledge, no individual Plaintiff has ever, throughout the entire course of this MDL, exercised his or her right to separately plead a claim not pled in the master complaints.

### 3.  How the Court's Prior Rulings Apply to Individual Cases

The Plaintiffs previously maintained that the Court's rulings on the master complaints applied in each individual case without the need for any further action from the Court.  In other words, the Plaintiffs took the position that case-specific adjudication of Short Form Complaints was unnecessary. *E.g.,* DE 6223 (referencing a prior appeal taken without a final judgment).  Based upon that belief, the Plaintiffs previously appealed many of the Court's prior rulings, arguing to the Eleventh Circuit that their appeals were both perfected and timely.

The Eleventh Circuit disagreed, finding that the Plaintiffs' prior appeals were improper for at least two reasons.[5]  First, at any time a Plaintiff could seek to amend a Short Form Complaint. As explained by the Eleventh Circuit: "Indeed, [Plaintiff] could file a third amended [Short Form Complaint] today incorporating the second amended [Master Personal Injury Complaint] and selecting a new combination of claims to assert." *Id.* at 12.  Second, because each case has *two* operative pleadings, the Court's ruling on a master complaint was not sufficient—the Court had to adjudicate both a Short Form Complaint and the master complaint the Short Form Complaint utilized.  As explained by the Eleventh Circuit:

> [The Plaintiff] cannot unilaterally declare his second amended [Short Form Complaint] dead when the district court has not done so, and he cannot deny that this [Short Form Complaint] is still alive and pending in the district court.
>
> . . .
>
> Because there is no final ruling against his operative complaint—the combination of the [Master Personal Injury Complaint] and his [Short Form Complaint]—to put the last nail in the coffin of his action, we lack jurisdiction to consider [the Plaintiff's] appeal.

*Id.* at 13.

---

5 The Court's understanding of Pretrial Order 31 and the need for case-specific adjudication of its rulings on the master pleadings matched the Eleventh Circuit's understanding of the same.

What is clear from the Eleventh Circuit's discussion on this topic, and from Pretrial Order 31's requirements, is that if an individual case is to be dismissed or to receive final judgment, a Defendant must move for dismissal or for entry of final judgment. All of the Defendants have now done so. The Brand Defendants, as active Defendants in the master complaints, clearly have standing to request the entry of final judgment. As to Non-Brand Defendants, while they are no longer named in the master complaints, they continue to be named (to this very day) as Defendants in individual cases in Short Form Complaints, and it would therefore be incorrect to suggest (as the Plaintiffs have done from time to time) that the Non-Brand Defendants are no longer parties to this MDL. The Court concludes for all of the reasons set forth above that the Non-Brand Defendants also have standing to seek entry of final judgment in individual cases where they are named in the Short Form Complaint. As for why and how final judgment should be entered, however, that is a different, distinct topic, and it is to this topic to which the Court now turns.

### B.  The Defendants' Basis for Seeking Entry of Final Judgment

The Brand Defendants have moved for the entry of final judgment, and the basis for their request is both clear and unopposed: the Court previously granted summary judgment in the Brand Defendants' favor because, at the general causation *Daubert* stage of these proceedings, the Court struck each of the Plaintiffs' general causation experts. The Plaintiffs therefore do not oppose the Brand Defendants' assertion that, based upon the Court's *Daubert* ruling, the Brand Defendants are entitled to the entry of final judgment.

Turning to the Non-Brand Defendants, defining the extent to which they remain in this MDL is difficult. Perhaps individual Short Form Complaints name them as Defendants merely to preserve a right to appeal prior rulings, or perhaps individual Short Form Complaints name them

to register an intent to pursue future claims, such as through amendment at the proper time.  Either way, the Non-Brand Defendants have moved for the entry of final judgment for three reasons: (i) because of the Court's prior rulings on pre-emption at the motion to dismiss stage, (ii) because the Court should decline to give any individual Plaintiff further leave to amend Short Form Complaints,[6] and (iii) because of the Court's *Daubert* rulings on general causation.  These final two reasons are related, insofar as the Court could refuse to allow any further amendment to the Short Form Complaints as to Designated Cancer[7] claims because such amendment would be futile based on the Court's *Daubert* ruling that the Plaintiffs lack evidence of general causation for Designated Cancers.  The Court could therefore enter final judgment on *Daubert* grounds in favor of the Non-Brand Defendants for the same reasons that claims against the Brand Defendants are precluded.

The Plaintiffs, however, oppose the entry of final judgment in favor of any Non-Brand Defendant on *Daubert* and summary judgment grounds because those Defendants did not join with the Brand Defendants' *Daubert* motions and related summary judgment motion.  As the Retailer and Distributor Defendants point out, however, Rule 56(f) of the Federal Rules of Civil Procedure allows for the entry of summary judgment in a non-movant's favor.  Pursuant to that rule, after giving notice and an opportunity to respond, a court may grant summary judgment to a non-movant, and it to this topic that the Court now turns.

---

6 Pursuant to Pretrial Order 78, the deadline for a Plaintiff's unilateral ability to amend a Short Form Complaint has passed, but the Court has heretofore left open the possibility that amendment may be granted upon motion.
7 Designated Cancers are bladder, esophageal, pancreatic, stomach, and liver cancer.

### C. The Court's Order to Show Cause

This Order serves as a Rule 56(f) notice and grants the Plaintiffs the opportunity to address why the Non-Brand Defendants are not entitled to summary judgment for all the reasons the Brand Defendants were entitled to summary judgment. To aid in the clarity and structure of the parties' briefing as to this Order to Show Cause, the Court will detail its current thinking as to the following seven salient points: (1) the case management structure of this MDL always provided for the Court's general causation rulings to apply to all of the Plaintiffs' claims; (2) the Plaintiffs were free to take discovery from Non-Brand Defendants, if the Plaintiffs believed it would assist them to prove general causation; (3) the theoretical capability of ranitidine to cause cancer is the same across all Defendants; (4) the Court's ruling at *Daubert* would have been the same, regardless of discovery from Non-Brand Defendants; (5) the Court's application of its general causation ruling to Non-Brand Defendants should come as no surprise to the Plaintiffs; (6) the Court's ruling applies equally to both the Defendants and to the Plaintiffs; and (7) the Court's ruling results in efficiency and streamlines case management of the MDL.

#### 1. The Case Management Structure of this MDL

Soon after this MDL was initiated, the Court scheduled an initial conference. Prior to the initial conference, the parties conferred on whether they could, through agreement, propose a case management structure to the Court at the initial conference. Because the parties did reach an agreement, the parties presented their proposal to the Court at the initial conference.

The parties' agreement was premised upon each side receiving—as a concession from the opposing side—something that was important to the party.[8] For the Defendants' part, it was

---

8 As explained to the Court at the initial conference:

important to the Defendants that the Court set an expedited schedule for expert discovery on general causation, together with *Daubert* practice on the same.  The Plaintiffs agreed to this general causation schedule because, in return, the Defendants agreed to two items that were important to the Plaintiffs.  It was important to the Plaintiffs that they be able to take *all* discovery—discovery on the merits and discovery on general causation—as soon as possible and without bifurcation. Non-bifurcated discovery was important to the Plaintiffs because it was equally important to the Plaintiffs that, should they prevail on general causation *Daubert* challenges, they would be prepared to immediately shift their focus to bellwether trials and specific causation.

The parties' agreement to focus, at least initially, on motions directed to general causation made sense from a case management standpoint.  It made sense because the theoretical capability of ranitidine to cause cancer was a threshold, central issue that was dispositive of every claim in the master complaints.  Consistent with the dispositive nature of general causation in this MDL, the Plaintiffs recently conceded that, at least as to the Brand Defendants, final judgment should be entered in the Defendants' favor or all personal injury claims. *See generally* DE 6234.

The Court agreed with the parties' proposed case management schedule and memorialized its intent to organize this MDL around general causation in Pretrial Order 24.  In short, it was, from the very inception of this MDL, always the intent and design of the parties and of the Court

---

The agreement is that we will file our *Daubert* motions 18 months from June 1st, which will be about December 1st, 2021. Hopefully we will be out of quarantine by then. That will be the first brief that we file and will trigger opposition briefs, replies, ultimately a hearing on this issue. Between now and then, we will engage in non-bifurcated discovery. In other words, we, the Defendants, have agreed not to insist on case discovery or bifurcated discovery such that only general causation discovery will go first. We will agree that all discovery against the Defendants will happen within that 18-month period. That was important to the Plaintiffs because for them, if they prevail on some or all of the general causation hearing, they want to get right to it in working up individual cases for trial.

DE 960 at 189.

that general causation would, if decided in the Defendants' favor, be dispositive of all claims in the MDL.

### 2.   The Plaintiffs Were Free to Take Discovery from Non-Brand Defendants

In a recent filing, the Plaintiffs indicated that it would be wrong for this Court to apply its general causation ruling to the Retailer and Distributor Defendants because the Plaintiffs were deprived of the opportunity to take general causation discovery from those Defendants. DE 6263 at 3.   They were deprived of the opportunity, according to the Plaintiffs, because the Court previously dismissed the Defendants from the master complaints. *Id.* ("Discovery from the Retailers and Distributors would be relevant—discovery which never occurred, since claims against them were dismissed on a Rule 12 motion.").   The Plaintiffs do not explain, and the Court is unable to discern, why the Plaintiffs would have been unable to take third-party discovery from any Defendant previously dismissed from the master complaints.[9]   The Court presumes instead that the Plaintiffs deemed it unnecessary to take general causation discovery from Retailer and Distributor Defendants because it makes sense that the best source of discovery to prove the theoretical capability of ranitidine to cause cancer is from the Brand Defendants who designed and manufactured the product, not from members of the supply chain who merely resold the product, which brings the Court to its next point of discussion.

### 3.   The Potential of Ranitidine to Cause Cancer Applies Equally to All Defendants

The Court's ruling on general causation was on the Plaintiffs' evidence in support of the proposition that the ranitidine molecule is capable of causing cancer.   The Court's ruling was not on the theoretical capability of the ***Brand*** Defendants' ranitidine to cause cancer—it was on

---

9 The Plaintiffs engaged in third-party discovery in this MDL.  For example, the Plaintiffs sought discovery from a privately owned laboratory that conducted experiments for the Food and Drug Administration. *E.g.,* DE 3166.

ranitidine, generally; the ranitidine molecule and its propensity to cause cancer is the same no matter where it is found.  In a recent filing, the Plaintiffs strongly implied that if they had discovery from Non-Brand Defendants, their experts might have survived the Defendants' *Daubert* challenges: "To put the issue another way, an expert opinion that the brand manufacturers' ranitidine *in general* can cause cancer is not the same thing as an opinion that ranitidine that is *mishandled* in a specific manner can cause cancer." DE 6263 at 3.  The Court has several concerns with this statement.

      4.  <u>The Court's *Daubert* Ruling Would Not Have Been Altered with Non-Brand Discovery</u>

First, mishandled ranitidine is merely a subset of ranitidine, generally.  The Plaintiffs' burden at *Daubert* was to prove that *any* form of ranitidine could cause cancer, regardless of how ranitidine was handled in its supply chain.  Can ranitidine, if properly handled, cause cancer?  Can ranitidine, if not properly handled, cause cancer?  Both questions were subsumed within the question addressed by the Court at summary judgment—whether ranitidine could cause cancer, generally.

Second, in full recognition that "mishandled" ranitidine has a theoretically greater potential to cause cancer, the Plaintiffs' expert chemist (Dr. Najafi) thoroughly explored the potential of ranitidine to produce a carcinogen in "mishandled" conditions.  In Dr. Najafi's own words: "The drug product may be subject to various environmental conditions at the wholesalers' facility, pharmacy, during transport, and in the patient's possession." Najafi Report at 72.  To test the properties of "mishandled" ranitidine in a supply chain to produce a carcinogen, Dr. Najafi studied ranitidine exposed to 60-degree Celsius heat and 95% humidity in various combinations at various levels. *Id.* at 75-82.  Indeed, Dr. Najafi subjected ranitidine to extreme conditions (at varying

levels) for as long as 180 days. *Id.* at 81.  To put these parameters into context, 60 degrees Celsius is 140 degrees Fahrenheit.  The "feels like" temperature for 140-degree Fahrenheit heat, combined with 95% humidity, is around 600 degrees Fahrenheit. *Heat Index Calculator*, Nat'l Weather Serv., https://weather.gov/epz/wxcalc_heatindex (last visited Feb. 23, 2023).

Yet Dr. Najafi was not stricken as an expert witness because of insufficient data.  Instead, he was stricken for many other reasons, none of which would have been affected by theoretical discovery from Non-Brand Defendants.  Dr. Najafi was stricken, *inter alia*, because of his poor documentation of experiments and because of his excessive reliance upon assistants that exercised their own independent judgment.  Suffice it to say that if Dr. Najafi had performed additional experiments on Non-Brand Defendant discovery, those experiments would have been performed in the same laboratory, with the same protocols, and with the same assistants.

Additionally, the Plaintiffs' epidemiological experts, who were also stricken at the *Daubert* stage of the proceedings, would have been similarly unaffected by Non-Brand Defendant discovery.[10]  As a threshold matter, the Plaintiffs' epidemiological experts did not even rely upon the Plaintiffs' testing of the Defendants' product for their opinions—they relied upon data from the Food and Drug Administration. *E.g.,* McTiernan Report at 15 ("The Emery Lab testing results strengthen my causation opinions, but my opinions are not predicated on these higher levels.").  But even to the extent that the Plaintiffs' epidemiological experts did consider data from the Plaintiffs' own testing, the epidemiology in this case was necessarily based upon *ranitidine that traveled through the supply chain*.  The ranitidine consumed by participants in the epidemiology studies that the experts reviewed was handled by Brand Defendants, Generic Defendants,

---

[10] The Plaintiffs' secondary general causation evidence, such as experiments on animals, would have similarly been unaffected by Non-Brand Defendant discovery.

Distributor Defendants, and Retailer Defendants.  Stated differently, if "mishandled" ranitidine had the ability to cause cancer, the ranitidine epidemiology attempted to detect that ability.[11]  Yet for all of the reasons set forth in the Court's *Daubert* decision, no study outside of this litigation reached the conclusion that ranitidine causes cancer.  Finally, the Plaintiffs' epidemiologists even relied in great part (and quite possibly for the most part) on studies that had absolutely nothing to do with ranitidine or Non-Brand Defendants; they relied upon studies about rubber production, meat consumption, and well water. *Id.* at 16.

The Court struck the Plaintiffs' epidemiological experts for many reasons, none of which had anything to do with Non-Brand Defendant discovery.  By way of example, the Plaintiffs' epidemiological experts were stricken because they failed to adequately explain their methodologies and because they relied upon "cherry picked" data from studies to support their conclusions, conclusions that differed from the study authors' interpretation of the very same data.  In short, Non-Brand Defendant discovery would have had no bearing on the Plaintiffs' epidemiological experts or the Court's *Daubert* decision.

5.  <u>The Application of the Court's *Daubert* Decision to Non-Brand Defendants Should Come as No Surprise to the Plaintiffs</u>

During the Plaintiffs' general causation expert discovery, the Court heard argument on various motions to dismiss.  The Court ultimately dismissed Retailer and Distributor Defendants from the master complaints without leave to amend, but the Court made clear that just because those Defendants no longer faced claims in the master complaints, the Court's future general causation determination would still be relevant and important to those parties:

---

11 Much of the ranitidine studied in ranitidine epidemiology was not even sold in the United States.  Thus, the Plaintiffs attempted to use evidence from non-Brand third parties to prove that ranitidine can cause cancer, generally.

> The Court does not mean to suggest that this MDL is no longer relevant to the negligence claims against the Retailer and Distributor Defendants. For example, the Court will adjudicate a common issue that is highly relevant to the Plaintiffs' negligence claims—general causation. If the Plaintiffs lose on general causation, they will necessarily lose on every claim, including any individualized negligence claim. Similarly, the Court's *Daubert* rulings may limit the number of cancers that an individual Plaintiff may bring. Should only a subset of cancers survive *Daubert*, only some of the individual Plaintiffs could litigate an individualized negligence claim. Should the Plaintiffs survive the Defendants' *Daubert* challenges, then, at the proper time, an individual Plaintiff may seek to pursue his or her individualized negligence claim against a Retailer or Distributor Defendant. They simply cannot do so now for all of the reasons set forth in the Court's orders of dismissal.

DE 3913 at 5. The Plaintiffs never objected to the Court's observation that its general causation rulings would continue to apply (in the future) to Defendants dismissed from the master complaints. And this made sense to the Court because the application of general causation principles to every claim in the MDL is a self-evident, unobjectionable proposition.

6.   <u>The Court's Ruling Applies to the Defendants as Well as to the Plaintiffs</u>

Just as ranitidine's theoretical capability to cause cancer applies with equal force to all of the Plaintiffs' claims, it also applies to all of the Defendants' defenses. In the event this Court were to be reversed on its pre-emption and *Daubert* rulings and the previously dismissed Non-Brand Defendants were to return to this MDL and again be named in the master complaints, the Court would not permit those Non-Brand Defendants to bring their own general causation *Daubert* motions;[12] the issue would have already been decided as the law of the case. Because the ranitidine molecule is the same no matter which Defendant sold ranitidine, the Court's ruling on general

---

12 Of course, the Court's *Daubert* rulings would not preclude the Defendants from challenging any expert's conclusions at trial.

causation applies with equal force to all of the Defendants, whether they participated in the *Daubert* briefing or not.[13]

7.   Applying the Court's General Causation Ruling Across all Defendants Serves the Purpose of MDLs

The Retailer and Distributors persuasively argue that there is no unfairness in applying the Court's general causation ruling to all claims in the MDL because, instead, what would be unfair is if the Non-Brand Defendants were forced to endure the delay and expense of an additional, second, year-long general causation process merely because they previously succeeded at the motion to dismiss stage.  Relatedly, it is of course undisputed that, were the Plaintiffs to prevail on their appeal of the Court's rulings on the Non-Brand Defendants at the motion to dismiss stage, the Plaintiffs would have to have proof of general causation on remand.

By applying the Court's general causation ruling to the Non-Brand Defendants *now*, the Eleventh Circuit may consider on appeal whether the Non-Brand Defendants can proceed not only through the motion to dismiss of these proceedings, but also through the general causation phase. Otherwise, the Non-Brand Defendants and the Plaintiffs would have to wait upon a resolution of their motion to dismiss appeal, litigate general causation once more, and, if unsuccessful, again appeal the Court's general causation ruling to the Eleventh Circuit.  That is inefficient, and the Eleventh Circuit should have the opportunity to resolve all of the appeals and all of the cases in this MDL with one final, binding appellate ruling.  The efficiencies gained through the Court's application of its general causation ruling now is comparable to the case of *In re Lipitor*

---

13 Had any dismissed Defendant, such as a Retailer Defendant or Generic Defendant, moved to participate in the *Daubert* briefing process, the Court would have granted the request because the Non-Brand Defendants continued to be named in Short Form Complaints and because of the possibility that the Court's pre-emption rulings could be reversed on appeal.

*(Atorvastatin Calcium) Marketing, Sales Practices & Products Liability Litigation*, 892 F.3d 624 (4th Cir. 2018).

In *Lipitor*, the district court excluded the general causation experts for all of the plaintiffs that consumed less than 80 mg of the drug at issue but permitted plaintiffs who had consumed at least 80 mg to try to prove specific causation. *Id.* at 630. After a series of bellwether trials for the 80 mg plaintiffs, all of the plaintiffs' specific causation experts were excluded as well. *Id.* The district court then issued an order to show cause why summary judgment should not be entered in all of the remaining 80 mg plaintiff cases. *Id.* The remaining individual plaintiffs objected, arguing that they should have the opportunity to prove specific causation at trial, just as the bellwether plaintiffs did. *Id.* at 630-31. After analysis of the remaining plaintiffs' responses to the order to show cause (which did include some evidence), the district court entered summary judgment in favor of the defendant in all cases in the MDL. *Id.*

The Fourth Circuit affirmed, noting that the district court "was familiar with the science and issues" and that it could "dispose of the issues far more quickly and efficiently than dozens of courts spread across the country." *Id.* at 648-49. The Fourth Circuit further affirmed the district court's decision to decline additional specific causation litigation that would "essentially disregard the entire course of the MDL proceedings." *Id.*

The instant case resembles *Lipitor* in certain key respects. Like *Lipitor*, to not apply the Court's ruling on general causation to Non-Brand Defendants would "essentially disregard the entire course of the MDL proceedings." It was always the case management design of this MDL that general causation would impact every claim for every party. The Plaintiffs made their best argument as to why their evidence was sufficient to show that ranitidine can cause cancer, but the

Plaintiffs were unsuccessful.  This Court is familiar with the science at issue, and it can see no reason why its ruling does not apply to Non-Brand Defendants.  If the Court's *Daubert* conclusions were wrong and the Eleventh Circuit reverses, that reversal should apply to every Defendant in this MDL, Brand or Non-Brand.  The converse is true as well.  If the Eleventh Circuit affirms this Court's *Daubert* ruling, that affirmance should apply to every personal injury claim in this MDL.[14]

### D. Briefing Schedule on the Order to Show Cause

For all of the foregoing reasons, the Plaintiffs shall show cause why summary judgment should not be entered in favor of the non-Brand Defendants for Designated Cancers for the same reasons summary judgment was entered in favor of the Brand Defendants.  This Order to Show Cause, although it reflects the Court's current thinking on the points set forth above, is a non-final order subject to change after the Court reviews the Plaintiffs' response and the Defendants' reply.

The Plaintiffs shall file a joint response to this Order to Show Cause by April 17, 2023.[15]

The Defendants shall file a joint reply to the Plaintiffs' response by May 1, 2023.[16]

The response and reply shall be limited to thirty pages each.

All Plaintiffs in this MDL, including newly-filed Plaintiffs, may confer with Plaintiffs' Leadership and be heard, through Plaintiffs' Leadership, on this Order to Show Cause. *See generally* Pretrial Order 24.  The ability of newly-filed Plaintiffs to participate in the Order to

---

14 The Court will address the Plaintiffs' class claims in a separate order.

15 The Court has selected this date to permit as many Plaintiffs as possible the opportunity, through lead counsel, to respond to the order to show cause.  By approximately April 5, 2023, many thousands of Plaintiffs (former participants in a Registry database) are anticipated to have filed their claims in this MDL. *See* Pretrial Order 80.

16 The Court acknowledges that different Defendants may wish to raise different arguments, however, the Court believes that a joint response of thirty pages should be sufficient for each Defendant to be heard.

Show Cause process extends even to those Plaintiffs who have yet to have their case formally assigned and consolidated into this MDL.[17]

    **DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 28th day of February, 2023.

Copies furnished to Counsel of Record

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

---

[17] Because of the large number of newly-filed Plaintiffs in this MDL, the Clerk of the Court may lack sufficient staff to formally assign each newly-filed case to the undersigned before the deadline for the response to the Order to Show Cause.  The backlog of newly filed cases shall not impair the legal right of any Plaintiff to participate in the Order to Show Cause process through lead counsel.