UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION | MDL NO. 2924<br>20-MD-2924<br><br>JUDGE ROBIN L. ROSENBERG<br>MAGISTRATE JUDGE BRUCE E. REINHART |

_____/

THIS DOCUMENT RELATES TO: ALL CASES

### ORDER TO SHOW CAUSE WHY SUMMARY JUDGMENT SHOULD NOT BE ENTERED AGAINST ALL PLAINITFFS FOR DESIGNATED CANCERS, REGARDLESS OF THE DATE THE CASE WAS FILED, AND ORDER OF REQUIREMENTS FOR THE BRIEFING OF RESPONSES TO THIS ORDER TO SHOW CAUSE

This matter is before the Court on the Retailers' and Distributors' Motion for Summary Judgment at docket entry 6233, the Generic Defendants' Motion for Entry of Final Judgment at docket entry 6236, the Generic Defendants' Motion for Entry of Judgment at docket entry 6237, the Brand Defendants' Memorandum of Law Addressing Entry of Final Judgment at docket entry 6235, and the Plaintiffs' Memorandum Addressing Final Judgment at docket entry 6234.  The Motions have been fully briefed and each matter is ripe for adjudication.

In the above-referenced filings, the Defendants seek entry of final judgment and the Plaintiffs oppose entry of final judgment.  After careful consideration, the Court concludes that its decision whether to enter final judgment is based on certain threshold determinations.  One such threshold determination[1] is whether certain Defendants are entitled to summary judgment because, if they are, summary judgment would in turn entitle those Defendants to the entry of final

---

[1] The Court addressed the threshold determination of whether certain non-Brand Defendants are entitled to summary judgment at docket entry 6303.  Another threshold determination is whether the Court's summary judgment ruling disposed of the Plaintiffs' class action cases.  The Court will issue a separate order on that issue.

judgment. The purpose of this Order is to resolve the question of whether summary judgment should be entered in favor of certain Defendants in each Plaintiff's case without regard to the date the case was first filed; once the question of summary judgment is resolved, the Court will return to the question of which Defendants are entitled to final judgment and how final judgment will be entered.

The Court organizes this order as follows. First, the Court (A) gives a summary of the procedural history underpinning the dispute before the Court. Next, the Court (B) explains the parties' arguments on how, as a matter of due process, the Court should enter judgment before (C) the Court issues an order to show cause as to whether summary judgment should be entered against all Plaintiffs in this MDL. Finally, the Court (D) establishes certain requirements and sets a schedule for responses and replies to this Order to Show Cause.

**A. Procedural History Underpinning the Dispute Before the Court**

To summarize the relevant procedural history in this MDL, the Court first (1) explains why general causation was a focus of the Court's case management of the MDL and (2) explains how the parties briefed all general causation challenges.

1. General Causation Challenges and the Court's Case Management of the MDL

Soon after this MDL was initiated, the Court scheduled an initial conference. Prior to the initial conference, the parties conferred on whether they could, through agreement, propose a case management structure to the Court at the initial conference. Because the parties did reach an agreement, the parties presented their proposal to the Court at the initial conference.

The parties' agreement was premised upon each side receiving—as a concession from the opposing side—something that was important to the party.[2] For the Defendants' part, it was important to the Defendants that the Court set an expedited schedule for expert discovery on general causation, together with *Daubert* practice on the same. The Plaintiffs agreed to this general causation schedule because, in return, the Defendants agreed to two items that were important to the Plaintiffs. It was important to the Plaintiffs that they be able to take *all* discovery—discovery on the merits and discovery on general causation—as soon as possible and without bifurcation. Non-bifurcated discovery was important to the Plaintiffs because should the Plaintiffs prevail on general causation *Daubert* challenges, they would be prepared to immediately shift their focus to bellwether trials and specific causation.

The parties' agreement to focus, at least initially, on motions directed to general causation made sense from a case management standpoint because the theoretical capability of ranitidine to cause cancer was a threshold, central issue that was dispositive of every claim in the master complaints. Consistent with the dispositive nature of general causation in this MDL, the Plaintiffs recently conceded that, at least as to the Brand Defendants, final judgment should be entered in the Defendants' favor for many personal injury cases. *See generally* DE 6234.

---

[2] As explained to the Court at the initial conference:
> The agreement is that we will file our *Daubert* motions 18 months from June 1st, which will be about December 1st, 2021. Hopefully we will be out of quarantine by then. That will be the first brief that we file and will trigger opposition briefs, replies, ultimately a hearing on this issue. Between now and then, we will engage in non-bifurcated discovery. In other words, we, the Defendants, have agreed not to insist on case discovery or bifurcated discovery such that only general causation discovery will go first. We will agree that all discovery against the Defendants will happen within that 18-month period. That was important to the Plaintiffs because for them, if they prevail on some or all of the general causation hearing, they want to get right to it in working up individual cases for trial.

DE 960 at 189.

The Court agreed with the parties' proposed case management schedule and memorialized its intent to organize this MDL around general causation in Pretrial Order 24. In short, it was, from the very inception of this MDL, always the intent and design of the parties and of the Court that general causation would, if decided in the Defendants' favor, be dispositive of all cases in the MDL.

2. How the Parties Briefed General Causation Challenges

The deadline for the completion of all fact discovery, including discovery on issues relating to general causation, was January 24, 2022,[3] and the Plaintiffs served their general causation expert reports on the Brand Defendants the very same day. Second Amended Pretrial Order 65, page 2. Simultaneously with the production of their expert reports, the Plaintiffs selected the specific cancers for which they would produce general causation expert reports, and those cancers became known as Designated Cancers.[4] DE 5147.

The Brand Defendants produced their responsive expert reports on March 7, 2022, and the Plaintiffs produced their rebuttal reports on March 28, 2022. After the parties conducted depositions of the various experts, the Brand Defendants filed three *Daubert* motions challenging the Plaintiffs' general causation experts on June 13, 2022. Relatedly, the Brand Defendants filed a motion for summary judgment on the same day as their *Daubert* motions which asserted that, were the Court to grant each *Daubert* motion, the Brand Defendants would be entitled to summary judgment on all Designated Cancers.

---

3 The original deadline for discovery was set for the summer of 2021, however, upon Plaintiffs' motion the Court extended the deadline to December 2021.
4 The Plaintiffs initially pursued dozens of cancers.

4

The Plaintiffs responded to the Brand Defendants' motions on August 1, 2022, and the Brand Defendants replied on August 22, 2022.[5] The Court heard oral argument on September 21 and 22, 2022. After oral argument the Plaintiffs moved to amend their general causation expert reports. DE 6041. The Court granted the motion and the parties conducted supplemental discovery on the amendments. DE 6056. On December 6, 2022, the Court granted all of the Brand Defendants' *Daubert* motions and entered summary judgment in the Brand Defendants' favor for all Designated Cancers. DE 6120.

Each of the above-referenced tasks was performed not by any individual Plaintiff's counsel, but by Plaintiffs' lead counsel. The Court appointed lead counsel in Pretrial Order 20 and the Court conferred on lead counsel the duty, *inter alia*, to "brief and argue motions for the Plaintiffs and file opposing briefs and argue motions and proceedings initiated by other parties." Thus, while it is certainly true that, as a general matter, each individual Plaintiff is entitled to counsel of his or her choice, *e.g., In re BellSouth Corp.*, 334 F.3d 941, 956 (11th Cir. 2003), that general right yields to the case management challenges inherent to MDLs as complex as the one at bar. "[T]he right to counsel of choice is not absolute and can be overridden where the choice of counsel interferes with the orderly administration of justice." *In re Baycol Prods. Litig.*, No. 1431, 2007 WL 9717940, at *2 (D. Miss. July 13, 2007) (citing *United States v. Dinitz*, 538 F.2d 1214, 1219 (5th Cir. 1976)). The authority of an MDL court in a complex matter to appoint leadership attorneys to handle pre-trial matters, for the "orderly administration of justice," is a matter beyond debate. *See In re Air Crash Disaster at Fla. Everglades*, 549 F.2d 1006, 1014 (5th Cir. 1977) ("It

---

[5] The Plaintiffs filed their own *Daubert* motions challenging the Brand Defendants' general causation experts, but the Court denied those motions as moot and, as a result, the Plaintiffs' *Daubert* motions have no relevance to the matters before the Court.

is not open to serious question that a federal court in a complex, consolidated case may designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide.").

### B. The Parties' Dispute on How the Court Should Enter Judgment in this MDL

The Plaintiffs agree that final judgment should be entered, without an order to show cause process, in favor of the Brand Defendants[6] for all Designated Cancer cases filed prior to August 1, but they argue that the Court should not enter final judgment for post-August 1 cases without an order to show cause process. The Plaintiffs choose a date of August 1 because that is the date Plaintiffs' Leadership filed responses to the Brand Defendants' *Daubert* motions. For the Brand Defendants' part, they argue that final judgment should be entered, without an order to show cause process, in their favor for all Designated Cancer cases filed before December 6—the date the Court rendered its *Daubert* decision. DE 6234 at 1. The Defendants contend that cases filed after December 6 should not receive the entry of final judgment without an order to show cause process. DE 6235.

To support their selection of August 1 as the date an order to show cause process becomes necessary, the Plaintiffs pursue an argument based upon the Fourteenth Amendment to the Constitution. The Plaintiffs argue that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). If post-August 1 filed Plaintiffs are not afforded an opportunity to be heard prior to the entry of final judgment, the Plaintiffs argue, the Plaintiffs will have been deprived of due process.

---

6 The Court has separately issued an order to show cause why the Non-Brand Defendants should not receive summary judgment for all of the reasons the Brand Defendants were entitled to summary judgment. DE 6303.

6

The Court agrees with the parties' consensus that all Plaintiffs are entitled to a meaningful opportunity to be heard.  But the Court makes two observations about *how* the individual Plaintiffs must be heard and *when* they must be heard.

As for *when* the individual Plaintiffs must be heard, the Court fails to see how an arbitrary date of August 1 somehow divided the Plaintiffs into a group of those who received a meaningful opportunity to be heard and those who did not.  The filing of the Plaintiffs' *Daubert* opposition on August 1 is of no moment, as demonstrated by Plaintiffs' Leadership's own actions.  By way of example, after August 1 Plaintiffs' Leadership moved for their *Daubert* responses to be amended and their evidence in opposition to be supplemented—a request that the Court granted.[7]  And just as Plaintiffs' Leadership, acting on behalf of all of the Plaintiffs, had the opportunity to be heard after August 1 at oral argument and via a motion to amend their *Daubert* responses, Plaintiffs' Leadership—and indeed all of the Plaintiffs—continue to have the opportunity to be meaningfully heard to this very day, even if the procedural vehicle for that opportunity to be heard is a motion for reconsideration.  In short, either the Plaintiffs, collectively, have had (or will have) a meaningful opportunity to be heard, or they haven't, but the Court fails to see how any specific date created differing levels of due process.

As for *how* the Plaintiffs had or will have the opportunity to be heard, Plaintiffs' Leadership was appointed by the Court for that very purpose.  The Court appointed lead counsel to act on behalf of all the Plaintiffs, conferring on all Plaintiffs—through lead counsel—a meaningful

---

[7] Using Plaintiffs' Leadership's own logic, why wouldn't the relevant date be the date upon which Plaintiffs' responses were amended and supplemented? Relatedly, given that the Court asked many questions at oral argument to understand the Plaintiffs' responses, why wouldn't the relevant date be the date of oral argument? Distilled down, why would it be that Plaintiffs who filed cases on July 31 were afforded meaningful due process, but Plaintiffs who filed cases on August 1 were not?

7

opportunity to be heard. The Court also created a process wherein individual Plaintiffs could seek leave of Court to file motions or otherwise disagree with lead counsel, a process which remains in place to this very day. Either the MDL's case management structure allowed (and will continue to allow) the Plaintiffs the opportunity to be meaningfully heard or it didn't, but the Court's *Daubert* decision did not remove the ability of lead counsel to advocate on behalf of all Plaintiffs, nor did the *Daubert* decision remove the ability of any individual Plaintiff to file a motion or otherwise be heard.

The Court's observations above are brief because the Court has created, through this Order, an order to show cause process as the Plaintiffs have requested.

### C. The Court's Order to Show Cause

This Order serves as a Rule 56(f) notice, through an order to show cause process, and grants the Plaintiffs the opportunity to address why the Court should not enter summary judgment as to every Designated Cancer personal injury case in the MDL, regardless of the date the case was first filed, including cases filed on or after August 1, 2022, for of all the reasons the Brand Defendants were previously found to be entitled to summary judgment. To aid in the clarity and structure of the parties' briefing on this Order to Show Cause, the Court focuses on the following five salient points: (1) the case management structure of this MDL always provided for the Court's general causation rulings to apply to all of the Plaintiffs' cases; (2) the theoretical capability of ranitidine to cause cancer is the same across all Defendants and across all cases; (3) the Court's application of its general causation ruling to all of the Plaintiffs' cases should come as no surprise to the Plaintiffs; (4) the Court's ruling applies equally to both the Defendants and to the Plaintiffs; and (5) the Court's ruling results in efficiency and streamlines case management of the MDL.

1. <u>The Case Management Structure of this MDL</u>

As set forth in greater detail in Section (A)(1), *supra*, the parties agreed to focus on general causation on an expedited basis. Consistent with the parties' agreement, the Court ordered its case management structure upon the principle that general causation would be adjudicated as quickly as possible. At no point in time did any party voice an opinion to the Court that, although the Court should adjudicate general causation as quickly as possible, the Court would continue to adjudicate general causation on a rolling, case-by-case, individualized basis so long as additional cases continued to be filed in the MDL.

2. <u>The Potential of Ranitidine to Cause Cancer Applies Equally to All Defendants and All Cases</u>

The Court's ruling on general causation was on the Plaintiffs' evidence in support of the proposition that the ranitidine molecule is capable of causing cancer. The Court's ruling was not on the theoretical capability of any specific Defendant's ranitidine to cause cancer—it was on ranitidine, generally; the ranitidine molecule and its propensity to cause cancer is the same no matter where it is found and no matter which Plaintiff's case is implicated.

3. <u>The Application of the Court's *Daubert* Decision to Each Case Should Come as No Surprise to the Plaintiffs</u>

Long before the Court's general causation ruling, the Court heard argument on various motions to dismiss. The Court ultimately dismissed Retailer and Distributor Defendants from the master complaints without leave to amend, but the Court made clear that just because those Defendants no longer faced claims in the master complaints, the Court's future general causation determination would still be relevant and important to those parties:

> The Court does not mean to suggest that this MDL is no longer relevant to the negligence claims against the Retailer and Distributor Defendants. For example,

9

>  the Court will adjudicate a common issue that is highly relevant to the Plaintiffs' negligence claims—general causation. If the Plaintiffs lose on general causation, they will necessarily lose on every claim, including any individualized negligence claim. Similarly, the Court's *Daubert* rulings may limit the number of cancers that an individual Plaintiff may bring. Should only a subset of cancers survive *Daubert*, only some of the individual Plaintiffs could litigate an individualized negligence claim. Should the Plaintiffs survive the Defendants' *Daubert* challenges, then, at the proper time, an individual Plaintiff may seek to pursue his or her individualized negligence claim against a Retailer or Distributor Defendant. They simply cannot do so now for all of the reasons set forth in the Court's orders of dismissal.

DE 3913 at 5. The Plaintiffs never objected to the Court's observation that its general causation rulings would continue to apply (in the future) to Defendants dismissed from the master complaints. And this made sense to the Court because the application of general causation principles to every claim in the MDL is a self-evident, unobjectionable proposition.

    4.  <u>The Court's Ruling Applies to the Defendants as Well as to the Plaintiffs</u>

Just as ranitidine's theoretical capability to cause cancer applies with equal force to all of the Plaintiffs' claims, it also applies to all of the Defendants' defenses. In the event this Court were to be reversed on its pre-emption and *Daubert* rulings and the previously dismissed Non-Brand Defendants were to return to this MDL and again be named in the master complaints, the Court would not permit those Non-Brand Defendants to bring their own general causation *Daubert* motions;[8] the issue would have already been decided as the law of the case. Because the ranitidine molecule is the same no matter which Defendant sold ranitidine, the Court's ruling on general

---

[8] Of course, the Court's *Daubert* rulings would not preclude the Defendants from challenging any expert's conclusions at trial.

causation applies with equal force to all of the Defendants, whether they participated in the *Daubert* briefing or not.[9]

> 5. Applying the Court's General Causation Ruling Across all Personal Injury Cases Serves the Purpose of MDLs

The Retailer and Distributor Defendants persuasively argue that there is no unfairness in applying the Court's general causation ruling to all personal injury[10] cases in the MDL because, instead, what would be unfair is if the Non-Brand Defendants were forced to endure the delay and expense of an additional, second, year-long general causation process should the Eleventh Circuit reverse the Court's rulings at the motion to dismiss stage.  Relatedly, it is of course undisputed that, were the Plaintiffs to prevail on their appeal of the Court's rulings on the Non-Brand Defendants at the motion to dismiss stage, the Plaintiffs would have to prove general causation on remand.

By applying the Court's general causation ruling to every claim in the MDL *now*, the Eleventh Circuit may consider on appeal whether the Plaintiffs can proceed not only through the motion to dismiss of these proceedings, but also through the general causation phase.  Otherwise, the Defendants and the Plaintiffs would have to wait upon a resolution of multiple appeals and, were those appeals successful, go through yet another round of general causation litigation.  That is inefficient, and the Eleventh Circuit should have the opportunity to resolve all of the appeals and all of the cases in this MDL with one final, binding appellate ruling.  The efficiencies gained through the Court's application of its general causation ruling now is comparable to the case of *In*

---

9 Had any dismissed Defendant, such as a Retailer Defendant or Generic Defendant, moved to participate in the *Daubert* briefing process, the Court would have granted the request because the Non-Brand Defendants continued to be named in Short Form Complaints and because of the possibility that the Court's pre-emption rulings could be reversed on appeal.
10 The Court will address the Plaintiffs' class action cases in a separate order.

11

*re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products Liability Litigation*, 892 F.3d 624 (4th Cir. 2018).

In *Lipitor*, the district court excluded the general causation experts for all of the plaintiffs who consumed less than 80 mg of the drug at issue but permitted plaintiffs who had consumed at least 80 mg to try to prove specific causation. *Id.* at 630. After a series of bellwether trials for the 80 mg plaintiffs, all of the plaintiffs' specific causation experts were excluded as well. *Id.* The district court then issued an order to show cause why summary judgment should not be entered in all of the remaining 80 mg plaintiff cases. *Id.* The remaining individual plaintiffs objected, arguing that they should have the opportunity to prove specific causation at trial, just as the bellwether plaintiffs did. *Id.* at 630-31. After analysis of the remaining plaintiffs' responses to the order to show cause (which did include some evidence), the district court entered summary judgment in favor of the defendant in all cases in the MDL. *Id.*

The Fourth Circuit affirmed, noting that the district court "was familiar with the science and issues" and that it could "dispose of the issues far more quickly and efficiently than dozens of courts spread across the country." *Id.* at 648-49. The Fourth Circuit further affirmed the district court's decision to decline additional specific causation litigation that would "essentially disregard the entire course of the MDL proceedings." *Id.*

The instant case resembles *Lipitor* in certain key respects. Like *Lipitor*, to not apply the Court's ruling on general causation to all cases would "essentially disregard the entire course of the MDL proceedings." It was always the case management design of this MDL that general causation would impact every claim in every case. The Plaintiffs made their best argument as to why their evidence was sufficient to show that ranitidine can cause cancer, but the Plaintiffs were

12

unsuccessful. This Court is familiar with the science at issue, and it can see no reason why its ruling does not apply to all of the cases in this MDL. If the Court's *Daubert* conclusions were wrong and the Eleventh Circuit reverses, that reversal should apply to every Defendant in this MDL, Brand or Non-Brand, and it should apply to every case, regardless of when that case was filed. The converse is true as well. If the Eleventh Circuit affirms this Court's *Daubert* ruling, that affirmance should apply to every personal injury case in this MDL.

### D. Responsive Briefing to the Order to Show Cause

Consistent with the procedural basis for the Court's entry of this Order to Show Cause, Rule 56(f), the Court expects that the Plaintiffs' responses will be premised upon Rule 56 and the standard for summary judgment. Based upon the parties' briefing, however, the Court anticipates that the parties may additionally argue (i) whether the Plaintiffs **have been afforded due process**, (ii) whether the Court's *Daubert* ruling **was correct**, and (iii) whether the Court's *Daubert* ruling (and related summary judgment ruling) **applies** to certain individual cases.

With respect to whether the Plaintiffs **have been afforded due process**, the Court's understanding is that, because it has structured an order to show cause process as Plaintiffs' leadership requested, each Plaintiff will be, through that process, afforded due process. If the Court's understanding on that point is incorrect, however, the affected party should explain with particularity how the Court has denied any Plaintiff due process in light of the Court's order to show cause process set forth in this Order.

With respect to whether the Court's *Daubert* decision **was correct**, the Court's *Daubert* decision rested on many different, alternative grounds. By way of example, the Court excluded one of the Plaintiffs' primary epidemiologists, Dr. McTiernan, on as many as thirteen different

grounds. Therefore, if any party argues that the Court's *Daubert* decision was incorrect, such as requesting that the Court reconsider its decision, that party must address each alternative ground for the Court's *Daubert* decision, together with the requisite standard for a motion for reconsideration.

With respect to whether the Court's *Daubert* decision (and related summary judgment motion) **applied** to any particular case or **should or should not apply** to any particular case (such as a case filed after August 1), the Court **ORDERS** that a party arguing the same address the following topics in any response or reply:

    1.  <u>The Applicable Legal Standard</u>

With what standard should the Court analyze an argument that its summary judgment ruling does not or should not apply to a particular case? Is the standard the same as a motion for reconsideration, given that the Court has previously ruled? The Court notes that each individual case in this MDL, regardless of when it was filed, utilizes the same MDL master pleadings and avails itself of the same MDL record evidence—the same pleadings and the same evidence that gave rise to the Court's *Daubert* decision. The Court requires briefing on this subject because Plaintiffs' Leadership have suggested that individual Plaintiffs who filed (or file) their cases later in the MDL should have the opportunity to relitigate general causation. *E.g.,* DE 6234 at 3 ("[Individual Counsel] may oppose . . . setting forth individual arguments for why summary judgment cannot be entered. Others still may wish to seek discovery or bring new evidence to this Court's attention.").

    2.  <u>Case Management of MDLs</u>

In the event any party argues that a Plaintiff should have the opportunity to relitigate general causation (such as through a request for additional discovery or through a proffer of additional evidence), the parties must provide argument on how an individual Plaintiff's right to relitigate earlier consolidated decisions may be reconciled with the inherent case management challenges of a large toxic tort MDL. As this MDL has approximately 10,000 individual personal injury Plaintiffs, with hundreds of new cases being filed each week, the parties must explain how an MDL court could adjudicate general causation on an individualized basis, as opposed to a consolidated basis utilizing leadership counsel.[11] Relatedly, the parties must discuss whether individualized argument and objections on general causation would provide a disincentive for an MDL to expeditiously adjudicate any cross-cutting threshold issue, such as general causation, prior to the expiration of all statutes of limitations for Plaintiffs to file cases in the MDL. Finally, the parties should provide examples of cases where an MDL (or large toxic tort) case reached a *Daubert* or summary judgment decision on general causation but, for cases filed after the court's ruling, the court permitted the question of general causation to be relitigated.

3. Law of the Case

Also in the event any party argues that a Plaintiff should have the opportunity to relitigate general causation, the party must address the Court's general causation ruling in the context of the law of the case doctrine. "As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting

---

[11] Although the *Lipitor* court considered individualized evidence as part of an order to show cause process, the *Lipitor's* focus was on *plaintiff-specific* causation, not on *general* causation. *Lipitor*, 892 F.3d at 630-31.

15

against the agitation of settled issues.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988). Relatedly, the parties must address how the law of the case could be different for any individual late-filing Plaintiff, given the intent of many (earlier-filed) Plaintiffs to appeal the Court's *Daubert* decision. To explain, many Plaintiffs will soon appeal the Court's *Daubert* decision because the Court will soon, consistent with the parties' agreement, enter final judgment in many individual Plaintiff's cases. The parties must explain the potential disparity, then, with the Court reaching one conclusion on general causation for earlier-filed Plaintiffs who appeal to the Eleventh Circuit, but reaching a different general causation conclusion for later-filed Plaintiffs who relitigated the issue.

4. <u>Individual Plaintiffs who Utilized the Court's Registry</u>[12]

Should any party argue that a Plaintiff is entitled to relitigate general causation, the party should argue what effect, if any, a Plaintiff's prior participation in the Registry should have on the relitigation of general causation.

Turning to the scheduling and briefing of responses, Plaintiffs' Leadership shall file a joint response, after conferral with individual Plaintiffs who wish to respond to this Order to Show Cause, by April 18, 2023.[13]

Individual Plaintiffs who elect to file a response to this Order to Show Cause that differs from the response filed by Plaintiffs' Leadership may file a motion for leave to file a response by May 5, 2023. Before filing such a motion, individual Plaintiffs are not required to confer with

---

[12] The Registry is a private database of claims. A detailed description of the Registry and its purpose may be found at docket entry 6258. The vast majority of Plaintiffs who utilized the Court's Registry were represented by MDL leadership counsel.

[13] The Court has selected this date to permit as many Plaintiffs as possible the opportunity, through lead counsel, to respond to the order to show cause. By approximately April 5, 2023, many thousands of Plaintiffs (former participants in the Registry database) are anticipated to have filed their cases in this MDL because of impending statutes of limitations. *See* Pretrial Order 80.

Defendants or the Special Master. Individual Plaintiffs shall confer, however, with Plaintiffs' Leadership, and individual Plaintiffs must comply with the requirements of this Order to Show Cause, including the requirement to address certain topics. The Court reserves on whether it will require a supplemental response from Plaintiffs' Leadership on the content of any individual Plaintiff's response to this Order to Show Cause.

The Defendants shall file a joint reply to Plaintiffs' Leadership's response by May 2, 2023.[14] The Defendants shall file a joint reply to any individual Plaintiff's response by the deadline set by the Court in any order granting an individual Plaintiff leave to file a response.

All responses and replies shall be limited to thirty pages each.

The ability of newly-filed Plaintiffs to participate in the Order to Show Cause process extends even to those Plaintiffs who have yet to have their case formally assigned and consolidated into this MDL.[15] This Order to Show Cause applies to every Designated Cancer case in this MDL that has not received entry of a Rule 58 final judgment.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 31st day of March, 2023.

_____
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record

---

[14] The Court acknowledges that different Defendants may wish to raise different arguments, however, the Court believes that a joint response of thirty pages should be sufficient for each Defendant to be heard.

[15] Because of the large number of newly-filed Plaintiffs in this MDL, the Clerk of the Court may lack sufficient staff to formally assign each newly-filed case to the undersigned before the deadline for the response to the Order to Show Cause. However, the backlog of newly filed cases shall not impair the legal right of any Plaintiff to participate in the Order to Show Cause process, as individual Plaintiffs must file their motion for leave to file a response on the main MDL docket, not in any individual case. Nothing in this Order precludes an individual Plaintiff from filing a motion for extension of time.