## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

IN RE: ZANTAC (RANITIDINE)                          MDL NO. 2924
PRODUCTS LIABILITY                                   20-MD-2924
LITIGATION

                                        JUDGE ROBIN L. ROSENBERG
                            MAGISTRATE JUDGE BRUCE E. REINHART

_____/

THIS DOCUMENT RELATES TO: ALL CASES

### ORDER TO SHOW CAUSE ON CLASS
### PLAINTIFFS' MOTION TO STAY CLASS PROCEEDINGS

**THIS MATTER** comes before the Court upon the Class Plaintiffs' Motion to Stay Class

Proceedings. DE 6148.  The parties agree that the Court's prior *Daubert* ruling on general

causation applies to all of the class action claims filed in this MDL, which includes the medical

monitoring class action claims and the economic loss class action claims.  However, they disagree

on the *effect* of the *Daubert* ruling on these claims. DE 6227 at 6; DE 6234 at 1; DE 6254 at 1-2.[1]

In their Motion, the Plaintiffs[2] move the Court to stay class proceedings pending completion of

their appeals of the *Daubert* ruling, arguing that the Court should wait to apply the *Daubert* ruling

to the class action claims. DE 6148 at 7.  In response, the Defendants[3] oppose the stay of class

proceedings and request that the Court grant summary judgment for the Defendants on all of the

---

[1] All page number references herein to documents on the Court's docket are to the page numbers generated by
CM/ECF in the header of each document.

[2] "Plaintiffs" in this Order to Show Cause refers to the Plaintiffs pursuing class action claims in this MDL.  The
Plaintiffs' class counsel are also the lead counsel in this MDL. *See* DE 685 at 13-14 ("Lead Counsel will be responsible
for prosecuting any and all potential common benefit claims and class claims, as well as coordinating the pretrial
proceedings conducted by counsel for the individual Plaintiffs.").

[3] The Plaintiffs only bring class claims against the Brand Defendants.  Therefore, reference to "Defendants" or "Brand
Defendants" includes Boehringer Ingelheim Pharmaceuticals, Inc., Chattem, Inc., Sanofi US Services Inc., Sanofi-
Aventis U.S. LLC, Patheon Manufacturing Services, LLC, Pfizer Inc., and GlaxoSmithKline LLC.

class action claims now. DE 6227 at 26.  The Defendants also request[4] that the Plaintiffs' economic loss class action claims, a subset of the class action claims filed in this MDL, be dismissed for lack of standing and dismissed as pre-empted by federal law.  The Court has reviewed the Motion, DE 6148, the Response, DE 6227, the Reply, DE 6254, and the record.  The Court concludes that there are certain threshold determinations that bear on whether the Court should enter an extended stay of the class proceedings, as the Plaintiffs request, or grant summary judgment for the Defendants and/or dismiss the Plaintiffs' class actions claims, as the Defendants request.

After careful consideration, the Court enters this Order to Show Cause in order for the Plaintiffs to show cause why their economic loss class action claims should not be dismissed for lack of standing and as pre-empted by federal law.  Additionally, the Court issues this Order to Show Cause under Federal Rule of Civil Procedure 56(f), requiring the Plaintiffs to show cause why the Court should not enter summary judgment in the Defendants' favor for the Plaintiffs' economic loss class action claims for the same reasons that the Court entered summary judgment in the Defendants' favor[5] for the Plaintiffs' personal injury claims; this Order is not final as it serves only as Rule 56(f) notice.  All class proceedings are stayed pending the parties' briefing addressing these issues and the Court's ultimate ruling on the Plaintiffs' Motion.

In this Order, the Court outlines its current understanding of the medical monitoring class action claims and the economic loss class action claims.  The focus of the Order, though, is on the

---

[4] The Defendants previously moved for dismissal of the class claims on standing and pre-emption grounds. *See* DE 1580 DE 1630; DE 2515; DE 2532; DE 3114; DE 3116; DE 3715; DE 3720; DE 4107; DE 4487.  Their Response to the Motion requests that these issues (which were previously adjudicated in the Plaintiffs' favor) be revisited by the Court.

[5] By separate order, the Court has ordered the Plaintiffs to show cause under Rule 56(f) why summary judgment should not be entered in the non-Brand Defendants' favor for the same reason summary judgment was previously entered in the Brand Defendants' favor. DE 6303.  The Court has set a briefing schedule on that issue and does not address that matter in this Order.

economic loss class action claims. After the Court outlines its understanding of the economic loss class action claims, the Court then details threshold determinations that it must make regarding these claims and ultimately orders the Plaintiffs to respond to enable the Court to make the required threshold determinations.

## I.     Procedural History and Posture

As background for this Order to Show Cause, the Court briefly recounts the procedural history of all of the class action claims in this MDL. Over the course of two years, the Plaintiffs filed three rounds of two different class action complaints: the Medical Monitoring Class Action Complaint and the Economic Loss Class Action Complaint. Simultaneously, pursuant to the parties' agreement, the parties proceeded with fact discovery on all issues, including issues related to the class action claims and class certification, with the intent for the parties to proceed with class certification motions soon after the conclusion of the *Daubert* proceedings on general causation. DE 3619; DE 960 at 189-90, 193.

The Plaintiffs filed their first-round complaint on June 22, 2020. In this first round, the Plaintiffs included their medical monitoring and economic loss class action claims in one master complaint. *See* DE 889. The Brand Defendants, as well as the other defendants in this MDL, moved to dismiss the first-round master complaint on several grounds, including that the Plaintiffs' state-law claims for economic loss were pre-empted by federal law and that the Plaintiffs lacked standing to pursue their economic loss class action claims. *See, e.g.*, DE 1580 at 18; DE 1582 at 16; DE 1583 at 12-13; DE 1584 at 5; DE 1586 at 26; DE 1630 at 17. In a series of orders, the Court reserved[6] ruling on the issue of standing, found that the Plaintiffs' economic loss class action

---

[6] Because the Court determined that the first-round class action complaint was a shotgun pleading and dismissed the complaint without prejudice, the Court could not undertake a determinative standing analysis at that time.

claims as pled were pre-empted in part, and granted the Plaintiffs leave to amend their economic loss class action claims. DE 2532 at 36; DE 2515 at 27.

The Plaintiffs filed their second-round complaints on February 22, 2021. In this second round, the Plaintiffs filed the Consolidated Medical Monitoring Class Action Complaint and the Consolidated Amended Consumer Economic Loss Class Action Complaint separately, pursuant to the Court's Order. The Defendants moved to dismiss the second-round master complaints for several reasons, including, again, pre-emption and lack of standing. *See, e.g.*, DE 3105 at 14; DE 3114 at 6; DE 3116 at 35. On June 30, 2021, the Court found that the Plaintiffs, at that moment in time, had standing to pursue their economic loss class action claims. DE 3720 at 55 (determining that it was "reasonable, and arguably consistent with the reasoning in [*Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019)], to allow the case to proceed," while noting that the Court would return to the issue of standing when the factual record in the MDL developed). The Court also found that all of the Plaintiffs' economic loss class action claims relating to over-the-counter ("OTC") ranitidine *not* premised upon ranitidine's allegedly false or misleading label were pre-empted and granted the Plaintiffs leave to amend their complaint to omit such pre-empted claims. DE 3715 at 50.

The Plaintiffs filed their third-round complaints on August 2, 2021. In this third round, Plaintiffs filed the Amended Consolidated Medical Monitoring Class Action Complaint ("AMMC") and the Second Consolidated Amended Consumer Economic Loss Class Action Complaint ("SAELC"). The Defendants moved to dismiss both complaints, arguing that all of the Plaintiffs' economic loss class action claims were pre-empted. *See, e.g.*, DE 4107 at 12. The Court denied the Defendants' motions to dismiss, finding that the Plaintiffs had properly pled non-pre-

empted economic loss class action claims. DE 4487 at 17.  As a result, after three rounds of motions to dismiss and orders on the same, the motion to dismiss stage of the MDL concluded, and the AMMC and the SAELC became the operative class action complaints through the subsequent *Daubert* proceedings on general causation.

Although the parties had agreed, and the Court had ordered, class proceedings to begin after the conclusion of the *Daubert* proceedings, at present, the parties now have agreed not to move forward with class proceedings.  In light of the Court's *Daubert* ruling, the Plaintiffs move the Court to stay class proceedings pending completion of their appeals of the ruling. DE 6148 at 7.  And, in contrast, the Defendants, in their Response, request that the Court, "with the parties' assistance, develop appropriate orders to dismiss the putative class claims and enter final judgment as to each." DE 6227 at 26.

## II.    Medical Monitoring

In this section, the Court analyzes the Plaintiffs' medical monitoring class action claims. In the AAMC, twenty-seven named Plaintiffs brought medical monitoring class action claims on behalf of themselves and various proposed classes. DE 3884 ¶¶ 26-52, 463.  The Plaintiffs are individuals who allege that (1) they are at an increased risk of cancer because of their ranitidine consumption and, while they do not have cancer, (2) they require medical monitoring because of their ranitidine-induced, increased cancer risk. *Id.* at 13.

The Plaintiffs pled medical monitoring class action claims under state laws that require plaintiffs to prove causation.  Using Florida law as an example, to pursue a medical monitoring claim, a plaintiff must proffer evidence of

> (1) exposure greater than normal background levels; (2) to a proven hazardous
> substance; (3) caused by the defendant's negligence; (4) as a proximate result of

the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

*Petito v. A.H. Robins Co.*, 750 So. 2d 103, 106-07 (Fla. Dist. Ct. App. 1999) (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 138 (3d Cir. 1998)). Consequently, if a plaintiff lacks reliable evidence that a defendant's negligence significantly increased his or her risk of disease, then a court should dismiss the plaintiff's claim. *Id.* at 107; *see Williams v. Mosaic Fertilizer*, LLC, 889 F.3d 1239, 1242, 1250-51 (11th Cir. 2018).

In this MDL, the Plaintiffs lack reliable evidence that the Defendants' alleged negligence significantly increased their risk of cancer. In the Court's *Daubert* ruling, the Court ruled that the Plaintiffs lack reliable evidence with which to prove that ranitidine causes the Designated Cancers.[7] The Plaintiffs have also chosen not to proffer evidence that ranitidine causes Non-Designated Cancers.[8] DE 6299. Therefore, as the Plaintiffs concede,[9] the Court should grant summary judgment in favor of the Defendants on the Plaintiffs' medical monitoring class action claims because the Plaintiffs cannot prove ranitidine significantly increased their risk of cancer.

## III.    Economic Loss

In this section, the Court turns to the Plaintiffs' economic loss class action claims. First, the Court (A) explains its understanding of the economic loss class action claims in the SAELC.

---

[7] The Designated Cancers are bladder, esophageal, gastric, liver, and pancreatic cancers. DE 6120 at 15.

[8] The Non-Designated Cancers are all cancers that are not Designated Cancers.

[9] The Plaintiffs concede that summary judgment should be granted for the Defendants on the medical monitoring class action claims because the Plaintiffs explain that "affirmance of the [*Daubert* ruling] in its entirety would likely spell the death knell of the medical monitoring claims," DE 6254 at 2, and they do not argue in their Motion or Reply that the medical monitoring class action claims survive the *Daubert* ruling.

Next, the Court (B) explains the legal theory that the Plaintiffs previously advanced in support of the economic loss class action claims (misbranding) before turning to (C) the Plaintiffs' current legal theory (adulteration). Finally, the Court addresses certain threshold determinations about adulteration, such as (D) whether the theory was previously abandoned by the Plaintiffs, (E) whether such a theory can survive a federal law pre-emption analysis, and (F) whether the Plaintiffs have sufficient constitutional standing to pursue their legal theory, before the Court addresses its final topic, (G) whether the Court's prior *Daubert* ruling otherwise disposes of the Plaintiffs' economic loss class action claims.

### A. Overview of the Plaintiffs' Economic Loss Class Action Claims

In the SAELC, more than one hundred named Plaintiffs brought economic loss class action claims on behalf of themselves and various proposed classes. DE 3883 ¶¶ 25-135, 333. The Plaintiffs pursued refunds for the ranitidine that they purchased as a remedy for their economic loss class action claims. DE 4487 at 2. The claims themselves are an array of state-law claims alleging, among other causes of action, breach of implied warranties, unjust enrichment, and deceptive trade practices. Using the Plaintiffs' Arkansas Deceptive Trade Practices Act claim as a representative example, to pursue an economic loss claim, the Plaintiffs in this MDL must proffer evidence that the Defendants were

> knowingly and intentionally misrepresenting, omitting, concealing and failing to disclose material facts on the labels for its Ranitidine Containing Products, including that: such drugs were inherently defective, unreasonably dangerous, not fit to be used for their intended purpose, contained elevated levels of NDMA that rendered them unsafe and unfit for human consumption, and/or caused cancer.

DE 4240 at 12 (emphasis omitted) (quoting DE 3883 ¶ 1260). Therefore, to succeed on this economic loss claim and others, the Plaintiffs must prove that ranitidine was inherently defective,

unreasonably dangerous, not fit to be used for its intended purpose, or was unsafe and unfit for human consumption because it contained elevated levels of NDMA (a carcinogen).

The Plaintiffs sought to prove their case by showing that ranitidine could cause cancer. According to the Plaintiffs, ranitidine was inherently defective, unreasonably dangerous, unfit for its intended purpose, and unsafe for human consumption because ranitidine caused cancer.  Stated simply, it was the Plaintiffs' contention that the Defendants' sale of ranitidine was deceptive and in violation of Arkansas law, and the laws of other states, because the product caused cancer and contained no warning of its cancer-causing properties.  Relatedly, it was also the Plaintiffs' contention that an undisclosed cancer-causing drug violated Arkansas law on implied warranties and unjustly enriched the Defendants.  The Plaintiffs indicated that the "fundamental premise" of all of the economic loss class action claims in this MDL, including those stated under Arkansas law and those stated under the laws of other states, was that the ranitidine "label needed to warn about the risk of NDMA and cancer in order to avoid misleading consumers about the true nature of the product they were purchasing." DE 3325 at 14-15.  As a result, the alleged undisclosed cancer-causing property of ranitidine was a foundation of the Plaintiffs' demands for refunds in the SAELC.

### B. The Plaintiffs' Prior Legal Theory in Support of the Economic Loss Class Action Claims

Because the Defendants previously moved to dismiss the Plaintiffs' economic loss class action claims on the basis that federal law pre-empted the state-law causes of action, the Plaintiffs advanced a legal argument in support of their position that the claims were *not* pre-empted.  As the Plaintiffs explained, their legal theory was that the label on ranitidine was "false, misleading, and deceptive" under state law, and therefore cognizable, because it failed to warn consumers that

8

ranitidine could cause cancer, DE 4240 at 5-6, 12, and ranitidine's undisclosed potential to cause cancer simultaneously violated federal law, DE 3325 at 7.  Because the federal law at issue pertained to FDA regulations on "misbranded" drugs, the Plaintiffs referred to their theory as a "misbranding theory." *Id.*  Because both state law and federal law prohibited the sale of undisclosed cancer-causing drugs, the Plaintiffs argued, federal law did not pre-empt the Plaintiffs' state-law causes of action; instead, the Plaintiffs contended that state law and federal law were parallel and therefore compatible.

The foundation of the Plaintiffs' misbranding theory was the potential of ranitidine to cause cancer, and thus the Plaintiffs put forward evidence in the form of scientific expert opinions that ranitidine could cause the Designated Cancers.  The Defendants sought to exclude the Plaintiffs' experts' opinions under *Daubert*, and the Court ultimately agreed with the Defendants, finding that the Plaintiffs' expert opinions were unreliable.[10]  Without evidence of cancer causation, the Defendants argue that the Plaintiffs' economic loss class action claims cannot prevail as a matter of law on the current evidentiary record and, therefore, that they are entitled to summary judgment. The Plaintiffs disagree, arguing that they can still pursue their economic loss class action claims, even without evidence that ranitidine can cause cancer, under a legal theory other than misbranding.  The Plaintiffs refer to this other legal theory as an "adulteration" theory, and the Court now summarizes that theory, as best as the Court is able to understand the Plaintiffs' theory.

---

[10] The Court's *Daubert* ruling only applied to Designated Cancers, but the Plaintiffs, to date, have elected not to put forward evidence that ranitidine can cause Non-Designated Cancers in support of their claims for economic loss. DE 6299.

### C.  The Plaintiffs' Adulteration Theory

From the Court's review of the Plaintiffs' Motion and Reply, the Court understands the Plaintiffs' adulteration theory to proceed as follows: under federal law, 21 U.S.C. § 331, the Defendants had a duty not to manufacture and sell an adulterated drug; ranitidine was an adulterated drug because, pursuant to 21 U.S.C. § 351(a)(1), ranitidine contained a carcinogen, NDMA; therefore, when the Defendants manufactured ranitidine, which contained NDMA, the Defendants violated their duty under the Federal Food, Drug, and Cosmetic Act ("FDCA"); and, in doing so, the Defendants also violated a state-law duty not to sell products with trace amounts of carcinogens without a warning label.

The Defendants argue that the Plaintiffs cannot proceed on an adulteration theory for at least four reasons: the Plaintiffs previously abandoned their adulteration theory and cannot now revive that theory; such a theory would be pre-empted by federal law; such a theory does not confer sufficient constitutional standing on the Plaintiffs to pursue their claims for a refund; and the Court's *Daubert* ruling precludes the Plaintiffs from relief as a matter of law.  The Court addresses each argument in turn.

### D.  The Plaintiffs' Prior Abandonment of an Adulteration Theory

If a party abandons a legal theory and then succeeds on a contradictory legal theory, a court may invoke judicial estoppel to prohibit that party from relying upon the abandoned legal theory in a later stage of the proceedings. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  Judicial estoppel is appropriate when the party's reliance upon the abandoned legal theory would result in unfair prejudice to the other party, *id.* (quoting *Davis v. Wakelee*, 156 U.S. 680, 691 (1895)), or

harm "the integrity of the judicial process," *id.* at 750 (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982)).

Here, the Plaintiffs argue that they have pursued their economic loss class action claims under an adulteration theory throughout the MDL proceedings. DE 6254 at 5, 8. The Defendants argue that the Plaintiffs have not done so; further, they argue that the Plaintiffs abandoned such a theory and instead pursued only their misbranding theory. But the parties have not adequately briefed the standard for judicial estoppel or how that standard applies to the procedural history of this case. Lacking adequate briefing, the Court is not yet prepared to rule, for example, on whether the Plaintiffs' adulteration theory is "contrary" to their misbranding theory, whether the Plaintiffs' pursuit of an adulteration theory in the present would result in "unfair prejudice to the other party," or whether the Plaintiffs' pursuit of an adulteration theory would harm "the integrity of the judicial process." The parties should brief this subject in their forthcoming responses to this Order to Show Cause. What the Court can and will address at this juncture is (1) its understanding of the Plaintiffs' prior pursuit of an adulteration theory and (2) certain salient points that the parties must address in their response to this Order to Show Cause.

    1.  <u>The Court's Understanding of the Plaintiffs' Prior Pursuit of an Adulteration Theory</u>

There were three rounds of motion to dismiss in this MDL. In the first round, it was clear to the Court that the Plaintiffs were pursuing, as a general matter, the theory that ranitidine was misbranded and that ranitidine was also simultaneously adulterated. By way of example, the Plaintiffs at oral argument made repeated references to both legal theories. *E.g.,* DE 2498 at 127-28 ("The Plaintiffs allege that Ranitidine was misbranded and adulterated and therefore illegal to sell under the Food, Drug and Cosmetics Act."). Yet on a more *specific* matter—the Defendants'

argument that the Plaintiffs' state-law claims were pre-empted by federal law—the Plaintiffs' opposition focused not on alleged impurities in ranitidine (which could render ranitidine adulterated), but instead on ranitidine's *label* (which could render ranitidine misbranded).  On this matter, the Plaintiffs focused exclusively on ranitidine's label.  Therefore, the Court deemed Plaintiffs to have abandoned any argument that claims premised upon something *other than* a deficient label could survive the Defendants' federal pre-emption challenge, such as a claim based upon alleged adulteration.

The Court's belief that the Plaintiffs had abandoned, for pre-emption purposes, non-label-based claims was grounded in the Plaintiffs' written opposition as well.  At docket entry 1976, the Plaintiffs filed their opposition to the Defendants' first-round motion to dismiss on pre-emption grounds.  The word "adulteration" does not appear in the filing.  The word "impurity" also does not appear in the filing.  In contrast, the word "misbrand" appears 53 times and the word "label" appears 37 times.  In summary, the Plaintiffs focused on misbranding and the ranitidine label.  And this focus was grounded in a concession by the Plaintiffs on page 19 of their opposition that "[c]hanging the formulation of an approved medication is a major change requiring FDA preapproval."  In other words, the Plaintiffs conceded that the Defendants could not independently comply with any state-law duty to change the formulation or design of ranitidine.  Instead, the Plaintiffs sought to impose liability on the Defendants because they did not alter the ranitidine label which, unlike ranitidine's formulation and design, could, under certain circumstances, be modified by the Defendants without violation of federal law.

Based upon the Court's understanding that the Plaintiffs sought to survive the Defendants' pre-emption challenge on a labeling and misbranding theory—not an adulteration or a non-label-

based theory—the Court had the following to say in its ruling on the Defendants' first-round motion to dismiss:

> The Plaintiffs concede that the Defendants could not independently redesign the FDA-approved formulation of ranitidine products while remaining in compliance with federal law. DE 1976 at 16 (citing 21 C.F.R. § 314.70(b)(2)(i) for the proposition that "[c]hanging the formulation of an approved medication is a major change requiring FDA preapproval"). The Plaintiffs contend, however, that their design-defect claims should not be dismissed as pre-empted for two reasons. *Id.* at 7, 16. First, they have alleged in the Master Complaints that ranitidine products were "misbranded" as that term is defined in 21 U.S.C. § 352(a)(1) and (j). *Id.* at 20-21, 24. The U.S. Code prohibits the introduction of misbranded drugs into interstate commerce. *Id.* at 11, 21. And state laws prohibit the sale of defectively designed drugs. *Id.* at 21. Therefore, because federal law and state laws "parallel" to prohibit the same action, the sale of drugs that are misbranded and dangerous, there is no conflict between federal and state law and no impossibility in complying with both federal and state law. *Id.* at 17, 21-23. The Defendants can be held liable under state design-defect causes of action for failing to stop selling misbranded ranitidine products. *Id.* at 7, 17.

DE 2532 at 19.  The Court's ruling contains no discussion on adulteration.  Instead, the Court's ruling notes that the Plaintiffs "ha[d] provided neither argument nor caselaw" that "some of their claims are ***not*** premised upon the adequacy of ranitidine products' design or label" and that the Plaintiffs had instead "rest[ed] upon their misbranding argument." *Id.* at 30 (emphasis added).

Based upon the Court's understanding of the issues, the Plaintiffs' briefing, and the Plaintiffs' concessions, the Court permitted the Plaintiffs' misbranding theory, based upon ranitidine's labeling, to proceed and to be pled in a future complaint, but it did not permit non-label-based claims (such as some design defect claims) to proceed. *Id.* at 10.  After the Court's decision, the Plaintiffs never disputed the Court's premise for its analysis and ruling that the Plaintiffs had exclusively relied upon misbranding and labeling-based-claims to survive the Defendants' pre-emption challenge.

During the second round of motions to dismiss, the parties and the Court again focused on misbranding and labeling—not adulteration.  By way of example, at oral argument the Plaintiffs referenced adulteration only once, in passing. DE 2499 at 16.  The strength of the focus on misbranding is demonstrated in the following exchange with Plaintiffs' counsel at oral argument:

> THE COURT: This is a question for Plaintiffs. *Debernardis* posed two questions to ascertain standing. Number one, does a purchaser acquire a worthless product when he purchases an adulterated supplement; and if so, did the Plaintiffs adequately allege that the supplements they purchased were adulterated. ***Applying those questions to our case and substituting adulterated supplement with misbranded drug***, how would you answer these questions and why?

DE 2498 at 172-73 (emphasis added).  Thus, not only was the Court focused on misbranding, but the Court also asked for the Plaintiffs' counsel to substitute the phrase "misbranded drug" for "adulterated supplement" in counsel's discussion of a relevant, binding, and published case in the Eleventh Circuit.  This exchange demonstrates that the Court's understanding, based on the briefing, was that the Plaintiffs' adulteration theory was no longer relevant to the Plaintiffs' case, given the Plaintiffs' concessions during the first round of motions to dismiss and the Court's ruling based upon those concessions.

The Plaintiffs' reliance on misbranding was also made clear in the Court's second-round ruling on pre-emption.  From the Court's written ruling:

> Because the Plaintiffs have limited their opposition to § 379r pre-emption to the argument that "false or misleading label" claims are parallel to federal law, the Plaintiffs have abandoned any defense of OTC claims that are not premised upon a false or misleading label. The Plaintiffs conceded this point at the Hearing, admitting that, for example, their claims based upon negligent product containers would not, consistent with the Court's prior rulings, be parallel claims. Hearing Tr. at 206. ("Based on your Honor's previous order which limited the scope of misbranding to just the label, I think I would have to concede that the product container is not the label itself, and so the product container would not count to satisfy the misbranding definition."). The Court therefore grants the Defendants'

> Motion in part insofar as any OTC claim not based upon a false or misleading label is dismissed with prejudice as pre-empted.
>
> . . . .
>
> Initially, the Plaintiffs' Master Personal Injury Complaint alleged that ranitidine was adulterated—a potential legal basis to avoid a pre-emption challenge. *See* DE 887 at 97. The Plaintiffs either abandoned or waived this legal argument, however, when the Plaintiffs raised only misbranding—not adulteration—in their written responses to the Defendants' first-round motions to dismiss on pre-emption. Further, the Plaintiffs did not raise an adulteration defense to pre-emption at the hearing on the first-round pre-emption motions to dismiss on December 15, 2020. The Plaintiffs only argued adulteration in the context of establishing an economic injury in opposition to the Defendants' Motion to Dismiss for Lack of Standing.

DE 3715 at 20, 36.  Moreover, far from disputing that their claims were based upon something other than ranitidine's labeling, such as adulteration due to impurities, the Plaintiffs contended in their briefing on the second-round motion to dismiss that the "fundamental premise" of their claims was that the ranitidine "label needed to warn about the risk of NDMA and cancer in order to avoid misleading consumers about the true nature of the product they were purchasing." DE 3325 at 14-15.

2.   Salient Points on Adulteration and Abandonment that the Parties Must Address

Based upon the Court's understanding of the Plaintiffs' adulteration theory and the history of that theory throughout the MDL, the Court requires the parties to address three key points in their responses to this Order to Show Cause, as set forth below.

First, on the topic of the Court's understanding of the Plaintiffs' adulteration theory, do the parties agree, whether it be from the Plaintiffs' concession or from the Court's prior rulings, that no economic loss class action claim may proceed in this MDL unless the claim is based upon the adequacy of ranitidine's label?  If so, do the parties agree that the Plaintiffs' adulteration theory may only proceed in this MDL if it is based upon ranitidine's label?

15

Second, on the topic of abandonment, do the Plaintiffs agree that they abandoned the contention that the economic value of ranitidine was ever greater than zero?  To elaborate, at the hearing on the second round of motions to dismiss, the Court endeavored to understand whether the Plaintiffs were seeking a refund for their ranitidine purchases because the value of ranitidine was less than the purchase price, but something above zero, or whether the value of ranitidine was zero.  In other words, the Court endeavored to understand whether this MDL could be analogized to cases that found a cognizable economic loss because the consumer received only a *partial* value for the purchased product:

> THE COURT*:* Do you believe that you have alleged facts that would allow a fact finder to value the purported injury without resorting to conjecture; and if so, how?
>
> MS. FEGAN: Yes, I think fundamentally Plaintiffs' position is that this particular product was worth zero, but ultimately, at least in the cases that I have litigated in the pharmaceutical area, this is a question for the economists and how they will calculate damages, and under an econometric analysis, where that pans out. But ultimately, for purposes of today, we have certainly alleged that the Plaintiffs would not have purchased it, and that it was worth zero. This is not a price premium case given the nature of the NDMA, the risk of cancer, and the fact that it was recalled.
>
> THE COURT: Right. I am not reading it as a price premium case, but two different theories I think are being pled, worthless, one word, and worth less, two words. Right?
>
> MS. FEGAN: Yes, I think that that's right and I think one subsumes the other, but ultimately, for purposes at this stage, I don't think anything more is needed.

DE 3682 at 189.  Almost immediately after this exchange, the Defendants sought greater clarity on the Plaintiffs' position:

> MS. COHAN: I think both are being argued, the worthless and worth less, but I think Plaintiffs concede both are not pled. Here they have merely pled Plaintiffs would not have purchased the product if they had been aware of the alleged cancer risk. In addition, in their briefing throughout they have said that the product is worth zero dollars. So, I do think that, despite that argument, that is not something they have followed through on.

THE COURT: Well, I guess you do argue it at 3429 at page 36. Are you putting that forth as a theory, the worth less, two words? I know you are saying it is subsumed, but **I think the Defense should know what you are arguing right now**.

MS. FEGAN: Your Honor, when I think of worth less as two words, I think of drug price premium cases, and **I will commit this is not a price premium case, this is not about a slight overcharge and what it would have cost versus a competitor**. We are talking about a drug that was recalled because it causes cancer, and in that context **we are saying it as one word, it is worthless**.

*Id.* at 190 (emphasis added).

The Court requires discussion on this topic in the parties' forthcoming responses to this Order to Show Cause for the following reasons. If the Plaintiffs were to proceed with their economic loss class action claims on an adulteration theory, the Plaintiffs would be seeking a refund for their purchase of ranitidine due to trace impurities that are unconnected to harm because the Plaintiffs lack reliable scientific evidence that the trace impurities can cause harm. Given that the Plaintiffs have no reliable scientific evidence of harm and given that the Plaintiffs have not alleged that ranitidine failed to perform or alleviate the Plaintiffs' symptoms as advertised, *e.g., id.* at 139, the Court does not understand how a reasonable juror could conclude that the value of ranitidine was zero. And while the Court can intuitively understand how a reasonable juror could assign a reduced but non-zero value to a ranitidine purchase, the Plaintiffs "commit[ed] this is not a price premium case." *Id.* at 190. In light of the Plaintiffs' commitment on the record, the parties should brief in their responses whether the Plaintiffs can pursue an adulteration theory on the summary judgment record evidence.

Third and finally, the parties should brief whether the Plaintiffs' adulteration theory and the summary judgment record evidence departs so strongly from the SAELC that, in order for

17

Plaintiffs to pursue an adulteration theory, the SAELC must be amended to conform to the evidence, as the Defendants argue in their Response.  The Court's inquiry on this topic is based upon its observation and understanding that the core allegation in the SAELC is that ranitidine causes cancer.  If this case is to proceed, not on the theory that ranitidine causes cancer, but instead on ranitidine's propensity to include trace impurities unconnected to reliable evidence of human harm, the parties should brief and argue whether an amended master complaint is necessary. Relatedly, the parties should brief whether an amended SAELC could include the allegation that ranitidine has a value greater than zero, given the Plaintiffs' prior commitment on the record that this is not a price premium case.  Moreover, the Court requires briefing on these three issues to move forward with the economic loss claims.

### E.  Federal Pre-emption and the Plaintiffs' Adulteration Theory

In this section, the Court turns to the issue of pre-emption.  There are two kinds of pre-emption at issue in this MDL: express pre-emption and implied pre-emption.  As for express pre-emption, pursuant to 21 U.S.C. § 379r(a)(2), a state-law claim is pre-empted when it imposes any "requirement" on an OTC drug that is "different from or in addition to, or that is otherwise not identical with, a requirement under" the FDCA.  As for implied pre-emption, when a party cannot satisfy duties imposed by a state law, while independently complying with the FDCA and without ceasing to act altogether, the state law imposing the duties is pre-empted. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 624-25 (2011); *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 488 (2013).

Working in tandem, express and implied pre-emption create a "narrow gap" for pleadings. *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1327 (11th Cir. 2017) (quoting *In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1204 (8th Cir. 2010)).  "To make it

through, a plaintiff has to sue for conduct that violates a federal requirement (avoiding express pre-emption), but cannot sue only because the conduct violated that federal requirement (avoiding implied pre-emption)." *Id.*  Therefore, for this Court to analyze the issue of pre-emption, the Court must know (1) the state-law duties that the Defendants allegedly violated, (2) the federal-law duty that the Defendants allegedly violated, and (3) whether the Defendants' state-law and federal-law duties are parallel and compatible.  Each is addressed in turn.

### 1.   The State-Law Duties that the Defendants Allegedly Violated

First, in response to this Order to Show Cause the Plaintiffs must identify the state-law duties for their claims in the SAELC.[11]  At this time, the Plaintiffs are not required to identify the state-law duty for each claim pled in the SAELC; the Plaintiffs may use examples, identifying state-law duties that are typical among the laws of multiple states.

Second, after the Plaintiffs identify the state-law duties implicated in their SAELC, the Plaintiffs must explain how the Defendants violated those duties by manufacturing ranitidine with trace amounts of NDMA.  Courts in several states have held that a defendant's failure to disclose that its product contains trace amounts of carcinogens does not violate state-law duties. *See, e.g.*, *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d 170, 182-83 (E.D.N.Y. 2018), *aff'd sub nom. Axon v. Florida's Nat. Growers, Inc.*, 813 F. App'x 701 (2d Cir. 2020); *In re: General Mills Glyphosate Litig.*, 2017 WL 2983877, at *6 (D. Minn. July 12, 2017); *In re Methyl Tertiary Butyl Ether*

---

[11] The Defendants previously moved for the various economic loss class action claims to be dismissed as pre-empted by federal law; the Court informed the parties that it would analyze and revisit the various state-law duties at issue "at the proper time." DE 3715 at 36.  The parties should brief in their responses to this Order to Show Cause whether the time has come for the Court to analyze the state-law duties implicated by each claim in the SAELC.  By way of example, the parties should brief whether an amended SAELC could be accompanied with an appendix of state-law duties and an appendix of case law for the proposition that, given the record evidence in this MDL, each cause of action is cognizable.  Alternatively, the parties should brief whether a motion for summary judgment would be a more appropriate procedural vehicle for a state-by-state and claim-by-claim analysis.

*(MTBE) Prods. Liab. Litig.*, 117 F. Supp. 3d 276, 296 (S.D.N.Y. 2015); *Conde v. Velsicol Chem. Corp.*, 804 F. Supp. 972, 979 (S.D. Ohio 1992), *aff'd*, 24 F.3d 809 (6th Cir. 1994).

    2.  <u>The Federal-Law Duties that the Defendants Allegedly Violated</u>

Third, the Plaintiffs must explain how the Defendants violated federal law (the FDCA) by manufacturing ranitidine with trace amounts of NDMA.  In doing so, the Plaintiffs must explain in plain terms what constitutes an adulterated drug under the FDCA and whether and how they have put forward evidence that ranitidine was adulterated under that standard.  The Plaintiffs must clarify whether the Plaintiffs rely upon the FDA's acceptable daily intake level ("ADI") for NDMA as evidence of adulteration under federal law, and, if they do so, how such reliance is permissible under Eleventh Circuit caselaw. *Contra* DE 6120 at 335 ("The FDA's 'risk-utility analysis involves a much lower standard than that which is demanded by a court of law. A regulatory agency such as the FDA may choose to err on the side of caution.'" (quoting *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005))).  Also, the Plaintiffs must clearly explain how, if they rely upon the FDA's ADI, ranitidine could have been adulterated prior to the date that the ADI was created by the FDA in 2019.

    3.  <u>Comparing the Defendants' State-Law Duties and Federal- Law Duties</u>

Fourth, the Plaintiffs must demonstrate that the state- and federal-law duties that the Defendants allegedly violated are parallel.  To do so, the Plaintiffs must explain how a state-law duty not to sell a product with trace amounts of carcinogens without a warning label, if it exists,

could be satisfied[12] without violation of federal law.  In addition to providing the Court with a more general explanation on this topic, the Court requires the parties to brief two specific topics.

<u>Curing Adulteration via a Label Change</u>

First, given this Court's prior ruling that only label-based claims survived the Defendants' federal pre-emption challenge and given the Plaintiffs' definition of adulteration (ranitidine is adulterated because it contained NDMA), the Court does not understand how the Defendants could have satisfied a state law prohibiting adulteration with a label change.  As the Court understands it, a drug is adulterated if it contains an impurity; here, it is NDMA.  Also as the Court understands it, the way a Defendant would cure an adulterated drug with an impurity would be to remove the impurity, not to disclose the impurity on a label.[13]

To be sure, a drug manufacturer may be required under federal law to place certain information on its label.  But as the Court understands it, the FDA requires information on a drug's label to ensure the safety of consumers, meaning that the governing principle is safety.  In light of the Plaintiff's lack of reliable scientific evidence that the trace impurities in ranitidine can cause harm, the Plaintiffs should provide authority for the proposition that state law would require information on a label in the absence of reliable evidence of potential harm from the impurity and that federal law would permit such a change.  Relatedly, the Plaintiffs should provide authority for the proposition that a Defendant manufacturer may comply with state law (as well as federal law)

---

[12] The Court previously rejected the Plaintiffs' argument that state-law causes of action contain an infinite amount of "sub duties" and that a cause of action could be based (for pre-emption analysis purposes) on a "sub duty." *See* DE 3750 at 35.

[13] To illustrate with an example, if a drug was adulterated with an impurity so substantial that the impurity rendered the drug illegal to sell under federal law with a value of zero, the Court does not understand how the impurity, once disclosed on the label, would return the drug to unadulterated status, would make the drug legal to sell, and would raise the drug's value back above zero.  The Court's focus on the legality of the sale of ranitidine and its monetary value is because of the Plaintiffs' commitment, on the record, that their case was premised on the worthlessness of ranitidine. *See* DE 3682 at 190.

if the Defendant discloses the impurity on its label in lieu of removing the impurity. Finally, the parties should disclose if they are aware of any instance in which the FDA classified a drug as adulterated but, because the adulteration was subsequently disclosed on a label, the drug ceased to be adulterated.

<u>Ranitidine's Propensity to Self-Adulterate</u>

Second, because of the Court's understanding outlined above that a Defendant could only remedy an impurity issue through removal of the impurity—not a label change—the Court does not understand how the Plaintiffs' adulteration theory could ever result in a Defendant complying with both state law and federal law. The Plaintiffs' allegations and the Plaintiffs' summary judgment evidence are that ranitidine, by its inherent design, breaks down into NDMA. Both the Plaintiffs' allegations and the Plaintiffs' evidence stand for the proposition that, even if ranitidine was stored exactly as the FDA required it to be stored, ranitidine would still, at all points in time, degrade into NDMA. Stated simply, if the NDMA in ranitidine adulterates ranitidine, then ranitidine, by its very design, would appear to adulterate itself.[14] As a result, short of ceasing to sell ranitidine or short of redesigning the ranitidine molecule, the Plaintiffs should explain how the Defendants could have complied[15] with state law without violating federal law to do so, given that ranitidine self-adulterates. Moreover, for these reasons, the Court requires briefing on the issue of pre-emption in general and the two specific pre-emption issues addressed in this section.

---

[14] Because ranitidine, by its very design, would adulterate itself, the only way a Defendant could comply with a state-law duty prohibiting adulterated drugs would be to redesign ranitidine—a design defect claim pre-empted by federal law—or by ceasing to sell ranitidine altogether, which would result in the state law being pre-empted by federal law. *See* DE 2532 at 10; DE 3750 at 43.

[15] The Court reiterates that the Plaintiffs must reconcile their proposition that a state law prohibiting impurities would be satisfied not with the removal of the impurity, but with the disclosure of the impurity.

### F.  Plaintiffs' Standing After the *Daubert* Ruling

In this section, the Court returns to the issue of standing in light of the Court's *Daubert* ruling.  In this MDL, the Court found that the Plaintiffs had standing under *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019), to pursue their economic loss class action claims through the motion to dismiss stage of the proceedings.

Standing is "perhaps the most important of the jurisdictional doctrines." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)).  Because of its importance, federal courts must analyze standing at each stage of a case.  This Court also told the parties that it would analyze standing throughout the proceedings. *See* DE 3720 at 53 (citing *Debernardis*, 942 F.3d at 1090 (Sutton, J., concurring)) (explaining that that "[d]iscovery may reveal additional facts bearing on the Plaintiffs' standing (or lack thereof), and the Plaintiffs must back up the allegations that they rely on for standing with evidentiary support in the record").  Therefore, now, after its *Daubert* ruling, the Court returns to the issue of whether the Plaintiffs have an injury in fact that warrants standing.

The injury-in-fact analysis in this MDL begins with *Debernardis*.  In *Debernardis*, plaintiffs who had purchased dietary supplements filed state-law claims and claims for common law fraud and unjust enrichment against the manufacturer and the exclusive distributor of the supplements. 942 F.3d at 1082.  The plaintiffs alleged that the supplements contained a "new dietary ingredient." *Id.* at 1081.  As a result, under the FDCA, the supplements were presumptively "adulterated." *Id.* at 1080-81.  Because the supplements were presumptively adulterated and the defendants did not seek to rebut the presumption, the defendants could not sell the supplements under federal law.  Therefore, when the defendants sold the supplements to the plaintiffs, the

plaintiffs suffered harm by "purchasing supplements that . . . had 'no economic or legal value,'" and, thereby, paying an "unwarranted amount" for the supplements. *Id.* at 1082 (citation omitted).

The Eleventh Circuit concluded that the plaintiffs had standing to pursue these claims. The court found that "the plaintiffs were deprived of the entire benefit of their bargain . . . [and] experienced economic loss" because the plaintiffs plausibly alleged that the supplements were adulterated, as they were presumed to be unsafe and the defendants did not rebut this presumption. *Id.* at 1082, 1085 n.6, 1088. In so concluding, the court limited its holding to the specific facts of that case. Therefore, *Debernardis* seems to be limited to economic loss claims stemming from the purchase of unsafe products, and it does not appear to "mean that any consumer who purchased a product that could not legally be sold for any reason will have acquired a worthless product and thus have standing to sue." *Id.* at 1088.

A plaintiff does not have standing to sue a defendant merely because of his or her buyer's remorse. In what appears to be a case analogous to this MDL, the Third Circuit concluded that a plaintiff lacked standing to sue L'Oréal for its failure to disclose to consumers that there were trace amounts of lead found in its lipstick in part because the plaintiff's "subjective allegation that the trace amounts of lead in the lipsticks are unacceptable to her" did not constitute injury in fact. *Koronthaly v. L'Oréal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010). Without evidence that a product was illegal to sell, harmful, or overpriced, a plaintiff does not suffer injury from purchasing a product and later wishing that he or she had not done so. *See Herrington v. Johnson & Johnson Consumer Cos., Inc.*, No. C 09-1597 CW, 2010 WL 3448531, at *5 (N.D. Cal. Sept. 1, 2010) (holding that the plaintiffs had failed to plead an injury in fact in part because the Consumer Product Safety Commission was merely monitoring the product at issue, not recalling it); *Doss v.*

24

*Gen. Mills, Inc.*, No. 18-61924, 2019 WL 7946028, at *2 (S.D. Fla. June 14, 2019) (finding that a plaintiff lacked standing where she did not allege resulting, negative health effects from eating Cheerios), *aff'd*, 816 F. App'x 312 (11th Cir. 2020).

Here, the parties disagree as to whether the Plaintiffs have standing to pursue their economic loss class action claims after the Court's *Daubert* ruling. The Defendants argue that, under *Debernardis*, the Plaintiffs now lack standing because they were not harmed when they purchased ranitidine. DE 6227 at 18, 20. Since there is no reliable scientific evidence that ranitidine causes cancer, the Defendants reason that the Plaintiffs received the benefit of their bargain in their ranitidine purchases. *Id.* In their Reply, the Plaintiffs argue that "*Debernardis* does not now undermine Class Plaintiffs' standing." DE 6254 at 8. They contend, first, that any holdings from *Debernardis* should not be extended, DE 6254 at 8 (quoting *Debernardis*, 942 F.3d at 1088), and, next, that ranitidine "was adulterated." *Id.* [16]

As a threshold matter, it appears to the Court that the Plaintiffs' current position on standing conflicts with their past position. For example, in the past, the Plaintiffs affirmed that, if they lacked reliable evidence that ranitidine could cause cancer, they did not have standing:

> THE COURT: For example, am I understanding what you just said to say that perhaps, once we get into individual Plaintiff discovery and we learn, let's just say hypothetically, gee, the risk was not so great, it wasn't so harmful, or it wasn't as harmful as alleged, would that bear -- should that bear on the Court's consideration of standing, and would that be the more -- if yes, would that be a reason why the Court would want to consider that at a later point, or does that have nothing to do with the analysis of standing?
>
> MS. FEGAN: Your Honor, if ultimately the proof showed that the drug was not dangerous, or did not create NDMA, absolutely, I think we lose. . . .

---

[16] The Plaintiffs do not appear to rebut the Defendants' argument that the Plaintiffs lack standing to pursue their economic loss claims based upon a misbranding theory; they merely shift their focus in their Reply to defense of an adulteration theory. The Plaintiffs shall, in their response to this Order to Show Cause, clarify their position on this point.

DE 3682 at 184.  More importantly, the Plaintiffs affirmed that the touchstone for standing for

their economic loss claims was safety:

> MS. FEGAN: Certainly for 12(b)(6), your Honor. I see where the Court is drawing
> a line in this gray area of just what is that safety risk, and certainly that is part of
> what is developed in the context of causation, and whether a jury, **or at summary
> judgment** the Court would find that that **safety risk was sufficient enough to rise
> to the level of being material**, would it meet the proximate cause requirements,
> but in 12(b)(6), absolutely, your Honor.
>
> . . . .
>
> MS. FEGAN: But the idea here that we would **decide the level of safety** that makes
> a product worthless on a 12(b)(6) motion where we have alleged not just our belief,
> but underlying studies, underlying work that was done by Valisure and others, that
> is sufficient at this stage to make the **allegations of safety plausible**, and that is as
> far as we need to go at this stage.

*Id.* (emphasis added).

The application of *Debernardis* to the Plaintiffs' adulteration theory and the Court's

*Daubert* ruling warrants additional briefing.  In *Debernardis*, the Eleventh Circuit reviewed the

issue of standing on an appeal of the defendants' successful motion, dismissing the plaintiffs'

complaint.  In that posture, the Plaintiffs had standing because they "plausibly alleged that they

suffered an economic loss when they purchased supplements that were worthless because the

FDCA prohibited sale of the supplements." 942 F.3d at 1080.  The concurrence indicated that

"[w]ithout the benefit of discovery, [the court was] not in a position to second guess the harm"

alleged and further that "[a]t summary judgment, each claimant will need evidence to back the

point up. Why was the product worthless to each of them? How did it deliver less than expected?"

*Id.* at 1090 (Sutton, J., concurring) (emphasis added).

In this MDL, unlike in *Debernardis*, the Plaintiffs have proffered their best scientific evidence that ranitidine was worthless because it could cause cancer.  The Court carefully reviewed that evidence and determined that it was unreliable.  Therefore, if ranitidine was adulterated, there is still no evidence that the adulteration could cause harm.  Moving forward, the Plaintiffs must explain how they suffered an injury in fact.  As the *Debernardis* court put it: How did the trace amounts of NDMA in ranitidine make each ranitidine purchase worthless?  How did the Defendants' ranitidine deliver less than expected?  Finally, the Plaintiffs must explain how their position on standing and their position on pre-emption are internally consistent. *See Doss*, 816 F. App'x at 314.  For instance, if the Plaintiffs allege that they have standing to pursue their economic loss class action claims because all ranitidine was always adulterated because the molecule, when manufactured in line with FDA requirements, broke down into NDMA, then they must explain how this same theory is not pre-empted by the FDCA.

### G.  The Application of the Court's *Daubert* Ruling to the Class Claims

For all of the reasons set forth in the Court's prior order to show cause at docket entry 6303, the Plaintiffs shall show cause, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, why summary judgment should not be entered in the Defendants' favor for the Plaintiffs' class claims for the same reasons summary judgment was entered in the Defendants' favor for the Plaintiffs' personal injury claims.  In other words, if the Plaintiffs believe that the issues of abandonment, pre-emption, and lack of standing raised above do not prevent them from pursuing their economic loss class action claims, they shall show cause as to why they may pursue their economic loss class action claims without evidence that ranitidine causes cancer as a matter of law; they must explain

how their economic loss class action claims could prevail as a matter of law on the current evidentiary record in this MDL.

## IV.    Conclusion

The Court briefly addresses one final matter.  In this Order, the Court invites briefing on disparate legal issues.  If some or all of these issues are resolved in the Defendants' favor, then the Plaintiffs' economic loss class action claims would be futile.  But the ultimate resolution of the economic loss class action claims would differ depending upon which legal issue or issues the Court ultimately resolves in the Defendants' favor, should the Court resolve any or all of the legal issues.  For instance, if the Court determines that the Plaintiffs lack standing to pursue their economic loss class action claims, then that determination may lead to a dismissal by the Court of the economic loss class action claims; however, if the Court instead determines that the Plaintiffs cannot pursue their economic loss class action claims without evidence of harm as a matter of law, that determination may lead to summary judgment in favor of the Defendants.

Therefore, in their briefing, the parties should address how the Court should resolve the economic loss class action claims, if the Court concludes that the Defendants are entitled to relief on any of the issues outlined in this Order.  Further, the parties should address how the Court should resolve the economic loss class action claims if the Court concludes that the Defendants are entitled to relief on multiple grounds.  By way of example, the parties should address how courts generally enter judgment in a case where a party fails to prove an injury in fact and, thereby, both lacks standing and fails to state a cognizable claim.  The parties should explain whether such circumstances would result in a dismissal on standing grounds or whether judgment should be entered on the merits.

In summary, because the parties agree that summary judgment should be entered in favor of the Defendants on the Plaintiffs' medical monitoring class action claims, the parties do not need to discuss these claims further.  As for the economic loss class action claims, the parties disagree as to whether these claims are pre-empted and whether the Plaintiffs have standing to pursue these claims, among other points of disagreement.  The Plaintiffs shall file a joint response to this Order to Show Cause by May 1, 2023, addressing the threshold determinations that the Court must resolve, as outlined in this Order.  The Defendants shall file a joint reply to the Plaintiffs' response by May 15, 2023.  The class proceedings will be otherwise stayed, until the Court issues an order responsive to the parties' forthcoming briefing and ultimately resolves the Plaintiffs' Motion.

**DONE and ORDERED** in Chambers at West Palm Beach, Florida, this 6th day of April, 2023.

Copies furnished to counsel of record

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE