**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)                         MDL NO. 2924
PRODUCTS LIABILITY                                    20-MD-2924
LITIGATION

                                        JUDGE ROBIN L. ROSENBERG
                        MAGISTRATE JUDGE BRUCE E. REINHART

_____/

THIS DOCUMENT RELATES TO: ALL ECONOMIC LOSS CLASS ACTION CASES

**CLASS PLAINTIFFS' RESPONSE TO**
**THE COURT'S ORDER TO SHOW CAUSE**

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................1

II.  ARGUMENT .............................................................................................................3

    A.   Judicial Estoppel Would Be Improperly Applied to Bar Class Plaintiffs
         from Pursuing an Adulteration Theory .................................................................3

         1.   The Procedural History Reflects that Class Plaintiffs Did Not
              Abandon Their Adulteration Theory .........................................................4

         2.   Class Plaintiffs' Misbranding and Adulteration Theories Are Not
              Clearly Inconsistent ...................................................................................6

         3.   Class Plaintiffs Did Not Mislead the Court as to Their Adulteration
              Theory, Nor Could Anyone Claim that They Intended to Make a
              Mockery of the Judicial System................................................................7

          4.   Class Plaintiffs Would Not Derive an Unfair Advantage From
              Continuing to Pursue Their Adulteration Theory ......................................8

         5.   Class Plaintiffs' Response to the Court's Remaining Adulteration
              and Abandonment Questions ......................................................................9

    B.   Class Plaintiffs Have Article III Standing to Pursue Their Claims for
         Economic Loss; There Is No Record Evidence to Demonstrate Otherwise ..........11

    C.   Preemption Does Not Apply to Adulteration Because No Federal Law
         Required NDMA to be in ranitidine .....................................................................13

    D.   Summary Judgment Based on the *Daubert* Order Would Be Error Because
         the *Daubert* Order Has No Bearing on the Economic Loss Class' Claims ..........15

         1.   The Issue at Stake, *i.e.*, "General Causation," Is Specific to
              Personal Injury Cases and Has No Direct Bearing on the Economic
              Loss Class' Claims....................................................................................16

          2.   The Court's Pretrial Orders Established a Separate Track and
              Schedule in Which Class Plaintiffs Have Not Yet Been Required to
              Submit Expert Reports ...............................................................................19

III.  CONCLUSION.........................................................................................................20

The Economic Loss Class Plaintiffs ("Class Plaintiffs") respectfully submit this response to the Order to Show Cause on Class Plaintiffs' Motion to Stay Class Proceedings (ECF 6484), in which the Court ordered "[Class] Plaintiffs to show cause why their economic loss class action claims should not be dismissed for lack of standing and as pre-empted by federal law[,]" as well as "why the Court should not enter summary judgment in the Defendants' favor for the Plaintiffs' economic loss class action claims for the same reasons that the Court entered summary judgment in the Defendants' favor for the Plaintiffs' injury claims[.]"  *Id.* at 2.[1]

## I.    INTRODUCTION

In the Second Amended Consolidated Economic Loss Class Action Complaint ("SAELC"), Class Plaintiffs alleged that ranitidine-containing products sold under the brand name Zantac contained N-Nitrosodimethylamine ("NDMA").  ECF 3883.  Class Plaintiffs further alleged that Zantac was misbranded and adulterated, such that the labeling – including all advertising material – for Zantac was unfair and deceptive and breached the implied warranty of merchantability that Zantac was fit for the ordinary purpose for which it would be used.  For many reasons, the SAELC still supports Class Plaintiffs' claims.

First, Class Plaintiffs did ***not*** abandon their adulteration theory; rather, in responding to the Defendants' motions to dismiss that Class Plaintiffs' ***misbranding*** theories were preempted, Class ***Plaintiffs did not respond to an argument that was never made***, *i.e.*, that Class Plaintiffs' ***adulteration*** theories were preempted.  Eleventh Circuit abandonment doctrine requires that Class Plaintiffs expressly revoke their adulteration theories under oath or take positions intended to make

---

[1]    Citations, internal quotations, and footnotes omitted and emphasis added unless noted otherwise.

a mockery of this Court.  That *never* happened. It would be reversible error to invoke judicial estoppel to preclude Class Plaintiffs from pursuing their claims that Zantac was adulterated.

Second, Class Plaintiffs have Article III standing.  Notwithstanding the Court's *Daubert* rulings, Class Plaintiffs have alleged and will prove that Zantac is worthless based on factual evidence and expert testimony.  Even if the Court concludes that Zantac is not worthless, granting dismissal would be a decision on the merits (before the Class Plaintiffs have submitted their evidence), not on Article III standing grounds.

Third, Class Plaintiffs' adulteration claims are not preempted given that no federal law required that Zantac contain NDMA.  Thus, it was not impossible for Defendants to both comply with federal law and sell an unadulterated product. The United States Food and Drug Administration's ("FDA") recall of Zantac due to a "contaminant" known as NDMA[2] reflects the quintessential definition of adulteration. Defendants thus violated federal law – and parallel state law claims are not preempted.

Finally, summary judgment based on the *Daubert* Order would be error because the issues in the personal injury cases and those in the economic loss class action are distinct.  Because the issues are different, no relevant doctrine (law of the case, collateral estoppel, or others) applies. One element of collateral estoppel requires that the issue at stake must be identical to the one involved in the prior litigation.  Here, the issue of "general causation" that was the subject of the *Daubert* Order arises *only* in personal injury cases.  "General causation" is *not* relevant to any legal claims or evidentiary issues in the Economic Loss Class case, and thus is far from identical. Collateral estoppel also requires that the party against whom the earlier decision is asserted must

---

[2] FDA, *FDA Requests Removal of All Ranitidine Products (Zantac) from the Market* (Apr. 1, 2020),         https://www.fda.gov/news-events/press-announcements/fda-requests-removal-all-ranitidine-products-zantac-market.

have had a full and fair opportunity to litigate the issue in the earlier proceeding. Here, the applicable proximate cause standard for the Economic Loss Class' claims has not yet been litigated, and Class Plaintiffs have not yet submitted their evidentiary record or experts. Thus, they have not yet had a full and fair opportunity to be heard.

Applying the correct legal standards must result in this Court denying Defendants' requests for dismissal and summary judgment. Instead, the Court should grant Class Plaintiffs' motion for stay.

## II.   ARGUMENT

### A.   Judicial Estoppel Would Be Improperly Applied to Bar Class Plaintiffs from Pursuing an Adulteration Theory

The Court asks whether Class Plaintiffs' adulteration theory was "previously abandoned by the [Class] Plaintiffs[.]" ECF 6484, at 7. "NO" is the answer.

Essentially, this question is one of estoppel: Should Class Plaintiffs be judicially estopped from pursuing an adulteration theory? The Supreme Court has stated:

> [S]everal factors typically inform the decision whether to apply the [judicial estoppel] doctrine in a particular case: First, a party's later position must be "***clearly inconsistent***" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled[.]" Absent success in a prior proceeding, a party's later inconsistent position introduces no "risk of inconsistent court determinations," and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). In the Eleventh Circuit, a court must "examine[] two factors in deciding whether judicial estoppel should apply: first, it must be established that the allegedly inconsistent positions were made under oath . . . ; and, second, the inconsistencies must have been ***calculated*** to make a ***mockery of the judicial system***."

*Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326, 1335 (11th Cir. 2005); *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 643 (11th Cir. 2019) (same).

As reflected below, none of these factors supports invoking judicial estoppel to bar Class Plaintiffs from pursuing an adulteration theory here, and the realities of litigation and the preference to resolve cases on the merits counsel against it. C.A. Wright and A.R. Miller, 18B FED. PRAC. & PROC. JURIS. §4477 (3d ed.) ("modern procedure welcomes inconsistent positions in the course of a single litigation"); *Comcast Corp. v. F.C.C.*, 600 F.3d 642, 647 (D.C. Cir. 2010) ("Doubts about inconsistency often should be resolved by assuming there is no disabling inconsistency, so that the second matter may be resolved on the merits.")  Accordingly, this Court should not exercise its discretion to estop Class Plaintiffs from pursuing their adulteration theory.

### 1.     The Procedural History Reflects that Class Plaintiffs Did Not Abandon Their Adulteration Theory

Class Plaintiffs provide relevant context to the Court's recitation of the procedural history (ECF 6484, at 11-18) to assist the Court's evaluation of whether Class Plaintiffs abandoned their adulteration theory.

It is true, and the Court agrees, that it was "clear" in the first round of motion-to-dismiss briefing that Class Plaintiffs were pursuing both misbranding and adulteration theories.  ECF 6484, at 11.  Equally clear is that Defendants' several preemption motions focused almost exclusively on the misbranding theory.  *See* ECFs 1580 (Brand Motion), 1582 (Generics Motion), 1583 (Distributors Motion), 1584 (Retail and Pharmacy Motion).  Only the Retail and Pharmacy Motion expressly mentioned adulteration, and then, did so only in passing.  ECF 1584.

Thus, Class Plaintiffs' responses to Defendants' preemption motions as to misbranding do not evince an intent to "abandon" adulteration.  Class Plaintiffs simply responded to the arguments raised.  Responding to the arguments Defendants raised neither reflects inconsistent positions

"made under oath[,]" nor was "calculated to make a mockery of the judicial system." *Transamerica*, 430 F.3d at 1335.

The Court suggests that "[Class] Plaintiffs did not raise an adulteration defense to pre-emption at the hearing on the first-round pre-emption motions to dismiss on December 15, 2020." ECF 6484, at 15 (citing ECF 3715, at 20 n.10).[3]  That  is easily explained by Defendants' near-exclusive focus on misbranding. The Court granted the Rule 12(b)(6) preemption motions, focusing on Class Plaintiffs' misbranding theory.  ECFs 2512, at 27 (Generic Order), 2513 (Distributors, Retail, and Pharmacy Order), 2532 (Brand Order).[4]

As the Court's recitation of the second round of motion-to-dismiss briefing and related oral argument makes plain, Class Plaintiffs' adulteration theory was, again, not raised by the Court or the parties in the second round.  ECF 6484, at 14-15.  Rather, that briefing focused on Class Plaintiffs' non-label misbranding claims.  Based (primarily) on Class Plaintiffs' response to Defendants' preemption arguments in the first round of motion-to-dismiss briefing, the Court "deemed [Class] Plaintiffs to have abandoned . . . adulteration" for the entire case. *Id*.  But this is incorrect.  And Class Plaintiffs certainly never adopted such a position under oath. *Transamerica*, 430 F.3d at 1335.

 Class Plaintiffs ***omitted*** discussion of their adulteration theory in responding to Defendants' preemption arguments as to their misbranding theory in the first round of motion-to-dismiss briefing because Defendants' preemption arguments focused on Plaintiffs' misbranding claims, to the near-exclusion of Plaintiffs' adulteration theory (even though the arguments

---

[3]    At the December, 14, 2020 hearing, Class Plaintiffs referred to both theories.  ECF 2498, at 127-128.  The Court recognizes as much.  ECF 6484, at 11.

[4]    Class Plaintiffs appealed (*see* ECF 2694) (*see* Opinion of the Court*, In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 21-10335 (11th Cir. Nov. 7, 2022), ECF 149).

overlap).   The adulteration nomenclature slipped off Defendants' radar.   By responding to the arguments Defendants made, using the terminology Defendants chose, Class Plaintiffs did not abandon their adulteration theory, nor does mere omission under these circumstances support judicial estoppel.   "*[O]mission* of [an] argument doesn't constitute an ***affirmative position*** to the contrary" that would support judicial estoppel.   *Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977, 991 (10th Cir. 2019) (emphasis in original).   *Cf. McCarthy v. Azure*, 22 F.3d 351, 355 n.4 (1st Cir. 1994) (express abandonment of a position in circumstances that induce judicial reliance is enough to support estoppel).   A litigant is not obligated to respond to arguments that the opposing party does not make – only the arguments it does.   *See Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) ("[D]istrict courts cannot concoct or resurrect arguments neither made nor advanced by the parties."); *David v. Dist. of Columbia*, 436 F. Supp. 2d 83, 90 n.2 (D. D.C. 2006) (holding that arguments not raised in the defendant's original motion are deemed waived and will not be considered).   It was not Class Plaintiffs' burden to anticipate and respond to each and every argument Defendants could have made, but failed to raise.   The procedural history reflects that Class Plaintiffs responded to the challenges advanced by Defendants to their misbranding theory; it does ***not*** reflect, nor even imply, that Class Plaintiffs abandoned their adulteration theory.

### 2.     Class Plaintiffs' Misbranding and Adulteration Theories Are Not Clearly Inconsistent

To invoke judicial estoppel, the Court must find that Class Plaintiffs' took "clearly inconsistent" positions.   *New Hampshire*, 532 U.S. at 750-51.   But there is no inconsistency between Class Plaintiffs' position in opposing preemption on their misbranding theory based on parallel duties under state and federal law and ***omitting*** mention of the adulteration theory in responding to Defendants' misbranding-focused preemption arguments.   Further, judicial estoppel is inappropriate where this Court's perception of inconsistency can be readily explained by the

different standards applied to the arguments for misbranding and adulteration.  18B FED. PRAC. & PROC. JURIS. §4477.3 ("Application of judicial estoppel to the law elements of prior positions must take care to recognize that seeming inconsistencies may be explained by the different legal standards that may masquerade under similar legal expressions.") (citing cases).

Indeed, it appears that the Court's concern is less about inconsistency between Class Plaintiffs' misbranding and adulteration theories, and more about the Court's misunderstanding that – because Class Plaintiffs "conceded" that "Defendants could not independently redesign the FDA-approved formulation of ranitidine products while remaining in compliance with federal law" (ECF 6484, at 13 (quoting ECF 2532, at 19)) – Class Plaintiffs' adulteration theory will ultimately be preempted.  That is a merits argument, not a question of inconsistent positions.

There is nothing inconsistent about Class Plaintiffs' adulteration theory and their misbranding theory.  Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), a drug is misbranded if it contains an ingredient that is not specified on the label (or if it is unsafe, or if the label is misleading), and it is adulterated if it contains an ingredient that is not approved or disclosed.  21 U.S.C. §352(j), (p), (a)(1).  Having NDMA in ranitidine renders Defendants' ranitidine both misbranded and adulterated; there is no inconsistency between these positions.

### 3. Class Plaintiffs Did Not Mislead the Court as to Their Adulteration Theory, Nor Could Anyone Claim that They Intended to Make a Mockery of the Judicial System

Even if the Court found that Class Plaintiffs took inconsistent positions (they did not), the Court would still need to find that MDL Plaintiffs took those positions with the intent to make a mockery of the judicial system.  *Smith*, 940 F.3d at 647.  In the Eleventh Circuit, that is the core of the judicial estoppel inquiry.  *Id.*  Mere inconsistency is insufficient to support a finding that Class Plaintiffs intended to make a mockery of the judicial system.  *Id.*  ("Inconsistencies in a party's statements during litigation are supposed to add to the adversary process, not destroy it.").

Nor is mere omission.  *Id*. at 644 ("[W]hether a plaintiff intended to mislead the court . . . is separate from and not answered by whether the plaintiff voluntarily, as opposed to inadvertently, omitted [discussion of other issues].").

Looking at the totality of the facts and circumstances, there is no credible record evidence demonstrating that Class Plaintiffs intended to make a mockery of the judicial system by not rebutting arguments Defendants never made.  Discussion of Class Plaintiffs' ***adulteration*** theory was not germane in responding to Defendants' arguments that Class Plaintiffs' ***misbranding*** theory was preempted.  Class Plaintiffs had valid legal grounds to not rebut Defendants' hypothetical arguments; indeed, had Class Plaintiffs explicitly raised adulteration in their opposition, it would have opened the door for Defendants to make arguments for the first time in their reply that ***they had already been waived by failing*** to raise them in their motion.

### 4.  Class Plaintiffs Would Not Derive an Unfair Advantage From Continuing to Pursue Their Adulteration Theory

Finally, Class Plaintiffs cannot gain an unfair advantage from their prior misbranding arguments under the Rule 12(b)(6) standard because this Court never accepted our misbranding arguments (*see, e.g.*, ECF 2512).  *See Lara v. Trominski*, 216 F.3d 487, 495 n.9 (5th Cir. 2000) ("[I]n order for judicial estoppel to apply, the inconsistent party must have convinced the court to accept [its] prior position.").  And the Court did not waste any judicial resources in considering the argument that Defendants did not advance about adulteration.  The Court is now properly positioned to consider preemption as to adulteration on the merits at summary judgment and beyond, based on the evidence and arguments to be presented by the parties.

*Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1071 (Fed. Cir. 2009), is instructive.  There, the plaintiff argued that the defendant in an action for patent infringement was "estopped" from relying on one branch of prior art to invalidate the patent because of delay in

making the argument.  The defendant raised the new branch of prior art, they contended, in response to new case developments that made the new branch of prior art relevant.  Framing the question as one of judicial estoppel, the court found no abuse of discretion in allowing the new argument to be raised.  The same result should issue here.  Class Plaintiffs' previously unchallenged adulteration theory may now properly be litigated.  Whether Class Plaintiffs' adulteration theory will be successful on the merits is a separate question, and thus not subject to estoppel.

### 5.	Class Plaintiffs' Response to the Court's Remaining Adulteration and Abandonment Questions

Here, Class Plaintiffs respond to the Court's remaining questions concerning adulteration and abandonment.

#### a.	Class Plaintiffs' Adulteration and Misbranding Theories Are Based on the Label, Which Encompasses Every Form of Promotional Activity Including Advertising

First, the Court asked: "[O]n the topic of the Court's understanding of the [Class] Plaintiffs' adulteration theory, do the parties agree, whether it be from the [Class] Plaintiffs' concession or from the Court's prior rulings, that no economic loss class action claim may proceed in this MDL unless the claim is based upon the adequacy of ranitidine's label?"  ECF 6484, at 15; *see also id.* ("If so, do the parties agree that the [Class] Plaintiffs' adulteration theory may only proceed in this MDL if it is based upon ranitidine's label?").

Class Plaintiffs agree that under the Court's preemption rulings, their economic loss class action claims are based on whether the ranitidine labeling was unfair or deceptive, *i.e.*, inadequate because it failed to disclose the presence of an adulterant – NDMA. However, to be clear, Class Plaintiffs contend that "'[l]abeling' encompasses *all* written, printed, or graphic material accompanying the drug or device, and therefore broadly encompasses nearly every form of

promotional activity, including not only 'package inserts' but also advertising."  SAELC, ¶349

(citing 21 C.F.R. §201.5; 65 Fed. Reg. 14286 (Mar. 16, 2000)).  *See also id.*  ¶350 ("'Most, if not

all, labeling is advertising. The term 'labeling' is defined in the FDCA as including all printed

matter accompanying any article. Congress did not, and we cannot, exclude from the definition

printed matter which constitutes advertising.") (quoting *United States v. Research Labs., Inc.*, 126

F.2d 42, 45 (9th Cir. 1942)). Thus, Class Plaintiffs allege misrepresentations and omissions on the

package and in advertising. *See, e.g.*, SAELC, ¶372 ("Examples of this campaign include a series

of television, print, radio, and internet ads for OTC Zantac throughout the United States and to

consumers that uniformly omitted the material safety risks that the products contained NDMA,

that ranitidine was instable, that NDMA content could increase through the lapse of time and when

exposed to heat or humidity, and that it should not be used in connection with high-nitrate or -

nitrite foods."); *id.* ¶392 ("At no time did any Defendant attempt to change its label to delete a

false or misleading expiration date, or to add a proper expiration date to ensure that ranitidine-

containing products would not break down into NDMA prior to human consumption."); *id.* ¶397

("Because they failed to package their products in appropriate container sizes, Brand Name OTC

Manufacturer Defendants made false statements in the packaging of their products."). In sum, with

that understanding of labeling, Class Plaintiffs agree that their currently pleaded economic loss

claims are based on labeling.

**b.      Class Plaintiffs Have Not Abandoned Alternative
Theories of Damages**

Second, this Court asked: "[O]n the topic of abandonment, do the [Class] Plaintiffs agree

that they abandoned the contention that the economic value of ranitidine was ever greater than

zero?"  ECF 6484, at 16.  Class Plaintiffs have not submitted their class certification motion and

expert reports, Pretrial Order ("PTO") 65 (ECF 4660), at 3 (setting schedule for class certification

10

motions, including experts in support thereof, to follow the Court's general causation *Daubert* rulings) and, thus, have not abandoned the contention that the economic value of ranitidine was ever greater than zero. Rather, for certain claims, such as consumer protection act claims, Class Plaintiffs plan to present expert testimony in support of class certification that, under well-accepted, basic economic principles, Zantac is and was worthless, and the Class is entitled to full refunds. Class Plaintiffs may also submit alternative theories of damages for various counts, requiring disgorgement of revenues or profits, for example.

**B.    Class Plaintiffs Have Article III Standing to Pursue Their Claims for Economic Loss; There Is No Record Evidence to Demonstrate Otherwise**

The Court asked the parties to brief the issue of whether "the [Class] Plaintiffs have sufficient constitutional standing to pursue their legal theory[.]" ECF 6484, at 7. Class Plaintiffs answer: They have sufficient constitutional standing to pursue their legal theory. "On June 30, 2021, the Court found that the [Class] Plaintiffs, at that moment in time, had standing to pursue their economic loss class action claims." *Id*. at 4 (citing ECF 3720, at 55 (determining that it was "reasonable, and arguably consistent with the reasoning in [*Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019)], to allow the case to proceed," while noting that the Court would return to the issue of standing when the factual record in the MDL developed)). The next time for doing so is at summary judgment, which has not yet occurred; the Court should not revisit its holdings at this time.

*First,* Defendants have not moved for summary judgment on the issue of economic injury.[5] The Court has not considered any experts put forward by the Class on economic loss, the

---

[5]    Class Plaintiffs recognize that Defendants previously moved under Rule 12 for dismissal based on standing. ECF 6484 at 2 n.4. But the Court has already ruled on those motions, and Defendants have not moved under Rule 56 for judgment based on record evidence on standing. Thus, it would be premature for the Court to *sua sponte* enter judgment in favor of Defendants on standing

depositions taken of the Class representatives, or any evidence at all other than expert testimony put forward by Personal Injury Plaintiffs regarding general causation of certain cancers – nor any experts put forward by Class Plaintiffs, nor even regarding economic injuries.  As explained further below, the *Daubert* motions and Order, and the general causation experts, have no direct bearing on the question of economic injury.

*Second*, notwithstanding the Court's *Daubert* rulings, Zantac is still worthless under Class Plaintiffs' theory of the case, and as such, Class Plaintiffs' allegations – that they suffered an injury-in-fact by purchasing it – still state a cause of action that must be tested.  Whether Zantac is worthless is a question of fact.  In support of Zantac's worthlessness, Class Plaintiffs can introduce a variety of evidence, such as: (1) their deposition testimony regarding what they would pay for Zantac (nothing); (2) expert testimony regarding the safety, or perceived safety, of Zantac in general (as opposed to expert testimony regarding whether Zantac causes the five designated cancers); (3) expert testimony regarding the economic value of Zantac, including expert testimony regarding how consumers consider dangers that are less rigorously proven than what a court would accept for purposes of *Daubert*; (4) evidence regarding the FDA's recall of Zantac[6] (likewise applying precautionary standards lower than that which passes muster under *Daubert*); and (5) Defendants' unwillingness to sell the product knowing it degrades into NDMA.  Class Plaintiffs should be given an opportunity to marshal such evidence in opposition to summary judgment.

---

grounds, when Defendants have not made such a motion at this time.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (discussing the various standing requirements "[a]t the pleading stage," "[i]n response to a summary judgment motion," and "at the final stage" (*i.e.*, trial)).  This issue is also not appropriate under Rule 56(f) because no record has been compiled.

[6] *Debernardis* holds that a drug that is misbranded or adulterated under the FDA's standards is worthless.  942 F.3d at 1084-85.  This is exactly the case here.

*Third,* if the Court nonetheless believes that Zantac is not worthless based on its *Daubert* Order finding that Zantac does not cause five specific cancers, the Court has made a decision on the merits of the claims, not on Article III standing grounds.  For example, when the Court held that the Personal Injury Plaintiffs' evidence that Zantac caused certain designated cancers was unreliable, the Court did not dismiss their personal injury claims for lack of standing (even though such a holding could be framed as defeating the "traceability" requirement for standing).  Rather, it granted summary judgment pursuant to Defendants' motion for summary judgment.  No such motion is pending here.  Furthermore, quantity of damages and existence of damages are two separate inquiries, with quantity of damages irrelevant for purposes of standing once an injury-in-fact is shown.  Thus, even if the Court disagrees that Zantac is worthless does not mean that Plaintiffs were not injured.

## C.     Preemption Does Not Apply to Adulteration Because No Federal Law Required NDMA to be in ranitidine

In the interests of efficiency, Class Plaintiffs incorporate the background on preemption law from Class Plaintiffs' Opposition to Brand-Name Defendants' Rule 12 Partial Motion to Dismiss on Preemption Grounds.  ECF 1976.

The FDCA prohibits, among other things, "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded." 21 U.S.C. 331(a).  A drug is deemed to be adulterated when "it purports to be or is represented as a drug the name of which is recognized in an official compendium, and its strength differs from, or its quality or purity falls below, the standard set forth in such compendium" unless it so states on the drug's label.  21 U.S.C. § 351(b).

The FDA requested removal of Zantac from the market in April 2020 due to "a contaminant known as N-Nitrosodimethylamine (NDMA) in ranitidine medications (commonly known by the

brand name Zantac)."[7]   This is the quintessential definition of adulteration: an undisclosed contaminant is present in the drug such that Zantac's quality fell below federal standards. Defendants thus violated federal law – and parallel state law claims do not conflict and are not preempted.   *See, e.g.*, *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 487 n.3 (2013) (recognizing "the rare case in which state or federal law actually requires a product to be pulled from the market" will not support a presumption of preemption).

Here, Class Plaintiffs allege that ranitidine-containing products were adulterated and not made in a cGMP-compliant manner to assure they possessed the quality and identity represented, and were fit for their intended purpose.[8]   Defendants engaged in unfair and deceptive acts by wrongly representing Zantac was "a particular standard, quality, and grade when they are not,"[9] which is state-law parlance for the same factors that establish adulteration.   *See* 21 U.S.C. §351(a)(1) (drug adulterated if does not possess "the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess"); *id.* ¶351(b) ("adulterated under this paragraph because it differs from the standard of strength, quality, or purity"). *See also*

---

[7] *See* FDA, *supra* n.1.

[8]   *See, e.g.*, SAELC, at ¶¶313-317 (compliance with current Good Manufacturing Practices); ¶¶347-398 (misrepresentations and omissions); ¶1251 (incorporating same as to GSK); ¶1847 (incorporating same as to Pfizer); ¶2843 (incorporating same as to BI); ¶4321 (incorporating same as to Sanofi); *see also, e.g.*, ¶¶506, 508, 1308, 1310, 1906, 2984, 2986, 4405, 4407 (referencing cGMPs and adulteration).

[9] *See, e.g.*, SAELC, at ¶¶435, 2884 (Alaska), ¶¶463, 1263, 1859 , 2939, 4360 (Arkansas), ¶¶520, 539, 1322, 1918, 1938, 2998, 3018, 4419, 4439 (California), ¶¶577, 1381, 1977, 3057, 4478 (Colorado), ¶672, 1479, 2210, 3308, 4731 (Maryland), ¶¶750, 1519, 2250, 3387, 4810 (Michigan), ¶¶1022, 3839, 5207 (Oklahoma), ¶¶1061, 3920, 5247 (Pennsylvania), ¶¶1140, 2647, 4020, 5310 (Tennessee), ¶¶1181, 1753, 2689, 4062, 5352 (Texas), ¶¶1624, 2415, 3581 (Nevada), ¶¶1690, 2584, 3879 (Oregon), ¶¶2072, 3172, 4593 (Georgia), ¶¶2856 (Alabama), ¶¶3609, 4977 (New Hampshire), ¶¶3685, 5053 (New Mexico), ¶¶4104, 5394 (Utah), ¶¶4166, 5456 (Virginia).

ECF 3715, at 20 n.10 (this Court expressly noting that Plaintiffs "argued adulteration in the context of establishing an economic injury" sufficient to assert claims based on economic loss). Courts regularly decline to find that state law claims are preempted where plaintiffs allege the defendant violated specific cGMP requirements. *See, e.g.*, *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, MDL No. 2875 (RBK-JS), 2020 WL 7418006 (D.N.J Dec. 18, 2020).

In sum, it was not impossible for Defendants to comply with federal law ***and*** manufacture an unadulterated drug, because federal law did not require that Zantac contain NDMA. Quite the contrary, federal law required drugs not to be adulterated. Accordingly, the Class Plaintiffs' adulteration claims are not preempted.

**D.**   **Summary Judgment Based on the *Daubert* Order Would Be Error Because the *Daubert* Order Has No Bearing on the Economic Loss Class' Claims**

To apply the Court's *Daubert* Order to the Economic Loss Class' claims, this Court would need to apply the doctrine of collateral estoppel. To invoke collateral estoppel under federal principles, Defendants must establish that the following elements have been satisfied:

(1) the issue at stake must be identical to the one involved in the prior litigation;

(2) the issue must have been actually litigated in the prior suit;

(3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and

(4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Matter of McWhorter*, 887 F.2d 1564, 1566 (11th Cir. 1989) (quoting *I.A. Durbin, Inc. v. Jefferson Nat'l Bank*, 793 F.2d 1541, 1549 (11th Cir. 1986)). Defendants cannot establish the first and fourth elements.[10]

---

[10] As to the second element, while the *Daubert* motions on general causation experts were fully litigated by the Personal Injury Plaintiffs, the deadline for the Class Plaintiffs' experts – which

1. **The Issue at Stake, *i.e.*, "General Causation," Is Specific to Personal Injury Cases and Has No Direct Bearing on the Economic Loss Class' Claims**

The first element of collateral estoppel requires that the issue at stake must be identical to the one involved in the prior litigation. Here, the issues that were the subject of the *Daubert* Order arose on motions *in limine* in the personal injury cases and were evidentiary in nature – and are not identical to any evidentiary issues in the Economic Loss Class case. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), concerned the admissibility of evidence, *i.e.*, expert testimony for trial in a particular case. *United States v. Reddy*, 534 F. App'x 866, 868 (11th Cir. 2013) (reversing judgment and remanding for new trial, based on defendant's contention "that the trial judge committed reversible error in two of his ***evidentiary rulings***," of which one was the exclusion of the proposed defense expert testimony under *Daubert*). Here, as explained in the Brand Defendants' Roadmap Brief in Support of Their Motions to Exclude Plaintiffs' General Causation Experts and for Summary Judgment (ECF 5734), the evidentiary issue concerned only general causation experts, which were specific to the personal injury cases to prove that Zantac has the potential to cause those plaintiffs' cancers. *Id.* at 1 ("Together, Defendants' motions seek to exclude all of [Personal Injury] Plaintiffs' experts' ***general causation opinions*** as unreliable and otherwise inadmissible under Federal Rules of Evidence 104(a), 702, 703, and 403.").

In fact, Defendants expressly did not move to exclude experts that had been proffered for other purposes, such as shipping, transportation, and knowledge. *Id* at n.2 (expressly reserving the right to move to exclude non-general causation expert opinions, "including opinions regarding

---

have nothing to do with general causation – had not yet passed. As to the third element, while the determination on the *Daubert* motions as to general causation were a critical and necessary part of the judgments to be entered against the Personal Injury Plaintiffs, the *Daubert* Order has no bearing on the Class Plaintiffs' Economic Loss Claims.

shipping and transportation and opinions that Defendants were or should have been aware of certain studies[,]" based on PTOs 63 (ECF 4660) and 77 (ECF 5579), "at the appropriate time after their motions on general causation opinions have been decided"). And they certainly didn't challenge any not-yet-disclosed experts by Class Plaintiffs, whose motion for class certification was not yet due. *See* PTO 65 (ECF 4660), at 3 (setting schedule for class certification motions, including experts in support thereof, to follow the Court's general causation *Daubert* rulings).

Because a court's *Daubert* decisions are specific to a plaintiff's case, that decision may not be used as collateral estoppel in a separate case by or against separate plaintiffs with separate and different claims. *See, e.g.*, *Coburn v. SmithKline Beecham Corp.*, 174 F. Supp. 2d 1235, 1240 (D. Utah 2001) (denying plaintiff's *Daubert* motion based on parallel court's decision, stating, "[c]ollateral estoppel . . . is not intended to operate as a shield against scrutiny of the reliability of the underlying science and the experts"). *See generally*, MDL Plaintiffs' Leadership's Response to Orders to Show Cause (ECF 6540). The Personal Injury Plaintiffs' claims (and elements of those claims) are distinct from the Class Plaintiffs' Economic Loss claims.

Here, the concept of "general causation" is specific to the Personal Injury Plaintiffs' claims. Section 28 of the RESTATEMENT OF THE LAW (3d) OF TORTS-LIABILITY FOR PHYSICAL AND EMOTIONAL HARM defines "general causation" as follows:

> "General causation" exists when a substance is capable of causing a given disease. The concept developed because a prominent form of scientific methodology investigates causation on a group basis and therefore addresses whether an agent causes an increased incidence of disease in the group being studied.

It is a necessary element to claims that allege a product or chemical caused a particular physical injury. *See, e.g.*, *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1248, n.1 (11th Cir. 2010) ("general causation" "refers to the more general issue of whether a substance has the potential to cause the plaintiff's injury"); *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007)

(discussing the distinction between specific and general causation in toxic tort cases); *Golden v. CH2M Hill Hanford Grp., Inc.*, 528 F.3d 681, 683 (9th Cir. 2008) ("To survive summary judgment on a toxic tort claim for physical injuries, [a plaintiff] ha[s] to show that he was exposed to [a product] that could have caused the physical injuries he complains about (general causation), and that his exposure did in fact result in those injuries (specific causation)."); *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885, 2021 U.S. Dist. LEXIS 125752, *10 (N.D. Fla. April 8, 2021) (same).

Class Plaintiffs' Economic Loss Claims have not alleged that Zantac caused any of the designated cancers, they do not seek recompense for physical injuries, and thus, they do not have to prove general causation for such injuries. *See* SAELC, at 1 (seeking "damages and equitable relief to remedy the economic losses resulting from Defendants' design, manufacture, marketing, packaging, labeling, handling, distribution, storage, and/or sale of" Zantac).

Rather, the legal causation element appropriate to Class Plaintiffs' misrepresentation and omission-based claims is proximate cause, or "loss causation." *Bass v. Bowmar Nutrition, LLC*, No. 4:21-cv-00307-SHL-HCA, 2022 WL 4182203, at *5 (S.D. Iowa Aug. 30, 2022) ("There is an intricate relationship under many state consumer fraud statutes between reliance, proximate cause, and damages.")  Loss causation is established where a consumer "would not have suffered a loss if the facts were what he believed them to be." *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 747 (Ill. 1994) (noting loss causation is equivalent to proximate cause).  This Court previously ruled that the SAELC's allegations that Defendants' failure to disclose that Zantac was adulterated was likely to deceive consumers, and whether the Class' economic losses were caused thereby, state a cause of action.  The merits of those claims is a wholly separate inquiry from whether the

Personal Injury Plaintiffs can prove that Zantac causes or can cause specific cancers. Accordingly, Defendants cannot establish the first element for collateral estoppel.

To be sure, if this Court had determined that admissible evidence supports the Personal Injury Plaintiffs' claim that Zantac causes cancer, the Class Plaintiffs could have hired the same experts and disclosed their admitted opinions as support for their claim that Zantac is worthless. Drugs that cause cancer are, in general, worthless. But many drugs that do not provably cause cancer are also worthless. Class Plaintiffs have other avenues to meet their burden.

### 2. The Court's Pretrial Orders Established a Separate Track and Schedule in Which Class Plaintiffs Have Not Yet Been Required to Submit Expert Reports

The fourth element for collateral estoppel requires that the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding. For several reasons, the applicable causation standard for the Class Plaintiffs' Economic Loss Claims has not yet been litigated, nor had a full and fair opportunity to be heard. First, throughout the MDL proceedings, the Class Plaintiffs Economic Loss Claims were recognized as distinct from the Personal Injury and Medical Monitoring claims – including in pleadings and Court Orders.[11] Confirming this distinction, the Court expressly set separate deadlines for class discovery, class expert disclosures, and *Daubert* motions specific to the class experts – separate from the schedule for Personal Injury Plaintiffs, the disclosure of general causation experts and corresponding *Daubert* motions. *See, e.g.*, ECF 4660 (PTO 65). These distinctions recognized the substantive, material differences between the claims and damages

---

[11] *See, e.g.*, ECF 887 (original Master Personal Injury Complaint), 889 (original Consolidated Consumer Class Action Complaint containing claims for both economic loss and medical monitoring), 2515 (Order requiring separate medical monitoring and economic loss class complaints), 3883 (Second Amended Consolidated Economic Loss Class Action Complaint), 3884 (Amended Consolidated Medical Monitoring Class Action Complaint).

sought across the different plaintiff groups.  *See In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, 609 F. Supp. 3d 942, 1002-03 (N.D. Cal. 2022) (granting certification of economic loss class over objection that a class was "not superior" due to individual personal injury claims in the MDL because the "argument wholly ignores the significant distinction between the economic loss claims raised in the operative class action complaint, which can be resolved through aggregate damages or restitution awards based on the price premium model of recovery"); *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, MDL No. 2875 (RBK/KW), 2021 WL 364663, at *13 (denying motion to dismiss economic loss claims, noting that economic loss and personal injury claims "arise under distinct legal theories," *i.e.*, personal injury claims "are for 'damages for a defective product or service . . . [that] cause[] personal injury,' whereas contract law applies to claims for 'purely economic loss arising from the failure of the product or service to perform as expected'") (quoting *Gunkel v. Renovations, Inc*., 822 N.E.2d 150, 153 (Ind. 2005)).

The distinctions in the MDL Orders between Class Plaintiffs Economic Loss Claims and the Personal Injury Plaintiffs conclusively show that the Court recognized the substantive differences in claims and injuries between the plaintiff groups; those Orders should not be rendered meaningless *post hoc.* Given that the Class Plaintiffs have not yet submitted experts on their distinct claims and theories, the element of causation for the Economic Loss Claims have not yet been fully and fairly litigated.  Therefore, applying collateral estoppel (or any other doctrine)would be error.

## III.    CONCLUSION

Class Plaintiffs respectfully request that the Court enter an Order staying the Economic Loss Claims, decline dismissing this matter for lack of standing, and decline granting summary judgment on the Class' Economic Loss Claims.

Respectfully submitted,

/s/ Tracy A. Finken
Tracy A. Finken
Email: tfinken@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

By: /s/ Robert C. Gilbert
Robert C. Gilbert, FBN 561861
Email: gilbert@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (305) 384-7270

/s/ Michael L. McGlamry
Michael L. McGlamry
Email: efile@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

/s/ Adam Pulaski
Adam Pulaski
Email: adam@pulaskilawfirm.com
PULASKI KHERKHER, PLLC
2925 Richmond Avenue, Suite 1725
Houston, TX 77098
Tel: (713) 664-4555

*Plaintiffs' Co-Lead Counsel*

Rosemarie R. Bogdan
Email: Rosemarie.bogdan@1800law1010.com
MARTIN, HARDING & MAZZOTTI
1 Wall Street
Albany, NY 12205
Tel: (518) 862-1200

Mark J. Dearman, FBN 0982407
Email: mdearman@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Tel: (561) 750-3000

Elizabeth A. Fegan
Email: beth@feganscott.com
FEGAN SCOTT, LLC
1456 Sycamore Rd.
Yorkville, IL 60560
Tel: (312) 741-1019

Marlene J. Goldenberg
Email: mgoldenberg@nighgoldenberg.com
NIGH GOLDENBERG RASO & VAUGHN, PLLC
712 H Street NE, DPT 32022
Washington, DC 20002
Tel: (202) 978-2228

Ashley Keller
Email: ack@kellerpostman.com
KELLER | POSTMAN
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (312) 741-5222

Frederick S. Longer
Email: flonger@lfsblaw.com
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500

Roopal P. Luhana
Email: luhana@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY 10016
Tel: (888) 480-1123

Ricardo M. Martinez-Cid, FBN 383988
Email: RMartinez-Cid@Podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Melanie H. Muhlstock
Email: mmuhlstock@yourlawyer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4629

Carmen S. Scott
Email: cscott@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9160

Sarah N. Westcot, FBN 1018272
Email: swestcot@bursor.com
BURSOR & FISHER, P.A.
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Tel: (305) 330-5512

Frank Woodson
Email: Frank.Woodson@BeasleyAllen.com
BEASLEY ALLEN LAW FIRM
234 Commerce St
Montgomery, AL 36103
Tel: (334) 269-2343

Francisco R. Maderal, FBN 0041481
Email: frank@maderalbyrne.com
MADERAL BYRNE PLLC
2800 Ponce de Leon Blvd., 11th Floor
Coral Gables, FL 33134
Tel: (305) 520-5690

Lauren S. Miller
Email: laurenm@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1914 4th Avenue North
Suite 320
Birmingham, AL 35203
Tel: (205) 533-4175

Daniel A. Nigh, FBN 30905
Email: dnigh@nighgoldenberg.com
NIGH GOLDENBERG RASO & VAUGHN, PLLC
712 H Street NE, DPT 32022
Washington, DC 20002
Tel: (202) 792-7927

Mikal C. Watts
Email: mcwatts@wattsguerra.com
WATTS GUERRA LLP
4 Dominion Drive
Building 3, Suite 100
San Antonio, TX 78257
Tel: (800) 294-0055

Conlee S. Whiteley
Email: c.whiteley@kanner-law.com
KANNER & WHITELEY, L.L.C.
701 Camp Street
New Orleans, LA 70130
Tel: (504) 524-5777

Steven B. Rotman
Email: srotman@housfeld.com
HAUSFELD, LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel: (617) 207-0602

Paige Boldt
Email: pboldt@wattsguerra.com
WATTS GUERRA LLP
1815 Windsong Circle
Keller, TX 76248
Tel: (210) 447-1534

Adam W. Krause
Email: adam@krauseandkinsman.com
KRAUSE AND KINSMAN, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 760-2700

Bradford B. Lear
Email: Lear@learwerts.com
LEAR WERTS LLP
103 Ripley Street
Columbia, MO 65203
Tel: (573) 875-1992

Je Yon Jung
Email: Jeyon@mayjung.com
MAY JUNG, LLP
1100 W. Town & Country Road, Suite 1250
Orange, CA 92868
Tel: (818) 869-6476

Nicola Larmond-Harvey, FBN 0105312
Email: nicola@mayjung.com
MAY JUNG, LLP
3216 11th Place SE
Washington D.C. 20032
Tel: (818) 869-6476

*Plaintiffs' Steering Committee*

Harrison M. Biggs
Email: hbiggs@yourlawayer.com
PARKER WAICHMAN LLP
6 Harbor Park Drive
Port Washington, NY 11050
Tel: (516) 723-4633

Alexander C. Cohen
Email: acohen@rgrdlaw.com
ROBBINS GELLER RUDMAN & DOWD
225 NE Mizner Boulevard
Suite 720
Boca Raton, FL 33432
Tel: (561) 750-3000

Kendra Goldhirsch
Email: goldhirsch@chaffinluhana.com
CHAFFIN LUHANA LLP
600 Third Avenue, 12th Floor
New York, NY 10016
Tel: (888) 480-1123

Lea P. Bucciero
Email: lbucciero@podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 3200
Miami, FL 33130
Tel: (305) 358-2800

Marlo E. Fisher
Email: marlof@lpm-triallaw.com
Laminack, Pirtle & Martines
5020 Montrose Blvd., 9th Floor
Houston, TX 77006
Tel: (713) 292-2750

Noah Heinz
Email: noah.heinz@kellerpostman.com
KELLER | POSTMAN
1100 Vermont Avenue NW, Floor 12
Washington, DC 20005
Tel: (202) 918-1841

Catelyn McDonough
Email: cmcdonough@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, PA 19103
Tel: (215) 735-1130

Caroline G. McGlamry
Email: carolinemcglamry@pmkm.com
POPE McGLAMRY, P.C.
3391 Peachtree Road NE, Suite 300
Atlanta, GA 30326
Tel: (404) 523-7706

Madeline Pendley
Email: mpendley@levinlaw.com
LEVIN PAPANTONIO THOMAS
MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7003

Laura K. Stemkowski
Email: lstemkowski@motleyrice.com
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: (843) 216-9165

Daniel E. Tropin
Email: tropin@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
Tel: (954) 990-2216

*Plaintiffs' Leadership Development Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

/s/ <i>Robert C. Gilbert</i>
Robert C. Gilbert
