**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE: ZANTAC (RANITIDINE)  
PRODUCTS LIABILITY  
LITIGATION

MDL No. 2924  
20-MD-2924

**JUDGE ROBIN L. ROSENBERG**  
**MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**

**BRAND DEFENDANTS' REPLY TO THE COURT'S ORDER TO SHOW CAUSE**
**WHY THE ECONOMIC LOSS COMPLAINT IS NOT SUBJECT TO DISMISSAL**
**OR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

ARGUMENT AND CITATION OF AUTHORITY .........................................................2

I.     PLAINTIFFS' MISBRANDING THEORY FAILS IN LIGHT OF THIS
COURT'S GENERAL CAUSATION ORDER. ...............................................2

II.    PLAINTIFFS' ADULTERATION THEORY FAILS AS A MATTER OF LAW. ............4

    A.    Plaintiffs Knowingly and Voluntarily Waived Their Adulteration Theory.............6

    B.    Plaintiffs' Claims Likely Also Would Be Barred by Judicial Estoppel
Under Many States' Laws..........................................................................9

    C.    Plaintiffs Lack Standing to Pursue Their Adulteration Theory. ............................9

    D.    Plaintiffs Have Failed to Identify State-Law Duties That Were Violated. ............12

    E.    Plaintiffs' Adulteration Theory Is Barred by Federal Preemption.........................14

III.   THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF
DEFENDANTS. ...............................................................................................19

CONCLUSION.................................................................................................................20

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

<u>Cases</u>

*Adventure Outdoors, Inc. v. Bloomberg*,
    552 F.3d 1290 (11th Cir. 2008) ..........................................................................19

*In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*,
    549 F.2d 1006 (5th Cir. 1977) ...............................................................................4

*Axon v. Citrus World, Inc.*,
    354 F. Supp. 3d 170 (E.D.N.Y. 2018) .................................................................13

*Banfi Prods. Corp. v. United States*,
    40 Fed. Cl. 107 (1997) ..........................................................................................15

*In re Baycol Prods. Liab. Litig.*,
    MDL No. 1431, 2007 WL 9717940 (D. Minn. July 13, 2007)................................4

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001).............................................................................................19

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...............................................................................................4

*In re Checking Acct. Overdraft Litig.*,
    754 F.3d 1290 (11th Cir. 2014) .............................................................................7

*Conde v. Velsicol Chem. Corp.*,
    804 F. Supp. 972 (S.D. Ohio 1992) .....................................................................13

*Davis v. Infinity Ins. Co.*,
    No. 15-CV-1111, 2017 WL 4224588 (N.D. Ala. Sept. 22, 2017)...........................8

*Debernardis v. IQ Formulations, LLC*,
    942 F.3d 1076 (11th Cir. 2019) ....................................................................11, 12

*In re Denture Cream Prods. Liab. Litig.*,
    204 F. Supp. 3d 1348 (S.D. Fla. 2016) ...............................................................20

*Doss v. Gen. Mills, Inc.*,
    816 F. App'x 312 (11th Cir. 2020) ......................................................................10

*Eike v. Allergan, Inc.*,
    850 F.3d 315 (7th Cir. 2017) ...............................................................................11

*Erickson v. Bos. Sci. Corp.*,
   846 F. Supp. 2d 1085 (C.D. Cal. 2011) ...................................................16

*In re Fisher Island Invs.*,
   778 F.3d 1172 (11th Cir. 2015) ...............................................................4

*In re Fruit Juice Prods. Mktg. & Sales Prac. Litig.*,
   831 F. Supp. 2d 507 (D. Mass. 2011) .....................................................11

*Geier v. Am. Honda Motor Co.*,
   529 U.S. 861 (2000)................................................................................16

*In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*,
   No. 21-CV-269, 2022 WL 10197651 (E.D. Va. Oct. 17, 2022).............11

*Green v. PepsiCo, Inc.*,
   No. 18-CV-62011, 2019 WL 8810364 (S.D. Fla. Apr.  12, 2019) .........11

*Home Depot USA, Inc. v. Lafarge N. Am., Inc.*,
   59 F.4th 55 (3d Cir. 2023) .......................................................................3

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
   524 F. Supp. 3d 1007 (S.D. Cal. 2021)...................................................18

*Islam v. Sec'y, Dep't of Homeland Sec.*,
   997 F.3d 1333 (11th Cir. 2021) ...............................................................7

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Prac. & Liab.
Litig.*,
   903 F.3d 278 (3d Cir. 2018)....................................................................10

*Koronthaly v. L'Oreal USA, Inc.*,
   374 F. App'x 257 (3d Cir. 2010) ............................................................10

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Prac. & Prods. Liab. Litig. (No.
II) MDL 2502*,
   892 F.3d 624 (4th Cir. 2018) .............................................................3, 4

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)................................................................................11

*Mink v. Smith & Nephew, Inc.*,
   860 F.3d 1319 (11th Cir. 2017) .............................................................19

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   387 F. Supp. 3d 323 (S.D.N.Y. 2019).....................................................20

*Nexus Pharms., Inc. v. Cent. Admixture Pharmacy Servs., Inc.*,
48 F.4th 1040 (9th Cir. 2022) .............................................................................19

*Original Appalachian Artworks, Inc. v. S. Diamond Assocs., Inc.*,
44 F.3d 925 (11th Cir. 1995) ................................................................................9

*In re Plum Baby Food Litig.*,
No. 21-CV-02417, 2022 WL 16552786 (D.N.J. Oct. 31, 2022) ...........................11

*Rubinstein v. Yehuda*,
38 F.4th 982 (11th Cir. 2022) ...............................................................................6

*Searcy v. R.J. Reynolds Tobacco Co.*,
902 F.3d 1342 (11th Cir. 2018) ............................................................................9

*Slater v. U.S. Steel Corp.*,
871 F.3d 1174 (11th Cir. 2017) ............................................................................9

*Smith v. Sch. Bd. of Orange Cnty.*,
487 F.3d 1361 (11th Cir. 2007) ............................................................................9

*Thomas v. Alcon Labs.*,
116 F. Supp. 3d 1361 (N.D. Ga. 2013) ................................................................16

*U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*,
894 F.3d 1313 (11th Cir. 2018) ..........................................................................13

*State ex rel. Universal Underwriters Ins. Co. v. Wilson*,
825 S.E.2d 95 (W. Va. 2019) ................................................................................9

*In re Valsartan, Losartan & Irbesartan Prods. Liab. Litig.*,
MDL No. 2875, 2020 WL 7418006 (D.N.J Dec. 18, 2020) ................................17

*Weber v. Allergan, Inc.*,
940 F.3d 1106 (9th Cir. 2019) ............................................................................16

*Wolicki-Gables v. Arrow Int'l, Inc.*,
634 F.3d 1296 (11th Cir. 2011) ..........................................................................16

## Statutes and Regulations

21 U.S.C. § 321 ..................................................................................................17

21 U.S.C. § 331 ....................................................................................................7

21 U.S.C. § 337 .............................................................................................14, 19

21 U.S.C. § 351 .............................................................................................7, 15

21 U.S.C. § 379r .................................................................................................................14

21 C.F.R. § 210.1 ...............................................................................................................16

21 C.F.R. § 211.142 ...........................................................................................................16

21 C.F.R. § 314.70 .............................................................................................................18

**<u>Rules and Other Authorities</u>**

Fed. R. Civ. P. 56 ................................................................................................................4

*AAM/CHPA/PhRMA Questions for May 4th FDA-Industry Meeting to Discuss*
    *Nitrosamine Impurities in Pharmaceuticals*,
    https://www.fda.gov/media/150864/download ......................................................15

## **INTRODUCTION**

Given that Plaintiffs' misbranding argument was expressly premised on their allegation that Zantac causes cancer, it is unsurprising that they now make no argument and adduce no evidence that this theory has survived this Court's *Daubert* and Summary Judgment Order (the "General Causation Order"), which held Plaintiffs lack any reliable or admissible evidence that Zantac causes cancer or contains unsafe levels of NDMA. *See* General Causation Order, Dkt. 6120, at 38–39. In light of that ruling, Plaintiffs cannot establish that Zantac was worthless because it did not warn of such unproven risks. Moreover, this safety-based nondisclosure theory is "the 'fundamental premise' of *all of the economic loss class action claims in this MDL*." Show Cause Order, Dkt. 6484, at 8 (quoting Resp. to Mot. to Dismiss, Dkt. 3325, at 14 (emphasis added)). Accordingly, judgment on the merits of all economic loss claims premised on this foundational allegation should be granted without delay. Plaintiffs make no serious attempt to argue otherwise.

Rather than defend the claims they pled, Plaintiffs attempt to resurrect a long-abandoned and futile theory that trace amounts of NDMA rendered Zantac "adulterated" and therefore worthless, without evidence of any safety risk and without any allegation that Zantac otherwise failed to perform as intended. Plaintiffs' "adulteration" theory is an incoherent mashup of labeling, design, and manufacturing challenges, which does not correspond with the claims actually pled in the Second Amended Consolidated Economic Loss Class Action Complaint ("SACELC"), Dkt. 3883, and does not invoke any cognizable state-law theories of liability. This theory departs from federal adulteration standards, which pertain to alleged impurities (not labeling) and which would require evidence, at minimum, that the Zantac pills that Plaintiffs purchased contained NDMA at levels exceeding FDA's acceptable limits (evidence that Plaintiffs have failed to adduce).

Moreover, as this Court's Order to Show Cause suggests, Plaintiffs' adulteration theory fails as a matter of law for multiple reasons: (1) Plaintiffs knowingly waived such a theory at the

outset of this litigation; (2) Plaintiffs lack standing to pursue a theory based on trace levels of NDMA that have no impact on safety or efficacy; (3) no state law Defendants could find recognizes a cause of action for "adulteration" premised on such a theory (and Plaintiffs have not pointed to one); and (4) this theory is barred by express and implied federal preemption.

And although the Court asked Plaintiffs many pointed questions about the flaws in their adulteration theory and otherwise gave them ample opportunity to explain them away, Plaintiffs have utterly failed to do so and have therefore failed to show cause as to why summary judgment should not be granted on all of their claims.

## ARGUMENT AND CITATION OF AUTHORITY

### I.   PLAINTIFFS' MISBRANDING THEORY FAILS IN LIGHT OF THIS COURT'S GENERAL CAUSATION ORDER.

From the outset, Plaintiffs' economic loss class action has been premised on the claim that they are entitled to a full refund of Zantac's purchase price on the ground that Defendants failed to "disclose that . . . Ranitidine-Containing Products were unsafe" because "the ranitidine molecule breaks down into carcinogenic NDMA at levels that exceed the maximum daily limit." SACELC 14. Plaintiffs pursued that claim by advancing a narrow misbranding argument: that Zantac's label failed to disclose harmful levels of NDMA, which rendered the drug worthless to Plaintiffs. *See, e.g.*, Order on Mot. to Dismiss, Dkt. 3715, at 28, 32; Defs.' Resp. to Mot. to Stay, Dkt. 6227, at 3.

This Court has concluded, however, that Plaintiffs have no reliable evidence that Zantac has unsafe levels of NDMA that cause harm, much less reliable evidence that the Zantac Plaintiffs purchased can cause cancer. *See* General Causation Order, Dkt. 6120, at 38–39. That ruling—the product of a careful and thorough process—pulled the "lynchpin" from all three of Plaintiffs' master complaints. *See* Defs.' Resp. to Mot. to Stay, Dkt. 6227, at 2–5; *see also* General Causation Order, Dkt. 6120, at 13–14, 336. Plaintiffs' claims simply cannot survive in the absence of

evidence that Zantac actually is unsafe or causes cancer.

Accordingly, this Court, consistent with its authority to administer the MDL, ordered Plaintiffs to show cause why summary judgment should not be granted in light of the General Causation Order.   In their response, Plaintiffs concede that the General Causation Order is dispositive of two of their master complaints (personal injury and medical monitoring), yet they assert that the Order has no application to their putative economic loss class action.  *See, e.g.*, Pls.' Resp. to Show Cause Order, Dkt. 6589 ("Pls.' Resp."), at 2.  Yet, Plaintiffs make no effort to undermine the Court's rejection of their misbranding argument's essential premise that Zantac contains dangerous levels of NDMA that posed a cancer risk.   Nor do they make any attempt to respond to the Court's pointed question regarding how their current position can be reconciled with their own prior admission that they would "lose" if "ultimately the proof showed that the drug was not dangerous."  Mot. to Dismiss Hearing Tr., Dkt. 3682, at 184; *see also* Show Cause Order, Dkt. 6484, at 25, 27.  And, in the face of the Court's Order to Show Cause, Plaintiffs do nothing to meet their evidentiary burden.   Remarkably, they simply insist that they are entitled to still further opportunities to show that Zantac causes some type of harm and mistakenly attempt to frame their opposition to application of the General Causation Order as an issue of collateral estoppel.  Pls.' Resp. 12, 15, 19.

That is not the case: collateral estoppel is not the applicable framework to determine how a potentially dispositive MDL ruling applies to other cases in the litigation.  Rather, MDL courts routinely employ order to show cause proceedings to apply prior legal rulings to other plaintiffs. *See, e.g.*, *Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 66 (3d Cir. 2023); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Prac. & Prods. Liab. Litig. (No. II) MDL 2502*, 892 F.3d 624, 648–49 (4th Cir. 2018).  Further, this Court broadly authorized Plaintiffs' Leadership to

3

bring all common benefit and class claims, and they took the necessary steps during the *Daubert* process to represent Plaintiffs' interests.  *See* Pretrial Order No. 20, Dkt. 685, at 13–15.  This procedure has in no way deprived Plaintiffs of their ability to litigate their claims.  *See In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1014 (5th Cir. 1977) ("It is not open to serious question that a federal court in a complex, consolidated case may designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide."); *see also id.* at 1012 n.8; *In re Baycol Prods. Liab. Litig.*, MDL No. 1431, 2007 WL 9717940, at *2 (D. Minn. July 13, 2007).[1]

Moreover, when responding to an order to show cause under Rule 56(f), Plaintiffs must "come forward with evidence" why summary judgment should not be granted.  *In re Fisher Island Invs.*, 778 F.3d 1172, 1195 (11th Cir. 2015) ("A court may *sua sponte* grant summary judgment 'so long as the losing party was on notice that [it] had to come forward with all of [its] evidence.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986))); *see also* Fed. R. Civ. P. 56(c)(1)(A).  Plaintiffs failed to do so.  Similar failures have led to entry of summary judgment in other MDLs, and Plaintiffs present no reason why that should not be the case here.  *See, e.g.*, *In re Lipitor*, 892 F.3d at 630, 648–49 (affirming disposition of entire litigation through summary judgment and order to show cause process for failure to submit contrary evidence).

## II.   PLAINTIFFS' ADULTERATION THEORY FAILS AS A MATTER OF LAW.

Having laid down their misbranding claims, Plaintiffs attempt to change course entirely,

---

[1] Regarding the General Causation Order's applicability, Plaintiffs assert that "throughout the MDL proceedings, the Class Plaintiffs['] Economic Loss Claims were recognized as distinct from the Personal Injury and Medical Monitoring claims."  Pls.' Resp. 19.  The record is to the contrary.  The MDL's pretrial orders contemplated the intertwined nature of the cases.  *See, e.g.*, Pretrial Order No. 30, Dkt. 875, at 5 (explaining that the parties considered and understood the implications of "concurrent briefing of general causation *Daubert* and class certification"); Pretrial Order No. 65, Dkt. 4660, at 2–3 (maintaining coordinated deadlines).  None of the filings Plaintiffs cite put the Plaintiffs on different "tracks," as they suggest.

resurrecting a distorted version of their previously abandoned "adulteration" theory that seeks refunds based on purportedly undisclosed trace levels of NDMA, which are unsupported by admissible evidence showing any safety risk.  At the outset, Plaintiffs' brief hopelessly confuses what their own "adulteration" theory entails.  Plaintiffs apparently reject this Court's (correct) understanding that this theory contends Defendants violated both the Food, Drug, and Cosmetic Act ("FDCA") and state law by selling products with trace amounts of NDMA without a warning label.  Rather, Plaintiffs now characterize their theory of adulteration in contradictory, incoherent, and wide-ranging ways: on the one hand, they claim that a product is "adulterated if it contains an ingredient that is not approved or disclosed," but they then "agree . . . [t]heir economic loss class action claims are based on whether the ranitidine labeling was unfair or deceptive," and later they invoke advertising, storage, packaging, and expiration dates, and finally, in arguing against federal preemption, they assert ill-defined violations of current Good Manufacturing Practices ("cGMP") regulations.  Pls.' Resp. 7, 9, 10, 14–15.  In their scattershot explanation of their theory, Plaintiffs do nothing to grapple with the Order to Show Cause's admonition to provide authority explaining how disclosure on a label could cure an adulteration problem.  Show Cause Order, Dkt. 6484, at 21–22.  Plaintiffs also do not respond to the Court's concern that Defendants could not, consistent with federal law, change the design and formulation of ranitidine to avoid its inherent capacity to "adulterate itself," by breaking down into NDMA.  *Id.* at 22.

No variant of this trace-NDMA "adulteration" theory is viable; it fails on at least four grounds.  *First*, Plaintiffs not only waived this theory, but they also expressly disclaimed the corresponding partial-damages theory that ranitidine was worth less, rather than entirely worthless.  *Second*, Plaintiffs lack standing to seek refunds without evidence that Zantac was unsafe or failed to perform as promised.  *Third*, Plaintiffs identify no state law that recognizes a claim based on

trace amounts of NDMA that are not proven to exceed federal thresholds, nor do they explain "how a reasonable juror could conclude that the value of ranitidine was zero" without "reliable scientific evidence that the trace impurities can cause harm." Show Cause Order, Dkt. 6484, at 17. And *fourth*, Plaintiffs' adulteration theory is expressly and impliedly preempted by federal law because trace amounts of NDMA do not render Zantac adulterated in violation of federal law, disclosure of the risk of NDMA formation would not cure such an adulteration issue (and thus the state and federal duties would not be parallel), and Defendants could not change Zantac's FDA-approved design or label.

### A.     Plaintiffs Knowingly and Voluntarily Waived Their Adulteration Theory.

The Court should dismiss with prejudice any claims predicated upon an adulteration theory because Plaintiffs waived that theory. Waiver is "the intentional relinquishment or abandonment of a known right." *Rubinstein v. Yehuda*, 38 F.4th 982, 995 (11th Cir. 2022) (internal quotation marks omitted). "A party can waive an issue by making only a passing reference to it and failing to make arguments and cite authorities in support of [the] issue." *Id.* (internal quotation marks omitted) (finding waiver).

Here, Plaintiffs failed to raise their adulteration theory in response to Defendants' motions to dismiss the economic loss claims as preempted. In response to Defendants' motion to dismiss the original putative class complaint, Plaintiffs' opposition brief focused entirely on the allegation that Zantac "was misbranded under federal law." Pls.' Resp. to Mot. to Dismiss, Dkt. 1976, at 15. As the Court noted in its second preemption order, Plaintiffs' master complaints had "alleged that ranitidine was adulterated—a potential legal basis to avoid a preemption challenge," but "Plaintiffs either abandoned or waived this legal argument . . . when the Plaintiffs raised only misbranding—not adulteration—in their written responses to the Defendants' first-round motions to dismiss on

preemption."  Order on Mot. to Dismiss, Dkt. 3715, at 20 n.10.  Then, the 1,135-page SACELC made only a few unsubstantiated references to "adulteration" in a California statutory claim for unfair competition filed against each of the Defendants.  *See* SACELC, Dkt. 3883 ¶¶ 506, 508, 1308, 1310, 1904, 1906, 2984, 2986, 4405, 4407 (citing 21 U.S.C. §§ 331, 351).  When the Defendants moved to dismiss the SACELC as preempted, adulteration did not appear one time in any party's brief or the Court's order.  *See generally* Mot. to Dismiss, Dkt. 4107; Pls.' Resp. to Mot. to Dismiss, Dkt. 4240; Defs.' Reply, Dkt. 4319; Order on Mot. to Dismiss, Dkt. 4487.

Having consciously abandoned all arguments based on adulteration during the motion-to-dismiss briefing, Plaintiffs cannot revive the theory at this late stage.  The Eleventh Circuit has made clear that parties waive arguments that they decide not to raise before the relevant issue is decided.  *Islam v. Sec'y, Dep't of Homeland Sec.*, 997 F.3d 1333, 1343 (11th Cir. 2021) (finding waiver where party told district court he was not challenging applicable statutory definition).  In fact, given the serious federal interests at stake, the Eleventh Circuit has found that district courts commit reversible error by permitting a party to recover its waived argument at a later date.  *See In re Checking Acct. Overdraft Litig.*, 754 F.3d 1290, 1298 (11th Cir. 2014) (reversing order compelling arbitration where movant "waited to raise [an] issue until after it had asked the district court to decide arbitrability—and lost" and attempted to revive the argument in a later motion).

In their response to the Order to Show Cause, Plaintiffs protest that they never mentioned their adulteration theory because Defendants never argued it was preempted.  Pls.' Resp. 1.  But Defendants moved to dismiss as preempted "***all*** state law claims" in the original complaint "that [sought] economic damages arising out of the use and purchase of [over-the-counter ("OTC")] Zantac."  Defs.' Mot. to Dismiss, Dkt. 1580, at 22 (emphasis added).  In opposing the motion, Plaintiffs had the opportunity to identify the legal theories they were asserting to escape

preemption.  "[T]he time for legal arguments arises '***after*** the defendant moves for dismissal."  Order, Dkt. 6317 (quoting *Davis v. Infinity Ins. Co.*, No. 15-CV-1111, 2017 WL 4224588, at *6 (N.D. Ala. Sept. 22, 2017) (emphasis added)).  If Plaintiffs believed economic loss claims based on adulteration were not preempted, they were required to make that argument.  They did not.[2]

Likewise, Plaintiffs disclaimed any intent to advance a "price premium" theory.  To the extent that Plaintiffs now suggest that they might wish to argue they are entitled to partial, rather than full, refunds, *see* Pls.' Resp., at 10–11, Plaintiffs have expressly waived that argument.  In response to a direct question from the Court, counsel for the Plaintiffs "commit[ted] [that] this is not a price premium case, . . . not about a slight overcharge," but rather "[w]e are talking about a drug that was recalled because it causes cancer, and in that context we are saying . . . it is worthless."  Mot. to Dismiss Hearing Tr., Dkt. 3682, at 190.  Although this Court's Order to Show Cause directed Plaintiffs to address it, Plaintiffs' response says nothing about this explicit, knowing waiver of a price-premium theory.  Show Cause Order, Dkt. 6484, at 11, 17.

Even absent the express waiver, Plaintiffs' price-premium theory would be foreclosed by their failure to plead it: the SACELC alleges that every named Plaintiff "purchased Ranitidine-Containing Products that were unsafe for human ingestion and, therefore, were ***worthless*** at the time of purchase."  SACELC ¶¶ 25–135 (emphasis added).  Plaintiffs did not allege that, even if the ranitidine they purchased was safe and thus not completely ***worthless***, it was still ***worth less*** than its purchase price because it contained trace levels of NDMA.

---

[2] Permitting Plaintiffs to revive their adulteration theory at this late stage is both unwarranted and unfair to Defendants—particularly to the extent that it could require reopening the 116 depositions of putative class representatives and their health-care providers that were taken on the understanding that Plaintiffs' claims centered on the absence of a cancer-risk warning on ranitidine's label and that the product was allegedly worthless.

Plaintiffs cannot seek to amend their complaint at this stage, as they could never show the good cause that is required after the deadline for amending pleadings has long passed.  *See Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361, 1366 (11th Cir. 2007).  As further explained below, amendment would be futile because the theory that ranitidine was worth less than its purchase price because it was adulterated with non-carcinogenic levels of NDMA fails as a matter of law.

### B.    Plaintiffs' Claims Likely Also Would Be Barred by Judicial Estoppel Under Many States' Laws.

This Court directed the parties to address whether judicial estoppel precludes Plaintiffs' theory of adulteration.  The federal doctrine of judicial estoppel would foreclose Plaintiffs' change in position here.  *See, e.g.*, *Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1181 (11th Cir. 2017).  In diversity cases, however, "the application of the doctrine of judicial estoppel is governed by state law."  *Original Appalachian Artworks, Inc. v. S. Diamond Assocs., Inc.*, 44 F.3d 925, 930 (11th Cir. 1995).  Because the doctrine's contours vary from state to state, judicial estoppel does not provide a ready basis for disposing of Plaintiffs' claims at this juncture—in some states, judicial estoppel would apply in these circumstances, but in others it may not.  *See, e.g.*, *State ex rel. Universal Underwriters Ins. Co. v. Wilson*, 825 S.E.2d 95, 111 (W. Va. 2019) (applying judicial estoppel); *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1359 n.7 (11th Cir. 2018).  In any event, the well-established federal waiver doctrine, described above, forecloses Plaintiffs' "adulteration" theory without this concern.[3]

### C.    Plaintiffs Lack Standing to Pursue Their Adulteration Theory.

Plaintiffs also lack standing to advance their trace-NDMA adulteration theory because they do not assert a cognizable injury.  Despite this Court's direct inquiry, they do not explain how they

---

[3] Defendants nonetheless will submit further briefing on the relevant states' judicial estoppel doctrines if that would assist the Court.

suffered an economic loss after purchasing an effective medication with trace levels of NDMA that they have not shown poses any risk of harm. *See* Show Cause Order, Dkt. 6484, at 27. Plaintiffs' assertion that Zantac is "still" worthless under their "theory of the case" (that is, based on the presence of trace levels of NDMA) is nothing more than an assertion of buyer's remorse. They suggest, for example, that—if litigation continues—they might put forward individuals' anecdotal testimony about the value of Zantac *to them*, as well as "expert evidence" about the "perceived safety" of Zantac based on "less rigorous" standards than *Daubert* requires. Pls.' Resp. 12. According to Plaintiffs, as long as they can show that they subjectively believe they were tricked into buying a dangerous product, *it does not matter whether they can prove that it actually was dangerous*.

As this Court has explained, however, "[a] plaintiff does not have standing to sue . . . merely because of buyer's remorse," or based on a "subjective allegation that the trace amounts" of a carcinogen are "unacceptable." Show Cause Order, Dkt. 6484, at 24 (quoting *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010)). To satisfy Article III's requirements, Plaintiffs must demonstrate a concrete and particularized injury. As courts have explained, for an economic loss claim, this means they must ultimately be able to show that the product they purchased poses an actual safety risk or otherwise failed to perform in some essential respect. *See, e.g.*, *Doss v. Gen. Mills, Inc.*, 816 F. App'x 312, 314 (11th Cir. 2020) (affirming dismissal of economic loss claim for lack of standing where plaintiff did not allege purchasing Cheerios with "a level of glyphosate that is so harmful" that the cereal would be "'presumptively unsafe' and therefore worthless"); *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Prac. & Liab. Litig.*, 903 F.3d 278, 289 (3d Cir. 2018) (finding no standing where plaintiff did not allege physical

harm); *Eike v. Allergan, Inc.*, 850 F.3d 315, 318 (7th Cir. 2017) (finding no standing based on purchaser "regret or disappointment").[4]

At this stage, the absence of admissible evidence that the Zantac Plaintiffs purchased contained levels of NDMA affecting its safety, efficacy, or quality is fatal to their adulteration-based claim—leaving them without a cognizable injury from, or a proper claim based on, alleged "adulteration."  For that reason, Plaintiffs are wrong that the General Causation Order has "no direct bearing" on these claims.  Pls.' Resp. 16.  As the cases cited demonstrate, economic loss claims cannot survive where plaintiffs cannot establish the product was unsafe or unfit for its intended purpose.[5]

The lack of cognizable harm distinguishes this case from *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019).  There, the Eleventh Circuit's finding of standing at the motion to dismiss stage was based on an allegation, grounded in FDA findings, that the dietary supplement at issue was both adulterated *and unsafe*.  Show Cause Order, Dkt. 6484, at 23–24 (citing *Debernardis*, 942 F.3d at 1080–82, 1085 n.6, 1088); *see* Defs.' Resp. to Mot. to Stay, Dkt.

---

[4] *See also, e.g.*, *In re Plum Baby Food Litig.*, — F. Supp. 3d —, No. 21-CV-02417, 2022 WL 16552786, at *7–8 (D.N.J. Oct. 31, 2022) (finding no standing where plaintiffs alleged presence of heavy metals in baby food reduced or eliminated the value of the product but lacked "factual support of adverse health consequences"); *In re Fruit Juice Prods. Mktg. & Sales Prac. Litig.*, 831 F. Supp. 2d 507, 511–12 (D. Mass. 2011) (finding no standing where plaintiffs purchased products containing levels of lead too low to pose unacceptable health risk and were unable to show any actual harm); *In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*, No. 21-CV-269, 2022 WL 10197651, at *8 (E.D. Va. Oct. 17, 2022) (finding no standing where plaintiffs claimed levels of heavy metals in baby food were "unsatisfactory to [them]"); *Green v. PepsiCo, Inc.*, No. 18-CV-62011, 2019 WL 8810364, at *1–2 (S.D. Fla. Apr. 12, 2019) (finding no standing based on the purchase of oats containing glyphosate without allegation of adverse health consequences).

[5] Plaintiffs acknowledge that at summary judgment they must be able to adduce evidence to demonstrate standing.  Pls.' Resp. 11–12 n.5 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  But they mistakenly suggest that, at this late stage, they may rely on unsupported allegations and hypothetical *categories* of "evidence" they hope to introduce at some later point in the proceedings.  The time to show cause is *now*.  In any event, as explained here, Plaintiffs' claims of buyer's remorse fail to establish a cognizable injury at any stage.

6227, at 14–15.  Unlike *Debernardis*, the present case is long past the pleading stage and Plaintiffs have failed (despite every opportunity) to proffer admissible evidence that Zantac "could cause harm."  Show Cause Order, Dkt. 6484, at 27.

Plaintiffs rightfully conceded early in the litigation that "the touchstone for standing for their economic loss claims was safety."  *Id.* at 26.  Since then, this Court has held that Plaintiffs have no reliable evidence that, in purchasing Zantac, they bought an unsafe medication or one that contained dangerous levels of NDMA.  Accordingly, Plaintiffs' adulteration theory, based on the alleged presence of trace levels of NDMA, fails at the threshold.

### D.   Plaintiffs Have Failed to Identify State-Law Duties That Were Violated.

The Court required Plaintiffs to "identify the state-law duties for their claims in the SAELC," and they failed to do so, even by example.  *Id.*, at 19.  That is because, as the Court suggests, state laws do not impose a duty to disclose trace amounts of substances that do not risk harm or change a product's efficacy.  *See id.* at 19–20 (collecting cases).

Plaintiffs go no further than a string cite of paragraphs in the SACELC that they say establish "unfair and deceptive acts by wrongly representing Zantac was 'a particular standard, quality, and grade when they are not [sic].'"  Pls.' Resp. 14 & n.9.  Plaintiffs' mere citation to the complaint fails for two reasons.  First, Plaintiffs point to no state cases or statutes showing that any state's law imposes a duty to disclose trace levels of a substance on the product label or that such trace levels are considered by any state to change the product's "standard, quality, and grade," particularly where, as here, Plaintiffs have no reliable evidence that they purchased Zantac pills with NDMA in levels above the FDA's acceptable daily intake level ("ADI").  *See* General Causation Order, Dkt. 6120, at 38–39.  Meanwhile, the cases cited by the Court demonstrate that numerous states expressly reject state-law duties to disclose trace levels of impurities under their

consumer protection statutes.  *See, e.g.*, Show Cause Order, Dkt. 6484, at 19–20; *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d 170, 182 (E.D.N.Y. 2018) (finding it implausible that consumers would be misled by existence of trace pesticide in orange juice labeled "natural"); *see also Conde v. Velsicol Chem. Corp.*, 804 F. Supp. 972, 979 (S.D. Ohio 1992), *aff'd*, 24 F.3d 809 (6th Cir. 1994) ("The relevant inquiry is whether the objective consumer thought the product was safe and would not cause adverse health effects.").

This disclosure's lack of materiality also forecloses Plaintiffs' trace-NDMA theory. Plaintiffs' own pleadings claim that the failure to warn of NDMA is "material" only because it purportedly renders ranitidine "unreasonably dangerous" and poses a risk to "safety."  *See, e.g.*, SACELC ¶¶ 453–93 (Arkansas law).  For the reasons explained above, this Court's General Causation Order dispels those allegations.  Further, Plaintiffs' assertion that "many drugs that do not provably cause cancer are also worthless," Pls.' Resp. 19, is unsupported and irrelevant here, where the record concerns a safe and effective drug.  As reflected in Plaintiffs' response, their suit has never sought to address safety concerns other than their now-failed allegation that Zantac could cause cancer.  And Plaintiffs have never suggested that this case is premised upon a claim that Zantac was an ineffective medication.

Plaintiffs' discussion of "loss causation," or proximate causation, misses the mark.  *Id.* at 18.  The General Causation Order recognizes that Plaintiffs are unable to show actual causation, which is "necessarily encompass[ed]" in proximate causation.  *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1329 (11th Cir. 2018).  Finally, Plaintiffs further fail to address this Court's order to provide authority to demonstrate that, if any state law prohibits trace impurities, such a duty would be satisfied "not with the removal of the impurity"—which is a design-change prohibited by federal law, *see infra* Section II.E—but instead with "disclosure of

the impurity." Show Cause Order, Dkt. 6484, at 22 & n.15. Plaintiffs cite no support in state or federal law for such a "solution."[6]

### E. Plaintiffs' Adulteration Theory Is Barred by Federal Preemption.

The Order to Show Cause poses a number of questions to the parties about whether Plaintiffs' newly conceived adulteration theory would be barred by preemption. Plaintiffs' response brief fails to address many of those questions and ignores express preemption entirely. Plaintiffs offer no colorable explanation for how their newly conceived adulteration theory, premised on trace levels of NDMA avoid express *and* implied federal preemption.

The likely reason Plaintiffs say nothing about express preemption is that § 379r expressly preempts state-law claims that would impose any "requirement" on an OTC drug that is "'different from or in addition to, or that is otherwise not identical with, a requirement under' the FDCA." Order on Mot. to Dismiss, Dkt. 3715, at 28 (quoting 21 U.S.C. § 379r(a)(2)). To survive express preemption while avoiding implied preemption stemming from the federal bar on private enforcement of the FDCA, *see* 21 U.S.C. § 337(a), a plaintiff must thread the "narrow gap" for claims that "parallel" federal law, *i.e.*, that are premised on conduct that simultaneously violates federal law and breaches well-recognized, traditional state law duties. *See, e.g.*, Order on Mot. to Dismiss, Dkt. 4487, at 3–5, 8–9. That is why the Court's Order to Show Cause required Plaintiffs to identify the relevant state law duties (which Plaintiffs failed to do for the reasons explained

---

[6] Likewise, Defendants have found no instance in which the FDA classified a medication as adulterated based on the presence of an impurity but, because of subsequent disclosure of the impurity, the medication stopped being adulterated.

The Court requested that the parties address "whether the time has come for the Court to analyze the state-law duties implicated by each claim in the SAELC." Show Cause Order, Dkt. 6484, at 19 n.11. Defendants submit that no state-level analysis is required at this juncture because Plaintiffs' misbranding theory is foreclosed in its entirety by the General Causation Order, and Plaintiffs have waived all claims based on an adulteration theory.

above), and asked Plaintiffs to identify "in plain terms" the federal requirements upon which their new adulteration theory would be premised.  Show Cause Order, Dkt. 6484, at 20.  Plaintiffs, however, have failed to show that trace levels of NDMA violate federal adulteration laws, much less that changes to Zantac's label (or design) would be permissible under federal law.  As a result, federal preemption bars their claims.

       1.     *Plaintiffs Fail to Show Trace-NDMA Levels Would Make Zantac Adulterated.*

First, notwithstanding that the Court directed them to do so, Plaintiffs have never explained how Zantac was rendered "adulterated" without reliable evidence that the Zantac they purchased had NDMA levels that exceed the ADI established by FDA in 2019.  Rather than answer that question, Plaintiffs resort only to the general adulteration statute, which deems a drug adulterated if its "quality or purity falls below[] the standard set forth in [the official] compendium."  Pls.' Resp. 13; *see also* 21 U.S.C. § 351(b).  But Plaintiffs have not identified any deviation from the compendium whatsoever.  *See* Order, Dkt. 3716, at 14–16 (explaining that Zantac was stored properly under the compendium's requirements).  At summary judgment, Plaintiffs have the burden to explain the strength and purity standards that they claim Zantac fell below and to identify evidence that the product did so; they have done neither.  Moreover, the FDA's ADI that was established specifically for NDMA surely trumps Plaintiffs' generalized "quality or purity" claim. *See Banfi Prods. Corp. v. United States*, 40 Fed. Cl. 107, 113 (1997), *aff'd as modified*, 41 Fed. Cl. 581 (1998) (describing ADIs as "the level of a substance, measured in milligrams per kilograms of body weight, that FDA determines is safe for lifetime exposure by an individual").[7]

---

[7] Plaintiffs' adulteration argument is further inconsistent with FDA's establishment of a three-year process for requiring manufacturers to implement a testing protocol for nitrosamines, setting a September 2023 deadline for compliance after carefully considering the risks, the implementation challenges, and the risk to supply chain for therapeutic medications.  *See AAM/CHPA/PhRMA Questions for May 4th FDA-Industry Meeting to Discuss Nitrosamine Impurities in*

2. *Plaintiffs Offer No Evidence to Support Their Conclusory cGMP Argument.*

Given the lack of admissible evidence that NDMA levels exceeded FDA's ADI, Plaintiffs instead rely on a vague assertion that Zantac was "not made in a cGMP-compliant manner." Pls.' Resp. 14. But, Plaintiffs do not identify any specific cGMP regulations, and merely reference a handful of paragraphs in the SACELC. *Id.* at 14 n.8. In turn, those SACELC paragraphs cite just two cGMP regulations: 21 C.F.R. § 210.1(a) (establishing the general requirement that companies follow cGMP in the manufacture, processing, packing, or holding of a drug) and 21 C.F.R. § 211.142(b) (requiring that companies store drugs under proper conditions). The SACELC, however, is not admissible evidence.

Plaintiffs cannot meet their burden to show cause with only "general pleading" of cGMP violations and no evidence. *Weber v. Allergan, Inc.*, 940 F.3d 1106, 1114 (9th Cir. 2019) (rejecting assertion at summary judgment that defect in some products implied violation of federal cGMP regulations); *Erickson v. Bos. Sci. Corp.*, 846 F. Supp. 2d 1085, 1093 (C.D. Cal. 2011) ("Many courts have recognized that product recalls do not create a presumption that FDA requirements have been violated."). Plaintiffs could not even get past a motion to dismiss with such vague allegations. *Wolicki-Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1301–02 (11th Cir. 2011) (dismissing claims as preempted for not setting forth any specific problem or alleged failure to comply with any FDA regulation that could be linked to the injury); *see also Thomas v. Alcon Labs.*, 116 F. Supp. 3d 1361, 1369 (N.D. Ga. 2013). Plaintiffs further make no effort to connect any purported cGMP violations with the formation of NDMA, much less adduce evidence to support such a conclusion.

---

*Pharmaceuticals*, https://www.fda.gov/media/150864/download; *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 886 (2000) (holding that implied preemption barred state requirement that car manufacturers install airbags prior to federal-law deadline).

The one opinion Plaintiffs cite, *In re Valsartan, Losartan & Irbesartan Prods. Liab. Litig.*, MDL No. 2875, 2020 WL 7418006 (D.N.J Dec. 18, 2020), is inapposite.  That decision was at the motion to dismiss stage, and, in any event, the plaintiffs there had some evidence of specific violations: the FDA had "already issued an initial determination" that the manufacturers "likely did not follow cGMPs when they changed the solvent(s) in the [Active Pharmaceutical Ingredient] manufacturing process." *Id.* at *12.  In this case, however, the parties are long past the pleadings.  Plaintiffs had three years to build their case.  Despite obtaining millions of documents and taking hundreds of depositions, Plaintiffs offer no evidence that Zantac's manufacturers deviated from the cited cGMPs.

3.      *A Label Change Would Not Cure "Adulteration" and Was Not Permitted in the Absence of a New Safety Risk.*

Plaintiffs also have no answer to the Court's question about how Defendants could have satisfied a state-law duty prohibiting adulteration by changing the Zantac label.  Both express and implied preemption foreclose a claim that manufacturers should have added a label warning of trace-NDMA levels without reliable evidence of potential harm.  Although Plaintiffs concede that any theory of liability is "based on whether the ranitidine labeling was unfair or deceptive," Pls.' Resp. 9, Plaintiffs do not cite a single state law that contemplates that adulteration can be cured through a label change.[8]  Even if there were, such a labeling requirement would clearly be "different from" and "in addition to" federal law, which does not require trace impurities to be included on the label.

---

[8] Plaintiffs define "label" far too broadly, attempting to shoehorn in "television, print, radio, and internet ads for OTC Zantac."  Pls.' Resp. 10 (quoting SACELC ¶ 372).  As the Court noted in its prior preemption ruling, the term "label" in the FDCA means written material that accompanies the product or is placed on its packaging.  *See* Order on Mot. to Dismiss, Dkt. 3715, at 11 (citing 21 U.S.C. § 321(m)).  Advertisements in other media are not part of the "label."

Beyond that, implied preemption also bars a claim that Defendants should have changed Zantac's label to warn of trace amounts of NDMA.  Brand manufacturers may only utilize the Changes Being Effected ("CBE") process to change an FDA-approved label when "newly acquired information" shows reasonable evidence that the drug poses a safety risk that occurs with greater frequency, severity, or degree than previously submitted to the FDA.  *See* 21 C.F.R. § 314.70(c)(6)(iii)(A).  The Court's General Causation Order forecloses Plaintiffs' argument that Defendants could have used the CBE process to change Zantac's label to disclose the risk that it could contain trace levels of NDMA because no such new safety information exists.  *See In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1029 (S.D. Cal. 2021) (holding label change was impossible absent evidence of general causation), *aff'd*, No. 21-55342, 2022 WL 898595 (9th Cir. Mar. 28, 2022).

4.     *Federal Law Barred Defendants from Changing Zantac's FDA-Approved Design, as This Court Has Already Held.*

This Court already has correctly held that federal law expressly and impliedly preempts Plaintiffs' claims challenging the formulation and design of ranitidine and the inherent potential of its molecular structure to break down into NDMA.  Order on Mot. to Dismiss, Dkt. 2532, at 30; Order on Mot. to Dismiss, Dkt. 3750, at 39–43 (recognizing that Plaintiffs' expiration-date claims and temperature-based claims seek to impose liability based on a design-defect/molecular-defect theory).  That ruling recognized that manufacturers may not change the design of Zantac without FDA approval.  Plaintiffs do not and cannot challenge that holding.  Plaintiffs have adduced no evidence of any other way in which NDMA forms in ranitidine.  *See* General Causation Order, Dkt. 6120, at 15–17.  And Plaintiffs have never argued that ranitidine can be manufactured, distributed, and purchased with no NDMA.  Design-based challenges to the FDA-approved formulation of ranitidine are further barred by express preemption as they are not premised on any

violation of federal requirements and therefore necessarily would impose requirements that are "different from" and "in addition to" federal law.

5.      *Plaintiffs' Attempt to Privately Enforce the FDCA Is Preempted.*

Finally, Plaintiffs' adulteration claim is an impermissible effort to privately enforce the FDCA because it is based purely on a putative violation of federal adulteration laws, not traditional state law duties.  The FDCA does not allow any private right of action to enforce it; rather, the FDCA reserves exclusive enforcement authority to the FDA.  *See* 21 U.S.C. § 337(a); *see Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 352 (2001); *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1327–30 (11th Cir. 2017) (implied preemption bars state-law claims premised on alleged violations of federal reporting obligations); *Adventure Outdoors, Inc. v. Bloomberg*, 552 F.3d 1290, 1295 (11th Cir. 2008) (explaining that no private right of action exists under the FDCA).  As the Ninth Circuit recently explained, federal law impliedly preempts claims, like Plaintiffs' trace-NDMA claim, that they were "harmed economically because the defendant violated the FDCA," without a claim of "harm to a patient, where a traditional common law tort action might provide a remedy to the patient and escape preemption."  *Nexus Pharms., Inc. v. Cent. Admixture Pharmacy Servs., Inc.*, 48 F.4th 1040, 1050 (9th Cir. 2022).

## III.    THIS COURT SHOULD GRANT SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS.

Plaintiffs' economic loss class action fails on multiple grounds.  This Court's Order to Show Cause requests that the parties address "how the Court should resolve the economic loss class action claims" and, in particular, whether the circumstances result in a dismissal on standing grounds or whether judgment should be entered on the merits.  Show Cause Order, Dkt. 6484, at 28.  This Court previously held that Plaintiffs had Article III standing to pursue their economic loss claims premised on their "misbranding" theory because those claims asserted Zantac posed a

health risk due to dangerous levels of NDMA.  Order on Mot. to Dismiss, Dkt. 3715, at 29, 34–35.  But Plaintiffs failed on the merits to prove that claim, as this Court's General Causation Order found no reliable evidence that Zantac causes cancer or contains dangerous levels of NDMA.  The General Causation Order ends the case Plaintiffs actually brought on the merits, not as a matter of standing.  *See, e.g.*, *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 387 F. Supp. 3d 323, 358 (S.D.N.Y. 2019) (recognizing that, where plaintiffs failed to create genuine dispute on causation, summary judgment is appropriate), *aff'd*, 982 F.3d 113 (2d Cir. 2020); *In re Denture Cream Prods. Liab. Litig.*, 204 F. Supp. 3d 1348, 1353 (S.D. Fla. 2016) (granting summary judgment across MDL cases for failure to prove general causation).

This Court confronts a multitude of other issues only because Plaintiffs, at this belated stage, seek to resurrect their abandoned "adulteration" theory.  This Court may (and should) find that any and all of these issues—waiver, lack of standing, absence of state law grounds, and federal preemption—foreclose Plaintiffs' pursuit of their "adulteration" theory.  Such reasoning shows why Plaintiffs did not previously pursue this theory, cannot resurrect it now, and why forgiveness of their intentional waiver would be futile and prejudicial.  Because these dispositive legal impediments are posed by an argument about "adulteration" not properly before this Court and not central to Plaintiffs' claims for relief as actually pled, the Court has discretion as to which issues to decide and in what order to decide them.

## **CONCLUSION**

For the foregoing reasons, the Brand Defendants respectfully request that the Court grant summary judgment in their favor, dismiss the putative class claims, and enter final judgment.

Dated:  May 15, 2023     Respectfully submitted,

       By: */s/ Anand Agneshwar*
         Anand Agneshwar
         **ARNOLD & PORTER**
         **KAYE SCHOLER LLP**
         250 West 55th Street
         New York, NY 10019
         Tel: (212) 836-8000
         Fax: (212) 836-8689
         anand.agneshwar@arnoldporter.com

         Daniel S. Pariser
         Paige H. Sharpe
         601 Massachusetts Avenue, NW
         Washington, DC  20001
         Tel: (202) 942-5000
         Fax: (202) 942-5999
         daniel.pariser@arnoldporter.com
         paige.sharpe@arnoldporter.com

         Loren Brown
         **DLA PIPER LLP**
         1251 Avenue of the Americas
         27th Floor
         New York, New York 10020-1104
         Tel: (212) 335-4500
         Fax: (212) 884-8543
         loren.brown@us.dlapiper.com

         Ilana H. Eisenstein
         Rachel A.H. Horton
         Gregory J. Ferroni
         1650 Market Street, Suite 5000
         Philadelphia, PA 19103
         Tel: (215) 656-3300
         ilana.eisenstein@us.dlapiper.com
         rachel.horton@us.dlapiper.com
         gregory.ferroni@us.dlapiper.com

Matthew A. Holian
33 Arch Street, 26th Floor
Boston, MA 02110-1447
Tel: (617) 406-6009
Fax: (617) 406-6109
matt.holian@us.dlapiper.com

*Attorneys for Defendants Sanofi US Services*
*Inc., Sanofi-Aventis U.S. LLC, and Chattem,*
*Inc.*

*/s/ Andrew T. Bayman*
Andrew T. Bayman
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
Tel: (404) 572-3583
Fax: (404) 572-5100
abayman@kslaw.com

*Attorney for Defendant Boehringer Ingelheim*
*Pharmaceuticals, Inc.*

*/s/ Mark Cheffo*
Mark Cheffo
Judy Leone
Will Sachse
Lindsey Cohan
**DECHERT LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10019
Tel: (212) 689-3500
Fax: (212) 689-3590
mark.cheffo@dechert.com
judy.leone@dechert.com
will.sachse@dechert.com
lindsey.cohan@dechert.com

*Attorneys for GlaxoSmithKline LLC*

*/s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli
M. Elaine Horn
Jessica B. Rydstrom
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
Fax: (202) 434-5029
jpetrosinelli@wc.com
ehorn@wc.com
jrydstrom@wc.com

*Attorneys for Defendant Pfizer Inc.*

*/s/ Christopher R. Carton*
Christopher R. Carton, Esq.
**BOWMAN AND BROOKE LLP**
317 George Street, Suite 320
New Brunswick, NJ 08901
Tel: (201) 577-5175
christopher.carton@bowmanandbrooke.com

John D. Garrett, Esq.
2901 Via Fortuna Drive, Suite 500
Austin, TX 78746
Tel: (512) 874-3832
john.garrett@bowmanandbrooke.com

*Attorneys for Defendant Patheon*
*Manufacturing Services LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 15th day of May, 2023, the foregoing Brand Defendants' Reply to the Court's Order to Show Cause Why the Economic Loss Complaint Is Not Subject to Dismissal or Summary Judgment was filed electronically through the Court's CM/ECF system, which will send notice of filing to all CM/ECF participants.

*<u>/s/ Anand Agneshwar</u>*
Anand Agneshwar
