**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION | MDL NO. 2924<br>20-MD-2924<br><br>**JUDGE ROBIN L. ROSENBERG**<br>**MAGISTRATE JUDGE BRUCE E. REINHART** |

_____/

**THIS DOCUMENT RELATES TO: ALL CASES**

**SECOND ORDER TO SHOW CAUSE**

**THIS MATTER** comes before the Court *sua sponte*. On April 6, 2023, the Court ordered the Plaintiffs to show cause why their economic loss class action claims should not be dismissed for lack of standing or as pre-empted by federal law and why the Court should not enter summary judgment in the Defendants' favor for the Plaintiffs' economic loss class action claims, pursuant to Federal Rule of Civil Procedure 56(f). *See* DE 6484. In the Order to Show Cause, the Court also asked the Plaintiffs to respond to several specific questions. The Plaintiffs responded to some, but not all, of the Court's questions about two important issues: standing and pre-emption. Therefore, the Court issues this Second Order to Cause, ordering the Plaintiffs to respond to the Court's remaining questions to inform the Court as to whether the Plaintiffs may proceed with their state-law claims for economic loss. In this Order, the Court organizes the questions to which the Plaintiffs shall respond by issue and provides the Plaintiffs with another opportunity to explain why their claims are viable, including why they have standing to bring the claims and how the claims are not pre-empted by federal law.

## I. Standing Questions

As recounted in the first Order to Show Cause, the Court found that the Plaintiffs had standing under *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076 (11th Cir. 2019), to pursue their economic loss class action claims through the motion to dismiss stage of the proceedings in this MDL. The Plaintiffs had standing because they claimed that they had purchased a worthless product when they purchased ranitidine because ranitidine could cause cancer and, therefore, was misbranded and illegal to sell. After the Court's *Daubert* ruling, however, the Plaintiffs do not have any reliable evidence that ranitidine could cause cancer. Therefore, in the Order to Show Cause, the Court instructed the Plaintiffs to explain why they have standing. Yet, the Plaintiffs did not answer some of the Court's questions on the issue of standing and therefore the Court outlines the Court's remaining questions on the issue of standing which the Plaintiffs shall answer.

First, the Court asked, "on the topic of abandonment, do the Plaintiffs agree that they abandoned the contention that the economic value of ranitidine was ever greater than zero?" DE 6484 at 16. The Plaintiffs responded that they "have not submitted their class certification motion and expert reports . . . and, thus, have not abandoned the contention that the economic value of ranitidine was ever greater than zero." DE 6589 at 12-13. This point requires further discussion. At the hearing on the second round of motions to dismiss in this MDL, the Court asked the Plaintiffs whether the theory of their case was that ranitidine was worth less (two words) or worthless (one word), and the Plaintiffs answered,

> Your Honor, when I think of worth less as two words, I think of drug price premium cases, and I will commit this is not a price premium case, this is not about a slight overcharge and what it would have cost versus a competitor. We are talking about a drug that was recalled because it causes cancer, and in that context we are saying it as one word, it is worthless.

2

DE 3682 at 190. On the record, the Plaintiffs said that the theory underlying their economic loss class action claims is *not* that ranitidine was worth less, as this MDL is not a drug price premium case; instead, the theory is that ranitidine was worthless. Therefore, the Plaintiffs shall now explain, in light of their commitment on the record that this is not a drug price premium case and their subsequent briefing filed in this case, how they have not abandoned the contention that ranitidine was worth less (two words) (with a value greater than zero), rather than worthless (one word) (with a value of zero).

Further, the Plaintiffs shall explain the factual and legal bases on which they argue that they are able to proceed with the contention that ranitidine was worth less (two words). The Court had set a deadline for class certification motions to be due just forty-five days after the Court's *Daubert* ruling at the parties' request. While the Court stayed class proceedings following *Daubert*, without the Court's stay, at this time, the Plaintiffs would have already had to file their class certification motions. Thus, the Plaintiffs should be able to articulate the factual and legal bases to support their claim that ranitidine was worth less (two words), and the Court orders the Plaintiffs to do so, if such bases exist, pointing to all relevant citations in the record. In the alternative, if the Plaintiffs do not have a factual basis with which to proceed and instead are making a legal argument about abandonment for preservation purposes, the Plaintiffs shall acknowledge that they lack the bases with which to proceed and explain why they are making this argument.

While the Plaintiffs assert in their Response to the first Order to Show Cause that they have not abandoned the contention that ranitidine was worth less (two words), they also inform the Court that they are proceeding with the contention that ranitidine was worthless (one word), rather

3

than worth less (two words).  Consequently, the second and third of the Court's questions about standing concern the Plaintiffs' contention that ranitidine was worthless.

Second question: the Court instructed that the Plaintiffs "must explain how they suffered an injury in fact.  As the *Debernardis* court put it: How did the trace amounts of NDMA in ranitidine make each ranitidine purchase worthless? How did the Defendants' ranitidine deliver less than expected?" DE 6484 at 27.  In their Response, the Plaintiffs state that they have standing because they purchased ranitidine and it was worthless, but they do not explain why it was worthless. *See* DE 6589 at 21 (arguing that "many drugs that do not provably cause cancer are also worthless," instead of explaining how they intend to prove that ranitidine was worthless).  The Plaintiffs also do not grapple with their earlier position that ranitidine was worthless only on account of its alleged cancer-causing propensity. *See* DE 3682 at 184 (stating "if ultimately the proof showed that the drug was not dangerous, or did not create NDMA, absolutely, I think we lose").  The Plaintiffs must explain to the Court their theory of injury in fact, if their theory is an injury other than cancer, and inform the Court where in their pleadings they have pled such a theory and in what filings they have pursued such a theory.  In explaining their theory of injury in fact, the Plaintiffs must answer in response to this second Order to Show Cause: (1) Why was ranitidine worthless? If it was worthless because ranitidine allegedly causes a harm other than cancer, please cite to the paragraphs in the Complaint that plead the harm alleged.[1]  If ranitidine was worthless because, while there is no reliable evidence that it could cause cancer, it is perceived to cause cancer, or if it was worthless because of the FDA's recall, then the Plaintiffs shall provide

---

[1] The claims in this MDL are related to NDMA and cancer only. *See* June 3, 2022, Motion Hearing Tr. at 213-14 (confirming to the Court that the Plaintiffs' case was limited to harm caused from NDMA and cancer).

4

the Court with caselaw to support their contention that either theory provides them with standing. (2) And how do the Plaintiffs reconcile their earlier and current positions on standing?

Third question: the Court asked, "whether the Plaintiffs' adulteration theory and the summary judgment record evidence departs so strongly from the [Second Consolidated Amended Consumer Economic Loss Class Action Complaint ('SAELC')] that, in order for Plaintiffs to pursue an adulteration theory, the SAELC must be amended to conform to the evidence, as the Defendants argue in their Response." DE 6484 at 17-18.  The Plaintiffs did not respond to this question.  The economic class action claims pled in the SAELC centered upon the claim that ranitidine could cause cancer.  Now, the Plaintiffs seem to argue that they want to pursue a different theory of harm, a theory of harm other than that of cancer.  Consequently, the Plaintiffs shall, in addition to informing the Court of this theory, inform the Court of whether they can proceed with this theory on the SAELC by answering the following questions: (1) Can the Plaintiffs proceed with the SAELC without further amendment? (2) What allegations in the SAELC support their non-cancer theory of harm? (3) To proceed with this other theory, do the Plaintiffs have to amend the SAELC? (4) And why would it be fair and equitable to allow for amendment at this time after the completion of discovery and the issuance of the Court's *Daubert* ruling?

The Plaintiffs must answer all of the questions the Court presents above for the Court to determine whether the Plaintiffs have standing to pursue their economic loss class action claims.

## II.   Pre-Emption Questions

In this section, the Court turns to the issue of pre-emption.  The parties and the Court grappled with the issue of pre-emption throughout the motion to dismiss stage of the proceedings in this MDL.  The Defendants filed multiple motions in which the Defendants argued that the

5

Plaintiffs' economic loss class action claims were pre-empted. The Court ultimately determined that the economic loss class action claims were not pre-empted because the claims sought to enforce state laws requiring disclosure on the ranitidine label of the product's alleged cancer-causing propensity. Since the Plaintiffs do not have reliable evidence that ranitidine could cause cancer, the Plaintiffs now need to explain to the Court anew why their claims are not pre-empted, as the Defendants argued in their motions to dismiss. The Court now asks the Plaintiffs a series of questions about pre-emption that the Court asked in its first Order to Show Cause but that the Plaintiffs did not answer fully.

First, in the Order to Show Cause, the Court instructed, "in response to this Order to Show Cause the Plaintiffs must identify the state-law duties for their claims in the SAELC." *Id.* at 19. The Plaintiffs did not identify the state-law duties that they allege the Defendants violated. Instead, the Plaintiffs explained, "Defendants engaged in unfair and deceptive acts by wrongly representing Zantac was 'a particular standard, quality, and grade when they are not,' which is state-law parlance for the same factors that establish adulteration." DE 6589 at 16. The Plaintiffs' summary of the duties violated does not inform the Court of the specific state-law duties pled in the SAELC. Therefore, the Plaintiffs shall identify specifically the state-law duties that they allege the Defendants breached for the claims pled in the SAELC; the Plaintiffs may use examples to identify the state-law duties that are typical among the laws of the relevant states and should include sample jury instructions citing those state-law duties.[2]

---

[2] The Court previously rejected the Plaintiffs' argument that state-law causes of action contain an infinite amount of "sub duties" and that a cause of action could be based (for pre-emption analysis purposes) on a "sub duty." *See* DE 3750 at 35.

Also, when the Plaintiffs identify the state-law duties allegedly breached, the Plaintiffs must also respond to the Defendants' argument that the "Plaintiffs' adulteration claim is an impermissible effort to privately enforce the [Federal Food, Drug, and Cosmetic Act ('FDCA')]." DE 6624. In the Defendants' Reply, the Defendants argue that the Plaintiffs' economic loss claims are based solely upon the Defendants' alleged violations of the FDCA, rather than upon violations of any state-law duties. *Id.* In other words, the Defendants seem to argue that the Plaintiffs do not identify the traditional state-law tort duties underlying their economic loss class action claims because there are none. The Plaintiffs did not suffer harms that traditional state tort law recognizes, according to the Defendants. *Id.* The Plaintiffs shall respond to this argument.

Next, in the Order to Show Cause, the Court instructed the Plaintiffs, "after the Plaintiffs identify the state-law duties implicated in their SAELC, the Plaintiffs must explain how the Defendants violated those duties by manufacturing ranitidine with trace amounts of NDMA." DE 6484 at 19. Further, related to this instruction, the Court asked the Plaintiffs "whether the Plaintiffs rely upon the FDA's acceptable daily intake level ('ADI') for NDMA as evidence of adulteration under federal law," and the Court instructed the Plaintiffs to "clearly explain how, if they rely upon the FDA's ADI, ranitidine could have been adulterated prior to the date that the ADI was created by the FDA in 2019." *Id.* at 20. The Plaintiffs did not answer the questions posed by the Court. The Plaintiffs must answer these questions to inform the Court of, not only the state-law duties underlying the claims pled, but also how the Defendants allegedly violated them. Therefore, the Plaintiffs shall explain how the Defendants violated the duties underlying the state-law claims pled in the SAELC, ensuring to explain whether the Plaintiffs claim that ranitidine was adulterated is

7

based upon the claim that NDMA was found in some ranitidine at rates higher than the FDA's ADI and, if so, how ranitidine could have been adulterated before the creation of the ADI.

Last, the Court asked the Plaintiffs to compare the state-law and federal-law duties that the Defendants allegedly violated. On pages 21 to 22 of the Order to Show Cause, the Court asked the Plaintiffs a series of questions to understand a central pre-emption issue in this case: Since ranitidine appears to "self-adulterate," meaning, when ranitidine was manufactured in compliance with federal law, it created NDMA, what could the Defendants have done to comply with both state and federal law, without stopping the sale of ranitidine? The Court instructed the Plaintiffs to (1) "explain how a state-law duty not to sell a product with trace amounts of carcinogens without a warning label, if it exists, could be satisfied without violation of federal law," (2) "provide authority for the proposition that state law would require information on a label in the absence of reliable evidence of potential harm from the impurity and that federal law would permit such a change," (3) "provide authority for the proposition that a Defendant manufacturer may comply with state law (as well as federal law) if the Defendant discloses the impurity on its label in lieu of removing the impurity," and (4) "disclose if they are aware of any instance in which the FDA classified a drug as adulterated but, because the adulteration was subsequently disclosed on a label, the drug ceased to be adulterated." *Id.* at 21-22.

The Plaintiffs did not address these issues. The Plaintiffs responded, "it was not impossible for Defendants to comply with federal law and manufacture an unadulterated drug, because federal law did not require that Zantac contain NDMA." DE 6589 at 17. While federal law did not require ranitidine to contain NDMA, the Plaintiffs' evidence and theory of the case was that, even when ranitidine was stored in conditions approved by the FDA, ranitidine, by its design, would

8

continuously create NDMA. Therefore, the Plaintiffs' response does not appear to address the notion that ranitidine self-adulterates, and the Court requires further discussion on this issue. As a result, the Plaintiffs shall respond to this issue and address the specific directives (numbered 1-4) outlined in this paragraph.

### III.    Conclusion

Accordingly, it is hereby **ORDERED and ADJUDGED** that the Plaintiffs shall show cause, on or before June 2, 2023, why summary judgment should not be granted in the Defendants' favor. The Plaintiffs must address the questions outlined in this Order and provide the Court with evidence with which to withstand summary judgment. The Court will determine whether the Defendants may reply to the Plaintiffs' response after the Court reviews the Plaintiffs' response.

**DONE and ORDERED** in Chambers at West Palm Beach, Florida, this 27th day of May, 2023.

_____
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to counsel of record