EXHIBIT 1

2010 WL 3516755
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. Arizona.

In re ZICAM COLD REMEDY
MARKETING, SALES PRACTICES, and
PRODUCTS LIABILITY LITIGATION.
This Document Relates to:
Mikolas v. Matrixx Initiatives,
et al., CV 10–1233–PHX–FJM.

No. 09–md–2096–PHX–FJM.
|
Sept. 1, 2010.

**ORDER**

FREDERICK J. MARTONE, District Judge.

**\*1** The court has before it plaintiff Johnny Mikolas's motion to remand to state court (doc. 605) and defendants' response (doc. 652). Plaintiff did not file a reply.

This action commenced on October 9, 2009, when plaintiff filed a claim against defendants Matrixx Initiatives, Inc., Zicam L.L.C., and Texas-based retailer HEB Grocery Company, LP ("HEB" in the County Court at Law No. 1 of Calhoun County, Texas. On November 13, 2009, defendants removed the action to the United States District Court for the Southern District of Texas, pursuant to 28 U.S.C. § 1332. Plaintiff moved to remand on December 4, 2009, but the transferor court did not rule on his motion before the Judicial Panel on Multidistrict Litigation transferred the action to MDL 09–2096.

Plaintiff now renews his motion to remand. Plaintiff argues that because both he and defendant HEB are residents of Texas, there is not complete diversity between the parties, and thus we lack jurisdiction over his claims. See 28 U.S.C. § 1332; Exxon Mobil Corp. v. Allapattah Services, Inc., 545 U.S. 546, 553, 125 S .Ct. 2611, 2617 (2005). Defendants oppose remand on the grounds that HEB was fraudulently joined, as HEB cannot be liable under Texas law. They contend that removal was proper, and further, that HEB should be dismissed with prejudice.

**I**

We note at the outset that defendants have previously agreed to the inclusion of other retailer defendants in personal injury actions arising in Texas. Plaintiff Mary Ann Brandon moved for leave to amend her complaint to add Wal–Mart Stores, Inc. and Wal–Mart Stores Texas as defendants (doc. 288), and plaintiff John Touhey moved for leave to amend his complaint to add as a defendant "John Doe Retailer/Distributor" (doc. 400). Defendants did not oppose the addition of the retailer defendants (doc. 306). [1] Plaintiff Eugene Thomas Stanley later moved for leave to amend his complaint to add HEB as a defendant (doc. 551). Defendants opposed this motion due to its untimeliness, but did not argue that HEB could not be liable under Texas law (doc. 595). [2]

**II**

"Joinder is fraudulent if the plaintiff fails to state a cause of action against a resident defendant, and the failure is *obvious* according to the settled rules of the state." Hunter v. Philip Morris USA, 582 F.3d 1039, 1043 (9th Cir.2009). Defendants have the burden to establish fraudulent joinder by "clear and convincing evidence." Hamilton Materials, Inc. v. Dow Chemical Corp., 494 F.3d 1203, 1206 (9th Cir.2007). In determining whether we have jurisdiction over an action, we may go beyond the pleadings. "The defendant seeking removal to the federal court is entitled to present the facts showing the joinder to be fraudulent." Ritchey v. Upjohn Drug Co., 139 F.3d 1313, 1318 (9th Cir.1998). However, we analyze only whether plaintiff has stated a cause of action against the in-state defendant, and will not conduct an "inquiry as to whether those defendants could propound defenses to an otherwise valid cause of action." Id.

**\*2** Plaintiff's causes of action are governed by the Texas Civil Practice & Remedies Code's provisions on products liability. See Tex. Civ. Prac. & Rem.Code § 82.001(2). Under Texas law, a seller that did not manufacture a product is not liable for harm caused by that product unless the claimant proves one of seven statutory exceptions to innocent seller immunity. Tex. Civ. Prac. & Rem.Code § 82.003(a). Therefore, in order to demonstrate fraudulent joinder and for us to have jurisdiction over this action, defendants must show

Case 9:20-md-02924-RLR   Document 6675-1   Entered on FLSD Docket 06/06/2023   Page 3 of 86

In re Zicam Cold Remedy Marketing, Sales Practices,..., Not Reported in...

that plaintiff has obviously failed to allege that HEB could be liable under any one of the exceptions.

We conclude that although plaintiff has not stated a claim against HEB in accordance with federal pleading standards, his failure is not "obvious according to the settled rules of the state," and thus, the joinder of defendant HEB is not fraudulent. To state a claim for relief, a complaint must contain "well-pleaded factual allegations" that "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1950 (2009). Plaintiff has not set forth specific facts to show that HEB could plausibly be liable to plaintiff under one of the exceptions to innocent seller immunity. However, the pleadings are not so insufficient as to meet the "obviously" without merit prong of fraudulent joinder. Therefore, plaintiff is entitled to remand.

### A

Plaintiff claims HEB may be liable under the first exception, for sellers who participated in the product's design. Tex. Civ. Prac. & Rem.Code Ann. § 82.003(a)(1). Plaintiff makes no specific factual contention that HEB, a Texas-based grocery store and not a drug producer, was involved in Matrixx's design of the Zicam products. Such participation would be unusual, and HEB executive John Plemmons has denied involvement in product design. *Plemmons Affidavit, Ex. 1.* Plaintiff's generalized and conclusory allegation that "defendants defectively designed the Zicam No–Drip Liquid Nasal Gel" is insufficient to show that HEB could be found liable due to its participation in product design. This exception is obviously inapplicable.

### B

Second, plaintiff claims HEB could be liable as a retailer who made express, incorrect factual representations on which plaintiff relied, where plaintiff would not have been harmed if the product had been as represented. Tex. Civ. Prac. & Rem.Code Ann. § 82.003(a)(5). Plaintiff argues he has sufficiently alleged that HEB misrepresented Zicam and can therefore be liable. In his complaint, plaintiff alleged that all defendants, including, HEB, violated the Texas Deceptive Trade Practices Act. That law prohibits "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have" and "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Tex. Bus. & Com.Code Ann. § 17.46(b)(5) & (7). Plaintiff claims this allegation is sufficient to have pled the innocent sellers exception for factual misrepresentation.

**\*3** Defendants have not presented clear and convincing evidence that HEB could not be liable under the express misrepresentations exception. It is true that plaintiff has not asserted any allegations about statements HEB made regarding Zicam products, much less specific misrepresentations on which plaintiff relied and which lead to his harm. Additionally, Plemmons stated that HEB made no representations about the safety or efficacy of Zicam. *Plemmons Affidavit, Ex. 1.* This would be fatal if the complaint were judged by federal standards. However, that does not mean that plaintiff has obviously failed to state a claim under Texas law against HEB under the misrepresentation exception to seller immunity. It is too soon to know with certainty that no representative of HEB made any claim about Zicam, and in considering fraudulent joinder, we make no "inquiry into the merits of the plaintiff's claims." *Hunter,* 582 F.3d at 1045. Because it is not obvious according to settled Texas rules that plaintiff has failed to state a claim against HEB for liability pursuant to the misrepresentation exception, we cannot conclude that joinder was fraudulent.

### C

Third, plaintiff claims defendants, including HEB, may be liable for having actual knowledge of the defect. Plaintiff alleges in his complaint that defendants, including HEB, violated the Texas Deceptive Trade Practices Act's prohibition on failure to disclose known information with intent "to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." Tex. Bus. & Com.Code Ann. § 17.46(b)(24). Plaintiff argues that this claim of failure to disclose sufficiently alleges liability under the innocent sellers exception for sellers who know of the defect that caused the claimant's harm. Tex. Civ. Prac. & Rem.Code Ann. § 82.003(a)(6).

Again, plaintiff makes no specific allegations that HEB knew of the alleged defect in Zicam that caused his injury, and

In re Zicam Cold Remedy Marketing, Sales Practices,..., Not Reported in...

Plemmons denies HEB's awareness of any risk. *Plemmons Affidavit, Ex. 1.* While this would be insufficient under federal pleading standards, again, it does not follow that plaintiff has obviously failed to state a claim under Texas law. What relevant HEB employees knew is unknown at this stage. Plaintiff has made allegations about HEB's failure to disclose information, and those allegations are sufficient to prevent defendants from overcoming the "strong presumption against removal jurisdiction." ⚐ *Hunter,* 582 F.3d at 1042.

**D**

Fourth, plaintiff alleges that HEB is liable under the innocent sellers exception for retailers who have exercised substantial control over the content of a warning, where that warning is inadequate and claimant's harm resulted from the inadequacy of the warning. Tex. Civ. Prac. & Rem.Code Ann. § 82.003(a) (4). This exception obviously does not apply to HEB. Plaintiff does not allege that HEB was involved in the labeling of

Zicam, which would be unlikely, and Plemmons denies any such control. *Plemmons Affidavit, Ex. 1.* Plaintiff's allegations are obviously insufficient to show that HEB could be found liable due to its control over Zicam product labeling.

**III**

**\*4** We conclude that defendant has not shown that plaintiff has obviously failed to state a claim under Texas law against HEB. Therefore, **IT IS ORDERED GRANTING** plaintiff's motion to remand (doc. 605). **IT IS FURTHER ORDERED REMANDING** *Mikolas v. Matrixx Initiatives, et al.,* CV 10–1233–PHX–FJM to the County Court at Law No. 1 of Calhoun County, Texas.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3516755

---

**Footnotes**

1       We did not permit the addition of a John Doe retailer defendant, due to inconsistency with the Rule 16 Scheduling Order and the Federal Rules of Civil Procedure (doc. 510).

2       We denied the motion because of plaintiff's failure to act diligently to comply with the Rule 16 Scheduling Order (doc. 673).

---

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 2

DISTRICT CLERK OF
JEFFERSON CO TEXAS
12/9/2022 5:00 PM
JAMIE SMITH
DISTRICT CLERK
D-209468

**CAUSE NO. D-0209468**

| | | |
|---|---|---|
| **MARIA HEALD, INDIVIDUALLY, AND** | § | **IN THE COUNTY COURT OF** |
| **AS REPRESENTATIVE OF THE ESTATE** | § | |
| **OF RUSSELL W. HEALD, DECEASED,** | § | |
| **JEFFREY ALEXANDER HEALD,** | § | |
| **NICHOLAS MATTHEW HEALD, SEAN** | § | |
| **LOUIS HEALD** | § | |
| *Plaintiffs,* | § | |
| | § | |
| **VS.** | § | **JEFFERSON COUNTY, TEXAS** |
| | § | |
| | § | |
| | § | |
| **H-E-B, L.P., CHATTEM, INC., BOEHRINGER** | § | |
| **INGELHEIM  PHARMACEUTICALS,  INC.,** | § | |
| **BOEHRINGER INGELHEIM** | § | |
| **CORPORATION, BOEHRINGER** | § | |
| **INGELHEIM USA CORPORATION,** | § | |
| **GLAXOSMITHKLINE LLC,** | § | |
| **GLAXOSMITHKLINE HOLDINGS** | § | |
| **(AMERICAS) INC., PFIZER INC.,** | § | |
| **SANOFI-AVENTIS U.S. LLC,** | § | |
| **SANOFI US SERVICES, INC., and PATHEON** | § | |
| **MANUFACTURING SERVICES, LLC,** | § | |
| *Defendant,* | § | **136TH  JUDICIAL DISTRICT** |

## PLAINTIFFS' THIRD AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW MARIA HEALD, INDIVIDUALLY AND ON BEHALF OF THE ESTATE

OF RUSSELL W. HEALD, DECEASED, JEFFREY ALEXANDER HEALD, NICHOLAS

MATTHEW HEALD, and SEAN LOUIS HEALD (hereinafter referred to by name or collectively

as "Plaintiffs"), and file this Third Amended Petition complaining of H-E-B, L.P. (hereinafter

referred to by name or as "Defendant") and in support thereof, respectfully show this Court as

follows:

I.
**DISCOVERY CONTROL PLAN**

1.    Pursuant to the provisions of Texas Rule of Civil Procedure 190.4, Plaintiffs propose to conduct discovery according to Discovery Control Plan Level 3 and hereby request that the Court schedule a docket control conference and enter a docket control order as soon as practicable following Defendants' answer.

II.
**PARTIES**

2.    Plaintiff, Maria Heald is the surviving spouse of Russell W. Heald and the Representative of the Estate of Russell W. Heald. She is currently a resident of Corpus Christi, Texas.

3.    Plaintiff, Jeffrey Alexander Heald is the adult child of Russell W. Heald. He is currently a resident of Corpus Christi, Texas.

4.    Plaintiff, Nicholas Matthew Heald is the adult child of Russell W. Heald. He is currently a resident of Corpus Christi, Texas.

5.    Plaintiff, Sean Louis Heald is the adult child of Russell W. Heald. He is currently a resident of Corpus Christi, Texas.

6.    Defendant, H-E-B, L.P. is a Texas corporation and has appeared in this lawsuit.

7.    Defendant Chattem, Inc. is a Tennessee corporation with its principal place of business located at 55 Corporate Dr., Bridgewater, NJ 08807. Defendant Chattem, Inc. may be served with process by serving its registered agent, Corporation Service Company, 2908 Poston Avenue Nashville,Tennessee 37203.

8.    Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877.

2

Defendant Boehringer Ingelheim Pharmaceuticals, Inc., is a citizen of Delaware and Connecticut. Defendant Boehringer Ingelheim Pharmaceuticals, Inc. may be served with process by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington Delaware 19801.

9.      Defendant Boehringer Ingelheim Corporation is a Nevada corporation with its principal place of business located at 900 Ridgebury Road, Ridgefield, Connecticut 06877. Defendant Boehringer Ingelheim Corporation is a citizen of Nevada and Connecticut. Defendant Boehringer Ingelheim Corporation may be served with process by serving its registered agent, C T Corporation System, 701 S. Carson Street, Ste. 200, Carson City, Nevada, 89701.

10.      Defendant Boehringer Ingelheim USA Corporation is a Delaware corporation with its principal place of business located at 900 Ridgebury Road, Ridgebury, Connecticut 06877. Boehringer Ingelheim USA Corporation is a citizen of Delaware and Connecticut. Defendant Boehringer Ingelheim USA Corporation may be served with process by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 79801.

11.      Defendant Boehringer Ingelheim Pharmaceuticals, Inc. is a direct or indirect subsidiary of Boehringer Ingelheim Corporation and Boehringer Ingelheim USA Corporation, shall be referred to as "Boehringer Ingelheim" or "BI."

12.      Defendant GlaxoSmithKline LLC is a Delaware limited liability company with its principal place of business located at Five Crescent Drive, Philadelphia, Pennsylvania, 19112. GlaxoSmithKline LLC's sole member is GlaxoSmithKline (America) Inc., a Delaware corporation with its principal place of business in that state. GlaxoSmithKline LLC is a citizen of Delaware. Defendant GlaxoSmithKline LLC may be served with process by serving its registered agent,

Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

13.     Defendant GlaxoSmithKline Holdings (Americas) Inc. is a Delaware corporation with its principal place of business located at 1105 N. Market Street, Suite 622, Wilmington, Delaware 19801. Defendant GlaxoSmithKline Holdings (Americas) Inc. is a citizen of Delaware. DefendantGlaxoSmithKline Holdings (Americas) Inc. may be served with process by serving its registered agent, Wilmington Trust SP Services, Inc., 1105 N. Market Street, Suite 1300, Wilmington, Delaware 79801.

14.     GlaxoSmithKline LLC and GlaxoSmithKline Holdings (Americas) Inc. shall be referred to as "GSK."

15.     Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation with its principal place of business located at 235 East 42nd Street, New York, New York 10017. Pfizer Inc. is a citizen of Delaware and New York. Defendant Pfizer Inc. may be served with process by serving its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

16.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability company with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807. Sanofi-Aventis U.S. LLC's sole member is Sanofi U.S. Services, Inc., a Delaware corporation with its principal place of business in New Jersey. Sanofi-Aventis U.S. LLC is a citizen of Delaware andNew Jersey. Defendant Sanofi-Aventis U.S. LLC may be served with process by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

17.     Defendant Sanofi US Services Inc. is a Delaware corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807.  Sanofi US

Services Inc. is a citizen of Delaware and New Jersey. Defendant Sanofi US Services Inc. may be served with process by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

18.     Defendant Patheon Manufacturing Services LLC is a Delaware limited liability company with its principal place of business located at 5900 Martin Luther King Jr. Highway, Greenville, North Carolina 27834. Thermo Fisher Scientific, Inc. is the sole member of Patheon Manufacturing Services LLC. Thermo Fisher Scientific, Inc. is a Delaware corporation with its principal place of business in Massachusetts. Patheon Manufacturing Services LLC is a citizen of Delaware and Massachusetts. Defendant Patheon Manufacturing Services LLC may be served with process by serving its registered agent, Capitol Services, Inc., 1675 S. State Street, Suite B, Dover, DE 19901.

19.     Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. is a subsidiary of Patheon Manufacturing Services LLC and has packaged and manufactured the finished Zantac product for Sanofi. Collectively, these entities shall be referred to as "Sanofi."

20.     "Manufacturer Defendants" refer to Pfizer, Inc., Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Corporation, Boehringer Ingelheim USA Corporation; Sanofi-Aventis U.S. LLC and Sanofi U.S. Services, Inc., who were responsible for the manufacture, packaging, marketing, shipping, storage, handling, distribution and selling of Zantac purchased and ingested by Plaintiff.

21.     "Retailer Defendant" refers to H-E-B, L.P., a Texas corporation and has appeared in this lawsuit.

22.     At all relevant times, Defendants have conducted business and derived substantial revenue from their design, marketing, labeling, packaging, handling, distribution, storage, and/or

sale of Zantac within the state of Texas.

23.     All of the foregoing Defendants are collectively composed of entities that designed, manufactured, marketed, distributed, packaged, and sold ranitidine also known as Zantac.

### III.
### JURISDICTION AND VENUE

24.     This cause of action is within the jurisdictional limits of this Court, as Plaintiffs are seeking damages in the excess of the minimum jurisdictional limits of this Court.

25.     The Court has subject-matter jurisdiction over the lawsuit under Texas law, including, but not limited to under Texas Civil Practice & Remedies Code § 71.002 and the Texas Government Code § 24.007.

26.     This Court has personal jurisdiction over H-E-B because H-E-B is organized under the state laws of Texas and is headquartered in Texas and engages in foreseeable, intentional, continuous, and/or systematic contacts within Texas, so that there is both general and specific personal jurisdiction and exercising jurisdiction over H-E-B and does not offend the notions of fair play and substantial justice.

27.     This Court has personal jurisdiction over all Defendants because they:

  a.   engaged in business in Texas by contracting with a Texas resident, specifically Defendant H-E-B, which was to be performed in whole or in part in Texas;

  b.   engaged in business in Texas with a Texas resident (decedent), wholly within the state of Texas; and

  c.   committed torts, which are the subject of this suit, in whole or in part in Texas.

28.     This Court also has personal jurisdiction over all Defendants because they purposefully availed themselves of the privileges and benefits of conducting business in Texas including the production, packaging, distribution, transportation, contracting, selling, advertising,

marketing, and promoting their product for sale within Texas, to Texas residents. At all relevant times alleged herein, Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine-containing products within Texas and targeted Texas consumers, like and including, decedent. Defendants have significant contacts in Texas such that personal jurisdiction is proper and Defendants have derived revenue from the sale of their ranitidine-containing products in Texas.

29.     Plaintiffs expressly disavow that any claims are being made pursuant to or in reliance on federal law, federal causes of action, treaties, or the U.S. Constitution. Any reference to federal agencies herein is for informational and background purposes only, not as a means to assert a federal cause of action or rely upon federal law. Although the amount in controversy exceeds $1,000,000.00, exclusive costs and interest, there is a lack of complete diversity because of the presence of Plaintiffs and a Defendant that is a citizen of Texas. As such, this case is not removable to federal court. Any removal would be improper and should be remedied by sanctions and a remand with an award of all costs, expenses, and fees including, but not limited to, attorneys' fees under 28 U.S.C. § 1447(c).

30.     Venue is proper in Jefferson County, Texas, pursuant to Texas Civil Practice and Remedies Code section 15.002(a)(1) because all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Jefferson County, Texas.

### IV.
### FACTS

31.     This case stems from the horrific injuries, and ultimate death, of Mr. Russell W. Heald, Decedent, on July 20, 2021, after he was diagnosed with an aggressive form of bladder cancer as a result of his daily consumption and exposure to the over-the-counter, non-prescription

drug, Zantac, which was sold at Defendant H-E-B's locations in Nueces County, Texas and Jefferson County, Texas.

32.     From on or about 1992 until on or about 2019, Mr. Heald purchased over-the-counter non-prescription Zantac at various H-E-B stores located in Nueces County, Texas and Jefferson County, Texas.

33.     Testing has shown that Zantac, its generic versions, and the active pharmaceutical ingredient in each, Ranitidine, prior to being ingested, degrades under foreseeable storage conditions to form NDMA, which is a probable human carcinogen., in amounts which cannot be predicted or controlled.

34.     Zantac, chemically known as ranitidine, has been shown to break down inside the body into over three million nanograms of NDMA. This is over 30,000 times higher than the threshold level of 96 nanograms per day. The FDA has also stated that early tests conducted by the FDA have found "unacceptable levels" of NDMA in samples of ranitidine. NDMA is a probable human carcinogen. When laboratory researchers want to study tumors in experimental animals, the toxin of choice to induce tumors in the animals is often N-Nitrosodimethylamine (NDMA). Unfortunately, the manufacturers of Zantac have been poisoning American consumers with extremely high levels of NDMA for over 35 years.

35.     Preliminary data indicates that NDMA accumulates in ranitidine-containing drug products on exposure to elevated temperatures and/or humidity, which would be routinely reached during shipment and during storage. Accordingly, NDMA levels in ranitidine may be acceptable when they leave the manufacturer, he added, but potentially not when the product reaches the customer. Ramin Janafi, Ph.D., President, and CEO of Emery Pharma wrote, "since significantly elevated temperatures can occur within closed vehicles during transportation and during storage

of the drug, because there is no requirement for ranitidine to be cold-chained, i.e., shipped in temperature-controlled conditions and stored under refrigeration." In fact, after just five days at 70 degrees Celsius (158 degrees Fahrenheit), NDMA can rise above the FDA's 96-nanogram limit for NDMA. After 12 days, it was up to 142 nanograms of NDMA. Lower temperatures also caused the NDMA in ranitidine to increase over time.

36.     Relative to how consumers should store Zantac / Ranitidine, the label for Zantac / Ranitidine, indicates only that the product should be stored at 20° - 25° C (68° – 77° F), and to "avoid excessive heat and humidity", with no reference to the effect of excursions in temperature and / or humidity on Ranitidine.

37.     In spite of this labelling, Defendant H.E.B was aware, Zantac / Ranitidine was being manufactured in, and shipped to it overland in non-refrigerated and non-humidity controlled trucks from, locations such as Promeco Mexico and North Carolina, where it would have been exposed to both excessive heat and humidity.

38.     Unbeknownst to the Plaintiff, and although the labelling on Zantac / Ranitidine makes no reference to it, representatives of the manufacturers of Zantac / Ranitidine now admit that they consider it unsafe for consumers to keep Zantac / Ranitidine in their bathrooms.

39.     Mr. Heald took Zantac for over a decade, and as a result, was diagnosed with Metastatic Sacromatoid Urothelial Cancer, an aggressive form of bladder cancer. Mr. Heald's cancer progressed to the point where it caused significant and irreparable harm to his body, which ultimately resulted in his death on July 20, 2021, because of NDMA exposure due to Plaintiff's daily ingestion of Zantac.

40.     Notably, H-E-B cannot disclaim any knowledge with respect to the handling, storage, and shipping requirements and warnings associated with Ranitidine, as H-E-B had its own, private label version of the drug, that it directly compared to Zantac:



41.     For decades, Defendants widely promoted and/or sold Zantac (ranitidine) as being safe and effective for use to combat heartburn symptoms, making it the first pharmaceutical drug to reach $1 billion in sales. But Defendants concealed from the public a devastating secret. The secret: Zantac transform over time and under certain conditions into a well-known cancer-causing compound, N-Nitrosodimethylamine ("NDMA"). When that secret was revealed in 2019, manufacturers quickly withdrew their product from the market and, in 2020, the U.S. Food and Drug Administration ("FDA") ultimately directed removal of all ranitidine-containing products from shelves nationwide, including Texas. Now, Plaintiffs seek to hold Defendants accountable for their role in their injuries and damages.

***General Background of Zantac***

42.     Zantac is the branded name for ranitidine, a "blockbuster" drug that was sold as a safe and effective antacid. But ranitidine transforms over time and under particular conditions into

high levels of NDMA, a carcinogen that is as potent as it is dangerous.  After almost four decades and billions of dollars of sales, ranitidine consumption has caused scores of consumers to develop cancer.  Plaintiffs bring this action for personal injuries and death as a result of Defendants' design, testing, marketing, labeling, packaging, handling, distribution, storage and sale of ranitidine-containing products.

43.    Until its recent recall by the FDA, ranitidine was a popular heartburn drug consumed by millions of people every day.  Recent scientific studies, however, confirm what drug companies knew or should have known decades earlier: ingesting ranitidine exposes the consumer to unsafe and excessive amounts of NDMA.

44.    NDMA is a well-known potent carcinogen.  It was first discovered in the early 1900s as a byproduct of manufacturing rocket fuel.  Today, its only use is to induce cancerous tumors in animals as part of laboratory experiments.  Its only function is to cause cancer.  It has no medicinal purpose whatsoever.

45.    NDMA is not akin to other compounds that have a salutary effect at low levels and a negative effect with greater exposure.  There is no recommended daily dose of NDMA.  The ideal level of exposure is zero.  Nonetheless, the FDA previously set an allowable daily limit of NDMA of 96 nanograms (ng) to minimize the risks posed by this dangerous molecule.  Yet a single pill of ranitidine can contain quantities of NDMA that are hundreds, if not thousands, of times higher than the allowable limit.

46.    Those recent revelations by the scientific community have caused  widespread recalls of ranitidine both domestically and internationally.  In fact, after numerous voluntary recalls, on April 1, 2020, the FDA ordered the immediate withdrawal of all

ranitidine-containing products sold in the United States, citing unacceptable levels of NDMA accumulation.

47.     The high levels of NDMA observed in ranitidine-containing products are a function of various factors.  The ranitidine molecule internally degrades to form NDMA.  The degradation of ranitidine into NDMA can increase over time under normal storage conditions, but more so with exposure to heat and/or humidity.  Once in the body, ranitidine continues to degrade and can yield increasing levels of NDMA in the human digestive system.

48.     In the aggregate, ranitidine-containing products were akin to billions of Trojan horses that smuggled dangerously high levels of NDMA into the bodies of millions of consumers where it then produced more NDMA once in the body.

49.     Zantac wreaked such widespread harm in large part because Glaxo—the inventor of ranitidine—succumbed to a temptation that is all too familiar to pharmaceutical innovators: maximizing the profits of an incredibly lucrative, government-conferred monopoly.

50.     To encourage pharmaceutical companies to invest in research and development ("R&D"), the U.S. legal and regulatory system offers drug companies who invent "new chemical entities" two powerful inducements. First, innovators obtain patent protection for their pharmaceutical compounds.  Second, approved new drugs enjoy FDA exclusivity, irrespective of whether the molecule is protected by one or more issued patents.  Taken together, these policies assure that a pharmaceutical innovator will receive the exclusive right, for a limited period of time, to sell its drug to the American public.

51.     The argument for monopoly pharmaceutical franchises rests on the profit-motive.  R&D is time consuming and expensive, and not all drug-development efforts

will succeed.  Once a drug is approved, some period of monopoly profits is necessary to allow innovators to recoup their sunk R&D costs in both successful and unsuccessful pursuits.  A costly pursuit of a new potential blockbuster that ultimately fails can be financially devastating for smaller pharmaceutical companies.

52.     In some ways, the system works as intended.  Pharmaceutical companies do invent new and useful medicines that—absent high profit potential—might not otherwise come to market.  But once an innovator possesses a blockbuster monopoly franchise, it has a virtual license to mint money. Most pharmaceutical ingredients are cheap commodities, which brand-name manufacturers then resell at a monopoly markup.  During the exclusivity period, brand-name drugs routinely enjoy gross profit margins of 70, 80, or even 90+ percent.  No other industry comes close to matching this profit-generating potential.

53.     As a result of these economic realities, branded drug manufacturers have a strong— and too often perverse—incentive to sell as much product as they can during their exclusivity window.  That is why brand-name manufacturers spend billions of dollars per year in sales and marketing efforts to push incremental sales of a brand-name drug.  Where every $1 in new sales can produce upwards of $.90 in gross profit, staggering sales and marketing budgets are a very profitable investment.  But while it makes sense for brand-name manufacturers to spend vast sums of money to develop and promote FDA approved drugs, they have no equivalent economic or regulatory incentive to uncover and investigate developing risks posed by their products.

54.     That problem is especially acute for bestselling, blockbuster drugs. And Zantac is the brand that gave meaning to a blockbuster pharmaceutical product, becoming the first drug ever to generate over $1 billion in annual sales.  Zantac's success catapulted Glaxo ahead of

its previously larger rivals, fueling the market capitalization and corporate combinations that gave the company its current name: GlaxoSmithKline. It is little wonder Glaxo spared no expense to both get Zantac to market and to aggressively promote it to millions of consumers. Yet Glaxo did not part with a comparative pittance to investigate the obvious cancer risk posed by ranitidine. Turning a blind eye was far more profitable.

55.     Ultimately, the law holds Zantac's manufacturers responsible for the personal injuries and death caused by such an unsafe product. And the civil justice system is the first, last, and only line of defense against the unchecked avarice that is a byproduct of a regulatory regime with the well-intentioned aim of bringing safe and effective medicines to market. Plaintiffs seek redress both to compensate them for the horrific losses they have suffered in the past and to strongly deter future misconduct.

56.     This is an action for damages suffered by Mr. Heald, and Plaintiffs, as a direct and proximate result of Defendants' conduct. As a result of Defendants' actions and inactions, Mr. Heald suffered the physical, emotional, and financial harms complained of herein, including death after his agonizing battle with extremely aggressive bladder cancer. Plaintiffs additionally suffered injuries and damages as a result of Mr. Heald's death at the hands of the drug Zantac which was sold, distributed, and marketed by Defendant. Plaintiffs accordingly seek damages associated with these injuries as permitted under Texas law.

***The Creation of Ranitidine-Containing Products and their Introduction to the Market***

57.     Defendants designed, manufactured, tested, marketed, labeled, packaged, handled, distributed, stored, and/or sold ranitidine under the brand name Zantac by either prescription or over the counter ("OTC"). Defendants sold or otherwise made available ranitidine in the following forms: injection, syrup, granules, tablets and/or capsules.

**A. GSK Develops Zantac Through a Flurry of Aggressive Marketing Maneuvers**

58.    Ranitidine belongs to a class of medications called histamine H2-receptor antagonists (or H2 blockers), which decrease the amount of acid produced by cells in the lining of the stomach.  Other drugs within this class include cimetidine (branded Tagamet), famotidine (Pepcid), and nizatidine (Axid).

59.    GSK-predecessor Smith, Kline & French discovered and developed Tagamet, the first H2  blocker and the prototypical histamine H2 receptor antagonist from which the later members of the class were developed.

60.    GSK [1] developed Zantac specifically in response to the success of cimetidine. Recognizing the extraordinary potential of having its own H2 blocker in the burgeoning anti-ulcer market, GSK was all too willing to ensure its drug succeeded at all costs.

61.    In 1976, scientist John Bradshaw, on behalf of GSK-predecessor Allen & Hanburys Ltd. synthesized and discovered ranitidine.

62.    Allen & Hanburys Ltd., a then-subsidiary of Glaxo Laboratories Ltd., is credited with developing ranitidine and was awarded Patent No. 4,128,658 by the U.S. Patent and Trademark Office in December 1978, which covered the ranitidine molecule.

63.    In 1983, the FDA granted approval to Glaxo to sell Zantac, pursuant to the New Drug Application ("NDA") No. 18-703, and it quickly became GSK's most successful product— a "blockbuster."  Indeed, Zantac became the first prescription drug in history to reach $1 billion in sales. To accomplish this feat, GSK entered into a joint promotion

---

[1] GSK, as it's known today, was created through a series of mergers and acquisitions:  In 1989, Smith, Kline & French merged with the Beecham Group to form SmithKline Beecham plc.  In 1995, Glaxo merged with the Wellcome Foundation to become Glaxo Wellcome plc.  In 2000, Glaxo Wellcome plc merged with SmithKline Beecham plc to form GlaxoSmithKline plc and GlaxoSmithKline LLC.

agreement with Hoffmann-LaRoche, Inc., and more salespersons drove more sales and blockbuster profits for GSK.

64.     In June of 1986, the FDA approved Zantac for maintenance therapy of duodenal ulcers and for treatment of patients with gastroesophageal reflux disease (GERD). In December 1993, GSK (through Glaxo Wellcome plc) entered into a partnership agreement with Pfizer-predecessor company Warner-Lambert Co. to develop and market an OTC version of Zantac. In 1995, the FDA approved OTC Zantac 75 mg tablets through NDA 20-520. In 1998, the FDA approved OTC Zantac 75 mg effervescent tablets through NDA 20-745.

65.     In 1998, GSK (Glaxo Wellcome plc) and Warner-Lambert Co. ended their partnership.  As part of the separation, Warner-Lambert Co. retained control over the OTC NDA for Zantac and the Zantac trademark in the United States and Canada but was required to obtain approval from GSK prior to making any product or trademark improvements or changes.  GSK retained rights to sell OTC Zantac outside of the United States and Canada, and retained control over the Zantac trademark internationally.

66.     In 2000, Pfizer acquired Warner-Lambert Co.  Pfizer controlled the Zantac OTC NDAs until December 2006.

67.     In October 2000, GSK sold to Pfizer the full rights to OTC Zantac in the United States and Canada pursuant to a divestiture and transfer agreement.  As part of that agreement, GSK divested all domestic Zantac OTC assets to Pfizer, including all trademark rights.  The agreement removed the restrictions on Pfizer's ability to seek product line extensions or the approval for higher doses of OTC Zantac.  GSK retained the right to exclusive use of the Zantac name for any prescription ranitidine-containing product in the United States.

68.     In October 2003, Pfizer submitted NDA 21-698 for approval to market OTC Zantac 150 mg.  The FDA approved NDA 21-698 on August 31, 2004.

69.     During the time that Pfizer owned the rights to OTC Zantac, GSK continued to manufacture the product. In 2006, pursuant to a Stock and Asset Purchase Agreement, Pfizer  sold  and  divested  its  entire  consumer  health  division  (including  employees  and documents) to Johnson & Johnson ("J&J").  Because of antitrust issues, however, Zantac was transferred to Boehringer Ingelheim.

70.     Pfizer, through a divestiture agreement, transferred all assets pertaining to its Zantac OTC line of products, including the rights to sell and market all formulations of OTC Zantac  in  the  United  States  and  Canada,  as  well  as  all  intellectual  property,  R&D,  and customer and supply contracts to Boehringer Ingelheim.  As part of that deal, Boehringer Ingelheim obtained control and responsibility over all of the Zantac OTC NDAs.

71.     GSK continued marketing prescription Zantac in the United States until 2017 and still holds the NDAs for several prescription formulations of Zantac.  GSK continued to maintain  manufacturing  and  supply  agreements  relating  to  various  formulations  of  both prescription  and  OTC  Zantac.   According  to  its  recent  annual  report,  GSK  claims  to  have "discontinued making and selling prescription Zantac tablets in 2017 . . . in the U.S."

72.     Boehringer  Ingelheim  owned  and  controlled  the  NDA  for  OTC  Zantac between December 2006 and January 2017, and manufactured, marketed, and distributed the drug in the United States, including Texas, during that period.

73.     In 2017, Boehringer Ingelheim sold the rights of OTC Zantac to Sanofi pursuant to an asset swap agreement.  As part of that deal, Sanofi obtained control and responsibility over Boehringer Ingelheim's entire consumer healthcare business, including the OTC Zantac

NDAs. As part of this agreement, Boehringer Ingelheim and Sanofi entered into a manufacturing agreement wherein Boehringer continued to manufacture OTC Zantac for Sanofi.

74.     Sanofi has controlled the OTC Zantac NDAs and marketed, sold, and distributed Zantac in the United States from January 2017 until 2019 when it issued a global recall and ceased marketing, selling, and distributing OTC Zantac.  In addition, Sanofi has marketed, sold, and distributed ranitidine globally, including Texas, since 1983

75.     Throughout the time that Sanofi controlled the OTC Zantac NDAs, Boehringer Ingelheim Promeco, S.A. de C.V. and Patheon Manufacturing Services LLC manufactured the finished drug product. Sanofi voluntarily recalled all brand-name OTC Zantac and ranitidine on October 18, 2019.

76.     Pfizer and Boehringer Ingelheim have made demands for indemnification per the Stock and Asset Purchase Agreement against J&J for legal claims related to OTC Zantac products.

77.     Sanofi has made a demand for indemnification against J&J pursuant to a 2016 Asset Purchase Agreement between J&J and Sanofi.

78.     The times during which each Defendant manufactured and sold branded Zantac are alleged below:

| Manufacturer/ Repackager | Product | Prescription or Over the Counter | Sale Start Date Year | Sale End Date Year |
|---|---|---|---|---|
| GlaxoSmithKline | Pills, Syrnp, and Injection | Prescription | 1983 | 2019 |
| Pfizer | Pills | OTC | 1998 | 2006 |
| Boehringer Ingelheim | Pills | OTC | 2007 | 2016 |
| Sanofi | Pills | OTC | 2017 | 2019 |

## NDMA IS A CARCINOGEN WHOSE DANGEROUS PROPERTIES ARE WELL-ESTABLISHED

79.     According to the Environmental Protection Agency ("EPA"), "NDMA is a semivolatile organic chemical that forms in both industrial and natural processes."  It is one of the simplest members of a class of N-nitrosamines, a family of potent carcinogens.  Scientists have long recognized the dangers that NDMA poses to human health.  A 1979 news article noted that "NDMA has caused cancer in nearly every laboratory animal tested so far.  NDMA is no longer produced or commercially used in the United States except for research.  Its only use today is to cause cancer in laboratory animals.

80.     Both the EPA and the International Agency for Research on Cancer ("IARC") classify NDMA as a probable human carcinogen.

81.     The IARC classification is based upon data that demonstrates NDMA "is carcinogenic in all animal species tested: mice, rats, Syrian gold, Chinese and European hamsters, guinea-pigs, rabbits, ducks, mastomys, various fish, newts and frogs.  It induces benign and malignant tumors following its administration by various routes, including ingestion and inhalation, in various organs in various species."  Further, in 1978, IARC stated that NDMA "should be regarded for practical purposes as if it were carcinogenic to humans."

82.     The American Conference of Governmental Industrial Hygienists classifies NDMA as a confirmed animal carcinogen.

83.     The Department of Health and Human Services ("DHHS") states that NDMA is reasonably anticipated to be a human carcinogen.  This classification is based upon DHHS's findings that NDMA caused tumors in numerous species of experimental animals, at several

different tissue sites, and by several routes of exposure, with tumors occurring primarily in the liver, respiratory tract, kidney, and blood vessels.

84.     The FDA considers NDMA a carcinogenic impurity and chemical that "could cause cancer" in humans. The FDA recognizes that NDMA is "known to be toxic."

85.     The World Health Organization states that there is "conclusive evidence that NDMA is a potent carcinogen" and that there is "clear evidence of carcinogenicity." NDMA belongs to the so-called "cohort of concern" which is a group of highly potent mutagenic carcinogens that have been classified as probable human carcinogens.

86.     The EMA has referred to NDMA as "highly carcinogenic."  It recommended that "primary attention with respect to risk for patients should be on these highly carcinogenic N- nitrosamines" (including NDMA), and categorized NDMA as "of highest concern with respect to mutagenic and carcinogenic potential." In 1989, the Agency for Toxic Substances and Disease Registry (ATSDR) stated that it is "reasonable to expect that exposure to NDMA by eating, drinking or breathing could cause cancer in humans" and that the "carcinogenicity of orally-administered NDMA has been demonstrated unequivocally in acute, intermediate and chronic durations studies" in animals and "it is important to recognize that this evidence also indicates that oral exposures of acute and intermediate duration are sufficient to induce cancer." Moreover, "hepatoxicity has been demonstrated in all animal species that have been tested and has been observed in humans who were exposed to NDMA by ingestion or inhalation."

87.     The International Register of Potentially Toxic Chemicals (IRPTC 1988) lists regulations imposed by 13 countries for NDMA for occupational exposure, packing, storing and transport, disposal, and warns of its probable human carcinogenicity and its high

level of toxicity by ingestion or inhalation.

88.     OSHA classifies NDMA as "a carcinogen" that requires special and significant precautions along with specific hazard warnings.

89.     NDMA is a genotoxin which interacts with DNA and may subsequently induce mutations.  Genotoxins are not considered to have a safe threshold or dose due to their ability to alter DNA.

90.     The FDA has set an acceptable daily intake ("ADI") level for NDMA at 96 ng.  That means that consumption of 96 ng of NDMA a day would increase the risk of developing cancer by 0.001% over the course of a lifetime.  That risk increases as the level of NDMA exposure increases.  However, any level above 96 ng is considered unacceptable.

91.     In studies examining carcinogenicity through oral administration, mice exposed to NDMA developed cancer in the kidney, bladder, liver, and lung.  In comparable rat studies, cancers were observed in the liver, kidney, pancreas, and lung.  In comparable hamster studies, cancers were observed in the liver, pancreas, and stomach.  In comparable guinea-pig studies, cancers were observed in the liver and lung.  In comparable rabbit studies, cancers were observed in the liver.

92.     In other long-term animal studies in mice and rats utilizing different routes of exposures—inhalation, subcutaneous injection, and intraperitoneal (abdomen injection)—cancer was observed in the lung, liver, kidney, nasal cavity, and stomach.

93.     Prior to the withdrawal of ranitidine, it was considered a category B drug for birth defects, meaning it was considered safe to take during pregnancy.  Yet animals exposed to NDMA during pregnancy birthed offspring with elevated rates of cancer in the liver and kidneys.

94.     NDMA is a very small molecule.  That allows it to pass through the blood-brain and placental barrier.  This is particularly concerning as ranitidine has been marketed for pregnant women and young children for years.

95.     Exposure to high levels of NDMA has been linked to liver damage in humans.

96.     Numerous *in vitro* studies confirm that NDMA is a mutagen—causing genetic mutations in human and animal cells.

97.     Overall, the animal data demonstrates that NDMA is carcinogenic in all animal species tested: mice; rats; Syrian golden, Chinese and European hamsters; guinea pigs; rabbits; ducks; mastomys; fish; newts; and frogs.

98.     The EPA classified NDMA as a probable human carcinogen "based on the induction of tumors at multiple sites in different mammal species exposed to NDMA by various routes." Pursuant to EPA cancer guidelines, "tumors observed in animals are generally assumed to indicate that an agent may produce tumors in humans."

99.     In addition to the overwhelming animal data linking NDMA to cancer, there are numerous human epidemiological studies exploring the effects of dietary exposure to various cancers.  These studies consistently show increased risks of various cancers.

100.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 220 cases, researchers observed a statistically significant 700% increased risk of gastric cancer in persons exposed to more than 0.51 micrograms/day.

101.    In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 746 cases, researchers observed statistically significant elevated rates of gastric cancer in persons exposed to more than 0.191 micrograms/day.

102.    In another 1995 epidemiological case-control study looking at, in part, the

effects of dietary consumption on cancer, researchers observed a statistically significant elevated risk of developing aerodigestive cancer after being exposed to NDMA at 0.179 micrograms/day.

103.    In a 1999 epidemiological cohort study looking at NDMA dietary exposure with 189 cases and a follow up of 24 years, researchers noted that "*N*-nitroso compounds are potent carcinogens" and that dietary exposure to NDMA more than doubled the risk of developing colorectal cancer.

104.    In a 2000 epidemiological cohort study looking at occupational exposure of workers in the rubber industry, researchers observed significant increased risks for NDMA exposure for esophagus, oral cavity, and pharynx cancer.

105.    In a 2011 epidemiological cohort study looking at NDMA dietary exposure with 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was significantly associated with increased cancer risk in men and women" for all cancers, and that "NDMA was associated with increased risk of gastrointestinal cancers" including rectal cancers.

106.    In a 2014 epidemiological case-control study looking at NDMA dietary exposure with 1,760 cases, researchers found a statistically significant elevated association between NDMA exposure and rectal cancer.

107.    NDMA is also known to be genotoxic—meaning, it can cause DNA damage in human cells.  Indeed, multiple studies demonstrate that NDMA is genotoxic both *in vivo* and *in vitro.*  However, recent studies have shown that the ability of NDMA to cause mutations in cells is affected by the presence of enzymes typically found in living humans, suggesting that "humans may be especially sensitive to the carcinogenicity of NDMA."

108.    In addition to studies demonstrating that NDMA directly causes cancer, research shows that exposure to NDMA (1) can exacerbate existing but dormant (*i.e.* not malignant) tumor cells; (2) promote otherwise "initiated cancer cells" to develop into cancerous tumors; and (3) reduce the ability of the body to combat cancer as NDMA is immunosuppressive. Thus, in addition to NDMA being a direct cause of cancer itself, NDMA can also be a contributing factor to a cancer injury caused by some other source.

### NDMA IS DISCOVERED IN RANITIDINE-CONTAINING PRODUCTS, LEADING TO MARKET WITHDRAWAL

109.    On September 9, 2019, pharmacy and testing laboratory Valisure LLC and ValisureRX LLC (collectively, "Valisure") filed a Citizen Petition calling for the recall of all ranitidine-containing products due to detecting exceedingly high levels of NDMA when testing ranitidine pills using gas chromatography-mass spectrometry. FDA and European regulators started reviewing the safety of ranitidine with specific focus on the presence of NDMA. This set off a cascade of recalls by the Defendants.

110.    On September 13, 2019, the FDA's Director for Drug Evaluation and Research, Dr. Janet Woodcock, issued a statement warning that some ranitidine medicines may contain NDMA.

111.    On September 24, 2019, Sandoz voluntarily recalled all of its ranitidine-containing products due to concerns of a "nitrosamine impurity, N-nitrosodimethylamine (NDMA), which was found in the recalled medicine." On September 26, 2019, generic manufacturer Apotex Corp. and Walgreens, Walmart, and Rite Aid voluntarily recalled all ranitidine products and removed them from shelves. Apotex issued a statement, noting that "Apotex has learned from the U.S. Food and Drug Administration and other Global regulators that some ranitidine medicines including brand and generic formulations of ranitidine

regardless of the manufacturer, contain a nitrosamine impurity called N-nitrosodimethylamine (NDMA)."

112.    On September 28, 2019, CVS stated that it would stop selling Zantac and its CVS- repackaged ranitidine out of concern that it might contain a carcinogen.

113.    On October 2, 2019, the FDA ordered manufacturers of ranitidine to test their products and recommended using a liquid chromatography with high resolution mass spectrometer ("LC-HRMS") testing protocol, which "does not use elevated temperatures."

114.    On October 8, 2019, GSK voluntarily recalled all ranitidine-containing products internationally.  As part of the recall, GSK publicly acknowledged that unacceptable levels of NDMA were discovered in Zantac and noted that "GSK is continuing with investigations into the potential source of the NDMA."

115.    On October 18 and 23, 2019, Defendant Sanofi and Dr. Reddy's voluntarily recalled all of their ranitidine-containing products.  On October 28, 2019, Generic Manufacturers Perrigo, Novitium, and Lannett voluntarily recalled all their ranitidine-containing products.

116.    In its recall notice, Generic Manufacturer Perrigo stated, "[a]fter regulatory bodies announced that ranitidine may potentially contain NDMA, Perrigo promptly began testing of its externally sourced ranitidine API (active pharmaceutical ingredient) and ranitidine-based products.  On October 8, 2019, Perrigo halted shipments of the product based upon preliminary results.  Based on the totality of data gathered to date, Perrigo has made the decision to conduct this voluntary recall."

117.    Generic Manufacturer Lannett also acknowledged the presence of NDMA in the drug product in its recall notice: "Lannett was notified by FDA of the potential presence of

NDMA on September 17, 2019 and immediately commenced testing of the Active Pharmaceutical Ingredient (API) and drug product.  The analysis confirmed the presence of NDMA."

118.    On November 1, 2019, the FDA announced the results of recent testing, finding unacceptable levels of NDMA in ranitidine-containing products, and requested that drug makers begin to voluntarily recall their ranitidine-containing products if the FDA or manufacturers discovered NDMA levels above the acceptable limits.

119.    On December 4, 2019, the FDA issued a statement notifying consumers who wished to continue taking ranitidine to consider limiting their intake of nitrite-containing foods, *e.g.*, processed meats and preservatives like sodium nitrite.  This advice ***mirrored*** an admonition issued by Italian scientists in 1981 after finding that ranitidine reacted with nitrites *in vitro* to form toxic and mutagenic effects in bacteria.  The prudent advice of Dr. de Flora published in October 1981 in *The Lancet* was to "avoid nitrosation as far as possible by, for example, suggesting a diet low in nitrates and nitrites, by asking patients not to take these at times close to (or with) meals or by giving inhibitors of nitrosation such as ascorbic acid."[79]  If GSK had only heeded Dr. de Flora's advice in 1981, millions of people might have avoided exposure to NDMA formed as a result of ranitidine's interaction with the human digestive system.

120.    Between November 1, 2019 and February 27, 2020, the following Generic Manufacturers recalled their products from the market, citing NDMA concerns: Aurobindo, Amneal, American Health Packaging, GSMS, and Glenmark.

121.    On January 2, 2020, research laboratory, Emery Pharma, submitted a Citizen Petition to the FDA, showing that the ranitidine molecule is heat-liable and under certain

temperatures progressively accumulates NDMA. Emery's Citizen Petition outlined its substantial concern that ranitidine is a time- and temperature-sensitive pharmaceutical product that develops NDMA when exposed to heat, a common occurrence during shipping, handling, and storage. Emery requested that the FDA issue a directive to manufacturers to clearly label ranitidine with a warning that "by-products that are probable carcinogens can be generated if exposed to heat." In addition to warning about this condition, Emery requested agency directives to manufacturers and distributors to ship ranitidine products in temperature-controlled vehicles.

122.    In response, on April 1, 2020, the FDA recounted that a recall is an "effective methods [sic.] of removing or correcting defective FDA-regulated products . . . particularly when those products present a danger to health." The FDA sought the voluntary consent of manufacturers to accept the recall "to protect the public health from products that present a risk of injury." The FDA found that the recall of all ranitidine-containing products and a public warning of the recall was necessary because the "product being recalled presents a serious health risk."

123.    The FDA therefore sent Information Requests to all applicants and pending applicants of ranitidine-containing products "requesting a market withdrawal."

124.    The FDA found its stability testing raised concerns that NDMA levels in some ranitidine-containing products stored at room temperature can increase with time to unacceptable levels. In the same vein, FDA testing revealed that higher NDMA levels were found as the products approached their expiration dates. The FDA's testing eroded the agency's confidence that any ranitidine-containing product would remain stable through its labeled expiration date. Consequently, the FDA requested a market withdrawal of all

ranitidine products.  The FDA also announced to the public that the Agency's laboratory tests indicate that temperature and time contribute to an increase in NDMA levels in some ranitidine products.  The FDA's decision to withdraw the drug rendered moot Emery's request for temperature-controlled shipping conditions.

### HOW RANITIDINE TRANSFORMS INTO NDMA

125.    On September 17, 2020, after a ranitidine manufacturer requested that the EMA re- examine its decision and permit ranitidine to be marketed again in the EU, the EMA confirmed its prior recommendation to suspend all ranitidine medicines in the EU due to the presence of NDMA noting that it is a probable human carcinogen and that there is evidence that NDMA forms from the degradation of ranitidine itself with increasing levels seen over shelf life.

126.    The ranitidine molecule itself contains the constituent molecules to form NDMA.



**Figure 1 — Diagram of Ranitidine & NDMA Molecules**

127.    The degradation occurs independently in two parts of the ranitidine molecule, with the products of the degradation combining to produce NDMA.

128.    The formation of NDMA by the reaction of DMA and a nitroso source (such as a nitrite) is well characterized in the scientific literature and has been identified as a concern for contamination of the U.S. water supply.  Indeed, in 2003, alarming levels of NDMA in drinking water processed by wastewater-treatment plants were specifically linked to the presence of ranitidine.

129.    The high levels of NDMA observed in ranitidine-containing products are a function of various factors.  The ranitidine molecule internally degrades to form NDMA.  The degradation of ranitidine can increase over time under normal storage conditions, but more so with exposure to heat and/or humidity.  Once in the body, ranitidine continues to degrade and can yield increasing levels of NDMA in the human digestive system, and when it interacts with nitrogenous products.

**FORMATION OF NDMA IN THE ENVIRONMENT OF THE HUMAN STOMACH**

130.    When the ranitidine molecule is exposed to the acidic environment of the stomach, particularly when accompanied by nitrites (a chemical commonly found in heartburn-inducing foods), the Nitroso molecule (0=N) and the DMA molecule (H3C-N-CH3) break off and reform as NDMA.

131.    In 1981, Dr. Silvio de Flora, an Italian researcher from the University of Genoa, published the results of experiments he conducted on ranitidine in the well-known journal, *The Lancet*.  When ranitidine was exposed to human gastric fluid in combination with nitrites, his experiment showed "toxic and mutagenic effects."  Dr. de Flora hypothesized that these mutagenic effects could have been caused by the "formation of more than one nitroso derivative [which includes NDMA] under our experimental conditions."  *Id.*  Dr. de Flora cautioned that, in the context of ranitidine ingestion, "it would seem prudent to … suggest[] a

diet low in nitrates and nitrites, by asking patients not to take these at times close to (or with) meals."

132.    GSK knew of Dr. de Flora's publication because, two weeks later, GSK responded in *The Lancet*, claiming that the levels of nitrite needed to induce the production of nitroso derivatives (*i.e.*, NDMA) were not likely to be experienced by people in the real world.

133.    This response reflects GSK's reputation for "adopting the most combative, scorched-earth positions in defense of its brands." The company has no compunctions against distorting objective science to maintain its lucrative monopoly franchises, and its egregious conduct surrounding Zantac is not some isolated incident. GSK endangered patient health while reaping billions of dollars in profits from Paxil, Wellbutrin, and Avandia. As we now know, the company was involved in covering up scientific data, offering illegal kickbacks to prescribing physicians, intimidating witnesses, and defrauding Medicare to profit from these medicines. In the wake of Congressional hearings into the company's outrageous misbehavior, GSK's actions resulted in a criminal investigation and the then-largest guilty plea by a pharmaceutical company for fraud and failure to report safety data in the country's history.

134.    There is currently an open investigation of GSK and Sanofi being conducted by the Department of Justice relating to the failure to disclose to the federal government information about the potential presence of NDMA in Zantac. GSK attended an FDA Advisory Committee in May 1982 where its representative testified and presented evidence relating to the safety of Zantac, including the potential for ranitidine to form nitrosamines. However, GSK failed to disclose its new evidence relating to ranitidine and the formation of a nitrosamine, specifically the formation of NDMA. One month later, in June 1982, GSK submitted its draft Summary Basis of Approval and labeling for Zantac. Again, GSK failed to

submit or otherwise disclose its new evidence relating to ranitidine and the formation of NMDA.

135.   In its submission to the FDA, GSK discussed its findings from internal studies performed in 1980 that ranitidine formed a different nitrosamine, n-nitroso-nitrolic acid, a potent mutagen, but explained that these results had no "practical clinical significance."

> Although N-nitroso-nitrolic acid was a potent mutagen, it is not likely to be formed in the stomach of a patient ingesting ranitidine, as an unrealistically large amount of nitrite needs to be present to form and maintain the nitrosamine. For this reason, and also because ranitidine was not carcinogenic in life-span studies in rodents, the in vitro nitrosation of ranitidine to a mutagenic nitrosamine does not seem to have practical clinical significance.

136.   In 1980—before Zantac was approved by the FDA—GSK conducted another

> The importance of this finding is not clear. High levels of nitrite could react with certain organic compounds to form nitrosamines, which are known carcinogens. To date, however, neither ranitidine nor cimetidine have been carcinogenic in rodents, so the level of human risk cannot be estimated from animal studies. Ranitidine is recommended only for short-term use and carcinogenic risk, if any, should thus be minimized.

study to examine, among other things, how long-term use of ranitidine could affect the levels of nitrite in the human stomach.  Remarkably, GSK admitted that ranitidine use caused the proliferation of bacteria in the human stomach that are known to convert nitrates to nitrites, which leads to elevated levels of nitrite in the stomach environment.  GSK acknowledged this could increase the risk of forming nitrosamines and, in turn, cancer, but then dismissed this risk because people were allegedly only expected to use ranitidine-containing products for a short-term period:

137.   GSK knew—and indeed specifically admitted—that ranitidine could react with

nitrite in the human stomach to form nitrosamines and, at the same time, that long-term use of ranitidine could lead to elevated levels of nitrite in the human stomach. GSK also knew but did not disclose that it had new evidence showing that NDMA was generated by ranitidine under certain conditions.

138.    In response to Dr. de Flora's findings, in 1982, GSK conducted a clinical study specifically investigating gastric contents in human patients. The study, in part, specifically measured the levels of N-Nitroso compounds in human gastric fluid. GSK indicated that there were no elevated levels, and even published the results of this study five years later, in 1987. The study, however, was flawed. It did not use gold-standard mass spectrometry to test for NDMA, but instead, used a process that could not measure N-nitrosamines efficiently. And worse, in the testing it did do, GSK refused to test gastric samples that contained ranitidine in them out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded." In other words, GSK intentionally engineered the study to exclude the very samples most likely to contain a dangerous carcinogen.

139.    Given the above information that was disclosed relating to the nitrosation potential and formation of nitrosamines, it is shocking that GSK conducted an internal study to assess the formation of NDMA and found that ranitidine, when exposed to sodium nitrite, formed hundreds of thousands of nanograms of NDMA. The GSK study was never published or disclosed to the public.

140.    In 1983, the same year GSK started marketing Zantac in the United States, seven researchers from the University of Genoa published a study discussing ranitidine and its genotoxic effects (ability to harm DNA). The researchers concluded "it appears that reaction of ranitidine with excess sodium nitrite under acid conditions gives rise to a nitroso-derivative

(or derivatives) [like NDMA] capable of inducing DNA damage in mammalian cells." *Id.*

141.    Then, again in 1983, Dr. de Flora, along with four other researchers, published their complete findings. The results "confirm our preliminary findings on the formation of genotoxic derivatives from nitrite and ranitidine." Again, the authors noted that, "the widespread clinical use [of ranitidine] and the possibility of a long-term maintenance therapy suggest the prudent adoption of some simple measures, such as a diet low in nitrates and nitrites or the prescription of these anti- ulcer drugs at a suitable interval from meals." This admonition carries weight considering GSK's studies indicate that long-term ranitidine consumption, itself, leads to elevated levels of nitrites in the human gut.

142.    The high instability of the ranitidine molecule was elucidated in scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the breakdown of ranitidine were proposed.[2]  These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in the environment of water treatment plants which supply many American cities with water.

143.    In 2016, researchers at Stanford University conducted an experiment on healthy volunteers (Stanford Study). [3]  They measured the NDMA in urine of healthy individuals over the course of 24 hours, administered one dose of ranitidine, and then measured the NDMA in the urine of the same individuals for another 24 hours.  On average, the level of NDMA increased by 400 times, to approximately 47,000 nanograms.  The only change during that 24-hour period was the consumption of ranitidine.  This study directly

---

[2] Le Roux, *et al.*, *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism*, 46 *Environ. Sci. Technol.* 20, 11095-11103 (2012).
[3] Zeng, *et al.*, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37 CARCINOGENESIS 625-634 (2016).

demonstrated that unsafe levels of NDMA are formed in the human body as a result of ranitidine ingestion. The scientists further explained that humans do not typically excrete NDMA in their urine, so that the observed 47,000 nanograms likely only captured 1/100 of the actual NDMA levels in the human body.

144.    These studies did not appreciate the full extent of NDMA formation risk from ranitidine; specifically, the added danger of this drug having not only a labile DMA group but also a readily available nitroso source in its nitrite group on the opposite terminus of the molecule. Recent testing reveals that NDMA levels in ranitidine batches are so high that the nitroso for NDMA likely comes from no other source than the ranitidine molecule itself.

145.    Valisure is an online pharmacy that also runs an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization ("ISO") – an accreditation recognizing the laboratories technical competence for regulatory. Valisure's mission is to help ensure the safety, quality, and consistency of medications and supplements in the market. In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays to test every batch of every medication it dispenses.

146.    In its September 9, 2019 Citizen's Petition to the FDA, Valisure disclosed as part of its testing of Zantac, and other ranitidine-containing products that in every lot tested there were exceedingly high levels of NDMA discovered. Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method FY19-005-DPA8 for the determination of NDMA levels. As per the FDA protocol, this method was validated to a

lower limit of detection of 25 ng.[4]  The results of Valisure's testing show levels of NDMA

well above 2 million ng per 150 mg Zantac tablet, shown below in Table 1.

| Table 1 – Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol | | |
|---|---|---|
| 150 mg Tablets or equivalent | Lot # | NDMA per tablet (ng) |
| Reference Powder* | 125619 | 2,472,531 |
| Zantac, Brand OTC | 18M498M | 2,511,469 |
| Zantac (mint), Brand OTC | 18H546 | 2,834,798 |
| Wal-Zan, Walgreens | 79L800819A | 2,444,046 |
| Wal-Zan (mint), Walgreens | 8ME2640 | 2,635,006 |
| Ranitidine, CVS | 9BE2773 | 2,520,311 |
| Zantac (mint), CVS | 9AE2864 | 3,267,968 |
| Ranitidine, Equate | 9BE2772 | 2,479,872 |
| Ranitidine (mint), Equate | 8ME2642 | 2,805,259 |
| Ranitidine, Strides | 77024060A | 2,951,649 |

147.    Valisure's testing shows, on average, 2,692,291 ng of NDMA in a 150 mg

Zantac tablet.  Considering the FDA's permissible limit is 96 ng, this would put the level of

NDMA at *28,000 times* the legal limit.  In terms of smoking, a person would need to smoke

at least 6,200 cigarettes to achieve the same levels of NDMA found in one 150 mg dose of

Zantac.

148.    Valisure, however, was concerned that the extremely high levels of NDMA

observed in its testing were a product of the modest oven heating parameter of 130 °C in the

FDA recommended GC/MS protocol.  So, Valisure developed a low temperature GC/MS

---

[4] US Food and Drug Administration. (updated 01/25/2019). Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, *FY19-005-DPA-S.*

method that could still detect NDMA but would only subject samples to 37 °C, the average temperature of the human body. This method was validated to a lower limit of detection of 100 ng.

149.     Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach. Industry standard "Simulated Gastric Fluid" ("SGF" 50 mM potassium chloride, 85 mM hydrochloric acid adjusted to pH 1.2 with 1.25 g pepsin per liter) and "Simulated Intestinal Fluid" ("SIF" 50 mM potassium chloride, 50 mM potassium phosphate monobasic adjusted to pH 6.8 with hydrochloric acid and sodium hydroxide) were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs. The inclusion of nitrite in gastric fluid testing is commonplace and helps simulate the environment of a human stomach.

150.     Indeed, Zantac was specifically advertised to be used when consuming foods containing high levels of nitrates, like tacos, pizza, *etc.*[z]

151.     The results of Valisure's tests on ranitidine tablets in biologically relevant conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present (*see* Table 2).

| Table 2 – Valisure Biologically Relevant Tests for NDMA Formation | | |
|---|---|---|
| **Ranitidine Tablet Studies** | **NDMA (ng/mL)** | **NDMA per tablet (ng)** |
| Tablet without Solvent | Not Detected | Not Detected |
| Tablet | Not Detected | Not Detected |
| Simulated Gastric Fluid ("SGF") | Not Detected | Not Detected |
| Simulated Intestinal Fluid | Not Detected | Not Detected |
| SGF with 10 mM Sodium Nitrite | Not Detected | Not Detected |
| SGF with 25 mM Sodium Nitrite | 236 | 23,600 |
| SGF with 50 mM Sodium Nitrite | 3,045 | 304,500 |

152.    Under biologically relevant conditions, when nitrites are present, high levels of NDMA are found in one dose of 150 mg Zantac, ranging between 245 and 3,100 times above the FDA-allowable limit.  In terms of smoking, one would need to smoke over 500 cigarettes to achieve the same levels of NDMA found in one dose of 150 mg Zantac at the 25 nanogram level (over 7,000 for the 50 nanogram level).

153.    When the scientific data is assessed overall, the literature demonstrates that the ingestion of ranitidine in the presence of human-relevant levels of nitrite in the stomach—a substance that is commonly found in foods that induce heartburn and that is known to be elevated in people taking ranitidine for longer than a month—the ranitidine molecule breaks down into levels of NDMA that would dramatically increase a person's risk of developing cancer.

**FORMATION OF NDMA IN THE OTHER ORGANS OF THE HUMAN BODY**

154.    In addition to the gastric fluid mechanisms investigated in the scientific literature, Valisure identified a possible enzymatic mechanism for the liberation of ranitidine's DMA group via the human enzyme dimethylarginine dimethylaminohydrolase ("DDAH"), which can occur in other tissues and organs separate from the stomach.

155.    Liberated DMA can lead to the formation of NDMA when exposed to nitrite present on the ranitidine molecule, nitrite freely circulating in the body, or other potential pathways, particularly in weak acidic conditions such as that in the kidney or bladder.  The original scientific paper detailing the discovery of the DDAH enzyme in 1989 specifically comments on the propensity of DMA to form NDMA: "This report also provides a useful knowledge for an understanding of the endogenous source of dimethylamine as a precursor

of a potent carcinogen, dimethylnitrosamine [NDMA]."[5]

156.    In Figure 2, below, computational modelling demonstrates that ranitidine



(shown in green) can readily bind to the DDAH-1 enzyme (shown as a cross-section in grey)

in a manner similar to the natural substrate of DDAH-1 known as asymmetric

dimethylarginine ("ADMA," shown in blue).

157.    These results indicate that the enzyme DDAH-1 increases formation of NDMA

in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene

is useful for identifying organs most susceptible to this action.

158.    Figure 3 below, derived from the National Center for Biotechnology

Information, illustrates the expression of the DDAH-1 gene in various tissues in the human

---

[5] Ogawa, *et al.*, *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney*, 264 *J. Bio. Chem.* 17, 10205-10209 (1989).

body.



159.    DDAH-1 is most strongly expressed in the kidneys but also broadly distributed throughout the body, such as in the liver, prostate, stomach, bladder, brain, colon, and prostate. This offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically raises concern for the effects of NDMA on numerous organs, including the bladder.

160.    The possible enzymatic reaction of ranitidine to DDAH-1, or other enzymes, suggests that high levels of NDMA can form throughout the human body.  Indeed, ranitidine metabolizes and circulates throughout the human body, crossing the placental and blood-brain barrier, within 1-2 hours.  When the ranitidine interacts with the DDAH-1 enzyme in various organs throughout the body, it breaks down into NDMA.  This observation is validated by the Stanford study.

**FORMATION OF NDMA BY EXPOSURE TO HEAT AND/OR TIME**

161.    The risk of creating NDMA by exposing ranitidine to heat has been well-known and documented.  Early studies, including the one conducted by GSK in the early

1980s, demonstrated that NDMA formed when ranitidine was exposed to heat.  This point was underscored in the Valisure petition, which specifically developed a detection protocol that did not use heat.

162.    In response to Valisure, on October 2, 2019, the FDA recommended that researchers use the LC-HRMS protocol for detecting NDMA in ranitidine because the "testing method does not use elevated temperatures" and has been proven capable of detecting NDMA.

163.    On January 2, 2020, Emery Pharma, an FDA-certified pharmaceutical testing laboratory, conducted a series of tests on ranitidine using the FDA-recommended LC-HRMS protocol.  The researchers exposed ranitidine to 70 °C for varying periods of time.  The results showed that increasing levels of NDMA formed based on exposure to heat.  The following diagram reveals how NDMA accumulates over time when exposed to 70 °C:



164.    The researchers cautioned: NDMA accumulates in ranitidine-containing drug products on exposure to elevated temperatures, which would be routinely reached during shipment and during storage. More importantly, these conditions occur post-lot release by the

Case 9:20-md-02924-RLR   Document 6675-1   Entered on FLSD Docket 06/06/2023   Page 46 of 86

manufacturer. Hence, while NDMA levels in ranitidine may be acceptable at the source, they may not be so when the drug is purchased and subsequently at the time of consumption by the consumer.

165.    Indeed, the FDA's recent testing confirms that NDMA levels increase in ranitidine even under normal storage conditions, and NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures to which ranitidine may be exposed during distribution and handling by retailers.[6]

166.    The results of this data demonstrate that in normal transport and storage, and especially when exposed to heat, the ranitidine molecule systematically breaks down into NDMA, accumulating over time in the finished product.  Considering ranitidine-containing products have an approved shelf life of 36 months, the possibility of the drug accumulating dangerously high levels of NDMA prior to consumption is very real—a point underscored by the FDA's swift removal of the product from the market.


**EVIDENCE ALSO DIRECTLY LINKS RANITIDINE EXPOSURE TO CANCER**

167.    In addition to numerous epidemiology studies examining how NDMA causes cancer in humans, researchers have also specifically looked at ranitidine and found an association with cancer.

168.    One epidemiology study, published in 2004, showed that men taking either ranitidine or cimetidine (Tagamet) had increased risks of bladder cancer.[7]

---

[6] Press Release, *FDA Requests Removal of All Ranitidine Products (Zantac) from the Market*, U.S. Food and Drug Administration (April 1, 2020), *available at* https://www.fda.gov/news-events/press-announcements/fda-requests-removal-all-ranitidine-products-zantac-market

[7] D. Michaud, et al, *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, 13 CANCER EPI. BIOMARK. & PREV. 250–254, 252 (Feb. 2004).

169.    In one epidemiology study specifically designed to look at breast cancer, ranitidine was shown to more than double the risk of breast cancer, an effect that was even more pronounced in those with specific gene mutations.[8]

170.    In another comprehensive epidemiological study looking at various cancer risks and H2 blockers, including ranitidine, the data showed that ranitidine consumption increased the risk of prostate, lung, esophageal, pancreatic, and kidney cancer.[9] Of particular note, the study indicated that people under the age of 60 that took ranitidine were five times more likely to contract prostate cancer.

171.    A study published in 2018, demonstrated an increased risk of liver cancer associated with use of ranitidine in comparison with other histamine type 2 receptor antagonists (H2RAs) in the class. The purpose of the study was to determine whether there was an increased risk of liver cancer associated with proton pump inhibitors, a different class of medications indicated for the treatment of GERD. This finding is particularly notable as the authors adjusted for variables and, more significantly, did not study or consider long term use of H2RAs or the possibility of a dose dependent increase in risk.[10]

172.    In 2018, a study found an increased risk in hepatocellular carcinoma associated with use of H2RAs.[11] The authors were evaluating the risk of cancer in association with proton pump inhibitors and looked at H2RAs as a confounder. The study only considered use of

---

[8] Robert W. Mathes, et al, *Relationship between histamine2-receptor antagonist medications and risk of invasive breast cancer*, 17 CANCER EPI. BIOMARKERS & PREVENTION 1, 67-72 (2008).
[9] Laurel A. Habel, et al, *Cimetidine Use and Risk of Breast, Prostate, and Other Cancers*, 9 PHARMACOEPIDEMOLOGY & DRUG SAFETY 149-155 (2000).
[10] Kim Tu Tran,, et al., *Proton pump inhibitor and histamine-2 receptor antagonist use and risk of liver cancer in two population-based studies*, 48 ALIMENTARY PHARMA & THERAP 1, 55-64 (2018).
[11] Shao, Y—HJ, et al., *Association between proton pump inhibitors and the risk of hepatocellular carcinoma*, 48 ALIMENTARY PHARMA & THERAP 4, 460-468 (2018).

H2RAs within one year of cancer diagnosis and still found an increased odds ratio associated with use of H2RAs and hepatocellular carcinoma, a type of liver cancer.

173.    A number of other studies have been published over the years showing an increased risk of various cancers associated with use of ranitidine and/or H2RAs.[12]

174.    In addition, Memorial Sloan Kettering recently tested ranitidine for cancer association.  In January 2021, a Sloan Kettering paper demonstrated an association with cancer that showed a "significant increase" in the odds of developing multiple types of cancer.

## DEFENDANTS MADE FALSE STATEMENTS IN THE LABELING OF THEIR RANITIDINE-CONTAINING PRODUCTS

175.    None of the Defendants are entitled to any protection under Texas Civil Practice & Remedies Code §82.007 because:

a.   the defendants, before or after pre-market approval or licensing of the product, withheld from or misrepresented to the United States Food and Drug Administration required information that was material and relevant to the performance of the product and was causally related to the Plaintiffs' injuries;

b.   the pharmaceutical product was sold or prescribed in Texas by the Defendants after the effective date of any order of the United States Food and Drug Administration to remove the product from the market or to withdraw its approval of the product; and

c.   Defendants recommended, promoted, or advertised the pharmaceutical product for an indication not approved by the United States Food and Drug Administration.

---

[12] Robert W. Mathes, et al., *Relationship between histamine2-receptor antagonist medications and risk of invasive breast cancer*, 17 CANCER EPID. & PREV BIOMARKERS 1, 67-72 (2008); *see also* Ahn, Jeong Soo, et al., *Acid suppressive drugs and gastric cancer: a meta-analysis of observational studies*, 19 WORLD J. GASTROENTEROLOGY 16, 2560 (2013); Lai, Shih-Wei, et al., *Use of proton pump inhibitors correlates with increased risk of pancreatic cancer: a case-control study in Taiwan*, 46 KUWAIT MED J. 1, 44-48 (2014); Poulsen et al., *Proton Pump Inhibitors and risk of gastric cancer – a population based cohort study*, 100 BRITISH J CANCER 1503-1507 (2009); E Wennerström, *Acid-suppressing therapies and subsite-specific risk of stomach cancer*, 116 BRITISH J CANCER 9, 1234-1238 (2017).

176.    A manufacturer failed to label the ranitidine properly and failed to state the tendency that the ranitidine would degrade, discolor and/or form NDMA when being stored in a humid or hot environment.

177.    "Labeling" encompasses all written, printed or graphic material accompanying the drug or device,[13] and therefore broadly encompasses nearly every form of promotional activity, including not only "package inserts" but also advertising.

178.    "Most, if not all, labeling is advertising.  The term 'labeling' is defined in the FDCA as including all printed matter accompanying any article.  Congress did not, and we cannot, exclude from the definition printed matter which constitutes advertising."[14]

179.    If a manufacturer labels a drug but omits ingredients, that renders the drug misbranded.

180.    Because Defendants did not disclose NDMA as an ingredient in the Ranitidine-Containing Products ingested by Plaintiff, the subject drugs were misbranded.

181.    It is unlawful to introduce a misbranded drug to Texas consumers.  Thus, the Ranitidine-Containing Products ingested by Plaintiff were unlawfully distributed and sold.


**DEFENDANTS KNEW OR SHOULD HAVE KNOWN OF THE NDMA RISK**

182.    During the time that Defendants manufactured and sold Ranitidine-Containing Drugs in the United States, the weight of scientific evidence showed that Ranitidine-Containing Drugs exposed users to unsafe levels of NDMA.  Defendants failed to disclose this risk to consumers on the drug's label—or through any other means—and Defendants failed to report these

---

[13] Id. 65 Fed. Reg. 14286 (March 16, 2000).
[14] *U.S. v. Research Labs.,* 126 F.2d 42, 45 (9th Cir. 1942).

risks to the FDA.

183.    Going back as far as 1981, two years before Zantac entered the market, research showed elevated rates of NDMA, when properly tested.  This was known or should have been known by the Defendants or any other maker or distributor of ranitidine-containing products.

184.    Defendants concealed the Zantac–NDMA link from consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like Ranitidine-Containing Drugs to the agency's attention.

185.    Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety.

186.    The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

187.    The manufacturer's annual report also must contain copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (*e.g.*, mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product.

188.    Defendants ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety

or labeling of Ranitidine-Containing Drugs.

189.    Knowledge regarding the risk of NDMA in ranitidine was sufficiently available in the publicly available scientific literature that any maker or distributor, consistent with their heightened obligations to ensure the safety of their products, should have known about the potential NDMA risks associated with ranitidine consumption.

190.    Defendants never conducted or provided the relevant studies to the FDA, nor did they present to the FDA with a proposed disclosure noting the link between ranitidine and NDMA.  Accordingly, because the Defendants never properly disclosed the risk to the FDA, they never proposed any labeling or storage / transportation guidelines that would have addressed this risk.  Thus, the FDA was never able to reject any proposed warning or proposal for transport / storage.

191.    Nothing prevented any Defendant from, on its own, taking actions to prevent accumulation of NDMA in ranitidine drugs by ensuring cooled storage and transport.  Such actions would not have required FDA approval, nor would they have violated any regulatory decisions or laws.

192.    Defendants also knew pharmaceutical drugs to should be stored, warehoused, and distributed in accordance with current "Good Manufacturing Practices" ("GMPs") to ensure they meet safety, quality, purity, identity, and strength standards.

193.    GMPs require that warehousing of drug products shall be performed to provide for "[s]torage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength, quality, and purity of the drug products are not affected."  In other words, Defendants had a duty and were obligated to properly store, handle, and warehouse Ranitidine-Containing Drugs.

194.    Testing conducted by the FDA, which led to the agency's ban on Ranitidine-Containing Drugs, confirms that improper storage of Ranitidine-Containing Drugs has resulted in extremely high levels of NDMA.  FDA has also concluded that NDMA can increase in Ranitidine-Containing Drugs even under normal storage conditions. And, NDMA has been found to increase significantly in samples stored at higher temperatures, including temperatures the product may be exposed to during distribution and handling by consumers. FDA's testing also showed that as Ranitidine-Containing Drugs age the level of NDMA in the product increases.

195.    FDA concluded that these defects raised the level of NDMA in Ranitidine-Containing Drugs above the acceptable daily intake limit to the point that the drugs had to be banned.

196.    In a 1981 study published by GSK, the originator of the ranitidine molecule, the metabolites of ranitidine in urine were studied using liquid chromatography.[15] Many metabolites were listed, though there is no indication that NDMA was looked for.  Plaintiff believes this was intentional—a gambit by the manufacturer to avoid detecting a carcinogen in their product.  All Defendants knew or should have known about this study and, therefore, were obligated to investigate this issue properly.  None did.

197.    Indeed, in that same year, Dr. de Flora published a note in The Lancet discussing the results of his experiments showing that ranitidine was turning into mutagenic N-nitroso compounds, of which NDMA is one, in human gastric fluid when accompanied by nitrites – a substance commonly found in food and in the body.  GSK was aware of this as

---

[15] Carey, *et al.*, *Determination of ranitidine and its metabolites in human urine by reversed-phase ion-pair high-performance liquid chromatography*, 255 J. CHROMATOGRAPHY B: BIOMEDICAL SCI. & APPL. 1, 161-168 (1981).

GSK specifically responded to the note and attempted to discredit it. Defendants knew or should have known about this scientific exchange as it was in a popular scientific journal, The Lancet. Therefore, the Defendants were obligated to investigate this issue properly, and none did.

198.    By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso compounds (discussed previously), GSK published a clinical study specifically investigating gastric contents in human patients and N-nitroso compounds.[16] This study specifically indicated that there were no elevated levels of N-nitroso compounds (of which NDMA is one). However, the study was rigged to fail. It used an analytical system called a "nitrogen oxide assay" for the determination of N-nitrosamines, which was developed for analyzing food and is a detection method that indirectly and non-specifically measures N-nitrosamines. Furthermore, in addition to this approach being less accurate, GSK also removed all gastric samples that contained ranitidine out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded." So, without the chemical being present in any sample, any degradation into NDMA could not, by design, be observed. Again, this spurious test was intentional and designed to mask any potential cancer risk. The inadequacy of this test was knowable in light of its scientific publication in 1987. All Defendants either knew or should have known about the inadequacy of this study and should have investigated the issue properly and/or took action to protect consumers from the NDMA risks in their products. None did.

199.    In fact, upon information and belief, none of the Defendants ever used a mass

---

[16] Thomas, *et al.*, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents*, 6 *GUT*. Vol. 28, 726-738 (1987).

spectrometry assay to test for the presence of nitrosamines in any of the studies and trials they did in connection with their trials associated with the ranitidine NDA.  That is because when using mass spectrometry, it requires heating of up to 130 degrees Celsius, which can result in excessive amounts of nitrosamines being formed.  Had the Defendants used a mass spectrometry assay, it would have revealed in the finding of large amounts of NDMA, and the FDA would never have approved Zantac as being safe.

200.    Based on the public scientific information available starting in 1983 (or earlier), the Defendants knew or should have known that NDMA could form in ranitidine by exposure to heat and/or over time in storage.  No Defendants, upon information and belief, took action to reduce this risk through altering supply-chain conduct or warning consumers.  Additionally, no Defendants took any action to further investigate this issue notwithstanding the signal that existed in the scientific literature.

201.    Although the labels for Ranitidine-Containing Drugs do not warn of any NDMA or cancer risk, Defendants were aware of the dangers of exposing Ranitidine-Containing Drugs to excess heat– but failed to take steps to reduce NDMA accumulation – given that each Zantac *box* states, "to avoid excessive heat" and to keep the drug below 77˚F:



**Other information**
• do not use if individual foil pouch is open or torn
• avoid excessive heat or humidity
• store at 20°-25°C (68°-77°F)
• this product is sodium and sugar free

202.    Any distributor or seller of a Ranitidine-Containing Drug would be duty-bound to follow the handling procedures and ensure the product is not exposed to temperatures above 77˚ F during transport and storage.

203.    There are multiple alternatives to Zantac that do not pose the same risk, such as Cimetidine (Tagamet), Famotidine (Pepcid), Omeprazole (Prilosec), Esomeprazole

(Nexium), and Lansoprazole (Prevacid).

## EQUITABLE TOLLING/ESTOPPEL

204.    Plaintiffs assert all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule and/or fraudulent concealment.

205.    The discovery rule applies to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts that Plaintiffs had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

206.    The nature of Plaintiffs' injuries, damages, or Plaintiffs' causal relationship to Defendants' conduct was not discovered, and through reasonable care and due diligence could not have been discovered until a date within the applicable statute of limitations for filing Plaintiffs' claims.

207.    The running of the statute of limitations is tolled due to equitable tolling. Defendants are estopped from relying on any statutes of limitation or repose by virtue of their acts of fraudulent concealment, through affirmative misrepresentations and omissions to Plaintiff and defects associated with Ranitidine-Containing Drugs including the severity, duration, and frequency of risks and complications.  Defendants affirmatively withheld and/or misrepresented facts concerning the safety of Ranitidine-Containing Drugs.  As a result of Defendants' misrepresentations and concealment, Plaintiff could not have known or have learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and/or omissions

of the Defendants.

208.    Given Defendants' affirmative actions of concealment by failing to disclose this known but non-public information about the defects – information over which the Defendants had exclusive control – and because Plaintiffs could not reasonably have known that Ranitidine-Containing Drugs were and are defective, Defendants are estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

**V.**
**<u>CAUSES OF ACTION</u>**

**COUNT ONE**
**WRONGFUL DEATH AND SURVIVAL CLAIMS**
**<u>AGAINST ALL DEFENDANTS</u>**

209.    Plaintiffs incorporate each and every allegation of the foregoing paragraphs as if fully set forth herein.

210.    This action is brought pursuant to the Texas Wrongful Death Statute, Texas Civil Practices and Remedies Code, and the Texas Survival Statute. Plaintiffs individually and as the wife and children of Mr. Heald, are the statutory beneficiaries of Mr. Heald, and are entitled to bring these causes of action against Defendants pursuant to the Texas Wrongful Death Act, as codified in Section 71.002 of the Texas Civil Practices and Remedies Code, as Defendants are liable for damages arising from Mr. Heald's injuries that ultimately caused his death, because his injuries were caused by Defendants' wrongful acts, neglect, carelessness, unskillfulness, and default.

211.    Additionally, Plaintiffs bring claims pursuant to the Texas Survival Statute found in the Texas Civil Practices and Remedies Code Section 71.021, Plaintiffs as heirs and the

51

representative of the Estate of Russell W. Heald, seek damages incurred to him due to the injuries he sustained and death as a result of Defendant's actions.

## COUNT TWO
## NEGLIGENCE
## AGAINST ALL DEFENDANTS

212.    Plaintiffs incorporate each and every allegation of the foregoing paragraphs as if fully set forth herein.

213.    Defendants committed acts of omission and commission, which constituted negligence, which was a proximate cause of the injuries and damages to Plaintiffs and Mr. Heald. Defendants were negligent, which was a proximate cause of the injuries to Plaintiffs/Mr. Heald in the following respects:

a.    As manufacturers, suppliers, producers, distributors, sellers, transporters, and handlers of Zantac to the Mr. Heald, Defendants exercised substantial control over the content of the warnings and instructions that accompanied the sale of the drug;

b.    The warnings and instructions provided to the Mr. Heald by the Defendants were inadequate and failed to adequately advise the him of the risks associated with Zantac;

c.    Mr. Heald's harm and damages resulted from the inadequacy of Defendants' warnings and instructions, and their manufacture, handling, processing, production, supply, transporting, and storage of Zantac;

d.    Defendants failed to remove Zantac from its shelves after it knew or should have known of the adverse side effects of Zantac; and

e.    Defendants transported and/or stored Zantac at a temperature above 70 degrees Celsius (158 degrees Fahrenheit).

f.    Defendants received Zantac / Ranitidine from trucks which it knew, or should have known, were neither temperature or humidity controlled and which originated from hot / humid environments before being transported through the Texas heat, and therefore knew, or should have known, that the temperatures that the product was being exposed to exceeded  20° - 25° C (68° – 77°F) before being stocked onto HEB's shelves for purchase; and purchased by consumers.

214.    Once Zantac / Ranitidine begins to change colors and/or once NDMA begins to form in the product, the product is contaminated.

215.    Each and all of the foregoing acts and omissions constitute negligence and are each and all the proximate cause of the incident that forms the basis of this suit, including Mr. Heald and Plaintiffs' injuries and damages. The risk of harm to Mr. Heald and others similarly situated was both unreasonable and foreseeable.

**COUNT THREE**
**PRODUCTS LIABILITY: BREACH OF EXPRESS WARRANTY**
<u>**AGAINST ALL DEFENDANTS**</u>

216.    Plaintiffs hereby incorporate all paragraphs above as though fully set forth herein.

217.    Defendants are "sellers" as that term is defined in Texas Civil Practice & Remedies Code Section 82.001(3).

218.    The Zantac drug sold to Mr. Heald by H.E.B. materially failed to conform to those representations made by Defendant in package inserts, and otherwise, concerning the properties and effects of Zantac respectively sold by Defendant, and which Mr. Heald purchased and ingested in direct or indirect reliance upon these express representations. Such failure by the Defendant constituted a material breach of express warranties made, directly or indirectly, to Mr. Heald concerning Zantac sold to him.

219.    As a direct, proximate, and foreseeable result of Defendant's breaches of express warranties, Mr. Heald suffered grievous bodily injury, and ultimately death, and consequent economic and other loss, as described herein.

**COUNT FOUR**
**PRODUCTS LIABILITY: BREACH OF IMPLIED WARRANTY**
**AGAINST ALL DEFENDANTS**

220.     Plaintiffs incorporate by reference each preceding paragraph as though set forth fully at length herein.

221.     Defendants are "sellers" as that term is defined in Texas Civil Practice & Remedies Code Section 82.001(3).

222.     Defendants impliedly warranted the Zantac which it and sold, and which Mr. Heald purchased and ingested, to be merchantable quality and fit for the common, ordinary, and intended use for which the products were sold.

223.     Defendants breached their implied warranties regarding the Zantac sold to Mr. Heald because these products were not fit for their common, ordinary, and intended use.

224.     As a direct, proximate, and foreseeable result of Defendants' breaches of implied warranties, Mr. Heald suffered grievous bodily injury, death, and consequent economic and other losses as described herein.

**COUNT FIVE**
**STRICT LIABILITY FAILURE TO WARN**
**AGAINST MANUFACTURER DEFENDANTS**

225.     Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

226.     At all relevant times, Defendants engaged in the business of researching, testing, developing, designing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and promoting Ranitidine-Containing Drugs, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Ranitidine-Containing Drugs and NDMA.

These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Ranitidine-Containing Drugs and aimed at a consumer market.

227.   Defendants researched, tested, developed, designed, manufactured, labeled, marketed, sold, inspected, handled, stored, distributed, and promoted, and otherwise released into the stream of commerce their Ranitidine-Containing Drugs, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Ranitidine-Containing Drugs.

228.   At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, handle, store, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Ranitidine-Containing Drugs did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiff of dangers associated with Ranitidine-Containing Drugs. Defendants, as a manufacturer, seller, or distributor of pharmaceutical medication, are held to the knowledge of an expert in the field.

229.   Defendants had a continuing duty to provide appropriate and accurate instructions regarding the proper storage and handling of Ranitidine-Containing Drugs.

230.   At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Ranitidine-Containing Drugs because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

231.   At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their

product and to those who would foreseeably use or be harmed by Defendants' Ranitidine-Containing Drugs.

232.    Even though Defendants knew or should have known that Ranitidine-Containing Drugs posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the drugs.  The dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting Ranitidine-Containing Drugs, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as the Plaintiff.

233.    Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn or instruct consumers, *i.e.*, the reasonably foreseeable users, of the risks of exposure to their products.  Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in their Ranitidine-Containing Drugs and the potential for ingested Ranitidine-Containing Drugs to transform into the carcinogenic NDMA compound, and further, have made false and/or misleading statements concerning the safety of Ranitidine-Containing Drugs.

234.    At all relevant times, Defendants' Ranitidine-Containing Drugs reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

235.    Plaintiff was exposed to Defendants' Ranitidine-Containing Drugs without knowledge of their dangerous characteristics.

236.    At all relevant times, Plaintiff used and/or was exposed to the use of Defendants' Ranitidine-Containing Drugs while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

237.    Plaintiff could not have reasonably discovered the defects and risks associated with Ranitidine-Containing Drugs prior to or at the time of Plaintiff consuming Zantac.  Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

238.    Defendants knew or should have known that the minimal warnings disseminated with their Ranitidine-Containing Drugs were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

239.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to avoid using the drug.  Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Ranitidine-Containing Drugs; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting Ranitidine-Containing Drugs.

240.   This alleged failure to warn is not limited to the information contained on Ranitidine-Containing Drugs' labeling.  The Defendants were able to comply with relevant state law by disclosing the known risks associated with Ranitidine-Containing Drugs through other non-labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources.  But the Defendants did not disclose these known risks through any medium.

241.   Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Ranitidine-Containing Drugs, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative medication. However, as a result of Defendants' concealment of the dangers posed by their Ranitidine-Containing Drugs, Plaintiff could not have averted Plaintiff's injuries.

242.   Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of their products, including Plaintiff, with knowledge of the safety problems associated with Ranitidine-Containing Drugs, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

243.   The Defendants' lack of adequate warnings and instructions accompanying their Ranitidine-Containing Drugs were a substantial factor in causing Plaintiff's injuries.

244.   As a direct and proximate result of the Defendants' failure to provide an adequate warning of the risks of Ranitidine-Containing Drugs, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, and ultimately death, as well as economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

## COUNT SIX
## STRICT LIABILITY MANUFACTURING DEFECT
## <u>AGAINST MANUFACTURER DEFENDANTS</u>

245.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

246.    At all times herein mentioned, Defendants designed, manufactured, tested, marketed, sold, handled, distributed, and stored the Ranitidine-Containing Drugs ingested by Plaintiff to patients and physicians.

247.    At all relevant times, the medication ingested by Plaintiff was expected to and did reach Plaintiff without a substantial change in its condition as manufactured, handled, distributed, stored, and sold by Defendants.

248.    At all relevant times, the medications ingested by Plaintiff were used in a manner that was foreseeable and intended by Defendants.

249.    The Ranitidine-Containing Drugs ingested by Plaintiff were not reasonably safe for their intended use and were defective with respect to their manufacture, as described herein, in that Defendants deviated materially from their design, manufacturing, handling, and storage specifications and/or such design, manufacture, storage, and handling posed an unreasonable risk of harm to Plaintiff.

250.    The Defendants' Ranitidine-Containing Drugs are inherently dangerous and defective, unfit and unsafe for its intended and reasonably foreseeable uses, and do not meet or perform to the expectations of patients and their health care providers.

251.    The Ranitidine-Containing Drugs create risks to the health and safety of the patients that are far more significant and devastating than the risks posed by other products and treatments available to treat the corresponding medical conditions, and which far outweigh the utility of the

ranitidine-containing products because of Defendants' manufacturing defects, which included but were not limited to:

    a.        Failure to follow Good Manufacturing Practices;

    b.        Failure to adequately inspect/test the drugs during the manufacturing process;

    c.        Failure to implement procedures that would reduce or eliminate NDMA levels in Ranitidine-Containing Drugs;

    d.        Failure to implement appropriate handling instructions and storage conditions for the drug.

252.    Defendants have intentionally and recklessly manufactured the Ranitidine-Containing Drugs with wanton and willful disregard for the rights and health of the Plaintiff, and with malice, placing their economic interests above the health and safety of the Plaintiff.

253.    The manufacturing defects in Defendants' Ranitidine-Containing Drugs were substantial factors in causing Plaintiff's injuries.

254.    As a direct and proximate result of the Defendants' defective manufacture of the Ranitidine-Containing Drugs, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

**COUNT SEVEN**
**NEGLIGENT FAILURE TO WARN**
**<u>AGAINST ALL DEFENDANTS</u>**

255.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

256.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, handling, storing, distributing, and promoting Ranitidine-Containing Drugs. Defendants knew or by the exercise of reasonable care should have

known that their Ranitidine-Containing Drugs are not accompanied with adequate warnings or instructions concerning the dangerous characteristics of Ranitidine-Containing Drugs and NDMA. These actions were under the ultimate control and supervision of Defendants.

257.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, handled, stored, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce their Ranitidine-Containing Drugs, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the use of Ranitidine-Containing Drugs.

258.    At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, handle, store, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Ranitidine-Containing Drugs did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Plaintiff of dangers associated with Ranitidine-Containing Drugs. Defendants, as a manufacturer, seller, or distributor of pharmaceutical medication, are held to the knowledge of an expert in the field.

259.    Defendants had a continuing duty to provide appropriate and accurate instructions regarding the proper storage and handling of Ranitidine-Containing Drugs.

260.    At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of Ranitidine-Containing Drugs because they knew or should have known use of Ranitidine-Containing Drugs was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

261.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their

product and to those who would foreseeably use or be harmed by Defendants' Ranitidine-Containing Drugs.

262.   Defendants knew or should have known that Ranitidine-Containing Drugs posed a grave risk of harm but failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the products. The dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting Ranitidine-Containing Drugs, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as the Plaintiff.

263.   Defendants further breached their duty by failing to use reasonable care to adequately warn or instruct consumers (*i.e.*, the reasonably foreseeable users) of the risks of exposure to their products.  Defendants failed to warn and have wrongfully concealed information concerning the dangerous level of NDMA in their Ranitidine-Containing Drugs and the potential for ingested Ranitidine-Containing Drugs to transform into the carcinogenic NDMA compound, and further, have made false and/or misleading statements concerning the safety of Ranitidine-Containing Drugs.

264.   At all relevant times, Plaintiff used and/or was exposed to excessive levels of NDMA through the use of Defendants' Ranitidine-Containing Drugs while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

265.   Defendants knew or should have known that the minimal warnings disseminated with their Ranitidine-Containing Drugs were inadequate, failed to communicate adequate

information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

266.   The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiff to avoid using the product.  Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Ranitidine-Containing Drugs; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting Ranitidine-Containing Drugs.

267.   A reasonable company under the same or similar circumstance would have warned and instructed of the dangers of Ranitidine-Containing Drugs.

268.   This alleged failure to warn is not limited to the information contained on Ranitidine-Containing Drugs' labeling.  The Defendants were able to comply with relevant state law by disclosing the known risks associated with Ranitidine-Containing Drugs through other non-labeling mediums, *i.e.*, promotion, advertisements, public service announcements, and/or public information sources.  But the Defendants did not disclose these known risks through any medium.

269.   Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Ranitidine-Containing Drugs, Plaintiff could have avoided the risk of developing injuries and could have obtained or used alternative

medication. However, as a result of Defendants' concealment of the dangers posed by their Ranitidine-Containing Drugs, Plaintiff could not have averted Plaintiff's injuries.

270.    Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of their products, including Plaintiff, with knowledge of the safety problems associated with Ranitidine-Containing Drugs, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

271.    The Defendants' lack of adequate warnings and instructions accompanying their Ranitidine-Containing Drugs were a substantial factor in causing Plaintiff's injuries.

272.    As a direct and proximate result of the Defendants' failure to provide an adequate warning of the risks of Ranitidine-Containing Drugs, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, ultimately death, as well as economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

## COUNT EIGHT
## NEGLIGENT AND DEFECTIVE PRODUCT DESIGN
## <u>AGAINST MANUFACTURER DEFENDANTS</u>

273.    The Defendants knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Ranitidine-Containing Drugs.

274.    The Defendants owed a duty to all reasonably foreseeable users to design a safe product.

275.    The Defendants breached their duty by failing to use reasonable care in the design of Ranitidine-Containing Drugs because the drug exposed users to unsafe levels of the carcinogen NDMA.

276.    The Defendants breached their duty by failing to use reasonable care in the design

of Ranitidine-Containing Drugs by negligently designing the drug with an inherent susceptibility to form NDMA.

277. The Defendants breached their duty by failing to use reasonable care in the design of Ranitidine-Containing Drugs by negligently designing in design and formulation, in one or more of the following ways:

    a. When placed in the stream of commerce, Defendants' Ranitidine-Containing Drugs were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

    b. When placed in the stream of commerce, Defendants' Ranitidine-Containing Drugs were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

    c. When placed in the stream of commerce, Defendants' Ranitidine-Containing Drugs contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

    d. Defendants did not sufficiently test, investigate, or study their Ranitidine-Containing Drugs and, specifically, the ability for Ranitidine-Containing Drugs to transform into the carcinogenic compound NDMA within the human body;

    e. Defendants did not sufficiently test, investigate, or study their Ranitidine-Containing Drugs and, specifically, the ability for Ranitidine-Containing Drugs to develop increasing levels of NDMA over time under anticipated and expected storage and handling conditions;

    f. Exposure to Ranitidine-Containing Drugs presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the drug;

    g. Defendants knew or should have known at the time of marketing Ranitidine-Containing Drugs that exposure to Ranitidine-Containing Drugs could result in cancer and other severe illnesses and injuries;

    h. Defendants did not conduct adequate post-marketing surveillance of their Ranitidine-Containing Drugs; and

    i. Defendants could have employed safer alternative designs and formulations. For example, the Defendants could have added ascorbic acid (Vitamin C) to each dose of Ranitidine-Containing Drugs, which is known to scavenge nitrites and reduce the ability of the body to recombine ranitidine into NDMA.

278. The Defendants breached their duty by failing to use reasonable care by failing to

use cost effective, reasonably feasible alternative designs. there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Ranitidine-Containing Drugs.

279.    A reasonable company under the same or similar circumstances would have designed a safer product.

280.    Plaintiff was harmed directly and proximately by the Defendants' failure to use reasonable care in the design of their Ranitidine-Containing Drugs. Such harm includes significant exposure to a known carcinogen, NDMA, which can cause or contribute the development of cancers.

281.    Defendants' defective design of Ranitidine-Containing Drugs was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of the Ranitidine-Containing Drugs, including Plaintiff.

282.    The defects in Defendants' Ranitidine-Containing Drugs were substantial factors in causing Plaintiff's injuries.

283.    As a direct and proximate result of the Defendants' defective design of the Ranitidine-Containing Drugs, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

## COUNT NINE
## NEGLIGENT AND DEFECTIVE PRODUCT DISTRIBUTION
## AGAINST RETAILER DEFENDANT

284.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

285.    At all times herein mentioned, the Retailer Defendant marketed, sold, handled, distributed, and stored the Ranitidine-Containing Drugs ingested by Plaintiff to patients.

286.    While the Ranitidine-Containing Drug were being marketed, sold, handled, distributed, and stored by the Retailer Defendant, the drugs accumulated dangerous levels of NDMA rendering the products not reasonably safe for their intended use and defective.

287.    At all relevant times, the medications ingested by Plaintiff were used in a manner that was foreseeable and intended by Defendants.

288.    The Ranitidine Containing Drugs that were ingested by Plaintiff contained the NDMA defect when they left the Retailer Defendant's possession.

289.    The Ranitidine-Containing Drugs create risks to the health and safety of the patients that are far more significant and devastating than the risks posed by other products and treatments available to treat the corresponding medical conditions, and which far outweigh the utility of the ranitidine-containing products because of Retailer Defendants' distribution defect, which included but were not limited to:

    a.  Failure to implement procedures that would reduce or eliminate NDMA levels in Ranitidine-Containing Drugs; and

    b.  Failure to implement appropriate handling instructions and storage conditions for the drug.

290.    The NDMA defects in the Retailer Defendant's Ranitidine-Containing Drugs were substantial factors in causing Plaintiff's injuries.

291.    As a direct and proximate result of the Retailer Defendants' defective distribution and handling of Ranitidine-Containing Drugs, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

**COUNT TEN**
**STRICT LIABILITY**
**AGAINST RETAILER DEFENDANT**

292.    Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs as it fully stated herein.

293.    At all times relevant to this suit, Retailer Defendant was in the business of marketing, promoting selling, handling, distributing, and storing the Ranitidine-Containing Drugs ingested by Plaintiff, including Zantac. Retailer Defendant is a "seller" as that term is defined in Texas Civil Practice & Remedies Code Section 82.001(3).

294.    Retailer Defendant promulgated marketing and advertisements for the product, like those pictured below, guaranteeing consumer satisfaction.



295.    Despite their "100% Guarantee Promise," Retailer Defendant failed to disclose to the Mr. Heald that the Ranitidine-Containing Drugs ingested by Plaintiff, including, the Zantac it sold to him was defective at the time it left the Retailer Defendant's possession. In particular, there were not adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known, and Retailer Defendant

failed to give adequate instructions to avoid such dangers. These lack of warnings and instructions rendered the product unreasonably dangerous.

296.    Further, Retailer Defendant knew information about storage temperatures and expiration dates that impacted the safety of the product, but failed to relay that information to innocent consumers, such as the Mr. Heald in the instant case. Because of the degradation in the products' safety and chemical composition as a result of this improper storage and handling— information known to Retailer Defendant but withheld from Mr. Heald — that the Ranitidine-Containing Drugs including Zantac were unreasonably dangerous as it was marketed and sold to Mr. Heald, when taking into consideration the utility of the drug and the risks involved in its use. The drugs, as sold to Mr. Heald, was dangerous to an extent beyond that which would be contemplated by the ordinary user of Ranitidine-Containing Drugs, including Zantac, with the ordinary knowledge common to the community as to Zantac's characteristics.

297.    Reasonable sellers of Ranitidine-Containing Drugs including Zantac would have ensured that the product was adequately handled and stored and equipped with correct expiration dates and would have relayed any potential risks involved with failing to do any of the foregoing to consumers, like Mr. Heald.  There were safer alternative designs for handling and storing Ranitidine-Containing Drugs and Zantac available to Retailer Defendant, other than the ones adopted by Defendant, that would have prevented or significantly reduced the risk of harm to the Mr. Heald. These safer handling and storage designs were economically and technologically feasible at the time that Defendant sold the defective Ranitidine-Containing Drugs and Zantac, had Defendant simply applied then existing and reasonably achievable scientific knowledge at the time that the subject Ranitidine-Containing Drugs and Zantac left Defendant's control. Safer alternative handling and storage designs included, but are not limited to, those which would have ensured a

more stable temperature, perhaps refrigeration, if necessary, quicker handling and processing times, or transporting at different times of the day.

298.    While the Ranitidine-Containing Drugs including Zantac were being marketed, sold, handled, distributed, and stored by the Retailer Defendants, the drugs accumulated dangerous levels of NDMA rendering the products not reasonably safe for their intended use and defective.

299.    At all relevant times, the medications ingested by Plaintiff were used in a manner that was foreseeable and intended by Defendants.

300.    The Ranitidine Containing Drugs including Zantac that were ingested by Plaintiff contained the NDMA defect when they left Retailer Defendant's possession.

301.    The Ranitidine-Containing Drugs including Zantac create risks to the health and safety of the patients that are far more significant and devastating than the risks posed by other products and treatments available to treat the corresponding medical conditions, and which far outweigh the utility of the ranitidine-containing products because of Retailer Defendants' distribution defect, which included but were not limited to:

      a.    Failure to implement procedures that would reduce or eliminate NDMA levels in Ranitidine-Containing Drugs; and

      b.    Failure to implement appropriate handling instructions and storage conditions for the drug.

302.    The NDMA defects in the Retailer Defendants' Ranitidine-Containing Drugs were substantial factors in causing Plaintiff's injuries.

303.    The defects in Ranitidine-Containing Drugs and Zantac, occasioned by Retailer Defendant's conduct, were a producing cause of Plaintiffs' and Mr. Heald's injuries and damages in question.

304.     Retailer Defendant is additionally liable under Texas Civil Practice & Remedies Code Section 82.003(2) because they altered or modified the product by virtue of their storage and handling procedures, and resulting chemical composition changes of the drug, and the Plaintiffs' harm resulted from that alteration or modification.

305.     Retailer Defendant is additionally liable under Texas Civil Practice & Remedies Code Section 82.003(5) because, as detailed herein, it made an express factual representation about the product, the representation was incorrect, Mr. Heald relied on the representation in obtaining and using the product, and if the aspect of the product had been as represented, Mr. Heald would not have been harmed by the product or would not have suffered the same degree of harm.

306.     Retailer Defendant is additionally liable under Texas Civil Practice & Remedies Code Section 82.003(6) because, as detailed herein, the seller actually knew of a defect to the product at the time the seller supplied the product and the Mr. Heald's harm, and ultimate death, resulted from the defect.

**COUNT ELEVEN**
**NEGLIGENT STORAGE AND TRANSPORTATION**
**AGAINST ALL DEFENDANTS**

307.     Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

308.     As previously alleged, ranitidine degrades into NDMA more quickly at higher temperatures, at higher humidity levels, and under other poor storage or handling conditions.

309.     Defendants were aware of the need to maintain sensitive pharmaceutical drugs under proper shipping and storage conditions, and that maintaining the highest safety techniques is best for the consumer. Pharmaceutical transportation companies are well aware of the importance of precise temperature control down to the degree, and advertise on their ability to

71

provide precise, quality service. More precise, colder transportation is, of course, more expensive than less precise, warmer transportation.

310.    Testing of the quantity of NDMA in ranitidine performed to date has shown substantial variation among different batches. Some ranitidine has significantly more NDMA when tested.

311.    NDMA forms due to chemical reactions in the human body, and from degradation before consumption (principally heat, humidity, or time). Testing is performed before consumption and the age of the ranitidine is documented, so neither time nor degradation in the body should produce substantial variation. The best inference must be that substantial variation in heat and humidity is causing differing amounts of NDMA to form.

312.    Different ranitidine-containing products listed slightly different storage and transportation requirements.

313.    Defendants systematically exposed ranitidine to excessive levels of heat and humidity that violated the instructions on the products' labels.

314.    Defendants failed to implement rigorous policies to ensure substantial compliance with the heat and humidity requirements on product labels. This failure led to widespread noncompliance.

315.    For example, Defendants shipped ranitidine-containing products through the mail. This method of transportation—whether through the United States Postal Service or large common carriers such as FedEx and UPS—does not guarantee controlled temperature or humidity. Because of Defendant's choice to use or allow this method of transportation, ranitidine-containing products shipped through the mail were systematically subject to excessive heat or humidity on days when the weather was hot or humid.

316. Defendants, directly or indirectly, transported, stored, handled, and/or sold ranitidine-containing products that were used by Mr. Heald.

317. A retailer or distributor has a duty to exercise reasonable care in transporting and storing products.

318. Defendants breached this duty by failing to implement or enforce policies to ensure ranitidine-containing products remained free from excessive heat and humidity, as required both by the duty of reasonable care and the label.

319. At all relevant times, Defendants had a duty to exercise reasonable care in the storage and transportation of ranitidine-containing products to ensure the products were not unreasonably dangerous to consumers and users.

320. At all relevant times, Defendants knew or should have known of the need for storing and transporting ranitidine-containing products within the labeled temperature range and at low humidity.

321. Defendants ignored this risk. Defendants did not ensure ranitidine-containing products were stored at low humidity or within the temperature range on the label. Instead, some ranitidine was subjected to excessive humidity and heat during storage, transportation, and shipping which caused the drug to degrade leading to the formation of excessive levels of NDMA.

322. Ignoring the risks of NDMA forming was unreasonable and reckless.

323. Mr. Heald did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to ranitidine-containing products.

324. Defendants' negligence was a substantial factor in causing Mr. Heald's injuries and death.

325.     As a direct and proximate result of Defendants' failure to store and transport ranitidine-containing products properly, Mr. Heald was injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, mental anguish, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages, and ultimately death.

326.     As a direct and proximate result of these systematic failures, excessive levels of NDMA formed in the ranitidine-containing products the Defendants handled, stored and sold. These high levels of NDMA caused Plaintiffs' injuries.

327.     Furthermore, Defendants were additionally negligent in the following respects:

a.   Through its distribution and storage practices, Defendants altered the product prior to sale from pure ranitidine hydrochloride to Nitrosodimethylamine (NDMA), caused by exposure of the product to heat, humidity and/or light, which caused the Plaintiff's cancer;

b.   Defendants actually knew that Zantac, when exposure of the product to heat, humidity and/or light, would degrade from pure ranitidine hydrochloride to Nitrosodimethylamine (NDMA), caused by exposure of the product to heat, humidity and/or light, which caused the Mr. Heald's cancer and ultimate death;

c.   Defendants' distribution and storage protocols failed to refrigerate Zantac, a product with an active pharmaceutical ingredient, ranitidine hydrochloride, long known in the pharmaceutical industry to be notoriously unstable when exposed to heat, humidity and/or light, and thereby accelerated its alteration prior to sale from pure ranitidine hydrochloride to Nitrosodimethylamine (NDMA), caused by exposure of the product to heat, humidity and/or light, which caused the Mr. Heald's cancer and ultimate death.

## COUNT TWELVE
## FRAUD AND FRAUDULENT MISREPRESENTATION
## <u>AGAINST ALL DEFENDANTS</u>

328.     Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

329.     Defendants negligently and/or recklessly misrepresented to Mr. Heald material

facts regarding the safety and effectiveness of ranitidine.

330.    Defendants knew or should have known through the exercise of due care that these representations were false yet made the deceitful representations to Mr. Heald.

331.    Defendants actively concealed information about the defects and dangers of ranitidine with the absence of due care such that Mr. Heald and the consuming public would rely on such information, or the absence of information, in selecting ranitidine as a treatment.

332.    The maker's knowledge of the falsity of the representation fundamentally supplies the element of "fraudulent utterance" required to make a misrepresentation actionable.

333.    Defendant made the misrepresentations alleged herein with the intent to induce consumers, like Mr. Heald, to take their ranitidine products.

334.    Mr. Heald justifiably relied on and/or was induced by Defendants' negligent or reckless misrepresentations and/or negligent or reckless failure to disclose the dangers of ranitidine and relied on the absence of information regarding the dangers which Defendants negligently or recklessly suppressed, concealed, or failed to disclose to Mr. Heald's detriment.

## VI.
## DAMAGES

### A.    Damages Sustained by Mr. Heald/Estate

335.    As a direct and proximate result of Defendant's actions (including negligence, strict liability, and fraud), Mr. Heald suffered injury, which culminated in his diagnosis of Metastatic Sarcomatoid Urothelial Cancer of the bladder, which is a particularly invasive and aggressive form of cancer. As a result of these injuries, Mr. Heald incurred medical bills related to his treatment. At this time Mr. Heald's estate makes a claim for all medical expenses incurred herein.

336.    As a direct and proximate result of Defendant's actions (including negligence, strict liability, and fraud), Mr. Heald suffered severe physical pain and suffering during his agonizing

treatment leading up to his death on July 20, 2021. At this time Mr. Heald's estate makes a claim for all physical pain that Mr. Heald experienced.

337.    As a direct and proximate result of Defendant's actions (including negligence, strict liability, and fraud), Mr. Heald suffered severe mental anguish during his agonizing treatment leading up to his death. At this time Mr. Heald's estate makes a claim for all mental anguish that Mr. Heald experienced.

338.    As a direct and proximate result of Defendant's actions (including negligence, strict liability, and fraud), Mr. Heald could not work, and therefore lost wages leading up to his death. After his death, Mr. Heald lost future earning capacity. At this time Mr. Heald's estate makes a claim for all past lost wages and the loss of future earnings herein.

339.    As a direct and proximate result of Defendant's actions (including negligence, strict liability, and fraud) and because of Mr. Heald's death, Mr. Heald's estate incurred expenses related to his funeral and burial. At this time Mr. Heald's estate makes a claim for costs associated with Mr. Heald's funeral and burial.

      **B.**      **<u>Damages Sustained by Plaintiffs</u>**

340.    In addition to those damages suffered by Mr. Heald and his estate, Plaintiffs, as his wife and children, suffered damages in their own right that were proximately caused by Defendant's actions. Each Plaintiff, therefore, makes a claim for the following:

      **a.**   Severe mental anguish in the past and severe mental anguish in the future as a result of Mr. Heald's death;

      **b.**   Lost maintenance, support, services, advice, counsel that Mr. Heald would have provided to each Plaintiff;

      **c.**   Reasonable contributions of pecuniary value that Mr. Heald would have

contributed to each Plaintiff;

    **d.**   Loss of love, comfort, companionship, consortium, and society that each Plaintiff would have received from Mr. Heald had his death not occurred.

341.    Plaintiffs will also seek any and all other damages enumerated in the Texas wrongful death statute and under the common law, including exemplary damages as put forth in the following section.

## VII.
## EXEMPLARY DAMAGES

342.    Plaintiffs seek punitive or exemplary damages in order to punish and deter the outrageous conduct taken in heedless and reckless disregard for the safety of Mr. Heald as a result of Defendant's conscious indifference to the safety and welfare of Mr. Heald in violation of the laws of the state of Texas. Defendant's conduct amounts to gross negligence and is therefore proper under the common law, as well as Texas' wrongful death statute.

## VIII.
## PRE-JUDGMENT AND POST-JUDGMENT INTEREST

343.    Plaintiffs seek pre-judgment and post-judgment interest as allowed by law.

## IX.
## DEMAND FOR JURY TRIAL

344.    Plaintiffs hereby demand that this cause be set for trial before a jury and has issued the jury fee payment in full.

## X.
## CONDITIONS PRECEDENT

345.    All conditions precedent to Plaintiffs' right to recover the relief sought herein have occurred or have been performed.

## XI.
## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that the Defendants be cited and required to answer herein accordingly to law, that this cause be set for trial before a jury, that Plaintiffs recover judgment of and from Defendants for its actual and exemplary damages in this cause in such amounts as the evidence may show and the jury may determine to be proper, together with the costs of suit, pre-judgment interest and post-judgment interest, and for all such other and further relief, both in equity and at law, to which Plaintiffs may show that they are justly entitled.

Respectfully submitted,

**HILLIARD MARTINEZ GONZALES LLP**

By: *<u>/s/ Robert C. Hilliard</u>*
    Robert C. Hilliard
    State Bar No. 09677700
    bobh@hmglawfirm.com
    Rudy Gonzales, Jr.
    State Bar No. 08121700
    rudyg@hmglawfirm.com
    Catherine Tobin Hilliard
    State Bar No. 24013642
    catherine@hmglawfirm.com
    Marion M. Reilly
    State Bar No. 24079195
    Jessica J. Pritchett
    State Bar No. 24102377
    jpritchett@hmglawfirm.com
    John C. Duff
    State Bar No. 24086979
    jduff@hmglawfirm.com
    Alexander Hilliard
    State Bar No. 24099145
    alex@hmglawfirm.com

719 S. Shoreline Boulevard
Corpus Christi, Texas 78401
Telephone No.:     361-882-1612
Facsimile No.:     361-882-3015

**hmgservice@hmglawfirm.com**
***service by e-mail to this address only**

AND

**WATTS GUERRA LLP**

Mikal C. Watts
State Bar No. 20981820
mcwatts@wattsguerra.com
Francisco Guerra IV
State Bar No. 00796684
fguerra@wattsguerra.com
4 Dominion Dr.
Bldg 3, Suite #100
San Antonio, TX 78257
Telephone No.: (210) 447-0500
Facsimile No.: (210) 447-0501

AND

**GILBERT ADAMS LAW OFFICES**

Gilbert T. Adams, III
State Bar No. 00790201
gilbert@gta-law.com
1855 Calder Ave @ Third Street (77701)
Post Office Drawer 3688
Beaumont, Texas 77704
Telephone No.: (409) 835-3000
Facsimile No.: (409) 832-6162

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing instrument has been served upon all counsel of record to this proceeding via email and/or e-file on this 9th day of December 2022.


<u>/s/ Robert C. Hilliard</u>
Robert C. Hilliard

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Caitlin Salinas on behalf of Robert Hilliard
Bar No. 9677700
caitlin@hmglawfirm.com
Envelope ID: 70886724
Status as of 12/12/2022 7:07 AM CST

Associated Case Party: MARIA HEALD

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Robert CHilliard | | hmgservice@hmglawfirm.com | 12/9/2022 5:00:45 PM | SENT |
| Mikal Watts | | mcwatts@wattsguerra.com | 12/9/2022 5:00:45 PM | SENT |
| Gilbert T.Adams, III | | gilbert@gta-law.com | 12/9/2022 5:00:45 PM | SENT |
| Zantac HMG | | ZantacHMG@hmglawfirm.com | 12/9/2022 5:00:45 PM | SENT |
| Regina Carmony | | rcarmony@wattsguerra.com | 12/9/2022 5:00:45 PM | SENT |

Associated Case Party: HEB LP

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Timothy Hudson | | tim.hudson@btlaw.com | 12/9/2022 5:00:45 PM | SENT |
| Jenna Johnson | | jenna.johnson@btlaw.com | 12/9/2022 5:00:45 PM | SENT |
| Benjamin T.Pendroff | | bpendroff@btlaw.com | 12/9/2022 5:00:45 PM | SENT |