# Exhibit 3

Nevada Trial Court Decision
Adopting Innovator Liability in
*Elabbassy*

Case 9:20-md-02924-RLR   Document 6874-32   Entered on FLSD Docket 08/04/2023   Page 2 of 12

ELECTRONICALLY SERVED
9/9/2022 11:18 AM

Electronically Filed
09/09/2022 11:18 AM

CLERK OF THE COURT

**ORDER**

MICHAEL C. KANE. ESQ. (10096)
BRADLEY J. MYERS, ESQ. (8857)
BRANDON A. BORN, ESQ. (15181)
**THE702FIRM**
400 S. 7th Street, Suite/Floor 4
Las Vegas, Nevada 89101
Telephone:  (702) 776-3333
Facsimile:  (702) 505-9787
E-Mail:  service@the702firm.com
*Attorneys for Plaintiffs*

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| SARA ELABBASSY, as Special Administrator of the ESTATE OF DECEDENT HUSROM, deceased; JAMIL HUSROM, individually and as the legal guardian for KHULOD HUSROM, a minor, SALIH HUSROM, a minor, FATIMA HUSROM, a minor, and MOHAMMED HUSROM, a minor,<br><br>Plaintiffs,<br>vs.<br><br>LAS VEGAS MEDICAL GROUP, LLC; NAUMAN JAHANGIR, M.D.; GLAXOSMITHKLINE, LLC, GLAXOSMITHKLINE, PLC; BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; BOEHRINGER INGELHEIM USA CORPORATION; BOEHRINGER INGELHEIM CORPORATION; SANOFI US SERVICES, INC.; SANOFI S.A.; SANOFI-AVENTIS U.S. LLC; CHATTEM, INC.; SMITH'S FOOD & DRUG CENTERS, INC.; WALMART, INC.; CVS PHARMACY, INC.; WALGREEN CO. d/b/a WALGREENS; DOES I THROUGH X; AND ROE CORPORATIONS XI THROUGH XX, INCLUSIVE,<br><br>Defendants. | CASE NO. A-21-835385-C<br>DEPT. 15<br><br>**ORDER DENYING DEFENDANT GLAXOSMITHKILINE LLC'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM** |

…

…

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

1

PA-179

Case Number: A-21-835385-C

On February 25, 2022, Defendant GlaxoSmithKline LLC ("GSK"), filed *Defendant GlaxoSmithKline LLC's Motion to Dimiss for Lack of Personal Jurisdiction and Failure to State a Claim*. On March 25, 2022, Plaintiffs Sara Elabbassy, as Special Administrator of the Estate Of Decedent Husrom, deceased Jamil Husrom, individually and as the legal guardian for Khulod Husrom, a minor, Salih Husrom, a minor, Fatima Husrom, a minor, and Mohammed Husrom, a minor (collectively, the "Plaintiffs"), filed *Plaintiffs' Opposition to Defendant GlaxoSmithKline LLC's Motion to Dismiss*. On April 13, 2022, GSK filed *Defendant GlaxoSmithKline LLC's Reply in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim*. On April 20, 2022, the Court heard argument at the hearing on this Motion. The Court, having heard oral arguments and after review of the points and authorities and the pleadings, hereby DENIES GSK's motion to dismiss without prejudice.

## I.   BACKGROUND.

According to Plaintiffs' Second Amended Complaint, ranitidine, better known as Zantac, was developed by GSK and approved for prescription use in 1983. In their Complaint and briefing, Plaintiffs assert that Zantac was a "wildly successful" drug. They further assert that, due to GSK's marketing strategy, Zantac was the world's best-selling drug in 1988, and in the fiscal year that ended in June 1989, Zantac accounted for over half of GSK's sales of $3.98 billion. According to the pleadings, even as late as 2016, Zantac was the 50th most prescribed drug in the United States with over 15 million prescriptions.

Plaintiffs contend that the marketing strategy that led to Zantac's success for over 30 years emphasized the purported safety of the drug. They assert that Zantac has been marketed as a safe and effective treatment for infants, children, and adults; that GSK, through its constant television campaigns, marketed Zantac as safe to use when consuming foods containing high levels of nitrates, such as tacos and pizza; and that because GSK promoted the drug as being safe, Zantac became available without a prescription in 1996. Generic versions of the drug (ranitidine) became available the following year. In their Second Amended Complaint, Plaintiffs contend that GSK knew from the beginning that ranitidine has the potential to cause cancer. They reference studies purportedly conducted by GSK in 1981 and 1987 that, they allege, were purposefully distorted to

mask any potential cancer risk.

Plaintiffs are a Nevada family suing over the death of a loved one. According to the Second Amended Complaint, the decedent contracted esophageal cancer and died after taking both the branded and the generic versions of Zantac—a drug that was marketed by GSK as a method for treating gastroesophageal reflux disease—from November 2016 to September 2019. Plaintiffs allege that GSK cultivated a market in Nevada for the product and derived substantial revenue from this state. In their argument in opposition to GSK's motion to dismiss, Plaintiffs assert that the decedent lived in Nevada, was subjected to GSK's marketing in Nevada, presumably believed GSK's alleged representations that the drug was safe in Nevada, took both the branded and generic Zantac drugs bearing GSK's warning label in Nevada, and died in Nevada. At oral argument, the Court questioned GSK's counsel as to whether, at the pleading stage, the Court should assume that GSK did market and sell Zantac in Nevada. (Hr'g Tr. 29:24-30:2.) GSK's counsel conceded this point. (*Id.* at 30:3.)

## II.  THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER GSK.

GSK first argues that this Court lacks personal jurisdiction over it. The parties agree that GSK is not headquartered or incorporated in Nevada, and therefore there is no general jurisdiction over it. Rather, the question is whether "specific" jurisdiction exists over GSK in this state.

In *Ford*, the Supreme Court clarified that there are two different ways that a plaintiff may establish specific jurisdiction. First, the plaintiff may show that the claims "arise out of" the defendant's contacts with the forum—an inquiry that "asks about causation." *Id.* But if the plaintiff cannot make a "causal showing," he can still satisfy the requirements of specific jurisdiction by showing that his claims "relate to" the defendant's contacts with the forum. *Id.* It is this second test—the "relate to" test—that Plaintiffs in this case have satisfied.

This second test "contemplates that some relationships will support jurisdiction without a causal showing." *Id.*; *Ayla, Ltd. Liab. Co. v. Alya Skin Pty. Ltd.*, No. 20-16214, 2021 U.S. App. LEXIS 25921, at *18 n.5 (9th Cir. Aug. 27, 2021) ("We clarify that our precedents permit but do not require a showing of but-for causation to satisfy the nexus requirement."). Rather, the "relate to" inquiry focuses on whether there is a "strong relationship among the defendant, the forum, and

the litigation." *Ford*, 141 S. Ct. at 1028. The relatedness requirement "incorporates real limits." *Id.* at 1026. Nevertheless, "regularly marketing" a product in a state puts a defendant on "clear notice" that it will be "subject to jurisdiction in the State's courts when the product malfunctions there." *Id.* at 1030.

GSK argues that because Plaintiffs seek to hold GSK liable based on the theory of "innovator liability," under which the sole basis for Plaintiffs' cause of action is GSK's alleged failure to update and maintain the warning label for brand-name Zantac, the only relevant jurisdictional facts are those that pertain to GSK's labeling decisions. Plaintiffs do not contest that those labeling decisions took place out of state. In support of its position, GSK relies on the decision of the MDL Court in the Zantac litigation, *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 2021 WL 2682602, at *14 (S.D. Fla. June 30, 2021). The MDL Court concluded that "[t]he nature of an innovator-liability claim … compels" the conclusion that "only those activities that relate to the brand-name manufacturers' labeling decisions" could support specific jurisdiction. *Id.*

By contrast, Plaintiffs rely directly on the Supreme Court's analysis in *Ford* and on an analogous case within the Ninth Circuit. Plaintiffs argue that in the innovator liability case *Quinn-White v. Novartis Pharm. Corp.*, the court found specific personal jurisdiction because "[a]lthough Plaintiff Quinn-White did not ingest Defendant's drug, Plaintiff alleges that her California-based physician reviewed and relied on Novartis's label and its warnings in California, where Novartis marketed its drugs." No. CV 16-4300 PSG (AGRx), 2016 U.S. Dist. LEXIS 201328, at *7 (C.D. Cal. Oct. 7, 2016). GSK, in its reply brief, asserts that *Quinn-White* was wrongly decided.

After careful consideration and a thorough reading of many of the relevant opinions, and with all due respect to the MDL Court, this Court concludes that, at this early stage, GSK's motion to dismiss for lack of personal jurisdiction should be denied. Plaintiffs' arguments and authorities better harmonize with the Supreme Court's reasoning in *Ford*. In *Ford*, the Supreme Court did not first winnow down the relevant jurisdictional facts to only those aspects of the defendant's conduct that were allegedly tortious. Rather, the Court asked whether there was "'an affiliation between the forum and the underlying controversy,' without demanding that the inquiry focus on cause." *Ford*, 141 S. Ct. at 1026. An "affiliation" may occur where the plaintiff is injured by a product in

a state and the defendant has made "efforts" to "serve, directly or indirectly, the market" in that state. *Id.* at 1027 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Thus, so long as there is at least some "affiliation between the forum and the underlying controversy," a defendant cannot complain that the exercise of personal jurisdiction "offend[s] traditional notions of fair play and substantial justice." *Id.* If a defendant does not wish to be sued in a certain state, it can "structure [its] primary conduct to lessen or avoid exposure to a given State's courts," for example by declining to do any business in that state. *Id.* at 1025. But when a company "exercises the privilege of conducting activities within a state—thus enjoy[ing] the benefits and protection of [its] laws—the State may hold the company to account for related misconduct." *Id.*

GSK poses a hypothetical that it argues defeats Plaintiffs' position. GSK argues that even if it had *never* marketed or sold Zantac in Nevada, then under Plaintiffs' theory of jurisdiction, Plaintiffs could still seek to hold GSK liable under a theory of innovator liability in Nevada—and that this would be, it contends, an absurd result. As GSK's counsel conceded at oral argument, however, this hypothetical is not the case here. At this stage, the Court must assume that GSK did, through its marketing, cultivate a market for Zantac in Nevada. If GSK had never marketed Zantac in Nevada, then it would be unclear that Plaintiffs' claims would sufficiently "relate to" the forum for GSK to be hailed into a Nevada Court. Because GSK actively cultivated a market for ranitidine in this State, however, under *Ford*, its regular marketing put it on "clear notice" that it could be "subject to jurisdiction in the State's courts when the product malfunctions there." *Id.* at 1030. Here, unlike in GSK's hypothetical, there is a sufficient "affiliation" between the parties, the product, and the forum state.

GSK further argues that finding specific personal jurisdiction would violate Due Process because, with respect to other companies' products, it has not received the benefits and protections of Nevada law. At least at the pleading stage, however, the Court assumes that by "conducting so much business in" Nevada and reaping the financial rewards of successfully marketing ranitidine in this State, GSK has "enjoy[ed] the benefits and protection of" Nevada's laws—"the enforcement of contracts, the defense of property, the resulting formation of effective markets." *Id.* at 1030.

Those benefits give rise to "reciprocal obligations for the Defendants under state law," notably the obligation not to make negligent misrepresentations; and breaching those obligations "relates to" the negligent misrepresentation claims, allowing Nevada courts to hold GSK accountable consistent with the Constitution and Due Process. *Id.* Having addressed the threshold jurisdictional issue, the Court now turns to GSK's motion to dismiss for failure to state a claim.

### III. PLAINTIFFS HAVE STATED A CLAIM FOR INNOVATOR LIABILITY.

Nevada is a notice pleading state. *McGowen v. Second Judicial Dist. Court of Nev.*, 432 P.3d 220, 225 (Nev. 2018) ("Nevada has not adopted the federal 'plausibility' pleading standard."). Thus, to succeed on a motion to dismiss for failure to state a claim, the defendant must show that, after every reasonable inference is drawn in the plaintiff's favor, "it appears beyond a doubt that the plaintiff could prove no set of facts that would entitle him to relief." *Munda v. Summerlin Life & Health Ins. Co.*, 127 Nev. 918, 923, 267 P.3d 771, 774 (2011) (cleaned up). With this in mind, the Court turns to Plaintiffs' theory of "innovator liability."

Under the theory of "innovator liability," a brand-name manufacturer of a drug may be held responsible for the contents of a generic manufacturer's warning label because, under federal law, the generic manufacturer is *required* by to copy the brand-name manufacturer's label. *Rafferty v. Merck & Co.*, 92 N.E.3d 1205, 1210 (Mass. 2018) (citing 21 U.S.C. § 355(j)(2)(A)(v) & (j)(4)(G)). Because federal law only requires the generic manufacturer to copy the brand-name manufacturer's label, many of Plaintiffs' state law failure-to-warn claims against the generic manufacturer are impliedly preempted by federal law. *PLIVA, Inc., v. Mensing*, 564 U.S. 604 (2011).

Courts have recognized that this is fundamentally unfair to the plaintiff. For instance, in *Franzman v. Wyeth, Inc.*, a Missouri court acknowledged (in applying Kentucky law to the case before it) that there was "inherent unfairness [in] first substantially preempting a consumer's tort claims against the generic manufacturer, and next concluding that the same consumer's tort claims are also barred against the brand-name manufacturer responsible for the product design, formula, dosage, labeling and warning that are at the core of the consumer's claims." 451 S.W.3d 676, 691 (Mo. Ct. App. 2014). The Sixth Circuit has also recognized the "basic unfairness" of the "classic

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

6

PA-184

'Catch 22'" that occurs where the plaintiff cannot sue the *generic* manufacturer for failure to warn because that company didn't design the label, but also can't sue the *brand-name* manufacturer because it didn't make the product the plaintiff consumed. *Strayhorn v. Wyeth Pharm., Inc.*, 737 F.3d 378, 407 (6th Cir. 2013) (applying Tennessee law).

In *Franzman* and *Strayhorn*, however, state law products liability statutes prevented the Courts from adopting the "innovator liability" theory. *See Rafferty v. Merck & Co.*, 92 N.E.3d 1205, 1221 (Mass. 2018) (distinguishing cases finding no duty because those were "resolved under the products liability statutes of other States"). The federal case law presented by GSK is not persuasive, as those decisions were "issued by Federal courts that are constrained in their interpretation of State law in the absence of clear guidance from State appellate courts." *Id.* This Court must, relying on Nevada tort principles, reach its own conclusion.

Where, as here, no legislative scheme bars application of the theory, judges have applied traditional tort law principles to properly allocate the risk of loss onto the party in the best position to prevent the harm (the brand-name manufacturer). *See, e.g.*, *Rafferty*, 92 N.E.3d at 1221; *T.H. v. Novartis Pharms. Corp.*, 407 P.3d 18 (Cal. 2017); *Wyeth, Inc. v. Weeks*, 159 So. 3d 649, 676 (Ala. 2014), *superseded by statute*, Ala. Code § 6-5-530(a); *Dolin v. SmithKline Beecham Corp.*, 62 F. Supp. 3d 705, 714 (N.D. Ill. 2014); *Kellogg v. Wyeth*, 762 F. Supp. 2d 694, 708–09 (D. Vt. 2010). While the name GSK uses for Plaintiffs' theory—"innovator liability"—may be relatively recent, the principles underpinning it are well-established.

So-called "innovator liability" is based on the commonsense principle that liability for injuries should be assigned those parties who are in the best position to avoid them. *Allison v. Merck & Co.*, 878 P.2d 948, 952 (Nev. 1994) (The "responsibility for injuries caused by defective products is properly fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market.").

In *Allison*, the Nevada Supreme Court explained that when considering whether to permit the plaintiff's theory of liability, the Court should consider "public interest" principles. *Id.* at 953. The Court reasoned that these "public policy considerations . . . were put well by Professor Prosser in the noted law review article, 'The Fall of the Citadel':

> The public interest in human safety requires the maximum possible protection for the user of the product, and those best able to afford it are the suppliers of the chattel. By placing their goods upon the market, the suppliers represent to the public that they are suitable and safe for use; and by packaging, advertising and otherwise, they do everything they can to induce that belief . . . .

*Id.* (citing 50 Minn. L. Rev. 791, 799 (1966)).

The Court further endorsed this vision of Nevada's common law tort principles, explaining that "[t]his concept of 'public interest' is the guiding principle of our present opinion." *Id.* Indeed, Nevada law has viewed products liability law in this light for over fifty years. *See Stackiewicz v. Nissan Motor Corp.*, 686 P.2d 925, 926–27 (Nev. 1984) (providing an overview of the evolution of products liability law in Nevada); *Shoshone Coca-Cola Bottling Co. v. Dolinski*, 420 P.2d 855, 857 (Nev. 1966) (adopting the California Supreme Court's expansion of strict liability doctrines).

Recently, Nevada has reaffirmed its commitment to providing the "maximum possible protection" for consumers and has rejected attempts to narrow liability. *Ford Motor Co. v. Trejo*, 402 P.3d 649, 655 (2017) (not requiring the plaintiff to proffer evidence of an alternative feasible design). In *Trejo*, the Court recognized the "unique position of manufacturers" in "establishing the reasonable expectations of a product that in turn cause consumers to demand that product." *Id.* at 529–30. Moreover, the Court has not shied away from following California's lead in products liability cases. *Shoshone*, 420 P.2d at 857. There is, accordingly, no reason for this Court to reject Plaintiffs' "innovator liability" theory.

Rather, following the principle laid out in *Allison*, this Court should assign responsibility for injuries "*wherever* it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." *Allison*, 878 P.2d at 952 (emphasis added). The best, and likely only, way to "effectively reduce the hazards to life and health" arising from inadequate or otherwise defective generic drug labels is to hold the brand-name manufacturer (who exercises complete control over the contents of the drug label) liable for injury resulting from its failure to properly warn of known risks. Indeed, this is the same logic that California relied on when it found a brand-name manufacturer liable for an inadequate drug label included with a generic drug. *See T.H. v. Novartis Pharm. Corp.*, 407 P.3d 18, 32 (Cal. 2017) ("The brand-name drug manufacturer is the only entity with the unilateral ability to strengthen the warning label. So a duty of care on


behalf of all those who consume the brand-name drug or its bioequivalent ensures that the brand-name manufacturer has sufficient incentive to prevent a known or reasonably knowable harm.").

GSK relies on the unpublished decision *Moretti v. Wyeth, Inc.*, where the federal court read *Allison* to hold that only the manufacturer of a product could be liable to a consumer. No. 2:08-cv-00396-JCM-(GWF), 2009 U.S. Dist. LEXIS 29550, at *9–10 (D. Nev. Mar. 20, 2009). With all respect to the Court in that case, this Court does not read *Allison* for this proposition. Rather, in *Allison*, the Nevada Supreme Court stated that under general tort principles, liability should be assigned "*wherever* it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." *Allison*, 878 P.2d at 952 (emphasis added). Under the facts of that *particular* case, the risk of loss was most appropriately allocated to the manufacturer. *Allison* never held, however, that only the manufacturer of a specific item could be liable for damages. Further, because the MDL Court relied on *Moretti* to predict that the Nevada Supreme Court would reject "innovator liability," but does not address the guiding principles outlined in *Allison*, the MDL Court's opinion is not persuasive. *In re Zantac*, 510 F. Supp. at 1219.

GSK also cites to *Dow Chem. Co. v. Mahlum*, where the Nevada Supreme Court stated that "[t]he duty to disclose requires, at a minimum, some form of relationship between the parties." 114 Nev. 1468, 1486 (1998). The Court in *Dow Chemical*, however, was not faced with the unique federal regulatory scheme in place in this situation. Moreover, GSK had a duty created by federal law to disclose to the public any defects in its drug. *Rafferty*, 92 N.E.3d at 1209 ("the manufacturer must also show that the proposed warning label for the drug is accurate and adequate." (citing 21 U.S.C. § 355(b)(1). And once GSK "assumed the duty to supervise and exert control" over the New Drug Application ("NDA"), "it had to do so in a reasonably prudent manner." *Wright v. Schum*, 781 P.2d 1142, 1146 (Nev. 1989). The Court therefore holds that, under the facts as alleged in the Second Amended Complaint, GSK did owe a duty to Plaintiffs under Nevada law.

Lastly, GSK urges this Court to reject what it styles "predecessor liability," which it defines in its brief as the theory "according to which a brand-name company can be held liable even after it transfer the NDA to a different company, if it was foreseeable that the successor would rely on the predecessor's labeling decisions." The Court agrees with the Supreme Court of California,

however, that a brand-name manufacturer's sale of the rights to a drug does not, as a matter of law, terminate its liability for injuries foreseeably and proximately caused by deficiencies present in the warning label prior to the sale. *T.H. v. Novartis Pharm. Corp.*, 407 P.3d 18 (Cal. 2017). This is because "significant moral blame attaches to the failure to warn about a drug's risks when the brand-name drug manufacturer knew or should have known about those risks. The fact that the brand-name manufacturer has since exited the market does not alter the calculus." *Id.* at 46–47.

Moreover, as argued by counsel for Plaintiffs at oral argument, even if GSK lost the ability to alter or change the warning label when it sold its rights in the NDA, it still allegedly had knowledge about the risk of cancer associated with ranitidine and still had the ability to alert the public or the FDA. Lastly, GSK's theory—that the sale of a New Drug Application prospectively cuts off a manufacturer's liability moving forward—creates a perverse incentive for brand-name manufacturers to conceal defects in their drugs and then sell them off to limit their liability.

Lastly, GSK argues that Nevada law precludes Plaintiff from recovering for personal injury for a negligent misrepresentation. According to GSK, Plaintiff's damages for negligent misrepresentation are limited to pecuniary or "out-of-pocket" loss only. For instance, Plaintiffs would be limited to their special damages and, as alleged in the Complaint in Plaintiffs' prayer for relief, funeral expenses. Plaintiffs' counsel moved orally at the hearing for leave to file a surreply addressing these arguments. Plaintiffs' motion for leave to file a surreply is denied without prejudice, and the Court takes the matter regarding whether Plaintiffs damages are limited to their out-of-pocket expenses under advisement.

THEREFORE, the Motion is DENIED WITHOUT PREJUDICE.

~~IT IS SO ORDERED this _____ day of _____ 2022.~~

Dated this 9th day of September, 2022

_____
DISTRICT COURT JUDGE

4D9 CF5 DCF8 0DB7
Joe Hardy
District Court Judge

Garman Turner
Gordon LLP
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
(725) 777-3000

| | |
|---|---|
| Respectfully submitted: | Approved as to Form: |
| THE702FIRM | EVANS FEARS & SCHUTTERT LLP |
| /s/ Michael C. Kane | /s/ Justin Hepworth |
| MICHAEL C. KANE | KELLY A. EVANS |
| Nevada Bar No. 10096 | Nevada Bar No. 7691 |
| BRADLEY J. MYERS | CHAD R. FEARS |
| Nevada Bar No. 8857 | Nevada Bar No. 6970 |
| BRANDON A. BORN | JUSTIN S. HEPWORTH |
| Nevada Bar No. 15181 | Nevada Bar No. 10080 |
| 400 S. 7th Street, Suite/Floor 4 | 6720 Via Austi Parkway, Suite 300 |
| Las Vegas, Nevada 89101 | Las Vegas, Nevada 89119 |
| HILTON PARKER, LLC | KIRKLAND & ELLIS LLP |
| JONATHAN HILTON | COLE THOMAS CARTER (*pro hac vice*) |
| (*pro hac vice forthcoming*) | JAY PHILIP LEFKOWITZ (*pro hac vice*) |
| 7544 Slate Ridge Blvd. | 601 Lexington Ave. |
| Reynoldsburg, OH 43068 | New York, NY 10022 |
| KRAUSE & KINSMAN | *Attorneys for Defendant* |
| ADAM KRAUSE | *GlaxoSmithKline LLC* |
| (*pro hac vice forthcoming*) | |
| 4717 Grand Ave #300 | |
| Kansas City, MO 64112 | |
| *Attorneys for Plaintiffs* | |